**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re | **Jointly Administered under**<br>**Case No. 08-45257** |
| Petters Company, Inc., et al., | |
| Debtors. | Court File No. 08-45257 |
| | Court File No.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc.; | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |
| | Chapter 11 Cases<br>Judge Gregory F. Kishel |

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the<br>Court-appointed Chapter 11 Trustee of<br>Petters Company, Inc., | |
| Plaintiff, | |
| vs. | ADV. NO. _____ |
| BMO Harris Bank N.A., as successor<br>to M&I Marshall and Ilsley Bank, | |
| | **JURY TRIAL DEMANDED** |
| Defendant. | |

**COMPLAINT**

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Petters

Company, Inc., by and through his legal counsel, Lindquist & Vennum P.L.L.P., as and for his

claims against BMO Harris Bank N.A., as successor to M&I Marshall and Ilsley Bank, states and alleges as follows:

## PARTIES

1.       Petters Company, Inc. ("PCI") is a corporation organized and existing under the laws of the State of Minnesota.  Prior to the appointment of a receiver by the United States District Court for the District of Minnesota on October 6, 2008, PCI was wholly owned by Thomas J. Petters ("Petters").  At all times material hereto, Deanna Coleman ("Coleman") and Robert White ("White") were officers and managers of PCI.

2.       On April 6, 2011, the Trustee filed an Amended and Restated Motion for Substantive Consolidation seeking to substantively consolidate the estates of, among others, PC Funding, LLC, Thousand Lakes, LLC, SPF Funding, LLC, PL Ltd., Inc., Edge One, LLC, MGC Finance, Inc., PAC Funding, LLC, and Palm Beach Finance Holdings, Inc. (the "Special Purpose Entities" or "SPEs"), and PCI.  The Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") held a three-day evidentiary hearing beginning on December 12, 2012. The Trustee's Amended and Restated Motion for Substantive Consolidation is currently under advisement before the Bankruptcy Court.

3.       M&I Marshal & Ilsley Bank ("M&I Bank") was a Wisconsin banking corporation that maintained an office in Hennepin County, Minnesota, at 651 Nicollet Mall, Minneapolis, Minnesota 55402.  BMO Harris Bank, N.A. is the successor in interest to M&I Bank.

## PROCEDURAL BACKGROUND

4.       On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota (the "District Court") placed PCI into receivership in response to litigation commenced by the United States of America against, among others, Petters and PCI (Court File No. 08-CV-05348) (the "Receivership Action").

5.      By Order of the District Court in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008, the District Court appointed Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI.

6.      As the court-appointed Receiver, Kelley serves as an agent of the District Court and in that capacity had exclusive custody, control and possession of the property, assets and estates of PCI.

7.      On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in Court File No. 08-45257.

8.      On October 22, 2008 this Court ordered the above-captioned Bankruptcy cases to be administratively consolidated as *In re Petters Company, Inc., et al.*, under case number 08-45257.

9.      On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley (the "Trustee"), as the Chapter 11 Trustee for all Chapter 11 debtors in this jointly administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI.

## JURISDICTION, VENUE AND STANDING

10.     This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

DOCS-#3769181-v5

11.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

12.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The Trustee has standing to assert the claims herein pursuant to Sections 323 and 1106 of the Bankruptcy Code.

## FACTUAL BACKGROUND

I.      **Petters, Coleman, and White Conduct A Fraud Outside Their Employment Capacity and of No Benefit to PCI.**

14.     This case arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters, Coleman, and White.  Petters operated the Ponzi scheme with the assistance of, among others, Coleman and White from approximately 1993 through the date of his arrest by federal agents in 2008.  Petters, Coleman, and White laundered proceeds of the Ponzi scheme estimated to be an amount in excess of $40 billion throughout the course of the Ponzi scheme.

15.     Petters, Coleman and White represented to various investors that the business of PCI involved the purchase and sale of goods to discount wholesalers such as Boscov's, Costco, Sam's Club, and B.J.'s Wholesale Club and the purchase-order and receivables financing of those transactions.

16.     PCI owned (except for one owned by Petters) and operated the SPEs, which were formed specifically to receive funds from various investors who were allegedly financing PCI's purchase order and receivables financing business.  Typically, investors would wire their funds to a dedicated SPE, which would then forward the funds to one of two purported vendors.  These alleged vendors were Nationwide International Resources ("Nationwide") (operated by Larry Reynolds ("Reynolds") and Enchanted Family Buying Company ("Enchanted") (operated by

4

Michael Catain ("Catain")).  Instead of purchasing goods with the funds, Reynolds, through

Nationwide, and Catain, through Enchanted – in cooperation with Petters, Coleman, and White –

fraudulently rerouted the funds back to PCI after deducting a commission.  Petters, Coleman, and

White then transferred those funds from PCI to the SPEs, to other third party entities controlled

by Petters, or to themselves personally.

17.     Petters induced investors into financing the purchase of purported goods, with

loans purportedly secured by purchase orders and potential future accounts receivable.  Instead

of procuring legitimate purchase orders from retailers to provide to investors, Petters, Coleman,

and White, while acting adversely to PCI and the SPEs and outside their employment capacity,

fabricated purchase orders in the dollar amounts necessary to pay earlier investors back with

more recent investors' money and to keep the Ponzi scheme alive.

18.     To obtain many of the investors in the Ponzi scheme, Petters, Coleman, and White

portrayed PCI or SPE as a middleman that purchased consumer electronic goods or other goods

from wholesalers, such as Nationwide or Enchanted, and resold the merchandise to large, "big

box" retailers such as Costco, Sam's Club and B.J.'s Wholesale Club.  Petters, Coleman, and

White fabricated the documents necessary to recruit investors into the Ponzi scheme.  Petters,

Coleman, and White prepared and utilized fabricated documents that were represented to

investors to be purchase orders and related documents.  The fabricated documents typically

included: (1) purchase orders from retailers to PCI purportedly ordering electronic goods for

purchase from PCI; (2) purchase orders from PCI to vendors, such as Nationwide or Enchanted,

purportedly ordering electronic goods, and (3) false invoices.  Petters, Coleman, and White

fabricated the quantity and prices on these documents to create the false appearance that the

purported transactions actually resulted in profit.

5

19.     PCI and the affiliated SPEs experienced substantial losses and were in fact insolvent at all times.  As a result of the fraudulent conduct of Petters, Coleman, and White, PCI and the affiliated SPEs received no benefit, but were instead seriously damaged.

20.     The Ponzi scheme was massive in size – more than $3.8 billion of losses were incurred on a book basis.  But the Ponzi scheme structure was also simple in operation.  The funds were transferred in three simple steps.  First, PCI or one of its SPEs, would transfer funds to Nationwide or Enchanted.  Second, Nationwide or Enchanted would deduct a commission and then transfer those funds to PCI's bank account at M&I Bank controlled by Petters, Coleman, and White.  Third, PCI, acting on instructions from Petters, Coleman, and/or White, would transfer funds to the SPEs, to other third party entities controlled by Petters, or to themselves personally.  Step one represented the purported purchase of goods – no goods were purchased.  Step two represented the purported creation of an accounts receivable – no accounts receivable was created.  Step three represented a purported repayment to investors from an alleged account receivable based on alleged legitimate business activity – no business activity occurred.  The bank statements and check registers of PCI and the SPEs, and the flow of funds shown in these documents, reveal the Ponzi scheme because they reveal, among other things, that no money was coming from any retailers.

## II.     PCI's M&I Account.

21.     PCI opened a depository account with National City Bank in December 1999.  In July 2001, M&I acquired National City Bank.  PCI established one checking account that was dedicated solely to PCI's fraudulent purchase order financing transactions — Account No. 1959018 (the "M&I Account").

22.     After opening the M&I Account, billions of dollars were wired into and out of the M&I Account purportedly to facilitate PCI's purchase order financing transactions.

23.     M&I was well aware of the frenzied activity occurring in the M&I Account. Throughout its relationship with Petters, M&I focused on improving performance and selling more products and services to PCI in order to increase M&I's profits.

24.     After the account was opened, M&I banker Edward Jambor ("Jambor") was assigned day to day responsibility for managing the Petters' relationship and overseeing the M&I Account.  Jambor was a consumer/retail banker with no commercial banking experience.

25.     Because Petters was an important and substantial customer,  Jambor and other M&I bankers met with PCI representatives, including Coleman, on a regular ongoing basis to learn and understand the business and needs of PCI.

### III.     M&I Had Actual Knowledge Regarding PCI's Purported Business Model.

26.     Based on its dealings with PCI and numerous and ongoing meetings with PCI representatives, M&I understood PCI's purported business model, including that PCI was borrowing funds from investors purportedly to finance purchase order financing transactions, which generated the frenzied wire activity in the M&I Account.

27.     For example, in March 2002, M&I banker Christopher Flynn ("Flynn") met with Frank Vennes, a Petters business associate and the president, CEO and sole shareholder of PCI investor Metro Gem, Inc. ("MGI").  The purpose of the meeting was to discuss M&I potentially making a loan to MGI, with the proceeds of the loan being used to fund purchase order financing transactions with PCI.  During this meeting, Flynn became aware how the purported purchase order financing transactions were structured.  Following the meeting, Flynn had a clear understanding of PCI's business model and the fact that retailers such as Wal-Mart were

supposed to be making payments to the M&I Account as part of the purchase order financing transactions. Flynn later assumed responsibility for the Petters' relationship after Jambor left M&I in 2007.

28.    M&I also became aware that issues arose in connection with the movement of funds in the transactions.

29.    For example, although, for some investors, payments for the merchandise in the purchase order financing transactions were supposed to be made directly from the big box retailer to the particular investor's SPE that funded the purchase order financing transaction, the funds were instead being remitted to the M&I Account by Nationwide or Enchanted, not by any retailers. PCI was then sending the funds to the SPEs.

30.    When asked by investors about why retailers were not directly making payments on these transactions to the SPEs, Petters, Coleman and/or White represented that the retailers were unwilling to issue payments to multiple investors directly, but instead, would only direct payments to PCI.

31.    Because Petters refused to permit investors to transact business or communicate directly with his purported retailer customers, some investors suggested an arrangement by which M&I would control the disbursement of funds from the M&I Account. By having M&I control disbursements, investors purportedly could ensure that Petters would not misuse retailer payments.

32.    In early 2003, M&I stepped into these discussions and understood from direct meetings with Petters that (i) monies supposedly being sent by retailers to PCI were being placed into the M&I Account and (ii) PCI was holding these funds in trust for the benefit of its investors and the particular deal(s) they financed.

33.     Two of Petters' investors contacted M&I to see if it would agree to exercise control over the M&I Account and ensure that their purported earmarked retailer payments were properly routed.

34.     In 2003, one investor met with Coleman, Petters and Jambor at PCI's offices in Minnetonka, Minnesota.  At the meeting, the mechanics of PCI's purchase order financing transactions were explained and how the monies supposedly flowed in and out of the M&I Account.  The investor then e-mailed Jambor and another M&I employee, Shari Rhode, along with PCI's outside counsel, Simon Root, confirming that the investor was looking for M&I Bank to act as custodian to receive retailer wire payments and to forward those monies on to the appropriate bank accounts, a process that was purportedly already occurring every day through the M&I Account.  Attached as Exhibit A, and incorporated herein by reference, is a copy of the e-mail that the investor sent to Jambor and Rhode.

35.     M&I rejected the investor's proposal.

36.     Around the same time, another investor's counsel sent a letter to an operations officer at M&I, Carolyn Moline ("Moline"), enclosing a proposed form of a deposit control agreement with M&I.  Attached as Exhibit B, and incorporated herein by reference, is a copy of the letter.  The letter stated, among other things, that many dollars were running through the M&I Account that should have been deposited into other lock box accounts.

37.     M&I rejected this investor's proposal as well.

## IV.     M&I Had Actual Knowledge That Retailers Were Not Making Payments To PCI's M&I Account.

38.     The M&I Account was used to launder billions of dollars by concealing the ownership, source, and location of the funds, yet the daily average balance in the account was

often less than $1 million.  Tens of millions of dollars, very frequently in large whole dollar amounts, were transferred into the account and then immediately wired out that same day.

39.    During the course of its relationship with Petters, thousands of records were created relating to the activity in the M&I Account.  None of these records, however, reflected that a retailer was the source of monies being deposited in the M&I Account as contemplated by the structure of the PCI purchase order financing transactions.  This flow of funds did not comport with the structure explained to multiple M&I personnel and to the various investors.

40.    From January 1, 2003 through August 31, 2008, in excess of the astronomical sum of $35.3 billion was deposited into the M&I Account (clearly belying the notion that PCI's annual revenues were a mere $1.3 billion).  Of that, over $24.1 billion, or 68.3%, was received from two sources: Nationwide and Enchanted.  Upon information and belief, there were no material deposits from retailers at any point.  M&I was never provided a valid business reason for such a staggering amount and percentage of transfers to be received from PCI's purported sellers of merchandise, as opposed to PCI's retailers, to whom PCI supposedly sold the merchandise.  An additional $10.7 billion, or 30.3%, was received from investor related sources. M&I never inquired, nor was it ever provided, a valid business reason for such a large amount of deposits from investors.  Thus, 98.6% of the over $35 billion deposited during this less than six year period was sourced from PCI's two purported vendors or from investors.

41.    During the same time period, in excess of $35.3 billion was transferred out of the M&I Account.  Of that amount, in excess of $34.2 billion, or 96.9%, was transferred to or for the benefit of investors.

42.    For the period January 1, 2003 through August 31, 2008 (weeks before the fraud collapsed), 68.3% of the monies in the M&I Account were sourced from Nationwide and

10

Enchanted and from PCI's investors; over 96.9% of the monies in the M&I Account were used to fund payments to investors. This activity was not only facially illogical, it also conflicted with the information about PCI, and the structure of its purchase order financing business, that had been provided to M&I.

43.     During this same time period, in excess of $68.4 million was transferred from the M&I Account directly or indirectly to Petters' personal accounts. On at least 17 different occasions, the transfers to Petters' personal accounts exceeded $1 million, including transfers of over $3 million on November 17, 2003, $5 million on December 13, 2004, $8 million on February 17, 2006, and over $11 million on October 27, 2006.

44.     The transfers to Petters' personal accounts are facially illogical given the intended purpose of the M&I Account. M&I never inquired, nor was it ever provided, a valid reason for these transfers.

45.     During this same time period, in excess of $119.2 million was transferred from the M&I Account to Petters Group Worldwide, LLC ("PGW"), a separate entity owed by Petters. In addition, $2.49 million was transferred from the M&I Account to Thomas Petters, Inc. ("TPI"), another separate entity owed by Petters.

46.     The transfers to PGW and TPI are facially illogical given the intended purpose of the M&I Account. M&I never inquired, nor was it ever provided, a valid reason for these transfers.

47.     Accordingly, M&I knew that PCI was not receiving monies from retailers and that the majority of the dollars deposited into the M&I Account were sourced from Nationwide and Enchanted, PCI's two principal purported sellers of merchandise, a fact that made no conceivable sense, contradicted the explanations provided to M&I as to how PCI's business

operated, and contradicted how PCI represented its business model to its investors.  M&I knew that the representations made by Petters, Coleman and White to PCI's investors regarding how PCI's business model operated were false.

48.     M&I was aware that at least one potential third party investor interested in transacting business with an SPE was misinformed that there were tens of millions of dollars sitting idle in the M&I Account.

49.     On Friday, December 5, 2003, Mark Apostalon, Compliance Officer at C.J.M. Holding Corporation ("Apostalon") e-mailed Jambor an authorization permitting M&I to confirm that PCI had $39,250,000.00 in available funds to facilitate the purchase of 100,000 cell phones.  The authorization was signed by Steve Ratliff, a Petters Consumer Brands, LLC employee who owned a separate entity called Integrity Marketing and Sales, LLP.  Attached as Exhibit C, and incorporated herein by reference, is a copy of the e-mail and authorization that Apostalon sent to Jambor dated December 5, 2003.

50.     On December 5, 2003, PCI had an opening balance in the amount of $1,672,681.59 and an ending balance in the amount of $5 million in the M&I Account.  At no point in December 2003 did PCI's closing daily balance approach $39 million.

51.     After receiving this e-mail from Apostalon, Jambor forwarded it to Coleman on Monday, December 8, 2003, without including any text in his own forwarding e-mail.  Despite knowing something was radically wrong and illegitimate with the manner in which PCI was conducting its business, Jambor failed to request or receive an adequate explanation from PCI as to the misrepresentation made to Apostalon regarding the M&I Account balance.

52.     After receiving the email from Jambor, Coleman forwarded it to, among others, Tom Petters, criticizing Ratliff for signing the authorization without approval and noting that, sending such letters "ruin's our relation and the trust we have with our banker."

## V.     M&I Enters into a Deposit Control Agreement to Ensure that Retailers' Payments Flow Directly to the Appropriate SPE.

53.     Through 2006, PCI had made billions of dollars in payments to its investors in a timely manner.  Near the end of 2007, however, PCI's payments to its investors began to slow and investors began to inquire why.   Petters responded that the retail community was experiencing significant cash flow difficulties as the economy began to recede, which impacted the shipment of goods and timing of payments to the investors.

54.     To placate investors and to continue perpetrating the Ponzi scheme, Petters agreed to enter into several account control agreements in connection with the M&I Account.

55.     Generally, the framework of the agreements was similar to the previous proposals made by two investors, both of which M&I rejected.   M&I would transfer deposited retailer monies from the M&I Account to the SPE based on a transaction list, which would detail the retailer and the amount and date of payment being sent for the benefit of the investor.

56.     PBFP Holdings, LLC, Palm Beach Capital Corp., and Palm Beach Finance Partners, L.P. (collectively, the "Palm Beach Fund") were PCI lenders through a dedicated SPE. The Palm Beach Fund was the first of PCI's investors to demand such an arrangement.   The Palm Beach Fund represented that it would withdraw from all PCI purchase order financing transactions and close out its outstanding positions if PCI would not agree to enter into such an arrangement.

57.     On February 8, 2008, Coleman emailed Flynn about setting up a deposit control agreement among M&I, PCI and the Palm Beach Fund, attaching a draft agreement.  Attached as

Exhibit D, and incorporated herein by reference, is a copy of the e-mail and draft agreement that Coleman sent to Flynn dated February 8, 2008.

58.     On February 14, 2008, Flynn forwarded the draft agreement to Moline and another M&I employee, Carolyn Schwede, and requested that they review the document.  Flynn noted: "There is urgency to get this handled for the customer Petters Company."  Attached as Exhibit E, and incorporated herein by reference, is a copy of the e-mail that Flynn sent Moline dated February 14, 2008, and Moline's reply on the same date.

59.     That same day, Moline replied to Flynn questioning, among other things, how M&I could fulfill its obligations and whether M&I was getting properly compensated for its services.

60.     Also on February 14, 2008, Flynn forwarded the draft agreement to M&I's outside counsel, Kevin Busch at Moss & Barnett, P.A., asking whether Busch would "mind giving this a cursory review."  Attached as Exhibit F, and incorporated herein by reference, is a copy of the e-mail that Flynn sent Busch dated February 14, 2008.

61.     On February 18, 2008, Flynn sent an email to the Palm Beach Fund's counsel, Craig Howse, stating that M&I was willing to attempt to accommodate the Palm Beach Fund so it could "feel comfortable with the working of the purchase order financing in which they are engaged."  Attached as Exhibit G, and incorporated herein by reference, is a copy of the e-mail that Flynn sent Howse dated February 18, 2008.

62.     On February 19, 2008, Flynn sent an email to both Coleman and Howse outlining two factors that would make it "difficult" for M&I to execute the agreement, including:

> 1.  While we have good limited liability language protecting the bank from any liability from Petters, the Protected Parties are not a party to the agreement and could seek recourse from the bank if the directions supplied to the bank by Petters were somehow in dispute.  Essentially, the bank is potentially put in the middle of

14

some future dispute.  We appear to take on some potential liability for which we are not compensated.

2.  It is unclear what value the bank provides in this arrangement to the Protected Parties – we are asked to perform work administering account transfers but we are only transferring in accordance with the direct instructions of Petters.  Why can't Petters do this directly? It is not materially different from the perspective of the Protected Parties.

Attached as Exhibit H, and incorporated herein by reference, is a copy of the e-mail that Flynn sent Coleman and Howse dated February 18, 2008.

63.     Despite these questions regarding how it would perform its functions, how it would be compensated, what potential liability it was taking on, and what value it was adding, on February 25, 2008, M&I executed a deposit account control agreement with PCI relating to the Palm Beach Fund (the "Palm Beach Deposit Agreement").   Attached as Exhibit I, and incorporated herein by reference, is a copy of the Palm Beach Deposit Agreement.

64.     The Palm Beach Deposit Agreement reflected M&I's understanding that some payments being deposited into the M&I Account belonged to the Palm Beach Fund and PCI was not entitled to use them.

65.     As set forth in the Palm Beach Deposit Agreement, M&I acknowledged and agreed that: (1) Petters would provide transaction lists to M&I at least once a week; (2) the transaction lists would identify the purchaser of the goods, the purchaser's payor bank, the purchase order date and number, the invoice date and number, the payment due date, the name of the investor which financed a given transaction and the amount of such financing; (3) M&I would control the disbursements from the M&I Account to ensure the transfer of monies to the Palm Beach Fund exclusively based on the transaction lists; and (4) the M&I Account would be under M&I's "sole dominion and control."

66.     As required by Section 3 of the Palm Beach Deposit Agreement, the Palm Beach Fund established an account at M&I (the "Palm Beach Account").  The purpose of the Palm Beach Account was to receive the monies routed by M&I from the M&I Account pursuant to its custodial and escrow duties under the terms of the Palm Beach Deposit Agreement.

67.     The Palm Beach Deposit Agreement was a significant undertaking for M&I and required "special handling" that would have entailed additional resources and costs.  Moline testified under oath:

> Q.     Had you ever been asked to do this or handle a request such as this in your banking career?
>
> A.     No.
>
> Q.     When you say take a person to monitor the account, who would that person be?
>
> A.     It would have had to have been one of the two folks out at that office. Whatever was in that control agreement and they were asking us to do, that staff person would have to do it.
>
> Q.     There's a cost associated with paying that staff person hourly rates and benefits and so forth, is that right?
>
> A.     Yes.
>
> Q.     Was there an arrangement for that cost to be passed on to the customer?
>
> A.     I don't know the answer to that question.
>
> Q.     Would you expect that cost to be passed on to the customer?
>
> A.     I would think so.
>
> Q.     Why is that?
>
> A.     It's special handling.
>
> Q.     What does special handling mean?
>
> A.     Anything over and above what a client would be asking you to do, whatever is in that control agreement.

16

Q.   Did Mr. Flynn respond to your concern about getting fairly compensated?

A.   I do not know that he ever came back and said -- I was never clear on that, no, whether he did or not.

Moline Dep. 82:8-83:16. Mar. 15, 2011.

68.   Ultimately, M&I, through Flynn, completely discounted and disregarded Moline's concerns regarding how M&I logistically would perform these special services, whether M&I was being fairly compensated, which employees could handle this role and whether the function should be performed by a different department within M&I.  This is because M&I never intended to perform.

69.   Moline acknowledged under oath that, because of the special and extraordinary nature of the contemplated services, she would not have expected M&I to execute the Palm Beach Deposit Agreement unless and until appropriate personnel first understood operationally and logistically what they needed to do to appropriately implement the agreement.

70.   And yet, Moline testified that M&I did not need to develop such an understanding because "we hadn't gotten that far":

Q.   Did you ever discuss, communicate with anyone about what activity was taking place in the M&I Account in or about February of 2008?

A.   No.

Q.   For instance, did you know anything about how many wires were taking place on a daily or weekly basis?

A.   Into their account, no.  I had no knowledge of that account prior to any of this.

Q.   I want to make sure we are clear on your testimony.  Let me ask specific questions.  I'm not talking about prior to this.  I'm talking about in February of 2008 did you know anything about the level of wire activity in or out of the PCI account?

A.   No.

17

Q.    Or the amount of monies being deposited or being transferred out of the PCI account?

A.    No.

Q.    Or the sources or uses of monies into or out of the PCI account?

A.    No.

Q.    Did you undertake any thought process or analysis as to how much staff time would be required to perform this function?

A.    No. We hadn't gotten that far.

*** 

Q.    Lower down it says, "So I would be concerned we get the staff or knowledge to take care of this."  What did you mean by that?

A.    I have two people out there.  I was concerned about the amount of time it would take to do this for just one client.

Q.    When you were expressing your concern about having the staff, did you do anything to understand the amount of activity that was even being discussed?

A.    We hadn't gotten that far yet.

Q.    How did you know whether or not you didn't have the staff, that perhaps there was only going to be one wire a week?

A.    Because it's special handling, period, and it's not something we do for every customer, and whatever the activity would have been we would have had to be responsible for looking at it.

Moline Dep. 87:21-88:20 and 103:16-104:8.

71.    Flynn cannot identify any instructions he ever provided to his staff as to logistically what they would need to do in order to perform and concedes that M&I had performed no due diligence before signing the Palm Beach Deposit Agreement.

72.    M&I's failure to undertake a perfunctory analysis of how it would perform its duties demonstrates its lack of intent to perform.

18

73.     By executing the Palm Beach Deposit Agreement without understanding how it would perform the contemplated functions, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

74.     M&I agreed to enter into the Palm Beach Deposit Agreement without any compensation whatsoever even though Flynn asserted that "if we're being asked to provide a service, it would be reasonable to expect that we should be compensated for doing that."  Flynn Dep. 193:14-16.  Moline was also concerned about who would pay the legal fees for outside counsel to review the agreement.  Flynn never addressed with Moline any of these concerns.

75.     M&I's failure to even quantify its anticipated internal costs or otherwise price the services it would provide pursuant to the Palm Beach Deposit Agreement demonstrates its lack of intent to perform.

76.     M&I, through Moline, understood that in order to perform: (1) specific procedures needed to be drafted and (2) at least two M&I personnel must be adequately trained. M&I also understood that it had no existing policies, procedures or guidelines in place for this new financial service that it was creating.  And yet neither Moline nor any other M&I employee ever prepared any policies, procedures or guidelines outlining how M&I would perform the functions set forth in and created by the Palm Beach Deposit Agreement.

77.     M&I's failure to prepare operating procedures demonstrates its lack of intent to perform.

78.     M&I's failure to train any personnel how to perform the agreed upon functions demonstrates its lack of intent to perform.

79.     By failing to prepare operating procedures, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

19

80. By failing to train pertinent personnel how to perform, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

81. At no time did any internal committee of M&I review or approve the creation, sale or implementation of this new product. The failure to do so demonstrates M&I's lack of intent to perform.

82. Moreover, such failure was a violation of, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

83. M&I's failure to inform any personnel that it had executed the Palm Beach Deposit Agreement — other than the two officers who executed the Palm Beach Deposit Agreement — demonstrates its lack of intent to perform.

84. Moreover, the failure of the two officers to inform any personnel that they had executed the agreement on behalf of M&I was a violation of, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

85. Moreover, by failing to maintain a copy of the executed agreement, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

86. Upon information and belief, M&I failed to record or memorialize any of the discussions surrounding, or the actual execution of the Palm Beach Deposit Agreement. M&I's failure to record and memorialize any of these events demonstrates a lack of intent by M&I to perform under the Palm Beach Deposit Agreement. By failing to record and memorialize any of these events, upon information and belief, M&I violated its own policies, procedures or practices.

20

87.     M&I executed the Palm Beach Deposit Agreement not only without informing the appropriate operations personnel responsible for implementing the agreement, but after expressly informing such personnel that M&I in fact would not perform and need not perform.

88.     By executing the Palm Beach Deposit Agreement without informing the appropriate operations personnel responsible for implementing the agreement, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices.

89.     M&I's motivation in executing the Palm Beach Deposit Agreement and thereby misrepresenting its intent to perform was to appease Petters and PCI so as to enhance the potential to make additional profit from the Petters' relationship. M&I's overriding goal was to further and cultivate the relationship with Petters at the expense of and without regard to the Palm Beach Funds, bank industry standards or M&I's own policies, procedures or practices.

## VI.     M&I Enters into Several Other Deposit Control Agreements.

90.     After executing the Palm Beach Deposit Agreement, M&I entered into similar agreements for other PCI investors, including Ritchie Capital Management, Ltd. ("Ritchie") and Interlachen Harriet Investments, Ltd. ("Interlachen").  In May 2008, M&I executed a deposit account control agreement with PCI relating to the Ritchie (the "Ritchie Deposit Agreement"). A copy of the Ritchie Deposit Agreement is attached, and incorporated herein by reference, as Exhibit J.  On May 29, 2008, M&I executed a deposit account control agreement with PCI relating to the Interlachen (the "Interlachen Deposit Agreement").  A copy of the Interlachen Deposit Agreement is attached, and incorporated hereinby reference, as Exhibit K.  The Ritchie Deposit Agreement and the Interlachen Deposit Agreement imposed substantially the same obligations on M&I as the Palm Beach Deposit Agreement.   The Palm Beach Deposit

Agreement, the Ritchie Deposit Agreement, and the Interlachen Deposit Agreement are collectively referred to throughout as the "Deposit Control Agreements."

**VII.    M&I Took No Steps To Perform Any Of Its Obligations Under the Deposit Control Agreements.**

91.    M&I took no steps to perform any of its obligations under the Deposit Control Agreements, even though M&I considered the nature of the contemplated services to be special and extraordinary.

92.    In sum, M&I violated, upon information and belief, bank industry standards and its own internal policies, procedures or practices by, among other things:

- Failing to make even an perfunctory analysis of how it would perform its duties and obligations under the Deposit Control Agreements;

- Imposing no charge for the special and extraordinary services it represented it would provide pursuant to the Account Control Agreements and failing to even consider what an appropriate charge would be;

- Preparing no operating procedures to enable it to perform the functions set forth in and created by the Deposit Control Agreements, even though M&I knew specific procedures needed to be drafted because it had no existing policies, procedures or guidelines in place;

- Failing to train any personnel how to perform the agreed upon functions set forth in and created by the Deposit Control Agreements;

- Failing to inform M&I employees – other than the signatories – about the Deposit Control Agreements or M&I's obligations thereunder;

- Failing to obtain internal committee approval before entering into the Deposit Control Agreements, which in essence represented a new product;

- Failing to maintain an executed copy of the Palm Beach Deposit Control Agreement in its files;

- Failing to memorialize any discussions regarding the Palm Beach Deposit Control Agreement in its meeting notes;

- Failing to obtain or attempt to obtain any transaction lists from PCI.

93.     The Federal Financial Institutions Examination Counsel has published a list of suspicious activities or "red flags" that are indicative of money laundering.  The activity in the M&I Account violated, without limitation, the following of those "red flags":

<u>Activity Inconsistent with the Customer's Business</u>

▪ The currency transaction patterns of a business show a sudden change inconsistent with normal activities.

▪ A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity.

▪ Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.

▪ Goods or services purchased by the business do not match the customer's stated line of business.

▪ Payments for goods or services are made by checks, money orders, or bank drafts not drawn from the account of the entity that made the purchase.

▪ The stated occupation of the customer is not commensurate with the type or level of activity.

<u>Funds Transfers</u>

▪ Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.

▪ Many small, incoming transfers of funds are received, or deposits are made using checks and money orders. Almost immediately, all or most of the transfers or deposits are wired to another city or country in a manner inconsistent with the customer's business or history.

▪ Funds transfer activity is unexplained, repetitive, or shows unusual patterns.

▪ Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.

▪ Funds transfers are sent or received from the same person to or from different accounts.

▪ Funds transfers contain limited content and lack related party information.

- ▪ A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations.

<u>Other Unusual or Suspicious Customer Activity</u>

- ▪ Suspicious movements of funds occur from one bank to another, and then funds are moved back to the first bank.

- ▪ Customer uses a personal account for business purposes.

94.     The foregoing actions and inactions by M&I violated bank industry standards and, upon information and belief, its own internal policies, procedures or practices.

## COUNT I – AIDING AND ABETTING FRAUD

95.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

96.     Petters, Coleman and White were perpetrating a massive fraud and were laundering the proceeds of the fraud to conceal the ownership, source and location of the funds.

97.     M&I had actual knowledge of the fraud.  M&I knew that Petters, Coleman and/or White were perpetrating a fraud or engaging in other wrongful acts through the M&I Account based upon, among other things, M&I's knowledge of the manner in which the purchase order financing transactions were supposed to be conducted, and M&I's knowledge that no funds flowed from any retailers to the M&I Account and that instead the M&I Account was funded primarily from Nationwide and Enchanted and PCI's investors, and that the representations and recitals set forth in the Deposit Control Agreements were materially false.

98.     By effectuating tens of billions of dollars in wire transfer payments through the M&I Account, M&I provided substantial assistance to the Petters Ponzi scheme.

99.     As a result of the continuing fraud, investors continued to pour money into the Ponzi scheme through September 2008.

100.    Without the substantial assistance that M&I provided, the Ponzi scheme would have been discovered earlier by law enforcement authorities and victims of the Ponzi scheme.

101.    As a direct and proximate result of the M&I's conduct, PCI and its related entities suffered damages exceeding $50,000 and in an amount to be proven at trial in this matter.

102.    The Trustee respectfully requests that the Court enter judgment against the Defendants in an amount exceeding $50,000.

### COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

103.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

104.    Petters, Coleman and White served as officers and directors of multiple Petters entities, including PCI and various SPEs.  As officers and directors, Petters, Coleman and White owed their companies fiduciary duties of care, loyalty and good faith.

105.    PCI and the SPEs were insolvent from their creation and throughout the entire course of the Ponzi scheme.

106.    As officers and directors of insolvent entities, Petters, Coleman and White owed a fiduciary duty not only to those entities, but also to the creditors of the entities.

107.    Rather than acting in a manner consistent with their fiduciary duties, Petters, Coleman and White engaged in a series of actions injuring those entities, including, but not limited to, looting tens of millions of dollars for their personal use, and using every means available to prolong (and thereby deepen) the Ponzi scheme.  Petters, Coleman and White's actions not only injured the entities, but damaged the creditors of the insolvent entities.

108.    M&I had actual knowledge of Petters, Coleman and White's breaches of fiduciary duties. M&I knew that Petters, Coleman and White were breaching their fiduciary duties or engaging in other wrongful acts through the M&I Account based upon, among other things,

M&I's knowledge of the manner in which the purchase order financing transactions were supposed to be conducted, and M&I's knowledge that no funds flowed from any retailers to the M&I Account and that instead the M&I Account was funded primarily from sellers of merchandise and investors, and that the representations and recitals set forth in the Deposit Control Agreements were material false.  M&I also had actual knowledge that millions of dollars in payments from the M&I Account were sent directly to Petters' individual bank accounts.

109.    M&I substantially assisted Petters, Coleman and White's breaches of fiduciary duties.

110.    As a direct and proximate result of the M&I's conduct, PCI and its related entities suffered damages exceeding $50,000 in an amount to be proven at trial in this matter.

111.    The Trustee respectfully requests that the Court enter judgment against the Defendants in an amount exceeding $50,000.

## COUNT III – CIVIL CONSPIRACY

112.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

113.    The Ponzi scheme was a massive fraud, perpetrated over a number of years, with a wide range of victims.

114.    Petters, Coleman and White conspired for more than a decade to defraud investors to the Ponzi scheme.

115.    Upon information and belief, M&I conspired with Petters, Coleman and White to fraudulently represent to investors that M&I would comply with the Deposit Control Agreements.

116.    Upon information and belief, M&I conspired with Petters, Coleman and White to fraudulently represent to investors that PCI would comply with the Deposit Control Agreements.

26

117.    Upon information and belief, M&I and Petters, Coleman and White had a meeting of the minds that they would represent to investors, including the Palm Beach Fund, Ritchie and Interlachen, that they would comply with the Deposit Control Agreements.

118.    Upon information and belief, M&I and Petters, Coleman and White had a common understanding to commit this wrong.

119.    Upon information and belief, M&I and Petters, Coleman and White committed conspiratorial acts in furtherance and in pursuit of this wrong.

120.    Upon information and belief, M&I conspired with Petters, Coleman and White to commit fraud, through the Deposit Control Agreements that were part of the Petters Ponzi Scheme, which caused massive damages.

121.    As such, the Trustee respectfully requests damages in an amount exceeding $50,000 to be proven at trial.


DATED:  November 14, 2012                    **LINDQUIST & VENNUM P.L.L.P.**

By:      /s/  Terrence J. Fleming
Terrence J. Fleming (0128983)
James A. Lodoen (173605)
Sandra S. Smalley-Fleming (0296983)
Daryle L. Uphoff (111831)
Mark S. Enslin (338813)
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com
**ATTORNEYS FOR DOUGLAS A. KELLEY CHAPTER 11 TRUSTEE OF PETTERS COMPANY, INC.**

001007_2002582_d

From:  Jon Sabes <sabesjon@qwest.net>
Sent:  Wednesday, February 19, 2003 3:45 PM
To:    shari.rhode@micorp.com; edward.jambor@micorp.com
Cc:    Root, Simon C <sroot@fredlaw.com>
Subject:  Petters

Shari & Ed,

It was a pleasure meeting with you today regarding our collective efforts to implement a bank custodial mechanism to accommodate Petters various lending structures.

In reality, we are looking to have M&I Bank act as custodian to receive retailer wire payments and with the further direction of Deanna Munson at Petters, forward those monies on to their appropriate bank accounts. This exact process happens every day with Petters and we are merely looking for further assistance from the Bank by which those monies are forwarded to their appropriate accounts prior to being credited to Petters general corporate ledger.

That being said, we would like to do this in a manner such that: (i) we do not disturb the M&I Bank account in such a manner that Petters needs to change his vendor set up information with his retail customers; (ii) operationally it works for M&I Bank and Petters; and (iii) we do not cause M&I to accept an liability because of discretionary powers. Additionally, we are not looking for a solution that the bank will have to defend in the face of a bankruptcy trustee challenge.

I envision something quite mechanical that allows M&I to essentially act as custodian on behalf of Petters whereby M&I receives payments in the current account and zeros out that account each day by forwarding monies on to preset accounts per Petters instructions. I would be more than happy to discuss the options further prior to reconvening on March 3rd as I believe we can get something done which accommodates us all if M&I is willing to be creative and innovative with us on this project. Thank you in advance for your consideration.

Sincerely

Jon Sabes
Opportunity Finance LLC
60 South Sixth Street, Suite 2540
Minneapolis, MN 55402
612.339.8994
612.339.8922 fax
612.388.2223 mobile





# HOWSE & THOMPSON, P.A.

**ATTORNEYS AT LAW**

*Providing counsel to individuals and businesses*

3189 FERNBROOK LANE
PLYMOUTH, MN 55447

*telephone* 761.577.0150
*facsimile* 761.577.0151

G. CRAIG HOWSE
JEFFREY C. THOMPSON

OF COUNSEL
JEFFREY K. VEST
GREGORY W. DECKERT

January 27, 2004

*Sent by Facsimile Transmission Only (612)904-8015*

Carol Moline
M&I Bank

Re:   Deposit Account Agreement
Our File No.: C1925-45

Dear Ms. Moline:

Several weeks ago I talked to you about the need for a deposit agreement with one of your customers. Many dollars are currently running through this account, some of which should have more appropriately been deposited into several lock box arrangements which were established. Unfortunately, not all of the account holders vendors have been trained to direct the payments to the lock box. For that reason, we have prepared the enclosed Deposit Account Control Agreement to set up a mechanism to provide protection to the parties to the lock box accounts without interfering with the business practices of the account holder. Please review this Agreement and provide your comments. Please also give us an indication of the charges that M&I will require to administer this Agreement. I believe the parties are ready to move forward with this as soon as these matters are resolved. Thank you.

Very truly yours,

G. Craig Howse

GCH:jlw
Enclosure



EXHIBIT
B

1905

CH001810

**From:**
**Sent:**   Thu, 01 Jan 1970 00:00:00 GMT
**To:**   Romenesko, Stuart
**CC:**   Petters, Tom
**Subject:** FW: Letter of Authorization

---

Steve Ratliff DOES NOT have the authority to be sending these letters to his customers and having his customers contacting Petters Company banker.

Ed Jambor received a phone call last Friday from Mark at CJM Holdings Company wanting to verify that Petters Company has $39,250,000 in our account.

Ed will not give out any information on our account without Tom Petters or myself approving it, and by employees sending letters like this to our Banker, it ruin's our relation and the trust we have with our banker.

Thanks

Deanna

Stuart:  Do you want me to

-----Original Message-----
From: Edward.Jambor@micorp.com [mailto:Edward.Jambor@micorp.com]
Sent: Monday, December 08, 2003 8:53 AM
To: Munson, Deanna
Subject: Letter of Authorization

Ed Jambor
Business Bank Officer
M & I Marshall & Ilsley Bank
(612)798-3345
----- Forwarded by Edward Jambor/MICorporation on 12/08/2003 08:53 AM -----

        "Immix, LLC"

        <immix@zianet.com      To:    edward.jambor@micorp.com

        >             cc:

        Subject:  Letter of Authorization



12/05/2003 04:25

PM

Dear Edward Jambor,
Attached in a pdf format is a letter of authorization to confirm funds.
I will call you shortly.
Best regards,
Mark A. Apostalon
Compliance Officer
C.J.M. Holding Corporation
(See attached file: Authorized Bank Letter.pdf)

**To:** (M&I Bank) Marshall Isley Bank
**Address:** PO Box 2045, Milwaukee, WI, USA, 53201-2045
**Tel:** 888-464-5463
**Bank Officers Name:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ED JAMBOUR
(612) 798-3345

### Authority to Disclose

**To Whom It May Concern:**

We, the for mentioned account holder give you authority to disclose to CJM Holding Corporation and/or their Banking Institution details regarding our ability to enter into a Sales/Purchase contract for the purchase of 100,000 units of *Nokia 8910i* phones ($392.50 ea) at a total cost of $US *39,250,000* payable by way of *Standby Letter of Credit or Blocked Funds*.  Any information you give, you do so without prejudice and without any contractual or financial involvement or recourse for whatsoever reason and at our express request.

Disclosure should only be made against a requirement to satisfy Nokia of our ability in entering into a contractual arrangement with them as stated above and in any event on the production of

*Integrity* As the agreed Password.

Yours sincerely,

Name: Steve Ratliff

Signature:

Title: President

Company: Integrity Marketing and Sales, LLLP   is an I.O.C of
The Petters Company, Inc.

**From:**   Coleman, Deanna
**Sent:**   Fri, 08 Feb 2008 14:03:13 GMT
**To:**   christopher.flynn@micorp.com
**BCC:**   Hay, Tom
**Subject:** FW: Deposit Account Agreement

Enclosed is the Deposit Control Agreement. As I mentioned, I will be out of the office all next week, but can be reached on my cell at 952-200-0939.

Thanks
Deanna Coleman



DRAFT

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement, dated as of _____ 2008, is by and between M&I Bank, a national banking association bank (M&I), and Petters Company, Inc., a Minnesota corporation (Petters).

WHEREAS, each of several financial entities hereinafter designated as third party beneficiaries (the Protected Parties) provides financing to Petters or an affiliate company of Petters with respect to transactions comprising the sale and purchase of consumer merchandise (Transaction); and

WHEREAS, each of the Protected Parties has some form of securitization structure for its financing, including for some Protected Parties "lock box" arrangements; and

WHEREAS, from time to time Petters will receive payments with respect to Transactions into its bank account at M&I which should have been paid to a "lock box" of a Protected Party or directly to a Protected Party; and

WHEREAS, Petters desires to provide legal assurance to the Protected Parties that deposits into the Petters bank account which should have been paid into a Protected Parties lock box or directly to a Protected Party are held for the benefit of the Protected Party and will be immediately transferred to the Protected Party's lockbox or to a separate account at M&I owned by the Protected Party;

NOW, THEREFORE, the parties hereto recite and agree as follows:

1.    Deposit Account

      (a)    Designation and Rights.

            Petters hereby designates its bank account at M&I bearing account number _____ as the Deposit Account referred to herein which is subject to the terms and conditions of this Agreement.

            Moneys deposited into the Deposit Account shall be held for the benefit of Petters and the Protected Parties as hereinafter defined, and shall be distributed as herein provided.  Petters acknowledges that all moneys deposited into the Deposit Account which are the proceeds of purchase orders and/or invoices financed by a Protected Party (Protected Party Funds) which are intended for payment into a "lock box" or other securitized structure for the benefit of a Protected Party do not constitute funds of Petters and are held for the benefit of and shall be paid to the Protected Party. Further, Petters declares Protected Party Funds are held in trust for the Protected Party to whom the funds are required to be paid.

    (b)   <u>Protected Parties</u>

As used in this Agreement the terms Protected Party means and refers to any and all of the following:

_____

Each Protected Party is a third party beneficiary of this agreement with respect to any moneys held in trust for it in the Deposit Account.

    (c)   <u>Deposits into Account</u>.

Certain deposits will be made into the Deposit Account by and for the benefit of Petters.  Such deposits are not held in trust for the Protected Parties and no Protected Party shall make any claim upon the moneys in the account held exclusively for Petters or for the benefit of another Protected Party.

    (d)   <u>Control of Deposit Account</u>.

The Deposit Account shall be under the sole dominion and control of M&I as custodian of the Account for the benefit of Petters and the Protected Parties as the rights of each are established herein.  M&I shall manage and control this Account in accordance with the guidelines and procedures established by this Agreement.

    (e)   <u>Termination of Deposit Account</u>.

With 120 days notice to each Protected Party, Petters shall have the right to close the Deposit Account at any time no moneys are held in the Deposit Account in trust for any Protected Party.

2.    <u>Procedures for Deposit Account</u>.  M&I shall follow the following procedures with respect to all moneys deposited or credited to the Deposit Account:

    (a)   M&I shall deposit in the Deposit Account all moneys collected or received with respect to Transactions and all other receipts from time to time tendered by or on behalf of or to Petters for deposit therein, including without limitation all wire transfers and other payments directed to the Deposit Account.

    (b)   Petters shall provide to each Protected Party and M&I at least once each week (or more often if necessary to enable M&I to discharge its obligations hereunder), a list of all Transactions funded by a Protected Party with respect to which payment may be received by M&I for deposit in the Deposit Account (Transaction List).  This Transaction List shall include the name of the purchaser or obligor,

the purchaser's payor bank and the banking coordinates, the purchase order date and number, the invoice date and number, the payment due date, and the Protected Party which has financed the Transaction and the amount financed by the Protected Party.

(c)     M&I shall compare each payment received by wire transfer or otherwise to the most recently received Transaction List provided to it by Petters and shall automatically transfer each payment on a Transaction funded by a Protected Party to an M&I account established by and for the benefit of each Protected Party as required herein.  M&I shall advise Petters and each Protected Party promptly of each payment and the Transaction described on the Transaction List to which it relates.

(d)     Within one business day, Petters and the Protected Party shall thereafter determine, by mututal agreement, the amount, if any, of any payment transferred to the Protected Party account that is the property of Petters or its affiliate under the terms of those agreements identified on Exhibit A (Petters Amount).  Protected Party shall then notify M&I of the Petters Amount which amount shall be returned to the Deposit Account.

(e)     Petters shall not make any withdrawals of Protected Party Funds from the Deposit Account by check, electronic means or otherwise, and M&I will not honor any request for payment of Protected Party Funds (as shown on the Transaction List) to Petters.  Petters may withdraw or direct the transfer of moneys which do not comprise Protected Party Funds from the Deposit Account at any time.

(f)     Protected Party shall promptly cause any amount transferred to its account to which the Protected Party is not the rightful owner to be returned to the Deposit Account.

3.     <u>Method of Disbursement</u>.  Each Protected Party shall establish an account with M&I into which M&I shall transfer moneys on deposit in the Deposit account which are to be released to the Protected Party as provided in Section 2 (c).  Each Protected Party shall thereafter establish the protocol for disbursement of the funds from its account.

4.     <u>Fees</u>.  All fees for the Deposit Account shall be paid by Petters.  In the event that Petters fails to timely make a payment of a fee on the Account, M&I may thereafter exercise its right of set-off against amounts in the Deposit Account available for disbursement to Petters.  All fees for the separate account of a Protected Party shall be paid by the Protected Party.

5.     <u>Set Off</u>.  The M&I hereby agrees that the M&I will not exercise or claim any right of set-off or banker's lien against the Deposit Account or any Protected Party

Funds on deposit therein, and the M&I hereby further waives any such right or lien which it may have against any Protected Party Funds held in the Deposit Account.

6.    Limited Liability of Bank.

    (a)    To induce M&I to enter into this Agreement, establish the Deposit Account and perform services through the Deposit Account provided for or contemplated by this Agreement, Petters agrees that:

        (i)    M&I shall have no liability to Petters or any Protected Party for any loss or damage that any of them may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement, the Deposit Account or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of M&I.  Under no circumstances will M&I be liable for indirect, special or consequential damages, or to any third party as a result of any actions taken or omitted by M&I in accordance with this Agreement;

        (ii)    M&I shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, telex, teletype or telecopier message, order or other documentary, or teletransmission received by M&I from Petters and reasonably believed by M&I to be genuine and correct and to have been signed, sent or made by an authorized person, and without making any inquiry whatsoever as to Petters right or authority to give such order or direction contained therein or as to the application of any payment made pursuant thereto; and

        (iii)    M&I may consult with legal counsel and other experts selected by it with respect to claims against it with respect to the Deposit Account.  M&I shall not be liable for any act or omission taken or suffered by M&I as a result of M&I's good faith reliance on such counsel or experts.

    (b)    Petters agrees to indemnify M&I, its directors, officers, agents and employees, and hold each of them harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of M&I, and from and against any damage, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred as a result of, arising out of or otherwise related to any transaction conducted or service provided by M&I through the use

of the Deposit Account pursuant to the procedures provided for or contemplated by this Agreement.

7.    <u>Termination</u>.  Upon 120 days notice to the Protected Parties, this Agreement may be terminated by Petters, and at the end of the 120 day notice period, Petters is entitled to close the Deposit Account after transfer of all funds of the Protected Party to its separate account.  Upon receipt of the notice by Petters of termination of the account, M&I shall provide written notice of receipt of the Petters notice to the Protected Party at the address most recently provided by said party to M&I.  This Agreement may be terminated by M&I at any time on not less than 120 days prior written notice delivered to each Protected Party.  During the 120 days prior to termination, M&I will continue to manage the Deposit Account in accordance with the provisions of this Agreement.  Upon termination of this Agreement, M&I will deliver all moneys on deposit in the Deposit Account to Petters.

8.    <u>Irrevocable Agreement</u>.  Petters acknowledges that except as provide in Sections 1(e) and 8, the agreements made by it and the authorizations granted by it in Sections 2 and 3 hereof are irrevocable, and that authorizations granted in Sections 2 and 3 hereof are powers coupled with an interest.

9.    <u>Notices</u>.  Any notices, consents, directions, demands, or other communications given under this Agreement (unless otherwise specified herein) shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to, the respective addresses or telecopy numbers (or such other address or telecopy number as may hereafter be furnished to the other party or parties by like notice), as the case may be, set forth below:

> Petters:          Petters Company, Inc.
> 4400 Baker Road
> Attention:  Thomas Petters & Deanna Munson
> Minnetonka, MN 55343-8684
> Telephone No.: (952) 975-2295
> Telecopier No.: (952) 975-4073

> Bank:          M&I Bank
> _____
> _____
> Attention: _____
> Telephone No.: _____
> Telecopier No.: _____

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Section.  Each notice, request or other communication shall be in writing and shall be deemed to be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and confirmation of receipt is made by the appropriate

party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 10. Notices requiring a response within less than 48 hours shall be given by facsimile transmission.

10. <u>Legal Holidays</u>. In any case where the date on which a notice is required to be sent to any person pursuant to the terms of this Agreement shall not be a business day in the State of Minnesota, then (notwithstanding any other provision of this Agreement) the time period for response shall begin at 9:00 a.m. on the first business day following the legal holiday.

11. <u>Severability Clause</u>. Any part, provision, representation, or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12. <u>Assignment; Additional Parties</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither Petters nor M&I shall be entitled to assign or delegate any of its rights or duties hereunder.

13. <u>Counterparts</u>. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, and by the different parties on separate counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

14. <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

    (a) Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws (without giving effect to the conflicts of laws provisions) of the State of Minnesota.

    (b) Jurisdiction. Each of the parties hereto hereby irrevocably submits to the nonexclusive jurisdiction of any Minnesota state or federal courts sitting in Minneapolis or St. Paul, Minnesota, in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state court or in such federal court. Each of the parties hereto hereby

irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing of copies of such process to the applicable party at its addresses specified in Section 10. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRAIL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

15.     Amendments.  This Agreement may be amended from time to time by written instrument signed by Petters and M&I after 120 days written notice of the Amendment to each Protected Party.  No waiver of any of the terms hereof shall be effective unless it is in writing and signed by the party against which such waiver is being asserted.

16.     No Waiver.  No failure on the part of the Protected Parties, Petters or M&I to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

17.     Integration.  This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

18.     Agreement Effectiveness.  This Agreement shall become effective upon delivery of fully executed counterparts hereof to each of the parties hereto.

19.     Headings Descriptive; Construction.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement.  All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

DRAFT

20.   <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

*[Signature Page Follows]*

DRAFT

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

M&I BANK

By: 

Its: _____

PETTERS COMPANY, INC.

By: 

Its: _____

 **Carolyn Moline/MICorporation**
02/14/2008 01:07 PM

To   Christopher Flynn/MICorporation@MICorporation
cc   Jane Schwede/MICorporation@MICorporation
bcc
Subject   Re: Fw: Deposit Account Agreement

Chris and Jane:  I had asked Peggy Franzen what her experience has been in the past with control agreements.  The information that she had is if the customer is to use Treasury Management products especially they have worked with Godfrey and Kahn law firm to review.  She also had a control agreement that was approved for the bank.  The problem is do we get fairly compensated to take care of a situation like this.  One of the things I wanted to confirm is do they want an actual lockbox for these payments to come in?

The control agreement talks about a Transaction list  of the obligor, and that the bank shall compare each payment received by wire transfer or otherwise to the most recently received Transaction list.  I dont know that something like this should be done by the business banking team vs. trust. We could set them up on a fax or e-mail notification for wires but not sure how to monitor any other type of deposit.    It is saying that then M& I shall advise Petters and the protected party promptly of each payment  as well as determining each day what amount should be transferred.

One page 3 it says we can use our right to set-off for fees of the deposit account, but in the next paragraph is says that M & I will not exercise and right to set-off against the deposit account.

So I would be concerned that we have the staff or knowledge to take care of this.

There is a new person in trust who I might run this by.

Carolyn L. Moline
Assistant Vice President/Administrative Services Supervisor
M & I Marshall & Ilsley bank
651 Nicollet Mall
Minneapolis, MN  55402
Phone 612-904-8133
Fax 612-904-8015
Email: carolyn.moline@micorp.com
Christopher Flynn/MICorporation

**Christopher Flynn/MICorporation**
02/14/2008 10:11 AM

To   Carolyn Moline/MICorporation@MICorporation, Jane Schwede/MICorporation@MICorporation
cc
Subject   Fw: [redacted]

Carolyn and Jane,

Attached is a request from one of our customers regarding some special handling for a new account to be opened.  There is urgency to get this handled for the customer Petters Company.

I have reviewed the agreement and it does seem to provide good indemnification language to protect the bank but I would appreciate your input regarding the opening and maintaining an account of this nature.

Thanks very much for your prompt review of this document.


M : I
EXHIBIT NO. 6
9-21-10
R. L. KLANDERUD

MI2013570


EXHIBIT
E
tabbies

**From:** Christopher Flynn
**Sent:** Thursday, February 14, 2008 3:38 PM
**To:** buschk@moss-barnett.com
**Subject:** Fw: Deposit Account Agreement
**Attach:** MI Bank Deposit Account Control Agmt 2008-01-29 .doc

Kevin,

Would you mind giving this a cursory review. Petters is requesting we open a
new depository account governed by this document.

Christopher Flynn
Senior Vice President
M&I Marshall & Ilsley Bank
Phone:612-798-3223
----- Forwarded by Christopher Flynn/MICorporation on 02/14/2008 03:02 PM -----

"Coleman, Deanna" <deanna.coleman@pettersgroup.com>
02/08/2008 08:03 AM

To
<christopher.flynn@micorp.com>
cc

Subject
FW: Deposit Account Agreement

Enclosed is the Deposit Control Agreement. As I mentioned, I will be out of
the office all next week, but can be reached on my cell at 952-200-0939.

Thanks
Deanna Coleman

This e-mail, including attachments, may include confidential and/or proprietary
information,
and may be used only by the person or entity to which it is addressed. If the
reader of this
e-mail is not the intended recipient or his or her authorized agent, the reader
is hereby
notified that any dissemination, distribution or copying of this e-mail is
prohibited. If you
have received this e-mail in error, please notify the sender by replying to
this message and
delete this e-mail immediately.





MIPB000325

DRAFT

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement, dated as of _____ 2008, is by and between M&I Bank, a national banking association bank (M&I), and Petters Company, Inc., a Minnesota corporation (Petters).

WHEREAS, each of several financial entities hereinafter designated as third party beneficiaries (the Protected Parties) provides financing to Petters or an affiliate company of Petters with respect to transactions comprising the sale and purchase of consumer merchandise (Transaction); and

WHEREAS, each of the Protected Parties has some form of securitization structure for its financing, including for some Protected Parties "lock box" arrangements; and

WHEREAS, from time to time Petters will receive payments with respect to Transactions into its bank account at M&I which should have been paid to a "lock box" of a Protected Party or directly to a Protected Party; and

WHEREAS, Petters desires to provide legal assurance to the Protected Parties that deposits into the Petters bank account which should have been paid into a Protected Parties lock box or directly to a Protected Party are held for the benefit of the Protected Party and will be immediately transferred to the Protected Party's lockbox or to a separate account at M&I owned by the Protected Party;

NOW, THEREFORE, the parties hereto recite and agree as follows:

1.    Deposit Account

      (a)    Designation and Rights.

            Petters hereby designates its bank account at M&I bearing account number _____ as the Deposit Account referred to herein which is subject to the terms and conditions of this Agreement.

            Moneys deposited into the Deposit Account shall be held for the benefit of Petters and the Protected Parties as hereinafter defined, and shall be distributed as herein provided.  Petters acknowledges that all moneys deposited into the Deposit Account which are the proceeds of purchase orders and/or invoices financed by a Protected Party (Protected Party Funds) which are intended for payment into a "lock box" or other securitized structure for the benefit of a Protected Party do not constitute funds of Petters and are held for the benefit of and shall be paid to the Protected Party.  Further, Petters declares Protected Party Funds are held in trust for the Protected Party to whom the funds are required to be paid.

1

MIPB000326

DRAFT

(b) Protected Parties

As used in this Agreement the terms Protected Party means and refers to any and all of the following: _____
Each Protected Party is a third party beneficiary of this agreement with respect to any moneys held in trust for it in the Deposit Account.

(c) Deposits into Account.

Certain deposits will be made into the Deposit Account by and for the benefit of Petters. Such deposits are not held in trust for the Protected Parties and no Protected Party shall make any claim upon the moneys in the account held exclusively for Petters or for the benefit of another Protected Party.

(d) Control of Deposit Account.

The Deposit Account shall be under the sole dominion and control of M&I as custodian of the Account for the benefit of Petters and the Protected Parties as the rights of each are established herein. M&I shall manage and control this Account in accordance with the guidelines and procedures established by this Agreement.

(e) Termination of Deposit Account.

With 120 days notice to each Protected Party, Petters shall have the right to close the Deposit Account at any time no moneys are held in the Deposit Account in trust for any Protected Party.

2. Procedures for Deposit Account. M&I shall follow the following procedures with respect to all moneys deposited or credited to the Deposit Account:

(a) M&I shall deposit in the Deposit Account all moneys collected or received with respect to Transactions and all other receipts from time to time tendered by or on behalf of or to Petters for deposit therein, including without limitation all wire transfers and other payments directed to the Deposit Account.

(b) Petters shall provide to each Protected Party and M&I at least once each week (or more often if necessary to enable M&I to discharge its obligations hereunder), a list of all Transactions funded by a Protected Party with respect to which payment may be received by M&I for deposit in the Deposit Account (Transaction List). This Transaction List shall include the name of the purchaser or obligor, the purchaser's payor bank and the banking coordinates, the purchase order date and number, the invoice date and number, the payment due date, and the Protected Party

2

MIPB000327

DRAFT

which has financed the Transaction and the amount financed by the Protected Party.

(c)    M&I shall compare each payment received by wire transfer or otherwise to the most recently received Transaction List provided to it by Petters and shall automatically transfer each payment on a Transaction funded by a Protected Party to an M&I account established by and for the benefit of each Protected Party as required herein.  M&I shall advise Petters and each Protected Party promptly of each payment and the Transaction described on the Transaction List to which it relates.

(d)    Within one business day, Petters and the Protected Party shall thereafter determine, by mututal agreement, the amount, if any, of any payment transferred to the Protected Party account that is the property of Petters or its affiliate under the terms of those agreements identified on Exhibit A (Petters Amount).  Protected Party shall then notify M&I of the Petters Amount which amount shall be returned to the Deposit Account.

(e)    Petters shall not make any withdrawals of Protected Party Funds from the Deposit Account by check, electronic means or otherwise, and M&I will not honor any request for payment of Protected Party Funds (as shown on the Transaction List) to Petters.  Petters may withdraw or direct the transfer of moneys which do not comprise Protected Party Funds from the Deposit Account at any time.

(f)    Protected Party shall promptly cause any amount transferred to its account to which the Protected Party is not the rightful owner to be returned to the Deposit Account.

3.    Method of Disbursement.  Each Protected Party shall establish an account with M&I into which M&I shall transfer moneys on deposit in the Deposit account which are to be released to the Protected Party as provided in Section 2 (c).  Each Protected Party shall thereafter establish the protocol for disbursement of the funds from its account.

4.    Fees.  All fees for the Deposit Account shall be paid by Petters.  In the event that Petters fails to timely make a payment of a fee on the Account, M&I may thereafter exercise its right of set-off against amounts in the Deposit Account available for disbursement to Petters.  All fees for the separate account of a Protected Party shall be paid by the Protected Party.

5.    Set Off.  The M&I hereby agrees that the M&I will not exercise or claim any right of set-off or banker's lien against the Deposit Account or any Protected Party Funds on deposit therein, and the M&I hereby further waives any such right or lien which it may have against any Protected Party Funds held in the Deposit Account.

MIPB000328

DRAFT

6.    Limited Liability of Bank.

    (a)    To induce M&I to enter into this Agreement, establish the Deposit Account and perform services through the Deposit Account provided for or contemplated by this Agreement, Petters agrees that:

        (i)    M&I shall have no liability to Petters or any Protected Party for any loss or damage that any of them may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement, the Deposit Account or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of M&I. Under no circumstances will M&I be liable for indirect, special or consequential damages, or to any third party as a result of any actions taken or omitted by M&I in accordance with this Agreement;

        (ii)    M&I shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, telex, teletype or telecopier message, order or other documentary, or teletransmission received by M&I from Petters and reasonably believed by M&I to be genuine and correct and to have been signed, sent or made by an authorized person, and without making any inquiry whatsoever as to Petters right or authority to give such order or direction contained therein or as to the application of any payment made pursuant thereto; and

        (iii)    M&I may consult with legal counsel and other experts selected by it with respect to claims against it with respect to the Deposit Account. M&I shall not be liable for any act or omission taken or suffered by M&I as a result of M&I's good faith reliance on such counsel or experts.

    (b)    Petters agrees to indemnify M&I, its directors, officers, agents and employees, and hold each of them harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of M&I, and from and against any damage, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred as a result of, arising out of or otherwise related to any transaction conducted or service provided by M&I through the use of the Deposit Account pursuant to the procedures provided for or contemplated by this Agreement.

7.    Termination. Upon 120 days notice to the Protected Parties, this Agreement may be terminated by Petters, and at the end of the 120 day notice period, Petters is entitled to close the Deposit Account after transfer of all funds of the Protected Party to its separate account. Upon receipt of the notice by Petters of termination of the account, M&I shall

4

DRAFT

provide written notice of receipt of the Petters notice to the Protected Party at the address most recently provided by said party to M&I.  This Agreement may be terminated by M&I at any time on not less than 120 days prior written notice delivered to each Protected Party.  During the 120 days prior to termination, M&I will continue to manage the Deposit Account in accordance with the provisions of this Agreement.  Upon termination of this Agreement, M&I will deliver all moneys on deposit in the Deposit Account to Petters.

8.    Irrevocable Agreement.  Petters acknowledges that except as provide in Sections 1(e) and 8, the agreements made by it and the authorizations granted by it in Sections 2 and 3 hereof are irrevocable, and that authorizations granted in Sections 2 and 3 hereof are powers coupled with an interest.

9.    Notices.  Any notices, consents, directions, demands, or other communications given under this Agreement (unless otherwise specified herein) shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to, the respective addresses or telecopy numbers (or such other address or telecopy number as may hereafter be furnished to the other party or parties by like notice), as the case may be, set forth below:

> Petters:    Petters Company, Inc.
>             4400 Baker Road
>             Attention:  Thomas Petters & Deanna Munson
>             Minnetonka, MN 55343-8684
>             Telephone No.: (952) 975-2295
>             Telecopier No.: (952) 975-4073
>
> Bank:       M&I Bank
>             _____
>             _____
>             Attention: _____
>             Telephone No.: _____
>             Telecopier No.: _____

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Section.  Each notice, request or other communication shall be in writing and shall be deemed to be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 10.  Notices requiring a response within less than 48 hours shall be given by facsimile transmission.

10.   Legal Holidays.  In any case where the date on which a notice is required to be sent to any person pursuant to the terms of this Agreement shall not be a business day in the

5

MIPB000330

DRAFT

State of Minnesota, then (notwithstanding any other provision of this Agreement) the time period for response shall begin at 9:00 a.m. on the first business day following the legal holiday.

11. Severability Clause. Any part, provision, representation, or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12. Assignment; Additional Parties. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither Petters nor M&I shall be entitled to assign or delegate any of its rights or duties hereunder.

13. Counterparts. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, and by the different parties on separate counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

14. Governing Law; Jurisdiction; Waiver of Jury Trial.

    (a)    Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws (without giving effect to the conflicts of laws provisions) of the State of Minnesota.

    (b)    Jurisdiction. Each of the parties hereto hereby irrevocably submits to the nonexclusive jurisdiction of any Minnesota state or federal courts sitting in Minneapolis or St. Paul, Minnesota, in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state court or in such federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing of copies of such process to the applicable party at its addresses specified in Section 10. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by

6

DRAFT

law.

    (c)    <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRAIL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

15.    <u>Amendments</u>. This Agreement may be amended from time to time by written instrument signed by Petters and M&I after 120 days written notice of the Amendment to each Protected Party. No waiver of any of the terms hereof shall be effective unless it is in writing and signed by the party against which such waiver is being asserted.

16.    <u>No Waiver</u>. No failure on the part of the Protected Parties, Petters or M&I to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

17.    <u>Integration</u>. This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

18.    <u>Agreement Effectiveness</u>. This Agreement shall become effective upon delivery of fully executed counterparts hereof to each of the parties hereto.

19.    <u>Headings Descriptive; Construction</u>. The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement. All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

20.    <u>Judicial Interpretation</u>. Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

*[Signature Page Follows]*

MIPB000332

DRAFT

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

M&I BANK


By: _____
Its: _____


PETTERS COMPANY, INC.


By: _____
Its: _____

8

MIPB000333

| From: | Christopher Flynn |
|---|---|
| Sent: | Monday, February 18, 2008 10:09 AM |
| To: | chowse@howselaw.com |
| Subject: | Petters Company Agreement |

Craig,

I have asked Kevin Busch at the firm of Moss & Barnett to review the agreement you drafted for the proposed account for Petters with M&I. I did receive some preliminary feedback from Kevin regarding concerns with the agreement as written.

I will be visiting in detail with Kevin today and will supply full and detailed feedback to you and Deanna Coleman on any and all issues the bank may have with the agreement as drafted.

We approach this request in the spirit of trying to help accomodate our customer and your client along with the other protected parties with the assurances you need to feel comfortable with the working of the purchase order financing in which they are engaged. We just want to make sure the agreement provides the proper level of durability so it can be properly managed by our organization in a way which represents a fair arrangement for all.

While I will be responding in more detail shortly, please do not hesitate to contact me directly should you like to discuss further.

Thank you.

Christopher Flynn
Senior Vice President
M&I Marshall & Ilsley Bank
Phone:612-798-3223



M:I
EXHIBIT NO. 9
9·21·10
R. L. KLANDERUD

EXHIBIT
G

MIPB000335

**From:**   Christopher.Flynn@micorp.com
**Sent:**   Tue, 19 Feb 2008 18:07:55 GMT
**To:**     Coleman, Deanna; chowse@howselaw.com
**Subject:** Bank response to Deposit Control Agreement

---

I had the chance to visit with Kevin Busch at Moss & Barnett regarding the "Deposit Account Control Agreement" drafted by Craig.

Per Kevin's advice I believe this arrangement as proposed would be difficult for the bank to execute for the following primary reasons:

1.   While we have good limited liability language protecting the bank from any liability from Petters, the Protected Parties are not a party to the agreement and could seek recourse from the bank if the directions supplied to the bank by Petters were somehow in dispute. Essentially, the bank is potentially put in the middle of some future dispute. We appear to take on some potential liability for which we are not compensated.
2.   It is unclear what value the bank provides in this arrangement to the Protected Parties – we are asked to perform the work of administering account transfers but we are only transferring in accordance with the direct instructions of Petters. Why can't Petters do this directly? It is not materially different from the perspective of the Protected Parties.

As an alternative, can we setup a Trust Account similar to Lawyers Trust Accounts or Real Estate Trust Accounts? This allows for the segregation of Protected Parties funds from Petters operating funds. Additionally, it prevents the bank from being put in the middle of a potential dispute between our valued customer and the Protected Parties.

Christopher Flynn
Senior Vice President
M&I Marshall & Ilsley Bank
Phone:612-798-3223



## DEPOSIT ACCOUNT MANAGEMENT AGREEMENT

This Deposit Account Management Agreement, dated as of February 25, 2008, is by and between M&I Marshall & Ilsley Bank, a Wisconsin banking corporation (M&I), and Petters Company, Inc., a Minnesota corporation (Petters).

WHEREAS, each of several financial entities hereinafter designated as third party beneficiaries (the Protected Parties) provides financing to Petters or an affiliate company of Petters with respect to transactions comprising the sale and purchase of consumer merchandise (Transaction); and

WHEREAS, each of the Protected Parties has some form of securitization structure for its financing, including for some Protected Parties "lock box" arrangements; and

WHEREAS, from time to time Petters will receive payments with respect to Transactions into its bank account at M&I which should have been paid to a "lock box" of a Protected Party or directly to a Protected Party; and

WHEREAS, Petters desires to provide legal assurance to the Protected Parties that deposits into the Petters bank account which should have been paid into a Protected Parties lock box or directly to a Protected Party are held for the benefit of the Protected Party and will be immediately transferred to the Protected Party's lockbox or to a separate account at M&I owned by the Protected Party;

NOW, THEREFORE, the parties hereto recite and agree as follows:

1. Deposit Account

    (a)   Designation and Rights.

        Petters hereby designates its bank account at M&I bearing account number 1959018 as the Deposit Account referred to herein which is subject to the terms and conditions of this Agreement.

        Moneys deposited into the Deposit Account shall be received by M&I as wire transfers or collected funds, shall be held for the benefit of Petters and the Protected Parties as hereinafter defined, and shall be distributed as herein provided. Petters acknowledges that all moneys deposited into the Deposit Account which are the proceeds of purchase orders and/or invoices financed by a Protected Party (Protected Party Funds) which are intended for payment into a "lock box" or other securitized structure for the benefit of a Protected Party do not constitute funds of Petters and are held for the benefit of and shall be paid to the Protected Party. Further, Petters declares Protected Party Funds are held in trust for the Protected Party to whom the funds are required to be paid.



M:I

EXHIBIT NO. 11

9·21·10

R. L. KLANDERUD

1

(b)     Protected Parties

As used in this Agreement the terms Protected Party means and refers to any and all of the following: PBFP Holdings, LLC, a Delaware limited liability company, Palm Beach Capital Corp., a Delaware corporation and Palm Beach Finance Partners, LP, a Delaware limited partnership, each sharing the following address, which address shall be used for notice purposes pursuant to Section 10 herein:

3601 P.G.A. Boulevard, Suite 301
Palm Beach Gardens, FL 33410
Telephone: (561) 624-0594
Telecopier: (561) 626-7564

Each Protected Party is a third party beneficiary of this agreement with respect to any moneys held in trust for it in the Deposit Account.

(c)     Deposits into Account.

Certain deposits will be made into the Deposit Account by and for the benefit of Petters. Such deposits are not held in trust for the Protected Parties and no Protected Party shall make any claim upon the moneys in the account held exclusively for Petters or for the benefit of another Protected Party.

(d)     Control of Deposit Account.

The Deposit Account shall be under the sole dominion and control of M&I as custodian of the Account for the benefit of Petters and the Protected Parties as the rights of each are established herein. M&I shall manage and control this Account in accordance with the guidelines and procedures established by this Agreement.

(e)     Termination of Deposit Account.

With 120 days notice to each Protected Party, Petters shall have the right to close the Deposit Account at any time no moneys are held in the Deposit Account in trust for any Protected Party.

2.    Procedures for Deposit Account. M&I shall follow the following procedures with respect to all moneys deposited or credited to the Deposit Account:

(a)     M&I shall deposit in the Deposit Account all moneys collected or received with respect to Transactions and all other receipts from time to time tendered by or on behalf of or to Petters for deposit therein, including without limitation all wire transfers and other payments directed to the

2

Deposit Account.

(b)    Petters shall provide to each Protected Party and M&I at least once each week (or more often if necessary to enable M&I to discharge its obligations hereunder), a list of all Transactions funded by a Protected Party with respect to which payment may be received by M&I for deposit in the Deposit Account (Transaction List). This Transaction List shall include the name of the purchaser or obligor, the purchaser's payor bank and the banking coordinates, the purchase order date and number, the invoice date and number, the payment due date, and the Protected Party which has financed the Transaction and the amount financed by the Protected Party.

(c)    M&I shall compare each payment received by wire transfer or otherwise to the most recently received Transaction List provided to it by Petters and shall automatically transfer each payment on a Transaction funded by a Protected Party to an M&I account established by and for the benefit of each Protected Party as required herein. M&I shall advise Petters and each Protected Party promptly of each payment and the Transaction described on the Transaction List to which it relates.

(d)    Within one business day, Petters and the Protected Party shall thereafter determine, by mutual agreement, the amount, if any, of any payment transferred to the Protected Party account that is the property of Petters or its affiliate under the terms of those agreements identified on Exhibit A (Petters Amount). Protected Party shall then notify M&I of the Petters Amount which amount shall be returned to the Deposit Account. M&I is not obligated to either Petters or Protected Party in the determination of Petters Amount and M&I will rely solely on the information provided to it by Protected Party under this paragraph.

(e)    Petters shall not make any withdrawals of Protected Party Funds from the Deposit Account by check, electronic means or otherwise, and M&I will not honor any request for payment of Protected Party Funds (as shown on the Transaction List) to Petters. Petters may withdraw or direct the transfer of moneys which do not comprise Protected Party Funds from the Deposit Account at any time.

(f)    Protected Party shall promptly cause any amount transferred to its account to which the Protected Party is not the rightful owner to be returned to the Deposit Account. M&I is not obligated to confirm rightful ownership of any amounts transferred.

3.    <u>Method of Disbursement</u>. Each Protected Party shall establish an account with M&I into which M&I shall transfer moneys on deposit in the Deposit account which are to be released to the Protected Party as provided in Section 2 (c). Each Protected Party shall thereafter establish the protocol for disbursement of the funds from its account.

4.    <u>Fees</u>. All fees for the Deposit Account shall be paid by Petters. In the event that Petters fails to timely make a payment of a fee on the Account, M&I may thereafter exercise its right of set-off against amounts in the Deposit Account available for disbursement to Petters. All fees for the separate account of a Protected Party shall be paid by the Protected Party.

5.    <u>Set Off</u>. The M&I hereby agrees that the M&I will not exercise or claim any right of set-off or banker's lien against the Deposit Account or any Protected Party Funds on deposit therein, and the M&I hereby further waives any such right or lien which it may have against any Protected Party Funds held in the Deposit Account.

6.    <u>Limited Liability of Bank</u>.

    (a)    To induce M&I to enter into this Agreement, establish the Deposit Account and perform services through the Deposit Account provided for or contemplated by this Agreement, Petters agrees that:

        (i)    M&I shall have no liability to Petters or any Protected Party for any loss or damage that any of them may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement, the Deposit Account or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of M&I. Under no circumstances will M&I be liable for indirect, special or consequential damages, or to any third party as a result of any actions taken or omitted by M&I in accordance with this Agreement;

        (ii)    M&I shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, telex, teletype or telecopier message, order or other documentary, or teletransmission received by M&I from Petters and reasonably believed by M&I to be genuine and correct and to have been signed, sent or made by an authorized person, and without making any inquiry whatsoever as to Petters' right or authority to give such order or direction contained therein or as to the application of any payment made pursuant thereto; and

        (iii)    M&I may consult with legal counsel and other experts selected by it with respect to claims against it with respect to the Deposit Account. M&I shall not be liable for any act or omission taken or suffered by M&I as a result of M&I's good faith reliance on such counsel or experts.

    (b)    Petters agrees to indemnify M&I, its directors, officers, agents and employees, and hold each of them harmless from and against any and all

4

claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of M&I, and from and against any damage, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred as a result of, arising out of or otherwise related to any transaction conducted or service provided by M&I through the use of the Deposit Account pursuant to the procedures provided for or contemplated by this Agreement.

7.    Termination.  Upon 120 days notice to the Protected Parties, this Agreement may be terminated by Petters, and at the end of the 120 day notice period, Petters is entitled to close the Deposit Account after transfer of all funds of the Protected Party to its separate account.  Upon receipt of the notice by Petters of termination of the account, M&I shall provide written notice of receipt of the Petters notice to the Protected Party at the address most recently provided by said party to M&I.  This Agreement may be terminated by M&I at any time on not less than 120 days prior written notice delivered to each Protected Party.  During the 120 days prior to termination, M&I will continue to manage the Deposit Account in accordance with the provisions of this Agreement.  Upon termination of this Agreement, M&I will deliver all moneys on deposit in the Deposit Account to Petters.

8.    Irrevocable Agreement.  Petters acknowledges that except as provide in Sections 1(e) and 7, the agreements made by it and the authorizations granted by it in Sections 2 and 3 hereof are irrevocable, and that authorizations granted in Sections 2 and 3 hereof are powers coupled with an interest.

9.    Dispute Resolution.  The parties agree that in the event of a dispute arising out of or related to the deposit of funds to M&I pursuant to this Agreement, M&I will act according to the direction of Petters after giving Protected Parties ten days written notice during which Protected Parties may seek a court order.  Petters agrees that M&I may deposit the disputed funds with the court pending final resolution of any dispute.

10.    Notices.  Any notices, consents, directions, demands, or other communications given under this Agreement (unless otherwise specified herein) shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to, the respective addresses or telecopy numbers (or such other address or telecopy number as may hereafter be furnished to the other party or parties by like notice), as the case may be, set forth below:

Petters:        Petters Company, Inc.
                4400 Baker Road
                Attention:  Thomas Petters & Deanna Munson
                Minnetonka, MN 55343-8684
                Telephone No.: (952) 975-2295
                Telecopier No.: (952) 975-4073

Bank:           M&I Marshall & Ilsley Bank

5

Attention: Christopher Flynn
6625 Lyndale Avenue S.
Richfield, MN 55423
Telephone No.: (612) 798-3223
Telecopier No.: (612) 798-3146

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Section. Each notice, request or other communication shall be in writing and shall be deemed to be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 10. Notices requiring a response within less than 48 hours shall be given by facsimile transmission.

11.   Legal Holidays. In any case where the date on which a notice is required to be sent to any person pursuant to the terms of this Agreement shall not be a business day in the State of Minnesota, then (notwithstanding any other provision of this Agreement) the time period for response shall begin at 9:00 a.m. on the first business day following the legal holiday.

12.   Severability Clause. Any part, provision, representation, or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

13.   Assignment; Additional Parties. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither Petters nor M&I shall be entitled to assign or delegate any of its rights or duties hereunder.

14.   Counterparts. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, and by the different parties on separate counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

15.   Governing Law; Jurisdiction; Waiver of Jury Trial.

      (a)   Governing Law. This Agreement shall be governed by, and construed in

6

accordance with, the internal laws (without giving effect to the conflicts of laws provisions) of the State of Minnesota.

(b)   Jurisdiction.  Each of the parties hereto hereby irrevocably submits to the nonexclusive jurisdiction of any Minnesota state or federal courts sitting in Minneapolis or St. Paul, Minnesota, in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state court or in such federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing of copies of such process to the applicable party at its addresses specified in Section 10.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRAIL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

16.   Amendments.  This Agreement may be amended from time to time by written instrument signed by Petters and M&I after 120 days written notice of the Amendment to each Protected Party.  No waiver of any of the terms hereof shall be effective unless it is in writing and signed by the party against which such waiver is being asserted.

17.   No Waiver.  No failure on the part of the Protected Parties, Petters or M&I to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

18.   Integration.  This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

19.   Agreement Effectiveness.  This Agreement shall become effective upon delivery of fully executed counterparts hereof to each of the parties hereto.

20. <u>Headings Descriptive; Construction</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement.  All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

21. <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Management Agreement as of the day and year first above set forth.

M&I MARSHALL & ILSLEY BANK

By: _____
Its: Sr Vice President

By: _____
Its: Vice President

PETTERS COMPANY, INC.

By: _____
Its: _____

8

20.  <u>Headings Descriptive; Construction</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement.  All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

21.  <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Management Agreement as of the day and year first above set forth.

M&I MARSHALL & ILSLEY BANK

By: _____
    Its: _____

By: _____
    Its: _____

PETTERS COMPANY, INC.

By: _____
    Its: _____

8

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement, dated as of May ___, 2008 is by and among M&I Marshall & Ilsley Bank, a Wisconsin banking corporation ("M&I"), Petters Company, Inc., a Minnesota corporation ("PCI"), and Ritchie Capital Management, Ltd. (the "Protected Party").

WHEREAS, the Protected Party serves as the Administrative Agent under a Note Purchase Agreement dated as of March 21, 2008 (the "Note Purchase Agreement") pursuant to which the purchasers of notes issued thereunder (the "Purchasers") have provided financing to PCI for the purchase and sale of certain consumer merchandise subject thereto (the "Transaction"); and

WHEREAS, from time to time payments will be received with respect to the Transaction that are to be deposited into the Deposit Account (as defined herein) and subsequently paid to the Protected Party in accordance with the terms of the Note Purchase Agreement and the notes issued under the Note Purchase Agreement (the "Notes").

NOW, THEREFORE, the parties hereby recite and agree as follows:

1.    Deposit Account

    (a)    Designation and Rights.

PCI hereby designates its bank account at M&I bearing account number 457 99358 as the "Deposit Account" referred to herein which is subject to the terms and conditions of this Agreement.

Monies deposited into the Deposit Account shall be received by M&I as wire transfers or collected funds, shall be held for the benefit of PCI and the Protected Party, and shall be distributed only as herein provided.

PCI agrees and acknowledges that the only monies that shall be contained in and deposited into the Deposit Account shall be the revenue directly or indirectly realized by PCI or any affiliate thereof from the sale of the merchandise subject to (i) the purchase order no. 104639 issued by uBid, Inc. to PCI and (ii) the purchase order no. 49237 dated March 19, 2008 issued by PCI to Nationwide Int'l Resources (collectively, the "Protected Party Funds"), and that the Protected Party Funds do not constitute funds of PCI and are held for the benefit of and shall be paid to the Protected Party until such time as the Protected Party has received, for the benefit of the holders of each of the Notes, payment of all amounts owed to the holders of the Notes under the Notes (the "Protected Party Amount"). Further, PCI declares that the Protected Party Funds are held in trust for the Protected Party until such time as the Protected Party Amount has been paid in full.





- 2 -

(b)   Deposit Into Deposit Account.

Deposits made into the Deposit Account in excess of the Protected Party Amount ("PCI Funds") are not held in trust for the Protected Party and the Protected Party shall not make any claim upon the monies in the Deposit Account in excess of the Protected Party Amount. If the Protected Party receives any PCI Funds, within one business day thereafter, it shall pay the PCI Funds to PCI.

(c)   Control of Deposit Account.

Until such time as the Protected Party notifies M&I that the Protected Party Amount has been paid in full, PCI authorizes and directs M&I to comply, and M&I will comply, with (a) all instructions directing disposition of the funds in the Deposit Account, (b) all notifications and entitlement orders that M&I receives directing it to transfer monies in the Deposit Account, and (c) all other directions concerning the Deposit Account (any such instruction, notification, entitlement order or direction referred to in clause (a), (b) or (c) above being an **"Account Direction"**), in each case of clauses (a), (b) and (c) above originated by the Protected Party without further consent by either PCI or any other Person.

(d)   Termination of Deposit Account.

After payment of the Protected Party Amount to the Protected Party, PCI shall have the right to close the Deposit Account. The Protected Party agrees to give M&I Bank notice within two days after the Protected Party has received payment in full of the Protected Party Amount.

2.   Procedures for Deposit Account. M&I shall follow the following procedures with respect to all monies deposited or credited to the Deposit Account.

(a)   M&I shall deposit in the Deposit Account all monies tendered by or on behalf of or to PCI for deposit therein, including without limitation all wire transfers and other payments directed to the Deposit Account.

(b)   M&I shall advise PCI and the Protected Party promptly of each payment received in the Deposit Account.

(c)   Within one business day after M&I has advised PCI and the Protected Party of a cleared and collected payment received in the Deposit Account, M&I shall transfer such payment to the Protected Party, to an account or accounts specified by the Protected Party, until such time as the Protected Party has notified M&I that the Protected Party has received payment in full of the Protected Party Amount. The determination of when the Protected Party Amount has been paid in full shall be in the sole good faith discretion of the Protected Party, with reference to the terms of the Note Purchase Agreement and the Notes.

**STRY_M&I_000003**

- 3 -

    (d)    The Protected Party shall promptly cause any amount transferred to its account to which the Protected Party is not the rightful owner to be paid to PCI. M&I is not obligated to confirm rightful ownership of any amounts transferred.

3.    Security Interest. PCI hereby irrevocably grants a first priority perfected security interest in and lien on, and pledges, assigns and sets over to the Protected Party, all of PCI's right, title and interest in the Deposit Account, the funds now or hereafter placed or deposited in the Deposit Account, and any and all proceeds of the foregoing, in order to secure the obligations of PCI or its affiliates arising under or pursuant to the Note Purchase Agreement and the Notes issued under the Note Purchase Agreement (collectively, the "Secured Obligations"). M&I hereby acknowledges the Protected Party's security interest and lien as set forth above. PCI shall take all actions necessary or desirable at the request of the Protected Party on its part to insure the continuance of a first priority perfected security interest in the Deposit Account and the funds contained therein in favor of the Protected Party in order to secure all the Secured Obligations.

4.    Fees. All fees for the Deposit Account shall be paid by PCI. In the event that PCI fails to timely make a payment of a fee on the Deposit Account, following payment in full of all Protected Party Amounts, M&I may thereafter exercise its right of set-off against amounts in the Deposit Account available for disbursement to PCI.

5.    Set Off. M&I hereby agrees that M&I will not exercise or claim any right of set-off or banker's lien against the Deposit Account or the Protected Party Funds on deposit therein, and M&I hereby further waives any right or lien which it may have against the Protected Party Funds held in the Deposit Account.

6.    Limited Liability of Bank.

    (a)    To induce M&I to enter into this Agreement, establish the Deposit Account and perform services through the Deposit Account provided for or contemplated by this Agreement, PCI and the Protected Party agree that:

        (i)    M&I shall have no liability to PCI or the Protected Party for any loss or damage that any of them may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement, the Deposit Account or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of M&I. Under no circumstances will M&I be liable for indirect, special or consequential damages, or to any third party as a result of any actions taken or omitted by M&I in accordance with this Agreement.

        (ii)    M&I shall be entitled to rely, and shall be fully protected in relying upon any note, writing, resolution, notice, statement, telex, teletype

STRY_M&I_000004

- 4 -

or telecopier message, order or other documentary, or teletransmission received by M&I from PCI or the Protected Party reasonably believed by M&I to be genuine and correct and to have been signed, sent or made by an authorized person, and without making any inquiry whatsoever as to PCI's or the Protected Party's right or authority to give such order or direction contained therein or as to the application of any payment made pursuant thereto; and

(iii)    M&I may consult with legal counsel and other experts selected by it with respect to claims against it with respect to the Deposit Account. M&I shall not be liable for any act or omission taken or suffered by M&I as a result of M&I's good faith reliance on such counsel or experts.

(b)    PCI agrees to indemnify M&I, its directors, officers, agents and employees, and hold each of them harmless from and against any and all claims other than those ultimately determined to be founded on gross negligence or willful misconduct of M&I, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred as a result of, arising out of or otherwise related to any transaction conducted or service provided by M&I through the use of the Deposit Account pursuant to the procedures provided for or contemplated by this Agreement.

7.    Termination.  This Agreement may be terminated by the Protected Party at any time upon receipt by M&I of the Protected Party's written notice of termination. This Agreement may be terminated by PCI only with the express prior written consent of the Protected Party and, in that case, the Protected Party and PCI shall jointly notify M&I of such termination. Notwithstanding the foregoing, this Agreement shall be terminated with the closing of the Deposit Account in accordance with the terms hereof. This Agreement may be terminated by M&I at any time on not less than 120 days prior written notice delivered to PCI and the Protected Party.  During the 120 days prior to such termination, M&I will continue to manage the Deposit Account in accordance with the provisions of this Agreement.  In addition, during such 120 day period, PCI and the Protected Party shall mutually agree to a bank to take the place of M&I.  Upon termination of this Agreement, M&I will deliver all moneys on deposit in the Deposit Account to the new bank mutually named by PCI and the Protected Party.

8.    Dispute Resolution.  In the event that PCI and the Protected Party dispute who is entitled to any funds in the Deposit Account, they agree that M&I may deposit the disputed funds with the court pending final resolution of any dispute.

9.    Notices.  Any notices, consents, directions, demands, or other communications given under this Agreement (unless otherwise specified herein) shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to, the respective addresses or telecopy

- 5 -

numbers (or such other address or telecopy number as may hereafter be furnished to the other party or parties by like notice), as the case may be, set forth below.

PCI:    Petters Company, Inc.
        4400 Baker Road
        Minnetonka, MN 55343
        Attention: Deanna Coleman
        Telephone No.: _____
        Telecopier No.: _____

Protected
Party:   Ritchie Capital Management, Ltd.
         801 Warrenville Road, Suite 650,
         Lisle, Illinois 60532
         Attention: President
         Telephone: (630) 786-4000
         Fax: (630) 810-5240

Bank:    M&I Marshall & Ilsley Bank
         6625 Lyndale Avenue South
         ATTN: Christopher Flynn
         Richfield, MN 55423
         Telephone No.: 612-798-3223
         Telecopier No.: 612-798-3146

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Section. Each notice, request or other communication shall be in writing and shall be deemed to be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 8. Notices requiring a response within less than 48 hours shall be given by facsimile transmission.

10.   Legal Holidays. In any case where the date on which a notice is required to be sent to any person pursuant to the terms of this Agreement shall not be a business day in the State of Minnesota, then (notwithstanding any other provision of this Agreement) the time period for response shall begin at 9:00 a.m. on the first business day following the legal holiday.

11.   Severability Clause. Any part, provision, representation, or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be

STRY_M&I_000006

- 6 -

ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12. Assignment; Additional Parties. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither PCI nor M&I shall be entitled to assign or delegate any of its rights or duties hereunder.

13. Counterparts. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, and by the different parties on separate counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

14. Governing Law: Waiver of Jury Trial.

    (a)    Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws (without giving effect to the conflicts of laws provisions) of the State of Minnesota.

    (b)    Jurisdiction. Each of the parties hereto hereby irrevocably submits to the nonexclusive jurisdiction of any Minnesota state or federal courts sitting in Minneapolis or St. Paul, Minnesota, in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state court or in such federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing of copies of such process to the applicable party at its address specified in Section 10. Each of the parties hereto agrees that a final judgment in any such action or proceedings shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

    (c)    WAIVER OF JURY TRIAL. EACH OF THE PARITES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

STRY_M&I_000007

- 7 -

15. <u>Amendments</u>.  This Agreement may be amended from time to time by written instrument signed by the parties hereto.  No waiver of any of the terms hereof shall be effective unless it is in writing and signed by the party against which such waiver is being asserted.

16. <u>No Waiver</u>.  No failure on the part of the Protected Party, PCI or M&I to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

17. <u>Integration</u>.  This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

18. <u>Agreement Effectiveness</u>.  This Agreement shall become effective upon delivery of fully executed counterparts hereof to each of the parties hereto.

19. <u>Headings Descriptive: Construction</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement.  All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

20. <u>Judicial Interpretation</u>.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

STRY_M&I_000008

- 8 -

IN WITNESS WHEREOF, each of the parties have executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

M&I MARSHALL & ILSLEY BANK

By _____
Its _Sr. Vice President_____

PETTERS COMPANY, INC.

By _____
Its _____

RITCHIE CAPITAL MANAGEMENT, LTD.

By _____
Its _Director_____

STRY_M&I_000009

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "Agreement"), dated as of May 29, 2008 is by and among M&I Marshall & Ilsley Bank, a Wisconsin banking corporation ("M&I"), Petters Company, Inc., a Minnesota corporation ("PCI"), and Interlachen Harriet Investments Limited (the "Protected Party").

WHEREAS, the Protected Party serves as the Administrative Agent under a Note Purchase Agreement dated as of April 18, 2008 (the "Note Purchase Agreement") pursuant to which the purchasers of notes issued thereunder (the "Purchasers") have provided financing to PCI (the "Transaction") for the purchase of certain consumer merchandise described in Section 1.3 of the Note Purchase Agreement (the "Merchandise"); and

WHEREAS, Section 1.4 of the Note Purchase Agreement obligates PCI to establish a bank account for the sole purpose of receiving proceeds from the sale of any Merchandise and to enter into a deposit account control agreement with respect to such account; and

WHEREAS, PCI has granted to the Administrative Agent a security interest in the Deposit Account (as defined herein) and all assets therein and proceeds thereof pursuant to a Security Agreement dated April 18, 2008 (the "Security Agreement") between PCI and the Administrative Agent; and

WHEREAS, all proceeds associated with the sale, transfer or other disposition of any Merchandise will be deposited into the Deposit Account and subsequently paid to the Protected Party in accordance with the terms of this Agreement, the Note Purchase Agreement and the notes issued under the Note Purchase Agreement (the "Notes").

NOW, THEREFORE, the parties hereby recite and agree as follows:

1.   Deposit Account

   (a)   Designation and Rights.

   PCI hereby designates its bank account at M&I bearing account number _____ as the "Deposit Account" referred to herein which is subject to the terms and conditions of this Agreement. M&I confirms that the Deposit Account has been established at M&I in the name of PCI and that the Deposit Account is a "deposit account" as defined in Section 9-102(a)(29) of the Uniform Commercial Code of the applicable jurisdiction. M&I will not change the name or account number of the Deposit Account without the prior written consent of the Protected Party.

   Monies deposited into the Deposit Account shall be received by M&I as wire transfers or collected funds, shall be held for the benefit of PCI and the Protected Party, and shall be distributed only as herein provided.



M:I
EXHIBIT NO. 18
9·21·10
R. L. KLANDERUD

EXHIBIT
K
tebbles

MI2013444

PCI agrees and acknowledges that the only monies that shall be contained in and deposited into the Deposit Account shall be the proceeds or other revenue directly or indirectly realized by PCI or any affiliate thereof from the sale of the Merchandise (collectively, the "Protected Party Funds"), and that all such proceeds and other revenue shall be deposited into the Deposit Account.  PCI also agrees and acknowledges that the Protected Party Funds do not constitute funds of PCI and are held for the benefit of and shall be paid to the Protected Party until such time as the Protected Party has received, for the benefit of the holders of each of the Notes, payment of all amounts owed to the holders of the Notes under the Notes and otherwise performs all other Secured Obligations (as defined below) (the "Protected Party Amount").  Further, PCI declares that the Protected Party Funds are held in trust for the Protected Party until such time as the Protected Party Amount has been paid in full.

(b)     Deposit Into Deposit Account.

Deposits made into the Deposit Account in excess of the Protected Party Amount ("PCI Funds") are not held in trust for the Protected Party and the Protected Party shall not make any claim upon the monies in the Deposit Account in excess of the Protected Party Amount.  If the Protected Party receives any PCI Funds, the Protected Party shall pay the PCI Funds to PCI within one business day after becoming aware that the Protected Party has received such PCI Funds.

(c)     Control of Deposit Account.

Until such time as the Protected Party notifies M&I that the Protected Party Amount has been paid in full, (i) PCI authorizes and directs M&I to comply, and M&I will comply, with (a) all instructions directing disposition of the funds in the Deposit Account, (b) all notifications and entitlement orders that M&I receives directing it to transfer monies in the Deposit Account, and (c) all other directions concerning the Deposit Account (any such instruction, notification, entitlement order or direction referred to in clause (a), (b) or (c) above being an "Account Direction"), in each case of clauses (a), (b) and (c) above originated by the Protected Party without further consent by either PCI or any other person or entity, and (ii) PCI will not give any Account Direction to M&I, and M&I will not comply with any Account Direction originated from PCI or any other person or entity (other than the Protected Party pursuant to clause (i) above).

(d)     No Adverse Claims.

M&I has not entered into, and until the Protected Party has notified M&I that the Protected Party Amount has been paid in full will not enter into, any agreement with any person or entity (other than the Protected Party) relating to the Deposit Account, including without limitation any

12853v4

MI2013445

agreement to comply with any instruction of such person or entity. Except for the claims and interests of the Protected Party and PCI described herein, M&I does not know of any claim to or interest in the Deposit Account. If any person or entity asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, attachment, execution or similar process) against the Deposit Account or any amount deposited therein, M&I will promptly notify the Protected Party and PCI thereof in writing.

(c)   Closing of Deposit Account.

After the Protected Party notifies M&I that the Protected Party Amount has been paid in full, PCI shall have the right to close the Deposit Account. The Protected Party agrees to give M&I Bank notice within two business days after the Protected Party has received payment in full of the Protected Party Amount.

2.   Procedures for Deposit Account.  M&I shall follow the following procedures with respect to all monies deposited or credited to the Deposit Account.

(a)   M&I shall deposit in the Deposit Account all monies tendered by or on behalf of or to PCI for deposit therein, including without limitation all wire transfers and other payments directed to the Deposit Account.

(b)   M&I shall advise PCI and the Protected Party promptly of each payment received in the Deposit Account.

(c)   Within one business day after M&I has advised PCI and the Protected Party of a cleared and collected payment received in the Deposit Account, M&I shall transfer such payment to the Protected Party, to an account or accounts specified by the Protected Party, until such time as the Protected Party has notified M&I that the Protected Party has received payment in full of the Protected Party Amount. The determination of when the Protected Party Amount has been paid in full shall be in the sole good faith discretion of the Protected Party, with reference to the terms of the Note Purchase Agreement and the Notes.

(d)   The Protected Party shall cause any amount transferred to its account to which the Protected Party is not the rightful owner to be paid to PCI promptly upon the Protected Party's becoming aware that it has received such amount.  M&I is not obligated to confirm rightful ownership of any amounts transferred.

3.   Security Interest.  PCI hereby confirms its irrevocably grant of a first priority perfected security interest in and lien on, and pledge, assignment and set over to the Protected Party, all of PCI's right, title and interest in the Deposit Account, the funds now or hereafter placed or deposited in or credited to the Deposit Account, and any and all proceeds of the foregoing, in order to secure the obligations of

12853v4

MI2013446

PCI or its affiliates arising under or pursuant to the Note Purchase Agreement, the Notes issued under the Note Purchase Agreement and the Security Agreement (collectively, the "Secured Obligations"). M&I hereby acknowledges the Protected Party's security interest and lien as set forth above. PCI shall take all actions necessary or desirable at the request of the Protected Party on its part to insure the continuance of a first priority perfected security interest in the Deposit Account and the funds contained therein in favor of the Protected Party in order to secure all the Secured Obligations. The rights and powers granted herein to the Protected Party have been granted in order to perfect the security interest in the Deposit Account granted to the Protected Party under the Security Agreement, are powers coupled with an interest and will not be affected by any bankruptcy of PCI or any lapse of time.

4.   Fees. All fees for the Deposit Account shall be paid by PCI. In the event that PCI fails to timely make a payment of a fee on the Deposit Account, M&I may exercise its right of set-off against amounts in the Deposit Account available for disbursement to PCI, but only after the Protected Party notifies M&I that the Protected Party Amount has been paid in full.

5.   Set Off. M&I hereby agrees that M&I will not exercise or claim any right of set-off or banker's lien against the Deposit Account or the Protected Party Funds on deposit therein, and M&I hereby further waives any right or lien which it may have against the Protected Party Funds held in the Deposit Account.

6.   Limited Liability of Bank.

(a)   To induce M&I to enter into this Agreement, establish the Deposit Account and perform services through the Deposit Account provided for or contemplated by this Agreement, PCI and the Protected Party agree that:

(i)   M&I shall have no liability to PCI or the Protected Party for any loss or damage that any of them may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement, the Deposit Account or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of M&I. Under no circumstances will M&I be liable for indirect, special or consequential damages, or to any third party as a result of any actions taken or omitted by M&I in accordance with this Agreement.

(ii)   M&I shall be entitled to rely, and shall be fully protected in relying upon any note, writing, resolution, notice, statement, telex, teletype or telecopier message, order or other documentary, or teletransmission received by M&I from PCI or the Protected Party reasonably believed by M&I to be genuine and correct and to have been signed, sent or made by an authorized person, and without making any inquiry whatsoever as to PCI's or the Protected Party's

12853v4

MI2013447

right or authority to give such order or direction contained therein or as to the application of any payment made pursuant thereto; and

(iii)   M&I may consult with legal counsel and other experts selected by it with respect to claims against it with respect to the Deposit Account. M&I shall not be liable for any act or omission taken or suffered by M&I as a result of M&I's good faith reliance on such counsel or experts.

(b)   PCI agrees to indemnify M&I, its directors, officers, agents and employees, and hold each of them harmless from and against any and all claims other than those ultimately determined to be founded on gross negligence or willful misconduct of M&I, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred as a result of, arising out of or otherwise related to any transaction conducted or service provided by M&I through the use of the Deposit Account pursuant to the procedures provided for or contemplated by this Agreement.

7.   Termination. This Agreement may be terminated by the Protected Party at any time upon receipt by M&I of the Protected Party's written notice of termination. This Agreement may be terminated by PCI only with the express prior written consent of the Protected Party and, in that case, the Protected Party and PCI shall jointly notify M&I of such termination. Notwithstanding the foregoing, this Agreement shall be terminated with the closing of the Deposit Account in accordance with Section 1(e) hereof. This Agreement may be terminated by M&I at any time on not less than 120 days prior written notice delivered to PCI and the Protected Party. During the 120 days prior to such termination, M&I will continue to manage the Deposit Account in accordance with the provisions of this Agreement. In addition, during such 120 day period, PCI and the Protected Party shall mutually agree to a bank to take the place of M&I and will enter into a deposit account control agreement satisfactory to the Protected Party with such bank. Upon termination of this Agreement, M&I will deliver all moneys on deposit in the Deposit Account to the new bank mutually named by PCI and the Protected Party.

8.   Dispute Resolution. In the event that PCI and the Protected Party dispute who is entitled to any funds in the Deposit Account, they agree that M&I may deposit the disputed funds with the court pending final resolution of any dispute.

9.   Notices. Any notices, consents, directions, demands, or other communications given under this Agreement (unless otherwise specified herein) shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to, the respective addresses or telecopy numbers (or such other address or telecopy number as may hereafter be furnished to the other party or parties by like notice), as the case may be, set forth below.

12853v4

MI2013448

PCI:  Petters Company, Inc.
    4400 Baker Road
    Minnetonka, MN 55343
    Attention: Deanna Coleman
    Telephone No.: _____
    Telecopier No.: _____

Protected
Party:  Interlachen Harriet Investments Limited
    c/o Interlachen Capital Group LP
    800 Nicollet Mall, Suite 2500
    Minneapolis, MN  55402
    Attention:  Gregg T. Colburn AND Legal Department
    Telephone:  (612) 659-4407 or (612) 659-4450
    Telecopier:  (612) 659-4457 AND (612) 659-4401

Bank:  M&I Marshall & Ilsley Bank
    6625 Lyndale Avenue South
    ATTN:  Christopher Flynn
    Richfield, MN 55423
    Telephone No.:  612-798-3223
    Telecopier No.:  612-798-3146

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Section. Each notice, request or other communication shall be in writing and shall be deemed to be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, 24 hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Section 9. Notices requiring a response within less than 48 hours shall be given by facsimile transmission.

10. Legal Holidays. In any case where the date on which a notice is required to be sent to any person pursuant to the terms of this Agreement shall not be a business day in the State of Minnesota, then (notwithstanding any other provision of this Agreement) the time period for response shall begin at 9:00 a.m. on the first business day following the legal holiday.

11. Severability Clause. Any part, provision, representation, or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation, or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without

12853v4

MI2013449

invalidating the remaining provisions hereof. To the extent permitted by applicable law, the parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12.   Assignment; Additional Parties. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither PCI nor M&I shall be entitled to assign or delegate any of its rights or duties hereunder. The Protected Party shall be free to assign its rights and delegate its duties under this Agreement to any successor "Administrative Agent" under the Note Purchase Agreement.

13.   Counterparts. For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, and by the different parties on separate counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

14.   Governing Law; Waiver of Jury Trial.

    (a)   Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws (without giving effect to the conflicts of laws provisions) of the State of Minnesota.

    (b)   Jurisdiction. Each of the parties hereto hereby irrevocably submits to the nonexclusive jurisdiction of any Minnesota state or federal courts sitting in Minneapolis or St. Paul, Minnesota, in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota state court or in such federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing of copies of such process to the applicable party at its address specified in Section 9. Each of the parties hereto agrees that a final judgment in any such action or proceedings shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

    (c)   WAIVER OF JURY TRIAL. EACH OF THE PARITES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

15.   Amendments. This Agreement may be amended from time to time by written instrument signed by the parties hereto. No waiver of any of the terms hereof

12853v4

MI2013450

shall be effective unless it is in writing and signed by the party against which such waiver is being asserted.

16. <u>No Waiver</u>. No failure on the part of the Protected Party, PCI or M&I to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

17. <u>Integration</u>. This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

18. <u>Agreement Effectiveness</u>. This Agreement shall become effective upon delivery of fully executed counterparts hereof to each of the parties hereto.

19. <u>Headings Descriptive:   Construction</u>.   The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement. Unless otherwise specifically provided, references in this Agreement to Articles, Sections, and Exhibits are to Articles, Sections, Annexes, and Exhibits of or to this Agreement.   All Exhibits hereto are incorporated herein by the references thereto in this Agreement.

20. <u>Judicial Interpretation</u>. Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

12853v4

IN WITNESS WHEREOF, each of the parties have executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

M&I MARSHALL & ILSLEY BANK

By_____
Its  Sr Vice Presdt

PETTERS COMPANY, INC.

By_____
Its  Thomas J Petters, CEO

INTERLACHEN   HARRIET   INVESTMENTS LIMITED

By:  Interlachen Capital Group LP, an authorized signatory

By_____
Its  Authorized Signatory

12853v4

MI2013452

IN WITNESS WHEREOF, each of the parties have executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

M&I MARSHALL & ILSLEY BANK

By _____

Its _Sr Vice Presdt_

PETTERS COMPANY, INC.

By _____

Its _Thomas J. Petters, CEO_

INTERLACHEN   HARRIET   INVESTMENTS LIMITED

By:   Interlachen Capital Group LP, an authorized signatory

By _____

Its _Authorized Signatory_

12853v4

**MI2013452**