# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the Trustee of the BMO Litigation Trust, | Case No.: 0:19-cv-01756-WMW |
| | Hon. Wilhelmina M. Wright |
| Plaintiff, | |
| vs. | **Plaintiff Douglas A. Kelley's Trial Brief** |
| BMO Harris Bank N.A., as successor to M&I Marshall and Ilsley Bank, | |
| Defendant. | |

In accordance with the Court's Trial Notice and Final Pretrial Order of June 6, 2022, Plaintiff Douglas A. Kelley, in his capacity as the Trustee of BMO Litigation Trust, hereby files the following Trial Brief to address the topics listed in Paragraph 6 (B) of that Order.

### A.    Trial Counsel

1.    Michael A. Collyard
      Robins Kaplan LLP
      800 LaSalle Avenue, Suite 2800
      Minneapolis, MN 55402-2015
      612.349.8500
      Email: mcollyard@robinskaplan.com

2.    Joseph W. Anthony
      Anthony, Ostlund, Louwangie, Dressen & Boylan P.A.
      90 South 7th Street, Suite 3600
      Minneapolis, MN 55402
      612.492.8200
      Email: janthony@anthonyostlund.com

3.    David E. Marder
      Robins Kaplan LLP
      800 Boylston Street, 25th Floor
      Boston, MA 02199
      617.267.2300
      Email: dmarder@robinskaplan.com

4.    Peter C. Ihrig
      Robins Kaplan LLP
      800 LaSalle Avenue, Suite 2800
      Minneapolis, MN 55402-2015
      612.349.8500
      Email: pihrig@robinskaplan.com

5.      Morgia D. Holmes
        Robins Kaplan LLP
        800 Boylston Street, 25th Floor
        Boston, MA 02199
        617.267.2300
        Email: mholmes@robinskaplan.com

6.      Joseph R. Richie
        Anthony, Ostlund, Louwangie, Dressen & Boylan P.A.
        90 South 7th Street, Suite 3600
        Minneapolis, MN 55402
        612.492.8200
        Email: jrichie@anthonyostlund.com

7.      Ryan M. Lawrence
        Anthony, Ostlund, Louwangie, Dressen & Boylan P.A.
        90 South 7th Street, Suite 3600
        Minneapolis, MN 55402
        612.492.8200
        Email: rlawrence@anthonyostlund.com

**B.      Length of Trial**

This case can be fully tried within 2 ½ weeks.

**C.      Jurisdiction**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and

1334. Jurisdiction also exists under 28 U.S.C. § 1332.

**D.      Facts**

From 2002-2008, M&I Marshall and Ilsley Bank ("M&I") provided Tom

Petters of Petters Company, Inc. ("PCI") with the small business checking

account (the "PCI Account") that he used—with M&I's assistance—to perpetuate

a multi-billion dollar Ponzi scheme. In July 2011, BMO Harris Bank N.A. purchased M&I and assumed its liability (the banks are collectively referred to hereinafter as "BMO").

The key issue at trial will be BMO's state of mind at the time of the scheme. Plaintiff will establish that BMO knew or was willfully blind to Petters' fraud and breaches of fiduciary duty, and acted in bad faith in connection with transfers of funds out of the PCI Account. Plaintiff will not attempt to catalog *all* its evidence here (in order to respect the Court's instruction that this factual summary be brief). Rather, Plaintiff will summarize some of the key evidence to be introduced at trial concerning BMO's mental state.

First, Plaintiff will submit evidence showing that Edward Jambor, the BMO employee who managed PCI's account from 2002 to 2007, was at least willfully blind to Petters' fraudulent conduct. Mr. Jambor had a front-row seat to Petters' fraudulent conduct, including Petters' representations to PCI's investors and information showing that the representations were false. Mr. Jambor will admit that he knew that PCI's purported business model was to purchase electronics from wholesalers and sell them to big box retailers, who would wire payments into the PCI Account. Documentary evidence and testimony will establish that Mr. Jambor accessed and examined the account activity and saw that *no* such retailers had ever wired money into the PCI account. He also saw

that Petters and company officers Deanna Coleman and Robert White were sending substantial payments to themselves directly from the account, even though it was not a payroll account.

The evidence will also include certain communications that BMO had with PCI and its investors concerning proposed Deposit Account Control Agreements ("DACA") while Jambor was managing the PCI relationship. These proposed agreements were red flags of fraud because they were highly out of the ordinary in the banking industry and completely unworkable. Based upon the draft agreements and communications with investors during this time period, there is little doubt that BMO, including Jambor, knew that PCI's investors had been misled into believing that big box retailers were paying substantial amounts into the PCI account. Nonetheless, Mr. Jambor *never* disclosed to investors that retailers were not doing so.

Of course, Mr. Jambor was not the only employee of BMO with the requisite knowledge and/or willful blindness. Much of the evidence at trial will focus on BMO's Anti Money Laundering ("AML") department, which was responsible for ensuring that the bank's accounts were not being used for illegal activity. The AML department operated a system known as "SearchSpace," which was a computer software system implemented by BMO in March 2005 to identify potentially suspicious activity. Documents from the system show that

4

the PCI Account triggered a suspicious activity alert nearly *every month* from that date to July 2008. Under the SearchSpace scoring system, many of these monthly alerts on the PCI Account scored more than *three times* the threshold level to trigger the alert. In response to these alerts, BMO's policies required AML analysts to investigate and analyze all of the transfers into and out of the triggered account to understand the activity and explain how the activity was legitimate and not suspicious. To do this, BMO's AML analysts needed to understand the nature of PCI's business and how the PCI Account activity comported with the business. Part of that requirement involved investigating who was paying money into PCI's account, to whom outgoing transfers were being made and the legitimate reasons for all of this activity. According to their testimony, BMO's AML analysts fully complied with BMO's policies and conducted all of the required investigations. Yet the analysts closed every single alert and took no follow-up action, even though they knew PCI's purported business model and saw none of the incoming payments were from big box retailers but were instead substantially all (75-80% of the value of incoming wires – literally billions and billions of dollars) from the two entities from which PCI was supposed to be buying the products. PCI should have been making payments *to* these entities (in exchange for the purchased goods), not receiving billions of dollars from them. In fact, these two entities were sham companies,

instruments of the fraud created and operated by two of Tom Petters' co-conspirators.

The bank's policies also required AML analysts, before closing an alert, to explain, in writing, exactly *why* the activity in the account was legitimate and not suspicious. The policies required that the written explanation be sufficient to convince the reader – this is *any* reader, whether it be a supervisor, a regulator or a juror in this case – that the activity was legitimate and not suspicious. Incredibly, even after reading their *own* written explanations, AML analysts who handled the alerts testified in their depositions that they could not explain why the activity for the incoming and outgoing wires was legitimate and not suspicious or how they concluded there was no suspicious activity for any alert. It is obvious that they simply closed their eyes to the fraud.

Plaintiff will also offer evidence of the knowledge of Christopher Flynn, the BMO employee who took over management of the BMO account from Mr. Jambor when he departed BMO in 2007. Like Mr. Jambor, Mr. Flynn knew the nature of PCI's purported business model. Also like Mr. Jambor, Mr. Flynn will admit that, contrary to that model, he was unaware of a single big-box retailer every wiring money into the PCI account.

Also probative is Mr. Flynn's conduct associated with an additional round of atypical DACAs in 2008 with PCI and its investors. Unlike the prior attempts,

these agreements were consummated. As before, BMO, including Mr. Flynn, knew that investors were falsely told that retailers were wiring funds into the account, and never did anything to correct this falsehood.

BMO's conduct with regard to these agreements shocks the conscience. The DACA relating to investor Palm Beach, for example, required BMO to manage and control the PCI Account. It contemplated that retailer payments would be protected by a "lockbox" arrangement. Under this arrangement, Petters was to provide BMO with a transaction list at least weekly, which was to show all the details of incoming payments from big-box retailers (which, again, now five years after the bank's first consideration of DACAs, still did not exist). BMO was to compare the incoming payments with the transaction list and match up the transactions with the incoming retailer payments. The purpose of this arrangement was to ensure that there would be no withdrawals of the proceeds of transactions funded by Palm Beach other than to repay Palm Beach.

Mr. Flynn knew that Tom Petters would *never* let PCI act on this agreement and that the agreement itself was a sham – an instrument to further mislead PCI investors that big-box retailers were paying substantial amounts into PCI's account. Yet Mr. Flynn took part. He signed the agreement (and others like it in the coming months), knowing that it wasn't a "real" agreement because Tom Petters would never require BMO to live by its terms. BMO took no action to set

7

up any resources required to take on the tasks it was to perform under the
agreements. The jury will hear Flynn freely admit that BMO never received any
transaction lists from PCI and that no "lockbox" arrangement was set up. BMO
was content to create the impression of management and control, and then
simply let the fraud continue.

BMO also knew these agreements didn't make sense and were atypical
and only entered into these agreements to accommodate its "top client," PCI.
Indeed, Mr. Flynn admitted during his deposition that he was trying to
accommodate PCI and that it would be "very unusual" for the bank to agree to
monitor deposits in this manner. These atypical banking practices are highly
indicative of fraud.

In addition to the compelling evidence outlined above, the Plaintiff will be
aided at trial by an adverse inference that the jury is entitled to draw as a result
of BMO's spoliation of documents. As the Court knows from prior filings, BMO
intentionally destroyed more than a *billion* pages of emails and documents. It did
so in violation of Judge Montgomery's Order requiring BMO to preserve and not
destroy any Petters business documents. Then, during the prosecution of this
lawsuit in 2014, BMO (the current defendant and *not* M&I) intentionally
destroyed *millions* of more pages of emails and documents. From 2017-2019, in
filings and proceedings in open court, BMO *lied* to Plaintiff and to Chief

Bankruptcy Judge Sanberg about its destruction to hide the truth about what it had done.

As a result of BMO's intentional destruction, Chief Judge Sanberg ordered that Plaintiff is granted an adverse inference at trial that BMO intentionally destroyed documents it *knew* were harmful to BMO.[1] In the Order, Judge Sanberg specifically found that BMO "lied, by omission or commission, to the Court and Plaintiff, even after being sanctioned" for "willful discovery abuses."[2] This Court affirmed Judge Sanberg's order in every respect, finding that that BMO "acted methodically and that its conduct was carefully calculated."[3]

The only other significant issue to be decided at trial is the issue of damages. The damages calculated by Plaintiff's damages expert comprise the amount that Petters and his associates fraudulently paid from the PCI Account that became unavailable for repayment of creditors—i.e. the net cash losses of PCI's creditors when the fraud collapsed in September 2008. This damages model comports exactly with the governing Orders, which provide that the

---

[1] Order Granting Plaintiff's Motion For Rule 37 Sanctions for Defendant's Spoliation of Evidence at 2, 40-44 (July 1, 2019) (Dkt. 15-18) ("Sanctions Order"). Judge Sanberg also ordered that BMO should be prohibited from objecting to the introduction of any pre-March 2005 emails and documents produced by third parties. *Id.* at 43.

[2] Sanctions Order, Dkt 15-18 at 4.

[3] Order, Dkt 125 at 21.

Plaintiff is entitled to collect for the amount that Petters and his associates fraudulently paid from the PCI Account that became unavailable for repayment of creditors. That amount is $1.926 billion.

  E.  **Claims or Defenses**

  Plaintiff asserts four claims that are all based on similar facts and evidence:

  *Count I - Minnesota Uniform Fiduciaries Act (Minn. Stat. § 520.08):* BMO acted in bad faith and in violation of MUFA when it processed transactions on the PCI Account at the direction of PCI's fiduciaries, harming PCI.

  *Count II – Breach of Fiduciary Duty:* BMO owed a fiduciary duty to PCI to hold the money in the PCI Account for PCI's benefit. BMO breached its duty by allowing Petters to use that money to commit fraud.

  *Count III – Aiding and Abetting Fraud:* BMO aided and abetted Petters' fraud because it knew Petters was conducting fraud through the PCI Account and substantially assisted him in doing so.

  *Count IV – Aiding and Abetting Breach of Fiduciary Duty*: BMO aided and abetted Petters in breaching fiduciary duties to PCI which harmed PCI. BMO knew Petters' fraudulent conduct constituted a breach of fiduciary duty to PCI and substantially assisted or encouraged Petters to commit the breach.

## F.     Unresolved Issues

*Unresolved substantive or procedural issues:*

Plaintiff believes there are none, with the exception of a motion filed by BMO to bifurcate punitive damages. All issues have been properly addressed by this Court and the Bankruptcy Court and Chief Judge Sanberg certified the case as trial ready when the Bankruptcy Court transferred it to this Court on July 2, 2019.

*Unresolved evidentiary issues:*

Experts: Plaintiff contends that the Court should preclude all or most of the proposed testimony of BMO's two experts, Charles Grice and Karl Jarek. Motions to preclude were filed on July 1, 2022 and are currently pending before the Court.

Motions in Limine: Plaintiff files four motions in limine concurrently with this brief. These motions seek to exclude evidence of: 1) complicity of PCI's investors in the Petters Ponzi scheme; 2) certain government examinations and investigations of PCI; and 3) alleged recoveries, offsets, and reductions. Plaintiff also files a fourth motion asking that the Court admit certain evidence concerning criminal convictions and issue certain related instructions.

Respectfully submitted,

Dated: September 22, 2022                By: */s/ Michael A. Collyard*
                                             Michael A. Collyard (#302569)
                                             David E. Marder (*admitted pro hac vice*)
                                             Peter C. Ihrig (#0390392)
                                             Morgia D. Holmes (*admitted pro hac vice*)
                                             ROBINS KAPLAN LLP
                                             800 LaSalle Avenue, Suite 2800
                                             Minneapolis, MN 55402–2015
                                             Telephone: 612.349.8500
                                             Facsimile: 612.339.4181
                                             mcollyard@robinskaplan.com
                                             dmarder@robinskaplan.com
                                             pihrig@robinskaplan.com
                                             mholmes@robinskaplan.com

                                             Joseph W. Anthony (#2872)
                                             Joseph R. Richie (#400615)
                                             Ryan M. Lawrence (#399135)
                                             ANTHONY OSTLUND LOUWAGIE
                                             DRESSEN BOYLAN P.A.
                                             90 South 7th Street, Suite 3600
                                             Minneapolis, MN 55402
                                             Telephone: 612.349.6969
                                             Facsimile: 612.349.6996
                                             janthony@anthonyostlund.com
                                             jrichie@anthonyostlund.com
                                             rlawrence@anthonyostlund.com

                                             ***Counsel for Plaintiff***