UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Douglas A. Kelley, *in his capacity as the Trustee of the BMO Litigation Trust,*

Plaintiff,

v.

BMO Harris Bank N.A., *as successor to M&I Marshall and Ilsley Bank,*

Defendant.

Case No. 19-cv-1756 (WMW)

**ORDER**

---

In this bankruptcy matter, Plaintiff Douglas A. Kelley, in his capacity as the Trustee of the BMO Litigation Trust (hereinafter, Kelley or the Trustee), and Defendant BMO Harris Bank N.A. (BMO Harris) cross-move to exclude expert testimony. (Dkts. 110, 118, 119.)  The parties also cross-move for clarification as to the scope of, and how the jury will be presented with, the adverse inference spoliation sanction that the Court previously imposed against BMO Harris.  (Dkts. 138, 149.)  And BMO Harris moves to bifurcate the punitive damages portion of trial from the liability and compensatory damages portion of trial.  (Dkt. 154.)  For the reasons addressed below, the parties' motions to exclude expert testimony and motions for clarification are granted in part and denied in part, and BMO Harris's motion to bifurcate is denied.

**BACKGROUND**

This bankruptcy matter arises from a Ponzi scheme orchestrated by Thomas J. Petters and his associates between 1994 and 2008.  Petters was the owner,

director and CEO of Petters Company, Inc. (PCI).  Throughout the Ponzi scheme, PCI obtained billions of dollars from investors through fraud, false pretenses and misrepresentations about PCI's purported business.  Billions of dollars were wired into and out of PCI's depository account at National City Bank, which M&I Marshall and Ilsley Bank (M&I) acquired in July 2001.  BMO Harris is the successor to M&I, and the claims at issue in this bankruptcy matter pertain to M&I's handling of PCI's account.

In the underlying fraud action, the district court appointed Kelley as the equity receiver for PCI in 2008.  *See United States v. Petters*, No. 08-SC-5348 (ADM/JSM), 2008 WL 4614996, at *3 (D. Minn. Oct. 6, 2008).  The district court also enjoined third-party financial and banking institutions—including BMO Harris, as successor to M&I— from disposing of any material "business, corporate, foundation, banking, financial, and/or accounting records in their possession" that pertain to Petters, PCI and other affiliated entities.  *Id.*

Kelley filed for Chapter 11 bankruptcy relief on behalf of PCI and the bankruptcy court appointed Kelley as the Chapter 11 Trustee.  *In re Petters Co.*, 401 B.R. 391, 415 (D. Minn. Bankr. 2009).  The bankruptcy court confirmed PCI's Second Amended Plan of Chapter 11 Liquidation, which transferred certain assets, including the causes of action at issue here, to the BMO Litigation Trust.  The Trustee subsequently commenced this adversary proceeding alleging that BMO Harris was complicit in the Ponzi scheme through its dealings with Petters, PCI and PCI's account.  The Trustee alleges that BMO Harris failed to respond to irregularities as required by banking regulations that, together

with other acts and omissions, legitimized and facilitated the Ponzi scheme. Four of the Trustee's claims remain unresolved: Count I alleges that BMO Harris violated the Minnesota Uniform Fiduciaries Act, Count II alleges that BMO Harris breached its fiduciary duties to PCI, Count III alleges that BMO Harris aided and abetted fraud against PCI and Count IV alleges that BMO Harris aided and abetted the breach of fiduciary duties owed to PCI.

During fact discovery, which ended in 2018, several disputes arose with respect to BMO Harris's preservation and production of email backup tapes. In particular, these disputes pertained to the Trustee's attempts to obtain M&I email records from before March 2005, when M&I implemented a new email archive system.[1]

In a July 1, 2019 Order, the bankruptcy court granted the Trustee's motion for spoliation sanctions against BMO Harris. The bankruptcy court found that, at least as early as January 2010, BMO Harris had a duty to preserve email backup tapes as evidence. The bankruptcy court also found that BMO Harris did not take reasonable steps to preserve the email backup tapes and, to the contrary, BMO Harris intentionally destroyed email backup tapes that contained electronically stored information from before March 2005 that cannot be restored or replaced. As a result, the bankruptcy court found, the Trustee has been prejudiced because the destroyed evidence likely contained relevant information that cannot be obtained from an alternative source. Relying on the

---

[1]   This Court's July 18, 2022 Order includes a detailed summary of this issue.

circumstantial evidence in the record, the bankruptcy court also found that BMO Harris acted in bad faith with the intent to deprive the Trustee of the use of this evidence.

Based on these findings, the bankruptcy court concluded that sanctions against BMO Harris are warranted under Rules 37(e)(1) and 37(e)(2) of the Federal Rules of Civil Procedure.  Specifically, the bankruptcy court granted the Trustee's request for three remedial sanctions: (1) requiring an adverse inference instruction at trial advising the jury that BMO Harris intentionally destroyed evidence that it knew was harmful to its case, (2) permitting the Trustee to present evidence to the jury about BMO Harris's destruction of evidence, and (3) prohibiting BMO Harris from objecting to the introduction of any pre-March 2005 emails or documents produced from third parties. BMO Harris appealed, and this Court affirmed the bankruptcy court's Spoliation Order.

The parties now cross-move to exclude the opinions and testimony of each party's respective banking and damages experts.  The parties also cross-move for clarification as to the scope of the adverse inference spoliation sanction and how that issue will be presented to the jury at trial, including whether the sanction involves a rebuttable presumption.  In addition, BMO Harris moves to bifurcate the punitive damages portion of the trial from the liability and compensatory damages portion of the trial.

## ANALYSIS

### I.    Cross-Motions for Clarification as to Adverse Inference Sanction

BMO Harris moves for clarification as to the scope of, and how the jury will be presented with, the adverse inference spoliation sanction that the Court previously

imposed against BMO Harris.  Specifically, BMO Harris seeks clarification as to whether the adverse inference sanction functions as a rebuttable presumption, whether BMO Harris will be permitted to elicit rebuttal evidence as to the spoliation issue and whether the Trustee will be permitted to elicit evidence pertaining to the conduct or credibility of BMO Harris's counsel.  The Trustee argues that the adverse inference sanction is *not* rebuttable and proposes a preliminary adverse inference jury instruction that would require the jury to accept as true certain facts underlying the adverse inference sanction. And the Trustee contends that, if such an instruction is given, there will be no need for either party to present evidence as to the spoliation issue.

Under Rule 37, Fed. R. Civ. P., federal courts have the authority to impose sanctions, including an adverse inference instruction, if a party fails to take reasonable steps to preserve electronically stored information that should have been preserved during or in anticipation of litigation and the information cannot be restored or replaced through additional discovery.  Fed. R. Civ. P. 37(e); *see also* Fed. R. Bankr. P. 7037 (providing that Rule 37, Fed. R. Civ. P., "applies in adversary proceedings" in bankruptcy court). Federal courts also have inherent authority to impose sanctions against a party when that party destroys evidence that it knew or should have known is relevant to imminent litigation and, in doing so, prejudices the opposing party.  *See Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993).  The nature of the sanction imposed is within a district court's discretion.  *Id.*

Before imposing certain types of sanctions, such as an adverse inference instruction requiring or permitting the jury to presume that the lost information was unfavorable to the sanctioned party, a court must find that the sanctioned party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *accord Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746–47 (8th Cir. 2004). In a July 18, 2022 Order, this Court affirmed the bankruptcy court's finding that BMO Harris destroyed evidence with the intent to deprive the Trustee of that evidence.

After a district court has made the requisite finding of intent under Rule 37(e)(2), determining the particular type of adverse inference instruction to give as a spoliation sanction is within a district court's discretion. *See Davis v. White*, 858 F.3d 1155, 1160 (8th Cir. 2017). A court may adjust the severity of an adverse inference instruction either by instructing the jury that certain specific facts must be accepted as true or by imposing a general, but rebuttable, presumption that the spoliated evidence would have been harmful to the sanctioned party or favorable to the innocent party. *See Evenson v. Johnson Bros. Liquor Co.*, No. 18-cv-3188 (JRT/LIB), 2020 WL 12948541, at *14 (D. Minn. Nov. 12, 2020). Here, the bankruptcy court granted the Trustee's request for three remedial sanctions: (1) requiring an adverse inference instruction at trial advising the jury that BMO Harris intentionally destroyed evidence that it knew was harmful, (2) permitting the Trustee to present evidence to the jury about BMO Harris's destruction of evidence and (3) prohibiting BMO Harris from objecting to the introduction of any pre-March 2005 emails or documents produced from third parties. This Court affirmed

the bankruptcy court's findings and imposition of sanctions but did not specifically address the scope of the sanctions or the type of adverse inference instruction that should be given to the jury.

"An adverse inference instruction is a powerful tool in a jury trial" because it involves "a federal judge brand[ing] one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900 (8th Cir. 2004). An adverse inference instruction "necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of" destroyed evidence. *Id.* at 900–01. As such, courts should exercise caution when giving an adverse inference instruction because such an instruction encourages the jury speculate about the nature of the contents of missing evidence. *See id.* at 901 (citing *Felice v. Long Island R.R. Co.*, 426 F.2d 192, 195 n.2 (2d Cir. 1970)).

Here, the Court previously determined that an adverse inference instruction is warranted because BMO Harris acted in bad faith with the intent to deprive the Trustee of the use of certain evidence in this case. Nonetheless, even when a court makes the requisite finding of bad-faith intent, the United States Court of Appeals for the Eighth Circuit has provided guidance as the appropriate severity of an adverse inference sanction. *See Stevenson*, 354 F.3d at 750. Typically, a permissive adverse inference "is subject to reasonable rebuttal." *Id.* "[U]nfair prejudice should be avoided by permitting the [sanctioned party] to put on some evidence" that might demonstrate "an innocent

explanation for its conduct." *Id.* This rule holds true even if the district court has already found that the sanctioned party acted in bad faith. *Id.* Here, although the bankruptcy court did not address whether the adverse inference sanction it imposed would be rebuttable, the bankruptcy court ruled that the Trustee should be permitted to present evidence to the jury about BMO Harris's destruction of evidence. This ruling implies that the jury should be allowed to evaluate the facts and circumstances pertaining to the spoliation issue. Absent an opportunity for a sanctioned party to present rebuttal evidence, "the jury is deprived of sufficient information on which to base a rational decision of whether to apply the adverse inference, and an otherwise permissive inference easily becomes an irrebuttable presumption." *Id.*

To be sure, the Eighth Circuit has sustained the use of harsher sanctions "precluding evidence completely or settling a disputed matter of fact (thus permitting no rebuttal)." *Id.* at 750–51 (collecting cases). But a sanction of such severity typically is reserved for circumstances when "the offending party had destroyed the one piece of crucial physical evidence in the case." *Id.* at 750. Here, the Court has not found—and the record does not reflect—that BMO Harris destroyed any particular document of crucial evidentiary value. Instead, the Court found that the high volume of destroyed evidence *likely* contained relevant information that cannot be obtained from an alternative source. As the Court also found, it is impossible to determine the precise quantity or quality of relevant evidence that BMO Harris destroyed, let alone whether any of the destroyed documents included a unique piece of crucial evidence in this case, because

BMO Harris destroyed the email backup tapes without assessing their contents. For these reasons, the appropriate sanction in these circumstances is a permissive adverse inference instruction subject to reasonable rebuttal.[2]

The parties dispute the scope of the evidence that may be offered as to the spoliation issue. The Trustee asserts that "[n]othing in the Bankruptcy Court's Spoliation Order or this Court's Affirmance limits the nature of the evidence Plaintiff can offer about BMO's destruction" of the email backup tapes. But although the parties will be permitted to offer evidence pertaining to the spoliation issue, the parties are mistaken if they believe that the presentation of such evidence will unlimited. A "district court need not permit a complete retrial of the sanctions hearing during trial," and rebuttal evidence must be "reasonable." *Id.* Moreover, any such evidence is subject to the limitations imposed by the Federal Rules of Evidence, including the Court's authority to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. For example, the conduct and credibility of BMO Harris's counsel was relevant to the Court's prior determination that BMO Harris acted with bad-faith intent to deprive the Trustee of evidence. However, such evidence has less probative value as to the primary issue that

---

[2]     The Trustee suggests that a mandatory, non-rebuttable presumption is necessary because the Court previously found that BMO Harris destroyed evidence with the bad-faith intent to deprive the Trustee of that evidence. But such a finding is a prerequisite to giving *any* adverse inference instruction. *See id.* at 746. After making such a finding, the Court retains the discretion to use a permissive rebuttable adverse inference instruction. *See id.* at 750; *see also* Fed. R. Civ. P. 37(e)(2)(B).

the jury must decide when considering whether to draw an adverse inference—namely, whether BMO Harris's employees likely destroyed crucial evidence that would have been favorable to the Trustee or harmful to BMO Harris.  And the probative value of this evidence is outweighed by several risks, including unfair prejudice, confusing the issues, misleading the jury and wasting time.  As such, the Trustee will not be permitted to call BMO Harris's counsel as witnesses, and the Court may impose additional limitations on the presentation of evidence pertaining to the spoliation issues as necessary.

Finally, the parties dispute whether the adverse inference instruction should be included in preliminary jury instructions.  The Eighth Circuit has recognized that unduly emphasizing an adverse inference at the outset of trial may cause unfair prejudice, "especially [when] there is no finding that the evidence destroyed was crucial to the case." *Id.*  As such, the Court will not provide an adverse inference instruction to the jury until after the evidentiary phase of trial has concluded, and the Court will conform the language of the instruction to be consistent with the evidence presented to the jury and any evidentiary rulings the Court issues during trial.

Accordingly, the Court grants in part and denies in part BMO Harris's motion seeking clarification as to the adverse inference sanction.  And the Court denies the Trustee's cross-motion seeking a preliminary, mandatory, non-rebuttable adverse inference jury instruction.  The Court will provide the jury with a permissive adverse inference instruction, subject to rebuttal evidence and argument, at the conclusion of the trial.  The Court will permit both parties to elicit evidence pertaining to the spoliation

issue, but both parties' spoliation evidence will be subject to reasonable limitations as addressed herein.[3]

## II.     Cross-Motions to Exclude Expert Testimony

The Trustee moves to exclude the opinions and testimony of BMO Harris's banking expert, Charles Grice, and BMO Harris's damages expert, Karl Jarek.   BMO Harris moves to exclude the opinions and testimony of the Trustee's banking expert, Catherine Ghiglieri, and the Trustee's damages expert, Theodore Martens.

The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[3]     To avoid wasting time, *see* Fed. R. Evid. 403, the Court encourages the parties to present any undisputed facts pertaining to the spoliation issue—including but not limited to the fact that a certain number of Minnesota email backup tapes were destroyed on or about certain dates—in the form of a stipulation that can be provided to the jury.

Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion.  *Id.* (internal quotation marks omitted).  Determinations as to the admissibility of expert testimony are within a district court's discretion.  *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  When making this reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance.  *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94).  These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case.  *Id.*  A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently

connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted).  When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that the proposed testimony is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted).  But ordinary disputes about the factual basis of an expert's testimony typically implicate the credibility—not the admissibility—of the testimony.  *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.  The Court addresses, in turn, each challenged expert witness.

### A.    Charles Grice

The Trustee moves to exclude the opinions and testimony of BMO Harris's banking expert, Charles Grice.  The Trustee argues that Grice's opinions are improper for three reasons: first, because Grice offers speculative opinions about the knowledge and state of mind of others; second, because some of Grice's opinions lack a sufficient factual

basis; and third, because some of Grice's opinions undermine the adverse inference spoliation sanction imposed against BMO Harris.

### 1.      State-of-Mind Opinions

The Trustee first argues that Grice should be precluded from offering his opinion about the knowledge or state of mind of M&I, its employees or other individuals. According to Grice's expert report, BMO Harris intends to offer Grice to opine about, among other topics, whether M&I or its employees had knowledge of or were willfully blind to suspicious or fraudulent activity involving PCI and whether M&I or its employees acted improperly to assist PCI in perpetuating fraudulent activity.

Expert testimony is not admissible if it is speculative, *Marmo*, 457 F.3d at 757, and must be reasonably based on the expert's expertise, *see Weitz Co. v. MH Washington*, 631 F.3d 510, 527 (8th Cir. 2011). Expert testimony as to an entity's or individual's intent, motive, or mental state has "no basis in any relevant body of knowledge or expertise." *Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) (internal quotation marks omitted); *accord In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1069 (D. Minn. 2007) (excluding expert opinions about the "motive, intent, knowledge or state of mind" of an entity and its employees). As such, it is improper for an expert to opine about "what individuals . . . *thought* about information found in certain . . . documents or about their *motivations* regarding those documents." *Kruszka*, 28 F. Supp. 2d at 937 (emphasis added). Similarly, an expert may not speculate about what other individuals knew or would have done with certain information. *Baycol*, 532 F.

Supp. 2d at 1069 (observing that inferring motive or intent is "for the jury, not for an expert").

An expert may, however, testify about observable underlying facts that could be relevant to determining the mental state of an individual or entity. *See, e.g.*, *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 930 (D. Minn. 2020) (acknowledging that "fact-based testimony as to what an entity actually did—as opposed to what it was motivated by, thought, or intended— . . . does not cross the line into inadmissible testimony"); *Metro Sales, Inc. v. Core Consulting Grp., LLC*, 275 F. Supp. 3d 1023, 1058 n.13 (D. Minn. 2017) (observing that an expert may testify about underlying conduct that is indicative of a plaintiff's intent if such testimony will "assist the factfinder in evaluating [the plaintiff's] actions"). For instance, a qualified expert may opine as to his or her "interpretation of whether certain information contained in [a defendant's] internal documents indicated certain risks and whether such information would have been useful" to individuals in the same profession. *Kruszka*, 28 F. Supp. 2d at 937 (internal quotation marks omitted). Such testimony might assist a jury "in defining complex or specialized terminology, or drawing inferences that may not be apparent without the benefit [of] experience or specialized knowledge." *Id.* (internal quotation marks omitted). The expert may not, however, usurp the jury's role to draw those inferences. *See Baycol*, 532 F. Supp. 2d at 1069.

In his expert report, Grice analyzes M&I's internal documents and M&I's employees' conduct. In doing so, Grice employs his banking knowledge and expertise to

describe and explain PCI's account activity; the contents of M&I's business documents and the contemporaneous statements and behaviors of M&I's employees; the type of information about PCI that M&I's employees obtained or observed and whether this information is consistent with the contemporaneous statements and behavior of M&I's employees; and the typical information, statements and behaviors that Grice would expect to observe as either consistent or inconsistent with a bank's or bank employee's awareness of fraud.  Grice also explains certain factors that, in his opinion, could be relevant to determining a bank's or bank employee's mental state, including but not limited to the "economics of the banking relationship between PCI and M&I," the expected "substantial drivers of profit for banks," and the risks associated with aiding a Ponzi scheme in light of the applicable ethical and legal requirements.

These aspects of Grice's opinions do not directly speculate about the knowledge or other mental state of M&I or its employees.  For instance, to the extent that Grice addresses whether M&I's employees "*expressed* concerns about fraudulent activity" (emphasis added), his opinions are based on observable behaviors or written statements, not speculation that directly opines about an individual's mental state.  These aspects of Grice's opinions are not improper speculation as to mental state, but instead describe and explain—based on Grice's relevant knowledge and expertise—various observable documents, statements, behaviors and other factors that might be relevant to a jury's

determinations about knowledge or mental state.[4]   Moreover, many of these opinions reflect rebuttal expert testimony, which BMO Harris may use to challenge the Trustee's evidence or theories of liability by casting doubt as to the mental state necessary to prove the Trustee's claims.  *Cf. Marmo*, 457 F.3d at 759 ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." (internal quotation marks omitted)).  As such, these aspects of Grice's opinions are not improper on this basis.

BMO Harris concedes that an expert may not opine directly as to the mental state of an entity or individual.  But BMO Harris argues that Grice does not offer any such opinions.  To the contrary, Grice's expert report also includes several opinions that directly address the mental state of M&I, its employees and others.

Grice opines, for example, that M&I's documents "reflect an understanding that PCI was a legitimate business," and that M&I "would not have actively considered lending money secured by fraudulent loan collateral" if M&I had "been aware that PCI was engaged in a Ponzi scheme."  Grice also opines that he "would expect that M&I may have understood that PCI's purported business involved" legitimate activities and "would not expect M&I to have known exactly how the funds . . . flowed into" the PCI account. These opinions reflect speculation about what M&I and its employees knew or did not know and what M&I and its employees *might* have done or not done had they known

---

[4]   Similarly, Grice does not offer a legal interpretation of contract terms but instead evaluates, based on his industry experience, whether and to what extent those contracts might have impacted M&I's actions and M&I's evaluations of PCI's conduct.

certain information.  Such speculation is improper.  *See, e.g.*, *Baycol*, 532 F. Supp. 2d at 1069 (observing that an expert may not speculate about what other individuals knew or would have done with certain information).  These aspects of Grice's opinions are, therefore, inadmissible.

Grice similarly opines that the FBI, other banks, law firms, auditing firms and other third parties did not detect PCI's fraudulent activities and had a positive opinion of Petters.  Consequently, Grice suggests, M&I and its employees likely were not aware of or involved in PCI's fraudulent activity.[5]  In reaching this conclusion, Grice improperly speculates about the knowledge and mental state of third parties to, in turn, improperly speculate that M&I and its employees likely had the same knowledge or mental states. Such opinions, which involve speculation based on speculation, improperly draw inferences that are for the jury to decide.  *See id.* (observing that it is the role of a jury, not an expert, to draw inferences from the evidence about motive, knowledge, intent or state of mind).  Moreover, the knowledge or mental state of one person or entity has little or no probative value as to the knowledge or mental state of another person or entity.  As such, these aspects of Grice's opinions also are inadmissible.

Accordingly, the Trustee's motion to exclude expert testimony is granted in part and denied in part as to this issue.  Grice may opine about observable documents,

---

[5]     For example, Grice opines that PCI's fraud avoided detection from others because of its complexity, because the funds flowing through PCI's account were intentionally designed to avoid detection and because the Federal Reserve Bank investigated PCI's account and identified no concerns about how M&I handled the account.  These opinions all involve speculation about the knowledge, intent or other mental states of M&I, its employees and third parties.

statements, behaviors and other factors that might be relevant to a jury's determinations about the knowledge or mental state of M&I and its employees. But Grice's expert opinions are excluded to the extent that he speculates or directly opines about the mental state of M&I, its employees or other third parties.

### 2. Factual Basis

The Trustee also argues that several of Grice's opinions must be excluded because they lack an adequate factual basis.

Admissible expert opinions must be "based on sufficient facts or data." Fed. R. Evid. 702(b). Disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. Expert testimony may be excluded, however, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Trustee first challenges Grice's "Hypothetical Legitimate Transaction," which Grice relies on to opine that that M&I's "limited visibility into PCI's activity did not— and could not—provide M&I sufficient knowledge to distinguish PCI's fraudulent operations from a legitimate business." "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. An expert witness also "may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). And an expert may rely on a hypothetical that has a reliable foundation. *See,*

e.g., *Estate of West v. Domina Law Grp., PC LLO*, 981 F.3d 652, 654–55 (8th Cir. 2020) (affirming admissibility of expert testimony that included hypothetical factual scenarios); *Mears v. Olin*, 527 F.2d 1100, 1104 (8th Cir. 1974) (affirming admissibility of expert testimony that included "hypotheticals [that] assumed all material facts necessary for the experts to draw rational conclusions"); *Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 996 (D. Minn. 2013) (concluding that expert testimony based on hypothetical scenario is admissible if the testimony is "not so fundamentally unsupported that it can offer no assistance to the jury" (internal quotation marks omitted)).

Grice's report explains that his hypothetical legitimate transaction is based on an actual transaction, but he "replace[d] a fraudulent portion of the transaction [that was] not visible to M&I . . . with a legitimate transaction" to demonstrate that, from M&I's perspective, the fraudulent transaction might have appeared to be legitimate.  The Trustee does not dispute that Grice's hypothetical is based on an actual transaction that occurred. And it also is undisputed that certain fraudulent details of this transaction may not have been visible to M&I.  Grice's hypothetical merely removes those "invisible" transaction details and replaces them with arguably plausible alternative details based on record evidence of methods that PCI used to conceal fraudulent activities.  On this record, Grice's hypothetical relies on all the material facts necessary to reach a rational conclusion and is not so fundamentally unsupported that it cannot assist a jury.  *See Mears*, 527 F.2d at 1104; *Huggins*, 932 F. Supp. 2d at 996.  The Trustee's challenge to this aspect of Grice's report implicates the credibility—not the admissibility—of Grice's

anticipated testimony.  *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.  As such, excluding this aspect of Grice's opinions on this basis is unwarranted.

The Trustee also contends that Grice improperly opines about how M&I's anti-money laundering group investigated suspicious activity.  According to the Trustee, there is no factual basis to support Grice's opinion that M&I's investigators acted appropriately and reasonably resolved suspicious-activity alerts.  Grice acknowledges the existence of 39 such alerts, explains why he believes M&I's investigators reasonably resolved the first three alerts and opines about why the resolution of these first three alerts would have impacted the investigators' review of subsequent alerts.  In doing so, Grice relied on evidence—including business records and deposition testimony—pertaining to M&I's policies, the training and experience of M&I's investigators, the general practices of M&I's investigators and the handling of particular suspicious-activity alerts.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  Here, the Trustee's disagreement with the factual basis of Grice's opinions about M&I's investigation of suspicious-activity alerts implicates the weight and credibility of Grice's testimony, not its admissibility.  As such, excluding these aspects of Grice's opinions on this basis is unwarranted.

The Trustee also argues that Grice improperly weighed the evidence and made credibility determinations.  An expert may not opine about the weight of the evidence or a witness's credibility.  *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883–84 (8th Cir.

1998).  But "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  Here, Grice watched video deposition testimony "to form a complete understanding" of witnesses' testimony, but he expressly denied that he made credibility determinations when forming his opinions.  The Trustee has not identified any aspect of Grice's expert report that purports to opine, directly or indirectly, about the weight and credibility of witness testimony or other evidence.  As such, excluding these aspects of Grice's opinions on this basis is unwarranted.

In summary, the Trustee's arguments about the factual bases of Grice's opinions implicate weight and credibility of his opinions, not the admissibility of his opinions.  Accordingly, the Trustee's motion to exclude expert testimony on this basis is denied.

### 3.    Adverse Inference Spoliation Sanction

The Trustee next argues that some of Grice's opinions undermine the adverse inference spoliation sanction imposed against BMO Harris.

As addressed above, the Court will provide the jury with a permissive adverse inference instruction, subject to rebuttal evidence and argument, at the conclusion of the trial.  And both parties will be permitted to elicit evidence pertaining to the spoliation issue, subject to reasonable limitations.  In his expert report, which predates the imposition of spoliation sanctions, Grice repeatedly opines that, if M&I and its employees had been aware of or involved in fraudulent activity, such awareness or involvement would be reflected in contemporaneous documents, including M&I's

22

employees' emails.   In doing so, Grice suggests that the absence of incriminating evidence weighs against finding BMO Harris liable.   The Trustee contends that these opinions contradict the adverse inference spoliation sanction because the jury must presume that the absence of incriminating evidence is a consequence of BMO Harris's spoliation of evidence.   However, the Court has concluded that the adverse inference instruction will be both permissive and subject to rebuttal.   The jury will be entitled to evaluate the weight and credibility of the evidence and to determine whether to presume that the evidence BMO Harris destroyed would have been harmful to BMO Harris or favorable to the Trustee.   And the Trustee will be entitled to present some evidence pertaining to spoliation, including cross-examining Grice about his opinions that rely on the absence of evidence.   The Trustee's disagreement with these aspect of Grice's opinions implicates the weight and credibility of Grice's testimony, not its admissibility. As such, excluding these aspects of Grice's opinions on this basis is unwarranted.

Accordingly, the Trustee's motion to exclude expert testimony on this basis is denied.

### B.   Karl Jarek

The Trustee also moves to exclude the opinions and testimony of BMO Harris's damages expert, Karl Jarek.   The Trustee argues that Jarek's opinions are improper for four reasons: first, because Jarek offers speculative opinions about the knowledge and state of mind of others; second, because Jarek's opinions contradict the rulings in this case and established law; third, because Jarek is unqualified to testify about causation and

his causation opinions lack a factual basis; and fourth, because Jarek's opinions undermine the adverse inference spoliation sanction imposed against BMO Harris.

### 1.    State-of-Mind Opinions

The Trustee argues that Jarek offers improper opinions about the knowledge and mental state of M&I and its employees.

As addressed above, an expert may not offer an opinion as to an entity's or individual's knowledge, intent, motive or other mental state. *See Kruszka*, 28 F. Supp. 3d at 931, 937; *Baycol*, 532 F. Supp. 2d at 1069. An expert may, however, testify about observable underlying facts that might be relevant to determining the mental state of an individual or entity. *See ResCap*, 432 F. Supp. 3d at 930; *Metro Sales*, 275 F. Supp. 3d at 1058 n.13; *Kruszka*, 28 F. Supp. 2d at 937. Here, Jarek employs his forensic accounting knowledge and expertise to analyze deposition testimony and other evidence of M&I's relationship with PCI, M&I's employees' conduct and factors that could motivate M&I employees to benefit from participating in fraudulent conduct. In doing so, Jarek does not directly speculate about the knowledge or other mental state of M&I or its employees. These aspects of Jarek's opinions are not improper speculation as to mental state, but instead describe and explain—based on Jarek's knowledge and expertise—various observable documents, statements, behaviors and other factors that might be relevant to a jury's determinations about knowledge or mental state. Moreover, many of these opinions reflect rebuttal expert testimony, which BMO Harris may use to challenge the Trustee's evidence or theories of liability by casting doubt as to the mental state

necessary to prove the Trustee's claims.  *Cf. Marmo*, 457 F.3d at 759 ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." (internal quotation marks omitted)).  As such, these aspects of Jarek's opinions are not improper.

Accordingly, the Trustee's motion to exclude Jarek's opinions and testimony on this basis is denied.

### 2.    Consistency with the Law and Rulings in this Case

The Trustee also argues that several aspects of Jarek's opinions are inconsistent with the applicable law and prior rulings from this Court and the bankruptcy court in this case.  In particular, the Trustee challenges Jarek's opinions about the knowledge and culpability of PCI's investors; whether offsets, deductions and recoveries should be subtracted from the Trustee's damages; and the basis for calculating damages, including alternative damages theories.[6]  The Court addresses each challenge in turn.

### a.    Investor Knowledge and Culpability

The Trustee argues that Jarek's opinions about the knowledge and culpability of PCI's investors contradict the applicable law and prior orders in this case and that such opinions are irrelevant.  BMO Harris argues that these opinions are relevant to the

---

[6]    The Trustee also challenges Jarek's opinion that PCI was an unharmed "sham" entity that cannot recover damages.  It is undisputed that the bankruptcy court's summary-judgment ruling rejected this theory as a matter of law.  But BMO Harris represents that it will not offer this opinion at trial and will instead preserve this disputed legal issue for appeal.

causation element of the Trustee's breach-of-fiduciary-duty and aiding-and-abetting claims.

To prove his breach-of-fiduciary-duty claim, the Trustee must prove that BMO Harris was the proximate cause of the Trustee's damages. *See State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 887 (Minn. 2006) (listing elements of negligence claim); *Padco, Inc. v. Kinney & Lange*, 444 N.W.2d 889, 891 (Minn. Ct. App. 1989) (recognizing that negligence and breach-of-fiduciary-duty claims involve the same elements). To prove proximate causation, the Trustee must establish that BMO Harris's negligent conduct was "a substantial factor in bringing about the injury." *Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620 (Minn. 2021). "There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury." *Id.* at 621. Similarly, to prove his aiding-and-abetting claims, the Trustee must prove that BMO Harris "substantially assist[ed] or encourage[d] the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). "Factors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind all come into play." *Id.* at 188.

Here, Jarek opines that PCI's investors continued to invest in PCI even though they knew or should have known about the ongoing fraudulent conduct. BMO Harris contends that these opinions are "highly relevant causation evidence" because the

opinions rebut the Trustee's allegations that BMO Harris caused the Trustee's injuries. But evidence is relevant only if it could make a material fact "more or less probable." Fed. R. Evid. 401(a).   Even if Jarek could demonstrate that PCI's investors were a proximate cause of the Trustee's injuries, this fact would not make it less probable that BMO Harris was a proximate cause of the Trustee's injuries, because Minnesota law allows for "more than one proximate cause . . . that contributes to an injury." *Staub*, 964 N.W.2d at 621.   Similarly, as to the Trustee's aiding-and-abetting claims, whether third parties assisted the primary tortfeasor has no bearing on whether BMO Harris provided substantial assistance because this element pertains to the conduct of the defendant and the relationship between the defendant and the primary tortfeasor, not the conduct of or relationship between the primary tortfeasor and third parties.   *Witzman*, 601 N.W.2d at 188.  Even if Jarek could demonstrate that PCI's investors provided substantial assistance as to any tortious conduct, this fact would not make it any less likely that BMO Harris also provided substantial assistance.   As such, Jarek's opinions about PCI's investors' knowledge or culpability is not relevant to the Trustee's claims.[7]

Accordingly, the Court grants the Trustee's motion to exclude Jarek's opinions pertaining to the knowledge and culpability of PCI's investors.

---

[7]     Moreover, to the extent that Jarek speculates about the knowledge or mental state of PCI's investors, such testimony also is improper because, as addressed above, an expert may not offer an opinion about an individual's knowledge, intent, motive or other mental state.  *See Kruszka*, 28 F. Supp. 3d at 931, 937; *Baycol*, 532 F. Supp. 2d at 1069.

### b.    Offsets, Deductions and Recoveries

The Trustee challenges Jarek's opinion that the Trustee's damages should be reduced based on offsets, deductions and other recoveries that the Trustee has obtained with respect to particular creditors.

The claims asserted by the Trustee in this case arose prior to commencement of the bankruptcy proceedings in 2008.  As such, the alleged harm that BMO Harris caused, for which the Trustee seeks damages, occurred between in or before 2008.  For this reason, the bankruptcy court concluded that the Trustee's damages are "measured at the time . . . the bankruptcy case [was] filed, because that's when the claim was established." Jarek nonetheless seeks to opine that the Trustee's damages must be reduced based on settlements and other recoveries the Trustee subsequently obtained.  For instance, Jarek observes that the Trustee filed several adversary proceedings against PCI creditors but later settled those disputes for less than the original debt that PCI owed.  According to Jarek, the Trustee improperly seeks damages based on the original debts incurred before 2008 rather than adjusting the damages downward to reflect the actual amounts paid to settle those debts.  According to BMO Harris, such a reduction is necessary to prevent either PCI's creditors from obtaining a double recovery or the Trustee from obtaining a windfall for the Estate.

As this Court previously concluded, under Minnesota law, when a corporation is unable to repay creditors because the corporation's assets have been fraudulently depleted, it is the corporation—not each individual creditor—that is directly harmed, and

the legal claim belongs to the bankruptcy estate.  *See In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001, 1006 (8th Cir. 2007); *accord Greenpond S., LLC v. Gen. Elec. Cap. Corp.*, 886 N.W.2d 649, 657 (Minn. Ct. App. 2016) (observing that "the harm sustained by the Petters entities as a result of fraudulent withdrawals from their accounts of other lenders' funds was its insolvency and inability to repay its creditors").  Any recovery by the Trustee in this case, therefore, is a recovery on behalf of the Trustee to compensate the bankruptcy estate for direct harm suffered by PCI.  As the Trustee correctly observes, BMO Harris's argument (and Jarek's opinions) conflate two distinct concepts: the collection of estate assets and the process of distributing estate assets.  *See In re Emerald Casino, Inc.*, 530 B.R. 44, 235 (N.D. Ill. 2014), *vacated in part on other grounds*, 867 F.3d 743 (7th Cir. 2017).  A bankruptcy trustee's recovery "has nothing to do with identifying who gets how much when the estate distributes [the estate's] assets."  *Id.* (quoting *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1396 (7th Cir. 1996)).  Here, the Trustee seeks to recover, on behalf of the bankruptcy estate, compensation for the harm to PCI allegedly caused by BMO Harris' conduct, which is independent of any distributions to (or recoveries by) PCI's creditors.  BMO Harris's contention that PCI's creditors will obtain a double recovery, therefore, is misplaced.

In addition, under the common law collateral-source rule, a plaintiff may recover damages from a tortfeasor even if "the plaintiff has received money or services in reparation of the injury from a source other than the tortfeasor," because a "benefit conferred on the injured person from [a] collateral source is not credited against the

tortfeasor's liability."[8]  *Swanson v. Brewster*, 784 N.W.2d 264, 268 (Minn. 2010) (internal quotation marks omitted).  This rule recognizes that it is the "tortfeasor's responsibility to compensate for all harm that [the tortfeasor] causes, not confined to the net loss that the injured party receives."  *Duluth Steam Coop. Ass'n v. Ringsred*, 519 N.W.2d 215, 217 (Minn. Ct. App. 1994) (quoting *Restatement (Second) of Torts* § 920A(2) (1979)).  The "central justification" for the collateral-source rule "is that a tortfeasor, as a wrongdoer who caused a particular harm, should not benefit from a tort plaintiff's ability to secure other compensation."  *Swanson*, 784 N.W.2d at 269 n.7; *accord McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994) (observing that the collateral-source rule "recognize[s] that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation").

Here, Jarek opines that the "Trustee will obtain a windfall" if damages are not reduced based on other recoveries the Trustee has obtained as the result of settlements or other sources.  But this result is not improper under the collateral-source rule, which recognizes that a collateral source of recovery should inure to the benefit of the tort victim rather than benefitting the tortfeasor through a reduction in the tortfeasor's liability. *See Swanson*, 784 N.W.2d at 269 n.7; *McDermott*, 511 U.S. at 219.  Indeed, "[b]ecause settlement amounts are based on rough estimates of liability, anticipated savings in litigation costs, and a host of other factors, they will rarely match exactly the amounts a

---

[8]    Although the common law collateral-source rule has been partially abrogated by statute in Minnesota, this statutory abrogation "applies only to cases involving physical injury to the person."  *Leamington Co. v. Nonprofits' Ins. Ass'n*, 661 N.W.2d 674, 678 (Minn. Ct. App. 2003).

trier of fact would have set."   *McDermott*, 511 U.S. at 219–20 (observing that "settlements frequently result in the plaintiff's getting more than he would have been entitled to at trial" and a plaintiff's "good fortune in striking a favorable bargain" through settlement does not reduce a tortfeasor's liability).   Thus, reducing the Trustee's damages based on settlements the Trustee negotiated with third parties would be improper and would not accurately reflect BMO Harris's alleged liability or PCI's injury.   To the extent that the Trustee may have mitigated PCI's damages by reaching favorable settlements with PCI's creditors, the Trustee is entitled to reap the benefit of those settlements, not BMO Harris.   Jarek's opinions are inconsistent with the collateral-source rule.

Accordingly, the Court grants the Trustee's motion to exclude Jarek's opinions pertaining to damages reductions based on offsets, deductions and other recoveries that the Trustee or PCI's creditors have obtained.

###    c.    Alternative Damages Theories

The Trustee challenges Jarek's alternative damages theory "based on amounts [that] appear to have been diverted for the personal benefit of Petters and his employees."[9]   The Trustee contends that Jarek's theory is inconsistent with the Trustee's theory of harm, which is premised on the amount that PCI was unable to pay its creditors, and Jarek's theory "fails to quantify the full scope and extent of Petters' misuse of investor funds."   Relatedly, the Trustee challenges Jarek's opinion that the Trustee's

---

[9]    Because BMO Harris represents that Jarek will not offer his alternative damages theory pertaining to the Minnesota Uniform Fiduciaries Act, the Court declines to address this aspect of Jarek's opinions.

damages expert "cherry pick[ed] only the largest losing investors to calculate PCI's alleged losses" without accounting for "other investors who were net cash winners."

In general, a rebuttal expert may properly "explain, repel, counteract or disprove evidence of the adverse party," *Marmo*, 457 F.3d at 759 (internal quotation marks omitted), and disputes about the factual basis of expert testimony implicate credibility rather than admissibility, *see Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. To the extent that Jarek merely seeks to rebut the factual bases underlying the opinions of the Trustee's damages expert, such opinions may be admissible. But here, as part of Jarek's alternative damages theory, Jarek deducts millions of dollars in "funds that have been recovered" through receiverships and clawback litigation. Similarly, Jarek's references to "investors who were net cash winners" appear to pertain to Jarek's opinion that the Trustee's damages should be reduced to "offset" independent recoveries by PCI creditors and prevent those creditors from obtaining a "double recovery." As addressed above, BMO Harris's attempts to offset the Trustee's damages based on either recoveries obtained by PCI's creditors or recoveries obtained by the Trustee from collateral sources is contrary to law. Because these opinions are not merely based on factual disagreements, but instead rely on a flawed legal theory regarding offsets based on collateral recoveries, these aspects of Jarek's opinions are inadmissible.

Accordingly, the Court grants the Trustee's motion to exclude Jarek's alternative damages opinions based on improper damages reductions.

### 3.    Causation Opinions

The Trustee argues that Jarek is unqualified to testify about causation and that Jarek's causation opinions are unreliable.

As to qualifications, the Trustee contends that Jarek has no expertise pertaining to causation issues.  A witness may be qualified as an expert based on knowledge, skill, experience, training, or education.  Fed. R. Evid. 702.  The witness's qualifications must match the subject matter of the witness's testimony.  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006).  But "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Id.* at 1100 (internal quotation marks omitted).  Here, the record reflects that Jarek has worked as a forensic accountant for more than 30 years and has investigated and studied financial misconduct, including Ponzi schemes.  As addressed above, Jarek may not speculate or offer opinions about the motivations or mental states of individuals or entities.  But the record reflects that Jarek has the qualifications and experience to offer opinions about the conduct of M&I, its employees and investors that may be relevant to causation.  The Trustee may address any gaps in Jarek's qualifications and experience through cross-examination and the presentation of contrary evidence. *See id.*

As to reliability, the Trustee argues that Jarek's theories do not demonstrate any indicia of reliability, such as whether the theories have been tested or subjected to peer review and publication, the known or potential error rate of the theories or whether the theories have attracted widespread acceptance within a relevant scientific community.

Although expert testimony must be based on "reliable principles and methods," a district court's reliability determination " 'may focus upon personal knowledge or experience' rather than scientific foundations." *United States v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *accord United States v. McDaniel*, 925 F.3d 381, 385 (8th Cir. 2019) (observing that expert testimony need not be based on a particular scientific methodology to be admissible). A qualified expert's "observations coupled with expertise generally may form the basis of an admissible expert opinion." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007) (affirming admissibility of expert testimony when the experts "observed the relevant evidence, applied their specialized knowledge, and systematically included and excluded possible theories of causation"). A challenge to an expert's methodology is "particularly misplaced" when the expert based his or her opinion "on observations rather than tests." *Id.* at 874. Here, Jarek relied on his observations of the evidence in this case together with his extensive experience involving Ponzi schemes and other financial misconduct. *See id.* at 875. The Trustee has not demonstrated that Jarek's causation opinions are inadmissible for lack of reliability.

Accordingly, the Court denies the Trustee's motion to exclude Jarek's causation opinions.

### 4.    Adverse Inference Spoliation Sanction

The Trustee also argues that some of Jarek's opinions undermine the adverse inference spoliation sanction imposed against BMO Harris.

The Trustee fails to identify any specific portion of Jarek's expert reports that contradict the adverse inference spoliation sanction. Even if the Trustee had identified any such opinions, as addressed above, the adverse inference instruction will be both permissive and subject to rebuttal. The jury will evaluate the weight and credibility of the evidence and determine whether to presume that the evidence BMO Harris destroyed would have been harmful to BMO Harris or favorable to the Trustee. And the Trustee will be permitted to present evidence pertaining to spoliation, including cross-examining Jarek about his opinions that rely on the absence of evidence. The Trustee's disagreement with these aspect of Jarek's opinions implicates the weight and credibility of Jarek's testimony, not its admissibility. As such, excluding these aspects of Jarek's opinions on this basis is unwarranted.

Accordingly, the Court denies the Trustee's motion to exclude Jarek's expert testimony on this basis.

### C.   Catherine Ghiglieri

BMO Harris moves to exclude the opinions and testimony of the Trustee's banking expert, Catherine Ghiglieri. BMO Harris argues that Ghiglieri's opinions are improper for four reasons: first, because Ghiglieri offers speculative opinions about the knowledge and state of mind of others; second, because Ghiglieri impermissibly opines about legal issues pertaining to the Bank Secrecy Act; third, because Ghiglieri's opinions impermissibly summarize evidence; and fourth, because Ghiglieri is not qualified to

testify about M&I's deposit account control agreements or whether PCI's account activity comported with PCI's purported business.

### 1. State-of-Mind Opinions

BMO Harris argues that Ghiglieri offers improper opinions about the knowledge and mental state of M&I and PCI investors.

As addressed above, an expert may not offer an opinion as to an entity's or individual's knowledge, intent, motive or other mental state. *See Kruszka*, 28 F. Supp. 3d at 931, 937; *Baycol*, 532 F. Supp. 2d at 1069. An expert may, however, testify about observable underlying facts that might be relevant to determining the mental state of an individual or entity. *See ResCap*, 432 F. Supp. 3d at 930; *Metro Sales*, 275 F. Supp. 3d at 1058 n.13; *Kruszka*, 28 F. Supp. 2d at 937. Here, Ghiglieri employs her decades of banking industry regulatory experience and knowledge of banking industry standards to analyze evidence of PCI's account activity and M&I's policies, procedures, systems and conduct. In doing so, she compares M&I's actions with those of financial institutions that she has observed as a bank regulator and consultant.

BMO Harris challenges aspects of Ghilgieri's report that opine about what M&I "knew." The Trustee counters that Ghilgieri merely relies on M&I's admissions of knowledge. For example, according to the Trustee, "Ghilgieri uses the term 'knew' to mean that the person, according to the record evidence, received the information at issue." But the Trustee conflates two concepts: access to information and personal knowledge. Although an expert may testify about observable underlying facts that are

indicative of the mental state of an individual or entity, including direct admissions of knowledge, some of Ghilgieri's opinions go beyond describing such observable evidence and instead draw inferences from that evidence about what M&I and its employees knew. For instance, rather than merely describing what information M&I employees had access to or received, Ghilgieri opines that M&I "knew that Petters' purported business model was for retailer payments to be deposited into the [account], but also knew that no such retailer payments were being deposited."  Absent a direct admission, the fact that an individual had access to or received a particular document does not necessarily establish what knowledge that individual possessed.  Ghilgieri may opine about objective facts, such as the fact that a document was conveyed to an individual, the fact that a document contained certain information or the fact that an individual testified or otherwise represented that he or she had knowledge of particular information.  But determining what an individual or entity knew as a result of these objective facts is an inferential step to be performed by the jury.  *See Baycol*, 532 F. Supp. 2d at 1069 (observing that drawing inferences about mental state is "for the jury, not for an expert").  Ghilgieri may opine about facts that might help the jury draw inferences about an individual's or entity's knowledge or mental state, including testifying about the significance of certain information and what a banking employee *should* have done with information the employee had access to or received.  But Ghilgieri may not speculate that an individual or entity had knowledge of certain facts absent a direct admission from that individual or entity.

Ghilgieri also repeatedly opines that M&I was "willfully blind" to certain suspicious activity.  Willful blindness is a mental state based on an individual's subjective beliefs.  *See United States v. Hansen*, 791 F.3d 863, 868 (8th Cir. 2015).  The Trustee argues that "Ghiglieri took the term 'willful blindness' directly from BMO's own 2004 internal anti-money laundering . . . training presentation" and, therefore, "willful blindness is a 'practice' (not a state of mind) that Ghiglieri can observe without speculating on BMO's employees' internal thoughts."  But willful blindness does not cease being a mental state merely because M&I referenced it in a training presentation.  An individual or entity's mental state has "no basis in any relevant body of knowledge or expertise," *Kruszka*, 28 F. Supp. 3d at 931, and the fact that M&I used the term "willful blindness" in its training materials does not permit Ghilgieri to speculate about the subjective beliefs of M&I or its employees.  Ghilgieri's opinions about willful blindness, therefore, must be excluded.

Ghiglieri also opines that M&I "assisted Petters in deceiving the [PCI] investors into thinking that Petters was conducting legitimate business" and that "investors expected retailers to be making payments into" the PCI account.  Opinions about what investors "expected" and whether investors were "deceived" implicate the knowledge and mental state of investors.  Although Ghiglieri may testify about underlying facts, such as whether M&I provided misleading or deceptive information to investors, she may *not* testify—directly or implicitly—about the impact of those facts on the minds of investors.  Such testimony is improperly speculative.  *See id.*

For these reasons, Ghiglieri's opinions are excluded to the extent that she opines about willful blindness or the knowledge or mental state of M&I, its employees or PCI's investors.

### 2.   Bank Secrecy Act

BMO Harris argues that Ghiglieri offers improper opinions about whether M&I violated the Bank Secrecy Act.

"As a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony." *United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) (internal quotation marks omitted); *accord S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible."). However, "[c]ourts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry." *Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343, 1350 (8th Cir. 1989). Therefore, a court may permit an expert to testify about industry practices or standards and terms of art. *Id.* Such expert testimony must be helpful to a jury. *See* Fed. R. Evid. 702. "Expert testimony is helpful to a jury if it concerns matters beyond the knowledge of average individuals; however, it cannot supplant the jury's role in evaluating the evidence." *United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995). Nor can such testimony supplant the court's role to address questions of law. *See Klaphake*, 64 F.3d at 438.

In her expert report, Ghiglieri provides extensive background about the Bank Secrecy Act and other regulatory standards. But she also repeatedly opines, directly or implicitly, that M&I engaged in conduct that violated the Bank Secrecy Act. Although expert testimony about industry practice or standards often may be relevant and admissible, expert opinion "about whether federal law was contravened" is "simply inadmissible." *S. Pine Helicopters*, 320 F.3d at 841 (observing that "a battle of experts as to whether [the defendant] had violated [federal] regulations" involved "expert testimony on legal matters [that] is not admissible"); *accord Cattanach v. Burlington N. Santa Fe, LLC*, No. 13-cv--1664 (JRT/JSM), 2015 WL 5521751, at *9 (D. Minn. Sept. 18, 2015) (observing that, although an expert may reference the law when expressing opinions, "legal compliance and liability determinations are the province of the jury"). Here, although Ghiglieri may reference the Bank Secrecy Act and other regulatory standards, she may not opine about whether M&I complied with or violated federal laws or regulations.

In addition, as several courts have recognized, the Bank Secrecy Act imposes obligations on banks to report certain customer activity to the government, but the Bank Secrecy Act does not establish obligations that banks owe to private parties. *See, e.g.*, *Armstrong v. Am. Pallet Leasing Inc.*, 678 F. Supp. 2d 827, 874–75 (N.D. Iowa 2009) (collecting cases); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 923–24 (W.D. Mich. 2010) (same). Although Ghiglieri's general opinions about the Bank Secrecy Act and other banking regulations may be relevant to elements of the

Trustee's claims, her opinions about whether M&I violated the Bank Secrecy Act have little or no apparent relevance. Moreover, the risk of unfair prejudice, confusing the issues or misleading the jury outweighs the probative value of such opinions. *See* Fed. R. Evid. 403. Indeed, expert testimony that M&I violated banking laws may unduly prejudice BMO Harris by suggesting to the jury that M&I is a bad actor and, therefore, is liable in this case.

Accordingly, Ghiglieri's opinions about whether M&I violated the Bank Secrecy Act must be excluded.

### 3.     Summarization of Evidence

BMO Harris next argues that Ghiglieri's opinions improperly summarize evidence and, therefore, are unhelpful and inadmissible.

Expert testimony must be helpful to a jury. *See* Fed. R. Evid. 702. "Expert testimony is helpful to a jury if it concerns matters beyond the knowledge of average individuals," but an expert "cannot supplant the jury's role in evaluating the evidence." *Shedlock*, 62 F.3d at 219. An expert may summarize technical evidence and provide an opinion as to whether the summarized evidence is consistent or inconsistent with alleged conduct. *Cf. United States v. Eagle*, 515 F.3d 794, 800 (8th Cir. 2008) (observing that an expert may "summarize . . . medical evidence and express an opinion that the evidence is consistent or inconsistent with [a] victim's allegations of sexual abuse"). But such summaries may be inadmissible if "the jury could interpret the documents that [the expert] highlights in her report without the assistance of an expert." *In re Viagra Prods. Liab.*

*Litig.*, 658 F. Supp. 2d 950, 967 (D. Minn. 2009) (excluding expert's historical summary of regulatory activity that "does not appear to benefit from [the expert's] regulatory expertise in any way").

Here, Ghiglieri's report describes regulatory laws and guidelines applicable to the banking industry; M&I's internal policies, procedures and systems; PCI's account activity; and the conduct of M&I and its employees. In doing so, Ghiglieri repeatedly applies her decades of banking industry regulatory experience and knowledge of banking industry standards to explain the significance of M&I's conduct and other evidence. For example, Ghiglieri opines about possible "red flags" involving PCI's account, purported "flaw[s]" in M&I's systems and responses to suspicious activity, whether and to what extent certain behavior reflected "high money laundering risk" and M&I's alleged deviations from banking industry standards or its own policies. Because admissible expert opinions must be "based on sufficient facts or data," Fed. R. Evid. 702(b), Ghiglieri's reliance on and explanation of voluminous evidence is not improper. BMO Harris agrees that experts must support their opinions with sufficient evidence but contends that "Ghiglieri's report goes way beyond that," emphasizing that the high volume of background evidence in her report overshadows her opinions. But Ghiglieri adds value to the evidence by using her knowledge and experience to explain the meaning and significance of technical banking industry information, including regulations, transactions, behaviors and business records. Moreover, although Ghiglieri's report includes a highly detailed narrative of the evidentiary background underlying her

opinions, it is not clear that the Trustee intends to elicit this same degree of background detail from Ghiglieri when she testifies at trial. [10]   Indeed, when formulating their opinions, experts may rely on a broader range of information than what may be disclosed to the jury.  *See* Fed. R. Evid. 703 (providing that experts may rely on facts or data that is not otherwise admissible in evidence).  BMO Harris has not demonstrated that Ghiglieri's reliance on and explanation of substantial background evidence warrants exclusion of her opinions.

Accordingly, BMO Harris's motion to exclude Ghiglieri's testimony on this basis is denied.

### 4.    Qualifications

BMO Harris also argues that Ghiglieri is not qualified to testify about M&I's deposit account control agreements or whether PCI's account activity was consistent with PCI's purported business.

A witness may be qualified as an expert based on knowledge, skill, experience, training or education.  Fed. R. Evid. 702.  The witness's qualifications must, however, match the subject matter of the witness's testimony.  *Robinson*, 447 F.3d at 1101; *accord Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (observing that admissible expert testimony must be within "the scope of the expert's expertise").  In her report, Ghiglieri contends that M&I's entry into deposit

---

[10]    To the extent that any aspect of Ghiglieri's testimony at trial resembles improperly excessive summarization that is untethered to admissible expert opinions, the Court will address any objections from BMO Harris in the context in which any such dispute arises.

account control agreements was unsafe and unsound banking practice, violated banking industry standards and deceived investors. And she opines that the activity in PCI's account was inconsistent with PCI's purported business of purchasing and reselling consumer goods with financing obtained through commercial factoring.

The Trustee concedes that Ghiglieri lacks specific expertise pertaining to control deposit agreements and commercial factoring. But the Trustee contends that Ghiglieri's opinions do not require such specific expertise. Indeed, Ghiglieri does not purport to opine about the technical intricacies of control deposit agreements or commercial factoring, nor does she hold herself out as an expert about these topics. Instead, Ghiglieri's opinions about these topics involve whether M&I's conduct and PCI's account activities were unusual, inconsistent or otherwise contravened industry standards or regulations. At their core, Ghiglieri's opinions that reference control deposit agreements and commercial factoring pertain to her undisputed expertise with banking industry regulations and her experience as a bank examiner.[11] BMO Harris will have the opportunity to challenge the basis of these opinions through cross-examination and the presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

Accordingly, BMO Harris's motion to exclude Ghiglieri's testimony on this basis is denied.

---

[11] The Court is mindful that expert testimony must concern "matters beyond the knowledge of average individuals" so as to be helpful to a jury. *Shedlock*, 62 F.3d at 219; *accord* Fed. R. Evid. 702. To the extent that the Trustee seeks to elicit testimony from Ghilgieri that is *not* beyond a lay juror's understanding or is otherwise unhelpful, the Court will address any objections from BMO Harris in the context in which such a dispute arises at trial.

### D.      Theodore Martens

BMO Harris also moves to exclude the opinions and testimony of the Trustee's damages expert, Theodore Martens.   BMO Harris argues that Martens's opinions are contrary to established law, his damages methodology is unreliable and he did not reliably apply his purported methodology.

### 1.      Consistency with the Law

BMO Harris first contends that Martens's damages opinions are contrary to established law.

Applying Minnesota law, the bankruptcy court and this Court previously held that, when a corporation's assets have been fraudulently depleted, the harm sustained by the corporation is the corporation's "insolvency and inability to repay its creditors." *Greenpond*, 886 N.W.2d at 657.   This characterization of a corporation's injury arising from the fraudulent depletion of corporate assets applies regardless of the asserted legal theory, which may include conspiracy to commit fraud, aiding and abetting fraud and federal or state statutory claims of actual or constructive fraudulent transfer. *Id.*   As such, the Minnesota Court of Appeals' characterization of a corporation's injury in *Greenpond* applies to the Trustee's claims against BMO Harris in this case.   Consistent with *Greenpond*, Martens calculates the Trustee's damages based on the amount PCI owed to its eight largest unsecured creditors during the pre-bankruptcy damages period, from 2002 to 2008.

CASE 0:19-cv-01756-WMW   Doc. 214   Filed 09/29/22   Page 46 of 60

BMO Harris correctly observes that the measure of damages was not at issue in *Greenpond*.  Instead, *Greenpond* involved whether a creditor, as opposed to a bankruptcy trustee, has the authority to pursue an aiding-and-abetting-fraud claim.  *Id.* at 654–55.  But addressing this issue required the *Greenpond* court to "look to the injury itself, rather than the legal theory in which [the claim] is couched."  *Id.* at 656.  When defining the relevant injury, the court observed that the creditor's injury—the "loss of money loaned" to the corporation—"is inseparable from and based upon an injury suffered by" the corporation.  *Id.* at 657.  Thus, the analysis in *Greenpond* necessarily implies that the measure of damages sustained by a defrauded corporation may be derived by measuring the loss of money loaned to the corporation by creditors that the corporation was unable to repay as a result of the fraud.

BMO Harris argues that Martens improperly conflates losses sustained by PCI's investors and losses sustained by PCI.  But in doing so, BMO Harris mischaracterizes both Minnesota law and this Court's prior rulings.  The losses sustained by PCI's investors during the damages period are incidental to the Trustee's claims because the *direct* harm to PCI only *indirectly* harmed PCI's investors during the damages period. *See id.*  As such, the indirect harm suffered by PCI's investors was immaterial to this Court's determination that PCI's investors do not have the authority to bring the claims asserted by the Trustee in this case.  But that issue—defining the injury and the party to whom the legal claims belong—is distinct from the issue presented now, namely, how to properly measure the Trustee's damages.  The *Greenpond* court recognized that the

indirect loss of money that creditors invested in a defrauded corporation are "inseparable from and based upon" the direct injury suffered by the corporation. *See id.* Consequently, the indirect harm suffered by PCI's investors during the pre-bankruptcy damages period is inseparable from the measure of damages arising from the direct harm suffered by PCI.[12]

In an attempt to avoid this result, BMO Harris argues that Martens's damages calculation reflects PCI's "deepening insolvency," which Minnesota does not recognize as a distinct harm. *See Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 811–12 (Minn. Ct. App. 2007). The concept of deepening insolvency "presumes that, in taking on additional unpayable debt, a corporation might be harmed by operational limitations, strained corporate relationships, diminution of corporate assets, and the legal and administrative costs of bankruptcy." *Id.* at 810. In *Christians*, the Minnesota Court of Appeals observed that "deepening-insolvency damages are superfluous because traditional-damages measures are sufficient for assessing injuries to insolent corporations." *Id.* Consequently, the court concluded that "deepening insolvency is not a recognized form of corporate damage in Minnesota." *Id.* at 812. However, the court

---

[12]     BMO Harris suggests that this conclusion is inconsistent with prior rulings from the bankruptcy court and this Court, namely, that investors' losses are not relevant to the Trustee's alleged damages or to BMO Harris's defenses. But BMO Harris mischaracterizes these rulings, which pertained to BMO Harris's attempts to seek discovery about investors' *adjusted* losses, namely, information about PCI's investors' bankruptcy claims and loss recoveries *after* 2008. Such discovery has no relevance to the direct harm sustained by PCI during and before 2008. As addressed throughout this Order, amounts that PCI's investors recovered *after* the damages period, through settlements or by other means, are not relevant in this case and cannot be used to "offset" the Trustee's damages.

recognized that a corporation may recover damages incurred as "the result of an additional illegal act rather than the mere continuation of the corporation's existence." *Id.* at 810 (distinguishing deepening-insolvency damages from "damages that an insolvent corporation suffered as a result of embezzlement that would have been prevented but for [the defendant's] negligence"). Here, the Trustee does not seek damages based on the mere continuation of PCI's existence. Instead, the Trustee seeks damages for harm that PCI suffered based on illegal acts—namely, BMO Harris's alleged fraudulent and negligent conduct. As such, this case does not implicate the concept of deepening insolvency, and BMO Harris's reliance on *Christians* is misplaced.

BMO Harris also relies on legal authority from other jurisdictions. *See In re Latitude Sols., Inc.*, 922 F.3d 690, 695–97 (5th Cir. 2019); *Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399, 1404 (6th Cir. 1984); *Reneker v. Offill*, No. 3:08-cv-1394, 2012 WL 2158733, at *6 (N.D. Tex. June 14, 2012); *Perkins v. Smith, Gambrell & Russell, LLP*, No. 1:08-CV-2673-JEC, 2011 WL 13174414, at *4–5 (N.D. Ga. Nov. 18, 2011). But this Court must adhere to Eighth Circuit and Minnesota law. To the extent that BMO Harris's cited authority may be considered for its persuasive value, the Trustee contends that these decisions are legally and factually inapposite.

The courts in *Latitude* and *Reneker* concluded that a bankruptcy trustee lacks standing to seek damages based on the unpaid obligations of the debtor to a creditor because the creditor, not the debtor, suffered the injury. *Latitude*, 922 F.3d at 695–97; *Reneker*, 2012 WL 2158733, at *6. These conclusions are contrary to Eighth Circuit and

Minnesota law.[13]  *See Ritchie Special Credit Invs., Ltd. v. JPMorgan Chase & Co.*, ___ F.4th ___, 2022 WL 4138420, at *2 (8th Cir. 2022); *Senior Cottages*, 482 F.3d at 1004–06; *Greenpond*, 886 N.W.2d at 657.  Moreover, in *Latitude*, the bankruptcy trustee attempted to prove a portion of the debtor's damages based on evidence of a creditor's claim against the bankruptcy estate, even though the debtor retained the benefit of its bargain with that creditor—namely, manufacturing equipment that the bankruptcy trustee leased and sold as part of the bankruptcy proceedings.  922 F.3d at 694, 696–97.  By contrast, here the Trustee seeks to recover amounts that PCI was unable to repay its creditors as a result of the fraudulent depletion of PCI's assets.  For these reasons, *Latitude* and *Reneker* are legally and factually inapposite.

In *Melamed*, the Sixth Circuit concluded that a trustee lacked standing to recover damages that a creditor suffered as a result of tortious interference with a business relationship.  727 F.2d at 1404.[14]  Notably, the Sixth Circuit applied "Ohio's measure of damages for destruction of a business" based on tortious interference with a business relationship, not the measure of damages for the fraudulent depletion of corporate assets under Minnesota law.  *Id.*  And the bankruptcy trustee in *Melamed* attempted to prove the

---

[13]     Indeed, the Fifth Circuit's standing analysis in *Latitude* relies on cases applying the Second Circuit's *Wagoner* rule.  *See Latitude*, 922 F.3d at 696 (citing *In re Waterford Wedgwood USA, Inc.*, 529 B.R. 599, 604–05 (Bankr. S.D.N.Y. 2015), and *In re Am. Tissue, Inc.*, 351 F. Supp. 2d 79, 93–94 (S.D.N.Y. 2004)).  The Eighth Circuit has expressly rejected the *Wagoner* rule.  *See Senior Cottages*, 482 F.3d at 1002–04.

[14]     Because the Sixth Circuit's standing analysis is both brief and intertwined with its evidentiary analysis, it is unclear whether this standing conclusion is contrary to Eighth Circuit law or merely factually distinguishable.

debtor's damages using the creditors' claims filed against the bankruptcy estate.  *Id.*  The Sixth Circuit expressly declined to analyze the damages evidence in detail but observed that "the amount of creditors' claims is totally unrelated to the determinative fact in setting damages" under Ohio law.  *Id.*  In this case, Martens does not rely on PCI's creditors' bankruptcy claims, but instead relies on promissory notes between PCI and PCI's investors that were not repaid as of September 2008.  Under Minnesota law, such evidence is not "totally unrelated" to the measure of damages in this case.  For these reasons, the *Melamed* decision is legally and factually inapposite.

In *Perkins*, the district court relied on the Eleventh Circuit's sham-corporation rule, which provides that "a debtor Ponzi entity 'cannot be said to have suffered injury from the scheme it perpetrated.' "  2011 WL 13174414, at *4 (quoting *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003).  BMO Harris has not identified any Eighth Circuit or Minnesota legal authority recognizing the Eleventh Circuit's sham-corporation rule.  To the contrary, the Eighth Circuit has recognized that a both investors *and* the Ponzi entity may be victims of those who perpetrated the fraud.  *See Ritchie*, ___ F.4th at ___, 2022 WL 4138420, at *2.  Moreover, the Eleventh Circuit has not applied the sham-corporation rule when the Ponzi entity has assumed receivership status.  *See, e.g.*, *Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014) (observing that Ponzi entities "are harmed when assets are transferred for an unauthorized purpose to the detrminent of the defrauded investors," and "once the Ponzi schemer is removed and the receiver is appointed," the Ponzi entities "become entitled to the return of the money

diverted for unauthorized purposes"). Here, as in *Wiand*, PCI assumed receivership status before commencing the bankruptcy proceedings. As such, the *Perkins* decision is inapposite.

Because BMO Harris has not established that Martens's damages opinions are contrary to law, the Court denies BMO Harris's motion to exclude Martens's opinions and testimony on this basis.

### 2.   Reliability of Methodology

BMO Harris also argues that Martens's methodology is unreliable because Martens ignores "the amount of the investors' allowed or fully administered claims in PCI's bankruptcy" and "amounts already recovered by investors."

As addressed above, BMO Harris's attempts to offset the Trustee's damages based on either recoveries obtained by PCI's creditors or recoveries obtained by the Trustee from collateral sources is contrary to law. The injury PCI suffered as of 2008, when its claims against BMO Harris arose, consists of PCI's "insolvency and inability to repay its creditors." *Greenpond*, 886 N.W.2d at 657. Subsequent recoveries by PCI's creditors, including settlements that those creditors negotiated with the Trustee or other third parties, are irrelevant to the measure of PCI's damages. Under Minnesota law, it is the "tortfeasor's responsibility to compensate for all harm that [the tortfeasor] causes, not confined to the net loss that the injured party receives." *Duluth Steam Coop. Ass'n*, 519 N.W.2d at 217 (quoting *Restatement (Second) of Torts* § 920A(2) (1979)). A "tortfeasor, as a wrongdoer who caused a particular harm, should not benefit from a tort plaintiff's

ability to secure other compensation." *Swanson*, 784 N.W.2d at 269 n.7.  Consistent with these principles of law, Martens calculated the Trustee's damages without regard to subsequent recoveries by PCI's investors.

BMO Harris contends that Martens's damages calculations reflect a double recovery.  BMO Harris is mistaken for several reasons.  First, a third-party creditor's recovery is distinct from the Trustee's recovery on behalf of PCI.  *See Emerald Casino*, 530 B.R. at 235.  Second, to the extent that the Trustee has recovered other assets on behalf of PCI, the Trustee's recovery from other tortfeasors does not offset BMO Harris' alleged liability for separate harms.  *See Duluth Steam Coop. Ass'n*, 519 N.W.2d at 218 (observing that the plaintiff did "not seek double recovery for the exact same loss" but instead sought "damages from two sources for related, but separate, losses").  Third, the collateral-source rule "recognize[s] that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation."  *McDermott*, 511 U.S. at 219; *accord Swanson*, 784 N.W.2d at 269 (recognizing that "under the common-law collateral-source rule a tort plaintiff may receive more than the actual compensation amount—essentially a 'double recovery'—because the tortfeasor must pay the entire compensation amount regardless of other compensation sources").  Although an "injured party's net loss may have been reduced" by payments or benefits conferred by other sources, "a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor."  *Restatement (Second) of Torts* § 920A cmt. b (recognizing that "there may be a double compensation for a part of the plaintiff's

injury").  As such, the collateral-source rule permits the Trustee to recover the full amount of harm allegedly caused by BMO Harris *even if* the Trustee has secured compensation from other sources.  BMO Harris's "double recovery" arguments do not demonstrate that Martens's damages opinions are unreliable.

BMO Harris also contends that Martens's opinions would improperly permit the Trustee to recover based on both investor losses *and* investor profits.  According to BMO Harris, because the Trustee has sued "net winners" in the Petters Ponzi scheme to recover a portion of their profits, the Trustee should not be permitted to also recover damages measured based on investors' losses.  But as the Trustee correctly observes, the Trustee's lawsuits against "net winners" involved distinct legal theories advanced on behalf of PCI's creditors pursuant to the Trustee's avoidance powers under the United States Bankruptcy Code.  *See, e.g.*, *In re Petters Co.*, 561 B.R. 738, 746 (Bankr. D. Minn. 2016).  In those lawsuits, the Trustee sought to redress unfairness to PCI's creditors pursuant to the Bankruptcy Code.  By contrast, in this lawsuit, the Trustee seeks to redress harm to PCI based on alleged violations of Minnesota law.  Because these recoveries are distinct, Martens's damages opinions are not improper.

Accordingly, because BMO Harris has not established that Martens's damages opinions are based on an unreliably methodology, the Court denies BMO Harris's motion to exclude Martens's opinions and testimony on this basis.

### 3.    Application of Methodology

BMO Harris also argues that Martens fails to reliably apply his purported methodology to the facts in this case.  Specifically, according to BMO Harris, Martens erroneously miscalculated the amount of one PCI investor's money that flowed through the PCI account at M&I.

Martens purports to calculate the Trustee's damages based on investment money that either directly or indirectly flowed through PCI's account at M&I.  BMO Harris asked Martens at his deposition to explain an apparent discrepancy in his calculation of one investor's deposits.  Specifically, although Martens's expert report calculates $9.8 million in damages attributable to this investor's deposits, a portion of those deposits initially flowed through the M&I account of a different PCI entity before being split, such that one portion transferred to the PCI account at M&I and one portion transferred to an account at a different bank.  Martens initially testified that this could have been a calculation error.  But in a subsequent errata sheet, Martens revised his testimony to confirm that he is "claiming $9.8 million in damages because that is the total calculated net cash loss on [this investor's] investments with PCI."  BMO Harris argues that Martens has failed to adequately explain this discrepancy and that this discrepancy demonstrates that Martens did not reliably apply his methodology.  The Trustee counters that Martens's calculation is not erroneous "because [M&I] was in a position to stop the dissipation of those funds as part of the Ponzi scheme, even if such funds were transferred through another related account where they were initially deposited."

The Court need not determine whether Martens's calculation is erroneous because, even if BMO Harris is correct, BMO Harris has not demonstrated that Martens's opinions are fundamentally unreliable. "Not every error in the application of a particular methodology should warrant exclusion." *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993). "An alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself." *Id.* Here, Martens's overall methodology involves calculating investments that either directly or indirectly flowed through PCI's account at M&I. A single isolated discrepancy, for which Martens and the Trustee have a colorable explanation, is not significant enough to fundamentally undermine the reliability of Martens's methodology. Instead, this purported discrepancy relates to weight and credibility, not admissibility. BMO Harris will have the opportunity to challenge the basis of Martens's opinions through cross-examination and the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

Because BMO Harris has not established that Martens unreliably applied his methodology, the Court denies BMO Harris's motion to exclude Martens's opinions and testimony on this basis.

### III.    BMO Harris's Motion to Bifurcate Trial

BMO Harris moves to bifurcate the punitive damages portion of trial from the liability and compensatory damages portion of trial. The Trustee opposes this motion.

According to BMO Harris, bifurcation is mandatory pursuant to Minnesota Statutes Section 549.20, subdivision 4, which provides that "[i]n a civil action in which punitive damages are sought, the trial of fact shall, if requested by any of the parties, first determine whether compensatory damages are to be awarded." Subsequently, "the trier of fact shall, in a separate proceeding, determine whether and in what amount punitive damages will be awarded." Minn. Stat. § 549.20, subdiv. 4. However, even when applying state substantive law, federal courts apply federal law as to matters of procedure. *Bradshaw v. FFE Transp. Servs., Inc.*, 715 F.3d 1104, 1107 (8th Cir. 2013). A federal court "should not apply a state law or rule if (1) a Federal Rule of Civil Procedure answers the same question as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Selective Ins. Co. of S.C. v. Sela*, 353 F. Supp. 3d 847, 856 (D. Minn. 2018) (internal quotation marks and brackets omitted) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010)). A federal district court has discretion to determine whether to bifurcate the issues of liability and punitive damage, because federal procedural rules governing bifurcation "control over conflicting state law." *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998) (holding that "the district court did not abuse its discretion in declining to bifurcate the issues" notwithstanding a state statute that "permits separation upon request by either party). Because Federal Rule of Civil Procedure 42 addresses bifurcating issues and ordering separate trials, Minnesota's bifurcation statute is inapplicable here.

Rule 42 provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." Fed. R. Civ. P. 42(b). The "separation of issues for trial is not to be routinely ordered." Fed. R. Civ. P. 42 advisory committee's note to 1966 amendment. "The decision of whether to isolate the punitive damages phase of the trial is within the sound discretion of the trial court." *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1213–14 (8th Cir. 1999).

BMO Harris does not contend, and the Court cannot conclude, that bifurcating the trial in this case would promote convenience or otherwise expedite or economize this case. A bifurcated trial in this case would be "unduly burdensome and time consuming" for the parties, the jurors and the Court. *Kociemba v. G.D. Searle & Co.*, 683 F. Supp. 1577, 1579 (D. Minn. 1988) (denying motion to bifurcate the punitive damages portion of trial from the liability and compensatory damages portion of trial). Indeed, the burdens of a bifurcated trial would be exacerbated by the circumstances here, including the anticipated length and complexity of this trial, the prior delays in this case attributable to the COVID-19 pandemic and the ongoing risk that jurors or other case participants could contract COVID-19 during the trial. As such, the factors of convenience, expeditiousness and economization weigh against bifurcation. *See id.*

BMO Harris instead argues that bifurcation is necessary to avoid prejudice. *See* Fed. R. Civ. P. 42(b). Undue prejudice may occur when "a punitive damage award is the result of passion and prejudice." *Parsons v. First Invs. Corp.*, 122 F.3d 525, 529 (8th Cir. 1997) (internal quotation marks omitted). According to BMO Harris, it will be "severely

prejudiced" if punitive damages issues are not bifurcated from liability and compensatory damages issues because "evidence of BMO's financial condition, net worth, or income" might influence the jury when assessing BMO Harris's liability or the amount of compensatory damages. But aside from this broad, speculative generalization, BMO Harris provides no evidence or persuasive argument as to the risk of prejudice. It is unlikely that jurors will be surprised to learn the financial condition, net worth or income of a large bank in a case such as this one. And evidence relevant to liability and compensatory damages likely will directly or indirectly suggest the nature of BMO Harris's financial condition. Indeed, evidence relevant to liability and compensatory damages will demonstrate the nature and scope of the banking industry in general and BMO Harris's business in particular. This evidence also will reflect, among other things, that billions of dollars passed through PCI's account. Moreover, the jury will be instructed as to the appropriate application of the law, and a "jury is presumed to follow the instructions given." *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 832 (8th Cir. 2008). For these reasons, BMO Harris has not established that, absent bifurcation, the jury will reach a punitive damages decision that is based on passion or prejudice. *See Parsons*, 122 F.3d at 529; *see also* Fed. R. Civ. P. 42(b).

Accordingly, BMO Harris's motion to bifurcate is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.    Defendant's motion for clarification, (Dkt. 138), is **GRANTED IN PART AND DENIED IN PART** as addressed herein.

2.    Plaintiff's motion for a preliminary, mandatory, non-rebuttable adverse inference jury instruction, (Dkt. 149), is **DENIED**.

3.    Plaintiff's motion to exclude expert testimony, (Dkt. 110), is **GRANTED IN PART AND DENIED IN PART** as follows:

> a.  Charles Grice's expert opinions are excluded to the extent that he speculates or directly opines about the mental state of M&I, its employees or other third parties;

> b.  Karl Jarek's expert opinions are excluded to the extent that he opines about the knowledge and culpability of PCI's investors, damages reductions based on offsets and other recoveries that the Trustee or PCI's creditors have obtained and alternative damages theories based on inadmissible damages reductions; and

> c.  Plaintiff's motion to exclude expert testimony is denied in all other respects.

4.    Defendant's motion to exclude the expert testimony of Catherine Ghiglieri, (Dkt. 118), is **GRANTED IN PART** to the extent that Ghiglieri opines about willful blindness or the knowledge or mental state of M&I, its employees or PCI's investors and whether M&I violated the Bank Secrecy Act and **DENIED** in all other respects.

5.      Defendant's motion to exclude the expert testimony of Theodore Martens,

(Dkt. 119), is **DENIED**.

6.      Defendant's motion to bifurcate, (Dkt. 154), is **DENIED**.

Dated:  September 29, 2022                                s/Wilhelmina M. Wright
                                                         Wilhelmina M. Wright
                                                         United States District Judge