## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas A. Kelley, in his capacity as
the Trustee of the BMO Litigation
Trust,

Case No.: 0:19-cv-01756-WMW

Hon. Wilhelmina M. Wright

     Plaintiff,

 vs.

**Plaintiff's Memorandum of Law in
Opposition to Defendant's Motion
for Judgment as a Matter of Law**

BMO Harris Bank N.A., as successor
to M&I Marshall and Ilsley Bank,

     Defendant.

## Table of Contents

Introduction ........................................................................................................ 1

Legal Standard ................................................................................................... 1

Argument ............................................................................................................ 3

    I.   A reasonable jury could conclude that BMO acted with the requisite mental state. ................................................................................................ 3

        A.   Plaintiff did not withdraw its claim of actual knowledge. ................. 3

        B.   BMO misstates the knowledge requirements. ...................................... 5

        C.   Plaintiff's evidence of knowledge was sufficient. ............................... 9

    II.   A reasonable jury could conclude that the other elements of Count I (MUFA) are satisfied. ....................................................................... 25

        A.   Plaintiff need not prove anything about the employee who actually processed the transaction. ...................................................... 25

        B.   BMO is incorrect about the scope of MUFA damages. ...................... 27

    III.   A reasonable jury could conclude that the other elements of Count II (Breach of Fiduciary Duty) are satisfied. ........................................ 27

        A.   The DACA imposed a fiduciary duty. ................................................. 27

        B.   A reasonable jury could conclude that BMO breached the DACA. . 28

        C.   A reasonable jury could conclude that causation was satisfied. ........ 29

    IV.   A reasonable jury could conclude that the other elements of Count III (aiding and abetting fraud) are satisfied. ...................................... 29

        A.   BMO assumes an underlying fraud on the wrong party. ................... 29

        B.   A reasonable jury could conclude that there was substantial assistance. ............................................................................................ 31

    V.   A reasonable jury could conclude that the other elements of Count IV (aiding and abetting breach of fiduciary duty) are satisfied. ..................... 33

VI.    The contractual limitations periods do not apply...........................................35

VII.   A reasonable jury could conclude that the action was filed within the statute of limitations period. ..........................................................40

VIII.  BMO's equitable defenses of Acquiescence, Consent, Ratification, and Waiver fail for the same reasons as its *In Pari Delicto* defense...................43

IX.    There is No UCC preemption. .......................................................46

X.     A reasonable jury could find Plaintiff has proven compensatory damages....................................................................................51

XI.    A reasonable jury could award punitive damages......................................52

XII.   BMO's "previously considered" arguments do not warrant judgment as a matter of law.........................................................................56

Conclusion .....................................................................................57

## Introduction

BMO's principal argument in support of judgment as a matter of law ("JMOL") is premised upon a contrived and incorrect interpretation of the testimony of one witness. BMO contends that the Plaintiff has "withdrawn" any contention of actual knowledge through this testimony, but Plaintiff has done nothing of the sort. Instead, Plaintiff has painstakingly proven, through compelling circumstantial evidence, the requisite state of mind. Any argument to the contrary is simply not credible. When the evidence of mental state is properly considered under the correct legal standards, and is combined with the inference to which Plaintiff is entitled due to BMO's intentional spoliation of evidence, only one conclusion can be drawn: a reasonable jury could rule in Plaintiff's favor. The same is true of the other elements of Plaintiff's proof. BMO's motion should be denied.

## Legal Standard

Under Fed. R. Civ. P. 50, "judgment as a matter of law is appropriate if no reasonable juror could have returned a verdict for the nonmoving party."[1] It is improper to grant such relief unless "all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving

---

[1] *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 610 F. Supp. 2d 998, 1005 (D. Minn. 2009).

1

party.'"[2] In applying this exacting standard, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[3] In cases like this one that turn on a party's knowledge or state of mind, judgment as a matter of law is rarely appropriate.[4] Also, when knowledge or intent is at issue, the "jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue."[5]

---

[2] *Edgley v. Lappe*, 342 F.3d 884, 88 (8th Cir. 2003) (quoting *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992)).

[3] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[4] *See Best Buy Stores, L.P. v. Benderson-Wainberg Assocs.*, L.P., 668 F.3d 1019, 1030 (8th Cir. 2012) (issues containing a knowledge component are "generally inappropriate for summary judgment"); *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985) ("issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties").

[5] 10B Fed. Prac. & Proc. Civ. § 2730 (4th ed.) (citation omitted).

## Argument

### I. A reasonable jury could conclude that BMO acted with the requisite mental state.

#### A. Plaintiff did not withdraw its claim of actual knowledge.

BMO clings to a single quote from the Trustee's testimony, arguing it removes BMO's actual knowledge as an issue.[6] The testimony does no such thing.

First, BMO misconstrues the Trustee's testimony. That testimony addressed the straw man that BMO has attempted to set up for the jury—that the Trustee was supposedly claiming that BMO participated in the Ponzi scheme itself.[7] The Trustee's counsel asked the Trustee if he contended that a BMO employee *both* (i) took a bribe or participated in the Ponzi scheme, *and* (ii) knew there was a Ponzi scheme.[8] He answered, "No." The reason is clear. Plaintiff has never alleged that a BMO employee took a bribe. Moreover, Plaintiff does not contend that any BMO employees participated or was a co-conspirator in the scheme itself (like the PCI officers who solicited investors). Rather, Plaintiff

---

[6] Mem. i/s/o Def's Rule 50(a) JMOL Motion ("Mem."), 1.

[7] Tr.201:7-14 (BMO characterizing Plaintiff's claims as participation in scheme).

[8] Tr.1951:2-5; *see also* Tr.1950:12-1951:1 (asking whether Trustee claimed any BMO employee was bribed or participated in Ponzi scheme).

contends that BMO allowed wires and checks to be drawn (MUFA Count I) and

"substantially assisted or encouraged" the fraud and breaches of fiduciary duty

through the banking services they provided (aiding and abetting Counts III and

IV). Thus, the Trustee's answer of "no," did not change *any* of the Plaintiff's

contentions in this case. Moreover, he clarified immediately thereafter that BMO

"should have investigated much more fully"—a reference to the concept of

willful blindness (discussed below in Section I(B)(2))—which satisfies the

element of actual knowledge.

Second, the Trustee's personal understanding of the allegations in the

Complaint and comments on the evidence—rather than factual testimony—

cannot, as BMO contends, be an abandonment of any element.[9]

---

[9] *See, e.g.*, *McGuire v. Bourbon Community Hosp.*, No. 04-480-KSF, 2006 WL 208826,
*3 (E.D. Ky. Jan. 25, 2006) (legal issue of whether claim has been abandoned or
waived requires more than plaintiff's lay personal opinions); *Stanazai v. Broad.
Bd. of Governors*, No. CV 17-2653 (RDM), 2020 WL 6118183, at *6 (D.D.C. Oct. 16,
2020) (legal claim " not so easily abandoned, particularly where there is good
reason to believe that the witness has not made an informed decision, in
consultation with counsel, to abandon the claim"); *Lemmons v. Georgetown Univ.
Hosp.*, 241 F.R.D. 15, 31 (D.D.C. 2007) (voluntary elimination of claim occurs only
by FRCP 15 amendment of claim; abandonment without FRCP 15 to extent
allowed requires explicit and unambiguous statement that claim no longer being
brought or factual assertions undermining factual predicate of claim); *Marci's
Fun Food, LLC v. Shearer's Foods, Inc.*, No. CIV.A. 10-188, 2011 WL 5360808, at *2
(W.D. Pa. Nov. 7, 2011) (plaintiff's beliefs as to which facts support legal claims
does not limit facts plaintiff's attorney could rely upon).

### B.    BMO misstates the knowledge requirements.

BMO's brief misstates the knowledge requirements for Plaintiff's claims.

### 1.    Count I: Plaintiff can support his Minnesota Uniform Fiduciaries Act claim with either actual knowledge or bad faith, either of which can be proven through circumstantial evidence.

A Plaintiff may show the requisite state of mind found in the Minnesota Uniform Fiduciaries Act ("MUFA") by establishing *either* actual knowledge of a breach of fiduciary duty *or* knowledge of facts such that its action in paying the check amounts to bad faith.[10] As discussed above, Plaintiff has *not* dropped its claim of actual knowledge. Moreover, Plaintiff can establish bad faith by showing a "reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary."[11]

### 2.    Counts III and IV: the actual knowledge required for Plaintiff's aiding and abetting claims can be established with circumstantial evidence or otherwise through a showing of willful blindness.

BMO erroneously contends that Plaintiff does not meet the actual[12] knowledge requirements for aiding and abetting fraud and aiding and abetting

---

[10] Minn. Stat. § 520.08.

[11] *McCartney v. Richfield Bank & Trust Co.*, No. CX-00-1466, 2001 WL 436154, at *4 n.2 (Minn. Ct. App. May 1, 2001).

[12] BMO seems to attach great significance to the term "actual" knowledge, but the cases cited by BMO merely refer to "actual" knowledge as a means of

breach of fiduciary duty. This argument principally rests on the flawed premise that Plaintiff has withdrawn his contention of actual knowledge. But Plaintiff is, in fact, claiming actual knowledge—that is "actual knowledge that the primary tortfeasor's conduct was wrongful."[13] The evidence required to show actual knowledge "depends in part on the particular facts and circumstances of each case,"[14] and it is well-settled that actual knowledge can be shown by circumstantial evidence,[15] which, as discussed below, Plaintiff has done here. And, of course, the jury will be permitted in this case to infer that BMO's

---

contrasting knowledge with constructive knowledge. *See Witzman*, 601 N.W.2d at 187; *Zayed*, 913 F.3d at 714-15. This is irrelevant here because Plaintiff's claim is not founded on constructive knowledge. Moreover, *Witzman* held that actual knowledge was not required where there is a facial breach, such as the breach in this case. *Witzman*, 601 N.W.2d at 188. Other Minnesota aiding and abetting cases reciting the elements do not specify "actual" knowledge. *See, e.g.*, *RSS Fridley, LLC v. Northwestern Orthopaedic Surgeons Partnership, LLP*, No. A21-0664, 2022 WL 200359 (Minn. Ct. App. Apr. 27, 2022).

[13] *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999).

[14] *Id.*

[15] *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 715 (8th Cir. 2019); 8th Cir. Civil Jury Instr. No. 1.04 (no distinction between circumstantial and direct evidence under the law).

destruction of documents further evidences the bank's actual knowledge of Petters' fraud and breaches of fiduciary duty.[16]

Willful blindness or conscious avoidance meets the requirement for actual knowledge, as the United States Supreme Court recognized in *Global-Tech*.[17] The Minnesota Court of Appeals cited *Global-Tech* with approval for the relevant standard in civil cases, providing guidance that under Minnesota law willful blindness is a viable "theor[y] for proving actual knowledge."[18]

BMO tries to avoid application of the willful blindness doctrine, suggesting *Zayed*'s and *Varga*'s silence on willful blindness precludes its application here.[19] But willful blindness was not raised or discussed as an issue

---

[16] Because Plaintiff ***does*** contend that BMO had actual knowledge, the Court must reject BMO's argument that its spoliation of evidence can no longer support an inference of knowledge. In any event, spoliation relates to bad faith as well.

[17] *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011); *see also Ariola v. City of Stillwater*, 889 N.W.2d 340, 359 (Minn. Ct. App. 2017) (although finding no evidence of willful blindness in order for theory to apply on the facts, recognizing theory in civil or criminal cases).

[18] *Ariola v. City of Stillwater*, 889 N.W.2d 340, 359 (Minn. Ct. App. 2017) (court held, however, that "willful blindness does not apply" because plaintiff did not support theory with evidence). *Cf. State v. Fountain*, No. A07-0199, 2008 WL 1971413 (Minn. Ct. App. May 6, 2008) (where defendant required to have believed victim was certain age, jury could reasonably infer lack of inquiry into age was tantamount to willful blindness of fact that victim was younger).

[19] Mem. 33 & n.144.

in those cases,[20] and "and a prior panel's implicit resolution of an issue that was not raised or discussed is not binding precedent."[21] To be sure, *Zayed* ruled that "constructive knowledge" is insufficient to support aiding-and-abetting liability.[22] But constructive knowledge imputes knowledge based on a negligence standard, "that one using reasonable care and diligence should have, and therefore that is attributed by law to a given person."[23] By comparison, willful blindness, which *Zayed* did not address, is a concept that "surpasses recklessness and negligence."[24] It occurs when the defendant "consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers."[25] Indeed, case law from other jurisdiction holds

---

[20] *See Zayed*, 913 F.3d 709, 715-19 (8th Cir. 2019); *Varga v. U.S. Bank N.A.*, 952 F. Supp. 2d 850, 857-59 (D. Minn. 2013), *aff'd*, 764 F.3d 833 (8th Cir. 2014).

[21] *United States v. Green*, 691 F.3d 960, 964 n.5 (8th Cir. 2012).

[22] *Zayed*, 913 F.3d at 719.

[23] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (quoting Black's Law Dictionary (8th ed. 2004)).

[24] *Global-Tech*, 563 U.S. 769.

[25] *Id.*

that willful blindness can constitute actual knowledge for purpose of aiding and abetting claims.[26]

Citing *Zayed*, among others, BMO contends mere awareness of red flags or other suspicious behavior that should have prompted further inquiry is insufficient for actual knowledge.[27] But that authority is inapposite because here, as explained below, red flags or suspicious behavior in fact did prompt further inquiry by the bank and the bank ignored the results of its own inquiries. That distinction, in addition to the inferences that may be drawn from the bank's spoliation of evidence, firmly commends that a jury should be allowed to determine the question of actual knowledge.

### C.    Plaintiff's evidence of knowledge was sufficient.

#### 1.  The jury has received an avalanche of evidence of knowledge.

The relationship managers and first points of contact for the PCI Account, Christopher Flynn and Edward Jambor, understood they were required—as business bankers and for anti-money laundering ("AML") purposes—to

---

[26] *See, e.g.*, *Ritchie Special Credit Investments, Ltd. v. JPMorgan Chase & Co.*, Civ. No. 14-4786, 2021 WL 2686079, at *9 (D. Minn. June 30, 2021) (holding "conscious avoidance" would be sufficient to state aiding-and-abetting claim under New York law), *aff'd*, 48 F.4th 896 (8th Cir. 2022); *Al-Sabah v. World Bus. Lenders, LLC*, 2022 WL 991385, at *7 (D. Md. Apr. 1, 2002).

[27] Mem. 3.

understand the activity in the accounts to determine whether there was a legitimate business purpose for the activity.[28] They understood the requirements for reporting, and were trained to detect, unusual or suspicious activity.[29] They had complete access to account activity, including balance information, monthly reports, account statements, and information showing incoming and outgoing funds, whether via wire or otherwise.[30]

The testimony adduced at trial is replete with evidence of Flynn's knowledge, bad faith, and willful blindness. Despite his duties and comprehensive access to PCI transaction activity, Mr. Flynn astonishingly contends he *never* reviewed the billions of dollars of PCI account transaction activity, even though he was introduced to PCI's business by a convicted money

---

[28] Tr.1168:7-16, 1169:9-17, 1214:18-22, 1216:16-1217:3, 1218:18-1219:18, 1220:4-13, 1222:4-14, 1223:14-1224:4, 1513:11-14, 1540:20-1541:24, 1547:12-16, 1551:21-1552:3, 1576:7-20, 1578:20-23, 1745:19-24; Exhibits P4-0019, -0042, -0044, -0046, -0050, P5-0024, -0030, -0031, -0034, DX40067-0038.

[29] Tr.1215:12-22, 1216:6-15, 1216:16-1217:3, 1217:22-1218:7, 1218:18-1219:18, 1219:19-1220:13, 1220:22-25, 1221:20-23, 1222:4-14, 1223:14-1224:14, 1226:3-20, 1227:2-13, 1230:17-1231:1, 1542:9-1543:6, 1544:5-8, 1544:16-1545:7, 1546:16-24, 1547:12-16, 1549:8-1552:21; Exhibits P4-0011, -0019, -0046, -0047, -0050, P5-0024, -0030, -0031, -0034, DX40067-0012.

[30] Tr.1232:16-1233:21, 1246:11-14, 1259:7-11, 1571:12-15, 1571:25-1572:21, 1573:3-13, 1802:16-24.

lauderer.[31] Despite knowing PCI's purported business model, he has no memory of seeing any big-box retailer wiring money into the account.[32] He knew PCI refused to provide the bank with its financial information despite being a longstanding client.[33] And although loans were the most profitable part of his business and BMO repeatedly pitched loans for other Petters projects, Flynn never once pitched to PCI the idea of the bank funding the consumer electronics purchases from wholesalers, and couldn't explain why.[34]

    Flynn's handling of the sham deposit account management/control agreements ("DACAs") is further evidence of Flynn's state of mind. He had never before agreed to do what was contemplated by the DACAs.[35] He knew a customer requesting "special treatment" was a red flag yet referred to the request for the Palm Beach DACA as "special handling."[36] He collaborated on the DACAs with a lawyer associated with the same convicted felon who introduced

---

[31] Tr.1520:11-1521:15, 1524:8-13, 1524:20-25, 1525:11-20, 1745:19-1746:8; Exhibits P2-0014, P11, P145.

[32] Tr.1524:8-13, 1577:15-17.

[33] Tr.1621:14-1622:4, 1622:25-1623:11.

[34] Tr.1521:16-19, 1733:18-1735:7; Exhibits P2, P26, P270.

[35] Tr.1613:21-1614:3, 1738:19-22.

[36] Tr.1738:23-1740:8; Exhibit P20-0003, P21.

PCI's business model to Flynn previously.[37] Flynn made the decision to enter into the DACAs despite knowing the bank was neither providing value nor necessary to achieve the purported objectives of the DACAs.[38] He signed the DACAs over others' objections as to the bank's ability to perform the DACA and the willingness of the bank to take on the responsibility of reconciling and transferring the funds.[39] He did not seek compensation for BMO.[40] Flynn knew, under the Ritchie DACA, that Nationwide was a supplier but never looked to see if outgoing wires were going to Nationwide (in fact billions were being wired into the account).[41] Once the DACAs were executed, Flynn never received the weekly transaction list contemplated by the Palm Beach DACA; never asked why; and could not identify any written procedures put in place to comply with the DACAs.[42] He just signed the agreements and ignored them.

Jambor accessed PCI's transaction activity on numerous occasions and was

_____

[37] Tr.1524:8-1525:20, 1591:10-1592:1, 1592:16-1693:14; Exhibits P2-0014, P23.

[38] Tr.1594:1-1595:1, 1596:23-25; Exhibit P22.

[39] Tr.1588:4-1589:9, 1589:24-1590:24, 1596:23-25, 1597:8-11, 1607:6-12, 1612:24-1613:5; Exhibits P20, P21, P116, P117, P645.

[40] Tr.1588:21-23.

[41] Tr.1611:5-16; 1611:20-1612:1; Exhibit P116.

[42] Tr.1606:6-19, 1614:1-7, 1728:14-23, 1745:19-1746:17; Exhibits P116, P117, P645.

familiar with the balance fluctuations.[43] He knew that a small business checking account had **billions** of dollars flowing through it, with similarly-sized incoming and outgoing payments and transfers in round numbers, a clear sign of money laundering.[44] He knew PCI's purported business was buying overstock consumer goods and reselling to retailers, and received emails telling him that retailer payments should be coming into the account.[45] However, he couldn't recall ever seeing an incoming retailer wire.[46] Despite account activity inconsistent with PCI's purported business model, he never filled out the suspicious activity log.[47]

Jambor knew PCI was a non-payroll, business depository account, yet learned of two, round-number $1 million checks issued by Deanna Coleman to herself with no taxes withheld.[48] He testified that it raised a red flag, and upon investigation was told by Tom Petters these checks were for Coleman to

---

[43] Tr.1233:19-1234:3, 1236:9-1239:25; Exhibits P35, P36.

[44] Tr.1233:19-1234:5, 1234:13-21, 1236:7-1239:25, 1258:1-1261:22; Exhibit P1.

[45] Tr.1231:7-18, 1263:21-1264:9, 1277:5-18; Exhibits P52, P104.

[46] Tr.1255:10-18.

[47] Tr.1221:11-16, 1264:2-5, 1264:25-1265:7.

[48] Tr.1178:12-17, 1179:9-10, 1299:19-23, 1307:1-7.

purchase real estate.[49] He didn't, however, escalate the issue in any way, despite being trained that such purchases were signs of money laundering.[50] Jambor also knew that a wire for $100,000 was being sent from the PCI account to Tom Petters's personal account.[51] But he never once filled out the suspicious activity log.[52] Jambor also initiated an exception to the bank's overdraft policy whereby, in the event of insufficient funds, the wire department would check throughout the day to confirm when or if there would be sufficient funds.[53]

Tellingly, Jambor received several unique and unusual requests from PCI. For the first time in his career, Jambor allowed a customer to ghost-write a letter from the bank—in this case, at PCI's request—and he did so without escalating the issue to his supervisor or filling out an entry in the suspicious activity log.[54] Similarly, Mr. Sabes requested for BMO to act as custodian to receive retailer wire payments and forward them to other accounts at PCI's direction. No other

-----

[49] Tr.1305:10-1306:7, 1310:6-1311:4.

[50] Tr.1221:11-16, 1305:20-1306:25.

[51] Tr.1314:18-1315:3, Exhibit 58.

[52] Tr.1221:11-16, 1315:4-8.

[53] Tr.2271:22-2272:25.

[54] Tr.1221:11-16, 1285:2-1287:17, 1288:1-17, 1288:20-23; Exhibits P55; P56.

customer had ever asked him for such request before.[55] He knew that, in connection with this request, Petters wanted to keep PCI's lenders from learning who the other lenders were.[56] But Jambor never filled out the suspicious activity log about Sabes's request.[57] In addition, Jambor had never before had a customer transfer half a billion dollars into a small business checking account to purchase a major U.S. corporation, but knew Tom Petters planned to do so in the PCI account to acquire Polaroid. He did not recall calling his supervisor about this and did not fill out the suspicious activity log, admitting he wanted the bank to profit from the Polaroid deal.[58]

The AML analysts likewise had the requisite knowledge. Their responsibilities and policies required that they know the customer's activity, and they were trained to recognize suspicious activity. They knew that money-launderers used banks to clean money for purchases of things like houses and yachts.[59] AML policies and Searchspace reporting guidelines specified the

---

[55] Tr.1267:10-1268:2, 1270:6-23, 1271:19-1272:3, 1274:5-14, 1282:15-1283:1; Exhibits P51, P52, P104.

[56] Tr.1290:1-16, 1293:1-19, 1501:1-18; Exhibit P2-0062.

[57] Tr.1221:11-16, 1268:6-8.

[58] Tr.1198:9-1199:8, 1199:18-21, 1200:2-6; 1200:16-1200:23; 1202:1-10; 1203:18-1205:18, 1221:11-16; Exhibits P2-0077, P47.

[59] Tr.343:11-14, 585:3-17, 587:9-588:20, 589:15-590:4, 595:2-21, 599:11-600:1, 644:7-

analysis and procedure analysts were required to follow in auditing the alerts, including, *inter alia*, explaining the reason for the alert, noting the source of the wires and use of the funds, and convincing the reader the alert was not suspicious in their comments.[60] If analysts suspected suspicious activity, they had to file a Suspicious Activity Report ("SAR"), and, if there was even a question, they had to perform a case review.[61] They were also trained to focus more on the activity than the customer, that they were not allowed to merely conclude that the customer "does it all the time," and that they couldn't close an alert without understanding the activity.[62]

AML analysts had access to, and looked at, everything in the account and all the account activity, and they could call the business banker on the account and run internet searches.[63] As part of their process, analysts conducted a review

---

12, 655:18-656:1, 681:13-683:5, 686:1-17; 723:21-724:3, 751:1-752:2, 757:19-24, 761:12-18, 968:2-23, 969:7-20, 992:2-5, 1006:22-25, 1013:7-23 1027:17-19, 1114:7-15, 1156:7-11, 1158:18-20, 1159:6-11, 1159:20-1160:9; Exhibits P4-00019,-0044, P5-00012, P180, P181-0003, P398, DX40067-20.

[60]Tr.253:6-13; 343:1-22, 365:16-368:10; 371:6-372:2, 382:16-383:1, 397:23-399:13, 406:4-14, 511:2-6, 585:18-25, 646:1-647:21, 971:21-972:6, 1094:12-1099:18; Exhibits P4-00019, -0044, P5-00012, P180, P181-0003, P398-0005, 0006, -0007; DX40067-20.

[61] Tr.349:12-15, 350:2-7, 397:23-399:13; Exhibit P398-0005.

[62] Tr.365:19-367:8, 585:9-25, 603:2-21, 906:5-21, 968:14-23.

[63]Tr.224:6-15, 352:10-22, 364:8-21, 368:6-369:18, 551:9-18, 624:1-625:25, 627:17-628:14, 644:17-24, 702:12-703:2, 810:4-6, 892:5-12, 899:9-21, 983:13-984:12, 985:24-

or investigation into entities who were wiring money into the account.[64] All transaction data underlying the report that recommended filing a SAR was available to—and reviewed by—AML analysts at the time of the transactions and alerts.[65]

Shockingly, PCI's account activity alerted in Searchspace nearly every month for 3.5 years.[66] The analysts could not recall any other customer with billions of dollars in wire transfers alerting, much less monthly.[67] Faced with so many alerts, BMO placed PCI on the QAPOR list, even though it did not qualify.[68]

The analysts had access to MiContacts and reviewed it, as revealed by the many audit trail entries referencing the database.[69] Thus, it can be inferred that

---

986:5,995:16-18, 999:10-15; 1000:4-1001:15, 1028:18-21; 1092:21-25; 1105:8-20, 1149:18-1150:4, 1150:10-19.

[64] Tr.368:6-10.

[65] Tr.727:4-18, 749:7-16, 750:2-20, 758:25-759:10, 775:25-776:4, 889:3-11, 890:4-8; Exhibits P189, P333.

[66] Exhibit P182.

[67] Tr.683:6-14; 688:17-22, 990:1-4, 990:14-19, 1118:11-18.

[68] Tr.2273:3-2274:1.

[69] Tr.352:10-22, 362:9-12, 413:3-4, 1056:13-25; Exhibits P183-0015, -0020, -0027, and -0038.

they knew that Petters did not want lenders to know who other lenders were, that Petters intended to wire $450 million in funds into PCI's account to purchase Polaroid, and that the person who introduced the PCI business model to the bank was a convicted felon.[70]

From their review of MiContacts, they also knew that PCI's business model was buying consumer electronics from wholesalers and selling to big-box retailers.[71] Despite reviewing everything in the account, they never saw retailer payments flowing into the account. The analysts repeatedly noted that the Enchanted and Nationwide were the primary sources of incoming wires,[72] with one alert calling out Enchanted as the largest incoming wire in an amount of over $1 billion.[73] Even though researching the entities wiring money into an account was a required part of the AML review process, no analyst did so with respect to Nationwide and Enchanted.[74] No one from the AML group ever contacted Flynn

---

[70] Exhibits P2-0008, -0014, -0062, -0065, -0077.

[71] Tr.338:1-22, 352:10-22, 362:9-12, 413:3-4, 1056:13-25; Exhibits P2-0008, -0062, -0065, -0077, P183-0015, -0020, -0027, and -0038.

[72] Exhibit P183-0007, -0028, -0038, -0044, -0050, -0056, -0063, -0068, -0073, -0081.

[73] Exhibit P183-0050.

[74] Tr.289:14-23, 368:6-10, 892:21-893:1, 1020:6-16, 1123:4-5.

or Jambor about Nationwide or Enchanted.[75] Had they done so, they would have learned that the billions of dollars in payments were going the wrong direction.

The audit trails and alerts are replete with suspicious activity, including round trips, round numbers, similar incoming and outgoing amounts, layering, and others. The audit trail comments show the analysts violated AML policies and ignored suspicious wire activity at every turn. They failed to document reasons for the wires; failed to explain why they were consistent with PCI's business model or what the lawful purpose was; failed to provide comments sufficient to convince the reader the wires were not suspicious; merely said the wires were consistent with prior activity; focused more on the customer than on the activity; and then closed the alerts without fully understanding the activity.[76]

In addition to disregarding AML policies, analysts used the audit comments to highlight innocuous checks (such as for concert tickets), but ignored insider checks of millions of dollars from the same time period.[77] They chose to

---

[75] Tr.551:9-18, 892:9-12, 899:3-900:21, 1229:24-1330: 10, 1553:5-8.

[76] *See, e.g.*, Tr.271:25-272:14, 273:13-18, 274:4-24, 275:8-10, 283:7-19, 296:19-297:4, 297:21-24, 298:10-15, 300:22-301:17, 414:12-415:22, 658:6-660:2, 673:5-674:8, 676:3-7, 681:5-12, 685:9-686:17, 692:3-17, 693:5-18, 694:5-20, 704:3-706:17, 708:10-711:3, 751:10-752:2, 947:11-16, 948:7-949:3, 1006:8-21, 1007:1-10; 1008:7-25, 1111:24-1112:9, 1025:4-19; 1035:7-16, 1116:3-21.

[77] *See, e.g.*, Tr.700:21-702:18, 703:18-706:17, 708:10-711:3; Exhibits P182, P183, P185A-0009, -0011, -0014, -0015, -0016, -0017, -0018.

document the source of checks when they were harmless, such as for Disney on Ice, while failing to document the source of billions of dollars of incoming wires in the same alert.[78] When money laundering jumped off the page—for example, a $10 million outgoing wire to people in the yachting industry[79]--the AML analyst, who had been trained to look for both round numbers and purchases of things like houses and yachts, closed the alert. When asked, she could not explain how she concluded the activity was not unusual.[80]

Remarkably, although the AML group was described as an open-door, warm environment, not a single AML analyst recalls discussing the billions of dollars flowing through the PCI account.[81]

In addition to the foregoing, Plaintiff presented the testimony of expert Cathy Ghiglieri, who provided an extensive laundry list of BMO's atypical banking practices with respect to PCI.[82]

_____

[78] *See, e.g.*, Tr.662:17-665:25, 676:3-7, 688:17-689:23, 690:8-693:24, 933:1-4; Exhibit P183-0039.

[79] Tr.1006:8-13, 1006:17-21, 1007:1-10; P183-0050.

[80] Tr.1008:7-25, 1013:7-23, 1025:4-7; P183-0051.

[81] Tr.990:5-12, 1141:16-25, 1161:19-1162:10.

[82] Tr.2054:12-2205:7, 2249:5-2416:6.

## 2.    BMO ignores the adverse inference.

Critically, JMOL on the issue of knowledge must be evaluated through the prism of the adverse inference that a reasonable jury is entitled make due to BMO's intentional spoliation of evidence. As federal courts have held, that inference—in which the jury may assume that BMO's numerous discarded emails and documents would have supported Plaintiff's claims—undermines any JMOL argument based on a supposed lack of evidence.[83] When inferring the destroyed evidence was unfavorable to BMO, the jury could assume that it contained the very evidence of knowledge that BMO claims is lacking. For example, the jury could infer that it contained emails expressing concern about signs of ongoing criminal activity in the PCI account or evidence of gifts or kickbacks. By its nature, an adverse inference instruction "encourages the jury to

---

[83] *See Swift Transp. Co. v. Angulo*, 716 F.3d 1127, 1134 (8th Cir. 2013) (affirming denial of directed verdict; spoliation instruction permitted reasonable jury to infer facts supporting plaintiff's claim); *see also American Builders & Contractors Supply Co. v. Roofers Mart, Inc.*, No. 1:11–CV–19 (CEJ), 2012 WL 3027904, at *3 (W.D. Mo. July 24, 2012) (Defendant "argues that lack of evidence would preclude a reasonable juror from finding at least one of the elements required for each of plaintiff's claims. This argument fails when the adverse inference sanction is considered."); *Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000) (denying summary judgment because "the Court finds that a spoliation inference could be drawn from IBM's destruction of documents . . . , and that this inference in turn could provide evidence from which a reasonable jury might disbelieve IBM's articulated reasons**)**.

speculate about the nature of the contents of missing evidence." Oct. 29, 2022

Order, ECF 214, at 7 (citing *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900 (8th Cir.

2004). It obviates any obstacle to the jury's ability to decide whether BMO acted

with the requisite knowledge to support liability in this case.

### 3. The evidence satisfies the requirements for each cause of action.

Plaintiff's circumstantial evidence recited above overwhelmingly

establishes BMO's knowledge[84] of the Petters fraud and breaches of fiduciary

duty.[85]

Atypical conduct by a bank is evidence of knowledge.[86] The evidence

recited above shows that the business bankers and AML analysts[87] did precisely

that and repeatedly violated BMO's internal policies. This includes Flynn failing

to review PCI's transaction activity, in violation of BMO's know-your-customer

---

[84] The evidence discussed herein also establishes BMO's deliberate closing of its eyes to avoid what would otherwise have been obvious to it, as well as BMO's bad faith in its reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary.

[85] It is axiomatic that abusing one's position as an officer in order to run a Ponzi scheme is a breach of fiduciary duty.

[86] *See Am. Bank of St. Paul v. TD Bank, N.A.*, No. 09-2240 ADM/TNL, 2011 WL 1810643, at *8 (D. Minn. May 9, 2011) (atypical conduct of business evidence of knowledge; knowledge inferred from circumstantial evidence).

[87] Plaintiff does not rely on a collective scienter theory. Instead, Jambor, Flynn, and the AML analysts each had the requisite knowledge.

policies, and pushing a sham DACA to execution. It also includes Jambor never filling out the suspicious activity log or escalating any issues, despite knowing billions of dollars were running through a small business checking account; knowing the transaction activity was inconsistent with PCI's business model; knowing insiders were writing checks to other insiders and themselves for large, round numbers; allowing PCI to ghost-write a bank letter to PCI; and initiating the exception to the bank's overdraft policy. As set forth above, the AML analysts routinely broke AML policies on numerous occasions when documenting (and failing to document) suspicious activity.

Rather than a mere failure to investigate, BMO employees saw red flags, investigated or otherwise knew the truth, *and then* purposefully looked the other way. Jambor's failure to follow up after calling Petters about the two $1 million checks to Coleman is a good example. The conduct of the AML analysts is worse. On a near monthly basis from 2005 through 2008, AML analysts received alerts of billions of dollars being funneled through the PCI account, investigated the transaction activity, and then turned a blind eye to the facts they found, as described above. Most telling is Exhibit 333, which recommended the filing of a SAR, and which concluded the activity was suspicious after examining ***the very same patterns found in the data available to AML analysts at the time of the alerts.***

23

In the face of overwhelming circumstantial evidence, BMO's attempts to diminish the significance of Plaintiff's evidence fail. In addition to its contention that Plaintiff has abandoned the element of actual knowledge (which he has not),[88] BMO cites to the Trustee's testimony about what the bank should have done as "sound[ing] in negligence."[89] That testimony, however, addressed causation, not scienter. Given its actual knowledge of fraudulent activity on the PCI account, what BMO should have done is close the account and report that activity to federal authorities, not substantially assist in furthering that fraud by allowing it to continue on the PCI account. The difference between what BMO did and what it should have done is the actual and proximate cause of Plaintiff's damages.[90]

Likewise, BMO employees' self-serving testimony of their lack of awareness of the fraud is a matter of credibility for the jury to credit (or not), and weigh against the circumstantial evidence that they knew, rather than a determination for the Court on JMOL. In sum, when coupled with the adverse

---

[88] *See* Section I(A) *supra.*

[89] Mem. 6 (citing 10/20/22 Tr.1951:6-15).

[90] Mem. 4 n.11.

inference, a reasonable jury could find BMO possessed the requisite scienter for each of its causes of action.

## II. A reasonable jury could conclude that the other elements of Count I (MUFA) are satisfied.

### A. Plaintiff need not prove anything about the employee who actually processed the transaction.

BMO's claim that Plaintiff must prove that the specific M&I employee who processed the transfer had the requisite knowledge is wrong. Such a requirement is not found in the actual language of Minn. Stat. § 520.08, which states in relevant part: "unless the *bank* pays the check with actual knowledge that the fiduciary is committing a breach of an obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith."[91] BMO's position directly contradicts this statutory language.[92]

---

[91] Minn. Stat. § 520.08 (emphasis added).

[92] *See also In re Lauer*, 98 F.3d 378, 386 (8th Cir. 1996) ("The elements of a cause of action under that statute are: (1) the defendant dealt with one who was a fiduciary; (2) the fiduciary breached his fiduciary duty; and (3) the defendant had either actual knowledge of the breach or knew sufficient facts to amount to bad faith"); *New Jersey Title Ins. Co. v. Caputo*, 163 N.J. 143, 151, 748 A.2d 507, 511 (2000) (stating that the term "bad faith" means "knowledge by any responsible agency officer or employee, of a bank").

The sole authority that BMO cites, the district court opinion in *Buffets, Inc. v. Leischow*,[93] does not support its position. Although the Court mentioned that there was no evidence that the employee processing the transaction had knowledge, it did so in the context of discussing the presumption of ownership and the fact that the account contained comingled funds.[94] Affirming judgment on appeal, the Eighth Circuit appropriately refocused that same inquiry on the *bank's* knowledge:

> *the bank* must be aware that the funds in question are held pursuant to a fiduciary obligation in the first place… Buffets has not shown that a genuine dispute exists as to whether, despite the commingled, non-fiduciary nature of LGI's accounts, *the banks* were so aware.[95]

BMO also emphasizes that the statute requires bad faith processing of a "specific transaction." That requirement, to the extent it exists, is satisfied. As set forth above, BMO's evidence of knowledge is far-reaching and at least encompasses the entire time when investors with claims against PCI's estate lost money. Accordingly, the Bank would have had the requisite knowledge each time it processed the offending transactions.

---

[93] No. CIV. 11-405, 2012 WL 2402828, at *4 (D. Minn. June 26, 2012).

[94] *Id.* at *5.

[95] *See Buffets, Inc. v. Leischow*, 732 F.3d 889, 900 (8th Cir. 2013) (emphasis added and citation removed).

**B.    BMO is incorrect about the scope of MUFA damages.**

BMO offers a two-pronged attack on Plaintiff's claimed damages under MUFA. The first is BMO's spurious assertion that the claim must be limited to the $63 million that PCI management directed to themselves because PCI was insolvent.[96] This argument is debunked in Section IV below. Relying on the *Buffets* case, BMO's second argument is that there is no connection between the MUFA violations and the $1.9 billion damages sought. However, unlike the *Buffets* case, our case does not involve a legitimate business with some illegitimate transactions. Here, there were no legitimate transactions—Plaintiff alleged and proved that the PCI operation was a sham with no real business. Accordingly, *every* transaction violated MUFA and was a component of a massive breach of fiduciary duty. The portion of the money flow sought by Plaintiff as compensation (representing the amounts it cannot pay its creditors) is the Court's approved measure of damages.

**III.    A reasonable jury could conclude that the other elements of Count II (Breach of Fiduciary Duty) are satisfied.**

**A.    The DACA imposed a fiduciary duty.**

The DACA agreement at issue in this case defines PCI as "Petters" and defines all monies deposited into the PCI account that are proceeds of purchase

---

[96] Mem. 18.

orders and/or invoices financed by the Protected Party are defined as "Protected Party Funds."[97] It further provides that the Protected Party Funds are to be held "in trust" and that moneys deposited into the account shall be held "for the benefit of" Petters and the protected parties. The Bankruptcy Court already held that this language created a fiduciary duty when denying BMO's Motion to Dismiss.[98]

### B.    A reasonable jury could conclude that BMO breached the DACA.

The evidence at trial established that BMO did nothing to comply with the DACA. It never received any transaction lists, never asked why, and never set up procedures to comply with it.[99] BMO misses the point with its argument that BMO had no duties until it received a transaction list. As set forth above, BMO had general fiduciary duties with respect to the funds in the account, and, as a fiduciary, had the highest form of duty recognized under the law, and it breached its duties by turning a blind eye to all the facts listed above.

---

[97] P645 at 1.

[98] Dkt. 4-13.

[99] Tr.1606:6-19, 1614:1-7, 1728:14-23, 1745:19-1746:17.

**C.    A reasonable jury could conclude that causation was satisfied.**

BMO's causation theory is unduly restrictive. For breaches of fiduciary duty, Plaintiff need only establish proximate cause.[100] Accordingly, causation here has been established for all the same reasons as it has for the substantial assistance elements of claims III and IV. *See* Sections III(B), IV *infra*.

**IV.    A reasonable jury could conclude that the other elements of Count III (aiding and abetting fraud) are satisfied.**

**A.    BMO assumes an underlying fraud on the wrong party.**

The underlying fraud in Plaintiff's claim for aiding and abetting fraud is the fraud upon investors. In Count III of the Amended Complaint, plaintiff alleges that Petters, Coleman, and White perpetrated a massive fraud, which caused ***investors*** to pour money into the Ponzi scheme.[101] Count III incorporates the prior paragraphs of the Amended Complaint explaining the scheme, where it sets forth how the fraud was perpetrated on ***investors***.[102]

Plaintiff has standing to assert this claim. BMO's recycled standing arguments to the contrary have been rejected repeatedly. In its Order denying BMO's Motion to Dismiss, the Bankruptcy Court held that "when a corporation

---

[100] *Tyler Holdings, Inc. v. JJT, LLC,* No. A07-2046, 2008 WL 5136443, at *8 (Minn. Ct. App. Dec. 9, 2008)

[101] Dkt. 3-11 at ¶¶ 160, 163.

[102] *See Id.* at ¶17 (representations to investors); ¶19 (investors induced).

is insolvent, the corporation's derivative claims include claims to recover for harm to creditors . . . here, the estate's derivative claims for harm to creditors are properly pursuable by the Plaintiff who stands in the shoes of the debtor."[103] This Court upheld the Bankruptcy Court's view of derivative standing, explaining that: 1) claims are "derivative" and belong to the debtor when they involve harm to the debtor that only incidentally harmed creditors; and 2) that the Bankruptcy Court's correctly concluded that the Trustee's claims involved incidental harm to the creditors and direct harm PCI.[104] PCI was injured as a result of the fraud perpetrated on the investors since it owes money to those investors.[105] Therefore, it is clear that there is standing to assert this claim.

Even if Plaintiff were required to prove aiding and abetting of a fraud on *PCI*, that evidence has been supplied. Ms. Coleman explained that information regarding the fraud was kept from employees other than her, Mr. White, and Mr.

---

[103] Dkt. 4-13, at 7.

[104] Dkt. 70, at 10-11.

[105] Dkt. 70, at 6-7.

Petters.[106] As fiduciaries, PCI officers were required to disclose that information, and failure to do so constitutes fraud.[107]

## B.    A reasonable jury could conclude that there was substantial assistance.

Once the correct nature of the underlying fraud its understood, most of BMO's arguments on substantial assistance fall away.[108] A few of BMO's contentions do, however, relate to other issues. First, BMO asserts that Plaintiff cannot rely upon routine banking services coupled with inaction as constituting substantial assistance. To the contrary, under Minnesota law, providing even routine banking services with knowledge of the fraud can be substantial assistance.[109] Besides, as established in Section I(C)(3) *supra*, BMO provided atypical, non-routine banking services.

BMO also suggests that substantial assistance cannot exist because, in its view, the employees involved had no motive to assist. This argument can be

---

[106] Tr.2830:4-10.

[107] *Zimmerschied v. JP Morgan Chase Bank, NA.*, 49 F. Supp. 3d 583, 595-56 (D. Minn. 2014).

[108] Mem. 11-15.

[109] *Anderson v. U.S. Bank Nat. Ass'n*, No. A13-0677, 2014 WL 502955, at *7 (Minn. Ct. App. Feb. 10, 2014) (providing services with knowledge of fraud may be substantial assistance).

made to the jury, but it not grounds for JMOL, in which all inferences are made in Plaintiff's favor. Besides, Plaintiff offered extensive evidence of motive, including evidence that PCI was an important, profitable client for the bank, and that BMO's employees were motivated to assist Petters to cross-sell and obtain lucrative additional business from his related companies.

Nor is there any merit to BMO's causation arguments.[110] BMO's statement that PCI had been unable to pay its creditors for years cannot be reconciled with the evidence that it paid its investors who signed notes before December 2007.[111] Thus, there could be no damages until the post-December 2007 notes came due and PCI was unable to pay them. Moreover, contrary to BMO's suggestion, there is no requirement that the bank has to be involved in soliciting the loans in order for its conduct to have been a proximate cause for this injury. A reasonable jury could find causation because if BMO had not turned a blind eye and reported the fraud, the damages would never have happened. As Plaintiff's banking expert Catherine Ghiglieri so colorfully explained, such a report would have caused someone from the FBI to show up on the bank's doorstep.[112]

---

[110] Mem. 14-15.

[111] Tr.2453:24-2454:3; *see also* Tr.3239:11-16 (BMO's expert admitting that all investors were paid or rolled their notes).

[112] Tr.2390:8-9.

**V.    A reasonable jury could conclude that the other elements of Count IV (aiding and abetting breach of fiduciary duty) are satisfied.**

BMO also seeks JMOL on Plaintiff's aiding-and-abetting-breach-of-fiduciary-duty claim for lack of evidence of substantial assistance. For reasons already explained, *see* Section III(B) *supra*, there is ample evidence that the bank's conduct substantially assisted the Ponzi scheme.

BMO also contends that because officers' duties during insolvency are supposedly limited to "the prohibition against self-dealing and preferential treatment," and PCI was consistently insolvent during the relevant time period, any damages should be limited to the $63 million in self-dealing transfers that Petters, Coleman, and White made on the PCI account.[113]

This argument falls apart at every turn. First, it's premise: BMO's cited authorities do indicate that when a corporation becomes insolvent, its officers obtain corporation incur an *additional* duty to creditors of the corporation (that BMO argues is limited to the prohibition against self-dealing and preferential treatment).[114] That is because, as fiduciaries of the corporate assets for the benefit

---

[113] Mem. 16 (citing *Helm Fin. Corp. v. MNVA R.R. Inc.*, 212 F.3d 1076, 1081 (8th Cir. 2000)).

[114] *See Helm*, 212 F.3d at 1081.

of creditors, they cannot treat themselves to a preference over other creditors.[115]

But as the Bankruptcy Court has explained, despite this additional duty,

directors and officers of insolvent corporations continue to owe a duty of loyalty

and due care to the corporation.[116] Since Count IV is based on BMO's aiding and

abetting the breach of this duty to *PCI*, not its creditors, the alleged limit to self-

dealing related to the duties to creditors is irrelevant.[117]

There is also no reason to limit damages as BMO suggests. When BMO's

conduct assisted the fraud, it caused *all* the losses that followed. The Court has

determined on multiple occasions that that harm is properly measured by using

the method employed by Plaintiff's damages expert Ted Martens (net losses by

PCI's investors for which PCI is liable), not the amounts allegedly paid to Petters

and his confederates.[118]

Finally, the amount mentioned by BMO grossly understates the amounts

depleted from the account, since it only counts direct payments to the Petters and

---

[115] *Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 869 (Minn. 1981).

[116] *Sec. In re Asset Capital Corp.*, 396 B.R. 35, 40 (Bankr. D. Minn. 2008) (cited in MTD Order at 7 n.27).

[117] Dkt. 241 at 20 (noting the court "dismissed the Trustee's claims arising from duties that BMO Harris allegedly owed directly to PCI's investors").

[118] *See, e.g.*, Dkt. 214 at 45-55.

his two confederates and does not include other monies removed from the account for their benefit (such as the half a billion dollars stolen from investors to buy Polaroid).

## VI.    The contractual limitations periods do not apply.

The Court should reject BMO's invocation of purported contractual limitations periods set forth in PCI's Depository Agreement and Wire Transfer Agreement with BMO. That is because the plain language of these agreements do not apply to Plaintiffs' claims and are void as against public policy in any event.

**Depository Agreement.** The Depository Agreement, which was not entered until January 25, 2008, required Depositor to "timely review all account statements and to notify the Bank within 60 days . . . of any unauthorized or missing signature or alteration on a check, or . . . unauthorized or missing endorsements, improper charges or other account problems."[119] That Agreement "preclude[s]" PCI "from commencing legal against against [BMO] unless Depositor has given Bank notice as provided above and also initiated legal action within 180 days after Bank mailed or made statements or items available to

---

[119] DX10014 at 3-4.

[PCI]."[120] Even if the provision covered Plaintiff's claims, it would not apply to claims like Plaintiff's that are largely based on conduct that occurred before 2008.

Moreover, by its terms, this provision only applies when there are unauthorized or missing signatures or alterations on a check, unauthorized or missing endorsements, improper bank charges, or other similar account problems. This is the unambiguous reading of the provision, which must be strictly construed against the party invoking it, *i.e.*, BMO.[121] The structure and plain language of the provision support this conclusion. The sentence containing the limitations provision precludes commencing legal action unless notice "as provided above" is given, which necessarily limits the scope of the clause to account problems akin to missing signatures and improper bank charges.[122] Plaintiff is not asserting claims based on these kinds of issues, so this agreement is entirely irrelevant and cannot operate as a defense.

---

[120] *Id.*

[121] *See Olmsted Med. CTr.v. Cont'l Cas. Co.*, No. CV 21-1309 (MJD/BRT), 2022 WL 126336, at *4 (D. Minn. Jan. 13, 2022).

[122] *See* 11 Williston on Contracts § 32:10 (4th ed.) (specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate).

The Depository Agreement is also unenforceable and void for two reasons. First, because the depository agreement was entered into between PCI and Defendant for the purpose of perpetrating a fraud on investors in addition to PCI, it is void on public policy grounds.[123] Second, a provision barring Plaintiff's claims here because where notice is not provided to the bank within sixty days after the statements were issued to PCI (and suit was not filed within 180 days) is *per se* unreasonable because it would have prevented the Trustee from bringing suit before the claims accrued.[124] The bank's account statements were issued to PCI monthly between 2002 and 2008,[125] but the Trustee's claims in this case did not accrue until years later when the underlying fraud came to light and the Trustee was appointed. Thus, the contractual limitations period would bar

---

[123] *Torpey v. Murray*, 101 N.W. 609, 610 (Minn. 1904); *Horbach v. Coyle*, 2 F.2d 702, 706, 707 (8th Cir. 1924).

[124] *See Davies v. Waterstone Cap. Mgmt., L.P.*, 856 N.W.2d 711, 718-19 (Minn. Ct. App. 2014) ("A contractually modified limitations period is unreasonable if the reduced limitations period 'effectively deprives a party of the reasonable opportunity to vindicate his or her rights.' . . . [A] limitations provision that requires the plaintiff to bring an action before any loss can be ascertained is per se unreasonable.") (citations omitted); *Peggy Rose Revocable Trust v. Eppich*, 640 N.W.2d 601, 606 (Minn. 2002) (holding that 18-month contractual limitations period was unenforceable when applied to the claim of fraud that does not accrue until its discovery).

[125] Exhibit P1.

Plaintiff's claims against the bank before any of those claims accrued.[126] Finally,

the contractual provision does not apply to the MUFA claim, because a party

cannot limit its liability under the Uniform Fiduciaries Act by contract.[127]

**Wire Transfer Agreement.** The Wire Transfer Agreement, entered in 2006,

required Customer to notify Bank of "any unauthorized payment order, any

payment to a beneficiary not intended by Customer, any payment in an amount

greater than the amount intended by Customer and any payment order

duplicative of a payment order previously sent by the Customer, along with the

relevant facts relating to the error" within 20 days of receiving notice that the

payment order was accepted by the bank.[128] It then provides that "[a]ll claims

arising by reason of any transfer must be submitted to Bank in writing within

---

[126] *See Digital Angel Corp. v. Corporativo SCM, S.A. de C.V.,* No. CIV. 05-1060
ADM/JJG, 2006 WL 1228859, at *4 (D. Minn. May 8, 2006) (finding clause did not
apply to fraud in inducement claim because it was unreasonable insofar as it
"essentially bar[red] any cause of action that *occurred* more than two years ago,
meaning that Defendant's cause of action could be barred long before Defendant
even discovers its existence").

[127] *Master Chem. Corp. v. Inkrott*, 55 Ohio St. 3d 23, 28 563 N.E.2d 26, 31 (1990)
(bank cannot absolve itself of protections provided by the Uniform Fiduciaries
Act).

[128] Exhibit P356.

one year after the Customer received notification from Bank identifying the

order."[129]

Strictly construed (as it must be), this provision only applies to claims that

the Trustee has not asserted here, namely claims concerning transfer errors such

as payment or amended payment orders by an unauthorized person as defined

in the Agreement, paying the wrong beneficiary, paying an amount greater than

ordered, and paying one order twice. The structure and plain language of the

provision support this conclusion: Although the contractual limitation provision

refers to "[a]ll claims arising by reason of any transfer," the paragraph containing

the limitations period concerns the transfer errors listed above it.[130] Plaintiff,

however, asserts no claims based on these transfer errors. Moreover, even if the

provision were construed broadly to mean any claims, even those unrelated to

the specified transfer errors, this provision is still inapplicable, because Plaintiff's

claims do not arise by reason of a transfer—rather Defendant's actions and

inactions that have resulted in Defendant breaching fiduciary duties, violating

---

[129] *Id.*

[130] *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 920 (Minn. Ct. App. 1999)
(applying *noscitur a sociis* doctrine to find that "any person," with surrounding
language concerning real estate, meant any person involved in real estate
transaction).

MUFA, and knowingly providing substantial assistance to others in committing fraud and breaches of fiduciary duty.

Even if the provision did apply to the Trustee's claims, which it does not, the provision is unenforceable and void for several reasons. First, for the reasons described above, because the wire transfer agreement was entered into between PCI and Defendant for the purpose of perpetrating a fraud on investors in addition to PCI, it is void on public policy grounds. Second, it is also *per se* unreasonable because PCI received wire transfer notices when they were made, but Plaintiff's claims did not accrue until years later. And, as with the Depository Agreement, the Wire Transfer Agreement's contractual provision does not apply to the MUFA claim.

## VII. A reasonable jury could conclude that the action was filed within the statute of limitations period.

Based on the applicable six-year statutes of limitations,[131] BMO also seeks judgment as a matter of law barring the jury from considering its conduct and PCI Account transactions that occurred before November 15, 2006.[132] But under settled Minnesota law, accrual "requires the existence of operative facts

---

[131] *See* Minn. Stat. § 541.05.

[132] Mem. 26.

supporting each element of the claim."[133] In this case, the element of damages

depends arose from PCI's inability to repay its creditors[134]—a harm that did not

come into existence until the Ponzi scheme collapsed in 2008.

BMO argues, however, that this harm necessarily occurred earlier because

PCI was insolvent "long before 2006."[135] But, as Plaintiff's damages expert

explained, PCI was able to and did repay its investors until the Ponzi scheme

collapsed.[136] Here, PCI was only unable to repay investments on notes dated

after December 5, 2007, and the "losses really are really at the end, at the end of

the scheme, when the scheme implodes. It's at that point in time when you have

investors who have typically invested late and now there's no new money to

come in to pay them off."[137] Ponzi schemes necessarily involve the use of new

investor funds to repay existing investors, such that the actual inability to repay

---

[133] *Sec. Bank & Tr.Co. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 916 N.W.2d 491, 496 (Minn. 2018).

[134] *See* Bankr. S.J. Order, ECF No. 15-16, at 9-11, 13; Order Denying BMO's Appeal, ECF No. 70 at 6-7.

[135] Mem. 27.

[136] Tr.2453:11-2454:10, 3239:11.

[137] Tr.2453:24-2454:3.

creditors does not occur until the scheme collapses.[138] This harm did not occur until 2008, well within the statute of limitations for each of Plaintiff's four claims.[139]

Although the Court need not reach this issue, Plaintiff's aiding and abetting fraud claim is also timely because it is subject to a discovery rule of accrual,[140] and Plaintiff as bankruptcy Receiver and Trustee could not have, in the exercise of reasonable diligence, discovered the facts supporting his claim until after 2008. BMO does not argue otherwise. Instead, it contends that PCI's "imputed knowledge of its management misconduct" should be attributed to Plaintiff as Trustee.[141] But this argument rests on a faulty premise because "[a] principal," such as PCI, "is not imputed with the knowledge of an authorized agent acting adversely to the interest of the principal," such as Petters, Coleman,

---

[138] *See In re Petters Co.*, 550 B.R. 457, 468 (D. Minn. Bankr. 2016) (describing "real economic harm" when investors "are left unpaid when the scheme collapses due to its inability to take in enough new money").

[139] Since Ponzi schemes are typically insolvent from their inception but inevitably result in bankruptcy, BMO's proposed principle of accrual would allow wrongdoers who perpetuate them to avoid liability to the bankruptcy estate simply by keeping the scheme afloat longer than the applicable statute of limitations.

[140] *See Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985).

[141] Mem. 27.

and White.[142] The relevant inquiry here is not when did PCI know, but "what did the Receiver know and when did the Receiver know it."[143]

In sum, the undisputed evidence shows that the injury to PCI's estate at issue in this case did not occur until the Ponzi scheme collapsed in 2008 and that Plaintiff could not have discovered his claims before then in any event. Plaintiff's 2012 complaint was well within the limitations period.

## VIII. BMO's equitable defenses of Acquiescence, Consent, Ratification, and Waiver fail for the same reasons as its *In Pari Delicto* defense.

The Court's ruling that the *in pari delicto* defense does not apply "in light of PCI's status as a receivership entity"[144] also precludes the application of the kindred equitable defenses of acquiescence, consent, ratification, and waiver. These equitable defenses, which are all based on the fact that "PCI permitted or approved all of the M&I conduct that allegedly gives rise to liability,"[145] do not apply here because Plaintiff's appointment as a receiver eliminated PCI as a

---

[142] *Nat'l Credit Union Admin. Bd. v. CUMIS Ins. Soc'y, Inc.*, 241 F. Supp. 3d 934, 939 (D. Minn. 2007); *see also Steigerwalt v. Woodhead Co.*, 244 N.W. 412, 414 (Minn. 1932) ("If therefore the third person acts in collusion with the agent to defraud the principal, the latter will not be chargeable with any information which the agent receives pertaining to the transaction.") (quotation omitted).

[143] *Ass'n v. Commonwealth Claimants v. Moylan*, 71 F.3d 1398, 1402 (8th Cir. 1995).

[144] Order Denying BMO Appeal, ECF 70 at 12.

[145] Mem. 28.

target for those defenses.

This Court has already rejected BMO's *in pari delicto* defense "when a receiver has been appointed for a corporation, the wrongdoer (the corporation) is removed from the picture and, hence, *in pari delicto* does not apply."[146] In so holding, the Court relied on Minnesota Supreme Court cases explaining that this receivership principle negates *all* equitable defenses that may be asserted against a receivership entity.[147] Under that authority, "when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself."[148] Indeed, the Supreme Court in *Magnusson* applied this principle to reject an equitable defense based on the insolvent corporation's consent: "Even assuming that this defense would be available against [the corporation], it cannot constitute a defense against the receiver in this case. The receiver represents the rights of creditors and is not bound by the fraudulent acts

---

[146] ECF 70 at 12 (quoting *Kelley v. Coll. of St. Benedict*, 901 F. Supp. 2d 1123, 1129 (D. Minn. 2012)).

[147] *Id.* (citing *German Am. Fin. Corp. v. Merchants & Mfrs. State Bank of Minneapolis*, 225 N.W. 891, 893 (Minn. 1929), and *Magnusson v. Am. Allied Ins. Co.*, 189 N.W.2d 28, 33 (Minn. 1971)).

[148] *German Am. Fin. Corp.*, 225 N.W. at 893.

of a former officer of the corporation."[149] As the Ninth Circuit put it, "[e]quitable defenses are inapplicable against a receiver because a receiver is acting for third parties and was not privy to the insolvent institution's inequitable conduct."[150] BMO's memorandum does not address any of these principles. Whatever equitable defenses BMO may have had against PCI evaporated the moment this Court appointed Plaintiff as a receiver.

Even if these defenses were available against Plaintiff, they cannot overcome the established principle that PCI cannot itself be charged with knowledge of—and thus could not acquiesce, consent to, ratify, or waive objection to—the fraudulent acts of its principals.[151] As federal courts have recognized in other contexts, "the knowledge and effect of the Ponzi scheme principal's fraudulent transfers may not be attributed to his robotic corporate tools, or prevent a receiver from suing on behalf of those entities."[152]

---

[149] 189 N.W.2d at 33; *see also Bonhiver v. Graff*, 248 N.W.2d 291, 296 (Minn. 1976).

[150] *S.E.C. v. Am. Capital Investments, Inc.*, 99 F.3d 1146, 1996 WL 608527, at *4 (9th Cir. 1996) (citation omitted).

[151] *See Steigerwalt*, 244 N.W. at 414.

[152] *See Janvey v. Democratic Sen. Campaign Comm., Inc.*, 712 F.3d 185, 192 (5th Cir. 2013) (citing *Scholes v. Lehmann*, 56 F.3d 750, 753-55 (7th Cir. 1995)).

**IX.    There is No UCC preemption.**

**Wire Transfers.** Article 4A is designed to be the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation *covered by particular provisions of the Article.*"[153] Resorting to "principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities *inconsistent* with those stated in the Article." *Id.* (emphasis added).

The particular provisions of Article 4A cited by Defendant pertain to the wire transfer process itself. This includes provisions relating to the issuance and acceptance of payment orders and the authorization or verification of payment orders,[154] the process for refunding an unauthorized or unenforceable payment order,[155] and the liability and duty of a receiving bank regarding an unaccepted payment order.[156]

Plaintiff's claims are not displaced because the claims do not relate to these provisions. They do not require a determination of the rights, duties, and liabilities of the parties as to authorized or unauthorized payment orders or the

---

[153] Minn. Stat. § 336.4A-102 cmt. (emphasis added).

[154] Minn. Stat. § 336.4A-202.

[155] Minn. Stat. § 336.4A-204(a).

[156] Minn. Stat. § 336.4A-212.

mechanics of the payment order process.[157] The nature of the Plaintiff's claims

and the duties and obligations asserted fall outside of the wire transfer process.[158]

Moreover, even if Plaintiff's claims are considered to implicate the wire

transfer process, the UCC does not displace Plaintiff's claims. The Minnesota

Court of Appeals has opined that "principles of law and equity may be applied

to disputes relating to funds transfers so long as those principles do not create

rights, duties, or liabilities inconsistent with those stated in the Article."[159] In

*Hedged Inv. Partners*, the court held that the breach of contract and breach of

---

[157] *See Koss Corp. v. Am. Ex. Co.*, 233 Ariz. 4 (Ariz. Ct. App. 2013) ("[T]he actions of the parties involved in a funds transfer that implicate the transaction itself are exclusively governed by Article 4A," but the "U.C.C. does not necessarily preempt claims based on additional actions that occur *outside* the funds transfer process or exceed the allocation of liability under Article 4A provided the application of other law is not inconsistent with Article 4A").

[158] BMO also cites the statute of repose in Article 4A, Minn. Stat. §336.4A-505. Reading this statue makes clear how far removed the scope of Article 4A is from the causes of action asserted here. It only precludes a customer from making untimely assertions that a bank is not entitled to retain a payment where "a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order…"

[159] *Hedged Inv. Partners, L.P. v. Norwest Bank Minn., N.A.*, 578 N.W.2d 765, 771 (Minn. Ct. App. 1998); *see also* Minn. Stat. Ann. § 336.1-103 ("[u]nless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including . . . the law relative to capacity to contract, principal and agent, estoppel, *fraud*, misrepresentation, duress, coercion, mistake, bankruptcy. . . supplement its provisions.").

fiduciary duty claims relating to a series of wire transfers did not create inconsistent—but, instead, additional—rights, duties, or liabilities. The court held that the contractual responsibilities, including the contractual fiduciary duties, were *not* displaced by Article 4A.[160] Thus, even if Plaintiff's claims could be deemed to be a dispute that implicates the wire-transfer process, which they aren't, Plaintiff's claims of fraud, fiduciary duties, MUFA, and aiding and abetting concern additional, rather than inconsistent, duties and liabilities.

Additionally, Article 4A does not preempt a state law claim where, as here, it is based on a theory that the beneficiary bank accepted funds that it knew were fraudulently obtained.[161]

BMO's arguments regarding wire transfer processing and Article 4A of the UCC completely ignore the governing *Hedged Inv. Partners* case. Instead, BMO cites to *ReAmerica, S.A. v. Wells Fargo Bank Int'l*,[162] a Second Circuit case where, unlike here, the parties entered into a wire transfer agreement agreeing that the

---

[160] *Id.*

[161] *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1276, 1279 (11th Cir. 2003) ("It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A."); *see also Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 749 n.3 (N.C. 2012) (quoting *Regions Bank*)).

[162] 577 F.3d 102 (2d Cir. 2009).

parties' rights and obligations were governed by Article 4, and case from California.[163]

**Checks.** Only a *de minimis* portion of Plaintiff's UFA claims are based on BMO's check processing. Nonetheless, BMO argues it is entitled to JMOL on any claims that rely on the processing of checks based on UCC Section 3-307.[164] As the commentary explains, this Section of the UCC provides "rules for determining when a person taking an instrument has notice of the claim which will prevent assertion of rights as a holder in due course."[165] It was adopted to "clarify the law by stating rules that comprehensively cover the issue of when the taker of an instrument has notice of breach of a fiduciary duty and thus notice of a claim to the instrument or its proceeds."[166] BMO's contention that this provision broadly preempts Plaintiff's claims is mistaken because those claims are not based on duties that arise under Article 3 of the UCC, but instead are founded on duties outside of Article 3.

First, Plaintiff's common-law claims do not at all depend on whether BMO

---

[163] BMO Memo, at n. 134.

[164] Minn. Stat. § 336.3-307(b).

[165] UCC 3-307 cmt. 2.

[166] *Id.* cmt. 1.

processed checks issued to PCI insiders, but instead BMO's conduct in willfully

ignoring obvious insider payments among many, many other indicators of fraud

on the PCI account that perpetuated a Ponzi scheme. Nothing in BMO's cited

authority, *Bradley v. First National Bank of Walker, NA,*[167] or, to Plaintiff's

knowledge, any other authority would broadly preempt fraud and other

common law claims when the scheme happens to involve checks. The UCC

instead expressly preserves such claims.[168]

Second, the weight of authority analyzing this displacement issue holds

that Section 3-307 does not displace UFA claims with respect to checks.[169] As that

authority explains, Section 3-307 "tells us when the taker of an instrument has

notice of a claim"—for the purpose of qualifying the rights and defenses

available for putative a "holder in due course" under UCC § 3-306—"it does not

_____

[167] 711 N.W.2d 121 (Minn. Ct. App. 2006).

[168] Minn. Stat. § 336.1-103 ("[u]nless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including . . . the law relative to . . . fraud . . . supplement its provisions").

[169] *See Choteau Auto Mart, Inc. v. First Bank of Missouri*, 148 S.W.3d 17, 19, 21-22, 24 (Mo. Ct. App. 2004) (holding that Section 3-307 does not displace UFA provision, finding that bank's liability arose from duty imposed by UFL and not UCC); *Willowlgen Acad.-Wisconsin, Inc. v. Connelly Investors, Inc.*, 746 N.W.2d 570, 579 (Wis. Ct. App. 2008) (no displacement because "a lawsuit attempting to enforce a claim pursuant to the Uniform Fiduciaries Act is not a lawsuit to 'enforce an obligation, duty or right arising under' the Uniform Commercial Code").

itself provide the basis for a claim."[170] In holding otherwise, *Bradley* acknowledged the "policy favoring consistent judicial interpretation and application of the uniform laws" but did not identify any contrary decisions on this issue.[171] The *Bradley* decision is only persuasive authority on how the Minnesota Supreme Court would decide the issue, but its misinterpretation of Section 3-307 as a cause of action with its own limitations period and inconsistency with other authority on the subject strongly suggests that the Minnesota Supreme Court would not follow it.

## X.    A reasonable jury could find Plaintiff has proven compensatory damages.

Plaintiff's damages expert's testimony was more than sufficient. He explained the total amount of damages of approximately $1.9 billion. He described his methodology in detail, explaining that it was a straight-forward calculation that compared the monies paid by the investors to the monies paid to the investors.[172] He also identified who the investors were, which investors were direct investors and which went through a special purpose entity and the names

---

[170] *See Choteau Auto Mart, Inc. v. First Bank of Missouri*, 148 S.W.3d 17, 23 (Mo. Ct. App. 2004).

[171] *Bradley*, 711 N.W.2d at 126-27.

[172] Tr.2443:3-2444:24, 2454:17-21, 2459:11-20.

of those entities.[173] For the vast majority of the damages, he broke down the

damages by investor.[174]

BMO's contention that Plaintiff did not include the underlying data is

incorrect. Martens explained that substantially all the monies going to and from

investors passed through the PCI account at BMO, and Plaintiffs submitted into

evidence multiple documents establishing the monies wired to and from the

account, which identified the names of the parties who wired money into the

account and received payments.[175]

## XI.    A reasonable jury could award punitive damages.

BMO's request for JMOL on punitive damages should be denied. There is

ample evidence from which a jury could conclude that BMO's management

acted with "deliberate disregard for the rights or safety of others" in facilitating

Petters' fraudulent scheme.

**State of Mind.** According to BMO, its AML training materials and

compliance program shield it from any finding that its conduct could satisfy the

---

[173] Tr.2469:20-2474:25.

[174] *Id.*

[175] *See, e.g.,* Exhibit P769.

"deliberate disregard" standard.[176] On the contrary, the compliance materials do establish that BMO's management knew better, but there is abundant evidence that this guidance was systematically ignored, as bank personnel uniformly closed suspicious activity alerts without action, ignored billions of dollars in patently suspicious wire transfers and glaring round-dollar payments to insiders with no apparent lawful purpose, and made special exceptions to bank procedure to aid the scheme. BMO can certainly argue to the jury that its compliance efforts negate "deliberate disregard." But when a corporation commits tortious acts "in contravention of its own policies, the existence of those policies does not allow the [corporation] to escape punitive damages."[177] Besides, armed with the spoliation inference, a reasonable jury could conclude that the millions of documents that BMO destroyed in bad faith concealed additional evidence that its conduct was malicious, intentional, or in reckless disregard of the rights of others.[178] That inference, combined with the evidence presented,

---

[176] Mem. 8.

[177] *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004).

[178] *Harl v. St. Edward Mercy Health Sys., Inc.*, Civ. No. 09-2054, 2009 WL 10708470, at *3 (W.D. Ark. Dec. 18, 2009) (denying motion to dismiss punitive damage claim because a jury could infer that defendant spoliated evidence "to conceal other actions or inactions that were malicious, intentional, or in reckless disregard").

easily support an award of punitive damages in this case.

**Vicarious Liability.** BMO also argues that it cannot be held liable for punitive damages based on the acts of its non-managerial employees.[179] But Section 549.20 permits punitive damages to be assessed against a corporation when managerial employees with planning and policy authority either engage in or ratify the conduct at issue.[180] Bernita Hile and Flynn were managerial employees of BMO who played central roles in facilitating Petters' fraudulent scheme.

Hile was the Manager of BMO's AML Monitoring Group who was responsible for formulating the AML procedures and guidelines,[181] and developing the QAPOR procedures for expedited review.[182] She knew the purported PCI business model,[183] and had reviewed all of the PCI account activity and commentary—none of which matched the PCI business model.[184]

---

[179] *Id.* 9.

[180] Minn. Stat. § 549.20 Subd. 2.

[181] Tr.333:1-7, 334:10-335:9.

[182] Tr.374:23-375:10.

[183] Tr.338:16-22.

[184] Tr.391:1-392:4.

She not only ignored the apparent fraud, she was personally responsible for approving PCI's placement on the QAPOR for expedited review. Flynn was the Executive Vice President responsible for managing and planning the entire Business Banking Division.[185] His knowledge and participation, as discussed in greater detail above, stretches from learning the supposed Petters business model from a convicted felon to the "special handling" given PCI in the DACA sham agreements in 2008.

Because these BMO employees were managerial employees acting within the scope of their employment, it does not matter, as BMO suggests, whether they elevated that information to elevated their concerns management. They were management. A reasonable jury could also infer that BMO's spoliation concealed other damaging evidence of BMO's management's knowledge and involvement in this conduct.[186]

---

[185] Tr.1511:1-12.

[186] *See Ration v. Stallion*, No. Civ. 03-110 BB/ACT, 2004 WL 7338063, at *3 (D.N.M. Feb. 3, 2004) (spoliation inference permitted reasonable jury to infer that corporation knew that employee regularly violated federal regulations "but did nothing to correct his behavior" supporting corporation's vicarious liability for punitive damages).

## XII.   BMO's "previously considered" arguments do not warrant judgment as a matter of law.

The Court may summarily deny BMO's request for JMOL on its arguments that the Court "previously considered and rejected:"[187] (1) MUFA liability based on wire transfers;[188] (2) proximate causation;[189] (3) its *in pari delicto* defense;[190] and (4) Plaintiff's damages model.[191] BMO requested JMOL on these issues "for preservation purposes," but does not identify any new facts or new legal authority that would warrant reconsideration of any of these issues, let alone entitling it to JMOL on any of them.[192]

---

[187] Mem. 34.

[188] *See* MTD Order, ECF 4-14 at 13-14 ("the Minnesota Supreme Court would decline to apply the relevant UFA section solely to check transactions").

[189] *See Daubert* Order, ECF 214 at 25-26 (holding that other causes of Trustee's injuries are irrelevant to whether BMO's conduct was a proximate cause).

[190] *See* MTD Order at 11-13; MSJ Order, ECF 15-16 at 14-17; Appeal Order, ECF 70 at 12-14 (all rejecting BMO's *in pari delicto* defense).

[191] *See Daubert* Order at 45-47, 50 (rejecting BMO's "sham corporation" argument and upholding measure of damages based on investor loss).

[192] "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (internal quotation marks omitted). "A motion to reconsider cannot be used to relitigate old issues, and the [C]ourt need not address these arguments." *Benacquisto v. Am. Express Fin. Corp.*, Civ. No. 00-1980 (DSD/JMM) (D. Minn. Mar. 12, 2013).

## Conclusion

For these reasons, Plaintiff respectfully requests that the Court deny

BMO's motion for judgment as a matter of law and submit this case to the jury.

Respectfully submitted,

Dated: October 28, 2022

By: */s/Michael A. Collyard*
Michael A. Collyard (#302569)
David E. Marder (*admitted pro hac vice*)
Peter C. Ihrig (#0390392)
Morgia D. Holmes (*admitted pro hac vice*)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402–2015
Telephone: 612.349.8500
Facsimile: 612.339.4181
mcollyard@robinskaplan.com
dmarder@robinskaplan.com
pihrig@robinskaplan.com
mholmes@robinskaplan.com

Joseph W. Anthony (#2872)
Joseph R. Richie (#400615)
Ryan M. Lawrence (#399135)
ANTHONY OSTLUND LOUWAGIE
DRESSEN BOYLAN P.A.
90 South 7th Street, Suite 3600
Minneapolis, MN 55402
Telephone: 612.349.6969
Facsimile: 612.349.6996
janthony@anthonyostlund.com
jrichie@anthonyostlund.com
rlawrence@anthonyostlund.com

*Counsel for Plaintiff*

57