# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas A. Kelley, in his capacity as the
Trustee of the BMO Litigation Trust,

        Plaintiff,

v.

BMO Harris Bank N.A., as successor to
M&I Marshall and Ilsley Bank,

        Defendant.

Case No.: 0:19-cv-01756-WMW

Hon. Wilhelmina M. Wright

## DEFENDANT BMO HARRIS BANK'S MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT...................................................................................................... 1

I.      STATUTES OF LIMITATIONS RESTRICT ANY BMO HARRIS
        LIABILITY TO THE PERIOD AFTER NOVEMBER 14, 2006. ......................... 1

II.     MINNESOTA'S UCC PREEMPTS PLAINTIFF'S CLAIMS................................ 4

III.    CONTRACTUAL LIMITATIONS PERIODS BAR PLAINTIFF'S
        CLAIMS ............................................................................................... 10

IV.     PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON THE
        EQUITABLE AFFIRMATIVE DEFENSES. ....................................................... 14

V.      PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON
        AFFIRMATIVE DEFENSE NO. 23. ................................................................. 16

VI.     PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON
        AFFIRMATIVE DEFENSES NO. 1, 2, 15, 26, OR 28. ...................................... 17

VII.    BMO HARRIS RESERVES ITS RIGHTS WITH RESPECT TO
        OTHER LEGAL PRINCIPLES ADDRESSED IN PLAINTIFF'S
        MOTION. ............................................................................................... 18

CONCLUSION ................................................................................................. 20

## INTRODUCTION

Plaintiff has not met his burden to show he is entitled to judgment as a matter of law on BMO Harris's affirmative defenses. As to the affirmative defenses based on statutes of limitations (No. 5), the Minnesota UCC (No. 3), contractual limitations periods (No. 27), consent and ratification (No. 23), and equitable defenses (Nos. 9, 10, 11, 12, 13, and 16), the Court should either grant judgment as a matter of law to BMO Harris,[1] or else submit the defenses to the jury for its consideration. Although BMO Harris recognizes that, based on prior rulings (to which BMO Harris respectfully preserves its objections), the Court may take a contrary view as to the affirmative defenses based on *in pari delicto* (No. 1), standing (No. 2), lack of authority to assert claims (No. 28), setoff (No. 26), and failure to mitigate (No. 15), BMO Harris respectfully submits that the Court should also grant judgment as a matter of law to BMO Harris or else submit those defenses to the jury. As to other affirmative defenses, BMO Harris reserves all rights to rely on the relevant legal principles and assert related arguments in support of BMO Harris's defenses to Plaintiff's claims.

## ARGUMENT

## I.   STATUTES OF LIMITATIONS RESTRICT ANY BMO HARRIS LIABILITY TO THE PERIOD AFTER NOVEMBER 14, 2006.

The Court should deny Plaintiff's motion for judgment as a matter of law on BMO Harris's Fifth Affirmative Defense, based upon statutes of limitations (Mot. at 7-10), and should grant BMO Harris's motion for judgment as a matter of law restricting BMO

---

[1] *See* ECF Nos. 289, 321.

Harris's liability to the period after November 14, 2006.[2]  The parties' respective motion papers identify only two areas of disagreement on this issue: (1) as to all of Plaintiff's claims, when the damages element accrued under Minnesota law; and (2) as to Count III only, whether the "discovery rule" of accrual applies.  Plaintiff's position regarding both of those questions is wrong as a matter of law.

As BMO Harris explained in its own motion for judgment as a matter of law, and Plaintiff does not dispute, each of Plaintiff's claims is subject to a six-year statute of limitations.[3]  Therefore, insofar as those claims accrued on or before November 14, 2006, they are untimely.  Under Minnesota law, a cause of action accrues once "operative facts exist[] to support" each element of the claim.[4]  On all this, the parties agree.  Plaintiff also does not dispute—nor could he, based on the evidence introduced at trial—that he seeks to satisfy the elements of Counts I, III, and IV (which are the MUFA and aiding-and-abetting claims) with evidence of events predating November 14, 2006.  BMO Harris has argued that, based on settled statute-of-limitations principles, none of that evidence can be the basis of liability because any claim based on those events is untimely.

Plaintiff resists the straightforward application of the statute of limitations to all of his claims on one ground, and its application to Count III on one additional ground, but both are unavailing.

---

[2] ECF No. 289 at 26-27; ECF No. 321 at 1, 8-9.
[3] *See* ECF No. 289 at 26; ECF No. 321 at 1, 8-9.
[4] *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019).

*First*, as to all his claims, Plaintiff argues (at 8-9) that operative facts did not exist to support the damages element of those claims before November 2006 because, when the Ponzi scheme eventually and inevitably did collapse, only those investors with promissory notes executed on or after December 5, 2007 lost money. That argument is contrary to Minnesota law and to this Court's and the bankruptcy court's prior rulings.

This Court has ruled repeatedly that Plaintiff may pursue claims for harm to PCI only, not harm to third parties.[5] Plaintiff's statute-of-limitations argument would have the Court turn that carefully drawn distinction on its head. Plaintiff cannot contest that the harm he claims PCI suffered as a result of M&I's alleged conduct—PCI's inability to repay its creditors—arose before November 2006, and was in fact present throughout the entire time period in which PCI had a bank account at M&I.[6] In other words, Plaintiff has contended that PCI's insolvency, which arose long before November 2006, gives him a basis to pursue claims on behalf of PCI.[7] But Plaintiff now argues (Mot. 8-9) that because losses did not become ascertainable for *particular* investors in *particular* amounts until the scheme was actually shut down, PCI's claim for damages did not accrue until that time. That argument is directly contrary to the basis on which Plaintiff has been permitted to

---

[5] *See* ECF No. 108 at 17-18; ECF No. 70 at 10. The distinction between harm to PCI and harm to creditors also was central to the Court's rulings on damages and evidentiary issues, including its determination that Plaintiff could recover damages without regard to recoveries, offsets, or reductions. *See* ECF No. 241 at 8-11; ECF No. 214 at 52-53. BMO respectfully preserves its arguments against, and objections to, all those rulings.
[6] 10/27/22 Tr. 3169:5-3174:22, 3177:7-3179:15; 10/26/22 Tr. 2855:6-8; 10/20/22 Tr. 2855:6-8.
[7] ECF No. 70 at 6. Again, BMO respectfully preserves its objections to the Court's rulings embracing this contention.

3

pursue these claims in the first place.  Further, it is directly contrary to Minnesota law's "some damage" rule, under which operative facts exist to support the damages element, and a claim therefore accrues, upon "the occurrence of *any compensable damage*," even if the amount of the loss is not then ascertainable.[8]

*Second*, as to Count III (aiding and abetting fraud) specifically, Plaintiff argues (at 9-10) that the "discovery rule" of accrual applies and that the Trustee personally had no reason to suspect fraud before 2008.  But it is black-letter law that a trustee stands in the shoes of the corporate debtor, whose imputed knowledge of its management's misconduct is attributed to the trustee, especially where (as here) the corrupt managers owned and wholly controlled the debtor.[9]  Because it is undisputed that PCI had knowledge of the fraud that it existed only to perpetrate, there is no factual basis for application of the discovery rule in this case.

## II.    MINNESOTA'S UCC PREEMPTS PLAINTIFF'S CLAIMS.

The Minnesota UCC displaces state-law causes of action that undermine or circumvent the comprehensive regime established by the UCC.  As BMO Harris's Third Affirmative Defense asserts, Plaintiff's claims are displaced by the UCC, because they have that prohibited effect with respect to UCC Article 3 (governing check handling) and UCC Article 4A (governing wire-transfer processing).

---

[8] *Hansen*, 934 N.W.2d at 327.
[9] *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1005 (8th Cir. 2007); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 838-41 (8th Cir. 2005); *Stumpf v. Albracht*, 982 F.2d 275, 277-78 (8th Cir. 1992).

4

Plaintiff's motion scarcely even attempts to contradict that Article 3 preempts his claims to the extent they rely on M&I's handling of checks, a proposition that is firmly established by the UCC itself and by Minnesota law.  Thus, at a minimum, the Court must deny Plaintiff's motion as to check handling, and either grant BMO Harris's motion for judgment as a matter of law on that issue,[10] or else submit the issue to the jury.[11]

Because Plaintiff's claims also undermine or circumvent Article 4A of the UCC to the extent they rely on M&I's processing of wire transfers, the Court should deny Plaintiff's motion (at 4-7) on that issue as well, and grant judgment as a matter of law to BMO Harris on all of Plaintiff's claims on this ground,[12] or else submit the issue to the jury.[13]

**Check Handling.**  As BMO Harris's motion for judgment as a matter of law explains, under Minnesota law, UCC Article 3 "comprehensively addresses the problem of fiduciary fraud" with respect to checks and "pervasively occupies this field of law," displacing MUFA claims, common-law claims, and all other causes of action that could impose liability on a bank for handling checks presented by individuals breaching fiduciary duties.[14]  As the trial has made clear, Plaintiff's claims would do exactly that.  Indeed, in Plaintiff's response to BMO Harris's motion for judgment as a matter of law, the lead example Plaintiff cites to show that M&I employees purportedly "purposefully looked the other way" is that upon seeing checks to Deanna Coleman drawn on the PCI account, Ed

---

[10] ECF No. 289 at 29; ECF No. 321 at 1.

[11] ECF No. 201 at 317 (Defendant's Proposed Closing Instruction No. 83).

[12] ECF No. 289 at 30-31; ECF No. 321 at 1.

[13] ECF No. 201 at 320 (Defendant's Proposed Closing Instruction No. 84).

[14] *Bradley v. First Nat'l Bank of Walker, N.A.*, 711 N.W.2d 121, 125, 127 (Minn. Ct. App. 2006).

Jambor purportedly "fail[ed] to follow up [further] *after* calling" Tom Petters, the other authorized signer of checks drawn on PCI's account, to verify that the checks to Coleman were authorized.[15]  UCC Article 3 exists precisely to displace otherwise applicable state-law claims that could subject banks to liability for employees' "fail[ure]" to engage in unspecified "follow up"[16] when a check is paid to a corporate officer out of a corporate account and the corporation's CEO personally confirms it was authorized.[17]  In all events, because each of Plaintiff's claims seeks to impose liability on the theory that M&I purportedly knew that PCI fiduciaries were breaching their duties, in part through check transactions handled by M&I, those claims fall within the heartland of the field "pervasively occupie[d]" by Article 3.[18]

Plaintiff's motion acknowledges that BMO Harris "asserts UCC preemption concerning checks" and does not attempt to argue that the Court should grant judgment as a matter of law to Plaintiff on that issue.  Plaintiff merely asserts (at 7 n.14) that "[t]he checks are *de minimus* [*sic*] compared to" the billions of dollars of wire transfers M&I processed.  But there is no *de minimis* exception to the UCC's application under Minnesota law, let alone one that would countenance liability for tens of millions of dollars in check-handling transactions.[19]

---

[15] ECF No. 313 at 26 (emphasis added).
[16] *Id.*
[17] *See* Minn. Stat. § 336.3-307, cmt. 1; *Bradley*, 711 N.W.2d at 125.
[18] *Bradley*, 711 N.W.2d at 127.
[19] 10/28/22 Tr. 3452:13-16.

Minnesota/2014198.0788/155392947.1

Plaintiff also refers generally in a footnote to arguments he raised in opposition to BMO Harris's initial Rule 50(a) motion.  But those arguments provide no reason to deny judgment as a matter of law to BMO Harris, let alone grant it to Plaintiff, on this issue. Plaintiff cannot explain how claims he describes as turning on M&I's "willfully ignoring obvious insider payments" do not necessarily require a determination of whether M&I had "'notice of breach of a fiduciary duty,'" and therefore fall within the category of claims he is forced to concede are "'comprehensively cover[ed]'" by Article 3.[20]

Moreover, Plaintiff concedes that BMO Harris's position is supported by the sole authority cited by either party involving Article 3 of Minnesota's UCC.  In *Bradley v. First National Bank of Walker, N.A.*, the Minnesota Court of Appeals held that Article 3 preempts MUFA and common-law claims covering matters that Article 3 addresses.[21]  In doing so, the court carefully considered the text, structure, history, and purpose of the UCC and the intent of the Minnesota legislature.[22]  The court also relied on Minnesota Supreme Court precedent, observing that "the Minnesota Supreme Court has indicated that it favors an approach which recognizes the comprehensive, and exclusive, liability scheme of the UCC" and "has emphasized the value of maintaining an exclusive set of remedies for commercial transactions."[23]  The Eighth Circuit has instructed that, although federal courts sitting in diversity are not bound by the decisions of a state's intermediate appellate courts, they are to "consider their decisions 'highly persuasive' and follow them 'when they are

---

[20] ECF No. 313 at 52-53 (quoting UCC 3-307 cmt. 1.).
[21] 711 N.W.2d at 125-27.
[22] *See id.*
[23] *Id.* at 127.

7

the best evidence of state law.'"[24]  Here, notwithstanding Plaintiff's attempt to rely on two intermediate appellate court decisions from other jurisdictions, *Bradley* is the best evidence of Minnesota law, especially considering that decision's careful reasoning and reliance on Minnesota Supreme Court decisions.

**Wire Processing.**  Plaintiff recognizes that UCC Article 4A, which governs the processing of wire transfers, is "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article," making "resort to principles of law or equity outside of Article 4A . . . not appropriate to create rights, duties and liabilities inconsistent with those stated in th[e] Article.[25]  Plaintiff argues (at 4-5) that his claims would not create rights, duties, or liabilities "inconsistent" with the provisions of Article 4A, but in doing so he construes those provisions too narrowly and fails to appreciate the disruptiveness of his claims to the rules Article 4A establishes.  For instance, although Section 4A-212 primarily concerns liability for failing to accept a payment order, it also states that "[l]iability based on acceptance . . . is limited to that provided in [Article 4A]" and that "[a] receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer except as provided in [Article 4A] or by express agreement."[26]

---

[24] *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (quoting *First Tenn. Bank Nat. Ass'n v. Pathfinder Exploration, LLC*, 754 F.3d 489, 490-91 (8th Cir. 2014)).
[25] Minn. Stat. § 336.4A-102, cmt.
[26] Minn. Stat. § 336.4A-212.

Minnesota/2014198.0788/155392947.1

Plaintiff's claims are incompatible with the liability regime established by this and other provisions of Article 4A. Plaintiff has sought to prove, in substance, that BMO Harris is liable because M&I wrongfully executed wire transfers that harmed PCI. In particular, Plaintiff has sought to establish M&I's liability for processing those transactions without taking certain additional steps.[27] Those steps not only are not required by Article 4A but also would effectively make receiving banks "the agent of the . . . beneficiary" of the wire transfers, with duties to the beneficiary as alleged by Plaintiff, in contravention of Section 4A-212 and other UCC Section 4A provisions.[28] Moreover, Plaintiff's claims would circumvent the shorter Section 4A statute of repose, which the Second Circuit, applying Minnesota law, held created a conflict with the UCC that precluded a plaintiff from maintaining a Minnesota common-law claim.[29] Plaintiff's attempts to distinguish that authority (at 7) miss the point, which is that a common-law or other claim that allows a plaintiff to circumvent the statute of repose set forth in Article 4A would necessarily "'impose liability inconsistent' with the liabilities created by Article 4A."[30] BMO Harris respectfully submits that the Second Circuit's decision applying Minnesota law is persuasive, and is more in line with the Minnesota Supreme Court's favored approach of

---

[27] 10/12/22 Tr. 152:25-153:4 (Plaintiff's opening statement: "The bank had to investigate the wires coming in from Nationwide and Enchanted, and in order to do that they had to figure out who was Nationwide, who was Enchanted, why were they writing that money in . . . .").

[28] *See also* Minn. Stat. §§ 336.4A-202, 336.4A-204(a), 336.4A-505.

[29] *See ReAmerica, S.A. v. Wells Fargo Bank Int'l*, 577 F.3d 102, 106-07 (2d Cir. 2009).

[30] *Id.* at 106.

9

"recogniz[ing] the comprehensive, and exclusive, liability scheme of the UCC" than is the authority that Plaintiff cites.[31]

## III.   CONTRACTUAL LIMITATIONS PERIODS BAR PLAINTIFF'S CLAIMS

Contrary to Plaintiff's motion (at 10-17), both the Depository Agreement and the Wire Transfer Agreement are applicable and enforceable.  Consequently, the Court should deny Plaintiff's motion as to BMO Harris's contractual-limitations affirmative defense (No. 22), and either grant BMO Harris's motion for judgment as a matter of law on that defense,[32] or else submit it to the jury.[33]

***Depository Agreement.***  It is undisputed that on January 25, 2008, Tom Petters, on behalf of PCI, signed a "Depository Agreement" with M&I related to the PCI Account.[34] The Agreement requires PCI "to timely review all account statements and to notify the Bank within 30 days of the date the Bank mailed or made statements or items available to [PCI] of any unauthorized or missing signature or alteration on a check, or within 60 days in the case of unauthorized or missing endorsements, improper charges or other account problems."[35]  It also "preclude[s]" PCI "from commencing legal action against Bank unless [PCI] has given Bank notice as provided above and also initiated legal action within 180 days after Bank mailed or made statements or items available to [PCI]."[36]

The Agreement unambiguously covers Plaintiff's claims, all of which arise from

---

[31] *Bradley*, 711 N.W.2d at 127.
[32] *See* ECF No. 289 at 23-25; ECF No. 321 at 1, 8.
[33] ECF No. 201 at 268, 276 (Defendant's Proposed Closing Instruction Nos. 72, 73).
[34] DX10014 at 3-4.
[35] *Id.* at 2.
[36] *Id.* at 4.

"improper charges or other account problems."  It is not correct, as Plaintiff argues, that the relevant "account problems" covered by the Agreement must be similar to "unauthorized or missing signature or alteration on a check" or "unauthorized or missing endorsements."[37]  In any event, the common thread running through all of the contractual terms in the relevant provision is the possibility of a fraudulent transaction, such as those consummated by an "alter[ed]" or "unauthorized" financial instrument.  Plaintiff's claims are obviously grounded in fraudulent transactions, and thus must be deemed to arise from "improper charges or other account problems" as contemplated by the Agreement.

The Agreement also applies to claims and conduct occurring before Petters signed it in 2008.  Read most naturally, the Agreement compelled PCI to "review all account statements" and initiate legal action based on any issues within 180 days of signing or, for future account statements, within 180 days from when M&I "mailed or made statements or items available."[38]  At minimum, the Agreement bars claims and conduct occurring after January 25, 2008.

Finally, the Depository Agreement is fully enforceable.  Plaintiff does not cite a single shred of evidence to support his bald assertion (at 12) that the standard-form Agreement's purpose was "perpetrating a fraud."  In addition, under Minnesota law a contract is void under this principle only if *both* parties—that is, PCI and M&I—"entered

---

[37] *See Brookdale Pontiac-GMC v. Federated Ins.*, 630 N.W.2d 5, 10 (Minn. Ct. App. 2001) ("catchall provision" in contract must cover more than the "specifically enumerated" items that precede it).
[38] DX10014 at 4.

Minnesota/2014198.0788/155392947.1

into the contract at issue with the purpose of deceiving a third party."[39]  Plaintiff contends

the Depository Agreement was executed "for the purpose of perpetrating a fraud *on . . .*

*PCI*."[40]  Plaintiff does not explain how, given his theory, PCI could be both the defrauded

and defrauding party in the same contract.

The Depository Agreement's 180-day limitations period is also not unreasonably

short.  Plaintiff incorrectly frames the relevant inquiry as whether *he* could conceivably

discover the fraud within the limitations period.  Because, however, he stands in "the shoes

of the debtor,"[41] and is subject to the same defenses that "could have been raised against

the debtor,"[42] the proper analysis must focus on whether the 180-day limitations period

allowed *PCI* enough time to discover the fraud.[43]  Clearly, PCI had ample opportunity to

discover improper charges or other account problems within 180 days of receiving an

account statement.[44]  Indeed, that length of time is consistent with the six-month limitations

periods that "courts almost invariably uphold" as reasonable.[45]

---

[39] *Kelley v. Boosalis*, 974 F.3d 884, 894 (8th Cir. 2020).

[40] ECF No. 315 at 12-13 (emphasis added).

[41] *In re B.J. McAdams, Inc.*, 66 F.3d 931, 935 (8th Cir. 1995).

[42] *Grassmueck*, 402 F.3d at 836.

[43] *See Stumpf*, 982 F.2d at 277 ("While the trustee may have been unaware of the alleged malpractice prior to that time, the relevant inquiry is whether the [debtors] knew or reasonably could have known of the alleged malpractice.").  Even assuming the clock reset when Mr. Kelley received account statements, the Depository Agreement would still bar his claims because he commenced this lawsuit on November 15, 2012, more than a year after he received account statements and bank records for the PCI Account.  And the discovery rule is inapplicable in any event.  *See* ECF No. 289 at 26-27.

[44] Indeed, through Petters, Coleman, and White, PCI had actual knowledge of those issues well within 180 days of receiving account statements.  *See Grassmueck*, 402 F.3d at 838-41 (imputing agent's knowledge to corporation).

[45] *AMOCO Canada Petroleum Co. v. Lakehead Pipe Line Co.*, 618 F.2d 504, 506 (8th Cir. 1980).

Minnesota/2014198.0788/155392947.1

Plaintiff also cites no authority refusing to apply a contractual limitations provision to a MUFA claim. *Master Chemical Corp. v. Inkrott*,[46] which held that a bank cannot "contract away its bad-faith liability . . . beyond the protections provided by the Uniform Fiduciaries Act," did not involve a limitations provision. Nor would its holding apply to such a provision because a limitations period "does not limit a party's substantive obligations" under MUFA; rather, such a period is a procedural device that "shortens the time period during which claims may be brought."[47]

***Wire Transfer Agreement.*** It is also undisputed that Deanna Coleman, on behalf of PCI, signed a "Wire Transfer Agreement" with M&I related to the PCI Account on January 17, 2006.[48] That Agreement conditions the existence of any "claims arising by reason of any transfer" on the submission of the claim "to [M&I] in writing within one year after the Customer received notification from [M&I] identifying the order."[49] The Agreement provides that "[a]ny claims not so submitted shall be void."[50]

The Wire Transfer Agreement unambiguously covers Plaintiff's claims, all of which arise "by reason of any transfer." Even if that phrase covers only transfer issues of the same varieties listed earlier in the agreement,[51] the fraudulent transactions that form the basis of Plaintiff's claims are similar to "unauthorized payment[s]," payments to

---

[46] 55 Ohio St. 3d 23, 28 (1990).
[47] *Minnesota Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 518 (Minn. 2014).
[48] P-356.
[49] *Id.* at 2 (¶ 8).
[50] *Id.*
[51] *But see Brookdale Pontiac-GMC*, 630 N.W.2d at 10.

Minnesota/2014198.0788/155392947.1

unauthorized beneficiaries, and payments for unauthorized amounts—all of which contemplate some possibility of fraud. Moreover, the "actions and inactions" for which Plaintiff faults M&I are tied entirely to the fact that M&I processed transfers into and out of the PCI Account.[52] It is, therefore, "the fact of Defendant's transfers that gives rise to Plaintiff's claims."[53]

For the reasons stated above with respect to the Depository Agreement, the one-year limitations period in the Wire Transfer Agreement is reasonable, fully enforceable, and applies to Plaintiff's MUFA claim.

## IV. PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON THE EQUITABLE AFFIRMATIVE DEFENSES.

Contrary to Plaintiff's contention (at 17-20), BMO Harris's equitable affirmative defenses apply with full force.[54] "A trustee's ability to assert causes of action on behalf of the bankrupt estate is subject to any *equitable* or legal defenses that could have been raised against the debtor."[55] The pre-bankruptcy appointment of a receiver does not modify that principle. Under the Code, once a petition is filed, "all" of the debtors' interests become property of the bankruptcy estate, "notwithstanding any . . . nonbankruptcy law" that—

---

[52] *See, e.g.*, ECF No. 3-11 (First Amended Complaint), ¶¶ 150-152 ("M&I is liable under [MUFA] for all such transfers"), 157 ("M&I's knowledge and action in allowing Petters, Coleman and White to transfer funds from the M&I Account . . . was a breach of its fiduciary duty"), 162 ("By . . . effectuating tens of billions of dollars in wire transfer payments through the M&I Account, M&I provided substantial assistance").

[53] ECF No. 315 at 15-16.

[54] If the Court does not grant judgment as a matter of law for BMO Harris on the equitable defenses, it should submit them to the jury for consideration. *See Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 469 (8th Cir. 2011) ("The equitable defenses presented fact-bound inquiries that were properly submitted to the jury.").

[55] *Grassmueck*, 402 F.3d at 836 (emphasis added).

Minnesota/2014198.0788/155392947.1

like a receivership—"is conditioned on the insolvency or financial condition of the debtor

. . . or on the appointment of or taking possession by . . . a custodian."[56]  The import of that

provision is clear:  where, as here, a plaintiff acts in his capacity as trustee, he "is governed

by the Bankruptcy Code, not the law of receiverships."[57]

In any event, PCI's receiver could not have acquired any immunity to BMO Harris's

equitable defenses in this case because the receivership order authorizes claims only to

recover diverted funds from the beneficiaries of the diversions,[58] which are not the kind of

claims Plaintiff asserts against BMO Harris.[59]   And an amended receivership order also

provided that "[a]ny bankruptcy cases … commenced by the Receiver" shall "be governed

by and administered pursuant to the requirements of the United States Bankruptcy Code."[60]

As noted, under the Code the trustee is subject to the same equitable defenses that could

have been raised against PCI.

Moreover,  for  equitable  affirmative  defenses  that  require  PCI  to  have  had

knowledge of the fraudulent acts of its principals, PCI is charged with such knowledge.

Where  the  principal  and  agent  are  alter  egos,  the  agent's  knowledge  is  imputed  to  the

---

[56] 11 U.S.C. §§ 541(a)(1), 541(c)(1)(B), 543(b)(1).

[57] *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006); *see also In re Derivium Cap. LLC*, 716 F.3d 355, 367 (4th Cir. 2013); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996) (trustee subject to equitable defense because, "[p]ut most simply, Mr. Sender is a bankruptcy trustee acting under 11 U.S.C. § 541").

[58] *See United States v. Petters*, No. 08-cv-05348 (D. Minn.) ("*Receivership Action*"), ECF No. 12 at 9-15; ECF No. 15-7 at 36 (BMO Br.); ECF No. 3-12 at 35-36 (BMO Br.).

[59] *See Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 236-37 (7th Cir. 2003); *Zayed v. Associated Bank, N.A.*, 2015 WL 4635789, at *3 (D. Minn. Aug. 4, 2015).

[60] *Receivership Action*, ECF No. 127 at 15.

Minnesota/2014198.0788/155392947.1

principal.[61]    As the evidence at trial shows, Petters, Coleman, and White were indistinguishable from PCI, which existed solely as a means to perpetuate those individuals' Ponzi scheme.[62]

Plaintiff is also patently incorrect (at 20) that PCI's "knowledge and conduct are not relevant to these affirmative defenses." Plaintiff stands in PCI's shoes and is subject to the same defenses that could have been raised against PCI, including those based on PCI's knowledge and conduct.[63]

## V.   PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON AFFIRMATIVE DEFENSE NO. 23.

For the same reasons, the Court should not enter judgment against BMO Harris on its twenty-third affirmative defense of consent and ratification. Plaintiff's focus (at 20) on whether "the *Trustee* knowingly consented or ratified BMO Harris's conduct" is misplaced. What matters is whether PCI did so.[64] From the evidence presented at trial, the jury could reasonably conclude that PCI did.

## VI.   PLAINTIFF IS NOT ENTITLED TO JUDGMENT ON AFFIRMATIVE DEFENSES NO. 1, 2, 15, 26, OR 28.

Although BMO Harris acknowledges that, based on prior rulings (to which BMO Harris respectfully preserves its objections), the Court may take a contrary view to BMO's

---

[61] *Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul*, 307 Minn. 199, 203 (1976); *Grassmueck*, 402 F.3d at 838.

[62] 10/20/22 Tr. 1932:1-1933:7, 1959:10-21; P-679 (PCI judgment and conviction); DX9000 at 8-13; *see Grassmueck*, 402 F.3d at 840-41 (principals charged with agent's knowledge because they "were entities of convenience" which agent "dominated").

[63] *See Stumpf*, 982 F.2d at 277 (applying defense based on debtors' knowledge and conduct); *Grassmueck*, 402 F.3d at 836.

[64] *Grassmueck*, 402 F.3d at 836; *In re B.J. McAdams, Inc.*, 66 F.3d at 935.

16

regarding some of the affirmative defenses BMO has raised, Plaintiff is incorrect (at 1-2) that the Court has already rejected BMO's *in pari delicto* defense (first defense). After the Bankruptcy Court found the doctrine inapplicable at the summary judgment stage, BMO Harris asked this Court for leave to appeal that determination under 28 U.S.C. § 158(a)(3).[65] This Court denied leave because the "dearth of cases" on the issue meant there was not a "substantial ground for difference of opinion" that would justify an interlocutory appeal.[66] The Court did not, however, squarely accept or reject the Bankruptcy Court's reasoning on the merits—and has not done so since. BMO Harris has urged the Court to do so now.[67]

Plaintiff also is incorrect that failure to mitigate (fifteenth defense) is so closely related to offsets (twenty-sixth defense) that the former should be rejected for the same reasons as the latter.[68] Plaintiff theorizes (at 2) that "the only action that the Trustee could take to mitigate is to pursue other parties for offsets." But the mitigation defense encompasses questions about what *PCI* could have done to mitigate damages, not just what the Trustee could have done. "The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of action,"[69] and is therefore subject to any defenses to the same extent as "could have been raised against the debtor."[70] Based on the evidence presented at trial, a jury could reasonably conclude that PCI failed to mitigate

---

[65] *See* ECF No. 70 at 3-4.
[66] ECF No. 70 at 14.
[67] ECF No. 289 at 37 n.162.
[68] *See* ECF No. 241 at 8-11 (order rejecting offsets).
[69] *In re B.J. McAdams, Inc.*, 66 F.3d at 935.
[70] *Grassmueck*, 402 F.3d at 836.

17

damages by, for example, stopping the Ponzi scheme or alerting M&I to it.[71]

With respect to the previously rejected affirmative defenses, for the reasons stated in BMO Harris's motion for judgment as a matter of law, BMO Harris respectfully suggests that, based on developments at trial, the Court should revisit its rulings on those points. BMO Harris also respectfully preserves its arguments with respect to those rulings.[72]

## VII.   BMO HARRIS RESERVES ITS RIGHTS WITH RESPECT TO OTHER LEGAL PRINCIPLES ADDRESSED IN PLAINTIFF'S MOTION.

Plaintiff's motion (at 2-4) identifies certain affirmative defenses asserted in the Answer that BMO Harris has not pressed at trial as affirmative defenses.  BMO Harris does not dispute that none of those defenses provides a complete defense to any of Plaintiff's claims, but reserves all rights to rely on the relevant legal principles and assert related arguments in support of BMO Harris's defenses.

In particular, BMO Harris agrees that the affirmative defenses discussed in part III (p. 3) of Plaintiff's motion refer to elements of Plaintiff's claims that he must prove, and respectfully submits that he cannot and has not done so.

As to the affirmative defenses discussed in parts II (p. 2) and IV (p. 3-4) of Plaintiff's motion, BMO Harris does not assert for Rule 50 purposes that any of those defenses provides a complete defense to any of Plaintiff's claims.   Nevertheless, BMO Harris reserves its right to rely on the relevant principles, which are pertinent to this case.  As one

---

[71] *See, e.g.*, P-679 (PCI judgment and conviction).

[72] *See* ECF No. 289 at 34-39 ("In light of developments at trial and for preservation purposes, BMO Harris also seeks judgment as a matter of law on several arguments that this Court or the Bankruptcy Court previously considered and rejected."); ECF No. 321 at 1 (renewing, based on all the evidence at trial, all arguments for Rule 50(a) relief).

Minnesota/2014198.0788/155392947.1

example, judicial estoppel, which BMO Harris raised as its twenty-fifth affirmative defense, is implicated because, among other things, Plaintiff's counsel successfully prevailed on the Court not to allow BMO Harris to present testimony about Chris Flynn's character for truthfulness by representing that Mr. Flynn's "honesty or his character for truthfulness has not been put at issue."[73]  Having done so, Plaintiff is judicially estopped from arguing, for instance, that Flynn acted in bad faith for purposes of MUFA (which, as Plaintiff has acknowledged, defines "bad faith" by whether or not conduct was honest),[74] or that he intentionally caused the bank to enter into a "sham" agreement, or that doing so is evidence of the maliciousness required for punitive damages—yet Plaintiff makes all those arguments in opposing BMO Harris's initial Rule 50(a) motion.[75]  Having obtained the exclusion of evidence of Flynn's honest character by representing to the Court that Flynn's honest character was not at issue, Plaintiff must be judicially estopped from arguing to this Court or to the jury that Flynn acted dishonestly in any way.[76]  Judicial estoppel also applies to contentions Plaintiff has made successfully in other, related litigations, such as that PCI was a mere alter ego and instrumentality of Tom Petters.[77]

---

[73] 10/25/22 Tr. 2612:7-2614:2.

[74] See ECF No. 201 at 147 (Plaintiff's Proposed Closing Instruction No. 40); see also Minn. Stat. § 520.01 subdivision 6 ("A thing is done 'in good faith' when it is done honestly, whether it be done negligently or not.").

[75] *See* ECF No. 313 at 10-12, 53-55.

[76] *See Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 410-411 (8th Cir. 2022) ("Whenever a party takes a position in a legal proceeding and succeeds in maintaining that position, the doctrine of judicial estoppel operates to prevent that party from later assuming a contrary position.").

[77] *In re Petters Co., Inc.*, 506 B.R. 784, 800, 805-06, 853-54 (Bankr. D. Minn. 2013); *PCI Bankruptcy*, ECF No. 1099 at 11 (Ch. 11 Tr.'s Br.); ECF No. 15-7 at 140-41, 143 (Martens Test.).

Minnesota/2014198.0788/155392947.1

## **<u>CONCLUSION</u>**

BMO Harris respectfully submits that the Court should deny Plaintiff's motion for judgment as a matter of law and permit the jury to consider BMO Harris's affirmative defenses.

20

Dated: October 31, 2022

John Gleeson (*pro hac vice*)
Michael Schaper (*pro hac vice*)
Susan Reagan Gittes (*pro hac vice*)
Morgan Davis (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6389
jgleeson@debevoise.com
mschaper@debevoise.com
srgittes@debevoise.com
mdavis@debevoise.com

Lucia Nale (*pro hac vice*)
Joshua D. Yount (*pro hac vice*)
Thomas V. Panoff (*pro hac vice*)
Christopher S. Comstock (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
lnale@mayerbrown.com
jdyount@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com

Richard A. Spehr (*pro hac vice*)
Gina M. Parlovecchio (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2578
rspehr@mayerbrown.com
gparlovecchio@mayerbrown.com

Respectfully submitted,

/s/ Keith S. Moheban
Keith S. Moheban (#216380)
Adine S. Momoh (#390085)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
keith.moheban@stinson.com
adine.momoh@stinson.com

Donald B. Verrilli, Jr. (*pro hac vice*)
Elaine J. Goldenberg (*pro hac vice*)
Brendan B. Gants (*pro hac vice*)
MUNGER TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC 20004
Telephone: (202) 220-1100
donald.verrilli@mto.com
elaine.goldenberg@mto.com
brendan.gants@mto.com

**ATTORNEYS FOR BMO HARRIS BANK N.A., AS SUCCESSOR TO M&I MARSHALL & ILSLEY BANK**

21

Minnesota/2014198.0788/155392947.1