# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Douglas A. Kelley, in his capacity as the
Trustee of the BMO Litigation Trust,

      Plaintiff,

v.

BMO Harris Bank N.A., as successor to
M&I Marshall and Ilsley Bank,

      Defendant.

Case No.: 0:19-cv-01756-WMW

Hon. Wilhelmina M. Wright

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I. THE ACTUAL-KNOWLEDGE CLAIMS FAIL AS A MATTER OF LAW ................................................................................................................ 1

II. THE MUFA BAD-FAITH CLAIM ALSO FAILS AS A MATTER OF LAW ................................................................................................................ 3

III. THE BREACH-OF-FIDUCIARY-DUTY CLAIM FAILS BECAUSE THERE WAS NO BREACH AND NO FIDUCIARY DUTY ............................... 5

IV. THE EVIDENCE DOES NOT ENTITLE PLAINTIFF TO PUNITIVE DAMAGES ............................................................................................................ 7

V. ADDITIONAL GROUNDS WARRANT JUDGMENT FOR BMO HARRIS ............................................................................................................... 11

CONCLUSION .............................................................................................................. 17

Defendant BMO Harris Bank N.A. ("BMO Harris"), as successor to M&I Marshall and Ilsley Bank ("M&I"), submits this reply memorandum in support of its Renewed Rule 50(a) Motion for Judgment as a Matter of Law.

## INTRODUCTION

Plaintiff's claims suffer from a series of fatal defects that require judgment as a matter of law for BMO Harris. Plaintiff tries to disguise those defects, and the strength of BMO Harris's defenses, by mischaracterizing the trial evidence and ignoring the controlling law. But those efforts fail. For all of the reasons detailed in this brief and BMO Harris's other Rule 50(a) briefing, judgment should be entered for BMO Harris.

## ARGUMENT

**I.   THE ACTUAL-KNOWLEDGE CLAIMS FAIL AS A MATTER OF LAW.**

BMO Harris's Rule 50(a) briefs show that, for two related reasons, judgment is warranted on the claims requiring proof that an M&I employee *actually knew* that PCI management was engaged in misconduct—the aiding-abetting claims of Counts III and IV and the MUFA actual-knowledge claim in Count I.[1] *First*, Plaintiff (a lawyer) testified that he is not "claiming" that any M&I employee "knew that there was a Ponzi scheme."[2] *Second*, Plaintiff could not testify otherwise because there is no evidence that could support a finding of actual knowledge.[3]

---

[1]   Doc. 289 at 6-8 (JMOL Br.); Doc. 321 at 4 (JMOL Br.); Doc. 328 at 2 (JMOL Reply).
[2]   10/20/22 Tr. 1950:12-1951:5; *see Hailes v. Compudyne Corp.*, No. 2:05-cv-54, 2007 WL 60923, at *1 n. 1 (M.D. Ala. Jan. 8, 2007).
[3]   Doc. 289 at 6 n.11 (JMOL Br.).

1

Although Plaintiff's relevant opposition brief focuses on the second issue, Plaintiff should be held to his testimony about his claims for the reasons described in other BMO Harris briefs.[4] Doing so would resolve the actual-knowledge claims without any need to consider other trial evidence.

As for the sufficiency of the trial evidence to prove actual knowledge, nothing in Plaintiff's recitation of purported knowledge evidence saves his actual-knowledge claims from judgment as a matter of law. That evidence confirms that M&I employees were unaware of PCI management's misconduct. It shows that they did not see certain information.[5] Or that they investigated information to their satisfaction.[6] Or that they did not view circumstances as suspicious.[7] Plaintiff, of course, says that M&I employees could or should have done more and could or should have discovered what PCI management was up to. But that is a negligence argument, not an actual-knowledge argument.[8]

Nor is actual knowledge a reasonable, non-speculative inference from the trial evidence. Plaintiff admits that PCI was lying to M&I employees and hiding the fraud from

---

[4]  Doc. 289 at 6-8 (JMOL Br.); Doc. 321 at 4 (JMOL Br.).
[5]  *E.g.*, Doc. 313 at 13 (Flynn "***never*** reviewed the billions of dollars of PCI account transaction activity"); *id.* at 14 (Flynn "knew PCI refused to provide the bank with its financial information"); *id.* at 15 (Flynn "never looked to see if outgoing wires were going to Nationwide").
[6]  *E.g.*, Doc. 313 at 14 (Flynn "collaborated on the DACAs with a lawyer") *id.* at 16 (Jambor investigated supposed red-flag check to Coleman).
[7]  *E.g.*, Doc. 313 at 16-18 (Jambor did not fill out suspicious activity log); *id.* at 18-22 (AML analysts closed alerts).
[8]  *See Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714-19 (8th Cir. 2019); *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857-59 (D. Minn. 2013), *aff'd*, 764 F.3d 833 (8th Cir. 2014); *Kamal v. Baker Tilly US, LLP*, No. 21-cv-1549, 2022 WL 1050053, at *10-*11 (D. Minn. Apr. 7, 2022).

2

them—which makes no sense if M&I employees had actual knowledge.[9] The same is true for M&I's efforts to establish lending relationships and trust accounts with PCI, which could have exposed the fraud.[10] And why would M&I employees knowingly go along with PCI's fraud without the kind of generous compensation received by those involved in the fraud?[11] Unreasonable, speculative inferences do not preclude judgment as a matter of law.[12]

Judgment for BMO Harris is warranted on all actual-knowledge claims.

## II.   THE MUFA BAD-FAITH CLAIM ALSO FAILS AS A MATTER OF LAW.

BMO Harris's Rule 50(a) briefs establish that the trial record warrants judgment on the MUFA bad-faith claim in Count I because Plaintiff has no evidence that any M&I employee acted with the required dishonesty.[13] None of Plaintiff's responses show otherwise.

Plaintiff (at 6) tries to lower the bar for bad-faith findings by citing a 2001 non-precedential Minnesota Court of Appeals decision as "modern case law" that supposedly does not require dishonesty.[14] But MUFA's plain language requires dishonesty to establish

---

[9]  DX9000 at 22-23; *see also* 10/26/22 Tr. 2798:15-2799:25 (Coleman testimony about lies to M&I).
[10]  *See* Doc. 289 at 16-17 (JMOL Br.). Plaintiff tries to make something of the fact that Chris Flynn did not seek to enter purchase-order financing deals with PCI, but that misses the point. Any attempts to lend to a Ponzi scheme entity are inconsistent with knowledge of the scheme.
[11]  *See id.* at 17.
[12]  *In re RFC & ResCap Liquidating Tr. Action*, 399 F. Supp. 3d 804, 810 (D. Minn. 2019).
[13]  Doc. 289 at 8-9 (JMOL Br.); Doc. 321 at 5 (JMOL Br.); Doc. 328 at 3 (JMOL Reply).
[14]  *McCartney v. Richfield Bank & Trust Co.*, No. CX–00–1466, 2001 WL 436154, at *4 (Minn. Ct. App. May 1, 2001).

3

bad faith.[15] The Minnesota Supreme Court has expressly held that "[b]ad faith does not exist if the bank was acting honestly."[16] And the Eighth Circuit in 2013 applied that holding while determining that the case cited by Plaintiff accepted the dishonesty standard and was, in any event, limited to suits (unlike this one) involving designated fiduciary accounts.[17]

Plaintiff fares no better with his efforts to identify evidence of bad faith. Again, all of his evidence goes to negligence at best and does not support reasonable, non-speculative knowledge inferences. He also mischaracterizes the evidence. For example, Plaintiff (at 2) says he has evidence of atypical activity that controverts the testimony from Deanna Coleman, Jeanne Crain, and Charles Grice that PCI did not receive "special treatment" from M&I.[18] But just because Chris Flynn or Ed Jambor might not have previously done something (arranged for a DACA, signed a good-standing letter, allowed deposits to bring NSF balances positive), does not mean that such acts were special treatment for PCI. As Ms. Crain and Mr. Grice testified, such services and accommodations were ordinary for M&I and other banks.[19]

Finally, Plaintiff (at 3-6) tries to evade judicial estoppel on Mr. Flynn's honesty by saying that he should not be held to his counsel's representation that Mr. Flynn's "honesty

---

[15]  Minn. Stat. § 520.01 subd. 6 ("A thing is done 'in good faith' when it is done honestly, whether it be done negligently or not.").
[16]  *Rheinberger v. First Nat'l Bank of St. Paul*, 150 N.W.2d 37, 40-42 (Minn. 1967).
[17]  *Buffets, Inc. v. Leischow*, 732 F.3d 889, 899-902 (8th Cir. 2013).
[18]  *See* 10/26/22 Tr. 2801:5-10, 2822:11-16, 2863:14-16 (Coleman); 10/25/22 Tr. 2678:3-24 (Crain); 10/28/22 Tr. 3446:24-3447:5 (Grice).
[19]  *See* 10/25/22 Tr. 2678:3-24 (Crain); 10/28/22 Tr. 3440:9-3443:21, 3446:24-3447:5 (Grice).

or his character for truthfulness has not been put at issue."[20] But Plaintiff's counsel made that representation without any of the reservations Plaintiff now offers. The representation led the Court to exclude key Rule 608 testimony. The representation is clearly inconsistent with proof of the dishonesty required for a MUFA § 8 claim. And allowing Plaintiff to have it both ways on Flynn's honesty would be manifestly unfair to BMO Harris by freeing Plaintiff to argue Flynn's dishonesty without facing key contrary evidence. No more is required for judicial estoppel.[21]

Judgment for BMO on the MUFA bad-faith claim is warranted.

## III.   THE BREACH-OF-FIDUCIARY-DUTY CLAIM FAILS BECAUSE THERE WAS NO BREACH AND NO FIDUCIARY DUTY.

BMO Harris's Rule 50(a) briefs show that judgment should be entered on the breach-of-fiduciary-duty claim (Count II) because M&I did not owe, and did not breach, any fiduciary duties under the DACAs.[22] Now limiting his claim to the Palm Beach DACA, Plaintiff (at 6) asserts that the Bankruptcy Court's motion-to-dismiss ruling found "general fiduciary duties" under the Palm Beach DACA that M&I supposedly breached in some unspecified way. He is wrong about all of that.

---

[20]  10/25/22 Tr. 2612:7-2614:2.
[21]  *Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 410-411 (8th Cir. 2022). Contrary to what Plaintiff seems to argue based on *Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1203 (8th Cir. 2015), it does not matter whether the mere bringing of a MUFA claim would have entitled BMO Harris to offer Rule 608 evidence. All that matters is that the Court ruled for Plaintiff on the Rule 608 issue based on a representation that Plaintiff now is trying to argue the opposite of.
[22]  Doc. 289 at 9-10, 22-25 (JMOL Br.); Doc. 321 at 6, 9 (JMOL Br.); Doc. 328 at 3 (JMOL Reply).

5

The motion-to-dismiss-ruling held that "what duties Defendant owed and to whom" was "a fact question not appropriately resolved on a motion to dismiss."[23] That ruling says nothing that recognizes M&I fiduciary duties to PCI under the Palm Beach DACA or otherwise. And Plaintiff has no answer to the Palm Beach DACA language inconsistent with such fiduciary duties.[24] Nor does he dispute the ruling by the court presiding over Palm Beach's bankruptcy that the Palm Beach DACA imposed no fiduciary duties on M&I.[25]

Insofar as the motion-to-dismiss ruling held open the possibility that Plaintiff might be able to introduce extrinsic evidence to establish that M&I owed PCI a fiduciary duty under the DACAs, Plaintiff has failed entirely to do so. Indeed, although Plaintiff contests the evidence BMO Harris offered at trial to disprove the existence of a fiduciary duty, he cannot point to a shred of evidence supporting his own claim that one did exist. Where, as here, a claimed fiduciary duty is supported by no extrinsic evidence, but relies only on contractual language, the party claiming such a duty has not presented an issue of fact for the jury, but a question of law that may be resolved against him by the Court.[26]

Plaintiff has even less to say about M&I's purported breach of duties. He concedes that M&I never received the transaction list required for any action by M&I. He identifies

---

[23] Doc. 4-14 at 15.
[24] *See* Doc. 289 at 23-24 (JMOL Br.).
[25] *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 781-82 (Bankr. S.D. Fla. 2013).
[26] *See Rucki v. Grazzini*, Nos. A09-0694 *et al.*, 2010 WL 1286725, at *4 (Minn. Ct. App. Apr. 6, 2010); *see also Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982).

6

no Palm Beach DACA provision that M&I allegedly breached. And he describes nothing else that could be a breach of any duty arising from the Palm Beach DACA.

IV. **THE EVIDENCE DOES NOT ENTITLE PLAINTIFF TO PUNITIVE DAMAGES.**

Plaintiff (at 2) briefly points to arguments in support of his punitive-damages claim that he made in opposing BMO Harris's initial Rule 50 motion. But Plaintiff nowhere acknowledges that punitive damages require *clear and convincing evidence*. Judgment as a matter of law is warranted unless a reasonable jury could find that Plaintiff has proved his entitlement to punitive damages by that demanding standard of proof.[27] No reasonable jury could make that finding here, for at least two reasons.

**No malicious state of mind.** No reasonable jury could find proof by clear and convincing evidence that BMO Harris acted with a state of mind akin to "maliciousness, an intentional or willful failure to inform or act."[28]

Plaintiff references the state-of-mind arguments in his prior-filed opposition, but those arguments only reinforce that this is not a punitive-damages case. Plaintiff argues, in substance, that M&I established policies and provided training that various M&I employees allegedly failed to adequately follow. For example, Plaintiff claims that AML analysts "had the requisite knowledge" because M&I "policies required that they know the

---

[27] *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1165 (D. Minn. 2011).
[28] *In re Levaquin Prod. Liab. Litig.*, 700 F.3d 1161, 1169 (8th Cir. 2012); *Beniek v. Textron, Inc.*, 479 N.W.2d 719, 723 (Minn. Ct. App. 1992).

7

customer's activity, and they were trained [by M&I] to recognize suspicious activity."[29] Although the mere existence of a corporate policy might not defeat punitive damages, Plaintiff cannot hold up M&I's policies and training as such a measure of AML compliance that any deviation from them is purportedly evidence of actual knowledge, and at the same time contest that M&I "actively sought ways to prevent the dangers associated with" its services—a state of mind that precludes punitive damages.[30]

Moreover, Plaintiff's arguments rely on the mistaken premise that the *malicious* and *deliberate* state of mind required for punitive damages can be satisfied with evidence of, at best, constructive knowledge. Plaintiff repeatedly asserts that M&I employees must be charged with knowledge of information they had "access to" or that was "available to" them,[31] as well as information they *could have* uncovered.[32] If M&I employees testified to ever looking at a particular category of information, like MiContacts reports or transaction activity, then Plaintiff insists they must be charged with awareness of all such information

---

[29] Doc. 313 at 18; *see also, e.g.*, *id.* at 13 (Flynn and Jambor "were trained" to recognize suspicious activity); *id.* at 25 (claiming the business bankers and AML analysts "repeatedly violated BMO's internal policies").
[30] *Levaquin*, 700 F.3d at 1169; *Beniek*, 479 N.W.2d at 723.
[31] *See, e.g.*, Doc. 313 at 13 (Flynn and Jambor "had complete access to account activity."); *id.* (Flynn had "comprehensive access to PCI transaction activity"); *id.* at 15 ("AML analysts had access to" account information and activity); *id.* at 20 (transaction data was "available to" AML analysts); *id.* (AML "analysts had access to MiContacts"); *id.* at 26 (after-the-fact analysis determined activity was suspicious based in part on "***data available to AML analysts***" when alerts were triggered).
[32] *See* Doc. 313 at 15 (suggesting Flynn could have "asked why" M&I never received transaction lists); *id.* at 19 (AML analysts "could call the business banker on the account and run internet searches").

8

at all relevant times.[33] If they did *not* look at a particular category of information, then Plaintiff insists that is evidence of willful blindness.[34] These are, at most, negligence arguments. Under Minnesota law, evidence that a corporation "was incompetent or careless," or that it did not comply with regulatory requirements, is legally insufficient for punitive damages.[35] Thus, Plaintiff's evidence is legally insufficient for a reasonable jury to find, by clear and convincing evidence, that BMO acted with a state of mind akin to maliciousness.

**No corporate principal liability.** Plaintiff also has no evidence that would satisfy Minnesota's statutory preconditions for imposing punitive damages against a corporate principal because of an act done by an agent.[36] Plaintiff's contrary argument is that Bernita Hile and Chris Flynn were managerial agents whose actions justify awarding punitive damages. No reasonable jury could accept that contention.

Bernita Hile, tellingly, is not mentioned in Plaintiff's opposition until the punitive damages section, where Plaintiff asserts that Hile "was responsible for formulating the AML procedures and guidelines."[37] Again, Plaintiff cannot have it both ways, arguing on

---

[33] *See, e.g.,* Doc. 313 at 19 (AML analysts "had access to, and looked at, everything in the account and all the account activity"); *id.* at 20 "All transaction data . . . was available to – and reviewed by – AML analysts"); *id.* at 20-21 (arguing that, because AML analysts reviewed MiContacts entries, "it can be inferred that they knew" various statements drawn from five different entries, without evidence that any analyst reviewed any of those entries).
[34] *See, e.g.,* Doc. 313 at 13 (Flynn had access to information he "***never*** reviewed"); *id.* at 15 (Flynn "never looked to see" if there were outgoing wires to Nationwide); *id.* at 16 (Jambor "couldn't recall ever seeing an incoming retailer wire").
[35] *Kapps*, 813 F. Supp. 2d at 1167; *see also Ba Lam v. Cnty. of Ramsey*, No. A08-0035, 2009 WL 173523, at *3 (Minn. Ct. App. Jan. 27, 2009).
[36] Minn. Stat. § 549.20 subd. 2.
[37] Doc. 313 at 57.

9

the one hand that the policies Hile developed for M&I instructed bank employees so thoroughly on their obligations that any purported failure to follow that guidance proves a culpable state of mind, while on the other hand arguing that Hile's role in developing those policies is culpable to the point of warranting punitive damages. The only other act Plaintiff identifies for which Hile was personally responsible is her decision to place PCI on the "QAPOR" list—but while Plaintiff argues that decision was incorrect (in that he claims PCI did not qualify for the list), he offers no evidence, let alone clear and convincing evidence, that it reflected a *malicious* or *deliberate* disregard for the rights or safety of others. That a plaintiff's expert disagrees after the fact with an employee's on-the-job decision does not provide a basis for punitive damages.

As to Chris Flynn, Plaintiff points to no evidence that Flynn was a managerial agent "with authority to establish policy and make planning level decisions for [M&I]."[38] As undisputed evidence at trial established, it was Jeanne Crain who was "responsible for managing and planning the entire Business Banking Division"—not Flynn (Crain's subordinate), as Plaintiff inaccurately claims.[39] Plaintiff points to Flynn's testimony that he supervised five to seven people in the business banking division, while also handling his own direct portfolio of clients.[40] But a mid-level supervisor is not ordinarily a policymaker, and Plaintiff identifies no evidence that Flynn was one. Flynn testified about

---

[38] Minn. Stat. § 549.20 subd. 2.
[39] 10/19/22 Tr. 1566:13-15; 10/25/22 Tr. 2532:8-14.
[40] 10/19/22 Tr. 1511:1-1512:1.

10

*receiving* policies handed down by higher-level employees, not making policy.[41] In all events, Flynn did nothing that would remotely justify punitive damages.

## V.     ADDITIONAL GROUNDS WARRANT JUDGMENT FOR BMO HARRIS.

There are many other grounds for entering judgment as a matter of law in favor of BMO Harris. There was no fraud against PCI that can support the aiding-and-abetting-fraud claim (Count III).[42] M&I took no affirmative step, with knowledge of a wrongful purpose, that aided PCI management's wrongdoing and caused the alleged harm to PCI (Counts III and IV).[43] Any damages on Counts I and IV must be limited to amounts that PCI management took from PCI.[44] For his MUFA claim (Count I), Plaintiff failed to connect an scienter-possessing M&I employee or the claimed damages to specific MUFA-violating transactions.[45] Plaintiff offered no evidence of damages caused by the purported breach of fiduciary duties arising from the Palm Beach DACA (Count II).[46] Various timeliness, preemption, and other defenses bar Plaintiff's claims in whole or in part.[47] And, in several ways, Plaintiff has failed to prove the purported damages to PCI or that M&I caused them.[48]

---

[41]  10/19/22 Tr. 1553:18-1554:20.
[42]  Doc. 289 at 13-14 (JMOL Br.); Doc. 328 at 3-4 (JMOL Reply).
[43]  Doc. 289 at 14-18 (JMOL Br.); Doc. 321 at 7-9 (JMOL Br.).
[44]  Doc. 289 at 19-21 (JMOL Br.); Doc. 328 at 4 (JMOL Reply).
[45]  Doc. 289 at 20-22 (JMOL Br.); Doc. 328 at 3 (JMOL Reply).
[46]  Doc. 289 at 25-26 (JMOL Br.); Doc. 321 at 9-10 (JMOL Br.); Doc. 328 at 3 (JMOL Reply).
[47]  Doc. 289 at 26-42 (JMOL Br.); Doc. 321 at 10-11 (JMOL Br.); Doc. 324 at 3-21 (JMOL Opp.).
[48]  Doc. 289 at 34-35, 38-39, 41-42 (JMOL Br.); Doc. 321 at 11-12 (JMOL Br.).

11

In his current opposition, Plaintiff addresses only some of these points. For the rest, he presumably rests on prior briefing. BMO Harris will do the same for the arguments not addressed below.

**Aiding-and-Abetting Claims.** BMO Harris's Rule 50(a) briefs explain that judgment on Plaintiff's aiding-and-abetting claims (Counts III and IV) is appropriate because Plaintiff has no evidence that M&I provided substantial assistance to the tortious actions of PCI management or that any such assistance caused the purported harm to PCI.[49]

Plaintiff (at 2-3) first responds by trying to controvert the evidence refuting substantial assistance. This brief has already addressed Plaintiff's challenges to the testimony that PCI received no special treatment from M&I and that M&I tried to establish lending relationships with PCI.[50]

Plaintiff also challenges the lack of any financial motive for M&I or its employees by pointing to evidence that PCI was a profitable client to which employees tried to cross-sell. But the inference Plaintiff wants is not at all reasonable—less than $1.5 million over seven years is not going to motivate any bank to knowingly aid a Ponzi scheme.[51] And no trial evidence supports that any M&I employees were willing to risk their livelihood and liberty for the unfulfilled promise of obtaining more PCI business for M&I.[52]

---

[49] Doc. 289 at 14-18 (JMOL Br.); Doc. 321 at 7-9 (JMOL Br.).
[50] *See supra* pp. 3-4.
[51] 10/27/22 Tr. 3201:9-3207:4 (Jarek).
[52] 10/27/22 Tr. 3201:9-3203:2 (Jarek); 10/28/22 Tr. 3447:6-3448:10 (Grice).

12

Plaintiff further challenges the evidence that PCI did and could use other banks for its scheme by citing testimony from Deanna Coleman that it took ten years to find a bank that PCI could work with. Nothing about that testimony contradicts the fact that PCI actually used other banks for the Ponzi scheme (some of which provided special treatment facilitating the scheme), as Ponzi schemers often do.[53]

Plaintiff (at 3) finally says that Coleman's commitment to lying to M&I to keep the scheme under wraps is essentially irrelevant to causation because "a bank's responsibility is to ferret out fraud." Whether or not banks have that kind of responsibility under banking regulations, any such responsibility is not enforceable through an aiding-and-abetting claim, which requires (among other things) that a defendant bank take an affirmative step, with knowledge of a wrongful purpose, that aided tortious conduct.[54] And more generally, that defect plagues Plaintiff's recitation of supposed substantial-assistance evidence. That evidence is all either failures to act or banking services provided without any knowledge of a wrongful purpose.[55]

Plaintiff (at 7-8) next takes on BMO Harris's showing that M&I's conduct did not cause PCI's purported harm because PCI was insolvent and unable to repay its creditors before it started banking with M&I.[56] Plaintiff says that insolvency does not equal an

---

[53] 10/27/22 Tr. 3185:13-3191:6 (Jarek); 10/26/22 Tr. 2792:22-25, 2822:8-2823:13, 2855:9-11 (Coleman).
[54] *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 859-61 (D. Minn. 2013), *aff'd*, 764 F.3d 833 (8th Cir. 2014); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 923 (W.D. Mich. 2010), *aff'd* 712 F.3d 917 (6th Cir. 2013).
[55] Doc. 313 at 12-23, 34-35 (JMOL Opp.).
[56] *See* Doc. 289 at 17-18 (JMOL Br.).

inability to pay creditors and that PCI did pay creditors (except note-rollers) until 2008. Plaintiff's argument contradicts his theory of the case and the accepted understanding of "inability to repay creditors." Plaintiff's theory of harm and damages is that fraudulent depletions of PCI assets throughout the 2002-2008 damages period caused the insolvency and inability to pay creditors that the *Greenpond* case treats as one and the same for PCI.[57] Nor is it unusual to treat insolvency as an inability to repay creditors given that insolvency occurs when debts exceed assets.[58] Indeed, cases recognize that "a Ponzi scheme is, by definition, unable to repay all its creditors."[59] The same is true here. While PCI did manage to repay some of its creditors some of what it owed for a long time (by adding more creditors and debt), it is undisputed that after 1996 (at the latest) PCI was never capable of repaying *all* of its creditors.[60] As a result, nothing M&I did after the PCI Account opened in 1999 could have caused PCI to become unable to repay its creditors.

**Breach-of-Fiduciary-Duty Causation.** BMO Harris's Rule 50(a) briefs show that judgment on Plaintiff's breach-of-fiduciary-duty claim (Count II) is also warranted because Plaintiff has no evidence that a breach of duties under the February 2008 Palm Beach DACA caused any damages to PCI.[61] Indeed, by that point, PCI already owed investors

---

[57] *See* Doc. 214 at 45-47 (*Daubert* Ordert); *Greenpond S., LLC v. Gen. Elec. Cap. Corp.*, 886 N.W.2d 649, 657 (Minn. Ct. App. 2016)
[58] Minn. Stat. § 513.42.
[59] *Wing ex rel. 4NExchange, L.L.C. v. Yager*, No. 1:03-cv-54, 2003 WL 23354487, at *2 (D. Utah Nov. 7, 2003); *Marion v. Benistar, Ltd.*, No. 03-cv-4700, 2005 WL 563698, at *1 (E.D. Pa. Mar. 10, 2005).
[60] 10/27/22 Tr. 3169:5-3172:13 (Jarek); 10/24/22 Tr. 2475:21-2477:19 (Martens).
[61] Doc. 289 at 25-26 (JMOL Br.); Doc. 321 at 9-10 (JMOL Br.); Doc. 328 at 3 (JMOL Reply).

14

billions of dollars.[62] And PCI's debt to Palm Beach decreased during the last nine months of the Ponzi scheme.[63]

In response, Plaintiff does not identify any evidence that PCI's debt to Palm Beach increased after February 2008. Nor does he even try to explain how any of the claimed damages could be attributable to anything M&I failed to do under the Palm Beach DACA. All he argues (at 8 n.4) is that his lawyer's questioning to Karl Jarek about Mr. Jarek's net-cash analysis from December 2007 forward (which Jarek testified is consistent with the net-cash analysis Ted Martens used for the claimed damages period[64]) somehow shows the analysis is erroneous or controverted. But without *evidence* of increased debt to Palm Beach or *evidence* of other post-February 2008 PCI damages linked to the Palm Beach DACA, the breach-of-fiduciary-duty claim fails.

**Contractual Limitations Period.** BMO Harris's Rule 50(a) briefs explain that provisions in Deposit Account and Wire Transfer Agreements between PCI and M&I required that any suit like this one be brought long before Plaintiff commenced this action.[65] Plaintiff (at 10) maintains that those agreements are void and do not apply here. But as BMO Harris has explained elsewhere, those agreements are perfectly enforceable

---

[62] 10/27/22 Tr. 3173:3-13 (Jarek); 10/25/22 Tr. 2511:17-19 (Martens).
[63] 10/27/22 Tr. 3180:2-3181:8 (Jarek).
[64] 10/27/22 Tr. 3252:23-3254:15 (Jarek).
[65] Doc. 289 at 26-28 (JMOL Br.); Doc. 321 at 10 (JMOL Br.); Doc. 324 at 12-16 (JMOL Opp.).

in this case under Minnesota law.[66] The claims here fall within the plain language of the agreements, and the limitations periods are not unreasonably short.

**Statute of Limitations.** BMO Harris's Rule 50(a) briefs have shown that the six-year statutes of limitations applicable to Plaintiff's claims bar liability for conduct predating November 2006.[67] Reiterating his argument that PCI did not become unable to repay its creditors until the Ponzi scheme collapsed in 2008, Plaintiff (at 8-9) maintains that his claims are timely because they accrued in 2008 under Minnesota's "some damages" rule. As already explained, PCI's inability to repay its creditors always existed.[68] Plaintiff's claims thus accrued when M&I's alleged wrongdoing occurred. Claims based on wrongdoing before November 2006 are therefore untimely.

**Compensatory Damages.** BMO Harris's Rule 50(a) briefs show that Ted Martens has provided inadequate factual support for his damages figure as a measure of PCI harm caused by M&I's wrongful conduct.[69] In response, Plaintiff (at 9-10) says that the Court declined to exclude Martens's damages opinions and that Martens was under no obligation to provide causation opinions. But none of that frees Plaintiff from *his* burden to *prove* harm and causation with trial evidence.

---

[66] Doc. 289 at 26-28 (JMOL Br.); Doc. 324 at 12-16 (JMOL Opp.).
[67] Doc. 289 at 29-30 (JMOL Br.); Doc. 321 at 10-11 (JMOL Br.); Doc. 324 at 3-6 (JMOL Opp.).
[68] *See supra* pp. 13-14.
[69] Doc. 289 at 34-35, 38-39, 41-42 (JMOL Br.); Doc. 321 at 11-12 (JMOL Br.).

Plaintiff must establish as a factual matter that the claimed damages measure harm to PCI.[70] Yet he points to no evidence doing so. And the only evidence on the subject shows that the damages do not measure PCI harm.[71]

Likewise, Plaintiff must prove causation. On this issue, Plaintiff points to testimony from his banking expert that, if M&I had reported what it knew to bank regulators, the FBI would have stopped the Ponzi scheme. That testimony is pure speculation. But, more importantly, the testimony is not tied to Plaintiff's damages figure because there is no evidence that M&I had anything to report by January 2002, much less that the FBI could or would have stopped the scheme by then.[72]

The jury does not have a factual basis to award any damages, let alone $1.9 billion. Accordingly, judgment should be entered for BMO Harris.

## CONCLUSION

For the foregoing reasons and those stated in its other Rule 50(a) briefs, BMO Harris respectfully asks that the Court enter judgment for BMO Harris as a matter of law.

---

[70] 4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG 90.15 (6th ed.) ("A party asking for damages must prove the nature, extent, duration, and consequences of his or her (injury)(harm).").
[71] 10/27/22 Tr. 3212:4-20 (Jarek).
[72] Indeed, although the Court excluded evidence on the subject (Doc. 241 at 16-19), the FBI investigated PCI in 2003 with the benefit of M&I's banking records and did not stop PCI's Ponzi scheme. Doc. 308 at 3-4 (Offer of Proof).

17

Dated: November 1, 2022                                   Respectfully submitted,

/s/ Keith S. Moheban

| | |
|---|---|
| John Gleeson (*pro hac vice*) | Keith S. Moheban (#216380) |
| Michael Schaper (*pro hac vice*) | Adine S. Momoh (#390085) |
| Susan Reagan Gittes (*pro hac vice*) | STINSON LLP |
| Morgan Davis (*pro hac vice*) | 50 South Sixth Street, Suite 2600 |
| DEBEVOISE & PLIMPTON LLP | Minneapolis, MN 55402 |
| 919 Third Avenue | Telephone: (612) 335-1500 |
| New York, NY 10022 | keith.moheban@stinson.com |
| Telephone: (212) 909-6389 | adine.momoh@stinson.com |
| jgleeson@debevoise.com | |
| mschaper@debevoise.com | Donald B. Verrilli, Jr. (*pro hac vice*) |
| srgittes@debevoise.com | Elaine J. Goldenberg (*pro hac vice*) |
| mdavis@debevoise.com | Brendan B. Gants (*pro hac vice*) |
| | MUNGER TOLLES & OLSON LLP |
| Lucia Nale (*pro hac vice*) | 1155 F Street, NW, 7th Floor |
| Joshua D. Yount (*pro hac vice*) | Washington, DC 20004 |
| Thomas V. Panoff (*pro hac vice*) | Telephone: (202) 220-1100 |
| Christopher S. Comstock (*pro hac vice*) | donald.verrilli@mto.com |
| MAYER BROWN LLP | elaine.goldenberg@mto.com |
| 71 South Wacker Drive | brendan.gants@mto.com |
| Chicago, IL 60606 | |
| Telephone: (312) 782-0600 | **ATTORNEYS FOR BMO HARRIS** |
| lnale@mayerbrown.com | **BANK N.A., AS SUCCESSOR TO** |
| jdyount@mayerbrown.com | **M&I MARSHALL & ILSLEY BANK** |
| tpanoff@mayerbrown.com | |
| ccomstock@mayerbrown.com | |

Richard A. Spehr (*pro hac vice*)
Gina M. Parlovecchio (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2578
rspehr@mayerbrown.com
gparlovecchio@mayerbrown.com

Minnesota/2014198.0788/155393895.1