<pre>
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------------
                                   )
       Douglas A. Kelley, in his   )   File No. 19-cv-1756
 4     capacity as the Trustee of the )         (WMW)
       BMO Litigation Trust,       )
 5                                  )
               Plaintiff,           )   St. Paul, Minnesota
 6                                  )   October 6, 2022
       vs.                          )   1:05 p.m.
 7                                  )
       BMO Harris Bank N.A., as     )
 8     successor to M&I Marshall and )
       Ilsley Bank,                 )
 9                                  )
               Defendant.           )
10     ------------------------------------------------------------

11

12

13              BEFORE THE HONORABLE WILHELMINA M. WRIGHT
                   UNITED STATES DISTRICT COURT JUDGE
14
                          (PRETRIAL CONFERENCE)
15

16

17

18

19

20

21

22

23
            Proceedings reported by certified court reporter;
24     transcript produced with computer.

25
</pre>

```
 1        APPEARANCES:
            For the Plaintiff:        Robins Kaplan, LLP
 2                                     MICHAEL A. COLLYARD, ESQ.
                                       DAVID E. MARDER, ESQ.
 3                                     PETER C. IHRIG, ESQ.
                                       MORGIA D. HOLMES, ESQ.
 4                                     800 LaSalle Avenue
                                       Suite 2800
 5                                     Minneapolis, Minnesota 55402

 6                                     Anthony, Ostlund, Louwagie,
                                       Dressen, Boylan, P.A.
 7                                     JOSEPH W. ANTHONY, ESQ.
                                       JOSEPH R. RICHIE, ESQ.
 8                                     RYAN M. LAWRENCE, ESQ.
                                       90 South Seventh Street
 9                                     Suite 3600
                                       Minneapolis, Minnesota 55402
10
            For the Defendant:        Stinson, LLP
11                                     KEITH S. MOHEBAN, ESQ.
                                       ADINE S. MOMOH, ESQ.
12                                     50 South Sixth Street
                                       Suite 2600
13                                     Minneapolis, Minnesota 55402

14                                     Debevoise & Plimpton, LLP
                                       JOHN GLEESON, ESQ.
15                                     MICHAEL SCHAPER, ESQ.
                                       SUSAN REAGAN GITTES, ESQ.
16                                     MORGAN A. DAVIS, ESQ.
                                       919 Third Avenue
17                                     New York, New York 10022

18                                     Mayer Brown, LLP
                                       JOSHUA D. YOUNT, ESQ.
19                                     71 South Wacker Drive
                                       Chicago, Illinois 60606
20
                                       Mayer Brown, LLP
21                                     RICHARD A. SPEHR, ESQ.
                                       GINA PARLOVECCHIO, ESQ.
22                                     1221 Avenue of the Americas
                                       New York, New York 10020
23
            Court Reporter:           LORI A. SIMPSON, RMR-CRR
24                                     316 North Robert Street
                                       St. Paul, Minnesota 55101
25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3          LAW CLERK:  The case before the Court is Case

4    Number 19-cv-1756, Douglas A. Kelley vs. BMO Harris Bank.

5          Counsel, please make your appearances for the

6    record.

7          MR. COLLYARD:  Good morning, Your Honor.  Mike

8    Collyard on behalf of plaintiff.

9          THE COURT:  Good afternoon.

10         MR. GLEESON:  Good afternoon, Judge.  John Gleeson

11   from Debevoise & Plimpton for the defendant.

12         THE COURT:  Thank you.  Good afternoon.

13         MR. GLEESON:  Judge, do you want to introduce the

14   others at the table or --

15         THE COURT:  I would like everyone who is appearing

16   and representing a party here to be noted on the record.

17         MR. GLEESON:  Would you like me to do it, or would

18   you like them to introduce --

19         THE COURT:  You may do it, certainly.

20         MR. GLEESON:  Okay.  With me at the table are Mike

21   Schaper.

22         MR. SCHAPER:  Good afternoon, Your Honor.

23         MR. GLEESON:  Rich Spehr.

24         MR. SPEHR:  Good afternoon.

25         MR. GLEESON:  Keith Moheban.

```
 1                    MR. MOHEBAN:  Good afternoon.

 2                    THE COURT:  Good afternoon.

 3                    MR. GLEESON:  Adine Momoh.

 4                    MS. MOMOH:  Good afternoon, Your Honor.

 5                    THE COURT:  Good afternoon.

 6                    MR. GLEESON:  Susan Gittes.

 7                    MS. GITTES:  Good afternoon.

 8                    MR. GLEESON:  And Josh Yount.

 9                    MR. YOUNT:  Good afternoon, Your Honor.

10                    THE COURT:  Good afternoon.

11                    MR. GLEESON:  I will let my adversary introduce

12      his colleagues.

13                    THE COURT:  Thank you.

14                    MR. COLLYARD:  Your Honor, with me is Doug Kelley.

15                    THE COURT:  Good afternoon.

16                    MR. KELLEY:  Good afternoon, Your Honor.

17                    THE COURT:  Joe Anthony.

18                    MR. ANTHONY:  Afternoon, Your Honor.

19                    THE COURT:  Good afternoon.

20                    MR. COLLYARD:  David Marder.

21                    MR. MARDER:  Good afternoon.

22                    THE COURT:  Good afternoon.

23                    MR. COLLYARD:  And Peter Ihrig.

24                    MR. IHRIG:  Good afternoon, Your Honor.

25                    THE COURT:  Good afternoon.  Thank you.
```

1          I will just review at this time the matters that

2     have been provided to you, Counsel, as to how we will

3     proceed in an orderly fashion in our trial.

4          Cell phones must be turned off during trial.

5          Counsel will conduct witness examinations from the

6     podium, and you'll approach the witness, the bench, the jury

7     only with permission from the Court.

8          Only water is permitted here in the courtroom, and

9     no food or other drinks are permitted.

10          It's important when you're making your

11     arguments -- well, when you're making your objections, that

12     you not make arguments during the objection and instead

13     provide the basis for your objection.  If argument is

14     necessary, we will conduct a sidebar for that purpose.

15          Counsel, you will stand at the counsel table when

16     objecting and at the podium when you are addressing the

17     Court.

18          Also, do not speak over one another or over the

19     witnesses in the course of our trial.

20          It's important to address the Court, opposing

21     counsel, witnesses, our court staff with civility, with

22     formality, using titles and last names.

23          When we are proceeding with the trial, only the

24     attorney asking questions and the attorney defending may

25     argue to the Court during our sidebar proceedings.

1          You are reminded to be mindful about the evidence

2    that may be admitted, and counsel must abide by the pretrial

3    rulings during the trial.

4          Also, the parties should be familiar with our

5    courtroom technology before you start -- this trial starts;

6    and if you need to have access to the courtroom for purposes

7    of doing so, please be in touch with my staff so that you

8    can do so.

9          And you are reminded that when using the ELMO,

10   it's helpful to the Court and to the jury to use the zoom

11   feature so that the documents are visible.

12          There will be 12 jurors.  We will call 18 jurors

13   to answer voir dire, and our strikes will occur in the

14   following order:  The defendant will have one, the plaintiff

15   will have one, the defendant will have one, the plaintiff

16   will have one, the defendant will have one, and the

17   plaintiff will have one.

18          Are there any additions or objections by the

19   parties to the Court's voir dire questions?

20          MR. GLEESON:  None from the defendant.

21          MR. COLLYARD:  None from plaintiff, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Each party will be allowed 10 to 15 minutes of

24   voir dire after the Court's voir dire, and that voir dire

25   will be conducted at the podium.  And the defense counsel

```
1     will go first.
2            If the Court excuses a juror for cause, the new
3     juror replacing the excused juror will retain his or her
4     original juror number, and it will not adopt the juror
5     number of the juror who was replaced.  Understood?
6            Okay.  And the process for striking the jurors
7     will be conducted with the jurors in the courtroom, and I'll
8     ask who will be seated at counsel table during these
9     proceedings?
10           MR. COLLYARD:  Your Honor, for plaintiff, it will
11    be myself, Mike Collyard; Joe Anthony; Doug Kelley; and Ryan
12    Malphurs, that's M-a-l-p-h-u-r-s.
13           THE COURT:  Thank you, Counsel.
14           MR. GLEESON:  Judge, it will be me, John Gleeson;
15    Mr. Moheban; Mr. Schaper; Ms. Momoh; Mr. Spehr; Gina
16    Parlovecchio, who I did not introduce you to here today,
17    although she's in the courtroom.  There she is.
18           THE COURT:  Thank you, Ms. Parlovecchio.
19           MR. GLEESON:  Another lawyer from my firm, Morgan
20    Davis, who is here; and Susan Gittes, whom you met.  We will
21    have two representatives from the client sitting behind.
22           THE COURT:  Okay.
23           MR. GLEESON:  Fair enough?
24           THE COURT:  Yes.
25           MR. GLEESON:  Thank you, Judge.
```

1          THE COURT:  Right now I will go through the list

2     of parties, attorneys, and witnesses to verify

3     pronunciation, and so please correct me as needed.

4          Adine Momoh, Bernita Hile, BMO Harris Bank,

5     Carolyn Moline.  Is that correct?

6          MR. GLEESON:  Yes.

7          THE COURT:  Okay.

8          MR. GLEESON:  Sorry.  Yes.

9          THE COURT:  And for this purpose, Counsel, you may

10     remain seated when addressing the Court.  Thank you.

11          Catherine Cali- -- that's not right.

12          MR. ANTHONY:  Catherine Ghiglieri, Your Honor,

13     ga-lair-ee.  Pretty easy.

14          THE COURT:  All right.  Catherine Ghiglieri?

15          MR. ANTHONY:  Catherine Ghiglieri.

16          THE COURT:  Thank you.

17          Charles Grice, Christopher --

18          MR. GLEESON:  Do you want us to say "correct" or

19     just correct you if you are wrong?

20          THE COURT:  Please correct me if I am wrong.

21     Okay?

22          Christopher Flynn, David Marder, David Scherer,

23     Deanna Coleman, Debbie Lindstrom, Debra Bogo-Ernst, Douglas

24     Kelley, Edward Jambor, Elliot Berman, Gil Davis, Jeanne

25     Crain, Jerry Sims, John Gleeson, John Vanderheyden.

```
1                MR. SCHAPER:  That's right.

2                THE COURT:  Thank you.  John -- is it sah-bais?

3                MR. GLEESON:  Say-bees.

4                THE COURT:  Say-bees.  Thank you.

5                MR. GLEESON:  Rhymes with "rabies."

6                MR. COLLYARD:  Your Honor, it's say-bis.

7                MR. GLEESON:  Oh, thank you.

8                THE COURT:  Sabes, S-a-b-i-s, would be the

9     phonetical spelling?

10               MR. COLLYARD:  Correct.

11               THE COURT:  Thank you.

12               Jonathan Ingrisano.

13               MR. GLEESON:  Correct.

14               THE COURT:  Joseph Anthony, Joseph Richie, Karl

15    Jarek, Keith Moheban.

16               MR. MOHEBAN:  Moe-ha-bon.

17               THE COURT:  Moheban.  Okay.  Thank you.

18               Kelley Maltsch, Lance Bellyard -- I'm sorry,

19    Breiland.

20               MR. COLLYARD:  Bry-land, Your Honor.

21               THE COURT:  Breiland.  Thank you.

22               Lucia Nale, Mandy Ramlow.

23               MR. YOUNT:  It's loo-see, nahl-ee.

24               THE COURT:  Okay.  And is it loo-see-ah or

25    loo-see?
```

```
 1                   MR. YOUNT:  Loo-see.

 2                   THE COURT:  Loo-see.  And nahl-ee, is that what

 3       you said?

 4                   MR. YOUNT:  Yes, that's correct, Your Honor.

 5                   THE COURT:  Thank you.  Mandy Ramlow.

 6                   MS. MOMOH:  Ram-loe, Your Honor.

 7                   THE COURT:  Thank you.

 8            Mary Pesch.  Michael Couillard or Collyard?

 9                   MR. COLLYARD:  Caul-yard, Your Honor.

10                   THE COURT:  Thank you.  Collyard.

11            Michael Schaper, Morgan Davis, Morgia Holmes.

12                   MR. COLLYARD:  Moor-ja.

13                   THE COURT:  Morgia, Nicholas Bauer, Patricia

14       Currie-Smotherman, Paul Stroble, Peter Ihrig, Peter Janczak,

15       Raymond Neufeldt, Ryan Lawrence, Sara Indahl, Sara Johnson.

16                   MR. COLLYARD:  Your Honor, just a correction.

17       It's Sandra Indahl.

18                   THE COURT:  Oh, I'm sorry.  That is correct.  I am

19       misreading that.  Sandra Indahl.  Is that correct?

20                   MR. COLLYARD:  That's correct.

21                   THE COURT:  Thank you.

22            Sara Johnson, Shandra Roehrig.

23                   MR. GLEESON:  Roar-ig.

24                   MS. MOMOH:  Your Honor, it's shan-dra.

25                   THE COURT:  Shandra, thank you.
```

 1              Shari Rhode.

 2              MR. GLEESON:  Road-ee.

 3              THE COURT:  Rhode, thank you.

 4              Simon Root, Susan Reagan -- stump the judge.

 5              MS. GITTES:  I am glad I was the one that stumped

 6      you.  Git-is.

 7              THE COURT:  Gittes.  Thank you.

 8              MS. GITTES:  But you can botch it.  You'll be in

 9      good company.

10              THE COURT:  Thank you, Ms. Gittes.  Theodore

11      Martens, and Thomas Haller.  Is that correct?

12              Okay.  I'll ask the parties to ensure that we have

13      sufficient witnesses available each day to make use of the

14      entire trial day.

15              A list of witnesses the parties expect to call

16      each day must be provided to the Court and opposing counsel

17      by e-mail no later than 7:00 p.m. the previous day.

18              MR. GLEESON:  Judge, can I be heard on that, if

19      not now, when we're done?

20              THE COURT:  You may now.

21              MR. GLEESON:  Thank you.  And to go back, there

22      are lawyers who are no longer going to be witnesses that are

23      on our list in case you're keeping score.  Ms. Bogo-Ernst,

24      Mr. Ingrisano, and Lucy Nale are no longer going to be

25      witnesses in light of intervening events.

1            And then, of course, you've met Mr. Spehr, Richard

2     Spehr, and Gina Parlovecchio who are not witnesses, but they

3     are part of the trial team.

4            On this, we were grateful to read that there are

5     going to be long trial days five days a week, going to move

6     the case along.  The 7:00 p.m. the night before, and this is

7     not something we haven't interacted with our colleagues

8     across the bar about, because we have some out-of-town

9     witnesses and there's some witnesses whose presence we'll

10    procure, but who no longer work for BMO, we're going to have

11    some difficulty in making sure we have them -- well, let me

12    back up.

13           We do want to have full trial days, but we're also

14    trying to reconcile the tension that this

15    7:00 p.m.-the-night-before notification provides because we

16    don't really think it's reasonable to have people lined up

17    outside the courtroom unnecessarily.

18           So long story short, we've asked plaintiff to --

19    for two things:  One, is to give us the best estimate of

20    when each witness they expect to bring will testify a week

21    in advance, and we know that can't be carved in stone

22    because trials are not scientific in that way.  But also

23    we've asked if they would agree at the end of each trial day

24    to tell us the expected witnesses for the next two days, and

25    of course we would do the same in our case.

1          But if we wait until 7:00 p.m. the night before a

2     trial day, we're going to have to get someone from Milwaukee

3     or someone who now works for another bank, and it might be

4     more difficult.  If we have a little advance notice, I think

5     we'll do a much better job of both ensuring there's no dead

6     time in the courtroom, witnesses until 5:00, but also not

7     unduly burdening witnesses who live out of state -- I'm

8     going to move this.

9          THE COURT:  That's fine.

10          MR. GLEESON:  -- who live out of state or work for

11     another employer because it's harder to get them here

12     without inconveniencing them.

13          THE COURT:  And so your agreement is to do what

14     that is different than what I have asked?

15          MR. GLEESON:  We don't have an agreement, but we

16     have proposed that to counsel, and we want to work in good

17     faith with them to try to reach accommodations that move the

18     trial along.  In the event we can't, it may be something I

19     come back to the Court on with regard to how short the time

20     is for us to give notice to witnesses to show up in court.

21          THE COURT:  Is there any need for a response,

22     Counsel?

23          MR. GLEESON:  I don't mean to put counsel on the

24     spot.  We'll talk about it.  We've got some time between now

25     and when the trial begins, but I'm just apprising the Court

1    of a concern we have.  Just and we want to balance the

2    amount of time witnesses have to spend waiting outside and

3    the Court's desire to have the trial proceed without any

4    dead time at the end of the day -- of a trial day.

5                THE COURT:  Counsel, do you wish to be heard?

6                MR. COLLYARD:  Thank you, Your Honor.  Plaintiff,

7    we don't have any disagreement with what Mr. Gleeson is

8    proposing, and certainly we want to move the trial along.

9    But it is very difficult to predict that far in advance.

10   But we would be okay with the two days' at the end of each

11   trial day, and for their out-of-state folks, if we gave them

12   three days' notice, we could certainly do that.

13               THE COURT:  So I will allow counsel to make any

14   agreements you wish to make that will allow for your

15   convenience.  The Court needs to have an e-mail no later

16   than 7:00 p.m. the previous day as to who will be serving as

17   a witness.  Understood?

18               MR. COLLYARD:  Understood.

19               MR. GLEESON:  Thank you, Judge.

20               THE COURT:  You're welcome.

21               Witnesses will be sequestered from the courtroom

22   prior to their testimony pursuant to Federal Rule of

23   Evidence 615, except that each side may designate a party

24   representative to appear in the courtroom during the trial,

25   and no sequestered witness is permitted to view realtime

1    transcripts of the proceedings prior to their testimony.

2                MR. GLEESON:  Judge, does that exclude expert

3    witnesses?

4                THE COURT:  I'm happy to hear from counsel as to

5    that.

6                MR. MARDER:  That was going to be our question as

7    well, Your Honor.  Certainly we have no issue with the fact

8    witnesses, but traditionally the experts are present because

9    they're going to need to base their testimony on the factual

10   testimony before them.  So we interpreted this to exclude

11   expert witnesses, and we're happy with that arrangement.

12               MR. GLEESON:  As did we.

13               THE COURT:  Okay.  Very well.

14               MR. GLEESON:  Thank you.

15               THE COURT:  Then expert witnesses are not required

16   to comply with that.

17               MR. MARDER:  Your Honor, could I just get a point

18   of clarification on something you mentioned earlier?  You

19   mentioned the 12 jurors.  We just wanted to ask with respect

20   to jurors versus alternates, does that include alternates or

21   there will be alternates in addition to the jurors?

22               THE COURT:  We will have alternates.

23               MR. MARDER:  In addition to the 12?

24               THE COURT:  Yes.

25               MR. MARDER:  Okay.  Also, you had asked about who

1    would be present at the counsel table, and I think counsel

2    had different interpretations of that.  Mr. Gleeson listed

3    everybody for the whole trial.  I think Mr. Collyard just

4    listed the people who would be present during voir dire.

5    Was your question broader than that?  Because there will be

6    additional people seated at the table later on during the

7    trial if you needed those names.

8              THE COURT:  It is broader than that --

9              MR. MARDER:  Okay.

10             THE COURT:  -- so please provide information to

11   the Court.

12             MR. COLLYARD:  I'm sorry, Your Honor.  I thought

13   it was just talking about jury selection.  During trial it

14   will be myself, Doug Kelley, Joe Anthony; and then it's

15   going to change, but I will give you various names.  It will

16   be David Marder, Peter Ihrig, and there may be some --

17             MR. ANTHONY:  Joe Richie.

18             MR. COLLYARD:  Yeah, Joe Richie, Ryan Lawrence,

19   Morgia Holmes.  Thank you, Your Honor.

20             THE COURT:  I think we addressed the

21   sequestration.  Is there anything else that needs to be

22   addressed as to that?

23             MR. GLEESON:  No, but the alternates issue raised

24   a question for me.  How many alternates, Judge, do you

25   intend to impanel?

1          THE COURT:  I have not decided that yet.

2          MR. GLEESON:  Okay.  In any event, the principal

3     12 jurors, they will all deliberate, I take it?  None of

4     them will be deemed alternates?

5          THE COURT:  Pardon me?

6          MR. GLEESON:  You intend to have 12 jurors

7     deliberating at the end of the case?

8          THE COURT:  (Nodding.)

9          MR. GLEESON:  Thank you.

10          THE COURT:  Also, to avoid any delay, and to

11     ensure that the parties can prepare their exhibits, the

12     parties are to notify the Court and opposing counsel of

13     deposition designations and objections at least 48 hours

14     before testimony is expected to be presented by deposition

15     so that the Court can make the appropriate rulings, and that

16     is 48 hours, not 24 hours.  I don't know if you have a

17     document that says 24 hours.  The ruling is 48 hours before.

18          Copies of the relevant transcripts also must be

19     provided to the Court in advance; and if a deposition is

20     used at trial, the court reporter will transcribe the

21     deposition as it is played and/or read.  So please provide

22     the court reporter with a copy of the deposition transcript.

23          And also additional instructions regarding the use

24     of deposition testimony at trial will be included in the

25     Court's forthcoming motion in limine order.

1          I'll ask now, Counsel, how long will each party's

2     opening statement be?

3          MR. COLLYARD:  Your Honor, plaintiff plans to be

4     around an hour.

5          MR. GLEESON:  Judge, it's our -- we want to ask

6     for a little bit more, 75 minutes for our opening.

7          THE COURT:  For an opening statement?

8          MR. GLEESON:  Yes.  Obviously to the extent the

9     Court affords us that luxury, we agree that plaintiff should

10    have it as well.  And I shouldn't describe it as a luxury.

11    It's kind of a big, complicated case.  We know that openings

12    just unfold the map, but it's a big map.

13         THE COURT:  The Court will so rule and provide

14    direction.

15         MR. GLEESON:  Thank you.

16         THE COURT:  Opening statements will be given at

17    the podium, and there will be a podium that faces the jury

18    box.  And, Counsel, you are not allowed to walk around the

19    courtroom without permission.

20         Also, Counsel, you are to exchange your exhibits

21    and that will be used during the opening statements,

22    including any stipulated before trial exhibits and

23    demonstratives.  That must be done at least 24 hours before

24    the trial begins.

25         And each party shall notify chambers at least one

1     hour before the trial begins whether there are any

2     objections to the other party's opening statement exhibits.

3     The Court will appreciate more than one hour's notice if

4     that can be provided.

5            And any objections to the use of such exhibits in

6     the opening statements will be heard during the jury

7     selection -- I'm sorry, will be heard before jury selection

8     begins.

9            Also, as to exhibits, do not display an exhibit to

10    the jury or read aloud from the exhibit unless it has been

11    admitted into evidence.  And, Counsel, you shall e-mail

12    opposing counsel a list of trial exhibits that counsel plans

13    to use the following day, and that must be done by 7:00 p.m.

14    on the preceding evening.

15           MR. ANTHONY:  Your Honor, may we be heard on that

16    point, Your Honor?

17           THE COURT:  Yes, you may.

18           MR. ANTHONY:  The question is this:  We understand

19    that if you're calling a witness direct, that you provide

20    the other side with the exhibit you're going to use in your

21    direct testimony.  However, there will be a number of

22    witnesses called by both sides adverse for

23    cross-examination.  Ordinarily you wouldn't disclose to

24    the -- the cross-examiner wouldn't disclose to the adverse

25    witness the road map that they were going to use with their

1      documents for cross-examination.

2              So we are reading your order to say that if you

3      are calling a witness for direct, you turn it over.  If you

4      are calling for adverse, you wouldn't turn it over because

5      you wouldn't be revealing your cross.  You might not even

6      know all the exhibits you would be using for cross until you

7      hear the witness.  So that's the way we read it and

8      historically that's the way it's been done and I was

9      wondering if that's what you intended.

10             THE COURT:  You're saying if you are calling them

11     for cross?

12             MR. ANTHONY:  Yes.

13             THE COURT:  Would they be your witness?

14             MR. ANTHONY:  No, it wouldn't be our witness.  We

15     would be calling their witnesses adverse for

16     cross-examination under the rules.

17             THE COURT:  Okay.

18             MR. ANTHONY:  There's going to be a lot of that.

19             MR. GLEESON:  I'm not sure there's any daylight

20     between us, but I think we ought to be clear about --

21     because we agree that to the extent that an exhibit is used

22     solely for impeachment, you don't even know what the

23     impeachment is going to be before the exam.

24             So what we would disclose, both sides, are

25     exhibits that we intended to offer into evidence, whether

1    it's on direct or on cross, but that would not include

2    exhibits that we intended to use only for impeachment

3    purposes.

4            THE COURT:  That's right, because they are not

5    exhibits that are --

6            MR. GLEESON:  Correct.

7            THE COURT:  -- admitted into the record.

8            MR. GLEESON:  I think we are of one mind on that,

9    although, if not, maybe we ought to clear that up.

10           MR. ANTHONY:  Ordinarily you wouldn't disclose

11   your cross-examination exhibits because the witness would

12   know what you were going to ask if they had the exhibit

13   before them.  That's why you're calling them for

14   cross-examination under the rules adverse.  And part of the

15   advantage of doing that is the surprise that's generated on

16   the cross-examination from the witness not knowing what

17   exhibits are going to be covered.  This deprives the

18   examiner of the opportunity to cross-examine without the

19   witness knowing exactly what you are going to say.

20           So I have never seen a situation where you're

21   calling someone on cross-examination and you have to give

22   them the road map of all your exhibits in advance.  It's

23   usually only limited for direct, when you are calling a

24   witness for direct that you are not going to be leading,

25   because you are going to be leading a lot on

1    cross-examination.  That's when you would turn over all your

2    exhibits in advance.

3            MR. GLEESON:  Judge, I think direct and cross are

4    the wrong thing to focus on, in part because the trustee is

5    calling our witnesses.  We'll address how we're going to

6    proceed with witnesses that are on both lists, just so we're

7    clear on that.

8            But when a party intends to offer into evidence an

9    exhibit, the whole point of the notification requirement is

10   to let folks know in advance what exhibits are going to be

11   offered, whether it's technically a cross of an adverse

12   witness or a friendly witness or technically a direct of an

13   adverse witness.  We intend, when we cross the witnesses

14   that the trustee will call, if we know we're going to use an

15   exhibit -- we know we are going to offer it into evidence,

16   we think in fairness to our adversary and the Court, we

17   should say that so that objections can be anticipated and

18   ruled upon by the Court.

19           When we intend to use a document solely to

20   impeach, that's the thing we don't know in advance what it's

21   going to be and whether we intend to offer it in evidence.

22           But this is a simple case.  There aren't any real

23   surprises here.  There are exhibits.  There's no real

24   tipping of the mitt in terms of identifying the exhibits

25   that will be used when they examine one of their trustee

1    witnesses or a BMO witness.  We don't think that -- we think

2    the ordinary course is if you intend to offer it in evidence

3    the next day, notify your adversary, notify the Court, and

4    we ask the Court to so rule.

5         THE COURT:  Counsel.

6         MR. ANTHONY:  Your Honor, that's an interesting

7    exposition, because in asking for 75 minutes of time, we

8    heard how complicated and challenging and difficult this

9    case was.  Now I heard it is a simple case.

10        As a practical matter, Your Honor, this might be

11   addressed if the parties were to stipulate, for example, on

12   each of our exhibit lists.  We've identified there's much

13   overlap.  If we agreed on those being exhibits admissible in

14   evidence, this would not be a problem.  We would just

15   identify the ones that we've all agreed are in evidence.

16        But the parties have been challenged in coming to

17   an agreement on stipulating to exhibits and on stipulating

18   to, for example, their records and the authenticity.  So a

19   lot of this could be addressed if we could come to terms on

20   that.

21        Absent that --

22        THE COURT:  You said you have been -- you've tried

23   to and you were challenged to do so?

24        MR. ANTHONY:  We are challenged on that,

25   Your Honor.  For example, yesterday we sent them a list of

1    documents that overlap on both witness [sic] lists and asked

2    if they could agree that those will come into evidence, and

3    we haven't heard back.  They say they will get back to us

4    tomorrow.  So this issue may be resolved in that fashion

5    because there's much overlap on the exhibit lists.

6           But absent that, we should be allowed to use the

7    exhibits that we intend to use.  Many of them, if they are

8    on the agreed-upon exhibit list, we'll tell them that.  But

9    if they're not on the agreed-upon exhibit list, we're not

10   sure whether we will use them or not, depending upon what

11   the witness says, and we don't want to be foreclosed from

12   using an exhibit in cross-examination that we didn't

13   anticipate using until we heard the witness's testimony.

14   And that's the predicament we're in when you are on

15   cross-examination.

16           When you are on direct, you know where you are

17   going.  You've got a blueprint laid out, what you are going

18   to ask, what exhibits you are going to use.  When you are on

19   cross, you don't know what the witness is going to say.

20           For example, we've taken the depositions of their

21   witnesses.  What if they change their testimony and we

22   didn't anticipate it?  Are we going to be foreclosed from

23   using a document?  I don't think we should be.

24           THE COURT:  You won't be foreclosed from using

25   that document to impeach, but that is not an exhibit.  When

1   you impeach a party-opponent, you do it with their prior

2   inconsistent statement.  You do not admit their prior

3   inconsistent statement as evidence.

4        MR. ANTHONY:  But the document might rebut the

5   inconsistent statement.  And under what the -- the defendant

6   is proposing, we couldn't use a document to rebut an

7   inconsistent statement because we didn't disclose it the

8   night before.

9        So there are documents that will need to be used

10  for rebuttal and otherwise that we would be foreclosed from

11  using because we didn't anticipate it the night before

12  because we didn't know what the witness was going to say the

13  night before.  So that's why it's an unusual process to

14  require the cross-examiner to disclose all their exhibits in

15  advance of cross-examining.

16       MR. GLEESON:  I don't want to keep it going

17  unnecessarily, but it's not what I'm saying.  If it turns

18  out that a document that the trustee did not intend to offer

19  into evidence is useful for cross, whether it's a deposition

20  transcript that's an inconsistent statement or otherwise, we

21  don't expect that to be disclosed.

22       But it's a fairly, I'll suggest respectfully,

23  simple and straightforward rule.  If you intend to offer it

24  in evidence, we should know about it.  We'll notify them as

25  well.  It apprises the Court of what's coming the next day.

1     It apprises the adversary.

2             I'm not going to repeat myself.  I'll rest on the

3     remarks I've made.

4             THE COURT:  Thank you, Counsel.

5             As the pretrial agenda indicates, all exhibits

6     will be provided to jurors through Box, which is

7     www.box.com, and parties will receive further information

8     prior to trial regarding the use of Box.

9             At the end of each trial day, a representative

10    from each party will work with chambers staff to

11    cross-reference the exhibits that have been admitted that

12    day, including ensuring that all exhibits that have been

13    admitted each day are properly uploaded to Box.

14            And I will ask whether the Court has received

15    electronic copies of all of the exhibits counsel plans to

16    offer?  I would like an audible answer.

17            MR. GLEESON:  We agree.  We're fine with all that.

18            MR. COLLYARD:  We are too, Your Honor.

19            THE COURT:  And we have received electronic copies

20    of all of the exhibits?

21            MR. COLLYARD:  Yes, Your Honor.

22            MR. GLEESON:  Yes.  There might be five or six

23    more that we'll exchange, but to the extent those stragglers

24    are not already with the Court, they will be as soon as we

25    agree.

1              THE COURT:  And when do you plan to meet and

2       confer as to that?

3              MR. GLEESON:  By the end of the week.  It's just a

4       handful of documents that is a grain of sand on the beach --

5              THE COURT:  So the end of the week is by the close

6       of business tomorrow.

7              MR. GLEESON:  It is.

8              THE COURT:  By Friday.

9              MR. GLEESON:  Yes.

10             THE COURT:  I just want to make sure we understand

11      where we are.

12             MR. GLEESON:  Thank you, Judge.

13             THE COURT:  Are there any objections or additions

14      to the draft preliminary jury instructions that the Court

15      e-mailed to counsel?

16             MR. MARDER:  Your Honor, we just have one point.

17      We fully appreciate and respect what you said in the *Daubert*

18      order that you would not be giving a preliminary instruction

19      on spoliation, but just for the record, to preserve it for

20      appeal, we want to just state that we do formally object to

21      the lack of the inclusion of the spoliation instruction with

22      the preliminary instructions.  We understand you've already

23      ruled against us, but just for the record, we would like to

24      make that formal objection.  Thank you, Your Honor.

25             THE COURT:  Understood, and that objection is

1    noted.

2              MR. GLEESON:  No objection from the defendant.

3              THE COURT:  Then as to our trial schedule, jury

4    selection will take place in Courtroom 7A in this courthouse

5    beginning at 8:30 on Wednesday, October 12th.

6              In general, our court hours will be from 8:30 to

7    noon and from 1:00 until 5:00 each day, and that will be

8    Monday through Friday.

9              If counsel needs to discuss any issues with the

10   Court outside of the jury's presence, counsel will meet with

11   the Court at 8:00 a.m. before the jury arrives or at 5:00

12   p.m. after the Court has dismissed jurors.

13             And counsel for each party, please confirm now

14   your estimates for how long you anticipate the trial will

15   run.

16             MR. ANTHONY:  Your Honor, we think, if the parties

17   work cooperatively as counsel suggested they are willing to

18   do and if we can stipulate to a lot of these exhibits,

19   especially ones that are their records and the authenticity

20   of their records and the summaries of those records, two and

21   a half weeks, three weeks, two to three weeks should be

22   enough for very efficient, seasoned lawyers like the

23   plaintiffs have -- or defendants have to get this done.

24             THE COURT:  I would say plaintiffs and defendants.

25             MR. ANTHONY:  Yes.  Thank you.

1          MR. GLEESON:  Plaintiffs have them too.

2          This is so hard to predict.  We put our heads

3     together and tried to figure out how many hours in the

4     aggregate.  It's not only hard to predict, but I am

5     notoriously bad at predicting it, I should mention.

6          We tried to figure out how many hours we would

7     spend, us, examining our witnesses, trying to anticipate the

8     degree to which the trustee's counsel will examine them, and

9     we came up with roughly 40 hours, maybe five hours more of

10    deposition playing.

11         So what does that boil down to?  Maybe six, seven

12    trial days, just for us, for our witnesses.  So I think,

13    again, with the disclaimer that I've never really actually

14    been right at this, I actually think it's probably a three-

15    to four-week trial, but you have long trial days, and we're

16    going to work hard to use every minute of them.

17         And I might be wrong.  Many of us are from out of

18    town.  We would love to go home sooner rather than later.

19         So I think it will be a little longer than my

20    colleague across the aisle has anticipated, but not that

21    much longer.

22         Does that answer the Court's question?

23         THE COURT:  It tells me what you think, yes.

24         Counsel, you are required to notify chambers by

25    e-mail no later than 7:00 each day whether there are issues

1    that the parties need to address with the Court before the

2    jury is brought in.  And, if so, provide a brief description

3    of those issues.  And the pretrial agenda has the e-mail

4    addresses to which you must send that notification.  I won't

5    repeat them here.

6              At present, the parties have not indicated that

7    they've agreed to any stipulations for the record.  Do the

8    parties offer any stipulations or intend to prior to the

9    start of trial?

10             MR. GLEESON:  Yes, Judge, we've been working on

11   this.  We've been -- the plaintiff has proposed a bunch of,

12   about 170 or so, fact stipulations.  This is not including

13   prospective stipulations on spoliation.  We've agreed to a

14   substantial portion, roughly half.  We're continuing to work

15   on the remainder.

16             We proposed to the trustee about 115 stipulations

17   of fact.  We only did that on Monday.  They're working on

18   them.  They made -- they asked us a follow-up question.

19   We're running down the answer to that question.  We're

20   hoping to have a substantial number of stipulations.

21             As for documents relating to spoliation, we're

22   working on stipulations there as well.  We're working in

23   good faith to try to reach agreement.

24             Before I turn it over to my colleagues over here

25   on this side, I will say this:  With respect to the use of

1   the stipulations at trial, it wasn't clear to us what the

2   Court anticipated.  Our preference and our -- we think a

3   common practice is to the extent we have stipulations

4   entered into prior to trial, we will use them in the case as

5   they become relevant, read them to the jury in the context

6   in which they are most informative to the jury.

7          I couldn't tell -- we couldn't tell from your

8   order whether you anticipated reading them to the jury up

9   front at the beginning of the trial.  If not, we would ask

10  you to entertain an application that we -- to the extent

11  they're reached, they are used during the trial in context

12  so they will be more informative than if they are just read

13  to the jury at the beginning of the trial.

14         If I misunderstood what your order suggested in

15  that regard, forgive me.

16         THE COURT:  Let me tell you what I suggest, and

17  then I'll hear from opposing counsel.  It is my intent, if

18  there are stipulations, that I will read the stipulation at

19  the time it is appropriate to read the stipulation such that

20  the jury is receiving information as to the stipulation in

21  context with the evidence that is about to be presented or

22  has been presented to them so that they understand the

23  relevance of the stipulation and how that stipulation should

24  be considered.

25         MR. GLEESON:  Thank you.  My mistake.

1          MR. ANTHONY:  That was our understanding,

2    Your Honor, that you would be guided by what the stipulation

3    was and at the appropriate time would announce it to the

4    panel, to the jury to let them know its relevance in the

5    context of wherever we are.

6          There was --

7          THE COURT:  And that said, that doesn't mean that

8    you wait until the last minute to provide the stipulation.

9    So I would like the stipulations in advance.  We can talk

10   about and you can notify me when it is appropriate to read

11   that stipulation.  Understood?

12         MR. ANTHONY:  Yes.

13         MR. GLEESON:  Yes.

14         MR. ANTHONY:  Your Honor, two practice issues that

15   I would like to raise, and I think this is about the time to

16   do that.

17         Whenever the exhibits are disclosed to the other

18   side in advance of the next day's witnesses, is the other

19   party going to be expected to provide their objections in

20   advance of the trial -- the next day so we can try to

21   resolve them before we get before the jury with the witness

22   on the stand?  Because it would be much more efficient if we

23   could resolve any objections before we get to the courtroom.

24         So I'd suggest that the next morning, if there are

25   objections to the witnesses -- to the exhibits disclosed the

1       night before, that they be lodged with the opposing party so

2       we can address it with you an hour before we start trial to

3       hopefully eliminate the objection, if possible.

4              THE COURT:  Is there any objection to proceeding

5       in that manner, which sounds very reasonable to me?

6              MR. GLEESON:  Sounds reasonable to us too, Judge,

7       with the possible exception of foundation objections.

8       Certainly relevance, but until a foundation -- if there's a

9       dispute about the admissibility of a document and it relates

10      to foundation, I'm not sure how we would do that in advance.

11      I'm not trying to slow things down.

12             THE COURT:  No, I understand the difference

13      between a foundation objection and the other types of

14      objections and stipulations that we're talking about.

15      Understood?

16             MR. ANTHONY:  It is here, Your Honor.

17             The other practice issue I think that may come up

18      that I want to alert the Court to is there may be a need to

19      use demonstratives.  That the other side will object to the

20      admissibility of the -- the exhibit could come in as an

21      exhibit or be shown as a demonstrative, and it would be

22      shown as a dispositive because one party or the other were

23      objecting to it on foundation, and foundation would need to

24      be laid by a subsequent witness.

25             And I highlight that for the Court because what

1       we're experiencing is there's a lot of bank records that

2       need to be authenticated.  If the bank will authenticate

3       them as their records and their original records and they're

4       theirs so we don't have to lay foundation for that by

5       calling multiple witnesses, that will eliminate that issue.

6                But I just highlight it for the Court, not asking

7       you to do anything right now, but I want to make the Court

8       aware that could become an issue if we are unable to come

9       into an agreement on the authenticity of the defendants'

10      records.

11               MR. GLEESON:  I don't anticipate that's going to

12      be an issue.

13               MR. ANTHONY:  Thank you.

14               MR. GLEESON:  I have a related question, though,

15      that --

16               THE COURT:  And I will thank you as well, because

17      what you have just described sounds like a reasonable

18      process --

19               MR. GLEESON:  Yeah.

20               THE COURT:  -- and something that reasonable minds

21      can come to terms and agree on.  And we need to -- in light

22      of the length of this trial, we need not lengthen it --

23               MR. GLEESON:  Yeah.

24               THE COURT:  -- with unnecessary disputes.

25               MR. GLEESON:  Sorry to interrupt the Court.

1          I agree.  There are records.  We provided them.

2     We'll be reasonable about it.  And we all have lives to

3     live.  We don't want to have to bring in unnecessary

4     witnesses to establish authenticity of records that we

5     produced.  We'll work with counsel on that.

6          There's a related issue that I would ask the Court

7     to help us with a pragmatic solution, and that is both sides

8     want to rely on bank documents that contain information

9     about bank customers.  It's dated, but it's still bank

10    information about customers of the bank and some data about

11    money going through the accounts, not just the

12    Petters-related accounts.  And in recognition of the fact

13    that I think both sides are going to use them, it's not that

14    practical, in terms of presenting the evidence, to do a ton

15    of redacting.

16         What -- my suggestion to the Court is that you

17    help us in the following sense:  To the extent bank

18    documents, and in a case like this it's inevitable they will

19    be in evidence, we would like, you know, for practical

20    purposes, like for a subsequent appeal, not to have it in a

21    joint appendix.  For current purposes if -- we would like to

22    actually have them kind of maintained under seal.  And in

23    the event there's an application for public access to them,

24    we'll respond to that appropriately, maybe suggest some

25    redactions.

1          But rather than redact everything on those

2     documents except for what we intend to focus the jury on and

3     what my adversaries intend to focus the jury on, we would

4     rather just, to the extent they are in evidence, have them

5     come into evidence, but in recognition of the privacy

6     interests of the other customers of the bank 15 years ago,

7     have them maintained under seal.

8          We recognize there's a public right of access to

9     those documents.  And to the extent that access is sought,

10    we'll deal with that at the time, but, in the meantime, if

11    we could, as kind of pragmatic way of reconciling the needs

12    of this -- of both sides and the jury with the privacy

13    interests of those customers of the bank from 14 to 18 years

14    ago, we think that's the better way to proceed.

15         Unless the Court has any question, I will stop

16    there.  And I have a feeling I might not have any pushback

17    from my colleagues because they want to use the records as

18    well.

19         MR. IHRIG:  Your Honor, I guess we weren't aware

20    that this was an issue.

21         THE COURT:  Note your appearance just so that we

22    have a clear record, Counsel.

23         MR. IHRIG:  Of course, Your Honor.  This is Peter

24    Ihrig, counsel for the plaintiff.

25         THE COURT:  Thank you.

1              MR. IHRIG:  Good afternoon.

2              We understand what counsel is talking about,

3       although we were not aware that this was an issue.  Most of

4       the documents that we have seen in this case that do not

5       relate to the Petters Company, Inc. account or one of the

6       accounts held at the bank by, you know, one of Tom Petters'

7       entities, have been redacted.  And so I guess we would

8       really probably like to see what exhibits counsel is really

9       talking about here so we can understand, you know, the

10      breadth of this issue.

11             Certainly I don't think we have an objection to

12      keeping, you know, unrelated parties' personal information

13      private to the extent it's appropriate to do so, but I'm

14      sort of, you know, fairly well-versed in the documents in

15      this case, and this is an issue that I was not aware of.

16             MR. GLEESON:  That's a great point, the last one,

17      and there should be time for us to confer on it.  It's kind

18      of important because it would -- it includes things like the

19      identities of parties on wire transfer records, the

20      identities of parties -- you know, a business banker has an

21      account.  He is responsible for the Petters account, for

22      example, and that account and the data in that will be

23      contextualized.  Is this account larger or smaller than

24      other accounts?

25             And one way to present all that data is just the

1    way we have done it in the depositions and the like, where

2    the information was kept intact on the records; but I'm just

3    concerned, not overly so because this is dated information,

4    but I want to turn square corners with regard to the

5    identities of folks whose names are on those records.  And

6    as I'm saying this out loud and as I hear Mr. Ihrig --

7    you're Mr. Ihrig, right?

8              MR. IHRIG:  Correct.

9              MR. GLEESON:  -- mention appropriately we hadn't

10    flagged this with them, it strikes me as something we ought

11    to talk about, not on the Court's time --

12              THE COURT:  I agree.

13              MR. GLEESON:  -- and see if we can resolve it.

14    Okay?

15              THE COURT:  I agree.  So, Counsel, please, I

16    appreciate your suggestion that you confer and try very hard

17    to resolve this issue and then bring it back to the

18    attention of the Court with a specific indication of what

19    the disagreement is, if it cannot be resolved, and a plan of

20    action proposed by each party so that the Court can resolve

21    it.

22              MR. GLEESON:  Thank you.

23              MR. IHRIG:  Thank you, Your Honor.

24              THE COURT:  Okay.  I think we're ready to move

25    into motions in limine.  Is counsel prepared?

1          MR. GLEESON:  Yes.

2          THE COURT:  Okay.  The first is the motion to

3    preclude defendant from offering evidence of investor

4    complicity.  This is plaintiff's motion.

5          MR. MARDER:  Good afternoon.  It's David Marder

6    again, appearing on behalf of the plaintiff.  Can I get some

7    guidance, Your Honor?  Would you envision me addressing all

8    four of our motions, or would you like to do them one at a

9    time and hear from the plaintiff and then the defendant?

10          THE COURT:  I would like to hear a response to

11    each motion, please.

12          MR. MARDER:  Okay.

13          THE COURT:  So one at a time.

14          So as I have it here, it's a motion to preclude

15    defendant from offering evidence of investor complicity.

16    I'll hear response to that motion to exclude evidence of

17    certain recoveries, offsets, and reductions; motion to admit

18    into evidence certain criminal convictions; motion to

19    exclude and limit certain evidence of government

20    investigations.

21          Now, motions have been filed.  You don't -- and

22    arguments have been written and made.  So if there's nothing

23    more to add, please don't feel that the Court is compelling

24    you to speak in open court today the same thing that you

25    have already provided to the Court.

1          MR. MARDER:  Understood, Your Honor.  There was no

2     reply brief here, so I am going to limit my comments to

3     addressing the things that were said in the opposition.

4          Your Honor, this issue has been ruled on multiple

5     times already.  The Bankruptcy Court ruled on this issue

6     saying that deposition exhibits and deposition topics

7     relating to this issue were out, not relevant.

8          And then this Court tackled this issue head on in

9     its *Daubert* order.

10          THE COURT:  And you're talking about investor

11     complicity?

12          MR. MARDER:  Yes, Your Honor.

13          THE COURT:  Very well.

14          MR. MARDER:  On page 27 of your report, you went

15     into this topic in great detail and you ruled that alleged

16     investor complicity was irrelevant so their expert couldn't

17     opine on it.  And it is our position, and I think it is

18     true, that if it's not relevant to the case for the expert

19     to testify about it, then it certainly isn't relevant for

20     any other purpose.

21          In the opposition, the defendants identify four

22     different reasons why they claim that this investor

23     complicity is relevant.  The first that they mention is the

24     issue of damages.  Your Honor, in your *Daubert* motion, you

25     extensively addressed the topic of damages, and you gave

1    your stamp of approval to our expert's damages theory, which

2    is that it's the -- the harm is the fact that PCI is

3    subjected to owe money to the investors and, therefore, our

4    damages theory is acceptable in that the measure of damages

5    is the amount of money that PCI owes to those investors or

6    at least owed at the time of the bankruptcy.

7            The knowledge of the investors has absolutely

8    nothing to do with that measure of damages.  Moreover, there

9    is no procedural mechanism where that ever will become

10   relevant.

11           In the bankruptcy, the time for challenging the

12   amounts that are owed to these investors has long since

13   passed.  Those claims were resolved in the bankruptcy, and

14   this Court will never have to address this because the

15   Bankruptcy Court has already addressed it.  There were

16   resolutions of all of these claims in the Bankruptcy Court.

17           It is BMO's argument that that's unfair to it

18   because BMO was not a party to those various settlements in

19   the Bankruptcy Court.  But what they don't say in their

20   papers, Your Honor, and this is absolutely critical, is that

21   BMO was a party in interest in the bankruptcies.  As a party

22   in interest, it had the right to object under Bankruptcy

23   Code Section 502(a) to any of those settlements with these

24   investors.  They had the right to jump in and say, This

25   settlement should not be approved because these investors

1    were complicitous, and they didn't do that.

2              So there is absolutely no mechanism by which the

3    investor knowledge will ever become relevant to the topic of

4    damages.  PCI owes that money regardless of the investor

5    complicity.

6              Now, there's another point that I would like to

7    address that was in their brief that I think is critical.

8    They identify two of the investors that they claim were

9    complicitous.  It's Lancelot and Palm Beach.  And what they

10   say is that those two entities collectively are owed $2.6

11   billion, yet they were part of the fraud, and then they go

12   on and on to talk about how unfair that is.

13             There's a couple of points that need to be

14   addressed in rebuttal to that, Your Honor.  First of all,

15   this figure that they've identified, the $2.6 billion, is

16   completely irrelevant.  As we've said in our papers

17   countless times, our expert's measure of damages has to do

18   with the net losses of those investors, meaning how much

19   money they put in, how much money do they get back.  The

20   claims those investors made in the bankruptcy are completely

21   irrelevant.  That has nothing to do with our damages

22   expert's assessment of damages.  That's one critical point

23   that needs to be made.

24             The second critical point, Your Honor, is that

25   both of these entities, Lancelot and Palm Beach, are

1    bankrupt.  And to the extent monies are paid from the

2    trustee here, who is sitting with us today, and to the

3    extent those monies are paid to Lancelot and Palm Beach,

4    those monies are going to go back to the creditors of

5    Lancelot and Palm Beach.

6          These individuals that were described as being

7    complicits in the fraud, those people are in jail.  They're

8    not the creditors that are going to receive those monies.

9    And, most importantly, the person who is going to receive

10   most of this money, shockingly enough, Your Honor, is BMO

11   Harris because BMO Harris entered into a settlement with

12   Lancelot in which -- I'm sorry, with Palm Beach in which

13   they reached a deal whereby they were going to receive back

14   almost all of Palm Beach's distributions as a result of this

15   matter.

16         So the notion that there's this $2.6 billion that

17   Lancelot and Palm Beach are -- claim to be owed as part of

18   this case and the notion that these wrongdoers are going to

19   receive this money is simply not true.

20         Your Honor, I'll now proceed to their second

21   argument, which relates to the topic of causation and

22   substantial assistance.

23         Once again, Your Honor, this is a topic that this

24   Court has already resolved.  At page 25 through 27 of your

25   *Daubert* ruling, you specifically addressed the concept of

1    causation and substantial assistance.  And what you ruled

2    was that proximate cause is a substantial factor test, and

3    whether or not investor complicity was a factor was

4    irrelevant because it doesn't matter -- it doesn't make it

5    any more or less likely that BMO's conduct was a factor

6    because that is the test.  You already ruled on that topic,

7    and I won't belabor that point anymore.

8         The third point, Your Honor, that the defendants

9    raise, and this is a new one, they take up two pages of

10   their brief to address Count II.  And what they say is this

11   must relate to fiduciary duty because part of the fiduciary

12   duty claim in Count II implicates investors in that we

13   alleged in Count II that these so-called DACA agreements, or

14   Depository Account Control Agreements, gave rise to a

15   fiduciary duty to investors.

16        But, again, what's not mentioned there is that in

17   the Bankruptcy Court, the Bankruptcy Court Judge dismissed

18   that part of Count II that had to do with the fiduciary duty

19   to investors.  So as it sits now, Count II is only directed

20   to breach of fiduciary duty owed to PCI, not to those

21   investors, and, therefore, the knowledge or complicity of

22   investors has nothing to do with Count II.

23        And that, Your Honor, brings us to the very last

24   claim, which is they claim that these relate to the aiding

25   and abetting allegations, which is Count III and Count IV.

1    And they say, Well, investor complicity must relate to those

2    causes of action.  And this is just sort of a throw-away

3    argument at the end of their brief, it's one paragraph, but

4    I do want to address it, because all of the other statements

5    that they make in the brief you've already rejected in your

6    prior orders.

7         With regard to Count III, we do allege that there

8    is a fiduciary duty to both PCI and its investors that was

9    breached by PCI's officers, including Mr. Petters,

10    Ms. Coleman, and Mr. White, and we do allege that they

11    breached that duty both to PCI and its investors.

12         But, Your Honor, that claim is going to rise and

13    fall based upon the facts about whether there was a breach

14    of the duty to PCI.  If there was a breach of the duty to

15    PCI, then it doesn't matter whether there was also a breach

16    of duty to the investors.  And if there wasn't a breach of

17    fiduciary duty to PCI, then for the same reason there

18    wouldn't be a breach of the fiduciary duty to the investors.

19         So whether investors were knowledgeable or

20    complicit as the defendants allege in any of this conduct is

21    completely irrelevant to that claim.

22         Finally, Your Honor, they contend that investor

23    complicity or investor knowledge has something to do with

24    the fraud claims, but, Your Honor, in this instance they are

25    taking contradictory positions.  In their jury instructions,

1    they argue strongly that for the aiding and abetting claim

2    that relates to the fraud, that the person who had to have

3    received the misrepresentations in the underlying fraud was

4    PCI, not the investors.  And if that's the case, Your Honor,

5    then certainly investor knowledge is completely irrelevant.

6         Even if the recipient of the representations could

7    have been PCI, that's already been established in this case

8    that the investors were misled.  We have on our exhibit

9    list, Your Honor, the summary judgment papers filed by BMO.

10   We're also offering into evidence all of the criminal

11   convictions.  They've already agreed that the plea

12   agreements will come in with that, and those documents all

13   establish that investors were fraudulently induced into

14   entering into these transactions.

15        So, Your Honor, in essence, there is no reason to

16   revisit your instruction in the *Daubert* order that investor

17   complicity is irrelevant.  That is the law of the case.

18   It's been established.  And in order to overturn that, the

19   defendants would have to identify some compelling argument

20   that wasn't raised earlier or some reason why your prior

21   ruling was contrary to law, and they haven't done that,

22   Your Honor.

23        THE COURT:  Thank you, Counsel.

24        MR. SPEHR:  Thank you, Your Honor.  Richard Spehr,

25   Mayer Brown, for the defendant.  I will address some of the

1    arguments made by counsel, but let me try to create a little

2    context around what their real claims are in this case.

3            Plaintiff's case centers on the claim that the

4    eight, quote, innocent investors, the beneficiaries of the

5    BMO Litigation Trust, which Mr. Kelley is the trustee, lost

6    1.9 billion due to the alleged improper actions of M&I Bank

7    in, again, their quote, actively deceiving these investors.

8            How do we know that?  Because plaintiff asserts

9    this innocent investor claim over and over and over in

10   multiple court filings, including their Amended Complaint.

11   Plaintiff makes multiple allegations that M&I misled

12   investors about whether retail payments were being wired

13   into the M&I account.

14           You need look no further than the trial brief that

15   plaintiffs filed.  Page 4, first paragraph, I will read it:

16   (As read), "The evidence will establish -- this is their

17   trial brief -- will also include certain communications that

18   BMO had with PCI and its investors concerning proposed

19   Deposit Account Control Agreements while Jambor was managing

20   the PCI relationship.  These proposed agreements were red

21   flags because they were highly out of the ordinary in the

22   banking industry.  Based upon the draft agreements and

23   communications with these investors over this time period,

24   there is little doubt that the investors had been misled."

25           That is the factual centerpiece of the plaintiff's

1    case.  Plaintiff also attacks M&I's conduct with respect to

2    these DAMAs and these DACAs that were mentioned by counsel,

3    claiming both that M&I actively misled the investors and

4    that it withheld crucial information from the investors,

5    according to plaintiff's theory of the case, that BMO had or

6    M&I had no intention of executing or otherwise administering

7    those agreements.

8              And now we have the proposed jury instruction

9    added by the plaintiff in this case, which argues that there

10    should be an instruction to the jury based upon a fraud

11    claim or breach of fiduciary duty claim that M&I, BMO, had a

12    duty to the investors that was breached, either breach of

13    fiduciary duty or they committed fraud directed to the

14    investors.

15             We intend to show that many, if not all, of the

16    BMO Litigation Trust investors were anything but innocent,

17    were certainly never misled by M&I and could not have

18    reasonably relied on anything M&I bankers allegedly said or

19    failed to say because -- how do we know that?  Because

20    plaintiff alleged in multiple objections in adversary

21    proceedings, that's Mr. Kelley, the plaintiff, he alleged in

22    multiple adversary complaints, multiple objections brought

23    against many of these investors that they, in fact, were

24    complicit in the Ponzi scheme.  This is not a BMO fantasy.

25    This is what Mr. Kelley argued over and over again with

1          respect to the investor claims.

2                    Indeed, plaintiff, Mr. Kelley, sought to disallow

3          the entirety of many of the investor claims due to their

4          alleged complicity.  There were multiple criminal

5          convictions of the investors in this case, and counsel just

6          said convictions were based upon their inducement into the

7          Ponzi.  You'll see the plea agreements, Your Honor.  There's

8          no argument that they were induced into the Ponzi.  The plea

9          agreements and Mr. Kelley's own allegations establish that

10         they were complicit in the Ponzi scheme itself.

11                   Finally, Mr. Kelley's expert, plaintiff's expert,

12         Mr. Martens, and you will hear from him at trial, concluded

13         that at least two of the investors, Lancelot and Palm Beach,

14         were also complicit in the PCI fraud.

15                   Let me give you some highlights, and maybe we can

16         treat this sort of as an offer of proof, Your Honor, but I

17         want to give you some sort of granularity around the alleged

18         conduct of these investors by Mr. Kelley and in respect of

19         the criminal convictions.

20                   At the very time the Palm Beach DACA was being

21         negotiated with M&I, Palm Beach was executing a series of

22         note swap transactions with PCI that were solely designed to

23         prevent PCI's default in respect of over $1.1 billion in

24         notes that PCI owed Palm Beach at that time.

25                   In essence, what was happening here, and you are

1    going to hear this investor after investor, these PCI notes

2    are about to default.  PCI goes to the investor and says, We

3    don't want it to default.  The investor doesn't want to tell

4    its own investors that it's about to default on a billion

5    dollars of notes, so they execute something called a note

6    swap.  Old notes are exchanged for new notes with new

7    maturity dates.  Everybody goes about their business.  No

8    disclosure that $1.1 billion in notes was about to default.

9            This $1.1 billion note swap that was executed in

10   the period February 2008 is about twice the claim that Palm

11   Beach asserts in this case or that PCI asserts on behalf of

12   Palm Beach.

13           Important to the knowledge point, there is no

14   allegation in this case that PCI or Palm Beach ever said a

15   word about the default, the note swaps, these illicit

16   transactions at the time they were negotiating the Palm

17   Beach DAMA.

18           Exhibit 3 to the Moheban declaration contains the

19   plea agreement of Palm Beach founder, Bruce Prevost.  In

20   that agreement, he admits several critical things.  One,

21   Prevost knew that contrary to his representations to Palm

22   Beach's own investors between 2002, 2008, he understood that

23   no retail payments were ever made into the Palm Beach bank

24   account by any retailer.  Think about that.  Their case is

25   built on the argument that M&I didn't tell the investors

1    that it knew -- it didn't know, but we'll take that as true

2    for the moment -- that it knew that no retail payments were

3    ever being made into these accounts.  Well, Mr. Prevost on

4    behalf of Palm Beach admits that he knew that there were

5    never any retail payments made into Palm Beach's account by

6    any retailer.  That is a critical set of facts for the jury

7    to hear, I would submit.

8              Mr. Prevost also admits in his plea agreement that

9    the 2008 note swaps, 1.1 billion, were fraudulently designed

10   to avoid PCI defaults.  He doesn't say I was induced into

11   the scheme.  What he says is, I intentionally conducted a

12   fraudulent transaction so that I wouldn't have to disclose

13   to my own investors that these guys owed us 1.1 billion and

14   were about to default.

15             The Palm Beach funds entered into 38 note swap

16   agreements beginning in February 2008.  That's the time of

17   the DAMAs and the DACAs that you're going to hear a lot

18   about at trial, which, as I mentioned, turns out to be

19   double the amount of money that the trustee is seeking on

20   behalf of Palm Beach in this case.

21             Prevost's co-founder, David Harrold, also served a

22   multiyear jail sentence, just like Prevost, in respect of

23   fraud committed around the PCI Ponzi scheme.

24             Let's talk about Lancelot.

25             THE COURT:  Counsel?  Counsel?

1              MR. SPEHR:  Yes, Your Honor.

2              THE COURT:  We have a limited amount of time.

3              MR. SPEHR:  I will move through quickly.

4              We have heard about Lancelot.  It's developed.

5    You will see the Complaint.  You will see the plea

6    agreements, also arguably participated in the fraud.

7              We've heard about Acorn.  We've heard about

8    Richie.  We have attached the Richie adversary Complaint in

9    which the trustee claims that Richie also was in on the

10   fraud.

11             We've heard about Elistone.  That's also attached

12   to the Moheban affidavit.  I will not cover those in any

13   level of detail.

14             Let me address for a second the argument that

15   Mr. Kelley's compromise of these claims should be binding on

16   BMO.  BMO was not a party to the bankruptcy proceeding.  It

17   was not a party in interest to the bankruptcy proceeding.

18   It had no ability to object to the compromise claims that

19   Mr. Kelley reached with these investors.

20             The jury, Your Honor, should be allowed to

21   determine whether the investor claims should be invalidated

22   as this Court made a very clear ruling that the measure of

23   damages in this case was PCI's, quote, inability to repay

24   creditors.  If the transactions executed by those creditors

25   were fraudulent, there is no basis for that claim to be

1    asserted in this case.

2            Counsel also argues that the Bankruptcy Court made

3    a ruling that all investor complicity facts should be out of

4    the case.  The bankruptcy Court didn't have the power to

5    make that ruling, Your Honor, and, in fact, Judge Sanberg

6    did not make that ruling.  In fact, Judge Sanberg ordered

7    discovery against one of the eight investors, Interlachen.

8    So whatever investor discovery may or may not have been

9    permitted in the Bankruptcy Court, the Court made no global

10   ruling that investor culpability was out of the case.

11           Plaintiff's final argument is that it would be

12   unfairly prejudiced if investor complicity is introduced at

13   trial.  That argument should be rejected out of hand, I

14   submit.

15           The argument translated is simply an attempt to

16   ensure that this case devolves into a one-sided presentation

17   by plaintiff enabling it to attack BMO and to ensure that no

18   contrary evidence is offered to the jury.

19           There is nothing prejudicial, Your Honor, about

20   providing to the jury a fulsome understanding of what these

21   investors were up to and when they were up to it in the

22   context of their communications with M&I.

23           I will leave with this, Your Honor, and I

24   apologize for going so long, I really do.  The fact pattern

25   here is pretty simple.  Ponzi schemers, including a number

1    of the eight investors, loaned money to another Ponzi

2    schemer, PCI.  Under those circumstances, I submit to the

3    Court that it would be manifestly unjust to permit a damages

4    recovery based solely on Mr. Kelley's unilateral and

5    unchallenged claims determinations without proper vetting

6    before the jury.

7              And I thank Your Honor.

8              THE COURT:  Response, please.

9              MR. MARDER:  Your Honor, may I have one minute in

10   rebuttal before moving on to the next?

11             THE COURT:  You may.

12             MR. MARDER:  Thank you, Your Honor.  I just want

13   to address three points that were made by BMO's counsel.

14             The first is that BMO most certainly was a party

15   in interest in the bankruptcy.  And if there's any doubt

16   about that, you can just look in the bankruptcy filing.

17   They were -- had an adversary proceeding brought against

18   them in a case.  And as a party in interest, they had the

19   ability to object under Bankruptcy Code Section 502(a).

20             Second of all, all of the arguments that BMO's

21   counsel made about the investor claims all have to be viewed

22   in the prism of how they characterize our case.  And they

23   said it best when they said these are claims that PCI

24   asserts on behalf of Palm Beach.  We are not asserting

25   claims on behalf of any investors, Your Honor.  We are

1       asserting claims because the trustee has stepped into the

2       shoes of PCI and PCI has been damaged by virtue of these

3       claims.

4               Finally, Your Honor, all of these arguments that

5       Mr. Kelley made in the underlying proceedings about whether

6       there was complicity that they want to use against him,

7       those were allegations that were made.  Those cases were all

8       settled.  The settlements were approved by the Bankruptcy

9       Court and BMO had the ability as a party in interest to

10      object to those, and they did not.

11              So those are the only points I want to raise.  And

12      with that, Your Honor, I will move to the next motion that

13      you wanted to hear, or maybe you don't want to hear, but you

14      are obligated to hear, is the argument on the offsets and

15      reductions.

16              This, too, again, Your Honor, is an issue on which

17      you very carefully thought about the issues, went through

18      the issues one by one, and ruled very clearly in your

19      *Daubert* order that offsets and reductions were irrelevant.

20      And because they're irrelevant for the expert's testimony,

21      they're also irrelevant for the case at large.

22              They are irrelevant for multiple reasons, and

23      first of all I'll talk about the recovery by creditors.  As

24      you stated in your *Daubert* order at page 29 and 52, any

25      recoveries by creditors are irrelevant because they're not

1    the party here.  The party here is PCI, who is seeking

2    damages for its own harm.

3              And as you correctly ruled in your *Daubert* order,

4    the *Emerald Casino* case is directly on point because there,

5    as here, the party conflated the issue of distribution with

6    recovery, and very clearly that case governs and is

7    persuasive for the very reasons that you already articulated

8    in the *Daubert* order.

9              In their opposition, BMO argues that that case is

10   distinguishable.  Even though you have already ruled on

11   this, Your Honor, that it's directly on point, they say it

12   is distinguishable because the theory of recovery there was

13   the dissipation of assets.  But I'd ask Your Honor, if you

14   look at that case, you will see that nothing about the

15   Court's rationale in that opinion has anything to do with

16   what -- the theory of recovery.  The rationale in that

17   opinion was that the trustee's recovery has nothing to do

18   with identifying who gets what when the estate distributes

19   the assets, and that rationale has nothing to do with

20   whether the theory of recovery was dissipation of assets or

21   not.

22             The second critical point here, Your Honor, with

23   regard to offsets and reductions, has to do with this issue

24   of the time period.  And on two occasions, Your Honor, in

25   your *Daubert* ruling you very clearly went through this issue

1    and on page 28 and on page 51 of your *Daubert* order, and you

2    very clearly explained why it was that this time period of

3    the time that the case was filed is a critical one and that

4    offsets and reductions after that time period were not

5    relevant.

6              We also directed you to the relevant case law and

7    the statutory authority in our brief, which I'm not going to

8    belabor here.  So, Your Honor, there's nothing to address

9    there.  The defendant simply ignores that part of your

10   ruling.

11             Third, Your Honor, is that BMO is clearly wrong

12   about double counting with regard to the issue of any

13   recoveries by the trustee.

14             You also, in your opinion, Your Honor, went

15   through this very carefully, and you explained on page 52 to

16   53 that those actions brought by the trustee, which were

17   avoidance action by and large, but also involved some

18   criminal and forfeiture type proceedings, those actions were

19   not for the same harm.

20             And so all of the case law they cite and all of

21   the arguments they make, Your Honor, just ignore that part

22   of your ruling.  You have already ruled that these actions

23   that were brought for the trustee were on different legal

24   theories for different harms, and there's no reason to

25   revisit that.

1          Finally, Your Honor, I would like to address the

2   collateral source rule.  In your ruling, you addressed the

3   collateral source rule at page 29 through 31 and 52 and 53,

4   and you said that the rule applies, and you very carefully

5   set forth your rationale.

6          BMO now asks you to reconsider that in the form of

7   an opposition to this motion in limine.  And what they say

8   is you should reconsider that because that rule doesn't

9   apply where the two different cases are -- relate to the

10   same tort liability.

11          But, Your Honor, this is the same issue that you

12   already addressed when you were talking about the double

13   counting in the trustee recoveries.  As before, when it had

14   to do with that topic, you carefully went through the

15   different causes of action and showed how they were for

16   different theories and different harms.  That very same

17   rationale undermines the arguments that the defendants are

18   making.

19          They reference various actions that they say the

20   collateral source rule shouldn't apply to, but when you look

21   at them, Your Honor, they are the very same actions they

22   keep repeating.  They are all these actions relating to

23   preferential transfers and criminal restitution and various

24   receiver actions for forfeiture and the like, none of which

25   are for the same tort liability, and, therefore, your

1     rationale and your position that you took with regard to the

2     collateral source rule still applies.

3              And, once again, Your Honor, I don't want to miss

4     the point of the doctrine of law of the case, which is you

5     have already made these rulings.  And for BMO to revisit

6     these rulings, they would have to identify some grave error

7     in your prior rulings, some new case law, some new facts

8     that they couldn't have pointed out before.  And,

9     Your Honor, they've done none of that.  All they've done is

10    rehash the same arguments that they made in opposition to

11    the *Daubert* again and again and again.

12             So for those reasons, Your Honor, we would ask

13    that you grant our motion to exclude the evidence relating

14    to offsets and reductions.

15             THE COURT:  Thank you, Counsel.

16             Any response?

17             MR. YOUNT:  Thank you, Your Honor.  Josh Yount for

18    BMO Harris Bank.

19             Because your order from last week addressed

20    offsets, recoveries, and reductions, we're going to rest on

21    our brief for the points that were considered in that order,

22    unless you have questions for us on that.

23             But there are two questions -- two issues that we

24    want to raise for clarification purposes, and they build off

25    of one of the last points that Mr. Marder raised.

1          And so the first is whether BMO can offer evidence

2     of payments from those subject to the same tort liability as

3     BMO.  The collateral source rule in Minnesota, Restatement

4     Section 920A, Sub 1, allows offsets for payments by those

5     subject to the same tort liability as the defendant.

6          The estate recoveries identified by BMO and its

7     expert fit that description.  Most obviously that's true for

8     Tom Petters, Deanna Coleman, and Robert White.  In the

9     Complaint in this case, they are alleged to have committed

10    torts that M&I aided and abetted.  No clearer instance of

11    joint tortfeasor could be possible.

12         The same is true for other individuals who

13    alleged -- I'm sorry, so other individuals who joined the

14    Ponzi scheme and contributed the same liability.  So that

15    would be folks like at the phony vendors, Frank Vennes,

16    others.  I won't go through all the names.  And we submit

17    that it also includes investors whose alleged misconduct

18    propped up the Ponzi scheme for years and years who also

19    have liability for fraudulently depleted assets.

20         Now, the trustee says that those cases against the

21    investors, the winning investors, those were different

22    theories and different harms.  The harm is the same.  It's

23    fraudulently depleted assets.  That is the theory of harm in

24    this case.  That's the theory of harm behind a fraudulent

25    transfer claim.

1          And the fact that they are different legal

2     theories, that doesn't matter.  Under Minnesota law, a

3     double recovery exists when it's the same harm but different

4     theories of liability.  That's how Minnesota law applies its

5     double recovery rule.  And so I would submit that BMO should

6     at least have the chance to prove at trial what recoveries

7     came from payments by those subject to the same tort

8     liability as BMO is alleged to be.

9          The second issue I want to address, Your Honor, is

10    whether BMO can offer evidence of assets that PCI obtained

11    pre-bankruptcy in the transactions allegedly depleting PCI's

12    assets.  Right?  So in connection with the fraudulent

13    depletion of PCI's assets, PCI received certain assets in

14    return.  So, for instance, PCI and the related debtors, who

15    have been consolidated, purchased companies, like Polaroid,

16    which has value and had value at the time of the bankruptcy.

17         They also, even in making fraudulent transfers to

18    investors, received causes of action against those investors

19    to recover the fraudulent transfers.  And, again, PCI had

20    these assets when it entered bankruptcy.  So this would not

21    be a post-bankruptcy asset.

22         And under established Eighth Circuit law, when a

23    debtor receives value for a fraudulent transfer, that value

24    must be deducted from the damages that are assessed in a

25    tort action on behalf of the debtor.  That's one of the main

1    holdings in the *Senior Cottages* case.

2            I think I can stop there unless Your Honor has

3    questions about any of the points Mr. Marder raised that you

4    would like me to additionally raise -- or address or

5    anything I said that you have questions about.

6            THE COURT:  I have no questions.  Thank you,

7    Counsel.

8            MR. YOUNT:  Thank you, Your Honor.

9            MR. MARDER:  Your Honor, again, just very briefly

10   I would like to rebut those points.

11           The first is counsel for BMO said he would like

12   you to clarify a few points, but this is not a request for

13   clarification.  This is a request for you to overturn your

14   prior ruling where you very clearly stated that all of the

15   offsets and reductions were irrelevant.

16           Second of all, Your Honor, his whole first

17   argument about the collateral source rule is utterly

18   irrelevant because the collateral source rule in your

19   *Daubert* motion ruling was an alternative reason why these

20   monies were irrelevant.  Before you even got to the

21   collateral source rule, you ruled that these were irrelevant

22   for all these other reasons, such as the fact that there was

23   no double counting and the fact that the ruling in the

24   *Emerald Casino* case and the time period and all those other

25   issues before you even got to the cholesterol estoppel.

1          So even if there was an argument on collateral

2     estop- -- I'm sorry, not collateral estoppel.

3          THE COURT:  Collateral source rule.

4          MR. MARDER:  Right.  Collateral source rule.

5     Sorry.

6          So even if they were correct about the collateral

7     source rule, it wouldn't affect it because you already ruled

8     that these things were irrelevant for other reasons.

9          Second of all, their duty here as the proponents

10    of the evidence would be to establish cases where the

11    trustee received recovery which clearly were for the same

12    tort liability, and they haven't done that.  They have just

13    thrown a laundry list of cases into their brief without

14    really laying out what these cases were for.  The ones that

15    they've identified either, and as I can see, fall into three

16    categories.  Some of them that they mention are -- like

17    *Vennes* and the *Fry* case have to do with criminal

18    restitution.  They are not even civil cases.  They have a

19    bunch of these fraudulent transfer cases, Your Honor, that

20    you've already said regardless of the theory of liability

21    are for a different harm.  And then they throw in some

22    actions that the receiver took.  We're not even talking

23    about a recovery by the trustee.  We're talking about

24    receiver recoveries.

25          So these actions -- the duty upon BMO would be to

1    actually identify some other cases and tell you why they're

2    subject to the same tort liability, but they haven't done

3    that.  But as I said earlier, you don't even need to get

4    there because the collateral source rule was just an

5    alternative ruling -- basis for your ruling.

6            So with that, Your Honor, I'll just move on to the

7    next one on the list.

8            THE COURT:  Motion to admit into evidence certain

9    criminal convictions.

10           MR. MARDER:  Yes.  With respect to that one, it's

11   actually a fairly simple issue to resolve.  The defendants

12   agreed to the entry of the plea agreements.  They agree to

13   the entry of the judgments.  The only issue has to do with

14   this instruction, and what they've done is given you an

15   alternative instruction to provide that's different from

16   ours.

17           We actually are okay with their alternative

18   exception as long as a few small edits were made, and I will

19   just tell you what they are, Your Honor.

20           In BMO's proposed instruction, they -- on the

21   third line down, they say that there was -- the PCI

22   employees furthered a scheme to obtain billions of dollars

23   in money and property.  If you look at the relevant plea

24   agreement, Your Honor, which is the PCI plea agreement, on

25   page 2, it's Exhibit I to the declaration, and also on page

1    3, they have omitted a particular word that's very

2    important.  The actual plea agreement says, "Furthered a

3    scheme to defraud and obtain billions."  They have taken out

4    the word "defraud" there because they don't like it, but

5    that's not the purpose of this exercise.  The purpose of

6    this exercise is to accurately describe what is contained in

7    those plea agreements.

8            And they've omitted those words, and we would ask

9    that those be added on the third line of their instruction,

10   so that it would read, "furthered a scheme to defraud and

11   obtain billions of dollars" as it says in the plea

12   agreement.

13           Second of all, Your Honor, and this is a similar

14   one, the first sentence of their third paragraph, they take

15   out certain key words that were in the plea agreement.

16   Their version says, "The scheme used false statements, false

17   representations, and material omissions to induce lenders to

18   loan PCI billions of dollars."

19           If you look at the PCI plea agreement, which is

20   Exhibit I to the declarations, on page 2 they have omitted a

21   very important word there as well.  It says, "to

22   fraudulently induce investors."  They took the word

23   "fraudulently" out, and we would request that it be put back

24   in so that it reads, "material omissions to fraudulently

25   induce investors" because that's the language that's used in

1    the PCI plea agreement.

2            Also, Your Honor, they cut out some language at

3    the end of that sentence.  They say -- it should read, as I

4    said, "Fraudulently induced lenders to loan PCI billions of

5    dollars," and they took out the words "based upon the

6    representations and omissions" -- they took out those

7    critical words, and those are found also in the PCI plea

8    agreement, Your Honor, on page 2, and in the Coleman plea

9    agreement as well.  It's a very critical concept that when

10   they fraudulently induced these lenders to loan the money,

11   that they loaned the money based on the representations.

12           The last change, Your Honor, that we would

13   recommend is that there was a sentence that we had in our

14   version that they've cut out, and that sentence read, "In

15   connection with the fraud, Petters or his co-conspirators

16   caused money to be transferred to and from PCI's bank

17   account at M&I."

18           And they removed that from their version.  We

19   would ask that that be added back in, and the reason is very

20   simple.  If you look at the underlying papers, that sentence

21   is clearly supported.  If you look at the verdict against

22   Mr. Petters, and specifically Counts 7, 16, and 17, there it

23   clearly states that the monies were transferred to and from

24   PCI's bank account.  Similarly, in the PCI plea agreement at

25   page 6, which is Exhibit I to the papers, it also has that

1      language.

2                So, in essence, Your Honor, there's very little

3      for you to resolve in connection with this.  They've agreed

4      that the plea agreements come in.  They've agreed that the

5      judgments come in.  And we just have a few edits that I've

6      mentioned that are clearly derived from the underlying

7      documents, which is essentially words that they have

8      omitted.

9                THE COURT:  Thank you, Counsel.

10               Any argument on this matter?

11               MR. GLEESON:  I think if I get to see the

12     suggestion that's made by counsel in writing, we can

13     probably take it off your plate.

14               THE COURT:  I would ask that you take it off my

15     plate --

16               MR. GLEESON:  I figured --

17               THE COURT:  -- if you can, and so please confer

18     and let the Court know within two days whether this matter

19     is still a live matter.

20               MR. GLEESON:  Will do.

21               THE COURT:  It sounds like it is likely to be able

22     to be resolved.

23               MR. GLEESON:  Yes.

24               THE COURT:  And I appreciate the fact that counsel

25     agrees.

1          MR. MARDER:  Your Honor, by 7:00 p.m. I can send

2     to Mr. Gleeson and his colleagues a redlined version with

3     our suggested changes.

4          THE COURT:  Okay.  Very well.  Thank you.  So

5     ordered.

6          MR. MARDER:  Finally, Your Honor, I would like to

7     address the motion to exclude and limit certain evidence

8     relating to government investigations.

9          And, once again, Your Honor, we are not writing on

10    a clean slate here.  You have already ruled on these issues

11    in connection with your *Daubert* motion ruling.

12         What I would like to do, Your Honor, is take the

13    arguments slightly out of order because there's one that's

14    particularly important.  There is a witness, Mr. Janczak,

15    who is an employee of BMO who testified that some

16    unidentified person from the Federal Reserve told

17    Mr. Janczak sometime after the fraud was revealed to the

18    world that the Federal Reserve looked at this and found

19    nothing that they think BMO should have done differently.

20         In your *Daubert* ruling, Your Honor, and if you

21    look at page 18 of your opinion, you cite this testimony

22    specifically in the footnote, and you ruled that this

23    testimony is irrelevant for the expert to testify about.

24    And the reason is that you can't draw conclusions about what

25    BMO thought or knew based upon what some other person

1    thought or knew.  And, therefore, Your Honor, this testimony

2    is absolutely irrelevant and should not make its way to the

3    jury.

4         Equally important, Your Honor, is this language is

5    clearly hearsay.  They want to put on a witness to testify

6    that somebody else told them that they looked at this

7    conduct and they thought it was okay and that person was a

8    government employee.

9         That's only relevant if the truth of the matter

10   asserted is true.  They say that the only reason they're

11   putting this into evidence is to show the effect on the

12   listener, and, therefore, it's not for the truth of the

13   matter asserted.

14        But, Your Honor, the effect on the listener is

15   completely irrelevant to this case.  Whether Mr. Janczak

16   listened to what the government employee said after the fact

17   and thought, Oh, that makes sense, is not at issue in this

18   case.  It simply doesn't matter.  The issue is what BMO knew

19   or didn't know back at the time.  It has nothing to do with

20   whether Mr. Janczak, after the fact, upon hearing something

21   that a government employee said, thought that everything the

22   bank did was just fine.

23        So for two reasons, Your Honor, that testimony

24   must be excluded.  Number one is it's completely irrelevant

25   as you've already ruled, and, second of all, it is complete

1     abject hearsay.

2              The second issue with these government

3     investigations are these various notes from the interviews

4     by the FBI.  Apparently there was an interview in 1998,

5     another one in 2003.  We know very little about what the FBI

6     was investigating.

7              In the first one, we have a one-page typewritten

8     note that's narrowly focused on a transaction with someone

9     named Mr. Hettler.  And in the 2003 notes, the FBI

10    interviewed Mr. Coleman and Mr. Petters and the notes are

11    limited to some sham vendor called ASM.

12             Now, remember, Your Honor, our theory in this case

13    is that the business model was allegedly that retailers

14    would be wiring money to the account and -- in payment for

15    these electronic -- electronic products.  In fact, the

16    evidence is going to show that 70 to 80 percent of these

17    incoming wires, which accounts for billions of dollars, were

18    from the two wholesalers that PCI was supposed to be buying

19    goods from and that they never actually received any money

20    from the retailers.

21             Now, for this test -- for this interview notes --

22    for these two interview notes that have been mentioned to

23    have some tendency to prove or disprove anything of

24    consequence, then they would have to show somehow that the

25    FBI was looking at the same issue that they were looking at,

1    had the same information, had the same motive, and made a

2    decision not to pursue this or, worse still, didn't even

3    notice the wrongdoing.  But we have no idea whether that

4    happened.  Based upon these two notes, all we know is that

5    the FBI had some narrow investigation that they looked at

6    and didn't pursue it.

7            Under your *Daubert* ruling, you've already held

8    that that type of information is irrelevant on page 18

9    because you can't draw conclusions about one person's mental

10   state from the mental state of another.

11           And even if you could, Your Honor, think of the

12   Rule 403 issues here.  To have this jury hear that the FBI

13   thoroughly looked into this, which isn't true, and didn't do

14   anything about it or didn't notice it and therefore the bank

15   shouldn't notice it either, that would be extremely

16   prejudicial because the jurors, upon hearing that the

17   government gave its alleged stamp of approval to this or

18   didn't notice anything, would be highly prejudicial to our

19   case.

20           So, Your Honor, not only to 403, even if this had

21   some probative value, but we would say even under 402 this

22   has zero probative value because there's no showing that

23   anything that the FBI did or didn't do is remotely analogous

24   to anything that was done by the bank.

25           Similar categories of documents are these FBI --

1        I'm sorry -- these FRB Chicago exams.  This is the Federal

2        Reserve Chicago office.  And there are some wire transfer

3        records where the FRB Chicago, the Federal Reserve in

4        Chicago requested that the bank provide certain wire

5        transaction spreadsheets.

6                Your Honor, these spreadsheets are massive.  They

7        have thousands and thousands of transactions in them, and

8        only a tiny number of those transactions relate to BMO.  We

9        have no evidence that anybody at the Federal Reserve looked

10       at any of these transactions that related to BMO.  There's

11       no evidence of that, and we'll never know that.

12               We don't know what the Federal Reserve did with

13       those documents.  We don't know what conclusions they drew,

14       and we don't know what they decided to do with them because

15       it's a complete blank slate.

16               This testimony is already subject to your *Daubert*

17       ruling that you can't draw conclusions on one person's

18       mental state from the state of another.  Whether or not the

19       Chicago FRBs looked at this and decided that they weren't

20       going to pursue it or if they didn't notice it, doesn't have

21       anything to do with BMO's mental state.  And even if it did,

22       they can't prove that the FRB Chicago actually looked into

23       this material because all we know is that they were given a

24       big pile of spreadsheets and we don't know what they did

25       with it.

1              And then, once again, Your Honor, there's the

2      terrible 403 problem that we would suffer from -- prejudice

3      from.

4              BMO makes two arguments that I will address

5      briefly, Your Honor, and that will be the end of this

6      argument.

7              BMO says that these documents are relevant for two

8      reasons.  First of all, they say, Well, Judge, this

9      undercuts the plaintiff's argument that anyone with access

10     to the transaction history would have come to a conclusion

11     of fraud.

12             But, Your Honor, that has never been our argument.

13     We don't say simply the fact that BMO had access to the

14     transaction history means that they would have come to the

15     conclusion of fraud.  If you look at our trial brief and all

16     the papers we submitted, our case is much more significant

17     of that.  There were red flags after red flags after monthly

18     alert after monthly alert after having AML investigators

19     review these transactions in detail, we have all of the

20     various pieces of evidence that I am not going to belabor

21     here and repeat here that are set forth in our trial brief.

22     We are not simply arguing the mere fact that they had the

23     transaction history was enough for them to come to the

24     conclusion of fraud.  They had to know, for example, the

25     business model.

1          THE COURT:  Counsel, I am going to stop you here.

2          MR. MARDER:  Uh-huh.

3          THE COURT:  And I am going to also just advise

4    both counsel, I have read your written submissions, and so

5    we do not need to have a recounting of those written

6    submissions.  We have a limited amount of time.  We have

7    several motions more.

8          MR. MARDER:  Understood, Your Honor.  That

9    concludes my argument.

10          MR. MOHEBAN:  Your Honor, Keith Moheban on behalf

11   of BMO, and I will certainly take heed to what you just

12   said.  I really want to just make three points.

13          I want to talk about the *Daubert* -- your *Daubert*

14   decision, because I think it completely supports our

15   position on this motion.  I want to talk about this is a

16   relevance objection and that the threshold for relevance is

17   exceedingly low, and then I want to talk about sort of a

18   goose and gander argument, because what you are hearing here

19   is not that these documents or this information or that law

20   enforcement involvement is irrelevant.  You're just hearing

21   that they don't like the parts that are helpful to the bank,

22   and they want you to exclude half of that evidence and leave

23   the other half.

24          Let me start with the *Daubert*.  So what I read in

25   your decision was you did not favor the notion of experts

1    giving opinions about what M&I people would have thought or

2    done based on what other people might have thought or done.

3    I got that.

4         But this evidence is about what M&I people did.

5    This is their actions, which you said is the probative thing

6    for a jury to consider.  So we have these Federal Reserve

7    examinations.  I think the first ten witnesses on the

8    witness list for the trustee are AML exam people, people at

9    the bank who were working in an area where they are reviewed

10   by the Federal Reserve.

11        And I think a good portion of the evidence that

12   the trustee wants to submit is how M&I interacted with the

13   Federal Reserve and what kind of feedback they got.  And to

14   the extent that the Federal Reserve was ever critical of the

15   bank, they certainly think the jury should hear that.

16        But when other things happen to provide a full

17   context of that relationship or when the Federal Reserve

18   says something laudatory about the bank, such as, we

19   wouldn't have seen you do anything different than what you

20   did with respect to these accounts, they want those

21   excluded.  That's the goose and gander problem, and that's

22   the relevance problem.

23        If the Court is going to have the jury hear

24   evidence about how M&I interacted with the Federal Reserve,

25   including all of these examinations that the trustee is

1    going to put in, then the bank ought to, in fairness, to

2    round out the entire evidence here, be able to talk about

3    the submittals that they made, these wire transfers, the

4    interactions that they had with the Federal Reserve.  We're

5    not going to put in evidence of conclusions of what the

6    Federal Reserve concluded.  The jury can make that

7    conclusion, but they ought to have the facts.

8         And with respect to Mr. Janczak and the fact that

9    he had this response from the person at the Federal Reserve

10   is absolutely relative -- they have a huge contention here

11   about punitive damages.  They think that -- at some point

12   they are going stand here and ask the jury to award punitive

13   damages because of the conduct of the bank which includes

14   the bank's failure to make corrective measures.

15        And one of the reasons Mr. Janczak said we didn't

16   change the AML program is because we were told by the fed

17   that our AML program was fine.  So there's -- I mean, we are

18   talking about relevance here.  The very low standard.

19   Should the jury hear the evidence.

20        So then we get to the DOJ subpoena, right?  This

21   is, again, facts involving M&I.  M&I was sent a subpoena

22   from the Department of Justice in 2003 for records.  Now,

23   granted, we don't know every last detail about what happened

24   with that subpoena, just like we don't know every last

25   detail of all these things, which are now ancient history.

1           But should the jury hear it?  Trustee doesn't say

2      you should exclude it entirely.  What the trustee says is,

3      Well, we want you to use it as a red flag.  We want to you

4      tell the jury this is relevant because it put M&I on notice

5      that somebody was investigating Petters.

6           And, rather, I think the right answer for that is

7      to say, We are going to put this evidence in.  The jury can

8      reach its conclusion, along with all the other evidence that

9      it's provided.

10          Again, they're not asking to exclude it --

11          THE COURT:  When you say "we are going to put this

12     evidence in," what is "this evidence"?

13          MR. MOHEBAN:  The grand jury subpoena.  Both

14     parties believe it's relevant.  I think the issue before you

15     is whether you should give some kind of limiting instruction

16     that tells the jury what they should make of it.  And I'm

17     simply saying let the jury decide, let them hear all the

18     facts and circumstances, whatever evidence there is about

19     the subpoena.

20          This isn't an issue of excluding evidence.  This

21     is really a request for a limiting instruction to tell the

22     jury what to think, and that's not how courts work.  Let the

23     jury make its own conclusion.

24          And then, lastly, I will just talk about --

25          THE COURT:  What is the relevance of the --

1          MR. MOHEBAN:  I'm sorry?

2          THE COURT:  What is the relevance of the evidence?

3          MR. MOHEBAN:  Of the subpoena?

4          THE COURT:  Yes.

5          MR. MOHEBAN:  Well, it indicates that there was

6    some type of an inquiry.  We know sort of what was asked

7    for.  There are some records that go back and forth.  We

8    know that there was a bank response, and we know that as a

9    result of that, this Ponzi scheme went on for five more

10   years.  So there are inferences the jury can draw as to

11   those facts.

12          We're not telling, you know -- we're not asking

13   for an instruction as to what they should -- how they should

14   receive that evidence, but we think it is -- your *Daubert*

15   order was saying we should talk about what was said and

16   done, and here is a direct activity that M&I was involved in

17   that relates to an investigation of Petters.  It's part of

18   the whole facts scheme here, that the contention is that M&I

19   was aiding and abetting in a fraud.

20          What we know is that they were submitted -- they

21   were presented to a grand jury.  They made some kind of

22   response.  Life went on.  Nobody indicted anyone at M&I.

23   Whatever information was provided didn't result in exposing

24   the scheme at that time.

25          They're relevant facts, and the jury ought to hear

1     it and they can decide what to make of it, along with all

2     the other facts they are going to hear.

3                    THE COURT:  You said they're relevant.  They're

4     relevant to what?

5                    MR. MOHEBAN:  Relevant to what M&I knew about the

6     information they were asked to provide by the Department of

7     Justice.

8                    And it's very similar to the situation in 1998 and

9     in 2003 when we know that there were other investigations

10    made by Petters -- about Petters, I should say, by the

11    government, and we know that we have notes of those.  And

12    you're going to have in this courtroom Deanna Coleman, the

13    whistleblower of the Ponzi scheme.  She will appear and she

14    will testify these are notes about her interviews.  And to

15    the extent that she concealed the Ponzi scheme to law

16    enforcement at that time is corroborative of our case, which

17    is that she concealed it from us too.

18                    And, again, these are factual points of reference

19    that a jury can consider and can make their own conclusions

20    as to what to make of it.  So the idea that these -- some of

21    the most critical pieces of evidence that we have here about

22    what -- you know, evidence of Deanna Coleman and Tom Petters

23    concealing the Ponzi scheme is contained in these notes, and

24    it's corroborative of our view that they concealed it from

25    us as well.

1              So the other thing is that these are witnesses

2     that are going to come before you.  You can make these

3     decisions in the context of the evidence that's presented.

4     I don't think any of these pieces of evidence have to be

5     decided upon at this time, and it may be useful for you to

6     have more context in the case in deciding.

7              But the last thing I'll say about this is don't

8     let half the evidence in.  Don't let them be able to put in

9     Federal Reserve or other evidence just when they think that

10    it helps their case and then allow them to have the things

11    that help us be excluded.  Thank you.

12             MR. MARDER:  Your Honor, you will be happy to hear

13    I have nothing further on that motion.

14             THE COURT:  We are ready to move to defendant's

15    motions then?

16             MS. GITTES:  Thank you, Your Honor.  Susan Gittes

17    for BMO.  So defendant's first motion is for exclusion of

18    plaintiff's use of a 2018 settlement under FIRREA that BMO

19    entered into in 2018.  And I want to be respectful of the

20    Court's time, but just very briefly because I think the way

21    the *Daubert* motion came in, there's a little bit of

22    confusion as to exactly where this stands.

23             So we argue in our motion plaintiffs can't rely on

24    the settlement for the truth of the matter asserted there

25    sort of to prove its claim that BMO is liable in this case.

1       There are a number of reasons laid out in our brief that I

2       don't need to rehash as to why such a settlement should be

3       excluded.  It's not relevant.  There was no admission.

4       Under Federal Rule of Evidence 408, there's a strong policy

5       against admissions of voluntary resolutions.  403 and

6       hearsay.

7               So to get to the heart of where I think we stand

8       today, plaintiff's opposition claims the motion is moot

9       because Your Honor's ruling on the *Daubert* motions already

10      excluded any evidence in this regard.  And I think -- and

11      this dovetails with Mr. Moheban's conversation with you a

12      few minutes ago -- they cite to page 18 of Your Honor's

13      *Daubert* decision and claim that any evidence of sort of

14      anything in this -- that BMO did nothing wrong is excluded

15      on that basis.

16              And in reading page 18 of your order, that

17      concerned Mr. Grice, defendant's AML expert's ability to

18      opine on the state of mind of both M&I employees and of

19      third parties like the FBI.  The way we read your decision,

20      Your Honor, is that it did not exclude the underlying facts

21      to the extent otherwise relevant here, and I think

22      Your Honor's decision mentioned something to that effect,

23      that ultimately the opinions and inferences that were

24      impermissible in Mr. Grice's opinion are for the jury to

25      decide, not a proper topic of expert opinion.

1              So defendant does intend to offer evidence in this

2      regard, including that, you know, no one at M&I was

3      criminally prosecuted.  We'll have witnesses from M&I, and

4      they'll each testify they were never criminally prosecuted.

5      There will be no evidence, and we can point that out.

6              In addition, that the scheme, you know, evaded

7      detection for many years.

8              THE COURT:  Why is it relevant that no one was

9      criminally prosecuted?

10             MS. GITTES:  Your Honor, I think here, where we're

11     dealing with the knowledge of Bank of Montreal employees and

12     where you have federal investigators having spent years

13     going through all of the things that happened, and where we

14     see that there are others that were criminally prosecuted

15     here, like Deanna Coleman, the absence of that is probative,

16     is relevant to whether the bank should have done something

17     different here.

18             THE COURT:  How so?  And what would you point to?

19     What case law would you point to that supports that?

20             MS. GITTES:  I don't know that I specifically -- I

21     think it goes back to some of the arguments of Mr. Moheban.

22     I am happy to look, Your Honor.  I think our -- it's more

23     the commonsense point that the liability here, whether

24     BMO -- the questions presented by plaintiff's claims are did

25     M&I employees know about the conduct.  I think our view is

1   no.  And, you know, a number of different entities all went

2   back through these records in great depth.  And the fact

3   that, for example, Mr. Jambor, one of the witnesses that

4   you'll hear about, in fact, was a witness in the prosecution

5   against Mr. Petters and was never prosecuted is probative.

6   I mean, plaintiffs can point out both parties can make

7   arguments as to what probative value the jury should weigh

8   on it, but I think -- and I would also worry --

9        THE COURT:  I'm concerned about the prejudicial

10  effect, and so if we weigh probative value as to prejudicial

11  effect, the prosecutorial discretion exercised has what

12  probative value in this instance?

13       MS. GITTES:  Well, Your Honor, I think I would say

14  it -- somewhat respectfully, I think I would flip it around.

15  I think we're going to have a situation --

16       THE COURT:  Answer my question, and then you can

17  flip it as much as you want.

18       MS. GITTES:  Fair enough, Your Honor.

19       In our view, that has probative value to, in fact,

20  whether anyone at the bank was -- did have knowledge of the

21  scheme.  And I think it would be just as prejudicial -- and,

22  again, we're not saying that they did -- I think plaintiff

23  will be, and I am sure they will, make many arguments about,

24  you know, the lack about -- all the things that the bank did

25  wrong.  I don't think we can argue, you know, and if we do,

1      they will be able to rebut it, that everything was perfect.

2      I'm not saying that.  I'm saying the lack of a criminal

3      prosecution here, especially in the specter of a criminal

4      scheme, is I think a core question that we can't avoid.

5              And now to flip it, I think it would be

6      prejudicial to Bank of Montreal if we're not allowed to say

7      that, because I think otherwise you could have -- you know,

8      where you have this unknown for the jury to speculate about

9      whether there was any criminal prosecutions here, I think

10     that's a question that, frankly, is going to come into the

11     jury's mind here.

12             Plaintiffs will be free to argue that they -- you

13     know, as to what conclusions, if any, should be drawn from

14     that, just as we will.  But I think, Your Honor, given the

15     specific nature of the scheme here, it would be unfair and

16     unduly prejudicial to defendants not to be able to point out

17     that fact.

18             And so, you know, going back to FIRREA, our view

19     is that we should be permitted to make those arguments.

20     Also that the FBI didn't detect this scheme until, as Deanna

21     Coleman will testify, she, you know, brought the scheme to

22     the government's attention in 2008.  That speaks, in our

23     view, to the complexity of the scheme, to, you know, whether

24     the Bank of Montreal and M&I should have been able to figure

25     it out.

1          And so, in our view, none of that should open the

2    door, to the extent that's I think where the plaintiffs

3    would be, is none of that should open the door to the

4    settlement.  There are strong reasons why settlements of

5    this kind have a great risk of prejudice, limited probative

6    value.  But I think also, Your Honor, to the extent that the

7    door is ultimately opened -- or to the extent plaintiffs

8    want to make that argument down the line, we can consider

9    that as we go.  It's not to say there's nothing we could

10   ever put forward that could open the door.  I think the

11   question is dealing with those instances as they arise.

12          I think that's all I have, unless Your Honor has

13   any other questions.  Thank you.

14          THE COURT:  I do not.  Thank you, Counsel.

15          MR. MARDER:  Sorry, Your Honor.  May I proceed?

16          THE COURT:  You may.

17          MR. MARDER:  Your Honor, I will just be very brief

18   here.  BMO's counsel indicates that in your *Daubert* motion

19   it was their understanding -- in your *Daubert* ruling, it was

20   their understanding that what you ruled was that the expert

21   could not testify on people's state of mind but the

22   underlying documents would be admissible.

23          But, Your Honor, they are only reading half of

24   your rationale.  You, on page 18 of your order, gave two

25   different reasons why this Janczak testimony was

1  inadmissible.  One was because the expert shouldn't be

2  testifying based on state of mind, but then in the last

3  sentence of the paragraph there, you say, "Moreover, the

4  knowledge or mental state of one person or entity has little

5  or no probative value as to the knowledge or mental state of

6  another person or entity."

7          So your ruling was based on two things:  First,

8  that the expert couldn't testify as to state of mind; and,

9  second of all, this type of testimony that they are trying

10  to rely on where the government says we don't think you did

11  anything wrong has no probative value.

12          So with that understanding, Your Honor, because

13  it's our understanding that the Janczak testimony about what

14  some unnamed official told him is irrelevant, we stated in

15  our papers that this was moot.

16          The only purpose of us putting on this FIRREA

17  settlement was to rebut what their expert was going to say.

18  Their expert was going to say that the government looked at

19  it and said it was okay and didn't -- decided not to pursue

20  anything.

21          But, Your Honor, that's simply not true.  What the

22  other side of the story is they did decide to pursue it.

23  They were going to bring this action, and the only reason

24  they didn't bring this action is because BMO settled the

25  case with the government for $10 million with regard to

1    their wrongdoing on how they handled this account.

2             So if the Janczak testimony were going to be

3    admitted into evidence, then we would offer this settlement

4    for the sole and limited purpose of rebutting their argument

5    that the government looked at it and decided not to do

6    anything about it.  But because this Janczak testimony is

7    out, as we understand your ruling, then this is, in fact,

8    moot, and assuming you ruled that the Janczak testimony is

9    out, this is moot.

10            If you were to rule that notwithstanding the

11   relevance problems and notwithstanding the hearsay problems

12   somehow this Janczak testimony gets in, then this would be

13   admissible for the limited purpose of showing that their

14   argument is wrong, that the government didn't look at this

15   and decide it was okay.  In fact, the government pursued it

16   and then dropped it after they settled the case for $10

17   million.  That's not hearsay.  That doesn't fall within Rule

18   408 because it's not for any purpose prohibited by that rule

19   and would be otherwise admissible.

20            But, Your Honor, it seems so clear to us what you

21   ruled, and that this Janczak testimony is inadmissible.  For

22   that reason, we said we thought this was moot.

23            That's the extent of my argument, Your Honor.

24            MS. GITTES:  Just briefly, Your Honor.  I think --

25   I guess to counsel's point, I think some of this depends on,

1    you know, if one thing comes in, then another, and so I do

2    think we can sort these out probably more ably as the trial

3    goes on.

4           The other thing I would just say about relevance

5    is to make one additional point.  One of the key witnesses

6    in this trial, likely for both sides, will be Deanna

7    Coleman, who was a co-conspirator of Mr. Petters and

8    ultimately told the FBI about the scheme.

9           Ms. Coleman never pointed the finger at M&I, and I

10   think that's another powerful piece of evidence that we will

11   want to elicit, that again here is probative of the fact

12   that M&I didn't have knowledge of or kind of participation

13   in this scheme.  She cooperated with the government.  She

14   had every incentive to give up anyone involved in the

15   scheme.  She gave up plenty of people who were.  She never

16   pointed the finger at M&I.  And so that's just one

17   additional piece of context as we think about kind of how

18   the jury will be processing information on the situation as

19   a whole.

20          Thank you.

21          THE COURT:  Thank you, Counsel.  We're going to

22   take a recess at this time and we will be ready to resume at

23   3:25.

24       (Recess taken at 3:09 p.m.)

25                         *    *    *    *    *

1          (3:25 p.m.)

2                        **IN OPEN COURT**

3          THE COURT:  Please be seated.  Counsel, we are

4  ready to resume.  We will have a hard stop at 3:50.  Okay?

5          MR. YOUNT:  Thank you, Your Honor.  Josh Yount

6  again on behalf of BMO Harris Bank.

7          We have moved to exclude any evidence of M&I

8  duties to investors or any breach of such duties as

9  irrelevant, unfairly prejudicial, and confusing.

10          It's irrelevant in the first instance because the

11  plaintiff cannot enforce duties that are owed to investors.

12  The plaintiff represents PCI in this matter and not its

13  investors.

14          M&I -- beyond that, M&I's duties to investors

15  can't be the basis for the breach of fiduciary duty claim

16  against M&I because that part of that claim was dismissed,

17  and they can't be the basis of the trustee's other claims

18  because those are claims that arise from duties owed by PCI

19  management, not by M&I.

20          Now, the trustee says that this evidence is

21  relevant to M&I's scienter, but what M&I knew and whether

22  those facts amount to actual knowledge or bad faith does not

23  depend on whether M&I was under any duty to tell investors

24  those facts or failed to fulfill such a duty.

25          That evidence is also not relevant to the

1    substantial assistance element of an aiding and abetting

2    claim, as the plaintiff claims.  Substantial assistance

3    requires affirmative acts under the *Witzman* case from the

4    Minnesota Supreme Court.  And a failure to disclose is not

5    an affirmative act under the *American Bank* case from the

6    Eighth Circuit.

7          Beyond the relevance problems, this kind of duty

8    evidence about M&I's duties to investors would create

9    tremendous amount of unfair prejudice and jury confusion.

10   The jury would be confused, I think, about what the basis

11   for liability against M&I would be, whether they could

12   impose liability on M&I for M&I not fulfilling some duty to

13   an investor.

14         Allowing in this evidence would also create a

15   considerable amount of collateral litigation as the parties

16   sparred over whether M&I had disclosure duties to investors,

17   when those duties arose, and which investors were owed

18   duties.

19         And, finally, the plaintiff has been quite

20   inconsistent on investor evidence.  The plaintiff, as you

21   know, successfully opposed investor discovery on the idea

22   that investor knowledge and conduct is irrelevant.

23   Plaintiff should not now be able to turn around and offer

24   evidence about duties to investors, which would make

25   investor knowledge and conduct highly relevant.

1            In fact, I noted one thing that I wanted to refer

2     back to in Mr. Marder's first argument.  He said that it

3     doesn't matter to the aiding and abetting breach of

4     fiduciary duty -- I'm sorry.  He said that the aiding and

5     abetting -- any aiding and abetting of breach of fiduciary

6     duty to investors doesn't matter, that the case rises and

7     falls on aiding and abetting breach of fiduciary duty to

8     PCI.  And we would submit that that is correct as a matter

9     of law because they cannot bring a breach of fiduciary

10    duty -- aiding and abetting breach of fiduciary duty to

11    investor claim.

12            Finally, I want to address one of the main

13    arguments that the plaintiff made in responding, and that's

14    that the plaintiff now says that this evidence about M&I's

15    duties to investors is relevant because he's now bringing

16    claims for aiding and abetting fraud against and breaches of

17    fiduciary duties to investors.

18            Now, maybe Mr. Marder backtracked on that earlier

19    today, it's a little unclear to me, but if they do intend to

20    proceed with those claims, our position is that they cannot

21    assert those claims; and even if they could, they should not

22    be allowed to shift their theory of liability at this late

23    stage of the case.

24            Plaintiff has no standing to assert claims for

25    wrongs against investors.  He can only assert PCI's rights.

1   That's what *Ozark* holds.  It's what *Senior Cottages* holds.

2   That's what the *Duke* and *King* case from the Minnesota

3   Bankruptcy Court holds.  He therefore can't assert claims

4   for aiding and abetting frauds against and breaches of

5   fiduciary duties to creditors.

6              Again, *Duke* and *King* considered this issue.  It's

7   also addressed at length in a Fifth Circuit decision called

8   *In re Seven Seas Petroleum*, 522 F.3d 575 at page 586, a 2008

9   case.

10             Now, plaintiff's fallback argument seems to be

11   some version of a reverse derivative standing argument, that

12   PCI can assert claims that -- claims for rights and injuries

13   of creditors.  There's really no such thing as reverse

14   derivative standing.  A derivative claim is when a

15   shareholder or a creditor brings a claim on behalf of the

16   corporation.  A corporation can't bring claims on behalf of

17   its creditors.  And you see that in cases like *Medtronic*

18   from the Minnesota Supreme Court and the *Seven Seas* case

19   that I just mentioned.

20             Your Honor's ruling on the motion for leave to

21   amend, I think, recognized this when it interpreted what the

22   Bankruptcy Court had said about this kind of standing by,

23   quote, saying this:  "The Bankruptcy Court concluded that

24   the trustee's claims are," quote, "derivative vis-a-vis the

25   creditors because the trustee's claims involved direct harm

1    to PCI, but only incidental harm to PCI's creditors

2    resulting from their status as creditors."

3              That's the ordinary understanding, that if the

4    trustee is going to bring a claim, it has to be based on the

5    rights of PCI and direct injury to PCI.  It can't bring

6    claims for wrongs against investors.

7              And, finally, I would note that for a long while

8    in this case these aiding and abetting claims have been

9    described as claims for breaches of fiduciary duty to PCI

10   and fraud against PCI.  That's the way the Bankruptcy Court

11   described it in its motion for summary judgment ruling.

12   That's how this Court described those claims in the motion

13   for leave to appeal ruling.  That's how this Court described

14   those claims in the investor discovery ruling.  That's how

15   this Court described those claims last week in its *Daubert*

16   rulings.

17             And plaintiffs themselves in their joint status

18   letter and in their own trial brief, they describe the claim

19   for aiding and abetting breach of fiduciary duty as being an

20   aiding and abetting breach of fiduciary duty to PCI claim.

21             So I'll stop there and reserve maybe a minute for

22   rebuttal, if that's okay with Your Honor.  Thank you.

23             THE COURT:  Thank you, Counsel.

24             MR. MARDER:  Your Honor, again, I'll be pretty

25   brief here because we addressed most of these points in our

1     opposing memorandum.  I'll just make a few points.

2          Number one, this is not a motion in limine.  This

3     is -- they haven't even identified any evidence that they

4     seek to exclude.  This is a motion for summary judgment, and

5     the courts have said that the motion in limine procedure is

6     not an appropriate procedure to use for something that's

7     summary judgment.  And you, Your Honor, in your order

8     specifically state that the parties shouldn't file motions

9     in limine to re-argue issues they lost on summary judgment.

10          With regard to the standing arguments that we just

11    heard, Your Honor, these arguments have been rejected not

12    once, not twice, not three, but four times.  These very same

13    claims, claims 3 and 4 that they're arguing about, were the

14    subject of a motion to dismiss on standing grounds in front

15    of the Bankruptcy Court and the Bankruptcy Court upheld

16    these claims, notwithstanding their motion for summary

17    judgment.

18          In addition, the Court once again ruled against

19    them on standing when they tried to assert it in connection

20    with the summary judgment, and then this Court dealt with

21    these issues on appeal and most recently in the *Daubert*

22    order.

23          So I'm not going to address the standing issues

24    that counsel addressed because the Court has already

25    addressed them at length.  I do want to address a couple of

1    points that BMO's counsel made.

2            One, they say they shouldn't be allowed -- that

3    our side shouldn't be allowed to add certain theories at

4    this late stage of the case.  Your Honor, I would urge you

5    to look back at our Amended Complaint, which the defendants

6    have had in their possession for years, which specifically

7    lays out the notion that this breach of fiduciary duty is

8    not only owed to the investors -- I'm sorry, not only owed

9    to PCI, but also to PCI's investors.  So the notion that

10   we're springing some new argument on them at a late stage is

11   simply not true.

12           Lastly, Your Honor, the other point I would like

13   to make is this notion that we need to establish that there

14   was an affirmative act to be relevant.

15           As we set forth in our brief, we outlined in

16   detail the evidence that we would be using to show why there

17   is a duty owed to the investors, and that relied in part on

18   the fact that BMO communicated directly with the investors

19   and uttered to them certain half-truths.

20           And the Supreme Court of Minnesota has very

21   clearly laid out that when you do interact with someone, you

22   have a duty to make a full and fair disclosure and not to

23   suppress or conceal material facts that would qualify those

24   stated.

25           And therefore, under that law, it is very clear

1      that even if there was no standing, that there was a duty

2      and a breach of a duty by the defendants.  And that duty and

3      breach of duty is clearly relevant because it is strong

4      evidence that they acted with knowledge.

5           We have to prove in this case that the defendants

6      acted with knowledge, and the fact that they knew that what

7      the business model was, that the investors weren't told that

8      the business model was false, and that they communicated

9      directly with investors about certain agreements -- sham

10      agreements is directly relevant to their knowledge.

11           So for those reasons, Your Honor, we certainly

12      oppose this motion.

13           And, finally, Your Honor, I would just say with

14      regard to the next motion, we can skip it because we can

15      tell you that we are not offering the *Mohns* decision into

16      evidence and therefore, unless opposing counsel disagrees,

17      we don't need to address the third -- their third motion

18      because we have withdrawn our request to even use that.

19           THE COURT:  Thank you, Counsel.

20           MR. YOUNT:  Thank you, Your Honor.  I'll be very

21      quick, and then I think my colleague will address the *Mohns*

22      issue.

23           I just want to address what the Bankruptcy Court

24      did at the dismissal stage.  I think if you look at the

25      order there, you're going to see that the Bankruptcy Court

1    only allowed Counts III and IV to go forward to the extent

2    that it was based on harm directly done to PCI.  And, in

3    fact, the Court acknowledges their Complaint is vague about

4    who they're bringing this on behalf of, but the Bankruptcy

5    Court was very clear that they have to bring claims based on

6    direct harm to PCI.

7            And so I will stop there and then cede the rest of

8    my time.  Thank you.

9            THE COURT:  Thank you, Counsel.

10           MR. SCHAPER:  Good afternoon, Your Honor.  Mike

11   Schaper from Debevoise for defendant.

12           We do want to be heard on *Mohns* because -- I'll

13   rest on the briefs as to why it should be excluded, but what

14   plaintiffs do in their opposition is, in effect, a motion

15   for reconsideration of Your Honor's ruling last week that we

16   will be able to put on rebuttal evidence on the spoliation

17   issue.

18           The Court, relying on the *Stevenson* case from the

19   Eighth Circuit, said that the bank will be able to put

20   forward a, quote, innocent explanation for its conduct,

21   closed quote.  And the Court ruled that notwithstanding that

22   there already has been a finding of bad faith.

23           The plaintiff now suggests a much narrower reading

24   of the Court's order of the rebuttal evidence that BMO can

25   put on and they say that the only issue for rebuttal is

1  whether the disposal of backup tapes was harmless.  But

2  that's not what the Court said.

3          The Court stated that in order for the defendant

4  to be able to avoid unfair prejudice, quoting *Stevenson*, it

5  said that we should be able to put on, as I said, an

6  innocent explanation for our conduct.

7          The Court also noted that the Bankruptcy Court's

8  ruling on this issue implied that the jury should be allowed

9  to evaluate the facts and circumstances pertaining to the

10 spoliation issue.

11         And we intend to put on evidence, Your Honor.  We

12 have one witness.  And we understand that the Court said

13 evidence is not going to be unlimited on this issue, but we

14 have one primary witness on the issue.  His name is John

15 Vanderheyden.  He was the IT head at M&I Bank at the time

16 that the decommissioning project was underway that resulted

17 in the disposal of backup tapes.

18         We look forward to the Court and the jury hearing

19 his testimony, and he'll explain what the server

20 consolidation project was about that led to the disposal of

21 backup tapes.  That's the very kind of, in our view,

22 innocent explanation of conduct that the *Stevenson* court and

23 the Eighth Circuit permits.  In that case it was evidence

24 regarding a document retention policy.  Here it's evidence

25 of a pre-existing server consolidation project.

1          The fact that the tape disposal occurred pursuant

2     to a long planned consolidation project and that no M&I

3     employees reviewed the tapes or the contents of them before

4     their destruction makes it less likely that the crucial --

5     that any crucial evidence was destroyed.

6          Now, what plaintiff points to is that the Court

7     said that the primary issue that the jury must decide is

8     whether BMO employees likely destroyed crucial evidence that

9     would have been favorable to plaintiff or harmful to

10    defendant.  But, of course, "primary" doesn't mean that

11    that's the only evidence.

12         And in their brief the plaintiff does not address

13    at all the Court's reliance on *Stevenson*, the Court saying

14    that we should be able to put on evidence related to the

15    innocence of our conduct; does not address at all the Court

16    saying that the Bankruptcy Court implied that we should be

17    able to put on evidence as to the circumstances of the

18    alleged spoliation.

19         The plaintiff also suggests that the Court's

20    exclusion of evidence of counsel conduct is consistent with

21    plaintiff's very narrow interpretation about what rebuttal

22    evidence should be.  But that's also wrong, Your Honor.

23         Your Honor did a very standard 403 analysis as to

24    whether counsel conduct should be able to be put in front of

25    the jury and determined that the prejudice would outweigh

1     the probative value, period.  That didn't undo what the

2     Court at pages 7 and 8 said about allowing evidence as to

3     the facts and circumstances of spoliation and the innocence

4     of the bank's conduct.

5              So, again, we are heeding the Court's indication

6     that spoliation evidence would not be unlimited.  We plan on

7     having one primary witness.

8              We're trying to stipulate to other facts about the

9     spoliation issue with plaintiffs, as the Court suggested in

10    its order.  That includes some facts about the details and

11    scope and volume of the documents that actually were

12    produced by the bank, and we're working with them on a

13    stipulation on that.  They have some other stipulations

14    proposed to us and we are working on those.

15             The only other possible evidence on this issue

16    would be put forward by the plaintiff.  They have some

17    deposition designations that they would like to put forward,

18    which we have some counters to, and they have one other fact

19    witness that they've asked us to bring forward and we've

20    agreed to that.

21             So, Your Honor, respectfully, their opposition

22    really is a motion to reconsider what the Court did last

23    week, and we think that should be seen as such and denied.

24             Thank you.

25             THE COURT:  Thank you, Counsel.

1          MR. COLLYARD:  Your Honor, I'll be brief.  I

2     wasn't prepared to argue this, but what I just heard was a

3     brand-new motion and it was sitting here and trying to

4     clarify what your recent order was.  And as I understand

5     your recent order, there is no way that anybody can come

6     here and say that intent is at issue anymore in this case.

7          The only thing that's at issue in this trial is

8     whether or not the documents that they intentionally

9     destroyed were actually harmful to BMO or not.  That's at

10     least our interpretation of your order, Your Honor.

11          And that raises an issue that I think I need to

12     address right now and get clarification on, because as a

13     result of your order where you say that the Court will

14     provide the jury with a permissive adverse inference, it

15     raises the need to preview that issue for the jury as to why

16     they're going to hear about whether or not documents were

17     harmful to BMO or not on any type of destruction.

18          And so what I would do in my opening statement or

19     what I would seek clarification from you on before doing it,

20     Your Honor, is I need to raise this and tell the jury that

21     BMO intentionally destroyed documents in this case, and at

22     the end of the case you're going to provide an instruction

23     on that issue and the Court has found that they

24     intentionally destroyed evidence and the only issue is

25     whether or not those documents were harmful or not to BMO.

1    They're going to hear evidence on that and preview that type

2    of evidence.

3          So I raise that for clarification, Your Honor, and

4    then I'll just address one more thing with respect to

5    Mr. Vanderheyden.

6          Whether or not they did a recycling of tapes or

7    anything like that, that all goes to intent.  That has

8    nothing to do about whether or not these documents were

9    actually harmful to BMO or not.

10          MR. SCHAPER:  Just very quickly, Your Honor.

11          Yes, it does go into intent.  It goes to the

12   ability to put on an innocent explanation that the *Stevenson*

13   court and the Court -- and this Court last week said was

14   permissible.

15          We're not disputing that both sides can open on

16   this issue, but we don't think that the plaintiff can say

17   what the Court will instruct the jury at the end and that's

18   because that's what the Court told the parties last week.

19          The Court said, "As such, the Court" -- and this

20   is on page 10.  "As such, the Court will not provide an

21   adverse inference instruction to the jury until after the

22   evidentiary phase of trial has concluded, and the Court will

23   conform the language of the instruction to be consistent

24   with the evidence presented to the jury and any evidentiary

25   rulings the Court issues during the trial."

1          So we think that's -- the suggestion from

2     plaintiff's counsel has already been resolved and we think

3     that the Court should stand by that.

4          MR. COLLYARD:  Your Honor, there's a difference

5     from you giving the adverse inference in a preliminary

6     instruction, and that's what we had requested.  Those cases

7     talk about the damage from -- it coming from you versus me

8     standing up and saying that they intentionally destroyed

9     evidence and the Court has found that and that Your Honor

10    will instruct them about that at the end of the case.

11         It would be just like standing up and talking

12    about burden of proof or something and talking about how

13    they'll be instructed on that at the end of the case.  It

14    would be no different, Your Honor.

15         So the harm that these cases are talking about is

16    the harm that's inflicted because of the way the jury views

17    you and when they hear you say it versus what I am going to

18    say.

19         MR. SCHAPER:  That's why he can get up and say the

20    evidence will show that we intentionally destroyed evidence.

21    He cannot get up and say that you found it, in his opening

22    statement.  That is a different thing and that's exactly --

23    for the reason Mr. Collyard just said, which is the cases

24    that talk about why a preliminary adverse instruction is so

25    harmful to a party; it's just that prejudice.

1          And so Mr. Collyard saying it is just as

2     harmful -- if he says the Court already found, where is the

3     daylight between that and the Court giving an adverse

4     instruction preliminarily?  I think that's the same thing,

5     and they shouldn't allowed to do that.

6          THE COURT:  I will make my ruling on this matter,

7     and it will be clear and it will be abided by.

8          MR. COLLYARD:  Thank you.

9          MR. SCHAPER:  Thank you, Your Honor.

10          MS. MOMOH:  Good afternoon, Your Honor.  Adine

11     Momoh from Stinson, LLP on behalf of BMO Harris Bank.

12          We are now on the final motion in limine that is

13     being brought by BMO.  This is the motion in limine to

14     exclude evidence related to Bank of Montreal's finances.

15          The initial purpose of our motion, Motion in

16     Limine 4, was to exclude three proposed exhibits that are on

17     the plaintiff's exhibit list.  Those documents, for the most

18     part, concern a separate legal entity, an entity that's not

19     a party to this lawsuit, the Bank of Montreal.  The

20     defendant in this case is BMO Harris Bank.

21          We have since received the plaintiff's opposition.

22     We have a better sense now as to how they claim to use these

23     particular exhibits.  But what are these exhibits that we're

24     talking about, Your Honor?

25          The first one is Plaintiff's Exhibit P-0296.  This

1   is essentially a letter from Rosemary Spaziani -- I can

2   spell that for the record -- S-p-a-z-i-a-n-i, to Colette A.,

3   C-o-l-e-t-t-e, Fried, F-r-i-e-d, dated January 17, 2002,

4   enclosing an application to acquire Bank of the West, an

5   application that was put forth by nonparties in this case.

6   And, Your Honor, this document is over 400 pages long.  So

7   for purposes of the document that we attached to the Davis

8   declaration, we only attached an excerpt.

9           The third [sic] document that we attached to our

10  declaration is at Exhibit 2.  It is Plaintiff's Exhibit

11  P-0667.  This is a SEC filing.  It's a form SK that was

12  filed in the month of December 2021, ten pages, but again

13  this is a SEC filing that was used by a nonparty for

14  purposes of this potential acquisition.

15          The third [sic] exhibit that we identified is

16  Plaintiff's Exhibit P-0668.  This is another SEC, Securities

17  and Exchange Commission, filing, Form 10 -- excuse me,

18  Form 40-F, dated December 2nd, 2021.  This document is over

19  570 pages.  It's exactly 575 pages.  And, again, it's an SEC

20  filing made by a nonparty, Bank of Montreal.

21          Now, these documents clearly are not relevant.

22  We've identified in our brief the reasons why.  I won't

23  articulate that for purposes of my argument today.  But,

24  again, these documents largely concern Bank of Montreal and

25  another nonparty, BMO Financial Corp., purchasing Bank of

1     the West.

2              And while this purchase is expected to close in

3     2002, this deal has not yet finalized.  This is not relevant

4     information.

5              Now, certainly the plaintiff contends that these

6     documents are relevant for purposes of this case because not

7     only do they concern information about this nonparty, they

8     may also concern information about BMO, the defendant

9     itself.

10             They make the argument in their papers that

11    information of a parent entity, in this instance Bank of

12    Montreal, is relevant to the subsidiary, here the Defendant

13    BMO, and in doing so they rely on a Minnesota Court of

14    Appeals case, the *Molenaar vs. United Cattle* decision by the

15    Minnesota Court of Appeals.

16             But, Your Honor, that case and the analysis that

17    they are relying upon is very limited, and even then the

18    case is extremely distinguishable from the present case.  I

19    mean, there the court held that the parent's financial

20    information was relevant to the subsidiary's financial

21    condition for purposes of punitive damages because during

22    the case admissions were made.  Admissions were made with

23    respect to there being identical corporate officers and

24    directors between the parent and the subsidiary, there were

25    shared bank accounts between the parent and subsidiary, and

1      all accounts were held by the parent in that case.  We

2      simply don't have those facts, Your Honor, here.

3              And even if the documents that plaintiffs are

4      trying to offer are relevant, which we certainly do not

5      concede, they are certainly prejudicial, unfairly

6      prejudicial.

7              What other purpose could the plaintiff be seeking

8      to admit evidence related to a potential acquisition

9      involving a nonparty other than to confuse the issues,

10     mislead the jury, cause undue delay, and simply waste this

11     Court's time?  We know all of these sorts of rationale are

12     not permitted under Federal Rule of Evidence 403.

13             So that's where the papers stand, Your Honor.  I

14     offer a solution.  We are mindful of your ruling on our

15     bifurcation motion, the ruling that was in your

16     September 29th order, Docket Number 214.

17             And that order with respect to our bifurcation

18     motion, it touches a little bit on this very issue that we

19     raise in our motion in limine, and I will just state some of

20     the statements that you made in that order at page 58.

21             Financial condition of BMO could be relevant to

22     liability and compensatory damages because it could --

23     likely will directly or indirectly suggest the nature of

24     BMO's financial conditions.

25             You also stated, quote, Evidence relevant to

1      liability and compensatory damages will demonstrate the

2      nature and scope of the banking industry in general and

3      BMO's business in particular.

4              And, third, you stated that the evidence will also

5      reflect, among other things, that billions of dollars passed

6      through PCI's account.

7              Now, putting aside the fact of our position with

8      respect to these statements, I mean, this was in your order

9      as to how BMO's financial condition could possibly be

10     relevant.  And, again, we are not contesting your order for

11     purposes of today.

12             But if that is true, the three exhibits that I

13     just identified from plaintiffs certainly do not address

14     these three buckets of statements that are in your order

15     with respect to how BMO's financial condition could possibly

16     be relevant to compensatory damages, liability, or even

17     punitive damages if plaintiff gets to that stage.

18             So the solution that I present, Your Honor, is

19     that we -- BMO, we would be willing to enter into some sort

20     of stipulation.  We would work in good faith with

21     plaintiff's counsel to identify limited information about

22     BMO's -- not Bank of Montreal, but BMO's financial condition

23     that would certainly address these limited issues that you

24     already have in your order, Your Honor.

25             If we have had that time, I -- again, we'll work

1    in good faith that we can reach agreement and we ask that

2    once that stipulation is reached, that that be ordered and

3    entered by the Court.

4            Your Honor, unless you have any questions, we

5    respectfully request that you grant our motion in limine to

6    exclude any evidence and argument with respect to Bank of

7    Montreal's financial condition; and, in the alternative,

8    with respect to entering into a stipulation as to limited

9    information concerning BMO's financial condition, we propose

10   to enter into a stipulation and submit that to the Court for

11   approval.

12           Thank you.

13           THE COURT:  Thank you, Counsel.

14           MR. MARDER:  Your Honor, you indicated that we had

15   a hard stop at 3:50.  Do I have a couple of minutes here?

16           THE COURT:  You have a couple of minutes.

17           MR. MARDER:  Okay.  Counsel for BMO said that

18   these documents for the most part relate to the financials

19   of the parent and that therefore they're clearly not

20   relevant.

21           But what they gloss over is what we said in our

22   brief, Your Honor, which is that these documents have very

23   specific information in them about BMO Harris itself, not

24   Bank of Montreal, the parent corporation, but BMO, the

25   defendant.

1          In the merger application, we went through page by

2     page and showed you where it included financial information

3     about BMO Harris Bank in the merger application.

4          Similarly, Your Honor, in the 40-F, which is

5     Exhibit 668, we went through and showed you the pages where

6     they break out their financial information by various

7     segments, including the BMO Harris segment.

8          So the whole notion that these are irrelevant

9     because they don't include BMO Harris's information is

10    categorically false.

11         Second of all, Your Honor, even to the extent they

12    include information about the parent, that information is

13    clearly relevant for two reasons.

14         If you look at the *Molenaar* decision, it talks

15    about relying on the parent's financial condition, and it

16    talks about doing that because of various factors showing

17    control.

18         Here, we clearly have control because we know that

19    BMO Harris, in its financial filings, files consolidated

20    financial statements.  And the only reason it can do that

21    under the law, the only -- the test is whether they have the

22    power to control the subsidiary.  Not only to control it,

23    but to control the subsidiary's returns.

24         And, second of all, Your Honor, the other reason

25    why the parent's capital is relevant is because guess who

1    who bought Bank of the West for BMO Harris?  Where did that

2    capitol come from?  It came from the parent company.  If you

3    look at the press release, they explain that they pay cash

4    for the transaction, and that cash didn't come from BMO

5    Harris.  It came from within the larger Bank of Montreal

6    transaction.

7           So we have a situation where there is control by

8    the parent over the subsidiary, pervasive control, number

9    one; and, number two, they are sharing capital back and

10   forth and the parent is using its capital might to buy

11   another bank for BMO Harris.  So clearly if it has the

12   ability to access that capital, then the parent's financial

13   condition should be relevant.

14          So two points, Your Honor.  Number one, these do

15   include BMO Harris's financial information; and, number two,

16   the parent's financial information is clearly relevant, as

17   we set forth in our brief, because of the pervasive control

18   and the fact that they share capital back and forth between

19   the entities.

20          THE COURT:  Thank you, Counsel.

21          All matters have been presented to the Court.

22   They are taken under advisement.  Thank you for your

23   arguments today, and the Court will respond with orders

24   regarding them.  This concludes our hearing.

25          MR. GLEESON:  Judge, can I ask just one question?

1     It only pertains to jury instructions to the extent you

2     intend to address them at this point.

3              In light of your *Daubert* ruling, there needs to be

4     adjustments to the proposed instructions.  I assume at some

5     later point we will have an opportunity to do that and there

6     will be a charge conference.

7              I just wanted to tell you that because they are

8     not a stationary target if the Court intends to rule on them

9     at this point.

10              THE COURT:  Thank you, Counsel.

11              MR. GLEESON:  Thank you, Judge.

12         (Court adjourned at 4:00 p.m.)

13                              *     *     *

14

15         We, Lori A. Simpson and Erin D. Drost, certify that
      the foregoing is a correct transcript from the record of
16    proceedings in the above-entitled matter.

17         Certified by:  *s/ Lori A. Simpson*
                           Lori A. Simpson, RMR, CRR
18
           Certified by:  *s/ Erin D. Drost*
19                         Erin D. Drost, RMR, CRR

20

21

22

23

24

25