1      UNITED STATES DISTRICT COURT
       DISTRICT OF MINNESOTA
2

3 ------------------------------------------------------------
           )
 Douglas A. Kelley, in his  ) File No. 19-cv-1756
4 capacity as the Trustee of the )   (WMW)
 BMO Litigation Trust,   )
5           )
     Plaintiff,   ) St. Paul, Minnesota
6           ) October 12, 2022
 vs.        ) 12:19 p.m.
7           )
 BMO Harris Bank N.A., as   )
8 successor to M&I Marshall and )
 Ilsley Bank,     )
9           )
     Defendant.   )
10 ------------------------------------------------------------

11

12

13   BEFORE THE HONORABLE WILHELMINA M. WRIGHT
    UNITED STATES DISTRICT COURT JUDGE
14

    **(JURY TRIAL PROCEEDINGS - VOLUME I)**
15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by certified court reporter;
 transcript produced with computer.

```
 1        APPEARANCES:
            For the Plaintiff:        Robins Kaplan, LLP
 2                                    MICHAEL A. COLLYARD, ESQ.
                                      DAVID E. MARDER, ESQ.
 3                                    PETER C. IHRIG, ESQ.
                                      MORGIA D. HOLMES, ESQ.
 4                                    MICHAEL D. REIF, ESQ.
                                      800 LaSalle Avenue
 5                                    Suite 2800
                                      Minneapolis, Minnesota 55402
 6
                                      Anthony, Ostlund, Louwagie,
 7                                    Dressen, Boylan, P.A.
                                      JOSEPH W. ANTHONY, ESQ.
 8                                    JOSEPH R. RICHIE, ESQ.
                                      RYAN M. LAWRENCE, ESQ.
 9                                    90 South Seventh Street
                                      Suite 3600
10                                    Minneapolis, Minnesota 55402

11        For the Defendant:          Stinson, LLP
                                      KEITH S. MOHEBAN, ESQ.
12                                    ADINE S. MOMOH, ESQ.
                                      50 South Sixth Street
13                                    Suite 2600
                                      Minneapolis, Minnesota 55402
14
                                      Debevoise & Plimpton, LLP
15                                    JOHN GLEESON, ESQ.
                                      MICHAEL SCHAPER, ESQ.
16                                    SUSAN REAGAN GITTES, ESQ.
                                      MORGAN A. DAVIS, ESQ.
17                                    919 Third Avenue
                                      New York, New York 10022
18
                                      Mayer Brown, LLP
19                                    JOSHUA D. YOUNT, ESQ.
                                      71 South Wacker Drive
20                                    Chicago, Illinois 60606

21                                    Mayer Brown, LLP
                                      RICHARD A. SPEHR, ESQ.
22                                    GINA PARLOVECCHIO, ESQ.
                                      1221 Avenue of the Americas
23                                    New York, New York 10020

24        Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                      316 North Robert Street
25                                    St. Paul, Minnesota 55101
```

1                    **I N D E X**

2                                                        PAGE

3        PRELIMINARY JURY INSTRUCTIONS                    117
         OPENING STATEMENT BY MR. COLLYARD                129
4        OPENING STATEMENT BY MR. GLEESON                 168

5

6        PLAINTIFF'S WITNESSES:

7        **SARA JOHNSON**
              Video Deposition Played                     217
8

9

10       PLAINTIFF'S EXHIBITS                            REC'D
              180                                         216
11            183                                         216
              223                                         216
12            248                                         216

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                   IN OPEN COURT

3                 (JURY NOT PRESENT)

4              THE COURT:  We have some matters to take up as it

5     relates to the opening statements and the evidence that has

6     been objected to.  It's been, as I understand it, with

7     regard to -- I am just trying to make sure.  So we will

8     begin with Ms. Momoh's e-mail that has laid out the

9     positions of the parties or the area of controversy, let's

10    say.

11             So the Court will -- understands that Issue 1,

12    which is the process for cause, dismissal of potential

13    jurors, questioning witnesses at sidebar, that is moot.  As

14    well as objections as to proposed depositions, I understand

15    that that is moot.  Is that correct?

16             MR. GLEESON:  Yes.

17             THE COURT:  Okay.  So then the third issue, the

18    objection is sustained.

19             The fourth issue as to plaintiff's opening and

20    investor culpability, that is also sustained.

21             I believe that's all we need to address with

22    regard to that set of objections.

23             Then plaintiff's objections to defendant's opening

24    PowerPoint is next.

25             MR. MARDER:  Your Honor, with respect to the issue

1    of investor culpability, could I just be heard briefly on

2    that?

3              THE COURT:  Why do you need to be heard?

4              MR. MARDER:  Because, Your Honor, the evidence in

5    question, if I'm understanding the ruling, doesn't relate to

6    investor culpability at all.  The slide is not directed to

7    investor culpability.  This is a critical issue in the case

8    that's going to affect all of the evidence going forward,

9    and I would just like an opportunity to be heard just for

10   three minutes so I can explain the nature of the proof and

11   why it doesn't relate to investor complicity at all.

12             THE COURT:  I'm trying to understand -- let me

13   just make sure I am tracking.  I have before me an e-mail to

14   "Dear David and Chambers" and to "Dear Chambers."  Which

15   matter are you speaking to?

16             MR. MARDER:  It was my understanding that there

17   were some objections to the opening slides.

18             THE COURT:  Right.  And so there's numbers -- I

19   have two e-mails, one from Ms. Momoh and one from Mr. Reif.

20   Are you speaking to the issues with regard to Ms. Momoh's

21   e-mail or Mr. Reif's e-mail?

22             MR. MARDER:  I'm sorry, Your Honor.  I don't have

23   those e-mails in front of me.  I'm not sure which -- it's

24   Ms. Momoh's e-mail, sorry.

25             THE COURT:  Ms.?

1          MR. MARDER:  Ms. Momoh's e-mail, yes.

2          THE COURT:  Okay.  And which issue are you

3     addressing?

4          MR. MARDER:  There was a slide in particular where

5     we had --

6          THE COURT:  I have the e-mail.  I am tracking this

7     e-mail and this document, so you need to find the document

8     and make a coherent argument as it relates to this document.

9     It's the October 12th, 2022, 6:55 a.m. e-mail.

10         MR. MARDER:  Yes, Your Honor.  It's Ms. Momoh's

11    e-mail, and it's Point Number 4.

12         THE COURT:  Okay.

13         MR. MARDER:  So if I could address that slide?

14    That is what I was requesting.

15         THE COURT:  You may make a record.

16         MR. MARDER:  Thank you.  Your Honor, the slide in

17    question has to do with the felony conviction of an

18    individual named Frank Vennes.  The conduct that gave rise

19    to that conviction occurred back in the 1980s, and the

20    conduct is not the conduct in this case.

21         The exhibit that discusses the conduct and the

22    prior convictions is an exhibit that is actually on the

23    defendant's exhibit list that they intend to offer.

24         The issue and the conviction has nothing to do

25    with the issue of investor complicity.  We have no interest

1    in establishing that Mr. Vennes was complicit.  That's not

2    the purpose of getting that conviction into evidence.

3            The reason we want to put that conviction into

4    evidence is because it is directly relevant to the knowledge

5    of the bank.  It is one of the critical pieces of evidence

6    that we rely upon to establish that the bank was

7    knowledgeable.

8            You may recall, Your Honor, that the whole theory

9    of our case is that the bank understood what the business

10   model was, saw the activity in the account, and understood

11   that the activity in the account was inconsistent with a

12   business model.

13           The very person who came over to BMO Bank and

14   explained the business model to them was a convicted felon

15   who had been convicted of money laundering.  So it is our

16   position that the fact that Mr. Vennes came over to the

17   bank, explained the nature of the investment, and that the

18   bank knew that that individual was a convicted money

19   launderer is very strong evidence that the bank had

20   knowledge.  It is one of the pieces of circumstantial

21   evidence that we rely upon in support of our case.

22           So, Your Honor, this evidence has nothing to do

23   with the issue of investor complicity.  We are not putting

24   it on to prove or disprove investor complicity.  We are

25   merely putting it on to establish that the bank should have

1    been on alert even more -- should have been on alert because

2    the person that they were dealing with they knew to be a

3    felon who had been convicted of money laundering, and that's

4    the purpose of establishing the conviction.

5            And this evidence is going to come not just for

6    the opening statement, but it's a major part of our case

7    that we are going to be relying on going forward.  So I just

8    wanted to make sure that I could be heard on that and that

9    Your Honor understood the issues.

10           THE COURT:  Thank you.

11           Does opposing counsel wish to be heard?

12           MR. MOHEBAN:  Keith Moheban on behalf of the bank.

13   So I don't know if you have the benefit of the actual slide,

14   but I'm holding it up what was -- what we're talking about.

15           THE COURT:  Are we -- I understood that this

16   related to the slide deck for openings.

17           MR. MOHEBAN:  Correct.

18           THE COURT:  Is that correct?

19           MR. MOHEBAN:  This is part of plaintiff's opening

20   slides that they're proposing to use.  We have objected to

21   it, and there's several layers of objection.

22           The first one is it depicts Christopher Flynn, who

23   is an M&I Bank employee, who was never convicted or charged

24   of anything, in a slide with Mr. Vennes, who was convicted

25   both back in the '80s and for his role in the Petters

1    scheme.  And they put the two pictures side by side, and

2    they list Mr. Vennes as a convicted felon.  And they're

3    trying to make this look like mugshots to suggest that

4    Mr. Flynn was already -- was also convicted, which first of

5    all isn't true, and I think your rulings have said that

6    you're not going to get into whether people were exonerated

7    or convicted.

8            So it's -- on the 403 basis, it sends an unfair

9    and improper message to the jury.  They can make arguments

10   about what they want to do without trying to make it look

11   like Mr. Flynn is also convicted along with Mr. Vennes.

12           The more fundamental issue is Mr. Vennes -- he

13   was, in fact, convicted in the Petters case.  He was

14   convicted in a prior case.  And what the implication is here

15   is that if Mr. Flynn, an M&I Bank employee, years ago, 2002,

16   had one meeting with Mr. Vennes, that somehow that that's

17   probative of his state of mind in terms of being complicit

18   in the fraud.

19           So it's an extremely attenuated argument, and it's

20   also one of these things where you have consistently ruled

21   that what other people thought or other people concluded

22   isn't probative of what the M&I Bank people thought, and

23   here, you know, they're trying to do that with this slide

24   and that's why we've objected to it.

25           MR. MARDER:  If I could just address that, please,

1    Your Honor?  First of all, deal with the second point.

2    We're not trying to ascertain what some people thought based

3    on what other people thought.  We're ascertaining what the

4    bank should have known based on the fact that the person who

5    was pitching this investment to them was a convicted money

6    launderer.

7              Second of all, Your Honor, the slide itself is not

8    misleading.  When it comes up, what you will see is that it

9    will show that Mr. Flynn met with Mr. Vennes, and then it

10   explains very clearly that Mr. Vennes is the one who was

11   convicted.  We don't argue nor do we assert that Mr. Flynn

12   was convicted of anything.  That's not the purpose of the

13   slide, and that's not what the slide shows.

14             THE COURT:  What is the purpose of the slide?

15             MR. MARDER:  The slide is to show that Mr. Flynn

16   met with Mr. Vennes; that Mr. Vennes was a convicted money

17   launderer; and that Mr. Vennes learned about the whole

18   business model from someone who was a convicted money

19   launderer, and that is a critical piece of evidence to show

20   that he had knowledge or at least was willfully blind to the

21   scheme.  So it has nothing to do with the issue of investor

22   complicity.

23             THE COURT:  Okay.  As to the issue that is before

24   me, which is what is in the opening, my ruling stands.

25             MR. MARDER:  We can't use the slide, but can we

1    say that Mr. Flynn met with Mr. Vennes and that Mr. Vennes

2    was a convicted felon without putting up the slide?

3              THE COURT:  Is there --

4              MR. MARDER:  I thought you said that that was

5    acceptable.

6              MR. MOHEBAN:  I mean, Your Honor, the evidence is

7    that Mr. Vennes met with Mr. Flynn, wanted the bank to give

8    him a loan, and they declined to give him a loan.  They did

9    it expressly because they knew that Mr. Vennes had a

10   criminal conviction.  So how this is probative of anything,

11   it's really a mystery to us.

12             MR. MARDER:  Your Honor, as I've said, it's

13   probative because the person who taught them the scheme and

14   explained to them how the investments work was a convicted

15   felon; and the fact that they met with someone like that is

16   probative.

17             So we can pull the slide, but throughout our

18   entire case, the jury is going to hear about this,

19   especially because the exhibit is one of the defendant's

20   exhibits, Your Honor.

21             THE COURT:  You've addressed the issue, then.  It

22   sounds like you said you're conceding that you can pull the

23   slide.  The slide will be stricken.

24             MR. MARDER:  The slide will be stricken,

25   Your Honor; but I just want to make sure that this isn't a

1    broader ruling that we can't mention --

2         THE COURT:  I have not made a broader ruling.  I

3    was addressing the slide.

4         MR. MARDER:  Okay.  Thank you, Your Honor.

5         The other issue is that --

6         THE COURT:  What other issue?

7         MR. MARDER:  With respect to the other issue that

8    they raised, can I address that as well?

9         THE COURT:  I don't know what you are talking

10   about.

11        MR. MARDER:  Sure, Your Honor.  Number 3 on

12   Ms. Momoh's e-mail.

13        THE COURT:  Okay.

14        MR. MARDER:  That has to do with this e-mail from

15   Mr. Vanderheyden, and let me explain that.  Again, this

16   e-mail that they're concerned about is an exhibit that is on

17   their exhibit list that they plan to offer into evidence.

18        This e-mail does not suggest anything about the

19   conduct of counsel for BMO Bank, nor do we intend to say in

20   our opening that it reflects or says anything about the

21   conduct of the counsel for the bank.

22        The reason that this document is critical,

23   Your Honor, is that we are putting it in as part of the

24   spoliation case.  And as you know, and from all the prior

25   filings, there was this issue in 2014 with these tapes that

1   were discovered, and the tapes show that -- I'm sorry -- the

2   tapes that had evidence on them which were destroyed.

3          And so this document shows that this employee of

4   the bank found the tapes that were destroyed and he's

5   reporting that to the lawyer.  So this e-mail has to do with

6   the conduct of BMO's employee.  We are not putting it in to

7   say anything about the conduct of counsel, and there's

8   nothing in the e-mail that suggests counsel engaged in any

9   misconduct.

10          The last point I would like to make about this,

11  Your Honor, and this is even more important for the broader

12  case itself, is that in Ms. Momoh's e-mail, she said that

13  you ruled that we had excluded from the case all evidence of

14  counsel's conduct, and that's not quite what you said in

15  your order, Your Honor.  What you said is that we could not

16  call BMO's counsel as a witness, but you did not say that we

17  could not address anything to do with their conduct.

18          And such a ruling, Your Honor, I would

19  respectfully submit would be grossly unfair.  As you recall,

20  it was BMO that moved the Court to put in rebuttal evidence

21  relating to spoliation.  After Your Honor said that the

22  primary issue in the case should be whether or not the

23  documents themselves were favorable or unfavorable, they

24  came back and argued that they were allowed to put in

25  evidence broader than that; that it could relate to whether

1    there was an innocent mistake and whether they engaged in

2    good faith.

3           Now, if they're going to make that argument that

4    they engaged in good faith, we need to be free to come back

5    and rebut that, and a critical portion of our proof there is

6    the conduct of counsel.  And it's not just me saying this,

7    Your Honor.  This has been in multiple court orders.

8           THE COURT:  Counsel, we are talking about

9    plaintiff's opening.

10          MR. MARDER:  Yes.

11          THE COURT:  Okay?  We are not talking about the

12   evidence.  I'm talking about what is being used during the

13   opening.

14          MR. MARDER:  Okay.  Well, Your Honor, this

15   particular e-mail is not being used for the topic that BMO's

16   counsel has suggested, and specifically we're not going to

17   say anything about BMO's counsel's conduct.  It's merely to

18   show that the employee of BMO Bank found these materials in

19   2014, and these are the very same materials that contained

20   the tapes that we not only allege, but have proved were

21   destroyed and contained nonduplicative information.

22          THE COURT:  Yes, please, Counsel.  Who is

23   responding?  One counsel.

24          MR. GLEESON:  Judge, with respect, we need clarity

25   on this issue with respect to slides in an opening, oral

1    statements in an opening, the evidence.  We had a pretty

2    clear understanding from your ruling dated September 29th

3    that for very good reason, there was insufficient probative

4    value regarding -- and I am reading from page -- the bottom

5    of page 9 -- regarding the conduct and credibility of BMO

6    Harris' counsel.  And it doesn't matter in the slightest if

7    conduct of counsel or credibility of counsel is raised

8    because they're on the witness stand or because they elicit

9    it from some other source of evidence.  It is disabling for

10   counsel who are proceeding as advocates in the case.

11          And, with respect, we believe the Court made a

12   ruling, and we think we need a hard-and-fast rule that

13   counsel's conduct and credibility is out of the case.  You

14   said there would be limited testimony.  We are going to have

15   one witness about the backup tapes.

16          And, Judge, while I'm on the, topic, I also

17   think --

18          THE COURT:  Let me just address this, because we

19   are not going to allow this to expand.  I am addressing the

20   objections that have been presented to me in the e-mail

21   regarding the PowerPoint for openings.  The objection is

22   sustained as to Issue 3 that's on that e-mail to me.

23          MR. GLEESON:  Yes.

24          THE COURT:  Does everyone know what e-mail I am

25   talking about and what the issue is?

1          MR. GLEESON:  I think it's the Adine Momoh e-mail,

2     and it's our objection regarding plaintiff's opening on

3     spoliation.

4          THE COURT:  Okay.  So I have ruled.

5          MR. GLEESON:  Thank you, Judge.

6          THE COURT:  Now, there's another e-mail.

7          MR. GLEESON:  There is.

8          THE COURT:  And so let's just take up each of

9     those issues.  Does counsel wish to be heard as to Issue 1?

10    And please be brief.  I am very familiar with the issues.  I

11    am prepared.  You may make a quick record.

12         MR. MARDER:  Thank you, Your Honor.  As to the

13    issues that are raised in our e-mail, our concern is the

14    same on each one, which is that they step over the line from

15    an opening statement to an opening argument.

16         With respect to the first slide, which is Slide

17    Number 6, where it says M&I did not make PCI unable to pay

18    its investors, that is a dispute over causation in this

19    case.  They're not pointing to a particular document.  It is

20    just a lawyer argument.

21         The second slide that we have an issue with is

22    page 24 where they have this sports car and the Vikings

23    tickets and two million dollar checks and say, "Benefits you

24    would have expected to see."  Once again, Your Honor, this

25    has absolutely nothing to do with any evidence in the case.

1    There are no sports cars or Vikings tickets that have

2    anything to do with BMO Bank, and this is purely a legal --

3    an argument by the attorneys that is not tied to any

4    evidence.

5            Finally, Your Honor, they have a slide, Number 47,

6    which addresses the issue of spoliation; and in that

7    e-mail -- in that slide, there are several problems.  First

8    of all, they argue that no document suggests that any M&I

9    employee knew about the Ponzi scheme.  That is extremely

10   unfair and misleading, Your Honor, given that the Court has

11   ruled that there's been a substantial destruction of

12   documents.  So for them to say that there's no document

13   suggesting something, when, in fact, they destroyed

14   documents which could have suggested something, is

15   misleading and unfair in light of the Court's spoliation

16   orders.

17           The other problem with the e-mail is that it says

18   2 point -- I'm sorry.  The other problem with the slide is

19   that it says 2.7 million e-mails from restored backup tapes,

20   including Jambor's e-mails, and that makes it sound as if

21   all of Mr. Jambor's e-mails have been produced.  In fact,

22   it's very clear that many e-mails were not produced.  We

23   have multiple e-mails from Mr. Jambor who were produced by

24   third parties that were not produced by BMO.  So we know it

25   to be the case that Mr. Jambor's e-mails were not included.

1    So the document itself is inconsistent with the spoliation

2    order, and we believe it is unfair and misleading.

3              MR. GLEESON:  Briefly, Judge, with respect to the

4    first objection, which is to a slide that says, "M&I did not

5    make PCI unable to pay its investors," that's what this case

6    is about, is an allegation that that's what we did.  There's

7    nothing wrong with that statement.  It's supported.  It will

8    be supported by expert testimony, and we -- our damages

9    expert -- excuse me, the cross of their damages expert will

10   support that, and it is a causation issue.

11             That's the whole central issue in the case is

12   whether M&I did not make PCI unable to pay its investors.

13   We're going to prove that, and we should be, I respectfully

14   suggest, permitted to say it in our opening.  There's

15   nothing inappropriate with presenting components of our

16   argument and components of the evidence we'll elicit in that

17   way.

18             With respect to the benefits you would have

19   expected to see, we are going to elicit expert testimony to

20   that effect, and we do intend to argue to the jury, we think

21   it's extremely probative, that the absence of evidence, such

22   as, tickets to games, sports cars, checks, we think the

23   absence of evidence is probative to the absence of M&I's

24   liability or BMO's liability through M&I in this case.

25             Third, these are just absolutely factually true

1    documents -- true statements.  No document suggests that any

2    M&I employee knew about the Ponzi scheme.  We understand

3    that our adversaries will be permitted to argue the reason

4    for that is there was document destruction.  They can do

5    that.  But it's factually true there's no document that

6    suggests M&I employee knew about the Ponzi scheme.

7            It's also factually true that the Ed Jambor's

8    e-mail box was saved.  And, again, they're free to argue

9    that there might have been deleted e-mails in that box.

10   We're not suggesting otherwise.  But it's a probative fact

11   with regard to the prejudice suffered by Mr. Kelley, if any,

12   from the backup, from the destruction, the erasure of the

13   backup tapes.

14           That's all I have, Your Honor, unless you have a

15   question.

16           THE COURT:  I do not.

17           MR. GLEESON:  Thank you.

18           MR. MARDER:  I have nothing further, Your Honor.

19           THE COURT:  So I am ready to rule on those

20   objections as well.

21           The objection as to the first issue is sustained.

22           I sustain the objection as to the second issue,

23   which is the PDF at page 27.  The first issue was at page 3.

24           And then as to the third issue at PDF 51, that

25   objection is sustained as well.

1          And so we will proceed with our openings with the

2     rulings -- consistent with the rulings.

3          MR. GLEESON:  Judge, I have an application.  Do

4     you prefer I make it after the --

5          THE COURT:  I didn't hear you.

6          MR. GLEESON:  Sorry.  I have an application I

7     would like to make.  Would you prefer I make it -- and I

8     want to make it before the opening statements.  Would you

9     prefer I wait until after the lunch hour?

10          THE COURT:  You may make it now.

11          MR. GLEESON:  I'm going to -- this is -- enlarges

12     on our conversation at sidebar.  We are mindful.  I heard

13     the Court say you're going to give jury instructions, but I

14     want to make a little more fulsome application for a more

15     fulsome corrective curative instruction based on the voir

16     dire by Mr. Anthony.

17          In that voir dire, he said multiple things that

18     are just flat-out wrong and prejudicial.  I addressed some

19     of them, but if the Court will bear with me.  He said the

20     question is:  Did the bank see something suspicious that it

21     needed to do something about?  That's not the question.

22     It's emphatically not the question.

23          The Court knows that opening statements, and

24     before opening statements, voir dire, make impressions that

25     are not indelible, but they're important and they stick.  In

1    his voir dire, this is a case in which the fact that the

2    beneficiaries, the recipients of the damages that Mr. Kelley

3    seeks, will be hedge funds whose principals went to prison

4    for conspiring with Tom Petters, that's out of the case.

5    But what's now in the case is that the recipients are

6    sympathy -- or teachers and unions, and that's just

7    fundamentally wrong.  What this case is about is about harm

8    to PCI.

9           Those teachers, those charities, they can sue on

10   their own.  That's what the recent case from the Eighth

11   Circuit said.  This is a case that's not brought on their

12   behalf.  It's brought for harm to PCI, and that was -- that

13   is a fundamental baseline proposition of this case that

14   Mr. Anthony just blew out of the water by saying one other

15   completely erroneous fact is that the trustee -- that was

16   asserted to this panel was that the trustee doesn't get a

17   dollar from this.  Of course he does.  He's gotten $6

18   million.  He gets paid out of the proceeds of his successful

19   lawsuits.

20          The other -- another dimension to this is sending

21   a message to the community is just -- it's just wrong.

22   There's no courtroom in which that's appropriate.  It's to

23   decide the factual issues before -- that these two parties

24   have, not to send messages.

25          And, lastly, Judge, there is no courtroom in

1    America where a lawyer can properly say, He's from New York,

2    so he doesn't know where Oakdale [sic] is.  That's an appeal

3    to prejudice.  I think that's what it must be.  Maybe

4    Mr. Arnold [sic] can speak for himself.  There's no

5    courtroom in America where that's appropriate.

6              For that reason, I ask the Court to give the

7    following curative instructions before opening statements:

8              First, what attorneys say in voir dire is not

9    evidence.

10             Second, any legal principles they mentioned are

11   not law.  You'll get the law from me, from Judge Wright.

12             Third, the question in this case is not did the

13   bank see something suspicious that it needed to do something

14   about.  That's a complete misdirection about what this case

15   is really about.  And I would ask you to say, That's not the

16   question.  I will tell you what the question is when I give

17   you my instructions.

18             Third, I would ask the Court to say, PCI is suing

19   for damage to PCI.  It is not bringing this claim on behalf

20   of charities or teachers or any other people.  They can

21   bring their own claims if they have them.

22             And, lastly, I ask the Court to say, It is

23   entirely irrelevant where the lawyers are from, and it was

24   improper for Mr. Anthony to suggest otherwise.

25             Thank you.

1          THE COURT:  Is there any response that needs to be

2     made at this time?

3          MR. ANTHONY:  Well, since I was the subject of the

4     remarks, I probably should respond, Your Honor, but briefly.

5          One of my responses in the voir dire was to

6     counsel for the bank saying, and I think I pointed it out

7     when he said, you know, this case is about the claim that

8     the bank participated in the Ponzi scheme.  That's not what

9     this case is about.  And that's what their defense is, that

10    the bank didn't participate in the Ponzi scheme.  And the

11    claim is that the bank was aware of information -- of

12    suspicious activity that it had a duty to act on, and those

13    are the issues drawn in the case.

14         And I think it was a fair comment in response to

15    what he said to point out what we thought the case was

16    about.  I think this is an overly dramatic response to my

17    taking on their mischaracterization of what the case is

18    about.

19         I think you've already said you're going to give

20    the instructions.  You are going to tell the jury what the

21    lawyers say is not evidence.  They are going to hear the

22    evidence.  Opening statements will put everything in

23    context, and perhaps we can put behind us these squabbles

24    and skirmishes.  Thank you, Your Honor.

25         THE COURT:  Counsel, we will take our recess now.

1    I will come back with the instructions and we will proceed

2    with the trial.

3              MR. ANTHONY:  What time, Your Honor?  How much

4    time would you like us to have for lunch?

5              THE COURT:  The jury is returning at 1:30.

6              MR. ANTHONY:  Thank you, Your Honor.

7              THE COURT:  And so counsel should be ready to

8    proceed at 1:30.

9         (Recess taken at 12:49 p.m.)

10                   *    *    *    *    *

11        (1:39 p.m.)

12                         **IN OPEN COURT**

13                        **(JURY PRESENT)**

14             THE COURT:  You may be seated.  Good afternoon.

15             Women and Men of the Jury, I will now give you

16   some instructions about this case and about your duties as

17   jurors.  At the end of the trial I will give you more

18   instructions.  I may also give you instructions during the

19   trial.  All instructions, those I give you now and those I

20   give you later, are equally important and you must follow

21   them all.

22             First, you must leave your cell phone and other

23   wireless communication devices in the jury room during

24   trial.  You may use them only during breaks.

25             However, you will not be able to have cell phones

1    in the jury room during deliberations.  And if you bring

2    your cell phone with you on those days during deliberations,

3    you will be required to give your cell phone to the

4    courtroom deputy just before you start to deliberate and it

5    will be returned to you when your deliberations are complete

6    for the day.

7           This case is brought by Plaintiff Douglas A.

8    Kelley as the trustee of BMO Litigation Trust against

9    Defendant BMO Harris Bank, N.A., who will be referred to

10   throughout the trial as BMO, the bank, or defendant.

11          Mr. Kelley, who will be referred to throughout the

12   trial as the trustee or plaintiff is bringing claims on

13   behalf of a company called Petters Company, Incorporated,

14   which I and the parties will refer to as PCI.

15          The case arises out of a type of fraud that is

16   popularly known as a Ponzi scheme.  Tom Petters and his

17   co-conspirators, including Robert White and Deanna Coleman,

18   carried out the scheme over a period of approximately

19   14 years, ending in late 2008.

20          Generally speaking, and you will hear much more

21   about these facts during the course of trial, Petters and

22   his co-conspirators induced lenders to loan billions of

23   dollars to PCI by offering to pay interest on the money lent

24   to PCI and promising that the loans would be used to

25   purchase consumer merchandise from wholesalers, which would

1   then be sold to big-box retailers at a profit.

2            However, it was all a fraud.  There were no

3   purchases of merchandise.  There were no sales to retailers.

4   Instead, Petters and his co-conspirators diverted the

5   lenders' funds for other purposes.  They paid off others who

6   assisted in the fraud, they took some of the money for

7   themselves, and they used the vast majority of the money to

8   pay off loans from earlier lenders.

9            PCI had a bank account at Marshall & Ilsley Bank,

10  also known as M&I Bank, that plaintiff alleges was used as

11  part of the fraud, which BMO disputes.  M&I is now part of

12  BMO.

13           Petters, White, and Coleman were arrested in 2008

14  and eventually convicted of crimes in connection with the

15  Ponzi scheme and sentenced to prison.

16           PCI filed for bankruptcy on October 11th, 2008.

17  Plaintiff became trustee for PCI and eventually the

18  plaintiff in this case through the bankruptcy process.

19           Plaintiff asserts four claims or counts against

20  BMO.

21           Count I alleges that BMO violated a law called the

22  Minnesota Uniform Fiduciaries Act.

23           Count II alleges that BMO owed fiduciary duties to

24  PCI and breached those duties.

25           Count III alleges that BMO aided and abetted

1    Petters or associates' fraud.

2            Count IV alleges that BMO aided and abetted

3    Petters or his associates' breach of their fiduciary duties.

4            For its part, BMO denies liability for any of

5    plaintiff's claims.  In addition, BMO asserts, in response

6    to plaintiff's claims, a number of what are known as

7    affirmative defenses to liability, which I will instruct you

8    on later.

9            The other major dispute between the parties

10   relates to whether PCI was damaged by defendant and, if so,

11   the amount of the damages.

12           You are here to resolve these disputes of fact

13   between the parties.  Based on the evidence in the case and

14   with the legal framework that I will provide for you, you

15   will resolve the factual disputes that these parties have

16   brought into this Court and those findings will determine

17   whether plaintiff is entitled to relief from defendant.

18           Now, don't be concerned now about the precise

19   nature of plaintiff's allegations, BMO's responses, or the

20   affirmative defenses.  After you have heard all the evidence

21   and before your deliberations, I will give you extensive

22   detailed instructions regarding the elements that plaintiffs

23   must prove to prevail on his claims.  And I will also give

24   you instructions regarding the elements BMO must prove to

25   prevail on its affirmative defenses.

1              It will be your duty to decide from the evidence

2       whether the plaintiff is entitled to a verdict against the

3       defendant.  Your duty is to decide what the facts are from

4       the evidence.  You are allowed to consider the evidence in

5       light of your own observations and experiences.  After you

6       have decided what the facts are, you will have to apply

7       those facts to the law, which I give you in these and other

8       instructions.  That is how you will reach your verdict.

9              Only you will decide what the facts are.  However,

10      you must follow my instructions, whether you agree with them

11      or not.  You have taken an oath to follow the law that I

12      give you in my instructions.

13             In deciding what the facts are, you may have to

14      decide what testimony you believe and what testimony you do

15      not believe.  You may believe all of what a witness says or

16      only part of it or none of it.

17             In deciding what testimony to believe, consider

18      the witness's intelligence, their opportunity to have seen

19      or heard things they testify about, their memories, any

20      reasons they might have to testify a certain way, how they

21      act while testifying, whether they said something different

22      at another time, whether their testimony is generally

23      reasonable, and how consistent their testimony is with other

24      evidence that you believe.

25             Now, do not let sympathy or your own likes or

1    dislikes influence you.  The law requires you to come to a

2    just verdict based only on the evidence, your common sense,

3    and the law that I give you in my instructions and nothing

4    else.

5           And nothing that I say or do during this trial is

6    meant to suggest what I think of the evidence or what I

7    think your verdict should be.

8           Now, when I use the word "evidence," I mean the

9    testimony of witnesses, documents, and other things that I

10   receive as exhibits, facts that I tell you that the parties

11   have agreed are true, and any other facts that I tell you to

12   accept as true.

13          Now, some things are not evidence, and I'll tell

14   you now what is not evidence.

15          Lawyers' statements, lawyers' arguments, lawyers'

16   questions and comments are not evidence.

17          Documents or other things that might be in court

18   or talked about but that I do not receive as exhibits are

19   not evidence.

20          Objections are not evidence.  Lawyers have a

21   right, and sometimes a duty, to object when they believe

22   something should not be part of the trial.  Do not be

23   influenced one way or the other by objections.

24          If I sustain a lawyer's objection to a question or

25   an exhibit, that means the law does not allow you to

1  consider that information.  When that happens, you have to

2  ignore the question or the exhibit and you must not try to

3  guess what the information might have been.

4        Now, testimony and exhibits that I strike from the

5  record or tell you to disregard are not evidence and you

6  must not consider them.

7        And anything you see or hear about this case

8  outside the courtroom is not evidence and you must not

9  consider it unless I explicitly and specifically tell you

10  otherwise.

11        Also, I may tell you that you can consider a piece

12  of evidence for one purpose only and not for any other

13  purpose.  If that happens, I will tell you what purpose you

14  can consider the evidence for and what you are not allowed

15  to consider it for.

16        You need to play close attention when I give an

17  instruction about the evidence that you can consider only

18  for certain purposes because you might not have that

19  instruction in writing later in the jury room.

20        Now, some of you have heard the terms "direct

21  evidence" and "circumstantial evidence."  You should not be

22  concerned with those terms since the law makes no

23  distinction between the weight to be given to direct and

24  circumstantial evidence.

25        Now, during the trial I will sometimes need to

1      talk privately with the lawyers.  I may talk with them here

2      at the bench while you are still in the courtroom, we call

3      it our sidebar, or I may call a recess and let you leave the

4      courtroom while I talk to the lawyers.  Either way, please

5      understand that while you are waiting, we are working.

6             We have these conferences to make sure that the

7      trial is proceeding according to the law and to avoid

8      confusion or mistakes.  We will do what we can to limit the

9      number of these conferences and to keep them as short as

10     possible.

11            At the end of trial, you must make your decision

12     based on what you recall of the evidence.  You will not have

13     a written copy of the testimony to refer to.  Because of

14     this, you have to pay close attention to the testimony and

15     other evidence as it's presented here in the courtroom.

16            If you wish, however, you may take notes to help

17     you remember what witnesses said.  If you do take notes, do

18     not show them to anyone until you and your fellow jurors go

19     to the jury room to decide the case after you have heard and

20     seen all of the evidence.  And do not let note -- taking

21     notes distract you from paying close attention to the

22     evidence as it is presented.

23            The courtroom deputy will provide each of you with

24     a pad of paper and a pen or pencil.  At each recess you may

25     leave them at your seats.  When you leave at night, your

1    notes will be locked up and returned to you when you return.

2    When the trial is over, your notes will be destroyed.  They

3    will not be read by anyone other than you; not me, not

4    anyone other than you.

5              Now, Jurors, to make sure that the trial is fair

6    to all parties you must follow these rules:

7              First, do not talk or communicate among yourselves

8    about this case or about anyone involved in it until the end

9    of the case when you go to the jury room to consider your

10   verdict.

11             Second, do not talk with anyone about this case or

12   about anyone involved in this -- or involved with it until

13   the jury -- I'm sorry, until the trial has ended and you

14   have been discharged as jurors.

15             Third, when you are outside the courtroom, do not

16   let anyone tell you anything about the case or about anyone

17   involved with it until the trial has ended and your verdict

18   has been accepted by me.  If someone tries to talk to you

19   about the case during the trial, please report it to the

20   courtroom deputy.

21             Fourth, during the trial do not talk with or speak

22   to any of the parties, the lawyers, or the witnesses in this

23   case, not even to pass the time of day.  It is important not

24   only that you do justice in this case, but that you also act

25   accordingly.  If a person from one side of the lawsuit sees

1    you talking to a person from the other side, even if it's

2    just about the weather, that might raise a suspicion about

3    your fairness.

4         So when the lawyers, the parties, and the

5    witnesses do not speak to you in the halls, on the elevator

6    or the like, you must understand that they are not being

7    rude.  They know they are not supposed to talk to you while

8    the trial is going on and they are just following the rules.

9         Fifth, you may need to tell your family, close

10   friends, and other people that you are part of this trial.

11   You can tell them when you have to be in court and you can

12   warn them not to ask you about this case, not to tell you

13   anything they know or they think they know about this case,

14   not to talk to you about this case in front of you or talk

15   about this case in front of you.

16        But you must not communicate with anyone or post

17   information about the parties, the witnesses, the

18   participants, the claims, the evidence, or anything else

19   related to this case.

20        You must not tell anyone anything about the jury's

21   deliberations in this case until after I accept your verdict

22   or until I give you specific permission to do so.

23        If you talk about the case with someone besides

24   other jurors during deliberations, it looks as if you might

25   have decided the case or that you might be influenced in

1    your verdict by their opinions, and that would not be fair

2    to the parties and it might result in the verdict being

3    thrown out and the case having to be tried over again.

4           Now, during the trial, while you are in the

5    courthouse and after you leave for the day, do not give any

6    information to anyone by any means about the case.

7           Now, sixth, do not do any research on the

8    internet, in libraries, newspapers or otherwise.  And do not

9    investigate this case on your own.  Do not visit or view any

10   place discussed in the case, and do not use the internet or

11   other means to search for or view any place discussed in the

12   testimony.  Also, do not look up any information about this

13   case, about the law, or about the people involved, including

14   the parties, the witnesses, the lawyers, or me, the judge.

15          Seventh, do not read any news stories or internet

16   articles or blogs that are about the case or about anyone

17   involved with it.  Do not listen to any radio or television

18   reports about the case or about anyone involved with the

19   case.  In fact, until the trial is over, I suggest that you

20   avoid reading any newspapers or news journals at all and

21   avoid listening to any television or radio newscasts at all.

22          I do not know whether there will be news about

23   this case.  But if there is any news about this case, or

24   news reports, you might accidentally find yourself reading

25   or listening to something about the case.  If you want, you

1   can have someone clip out any stories and set them aside to

2   give you after the trial is over.

3        The parties have a right to have you decide this

4   case based only on evidence admitted here in court.  If you

5   research, investigate, or experiment on your own or get

6   information from other sources, your verdict might be

7   influenced by inaccurate, incomplete, or misleading

8   information.

9        Witnesses here in court take an oath to tell the

10  truth, and the accuracy of their testimony is tested through

11  cross-examination.

12       All of the parties are entitled to a fair trial

13  and an impartial jury, and you have to conduct yourselves in

14  a way that assures that the integrity of the trial process

15  remains throughout the trial process.  If you decide a case

16  based on information not admitted in court, you will deny

17  the parties a fair trial, you will deny them justice.

18       Remember, you have taken an oath to follow the

19  rules and you must do so.  If you do not, the case might

20  have to be retried and you could be held in contempt of

21  court and possibly punished.

22       Now, eighth, do not make up your mind during the

23  trial about what your verdict should be.  Keep an open mind

24  until after you and your fellow jurors have discussed all of

25  the evidence.

1          Now, the trial will proceed in the following

2     manner:

3          First, the plaintiff's lawyer may make an opening

4     statement.  Next, the defendant's lawyer may make an opening

5     statement.

6          An opening statement is not evidence.  It is a

7     summary of the evidence the lawyer expects you will see and

8     hear during trial.

9          After opening statements, the plaintiffs will then

10    present evidence.  The defendant's lawyer will have a chance

11    to cross-examine the plaintiff's witnesses.

12         After the plaintiff has finished presenting his

13    case, the defendant may present evidence and the plaintiff's

14    lawyer will have the chance to cross-examine the defendant's

15    witnesses.

16         After you have seen and heard all of the evidence

17    from both sides, the lawyers will make closing arguments

18    that summarize and interpret the evidence.  Just as with

19    opening statements, closing arguments are not evidence.

20         After the closing arguments, I will instruct you

21    further on the law and you will go to the jury room to

22    deliberate and decide your verdict.

23         Counsel, are we ready to proceed?

24         MR. COLLYARD:  Yes, Your Honor.  Thank you.  May

25    it please the Court, Counsel.

1          Women and Men of the Jury, good afternoon.  Thank

2     you for being here and thank you for being willing to serve

3     on a jury and, most importantly, thank you for giving me

4     your time.  I really do appreciate your giving me your time.

5          This is a simple case.  It's about how a bank

6     helped a criminal use a small business checking account to

7     carry out one of the biggest money laundering frauds in

8     American history and then turned around and intentionally

9     destroyed key evidence to try to cover up everything it knew

10    and to try to hide everything it had done.

11         The evidence will show, Ladies and Gentlemen, that

12    banks have a responsibility to detect and prevent suspicious

13    activity on their accounts and they cannot let their

14    accounts be used to carry out illegal activity.  That is a

15    responsibility that all banks must live up to.

16         We are here today, we are here today because, as

17    the evidence will show, BMO Harris Bank chose to ignore its

18    responsibility by looking the other way and allowing this

19    man, Tom Petters, to use the Petters Company, Inc. small

20    business checking account all as part of a massive money

21    laundering fraud, a massive Ponzi scheme where he laundered

22    $37 billion in and $37 billion out of that account, all as

23    part of that massive fraud and massive Ponzi scheme.  And

24    Mr. Petters was found guilty to have been -- to have

25    defrauded investors into loaning $1.926 billion.

1          This case, honestly, boils down to something as
2    simple as the four-letter word that I just told you it was
3    about.  The evidence will show that the bank was required to
4    know whether or not the billions of dollars going in and
5    going out of that account made sense for the Petters Company
6    business, and the evidence will show that the bank could see
7    that none of it made sense.
8          And the evidence will show that, therefore, the
9    bank knew that that activity wasn't right.  And instead of
10   stopping it or reporting it, the bank assisted Petters with
11   it.  The bank looked the other way and allowed Tom Petters
12   to continue to use that account over and over and over for
13   years and years and years carrying out that illegal
14   activity.
15         The evidence is going to show, Ladies and
16   Gentlemen, that the bank could see and the bank knew that
17   the billions of dollars going in and out of that account did
18   not make sense for the Petters Company, Inc. business.
19   That's what this entire case is going to be about.  I want
20   to give you a preview of that.  And when I talk about that,
21   I'm going to talk about what I will call the three
22   fingerprints of the bank's knowledge, and this will be the
23   evidence that will show that the bank knew that the money
24   going in and out did not make sense.
25         And then I want to unpack that in more detail.

1    I'm going to spend about seven minutes giving you this

2    preview and then I'm going to spend the rest of the time

3    unpacking that in more detail.

4           But before we do that, I need to tell you what Tom

5    Petters was doing so that you have context for that when we

6    get there.

7           You'll hear that what Tom Petters was doing was he

8    was supposedly buying and reselling big-screen TVs, consumer

9    electronics.  And what he would do, Ladies and Gentlemen, is

10   he would supposedly buy them from big wholesalers.  He would

11   buy these TVs from wholesalers and then he would turn around

12   and he would sell them to retailers like Costco and Walmart.

13   And in order to do that, he would borrow money from

14   investors and he promised to pay them back.

15          But other than borrowing money from investors,

16   Ladies and Gentlemen, you will hear and you will learn it

17   was all fake, it was all phony, it was all a fraud.  And Tom

18   Petters, Petters Company, Inc., the entire business was

19   being run out of a small business checking account at the

20   bank.

21          So let me tell you about those three fingerprints

22   of how the evidence will show that the bank could see that

23   the money going in and out didn't make sense.

24          One, we're going to have evidence that retailers

25   were supposed to be wiring money into that account to pay

1    for the TVs.  But the bank could see and the bank knew that

2    no retailer ever wired a cent into the account.

3            Two, we're going to have evidence that, instead,

4    nearly all of the money being wired into the account was

5    coming in from the two wholesalers who Tom Petters was

6    supposed to be buying the TVs from.  And that didn't make

7    sense for the Petters Company business because that money is

8    coming in the wrong way.

9            And when I say it's going in the wrong way, Ladies

10   and Gentlemen, I mean it's going the wrong way.  Money

11   should not have been coming in from them.  Money should have

12   been going to them.

13           This would be like, for example, if McDonald's had

14   a checking account and nearly all the money was going into

15   the checking account from the two people or the two

16   companies that McDonald's buys its hamburgers from.

17           And you will hear that these two entities up here,

18   Nationwide and Enchanted, the ones on the TV, you're going

19   to hear about them a lot in this case.  Their real names --

20   their full names are Nationwide International Resources and

21   Enchanted Family Buying Company.  And you will hear, Ladies

22   and Gentlemen, that they were involved in activities related

23   to the fraud.

24           And, third, the evidence will show that the bank

25   could see and the bank knew that tens of millions of dollars

1    were going out of that small business checking account and

2    directly into the pockets of Tom Petters and his

3    co-conspirators, and nobody from the bank will be able to

4    come here and explain what the legitimate business purpose

5    was for that happening.

6              Now, as part of all of this and along the way,

7    you're going to hear that for years money laundering alarms

8    were sounding off inside of the bank telling the bank that

9    it was all suspicious and it was all potentially fraudulent

10   and it all needed to be looked at.  Here they are

11   (indicating).

12             This went on for 39 months, for three and a half

13   years, for all of the billions of dollars going in and out

14   of that account.  From 2005 up to June of 2008, these things

15   were sounding off.

16             And you will hear that the bank has its own

17   Anti-Money Laundering Group who has to investigate these

18   things to see if those wires going in and out were

19   legitimate or for legitimate business purposes.

20             And you will hear, Ladies and Gentlemen, that

21   nobody, none of the investigators who looked at these alerts

22   will be able to come here and say why they closed them, why

23   did they close them, and what was the legitimate business

24   purpose for why Nationwide and Enchanted, for example, were

25   wiring that money into the account.  And I want to give you

1      a preview of what the evidence on that will show, because

2      we're going to spend a lot of time in this case talking

3      about that.

4              This is Sara Johnson, Ladies and Gentlemen.

5      Ms. Johnson worked at BMO Harris Bank until 2017.  She was

6      in the Anti-Money Laundering Group and when she showed up to

7      work every single day, her job was to look for suspicious

8      activity, and you will hear that.  She was at the bank for

9      12 years and she was a manager in the group.  She herself

10     turned off more than $27 billion in alarms.

11             Now, Ms. Johnson lives in Texas, so she won't come

12     here to testify live.  I'm going to call her adverse in my

13     case-in-chief by playing a videotaped deposition of her, and

14     you're going to hear it.  It's going to be about an hour and

15     a half long.  I want to give you a preview of the type of

16     evidence you'll hear from Ms. Johnson.

17         "Do you have an understanding that as an AML analyst one

18     of the things you were trying to do is figure out whether or

19     not there was money laundering going on with activity

20     pertaining to an account?

21         "I don't remember.

22         "Did you understand that that was the function of the

23     Anti-Money Laundering Group?

24         "I don't remember.

25         "What did you understand the function of the Anti-Money

1    Laundering Group was while you were at M&I Bank?

2         "I don't remember.

3         "You can't describe for the jury a single function of

4    what the Anti-Money Laundering Group was trying to

5    accomplish?

6         "I don't remember."

7              You will hear Ms. Johnson left BMO Harris Bank in

8    2017 and that deposition was taken of her in January of

9    2018.

10             Ladies and Gentlemen, the big fight in this case

11   is going to be about whether or not the bank knew enough to

12   know, whether the bank knew enough to know that the activity

13   going in and out of that account wasn't right.  And the

14   evidence will show, Ladies and Gentlemen, that the bank

15   could see way too much and the bank knew way too much to not

16   know.

17             Now, I'd like to make some re-introductions and

18   I'd like to re-introduce myself.  My name is Mike Collyard,

19   and with me as well trying this case is Mr. Joe Anthony and

20   Mr. David Marder.  And we have the honor and privilege of

21   representing Mr. Douglas Kelley.

22             You will hear that Mr. Kelley was appointed by the

23   Federal Bankruptcy Court to be what's called the

24   court-appointed trustee to be able to bring these claims

25   against BMO Harris Bank.

1          And Mr. Kelley will testify and he will tell you

2     how he's been a lawyer here in Minnesota for 48 years now,

3     and he will talk about some of the high-profile cases that

4     he's worked on to give you background.

5          And he will talk about how he was selected and how

6     he was chosen to be the court-appointed trustee to be able

7     to bring these claims that Petters Company, Inc. has against

8     BMO Harris Bank.

9          And Mr. Kelley will tell you that, unlike a

10    traditional situation, where you have a plaintiff suing to

11    get money, Mr. Kelley is not here suing to get money for

12    himself.  Mr. Kelley is here as a court-appointed trustee to

13    bring claims that Petters Company, Inc. has against BMO

14    Harris Bank.

15         Now, Mr. Kelley brought this case against BMO

16    Harris Bank.  BMO Harris Bank is a massive bank based out of

17    Chicago.  They are part of the Bank of Montreal from Canada,

18    one of the bigger banks in the world.  And what you need to

19    know about that is in 2011 BMO bought a bank called M&I or

20    Marshall & Ilsley Bank.

21         And from 2002 up through 2008, which is the

22    relevant time period in this case, Tom Petters had that

23    small business checking account at M&I Bank.

24         And when BMO bought M&I, the bank personnel who

25    were working on the Petters Company account, the Petters

1    relationship, and those anti-money laundering people, like

2    Sara Johnson that I was telling you about, they became BMO.

3    And you will hear throughout this case us talk about M&I as

4    BMO, BMO as M&I, and both of them together as the bank.

5            So why are we here?  Mr. Kelley will tell you that

6    he is here seeking justice.  And it's going to be up to you

7    to determine justice in this case.  You are the only ones

8    who hold the power to be able to do that.

9            And the evidence is going to show that BMO Harris

10   Bank is responsible for what happened here, and at the end

11   of this case we're going to ask that BMO Harris Bank be held

12   responsible.

13           And as you determine the facts in this case -- it

14   is your role as a jury to be able to do that -- it's

15   actually pretty simple.  It's not that much different than

16   what you see on TV.  You're simply going to follow the

17   evidence.

18           And the evidence that we're going to show you is

19   going to fall into a few different categories:

20           One, we're going to have evidence of the bank's

21   knowledge and how the bank knew that billions of dollars

22   going in and out of that account did not make sense for the

23   Petters Company business.

24           Two, we're going to have evidence of the bank's

25   motive and the big opportunity that the bank saw by having

1   this relationship with Tom Petters and trying to grow it.

2          And, three, we're going to have evidence of the

3   losses, the $1.926 billion that those lenders loaned Petters

4   Company, Inc. and were not paid back.

5          Now, I want to talk about the evidence, but before

6   we do that I need to tell you what BMO did to some of the

7   evidence in this case, because you will hear, Ladies and

8   Gentlemen, as I told you when I stood up here, I told you

9   that the bank intentionally destroyed key evidence to cover

10  up what it knew and to try to hide what it had done.

11         And the facts and the evidence are going to show

12  that that is exactly what happened, BMO Harris Bank

13  intentionally destroyed evidence in this case.  And you will

14  hear and the facts will show that BMO did that, and the

15  evidence was harmful to BMO.  Now, I just want to tell you a

16  little bit about that.  It will take just about five

17  minutes.

18         You will hear that in September of 2008 Tom

19  Petters is arrested.  The FBI goes in and it raids Petters

20  Company, Inc. business and it shuts down the fraud.

21         And you will hear that right after that happened,

22  the federal district court here in Minnesota, a judge by the

23  name of Ann Montgomery issued what's called an order.  This

24  is an order.  It's an injunction.

25         And what this did is it required the bank,

1    required the bank to keep all of its documents, all of its

2    e-mails, all of its records pertaining to the Petters

3    Company, Inc. and the Petters Company, Inc. account so that

4    that evidence and that information could be preserved and be

5    kept.

6              And you will hear, Ladies and Gentlemen, that BMO

7    Harris Bank did not do that.  And, instead, BMO Harris Bank

8    went ahead and intentionally destroyed evidence on what is

9    called e-mail backup tapes.  These are massive backup tapes

10   that have a massive amount of e-mails and information on

11   them and documents.

12             And you'll hear that BMO really did this in three

13   big swoops.  It did it once in 2010.  Then it did it again

14   in 2011.  And BMO -- and when I say "BMO," Ladies and

15   Gentlemen, I mean BMO Harris Bank, not M&I.  In 2014 BMO

16   Harris Bank found more backup tapes and then destroyed them,

17   and that was after it had bought M&I and it was after

18   Mr. Kelley had already filed this very lawsuit against them.

19             And what you will learn is that in 2014 BMO was

20   out looking for more backup tapes because they were involved

21   in a lawsuit in Florida, and they found these backup tapes

22   because they were searching for more backup tapes that had

23   potentially survived that destruction from 2010 and 2011.

24             And you will learn that they find them.  There's

25   six of them.  They found six backup tapes.  But they don't

1    review them.  They don't look at what's on them.  And

2    instead you will hear that they intentionally destroy them.

3             And when they do that, Ladies and Gentlemen, they

4    did not tell the plaintiff in this case that they had those.

5    The plaintiff in this case had to find out later on during

6    this litigation that that happened.

7             Let's go back to the evidence.  Let's talk about

8    knowledge.  Really what I want to do is I want to break

9    knowledge up into three parts:

10            First, I want to talk about how the bank had a

11   responsibility to detect and prevent suspicious activity.

12            Then I have to tell you real quickly the Petters

13   Company story, and the evidence that will show that the bank

14   knew how the Petters Company business was supposed to work.

15            And then I want to go back to those three

16   fingerprints and focus on those three fingerprints of the

17   knowledge.

18            Let's start with the bank's responsibility.  When

19   I stood up here, I told you that banks have a responsibility

20   to detect and prevent suspicious activity.  And I could show

21   you documents and I can show you e-mails that you're going

22   to see in this case, PowerPoint presentations.

23            But I'm going to play for you a one-minute clip of

24   M&I's CEO back in 2004 during a training video explaining to

25   the bank personnel how important the responsibility to

1    detect and prevent suspicious activity is and what that

2    means.

3              And here it is:  This is the CEO of M&I back in

4    2004.  His name is Dennis Kuester.

5         (Video clip played)

6              MR. COLLYARD:  The evidence will show that the

7    bank knew it had a responsibility to detect suspicious

8    information or suspicious activity, and the bank knew it

9    couldn't ignore that.

10             The bank had a term for that.  And I'll show you

11   this.  This is Plaintiff's Exhibit 5.  This is training

12   material of the bank's.  And the bank calls that willful

13   blindness.  If you ignore suspicious activity, that is

14   willful blindness.  And you can see under the bank's

15   own definition, the bank says it's the practice of ignoring

16   potential criminal activity.

17             And you will hear in this case when the bank is

18   looking for things like money laundering or looking at

19   alarms on accounts or alerts on accounts for suspicious

20   activity and they are looking to see if the money going in

21   and out of that account makes sense for the business, you

22   will hear that if they have reason to suspect -- that's all

23   it is -- if they have reason to suspect that that activity

24   doesn't make sense for the business, they have to file a

25   report with the federal government and it's called a

1    Suspicious Activity Report.  It's spelled SAR.  It's S-A-R.

2    And you will hear about that in this case.

3           And the bank knows, Ladies and Gentlemen, its own

4    documents here say that a bank can be implicated in a money

5    laundering scheme for failing to identify activity that

6    should have been reasonably identified as suspicious.

7           Let me tell you real quickly the Petters Company

8    story, and I'll just break this up into three short

9    chapters:

10          One, I want to tell you how the Petters Company

11   business was fake.

12          Two, I want to show you how the bank understood

13   the Petters Company business model.

14          And then, three, I want to talk about how the

15   evidence will show the bank knew it didn't work that way.

16          Let's start with the Petters Company business was

17   fake.  And, really, this story takes place from 2002 up

18   through 2008.  We've got to go back to 2002 to 2008 in this

19   case.  That's the relevant time period.

20          And if we start with Chapter 1, the Petters

21   Company base was fake.  You will hear that in September, it

22   was September of 2008, the FBI is tipped off that Tom

23   Petters and the other officers of the Petters Company, Inc.

24   are using the Petters Company business as a fake business to

25   run this massive money laundering fraud, this massive fraud.

1    And as soon as that happens, you will hear the FBI goes in

2    and arrests Tom Petters.

3              Here is Tom Petters, and here are the other two

4    officers involved in the Petters Company business.  It's

5    Deanna Munson or Coleman and Bob White.

6              Deanna Munson or Coleman, she'll actually testify

7    in this trial and you will learn that she was actually the

8    one who tipped off the FBI about Tom Petters.

9              And you will hear that Ms. Munson and Mr. White,

10   they both pled guilty for their part in the fraud.  And Tom

11   Petters, he was actually tried and convicted in the same

12   exact courtroom that we are in right now and he was

13   convicted on charges of wire fraud, conspiracy, and money

14   laundering.  And as we're sitting here today doing this,

15   Mr. Petters is sitting in Leavenworth federal prison serving

16   out his 50-year long sentence, where he belongs.

17             But you will hear, Ladies and Gentlemen, that the

18   three of them, they were running that business out of the

19   Petters Company, Inc. small business checking account.

20             And I keep calling it the small business checking

21   account because you will hear that the bank kept it in what

22   the bank calls its small business banking group.

23             And to give you context for what that means, the

24   biggest customer, the biggest business customer in the small

25   business banking group at the bank, they did about

1    $15 million in annual revenues a year.  And if you compare

2    that to just the average of the $5 and a half billion that

3    was being wired into the Petters Company account every

4    single year from 2002 to 2008, that's about 350 times bigger

5    than the revenues of the next biggest customer.  There was

6    no other account.  There was no other client like the

7    Petters Company, Inc. at the bank and the bank knew it.

8         Let's go to Chapter 2 and let's talk about how the

9    bank knew how the Petters Company business was supposed to

10   work.  The evidence will show that the bank knew that the

11   business model was simple and it worked like this:

12        Petters would borrow money from investors.  He'd

13   take that money and supposedly buy TVs, consumer

14   electronics.  Then he'd turn around and he would sell them

15   to big-box retailers like Costco and Walmart.  And after

16   those retailers wired their payments into the Petters

17   Company, Inc. account, Mr. Petters would use that money to

18   pay back the investors.

19        That's how the business model was supposed to

20   work.  That's how the bank learned the business model was

21   supposed to work.

22        But let's just pause this for a moment, Ladies and

23   Gentlemen because, again, other than borrowing money from

24   investors, none of this happened.  Petters didn't buy any

25   TVs.  He didn't sell any TVs.  And certainly no retailer

1    ever wired a cent into the account.

2           Instead, I'll tell you what happened was, and

3    you'll learn, that what Petters was doing is he's taking the

4    money from investors, he's putting it into his pockets,

5    using some of it to pay back old investors, and then he

6    would go out and get new investors.  And he would do it over

7    and over and over.  This is a Ponzi scheme, Ladies and

8    Gentlemen, and that's what was going on here.

9           Now, what you'll learn is he was taking the

10   billions of dollars that he was getting while he was doing

11   this and he was running it through the small business

12   checking account to make it look legitimate, to make it look

13   real, and he was using that account to run the fraud.  That

14   is money laundering, Ladies and Gentlemen, and that's what

15   that was.

16          Now, throughout this case you will learn that the

17   bank teaches its bank personnel to look for that.

18          This is another training material of the bank.

19   This is Plaintiff's Exhibit 4.  This is how the bank would

20   teach its personnel about money laundering:  You have a bad

21   guy who takes the money.  He runs it through the bank to try

22   to clean it up to make it look legitimate so it re-enters

23   the world looking clean.  That's essentially what this slide

24   is doing and teaching.

25          And the bank taught its people to look for that.

1    Even the people that weren't in the Anti-Money Laundering

2    Group that they had were supposed to be looking for it

3    because, as you will hear, ladies and gentlemen, of the

4    responsibility that banks have.

5              Here's another training material.  This is

6    Plaintiff's Exhibit 5 again.  And this is how the bank

7    described it, it says, "Money launderers clean their dirty

8    money through banks."

9              And, Ladies and Gentlemen, the bank is teaching

10   its people that because of its responsibility and because

11   you can't run a massive money laundering fraud without a

12   bank.

13             Let's go back to how the bank knew the business.

14   You're going to hear this concept in banking called "know

15   your customer."  This is basic Banking 101 stuff.  Okay?

16   Banks are obligated to know their customers and understand

17   their customer's activities and their business.  And you

18   will learn that not only do banks -- not only are they

19   required to know it, they want to know it.

20             And you will hear about this bank in particular

21   wants to know their customer's business so they can sell

22   them products and services, so they want to know as much

23   about their customer as they can.  And you'll learn that,

24   Ladies and Gentlemen.

25             But the bank also knew how the Petters Company

1    business was supposed to work.  Because if we step back to

2    2002, you will hear that the bank was told how the business

3    was supposed to work by a then-convicted money launderer,

4    and his name was Frank Vennes, everybody, and we'll talk

5    about Frank Vennes throughout this case.

6          But you will learn that Frank Vennes sat down with

7    banker Christopher Flynn.  This is Christopher Flynn

8    (indicating).  He was a banker at M&I Bank, and he managed

9    the Petters Company relationship and the Petters Company

10   account at one time.  He was also the boss of the other guy,

11   Ed Jambor, who managed the account up to that period.

12         And you will learn that Christopher Flynn went out

13   and met with Frank Vennes out at Frank Vennes's fancy Lake

14   Minnetonka home, where Mr. Vennes told Mr. Flynn how the

15   business worked.

16         And Mr. Vennes was telling Mr. Flynn how the

17   business worked because Mr. Vennes wanted the bank to give

18   him a $5 million loan for his business called Metro Gem to

19   be able to invest in Petters Company, Inc.

20         And you will hear that when Mr. Vennes was telling

21   Mr. Flynn about the business, Mr. Vennes was telling him how

22   he had been working with Petters and he was making about

23   20 million bucks a year doing this.  This is back in 2002.

24         And you will learn that the bank knew that if the

25   bank was going to loan Frank Vennes, a guy who had been

1    making $20 million a year, $5 million, if they were going to

2    loan him $5 million, they would have to put up their own

3    money to be able to do that.

4         And you will hear that Christopher Flynn and the

5    bank told Mr. Vennes, no, we're not going to give you a

6    $5 million loan for you to invest -- for your Metro Gem

7    business to invest in the Petters Company, Inc. business.

8         Let's go to Chapter 3.  The evidence will show

9    that the bank knew the Petters Company, Inc. business model

10   did not work the way that it was supposed to.  If we go

11   back, this (indicating) is how it was supposed to work.

12        But the bank could see every single day, Ladies

13   and Gentlemen, that this didn't happen because the bank

14   could see and the evidence will show that this happened

15   instead (indicating).

16        The bank could see, because the bank had access to

17   the account and would review the account and could access it

18   at any time, that no retailers ever wired a cent into the

19   account.

20        The bank could see that, instead, nearly all of

21   those billions of dollars were coming in from the two

22   wholesalers who Petters is supposed to be buying the TVs

23   from.  And that didn't make sense for the business because

24   it was going the wrong way.  And the bank could see that,

25   instead, tens of millions of dollars were going directly

1    into the pockets of Tom Petters, Deanna Munson, and Bob

2    White.

3            This (indicating) is the transaction activity that

4    the bank could see.  I also call this the line of sight.

5    This was the bank's line of sight that they could see every

6    day, and the bank could see every day from this line of

7    sight that this activity wasn't right.  They had access to

8    it.  They could look at it.

9            And these (indicating) are those three

10   fingerprints, Ladies and Gentlemen, that I told you about

11   earlier and it will always come back to this.

12           If we just focus on the Nationwide and Enchanted

13   piece, I just want to give that some context.  Because if

14   you just look at the wires that came in from Nationwide and

15   Enchanted, there was $37 billion that was wired into the

16   account.  Nearly 25 billion of that came in from Nationwide

17   and Enchanted, so about 68 percent of it, and that's from

18   2002 up through 2008.  And this is what it looked like to

19   the bank.

20           So let's go back to the three fingerprints, and

21   it's the same exact transaction activity I just showed you,

22   but this time I want to talk about it in a little bit

23   different order.

24           I want to talk about, one, Nationwide and

25   Enchanted and I'll show you more on that.

1          Two, I'm actually going to show you millions of

2     dollars going to Deanna Munson and Bob White.

3          Three, I want to talk about how the bank knew the

4     retailers were supposed to be wiring money into the account

5     and that didn't happen.

6          So let's start with Nationwide and Enchanted, and

7     the best way to do this is if we go to 2005.  You will hear

8     that in 2005 the bank had installed its own computerized

9     money laundering software and system.  You will hear this

10    called Searchspace.  And what Searchspace does is it looks

11    for patterns of unusual activity or suspicious activity.

12         And I'll show you this (indicating), because as

13    soon as they installed this in 2005, money laundering alarms

14    started sounding off inside of the bank on the Petters

15    Company, Inc. account.

16         This is the first alarm, Ladies and Gentlemen.

17    This is an alert called 05327.  This is the first alert.  It

18    happened in March of 2005.

19         And what Searchspace does is it looks at the wires

20    coming in and going out and it compares them to what other

21    customers' wires should be and it creates a score.  And if

22    that score breaks a certain threshold, in this instance you

23    will hear it's 75, the alarm triggers or the alert triggers.

24    And you can see how loud this alarm is.  More than three

25    times bigger, three times louder than what the threshold

1    was.

2              And this did not just happen once.  As I showed

3    you earlier, this happened, and you will hear, 39 months,

4    for three and a half years for all of the billions of

5    dollars going in and going out of the account.

6              And if we just focus on the Nationwide and

7    Enchanted piece, because every wire that came in from

8    Nationwide and Enchanted triggered these alarms.  Every wire

9    that came in triggered these alarms, but every wire that

10   came in from Nationwide and Enchanted triggered these

11   alarms.

12             And what you'll hear what that means is the bank

13   had to investigate them, they had to look at them, they had

14   to figure out how they made sense for the Petters Company,

15   Inc. business.

16             And they had the Anti-Money Laundering Group that

17   did that, and here (indicating) they are.  I'll show you

18   these folks.  This was the Anti-Money Laundering Group who

19   investigated and analyzed those wires coming in from

20   Nationwide and Enchanted.

21             And that number by them is the amount of money

22   that they closed, Sara Johnson leading the way with more

23   than $27 billion in alarms for incoming and outgoing wires

24   that she chose to close.

25             The bank had to investigate the wires coming in

1   from Nationwide and Enchanted, and in order to do that they

2   had to figure out who was Nationwide, who was Enchanted, why

3   were they wiring that money in in order to turn off the

4   alarms.

5            And you will hear, Ladies and Gentlemen, that this

6   wasn't some guessing game, this wasn't some mystery to them.

7   They had all kinds of tools that they could use to figure

8   out why those wires were coming into the account.  They

9   could look at their own databases about the customer and see

10  if there was information about that.  They could search the

11  internet.  They could look on the Secretary of State's

12  website.  They could do all kinds of things.

13           But, easiest of all, they could just pick up the

14  phone.  They could literally just pick up the phone and call

15  the customer relationship managers or the business bankers

16  to see what they knew about it.

17           And here are the two business bankers on the

18  Petters Company relationship and the Petters Company

19  account, it's Edward Jambor and then his boss at one time,

20  Christopher Flynn.

21           Those anti-money laundering analysts could have

22  picked up the phone and just called these two people and

23  said:  Who is Nationwide?  Who is Enchanted?  Why in the

24  world are they wiring in billions and billions of dollars

25  consistently over all of these years?

1          And you will even hear that those anti-money

2     laundering analysts and investigators, when they

3     investigated other alerts on other customers, they would do

4     that.  They would pick up the phone and they would call the

5     customer relationship manager and ask them questions.

6          And you will learn that if Mr. Jambor or Mr. Flynn

7     couldn't explain why those wires were coming in, well, they

8     couldn't close the alert.  And none of them, none of them

9     picked up the phone to call these two people, not once, with

10     all of that volume of money going in and out.

11          But not only that, Ladies and Gentlemen, they

12     couldn't just turn them off.  And you will hear this.  In

13     order to turn off the alarms or to close the alerts, as they

14     will call it, they had to document it, they had to document

15     their reasons.

16          And it wasn't just closing them and filling in

17     some information.  They had to actually explain why, why

18     they were concluding that the activity was not suspicious,

19     and they had to do that in enough detail to convince the

20     reader of their documentation that that activity was not

21     suspicious.

22          I'll show you this, because we're going to talk

23     about the "why" in this case.  This is a bank policy or a

24     bank guideline.  This is one of the bank's documents.  This

25     is Plaintiff's Exhibit 398.  I'll show you the relevant

1    parts here.

2             This (indicating) is what they follow when they

3    are turning off an alert or closing an alert.  It says make

4    sure you ensure that you understand and explain what is

5    going on.  Ask yourself the following questions when closing

6    an alert.  This is what they're supposed to do.

7             And it says right here, "Do the comments provided

8    convince the reader that the alert is not suspicious?"  That

9    is the level of detail that they had to document when they

10   chose to close those alerts.

11            So I want to give you a preview of what the

12   evidence of that will show.  And in order do that, I want to

13   start with an alert and then I want to give you a preview of

14   some of the testimony.

15            This is an actual alert that was closed.  This is

16   Alert 55878.  This was an alert that scored at 237, and it

17   was one that Sara Johnson did.  And this just tells us that

18   it was for incoming and outgoing wires, so it would include

19   all those wires coming in from Nationwide and Enchanted

20   during that period.

21            And here's what Ms. Johnson's "why" is:  "Wires to

22   and from various businesses.  Activity does not appear

23   suspicious.  Activity is consistent and expected for type of

24   business customer."

25            So you'll hear, Ladies and Gentlemen, testimony

1     about this.  I want to give you a preview of that.  Here's

2     Sara Johnson talking about her "why" on this same exact

3     alert:

4          "It says, 'Activity does not appear suspicious.

5     Activity is consistent and expected for the type of business

6     customer.'  Do you see that?

7          "I do.

8          "Why are you concluding that the activity does not

9     appear suspicious?

10          "I don't remember."

11          Again, that was her own documentation, Ladies and

12     Gentlemen, that you will see, her own documentation where

13     she's supposed to convince the reader that it's not

14     suspicious.

15          So I'll give you a preview of another witness who

16     you will hear from in this case.  This is Sara Johnson's

17     boss.  Her name is Bernita Hile.  Ms. Hile worked at BMO

18     Harris Bank up until -- from 2005 up until 2013, when she

19     retired.  She was Ms. Johnson's boss.  She was a manager in

20     the Anti-Money Laundering Group.

21          Now, she no longer works at BMO Harris Bank

22     because she retired and she doesn't live here in Minnesota,

23     so you're going to hear me call her adverse in this case as

24     well and I'm again going to have to play her videotape

25     deposition.  That one, too, is going to be somewhere around

1    an hour and a half.

2           But here is a preview of what Ms. Hile is going to

3    say, and this is Ms. Hile talking about the same exact alert

4    that you just heard Sara Johnson talk about.  Here is a

5    preview of that evidence:

6        "She said, 'Activity does not appear suspicious.'  Do

7    you see that?

8        "Yes.

9        "Can we look at her comments and conclude why she

10   believes that the activity was not suspicious?

11       "I don't -- I don't know.  I don't know -- well, you're

12   saying from her comments?

13       "Yeah.  Does she explain why she believes the activity

14   is not suspicious?

15       "Not really, no."

16          Again, Ladies and Gentlemen, that is the

17   documentation that is supposed to convince the reader that

18   the activity was not suspicious, and that's the type of

19   testimony you're going to hear on this.

20          Now, let me just tell you one more thing about

21   this.  So these alarms are sounding off and going off from

22   2005 up until June of 2008, and you will hear that this is

23   about 26 billion in, 26 billion dollars out during this time

24   period.

25          Now, after Tom Petters is arrested, after the FBI

1    comes in and shuts down the fraud, you will learn that the

2    bank goes back and reviews, goes back and reviews some of

3    the alerts that they had looked at and closed.

4         Now, they only go back to 2008.  They don't go

5    back all the way.  They go back to 2008 and they relook at

6    the alerts that they once closed and said were absolutely

7    not suspicious and they look at that exact same activity.

8         Now, of course, the Ponzi scheme and the money

9    laundering fraud is revealed to the rest of the world

10   because it's out in the press, and they know that.

11        So they go back and they look at it, Ladies and

12   Gentlemen, but this time they conclude, and you'll hear,

13   that they decide that the activity back in 2008 did appear

14   to be suspicious.

15        And here's what they say.  This is Plaintiff's

16   Exhibit 333, and this is an analysis that they do on that.

17   I'll show you the relevant conclusion.

18        It says, "The investment scam can be seen in

19   Petters Company Inc.'s account" -- that's the transaction

20   activity -- "during the review period.  The incoming and

21   outgoing wires and funds transferred through checks between

22   companies and individuals known to have been involved in the

23   fraud, such as Enchanted, Nationwide, Deanna Coleman, Bob

24   White, Metro Gem, Frank Vennes, appear suspicious."  And

25   they base that conclusion on the same exact activity that

1    they once said was not suspicious.

2           Let's go to the second fingerprint, talk about the

3    tens of millions of dollars that the bank could see going to

4    Tom Petters, Deanna Munson, and Bob White.  And I keep

5    telling you that there's tens of millions.  I'm going to

6    show you some millions.

7           These are checks that went out of the account that

8    Deanna Munson wrote.

9           If you look at the top, there's a check.  And

10   you'll see this one.  It's a check from Deanna Munson to

11   Deanna Munson for 2 and a half million dollars in cash.

12          If you look to the one on the right, that's Deanna

13   Munson writing a check to Bob White for a million bucks and

14   she says, "Merry Christmas."

15          And then if you look down below, it says Deanna

16   Munson to Deanna Munson for a million, another Deanna Munson

17   to Deanna Munson for a million, another Deanna Munson to

18   Deanna Munson for a million.  And you'll see this.

19          Now, I'll tell you something else that you will

20   hear, is that at one point in time the checks department

21   called up the business banker, Mr. Edward Jambor.  And you

22   will hear this.  The checks department reached out to Ed

23   Jambor to ask:  Why is Deanna Munson writing a million

24   dollar check to herself?

25          And Ed Jambor actually picked up the phone or

1   talked -- I can't say he picked up the phone.  He talked to

2   Tom Petters.  You will hear he talked to Tom Petters.  And

3   Tom Petters told him:  Deanna Munson, she's building a

4   house.  That's what the million bucks is for.  Now,

5   remember, this isn't a payroll account.  This is cash.

6   There's no taxes taken out of this.

7           And the evidence will show, Ladies and Gentlemen,

8   go back to -- remember that slide I showed you with the bad

9   guy putting the money in the bank and circulating it?

10          Go back to Plaintiff's Exhibit 5.  Okay?  This is

11   another one of their training materials where they are

12   trained to look for this stuff, because here they go.  They

13   teach their people illegal funds are circulated into the

14   economy to take on the appearance of legitimacy through

15   purchases, like cars, houses.  Okay?  This is the type of

16   stuff that the bank could see and the bank knew.

17          Let's go on to the third fingerprint.  The

18   evidence will show that the bank knew that retailers were

19   supposed to be wiring money into the account, and we'll have

20   evidence that will show that no retailer ever wired a cent

21   into that account.

22          So let me tell you this little story by just two

23   little pieces.  I'm going to bookend it.  I'm going to deal

24   with the business bankers.  I want to do it in 2003 with

25   business banker Ed Jambor, and I'm going to do it again in

1    2008 with business banker Christopher Flynn.

2           Let's talk about Mr. Jambor first.  Now, he

3    managed the Petters Company account and the relationship

4    from 2002 up until the time he left the bank in August of

5    2007, and that's when you will hear Christopher Flynn came

6    over as boss and took over the account because it was a big

7    opportunity.  You will hear about that.

8           I'm going to show you an e-mail that Mr. Jambor is

9    on.  This is Plaintiff's Exhibit 104.  This is from February

10   of 2003.  This is from -- this is one of Tom Petters'

11   investors named Jon Sabes, and he writes Shari Rhode --

12   she's at the bank; she was Ed Jambor's boss at one time --

13   and Mr. Jambor.

14          And Mr. Sabes says to Ms. Rhode and Mr. Jambor

15   this:  In reality, we are looking to have M&I Bank act as

16   custodian to receive retailer wire payments.  With the

17   further direction of Deanna Munson at Petters, forward those

18   monies on to their appropriate bank accounts.  And this

19   exact process happens every day with Petters.

20          And you will hear, Ladies and Gentlemen, this

21   evidence will show that the bank knew that retailers were

22   supposed to be wiring money into the account and the bank

23   knew that other people thought retailers were supposed to be

24   wiring money into the account.

25          But you will learn that Ed Jambor, he had never

1    seen a retailer wire money into the account.  Nobody from

2    the bank will be able to say that they saw retailers wiring

3    money into that account.

4           Let's talk about Christopher Flynn.  So

5    Christopher Flynn is the one -- again, he was Mr. Jambor's

6    boss.  And when Mr. Jambor leaves in 2007, he takes over the

7    account.

8           And in 2008 you will hear that Mr. Flynn comes in

9    and he signs an agreement.  It's called a Deposit Account

10   Management Agreement.  And I won't talk about the specifics

11   of the agreement other than this:

12          You will learn that the entire agreement that he

13   signs -- and he signs it with Tom Petters.  He signs it with

14   Tom Petters, and the purpose of the agreement contemplates

15   that retailers, and you will hear the example Costco,

16   retailers like Costco are supposed to be wiring money into

17   the account for then Christopher Flynn or the bank to have

18   that money, get a transaction list from Deanna Munson that

19   says now that retailers have wired money into the account,

20   take it and send it here.  And that's what the purpose of

21   that agreement is.

22          And that evidence will show that the bank knew

23   that retailers were supposed to be wiring money into the

24   account.  Again, nobody, nobody will be able to say that

25   retailers actually did that.

1          Now, I have a banking expert here who I'd like to

2     introduce you to.  Her name is Cathy Ghiglieri.

3          Ms. Ghiglieri, are you here?  Can you please stand

4     up?  Thank you, Ms. Ghiglieri.

5          Ms. Ghiglieri will testify as a banking expert.

6     She was a former Texas banking commissioner.  She was a bank

7     regulator in Texas.  And she will tell you that in her

8     expert opinion -- she will talk about some of the documents

9     and some of the things that we've talked about here, and she

10    will talk about how in her opinion those were red flags and

11    she'll tell you what that means, what red flags means.

12         And she'll also talk you about how -- some of that

13    evidence and other evidence as well that you will hear about

14    where what the bank was engaged in was called atypical

15    banking practices, and she'll talk about that and what that

16    means.

17         Let's talk about motive.  The bank had the motive,

18    Ladies and Gentlemen, and the motive was opportunity.  Tom

19    Petters was a big relationship for these guys.  You will

20    hear it.  And Tom Petters -- back in the day, Tom Petters

21    was a big name in town.  He was.

22         He was very well known in this town because what

23    he was doing is he was taking all the billions of dollars

24    from the money that he was making on the fraud and he was

25    putting it into legitimate businesses to make himself look

1    legitimate.

2              He was involved, for example, in Sun Country.  He

3    bought Polaroid.  He was involved in Fingerhut.  I don't

4    know if you remember Fingerhut, but you'll hear Fingerhut is

5    a mail order catalog back in the day.

6              And this gave the bank a big opportunity to try

7    and go get more business.  You're going to hear about this

8    concept in banking called cross-selling, and the bank will

9    talk about it.  What they do is they take their customers

10   and they try to cross-sell their customers.

11             And what that means is if they have accounts, they

12   try to figure out what other accounts, what other types of

13   products or what other types of services can we sell our

14   customer.  Let's bring in other people internally from the

15   bank in those particular areas to try to see if we can get

16   more business doing that.  That's cross-selling.

17             But what cross-selling also is is you take your

18   customer and you leverage the relationships that your

19   customer has.  So what a good opportunity to get new

20   business.  You take your customer's business relationships

21   and you try to go get more business from them.

22             And that gave the bank a big opportunity.  Because

23   you will hear even the bank, they tried to get in on the

24   Polaroid deal, for example.  Now, they didn't get it, but

25   they certainly tried.  And you'll hear that.

1          Also, Tom Petters had a lot of accounts outside of

2     the bank.  So he had his payroll account at Highland Bank,

3     for example.  You'll hear that.  And what the bank would do

4     is they saw that as an opportunity to go out and try to get

5     Mr. Petters to move all of those accounts to the bank so

6     that they could have more business.

7          Here's a -- I'll just show you one document on

8     this.  This is from what's called "MIContacts."  This is an

9     internal database that the bank has, and what MIContacts is

10    is where the bankers go in and they write their notes about

11    what is happening or their communications with their client

12    so they can track it and see where things are at.

13         So this is MIContacts.  This is an entry that Ed

14    Jambor was on back in 2003.  And this is just one example.

15    You will see many.  It says here, "Tom will need credit with

16    the companies when he moves all the accounts to us.  He

17    hates U.S. Bank, works with Highland, but wants to move out

18    of there also.  This is now too large for small business and

19    Ed will transition to Chris Flynn."

20         You'll see evidence like this, Ladies and

21    Gentlemen, where they are talking about how they are going

22    to get Tom to move all of the accounts over to the bank

23    because that was a good opportunity, that was a big

24    opportunity.  That is what they were trying to do, Ladies

25    and Gentlemen.

1          Let's talk about losses.  The evidence will show

2     that the losses that the bank is responsible for in this

3     case are actually pretty darn simple.  It's the

4     $1.926 billion in debts that Petters Company, Inc. owes to

5     those lenders who loaned Petters Company that money.  Now,

6     you will hear those called the net losses.

7          I have another expert here that I'd like to

8     introduce you to.  His name is Ted Martens.  Mr. Martens,

9     will you please stand up.  This is Mr. Martens, Ladies and

10    Gentlemen.  Thank you, Mr. Martens.

11         Mr. Martens was a forensic accountant.  He worked

12    at one of the biggest accounting firms in the world called

13    PricewaterhouseCoopers.

14         And you will hear that in 2008, right after the

15    fraud was revealed and it was shut down by the FBI,

16    Mr. Martens was approved by the Federal Bankruptcy Court,

17    too, to come in and work with Doug Kelley to do a forensic

18    accounting of the fraud, where he mapped out where all the

19    money came and went.

20         And in this case you will hear that Mr. Martens

21    mapped out what the losses were, and he will talk about them

22    as net losses.  He will tell you this is the amount of money

23    that was loaned to Petters Company, Inc. and he will tell

24    you that that amount is somewhere around $1.926 billion.

25    That's the amount of money that was loaned to Petters

1    Company, Inc. as a result of this.

2            So, Ladies and Gentlemen, why would the bank be

3    responsible for this?  The evidence will show that you can't

4    run a multi-billion dollar fraud like this without the

5    willingness, without the assistance of a bank, and without a

6    bank who is willing to look the other way.

7            And at the end of this case, Ladies and Gentlemen,

8    we're going to ask that you award damages to Mr. Kelley,

9    damages to Mr. Kelley so that those debts that Petters

10   Company, Inc. owes to those lenders can be paid back to

11   them.

12           I thank you for your time, Ladies and Gentlemen.

13   I appreciate your patience.  We look forward to trying this

14   case before you, and we look forward to standing up here

15   again at the end of this case and asking you for your

16   verdict in favor of Mr. Kelley.

17           Thank you so much.

18           THE COURT:  Members of the Jury, we will take our

19   mid afternoon break.  Please be prepared to come back into

20   the courtroom in 15 minutes, so at 3:15.

21           Please remember the instructions that I have given

22   you.  Please do not discuss this case with anyone.  Please

23   don't have any discussions or -- with any of the parties or

24   anyone who is likely to be a witness in this case.  As you

25   know, you alone are the judges of the facts and must use

1    your judgment based on the evidence that's presented here in

2    the courtroom.

3              We'll take our 15-minute break, and thank you

4    again for your patience and your service.

5         (Jury excused)

6              THE COURT:  Okay.  We'll be ready to proceed at

7    3:15.

8         (Recess taken at 3:03 p.m.)

9                        *    *    *    *    *

10        (3:18 p.m.)

11                        **IN OPEN COURT**

12                        **(JURY PRESENT)**

13             THE COURT:  You may be seated.

14             Are we ready to proceed?

15             MR. GLEESON:  I am.

16             THE COURT:  You may.

17             MR. GLEESON:  Thank you, Judge Wright.

18             THE COURT; you're welcome.

19             MR. GLEESON:  May it please the Court, counsel and

20   the parties on both sides, women and men of the jury.

21             As you just heard from Mr. Collyard, Mr. Kelley

22   has set his sights on BMO Harris.  He has brought this

23   lawsuit based on his claim that M&I Bank actually caused

24   $1.9 billion in harm to PCI.  More about that in a minute.

25             The evidence in this case is going to show you

1   that Mr. Collyard is just dead wrong on almost all of his

2   very serious allegations.  It's going to show you that BMO

3   Harris is not liable to PCI at all.  Not for $1.9 billion.

4   Not for a penny.

5          We do agree on one thing.  We know now and we've

6   known since late 2008 that PCI was a Ponzi scheme.  You will

7   hear that in 2008 PCI pleaded guilty to crimes arising out

8   of the Ponzi scheme.  Companies can plead guilty too, and it

9   did, along with Petters and Coleman and White.  In fact,

10  we'll hear that Mr. Kelley entered the plea for PCI.

11  Petters, of course, as you know, was convicted and is

12  serving his prison time.

13         What was the scheme?  A brief recap is, I think, a

14  little useful for you.  This one was anything but simple, as

15  you just heard Mr. Collyard say.  It was a particularly

16  complex criminal enterprise that evaded detection for more

17  than 14 years.

18         As you heard from Mr. Collyard, PCI claimed it was

19  buying electronics and selling electronics, and it got money

20  from a large number of investors to fund that business.

21         PCI's investors were hedge funds.  As you may

22  know, hedge funds are a way sophisticated investors can

23  invest large amounts of money.  Those hedge funds made

24  business decisions over many years to give PCI -- and when I

25  say "PCI," I, of course, mean Petters Company, Inc. --

1    billions and billions of dollars in exchange for huge

2    returns.

3            When the PCI Ponzi scheme went bust, PCI owed

4    those hedge funds investors lots of money.  But let me just

5    take a second to ask a simple question, and I'm going to say

6    more about this in the course of my opportunity to address

7    you.  Why wasn't PCI able to pay the hedge funds back?  It's

8    because the Ponzi scheme that was PCI was essentially -- it

9    stopped working.  It was like a game of musical chairs.

10           Since around 1994, long before PCI had any

11   involvement with M&I Bank, investors loaned money to PCI

12   with the agreement they would get their money paid back plus

13   interest.

14           But, as you heard, instead of using the money to

15   buy and then sell electronics, PCI just took the money from

16   new investors and paid it to old ones.  The scheme could

17   stay hidden only as long as, to use the metaphor again, the

18   music kept playing on, that is, as long as the hedge funds

19   kept making new loans to PCI.

20           But in 2008, as I think all of you know, in 2008

21   the economy slowed and then it crashed, money dried up, the

22   music stopped.  And, as you will hear, it stopped when

23   Deanna Coleman, Petters' chief lieutenant, who was in on the

24   Ponzi scheme for its entire 14-plus-year span, saw the

25   collapse coming and decided to turn herself in to the FBI

1   and tell the FBI what she knew.

2           After the agents raided PCI and arrested Petters,

3   PCI filed for bankruptcy.  And some of the investors had

4   already gotten all of their money back plus a lot of

5   interest.  They were safely seated in the remaining chairs

6   when the music stopped.  But, in this big game of musical

7   chairs, those hedge funds that are at issue in this case had

8   not.  They got stuck without a chair to sit in.

9           And Mr. Kelley's here all these years later -- and

10  this is important -- he's standing in the shoes of PCI.

11  He's not from the government.  He's a respected lawyer, but

12  he's a lawyer in a law firm appointed to bring claims on

13  behalf of that bankrupt company.  As I said, when PCI pled

14  guilty, Mr. Kelley entered the plea for it.

15          He doesn't bring claims on behalf of investors.

16  He can't.  They can bring their own claims.  He can only

17  bring claims in which he says -- and this is fundamentally

18  important -- in which he says PCI was itself the victim.

19          The evidence in this case will show he gets paid

20  out of the money he collects, and in this case he's asking

21  you to find that the men and women at M&I Bank caused PCI to

22  owe the $1.9 billion to the hedge funds and therefore M&I

23  Bank and BMO Harris Bank, which I and my colleagues

24  represent, should pay the tab.  That's what this case is

25  about.

1          The evidence, Ladies and Gentlemen, is going to

2     show you the following things:

3          M&I Bank did not make PCI into a Ponzi scheme.

4     PCI did that.

5          M&I Bank did not take any money from those hedge

6     funds investors that invested in PCI.  PCI did that, too.

7          M&I Bank did not use those investors' loans to PCI

8     to pay off other investors, previous investors in this Ponzi

9     scheme, rather than run a legitimate business.

10          And it didn't make PCI unable to repay those loans

11     to the hedge funds, back to the hedge funds.  That was all

12     PCI as well.

13          And, finally, M&I Bank didn't cause PCI to enter

14     into bankruptcy.  The global financial collapse and the FBI

15     raid took care of that.

16          So what did M&I Bank do?  It was a bank where PCI

17     had a deposit account for several years until the complex

18     scheme collapsed.  The scheme was complex.  The account was

19     simple.

20          Mr. Collyard just stood up before you and for

21     nearly an hour claimed that this PCI deposit account at M&I

22     Bank was somehow a centerpiece of this elaborate fraud.  He

23     claimed that M&I employees -- you're going to see all these

24     employees; you're going to get to size them up for

25     yourselves -- knew about the scheme and with that knowledge

1    turned a blind eye, took steps to help Petters and PCI

2    perpetrate its massive fraud.

3           But, Ladies and Gentlemen, the evidence in this

4    case is going to prove exactly the opposite.  For starters,

5    and it's very telling, he began with Sara Johnson.  It's

6    telling he began with an unfounded claim of document

7    destruction.  It's telling that he did not have a -- point

8    to a single witness, a single document to back up these very

9    serious claims that the people at M&I Bank were in on this

10   Ponzi scheme.  He can't explain.

11          The evidence in this case is going to show you

12   that there's no explanation for how an elaborate Ponzi

13   scheme that lasted for so long could possibly have been

14   dependent on a single deposit account that PCI opened

15   substantially into the life of the scheme.

16          Most importantly, the evidence in this case is not

17   going to show even closely, anywhere close, support for this

18   allegation that any M&I employee knew about the Ponzi scheme

19   or had any role in participating in it.

20          You're going to hear throughout the course of this

21   trial from quite a few people at M&I Bank.  You know, banks,

22   like any other companies, operate, act through people.  And

23   you're going to see quite a few of the people who from the

24   relevant period, 2002 to 2008, worked at that bank.

25          And to one degree or another, because this case

174

1   depends upon it, Mr. Kelley is going to demonize just about

2   every one of them, claiming they were in on the fraud or

3   knew about it and deliberately turned a blind eye so they

4   wouldn't find out about it or that their inability to

5   remember details from nearly 20 years ago means they are

6   hiding something.

7           Of course they don't remember all those details.

8   These events happened 15 to 20 years ago, and PCI was one of

9   hundreds of customers these employees encountered at the

10  time.  And it was not their most prominent customer.  I'll

11  come back to that.

12          You're going to see for yourselves that these

13  women and men at M&I Bank were just doing their jobs

14  diligently, honestly.  Again, you will get to size them up.

15  You make your own determinations.  They are good, honest,

16  solid, hardworking members of this community.  And like the

17  rest of the world outside of Petters' scheme, they had

18  literally no idea, no inkling.

19          I suggest to you, respectfully, you're going to

20  find the facts and at the end of this case you're going to

21  find they had no idea that Tom Petters was not the

22  upstanding, successful businessman, pillar of the community

23  that he held himself forth and people believed him to be at

24  the time.

25          Mr. Kelley's counsel is going to drag those

1   employees of M&I Bank through the mud -- watch; you'll

2   see -- hoping it will stick to at least one of them, because

3   he has to prove that an M&I employee actually knew about

4   this scheme or knew about suspicious circumstances and in

5   bad faith turned a blind eye so they wouldn't learn the

6   truth.

7           He's not going to be able to do that.  You're not

8   going to see any of the evidence of the sort that you should

9   expect to see if Mr. Kelley's claims that they were

10  complicit in the way he has described in this Ponzi scheme

11  were true.

12          You're going to learn that no one at M&I Bank got

13  anything from PCI or Tom Petters.  No million dollar checks

14  like Deanna Coleman got.  No payments in any amount.  No

15  Twins tickets.  No chicken dinner.  No nothing.

16          Mr. Kelley doesn't have any actual evidence or any

17  evidence of a motive on either side.  There's no motive on

18  the side of PCI to put these M&I bankers in a position where

19  they would know about the scheme.  There was certainly no

20  motive on their part or on the part of the bank to become

21  part of the scheme or turn a blind eye to it.  More about

22  that in a few minutes.

23          Instead, as you just heard from Mr. Collyard,

24  Mr. Kelley is here almost 15 years later pointing to events

25  that he claims are red flags, claiming that, of course, they

1    put M&I employees on notice that PCI was nothing but a

2    fraud.  And you're going to see that these things that

3    Mr. Collyard pointed to was not -- were not red flags at

4    all.

5           And just as importantly, the events -- and this is

6    so critical to this trial -- the events that Mr. Kelley and

7    his counsel will identify for you as red flags were all

8    dredged up with the benefit of an investigation that was

9    done years after Tom Petters was arrested and the scheme

10   collapsed.

11          This case is a monument to a term that you have

12   all heard, "hindsight bias."  It's not uncommon.  You know,

13   people convince themselves after a significant event happens

14   that there were signs of it all along before it happened,

15   even though in truth it really couldn't have been

16   anticipated at the time.  There's other terms for it.  Some

17   people call it Monday morning quarterbacking.  That's what

18   this case is all about.

19          One way to look at it, to borrow the metaphor that

20   Mr. Collyard used, Mr. Kelley's case is kind of like a

21   detective story, a true crimes story.  You flip all the way

22   to the end, to the last chapter, see how the story ends when

23   it was revealed that Tom Petters was not the upstanding

24   member of the community everybody thought he was, successful

25   local businessman.  In fact, he was the villain, a huge

1    villain.  His company was convicted of crimes, including

2    mail fraud, wire fraud, conspiracy.

3              And now Mr. Kelley is here, using today what he

4    knows today, only after the FBI raid and after all of his

5    staff's investigation, claiming that M&I Bank and its

6    employees should have, must have, actually did figure out

7    the ending of the story before Tom Petters was arrested.

8    This is a classic example of hindsight bias.

9              We do know now that Petters is in Leavenworth,

10   Kansas, in the federal prison there, a disgraced criminal,

11   presided over one of the most notorious Ponzi schemes in our

12   country's history.

13             But at the time PCI had an account at M&I Bank, as

14   I mentioned, he looked like something fundamentally

15   different, a successful local businessman.  He owned several

16   legitimate businesses that I'm sure many of you heard of,

17   Polaroid, Sun Country Airlines.  And, significantly, he also

18   owned some multiple -- he owned multiple retail businesses,

19   Fingerhut, Petters Warehouse Direct.  He was a prominent

20   philanthropist as well, who gave millions to charities,

21   political causes.  He was seen with celebrities and

22   governors at fundraisers and galas.

23             A perfect example of this looking at things

24   through the prism of hindsight is the document Mr. Collyard

25   showed you in which one of M&I Bank's AML, anti-money

1    laundering, analysts, Mary Pesch, analyzed PCI's account

2    activity after the raid, after Petters was arrested.  It

3    really makes my case for me.

4         Mary Pesch had no idea before the arrest occurred

5    that there was a Ponzi scheme afoot, but she went back after

6    the scheme was publicly revealed, widely reported in the

7    news, and then she poured over the files from the PCI

8    account looking for clues.

9         Armed with that information, including that

10   Nationwide and Enchanted were actually sham vendors, which

11   no one knew at the time, she was able to piece it together.

12   She will tell you it took a week or more.  Equipped with the

13   last chapter of the true crime story, it took her a week or

14   more to trace how the scheme worked, even once she already

15   knew that PCI was a scam.

16        So Mr. Kelley's contention that Mary Pesch and her

17   colleagues must have understood the Ponzi scheme at the time

18   in the moment that matters, before the Petters arrest, is

19   just not supported by the evidence.  It's not going to pan

20   out.

21        We're asking you now to put aside these

22   after-the-fact claims that Petters and PCI's fraud, you

23   know, was obvious from the start and we're going to ask you,

24   as you listen to the evidence unfolds, to put yourself in

25   the shoes of those M&I Bank employees back at the time, 2002

1       to 2008.  2008 is when the scheme collapsed.  It's only

2       fair.  We're going to ask you to see things through their

3       eyes at the time that they saw them, they saw all the events

4       and they saw Petters.

5              One thing we'll ask you to bear in mind is the

6       period that we're talking about.  It was from just after the

7       terrorism attacks on 9/11/2001 until the 2008 global

8       financial crisis.  It's a long time ago.  The Twins were

9       still playing in the Metrodome.  Smartphones were just

10      hitting the hard market.

11             And I want to emphasize this because it's so

12      important.  The question for you as jurors is not whether in

13      retrospect, with the benefit of hindsight, there were things

14      that M&I Bank employees could have or should have done.  You

15      heard them say that they must have been aware and then they

16      turned a blind eye.

17             One very critical thing this case emphatically is

18      not about.  I'm not going to give you legal instructions.

19      Judge Wright will give you the instructions and you will

20      listen to Judge Wright's instructions.  You're going to

21      learn this case is not about seeing something suspicious and

22      not doing anything about it.  This is no negligence case.

23      Negligence means coulda, shoulda, in hindsight could have

24      found out, maybe.

25             Mr. Kelley has his eyes on a much bigger prize

1    here.  He has his eyes on a $1.9 billion prize, and to get

2    there he has made extremely serious allegations that require

3    him to show much more than negligence.  He's not going to be

4    able to meet that burden.

5         The evidence is going to prove to you -- you will

6    be the judges of the facts -- that the M&I employees in this

7    case were not only not negligent, but they did nothing

8    wrong -- I mean that, nothing wrong -- and that there will

9    be no liability here.

10        Before I get to the rest of my presentation,

11   obviously let me re-introduce myself, John Gleeson.  You met

12   me earlier.  You met my co-counsel, Keith Moheban, Morgan

13   Davis, Mike Schaper, Adine Momoh, Rich Spehr.  This is Gina

14   Parlovecchio.  And you met Jeff Jamison and Julie Rodriguez

15   Aldort, representatives from the client, from BMO Harris

16   Bank.  We have the privilege of representing BMO Harris

17   Bank.  I mean that, it is a privilege.

18        We all thank you in advance for your jury service.

19   As I mentioned to you this morning, it's a big deal to put

20   aside your lives for as long as this trial is going to

21   require you to do that, so we're all grateful.

22        The first critical thing I want to focus on is

23   what I just said.  The M&I Bank employees did nothing wrong.

24        And let me start by giving you a little

25   background.  In the mid '90s PCI was already a Ponzi scheme.

1     It began around 1994.  There's no dispute about that.  It

2     attracted investors by telling lies about a business it

3     pretended to be in, and those lies sustained the Ponzi

4     scheme for a long time.

5           It wasn't just the lies, but they were a critical

6     part of it, including for several years before PCI even had

7     an account at M&I Bank, this was a fully-baked,

8     up-and-running, successful Ponzi scheme before M&I Bank even

9     went on stage.

10          The -- 14 years is a long time to sustain a

11    scheme.  One thing is for sure, you can't sustain a simple

12    scheme for 14 years.  So how did Petters and his criminal

13    colleagues fool the world for so long?  The evidence is

14    going to show you they were very, very good at it.  And let

15    me focus on a few ways in which they did that.

16          One was Tom Petters' reputation.  He had, as I

17    mentioned, a well -- everyone thought a well-earned

18    reputation as a successful legitimate businessman.  Apart

19    from PCI, he owned many other companies, household name

20    companies like I mentioned already.

21          He played an important role.  You're going to

22    learn from lay witnesses and expert witnesses that in that

23    period, 2002 to 2008, the fact that Petters appeared to be

24    what he claimed to be was a very important fact.  That fact

25    alone played an important role in helping him to hide the

1    reality that other than -- you know, unlike his other

2    legitimate businesses, PCI was wholly a Ponzi scheme.

3              The other -- another way in which Petters,

4    Coleman, and White were able to conceal their criminality

5    was -- as I say, it was anything but a simple scheme.

6    Mr. Kelley, I suppose, from Mr. Collyard's opening, wants

7    you to believe that.

8              But you're going to see from the evidence in the

9    case that they made sure that the PCI business model was

10   extremely complex, extremely difficult to untangle.  All

11   in all, over the life of the scheme, it involved over a

12   dozen phony companies, several phony vendors, more than

13   85 accounts spread over 20 banks.

14             It wasn't just his reputation and the complexity

15   of the scheme.  Another way Petters and his colleagues hid

16   the scheme was by creating fake documents.  They created

17   phony financial statements, fake wire transfer records, even

18   fake bank statements.  They also made up fake invoices.

19             But the most important way in which PCI, in whose

20   shoes Mr. Kelley stands, and Petters and Coleman and White

21   kept the scheme a secret was the simplest of all ways, they

22   lied.  They lied a lot and they were great at it.  They had

23   to be.  If people found out what they were doing, they could

24   literally spend the rest of their lives in prison, like Tom

25   Petters is.

1          Mr. Kelley has admitted that PCI lied to M&I Bank.

2     Here is Mr. Kelley's answer to questions posed to him in

3     this case answered by him under oath in this case:

4          "Admit that representatives of PCI made

5     misrepresentations about PCI's business to M&I."

6     Misrepresentations, you know this, that's lawyer for lies.

7     Mr. Kelley admitted it.

8          "Admit that the representatives of PCI took

9     actions to hide Petters' Ponzi scheme from M&I."  And you

10    see here the trustee admits.

11         So Mr. Kelley himself, the plaintiff in this case,

12    admitted under oath that Petters lied to M&I Bank, hid the

13    scheme from M&I Bank, just like he did from the rest of the

14    honest world.  But, somehow, here we are anyway.

15         It shouldn't be surprising that Petters and his

16    accomplices, Coleman and White, lied to M&I Bank.  They had

17    every reason to believe that bank employees never figured

18    out the scheme.  They had every reason to make sure they

19    never figured out the scheme.

20         For one thing, they would have gone to jail a lot

21    sooner because M&I employees -- you're going to learn this.

22    You're going to learn this from the people who are going to

23    be besmirched on that witness stand by Mr. Kelley's lawyers.

24    Their job was to ferret out suspicious activity and to

25    report it, not to hide it.

1          So it was important to keep the truth from the M&I

2     Bank employees.  And another reason it was important was it

3     enabled PCI to continue using those employees and the bank

4     as pawns in the scheme, and that's what they did.

5          Here's an important point the evidence in the case

6     will show you:  PCI took pains to keep its relationship with

7     M&I Bank as narrow as possible.  And the most important way

8     it did that was making sure that PCI had nothing more than a

9     simple deposit account at M&I Bank.

10          A deposit account is the simplest relationship a

11     person or a company can have with a bank.  It's really no

12     different than your own checking account.  To open the

13     account you pretty much need a name, an address, a Social

14     Security number, or for a company a tax ID number.

15          Mr. Collyard -- you're going to see in this case

16     an e-mail where Ed Jambor and his supervisor, Shari Rhode,

17     discussed a potential loan to PCI.

18          And you heard Mr. Collyard talk about

19     cross-selling.  Another, like, fundamental fact about

20     business banking is all business banks cross-sell.  Of

21     course it's good for the bank and it's good for the

22     customer.  They all want to deepen their relationship with

23     their clients.

24          But you're going to learn that whenever the topic

25     of a loan came up with PCI, it wanted nothing to do with it.

1    And the reason for that is if this narrow deposit account

2    relationship was expanded into a loan relationship, a lot

3    more information would have to go from PCI to M&I Bank,

4    financial statements, audit reports, tax returns.

5           More people from M&I Bank would have been assigned

6    to the account, meaning more scrutiny of PCI's business,

7    which was the very last thing that Petters and Coleman and

8    White and PCI itself wanted.  So, instead, PCI made sure it

9    just kept that one -- just that deposit account

10   relationship.

11          And by keeping it so narrow, it also made sure it

12   only had a single business banker servicing the PCI account

13   at any given time, a banker who serviced hundreds of other

14   customers, which made it much easier for PCI to keep the

15   business banker relationship manager with the PCI account in

16   the dark.

17          How else do we know that M&I Bank wasn't involved

18   in the scheme run by Petters and his co-conspirators?  The

19   best possible way, you're going to hear from Deanna Coleman.

20          She was on the inside of this scheme.  And as I

21   mentioned, in 2008, as the end was nearing because the

22   economy was collapsing and the music was beginning to stop,

23   Coleman decided to cut her losses by turning herself in to

24   the FBI to report the massive fraud of which she was a

25   central part, a key player, for all 14-plus years of its

1    existence.

2           She agreed to cooperate with the government in the

3    hopes she would avoid a long prison sentence, like the one

4    Petters is serving now.  She succeeded in that goal.  You'll

5    learn, the evidence will show you about the terms of her

6    cooperation.  It gave her a very powerful incentive to tell

7    the FBI the truth.

8           If she falsely withheld information about a person

9    or a company that was involved in this scheme, knew about

10   it, turned a blind eye so it could perpetuate itself, she,

11   too -- if she did not tell the FBI about a person or a

12   company that fit that description, she, too, could have

13   spent the rest of her life in prison.

14          She's testified under oath many times now.  She

15   has never once said that M&I employees knew about the

16   scheme, and she's going to tell you that they did not know

17   about the scheme.

18          How else do we know?  Mr. Collyard talked about

19   motive, about the bank's motive to get involved in a billion

20   dollar fraud, multi-billion dollar fraud.  They had no

21   motive to participate in this scheme.  The evidence is going

22   to show you that.  Their motive would have been to report it

23   if they had any inkling of it.  And as you listen to the

24   evidence, think about what it would take to motivate one of

25   these M&I employees.

1              And make no mistake about it.  They talk about M&I

2       and they talk about BMO, and they want them both to be a

3       combined inanimate bank.  But this case is about human

4       beings, individuals, decent honest people who are going to

5       come in here and say:  No, we didn't know about this.  We

6       turned a blind eye to nothing.  We're honest.  We're doing

7       our jobs, supporting our families.

8              And on the subject of motive, really, as you

9       listen to the evidence, you're not going to see any, but

10      think about what it would take to motivate someone to risk

11      their job, their reputation, their family's livelihoods

12      deliberately to knowingly help participate in this scheme,

13      to be aware of suspicious circumstances and deliberately

14      turn a blind eye so as not to find out bad information about

15      Petters and PCI.  Think about what it would take for these

16      people to risk all that.  You'd have to get a pretty big

17      benefit.

18             As I mentioned earlier, you're not going to see

19      anything like that, none of the evidence that I respectfully

20      suggest you should expect to see if Mr. Kelley were right,

21      no checks, no job offers, no cars, no fancy vacations, no

22      nothing.

23             Because Mr. Kelley doesn't have that evidence, the

24      evidence that you should expect to see, he wants you to

25      think -- you heard this in Mr. Collyard's opening

1    statement -- he wants you to think -- he says to you the

2    evidence will show.  That's what's important in an opening

3    statement.  It's what -- the lawyers tell you what the

4    evidence will show.

5           You watch.  You watch the evidence to see if the

6    evidence supports the claim that PCI was so special to Ed

7    Jambor and Chris Flynn or anyone at M&I Bank that they would

8    do anything to please them, bend over backwards to help

9    them, even if it meant committing -- helping them commit a

10   fraud, even if it meant years in prison.  And that's not

11   what the evidence is going to show you.  It's just not.

12          You heard a lot about Mr. Collyard -- I'm sorry,

13   from Mr. Collyard, excuse me, about Ed Jambor and Chris

14   Flynn, who were -- who succeeded -- Chris Flynn succeeded Ed

15   Jambor as the relationship business banker for the PCI

16   account.  You would think incorrectly, based on the opening

17   statement, it was their only account.

18          It wasn't even their biggest customer, and it

19   certainly wasn't the most profitable customer for the bank.

20   In fact, between -- this is all in connection with this

21   alleged motive.  You're going to see the evidence that

22   between 2005 and 2008 PCI wasn't even in the top 15 banking

23   customers in Minnesota.

24          On this slide you can see the profits for the M&I

25   Bank's Minnesota business banking customers, just that

1    department, not commercial banking, just their business

2    banking customers overall compared to the profit it got from

3    the PCI account.

4          So you see in 2008, for example, there's a little

5    tiny blue line that barely makes it up off the bottom of the

6    chart.  That roughly reflects the profit from PCI.  And just

7    picking one year, you see on the chart, for example, M&I

8    Bank earned just $81,254 from the PCI account, that tiny

9    little blue bar.

10         Well, you know, you might be thinking maybe the

11   bank was making a lot of money from Petters and his

12   companies in some other way.  They weren't.  The evidence is

13   going to show you that.

14         One of our experts, Karl Jarek, calculated the

15   maximum possible amount M&I Bank could have made from the

16   PCI account.  It was an average, you will learn from his

17   testimony, of $212,000 per year in terms of interest and

18   other charges.  You're going to learn it from Mr. Jarek.

19   That was less than .023 percent of M&I's Bank income at the

20   time, 23/1,000ths of 1 percent.

21         So the revenue, looking at it from the perspective

22   as my adversary asked you to look at it from, the motive of

23   M&I Bank, the revenue was a drop in the bucket for the bank.

24   What it means is the maximum amount the bank could have

25   earned from this account, from the PCI deposit accounts,

1    from 2002 to 2008 is about 1.6 million total.  And it

2    different earn nearly that much.  That's the maximum amount

3    it could have, 1.6 million total.  Compare that to the

4    1.9 billion that Mr. Kelley feels he's entitled to on behalf

5    of PCI, the criminal enterprise PCI, from the bank in this

6    case.

7           Let me make that point in a different way, make it

8    more accessible maybe.  If a Minnesota family earning

9    $50,000 per year got the same percentage benefit that M&I

10   Bank got from the PCI deposit account, maximum amount it

11   could have gotten, that family would end up with $11.50.

12   Ask yourselves whether that would be enough temptation for

13   you to put your livelihood, your family, your liberty at

14   risk.

15          Mr. Kelley knows the bank didn't make any real

16   money from the PCI account, so you heard in Mr. Collyard's

17   opening a different angle.  The evidence is going to show

18   you just how rich this angle is.

19          He asked you to believe that the M&I Bank

20   employees put their freedom at risk in the hopes they might

21   attract more bank business.  I already told you that the

22   evidence will show you that PCI wanted nothing to do with

23   loans or any bank business that had anything to do with

24   providing information to M&I Bank.  But Mr. Kelley's thesis

25   here is they were so eager to put their freedom at risk to

1    attract more bank business from PCI sometime in the future.

2          You know, one great thing about jurors and our

3    jury system is you don't leave your common sense at the

4    courthouse door when you come in.  People don't risk -- and

5    the evidence is going to show you this -- people don't risk

6    spending years in prison because they hope they might --

7    emphasis on "might" -- get additional business for their

8    employer at some point in the future.  In any event, there's

9    going to be no such evidence here.

10         You have all heard, I bet, in your lives the

11   expression "follow the money."  If you follow the money in

12   this case, it leads right back to PCI, the entity that

13   Mr. Kelley represents, and it leads to Petters and the

14   insiders in the scheme.  None of it leads to M&I Bank or any

15   of the people who work there.

16         So, to recap, before moving on to the so-called

17   red flags, Mr. Kelley admitted that PCI lied to and misled

18   M&I Bank.  There will be no evidence of anyone at M&I Bank

19   benefitting in any way from PCI or Petters or Coleman or

20   White.  And Mr. Kelley will not have any evidence that

21   anyone at M&I Bank had any idea what was going on, and

22   Deanna Coleman said that the bank was not in on the scheme.

23         So let me turn to these so-called red flags.

24   Mr. Kelley, huge dollars signs in his eyes, has spent years

25   combing through records from M&I Bank, PCI.  He is the

1    trustee for PCI and others.  And, as we've talked about, you

2    will see none of the evidence you should expect to support

3    claims like these, these serious claims.  But he's got these

4    red flags, things that he claims, through the prism of

5    hindsight bias, screamed Ponzi scheme.

6            We're going to demonstrate to you through

7    evidence -- and let me step back a second.  Mr. Kelley is

8    the plaintiff in this case.  It's his burden.  He has the

9    burden of proving these very serious claims by a

10   preponderance of the evidence.

11           But we are going to prove to you -- we have no

12   burden.  We're going to prove to you that none of these

13   so-called red flags even whispered Ponzi scheme, let alone

14   screamed Ponzi scheme.

15           Let me start with these AML alerts.  You heard

16   what -- you heard in Mr. Collyard's opening about anti-money

17   laundering and the Anti-Money Laundering Group at M&I Bank.

18   It's headquartered in Milwaukee.  That's where the AML Group

19   was.

20           They had no interaction with PCI at all.  No

21   reason whatsoever to help PCI carry out a Ponzi scheme.  As

22   you will hear, their job was to monitor accounts across the

23   whole bank to look for particular types of activities that

24   bank regulations, federal laws, bank policy instructed them

25   to focus on.

1          And this goes back to what I mentioned earlier.

2     You know, we're here in 2022, but bear in mind, as the

3     evidence comes in, the time period in which these events

4     occurred.

5          The relationship between PCI Bank -- excuse me,

6     between PCI and M&I Bank began right around the time of the

7     terrorist attacks, September 11th, 2001.  And if you were

8     old enough then, I'm sure you remember the fear we all felt

9     that another terrorist attack could happen.

10          You may remember, but you'll learn from the

11     evidence, that right after the attack Congress passed new

12     laws designed to make sure that banks could identify

13     potential terrorist activity.  Federal regulators told banks

14     to focus on signs of terrorist activity, like transactions

15     to or from foreign countries.

16          Regulators were also focused -- and you'll learn

17     this from the evidence, from those trainings that

18     Mr. Collyard alluded to in his opening statement --

19     regulators were focused on transactions involving large

20     amounts of cash, think duffle bags full of hundred dollar

21     bills.  Well, the evidence is going to show you that PCI did

22     none of those things.  Its transactions were not with

23     foreign countries, didn't involve large amounts of cash.

24          You'll hear from several members of M&I's -- M&I

25     Bank's AML Group.  You see a few of them on this slide.

1    They are going to tell you how hard M&I Bank worked on its

2    AML program.

3              If you listen to these witnesses and you consider

4    the evidence -- again, put yourself in their shoes, think

5    about -- listen to the evidence about what they were

6    correctly focused on at the time, the terrorist activity,

7    money laundering involving large amounts of cash.

8              They were not focused on, nor were they told to

9    focus on, community leaders and businessmen of Minnetonka --

10   from Minnetonka that Tom Petters held himself out to be and

11   that everyone believed him to be.

12             The evidence is going to show you that PCI was

13   revealed to be a Ponzi scheme right before the arrest of

14   Bernie Madoff.  I bet many of you heard of him, remember

15   him.  He ran an even bigger Ponzi scheme, biggest one in US

16   history.  It went bust shortly after the Petters scheme did,

17   in the latter part of 2008.

18             But in the years before Bernie Madoff was

19   plastered over the front pages of all of the papers, Ponzi

20   schemes, as my kids would say, weren't a thing then.  Right?

21   They were -- they weren't what people in the AML Group were

22   focused on.  They were not what people in the banking

23   industry writ large were focused on.  They were not what the

24   regulators were focused on, what law enforcement was focused

25   on.

1          You're going to learn that back then a lot of

2     very -- you know, Judge Wright said it exactly right,

3     "popularly known as a Ponzi scheme."  That's true now.

4     You're going to learn that very experienced bankers and bank

5     employees hadn't even heard the phrase "Ponzi scheme" before

6     Tom Petters and Bernie Madoff were arrested and they hadn't

7     been taught to look for signs of one.

8          It's only through hindsight bias that Mr. Kelley

9     is claiming that bank employees should have spotted, could

10    have spotted the Ponzi scheme before 2008.  And even that

11    isn't enough.  This is not a negligence case.  This is not

12    shoulda or coulda.

13         You're going to see people beaten up on this

14    witness stand because much more serious allegations have

15    been made against them, and Mr. Kelley is not going to be

16    able to prove those allegations.

17         But I do want to be clear about this.  Just

18    because Ponzi schemes weren't a thing, they weren't the

19    focus of any bank's AML team before 2008, that doesn't mean

20    that PCI's account wasn't regularly and properly and

21    appropriately reviewed and monitored by M&I's AML

22    department.  The evidence is going to show you it was.

23         M&I Bank had a variety of monitoring systems to

24    help its AML analysts do that work, to place potentially --

25    to identify potentially suspicious activity in all of its

1    customer's accounts, including PCI's account.

2            One was called Searchspace, which you heard a

3    little bit about from Mr. Collyard.  It was a program that

4    M&I Bank implemented in 2005 after a rigorous vetting

5    process.  Searchspace was the gold standard at the time in

6    monitoring programs.  As you heard from Mr. Collyard, PCI's

7    transactions triggered automated alerts in Searchspace.

8            I'm going to make a very important point to you

9    right now about what the evidence will show you.

10   Mr. Collyard toggled back and forth between "alert" and

11   "alarm."  And there's no reason for you right now -- you

12   just came in here -- to understand the fundamental

13   distinction and why he has started the case by conflating

14   "alert" and "alarm."

15           He suggested to you the alerts that were -- that

16   came up through the software, through the monitoring devices

17   at M&I Bank, AML analysts' offices were suspicious activity,

18   that they were alarms.  And the evidence isn't going to

19   support the narrative.

20           You're going to hear from the analysts.  You're

21   going to hear from their supervisors.  You're going to hear

22   from an expert witness, Charles Grice.

23           And I guess we're in the business of introducing

24   the experts.  Mr. Grice, there he is.  Hello, sir.

25           And you're going to learn from all of them -- and,

1  again, this is a very important distinction -- that an alert

2  is just that, it's an alert.  It's not in and of itself --

3  this is a bedrock principle of AML analyst monitoring.  It's

4  not in and of itself evidence of suspicious activity.

5          All it does is prompt an analyst to look further

6  at the customer's account activity and the transactions that

7  triggered the alert to see whether the alert actually

8  qualifies as suspicious activity under the bank's policies.

9          And that's exactly what those AML analysts will

10  tell you that they did.  They used the tools available to

11  them to review each alert.  They acted consistent with bank

12  policies at the time, with regulatory requirements at the

13  time, and determined that the activity wasn't unusual or

14  suspicious -- and it wasn't -- because the activity they saw

15  made sense given what they knew.  They saw that -- the

16  activity they saw made sense, and it did, given what they

17  knew at the time about Tom Petters and his companies and the

18  PCI account activity.

19          Here's an example of an alert.  As you see, a

20  member of the AML team at M&I Bank reviewed the alert,

21  explained why the alert was closed.  The account activity

22  was expected for a large business such as this and her

23  manager approved that decision, confirming that activity

24  appears consistent and expected for this customer and type

25  of business.

1          Now, Mr. Kelley claims now, years later, that this

2     wasn't enough and the analysts should have done more because

3     now we know that Tom Petters was a fraud.  But as you listen

4     to the evidence, ask yourselves why would they have done

5     that in the moment, not now after reading the last chapter

6     of a true crime novel?  Why would they have done that given

7     what they knew and what they were told and what they were

8     trained to do at the time?

9          Think about it.  They knew Petters owned big

10     businesses, big legitimate businesses.  They believed PCI

11     was part of a large collection of legitimate companies.

12     They saw that PCI had been wiring large amounts of money on

13     a regular basis into that account for years.

14          As I mentioned, they didn't start this fraud

15     scheme, this Ponzi scheme when they came to M&I.  It was up

16     and running and working just fine by the time it got to M&I,

17     and the analysts saw the same pattern of activity going back

18     to the beginning of the account.

19          The evidence is going to show you that AML

20     analysts had no idea who or what Nationwide or Enchanted or

21     these other what we know now are fraudulent companies were,

22     and they didn't need to to do their jobs properly.  There

23     was no reason for them to know.

24          You're going to learn this from the evidence.  The

25     bank's policies at the time, which were driven by regulatory

1    mandates and federal laws, did not require analysts to learn

2    who the bank's customers were, right?  Didn't require them.

3    PCI was the customer.  There's nothing in this case, there's

4    no evidence in this case they were required to learn about

5    who PCI, their customer, was doing business with.

6          So from the perspective of those AML analysts,

7    there was nothing about any of these wires that seemed out

8    of the ordinary or required further review.  Policies didn't

9    require it.

10          You know, Mr. Kelley and his lawyers can talk

11   about the amounts of money that went in and out of the PCI

12   account at M&I Bank all he wants.  It wasn't even their

13   biggest customer.  It doesn't change the fact that AML

14   analysts did their jobs properly and reviewed every alert

15   properly on the PCI account, as they did for all their other

16   accounts.  You will get to see them.  You will make that

17   judgment based on the evidence in the case.

18          He's going to criticize -- these lawyers are going

19   to criticize these AML analysts in Milwaukee.  The evidence

20   is going to show --

21          MR. COLLYARD:  May we approach?

22          THE COURT:  Pardon me?

23          MR COLLYARD:  May we approach?

24          THE COURT:  Is there an objection?

25          MR. COLLYARD:  Yes.

1          THE COURT:  Okay.  You may.

2          Members of the Jury, if you would like to stand

3     and stretch while we have this sidebar, you may.

4        **(At sidebar)**

5          MR. COLLYARD:  Your Honor, he keeps talking about

6     how we're going to put these people up on the stand and

7     we're going to beat them up and we're going to criticize and

8     we're going to do this and do that.  He's talking about

9     argument.  I've sat here and listened to it.  It's gone on

10    for a very long time.

11         MR. GLEESON:  That's what the evidence is going to

12    show, that he's going to beat them up.  And if I'm wrong

13    about that --

14         THE COURT:  The evidence is going to show?

15         MR. GLEESON:  The testimony.

16         THE COURT:  How is the evidence going to show that

17    he's going to beat them up?  What evidence of beating up is

18    going to happen?

19         MR. GLEESON:  The way the testimony -- the way the

20    examinations will be conducted is the evidence.  It's their

21    demeanor.  They are going to -- Judge, sorry.  I'll walk

22    away from it.

23         THE COURT:  The objection is sustained.

24         MR. GLEESON:  Thank you, Judge.

25         MR. COLLYARD:  Thank you, Your Honor.

1          **(In open court)**

2                    MR. GLEESON:  Thank you, Judge.

3               Let me turn to another thing that Mr. Kelley's

4     counsel mentioned in his opening statement.  I'll talk to

5     you about the evidence on this topic, which is these

6     retailer payments into the PCI account.

7               Mr. Collyard said that Ed Jambor and Chris Flynn,

8     the business bankers I introduced you to earlier, somehow

9     were supposed to have known that PCI was a Ponzi scheme

10    because of the activity in PCI's account and that's how

11    you're going to know they knew that the scheme existed and

12    that they participated in it.  You're going to hear from

13    Mr. Jambor and Mr. Flynn, Ed Jambor and Chris Flynn, that

14    that's not true.

15              First of all, this theory is based on a notion

16    that Ed and Chris were paying a lot of attention to the

17    specific details of how PCI was supposedly running its

18    business, that they knew these random companies, which were

19    fronts of fraud, Enchanted and Nationwide, were supposed to

20    be the wholesalers that were supposed to be selling

21    merchandise to PCI.

22              The reality, you'll learn from the evidence, from

23    their testimony, is that Chris Flynn and Ed Jambor had never

24    heard of Nationwide or Enchanted, let alone what business

25    they were supposed to have been doing with PCI.

1          Second, you will see no evidence that Ed and Chris

2     understood that the retailers were supposed to be making

3     payments directly into PCI's account, as opposed to

4     indirectly through any of the dozens of other companies that

5     Petters owned, through any of the other banks where Petters

6     or PCI had their bank accounts, or even through the

7     wholesalers themselves.

8          Mr. Collyard showed you an e-mail -- you're going

9     to see it again during the trial -- from which you're going

10    to be asked to infer that Ed Jambor and Shari Rhode were

11    made aware that retailer payments were to be made directly

12    by the retailers into the PCI account.  The e-mail doesn't

13    say that.  You'll see it.  It didn't say what the names of

14    the supposed retailers were.  The next time you see the

15    e-mail at trial, read it carefully for yourselves.  You'll

16    see what I mean.

17         Third, if Ed Jambor and Chris Flynn had

18    believed -- and the evidence is going to show that they did

19    not -- that retailers were supposed to be making payments

20    directly into the PCI deposit account, there will be no

21    evidence that they looked to see whether that was happening

22    or they had any reason to believe that -- as business

23    bankers who worked there, that they had any reason as

24    business bankers to look to see where the incoming deposits

25    were coming from.

1              And that's because, what you will learn from them

2       when they testify, Ed and Chris were focused on what

3       business bankers focus on, which is completely different.

4       It's the average deposit balance in the account, that is,

5       the amount of money that sat in the PCI account overnight.

6       That's the money, you will learn, that banks use to loan to

7       other customers.  That's how banks make money off our

8       checking accounts; they loan the money to other customers.

9              So, as you will hear, that's what Ed and Chris

10      were focused on because when someone, when an entity, a

11      person or a company, has just a deposit account, it's the

12      average deposit balance that makes the profit for the bank.

13             Here's an example of the kinds of reports that Ed

14      and Chris, Jambor and Flynn, got on a regular basis.  These

15      reports track the profitability of their customers.  You can

16      see a column on the report.  You will see these as the trial

17      unfolds.  It says average deposit balance for the PCI

18      account and others.

19             And although lots of money went in and out of the

20      account, the average deposit balances were not especially

21      high compared to the numbers Mr. Kelley's counsel threw

22      around here.  It was about 3 million.  That's what Ed and

23      Chris were focused on.

24             They didn't know this was a Ponzi scheme.  They

25      were focused on the average deposit balance in the simple

1    deposit account.  That was the only relationship that PCI

2    made sure it had with M&I.  They weren't focused on how much

3    was going in or out, and they were not focused on who was

4    doing it.

5         And you know what else?  Even if Chris Flynn and

6    Ed Jambor had pulled up PCI's own account statements and

7    looked at the transfers, the wire transfers in and out of

8    the account, those account statements didn't show who the

9    money was coming from either.

10        Here's an example of an account statement for

11   PCI's account.  There are numbers here for the transactions,

12   but you don't see any names of who was sending or receiving

13   the money.  That information is not there.

14        So this narrative, again, for a substitute of

15   actual proof of involvement in this Petters scheme, this

16   narrative about the structure of the business and retailer

17   payments going directly in and they knew there were no

18   retailers payments going in and therefore, a-ha, they knew

19   it was a Ponzi scheme, it's not going to be supported by the

20   evidence.

21        Mr. Collyard pointed to and alluded to these

22   Deposit Account Agreements in 2008.  These are the types of

23   things that Ed and Chris and all bankers do for their

24   customers.  It's called customer service.

25        Wait until you actually hear the evidence about

1      this effort to have PCI and M&I Bank set up separate

2      custodial accounts from which some of the money in the PCI

3      account would be removed and deposited into.

4              A request from PCI Bank of its relationship

5      banker, Chris Flynn:  Would you set up these accounts?  They

6      get an outside lawyer.  They see what it's going to involve

7      in terms of work for the bank, what it's going to cost, who

8      is going to pay the cost.  Get the lawyer.

9              There's not just one agreement.  There's an

10     agreement between the bank and these hedge funds,

11     Interlachen, Richie, Palm Beach, the hedge funds who PCI

12     couldn't pay back and that's why they are here.

13             There was one agreement between the bank and the

14     hedge funds -- excuse me, and PCI to do what the customer

15     asked the bank to do, set up these accounts, and then a

16     separate agreement between the bank and the hedge funds

17     themselves.  It's like:  You want us to do this?  You're

18     going to have to make sure the bank is protected.

19             They did -- this is a perfect example of how you

20     take completely appropriate, good service by a banker and,

21     with the -- through the prism of hindsight bias, distort it

22     into something sinister.  You're going to see the evidence

23     about these Deposit Account Agreements, and they are not

24     going to support the trustee's, Mr. Kelley's case.

25             Let me turn to one of two more topics I want to

1    address with you, and it's causation.  In order to obtain

2    a single dollar from BMO Harris Bank, let alone the

3    $1.9 billion Mr. Kelley seems to think he's entitled to, he

4    has to prove -- PCI has to prove that M&I Bank's actions

5    caused PCI to owe the 1.9 billion to the eight hedge funds

6    that invested in PCI.  He won't be able to do that.

7         The evidence is going to show that the scheme, as

8    I mentioned, existed for years.  M&I Bank wasn't needed for

9    this scheme to get up and running.

10        As I said before, M&I Bank didn't cause PCI to lie

11   to the investors; didn't cause the investors to give PCI

12   their money; certainly didn't cause PCI to be unable to pay

13   the people, the entities, the hedge funds, it owed money to

14   when the music stopped in 2008.

15        PCI had relationships with many other banks.

16   You're not going to hear any evidence that demonstrates that

17   M&I Bank was the only place PCI could have had a deposit

18   account like this.

19        This theory is no different than blaming the

20   electric company that powered PCI's offices for the entirety

21   of the Ponzi scheme or the company that sold them the

22   computers they used to make up their phony documents.  And

23   then he's saying that he's entitled to have them pay the

24   $1.9 billion?

25        One other thing the evidence will show you, and

1    I'll just allude to this briefly.  Wait until you see the

2    evidence about this Frank Vennes.

3              Frank Vennes was a convicted criminal.  He came

4    into the bank in the early part of this period, from 2002 to

5    2008, and asked the bank for a loan so Vennes could invest

6    in PCI.  And the bank said, no, we're not going to deal with

7    a convicted criminal, no thanks.  That's what happened.

8              And, again, now we've got this -- we've got to

9    find some substitute for actual evidence, so now you're

10   going to hear Chris Flynn be questioned about that.  You're

11   going to hear from the evidence that he did exactly what any

12   good business banker would do.

13             One other thing about these Deposit Account

14   Agreements.  Two of the three hedge funds that entered into

15   those agreements in 2008 made their investments in PCI

16   before they signed the agreements.

17             So when -- the evidence is going to show you, by

18   way of causation, that it could not be the case that the

19   bank's involvement, which was completely blameless in those

20   agreements, could not possibly have caused any harm because

21   the investments were made before the agreements were signed.

22             And the third hedge fund, Palm Beach, got more

23   money back than it lost after the agreement was signed.

24             So nothing about those agreements could possibly

25   have caused PCI's inability, having defrauded those hedge

1   funds, could have caused PCI's inability to pay them.

2          One last thing on this topic.  You're going to

3   conclude, based on the testimony, that M&I Bank, as I told

4   you, did nothing wrong with these Deposit Account

5   Agreements, but you may want to ask yourselves as the

6   evidence comes in why Mr. Kelley seems to think that even if

7   they had done something wrong, he is entitled to

8   $1.9 billion.

9          Pay attention to the evidence, please.  Pay

10   attention to the sequence of events.  Those agreements,

11   those Deposit Account Agreements, all happened in 2008, just

12   a few months before the scheme collapsed.

13          Mr. Kelley is obviously determined to tag M&I in

14   the first instance, BMO Harris Bank ultimately with all of

15   those hedge funds' losses over all the years.  But when you

16   see the evidence on which he relies and when the events on

17   which he relies occurred, you're going to wonder how that

18   could possibly be right.

19          Mr. Collyard claimed that M&I Bank allowed PCI to

20   send money out of its own account to people like Coleman and

21   Petters.  That's what banks do.  They let you use your

22   checking account, your deposit account the way you want to

23   use it.  That's what a deposit account is all about.

24   Mr. Kelley's expert witness won't even be able to tell you

25   how much money he thinks M&I shouldn't have let leave the

1    account or why.

2           And M&I Bank is not in the business of policing

3    what money these criminals, PCI, Petters, Coleman, and

4    White, what they do with the money in the account.  Their

5    job is to make sure if the check is properly signed and

6    there's money in the account, to honor it.  It's not their

7    money.  That's why the deposit account being so narrow is so

8    important.

9           Let me finish this section of my opening statement

10   the way I started it.  Separate and apart from the fact that

11   the bank did nothing wrong, you're going to learn from the

12   evidence that M&I Bank -- to hold M&I Bank responsible for

13   the harm that PCI and Petters and Coleman and White caused,

14   and they are all convicted of crimes, is just -- there's no

15   basis of it in the evidence.

16          Let me turn to the last section, you will be happy

17   to hear, the last section of what I want to tell you now.

18   Obviously, you will hear a lot more during the course of the

19   trial.  Mr. Collyard or one of Mr. Kelley's lawyers and I

20   will get a chance to speak to you in summation.  But the

21   last thing I want to talk to you about is this document

22   destruction point.

23          The substitute -- you're going to learn from the

24   evidence that a substitute for actual evidence of

25   complicity -- and make no mistake about it, the allegation

210

1    here is M&I Bank was complicit in a Ponzi scheme.  The last

2    substitute for actual evidence of that is this allegation

3    that M&I Bank intentionally destroyed documents to prevent

4    Mr. Kelley from discovering evidence that would be

5    unfavorable to M&I Bank in this case.

6         Once again, look, it's not about us.  It's about

7    the evidence.  It's about the real, like, three-dimensional

8    human beings that Mr. Kelley has accused of serious

9    activity.

10        You're going to hear from John Vanderheyden.  He

11   was the head of IT at M&I Bank.  He led the IT department

12   during the relevant period.  He's going to tell you in 2009

13   he and his colleagues in the IT department began planning a

14   project to consolidate M&I Bank's 11 regional servers across

15   the country.  The project was necessary because M&I Bank's

16   software and hardware were out of date.  It happens.

17        As part of this server consolidation project, the

18   IT department didn't save old backup tapes that contained

19   e-mails.  They thought they didn't need to.  This was

20   happening in 2009, 2010, early 2011.  They thought they

21   didn't need to because the bank had adopted software that

22   captured every single e-mail going all the way back to March

23   of 2005.

24        Unfortunately, what the IT department didn't

25   consider was that the backup tapes contained the last copy

1    of e-mails from further back in time, pre-March of 2005.

2              So all of the e-mails from March 2005 forward --

3    right? -- from three and a half years before this scheme

4    collapsed forward were preserved, but some of the e-mails

5    from before that date were not.  It was a mistake, no doubt

6    about it.  We don't run from that.  They should have

7    preserved the tapes.  But in today's world, where companies

8    have massive amounts of data, those mistakes happen.

9              And the really important thing about this aspect

10   of the case is not that those backup tapes were recycled,

11   but whether it was done innocently.  That's the key.  And

12   the evidence will show, we'll prove to you that it was done

13   innocently.  It had nothing to do with this case.  The IT

14   department didn't even know what was on the backup tapes

15   that they recycled.

16             Mr. Kelley's counsel told you about some old

17   backup tapes found in 2014 at one of BMO Harris's offices in

18   Wisconsin.  Let's be clear about one thing that the evidence

19   will show you.  You're going to hear they found those tapes

20   because they were sent to look for them, specifically to

21   look for them.  They were not trying to hide them.

22             You will hear from them.  They were asked to look

23   for tapes dated before March of 2005, and what they found

24   were tapes that had dates on them and the earliest one was

25   dated in 2007, August of 2007.

1           So you're going to learn from the evidence that

2     they honestly did not think that they were among the tapes

3     they were asked to look for.

4           A few years later IT employees searched again for

5     tapes, again, for the right reason.  Found them and

6     processed them.  Nothing was deleted in 2014 or later.

7           You're going to learn from the evidence that this

8     sideshow, this document destruction allegation is a

9     substitute for actual evidence of the allegations, the

10    central allegations in the case.

11          BMO Harris has produced literally millions of

12    documents to Mr. Kelley, including from the backup tapes

13    that BMO Harris was able to recover.  Those documents

14    included all e-mails after March 2005 that Mr. Kelley asked

15    for.  They included all non-e-mail documents for every year

16    for which he asked for them, like Word documents, letters,

17    faxes, account statements, meeting details that you will

18    hear about.

19          It included the entire e-mail boxes of over a

20    dozen employees, including from before 2005, and one was Ed

21    Jambor's.  Ed Jambor was the relationship manager from 2002

22    to two thousand -- August of 2007, and the backup tapes

23    contained his entire e-mail box.

24          One other thing you will learn about Ed Jambor.

25    Coincidentally, in March of 2005 in his performance

1    evaluation his supervisor said:  Could you use e-mail more?

2    You write in handwriting.  We can't read your handwriting.

3    It happened exactly at that point, March 2005.

4            On top of that, Mr. Kelley is the trustee of the

5    bankrupt estate of PCI.  He's got all of PCI's documents.

6    It includes all the e-mails from M&I Bank employees,

7    documents from third parties, like investors.

8            No one at PCI had ever discussed the Ponzi scheme

9    with anyone at M&I Bank by e-mail or any other way.  The

10   evidence will show you that.  But if they had, Mr. Kelley

11   would have those e-mails.

12           And you just heard from Mr. Collyard's opening,

13   and you're going to hear it a lot during the trial, about

14   these missing documents.  But you're going to hear from the

15   real people who were involved, and you're going to make your

16   own determination about whether they were intentionally

17   destroyed to keep evidence from the trustee in this case,

18   from Mr. Kelley in this case.

19           Okay.  I'm just about done.  Just a couple of

20   minutes.  And thank you for your attention.  I appreciate

21   it.

22           I didn't cover everything.  Nobody can in an

23   opening statement.  The evidence is going to reveal other

24   defects in Mr. Kelley's case, but we'll deal with them at

25   the close of the case when we get to speak to you again in

1    summation.

2           As the evidence unfolds, I want you to please keep

3    in mind the most important aspects of the case.

4           First, the human dimension.  Just a group of

5    honest, hardworking people, doing their jobs with no reason,

6    no financial motive, no financial incentive, no reason

7    whatsoever to risk their lives -- their liberty, rather, and

8    their jobs and their family's livelihood to help Petters and

9    Coleman and White perpetrate a Ponzi scheme.

10          Again, bear in mind hindsight is almost

11   inevitable.  We always look back on things in a way through

12   a lens knowing what happened in the meantime.  But judge

13   their actions by putting yourselves in their shoes at the

14   time.  It's the only way to be fair to them.  And all

15   companies, including M&I and BMO, it's the only way to be

16   fair to the banks.  Resist the temptation to judge them

17   through the lens of hindsight bias.

18          And, lastly, look, do those M&I Bank employees and

19   the M&I Bank make a mistake?  Absolutely.  Like so many

20   others, they fell for Tom Petters and Deanna Coleman and Bob

21   White and PCI.  That's all.  That was their only mistake.

22   And they weren't the only ones.  A lot of people did.  That

23   is no basis to hold BMO liable for $1.9 billion.  That's no

24   basis to hold them liable for even a penny.

25          Thanks again for your attention.  Thank you, Your

1    Honor.

2              THE COURT:  Members of the Jury, you may stand and

3    take a stretch break at your seats now.  We'll begin with

4    our first witness.

5         (Pause)

6              THE COURT:  Are we ready?

7              MR. COLLYARD:  We're ready, Your Honor.

8              THE COURT:  We will -- please be seated.  We will

9    end with the jury today promptly at 5:00 o'clock, and I will

10   give them recess instructions before that which will be

11   about a minute long.  But I just want to give you that

12   understanding as you begin your examination.

13             MR. COLLYARD:  Thank you, Your Honor.  The

14   plaintiff calls Ms. Sara Johnson, Your Honor.  Our first

15   witness is Sara Johnson, who was one of BMO's anti-money

16   laundering analysts that reviewed the anti-money laundering

17   alerts was raised on PCI's account.  She will appear by

18   video.

19             And there are various exhibits that will be the

20   subject of Ms. Johnson's testimony.  And we are calling

21   Ms. Johnson adverse, Your Honor.  Plaintiff's exhibits for

22   this video deposition will be P-180, P-183, P-223, and

23   P-248, which plaintiff offers into evidence.

24             MR. MOHEBAN:  Your Honor, we have no objection to

25   the admission of these exhibits.

1          THE COURT:  The exhibits are received.

2          MR. COLLYARD:  Lastly, Your Honor, the parties had

3     agreed on a joint jury instruction concerning deposition

4     testimony that we would ask to be read to the jury as well,

5     and that is Jury Instruction Number 10.  And I have copies

6     here for the Court if the Court would like to have them.

7          THE COURT:  I would, please.

8          MR. COLLYARD:  May I approach, Your Honor?

9          THE COURT:  Yes, you may.

10       (Document handed to the Court)

11          THE COURT:  And I take it counsel does not object

12    to this instruction; is that correct?

13          MR. GLEESON:  That's correct.

14          THE COURT:  Okay.  Members of the Jury, testimony

15    will now be presented to you in the form of a deposition.  A

16    deposition is the recorded answers a witness made under oath

17    to questions asked by lawyers before trial.  The deposition

18    testimony to be offered was electronically video recorded

19    and that recording now will be played for you.

20          You should consider the deposition testimony and

21    judge its credibility as you would that of any witness who

22    testifies here in person.

23          Videos have been edited to remove things like

24    objections and statements by attorneys, and you should not

25    concern yourself with such edits since I have determined

1    that the videos fairly represent the testimony.

2              And, as I indicated, we will be ending at -- our

3    session today at 5:00 o'clock, and I will need at least two

4    minutes to instruct the jury before they recess.

5              Are we ready to proceed?

6              MR. COLLYARD:  Yes, Your Honor, we are.

7              THE COURT:  You may.

8                        **(Sara Johnson)**

9                   **VIDEO DEPOSITION PLAYED**

10   BY MR. COLLYARD:

11   Q.  Can you please state your full name for the record.

12   A.  Sara Ann Johnson.

13   Q.  Who are you currently employed by?

14   A.  Bankers Toolbox.

15   Q.  And when did you begin your employment there?

16   A.  February 2017.

17   Q.  Before that time were you at BMO Harris Bank?

18   A.  Yes.

19   Q.  When did you leave BMO?

20   A.  February 2017.

21   Q.  Now, you started working at a bank called M&I Bank; is

22   that right?

23   A.  Correct.

24   Q.  And when did you start working there?

25   A.  In 1994.

1    Q.  And you stayed with M&I Bank until BMO and Harris Bank

2    merged and, I guess, acquired M&I Bank; is that right?

3    A.  Correct.

4    Q.  What year was that?

5    A.  I think it was the end of 2010.

6    Q.  You went to the AML department about April of 2005?

7    A.  April 2005, um-hum.

8    Q.  And then you -- and when you moved to the AML Group, you

9    became an AML analyst; is that right?

10   A.  Correct.

11   Q.  And how long were you an AML analyst?

12   A.  I held many different positions, analyst investigator,

13   team lead.  I mean, I was in the AML department until I left

14   in 2017.

15   Q.  So in April of 2005 you started as an AML analyst and

16   then eventually you became a lead analyst; is that right?

17   A.  Yes, I did.

18   Q.  And do you recall about when that was?

19   A.  I'm thinking in terms of it happened when we moved

20   offices, so I'm trying to remember if I remember when we

21   moved offices.  2009 or 2010.

22   Q.  And between that time did you hold any other positions

23   in the Anti-Money Laundering Group at M&I Bank?

24   A.  I would -- I did receive a promotion, an analyst

25   promotion, at one point.

1    Q.  Before you were a lead analyst, was the highest position

2    that you had called an Analyst II?

3    A.  I don't remember.

4    Q.  Were there different roles if you were an Analyst I

5    versus an Analyst II or were you essentially doing the same

6    job with a different title?

7    A.  No, you had different responsibilities.

8    Q.  Do you remember what any of those were?

9    A.  I partook in training, helped in training new analysts.

10   That was a big part of it.

11   Q.  When you -- when you helped partake in training other

12   analysts, describe just generally what that involved.

13   A.  That involved taking them on, you know, kind of a start

14   to finish process on what we did on a daily basis so that

15   they could get up to speed on how to work alerts.

16   Q.  And about how many years did you do that?

17   A.  I don't remember exactly.

18   Q.  Did that include training them in Searchspace?

19   A.  Yes.

20   Q.  And how to use Searchspace?

21   A.  Yes.

22   Q.  And so, for example, would that include training them on

23   how to investigate an alert in Searchspace for incoming and

24   outgoing wires?

25   A.  Yes, it would.

1   Q.  And so after 2009 did you stay in the Anti-Money

2   Laundering Group?

3   A.  Yes.

4   Q.  And what were your roles after 2009, if you can

5   remember?

6   A.  I would have been a lead analyst until 2014, when I

7   became a manager.

8   Q.  What was your role as a manager in the Anti-Money

9   Laundering Group?

10  A.  I oversaw the SAR Group.

11  Q.  Can you just explain briefly what a SAR is.

12  A.  Sure.  A SAR is a Suspicious Activity Report that a bank

13  will file on a customer if they deem the activity

14  suspicious.

15  Q.  Do you have an understanding that you're here today

16  because there's a lawsuit against BMO?

17  A.  Yes.

18  Q.  And that lawsuit involves the bank account that was held

19  at M&I Bank for a company by the name of Petters Company,

20  Inc.?

21  A.  Yes.

22  Q.  And do you remember that you had worked with respect to

23  reviewing and investigating anti-money laundering alerts at

24  M&I Bank that pertained to Petters Company, Inc.?

25  A.  I don't remember the exact alerts that I worked, but I

```
1    know that I worked alerts, a lot of alerts, during that

2    timeframe.

3    Q.  Do you remember the company Petters Company, Inc.?

4    A.  Yes.

5    Q.  And do you remember that you did work on alerts

6    pertaining to Petters Company, Inc.?

7    A.  Yes.

8    Q.  What's your understanding as to what this case is about?

9    A.  As far as what I've read on the internet, which was from

10   Wikipedia, so you can take it for what it's worth, that

11   there was a Ponzi scheme involving Petters and his

12   companies.

13   Q.  And do you have an understanding that that Ponzi scheme

14   was run out of the bank account at M&I Bank?

15   A.  To some degree.

16   Q.  Did you have an understanding that the Ponzi scheme that

17   we're talking about is the second largest Ponzi scheme in US

18   history?

19   A.  I did know that.

20   Q.  You did know that?

21   A.  Yes.

22   Q.  And how did you become aware of that?

23   A.  On the internet.

24   Q.  So I'm going to talk about the PCI account or the

25   Petters Company, Inc. account, and when I do that I'm going
```

1    to be -- what I'm doing is I'm talking about the depository

2    account that was held at M&I Bank for that customer.  If I

3    do that, will you understand what I'm talking about?

4    A.  Yes.

5    Q.  Back when you were in the Anti-Money Laundering Group

6    from the time period of 2005 through 2008, did you have an

7    understanding as to what Petters Company, Inc. was?

8    A.  I don't remember.

9    Q.  Did you know who Tom Petters was?

10   A.  I don't remember.

11   Q.  And you don't know if you knew who Tom Petters was back

12   in that time period?

13   A.  I don't remember.

14   Q.  Have you heard of the concept "know your customer"?

15   A.  Yes.

16   Q.  You're familiar with that with respect to the Anti-Money

17   Laundering Group at BMO Harris Bank and M&I Bank?

18   A.  I'm familiar with it as of now.

19   Q.  You were familiar with it back in 2005 through 2008?

20   A.  I don't remember.

21   Q.  Did you know that part of your job back in 2005 to 2008

22   was to have an understanding of "know your customer"?

23   A.  I don't remember.

24   Q.  So do you have any understanding as to what "know your

25   customer" means?

1    A.  Yes.

2    Q.  What does that mean?

3    A.  We have a responsibility to know as much of our customer

4    as we can, including -- if it's a business, what kind of

5    business it is.  If it's a personal account, what do they do

6    for a living.

7    Q.  And when you say "what kind of business it is," what do

8    you mean by that?

9    A.  If it's a restaurant, what type of restaurant is it,

10   that type of information.

11   Q.  When you were training analysts, do you remember if you

12   trained them on the concept of "know your customer"?

13   A.  I don't remember.

14   Q.  Let's talk about Petters Company, Inc. back in 2005 up

15   through 2008.  Do you recall what Petters Company, Inc.

16   business was?

17   A.  I don't remember.

18   Q.  Did you deal with the concept of "know your customer" at

19   BMO Harris up until the time you left BMO Harris?

20   A.  Yes.

21   Q.  Let's talk about your job as an analyst back at M&I

22   Bank.  Can you describe generally what you did to

23   investigate alerts in Searchspace for incoming or outgoing

24   wires.

25   A.  I can tell you my general process --

1    Q.  Um-hum.

2    A.  -- was to look at the activity, going through the

3    account as a general whole, holistic review of the customer.

4    Q.  "Holistic" is a term that you used?

5    A.  I -- I mean, that's the term I'm using right now.

6    Q.  What do you mean by "holistic"?

7    A.  You weren't just looking at wires or whatever a customer

8    would alert for because there was many different things that

9    a customer could alert for, so you would look at -- if you

10   were looking at their account, you would look generally as a

11   whole on what was going on in their account.

12   Q.  So even if -- so let's say, for example, there was an

13   alert for incoming wires.  Would you look at everything or

14   would you just look at the incoming wires?

15   A.  It was standard practice to look at everything.

16   Q.  So take me through generally what you would do, for

17   example, to investigate an alert in Searchspace that alerted

18   for value and volume of -- for incoming wires.

19   A.  I can't give you specifics on what I would do for any

20   one alert, just what would happen in general doing any kind

21   of alert.  I can do that.

22   Q.  Sure, we can speak generally and then we'll go from

23   there.

24   A.  You would look at what the customer alerted for; and if

25   they are alerting for their wires, you would, depending

1   on -- it all depended on the alert on how you -- on how you

2   would look at it.

3   Q.  Okay.  Can you think -- can you think generally what you

4   would do for incoming wires?

5   A.  It varied depending on the alert.

6   Q.  What do you mean by "depending on" -- I keep asking you

7   about incoming wires and you keep saying it varies depending

8   on the alert.  What do you mean by that?

9   A.  Every alert that you look at was different.

10  Q.  How so?

11  A.  It would depend on the circumstances surrounding the

12  alert.

13  Q.  What do you mean by that?

14  A.  I don't -- I don't -- I mean, I don't remember exactly

15  what I would have done.  It was just -- I know that every

16  alert that we would work on would be different.

17  Q.  So if we have an alert for incoming wires -- and when I

18  say "for value and volume," you understand what that means?

19  A.  I do.

20  Q.  And "value" means the amount of the wires; is that

21  right?

22  A.  Correct.

23  Q.  And "volume" means the number of wires?

24  A.  Correct.

25  Q.  Okay.  So if we have an alert in Searchspace for value

1    and volume of incoming wires, would you take a look to see

2    where those wires were coming from?

3    A.  Yes, you would.

4    Q.  And do you remember having resources available for you

5    to actually investigate or to look into where those wires

6    were coming from?

7    A.  Yes, we had resources.

8    Q.  Can you describe what some of those resources were.

9    A.  We had -- obviously, the internet was at our disposal

10   and we had bank systems at our disposal.

11   Q.  What do you mean by "bank systems"?

12   A.  We had a wire system where you could look up the

13   different wires to get more detail on them if there was --

14   if they were available.  A lot of times there wasn't

15   additional information available.

16   Q.  Well, one of the things you would definitely do was look

17   at the actual incoming wires, correct?

18   A.  Not necessarily.

19   Q.  There would be times when there would be alerts for

20   incoming wires where you wouldn't look at the actual wires?

21   A.  Well, not necessarily.

22   Q.  In what instance would you not look at the incoming

23   wires?

24   A.  I don't remember.

25   Q.  So you believed that during the timeframe of 2005 to

```
1    2008, if there was an alert in Searchspace for value and
2    volume of incoming wires you may not actually look at the
3    incoming wires?
4    A.  I don't remember.
5    Q.  Do you recall in the instance of an alert for incoming
6    wires doing research on the entity who was wiring the money
7    into the account?
8    A.  I don't remember.
9    Q.  And I'm just talking generally do you remember doing
10   that?
11   A.  I don't remember any exact alert that I would have
12   worked on during that timeframe.
13   Q.  But you do remember generally what your practices were,
14   right?
15   A.  I do, yes.
16   Q.  And what I'm asking you is generally.  I'm not asking
17   you about any specific -- to recall any specific wire.
18   A.  Um-hum.
19   Q.  I'm saying generally do you recall investigating or
20   looking into the entity who was wiring the money into the
21   account?
22   A.  I don't remember.
23   Q.  So, for example, do you recall just generally ever
24   looking to see whether or not the entity wiring the money
25   into the account was an actual business?
```

1    A.  I don't remember.

2    Q.  And do you recall looking to see whether or not the

3    entity wiring the money into the account, what type of

4    business they were in?

5    A.  I don't remember.

6    Q.  Would you, when you were investigating an alert for

7    incoming wires, look to see what type of business activity

8    the entity wiring the money was involved in so you would

9    have an understanding as to whether or not those wires that

10   were alerting could be associated with a legitimate business

11   purpose?

12   A.  I don't remember.

13   Q.  Do you remember using, for example, LexisNexis to look

14   into an entity who was wiring money into an account?

15   A.  I remember using LexisNexis, but not -- but I don't

16   remember why I would have looked at LexisNexis, but it was a

17   system that we did have access to.  But I -- actually, I

18   don't even remember if we had access to it in 2005 to 2008.

19   Q.  Do you recall when you were an analyst that if you had

20   questions about any of the activity that was being alerted

21   in Searchspace, that one of the things you could do was pick

22   up the phone and call a business banker who was managing the

23   customer relationship?

24   A.  Yes.

25   Q.  And do you recall doing that generally as part of your

1    practice?

2    A.  I don't remember.

3    Q.  Do you believe that you had done that before with

4    respect to an alert?

5    A.  I'm sure I did.

6    Q.  And that would have been one of the things that you

7    would have trained analysts on, is that they had the ability

8    to pick up the phone and call an account officer, for

9    example?

10   A.  Yes.

11   Q.  And do you remember why analysts would pick up the phone

12   and call account officers?

13   A.  During the course of our investigation, if there was

14   something that we couldn't explain that we wanted further

15   information, an option was to call the banker and sometimes

16   they knew information and sometimes they did not.

17           THE COURT:  Counsel, we'll stop here.

18           MR. COLLYARD:  Thank you, Your Honor.

19           THE COURT:  Members of the Jury, it is time for us

20   to take our recess.

21           And I have some instructions for you.  I will give

22   you these instructions now.  They will apply every time we

23   take a recess.  I may not give them to you in the full form

24   every time, so I may just reference them and ask you to

25   remember what I have given you as our recess instruction.

1          During this recess and every other recess you must

2     not discuss this case with anyone, including other jurors,

3     members of your family, people involved in the trial, or

4     anyone else.  And do not allow anyone to discuss the case

5     with you or within your hearing.  Only you have been chosen

6     as jurors in this case.  Only you have sworn to uphold the

7     law.  No one else has been chosen to do this important work.

8          And you should not even talk among yourselves

9     about the case before you have heard all of the evidence and

10    the case has been submitted to you by me for your

11    deliberations because it may affect your final decision.

12    And if anyone tries to talk to you about the case, please

13    let me know about it immediately.

14          And when I say you must not discuss the case with

15    anyone, I also mean you must not e-mail, send text messages,

16    blog, or engage in any other form of written, oral, or

17    electronic communication, as I instructed you before.

18          Also, do not read any newspaper or written account

19    or watch any televised account or listen to any radio

20    program about this trial.

21          And do not conduct any research, internet

22    research, or consult with any sources about this case, about

23    the people involved in the case, or the general subject

24    matter of the case.

25          As you know, you must keep an open mind free of

1  outside information.  Only in this way will you be able to

2  decide the case fairly, based solely on the testimony, the

3  evidence presented in this courtroom, and my instructions on

4  the law.

5          And it would be a violation of your oath for you

6  to base your decision on some reporter's opinion or upon

7  other information you acquire outside the courtroom.  If you

8  decide this case on anything else, you will have done an

9  injustice.

10          So it's very important that you follow these

11  instructions.  As you know, I may not repeat these things to

12  you before every recess, but please keep them in mind

13  throughout our trial.

14          And I want to thank you for your service.  Please

15  be prepared to return to the courtroom tomorrow morning, and

16  we will begin at 8:30.  And so if you are in the jury room,

17  where you will be meeting before coming to the courtroom at

18  that time, we will be ready to bring you into the court.

19  Thank you for your service.

20          All rise for the jury.  And have a good evening.

21      (Jury excused)

22                    **IN OPEN COURT**

23                 **(JURY NOT PRESENT)**

24          THE COURT:  You may be seated.

25          Is there anything else that needs to be addressed

1    at this time?

2            MR. COLLYARD:  Not from plaintiff, Your Honor.

3            MR. GLEESON:  No, we're good.

4            THE COURT:  Very good.

5            MR. GLEESON:  Thank you, Judge.

6            THE COURT:  Have a good evening.  Thank you,

7    Counsel.

8            MR. COLLYARD:  Thank you, Your Honor.

9        (Court adjourned at 5:02 p.m.)

10                        *      *      *

11            We, Lori A. Simpson and Carla R. Bebault, certify
     that the foregoing is a correct transcript from the record
12   of proceedings in the above-entitled matter.

13           Certified by:  *s/ Lori A. Simpson*
                            Lori A. Simpson, RMR, CRR
14

15           Certified by:  *s/ Carla R. Bebault*
                            Carla R. Bebault, RMR, CRR, FCRR
16

17

18

19

20

21

22

23

24

25