1          UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Douglas A. Kelley, in his      )   File No. 19-cv-1756
4    capacity as the Trustee of the )           (WMW)
     BMO Litigation Trust,          )
5                                   )
              Plaintiff,            )   St. Paul, Minnesota
6                                   )   October 20, 2022
     vs.                            )   8:31 a.m.
7                                   )
     BMO Harris Bank N.A., as       )
8    successor to M&I Marshall and  )
     Ilsley Bank,                   )
9                                   )
              Defendant.            )
10   ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE WILHELMINA M. WRIGHT
             UNITED STATES DISTRICT COURT JUDGE
14
          **(JURY TRIAL PROCEEDINGS - VOLUME VII)**
15

16

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25   transcript produced with computer.


                    LORI A. SIMPSON, RMR-CRR
                         (651) 848-1225

```
 1      APPEARANCES:
          For the Plaintiff:         Robins Kaplan, LLP
 2                                    MICHAEL A. COLLYARD, ESQ.
                                      DAVID E. MARDER, ESQ.
 3                                    PETER C. IHRIG, ESQ.
                                      MORGIA D. HOLMES, ESQ.
 4                                    MICHAEL D. REIF, ESQ.
                                      800 LaSalle Avenue
 5                                    Suite 2800
                                      Minneapolis, Minnesota 55402
 6
                                      Anthony, Ostlund, Louwagie,
 7                                    Dressen, Boylan, P.A.
                                      JOSEPH W. ANTHONY, ESQ.
 8                                    JOSEPH R. RICHIE, ESQ.
                                      RYAN M. LAWRENCE, ESQ.
 9                                    90 South Seventh Street
                                      Suite 3600
10                                    Minneapolis, Minnesota 55402

11      For the Defendant:           Stinson, LLP
                                      KEITH S. MOHEBAN, ESQ.
12                                    ADINE S. MOMOH, ESQ.
                                      50 South Sixth Street
13                                    Suite 2600
                                      Minneapolis, Minnesota 55402
14
                                      Debevoise & Plimpton, LLP
15                                    JOHN GLEESON, ESQ.
                                      MICHAEL SCHAPER, ESQ.
16                                    SUSAN REAGAN GITTES, ESQ.
                                      MORGAN A. DAVIS, ESQ.
17                                    919 Third Avenue
                                      New York, New York 10022
18
                                      Mayer Brown, LLP
19                                    JOSHUA D. YOUNT, ESQ.
                                      71 South Wacker Drive
20                                    Chicago, Illinois 60606

21                                    Mayer Brown, LLP
                                      RICHARD A. SPEHR, ESQ.
22                                    GINA PARLOVECCHIO, ESQ.
                                      1221 Avenue of the Americas
23                                    New York, New York 10020

24      Court Reporter:              LORI A. SIMPSON, RMR-CRR
                                      316 North Robert Street
25                                    St. Paul, Minnesota 55101
```

1

**I N D E X**

2

PAGE

3

**CHRISTOPHER FLYNN**
Direct Examination (Continued) by Mr. Moheban    1699

4
Recross-Examination by Mr. Marder                1729
Redirect Examination by Mr. Moheban              1747

5

**RAYMOND NEUFELDT**

6
Deposition Transcript Played                     1750

7

**DAVID SCHERER**
Deposition Transcript Played                     1827

8

**DEBRA LINDSTROM**

9
Direct Examination by Mr. Anthony                1842
Cross-Examination by Ms. Gittes                  1854

10
Redirect Examination by Mr. Anthony              1869

11

**DOUGLAS KELLEY**
Direct Examination by Mr. Anthony                1882

12
Cross-Examination by Mr. Spehr                   1954

13

14

PLAINTIFF'S EXHIBITS                             REC'D
3                                                1722

15
16                                               1749
325                                              1826

16
327                                              1826
328                                              1826

17
355                                              1749
356                                              1749

18
357                                              1749
359                                              1749

19
360                                              1749
361                                              1749

20
362                                              1750
364                                              1750

21
372                                              1750
660                                              1851

22
674                                              1932
676                                              1932

23
679                                              1932
682                                              1932

24
687                                              1934
796                                              1827

25

1        **P R O C E E D I N G S**

2              **IN OPEN COURT**

3            **(JURY NOT PRESENT)**

4              THE CLERK:  The case before the Court is

5      19-cv-1756, Kelley vs. BMO Harris.

6              Counsel, please stand and note your appearances

7      for the record.

8              MR. MARDER:  Good morning, Your Honor.  David

9      Marder appearing for the plaintiff.

10             THE COURT:  Thank you.  Good morning.

11             MR. GLEESON:  Good morning, Your Honor.  John

12     Gleeson for BMO Harris Bank.

13             THE COURT:  Thank you.

14             Are there matters that we need to address before

15     the jury comes in?

16             MR. ANTHONY:  I think, Your Honor, yesterday you

17     raised the question at the close of the day about a juror

18     who had provided you some information to the effect that she

19     had gone to high school and knew one of the major witnesses

20     in this case, Mr. Flynn.  I think we're waiting for either

21     your decision on that or whether you are going to entertain

22     argument on that and how you would like to proceed.

23             THE COURT:  Okay.  I would like to hear the

24     parties' views, if they wish to --

25             MR. ANTHONY:  I would be glad to share them with

1    you, Your Honor.  Joe Anthony for the plaintiff.

2         THE COURT:  Thank you.  And if you would like,

3    Mr. Anthony, you may come to the podium.

4         MR. ANTHONY:  I'm going to come to the podium.

5         May it please the Court.  Joe Anthony for the

6    plaintiff.

7         THE COURT:  Yes.

8         MR. ANTHONY:  Judge, I don't think I have ever

9    seen a case in this jurisdiction where unfortunately we have

10   a juror who knows a major witness in the case, went to high

11   school with them, now recognizes them during the midst of

12   the testimony here.

13        I don't need -- even need the name of the juror to

14   know what our view of that is.  We have 12 jurors in the

15   box.  As everybody in this courtroom knows, in Minnesota,

16   you can have as few as six jurors.  So excusing this juror

17   would still leave us with 11 and with plenty of room for the

18   remaining week or two for this trial.

19        I think that if this witness had recognized or if

20   the -- if the juror had recognized one another or the juror

21   had recognized the name, it would have been revealed, and I

22   think she would have been excused for cause or she certainly

23   would have been stricken.

24        The Court is mindful of all the other jurors who

25   were excused for cause, for example, because they had a

1    problem with their bank or they had some concerns.  And I

2    think the Court was very fair in the way you went about

3    excusing those jurors, and it's our hope and expectation

4    that the Court will view this juror in a similar fashion.

5            You know, just questioning her, I think, even

6    having her come in to be questioned would revive her

7    recollections of her experience with the witness, which

8    would make it even more problematic for her to serve.

9            One of the biggest risks is her participation

10   could taint the entire jury panel, and we'd have no way of

11   knowing that or measuring it.  All she has to say in

12   deliberations or as an aside is that she went to high school

13   with the witness, Mr. Flynn, and share some view, good or

14   bad.  By the way, whether it's good or bad, it's just going

15   to taint the pool.  Maybe she didn't like him, and that

16   might favor one side.  Then the other, maybe she was friends

17   with him or he was, you know, the king of the prom or

18   something.  Who knows?

19           But, in any event, her recollections have the risk

20   of tainting the entire jury; and, for that reason, and

21   because there's no way to impact -- or evaluate that impact,

22   we think it's -- the only fair thing is that whoever the

23   juror is, that the juror be excused.

24           Thank you, Your Honor.

25           THE COURT:  Thank you, Mr. Anthony.

1          MR. GLEESON:  Good morning, Judge.

2          THE COURT:  Good morning.

3          MR. GLEESON:  Mr. Anthony is right.  Like who

4    knows?  It does seem like an attenuated connection.  Mr. --

5    we're trying to figure out when Mr. Flynn left high school.

6    We think it's 37 years ago.  It's a long time.

7          And I think actually if this had come up during

8    the voir dire, you would have asked this juror whether

9    there's anything about the Chris Flynn that she remembered

10   that would affect her ability to be fair.  And my suggestion

11   is let's fill in that gap of who knows and just ask her

12   whether or not she can be fair.

13         We selected her.  She was part of a panel.

14   There's a right on the part of both sides not to have a

15   jury -- juror excused unless there's some good reason once

16   the person is on the panel.

17         Here's my suggestion, Judge.  This is kind of

18   intimidating.  It can be.  My suggestion is you invite her

19   into chambers, have the court reporter.  We can watch the

20   live feed.  You can probe her what the nature of her

21   relationship was then and ask her whether or not there's

22   anything about her recollections or relationship, if there

23   was one, with or about Chris Flynn that would prevent her

24   from rendering a verdict based solely on the evidence in the

25   case.

1          I think that would promote candor.  This can be a

2     little intimidating.  And we can watch the feed.  And then

3     the Court can listen to argument, if it wishes to.  And to

4     the degree that this juror can't be fair, she could be

5     excused.  That's my suggestion -- that's our suggestion.

6          Thank you.

7          MR. ANTHONY:  Back in the 15th and 16th centuries

8     when they started jury trials, it used to be your neighbors

9     who would sit in judgment of you.  We don't do that anymore.

10    We don't allow jurors to serve who know major witnesses.

11    It's really not more complicated than that.

12         And I think that one of the reasons why we do voir

13    dire and why you do voir dire in front of the public and in

14    front of the lawyers is so that everybody can evaluate

15    face-to-face what the juror is saying.

16         Yes, it is intimidating, but in addition to

17    anybody from here watching it, you asking questions

18    raises -- revives the recollections of the juror, which is

19    the last thing we should be trying to do.

20         We should be figuring out whether, for example,

21    she would have been stricken, which she would have been if

22    she said she knew one of the witnesses.  We wouldn't have

23    inquired then if she could have been fair or what she knew

24    about the witness.  She wouldn't have been allowed in open

25    court in front of all the other jurors to say how she knew

1       the witness and whether they went to high school and could

2       she be fair and did she know anything.  We would have never

3       done that.  She would have been gone.

4               And for that reason, Your Honor, I think the only

5       fair thing to do is to excuse this juror and allow the other

6       11 to sit in judgment.

7               Thank you, Your Honor.

8           (Pause)

9               THE COURT:  I'll take a brief recess and then be

10      back with my decision.

11          (Recess taken at 8:39 a.m.)

12                          *   *   *   *   *

13          (8:47 a.m.)

14                          **IN OPEN COURT**

15                        **(JURY NOT PRESENT)**

16              THE COURT:  We are going to have the juror come

17      in, and I will ask her questions -- you may be seated -- I

18      will ask her questions about what she's disclosed and make a

19      decision after that.

20          (Pause)

21          (Juror 26 brought into courtroom)

22              THE COURT:  Take your seat in your normal seat.

23          (The Court and law clerk confer)

24              THE COURT:  You may be seated.  Good morning.

25              So, Juror Number 26, good morning.

1          JUROR 26:  Good morning.

2          THE COURT:  And I understand that it has come to

3    your attention that you recognize one of the people who is

4    involved in this case.  Who is that person?

5          JUROR 26:  Christopher Flynn.

6          THE COURT:  Okay.  I am going to ask you to speak

7    up just so that everyone in the courtroom can hear you.  You

8    said Christopher Flynn?

9          JUROR 26:  Christopher Flynn, yes.

10          THE COURT:  And how do you know Mr. Flynn?

11          JUROR 26:  I went to high school with him.

12          THE COURT:  Okay.  Have you been in touch with

13    Mr. Flynn since high school?

14          JUROR 26:  No.  Possibly a reunion along the way,

15    but nothing that I can exactly pinpoint.

16          THE COURT:  Okay.  Have you told the other jurors

17    that you know this person or recognize this person?

18          JUROR 26:  I have not told anyone.

19          THE COURT:  Okay.  Thank you.  And would the fact

20    that you recognized this person have any effect on your

21    ability to be a fair and impartial juror?

22          JUROR 26:  I've kind of been asking myself that,

23    and it's a very difficult question to answer.  Truthfully,

24    that's my answer.  I can't say yes or no --

25          THE COURT:  Okay.

1          JUROR 26:  -- and be positively honest.

2          THE COURT:  Okay.  Thank you.  Thank you for your

3   candor.

4          Does counsel have any questions that they would

5   like me to ask?

6          MR. ANTHONY:  No questions, Your Honor, at this

7   point.

8          THE COURT:  Okay.  Thank you.

9          MR. GLEESON:  Agreed.

10          THE COURT:  All right.  Thank you.  I will excuse

11   you for now.  Thank you very much for coming in, and thank

12   you for bringing this to our attention.

13      (Juror 26 excused from the courtroom)

14          THE COURT:  Counsel, do you wish to be heard?

15          MR. ANTHONY:  Mr. Gleeson and I have agreed, if

16   the Court agrees, that the witness -- the juror should be

17   excused.

18          THE COURT:  And I do agree.  So we will excuse

19   this juror.

20          MR. ANTHONY:  Thank you, Your Honor.

21          THE COURT:  You're welcome.  And thank you,

22   Counsel.

23          MR. ANTHONY:  I will say I didn't want to ask the

24   juror -- I'm sure we both had questions we would have asked,

25   but I think it was so clear that we wanted to respect the

1   juror by not putting her through anything.

2           THE COURT:  Okay.  I guess -- I think that's

3   right.  So we will proceed.  I will notify the juror that

4   she is excused.  Do the parties wish to have that done in

5   open court or are you satisfied with me doing so privately?

6           MR. GLEESON:  My suggestion, Judge, is you let the

7   rest of the jurors know that she's been excused with the

8   thanks of the Court, and we can just -- I don't think we

9   should do anything more than that.

10          MR. ANTHONY:  I agree.

11          THE COURT:  Okay.

12      (Recess taken at 8:54 a.m.)

13                      *   *   *   *   *

14      (8:59 a.m.)

15                      **IN OPEN COURT**

16                      **(JURY PRESENT)**

17          THE COURT:  Good morning.  Please be seated.

18          And we are ready to proceed.  I will announce that

19   Juror Number 26 is excused.  Are we ready to go?

20          Good morning.

21          THE WITNESS:  Good morning.

22          THE COURT:  And you may proceed, Counsel.

23          MR. MOHEBAN:  Thank you, Your Honor.

24

25

1           **(Christopher Flynn)**

2           **DIRECT EXAMINATION** (Continued)

3    BY MR. MOHEBAN:

4    Q.  Good morning, Mr. Flynn.

5    A.  Good morning.

6    Q.  I want to start off this morning sort of at the end.  I

7    want to have you tell us, how did you find out about the

8    Petters Ponzi scheme?

9    A.  I was in a meeting first thing in the morning near by my

10   office, and as I was coming out of this meeting, I got a

11   call from our office and they indicated there were some

12   members of law enforcement that were here to see me about

13   one of our clients.

14          So I went to the office.  I greeted the three

15   individuals that were there, and they proceeded to tell me

16   that they were going to be asking for information about one

17   of our clients.

18   Q.  These individuals, the three individuals, did they

19   identify where they were from?

20   A.  They did.  I don't exactly remember, but I remember

21   possibly the FBI, the IRS, and the postal inspector.

22   Q.  And was there a point in time where they informed you

23   which of your customers they wanted information about?

24   A.  Yes.

25   Q.  And who was that?

Flynn - Direct

1    A.  Tom Petters.

2    Q.  Okay.  Did they ask you to provide them documents and

3    information?

4    A.  Yes, they did.

5    Q.  Did you comply with that request?

6    A.  I consulted legal counsel and was told that let them

7    know we would be happy to comply if presented with a

8    subpoena.

9    Q.  And did you at some point receive a subpoena from law

10   enforcement for records of the Petters Company?

11   A.  Yes.

12   Q.  And then did you assist in complying with that request?

13   A.  Yes.

14   Q.  So that's 14 years ago, right?

15   A.  Yes.

16   Q.  And you're still telling people what you know about the

17   Petters account today, right?

18   A.  Yes.

19   Q.  In that intervening time, from 2008 to now, have you

20   been called on by law enforcement to testify?

21   A.  Yes.

22   Q.  When did that occur?

23   A.  I don't remember the exact dates, but at one point I was

24   asked to be a possible witness for the trial of Frank

25   Vennes.

Flynn - Direct

1    Q.  Okay.  Are there other times when you've been asked to

2    provide assistance or cooperation with law enforcement?

3    A.  Yes.

4    Q.  Can you describe those.

5    A.  At one point there was -- if this was law enforcement, I

6    believe it was, I'm not exactly sure, but at one point we

7    were asked to meet with some forensic accountants to provide

8    information.

9    Q.  Okay.  So the plaintiff in this case is Doug Kelley.

10   Was there ever a point in time when you were asked to

11   provide cooperation and assistance to him?

12   A.  I remember reaching out to Mr. Kelley shortly after

13   Mr. Petters had been arrested and they had been -- he had

14   been appointed the receiver.  And, you know, one, we just

15   wanted to understand who he was and see what he needed in

16   his capacity as receiver; and, you know, basically at that

17   point there was nobody who was an active signer on the

18   account other than at that point the receiver.  So I believe

19   we had to give him some signing authority over the checking

20   account.

21   Q.  So was there a point in time where Mr. Kelley took

22   control of the PCI accounts at M&I Bank?

23   A.  I believe so, yes.

24   Q.  Could we look at Exhibit P-2-144.  We will blow up the

25   Call Report part.

Flynn - Direct

1          Okay.  That's good.

2          Is this a Call Report that you prepared in the

3    MIContacts database?

4    A.  Yes, it appears to be.

5    Q.  There's a place where it says, "Reporting Person," and

6    that's got your name next to it?

7    A.  Yes, that's correct.

8    Q.  And can you tell us the date of the meeting or contact.

9    A.  I entered this on December 11th, 2008.

10   Q.  And the time frame when law enforcement came to see you

11   to get information about Petters, when was that?

12   A.  I believe it was sometime in September of that year.

13   Q.  Okay.  So we're now about three months later; is that a

14   fair statement?

15   A.  That sounds about right, yeah.

16   Q.  And your log says, "Doug has been appointed receiver for

17   Petters assets."  Do you recall where you got the source of

18   that information?

19   A.  I don't specifically recall, no.

20   Q.  It says, "We have been in contact on a few matters.  He

21   needed to be set up on new signature cards for the accounts,

22   et cetera."  Do you see that?

23   A.  Yes, I do.

24   Q.  Okay.  After that point in time, did you have continued

25   contact with Mr. Kelley regarding his control of the PCI

Flynn - Direct

1    accounts at M&I Bank?

2    A.  I don't specifically recall if we did.

3    Q.  Okay.  You mentioned meeting with forensic accountants.

4    Were those forensic accountants meeting with you at the

5    request of Mr. Kelley?

6    A.  I don't recall specifically if that was the case.

7    Q.  Do you know how much time you spent assisting the

8    forensic accountants?

9    A.  I don't.  My knowledge on that is a little bit foggy

10   after all these years, but it seemed to be a better part of

11   a day.

12   Q.  Fair enough.

13            I now want to turn to these -- yesterday you were

14   asked a number of questions about these Deposit Account

15   Control Agreements.  Do you remember that testimony?

16   A.  Yes, I do.

17   Q.  And I would like to put up Plaintiff's Exhibit 20 for

18   that purpose.  It's an e-mail chain, and I think we need to

19   go to the last page and we're going to work forward on this.

20            MR. MOHEBAN:  So, yes, that's good right there.

21   BY MR. MOHEBAN:

22   Q.  So the first part of this e-mail chain is an e-mail from

23   Deanna Coleman to you on February 8th of 2008, correct?

24   A.  Yes.

25   Q.  Okay.  And you looked at this yesterday, and I think it

Flynn - Direct

1   was established that there was a copy of a Deposit Control

2   Agreement attached to her e-mail; is that right?

3   A.  That's what I recall, yes.

4   Q.  Was it your idea to do a Deposit Control Agreement with

5   the Petters companies?

6   A.  No.

7   Q.  So this came to you as a request from the customer?

8   A.  That's correct.

9   Q.  So then if we go to the next part of this e-mail, so you

10  get the request and then the same day you are sending an

11  e-mail to Carolyn Moline and Jane Schwede at M&I, correct?

12  A.  Yes.

13  Q.  Now, yesterday when we looked at this e-mail, Mr. Marder

14  focused on the language "special handling."  Do you see that

15  there?

16  A.  I do.

17  Q.  And then he took you to the AML training slides.  Do you

18  remember doing that?

19  A.  Yes.

20  Q.  I would like to go to that slide now.  I think it's

21  PX-5-34.  And then we are going to come back to this.

22          So this is the part of the AML training that you

23  talked about yesterday, correct?

24  A.  Yes.

25  Q.  And would you read the third bullet point.  That is what

```
 1      we were discussing, right?

 2      A.  Out loud?

 3      Q.  Just to yourself.

 4      A.  Okay.

 5      Q.  So when it says, "A customer" -- so it's a red flag.  It

 6      says here, "A customer who requests special treatment or

 7      'exceptions' to the documentation rules," right?

 8      A.  Yes.

 9      Q.  So in the context of these Deposit Account Agreements,

10      did anyone ever request that there be some exception to

11      documentation rules?

12      A.  Not that I recall.

13      Q.  And, in fact, the agreement that ultimately was reached

14      for these three hedge funds, Ritchie and Palm Beach and

15      Interlachen, they were documented and signed contracts; is

16      that true?

17      A.  Yes.

18      Q.  Let's go back now to Plaintiff's Exhibit 20.  Why were

19      you sending the agreement or draft agreement to these two

20      individuals?

21      A.  I don't know if I recall specifically, but Carolyn -- in

22      our -- the way our job duties are segmented, someone in my

23      role wouldn't physically open accounts, close accounts,

24      things of that nature.  That would fall upon our

25      administrative staff to actually physically open an account.
```

Flynn - Direct

1    And Carolyn oversaw that team, so I wanted her to be aware

2    of it.

3              And, again, as I mentioned yesterday, I don't

4    specifically remember Jane's role in this, so I can't really

5    comment on why I sent it to Jane, but for some reason I felt

6    like -- I thought she should be in the loop.

7    Q.  Did you think that Carolyn Moline at the bank would be

8    involved in implementing this agreement if it was to go into

9    effect?

10   A.  I believe so, yes.

11   Q.  So was contacting Ms. Moline part of your attempt to

12   determine how you could actually implement the agreement?

13   A.  Yes.

14   Q.  And you say in the second paragraph, "I have reviewed

15   the agreement."  Is that true?

16   A.  Yes.

17   Q.  So at the time you got the agreement, you actually read

18   through it?

19   A.  Yes, I did.

20   Q.  You're not an attorney, correct?

21   A.  That's correct.

22   Q.  But you did read it to the best you could understand it?

23   A.  Yes.

24   Q.  Okay.  And then you asked them to review it as well; is

25   that right?

Flynn - Direct

1   A.  Yes, I did.

2   Q.  So the same day you got this request from your client or

3   your customer, three people at the bank are reviewing or

4   being asked to review the document; is that correct?

5   A.  Yes, I asked them to review the document, that's

6   correct.

7   Q.  Let's work up, then, to the next e-mail I think at the

8   very --

9          MR. MOHEBAN:  Okay.  That's good.

10  BY MR. MOHEBAN:

11  Q.  Now, this is a responsive e-mail from Ms. Moline to you,

12  and she says in the first line, "I had asked Peggy Franzen

13  what her experience has been in the past with Control

14  Agreements."  So am I right that Ms. Moline brought yet a

15  fourth person from the bank into this review of the

16  agreement?

17  A.  Yes.

18  Q.  Do you recall who Peggy Franzen was?

19  A.  She had a role in overseeing some of the depository

20  services that clients might utilize.

21  Q.  It goes on to say, "The information that she had is if

22  the customer is to use Treasury Management projects [sic],

23  especially they have worked with Godfrey and Kahn law firm

24  to review."  And when you talk about "treasury management

25  products," can you tell us what's being referred to there.

Flynn - Direct

1   A.  Sure.  Treasury management sort of encompasses a variety

2   of depository services that a client might use; online

3   banking access, the ability to send ACH, fraud protection

4   items, positive pay, things like that.

5           COURT REPORTER:  I'm sorry.  Deposit to pay?

6           THE WITNESS:  Positive pay.

7           COURT REPORTER:  Positive pay.  Thank you.

8           THE WITNESS:  When a client is evaluating what

9   their needs are and sort of overseeing their deposit

10  accounts, they would be working with a treasury management

11  specialist.

12  BY MR. MOHEBAN:

13  Q.  Was one of the things you considered in response to

14  Ms. Coleman's request that maybe there was a treasury

15  management product that could meet their needs here?

16  A.  I don't specifically remember that.

17  Q.  Ms. Moline also refers to in the next sentence that

18  Peggy Franzen had a Control Agreement that was approved for

19  the bank.  Do you see that?

20  A.  Yes.

21  Q.  So there was at least one prior instance where the bank

22  had done a Deposit Control Agreement; is that a fair

23  statement?

24  A.  It appears to be, yes.

25  Q.  Okay.  And then she raises some questions.  How are we

Flynn - Direct

1    going to get compensated?  Do they want an actual lockbox?

2    Do you recall conveying those questions back to your

3    customer?

4    A.  I remember sending an e-mail about the agreement itself.

5    I don't know if I recall, you know, looking at specific

6    depository services for what they were asking with the

7    agreement that they had sent to me.

8    Q.  Okay.  Ms. Moline, if we go down a couple paragraphs,

9    has a sentence, "So I would be concerned that we have the

10   staff or knowledge to take care of this."  Do you see where

11   that is?

12   A.  I do.

13   Q.  So was one of your objectives in getting all these

14   people involved in looking at this agreement was that you

15   could make sure that you could actually carry out whatever

16   obligations the bank would have?

17   A.  Yes.

18   Q.  And then she raises in her last sentence the idea that,

19   "There's a new person in trust who I might run this by."

20   Did the bank have a trust department?

21   A.  I recall that they did, yes.

22   Q.  And did you, on occasion, refer things or have the trust

23   department at the bank provide services for your customers?

24   A.  Yes.

25   Q.  And what's your basic understanding about what the trust

1    department of the bank could do?

2    A.  It could be a variety of things, but one might be to

3    function as, you know, an intermediary or someone that has

4    some additional oversight into accounts.

5    Q.  Do you have accounts at the bank -- at M&I at that time

6    which are called trust accounts?

7    A.  I believe so, yes.

8    Q.  And in a trust account, would someone be a trustee and

9    then have some authority over that account?

10   A.  Yes.

11   Q.  Did you evaluate that as a potential way to meet

12   Ms. Coleman's objectives?

13   A.  Yes.  I believe we did, yes.

14   Q.  Let's see if we have any more of this e-mail.  I think

15   that covers all of Exhibit 20.

16           Let's go then to Exhibit 21, Plaintiff's Exhibit

17   21.  If we go to the beginning of this, again, we have to

18   start at the bottom.  If we go to the beginning, we start

19   with that same e-mail from Ms. Coleman and your e-mail to

20   Ms. Moline and Ms. Schwede.  And if we go to the next

21   page -- sorry, I know am challenging you back there.  One

22   page before that.

23           Now you are getting -- in this e-mail, you get

24   some feedback from Ms. Schwede.  This is also the same day,

25   February 14th, right?

Flynn - Direct

```
 1     A.  Yes.

 2     Q.  Okay.  She says, "I do not like 2C."  Was that a

 3     reference to a paragraph of the draft agreement?

 4     A.  Yes, it was.

 5     Q.  And then she says, "I do not think M&I wants to be

 6     responsible for reconciling an account and transferring

 7     funds out.  The client should reconcile and transfer the

 8     funds.  M&I doesn't want any responsibility in this area."

 9     So that's the feedback you got from Ms. Schwede?

10     A.  Yes.

11     Q.  If we go farther up, Ms. Moline poises the question:

12     "Is there a rule of thumb on who should be reviewing these?

13     DO we want our legal to look at this?"  Do you see that?

14     A.  I do.

15     Q.  So was there a point in time when you asked your legal

16     department to help in evaluating this request from

17     Ms. Coleman?

18     A.  I remember reaching out to my supervisor at the time,

19     and she advised me to engage legal counsel familiar to the

20     bank to review and provide an opinion on the document.

21     Q.  And did you do that?

22     A.  Yes.

23     Q.  Okay.  Let's look at Plaintiff's Exhibit 23.  We can

24     make that a little bit bigger.

25              So you received the request from Ms. Coleman on
```

Flynn - Direct

```
 1    February 14th, and so now four days later, you are
 2    responding to see chowse@howselaw.com, right?
 3    A.  Yes.
 4    Q.  And you indicate in the first line his name is Craig?
 5    A.  Yes.
 6    Q.  Okay.  And you testified yesterday your understanding
 7    was that he was the lawyer for the hedge fund that would be
 8    the protected party under this agreement?
 9    A.  Yes.
10    Q.  That was your understanding at that point in time?
11    A.  Yes.
12    Q.  Mr. Marder yesterday brought up the name of Frank Vennes
13    and suggested to you that Mr. Howse had been a lawyer for
14    Mr. Vennes.  Do you remember those questions?
15    A.  I do.
16    Q.  Is there any reference in this e-mail to Frank Vennes
17    being involved with this transaction?
18    A.  Not that I can see, no.
19    Q.  Now, in the first paragraph of your e-mail to Mr. Howse,
20    you're saying, "I have asked Kevin Busch at the firm of Moss
21    & Barnett to review the agreement."  So is that the outside
22    counsel that you just mentioned that you had a relationship
23    with?
24    A.  Yes.
25    Q.  So from time to time would you send questions, legal
```

1    questions, to Mr. Busch for advice?

2    A.  Yes.

3    Q.  So you asked him to review the agreement, and then

4    you're sharing with Mr. Howse some of the feedback that you

5    got from your attorney; is that right?

6    A.  Yes.

7    Q.  And then you tell him on that same day you plan to be

8    visiting with Kevin, your attorney, and then you'll give him

9    further feedback and Deanna Coleman once you've talked to

10   your attorney, correct?

11   A.  Yes.

12   Q.  Okay.  If we go further down this e-mail, you make a

13   statement of your intention with respect to this agreement.

14   You say, "We approach this request in the spirit of trying

15   to help accommodate our customer and your client, along with

16   the other protected parties, with the assurances you need to

17   feel comfortable with the working of the purchase order

18   financing in which they are engaged.  We just want to make

19   sure the agreement provides the proper level of durability

20   so it can be properly managed by our organization in a way

21   which represents a fair arrangement for all."

22           Is that an accurate statement of your intent at

23   the time?

24   A.  Yes.

25   Q.  Was it your intent to actually find some mechanism to

Flynn - Direct

1    provide Mr. Howse and Ms. Petters -- or Ms. Coleman the

2    assistance that they wanted?

3    A.  Yes.

4    Q.  Okay.  Let's now go to Plaintiff's Exhibit 22.  So this

5    is the following day, and now -- yesterday -- or the prior

6    day your e-mail was just to Mr. Howse, right?

7    A.  Yes.

8    Q.  And today you're sending what's called the "Bank

9    response to Deposit Control Agreement" to both Ms. Coleman

10   and Mr. Howse, right?

11   A.  Yes.

12   Q.  And now you're recounting to them the advice that you

13   got from Mr. Busch?

14   A.  Yes.

15   Q.  Now, in the first paragraph, to summarize, and tell me

16   if I summarized this right, you're addressing issues that

17   the bank has about being protected from liability?  You can

18   read that to yourself.

19       (Witness reviews document)

20   Q.  You're raising -- was it your concern that the bank

21   could be put in the middle of some dispute between Petters

22   and one of the hedge funds?

23   A.  Well, I'm not an attorney, but, you know, on the advice

24   of the attorney I consulted, these were items that he

25   indicated that would make it -- the document that was sent

1    to us to review, that it wouldn't be necessarily acceptable

2    for us.

3    Q.  So your attorney had expressed concerns to you --

4    A.  Yes.

5    Q.  -- about that this agreement creates some liability for

6    the bank?

7    A.  Yes.

8    Q.  And then the second paragraph you raise this question

9    about the value the bank would provide in this arrangement.

10   You say, "It is unclear what value the bank provides in this

11   arrangement to the Protected Parties."  And was that also

12   advice that you got from Mr. Busch?

13   A.  Yes.

14   Q.  You say, "We are asked to perform the work of

15   administering account transfers, but we are only

16   transferring in accordance with the direct instruction of

17   Petters.  Why can't Petters do this directly?"

18              So you raised those issues that your attorney had

19   raised with you?

20   A.  Yes.

21   Q.  And this e-mail is just not going to Ms. Coleman at

22   Petters, right?

23   A.  Yes.

24   Q.  You also sent that to the lawyer for the hedge fund?

25   A.  Yes.

Flynn - Direct

1    Q.  So this wasn't some secret conversation between the bank

2    and Petters?

3    A.  No, not to my knowledge.

4    Q.  The concerns and observations that your lawyer had about

5    this agreement were shared directly with the lawyer for the

6    hedge fund?

7    A.  They were -- yeah, they were shared directly with

8    Mr. Howse who had drafted that form, yes.

9    Q.  So if we can look at the big picture again on this

10   exhibit, then you offer some suggestions, right?  At the

11   bottom you say, "Can we set up a Trust Account similar to

12   Lawyers' Trust Accounts or Real Estate Trust Accounts?"

13            Was that a suggestion that came from your

14   attorney?

15   A.  I don't recall specifically if it was suggested by

16   someone within the bank or from our attorney.

17   Q.  And your comment is, "This allows for the segregation of

18   Protected Parties' funds from Petters operating funds."

19            So you would actually set up a separate account;

20   is that correct?

21   A.  Yes.

22   Q.  And then if you set up the trust account, it would also

23   solve the problem of the bank being put in the middle of

24   things?

25   A.  That was my understanding at the time, yeah.

1    Q.  So you provided this suggestion and your observations

2    about the agreements that you got from your lawyer to

3    Mr. Howse and Ms. Coleman.  Do you recall them responding to

4    these points in any way?

5    A.  I don't specifically recall.

6    Q.  Okay.  Was there -- did there come a point in time when

7    you did end up having a signed Deposit Account Control

8    Agreement?

9    A.  Yes.

10   Q.  Were you privy to all the discussions between the hedge

11   fund and Petters about this agreement?

12   A.  No.

13   Q.  Were you ever invited to any meeting, you know, that

14   they were discussing this subject?

15   A.  No.

16   Q.  Did you ever get provided copies of their, you know,

17   markups or red lines of the Control Agreement where they

18   were, you know, making changes and negotiating the terms?

19   A.  Not that I recall, no.

20   Q.  Was there a point in time -- I mean, do you know whether

21   the final agreement is identical to the one that was sent to

22   you by Ms. Coleman on February 14th, 2008?

23   A.  The final agreement was drafted by Mr. Busch.

24   Q.  Okay.  So Mr. Busch and the lawyers for the hedge funds

25   and the lawyers for Petters worked out the terms of the

1    agreement?

2    A.  Yeah.  I don't know who specifically was involved, but

3    ultimately there was a document that was drafted by

4    Mr. Busch that the parties to that agreement found

5    acceptable.

6    Q.  Okay.  So did you know all the details of the

7    relationship between the hedge fund and Petters?

8    A.  No.

9    Q.  Did you have copies of their contracts or purchase

10   orders or invoices?

11   A.  No.

12   Q.  Did you have full transparency of what might be useful

13   or effective or helpful for those parties in an agreement

14   like this?

15   A.  No.

16   Q.  Did it come to your attention at some point in time that

17   they thought they wanted to sign the agreement?

18   A.  I'm sorry.  Could you repeat that?

19   Q.  Was there a point in time when it was brought to your

20   attention that the agreement was ready to be signed?

21   A.  I believe so, yes.

22   Q.  And then you did sign it?

23   A.  Yes.

24   Q.  Okay.  Now, let's look at Plaintiff's Exhibit 645.  So

25   this is -- this was shown to you yesterday by Mr. Marder,

1    and one of the things he said when he showed it to you is

2    something about the bank destroying this agreement.  Do you

3    remember him saying that?

4    A.  Yes.

5    Q.  And I asked you yesterday did you have any knowledge of

6    anybody at the bank destroying this agreement, and do you

7    have any knowledge of that?

8    A.  Hm-mmm.

9           THE COURT REPORTER:  I'm sorry.  What was the

10   answer?

11          THE WITNESS:  "No" was the answer.  Thank you.

12   BY MR. MOHEBAN:

13   Q.  And it's fair to say that as we see it up on the screen,

14   this agreement has not been destroyed, right?

15   A.  Correct.

16   Q.  We're looking at it?

17   A.  Yeah.

18   Q.  Okay.  And it has a label.  You didn't talk about this

19   with Mr. Marder, but it has a label and an exhibit number on

20   it.  Do you see that?

21   A.  I do.

22   Q.  And that has a date.  Can you tell us the date.

23   A.  September 21, 2010.

24   Q.  And then it says, "MI" above that?

25   A.  Yes.

1    Q.  The version of this document that was shown to you

2    yesterday, does it have a Bates number on it?

3    A.  I'm not sure what a Bates number is exactly, but.

4    Q.  Okay.  Let me try to refresh you on that.  You've sat

5    for a number of depositions in this case and others, right?

6    A.  Yes, I have.

7    Q.  And from time to time you're shown documents?

8    A.  Yes.

9    Q.  And has it been explained to you in depositions that the

10   origin of documents is sometimes determined by a Bates

11   number, a number at the bottom of the page that identifies

12   the document?

13   A.  Yes.

14   Q.  And it can also identify the origin of the document?

15   A.  Okay.

16   Q.  Do you remember --

17   A.  I do recall.

18   Q.  I am not trying to tell you that now.  I just want to

19   see if you remember that --

20   A.  I do.

21   Q.  -- from all the depositions that you have been in.

22   A.  Yeah, I do recall that.

23   Q.  This document doesn't have a Bates number on it; is that

24   fair to say?

25   A.  Yes.

```
 1   Q.  I mean, we have the number below, the P0645.  That's the
 2   trial exhibit number.
 3   A.  Yes.
 4   Q.  I would like you to look in the binder.  This hasn't
 5   been admitted yet, but look at Plaintiff's Exhibit 3.
 6   A.  Yes, I see it.
 7   Q.  Now, is this -- do you recognize this document?
 8   A.  I believe it's the same document that was on display on
 9   the screen here.
10   Q.  Okay.  Does it have that same stamp on it from September
11   21, 2010?
12   A.  Yes, it does.
13   Q.  And if we go to -- I want to get you to the signature
14   page so you can tell me that it's your signature.  If you go
15   to P-3-24, there's a place for a signature.  Do you see
16   that?
17   A.  Yes.
18   Q.  This document actually is a compilation of a couple
19   agreements, isn't it?
20   A.  Yes, it is.
21   Q.  Okay.  And then if we go to page P-3-17, is that also
22   your signature?
23   A.  Yes, it is.
24   Q.  And is that a signature on the February 25th, 2008,
25   Deposit Account Management Agreement?
```

Flynn - Direct

1    A.  February 25th, yes.

2              MR. MOHEBAN:  Your Honor, I would offer

3    Plaintiff's Exhibit 3.

4              MR. MARDER:  No objection, Your Honor.

5              THE COURT:  Plaintiff's Exhibit 3 is received in

6    evidence.

7    BY MR. MOHEBAN:

8    Q.  Now, if we go to the second page of Plaintiff's

9    Exhibit 3, now we're looking at the same Deposit Account

10   Management Agreement that you were shown yesterday by

11   Mr. Marder, right?  It says February 25th, 2008, at the top?

12   A.  Yes.

13   Q.  And it's got that same M&I Exhibit 11, September 21,

14   2010, sticker on it, right?

15   A.  Yes, it does.

16   Q.  But does this version have a Bates number on it?

17   A.  Yes, it does.

18   Q.  And does that say, "MI"?

19   A.  Yes.

20   Q.  And is it your understanding that a document with an M&I

21   Bates number would be a document produced by M&I Bank?

22   A.  I believe so, yes.

23   Q.  So this document, unlike the one that you were shown,

24   this was a document that was used in some proceeding on

25   September 21st, 2010, that was produced by M&I Bank?  Is

Flynn - Direct

1    that the way you read this?

2    A.  Yeah.  I'm not exactly an expert on, you know, how this

3    Bates coding works or anything like that, but it does have a

4    Bates number and it does reference MI on it.

5    Q.  And the document is not destroyed because we're looking

6    at it; is that right?

7    A.  Yeah, and it's dated September 21 of 2010.

8    Q.  Okay.  Now, you were asked some questions about how

9    these DACAs, Deposit Control Agreements, were to work

10   yesterday.

11          Now, if we look at the fourth paragraph here, you

12   were asked about this language, "WHEREAS, from time to time

13   Petters will receive payments with respect to Transactions

14   into its bank account at M&I which should have been paid to

15   a 'lockbox' of a Protected Party or directly to a Protected

16   Party."

17          So when you were reviewing this agreement and you

18   saw the language "from time to time," did you understand

19   that this was going to be occasionally that there was going

20   to be payments, or did you understand it to be a regular

21   event?

22   A.  To me, the term "time to time" means it may happen, and

23   time to time suggests that it's not expected to be frequent.

24   Q.  And did you understand from this language that

25   essentially it would have been a mistake if a transaction

 1    payment went into this account because it should -- the

 2    language says it should have been paid to a lockbox?

 3    A.  Yes.

 4    Q.  So this agreement would go into effect, to your

 5    understanding, only if a mistake had been made by someone?

 6    A.  Yes.

 7    Q.  And then if we go to the next page, to Section 1 (c),

 8    it's a section on "Deposits into Account."  The second

 9    sentence says, "Such deposits are not held in trust for the

10    Protected Party."  Do you see that?

11    A.  Yes.

12    Q.  So you had made the suggestion to Mr. Howse and

13    Ms. Coleman why not have a trust fund.  Is it a fair

14    statement that they didn't end up having a trust account?

15    A.  Yes, it's a fair statement.

16    Q.  And then if we could go to paragraph 2(b), so that's the

17    next page over -- I'm sorry.  "Procedures for Deposit

18    Account," do you see that at the bottom of the page?  That's

19    2(a).

20            And if we go to the next page, we'll get to 2(b).

21    We need to back up, I think.  I apologize.  Make sure I have

22    the right -- we're looking for the language that starts

23    with, "Petters shall provide."

24    A.  Yeah, it seems like --

25    Q.  Do you know what?  Let's switch, because this has got

1    some intermingled other documents.  Let's switch to

2    Exhibit 645, and now we can go to Section 2(b).  So that's

3    1(b).  If we go to the next page.  There we go.  All right.

4              So this provision, we're talking about a section

5    on the implementation of this Deposit Control Agreement, and

6    this says, "Petters shall provide to each Protected Party

7    and M&I at least once each week (or more often if necessary)

8    a list of all Transactions funded by a Protected Party."  Do

9    you see that language?

10   A.  I do.

11   Q.  So was it your understanding that for you to do anything

12   under this agreement, Petters would have to provide you a

13   transaction list?

14             MR. MARDER:  Objection, leading, Your Honor.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yes, that was my understanding.

17   BY MR. MOHEBAN:

18   Q.  And I think the testimony was established yesterday you

19   never got a transaction list?

20   A.  That's correct.

21   Q.  The obligation here was for Petters to provide the list

22   not just to M&I, but to the protected party, right?

23   A.  Yes.

24   Q.  So the protected party would know if they're not getting

25   these lists just as well as M&I would know; is that your

Flynn - Direct

1    understanding?

2    A.  I would presume so, yes.

3    Q.  So the way this was set up, did the protected party need

4    to get notified by M&I that the lists were not being

5    provided?

6    A.  No.

7    Q.  And if you didn't get the lists, could you fulfill your

8    obligations under this agreement?

9    A.  No.

10   Q.  The date of this agreement was February 25th, 2008?

11   A.  Yes.

12   Q.  Okay.  So how much time passed from when this agreement

13   was implemented until the Ponzi scheme was discovered and

14   put an end to?

15   A.  I would guess it's about somewhere between five and six

16   months.

17   Q.  So this came at the very end of the Ponzi scheme?

18   A.  Yes, it seems that way.

19   Q.  Do you have an understanding of when the Ponzi scheme

20   started?

21   A.  No, I don't remember exactly.

22   Q.  But this -- the first DACA, Deposit Account Agreement,

23   that M&I entered into was just six months before the Ponzi

24   scheme ended?

25   A.  Yes.

Flynn - Direct

1    Q.  And in that six months, you didn't get any transaction

2    lists from Petters; is that right?

3    A.  That's correct.

4    Q.  And the protected party, Mr. Howse or Mr. Howse's

5    client, they never called you and said, Hey, what's going on

6    with these transaction lists?

7    A.  No.  No one ever asked.

8    Q.  You were also asked about the Deposit Control Agreement

9    with Ritchie.  That's Plaintiff's Exhibit 116.  Can we look

10   at that?  And this one was entered into when?

11   A.  Sometime in May.

12   Q.  May of 2008.

13   A.  Yes.

14   Q.  So how much time passed between when this Account

15   Agreement was entered and the Ponzi scheme was discovered

16   and put an end to?

17   A.  About four months.

18   Q.  Okay.  And then we also have the agreement with

19   Interlachen that's Plaintiff's Exhibit 117.  Can we see

20   that?  When was that agreement entered into?

21   A.  May 29th, 2008.

22   Q.  So this is at the end of May, right?

23   A.  Yes.

24   Q.  So then we have June, July, August, and then September

25   the scheme is discovered; is that right?

Flynn - Direct

1    A.  Yes.

2    Q.  Were you fully prepared to implement and fulfill any

3    obligations under any of these Deposit Control Agreements?

4    A.  That was my expectation, yes.

5    Q.  Is it a fair statement that your performance of the

6    three agreements was dependent on Petters or other third

7    parties providing information to the bank?

8    A.  Yes.

9    Q.  The Interlachen and Ritchie agreements were going to be

10   triggered by funds being deposited into a special account

11   that had been set up for them; is that right?

12   A.  Yeah, I would have to review those in more detail, but

13   that's my recollection.

14   Q.  In the short time between when you entered into these

15   agreements and the Ponzi scheme was discovered, did any of

16   the hedge funds contact you to ask about what was going on

17   with these agreements?

18   A.  No, I don't recall that ever happening.

19   Q.  Did anyone complain to you that there was something that

20   M&I wasn't doing that they should have been doing?

21   A.  Not that I recall, no.

22   Q.  Did Petters complain about that?

23   A.  No.

24   Q.  So I'm going to conclude here with just a couple of

25   questions.

```
 1              During the time that you were working at M&I Bank
 2     and Petters was your customer, did you know that Petters was
 3     running a Ponzi scheme?
 4     A.  Only after it had been exposed.
 5     Q.  Was there ever a point in time where you suspected they
 6     were running a Ponzi scheme?
 7     A.  No.
 8     Q.  Are you aware of anyone else at M&I Bank who suspected
 9     there was a Ponzi scheme?
10     A.  No.
11     Q.  Did you do anything that you would say was turning a
12     blind eye to the Ponzi scheme?
13     A.  No.
14     Q.  And the first you heard about it was when law
15     enforcement came to you with a subpoena for your
16     cooperation?
17     A.  That's correct, yes.
18     Q.  And since that time, you've cooperated and come to court
19     when called on to tell what you know honestly and
20     truthfully?
21     A.  Yes.
22              MR. MOHEBAN:  I have no further questions.
23                         RECROSS-EXAMINATION
24     BY MR. MARDER:
25     Q.  Good morning, Mr. Flynn.
```

1    A.  Good morning.

2    Q.  I want to ask you some questions this morning about some

3    things that Mr. Moheban asked you yesterday, and then we

4    will move into today.

5            I would like to start, if you could, please, by

6    looking at the MIContacts entry that he asked you about at

7    the beginning of your examination, which was Exhibit P-2,

8    page 14.

9    A.  Okay.  Yes, I see it on the screen.

10   Q.  You recall this is the document that Mr. Moheban showed

11   you at the beginning of his examination, and you remember he

12   took the white part in the middle of the page and compared

13   it to the other version to see if there were any

14   differences; do you recall that?

15   A.  Yes, I do.

16   Q.  Okay.  When he did that, did he just blow up the white

17   part, or did he blow up the fields above it?  Do you

18   remember?

19   A.  I don't specifically recall from that question.

20   Q.  Okay.  Well, here's what we're going to do.  We're going

21   to put Plaintiff's Exhibit 2, page 14, at the bottom of the

22   screen.  Actually, sorry, page 13.  We can remove page 14.

23   We don't need that.

24           We are just going to put page 13 at the bottom of

25   the screen, and we're going to blow up the top part of that.

1    And now we're going to look at Plaintiff's Exhibit 145.  So

2    now what we're looking at are the fields at the top of the

3    two MIContacts -- right? -- one of them being the one that

4    was the original form on the top, and one of them on the

5    bottom that says, "Last edited 12-4-2008."  Do you see that?

6    A.  I do.

7    Q.  And that's six years after the entry, right?

8    A.  Yes.

9    Q.  Okay.  Now, if you look at the original version, you see

10   it has the name -- you see it has a field called "Bank

11   Primary" up at the top?

12   A.  Yes.

13   Q.  That's the person who owned the relationship, right?

14   A.  Yes.

15   Q.  And then if we look down where it says, "Last edited

16   2-4-2008."  Do you see that?

17   A.  I do.

18   Q.  Your name has been removed, right?

19   A.  Yes.

20   Q.  And this was after the Court issued the injunction that

21   documents were not to be altered, right?

22   A.  I don't know when my name was removed from this.

23   Q.  But it says, "Last edited 12-4-2008," right?

24   A.  Yes.

25   Q.  And that was after the Ponzi scheme was revealed to the

Flynn - Recross

```
1    public?

2    A.  Yes.

3    Q.  And that's a time at which you didn't want your name

4    associated with Mr. Vennes, right?

5    A.  I don't think that's a fair characterization.

6    Q.  Let's move next to the ACE Reports that Mr. Moheban

7    asked you about yesterday.  You recall Mr. Moheban showed

8    you some ACE Reports yesterday?

9    A.  Yes.

10   Q.  And the reports he showed you, they related to the

11   profitability of the Petters account, right?

12   A.  Yes.

13   Q.  And the reports that he showed you were the last few

14   months before the Ponzi scheme unraveled, right?

15   A.  That's right, yes.

16   Q.  And you understand how Ponzi schemes work in general,

17   right?

18   A.  I do.

19   Q.  You understand that investor funds from new investors

20   are used to pay off old investors?

21   A.  Yes.

22   Q.  And eventually they have to collapse because you can't

23   keep collecting more and more investors, right?

24   A.  Right.

25   Q.  Okay.  So the ones that he showed you were from the last
```

Flynn - Recross

1    few months before the scheme unraveled, correct?

2    A.  Yeah.  I believe it was about the last year, yes.

3    Q.  The last few months, it was July and August, right?

4    A.  I think we looked at some reports that were dated

5    earlier than that as well.

6    Q.  I think you testified that the reason the PCI account

7    was not more profitable was because the daily balance wasn't

8    that high, right?

9    A.  Yes.

10   Q.  But the reason the daily balance wasn't that high was

11   because Mr. Petters was moving money in and out of the

12   account so fast that the daily balance would never be high,

13   right?

14   A.  That's correct.

15   Q.  Did you know that back during the time frame when you

16   were supervising the account?

17   A.  No, I didn't.

18   Q.  And while we're talking about profitability, you

19   mentioned that loans are the most profitable part of your

20   business in response to Mr. Moheban's questions, right?

21   A.  Yes, I did.

22   Q.  And you had various meetings where you tried to pitch to

23   Petters the idea of the bank lending money for various real

24   estate and other projects, right?

25   A.  We were asked by Petters to explore those projects.

1    Q.  But you never once pitched to PCI the idea of the bank

2    funding any of these sales of electronics from wholesalers

3    to retailers, did you?

4    A.  They never expressed that as a need to us.

5    Q.  But that's not something that you pitched?

6    A.  No.

7    Q.  Because you weren't interested in that business, right?

8    A.  I don't think that's a fair characterization.  The

9    client never asked us to take a look at that.  Those other

10   projects, they did.

11   Q.  Is it your testimony that the only time that you

12   suggested a bank service to the Petters Group is when they

13   asked you for it?

14   A.  I'm not saying that's absolutely everything.  I don't

15   recall from this time period, but I was never asked by

16   Petters to take a look at financing Petters Company.

17   Q.  But as we discussed, it was very important to you to try

18   to grow the bank's business -- right? -- that's part of your

19   job?

20   A.  Yes.

21   Q.  And you would frequently pitch to your clients new ideas

22   for new bank services?

23   A.  If we felt they needed them and they wanted to discuss

24   them, yes.

25   Q.  And if it was something you thought you could make money

1    off of?

2    A.  Well, we're in business, yes.  It's not a nonprofit.

3    Q.  But you never, as you sit here today, have any

4    recollection of asking Mr. Petters if the bank could invest

5    in his PCI business relating to the purchase and sale of

6    electronics, right?

7    A.  That's correct.

8    Q.  I believe that you testified yesterday that you had to

9    go to a committee to give a loan to Mr. Vennes?

10   A.  We didn't quite make it to committee, but that would

11   have been part of the process had we decided we wanted to

12   move forward.

13   Q.  But you had the ability to approve loans up to a certain

14   amount on your own without going to a committee, right?

15   A.  I don't specifically recall approval authority.

16   Q.  Do you have your binder there?

17   A.  I do.

18   Q.  If I could ask you, please, to turn to your transcript

19   from 10-30-17.

20   A.  Okay.  Got it.

21          MR. MOHEBAN:  Page?

22          MR. MARDER:  I will get it to you in a second.

23   BY MR. MARDER:

24   Q.  I would ask you to turn to page 24, please.

25   A.  Yes.

1   Q.  If I could ask you to take a look at page 24-23 through

2   25-2.  Can you read that to yourself.

3   A.  I'm sorry.  What lines, sir?

4   Q.  Sure.  Page 24 --

5   A.  Yes.

6   Q.  -- line 23 through page 25, line 2.

7       (Witness reviews document)

8   A.  Okay.  I see the testimony.

9   Q.  Okay.  So does that refresh your recollection that you

10  had some authority to lend to customers without going to the

11  creditors' committee?

12  A.  As I read this, that's what I answered at that time, but

13  as we sit here today, I simply do not recall.

14  Q.  And do you recall that amount was roughly up to

15  $3 million?

16  A.  I see that's how I answered it here, yes.

17  Q.  Okay.  Now, I think you told us about this conversation

18  that you had with Mr. Vennes, that he was going to walk the

19  better path now that he was out of jail.  Is that what he

20  told you?

21  A.  Effectively, yes.  I'm paraphrasing.

22  Q.  But the bank rejected his loan request, right?

23  A.  That's correct.

24  Q.  So his promises of walking a better path weren't enough

25  to satisfy the bank at the time, right?

1    A.  That's correct.

2    Q.  Now I would like to go to some of the questions that

3    Mr. Moheban asked you about today.  I'd ask you first to

4    turn to Plaintiff's Exhibit 20, which relates to the DACA

5    agreement that you testified about.  I would ask you to go

6    to page 2 of that agreement -- I'm sorry, page 2 of that

7    document.

8    A.  Yes.

9    Q.  And if we could look at the middle paragraph and blow

10   that up, there's a line there that says, "I don't know that

11   something like this should be done by the business banking

12   team versus trust."  Right?

13   A.  Yes, it does.

14   Q.  And what she's talking -- and if you look at the

15   previous sentence, what she's talking about is that, "The

16   Control Agreement talks about a Transaction list of the

17   obligor, and that the bank shall compare each payment

18   received by wire transfer or otherwise to the most recently

19   received transaction list."  Do you see that?

20   A.  I do.

21   Q.  And what Ms. Moline is saying is that she doesn't think

22   something like that should be done by the business banking

23   group, right?

24   A.  That's what she wrote, yes.

25   Q.  And this concept of getting a transaction list and

1   comparing it to activity was something that made its way

2   into the final agreement, right?

3   A.  Yes.

4   Q.  Now, in response to Mr. Moheban's questions, you

5   explained -- if we could look at the first paragraph, it

6   says there that she spoke with Peggy Franzen and that there

7   was a Control Agreement that was approved for the bank.  Do

8   you see that?

9   A.  Yes.

10  Q.  So you testified that the bank had done a Control

11  Agreement before?

12  A.  That was my understanding based on this language.

13  Q.  Do you know anything about that Control Agreement?

14  A.  I don't.

15  Q.  Do you know whether it contained a provision that there

16  would be a transaction list that the bank was going to

17  compare each wire transfer to?

18  A.  No, I don't.

19  Q.  So as far as you know, this DACA that you received was

20  the first time the bank had ever been requested to do that,

21  right?

22  A.  As far as I know, but I can't say for certain.

23  Q.  Now, if we go to page 3, I would like to blow up the

24  first paragraph of the e-mail you wrote.  It says there,

25  "Attached is a request from one of our customers regarding

1    some special handling for a new account to be opened."  Do

2    you see that?

3    A.  I do.

4    Q.  Those words, "special handling," those were words that

5    you chose, right?

6    A.  Yes.

7    Q.  Okay.  Now I would like you to look, please, back at the

8    document Mr. Moheban showed you, which is Plaintiff's

9    Exhibit 5.  Do you recall he showed you page 34 of that?

10   A.  Yes.

11   Q.  And this is a list of red flags to be on alert for,

12   right?

13   A.  Yes.

14   Q.  Let's look at the last bullet point there.  Do you see

15   it says, "A customer who requests special treatment or

16   'exceptions' to the documentation rules."  Right?

17   A.  I see that, yes.

18   Q.  And those are things that you were supposed to be on

19   alert for, right?

20   A.  It was part of our compliance training, yes.

21   Q.  Okay.  Now, that last paragraph has an "or" in the

22   middle of it, right?

23   A.  Yes.

24   Q.  And Mr. Moheban pointed you to the section that talks

25   about "exceptions to the documentation rules."  Do you see

1    that?

2    A.  I do.

3    Q.  But the first part of it lists, "A customer who requests

4    special treatment," right?

5    A.  Yes.

6    Q.  And in your own words, this was a request for special

7    handling, right?

8    A.  As I wrote that e-mail, yes.

9    Q.  Now if we could go to Plaintiff's Exhibit 21, please.

10   I'd ask -- this was a document that Mr. Moheban showed you

11   this morning, right?

12   A.  Yes.

13   Q.  If I could ask you to turn to page 2 of that, and we're

14   going to blow up the e-mail at the very bottom there from

15   Ms. Schwede.  She says there, "I do not like 2C."  Right?

16   A.  Yes.

17   Q.  It says, "I do not think M&I wants to be responsible for

18   reconciling an account and transferring funds out."  Right?

19   A.  Yes.

20   Q.  Now, this file agreement that you signed with Palm Beach

21   had a Section 2(c) in it, right?

22   A.  I would have to take a look at the document again, but

23   I'm not going to dispute it.

24   Q.  But it did have a section that required you to reconcile

25   a transaction list with transactions, right?

1    A.  Yes.

2    Q.  And that's the very thing that the assistant vice

3    president/customer service manager -- I'm sorry, that's the

4    very thing that the assistant vice president/customer

5    service manager told you she didn't like in the agreement,

6    right?

7    A.  That's correct, as it was written by the original

8    document.

9    Q.  I would ask you next, please, to look at Plaintiff's

10   Exhibit 23.  If we could blow up the text of that document,

11   please.  Do you recall Mr. Moheban asking you if Frank

12   Vennes' name was mentioned in that document?

13   A.  Yes.

14   Q.  But at this time, you already knew that the attorney,

15   Mr. Howse, represented Frank Vennes, right?

16   A.  That is correct, yes.

17   Q.  But you didn't need it to be in the document to know

18   that, right?

19   A.  I was glancing at this as he was asking questions, but

20   you are correct.

21   Q.  Next I would like to go to Plaintiff's Exhibit 645,

22   please.  You recall Mr. Moheban asking you some questions

23   about whether this document had been destroyed by M&I or

24   not?

25   A.  Yes.

1    Q.  Okay.  You see the sticker on the bottom of the page

2    there?

3    A.  I do.

4    Q.  It's an exhibit number to a deposition, right?

5    A.  Yes.

6    Q.  So you know this was marked at a deposition -- right? --

7    that's what it appears?

8    A.  That's what it appears to be, yes.

9    Q.  Now if we go to Plaintiff's Exhibit 3, please, and I

10   would like you to look at Plaintiff's Exhibit 3, page 2.  In

11   fact, if we can leave them both on the screen and put them

12   side by side.

13           So you see the document on the right that's marked

14   at the deposition has no Bates number on it, right?

15   A.  Yes, that's correct.

16   Q.  And the document on the left has a Bates number, right?

17   A.  Yes.

18   Q.  So what M&I did is produce a document that someone else

19   gave them at a deposition, right?

20           MR. MOHEBAN:  Objection, lack of foundation.

21           THE COURT:  Overruled.  You may answer.

22           THE WITNESS:  I don't know the answer to your

23   question.

24   BY MR. MARDER:

25   Q.  So as you sit here today, you have no information about

1   whether or not M&I actually produced this document from its

2   files?

3   A.  I just simply do not recall.

4   Q.  And as far as you know from looking at this record, it

5   appears that the Bates numbers were added after this was a

6   deposition exhibit -- right? -- because the original

7   deposition exhibit doesn't have numbers on it?

8               MR. MOHEBAN:  Objection to the notion that one is

9   the original.  We don't have any foundation for that.

10              THE COURT:  Sustained.

11  BY MR. MARDER:

12  Q.  In any event, Mr. Flynn, you're not the right person to

13  testify about this, right?

14  A.  I'm not a legal expert or an attorney.

15  Q.  You have no idea who produced this document or who put

16  Bates numbers on it or when, right?

17  A.  That's correct.

18  Q.  Let's go back to Plaintiff's Exhibit 645.  I think you

19  testified that this agreement would only go into effect if a

20  mistake was made?

21  A.  I don't believe I said that exactly, but I was

22  referencing the term "time to time."

23  Q.  Didn't you use the term "a mistake"?

24  A.  I don't believe that I said mistake.  I could be wrong.

25  I don't recall specifically.

1    Q.  If we go to page 3 of this agreement, I'd like to blow

2    up Section (b).  This is the section that talks about the

3    transaction list, right?

4    A.  Yes.

5    Q.  And it says that, "Petters shall provide each Protected

6    Party and M&I at least once each week (or more often if

7    necessary to enable M&I to discharge its obligations

8    hereunder), a list of all Transactions funded by a Protected

9    Party with respect to which payment may be received by M&I

10   for deposit into the Deposit Account."  Right?

11   A.  Yes.

12   Q.  So that is supposed to happen once each week, right?

13   A.  That was in the agreement, yes.

14   Q.  Then if we go to the next paragraph, paragraph (c), that

15   talks about how M&I is supposed to compare each payment

16   received by wire transfer or otherwise to the most recently

17   received transaction list, right?

18   A.  Yes.

19   Q.  As I think you explained to -- in response to

20   Mr. Moheban's testimony [sic], you never received any

21   transaction list, right?

22   A.  That's correct.

23   Q.  And did you make some assumptions as to why?

24   A.  I didn't make any assumptions, no.

25   Q.  Did you call up anybody at PCI and ask why?

Flynn - Recross

1    A.  No.

2    Q.  If we could please go to DX-67 -- hang on a second.  I

3    may have the wrong exhibit number.  I apologize.

4        (Mr. Marder and Ms. Holmes confer)

5    BY MR. MARDER:

6    Q.  I apologize.  I had the wrong exhibit number.

7    A.  No problem.

8    Q.  If we could go to DX-40067.  Let's go to page 38.  We're

9    going to blow up the third line from the bottom, the

10   speaker's notes.  You see there it says, "It's not always

11   easy to ask the tough questions to make sure we understand

12   the customer and their activity"?  Do you see that?

13   A.  I see that, yes.

14   Q.  Finally, I want to ask you about something that

15   Mr. Moheban asked you right before he finished asking you

16   questions.  He asked you if you had ever turned a blind eye

17   to the Petters situation, right?

18   A.  That's correct.

19   Q.  Now, yesterday when you testified, you admitted that

20   understanding your customer's bank account activity was an

21   important part of being able to identify whether there was

22   unusual or suspicious activity relating to that customer,

23   right?

24   A.  Yes.

25   Q.  But you never reviewed the transaction activity in the

```
 1    PCI account, correct?
 2    A.  That's correct.
 3    Q.  You didn't know that billions and billions of dollars
 4    were running through that account, right?
 5    A.  That's correct.
 6    Q.  Even though the person who introduced PCI's business to
 7    you was a convicted felon, right?
 8    A.  That's correct.
 9    Q.  And even though you signed the DACA agreement, right?
10    A.  Yes.
11    Q.  And even though the DACA agreement said that you were
12    supposed to get a weekly transaction list, right?
13    A.  That was in the document, yes.
14    Q.  And even though you never got a transaction list, right?
15    A.  That's correct.
16    Q.  And even though you never asked why, right?
17    A.  That's correct.
18    Q.  Sir, can you think of a clearer example of somebody who
19    turned a blind eye?
20            MR. MOHEBAN:  Objection, argumentative.
21            THE COURT:  Sustained.
22            MR. MARDER:  I have no further questions for this
23    witness.
24            MR. MOHEBAN:  Your Honor, one or two follow-up
25    questions is all I have.
```

1        THE COURT:  You may.

2                    **REDIRECT EXAMINATION**

3    BY MR. MOHEBAN:

4    Q.  Mr. Flynn, you were asked about, again, this notion that

5    Mr. Howse represented Frank Vennes.  You had been told that,

6    right?

7    A.  Yes.

8    Q.  And you have worked with lawyers like Kevin Busch at

9    Moss & Barnett, correct?

10   A.  Yes.

11   Q.  Lawyers have more than one client -- is that right? --

12   in your experience?

13   A.  I would presume so, yes.

14   Q.  M&I Bank wasn't the only client for Mr. Busch?

15   A.  Correct.

16   Q.  And the fact that Mr. Howse had represented Mr. Vennes

17   at some point in time on something, does that mean that he

18   was representing Mr. Vennes on this Deposit Control

19   Agreement?

20   A.  I was directed to Mr. Howse by our client, and that's

21   who I interacted with.

22   Q.  Did anyone ever tell you that Mr. Howse was representing

23   Mr. Vennes with respect to this Deposit Control Agreement?

24   A.  I do recall some e-mail with Deanna Coleman that there

25   was a connection, affiliation between Frank and Mr. Howse.

1    I do have that recollection.

2    Q.  So you knew that Mr. Howse represented Mr. Vennes.  My

3    question is:  Did anyone ever tell you that for this Palm

4    Beach Deposit Control Agreement, that Mr. Vennes was

5    involved with that?

6    A.  I don't recall that.

7              MR. MOHEBAN:  That's all I have.

8              THE COURT:  Anything further?

9              MR. MARDER:  Nothing further, Your Honor.

10             THE COURT:  Sir, you are excused.

11             THE WITNESS:  Thank you, Your Honor.

12             MR. COLLYARD:  May I proceed, Your Honor?

13             THE COURT:  Let's let things settle down.

14        (Pause)

15             THE COURT:  Counsel, you may proceed.

16             MR. COLLYARD:  Your Honor, plaintiff calls its

17   next witness adverse by video.  It's a former BMO Harris

18   Bank employee named Mr. Raymond Neufeldt, who during the

19   relevant time in this case was a manager in BMO's money

20   transfer department, which included the bank personnel that

21   processed all the wire transfers in and out of the Petters

22   Company, Inc. account.  We would like to play that video and

23   also offer along with that video certain exhibits into

24   evidence.

25             THE COURT:  You may.

```
 1              MR. COLLYARD:  And by the way, Your Honor, just
 2      for your information, the video is about 90 minutes long.
 3              THE COURT:  Thank you.
 4              MR. COLLYARD:  Along with the video, plaintiff
 5      offers Plaintiff's Exhibit 16.
 6              THE COURT:  Exhibit 16 is received.  I hear no
 7      objection.
 8              MR. COLLYARD:  Plaintiff offers Exhibit 355.
 9              MS. GITTES:  No objection.
10              THE COURT:  355 is received.
11              MR. COLLYARD:  Plaintiff offers P-356.
12              MS. GITTES:  No objection.
13              THE COURT:  356 is received.
14              MR. COLLYARD:  Plaintiff offers P-357.
15              MS. GITTES:  No objection.
16              THE COURT:  Exhibit 357 is received.
17              MR. COLLYARD:  Plaintiff offers P-359.
18              MS. GITTES:  No objection.
19              THE COURT:  Exhibit 359 is received.
20              MR. COLLYARD:  Plaintiff offers P-360.
21              MS. GITTES:  No objection.
22              THE COURT:  Exhibit 360 is received.
23              MR. COLLYARD:  Plaintiff offers P-361.
24              MS. GITTES:  No objection.
25              THE COURT:  Exhibit 361 is received.
```

 1              MR. COLLYARD:  Plaintiff offers P-362.

 2              MS. GITTES:  Apologies, Your Honor.  We're just

 3      checking our list for one moment.

 4              THE COURT:  That's quite all right.

 5              MS. GITTES:  Thank you.

 6          (Pause)

 7              MS. GITTES:  No objection.  Thank you.

 8              THE COURT:  362 is received.

 9              MR. COLLYARD:  Two more, Your Honor.  Plaintiff

10      offers P-364.

11              MS. GITTES:  No objection.

12              THE COURT:  It's received.

13              MR. COLLYARD:  And plaintiff offers P-372.

14              MS. GITTES:  No objection.  Thank you.

15              THE COURT:  P-372 is received.

16              MR. COLLYARD:  Thank you, Your Honor.

17                        **(Raymond Neufeldt)**

18                   **DEPOSITION TRANSCRIPT PLAYED**

19      Q.  Can you please state your name for the record.

20      A.  Raymond Neufeldt.

21      Q.  Mr. Neufeldt, have you ever been deposed before?

22      A.  To my knowledge, no.  I mean, this is obviously a first

23      here for this, you know, on film and so forth.  I've been

24      asked, I'm sure, of other things.

25      Q.  But as far as you can recall sitting down having a court

CASE 0:19-cv-01756-WMW   Doc. 371   Filed 12/05/22   Page 65 of 286

1    reporter --

2    A.  No.

3    Q.  No?

4    A.  No.

5    Q.  So can you just tell me a little bit about your work

6    history, when you started at M&I Bank.

7    A.  I believe it was in 1972 I started in check processing

8    and worked my way up to be the manager of check processing

9    in the late '70s and stayed in check processing until -- I

10   stayed associated with it until 1997.  The last five or so

11   years, I was more into sales support than in managing the

12   area directly.  And then in 1997, I was brought in to manage

13   the money transfer area.

14   Q.  How long did you stay in the money transfer department?

15   A.  Until it was eliminated, if you will, by the BMO

16   acquisition.

17   Q.  Do you recall when that was?

18   A.  I left in approximately 2014, first quarter.

19   Q.  What was -- were you working at that time for BMO Harris

20   Bank?

21   A.  Yes.

22   Q.  What was your role at BMO Harris when you left?

23   A.  I was the money transfer manager.

24   Q.  Are you currently employed?

25   A.  No, I am not.

1    Q.  What did you do to prepare for today's deposition?

2    A.  Reviewed transactions, how they looked, and that is it.

3    Q.  Did you talk to anyone at BMO Harris Bank?

4    A.  No.

5    Q.  Did you talk to anyone that you used to work with at M&I

6    Bank?

7    A.  Yes.  Well, the person that worked for me I did talk to.

8    Q.  Who was that?

9    A.  Linda Perleberg.

10   Q.  You said that Linda worked for you.  What role did Linda

11   have when she worked for you?

12   A.  She worked in money transfer.  He was a section leader,

13   senior person.

14   Q.  You said "section leader" and then you said "senior

15   person."  Is that basically what a section leader is,

16   someone more senior?

17   A.  More responsibility.

18   Q.  And what responsibilities did she have as a section

19   leader?

20   A.  Well, she could initiate wire transfers, follow a

21   procedure.  She could review money transfers for anything

22   that went to exception queues and then release as

23   appropriate.

24   Q.  We're going to get into the nuts and bolts of what an

25   actual transfer looked like and the process in an a little

1     bit.  But before I forget, what -- what is an exception

2     queue?

3     A.  It is when a transaction is routed that does -- because

4     there is something within the transaction that is causing it

5     to not go further, stopping it for review.

6     Q.  Can you give examples of what some of those exceptions

7     might be.

8     A.  An example would be OFAC, which is the Office of Foreign

9     Asset Control, the transaction that hit on one of the

10    criteria within OFAC.

11    Q.  Do you know whether any of the PCI wires ever ended up

12    in the exception queue?

13    A.  PCI, that is?

14    Q.  Petters Company, Inc., Incorporated?

15    A.  I cannot say they did.

16    Q.  In your personal capacity, when did you first learn

17    about the Petters Ponzi scheme?

18    A.  When it was stopped, if you will.

19    Q.  Would that be in late September of 2008?

20    A.  Yes.

21    Q.  Do you recall from whom you learned about the scheme?

22    A.  Not specifically, but it would have been somebody within

23    the area that got a call from appropriate authorities

24    looking for more detail.

25    Q.  Do you ever have any interaction with Tom Petters or his

Neuferac   Deposition

1    companies while he banks at --

2    A.   No.

3    Q.   -- M&I?

4    A.   No.

5    Q.   I'm handing you what's been marked as Exhibit 267.  It's

6    a Memorandum of Interview, and on the top it says, "Internal

7    Revenue Service, Criminal Investigation."  The date is

8    November 17th, 2008.  And under "Participants," you're

9    listed -- your name is misspelled, but you're listed as wire

10   department manager by phone.  Do you see that?

11   A.   Yes.

12   Q.   Does this refresh your recollection as to whether you

13   participated in a call with the IRS in November 2008?

14   A.   I may have participated.

15   Q.   So I'm going to ask you -- this is a summary of that

16   call made by a special agent, and so I understand that it's

17   not something that you've written down, but I want to walk

18   through some of these to see whether the statements in here

19   comport with your understanding of the Petters account and

20   wires in and out of that account.

21            So in paragraph 1 it says, "All incoming wires

22   into the PCI account received by the wire department in

23   Milwaukee."  Did that wire department in Milwaukee have a

24   particular name?

25   A.   The money transfer department.

Neufarde - Deposition

1   Q.  What was -- is the money transfer department also

2   referred to as the Money Transfer Center?

3   A.  Yeah.

4   Q.  What about a relationship, if any, between the Money

5   Transfer Center and treasury management services?

6   A.  We work with them closely.

7   Q.  And in broad strokes, what did that -- what did working

8   with them closely entail?

9   A.  Treasury management was an area that worked with

10  customers to make them efficient in handling their

11  operations, and part of that would be money transfers.

12  Q.  So is it a fair characterization to say that treasury

13  management may help suggest some of the services that the

14  Money Transfer Center would actually carry out?

15  A.  Yes.

16  Q.  Can you explain the process when an incoming wire came

17  into the Money Transfer Center for PCI?

18  A.  Any transfer coming in would go into an incoming queue,

19  and it would then be posted or a memo posted to the

20  appropriate account that it came into and in the deposit

21  system.

22  Q.  Can I just stop you right there?  What does "memo

23  posted" mean?

24  A.  That means it is there for purposes of availability and

25  seeing that it was -- it had arrived.

1    Q.  So once a memo posted, what happened next?

2    A.  It would stay there until the end of the day when the

3    deposit system was posted.  The memo posts would go away,

4    but the transaction would be part of the file sent to the

5    deposit system for posting.

6    Q.  And what -- when you reference the "deposit system,"

7    what does that mean?

8    A.  That is the system that has got all of the M&I demand

9    deposit accounts in it and their activity; debits, credits,

10   so forth, balance.

11   Q.  What would happen at the end of the day when it was

12   posting to that deposit system?

13   A.  The deposit system then would be updated with all other

14   transactions that went to it; checks, check deposits, ATM

15   transactions.  Anything that affected the balance would then

16   be posted at -- to that specific account that it was

17   associated with.

18   Q.  And when you say "posted to that specific account," does

19   that mean that at that point it would appear in the account

20   for purposes of use by the --

21   A.  Yes.

22   Q.  -- customer?

23   A.  Yes.

24   Q.  Yes?

25              What, if any, of the process you just described

1    was automated versus requiring human intervention?

2    A.  All of it was automated.

3    Q.  Was there any part of the receipt of an incoming wire

4    for the PCI account that required someone in the Money

5    Transfer Center to interact to ensure that that -- the

6    incoming wire went through?

7    A.  Wires were touched, but not to review, but just to pass

8    on.

9    Q.  And when you say "touched to pass on," what does that

10   mean?

11   A.  If they came in, they would be within our system, but

12   then they would be memo posted or transmitted to the deposit

13   system for memo posting.

14   Q.  When you -- and when you say "they would be memo

15   posted," is that something that a human would have to go in

16   and do to make that memo posting?

17   A.  No.

18   Q.  So that would be done automatically as well?

19   A.  Yes.

20   Q.  How did M&I -- how did the M&I system get notified of an

21   incoming wire in the first instance?

22   A.  Through that memo posting procedure.  You're talking now

23   specifically the deposit system?

24   Q.  Yes.

25   A.  Okay.  Yeah.

1    Q.  When that was -- when it was posted to the system, was

2    anyone else at the bank alerted that the money had come in?

3    A.  Not specifically that I'm aware of.  I mean...

4    Q.  Would -- for example, let's say an incoming wire came in

5    for a particular account.  Would the relationship manager on

6    that account be notified that a wire transfer had been

7    received for that account?

8    A.  No, not unless -- I will say if there was a specific

9    transaction that was occurring, a real estate transaction,

10   and the funds had to be there for the account officer to

11   see, they would be notified then, but not as a matter of

12   routine.

13   Q.  In that more exceptional circumstance, how -- you gave

14   the example of a real estate transaction.  How would the

15   account relationship manager be notified that that wire had

16   come in?

17   A.  Phone call.

18   Q.  Who would make that phone call?

19   A.  It was somebody in the money transfer department.

20   Q.  And how would the person in the money transfer

21   department know that the incoming wire had come in?

22   A.  We would look at the account, we'd watch for it.

23   Q.  What would you -- what would the people in the Money

24   Transfer Center look at to see whether an account -- whether

25   a wire had come in?

1    A.  Could look at the deposit system to see if a memo posted

2    or do an inquiry into the money transfer system.

3    Q.  As part of an incoming wire process, was the -- was a

4    customer who was receiving that incoming wire notified about

5    the wire coming in?

6    A.  If they had requested it, yes.

7    Q.  And what would be the process if a customer had

8    requested it for them to be notified?

9    A.  If they were using a money transfer work station, they

10   could do the inquiry themselves into their money transfer

11   activity.  They could also have it set up for a call to go

12   to them to notify them.  They would be notified in the

13   future when a statement was sent to them.

14   Q.  Were customers also notified by -- by letter?  Could

15   customers also be notified by letter that an incoming wire

16   was received?

17   A.  I'm not aware of that being done, but, I mean, a

18   statement was mailed or could be mailed.

19   Q.  How often was that statement mailed?

20   A.  That was daily.

21   Q.  And who at M&I was responsible for mailing that

22   statement?

23   A.  It was the mailroom.

24   Q.  What -- who at M&I was responsible for generating the

25   information that was mailed to the customer?

1    A.  Money transfer department.

2    Q.  And if a customer had requested to be notified by mail

3    or -- well, requested to be notified by mail, when would the

4    people in the Money Transfer Center collect the information

5    to send that to the customer?

6    A.  It would be at the end of the day or prior to the

7    following day.

8    Q.  Was notice also given to customers about incoming wires

9    by fax?

10   A.  Yes.

11   Q.  And was the Money Transfer Center responsible for

12   sending out those faxes?

13   A.  It was infrequent.  I cannot say.

14   Q.  Do you know whether those faxes when they were sent out

15   required human intervention?

16   A.  I can't say.

17   Q.  So you're not sure whether if a customer requested fax

18   notification related to an incoming transfer, whether

19   someone in your department personally faxed a confirmation

20   sheet to the customer after a particular wire?

21   A.  I believe it would have been, but, again, I can't say

22   for sure, system generated.

23   Q.  When you say "system generated," does that mean you

24   think that if they had requested a fax, that it would have

25   been automatically --

1     A.  Right.

2     Q.  -- sent to the customer?  Is that right?

3     A.  Yes.

4     Q.  We'll go back to Exhibit 267.  The second paragraph

5     says, "Outgoing wire transfers can be done over the phone.

6     For those customers who conduct telephonic wire transfers,

7     there is a formal agreement in place with M&I.  The customer

8     has to identify the authorized individuals that can conduct

9     the transactions and also create a Personal Identification

10    Number to be used with the transfer request."  Do you see

11    that?

12    A.  Yes.

13    Q.  Is this -- is that consistent with your understanding of

14    the outgoing wire requests process that PCI engaged in?

15    A.  It was available to them.  I know they -- yes.

16    Q.  This paragraph references a formal agreement in place.

17    Can you tell me what that formal agreement is.

18    A.  An agreement that was signed by the appropriate person

19    at the account that is being used and identifying those

20    people that can initiate.

21    Q.  Would it be called a Wire Transfer Agreement?

22    A.  Yes.

23    Q.  I'm handing you what's been marked as Exhibit 268.  It's

24    Bates labeled MIPB000669.  Do you see that at the bottom?

25    And it's a compilation of forms produced by BMO in this

 1   case.  I'll ask you to just page through it.

 2         I will direct you to specific provisions, but, in

 3   general, you've had a chance to look it over.  Is this

 4   consistent with your understanding of what a Wire Transfer

 5   Agreement --

 6   A.  Yes.

 7   Q.  -- looks like?

 8         Yes?

 9   A.  Yes.

10   Q.  And on the first page, you'll see that for

11   "Customer/Company Name," Petters Company, Inc. is listed.

12   Do you see that?

13   A.  Yes.

14   Q.  At the bottom it's dated January 17, 2006.  Do you see

15   that?

16   A.  Yes.

17   Q.  Have you seen any of these documents before this

18   morning?

19   A.  No.

20   Q.  Do you know whether there was a Wire Transfer Agreement

21   in place for Petters Company, Inc. before January 2006?

22   A.  No.

23   Q.  I want to direct you to paragraph 3 of the first page.

24   The first line of that says, "Bank may decline to execute a

25   payment order for any reason."  Do you see that?

Neufeldt - Deposition

1    A.  Yes.

2    Q.  When it's talking about a payment order, does that mean

3    that the bank could decline incoming and outgoing payments?

4    A.  Yes.

5    Q.  So from 2001 through 2008, the period at issue here, M&I

6    always had the right to stop wire transfers out of the PCI

7    account; is that right?

8    A.  Yes.

9    Q.  And from 2001 through 2008, M&I always had the right to

10   stop wire transfers coming into the PCI account; is that

11   right?

12   A.  Yes.

13   Q.  Was there anyone outside of the Money Transfer Center

14   that had the ability to stop a transfer in and out of the

15   account?

16   A.  The account officer, corporate security.

17   Q.  What are -- what are some reasons that corporate

18   security would stop a transfer in or out of a particular

19   account?

20   A.  Fraud.

21   Q.  Is the compliance department part of corporate security

22   in your understanding?

23   A.  It's separate, but they're compliance also.

24   Q.  Could compliance stop a transaction?

25   A.  Yes.

1    Q.  Are you familiar with a group called the Anti-Money

2    Laundering Monitoring Group?

3    A.  Yes.

4    Q.  Would they be able to stop a wire transaction?

5    A.  Yes.

6    Q.  Yes?

7            Can you turn to the second page of that document.

8    Paragraph 9 is "Miscellaneous," and 9(a) says, "Bank may

9    terminate this service at any time with or without notice to

10   the Customer."  Do you see that?

11   A.  Yes.

12   Q.  Is that -- is that referring to the bank can terminate

13   wire transfer service at any time?

14   A.  Yes.

15   Q.  Who at the bank could actually decide to terminate wire

16   transfer service?

17   A.  The account officer, corporate security.

18   Q.  Would it be the same group that we talked about being

19   able to stop a particular transfer?

20   A.  Yes.

21   Q.  During your tenure at M&I in the Money Transfer Center,

22   do you recall any instances in which an account -- in which

23   the bank did terminate money transfer services for a

24   particular account?

25   A.  Not specifically.  I'm sure it did occur.

1   Q.  Let's go back to the first page, again paragraph 3.  If

2   you go down I think six lines in the middle, there's a

3   sentence that starts, "If an overdraft in the Account

4   occurs."

5   A.  Um-hmm.

6   Q.  Do you see that?

7   A.  Yes.

8   Q.  So it says, "If an overdraft in the Account occurs,

9   Customer agrees to pay Bank on demand an amount equal to the

10  overdraft together with Bank's normal charges for overdrafts

11  and costs of collection, including reasonable attorneys'

12  fees."  Do you see that?

13  A.  Yes.

14  Q.  How would an overdraft occur in the wire transfer

15  context?

16  A.  Account officer would have had to have approved the

17  transaction and then sufficient funds not come in to cover

18  it.

19  Q.  And when you say that the account manager would have to

20  approve it, why is that?

21  A.  We would not wire out -- allow a wire to go out if it

22  was going to overdraw the account or -- excuse me, if

23  available funds were not there.

24  Q.  We'll talk about outgoing transfers in a little bit, but

25  is the idea that if a request for an outgoing transfer came

1  into the Money Transfer Center, if funds weren't available,

2  the normal practice would be that the Money Transfer Center

3  just wouldn't send that wire out; is that right?

4  A.  Unless there was a specific documentation or something

5  in place to allow that to occur.

6  Q.  And unless there was account manager approval or some

7  instruction in the record allowing that to occur, normal

8  practice would be to not let it go out if funds weren't

9  available?

10  A.  Correct.

11  Q.  And it would be only in the case of an agreement in

12  place or instructions by the account manager that the bank

13  would make that wire that would create a situation of an

14  overdraft?

15  A.  Correct.

16  Q.  And that's what this section would be referring to,

17  that's how an overdraft could arise in a wire transfer

18  context?

19  A.  Yes.

20  Q.  Could the account manager -- well, how would an account

21  manager go about notifying the Money Transfer Center that a

22  particular exception needed to be made for a customer?

23  A.  Phone call.

24  Q.  Was anything ever put into writing?

25  A.  No.  It would be documented that the approval was

1    obtained.

2    Q.  And who would document that?

3    A.  That would be part of the transaction.

4    Q.  And when you say it would be documented, where would

5    that information appear?

6    A.  I cannot say for sure.  I do not know.

7    Q.  You said earlier that it would be part of the

8    transaction.  Was there a file associated with each

9    transaction that that notice would appear in?

10   A.  No.  Well, I can't say.

11   Q.  So it's your testimony that some record was created that

12   an exception was made or that approval was given, but you

13   don't know where in M&I's records that would be notified

14   or --

15   A.  I think it would be part of the transaction detail, but

16   I'm not certain.

17   Q.  I'm handing you what's been marked as Exhibit 269.  It's

18   a two-page e-mail chain Bates numbered BMO00002062.  This

19   one starts at _002.  And I'll direct your attention to the

20   second page.  There's an e-mail from Aarif Leung to Ann

21   Benson.  Are you familiar with either Aarif or Ann?

22   A.  I'm familiar with Aarif.

23   Q.  And who is Aarif?

24   A.  He worked in money transfer.

25   Q.  Did he work for you?

1    A.  Yes.

2    Q.  And this e-mail is from September 7, 2006.  The subject

3    is "Petters Company."  And he says, "Just a reminder, please

4    have Ed Jambor drop a memo letting us hold until account is

5    funded for Petters Company."  Do you see that?

6    A.  Yes.

7    Q.  Do you have any idea what Aarif is talking about in this

8    e-mail to Ann Benson?

9    A.  He wants to get approval from the officer on -- on --

10   documented.

11   Q.  And when he says, "letting us hold until account is

12   funded," what is he talking about there?

13   A.  A wire transfer that is generated that there is not

14   sufficient funds in the account to allow it to go would stay

15   until sufficient funds came in or -- well, that was it,

16   sufficient funds came in right there.

17   Q.  Is the situation he's talking about also referred to as

18   daylight overdrafts?

19   A.  Yes.

20   Q.  And the idea, again, would be that requests wired -- or

21   requests would be made for a transfer -- for an outgoing

22   transfer, there wouldn't be sufficient funds in there, and

23   so he's asking for the account manager to draw up or to

24   record a memo that would allow that transfer to be held

25   until funds were available?

1    A.  Yes.

2    Q.  Do you know how long the transfer requests could be

3    held?

4    A.  They would be held until the end of the day and then

5    canceled.

6    Q.  Is the practice that Aarif is requesting be documented,

7    would that be different than normal Money Transfer Center

8    policy for outgoing transfers that didn't have the funds in

9    the account?

10   A.  We didn't release a transaction unless there were funds

11   in the account, unless the account officer gave approval.

12   And what apparently was here was that it was in an operation

13   that there were -- it was a need to have that done on a --

14   not a daily basis, but a more consistent basis, so that

15   allowed the operation or the officer not to have to call but

16   to let us proceed.

17   Q.  So the idea in having him request that from the account

18   officer would be that in some sort of routine capacity or

19   manner, the requests were coming in, funds weren't

20   available, and so instead of having the account manager have

21   to call on a regular basis, there would be a policy in place

22   that would allow the Money Transfer Center, instead of just

23   canceling it right away, to continue to check for funds --

24   A.  Yes.

25   Q.  -- through the end of the day; is that right?

1    A.  Yes.

2    Q.  Why did Aarif want this in writing?

3    A.  Put it in the customer's file.

4    Q.  And when you say "in the customer's file," was there a

5    file for each customer executing wire transfers that was

6    held within the Money Transfer Center?

7    A.  Yes.

8    Q.  And who had access to that file?

9    A.  The money transfer staff.

10   Q.  And when would they consult that file?

11   A.  As needed.

12   Q.  When you say "as needed," would that be every time that

13   a customer requested wire activity?

14   A.  No.  That would be when a customer was set up, they

15   would have their initiators and so forth established within

16   the system per that agreement with the dollar amount, levels

17   on, and so forth and so on.  So that was there to -- to have

18   that documentation.  If there was a need to have it changed,

19   new person initiating, it was updated.  Or if something

20   occurred with the customer that, again, wanted to have it

21   updated, they updated it.

22   Q.  And would the agreement that Aarif was asking for here

23   be something that would be placed, along with that other

24   documentation, in that customer file?

25   A.  Right.

1    Q.  So if a transfer was requested and the funds for the

2    transfer were available, the Money Transfer Center and --

3    would execute that request --

4    A.  Yes.

5    Q.  -- without checking the file; is that right?

6    A.  Yes.

7    Q.  If there was something unusual about that request, for

8    example, the funds requested weren't in the account, then

9    the Money Transfer Center would check the file to see if

10   there was an agreement in place that would address the

11   issue?

12   A.  It would be documented, yes.

13   Q.  So can you turn to the first page of that e-mail.  Ann

14   Benson sends to Ed Jambor five days later an e-mail.  She

15   tells him to clean this up and e-mail it to Aarif.  And in

16   it she says, "Unfortunately Aarif, Ed left on vacation

17   starting today and won't be back until Monday.  I guess he

18   never had a chance to get that memo written, although I did

19   nag him about it yesterday."

20          She goes on and says, "In his absence, allow me to

21   relay to you in writing the policy that he follows regarding

22   outgoing Petters wire transfers is that if the funds are not

23   available, if funds are not available in any Petters

24   accounts at the time the wire is initiated by the customer,

25   will the MTC please continue to check the account for

Neuferdt - Deposition

1    availability throughout the end.  If the funds never become

2    available that day, the MTC may cancel the wire transfer

3    request and do not need to contact the customer."  Do you

4    see that?

5    A.  Yes.

6    Q.  In this e-mail, Ms. Benson references funds not being

7    available in any Petters accounts.  Is it the case that the

8    Money Transfer Center could look to various accounts in a

9    customer's name in order to satisfy the -- in order to fund

10   a wire request?

11   A.  Yes.

12   Q.  So if a customer had associated with it a certain

13   person, like Tom Petters, for example, and Petters had

14   multiple accounts at M&I, it would be normal practice for

15   the bank, if there were not funds in the PCI account, for

16   example, to look to another Petters account to satisfy the

17   funding for a transfer request?

18   A.  If the account officer wished to have that occur.

19   Q.  So the account officer could make that request?

20   A.  Yes.

21   Q.  If that -- if the account officer didn't make that

22   request, would the Money Transfer Center automatically look

23   for other accounts associated with a particular customer?

24   A.  No.

25   Q.  When -- she also references in here this idea of the

Neufeldc - Deposition

```
1    Money Transfer Center continuing to check the account for

2    availability throughout the end -- and I think we talked

3    about this earlier.  That would be a different practice than

4    the Money Transfer Center would usually engage in if it

5    didn't have this instruction, the idea of checking

6    throughout the day, correct?

7    A.  Correct.  That would be a specific instruction from the

8    account management.

9    Q.  If there wasn't a specific person associated with the

10   Petters Company, Inc. account, how would you determine who

11   in your department would be responsible for checking the

12   account throughout the day in accordance with this policy?

13   A.  We had people monitoring an exception queue.  They would

14   look at it periodically.

15   Q.  If a -- if the funds didn't become available, would the

16   Money Transfer Center reach out to the customer to inform

17   them that the transfer didn't go through?

18   A.  Yes.

19   Q.  How was that done?

20   A.  Phone.

21   Q.  Who in your department would make that phone call?

22   A.  It would be a small group of people that -- you're

23   asking for names.  I don't have -- I can't give you specific

24   names.

25   Q.  When would that phone call be made?
```

```
1    A.  It could be made any time during the day.  Obviously at

2    the end when it is going to be a done deal, it is going to

3    be made.

4    Q.  The IRS memo that we looked at first --

5              THE COURT:  Let's take a break now.

6              Members of the Jury, please remember the

7    instructions that I have given you, and do not discuss the

8    case, do not do any research, do not encounter anyone

9    involved in the case during the course of this recess.

10   Let's plan to return at ten minutes after 11:00.  Okay?

11       (Jury excused)

12                      IN OPEN COURT

13                    (JURY NOT PRESENT)

14              THE COURT:  We are in recess.

15              MR. ANTHONY:  Thank you, Your Honor.

16              THE COURT:  You're welcome.

17       (Recess taken at 10:55 a.m.)

18                    *    *    *    *    *

19       (11:14 a.m.)

20                      IN OPEN COURT

21                     (JURY PRESENT)

22              THE COURT:  Are we ready to resume?

23              MR. COLLYARD:  Yes, Your Honor.  Thank you.  We'll

24   continue playing the videotape disposition.

25              THE COURT:  Very well.  Thank you.
```

1    BY MR. MOHEBAN:

2    Q.  The IRS memo that we looked at first, you don't have to

3    pull it out, but that's what I'm talking about here, made

4    reference to a customer identifying authorized individuals

5    that can conduct transaction and create a personal

6    identification number to be used with the request.  How did

7    that PIN system work?

8    A.  The person's name was entered within the money transfer

9    system along with the PIN that they could use to authorize a

10   transaction, along with the parameters.  So when a person

11   would call in, they would give their PIN number.  They would

12   be allowed to initiate a wire transaction up to the amount

13   of or whatever the parameters were that had been put in

14   place.

15   Q.  And I'll direct you back to Exhibit 268, please, and

16   specifically to the page at the bottom ends in 674.  Do you

17   have it in front of you?

18   A.  Yes.

19   Q.  And on here there's listed three people -- the first one

20   is crossed out -- listed as initiators.  Do you see that?

21   A.  Yes.

22   Q.  What -- what is "initiators" referring to?

23   A.  That means people that could initiate a wire transfer.

24   Q.  And next to them are listed some dollar limits.  There's

25   "Repetitive Dollar Limit" and "Nonrepetitive Dollar Limit."

Neufeldt - Deposition

1   Do you see that?

2   A.  Yes.

3   Q.  Are those the limits that you were referring to when you

4   talked about limits for an authorized user?

5   A.  Yes.

6   Q.  And in this case, the limits for the three people is $10

7   million.  Do you see that?

8   A.  Yes.

9   Q.  There's also in there a "Bank Use Reference Code" listed

10  at the far right.  Do you know whether those are the PIN

11  numbers?

12  A.  I believe they are.

13  Q.  So when a person was requesting a wire via telephone, he

14  or she would give their PIN number as part of the

15  authorization; is that right?

16  A.  Yes.

17  Q.  And they would also give the account number that they

18  wanted the transfer to come from; is that right?

19  A.  Yes.

20  Q.  All right.  Can you turn back to Exhibit 267.

21  Paragraph 3 says, "PCI's outgoing wires were done by phone

22  with the calls going directly to the wire department in

23  Milwaukee."  Do you see that?

24  A.  Yes.

25  Q.  I want to show you this.  This exhibit has been marked

1   as 271.  It's Bates labeled BMO00001869_002.  Note that part

2   of this exhibit is an attached spreadsheet that you can see

3   on the first page.  I've got a document placeholder there at

4   BMO1870, and then there's a spreadsheet printout, which is a

5   truncated version of the spreadsheet which counsel has

6   actually provided.  We're not going to get into all the

7   details, but part of what I wanted to ask about was the

8   meaning of these headings across the top.

9           And yesterday your counsel provided a worksheet

10  that gives an explanation of the column headings.  So that's

11  marked as 272.  And we'll kind of use these in tandem.

12          Did you play a role in helping provide information

13  about the column headings as characterized or as provided

14  here in Exhibit 272?

15  A.  Yes.

16  Q.  Yes?

17          Where -- where did the information in this

18  spreadsheet come from?  I'm sorry.  Going back to

19  Exhibit 271.

20  A.  Well, it's all part of a money transfer transaction,

21  either incoming or outgoing.

22  Q.  Right.  When -- when people that work for you pulled

23  that information in response to the government subpoena in

24  September 2008, where were they pulling that information

25  from?

1    A.  I'm guessing it was online.

2    Q.  And when you say you're guessing online, do you have any

3    sense of where online they were finding that information?

4    A.  In the history of the money transfer intranet system.

5    Q.  And so the particular system that they were accessing

6    would have been the money transfer intranet system --

7    A.  Yes.

8    Q.  -- that you referenced earlier?

9    A.  Right.

10   Q.  And that's, again, something that the money transfer

11   department could log into via an icon on their desktop to be

12   able to see the transactions for a particular account?

13   A.  Yes.

14   Q.  Could -- what were the -- what were the search

15   capabilities of that system?  Could, for example, you

16   isolate a particular account number and look for all wire

17   activity for that customer?

18   A.  You could sort by, yes, different criteria.

19   Q.  Would that intranet that you're talking about contain

20   only information about wires?

21   A.  Yes, only wires.

22   Q.  And one of the -- would this be the place that you would

23   go to look if you wanted to see how a transfer was

24   initiated?

25   A.  Yes.

1    Q.  And so if we look at Column D, which is "LOC," on the

2    description in 272 it says -- it's provided as "Location of

3    Wire Origination."  And "MTRANS" is Money Transfer Center?

4    A.  Yes.

5    Q.  Yeah.  So when "MTRANS" is listed --

6    A.  Uh-huh.

7    Q.  -- does that mean that it was a wire transfer -- an

8    outgoing wire transfer?

9    A.  It was initiated in the wire transfer department.

10   Q.  And as opposed to a wire transfer that was an incoming

11   wire which would not have been initiated?

12   A.  Correct.  Yes.

13   Q.  So is it fair to say that whenever "MTRANS" appears in

14   "Location," that would be a wire that PCI had initiated

15   through the Money Transfer Center?

16   A.  Yes.

17   Q.  Okay.  Thanks for the clarification.

18           How would people outside of the Money Transfer

19   Center be aware of a reason to cancel a particular wire?

20   A.  Corporate security, because of something unlawful that

21   is occurring with the customer, and that would be the first

22   thing that comes to mind.

23           OFAC, you know, or anybody that's aware of a

24   particular instance -- or not instance, but set of

25   circumstances that could cause -- or that they want to have

1    a transaction stopped or transactions stopped.

2    Q.  Would people outside of your department, outside of the

3    Money Transfer Center, rely on the Money Transfer Center to

4    notify them that there was an exception that they should be

5    looking at?

6    A.  They would not -- no.

7    Q.  So if they weren't relying on people in the Money

8    Transfer Center, how are they getting the information that

9    something untoward is going on that requires them to come in

10   and cancel?

11   A.  They would be aware of a customer that was using wire

12   transfer services maybe and that customer was now involved

13   in fraud or some other event, they would then -- they would

14   not just go to money transfer and shut it down, they would

15   also -- or not shut it down, but, you know -- they would

16   also go to checking accounts and cancel or have all checks,

17   you know, whatever, looked at, reviewed.  I mean, I'm not

18   going to tell you what they are going to do, but they would

19   stop that operation or slow it up or monitor it or

20   something.

21   Q.  So is it right that what -- the situations you're

22   talking about would be related to something about a

23   particular customer has been flagged by corporate security

24   or compliance, and as part of their investigation, they

25   could go to the Money Transfer Center and stop wires?

1    A.  Yes.

2    Q.  Would that also extend to their knowledge of particular

3    wires?  So not just the customer that did it, but would

4    something about a wire ever flag for them that they would

5    come in and stop that particular wire?

6    A.  Not that I'm aware of.

7    Q.  All right.  So before we broke, we were -- we started

8    talking about the spreadsheet attached to the Glanner e-mail

9    at 1870, and I gave to you an excerpt of that.  I think it's

10   just 15 pages.  But the spreadsheet itself has more than

11   23,000 entries on it.  Your counsel has actually produced a

12   copy.  It's sitting next to you.  It's about an inch and a

13   half, two inches thick.

14            In preparation for today's deposition, have you

15   reviewed that spreadsheet at all?

16   A.  Yes.

17   Q.  Are you aware in your time at M&I of other noncommercial

18   customers that engaged in that level of wire activity?

19   A.  No.

20   Q.  I'm handing you what's been marked previously as

21   Exhibit 16.  I think that was from Flynn.  And it's a

22   compilation of pages that on the top says, "Transaction

23   Detail Report."  Do you see that?

24   A.  Yes.

25   Q.  Do you know where -- are you familiar with Transaction

1    Detail Reports?

2    A.  Yes.

3    Q.  Where did Transaction Detail Reports come from?

4    A.  The money transfer system.

5    Q.  How were Transaction Detail Reports generated?

6    A.  You could request one through a terminal, online access.

7    Q.  And who could make that request?

8    A.  Appropriate people in the money transfer department.

9    Q.  Do you know whether people in the risk department could

10   request them as well?

11   A.  I believe they could.

12   Q.  What was the purpose of generating a Transaction Detail

13   Report?

14   A.  If you wanted to review the transactions for a purpose.

15   Q.  Were Transaction Detail Reports ever shared with

16   customers?

17   A.  To my knowledge, no.

18   Q.  Were they ever shared with account managers?

19   A.  Possibly.

20   Q.  Could an account manager request to see a Transaction

21   Detail Report for a particular transaction or a period of

22   time?

23   A.  Yes, they could.

24   Q.  And how would an account manager go about making that

25   request?

Neufeld - Deposition

1    A.  Phone call.

2    Q.  Phone call to the Money Transfer Center?

3    A.  Right.

4    Q.  And could a -- could an account manager make that

5    request for any reason?

6    A.  Yes.

7    Q.  Would there be any reason that the Money Transfer Center

8    would not give the Transaction Detail Report to the account

9    manager?

10   A.  No.

11   Q.  And within the Transaction Detail Report, at least on

12   page 1 in Exhibit 16, there's information about the party

13   sending the wire and the party receiving the wire; is that

14   right?

15   A.  Yes.

16   Q.  The originator and the beneficiary; is that right?

17   A.  Yes.

18   Q.  There's also listed on there the send date; is that

19   right?

20   A.  Yes.

21   Q.  And the amounts of the transfer?

22   A.  Yes.

23   Q.  And then "TRN," is that transaction number?

24   A.  Yes.

25   Q.  Would each transaction be given a unique identifying

1    number?

2    A.  Yes.

3    Q.  And that's what the transaction number would represent?

4    A.  Yes.

5    Q.  Was there any other way that an account manager would be

6    notified about wire transfer activity such that the account

7    manager would be able to call the Money Transfer Center to

8    make an exception request?

9    A.  Could you state that again?

10   Q.  Yeah, I'm sorry.  I'm just -- I'm driving at this.  We

11   know that Ed Jambor, for example, contacted the Money

12   Transfer Center with information about a policy that he

13   wanted in place for the PCI account, right?  That's what we

14   looked at in the e-mails --

15   A.  Right.

16   Q.  -- with Aarif, correct?

17   A.  Right.

18   Q.  How would Ed Jambor know that the wire activity of

19   Petters requesting outgoing wires, that there weren't funds

20   to cover those wires, was happening frequently enough to

21   actually make that request?

22   A.  Because there was probably daily contact with regard to

23   those transactions not being processed or processed timely,

24   and they were looking for a way to accelerate that.

25   Q.  And when you say "daily contact," what form would that

1    take?

2    A.  It could have been a -- initially a call to the account

3    officer, and then the account officer would -- because the

4    account officer could give approval and -- you know, to do

5    it; or if they did not want to do it, they could go to their

6    customer and look for a way or find a way to make it work

7    that they and the loan committee would be comfortable with.

8    Q.  So the idea would be that if a situation that was

9    creating an exception was occurring, the Money Transfer

10   Center would try to find a way to resolve that, and one of

11   the ways would be to reach out to an account manager for a

12   particular account?

13   A.  We probably would be dealing with the account manager,

14   and it would be a lot of contact, and the account manager

15   would not want to have that contact either.  We're used to

16   that contact, but it's, you know -- the people we're calling

17   or communicating with would be looking for a way to resolve

18   that issue and make it less.

19   Q.  And -- sorry.

20           And one way of resolving to -- well, resolve the

21   issue because they didn't want those phone calls coming

22   in --

23   A.  Correct.

24   Q.  -- all the time, right?

25           And one way to resolve it would be to put a policy

1    in place, like the one that we looked at earlier, in which

2    Mr. Jambor e-mailed Aarif with that policy, correct?

3    A.  Yes.

4    Q.  And what you're telling me is that one of the ways that

5    Mr. Jambor could have been alerted is that people within

6    your department would have reached out to him to try to work

7    through an exception --

8    A.  Yes.

9    Q.  -- including an exception that was occurring routinely,

10   correct?

11   A.  Yes.  And we normally would not be dealing with a

12   customer unless the account officer was involved as a matter

13   of just courtesy.  It's their account, therefore, they

14   should have some knowledge of it.

15   Q.  I understand.

16           And would calling that account manager by phone be

17   a normal way of contacting the officer?

18   A.  Yes.

19   Q.  Would there also be e-mails?

20   A.  Possibly, yes.

21   Q.  In fact, with the case of Aarif, we saw that Aarif

22   reached out to Ann Benson to be in touch with the account

23   manager, correct?

24   A.  Yes.

25   Q.  Let's go back to the spreadsheets, Exhibit 271, and then

Neufeldt - Deposition

1    also the explanation sheet on 272.  So we talked about --

2    sorry.

3    A.  Okay.

4    Q.  We talked about Column D, which was LOC.  And the next

5    one I want to ask about is Column G, which is "Tran Type,"

6    and the column description listed here is "Transaction

7    Type," correct?

8    A.  Yes.

9    Q.  The next one I want to look at is Column H, which is

10   "SRC Code," which is described as "Source Code," correct?

11   A.  Correct.

12   Q.  What is -- and there are various codes in here that

13   we'll talk about, but, in general, what is source code

14   signifying?

15   A.  How the wire was initiated.

16   Q.  Okay.  So one of the source codes is "FED," which listed

17   here -- is explained here as "Incoming Wire Sent Through

18   Fedwire."  Can you explain what that means.

19   A.  That means we received the wire from the federal wire

20   system.

21   Q.  And the federal wire system, can you explain that to me,

22   please.

23   A.  If a bank wants to send us a transaction for one of our

24   customers, they send it to Fed, but it's got our bank number

25   on it and it would go to Fed and then come to, in this case

Neufeldt - Deposition

```
 1    M&I.  We, in turn, would post it to the account that is
 2    indicated on there.
 3    Q.  And the appearance of "FED" would be associated with
 4    incoming wires made to the PCI account for the spreadsheet,
 5    correct?
 6    A.  Yes.
 7    Q.  The next one is "LTC," which is explained as "Wire
 8    Originated From Branch, Requires Callback."  Can you explain
 9    what that means.
10    A.  That means that the wire -- that somebody walked into a
11    branch, initiated a wire and it was called in or otherwise
12    initiated from the branch.  And we do a callback to verify
13    that it is correct.
14    Q.  What does it mean when you say you do a callback?  Who
15    are you calling back?
16    A.  Calling back the branch that -- the initiator.
17    Q.  When we -- I think we touched on this a little bit
18    earlier, but when a wire is coming from a branch, would that
19    mean that a customer is going in, finding their account
20    manager, and then the account manager is calling the Money
21    Transfer Center?
22    A.  It could be as simple as you, as just a regular retail
23    customer, going in there wanting to wire funds to your -- to
24    your brother in Pittsburgh.  That's -- so you don't have,
25    necessarily, an account manager.
```

Neufeldt - Deposition

1    Q.  Okay.

2    A.  You've got somebody that is initiating by going to a

3    counter person or an officer and making the request.

4    Q.  I understand.  So the distinction you're drawing is that

5    we can't say for sure that it was the account manager making

6    that call, but it was someone within a branch that was

7    making the call --

8    A.  Correct.

9    Q.  -- on behalf of the customer?

10                Again, what's the purpose for the callback?

11   A.  Verify authenticity.

12   Q.  And how would that be verified?

13   A.  By talking with the person that initiated it at that

14   branch.

15   Q.  On the -- on the big spreadsheet in 1870, there were 15

16   entries -- 15 entries for LTC.  Does that mean that there

17   were 15 instances in which PCI initiated a wire transfer by

18   going into a branch?

19   A.  I did not specifically look at those, but I would say

20   yes.

21   Q.  Okay.  The next entry is "LTR," which is explained as

22   "Wire Originated From Branch, No Callback Required."  Do you

23   see that?

24   A.  Yes.

25   Q.  What does that mean?

Neufeldt - Deposition

1   A.  It would be a wire that was set up already.  In other

2   words, it was a normal routine wire that was done.  So the

3   callback was not necessary because it was anticipated and

4   was part of the normal process.

5   Q.  How would a wire be part of the normal process?

6   A.  The customer and the account officer and the branch,

7   they had gotten together and that's how they wanted to do

8   it.

9   Q.  And the distinction between that and LTC is that because

10  they were all together, it was planned --

11  A.  Yes.

12  Q.  -- in the LTR case and therefore had some higher level

13  of understood authenticity --

14  A.  Correct.

15  Q.  -- is that fair?

16  A.  Yes.

17  Q.  Whereas, the LTC in some way was not expected and thus

18  required a callback for verification?

19  A.  Yes.

20  Q.  So there are, again, in the big spreadsheet 458 examples

21  in which LTR is listed.  Those would be representative of

22  times in which PCI and the account manager got together to

23  initiate a wire that was planned in some way such that a

24  callback wasn't required?

25  A.  Correct.

Neufeldt - Deposition

1    Q.  And then the last one, last entry is "PHN," which is

2    "Wire Originated Through Customer Call to the Money Transfer

3    Center."  Do you see that?

4    A.  Yes.

5    Q.  Can you describe what that is describing.

6    A.  That would be a customer that has a PIN.  They would

7    call the money transfer system and they would initiate a

8    transaction that was associated with -- an account that is

9    associated with that PIN and -- so it was a phone

10   initiation.

11   Q.  So in the big spreadsheet of 1870, there are more than

12   10,700 examples of "phone" being provided in the source

13   code.  Those would all be listing -- they would be records

14   of wires that PCI initiated by calling the Money Transfer

15   Center and providing their PIN to initiate a wire transfer;

16   is that correct?

17   A.  Yes.

18   Q.  The next column is "ADV Type," which in the column

19   description is described as "Type of Advice."  What does

20   "type of advice" mean?

21   A.  This is K?

22   Q.  I.

23   A.  I.  Oh, this is how the customer is notified that the

24   transaction has been completed or will be notified how the

25   transaction -- "LTR" means complete -- "LTR" stands for

```
1    letter.  Provide the customer with notification and
2    that's --
3    Q.  Okay.  So you talked about LTR.  So LTR would be a
4    physical letter sent out to a customer telling them that
5    they had received an incoming wire; is that right?
6    A.  That would be the statement, yes.
7    Q.  And this is a statement, that we had discussed earlier,
8    that someone in your department was responsible -- let me
9    say:  Was someone in your department responsible for
10   drafting it and getting it to the mailroom to send out?
11   A.  Right.  Yes.
12   Q.  What about the last entry, which is "SWF"?
13   A.  It's SWIFT.
14   Q.  What does "SWIFT" signify?
15   A.  That's -- again, it's an acronym for the Society for
16   Worldwide Interbank Financial Transactions.  They are
17   international transactions.
18   Q.  So if "SWIFT" is noted under "Type of Advice," do you
19   read that as denoting that an international transfer --
20   A.  Yes.
21   Q.  -- was either made or received?
22   A.  Made.
23   Q.  Made.
24   A.  I can't say for sure how incoming SWIFT would have been
25   notified.
```

Neufeldt - Deposition

1   Q.  For the remainder of the column headings and

2   descriptions, is it your testimony today that the column

3   descriptions contain the meaning of those column headings to

4   the best of your understanding and the understanding of

5   those that you worked with in putting together this sheet?

6   A.  Yes.

7   Q.  We can set that aside.

8           Can I turn your attention back to Exhibit 268,

9   please.  This is the Wire Transfer Agreement packet.  I'll

10  direct you to the fourth page, which ends in 672 on the

11  become.

12          At the top it says, "Addendum 1 to Wire Transfer

13  Agreement, Notification of Wire Transfers [sic]."  Do you

14  see that?

15  A.  Yes.

16  Q.  And, again, the customer listed here is Petters Company,

17  Inc., right?

18  A.  Yes.

19  Q.  A few lines down there's a bolded and underlined heading

20  that says, "Required Mailing address."  Do you see that?

21  A.  Yes.

22  Q.  And it says, "Bank will send notification of both

23  incoming and outgoing wire transactions as follows:"  And

24  there's an address listed there for Petters Company, Inc.,

25  right?

1    A.  Yes.

2    Q.  So we talked about the notification via letter of

3    incoming wires.  Is it your understanding, based on this

4    sheet, that M&I was sending notification via letter to

5    Petters Company about outgoing wires as well?

6    A.  Yes.

7    Q.  Do you know the process by which M&I sent confirmation

8    of outgoing wires to PCI?

9    A.  They would have mailed the appropriate information to

10   them.

11   Q.  And would someone in your department have been

12   responsible for compiling the information that someone in

13   the mailroom would ultimately mail to Petters Company?

14   A.  Yes, accumulating it.  It would be system generated.

15   Q.  And when you say it would be system generated and

16   someone in your department would accumulate it, what does

17   that mean?

18   A.  It means they would -- it would be -- for that

19   particular account it would be taken to the mailroom and

20   they would, in turn, mail it.

21   Q.  And when you say "system generated," does that mean that

22   it was -- the information was coming from the money transfer

23   intranet or from Trail and then would be collected by

24   someone in your department and taken to the mailroom?

25   A.  Yes.  It would be part of the end-of-day process.

1    Q.  And so this would be something that was done for every

2    day in which a wire transfer was made?

3    A.  Correct.

4    Q.  Or -- yeah, okay.

5           Underneath the section that we looked at, there's

6    a line that starts, "Optional Incoming Wire Transaction

7    Notification."  It says, "In addition to the mail

8    notification, customer may also receive notice of incoming

9    wire transactions via fax or phone call for an additional

10   fee."  Do you see that?

11   A.  Yes.

12   Q.  And right here the box is checked for "Fax

13   Notification - List Attention Name and Fax Number."  Do you

14   see that?

15   A.  Yes.

16   Q.  And listed there is "Deanna Munson," which is crossed

17   out, and then "Coleman" is put in and a fax number, right?

18   A.  Yes.

19   Q.  What do you understand that box being checked and

20   information provided to mean?

21   A.  Well, that would indicate to me that the customer wanted

22   to be notified of the specific transactions as they came in,

23   and the best way to do it would be to fax a copy of the

24   transaction as it came in because that would provide the

25   detail.

1    Q.  And so is it your understanding that as of the date of

2    this addendum -- and I guess there's a "Received" stamp here

3    of February 14th, 2006 -- that Petters Company had requested

4    that it receive, in addition to letter confirmation, that it

5    receive fax confirmation or fax notification of incoming --

6    A.  Yes.

7    Q.  -- wire transactions?

8    A.  Yes.

9    Q.  Mr. Neufeldt, I am showing you what was previously

10   marked as Lindstrom Exhibit 5.  It's a collection of faxes

11   that starts at Bates number BLT0540737.  Are you familiar at

12   all with the format of the faxes in this -- in this exhibit?

13   A.  Just what I see here.

14   Q.  Have you ever seen a fax like this before?

15   A.  Yeah.  Yes.

16   Q.  You'll note that, if you look across the top of the

17   various pages, there's a header that contains a date and

18   time and reference to the "M&I Bank Money Transfer

19   Department Via VSI-FAX."  Do you see that?

20   A.  Yes.

21   Q.  Do you understand this to mean that these are faxes sent

22   by the money transfer department?

23   A.  Yes.

24   Q.  At M&I?

25   A.  Yes.

1   Q.  And you see that there are different times on the

2   various faxes even though they're all dated January 11th and

3   that towards the end, next to "VSI-FAX," it says "Page 1 of

4   1" on these various sheets; do you see that?

5   A.  Yes.

6   Q.  Do you understand that to mean that these were not sent

7   all as one batch, but were, in fact, sent at different times

8   to the customer, PCI?

9   A.  Yes.

10  Q.  Are these examples of the fax confirmations sent to PCI

11  confirming incoming wire transfers received?

12  A.  Yes.

13  Q.  Some of the information in here we've talked about

14  through reference to Exhibit 1870.  Under "Payment

15  Information" there are some different entries.  Some say per

16  a number instruction from -- others on page 5, for example,

17  list PAC 598.  Do you know where the entries or the

18  information listed under "Payment Information" comes from?

19  A.  We're in this one right now?

20  Q.  Yeah, sorry, still in there.

21  A.  PAC598?

22  Q.  Yep.  And you can compare that to the first page, which

23  has "Payment Information," and it's listed "Per 11107

24  Instruction From."  Do you know where the text underneath

25  that "Payment Information" box came from?

Neufeldt - Deposition

1   A.   No.

2   Q.   Would that have been something entered by your

3   department?

4   A.   Yes.  I would say it would be something that was

5   available within the money transfer system and that you

6   could fax it.

7   Q.   Do you have an understanding of how the information

8   contained in the rest of this fax was populated?

9   A.   No.

10  Q.   Do you know whether there was someone in your department

11  responsible for manually entering this information and then

12  manually sending each fax to PCI once an incoming transfer

13  came in?

14  A.   I do not know.

15  Q.   Do you know -- well, did the Money Transfer Center have

16  any mechanism by which faxes could be automatically sent to

17  customers upon receipt of an incoming wire?

18  A.   I believe we did.  It was not a very highly used method

19  of notification.

20  Q.   So your testimony today is that you believe that your

21  department potentially had access to an automated system of

22  sending fax confirmations, but you can't be sure that these

23  faxes were not sent manually?

24  A.   Can't be sure, but I would -- I would say that they were

25  sent via automated.

1    Q.  If they were sent via automated, how did that -- how did

2    those faxes get sent, how did that process occur?

3    A.  It would have been the link from the money transfer

4    system to the automated system.

5    Q.  When you say it would be a link, do you mean a link that

6    someone in your department would click on to send it or the

7    information would link the information contained in the

8    money transfer system to the fax system and provide that

9    information to it?

10   A.  I can't say for sure.

11   Q.  We've talked about sort of the nuts and bolts of the

12   incoming wire process.  I'd like to walk through now the

13   process of a typical transaction for an outgoing wire in the

14   PCI account between 2001 and 2008.

15        To start, do you know whether it would have been

16   largely the same process if the vast majority of those

17   originating wires was taking place via phone throughout that

18   period?  I'm sorry.  Confusing question.

19        If PCI was originating wires, by and large, given

20   the numbers, by telephone from 2001 through 2008, would that

21   process have looked the same throughout that entire period?

22   A.  Yes.

23   Q.  And how would PCI start the process of wiring money to

24   someone else?

25   A.  A phone call.

Neufeldt - Deposition

1   Q.  Who would that phone call go to?

2   A.  It would come into the Money Transfer Center and then it

3   would go through a random -- you know, who's available.

4   Q.  So someone from PCI could call in.  Would that someone

5   have to be listed on the Wire Transfer Agreement as an

6   authorized user?

7   A.  Yes.  They'd have to have the name and PIN.

8   Q.  So a person could call in from PCI as long as he or she

9   was an authorized user and had a PIN, and he or she would

10  call to the Money Transfer Center in Milwaukee, correct?

11  A.  Right.

12  Q.  Would the person from Petters leave a message or were

13  they talking to a live person at the Money Transfer Center?

14  A.  They were talking to a live person.

15  Q.  So PCI calls the Money Transfer Center.  They talk to

16  one of a random group of authorized people within your

17  department.  They give their name and their PIN number.

18  What other information would they need to provide in order

19  to originate a transfer?

20  A.  Well, if they were -- if it's one that they normally did

21  and they had it set up as a repetitive, they would give the

22  repetitive code and then the dollar amount.

23  Q.  Okay.  We'll talk about repetitive in just a minute.

24          If it wasn't one that they had set up, what other

25  kind of information would they have to give?

1    A.  Then we would have to have all the appropriate

2    information: bank, name, account -- bank account number,

3    name, all the various things.

4    Q.  I'm handing you what's been marked as Exhibit 273.  I'll

5    have a few specific questions, but I'll represent that the

6    first page -- actually, I think just about all of them has

7    either reference to a Repetitive Transfer Form or an

8    addendum to the Wire Transfer Agreement that is Repetitive

9    Transfer Requests.  Do you see that?

10   A.  Yes.

11   Q.  What's the significance of a Repetitive Transfer Form or

12   a Repetitive Transfer Request?

13   A.  It allowed for the efficient and accurate entry and

14   sending of a wire because you would have all the information

15   that the customer wanted out there.  There was no keying

16   errors because you had it within the system as a repetitive,

17   and it could be done relatively fast and accurate.

18   Q.  So if we see here that -- for Petters Company, Inc.

19   there's a date on the first page that's December of 2005.

20   So as of that date Petters Company, Inc. had designated the

21   various entities listed on these pages as regular recipients

22   of funds from them; is that right?

23   A.  Yes.

24   Q.  And the idea is that they would complete these forms in

25   order to help expedite the wire process because they could

1    call in, reference a code instead of having to provide all

2    the information to you?

3    A.  Right.  If I'm not mistaken, there was a financial

4    benefit also because repetitive was a less costly

5    transaction for banking purposes, and that cost was made

6    available to the customer.  It made us more efficient and

7    therefore was...

8    Q.  So M&I incented customers to complete Repetitive

9    Transfer Forms because it was a less costly process for

10   them?

11   A.  Exactly.

12   Q.  And so that was -- do you know who would convey that to

13   the customer?

14   A.  That would be the account officer would suggest that or

15   encourage that.

16   Q.  How would the account officer know that there was a type

17   of volume of wires or a regular group of recipients of wires

18   such that repetitive transfers made sense?

19   A.  They would see the account analysis, if you will, of the

20   customer relationship with the bank and they could look at,

21   you know, all the various volumes for how many checks

22   cleared, how many deposits were made, how many wires came

23   in, how many wires came out, and they could see what was

24   there.

25   Q.  If you moved forward in this -- in Exhibit 273 four

1    pages to the page ending in 765, there is a Repetitive

2    Transfer Request to an entity with U.S. Bank as its

3    receiving bank and the beneficiary is listed as PC Funding,

4    LLC.  Do you see that?

5    A.   Yes.

6    Q.   There's not an address or city, state, and ZIP listed

7    for PC Funding.  Do you see that?

8    A.   Correct.

9    Q.   Although for both, in parentheses, it says "Required."

10   Do you know why there's not an address listed for that

11   particular entity?

12   A.   No, I do not.

13   Q.   Would the Money Transfer Center complete a transfer to a

14   repetitive transfer entity that didn't have that information

15   completed?

16   A.   I cannot say.

17   Q.   Were you allowed to -- was the Money Transfer Center

18   allowed to complete a wire transfer to an entity for which

19   it didn't have address, city, state, ZIP code, country

20   information?

21   A.   I'm sure there would have been circumstances that it

22   would have been allowed.

23   Q.   Do you know what those circumstances are?

24   A.   Customer did not have an address at the bank.

25   Q.   Wasn't a recipient address required in order to comply

```
1    with OFAC procedures, for example?

2    A.  I do not know.

3    Q.  All right.  So let's go back to the overall process of

4    originating a wire transfer.

5              THE COURT:  Let's take a break now.  This is a

6    good time.

7              So, Members of the Jury, please remember our

8    recess instructions and continue to follow them.  We will

9    take our break now for lunch, and please be prepared to come

10   back to the courtroom at 1:00.  Okay?  Have a good lunch.

11       (Jury excused)

12                        IN OPEN COURT

13                     (JURY NOT PRESENT)

14             THE COURT:  You may be seated.  I just want to

15   address some housekeeping matters.  Are there issues that

16   need to be addressed now?

17             MR. MARDER:  There is, Your Honor, regretfully.

18   There's an issue that arose this morning that I wanted to

19   address with the Court.  We can wait until after you raise

20   your housekeeping matters.

21             THE COURT:  No.  This is exactly what I wanted to

22   use this time for.

23             MR. MARDER:  Your Honor, you recall this morning

24   there was some testimony about this DACA agreement.

25             And here my understanding of the facts, and I'm
```

1    sure counsel for the defendants can correct me if I'm wrong,

2    but this document did not exist in BMO's files.  It was

3    apparently destroyed and was never produced by BMO.

4          It was marked as an exhibit at a deposition in

5    another case, in the Palm Beach case; and when they received

6    it as a deposition exhibit, they put their Bates number on

7    it and produced it, but it didn't come from their files.

8          This morning Mr. Moheban asked a series of

9    questions to the witness regarding this document, trying to

10   suggest that BMO did not destroy it because here it was in

11   black and white and it had their Bates number on it, trying

12   to suggest that they actually produced this document from

13   their files.  And by any stretch of the imagination,

14   Your Honor, this line of questioning was misleading.

15         And I raise it now for three reasons:

16         First of all, Your Honor, you have ruled that the

17   Court can't put counsel on the stand.  And the only way for

18   us to rebut this misleading line of testimony is to put

19   counsel on the stand and explain that this document was

20   destroyed and not produced.

21         Second of all, if you're not inclined to do that,

22   Your Honor, we would at least request a curative instruction

23   to the jury that this document was not produced by BMO from

24   its files, that they obtained it from a third party, and

25   that their copy was destroyed.

1            And, finally, Your Honor, setting aside the issue

2     of counsel testimony, it's still an open issue as to whether

3     we can bring up the conduct of opposing counsel in

4     connection with the spoliation issue because Your Honor has

5     not ruled on that portion of it.

6            And we would just like to bring this issue to the

7     Court's attention because it's certainly relevant in that

8     the Court should be considering whether we should take issue

9     with opposing counsel's conduct given the ongoing nature of

10    the representations made with regard to document

11    destruction.

12            THE COURT:  Thank you, Counsel.

13            MR. MOHEBAN:  Your Honor, Mr. Marder injected this

14    issue with a witness who had no knowledge about the subject

15    matter.  He brought this up and made without any support --

16    and he's provided no support today for the allegation that

17    this was document was destroyed.

18            I was simply rebutting the evidence that he -- the

19    innuendo that he had submitted with respect to the fact that

20    he had submitted to the witness a document that had no Bates

21    number on it and suggested, I think because of that, that

22    somehow they had gotten it from some other origin.  We don't

23    know where that came from, but it appears that it was just

24    their Exhibit 3 that they had enlarged to delete the

25    reference to the Bates number.

 1          So my response to that was to simply point out

 2     from their own exhibit list that they have a document that

 3     had -- that exact same document that has an M&I Bates number

 4     on it.

 5          So I don't think Mr. Marder can come up here and

 6     say the documents were destroyed.  And this witness was not

 7     a knowledgeable witness on the subject.  It was just a fair

 8     response to an unsupported allegation that was made by

 9     Mr. Marder.

10          MR. MARDER:  Your Honor, I have here the

11     transcript from the Palm Beach deposition, which indicates

12     that this particular document, which was marked as

13     Exhibit 11 at that deposition, was not produced by BMO and,

14     in fact, BMO asked Palm Beach to produce it.

15          The idea that they didn't destroy the document is

16     preposterous given that they have never produced it in this

17     case and the only version they have produced is the document

18     that someone else gave them at a deposition.  So it is clear

19     that this document was not produced by BMO.  There is no

20     factual dispute over that.

21          And these questions this morning directed to the

22     witness asking him whether the fact that there's an M&I

23     production number on the document indicates that BMO didn't

24     destroy it were grossly misleading, and that's why we seek

25     the requested relief.

1808

1          MR. MOHEBAN:  Again, I would just point out not

2     only with respect to that document, but also the attempt to

3     claim that Mr. Flynn had altered documents -- I mean, let's

4     keep in mind that the spoliation allegations that have been

5     addressed by this Court have to do with this server,

6     system-wide server issue.  And then there's a secondary

7     issue regarding documents in 2014.

8          These have never been -- they've never argued, to

9     my knowledge, to the Bankruptcy Court or to this Court that

10    DACA documents were destroyed.

11         THE COURT:  I'm sorry.  I didn't hear you.

12         MR. MOHEBAN:  That the Deposit Account Agreements

13    were destroyed.  That's the first I've heard of that.  Or

14    that this other document was altered.  And I think we have

15    fairly rebutted that, that it wasn't altered.

16         So I don't think that Mr. Marder has knowledge and

17    has submitted to the Court definitive evidence of anyone

18    destroying a DACA document.  And we were simply responding

19    to the unsupported allegations that he made, you know, with

20    a witness who had no knowledge about that particular

21    subject.

22         MR. MARDER:  And, Your Honor, just finally I would

23    note that the document destruction at issue in this case

24    encompassed not only e-mails, but attachments to e-mails and

25    the -- it's fair to presume that this DACA agreement, if it

1    was signed, would have been an attachment to an e-mail.

2         The problem is we're in a situation where we

3    simply don't know because millions of documents were

4    intentionally destroyed, and we don't know if the DACA

5    agreement was part of that and there's no way for us to

6    establish that because of the destruction.  That's why we've

7    been prejudiced by all this.

8         MR. MOHEBAN:  I hate to belabor this, but this --

9         THE COURT:  I didn't hear you.

10        MR. MOHEBAN:  I hate to belabor this, but this

11   e-mail destruction issue has to do with pre-2005 e-mails,

12   because after 2005 M&I had the Legato system in place, which

13   I think has established it saved every e-mail.  We're

14   talking about a document that was created in 2008, so that

15   cannot bear at all on this backup tape issue that has been

16   in the case.

17        THE COURT:  Counsel, would you respond to that?

18        MR. MARDER:  Your Honor, if I could defer to

19   Mr. Collyard just because he has been engaged in the

20   spoliation, if you don't mind?

21        THE COURT:  He may.

22        MR. COLLYARD:  Thank you, Your Honor.  The issues

23   on the document destruction are not limited.

24        So, for example, a major issue at the Bankruptcy

25   Court level -- and this was their argument at the bankruptcy

1    level -- was everything was captured by Legato.  The issue

2    with -- and Legato is their system that is supposed to

3    capture all their e-mails.  The issue with Legato was it

4    didn't capture attachments.  It didn't capture those types

5    of things.  And Judge Sanberg went into great detail in her

6    order explaining all of that and how important it was to

7    have those backup tapes.

8            A secondary issue is in 2014, and this was raised

9    in the Scherer designations that you considered already,

10   Your Honor, but in 2014 they find six tapes.  And all we

11   have, the only knowledge of BMO Harris Bank on those six

12   tapes is from one or two lines of an e-mail -- this is that

13   John Vanderheyden e-mail; it's Exhibit 325 off the top of my

14   head -- where it says that Dave looked high and low in the

15   nooks and crannies and found six Minnesota e-mail backup

16   tapes with the earliest or latest dated and then it gave an

17   '07 figure.

18           Nobody from BMO can say what actually was found,

19   what actually was destroyed because they didn't look at

20   them.  And that was another major explanation that Judge

21   Sanberg had in her order and that's how -- that's why it

22   raises the importance of what Mr. Scherer found in 2014 and

23   then was destroyed.

24           So nobody can come here and say that there wasn't

25   an e-mail, for example, with an attachment.  That could

1    include any document, and it's not limited to any specific

2    subject matter or anything like that.

3            THE COURT:  We're going to take our break now.

4            MR. SCHAPER:  Your Honor, there actually is one

5    more kind of related issue that we would like to address

6    briefly.  Mike Schaper for defendant.

7            We submitted something to the Court yesterday on

8    the Scherer deposition designation.  The plaintiffs

9    submitted a response with a request for alternative relief.

10   The Court has now ruled on the Scherer designations to let a

11   lot of that testimony in.

12           Our position is that that moots plaintiff's

13   request for alternative relief, which was kind of a mid

14   trial jury instruction of the sort that I think the Court

15   has already rejected, at least at the pretrial phase.

16           So our position is that that alternative request

17   for relief is mooted given that the Scherer testimony, the

18   portions that the Court is allowing in, will be played for

19   the jury.

20           THE COURT:  Counsel, do you wish to be heard on

21   that?

22           MR. COLLYARD:  I do, Your Honor, just real

23   quickly.

24           The request was in lieu of playing the -- the

25   request was in lieu of playing the Scherer deposition in its

1    entirety.  And you've ruled on several of the objections

2    that go to some of the issues that we need to be able to

3    talk about to prove that when they destroyed the tapes, the

4    six tapes in 2014, that there's no innocent explanation.

5              And so what we've done here, Your Honor, is we

6    took your guidance, where you asked the parties to just

7    agree to basic facts, and we took ten sentences, quoted you

8    basically verbatim from your July 18th order just to see if

9    they would agree to these basic facts about what was

10   destroyed and when.  And they simply won't agree.

11             And so that's why we raised the application as

12   part of Rule 37(e), as part of Rule 201 to move this thing

13   along to agree to basic things that are not in dispute.  And

14   they simply won't agree.  So what I think is going to happen

15   now is now they're going to actually dispute that tapes were

16   destroyed, they're going to dispute those basic facts.

17             And so my request is I've only listed the ten

18   sentences from your order that reasonably should not be in

19   dispute whatsoever and ask that those findings be read to

20   the jury as part of the Rule 37(e) portion of what plaintiff

21   was granted from the Bankruptcy Court to be able to put on

22   evidence.

23             Thank you, Your Honor.

24             MR. SCHAPER:  Your Honor, as I told the Court at

25   the end of yesterday, we would respond to their proposed

1    stipulation.  We did that last night.  We thought it was

2    incomplete and misleading, and we proposed an alternative

3    stipulation, to which we never got an answer and we still

4    don't have an answer right now, Judge.

5          We submitted with our filing this morning what our

6    proposed stipulation would be because we think that's more

7    complete.  It includes some basic details about documents

8    that were produced, for example.  Again, we don't have a

9    response on that.

10          But we think that what plaintiff's counsel is

11    seeking is the same kind of instruction on court findings

12    having been made that the Court declined to give multiple

13    times when plaintiff requested that pretrial, and we think

14    it continues to be appropriate for the same reasons.

15          THE COURT:  It is -- the request is moot and I

16    deny it.

17          We're in recess.

18      (Lunch recess taken at 12:13 p.m.)

19                    *    *    *    *    *

20      (1:16 p.m.)

21                    **IN OPEN COURT**

22                  **(JURY NOT PRESENT)**

23          THE COURT:  Good afternoon.  Please be seated.

24          We had one outstanding issue that was raised

25    before the break, and I'm ready to rule now.  Both forms of

1     the relief that were -- relief requested before the break,

2     both forms are denied.

3              We're ready, yes.  We'll bring in the jury.

4         (Pause)

5                           **IN OPEN COURT**

6                          **(JURY PRESENT)**

7              THE COURT:  Good afternoon.  Please be seated.

8     Good afternoon, Counsel.  You may proceed.

9              MR. COLLYARD:  Thank you, Your Honor.

10        (Deposition of Raymond Neufeldt continued)

11

12    Q.  All right.  So let's go back to the overall process of

13    originating a -- a wire transfer.

14              Once the customer gave the Money Transfer Center

15    information about the recipients of the wire, would they --

16    they were also required to give the amount of the transfer

17    requested, correct?

18    A.  Yes.

19    Q.  Once the customer had given all of the required

20    information to the person he or she was talking to within

21    the Money Transfer Center, what would the person in the

22    Money Transfer Center do?

23    A.  After they had all the required information?

24    Q.  Yes.

25    A.  And the customer was no longer on the phone?

Neufeldt - Deposition

1    Q.  Yes.

2    A.  They would enter that -- they would enter the

3    transaction -- or the transaction was actually being entered

4    when the customer was on the phone, so it would just be a

5    matter of complete and go.

6    Q.  Was -- so -- so your point of that is that the Money

7    Transfer Center person may not have waited until the call

8    was over, but may have been filling out the required forms

9    or entry lines while on the phone with the customer making

10   the request; is that right?

11   A.  Yes.  The customer could be calling in five wires.  So

12   the operator would take wire number one to its complete --

13   to its entirety; and when it was done, hit enter and go.

14   And then go to the next one.

15   Q.  What would happen after the operator hit "enter"?

16   A.  The transaction would be released into the system and

17   then -- depending as to what criteria was established for

18   it, is a callback required, is it -- you know, various

19   things like that.  It would then be processed.

20   Q.  If a request was made for an amount over the authorized

21   limit for a particular user and either an operator caught

22   that or the system caught that, what would happen?

23   A.  It would be called over the PIN limit and it would go to

24   an exception queue and then appropriate calls would have

25   been made to either the customer, if they had somebody that

Neufeldt - Deposition

1    was authorized over that amount, or the account officer.

2    Q.  And was there a set procedure that would dictate whether

3    it was -- whether that call went to the account manager or

4    to the customer?

5    A.  It would be probably what has been most effective for

6    that particular customer if it had occurred before.  You'd

7    look at also their profile.  If they didn't have anybody in

8    their profile that was allowed to do a transaction of that

9    level, then you go to the account officer.

10   Q.  I understand.  So some of the information within the

11   Wire Transfer Agreement may include a confirming party who

12   could confirm wires over particular limits, and if that

13   information was in your system, the natural first step might

14   be to call that person rather than the account manager

15   because that information was there; is that right?

16   A.  Correct.

17   Q.  Who in your department was responsible for handling

18   requests that ended up in an exception queue?

19   A.  It would be by the type of exception.  We had more than

20   one person working queues.

21   Q.  And when you say, "type of exception," you described one

22   that would have been over the authorized PIN limit.  Can you

23   think of other exceptions that would pop up?

24   A.  Another would be just no funds -- no funds sufficiently

25   available or a transaction would come back because the

Neufeldt - Deposition

1   information given to us by the customer for the recipient

2   was incorrect.

3   Q.  So the idea behind the exception is that for some

4   reason -- you just gave some ideas -- there needed to be

5   follow-up by someone in your department because the normal

6   process couldn't be followed?

7   A.  Right.

8   Q.  If the normal process did follow and the transfer

9   request didn't go into the exception queue, what would

10  happen next?

11  A.  It would be released.

12  Q.  And what are the actual mechanics of it being released?

13  Where would it go?

14  A.  It would go on to the -- Fedwire and go to Fed.

15  Q.  Would -- would something like the --

16  A.  Let me back up for a second --

17  Q.  Yeah.

18  A.  -- on that.  It would be released and then there would

19  be a final balance check.

20  Q.  What does that mean?

21  A.  That means are there sufficient funds in the account to

22  handle this transaction.  And if it came back that there

23  were sufficient funds in the account, it would be released.

24  Q.  So would that final balance check, given its nature as

25  final, would that be the last step before the transfer

1   actually going out the door?

2   A.  Yes.

3   Q.  And if it came back that there weren't enough funds, is

4   that a situation where it would go in the exception queue

5   and someone in your department may consult the file to see

6   if there was a policy in place, like the --

7   A.  Correct.

8   Q.  -- Jambor policy that we discussed earlier?

9   A.  Correct.

10  Q.  This document is marked as Exhibit 274.  It's Bates

11  labeled BMO00189065 and it's titled Compliance

12  Self-Monitoring Program, First Quarter 2007.

13          One of the entities listed underneath that title

14  is "Money Transfer Center."  Do you see that just at the top

15  of the page?

16  A.  Yes.  Oh, yeah.

17  Q.  Do you know anything about a compliance self-monitoring

18  program?

19  A.  I know we had a compliance group and I know that they

20  periodically would review what we did, and that's it.

21  Q.  Okay.  I'm just going to direct your attention to

22  page -- maybe four from the back.  At the bottom, it ends in

23  074.  The top of the page says, "Transaction Testing."  Do

24  you see that?

25  A.  Yes.

Neufeldt - Deposition

1    Q.  And next to number 1 it says, "Select a sample of

2    outgoing wire transfers conducted on behalf of a transmittor

3    between October 1st, 2006 and December 31st, 2006."  Do you

4    see that?

5    A.  Yes.

6    Q.  And then in the box it says, "Results of Testing," and

7    under that it says there are two exceptions.  In the middle

8    of the box it says, "No beneficiary name indicated."  It

9    lists "Bank 098, Originator:  Petters Company, Inc."  And it

10   shows that MTC responds, "The transaction was established as

11   a repetitive wire at the request of the customer in June of

12   2003.  No beneficiary name information was provided at the

13   time of setup."  Do you see that?

14   A.  Yes.

15   Q.  Do you have any knowledge of this exception being noted

16   by compliance?

17   A.  Not that I can remember.  I may have, but it's --

18   Q.  It was a long time ago?

19   A.  Yeah.

20   Q.  I understand.

21        Do you recall any -- well, do you have any

22   explanation for how wires could have been made from a period

23   of two thousand -- June 2003 through the end of 2006 without

24   a beneficiary name being provided?

25   A.  If it was set up as a repetitive, there would have been

1    no changing it or no review of it.

2    Q.  So you're saying that because it was set up as

3    repetitive, it would have just been in the system; and if

4    the customer had given the right code, it just would have

5    kept going?

6    A.  Correct.

7    Q.  And that's the case even though the bank, apparently,

8    didn't have any information about who the ultimate

9    beneficiary of those wires were?

10   A.  Correct.

11   Q.  Do you recall whether the Money Transfer Center took any

12   actions to remedy this situation?

13   A.  I can't recall if we did, but I'm sure that with this

14   particular thing we would have done something to -- to bring

15   it into compliance.  I mean, this is a self-monitoring

16   system, so it's --

17   Q.  So "self-monitoring" means something that you guys were

18   doing internally?

19   A.  Right, within the bank.

20   Q.  Right.  It wasn't in response to an outside auditor

21   coming --

22   A.  Correct.

23   Q.  -- correct?

24          And I guess just to kind of put the pin on the

25   whole origination process, the numbers that we looked at in

1    spreadsheet 1870, which listed, under source type, "phone,"

2    talking about -- which denoted wires originated to the --

3    via calls to the Money Transfer Center, for every one of

4    those phone calls in the -- that Petters was making to the

5    Money Transfer Center, they were talking to a live person

6    within your department, who was helping them originate one

7    of those wire transfers, correct?

8    A.  Right.  Yes.

9    Q.  And just given the sheer numbers that we're talking

10   about, that process was occurring multiple times a day on a

11   regular basis from this customer, correct?

12   A.  Correct.

13   Q.  Mr. Neufeldt, I have just a few more kind of final

14   questions for you.  Thanks for your time this morning.

15          I want to start by looking at Exhibit 276, which

16   is the policies and procedures, and I'll direct you to the

17   page ending in 165.  It's in Section M7.3.

18   A.  Am I on the right one?

19   Q.  I think so.

20          MR. COMSTOCK:  You'll be looking for number 165.

21          MR. REIF:  165 is at the bottom.

22          MR. COMSTOCK:  Just the number at the bottom.  So

23   this number but 165.

24          THE WITNESS:  Oh, okay.  Got it.  Sorry.

25          MR. REIF:  Okay.  Thanks.

1    Q.  And the second category or heading is "Daylight

2    Overdraft Calls and Canceled Transfers."  Do you see that?

3    A.  Yes.

4    Q.  And we talked about daylight overdrafts earlier in the

5    context of the Jambor memo, correct?

6    A.  Right.

7    Q.  And so I just want to confirm some of these here.

8            So this says, "A daylight transfer" -- or

9    "daylight overdraft occurs when the Available Balance in the

10   customer's account is less than the transfer amount.  If

11   this occurs, the transfer is delayed until release is

12   authorized.  If there are no daylight overdraft instructions

13   for the customer on file, the Money Transfer Center

14   representative will contact the account officer or

15   relationship manager for authorization to release the

16   transfer."  Correct?

17   A.  Yes.

18   Q.  Okay.  So when it's talking about the daylight overdraft

19   instructions on file, is that referring to a kind of policy

20   memo or written instructions from Ed Jambor that we looked

21   at earlier?

22   A.  Yes, it would be something specific to that account

23   relationship for daylight overdrafts.

24   Q.  And is one of the differences that was highlighted in

25   the Jambor memo that -- unlike normal bank policy, which

1    would be to cancel the transfer request if the funds weren't

2    available, under Jambor's instructions, the Money Transfer

3    Center would continually check the account through the day

4    to see if funds were available?

5    A.  Yes.

6    Q.  I asked you earlier about -- you can set that aside --

7    the idea of transactions -- wire transaction limits.  And

8    you were not sure whether the operator would check those

9    limits him or herself or whether the system would check that

10   limits -- the limits, correct?

11   A.  Correct.

12   Q.  The limits were associated with a particular authorized

13   user; is that right?

14   A.  Yes.

15   Q.  Is it the case that it was the entry of a PIN number

16   that would allow either the system or the operator to be

17   able to identify what the limit was for the particular

18   caller?

19   A.  The PIN number would be, yes, for -- would be checked

20   within the system that would come back with the daylight

21   overdraft or allow the transaction to occur.

22   Q.  So --

23   A.  I'm not certain if the operator would know -- the

24   operator wouldn't know anything until the amount was

25   entered.

1    Q.  Okay.  But, regardless, the system would contain the

2    information associated with transaction limits for a

3    particular PIN; is that right?

4    A.  Yes.

5    Q.  And so as part of the process, the -- of discussing an

6    outgoing transfer, the operator would have to input the

7    user's PIN, correct?

8    A.  Correct.

9    Q.  Do you know whether the spreadsheet that we looked at in

10   1870 contains information with the user's PIN in it?  This

11   would have been part of Exhibit 271.

12   A.  271?  I'll go through it, but my initial thought would

13   be no.  This is the transaction itself.

14   Q.  And so the detail of the transaction itself, that was

15   kept within Trail would not record the PIN number associated

16   with initiating that transaction?

17   A.  Well, you do have -- I do not know.

18   Q.  So you don't know whether it's recorded, but you know

19   for sure that it had to have been inputted in the system at

20   some point --

21   A.  Yes.

22   Q.  -- in the origination process, correct?

23   A.  Right.

24   Q.  Do you know whether Trail still exists in some form at

25   BMO Harris Bank?

1    A.  I do not know.

2    Q.  When you -- when M&I was acquired by BMO and during your

3    tenure still working at BMO, did you ever access wire

4    history via Trail while you were working for BMO?

5    A.  I'm guessing we did.  I can't give you an example, but

6    I'm guessing.

7    Q.  Did the money transfer intranet still exist after M&I

8    was acquired by BMO?

9    A.  Yes.

10   Q.  Do you know whether that still exists today?

11   A.  I do not believe it exists anymore.

12   Q.  And why do you say that you don't believe it exists?

13   A.  Because the wire transfer operation, if I'm not

14   mistaken, was absorbed into the BMO Harris operation.

15   Q.  That's all that I have.  Thank you very much for your

16   time.

17              MR. COLLYARD:  Your Honor, plaintiff calls its

18   next witness.  Plaintiff calls -- it has one more video to

19   play and it's only going to be about 15 minutes long.  But

20   plaintiff calls adverse former BMO Harris Bank employer

21   David Scherer, who was in M&I and BMO's IT department from

22   2004 up through 2018.

23              And I have four exhibits to offer along with

24   Mr. Scherer's video.  I offer Plaintiff's Exhibit 325.

25              MR. GLEESON:  Just a moment, Your Honor, please.

```
 1                THE COURT:  Thank you.

 2                MS. GITTES:  Your Honor, we just preserve our

 3     objection that was in our deposition designations that the

 4     Court has already ruled on.

 5                THE COURT:  If you'd like to.

 6                MS. GITTES:  Yes, please.  Thank you.

 7                THE COURT:  Okay.  So I have already ruled.

 8     Overruled.

 9                MR. COLLYARD:  Is Plaintiff's Exhibit 325 in

10     evidence, Your Honor, just so I'm clear?

11                THE COURT:  It is received.

12                MR. COLLYARD:  Thank you.  I offer Plaintiff's

13     Exhibit 327.

14                MS. GITTES:  Same objection, Your Honor.

15                THE COURT:  Overruled.  Received.

16                MR. COLLYARD:  Thank you.  I offer Plaintiff's

17     Exhibit 328.

18                MS. GITTES:  Same objection, Your Honor.

19                THE COURT:  Overruled and received.

20                MR. COLLYARD:  Thank you, Your Honor.  And I offer

21     Plaintiff's Exhibit 796.

22                MS. GITTES:  I apologize for the delay.  We just

23     need a moment, if that's okay?

24                THE COURT:  That's quite all right.

25                MS. GITTES:  Thank you.
```

1          (Ms. Gittes, Mr. Schaper, and Mr. Collyard confer)

2              MS. GITTES:  Just one more minute, Your Honor.

3      We've almost figured it out, I think.  Sorry.

4          (Pause)

5              MS. GITTES:  Thank you for the moment.  No

6      objection.

7              THE COURT:  That's Exhibit -- Plaintiff's

8      Exhibit 325, 327, 328, and 796, they are received.

9              MR. COLLYARD:  Thank you, Your Honor.

10                      **(David Scherer)**

11                  **DEPOSITION TRANSCRIPT PLAYED**

12

13     Q.  Mr. Scherer --

14     A.  Hi, again.

15     Q.  -- you and I have met before; is that right?

16     A.  Yes.

17     Q.  And we met at what I'll call an evidentiary hearing in

18     this case back in April of 2018; is that right?

19     A.  It was in April.  I don't know what the hearing is

20     called, but, yes, we met back in April in Minneapolis.

21     Q.  Let's just back up for one second.  Now, I think I

22     forgot to ask you to do this, but would you state your name

23     for the record.

24     A.  David Scherer.

25     Q.  Do you have an understanding that people have said that

 1    you found backup tapes in August of 2014?

 2    A.  Yes, I understand that.

 3    Q.  Do you believe that to be true?

 4    A.  That I reported the information to John Vanderheyden,

 5    yes.

 6    Q.  Do you believe that to be true?

 7    A.  Yes.

 8    Q.  All right.  Do you also have an understanding that

 9    backup tapes were also found in December of 2017?

10    A.  Yes.

11    Q.  And you were involved in talking with people at BMO

12    Harris about looking for those backup tapes; is that right?

13    A.  Yes.

14    Q.  And, in fact, your team went out and looked for those

15    backup tapes; is that also true?

16    A.  Paul Stroble looked for those tapes.

17    Q.  Do you agree with me that Paul Stroble was on your team?

18    A.  Yes.

19    Q.  So your team went out and looked for those backup tapes?

20    A.  Yes.

21    Q.  Okay.  And actually found the backup tapes, right?

22    A.  Paul did, yes.

23    Q.  We'll come back to some of this.  Let's go back for just

24    a second to -- and, by the way, when you testified at the

25    evidentiary hearing, you knew all this information; is that

1    right?

2    A.  I believe so.

3    Q.  For example, when I questioned you on the stand at the

4    evidentiary hearing, you had known that Paul Stroble had

5    found backup tapes in December of 2017; is that true?

6    A.  I believe so.

7    Q.  You knew as well, Mr. Scherer, at the time that I asked

8    you questions at the evidentiary hearing, that you had found

9    backup tapes in August of 2014; isn't that true?

10   A.  I didn't recall finding tapes.

11   Q.  I'm not asking about your specific recollection of the

12   tapes.  I'm asking you:  Just as a general matter, you knew

13   at the time that you and I were talking at that evidentiary

14   hearing that you had found backup tapes back in August of

15   2014, correct?

16   A.  Yes.

17   Q.  Mr. Scherer, you've been handed what's been marked as

18   Exhibit 325.  This is an e-mail from John Vanderheyden to an

19   A. Cares and Jonathan Ingrisano at Godfrey & Khan and it's

20   dated August 26th of 2014.  Do you see that?

21   A.  Uh-huh, yes.

22   Q.  Did you see this e-mail before the evidentiary hearing?

23   A.  I believe so, yes.

24   Q.  And, in fact, you knew about this e-mail before you took

25   the stand at the evidentiary hearing; is that right?

1    A.  I believe so.

2    Q.  You knew about this particular e-mail, Exhibit 325, when

3    you submitted your declaration to the Court; is that also

4    true?

5    A.  Yes.

6    Q.  Let's take a look at this e-mail.  Mr. Vanderheyden

7    writes, "Dave looked in all the nooks and crannies over

8    there today and found a total of six backup tapes from the

9    Minnesota e-mail server.  The oldest one was MSP105 labeled

10   'Aug '07.'"  Do you see that?

11   A.  Yes.

12   Q.  And the "Dave" that Mr. Vanderheyden is referring to is

13   you; is that right?

14   A.  I would assume so.

15   Q.  Well, you know that's true, right?

16   A.  I would assume so.

17   Q.  So you agree with me that the "Dave" referred to in this

18   e-mail is you?

19   A.  I have no reason to think otherwise.

20   Q.  And where it says "over there today," specifically I'm

21   focusing in on "over there," do you know what

22   Mr. Vanderheyden is referring to there?

23   A.  I'm assuming it was Centre Point, Liberty Point.

24   Q.  But you don't know?

25   A.  I'm assuming.

1    Q.  Do you know if you did find the backup tapes in August

2    of 2014 at the Centre Point location?

3    A.  I don't recall seeing the tapes or --

4    Q.  So -- go ahead, finish.  I'm sorry.

5    A.  I don't recall seeing the tapes.

6    Q.  So you can't say for sure that you found the backup

7    tapes at the Centre Point location?

8    A.  I can -- that is correct, yes.

9    Q.  So you can't come to trial, for example, and testify

10   that you actually found the tapes at the Centre Point

11   location?

12   A.  I -- like I said, I don't recall back in 2014.

13   Q.  So my question is specific.  You can't come to trial and

14   testify, for example, that you found the backup tapes in

15   August 2014 at the Centre Point location?

16   A.  Like I said, I don't remember finding the tapes.

17   Q.  Mr. Vanderheyden says that you "looked in the nooks and

18   crannies over there and found a total of six backup tapes

19   from the Minnesota e-mail server."  Do you see that?

20   A.  Uh-huh.

21   Q.  You have no reason to believe that that's not truthful,

22   do you?

23   A.  No, I do not.

24   Q.  And like we talked about, you would believe that

25   Mr. Vanderheyden was capable of conveying information in an

1    accurate manner; is that true?

2    A.  Yes.

3    Q.  So if this is indeed what you told John Vanderheyden,

4    you would believe that he's being truthful and accurate in

5    conveying this information to these folks; is that right?

6    A.  I have no reason to think otherwise.

7    Q.  It says, "The oldest one was MSP105 labeled 'August

8    '07.'"  Do you see that?

9    A.  Yes.  Yes.

10   Q.  Where it says, "MSP," what does that prefix stand for?

11   A.  Minneapolis-St. Paul.

12   Q.  And you know that just by looking at that?

13   A.  Uh-huh.  Yes.  Sorry.

14   Q.  So if you knew that -- let's go back to August of 2014.

15   You knew that if there was a prefix of "MSP," that meant

16   Minneapolis-St. Paul, right?

17   A.  Yes.

18   Q.  And that would refer to Minnesota regional tapes; is

19   that right?

20   A.  Yes.  Yes.

21   Q.  And you have no reason to believe, Mr. Scherer, that you

22   did not find six backup tapes from the Minnesota e-mail

23   server, correct?

24   A.  Like I said, I don't recall how many I found or how many

25   were in there.

1   Q.  I understand.

2   A.  Okay.

3   Q.  My question is different, though.  You have no reason to

4   believe that you did not find six backup tapes from the

5   Minnesota e-mail server; is that true?

6   A.  Yes.

7   Q.  And, again, Mr. Scherer, it was unusual for you to be

8   looking for backup tapes of this nature back in August of

9   2014; is that right?

10  A.  Yes.

11  Q.  And even though it was unusual, you still don't recall

12  doing it; is that what you are telling us?

13  A.  Yes.

14  Q.  If we go back, just so the jury knows what you are

15  talking about, that is the e-mail in Exhibit 325, right?

16  A.  Yes.

17  Q.  That e-mail refreshed your recollection that you had

18  found the backup tapes in 2014; is that right?

19  A.  It did not give me a memory of doing it, of finding

20  tapes or how many tapes or any of that.

21  Q.  Did it help you remember the fact that you found backup

22  tapes in 2014, even though you may not remember the

23  specifics of the tapes?

24  A.  I would assume so, because this "Dave" refers to me.

25  Q.  And I know you told me that you can't remember any of

Scherer - Deposition

1   the specifics of finding the tapes in August of 2014; is

2   that right?

3   A.  Yes.

4   Q.  And so you can't remember, Mr. Scherer, whether the

5   tapes were in a locked cabinet, for example, when you found

6   them?

7   A.  I cannot.

8   Q.  You certainly don't remember finding them in a locked

9   cabinet; is that right?

10  A.  Yes.

11  Q.  Just give me your best recollection as to when your

12  memory was refreshed by Exhibit 325.

13  A.  I don't recall when -- when I saw this.

14  Q.  Do you recall it being around the evidentiary hearing

15  time?

16  A.  It's possible.

17  Q.  Or was it during this December time frame, when you were

18  looking for the e-mail backup tapes?

19  A.  I can't recall.

20  Q.  Were you -- so let's just back up.  You understood,

21  through these multiple conversations with the Mayer Brown

22  lawyers, that it was important to find backup tapes, right?

23  A.  Yes.

24  Q.  And you told me you specifically remember them stressing

25  the importance of that, right?

1    A.  Yes.

2    Q.  What was your reaction, then, when you remembered that

3    you had actually found backup tapes back in August of 2014?

4    A.  I don't recall when it was that I was shown this, so I

5    don't -- so I don't know what time frame that was.

6    Q.  Is it your testimony that you just basically had no

7    reaction to seeing the e-mail?

8    A.  I didn't have a reaction, no.

9    Q.  Did you get a sense of what others' reaction was when it

10   was discovered that you had found backup tapes back in

11   August of 2014?

12   A.  No.

13   Q.  Did you ever talk with Paul Stroble about it?

14   A.  No.

15   Q.  Did you ever talk with anybody at BMO about it?

16   A.  I don't recall.

17   Q.  You don't recall if you spoke to anybody at BMO about

18   the fact that you found backup tapes back in August of 2014?

19   A.  I don't recall.

20   Q.  Mr. Scherer, you've now been handed what's been marked

21   as Exhibit 327, which is your declaration, the Declaration

22   of David Scherer, that you submitted as testimony into

23   evidence at the evidentiary hearing, and it is dated

24   March 29, 2018.  Do you see that?

25   A.  Yes.

Scherer - Deposition

1  Q.  This is your declaration; is that right?

2  A.  Yes.

3  Q.  You have seen this document, right?

4  A.  Yes.

5  Q.  Did you read this document before it was submitted?

6  A.  I believe I did back in the day.

7  Q.  Now, you knew at the time that you submitted this

8  declaration that you had found the backup tapes in August of

9  2014, right?

10  A.  Yes.

11  Q.  Yet you didn't say that in this declaration, did you?

12  A.  No, it's not in here.

13  Q.  And you knew, then, at that hearing that the hearing

14  involved the discovery of backup tapes; is that also

15  correct?

16  A.  Yes.

17  Q.  And certainly you knew when I was asking you questions

18  that the hearing involved the discovery of backup tapes,

19  right?

20  A.  I vaguely remember you asking me about that, yes.

21  Q.  Okay.  And I'll show you some of that in a second.

22       But you did not tell me at the hearing that you

23  found backup tapes in August of 2014, did you?

24  A.  I did not.

25  Q.  Did you want to disclose at the evidentiary hearing that

1    you had found those backup tapes in August of 2014?

2    A.  It didn't cross my mind.

3    Q.  Mr. Scherer, I'm handing you what's been marked as

4    Exhibit 328.  It's a copy of the transcript from the

5    evidentiary hearing where you testified and I asked you

6    questions.  Do you see that?

7    A.  Yes.

8    Q.  Just take a look at a few things here.  If you'd go to

9    page 50, please, I asked you on line 5, I said:

10        "Are you familiar with backup tapes?"

11        You answered:  "A little bit.  That was a different

12   team."

13            Do you see that?

14   A.  Yes.

15   Q.  Now, your team was the one who found the backup tapes in

16   August -- or, I'm sorry, December of 2017, right?

17   A.  Yes.

18   Q.  And you and your team found them in August of 2014 as

19   well, right, whatever tapes those were?

20   A.  Yes.

21   Q.  When I asked you if you were familiar with backup tapes,

22   you didn't tell me that you had found backup tapes in August

23   of 2014, did you?

24   A.  No, I did not.

25   Q.  Then I said, "Okay.  And tell us what your familiarity

1   is with backup tapes."  Do you see that?

2   A.  Line 16?

3   Q.  Line 7, actually.

4   A.  7.  Okay.

5   Q.  Do you see that?

6   A.  Yes.

7   Q.  And, again, you didn't tell me that you had found backup

8   tapes in August of 2014 when I asked you that question, did

9   you?

10  A.  Nope.

11  Q.  So you can't say that the tapes found in December of '17

12  are the same tapes as what was found in August 2014?

13  A.  And I can't say they're different either.

14  Q.  You can't say one way or the other?

15  A.  Right.

16  Q.  But you knew at the time I asked you the question that

17  there had been a representation that one of the tapes found

18  in December 2017 had been known about at BMO since August of

19  2014, right?

20  A.  I was going with this line of questioning as to the

21  tapes in 2017.  That was what I was basing my answers on.

22  Q.  Okay.  So your testimony is you were limiting your

23  answer to the tapes found in December of 2017; is that

24  right?

25  A.  Yes.

Scherer - Deposition

```
 1    Q.  Okay.  So you say, "I never saw the tape"?

 2    A.  Right.

 3    Q.  Do you remember I showed you a document that talked

 4    about a tape labeled MSP105?

 5    A.  Yes.

 6    Q.  I asked you in particular about this tape and I asked

 7    you about what a full system backup meant.  Do you remember

 8    that?

 9    A.  Yes.

10    Q.  And you told me that that means that there's e-mails and

11    documents on that tape, right?

12    A.  e-mails and operating system, yes.

13    Q.  And that would include documents, right?

14    A.  Attachments and e-mails, yes.

15    Q.  Do you agree with me that you did not tell me that you

16    had found tapes back in August of 2014?

17    A.  Yes.

18    Q.  And you were making no representation at the evidentiary

19    hearing that the Aug 2007 full system backup volume MSP105

20    was discovered in 2014, correct?

21    A.  Correct.

22    Q.  And you can't make that representation as you sit here

23    today?

24    A.  Again, I don't recall what was -- what tapes were found

25    back then, in 2014.
```

Scherer - Deposition

1    Q.  So you agree with me that you cannot make that

2    representation sitting here today?

3    A.  Yeah, I don't recall what was -- what was on the tapes

4    in 2014.

5    Q.  Do you agree with me?

6    A.  Yes.

7    Q.  Mr. Scherer, I'm handing you what's been previously

8    marked as Exhibit 324 and if you flip to -- you know what a

9    Bates number is, right?  Remember we went through that at

10   the evidentiary hearing?

11   A.  No, I don't remember that.

12   Q.  Okay.  If you look at the lower right-hand corner, you

13   see the BMO number?

14   A.  Yes.

15   Q.  Why don't you flip to the one ending in 953.  Are you

16   there?

17   A.  Yes.

18   Q.  And what do you see there?

19   A.  Looks like an HP tape cartridge in a case.

20   Q.  And can you tell me, by just looking at this photo, what

21   this tape is?

22   A.  I have no knowledge of tapes, so, no, I can't.

23   Q.  And can you tell me whether or not there would be

24   e-mails on this tape?

25   A.  I could not tell you that.

1    Q.  Can you tell me or anybody else whether or not this tape

2    would be associated with an e-mail server?

3    A.  I could not answer that, no.

4    Q.  You can't tell just by looking at the photo, right?

5    A.  Correct.

6    Q.  If you turn the page to Bates ending in 954.  Do you see

7    that one?

8    A.  Yes.

9    Q.  And do you see it says, "BK7505"?

10   A.  Yes.

11   Q.  What does that mean?

12   A.  I have no idea.

13   Q.  And, again, you can't tell by looking at that portion of

14   the tape whether or not it's associated with any particular

15   e-mail server, correct?

16   A.  Correct.

17   Q.  I have no further questions.

18           MR. ANTHONY:  Good afternoon, Your Honor.

19           THE COURT:  Good afternoon.

20           MR. ANTHONY:  I'm going to try to get this down to

21   my height.

22           THE COURT:  Understood.

23           MR. ANTHONY:  I see you laughing.

24           All right.  I'm going to try to find us a live

25   witness, Your Honor.  We're going to call Debra Lindstrom.

1        MR. ANTHONY:  Ms. Lindstrom, come up, come up.

2    You're going to go sit there.

3        THE WITNESS:  Okay.

4        COURT REPORTER:  Ms. Lindstrom, can you stand and

5    raise your right hand, please.

6    (Witness sworn)

7        COURT REPORTER:  You may have a seat.  Could you

8    please state your name and spell it slowly right into the

9    microphone there.  If you can pull the microphone up to you.

10       THE WITNESS:  Debra Marie Lindstrom, D-e-b-r-a,

11   M-a-r-i-e, L-i-n-d-s-t-r-o-m.

12                        **(Debra Lindstrom)**

13                       **DIRECT EXAMINATION**

14   BY MR. ANTHONY:

15   Q.  Ms. Lindstrom, I'm going to wait until they finish

16   unpacking all those exhibits that you are going to have to

17   identify.

18   A.  Okay.

19   Q.  So we're going to let them unpack them, but it's going

20   to be a lot easier than having to go through each one, I

21   assure you.

22   (Pause)

23       MR. ANTHONY:  Thank you.

24       THE COURT:  Counsel, you may proceed.

25       MR. ANTHONY:  Thank you, Your Honor.

```
 1    BY MR. ANTHONY:

 2    Q.  Please tell the jury a little bit about yourself.  Where

 3    do you live?

 4    A.  I live in Lester Prairie.

 5    Q.  And where is that?

 6    A.  It's about an hour and a half drive from here west of

 7    the Cities.

 8    Q.  Okay.  And do you have children?

 9    A.  I have three.

10    Q.  And I'm going to guess you have a dog?

11    A.  Yes.

12    Q.  Okay.  You're laughing.  What is it about your dog

13    that --

14    A.  Oh, he's just a big baby.

15    Q.  Okay.  All right.  So are you working?

16    A.  Yes.

17    Q.  Where do you work?

18    A.  I work for Loomis Homes in Chaska.

19    Q.  What do you do?

20    A.  I do accounting and payroll.

21    Q.  Okay.  How long have you been there?

22    A.  Six years.

23    Q.  And what did you do before that?

24    A.  I worked for a -- Wilson Development Services.

25    Q.  What did you do there?
```

1    A.   The same, bookkeeping, payroll.

2    Q.   That takes us back to about what year?

3    A.   That takes me back until unemployment after Petters.

4    Q.   Okay.  So let's focus on that.  When did you work at,

5    we'll call it, the Petters operation?

6    A.   From March of '97 through December of 2009.

7    Q.   What was the first job that you had there?

8    A.   Receptionist.

9    Q.   And how long did you hold that position?

10   A.   A year and a half.

11   Q.   And then what was the next position you had?

12   A.   Assistant to Tom Petters.

13   Q.   And how long did you hold that position?

14   A.   Four and a half years.

15   Q.   Was that a tough job?

16   A.   Yes.

17   Q.   Because high pressure?  What was it?

18   A.   Stress level.

19   Q.   Okay.  And what were your duties as his assistant,

20   administrative assistant?

21   A.   To Mr. Petters?

22   Q.   Yes.

23   A.   Setting up appointments, business and personal; setting

24   up personal appointments for his kids; typing e-mails if he

25   wanted an e-mail sent to a president or vice president of

1    one of the other departments, one of the other entities.

2    Q.  Now, at some point you worked for PCI, correct?

3    A.  Yes.

4    Q.  In what period of time did you work for PCI?

5    A.  June -- well, actually, since I started up until the

6    raid happened, 2008.

7    Q.  And the second position, the position you had after

8    working for Mr. Petters, who did you work for in that

9    position?

10   A.  Deanna Coleman.

11   Q.  And sometimes she's known by the name of Deanna?

12   A.  Munson.

13   Q.  So which name do you know her by better so we can use

14   that name for you?

15   A.  Coleman.

16   Q.  Okay.  So Deanna Coleman.  And what did you do for

17   Ms. Coleman?

18   A.  I typed promissory notes and called the investors when

19   the promissory notes were due to see if they wanted to renew

20   the note or to be paid.

21   Q.  And I think there's been some testimony that she was a

22   vice president --

23   A.  Yes.

24   Q.  -- and Mr. Petters was the president of PCI; is that

25   correct?

1    A.   President, CEO.

2    Q.   Okay.

3    A.   And Deanna was vice president.

4    Q.   Okay.  And in your role -- and so your duties -- in

5    addition to what you just described, did you also have some

6    duties or responsibilities with respect to wires?

7    A.   I'm sorry.  To what?

8    Q.   Did you have duties with respect to wires, sending

9    wires?

10   A.   Yes.

11   Q.   Okay.  So tell the jury what your -- the jury what your

12   duties were with respect to sending wires for PCI.

13   A.   When Deanna was out of the office for whatever reason, a

14   day, a week, whatever, promissory notes were due during that

15   time frame, and she would have a spreadsheet of what was due

16   and what dates it was due.  And I would have to call the

17   wire department at M&I Bank and initiate the wire.

18   Q.   So who were the people at PCI when you were there who

19   were responsible for sending and receiving wires?

20   A.   Deanna, myself, and Tom Petters.

21   Q.   Okay.  And the jurors heard some testimony from a

22   Mr. Neufeldt by video, who was in the operations department,

23   I think, of the bank.  And he talked a little bit about

24   wires, and now I'm going to ask you a little bit about

25   wires.

Lindstrom - Direct

```
1              When you say you called in a wire, how did you do
2      it?
3      A.  I would call the wire department.  I would -- let me
4      back up.  When we had to send a wire to a private investor,
5      we -- and it was going to be wires that were done over
6      multiple times, we would set up a code, a four-digit code,
7      so that when we called in the wire, that four-digit code
8      identified who it was going to and what bank it was going
9      to.
10             And so whenever I had to call in a wire, I would
11     call the wire department, give them the code, the dollar
12     amount, and that was pretty much it.
13     Q.  Okay.  And then when Ms. Coleman sent in a wire or made
14     a wire request, how would you know she had done that?
15     A.  You can request a confirmation number when the wire has
16     been sent.
17     Q.  Was that usually done?
18     A.  Yes.
19     Q.  Okay.
20     A.  And that four- to six-digit confirmation number would be
21     written at the top of the first page of the promissory note.
22     Q.  Okay.
23     A.  And then she would hand that promissory note to me to
24     call whoever that note belonged to and find out what they
25     wanted done with it.
```

Lindstrom - Direct

1    Q.  All right.  So it was either you sending the wire or her

2    sending the wire.  And if she sent it, she'd give you a

3    document that showed you she sent it?

4    A.  Yes.

5    Q.  Did you also get faxes that confirmed wires when you

6    made wire requests?

7    A.  We received fax notifications from the bank when there

8    was an incoming wire.

9    Q.  Okay.  Well, let's talk about how incoming wires worked.

10   How were you alerted by the bank -- when you say "the bank,"

11   which bank?

12   A.  M&I Bank.

13   Q.  Okay.  How did M&I Bank alert you to the incoming wires?

14   A.  They would send a fax.

15   Q.  And how would you know the fax was from M&I Bank and not

16   somebody else making believe they were M&I Bank?

17   A.  Well, I would hope it was M&I Bank.  It had it at the

18   top of the fax notification.

19   Q.  Okay.  Now, in your position at PCI, did you also --

20   were you also responsible for receiving and opening Money

21   Transfer Statements from M&I Bank to PCI showing the daily

22   wire activity that you were familiar with?

23   A.  Yes.

24   Q.  Now, I'm going to ask you to look at -- take any one of

25   those volumes there and just open it up to any page.  Now,

Lindstrom - Direct

1    at my request did you go through all those volumes today to

2    see what was in there?

3    A.  Yes.

4    Q.  And what's in there?

5    A.  Wire transfer statements from M&I Bank.

6    Q.  And does the bank's name appear on each and every one of

7    those statements, to the best of your recollection?

8    A.  Yes.

9    Q.  And tell the jury what those statements are that are in

10   those volumes that are next to you.

11   A.  It's a Money Transfer Statement.  It shows who the wire

12   is going to, who it's coming from, and the dollar amount.

13   Q.  And how often would statements like that come from M&I

14   Bank to you?

15   A.  I don't recall the exact number of times.  It could have

16   been weekly.  It could have been once a month.  I don't

17   recall.

18   Q.  Okay.  Do you recall the envelopes they came in?

19   A.  Yes.  They were your regular standard letter envelopes,

20   and sometimes they were pretty thick.

21   Q.  Okay.  And were those Money Transfer Statements that you

22   are referring to in that -- does that have an exhibit number

23   on those books?  Is it Exhibit 660?  If you look at the

24   binder on the side, does it say, "660"?

25   A.  Yes.

Lindstrom - Direct

1    Q.  And each of those six books have an Exhibit 660 marker

2    on them, right?

3    A.  Yes.

4    Q.  Okay.  And just tell the jury the information that

5    appears on the typical Money Transfer Statement that appears

6    in Exhibit 660.  Starting at the top of the page, what's on

7    the top?

8    A.  At the very top it says, "M&I Bank Money Transfer

9    Statement," and it says, "Page 2 of 2."  It gives the date.

10   It gives the company name, which is Petters Company, Inc.,

11   attention --

12   Q.  Does it give the address?

13   A.  Yes.

14   Q.  What's the address?

15   A.  4400 Baker Road, Suite 200, Minnetonka, Minnesota,

16   55342.

17   Q.  And then it has a list of transactions?

18   A.  Yes.

19   Q.  And you received those documents and opened them in the

20   ordinary course of doing your business at PCI?

21   A.  Yes.

22           MR. ANTHONY:  Plaintiff offers Exhibit 660,

23   Your Honor.

24           MS. GITTES:  No objection from defendants with

25   one -- I apologize.  One caveat is we just haven't had a

1    chance to look at the binders.  So perhaps, rather than

2    burden the Court and jury, we can look after and we can

3    raise any issues at that time.  But otherwise, no objection.

4            THE COURT:  Exhibit 660 is received.

5    BY MR. ANTHONY:

6    Q.  I'm going to ask you one thing about the wires.  Did you

7    ever send wires on your own without Ms. Coleman approving it

8    or authorizing it?

9    A.  No.

10   Q.  That wouldn't have been part of your job, to just send

11   out any wire, right?  Is that correct?

12   A.  Yes.

13   Q.  Okay.  Just to show the jury, I'm not going to go

14   through but one or two of these statements just to show them

15   visually what it looks like.

16           MR. ANTHONY:  So I'm going to ask Ms. Ellig to put

17   up page -- Plaintiff's 660-A-181, please.

18   BY MR. ANTHONY:

19   Q.  Do you have that on your screen?

20   A.  Yes.

21   Q.  Okay.  So --

22           MR. ANTHONY:  Actually, put up 660-180, please.

23           MS. GITTES:  Is this in the binder?

24       (Counsel confer)

25   BY MR. ANTHONY:

Lindstrom - Direct

```
1    Q.  And just tell the jury as you go through this -- you

2    mention it's got the bank's name at the top, right?

3    A.  Yes.

4    Q.  The date, right?

5    A.  Yes.

6    Q.  And then scroll down.  It says -- right there.  Is that

7    $10 million?

8    A.  Yes.

9    Q.  And does that show a wire from PCI to Thomas Petters in

10   the M&I Bank Transfer Statement of $10 million?

11   A.  It shows it on the statement.

12   Q.  Okay.

13   A.  Yes.

14            MR. ANTHONY:  And maybe if you could make that a

15   little smaller, Ms. Ellig, so we can see the entire

16   statement, please.  Okay.

17   BY MR. ANTHONY:

18   Q.  And so, for example, there may be -- if we look at that,

19   there may, in fact, be multiple wires on that date, right?

20   So if we look --

21            MR. ANTHONY:  If you'd put up page 181, please.

22   BY MR. ANTHONY:

23   Q.  That would be same day, December 19th, and there's

24   another three transactions there?

25   A.  Yes.
```

1    Q.  And then let's go to page 182 of Exhibit 660-A, and

2    we'll see there's another three there, right?

3    A.  Yes.

4    Q.  And is this the way the documents typically came in,

5    there might be multiple transactions on a particular

6    statement?

7    A.  Yes.

8    Q.  Now, I'm just going to cover one other thing with you.

9    Pretty traumatic what happened when the raid occurred for

10   you?

11   A.  Yes.

12   Q.  Okay.  You haven't been charged with any crime or

13   anything like that, have you?

14   A.  No.

15   Q.  No.  And just share with the jury what happened the day

16   of the raid so they get a sense of what was going on out at

17   the PCI headquarters on the day the FBI raided.

18   A.  Well, the day of the raid, it was a Wednesday.  I

19   believe it was September 23rd of 2008.  About 9:00 a.m. that

20   morning, an FBI agent came up to the third floor, which is

21   where we were located, and said, I am so-and-so from the

22   FBI.  Please step outside of your office.  Stop what you are

23   doing, hang up your phone, and step outside your door.  And

24   he proceeded to -- I don't recall exact words.  He said,

25   You're being -- done working, I guess you could say.  You're

1  free to leave.

2          And as I turned to go back into my office, I had

3  two postal workers standing on either side of me, who

4  followed me into my office and closed the door and proceeded

5  to question me for one to two hours.

6  Q.  Thank you for coming here today, Ms. Lindstrom.

7          MR. ANTHONY:  I don't have any more questions at

8  this time.  Thank you.

9          THE COURT:  Cross-examination?

10         MS. GITTES:  Yes, please, Your Honor.  Just one

11 moment and we can distribute what we have.  May I approach

12 to give --

13         THE COURT:  You may.

14    (Documents handed to witness)

15         MS. GITTES:  You don't need to open it yet,

16 Ms. Lindstrom.

17 (Documents handed to the Court)

18         THE COURT:  Thank you.

19                    **CROSS-EXAMINATION**

20 BY MS. GITTES:

21 Q.  Good afternoon, Ms. Lindstrom.

22 A.  Hi.

23 Q.  I'm Susan Gittes.  I'm one of the lawyers for BMO Harris

24 Bank.

25 A.  Okay.

1          THE COURT:  Counsel, will you adjust the mic so we

2     can hear you, and maybe the podium as well.

3          MS. GITTES:  Perhaps it's too low.  Fancy.  Okay.

4     Is that better?

5          THE COURT:  It is better.  Thank you.

6          MS. GITTES:  Okay.

7     BY MS. GITTES:

8     Q.  Hi, Ms. Lindstrom.

9     A.  Hi.

10    Q.  So I'd like to start by asking you a little more about

11    your understanding of Mr. Petters' businesses.

12          You said you started working at PCI in 1997; is

13    that right?

14    A.  Yes.

15    Q.  That means you worked there for -- is it 13 or 14 years?

16    A.  Twelve years, nine months.

17    Q.  Not that you are counting.

18          And in the course of your employment, you became

19    familiar with the kinds of business Mr. Petters was doing;

20    is that right?

21    A.  Yes.

22    Q.  And Mr. Petters and the companies he owned had hundreds

23    of employees between 2002 and 2008; is that right?

24    A.  Yes.

25    Q.  And we know today that PCI was a Ponzi scheme, but back

```
 1    then there were -- some of those businesses were legitimate;
 2    is that right?
 3    A.  Yes.
 4    Q.  Meaning they did actual business.  Like Polaroid?
 5    A.  Yes.
 6    Q.  Fingerhut?
 7    A.  Yes.
 8    Q.  Sun Country Airlines?
 9    A.  Yes.
10    Q.  UBid?
11    A.  Yes.
12    Q.  And at one point Mr. Petters had retail stories; is that
13    right?
14    A.  Yes, Petters Warehouse Direct.
15    Q.  And there was real merchandise in Petters Warehouse
16    Direct, right?
17    A.  Yes.
18    Q.  You could walk in and buy a TV or a washer/dryer or
19    something like that?
20    A.  Correct.
21    Q.  There were more than ten locations of Petters Warehouse
22    Direct at some points between 2002 and 2008, right?
23    A.  Yes.
24    Q.  And is it true that there was even one in the Mall of
25    America for a short time?
```

```
1    A.  For a short time.

2    Q.  And in the course of your work for Mr. Petters, you

3    became familiar with something called the Petters Group or

4    Petters Group Worldwide; is that right?

5    A.  Yes.

6    Q.  And that's another company that Mr. Petters owned?

7    A.  Yes.

8    Q.  And in the course of your work, you knew that Petters

9    Group published its own magazine, right?

10   A.  I knew what?

11   Q.  That Petters Group published a magazine.

12   A.  Was more of a newsletter, to my understanding.

13   Q.  Okay.  Well, if I can direct you to open up your binder,

14   just in the back -- or in the front, excuse me.  I'm not

15   going to ask anyone to put it up on the screen.  These

16   aren't in evidence.  But in the front pocket there are five

17   documents.  If you could just take a second to review those

18   and see if they are familiar to you.

19        MR. ANTHONY:  Your Honor, we'll have an objection

20   to these magazine articles.  I think you've already ruled on

21   them, so -- we have an objection that they have already been

22   ruled inadmissible hearsay.

23        THE COURT:  Yes, there has been a ruling.  There's

24   a question just asking for -- I don't know what the question

25   is.
```

1            MS. GITTES:  I'm happy to explain at sidebar,

2     Your Honor, or we can proceed and we can deal with it as it

3     comes.

4            THE COURT:  Yes, please, sidebar.

5            MS. GITTES:  Okay.  Thank you.

6         **(At sidebar)**

7            MS. GITTES:  So your ruling was based on, as I

8     understood it, Your Honor, was based -- excluding the

9     magazines was based on the fact that Ms. Pesch didn't have

10    personal knowledge of those materials.

11           And Ms. Lindstrom, in contrast, has testified

12    previously in another proceeding that she was familiar with

13    the magazine, that it was an employee newsletter, and as to

14    the content.

15           And I believe I can establish that it was a

16    business record that she received and was aware of in the

17    ordinary course of her business and that it's admissible

18    under 803(6).

19           THE COURT:  And why is it relevant?

20           MS. GITTES:  It goes to the public information in

21    the public about Mr. Petters and his businesses, and it goes

22    to the fact that this was out there.  And it's corroborative

23    of Ms. Pesch's testimony where she talked about having seen

24    magazines as relevant to her understanding of who

25    Mr. Petters was and his businesses.

1          THE COURT:  So they are not offered for the truth

2     of any matter asserted?

3          MS. GITTES:  Well, Your Honor, I think they are --

4     it's under the business records exception to the hearsay

5     rule.

6          THE COURT:  So what is the business record?

7          MS. GITTES:  These are business records of PCI and

8     Petters Group.

9          MR. ANTHONY:  That's not a business record.  It's

10     a hearsay publication that was hearsay then, is hearsay now.

11          There's been already plenty of testimony that

12     Petters was widely known.  Nobody has disputed the fact that

13     he's widely known.  We've had a number of witnesses talk

14     about that.  She can ask her if he was widely known and he

15     was a philanthropist and he made all these contributions.

16          This is hearsay that is simply inadmissible.  It's

17     not a business record that she created or even was

18     responsible for overseeing.  It's not something she did in

19     the ordinary course of her job, like the Money Transfer

20     Statements, where she got them every day, opened them, and

21     did what she did with them.  This is somebody else writing

22     about Petters Group.  That's why they are hearsay.

23          MS. GITTES:  May I respond on that point, Your

24     Honor?

25          THE COURT:  (Indicating.)

Lindstrom - Cross

1   MS. GITTES:  There's Eighth Circuit case law,

2   which I can if I go back and get my phone, I didn't want to

3   bring it up, that says to be admissible as a business

4   record, the witness does not have to have created the

5   document.  She just needs to have been aware of it in the

6   course of her daily activities at work.  And I believe I can

7   lay a proper foundation such that she was aware of them.

8   THE COURT:  What is the nature of this as a

9   business record?

10   MS. GITTES:  It's a record that Petters and his

11   company put -- distributed to employees, distributed

12   externally, put on a website.  It's a publication that they

13   made and they put out into the world.  And she's already,

14   you know --

15   MR. ANTHONY:  She doesn't have the foundation for

16   any of that.  That's why it's not a business record.

17   MS. GITTES:  It's --

18   MR. ANTHONY:  Excuse me.  Excuse me.  I didn't

19   mean to cut you off.

20   She didn't create it.  She wasn't responsible for

21   it.  She didn't oversee it.  It wasn't part of her duties or

22   responsibilities.  And she said she thought there was a

23   newsletter, but never testified that as a regular course of

24   the business she was somehow associated or affiliated with

25   that.  It's simply hearsay and it doesn't -- I think you've

1     already got all this stuff in.  This is repetitive in

2     addition.

3              MS. GITTES:  I would just add, Your Honor, and I

4     don't want to belabor the point, but the core of the

5     plaintiff's case is that we should have been aware of red

6     flags and of information and we should have figured out more

7     about Petters.

8              This is information that Mr. Petters and PCI,

9     which is the party against who you are claiming was harmed

10    in this, was -- what they were doing.  There are pictures in

11    here of the offices Mr. Jambor would have seen.

12             MR. ANTHONY:  It's --

13             MS. GITTES:  There is information about his

14    charitable activities, about his -- and so I think it goes

15    to what information was in the public record between 2002

16    and 2008.

17             And the other thing I would just add is, you know,

18    PCI here is the plaintiff.  Is Mr. Kelley going to

19    authenticate this?  Defendant's hands are tied if -- we're

20    limited because of the nature of the claims that are

21    brought.

22             Ms. Lindstrom, I believe, can say she received

23    them in the ordinary course of her job; and if she can do

24    that, she can testify as to their contents.

25             MR. ANTHONY:  She can't testify because it's

1    hearsay.  This is written by someone other than her about

2    someone other than her.  It would be like me saying it's a

3    business record that the *Star Tribune* writes a story about

4    me that I can somehow -- that someone can authenticate it

5    and say it's my business record because it's written about

6    me.  This is Tom Petters' hearsay that has no relevance and

7    no foundation through this witness.

8                THE COURT:  I am prepared to rule.  The objection

9    is sustained for the reasons that have been stated.  It is

10   hearsay, it is likely to confuse the jury, and it is more

11   prejudicial than probative.

12       **(In open court)**

13   BY MS. GITTES:

14   Q.  Sorry about that, Ms. Lindstrom.  Just one moment.

15       (Pause)

16   Q.  You worked closely --

17                MS. GITTES:  May I continue, Your Honor?

18                THE COURT:  Yes, you may.

19                MS. GITTES:  Thank you.

20   BY MS. GITTES:

21   Q.  You worked closely with Deanna Munson and Tom Petters

22   throughout the course of your employment at PCI; is that

23   right?

24   A.  Yes.

25   Q.  And you understood that Mr. Petters -- did you

1    understand that Mr. Petters was well known in the Twin

2    Cities at that time?

3    A.  Yes.

4    Q.  You knew that he was involved in a lot of charity work?

5    A.  Yes.

6    Q.  You knew that he would sometimes be pictured with

7    celebrities at events?

8    A.  Yes.

9    Q.  Do you remember any of the celebrities he was seen with,

10   sitting here today?

11   A.  Sitting here today?

12   Q.  I'm asking if you remember --

13   A.  Oh.

14   Q.  -- from your time at PCI any of the celebrities that you

15   might have seen Tom take pictures with?

16   A.  I don't know if you would consider him a celebrity, Ted

17   Mondale.

18       (Laughter)

19   Q.  Is that -- Ted Mondale, is that -- this is the son of

20   former Vice President Walter Mondale or vice president

21   presidential candidate?  I honestly don't remember.

22   A.  No, son of Walter Mondale.

23   Q.  Okay.  But Walter Mondale was a political figure, right?

24   A.  Right.  Yes.

25   Q.  And so his son was pictured with Tom Petters; is that

 1    right?

 2    A.  I believe so, yes.

 3    Q.  And is it true that his son actually worked at PCI or at

 4    one of Petters' companies?

 5    A.  Yes, actually two of them.

 6    Q.  Oh, two.  Which companies did Mr. Mondale work at?

 7    A.  Well, Ted, I believe, worked with Petters Group.  And

 8    then there was his brother Bill that also worked there, but

 9    I do not remember which company it was for.

10    Q.  And I guess, Mr. Mondale -- I don't know.  I guess

11    celebrity would be strong, but he was a public figure at the

12    time?

13    A.  Yes.

14    Q.  And do you know if he did any actual work for

15    Mr. Petters?

16    A.  I do not know if he did or not.

17             THE COURT:  You are asking about the vice

18    president?

19             MS. GITTES:  Excuse me.  I was asking about the

20    vice president's son who worked at PCI.  I apologize,

21    Your Honor.

22    BY MS. GITTES:

23    Q.  But you understood that Mr. Petters had a charity,

24    right?

25    A.  Yes.

Lindstrom - Cross

1    Q.  And that he would host big fundraising events, like

2    parties and polo matches, right?

3    A.  I don't know about polo matches, but, yes, he did have a

4    big gala.

5    Q.  And he sometimes had celebrities come to that kind of

6    event?

7    A.  Yes.

8    Q.  And you testified, in response to questions from

9    Mr. Anthony, about wire transfers, right?

10   A.  Yes.

11   Q.  And specifically wire transfers that involved M&I Bank?

12   A.  Yes.

13   Q.  And I think you said that you would sometimes speak to

14   members of M&I's wire department; is that right?

15   A.  Correct.

16   Q.  But those calls were limited to information about the

17   specific wire, right?

18   A.  Yes.

19   Q.  You didn't talk to anyone in M&I's wire department about

20   PCI's business?

21   A.  No.

22   Q.  Or anything else going on at PCI?

23   A.  No.

24   Q.  And you don't remember the names of anyone in M&I's wire

25   department sitting here today?

```
1    A.  No.

2    Q.  It was a long time ago.

3            Do you recall anyone at M&I who -- anyone who

4    worked at M&I at the time from your experience working

5    there, do you remember anyone from M&I who worked with

6    Petters?

7    A.  The only one that comes to mind, and I'm not positive on

8    the last name --

9    Q.  Uh-huh.

10   A.  -- but the first name was Ed.

11   Q.  Could that have been Ed Jambor?

12   A.  That's the one that comes to mind, yes.

13   Q.  And you sometimes saw that Mr. Jambor would -- he would,

14   you know, stop by PCI's office on occasion; is that right?

15   A.  Yes.

16   Q.  You never discussed PCI's business with Mr. Jambor,

17   right?

18   A.  No.

19   Q.  So just before I finish, you worked beginning in 2002 --

20   in September of 2002, if I have it right, at the Fingerhut

21   building in Minnetonka; is that right?

22   A.  Yes.

23   Q.  And is that the building where you recall Mr. Jambor

24   occasionally stopping by to see Mr. Petters or Ms. Munson?

25   A.  Yes.
```

Lindstrom - Cross

1  Q.  And so if I call that the Fingerhut building, is that

2  what you would have called it at the time?

3  A.  Yes.

4  Q.  Because it was a building owned by Fingerhut that became

5  something owned by Petters once he bought the company?

6  A.  Yes.

7  Q.  And so just to kind of walk the jury through what a

8  visitor at PCI like Mr. Jambor would have seen, that was a

9  three-story building, right?

10  A.  Correct.

11  Q.  It was a pretty nice office building, right?

12  A.  After it was remodeled, yes.

13  Q.  But it was -- you know, it was freestanding; is that

14  right?

15  A.  Yes.

16  Q.  Had its own parking lot?

17  A.  Yes.

18  Q.  And the building had offices for lots of Petters-owned

19  companies, right?

20  A.  Yes.

21  Q.  And you said you worked at the -- on the third floor at

22  the time of the raid; is that right?

23  A.  Correct.

24  Q.  But did you always work on the third floor or did you

25  work on the first floor before?

```
 1    A.  First floor before.

 2    Q.  Okay.  And so either on the first or the third floor,

 3    depending on your time there, there were other employees of

 4    other Petters entities kind of in the same general floor as

 5    you; is that right?

 6    A.  Yes.

 7    Q.  How many people do you think worked on a given floor

 8    during your time, like, let's say, from 2002 to 2008?

 9    A.  Anywhere from 50 to 100, maybe.

10    Q.  So it was just a -- kind of a normal busy office

11    building?

12    A.  Yes.

13    Q.  And so nothing about the office, when -- if you were a

14    visitor walking in, would have alerted you to the fact that

15    it was, in fact, the headquarters of a massive Ponzi scheme,

16    right?

17    A.  No.

18    Q.  Okay.  Thank you so much, Ms. Lindstrom.  I appreciate

19    your time.

20              MS. GITTES:  That's all I have, Your Honor.

21              THE COURT:  Anything further for this witness?

22              MR. ANTHONY:  Just a few, Your Honor, and then

23    we'll get you on your way.

24

25
```

1                    **REDIRECT EXAMINATION**

2      BY MR. ANTHONY:

3      Q.  You mentioned Ted Mondale, the son of Walter Mondale.

4      Who did he work for?

5      A.  Within the Petters companies?

6      Q.  Yeah.

7      A.  I believe it was Petters Group.

8      Q.  Okay.  And that Petters Group is different than PCI,

9      correct?

10     A.  Correct.

11     Q.  All right.  And you mentioned another company, Polaroid.

12     That was in the Petters Group also, right?

13     A.  Under Petters Group, yes.

14     Q.  But that was not part of PCI, was it?

15     A.  No.

16     Q.  And who was heading up Polaroid?  Do you remember?

17     A.  No.

18     Q.  Okay.  And then there was Fingerhut.  That was part of

19     the Petters Group but also not part of PCI, correct?

20     A.  Correct.

21     Q.  And Sun Country, they had a lot of people working there

22     because it was an airline and people getting you on and off

23     planes, but that was part of the Petters Group, right?

24     A.  Correct.

25     Q.  Not part of PCI, correct?

1    A.  Correct.

2    Q.  And other than you and Ms. Munson/Ms. Coleman,

3    Mr. Petters, who worked for PCI?

4    A.  There was Deanna Coleman, myself, there was Bob White

5    and Sandy Indahl.

6    Q.  Okay.  And Petters, Coleman, and White all went to jail?

7    A.  Yes.

8    Q.  And they were the officers of PCI, correct?

9    A.  Yes.

10   Q.  Now, you were asked if a -- the Fingerhut building, was

11   that one the one on Baker Road?

12   A.  Correct.

13   Q.  Okay.  So it's the location where all the Money Transfer

14   Statements were going?

15   A.  Yes.

16   Q.  So if someone wanted to find out who -- actually how big

17   PCI was or how many people worked there and wanted to

18   distinguish it from all the other businesses, they could do

19   that by simply asking someone like Mr. Petters or

20   Ms. Coleman, correct?

21   A.  Correct.

22   Q.  So while a visitor coming into the building might not

23   want to know about PCI or all these other companies, someone

24   who was in the business of banking who was trying to sell

25   something to these entities might want to know that,

Lindstrom - Redirect

1    correct?

2              MS. GITTES:  Your Honor, objection, calls for

3    speculation.

4              THE COURT:  Overruled.  You may answer if you can.

5              THE WITNESS:  Could you repeat that?

6    BY MR. ANTHONY:

7    Q.  Sure.  If somebody other than a visitor, who was selling

8    banking services to PCI and these other entities, wanted to

9    distinguish between the group, it would have been easy

10   enough to do just by asking questions, correct?

11   A.  Correct.

12   Q.  And if somebody who were trained in anti-money

13   laundering techniques who was a visitor to the building,

14   they might view these various entities in a different light,

15   correct?

16             MS. GITTES:  Objection, Your Honor, speculative

17   and calls -- and lack of foundation.

18             THE COURT:  Sustained.

19             MR. ANTHONY:  Okay.  I have nothing further,

20   Your Honor.

21             MS. GITTES:  Nothing further.

22             MR. ANTHONY:  And may the witness be relieved?

23             THE COURT:  Yes, you are excused.  Thank you.

24             MS. GITTES:  We'll just reshuffle for a moment.

25   Thank you, Your Honor.

 1              THE COURT:  Certainly.  Members of the Jury, if

 2      you'd like to take a stretch, you should feel free to.

 3          (Pause)

 4              THE COURT:  Are we ready to proceed?

 5              MR. ANTHONY:  We are, Your Honor.  We had raised

 6      with your chambers over the lunch hour four issues

 7      involving -- before we call Mr. Kelley.  I think two of

 8      those issues have been resolved, if I'm not speaking out of

 9      turn, Mr. Spehr.

10              MR. SPEHR:  No, you are not.  That is correct.

11      Rich Spehr, Mayer Brown, for the defendant.

12              MR. ANTHONY:  And two of those issues have been

13      resolved, but we have two other issues that we need your

14      guidance on.  So how would you like us to proceed on those

15      two other issues?

16              THE COURT:  Let's come to sidebar.

17              Members of the Jury, we will take a break now, and

18      hopefully it will not be a long one.  Please remember the

19      instructions that I have given you and continue to follow

20      them.

21              THE LAW CLERK:  All rise for the jury.

22                            **IN OPEN COURT**

23                         **(JURY NOT PRESENT)**

24              THE COURT:  Okay.  We are ready to proceed.

25              MR. ANTHONY:  Thank you, Your Honor.  Joe Anthony

1    for the plaintiff.

2              Your Honor, there were four issues that we raised

3    with you and alerted counsel to.  Counsel and I have spoken

4    and the -- of the four issues that we raised, two of them

5    counsel has agreed that he will not get into, which are:

6    Evidence of recoveries, offsets, and reductions, which is

7    item 2(b), as in boy, in our October 20, 2022 letter.  And

8    counsel has agreed not to get into item 2(c) or offer

9    evidence on 2(c), which is evidence of investor complicity.

10              And if Mr. Spehr confirms that, then we can move

11   to the other two, if that's okay with, Your Honor?

12              MR. SPEHR:  That is correct, Your Honor.

13              THE COURT:  Thank you.

14              MR. ANTHONY:  So that leaves two issues,

15   compensation and the PCI plea agreement.  I'm going to start

16   with the PCI plea agreement, Your Honor, because that's one

17   that is the subject of a previous order by you.

18              It is our intention with Mr. Kelley, and I wanted

19   to alert the Court to this so you're prepared, we're

20   prepared, the jury is prepared when we get to it, we're

21   going to offer the judgment of conviction, as your order

22   suggests we do, and then we're going to ask that the

23   instruction you said you would read when we did that be

24   read.  We are not going to attempt to offer the plea

25   agreement for the reasons mentioned or stated in your order.

1        So that's that issue.  Would you like me to step

2   aside to do that, to argue that?

3        THE COURT:  To allow opposing counsel to respond,

4   you mean?

5        MR. ANTHONY:  Yes.

6        THE COURT:  Yes.

7        MR. SPEHR:  Yes, Your Honor.  Thank you.

8        So we do plan to offer the Plea Agreement and

9   Sentencing Stipulations, which are DX-10036.  They should

10  come in, Your Honor.  They are executed by Mr. Kelley as

11  trustee of PCI.  They should come in, I think fairly

12  clearly, under Rule 801(b)(2) as an opposing party's

13  statement.  They are admissions of Mr. Kelley on behalf of

14  PCI.

15       Thank you, Your Honor.

16       MR. ANTHONY:  I'm not going to respond,

17  Your Honor.  I think your order addresses the issue and no

18  need for me to argue it further, I don't think.

19       The other issue is compensation, Your Honor.  We

20  think that counsel intends to get into compensation earned

21  and paid to Mr. Kelley for matters outside of the

22  compensation paid to him in connection with this lawsuit.

23       He's being paid for his services in connection

24  with this lawsuit and we think that's the issue about

25  compensation to be addressed, not to get into what he was

1    paid for for the 14 years of work that he did unraveling the

2    Petters Ponzi scheme.  And all the hours and hours, the

3    12,000, 14,000 hours he did doing that seems to us to be

4    prejudicial, unnecessary, irrelevant.

5           What is relevant is what he's done in this case,

6    how long he's done it, and how much he's been paid for it;

7    and he's prepared to testify to that.

8           THE COURT:  And --

9           MR. SPEHR:  Sorry, Your Honor.

10          THE COURT:  And that is relevant because?

11          MR. ANTHONY:  And it would be as though any -- you

12   know, he is spending time here.  He is going to be paid for

13   his time.

14          In opening statement from defense counsel it was

15   suggested that he's going to get a windfall out of this, and

16   it's relevant to show that he's getting paid on an hourly

17   basis, that he's not getting a percentage of the recovery,

18   which goes to his credibility.

19          And that's why what he is being paid for his time

20   on this matter is relevant.  But what he was paid for

21   services he provided at another time and place for 14 years

22   is not relevant.

23          MR. SPEHR:  Thank you, Your Honor.  I think --

24   there are two issues here.

25          One is the point made by counsel that he is -- I

1     think the words were only being paid -- only is being paid

2     for his time on, quote, this case is a bit misleading.

3              Mr. Kelley has been the trustee for PCI since

4     2008.  He was the trustee for the PCI Liquidating Trust.

5     This case was filed in 2012.  He was the trustee for the PCI

6     Liquidating Trust at that time.  Much of the work that

7     Mr. Kelley has done on this case was as PCI liquidating

8     trustee and perhaps even as receiver before he became

9     trustee for PCI.

10             He was paid millions of dollars in connection with

11    his work on this case before the confirmation of the

12    bankruptcy plan.  Now, I understand from the letter that

13    counsel sent this morning that once the plan was confirmed,

14    he is being paid, it sounds like, by the hour, but he is

15    being paid.

16             And that brings me to the second point, which is

17    both counsel, counsel that did the voir dire, Mr. Anthony,

18    and Mr. Collyard opened for the plaintiff, suggested in

19    quite strong and clear language that Mr. Kelley was not

20    going to get, quote, a penny from this matter.

21             And I can read you the transcript reference --

22    it's page 58 and page 59 of the voir dire transcript --

23    where Mr. Anthony says, "Mr. Kelley is appointed by a

24    federal court to his position, and he is charged with the

25    responsibility of recovering money for PCI so it can pay

1   back investors and creditors who loaned money to PCI."  No

2   problem.  That's fine.

3          "So Mr. Kelley is not going to be putting a nickel

4   of this in his pocket.  It's going to be the people who lost

5   money and organizations that lost money, whether they be

6   charitable or unions or teachers' unions."  And we'll have

7   something to say about that too.

8          But the point is they have raised this issue.

9   They have created the impression for the jury, both in the

10  voir dire and in the opening, that Mr. Kelley is a saint.

11  And I'm sure he's great, but saint I'm not sure.

12         He is getting paid associated with this matter.

13  He's been paid millions of dollars leading up to the time of

14  the confirmation of the plan, much of it, at least a

15  significant amount of it, associated with this litigation.

16         So thank you, Your Honor.

17         MR. ANTHONY:  I appreciate counsel recalling my

18  comments, but if he recalled them in context, it was not

19  getting a nickel out of this, referring to recovery in the

20  lawsuit, not getting -- he was going to get paid.  Everybody

21  knows people get paid for their time.  That was taken out of

22  context, I suggest, not intentional.

23         And there's some confusion here because I heard

24  counsel say that what he got as liquidating trustee -- I

25  could see if he made the argument that that was fair game,

 1    that what Mr. Kelley got in his position as trustee.

 2         But then he went beyond that and said, well, what

 3    he got as trustee, what he got as receiver, what he got in

 4    all these other positions that he was doing.  That would be

 5    prejudicial because it would create the impression that he

 6    got a windfall from all this work that he was doing.  That's

 7    simply not accurate.

 8         What is accurate is for Mr. Kelley to get on the

 9    stand and say what he's being paid for, what he's been paid

10    for in connection with this proceeding, and they can cross

11    him on it.

12         And I think it might even be fair game for them to

13    say what he's been paid as liquidating trustee, but

14    certainly going beyond that to the other positions that he

15    held would be inappropriate.

16         So I think it's more fair, more efficient to limit

17    it to what he's being paid for in this matter, but we, of

18    course, defer to Your Honor on that.

19         MR. SPEHR:  Very briefly.  I will take what I

20    think was a stipulation by counsel, which is if I am limited

21    to only what Mr. Kelley was paid as a liquidating -- as the

22    PCI liquidating trustee, that's fine with us.

23         THE COURT:  Okay.  So there's no longer an issue

24    of dispute?

25         MR. ANTHONY:  I'm going to check with my client,

1    Your Honor.

2        (Plaintiff's counsel confer)

3        (Mr. Anthony and Mr. Spehr confer)

4            MR. SPEHR:  Sorry, Your Honor.  Just give me a

5    minute to show counsel something here.

6            THE COURT:  No worries.

7        (Mr. Anthony and Mr. Spehr confer)

8        (Mr. Anthony confers with Mr. Kelley)

9            THE COURT:  It sounds to me that counsel is

10   continuing to try to resolve this issue, and I'm going to

11   give you time to do so.  I'll give you ten minutes to do so.

12           MR. ANTHONY:  Thank you, Your Honor.

13           MR. SPEHR:  We will resolve it, Your Honor.

14           THE COURT:  And we will resume, then, at 3:00.

15       (Recess taken at 2:52 p.m.)

16                    *    *    *    *    *

17       (3:01 p.m.)

18                       **IN OPEN COURT**

19                     **(JURY NOT PRESENT)**

20           THE LAW CLERK:  All rise.

21           THE COURT:  You may be seated.  Counsel, have you

22   reached a resolution on this matter?

23           MR. GLEESON:  Judge, the door behind you stayed

24   open.  I don't know if you --

25           THE COURT:  Oh, thank you very much.

1          MR. ANTHONY:  Okay.  May I proceed?

2          THE COURT:  Yes, you may.

3          MR. ANTHONY:  Counsel for the defendant,

4    Mr. Spehr, and I have agreed that he can ask about the

5    6.3 million received by Mr. Kelley in connection with his

6    role as liquidating trustee.  So that resolves the

7    compensation issue, which leaves unresolved the plea

8    agreement issue and I think Mr. Spehr has a comment he wants

9    to make to reserve a right or two.

10         MR. SPEHR:  Very briefly, Your Honor, just on the

11   complicity point.  I just want to make sure that we've

12   reserved our positions and rights.  Obviously, this is a

13   continuing discussion in the case.  So thank you.

14         THE COURT:  And so your point is what?

15         MR. SPEHR:  I'm agreeing that I'm not going to

16   raise complicity with Mr. Kelley.  I just don't want that to

17   be used someday as an argument that we've waived the

18   argument that we believe complicity should be in the case.

19         THE COURT:  Oh, certainly.

20         MR. SPEHR:  Yes.  Thank you so much.

21         THE COURT:  So is there any other ruling that

22   needs to be made?

23         MR. ANTHONY:  Yes, the plea agreement.  The plea

24   agreement -- is it just the convictions, the judgment and

25   the conviction, as you said in your order, or are you

1    amending it to allow the plea agreement to come in?

2         THE COURT:  Okay.  I am not amending my ruling.

3    It is -- it remains.

4         MR. ANTHONY:  Okay.

5         MR. SPEHR:  Which is that the plea agreement

6    doesn't come in; is that accurate?

7         THE COURT:  (Nodding.)

8         MR. SPEHR:  Okay.  Very good.  Thank you.

9         MR. ANTHONY:  That's how I understood it also,

10   Your Honor.

11        THE COURT:  Thank you.

12       (Pause)

13                        **IN OPEN COURT**

14                       **(JURY PRESENT)**

15        THE COURT:  Please be seated.  Counsel, you may

16   proceed.

17        MR. ANTHONY:  Thank you, Your Honor.  For our next

18   witness, plaintiff calls Douglas Kelley to the stand.

19        COURT REPORTER:  Would you raise your right hand,

20   please.

21       (Witness sworn)

22        COURT REPORTER:  Please have a seat.  And once

23   you're seated, pull that microphone right up to you.  State

24   your first and last name, and slowly spell them.

25        THE WITNESS:  Douglas Kelley.  D-o-u-g-l-a-s.

1    Kelley is K-e-l-l-e-y.

2                THE COURT:  Counsel, you may proceed.

3                MR. ANTHONY:  Thank you, Your Honor.

4                        **(Douglas Kelley)**

5                       **DIRECT EXAMINATION**

6    BY MR. ANTHONY:

7    Q.  Mr. Kelley, you're here as in your capacity as the

8    trustee of the BMO Litigation Trust, correct?

9    A.  That's correct.

10   Q.  So let's talk a little bit about your background and the

11   events that led up to your becoming the trustee.

12                When were you born, sir?

13   A.  1946.

14       (Laughter)

15   Q.  I had to say that to prove that you were older than me.

16                So -- all right.  Where were you born and raised?

17   A.  In Bloomington, Minnesota.

18   Q.  Okay.  Talk a little bit about your family, your father,

19   your mother, what they did, what you did as a kid.

20   A.  My dad was in the Air Force, so we -- I was born here

21   and then lived in New York, Florida, Japan, California

22   before coming back here to Minnesota.  I didn't go to one

23   school for a whole year until the 7th grade we moved so

24   often in the Air Force.

25   Q.  And where did you go to school when you got back here?

1    A.  Bloomington High School.

2    Q.  I assume you graduated?

3    A.  Yes, I did.

4    Q.  Okay.  And your father's role or title in the service

5    was what?

6    A.  My dad was a Marine in the Pacific and World War II.

7    And then after World War II he joined the Air Force, did a

8    tour in Korea and two tours in Vietnam.

9    Q.  Did you go to college?

10   A.  I did.

11   Q.  Where did you go?

12   A.  University of Minnesota.

13   Q.  And you graduated with a degree in what?

14   A.  Political science was my major, and history and music

15   history were my minors.

16   Q.  You're a musician?

17   A.  I was.

18   Q.  Playing what?

19   A.  I played clarinet and saxophone.  Reeds generally.

20   Q.  Okay.  Any remarkable experiences during your musician

21   days?

22   A.  The high point was subbing for Doc Severinsen when he

23   came here to Minnesota.

24   Q.  Okay.  So Doc Severinsen is going to require you to tell

25   the jury a little bit about who he was.  I knew he was with

Kelley - Direct

1    Johnny Carson, but tell the panel who that is, Doc

2    Severinsen.

3    A.  Well, he was a famous band leader and he -- his main job

4    was with Johnny Carson and he played that for many, many

5    years, but he would travel.  And he was also on the board of

6    the Minnesota Orchestra when he came back to Minnesota.

7    Q.  Okay.  Now, you graduated in what year from Minnesota?

8    A.  1968.

9    Q.  So that would have been right in the middle of the

10   Vietnam War.  What did you do when you got out of college?

11   A.  I went to the Tetons and climbed mountains and waited

12   for my draft notice to appear.

13   Q.  And did it come?

14   A.  Yes.

15   Q.  And where did you end up serving, in what branch?

16   A.  The United States Army.

17   Q.  And did you -- were you stationed somewhere?  Did you

18   have to go to class somewhere or school?  What happened?

19   A.  Well, you start out in basic training.  I did that at

20   Fort Dix, New Jersey.  Then I went to Officer Candidate

21   School, which was at Fort Belvoir in Virginia, and I

22   graduated from there.

23   Q.  How did you do at the Officer Candidate School?

24   A.  I was in the top three of my class, which meant I was a

25   distinguished military graduate, which means you get your

Kelley - Direct

```
 1    choice of any job you want in the Army.
 2    Q.  Okay.  So what did you choose?
 3    A.  I choose to go to Airborne School, Ranger School, and
 4    Special Forces training.
 5    Q.  Okay.  So back in that day, did they have a name for
 6    that?  Green Berets or anything like that?
 7    A.  Special Forces were Green Berets.
 8    Q.  Okay.  And how long did you serve as a Green Beret or
 9    Special Forces?
10    A.  I was in the service total for three years.
11    Q.  Okay.  And after you got out of the service, did you go
12    back to school?
13    A.  I did.
14    Q.  And where did you go to school?
15    A.  I went to the University of Minnesota Law School.
16    Q.  And when did you graduate?
17    A.  1974.
18    Q.  Okay.  Now, you are not currently married, are you?
19    A.  I am not.
20    Q.  Okay.  Do you have children?
21    A.  I do.
22    Q.  Their names and what do they do.  How old are they?
23    A.  I have a son Brett, who's 39, and a daughter Erin, who's
24    37.
25    Q.  Okay.  And your son, what does he do and what has he
```

1    done in his 39 years, briefly?

2    A.  Well, he right after 9/11 joined the Army and spent a

3    number of years in the Army.  He was an Army Ranger, went to

4    Afghanistan and was a Bronze Star winner in Afghanistan.

5    Q.  What's he doing now?

6    A.  He came back when he got out of the Army, went to

7    St. Thomas Law School, and now he is a partner in my law

8    firm.

9    Q.  Okay.  And how about your daughter?  Tell us about her.

10   A.  My daughter graduated from the University of Minnesota.

11   She was going to go to law school and said, no, I don't

12   think so.  And so she went and became a firefighter, a

13   wildlands firefighter for the United States Forest Service,

14   which she did for a number of years.

15   Q.  So you mentioned that you climbed the Grand Tetons.  Are

16   you also a mountain climber?  Is that one of your hobbies?

17   A.  Yes.

18   Q.  And just briefly touch on some of the mountains you've

19   actually gotten to the top of.

20   A.  Well, there are 14 mountains in the world that are over

21   8,000 meters, which is 26,000 feet high.  I -- in 1984 I

22   climbed one of those which was in Tibet.  Its name was

23   Shishapangma, 26,400 feet high, and I did that without

24   supplemental oxygen.  And then I climbed a number of other

25   big mountains all around the world.  In 1986 I went to Mount

Kelley - Direct

 1    Everest and tried to climb --

 2    Q.  Wait.  Did you climb Mount Everest?  How did you do?

 3    A.  I got about nine-tenths of the way up on the north face

 4    of Mount Everest, which is one of the hardest routes on the

 5    mountain, and then the monsoon came and dumped a whole bunch

 6    of snow and we had to get out because of avalanche danger.

 7    Q.  Ever run for public office?

 8    A.  Once.

 9    Q.  What office did you run for?

10    A.  Governor of Minnesota.

11    Q.  How did that go?

12    A.  I came in third.

13    Q.  So you didn't get elected governor, so what did you do

14    with respect to your legal career?

15    A.  Well, I was with a small firm for a while after I ran

16    for governor and then --

17    Q.  Did that firm have a name?

18    A.  Mahoney, Walling & Kelley.

19    Q.  Okay.  And then --

20    A.  And then that firm broke up and I started my own firm,

21    which is now called Kelley, Wolter & Scott.

22    Q.  Well, actually before -- between your -- coming back --

23    did you work for a firm called Holmes Eustace?

24    A.  Well, right out of law school I did.  It was a very

25    small firm called Holmes, Eustace, Kircher & Graven.

1    Q.  Before forming the Mahoney, Walling & Kelley firm, did

2    you work anywhere else?

3    A.  Well, after I left the U.S. Attorney's Office, I was --

4    Q.  We haven't even got to the U.S. Attorney's Office.  When

5    did you work there?

6    A.  Well, I worked there from 1978 to 1958.

7    Q.  Okay.  So from 1978 to 1985 you worked at the U.S.

8    Attorney's Office.  What position or title or role did you

9    have?

10   A.  Title was Assistant United States Attorney.  I was in

11   the criminal division at the beginning and then later headed

12   up the white-collar crime section.

13   Q.  So tell the jury a little bit about what an Assistant

14   U.S. Attorney in the criminal division and the one who heads

15   up the white-collar crime division does day to day in their

16   job.  What do they do?

17   A.  Well, you typically progress through.  When you first

18   start out as a new lawyer, probably prosecute we call them

19   drugs and guns.  You do drug cases and felons in possession

20   of guns and those kind of cases.  You kind of graduate up to

21   bigger -- big drug conspiracies and then you go to

22   white-collar crime, is kind of a typical progression, where

23   you do fraud, mail fraud, and that kind of stuff.  And

24   that's what I did.

25   Q.  Okay.  So I'm going to ask that you slow down a little

```
1    bit, because the court reporter -- especially when you are

2    using names of foreign countries and mountains, it's always

3    difficult.

4    A.  Sorry.

5    Q.  If you'd just slow down a little bit.

6            All right.  So did you ever have any significant

7    cases while an Assistant U.S. Attorney?

8    A.  Yes.

9    Q.  Tell the jury about one or two of those cases.

10   A.  I prosecuted in a courtroom just down the hallway here a

11   mafia case in 1982 and I convicted a mafia member who was

12   from the Kansas City Mob.  And after his conviction, I was

13   appointed by the Department of Justice to lead a grand jury

14   investigation in Kansas City that looked into the hidden

15   ownership of the Tropicana Casino in Las Vegas.

16   Q.  Okay.  You know, you said you had experience in

17   white-collar crime.  Now, a Ponzi scheme, is that

18   white-collar crime?

19   A.  Yes.

20   Q.  Okay.

21   A.  Uh-huh.

22   Q.  So let's go back to your experience in white-collar

23   crime.  While you were in charge of the criminal division or

24   as an assistant, did you have the opportunity to review

25   Suspicious Activity Reports?
```

1    A.  Yes.

2    Q.  And tell the jury about what your experience was in

3    reviewing Suspicious Activity Reports while you were with

4    the U.S. Attorney's Office.

5    A.  Well, I would get every month a stack of papers about

6    this thick (indicating), about a little over an inch thick,

7    from the FBI.  And they would gather up the Suspicious

8    Activity Reports that they had gotten from banks and they

9    would share them with me to see whether or not the United

10   States Attorney's Office was interested in any of the cases

11   that showed up in the Suspicious Activity Reports.

12   Q.  Did you ever see a Suspicious Activity Report involving

13   millions and millions of dollars?

14   A.  No.

15   Q.  Okay.  What types of Suspicious Activity Reports did you

16   see that caught your attention or what types would tend to

17   catch your attention?

18   A.  Well, back then there were a lot of -- I'd say the most

19   common things were teller thefts, which could be as low as

20   $500.  The banks would file an SAR for that.

21           There were check kites.  Check kiting was a fairly

22   common thing and if -- five to ten thousand dollars would

23   draw a Suspicious Activity Report.

24           And then embezzlements of various and sundry kinds

25   would come across the transom as well.

```
 1   Q.  Now, after you -- I think you said you left in 1985 and
 2       that's when you set up your own law firm?
 3   A.  Yes.
 4   Q.  Okay.  And then did you work for Senator David
 5       Durenberger's office for a while?
 6   A.  I did.
 7   Q.  And what was your position there?
 8   A.  I was chief of staff.
 9   Q.  And what was his role in the Senate at the time?
10   A.  At the time I joined him, which was during the Reagan
11       administration, he was chairman of the Senate Intelligence
12       Committee.
13   Q.  Okay.  All right.  So tell us a little bit about the
14       firm that you're with now.  The firm you're with now is the
15       same firm that you have been with during the entire time of
16       your trusteeship in the Petters Ponzi scheme, right?
17   A.  That's correct.
18   Q.  Okay.  So tell us the name of that law firm?
19   A.  Kelley, Wolter & Scott.
20   Q.  And approximately how many lawyers, how many employees
21       has it typically had over the last decade or so?
22   A.  Well, it has varied a fair amount.  But my partners were
23       Steve Wolter and Dan Scott, and then we had a number of
24       associates in the firm and then a number of contract lawyers
25       as well.  So we could have as many as 15, 18 lawyers at any
```

1    given time in that.

2          I also employed a lot of retired federal agents:

3    Postal inspectors, who are really good at mail fraud; FBI

4    agents and IRS Criminal Investigation Division agents, who

5    are good at follow the money.

6    Q.  So I was going to say tell the jury why -- what the

7    nature of your practice is such that you are employing

8    lawyers, investigators, accountants, forensic-type people.

9    Describe your practice, what it's been for the last couple

10   of decades.

11   A.  I would say it's about 60 percent white-collar crimes,

12   so federal crimes that occur in Minnesota and other places.

13   And then litigation generally involving fraud that's complex

14   litigation as well in civil courts.

15   Q.  Finally, before we start talking about the Petters

16   matter itself, tell the jury what, if any, significant cases

17   you have been involved in in the last few years.

18          MR. SPEHR:  Objection, Your Honor, relevance.

19          THE COURT:  Overruled.

20          MR. SPEHR:  Thank you.

21          THE WITNESS:  I think one that many Minnesotans

22   might recognize is I represented Patty and Jerry Wetterling

23   at the time that we found Jacob's body, and that was in

24   2016.

25   BY MR. ANTHONY:

1   Q.  So for those -- so Jacob Wetterling -- just briefly, who

2   was Jacob Wetterling and what happened?

3   A.  Jacob Wetterling went -- disappeared in 1989, and nobody

4   knew what had happened to him for 27 years.  And his mother,

5   Patty Wetterling, started a foundation called the Wetterling

6   Foundation that talked about missing children and stuff, and

7   she was fairly prominent.  I would say that crime was one of

8   the most iconic unsolved murders in the history of the

9   state.

10  Q.  Okay.  So you represented the parents of Jacob

11  Wetterling.  And when did that resolve itself?

12  A.  Well, in 2016 I got a call from the United States

13  Attorney, who said, Come and visit me.  I think we can do a

14  plea bargain with an individual, whose name was Danny

15  Heinrich, who was in federal prison -- or in federal jail at

16  the time for child pornography.

17          And it turns out that the United States Attorney's

18  Office had gotten some information.  Essentially, there was

19  a plea agreement in which he would plead guilty and Stearns

20  County, the state -- or division, would drop the murder

21  trial against him and then Heinrich would tell where Jacob's

22  body was.

23          And those meetings took place in my office with

24  Patty and Jerry Wetterling and the FBI and Stearns County.

25  Q.  Okay.  Did you charge the Wetterlings for that service

1    you provided?

2    A.  I did not.  That was my legacy case with them.

3    Q.  Okay.

4    A.  Pro bono.

5    Q.  Finally, did you ever represent any boards or -- in the

6    state of Minnesota?

7    A.  Yes.  I had a -- one client was the Board on Judicial

8    Standards.  That is the board which investigates complaints

9    against State Court judges; and if there's any merit to

10   them, then that board prosecutes the judges.

11   Q.  Okay.

12   A.  And I prosecuted a number of State Court judges over the

13   decade I represented that client.

14   Q.  Okay.  So let's talk about how you came to be the

15   receiver in the Petters matter, and then we'll talk about

16   how you became the trustee in the bankruptcy of the Petters

17   matter.

18             When did you first hear anything about Tom Petters

19   having problems with federal authorities?

20   A.  I was sitting in a meeting and everybody at the meeting

21   said, Holy cow, there's a hundred FBI agents out at Tom

22   Petters' place.

23   Q.  Had you heard of Tom Petters' name before then?

24   A.  Oh, yeah, I had heard his name, but I had no contact

25   with him.

1    Q.  Okay.  So you're at a meeting.  You heard what you

2    heard.  What happened then?

3    A.  Well, I had an inkling about whether I'd ever be

4    involved.  Then the next day I got a call from another

5    former Assistant United States Attorney, whose name was Jon

6    Hopeman.

7    Q.  What was his involvement?

8    A.  Jon Hopeman had been hired by Petters to represent

9    Petters, and Hopeman called me and said, Fredrikson, which

10   was the law firm here in town that had represented Petters,

11   has withdrawn, the general counsel has quit as a result of

12   the search warrant.  We need somebody to represent the

13   corporations.  And so he said, Would you come and have lunch

14   with Tom Petters and I?  And I did that.

15   Q.  So you had lunch with Mr. Petters and Jon Hopeman, his

16   lawyer.  Do you recall what day that was?

17   A.  That was -- so the search warrant was September 24th,

18   which was a Wednesday, and we had lunch on a Friday.

19   Q.  And that was the first time you met Mr. Petters?

20   A.  Yes.

21   Q.  How long did the lunch last?

22   A.  I'd say an hour and a half.

23   Q.  Tell the jury what the conversation was at that lunch

24   that furthered your involvement in the Petters situation?

25   A.  Well, Mr. Hopeman introduced me to Petters and then Jon

Kelley - Direct

1    said, Hey, we need somebody to take care of these

2    corporations.  Would you consider that, Kelley?  And, Tom,

3    would you consider hiring him?  So we did not cut a deal

4    right then, but I said I would be interested and we would

5    talk further.

6    Q.  Okay.  So after that meeting on -- I think you said it

7    was two days after the 24th.  That would have made it the

8    26th.  What happened next with respect to your involvement

9    in becoming the receiver for the Petters operations?

10   A.  The next day, Saturday morning, I was walking around

11   Lake Harriet, and --

12   Q.  With your dog?

13   A.  With my dog --

14   Q.  Okay.

15   A.  -- and my friend.

16   Q.  Okay.

17   A.  And I got a call from Assistant United States Attorney

18   Joe Dixon.

19   Q.  And what did he say?

20   A.  He said, essentially, We heard you met with Tom Petters.

21   And to be brief, he said -- asked me if I had had any

22   contact with Petters before this lunch.  And I said, No.  He

23   asked me if I had represented any of Petters' corporations

24   or anything like that.  And I said, No.  And he said, You

25   know, we have the ability to forfeit all of everything in

1    Tom Petters' portfolio.

2    Q.  What does that mean when you heard him say, we --

3    meaning the U.S. Government?

4    A.  Yes.

5    Q.  -- have the ability to forfeit, what does that mean?

6    A.  So when you commit a crime and you -- and the proceeds

7    of that crime, if you are convicted of the crime, the

8    government can essentially take those proceeds, and that can

9    be money or it can be corporations or it can be real estate

10   or anything else.

11          But if -- once you're convicted, if those are the

12   proceeds of the crime or if your crime is a high money

13   amount crime, the government can get what's called a

14   personal money judgment against you in the amount of the

15   loss of the crime and then proceed to collect that from you

16   in certain ways.

17          So Mr. Dixon said, Did you read the search

18   warrant?  Which the search warrant from the FBI had been

19   published in the newspaper.  And I read it and --

20   Q.  So when you read the search warrant, you had a pretty

21   good idea of what the government was alleging?

22   A.  Yes.  And I knew that the FBI was saying it was a

23   $3.5 billion loss.

24   Q.  Okay.  So here I am talking to Joe Dixon.  He and I know

25   what that means, and he's -- you know Mr. Dixon from the

1   U.S. Attorney's Office?

2   A.  I had tried a number of cases against Mr. Dixon.  We

3   tried them together.  And, yes, we knew each other for a

4   long time.

5           And he said, We have the ability to forfeit all

6   these things.  And he recognized -- said, You know, we'd

7   rather not forfeit everything.  Sun Country is an ongoing

8   business.  Polaroid was an ongoing business.  And,

9   essentially, if you forfeited those and that became public,

10  they'd have to stop functioning, essentially.

11  Q.  So all those travelers for Sun Country would be in some

12  foreign location and stuck there because the airline shut

13  down?

14  A.  That would be part of what would happen, if it happened.

15          So Joe Dixon said to me, essentially, If you can

16  get Tom Petters to give up control of those corporations, we

17  will refrain from forfeiting them.

18  Q.  Okay.  So this is on Saturday.  You're walking around

19  the lake.  Did you then have a conversation or a meeting

20  with Mr. Petters and his lawyer?

21  A.  Yes.

22  Q.  When did that occur?

23  A.  So let me finish the end of the conversation --

24  Q.  Sure.

25  A.  -- with Mr. Dixon.  And he said, So when will that

1    happen?  And I said, Hey, I'll call Mr. Petters and I'll

2    meet with him on Monday morning.  And Dixon said, That's a

3    lifetime away.  I need the answer today.

4    Q.  Oh, okay.  So then what happened?

5    A.  So I changed my plans for the afternoon, called

6    Mr. Hopeman, and we met with Mr. Petters at his place on

7    Lake Minnetonka.

8    Q.  And what happened in that conversation?

9    A.  Well, we sat down and I told him of my conversation with

10   Joe Dixon, and Petters kind of wanted to know how much

11   trouble he was in and --

12   Q.  What did you say?

13   A.  Well, Jon Hopeman, to my surprise, had not told him

14   about the sentencing guidelines yet.

15   Q.  Okay.  So you've got to help us there.

16   A.  Yep.

17   Q.  Jon Hopeman had not told him about the sentencing

18   guidelines yet.  Tell the jury what the sentencing

19   guidelines are.

20   A.  So for each -- if you are convicted of a crime in

21   federal court, there's --

22   Q.  Slowly, please, for the court reporter.

23            THE WITNESS:  Apologize.

24   A.  If you are convicted of a crime in federal court, there

25   is a set of guidelines that determine what your probable

1    sentence would be recommended to the judge, and it depends.

2              One of the big things in a fraud case is what is

3    the loss.  And the highest number in the federal sentencing

4    guidelines at the time, I think, was 550 million.  And

5    here's Tom Petters at 3.5 billion.

6              And I told him, I said, I've only taken a quick

7    look at the sentencing guidelines, Mr. Petters, but I

8    believe your guidelines would be in the life in prison

9    without a chance for parole.

10   Q.  So --

11   A.  And Mr. Petters, the blood drained out of his face and

12   he kind of sat back in his chair and he said, Okay.  What

13   can we do about it?  And I said, If you want to save the

14   people that worked for you, give up control of your

15   corporation so it doesn't get forfeited.  And he tentatively

16   agreed to it then.

17   Q.  Okay.  So how do you come into the picture?  He's faced

18   with the sentencing guidelines, life in jail.  He's

19   represented by a lawyer.  What are you supposed to do at

20   that point?

21   A.  Well, he had originally talked to me about -- and Jon

22   Hopeman had -- about representing the corporations.  And so

23   what Joe Dixon had said is:  If you'll give up control of

24   the corporations, then we won't forfeit them.

25              So I said to Tom Petters, If you are willing to

1    give that up, maybe we can save them.  And he said he would

2    do that and put me in control.

3    Q.  Okay.  So when did you -- so he agreed to put you in

4    control to save the corporations.  Did you then report back

5    to the U.S. Attorney's Office, Mr. Dixon, that Mr. Petters

6    was willing to give up control of the companies to you?

7    A.  Yes.

8    Q.  And when did you do that?

9    A.  I did that after the meeting when I was driving home.

10   Q.  Okay.  So what happened next with respect to your

11   becoming the receiver of the Tom Petters companies?

12   A.  So my recollection is on Sunday morning I went down to

13   the United States Attorney's Office with my partner, and we

14   met with the folks down there and talked about how this

15   would proceed, what they wanted to have in terms of

16   documentation and so forth.

17   Q.  When you say "they wanted to have," you mean the

18   U.S. Attorney's Office, the government?

19   A.  The U.S.'s Attorney, yeah.

20   Q.  What did the government want?

21   A.  They wanted to have some writing that would show that

22   Petters was truly giving up control and that he couldn't go

23   back on it.

24   Q.  Okay.

25   A.  And so we talked about what form that would be.  Didn't

Kelley - Direct

1   come up with an exact answer right then but had said, okay,

2   what are we going to do.

3           And then in the afternoon after that meeting I

4   went out and met with Jon Hopeman and Tom Petters, and I

5   think I had the Lindquist & Vennum lawyer with me.  And we

6   went out to the headquarters out at 4400 Baker Road and met

7   in Petters' office.

8   Q.  So was this on a Monday?

9   A.  No.  Sunday afternoon.

10  Q.  All right.  So -- and at that point did Mr. Petters

11  agree to turn over control of the companies to you to meet

12  the concerns raised by the U.S. Attorney's Office?

13  A.  Yes.

14  Q.  Okay.  So are you in discussions with the

15  U.S. Attorney's Office at this time?

16  A.  Continuously.

17  Q.  Okay.  So what happens the next day, which is Monday,

18  you know, four days after the raid, with respect to you

19  becoming more involved in the Petters companies?

20  A.  Well, Petters had cleaned out his desk on Sunday

21  afternoon and agreed to leave.  And then we scheduled a

22  meeting for first thing Monday morning at Baker Road,

23  where --

24  Q.  When you say "we scheduled a meeting," who are we

25  talking about?

1    A.  It would be Tom Petters, myself, and the people in his

2    company.  And I informed the United States Attorney's Office

3    that we were going to do that.

4    Q.  And so did you have the meeting?

5    A.  The meeting -- well, I had a meeting on Sunday night

6    with the government.  We talked about how we were going to

7    go forward.

8         And then on Monday morning, I met with the

9    employees, probably, I don't know, maybe 100 employees, and

10   I think it was in the basement of the headquarters.  Tom

11   Petters was there, and he tearfully resigned and said, I'm

12   turning over the business to Mr. Kelley and symbolically

13   walked out of the room then.

14        And I basically told the employees, I will do what

15   I can to keep the businesses running and to make sure that

16   things will be done in an orderly fashion.  You need to know

17   we're going to cooperate with the feds.  But if we do,

18   hopefully we can keep these businesses going.

19   Q.  When you say "cooperate with the feds," who do you mean

20   when you say "the feds"?

21   A.  I mean the United States Attorney's Office and the FBI,

22   the IRS, and the postal inspectors.

23   Q.  Okay.  Now, at some point the Federal Court gets

24   involved.  When does that happen?

25   A.  Well, later in that week -- the week would end on

1    September 30th, and then I think Friday was like

2    October 3rd.  Sometimes during that week, down in Chicago --

3    Q.  Are you the receiver at this point?  Had you been

4    appointed?

5    A.  No, I am not the receiver.

6         Down in Chicago one of the creditors, who lived in

7    Illinois, went to a Cook County State Court judge and got a

8    receivership appointed about Petters Company, Inc.

9         And so I heard about that and I told the United

10   States Attorney's Office here, and they were determined that

11   this case should be venued in Minnesota and they should have

12   control of it.

13        And so then they decided to get a temporary

14   restraining order, and they went to Judge Ann Montgomery and

15   I think she signed that on October 3rd, which was the Friday

16   of that week, I believe.

17   Q.  Okay.  So now -- federal Judge Ann Montgomery, she's a

18   United States District Court judge in Minneapolis?

19   A.  Correct.

20   Q.  Okay.  And she's also a former U.S. Attorney, right?

21   A.  Assistant United States Attorney, yes.

22   Q.  Assistant, okay.

23        So when the U.S. Attorney's Office gets an

24   injunction, what happens?  Are you also made a receiver at

25   the time?

1    A.  Well, on Friday the judge signed the temporary

2    restraining order.  And then the government decided to make

3    a motion as well to get a receiver appointed, and that

4    motion was heard in front of Judge Montgomery on the

5    following Monday morning.

6    Q.  Okay.

7    A.  Tom Petters was arrested that Friday, October 3rd, and

8    put in the slammer.

9    Q.  Okay.  And so October 3rd he goes into jail.  On Friday,

10   on the 6th, Judge Montgomery issues a receivership order; is

11   that right?

12   A.  Correct.

13   Q.  And --

14   A.  I met with her in the morning, along with Joe Dixon and

15   Jon Hopeman, so all parties were there.  And the judge

16   questioned me.

17   Q.  Okay.  About what?

18   A.  She wanted to know and she wanted to make sure that I

19   had no involvement with Tom Petters in the past before --

20   and I told her, I said, I met him for lunch on the 26th of

21   September and he's -- he was going to relinquish the

22   property -- or all of his properties to us.  And she said, I

23   just want to make sure you had nothing to do with him

24   beforehand.  And I said, Absolutely nothing.

25           And so both the government and Petters recommended

Kelley - Direct

1    me.  I think the government submitted three names to the

2    judge, and she decided to appoint me.

3    Q.  Okay.  Now, when you -- so you first become -- you

4    become a receiver.  And do you recall the day, roughly, you

5    became a receiver?  Was that on the 6th?

6    A.  Monday, October 6th.

7    Q.  Okay.  And what did you know generally about this

8    massive fraud that had taken place with Tom Petters when you

9    first became a receiver?

10   A.  Well, as I had mentioned earlier, I read the search

11   warrant affidavit that goes along with the Complaint that

12   was used to search his place and then also to arrest

13   Petters, and that was quite a long document and it

14   delineated the fraud in great detail and said that there was

15   a $3.5 billion loss.  So that's what I knew.

16   Q.  All right.  So now you're the receiver.  And what did

17   you understand your job was as receiver of, let's call it,

18   the Tom Petters operations?

19   A.  So first I think we should explain to the jury that

20   what -- a receiver is an arm of the court.

21   Q.  Okay.

22   A.  I work for the judge.  But different than almost every

23   other legal proceeding, where you don't go visit a judge

24   unless you have both parties together, as the receiver I was

25   allowed to and did go talk to the judge consistently about

1    decisions that were being made.

2    Q.  Did she have to approve all significant decisions you

3    made?

4    A.  Yes.

5    Q.  How did that work, that whatever you did as receiver she

6    had to approve?  And why is it done that way?

7    A.  Well, because everything -- there's not a penny that's

8    expended that doesn't have a court order, essentially.  And

9    so if you are going to do -- you know, you don't go say, I'm

10   going to write a check for $10.  But you do say, Hey -- one

11   of the early, early decisions had to do with Sun Country

12   Airlines.

13          In the fall of 2008 Sun Country always has to

14   borrow money in the fall to keep going because it's a low

15   time for them.  They needed a $5 million loan.  And, of

16   course, since Tom Petters owned them, there was no way any

17   bank was going to give them a loan.

18          So the president of Sun Country, Stan Gadek was

19   his name, came to visit me and said, We need this or we're

20   going to go under.  And that's a decision -- I went to the

21   judge and said, Judge, this is an iffy thing.  I have

22   consulted with some consulting experts who say, What?

23   You're going to lend money to an airlines in the

24   financial -- middle of the financial crisis?

25          And Judge Montgomery said, What are you -- what do

1    you want to do?  What do you think is wise business-wise?

2    And I said, I've got a lot of confidence in Sun Country.  I

3    think we should lend them the money.

4              So we did.  Sun Country survived.  And the judge

5    was a part of that decision.  And that was sort of typical

6    of the kinds of decisions which I would talk to her about.

7    I think we saved 750 jobs when we did that.  Sun Country is

8    alive and well today.

9    Q.  So when the judge issued the temporary restraining order

10   and appointed you as receiver, did she issue an order with

11   respect to preserving documents and records?

12   A.  Yes.

13   Q.  And I think we saw that order in this case, and I'm not

14   going to put it back up again, but tell the jury the

15   importance in the business you were in of being receiver to

16   having an order from a Federal Court judge that said you

17   can't destroy documents, you must preserve all documents.

18   A.  It was critically important that that order come out.

19   We were scrambling to try to figure out where all the money

20   had gone, and so we were trying to put together the records.

21   And we knew then that the Ponzi scheme had been going on for

22   13 years, so trying to go back and find documents that were

23   13 years old was really a hard job.

24             But so I think the United States Attorney's Office

25   publicized the order, which required -- anybody that had

1    anything to do with Petters or Petters' businesses or

2    Petters' banks or anything like that was told you need to

3    preserve all records with regard to Tom Petters.

4    Q.  Okay.  So tell the jury the first steps you took as the

5    court-appointed receiver.  What did the judge tell you your

6    job was as receiver?

7    A.  In simple terms, I was to gather up all of the property

8    of Tom Petters, monetize it -- that means get it ready to be

9    sold or whatever it took -- and to maximize the value of

10   that.  And then that would be paid back to creditors and

11   others, people who had lost money from Petters.

12   Q.  Did you do that all by yourself or did you have to hire

13   some people to help you?

14   A.  No way I could do that all by myself.  Yes, I hired

15   professionals.

16         I hired the law firm of Lindquist & Vennum, which

17   had bankruptcy lawyers.  It had -- a full service law firm

18   in the Twin Cities that could do a lot of things.  It helped

19   me with real estate to be sold and all the other issues.

20         And a very critical thing was I hired accountants.

21   I needed accountants terribly because we didn't know where

22   all the money had gone.  And Tom Petters had many different

23   corporations, and so we had to find out which corporations

24   or which people had gotten more money out from Petters than

25   had -- than they had put in and which people had lost money.

```
 1              And the reason it was so important to find out who
 2      were the net winners, that is, got more money out than they
 3      had put in, was because we had two years to file lawsuits
 4      against those people under the bankruptcy rules, two years
 5      to file the clawbacks.
 6      Q.  So that meant you had to take action quickly?
 7      A.  Yes.
 8      Q.  So did you hire -- did you interview and hire an
 9      accounting firm that knew what it was doing?
10      A.  I did.
11      Q.  Who did you hire?
12      A.  We interviewed a number of big firms.  And I was
13      impressed by PricewaterhouseCoopers and I had an instant
14      rapport with the partner that had come from New York, who
15      had a very extensive background in forensic accounting and
16      had been involved in a number of big, important cases.  He
17      and I hit it off and --
18      Q.  Was that Zack Kiefer, the young man we saw here today,
19      or --
20      A.  No.  Zack -- I don't think Zack was -- well, he was an
21      intern then.  The person who I hit it off with was Ted
22      Martens.
23      Q.  Is Mr. Martens in the courtroom?
24      A.  Yes.
25              MR. ANTHONY:  Mr. Martens, I think you raised your
```

1    hand before.  You're back there in the corner.

2            THE WITNESS:  Mr. Martens is a vet.

3    BY MR. ANTHONY:

4    Q.  Tell us about Mr. Martens and why you hired him.

5    A.  As I mentioned, because he had --

6            MR. SPEHR:  Objection, relevance.

7            THE COURT:  I didn't hear you.

8            MR. SPEHR:  I said objection, relevance as to the

9    reason why Mr. Martens was hired by the trustee.

10           THE COURT:  Overruled.

11           THE WITNESS:  I think we needed a big accounting

12   firm because it was going to take a lot of manpower, and Ted

13   had a lot of experience doing these kinds of complicated

14   things and I just had a lot of confidence in him personally.

15   So I hired PricewaterhouseCoopers.

16           And right off the bat we met with the government,

17   and the goal was -- I said, we need to know who the net

18   winners are so we can sue them.  And that's what they

19   started doing.

20   BY MR. ANTHONY:

21   Q.  Okay.  So tell the jury a little bit about the various

22   businesses that came under your jurisdiction as receiver.

23   A.  Well, there were two entities.  One was PCI that you

24   have heard about testified here and it's the subject of this

25   lawsuit.  And the other one was Petters Group Worldwide.

1    Petters Group Worldwide had a whole bunch of

2  companies underneath it, and that's where Polaroid was and

3  that's where -- Sun Country was separate in an aviation

4  part.  But Polaroid and then there were a number of other

5  companies that were in -- under that umbrella.

6    So the receivership included those two companies

7  and any of the subsidiaries that were under them, or

8  affiliates.

9  Q.  Okay.  So your job was to untangle the Petters Ponzi

10  scheme.  What were your initial impressions with respect to

11  the Petters Ponzi scheme?  Was it simple or complex?

12    MR. SPEHR:  Objection, Your Honor, relevance.

13  He's not here as an expert.

14    THE COURT:  Overruled.

15    MR. SPEHR:  Thank you.

16    THE WITNESS:  The org chart was complicated.  The

17  scheme was simple.

18  BY MR. ANTHONY:

19  Q.  Okay.  What was the scheme?

20  A.  The scheme was to get people to invest money and Petters

21  would pay off -- every one of Petters' businesses was

22  losing money, and they were losing money from the beginning

23  almost.  And so Petters would get money in, and he would go

24  out in these money-losing efforts and pretty soon he was in

25  debt like crazy.

1      And the new investors would be lied to.  They

2  would be told we're going to buy TVs and you'll get an

3  interest in the TVs.  And instead he would use the new money

4  to pay off the old investors whose notes had come due.

5      And -- pretty simple.  Named after Ponzi, who was

6  a famous guy who was doing this --

7  Q.  How long had the Ponzi scheme idea been around?

8  A.  Well, Ponzi was a guy who was convicted in Boston during

9  World War I for buying war bonds and doing other things.  So

10  the Ponzi schemes had been around for a while.

11  Q.  Okay.  So we've heard some testimony about Petters

12  buying electronics or purporting to buy electronics.  What

13  did you discover he was doing with the money as opposed to

14  buying electronics with it?

15  A.  Well, he was using some of it personally in a very

16  lavish lifestyle and then, as I mentioned, he was using it

17  to pay off old investors.

18  Q.  Okay.  Now, at some point, as receiver, you made a

19  decision to put PCI and other Petters companies into

20  bankruptcy; is that correct?

21  A.  Yes.

22  Q.  How long after you were appointed receiver and had been

23  functioning as receiver was it before you put PCI into

24  bankruptcy?

25  A.  I don't remember the exact date, but I think it was

1    within a week or ten days of the date that I was appointed

2    receiver.

3    Q.  Let's discuss your reasons for doing that.  Why did you

4    put PCI into bankruptcy?

5    A.  Well, the first thing that happened, as soon as people

6    heard that the search warrant had been executed, people

7    started suing Petters companies all over the country.  And

8    I'd get a call and somebody would say, You have to be in

9    New York court first thing tomorrow morning.  There's going

10   to be a TRO hearing.  And then I'd get one in San Francisco

11   and one in Chicago.

12          So one of the things that bankruptcy does is it

13   stops all other lawsuits and everything has to come to the

14   place where the bankrupt company has been put into

15   bankruptcy.

16          So that stay on lawsuits was really important to

17   us, and it also consolidated things here so we didn't have

18   to spend money hiring lawyers in all these different states

19   and defending them there.

20   Q.  And you had professional advice when you made that

21   decision?

22   A.  Yes.

23   Q.  And did you have to get approval from the federal

24   District Court when you made that decision?

25   A.  Yes.

1    Q.  Okay.  So you get professional advice as to what should

2    be done with the company, your recommendation is it go into

3    bankruptcy, and then you run it by the federal judge, who

4    then has to approve it, correct?

5    A.  I did then, yes, yeah.

6    Q.  Okay.  So you were approved -- so the Federal Court

7    approved you putting PCI into bankruptcy?

8    A.  Yes.

9    Q.  Okay.  And -- now, once you put a company into

10   bankruptcy, even if you are the receiver, does that mean you

11   automatically become the trustee?

12   A.  No.

13   Q.  What has to happen before you, who just put the company

14   into bankruptcy, can become the trustee?

15   A.  Well, there was quite a big fight about that.  And in

16   order to be a trustee, the U.S. Trustee's Office --

17   Q.  Tell the jury what the U.S. Trustee's Office -- we heard

18   about the Assistant U.S. Attorney's Office.  We heard about

19   the Federal Court.  What's the U.S. Trustee's Office?

20   A.  I was just about to do that.

21   Q.  Oh, yeah.

22   A.  It is an arm of the Department of Justice, and they

23   screen people to be trustees.  You have to be on a list and

24   so forth.

25          And as I had told Judge Montgomery, I had not been

1    in Bankruptcy Court a day in my life as a lawyer.  She

2    basically said, That's okay.  You know criminal law.  You

3    know forfeiture.  You know civil law.  You can hire

4    bankruptcy lawyers and they will help you.

5            So the bankruptcy lawyers helped and they decided

6    that it would have been kind of crazy to have somebody

7    different as a trustee than the receiver because we'd be

8    trying to do the same things and tripping all over each

9    other.  So the United States Trustee's Office decided to

10   nominate me as trustee, and they did.

11   Q.  Okay.  So you were nominated.  Does the Bankruptcy

12   Court -- is there a Bankruptcy Court judge who then has to

13   approve it?

14   A.  Yes.

15   Q.  So the Federal Court judge approves you being receiver

16   and then the Bankruptcy Court judge approves you becoming

17   trustee?

18   A.  True, yes.

19   Q.  Okay.

20   A.  And there was quite a fight about that.

21   Q.  Okay.  All right.

22   A.  A lot of the creditors did not want it, so we had a

23   battle about that and it went to court and we had hearings

24   on it.

25   Q.  Okay.  So now you're wearing two hats, one a receiver

Kelley - Direct

1    hat and one a trustee hat.  Explain to the jury how those

2    positions differed and how you were fulfilling -- did you

3    continue to fulfill both receivership position and trustee

4    position for a number of years?

5    A.  Yes.

6    Q.  Okay.  Explain how wearing these two hats, you had to

7    coordinate those activities.  What did you do as receiver

8    and what did you do as trustee for PCI?

9    A.  So one part that we haven't talked about much, though,

10   is I was named receiver for PCI and PGW, but also for Tom

11   Petters, Deanna Coleman, Bob White, Jim Wehmhoff, and Catain

12   is the last --

13   Q.  Michael Catain?

14   A.  Michael Catain.

15   Q.  Tell the jury about what that meant when you are

16   receiver for all these different people or entities, what

17   you have to do.

18   A.  So the first thing we had to do was to try to keep the

19   people -- and a number of those folks pled guilty early on.

20   Tom Petters didn't, but a number of them pled guilty.

21            And we were trying to gather up their assets, and

22   that took a couple of years and that meant chasing down

23   Ferraris in Los Angeles and Bentleys all over the country

24   that people owned; real estate, real estate all over the

25   world, real estate in the Caymans, Florida, Switzerland, all

Kelley - Direct                                                    1918

1    kinds of different places.

2    Q.  Just so I understand it, so Petters, Coleman, White,

3    Catain, Wehmhoff, they have assets located throughout the

4    world, like houses, cars, fancy cars.  And your job as

5    receiver is to do what?

6    A.  Well, I've got to take control of all their property.

7    And, of course, they weren't too happy about it and weren't

8    always cooperative, so -- and that's where the former

9    federal agents that I had hired, the FBI and IRS CID guys,

10   were really great at tracking down the money and tracking

11   down the titles and that kind of stuff.  And so that was

12   going on in the receivership, and I'd say that took a lot of

13   time and we collected a lot of money doing that.

14           Meanwhile, then, in bankruptcy -- so the

15   bankruptcy thing started and we started to go through the

16   process there.  So we had to figure out and file our

17   lawsuits and do that.  And that process proceeded at pace.

18           That was controlled by Judge -- Bankruptcy Judge

19   Kishel, who is in this building here on a different floor;

20   whereas, the receivership was in Minneapolis with Judge Ann

21   Montgomery.

22   Q.  So when you did something as trustee of significance, an

23   important decision as trustee, did that have to get approved

24   by Judge Kishel, the bankruptcy judge here in St. Paul?

25   A.  Yes.  You could make -- so in a Chapter 11 bankruptcy

1    that you are running a business, so you have a Polaroid

2    going, you don't have to go to the judge for every check

3    for --

4    Q.  Can you slow down just a little bit?

5    A.  Sorry.

6            THE COURT REPORTER:  You're giving me a workout.

7    BY MR. ANTHONY:

8    Q.  When she smiles, that's a good sign that she wants you

9    to slow down.  So I don't mean to be rude, Mr. Kelley, but

10   I'm going to try to slow you down.  I know it's hard, but do

11   your best.  Okay.

12           MR. SPEHR:  I'll just make my relevance objection

13   again, 403, Your Honor.  This is -- I've made my objection.

14           THE COURT:  Overruled.

15           MR. SPEHR:  Thank you.

16   BY MR. ANTHONY:

17   Q.  All right.  Go ahead.

18   A.  I forgot the question, Mr. Anthony.

19   Q.  Okay.  You were talking about what you were doing as

20   receiver to gather up assets and things of that nature.

21   Does that help you?

22   A.  I think you were transitioning to what's going on in the

23   bankruptcy?

24   Q.  Right.  And I said:  Did you have to get approval from

25   Judge Kishel?  And you did that?

1    A.  Yes.  So you don't have to have approval for every

2    single decision.  So every payroll in Polaroid, if it's in

3    the normal course of business, that's fine.  But when you

4    are going to make a significant decision, like settle a case

5    or, you know, a number of those kinds of decisions, those

6    have to be done.  And if you are going to pay people, pay

7    professionals and others, those all have to be approved by

8    the judge, every penny.

9    Q.  All right.  And did you follow that process with respect

10   to everything you did in the Bankruptcy Court, everything

11   you did that needed to be approved was approved?

12   A.  Yes.

13   Q.  All right.  So you mentioned part of the job was

14   determining net winners and losers, and I want to ask you to

15   talk to the jury a little bit about that.

16        Why was it important for you, as bankruptcy

17   trustee, to determine what you called net winners and

18   losers?  So tell the jury what net winners are and then what

19   net losers are as you're using that term.

20        MR. SPEHR:  In what -- objection, relevance.  In

21   context, Your Honor, I'm not sure what --

22        THE COURT:  Sustained.

23        MR. SPEHR:  Thank you.

24   BY MR. ANTHONY:

25   Q.  Okay.  You mentioned that some -- you started some

1    lawsuits to recover money from people who had made money.

2    Do you recall that?

3    A.  Yes.

4    Q.  And were those the net winners?

5    A.  Yes.

6    Q.  Okay.  So tell the jury what you meant when you used the

7    term "net winner."

8    A.  So if you loaned Petters $1 million and you were going

9    to charge him 20 percent interest, if he paid your principal

10   back, that million dollars, and paid you the interest, so he

11   would pay you back 1,020,000 [sic], and then you stop doing

12   business with Petters, they would be a net winner to the

13   tune of the 20 percent interest that they received.

14   Q.  Right.  So if it was a $1 million loan and they got

15   20 percent interest, that's $200,000, right?

16   A.  Yep.

17   Q.  And so the $200,000 would make them net winners?

18   A.  Correct.

19   Q.  Okay.  And so why were you trying to get money back from

20   the net winners?

21   A.  So frequently in Ponzi schemes --

22            MR. SPEHR:  Objection, Your Honor, relevance.  It

23   also calls for, I think, a legal conclusion or at least

24   that's implicit in the question.

25            THE COURT:  Overruled.

```
 1                 MR. SPEHR:  Thank you.

 2                 THE WITNESS:  In a Ponzi scheme, typically -- and

 3      this one had supposedly gone on for 13 years -- people who

 4      got in and out early, when they were overall done they got

 5      100 percent, they got all their principal back and they got

 6      all their profits.  And some people had hundreds of millions

 7      of dollars of profit.

 8                 But if you were at the end of the Ponzi scheme and

 9      you invested money, and when things stopped you didn't get

10      any of your principal back and you didn't get any of your

11      interest back, you were a net loser.

12      BY MR. ANTHONY:

13      Q.  And why couldn't you leave people where you found them?

14      Why did you have to go after the net winners?

15      A.  The law is that the net winners have to give their

16      profits back and those are distributed then to the net

17      losers.  And so that's the game that we were playing.

18      Q.  Okay.  And so tell the jury what Mr. Martens' role was

19      in identifying the flow of funds in the trustee --

20                 THE COURT:  Counsel, let's have sidebar.

21            (At sidebar)

22                 MR. SPEHR:  This is just so far afield.  I mean, I

23      think some of this is interesting for the jury in terms of

24      what he did as a trustee or a receiver, but this is going

25      beyond that.  He's talking about what Mr. Martens is doing.
```

1      He's an expert here.  He's going to testify.

2                Am I speaking loudly enough?

3                COURT REPORTER:  Just a little bit more.

4                MR. SPEHR:  Okay.  I'm sorry.

5                Now he's going into what Mr. Martens did.  He

6      tried to talk about his relationship with Mr. Martens.

7      Mr. Martens is an expert.  He's going to testify here.  He's

8      going to be cross-examined.

9                I'm not sure what the relevance of any of this and

10     I have been, I hope, very judicious in my objections, but

11     I'd just like to get to the point.  I've got a very short

12     cross-examination for the witness.  It's going to be well

13     less than an hour, maybe less than 45 minutes.

14               And I think we're building him -- he's building

15     him as this incredibly credible person, and that's fine, I'm

16     sure he is, but it's not relevant to the issues in this

17     case.

18               MR. ANTHONY:  The net losers and the net

19     winners -- the net winners and the net losers are the heart

20     of the case.  That's why this lawsuit is here.  He's

21     explaining that he had to go figure out who the net winners

22     are, get the money back from them to give it to the net

23     losers.  And he's going to talk about how the net losers are

24     the ones that are going to be the beneficiaries of all of

25     his activity here.

1  MR. SPEHR:  Which is exactly what Martens is going

2  to testify about.  It's the entirety of his damages

3  analysis, calculating the net cash losers.  We have an

4  expert.  It is not Mr. Kelley and just he's -- it's creating

5  an aura of credibility around this that this is for Martens

6  to handle, not Mr. Kelley.

7  THE COURT:  Well, first of all, I understand your

8  objection.  There is a need to ask questions and have the

9  witness answer those questions --

10  MR. ANTHONY:  Okay.

11  THE COURT:  -- and not to testify in a narrative

12  manner.

13  MR. ANTHONY:  I'm trying to stop him.  I'm trying.

14  THE COURT:  Well, you need to maybe instruct him.

15  MR. ANTHONY:  I will be better.

16  THE COURT:  I will ask him as well or tell him.

17  I think the other point is by you questioning him,

18  there can be the opportunity to direct the testimony.  This

19  narrative form is creating the basis for the objection.

20  MR. SPEHR:  Yes, Your Honor.

21  MR. ANTHONY:  That's a fair observation.

22  THE COURT:  The objection is sustained.  You are

23  directed to engage in direct examination, question and

24  answer, not inviting narratives.

25  MR. ANTHONY:  I understand.  Thank you.

```
 1                THE COURT:  Do you need to confer with your client

 2      or your witness?

 3                MR. ANTHONY:  I would like to do that because -- I

 4      would like to do that because --

 5                THE COURT:  I asked if he needs to confer with his

 6      witness.  Do you have any --

 7                MR. SPEHR:  I have no objection to that.  Let's

 8      just get to the point.  We talked about this before --

 9                MR. ANTHONY:  Yeah.

10                MR. SPEHR:  -- the witness was put on.  We can do

11      him very quickly.  This is creating an aura, a sense that's

12      just not relevant to the facts of this case.

13                MR. ANTHONY:  I would welcome the opportunity to

14      tell my client to let me ask the questions.

15                THE COURT:  Well, you know what I think I will do?

16      I will do that.  Therefore, there's no -- it will be in open

17      court.  I will instruct the witness to allow his counsel to

18      ask the question and to answer the question asked.

19                MR. SPEHR:  Thank you, Your Honor.

20                MR. ANTHONY:  Okay.

21           (In open court)

22                THE COURT:  The Court will direct counsel to

23      engage in direct examination, asking a question of the

24      witness, and allowing the witness to answer to avoid

25      narrative responses --
```

Kelley - Direct

```
 1                   MR. ANTHONY:  Thank you, Your Honor.

 2                   THE COURT:  -- and testimony.

 3      BY MR. ANTHONY:

 4      Q.  All right.  Mr. Kelley, when we broke you were talking

 5      about identifying net winners and net losers, and then we

 6      talked about your hiring Mr. Martens to do some

 7      calculations.  Do you remember?  Let's go back to that.

 8                   On whose behalf are you bringing this lawsuit?

 9      A.  Well, as the trustee.  The lawsuit here is on behalf of

10      the BMO Harris Trust, Liquidating Trust.

11      Q.  If there is any money collected as a result of that

12      lawsuit, how is it to be distributed?

13      A.  It will be distributed pursuant to the bankruptcy order

14      in the bankruptcy case.

15      Q.  And the -- tell the jury about that bankruptcy order.

16      Is it an order issued by the bankruptcy judge based on a

17      petition --

18                   THE COURT:  Counsel?

19                   MR. SPEHR:  Objection, Your Honor.  Thank you.

20                   THE COURT:  Sustained.

21      BY MR. ANTHONY:

22      Q.  Tell the jury about the bankruptcy order that oversees

23      what you are --

24                   THE COURT:  The objection is sustained.  Ask a

25      question.
```

```
1              MR. ANTHONY:  I will, Your Honor.

2    BY MR. ANTHONY:

3    Q.  Is there a bankruptcy judge's order in this case that

4    directs the manner in which the funds are to be distributed,

5    if any are collected?

6    A.  Yes.

7    Q.  And are you obligated to follow that order?

8    A.  I am.

9    Q.  As you understand the order that you are required to

10   follow, who will be the recipients or beneficiaries of any

11   money collected in this case?

12             MR. SPEHR:  Objection, Your Honor, legal

13   conclusion, relevance, 403.

14             THE COURT:  Overruled.

15             MR. SPEHR:  Thank you.

16             THE COURT:  You may answer.

17             THE WITNESS:  There's a schedule of the people who

18   have allowed claims, it's called, in bankruptcy.  And so the

19   jury knows, we had a plan that was confirmed in 2016, and

20   that was an agreement by the parties to come up with a

21   formula for who would get how much money.

22   Q.  Okay.  And is that --

23   A.  That has been set in stone and that's the order now.

24   And everybody gets a certain percent.  So if there's a

25   distribution, money will be distributed pursuant to that
```

1    order, which was approved by the bankruptcy judge.

2              THE COURT:  And I have -- I just want to instruct

3    the witness I have directed counsel to ask questions so that

4    we can avoid a narrative.

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  So please answer the questions.

7              MR. SPEHR:  If I may, Your Honor?  One second,

8    please.

9         (Pause)

10             MR. SPEHR:  May I approach, Your Honor?

11             THE COURT:  You may.

12        **(At sidebar)**

13             MR. SPEHR:  For years we have been trying to take

14   discovery of who the beneficiaries of the BMO Trust are,

15   what their percentage recoveries are, whether there was

16   claims trading in the BMO Litigation Trust between and among

17   so that -- the original beneficiaries, the eight investors

18   you've heard so much about in this case, are actually not

19   even in the trust any longer, are not beneficiaries of the

20   trust.

21             We've asked -- we've tried to ask questions about

22   it.  We've never been permitted.  And this witness is

23   getting on the stand and he's testifying about the

24   distributions that are going to be made and to whom they are

25   going to be made.  It's just --

Kelley - Direct

```
1                    THE COURT:  Are you saying --
2                    MR. SPEHR:  It's unfair and prejudicial to us.
3                    THE COURT:  Is it relevant?
4                    MR. SPEHR:  I don't think the question of -- I
5       think the question ultimately of who gets the money is
6       relevant, but I don't know if he's going to testify to that
7       or not testify to that.  But I can't cross on it because I
8       don't have discovery.
9                    MR. ANTHONY:  He hasn't identified anybody who is
10      going to get the money.  All he said is it's going to be
11      distributed pursuant to the bankruptcy plan and order.
12                   MR. SPEHR:  That's fine.
13                   MR. ANTHONY:  That's all I'm going to ask him.
14                   MR. SPEHR:  That wasn't the last couple questions.
15      The last couple of questions were how are the distributions
16      going to work, who is the money going to go to.  If that's
17      the question and that's the only question, that's fine.
18                   MR. ANTHONY:  Well, I don't know if it's the only
19      question because I'm trying to parse the questions in
20      accordance with your order, Judge, to keep him from doing a
21      narrative.
22                   He's not going to identify any particular
23      investors, lenders by name who are going to get money, if
24      that's your question.  He's not going to do that.  I'm not
25      going to ask him that.
```

Kelley - Direct

```
 1              THE COURT:  Well, why don't you say without
 2    addressing who will receive the money so that we can be
 3    certain that that is --
 4              MR. ANTHONY:  I'm sorry, Judge?
 5              THE COURT:  I said address -- ask the question
 6    with a preface that instructs without providing the
 7    information --
 8              MR. ANTHONY:  The names, yes.  I'll do that.
 9              THE COURT:  -- so that we can avoid your concern.
10              MR. SPEHR:  That's fine for the moment.  Thank
11    you.  We'll see where it goes.
12         (In open court.)
13              THE COURT:  And I will direct counsel to pose the
14    questions in a manner to avoid a narrative so that we have
15    true direct examination.
16              MR. ANTHONY:  Understand, Your Honor.
17    BY MR. ANTHONY:
18    Q.  Mr. Kelley, without identifying the names of any
19    entities or persons who will be receiving the money from the
20    bankruptcy plan or order, can you tell the jury whether
21    there will be any net winners receiving any money from the
22    bankruptcy plan and order.
23              MR. SPEHR:  Objection, form.
24              THE COURT:  Overruled.
25              THE WITNESS:  No net winners will participate in
```

1        the distribution.

2                MR. ANTHONY:  Your Honor, at this point we're

3        going to offer the judgment of convictions that we discussed

4        previously, and I'm going to offer those as Exhibits -- do

5        we have those numbers here?

6            (Pause)

7                MR. ANTHONY:  Pursuant to the Court's order, we're

8        going to offer Plaintiff's Exhibit 674, which is the

9        judgment and conviction of Robert White.

10               THE COURT:  I just need to confer.

11           (The Court and law clerk confer)

12               THE COURT:  You may.

13               MR. ANTHONY:  I'm waiting for counsel, whether

14       they object or not.

15               MR. SPEHR:  Oh, I thought you were going to read

16       off all of them.  No objection.

17               MR. ANTHONY:  I'll read them all off and then he

18       can respond.  We'll offer Exhibit -- Plaintiff's

19       Exhibit 676, which is the judgment and conviction of Deanna

20       Lynn Coleman.  We offer Plaintiff's Exhibit 677, which is --

21       actually, I think 677 and 676 are the same.  So I'll go to

22       679, which is the judgment and conviction of Petters

23       Company, Inc.  Then 682, which is the judgment and

24       conviction of Thomas Joseph Petters.  I think those are the

25       four.

1    MR. SPEHR:  No objection.

2    THE COURT:  And, Members of the Jury, the parties

3    have introduced into evidence the criminal convictions of

4    PCI, Thomas Petters, Deanna Coleman, and Robert White.

5    Under the Federal Rules of Evidence, evidence of a final

6    judgment of conviction can be used to prove any fact

7    essential to the judgment.

8    I am instructing you that the following facts are

9    essential to those convictions, in other words, you may

10   infer that in finding PCI, Petters, Coleman, and White

11   guilty, the following facts were admitted by those criminal

12   defendants or proven beyond a reasonable doubt:  They are:

13   Through September 2008 Thomas J. Petters was the

14   owner, director, and CEO of Petters Company, Incorporated,

15   PCI, and Deanna Coleman and Robert White were corporate

16   officers of PCI.  During that time Petters, Coleman, and

17   White used PCI to operate a criminal scheme to defraud

18   investors, also known as a Ponzi scheme.

19   Specifically, PCI obtained billions of dollars in

20   money and property based on false statements to investors

21   that PCI was purchasing consumer electronic goods from two

22   supplier companies and then selling those goods to big-box

23   retailers.

24   In connection with this scheme, Petters, Coleman,

25   and White used fake purchase orders, invoices, and other

1   documents to fraudulently induce investors to loan money to

2   PCI.

3          But rather than using the loan proceeds to

4   purchase consumer goods for sale to retailers, Petters and

5   PCI used the funds to, among other things, make lulling

6   payments to investors and to pay themselves.  In connection

7   with the fraud, Petters or his co-conspirators caused money

8   to be transferred to and from PCI's bank and accounts.

9          MR. ANTHONY:  Thank you, Your Honor.

10  BY MR. ANTHONY:

11  Q.  Now, Mr. Kelley, you caused PCI to plead guilty,

12  correct?

13  A.  Yes.

14  Q.  Did you obtain permission of any judges or courts before

15  doing so?

16  A.  Yes.

17  Q.  Which judge or court did you obtain permission from to

18  plead PCI guilty?

19  A.  Bankruptcy Court Judge Kishel.

20  Q.  Okay.  Did you plead PCI guilty pursuant to a

21  coordination agreement between PCI -- between U.S. Trustee

22  of PCI and the United States of America?

23  A.  Yes.

24  Q.  Would you turn to Exhibit 687 -- and I don't think this

25  has been admitted yet, Your Honor -- in the book before you,

Kelley - Direct

1    and tell the Court and the jury what Exhibit 687 is.

2    A.  Exhibit 687 is an agreement between myself and the

3    United States, and also I think there's another trustee in

4    there who signed.  And it delineates --

5    Q.  Okay.  Don't get into what it delineates.  Let me ask

6    you a question.

7             When did you enter into this agreement?

8    A.  August 16, 2010.

9    Q.  And you're looking at the last page of Exhibit 687?

10   A.  Correct.

11   Q.  And who are the parties whose signatures appear on this

12   agreement?

13   A.  Assistant United States Attorney Greg Brooker signed.  I

14   signed as receiver.  I signed as bankruptcy trustee for PCI.

15   And I signed as bankruptcy trustee for Petters Group

16   Worldwide.  And, lastly, John Stoebner, who was the

17   bankruptcy trustee for Polaroid, was a part of this

18   agreement.

19             MR. ANTHONY:  Plaintiff offers P-687.

20             MR. SPEHR:  No objection.

21             THE COURT:  P-687 is received.

22             MR. ANTHONY:  Would you publish this, please,

23   Ms. Ellig.

24   BY MR. ANTHONY:

25   Q.  So showing you the first page of Plaintiff 687, it's got

1    the names -- got the United States District Court up here.

2            Let's turn to page 2 and highlight the

3    "Coordination" portion at the top.  And turn to

4    the second -- the third "whereas" clause on page 2, please.

5            In this paragraph, Mr. Kelley, it says, "Whereas,"

6    and then it has a number of words, and then it says, "the

7    United States holds the statutory authority to forfeit

8    proceeds of fraud and assets involved in or traceable to

9    money laundering, including assets held by third parties,

10   and contends that said authority vests in the United States

11   the power to forfeit and seize all or substantially all of

12   the assets of PGW and PCI upon conviction for the crimes now

13   alleged."  Do you see that?

14   A.  I do.

15   Q.  And what -- in the nature of this document, what does a

16   "whereas" clause tell people who are reading the document?

17   A.  I think it's to delineate facts which people agree on

18   that lead to the agreement.

19   Q.  Okay.  Let's turn to the next page, page 3.  And what

20   would be the fifth "whereas" clause down, would you enlarge

21   that, please.

22            That says "Whereas, the United States, Kelley, as

23   the receiver and trustee, and Stoebner seek to maximize

24   recovery to victims and creditors and minimize receivership

25   and bankruptcy expenses through the coordination of their

1      respective efforts for the victims and creditors."  You

2      were -- are these "whereas" clauses typically discussed --

3      were they discussed by you with the U.S. Attorney's Office

4      before it was included in this document?

5      A.  Yes.

6      Q.  And then the next "whereas" clause, this talks about

7      and, "Whereas, the United States Attorney's Office has

8      sought to forfeit certain assets owned by individual

9      defendants and will seek to return the proceeds of those

10     forfeited assets."  Do you see that?

11     A.  I do.

12     Q.  And then the last "whereas" clause on this page says,

13     "Whereas, Kelley, as receiver, requires that this

14     Coordination Agreement be contingent upon judicial approval

15     of the agreement in the receivership action."  What are you

16     asking for there?

17     A.  Well, in the receivership action, that would be Judge

18     Montgomery, and I needed --

19     Q.  Can you pull that microphone closer to you?

20     A.  I would need to have her approval, Judge Montgomery's

21     approval.

22     Q.  Okay.  Let's look at the next paragraph on "whereas" on

23     the next page.

24             MR. ANTHONY:  Enlarge that, please.

25     BY MR. ANTHONY:

1    Q.  And this paragraph talks about your asking for

2    Bankruptcy Court approval, correct?

3    A.  Yes.

4    Q.  And did you get District Court approval and Bankruptcy

5    Court approval to enter into Exhibit 687?

6    A.  Yes.

7              MR. ANTHONY:  Okay.  So go to Bates Number

8    P687-0010 in this same document, please, Ms. Ellig.  And

9    highlight paragraph 4, please.

10   BY MR. ANTHONY:

11   Q.  It says, "In exchange for the consideration set forth

12   herein," and that sounds like legal lawyer stuff.

13   Consideration is what?

14   A.  Each side is giving up something in order to go into the

15   agreement.

16   Q.  Okay.  And it says, "In an effort to maximize

17   coordination and minimize unnecessary cost and undue delay

18   in distributions, unless otherwise agreed by Kelley, as the

19   receiver or as trustee, and the United States, the United

20   States Attorney's Office agrees it will not pursue its

21   forfeiture claims against third parties for the return of

22   corporate asset transfers, including, but not limited to,

23   the false profits or other clawback or avoidance claims,

24   including principal from purported loans or investments in

25   entities comprising the PCI estates or the PGW estate.  The

1       U.S. Attorney's Office agrees to execute releases as are

2       necessary and appropriate for the recovery of the foregoing

3       assets."  Was that an important provision to you as trustee

4       of the PCI bankruptcy estate?

5       A.  This was the most important part of this agreement.

6       Q.  Why was it the most important part?

7       A.  Because in a number of jurisdictions, the government and

8       the Bankruptcy Courts were fighting over the assets.  And,

9       for example, in the Madoff case, the federal judge forfeited

10      all of the --

11                  MR. SPEHR:  Objection, Your Honor.

12                  THE COURT:  Sustained.

13      BY MR. ANTHONY:

14      Q.  Don't go into the Madoff case.  Just say why it was

15      important to you, as trustee, that this provision be in

16      here.

17      A.  So we would not fight about who got these things.  The

18      government agreed to give up the forfeiture, would not

19      forfeit it out of the bankruptcy estate, and that was

20      extremely important to the creditors' committee and to me as

21      the trustee and receiver.

22      Q.  So explain why it was important that the government not

23      forfeit the assets.  Why was that important to the

24      bankruptcy estate?

25      A.  Because the assets would stay in the bankruptcy estate

1    to be distributed pursuant to the bankruptcy procedures.

2    Q.  Okay.  And if the assets remained in the bankruptcy

3    estate to be distributed pursuant to the bankruptcy

4    procedures, then creditors would get the money as opposed to

5    the government?  Is that what you are saying?

6            MR. SPEHR:  Object to the form.

7            THE COURT:  Sustained.

8    BY MR. ANTHONY:

9    Q.  So if the money stayed and the assets stayed in the

10   bankruptcy estate, who would receive it?  The government or

11   the creditors?

12           MR. SPEHR:  Same objection.

13           THE COURT:  Sustained.

14           MR. ANTHONY:  Your Honor, objection as to form or

15   foundation?

16           THE COURT:  Form.

17           MR. ANTHONY:  In what respect is the form lacking?

18   I think I can ask counsel that.

19           THE COURT:  It's suggesting an answer.

20   BY MR. ANTHONY:

21   Q.  Okay.  Without me suggesting an answer, who would be the

22   beneficiary of this paragraph 4?

23   A.  Well, the bankruptcy estate would.

24   Q.  And if the bankruptcy estate were the beneficiary,

25   who -- without giving us any names -- would be the

Kelley - Direct

```
1    beneficiary of that in the bankruptcy estate?

2              MR. SPEHR:  Object to the form.

3              THE COURT:  Overruled.

4              THE WITNESS:  The creditors.

5    BY MR. ANTHONY:

6    Q.  And creditors, is that a term -- what is -- what is a

7    creditor?

8    A.  A creditor is a person who is owed money by PCI or

9    others.

10   Q.  Okay.  If the government forfeited all the assets of the

11   bankruptcy estate, what, if anything, would be left for the

12   creditors?

13             MR. SPEHR:  Object to the form.

14             THE COURT:  Overruled.

15             THE WITNESS:  Well, if they took all of it, there

16   would be nothing for the creditors.

17   BY MR. ANTHONY:

18   Q.  Can you tell the jury why you pled PCI guilty.

19   A.  Yes.

20   Q.  Why?

21   A.  Because, first of all, the United States had indicted

22   PCI early on in this, and the government was insisting, in

23   this agreement, that we plead PCI guilty in order for them

24   to give up the forfeiture of the assets.

25   Q.  And is that why you did it?
```

```
 1   A.  Yes.
 2   Q.  Now, did you do anything wrong -- let me rephrase that.
 3           Did the government accuse you of doing anything
 4   wrong when you became receiver?
 5   A.  No.
 6   Q.  Did the government accuse you, when you were running
 7   PCI, of doing anything wrong when you were trustee in
 8   bankruptcy?
 9   A.  No.
10   Q.  In your capacity as trustee of the BMO Liquidating
11   Trust, you have brought this lawsuit, correct?
12   A.  Yes.
13   Q.  In your own words, tell the jury why you have brought
14   this lawsuit.
15   A.  Because my fiduciary obligation is to pursue all claims
16   that are in the trust, and so we evaluated this claim.  I
17   felt there was a good-faith basis to bring this lawsuit, and
18   so I authorized it to be brought.
19   Q.  Did you follow a process in arriving at your decision to
20   bring this lawsuit?
21   A.  Yes.
22   Q.  What process did you follow?
23   A.  I asked the lawyers that I had to -- along with the
24   forensic accountants at PwC, to analyze the financial
25   transactions at M&I Bank --
```

1   Q.  Okay.

2   A.  -- and they did that.

3   Q.  Stop there.  Did they do that?

4   A.  Yes.

5   Q.  And what -- when they did that, what information were

6   you made aware of?

7           MR. SPEHR:  Objection, hearsay, relevance, 403.

8           MR. ANTHONY:  It's nonhearsay.  It's not offered

9   for the truth.  It's offered to show his state of mind and

10  why he did what he did.

11          MR. SPEHR:  We --

12          THE COURT:  Sustained.

13  BY MR. ANTHONY:

14  Q.  What information did you have that you based your

15  decision on -- that you based the decision to move forward

16  with this lawsuit?

17          MR. SPEHR:  Same objections, Your Honor.

18          THE COURT:  Sustained.

19          MR. ANTHONY:  Is that form or foundation,

20  Your Honor?  And if it is foundation, where is --

21          THE COURT:  I'm sorry.  Overruled.

22          MR. ANTHONY:  Thank you, Your Honor.

23          THE COURT:  Thank you.  I misspoke.

24  BY MR. ANTHONY:

25  Q.  Okay.  So what did you find -- what information did you

1    get that led you to file the lawsuit?

2              MR. SPEHR:  Objection.  May I approach?

3              THE COURT:  You may.

4              MR. SPEHR:  Thank you, Your Honor.

5         **(At sidebar)**

6              MR. SPEHR:  So, he is relying entirely on the

7    advice of his counsel, advice of his accountants.  He's now

8    going to testify, I presume, that he credibly relied on all

9    this material that was provided to him and he authorized the

10   filing of this suit.  But it's way out of bounds.

11             It's -- he's not here as an expert.  He's not here

12   to talk about the facts of the case.  He's here to tell us

13   what he does as a trustee.  And you've gotten from the

14   witness already that he authorized the filing of this suit

15   and believed it was authorized in good faith.  That's fine.

16   But what he relied on, what he was told by his lawyers and

17   other advisors that caused him to file this suit I think is

18   off limits for all the reasons I said; 403, relevance, I

19   think it's hearsay.

20             MR. ANTHONY:  Your Honor, if you remember the

21   opening statement from defendant's counsel, the attacks on

22   him, on Mr. Kelley as to why he started this lawsuit and how

23   he was dredging up this thing, hindsight, after the fact,

24   bias.  I mean, he's entitled to say what facts motivated him

25   and the reasons why he started this lawsuit.  It's not going

1     to be a lengthy exposition.  It will be a very short

2     description of why he did what he did, and then they can

3     cross him on it if they want.

4              MR. SPEHR:  What's to cross him on?  Are we going

5     to get into the merits of the lawsuit?  Should I start

6     crossing him on PCI, on the transactions?  Should I cross

7     him on the investors, the multiple investor claims that he

8     sought to disallow, all the adversaries he filed against,

9     all of these investors who he's now acting as an agent for?

10    All of that stuff is -- the Court has ruled is off limits to

11    us.  And now here it is again.  It's an entirely one-sided

12    exhibition in which you put your case on and I cannot cross

13    on any of the other points as the Court has ruled that I

14    cannot.

15             MR. ANTHONY:  Okay.  That's not --

16             MR. SPEHR:  It's severely prejudicial.

17             THE COURT:  So limit your questioning to elicit

18    testimony about the scope of his role in this process

19    without addressing the details of the crimes that were

20    committed in the fraud.

21             MR. ANTHONY:  He's not going to get into the

22    crimes in the fraud, Your Honor.  He's simply going to say

23    that -- he's going to describe his -- he's the plaintiff in

24    this case.  He's entitled to describe why he brought this

25    lawsuit as trustee.  And that's all he's going to do.  It's

Kelley - Direct

 1    not going to be -- you've heard a lengthy discussion about

 2    what they are afraid he's going to say.  He's the plaintiff.

 3    The plaintiff always gets to describe why they brought the

 4    lawsuit.

 5              MR. SPEHR:  He's not --

 6              MR. ANTHONY:  Excuse me.

 7              MR. SPEHR:  I apologize.  Yes.  I apologize.

 8              MR. ANTHONY:  The plaintiff always gets to

 9    describe why they brought a lawsuit.  That's all he's going

10    to do.  He's not going to get into a lengthy discussion on

11    anything.  He's going to explain why he brought this

12    lawsuit, the reason he brought this lawsuit.  And he's

13    entitled to do that.

14              There couldn't be anything more basic or

15    fundamental in a case than letting the plaintiff explain why

16    they brought a lawsuit.  They may not want to hear why he

17    brought the lawsuit, but that's why they have

18    cross-examination.  He's entitled to explain why he brought

19    the lawsuit, the reasons why he brought the lawsuit, and

20    that's all he's going to do.

21              MR. SPEHR:  He is not a victim.  He's not a

22    personal injury victim.  He wasn't commercially injured.

23    That is your typical plaintiff that testifies about, you

24    know, what their claims are.  Everything that he knows, he

25    knows from his lawyers, advisors, consultants.  Mr. Martens

Kelley - Direct

1       is going to testify.

2               I have been barred from asking Mr. Kelley about

3       all of the other lawsuits that he's filed.  And for him to

4       testify about this lawsuit and why he filed it and why he

5       felt it was a meritorious lawsuit based upon what he was

6       told from -- by his lawyers and his consultants is severely

7       prejudicial under the rules that we're playing under, which

8       is, I can't ask him about anything else.

9               MR. ANTHONY:  Except the rules we're playing under

10      now is an opening statement where he was attacked for his

11      reasons for filing this lawsuit.  Counsel for the defendant

12      went over and over how Kelley had dredged this up and said

13      this and done this and there was no merit to it and he

14      didn't investigate it and it was after the fact.  And you --

15      you made that argument in your opening statement.  And so

16      he's entitled to a short, it's not a lengthy exposition, as

17      to why he's doing what he's doing.  And you can attack him

18      on it, and you can question whether it's meritorious.

19      He's --

20              MR. SPEHR:  So the door is now open --

21              MR. ANTHONY:  Excuse me.  Excuse me.

22              MR. SPEHR:  Oh, I thought you were finished.  I

23      apologize.

24              MR. ANTHONY:  He's not a personal injury

25      plaintiff, but the injured party is PCI, and he's the only

1    person who can speak for PCI.  He's the trustee for PCI.  If

2    he can't speak for PCI, no one can.

3              MR. SPEHR:  PCI --

4              MR. ANTHONY:  Excuse me.  PCI is the injured party

5    here.  He's the representative of the injured party.  As the

6    representative of the injured party, PCI, he's entitled to

7    say, PCI is bringing this lawsuit to recover the money that

8    it can pay back to its creditors.  He's entitled to say

9    that.  If he can't --

10             MR. SPEHR:  This is the core -- I'm sorry.  I

11   thought you were finished.

12             MR. ANTHONY:  If he can't say that, then who says

13   it for PCI?  I have no one else who can speak for PCI but

14   him as trustee.  The expert is going to talk about what he

15   discovered when he looked at the forensics.  The liability

16   expert is going to talk about what she observed.  But he is

17   the only one who can speak for PCI.  And to deprive the only

18   person who can speak for PCI from speaking seems to me to be

19   unfair.

20             MR. SPEHR:  The problem is that he is not going to

21   speak to any harm of PCI.  PCI pled guilty to fraud.  We

22   will cover that in the cross-examination.  The idea that he

23   is here speaking for a victim is just simply not the case.

24   PCI was a fraud.  It pled guilty to fraud.

25             So the idea that he's here speaking as a victim --

1    I have no problem with what I thought you were suggesting,

2    that he can talk about process, who he engaged, that he has

3    lawyers, that he has an accounting firm in PwC, no problem.

4    But when he starts to talk about what the claims are, what

5    the merits of the case are, why he thinks they are

6    meritorious and made in good faith, I think that crosses the

7    line.  I'll stop there.

8              MR. ANTHONY:  PCI is the victim.  There's no doubt

9    about that.  And he is entitled to say, as the victim, he's

10   seeking to recover the 1.976 billion that has been lost.

11   And he's also -- he can also say why he wants to do that.

12   And why you would preclude the only spokesperson from the

13   injured party from speaking is beyond me.  I know why you

14   don't want him to speak because then you want no one

15   speaking for the plaintiff.

16             THE COURT:  I am overruling the objection.  I am

17   directing you to narrowly direct this examination so that it

18   is providing information to the jury that is essential for

19   them to do their work but that is not prejudicial to the --

20   more prejudicial than probative.

21             MR. ANTHONY:  Okay.  Thank you.  I'll do that.

22        **(In open court.)**

23             MR. ANTHONY:  Your Honor, I'm going to take a

24   moment to go back and look at the last question where we

25   were at, if I may?

1   BY MR. ANTHONY:

2   Q.  When we broke, Mr. Kelley, I had asked you what

3   information did you have that led you to file this lawsuit.

4   So what information did you have that led you to file this

5   lawsuit?

6           MR. SPEHR:  Note my continuing objection.  Thank

7   you, Your Honor.

8           THE COURT:  Overruled.

9           THE WITNESS:  So the first piece of information

10  that came to me came through the forensic accountants, and

11  that evidence was presented to me.  And it showed that there

12  was a very high volume of money that went through the bank

13  account.  I think it was like 40 -- nearly $40 billion.  So

14  that was the first piece of evidence that I got from them.

15  BY MR. ANTHONY:

16  Q.  Okay.  So that was one piece of evidence -- or facts.

17  Any other facts that came to your attention?

18          MR. SPEHR:  Same objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  A question I asked was whether there

21  had been any SARs filed, and I was told there were not.

22  BY MR. ANTHONY:

23  Q.  Okay.  That's the second piece of information.  Any

24  other facts come to your attention?

25  A.  I'm sure that others were presented.

1    Q.  I'm sorry?

2    A.  I'm sure others were presented, but I don't have the

3    recollection at the time.  And obviously this is a decision

4    for the jury to make, but I -- I had a good-faith basis then

5    for saying go forth with the discovery in the case, and

6    that's what I authorized.

7    Q.  Okay.  Now, are you claiming anyone from the bank --

8    that -- let me rephrase this.

9              You were here to hear the testimony of certain

10   bank employees, correct?

11   A.  Yes.

12   Q.  Are you claiming, in your lawsuit, that any of those

13   persons who testified participated in a Ponzi scheme?

14             MR. SPEHR:  Objection, Your Honor, relevance, 403,

15   hearsay.

16             THE COURT:  Overruled.

17             THE WITNESS:  No.

18   BY MR. ANTHONY:

19   Q.  Are you claiming that any of the people who testified

20   from the bank received a bribe from anyone associated with

21   Tom Petters?

22   A.  No.

23   Q.  Are you claiming that anybody who testified got tickets

24   or food or beverages from anyone with the Petters

25   organization?

```
1    A.  No.
2    Q.  And whether they testified or not, are you claiming that
3    any M&I Bank employees took a bribe or was a participant --
4    who knew that there was a Ponzi scheme that was going on?
5    A.  No.
6    Q.  We are -- what did BMO do or didn't do in general terms
7    that you think caused losses to PCI?
8           MR. SPEHR:  Objection, all the same bases; 403,
9    relevance, hearsay.
10          THE COURT:  Overruled.
11          THE WITNESS:  I think they should have
12   investigated much more fully.  I think they should have
13   reported this to the feds.  And by that I mean by filing
14   SARs or otherwise letting people know about what was going
15   on.  And I think they should have shut down the account.
16          MR. SPEHR:  Move to strike.  I hate to ask again
17   to approach, Your Honor.  I know it's getting late.  I
18   totally apologize, but...
19          THE COURT:  You may approach.
20      (At sidebar)
21          MR. SPEHR:  I apologize.  He's got to prove his
22   case with witnesses and documents.  He's just -- he's
23   offering his own opinion about what he saw and felt or he's
24   told.  It's just not relevant.  It's severely prejudicial.
25          He spent an hour building him up as this, you
```

Kelley - Direct

1    know -- as this, you know, tremendous trustee.  John is

2    going to join us now.  And it's just -- it's just -- it's

3    not relevant to anything, and it's all hearsay.

4          MR. ANTHONY:  Your Honor, we could take him

5    through each paragraph in the complaint and have him say

6    what was alleged.  We're not doing that.  We've simply

7    summarized what his position is.

8          I have no -- I don't think I have any more

9    questions on this area.  I think that's the extent of what

10   we plan to do.  I don't think it's -- I don't think he's --

11   I don't think I went beyond the bounds of what you asked.  I

12   kept it pretty limited.  I kept his narrative short.  And I

13   think that it was an appropriate response to the objection.

14   I think it was an appropriate ruling, and I think we should

15   move on and try to finish him up.

16         THE COURT:  The objection is overruled.  You

17   should move on.

18         MR. ANTHONY:  I will.

19         THE COURT:  If you would like an instruction given

20   to the jury, you can let me know about that and we can give

21   it to them.  I will review it if you -- and determine

22   whether it should be given to the jury in the next session.

23         MR. SPEHR:  Thank you.

24         THE COURT:  Okay.

25         MR. SPEHR:  We'll caucus.  Thank you.

Kelley - Direct

```
 1          (In open court.)

 2               THE COURT:  Counsel, you may proceed.

 3               MR. ANTHONY:  Thank you.

 4     BY MR. ANTHONY:

 5     Q.  Is PCI making a claim for damages in this case?

 6     A.  Yes.

 7     Q.  And what is the amount of the claim?

 8     A.  Well, as determined by the forensic accountants, it's

 9     $1.9 billion.

10     Q.  Okay.  And by the "forensic accountants," you mean

11     Mr. Martens?

12     A.  Yes.

13               MR. ANTHONY:  Your Honor, if you'll bear with me

14     and give me a moment or two.  I think I'm just about

15     finished.

16               (Plaintiff's counsel confer.)

17               MR. ANTHONY:  I have nothing further at this time.

18     Thank you.

19               MR. SPEHR:  Thank you, Your Honor.  We do wish to

20     question the witness.

21               THE COURT:  Yes, you may.

22               MR. SPEHR:  If you can give us a moment to

23     distribute things, that would be great.

24               THE COURT:  Absolutely.

25          (Pause)
```

1    MR. SPEHR:  May we proceed?

2    THE COURT:  Yes, you may.

3                **CROSS-EXAMINATION**

4    BY MR. SPEHR:

5    Q.  Good afternoon, Mr. Kelley.

6    A.  Good afternoon.

7    Q.  The BMO Litigation Trust, for which you are the trustee,

8    is the plaintiff in this case, correct?

9    A.  That's correct.

10   Q.  And the BMO Litigation Trust, as you as trustee, is

11   asserting claims against Bank of Montreal in this case --

12   right? -- BMO Harris?

13   A.  Correct.

14   Q.  And in your capacity as trustee, I take it you would

15   agree with me that you can only bring claims for harms to

16   PCI?

17   A.  Correct.

18   Q.  So you would also agree with me, I take it, that as

19   trustee of the BMO Litigation Trust, you can't bring claims

20   on behalf of the eight hedge fund investors who claim to

21   have lost money in the PCI scheme; is that correct?

22               MR. ANTHONY:  Objection, objection, beyond the

23   scope of the agreement with respect to investors,

24   Your Honor.  May we have a sidebar on this, Your Honor?

25               MR. SPEHR:  I can respond here or approach,

1   Your Honor.

2          THE COURT:  Let's approach.

3       **(At sidebar)**

4          MR. SPEHR:  Your objection?

5          MR. ANTHONY:  My objection is it's beyond the

6   scope of what we agreed to; that you were not going to get

7   into investors, and talking about the investors is out of

8   bounds, I thought.

9          MR. SPEHR:  No, I'm not entitled to get into

10  investor complicity.  I totally agree with that.  I'm simply

11  asking him as the trustee for the BMO Litigation Trust, is

12  it the case that he does not have the ability to bring

13  claims on behalf of the investors.

14         MR. ANTHONY:  Objection, relevance because he's

15  not bringing claims on behalf of the investors.

16         MR. SPEHR:  I just want him to agree that he's not

17  bringing an investor claim here.

18         THE COURT:  Overruled.  You may ask the question.

19         MR. SPEHR:  Thank you.

20      **(In open court.)**

21  BY MR. SPEHR:

22  Q.  So let me try the question again, Mr. Kelley.

23         You would agree with me, wouldn't you, that as the

24  trustee of the BMO Litigation Trust, you can't bring claims

25  on behalf of the investors who claim to have not been repaid

1    by PCI in this case?  Do you agree with that?

2    A.  Correct.

3    Q.  So you can't bring claims for Lancelot, one of the eight

4    hedge funds, right?

5    A.  Well, in my trust, Lancelot is one of the -- the people

6    who is owed money.  So I'm not bringing it on behalf of

7    them; but in the collective group, they will be one of the

8    recipients if we recover any money.  So, I mean, there's

9    kind of a damages issue and a distribution issue.

10   Q.  We're going to come to the --

11   A.  Okay.

12   Q.  -- litigation trust in a bit.

13           My question now is that if Lancelot, as an

14   investor in PCI, came to you and -- as trustee and asked you

15   to bring a claim on behalf of Lancelot, you couldn't bring

16   that claim, correct?

17   A.  That's correct.

18           MR. ANTHONY:  Objection, repetitious, asked and

19   answered.

20           THE COURT:  Sustained.

21   BY MR. SPEHR:

22   Q.  You agree with me that you cannot bring a claim on

23   behalf of Lancelot in this case, correct?

24           MR. ANTHONY:  Objection, repetitious, asked and

25   answered.

Kelley - Cross

```
 1              THE COURT:  Sustained.  Move on, Counsel.
 2   BY MR. SPEHR:
 3   Q.  Do you agree you can't bring a claim on behalf of Palm
 4   Beach in this case?
 5              MR. ANTHONY:  Objection, relevance.
 6              THE COURT:  Overruled.
 7   BY MR. SPEHR:
 8   Q.  How about Acorn?  Can you bring a claim on behalf of
 9   Acorn in this case?
10   A.  No.
11   Q.  How about Ritchie Capital?
12   A.  No.
13   Q.  Ark Royal?
14   A.  No.
15   Q.  How about Edge One?
16   A.  No.
17   Q.  Elistone?
18   A.  No.
19   Q.  Now, we discussed -- you discussed with your counsel
20   earlier that PCI pled guilty to fraud, correct?
21   A.  Yes.
22   Q.  And you executed a plea agreement on behalf of PCI in
23   order for it to plead guilty, correct?
24   A.  Yes.
25   Q.  And prior to executing that plea agreement, you
```

1    conducted, along with Mr. Martens and PwC, an extensive

2    investigation into the Ponzi scheme, correct?

3    A.  Yes.

4    Q.  And that extensive investigation into the scheme caused

5    you to plead PCI guilty, correct?

6    A.  That was part of the cause.

7    Q.  And you pled PCI guilty because PCI was guilty of fraud,

8    correct?

9    A.  That's part of the cause.

10   Q.  And they were guilty -- and it was guilty -- I'm

11   sorry -- of mail fraud, correct?

12   A.  Yes.

13   Q.  Conspiracy to commit mail fraud, correct?

14   A.  Conspiracy to commit mail fraud and wire fraud, yes.

15   Q.  That was going to be my next question.  Also conspiracy

16   to commit mail fraud, correct?

17   A.  Yes.

18   Q.  And conspiracy to commit money laundering, correct?

19   A.  Yes.

20   Q.  I want to discuss for a couple of minutes this afternoon

21   a little bit more about the business of PCI.  Is that okay?

22   A.  Sure.

23   Q.  You've studied it extensively, correct?

24   A.  I have lived with it for a number of years now.

25   Q.  You've been at it since 2008?

1    A.  Correct.

2    Q.  You've invested an enormous amount time trying to

3    understand PCI and the scheme, correct?

4    A.  Yes.

5    Q.  And you have had various advisors along the way, such as

6    PwC and several law firms to advise you, correct?

7    A.  Correct.

8    Q.  So let me ask some questions so that kind of we're all

9    on the same page about PCI.

10             PCI was 100 percent owned by Petters, correct?

11   A.  Yes.

12   Q.  Petters was the sole shareholder of PCI, correct?

13   A.  Yes.

14   Q.  There were no other shareholders of PCI, correct?

15   A.  Yes.

16   Q.  Petters was also the sole director of PCI, right?

17   A.  I think so.

18   Q.  Is it fair to say, Mr. Kelley, that PCI was not just

19   wholly owned by Petters, but was also controlled in all

20   respect by Petters?

21   A.  Yes.

22   Q.  Is it fair to say that --

23             THE COURT REPORTER:  (Sneezes.)  Sorry.

24             THE COURT:  Bless you.

25             MR. SPEHR:  Let me try that one again.

1                    THE COURT REPORTER:  Sorry.

2                    THE WITNESS:  It's late.

3                    (Laughter.)

4    BY MR. SPEHR:

5    Q.  Is it fair to say that PCI was Petters, and Petters was

6    PCI?

7    A.  No.  I wouldn't agree with that I don't think.

8    Q.  Well, Petters was the decisionmaker, right?

9    A.  Yes.

10   Q.  He directed the action?

11   A.  Yes.

12   Q.  You don't have any basis to conclude that anybody at PCI

13   did anything other than at the direction of Tom Petters?

14   A.  I guess not.

15   Q.  Coleman took direction from Petters?

16   A.  Yes.

17   Q.  White took direction from Petters?

18   A.  Yes.

19   Q.  Now, it's also the case that PCI was insolvent by no

20   later than 1996, correct?

21   A.  Yes.

22   Q.  Is it also correct that PCI had no legitimate business

23   operations by no later than 1996?

24   A.  I don't know if that date is exactly precise, but it was

25   very early on that --

1    Q.  Mid-'90s.  Okay?

2    A.  Yeah.

3    Q.  Fair?

4    A.  That's fine.

5    Q.  Okay.

6              THE COURT:  Let's let the witness finish his

7    response --

8              MR. SPEHR:  I'm sorry.  I thought he was finished.

9              THE COURT:  -- and then you may question the

10   witness.

11   BY MR. SPEHR:

12   Q.  Fair that by the mid-'90s, PCI didn't have any

13   legitimate business any longer, if it ever did?

14   A.  Yes.

15   Q.  And you haven't identified any legitimate business

16   activity at any time for PCI, correct?

17   A.  Correct.

18   Q.  Is it also correct to say that PCI was a Ponzi scheme by

19   no later than 1995?

20   A.  I think that's fair.  Yeah.

21   Q.  And that was several years, was it not, before Petters

22   opened an account at National City Bank in 1999, correct?

23   A.  Yes.

24   Q.  Is it also fair to say that Petters, Coleman, and White,

25   at all relevant times, from the time the scheme began no

```
 1    later than the mid-'90s to September of 2008, ran the Ponzi
 2    scheme?  They were the -- they were the team leaders of the
 3    Ponzi scheme?
 4    A.  Correct.
 5    Q.  And all three served or are -- or in the case of
 6    Petters, are currently serving prison sentences, right?
 7    A.  Yes.
 8    Q.  And they are serving -- either they served or are
 9    serving in the case of Petters, prison services -- prison
10    sentences -- I'm sorry -- in -- due to their role in the PCI
11    Ponzi scheme?
12    A.  Correct.
13    Q.  So what we have here -- and you'll correct me if I
14    misstate anything -- are four convicted parties; four
15    parties convicted of executing the PCI Ponzi scheme.
16    Petters was convicted of fraud, correct?
17    A.  Yes.
18    Q.  Coleman was convicted of fraud, correct?
19    A.  Yes.
20    Q.  White was convicted of fraud, correct?
21    A.  Yes.
22    Q.  And as we've discussed, PCI was convicted of fraud,
23    correct?
24    A.  Yes.
25              THE COURT:  Counsel?
```

Kelley - Cross

```
1              MR. SPEHR:  Yes, Your Honor?

2              THE COURT:  The hour has reached.

3              MR. SPEHR:  Thank you so much.

4              THE COURT:  You're welcome.  We will resume

5     tomorrow.

6              Members of the Jury, I will instruct you today

7     that during this recess and every other recess, you must not

8     discuss this case with anyone, including the other jurors,

9     members of your family, people involved in the case or the

10    trial, or anyone else, and do not allow anyone to discuss

11    the case with you or within your hearing.

12             As you know, only you have been chosen to be

13    jurors in this case and only you have sworn to uphold the

14    law.  And no one else has been chosen to do this important

15    work.  And you should not speak among yourselves about the

16    case before you've heard all of the evidence and the case

17    has been submitted to you by me for your deliberations

18    because it may affect your final decision.

19             When I say you must not discuss this case with

20    anyone, I also mean you must not e-mail, you must not text

21    message, you must not blog or engage in any other written

22    form of communication, oral form of communication, or

23    electronic communication as I've instructed you before.

24             Also, do not read any newspaper or other written

25    account or watch any televised account or listen to any
```

1    radio program about this trial or conduct any type of

2    internet research or consult any other sources about the

3    case, about the people involved in the case, or the general

4    subject matter of this case.

5              As you know, you must keep an open mind free of

6    outside information, and only in this way will you be able

7    to decide the case fairly based solely on the testimony, the

8    evidence presented in this courtroom, and the instructions

9    on the law that I give you.  And as you know, it would be a

10   violation of your oath to base your decision on some

11   reporter's view or opinion or upon other information you

12   acquire outside the courtroom.

13             So it's very important that you follow these

14   instructions.  I know that you have been.  I just remind you

15   of the importance of you doing so and continuing to do so.

16   We will resume tomorrow at the regular time.  I hope you

17   have a good evening.  Thank you for your service.

18                         **IN OPEN COURT**

19                       **(JURY NOT PRESENT)**

20             THE COURT:  And our witness is excused for now.

21             THE WITNESS:  Thank you, Your Honor.

22             THE COURT:  And we'll see you tomorrow morning.

23   You're welcome.

24             And, Counsel, is there anything else we need to

25   address before we recess?

1               MR. GLEESON:  Yes.

2               THE COURT:  Everyone in the courtroom may be

3       seated.

4               MR. GLEESON:  Judge, I just want to take two

5       minutes to supplement the record of a motion you have before

6       you sub judice to allow BMO Harris to elicit evidence of

7       hedge fund complicity.

8               Two things bear mention at the outset.  This is

9       not a motion for a reconsideration.  We understood your

10      pretrial order.  But this is based on what we consider to be

11      a strikingly, like, abusive, unfair use of the order of

12      preclusion, and it was exacerbated again today.  And it's

13      just based on the way this -- the prosecution of these civil

14      claims have been conducted that have put us in just a -- a

15      terrible position.

16              And here's how I want to supplement it.  And this

17      is all based on the examination this morning of Chris Flynn

18      and the examination this afternoon of Mr. Kelley.

19              And, Judge, I'm just mentioning a couple of

20      vignettes.  There are a number of ways in which we believe

21      this abusive use of the order of preclusion have reared its

22      head.  So I'm just going to mention a couple.  I don't mean

23      to waive my complaints with respect to others.

24              One I want to focus the Court's attention on as it

25      considers our motion is the testimony about the transactions

1    lists that are referenced in the Deposit Account Agreements.

2    And part of the questioning by Mr. Marder of Chris Flynn was

3    the agreement -- the Deposit Account Agreement called for

4    transactions lists to be provided by PCI to M&I Bank.  And

5    the questioning went along the lines of:  You never received

6    those transactions lists, did you?  Did you make any

7    assumptions as to why?  Did you ever call PCI?  The answer

8    to that was he had no -- he didn't know why.  He didn't know

9    at the time that PCI was a billion dollars in the hole to

10   the very investors who are the claimed victims in this case.

11        And the evidence we've been precluded -- the

12   impression that was created was a false one that M&I failed

13   to police the Deposit Account Agreements, therefore, harming

14   the hedge funds who were the counter-parties with PCI to

15   those Deposit Account Agreements.

16        The evidence we've been precluded from presenting

17   shows that the transactions lists were never received

18   because the Deposit Account Agreements were never intended

19   to be implemented, never intended to protect the hedge

20   funds.  As I said, no one told Chris Flynn about the billion

21   dollars that the -- PCI owed these hedge funds.

22        And together with the hedge funds, the -- PCI

23   created these props, the Deposit Account Agreements, to keep

24   the investors in the hedge funds at bay, to keep them from

25   making capital calls.  And they not only succeeded by using

1    the Deposit Account Agreements in that way, but they

2    actually raised additional funds from those investors to put

3    into PCI.

4         So the false impression was the hedge funds needed

5    protection from PCI and M&I failed them.  That is the

6    indisputable inference that the trustee's counsel wants the

7    jury to draw.  The reality is PCI and the hedge funds were

8    deceiving the hedge funds' investors, as I say, to fend off

9    the capital calls.

10        The -- and, again, the hedge funds, throughout the

11   day, have been presented by counsel for Mr. Kelley as

12   innocent victims of M&I Bank and PCI.  When, in fact, the

13   evidence we're precluded from eliciting, but we should not

14   continue to be precluded from eliciting, would show the

15   hedge funds engaged in criminal behavior with PCI causing

16   the losses to the hedge funds.  And we respectfully submit

17   that there probably isn't any reasonable juror who could

18   conclude that PCI's inability to pay the hedge funds was

19   caused by M&I Bank.

20        And then, this afternoon, we had a number of

21   iterations of trying to maximize recovery to victims and

22   creditors, returning proceeds to victims.  The victims are

23   participants in the scheme.  We have the asymmetries, Judge,

24   now being taken unfair advantage of.  Investors were lied

25   to -- excuse me, investors lied to Mr. Kelley, he testified

1    to, but not all of them, and not the investors whose losses

2    he seeks M&I to have to pay for in this case.  They didn't

3    lie at all.  They were part of the scheme.  Some of them

4    literally knew it was a Ponzi scheme and invested more in

5    it.

6         The clawbacks, he's clawbacked -- he testified

7    about clawing back funds from net winners.  Well, we can't

8    say, Well, how much?  How many did you do that for?  Have

9    you accounted for those recoveries in the amount of damages

10   you're seeking?

11        It's -- the asymmetries, Judge, are all over the

12   lot.  And it's not the Court's fault.  I'm not complaining

13   about your pretrial ruling.  But your pretrial ruling

14   referenced the fact that there could be unfair advantage

15   taken of it; references depicting the hedge funds as

16   innocent.  They have been depicted as innocent victims all

17   over the lot in this trial, and they are not.

18        So we ask you to consider the continuing, unfair

19   advantage being taken by Mr. Kelley's counsel of your

20   Court's ruling.  And as I said yesterday, it's really hard

21   to look around and find a door that was closed having been

22   opened as wide as this one has in this case.  Thank you.

23        MR. MARDER:  Good afternoon, Your Honor.  I'll

24   address these two points separately.  The points relating to

25   the testimony of Mr. Flynn today are the exact same points

1    they unsuccessfully raised yesterday relating to the

2    testimony of Mr. Jambor.  And I'll try to avoid being

3    repetitive, but you said in your order that -- on page 21 on

4    the motion in limine, that you would allow us to inquire

5    into the DACA agreements to the extent that those agreements

6    were probative of the defendant's state of mind and to prove

7    that they were a sham.

8              As I did with Mr. Jambor, my questions of

9    Mr. Flynn were extremely limited.  Those questions were

10   directed to his knowledge and indicated that even though

11   he -- even though he entered into these DACA agreements, he

12   knew that they were a sham and knew that there was no

13   transaction list and knew that the -- that he never complied

14   with the agreement in any way.

15             So the notion that the purpose of this testimony

16   was to say that they were supposed to keep from harming

17   investors and that they failed the investors, that was not

18   part of any of the examination of Mr. Flynn.  I never once

19   mentioned the fact that he had a duty to investors or that

20   he failed investors or anything of that nature.  Nothing of

21   that extent occurred.  All of the questioning was limited to

22   ascertaining whether, in fact, because these were sham

23   agreements, that this had something to do with a mental

24   state.

25             So I'll move on, Your Honor, because I'm being

1    duplicative of the arguments we asserted yesterday.  And

2    I'll move on to Mr. Kelley.  With respect to that testimony,

3    Mr. Gleeson said that we were discussing how there were

4    innocent victims.  Those words never crossed the lips of the

5    witness, nor did they cross the lips of Mr. Anthony, who was

6    examining the witness.

7            Rather, Your Honor, the testimony related to three

8    things that Mr. Gleeson has pointed out.  The first one,

9    Your Honor, is that the witness testified about the basis

10   for damages.  And that the basis for damages in this case

11   was the amount of money that was owed to the investor.  That

12   is true.  That's going to be in the jury instructions.

13   That's the amount of money that's owed to the investors.

14   That does not open the door to anything.  No one is claiming

15   whether investors were innocent or not.  That's simply a

16   fact that that is the measure of damages in this case and

17   that was clearly articulated and accurately articulated.

18           The second thing that was raised was that there

19   were these clawback actions.  Again, Your Honor, this has

20   absolutely nothing to do with investor complicity.  What the

21   witness described was that the trustee or the receiver was

22   entitled to collect monies back from the investors who had

23   received -- who are net winners.  And that has nothing to do

24   with the complicity or lack thereof of those investors.  It

25   simply indicates that he has the right and the obligation to

1     claw back money to any investors who receive more than they

2     put in.  So that has nothing to do with investor complicity.

3             The last thing that Mr. Gleeson mentioned was the

4     issue of where the money was going.  And it is true, and it

5     is a truism that once these monies are paid by BMO, they are

6     going to be distributed according to the bankruptcy plan.

7     And that was the extent of the testimony as well.

8             So Mr. Kelley did not open the door to anything.

9     There was never any discussion of, quote, innocent victims.

10    There was discussion of clawbacks, which has nothing to do

11    with innocent victims.  There was discussion of the basis of

12    damages, which is a truism, and the jury is going to be

13    instructed on it.  And there was a description of where the

14    money is going under the distribution plan.  So none of that

15    has opened the door to anything to do with the -- with the

16    knowledge of the investors, Your Honor.

17            THE COURT:  This is how we will address this

18    issue.  I am not going to rule from the bench today.  Both

19    parties are to submit a brief of ten pages in length, if you

20    are interested in doing so.

21            The briefing schedule will be that BMO's deadline

22    is tomorrow at noon, plaintiff's deadline is Saturday at

23    noon.  Citations to the transcript to support your arguments

24    are required.  It will be a ten-page limit.  We'll proceed

25    tomorrow.

1          MR. MARDER:  Thank you, Your Honor.

2          MR. GLEESON:  Thank you.

3          THE COURT:  All rise.

4          (Court adjourned at 5:16 p.m.)

5                         *     *     *

6          We, Lori A. Simpson and Erin D. Drost, certify that
   the foregoing is a correct transcript from the record of
7   proceedings in the above-entitled matter.

8          Certified by:  *s/ Lori A. Simpson*
                          Lori A. Simpson, RMR, CRR
9
           Certified by:  *s/ Erin D. Drost*
10                         Erin D. Drost, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25