1           UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Douglas A. Kelley, in his      )   File No. 19-cv-1756
4    capacity as the Trustee of the )          (WMW)
     BMO Litigation Trust,          )
5                                    )
              Plaintiff,             )   St. Paul, Minnesota
6                                    )   October 24, 2022
     vs.                             )   8:42 a.m.
7                                    )
     BMO Harris Bank N.A., as        )
8    successor to M&I Marshall and   )
     Ilsley Bank,                    )
9                                    )
              Defendant.             )
10   ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE WILHELMINA M. WRIGHT
             UNITED STATES DISTRICT COURT JUDGE
14

          **(JURY TRIAL PROCEEDINGS - VOLUME IX)**
15

16

17

18

19

20

21

22

23

24

25        Proceedings reported by certified court reporter;
     transcript produced with computer.

```
 1       APPEARANCES:
           For the Plaintiff:        Robins Kaplan, LLP
 2                                    MICHAEL A. COLLYARD, ESQ.
                                      DAVID E. MARDER, ESQ.
 3                                    PETER C. IHRIG, ESQ.
                                      MORGIA D. HOLMES, ESQ.
 4                                    MICHAEL D. REIF, ESQ.
                                      800 LaSalle Avenue
 5                                    Suite 2800
                                      Minneapolis, Minnesota 55402
 6
                                      Anthony, Ostlund, Louwagie,
 7                                    Dressen, Boylan, P.A.
                                      JOSEPH W. ANTHONY, ESQ.
 8                                    JOSEPH R. RICHIE, ESQ.
                                      RYAN M. LAWRENCE, ESQ.
 9                                    90 South Seventh Street
                                      Suite 3600
10                                    Minneapolis, Minnesota 55402

11       For the Defendant:          Stinson, LLP
                                      KEITH S. MOHEBAN, ESQ.
12                                    ADINE S. MOMOH, ESQ.
                                      50 South Sixth Street
13                                    Suite 2600
                                      Minneapolis, Minnesota 55402
14
                                      Debevoise & Plimpton, LLP
15                                    JOHN GLEESON, ESQ.
                                      MICHAEL SCHAPER, ESQ.
16                                    SUSAN REAGAN GITTES, ESQ.
                                      MORGAN A. DAVIS, ESQ.
17                                    919 Third Avenue
                                      New York, New York 10022
18
                                      Mayer Brown, LLP
19                                    JOSHUA D. YOUNT, ESQ.
                                      71 South Wacker Drive
20                                    Chicago, Illinois 60606

21                                    Mayer Brown, LLP
                                      RICHARD A. SPEHR, ESQ.
22                                    GINA PARLOVECCHIO, ESQ.
                                      1221 Avenue of the Americas
23                                    New York, New York 10020

24       Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                      316 North Robert Street
25                                    St. Paul, Minnesota 55101
```

**I N D E X**

PAGE

**CATHERINE GHIGLIERI**
    Direct Examination (Continued) by Mr. Anthony      2249
    Cross-Examination by Mr. Schaper                  2293
    Redirect Examination by Mr. Anthony               2386
    Recross-Examination by Mr. Schaper                2412

**THEODORE MARTENS**
    Direct Examination by Mr. Anthony                 2423
    Cross-Examination by Mr. Spehr                    2463

PLAINTIFF'S EXHIBITS                                  REC'D
    717                                           2432
    764 (demonstrative)                           2445
    778                                           2265
    779                                           2268
    780                                           2270

DEFENDANT'S EXHIBITS                                  REC'D
    50136                                         2350
    50233                                         2354
    50356                                         2358
    50445                                         2362
    50588                                         2365
    50710                                         2367

1                **P R O C E E D I N G S**

2                   **IN OPEN COURT**

3                 **(JURY NOT PRESENT)**

4          THE COURT:  So we have some matters to address

5     before we begin with our jury today, and so I will first

6     address the defendant's objection to plaintiff's

7     demonstrative PD-19 and request that the Court limit the

8     testimony of plaintiff's damages expert, Theodore Martens,

9     and the reasons are given to me.

10          Is there anything that needs to be added to this?

11          MR. SPEHR:  First, good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. SPEHR:  Richard Spehr for BMO Harris.  You're

14     right, we object to PD-19, but it's part of a broader

15     objection, or at least anticipatory objection, with respect

16     to Mr. Martens.

17          He has been tendered as a damages expert here.

18     His job, as I understand it from his report and how he's

19     been offered, is to calculate the alleged damages of PCI

20     based upon inability to repay investors.

21          PD-19 doesn't talk about that.  It talks about the

22     merits dispute, the retailer dispute, the monies in from

23     Nationwide and Enchanted, monies in and out of the M&I

24     account.  So it's a liability calculation, not a damages

25     calculation.  So we are asking Your Honor to direct that

1    Mr. Martens is here to testify about damages and damages

2    only.  There could be some contextualization.  If necessary,

3    I suppose, he could talk about the broad strokes of the

4    Ponzi scheme if that's helpful.

5         What, from our standpoint, ought to be off limits

6    is any discussion going to M&I's or BMO's liability based

7    upon transactions in the account, AML alerts, Nationwide and

8    Enchanted, or any of the other points in PD-19.

9         Thank you, Your Honor.

10        THE COURT:  Thank you, Counsel.

11        MR. RICHIE:  Good morning, Your Honor.  Joe Richie

12   on behalf of the plaintiff.

13        THE COURT:  Good morning, Mr. Richie.

14        MR. RICHIE:  The allegedly offending demonstrative

15   is this one, Your Honor.  It states that from January 2002

16   to September 2008, approximately $80.1 billion went in and

17   out of the PCI account, that about $24.9 billion came in

18   from Nationwide and Enchanted, that about $780 million came

19   in from other vendors, and that nothing came in from big-box

20   retailers.  There's no suggestion that any information on

21   this demonstrative is inaccurate or misleading.  Instead,

22   the argument is that it is somehow outside the scope of

23   Mr. Martens' expert opinion.

24        Mr. Martens will testify that he conducted an

25   extensive forensic accounting examination of the PCI

1    account; that he determined all these things were true.  He

2    states them squarely in his expert report.

3              In paragraph 16 of his report he states, "During

4    the damages period, approximately $81 billion flowed in and

5    out of the PCI M&I account (i.e., approximately $40.5

6    billion in, $40.5 billion out).  Attached as Exhibit 2-2 is

7    a summary of the flow of funds in the PCI M&I Account during

8    the damages period.  As mentioned earlier in this report,

9    approximately $12.2 billion and $12.7 billion (or $24.9

10   billion) of the total $40.5 billion deposited into the PCI

11   M&I Account during the damages period came from the

12   purported vendors NIR," which refers to Nationwide, "and

13   Enchanted, respectively.  All but two of the transfers from

14   NIR and Enchanted were made by wire transfer."

15             Then if we look at Exhibit 2-2 to his report,

16   which is referred to in the paragraph, it contains all of

17   the information that is shown in the proposed demonstrative,

18   including the amount that came in from Nationwide and

19   Enchanted, as well as the amount that came in from other

20   vendors.  There is a suggestion in the e-mail to the Court

21   that Mr. Martens did not disclose who those other vendors

22   are.  He did so in Footnote G to the exhibit.

23             So this information was squarely disclosed in the

24   expert report, and, again, there's no contention that the

25   demonstrative is inaccurate or misleading.  What this really

1     is is a belated *Daubert* motion claiming that the scope of

2     Mr. Martens' testimony should be limited.  They didn't bring

3     that motion at the time of *Daubert*.  Instead they are trying

4     to do it as an objection to a demonstrative.  It was

5     squarely disclosed.  It's within the scope of what he was

6     asked to do in his testimony, and the objection should be

7     overruled.

8               Thank you, Your Honor.

9               MR. SPEHR:  If I may, Your Honor?

10              THE COURT:  You may.

11              MR. SPEHR:  This is not *Daubert* territory at all.

12    We're not attacking the credibility or the skills and

13    expertise of Mr. Martens.  This is a pure scoping exercise.

14              He is here to testify about damages.  All of this

15    goes to M&I liability.  That is not what he is here to

16    testify about.  And if he goes beyond his representation in

17    his report and otherwise that he is a damages expert for

18    plaintiff, I think there will be some fairly severe

19    prejudice to M&I/BMO.

20              Thank you.

21              We have one other Martens issue as well, but I

22    will wait to address that, Your Honor.

23              MR. RICHIE:  30 seconds, Your Honor.  First of

24    all, I think saying that he cannot talk about the money that

25    flowed in and out of the PCI account is an unduly narrow

1    view of what a damages expert does.  Again, he is a forensic

2    accounting expert who conducted an extensive forensic

3    accounting of this account.  In fact, BMO's own expert is

4    going to rely on Mr. Martens' calculations, the same

5    calculations that he uses to prepare this demonstrative, in

6    his own opinions.

7            Also, though, to understand damages in the

8    account, Mr. Martens had to understand the flow of funds in

9    and out of the PCI account and so that he can opine that the

10   PCI M&I account served as the primary account for the

11   movement of funds between the various entities involved in

12   the Petters Ponzi scheme.  That's what's discussed in

13   paragraphs 15 and 16 of his report, where he discloses all

14   of the information that's contained in that demonstrative.

15           Thank you.

16           THE COURT:  Counsel, how do you respond to the 15

17   and 16 argument, the paragraphs 15 and 16 of the report?

18       (Defendant's counsel confer)

19           MR. SPEHR:  Thank you, Your Honor.  This is

20   exactly it.  In his report he assumes liability, he assumes

21   causation, and then he puts in these paragraphs 15, 16, 17

22   on pages 11 and 12 of his report, and then he expands on it

23   in the demonstrative.  It's interesting, I suppose, but it's

24   not within the scope of his damages expertise.  This has

25   nothing to do with damages.  It has only to do with

1    liability.  He assumes liability.  He assumes causation.

2    And these go well beyond the scope of damages.

3              MR. RICHIE:  Your Honor, very briefly, that's a

4    *Daubert* argument that it goes beyond the scope of damages,

5    and it simply doesn't.  He has to understand the flow of

6    funds to be able to opine on damages.

7              I also note that BMO's expert, Mr. Jarek, also

8    assumes liability and offers many, many opinions that go

9    only to liability.

10             MR. SPEHR:  Very briefly, Your Honor.  Nothing

11   about the flow of funds in and out of the M&I account, the

12   fact that there were AML alerts as are alleged in the expert

13   report, has anything to do with damages.

14             THE COURT:  Understood.  The arguments -- have

15   reviewed the matter prior to your opportunity to provide

16   your oral arguments today, reviewed the correspondence with

17   the Court, and I do sustain the objection.

18             Let's go to the next.

19             MR. SPEHR:  I'm sorry.  We had one other

20   Martens-related issue before we get to your objections.

21             MR. RICHIE:  Okay.

22             MR. SPEHR:  We just sent to the Court, and I think

23   we copied -- I hope we copied counsel, on another issue that

24   we wanted to raise related to Mr. Martens; and we can raise

25   it now, or if the Court hasn't had a chance to review what

1    Ms. Momoh sent to the Court about a half an hour ago, we can

2    raise it before Mr. Martens testifies, whatever is more

3    convenient for the Court.

4              THE COURT:  That is what we will do.

5              MR. SPEHR:  Very good.  Thank you, Your Honor.

6              THE COURT:  Let's move to the next issue.

7              MR. RICHIE:  Your Honor, plaintiff has a number of

8    objections to proposed demonstratives that were disclosed by

9    BMO.  These demonstratives go to the issue of investor

10   complicity, which Your Honor originally excluded in the

11   motions in limine and then re-affirmed that ruling

12   yesterday.

13             The offending demonstratives are Numbers DD-20,

14   22, 27, 28, 29, 30, and 31.  These go to issues of the

15   specific timing of certain DACA and DAMA agreements that

16   were entered into by certain investors with PCI, which BMO

17   contends shows -- the timing of those agreements shows that

18   they were entered into to deceive the investors in some of

19   the funds that invested with PCI.  They go to the interest

20   rates that PCI paid to its investors, which BMO contends is

21   a red flag of fraud that the investors should have noted;

22   and they go to, quote, round-trip transactions and note

23   rolling that certain of the investors engaged in, which BMO

24   contends is evidence that those investors intended to

25   disguise PCI's fraud.

1              Now, we know that that's why BMO wants to

2      introduce those pieces of evidence because each of them was

3      included in the offer of proof that BMO filed last week

4      which contain all of the evidence of alleged investor

5      complicity that they would introduce if Your Honor permitted

6      them to do so, each of those things.

7              Your Honor denied their request to revisit that

8      ruling, and so each of these items, each of these

9      demonstratives, should be rejected and they should not be

10     permitted to elicit testimony on these issues.

11             We are not aware of any issue in the case that

12     these would be relevant to other than alleged investor

13     complicity.  To the extent that they might be tangentially

14     relevant to something -- I don't know what -- that relevance

15     would be overweighed -- would be negated by the prejudicial

16     value to the plaintiff of permitting them to introduce

17     evidence of investor complicity, especially that that was

18     included in their offer of proof.

19             THE COURT:  Thank you, Counsel.

20             MR. SPEHR:  Thank you, Your Honor.  None of these

21     go to investor complicity, and I'll explain to you why and

22     if I can take it slide by slide, I think you'll see.

23             If we look at the DD-20, which is the Ritchie

24     DACA/DAMA timeline, all we are doing -- and it has nothing

25     to do with investor complicity, it's a pure causation

1    argument -- is arguing that the Ritchie DACA was signed and

2    executed months after Ritchie made its last loan.  So,

3    therefore, as a matter of law and common sense, I might add,

4    Ritchie could not have relied on the DACA in making its

5    investments.  Pure causation/reliance argument.  No

6    complicity.

7           We are not arguing that Ritchie was a bad guy

8    because of the DACA.  What we're arguing is pure causation

9    and reliance.

10          The same goes for the Palm Beach.  Well, let me --

11   same goes for Palm Beach, but a little bit different twist

12   on it.  All we are arguing -- again, nothing about investor

13   complicity -- is that after the Palm Beach DAMA was executed

14   on February 25th, Palm Beach was a net winner; that is, it

15   made more money than it lost after the DAMA was executed in

16   February.  Pure damages.  Pure causation.  No complicity.

17   By the way, just for the record, that's slide DD-22.

18          The next objection relates to DD-27, which are

19   average annual interest rates 1999 to 2008.  Actually, let

20   me cover -- let me make this -- well, let me cover DD-28

21   first because these will make more sense in context.

22          All we've done on DD-28, which is investor

23   interest rates, is extract the interest rates on the notes

24   of the investors in the relevant time frame; and we've given

25   a range for each of the investors.  This comes right out of

1    Mr. Martens' report.  And it's just the fact of the

2    transaction.  We are not going to argue that they were

3    complicit because they executed these high interest rate

4    transactions with PCI.

5            And DD-27 follows, again, coming right out of

6    Mr. Martens' report, he sets out some benchmark rates --

7    10 percent, 8 percent, 5 percent -- in his report.  This is

8    just to contextualize the interest rates that were actually

9    executed by the investors, and that's DD-27.

10           Now let me pause on the three slides that I think

11   plaintiff views as most controversial, DD-29, DD-30 and

12   DD-31, which are a depiction of the round-trip transactions

13   for Lancelot, Palm Beach, and Acorn.

14           Again, we are not going to argue investor

15   complicity.  What we are going to argue is that these

16   transactions, the note rolls, the round-trip transactions,

17   the collateral exchange transactions, all occurred before

18   the Palm Beach DAMA was executed at the end of February

19   2008.  The PCI notes at that time were in default; hence,

20   these transactions got executed to extend out the maturity

21   of those loans.

22           What we are going to argue, and we will sum up on

23   this and we will make this argument to the jury, is that

24   before the 2008 transactions, the DAMAs and the DACAs, PCI

25   was in default to all of these lenders; and therefore, they

1    were not -- nobody was relying on those DAMAs or DACAs with

2    respect to further investments.  Their losses were locked

3    before the DAMAs and DACAs were executed.  So it's a pure

4    causation/reliance argument, Your Honor.

5            THE COURT:  I guess it seems to me it's tangled

6    with introducing evidence beyond outside investor

7    complicity.  So help me understand why not.

8            MR. SPEHR:  I'm not sure I exactly followed

9    Your Honor.

10           THE COURT:  It seems that each of these would

11   address investor complicity, correct?

12           MR. SPEHR:  That's right.

13           THE COURT:  And it also introduces evidence beyond

14   investor complicity.

15           MR. SPEHR:  I understand your tangled point now.

16   I think these are tangled.  There's no question that, you

17   know, if we were permitted to -- and obviously we have

18   followed the kind of letter of the law, at least I hope we

19   have, of Your Honor's orders around complicity, we couldn't

20   use these.

21           But we're not offering for complicity.  We are not

22   going to argue that Lancelot, Acorn, Palm Beach were

23   complicit conspirators in the fraud or what have you,

24   arguments we would have made had we been permitted to.

25           Instead we are arguing this as a pure causation

1    issue.  That defaults occurred that led to these

2    transactions before the Palm Beach DAMA was executed; and,

3    therefore, whatever losses they incurred, they incurred

4    before any reliance on any 2008 agreements with M&I.

5            So I agree, they're very tangled, and I guess all

6    I'm saying is that we are not -- you are not going to hear

7    the words "investor complicity" from us.  You are not going

8    to hear that these guys were conspiring with PCI.

9            The bottom line of this is that, just so we all

10   understand each other, this was a PCI fraud executed with

11   the investor on the investors in the hedge funds.  That's

12   what this was.

13           Now, we're not allowed to say that -- I get it --

14   and we're not going to say that, but I do think we should be

15   entitled to make the causation argument.

16           THE COURT:  And my concern is the confusion to the

17   jury.

18           MR. SPEHR:  I understand.  I think the only way I

19   can alleviate that confusion is not to say "complicity" or

20   "investor complicity" or "investor culpability" or

21   "investors as conspirators."  These are simply -- by the

22   way, these are simply outlining transactions that in fact

23   occurred.  I don't think there's any dispute with the other

24   side that these happened.  These are -- by the way, these

25   are throughout Mr. Martens' report.

1        One of the ironies here is Mr. Martens, in both

2   his interim report in 2010 and in the report he submitted in

3   this case, goes into detail on these transactions.  And

4   Mr. Martens himself states that the purpose of these

5   transactions was to avoid a PCI default that was imminent in

6   February of 2008.

7        So we are just stating facts, and these facts come

8   right out of Mr. Martens' report.  So that's how I think we

9   disentangle this.  I totally get it, Your Honor.  This is

10   bumping up against Your Honor's orders prohibiting investor

11   complicity, but I do think we have to be able to show the

12   existence of the transactions on my representation, and I'm

13   sure my colleagues' representation, that we are not going to

14   investor complicity given Your Honor's prior orders.

15        THE COURT:  My concern is the confusion for the

16   jury.

17        MR. SPEHR:  It's the problem that's been created

18   here, which is if we can't talk about investor complicity,

19   we can't talk about the actual transactions that took place.

20   I mean, it's one thing to talk about the transactions.  It's

21   another thing to say that because of those transactions,

22   there's a conspiracy to commit fraud on M&I.  We're not

23   allowed to say that.  But I do think we have to be able to

24   put the transactions in.

25        So I will stop there, Your Honor.

1          MR. RICHIE:  Your Honor, with respect to counsel,

2     I have, frankly, no understanding of what the relevance of

3     these issues are other than investor complicity.  I couldn't

4     follow what the purpose would be other than to suggest

5     investor complicity to the jury; and I think if I cannot

6     understand it and Your Honor is confused by it, the jury

7     will certainly be confused by it.  And it invites this

8     question of investor complicity, which everybody

9     acknowledges is not part of the case.

10          And we know that they want this evidence in.  All

11     of it is in their offer of proof, and that's the issue that

12     it goes to.  And I don't see what relevance it has to any

13     other issue, and, if it has some relevance, I don't see how

14     the jury can understand it.  I don't understand what that

15     relevance is to any other issue.

16          Also note that this argument is completely

17     contradictory to the argument they just made regarding the

18     demonstrative that Mr. Martens wanted to use about the $81

19     billion in and out, just the facts.  This is stuff that goes

20     to liability that they want to use with Mr. Martens.  I

21     don't see how he can be not permitted to testify about a

22     simple $81 billion in and out of the account, but be

23     permitted to testify on things like note rolling, DACA/DAMA

24     timing, all of these issues that they want to use.

25          I think clearly any probative value on any of this

1    is severely outweighed both by the prejudice to the

2    plaintiff of suggesting investor complicity, even if they

3    don't use those words, and the confusion to the jury.  I'll

4    also note that I expect all these topics to be well beyond

5    the scope of the direct testimony that Mr. Martens will

6    give.

7              Thank you, Your Honor.

8              MR. SPEHR:  Just very briefly, actually two

9    points, and I'm sure Your Honor has read this.

10             THE COURT:  I have.

11             MR. SPEHR:  Sorry?

12             THE COURT:  I said I have.

13             MR. SPEHR:  Yeah.  Beginning on page 30 through,

14   you know, roughly 35, 36, Mr. Martens details these

15   transactions in his report.  We're not doing anything that

16   Mr. Martens didn't do in his report.  And so I think we have

17   to be able to explore the underlying transactions without

18   implying, stating, otherwise indicating that there was some

19   improper purpose in respect to the transactions.

20             And then lastly, I do think this is kind of prime

21   for a limiting instruction at the appropriate time, that

22   whether it's in respect to Mr. Martens' testimony or at some

23   later date, to simply indicate that the question of whether

24   the investors committed fraud on PCI or on M&I is not before

25   the jury.

1           So I think maybe a limiting instruction would do

2      it at the end of the day, Your Honor.  We could work on that

3      if that made sense to Your Honor.

4           THE COURT:  It concerns me that it doesn't un-ring

5      the bell in terms of giving direction to the jury as to the

6      limited purpose.

7           MR. SPEHR:  I just --

8           THE COURT:  I understand your argument.

9           MR. SPEHR:  Thank you, Your Honor.  I appreciate

10     it.

11           MR. RICHIE:  The only thing I will say,

12     Your Honor, is I agree with you that you can't un-ring the

13     bell.  I think a limiting instruction about investor

14     complicity would further suggest investor complicity, and

15     we've just established that the fact that something is in

16     Mr. Martens' report apparently does not mean it's fair game

17     for testimony here today, just as we talked about with the

18     $81 billion in and out.

19           And so that's all I have.

20           THE COURT:  I appreciate the arguments that I have

21     received.  They are helpful in focusing my attention on the

22     things that I was focusing on before and making sure that I

23     am -- my view without oral argument is consistent with my

24     view now that I have had argument, and the ruling is to

25     sustain as to all of this aspect of the issues that are

1    raised here.  So the motion is sustained.

2            We have a third issue to address?

3            MR. ANTHONY:  I don't know if anybody has a third

4    issue, Your Honor, but in light of your order on -- your

5    order of about 8:16 this morning on Ms. Ghiglieri and bank

6    examinations, she's been sequestered all week and I have not

7    spoken to her, has she been prepared to testify about that.

8    May I have just five minutes -- may I have five minutes to

9    alert her that that is now an issue in the case that she's

10   going to be questioned about?  That's my request.

11           THE COURT:  To let her know that she will be

12   questioned about it?

13           MR. ANTHONY:  Yes.

14           THE COURT:  Is there any objection as to that?

15           MR. SPEHR:  Yes, Your Honor, we object.  I think

16   it's been clear all along that defendants plan to make that

17   an issue in the case.  I can't imagine that Ms. Ghiglieri

18   would be surprised, frankly, and I think she may have even

19   heard or seen some of the argument related to that issue, so

20   I don't see a need for counsel to be conferring with a

21   witness while she's on the stand.

22           MR. ANTHONY:  Your Honor, I think they raised

23   these objections after she had taken the stand, after we had

24   had sidebars where we alerted them that we were not going to

25   be asking her any questions about bank exams.

1        So, I mean, I think we highlighted this for you

2   last week that if you decided that issue in the defendant's

3   favor, that we would be placed at a disadvantage because our

4   witness will not have testified about it or been prepared to

5   testify about it.

6        All I'm asking for is the opportunity to tell her

7   nothing more than she will be asked about bank examinations

8   and that I will ask her about bank examinations and she

9   should expect to be cross-examined on it.  I think that's a

10  fair response to their late motion and the fact that your

11  ruling came in the middle of her testimony.

12       Thank you, Your Honor.

13       THE COURT:  Counsel, why is that a problem?

14       MR. SPEHR:  I just don't think -- Your Honor, the

15  witness wrote about this stuff in her report.  I don't think

16  that she needs notice of it.  I just think it's unnecessary

17  and it would be unusual for counsel to be able to confer

18  with a witness during her time on the stand.

19       She's done this a lot.  She's a very experienced

20  witness and she wrote about these issues in her report.  So

21  I don't see an issue to need to flag it for her.  And I

22  don't know how it would take five minutes, in any event.

23       MR. ANTHONY:  And it's not going to take five

24  minutes.  I'm just going to point out to her that she is

25  going to be asked, I am going to ask her about her exam and

1   her testimony about bank examinations.  That's all I'm going

2   to tell her.

3          And if you would like me to tell her that in front

4   of the Court and the other counsel, I'll do that before the

5   jury comes in, if that's their preference.  I'm not going to

6   discuss the substance of her testimony.

7          THE COURT:  What we will do is you can introduce

8   that in any questioning that you have -- I mean, as you

9   introduce the topic.  Understood?  So there will not be

10  conferring before she gets back on the witness stand.

11         MR. ANTHONY:  That's fine, Your Honor.  I just

12  want to, when I do that prefatory question for her to alert

13  her to the fact that we are going to get into that, I don't

14  want to hear an objection from defense counsel that I am

15  giving her prefatory advice or telling her where we're

16  going.  I'm fine doing that.

17         THE COURT:  Does counsel understand -- opposing

18  counsel understand where we are --

19         MR. SPEHR:  We understand, Your Honor.

20         THE COURT:  -- on the ruling?

21         MR. SPEHR:  We understand Your Honor's decision,

22  yes.

23         MS. MOMOH:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MS. MOMOH:  Adine Momoh on behalf of BMO Harris

1    Bank.  Hopefully this will be a brief issue, especially one

2    that's noncontroversial.  It was the last issue that was in

3    my e-mail from this morning.

4              Yesterday we did raise to plaintiff's counsel our

5    concern with respect to the treatment of the e-mails that we

6    have been sending this Court at approximately 7:00 a.m.

7    pursuant to paragraph 8 of your pretrial agenda.

8              Our concern is simply that by leaving our

9    communications, our objections, our arguments in e-mail,

10   that those e-mails are not going to be part of the record.

11   If you look at Rule 10 of the Federal Rules of Appellate

12   Procedure, "Composition of the Record on Appeal," the first

13   part simply says, "The original papers and exhibits filed in

14   the District Court," and these e-mails have not been filed.

15             And so we proposed to plaintiff's counsel that we

16   do just that, that we just file all of the e-mails that

17   we've exchanged to the Court pursuant to paragraph 8 of the

18   pretrial agenda, and that we just start in chronological

19   order and file the very first e-mail that we had submitted

20   on October 12th and then bring us current to today; and then

21   going forward after today, we just make it a practice for

22   each side to file our e-mails that we're transmitting to the

23   Court on PACER and ECF.

24             We did not receive a response from plaintiff's

25   counsel to this proposal, and so that's why we are raising

1    it with the Court this morning.

2              I have nothing further on that point, Your Honor.

3              THE COURT:  Thank you.

4              MR. RICHIE:  Your Honor, plaintiff just sees this

5    proposal as unnecessary, frankly.  We think the Court has

6    done a more than adequate job of creating a record.  We're

7    out here every morning discussing these issues.  At times

8    the court staff has asked counsel to file particular letters

9    or e-mails on ECF when necessary, and we think that the

10   record is adequate and this is just -- would be an

11   unnecessary amount of work for counsel to engage in.

12             MS. MOMOH:  Just briefly, Your Honor.  There have

13   been times where there's been more substance to what's been

14   put in the e-mails than what's been permitted for the

15   parties to actually argue about in open court.

16             And so just from a matter of making sure that the

17   record is clear, especially from a preservation purpose for

18   appellate reasons, we just simply ask that the e-mails that

19   we've submitted to the Court be filed on the record.

20             Thank you.

21             THE COURT:  Understood.

22             MR. RICHIE:  Nothing further.

23             THE COURT:  Thank you.

24             MR. COLLYARD:  Your Honor, just a real quick

25   matter for the Court.  We just want to give you a heads-up

```
1    that plaintiff intends to file a written offer of proof on

2    the issues that were related to BMO's destruction of

3    evidence that we had raised last week in asking for a

4    proposed finding of fact, and so we will be filing that

5    sometime today.  We just wanted to give you notice of that.

6              THE COURT:  Okay.

7              MR. COLLYARD:  Thank you.

8              MR. SCHAPER:  We haven't seen that, so, Your

9    Honor, we will just reserve, but the Court will hear live

10   witnesses on this issue this week.

11             THE COURT:  Absolutely.  I am going to take a

12   brief recess, ten minutes, and then we should be ready to

13   go.

14             LAW CLERK:  All rise.

15       (Recess taken at 9:15 a.m.)

16                      *    *    *    *    *

17       (9:26 a.m.)

18                      IN OPEN COURT

19                     (JURY PRESENT)

20             THE COURT:  Good morning.  Please be seated.

21             Good morning.

22             THE WITNESS:  Good morning.

23             THE COURT:  I do remind you that you remain under

24   oath.

25             Counsel, you may proceed.
```

1        MR. ANTHONY:  Thank you, Your Honor.

2                    **(Catherine Ghiglieri)**

3                  **DIRECT EXAMINATION** (Continued)

4    BY MR. ANTHONY:

5    Q.  Good morning, Ms. Ghiglieri.

6    A.  Good morning.

7    Q.  When we finished on Friday afternoon, I was asking you

8    about Plaintiff's Exhibit 183, page 50.

9        MR. ANTHONY:  Ms. Ellig, if you could put that up,

10   please.

11   BY MR. ANTHONY:

12   Q.  I was asking you about the comment at the bottom of page

13   50 opposite the date October 4, 2006.  Do you see that?

14   A.  I do.

15   Q.  And we were talking about the $10 million wire out of

16   PCI Account 9018 to Kurt Bosshardt & Associates who are

17   attorneys, accountants and brokers who focus on the yachting

18   industry.  Is that a red flag in your opinion?

19   A.  Yes.

20   Q.  Why is it a red flag?

21   A.  Well, in looking at transactions for money laundering,

22   large round dollar transactions are red flags that should be

23   looked into further.  And then that combined with the fact

24   that it looks like it might have gone for the purchase of a

25   yacht would be something that the AML analysts would want to

Grigtieri - Direct

1    look into further.

2    Q.  Could you from -- can you from reading this comment

3    determine what the relationship of this wire was to the

4    business purpose of the PCI account?

5    A.  You can't tell that.

6    Q.  Okay.  Now I would like you to turn in the same exhibit,

7    please, to page Exhibit 63.

8            MR. ANTHONY:  And, Ms. Ellig, if you would start

9    with the second full box from the top, just enlarge that,

10   please.

11   BY MR. ANTHONY:

12   Q.  If you go to the left one box, we'll see it is from

13   Ms. Sara Johnson.  She's the author.  And she says -- and if

14   you go over one more block, we will see the date.  It's

15   February 12, 2007.  Ms. Johnson writes, "Customer received

16   591 wires ranging from $10,000 to $34 million, for a total

17   of $1,772,000,000."  Do you see that?

18   A.  I do.

19   Q.  And it says the wires were from Acorn Capital Group,

20   Enchanted Family, Fidelis, Metro Gem, Nationwide

21   International Resources, Thousand Oaks, Palm Beach,

22   et cetera.  Do you see that?

23   A.  I do.

24           MR. ANTHONY:  And let's go down to the next box,

25   please, Ms. Ellig.  Down one.  Okay.

1     BY MR. ANTHONY:

2     Q.  And the same date one minute later, 1632, so military

3     time.  What time is 1632?  Is that 4:32?

4     A.  4:32.

5     Q.  Okay.  So at 4:32 on February 12th, 2007, Ms. Johnson

6     writes, "Customer sent out 471 wires, for a total of 1.778

7     billion," and says, "Wires were sent to," and she lists

8     Metro Gem, among others.  Do you see that?

9     A.  I do.

10    Q.  Anything suspicious in your professional opinion about

11    the closing of this wire with that description?

12    A.  So there's a couple things to look at.

13              First of all, you would want to look at the total

14    volume of activity going through of $1.77 billion, which is

15    a large amount of activity, but the inflow of funds is very

16    similar to the outflow of funds.  So that would be one red

17    flag that you would expect the AML analysts to look into

18    further.

19              And then we see Nationwide and Enchanted, which,

20    as we know from the documentation in the bank files, were

21    supposed to be the wholesalers; and the money would be

22    flowing the wrong way if it was coming in.  It should be

23    going out.

24              And then, lastly, just by looking at this, you see

25    that there are similar entities sending money in and getting

Ghigheri - Direct

1    money with outgoing wire transfers.  For example, Metro Gem

2    and Thousand Oaks, just to name two that are listed here.

3              So these would be three areas that the AML

4    analysts should have been looking into -- not just

5    quantifying them, but actually looking at to see if they are

6    truly suspicious activity -- would be red flags of money

7    laundering.

8              MR. ANTHONY:  Ms. Ellig, would you scroll down one

9    more block in this alert?

10   BY MR. ANTHONY:

11   Q.  And then at 1632 on the same date, February 12, 2007,

12   Ms. Johnson writes, "Additional account activity, as well as

13   the incoming and outgoing wire activity, appears consistent

14   with the last review and expected for the type of business.

15   Case can be closed."  Do you see that?

16   A.  I do.

17   Q.  Now, we've seen that description in many of these alerts

18   for the purpose of closing them, have we not?

19   A.  Yes.

20   Q.  And did you hear testimony from some of the analysts

21   saying that they believed what they wrote?

22   A.  Yes.

23   Q.  So why can't -- is it -- why can't an analyst simply

24   write that and say that's sufficient to close it?

25   A.  Because it doesn't explain why it's not suspicious

Ghigrieri - Direct

1    activity.

2    Q.  Do they have to explain that?

3    A.  Yes.  If you look at the policies and procedures that

4    were shown to the AML analysts -- and I'm sure we have here

5    somewhere -- the AML analysts are supposed to make sure in

6    their remarks in the alerts that the reader could understand

7    why the transactions weren't suspicious, not just a

8    quantification of the transactions like is listed here, but

9    why is this not suspicious.

10   Q.  So let me ask you this, and the jury will have

11   Exhibit 183 and they will see that statement being repeated

12   over and over in these closings, in these alert closings.

13   Can't an AML analyst rely on someone who previously closed

14   it saying it was okay?

15   A.  They can review what has been done previously, that's

16   true.  It's accessible to them and they've testified that

17   they did look to see what had occurred previously.  But just

18   because someone else has closed it as expected activity for

19   the company doesn't mean that what's taking place isn't

20   suspicious.  And that's the admonition that was in the

21   training materials.  You know, don't get comfortable with a

22   longstanding customer because their transactions could be

23   suspicious.

24        So each time the analyst looked at this, they

25   should look at it with fresh eyes.  Yes, take into

1    consideration what has taken place in the past, but do an

2    analysis that is sufficient.

3    Q.  So isn't it human nature that if some of your colleagues

4    closed an alert earlier and found nothing suspicious, that

5    it would be okay for you to do the same thing?  Can an

6    analyst do that and comply with the usual and customary

7    banking regulations and standards?

8    A.  That's not sufficient.  If all they were going to do was

9    look at how the very first alert was closed and not do

10   anything, they could just have the software look at the

11   alerts.  That's why you have analysts, because they bring

12   critical thinking to the process and they're supposed to be

13   curious about what the transactions are.  That's their job.

14   They are a critical link for the bank to comply with the

15   Bank Secrecy Act and not let a fraud go through the bank.

16          So they, in keeping with the policies and

17   procedures, are supposed to be looking at these transactions

18   that we can see red flags just looking at the text; and

19   there should be something to give the reader an

20   understanding of why would all of this would be okay and yet

21   they closed the alert.

22   Q.  All right.  You can put that away.  I'm not going to ask

23   you questions about that anymore.

24          In your opinion, were the bank employees trained

25   in such a way that they should have known to act further

1  when they saw information like that which we just saw in

2  Exhibit 183?

3  A.  Yes, they were trained.  They had policies and

4  procedures that required it, and they indicated that they

5  understood and complied with the policies and procedures.

6  Q.  Let's turn to Exhibit DX-40067.

7       MR. ANTHONY:  And, Ms. Ellig, if you would be so

8  kind as to put that up.  And if you put the first page or

9  page 0002 up, please.

10  BY MR. ANTHONY:

11  Q.  I think we have seen this exhibit before, and what I

12  would like you to do is turn to page --

13       MR. ANTHONY:  And, Ms. Ellig, put up page 0023,

14  please.  Actually I'm going to have you go to page 17 first,

15  Ms. Ellig.  And I would like you to go to the notes at the

16  bottom and enlarge the notes, the speaker's notes at the

17  bottom.

18  BY MR. ANTHONY:

19  Q.  And there's a reference to "Explain willful blindness -

20  looking the other way."  Do you see that?

21  A.  I do.

22  Q.  What is willful blindness?

23  A.  Well, it's a legal term that I probably can't give the

24  precise definition, but to me it is when you see something

25  and you look away from it.  When you see something

1    suspicious in the AML arena and you look away from it.

2    Q.  Were the bank employees --

3             MR. SCHAPER:  Object and move to strike, a legal

4    conclusion, Your Honor.

5             THE COURT:  Overruled.

6    BY MR. ANTHONY:

7    Q.  Were the bank employees trained in willful blindness and

8    not looking the other way?

9    A.  Yes.

10   Q.  Let's look at page 23 now.  So the highlighted portion

11   or the portion in green says, activity --

12   "Suspicious/unusual is when a person's transactions vary

13   from the type or size expected."  Do you see that?

14   A.  Yes.

15   Q.  And did the transactions that you saw in Exhibit 183,

16   the various alerts, did they vary from the type or size

17   expected?

18   A.  Yes.

19   Q.  In what way?

20   A.  Well, in a variety of ways.  You can take Nationwide and

21   Enchanted, for example, which we've already talked about,

22   where they were supposed to be the wholesalers for Tom

23   Petters purchasing consumer electronics from them.

24             So you would expect that Tom Petters would be

25   sending them money out of the PCI account to pay for the

1    electronics.  Instead, Nationwide and Enchanted were sending

2    large amounts of money to the PCI account.  So the money was

3    going the wrong way.  That would be one example.

4            Another example would be Metro Gem, and there's

5    two things about Metro Gem.  One is supposedly they were a

6    factoring operation for PCI, which means they'd be buying

7    the accounts receivable and sending money to the PCI account

8    and then getting the accounts receivable.

9            But instead what happened was there were

10   round-trip transactions.  So money was just coming in and

11   going out, coming in and going out.  On some days it was

12   going out and coming in.  So you could easily see that day

13   after day, maybe not every single day, but on a lot of the

14   days in the 2002 to 2008 time frame.  And those would be two

15   examples.

16           And then the wires and the checks to the insiders

17   that we looked at would be another example.

18           MR. ANTHONY:  All right.  So let's go to the

19   speaker's notes, Ms. Ellig, at the bottom, please.

20   BY MR. ANTHONY:

21   Q.  Were the bank employees trained as to what they should

22   do if they saw suspicious or unusual activity?

23   A.  Yes.

24   Q.  And look at the bottom one.  It says, "Be aware - Be

25   alert - Be curious about unusual activity - and when you see

Ghigtieri - Direct

```
 1    something that you can't explain or seems suspicious - refer
 2    it upward to your management or Corporate Compliance."  Do
 3    you see that?
 4    A.  Yes.
 5    Q.  Did you see any observable facts where any bank employee
 6    referred their view that certain facts were curious or
 7    unusual upward to management or corporate compliance?
 8    A.  No.
 9    Q.  Did you see Mr. Jambor or Mr. Flynn, anything in the
10    record, any observable fact that either of them referred
11    anything upward?
12    A.  I didn't see anything like that.
13    Q.  How about for any of the AML analysts?
14    A.  No.  They did not conclude that any transaction in this
15    whole 75 billion of in and out transactions was suspicious.
16    Q.  And then if you go up one line, it says, "You don't need
17    to get to bottom -- to the bottom of every suspicious event.
18    Your primary job is to identify unusual activity, not to
19    explain it."
20            Is that an accurate statement of what the
21    analyst's job is?
22    A.  Yes, to identify suspicious activity, and the bank's job
23    is to report it.
24            MR. ANTHONY:  Let's turn to page 12, Ms. Ellig, of
25    this exhibit.
```

Ghigtieri - Direct

```
1    BY MR. ANTHONY:

2    Q.  At the top it says "Always remember!  Any transaction --

3    any customer -- could be part of a money laundering scheme."

4         What is the purpose in the industry for giving

5    that warning to bank employees to be alert to things?

6    A.  So what this means is that, whether it's a new customer

7    or a long-time customer, whether it's a famous customer or a

8    not-famous customer, regardless of the type of customer,

9    they always have to be concerned about the type of

10   transactions going through the accounts, because it's the

11   bank's responsibility to identify suspicious activity and

12   report it and not to have some sort of a fraud running

13   through the bank.  So they're telling the employees any

14   transaction or any customer can be a part of a money

15   laundering scheme.

16        MR. ANTHONY:  Let's go down to the speaker's

17   notes, Ms. Ellig, please, of Exhibit 40067 on page 12.

18   BY MR. ANTHONY:

19   Q.  And these speaker's notes expand on the always remember

20   portion of this document that we're looking at, right?

21   A.  Yes.

22   Q.  And it says, "Criminals are more sophisticated, with

23   more complex and more involved schemes.  Loan schemes,

24   investments, et cetera."  Do you see that?

25   A.  Yes.
```

1    Q.  Then it says, "Oftentimes there is the misunderstanding

2    that 'if there is something wrong with this transaction, I'm

3    sure someone will let me know.'"  Do you see that?

4    A.  I do.

5    Q.  And then it says, "You are the first line of defense."

6    Is that last statement where it says "You are the first line

7    of defense," is that the custom and practice in the industry

8    that bank employees are the first line of defense against

9    money laundering?

10   A.  Yes.

11   Q.  And why is that?  Why is the bank in such a unique

12   position to be the first line of defense?

13   A.  Because they can see all the transactions.  People come

14   in and want to do a transaction, and they can decide whether

15   to do it or not.  And so the bank tellers, for example, are

16   the first line of defense for someone coming in and making a

17   deposit or putting cash in the bank.

18          The AML analysts are the first line of defense in

19   reviewing the transactions that have occurred.  The wire

20   room is the first line of defense in looking at whether

21   someone is on the OFAC list, you know, the terrorist list,

22   and stopping money going for terrorism or any other reason,

23   money laundering.

24          So every area -- and of course they talk about

25   loans and investments.  It's not just cash, and it's not

1     just what runs through the deposit accounts.  It's every

2     area of the bank is at risk of being used as an instrument

3     of fraud.  And so the training is, and it's standard in the

4     industry, to impress upon the bank employees sort of like

5     Homeland Security, If you see something, say something and

6     that's what they're trying to say here.

7              MR. SCHAPER:  Your Honor, I just object to the

8     improper narrative testimony that we heard.

9              THE COURT:  Overruled.

10    BY MR. ANTHONY:

11    Q.  And then the notes go on to talk about the employees

12    providing a link to the customer.  "You can see the

13    customer," and "You can see and visit their business

14    location."  Do you see that?

15    A.  I do.

16    Q.  And is that standard in the industry, standard advice

17    given to bank employees by management to tell them the

18    things they need to do to look out for suspicious activity?

19    A.  Yes.  It's good guidance.

20    Q.  So turn -- again, we are looking at a bank document that

21    they used to train their employees, right?

22    A.  Yes.

23    Q.  Let's look at page 19 of Bank Exhibit 40067, please, and

24    this is one that says, "What Does a Money Launderer Look

25    Like?"

```
1              MR. ANTHONY:  If you go to the notes at the
2    bottom, Ms. Ellig.
3    BY MR. ANTHONY:
4    Q.  I mean, I think most people recognize Al Capone on the
5    right and Carmela Soprano on the left, right?
6    A.  Yes.
7    Q.  And it says, "Looks can be deceiving - which one is the
8    money launderer?"  Answer:  "BOTH!"  "That's why it's really
9    important to stay focused on the activity - not just the
10   customer."
11             What's the message in the industry, what's the
12   custom and standard in the industry for giving that message
13   to bank employees?
14   A.  Because it doesn't matter who the customer is, but if
15   there are patterns of red flags of money laundering or other
16   financial frauds in the transactions, the bank needs to look
17   further.  And this is a good guidance because it doesn't
18   matter who it is, it could still be money laundering.
19   Q.  Okay.  And turn to page 20, if you will, of Exhibit
20   40067.  At the top where it says, "Don't Make Assumptions of
21   Legitimacy - Know Your Customer Well.  Being 'familiar' with
22   the customer isn't enough - 'Oh yeah, he does that all the
23   time.'"  "Be careful of 'best customer' syndrome."  Do you
24   see that?
25   A.  I do.
```

Ghigtieri - Direct

1   Q.  Is it standard practice in the industry to alert bank

2   employees that they can't assume the customer is legitimate?

3   A.  Right.  Yes.

4            MR. ANTHONY:  And then page 30 of this same

5   exhibit, Exhibit 40067, please.  This one talks about wire

6   transactions, and at the bottom, please bring up the notes.

7   BY MR. ANTHONY:

8   Q.  And it says, "Generally wires are considered higher risk

9   transactions - especially international wires."  And "Wires:

10  Money moves quickly, fairly anonymously, anywhere in the

11  world to anyone."  Do you see that?

12  A.  Yes.

13  Q.  And what I want to ask you about is did you look at the

14  wires coming in and out of the 901 account for Enchanted and

15  Nationwide in doing your review?

16  A.  Yes, they came in.

17  Q.  And did you create an exhibit or an appendix to your

18  report in which you set forth all of the wires that came in

19  from Enchanted and all the wires that came in from

20  Nationwide?

21  A.  I did.

22  Q.  And did you cause to be created an exhibit that shows

23  the wires that came in from Enchanted and the wires that

24  came in from Nationwide?

25  A.  Yes.

Ghigtieri - Direct

1    Q.  And do you think that exhibit, if shown to the jury,

2    would assist and aid you in providing the testimony that

3    you're giving?

4    A.  Yes.

5    Q.  And did you prepare --

6              MR. ANTHONY:  Why don't you take Exhibit 778,

7    please.  It's not in evidence, so please don't put it on the

8    screen, Ms. Ellig.

9    BY MR. ANTHONY:

10   Q.  What is Exhibit 778?

11   A.  This is an excerpt of an appendix to my report.

12   Q.  And what does it show?

13   A.  It shows all of the wires that have come in -- actually,

14   there is one wire going out to Enchanted.  You know what?  I

15   may have the wrong exhibit.  Did you say 778?

16   Q.  Yes.

17   A.  Okay.  Yeah, so this one is Enchanted's, all of their

18   wire transfers.

19   Q.  Okay.

20             MR. ANTHONY:  We'll offer Exhibit 778, Your Honor.

21             MR. SCHAPER:  Objection, hearsay as part of an

22   expert report.  Also lack of foundation.  It was not

23   prepared by the witness.

24             THE COURT:  Sustained as to foundation.

25             MR. ANTHONY:  I'm sorry, Your Honor?

```
1              THE COURT:  Sustained as to foundation.
2    BY MR. ANTHONY:
3    Q.  Okay.  Did you prepare or cause Exhibit 778 to be
4    prepared on your behalf?
5    A.  Yes.
6    Q.  And did you have PwC and Mr. Martens' organization
7    prepare it on your behalf?
8    A.  I did.
9    Q.  And do you believe it to be accurate and reliable?
10   A.  Yes, because I spot-checked it with the wire transfer
11   documentation.
12             MR. ANTHONY:  We offer Exhibit 778, Your Honor.
13             MR. SCHAPER:  Same objection, Your Honor.
14             THE COURT:  Overruled.
15             MR. ANTHONY:  Let's publish, please, Ms. Ellig.
16   BY MR. ANTHONY:
17   Q.  How many pages are there of this exhibit?
18   A.  22.
19             MR. ANTHONY:  Okay.  And maybe you can enlarge the
20   top portion, Ms. Ellig?
21   BY MR. ANTHONY:
22   Q.  So you went through the bank records and identified each
23   wire sent in by Enchanted to PCI's 9018 account?
24   A.  So I did not, but what I asked PwC to do is prepare a
25   spreadsheet with all of the transactions that went through
```

1    the 9018 account.

2    Q.  And is this that spreadsheet?

3    A.  No.  And then I had them do it in date order, which was

4    the first thing; and then do it in payee/payor order.  And

5    from that second spreadsheet with the same information but

6    rearranged differently, that's what this excerpt is from,

7    the payee/payor order spreadsheet.

8    Q.  So this shows all the wires in from Enchanted, and those

9    are in -- shown in black.

10              MR. ANTHONY:  And if you scroll down, Ms. Ellig,

11   is there one in red at the bottom?

12   BY MR. ANTHONY:

13   Q.  What's the piece in red?

14   A.  That looks like it's the only wire that went out in the

15   22 pages.  So there was -- for some reason that $9,800 went

16   back out to Enchanted; but, otherwise, all of these wires in

17   the 22 pages came in from Enchanted in the wrong direction,

18   as we've talked about.

19   Q.  So it's 22 pages, and there's about 25 wires on each

20   page.  So how many -- ball parking the number of wires that

21   came in from just Enchanted in the year 2002 to 2008 is?

22   A.  Whatever -- I think it might be more than 25, but,

23   anyway, there are a lot of wires that came in over the

24   course of 2002 to 2008.

25   Q.  Okay.  So let's look at the last page of Exhibit 778.

Ghiglieri - Direct

```
1    Do you have a total there of the amount of money that was

2    wired in by Enchanted, the purported wholesaler, to the PCI

3    9018 account?

4    A.  Yes.  $12.67 billion.

5           MR. ANTHONY:  And so, Ms. Ellig, would you just

6    go, for example, to page 007 of Exhibit 778 so the jury can

7    see that this is what it looks like on each of these pages.

8    BY MR. ANTHONY:

9    Q.  I mean, what we are seeing on page 7 looks like every

10   other page with a different date and a different amount,

11   right?

12   A.  Right.

13   Q.  Okay.

14   A.  They're in date order, so that it starts in 2002 and it

15   goes to 2008, and it lists the amount of the wire.  And if

16   the name of the bank was on the wire, then the name of the

17   bank starts to appear sometime in 2005.  Anchor Bank was the

18   bank for Enchanted.

19   Q.  All right.  So now let's look at -- why don't you look

20   at 779, please, Ms. Ghiglieri.

21           MR. ANTHONY:  Ms. Ellig, don't bring that up yet.

22   BY MR. ANTHONY:

23   Q.  Tell the jury what 779 is.

24   A.  So this is the Nationwide portion of the spreadsheet

25   that I asked PwC to do for me, which has all of the wire
```

```
1    transfers that have come in from Nationwide.

2    Q.  So you did a similar thing for Nationwide that we just

3    saw with Enchanted?

4    A.  Yes, by --

5    Q.  Do you believe it to be reliable?

6    A.  Yes.  I spot-checked --

7    Q.  Do you believe -- you spot-checked it?

8    A.  Yes.

9    Q.  Do you believe that it will aid you in providing

10   testimony to the jury?

11   A.  Yes.

12            MR. ANTHONY:  Plaintiff offers Exhibit 779.

13            MR. SCHAPER:  Your Honor, same hearsay objection

14   and no foundation objection.

15            THE COURT:  The objections are overruled.

16   BY MR. ANTHONY:

17   Q.  Let's put up 779.  Same format as 778 that we just saw

18   except this one relates to Nationwide, right?

19   A.  Yes.

20   Q.  And this one is a few more pages.  This one looks

21   like --

22            MR. ANTHONY:  Let's go to the last page, please,

23   Ms. Ellig.

24   BY MR. ANTHONY:

25   Q.  This is 92 pages.
```

Ghigtieri - Direct

1    A.  Yes.

2    Q.  And virtually every page is substantially the same, is

3    it not, in terms of presentation and format?

4    A.  Yes.

5    Q.  All right.  And this shows 92 pages and somewhere

6    between 25 and 30 transactions a page, right?

7    A.  Yes.  I think this one's got about 25 per page times 92.

8    Whatever that is is how many transactions there were --

9    Q.  Okay.

10   A.  -- totaling --

11   Q.  So if you had 10 pages, I can do the simple math.  If

12   you had 25 on a page and you had 10 pages, that would be 250

13   transactions, right?

14   A.  Yep.

15   Q.  So --

16   A.  I could get out my calculator, but I would probably make

17   a mistake doing it in my head, 25 times 92.

18   Q.  Okay.  And the amount -- the total amount reflected in

19   this exhibit of money wired into the PCI account from

20   purported wholesaler Nationwide was what?

21   A.  $11.9 billion.

22   Q.  And did you do a similar -- go through a similar

23   calculation for Metro Gem?

24   A.  I did.

25           MR. ANTHONY:  And, Ms. Ellig, would you -- don't

Ghiglieri - Direct

```
1    pull it up, but just be prepared.

2    BY MR. ANTHONY:

3    Q.  Ms. Ghiglieri, would you look at Exhibit 780.

4    A.  Yes.

5    Q.  And did you cause the underlying document on which this

6    was based to be prepared by PwC?

7    A.  I did.

8    Q.  Did you spot-check it?

9    A.  Yes.

10   Q.  Do you believe it to be accurate?

11   A.  Yes.

12   Q.  Will it help you in presenting testimony to this jury?

13   A.  Yes.

14           MR. ANTHONY:  Plaintiff offers Exhibit 780.

15           MR. SCHAPER:  Same hearsay and foundation

16   objections.

17           THE COURT:  Overruled.

18   BY MR. ANTHONY:

19   Q.  Let's publish Metro Gem.  It's the same format, but

20   there's a lot of wires here in red, which -- and the red

21   shows money going out of PCI to Metro Gem.

22   A.  Right.

23   Q.  So all this wire activity with money going out from PCI

24   to Metro Gem, would that be a red flag?

25   A.  Yes, because --
```

Ghigfieri - Direct

1    Q.  Why?

2    A.  -- Metro Gem was supposed to be a factoring operation,

3    which means they were, in theory, buying the accounts

4    receivable from PCI, so they would be giving money to PCI.

5    And instead PCI is giving Metro Gem money any place where

6    you see that it's red.  So that would be opposite of what

7    the transaction should be.

8    Q.  You can put that away.

9             So I want to ask you about bank management and how

10   bank management conducted itself and whether it did so

11   consistent with the custom and standards in the industry.

12            How would you describe the manner in which the

13   bank managed the 9018 account?

14   A.  I think it would be, well, atypical.

15   Q.  Let me ask you why would it be atypical the way the bank

16   managers managed this account?

17   A.  Because they did a number of things that would not be

18   what you would typically do with a bank customer.

19   Q.  Can you give us some examples?

20   A.  Yes.  The first example I can think of is how they

21   processed the wire transfers.

22   Q.  What was outside of customary banking practice with

23   respect to how they managed wire transfers?

24   A.  So Mr. Jambor initiated an exception to the bank's

25   policy whereby the wire department -- so the wire

Ghigtreri - Direct

1    department, before they send a wire, they look to see that

2    there's collected funds in the account.  We heard testimony

3    to that.  But PCI often did not have sufficient funds in the

4    account to send a wire.

5    Q.  Is that when we saw those overdrafts that we saw on the

6    screen on Friday?

7    A.  It could have been.

8    Q.  Okay.

9    A.  But in this case it's more like daylight overdrafts.  If

10   the wire would have gone, it would have overdrawn the

11   account.  But no bank wants to send a wire transfer if

12   there's not collected funds.  Because why?  They are making

13   a loan to the customer outside of the underwriting process.

14   So it's standard in the industry, and it was at M&I Bank,

15   that they wouldn't send a wire transfer unless there was

16   sufficient collected funds.

17          But the exception to the policy was that the wire

18   department was supposed to keep checking, sometimes hourly,

19   sometimes, you know, a couple times a day, perhaps even

20   calling PCI or the relationship manager, to see when or if

21   there is going to be sufficient funds.

22          And that is atypical.  Generally when someone

23   wants to do a wire transfer, the bank looks, and if you

24   don't have sufficient funds, they say, No, we're not going

25   to do it.

1    Q.  We talked a little bit about that on Friday, right?

2    A.  Yes.

3    Q.  I'm not going to belabor that.  I'm going to ask you:

4    Any other instances of what you described as atypical

5    banking practices?  One thing I do want to bring to your

6    attention is QAPOR, Q-A-P-O-R.  We have heard a little bit

7    about that.  Just sum up in a few words what QAPOR was.

8    A.  It was an acronym for Qualified Account at Peer-Only

9    Review, something like that.  I may not have exactly the

10   right words.  But basically what it was was the bank devised

11   this process to add on to Searchspace whereby if an account

12   alerted at only the peer level for the last few months, they

13   could go on this expedited process.

14   Q.  So did the 9018 account go on this expedited process at

15   the bank?

16   A.  Yes.

17   Q.  And do you believe that was atypical banking practice?

18   A.  Well, yes, because PCI didn't qualify to go on the list.

19   There's no documentation on why it was put on the list.  The

20   scores that PCI had were all over the minimum -- or maximum

21   scores that was allowed for anybody to be on that list.

22          And so if you think about Mary Pesch talking about

23   risk based, we look at everything on a risk base, well, here

24   we've got an account with a billion plus, 2 billion, 3

25   billion, 4 billion going in and out every month, and they

```
1    get put on this expedited process to look at the alerts.

2    Q.  So I don't want to go into great detail on the other

3    examples of atypical, because I think we've talked about

4    some of them.  I just want you to identify any other

5    atypical banking practices that you think the bank

6    management engaged in.

7    A.  Well, I think the DACA was another one.

8    Q.  Okay.  Stop there.

9    A.  Yes.

10   Q.  And then we can come back to that briefly.  What else?

11   A.  And then the very, very large overdrafts would be

12   atypical.

13   Q.  If you think of any others, just signal.  I am going to

14   try to move it along.  I think we talked about DACAs.  The

15   jury has heard a lot of about that.

16   A.  In the Polaroid letter where the bank was saying

17   there's --

18   Q.  Tell the jury about the Polaroid letter and why that was

19   atypical.

20   A.  It's atypical for a bank to send a letter to the board

21   of directors in a transaction that's about to take place.

22   Q.  Okay.  So the board of directors of another company?

23   A.  Of Polaroid.

24           MR. SCHAPER:  I just want to object, Your Honor.

25   This ground was covered on Friday, so it's cumulative.
```

1          THE COURT:  Sustained.

2          MR. ANTHONY:  We'll move on.

3    BY MR. ANTHONY:

4    Q.  Now, you have -- I'm going to invite your attention to

5    page 119 of your report because I am going to ask you about

6    Federal Reserve examinations that we have not covered yet

7    that you are going to be -- that I am going to inquire of

8    you about.  And if you want to look at page 119 to page 131

9    to refresh your recollection as to these subjects, please do

10   so.

11   A.  Yes.

12   Q.  Okay?

13   A.  Um-hmm.

14   Q.  Did the Federal Reserve ever examine M&I Bank during the

15   period 2002 to 2008?

16   A.  Yes.

17   Q.  Okay.  Remind the jury what the Federal Reserve is.

18   A.  So the Federal Reserve is in charge of monetary policy

19   for the United States, but they also have a supervisory

20   function; and any bank that's a member of the Federal

21   Reserve, which is all national banks and state banks that

22   choose to be, they have supervisory responsibility over the

23   state-chartered banks that are members of the fed.  So they

24   will go in once a year and do an examination in conjunction

25   with a banking commissioner's examiners.

Ghigtieri - Direct

1    Q.  So during the period 2002 to 2005, did the Federal

2    Reserve examine M&I Bank and determine that it had to

3    improve its suspicious activity detection and reporting

4    procedures?

5    A.  Yes.

6    Q.  Tell the jury what the Federal Reserve said about those

7    procedures and what it required M&I Bank to do.

8    A.  Let's see.  So they did an examination, and one of the

9    major flaws that they found in the bank's Bank Secrecy Act

10   program was that they didn't have an automated account

11   monitoring system.  There were many things that they told

12   the bank to do, but this would be the first one that I would

13   like to talk about, and that is why the bank figured out

14   which software they wanted to use and chose Searchspace,

15   which was very common for large banks to use to detect

16   suspicious activity.

17   Q.  All right.  So the Federal Reserve reviewed their

18   policies and recommended some changes to their policies?

19   A.  Yes.

20   Q.  And so up to that time had the bank been doing these

21   anti-money laundering reviews manually?

22   A.  Yes.

23   Q.  And was that consistent with the custom and practice in

24   the industry, to do reviews manually in the period 2002

25   through 2005?

1    A.  No.  Banks had automated systems.

2    Q.  All right.  So in 2005, in response to what the Federal

3    Reserve said, what did M&I Bank do?

4    A.  So M&I Bank purchased Searchspace to bolt onto their

5    system and started using the automated alerts in conjunction

6    with their manual reports, which they still generate.

7    Q.  And after 2005, after Searchspace and those policies had

8    been implemented, was the bank examined again by the Federal

9    Reserve?

10   A.  Yes.  So they were examined every year.  They are

11   examined every year.

12   Q.  And did having Searchspace meet the Federal Reserve's

13   concerns about updating the bank's capability with respect

14   to anti-money laundering?

15   A.  Well, it was a step forward.  The Federal Reserve still

16   had some issues with some of the other elements of their

17   program, but it was a big step forward in helping them

18   identify suspicious activity.

19   Q.  Have you seen any observable facts that the Federal

20   Reserve in any of its examinations of the bank after 2005,

21   that the Federal Reserve actually reviewed the PCI 9018

22   account?

23   A.  I saw no evidence that the bank -- I'm sorry, that the

24   Federal Reserve at any point in time looked at that account.

25   Q.  Did you see any evidence or any facts that indicated

 1    that the Federal Reserve was aware of the transaction

 2    activity in the 9018 account?

 3    A.  I did not see -- I was not privy to the Federal

 4    Reserve's examination reports that they sent back to the

 5    bank or their work papers, so I could not confirm that they

 6    ever saw any of the transactions in this account.

 7    Q.  Turn to page 141 of your report, please, and the

 8    question I want to ask you is:  You've testified about a

 9    number of red flags, correct?

10    A.  Yes.

11    Q.  And when did these red flags first start occurring, in

12    your professional opinion?

13    A.  In 2002, in the beginning of the litigation period.

14    Q.  And did they -- what is your opinion with respect to

15    whether or not they continued -- went on continuously from

16    2002 to 2008?  What's your opinion?

17    A.  Yes, continuous.

18    Q.  Do you have a view, based on custom and practice in the

19    industry, when M&I Bank should have closed this account

20    given the number of red flags that were occurring?

21    A.  Well, I mean, to give them the benefit of the doubt, I

22    would say sometime in 2002, because I did a very in-depth

23    transaction review and there were red flags in the

24    transactions in 2002.  So say sometime in 2002.

25    Q.  Is it the custom and practice in the industry to close

```
 1      accounts when a bank sees substantial -- or sees suspicious
 2      activity in the account?
 3                  MR. SCHAPER:  Objection to form, leading.
 4                  THE COURT:  Sustained.
 5      BY MR. ANTHONY:
 6      Q.  What is the custom and practice in the industry with
 7      respect to closing an account when a bank sees suspicious
 8      activity in the account?
 9      A.  So it's custom and practice that there be a policy in
10      place that tells the bank employees when they should close
11      the account.  So that's the first thing, and that's under
12      the FFIEC regulatory guidance.
13                  The second thing is that they should act on that
14      so that when they see suspicious activity, they go on and
15      close the account so that no one is using the bank as an
16      instrument of fraud.
17      Q.  Did you see any instances where any bank closed any
18      activity related to a Petters account?
19                  MR. SCHAPER:  Objection to form, and may we
20      approach on this one, Your Honor?
21                  THE COURT:  You may.
22                  Members of the jury, if you would like to stand
23      and stretch, feel free to do so.
24          (At sidebar)
25                  MR. SCHAPER:  Your Honor has already ruled that
```

Ghigtieri - Direct

1    what third-party banks, third-party other institutions did

2    or did not do with respect to the PCI account, what they

3    knew or didn't know with respect to the PCI account is

4    irrelevant and inadmissible.  Your Honor has excluded some

5    evidence that we would have put on with that respect -- in

6    that respect, and so this should be out too.  It's a

7    sword-shield issue, Your Honor.

8              MR. ANTHONY:  But this is a custom and practice in

9    the industry.  Has she ever seen any other bank close an

10   account?  She said yes, and she happens to have seen it in

11   connection with one of the Petters accounts.  So I think

12   it's relevant for that reason.

13             THE COURT:  Overruled -- I'm sorry.  Sustained.

14             MR. SCHAPER:  Thank you, Your Honor.

15        **(In open court)**

16   BY MR. ANTHONY:

17   Q.  Without mentioning any names of any companies or banks,

18   what is the custom and practice in the industry for closing

19   accounts where there is suspicious activity?

20             MR. SCHAPER:  Objection, Your Honor, same issue

21   that we talked about at sidebar.

22             THE COURT:  Sustained.

23             MR. ANTHONY:  Your Honor, I am limiting it to the

24   custom and practice, not related to any party in this

25   proceeding.

1          MR. SCHAPER:  Raises the same issue, Your Honor.

2          THE COURT:  Counsel, come up.

3      **(At sidebar)**

4          THE COURT:  Why is custom and practice in the

5     industry objectionable?

6          MR. SCHAPER:  Because the obvious implication that

7     plaintiff wants to be drawn is that that wasn't done in the

8     instance of the PCI account and therefore that PCI had done

9     something wrong.

10         If they are able to put on that evidence, that

11    should open the door to us being able to put on evidence of

12    what other banks knew, what other third parties knew.  The

13    Court has said we can't do that.

14         But they should not be able to come right up to

15    the line, in our opinion go over it by offering custom and

16    practice and then the fact that that wasn't done in the case

17    of the PCI account.  It's so obvious to the jurors, that it

18    just gets at the same issue that the Court has already ruled

19    was excluded.

20         MR. ANTHONY:  I didn't ask about this account.  I

21    didn't ask about Petters.  I just said is it the custom and

22    practice in the industry to close accounts when there's

23    suspicious activity.  That's all I asked.

24         MR. SCHAPER:  I guess my point --

25         MR. ANTHONY:  I think that's admissible.

1          MR. SCHAPER:  -- my observation is what other

2     inference does counsel for plaintiff want to be drawn by the

3     jurors in bringing that up than the inference about facts

4     that the Court has said are excluded?

5          MR. ANTHONY:  I'm not getting into any of the

6     facts of Petters accounts.  I specifically excluded that

7     from my question.  It's just pure custom and practice, and

8     it doesn't reflect on his client.  He can say it's not the

9     custom and practice.

10         MR. SCHAPER:  I'm not doubting that counsel is

11    strategically trying to tailor the question narrowly to

12    avoid the Court's ruling.  I'm saying that they should not

13    be allowed to do so given the prior Court's ruling because

14    there would be no other reason to elicit the testimony than

15    to have the jurors draw the implication.  That goes over the

16    line of what the Court has already ruled.

17         MR. ANTHONY:  The Court has not ruled I can't ask

18    about the custom and practice in the industry, and that's

19    all I'm doing.  The custom and practice is relevant to the

20    case, and the jury can make inferences from the custom and

21    practice to the fact that it wasn't closed.

22              And I'm not pointing that out.  I'm not pointing

23    out that Petters had an account with Wachovia and Wachovia

24    closed it because of suspicious activity.  I didn't go

25    there.  I respected the Court's order on that, and I think

Ghigfieri - Direct

```
 1    this is perfectly proper.
 2              MR. SCHAPER:  If it is relevant and admissible for
 3    plaintiff to elicit that there was some custom and practice
 4    in the industry about closing accounts, then it must be
 5    admissible for us to rebut that with the facts as to what
 6    happened with the actual account this litigation is about.
 7    It can't be that they can do it and we can't.
 8              MR. ANTHONY:  I don't know what he's talking about
 9    because I'm not doing it.
10              THE COURT:  No, what are you referencing?
11              MR. SCHAPER:  I'm referencing the testimony -- the
12    evidence that the Court has excluded about what third
13    parties knew and did with respect to the PCI account;
14    namely, there were many, many third parties, law firms,
15    auditors, other banks that dealt with Petters or other
16    companies that did not close accounts.  And so to the extent
17    that she's suggesting that there's a custom and practice
18    that would have resulted in closing the PCI --
19              THE COURT:  You said other entities.  Are there
20    banks?
21              MR. SCHAPER:  Yes, including other banks that had
22    accounts that are related to this matter.  And that's what
23    the Court excluded us from putting on.
24              THE COURT:  I understand your argument.  The
25    objection is sustained.
```

```
 1          (In open court)
 2                  THE COURT:  The objection is sustained.
 3                  MR. ANTHONY:  Thank you, Your Honor.
 4     BY MR. ANTHONY:
 5     Q.  Ms. Ghiglieri, based upon all the facts you've been
 6     talking about, when do you believe -- when, in your opinion,
 7     should the bank have taken action regarding the 9018
 8     account?
 9     A.  Sometime in 2002.
10     Q.  Okay.  Now, you're aware, are you not, that the bank has
11     hired an expert to also testify in this matter, correct?
12     A.  Yes.
13     Q.  And I'm going to ask you a few questions about what the
14     bank's expert has said about your opinion to allow you to
15     respond to them at this time.
16              Has -- and the bank's expert is a man by the name
17     of Mr. Grice; is that it?
18     A.  Yes, Charles Grice.
19     Q.  Charles Grice?
20     A.  Um-hmm.
21     Q.  Okay.  Has Mr. Grice challenged the methodology that you
22     used to examine the facts in this case?
23     A.  Yes.
24     Q.  And is his -- what is his criticism about your
25     methodology, as you understand it?
```

Ghigtieri - Direct

1    A.  As I understand it, he has a couple of criticisms.  He

2    says that my methodology, of course, has -- is negatively

3    affected by hindsight bias.  I've talked a little bit about

4    that already.

5              He also says that the methodology I used is not

6    recognized by the bank examination standards, which I

7    disagree.  And that Ponzi schemes weren't a focus at the

8    time.

9    Q.  So let's -- you've read his report, right?

10   A.  Yeah.

11   Q.  Okay.  So let's start with the bank examination

12   standards.  Does he criticize you and say -- does he say you

13   didn't follow the bank examination standards?

14   A.  I think his criticism is that what I say the bank

15   examination standards are using my methodology is not what

16   they are.

17   Q.  Are they?  Did you use bank examination standards

18   consistent with the way you conducted bank examinations when

19   you were in the business of doing that?

20   A.  Yes.

21   Q.  Okay.  Do you think there's any merit to his suggestion

22   that you didn't follow the bank examination standards that

23   you had learned and applied all those years you worked for

24   the bank examining offices?

25   A.  I really don't.

Ghigtieri - Direct

1    Q.  So let's talk about the hindsight bias criticism.  Did

2    you address the hindsight bias criticism in the way you

3    conducted your review in your report?

4    A.  Yes, and I've already testified to this.  What -- any

5    bank expert coming to a case is going to be coming to it

6    after all the facts happen.  And so in order to prevent any

7    kind of things that happened since that time, what I do is I

8    look at the contemporaneous documents, which would be the

9    checks and the wire transfers, the deposit tickets, the bank

10   opening information, anything that's produced by the bank,

11   of course along with deposition testimony of the bank

12   employees, along with I pull the regulatory materials from

13   that time frame.

14        And I try and, I guess, for lack of a better

15   description, kind of put a box around that and then look at

16   all of that with the same methodology that I did when I was

17   examining banks.  So I took all the documentation that was

18   provided to me from the bank's production, the deposition

19   testimony, the regulatory materials, and then I did an

20   in-depth analysis of the transactions in the accounts so I

21   could see what the AML analysts could see at the time they

22   looked at the alerts.

23        And all of those things were things that I did as

24   a bank examiner.

25   Q.  You mentioned that you were criticized something having

Ghigtieri - Direct

1    to do with Ponzi schemes.  What was the criticism and what

2    is your response to that?

3    A.  So I think the criticism is that Ponzi schemes weren't

4    really the focus of the regulators' examinations or

5    regulatory materials.

6    Q.  Do you agree with that observation on his part?

7    A.  Well, no, because, I mean, Ponzi schemes have been

8    around since the 1920s, I guess, and the patterns of

9    transactions that are present when there's money laundering

10   or some other financial frauds like check kiting, are the

11   same ones that are present if there's a Ponzi scheme.

12           So let's just say -- let's give some credence to

13   what he's saying, that, you know, the words "Ponzi scheme"

14   weren't in every single thing that came out from the

15   regulators.  There was some regulatory guidance about Ponzi

16   schemes warning the banks about it in 2006 from FinCEN, but

17   Ponzi schemes are well known in the banking industry, and

18   it's the patterns, not the name of the fraud, that is

19   important for a bank to be able to comply with the Bank

20   Secrecy Act, to be able to identify suspicious activity and

21   report it.

22   Q.  So you've testified at some length about red flags.  And

23   does Mr. Grice take issue with your reference to red flags?

24   A.  Let's see.  If I remember correctly, and I can't see it

25   in my rebuttal report, but I think he had a problem with the

Ghigtreri - Direct

```
1    nature -- I think the transactions in the account showed
2    numerous red flags.
3    Q.  What does he say?
4    A.  And he says that large round dollar transactions just,
5    for example, which I consider a red flag of money laundering
6    or other financial frauds like a Ponzi scheme, was, in fact,
7    not a red flag of that.
8    Q.  So why do you say your view makes more sense than his
9    view?
10   A.  Well, he agreed with me in another case.  He --
11   Q.  Agreed with you on what?
12   A.  He agreed with me that large round dollar transactions
13   were evidence of a Ponzi scheme and that the bank should do
14   something about it in another one of his cases.
15   Q.  This was another case in which you and he were both
16   experts?
17   A.  I wasn't on the other side, but I saw an affidavit that
18   he produced.
19   Q.  Okay.
20   A.  Yeah.
21   Q.  So why do you think that your view of large round dollar
22   transactions are evidence of red flags and he does not, and
23   why is yours better in your mind?
24   A.  I don't know why he said it in this case.  He didn't say
25   it in another case.
```

```
 1              But it's in the regulatory guidance.  It's right
 2      out of the regulatory guidance.  It's not something I'm
 3      making up.  I'm relying on the FDIC and the FFIEC and their
 4      regulatory materials that large round dollar transactions in
 5      and out on the same day or within a few days is a red flag
 6      of money laundering or other type of financial fraud.
 7      Q.  Okay.  Now, you talked about that expedited QAPOR
 8      process.  Does he have an opinion that's different than
 9      yours?
10      A.  Yes.  He did not think that there was a problem with
11      that QAPOR process.
12      Q.  And you did.
13      A.  Yes.
14      Q.  So why do you think your argument is the better of the
15      two?
16      A.  Well, first of all, I think the reason that they did the
17      QAPOR process, which we have heard testimony on, is because
18      they were trying to figure out a way to handle all the
19      alerts that were being generated instead of staffing up.
20      And so that's the first problem that I had with it.
21              The second problem that I had was the way they
22      went about putting PCI on the list when it didn't qualify I
23      had a problem with.  They never did an annual review or any
24      documentation that I ever saw about it.
25              So there were some flaws.  And they moved the
```

Ghigrieri - Direct

```
1    QAPOR process, which we haven't talked about, from one

2    category to another, putting it in a category that it was

3    theoretically low risk for money laundering.  And then, of

4    course, we know the PCI account was high risk for money

5    laundering on that list.

6              So I think there were a lot of problems with

7    having that whole QAPOR thing, which they did away with in

8    late 2008.

9    Q.  Turn, if you will, to page 7 of your report, please.

10   A.  I'm sorry.  What page?

11   Q.  Page 7.

12   A.  Of the regular one or the rebuttal?

13   Q.  Your regular report.

14   A.  Okay.

15   Q.  Is it your opinion that the bank turned a blind eye to

16   the transactions flowing through the 9018 account and

17   thereby assisted Petters in continuing his Ponzi scheme?

18              MR. SCHAPER:  Objection, Your Honor.  May we

19   approach, please?

20              THE COURT:  You may.

21         (At sidebar)

22              THE COURT:  What page are you referencing?

23              MR. ANTHONY:  Page 7.  That's one of about ten

24   different spots in the report where she gives that opinion

25   or something similar to it.
```

Grigtieri - Direct

```
 1              MR. SCHAPER:  Yes.  So Your Honor has excluded
 2    this expert from testifying about willful blindness, so a
 3    question about did the bank turn a blind eye is the same
 4    thing.  That is excluded.
 5              THE COURT:  Counsel, your response?
 6              MR. ANTHONY:  Pardon?
 7              THE COURT:  Your response?
 8              MR. ANTHONY:  She's not talking about what's in
 9    their mind.  It's a -- they turned a --
10              THE COURT:  Counsel, you've gone over the line
11    here, and I am going to caution you about even getting close
12    to it in other --
13              MR. ANTHONY:  Okay.  I won't get close to it.
14              THE COURT:  -- respects.
15              MR. ANTHONY:  Pardon?
16              THE COURT:  I said in other respects.
17              MR. ANTHONY:  Okay.  I won't.
18              THE COURT:  You have ethical obligations here.
19              MR. ANTHONY:  I understand that, Your Honor.
20              THE COURT:  And you are getting very close to
21    going beyond what is within the bounds of your ethical
22    obligations.
23              MR. ANTHONY:  I understand that.
24              THE COURT:  You are beyond them.  I want it to
25    stop.
```

1                    MR. ANTHONY:  I will.

2             **(In open court)**

3                    MR. SCHAPER:  Did the Court rule on the objection?

4                    THE COURT:  Sustained.

5      BY MR. ANTHONY:

6      Q.  My final question, Ms. Ghiglieri, is:  In your opinion

7      as a prior bank examiner and expert in the industry, did the

8      bank act consistently with the standards in the banking

9      industry in its treatment of the PCI account?

10     A.  No.

11                   MR. ANTHONY:  Nothing further, Your Honor.

12                   THE COURT:  We will take our midmorning break.

13     Please be ready to return at 10:45.

14                   LAW CLERK:  All rise for the jury.

15            (Jury excused)

16                        **IN OPEN COURT**

17                      **(JURY NOT PRESENT)**

18                   THE COURT:  We are in recess.

19            (Recess taken at 10:33 a.m.)

20                      *    *    *    *    *

21            (10:49 a.m.)

22                        **IN OPEN COURT**

23                       **(JURY PRESENT)**

24                   THE COURT:  Please be seated.

25                   MR. SCHAPER:  May we approach just to give the

Ghiglieri - Cross

```
 1    Court some binders?

 2              THE COURT:  Yes.  Thank you.

 3         (Binders handed to Court)

 4              MR. SCHAPER:  May I proceed, Your Honor?

 5              THE COURT:  You may.

 6              MR. SCHAPER:  Thank you.

 7                      CROSS-EXAMINATION

 8    BY MR. SCHAPER:

 9    Q.  Good morning, Ms. Ghiglieri.  It's nice to meet you.

10    A.  Good morning.

11    Q.  You testified you used to be a bank examiner?

12    A.  Yes.

13    Q.  And when you worked in that role, am I correct that that

14    was a role that was paid by the government?

15    A.  Yes, I worked for the Comptroller of the Currency.

16    Q.  And one of the things that bank examiners assess when

17    they do the examinations you testified about is a bank's

18    BSA/AML program, correct?

19    A.  Yes.

20    Q.  And in doing so, the bank examiners will sometimes find

21    that a bank's AML program is either adequate or

22    satisfactory, right?

23    A.  Yes.

24    Q.  And other times an examiner may find that the bank's

25    program is inadequate or unsatisfactory; is that right?
```

1    A.  Yes.

2    Q.  And you personally conducted or oversaw examination of

3    banks' BSA/AML compliance programs, correct?

4    A.  Yes.

5    Q.  And in those examinations, you sometimes found that a

6    bank's AML program was adequate or satisfactory, right?

7    A.  Yes.

8    Q.  And other times I suspect you found that a bank's

9    program was inadequate or unsatisfactory?

10   A.  Yes.

11   Q.  And, again, that was in a role where you were working

12   for the government and not retained by a private party; is

13   that right?

14   A.  Yes.

15   Q.  And since leaving the government, you've been hired to

16   provide expert opinions in cases just like this one

17   involving banks' AML programs; is that right?

18   A.  Yes.

19   Q.  And in those litigation assignments, your fees are paid

20   by either one of the parties or their attorneys; is that

21   right?

22   A.  Yes.

23   Q.  And I think you testified that you get paid by the hour

24   for this matter?

25   A.  Yes.

1    Q.  And that's a standard arrangement for expert witnesses,

2    they typically get paid by the hour?

3    A.  As far as I know, yes.

4    Q.  Fair enough.  And I think you said your rate is $595 an

5    hour, correct?

6    A.  And 695 when I'm testifying like today, yeah.

7    Q.  Thank you for that clarification.

8             Just approximately how many cases have you given

9    expert opinions involving AML compliance of a bank?

10   A.  Do you mean testifying at trials or --

11   Q.  Just opinions generally.

12   A.  Well, let's see.  I have been retained on 32 Ponzi

13   schemes cases, but I've been doing this for 23 years, so I

14   just don't know how many --

15   Q.  Hard to remember that far.

16   A.  -- what the number would be exactly.

17   Q.  It's hard to remember that far back?

18   A.  Well, I'm not saying that far back, but I'm just saying

19   I've been retained, you know, about 200 times in total on

20   different subjects.

21   Q.  And as an expert, when you've been compensated by a

22   private party or their counsel, you have never offered an

23   opinion that a bank's AML program was adequate, correct?

24   A.  That's probably right, because I've always been retained

25   on the other side for Bank Secrecy matters, yeah.

Ghigtieri - Cross

1    Q.  Thank you.

2              Let's talk a little bit more about your time at

3    the OCC.

4    A.  Okay.

5    Q.  You said that you conducted bank examinations while you

6    were there; is that right?

7    A.  Yes.

8    Q.  And you left the OCC in 1992, correct?

9    A.  Yes.

10   Q.  And then you worked as the Texas banking commissioner

11   until 1999; is that right?

12   A.  So I was the Texas banking commissioner, yes.  I was in

13   charge of the Texas Department of Banking.

14   Q.  And do I have the timing right that you held that

15   position until 1999?

16   A.  Yes.

17   Q.  And so the last -- and that position involved

18   supervising some bank examinations, correct?

19   A.  Yes.

20   Q.  And so am I right that the last time you were

21   supervising a bank examination was in 1999?

22   A.  Yes.

23   Q.  You testified about the fact that the United States

24   PATRIOT Act was passed after the 9/11 terrorist attacks; is

25   that right?

1    A.  Yes.

2    Q.  And you mentioned that the PATRIOT Act criminalized the

3    financing of terrorism, among other things?

4    A.  Yes.  And the "among other things" would be it added

5    provisions for "know your customer."

6    Q.  And all of the federal exams, the Federal Reserve exams

7    of M&I Bank during the 2002 to 2008 time period, those all

8    happened after you had left the Texas Banking Commission,

9    correct?

10   A.  Yes.  So the first one would have been three years after

11   I left, and then four years and five years, yeah.

12   Q.  And am I right, then, that you have not conducted

13   examination of a nationally-chartered bank since the PATRIOT

14   Act was passed?

15   A.  That's correct.

16   Q.  And you have not supervised an examination of a

17   nationally-chartered bank since the PATRIOT Act has passed;

18   is that right?

19   A.  Yes.  I left in 1999.  The PATRIOT Act was passed in

20   2002.

21   Q.  We'll get back to those federal exams later.

22          You also testified that you worked for the board

23   of directors at a company called NetBank?

24   A.  Yes.  I didn't work for the board of directors of a

25   company called NetBank.  I said yes, and that's not the

1    right answer.

2    Q.  You were a director?

3    A.  I was a director of NetBank.  I was on the board of

4    directors.

5    Q.  And am I correct that in that position you were not

6    involved with hiring or training AML analysts for that bank?

7    A.  So the board of directors is responsible for everything

8    that happens at the bank, but I was not involved in the

9    actual hiring of the bank employees.

10   Q.  So, Ms. Ghiglieri, you spent a number of hours today and

11   Friday talking about red flags, and you testified on Friday

12   that a red flag is a, quote, warning sign, closed quote,

13   correct?

14   A.  Yes, I would say that's right.

15   Q.  But just to be clear, a red flag does not mean that

16   something is necessarily wrong, does it?

17   A.  A red flag means that the bank should look into it to

18   determine if the activity is suspicious.

19   Q.  But you've actually written in a book that a red flag

20   does not necessarily mean that something is wrong, haven't

21   you?

22   A.  Yes.  I mean -- but going a little further, it means

23   that the bank, as we saw in the regulatory guidance, should

24   look into it to make a determination on whether it's

25   suspicious or not.

1    Q.  You wrote a book, I think you testified about it on

2    direct, called the *Ultimate Guide For Bank Directors*?

3    A.  Yes.

4    Q.  And that was aimed at giving the most senior people at

5    banks guidance about a number of issues, including

6    compliance?

7    A.  Yes, very high-level overview of banking for bank

8    directors, yes.

9    Q.  And you intended that advice to be honest,

10   straightforward advice for bank directors, correct?

11   A.  Yes.

12   Q.  And when it came to the concept of red flags in that

13   book that you wrote, you wrote, "A red flag does not mean

14   that something is wrong.  It means board members should make

15   inquiry about the issue and be satisfied with the response

16   from management."  Do you remember writing that?

17   A.  Yes.

18   Q.  Ms. Ghiglieri, I would like to talk briefly about some

19   testimony you gave on Friday about the types of transactions

20   that may be considered higher risk according to some

21   regulatory guidance.

22        You testified about Section 9.1 of the FDIC

23   manual.  Do you recall that testimony?

24   A.  Yes, um-hmm.

25        MR. SCHAPER:  Mr. Herzka, if you could please

```
 1     publish Plaintiff's Exhibit 573.
 2     BY MR. SCHAPER:
 3     Q.  This is one of the documents you testified about?
 4     A.  Yes.
 5              MR. SCHAPER:  And Mr. Herzka, if you could go to
 6     page 13 of this document, please.
 7     BY MR. SCHAPER:
 8     Q.  If we focus particularly on the right-hand side of the
 9     page, there's a section called "Wire Transfers.  Potential
10     Problems."  Do you see that, Ms. Ghiglieri?
11     A.  It's a little blurry, but...
12              MR. SCHAPER:  Perhaps, Mr. Herzka, you could blow
13     that up.
14              THE WITNESS:  Okay.  Thank you.
15              MR. SCHAPER:  Just the first paragraph so we can
16     really see that, Mr. Herzka, if you would?
17     BY MR. SCHAPER:
18     Q.  So, Ms. Ghiglieri, I just want to focus on some of this
19     language.  The second sentence reads, "Transactions may be
20     introduced by unauthorized persons who have obtained the
21     proper procedures from an unsuspecting employee."  Do you
22     see that?
23     A.  I do.
24     Q.  And you testified about this paragraph, right?
25     A.  Yes.
```

1    Q.  And you would agree with me that what's being discussed

2    there was not an issue with respect to the PCI account,

3    correct?

4    A.  I didn't hear all of your question.  Could you ask me

5    that again?

6    Q.  Yes.  You would agree with me that that sentence and the

7    concern being highlighted there by the regulator was not an

8    issue on the PCI account, correct?

9    A.  That's right.

10   Q.  And if you look at the next sentence, it says,

11   "Transactions may be altered in processing and posted to the

12   wrong account, posted in the wrong amount or posted to the

13   correct beneficiary but wrong account."

14           You would agree with me that that was not an issue

15   in the PCI account either, correct?

16   A.  Correct.

17   Q.  And then the last sentence, and you testified about

18   this, states --

19           MR. SCHAPER:  Same paragraph, Mr. Herzka.

20   BY MR. SCHAPER:

21   Q.  The last sentence of that paragraph says, "Wire

22   transfers are a popular form of laundering money, providing

23   an easy way of sending funds to and from bank secrecy haven

24   countries."  Do you see that?

25   A.  I do.

1   Q.  And can you give the jury, Ms. Ghiglieri, some examples

2   of what "bank secrecy haven countries" means.

3   A.  A place where people routinely hide money, be like down

4   in the Caribbean, some of the countries down there.  It

5   would be a bank --

6   Q.  The FDIC was flagging secrecy haven countries as

7   potentially raising problems, correct?

8   A.  Yes.  And also, I mean, they were also flagging that

9   wire transfers is a popular form of money laundering because

10  it's an easy way of sending money.

11  Q.  It's an easy way of sending funds to and from bank

12  secrecy haven countries.  That's what the FDIC wrote,

13  correct?

14  A.  Yes, that's what the sentence says.

15  Q.  When you testified on Friday, though, you read that

16  sentence and you added the words "but also, you know, to

17  nonsecrecy haven countries."  Do you recall that testimony?

18  A.  Yes.

19  Q.  And just to be clear, that's not what the document says,

20  correct?  That was your own gloss on it.

21  A.  Yes, because wire transfers -- it's my opinion and it's

22  in a lot of the bank policies and regulatory guidance that

23  wire transfers are high risk and a popular form of money

24  laundering because it's easy to send funds in and out of a

25  bank.

1    Q.  But you weren't suggesting that that's what this

2    document says, were you, in your testimony?

3    A.  No.  I was just explaining what -- how money laundering

4    through wire transfers can go to any country.

5              MR. SCHAPER:  We can take that down.  Thank you

6    thank you, Mr. Herzka.

7    BY MR. SCHAPER:

8    Q.  So I'd like to talk to you about some of the documents

9    you considered in forming your opinions in this case.

10             First of all, am I correct, Ms. Ghiglieri, that I

11   think you were in the courtroom for opening statements?

12   A.  Yes.

13   Q.  And so you heard in the defendant's opening statements

14   that one of the ways that PCI hid its Ponzi scheme was that

15   it lied a lot, correct?

16   A.  I'm having trouble hearing your questions.  I'm sorry.

17   Would you ask me that again?

18   Q.  Sure.  Do you recall hearing in the defendant's opening

19   statement that one of the ways that PCI hid its Ponzi scheme

20   was that it lied a lot; do you recall that?

21   A.  That's -- you are saying that's what you said on

22   opening?

23   Q.  My colleague said that during the opening.  Do you

24   recall that?

25   A.  I guess.  I mean, I didn't memorize everything that was

```
1    said on opening.

2    Q.  Fair enough.

3    A.  Okay.

4    Q.  You reviewed some court documents from this case in

5    forming your opinions, correct?

6    A.  Some court documents?

7    Q.  Yes.

8    A.  Yes, some of them.

9    Q.  You went to law school, right?

10   A.  I did.

11   Q.  Okay.  So I mean documents that were part of this

12   litigation, filed with the court, that sort of thing?

13   A.  Yes.  I mean, I know what court documents means.  I just

14   didn't know if I heard what you said correctly.

15   Q.  Oh, I'm sorry.  Maybe I'll work on the microphones.

16              THE COURT:  Counsel, you may want to lift the

17   podium and make it higher or raise it.  I don't know whether

18   that would help.

19              MR. SCHAPER:  Thank you, Judge.

20              THE WITNESS:  My hearing is messed up, so I just

21   want to make sure I know the question.

22   BY MR. SCHAPER:

23   Q.  One of the documents reviewed was the Complaint filed by

24   Mr. Kelley in this case?

25   A.  Yes.
```

1    Q.  And you also know that in this case there were requests

2    for admission that went back and forth between the parties,

3    are you aware of that?

4    A.  Yes.

5    Q.  And you know that a request for admission allows one

6    party to ask the other party to admit the truth of a

7    statement?

8    A.  Yes.

9    Q.  And you reviewed several of the requests for admission

10   that the plaintiff sent to the bank, correct?

11   A.  Yes.

12   Q.  And you relied on those in your report or you referenced

13   those in your report?

14   A.  I did.

15   Q.  Now I'd like to ask you about some of the documents that

16   you did not review in preparing your report.

17            In preparing your reports, you did not review any

18   of Mr. Kelley's responses to BMO Harris's requests for

19   admissions, correct?

20   A.  I would have to look in the back of my report.  I'm not

21   sure.  I mean, there were -- there was a lot of motion

22   practice, and I'm sure I didn't look at everything.

23   Q.  Okay.  So let's look at your report, and it's one of the

24   binders you have there.

25   A.  I'm not sure what happened to my report here.

1    Q.  I think we gave you our own copy.  There are multiple

2    copies up there.  Feel free to look at it.

3    A.  Okay.

4    Q.  And you have an Appendix C to your report.  Appendix C

5    is the documents that you reviewed, if you -- well, tell me

6    if I have that right.

7    A.  Yes.  So these are documents that -- in the court

8    document section that I reviewed.

9    Q.  And consistent with what you testified, there were

10   several instances where you reviewed the defendant's

11   responses to the plaintiff's requests for admission,

12   correct?

13   A.  Yes.

14   Q.  And you do not have listed here as documents that you

15   reviewed in this case Mr. Kelley's responses to the bank's

16   requests for admission, correct?

17   A.  I don't see those listed here, so I must not have

18   reviewed them.

19   Q.  If you could turn to the first tab of your binder, the

20   main exhibit binder, Ms. Ghiglieri.

21   A.  Okay.

22   Q.  If you turn to the first tab --

23   A.  Is it cross exhibits?  Is that the binder?

24   Q.  Yes, exactly right.

25   A.  Okay.  I've got it.

1   Q.  And the first tab is -- do you see that that is

2   Plaintiff Douglas Kelley's responses to BMO Harris's

3   requests for admission?

4   A.  The first set of requests?

5   Q.  Yes.

6   A.  Okay.

7   Q.  Do you see that?

8   A.  Yes, I see it.

9   Q.  And, again, this is a document that you did not review

10  in preparing your reports in this case that you've been

11  testifying about?

12  A.  I think that's right.

13  Q.  And did you ask plaintiff's counsel while you were

14  preparing your reports for a copy of this?

15  A.  I tried to look at as many of the motion practice

16  documents as possible, but I was in particular interested in

17  the bank's responses because I was looking at what the bank

18  did.

19  Q.  Did you ask plaintiff's counsel for a copy of this

20  document?

21  A.  I don't know if I did or not.

22  Q.  Nothing was stopping you from asking plaintiff's counsel

23  for a copy of this, correct?

24  A.  If I knew it existed.  I mean, I didn't know everything

25  that was going on with the motion practice, so...

1    Q.  If you turn to the last page of the document, you'll see

2    that it is dated September 21st, 2017.  Do you see that?

3    A.  I do.

4    Q.  And am I right that the report that you issued in this

5    case was about six months after Mr. Kelley responded to

6    these requests for admission?  Your report was in 2018?

7    A.  2018, yeah.

8              MR. SCHAPER:  I would like to publish a

9    demonstrative to which there has been no objection.  It's

10   DD-5.

11             THE COURT:  Is that correct, there's no objection?

12             MR. ANTHONY:  I don't believe there are any

13   objections to this, Your Honor.

14             THE COURT:  Very well.  You may.

15             MR. SCHAPER:  Thank you.

16   BY MR. SCHAPER:

17   Q.  So, Ms. Ghiglieri, these are some of the portions from

18   the responses from Mr. Kelley to the requests for admissions

19   that the bank sent him.

20             And if you see Request Number 4, you see that it

21   says, "Admit that representatives of PCI made

22   misrepresentations about PCI's business to M&I."  And the

23   response is that, "Trustee admits."  Do you see that?

24   A.  I do.

25   Q.  And so in forming your opinions in this case, you did

1    not consider Mr. Kelley's admission from 2017 that PCI made

2    misrepresentations about PCI's business to M&I, correct?

3    A.  I think that's correct.

4    Q.  And misrepresentations, again, that basically means

5    lies; is that fair?

6    A.  Would you say that again?

7    Q.  Misrepresentations is another word for lies; is that

8    fair?

9    A.  Yes, I guess that's right.

10   Q.  And then if we look at Request Number 25, it says,

11   "Admit that representatives of PCI took actions to hide the

12   Petters Ponzi scheme from M&I."  And the response is,

13   "Trustee admits."  Do you see that?

14   A.  I do.

15   Q.  And, again, you did not consider that admission by

16   Mr. Kelley when you were drafting your report in 2018,

17   correct?

18   A.  I think that's right.

19   Q.  So with that in mind, I would like to look at one of the

20   AML alerts in PCI's account, and you testified about these

21   alerts at some length.

22        MR. SCHAPER:  Mr. Herzka, if you would publish

23   Plaintiff's Exhibit 183 and go to page 27.

24   BY MR. SCHAPER:

25   Q.  Mr. Ghiglieri, you testified about a good number of

1    these alerts on direct, correct?

2    A.  Yes.

3    Q.  And I would like to focus in particular about the alert

4    at 11:49, and this is by Ms. Pesch using her maiden name,

5    correct, Ms. Ghiglieri?

6    A.  Yes.

7    Q.  And this comment shows that Ms. Pesch described this PCI

8    business as part of a collection of nearly 20 companies that

9    were doing a variety of consumer product business worldwide,

10   right?

11   A.  No.  It says, "Petters Company, Inc. is a collection of

12   nearly 20 companies that make and market a variety of

13   consumer products worldwide," not that they were a part of a

14   collection.

15   Q.  Thank you for that clarification.

16          So this, you would agree, reflects Ms. Pesch's

17   belief or Ms. Pesch writing down that PCI was a legitimate

18   business, correct?

19   A.  Yes.

20   Q.  And we now know, and we looked at Mr. Kelley's

21   admissions to the fact, that this information was a lie,

22   right?

23   A.  That they were a collection of 20 companies was a lie?

24   Q.  We now know that PCI was not a legitimate business,

25   correct?

1    A.  Yes, that's correct.

2    Q.  Ms. Ghiglieri, I would like -- you can put that document

3    aside.

4    A.  Okay.

5    Q.  I would like to talk to you a bit more about some of the

6    Searchspace alerts that you reviewed.

7            As we've been looking at between 2005 and 2008, a

8    range of AML analysts reviewed alerts for PCI in

9    Searchspace, right?

10   A.  Yes.

11   Q.  And Ms. Pesch was one of those?

12   A.  Yes.

13   Q.  And do you recall that Ms. Pesch testified that she

14   reviewed on average about four alerts per day?

15   A.  Yes, I believe I remember her saying that.

16   Q.  And am I right that, assuming that Ms. Pesch worked a

17   five-day week, that that would be 20 alerts a week?

18   A.  Yes, that would be the math.

19   Q.  And, again, if she worked 50 weeks a year, had a couple

20   weeks of vacation, we're talking about Ms. Pesch reviewing

21   about a thousand alerts per year, correct?

22   A.  Yes, that's -- I mean, if that's the math, yeah.

23   Q.  50 times 20?

24   A.  50 times 20.

25   Q.  And, Ms. Ghiglieri, how many times in a 12-month period

1    did PCI -- did the PCI account alert within Searchspace?

2    A.  Twelve times.

3    Q.  So am I right, then, Ms. Ghiglieri, do I basically have

4    the math right that out of the thousand -- out of the 1,000

5    alerts that Ms. Pesch would have reviewed in a year, the

6    most possible that would have been PCI alerts would be 12?

7    A.  Yes.

8    Q.  And is that -- you agree with me that's 1.2 percent?

9    A.  Yes.

10   Q.  And so it's fair to say that the other 988 alerts that

11   Ms. Pesch would have reviewed would have been from all other

12   customers of the bank, correct?

13   A.  Yes, all small businesses that didn't have billions of

14   dollars going through them.  So I think the percentage is

15   misleading from the standpoint of how remarkable those 12

16   alerts were.

17            MR. SCHAPER:  Move to strike that response,

18   Your Honor.

19            THE COURT:  Denied.

20   BY MR. SCHAPER:

21   Q.  So -- and the thousand reviews per year, that would just

22   be from Ms. Pesch, but there were other AML analysts

23   reviewing other alerts at the bank, correct?

24   A.  Sure.

25   Q.  Am I correct, Ms. Ghiglieri, that you did not review in

1    detail the account activity for any other bank customer

2    besides PCI?

3    A.  That's correct, I didn't have access to any other

4    account.  I want to correct that.  I had some related

5    Petters account activity, but not an unrelated Petters

6    account, I didn't have any access to that.

7    Q.  So I guess my question, Ms. Ghiglieri, is:  If the

8    alerts for PCI accounted for such a small percentage of the

9    alerts that even a single analyst would review in a 12-month

10   period, how did you know to focus your analysis on just the

11   12 PCI alerts in a given year?

12   A.  Those were the ones that were produced.

13   Q.  Am I right that those were the only ones that your

14   counsel asked you to look at in detail?  I'm sorry, that

15   Mr. Kelley's counsel asked you to look at in detail?

16   A.  They didn't tell me to look at anything in particular.

17   I asked for access to all of the bank's production; and in

18   all of that production, I asked for all the alerts, and I

19   looked at all of the alerts that the bank produced.

20   Q.  And those were focused on the 12 PCI alerts in any given

21   year, correct?

22   A.  Yes, and some of his related accounts also alerted.  So

23   there's a few more than that.  But yes, so I looked at all

24   of the pertinent alerts for this case.

25   Q.  And you would agree with me that in real time, as

1    Ms. Pesch was reviewing alerts between 2005 and 2008, she

2    did not have the option to focus only on 1 percent of the

3    alerts.  She had to review all of them as part of her job,

4    correct?

5    A.  She would have looked at more than just the Petters

6    Company alerts, yes.

7    Q.  Ms. Ghiglieri, I think we've covered that your report

8    was issued in 2018?

9    A.  Yes.

10   Q.  And when you were hired to look into M&I's monitoring of

11   PCI's account, you had access to information that was not

12   available to M&I before September 2008 when the Ponzi scheme

13   became public, right?

14   A.  You mean like things that happened after 2008; is that

15   what you mean?

16   Q.  Yes.  There was information that was available to you in

17   2018 that was not available to M&I Bank before September

18   2008, correct?

19   A.  So I'm sort of confused as to what your question is.  So

20   I had access to all the information that was available to

21   them, at least that was produced by the bank, along with I

22   had access to the regulatory materials that were available

23   in 2002 to 2008.  So I think my answer is I did have access

24   to everything that the bank had access to.

25   Q.  But you also had access to additional information

1    that -- of what transpired between 2008 and the time you

2    wrote your report in 2018, correct?

3    A.  Yes, but I didn't use any of that information in trying

4    to analyze what took place here.

5    Q.  So if we could maybe focus this by putting up DD-6,

6    which is a demonstrative to which there's been no objection.

7            MR. ANTHONY:  There's four books here.  It

8    isn't -- can you tell us --

9            MR. SCHAPER:  It's in the demonstratives that were

10   disclosed on Thursday evening.

11           MR. ANTHONY:  I know, but you gave us four books.

12   They all have the same cover.  I am looking for DD-6.

13       (Pause)

14           MR. ANTHONY:  Is it in your books that you gave

15   us?

16           MR. SCHAPER:  No.  It's in what we gave you on

17   Thursday.

18           MR. ANTHONY:  If you will bear with me, I will

19   look through this.

20       (Pause)

21           MR. SCHAPER:  Mr. Anthony, I think I can help out.

22   I have located a copy.

23       (Mr. Shaper and Mr. Anthony confer)

24           MR. ANTHONY:  It's for demonstrative?  No

25   objection.

1          MR. SCHAPER:  Correct.

2     BY MR. SCHAPER:

3     Q.  So going back to what we were just talking about,

4     Ms. Ghiglieri, and the information that you had in 2018 when

5     you wrote your report that the bank did not have before

6     September 2008.  When you were hired as an expert in this

7     case, the Petters Ponzi scheme had already been uncovered,

8     correct?

9     A.  Yes.

10    Q.  And you were already aware that the Ponzi scheme had

11    been uncovered, correct?

12    A.  Yes.

13    Q.  And when you were hired in this case, you had access to

14    news reports about the Petters Ponzi scheme, right?

15    A.  If I would have looked for news reports.  I didn't look

16    at news reports for preparing my report.

17    Q.  Well, when you were working on your report in 2018, you

18    would agree that Mr. Petters' criminal conviction had

19    already happened and you knew about that, right?

20    A.  I didn't know about it until I asked the lawyers if he

21    had been brought to trial.  I mean, I didn't have specific

22    information about the parties when I took the case.

23    Q.  By the time you wrote your opinion, am I correct that

24    you knew about Petters' criminal conviction?

25    A.  Yes.

1    Q.   And M&I did not know that before September 2008,

2    correct?

3    A.   No.

4    Q.   And by the time you wrote your opinion, you knew about

5    Ms. Coleman's criminal conviction, correct?

6    A.   Yes.

7    Q.   And the bank did not know about that before

8    September 24, 2008, correct?

9    A.   No, it hadn't happened yet.

10   Q.   Same thing for Mr. White's criminal conviction.  He was

11   another insider at PCI.  You knew about his criminal

12   conviction at the time you wrote your report in 2018, right?

13   A.   Yes.

14   Q.   And M&I didn't have that information before September

15   2008, correct?

16   A.   Correct.

17   Q.   And starting in late 2008, beyond the Petters Ponzi

18   scheme, there were other Ponzi schemes that were uncovered

19   and became public, right?

20   A.   Yes.

21   Q.   The Madoff one, maybe the most famous of all of them,

22   right?

23   A.   Yes.

24   Q.   And certainly that wasn't -- the news of the Madoff

25   Ponzi scheme broke after September 2008, right?

```
1    A.  I'm not sure exactly when it broke.

2    Q.  And the Rothstein Ponzi scheme, again, that was a 2008

3    revelation?

4    A.  I was hired on that case in 2008 or '09, I think.  So,

5    yeah, it would have been after.

6    Q.  You've testified a bit on direct examination about the

7    concept of hindsight bias.  Do you recall that testimony?

8    A.  Yes.

9    Q.  And I think your own words were that hindsight bias

10   means that something you know today, you put kind of a

11   varnish on something that happened yesterday.  Do you

12   remember that testimony that you gave?

13   A.  Yes, um-hmm.

14   Q.  And hindsight bias could also be described as the

15   tendency for people to perceive past events as having been

16   more predictable than they actually were.  Do you agree with

17   that?

18   A.  I have not heard that, but I guess that could be a way

19   of thinking about hindsight bias.

20   Q.  And in your testimony you said that to prevent hindsight

21   bias, in your opinion, you focused on the documents that

22   were contemporaneous from the time 2002 to 2008, correct?

23   A.  Yes.

24   Q.  And I think you said that you did that to put a box

25   around what happened between 2002 and 2008.  You testified
```

1    about that just this morning, right?

2    A.  Yes.  I tried to figure out what the bank could see at

3    the time.  That was my focus.

4    Q.  But, Ms. Ghiglieri, there was other information in your

5    report that you relied on that M&I did not have between 2002

6    and 2008, isn't there?

7    A.  I can't think of anything, but if you tell me where,

8    I'll be glad to look.

9    Q.  Sure.  If we go back to Exhibit C of your report, that

10   lists the materials that you considered, right?  Let's go

11   back to that.

12          And I would like to direct your attention in

13   particular to page 2 of your Exhibit C.  Again, your

14   Exhibit C says, "Documents Reviewed"?

15   A.  Yes.

16   Q.  So if you look at the top of page 2, do you see under a

17   heading called "Other Production," there's reference to

18   something called "PwC Interim Report dated December 15,

19   2010"?

20   A.  I do.

21          THE COURT REPORTER:  Can you just hit the button?

22          THE WITNESS:  Is that good now?  I think my binder

23   hit it.  Okay.

24   BY MR. SCHAPER:

25   Q.  So that was part of the materials that you reviewed in

1    coming up with your 2018 report, correct?

2    A.  So I did not confirm the Ponzi scheme.  I assumed the

3    Ponzi scheme, and so I relied upon that only -- and I think

4    I footnoted it different places -- for just background

5    information on the Ponzi scheme.

6    Q.  But just to confirm, Ms. Ghiglieri, I want to make sure

7    the record is clear, the PwC report from 2010 was among the

8    materials you reviewed in preparing your 2018 report,

9    correct?

10   A.  Yes.

11   Q.  And obviously between 2002 and 2018, M&I employees did

12   not have a copy of the 2010 PwC report, correct?

13   A.  Between 2002 and 2018, they would have had a copy of it.

14   Q.  Sorry.  2002 and 2008.

15   A.  Yes, that's correct.

16   Q.  Between 2002 and 2008, M&I did not have a copy of a

17   report that was written in 2010?

18   A.  Correct.

19   Q.  And that report that was written by PwC is hundreds of

20   pages long with the exhibits, right?

21   A.  Yes.  I don't know exactly how long, but it's long.

22   Q.  It's one of your binders that's up on your ledge, just

23   so people can see it.  This (indicating) is the PwC report.

24   My copy is double sided.  It's printed double sided.  Tell

25   me, Ms. Ghiglieri, if you also have a double-sided copy so

1    everybody is talking about the same kind of report that you

2    were relying on in your work in 2018.

3    A.  Yes.  I had access to that.

4    Q.  So I just want to understand a little bit about the

5    scope of this report that you had in 2018 when you formed

6    your opinions.

7            The PwC report explains how Mr. Petters and his

8    accomplices conducted the Ponzi scheme, correct?

9    A.  Yes.

10   Q.  And this 2010 report from PwC that you reviewed, it also

11   details that there were two entities that were sham vendors

12   as part of the Ponzi scheme, right?

13   A.  Yes.

14   Q.  And that's Nationwide and Enchanted, and I think you

15   testified about them earlier today, correct?

16   A.  Yes.

17   Q.  And so in 2010, PwC prepares this massive report, and it

18   says these two entities, Nationwide and Enchanted, were

19   shams, correct?

20   A.  I didn't memorize the report, but they do -- it does

21   discuss Nationwide and Enchanted, yes.

22   Q.  And it discusses their role as part of helping Petters

23   keep the Ponzi scheme going?

24   A.  Yes.

25            MR. ANTHONY:  Your Honor, may the document, the

1    exhibit be taken down from the screen if it's not being used

2    anymore?

3              MR. SCHAPER:  Oh, sure.  I'm sorry about that,

4    Mr. Anthony.

5              Mr. Herzka, if you would take that down, please.

6    BY MR. SCHAPER:

7    Q.  In talking about Nationwide and Enchanted, the PwC 2010

8    report says that neither of those entities ever actually

9    bought or sold the electronics inventory in the amounts that

10   had been indicated on what turned out to be fake invoices.

11   Do you recall that gist of the PwC report?

12   A.  Yes.  Yes, I vaguely recall that portion of it, yes.

13   Q.  So when you drafted your opinions in this case in 2018,

14   you knew from reading this 2010 report that Nationwide and

15   Enchanted were sham companies, right?

16   A.  Yes.

17   Q.  Another document that you testified about was P-713.

18             MR. SCHAPER:  And if we could put that up,

19   Mr. Herzka.

20   BY MR. SCHAPER:

21   Q.  And am I right that this also was an analysis that was

22   done by PwC; is that right?

23   A.  Yes.

24   Q.  Again, this analysis was done by PwC after 2008, right?

25   A.  Yes.

1    Q.  And, in fact, the date on the bottom right-hand corner,

2    if we could scroll out and just focus on that date, is as of

3    March 2, 2018.  Do you see that?

4    A.  I do.

5    Q.  So this is nine and a half years after the Ponzi scheme

6    became public, correct?

7    A.  Yes.

8    Q.  And you haven't seen evidence in the record, have you,

9    Ms. Ghiglieri, that prior to September 2008, M&I conducted

10   an analysis along the lines of what PwC did here, have you?

11   A.  Would you ask me that again?

12   Q.  When you put this information together, you relied on

13   this PwC document, correct?

14   A.  Yes.

15   Q.  You didn't see any document in the record that suggested

16   that M&I did this same analysis before 2008, did you?

17   A.  So in some of the alert summaries, as Mary Pesch

18   testified, she would pull down the wires and put them in an

19   Excel spreadsheet; and in some of the alert summaries, there

20   would be the amount of the wires from different parties.  So

21   I think some of this information was in the alert summaries,

22   but I didn't see this particular document in the bank's

23   production.

24   Q.  And there's a reference in Footnote 3, if we focus on

25   that, there's a reference to arrangements called round-trip

1    transactions between Nationwide and Enchanted with entities
2    called Thousand Lakes beginning in February 2008, correct?
3    A.  So that's not what this says.  What this says is that
4    the incoming wires from Nationwide and Enchanted were
5    reduced at a certain point because the round-trip
6    transactions in the account with Thousand Lakes started up.
7    So, in other words, money going out to Thousand Lakes,
8    coming into -- from Thousand Lakes.  And that was
9    substituted for this money coming in from Nationwide.
10   That's what this says.
11   Q.  And to the extent that there were arrangements between
12   Nationwide and Enchanted and Thousand Lakes, you're not
13   saying that the bank had visibility into those, do you --
14   are you?
15   A.  The bank could see all the transactions that were
16   occurring in the account.  So they could see the
17   transactions -- the round-trip transactions with Thousand
18   Lakes, the round-trip transactions with Metro Gem.  They
19   could see the incoming wires from Nationwide and Enchanted.
20   They could see everything.
21   Q.  But my question is, I think, different than what you
22   just answered.  If there were arrangements between
23   Nationwide and Enchanted and Thousand Lakes, the bank wasn't
24   seeing those, correct?
25   A.  Something off book, taking place somewhere else, is that

Ghiglieri - Cross

1     what you mean?

2     Q.  Yeah.

3     A.  Yeah.  I mean, they wouldn't have access to that.

4     Q.  Okay.  And going back to your answer about some of the

5     alert summaries, the alert summaries did not break down the

6     amounts of wire transfers by entity in the same way that

7     this chart prepared by PwC in 2018 does, correct?

8     A.  So if my memory is correct, I think some of the

9     summaries do make a calculation as far as what the incoming

10    number was for some of the entities and what the outgoing

11    number was, not just in total.  So that's what I'm saying is

12    I think some of the information in here was in the alert

13    summaries.  But this document I did not see in the bank's

14    production.

15    Q.  And, Ms. Ghiglieri, you didn't just review this PwC 2010

16    report when you prepared your own reports.  You actually

17    relied on it, correct?

18    A.  So where I relied on it was -- I relied on PwC to do the

19    transactions in the bank account and put them into

20    spreadsheets so that I could analyze the transactions more

21    efficiently.  I had them not only line them up by date, but

22    also by payee/payor; and then for the totals, I not only had

23    the totals in the payee/payor summaries, but this is another

24    iteration by alert date.  So I relied upon them, as is my

25    practice, to do the numbers part -- numbers crunching part

1    of it.

2                 And then I also relied on the PwC report only for

3    the standpoint that there was a Ponzi scheme and just

4    generally who the players were, but I didn't rely upon them

5    or their analysis for what I opined on in terms of, you

6    know, generating the red flags and things like that.

7    Q.  And the description of the fact that there was a Ponzi

8    scheme and who the players were, including Nationwide and

9    Enchanted, that information wasn't available to M&I before

10   September 2008, correct?

11   A.  From the standpoint that they could see the transactions

12   that were taking place and they could see the patterns of

13   red flags that were taking place.  So they had access to all

14   the information that is in my report.

15   Q.  Let's look at your report, Ms. Ghiglieri --

16   A.  Okay.

17   Q.  -- and where you cite to PwC.  I'll direct you to page

18   18, 19, 20.  Tell me when you're there.

19   A.  Yes, so that's what I said, so --

20   Q.  Let me ask --

21   A.  -- for a description of the Ponzi scheme --

22   Q.  I'll ask you --

23   A.  Oh, I'm sorry.  I thought you asked me a question.

24   Q.  I didn't want you to get ahead of me.

25                 So on page 19, you're quoting word for word from

1    the PwC report here, right?

2    A.  Yes.

3    Q.  And so you say, "The Ponzi scheme was described by PwC

4    as follows:  Petters and others conducted the Ponzi scheme

5    by soliciting investors for loans purported to enable

6    Petters Entities to purchase electronics inventory at

7    liquidation prices."  Do you see that?

8    A.  I do.

9    Q.  Okay.  And, again, this text of the PwC report, this was

10   not available to M&I Bank before September 2008, correct?

11   A.  Correct.

12   Q.  And it goes on to say that, "Petters formed eight

13   special purpose entities," or SPEs, "to better orchestrate

14   and control investor funds...and generally served as

15   pass-through entities for the financing activities of large

16   investment funds."  Do you see that?

17   A.  I do.

18   Q.  Again, that information that was written in 2010 was not

19   available to the bank before September 2008, correct?

20   A.  Right.

21   Q.  Ms. Ghiglieri, I would like to show you something else

22   that you testified about on direct.  Do you recall this

23   demonstrative that you testified about?

24   A.  Yes.

25   Q.  So in the PwC report in 2010, PwC, as we just talked

1    about, describes special purpose entity investors that

2    played a role in the Ponzi scheme, right?

3    A.  Yes.

4    Q.  And those SPEs, special purpose entities or SPEs, are

5    not reflected anywhere on this graphic that you prepared,

6    correct?

7    A.  I don't see them.  I don't see the acronym SPE on this,

8    no.

9    Q.  And the PwC report also describes that there were

10   hundreds of other bank accounts that played a role in the

11   Ponzi scheme.  Do you recall that subject being covered by

12   the PwC report?

13   A.  I only remember that the 9018 was the main account that

14   the Ponzi scheme went through.

15   Q.  If you look -- and you have the PwC report there.  Why

16   don't you look at page 119 of that report, and I will direct

17   you specifically to page 3 -- paragraph 399, and do you see

18   that there's a reference to hundreds of bank accounts?

19   A.  I do see the reference, yes.

20   Q.  And nowhere on the chart that we're looking at now, this

21   doesn't account for the fact that there were hundreds of

22   bank accounts involved in the Petters Ponzi scheme, correct?

23   A.  I'm only aware that the majority of the Ponzi scheme

24   went through this one account, which I think is right there.

25   So, no, the other accounts are not here on this

1   demonstrative.

2   Q.  And this demonstrative appears to be a relatively simple

3   portrait; and isn't that supposed to suggest that it should

4   have been simple for M&I to figure this out?  Is that what

5   you are suggesting here?

6   A.  Are you asking what I'm suggesting?

7   Q.  Yeah.  Did you prepare this demonstrative?

8   A.  No, I didn't.

9   Q.  Oh, you testified about it.  So who prepared this

10  demonstrative that you testified about?

11  A.  I'm not sure who prepared it.

12  Q.  But you did testify about it, right?

13  A.  Yeah.  I mean, as far as the business model, yeah.

14  Q.  And since you were able to testify about it, you agree

15  that this is supposed to suggest that the setup of the Ponzi

16  scheme was a simple one.

17  A.  Well, this does portray the business model as I'm aware

18  of it; and whether this portrays it in a simple fashion, I

19  guess it's easy to see, that's for sure.

20  Q.  So if we look back at what the PwC report said about

21  this, same paragraph that we were just talking about, PwC in

22  2010 concluded that, "The sheer complexity of the Petters

23  Ponzi scheme is staggering, involving dozens of Petters

24  entities, including two charitable foundations, hundreds of

25  bank accounts, and spanning more than ten years."  Do you

1    see that conclusion?

2    A.  I do.

3    Q.  Thank you.

4           MR. ANTHONY:  Objection.  Reading from a document

5    not in evidence.  Foundation.

6           THE COURT:  Overruled.

7           MR. ANTHONY:  Assumes facts.

8           MR. SCHAPER:  Thanks.  We can take that down,

9    Mr. Herzka.

10          MR. GLEESON:  It's on the ELMO.

11          MR. SCHAPER:  Thank you, Mr. Gleeson.

12   BY MR. SCHAPER:

13   Q.  So, Ms. Ghiglieri, you also testified about a MIContact

14   report in which Chris Flynn mentioned this Frank Vennes

15   character.  Do you recall that testimony?

16   A.  Yes.

17          MR. SCHAPER:  And if we could please put that up,

18   Mr. Herzka.  It's Plaintiff's Exhibit 2 at page 7.

19   BY MR. SCHAPER:

20   Q.  Do you recall testifying about this, Ms. Ghiglieri?

21   A.  Yes.

22   Q.  And the MIContact reports, those were filed for

23   particular customers, correct?

24   A.  Yes, whenever they had contact with the customer, they

25   would record it in this system.

1    Q.  And here this was filed for a customer called Metro Gem;

2    is that right?

3              MR. SCHAPER:  If we look back at the previous

4    page, Mr. Herzka, where it says "customer" at the top.

5    A.  Yes, Metro Gem.

6    Q.  And plaintiff's counsel asked you on direct about

7    whether AML analysts reviewed MIContacts reports, correct?

8    A.  Yes.

9    Q.  And this MIContact report was not for PCI's account,

10   right?

11   A.  No.

12   Q.  And if we look at the text on the next page -- sorry.

13   If we go back to the prior page.  This is actually, if you

14   see under the "Call Report," you see that it says,

15   "Prospect," that Metro Gem was a prospect, correct?

16   A.  I do see that.

17   Q.  Do you understand what that means?  Given your expertise

18   in the banking area, what a prospect is --

19   A.  Yes.

20   Q.  -- as opposed to a customer?

21   A.  Um-hm.

22   Q.  What does that mean?

23   A.  They are trying to develop a potential customer.

24   Q.  So it's not an existing customer?

25   A.  I'm sorry?

1    Q.  It's not an existing customer, it's a potential

2    customer?

3    A.  Yes.

4    Q.  And if we look now to the next page, PCI is not

5    referenced anywhere in this MIContacts report, is it?

6    A.  Tom Petters is.

7    Q.  But PCI is not, correct?

8    A.  I do not see PCI there.

9    Q.  And you testified earlier about PCI transactions with

10   Nationwide and Enchanted being inconsistent with PCI's

11   purported business model, and I think you said that part of

12   the reason was because Nationwide and Enchanted were

13   supposed to be wholesalers.  Am I recalling your testimony

14   correctly?

15   A.  Yes.

16   Q.  This MIContacts report does not even mention Nationwide

17   or Enchanted, correct?

18   A.  That's correct.

19   Q.  And there's certainly no reference to either of those

20   entities being a wholesaler, correct?

21   A.  Yes.

22   Q.  And there's no evidence that AML analysts at M&I were

23   given information that Nationwide and Enchanted were

24   supposed to be wholesalers, correct?

25   A.  There's testimony that they did -- some of them didn't

1   know what Nationwide and Enchanted was.  With billions of

2   dollars coming in, that would be one of the things that they

3   should have looked at, is who they were and what their

4   relationship was to PCI.

5   Q.  Looking at this MIContacts report, do you recall the

6   testimony that after this meeting, that M&I Bank turned down

7   Mr. Vennes for the loan he was seeking?

8   A.  Yes, that's correct.

9   Q.  You had slides that talked about convicted felons, but

10  M&I actually turned down this particular opportunity that

11  Mr. Vennes was asking about, right?

12  A.  I'm having trouble hearing what you said.  I'm so sorry.

13  Q.  You had testified about the notion of a convicted felon

14  of Mr. Vennes.  This MIContacts report, you just confirmed,

15  results in a loan opportunity Mr. Vennes was seeking where

16  the bank rejected him, correct?

17  A.  Correct.

18  Q.  Ms. Ghiglieri, you were asked about a training deck that

19  M&I did that communicated that people should not assume that

20  a customer is legitimate.  Do you remember that?

21  A.  Yes.

22  Q.  And that one of the things that a bank employee can do

23  is to visit the customer.  Do you remember that?

24  A.  Yes.

25  Q.  And I think that you called that good guidance, right?

1   A.  Yes.

2   Q.  And you do recall the testimony from Mr. Jambor that he

3   actually did visit M&I's offices, correct?

4   A.  M&I's offices?

5   Q.  Thank you.  He visited PCI's offices, correct?

6   A.  Yes.

7   Q.  And you heard Ms. Lindstrom from PCI testify during the

8   course of this trial; is that right?

9   A.  So I think that's the one that I didn't hear,

10  Ms. Lindstrom.

11  Q.  Did you read the transcript of her testimony?

12  A.  I did not.

13  Q.  Do you have any reason to doubt that there was testimony

14  that a visitor to PCI's offices would see a standard office

15  park setup that gave no visitor an indication that there was

16  a Ponzi scheme being run out of it?  Do you have any reason

17  to doubt that that was the testimony?

18  A.  I think that's a leap for me to be able to say that

19  because I saw nothing in the bank documentation that

20  described the offices or, you know, gave me that

21  information.  So I don't know how to answer that.

22  Q.  And is hers the only testimony that you're not familiar

23  with from this trial?

24  A.  Yes.  I think that's the only one I missed.

25  Q.  So, Ms. Ghiglieri, you talked a little bit about

1    Mr. Grice's opinion that Ponzi schemes were not a regulatory

2    focus until sometime after 2008 when the Petters Ponzi

3    scheme and some other large Ponzi schemes were uncovered.

4    Do you recall your testimony about that earlier today?

5    A.  Yes.

6    Q.  And you're familiar with a Suspicious Activity Report?

7    A.  Yes.

8    Q.  Also called a SAR sometimes?

9    A.  Um-hmm.

10   Q.  And the SAR is a form that the government puts out where

11   you can fill in the blanks about different kinds of

12   suspicious activity that's being observed, correct?

13   A.  Yes.

14   Q.  And the SAR form was first developed in 1996.  Do I have

15   that right?

16   A.  I don't know the exact date.  That's probably right.

17   Q.  I would like to put up another demonstrative again that

18   was not objected to, DD-7.

19   A.  Do I have that?

20   Q.  No.  We'll put that up on the screen once plaintiff's

21   counsel confirms that there's no objection.

22            MR. ANTHONY:  No objection, Your Honor.

23            THE COURT:  You may.

24   BY MR. SCHAPER:

25   Q.  And so, Ms. Ghiglieri, this was the government's 1996

1    Suspicious Activity Report form.  Do you see that up -- can

2    you see that on your screen okay?

3    A.  I can, yes.

4    Q.  And there are, I think, 17 types of suspicious activity

5    noted; and you would agree with me that Ponzi schemes is not

6    on this list, correct?

7    A.  No, it's not.

8    Q.  And neither is pyramid schemes, which can be similar to

9    a Ponzi scheme, right?

10   A.  No.

11   Q.  Not on the list?

12   A.  They're different.

13            Oh, you said similar.  They are not similar.  Is

14   that what you mean?

15   Q.  So your testimony is that pyramid schemes are different

16   than Ponzi schemes?

17   A.  Yeah.

18   Q.  Okay.  Neither one is on this list in any event?

19   A.  No, neither of them are on the list, correct.

20   Q.  And am I right that the government updates the SAR form

21   from time to time?

22   A.  Yes.

23   Q.  And, for example, in 2003, two years after September 11,

24   the SAR form was updated again, correct?

25   A.  It's updated -- I mean, it's been updated periodically,

Ghigleri - Cross

1    so I don't have the dates memorized.

2    Q.  Fair enough.  So we'll put up the next slide in the

3    demonstrative to just show that.

4            So, again, this is the July 2003 form of the

5    government's Suspicious Activity Report.  And if you see

6    that there are actually changes that the government made in

7    2003, and do you see that it added terrorist financing and

8    identity theft as additional types of suspicious activity?

9    Do you see that?

10   A.  I do.

11   Q.  But, again, we don't see any -- there's not a reference

12   to a Ponzi scheme in the enumerated items on this form,

13   correct?

14   A.  No.

15   Q.  And it's 2008 when the Petters Ponzi scheme was

16   discovered, correct?

17   A.  Yes.

18   Q.  And we've already talked about that around that time, I

19   know you don't have the specific dates, but around that time

20   there were other Ponzi schemes that were uncovered too,

21   correct?

22   A.  Yes.

23   Q.  And so if we look next at the 2011 form of the

24   Suspicious Activity Report, again, there's another change

25   here, there's a reference to pyramid schemes, correct?

1    A.  Yes.  And just to be clear, there's more than just the

2    highlighted change because they were changing different

3    things.  So we would have to actually compare the list, you

4    know, to each one.  But I do see pyramid scheme here where I

5    didn't see it before.

6    Q.  And, again, Ponzi schemes don't appear on this version,

7    correct?

8    A.  No, I don't see it.

9    Q.  And then in 2017, if we look at the next slide, you see

10   that there was -- and maybe you are aware of this given your

11   work in the field.  Do you see that there was some movement

12   to add Ponzi schemes as something, you know, very specific

13   on a SAR form?  Are you aware of that?

14   A.  Yes.

15   Q.  And are you aware that that change to the SAR form was

16   actually adopted in 2018 so that Ponzi schemes actually

17   became a category on the SAR form in 2018?

18   A.  Well, I would have to look at it to confirm it, but this

19   is the Notice of Proposed Rulemaking to do that.

20          MR. SCHAPER:  We can take that down, Mr. Herzka.

21   BY MR. SCHAPER:

22   Q.  Ms. Ghiglieri, I would like to talk a bit about the

23   methodology that you used in this case.  I think you've

24   testified several times that you attempted to use the same

25   methodology that you used as a regulator when you were

1    examining banks.  Do I have that right?

2    A.  Yes.

3    Q.  And you testified on Friday that one of your conclusions

4    in your report was that M&I's BSA/AML program was, quote,

5    severely flawed, close quote.  Do you recall that testimony?

6    A.  I do.

7    Q.  And I understand that that was your conclusion when you

8    wrote your report in 2018.  Am I right, though, that in this

9    matter, there actually was a regulator that examined M&I's

10   BSA/AML compliance program between 2002 and 2008?

11   A.  Yes.

12   Q.  And that was the Federal Reserve Bank of Chicago, right?

13   A.  Yes.

14   Q.  Is it okay if I call that the fed?  You will know what I

15   am talking about?

16   A.  Yes.

17   Q.  So I will come back to those exam results in a second,

18   but I would like you to help the jury understand a little

19   bit about what a fed examination process is like, and you

20   started doing that this morning, but I think there's

21   probably more to explain.

22           First of all, you would agree that the banking

23   industry is heavily regulated, correct?

24   A.  Yes.

25   Q.  And that bank regulators examine banks on a regular

1    basis?

2    A.  Yes.

3    Q.  And as we talked about here, the fed was examining M&I's

4    BSA/AML compliance program every year during the time period

5    that's at issue, correct?

6    A.  Yes.

7    Q.  And before each of those exams, am I right that the fed

8    sent what are known as preexam letters to M&I that requested

9    documents and other information as part of the exam?

10   A.  Yes.

11   Q.  And M&I would provide written responses to the fed,

12   right?

13   A.  Correct.

14   Q.  And in your work, I believe you have reviewed those

15   preexam letters and responses in part of your review of the

16   record, right?

17   A.  Yes.

18   Q.  If a bank failed to provide documentation to the fed or

19   refused to respond to these requests by the fed, the fed

20   could take an enforcement action, right?

21   A.  Yes.

22   Q.  The fed could go as far as to remove the bank's

23   management as part of that, correct?

24   A.  Yes.

25   Q.  Just to be clear, there's no evidence in the record that

1    anything like that happened with respect to M&I, right?

2    A.  Right.

3    Q.  And when the fed was doing its exams of M&I, it had --

4    the fed has unrestricted access to the bank, doesn't it?

5    A.  Yes.

6    Q.  And the fed can speak to bank employees if they want,

7    right?

8    A.  Yes.

9    Q.  They can ask for more documents to review, correct?

10   A.  Yes.

11   Q.  And one of the things that the fed does is it will

12   review a bank's AML policies and procedures, correct?

13   A.  Yes.

14   Q.  And it will also look at how does the bank identify

15   suspicious activity, right?

16   A.  Yes.

17   Q.  Another thing that the fed looks at is the bank's

18   automated and manual account monitoring systems, right?

19   A.  Yes.

20   Q.  And the fed also conducts what's called transaction

21   testing, doesn't it?

22   A.  Yes.

23   Q.  And transaction testing refers to actually looking at

24   samples of customer transaction data from the bank, right?

25   A.  Yes.

```
 1    Q.  And the fed, in fact, did that with respect to its

 2    examinations of M&I, correct?

 3              MR. ANTHONY:  Objection, lacks foundation.

 4              THE COURT:  You may answer if you know.

 5              THE WITNESS:  I do not know if they did

 6    transaction testing.  As I'm sitting here, I can't remember.

 7    I'm sorry.

 8    BY MR. SCHAPER:

 9    Q.  So if we look at --

10              MR. SCHAPER:  Don't put this up, please,

11    Mr. Herzka.

12    BY MR. SCHAPER:

13    Q.  If you would take a look in your binder of documents at

14    DX-50356.

15    A.  Is it the cross exhibits?

16    Q.  It is.  Thank you, Ms. Ghiglieri.

17    A.  Can you tell me the number again?

18    Q.  Yes.  50356.  Just let me know when you are there.

19    A.  I have it.

20    Q.  We will come back to this document later, Ms. Ghiglieri,

21    but can you just read the second paragraph and tell me

22    whether it refreshes your recollection about the fact that

23    the fed did transaction testing when it examined M&I Bank.

24    A.  Yes, they did perform transaction testing.

25    Q.  Thank you.
```

1          So getting into the fed exam results, am I right,

2    Ms. Ghiglieri, that you have no opinions that are critical

3    of the fed's AML review of M&I Bank between 2002 and 2008?

4    A.  That's right.

5    Q.  And you acknowledge that the fed, in doing its reviews,

6    had more information than you did, correct?

7    A.  Yes.

8    Q.  And, again, you testified, Ms. Ghiglieri, that your

9    conclusion -- when you wrote your 2018 report, your

10   conclusion was that the bank's AML/BSA compliance program

11   was severely flawed, correct?

12   A.  Yes.

13   Q.  I'd like to ask you about what the fed concluded at the

14   time that it did its examinations.

15          MR. SCHAPER:  So I'd like to put up DD-7, which is

16   a demonstrative that was the subject of back and forth with

17   the Court, and the Court overruled objections, but I don't

18   want to do that until plaintiff's counsel may look at that.

19       (Mr. Anthony and Mr. Schaper confer)

20          THE COURT:  Counsel, do you have --

21          MR. ANTHONY:  We will renew our objection,

22   Your Honor, as lacking foundation.

23          THE COURT:  Counsel, do you have extensive

24   questioning about this exhibit?

25          MR. SCHAPER:  I do.  So it would be a good time

Ghig, Tier P. - Cross

```
 1    for a break, if that's what you are asking.

 2              THE COURT:  Okay.  Let me just rule on the -- is

 3    there an objection?

 4              MR. ANTHONY:  There's an objection to this

 5    document and to the questioning on what the Federal Reserve

 6    did because it's all hearsay and lacks foundation.

 7              MR. SCHAPER:  This was part of what -- the issue

 8    that the Court ruled on this morning.

 9              MR. ANTHONY:  I understand that.  I am just making

10    our objection for the record because it's hearsay and lacks

11    foundation.

12              THE COURT:  Understood.  Overruled.

13              We will take our midday break, Members of the

14    Jury.  Please remember the instructions that I have given

15    you.  Please continue to follow those instructions, and

16    please be prepared to come back to the courtroom at 1:00.

17    Okay?  Have a good lunch.

18              LAW CLERK:  All rise for the jury.

19         (Jury excused)

20                        IN OPEN COURT

21                     (JURY NOT PRESENT)

22              THE COURT:  We are in recess.

23         (Lunch recess taken at 11:57 a.m.)

24                    *    *    *    *    *

25         (1:05 p.m.)
```

1                        IN OPEN COURT

2                       (JURY PRESENT)

3             THE COURT:  Please be seated.  Good afternoon.

4             MR. SCHAPER:  Good afternoon, Your Honor.  May I

5      proceed?

6             THE COURT:  And we will continue, yes.

7             MR. SCHAPER:  Thank you.

8             THE COURT:  Please proceed.

9      BY MR. SCHAPER:

10     Q.  Ms. Ghiglieri, right before the lunch break we were

11     starting to talk about the actual examinations that the

12     Federal Reserve did of M&I's AML/BSA compliance program.  Do

13     you remember we were just getting into that subject?

14     A.  Yes.

15            MR. SCHAPER:  So if we could put up

16     Demonstrative DD-7.

17     BY MR. SCHAPER:

18     Q.  And you had testified that your opinion in your report

19     was that the bank's BSA/AML compliance program was severely

20     flawed, correct?

21     A.  Yes.

22     Q.  And you're aware that the fed conducted an examination

23     of M&I's AML program in 2002, correct?

24     A.  Yes.

25     Q.  And you're aware that the conclusion that the fed

 1     reached in that year was that M&I's BSA/AML program was

 2     satisfactory.  Do you recall that?

 3     A.  In 2002?

 4     Q.  2002, yes.

 5     A.  Let's see.  I can't come to the letter.  I know that

 6     they had some criticisms and entered into a board resolution

 7     with them, so --

 8     Q.  In 2002 -- oh, I'm sorry, I didn't mean to --

 9     A.  Yeah.

10     Q.  We're talking about 2002.

11     A.  2002.

12     Q.  We'll get to 2003 in a second.

13     A.  Okay.  I'm sorry.

14     Q.  Do you recall, Ms. Ghiglieri -- and I know you testified

15     generally when plaintiff's counsel was asking questions.

16     You testified generally about being familiar with the fed

17     exams of the bank during this time period, right?

18     A.  Yes.

19     Q.  Do you recall the result of the 2002 examination of M&I?

20     A.  So I know they did one, I know there's a letter, but I

21     can't put my hands on it to see if they said it was adequate

22     or whatever term --

23     Q.  If you could just turn in your binder to DX-50073 and

24     tell me if you're there.

25     A.  Yes, I have it, 50073.

Ghigtler P - Cross

1    Q.  And if you just read the first sentence of that

2    document, does that refresh your recollection that the

3    result of the 2002 exam was that the bank's program was

4    considered satisfactory?

5    A.  So this is a bank-prepared document, not the letter from

6    the fed.

7    Q.  That's right.

8    A.  So the bank is characterizing it as satisfactory.

9    Q.  Do you have any reason to dispute that characterization?

10   A.  Unless I see the letter, I can't testify to exactly if

11   that's what they said.

12   Q.  But that's what's confirmed in the bank's documents,

13   though?  That's what's described --

14   A.  This is --

15   Q.  -- in the bank's documents?

16              MR. ANTHONY:  Objection, lacks foundation.

17              THE COURT:  Sustained.  The testimony stands.

18              MR. SCHAPER:  Sorry.

19              THE COURT:  She has testified about what she

20   understands.

21   BY MR. SCHAPER:

22   Q.  So let's, then, go to -- well, actually, let me ask you:

23   Am I correct that this is among the documents that you

24   reviewed in preparing your report?

25              MR. ANTHONY:  Objection, vague and ambiguous as to

```
 1        "this."
 2                MR. SCHAPER:  Sorry.  DX-50073.
 3                THE WITNESS:  I don't know without looking at my
 4        report to see if I cited it, but it looks like part of the
 5        documents I would have reviewed.
 6        BY MR. SCHAPER:
 7        Q.  Okay.  And if you just want to refer to your report and
 8        to the attachment to your report that talks about the
 9        documents that you reviewed.
10        A.  So I looked at -- I had access to all of the bank
11        production, and the documents that I relied upon I
12        footnoted.  And so to be able to confirm for sure that I
13        relied upon this, I would have to make sure I footnoted it.
14        Q.  But did you review this?  You said you had access to all
15        the bank's production?
16        A.  I had access to all of them.  The ones I relied upon for
17        my opinions I footnoted.  So I don't know a hundred percent
18        if I relied upon this or not for my opinions --
19        Q.  Okay.
20        A.  -- without looking at the footnotes.
21        Q.  Okay.  So let's move from 2002 to 2003.  And you
22        testified earlier today that again the fed conducted a
23        targeted examination of the bank's AML program in 2003,
24        correct?
25        A.  Yes.
```

1    Q.  And I think -- if you'd turn to DX-50136.

2    A.  I have it.

3    Q.  And do you recognize that document?

4    A.  I do.

5    Q.  And, Ms. Ghiglieri, this is a letter that is from the

6    Federal Reserve Bank of Chicago dated December 12, 2003 to

7    M&I Bank.  Do you see that?

8    A.  I do.

9    Q.  And it says at the outset --

10           MR. ANTHONY:  Your Honor, objection.  There's no

11   evidence that anything was established as satisfactory.  She

12   said -- there is no foundation.  Why is that up on the

13   screen, is my question, Your Honor?

14           MR. SCHAPER:  I believe she said that -- she

15   confirmed that that was what was in the document, Judge.

16           MR. ANTHONY:  Well --

17           THE COURT:  The objection is sustained.

18           MR. ANTHONY:  I think it needs to be taken down,

19   at least that reference.

20   BY MR. SCHAPER:

21   Q.  So do you see that this is a letter from the fed to M&I

22   in 2003?

23   A.  I do.

24   Q.  And it's saying that the Federal Reserve Board of

25   Chicago conducted a targeted examination of M&I, Marshall &

Ghigliery - Cross

1    Ilsley Bank's AML program as of August 11th, 2003.  Do you

2    see that?

3    A.  I do.

4    Q.  And you testified earlier that the fed regularly

5    conducts targeted examinations of banks' AML programs

6    pursuant to the BSA; is that right?

7    A.  Yes.

8    Q.  And this letter contains some factual findings from

9    those examinations; is that correct?

10   A.  Yes.

11   Q.  And you reviewed this letter in connection with your

12   2018 report, correct?

13   A.  I did.

14           MR. SCHAPER:  Your Honor, I offer into evidence

15   DX-50136.

16           MR. ANTHONY:  We'll maintain our objection, Your

17   Honor.  We realize that you have overruled it, but we still

18   have an objection to hearsay, foundation.  But you have

19   already ruled it's admissible.

20           THE COURT:  I have, and so it is received.

21           MR. SCHAPER:  Thank you, Your Honor.

22           THE COURT:  The objection is overruled.

23   BY MR. SCHAPER:

24   Q.  And in your direct examination you noted that in this

25   exam period for 2003 the fed actually found that the bank's

1    AML program was inadequate, correct?

2    A.  Yes.

3    Q.  And when the fed issues an inadequate finding, there's a

4    range of enforcement actions that the fed can take; is that

5    right?

6    A.  That's right.

7    Q.  And so that could include formal actions, like imposing

8    fines on the bank, or even something as drastic as shutting

9    the bank down altogether; is that correct?

10   A.  Well, the formal enforcement actions would be -- I mean,

11   they are not going to shut down a bank for Bank Secrecy Act

12   problems, but instead insolvency.  But for formal

13   enforcement actions there would be a cease and desist order

14   or a formal agreement or civil money penalties.

15   Q.  And there also are informal actions, like a board

16   resolution on the sort of lower end on the range of possible

17   outcomes, correct?

18   A.  Yes.

19   Q.  And in the case of M&I in 2003, the sanction was a board

20   resolution, right?

21   A.  Yes.

22   Q.  And I think you've referred to that in your deposition

23   as the lowest possible type of enforcement action, right?

24   A.  Yes.

25   Q.  And M&I responded to the criticisms that the fed had

1     promptly, correct?

2     A.  Yes.

3     Q.  So the fed exam letter that we just were looking at was

4     dated December 12th, 2003.  Do I have that right?

5     A.  Yes.

6     Q.  And shortly after that M&I adopted a board resolution

7     that committed the bank to make certain enhancements to its

8     AML program, correct?

9     A.  Yes.

10    Q.  And then after that, in early 2004 M&I actually sent the

11    fed a detailed response to address the concerns from the fed

12    2003 exam, correct?

13    A.  Yes.

14    Q.  And the board resolution was in place during M&I's next

15    exam review period; is that right?

16    A.  Yes.

17    Q.  And during the time that you have a board resolution in

18    place like that, regulators are in frequent contact with

19    management at the bank and the board, correct?

20    A.  Yes.

21    Q.  And that frequent contact includes frequent and longer

22    onsite visits to the bank; is that right?

23    A.  It can.  It depends on what -- how they want to do it.

24    It could be correspondence.  It could be coming on site.  It

25    just depends.

1   Q.  And during that time the bank is subject to frequent and

2   more intense reporting requirements as part of its

3   examination process; is that right?

4   A.  Yes.

5   Q.  And in 2004, am I correct that the fed did another

6   annual examination of M&I's BSA/AML program?

7   A.  Yes.

8   Q.  And am I right that this began about eight months after

9   the bank's rating of inadequate in 2003?

10  A.  I don't know without looking to see when they started

11  it.

12  Q.  That's fair.  So I'd like you to turn, Ms. Ghiglieri, to

13  DX-50233.

14  A.  Okay.

15  Q.  And do you recognize this as the Federal Reserve Bank of

16  Chicago's 2004 -- I should say September 22, 2004 exam

17  letter?

18  A.  I do.

19  Q.  And it says that the fed conducted a targeted

20  examination of M&I's AML program as of August 16, 2004; is

21  that right?

22  A.  Yes, um-hum.

23  Q.  And the letter, like the last one we looked at, contains

24  factual findings from the fed; is that correct?

25  A.  Yes.

1    Q.  And this is another document that you relied on in your

2    2018 reports, correct?

3    A.  Yes.

4           MR. SCHAPER:  Your Honor, we'd offer into evidence

5    DX-50233.

6           MR. ANTHONY:  Same objection, Your Honor,

7    foundation, hearsay, assumes facts not in evidence.

8           THE COURT:  It is received.  Overruled.

9    BY MR. SCHAPER:

10   Q.  If you go, Ms. Ghiglieri, to the second page of this

11   document, if you look at the third paragraph it states, "As

12   discussed with senior management during the exit meeting of

13   August 27, 2004, the overall rating of the bank's AML

14   program is adequate."  Do you see that?

15   A.  I do.

16   Q.  And do you see -- if we can go up to the top of that

17   page, again, looking at what the fed -- Federal Reserve Bank

18   of Chicago told the bank in 2004, at the top it reads, "Our

19   findings indicate that the board and management have

20   enhanced the bank's AML program to be commensurate with the

21   organization's size and complexity, and responsibility for

22   supervising the program has been assigned to appropriate

23   management-level positions."  Do you see that?

24   A.  I do.

25   Q.  And so that was part of the fed's conclusion in 2004,

1    right?

2    A.  Yes.

3    Q.  And the fed continues, "Applicable policies, procedures,

4    and expected practices provide personnel with adequate

5    guidance and result in an effective system of internal

6    controls for pertinent program components, including

7    customer risk analysis, suspicious activity monitoring and

8    reporting, currency transaction reporting, and OFAC

9    screening."  Do you see that?

10   A.  I do.

11            MR. SCHAPER:  So if we'd go back to the

12   demonstrative that we had up just to reflect that finding.

13   BY MR. SCHAPER:

14   Q.  Ms. Ghiglieri, your initial opinion in this case was

15   approximately 345 pages long; is that right?

16   A.  Well, that's the part that I wrote and then there's

17   another I don't know how many pages, maybe 600 or something

18   of the appendices.

19   Q.  And nowhere in your report do you reference the language

20   that we have just been reading from the fed's 2004 letter,

21   correct?

22   A.  I don't know if I did or not.  I know I have a section

23   in there about the Federal Reserve examinations.

24   Q.  During this 2004 time frame M&I was in the process of

25   setting up Searchspace, right?

1    A.  Yes.

2    Q.  But it wasn't yet up and running until 2005?

3    A.  No, not until 2005.

4    Q.  And in your report you give an opinion that M&I not

5    having Searchspace up and running until 2005, you called

6    that a, quote, unquote, colossal failure.  Do you recall

7    that part of your report?

8    A.  Yes.

9    Q.  But in the 2004 exam letter that we've just been looking

10   at, the fed references the fact that M&I didn't have

11   Searchspace up and running yet, doesn't it?

12   A.  I don't know because I didn't sit here and read the

13   whole entire letter, but I know it wasn't up and running

14   until 2005.

15   Q.  All right.  So if we look at -- if we go back to

16   DX-50233 --

17   A.  Okay.

18   Q.  -- and if we look at -- it's on page 3.  Do you see in

19   the first full bullet in the middle there that it says, "It

20   is the Federal Reserve Bank of Chicago's understanding that

21   with the implementation of Searchspace, all wires will be

22   monitored more closely in the future, but until the

23   implementation, the bank is expected to create an interim

24   solution to monitor wires for suspicious activity."

25   Correct?

Ghiglieri - Cross

1    A.  Yes.

2    Q.  And so the Federal Reserve, just based on what you're

3    reading, was aware that Searchspace was not up and running

4    yet, correct?

5    A.  Yes.

6    Q.  And notwithstanding that, as we've already talked about

7    on page 2, the Federal Reserve said that the overall rating

8    of the bank's AML program is adequate for that year,

9    correct?

10   A.  Yes.

11   Q.  Okay.  Am I right, Ms. Ghiglieri, that the Federal

12   Reserve did another examination of the bank's AML program in

13   2005?

14   A.  Yes.

15   Q.  And I'm showing you -- if you would turn in your binder

16   to what's been marked for identification as DX-50356.

17   A.  Okay.  I have it.

18   Q.  Let me know when you're there.

19   A.  I have it.

20   Q.  Do you recognize this as the Federal Reserve Bank of

21   Chicago's October 18, 2005 letter to M&I Bank?

22   A.  I do.

23   Q.  And do you see that it states that the Federal Reserve

24   Bank of Chicago was conducting a targeted examination of

25   M&I's AML program as of July 5th, 2005?

1    A.  Yes.

2    Q.  And, again, this letter contains factual findings from

3    the fed, correct?

4    A.  Yes.

5    Q.  And this was another of the fed letters that you

6    reviewed in connection with your 2018 report, right?

7    A.  I didn't hear that.  Say that again.

8    Q.  This was another fed letter that you reviewed in

9    connection with your 2018 report?

10   A.  Yes.

11           MR. SCHAPER:  Your Honor, we'd move into evidence

12   DX-50356.

13           MR. ANTHONY:  Same objections, foundation,

14   hearsay, assumes facts not in evidence.

15           THE COURT:  Overruled.

16   BY MR. SCHAPER:

17   Q.  Ms. Ghiglieri, I'd like to direct your attention to the

18   second page of this letter from the Federal Reserve Board to

19   M&I Bank.

20   A.  Okay.

21   Q.  And in particular the second full paragraph that says,

22   "As was discussed."  Do you see that?

23   A.  I do.

24   Q.  In this letter the fed told M&I Bank, "As was discussed

25   with senior management at the time of the examination, the

Ghigller P. - Cross

1   overall rating of the bank's AML program is adequate."  Do

2   you see that?

3   A.  I do.

4   Q.  And the fed continues that, "The rating is based

5   primarily on the Bank's implementation of interim program

6   improvements as set forth in the Board Resolution approved

7   by the Bank's Board of Directors on December 18th, 2003."

8   Do you see that?

9   A.  I do.

10  Q.  And that's the same board resolution that you testified

11  to earlier that the bank entered after the 2003 exam?

12  A.  Yes.

13  Q.  And is it correct that as a result of this examination,

14  the fed did not object to the board of directors rescinding

15  the board resolution?

16  A.  Is it a fact, is that how you asked me?

17  Q.  Is that correct, that that's what the fed is saying

18  here?

19  A.  Yes.

20  Q.  And, in fact, it says that in the last sentence of this

21  paragraph.  It says, "As a result, this Reserve Bank offers

22  no objection to the Bank's directorate rescinding the Board

23  Resolution."  Right?

24  A.  Yes.

25  Q.  And the fact that the fed was comfortable with the board

1    resolution being rescinded means that M&I's management

2    systems were functioning properly, correct?

3    A.  Well, again, I don't know what the Federal Reserve's

4    scope was, but based on what they did, they were okay with

5    rescinding the board resolution, yes.

6    Q.  Am I right, Ms. Ghiglieri, that in your book that you

7    testified about earlier, that you write about what it means

8    for an enforcement action to be terminated?

9    A.  Yes, I do.

10   Q.  And you say that, first of all -- you say several

11   things -- you say that substantial compliance with the

12   enforcement action is required, right?

13   A.  Yes.

14   Q.  So this reflects that the fed determined that M&I was in

15   substantial compliance with the enforcement action, correct?

16   A.  Right.

17   Q.  You also say that it means that the bank's risk

18   management systems are again functioning properly and the

19   actions taken are sustainable, correct?

20   A.  Yes.

21   Q.  That was your view?

22   A.  Yes.

23   Q.  And that's what this reflects too, correct?

24   A.  Yes.  And, again, I don't know what the scope of the

25   fed's examination is, but whatever they did, this is how

1      they felt, yes.

2              MR. SCHAPER:  Thanks.  We can take that one down.

3      BY MR. SCHAPER:

4      Q.  So, again, if we look now -- we've talked about the

5      finding in 2003 and we've talked about what happened in 2004

6      and 2005 when the bank addressed those issues.  Was there

7      another examination by the fed of the bank's AML program in

8      2006?

9      A.  Yeah.  They looked at it every year for this time

10     period.

11     Q.  So for 2006, Ms. Ghiglieri, if you would please look at

12     what's been marked as DX-50445.

13     A.  Okay.

14     Q.  And do you recollection nice this as an August 30, 2006

15     letter from the Federal Reserve of Chicago to Mr. Peter

16     Janczak at M&I Bank?

17     A.  Yes.

18     Q.  And again the fed is saying that it conducted a targeted

19     examination of M&I's AML program commencing June 12th, 2006.

20     Do you see that?

21     A.  Yes.  June 12th?  Yes.

22     Q.  And it says, "which assessed the extent to which the

23     board and management have taken necessary actions to

24     adequately identify, measure, monitor, and mitigate the

25     potential risks associated with AML compliance."  Do you see

1    that?

2    A.  I do.

3    Q.  And this is another fed examination letter that you

4    reviewed in connection with your 2018 report; is that right?

5    A.  Yes.

6           MR. SCHAPER:  Your Honor, I'd offer DX-50445 into

7    evidence.

8           MR. ANTHONY:  Same objections, Your Honor,

9    foundation, hearsay, assumes facts not in evidence.

10           THE COURT:  Overruled.  It is received.

11   BY MR. SCHAPER:

12   Q.  So, again, if we look at the second page, Ms. Ghiglieri,

13   do you see that there's a section in the middle that says,

14   "Overall Assessment"?

15   A.  "Overall Assessment," yes.

16   Q.  And the fed was writing to the bank in 2006, "The Bank

17   continues to implement satisfactory programs and processes

18   to detect and report money laundering and its continued

19   overall compliance with the BSA, USA PATRIOT Act and the

20   OFAC rules and regulations."  Do you see that?

21   A.  I do.

22   Q.  So this exam reflect that the overall rating from the

23   fed was satisfactory, correct?

24   A.  Yes.  Well, they don't say it's satisfactory.  They

25   don't say our rating is X, which I am assuming is here

1    somewhere.

2    Q.  They say "satisfactory programs," correct?

3    A.  Yes.

4    Q.  And you're aware, from your expertise in the industry,

5    that sometimes the fed exam letters are not the same year to

6    year?

7    A.  Well, they are saying that the bank continues to

8    implement satisfactory programs.  They are not saying that

9    everything is satisfactory.  That's how I'm reading it --

10   Q.  Right.

11   A.  -- unless it's here somewhere that I can't see.

12   Q.  But the overall assessment is that the bank continues to

13   implement satisfactory programs, correct?

14   A.  Yes.

15   Q.  And the fed continues that, "Our findings indicate that

16   the board and management have enhanced the M&I's AML program

17   to be commensurate with the organization's moderate size and

18   complexity, and responsibility for supervising the program

19   has been assigned to appropriate management-level

20   positions."  Do you see that?

21   A.  I do.

22   Q.  And then the fed continues, "Applicable policies,

23   procedures, and expected practices provide personnel with

24   adequate guidance and result in an effective system of

25   internal controls for pertinent program components,

1    including customer-risk analysis, suspicious activity

2    monitoring and reporting, currency transaction reporting,

3    and OFAC screening."  Do you see that?

4    A.  I do.

5    Q.  So if we look back at the demonstrative, again, we're

6    through 2006 and the fed uses the word "satisfactory" in its

7    "Overall Assessment" paragraph, correct?

8    A.  I mean, I think this is a little misleading because they

9    don't say overall the Bank Secrecy Act area is satisfactory.

10   But they say they are continuing to implement satisfactory

11   programs, so as long as that's understood.

12   Q.  Okay.  So with that understanding, then, we have a --

13   again, we have your opinion that the bank's programs were

14   severely flawed?

15   A.  Yes.

16   Q.  And we have 2004, a finding of adequate; 2005, adequate;

17   2006, satisfactory with the caveat that you just gave,

18   correct?

19   A.  Yes.

20   Q.  That's fair?

21   A.  Yes.

22   Q.  And then you just said that this was an annual

23   examination process.  And so if we look at 2007, there was

24   another exam in 2007, correct?

25   A.  Yes.

1    Q.  So I'd like you to turn in your binder to what's been

2    marked as DX-50588.

3    A.  Okay.  I've got it.

4    Q.  And, Ms. Ghiglieri, do you recognize this as the

5    July 31, 2007 letter from the Federal Reserve to M&I Bank?

6    A.  I do.

7    Q.  And, again, this -- as it says, this was the fed

8    conducting a targeted examination of the bank's AML program.

9    This one was as of June 18th, 2007.  Do you see that?

10   A.  Yes.

11   Q.  And this letter, like the others, has factual findings

12   about the bank's program; is that right?

13   A.  Yes.

14   Q.  And this is another one of the letters that you reviewed

15   in connection with your report?

16   A.  Yes.

17            MR. SCHAPER:  Your Honor, I would offer DX-50588

18   into evidence, please.

19            MR. ANTHONY:  Same objection, foundation, hearsay,

20   assumes facts not in evidence.

21            THE COURT:  Overruled.  It is received.

22            MR. SCHAPER:  Thank you.

23   BY MR. SCHAPER:

24   Q.  Again, if you turn to the second page, there's another

25   section, like the last letter, that is entitled "Overall

1    Assessment."  Do you see that?

2    A.  I do.

3    Q.  And, again, the first sentence -- the first sentence

4    reads, "The Bank continues to implement satisfactory

5    programs and processes to detect and report money

6    laundering."  Do you see that?

7    A.  Yes.

8    Q.  And then the fed continues in this letter to the bank by

9    saying, "The bank's compliance with the BSA, the USA PATRIOT

10   Act and OFAC rules and guidelines continues to be considered

11   satisfactory."  Correct?

12   A.  Yes.

13   Q.  So here you agree with me that they are more clearly

14   just saying satisfactory?

15   A.  They are.

16   Q.  So if we look back at the demonstrative, we're up to

17   2007 and getting close to the end of the time period.  So we

18   have satisfactory for 2007 and, again, that was the fed's --

19   that was the fed's finding that we just read in the letter,

20   correct?

21   A.  Yes.

22   Q.  And 2008 -- again, 2008 was the year that the Petters

23   Ponzi scheme was publicly revealed, correct?

24   A.  Yes.

25   Q.  And the fed again conducted a targeted examination of

```
 1     M&I's AML program, correct?

 2     A.  Yes.

 3     Q.  So, Ms. Ghiglieri, if you would please turn to DX-50710

 4     that's been marked for identification.

 5     A.  Okay.

 6     Q.  And do you recognize this as an August 18, 2008 letter

 7     from the Federal Reserve Bank of Chicago to Mr. Peter

 8     Janczak, the director of compliance at M&I Bank?

 9     A.  Yes.

10     Q.  And as with the prior letters, this says that the fed

11     was conducting a targeted examination of M&I's AML program,

12     right?

13     A.  Yes.

14     Q.  And this is another exam letter that you reviewed in

15     connection with your report; is that correct?

16     A.  Yes.

17              MR. SCHAPER:  Your Honor, I'd like to move into

18     evidence DX-50710.

19              THE COURT:  Is there any objection?

20              MR. ANTHONY:  Sorry, Your Honor.  Objection --

21     same objection, foundation, hearsay, assumes facts not in

22     evidence.

23              THE COURT:  Overruled.  It is received.

24              MR. SCHAPER:  And so if we look at this and put it

25     up on the screen, I'd actually like to look at the first
```

Ghigller P7 - Cross

```
1    paragraph of this.

2    BY MR. SCHAPER:

3    Q.  This letter --

4          MR. SCHAPER:  I'm sorry, Mr. Herzka.  Actually, if

5    you could zoom out there.

6    BY MR. SCHAPER:

7    Q.  This letter is dated August 18th, 2008?

8    A.  Yes.

9    Q.  And in the first paragraph it talks about this targeted

10   examination having commenced on June 9th, 2008.  Do you see

11   that?

12   A.  I do.

13   Q.  And so the examination process was a couple months long

14   in this case until --

15   A.  Or it took them that long to process a report, yeah.

16   Q.  And if you look in the middle of that paragraph, the fed

17   is writing that, "The examination of the corporation's AML

18   compliance program evaluated the actions taken by the board

19   of directors and senior management to adequately identity,

20   measure, monitor, and mitigate the organization's AML

21   compliance risk."  Do you see that?

22   A.  I do.

23   Q.  And that's consistent with your understanding of what

24   the fed looks at in these exams, right?

25   A.  I'm sorry.  Can you --
```

1    Q.  That's consistent with your understanding of what the

2    fed is looking at when it does these exams?

3    A.  Yes.  I mean, they can change the scope.  So they are

4    just saying what their scope was here.

5    Q.  And now if we look, Ms. Ghiglieri, at the second page

6    again, like the previous letters, there's an "Overall

7    Assessment" section.  Do you see that?

8    A.  I do.

9    Q.  And the first sentence of that says, "Overall, the Banks

10   have created a satisfactory AML compliance risk management

11   program, which includes compliance with BSA, USA PATRIOT Act

12   and OFAC."  Correct?

13   A.  Yes.

14   Q.  And again it's referring to the bank's as having -- the

15   program as being satisfactory, the AML compliance risk

16   management program, right?

17   A.  Yes.

18   Q.  And so if we -- again, if we go back to our

19   demonstrative, we're up to 2008, the year the Ponzi scheme

20   was revealed, and we have the fed finding again a

21   satisfactory exam result in that year, correct?

22   A.  Yes.

23          MR. SCHAPER:  Now I'd like to publish in a

24   second -- but please don't put it up yet -- I'd like to

25   publish our demonstrative DD-6.  I don't believe that

1    counsel had an objection to this when we disclosed it, but

2    I'll let Mr. Anthony take a look.

3              MR. ANTHONY:  DD-6?  Okay.  No objection.

4              THE COURT:  You may publish.

5              MR. SCHAPER:  DD-13.

6              MR. ANTHONY:  I'm sorry.  It's not 6?

7              MR. SCHAPER:  It's DD-13.  It's the one you have

8    in your hand.

9              THE COURT:  Is there any objection?

10             MR. ANTHONY:  Yes, no objection.

11             THE COURT:  Okay.  DD-13 --

12             MR. SCHAPER:  If you would put up DD-13, please,

13   Mr. Herzka.

14             If you could just give us a moment, Your Honor?

15             THE COURT:  (Indicating.)

16        (Pause)

17   BY MR. SCHAPER:

18   Q.  All right.  Ms. Ghiglieri, you'll have recognized that

19   we looked first at a slide like this earlier this morning in

20   terms of the information that was available to you when you

21   drafted your report in 2018 and the information available to

22   M&I Bank before September 24, 2018, when the FBI raided

23   PCI's offices.  Do you remember this slide?

24   A.  Yes.

25   Q.  And now if we would flip ahead to the next slide, you'd

1    agree with me that, similar to M&I's knowledge, that before

2    September 2008 the Federal Reserve didn't have the same

3    information that you had when you wrote your report in 2018;

4    correct?

5                MR. ANTHONY:  Objection, lacks foundation.

6                THE WITNESS:  So --

7                MR. SCHAPER:  I can ask a question, Your Honor.

8                THE COURT:  Pardon me?

9                MR. SCHAPER:  I can follow up to that objection

10   for foundation with a question.

11               THE COURT:  Sustained.

12               MR. ANTHONY:  Also relevance.

13   BY MR. SCHAPER:

14   Q.  You agree, Ms. Ghiglieri, that when the fed --

15               THE COURT:  Overruled.

16               MR. SCHAPER:  Sorry.

17   BY MR. SCHAPER:

18   Q.  You agree that when the fed was doing the examinations

19   of M&I Bank that we have just been discussing, which ran

20   through August of 2008, there's no evidence in the record

21   that the fed had seen news reports about the Petters Ponzi

22   scheme during that time frame, correct?

23   A.  I have no idea if they did or they didn't.  I mean, it

24   happened at the same time they were doing the exam, right.

25   Q.  So the fed letter from 2008 that we just looked at was

1    August 18th, 2008.

2    A.  Right.  And that's right around the time --

3    Q.  So the Ponzi scheme -- you're aware from this case that

4    the Petters Ponzi scheme became public in late September

5    2008?

6    A.  Right.  So they wouldn't have had it.

7    Q.  And would you agree with me that the fed would not have

8    known before September 2008 that Petters would go on to be a

9    convicted criminal?

10   A.  Right.

11   Q.  You would agree with me the same thing about

12   Ms. Coleman's criminal conviction and Mr. White's criminal

13   conviction, correct?

14   A.  Sure.

15   Q.  So, again, you had information about that in 2018.  M&I

16   and the Federal Reserve at the time in question, prior to

17   September 2008, would not have had that information,

18   correct?

19   A.  Right.

20   Q.  And also before August 2018, when the fed's -- 2008,

21   when the fed's last letter was, the fed did not yet have an

22   idea that the Madoff scheme would be revealed or that the

23   Rothstein or Stanford Ponzi schemes would be revealed later

24   that year, correct?

25   A.  I mean, I can't remember when the Madoff one was in the

1    press, but I know Rothstein they wouldn't have had and I

2    don't think the Sanford one either.

3    Q.  Thank you, Ms. Ghiglieri.

4          MR. SCHAPER:  We can take that one down.

5    BY MR. SCHAPER:

6    Q.  I just want to finish up with one more fed exam, which

7    was in 2009, the year after the Ponzi scheme was revealed,

8    and ask you to look, Ms. Ghiglieri, at DX-50821.

9    A.  Okay.

10   Q.  And do you see that this is an August 3rd, 2009 letter

11   from the Federal Reserve Bank of Chicago to again

12   Mr. Janczak at M&I Bank?

13   A.  Yes.

14   Q.  And again this reflects that the fed conducted a

15   targeted examination of M&I's AML program.  Do you see that?

16   A.  Yes.

17   Q.  Actually, I'm sorry, I misspoke.  It says, "a target

18   examination of M&I's AML program, compliance with the Bank

19   Secrecy Act, Office of Foreign Assets Control or OFAC, and

20   the U.S. PATRIOT Act, which commenced on June 8th, 2009."

21   Do you see that?

22   A.  Yes.

23   Q.  And this is another -- and this letter, like the others,

24   contains some factual findings?

25   A.  Yes.

1    Q.  And this is another fed exam letter that you reviewed in

2    connection with your assignment on this case, correct?

3    A.  Right.

4         MR. SCHAPER:  Your Honor, I would offer into

5    evidence DX-50821.

6         MR. ANTHONY:  Your Honor, objection, the usual,

7    foundation, hearsay, assumes facts, but also relevance and

8    timeliness.  This is a year -- almost a year after the

9    events in question here and I don't think it's relevant.

10        MR. SCHAPER:  Your Honor, this is the first exam

11   period that's after the Petters scheme became available.

12   It's something that the witness has just testified that she

13   considered in part of her expert opinions.

14        MR. ANTHONY:  May we have a sidebar on this?

15        THE COURT:  You may.

16   **(At sidebar)**

17        MR. ANTHONY:  Your Honor, this is something I

18   think your order precludes them from doing, which is trying

19   to prove that the bank couldn't have discovered it because

20   the fed didn't discover it in 2009, or didn't figure it out.

21   I think your order precluded them trying to say because the

22   fed didn't discover it, you should -- they shouldn't have

23   discovered it.

24        And also I will say that I thought from your

25   limiting instruction that they were going to be limited to

1    using these documents solely for the impeachment of

2    Ms. Ghiglieri and not to prove that the fed found that this

3    was inappropriate.

4            So we're going to probably have a modified

5    curative limiting instruction for you to consider because I

6    think that they have gone far beyond, I think, what your

7    limiting instruction was and I think they have left the

8    wrong impression with the jury, that because the fed didn't

9    cite it, that somehow they shouldn't have cited it.

10           MR. SCHAPER:  Your Honor, Ms. Ghiglieri's opinion

11   was that the bank's compliance program was severely flawed,

12   full stop.  She also has additional opinions about them not

13   doing the right thing vis-à-vis the PCI account.  But she

14   has positions just that the bank had a flawed compliance

15   program.  And so these documents that we have just been

16   walking through are relevant to impeaching her on that

17   issue.

18           The 2009 letter encompasses several months

19   before -- it was a month and a half before the Ponzi scheme

20   was uncovered.  So this is still relevant to -- for that

21   reason alone.

22           Part of this exam period covers before the Petters

23   Ponzi scheme became public, so it still -- this expert is

24   saying that the programs were severely flawed during that

25   time, and so it's relevant to impeach her on that basis

Ghig1ier i - Cross

1     alone.

2              MR. ANTHONY:  There's not a shred of evidence in

3     any of these Federal Reserve letters, not even a word, that

4     identifies Petters or says that the fed did anything to look

5     at anything in the Petters account or the 9018 account or

6     they considered the billions of dollars going in and out.

7     They looked at policies and programs and said, yeah, your

8     programs are okay, but not maybe the way you implemented

9     them or acted on them.

10             So they are trying to create the impression that

11    because the fed said the programs were good, therefore the

12    bank couldn't have and didn't need to catch this flaw.  And

13    that's, I think, an improper use of these letters and -- you

14    know, that's where we are and I think it's got to be cured.

15             MR. SCHAPER:  Your Honor, I have not elicited or

16    even asked a question about whether these letters say

17    anything about Petters or PCI.

18             The expert has an opinion that is not limited to

19    PCI.  She just has an opinion that the bank's policies and

20    procedures were severely flawed.  Again, full stop.  That's

21    one of her opinions.  She committed to it on Friday.  She

22    committed to it today.  And so this is relevant to that.  I

23    haven't said anything about PCI or Petters during this line

24    of questions.

25             MR. ANTHONY:  The --

```
1              THE COURT:  The objection is sustained.  In

2     addition to the reasons that have been stated, it is also

3     likely to confuse the jury.

4              MR. ANTHONY:  Okay.

5         (In open court)

6     BY MR. SCHAPER:

7     Q.  Ms. Ghiglieri, you are familiar with who Deanna Coleman

8     is, correct?

9     A.  Yes.

10    Q.  She was the person who reported the Petters Ponzi scheme

11    to the FBI in September 2008?

12    A.  Yes.

13    Q.  And she was one of the co-conspirators in the Ponzi

14    scheme, right?

15    A.  Yes.

16    Q.  You would agree with me that she played a key role in

17    the Ponzi scheme?

18    A.  Yes.

19    Q.  And Ms. Coleman was deposed in this case, correct, she

20    took -- her deposition was taken?

21    A.  Yes.

22    Q.  And you testified that you reviewed a lot of deposition

23    transcripts in this case.  Am I remembering correctly?

24    A.  Yes.

25    Q.  And hers was one of them; is that right?
```

1    A.  You know, I'm not 100 percent sure.  She had a lot of

2    depositions and -- let's see.  Is this my report?  No.  Let

3    me look and see what I looked at for her.

4    Q.  Are you looking -- just for the record, are you looking

5    at Appendix C to your report?

6    A.  Yes.

7    Q.  And that talks about what materials you reviewed and it

8    has a section on depositions and exhibits, right?

9    A.  Yes.  So I looked at her deposition from October 31st,

10   2017.

11   Q.  And are you aware that she gave depositions in other

12   cases related to the Ponzi scheme?

13   A.  Yes.

14   Q.  But you didn't look at the testimony from any of those?

15   A.  That's the only one that I looked at.

16   Q.  Okay.  So since that's the only one you looked at, I

17   will try to focus my questions accordingly because I don't

18   want to ask you questions about transcripts you haven't

19   seen.

20          So in her deposition in this case -- am I right

21   that in your report you only cite to it three times?

22   A.  I have no idea.  I mean, my report is 300 and some

23   pages, so -- no, it's longer than that.

24   Q.  Let me --

25   A.  But anyway.

1    Q.  Let me ask you a more focused question.

2    A.  Sure.

3    Q.  And I'll represent that you didn't cite some of this

4    testimony in your report, but if you disagree with me,

5    please say so.

6          You've testified that there were red flags about

7    PCI not being a legitimate business, right?

8    A.  Can you ask me that again?  I didn't hear everything.

9    Q.  You've given testimony that there were red flags about

10   the prospect that PCI was not operating a legitimate

11   business?

12   A.  I don't say that in my report, no.

13   Q.  That there were red flags around the PCI account?

14   A.  Yes.  The red -- regarding their business, I said that

15   the transactions don't comport with the business model as

16   the bank had identified in its documents in the bank.

17   Q.  But nowhere in your report do you cite testimony that

18   Ms. Coleman gave in this case that it was important to PCI

19   that M&I continue to think that PCI was a legitimate

20   business, correct?

21          MR. ANTHONY:  Objection, soliciting hearsay

22   testimony.

23          MR. SCHAPER:  I'm asking about whether she

24   included this in her --

25          THE COURT:  There's no foundation for that.

```
 1              MR. ANTHONY:  Foundation also.  Maybe we need a
 2     sidebar if they are going to start reciting deposition
 3     testimony, Your Honor.
 4              THE COURT:  On another --
 5              MR. SCHAPER:  I can point the witness to a
 6     transcript, if that would help the foundation issue.
 7              MR. ANTHONY:  Well, we may need a sidebar if
 8     they're going to start doing this.
 9              THE COURT:  I think we do.
10          (At sidebar)
11              MR. SCHAPER:  Your Honor, I'm just trying to draw
12     out what materials the expert included and didn't include in
13     her report, and this is a transcript that she reviewed.  I'm
14     just trying to highlight portions of it that she left out of
15     her analysis.
16              THE COURT:  Well, I think the proper way to do
17     that is to ask her to review it --
18              MR. SCHAPER:  Yeah.
19              THE COURT:  -- and then ask if, having reviewed a
20     section, not reading it to the jury --
21              MR. SCHAPER:  Okay.
22              THE COURT:  Because that is publishing to the jury
23     information that no one can vouch for --
24              MR. SCHAPER:  She has the transcript.  I can --
25              THE COURT:  -- without her ever -- without it
```

```
1    having a bona fide reason for the jury having access to it.

2              MR. SCHAPER:  I'll ask her that way.

3              MR. ANTHONY:  So you're going to give us a copy of

4    the transcript?

5              MR. SCHAPER:  You have it.  It's in one of the

6    binders that you have.

7              MR. ANTHONY:  I guess I have a more fundamental

8    question, which is:  Are we going to assume as true the

9    testimony that Ms. Coleman is giving?  Ms. Coleman is coming

10   here to testify.  I understand you're calling her, right?

11             MR. SCHAPER:  Yeah.

12             MR. ANTHONY:  Okay.  So why are we reading hearsay

13   testimony from a deposition transcript with this witness?

14             THE COURT:  What's the relevance?

15             MR. SCHAPER:  It's part of the record that she

16   considered and she -- that she reviewed in connection with

17   her report, and I'm highlighting parts of the record that

18   she reviewed that she does not mention.  It goes to the

19   credibility of her opinions.

20             MR. ANTHONY:  I would feel differently if he was

21   citing stuff that she cited in her report, but asking her to

22   remember stuff that she didn't cite is, I think, irrelevant

23   and confusing and --

24             THE COURT:  I will sustain the objection.

25             **(In open court)**
```

Ghiglieri - Cross

1          MR. ANTHONY:  The objection is sustained, Your

2      Honor?

3          THE COURT:  The objection is sustained.

4          MR. SCHAPER:  Okay.  Thank you, Your Honor.

5      BY MR. SCHAPER:

6      Q.  I'd like to touch on just two more topics,

7      Ms. Ghiglieri.

8          You testified on direct examination about your

9      opinion that M&I's AML analysts failed to report account

10     activity in the PCI account after there being red flags,

11     correct?

12     A.  Yes.  My testimony is not even one transaction was

13     considered suspicious over six years.

14     Q.  I'd like to ask you about your experience at the last

15     bank that you were involved with.  Am I right that that was

16     with NetBank?

17     A.  Yes.

18     Q.  And you were on the board of directors at NetBank from

19     2003 to 2005; is that right?

20     A.  Yes.

21     Q.  And as a board member, you had a certain term, a certain

22     amount of time that you were expected to serve, correct?

23     A.  Well, we were elected at annual shareholder meetings.

24     So I was elected twice.  I was on for seven quarters.  So I

25     was on for a year, got re-elected, and I resigned after

Ghiglieri - Cross

1    three quarters.

2    Q.  Okay.  So am I right -- you just mentioned that you

3    resigned.  Am I right that you resigned before your term had

4    expired?

5    A.  Yes, I did.

6    Q.  And am I right that, Ms. Ghiglieri, you did that because

7    you were asking questions at board meetings and weren't able

8    to get answers to those questions?

9    A.  Yes.

10   Q.  And specifically you were asking questions about the

11   most senior -- you were asking questions of the most senior

12   people at the entire bank, correct?

13   A.  Yes.

14   Q.  Including the CEO of the bank?

15   A.  Yes.

16   Q.  And you were asking questions about the deposit

17   processing area of the bank, correct?

18   A.  Yes.

19   Q.  And can you just remind the jurors what role the board

20   of directors plays at a bank, just at a very high level.

21   A.  Well, ultimately the board of directors is responsible

22   for everything.  So it's like that's, you know, where the

23   buck stops, with the board of directors.  So they have to

24   make sure that every area is functioning properly and is in

25   compliance with written policies and procedures, things that

1   we've seen in the Federal Reserve letters.

2   Q.  Okay.  And am I right, Ms. Ghiglieri, that you even

3   raised some of your concerns about the fact that you weren't

4   getting answers to your questions with other members of the

5   NetBank board?

6   A.  Yes.

7   Q.  And NetBank was overseen by federal regulators during

8   the time you were on its board; is that right?

9   A.  Yes.

10  Q.  But when you left NetBank, you didn't advise any of the

11  federal regulators that you had been asking questions of

12  management and weren't getting answers, correct?

13  A.  I did not.

14  Q.  And you didn't file a Suspicious Activity Report in

15  connection with your unanswered questions; am I right about

16  that?

17  A.  No, board -- no, I did not.  As a former board member, I

18  wouldn't be able -- it wouldn't be appropriate for me to

19  file a Suspicious Activity Report.  That's something the

20  bank actually does.

21  Q.  One of the opinions that you gave in your 2018 report

22  and have testified about was that M&I somehow gave PCI's

23  account special treatment.  Do you recall your testimony?

24  A.  Yes.

25  Q.  But in your 2018 reports you don't include any opinion

Ghigiler P - Cross

1    about why M&I employees would have had a reason to help the

2    Petters Ponzi scheme, do you?

3    A.  So I have some things in my report that are subject

4    to --

5    Q.  Okay.  Let me ask a different question.  You would agree

6    that there's no evidence that AML analysts received any

7    tangible benefit from PCI or Mr. Petters, correct, no

8    evidence in the record of that?

9    A.  I did not see that in the record.

10   Q.  There's no evidence that AML analysts were paid more for

11   having closed PCI alerts, is there?

12   A.  I did not see that in the record.

13   Q.  There's no evidence that AML analysts in their job

14   performance reviews were praised for having closed PCI

15   alerts, correct?

16   A.  I didn't look at their performance evaluations.

17   Q.  You're not aware of any such evidence, though?

18   A.  I just -- I don't have an answer to that question.

19   Q.  And more broadly, there's no evidence that you have seen

20   that any M&I employee received a financial benefit from PCI,

21   correct?

22   A.  Well, the record -- I didn't see any documentation to

23   that effect, let's just say that.

24   Q.  You have not seen any evidence that M&I employees

25   received any gifts from PCI, have you?

1    A.  I didn't see anything in the bank production to that

2    effect.

3              MR. SCHAPER:  No further questions, Your Honor.

4              THE COURT:  Members of the Jury, you have seen and

5    you have heard evidence pertaining to examinations conducted

6    by the Federal Reserve Bank of Chicago.  This evidence may

7    be considered by you only for the purpose of evaluating the

8    accuracy and the credibility of the opinions and testimony

9    of Catherine --

10              THE WITNESS:  Ghiglieri.

11              THE COURT:  -- Ghiglieri.  This evidence may not

12    be considered for any other purpose.  So only for the

13    credibility and opinions and testimony and accuracy of this

14    witness.  Understood?

15              Okay.

16              MR. ANTHONY:  Thank you, Your Honor.  May I

17    proceed?

18              THE COURT:  You may.

19                     **REDIRECT EXAMINATION**

20    BY MR. ANTHONY:

21    Q.  Ms. Ghiglieri, I'd like you to turn to -- let's put up

22    Demonstrative DD-5, which is the defendant's demonstrative,

23    and these were the answers to requests for admissions that

24    Mr. Kelley provided.  You were asked questions about these.

25              He admitted that representatives of PCI took

1    actions to hide the Petters Ponzi scheme.  Do you see that?

2    A.  I do.

3    Q.  And we now know -- who were the PCI officers who took

4    actions to hide the PCI Ponzi scheme?

5    A.  Tom Petters and Deanna Coleman and Robert White,

6    probably others, which were the same ones that we saw, you

7    know, the big wire transfers and checks written to.

8    Q.  Do you have any evidence that Mr. Kelley was involved in

9    taking any actions to hide any Ponzi scheme?

10   A.  No.

11   Q.  No.  Okay.  So isn't that what fraudsters do, they try

12   to hide their activity from everyone?

13   A.  Exactly.

14   Q.  And what is the bank's job when they are doing what they

15   are supposed to do to ferret out this suspicious activity

16   that these fraudsters engage in?

17   A.  Right.  I mean, no fraudster is going to tell the bank

18   I'm committing a big fraud through your bank, please don't

19   shut my account down.

20          So the bank is supposed to have policies and

21   procedures, which they did here, which would guide the

22   employees to be able to know if they see something that's

23   suspicious so that it can be reported and the account can be

24   shut down.

25          So this is something within the bank's knowledge

1    base.  I mean, this is their job, is to monitor for

2    suspicious activity and report it.  And, you know, this --

3    fraudsters are not going to come up and tell them there's a

4    fraud going on.  Notwithstanding that, it's their job to be

5    able to ferret this out.

6    Q.  Okay.  Let's look at -- I'm going to use this ELMO here.

7    You were shown DD-7, Demonstrative Exhibit 7.  This way

8    (indicating).

9         All right.  So here we are, DD-7.  This was the

10   1996 Suspicious Activity Report form.

11   A.  Right.

12   Q.  Do you see they've got a bunch of boxes there?  And you

13   were asked, well, there's no box for Ponzi scheme.  Do you

14   see that?

15   A.  Right.

16   Q.  Okay.  Which of these -- let's go through these boxes.

17   You know, following usual business practices in the banking

18   industry, what boxes would you check if you saw suspicious

19   activity relating, for example, to money laundering; which

20   boxes would you check?

21   A.  So you would check the first one.

22   Q.  And how about -- how about the last one, "Wire Transfer

23   Fraud"?

24            MR. SCHAPER:  Objection, leading.

25            MR. ANTHONY:  I'll withdraw it.

1    BY MR. ANTHONY:

2    Q.  Would you check any others?

3    A.  Yes.  So the activity in the 9018 account, if it would

4    have been, in my view, appropriately identified as

5    suspicious, using this form they could have checked "Money

6    Laundering," which would be A, and Q, "Wire Transfer Fraud,"

7    or "Other" and they could have put "Ponzi scheme" in there.

8    I mean, there was a variety of ways they could have reported

9    this.

10   Q.  All right.  So let's look at the 2003 form.  Same thing.

11   "Bank Secrecy Act/Money Laundering" they could check, right?

12   A.  Yes.

13   Q.  And "Wire Transfer Fraud" you could check?

14   A.  Yes.

15   Q.  "Other" you could check?

16   A.  Right.  Ponzi scheme, um-hmm.

17   Q.  And you could also -- they have a space for dollars.  Do

18   you see that in the upper right-hand corner?

19   A.  Yes.

20   Q.  And so if I were to put 1 billion up there -- is that

21   1 billion or did I go -- is that 1 trillion?

22   A.  I'm not sure what exactly that is, but, yes, if you put

23   1 billion in there, that would have definitely gotten

24   FinCEN's attention.

25   Q.  So all you had to do was put 1 billion on this form and

```
1     someone from FinCEN would have looked at it?
2               MR. SCHAPER:  Objection, calls for speculation.
3               THE WITNESS:  Someone from the FBI would have --
4               THE COURT:  Overruled.
5               THE WITNESS:  I'm sorry.
6     BY MR. ANTHONY:
7     Q.  You can answer.
8     A.  Someone from the FBI would have shown up on the bank's
9     doorstep.
10    Q.  So you were asked some questions about when did the
11    federal register -- or the federal government ever get
12    around to thinking about putting the words "Ponzi scheme" on
13    this form.  Do you recall that?
14    A.  I do.
15    Q.  And I think you said -- you were shown a document that
16    said like 2018.  Do you remember that?
17    A.  So the Notice of Proposed Rulemaking was in 2017.  You
18    can see the date on the top there.  And I don't know when
19    this rule was finalized, but somewhere around there.
20    Q.  So the fact that it took the government almost ten years
21    to get the phrase "Ponzi scheme" on the fraud line of the
22    SAR doesn't mean people didn't know about it, does it?
23    A.  Right.
24              MR. ANTHONY:  Would you put up, Ms. Ellig,
25    Exhibit 183-0027 and would you highlight the section that is
```

1    the second block down, which was the one that Ms. Ghiglieri

2    was asked questions about, please.

3    BY MR. ANTHONY:

4    Q.  Now, this is March of '06, right?

5    A.  Yes.

6    Q.  And this company, PCI, had been with the bank for a

7    number of years by 2006, correct?

8    A.  Yes.

9    Q.  That Jambor, Flynn, both of them talked to, knew about

10   the customer, knew it had been with the bank for some period

11   of time, correct?

12   A.  Yes.

13            MR. SCHAPER:  Objection, leading.

14            THE COURT:  Sustained.

15   BY MR. ANTHONY:

16   Q.  Did Jambor and Flynn know that PCI had been a customer

17   of the bank for some period of time, based on the testimony

18   you heard, by 2006?

19            MR. SCHAPER:  Objection, calls for testimony and

20   knowledge that's been ruled on.

21            THE COURT:  Sustained.

22   BY MR. ANTHONY:

23   Q.  Do you recall hearing any testimony from Mr. Jambor that

24   he knew PCI had been a customer of the bank for some period

25   of time?

1   A.  Yes.

2   Q.  Did you hear similar testimony from Mr. Flynn?

3   A.  Yes.

4   Q.  Okay.  So do you see any explanation -- now, we know

5   that Petters Company consisted of how many people?

6   A.  I don't know for sure, but I know at least four.

7   Q.  Okay.  Who were they?

8   A.  Tom Peters, Deanna Coleman, Robert White, and Rich

9   Menczynski.  I don't know how you say his name.

10  Q.  Okay.  So by -- did you see any evidence in the record

11  that as of 2006 that Petters Company, Inc. was a collection

12  of nearly 20 companies?

13  A.  No.

14  Q.  In fact, Petters Company was not a collection of -- was

15  Petters Company a collection of 20 companies in 2006?

16  A.  No.

17  Q.  Do you have any idea and do you see anything in this

18  record which would explain how Ms. Pesch could come to that

19  conclusion and put that in this comment in 2006?

20  A.  No.

21  Q.  Now, Ms. Pesch was a relatively new AML analyst at this

22  time.  Do you recall her testimony?

23  A.  Yes.

24  Q.  Do you recall what she said when she actually became an

25  analyst?  Do you recall when she said she became an analyst?

1    A.  The exact year I don't, but I heard her testimony

2    talking about her progression at the bank.

3    Q.  All right.  So do you have any reason to believe that

4    Ms. Pesch was relatively new to the AML laundering process

5    when she wrote this comment?

6              MR. SCHAPER:  Objection to form, leading.

7              THE COURT:  Sustained.

8    BY MR. ANTHONY:

9    Q.  Do you recall Ms. Pesch saying that she was a trainee

10   for most of 2005?

11   A.  Yes, and that Bernita Hile had to approve her work,

12   which you can see she did on this alert.

13   Q.  Okay.  Now I'd like you to look at Exhibit 713, please.

14             MR. ANTHONY:  Would you publish that, please,

15   Ms. Ellig.  And maybe you can enlarge that up at the top,

16   Ms. Ellig, please.

17   BY MR. ANTHONY:

18   Q.  Do you recall the line of questioning about whether the

19   information that is seen here in your Exhibit 713 was in the

20   possession of M&I Bank before the Petters fraud was

21   revealed; do you recall those questions?

22   A.  Yes.

23   Q.  Okay.  So what I'd now like -- so let's talk about

24   what's on 713 and then I'm going to show you a document --

25   another document.

1            713 has all the alerts, the date range, the

2    incoming wires, outgoing wires, Nationwide, Enchanted.  Do

3    you see that?

4    A.  I do.

5    Q.  Okay.  Now I'd like you to turn to what's already in

6    evidence, Plaintiff's Exhibit 333, and this has previously

7    been identified as a bank record.  I'd like you to turn to

8    page 0003 for the date.  Do you see in the middle of the

9    bottom of the page it's 10-9-08; do you see that?

10   A.  I do.

11            MR. SCHAPER:  Objection, Your Honor, outside the

12   scope of the cross.

13            THE COURT:  Overruled.

14   BY MR. ANTHONY:

15   Q.  And let's look at page 5.

16            MR. ANTHONY:  And at the bottom, would you enlarge

17   it, please.

18   BY MR. ANTHONY:

19   Q.  This is a document dated October of '08, prepared by the

20   bank, which shows on page 5 the information that's on the

21   screen, correct?

22   A.  Yes.

23   Q.  Now turn to page 6, please.  And this is, page 6, a bank

24   document that shows that in October of 2008, a couple of

25   weeks after the fraud was discovered, the number of

1     Enchanted Family Buying Group wires from January 8th through

2     August 8th of 2008, correct?

3     A.  Yes.

4     Q.  And it also shows the Metro Gem wires -- or the

5     Nationwide wires at the bottom, correct?

6     A.  Yes.

7     Q.  And it shows from January 8th --

8             MR. ANTHONY:  And if we'd go to the next page,

9     Ms. Ellig.

10    BY MR. ANTHONY:

11    Q.  It shows that the bank knew that it had in its records

12    in October of '08 all of the information with respect to the

13    Enchanted and Nationwide wires, correct?

14    A.  Yes.

15    Q.  And so the bank knew on October 8th that for eight

16    months, from January to August of '08, that $282 million had

17    been wired into the account by Nationwide, correct?

18    A.  Yes.

19            MR. ANTHONY:  And then, Ms. Ellig, just show the

20    next one for Metro Gem, the next two blocks.

21    BY MR. ANTHONY:

22    Q.  And also this October 8th bank report shows the wires

23    for the eight months of 2008 for Metro Gem, correct?

24    A.  Yes.

25            MR. ANTHONY:  Now let's put 713 back up, which you

Ghig1ier - Redirect

1    did, and let's enlarge that.

2    BY MR. ANTHONY:

3    Q.  And what 713 shows is the wires for the months of March

4    '05 to July of '08, correct?

5    A.  Yes.

6    Q.  So do you recall the suggestion from counsel that the

7    bank did not have this information about bank wires in its

8    possession until sometime after the Ponzi fraud was

9    discovered?

10   A.  Yes.

11   Q.  In fact, when did the bank have in its records each and

12   every wire transfer made by Enchanted and Nationwide?

13   A.  On the day that it happened.

14   Q.  So if it happened in 2002, the bank had it?

15   A.  Yes.

16   Q.  If it happened in 2005, the bank had it?

17   A.  Yes.

18   Q.  And are they required to maintain those documents and

19   those records as part of their business?

20   A.  Yes.

21   Q.  Okay.  Now let's talk about these Federal Reserve

22   letters.  Okay?  How is what you did different than what the

23   Federal Reserve did in those letters?

24   A.  So what I did is I focussed on what the bank did

25   regarding the PCI account and I looked at all the books and

1    records regarding the PCI account.  I looked at the

2    transactions that came in.  I looked at the transactions

3    that went out.  I compared my review to what the AML

4    analysts were looking at at the same time when they were

5    working the alerts.  I looked at the checks to Robert White

6    and Tom Petters and Deanna Coleman and the wire transfers.

7    So my focus was on what the bank did regarding the PCI

8    account and PCI itself.

9             Now, I cannot tell you what or if the bank -- if

10   the Federal Reserve, in its examination, looked at the PCI

11   account when they did their transaction review because they

12   did look at some alerts, they looked at -- they did do a

13   transaction review.

14            But because I didn't have access to the reports or

15   the work papers, I cannot say with any certainty that what

16   they did was the same as what I did.  And I can hardly

17   believe that their conclusions would be much different than

18   mine if they actually looked at what I looked at.

19   Q.  Let's look at a couple of these letters to see exactly

20   what it was that the Federal Reserve said what it did.

21   Let's look at DX-50136.  It's the December 12, 2003 Federal

22   Reserve Bank of Chicago letter.

23   A.  Okay.

24   Q.  Under "Scope," let's start there.  It says, "The scope

25   of the review focused on assessing the Bank's ability to

1   adequately identify, measure, monitor and control risks

2   relative to the BSA," which we know is the Bank Security

3   [sic] Act, "and to provide for an effective AML program."

4   Correct?

5   A.  Yes.  So that means they looked at the policies and

6   procedures in the BSA program.  It did sort of -- and I

7   looked at that too.  I looked at the policies and

8   procedures.

9   Q.  So the Federal Reserve is looking at the policies and

10  procedures, correct?

11  A.  Yes.

12  Q.  All right.  And then let's look at training on the next

13  page.

14          MR. ANTHONY:  And enlarge that first full

15  paragraph, please.

16  BY MR. ANTHONY:

17  Q.  At least as of December 12, 2003, the Federal Reserve

18  was saying that there was some deficiencies in the training

19  of these anti-money laundering analysts, correct?

20  A.  Yes.

21  Q.  And the bank says -- the reserve says, "Notwithstanding,

22  a review of the responses provided by relationship managers

23  coupled with our examination findings regarding potentially

24  suspicious transactions indicated that targeted retraining

25  is necessary."  Correct?

1    A.   Right.

2    Q.   By December of 2003 how long was the bank supposed to

3    have a viable functioning program in place?

4    A.   Well, the Bank Secrecy Act was passed in 1970, and it

5    was modified and changed by Congress.  And in 2002 the USA

6    PATRIOT Act amended the Bank Secrecy Act.  So from 1970 they

7    should have had a program, and then particular things would

8    have been added along the way.

9    Q.   All right.  So let's look at the last paragraph of this

10   page, and the sentence in the last paragraph says, "Failure

11   to address these required actions in a timely manner will

12   likely subject the bank to formal supervisory action."

13   Correct?

14   A.   Yes.

15   Q.   So at this point in time the fed is sending the signal

16   that the bank has got problems with its program, right?

17   A.   Yes.

18   Q.   All right.

19   A.   It says it's inadequate right above that.

20   Q.   I'm sorry?

21   A.   It says, "Considering the weakness noted above in the

22   Bank's independent testing, monitoring, and training, the

23   AML compliance program is considered inadequate."

24   Q.   Okay.  Let's go to page 5 of this Exhibit DX-50136 and

25   highlight what the -- "Suspicious Activity Monitoring and

1    Customer Due Diligence," those first two paragraphs.

2    A.  So -- let's see here.

3    Q.  Before you -- let me pose a question.

4    A.  I'm sorry.

5    Q.  Okay.  The bank is supposed to come up with a program

6    "to reasonably ensure the identification and timely,

7    accurate and complete reporting of all known or suspected

8    violations of law and suspicious activity against or

9    involving the Bank to law enforcement and supervisory

10   authorities."  Do you see that?

11   A.  Yes.

12   Q.  Okay.  In your opinion, did the bank ever come up with a

13   program that you believed met those requirements?

14   A.  So the documents themselves, the actual policies, they

15   did amend.  In practice, putting it into practice is where

16   they fell down.

17   Q.  Okay.  So looking at this, this -- all right.  So that's

18   2003.  Let's go to the 2004 one, the letter, which is

19   DX-50233.  Again, this was all before Searchspace was

20   implemented, right?

21   A.  Yes.

22   Q.  The bank was doing it manually at this point, right?

23   A.  Yes.

24   Q.  Okay.  Let's go to page 3 of this document.  So this

25   is -- this document is almost a year after the December

1    document.  This is September of '04.

2              MR. ANTHONY:  And highlight the "Enhance

3    monitoring of wire transfer activity," please, and take

4    the -- and highlight the line beginning with "The limited

5    review."  It's the third sentence there, "The limited

6    review."

7    BY MR. ANTHONY:

8    Q.  So in all the testimony you have given over the past two

9    days, is this what you really focused on, this sentence

10   here?

11   A.  In large part because they -- it says at the beginning

12   of this the bank was only monitoring wire transfers to

13   high-risk countries or ones that had also cash transactions.

14   So any other wire transfer, like all the wire transfers from

15   Nationwide and Enchanted, Nationwide and Metro Gem, just for

16   example, were not being monitored for suspicious activity.

17   Q.  So let's turn in this document to page 4.  This is the

18   2004 federal review.  And it says under "Observations" --

19             MR. ANTHONY:  Please enlarge that and highlight

20   it.  It says -- the first paragraph at the top, please, at

21   the top where it says, "A process should be put in place."

22   BY MR. ANTHONY:

23   Q.  Okay.  So one of the observations the Federal Reserve

24   makes is:  "A process should be put in place to address

25   whether or not to file a SAR, including criteria to close an

1    account after multiple SARs have been filed.  It was noted

2    during this review that the bank had closed one account due

3    to suspicious activity.  Although the bank has filed

4    multiple repeat SARs on numerous accounts, the bank has not

5    established criteria to address situations in which ongoing

6    suspicious activity may warrant account closure."

7          So in your review, did you see any bank policies

8    that were implemented that set forth the criteria upon which

9    an account should be closed if there was suspicious activity

10   noted?

11   A.  So after this they did add a section to their policies

12   and procedures for how they should go about closing the

13   accounts for a finding of suspicious activity.

14   Q.  Did you see any record or report from any bank employee

15   that suggested that the 9018 PCI account should be closed?

16   A.  No.

17   Q.  Now, this exhibit DX-50233, the Federal Reserve letter

18   of September 22, 2004, you now have had an opportunity to

19   look through it.  Do you see Tom Petters mentioned at all?

20   A.  No.

21   Q.  Do you see PCI being mentioned as an account that was

22   reviewed by the Federal Reserve?

23   A.  No.

24   Q.  In any of these Federal Reserve reports, do you see

25   anywhere where the Federal Reserve says it looked at the PCI

1    account and the billions of dollars going in and out?

2    A.  No.

3    Q.  So let's look at DX-50356, the October 18, 2005 Federal

4    Reserve letter.

5    A.  Okay.

6    Q.  And let's go to the third page entitled "Suspicious

7    Activity Reporting."  And so now we're in 2005, it's October

8    of 2005, and it says, "The examination revealed that the

9    decision whether to file a SAR or not did not always appear

10   to be consistent and/or fully documented by the narrative

11   appearing in the related file."

12        So when it says "the decision whether to file a

13   SAR or not did not always appear to be consistent and/or

14   fully documented by the narrative appearing in the related

15   file," do you know what file they are referring to?

16   A.  Well, in the summaries of the alerts that we looked at,

17   that would be where it should be documented.  That's what

18   they are talking about.

19   Q.  And then --

20        MR. SCHAPER:  I'm going to object and move to

21   strike that.  The witness previously testified that she

22   wasn't sure what materials the fed reviewed or didn't.

23        THE COURT:  Overruled.

24   BY MR. ANTHONY:

25   Q.  And then it says, "Discussion with management indicated

1    that decisions to file a SAR are recommended by the analyst,

2    but that a final determination is made by the SAR

3    committee."  Do you see that?

4    A.  Yes.

5    Q.  Did you hear testimony in this proceeding that there was

6    a SAR Committee?

7    A.  Yes.

8    Q.  And is it consistent with your understanding of banking

9    practice that it wouldn't be the analyst who filed the SAR

10   report, but that some committee of the bank would have to

11   consider it?

12   A.  Yeah.  So the analyst would recommend it, push it up the

13   chain, and then it would go to the SAR Committee.  Then they

14   would make a decision.  Then it would go a little higher to

15   actually do the filing.

16   Q.  Which brings me to the whole question:  When you were at

17   NetBank and you raised your questions and concerns, was it

18   your responsibility to file the SAR report or the bank

19   committee for the bank that you were working for to file the

20   report?

21   A.  They had a SAR Committee, but I never got the answers to

22   my questions, so I wouldn't have known whether -- to have

23   anybody, you know, file a SAR, in other words.

24   Q.  So tell us about that.  You were asking questions as a

25   director.  And what was happening?  You weren't getting

1    answers.  Tell the jury what was going on.

2    A.  So I was chairman of the Risk Committee, which was a

3    committee of the board, and also a board member and an

4    adjunct member of the Audit Committee.  So I had a lot of

5    kind of risk perspective on the bank.

6              And I kept asking questions regarding a particular

7    process that was going on, and I was never able to get any

8    answers.  I would ask a question, there would be a beat of

9    silence and then they would just go on with whatever the

10   next topic was.

11   Q.  So what did you do as a result?

12   A.  So I followed the advice that I give my clients, and

13   that is if you ask questions and you can't get the answers,

14   then you need to resign.  And that's what I did.  So I

15   resigned.

16   Q.  Okay.  So then let's go back to this Federal Reserve

17   letter.  It says, "Review of documentation indicated that

18   the files may not always effectively detail the committee's

19   reasoning, especially if it is different than the original

20   recommendation."

21             And then the examiners say that they believe that

22   this memo and continued attention to this issue should

23   address concerns regarding SAR's narratives.  Do you see

24   that?

25   A.  Yes.

1    Q.  So would it be fair to say that as of this time there

2    was still questions about the bank's implementation of its

3    BSA policies?

4              MR. SCHAPER:  Objection, leading.

5              MR. ANTHONY:  I'll rephrase.

6              THE COURT:  Sustained.

7    BY MR. ANTHONY:

8    Q.  What does this Federal Reserve letter indicate about

9    what the Federal Reserve was saying about its view of the

10   satisfactory nature of the BSA policies that the bank was

11   trying to implement?

12   A.  So with regard to suspicious activity, it wasn't being

13   fully implemented or properly implemented.

14   Q.  Again in Exhibit DX-50356, did you see any reference to

15   Petters or PCI or a review of that account by the Federal

16   Reserve?

17   A.  No.

18   Q.  Let's look at DX-50445, which is the August 30, 2006

19   Federal Reserve letter, and let's go to "Expected Actions"

20   on page 3.

21             MR. ANTHONY:  Oh, I'm sorry.  Ms. Ellig, can you

22   put up 50445.  Thank you.  No, that's 50 -- 50445.  I'm

23   sorry.

24   BY MR. ANTHONY:

25   Q.  This is the August 30th, 2006 Federal Reserve letter.

1    Again, there's no reference in this letter to Petters or PCI

2    account, right?

3    A.  No.

4    Q.  Am I correct?

5    A.  Yes.

6    Q.  Let's look at page 3.  And so this is the fed's review

7    of the anti-money laundering program at the bank, correct?

8    A.  Yes.

9    Q.  And it says, in the first sentence under "Review of

10   Funds Transfers for Common Characteristics" -- and this is

11   the reserve's criticism of the bank, correct?

12   A.  Yes.

13   Q.  And it says, "The bank does not presently have a process

14   whereby it is reviewing its fund transfers for these common

15   characteristics."  Do you see that?

16   A.  I do.

17   Q.  And then it says, "Management is expected to implement a

18   process whereby funds transfers...can be reviewed."  Do you

19   see that?

20   A.  Yes.

21   Q.  And they were supposed to review them to see if there

22   were patterns, right?

23   A.  Yes.

24   Q.  And let's go down to the next paragraph, "Validation of

25   Corporate Customers," and the Federal Reserve says, "The

1  bank's procedures permit that the bank may either perform a

2  site visit to a corporation or access a state's website to

3  verify the business is a legal entity."  Right?

4  A.  Yes.

5  Q.  Then it says, "Verifying that the business physically

6  exists via site visit is not the same as verifying it's a

7  lawful and legal entity."  Do you see that?

8  A.  I do.

9  Q.  Okay.  So did you hear -- you heard the testimony of

10 Mr. Jambor that he went to visit the corporate offices of

11 PCI; did you hear that?

12 A.  Yes.

13 Q.  Did you ever hear -- did Mr. Jambor ever testify that he

14 went to visit the offices of Enchanted?

15 A.  Not that I recall.

16 Q.  Did you hear Mr. Kelley testify that Enchanted was a car

17 wash in Edina?

18 A.  I wasn't here for Mr. Kelley's testimony.

19 Q.  Oh, okay.  Then I won't ask you about that.

20 A.  Sorry about that.

21 Q.  And then let's look at the paragraph "Risk

22 Assessment/Cash Intensive Customers," and it says, (As read)

23 "Various types of accounts traditionally recognized as 'cash

24 intensive businesses' are not identified as high-risk

25 customers at the bank."  Do you see that?

1    A.  Yes.

2    Q.  And that the Federal Reserve is making some

3    recommendations and about midway down they say, "This

4    approach will facilitate a determination as to whether a SAR

5    should be filed."  Do you see that?

6    A.  Yes.

7    Q.  And then the fed recommends that the management is

8    expected to classify cash-intensive accounts as high risk.

9    Do you see that?

10   A.  I do.

11   Q.  Do you know if M&I Bank ever classified PCI as a

12   high-risk account?

13   A.  No, they didn't.  But also PCI wasn't a cash-intensive

14   business, because that would be businesses that are handling

15   cash, yeah.

16   Q.  Okay.  Do you know whether the bank categorized PCI as a

17   Tier 1, Tier 2, or Tier 3 account?

18   A.  I don't know what they classified in that regard.

19   Q.  Turn, if you will, to Exhibit DX-50588 and there's -- on

20   page 3 there's a reference to different tiered accounts.

21   And apparently the bank classifies the high-risk accounts

22   into three tiers?

23              MR. SCHAPER:  Objection, foundation.  I think the

24   witness just said she didn't know about that.

25              THE COURT:  Sustained.

1    BY MR. ANTHONY:

2    Q.  You've read through Exhibit DX-50588, have you?

3    A.  I have, yeah.

4    Q.  Did you see any reference to PCI or Tom Petters in here?

5    A.  No.

6    Q.  Any reason to believe that the Federal Reserve -- I'll

7    withdraw that.

8              Let's look, finally, at -- now, do you recall that

9    QAPOR was implemented in December of 2006?

10   A.  Yes.

11   Q.  All right.  So remember -- remind the jury.  The QAPOR

12   was the expedited review process?

13   A.  Yes.

14   Q.  And remind us of your opinion with respect to whether

15   the bank's implementation of Searchspace was sufficient in

16   light of the adoption of QAPOR.  What was your opinion?

17   A.  Would you ask me that question again?

18   Q.  Sure.  Was the Searchspace implementation consistent

19   with banking practices in light of the bank's adoption of

20   QAPOR?

21   A.  No.

22   Q.  And why is that?

23   A.  Because Searchspace was modified by the bank with this

24   kind of add-on process to expedite alerts, alert reviews of

25   certain accounts that alerted at the peer level and -- but

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    they placed PCI on there when it wasn't qualified to be put

2    on there.

3            And then they also moved this QAPOR process into

4    another category, which put this process for a high risk for

5    money laundering into a low risk for money laundering

6    category.

7            So there were a couple of things they did

8    regarding QAPOR that reduced the effectiveness of

9    Searchspace.

10   Q.  Does -- do any of the Federal Reserve letters after

11   December of 2006 mention the modification that the bank made

12   to Searchspace by including this expedited review process

13   called QAPOR?

14   A.  No.

15           MR. ANTHONY:  If you will bear with me, Your

16   Honor, I think I'm done questioning this witness.

17       (Plaintiff's counsel confer)

18           MR. ANTHONY:  Nothing further.  Thank you,

19   Ms. Ghiglieri.

20           THE WITNESS:  Thank you.

21           MR. ANTHONY:  Thank, Your Honor.

22           THE COURT:  You're welcome.

23           Is there anything further.

24           MR. SCHAPER:  Briefly, I have a few more

25   questions, Your Honor.

1          THE COURT:  Mr. Schaper, you may begin when you're

2     ready.

3          MR. SCHAPER:  Thank you, Your Honor.

4                      **RECROSS-EXAMINATION**

5     BY MR. SCHAPER:

6     Q.  If we would look at Exhibit 50445 and -- 50445.  445,

7     not 455.  And I'll start asking questions while we're

8     pulling that up.

9          THE COURT:  You may.

10    BY MR. SCHAPER:

11    Q.  Ms. Ghiglieri, do you recall that plaintiff's counsel

12    just asked you questions about the 2006 fed exam letter that

13    is now up on the screen?

14    A.  Yes.

15    Q.  And if we look at the third page of that document, you

16    were asked questions about the validation of corporate

17    customers, correct?

18    A.  Yes.

19    Q.  And those are customers of the bank, right?

20    A.  Yes.

21    Q.  And plaintiff's counsel made a reference to Enchanted in

22    connection with this section of the fed's letter.  Do you

23    recall that?

24    A.  Yes.

25    Q.  And Enchanted was not a customer of the bank, correct?

Ghiglieri - Recross

1    A.  Right.

2    Q.  Now, there are a few letters here where the fed

3    indicates some so-called expected actions of the bank?

4    A.  Yes.

5    Q.  And that's even in the overall context of saying that

6    the bank's AML compliance programs were satisfactory or

7    sometimes they say adequate, right?

8    A.  I couldn't hear that.  Say that again.

9    Q.  The fed includes some expected actions of the bank even

10   when the overall conclusion is adequate or satisfactory,

11   correct?

12   A.  Yes.

13   Q.  And in your experience it's typical for the fed, even

14   when finding a bank's program to be adequate or

15   satisfactory, to also include some areas for improvement,

16   right?

17   A.  Yes.

18   Q.  If we'd look at P-333, which plaintiff's counsel just

19   asked you about.  And do you recognize this as the October

20   2008 review that Mary Pesch did at the bank after the Ponzi

21   scheme had become public?

22   A.  Yes.

23           MR. SCHAPER:  And if we scroll down to the second

24   page, Mr. Herzka, and keep going.  Keep going, please,

25   Mr. Herzka.  Thank you.  If we could stop there.

1    BY MR. SCHAPER:

2    Q.  So here, if you look at the fourth paragraph that

3    starts, "According to an article published in the *Star*

4    *Tribune,*" do you see here that in this M&I document --

5    again, this is after the Ponzi scheme has become public,

6    correct?

7    A.  Yes.

8    Q.  And the bank is talking about details that came out in

9    an article published by the *Star Tribune* on September 26th,

10   2008, correct?

11   A.  Yes.

12   Q.  And among the details that are being discussed here were

13   that there were vendors, such as Nationwide and Enchanted,

14   that were part of the Ponzi scheme that was revealed at this

15   time, correct?

16   A.  Yes.

17   Q.  And you said that in your report when you had a document

18   to cite, you put that in a footnote if it was something you

19   relied on, correct?

20   A.  Yes.

21   Q.  And if you look at your report, Ms. Ghiglieri, and turn,

22   please, to page 19.  And please let me know when you're

23   there.

24   A.  I'm at 19.

25   Q.  And here you are describing the Ponzi scheme, is that

1    right, what this covers?

2    A.  Yeah, this section just gives some background

3    information prior to me going into my opinions.

4    Q.  And you're attributing this description to the 2010 PwC

5    report, correct?

6    A.  Yes.

7    Q.  And we talked about that a lot when I questioned you

8    earlier, right?

9    A.  Yes.

10   Q.  And when you talk about Nationwide and Enchanted in the

11   second paragraph where you're quoting PwC, you see that you

12   have a footnote for that paragraph and the footnote is to

13   the PwC interim report, correct?

14   A.  Yes.

15   Q.  And that's the 2010 one that we have been talking about?

16   A.  Yes.

17   Q.  You didn't -- in describing the role of Nationwide and

18   Enchanted in the scheme, you did not cite any PSI -- any M&I

19   document, correct?

20   A.  Say that again.

21   Q.  In describing the role of Nationwide and Enchanted in

22   the Ponzi scheme, you did not cite any M&I document,

23   correct?

24   A.  No.  I cited the PwC report.

25   Q.  And is there any M&I document that you relied on that

1      establishes that AML analysts would have known that

2      Enchanted and Nationwide were vendors or wholesalers?

3      A.  I don't recall as I'm sitting here.

4              MR. SCHAPER:  Your Honor, I'd like to ask one more

5      question coming out of this document, but I would like to

6      approach before I do that, if that's okay?

7              THE COURT:  You may.

8              MR. ANTHONY:  Which document?

9              MR. SCHAPER:  Coming out of Plaintiff's 333 or

10     related to it.

11         **(At sidebar)**

12             MR. SCHAPER:  Your Honor indicated at a prior

13     sidebar that we could not ask about the 2009 fed exam

14     letter, including because it kind of goes beyond the post

15     discovery of the Ponzi scheme period.

16             Plaintiff's counsel elicited testimony about this

17     document that the bank prepared after the Ponzi scheme was

18     uncovered.  We think that that opens the door to that time

19     period and just bringing into the record what the fed's

20     conclusion was of how the bank was doing during that time

21     period.

22             I didn't want to ask about that on the record

23     without doing this because of your prior order.

24             MR. ANTHONY:  I didn't open the door by asking if

25     the bank had information in its records which showed that it

1    had the wire information relating to Enchanted and Worldwide

2    [sic] that was in the PwC report.  I said nothing about the

3    2009 Federal Reserve report.

4              It was to show that the impression you created and

5    I think was -- you tried to -- you created the impression to

6    try to say that the bank had no idea that Enchanted and

7    Nationwide were wiring in billions of dollars and you tried

8    to suggest that 713 was something created after the fact by

9    PwC when, in fact, I was using this to show that the bank

10   knew in October of 2008 that Enchanted and Nationwide had

11   been wiring in all this money.

12             THE COURT:  What's the time frame from your

13   reference?

14             MR. ANTHONY:  That as of October of '08 the bank

15   knew that it had in its records all this information that's

16   reflected here.  That's the only thing I asked.

17             MR. SCHAPER:  And the fed exam covers the period

18   from summer of '08 into '09.  So that's the only time

19   period -- that's the time period when the fed examined that

20   October '08 time frame.  That's when the fed did it.

21             MR. ANTHONY:  Well, I think that was in '09 they

22   did it.

23             MR. SCHAPER:  But they do it -- it's an annual

24   exam, so they are examining the period back to the summer of

25   '08 because the prior exam was concluded in the summer of

1       '80.  So then they do another exam the next year and it

2       captures October of 2008.

3                MR. ANTHONY:  Well, I don't agree that it captures

4       2008, nor does it suggest that it ever looked at any of this

5       information.  There's nothing in that exam letter to say

6       that they looked at any of this information.

7                And the point I'm trying to make is that your bank

8       had all this information, and your suggestion that it didn't

9       is simply inaccurate and misleading.

10               MR. SCHAPER:  Respectfully, Your Honor, that's

11      argument and that can be argued to the jury.  I think we

12      should be able to present -- him having drawn attention to

13      post September 2008 documents with this witness, I think we

14      should be able to elicit testimony from which we can make an

15      argument and they can make an argument, but it should be

16      part of the record in our view.

17               THE COURT:  What is the nature of the evidence and

18      the argument that you claim to make?

19               MR. SCHAPER:  With respect to this, just that the

20      fed did another examination and for the same time period it

21      also found -- that covered late '08 to '09 or mid '09 and

22      that that examination also came up with an adequate or

23      satisfactory rating about the bank's program.

24               THE COURT:  And why is that relevant?

25               MR. SCHAPER:  Because it covers the time period

1     of -- that is when the Ponzi scheme was uncovered.  It

2     covers the time period when the bank did the analysis that

3     counsel just referenced in that document.

4            THE COURT:  And why isn't that relevant?

5            MR. ANTHONY:  But it doesn't speak to what the --

6     the questions that I asked was did the bank have information

7     in its possession as to the Enchanted and Nationwide wires

8     before the Ponzi scheme broke.  That's the only thing it was

9     offered for.  The Federal Reserve letter has nothing to do

10    with what the bank had in its possession as of August --

11    January through August of 2008.

12           And he's trying to bootstrap onto my

13    factually-based question a conclusion that the Federal

14    Reserve must have blessed this, and that's not what I

15    offered it for, and he's trying to open it -- go through a

16    door that never was opened.

17           And that's all they are trying to do here, is to

18    get into evidence something that they are not entitled to

19    get into evidence by misrepresenting what I asked and what

20    she answered.  And that's why I think it's objectionable and

21    it's confusing.  You have already ruled on it and the door

22    hasn't been opened.

23           MR. SCHAPER:  I think this continues to be

24    relevant because the witness has now testified about the

25    time period in question.  It's just an extension of similar

Ghiglieri - Recross

1    testimony about the other fed exams which I asked about and

2    now plaintiff's counsel has an opportunity to ask about.

3    And so I think it's relevant for that reason.

4              THE COURT:  The objection is sustained.

5         **(In open court)**

6              MR. ANTHONY:  Is that sustained, Your Honor?

7              THE COURT:  I did.

8              MR. SCHAPER:  Your Honor, if I may just confer

9    with my colleagues for a second?

10        (Defendant's counsel confer)

11             Thank you, Your Honor.  No further questions.

12             THE COURT:  Is there anything further for this

13   witness?

14             MR. ANTHONY:  I have no further questions, Your

15   Honor.

16             THE COURT:  May the witness be excused?

17             MR. ANTHONY:  The witness may be excused, Your

18   Honor.  Thank you, Ms. Ghiglieri.

19             THE COURT:  You are excused.

20             Members of the Jury, we will take our midafternoon

21   break now.  That will give us time to have counsel set up

22   for the next witness and also give us time to have

23   uninterrupted testimony.

24             So please remember the instructions that I have

25   given you.  Do not discuss this case with anyone.  Do not do

2421

1    any type of investigation of this case with anyone.  Don't

2    allow anyone to discuss this case about you -- with you.

3    You know your responsibilities and you know that only you

4    are responsible for deciding the facts in this case and it

5    has to be based on the evidence that's been presented in

6    this courtroom.

7         Okay.  All rise for the jury.

8      (Jury excused)

9                    **IN OPEN COURT**

10                   **(JURY NOT PRESENT)**

11         THE COURT:  We are in recess.

12         MR. SPEHR:  Judge, if I may?  You may recall --

13         THE COURT:  We need to -- wait a minute.

14         MR. SPEHR:  Oh, I'm sorry.

15         COURT REPORTER:  Remind me again who you are.

16         MR. SPEHR:  Richard Spehr for BMO Harris.

17         You may recall earlier this morning, 8:30 or so, I

18   raised that we had a second point with respect to

19   Mr. Martens' testimony and we, I think, agreed to defer it

20   to prior to his testimony.  So we could talk about it now or

21   before the jury comes back, whatever your preference is, but

22   I just wanted to sort of tee that up for you.

23         THE COURT:  I appreciate you teeing it up.  I need

24   to take a break.  So we will talk about it when I come back

25   from the break.

```
 1              MR. SPEHR:  Very well.  Thank you.

 2         (Recess taken at 2:55 p.m.)

 3                        *    *    *    *    *

 4         (3:15 p.m.)

 5                        IN OPEN COURT

 6                        (JURY PRESENT)

 7              THE COURT:  Good afternoon.  You may be seated.

 8              Are we ready to proceed, Counsel?

 9              MR. ANTHONY:  I am ready to proceed.  Thank you,

10    Your Honor.

11              THE COURT:  Very well.

12              MR. ANTHONY:  Trustee Douglas Kelley calls for his

13    next witness Mr. Ted Martens.  And I will signal that this

14    is our last witness, Your Honor.

15              THE COURT:  Please state your full name.

16              THE WITNESS:  Theodore F. Martin.

17              THE COURT:  And would you spell your last name.

18              THE WITNESS:  M-a-r-t-e-n-s.

19         (Witness sworn)

20              THE COURT:  Please be seated.

21              Counsel, you may proceed.

22              MR. ANTHONY:  Thank you, Your Honor.

23

24

25
```

Martens - Direct

1                        **(Theodore Martens)**

2                      **DIRECT EXAMINATION**

3      BY MR. ANTHONY:

4      Q.  So make sure that microphone is close to you,

5      Mr. Martens.

6      A.  Okay.  Close enough?

7      Q.  I can hear you.

8              Mr. Martens, where do you live?

9      A.  I live in Demarest, New Jersey.  Demarest is a suburb of

10     New York City in the northeastern part of the state.

11     Q.  Tell us a little bit about you and your family.  Are you

12     married?

13     A.  My wife Marianne and I are married now 47 years.

14     Q.  Any children?

15     A.  We have three children.

16     Q.  And just briefly, what do your children do?

17     A.  Our oldest is Kelly.  She's 41.  She's a graduate of

18     MIT, the Massachusetts Institute of Technology in Cambridge,

19     Massachusetts.  She then enrolled in the --

20     Q.  Is she a doctor?

21     A.  She's a doctor.  She went to medical school at

22     Northwestern.  She's an orthopedic surgeon with Premier

23     Orthopedics in the Philadelphia area.

24     Q.  And what about your -- you have another daughter.  What

25     does she do?

Martens - Direct

1    A.  Well, we have twins.  They're 37.  Our daughter is

2    Maribeth.  She's a graduate of Yale University, and she's

3    currently a director on the staff -- on the strategy

4    consulting practice at my old firm, PwC, in New York City.

5    Q.  And your other -- I was going to ask if they are

6    identical, but I think the other twin is a boy, right?

7    A.  He's a boy.  He's Ted, and he's a graduate of the

8    University of Rochester in Rochester, New York, and Wake

9    Forest Law School in Winston-Salem, North Carolina.  He's

10   with the medical integrity unit.  He's a lawyer on the staff

11   in the state of New Jersey, Trenton, New Jersey.

12   Q.  You sound very proud of your children.

13   A.  I am.

14   Q.  Do you have any grandchildren?

15   A.  I have four grandchildren.  Kiara is seven, Liam is

16   five, Abigail is two, and Caroline is six months.

17            MR. ANTHONY:  Pull up Demonstrative PD-17, please.

18   BY MR. ANTHONY:

19   Q.  Let's talk about -- where did you go to college?

20   A.  I'm a graduate of Fairfield University, bachelor of

21   science in biology.  And I have an MBA in accounting from

22   Fairleigh Dickinson University.

23   Q.  Where did you begin your professional career?

24   A.  I joined one of the predecessor firms to PwC, Coopers &

25   Lybrand, in 1978.  I joined the audit staff and progressed

1    on -- worked on audits, audits of financial statements, and

2    industry experience that was largely in the financial

3    services industry, auditing banks, insurance companies, and

4    broker-dealers, as well as in the manufacturing industry, in

5    particular the tobacco industry.

6    Q.  Okay.

7    A.  I was admitted to the firm as a partner in 1987, as an

8    audit partner in 1987.

9    Q.  Okay.  And so then you left -- Coopers & Lybrand became

10   part of PwC; is that correct?

11   A.  Coopers & Lybrand merged with Pricewaterhouse to form

12   PricewaterhouseCoopers, PwC, in -- I believe it was in June

13   of 1998.

14   Q.  So you were a partner then in PwC?

15   A.  I was a partner in PwC.  I never really left the firm.

16   Q.  So your entire career has been with one firm?

17   A.  Essentially, yes.

18   Q.  Okay.  So did there come a time when you got out of

19   doing audit work and started doing some other kind of work

20   at PwC?

21   A.  Yes.

22   Q.  Let's do this question and answer rather than you giving

23   us a narrative, and then I can interpose questions.  Okay?

24   A.  Okay.

25   Q.  All right.  So when did you get out of doing audit work

Martens - Direct

1    and start doing something else?

2    A.  I was asked --

3    Q.  Give me the year.

4    A.  Oh, okay.  It was 1990.

5    Q.  Okay.  What did you start doing in 1990?

6    A.  I started -- I was asked to start a forensic accounting

7    practice in the New York office at Coopers & Lybrand.

8    Q.  Okay.  So now what is -- do you have any certifications

9    or professional affiliations?

10   A.  Yes.  I'm a CPA.  I'm a certified public accountant

11   licensed in the State of New York since 1981.

12   Q.  Do you have any other certifications?

13   A.  Yes.  I have a certificate in financial forensics from

14   the American Institute of Certified Public Accountants.

15   Q.  Do you have any other certifications or are you a member

16   of any other organizations?

17   A.  I'm a member of the AICPA.

18   Q.  Okay.  And the AICPA stands for what?

19   A.  The American Institute of Certified Public Accountants.

20   Q.  And do you serve -- I see you serve as a chair of the

21   AICPA Relations with Judiciary Committee.  Tell the jury

22   what that is.

23   A.  Well, the AICPA has various committees, one of which is

24   Relations with Judiciary Committee, and I've served as the

25   chair of that committee as well as vice chair for many

Martens - Direct

1   years.  And that's essentially, then, work that -- or I

2   should say my relationship with the National Judicial

3   College came from serving on that committee.

4   Q.  Have you done any teaching?

5   A.  Yes.

6   Q.  I see -- on the slide we have up on the board it says,

7   "Faculty at National Judicial College since 1994: teaches

8   forensic accounting to state and federal judges."  What is

9   that?

10  A.  The National Judicial College has a program.  It's

11  financial statements -- it's called "Financial Statements in

12  the Courtroom."  And I have -- I teach judges.  And over the

13  years we've had judges from federal courts, federal district

14  courts, bankruptcy courts, state courts attend this program.

15  I teach accounting, teach auditing.

16          And also, too, I wrote the module on forensic

17  accounting to teach the judges what forensic accountants can

18  do to help resolve disputes and things of that nature.

19  We've had over the years probably about 6,000 federal and

20  state court judges attend the program dating back from the

21  early 1990s.

22  Q.  In addition to your accounting career, have you had a

23  military career?

24  A.  Yes.  I'm a retired lieutenant colonel, New Jersey Army

25  National Guard.

Martens - Direct

1     Q.  What positions did you hold there?

2     A.  I was a combat engineer officer, numbers of billets in

3     the engineer battalion, as well as the division engineer at

4     Fort Dix.  And also then in my last billet served as a

5     commander of an anti-terrorism -- newly formed

6     anti-terrorism support group.

7     Q.  Were you engaged in service at the time of the 9/11

8     attack on the Twin Towers?

9     A.  Yes.  That was -- on 9/11 I was actually at the National

10    Guard Anti-Terrorism Training Center in San Luis Obispo,

11    California, and that day my unit was ordered to stay in

12    active duty and we were flown back on military transport and

13    reported to the World Trade Center within a couple of days

14    of 9/11 to assist first responders in their operations at

15    Ground Zero.

16    Q.  Okay.  Now, we have some of the other matters in which

17    you have been -- have you been an expert in a number of

18    different cases?

19    A.  I have been an expert in a number of different cases,

20    yes.

21    Q.  And are some of them up on the screen there that you

22    have had a role in as an expert?

23    A.  Yes.

24    Q.  Okay.  So tell the jury what your role was as lead

25    valuation expert for the U.S. State Department at the

 1    Iran-U.S. Claims Tribunal at The Hague, Netherlands.  What

 2    was that about?

 3    A.  That was about -- the tribunal itself was when the

 4    hostage crisis was settled.  I believe it was in 1981.

 5    Q.  Is that the one back in the '70s when the Iranians took

 6    the Americans hostage?

 7    A.  Yeah.  So the Shah and then return of the Ayatollah

 8    Khomeini.  There were hostages taken.  And as part of that

 9    settlement with respect to the release of the hostages, the

10    tribunal was developed to satisfy or to hear claims brought

11    by not only U.S. citizens who had their assets expropriated

12    by the Islamic Republic of Iran, but also by the Islamic

13    Republic of Iran bringing claims against the United States

14    of America.

15    Q.  And so who were you the expert for?  The U.S. State

16    Department?

17    A.  The U.S. State Department with respect to claims --

18    nonmilitary claims that were brought by the Islamic Republic

19    of Iran against the United States of America.

20    Q.  Tell the jury a little bit about what your role was as

21    independent auditor of tobacco master settlement agreement.

22    What was that about?

23    A.  The tobacco manufacturers entered into a settlement with

24    a number -- with most states -- there were some states that

25    were previously settled, one of which was the State of

Martens - Direct

1    Minnesota -- with respect to claims brought by, you know,

2    costs incurred from smoking cigarettes over the years.  The

3    settlement was entered into, and I believe it was in 1999.

4         In 2000 I led the engagement team that pursued the

5    matter, and PwC was retained as independent auditor.  I

6    served on that as the engagement partner on that matter for

7    the better part of 15 years or so.

8         And there our role basically is to capture or to

9    gather all of the data from the tobacco manufacturers that

10   were parties to the settlement and, in turn, then determine

11   how much then gets paid out to the setting states.

12   Q.  Okay.

13   A.  That's done annually.

14   Q.  And, finally, the Deepwater Horizon oil spill in the

15   Gulf of Mexico, what was that about and what was your role?

16   A.  Once again, I led the engagement team in pursuit of this

17   matter.  That oil spill occurred in 2010.  Initially we were

18   retained by Ken Feinberg and the Gulf Coast claims facility

19   and worked out of his offices in Washington, DC.

20        Ultimately, when the litigation settled, we

21   then were retained by the claims administrator, Patrick

22   Juneau, and we basically moved our operation down to

23   New Orleans.

24        And our role, PwC's role, in that regard was to

25   assess and evaluate business economic loss claims and to

1    make recommendations to the claims administrator as to how

2    much should be paid.

3    Q.  So you said now that your experience has been in

4    forensic accounting for the last two or three decades.  Tell

5    the jury, if you will, what is forensic accounting?

6    A.  Forensic accounting is a specialized area of accounting.

7    Essentially you're bringing to bear -- people like myself

8    bringing to bear your accounting, your auditing, your

9    investigative skills and techniques oftentimes in situations

10   where there's a dispute of some nature and oftentimes, too,

11   finding yourself having to reconstruct account balances and

12   account information and so forth for purposes of helping

13   resolve those disputes.

14   Q.  Since the mid 1990s, what percent of your practice has

15   been in forensic accounting, the way you have just described

16   it?

17   A.  Pretty much after I worked off my time on the audits --

18   as the engagement partner on a number of audits with the

19   firm, it's been pretty much full time since the mid 1990s

20   forward in the field of forensic accounting.

21   Q.  Turn to --

22           MR. ANTHONY:  Don't publish this, please,

23   Mr. Ellig.

24   BY MR. ANTHONY:

25   Q.  But you turn, Mr. Martens, to Exhibit 717, which is your

Martens - Direct

```
 1    resumé.  Just confirm for us that that is your resumé.  You
 2    will have to look at it in the book.
 3    A.  Oh, okay.
 4    Q.  Do you have the book there of your exhibits?
 5    A.  17?
 6    Q.  717, sir.  Is that your resumé, sir?
 7    A.  It's my resumé as well as a list of testimony.  This
 8    would have been filed when my report was prepared in 2018.
 9    I have -- my testimony is the only thing that's lacking
10    since that date and time.
11              MR. ANTHONY:  We'll offer Exhibit -- Plaintiff's
12    Exhibit 717 as his resumé.
13              MR. SPEHR:  No objection, Your Honor.
14              THE COURT:  Exhibit 717 is received.
15    BY MR. ANTHONY:
16    Q.  And were you retained in this matter by the trustee,
17    Mr. Kelley, to provide an opinion on damages?
18    A.  Yes.
19    Q.  And did you do that?
20    A.  I did.
21              MR. ANTHONY:  We'll tender Mr. Martens as an
22    expert on damages, Your Honor.
23              MR. SPEHR:  No objection.
24              THE COURT:  He is received as an expert.
25              MR. ANTHONY:  And we'll also tender him as an
```

1    expert in forensic accounting, Your Honor.

2              THE COURT:  He is received as an expert in

3    forensic accounting.

4              MR. SPEHR:  No objection for the moment.  We'll

5    see what questions are asked.

6    BY MR. ANTHONY:

7    Q.  Mr. Martens, were you retained to reach an opinion on

8    plaintiff's damages from the bank in this case?

9    A.  In this case, yes.

10   Q.  And how did you measure the damages in this case?

11   A.  I measured the damages -- the plaintiff's damages as the

12   amount that PCI owed to its lenders, to its creditors, but

13   was unable to pay.

14   Q.  When were you first hired by Mr. Kelley -- or when was

15   PwC and you first hired by Mr. Kelley to start doing some

16   work in matters relating to the Petters Ponzi scheme?

17   A.  In November 2008.

18   Q.  And who was it that retained you or PwC?

19   A.  Doug Kelley.

20   Q.  Did Judge Montgomery need to approve your hiring as an

21   expert?

22   A.  I believe so at the time.  She was the district court

23   judge overseeing the receivership.

24   Q.  Now, as the expert for the trustee, did Judge Montgomery

25   make you aware of any expectations or requirements that she

Martens - Direct

1    had with respect to the work you were doing and who you were

2    to share it with?

3                MR. SPEHR:  Objection, hearsay.

4                THE COURT:  Overruled.

5                THE WITNESS:  She did.  Mr. Kelley -- I knew from

6    the start, based on Judge Montgomery's input into the

7    process, that Mr. Kelley would retain one forensic

8    accounting expert and only one, and that forensic accounting

9    firm must be prepared and needed to be prepared to share

10   their work product with other parties that were impacted by

11   the Petters Ponzi scheme.

12   BY MR. ANTHONY:

13   Q.  Okay.  When you say you were supposed to share your

14   work, what are you talking about?  What work were you doing

15   and who did you have to share it with?

16   A.  Well, the work would be -- essentially from the start,

17   the focus was on determining -- really following the cash,

18   determining where cash came from and where it went, and

19   other analyses.

20                And we were sharing from the start our work with

21   the Department of Justice, the U.S. Attorney's Office.  Tom

22   Petters' criminal defense team, I met with them personally

23   and shared the work that we had done there up to that point

24   leading up to his criminal trial.  There were other --

25   really other law firms that were involved.

1    Q.  Let me ask you this:  Did you create a database of --

2    tell the jury what you did in terms of gathering up records,

3    how long it took, what you did, and then what you did with

4    the records and the information after you gathered it.

5    A.  Okay.  This is going to be hard to do without narrative.

6         But at any rate, the first order of business is to

7    determine just really what's -- you know, once we have our

8    marching orders and we know really what ultimately we need

9    to accomplish, it's up to me, as the forensic accountant, to

10   develop the necessary procedures and so forth to achieve

11   those objectives.  To do that you need to, first and

12   foremost, scope what's available to look at.

13        And in this case what was a little complicating,

14   but required just a little bit more in terms of bringing to

15   bear your training and experience, is that not only are we

16   looking at information at the Petters Company level, at the

17   PCI level, but we also know that the government has records

18   from their raid of Tom Petters' business there out in

19   Minnetonka, his home in Florida, as well as then raids of

20   Frank Vennes, you know, an investor that was involved,

21   you've heard his name, Metro Gem.

22        All that information that we know is available,

23   get our arms around that, scope that out, gather it

24   together.  And people with my background are involved in

25   doing that, but also people who have joined part of our team

1    with computer science backgrounds, people that bring to bear

2    information technology and how know where and how to extract

3    electronically stored information.  All of that was taking

4    place at the time.

5           And from there then going ahead and developing

6    databases of information, bank data, melding that with the

7    various promissory note information and so forth, pulling it

8    all together and then making that available for others to

9    use.

10   Q.  So when you say you make it available -- so you have

11   this database with all the information you pulled together.

12   Judge Montgomery says you have to let everybody who wants to

13   look at it.  So how do you make it assessable to whatever

14   wants to look at it who is involved in this Petters Ponzi

15   scheme situation?

16   A.  We take the information, we have it in a database.  Then

17   we work with a vendor.  At the time the vendor's name was

18   Stratify.  That's changed over the time -- over numbers of

19   years, I guess.  I think it's now known as Relativity.  But

20   that search tool -- we develop a master database.  That

21   search tool and so forth, we load the information into that

22   database.

23          And then we develop different satellite databases.

24   So let's say the trustee and his counsel have access to the

25   master database.  Then other parties, other lawyers -- other

```
1    law firms, I should say, other individuals in terms of like
2    Tom Petters' criminal defense team, there will be a
3    satellite database that then they will have access to that
4    information that is pertinent to their particular cases.
5    Q.  Okay.  So let me ask you this:  Did you provide access
6    to the database that PwC created to parties that had
7    disputes with Mr. Kelley?
8    A.  Yes.
9    Q.  Okay.  Did you provide that -- access to that database
10   to BMO Bank?
11   A.  Well, BMO Bank was a little bit different.  In the case
12   of BMO Bank, BMO Bank had served a subpoena on PwC.
13   Q.  Tell the jury who PwC was.
14   A.  PwC is the firm.
15   Q.  Petters Worldwide?
16   A.  No.
17   Q.  Oh, PwC.  I'm sorry.  It's getting late.  PwC is
18   PricewaterhouseCoopers.  They served a subpoena -- the bank
19   served a subpoena on PwC.  Okay.  Got it.
20   A.  Right.
21   Q.  What did --
22   A.  And so what we did, we PwC did, is we responded to that
23   subpoena, which was -- as I recall, it was an extensive
24   undertaking.  I was --
25   Q.  How much --
```

```
 1                  COURT REPORTER:  One at a time.

 2                  MR. ANTHONY:  I'm sorry.

 3                  THE COURT:  One at a time, please.

 4                  MR. ANTHONY:  I'm trying to stop him.

 5     BY MR. ANTHONY:

 6     Q.  How much did it cost to respond to the BMO subpoena?

 7     A.  Nearly $600,000 in fees of our time.

 8     Q.  Okay.  So did you provide the information that BMO

 9     wanted that it asked for by way of its subpoena?

10     A.  That's my -- I say yes, and done in an image format that

11     was compatible with their search tool.

12     Q.  All right.  Now, you're being compensated for the time

13     you're spending working on this matter, are you?

14     A.  I am, yes.

15     Q.  And what is your hourly rate?

16     A.  $650 an hour.

17     Q.  And in connection with this case, approximately how many

18     hours have you worked or has PwC worked?

19     A.  In connection with this case, PwC has worked 6,500

20     hours, I believe.  And my time, probably a little over

21     700 hours.

22     Q.  Okay.  How much have you and PwC been compensated to

23     date for the work on this matter?

24     A.  PwC -- I'm sorry.

25     Q.  No, you're okay.
```

1    A.  Okay.  PwC, $2.1 million, including the 600 or so --

2    $600,000 to respond to the subpoena.  And myself personally,

3    about $325,000.

4    Q.  Okay.  Does your compensation depend in any way on what

5    opinions you reach or what testimony you give?

6    A.  No.

7    Q.  Okay.  Are there any standards you need to apply or

8    adhere to when you conduct forensic accounting?

9    A.  When you hold yourself out, as I do, as a certified

10   public accountant, there are standards that you must comply

11   with.  They are set by the American Institute of Certified

12   Public Accountants.  Those standards that -- you know,

13   you're professionally competent; you have adequate training

14   to provide the services, the procedures; you provide those

15   procedures or perform those services with due professional

16   care; the work is done -- it's properly planned and

17   supervised; and, lastly, you gather sufficient evidential

18   matter to support the work that you have done and the

19   opinions that you might have to tender.

20   Q.  Have you adhered to those standards in this matter?

21   A.  Yes.

22   Q.  Now, do you understand that the bank's damages expert, a

23   Mr. Karl Jarek, claims that you have not adhered to

24   generally accepted forensic accounting standards; do you

25   understand he says that?

Martens - Direct

```
 1    A.  I do.

 2    Q.  Is his observation accurate in your view?

 3    A.  No, it's not.

 4    Q.  Why not?

 5    A.  There are -- first of all, there are no such thing as

 6    generally accepted forensic accounting standards.

 7    Q.  You just said there's generally accepted accounting

 8    standards.  Now, are you modifying that to include forensic

 9    accounting standards as something different?

10    A.  They are different.  There are generally accepted

11    accounting principles.  Those are accounting principles that

12    are used in preparing financial statements that are then

13    subject to audit and filed with the SEC.  There are also

14    generally accepted auditing standards that govern how audits

15    are to be performed by CPAs.

16    Q.  So let me ask you this:  Is there any such thing as

17    generally accepted forensic accounting standards?

18    A.  No.

19    Q.  Okay.  So what standards are those that a forensic

20    accountant must comply with?

21    A.  The standards I just described.  The statement on

22    consulting services sets forth -- forensic accounting is a

23    consulting service.  Auditing -- it's not an audit service.

24    Q.  Given your experience, why aren't there generally

25    accepted forensic accounting standards?
```

Martens - Direct

1    A.  Because essentially the work that's -- a forensic

2    accountant has and needs maximum flexibility in being able

3    to design procedures that get to the heart of the issue,

4    that get to what can best be done to help resolve the

5    dispute at hand.

6            And no one size fits all when working on matters

7    of this nature.  You need to be able to go ahead and react

8    to the information at hand and also, too, oftentimes the

9    information may not be at hand because records will be

10   destroyed and so forth.

11           And so as a forensic accountant, you have that

12   latitude, you have that flexibility to be able to design the

13   work that you need to do to get right, like I said, to the

14   core issue at hand in terms of what needs to be done and how

15   that can help best resolve the dispute.

16   Q.  Now, you talked about creating the database and all the

17   documents you had to gather up from all the different

18   sources.

19           Let me ask you this:  You've provided that

20   transaction database to the parties and their lawyers and

21   their experts, correct?

22   A.  Correct.

23   Q.  In all that time has anyone pointed out to you any

24   errors that they have alleged you made in assembling that

25   database?

1    A.  No.  There's been information that we've developed over

2    time.  This database definitely took some time to prepare.

3    To give some idea of the order of magnitude of how often we

4    updated it, we probably processed, I believe, almost 125,000

5    changes along the way to get to the final product as we were

6    tracking every cash transaction that took place in

7    connection with the Petters Ponzi scheme.  I'm not aware of

8    anyone to this point that has found an error in any of my

9    numbers.

10   Q.  Okay.  So did the bank's expert, Mr. Jarek, in his

11   report find any errors in the work you did?

12   A.  No.

13              MR. SPEHR:  Object to the form, Your Honor.

14              THE COURT:  Overruled.

15              THE WITNESS:  No.  In fact, he made reference to

16   the report in preparing some of his analysis.

17   BY MR. ANTHONY:

18   Q.  I am sorry.  He made?

19   A.  He utilized my report in preparing some of his analyses.

20   Q.  Okay.  Now, after you identified the -- all the

21   transactions that were occurring and created this database,

22   were you able to determine how much money each lender or

23   investor made or lost?

24   A.  Yes.

25   Q.  Now, was all that work that you did specifically related

Martens - Direct

1    to this case?

2    A.  No.

3    Q.  So tell the jury what the trustee directed you to do in

4    terms of gathering up the information, identifying the

5    lenders and the investors.  What was your direction by the

6    trustee?

7    A.  From the start, once we gathered the information, it

8    was -- the work that was done was to identify and to

9    track -- because there -- this is a situation where there

10   was a lot of documentation.  Records, by and large, were not

11   thrown away.

12          So we were able to take and develop a database

13   that tied out cash transactions starting from probably the

14   earliest point in time of the fraud, which was dating back

15   to 1996 or thereabouts.

16          And we were able to go ahead and -- based on the

17   level of bank data that we had to work with, as well as then

18   promissory notes, things of that nature.  A promissory note

19   is a document that would evidence the lending arrangement

20   that was in place between PCI and the investor.

21          And we were able to match up on a note-by-note

22   basis, transaction-by-transaction basis how much money was

23   invested, how much money was lent and then, in turn, what

24   sort of payments were made.

25          And if you look at a promissory note, it would

1     capture the basic information of the date of the note, the

2     amount that was invested, interest rate, and when the note

3     would mature.

4             And then we would go ahead and track through all

5     of that information such that at the end of the day we had a

6     pretty -- a very complete track record for each of the

7     investors and could determine net at the end of the day on a

8     cash basis how much money they either took out in excess of

9     what they put in versus instances where they took out less

10    than they put in in determining ultimately the net winners

11    and the net losers.

12    Q.  So why was it important for the work you were doing to

13    determine who the net winners and the net losers were?

14    A.  I think from the start on the -- from a net winners

15    perspective, the trustee had a certain period of time for

16    which to go ahead and take action to try to recover from the

17    net winners.  And so that was probably an early-on focus.

18            But, really, it was all done together.  It was

19    somewhat of a net cash basis kind of an approach and so

20    forth to determine winners and losers.  But I do believe

21    that the winners, from what I understood from the trustee,

22    was probably more of a focus at that point given the time

23    frame involved in terms of him trying to recover those

24    funds.

25    Q.  Did you prepare a slide for demonstrative purposes that

Martens - Direct

```
 1    show how this Ponzi scheme worked?

 2    A.  Yes.

 3    Q.  And was that created by you or PwC, by someone under

 4    your control and supervision?

 5    A.  Yes.

 6    Q.  And do you believe it will be helpful for you to have

 7    that slide available for the jury to see as you go through

 8    your testimony?

 9    A.  Yes.

10            MR. ANTHONY:  We'll put up P-764 for demonstrative

11    purposes, Your Honor.

12            MR. SPEHR:  No objection, Your Honor.

13            THE COURT:  P-764 is received --

14            MR. ANTHONY:  Is there any objection --

15            THE COURT:  -- for demonstrative --

16            MR. ANTHONY:  Is there any objection --

17            THE COURT:  I am speaking now.

18            MR. ANTHONY:  I'm sorry.  I didn't hear you, Your

19    Honor.  I'm sorry.

20            THE COURT:  PwC -- I'm sorry.  P-764 is received

21    for demonstrative purposes.

22            MR. ANTHONY:  Can you enlarge that, Ms. Ellig, at

23    all?

24    BY MR. ANTHONY:

25    Q.  Okay.  So let's talk about how the transactions occurred
```

1    with respect to investors or lenders who loaned or invested

2    money in the -- with -- in PCI and how it happened.

3              So you see at the top of your slide you have

4    "Investor" and then you have "Step 1."  Describe for the

5    jury what Step 1 was.

6    A.  Step 1 is the investor essentially being given a

7    promissory note with purchase orders, a purchase order to

8    acquire goods as well as to go ahead and sell goods, and

9    taking money, whatever that note amount is, and then going

10   ahead and transferring that -- those -- the funds per the

11   terms of the note, how much, whatever, into what is referred

12   to now as a special purpose entity.

13   Q.  Okay.  And I'm going to take you through each step one

14   at a time.

15   A.  Sure.

16   Q.  So the lender transfers money into an entity called a

17   special purpose entity?

18   A.  Correct.

19   Q.  And that's -- the lender's money is in that special

20   purpose entity?

21   A.  Correct.

22   Q.  Okay.  Now, it's in the special purpose entity.  And

23   then what happens to the money after that?

24   A.  The lender then goes ahead -- the lender controls -- the

25   investor, I should say, or lender controls the amount.

```
 1    First of all, the special purpose entity, this is PCI.
 2    Okay?
 3    Q.  So even though the lender controls the money, PCI is the
 4    special purpose entity?
 5               MR. SPEHR:  Object to the form, no foundation.
 6               THE COURT:  Sustained.
 7    BY MR. ANTHONY:
 8    Q.  Okay.  So explain how you know that the special purpose
 9    entity is PCI.
10               MR. SPEHR:  Same objection, object to the form.
11               THE COURT:  You may ask does he know and then how.
12    BY MR. ANTHONY:
13    Q.  Do you know how it is that the special purpose entity is
14    PCI?
15    A.  Yes.
16    Q.  How do you know that?
17    A.  The special purpose entities are all wholly-owned
18    subsidiaries of PCI.
19    Q.  Okay.
20    A.  Each investor, each investor had their own special
21    purpose entity, so there was no commingling of funds with
22    the initial investment.
23    Q.  Okay.  So now once it's in the special purpose entity,
24    what happens?
25    A.  The special purpose entity, once the funds are in that
```

1    special purpose -- this is after Step 1 -- the investor then

2    directs the release of the funds.  In other words, PCI

3    doesn't control that account; the investor does.  The

4    investor then gives direction to release those funds on this

5    note and have them transferred, then, in Step 2 to a vendor.

6    Okay.  That's --

7    Q.  So we've heard vendors.  We've heard names.  Who are

8    the -- and you've got -- in Step 3 you've got some names

9    down there.  Who are those vendors?

10   A.  Correct.  The first one -- there are two -- well, there

11   are two here, NIR -- that's Nationwide -- and then

12   Enchanted.

13   Q.  Okay.  So the vendors, Nationwide and Enchanted, get the

14   money.  Then what happens in Step 3?

15   A.  In Step 3 all that the vendor does is they deduct a

16   commission, and the commission amounts are there.

17   Nationwide is .05 percent.  Enchanted is .025 percent.

18   That's all they do.  They deduct their commission, and they

19   then go ahead and they return the money to Petters Company,

20   Inc., to the --

21   Q.  So -- go ahead.

22   A.  -- to the PCI M&I Bank account.

23   Q.  Okay.  So the money goes from Step 3 to Petters

24   Company's account at PCI?

25   A.  Correct.

1    Q.  And you know this because you've looked at what records

2    and what transactions that have informed you that that is

3    what happens with this money?

4    A.  We have tracked every cash transaction, every cash

5    transaction that took place with every note in the Petters

6    Ponzi scheme, every one of them.

7    Q.  Okay.

8    A.  That's how we know the flow of the cash and the notes

9    that were involved and the transactions and so forth at

10   issue.

11   Q.  All right.  So the money now, net of the commission to

12   Nationwide and Enchanted, is now with Petters Company in its

13   9018 bank account at M&I Bank, correct?

14   A.  Correct.

15   Q.  And you know that from how?

16   A.  From tracking every cash transaction.  The vendors -- it

17   wasn't a simple process of just taking -- I mean, it was

18   simple in the sense of how the flow of funds worked, but

19   there would be some bundling of funds at the vendor level

20   before they would be transferred into the PCI M&I account.

21   We would have to unbundle that to track that down on a

22   note-by-note basis.  So it was really more to just have a

23   complete and exact picture of what was taking place with

24   respect to the movement of the money.

25   Q.  Okay.  And so it goes, then, from Petters Company, Inc.

1    to where in Step 4?

2    A.  Ultimately, then, what will happen is, as a note

3    matures, the transfer price is ultimately then returned to

4    the special purpose entity.  Now, that can -- that maturity

5    date and so forth could be at some point in time down the

6    road.  It could be three months, six months or whatever.

7            But basically what was happening here is money was

8    returned to PCI.  It was effectively, then, being used to

9    then pay off the lender.  And so the money would be

10   transferred back into the special purpose entity account,

11   which, once again, is controlled by the investor, for

12   purposes then at the maturity date of those notes and so

13   forth satisfying the amounts that were due.

14   Q.  So now the money goes back up to the special purpose

15   entity.  And then where does it go out of that special

16   purpose entity after it goes back from Petters Company,

17   Inc.?

18   A.  Well, once it's in the -- at this point, once it's in

19   the special purpose entity account, the investor has

20   control.  They can take the money out of that account.

21   There may be some other adjustments -- I shouldn't say

22   adjustments, but in terms of the principal there in Step 5,

23   principal plus interest gets returned to the investor.

24           And then to the extent that there's any sort of a

25   profit, there really was this Step 6.  PCI was supposed to

Martens - Direct

```
1    have some portion of the investment made themselves.  That
2    didn't oftentimes happen in the sense that they didn't put
3    in their share, their 15 percent or 5 percent or whatever it
4    was.  But when they did, then that share would be returned
5    to PCI, and that's Step 6.
6    Q.  Is this generally how the transactions flowed in the
7    Petters Ponzi scheme?
8    A.  For the -- for those entities that had special purpose
9    entities, yes.  There was some slight -- there was some
10   variations, but basically what this figure, what this
11   exhibit portrays is essentially how the fraud -- the scheme
12   of the fraud itself.
13   Q.  Okay.  So tell the jury, if you will, based on your
14   review of all the documents and transactions, what time
15   period did you look at for arriving at your conclusions?
16   A.  Well, the focus of the work for this case was the period
17   of January 1st, 2002 through 2008.
18            And the special purpose entities, they came
19   into -- they came in, in terms of the evolution of the
20   fraud, in 2001 as Tom Petters was looking to attract more
21   cash with less of an administrative burden that he was
22   having to deal with with the private investors and so forth
23   with all of the paper and like and so forth that needed to
24   be processed.  This was more efficient.
25            It also -- when I say "this," the use of special
```

Martens - Direct

1    purpose entities and attracting investment funds provided
2    certainly additional cash, which he needed to keep the Ponzi
3    scheme afloat, and also could be done a little bit more
4    efficiently than what they were dealing with when they were
5    having to deal with all sorts of private investors.
6    Q.  Let me ask you this.  You've looked at all the
7    transactions going as far back as 1996; is that right?
8    A.  Correct.
9    Q.  So I want to ask you to describe for the jury -- and I
10   think we heard some of it in the opening statement from
11   defense counsel, about when the music stops, whoever doesn't
12   get a chair is the loser.  Do you recall that in the opening
13   statement?
14   A.  Yes.
15   Q.  So explain to the jury how that works and why at the
16   end, when the Ponzi scheme is revealed, whoever doesn't get
17   a chair when the music stops is the loser.
18             MR. SPEHR:  Object to the form.
19             THE COURT:  Overruled.
20             THE WITNESS:  Essentially a Ponzi scheme is --
21   what keeps a Ponzi scheme afloat is basically new money, new
22   cash, new money coming in to pay off old investors.
23             So as long as I have in the blue box more
24   investors, more new money coming in that can wind up being
25   used to go ahead and pay older investors, the -- you can

1    keep the Ponzi scheme going.  Okay?

2           What happens, though, is, and I shouldn't say

3    invariably, but oftentimes -- and certainly this was the

4    case with the Petters Ponzi scheme -- you get to a point

5    where there isn't enough new money coming into the scheme to

6    keep it afloat, to keep it going, and so it implodes.

7           People that invest early in a Ponzi scheme and get

8    out before the music stops make money.  People that wind up,

9    though, that invest late in the Ponzi scheme and still have

10   their notes outstanding when it implodes, they lose money.

11   Q.  So in terms of identifying who were the losers, what

12   time period reflects those noteholders who were the losers?

13   A.  Essentially when you look at all of the notes and you

14   look at the history of what took place with the Thomas

15   Petters Ponzi scheme, those investors who invested in notes,

16   I believe it was, December 5th of 2007 forward, they lost

17   money.

18          If you invested and had notes with start dates

19   prior to December 5th, 2007, you were repaid.  And that

20   depends on really where you were in that scheme of things,

21   but more often than not you made money.

22   Q.  So in a Ponzi scheme, are the losses spread out evenly

23   over the life of the scheme or not?

24   A.  Well, no, no.  The losses really are really at the end,

25   at the end of the scheme, when the scheme implodes.  It's at

```
 1     that point in time when you have investors who have
 2     typically invested late and now there's no new money to come
 3     in to pay them off, and they are typically your losers.
 4     Q.  And I think you said the -- you gave a date of
 5     December 5th, 2007.  What's the significance of that date,
 6     again?
 7     A.  That's the last date, the start date -- if you were
 8     invested prior to that December 5th, 2007, you were repaid.
 9     If you invested from December 5th, 2007 forward, you lost
10     money.
11     Q.  Okay.  So you did come up with a number for PCI's
12     damages, did you not?
13     A.  I did, yes.
14              MR. ANTHONY:  And for demonstrative purposes let's
15     put up Exhibit PD-20.
16     BY MR. ANTHONY:
17     Q.  And so the number that's on the screen is -- well, why
18     don't you say what the number is.
19     A.  The plaintiff's damages, $1,925,748,160.
20     Q.  And what does that number represent?
21     A.  That number represents the most significant net losers.
22     I basically took the results of my analyses and the tracking
23     of all the cash transactions and the summaries of the notes
24     and tallied up the most significant net losers to the
25     Petters Ponzi scheme.
```

1    Q.  Now, one of the things you did was -- look at

2    Exhibit 782, please.  And is this a demonstrative that you

3    created to assist in your testimony today?

4    A.  782?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And was this created by you under your supervision and

8    direction of others at PwC?

9    A.  Yes.

10   Q.  And will it aid in your testimony?

11   A.  Yes.

12             MR. ANTHONY:  We'll offer Exhibit 782 as a

13   demonstrative, Your Honor.

14             MR. SPEHR:  Objection, Your Honor.  I don't think

15   this was offered as a demonstrative.  It was offered as a

16   plaintiff's exhibit, and so I object on the grounds of lack

17   of foundation and goes beyond the scope of his intended

18   testimony.

19             MR. ANTHONY:  Your Honor, it was offered as both.

20   We sent it to them and told them we were going to offer it

21   as one or the other, and I'm choosing to do it as a

22   demonstrative.  So I think having heard no objection, as

23   they were required to do before this moment, I'm using it as

24   a demonstrative.

25             THE COURT:  You object to it as a demonstrative?

Martens - Direct

1          MR. SPEHR:  We do, Your Honor.  I think it goes

2     beyond his report.  This seems to be a document that was

3     created subsequent to his report.  It goes beyond the scope

4     because at least on its face doesn't deal with the scope

5     of -- proper scope of his testimony here.  So, yes, we

6     object to it as a demonstrative as well.

7          MR. ANTHONY:  Your Honor, their objection was

8     untimely.  They were supposed to have made it before now.

9     We heard no objection from them.  This is -- this relates to

10    exactly what this witness just testified to, which shows the

11    progression of a Ponzi scheme by investment and how at the

12    end of the -- when the music stops, those at the end don't

13    get paid and that's what its purpose is.  But it is for

14    demonstrative purposes.

15         MR. SPEHR:  We continue to object on the grounds I

16    asserted earlier.

17         THE COURT:  The objection is overruled.  This

18    exhibit is admitted solely for demonstrative purposes.

19    BY MR. ANTHONY:

20    Q.  Okay.  Showing you Exhibit 782 for demonstrative

21    purposes, tell the jury, if you will, what this exhibit

22    shows.

23         MR. ANTHONY:  And, Ms. Ellig, maybe you can follow

24    along by enlarging when he goes through it.

25    BY MR. ANTHONY:

1    Q.  What is the top line?  It has "SPE."

2    A.  Well, first of all, on the far left column there are the

3    three types of investors, groups of investors in the Petters

4    Ponzi scheme: the special purpose entities that I just

5    discussed; and then there is -- are the Vennes entities,

6    this is Frank Vennes; and then there are private investors.

7    Q.  Okay.  So let's just take the SPEs.  Those are the

8    special purpose entities, correct?

9    A.  Correct.

10          MR. ANTHONY:  And take the top line across and

11   enlarge it, please, Ms. Ellig.

12          THE COURT:  I'm going to stop you here.  Counsel,

13   please approach.

14       **(At sidebar)**

15          THE COURT:  I want your argument on the objection

16   as to whether or not this is a demonstrative exhibit.  I

17   didn't understand that this is the exhibit and the content

18   of the exhibit that you --

19          MR. SPEHR:  We didn't either.

20       (Simultaneous indiscernible crosstalk)

21          MR. SPEHR:  It was marked as an exhibit, so I was

22   treating it as an exhibit this morning.  I was not aware

23   that they intended to offer it as a demonstrative.

24          MR. ANTHONY:  We did send it.

25          MR. SPEHR:  But I might have missed it.  I treated

1    it as an exhibit.  I made the objection on that basis.  It's

2    really a scope objection.  Whether it's a demonstrative or

3    whether it's an exhibit, this has nothing to do with his

4    damages calculation in this case.

5            My understanding -- let me finish.  My

6    understanding of Your Honor's order this morning is that

7    there are scope limitations to this witness.  He can testify

8    as to damages.  I actually let him talk about the Ponzi

9    scheme, which I said I would, no problem.

10           THE COURT:  Keep your voice down.

11           MR. SPEHR:  I'm sorry.  And now he can testify

12   about damages.  He's calculated this 1.9 billion number, and

13   he can tell the jury how he calculated it.  This does not go

14   to that.

15           THE COURT:  How does this relate to this

16   testimony?

17           MR. ANTHONY:  Well, this goes to the testimony he

18   just gave, which was that the investors and lenders at the

19   end of the activity are the losers, and it shows investments

20   by year for each of these categories and it shows that it's

21   those who were at the end that are the big losers.  And

22   that's all he's going to say.  It's not any more complicated

23   than that.

24           MR. SPEHR:  You don't break it down by investor.

25   The name of the game here is he should go through the

1    investors and undertake his calculation for each investors.

2    I have no problem with that.

3              MR. ANTHONY:  I'm not going to do that.

4              THE COURT:  Okay.  Objection is sustained.

5         **(In open court)**

6              MR. SPEHR:  Just for the record, the objection is

7    sustained, Your Honor?

8              THE COURT:  Objection is sustained.  782 is not

9    received in evidence.

10   BY MR. ANTHONY:

11   Q.  All right.  So, Mr. Martens, in determining the amount

12   of damages, did you -- explain to the jury the process that

13   you went through in calculating the $1.9 billion, please.

14   A.  Well, that -- to arrive at that number, I identified the

15   most significant net losers in the Petters Ponzi scheme and

16   tallied up the number, and that's the -- it was the sum of

17   their losses that supports the $1.9 billion number.

18   Q.  The $1,925,748,160, does that represent the amount of

19   loans that PCI is unable to repay?

20   A.  That's correct.

21   Q.  Did you include any unpaid interest in that amount?

22   A.  I did not.  All the calculations have been done on a

23   cash basis.  I did not account -- or did not add in accrued

24   interest.

25   Q.  Now, so do you understand that the bank's expert,

Martens - Direct

1    Mr. Jarek, states that you have calculated harm caused to

2    PCI's investors, not PCI itself; do you understand that's

3    his criticism?

4              MR. SPEHR:  Object to the form.

5              THE COURT:  Overruled if you understand.  I don't

6    know what the question is.

7    BY MR. ANTHONY:

8    Q.  Do you understand that Mr. Jarek criticizes the manner

9    in which you've calculated the damages in this matter?

10             MR. SPEHR:  Same objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  I understand he has that criticism,

13   yes.

14   BY MR. ANTHONY:

15   Q.  And do you understand his criticism is that you're

16   calculating harm caused to PCI's investors, not PCI itself?

17             MR. SPEHR:  Object to the form.

18             THE COURT:  Overruled.

19             THE WITNESS:  I believe that's his criticism, yes.

20   BY MR. ANTHONY:

21   Q.  Do you think that's a valid criticism?

22   A.  I do not.

23   Q.  Why is that?

24   A.  Because I understand the measure of damages is the harm

25   to PCI and that harm is its inability to pay its lenders, to

Martens - Direct

 1     pay its creditors.

 2              MR. SPEHR:  Object to the form.  Move to strike,

 3     Your Honor.

 4              THE COURT:  Overruled.

 5              MR. SPEHR:  It calls for a legal conclusion as

 6     well.  Thank you, Your Honor.

 7     BY MR. ANTHONY:

 8     Q.  You know, another criticism from Mr. Jarek is that your

 9     calculations are inaccurate because they rely on outdated

10     information.  Do you understand him to be making that

11     criticism?

12     A.  Yes.

13     Q.  Is that an accurate criticism in your view?

14     A.  It is not.

15     Q.  Why is that?

16     A.  Because, as I testified earlier, we continued work that

17     was started on this matter, continued to update it such that

18     by the time or at the time I signed off on my report in

19     March of 2018, all of my cash analyses, all of the

20     transaction analyses, and the summaries and so forth that

21     were prepared were current.

22     Q.  Now, are you aware that Mr. Jarek has set forth an

23     alternative analysis of potential PCI losses?

24     A.  I believe that's the case, yes.

25     Q.  Do you believe that the alternative analysis that he

2462

1    proposes is the correct one?

2    A.  It is not the correct one.

3    Q.  And why do you believe that the analysis that you did is

4    the correct one?

5    A.  Because, once again, my understanding of the measurement

6    of damages is the harm done to PCI.  Mr. Jarek's calculation

7    does not calculate that.

8              MR. SPEHR:  Just note my objection to the form.

9    Also calls for a legal conclusion.

10             THE COURT:  Overruled.

11             MR. ANTHONY:  I have nothing further at this time,

12   Your Honor.

13             Thank you, Mr. Martens.

14             MR. SPEHR:  It will just take us a couple minutes

15   to transition, Your Honor.

16             THE COURT:  Yes.  And, Members of the Jury, while

17   they are transitioning, if you would like to stand up and

18   stretch, feel free to do so.

19             And you, sir, may as well.

20        (Pause)

21             MR. SPEHR:  May I approach?

22             THE COURT:  Yes, you may.

23

24

25

Martens - Cross

1          MR. SPEHR:  We had some document sharing before

2     and we're trying to figure out how to -- my apologies.

3          (Pause)

4          THE COURT:  Counsel, are you ready to proceed?

5          MR. SPEHR:  I'm ready to proceed.  Thank you, Your

6     Honor.

7          THE COURT:  You may.

8                    **CROSS-EXAMINATION**

9     BY MR. SPEHR:

10    Q.  Good afternoon, Mr. Martens.

11    A.  Good afternoon.

12    Q.  Let me just focus for a bit on the work that PwC and you

13    have done for the trustee.  Is that okay?

14    A.  That's okay.

15    Q.  So you and your firm, PricewaterhouseCoopers, were first

16    retained by Mr. Kelley in November 2008, correct?

17    A.  That's correct.

18    Q.  And so you have been working on this matter with

19    Mr. Kelley for approximately 14 years, correct?

20    A.  That's correct.

21    Q.  And I want to just focus on a little bit of the data

22    collection that you spoke about earlier.

23          Is it correct that PwC has collected over

24    68.4 terabytes of data in respect of its document gathering

25    in this matter?

Martens - Cross

```
1    A.   There are some estimates to give some idea of the scope
2    and breadth of the data, both hard copy, paper copy, as well
3    as electronically stored information.  I believe that's one
4    of the estimates that's been made.
5    Q.   68.4 terabytes, correct?
6    A.   I believe that's the number.
7    Q.   Approximation, anyway?
8    A.   There's -- another approximation would be like 560,000
9    Bankers Boxes.  Some estimate just to give the reader some
10   idea of the volume and the quantity of information that was
11   available for us to review and analyze.
12   Q.   And you've actually talked about it, the 560,332 Bankers
13   Boxes, in the context of how many copies of the Encyclopedia
14   Britannica that would equate with, correct?
15   A.   Correct.
16   Q.   And you've talked about 68,400 copies of the
17   Encyclopedia Britannica.  Does that make sense --
18   A.   I think that's the number.
19   Q.   -- ring a bell?
20        And you've also talked about it in terms of the
21   size of the printed collection in the U.S. Library of
22   Congress, correct?
23   A.   I believe so.
24   Q.   And you've talked about it as, just the data collection
25   here, as six times the entire volume, at least the printed
```

1    volume, of the U.S. Library of Congress, correct?

2    A.   I don't recall that one, but if that's what's in the

3    report, that's in the report.

4    Q.   You don't have any reason to disagree with me, do you?

5    A.   I don't.

6    Q.   Okay.  In the course of your investigation your team at

7    PwC -- and tell me if this is incorrect -- identified 648

8    bank accounts that were used by various Petters entities; is

9    that correct?

10   A.   I think we actually identified more than that number.  I

11   think initially the bank -- or, I'm sorry, Petters did not

12   have -- and when I'm talking about Petters now, this is not

13   just PCI.  This is PCI and Petters Group Worldwide.  And I

14   believe that -- and I know I recall they did not have a

15   master bank listing.

16        So when we first were retained, we PwC, developed

17   the master bank listing and that master bank listing covered

18   the entirety of all of the Petters entities, not just PCI,

19   and I believe the number was higher than the number you

20   cited.

21   Q.   So somewhere north of 648 bank accounts were identified

22   by PwC, correct?

23   A.   Correct.

24   Q.   And is it also correct that PwC collected data on 376

25   bank accounts?  So of the 648-plus, it actually got data on

1    376 bank accounts of the Petters entities, correct?

2    A.  I think you're working with older numbers because I

3    think we ultimately found data from more than that -- data

4    from more banks than what you're citing there.  But once

5    again, this is the entirety of the Petters organization, not

6    just PCI.

7    Q.  So let me focus you down on that a little bit.  Is it

8    correct to say of the -- whether it's 648 or 700 or 376 or

9    400 bank accounts, you identified, that is, PwC identified,

10   87 bank accounts at 21 banks that were related to the notes

11   payable transactions at issue in this case?

12   A.  That's correct.

13   Q.  And from these 21 accounts, is it correct to say that

14   PwC identified 46,000 transactions, totaling over

15   $102 billion?

16   A.  That's correct.

17   Q.  Let me ask you little bit about the team, the PwC team.

18   Is it correct that at least in the early days, call it 2008

19   to 2010 at the time you authored the interim report, that

20   PwC had 40 people working on the Petters companies working

21   full time in Minnetonka?

22   A.  When we started, we started -- it was in November

23   2008 -- the staff, the staffing, we were pretty much full

24   time in Minnetonka working at the Petters building there.

25   And I want to say that over time -- we didn't start with 40

Martens - Cross

1    people, but over time our staff peaked at about 40, 40

2    professionals on site working on this matter.  It took

3    roughly two years before the issuance of my first report,

4    which I refer to as the PwC interim report.  It took us two

5    years before that was published.

6    Q.  Let me focus you on that two-year time frame, November

7    2008 until the time the report was first published in 2010.

8    Is it correct to say that PwC spent more than 42,000 hours

9    just in that time frame working on Petters issues?

10   A.  I don't recall that number, but if that's in the

11   report --

12   Q.  Sound about right?

13   A.  Once again, I don't recall that particular number.

14   Q.  No reason to disagree with it?

15   A.  No reason to disagree.

16   Q.  And since 2008 -- now, this may be a little bit old

17   information -- PwC has billed the trustee over --

18              MR. ANTHONY:  Objection, Your Honor.  May we have

19   a sidebar, please?

20              THE COURT:  You may.

21         **(At sidebar)**

22              MR. ANTHONY:  Your Honor, this is objected for the

23   same reason why what Doug Kelley was paid for his work as

24   the trustee was objectionable.  It's irrelevant to this

25   case.  What is relevant is what he is being paid for in

Martens - Cross

1    connection with this matter.

2              He's trying to impugn the credibility by saying

3    that Mr. Martens, PwC, was paid an extraordinary amount of

4    money and that's designed to prejudice the jury against

5    Mr. Martens.

6              What's relevant here is what he's been paid in

7    connection with this case and what he's going to be paid.

8    That's what I think is relevant.  That's why I objected.

9              MR. SPEHR:  The problem with that analysis is that

10   the work that he did, the $40 million in work that he did in

11   the 2008 to 2012 time frame when this lawsuit was filed, is

12   exactly what he's using to base his damages calculations on.

13   He did not do new damages calculations.  All of this comes

14   out of the 2010 interim report.  All of the analysis, all of

15   the schedules, everything he bases his damages calculation

16   comes out of that report.

17             And, in fact -- and I know you've read it -- as

18   you read his expert report, he's referring over and over and

19   over again to the interim report on the schedules and

20   analyses in the interim report.  So that $40 million, it's

21   not just that he started working on this case in 2012

22   tabula rasa.  Everything he did between 2008 and 2010 form

23   the basis of his analysis in this case.

24             THE COURT:  Why is the amount paid for that period

25   of time relevant here?

1              MR. SPEHR:  To be honest with you, it shows how

2       much work that PwC did.  We're trying to -- it's not a

3       credibility issue.  It's you have been paid a tremendous

4       amount of money and spent a tremendous amount of time

5       working these matters, which I think is relevant to the

6       jury.

7              MR. ANTHONY:  He was paid $40 million to do a host

8       of things other than related to this case.  He appeared in a

9       number of proceedings, bankruptcy proceedings, federal court

10      proceedings unrelated to this case, and I think it would

11      prejudice the jury to know that he was paid $40 million when

12      it had nothing to do with this case or little to do with

13      this case.

14             THE COURT:  The objection is sustained.

15         **(In open court)**

16             MR. ANTHONY:  So the objection is sustained, Your

17      Honor?

18             THE COURT:  The objection is sustained.

19      BY MR. SPEHR:

20      Q.  Mr. Martens, I want to talk a little bit about your

21      damages calculation here of approximately 1.96 billion.  Is

22      that okay?

23      A.  That's okay.

24      Q.  What you did as a general matter to calculate damages,

25      as I understand it -- and you'll correct me if I'm wrong --

1    is you looked at eight investors, correct?

2    A.  Well, I looked at -- first of all, the cash analysis is

3    all investors, but at the end of the day there were eight

4    investors that comprised the significant -- you know, the

5    sum of those -- their losses, those were the significant

6    losses and so forth that sum to the $1.9 billion number.

7    Q.  And what you did was you analyzed how much money they

8    put in and then you analyzed how much money they got back,

9    and the difference between what they put in and what they

10   got back is what you claim are the net cash losses of those

11   investors, correct?

12   A.  That's correct.  These are investors that would have put

13   more in, invested more into the -- with PCI and took less

14   out.

15   Q.  Bottom line, they put more in than they got out and that

16   difference is what you call net cash loss, correct?

17   A.  Those investors have net cash losses, that's correct.

18   Q.  So you concluded -- I'm going to talk about three of the

19   investors now.  I want to talk about Acorn.  That's an

20   investor, right?

21   A.  Correct.

22   Q.  Thousand Lakes, Lancelot, another investor?

23   A.  Well, Lancelot is the investor.  Thousand Lakes is the

24   special purpose entity.

25   Q.  We're going to talk about special purpose entities in a

1    bit.  And I want to talk about Palm Beach.  Okay?

2    A.  Okay.

3    Q.  Your conclusion was that Acorn had net cash losses of

4    approximately $138 million, correct?

5    A.  Correct.

6    Q.  And you get there by, again, doing what we just

7    discussed, how much did Acorn put in, how much did it get

8    out, correct?

9    A.  On a transaction note-by-note basis, correct.

10   Q.  And you calculated that the net cash loss for Acorn --

11   well, let me back up.  So you calculated that Acorn invested

12   $2.5 billion into the scheme, right?

13   A.  I forget the exact numbers, but if you have something

14   you can refer me to, I would be more than happy to look at

15   it.

16   Q.  You have before you -- in one of the binders is a copy

17   of your expert report, Mr. Martens.

18   A.  In this matter?

19   Q.  In this matter.  I think it's the smaller of the two

20   binders.  Tell me when you have it.  Do you have that?

21   A.  I do.

22   Q.  Okay.  If you turn to page 39, paragraph 71.

23   A.  I have it.

24   Q.  And does that refresh your recollection that the

25   investment by Acorn was 2.5 billion?

Martens - Cross

```
 1    A.  In round numbers, yes.

 2    Q.  Right.  And that Acorn was paid back 2.4 billion?

 3    A.  That's correct.

 4    Q.  So is it fair to say that Acorn got back 96 percent,

 5    approximately, of its total investment in PCI?

 6    A.  I don't know the exact percentage.

 7    Q.  Pretty close?

 8    A.  Well, I don't know.

 9    Q.  They put in 2.5.  They got 2.4 out.  Does it sound about

10    right that that's about 96 percent of its investment that it

11    got back?

12    A.  That they -- well, the point being, though, is that they

13    are a net cash basis loss of $138.3 million.

14    Q.  Right.

15    A.  So I have a calculator if you want me to do the exact

16    numbers, if that would help.

17    Q.  Sure.  Why don't you do the exact numbers at 2.5 over

18    2.4 million.

19    A.  In round numbers, 96 percent.

20    Q.  Thank you.

21            Now let's take a look at Thousand Lakes and

22    Lancelot.  As you said, Thousand Lakes was the SPE for

23    Lancelot, correct?

24    A.  That's correct.

25    Q.  And Lancelot was another investor in the scheme,
```

1    correct?

2    A.  Correct.

3    Q.  And you concluded that Thousand Lakes' net cash losses

4    were 764 million, correct?

5    A.  That's correct.

6    Q.  And, again, you got there by subtracting the total

7    amount that -- you got there by calculating how much

8    Thousand Lakes put in and how much Thousand Lakes got back,

9    correct?

10   A.  That's how much Lancelot put in and then how much

11   Lancelot got out, okay.

12   Q.  Fair enough.  Thank you for the correction.

13   A.  Thousand Lakes is the name of the special purpose

14   entity.  That is just a pass-through entity.  It's just

15   taking money from the investor and then having it flow

16   through the fraud as part of PCI.

17   Q.  I appreciate that and thank you.  We will talk about

18   that in a bit.

19          Now, you calculated the total amount that Lancelot

20   invested in the scheme at 8.8 billion; is that correct?

21   A.  If you have a page -- let me find the --

22   Q.  If you go to paragraph 52 of your report, you will see

23   it there.

24   A.  Yes.  The Thousand Lakes, the investors invested

25   approximately 8.8 billion and were paid out 8 billion, round

1    numbers, for a $764.6 million cash basis loss.

2    Q.  So in this case -- and, again, you can feel free to use

3    your calculator -- Lancelot got about 90 percent of its

4    investment back in this scheme, correct?

5    A.  90 percent, that's correct.

6    Q.  Okay.  Thank you.

7            Now I want to focus on Palm Beach.  In this case

8    you've calculated Palm Beach's total net cash loss at

9    642 million, correct?

10   A.  That's correct.

11   Q.  And, again, you did that the same way you did the other

12   investors, by netting out the amount they put in versus the

13   amount they got out, correct?

14   A.  Correct.

15   Q.  And the total Palm Beach investment in the scheme was

16   8.7 billion?  And if you turn to paragraph 62 of your

17   report, you will see it there.

18   A.  I see it.

19   Q.  And the number is 8.7 billion invested, correct?

20   A.  Correct.

21   Q.  8 billion back, correct?

22   A.  8 billion in payments, that's correct.

23   Q.  So Palm Beach got about 91 percent of its investment

24   back, correct?

25   A.  That sounds correct.

Martens - Cross

1    Q.  Now I want to spend a little time on the financial

2    condition of PCI, if that's okay.

3    A.  Sure.

4    Q.  Based upon your analysis, PCI was a Ponzi scheme by no

5    later than the end of 1996; isn't that correct?

6    A.  That's correct.

7    Q.  And it could have been a Ponzi scheme earlier than that.

8    You just weren't able to fully verify that, correct?

9    A.  The paper trail prior to 1996 was fairly sparse, but

10   there probably were transactions in the 1995 to 1994 time

11   frame.  Whether or not some of those were real transactions

12   or not it's unclear.  But from 1996 forward we had a bit

13   more of a paper trail to work with in terms of pulling

14   together enough evidence to support calculations and

15   conclusions with regards to the funds that had been

16   invested.

17   Q.  Fair enough.

18           Let me just focus on insolvency.  You gave an

19   insolvency opinion in this case, right?

20   A.  I did, yes.

21   Q.  And in connection with your investigation, you found

22   that PCI was insolvent from the beginning of its corporate

23   life, correct?

24   A.  Well, once again, working from the information at hand

25   and insolvency here being defined as liabilities in excess

Martens - Cross

1    of assets, from 1996 forward I opined that PCI was an
2    insolvent entity.
3    Q.  And one way to think about insolvency is that the
4    liabilities of a company exceed its assets, correct?
5    A.  That's one way of thinking of it, yes.
6    Q.  It essentially owes more than it can pay, correct?
7    A.  That's correct.
8    Q.  And that was the case from '96 forward at least,
9    correct?
10    A.  That's correct.
11    Q.  And so hypothetically, Mr. Martens, if PCI was shut
12    down, say, in 2000, it could not pay its investors back in
13    2000, correct?
14    A.  If -- I mean, at that point shut down -- first of all,
15    this is not -- you're dealing with an entity that is not a
16    real entity.  There's no real business purpose behind PCI.
17    PCI was a fraud, a massive fraud, and -- but it served a
18    purpose and it served a purpose for Tom Petters to
19    perpetuate that fraud.  So to think of PCI in a traditional
20    business valuation sense is irrelevant.  It makes no sense.
21            So to talk about it in terms of a shutdown, what
22    you'd have to look at there is in terms of if there was a
23    cutoff of all the investors investing.  That's what would
24    shut the enterprise down.  But as long as there's the flow
25    of cash coming through, Tom Petters was able to use PCI as a

1    vehicle to perpetuate the fraud.

2    Q.  Let's say in 1998 somebody blew the whistle, somebody

3    discovered the fraud, FBI shuts them down.  At that point in

4    time PCI would not be able to repay its creditors, correct?

5    A.  That's correct.

6    Q.  Same is true in 2000, correct?

7    A.  Well, at each step along the way probably to a certain

8    extent that's true, yes.

9    Q.  At no point between 2000 and 2008 did PCI ever have

10   assets that exceeded its liabilities, correct?

11   A.  That's correct.

12   Q.  And so it follows, doesn't it, that at any time between

13   2000 and 2008 had PCI been shut down for whatever reason,

14   PCI could not pay its creditors?

15   A.  To the extent that its liabilities exceed its assets at

16   those points in time, that's correct.

17   Q.  And, in fact, its liabilities did exceed its assets in

18   every single year in that period, correct?

19   A.  Yes.

20           MR. SPEHR:  One movement.

21       (Defendant's counsel confer)

22           MR. SPEHR:  Thank you.  Sorry.

23   BY MR. SPEHR:

24   Q.  Now I want to focus a little bit more -- you testified a

25   bit about this before -- about how the scheme worked.  Is

1    that okay?

2    A.  Sure.

3         MR. SPEHR:  All right.  Let's put up, Mr. Herzka,

4    Demonstrative DD-4 as to which there has been no objection.

5    BY MR. SPEHR:

6    Q.  All right.  So in the left column -- correct me if I'm

7    wrong -- we have the eight investors, right?

8    A.  That's correct.

9    Q.  Edge One, Acorn, Palm Beach, Elistone, Lancelot,

10   Ritchie, Interlachen, and Ark Royal, correct?

11   A.  I see that.  I do.

12   Q.  And on the right column we have the SPEs that we've

13   discussed a little bit today.

14        Edge One is the SPE for Edge One Capital, right?

15   A.  Correct.

16   Q.  PAC Funding is the SPE for Acorn, correct?

17   A.  Correct.

18   Q.  Palm Beach Finance Partners Holdings is the SPE for Palm

19   Beach Capital Management?

20   A.  Correct.

21   Q.  Petters Company (PL), Inc. is the SPE for Elistone?

22   A.  Well, it's Petters Limited.

23   Q.  I'm sorry.

24   A.  You said Petters Company.  No, it's Petters Limited.

25   Q.  Petters Limited (PL), Inc.; is that correct?

1    A.  Correct.

2    Q.  And then, as we've discussed, Thousand Lakes is the SPE

3    for Lancelot, right?

4    A.  Correct.

5    Q.  And you've got three investors here, Ritchie,

6    Interlachen, and Ark Royal, who have no SPEs?

7    A.  That's correct.

8    Q.  And one of the reasons -- and, again, you'll tell me if

9    I'm incorrect about this -- that they don't have SPEs is

10   that these guys were all 2008 investors?

11   A.  I don't know if that's necessarily a reason, but just

12   for whatever reason they are late investors -- or in terms

13   of they are 2008 investors, but they were investing directly

14   with Petters.

15         But whether or not they could have used a SPE or

16   not, I mean Edge One was a 2008 investor.  Elistone, I

17   think, was a little bit earlier than that.  But why they

18   weren't a SPE or didn't have a SPE, that's something that

19   I'm not privy to understanding that or why that was the

20   case.  Okay.

21   Q.  Totally fair.  Thank you.

22         You have been studying these SPEs for years,

23   correct?

24   A.  I have been analyzing the transactions with the SPEs for

25   years.

1   Q.  And you've given testimony in court about the SPEs and

2   what they are and how they operate, correct?

3   A.  I've testified in court and given countless depositions

4   on this matter over the years, yes.

5   Q.  And when we talk about "this matter," just so you and I

6   are communicating, we're talking about the special purpose

7   entities at issue in this case, correct?

8   A.  Well, I'm talking -- what I'm just referring to was my

9   work on Petters at large in terms of SPEs and, for that

10  matter, Petters in general.  You're asking me questions

11  about this particular matter in court.  This is my first

12  time testifying with respect to the BMO matter in court.

13  That's all.

14  Q.  No, I understand.  Maybe I just wasn't clear.  My

15  question is:  With respect to the five SPEs that are listed

16  here, you've given testimony in court about those SPEs,

17  right?

18          Let me make it easier.  There was a substantive

19  consolidation hearing that took place several years ago

20  before Judge Kishel, correct?

21  A.  That's correct.

22  Q.  And in that substantive consolidation hearing, you gave

23  testimony on the special purpose entities that are listed on

24  this exhibit, correct?

25  A.  In that substantive consolidation hearing I was asked to

1     address the factors that courts consider in granting a

2     motion to substantively consolidate, in this case PCI with

3     its SPEs.  So to that extent, if these SPEs were in place,

4     and I believe they were -- I'm not sure about Edge One,

5     though -- I would have covered that in my testimony in 2011.

6     Q.  Fair enough.  And when you say "SPE," you mean S-P-E.

7     That's how I think of it.

8     A.  Okay.  SPE, that's correct.

9     Q.  And based upon your investigation of the SPEs, you

10    concluded that they had no operations, correct?

11    A.  They did not have any operations, that's correct.

12    Q.  They were not well capitalized; is that correct?

13    A.  Not well capitalized.

14    Q.  They were -- I think you mentioned this before.  They

15    were owned and controlled by Petters, correct?

16    A.  That's correct.

17    Q.  And, in fact, these SPEs for these investors had no

18    offices, correct?

19    A.  There were -- well, let me think now.  There were --

20    there were no offices, that's correct.

21    Q.  There were no phones at the SPEs.  You couldn't call up

22    an SPE and get someone on the line; is that right?

23              MR. ANTHONY:  Objection, Your Honor.  May we

24    approach?

25              THE COURT:  You may.

Martens - Cross

1           **(At sidebar)**

2                 MR. ANTHONY:  He's beginning to get into investor

3       knowledge, investor complicity.  This has nothing to do with

4       his report, whether the SPEs had offices or whether you

5       could reach them or not.  It's just designed to talk about

6       investors, who they were, what they knew, what they did,

7       where they were located.

8                 It's a violation of your order not to get into

9       this, and I think they know it's a violation of the order.

10      And as much as I made a mistake earlier, I think this is

11      equally bad, to be getting into investor knowledge in

12      violation of the Court's order.

13                MR. SPEHR:  I am not going anywhere near investor

14      knowledge.  The witness gave testimony about the status of

15      these SPEs in earlier hearings, and I'm just trying to

16      establish what they are so that the jury can get an

17      understanding of what these entities are.

18                THE COURT:  Why -- if he gave it in earlier

19      hearings, why is it relevant in this case at this time

20      before this jury?

21                MR. SPEHR:  Because we've just for the first time

22      today heard about special purpose entities, and I'm just

23      trying to educate the jury on what they are and are not.

24      But I'm actually done with the questioning about their

25      capital structure.

Martens - Cross

```
 1              THE COURT:  Keep your voice down, please.

 2              MR. SPEHR:  I'm done with the questioning about

 3    the capital structure.  So I don't think there should be any

 4    further issue.

 5              MR. ANTHONY:  You're withdrawing the question,

 6    then?

 7              MR. SPEHR:  I'm not withdrawing the question.  I

 8    think the question is -- the jury is entitled to understand

 9    what these entities are.

10              MR. ANTHONY:  I think they can hear.  It's kind of

11    loud.  I think they can hear.

12              MR. SPEHR:  The jury has to understand what these

13    entities are, and that's all I'm trying to establish.

14              MR. ANTHONY:  Asking if they have officers and who

15    is there, I think it's investor complicity and investor

16    knowledge and it's out of the case.  I mean, they are

17    companies to which monies flowed that got invested in

18    Petters.  That's all this is about.

19              We didn't introduce who they were and what they

20    did.  We stayed away from that for that reason, so as not to

21    get into the investor complicity, investor knowledge.  And

22    you're trying to skate into it now.

23              MR. SPEHR:  I'm not trying to skate into it.  I'm

24    not trying to open a door that has been closed by the Court.

25    This is an entirely new concept for this jury.  This is a
```

1        really important piece of the case.

2                THE COURT:  What's important?

3                MR. SPEHR:  How these SPEs function.  The whole

4        flow of funds in this case ran through the SPEs.

5                And you heard Mr. Ghiglieri on the stand entirely

6        ignore the structure of the transactions.  So we're going to

7        build through this witness what the structure of the

8        transactions actually was so that they understand what

9        really happened, not what Ms. Ghiglieri testified to.

10               MR. ANTHONY:  Well, how does how the money flows

11       through the SPEs and who is the SPE and who the investors

12       are and whether they have offices and whether they

13       investigated this, how does that have anything to do with

14       his damage report?  You can -- he's testified exactly what

15       he needed -- it has nothing to do with who owned the SPEs,

16       who managed them, whether they knew what was going on.  This

17       is getting on a slippery slope that you expressly said we're

18       not going to go down --

19               MR. SPEHR:  Counsel --

20               MR. ANTHONY:  -- because then we're going to have

21       to call in the SPEs to explain away what he's being asked

22       now.  That's not what this case is about.

23               MR. SPEHR:  You offered as a demonstrative the

24       whole SPE structure during Mr. Martens' direct examination.

25       These jurors never heard one word about an SPE before you

```
 1   put that on.  And so all I'm doing is explaining what they

 2   are.  But I'm done with -- I'm not going to ask any further

 3   questions about their structure.  I've done enough.  I will

 4   move on.

 5         So I don't want to withdraw the question because

 6   I think it's important that they know what these entities

 7   are.

 8         MR. ANTHONY:  Well, that's not the last question

 9   you asked, what these entities are.  I think that's --

10         MR. SPEHR:  I asked him whether they had offices,

11   whether they had phone lines.

12         MR. ANTHONY:  That's what I mean.  That's

13   objectionable.  And I think he testified what they were.

14   These were entities created, and he explained that the

15   investors put their money in, they control it, and then

16   PCI -- they send the money downstream.  We don't need to get

17   into do they have phones.

18         THE COURT:  So the objection is sustained.  How do

19   you propose to unring the bell?

20         MR. ANTHONY:  Well, I'll move to strike the last

21   question -- two questions and answer, Your Honor.  And if

22   you grant that, I think that's the best we can hope for.

23         **(In open court)**

24         MR. ANTHONY:  Your Honor, the objection is

25   sustained?
```

```
1              THE COURT:  The objection is sustained.

2              MR. ANTHONY:  And we move to strike the last two

3       questions and answer, Your Honor.

4              THE COURT:  The last two questions and answers are

5       stricken.

6              MR. ANTHONY:  Thank you.

7       BY MR. SPEHR:

8       Q.  Now, you testified earlier that each of the SPEs had its

9       own bank account, correct?

10      A.  Correct.

11      Q.  And some of those bank accounts were maintained at banks

12      like Crown Bank, for example.

13      A.  I'm not sure.  I'd have to -- Crown Bank could have been

14      a bank.  I'm familiar with Associated Bank, Highland Bank.

15      Q.  I was just going to open it up and ask you what you

16      recall.  So we have Associated Bank, Highland Bank,

17      U.S. Bank?

18      A.  I believe U.S. Bank, yes.

19      Q.  Okay.  None of the SPEs maintained bank accounts at M&I,

20      correct?

21      A.  I'm not sure.

22      Q.  Did you look at that issue in the course of your

23      investigation?

24      A.  I don't recall -- in other words, the special purpose

25      entities, are you saying, had an account at M&I?
```

1    Q.  No.  My question to you is:  You have not identified --

2    let me re-ask the question.

3         The SPEs did not maintain any accounts at M&I,

4    correct?

5    A.  Right.  But you wouldn't expect that to happen, though.

6    Q.  Yes or no?  Correct or no?

7    A.  I don't recall.  I don't believe that any of the special

8    purpose entities had a bank account at M&I Bank, that's

9    correct.

10   Q.  Thank you.

11        Now, unlike the SPE itself, which was owned by

12   Petters, the bank accounts for the SPEs were owned and

13   controlled by the investors, correct?

14   A.  The bank accounts for the special purpose entities were

15   controlled by the investors.

16   Q.  And they were in the name of the investors, correct?

17   A.  I believe so, yes.

18   Q.  And, in fact, the investors' control over those accounts

19   was pursuant to various agreements between PCI and the SPEs

20   and the investors called, variously, Depository Account

21   Pledge Agreements, correct?

22   A.  I'm not sure of all of the names of the agreements.

23        MR. ANTHONY:  Your Honor, may we approach on this

24   issue one more time?

25        THE COURT:  No.  I said no.

1           MR. ANTHONY:  No?  I'm sorry.

2           Then I'll interpose an objection.  The objection

3      is --

4           THE COURT:  You can address the objection after I

5      dismiss the jury for the day.

6           MR. ANTHONY:  Oh, okay.

7           THE COURT:  Members of the Jury, we've come to the

8      time where you are to be dismissed for the day.

9           During this recess, as with every recess, you must

10     not discuss this case with anyone, including other jurors,

11     members of your family, people involved in the trial, or

12     anyone else.  And do not allow anyone to discuss the case

13     with you or within your hearing.

14          As you know, only you have been chosen as jurors

15     in this case and only you have been sworn to uphold the law.

16     No one has been chosen to do this important job but you.

17          And you should not talk among yourselves about the

18     case before you've heard all of the evidence and the case

19     has been submitted to you by me for your deliberations

20     because it may affect your final decision if you were to do

21     so.

22          Also, do not read any newspaper accounts or watch

23     any televised account or listen to any radio program or

24     anything else.  Do not conduct any kind of research,

25     internet or otherwise, or consult any sources.

1          As you know, you must keep an open mind free of

2     outside information and only in this way are you able to

3     decide this case fairly based solely on the testimony, the

4     evidence presented in the courtroom, and my instructions.

5          If you decide the case on anything else, you will

6     have done an injustice and it would be a violation of your

7     oath for you to base your decisions on a reporter's view, on

8     an opinion, or upon other information you acquire outside

9     the courtroom.  So it's very important that you follow these

10    instructions.

11         And so we will complete our day today with you.

12    Thank you very much for your service.  And we will plan on

13    seeing you tomorrow at the regular time.

14        (Jury excused)

15                      *    *    *    *    *

16        (4:58 p.m.)

17                        **IN OPEN COURT**

18                      **(JURY NOT PRESENT)**

19         THE COURT:  Please be seated.

20         THE WITNESS:  May I step down?

21         THE COURT:  You're excused for the day.  I do want

22    to advise you that it is as if you're on the witness stand

23    for the purposes of the time that you retire.

24         THE WITNESS:  I understand.

25         THE COURT:  Counsel, I want to address the decorum

1    that I am seeing in the courtroom during -- in the presence

2    of the jury.

3              First of all, statements made by counsel are being

4    overheard by the jury or at least are loud enough such that

5    they could overhear them.

6              Dramatic gesturing is observable by jurors in the

7    courtroom that can communicate either displeasure or other

8    information as to counsel's view of the rulings of the

9    Court, and that's simply improper.

10             I'm advising all counsel to conduct themselves

11   with the proper decorum that is expected in a courtroom and

12   that has been the standard that has been set by every other

13   attorney who has been appearing in this courtroom.

14             I don't want us to deviate and I certainly don't

15   want us to enter into a downward spiral.  And so I make this

16   announcement now.  I ask you to take it seriously.  And I

17   expect to see different conduct tomorrow.

18             We're in recess.

19        (Court adjourned at 4:59 p.m.)

20                        *       *       *

21        We, Lori A. Simpson and Carla R. Bebault, certify that
     the foregoing is a correct transcript from the record of
22   proceedings in the above-entitled matter.

23        Certified by:   *s/ Lori A. Simpson*
                          Lori A. Simpson, RMR, CRR
24
          Certified by:   *s/ Carla R. Bebault*
25                        Carla R. Bebault, RMR, CRR, FCRR