1    UNITED STATES DISTRICT COURT
            DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Douglas A. Kelley, in his      )   File No. 19-cv-1756
4    capacity as the Trustee of the )         (WMW)
     BMO Litigation Trust,          )
5                                    )
              Plaintiff,             )   St. Paul, Minnesota
6                                    )   October 28, 2022
     vs.                             )   8:39 a.m.
7                                    )
     BMO Harris Bank N.A., as        )
8    successor to M&I Marshall and   )
     Ilsley Bank,                    )
9                                    )
              Defendant.             )
10   ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE WILHELMINA M. WRIGHT
            UNITED STATES DISTRICT COURT JUDGE
14
          **(JURY TRIAL PROCEEDINGS - VOLUME XIII)**
15

16

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25   transcript produced with computer.

```
 1       APPEARANCES:
           For the Plaintiff:        Robins Kaplan, LLP
 2                                    MICHAEL A. COLLYARD, ESQ.
                                      DAVID E. MARDER, ESQ.
 3                                    PETER C. IHRIG, ESQ.
                                      MORGIA D. HOLMES, ESQ.
 4                                    MICHAEL D. REIF, ESQ.
                                      800 LaSalle Avenue
 5                                    Suite 2800
                                      Minneapolis, Minnesota 55402
 6
                                      Anthony, Ostlund, Louwagie,
 7                                    Dressen, Boylan, P.A.
                                      JOSEPH W. ANTHONY, ESQ.
 8                                    JOSEPH R. RICHIE, ESQ.
                                      RYAN M. LAWRENCE, ESQ.
 9                                    90 South Seventh Street
                                      Suite 3600
10                                    Minneapolis, Minnesota 55402

11         For the Defendant:         Stinson, LLP
                                      KEITH S. MOHEBAN, ESQ.
12                                    ADINE S. MOMOH, ESQ.
                                      50 South Sixth Street
13                                    Suite 2600
                                      Minneapolis, Minnesota 55402
14
                                      Debevoise & Plimpton, LLP
15                                    JOHN GLEESON, ESQ.
                                      MICHAEL SCHAPER, ESQ.
16                                    SUSAN REAGAN GITTES, ESQ.
                                      MORGAN A. DAVIS, ESQ.
17                                    919 Third Avenue
                                      New York, New York 10022
18
                                      Mayer Brown, LLP
19                                    JOSHUA D. YOUNT, ESQ.
                                      71 South Wacker Drive
20                                    Chicago, Illinois 60606

21                                    Mayer Brown, LLP
                                      RICHARD A. SPEHR, ESQ.
22                                    GINA PARLOVECCHIO, ESQ.
                                      1221 Avenue of the Americas
23                                    New York, New York 10020

24         Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                      316 North Robert Street
25                                    St. Paul, Minnesota 55101
```

1                              **I N D E X**

2                                                                    PAGE

3     **CHARLES GRICE**
           Direct Examination by Mr. Schaper              3293
4          Cross-Examination by Mr. Anthony               3449
           Redirect Examination by Mr. Schaper            3526
5

6
      DEFENDANT RESTS                                     3548
7

8

9     DEFENDANT'S EXHIBITS                                REC'D
           50073                                          3353
10         50529                                          3343
           50902                                          3303
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2                           **IN OPEN COURT**

3                           **(JURY PRESENT)**

4              THE COURT:  Good morning.  Please be seated.

5              MR. SCHAPER:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. SCHAPER:  May I approach with some exhibits

8      for the next witness?

9              THE COURT:  You may.

10         (Binders handed to witness and the Court)

11             MR. SCHAPER:  Your Honor, defendant calls as its

12     next witness Mr. Charles Grice.

13             COURT REPORTER:  Please come forward and stop in

14     front of me.  Would you raise your right hand to be sworn,

15     please.

16         (Witness sworn)

17             COURT REPORTER:  You can have a seat in the

18     witness stand.  Speak into the microphone and state your

19     name, spelling your first and last name, please.

20             THE WITNESS:  Certainly.  It's Charles H. Grice,

21     G-r-i-c-e.

22             THE COURT:  Counsel, you may proceed.

23             Mr. Grice, if you would like to adjust the

24     microphone, you may.

25             MR. SCHAPER:  Thank you, Your Honor.

```
1              THE COURT:  You're welcome.

2                      (Charles Grice)

3                    DIRECT EXAMINATION

4    BY MR. SCHAPER:

5    Q.  Good morning, Mr. Grice.

6    A.  Good morning.

7    Q.  Could you please again introduce yourself by name to the

8    members of the jury.

9    A.  Charles Hamilton Grice.

10   Q.  What do you do for a living, Mr. Grice?

11   A.  I'm a consultant to banks.

12   Q.  And what is your current job title?

13   A.  I'm the managing director of a firm I created in 1988.

14   Q.  What's the name of that firm?

15   A.  CRI Compliance, LLC.

16   Q.  And what business is CRI in?

17   A.  The words we use, we advise banks on risk management,

18   but we specialize in high-risk compliance problems for the

19   banking industry.

20   Q.  And does CRI advise financial institutions?

21   A.  Primarily.

22   Q.  What types of institutions?

23   A.  Primarily banks of the size of M&I, so this kind of

24   midsized regional banks; not the giant ones and not the

25   small ones, the midsized.
```

1    Q.  And a little more specifically, what kind of consulting

2    work does CRI provide?

3    A.  We have done two primary issues over the course of the

4    34 years we've been in business.  The first is this topic,

5    Bank Secrecy Act, anti-money laundering, and all the related

6    laws and regulations.

7              And the second is the process of mortgage lending,

8    the issues that are -- surround mortgage lending; consumer

9    rights, the quality of mortgage loans, those kinds of

10   things.

11   Q.  And just in brief, we've heard some about it, but what

12   is the Bank Secrecy Act that you just mentioned?

13   A.  The Bank Secrecy Act is the law that was passed in 1970

14   primarily to address the problem of dirty money from drug

15   trafficking entering the financial system, and it's

16   broadened over the last 35 or 40 years.  So it now is almost

17   unrecognizable from its original form, but it's now a family

18   of laws, regulations, and instructions.

19   Q.  Okay.  Mr. Grice, let's take a step back.  If you could

20   please describe your educational background starting after

21   high school for the jury.

22   A.  I'll try to remember.  I attended college at a place

23   called Johns Hopkins University in Baltimore and studied --

24   the field was international studies, but it was really

25   development economics.  I was trying to understand why some

1      countries are rich and others were poor.

2                  I then went to Georgia Washington University in

3      Washington, D.C. and did two years of graduate school in

4      economics under a scholarship from the Federal Reserve.

5                  And then did a year in Brazil going to graduate

6      school studying the Brazilian financial system.  I was a

7      Fulbright scholar, so the U.S. government sent me there.

8                  I came back and did two years at the Kennedy

9      School of Government -- it's now called the Harvard School

10     of Government -- and got a master's degree in public policy.

11                 And then the last thing I did was a three-year

12     fellowship courtesy of the Kellogg Foundation of Battle

13     Creek, Michigan.  So I spent three years pursuing a variety

14     of questions, mostly about the effects of technology on

15     things like banking and low-income neighborhoods.  Is there

16     some way to help low-income neighborhoods with better

17     internet connection, but keep in mind this was 35 years ago,

18     so that was a long time ago.

19     Q.  Mr. Grice, have you prepared a set of demonstrative

20     exhibits to aid your testimony today?

21     A.  I have, yes.

22     Q.  And does one of them cover your professional background?

23     A.  Yes.

24                 MR. SCHAPER:  That is -- that exhibit is without

25     objection, so I would ask if we can put up DD-60 and

Grice - Direct

1      slide 0.

2      BY MR. SCHAPER:

3      Q.  Mr. Grice, when did you begin your career in banking?

4      A.  Technically it was a summer job, and then a job during

5      the school year when I was an undergraduate, so in 1978 at a

6      credit union at Johns Hopkins.

7              And then I had a variety of summer jobs in

8      banking.  One of them was at Bankers Trust, which is now

9      called Deutsche Bank.

10             And then officially got into the banking business,

11     I guess, in 1986 when I went to work for the California

12     Bankers Association training bank CEOs on new laws and

13     regulations.  This was right after the passage of part of

14     the Bank Secrecy Act.

15             And then in '88 --

16     Q.  Can I stop you there?

17     A.  Of course.

18     Q.  Mr. Grice, at some point did you spend some time at the

19     Federal Reserve Board?

20     A.  I did.  Yes, I spent two years at the Federal Reserve

21     really right -- well, I did a year at the Senate Banking

22     Committee right out of college, and then went to the Federal

23     Reserve for two years.  So I got to see the laws that we had

24     adopted in the Senate get turned into regulations that were

25     enforced or implemented by the Federal Reserve.

1    Q.  And sorry.  I interrupted you.  And I think you were on

2    to 1988.  What did you do then?

3    A.  So in 1988, I left the California Bankers Association;

4    and with the support of some of those bank presidents,

5    created what is now CRI to help banks understand and comply

6    with what I guess I would consider then were high-risk

7    regulations and laws, the Bank Secrecy Act in particular,

8    and then the laws around racial discrimination were called

9    fair lending laws.  Those were the original foci or the

10   original focus of CRI.

11   Q.  Did your work for the Senate Banking Committee and the

12   Federal Reserve Board and the California Bankers Association

13   inform your opinions today?

14   A.  It did.  It contributed a lot.  I got to see an idea of

15   legislation coming out of a senator's mind get turned into a

16   rule that was implemented by a federal agency, and then I

17   got to see how the real world wrestled with those sometimes

18   incomplete or unclear or ambiguous instructions.  So I got

19   to see all parts of the life of a regulation.

20   Q.  As part of your consulting work, Mr. Grice, have you

21   ever been asked to serve in a role inside a bank?

22   A.  I have.  So six times in my consulting life since 1988

23   I've been inserted into banks at the behest or at the

24   instruction of the government after they've removed an

25   employee from the bank for malfeasance, fraud,

1    nonperformance.  So six times I've been appointed by an

2    agency and then the board of directors of the bank to be the

3    chief compliance officer or the chief risk officer or in one

4    case both.

5    Q.  And in broad terms, in those six assignments, is your

6    job to kind of turn around the compliance function at a

7    bank?

8    A.  Yeah, I would step into banks of the size and complexity

9    of M&I after a tough exam where there's a big to-do list of

10   items to be fixed, and I would work myself out of a job.

11   And part of my assignment was also to find a replacement.

12   So I would keep the seat warm.  I would perform all the

13   duties and responsibilities of that federal examination and

14   then leave.

15   Q.  And, to your knowledge, were those assignments

16   successful?

17   A.  All of them, yes.

18   Q.  Were any of those roles where you worked inside a bank

19   as chief compliance officer during the 2002 to 2008 time

20   period?

21   A.  Two of them -- I'm sorry, three of them were during this

22   2002 to 2008 time frame, again of banks that are competitors

23   to M&I, similar size, similar complexity, a couple of

24   states, you know, 10 or 20 or 30 billion dollars in assets.

25   Q.  Did that -- did those roles involve hiring or

Grice - Direct

1    supervising AML analysts?

2    A.  They did.

3    Q.  And when you were in those roles, was your work subject

4    to scrutiny by the government?

5    A.  Both -- yes.  Both the annual examination that my --

6    that basically every bank gets of this size for BSA and also

7    I had a contractual relationship with the federal agency

8    that sent me in there.  My bills were paid by the bank, but

9    my supervisor was the Federal Reserve or the OCC.

10   Q.  So given that the Federal Reserve was supervising your

11   work, did you have interaction with the Federal Reserve in

12   terms of how to carry out your role?

13   A.  If not daily, certainly weekly.  Yeah, it was a very

14   close supervision by the agencies.

15   Q.  And did those interactions with the government at the

16   time, 2002 to 2008, inform your opinions today about what

17   regulatory expectations were at the time?

18   A.  Yeah, it gave me a real understanding for a lot of the

19   documents we have seen in this trial and a lot of the

20   witnesses we've heard from.  So it informed my

21   understanding.  It gave me the context.  So when I listened

22   to Kelley Maltsch yesterday, I understood exactly what she

23   was referencing because I had been in not an identical, but

24   almost identical conversation with my federal supervisor

25   during the same frame.

1    Q.  And do those interactions inform your opinions about

2    whether M&I's AML analysts carried out their duties

3    appropriately?

4    A.  Yes.

5    Q.  About how many banks have you consulted on BSA/AML

6    compliance over the course of your career, Mr. Grice?

7    A.  I don't have an exact count, but it's well over 125 over

8    the 35 years.

9    Q.  So we've talked about your consulting work for banks.

10   Have you ever performed consulting work for any regulatory

11   or government agencies?

12   A.  I've done two expert witness assignments like my

13   appearance here today where I was hired by the Department of

14   Justice, the anti-money laundering section or the anti-fraud

15   section, on bank matters.  One was a Ponzi case and the

16   other was a pyramid scheme, but very similar.  So the client

17   was the Department of Justice.

18          And then I've trained and advised the federal

19   banking supervisors, the Federal Reserve, the OCC and the

20   FDIC.  But in terms of formal consulting arrangements, it's

21   the Department of Justice.

22   Q.  I think you just made a reference to this, but do you

23   have specific experience when it comes to financial

24   institutions where Ponzi schemes have been identified?

25   A.  Yes.  I've worked I think on 12 or 15 litigation

1    assignments that are Ponzi schemes, or things that I think

2    people would call Ponzi schemes, and then another 15 or 20

3    that are complex financial frauds.  I'm hesitating because I

4    work on Enron for a couple of years.  Enron was not a

5    classic Ponzi scheme, but it was a very complex series of

6    financial frauds.

7    Q.  We've heard a number of times throughout this trial

8    about the Madoff Ponzi scheme that collapsed in late 2008 or

9    early 2009.  Did you have any role with respect to the

10   Madoff matter?

11   A.  I wasn't part of it.  I wasn't --

12   Q.  I wasn't suggesting that.

13   A.  No, by coincidence, I was in south Florida the day that

14   Mr. Madoff confessed, and I went to his country club the

15   next morning because I was curious.  I'm kind of a

16   regulatory nerd.  I wanted to see what I could learn, and a

17   lot of the victims purportedly were coming from the country

18   club.

19          So my first day I went to the country club and I

20   talked to the victims and looked at their documents.  Later

21   I was invited to join a thing that was called the Madoff

22   coalition, I believe was the name of it.  It was a

23   collection of about 100 law firms from around the world that

24   represented both victims of Madoff and also bank defendants,

25   banks that were involved in Madoff.  That lasted about a

 1    year before I resigned.

 2            And then maybe two or three years after that, I

 3    did a litigation assignment for a couple of families from

 4    Latin America who had invested through a French bank into

 5    one of the Madoff controlled funds.  So I've seen Madoff

 6    from different sides.

 7    Q.  How long have you been working in the banking industry,

 8    Mr. Grice?

 9    A.  Since 1978, but with long pauses for school and other

10    jobs.

11    Q.  Have you developed any areas of expertise in the banking

12    industry during your decades-long career?

13    A.  The nerd word that we use in the banking industry is

14    internal controls, but the subject matter is Bank Secrecy

15    Act compliance, fraud prevention, and then this family of

16    laws around racial discrimination, mortgage discrimination,

17    redlining, fair lending, the Community Reinvestment Act --

18    believe it or not, these are all the same thing -- and then

19    the techniques of how to make a mortgage loan properly.

20    Q.  Have you ever been asked to teach courses about bank

21    regulatory compliance matters?

22    A.  Yes.

23    Q.  Just -- I don't need an exhaustive list, but can you

24    give an example of some of the entities that have asked you

25    to teach courses on that subject?

1    A.  I think I have spoken at every national meeting and most

2    of the regional meetings and even most of the state trade

3    association meetings.  Kelley Maltsch yesterday was

4    referencing I think the Wisconsin Bankers Association.  I

5    don't think I appeared there, but I have done the American

6    Bankers Association, American Bar Association, international

7    groups outside the United States.  I've trained OCC

8    examiners on BSA issues, state regulators.

9    Q.  Mr. Grice, did you include a copy of your resumé as part

10   of your expert report in this case?

11   A.  I did, yes, sir.

12           MR. SCHAPER:  Your Honor, defendant offers into

13   evidence DX-50902, which is the excerpt from Mr. Grice's

14   report that is his resumé.  We don't intend to publish it

15   now, but rather just so it's available to the jury.

16           MR. ANTHONY:  Your Honor, I think -- no objection.

17   All the resumés have been admitted, so no exception here.

18   No objection.

19           THE COURT:  It is received.

20           MR. SCHAPER:  Thank you.

21   BY MR. SCHAPER:

22   Q.  Mr. Grice, have you ever been asked to testify as an

23   expert witness before?

24   A.  I have, yes, sir.

25   Q.  About how many times have you testified at trial?

Grice - Direct

1    A.  More than a dozen.  So maybe 13 or 14.

2    Q.  Have you testified on BSA/AML issues?

3    A.  Yes, and at least three or four of those have been

4    focused not as brightly as this case, but where BSA was a

5    major part of the case.

6    Q.  And as part of that, have you ever testified as an

7    expert on a bank's compliance with "know your customer"

8    requirements?

9    A.  Yes, in each of those.

10   Q.  Mr. Grice, when you've testified in courts, has it

11   always involved testifying on behalf of a bank?

12   A.  No.  I've done -- I've probably had a hundred litigation

13   assignments in my career, separate from the consulting we

14   talked about.  Of those, say, 15 are BSA-related litigation

15   assignments.  Of those 15, at least five or six were adverse

16   to banks.  So I was hired by plaintiffs to sue banks.

17   Q.  So in your work, sometimes you've testified on behalf of

18   plaintiffs and sometimes you've testified on behalf of

19   defendant banks; is that correct?

20   A.  That's correct.  In the two assignments for DOJ, I'm

21   clearly on behalf -- these were criminal matters where I'm

22   on behalf of the U.S. Government against banks or bankers.

23   Q.  Has there ever been a situation in which you were asked

24   to give an opinion about a bank's BSA/AML program and you

25   chose not to?

Grice - Direct

1    A.  Yes.  There have been four instances in my career in

2    this subject in BSA where I was asked to opine on the

3    quality of somebody's compliance program, for example, and

4    in both litigation and consulting where I didn't feel

5    comfortable with what I was seeing and I withdrew.  So we

6    signed engagements letters, I got the documents, and I

7    withdrew.

8    Q.  Have you ever been disqualified as an expert witness,

9    Mr. Grice?

10   A.  No, sir.

11        MR. SCHAPER:  Your Honor, defendant offers Charles

12   Grice as an expert in the field of banking and bank

13   regulatory compliance.

14        MR. ANTHONY:  No objection, Your Honor.

15        THE COURT:  He is received as such.

16        MR. SCHAPER:  Thank you, Your Honor.

17   BY MR. SCHAPER:

18   Q.  Mr. Grice, which party retained you in this case?

19   A.  Counsel for BMO, for BMO Harris.

20   Q.  And is your work on this case related to BSA/AML issues?

21   A.  Very much so, yes, sir.

22   Q.  Before we get to those areas, are you being compensated

23   for your role in the case?

24   A.  I am, yes, sir.

25   Q.  Just generally, what's the structure of that

1   compensation?  Is it hourly or --

2   A.  I'm paid hourly, and I'm also paid a 10 percent share or

3   commission for the work of people I supervise.  So I've been

4   supported by others in this engagement.

5   Q.  And what is your hourly rate?

6   A.  It's now 950 an hour.  It was 850 I think when I

7   started.

8   Q.  Is your compensation for this case contingent on the

9   nature of the opinions you give?

10  A.  No.

11  Q.  Is it contingent on the outcome of this case?

12  A.  No.

13  Q.  Has your compensation impacted your professional opinion

14  in any way in today's case?

15  A.  Not at all.

16  Q.  You said a moment ago that you were retained to -- in

17  connection with BSA/AML compliance issues.  Have you also

18  prepared a demonstrative that covers what questions you were

19  asked to look into in this case?

20  A.  Yes, sir, I have.

21  Q.  If we could please go to slide 1.  Can you just explain

22  what you were asked to look at.

23  A.  It was five seemingly simple questions, trying to look

24  at the conduct of the bank with the PCI account in a very

25  specific time frame.  Obviously the account ended -- or the

1    Petters scheme ended in 2008.  So I was looking at first the

2    policies and procedures of the bank, so did the bank have

3    the kinds of required elements of a compliance program that

4    a bank should have had at this time frame from '02 to '08;

5    whether the conduct of the bank with respect to PCI was

6    consistent with those policies and procedures.

7         One of the bigger issues was this question of red

8    flags and were there any red flags in the PCI account that

9    showed fraud that the bank should have seen, again, given

10   the information available at the time.

11        Fourth was did any employees -- I'm sorry.  Did

12   any employees at M&I behave in a way that was consistent

13   with conspiring with a fraudster, which I've seen before.

14        And then --

15   Q.  And then the last one references plaintiff's expert, who

16   we heard from earlier in the case, Ms. Ghiglieri.  What does

17   that item refer to?

18   A.  I was asked to address -- I wrote my original report

19   before Ms. Ghiglieri had filed her report, and then I was

20   asked to respond to the criticisms she raised in her report

21   back in 2018.

22   Q.  Mr. Grice, were you able to reach a conclusion on each

23   of these areas that you looked at?

24   A.  Yes, sir, I was.

25   Q.  Did you issue written reports in this case?

1    A.   Two reports in early 2018 and then mid 2018.

2    Q.   Did anyone help you with those reports?

3    A.   Yes, sir, I was supported by three people from my office

4    at CRI, and then a team of analysts at a firm called

5    Analysis Group.

6    Q.   At a very high level, Mr. Grice, can you just describe

7    how they helped you.

8    A.   So the three folks from my shop that helped were all

9    former bank examiners, so people who did BSA exams in the

10   past and had experience.  They were fluent in Bank Secrecy

11   Act issues.

12              And then the team at Analysis Group helped me --

13   I'm not a lawyer.  I don't understand legal productions very

14   well.  There's a special language.  This is a very special

15   world.  They helped me find the documents I was looking for

16   inside the production, which was, without a doubt, one of

17   the largest I've ever seen.

18   Q.   So you had some help in this case, Mr. Grice, but were

19   the opinions that you formed in this case entirely your

20   opinions?

21   A.   Entirely my own, yes, sir.

22   Q.   Before we get to your conclusions, I would like to just

23   discuss with you what your approach was in reaching them.

24              Was there anything, Mr. Grice, that was especially

25   difficult about working on an assignment that involved

Grice - Direct

```
1     events that took place as long as 20 years ago?
2     A.  Yes.  Most of my consulting work is in real time.  I'm
3     dealing with ongoing frauds or ongoing misconduct in real
4     time, so I can talk to people, I can see documents as
5     they're unfolding.  Here we had the passage of 20 years.  So
6     it was a challenge to do this analysis without suffering
7     from this kind of -- a kind of blindness that comes.  We
8     forget what life was like 20 years ago.  We forget what we
9     knew and didn't know 20 years ago, so the challenge of time
10    was a serious one.
11    Q.  Is there a name for the concept you are talking about?
12    A.  Yes, hindsight bias I have heard a lot of in this
13    courtroom, and it's certainly, I think, one of the biggest
14    challenges in this assignment is how to reconcile it, how to
15    deal with it.
16    Q.  And how, in your view, does the concept of hindsight
17    bias come into play in this case where we're looking at
18    events between 2002 and 2008?
19    A.  It's a serious challenge to set aside what you've
20    learned after Petters -- after the FBI raid and Mr. Petters
21    was arrested and then the criminal trial.  It's just very
22    hard to set that aside and not know it as you read these
23    documents.
24             And so I worked really hard to make sure I was
25    applying the standards that were in effect at the time and
```

1    the bank's conduct at the time without that certain

2    knowledge of what was going to happen in the future.

3    Q.  And did you prepare a slide that talks about your

4    approach?

5    A.  Yes, sir, I did.

6    Q.  If we could please move to slide 2.  Can you just

7    explain for the jury what you're talking about here in terms

8    of your approach, Mr. Grice.

9    A.  So I've been in this courtroom for all but two days, so

10   I'm talking to the converted here.  This is a case very much

11   about the regulatory context that was in place at the time

12   and the bank's actions with the PCI account at the time.

13        So I tried to look at both of these aspects using

14   documents and guidance and instruction from the government

15   and information inside the bank from the time period.

16   Again, setting aside this knowledge that comes from reading,

17   you know, the Ted Martens report at PwC, which answers a lot

18   of questions.  If you don't know what happens in September

19   2008, it gives you a different understanding of the

20   documents that preceded that.

21   Q.  And just at a very high level because we'll cover this

22   in more detail later, but at the time pre-September 2008 to

23   -- 2002 to 2008, just what was the regulatory context, just

24   very high level?

25   A.  It was very different.  I mean, an example of this

1    hindsight bias is trying to remember what life was like at

2    an airport before 9/11.  In this assignment, Ponzi schemes

3    and this kind of complex fraud was not top of mind for

4    federal government regulators and therefore for their

5    bankers.  And so --

6    Q.  What was top of mind?

7    A.  Really the twin issues of this old-fashioned narcotics

8    trafficking dirty cash money laundering, the original money

9    laundering, you know, mobsters, narcos; and then after 9/11,

10   the war on terror, which sort of didn't take all the oxygen

11   out of the room, but certainly became the number one

12   priority and it remains that way today.  So the drug traffic

13   war and then later the war on terror were clearly one and

14   two on the list of priorities.

15   Q.  And in terms of the second item you have here,

16   Mr. Grice, in terms of analyzing M&I's actions based on the

17   information M&I had about PCI at the time, when you say "at

18   the time," do you mean before September 2008?

19   A.  Precisely.

20   Q.  And so you mentioned the Petters guilty verdict and

21   guilty pleas by others.  You also mentioned the PwC report

22   by Mr. Martens.  Do you recall what year that was in?

23   A.  I think 2010 was the first version, but he went through

24   multiple -- he did a lot of work on this because it's

25   complex.

1    Q.  Was your approach to look at what the bank knew putting

2    aside that information that came after September 2008?

3    A.  I had to do that because, again, that wasn't available

4    to the AML analysts that we heard from or any of the

5    bankers.

6    Q.  Mr. Grice, I know you've written reports that are nearly

7    200 pages, and I am not going to take you through those in

8    detail.  I would like to focus on your main opinions in the

9    case, though.

10        Have you prepared a slide on that just to walk us

11   through those?

12   A.  Yes, I have.

13        MR. SCHAPER:  If we could please put up DD-60,

14   slide 3.

15   BY MR. SCHAPER:

16   Q.  Mr. Grice, did you form an opinion regarding whether

17   M&I's BSA/AML policies and procedures were appropriate

18   during the relevant time period of 2002 to 2008?

19   A.  Yes, sir.  I studied this very closely.  What was the

20   bank instructing its employees to do and was that

21   instruction proper given what the federal government was

22   saying at the time.

23   Q.  And did you form an opinion on that?

24   A.  Yes, sir, I did.  It was consistent with federal

25   guidance.

1    Q.  Did you form an opinion regarding whether M&I's

2    monitoring of and provision of services related to PCI and

3    the PCI account was appropriate?

4    A.  Yes, sir.  Again, given what was known at the time, was

5    the behavior -- was the conduct of M&I's staff reasonable

6    for the way they treated their client or was there

7    extraordinary service.  So was it reasonable?  Was it --

8    Q.  And was it?

9    A.  It was, yes.

10   Q.  We've heard a lot about red flags in this trial,

11   Mr. Grice.  Did you form an opinion regarding whether there

12   were any red flags in PCI's account that were signs of

13   suspicious activity or fraud?

14   A.  Yes, sir.  I think most of my 200 pages were dedicated

15   to analyzing each of the alleged red flags, and I found no

16   what the plaintiff has considered red flags at the time.

17   They just didn't exist.

18   Q.  And when you mean that, you are talking about red flags

19   of suspicious activity?

20   A.  Yes, sir.  I'm sorry.

21   Q.  And, Mr. Grice, did you form an opinion about whether

22   the conduct of M&I employees was what would be expected from

23   bank employees who actually were involved in some kind of

24   financial fraud?

25   A.  Yes, sir.  So I looked at this closely.  I read, I

1     think, somewhere about 60 deposition transcripts.  Some of

2     the bank employees like Mr. Flynn had been deposed at least

3     five times.  And, in my experience, that's a lot of chances

4     to ask the question or find evidence of potential misconduct

5     by an employee.  I saw no evidence or even a suggestion of

6     improper conduct or the things you would see that would

7     motivate improper conduct; you know, bribes, gratuities,

8     gifts, et cetera.

9     Q.  And then, lastly, and you've talked about this a bit

10    already, Mr. Grice, but did you form an opinion about the

11    criticisms that plaintiff's expert, Ms. Ghiglieri, had about

12    M&I, including how M&I handled PCI's account?

13    A.  I did.  In my opinion, she suffers from this hindsight

14    bias problem that I've described.

15    Q.  You mentioned that this is one of the biggest amounts of

16    material that you've ever reviewed in a case that you have

17    worked on.  Did I hear that correctly?

18    A.  Absolutely correct, yes, sir.

19    Q.  Did you feel that you had sufficient facts and data to

20    reach your conclusions?

21    A.  More than abundant.  More than sufficient, I guess I

22    should say.

23    Q.  Did you create a slide that goes through the types of

24    information that you had?

25    A.  Yes.  It's high level, but it will give you a sense for

1   what I had access to.

2              MR. SCHAPER:  Could we please put up slide 4 of

3   DD-60.

4   BY MR. SCHAPER:

5   Q.  And, again, don't need a lot of detail, but if you could

6   just walk through, Mr. Grice, the kind of materials that you

7   had access to for your report.

8   A.  So the graphic on the right is at least the footnotes to

9   my report.  There are hundreds of footnotes referencing

10  these many, many, many documents, but the regulatory

11  guidance is all of the laws, regulations, instruction

12  manuals, training manuals, examination manuals issued by

13  especially the Federal Reserve.

14             The bank's policies and procedures, which I think

15  Ms. Maltsch yesterday had a printed copy, which is a good --

16  it's the size of this binder (indicating).

17             The many kinds of reports generated by M&I's own

18  internal systems, and there are many.  There were many

19  before Searchspace, and there were many after or during

20  Searchspace, but the internal systems.

21             The collection of documents specifically

22  referencing the 9018 account and the relationship with

23  Petters.  That includes the e-mails with -- between Deanna

24  Coleman -- Ms. Coleman, for example, and bank employees.

25             All of the transactional data related to PCI that

1    was housed inside the bank.

2              An extremely large collection, and for me a little

3    bit unusual, of examination documents from the Federal

4    Reserve during this period of '02 to '08.

5    Q.  Why do you say it was unusual, the set of Federal

6    Reserve examination materials?

7    A.  In my consulting role, I'm inside the bank and I get

8    access to this.  These are very confidential documents, and

9    they're covered by an examination privilege.  And the

10   documents are stamped with "Property of the Federal

11   Reserve."  So during my career, it's rare in litigation that

12   we get access to this.

13   Q.  But in this case, you had access to a good volume of

14   federal exam materials?

15   A.  A very good volume.  So it's seven or eight years of

16   very detailed high-level, medium-level and very granular

17   conversations between the bank and the Federal Reserve about

18   their BSA program.

19   Q.  Okay.  And then what are the last two items in the

20   materials that you reviewed?

21   A.  Documents from M&I's internal audit department.  So they

22   have an internal audit inspection team that evaluates

23   compliance with their own policies and procedures.

24             And then, finally, this collection of 60

25   depositions and all of the exhibits.  So the depositions are

1    several hundred pages long, and the exhibits are another

2    large collection of documents.  So I think I had sufficient

3    information to understand what happened here.

4    Q.  Was there any information that you asked for from the

5    bank that you did not receive?

6    A.  No, sir.  In fact, it was the opposite.  There were

7    things I asked for that I expected I would not receive, and

8    I got them, so the fed documents in particular.

9    Q.  Have you also listened to or read the testimony at this

10   trial?

11   A.  I have.  I missed two days, I believe, but I've been

12   here in the back listening and taking this in.

13   Q.  And are you generally aware of an issue about whether

14   certain e-mails from before 2000 -- March 2005 were

15   recycled?  Are you aware of the issue that there's an issue

16   in this case whether e-mails before March 2005 were

17   recycled?

18   A.  Oh, yes.  I was here for some of that testimony as well.

19   Q.  And even with that issue, are you still confident that

20   the information you had was sufficient to reach your

21   conclusions?

22   A.  Yes, sir.

23   Q.  And why is that?

24   A.  Again, it was the sufficiency of the documents that I

25   saw.  There's a lot of redundancy in the document collection

```
 1    I saw, but my understanding is everything from March '05

 2    forward --

 3              MR. ANTHONY:  Objection, lacks foundation.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  So I was here for the testimony of

 6    the IT witness, and my understanding is --

 7              MR. ANTHONY:  Objection, mischaracterizing,

 8    commenting on the testimony of another witness.

 9              THE COURT:  Sustained.

10    BY MR. SCHAPER:

11    Q.  Just explain your understanding.

12    A.  My understanding is March 2005 going forward, everything

13    is there.

14              MR. ANTHONY:  Objection, lacks foundation.

15              MR. SCHAPER:  Already been ruled on, Your Honor.

16              THE COURT:  It has.

17              MR. ANTHONY:  I just want to preserve my objection

18    that it lacks foundation.

19              THE COURT:  It is preserved, Counsel.

20              MR. ANTHONY:  Thank you, Your Honor.

21    BY MR. SCHAPER:

22    Q.  Mr. Grice, were you also able to review some materials

23    in this case from before 2005?

24    A.  Yes, sir.  So I had the MIContacts, for example; I

25    had -- well, I had the exhibits and the documents gathered I
```

1   assume by the government and by the trustee from PCI.  So I

2   had bank internal documents that preceded March 2005; you

3   know, internal policies and procedures, training materials,

4   systems reports.  A lot of this, my understanding, is not

5   affected by the document destruction question.

6   Q.  Okay.  Thank you, Mr. Grice.

7          So you said that -- a little bit earlier that one

8   of the challenges in this assignment for you was to make

9   sure you were evaluating M&I in the context of the

10  regulatory expectations at the time.  Am I recalling that

11  correctly?

12  A.  Yes, sir.

13  Q.  Mr. Grice, have you prepared a demonstrative with a

14  timeline that shows regulatory developments at that time?

15  A.  Yes, sir.

16          MR. SCHAPER:  Okay.  Can we please put up slide 5

17  of DD-60.

18  BY MR. SCHAPER:

19  Q.  So, first of all, there's a fair amount going on here,

20  Mr. Grice.  So let's just start at the beginning.

21          When did federal banking agencies begin

22  prescribing regulations for BSA/AML compliance?

23  A.  Again, I feel like I grew up with these.  I was 12 when

24  the BSA was adopted by Congress.  But when I got to Capitol

25  Hill, there were hearings asking the fed to put out

1    instructions for how banks should comply.

2                So 1986 on this timeline is the Money Laundering

3    Control Act which criminalized money laundering for banks

4    and bankers.  That's when you started to see the beginning

5    of a formal examination process with examination procedures

6    that ultimately get published and released to the banks.  We

7    get a clearer understanding of what the expectations were

8    for bankers, how we're supposed to comply with this very

9    important, but, as of then, kind of un -- nonspecific

10   instructions.

11   Q.  Let's move to the early 2000s and get to the time that's

12   most relevant to this case.  Were any laws related to

13   BSA/AML issues passed then?

14   A.  Yes.  The largest single collection of BSA regulations

15   ever was brought about because of the USA PATRIOT Act, which

16   we heard about yesterday from Ms. Maltsch.  It's a

17   collection of laws that really changed the landscape for how

18   banks are supposed to comply with the issues in this case.

19   So this concept of "know your customer" gets, for the first

20   time, very specific.  It had not been specific until 2001,

21   and now finally we have a federal standard that applies to

22   all banks.

23   Q.  And what was the "know your customer" standard that came

24   out of the PATRIOT Act?

25   A.  In retrospect, it was kind of underwhelming, but I was

1    grateful to have specificity.  It's called the customer

2    identification procedures.  The banks were required to have

3    a very specific checklist of four items -- again,

4    Ms. Maltsch spoke to this yesterday -- the customer name,

5    the street address, the date of birth, and then either the

6    Social Security number or the tax ID number.

7    Q.  Social Security number if it's an individual, tax ID

8    number if it's a business?

9    A.  That's correct.

10   Q.  Did you see anything in the record in this case

11   suggesting that M&I didn't have the requisite customer

12   information about PCI?

13   A.  No.  I looked at the signature card.  I looked at the

14   onboarding documents.  I don't think there's any allegation

15   that the bank did not have sufficient identification

16   documents from Petters -- for Mr. Petters or from PCI when

17   it was established at the prior bank.

18   Q.  And were there also enhanced due diligence requirements

19   coming out of the PATRIOT Act?

20   A.  Yeah, they came in two phases, and I think Ms. Maltsch

21   spoke to this yesterday.  There was a requirement that banks

22   start to identify higher-risk customers, and she worded it

23   very precisely, higher-risk customers.  The government gave

24   us a list of who they thought were higher-risk customer

25   types and customer characteristics; and then later, much

1   later, in 2018 -- I'm sorry, 2016, there was a requirement

2   that we start risk rating effectively all customers.  We

3   have to find a high, medium, or low for everybody, but that

4   comes much later after the Petters scheme was discovered.

5   Q.  You said that concept was 2016?

6   A.  Yes, sir.

7   Q.  Focusing again on this early 2000s period, were Ponzi

8   schemes a focus of the laws and regulations that were coming

9   out in that time period?

10  A.  No, sir.

11  Q.  Does that mean that Ponzi schemes didn't yet exist?

12  A.  No.  I think there were questions on this yesterday.

13  Charles Ponzi existed 100 years ago and kind of gave birth

14  to the first Ponzi scheme.  There have been complex frauds

15  always.  It just wasn't top of mind or prominent in the

16  examination process between the fed and their banks.  And I

17  know, in my experience, I've never heard a Federal Reserve

18  or OCC or FDIC examiner ever ask, Where are your Ponzi

19  schemes, or tell me about your Ponzi scheme prevention

20  program.  It just wasn't -- I am using the phrase "top of

21  mind."  It wasn't in people's mind.

22  Q.  When you say you personally have never heard that, does

23  that include in your role at banks in the 2002, 2008 period

24  dealing with the federal regulators?

25  A.  Yeah, both in these six assignments where I'm the chief

1    compliance officer, but I guess as fundamentally, my -- I

2    have 30 people in my shop, and a lot of us are former bank

3    examiners or former bank examination employees.  We

4    supervise about 50 examinations a year.  So our clients are

5    being examined on their annual exams, and we advise the

6    banks on how to comply with the laws and regulations during

7    these exams.  We didn't hear and we continue not to hear

8    questions related or tied to Ponzi schemes.

9    Q.  We've heard some indications, Mr. Grice, that money

10   laundering has been a focus of regulators.  Have you heard

11   that testimony?

12   A.  Yes, sir.

13   Q.  Is it possible that a Ponzi scheme could involve money

14   laundering?

15   A.  Certainly.

16   Q.  Does that mean that regulators were focused on that type

17   of money laundering during this relevant period?

18   A.  No.  I guess I'm trying to address the symptoms that

19   banks were told to look for or the specific conditions or

20   behaviors banks were told to look for were not these complex

21   situations that I think we all agree are Ponzi schemes.

22        So, you know, fraud is a human condition.  It's

23   everywhere.  But Ponzi schemes are a complex collection of

24   symptoms or characteristics, and that was not prominently

25   part of an examination process or an inspection by the fed.

1    Q.  What was the focus when it came to money laundering at

2    this time?

3    A.  Originally just cash from drug dealing; literally, you

4    know, cocaine-stained cash or blood-stained cash, you know,

5    cash that was part of a criminal transaction.  That broadens

6    to other kinds of cash, including tax evasion.  But it's

7    always cash.

8            So cash was the issue really until 9/11.  So it

9    was cash-intensive businesses.  We heard Ms. Maltsch talk

10   about this yesterday.  It was the focus -- the sphere of

11   focus was cash.

12   Q.  And looking at your timeline, did there come a time when

13   bank regulators did have some more focus on Ponzi schemes?

14   A.  Yes, sir.

15   Q.  When was that?

16   A.  Well, so the Petters scheme is revealed in September

17   2008; and in very short order, we have several other large,

18   complex Ponzi schemes, the largest by far being Bernard

19   Madoff in December 2008.

20           A sort of baby version of Madoff was the Allen

21   Stanford Ponzi scheme in the Caribbean in February 2009.

22           And then an even smaller but more obnoxious Ponzi

23   scheme because it involved a dirty bank employee, was the

24   Scott Rothstein Ponzi scheme in November 2009.

25   Q.  And where on your timeline, Mr. Grice, is M&I's

1   relationship with the 9018 PCI account?

2   A.  So it starts in 1999 on the left-hand side of the page,

3   and it stops in September 2008 with the raid of the Petters

4   office.

5   Q.  So on your timeline, is that before Ponzi schemes got

6   some more interest in the regulatory environment?

7   A.  Yes, sir.  It's right in the middle, but it precedes

8   this later discovery of large, complex Ponzi schemes.

9   Q.  Mr. Grice, in the 2002 to 2008 period, did regulators

10  take steps to give banks more clarity in how to develop

11  their BSA/AML compliance programs?

12  A.  Happily, yes.  I was complaining earlier about the lack

13  of specificity; and in 2005, they gave us what we asked for,

14  which is a lot of specificity.

15  Q.  In what form did that guidance come?

16  A.  We got a 367-page examination manual from the FFIEC.  I

17  have heard testimony about this here.  The FFIEC is a

18  collection of the bank regulators.  And they published for

19  the first time the test.  So we got to see 367 pages of exam

20  questions and related to it a lot of instructions or

21  suggestions for how banks might want to prepare for that

22  part of the test.  So it really was like back in high school

23  where the teacher gives you a preview of the test.  This is

24  the test.

25  Q.  And, in general terms, what did the guidance say in

1    terms of how to approach designing and maintaining a

2    successful BSA/AML compliance program?

3    A.  It's a simple idea, but it takes them 367 pages to say

4    it.  It's a risk-based or risk-focused approach where --

5    Q.  What does that refer to?

6    A.  The government wants the banks, and I think this is

7    reasonable, the government wants the banks to understand

8    their own risk, you know, the kinds of customers they have,

9    the kind of business they're engaged in, the kinds of

10   transactions their customers engage in, and then build a

11   program that controls that risk or reduces that risk.  So

12   it's kind of like a test yourself program, and then you'll

13   be evaluated on how well you design your own compliance

14   regime or your own compliance program.

15   Q.  And have you prepared a demonstrative explaining that

16   concept?

17   A.  Yes, sir, I have.

18           MR. SCHAPER:  If we could please put up,

19   Mr. Herzka, slide 6 from DD-60.

20   BY MR. SCHAPER:

21   Q.  Okay.  So let's just start at a high level without

22   getting into detail, Mr. Grice.  What are we looking at

23   here?

24   A.  So the top of the slide is -- just to be clear, this is

25   an extract of this exam manual.  So we lifted that verbatim.

1    And then the bottom of the slide is a rough translation to

2    what these three boxes with the arrows mean; "risk

3    assessment," "internal controls," and then the consequent

4    "risk-based BSA compliance program."

5    Q.  So, first of all, what does "risk assessment" refer to?

6    A.  This is that idea that you, the bank, are the best judge

7    with our guidance, with the fed's guidance, on how much risk

8    you have in your organization.  You know your customers, you

9    know their businesses, therefore, design your own

10   appropriate compliance regime.  But the first step is you

11   have to assess your own risk, and then the fed comes in once

12   a year and reads that risk assessment and gives a thumbs up

13   or thumbs down on whether you have done it correctly.

14   Q.  And we'll come back to this in a minute, but this slide

15   indicates identifying and measuring risk across products and

16   services, customers, and geographic locations.  Those are

17   the components of the risk assessment?

18   A.  That is the secret to this 367-page manual.  So if you

19   capture this, everything else follows, right?  So there are

20   three parts of my risk; the products I offer.  There are

21   banks that only offer credit cards.  M&I offers a whole

22   variety of things, so, therefore, we have a whole variety of

23   different kinds of risk associated with each of those

24   products.

25              The customers.  There are banks that have only

1    internet customers.  M&I has customers of all types who come

2    and go in branches and live in different places, so that's a

3    different kind of risk.  But they are all in the United

4    States.

5            And then, finally, geographic locations.  If we

6    were on the border with Mexico or if we were in New York

7    City or in south Florida, we are in a high-risk jurisdiction

8    according to the Federal Reserve.  And if we did

9    transactions outside the United States, if our customers

10   did, for example, wires to Asia, Latin America, Europe, it's

11   a whole different ball of wax.  So geography matters.

12   Q.  We'll come back to that.  What does "internal controls"

13   refer to again at a high level?

14   A.  These are the what tools do you need to manage the risks

15   that we just talked about.  What are the things you need to

16   build; so the policies, the systems, and the other controls,

17   things like training.  What are the things you need in order

18   to capture and manage this risk.

19   Q.  And just third, what is "risk-based BSA compliance

20   program," what does that cover?

21   A.  So if you have done it right, then your program will

22   reflect the proper kind of weight and design of the internal

23   controls, meaning especially the software, things like

24   Searchspace, the audit process, the qualifications, the

25   quality of the compliance officer who runs the program, and

1    then finally the training for the employees.

2    Q.  I think you testified earlier, Mr. Grice, that as part

3    of your assignment, you've become familiar with M&I's

4    policies and procedures related to its BSA/AML program

5    during the 2002 to 2008 time period?

6    A.  Yes, sir.

7    Q.  And I think you compared the volume of those materials

8    to the binder that's sitting in front of you; is that right?

9    A.  It's a big thing.  It's a big pile.

10   Q.  And you reviewed those policies and procedures as part

11   of your work on this case?

12   A.  I did.  Again, the binder I looked at was just the

13   BSA-related policies and procedures, but I looked at all of

14   them across the 2002 to 2008 time period.

15   Q.  And based on your review of the record, were M&I's

16   BSA/AML policies and procedures consistent with regulatory

17   expectations and industry practice at the time?

18   A.  Yes, sir, and they were fine-tuned throughout the

19   period, so.

20   Q.  What do you mean by that?

21   A.  Well, each year the fed comes back and reads them again

22   and says, We suggest you add this or take out that.  So you

23   see the generations of the policies and procedures as the

24   fed comes and goes.

25   Q.  Let's talk -- you talked about a risk assessment.  Let's

1    just talk about that a little bit more.  Did M&I perform a

2    risk assessment?

3    A.  It did.  I think it was -- most of the first was in

4    2004, but that was my recollection.  Then it gets updated

5    throughout the period.

6    Q.  And I think you covered this.  Was there regulatory

7    guidance at the time regarding what kinds of customers

8    should be considered high risk?

9    A.  Yes.  It was a very specific instruction, recipe of

10   methodology for how to do this.

11   Q.  And did you prepare a slide to explain that?

12   A.  Yes, sir.

13            MR. SCHAPER:  Mr. Herzka, if we could go to slide

14   7 of DD-60, please.

15   BY MR. SCHAPER:

16   Q.  There are three categories here, right?

17   A.  Yes, sir, it's the same -- believe it or not, it's the

18   exact same three categories that we saw on the last slide of

19   the products and services, the customers, and the

20   geographies.

21   Q.  So if one of the higher-risk categories may apply to a

22   customer, does that customer automatically get considered

23   high risk?

24   A.  No.  We want to take that into consideration.  So you're

25   doing -- the rest of you may be totally not risky, but

1   you're engaged in a product or a service that has more risk

2   in it.  So it contributes to your overall risk profile, but

3   that's not your final grade.

4   Q.  And did M&I classify PCI as a high-risk account?

5   A.  No.

6   Q.  So let's look at some of the specifics.  What did the

7   regulatory guidance consider to be high-risk products and

8   services?

9   A.  So these are examples taken from the book on the right.

10  These are examples of high-risk products.  So electronic

11  funds payment services, which are -- this includes wires,

12  ACH, a lot of things we do routinely today, but the reason

13  they're considered higher risk is they're fast.  So it's a

14  fast way to move money as opposed to wheelbarrows of cash or

15  a check.

16          Trust and asset management, which is managing

17  money on behalf of others.  So if I'm a trustee or an asset

18  management business, if I'm your stockbroker, I am managing

19  your money and therefore there's some risk that I can engage

20  in fraud.

21          And then, finally, monetary instruments.

22  Cashier's checks or bank checks have always been an

23  attractive form for money launderers.  If I put the $3,000

24  on the check, that $3,000 is on the check.  If I lose the

25  paper, it's lost.

1    Q.  Mr. Grice, were there particular types of electronic

2    funds payments that were considered high risk at the time?

3    A.  The overall family, but wires are enumerated.  They are

4    listed as a kind of high-risk activity.

5    Q.  And was there a particular kind of wire transfer that in

6    the regulatory landscape were considered high risk?

7    A.  Yeah, the focus remains today, but it certainly was true

8    during the period, on international wires, crossing borders.

9    And the logic for this, if I can, is --

10   Q.  Sure.

11   A.  -- with the PATRIOT Act, there, for the first time,

12   became a kind of bias where our government really wants wire

13   transfers to have U.S.-regulated banks on both ends of the

14   wire transfer.

15          So a wire transfer is I go to my bank to send

16   money to you at your bank.  The two banks have both vetted

17   us.  So my bank knows their customer, so there's KYC by my

18   bank, and your bank does KYC on your bank, so, therefore,

19   this high-speed transmission is less risky because if the

20   banks are doing their job, in other words, if the fed is

21   doing its job, it's supervising our respective banks, the

22   risk is mitigated.  So that's why international wires are

23   frightening because you don't know who is on the other end.

24   Q.  Was there some consideration in terms of whether a

25   customer was a regular as opposed to an irregular sender of

1    wire transfers?

2    A.  Again, in the wire business, it's regular versus one-off

3    or one time.  So, yeah, the irregular, the occasional wire

4    remitter is seen as a different -- a higher risk, a

5    different risk, a less stable risk than the regular

6    remitter, the regular wire transfer customer.

7    Q.  And was PCI a regular wire transfer customer?

8    A.  It was a regular wire transfer customer, and what that

9    means in the United States is to be one of these regular

10   wire customers, you have to sign a Wire Transfer Agreement

11   with your respective bank.

12   Q.  Did PCI have one of those?

13   A.  They did.  And then as part of that -- part of that

14   vetting process, there are specific instructions and a PIN

15   number.  And I think Ms. Coleman testified about the fact

16   that she had access to the PIN number.  So then she could

17   call the bank and say -- I forget what the code was, she

18   could just give the code to the banker on the other end of

19   the telephone and they knew with certainty or reasonable

20   certainty they were talking to the properly authorized

21   person who could instruct the wire transfer.

22   Q.  So there's a reference to high-risk customers and

23   entities.  What kinds of customers were considered high risk

24   in terms of the regulatory guidance at the time?

25   A.  So not surprisingly, foreign banks, non-U.S. banks

1    because, again, we jut don't know the quality of their

2    regulations and KYC requirements.

3             Foreign political figures, and the jargon is PEPs,

4    politically exposed persons; you know, foreign diplomats,

5    heads of state, their family members.

6             NGOs, nongovernmental organizations, charities,

7    and, in particular, charities that are doing -- that are

8    active in places that were part of the war on terror.

9    During this time frame, religious schools in Pakistan, for

10   example, were considered extremely high risk and banks were

11   on the lookout for this.

12            And then, finally, this whole category of nonbank

13   financial institutions.  Ms. Maltsch talked about money

14   service businesses yesterday.  These are these storefront

15   operations, you walk in, I want to send money to my sister

16   someplace.  I'm not a customer of anybody.  I'm just walking

17   in.  I hand cash over to the attendant, and money goes

18   through Western Union or MoneyGram.  That's doing a banking

19   role but without any KYC, and so that's been a high priority

20   since 9/11.

21   Q.  And there's a reference also on the slide to other

22   "cash-intensive businesses."  What does that refer to?

23   A.  Again, anybody who -- Dollar Stores, anybody who does

24   primarily cash transactions, garage sales, farmers markets,

25   these things we take for granted.  Certainly prepandemic,

1    things we just take for granted or use cash.  Anybody taking

2    cash was seen as more risk, all things being equal, than

3    somebody who took credit cards or checks.

4    Q.  Just to be clear, was PCI any these high-risk customer

5    types?

6    A.  No, sir.

7    Q.  And what did the regulatory guidance consider to be

8    high-risk geographic locations?

9    A.  So this has become kind of an art form because the

10   government keeps changing its mind on where this geographic

11   risk is.

12   Q.  Let's focus on the 2002 to 2008 time period.

13   A.  So in 2002, on the right-hand side, bottom right of that

14   slide, it talks about domestic locations that were

15   high-intensity drug trafficking areas or high-intensity

16   financial crime areas; you know, New York City; Miami,

17   Florida.  I live in Texas now.  So along the border, we're

18   considered dangerous domestic jurisdictions for potential

19   financial crime.

20   Q.  Has Minnesota been on that list or was it during 2002 to

21   2008?

22   A.  It has never been on the list.  At least as of this

23   morning, I looked, it is still not on that list.  Chicago

24   is, interestingly, but not Minnesota.

25   Q.  What about the -- just briefly what about the

Grice - Direct

```
1    international locations that are high-risk geographies?

2    A.   This is an ever-changing list that reflects really the

3    success of the war on terror.  So countries get added and

4    deleted from this list; Switzerland, at one point, Israel.

5    Russia, they were on the list.  They came off.  Russia is

6    back on it again.  China has been off it and on it twice, so

7    it depends on the politics.  And the president is ultimately

8    the arbiter for what that list looks like.

9    Q.   And to your knowledge, was PCI involved with any

10   high-risk geographic locations?

11   A.   No, I saw no reference to international transactions.

12   Q.   Mr. Grice, do you recall Mr. Ghiglieri's testimony that

13   M&I should have been placed -- should have placed PCI on a

14   high-risk customer list?

15   A.   I do recall that, yeah.

16   Q.   And do you agree with that?

17   A.   Not at all.

18   Q.   Why is that?

19   A.   Why do I not agree?

20   Q.   Yeah.

21   A.   I think it's inconsistent with everything we just talked

22   about.  It's inconsistent with the guidance from the Federal

23   Reserve.  It's also inconsistent with industry custom and

24   practice at the time.

25   Q.   Let's switch topics, Mr. Grice.  You testified a moment
```

1    ago that you concluded M&I's policies and procedures were

2    appropriate and consistent with regulatory expectations; is

3    that right?

4    A.  That's correct.

5    Q.  And that was your own conclusion?

6    A.  Yes, sir.

7    Q.  And was that conclusion informed by your past roles that

8    you've testified about as an interim compliance officer

9    during the 2002 to 2008 time period?

10   A.  Yes, sir, certainly.

11   Q.  Are you aware that Ms. Ghiglieri, plaintiff's expert,

12   reached the opposite conclusion?

13   A.  I am.

14   Q.  Do we have to take your word for it about M&I's policies

15   and procedures, or is there some regulatory agency we can

16   look to that looked at the policies and procedures at the

17   time?

18   A.  I'm comfortable with you taking my word for it, but

19   there happens to also be --

20           MR. ANTHONY:  Your Honor, objection, opinion in

21   violation of the Court's *Daubert* ruling on September 29

22   that -- of this year.  If he is about to give an opinion as

23   to what some agency thought about something, that's been

24   barred.

25           MR. SCHAPER:  I believe that this has been

1   addressed by the Court this morning.  This objection has

2   been overruled.

3                 THE COURT:  Overruled.

4   BY MR. SCHAPER:

5   Q.  I'm sorry, Mr. Grice.  Was there a federal agency that

6   looked at M&I's policies and procedures in the 2002 to 2008

7   time period?

8   A.  Yes, sir.  The Federal Reserve Bank of Chicago came to

9   M&I every year to perform what's called a targeted BSA/AML

10  examination.

11  Q.  And did you prepare a demonstrative about the role that

12  the fed plays in the banking system?

13  A.  Yes, sir.

14                MR. SCHAPER:  If we could please put up slide 8 of

15  DD-60.

16  BY MR. SCHAPER:

17  Q.  So you've talked about the fed.  We've heard about it

18  some during the trial.  But can you just explain what we're

19  talking about when we mention the fed or the Federal

20  Reserve.

21  A.  So I think Jeanne Crain explained this since she's on

22  the board of the Federal Reserve Bank of Minneapolis.  This

23  is a graphic depiction of the way the Federal Reserve is

24  organized.  So I worked early in my career for the Federal

25  Reserve Board, which is where Jerome Powell is the chairman

1    of the board, and this is where monetary policies, interest

2    rates and so forth are established.

3            The member banks, the Federal Reserve banks --

4    there are 12 around the United States -- have responsibility

5    for supervising the performance of all of the banks that

6    they regulate around the United States.  And so M&I Bank

7    during this period was supervised by the Federal Reserve

8    Bank of Chicago.

9    Q.  What form does that supervision take?

10   A.  Annual inspections.  They call it supervisory

11   examinations, but it feels like an inspection.  It's very

12   detailed, and it's done by people in your office talking to

13   your employees and reading all of your documents, et cetera.

14   So it's a very --

15   Q.  When you say "it's done by people in your office," do

16   you mean it's done by people from the fed coming to a bank's

17   office?

18   A.  Yes, sir.  I'm sorry.  I should be specific.  It's

19   Federal Reserve employees who come into the bank and ask any

20   question, open any drawer, interview any employee about

21   anything.  So it's quite a thing to see this unfold.

22   Q.  And do these annual federal -- fed examinations include

23   examinations of banks' BSA/AML compliance?

24   A.  Yes, sir.  So during this period, the practice was for

25   the Federal Reserve to do several kinds of examinations.

1    There's a general safety and soundness examination they

2    perform, looking at loan quality, for example, and

3    profitability.

4         After 9/11, a special examination was born that

5    was targeted just to look at BSA/AML issues, and that's what

6    I'm referring to when I say these annual examinations.  They

7    were focused just on BSA/AML.

8    Q.  Did you prepare a slide to help aid your testimony in

9    describing what the examination process looks like?

10   A.  Yes, sir.

11        MR. SCHAPER:  If we could please put up slide

12   60 -- sorry, DD-60, slide 9.

13   BY MR. SCHAPER:

14   Q.  And the title that you gave this slide, Mr. Grice, was

15   "Continuous Improvement Cycle."  What does that mean?

16   A.  This reflects -- even though the examination happens

17   generally in the summer for M&I during this period, there's

18   activity all year long getting ready for, getting through,

19   and then recovering from the last examination, taking the

20   remedial steps that are always recommended.  Should I go

21   through it quickly?

22   Q.  Yeah, so what happens first?  You have, "Fed submits

23   questions and requests for information."

24   A.  Yeah, so the top of the slide, my contact at the Federal

25   Reserve Bank of Chicago would send me an e-mail saying,

Grice - Direct

1      Charles, we are going to come see you in a month, and here's

2      a questionnaire we want to you complete.  Basically send us

3      everything.  Even if you sent it to us last year, send it to

4      us again.  We want the new version of all your policies,

5      procedures, anything that's different.

6              And then as we work around the clock, the fed

7      examines that and asks more questions.  Then at about --

8      what is that? -- 4:00, the fed performs the on-site

9      examination.  That's the piece you see where the examiner is

10     going up and down the hallway interviewing people.

11             The bottom of the slide, there's a series of

12     closeout meetings.  There's a soft close and then the

13     official close where they tell you how you did on the exam.

14             And then if we go back up the other side, the bank

15     is providing updates.  And then the last step is the fed

16     reviews those updates, gives feedback, and then announces

17     their next examination.  So it really is kind of -- for a

18     bank this size and complexity, it's kind of a nonstop

19     examination cycle.

20     Q.  And in terms of M&I specifically, during this time

21     period did the fed, before an exam started, request

22     information from M&I Bank?

23     A.  Yeah, it's -- it averages about 15 pages.  It's called a

24     PERK letter, the Pre-Examination Response Kit.  So they tell

25     you what they want to see before they get there, so they use

1   their time efficiently when they're in the building.

2   Q.  And in preparing your report, did you see documents that

3   were those requests from the fed that M&I then responded to?

4   A.  Yes, sir.

5   Q.  Okay.

6           MR. SCHAPER:  If we could take a look at an

7   example, and, Mr. Herzka, please do not put it up on the

8   screen.  And we can take that slide down for the moment.

9   BY MR. SCHAPER:

10  Q.  Can you please turn in your binder, Mr. Grice, to what's

11  been marked for identification as DX-50529.

12  A.  Yes, sir.

13  Q.  Do you recognize this document?

14  A.  I do.

15  Q.  And what is it?

16  A.  This is the June 2007, it's called a chronological log.

17  This is a document I reviewed, which is -- I think this is

18  Peter Janczak's notes on what has been requested and what we

19  provided during -- what we -- what the bank provided the fed

20  during the examination.

21  Q.  And, again, did you rely on this document in forming

22  your expert opinions in this case?

23  A.  I did.  I find this really interesting.

24          MR. SCHAPER:  Your Honor, defendant offers

25  DX-50529 into evidence.

1          MR. ANTHONY:  Same objection.

2          THE COURT:  Overruled.

3          MR. SCHAPER:  If we could publish that, please,

4    Mr. Herzka.

5    BY MR. SCHAPER:

6    Q.  So if we could just focus in on the top there so the

7    jury can see it, so I think you said, Mr. Grice, that this

8    is M&I Bank, Federal Reserve Bank of Chicago, and it

9    references the BSA/AML examination of June 2007.  Do you see

10   that?

11   A.  That's correct.

12   Q.  And I think you testified that this is a chronological

13   log of activity as part of that exam process?

14   A.  Yes.  And it's in reverse order.  So the last thing is

15   first, so --

16   Q.  Okay.  If we --

17   A.  -- July 3rd.

18   Q.  If we look at page 3 -- I'm sorry.  I didn't mean to cut

19   you off, Mr. Grice.  If we look at page 3 at the top portion

20   there, there's a reference to "Off-Site Materials."  What

21   are we looking at here, Mr. Grice?

22   A.  This is the -- this pre-exam kit.  Send us everything

23   about you before we come to visit you so we can be ready to

24   go and hit the ground running.  It's the bank's opportunity

25   to describe all the changes that are in place so that the

1    fed will understand and be fluent in M&I when they arrive.

2              The left-hand side is what has been requested.

3    The middle is who is in charge of gathering that, either

4    bank employees, Kelley -- I am presuming Kelley Maltsch is

5    in charge of this.  And then on the right-hand side is the

6    status, so is it open or has it been resolved.  These are

7    completed items.

8    Q.  Mr. Grice, are there consequences for a bank or to a

9    bank for not responding to these kind of information

10   requests by the fed?

11   A.  There are -- yes, there are formal and informal

12   consequences.  You don't want to make the fed unhappy ever,

13   so you want to respond completely to any requests, in my

14   experience, from the Federal Reserve.  So you take these

15   requests very seriously.

16   Q.  And we'll look at a few examples, but just in your

17   review of the record, did you see any indication that M&I

18   failed to respond in a complete way to requests for

19   information by the fed?

20   A.  No.  In fact, I found the opposite, which is we

21   appreciate your complete, kindly, courteous, et cetera,

22   response.  So the fed is constantly saying, Thank you for

23   all this stuff.  We are asking for a lot of stuff and you

24   sent it to us.

25   Q.  Let's look at a few items on this page.

1              MR. SCHAPER:  If you could just look at Items 2

2      and 3, Mr. Herzka.

3      BY MR. SCHAPER:

4      Q.  And, Mr. Grice, if you would just explain what

5      information is the fed requesting from M&I Bank in Items 2

6      and 3?

7      A.  So this would be -- I think of this as kind of a

8      top-down request.  They want to see the policy, the

9      governance documents that guide the bank's BSA program.  So

10     we heard testimony from several people, including

11     Ms. Ghiglieri, about this.  We want to see a copy of the

12     bank's written BSA compliance program, so the formal adopted

13     package that governs everything about BSA.

14              Then Item 3 is all of the many, many parts of the

15     procedures related to how we're going to satisfy those

16     expectations.  So this is the more granular kind of like an

17     instruction manual.  This is how we do it.  And each year

18     that gets provided to the feds.  So they are seeing all of

19     the refinements in the program.

20     Q.  And are these policies and procedures that we're talking

21     about, are these the policies and procedures that you

22     reviewed as part of your assignment on this case?

23     A.  Yes, sir.

24     Q.  And are these the policies and procedures that you

25     concluded were appropriate given the regulatory guidance and

1    custom in the industry?

2    A.  Yes, sir, precisely.

3    Q.  So can we please look at the next page, page 4.  And in

4    the middle of this page, there's a header that's titled

5    "Suspicious Activity Monitoring."  Do you see that,

6    Mr. Grice?

7    A.  I do, yes, sir.

8    Q.  And what is Item Number 5 that the fed is requesting

9    from M&I?

10   A.  Item Number 5 is the list of customers and accounts

11   designated as high risk for money laundering and then

12   including a list of all MSBs, these money service

13   businesses, these storefronts.  So they want to see every

14   person or entity that the bank has identified as high risk

15   at the time.  So each year you see this same question, and,

16   again, the bank responds with their -- each iteration of

17   that list as it changes over time.

18   Q.  So there's some focus by the fed about what banks are

19   doing in terms of identifying high-risk customers?

20   A.  Yes, sir.

21         MR. SCHAPER:  Can we look now, Mr. Herzka, at page

22   8 of this document.

23   BY MR. SCHAPER:

24   Q.  And there's another set of issues called "Suspicious

25   Activity Reporting."  Do you see that, Mr. Grice?

1    A.  I'm trying to.  There we go.  That helps.  Yes, sir.

2    Q.  Okay.  And Item 29 is "A list of and access to

3    Suspicious Activity Reports or SARs filed with FinCEN since

4    the previous targeted BSA examination in June 2006."

5            Mr. Grice, based on your expertise, what is the

6    fed asking for here?

7    A.  We want a copy -- we're going to judge -- we, the fed,

8    is going to judge the bank's judgment on suspicious and not

9    suspicious.  And this is an important part of that.  They

10   look at all of the SARs that the bank has determined

11   during -- since the last exam.  This is June 2007.  This is

12   asking since June 2006, send us all of the SAR information

13   that you've collected, and we're going to read those

14   carefully -- we, the fed, are going to read those really

15   carefully and see if we agree with your determinations.

16   Q.  You mentioned that it would cover both SARs that were

17   filed, but also some instances when a SAR was not filed.

18   What are you referring to in terms of instances where a SAR

19   was not filed as it relates to this document request?

20           MR. ANTHONY:  Objection, lacks foundation.

21           THE COURT:  Overruled.

22           THE WITNESS:  So, I mean, Item 30 is we want to

23   see everything about the -- I mean, we've already asked for

24   the procedures.  Now we want to see all of the collected

25   files, including the SARs and the not SARs.  This was a new

1    development during this time period where the fast way to

2    examine a bank was not to read the SARs, but to read the not

3    SARs.  We want to see if we agree with the bank's decision

4    to not file a SAR.  And if we, the fed, are comfortable with

5    your decision not to report it, that's a more efficient way

6    maybe than reading about all of your suspicious customers.

7              So this is reflected -- left-hand side is the

8    request.  The column in the middle under "Bernita," this is

9    Bernita Hile, and she's been tasked with gathering this

10   information and making sure it gets sent off to the Federal

11   Reserve.

12   BY MR. SCHAPER:

13   Q.  And the right-hand column says, "Complete"?

14   A.  Yes.

15   Q.  Let's look further down this page, Mr. Grice, to Item

16   33.  And so this says, "A list of all wire transfers for the

17   month of January and February 2007."  Do you see that?

18   A.  I do.

19   Q.  Now, is your understanding, based on your work in this

20   case, is that a list of all wire transfers for all customers

21   of the bank during that period?

22   A.  Yeah, that's what item --

23             MR. ANTHONY:  Objection, inconsistent with motion

24   in limine.

25             THE COURT:  Overruled.

1              THE WITNESS:  I'm sorry.  Can you repeat the

2     question, please?

3     BY MR. SCHAPER:

4     Q.  Do you understand this to be a list of all wire

5     transfers for all customers for these months in 2007?

6     A.  Yeah, that's the request.  And then you see in the

7     middle column the reference to Jeff.  Jeff is the contact

8     for the bank at the Federal Reserve, and whoever is writing

9     this said, "Jeff agreed for us to use first week of January

10    only due to large volume."  So, I mean, I read this as there

11    was a conversation about:  Are you sure you want two months'

12    worth because this is -- do you want to see this many

13    thousands of wires?  They worked out a compromise.  We are

14    going to send you a week in January, and then we will give

15    you other forms of this data onsite later.

16    Q.  Is that a week in January for all wire transfers

17    throughout the bank?

18    A.  Yes.

19    Q.  And is this process that the fed engages in, is this

20    called transaction testing?

21    A.  Yes, sir.

22    Q.  What does that refer to?

23    A.  This is -- the fed teaches the banks that we're going to

24    compare policies and procedures to the results of interviews

25    and compare that to what we actually see in the bank.  So

1    it's a compare and contrast.  You told us your system was

2    this, your people said this, and now we want to see if it

3    plays out in the transactions.  So we're going to look at,

4    in this case, give us all your wires, and if we disagree

5    with -- if we find something irregular or suspicious, you'll

6    have to answer for it.

7              MR. ANTHONY:  Objection, move to strike, violation

8    of pages 17 and 18 of the Court's *Daubert* ruling.

9              THE COURT:  Overruled.

10   BY MR. SCHAPER:

11   Q.  The last item I want to cover on this document,

12   Mr. Grice, is on the next page, page 9.  If we look at Item

13   42, do you see the reference to "funds transfers"?

14   A.  Yes, sir.

15   Q.  And here the fed is asking for "Access to records of

16   funds transfers (if possible, in Excel format) including

17   incoming, intermediary, and outgoing transfers since the

18   previous BSA examination in June 2006."  What does that

19   refer to?

20   A.  This is a broader version of the same thing.  So they're

21   asking for the whole family of ways that banks can exchange

22   money with each other.

23              So there are domestic wires and there are

24   international wires.  And international wires are on a

25   different platform called SWIFT, which speaks its own kind

```
1    of specialized language.  And in international wires, there

2    are usually three banks involved instead of two in a

3    domestic transaction.

4            And so this is a request by the fed, basically

5    give us all of your funds transfers records and put it in

6    Excel so we can sort it, because when you sort it, you can

7    find some things.  So the fed is trying to get a leg up on

8    possible fraud or possible irregular behavior inside the

9    funds transfer area.

10   Q.  So, Mr. Grice, the document that we've been looking at

11   was for the 2007 fed exam of M&I; is that right?

12   A.  Yes, sir.

13   Q.  For other years where there were fed exams, were there

14   similarly detailed requests for information sent to the bank

15   in advance of the exam?

16   A.  Yes, sir.  They vary a little bit, maybe 20 percent

17   changes from time to time, but they all have this general

18   format.

19   Q.  And were these kind of --

20           MR. SCHAPER:  We can take that down.  Thank you,

21   Mr. Herzka.

22   BY MR. SCHAPER:

23   Q.  Were these kind of document requests the only way that

24   fed examiners could gather information from M&I?

25   A.  No.  They could -- they don't have to pick up the phone.
```

1    They can just walk in.  It's a very close relationship

2    between the fed and the bank, so --

3    Q.  Can they talk to bank employees?

4    A.  Absolutely.  They have unrestricted access to bank

5    employees.

6    Q.  Speaking about these fed exams, Mr. Grice, based on your

7    experience, was the fed expecting perfection from the banks

8    that they were examining?

9              MR. ANTHONY:  Objection, calls for speculation.

10             THE COURT:  Overruled.

11             THE WITNESS:  No.  I think that slide that

12   looked -- was labeled "Continuous Improvement" captures what

13   the expectation was.  We're going to come in and look at

14   you.  We're going to make recommendations.  I've never seen

15   a bank that had no recommendations.  There are always

16   findings.  It's the nature -- I think it's the nature of

17   examinations generally that we want you to be a better

18   student each time we see you, and also, as we've discussed,

19   the expectations of the fed changed during this period as

20   the focus went from old-fashioned money laundering for drugs

21   to terror finance.  As the emphasis changed, they kept

22   tweaking what they wanted.  So everybody got constant

23   suggestions, and all the banks I've ever worked with or

24   helped in their examination process, there's always a to-do

25   list.  It ranges from you must do it to you should do it,

1    but there are always recommendations.

2    BY MR. SCHAPER:

3    Q.  And when during the relevant time did the fed conduct

4    BSA/AML examinations, again between 2002 and 2008?

5    A.  I'm sorry.  When --

6    Q.  Yeah.

7    A.  -- for M&I?

8    Q.  Yeah.

9    A.  Generally in the summers, but every year.  It was an

10   annual ritual.

11   Q.  If we could look at, Mr. Grice, in your binder an

12   exhibit marked for identification as DX-50073.

13   A.  Yes, sir.  I have it.  Yes.

14   Q.  Do you recognize this document, Mr. Grice?

15   A.  I do.  This is -- it's labeled "Follow-Up on Examiner

16   Strongly Urged Recommendations" dated November 25, 2002.

17   Q.  Did you rely on this document in forming your expert

18   opinions in this case?

19   A.  I did, yes, sir.

20          MR. SCHAPER:  Your Honor, defendant offers

21   DX-50073 into evidence.

22          MR. ANTHONY:  Objection, Your Honor, for the same

23   reasons you kept it out previously, foundation, relevance.

24          MR. SCHAPER:  I think this was already ruled on.

25          THE COURT:  Overruled.

1              MR. SCHAPER:  If we could put that up, Mr. Herzka,

2        and focus in on the top portion of the document.

3        BY MR. SCHAPER:

4        Q.  And, again, I think you said this, Mr. Grice, this is

5        dated November 25, 2002?

6        A.  Yes, sir.

7        Q.  And it says, the first sentence -- well, can you read

8        the first sentence for us?

9        A.  "The BSA/AML compliance program is considered

10       satisfactory; however, opportunities for improving the

11       overall program were noted."

12       Q.  Any surprise to you that even with a satisfactory

13       result, there were opportunities for improvement noted?

14       A.  No, sir.  This is normal and customary.

15       Q.  Did the fed conduct a review of the M&I BSA/AML program

16       the following year, in 2003?

17       A.  Yes, sir.

18       Q.  And what was the rating of M&I's program after that

19       examination?

20       A.  You're asking about the 2003 exam?

21       Q.  Yes.

22       A.  It was rated inadequate was the one-word conclusion.

23       Q.  Okay.  So do you have a demonstrative that just kind of

24       starts to catalog what the ratings were by year?

25       A.  Yes, sir.

1    Q.  This is slide 10 of DD-60.

2              MR. SCHAPER:  Don't put it up, please, yet,

3    Mr. Herzka.  I believe Your Honor has already ruled on any

4    objections, so.

5              MR. ANTHONY:  I'm sorry.  Which slide?

6              MR. SCHAPER:  Slide 10, Mr. Anthony.

7              MR. ANTHONY:  I still need, for the record

8    purposes, Your Honor, to maintain our objection so we'll

9    object.

10             THE COURT:  Understood.  The objection is

11   overruled.

12             MR. SCHAPER:  Thank you, Your Honor.

13             Now if you would put that up.

14   BY MR. SCHAPER:

15   Q.  So, Mr. Grice, we have, just as far as we've gotten so

16   far, we've done 2002.  That was a satisfactory rating?

17   A.  Yes, sir.

18   Q.  And you just testified 2003 was an inadequate rating.

19   There's the words "Board Resolution" next to that.  What

20   does that refer to?

21   A.  So this is the -- with an inadequate conclusion or an

22   inadequate rating, the fed required the bank to take some

23   corrective measures.  And the fed has available to them

24   several different tools they can use, ranging from mild to

25   severe.  The mildest of those corrective actions is a board

1    resolution where the fed tells the board of directors of M&I

2    Bank, we want you to adopt a program, it's like a recovery

3    program, we want you to go into this resolution and resolve

4    as a corporation that you are going to take some steps to

5    fix whatever is required to be fixed.  That was -- that's

6    what occurred here.

7    Q.  Just to be clear, did the fed take any more severe

8    actions against the bank at this time?

9    A.  No.  The spectrum for what they can do is very long and

10   precise, but this is the mildest of the sanctions.

11   Q.  And in terms of the substance of the fed's exam that led

12   to this inadequate result, what specifically were the

13   examination findings focused on?

14   A.  They dealt with training, with audit, with some risk

15   rating issues tied to cash customers.

16   Q.  What do you understand that to refer to?

17   A.  They were concerned that the bank didn't have enough

18   data to capture all of the possible transactions that might

19   involve cash inside the bank.  So at the time in 2003, the

20   concern was customers who would come into a branch with cash

21   and then ask to send out a wire or the reverse.  They would

22   go into a branch and they would receive a wire and then

23   convert it to cash.  So one of the concerns was we want to

24   fix that -- if you think about money laundering as kind of a

25   plumbing problem, we want to make sure the bank's systems

1    are capturing that possible combination of transactions.

2    Q.  Did the PCI account have any of the traits of the kind

3    of wire into cash or cash into wire problem that you are

4    describing?

5    A.  No.  I should add this was about the most common thing

6    that I recall from this period, where, again, if you think

7    about the complexity of a bank, people just hadn't figured

8    out how to get reports that look at all parts of the bank

9    simultaneously; so where you cross products, you know, going

10   from a wire to cash or cash to wire.

11   Q.  When you say it was the most common thing, what are you

12   talking about?

13   A.  The technology of banking keeps changing.  And so in the

14   early 2000s, people started using wires more commonly and

15   then things like ACH.  A lot of us get paid now

16   electronically.  That was an example of a product that's

17   electronic, but the software didn't keep up for most banks

18   with that new technology.

19          And so the remedial action for everybody was you

20   need to make sure you fix this -- I'm calling it a plumbing

21   problem, but it's money moving through a bank to a customer,

22   and we want to make sure we capture that so we can report it

23   to the federal authorities.

24   Q.  When you say a problem for, I think you said the word

25   "everybody," but are you referring, based on your

1    experience, that this was a deficiency that was noted at the

2    time for other banks?

3    A.  This was extremely common.  Again, we're two years after

4    the PATRIOT Act, so the standards are rising very

5    aggressively.  And this was -- it functions like a speed

6    trap.  It was a new question that most banks weren't

7    prepared for.

8    Q.  Was there any mention of Ponzi schemes in the fed exam

9    2003 letter?

10   A.  No, sir.

11   Q.  Did you also -- did you look at what M&I did to address

12   the concerns that the fed expressed in its 2003 letter?

13   A.  I did.  I looked at the extensive back and forth between

14   the bank and the Federal Reserve.

15   Q.  And at a high level, before we get into any details, how

16   would you describe the bank's response to this 2003 exam

17   finding?

18   A.  Robust, energetic.  It was very aggressive in a good

19   way.  It was the bank completely satisfying, by my read,

20   everything that was part of that 2003 examination.  So if

21   there was a recommendation or a criticism, it was addressed

22   and it was addressed quickly.

23   Q.  Did you prepare a slide that just goes to some of the

24   specifics of the bank's response?

25   A.  I did, yes, sir.

Grice - Direct

```
1              MR. SCHAPER:  Mr. Herzka, if you would, please,
2      put up slide 11 of DD-60.
3      BY MR. SCHAPER:
4      Q.  So let's go through these one at a time.  What does the
5      "action plan" refer to, and what is M&I's response -- what
6      was M&I's response?
7      A.  So, again, in response to that 2003 exam, the fed was --
8      I'm sorry -- the fed told the bank, You need to first put a
9      plan in place to fix all the things that we're recommending,
10     kind of like a house inspection, we want to make sure you
11     make a list of all the things that need to be fixed and then
12     you have a program in order to get it resolved.  And so a
13     lot of the focus was on policies and procedures and this
14     cash for wire, wire for cash thing I discussed earlier.
15     Q.  Then there's a reference to an independent consultant.
16     Did the fed want M&I Bank to hire an independent consultant?
17     A.  Yes, sir.  They were told to hire an independent
18     consultant that the fed approved.  The fed had to approve
19     the hiring of the independent consultant, and then the
20     consultant was to help build out all of the program changes
21     that were identified by the Federal Reserve.
22     Q.  Do you know who the individual was that was hired?
23     A.  This is bittersweet.  So, yeah, she's a competitor of
24     mine.  She was hired by M&I to fix all the things that
25     needed to get fixed.  Carole Beaumier was her name -- or is
```

Grice - Direct

1    her name.

2    Q.  Is she a highly capable -- I realize she's a competitor

3    of yours, but is she a highly capable person in this area?

4    A.  She's wonderful.  I have no quarrel with her.  She's

5    very good.

6    Q.  What does "enhanced customer due diligence program"

7    refer to, and what did the bank do?

8    A.  So this was -- again, keeping in mind this is 2003, so

9    the PATRIOT Act has come online, we are now trying to

10   identify high-risk or higher-risk customers.  And that topic

11   or question keeps getting more and more complicated as time

12   goes by.

13          So in 2003, we're changing -- the bank was told to

14   change their account opening procedures to capture more

15   information about anticipated activity of that customer in

16   the future.  So what kind of activity you think your client

17   will engage in in the future, and that first appears in '03.

18   Q.  I think you testified earlier that the bank actually did

19   a risk assessment in 2004?

20   A.  That's right.

21   Q.  And just then briefly, what does "transaction review"

22   refer to?

23   A.  So this was sort of the proof in the pudding.  If

24   you've -- what the fed wants is proof that you've done all

25   the things they want you to do, and the proof they want is

1    in the form of results of a look-back.  So a team of people,

2    either consultants or bankers, have to go and pick out

3    transactions historically and test them and collect those

4    results, use them to fix whatever they've identified, and

5    reserve that information also for the Federal Reserve.  So

6    it's like a self test.

7    Q.  Did M&I do any upgrades to its automated monitoring

8    systems for its bank accounts?

9    A.  It did.  It modified two of the large systems that are

10   automatically running in the background around the bank at

11   the time.

12          One was called, I think, the CT31-500 program,

13   which is a -- it's an M&I software package that looks for

14   this wire to cash or cash to wire relationship.

15          And the other is called Rule 2, which was a

16   specific test that -- I mean, it was a specific report that

17   was generated that looked at customers, individuals and

18   companies, that were using large amounts of cash, not above

19   $10,000, but potentially interesting amounts of cash.  I

20   think it took it down to $3,000.  So the bank is trying to

21   broaden the transactions it's looking at to increase the

22   number of potential hits.

23   Q.  Did M&I keep the fed posted on its progress and the

24   actions it was taking as part of this response?

25   A.  Yeah.  That's what I think contributed to the success,

Grice - Direct

1    was they were constantly updating the fed on what they were

2    finding from all of these changes, including the transaction

3    review.

4    Q.  And when you say "contributed to the success," did the

5    fed then conduct another examination of M&I the following

6    year, 2004?

7    A.  That's right.  So in December 2006 -- I'm sorry,

8    December 2003, the inadequate examination ends; and in June

9    or July of 2007, the next annual exam starts.  So there is a

10   very short period of time between when they close out the

11   2003 exam and when they start the 2004 exam.

12   Q.  What was the result of the 2004 exam?

13   A.  It was satisfactory.

14   Q.  Was it -- do you recall was satisfactory the word used

15   or was it adequate?

16   A.  I'm sorry.  It was adequate.  That's another one of the

17   changes is that the fed changed the word they used to

18   describe this effectively pass/fail test, but so it was

19   adequate.

20   Q.  And did you prepare a slide that talks about the fed

21   exam results for the period of 2004 to 2008?

22   A.  Yes, sir, I have a summary.

23           MR. SCHAPER:  Mr. Herzka, if you could please put

24   up DD-60, slide 12, just for the year 2004.

25   BY MR. SCHAPER:

1   Q.  Did the fed conduct a review of M&I's BSA/AML program in

2   2005?

3   A.  They did, yes, sir.

4   Q.  And what was the result of that review?

5   A.  It was also called adequate.

6   Q.  Mr. Grice, if you could please look at a document that's

7   already in evidence at DX-50356.

8           MR. SCHAPER:  If you would please put that up,

9   Mr. Herzka.

10  A.  Yes, sir.

11  Q.  Is this the fed exam letter from the 2005 exam of M&I

12  Bank's BSA/AML program?

13  A.  It is, yes, sir.

14  Q.  And if you look at the second paragraph on this page,

15  just very briefly could you just describe, what is the fed

16  doing in this exam?

17  A.  The paragraph that begins with "the scope"?

18  Q.  Yeah.

19          MR. SCHAPER:  And if you could also include the

20  bullets below that, Mr. Herzka.

21  A.  Yeah, this is the -- kind of the boilerplate language.

22  They tell you what they are going -- actually, they tell you

23  before the exam starts, and here they are telling you after

24  the exam ended what they looked at.  So, again, the system

25  of internal controls, testing, the individual responsible

Grice - Direct

1   for compliance, and training.  So these are the same

2   elements that we saw in the examination manual an hour ago.

3   Q.  And if you look just below that, the next paragraph,

4   there's a reference to transaction testing having been

5   performed.  Do you see that?

6   A.  I do.

7   Q.  And is that what you testified to a bit ago in terms of

8   looking at actual transactions within the bank's files?

9   A.  Yes, sir.

10  Q.  And if you turn to the next page, Mr. Grice, just to

11  confirm, in this middle paragraph, is this where the fed

12  states its overall rating that the bank's program was

13  adequate?

14  A.  Yeah, I think that's in bold.  I can't tell with my

15  eyes, but the program is adequate, the bank's AML program is

16  adequate.

17  Q.  And then there's also a reference here at the bottom

18  about rescinding a board resolution.  What does that refer

19  to?

20  A.  I think this is in bold, but, again, it's hard to tell.

21  It's an important conclusion that the bank has been

22  successful enough in fixing things that we think it's safe

23  now for the bank to eliminate this board resolution, they

24  can end it.

25  Q.  So is this board resolution, this is a reference to what

1    you referred to as the least severe sanction that the bank

2    could get in 2003?

3    A.  That's correct.

4    Q.  And then in 2005, that is lifted by the fed, correct?

5    A.  And, again, in my opinion, this is significant.  I know

6    what it's like to get these things lifted.  This is a very

7    successful effort to address all the concerns made by the

8    fed, and, as a consequence, the fed agrees and the board

9    resolution goes away.

10   Q.  And if we go back to slide 12 of DD-60, did the bank --

11   did M&I Bank get evaluated again in 2006 and 2007?

12   A.  They did, yes, sir.

13   Q.  And do you recall what the conclusions that the fed made

14   were?

15   A.  The bank remained adequate in both years.

16   Q.  And adequate or was satisfactory also a word that was

17   used by the bank--

18   A.  I'm sorry.  Yes, satisfactory.  Again, they're

19   interchangeable in my mind, but satisfactory is the

20   conclusion for both.

21   Q.  In these years when the bank was getting either adequate

22   or satisfactory conclusions by the fed, were there still

23   actions that the fed expected the bank to take or improve

24   on?

25   A.  Always.  Again, in my experience, always.  I've never

1      seen a bank that did not have recommendations as part of

2      this exam process.

3      Q.  Did the fed conduct an exam of M&I in 2008, the year

4      that the Petters Ponzi scheme became public?

5      A.  They did.  I think they were there in July of 2008, and

6      the scheme was unveiled or revealed in September 2008.

7      Q.  If we could look at an exhibit that's already in

8      evidence, it's DX-50710, and, Mr. Grice, if you would please

9      turn to that in your binder.  Do you see this is an August

10     18th, 2008, letter from the Federal Reserve Bank of Chicago

11     to M&I?

12     A.  Yes, sir.

13     Q.  And is this a document that you reviewed in connection

14     with your report?

15     A.  Yeah, this is the report of the examination from that

16     2008 exam.

17     Q.  And so this is August 18th, 2008.  When did the Ponzi

18     scheme that Petters perpetrated get publicly revealed?

19     A.  Late September, so the following month.

20     Q.  And if you look at the second page here --

21              MR. ANTHONY:  Same objections, Your Honor.

22              THE COURT:  Overruled.

23     BY MR. SCHAPER:

24     Q.  If you look at the second page here, first of all, if we

25     look at the first full paragraph on the top that starts "In

```
 1    addition," do you see the reference to "Transaction testing
 2    was performed to assess the effectiveness of internal
 3    controls and to determine the accuracy and timeliness of the
 4    identification, monitoring, and reporting of suspicious
 5    activity"?
 6    A.  I do, yes, sir.
 7    Q.  Is that the same kind of transaction testing you
 8    testified about earlier in terms of a range of bank customer
 9    transactions?
10    A.  Yes, sir.
11    Q.  And if you look at the "Overall Assessment" below
12    that --
13               MR. ANTHONY:  Your Honor, we're going to assert --
14    re-assert our objection.  This exhibit was excluded a few
15    days ago in connection with another witness's testimony, and
16    we think it remains objectionable for those reasons then and
17    they are now.
18               MR. SCHAPER:  This came in through --
19               MR. ANTHONY:  Excuse me.  It violates your Daubert
20    ruling as well.
21               MR. SCHAPER:  This exhibit came in with
22    Ms. Ghiglieri, Your Honor.
23               THE COURT:  Overruled.
24    BY MR. SCHAPER:
25    Q.  Mr. Grice, if you'd look at the part of the page that
```

1   says, "Overall Assessment."

2          MR. SCHAPER:  Mr. Herzka, if you would blow that

3   up, please.

4   BY MR. SCHAPER:

5   Q.  And so, again, this is a month before the Petters Ponzi

6   scheme broke.  Can you read the first sentence of this

7   overall assessment?

8   A.  "Overall, the Banks have created a satisfactory AML

9   compliance risk management program, which includes

10  compliance with BSA, USA PATRIOT Act and OFAC."

11  Q.  And then the fed continued that "Management has

12  formulated and implemented an effective written program that

13  establishes an adequate system of internal controls, assigns

14  management responsibility for coordinating the program at an

15  appropriate level, provides training to all applicable

16  employees including senior management and the board of

17  directors, and requires an annual independent review of the

18  program."  Do you see that?

19  A.  I do.

20  Q.  Again, in this document and in this exam, Mr. Grice, are

21  there some recommendations for what the bank could do

22  better?

23  A.  Yes, sir.  In this and all of them, there's always a

24  to-do list.

25  Q.  Do you recall Ms. Ghiglieri's testimony --

1              MR. SCHAPER:  We can take that down, Mr. Herzka.

2       BY MR. SCHAPER:

3       Q.  Do you recall Mr. Ghiglieri's testimony that she used

4       the same methodology that she applied when she was a bank

5       examiner to conclude that M&I's BSA/AML program was severely

6       flawed during the relevant period?

7       A.  I recall her saying that, yes, sir.

8       Q.  Is Ms. Ghiglieri's testimony supported by the record in

9       your view?

10      A.  Not in my view, no, sir.

11      Q.  Why not?

12      A.  It's inconsistent with examination guidelines from the

13      fed that were in place during the relevant years.  It's also

14      inconsistent with industry custom and practice.  It's

15      inconsistent with my experience and my direct judgment and

16      opinion about the sufficiency of the policies and procedures

17      and the quality of the program.  I just don't -- I don't

18      know -- I don't recognize her basis for that.

19      Q.  Is the opinion that you're giving consistent with the

20      fed exam results that we just looked at?

21      A.  Yes, sir.

22      Q.  Let's move away from the fed exam results, Mr. Grice.

23              MR. SCHAPER:  Your Honor, I'm going to move to

24      another topic, so I just want to check in about when the

25      Court would like to take a midmorning break?

```
 1                THE COURT:  Yes.  Thank you.  We will take our
 2      midmorning break now.
 3                Members of the Jury, please remember the
 4      instructions you've been given and continue to abide by
 5      them.  We'll plan to resume at 11 -- 10:30.  15 minutes.
 6                LAW CLERK:  All rise.
 7           (Jury excused)
 8                        IN OPEN COURT
 9                      (JURY NOT PRESENT)
10                THE COURT:  We will be back in session at 10:30.
11                MR. ANTHONY:  Your Honor, before you go, there's
12      one exhibit that I think needs clarification.  Mr. Schaper
13      offered the entire expert report, I think, and I think you
14      meant to offer just the resumé pages, and I don't know that
15      the record is clear on that.
16                MR. SCHAPER:  I will --
17                MR. ANTHONY:  I think you meant pages 148 through
18      151 of DX-50902, and I think you offered all of 50902.
19                MR. SCHAPER:  I meant what you said, and so that's
20      all I intended to offer.  So I appreciate that
21      clarification.
22                MR. ANTHONY:  So maybe you can just pull those
23      pages out or highlight them.
24                MR. SCHAPER:  Yes.  Thank you.
25                MR. ANTHONY:  I just wanted to clarify that.
```

Grice - Direct

```
1              THE COURT:  So it is admitted as indicated by the
2      parties in this colloquy.
3              MR. ANTHONY:  Pages 148 through 151 of DX-50902 is
4      admitted.  The balance of the report is excluded.
5              THE COURT:  Thank you.
6              MR. SCHAPER:  The balance of the report is not in
7      evidence.  It's not excluded.  Thank you.
8              MR. ANTHONY:  Right.
9          (Recess taken at 10:17 a.m.)
10                        *   *   *   *   *
11         (10:33 a.m.)
12                         IN OPEN COURT
13                        (JURY PRESENT)
14             THE COURT:  Please be seated.
15     BY MR. SCHAPER:
16     Q.  Okay, Mr. Grice, we've covered the fed's conclusions.  I
17     would like to talk now some more about M&I's monitor -- how
18     it monitored accounts.  Between 2002 and 2004, did M&I have
19     any account monitoring in place?
20     A.  Yes, sir, it had several systems that were running as
21     part of the core operating system of the bank.
22     Q.  And just at a very high level, can you explain what
23     those were.
24     A.  Yeah.  These were sort of industry custom automated
25     packages that look for things like check kiting,
```

1    insufficient funds, overdrafts, high-velocity transactions,

2    but they're automated reports that I think some of the

3    bankers talked about they would come to work and they would

4    see overdraft reports the first thing in the morning.  These

5    are the kind of reports that banks routinely looked at

6    during the period.

7    Q.  So was having that kind of account monitoring in place

8    at M&I, was that consistent with industry custom and

9    practice?

10   A.  Yes.

11   Q.  Did there come a time when M&I made changes to its

12   account monitoring systems?

13   A.  It did.  I would say between 2003 and 2005, you see

14   efforts made by the bank to upgrade.  I think Ms. Ghiglieri

15   used the term "bolted on."  They added additional systems on

16   top of these core operating systems that were already in

17   place at M&I.

18   Q.  And was that consistent with custom and practice at the

19   time?

20   A.  Yes, that was responsive to the fed's pressure to

21   improve the technology really.  It wasn't different

22   information.  It was just packaging it in a way that was

23   even more useful to the bank.

24   Q.  And was M&I the only bank in your experience that was

25   getting pressure from the fed to upgrade those kind of

1    systems?

2    A.  No.  This was very much a national focus.  Everybody was

3    being told to up their game.

4    Q.  And then did M&I, in 2005, implement a system called

5    Searchspace?

6    A.  It did.

7    Q.  Is Searchspace a software that you were familiar with

8    before your work on this case?

9    A.  Yes, sir, I worked at it at several banks prior to my

10   engagement in this assignment.  So I have seen it.  I am

11   familiar with it.

12   Q.  Do you have a sense of how Searchspace was regarded in

13   the industry in terms of the quality of the product?

14   A.  It was the gold standard until really the end of this

15   period, 2007, 2008, when like all the devices in our pockets

16   got upgraded, artificial intelligence was introduced later.

17   But Searchspace was -- I don't want to paint it as more than

18   it was.  It was a very elaborate system for taking existing

19   information and rolling it up in a useful way so that

20   bankers could even better calibrate the risk of their

21   clients.  That gets then replaced by even more sophisticated

22   systems in the late 2000s.

23   Q.  That's after the relevant period of 2002 through 2008?

24   A.  Yes, sir.

25   Q.  At a high level, Mr. Grice, how did Searchspace work?

Grice - Direct

```
1    A.  It's a rules-based system.  So it's not AI.  It doesn't

2    learn.  It just tabulates.  It notices -- the metaphor I

3    always think of is -- I'm not a fisherman.  My late

4    father-in-law was a fisherman, but it's kind of a filter or

5    a net for catching fish.

6              And so it's running 24/7 in all of the

7    departments, products, services, and locations of a bank,

8    and it catches fish that are outliers, you know, big,

9    different, unusual.  So it's trying to flag things so that a

10   human could come and evaluate them to see if they are

11   potentially suspicious or not.

12   Q.  And so is that what would happen if there was something

13   that was detected by Searchspace, that would be reviewed by

14   somebody -- an employee at the bank?

15   A.  Exactly.  So the transaction occurs, Searchspace finds

16   it, and if it's of a certain dimension, if it has certain

17   characteristics, it rolls it up and it kind of nominates it

18   for an AML analyst at M&I who would then evaluate it.

19   Q.  Are you familiar with alert thresholds?

20   A.  Yes, sir.

21   Q.  What does that refer to?

22   A.  It's a point system.  So Searchspace is calibrated --

23   there's a software that comes -- there's an algorithm built

24   inside Searchspace that was its default logic.  And then you

25   could also add or modify the point system based on your
```

1    experience.  So if you really cared about international

2    transactions even more, it allowed to you modify it.  My

3    understanding is M&I took the algorithm that was installed

4    with the installation developer and used that and that gave

5    it this population of alerts that we've heard about during

6    the trial.

7    Q.  And did you see Ms. Ghiglieri use a slide that had alert

8    scores and then red alarm bells at the top?

9    A.  Yes.

10   Q.  And the alerts were some number of -- some number above

11   the 75-point threshold?  Did you see that?

12   A.  I did, yes.

13   Q.  At the top of each one, there was a red alarm bell?

14   A.  To my mind, it looked like a fire, but it was a

15   characterization of more risk, I think, based on the number.

16   Q.  Well, is the distance between the alert threshold and

17   the alert score, is that significant from a BSA/AML risk

18   perspective?

19   A.  That's not how I recall people at the time using it or

20   what the developer told us at the time.  So I think it's a

21   misinterpretation or -- it's applying today's standard

22   backwards.  I just don't think that's the way to think about

23   this.

24   Q.  Well, let me ask you this:  Is it the case that any

25   alert that was over the threshold would get reviewed by an

1    AML analyst?

2    A.  Yes.

3    Q.  And was there any different kind of review based on how

4    far above the threshold an alert was?

5            MR. ANTHONY:  Objection, leading, lacks

6    foundation.

7            THE COURT:  Sustained.

8    BY MR. SCHAPER:

9    Q.  Mr. Grice, do you understand, was there any connection

10   between the alert score and how an AML analyst reviewed an

11   alert?

12   A.  No.  You either were reviewed or you weren't.  You

13   either were above the threshold or you weren't, and all

14   cases -- or all alerts above the threshold were treated

15   exactly the same is my understanding and also my

16   recollection from other banks in the same time period.

17   Q.  So to that last point you just testified to, was that

18   way of reviewing alerts the custom and practice in the

19   industry?

20   A.  Yes.

21   Q.  Did a Searchspace alert necessarily mean that the

22   activity in the account was suspicious?

23   A.  Not at all.  And this is an important point.  It's

24   strictly telling you that this is something you might want

25   to look at.  I keep talking -- thinking about it as a

1    nomination.  It's saying, in our expert opinion as a

2    software package, we think this is something that you may

3    want to consider.  You may choose to do nothing with it, but

4    you may also choose to use that as a basis for an

5    investigation, but it's the bank that has to make the

6    determination.

7    Q.  How -- again, in general, how would M&I's AML analysts

8    review an alert?

9    A.  They had several generations of desktop procedures,

10   internal instructions that the bank developed for the

11   benefit of its own employees.  There's no requirement that

12   you have like a user handbook or rules for your AML

13   analysts, but the bank had all these internal operating

14   systems that they wrote and developed for the AML analysts

15   and a review procedure and then all that fed up to a SAR

16   Committee.

17          So the bank built out the systems around

18   Searchspace, and that's all the bank's election.  This is

19   discretionary.  This is not a rule or a requirement of the

20   government.  This is the bank choosing to do this to help

21   them use the software better.

22   Q.  And was that approach to Searchspace consistent with

23   custom and practice in the industry?

24   A.  Yes, sir, but I want to emphasize that Searchspace was

25   expensive.  This was the gold standard at the time and so it

1    was used, but it was not used commonly in banks this size.

2    So I think it's significant that the bank chose this system

3    as opposed to others.  The bank had -- the bank had its own

4    systems, right?  Metavante, which was owned by M&I at the

5    time, provided software systems that accomplished this goal

6    to other of my clients.  Searchspace was where you went if

7    you wanted the most elaborate system that existed at the

8    time, and so it was used by the leaders in the industry.

9    Q.  What types of information did analysts review for

10   business customers?

11   A.  They would look at, again, the onboarding information;

12   who is the account owner, who is the authorized signer, and

13   they would look at history, so what is the transactional

14   history of this customer.  And as part of that, they would

15   understand the questions we looked at earlier about

16   geography; is this customer doing international transactions

17   or not, what types of products is it using or not.  And so,

18   again, we're using this risk-focused approach even in the

19   way we think about reviewing our own customers.  So a

20   low-risk customer is low risk, and a high-risk customer is

21   high risk.  You care a lot about alerts or hits on high-risk

22   customers.

23   Q.  Regardless of how the bank thought about a particular

24   account in terms of high risk or low risk, did AML analysts

25   still review each alert that alerted in the Searchspace

Grice - Direct

1      system?

2      A.  Yes, they all got treated the same.

3      Q.  You mentioned that analysts would look at the kind of

4      prior history of an account.  Was there anything improper

5      about analysts doing that?

6      A.  I've thought about this a lot.  At the time, you know,

7      we were told to know your customer and here's a tool for

8      knowing your customer.  You have to understand history to

9      understand the risk of the customer, and so I don't

10     understand -- you know, my opposite, Ms. Ghiglieri, seems to

11     be arguing that it's improper to look at history; but I

12     think if I don't look at history, I am blinding myself to

13     knowledge that the bank has about history.  So it's

14     reasonable, it's industry custom and practice, and it was

15     consistent with guidance from the fed to look at and

16     understand the history.

17     Q.  Well, can you give us an example of how a customer's

18     transaction in any given month might be inconsistent with

19     its prior history.

20     A.  Sure.  So you take a customer whose normal transactions

21     are, you know, my dentist or a travel agency or a storefront

22     selling newspapers, they probably do cash and checks during

23     this time frame.

24              If they were to suddenly engage in wire

25     transactions, that might be interesting, especially if they

Grice - Direct

1    did international wire transactions, that would be very

2    interesting.  That would be a change in the way they do

3    business at the bank.  Or, likewise, if you take a PCI

4    account, it is doing domestic wires primarily.  If it

5    switched and started doing cash or primarily checks, that

6    would be interesting.  So it's the change in stripes of the

7    customer that's significant.

8    Q.  Based on your knowledge of the regulatory landscape at

9    the time and the custom and practice in the industry, were

10   analysts evaluating alerts expected to perform a detailed

11   investigation of every transaction in a customer's account?

12   A.  No, sir.

13   Q.  Were analysts evaluating alerts expected to understand

14   the entire transaction structure of each of their customer's

15   businesses?

16   A.  Absolutely not.

17   Q.  Were analysts evaluating alerts expected to investigate

18   exactly what funds that were being transferred out of the

19   account would be used for?

20   A.  Absolutely not.

21   Q.  What would happen, Mr. Grice, when an analyst at M&I

22   determined after review that the activity flagged in an

23   account was not suspicious?

24   A.  I'm sorry.  Could you repeat that, please?

25   Q.  Sure.  When an AML analyst was reviewing an account,

1    what happened if after their review they determined that the

2    alert and the activity was not suspicious?

3    A.  They would close the alert.  They would provide some

4    rationale.  There was a condition or a code that would

5    explain why they're closing that alert, why their conclusion

6    is this should not be escalated to a case that should be

7    investigated for suspicious activity.

8    Q.  And was what you've just described consistent with

9    custom and practice in the banking industry at the time?

10   A.  Yes, sir.

11   Q.  You testified earlier that during this period you played

12   a role as the interim compliance manager at several banks

13   like M&I; is that correct?

14   A.  That's correct.

15   Q.  And in that role you actually had to supervise AML

16   analysts; is that right?

17   A.  I trained them.  I supervised them.  I wrote procedures.

18   I would tell them how much of an investigation to do, when

19   to stop, what sufficiency looked like, et cetera.

20   Q.  And I believe in the capacity when you were working at

21   banks there, you testified that the fed was supervising your

22   work; is that right?

23   A.  Yes, sir.

24   Q.  Now, did that set of experiences inform the opinions

25   that you've just given?

1    A.  Absolutely, yes, sir.

2    Q.  Now, Ms. Ghiglieri testified about the amount of time

3    that it took for M&I analysts to review alerts.  Do you

4    recall that testimony?

5    A.  I do, yeah.

6    Q.  Based on the regulatory requirements at the time,

7    Mr. Grice, did AML analysts have to review alerts within a

8    certain time frame?

9    A.  No.  She spoke to two things really, the amount of

10   time -- the number of hours that would be devoted to

11   reviewing a situation, but also the number of days that

12   would elapse.  She seemed to suggest that there was a clock

13   ticking on how promptly the alert was investigated.

14   Q.  Is there -- in the bank regulations, is there some

15   guidance relating to the timing of reviewing suspicious

16   activity?

17   A.  There is.  It's quite precise.

18   Q.  And what is it?

19   A.  It begins -- so the beginning of this clock is upon

20   determination that something is suspicious.

21        So just as a work process, this would have to be

22   an alert that was reviewed where the conclusion was we need

23   to investigate it.  That investigation is done and now

24   we're -- we've established enough information that it is

25   suspicious.  So the organization has sufficient information

1     and they've concluded that it is suspicious.

2              Now the clock or the calendar starts counting.

3     And because it's the federal government, the calendar is

4     either 30 or 60 days.  So you can have even more time if you

5     need it because the government wants a high-quality work

6     product.  They want a good investigation with good results

7     that they can use in law enforcement.

8     Q.  And just to be clear, in terms of M&I's review of the

9     PCI account, did it ever get to the point where there was a

10    determination that activity in the account was suspicious?

11    A.  No, none of the, I think, 39 alerts for PCI ever rose to

12    the level where there was a determination of suspicious.

13    Q.  So that 30-day clock that you are talking about, that

14    didn't apply to M&I's review of PCI's account?

15    A.  Yeah, it was irrelevant because nothing ever got that

16    far.  It didn't get escalated to that point.

17    Q.  Did M&I have any internal policy about reviewing alerts

18    within 30 days?

19    A.  Yeah, they had an internal instruction, and I can't

20    recall the exact language, but it was -- I would call it an

21    instruction, where they wanted alerts to be evaluated on a

22    timely basis and I think the time they identified was

23    30 days, but I'm --

24    Q.  Do you recall what it was 30 days from in terms of the

25    alert?

1      A.  It was from the opening of the, I think it was -- it's

2      either called a case or a file.  So the alert has occurred,

3      the event has occurred which caused Searchspace to generate

4      an alert.  I'm sorry.  This sounds confusing.  Once that

5      alert is created, it is handed to -- or it is put in the

6      queue for an AML analyst.  So when the AML analyst opens

7      their queue and begins the investigation, that now starts

8      that clock, is my understanding.

9      Q.  Do you agree with Ms. Ghiglieri's views that --

10     criticizing the timeliness of M&I's review of alerts?

11     A.  No.  I think she is precisely incorrect about this.

12     Q.  Let's talk about M&I's monitoring of the PCI account.

13     Did you look at how M&I monitored PCI's account?

14     A.  I did.

15     Q.  And based on your review and expertise, was M&I's

16     monitoring of the PCI account consistent with M&I's policies

17     and procedures during the time?

18     A.  Yes, sir.

19     Q.  And was M&I's monitoring of the PCI account consistent

20     with custom and practice in the banking industry during the

21     time?

22     A.  Yes, sir.

23     Q.  Are you familiar with the different groups at M&I who

24     were responsible for monitoring customer accounts?

25     A.  Yes, sir.  I think we've heard from almost -- maybe all

Grice - Direct

1    of them, in fact.

2    Q.  And did you prepare a demonstrative on that subject?

3    A.  Yes, sir.

4           MR. SCHAPER:  Mr. Herzka, if you could just put up

5    DD-60, slide 13.

6    BY MR. SCHAPER:

7    Q.  This is titled, Mr. Grice, "M&I Corporate Compliance

8    Structure."  Can you just tell us what you are covering

9    here.

10   A.  Yeah, I'm trying -- actually, this is taken from a bank

11   document that was provided to the fed that summarized kind

12   of the team approach, you know, the units of the

13   organization that were involved in detecting, investigating,

14   and reporting suspicious activity.

15          So on the far left -- both the far left and the

16   far right are the business bankers and the business units,

17   so people like Ed Jambor -- Mr. Jambor, Mr. Flynn.

18          Corporate Compliance AML Monitoring Group is the

19   several witnesses we have heard from, Mandy Ramlow,

20   Ms. Maltsch, et cetera.

21          Corporate security is Mr. Haller.  So it's the

22   check fraud unit, the folks that think about that type of

23   suspicious activity.

24          And then the fourth column is the Money Transfer

25   Center, the MTC, or the Money Services Center and this is --

1    I forget the gentleman's name.

2    Q.  Mr. Neufeldt?

3    A.  Yes.  He appeared by video.  Mr. Neufeldt described how

4    the wire function operated and kind of the role it played in

5    both performing wires, but also resolutions of problems,

6    quality control, and ultimately -- he was also part of the

7    AML Committee of the bank -- its relationship to the

8    investigation process generally.

9    Q.  And is this kind of structure unusual for a bank like

10   M&I?

11   A.  No.  This is very common.

12   Q.  You mentioned corporate security and check monitoring

13   for check fraud.  What's an example of check fraud?

14   A.  Well, check fraud is if I take your checkbook out of

15   your pocket while you are out of the room and I start

16   signing your name and writing checks to myself.  That would

17   be the simplest example.

18   Q.  Did you see any check fraud with respect to the PCI

19   account?

20   A.  None.

21   Q.  So before M&I implemented Searchspace, was PCI's account

22   monitored?

23   A.  Yes, sir.

24   Q.  And did activity in PCI's account ever alert prior to

25   the implementation of Searchspace?

1   A.  It did from time to time.

2   Q.  And was any of that activity ever deemed to be

3   suspicious?

4   A.  No.

5   Q.  Was M&I monitoring wire account activity prior to

6   implementing Searchspace?

7   A.  It was, using these systems I described earlier off of

8   the core operating system of the bank.

9   Q.  And were those systems consistent with custom and

10  practice in the banking industry at the time?

11  A.  Yeah.

12          And I should add we've been talking about AML, but

13  these systems are also dedicated to another really important

14  purpose in the war on terror, which is blocking transactions

15  involving enemies of the United States, so a wire to

16  bin Laden or having a customer relationship with someone who

17  was a friend or family member, business associate of one of

18  the 9/11 hijackers.

19          So the bank had a very elaborate process also to

20  accomplish that in addition to looking for, quote, unquote,

21  suspicious activity.

22  Q.  Now let's go to the time after Searchspace was

23  implemented and how M&I monitored the PCI account.

24          I think you have said that the PCI account

25  alerted, your testimony was, 39 times?

1    A.  There was some test alerts also, but 39 actual alerts

2    generated by Searchspace were evaluated by the AML analysts.

3    Q.  And did you review all 39 of those alerts in forming

4    your opinions in this case?

5    A.  I did, and I think we have seen about half of them in

6    the courtroom.

7    Q.  Did you discuss all 39 in the report that you wrote?

8    A.  No.  In the report I'm describing a very elaborate

9    system, so I looked at the first three alerts that were

10   generated for PCI activity as exemplars, as examples of how

11   this process unfolded.  I didn't look at all 39 -- I mean, I

12   didn't discuss all 39 in the report.

13   Q.  But you reviewed all 39 in detail?

14   A.  I did.

15   Q.  What was the reason for the vast majority of alerts on

16   the PCI account?

17   A.  That the activity in the PCI account was greater than

18   its peer group, usually in terms of number and dollar

19   volume.  So it's by count.  There were more wires in PCI's

20   typical month than for most business customers of the bank.

21   And the volume of -- the dollar total of those wires was

22   also greater than most of the business customers of the

23   bank.

24   Q.  Mr. Grice, based on your review and expertise, was the

25   fact that there were frequent alerts for the PCI account a

1   red flag of suspicious activity, as Ms. Ghiglieri has

2   suggested?

3   A.  No.

4   Q.  Why were those frequent alerts not red flags of

5   suspicious activity?

6   A.  In my report I describe this frequent alert for PCI's

7   wire activity by count and by volume as artifacts of PCI's

8   business.  So this is a coincidence that PCI did almost all

9   of its activity through the wire room, both PCI and of the

10  bank.

11          So given that they were large users of wires and

12  their wires were typically larger than the dentist or the

13  newspaper vendor, they alerted commonly, so almost monthly.

14  So it's an artifact of the nature of what the bank documents

15  reflected as the PCI business.

16  Q.  Is there -- you mentioned that PCI primarily did its

17  business through wires.  Is there anything inherently

18  suspicious about a customer of a bank primarily transacting

19  in wires?

20  A.  No.  There are lots of customers that choose wires as

21  their primary source of transmission because they don't want

22  to lose the time for a check to go by the mail system, they

23  don't want to touch cash.  So it's convenient.  So for some

24  customers -- it's a modest fee you have to pay to send or

25  receive a wire.  It's worth the inconvenience of that fee to

Grice - Direct

1    get the benefit of that speedy transmission.

2    Q.  And I think you've testified in terms of who reviewed

3    Searchspace alerts at M&I.  It was the AML analysts?

4    A.  Yes, sir.

5    Q.  And, again, to your knowledge, what were the results of

6    the reviews of the PCI account alerts?

7    A.  These 39 were closed due to -- the activity in the

8    account that was reviewed was consistent with the prior

9    transactional activity of PCI.

10   Q.  Was a full case review warranted for any of the closed

11   alerts for the PCI account?

12   A.  Not in my opinion based on the information available at

13   the time.

14   Q.  And were the decisions made by the AML analysts in

15   accordance with M&I's BSA/AML policies and procedures?

16   A.  Yes, sir.

17   Q.  I would like to take a look at just a couple alerts,

18   Mr. Grice.

19            MR. SCHAPER:  And this is an exhibit already in

20   evidence.  It's P-183.  If we could go to page 37,

21   Mr. Herzka.

22   BY MR. SCHAPER:

23   Q.  Just focusing on the top portion of this page,

24   Mr. Grice, what is this that we are looking at?

25   A.  So we are looking at the beginning of the documentation

1    on the Alert 64556.  And then the title, it says, "Alert

2    64556, AML Monthly."  So it's an alert based on monthly

3    activity.  The closed-expected activity is the conclusion

4    reached by the AML analyst.

5            And as you read down, the alert summary describes

6    the customer ID, the customer name, who it was assigned to,

7    and you can see some of the details about what's behind this

8    alert or what caused this alert to occur in the first place.

9    Q.  If we take a look at the next page, which is 38, and

10   look at the top several entries, which go over from the

11   bottom of 37 to 38, what was the reason that there was an

12   alert on the PCI account?

13   A.  Because of a month's worth of wire activity.  I think it

14   was March of 2005, if I recall.

15   Q.  And what information would be relevant to look into here

16   to determine if the activity was suspicious?

17   A.  This is the beginning of Searchspace.  So it's one of

18   the first alerts that occurred -- I'm sorry.  I was

19   misreading the date.  This is June of 2006.

20           So this is -- we would want to understand who is

21   the customer, what is the nature of their business.  And

22   then we would want to compare the activity that caused the

23   alert, the month of wires that generated the alert, to what

24   we see in the history for this customer, is that transaction

25   activity consistent with the prior transaction activity.

1    Q.  And looking up here on the screen, does this reflect an

2    effort by the analysts to look at what the business of the

3    customer was?

4    A.  Yes, sir.  This is -- I believe this is Mary Pesch.

5    This is her maiden name.  And I believe we discussed -- this

6    was discussed earlier in the trial, but this is a summary of

7    her understanding of -- or the documents that were reviewed

8    about PCI and it's an attempt at explaining who PCI is, the

9    nature of the transactional activity --

10                MR. ANTHONY:  Objection, Your Honor, testifying as

11   to what's in the mind of a bank employee.  He can testify as

12   to what's on the page, but not what's in her mind.

13                THE COURT:  Sustained.

14   BY MR. SCHAPER:

15   Q.  Mr. Grice, if you could continue, but please just focus

16   on what information is on the document.

17   A.  Yes, sir.  Can you repeat the question?

18   Q.  Yes.  Does the information on the document reflect an

19   effort to look at the customer's business?

20   A.  Yes, sir.  This is part of the -- this is part of the

21   supporting background that informs the conclusion that

22   appears later in the document.

23                MR. SCHAPER:  Now if we could look at the,

24   Mr. Herzka, at the next several rows.

25   BY MR. SCHAPER:

1    Q.  Is there an indication here as to whether the analyst

2    looked at who wires were sent to and received from?

3    A.  Yes.  You see at the very top of the screen many wires

4    were to Corporate Trust Clearing, Metro Gem, PAC Funding,

5    Petters Limited, et cetera.  So this is the analyst

6    recording some of the more prominent recipients of wires out

7    of the PCI account.

8         The next paragraph down, it's the incoming credits

9    that are being summarized or captured, as well as references

10   to this Euro Sweep feature.

11        So there are credits and debits occurring in the

12   account on, I think, a daily basis as funds are swept out of

13   the account and back into the account as the new business

14   day begins.

15        MR. SCHAPER:  Mr. Herzka, could you please focus

16   on the wires that have a 9:54 -- sorry, the entries, the

17   comments that have a 9:54 timestamp on them.

18   BY MR. SCHAPER:

19   Q.  So on the bottom comment here, is there an indication of

20   where wires were received from?

21   A.  Yes, sir.  There's a specific mention of Enchanted,

22   Nationwide, PAC Funding, Palm Beach, Metro Gem, Thousand

23   Lakes.

24   Q.  And, Mr. Grice, in your work on this case and after

25   watching or reading testimony in the trial, did you see any

1    evidence that AML analysts had information about Nationwide

2    and Enchanted's supposed relationship to PCI?

3              MR. ANTHONY:  Objection, foundation as to what was

4    in the mind of employees.

5              THE COURT:  Overruled.

6              THE WITNESS:  There are no documents about --

7    there are no documents other than references to the frequent

8    transaction relationship with Nationwide and Enchanted.

9              So there are many references -- I haven't tried to

10   calculate.  If not every alert, it's most alerts

11   specifically mention Nationwide and Enchanted, but there's

12   not, nor should there have been, any understanding or

13   explanation for what Nationwide and Enchanted were engaging

14   in.  That's not the requirement that was in place at the

15   time, according to the fed or to industry custom and

16   practice.

17   BY MR. SCHAPER:

18   Q.  And you were here for Ms. Ghiglieri's testimony?

19   A.  I was.

20   Q.  Did she identify any evidence from before September 2008

21   that the AML analysts had information that Nationwide and

22   Enchanted were supposed to be wholesalers?

23   A.  No.

24   Q.  Did you see any evidence that became available after

25   September 2008 about what Nationwide and Enchanted actually

Grice - Direct

1   were?

2   A.  I was here for Mr. Martens' testimony.  Yes.  I was here

3   for Mr. Martens' testimony.

4   Q.  And what did it turn out that Nationwide and Enchanted

5   were?

6   A.  Because of the PwC report, the world came to -- we all

7   learned, I learned that these were sham vendors.

8   Q.  And how, if at all, does the fact that this evidence was

9   available after September 2008 relate to your opinions in

10  this case?

11  A.  This is that hindsight bias issue I was describing

12  earlier, where, thanks to Mr. Martens' many thousands of

13  hours of analysis, I can now understand -- I now know what

14  questions to ask that I did not know to ask if I were in the

15  bank on June 6th of 2006.

16  Q.  Did you see any evidence that the AML analysts had

17  information that PCI's account should be receiving incoming

18  funds directly from retailers?

19  A.  No.

20  Q.  Were the analysts supposed to seek out that information

21  in order to properly close the alert under custom and

22  practice in the banking industry?

23  A.  Not in my view at all.

24          MR. SCHAPER:  If we can turn back to page 37,

25  Mr. Herzka, and look at the row that's stamped 9:53.

Grice - Direct

1    Actually, I am sorry, we can skip that.  Mr. Herzka, if you

2    would go to page 39 instead and look at the last box of

3    text, 9:56, there.

4    BY MR. SCHAPER:

5    Q.  Based on your review of this document, Mr. Grice, did

6    the analyst identify how the value and volume of the wires

7    compared to PCI's prior activity?

8    A.  Can you repeat the question, please?

9    Q.  Did the analyst here make a comparison of the alert --

10   the alerted activity to the customer's prior activity?

11   A.  Yeah.  They're -- yes.  They're saying that it's

12   consistent with that prior transactional activity, which is

13   consistent with fed guidance and industry custom and

14   practice at the time.

15   Q.  So looking at this alert history as a whole, Mr. Grice,

16   in your view, do the comments appear too short or not

17   detailed enough according to industry standard and practice

18   and regulatory expectations at the time?

19   A.  I recognize -- what we're looking at is a business

20   record, and this is a conclusion stated by the AML analyst.

21   And I read this as somebody who supervised AML analysts

22   doing similar kinds of work.  They're stating their

23   conclusion.  They describe some of the analysis they

24   performed, but it's primarily a way to convey at a high

25   level their analysis and their conclusion.

1          So I read this as really part of a conversation

2     between, in this case, Ms. Pesch and her supervisor.  This

3     is -- it's like a memo being sent from the AML analyst

4     literally to the supervisor, saying this is my conclusion.

5     And so if you have any questions, come down to the hall and

6     talk to me.

7     Q.  Was the level of detail that Ms. Pesch provided here,

8     was that consistent with custom and practice in the banking

9     industry at the time?

10    A.  Yes.  And I guess I need to be clear.  There's no

11    regulation, law, guidance about how much of an internal memo

12    needs to be created, if any, supporting my conclusion.  I

13    want Mary Pesch to do her best analysis.  I'm using her

14    conclusion.  That's what drives the decision-making inside

15    the bank with respect to suspicious activity.  So this is a

16    statement of the conclusion, and this is consistent with fed

17    guidance and with industry custom and practice at the time.

18    Q.  Can you say -- just based on this document, can you say

19    with specificity exactly what all of the incoming and

20    outgoing funds wired through the account would be used for?

21    A.  No, nor should I at the time.  So this is where

22    Ms. Ghiglieri and I have the greatest disagreement.  There's

23    been lots of discussion about KYC, "know your customer."

24    This is an ancient concept.  I described it earlier as

25    somewhat vague until 9/11 when we had this CIP requirement

1    for very specific elements of KYC.  Later those expectations

2    change --

3              MR. ANTHONY:  Objection, narrative response.

4              THE COURT:  Sustained.

5    BY MR. SCHAPER:

6    Q.  Mr. Grice, in terms of the KYC guidance from regulators

7    and the custom and practice, did that change over time?

8    A.  It did, but it never became KYCC, right?  It never --

9    Q.  What is KYCC?

10   A.  So "know your customer."  And if we were to force banks

11   to go even deeper into the nature of Nationwide or the

12   nature of Enchanted or the nature of Metro Gem --

13             MR. ANTHONY:  Objection, narrative answer again.

14             THE COURT:  Sustained.

15   BY MR. SCHAPER:

16   Q.  First of all, what is KYCC that you just referred to?

17   A.  "Know your customer's customer," which is a concept.

18   It's not a requirement.

19   Q.  Was "know your customer's customer" industry standard

20   and practice in the banking industry between 2002 and 2008?

21   A.  Not at all.

22   Q.  Is "know your customer's customer" what you believe

23   Mr. Ghiglieri is opining should have been the standard?

24   A.  That's what I heard.  That's how I interpreted her

25   description of -- actually, that's how I understood her

Grice - Direct

1      criticism of M&I's conduct.

2      Q.  And do you agree with that criticism?

3      A.  No.

4                MR. SCHAPER:  And lastly on this alert, if we

5      could look at the last two rows on page 38 and the first

6      three rows on page 39, Mr. Herzka.

7      BY MR. SCHAPER:

8      Q.  Based on just the information --

9                MR. SCHAPER:  Mr. Herzka, I think that's 37 and

10     38.  If we could please look at 38 and 39, the end of 38 and

11     the beginning of 39.  And if you could scroll up on that

12     part of 38, please, and then scroll down on 39, actually.

13     BY MR. SCHAPER:

14     Q.  Is there an indication that the analyst looked into

15     different types of transactional activity for this alert?

16     A.  Yes.  They're compiling.  This is a reflection of our

17     customer, the bank's customer's activity, so who the wires

18     are to and wires are from, and then some discussion of

19     debits and credits, the Euro Sweep account and the check

20     activity.  So it is a comprehensive review of the account

21     activity for this time frame and it's being reflected here.

22     Q.  You just mentioned checks.  So is there a reference to

23     checks in the second to last row on here?

24     A.  Yes, sir.  So, again, the alert was for wires, but

25     Ms. Pesch is also addressing the information available.

1    First of all, she is telling me that there were checks also

2    during the time period, and she's pulling in some of that

3    information to help inform the reader of this alert about

4    what's understood.

5    Q.  Do checks contain information about the purpose of the

6    transaction sometimes?

7    A.  Generally in that memo field.

8    Q.  Is that reflected on this alert?

9    A.  Yes.  The reference to "Disney on Ice" is from somebody

10   writing into the memo field what the check is for.

11   Q.  Do wires -- wire transfers typically contain that same

12   information?

13   A.  Generally not, although I do recall the bank adopted a

14   policy -- I can't place the year.  The bank adopted a policy

15   for customers who are not regular wire remitters, that

16   outbound wires should include a purpose.  But if you are a

17   regular wire remitter, if you are doing wires frequently,

18   you don't have to gather this information.  So it's subject

19   to the preferences of the bank, but there's no requirement

20   that anybody gather or report the purpose of a wire.

21   Q.  Was PCI a regular wire remitter?

22   A.  Yes.

23   Q.  So did it have to include any information about purpose?

24   A.  None was required.

25   Q.  So this alert was reviewed by Mary Pesch; is that right?

Grice - Direct

1    A.  Yes, sir.

2    Q.  And did you watch her testimony that involved the

3    discussion of her performance reviews at M&I Bank?

4    A.  I did.

5    Q.  And how would you describe her reviews?

6    A.  Very positive.

7    Q.  Based on your review of records that Ms. Pesch looked at

8    and alerts that she dealt with, does that surprise you?

9    A.  Not at all.

10   Q.  Why is that?

11   A.  Again, I was impressed by the -- well, the HR reviews

12   showed that she was recognized for the quality of her work

13   and the detail and kind of the craftsmanship, and I see that

14   reflected here given the expectations of the fed and the

15   industry custom and practice at the time.

16   Q.  Let's just look at one more of these alerts, Mr. Grice.

17            MR. SCHAPER:  If we could go to page 80,

18   Mr. Herzka, and look at the top.

19   BY MR. SCHAPER:

20   Q.  This is an alert in the month of July 2007.  Do you see

21   that?

22   A.  Yes, sir.

23   Q.  And if we look at the alert history part of this

24   document, was this reviewed by Sara Johnson?

25   A.  Yes, sir.

1    Q.  So looking at the row that has a timestamp of 10:45 on

2    this page at the bottom, do you see a reference to something

3    called QAPOR?

4    A.  I do, toward the bottom of that --

5    Q.  Are you familiar with what QAPOR is?

6    A.  Yes.  Qualified account for peer-only review.

7    Q.  And just at a high level, can you explain what that is.

8    A.  It was a process added to the AML alert work stream that

9    allowed for a focused analysis of transactions that were

10   only alerting against peer activity or peer volume.

11   Q.  When was this implemented at M&I?

12   A.  In late 2006.

13   Q.  Were customers added to this QAPOR list?

14   A.  There was a process for adding customers to this list.

15   I think Bernita Hile was in charge of overseeing that

16   process.

17   Q.  Was it common for banks at the time to have some sort of

18   process like this?

19   A.  Yeah, because it was -- I mean, it's a kind of false

20   positive, right?  The system is running and it's

21   frequently -- in the case of PCI, it's almost monthly

22   generating an alert for that same customer for exactly the

23   same reason.

24          So it's -- I use this word "artifact," right?

25   It's a feature of the fact that PCI's primarily using wires

1    and using domestic wires.  They keep hitting on this rule of

2    their wires are big and there are more of them.  And at some

3    point our understanding doesn't change.  They keep having

4    the same attribute each month.

5    Q.  So if -- was PCI on the QAPOR list?

6    A.  It was added to the list I think in December of '06.

7    Q.  Even when it was on that list, if there was an alert on

8    PCI account activity, did that still get reviewed by an AML

9    analyst?

10   A.  Yes.

11   Q.  And was M&I's decision to put PCI on the QAPOR list

12   consistent with the risk-based approach to AML issues that

13   you discussed earlier?

14   A.  In my view, it's entirely consistent with this idea of

15   going to the -- modifying the process to focus on the most

16   likely to be suspicious cases.  And these are -- because of

17   the frequency of the alerts and the unchanging nature of

18   PCI's conduct or the customer conduct, it's perfectly

19   reasonable and consistent with fed guidance.

20         MR. SCHAPER:  Mr. Herzka, if you could just go

21   back to the main document.

22   BY MR. SCHAPER:

23   Q.  Mr. Grice, the comments in this alert --

24         MR. SCHAPER:  And if you could put up the second

25   page of that document too, Mr. Herzka.

Grice - Direct

1    BY MR. SCHAPER:

2    Q.  The comments in this alert seem to be a bit shorter than

3    in the last alert we looked at.  Does that concern you?

4    A.  Not at all.

5    Q.  Why not?

6    A.  Well, this is that issue you asked earlier about

7    history.  This is additive.  So this is part of "know your

8    customer."

9          So let's imagine a situation where I did a review

10   of you two years ago and then a year and a half ago and a

11   year ago.  I need to incorporate that history because that

12   history is part of my knowledge of you.  And so adding on to

13   my knowledge of you doesn't require that I repeat everything

14   I've ever done about you, right?

15         So my knowledge is additive.  I know more about

16   you this month than I knew last month, but I don't have to

17   repeat or recite again or redo that analysis.  My prior

18   knowledge is true and now I'm supplementing it with an extra

19   month of insight.

20   Q.  Well, just because you know a customer's account

21   history, does that mean that the bank would not in any

22   circumstance find that its activity was suspicious?

23   A.  No.

24               MR. ANTHONY:  Objection, leading.

25               THE COURT:  Overruled.

1              THE WITNESS:  What matters here is if the customer

2      is doing what PCI did, which is maintain its approach to

3      transactions and maintains the style of transactions, as

4      long as they continue maintaining that style of

5      transactions, the fed tells banks you know the customer

6      because the nature of the transactions is unchanging, so

7      that customer has not changed.

8              Now, if you were to change the facts and if

9      Petters -- Mr. Petters is suddenly sending wires to China or

10     receiving cash -- doing a cash for wire swap, that's a

11     different situation.  But Mr. Petters' transaction activity

12     never changed.  It stayed constant with this predominantly

13     wire -- domestic wire focus throughout the period.

14     BY MR. SCHAPER:

15     Q.  So going back to the fact that this -- the descriptions

16     on this alert are so much shorter than what we looked at

17     previously, in an ideal world, Mr. Grice, would you have

18     liked to see even more documentation than this?

19     A.  Absolutely, but that's a reflection of me being curious

20     or a nerd.  I want to understand more.

21             And we are looking at this from 15 or 20 years

22     later than the transaction history.  In real time we're all

23     limited by what we see and know.  So this is perfectly

24     sufficient to satisfy both fed expectations and industry

25     custom and practice, but in these retrospective projects,

Grice - Direct

1    like the one we're engaged in here, of course I would like

2    to know more because we now have the certain knowledge of

3    what happens later.  Nobody had that in 2007 when this

4    review was being done.

5    Q.  When you say you have a certain knowledge of what

6    happened later, what are you referring to?

7    A.  I am referring to the Martens report and the FBI raid

8    and the criminal trial, et cetera.

9    Q.  Do you recall Ms. Ghiglieri criticizing the fact that

10   M&I had only one peer group for business customers?

11   A.  I do.

12   Q.  Did M&I having only one peer group make it more or less

13   likely that PCI's account would alert in Searchspace?

14   A.  It caused it to alert more frequently.

15   Q.  So did the fact that there was only one peer group

16   result in more or less frequent reviews of PCI's account

17   activity?

18   A.  Even more frequent alerts.  I think we -- I can't recall

19   who the witness was, but yesterday I believe there was a

20   diagram showing total monthly volume of PCI's wires and at

21   the bottom was a very small line reflecting what the

22   business account average was at the time.  It's a small

23   percentage.

24          So PCI was clearly doing much more volume and

25   number of wires than the typical business customer, but it's

 1     because of that broad sample, we're comparing PCI to all

 2     business customers, that causes them to alert even more

 3     frequently.  If we were to put them into a small community

 4     of just financial clients or hedge funds or trading

 5     companies, they would alert less frequently.

 6              So I don't understand Ms. Ghiglieri's objective or

 7     her criticism about the peer group.

 8     Q.  Okay.  Thanks.

 9              MR. SCHAPER:  We can take that down, Mr. Herzka.

10     BY MR. SCHAPER:

11     Q.  Did the fact that M&I only had one peer group result in

12     PCI's account being reviewed more frequently?

13     A.  Yes, it was reviewed more frequently because of the

14     single peer population being all business customers of the

15     bank.

16     Q.  I would like to talk a little bit more specifically,

17     Mr. Grice, about what information, based on your review, M&I

18     had about PCI's activity in the 9018 account.  Did you

19     prepare a few demonstrative slides on that issue?

20     A.  I did, yes, sir.

21     Q.  Okay.

22              MR. SCHAPER:  So if we could pull up slide 14 of

23     DD-60.

24     BY MR. SCHAPER:

25     Q.  So what information was available to M&I in terms of the

Grice - Direct

1   transactions --

2          MR. SCHAPER:  If we could take that down.  Thank

3   you.

4   BY MR. SCHAPER:

5   Q.  In terms of the transactions in the PCI account, what

6   information was available to M&I?

7   A.  With this diagram I'm trying to convey the view of

8   the bank, what the bank can see about its customer, so,

9   you know, what does "know your customer" look like, in a

10  sense.

11         So my customer, if I am the bank, is PCI, the 9018

12  account.  I can see their account activity through the

13  various computer systems and software, and I see wires

14  coming in and going out.  I see wires to and from Petters

15  Limited and to and from -- I'm sorry, from Enchanted in this

16  instance.  Each of those other accounts is at other banks.

17         So those other banks have a "know your customer"

18  obligation on their customers, which would be Petters

19  Limited and Enchanted.  Those aren't our customers.  Those

20  are their customers.

21         So the only thing my bank can see is the account

22  activity in and out of my customer's account.

23  Q.  And so, based on your review, did M&I have insight into

24  transactions that occurred outside the gray area on this

25  slide?

1    A.  They couldn't see it.  It's outside their scope of view.

2    Q.  Okay.  So could the information that M&I was seeing be

3    consistent with how funds would flow as part of a legitimate

4    business?

5    A.  Can you ask that again, please?

6    Q.  Could the information that M&I had a view into be

7    consistent with how the flow of funds worked for a

8    legitimate business?

9    A.  Certainly.

10   Q.  And did you prepare something that explains that?

11   A.  Yes.  So I --

12              MR. SCHAPER:  If you could go to the next slide,

13   Mr. Herzka.

14              THE WITNESS:  This is an attempt at trying to

15   demonstrate what could be occurring outside my field of

16   vision.

17              MR. ANTHONY:  Objection, lack of foundation as to

18   any payments from a big-box retailer to Enchanted Family

19   Buying.  This demonstrative is not supported by any facts in

20   the record.

21              MR. SCHAPER:  Your Honor ruled on this one this

22   morning, and I also object to the speaking objection.

23              THE COURT:  Pardon me?

24              MR. SCHAPER:  Your Honor ruled on this this

25   morning, and I also object to the speaking objection.

```
 1            MR. ANTHONY:  We're renewing our objection,
 2   Your Honor, for the reasons stated.  There's no facts to
 3   support the demonstrative.
 4            THE COURT:  Overruled.
 5   BY MR. SCHAPER:
 6   Q.  Sorry, Mr. Grice.  Could you explain what you were just
 7   speaking about in terms of what's on this slide.
 8   A.  So if I were the bank at the time and I were trying to
 9   understand the things that I couldn't see, if I were trying
10   to fill in --
11            MR. ANTHONY:  Further objection, Your Honor.  He
12   is putting himself into the mind of the bank, which has been
13   off limits throughout this entire case, trying to talk about
14   what's in the bank's mind.
15            THE COURT:  Sustained.
16   BY MR. SCHAPER:
17   Q.  If you could just explain what you were putting on this
18   slide, Mr. Grice.
19   A.  I tried to describe a potential flow of funds that would
20   account for or relate to big-box retailers, electronics
21   manufacturers, and investors.
22            MR. ANTHONY:  Same objection, lacks foundation.
23            THE COURT:  Overruled.
24   BY MR. SCHAPER:
25   Q.  Was the portion of this transaction that was visible to
```

Grice - Direct

```
 1    M&I, based on the record you reviewed, sufficient for M&I to

 2    be able to distinguish PCI's fraudulent activities from a

 3    legitimate business?

 4              MR. ANTHONY:  Objection, calls for state of mind

 5    of the bank.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  No, sir.

 8    BY MR. SCHAPER:

 9    Q.  And do we know now what the transaction activity

10    actually looked like?

11    A.  We do, thanks to a lot of hard work and, again, the FBI

12    raid, the criminal trial, et cetera.

13    Q.  And do you have a slide that looks at that?

14    A.  Yes, sir.

15              MR. SCHAPER:  Can we go to the next slide.

16    BY MR. SCHAPER:

17    Q.  And what are you communicating on this slide, which is

18    titled "Fraudulent Transactions Throughout" -- or "Through

19    the PCI Account"?

20    A.  This is what I learned by reading the Martens report,

21    Exhibit 42.  So this is the some of the truth of the matter.

22    This is some of the truth of the --

23              MR. ANTHONY:  Objection to narrative response.

24              THE COURT:  Sustained.

25    BY MR. SCHAPER:
```

Grice - Direct

1    Q.  So, first of all, when you say "reading the Martens

2    report," what are you referring to?

3    A.  I'm referring to the PwC report authored by Mr. Martens

4    that he testified to last week.

5    Q.  So when you say "Mr. Martens," you are talking about one

6    of the plaintiff's experts?

7    A.  Yes, sir.

8    Q.  And what did you learn from reading that report as it

9    relates to this slide?

10   A.  Well, I mean, in the first instance we learn that both

11   Petters Limited and Enchanted are kind of fictitious or sham

12   operations.  So Enchanted is a sham vendor, I learned by

13   reading the Martens report.

14          And then sort of the second cut is I then got to

15   understand the flow of funds between Petters Limited and

16   investors and between Enchanted and additional investors,

17   SPEs.

18   Q.  Is this demonstrative, Mr. Grice, is this a simplified

19   version of the actual Ponzi scheme or is this intended to

20   represent what the actual scheme looked like?

21   A.  It's a simplified version because the actual -- again,

22   my understanding is the actual version is even more complex.

23   So this is an attempt to make it intelligible.

24   Q.  Did M&I have access to this analysis, as far as you

25   could tell from the record, before the Ponzi scheme was

Grice - Direct

1    uncovered in 2008?

2    A.  No.

3                MR. ANTHONY:  Objection, lacks foundation.  He

4    said it wasn't created until after 2008.

5                THE COURT:  Sustained.

6    BY MR. SCHAPER:

7    Q.  When -- you said this was based on Mr. Martens' work?

8    A.  Yes, sir.

9    Q.  And can you just remind us when that was done, when that

10   work was done.

11   A.  Again, there were multiple iterations.  I think 2010 was

12   the first, but I could be off.  But it was thousands of

13   hours of professional time to compile this information.  It

14   was complex.

15               MR. ANTHONY:  Objection, move to strike the last

16   portion as a narrative again.

17               THE COURT:  Overruled.

18   BY MR. SCHAPER:

19   Q.  At the time that Ms. Ghiglieri wrote her expert reports

20   in 2018, did she have access to this kind of information

21   from the PwC report?

22   A.  Of course.

23               MR. SCHAPER:  Okay.  We can take that down,

24   Mr. Herzka.

25   BY MR. SCHAPER:

Grice - Direct

1   Q.  Do you recall that Ms. Ghiglieri testified about what

2   she viewed as a number of red flags of suspicious activity

3   that M&I ignored?

4   A.  I do.

5   Q.  Before we get into those details, do you have a view on

6   whether the presence of a red flag itself is proof of

7   suspicious activity?

8   A.  Yeah, this is important.  A red flag is not in any way a

9   conclusion.  It's really a basis for asking other questions.

10  Q.  You've talked a little bit about regulators in the

11  industry.  Do regulators tell banks that the mere presence

12  of a red flag necessarily means it's criminal activity?

13  A.  No.  They make it quite clear that a red flag is nothing

14  more than an indicator and may be the basis for asking more

15  questions.  It's not a conclusion of criminal activity.

16          MR. SCHAPER:  So if we could put up DD-60,

17  slide 17, Mr. Herzka.

18  BY MR. SCHAPER:

19  Q.  What is this that we're looking at, Mr. Grice?

20  A.  So this is a sentence in the second paragraph of what's

21  labeled -- if you can read behind the quote, it's Appendix F

22  of that section of the BSA/AML Exam Manual from the FFIEC.

23          And I read this as a warning.  "The following

24  examples" -- which this is a seven- or eight-page appendix

25  of red flags.  "The following examples are red flags that,

1    when encountered, may warrant additional scrutiny.  The mere

2    presence of a red flag is not by itself evidence of criminal

3    activity."

4         So it is advising bankers like me to slow down,

5    don't reach a conclusion.  At best, this may be a way to

6    frame the next question.

7    Q.  So Ms. Ghiglieri testified --

8         MR. SCHAPER:  And we can take that down.  Thank

9    you.

10   BY MR. SCHAPER:

11   Q.  Ms. Ghiglieri testified that the bank should have seen

12   PCI's activity as a red flag of suspicious activity and

13   reported it as suspicious and considered closing the

14   account.  Do you recall that testimony?

15   A.  I do.

16   Q.  Do you agree with that?

17   A.  Not at all.

18   Q.  Have the federal regulators -- or did the federal

19   regulators at the time, between 2002 and 2008, give guidance

20   to the banking community about the amount of SARs being

21   filed?

22   A.  Yes.

23   Q.  What guidance did they give in that regard?

24   A.  They told the banks to slow down and do your work.  So

25   the instruction was do not engage in what Ms. Ghiglieri is

1    advocating, which is reactive filing or what was called

2    preemptive filing.

3              The bank has a job to do.  The bank has access to

4    information.  Look at the information, assess it based on

5    your knowledge of the customer, you, the bank's knowledge of

6    the customer, investigate it.  And then if you believe it's

7    suspicious, file it, but only upon determination that it's

8    suspicious do you file it.

9              This practice of preemptive filing was clogging

10   the system with kind of half-baked allegations of suspicion.

11   Q.  And was there indications from the regulators that that

12   was a problem?

13   A.  They warned us in no uncertain language do not engage in

14   this preemptive filing process because we don't want false

15   positives based on basically shoddy work.  We want

16   high-quality SARs that we can take and use for law

17   enforcement purposes.  Don't just give us all your red

18   flags, which I think is what Ms. Ghiglieri was advocating.

19   Q.  Were there banks that actually got in trouble from

20   regulators for filing too many SARs?

21             MR. ANTHONY:  Objection, lacks foundation, beyond

22   the scope of his report.

23             THE COURT:  Sustained.

24   BY MR. SCHAPER:

25   Q.  So what is the appropriate standard for the decision to

1    report suspicious activity?

2    A.   Again, the bank is required to go through a process of

3    detection -- you know, monitoring, obviously, but then this

4    detection of what is the thing that is potentially

5    suspicious, investigation, and then thoughtful filing.  So

6    it's got to be based on looking at the available information

7    and then coming to an independent determination with some

8    knowledge that this is suspicious.

9         So we want to have banks play their role in giving

10   useful referrals to law enforcement and not, again, kind of

11   these preemptive or reactive referrals.

12   Q.   Could there be filings of SARs where the bank has the

13   knowledge that gives it reason to know that there may be

14   suspicious activity?

15        MR. ANTHONY:  Objection, speculative, foundation,

16   not in his report and --

17        THE COURT:  Would you stand up when speaking.

18        MR. ANTHONY:  I'm sorry, Your Honor.  Lacking

19   foundation, speculative, an undisclosed opinion not in his

20   report and unrelated to the facts of this case.

21        THE COURT:  Sustained.

22   BY MR. SCHAPER:

23   Q.   Did you hear testimony in this case where plaintiff's

24   counsel asked Mr. Jambor numerous times about whether he

25   personally had filed SARs?

Grice - Direct

 1    A.  Yes.

 2    Q.  In your experience with banks like M&I, do individual

 3    bankers typically file SARs?

 4    A.  Not in my experience.

 5    Q.  Is there a process that banks, like M&I, go through

 6    before making a filing of a SAR?

 7    A.  Yes.  We've been discussing part of that, which is the

 8    AML analysts and the role they play and the AML Committee,

 9    the SAR Committee.  It's to be thoughtful, perform an

10    investigation, compile the relevant facts, and then share

11    that information with law enforcement.

12    Q.  Based on your expertise, do you know whether a bank

13    employee is permitted to disclose whether a SAR was filed on

14    a particular customer?

15    A.  I know their -- well, this applies to employees,

16    consultants like me.  You are never allowed, ever, for the

17    rest of your days to disclose the filing of a SAR.

18    Q.  Why not?

19    A.  We talked earlier about the clock, the 30-day or 60-day

20    clock, for the bank to make the filing once it has

21    determined something is suspicious.  That time pressure

22    means that in many instances I, a bank, may be filing a SAR

23    based on very early information.  I may be wrong.  So if I

24    assert that Mr. Schaper is engaging in a financial crime,

25    that has to be super confidential because the probability of

Grice - Direct

1    error is quite high.

2              So to protect your rights, I am precluded forever,

3    both as an institution and as a person, from ever disclosing

4    this.  Even if I leave the bank and were vacationing in

5    Hawaii and we bump into each other, I can never talk to you

6    about what was done back in my days at Bank X.

7    Q.  There's been some testimony about closing bank accounts

8    in this case.  Did M&I have a policy on when to close a

9    customer account?

10   A.  It did.  It was adopted sometime during the relevant

11   time here.  I can't place the precise time, but there was a

12   policy in place.

13   Q.  And was there a reason, in your review of the record,

14   that that policy was adopted?

15   A.  I don't know what informed that.  I believe it was

16   pressure from the fed.  I see the bank disclosing to the fed

17   the names of customers whose accounts were closed because of

18   a SAR in, I think it was, 2005.  So this was adopted at the

19   early end of the time frame.  So I know they did it.  I just

20   don't know the background to why they did it.

21   Q.  After that policy was adopted, did you see any criticism

22   by the fed of that policy at M&I Bank?

23   A.  No.

24   Q.  Are you familiar -- and you talked about it a bit --

25   with the list of red flags contained in the FFIEC manual?

Grice - Direct

1    A.  Yes, sir.

2    Q.  And based on your review of materials in this case, do

3    you believe that M&I employees ignored red flags that were

4    indicative of suspicious activity?

5    A.  No.

6    Q.  Why not, at a high level?

7    A.  I think they were doing -- if we think back to that

8    three-part triangle of --

9              MR. ANTHONY:  Object, narrative and also entering

10   into the mind of the employees.

11             MR. SCHAPER:  I'm just asking for his opinion,

12   Your Honor.

13             MR. ANTHONY:  But it depends on what he thinks is

14   in the mind of the employees.

15             THE COURT:  Sustained.

16   BY MR. SCHAPER:

17   Q.  Let's talk about some of the specific red flags

18   Ms. Ghiglieri mentioned.

19             Do you recall her testimony that the flow of funds

20   through the PCI account should have alerted M&I that there

21   were suspicious activity?

22   A.  I do.

23   Q.  Based on your review, was the way the transactions

24   flowed through the PCI account a red flag?

25   A.  Not based on the information that existed at the time.

1    Q.  Why not?

2    A.  Because there was no knowledge about sham vendors, for

3    example.  There was no information about sham vendors.

4    Q.  Based on your review, did you see evidence that M&I had

5    information that there would be direct retailer payments

6    into the PCI account?

7    A.  No.

8    Q.  Do you recall Ms. Ghiglieri's testimony that the value

9    and volume of funds flowing in and out of the account of PCI

10   constituting a red flag of suspicious activity?

11   A.  I do.

12   Q.  And based on your review, what's your opinion on that?

13   A.  I think it's without basis.

14   Q.  Were the transactions and the entities involved in the

15   PCI account generally similar over time?

16   A.  Yes.  They were very consistent.

17   Q.  Have you prepared a slide showing the volume of wires in

18   and out of the account over time?

19   A.  Yes, sir.

20           MR. SCHAPER:  Mr. Herzka, if you would please put

21   up slide 18 of DD-60.

22   BY MR. SCHAPER:

23   Q.  This is titled "PCI's Inflows Over Time."  Could you

24   just briefly describe this, Mr. Grice.

25   A.  So this is the number -- these are aqua bars?  I am may

1    be color-blind.  The greenish-aqua flavor is the monthly

2    number of inbound wires, and then the red jagged line is a

3    three-month rolling average just to help explain the data

4    more accurately.

5    Q.  And what does this graphic demonstrate about the inflows

6    in the account?

7    A.  It was very regular.  And, again, as a banker, I would

8    call this kind of well behaved.  It's a growing -- it looks

9    like a growing business, right?  It's a growing volume of

10   inbound activity.

11   Q.  Do you have a recollection, Mr. Grice, about whether the

12   economy generally was growing between 2002 and 2007?

13   A.  It followed the shape of this curve.  So things turned

14   down in 2007.

15   Q.  And if we look at the next slide, this says, "PCI's

16   Outflows Over Time."  What information is contained here?

17   A.  Again, this is just the opposite direction.  So we're

18   now counting the number of outbound wires in the 9018

19   account.

20   Q.  So do you agree with Ms. Ghiglieri's first red flag that

21   the transactions were inconsistent with PCI's purported

22   business model?

23   A.  No, sir.

24   Q.  If we look at the second red flag that Ms. Ghiglieri

25   talked about, do you recall that she suggested that PCI's

1   doing business with a money launderer was a red flag of

2   suspicious activity?

3   A.  I do.

4   Q.  Do you recall that that individual, Mr. Vennes, had some

5   affiliation with Metro Gem?

6   A.  Yes, sir.

7   Q.  And do you recall that Metro Gem was a party that would

8   transact from time to time with PCI?

9   A.  Yes.  Metro Gem was not a customer of M&I.  It was a

10  customer of the customer of M&I.  So it was a counterparty

11  to the PCI transactions.

12  Q.  So according to the regulatory guidance and custom and

13  practice at the time, what were analysts required to do, if

14  anything, regarding research into the counterparties in a

15  customer's account transactions?

16  A.  If the account had been identified as high risk, if the

17  bank had filed SARs, for example, because they thought

18  something was improper about the account -- I recognize

19  banks doing additional investigation into counterparties,

20  but that's not the fact here.  We did not have -- we did

21  not -- the bank did not see the PCI account as high risk and

22  there was no obviously suspicious conduct on the face of it.

23  Q.  Did you hear Ms. Ghiglieri testify that M&I analysts

24  should have known Metro Gem was involved with a convicted

25  felon?

1    A.  Yes.

2    Q.  Are you familiar with the MIContact report from 2002

3    regarding Metro Gem as a prospective customer of M&I?

4    A.  It was never a customer.  It was a prospective customer.

5    Yes, sir.

6    Q.  So if a customer like PCI has a counterparty like Metro

7    Gem, were AML analysts required to look at MIContacts

8    reports for those counterparties?

9    A.  No.

10   Q.  Were AML analysts expected to do so under industry

11   custom and practice in the banking field?

12   A.  No.

13   Q.  Did you see any evidence in the case, Mr. Grice, that

14   the AML analysts in the 2005 to 2008 time period looked at

15   2002 MIContact reports for Metro Gem when they were

16   reviewing PCI's account?

17   A.  No.  Marketing calls are not information about my

18   customer.  These are just that, marketing calls.

19   Q.  Did you see any evidence in this case that AML analysts

20   looked at information about Frank Vennes being a convicted

21   felon?

22   A.  No.

23   Q.  While we're talking about Metro Gem, do you recall that

24   Ms. Ghiglieri said that the AML analysts at the bank should

25   have identified that wire transfers to Metro Gem were

Grice - Direct

1    inconsistent with Metro Gem being in the factoring business?

2    A.  Yes, sir.

3    Q.  Do you recall that testimony?

4    A.  I do.

5    Q.  Do you agree with that?

6    A.  No.

7    Q.  Why not?

8    A.  It's putting an unreasonable burden on the AML analysts.

9    First of all, this is not about "know your customer."  This

10   is this "know your customer's customer" question.

11   Q.  What, in your view, would Ms. Ghiglieri's criticism have

12   required AML analysts to do?

13   A.  So they're stepping outside KYC.  They're now choosing

14   to go into this world of our customer's customer and doing

15   an investigation, which is, I would argue, outside the scope

16   and responsibility of a bank at the time.

17         And then would require the AML analyst to do a

18   kind of business analysis of the customer's customer and

19   reach sufficient understanding of factoring to be able to

20   know factoring or whether it's not factoring, which is a

21   very complex question.

22   Q.  So you regularly interacted with banking regulators in

23   the 2002 to 2008 time frame, correct?

24   A.  Yes, sir.

25   Q.  Did you ever hear regulators suggest that a bank should

1    do what Ms. Ghiglieri is suggesting with respect to M&I's

2    looking into Metro Gem?

3    A.  Never.

4    Q.  So do you agree with Ms. Ghiglieri's suggested red flag

5    of suspicious activity about PCI doing business with a money

6    launderer?

7    A.  No.

8    Q.  The next red flag on Ms. Ghiglieri's list was large

9    round dollar wire transfers to and from the same parties for

10   similar amounts on a monthly basis.  Do you recall her

11   testimony that that would have been an indication of

12   suspicious activity?

13   A.  I do.

14   Q.  Let's first talk about round-trip transactions.  She

15   referred to transactions going through PCI as round-trip.

16   Do you recall that testimony?

17   A.  I do, yes, sir.

18   Q.  And based on your review, do you agree with her that

19   these were round-trip transactions?

20   A.  No.  There were very few where the actual dollars tie

21   out or match on a transaction basis.

22   Q.  Are similar dollar amounts the same thing as a

23   round-trip transaction?

24   A.  No.

25   Q.  Let's talk about round dollar transactions.  Do you know

1    where the concept of round dollar transactions came from in

2    terms of being a regulatory concern?

3    A.  I do.  So before 9/11 I did a research project into the

4    history of some of the red flags that were available in the

5    industry at the time, and I went to the policy office of the

6    Federal Reserve Board in Washington and talked to the team

7    that was identifying red flags.  And there was a gentleman

8    who pulled me aside.  We did a national conference in, I

9    think, 1999.

10                  MR. ANTHONY:  Objection, narrative, hearsay.

11                  THE COURT:  Sustained.

12   BY MR. SCHAPER:

13   Q.  If you could just state your understanding of how round

14   dollar transactions became a regulatory concern in some

15   context.

16   A.  Of course.  It was cash transactions, usually involving

17   ATMs and personal accounts.

18   Q.  Would that regulatory concern around round dollar

19   transactions apply to the PCI account?

20   A.  No.

21   Q.  Even looking at PCI, did you analyze whether most of the

22   PCI transactions were in large round dollars?

23   A.  I did.  My team and I did an analysis of the wire

24   transactions to identify which ones were round to the

25   hundred dollars or to the thousand dollars.

Grice - Direct

1    Q.  And what did you find?

2    A.  Certainly not the majority.  I think 25 percent of the

3    transactions were rounded to the hundred dollars and

4    13 percent were rounded to the thousand dollars.  So it's a

5    minority of the transactions were large round dollar

6    amounts.

7    Q.  In your work on other cases, other litigation matters,

8    have you ever said that round dollar transactions could be a

9    red flag?

10   A.  Certainly in instances where the customer is doing

11   transactions through a personal checking account.

12          The one Ms. Ghiglieri mentioned, I did a report

13   for a case involving a private wealth -- a private banking

14   account where there was cash coming in and out in large

15   round dollars at an ATM, in addition to other risk factors

16   in the account.

17          So it's relevant to that -- my original

18   understanding of large round dollars, that it's cash in and

19   out of a retail account.  It's not wires in and out of a

20   business account.

21   Q.  When you say "a retail account," do you mean an

22   individual person's account?

23   A.  An individual person's account.  In this case it was a

24   high net worth individual, but, still, it's a person's

25   account as opposed to a business account.

 1    Q.  What was the name of that case?

 2    A.  I think it was *Stern vs. Wells Fargo*.  I was retained by

 3    counsel for the Stern family.

 4    Q.  So was that an example of when you testified against the

 5    bank?

 6    A.  Yes.

 7    Q.  Were the facts of that case similar to the facts in this

 8    case?

 9    A.  No.

10    Q.  And is the testimony that you are giving today about

11    large round dollar transactions in line with your opinion

12    that you gave in that case?

13    A.  Yes.

14              THE COURT:  Counsel, we will take our midday break

15    at this point.

16              And so, Members of the Jury, please remember the

17    instructions that you have been given and please continue to

18    abide by those instructions.

19              We will have a longer break than normal and so I

20    will ask you to be ready to return to the courtroom at 1:30.

21    Okay?

22         (Jury excused)

23                        **IN OPEN COURT**

24                     **(JURY NOT PRESENT)**

25              THE COURT:  And to our witness, I will ask you to

```
 1    do the same.

 2                 THE WITNESS:  Of course.  Thank you.

 3                 THE COURT:  We are in recess.

 4          (Lunch recess taken at 11:46 a.m.)

 5                         *    *    *    *    *

 6          (1:32 p.m.)

 7                             IN OPEN COURT

 8                            (JURY PRESENT)

 9                 THE COURT:  Good afternoon.  Please be seated.

10                 MR. SCHAPER:  May I proceed, Your Honor?

11                 THE COURT:  Yes, you may.  Good afternoon.

12                 MR. SCHAPER:  Thank you.

13    BY MR. SCHAPER:

14    Q.  Mr. Grice, am I correct that before we broke for lunch

15    that you went through your opinion that large round dollar

16    amounts in and out of the account, round-trip transactions

17    were not, in your opinion and based on your expertise, a red

18    flag of suspicious activity?

19    A.  Yes, sir.

20    Q.  So in the 20 or 30 minutes, Mr. Grice, that I think I

21    have left, I just want to cover a few more of the red flags

22    that Ms. Ghiglieri testified about.

23                 Do you recall her testimony that low beginning and

24    ending balances in the PCI account were red flags of

25    suspicious activity?
```

1    A.  Yes, sir.

2    Q.  And do you have a view of whether that, in fact, was a

3    red flag of suspicious activity?

4    A.  I think in this case it wasn't.

5    Q.  And why is that?

6    A.  I think it's consistent with careful banking by a

7    customer.  And I could imagine circumstances where it is

8    reflective of suspicious activity, but not in a business

9    account with some financial sophistication.  The Petters

10   scheme was well-concealed and sophisticated in its

11   management.  Using your cash efficiently would be consistent

12   with that, that would be part of that.

13   Q.  When you say "using your cash efficiently," what's your

14   understanding of whether PCI earned interest on the 9018

15   account?

16   A.  They did not.  So a large balance earned them nothing.

17   Q.  Do you recall Ms. Ghiglieri's testimony that transfers

18   of funds to Mr. Petters and other Petters employees -- or

19   other PCI employees constituted a red flag of suspicious

20   activity?

21   A.  Yes, sir.

22   Q.  And what is your view of that?

23   A.  I also don't believe that is reflective of suspicious

24   activity in this context at all.

25   Q.  And why is that, Mr. Grice?

1    A.  Tom Petters was the owner of the account.  I don't see

2    any controversy about that.  He was the authorized signer.

3    He properly granted signing authority to Deanna Coleman.  So

4    the transfers that Ms. Ghiglieri pointed to were properly

5    signed, completed checks by legitimate authorized signers on

6    the account.

7              So I -- the checks themselves were not improper or

8    irregular or suspicious, and that was confirmed by Ed Jambor

9    in the phone call he had with Tom Petters.  I don't know the

10   year of this, but it was in the early part of the 2002 to

11   2008 time frame.

12   Q.  Let me just stop you there.  You are not saying that

13   there -- you are not suggesting that the checks weren't

14   actually written to Deanna Munson and Tom Petters from the

15   account, are you?

16   A.  I'm sorry.  Say that again.

17   Q.  There were actually checks and transfers to Ms. Coleman

18   and Mr. Petters and Mr. White, correct?

19   A.  Yes.

20   Q.  So I guess the question:  Is there anything unusual

21   about checks or wires, even for significant amounts, being

22   sent from a business checking account to employees of the

23   company?

24   A.  No.  This is the right of the account owner and the

25   authorized signer.

1    Q.  Okay.  And you mentioned Mr. Jambor a minute ago.  Did

2    you hear evidence that Mr. Jambor actually confirmed with

3    the account owner that he was okay with Ms. Coleman or

4    Ms. Munson sending checks to herself?

5    A.  Yes.

6            MR. ANTHONY:  Objection, mischaracterizes the

7    testimony.  PCI is the account owner.

8            THE COURT:  Sustained.

9            MR. SCHAPER:  Thank you.

10   BY MR. SCHAPER:

11   Q.  Let me re-ask you that.  Have you heard evidence that

12   Mr. Jambor confirmed with Mr. Petters from PCI whether he

13   was okay with Ms. Munson sending checks to herself?

14   A.  Yes, I heard that testimony.

15   Q.  Okay.  Was it appropriate, under customary banking

16   practices, for Mr. Jambor to call one of the signatories to

17   the account to confirm that the checks were authorized?

18   A.  It was entirely proper.

19   Q.  Do you recall Ms. Ghiglieri's testimony, Mr. Grice, that

20   PCI's refusal to provide M&I with requested financial

21   statements constituted a red flag?

22   A.  Yes.

23   Q.  Okay.  And based on your review of the record and your

24   expertise, did that constitute a red flag of suspicious

25   activity?

Grice - Direct

1    A.  No.

2    Q.  And why do you say that?

3    A.  Customers have rights.  There are obligations under the

4    customer agreement in a depository relationship.  Again,

5    just to remind everyone, this was a simple checking account.

6    It was not a loan.

7            So under the rules of a simple checking account,

8    in my experience across my lifetime, commonly banks do not

9    ask for or require anything other than evidence of my

10   identity and proof of proper authorization to do a

11   transaction.

12           So if the bank were to ask me for my tax return or

13   a financial statement and all I had was a depository

14   relationship, I am well within my rights to say no.

15   Q.  Mr. Grice, did you hear testimony or see evidence in

16   this case about Mr. Jambor receiving a request about whether

17   there was $39 million in the PCI account to fund the

18   purchase of 100,000 cell phones?

19   A.  I do, yes.

20   Q.  Okay.  And we have an exhibit that is already in

21   evidence.  It's P-60.  And if you take a look at that --

22   it's also in your binder, Mr. Grice.  If we can -- and are

23   you familiar with this document, Mr. Grice?

24   A.  Just a second.

25   Q.  Okay.

1           (Witness reviews document)

2       A.  Yes, sir, I recall this.

3       Q.  So if we look at the third page -- and do you recall

4       Ms. Ghiglieri's view that this was signs of potentially

5       fraudulent activity?

6       A.  I do.

7       Q.  And do you agree with that?

8       A.  No.

9       Q.  Let's look first at what we're seeing here.  Would it be

10      unusual for a customer like PCI, who was supposed to be in

11      the electronics business, to get an inquiry about a

12      transaction involving cell phones?

13      A.  No.  This looks perfectly consistent with the activity

14      of somebody buying and reselling electronic goods, such as

15      cell phones.

16      Q.  Was this inquiry to -- that Mr. Jambor testified about,

17      was this from somebody outside of PCI?

18      A.  Yes.  It was from a potential, I guess, vendor to PCI.

19      Q.  And did Mr. Jambor, as far as you're aware in the

20      record, actually respond to this person who inquired?

21      A.  My understanding is he did not.

22      Q.  And was that the appropriate thing to do under banking

23      practice and customs?

24      A.  Yes, because, again, PCI has a right to financial

25      privacy.  This would violate that right to financial

1    privacy, by giving up information about account balances or

2    account activity to somebody who is not the authorized

3    signer or done with the expressed consent of the authorized

4    signer.

5    Q.  And so what did Mr. Jambor do?

6    A.  He called -- I can't recall if he called Mr. Petters or

7    Ms. Coleman, but anyways, he contacted his customer, which

8    was the proper thing to do under banking practices in the

9    United States.

10   Q.  Actually, if you look at the first page of this

11   document, do you see that Mr. Jambor actually sent this on

12   by -- in writing by e-mail?

13   A.  I do see that, yes.

14   Q.  And was that an appropriate thing to do under the

15   circumstances?

16   A.  Yes.  I would want my banker to do this for me if my

17   bank had received this kind of solicitation.

18   Q.  So if we then look back -- I just want to ask you,

19   Mr. Grice, about the last item on this particular list

20   created by Ms. Ghiglieri, and that's large overdrafts.

21          Do you recall Ms. Ghiglieri's testimony that large

22   overdrafts in PCI's account were red flags of suspicious

23   activity?

24   A.  I do.  I'm trying to recall the colorful language she

25   used.  They were flaming or glaring or they were something,

1    but they were big red flags, yes.

2    Q.  And do you agree with that opinion, Mr. Grice?

3    A.  No.

4    Q.  Why is that?

5    A.  Well, we heard testimony about this over the last few

6    days.  We heard from Chris Flynn's supervisor, who described

7    these overdrafts not as overdrafts, but as NSF, insufficient

8    funds conditions, which were corrected well within the time

9    limits before this became an overdraft -- I'm sorry, before

10   this became a -- yeah, before the account was officially

11   overdrawn.

12   Q.  So there was testimony that you heard in this trial that

13   these were not, in fact, overdrafts?

14   A.  Yes.  I'm just forgetting the woman's name who was

15   Mr. Flynn's supervisor.

16   Q.  Ms. Crain?

17   A.  Ms. Crain, exactly.  Thank you.

18   Q.  And even if these had been overdrafts, Mr. Grice, do you

19   remember how many Ms. Ghiglieri identified?

20   A.  I don't recall her number.  I recall my own research.  I

21   think it was six or seven during the life of the

22   relationship.  So it's six or seven in six or seven years,

23   which, by my measure, is a very modest number of NSF

24   conditions or overdrafts during that time.

25   Q.  So, Mr. Grice, just looking at the red flags of

1     suspicious activity that Ms. Ghiglieri identified here, what

2     is your view as to whether it's reasonable to view these

3     actions as indications of suspicious activity in the PCI

4     account?

5     A.  I disagree with each of the six that she identified, and

6     I think they are informed by hindsight bias.

7     Q.  Mr. Grice, there were -- there was some concerns that

8     Ms. Ghiglieri expressed that didn't make it onto that

9     particular slide.  I just want to ask you about a few of

10    those.

11          Do you recall Ms. Ghiglieri's testimony that M&I

12    gave PCI a special policy when it came to wire transfers

13    into the account?

14    A.  I do.

15    Q.  Okay.  What is your view of that concern?

16    A.  I think she's factually incorrect.

17    Q.  Why is that?

18    A.  Under the Wire Transfer Agreement that was executed

19    between the bank and PCI -- I'm sorry.  Could you ask the

20    question again?  I just lost my train of thought.

21    Q.  Yeah.  So I had asked you whether you recalled

22    Ms. Ghiglieri's testimony that there was a special policy

23    when it came to wire transfers into the account.

24    A.  Yeah.  In the wire policy of M&I at the time, there was

25    an allowance for this daylight overdraft extension.  So it

1    was allowed.  So what she's calling a special accommodation

2    was anticipated in the policy itself.  So, therefore, I

3    think this can't be considered an accommodation or an

4    exception.  This was contemplated in the drafting of the

5    policy.  And it didn't call out PCI or Tom Petters.  It

6    could apply to any customer that the bank chose to extend

7    that to.

8    Q.  And Ms. Ghiglieri also suggested that M&I provided PCI

9    with extra handling by manually processing wire transfers

10   even after PCI had signed up for online banking services.

11   Do you recall that?

12   A.  I do recall that.

13   Q.  And do you have a view as to whether it was

14   inappropriate under banking customs and standards for M&I to

15   manually process wire transfers after PCI had signed up for

16   online services?

17   A.  This is one of the more unusual red flags.  I have not

18   seen this ever before.  By my measure, before I ever read

19   Ms. Ghiglieri's report or heard her testimony, I see a bank

20   employee entering the data for my wire transfer as safer or

21   better than trusting me or my employee to enter that same

22   information.

23   Q.  Why do you say that it's safer when the bank is

24   inputting that information?

25   A.  Well, there's a thing in banking called the fat thumb

1    syndrome or the fat finger syndrome where there's a mistake.

2    Mistakes do happen.  And I would rather -- if a mistake is

3    going to occur, I would rather the bank be responsible for

4    this than my own employee being responsible for it.

5          I've just never seen trusting a bank officer to

6    perform a transaction as inferior to any other method.  I

7    just don't think in the banking business that's recognized

8    as dangerous or suspicious or irregular.

9    Q.  Ms. Ghiglieri also testified about a letter that

10   Mr. Jambor sent to the board of directors of Polaroid.  Do

11   you recall that testimony?

12   A.  I do.

13   Q.  And in the letter Mr. Jambor stated that Petters

14   affiliates had been a customer for five years and transacted

15   in high dollar amounts.  Do you remember that?

16   A.  Yes.

17   Q.  And Ms. Ghiglieri's view was that that letter was

18   unusual or atypical and misleading.  Do you agree with that?

19   A.  No.  In my experience, these are called good standing

20   letters.  They are not -- they are nothing more than

21   describing a relationship and verifying that there is, in

22   fact, a banking relationship between M&I and Tom Petters.

23   So it's not an endorsement.  It's not -- it's nothing more

24   than stating a fact.

25          So these are done routinely and, again, they are

1    carefully crafted because banks don't want to be making

2    endorsements or assuming risk where all they intend to do is

3    convey that we have had a relationship.

4            So it's like writing a letter of recommendation.

5    When somebody says, yes, they were in my employment for a

6    year or two, it, to me, is in the same vein.  It's not

7    anything more than a validation that there is, in fact, a

8    relationship.

9    Q.  And do you recall Ms. Ghiglieri's testimony that M&I, in

10   her view, gave PCI some kind of special accommodation by

11   maintaining it as a business banking account rather than

12   moving it to some other part of the bank?

13   A.  And again -- yes, I recall that.

14   Q.  And was that suspicious in your view?

15   A.  No.  I think this week we've heard lots of testimony

16   from two or three witnesses about the distinction between

17   business and commercial banking.  In my analysis --

18            MR. ANTHONY:  Narrative answer.

19            THE COURT:  Sustained.

20   BY MR. SCHAPER:

21   Q.  Why is it your view, Mr. Grice, that there was nothing

22   improper about maintaining the PCI account in the business

23   banking group?

24   A.  Because no matter where in the bank organization that

25   9018 account is housed, all of the controls are the same.

1    Q.  When you say "all the controls," what are you referring

2    to?

3    A.  I'm talking specifically about the anti-money laundering

4    control, such as Searchspace.  They are agnostic as to where

5    the account is.

6    Q.  So was a banking -- was a business banking account

7    reviewed any differently from other business customer types

8    in Searchspace?

9    A.  No.  I have seen no evidence to even suggest that.

10   Q.  Let's talk about the Deposit Account Control Agreements

11   that we've heard about in this case.

12            First of all, very briefly, can you -- are you

13   familiar with those kind of agreements?

14   A.  I am.  They have been around longer than I have.  They

15   have been around for a long time.

16   Q.  And can you just briefly explain to the jury what those

17   kinds of agreements are.

18   A.  These are common in different kinds of banking

19   relationships, such as commercial real estate transactions

20   or -- the first time I saw them was in a deposit

21   relationship involving a cemetery funeral home perpetual

22   care situation, where somebody purchases a plot and part of

23   the price is also maintenance of the plot.

24            So I'm buying both the land and a perpetual

25   maintenance contract for the care of that.  The business

 1    providing that care to the lawn or the landscaping has an

 2    interest in preserving their piece of that payment.

 3              And so this DACA or DAMA arrangement allows for a

 4    protection against a party in a transaction.

 5    Q.  And I think it's clear from your answer, but did you

 6    encounter that type of arrangement before your work on this

 7    case?

 8    A.  Yes.

 9    Q.  We've heard that some of the bankers at M&I were not

10    familiar with DACAs before the topic arose with PCI.  Do you

11    recall that?

12    A.  I do.

13    Q.  But just more generally in terms of banking custom and

14    practice in the industry, were these type of agreements

15    unusual?

16    A.  Not by my understanding or by my experience.  These have

17    been in the industry for at least as long as I've been

18    involved in banking.

19    Q.  In your view, was M&I's decision to enter into DACA or

20    DAMA agreements with PCI improper?

21    A.  No.

22    Q.  Let me just move to my final topic, Mr. Grice.  You've

23    given an opinion that M&I employees did not behave in a way

24    that would be consistent with involvement in a financial

25    fraud.  Am I recalling that correctly?

```
 1    A.  Yes, sir, that's correct.
 2    Q.  And what experience are you drawing from in giving that
 3    opinion?
 4    A.  Internal investigations in banks where we suspect or we
 5    discover that an employee is having an improper relationship
 6    with a customer or somebody committing a fraud with or
 7    against the bank.
 8    Q.  And did you prepare a slide related to this opinion?
 9    A.  I did, yes, sir.
10              MR. SCHAPER:  Mr. Herzka, if you would please put
11    up DD-60, slide 20.
12    BY MR. SCHAPER:
13    Q.  And the top there says, "Conduct of M&I Employees is
14    Inconsistent with Involvement in Financial Fraud."
15              So, first of all, in your experience, Mr. Grice,
16    do you expect to see efforts to limit access to an account
17    if employees are participating in a fraud?
18    A.  Can you just repeat the question?  I guess I didn't hear
19    it --
20    Q.  Sure.  Do you expect to see efforts on behalf of bankers
21    to limit access to an account if employees are participating
22    in a fraud?
23    A.  Yes.  In my experience, if an employee is engaging in an
24    improper relationship, whether it's planned or actual, the
25    last thing that employee wants to do is to broaden the
```

1    circle and increase the number of colleagues who have access

2    to the account or the information in the account.

3    Q.  And why is that?

4    A.  For fear of discovery.  So in -- again, in my career, in

5    my experience, once you make this mistake of conspiring

6    against your bank, that is the end of your career.  If

7    caught, that's it.  So you're betting your entire career on

8    this one improper transaction or relationship.  So the last

9    thing you want is discovery.

10   Q.  Okay.  So let's talk about the evidence in this case.

11   Have you seen any evidence of efforts by M&I bankers to

12   limit access to the PCI account?

13   A.  No.  In fact, on the contrary, we see the opposite.

14   Q.  Can you explain what you mean by that.

15   A.  Again, I'm -- it feels late in the day for me.  But

16   any -- there were instances in the relationship between M&I

17   and PCI where the bank was attempting to broaden the

18   relationship or deepen the relationship by selling

19   additional products and services to PCI.

20   Q.  And would those sales of other products in the bank have

21   exposed the PCI account to other bank employees?

22   A.  Yes.

23   Q.  And other bank departments?

24   A.  Yes.  Particularly, there was an exploration of the

25   possibility of a trust relationship, a trust department

1    relationship or a credit facility of some sort.  Both of

2    these would involve highly trained specialists who would

3    have probing questions for PCI.

4            And then I heard Ms. Coleman, I guess it was

5    Tuesday, testify that the last thing she was wanting was to

6    have more bankers ask questions because she could not

7    qualify for a loan.  The financials were fraudulent.

8    Q.  So is the -- is looking for opportunities to introduce

9    bank customers to other parts of the bank, is that also

10   called cross-selling?

11   A.  Yes, sir.

12   Q.  And you have heard testimony about cross-selling in this

13   case?

14   A.  Yes, sir.

15   Q.  Is cross-selling unusual in the banking industry given

16   your expertise?

17   A.  It's the most common thing I see in banking.  Not for

18   sinister reasons.  It's because banks, in fact, are trying

19   to help customers get solutions to their problems.  So you

20   don't have to buy the service, but if you need it, you need

21   to know that I have something available that may help you.

22   So it's in your interest and mine.

23   Q.  You testified just a few -- well, strike that.

24           What does the second bullet on your slide

25   reference to, Mr. Grice?

1    A.  "No evidence any M&I employee provided special

2    assistance to Petters or PCI."  This really gets to the

3    DACA/DAMA question, the letter to Polaroid, the board of

4    directors.  I just see no evidence of anything out of the

5    ordinary or unusual being provided to PCI.

6    Q.  In your experience, including having reviewed other

7    cases involving Ponzi schemes, would you expect to see a

8    bank employee who was involved in some kind of fraud receive

9    some kind of personal benefit?

10   A.  I can't think of an example on cases I've worked on

11   where somebody did this without a financial or pecuniary

12   gain or motive.  It's -- this is why you are jeopardizing

13   your career.  There's some benefit for the banker,

14   ostensibly.

15   Q.  And what -- in your experience and then we'll come back

16   to this case, but in your experience, what type of benefits

17   do bank employees typically receive if they are involved in

18   some kind of financial fraud?

19   A.  Illicit payments, creatively organized payments that are

20   hard to trace, so usually cash or payments -- now we see

21   Bitcoin payments outside of the United States.  So

22   hard-to-trace payments.  Offers of paying children's college

23   tuition or gifts of condos or apartments in Panama to make

24   it less discoverable.  So there are ways to make financial

25   rewards available to people that are hard to trace.

1    Q.  And did you see any evidence that any employee at M&I

2    was personally enriched from their relationship with

3    Mr. Petters or PCI?

4    A.  None.

5    Q.  Did you see any evidence of that with the various AML

6    employees who we've heard testify in this case?

7    A.  None.

8    Q.  Did you see any evidence of that with the different

9    bankers that we've heard testify in this case?

10   A.  None.

11           MR. SCHAPER:  No further questions at this time.

12           THE COURT:  I have one instruction for the jury.

13   Members of the Jury, you have seen and heard evidence

14   pertaining to examinations conducted by the Federal Reserve

15   Bank of Chicago.  This evidence may be considered by you

16   only for the purpose of evaluating the accuracy and

17   credibility of the opinions and testimony of Catherine

18   Ghiglieri and Charles Grice.  This evidence may not be

19   considered for any other purpose.

20           Okay.  Are you ready to proceed, Counsel?

21           MR. ANTHONY:  I am ready, Your Honor.  May I

22   proceed?

23           THE COURT:  You may.

24

25

1                          **CROSS-EXAMINATION**

2     BY MR. ANTHONY:

3     Q.  Good afternoon, Mr. Grice.

4     A.  Good afternoon.

5     Q.  Before I get to the main part of my outline, you said

6     something that caught my attention.  I want to deal with

7     that right off the bat.

8              You were asked who the owner of the 9018 account

9     at M&I Bank was.  Do you recall being asked that question?

10    A.  I do, yes.

11    Q.  And twice you said it was Tom Petters was the owner.  Do

12    you recall your answer?

13    A.  I do recall that.

14    Q.  That's inaccurate, right?

15    A.  I understand it's inaccurate.  Tom Petters controlled --

16    Q.  No.  Do you understand it's inaccurate?

17              MR. SCHAPER:  Objection, Your Honor.  Could the

18    witness please be allowed to finish his answers?

19              MR. ANTHONY:  I think he did, Your Honor, and he

20    was going into a narration.

21    BY MR. ANTHONY:

22    Q.  Do you now understand --

23              THE COURT:  Counsel, I have not ruled --

24              MR. ANTHONY:  I'm sorry, Your Honor.

25              THE COURT:  -- on your objection, and it is not

1    your prerogative to continue until I do.

2              MR. ANTHONY:  I apologize.

3              THE COURT:  The objection is overruled.

4              MR. ANTHONY:  Okay.

5    BY MR. ANTHONY:

6    Q.  When you gave the answer that Tom Petters was the owner

7    of this account, did you -- had you studied enough to know

8    that he wasn't the owner?  Was it just a mistake?

9    A.  It was a slip of the tongue.

10   Q.  Okay.  So twice there was a slip of the tongue as to who

11   the owner of the account was, right?

12   A.  Yes.

13   Q.  And, in fact, the owner of the account was PCI, Petters

14   Capital [sic] Inc., correct?

15   A.  Yes.

16   Q.  And that's an important distinction.  Because if the

17   bank had any obligations, it was to PCI, the owner of the

18   account, correct?

19   A.  Um --

20   Q.  Would you like me to rephrase?

21   A.  Please, yeah.

22   Q.  The bank had an agreement with PCI to open a depository

23   account with the bank, correct?

24   A.  Correct.

25   Q.  PCI was a corporation, correct?

1    A.  Correct.

2    Q.  And PCI is the entity to whom the bank owed whatever

3    duties it owed, correct?

4    A.  I'm not a lawyer.  So I recognize that's correct.

5    However, as a banker, I see this as a Subchapter S closely

6    held corporation controlled by Tom Petters.  So if I'm

7    incorrect, I'm incorrect, but that's my banker understanding

8    of the effective control of PCI.

9    Q.  Okay.  Whether it was effective control or not, you knew

10   the owner of the account was PCI, Inc., correct?

11   A.  Yes.

12   Q.  Okay.  And the bank owed obligations to PCI, Inc. as the

13   owner, correct?

14          MR. SCHAPER:  Just object to the extent that

15   counsel is calling for a legal conclusion.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yeah, I can't engage in a debate

18   about business law because I am not an expert on business

19   law.

20   BY MR. ANTHONY:

21   Q.  So given your 35 years of banking experience, you're

22   saying you have no opinion as to whether the bank owed

23   duties to the party that was the co-party to the agreement

24   of the account-opening agreement; is that your testimony?

25   A.  No, sir.

1    Q.  Yes, sir?

2    A.  I said, "No, sir."

3    Q.  So can you say that, in your 35 years of banking

4    experience, when a corporation opens an account with a bank,

5    that the bank owes a duty to the corporation?

6    A.  Again, I'm not here to offer legal opinions.  I

7    recognize that there's a duty to the corporation.  And as I

8    said earlier, my understanding is it's a Subchapter S

9    effectively controlled, in my language, by Tom Petters.

10   Q.  Okay.  Now, you know that Mr. Petters and Ms. Coleman

11   and Mr. White were officers of this corporation, correct?

12   A.  Yes, sir.

13   Q.  And you know that the officers of this corporation were

14   writing to themselves tens of millions of dollars of checks,

15   correct?

16   A.  In the aggregate, yes, sir.

17   Q.  Yes.  And you now know that Mr. Kelley is the trustee

18   who is representing the corporation, PCI, who is seeking to

19   recover funds from those who he claims have caused harm to

20   PCI, correct?

21   A.  I understand that's the nature of his complaint, yes,

22   sir.

23   Q.  And, in fact, you also understand he's gone after

24   Mr. Petters and Ms. Coleman and Mr. White to recover the

25   funds they have taken from PCI, correct?

1    A.  I have an understanding of that, yes, sir.

2    Q.  And he's doing that on behalf of PCI, correct?

3    A.  Yes, sir.  He's in -- he's now got effective control of

4    the estate, yes.

5    Q.  I think -- I just want to touch on the fact -- I think

6    you said you've never been a bank examiner, correct?

7    A.  That's correct.

8    Q.  Never been a bank regulator, correct?

9    A.  That's correct.

10   Q.  Never been a commissioner of banks in any state in the

11   United States, have you?

12   A.  That's correct.

13   Q.  I'm going to show you the demonstrative you were using.

14   It's slide 5 of DD-60.

15   A.  Do I have that here?

16   Q.  You have it on the screen --

17   A.  Oh, there we go.

18   Q.  -- or it's in the demonstrative booklet that your

19   lawyers gave you.

20   A.  I'll use the screen.  Thank you.

21   Q.  Now, you put on here -- you -- did you prepare this?

22   A.  It was done under my direction, yes, sir.

23   Q.  Who prepared it?

24   A.  My team.

25   Q.  Okay.

1    A.  I don't know how it was actually wordsmithed or

2    produced, but these are my ideas put on a slide.

3    Q.  Okay.  And, in fact, that's similar to the way you did

4    your report, right?  You didn't actually write the report,

5    your team wrote the report, right?

6    A.  I wrote the report.  As I said in my deposition, I don't

7    know how to type footnotes, and there are 400 of them or

8    something.  So it took a team to produce it.

9    Q.  In fact, you also had your lawyers review it and edit it

10   before you finished it, right?

11   A.  That wasn't my experience.

12   Q.  Pardon?

13   A.  That's not my understanding or experience.

14   Q.  Your lawyers didn't look at it before you finished it?

15   A.  I don't know.  I did not sit with my lawyers ever during

16   the production of these two reports.

17   Q.  May they have also made edits to your report?

18   A.  I'm sorry.  What's the question?

19   Q.  May your lawyers have made -- may BMO's lawyers have

20   made edits to your report?

21   A.  I don't recall that being the case.

22          MR. ANTHONY:  Why don't you get his deposition.

23   BY MR. ANTHONY:

24   Q.  We'll come back to that.

25          Do you know if your lawyers made edits to your

1   report?

2          MR. SCHAPER:  Your Honor, may the witness have a

3   copy of --

4          MR. ANTHONY:  I'm not yet to impeach him.  I'm not

5   about -- I'm just asking the question.

6   BY MR. ANTHONY:

7   Q.  Do you know if your lawyers made edits to your report?

8          MR. SCHAPER:  Objection as to the form of his

9   lawyers.

10          MR. ANTHONY:  I'm sorry.

11          THE COURT:  Sustained.

12   BY MR. ANTHONY:

13   Q.  Do you know for a fact whether Mayer Brown provided

14   typed edits to your report?

15   A.  So this was four or five years ago.  I just don't

16   recall.

17   Q.  Okay.  All right.  Let's look at -- back to DD-60 at 5.

18          So in December of '01 M&I acquires NCB -- that's

19   National City Bank, correct?

20   A.  Yes, sir.

21   Q.  -- and the 9018 account.  That's the PCI account, right?

22   A.  Yes, sir.

23   Q.  The corporate account?

24   A.  Yes, sir.

25   Q.  Okay.  And at that time, in 2001, M&I was obligated to

1    comply with the Bank Secrecy Act, correct?

2    A.  Correct.

3    Q.  Was supposed to be, I think in some of the materials we

4    saw, the first line of defense to money laundering and

5    things of that nature, correct?

6    A.  Are you referencing M&I training materials?

7    Q.  Yes.

8    A.  I recognize that, yes.

9    Q.  All right.  And the bank was supposed to continue to

10   be -- to comply with the Bank Secrecy Act from 2001

11   through 2008, correct?

12   A.  Yes, sir.

13   Q.  And I think you used the words the bank's obligations

14   were to monitor, detect, investigate, and then be thoughtful

15   about whether or not to file a SAR, correct?

16   A.  Yes, to do an investigation and then file a quality SAR,

17   yes.

18   Q.  And the -- from 2001 to 2008, how much money in billions

19   do you recall went through the M&I PCI account -- the M&I

20   Bank PCI account?

21   A.  I don't have that number in my mind.  Several people

22   have testified to that.

23   Q.  So --

24   A.  I don't know that specific number.

25   Q.  You knew it was billions, correct?

1    A.  I know to the billions.

2    Q.  So if there has been testimony that it was 73 billion,

3    you wouldn't have any information to dispute that, would

4    you?

5    A.  No.  I'm not doing the forensic accounting or the

6    damages analysis at all.

7    Q.  And the bank, M&I, had all the wire transactions that

8    would account for the $73 billion that went through the

9    bank, right?

10   A.  Well, by definition it's passing through the bank, so --

11   Q.  So that's "yes"?

12   A.  Well, if you're asking did they have data, yes.  The way

13   you phrased the question, they had the money.  The money

14   went into the account and then was sent out, but they had

15   the data about the transactions.

16   Q.  Did the bank have whatever information it needed or was

17   required to have by federal rules and regulations with

18   respect to all activity with respect to the wires going back

19   between PCI and any other company?

20            MR. SCHAPER:  Objection to form, vague.

21            THE WITNESS:  I have seen no evidence that the

22   bank --

23            THE COURT:  Overruled.

24            THE WITNESS:  I'm sorry.

25            THE COURT:  You may answer.

1              THE WITNESS:  I have seen no evidence that the

2       bank's records were inaccurate.

3       BY MR. ANTHONY:

4       Q.  Okay.  So the bank had all the information in its

5       records to keep an eye on the wire transactions, correct?

6       A.  I would say the bank had all the data on the wire

7       transactions in its possession.

8       Q.  What's the difference between data and records?

9       A.  Data and records are the same.  You used the word

10      "information" --

11      Q.  Okay.

12      A.  -- which to me is more refined than data.

13      Q.  Okay.  So they had information, data, and records,

14      correct?

15      A.  Well, you're changing the question.  Originally it was

16      did they have data.  I agree they have data.  They had the

17      data on the transactions.

18      Q.  Can we agree they had the data and the records of the

19      transactions?

20      A.  I can agree to that.

21      Q.  Okay.  And they were supposed to monitor that data and

22      records to determine if there was any suspicious activity,

23      correct?

24      A.  Yes, sir.

25      Q.  And in addition to having the data and records for the

1    wire transactions, they had the monthly bank statements,

2    correct?

3    A.  They produced monthly bank statements, yes.

4    Q.  Not only did they have them, it was the bank's job to

5    produce them, right?

6    A.  Under the account agreement, that's what banks do.

7    Q.  And they also had what we've seen in this proceeding,

8    the money transfer statements showing the wire activity,

9    correct?

10   A.  Yes, sir, that's correct.

11   Q.  Okay.  And the bank had would you say it was data or

12   records that showed the checks going out routinely to the

13   officers of PCI?  Would you call that data or records, those

14   checks?

15   A.  I guess I'm not understanding what you mean by

16   "routinely."  We saw the checks.  We've seen many of the

17   checks in exhibits during the trial.  The bank had that

18   information.  They had that -- they had that data.

19   Q.  Okay.

20   A.  They had those records.

21   Q.  So whenever the checks for millions of dollars went out

22   to the insiders, the banks had the records and the data that

23   showed that, right?

24   A.  Yes.  And I have seen no evidence that they were

25   inaccurate in the way they processed these transactions.

1    Q.  All right.  And the bank also had data or records that

2    showed billions of dollars coming in from Enchanted,

3    correct?

4    A.  Yes, sir.

5    Q.  And billions coming in from Worldwide [sic], correct?

6    A.  Yes, sir.

7            MR. SCHAPER:  Objection, misstates the record.

8    BY MR. ANTHONY:

9    Q.  Nationwide.  I'm sorry.  I didn't mean to say

10   "Worldwide."

11   A.  I understood what you were getting at.

12   Q.  Okay.  And the bank also had records and data which

13   would have showed if any wires came in from big-box

14   retailers, correct?

15   A.  Yes, sir.  They had all the data and the records for the

16   transactions that passed through the account.

17   Q.  Now, you didn't see any records or data or any evidence

18   that anyone -- any employee of the bank reported any

19   activity in PCI as being suspicious, correct?

20   A.  Nothing rose to the level of suspicious in this

21   relationship.

22   Q.  That was a little different.  My question is not whether

23   anything rose to that level.  I asked you if you saw anyone

24   from the bank, any bank employee who reported any suspicious

25   activity.

Grice - Cross

1    A.  These are important differences.  So there were no

2    determinations made of suspicious by the bank during the

3    life -- during the 2002 to 2008 time frame.

4    Q.  So if the bank never made that determination, then it

5    never made any report, correct?

6    A.  We've talked about the confidentiality reports.  I have

7    intentionally not tried to understand if the bank filed a

8    SAR.  Is that what you are asking?

9    Q.  No.  I'm asking you if you saw any evidence that any

10   bank employee reported to anyone, including their

11   supervisors, whether they saw any suspicious activity.

12   A.  I have seen no evidence of reports of suspicious

13   activity by any bank employee.

14   Q.  Did you see any reports by any bank employee of any

15   unusual activity?

16   A.  I think the answer to that is also, no, I have not seen

17   any evidence of that.

18   Q.  And did you see any reports, for example, that the

19   bank's customer -- the bank's customer, PCI, was doing

20   business with a money launderer?

21   A.  Can you ask that again, please, or maybe rephrase it?

22   Q.  Did you see any reports from any bank employee to

23   anyone, including their supervisors, that PCI was doing

24   business with a convicted money launderer?

25   A.  I don't recall seeing that.

1    Q.  And you saw no reports of any suspicious or unusual

2    activity from 2002 to 2008, correct?

3    A.  Can I just lay on the table I'm very uncomfortable

4    talking about suspicious activity given my earlier

5    discussion in my direct examination about the

6    confidentiality requirements around SARs.  I never sought to

7    understand if SARs were filed.  And if I did, I would feel

8    uncomfortable talking about it.

9    Q.  I'm not asking about SARs.  I'm asking if they

10   reported -- let's stick to their supervisors.  Did you see

11   anyone report to their supervisors that they thought any of

12   the checks to the insiders, the wires to the insiders, the

13   billions of dollars from Enchanted and Worldwide [sic] were

14   enough to cause anybody to be suspicious?

15   A.  I don't believe so.  I don't recall.

16   Q.  Now, I'm going to show you another exhibit.  It's DD --

17   it's the defendant's demonstrative from yesterday, DD-50, at

18   slide 15.

19          MR. ANTHONY:  Is this on?  Are we on?

20          MS. ELLIG:  No.  Do you want it up here?

21          MR. ANTHONY:  Sure.  Thank you.

22   BY MR. ANTHONY:

23   Q.  Now, yesterday we heard testimony from another bank

24   expert, a Mr. Jarek, who said that if the scheme had been

25   stopped in 2001, that the losses would have been about

1    $500,000.

2              MR. SCHAPER:  Objection, Your Honor, this is

3    beyond the scope of Mr. Grice's report.  This was the

4    damages expert issue.  It's nowhere in Mr. Grice's report.

5              MR. ANTHONY:  Your Honor, this is

6    cross-examination of this experienced expert who said there

7    was no evidence whatsoever of any wrongdoing.  I think I'm

8    entitled to test his credibility with these exhibits that

9    they prepared.

10             MR. SCHAPER:  He is an expert in bank regulatory

11   matters, Your Honor.  He's not a damages expert, and we did

12   not offer him as such.  I'm not sure of the relevance to his

13   testimony of this.

14             THE COURT:  The objection is overruled.  Counsel,

15   you need to keep your questions tethered to the testimony

16   that has been provided and the basis for offering this

17   witness.

18             MR. ANTHONY:  Okay.

19   BY MR. ANTHONY:

20   Q.  Did you -- in your opinion that nobody did anything

21   improper or outside of the ordinary and usual course of

22   business, did you take into consideration the losses that

23   occurred, that PCI sustained in the seven years that the

24   M&I -- the PCI account was with M&I Bank?

25   A.  I don't understand the question, which I think is the

1    answer.  I'm unfamiliar with this data or how it relates to

2    my opinion at all.

3    Q.  So you weren't here to see Mr. Jarek yesterday?

4    A.  No.  I missed Mr. Jarek entirely.

5    Q.  And you didn't read his testimony?

6    A.  I have not read it yet.

7    Q.  Okay.  So you have no knowledge of the information that

8    appears on the screen now; is that correct?

9              MR. SCHAPER:  Objection, asked and answered.

10             THE COURT:  Sustained.

11             THE WITNESS:  I don't recall ever seeing it.

12             MR. ANTHONY:  Okay.  Ms. Ellig, would you put up

13   Plaintiff's Exhibit 398, please.

14   BY MR. ANTHONY:

15   Q.  Do you have that in front of you, Mr. Grice?

16   A.  Yes, sir, I do.

17   Q.  Okay.  I can't remember.  Did you cover this with

18   counsel in your direct testimony?

19   A.  I can't either.

20   Q.  Okay.  Let's look at page 5 of Exhibit -- Plaintiff's

21   Exhibit 398.  And this -- you recognize this as one of the

22   bank's policies as to what AML analysts should be looking

23   for when they are doing these Searchspace alerts, correct?

24   A.  Yeah.  Give me just a moment if you would, please, to

25   situate myself.

1    Q.  And I'll let you do that, and you look up and tell us

2    when you are ready.

3         (Witness reviews document)

4    A.  Yes, sir, I recognize this as March -- I'm sorry,

5    June 7, 2006 --

6    Q.  Okay.  Let's highlight some of the things that are

7    referenced in this exhibit.

8              And this talks about comments.  Do you see at the

9    top it says, "Comments in Searchspace for 'closed to

10   expected or explainable activity'"?  Do you see that?

11   A.  I'm looking for my copy and trying to --

12   Q.  It's page 5 on the bottom.

13   A.  Yes, sir, I see it.

14   Q.  All right.  And so let's go to the second bullet point.

15   And one of the things that the analyst has to look for is

16   who is the customer and what kind of business, correct?

17   A.  Yes, sir.

18   Q.  And then if we go down to -- it would be the

19   paragraph -- bullet point seven, "Describe analysis

20   completed."

21   A.  "E.G., discussion," is that --

22   Q.  Yeah.

23   A.  Yes, sir, I see that.

24   Q.  And that describes what the analyst is supposed to do,

25   correct?

GRICE - CROSS

1    A.  Yes, sir.

2    Q.  And then at the bottom it says -- let's go to the last

3    one and the last sentence.  "Make sure that a conclusion is

4    reached and supported in your comments."

5    A.  Yes, sir, I see that.

6    Q.  That's -- and we're doing it at a high level what the

7    AML analyst is supposed to do, right?

8    A.  Could you ask the question a different way?

9    Q.  Sure.  We're describing for the jury what an AML analyst

10   is supposed to do, correct?

11   A.  Yeah, these -- I call these the desktop procedures.

12   These are the instructions to the AML analysts for how to

13   memorialize the work they did in support of their

14   conclusion.

15   Q.  Okay.  Let's turn to the next page, 6, of

16   Plaintiff's 398.  And under the heading 2, let's go to the

17   second paragraph.  It says, "Analysts will be required to

18   look at everything, but only document what alerted AND the

19   source or use of funds."  Do you see that?

20   A.  I do.

21   Q.  Then it says, "Of course, if other unusual activity is

22   identified, that should be commented on as well."

23   A.  Did you say, "If other"?  I didn't hear the "if," but --

24   Q.  Yes, I did.

25   A.  Okay.  All right.

Grice - Cross

1    Q.  So that's another thing the analyst has to do, correct?

2    A.  That's what this procedure calls for, yes.

3    Q.  And we'll see it later on, but you recall the -- did you

4    ever review the alert that had the $10 million payment for

5    the yacht?

6    A.  Yes.

7    Q.  Is that the kind of unusual activity in an account like

8    this that one would expect an AML analyst to comment on as

9    being unusual?

10   A.  It was called out and commented on.

11   Q.  Well, it was called out, but they didn't explain why it

12   related to the business purpose of the business, did it?

13   A.  No, but I don't think it needed to.

14   Q.  I know.  Let's start with:  There wasn't a description

15   of how it related to the business, correct?

16   A.  There was not a discussion of how it related to the

17   business.

18   Q.  And I know your view is they didn't need to point out

19   how it was related to the business, correct?

20   A.  That is my opinion.

21   Q.  All right.  So if you saw something that was unusual and

22   it -- you didn't have anything in the prior alerts that

23   related to yachts or boating and it was for $10 million,

24   don't you think it would trigger in the analyst's mind that

25   this is out of the ordinary?

1          MR. SCHAPER:  Objection, calls for a state of mind

2    conclusion.

3          THE COURT:  Sustained.

4    BY MR. ANTHONY:

5    Q.  Let me ask you that.  In the ordinary course of banking

6    business, an analyst who saw a $10 million payment for a

7    yacht out of the PCI account when PCI had nothing to do with

8    yachting, would, in the ordinary course of business, an

9    analyst have thought that to be unusual?

10         MR. SCHAPER:  Same objection --

11         MR. ANTHONY:  I didn't ask about -- I'm sorry.  I

12   didn't ask about an M&I Bank analyst.  I asked about the

13   practice in the industry, and he testified at length about

14   that.

15         MR. SCHAPER:  I think the question was asked to

16   the PCI account, so I don't think that that was a broader

17   question than that.

18         THE COURT:  Sustained.

19   BY MR. ANTHONY:

20   Q.  Okay.  Let's get away from PCI and the M&I account and

21   the $10 million for the yacht in the M&I account and talk

22   generally.

23         If an analyst saw $10 million for a yacht for a

24   company that had no business having to do with maritime

25   affairs or yachting, is that the kind of activity, in the

1    ordinary course, an analyst might say I have never seen this

2    before, it's unusual?

3    A.  I guess my view is in that hypothetical we're seeing an

4    analyst call it out, right?  They are drawing attention to

5    this.

6         And to be clear, we don't know this is the

7    purchase of a yacht.  We know it's a payment to a law firm

8    and a broker in a yachting business.  I'm not disputing that

9    a yacht may have been involved in that.  But the analyst is

10   drawing attention to the $10 million transaction with

11   Bosshardt, which is, you know, a legal/brokerage business

12   involving yachting.

13        So I think -- so maybe the difference is about the

14   quality of the documentation after calling it out.  I'm not

15   troubled by that.  So I'm comfortable with the fact it's

16   been identified, it's been called out by the analyst.  And

17   I'm comfortable that for banks similarly situated to M&I at

18   the time, this would be reasonable.

19   Q.  And you agree that, in looking at the example we just

20   gave about the yacht, that the analyst has to ensure him or

21   herself that she understands and can explain what is going

22   on with respect to that transaction, correct?

23   A.  I would want that, yes.

24   Q.  Let's scroll down where it says, "Ensure that you

25   understand and explain what is going on in the account."

1    In the hypothetical we used, is it custom and

2    practice in the industry when you see something like a

3    $10 million payment for a yacht, attorney, or broker, that

4    it should be explained more than just identified?

5    A.  Not in my opinion.

6    Q.  Okay.  And let's go down to "Wire Example" in the same

7    document.  You'll agree that the AMI -- the M&I analysts had

8    to have documented what would be needed for the source of

9    incoming wires and what the funds appeared to be used for,

10   correct?

11   A.  I -- that's what this procedure calls for.  I agree that

12   that's what this is calling for.

13   Q.  Okay.  And is it your testimony that with respect to all

14   the alerts we've seen in this case, that each and every one

15   of them -- in each and every one of them the AML analyst

16   explained what the source of the incoming wires was?

17   A.  To my satisfaction.  Maybe not to yours, but to my

18   satisfaction.

19        So I think consistent with expectations of the fed

20   and consistent with the industry custom and practice at the

21   time, the focus of the analyst was properly on the

22   transactions and whether those transactions could be

23   recognized as common or ordinary for that account.

24        That's not, I think -- that's not Ms. Ghiglieri's

25   definition, that's not her objective or goal, but that's

1    mine.  So mine is a recognition of the transactions as

2    consistent with prior transaction activity of the account.

3    Q.  Okay.  Let's talk about that prior transaction activity

4    opinion you gave.  Let's look at Exhibit 183.

5    A.  Do I have that?  I don't think I have that.

6        (Pause)

7    A.  I do have that.  I see it.  This is the alert?

8    Q.  Do you have it?

9    A.  I believe so.  What -- I don't know what page you're

10   going to, but I see a tab for 183.

11   Q.  And let's look at page 38 of Exhibit 183, please.  This

12   is the one you were shown.

13           MR. ANTHONY:  And highlight the third column down

14   dated 6-6-2006 at 9:54 and then the one underneath it and

15   then the one underneath that, so all three of them are up

16   there.

17           THE WITNESS:  So you're talking the 9:55 -- the

18   two 9:55 entries?

19   BY MR. ANTHONY:

20   Q.  I'm talking about the 9:54, 9:54, 9:55, the ones on the

21   screen.  Does that help you?

22   A.  Yes, I see where you are.  Yes, sir.

23   Q.  Okay.  Now, what I understood you to say was that the

24   reviewer, the analyst could rely on the history of the

25   account, correct?

Grice - Cross

 1    A.  That's correct.

 2    Q.  And what had gone before her review, correct?

 3    A.  Of course.

 4    Q.  And we see that it appears as though a lot of these

 5    analysts have relied on what went before them on the

 6    history, correct?

 7    A.  I call this additive, but we see reflections of prior

 8    analysis or facts that were referenced in earlier

 9    discussions.

10    Q.  And what is the first one, the first alert that was

11    closed?

12    A.  You want the number of it or the date?

13    Q.  Yeah.  Do you have the date?

14    A.  I think these are in chronological order and I think

15    it's the first tab, 53247.

16    Q.  Let's go to page 9 of Exhibit 183.  And so let's -- this

17    is dated April of '05.  Let's go to the bottom of that

18    alert.

19    A.  Well, it's May 6 of '05 for April of '05 if we're on the

20    same thing.  Page 9 of 183?

21    Q.  At the top it says, "April 2005."  That's what I was

22    referring to, sir.

23    A.  Right.  But the date this is raised is May 6.  So it's

24    about the month of April '05.

25    Q.  Okay.  In any event, let's go to the first comment.  It

1    says, "Petters Company, Inc."  Do you see that?

2    A.  Yes.

3    Q.  And then it goes to the next box and it says, "Petters

4    is a collection of nearly 20 companies."  Correct?

5    A.  Correct.

6    Q.  Now, we know that Petters Company, Inc. is not a

7    collection of 20 companies, correct?

8    A.  We know that today, yes.

9    Q.  Well, certainly it was information that was capable of

10   being known back on May 6th, 2005, wasn't it?

11   A.  I'm not here to quarrel about what was knowable.  My

12   position is -- and this is back to your very first question.

13   I think this may be a difference without a distinction in

14   the AML space.  I'm looking for effective control.  The fact

15   that PCI may not, in fact, be the owner of 20 companies is

16   not top of my concern list.

17   Q.  Sir, I wasn't asking you about the AML space.  I'm

18   asking you about:  Didn't the bank know in 2005 who its

19   customer was?

20   A.  I don't know how to answer that.  Yes, it's listed --

21   Q.  Okay.  Thank you.

22   A.  -- the customer name is, at the top of the page.

23        MR. ANTHONY:  Your Honor, I would ask if the Court

24   would invite the witness to answer the question; and once

25   he's done that, not narrate.  I'm trying to make it precise,

1    my questions.

2                 MR. SCHAPER:  That was a short answer to the

3    question, Judge.

4                 THE COURT:  Please respond to the question asked.

5                 THE WITNESS:  Yes, Your Honor.

6    BY MR. ANTHONY:

7    Q.  My question is:  Would you agree that the bank had

8    information in its data and records that showed that Petters

9    Company, Inc. was its customer in 2005?

10   A.  Yes, and that's reflected at the top of page 183-0009.

11   Q.  Okay.  Again, your answer is "yes," correct?

12   A.  Yes.

13   Q.  All right.  Now, Petters Company, Inc. was also known to

14   the bank employees to be something other than a collection

15   of nearly 20 companies, correct?

16                MR. SCHAPER:  Objection, form, vague, and calls

17   for employee knowledge.

18                THE COURT:  Overruled.  You may answer if you can.

19                THE WITNESS:  Could you ask it again or

20   differently?  I'm just -- you're asking about all the

21   employees and I'm -- certainly this employee has an

22   inaccurate understanding as I sit here today.

23   BY MR. ANTHONY:

24   Q.  Okay.  Well, you would presume that the employee who was

25   filling out this comment would have an accurate

1   understanding of who the customer was, wouldn't you?

2   A.  What was the verb?  I would presume?  Sir, I'm asking

3   just to be clear on your question so I can answer it.

4   Q.  In the ordinary practice of banking, wouldn't you expect

5   the bank employees to know who the customer is?

6   A.  Yes.

7   Q.  Okay.  So apparently, since PCI was not a collection of

8   20 companies, this comment is mistaken, correct?

9   A.  I'll grant it's -- yes, it's mistaken.

10  Q.  Right.  And there's no reference in this first alert to

11  incoming -- the amounts of incoming wires and things like

12  that.  Do you see that?

13  A.  And, again, I'm sorry to ask you to repeat the question.

14  Q.  Okay.  Do you see anything in this first alert from

15  Enchanted or Nationwide?

16          MR. SCHAPER:  Objection, mischaracterizes the

17  document as the first alert.

18          THE WITNESS:  There's no reference to Enchanted or

19  Nationwide --

20          THE COURT:  I need to respond.

21          THE WITNESS:  Oh, I'm sorry.  Forgive me.

22          THE COURT:  Sustained.

23  BY MR. ANTHONY:

24  Q.  Okay.  Looking at page 9 of Exhibit 183, do you see any

25  reference to Enchanted or Nationwide in this alert?

1    A.  No, they are not discussed in this alert.

2    Q.  So this goes back to your -- to what we were talking

3    about about history and how important it was, you said, for

4    the analysts to rely on history, correct?

5    A.  Yes, sir.

6    Q.  And if there's mistakes early on in the closing of the

7    alerts and the subsequent analysts rely on the earlier

8    history, they may also be mistaken, correct?

9    A.  Yes.

10   Q.  Okay.  So if the first analyst looking at these alerts

11   closes it and makes a mistake and subsequent analysts look

12   at the first -- the earlier reports, they may make a similar

13   mistake, correct?

14   A.  That's possible, yes, sir.

15   Q.  But we also know that the analysts can't rely entirely

16   on the previous history, correct?

17   A.  I agree with that, yes, sir.

18   Q.  Yeah.  In fact, they are told by the bank policies and

19   the regulators that they have to look at each of these

20   alerts individually and both monitor, detect, and

21   investigate them where appropriate, correct?

22   A.  Yes, but I want to be clear we're talking about --

23   there's an important difference between the bank's

24   instructions to its AML analysts and industry custom and

25   practice and fed requirements.

```
 1    Q.  Okay.

 2    A.  So this is -- this would be inconsistent with the bank's

 3    internal processes for AML alert discussions or

 4    documentation of AML alert investigations.

 5    Q.  And do you think it reasonable for customers like PCI to

 6    rely on the bank to follow its own policies?

 7    A.  I never thought about that.  I think with respect to

 8    treatment of the customer, yes.

 9    Q.  Well, is there any exception to the expectation, in your

10    view, that a customer like PCI can't rely on the policies of

11    the bank?

12            MR. SCHAPER:  Objection to form, vague.

13            MR. ANTHONY:  I'll rephrase it.  That's a bad

14    question, Your Honor.

15    BY MR. ANTHONY:

16    Q.  We can agree that customers can -- should be able to

17    rely on the bank following its own policies, correct?

18    A.  I think for some reason I can't answer this question.

19    This is --

20    Q.  Okay.  Thank you.

21    A.  -- outside my purview.

22    Q.  That's fine.

23    A.  This is a process that's outside the view of a

24    customer --

25            MR. ANTHONY:  Your Honor, again, he's narrating
```

1    and I'd ask that he not narrate.

2              THE COURT:  Please answer the question.

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  And I will ask all devices to be

5    turned off or silenced in the courtroom.

6    BY MR. ANTHONY:

7    Q.  Okay.  Can you turn to 183, page 39, please.  All right.

8    So let's look at the second box down, the Disney on Ice

9    tickets.

10             And I've looked at all these alerts.  And you have

11   too, right?

12   A.  Yes, sir.

13   Q.  Okay.  And we now see event tickets for Disney on Ice on

14   this one alert, right?

15   A.  Yes, sir.

16   Q.  So we know at least Ms. Pesch had access to checks in

17   order to determine that Disney on Ice should be mentioned,

18   correct?

19   A.  Correct.

20   Q.  Now, the bank analysts also had access to all the bank

21   checks that were made out to Mr. Petters, Mr. White,

22   Ms. Coleman, Ms. Coleman's boyfriend.

23             Did you ever ask Ms. Pesch why she never noted any

24   of those checks in any of these alerts?  I just want to know

25   if you asked her.

1   A.  I have never spoken to Ms. Pesch.

2   Q.  In fact, you've never spoken to any bank employee,

3   right, about this matter?

4   A.  That's correct.

5   Q.  In fact, as I recall, you said in an affidavit or

6   somewhere that the best way to find out information about

7   what's going on in a bank is to talk to the bank employees,

8   right?

9   A.  Yes.

10  Q.  But you didn't talk to any of the bank employees in this

11  case, correct?

12  A.  Yes, and I can explain why.

13  Q.  I know you're going to explain why.

14          You didn't interview them at all, correct?

15  A.  That's correct.

16  Q.  You never asked Mr. Flynn about -- the money launderer,

17  Frank Vennes, correct?

18  A.  I never interviewed any bank employee, so by extension

19  that also applies to Mr. Vennes, correct.

20  Q.  And you never interviewed Mr. Jambor about any

21  conversation he had with Ms. Coleman in which she said she

22  told him that the business was going to be selling -- PCI

23  was going to be selling electronics to big-box retailers,

24  correct?

25  A.  That's correct.  I relied on deposition transcripts --

GRICE - CROSS

1   Q.  Right.

2   A.  -- for my understanding.

3   Q.  Same is true with respect to talking to Ms. Rhode,

4   Mr. Jambor's boss, you never spoke to her either, did you?

5   A.  I have never spoken to any of the M&I employees.

6   Q.  You had access to them if you wanted, correct?

7   A.  I did not ask for it.  So I never tried.  So I don't

8   know the answer to that question.  I didn't attempt to

9   interview anybody from M&I.

10  Q.  So you don't know if the bank would have denied you

11  access to interview them?

12  A.  I don't know because I never asked, that's true.

13  Q.  I know you say you didn't talk to any bank employees,

14  but let me ask you this.  Do you recall any -- you read the

15  transcripts, did you?

16  A.  I read 60 transcripts.  Some of them were multiple

17  depositions of the same witness.

18  Q.  Yeah.  So did you see anywhere in Ms. Pesch's transcript

19  where she explained why she didn't mention any of the tens

20  of millions of dollars in checks that were made out to the

21  insiders?

22  A.  Sitting here, I don't recall if that was asked of her in

23  her depositions.

24  Q.  Well, if you read her deposition and it wasn't asked,

25  wouldn't that be something you'd want to ask her?

1          MR. SCHAPER:  Objection, calls for speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  I've explained I'm relying on the

4     depositions in this case because there are so many.  And

5     counsel has had so many opportunities to ask questions of

6     the witnesses, I didn't feel I should attempt to interview

7     them additionally.  There would be no benefit from that.

8     BY MR. ANTHONY:

9     Q.  Right.  But my question was:  If you didn't see that

10    question asked of her in the deposition, did you think to

11    take it on yourself to ask her?

12    A.  I did not.

13    Q.  So was it not important to you, in giving your opinion,

14    to know whether Ms. Pesch even knew about the tens of

15    millions of dollars in checks made out to the insiders?

16    A.  You are asking me a question -- I can't recall if I've

17    ever had that question in my mind.  So when I read her

18    transcript, I relied on her sworn testimony.

19          And I understood the history of those checks and

20    the treatment of those checks.  I didn't have any questions

21    about the analysts' understanding of those checks.  I was

22    relying on my own understanding of those checks.

23    Q.  Okay.  So setting aside the checks, these same analysts

24    who were reviewing these alerts, they also had access to the

25    wires that were being sent to Petters, Coleman, and White,

1    correct?

2    A.  Correct.

3    Q.  Did you see anywhere in any of these alerts where any of

4    these analysts mentioned anywhere that tens of millions of

5    dollars were being wired out of PCI to Tom Petters?

6    A.  I don't recall, across the 39 alerts, any discussion of

7    wires to insiders.

8    Q.  Okay.  And that --

9    A.  Again, my understanding was these were properly

10   authorized, but I just don't recall sitting here.

11   Q.  That would include Ms. Coleman and Mr. White, correct?

12   A.  And Mr. Petters, yes.

13   Q.  Okay.  So because you didn't see any reference to wires

14   to those insiders for tens of millions of dollars, did you

15   think to ask any of these analysts yourself why they didn't

16   mention the wires?

17   A.  I've -- we've already discussed I did not ask any M&I

18   employees any questions.  So I've never asked any M&I

19   employee any question.

20   Q.  So --

21   A.  And I was not troubled by the wires.

22   Q.  So your answer is you did not ask any M&I employees any

23   questions; is that your answer?

24        MR. SCHAPER:  I think the answer is longer than

25   that, Your Honor.

 1              MR. ANTHONY:  It is, Your Honor, and I'll move to

 2      strike everything beyond what I just said.

 3              MR. SCHAPER:  We object to that.  We oppose that

 4      motion.  He answered the question.

 5              THE COURT:  Pardon me?

 6              MR. SCHAPER:  We oppose the motion.  He answered

 7      the question.

 8              THE COURT:  The motion is denied.

 9      BY MR. ANTHONY:

10      Q.  Okay.  So you say you were not troubled by the wires.

11      You say you were not troubled by the wires.  Do you know how

12      much in wires were sent to Petters, Coleman, and White?  Any

13      idea?  I just want to know the amount.  Do you have any idea

14      as to the amount?

15      A.  In my mind, I don't have that number.  It's in the

16      several million dollars, but I don't have the specific

17      number.

18          (Plaintiff's counsel confer)

19      BY MR. ANTHONY:

20      Q.  Well, do you think it was closer to a million or

21      80 million?

22      A.  I just -- this is not my -- this is not what I studied.

23      I did not study the scale of the transactions with any

24      specificity and I cannot recall.

25      Q.  In order to determine whether the AML analysts were

1    seeing anything unusual or suspicious, wouldn't you need to

2    know what they were seeing about the tens of millions of

3    dollars in wires being sent out to Petters, Coleman, and

4    White?

5    A.  In the aggregate, yes.

6    Q.  So how much?  When you did your review of all these

7    documents, can you give us -- can you tell the jury a number

8    as to the size, the amount of wires sent out through M&I

9    Bank to these three insiders?  Can you tell us?

10             MR. SCHAPER:  Objection, asked and answered.

11             THE COURT:  Overruled.  You may answer if you can.

12             THE WITNESS:  Yeah, I can't answer.  I don't have

13   that number.  I just don't know that number in my mind.

14   BY MR. ANTHONY:

15   Q.  Would it make a difference to your opinion whether it

16   was a million dollars or $80 million?

17   A.  Yes, to a degree, but not -- it would not be materially

18   important.  My view is those wires and checks to the

19   insiders were properly authorized.  They were at the

20   instruction of account signers.

21             So that's my -- and then you're also asking a

22   question about in the aggregate.  That's not how AML alerts

23   occur or how they are analyzed, in the aggregate

24   retrospectively.

25   Q.  I hear you, but you also said the history makes a

1    difference.  So if the first analyst saw a wire for

2    $5 million to Petters, presumably that analyst would note it

3    in the records so that any subsequent analyst could add on

4    to that fact, right?

5    A.  I don't agree with that.  This is hindsight bias, if you

6    will.

7    Q.  You think it's hindsight bias for an analyst in 2006 to

8    note that $5 million was wired out to Deanna Munson, Deanna

9    Coleman; that's hindsight bias?

10   A.  I think it's hindsight bias today to look back and wish

11   the AML analysts had asked that question or recorded that

12   fact.

13   Q.  Well, wasn't it the AML analyst's obligation to report

14   suspicious or unusual activity?

15   A.  Yes, and this is precisely the problem.  Those

16   transactions are not suspicious.

17          MR. ANTHONY:  Your Honor, the answer was "Yes" and

18   now he wants to go on and explain and do a narration, and I

19   think that's improper.  He can be redirected.

20          MR. SCHAPER:  Your Honor, he was answering the

21   question.  It's a string of questions and he was explaining

22   his answer, which I think is permissible.

23          MR. ANTHONY:  I disagree, Your Honor.

24          THE COURT:  The objection is overruled.

25          MR. SCHAPER:  May the witness finish his answer?

Grice - Cross

```
 1                    THE WITNESS:  Can you --
 2                    THE COURT:  I believe he was finished.
 3                    THE WITNESS:  -- repeat the question, please?
 4            I'm sorry.
 5                    MR. ANTHONY:  The question was:  "Wasn't it the
 6      AML analyst's job to report suspicious or unusual activity?"
 7      I think that invites a "yes" or "no" answer, Your Honor.
 8                    THE COURT:  You're correct.
 9                    MR. ANTHONY:  And that's all I'm asking.
10      BY MR. ANTHONY:
11      Q.  Can you answer it, sir?  Yes or no.
12      A.  Can you repeat it again, please?  Again, I get lost in
13      the back and forth.  If you wouldn't, please, just repeat
14      the question.
15      Q.  Was it the AML analyst's job to report suspicious or
16      unusual activity?
17      A.  Yes.  And my more complete answer, it was not suspicious
18      or unusual.
19                    THE COURT:  Sir?
20                    THE WITNESS:  I'm sorry.  I don't want to leave an
21      inaccurate answer, so I'm struggling to give a "yes" or
22      "no."
23                    THE COURT:  You need to answer the question that's
24      asked.
25                    THE WITNESS:  Yes, ma'am.
```

1    BY MR. ANTHONY:

2    Q.  So turn, if you will, in the same document, Exhibit 183,

3    to page 81.

4            MR. ANTHONY:  And highlight the top two boxes,

5    please.

6    BY MR. ANTHONY:

7    Q.  And you'll see that there were wires coming in for

8    $1.464 billion in September of 2007.  And the same day for

9    about -- in the next comment that wires went out for

10   1.467 billion, correct?

11   A.  Yes, for the month.  Those are monthly totals, yes, sir.

12   Q.  And you didn't think there was anything unusual about

13   that type of activity, correct?

14   A.  No, sir.

15   Q.  Right.  Because that's the type of activity that had

16   been going on in this account from the very beginning,

17   right?

18   A.  Yes.

19   Q.  So if PCI and Petters and Coleman -- let me rephrase

20   that.

21            So if Mr. Petters was able to get past the first

22   analyst with this type of activity, then he could rely on

23   subsequent analysts looking at what happened with the first

24   analyst and not have to worry about anybody suspecting this

25   as being unusual activity, correct?

1   A.  I don't know how to answer that.

2   Q.  What I'm asking --

3   A.  I don't know what Mr. Petters --

4   Q.  What I'm asking is:  If the first analyst makes a

5   mistake, then everybody who follows what the first analyst

6   did is making the same mistake, right?

7   A.  That's not my view of what happened here.

8   Q.  Okay.  You were asked what the bank's policy was --

9           MR. ANTHONY:  You can take that down, please,

10  Ms. Ellig.

11  BY MR. ANTHONY:

12  Q.  You were asked what the bank's policy was with respect

13  to closing accounts.  Do you recall being asked that

14  question?

15  A.  Yes, sir.

16  Q.  I didn't hear an answer.  What was the bank's policy on

17  closing accounts where there was suspicious activity?

18  A.  I believe in '04 the bank adopted a policy that provided

19  for account closure when SARs were filed.  And we see

20  evidence in the record of the bank reporting account

21  closures because of filed SARs in two thousand and -- it's

22  either 2005 or 2006.

23  Q.  So, as I understand the policy as you've described it,

24  if the bank files a SAR, then the bank is required to close

25  the customer's account?

Grice - Cross

1     A.  I don't believe that's the policy.

2     Q.  That's why I'm asking you.

3     A.  Oh, I'm sorry.

4     Q.  I can't find it anywhere.  You said you read it and you

5     knew it, so I'm just asking you what it is.

6     A.  I see evidence of it at work.  I see accounts being

7     closed because of SARs.

8     Q.  So you've never seen the bank's policy with respect to

9     closing accounts for suspicious activity?

10    A.  I just don't recall as I sit here.

11    Q.  All right.  But you have seen evidence that when the

12    bank has filed SARs, that it has on occasion closed

13    accounts, correct?

14    A.  Yes, sir.  I was looking this morning at a -- it was a

15    2005 -- June 2005 document that reports six or seven

16    customer accounts that are closed because of SAR filings, in

17    response to a question from the fed.

18    Q.  Okay.  So I also want to follow up on your KYCC acronym.

19    I thought that was a pretty good acronym.  "Know your

20    customer's customer," that's what it means, right?

21    A.  Yes.  I can't take credit for that.

22    Q.  I don't know who did, but I like the acronym.

23              So we know what "know your customer" is.  You're

24    supposed to know the business the customer is in and things

25    of that nature, correct?

1          MR. SCHAPER:  Objection to form, vague.

2          THE COURT:  Overruled.  You may answer if you can.

3          THE WITNESS:  I think there's a lot of

4   disagreement about what fits inside KYC, but that is what

5   the term means, "know your customer."  It's just how it's

6   interpreted is different.

7   BY MR. ANTHONY:

8   Q.  And so "knowing your customer's customer," you say the

9   bank doesn't really have to concern itself with knowing its

10  customer's customer, that's my takeaway from your testimony.

11  Is that accurate?

12  A.  I tried not to be unclear about it.  That's absolutely

13  true.

14  Q.  Okay.  So, for example, if you were looking at your

15  customer's activity -- which you are required to do under

16  BSA, right?

17  A.  Yes.

18  Q.  Under the Bank Secrecy Act you have to look at what your

19  customer is doing, right?

20  A.  Yes.

21  Q.  And if you know your customer is doing business and

22  sending millions of dollars to a money launderer, don't you

23  have to ask yourself the question why is our customer doing

24  business with a money launderer?

25  A.  You're actually not required to do that, but I could

1    imagine a banker asking that question if they were aware of

2    it, of course.

3    Q.  Right.  It's common sense, isn't it?

4    A.  Again, if they are aware of it, of course.  I don't

5    disagree with the reasonableness of asking that question,

6    but it's not -- that happens not to be the requirement.

7    Q.  Right.  But we're not talking about a requirement just

8    to meet a banking regulation.  We're talking about the

9    bank's obligation to comply with the Bank Secrecy Act,

10   correct?

11   A.  I'm unclear on the difference you're making.  But I --

12   Q.  Okay.  I'll make it clear for you.

13   A.  Okay.

14   Q.  The Bank Secrecy Act requires the bank to look for and

15   report suspicious activity, correct?

16   A.  Yes, sir.

17   Q.  And whether it's complying with a federal rule or

18   regulation, if you see your customer sending millions of

19   dollars to a convicted money launderer, isn't that enough

20   under common sense to report it to someone?

21              MR. SCHAPER:  Objection, assumes facts not in

22   evidence.

23              THE COURT:  Overruled.  You may answer if you can.

24              THE WITNESS:  Again, the bank would have to have

25   certain knowledge that the money -- in your example, the

1    money is going to a convicted money launderer.

2    BY MR. ANTHONY:

3    Q.  Okay.  Let's talk about what the bank's knowledge was.

4          Mr. Flynn, as you know, met with Frank Vennes, a

5    convicted felon for money laundering, in 2001, correct?

6    Correct?

7    A.  I thought it was 2002 in the MIContacts.

8    Q.  So you are familiar with that?

9    A.  Yes, I have seen that.

10   Q.  Okay.  And you're aware that Mr. Flynn became the

11   business banker for PCI, correct?

12   A.  I'm aware of that.

13   Q.  And you will agree that from looking at the bank's wire

14   transfer records, you could see millions -- hundreds of

15   millions of dollars going from PCI to Frank Vennes's

16   company, Metro Gem, correct?

17         MR. SCHAPER:  Objection, misstates testimony.

18         THE COURT:  Overruled.

19         THE WITNESS:  Can you repeat the question, please?

20   BY MR. ANTHONY:

21   Q.  Sure.  You will agree that the bank had information in

22   its wire transfer records which showed tens of millions, if

23   not hundreds of millions, of dollars going from PCI to Frank

24   Vennes's company, Metro Gem?

25   A.  I'm not arguing.  The bank clearly had information in

1    its records about the wire transfers to Metro Gem.

2    Q.  Okay.  So whether or not under some federal rule it

3    needed to KYCC, wouldn't it have just been something that

4    would have alerted Mr. Flynn to suspicious activity when he

5    realized that his customer, PCI, was sending hundreds of

6    millions of dollars to a convicted money launderer?

7              MR. SCHAPER:  Objection, misstates the record.

8              THE COURT:  Sustained.

9    BY MR. ANTHONY:

10   Q.  Mr. Flynn knew Metro Gem and Frank Vennes from his

11   conversations, correct?

12   A.  My recollection of the MIContacts was --

13             MR. ANTHONY:  Your Honor, he's going beyond.  I

14   just asked a "yes" or "no" question and he's going --

15   launching into an explanation.

16             MR. SCHAPER:  I don't believe that was -- oh, I'm

17   sorry, Your Honor.  I don't believe that that was really a

18   "yes" or "no" question.

19             THE COURT:  Please answer the question.

20             THE WITNESS:  Yes, ma'am, Your Honor.

21   BY MR. ANTHONY:

22   Q.  Did you see in the MIContacts where Mr. Flynn met with

23   Mr. Vennes and where Mr. Vennes told him he owned Metro Gem,

24   that Metro Gem was doing business with PCI?

25   A.  I recall the MIContact.  I don't recall Vennes owning

Grice - Cross

1    Metro Gem in that document as I sit here.

2    Q.  Do you recall Mr. Vennes telling the bankers, Mr. Flynn,

3    that he was involved with Metro Gem and Metro Gem was

4    selling -- was doing business with PCI?

5    A.  It was a marketing call -- again, if I can answer the

6    question, as I recall, it was a marketing call where --

7              MR. ANTHONY:  Your Honor, I asked it "yes" or "no"

8    and he --

9              THE COURT:  Please answer the question.

10             THE WITNESS:  I guess I can't answer the question

11   the way you've asked it.

12   BY MR. ANTHONY:

13   Q.  In any event, you read the Metro -- the MIContacts with

14   respect to the conversation between Mr. Vennes and

15   Mr. Flynn, correct?

16   A.  Yes.

17   Q.  And you'll agree that whatever was said in that

18   conversation and whatever is reported in that MIContact

19   would be information in the possession of the bank, correct?

20   A.  Yes.

21   Q.  You asked -- you made reference to, I think it was,

22   Plaintiff's Demonstrative 16.  It was -- you described it as

23   a bunch of red -- how did you describe it?  A bunch of red

24   poles or something?  Do you remember how you described it,

25   the alerts going off each month?

1    A.  I don't recall, but I do recall the exhibit.

2            MR. ANTHONY:  Let's put up PD-16, please, and make

3    sure we're on the same page.

4    BY MR. ANTHONY:

5    Q.  And you said there's nothing unusual or suspicious about

6    an alert, an alarm going off every month for 39 months,

7    correct?

8    A.  I don't think I was asked that question.

9    Q.  You -- well, do you think it's unusual for an alert, an

10   alarm to go off every month for 39 months?  That's my

11   question.  Do you think it's unusual?  I think I've crafted

12   it "yes" or "no."

13   A.  No.

14   Q.  You think it's not unusual?

15   A.  That's correct.

16   Q.  Okay.  Now, you did say that once you're over the

17   threshold, it doesn't matter what the score is, you did say

18   that, right?

19   A.  That's correct.

20   Q.  Okay.  So can you tell me why it is they provide you

21   with a score?

22   A.  I just don't understand the question.

23   Q.  Okay.

24   A.  Can you rephrase?

25   Q.  If it doesn't matter what you have to do once it's over

1    the threshold, why would Searchspace give the analyst a

2    score?  Why wouldn't it just say you're over the threshold,

3    if it doesn't matter?

4    A.  Well, what matters is there's the threshold, right?  So

5    in this case 75 was the threshold, and anything above that

6    is going to be examined by the analyst.

7    Q.  Okay.  So why is there a score for each alarm?  Why

8    don't they just say here's an alarm for X?  Why do they keep

9    publishing the totals if it doesn't matter?

10   A.  Because it allows the bank to understand is it above or

11   below -- if you change the threshold, is it above or below

12   the threshold?  So the threshold -- the bank can control the

13   threshold.  And so the score matters in the sense that it

14   tells you the aggregate point total, but the bank is

15   directing the threshold.

16   Q.  So this -- these alarms are telling you that whatever is

17   happening in this PCI account is way above the threshold,

18   right?

19   A.  Yeah, I don't dispute that the numbers are higher than

20   the threshold.  That's why they are alerts --

21   Q.  Right.

22   A.  -- they are above the threshold.

23   Q.  And the numbers matter.  Otherwise, the bank wouldn't be

24   publishing them each month when they do these alerts, would

25   they?

Grice - Cross

1    A.  Right, but it's a tool the way your odometer is a tool

2    or your speedometer is a tool, right?  There's not meaning

3    inherent in what the data says.  It matters its relationship

4    to the threshold.

5    Q.  Okay.  So let's take that analogy you're using.  It

6    seems to me that there's a big difference between going 70

7    in a 60 mile an hour zone than 140 in a 60 mile an hour

8    zone.  Is that what you are saying, it's no different?

9    A.  I think it would depend on what the speed limit is in

10   this analogy, so --

11   Q.  The speed limit is 60.  Big difference between going 70

12   and going 240, isn't it?

13   A.  It matters what the limit is, right?  It matters what

14   the threshold is.

15   Q.  Okay.  So if you are the AML analyst and you are looking

16   at this for the first time and you see you're up at 287, do

17   you need to be a little more concerned than the analyst who

18   saw it at 159?

19   A.  Not in my view and not in my experience working with

20   Searchspace.

21   Q.  No.  Because you still have to do the same detailed

22   investigation, don't you?

23   A.  The system is kind of agnostic as to the score.  The

24   score is not what drives the depth or the quality of the

25   analysis.  It's the relationship to the threshold.

```
 1    Q.  Okay.  So --

 2              THE COURT:  Counsel, as you're about to move to a

 3    different topic --

 4              MR. ANTHONY:  I am.

 5              THE COURT:  -- it's a good time for us to take our

 6    midafternoon break.

 7              MR. ANTHONY:  Okay.

 8              THE COURT:  Members of the Jury, please continue

 9    to abide by the instructions that I have given you.  We'll

10    take a 15-minute break.  Please be ready to return to the

11    courtroom at 3:20.  Okay?

12              THE LAW CLERK:  All rise for the jury.

13                        IN OPEN COURT

14                      (JURY NOT PRESENT)

15              THE COURT:  We will plan to resume testimony at

16    3:20.

17        (Recess taken at 3:04 p.m.)

18                      *   *   *   *   *

19        (3:27 p.m.)

20                        IN OPEN COURT

21                       (JURY PRESENT)

22              THE COURT:  You may be seated.

23              You may proceed, Counsel.

24              MR. ANTHONY:  Thank you, Your Honor.

25    BY MR. ANTHONY:
```

1    Q.  Mr. Grice, I wrote down when you said that there was an

2    emphasis from the regulators telling the banks to slow down

3    with respect to filing preemptive kind of SARs.  Do you

4    remember that testimony?

5    A.  Yes, sir.

6    Q.  Okay.  And you said the regulators were saying tell the

7    bank slow down, do your job, investigate, do your job, don't

8    do any preemptive SARs.  That's what you said, right?

9    A.  That's correct.

10   Q.  And so remember we saw --

11          MR. ANTHONY:  Pull up Exhibit 183, please.

12   BY MR. ANTHONY:

13   Q.  We saw how, in the very beginning, there was an alert

14   that referred to Petters being a collection of 20 companies.

15   Do you see that?

16   A.  I recall that, yes.

17   Q.  Do you remember that?

18   A.  Yes, sir.

19   Q.  I think it was on page 9.

20          And I think you said that you thought the analysts

21   at M&I were pretty careful in the work they did, right?

22   A.  I don't recall testifying about the care of the

23   analysts.  I have that opinion.  I just don't think --

24   Q.  Okay.

25   A.  -- we spoke to that earlier.

1   Q.  So we saw the first one.  This is dated in '05, and I'm

2   just going to make a note of that.

3           MR. ANTHONY:  And then would you turn, Ms. Ellig,

4   please, to page 27.  And in the middle, at that 3-22-06,

5   highlight it where it says, "Petters Company is a collection

6   of nearly" -- "Petters Company, Inc. is a collection of

7   nearly 20 companies."

8   BY MR. ANTHONY:

9   Q.  So this is not quite a year later.  The analysts are

10  being told to take their time, investigate, do their jobs.

11  They are still reporting in '06, just as they reported in

12  '05, that Petters Company, Inc. was a collection of nearly

13  20 companies, correct?

14  A.  Correct.  It's the same general explanation.

15  Q.  Right.  Just following the history, right?

16  A.  The history is shaping this analysis, yes.

17  Q.  Okay.  So now let's go to page 37.  And the item at the

18  bottom, this is an alert for 6-6-2006 and once again the

19  analysts are reporting that, "PCI is a collection of nearly

20  20 companies."

21          This is -- you know, this is the history they see

22  in these alerts, right?

23  A.  This is part of it, yes.

24  Q.  Yeah.  So then let's look at page 43 of Exhibit 183.

25  This is August.  The one on the bottom, "Petters Company,

1    Inc. is a" -- and we go over to the top -- "collection of 19

2    companies" now.  I read that accurately, didn't I?

3    A.  That part, yes.

4    Q.  Okay.  And then let's look at page number 49 of

5    Exhibit 183.  This is October of '06.  And at the bottom,

6    now Petters is being described as "a collection of companies

7    that make and market a variety of consumer products

8    worldwide.  Office locations are in South America, Asia, UK,

9    and six locations in the U.S.A.  The Minneapolis location

10   uses account 9018."

11             Now, the facts in the record in this case show

12   that PCI was not a collection of worldwide companies,

13   correct?

14   A.  That's correct.

15   Q.  So you said you thought the analysts were being careful

16   in the way they analyzed the alerts relating to Petters

17   Company, Inc.

18             Would you agree that it -- at least for the first

19   18 months we've looked at, they still couldn't get the name

20   and business of Petters Company, Inc. accurate?

21   A.  I agree that that's an inaccuracy.

22   Q.  Does it suggest to you a kind of laziness or sloppiness?

23   A.  No.

24   Q.  No?

25   A.  No.  It's an inaccuracy.  I acknowledge it's an

1     inaccuracy.

2     Q.  All right.  And maybe it's just they were relying on the

3     alerts that went before the one they were looking at, right?

4     A.  I mean, history plays a role.  I said these were

5     additive.  I acknowledged if there's an inaccuracy earlier,

6     that could follow down the chain.  So I agree it's an

7     inaccuracy.

8     Q.  So let's put up Exhibit 57, please, and what I'd like

9     you to do is look at -- this is a document already in

10    evidence that the jury will be able to see in the jury room.

11    It's Exhibit 57, and it's a list of checks -- it's a bunch

12    of checks.

13             MR. ANTHONY:  So I'd like you to go, Ms. Ellig, to

14    page 15, please, and enlarge that.

15    BY MR. ANTHONY:

16    Q.  And that's a million dollars to Bob White.  Now I'd like

17    you to go to 42.  And this is Deanna Munson.  This is a

18    million dollars in January of '05.

19             And this is before Searchspace came into

20    existence, right?

21    A.  Yes, sir.

22    Q.  But this check would have been available to whoever was

23    looking at whatever alerts were going off with respect to

24    the Petters Company, this would have been available to

25    whoever -- whatever analyst was looking at any alerts that

1     were occurring, correct?

2     A.  That's my understanding.

3     Q.  So let's look at 71.  Okay.  This is an alert -- not an

4     alert.  It's a check for million dollars for Mr. Wehmhoff,

5     December 27th, 2005.

6              Now, that was after Searchspace had been

7     implemented, correct?

8     A.  Yes, sir.

9     Q.  Now, would you not expect this check to show up in one

10    of the alerts that we've seen in Exhibit 183, just like the

11    check for Disney tickets would show up?

12    A.  No, sir.

13    Q.  Okay.  And let's look at 75, page 75 of Exhibit 57.

14    This is another one to Wehmhoff for a million dollars.

15              MR. ANTHONY:  And let's look at these three

16    together, 75, 76, 77, please.

17    BY MR. ANTHONY:

18    Q.  Okay.  So we see three checks.  Wehmhoff is getting a

19    million, Ms. Munson is getting a million, and she's getting

20    a -- it looks like she's getting 2 million, or is that

21    1 million?

22              MR. SCHAPER:  Your Honor, I believe two of those

23    are the same checks, just for the record.

24              MR. ANTHONY:  Oh, she can only put two up at once.

25    I'm sorry.

Grice - Cross

1    BY MR. ANTHONY:

2    Q.  So the point I want to make with you, sir, is:  None of

3    these checks show up in any of the AML analyst alerts, do

4    they?

5    A.  I don't believe they do.

6    Q.  Now, I want to ask you about -- what I heard you say was

7    nobody was talking about Ponzi schemes before the Petters

8    thing basically blew up.  Is that a fair characterization of

9    what you said?

10   A.  I think I said something about top of mind.

11   Q.  Yeah.

12   A.  It was not a priority.

13   Q.  Yeah, that was your words.  I remember I wrote it down,

14   "top of mind."

15          It was not on anybody -- on the top of anybody's

16   mind until Petters hit the airwaves, right?

17   A.  Well, I guess I would say until really Madoff hit the

18   airwaves, but Petters preceded Madoff by a couple of months.

19          MR. ANTHONY:  Would you put up Exhibit 239,

20   please, Ms. Ellig, and highlight the top so we can all see

21   what it is, please.

22   BY MR. ANTHONY:

23   Q.  And this is "Marshall & Ilsley" -- that's M&I Bank,

24   right?

25   A.  Correct.

Grice - Cross

1    Q.  -- "Anti-Money Laundering Committee Meeting Minutes

2    November 4, 2004."  Do you see that?

3    A.  Yes, sir.

4    Q.  And you mentioned -- who was the woman you mentioned

5    that was a similar position you thought you had one time?

6    Kelley Maltsch, she's on here, right?

7    A.  Yes, sir.  You asked her about this yesterday, I

8    believe.

9           MR. ANTHONY:  Would you turn to -- Ms. Ellig,

10   would you pull up -- under paragraph number 1, it would be

11   the second bullet point, beginning with the word "despite."

12   BY MR. ANTHONY:

13   Q.  So whether it was top of mind in the industry, would you

14   agree that it was on somebody's mind -- I mean, a Ponzi

15   scheme was on somebody's mind at M&I Bank in November of

16   2004?

17   A.  Can you just repeat the last part of the question,

18   please?

19   Q.  Sure.  Would you agree that whether it was top of mind

20   for the industry or not, that on November 4, 2004 it was in

21   the minds of the people who were at this meeting at M&I Bank

22   that they should be thinking about Ponzi schemes?

23   A.  Ponzi schemes are certainly part of this, so I agree.

24   So this event happened before Petters and Madoff, I agree.

25   Q.  Right.  So it would be fair to say that at least at M&I

1    Bank, the people like Kelley Maltsch and all these other

2    people were talking about Ponzi schemes?

3    A.  In this instance, yes --

4    Q.  Okay.

5    A.  -- I agree.

6    Q.  And I think this memo basically says -- they are talking

7    about Ponzi schemes in connection with anti-money laundering

8    activity, right?

9    A.  Yes, sir.

10   Q.  So would it be fair to say this is an alert to the

11   anti-money laundering people at the bank to be alert to

12   Ponzi schemes?

13   A.  Yes.  And the requirement is you have knowledge.  These

14   are employees who have knowledge of a Ponzi scheme.  I

15   recall the facts of this case.  There were people joking

16   openly among the AML unit at AmSouth about this scheme.  So

17   they had knowledge, they were aware of it, and they were

18   also aware of their choice not to report it.

19   Q.  Right.  So who was it that was joking about a Ponzi

20   scheme?

21   A.  The AML analysts at AmSouth Bank.

22   Q.  Okay.  So this is a discussion at M&I Bank about AML

23   analysts at another bank that were not taking seriously

24   suspicious activity that ultimately resulted in a Ponzi

25   scheme being uncovered, right?

1    A.  I'm just having a hard time following the language of

2    your question.  If you could repeat it, please?

3    Q.  The -- I'm just trying to pin down what was funny about

4    the Ponzi scheme.  And are you saying that the people at M&I

5    Bank were commenting on the people at this AmSouth Bank of

6    Birmingham who were laughing about a Ponzi scheme?

7    A.  No, no.  I want to be really clear.  The news reports at

8    the time put out by FinCEN, the Treasury Department, were

9    that AmSouth employees were openly joking about this Ponzi

10   scheme that they had evidence of.  So they had awareness and

11   knowledge, and their supervisors chose not to report it.

12   Q.  Okay.  So back to that point, which is this alerted --

13   by "this" I mean Exhibit 239 -- alerted the people on the

14   Anti-Money Laundering Committee that they needed to take

15   Ponzi schemes seriously, right?

16   A.  In the context of a situation like this.  Do you have

17   awareness and knowledge of a Ponzi scheme?  And if you do,

18   take it seriously.

19   Q.  Right.  And also, whether you have awareness or not, you

20   have to ask questions to educate yourself as to what your

21   customer is doing with the funds going through the bank,

22   right?

23   A.  I guess I don't follow you that far.  I follow you --

24   Q.  Okay.  Let me rephrase, then.

25   A.  Okay.

1    Q.  Would you agree with me that if you want to take Ponzi

2    schemes seriously, you have to educate yourself about what's

3    happening with your customer at the bank, correct?

4    A.  Sure.

5    Q.  Okay.  Okay.  I want to touch on the Federal Reserve --

6    your comments about the Federal Reserve, and I'm not going

7    to take a lot of time on that, but what I want to ask you is

8    this:  I read all the Federal Reserve documents that you

9    referred to, and I didn't see PCI's name or Tom Petters'

10   name mentioned in any of those Federal Reserve documents.

11   Did you?

12   A.  No.

13   Q.  And I assume you didn't have access to the Federal

14   Reserve work papers for any review they did of M&I's

15   policies or procedures, did you?

16   A.  I did not.

17   Q.  And you would say -- I think it would be fair to say

18   that if you don't have access to those work papers, that it

19   would be difficult to opine on what the fed actually looked

20   at or didn't look at, correct?

21   A.  I know what was provided to the fed examiners.  I don't

22   know what they actually reviewed or did --

23   Q.  Okay.

24   A.  -- in their exam.

25   Q.  I know you testified that you thought the bank's BSA

1    program was adequate and consistent, right --

2    A.  Yes, sir.

3    Q.  -- with industry practice?

4    A.  And fed requirements and expectations.

5    Q.  I also know you said you're a fisherman.  My question is

6    more -- is also sports related.  Do you follow football at

7    all?

8    A.  Not in the slightest, so I beg your pardon.

9    Q.  Would you agree that you could have a really good

10   program -- in football it would be an offense -- you could

11   have a really good program, but it still depends on the

12   execution of the program for its success?

13   A.  Certainly I follow that.

14   Q.  Okay.  So the fact that the bank had a program that was

15   adequate or satisfactory still depends on the people

16   executing the program for it to be a success, correct?

17   A.  Sure, I agree with that.

18   Q.  You know, you testified about another case that you had.

19   I think you called it the *Stern* case?

20   A.  Yes, sir.

21   Q.  And you were an expert in that case, were you?

22   A.  Yes, sir.  I filed an affidavit.

23   Q.  All right.  And in that case you said that the bank

24   should have known about the Ponzi scheme, correct?

25   A.  I think I phrased it --

1          MR. SCHAPER:  Objection to form of the question.

2          THE COURT:  Overruled.

3          THE WITNESS:  Can you repeat the question, please?

4   BY MR. ANTHONY:

5   Q.  Sure.  Did you provide an affidavit in that case?

6   A.  I did, yes.

7   Q.  And did you say in your affidavit that the bank knew or

8   should have known about the Ponzi scheme?

9   A.  Something to the effect of they in all likelihood could

10  have known.  I just don't recall the exact language, but

11  they would have had access to this data.

12  Q.  And you said that you came to that conclusion because

13  the bank in that case provided extraordinary assistance to

14  the Ponzi scheme.  Do you recall saying that?

15  A.  I do recall saying that.

16  Q.  And you said the bank assisted the fraudsters in key

17  ways that enabled the Ponzi scheme, correct?

18  A.  I don't have it in front of me.  If you can show it to

19  me, I'll verify that I said that.  I was speaking about a

20  really complicated set of transactions and a complicated

21  relationship.

22  Q.  I will show it to you, if you'd like me to do that, if

23  it will refresh your recollection.

24  A.  That would be helpful.  Thank you.

25  Q.  Okay.  Do you have -- I'm being told it's in your

1    binder, and I'm going to give you the location for it

2    shortly.

3    A.  Great.

4    Q.  It's P-607.

5       (Pause)

6    Q.  Do you have it?

7    A.  I do, yes, sir.

8    Q.  And take a look at -- do you recall providing -- an

9    affidavit is something you do under oath, right?

10   A.  Yes, sir.

11   Q.  And was it your view at the time you did this affidavit

12   that during the period 2005 to 2007 time period banks had an

13   obligation to protect the public from Ponzi schemes?

14   A.  Can you direct me to where you are?

15   Q.  Look at page 5 of P-607, please.  It's at paragraph 9,

16   if you just want to look at paragraph 9 to refresh your

17   recollection.

18   A.  Yes, sir, I see that.

19   Q.  Okay.  So do you see that you said that the banks have

20   an obligation to protect the public from Ponzi schemes?

21   A.  Yes, sir.  I don't see the reference to years that you

22   made in your question, but I make that statement about banks

23   have a public policy obligation.

24   Q.  Okay.  And in that case you also indicated that the

25   bank, in that case where you provided the affidavit, was

Grice - Cross

1    aware of, you said, anomalous and irregular transactions

2    flowing through the account.  Do you recall that?

3    A.  I do, yes.

4    Q.  And you also said that one of the reasons why the bank

5    should have suspected the activity was the fraudsters wrote

6    and cashed several large round dollar checks payable to

7    cash.  Do you recall that?

8    A.  I do.

9    Q.  And do you recall how much money were involved -- was

10   involved in those large round dollar checks?

11   A.  I think I recall $28,500 in a three-month period.

12   Q.  So the fraudsters in that case, in which you opined that

13   it was a Ponzi scheme and the bank should have been aware of

14   it, wrote checks for $28,000 or so, correct?

15   A.  Yes, recognizing this is a personal account and not a

16   business account and it was taken out in cash.

17   Q.  You're aware that there were checks made out to cash in

18   the PCI account during the period in question, correct?

19   A.  I am.

20   Q.  Do you recall how many hundreds of thousands or millions

21   of dollars in checks were made out to cash in the PCI

22   account?

23   A.  I recall the testimony from Mr. Martens and I recall one

24   of the last exhibits he showed was a list of dollar amounts

25   payable to Ms. Coleman, Mr. Petters, Mr. White, and others.

1    I recall in his testimony him saying these were checks -- it

2    was either actual cash or checks payable to cash.

3    Q.  Right.

4    A.  I don't think that was accurate.

5    Q.  Okay.  Well --

6    A.  I think the checks were payable to Mr. White,

7    Mr. Petters, Ms. Coleman, the other Coleman, but they

8    weren't payable to cash.

9    Q.  So my question was:  Are you aware of checks payable to

10   cash?

11   A.  Yes, and I think the dollar total was $1,500 or

12   something like this.  It was a modest dollar amount.

13   Q.  Let me ask you this.  You said -- and this is the last

14   question on your affidavit there.  You said in that

15   affidavit that the withdrawals of cash in round dollars and

16   in the amounts in that case would cause a bank

17   investigations unit to open a case in order to investigate

18   the sources and uses of the funds and to determine if there

19   was a financial crime, such as money laundering.  That's

20   what you said, right?

21   A.  Yes.

22   Q.  And in that case that you provided the affidavit, the

23   withdrawals totaled, I think you're right, $25,800 in a

24   90-day period, correct?

25   A.  That's my recollection.  That's what I say in the

1    affidavit.

2    Q.  You heard testimony in this case about this expedited

3    review called QAPOR, correct?

4    A.  Correct.

5    Q.  And you and Ms. Ghiglieri diverge in your opinion.  She

6    thinks QAPOR was an expedited review that resulted in less

7    fulsome investigations than you believe occurred, correct?

8    A.  I -- yeah, I disagree with her, yes, sir.

9    Q.  Okay.

10            MR. ANTHONY:  Now, Ms. Ellig, would you put up

11   Exhibit 398, page 7, please.

12   BY MR. ANTHONY:

13   Q.  And we looked at this briefly earlier, but I didn't ask

14   you about the last point on paragraph 3.  These were

15   reminders.  I asked you about the first two bullet points:

16   Where do the funds come from?  Where do they go?

17            But in the final analysis, what the person writing

18   the comment in Exhibit 183, the alerts, what they have to

19   achieve is sufficient description to convince the reader

20   that the alert is not suspicious, correct?

21   A.  That's what it says, yes.

22   Q.  Right.  And so you used the phrase earlier it's not what

23   you believe or what I believe, right, it's -- in terms of

24   these alerts, it's whoever is reading it has to be

25   persuaded, convinced that whatever is being shown in that

Grice - Cross

1      comment section is not suspicious, correct?

2      A.  I don't follow the question.

3      Q.  You're right.  It's bad --

4      A.  The instruction is to the AML analysts.

5      Q.  Right.  So whoever is reading the comment has to be

6      convinced that the alert is not suspicious, correct?

7      A.  I agree that's what the instruction is, but I also, when

8      I testified to this earlier in my direct, was making it

9      clear that this is an instruction inside the context of the

10     AML unit.  So it's between the AML analyst and their

11     supervisor.

12     Q.  You know --

13     A.  It's not for -- it wasn't intended for litigation

14     15 years later, is my point.

15     Q.  Okay.  So I'm going to switch to a different topic.

16                MR. ANTHONY:  You can take that down, Ms. Ellig.

17     BY MR. ANTHONY:

18     Q.  You talked about a hypothetical transaction in response

19     to direct questions.  Do you remember that?  Money coming

20     from big-box retailers, maybe it went to the wholesalers and

21     then went to the PCI account.  Do you remember that?

22     A.  Are you referencing the diagram that we looked at?

23     Q.  Yeah, yeah.

24     A.  Yes, sir.

25     Q.  Do you remember that?

1    A.  I do recall that.

2    Q.  Okay.  So can you show us anywhere in any of the alerts

3    where any of these analysts thought the money that was going

4    into the PCI account that said Enchanted or Nationwide was

5    really coming from some big-box retailers and working its

6    way through Enchanted and Nationwide and going into PCI?  Do

7    you see that mentioned anywhere in any of those alerts?

8    A.  No, sir.

9    Q.  Did you hear anyone testify that they thought, whether

10   it be an analyst, a business banker, or business banker's

11   boss, any of them testify that they thought the money was

12   coming from the big-box retailers through the wholesalers

13   and into the PCI account?  Did you see any testimony like

14   that?

15   A.  No, sir, nor do I think it should have been.

16   Q.  I'm going to finish with two things.  And I saw -- you

17   know, you did that red flag comparison between you and

18   Ms. Ghiglieri.  Do you remember that?

19   A.  I think counsel for the bank did, but I was --

20   Q.  Yeah.

21   A.  -- part of that back and forth.

22   Q.  Yeah.  So I'm going to do something similar to what they

23   did.

24              MR. ANTHONY:  Let's do the ELMO.

25   BY MR. ANTHONY:

1    Q.  So Ms. Ghiglieri testified that she thought that the

2    flow of funds were going the wrong way.  Do you remember

3    that?

4    A.  I do.

5    Q.  And she said the business purpose -- if you were

6    following the business purpose as explained to the business

7    bankers, the money shouldn't have been coming from the

8    wholesalers, it should have been going to the wholesalers.

9    Do you remember that?

10   A.  That was her testimony.

11   Q.  And she said that was suspicious, didn't she?

12   A.  Yes.

13   Q.  So I'm going to put a little "X" there.  Do you think

14   that was suspicious?

15   A.  At the time, no.

16   Q.  Okay.  Now, Ms. Ghiglieri said she thought that the

17   monthly alerts that we saw with all the thresholds and the

18   numbers, she said that suggested to her that there was

19   suspicious activity.  Do you recall that?

20   A.  I do.

21   Q.  And I think we said there were 39 of them, right?

22   A.  Correct.

23   Q.  She said they were suspicious.  And you say they are or

24   aren't?

25   A.  Well, I mean, I'm -- I think you asked me -- none of

1    them said they were suspicious --

2    Q.  Okay.

3    A.  -- so I'm just reporting that's what the conclusions

4    were.

5    Q.  Well, I'm asking you if in your opinion you thought they

6    were suspicious, not whether they were reported as not being

7    suspicious.

8    A.  I was misunderstanding your question.  I agree that

9    there was -- those were properly adjudicated, to use their

10   word.  Those were correct decisions based on what was

11   available at the time.

12   Q.  My question is:  Do you -- is it your opinion that those

13   39 alerts going off is an indication of suspicious activity

14   or not?

15   A.  No.  I agree with the determinations made by the

16   analysts.

17   Q.  Okay.  Then Ms. Ghiglieri talked about billions going in

18   and out of the account.  Do you remember that?

19   A.  I do.

20   Q.  She thought that was suspicious.  Do you think that's

21   suspicious?

22   A.  Based on what was known at the time, no.

23   Q.  Then Ms. Ghiglieri said there were large round dollar

24   transactions and she thought that was suspicious.  Do you

25   think that's suspicious?

1    A.  Again, same answer.  Based on what was known at the time

2    and consistent with fed expectations and industry custom and

3    practice, no.

4    Q.  And then she said wires, millions of dollars, going to

5    insiders in her view were suspicious.  Do you agree that

6    that information is a cause for suspicion?

7    A.  No.  Based on what was known at the time, those were

8    properly authorized and not suspicious.

9    Q.  Well, in other words, what you say is one corporate

10   insider authorized another corporate insider to receive a

11   multimillion dollar wire, correct?

12   A.  Correct.  I agree, that's a correct description of what

13   those were.

14   Q.  And so you had those corporate insiders taking the

15   company's money -- and the company is the plaintiff in this

16   case -- taking the company's money for themselves and you

17   didn't think that was suspicious?

18   A.  I think, based on what was known at the time, that was

19   the proper determination by the AML analysts.

20   Q.  And Ms. Ghiglieri talked about checks in the millions as

21   being suspicious.  And is it your view that they weren't

22   suspicious?

23   A.  I have to take your word for it.  I can't see what you

24   are writing.

25   Q.  Oh, I'm sorry.  I apologize.

Grice - Cross

1    A.  I again agree that the -- in my view, the checks were

2    not suspicious or irregular or warranted an investigation.

3    Q.  And Ms. Ghiglieri referenced PCI doing business with a

4    money launderer as being a cause -- a reason for suspecting

5    something.  And I'm not sure what your view of that is.  Do

6    you think that is a reason for concern or not, the bank

7    should have had a concern over that or not?

8    A.  I think the bank should not have had a concern based on

9    what was known at the time.

10   Q.  Okay.

11   A.  She's --

12   Q.  Thank you.

13   A.  -- improperly ascribing risk where none was known.

14   Q.  So her view that -- if the customer is doing business

15   with a known money launderer where hundreds of millions of

16   dollars are being exchanged, are you saying that that was an

17   unreasonable view of what risk is?

18           MR. SCHAPER:  Objection, misstates the testimony.

19           THE WITNESS:  I'm saying --

20           THE COURT:  Overruled.

21   BY MR. ANTHONY:

22   Q.  Are you saying her view is unreasonable?

23   A.  I'm saying this is a reflection of hindsight bias.  She

24   knows about the marketing MIContact call in 2002 and is

25   ascribing that knowledge to all subsequent transactions with

1    Metro Gem, and the only way she knows to look for that and

2    ascribe that significant weight to that MIContact is by

3    virtue of the Martens report after 2010.

4    Q.  Well, in fact, every wire transfer to Metro Gem from

5    2002 to 2008 was information in the bank's data and records,

6    wasn't it?  Wasn't it in the bank's data and records?

7    That's my only question.

8    A.  The MIContact is inside the bank's data and records.

9    Q.  The MIContacts in the records and all the transactions

10   between the money launderer and PCI are in the bank's

11   records for anybody to see from 2002 to 2008.  Isn't that an

12   accurate statement?

13          MR. SCHAPER:  Your Honor, that mischaracterizes

14   the evidence as to there being any transactions between

15   Mr. Vennes and the bank.

16          MR. ANTHONY:  Metro Gem, Your Honor.

17          THE COURT:  So you're correcting your question?

18          MR. ANTHONY:  Yes, it's between Metro Gem.

19   BY MR. ANTHONY:

20   Q.  Any transaction between Metro Gem and PCI was available

21   to each and every person in the bank who wanted to look for

22   it, correct?

23   A.  Correct.  I agree with that.

24   Q.  All right.  But that wasn't a sign of any concern or

25   suspicious behavior in your view?

1    A.  Prior to the PwC work, it was not known.

2    Q.  Well --

3    A.  The suspicious nature of those transactions was not

4    known.

5    Q.  So you don't take at face value doing business with a

6    money launderer is suggestive of anything suspicious,

7    correct?

8         MR. SCHAPER:  Objection again, mischaracterizes

9    the record; same basis.

10        THE COURT:  Overruled.

11        THE WITNESS:  Could you repeat the question,

12   please?

13   BY MR. ANTHONY:

14   Q.  You don't think it's inherently suspicious when your

15   customer is doing business with a money launderer?

16   A.  You -- my -- I can't answer a simple "yes" or "no" the

17   way you've put the question.

18   Q.  Okay.  I'll ask a different question.

19        Now, we saw Ms. Ghiglieri talking about unusual

20   requests -- I'm not sure how to spell it -- unusual

21   requests.  She thought the requests to write a letter to

22   Polaroid, the request not to get the list of transactions,

23   the request to write a letter in connection with the DACAs

24   to Sabes, she thought that was all special requests that

25   were unusual.  Do you remember that?

1   A.  I do.

2   Q.  You don't think any of that was unusual, do you?

3   A.  No.  Based on what was known and available at the time,

4   no.

5   Q.  All right.  And the last one I'm going to put up is the

6   yacht.

7       (Plaintiff's counsel confer)

8   BY MR. ANTHONY:

9   Q.  All right.  I'm going to push the paper up.  10 million

10  for the yacht, she said she thought it was suspicious.  I

11  think you testified already you didn't attach any

12  significance or concern or suspicion to that, right?

13  A.  When we talked about the yacht or the transaction with

14  the yacht/broker/law firm, we were talking about the AML

15  analysts calling out that information.  I was happy they

16  called out that information.

17          But as I think you may have asked Ms. Maltsch

18  yesterday, wealthy people buy yachts.  So I don't think

19  there's anything inherently improper or suspicious about a

20  transaction involving a yacht --

21  Q.  Okay.

22  A.  -- if that's what this was.

23  Q.  So where did you see in the alert comment what the

24  business use or purpose for PCI owning a yacht?

25  A.  I did not see because that wasn't the standard.

1    Q.  Well, you did not see it because no one wrote it in the

2    comment section, that's why you didn't see it, isn't it?

3    A.  I don't know --

4            MR. SCHAPER:  Objection, Your Honor,

5    argumentative.

6            MR. ANTHONY:  I'll withdraw it, Your Honor.

7    BY MR. ANTHONY:

8    Q.  In any event, to sum it up, you didn't think it was

9    suspicious at all?

10   A.  On its face, knowing what was known at the time or based

11   on information available at the time, no.

12   Q.  Okay.  The last area I want to ask you about is --

13           MR. ANTHONY:  Oh, no, you can take it down,

14   please.  Oh, it's me.  I'm sorry.  I'm taking it down.

15   BY MR. ANTHONY:

16   Q.  Okay.  You answered in questions to counsel that, you

17   know, you had all the information you needed to do your

18   report, correct?

19   A.  Yes, sir.

20   Q.  All right.  And were you here for Mr. Vanderheyden's

21   testimony regarding the unique information on the millions

22   of pages of documents in evidence and e-mails that were

23   destroyed?  Were you here for that testimony?

24           MR. SCHAPER:  Objection, misstates testimony.

25           THE WITNESS:  I heard half and I saw half --

1          MR. ANTHONY:  Wait.  Wait.

2          THE WITNESS:  Oh, sorry.

3          THE COURT:  Sustained.

4    BY MR. ANTHONY:

5    Q.  Did you read his transcript yet?

6    A.  I heard half of it and I read half of it.

7    Q.  Did you read the part -- and I'll read it to you, the

8    question he was asked, and I'll give you his answer and see

9    if this is what you remember.

10        "And you can't say, Mr. Vanderheyden, for a fact that

11   there was not unique information on all those millions of

12   pages of documents that were destroyed from those backup

13   tapes in 2010 and 2011, right?

14        "Answer:  I cannot say that for --

15        "Question:  You can't.  So what we can say is there that

16   could have been unique information on all of those millions

17   of pages of evidence and e-mails that were destroyed, right?

18        "Answer:  Could have been."

19          Do you recall him saying those things?

20   A.  I do, yes, sir.

21   Q.  Okay.  And would it be fair to say that, as far as you

22   know, neither you nor anybody else here has had access to

23   those millions of pages of documents in evidence, correct?

24          MR. SCHAPER:  Objection to form, misstates the

25   record.

1             THE COURT:  Sustained.

2    BY MR. ANTHONY:

3    Q.  You haven't had access to those missing pages or

4    records, are you?

5    A.  Yeah, I have not been involved in that --

6    Q.  All right.

7    A.  -- question or issue at all.

8    Q.  And you don't know anything about it?

9    A.  Only what I heard here in the courtroom.

10   Q.  Yes.

11            MR. ANTHONY:  Nothing further at this time,

12   Your Honor.

13            MR. SCHAPER:  Just a few questions, Your Honor.

14                    **REDIRECT EXAMINATION**

15   BY MR. SCHAPER:

16   Q.  Mr. Grice, I think you testified earlier that the record

17   that you were able to review in this case was one of the

18   largest records that you have reviewed in any matter you

19   have worked on?

20   A.  That's correct.

21   Q.  And are you confident that you had sufficient

22   information to reach your conclusions?

23   A.  I think I said more than sufficient, yes.

24   Q.  Okay.  And if M&I employees had been participating in

25   some kind of fraudulent scheme, would you expect evidence of

1    their involvement to be limited to e-mails?

2    A.  Yes, sir.  Oh, I'm sorry, I misheard the question.  Can

3    you repeat it again?

4    Q.  Yeah.  If M&I employees had been participating in the

5    PCI scheme, would you expect evidence of their involvement

6    to be limited to e-mails?

7    A.  No.  There would be action associated to that.  There

8    would be something else.

9    Q.  And is that view based on your experience working on

10   other cases where employees at a bank were involved in some

11   wrongdoing?

12   A.  Yes.

13   Q.  You were asked by plaintiff's counsel about the fact

14   that you had not interviewed any bank employees in

15   connection with your work.

16   A.  Yes, sir.

17   Q.  Why did you not do that?

18   A.  Because I had so many deposition transcripts where

19   counsel was provided the opportunity to interview and

20   examine bank witnesses repeatedly.  So I didn't feel it was

21   necessary in this assignment.

22   Q.  Did you say that you looked at over 60 deposition

23   transcripts?

24   A.  Yes, sir.

25   Q.  And just ballpark, roughly how long do deposition

1   transcripts in this case typically run?

2   A.  Hundreds of pages each, plus the exhibits.  So, you

3   know, they're usually five, six, seven hundred pages, unless

4   I'm talking, in which case it might be more, but a large

5   selection of exhibits that are attached to it.

6   Q.  And you reviewed 60 of those?

7   A.  Yes, sir.

8   Q.  So did you feel that you had the information you needed

9   to render your opinions?

10  A.  Yes, sir, especially because there were multiple

11  transcripts for the bank witnesses.  So I got to see or hear

12  or read several opportunities to examine Ed Jambor, Chris

13  Flynn, and other bank analysts and AML employees.

14          MR. SCHAPER:  Can we please look at P-183,

15  Mr. Herzka, and go to pages 9 and 10.

16  BY MR. SCHAPER:

17  Q.  Do you remember being asked about this alert, Mr. Grice?

18  A.  Yes, sir.

19  Q.  And there is an entry, if we look down on the bottom of

20  the first page, "Petters is a collection of nearly 20

21  companies."  Do you see that?

22  A.  I do.

23  Q.  And you were asked several questions about that?

24  A.  Yes, sir.

25  Q.  And I think you started to say that the distinction

1   between whether that is technically accurate as to PCI did

2   not matter -- or was not important to you from an AML

3   perspective.  Did I hear that right?

4   A.  That's correct.

5   Q.  I don't think plaintiff's counsel asked you a follow-up

6   question, so I'd like to ask you:  Why did you say that?

7   A.  This inaccurate but broader definition of the customer

8   reflects -- again, my word -- effective control that

9   Mr. Petters had over PCI.

10          And so I don't think it's a meaningful distinction

11  whether or not Mr. Petters or PCI is described this way.  I

12  think what matters is that Petters is at the center of

13  Petters Group Worldwide, PCI, and the related companies.

14          And so I think from the bank's perspective,

15  Petters and his associated companies are the relevant

16  entities to examine for AML purposes.

17  Q.  And did plaintiff's counsel show you anything that

18  Mr. Petters was not in control of these other companies that

19  are referenced on this alert?

20  A.  No, sir.

21  Q.  And I think --

22          MR. SCHAPER:  If we'd keep that up, Mr. Herzka.

23  BY MR. SCHAPER:

24  Q.  I think if we go up to the top of this document, this is

25  an alert --

1           MR. SCHAPER:  Sorry.  Same page, top of 9.

2    BY MR. SCHAPER:

3    Q.  This is an alert.  The alerted month was April 2005.  Do

4    you see that?

5    A.  Yes, sir.

6    Q.  And I think that counsel for Mr. Kelley was referring to

7    this as the first alert?

8    A.  Yes, sir.

9           MR. SCHAPER:  Can we go back two pages?  One more

10   page.  Okay.  And look at the top.

11   BY MR. SCHAPER:

12   Q.  So was this actually an alert that was before what

13   counsel was calling the first alert?

14   A.  Yes, sir.  This is when Searchspace went live, is my

15   understanding.

16          MR. SCHAPER:  And if we scroll out and look at

17   both pages.

18   BY MR. SCHAPER:

19   Q.  And feel free.  This is -- you can look at this in your

20   binder too.  It's P-83 [sic], 6 and 7.

21          Do you recall questions about whether the early

22   alerts that were reviewed by AML analysts made any reference

23   to Nationwide and Enchantment?  Do you recall those

24   questions?

25   A.  Are you using "enchantment" specifically?  That's not

Grice - Redirect

1    the name.

2    Q.  Well, in this it says, "Enchantment Family Buying."  Do

3    you see a reference to that?

4    A.  Yes, sir, I see that.

5    Q.  And so does this alert that precedes the one that

6    plaintiff's counsel asked you about, does this reference

7    transaction activity with Nationwide and, as it's noted

8    here, Enchantment Family Buying?

9    A.  Yes, sir.  That's correct.

10   Q.  You were asked questions about whether it was unusual

11   for billions of dollars to go into an account.  What kind of

12   business was -- did PCI tell the world that it was involved

13   in?

14   A.  Effectively a trading company, buying and selling

15   electronic goods.

16   Q.  And would it have been unusual for a business that fit

17   that description to be doing transactions in very large

18   dollars every month?

19   A.  Not in my opinion, not in my experience.

20   Q.  You were also asked whether it was -- well, strike that.

21           Might it have been unusual for some other bank

22   customer to be doing transactions in such large amounts of

23   money every month?

24   A.  Certainly.

25   Q.  So, in your view, does the review of the alerts depend

1    on the customer that you're reviewing?

2    A.  Yes.  It depends on the contact.  So you have to look

3    again at the nature of the business, the nature of the

4    service the business is using at the bank, and the

5    geographic locations that the business is operating in.  All

6    of that matters.

7    Q.  Plaintiff's counsel also asked you about whether, in

8    your view, the fact that the account alerted 39 times was

9    unusual.  And what was your response to that?

10   A.  I said it was an artifact.  It's a characteristic of the

11   nature of the business.  They behaved consistently with this

12   profile.

13   Q.  When you say "the nature of the business," do you mean

14   the nature of PCI's business?

15   A.  Yes, as reflected in the documents of the bank.

16   Q.  So given the nature of PCI's business, was there

17   anything unusual about the fact that it alerted that many

18   times?

19   A.  No.  It's behaving consistently with the expectations of

20   that business.

21   Q.  You got some questions about whether the Federal Reserve

22   examination process that you testified about earlier went

23   into the execution of M&I's BSA/AML policies and procedures.

24   Do you recall that?

25   A.  I do.

```
 1    Q.  And if we can pull up DD-12.  Mr. Grice, did the fed --

 2    sorry, DD-60, page 12.  When the fed was doing these annual

 3    exams that you testified about earlier, did the fed look at

 4    how the bank implemented its procedures and policies?

 5    A.  Yes, they compared --

 6              MR. ANTHONY:  Objection, beyond the scope of

 7    cross.

 8              MR. SCHAPER:  Your Honor, plaintiff's counsel

 9    asked a question about the execution of the policies.  He

10    tried to use a sport's metaphor, asked whether the fed

11    looked at the execution of policies.  This is responsive to

12    that.

13              MR. ANTHONY:  Your Honor, I never asked a question

14    about fed asking about execution policies, not even close.

15    Beyond the scope and repetitious of his earlier testimony.

16              THE COURT:  Sustained.

17    BY MR. SCHAPER:

18    Q.  Mr. Grice, did anything that plaintiff's counsel asked

19    you on cross-examination cause you to change your opinions

20    as to the appropriateness of M&I's actions under the

21    regulatory requirements and the custom and practice in the

22    banking industry?

23    A.  Not at all.

24              MR. SCHAPER:  No further questions, Your Honor.

25              MR. ANTHONY:  Nothing further, Your Honor.
```

```
1              THE COURT:  May this witness be excused?

2              MR. SCHAPER:  Yes, Your Honor.

3              THE COURT:  Sir, you are excused.

4              THE WITNESS:  Thank you.

5         (Witness excused)

6              THE COURT:  Members of the Jury, you have seen and

7    heard evidence pertaining to examinations conducted by the

8    Federal Reserve Bank of Chicago.  This evidence may be

9    considered by you only for the purpose of evaluating the

10   accuracy and credibility of the opinions and testimony of

11   Catherine Ghiglieri and Charles Grice.  The evidence may not

12   be used for any other purpose.

13             MR. GLEESON:  Judge, there's just one or two

14   things that we would like to address to the Court outside

15   the presence of the jury before we rest.  If we may do that,

16   we can do it at sidebar.  Obviously your call whether to

17   excuse the jury or we do it at sidebar.

18             THE COURT:  I think it's appropriate for us to end

19   the jury's day today.

20             So we will have a recess in this trial from next

21   Monday through Thursday while the Court and the attorneys

22   prepare the case to be given to you for deliberations.  You

23   do not need to return to the courthouse until Friday,

24   November 4th, and that will be at the normal time.  So

25   please be in the courthouse by 8:00 and ready to enter the
```

1    courtroom by 8:30.

2            And I will provide you with our normal recess

3    instruction.  Members of the Jury, during this recess and

4    every other recess, you must not discuss this case with

5    anyone, and that includes other jurors, members of your

6    family, people involved in the trial, or anyone else.  And

7    do not allow anyone to discuss the case with you or within

8    your hearing.

9            Only you have been chosen as jurors in this case

10   and only you have sworn to uphold the law.  No one else has

11   been given this important responsibility.

12           And you should not even talk among yourselves

13   about the case before you've heard all of the evidence and

14   the case has been submitted to you by me for your

15   deliberations because it may affect your final decision.

16           If anyone tries to talk to you about the case,

17   please let them know that they may not do so and let me know

18   that they've tried to do so immediately.

19           And when I say you must not discuss the case with

20   anyone, I also mean do not e-mail, do not text, do not blog,

21   do not engage in any other form of written communication,

22   oral communication, or electronic communication, as I've

23   instructed you before.

24           Also, don't read any newspaper or other written

25   accounts, watch any television or televised account of this

3536

1    matter, listen to any radio program about the trial.  And do

2    not do any internet research or consult any other sources

3    about the case, about the people in the case, or about the

4    general subject matter of the case.

5             And, as you know, you must keep an open mind and

6    that's one free of outside information, and only in this way

7    will you be able to decide the case fairly, and that's based

8    on solely -- solely on the testimony, the evidence that's

9    been presented in the courtroom, and my instructions on the

10   law.

11            If you were to decide the case on anything else,

12   you would do an injustice.  It would be a violation of your

13   oath for you to base your decision on someone else's opinion

14   or a reporter's view or any information that you acquire

15   outside of the courtroom.  So it's important for you to

16   continue to follow these instructions.

17            Thank you for your service.  You're in recess.

18            THE LAW CLERK:  All rise for the jury.

19       (Jury excused)

20                       **IN OPEN COURT**

21                     **(JURY NOT PRESENT)**

22            THE COURT:  You may be seated.  So we will proceed

23   with the charge conference and oral argument on defendant's

24   motion for directed verdict on Thursday, November 3rd.

25   We'll notify you about the start time of that proceeding.

1       And we plan to have closing arguments and charge the jury on

2       November 4th, on Friday, assuming that the case is prepared

3       for doing so.  Okay?

4               Anything that you'd like to advise the Court about

5       this matter?

6               MR. GLEESON:  Judge, it's just one issue.  And I

7       don't want to shoot from the hip on it.  We want to have the

8       opportunity to file a very short brief.  And it reared its

9       head this afternoon on the cross-examination of Mr. Grice.

10      I have no doubt --

11              THE COURT:  Let me have you stop talking and have

12      counsel in the courtroom or anybody in the courtroom to be

13      seated while the Court is being addressed.

14              MR. GLEESON:  I have no doubt the Court recalls

15      those Petters newsletters that we offered into evidence a

16      couple of times.  And for good and sufficient reason at the

17      time, I think the Court made its ruling.

18              But the -- you may recall the questioning here

19      this afternoon about the -- in the closing of the alerts,

20      the statements by the AML -- the notes by the AML analysts

21      about nearly 20 Petters companies, which was attributed --

22      which was characterized by Mr. Anthony in his cross as a

23      mistake that was by the analyst that was carried forward in

24      the subsequent closures.  And that comes -- that nearly 20

25      companies, including companies overseas, come directly out

1    of those Petters newsletters.

2            We offered them not for the truth.  We said they

3    were not hearsay.  They were offered for their effect on the

4    AML analysts.  And, in fact, Mary Pesch testified that she

5    reviewed Defendant's Exhibit 80020, for example, and if she

6    reviewed that, she would come to the erroneous conclusion

7    that the Petters -- that Petters owned nearly 20 companies

8    and that they were overseas.

9            And here's the unfairness, Judge, that we want to

10   have a chance to address in a brief written submission.  The

11   unfairness is that mistake is characterized as an error in

12   accuracy in the AML analyst's investigation of an alert.

13   And it's charged by the plaintiff to the account of those

14   analysts, they screwed up and that affected the history

15   throughout.

16           When we offered those newsletters that Mary Pesch

17   had observed, the objection was that they were hearsay, that

18   they were offered for the truth.  And we said otherwise.

19   The objection was sustained.  It was sustained again in

20   connection with Ms. Lindstrom's testimony.

21           And now we're in the position where the

22   misinformation that the analysts learned about Petters by

23   investigating Petters will be argued as a mistake by the

24   bank as opposed to the bank having conducted a -- a

25   certainly acceptable, if not commendable, investigation

1    having read the publications of Petters that were false, but

2    they weren't to know they were false.

3           And they were kept out on the ground that they

4    were -- they were objected to on the ground that they were

5    being offered for the truth.  But now the very same untruth

6    that we were -- offered them for is being used by the

7    plaintiff against us.

8           There's just, I think, and maybe if I -- if we

9    have an opportunity to articulate it briefly in writing, it

10   will be articulated better than it is right now.

11          But I think -- I don't think.  I respectfully

12   submit to the Court there's a fundamental unfairness in the

13   use to which the defendants are going to put this nearly 20

14   companies, given the fact that the analyst who wrote those

15   down read that in Petters -- or said that they reviewed the

16   very same publication in which Petters said that falsely.

17          So, you know, the -- as I say, I would like an

18   opportunity for us to brief it because it was placed in

19   sharp relief today.  When it was offered through Lindstrom,

20   the Court ruled that it was irrelevant and confusing to the

21   jury.

22          Now I think -- and I'm not saying the Court was

23   equipped with just how unconfusing it would be at the time.

24   We would like to re-address it.

25          And I think our alternative relief requests will

```
1    be either the Court revisit the -- its decision to sustain

2    the objection of our offer into evidence of those

3    newsletters or, in the alternative, to preclude a very

4    unfair argument that could be made by counsel for the

5    trustee in its summation.

6              That's all I have.  I would like permission to be

7    able to do that.

8              And we are prepared to rest, I believe, right?

9    Because I think you've addressed the scheduling concerns we

10   wanted to address the Court to.  If not -- and we still have

11   the Rule 50 stuff.

12             I think Mr. Moheban has a couple of things to

13   address the Court on, but we'd like to -- we haven't rested.

14   Before we do when the jury comes back, we'd like an

15   opportunity to address this issue of what we think is acute

16   and pointed unfairness as a result of how this is unfolding.

17             THE COURT:  Thank you, Counsel.

18             MR. MARDER:  Good afternoon, Your Honor.  David

19   Marder appearing again for the plaintiff.

20             Your Honor, I believe with regard to these

21   magazines, there have been oral arguments before the Court

22   on at least two and maybe three occasions where these same

23   types of arguments were made and they were rejected.

24             I think the last thing anybody needs at this point

25   in this case is more briefing.  And I think this latest
```

1       argument can be dispensed with very simply, which is that

2       those magazines have nothing to do with the issue on which

3       this witness was examined.

4              The reason the audit trail was discussed with this

5       witness is because it is clear that the employees made a

6       mistake.  What they said was that instead of Petters

7       Worldwide Group being a collection of 20 companies, they

8       said that PCI was.

9              If this magazine were to come into evidence, it

10      would not disprove that.  This magazine would show that the

11      larger Petters Group was a collection of 20 companies, but

12      it would not correct the error which was in the audit trail,

13      which said that PCI was a collection of 20 companies.

14             So for those reasons, Your Honor, we don't think

15      we need to rehash this issue.  And if we do, Your Honor,

16      it's going to affect the schedule greatly because it would

17      prevent the defendant from resting, and we would like to

18      present now our judgment -- motion for judgment as a matter

19      of law.  And if they haven't rested, then we'd be precluded

20      from doing that.  And it seems to me that that should be

21      addressed at the same time as the other JMOL that's going to

22      be argued on Thursday.

23             So we think that this latest request should be

24      rejected.  We think that the defendant should rest, and that

25      we be then allowed to present our motion for judgment as a

1    matter of law.

2           MR. GLEESON:  Your Honor, just briefly on this

3    issue that requests permission to address this briefly in

4    writing.  And the reason I say that is there are transcript

5    cites, there are -- I want to be precise with the Court as

6    to the arguments that were made in opposition and the basis

7    of the ruling.

8           But just briefly in regard to what Mr. Marder just

9    said, the -- that obviously, I'll suggest to the Court, goes

10   only to the weight of this evidence, which is quite weighty.

11   Because the notion that approximately 20 companies, at some

12   times it says PCI, at least one time it says Petters,

13   that -- we know where that came from.  It came from the

14   false statements of Tom Petters that these analysts looked

15   at.  They didn't make a mistake.  What they did was

16   correctly report the erroneous information that Petters

17   himself had promulgated.  So we ask for that opportunity.

18          THE COURT:  So what would you propose -- oh,

19   sorry.  Go ahead.

20          MR. MARDER:  Just as a final point to that,

21   Your Honor.  I'd just note that on repeated examination the

22   AML analysts themselves were asked over and over again on

23   what facts they relied upon when they made the statements in

24   these audit trail, and they repeatedly said that they didn't

25   remember.  So the notion that these particular magazine

1    articles had an effect on them I think is a stretch.

2          But that's all we wanted -- the point we wanted to

3    make, Your Honor.

4          MR. GLEESON:  Very last word on this, Your Honor.

5    They weren't asked about it, about this topic, the analysts.

6    And we can brief this in five pages.  So we'd request that

7    opportunity, Your Honor.

8          THE COURT:  I will grant the opportunity to brief

9    it in five pages.  I'd like the five pages to arrive on

10   Monday.  I'd like a response on Tuesday, five pages.

11         MR. GLEESON:  Thank you, Judge.

12         MR. MARDER:  Just so the record is clear,

13   Your Honor, as I understand it, the defendant has not rested

14   because of this, so are we then -- I assume that you don't

15   want to hear at this point our motion for JMOL because they

16   have not yet rested; is that correct?

17         THE COURT:  That's correct.  I can't rule on it.

18   If you'd like to make the motion and argue it, I'm open.  We

19   have some time here.  And I want to be mindful of the jury's

20   time not only when they are at the courthouse, but when

21   their lives are pending.

22         MR. GLEESON:  Judge, we're happy to rest subject

23   to that one determination.  And then the Rule 50 motion can

24   be made by Mr. Marder.

25         THE COURT:  That's fine.

1          MR. MARDER:  Your Honor, when -- you may recall

2    that when the defendant moved for judgment as a matter of

3    law, instead of stating the basis they simply filed a brief.

4          We do move for judgment as a matter of law on the

5    defendant's affirmative defenses.  We move under Rule 50 for

6    judgment as a matter of law.

7          THE COURT:  Counsel, please be seated during

8    argument.

9          MR. GLEESON:  I just wanted to clarify.  We are

10   happy to rest subject to it, but Mr. Moheban just had one

11   other issue to address the Court before we actually rest.

12   Excuse me for interrupting Mr. Marder, but I just wanted to

13   make clear we hadn't yet rested because Mr. Moheban has an

14   issue to raise for the Court.

15         THE COURT:  Understood.

16         MR. GLEESON:  Okay.  Thank you, Judge.

17         MR. MARDER:  Your Honor, can I proceed?

18         THE COURT:  You may.

19         MR. MARDER:  Thank you, Your Honor.  So we have a

20   motion for judgment as a matter of law under Rule 50 on the

21   nonequitable affirmative defenses.  And we also move for

22   judgment on the equitable affirmative defenses.

23         As you may recall, Your Honor, when the defendants

24   moved for their JMOL, you requested that we follow a simple

25   procedure, which is rather than articulate it in court and

1      argue it at that time, that they have leave to file a brief.

2              And we'd ask the same thing, Your Honor, that

3      rather than spend the Court's time articulating the

4      argument, we have a motion for a judgment as a matter of law

5      that we could file within the next couple hours that would

6      lay out in detail our arguments.

7              If you'd prefer, I can articulate them now, but it

8      seems that we ought to follow the same procedure we did last

9      time, which is for us to make the motion, which we have, and

10     then to articulate the grounds in the memorandum that will

11     be filed, well, within the next few hours.

12             So I leave it to your preference, Your Honor.

13             THE COURT:  Counsel.

14             MR. MOHEBAN:  Your Honor, first of all, we don't

15     object to a briefing of the plaintiff's judgment for a --

16     motion for judgment as a matter of law.  As you know, we

17     brought a motion under Rule 50(a) at the close of the

18     plaintiff's case.

19             At this time we bring another motion for judgment

20     as a matter of law under Rule 50(a) based on all the

21     evidence now that all the evidence has been submitted,

22     subject to the one issue that's being briefed.

23             We also had in mind that we would file a motion

24     and memorandum, and it would be limited to the issues -- or

25     the facts that arise in the defense case.  In other words,

1    we won't backtrack and cover the things that were in our

2    initial motion.  We also are prepared to file that promptly,

3    although I don't think today because we want to have record

4    cites.  But we would be able to file it by tomorrow.  We

5    have in mind our motion could be -- our memorandum could be

6    ten pages.  And we're doing this, of course, to preserve our

7    rights on appeal.

8              THE COURT:  Understood.  And instead of

9    negotiating time frames, I appreciate hearing the parties'

10   views on the timing and I'll issue a text-only order.

11             MR. MOHEBAN:  Okay.

12             THE COURT:  And everybody will be on notice of

13   when everything is due.  Okay.

14             MR. MOHEBAN:  Thank you.

15             MR. MARDER:  Your Honor, at least with regard to

16   our motion for judgment as a matter of law, we're planning

17   on filing that this evening.  It's already written.  I'm

18   just going to hit send on that as soon as we leave the

19   courtroom, if that's okay, rather than articulate it now.  I

20   see you nodding.  Just for the record, that's a "yes"?

21        (Laughter)

22             THE COURT:  It is a "yes" with a smile.

23             MR. MARDER:  Thank you, Your Honor.

24             And then with respect to their JMOL that they

25   already filed, you had ordered us to file our response by

1    today, so we'll go ahead and file that.  It sounds like the

2    only open issue is this additional motion they have and,

3    again, I defer to the Court on the timing on that.

4          MR. MOHEBAN:  Your Honor, this may be the last

5    thing, famous last words, but --

6          THE COURT:  You said "may."

7       (Laughter)

8          MR. MOHEBAN:  I know we've submitted jury

9    instructions some time ago, and I know we've gotten

10   direction that you don't want a whole other set.  There are

11   a couple areas where we would just offer that this might be

12   helpful for the Court to get some updated instructions,

13   particularly on the issue of damages and spoliation.

14   Because a lot has happened -- we filed those proposed jury

15   instructions before your ruling on a number of issues that

16   have a big impact on that.

17          So we're offering to do that.  We've prepared

18   them.  It's obviously what will be useful to you.  But --

19   and on that subject matter, we think it might be useful.

20   And we also think it might make the charge conference go

21   faster because there are some things getting pared down, I

22   believe.

23          THE COURT:  Is there any objection from counsel,

24   opposing counsel?

25          MR. MARDER:  There is, Your Honor.  You may recall

1     that we went through an exhaustive process and filed I think

2     it was a 350-page submission on the parties' jury

3     instructions.

4              And the -- at that time there were motions pending

5     relating to the scope of damages, but the defendants filed

6     their papers at their risk, knowing this was a live issue,

7     and took a position on what the scope of damages should be.

8              The Court has already ruled on this and said that

9     it didn't want additional jury instructions filed.  We think

10    that the parties should rest on the papers they filed rather

11    than to have a whole other new round of proposed jury

12    instructions.

13             THE COURT:  I agree.  So we will not have a new

14    round of jury instructions.

15             Is there anything else we need to address?

16             MR. MOHEBAN:  I did say "may."  I just want you to

17    remember that.

18             I want to make sure that it's just on the record,

19    subject to the one issue that's being briefed, that the

20    defense does rest.

21             THE COURT:  Very well.  I think that concludes our

22    day and our week.  Thank you, Counsel.  Have a good weekend.

23        (Court adjourned at 4:44 p.m.)

24                          *      *      *

25

1

2          We, Lori A. Simpson and Erin D. Drost, certify that
the foregoing is a correct transcript from the record of
3     proceedings in the above-entitled matter.

4          Certified by:  _s/ Lori A. Simpson_
                           Lori A. Simpson, RMR, CRR
5
           Certified by:  _s/ Erin D. Drost_
6                          Erin D. Drost, RMR, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25