1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2

3      ------------------------------------------------------------
                                    )
       Douglas A. Kelley, in his    )   File No. 19-cv-1756
4      capacity as the Trustee of the )        (WMW)
       BMO Litigation Trust,        )
5                                    )
                 Plaintiff,          )   St. Paul, Minnesota
6                                    )   November 3, 2022
       vs.                           )   10:36 a.m.
7                                    )
       BMO Harris Bank N.A., as      )
8      successor to M&I Marshall and )
       Ilsley Bank,                  )
9                                    )
                 Defendant.          )
10     ------------------------------------------------------------

11

12

13            BEFORE THE HONORABLE WILHELMINA M. WRIGHT
                 UNITED STATES DISTRICT COURT JUDGE
14
              **(JURY TRIAL PROCEEDINGS - VOLUME XIV)**
15

16

17

18

19

20

21

22

23

24
            Proceedings reported by certified court reporter;
25     transcript produced with computer.

3551

```
 1    APPEARANCES:
        For the Plaintiff:        Robins Kaplan, LLP
 2                                MICHAEL A. COLLYARD, ESQ.
                                  DAVID E. MARDER, ESQ.
 3                                PETER C. IHRIG, ESQ.
                                  MORGIA D. HOLMES, ESQ.
 4                                MICHAEL D. REIF, ESQ.
                                  800 LaSalle Avenue
 5                                Suite 2800
                                  Minneapolis, Minnesota 55402
 6
                                  Anthony, Ostlund, Louwagie,
 7                                Dressen, Boylan, P.A.
                                  JOSEPH W. ANTHONY, ESQ.
 8                                JOSEPH R. RICHIE, ESQ.
                                  RYAN M. LAWRENCE, ESQ.
 9                                90 South Seventh Street
                                  Suite 3600
10                                Minneapolis, Minnesota 55402

11      For the Defendant:        Stinson, LLP
                                  KEITH S. MOHEBAN, ESQ.
12                                ADINE S. MOMOH, ESQ.
                                  50 South Sixth Street
13                                Suite 2600
                                  Minneapolis, Minnesota 55402
14
                                  Debevoise & Plimpton, LLP
15                                JOHN GLEESON, ESQ.
                                  MICHAEL SCHAPER, ESQ.
16                                SUSAN REAGAN GITTES, ESQ.
                                  MORGAN A. DAVIS, ESQ.
17                                919 Third Avenue
                                  New York, New York 10022
18
                                  Mayer Brown, LLP
19                                JOSHUA D. YOUNT, ESQ.
                                  71 South Wacker Drive
20                                Chicago, Illinois 60606

21                                Mayer Brown, LLP
                                  RICHARD A. SPEHR, ESQ.
22                                GINA PARLOVECCHIO, ESQ.
                                  1221 Avenue of the Americas
23                                New York, New York 10020

24      Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                  316 North Robert Street
25                                St. Paul, Minnesota 55101
```

1

## <u>I N D E X</u>

2                                                                        <u>PAGE</u>

3      RULE 50(a) MOTIONS                                          3556
       CHARGE CONFERENCE                                           3600
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(JURY NOT PRESENT)**

1

2

3

4          THE COURT:  Okay.  So we have a few things to

5     address today.

6          I want to first of all confirm on the record,

7     Counsel, that you've reviewed the contents of the admitted

8     exhibits folders in Box.com and agree that those exhibits

9     and folders are complete and correct.

10          MS. MOMOH:  Good morning, Your Honor.  Adine Momoh

11     on behalf of the defendant, BMO Harris Bank.

12          THE COURT:  Good morning, Ms. Momoh.

13          MS. MOMOH:  We have conferred with the other side,

14     and we do believe that the exhibits that are in Box are

15     accurate and up to date for both sides.

16          But we did raise with plaintiff's counsel this

17     morning the issue of some of the documents that were marked

18     as plaintiff's exhibits needing to be redacted, and so we're

19     going to be working with counsel for the plaintiff today to

20     resolve those issues.

21          THE COURT:  That's terrific.  Thank you,

22     Ms. Momoh.

23          MS. MOMOH:  Thank you, Your Honor.

24          MR. REIF:  Your Honor, Michael Reif for the

25     plaintiff.

1          We agree we are going to be working with BMO on

2     this today and will also be working on a joint index to be

3     able to submit to the Court, but that's a work in progress

4     right now.

5          THE COURT:  Okay.

6          MR. REIF:  Thank you, Your Honor.

7          THE COURT:  Happy to hear it.  Thank you, Counsel.

8          MS. MOMOH:  Thank you.

9          THE COURT:  So we also have cross-motions on the

10    judgment as a matter of law.  Are the parties ready to

11    proceed?

12          MR. MOHEBAN:  We are, Your Honor.

13          THE COURT:  Okay.

14          MR. MARDER:  We are, Your Honor.  Just one

15    preliminary matter.  You may recall we had asked to re-call

16    Mr. Martens as a rebuttal witness.  I understand Your Honor

17    has already rejected that request, but now that the

18    defendants have formally rested, we just, for the record and

19    for appellate purposes, wanted -- and to preserve that

20    issue, we wanted once again to submit our request to have

21    Mr. Martens testify as a rebuttal witness, understanding the

22    Court has already rejected that request, but just for the

23    record, we wanted to state that.

24          THE COURT:  Very well.

25          MR. MARDER:  I assume that's denied?

1                THE COURT:  It has been denied.

2                MR. MARDER:  Thank you, Your Honor.

3                THE COURT:  So then we will go forward with the

4     plaintiff's motion for judgment as a matter of law only as

5     to defendant's affirmative defenses.

6                MR. MOHEBAN:  Do you want to go first?

7                THE COURT:  You tell me how you would like to

8     proceed, Counsel.

9                MR. MOHEBAN:  Your Honor, we had discussed --

10    Keith Moheban on behalf of BMO Harris Bank.

11               We had discussed taking it sort of in order of the

12    case, so we would do the defendant's Rule 50, then the

13    plaintiff's Rule 50.

14               We understand also that we have an hour.  And so I

15    can tell you that for our side, I will be arguing our motion

16    and Mr. Gants will be arguing the opposition to their

17    motion.  And we will try to reserve time for rebuttal, so

18    we're going to keep track of time here.

19               THE COURT:  Very well.

20               MR. MOHEBAN:  Lastly, I do have a handful of

21    slides that I wanted to display during the argument, if that

22    is acceptable.

23               THE COURT:  Is there any objection?

24               MR. MARDER:  No objection, Your Honor.  We have

25    slides too.

1          MR. MOHEBAN:  Just going to give Mr. Herzka a

2   minute to get that set up.

3          May it please the Court, Your Honor, Counsel.  BMO

4   Harris Bank moves for judgment as a matter of law on all

5   claims.

6          We have a number of arguments in the brief.  I'm

7   going to limit my argument today to the most obvious reasons

8   why the Court should grant judgment as a matter of law to

9   BMO Harris, and that starts with we all sat here and watched

10  the plaintiffs put in a negligence case over the last three

11  weeks.

12         How many times did we hear counsel say to an AML

13  analyst or to a banker:  You could have just picked up the

14  phone and called someone.  You could have looked more

15  thoroughly into this.  You could have.  You should have.  We

16  heard that time and time again, of course, with the benefit

17  of 20/20 hindsight, but that's the sum total of the evidence

18  that the plaintiff has put forward here.

19         It's a negligence case that has been presented to

20  the jury, but there is no negligence claim in the case.  And

21  because they have not submitted evidence that a reasonable

22  jury could find the proper level of state of mind, which is

23  actual knowledge or bad faith, there's nothing to present to

24  the jury and no reasonable jury could find in their favor.

25         If you look at our first slide, this is not

1    disputed.  Aiding and abetting fraud requires actual

2    knowledge of that fraud.  Aiding and abetting breach of

3    fiduciary requires -- fiduciary duty requires actual

4    knowledge of that breach.  And the Minnesota Uniform

5    Fiduciary Act requires actual knowledge that in the

6    processing of a transaction, the fiduciary in doing that is

7    breaching a fiduciary duty, fiduciary in this case being the

8    principals at PCI.

9           I will get to bad faith in a moment, but on this

10   actual knowledge point, what is the evidence that we heard?

11          We started out with testimony from five AML

12   analysts from the bank.  They weren't accused of having

13   actual knowledge of the Ponzi scheme.  In fact, they were

14   criticized for not knowing more.  Sum total of plaintiff's

15   critique of the AML analysts was they didn't look far enough

16   to find enough information.  Each and every one of them

17   denied having actual knowledge.  There's no evidence that

18   contradicts that.

19          Same thing with the bankers, with Mr. Jambor, with

20   Mr. Flynn.  They were criticized for the things that they

21   didn't know about, that Mr. Flynn didn't look at the account

22   to find out more information.  They both denied having any

23   actual knowledge.  And there's no allegation to the contrary

24   there either.

25          We heard from the perpetrator, Deanna Coleman.

1    She confirmed that M&I did not have any actual knowledge.

2              And then we get to the statements of the

3    plaintiffs themselves.  Let's remember what plaintiff's

4    expert said in this case.  Plaintiff's expert had no

5    evidence of actual knowledge.  They didn't review the record

6    and find evidence of actual knowledge.  They made a list of

7    things that M&I should have done, again, on a negligence

8    standard.

9              If we go to the next slide, let's see what the

10   plaintiff himself and plaintiff's counsel has said on this

11   point.  We emphasized this in our brief, and I want to -- I

12   highlighted the word "claiming."  Mr. Anthony and Mr. Kelley

13   certainly know how to try a case.  They made the choice to

14   put this evidence in the record and they used the term

15   "claiming."

16             And on this point, Your Honor, the cow is out of

17   the barn, if that's the expression, horse, cow, whatever

18   that is.  They've told the jury that they are not claiming

19   that any M&I employee had actual knowledge.  I mean, they've

20   tried to parse this in their opposition, but that's what the

21   jury has heard.  And having said this to the jury, how could

22   a reasonable jury now be asked to look at the issue of

23   actual knowledge?

24             And plaintiffs doubled down on this in their

25   opposition brief to this motion where they go on -- again,

1    they're talking not about what the evidence is.  They're

2    talking about their contentions, and they're saying they

3    don't contend that any BMO employees participated or were

4    co-conspirators in the scheme.

5            So having disclaimed actual knowledge, why are we

6    sending this to the jury?  On what basis could a reasonable

7    jury find that?

8            And I want to say these statements by plaintiff

9    and plaintiff's counsel also encompass the issue of the

10   adverse inference on spoliation.  They could have said --

11   Mr. Anthony could have said, Well, isn't it possible there's

12   some evidence that got destroyed that would support your

13   claims?  But that's not what they told the jury.

14           They said they're not making that claim and

15   plaintiffs in their brief say we are not making that

16   contention with full knowledge of the adverse inference.

17   And so there just isn't an actual knowledge -- there are not

18   facts that would support actual knowledge.

19           And that brings us -- so with respect to aiding

20   and abetting fraud, there's an element they can't prove.

21   With aiding and abetting breach of fiduciary duty, there's

22   an element they can't prove.  And on the UFA, one of the two

23   prongs are dispensed with based on the lack of evidence and

24   their own admissions and statements to the jury.

25           Also on the issue of actual knowledge, if we go to

1    the next slide -- and this is important and not reflected in

2    the Court's current jury instructions, but is the law -- you

3    cannot piece together the knowledge that Mr. Flynn had from

4    a meeting that he had in 2002 and add that to what Ms. Pesch

5    found out, you know, 300 miles away years later with regard

6    to what the Petters Company was and what somebody else might

7    have seen when they looked into the accounts.  You can't

8    aggregate the knowledge of everyone in the bank to prove

9    actual knowledge.  And if you do take this to the jury, you

10   have to make that clear.

11          But, again, there is no -- who is the person?  If

12   there's someone at the bank who had actual knowledge of this

13   scheme, who is it?  That goes unanswered because there is no

14   person, and that's why no reasonable jury could conclude

15   that there is a person at M&I Bank who had actual knowledge

16   of the scheme during that time.

17          Let's then turn to bad faith, which is the next

18   slide, and here the Minnesota Supreme Court has made pretty

19   clear -- and this is, I think, properly reflected in the

20   jury instructions -- bad faith does not exist if the bank

21   was acting honestly.

22          And the dishonesty has to be proven with respect

23   to a specific transaction.  And, again, where is the

24   evidence of that?  Nobody is contending that any of the AML

25   analysts were dishonest or that the bankers were dishonest.

1    They're criticized for not being thorough, maybe not putting

2    the pieces together, again, on a negligence basis, but

3    nobody has contended that they were acting dishonestly.

4            And, in fact, counsel, you know, should be --

5    plaintiff should be estopped from arguing dishonesty because

6    you see Mr. Lawrence's comments here in the sidebar.  In

7    their efforts to avoid -- you know, or to prevail on an

8    evidentiary issue, plaintiff's counsel said, "Mr. Flynn's

9    honesty or his character for truthfulness has not been put

10   at issue."  Again, this is not me characterizing what's at

11   issue in the case.  This is plaintiff's counsel saying that.

12           And then, lastly, what's the transaction?  The UFA

13   is not a broad, you know, look at all your fiduciary duties

14   and see if the parties did anything wrong.  The UFA is based

15   on specific transactions, checks in particular is what the

16   statute says.

17           What's the transaction that the jury is going to

18   find that someone at M&I processed dishonestly?  There just

19   simply is no evidence by which this could go to the jury.

20           I want to turn now to the next chart -- or the

21   next slide, which has to do with breach of fiduciary duty.

22   And so this is the claim that M&I itself had a fiduciary

23   duty to PCI, which in itself logically is really hard to

24   understand because PCI, of course, was inherently corrupt.

25   PCI and its principals were inherently involved in all

1    aspects of the scheme.  So how could any kind of action that

2    M&I would take, you know, harm PCI, which was fully invested

3    and existed only to be a fraud?

4          But if we want to go with the plaintiff's

5    argument, the argument is we entered into a DACA, the bank

6    entered into a contract.  That contract supposedly created

7    fiduciary duties.  You know, that in itself is very

8    questionable.

9          But for purposes of this argument, let's assume

10    that they did prove that those -- that contract, the DACA

11    contract, created a fiduciary duty.  Then how do they prove

12    breach?

13          The breach would have to be that M&I violated the

14    agreement, and there is no evidence of that.  It was well

15    established at trial the predicate for any performance by

16    M&I on the DACA was that PCI itself had to provide the

17    transaction list or put money into these accounts.  So then

18    again, when we look at this, M&I didn't breach anything.

19          And how could that breach of fiduciary duty, if we

20    were to do something under these DACAs, how could that

21    possibly harm PCI when the reason we didn't do anything was

22    because PCI didn't perform under the contract?

23          So this -- logically, it makes no sense.  The

24    whole notion of this claim just simply makes no sense.  But

25    there is no -- no one will come here today, Your Honor, and

1    say this provision of this contract was breached by M&I.

2    There's no evidence of that.

3            So, lastly, I want to cover the issue of punitive

4    damages.  This is not a normal thing, to put punitive

5    damages to the Court -- to the jury.  And the Court has the

6    gatekeeper role under the statute to decide, having heard

7    now all the evidence, is there enough evidence for a jury to

8    actually find the required mental state, which is

9    maliciousness, which is deliberate disregard.  That's what

10   the cases say.

11           And this is in the context of where the jury,

12   apparently, is already going to be presented with an

13   astronomical compensatory damages claim.  The bank has

14   already got, you know, this claim for 1.9 billion.  And so

15   is this really the case where we add on to that?

16           We give the jury the opportunity to go further

17   only if the plaintiffs have proven that.  And we saw

18   precious little evidence in this trial, I would say none, to

19   support any evidence of maliciousness, of intentional or

20   willful failure to do something to harm other people, to

21   show deliberate disregard.  It just simply is not a punitive

22   damages case.  You have a gatekeeper role, and that claim

23   should not go to the jury.

24           And then my last point is if you are going to

25   impose punitive damages -- and we can go to the next slide

1      on this -- if you are going to impose punitive damages on a

2      corporation, you need to show that -- one of these elements,

3      and it means that the corporation itself was committed to

4      this maliciousness and deliberate disregard.

5               None of these elements are proven, that the

6      principal, if that's M&I, authorized some kind of malicious

7      conduct or had somebody who worked for the bank that was

8      unfit and disregarded the high probability that the agent

9      was unfit.

10              The only thing that you saw in this trial from

11     management of the bank was the video from the president who

12     stood behind the AML program, who instructed the employees

13     of the bank to take it seriously.

14              And the corporate policies were in place.  They

15     had devoted resources to AML analysts, not that an AML or

16     Bank Secrecy Act violation would even give rise to a claim.

17     There are no claims in this case under these regulatory

18     statutes.  There is no private cause of action for that.

19              But the only thing you saw from management in this

20     case was proper and appropriate policies and guidance to the

21     employees to follow the procedures which -- for which they

22     are now being criticized.

23              So on these bases -- we will reserve time for our

24     other arguments -- but based on the lack of evidence and the

25     statements that plaintiff and his counsel have decided to

1    make in this case, these claims should all be dismissed.

2    Thank you.

3              THE COURT:  Thank you, Counsel.

4              MR. MARDER:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. MARDER:  David Marder appearing once again for

7    the plaintiff.  Your Honor, we've got a lot of briefing

8    that's been in front of you.  I'm sure you've --

9              THE COURT:  Really?

10             MR. MARDER:  -- read it and you have seen enough

11   of it.

12             THE COURT:  I have.

13             MR. MARDER:  So I am going to restrict my comments

14   to the three things that Mr. Moheban raised, knowledge,

15   claim 2, and punitive damages, and rely on our briefing for

16   the rest.

17             Before I get to that, it bears reminding what the

18   standard is on JMOL, and it's an extremely exacting

19   standard.  You have to find that no reasonable juror could

20   return a verdict for the plaintiff.  You have to draw all

21   reasonable inferences in our favor.  And where state of mind

22   is at issue, as it is here, the key issue in the case, court

23   after court has said that JMOL is rarely appropriate when

24   state of mind is at issue.  And, most importantly, to the

25   extent there are any conflicts in the testimony, you have to

1     assume that they're all resolved in our favor.

2              I'd like to go first, Your Honor, to this notion

3     that we withdrew our claim of actual knowledge.  And in this

4     instance, Your Honor, on both occasions, on both of the

5     things that Mr. Moheban pointed to, he looks at half of what

6     the plaintiff said, ignores the other half.

7              I would like to first -- if we could go to

8     slide 3, this is the language that they keep relying on

9     where they contend that we withdrew the knowledge claim.

10    And what it says is -- the question was:  "Whether they

11    testified or not, are you claiming that any M&I employee

12    took a bribe or was a participant who knew that the Ponzi

13    scheme was going on?"

14             They ignore the whole first half of the question

15    and pretend that the witness said that they're not

16    contending that we knew -- that anyone knew there was a

17    Ponzi scheme going on.  The preface to the question was

18    limited only to people who either took a bribe or were

19    participants.

20             It is not our allegation here -- well, setting

21    aside what other inferences might arise from the

22    destruction of documents, we haven't put into evidence any

23    bribes.

24             And with regard to the participant, it's clear

25    what we're talking about here is the fact that we're not

1     claiming that anybody at the bank participated in the scheme

2     in the sense that they went out and solicited investors or

3     anything of that nature.  And we make this very clear in our

4     brief, where they also ignore half of what we said.

5            And with that, Your Honor, I would refer you to

6     page 4 of our opposition brief, which only quotes half of

7     what we said there.  If you look at page 4, we did, in fact,

8     say, relying on this language here, that we were not

9     alleging that any BMO employee participated or was a

10    co-conspirator in the scheme, and we made clear when we were

11    saying that that we were talking about people who were like

12    the PCI officers who actually solicited investors.

13           And then the very next sentence says, (As read)

14    "Rather, plaintiff contends that BMO allowed wires and

15    checks to be drawn (MUFA Count I) and 'substantially

16    assisted or encouraged' the fraud and breaches of fiduciary

17    duty through banking services that they provided."

18           In other words, Your Honor, what we are saying is

19    we're not claiming and we don't have to claim that they were

20    a participant in the fraud.  What we have to establish is

21    that they substantially assisted in the fraud, which is very

22    different from being an actual participant in the fraud.

23           So, Your Honor, I just wanted to start with that

24    and dispel that notion that somehow we had agreed that we

25    weren't alleging knowledge or that we have withdrawn that

1   from the case.

2          Our statement was very narrowly and very

3   particularly drawn to those employees who either took a

4   bribe or participated in the scheme in the sense that they

5   went out and solicited investors.

6          So moving on, then, Your Honor, I think it's very

7   important for everyone to understand what the actual

8   standards are that are applicable to these causes of action.

9          Mr. Moheban suggested that what we were arguing

10  was a negligence standard.  And, Your Honor, nothing could

11  be further from the truth.  There are two groups of causes

12  of action that we need to look at.  We need to look at the

13  MUFA claim, and then we need to look at all the other

14  claims.

15         If we could go to slide 1, please, this is the

16  MUFA statute.  And it says we have to prove one of two

17  things, either that the bank paid the check with actual

18  knowledge or with knowledge of such facts that its action in

19  paying the check amounts to bad faith.

20         There is a key case in the state of Minnesota,

21  which is dispositive in this action, that discusses exactly

22  what is meant by this language, and I would like to draw

23  your attention, Your Honor, to the language in that case,

24  and that's the second slide.

25         This is the Court of Appeals, the State of

1    Minnesota, and they're talking exactly about what the

2    standard is for bad faith under MUFA.  And they say, "Even

3    where the bank does not actually conspire with the

4    fiduciary," which is -- again, we're not saying they're

5    participants -- "its indifference may constitute bad faith

6    under particular circumstances."  And then it cites with

7    approval this case from New Jersey that says bad faith could

8    be a reckless disregard or purposeful obliviousness of the

9    known facts.

10          So here, Your Honor, we have the dispositive law

11   from the State of Minnesota saying that bad faith under MUFA

12   can be established by a reckless disregard or purposeful

13   obliviousness of the known facts, which is exactly what we

14   have proven here.

15          THE COURT:  What am I to make of the flags that

16   are accompanying those statements?

17          MR. MARDER:  I'm not sure, Your Honor.  I think

18   that's just a relic of the printout.  The flags give you

19   further history on those cases, I think.  I'm not sure.

20          THE COURT:  So the yellow flag doesn't mean it's

21   questionable as to whether that is still good law, and a red

22   flag doesn't mean that it has been challenged by another

23   case?

24          MR. MARDER:  I think, Your Honor, yellow flags

25   mean you look at the -- you need to -- it's possibly being

1      questioned, and a red flag is more of a questioning.

2           But I'm not aware of any cases postdating

3      *McCartney* that limit this principle.  There is a case, the

4      *Buffets* case, which is cited by the defendants, and in that

5      case they do talk about *McCartney* and they do say that a

6      bank's toleration of overdrafts doesn't amount to bad faith

7      unless it's a designated fiduciary account.

8           So that is the only case I am aware of that casts

9      any doubt on this, but, again, that's very limited to

10     situations where the plaintiff is alleging these overdrafts.

11     Those are the only cases I'm aware of that -- only case I'm

12     aware of that even addresses this principle from our

13     research.

14          Your Honor, the next point I would like to go to

15     is the other group -- and you can take that slide down --

16     the other group of causes of action, which is the non-MUFA

17     causes of action, specifically aiding and abetting.

18          And there's two principles that I want to make

19     sure are in mind.  The first is that actual knowledge can be

20     established by circumstantial evidence.  That is a key

21     point.  The second one, Your Honor, is that actual knowledge

22     can be satisfied by willful blindness, and this is an

23     absolutely key point that I want to make sure comes across.

24          The defendants cite the *State vs. Thowl* case,

25     saying that Minnesota had questioned the applicability of

3571

1   willful blindness.  But, Your Honor -- and this is the most

2   important thing I have to say today -- the Supreme Court of

3   the United States looked at this issue.  That's the

4   *Global-Tech* case.  And the Supreme Court of the United

5   States, looking at a cause of action that addressed actual

6   knowledge, specifically said that willful blindness

7   satisfies actual knowledge.

8        And lest someone argue that that case is not

9   dispositive because it's talking about federal law, there

10   was a case in Minnesota, which was considered after the

11   *State vs. Thowl* case, and in that case the court -- which is

12   *Ariola vs. Stillwater*, which we have cited in our papers --

13   in that case the State of Minnesota cited with approval the

14   *Global-Tech* case as the standard for willful blindness as is

15   applied to an actual knowledge cause of action.

16        Now, in that case the court did say that the

17   plaintiff there had not established willful blindness, but

18   it cites the *Global* -- the Supreme Court case of *Global-Tech*

19   and it follows the Supreme Court case of *Global-Tech* as to

20   what willful blindness is.

21        So, Your Honor, we strongly urge that the Court

22   consider that law, specifically the fact that the most

23   recent statement about this from the State of Minnesota, the

24   *Ariola* case, specifically incorporates the *Global-Tech*

25   standard from the Supreme Court of the United States that

1     says that willful blindness equals actual knowledge.

2             And, Your Honor, even if you aren't willing to go

3     that far, and we do urge you to go that far, but even if

4     you're not, even in the jury instructions that you submitted

5     last night, the draft jury instructions, you specifically

6     said and cited a case that willful knowledge could be a

7     mechanism for inferring knowledge.  So at a bare minimum,

8     willful knowledge is relevant because it's a mechanism for

9     inferring knowledge.

10            Now, with that, Your Honor, I will go to the

11    evidence that we put forth that establishes the requisite

12    standard of knowledge, and that evidence was overwhelming.

13    But before I get there, we need to look at the adverse

14    inference, because in this case there was a destruction of

15    documents and you're going to give an adverse inference

16    instruction.

17            And because of that instruction, this jury, they

18    can infer facts from those missing documents.  All of the

19    missing evidence that the plaintiff -- that the defendant

20    claims is missing, no evidence of bribes, no evidence of

21    actual knowledge, the jury can infer that all that was in

22    the documents that were destroyed.

23            Certainly, Your Honor, if we were relying on that

24    alone, that might be problematic, but the plaintiff offered

25    a variable avalanche of evidence, an avalanche of evidence

1    that was circumstantial evidence of knowledge.

2            We submitted evidence from the business bankers,

3    specifically both of them, that they knew that they had to

4    understand the accounts and that they were trained to detect

5    unusual and suspicious activity and that they had complete

6    access to the account activity.  And the evidence shows that

7    they were certainly willfully blind.

8            Mr. Flynn never even bothered to review the

9    account statements showing that billions of dollars had gone

10    through the accounts, didn't see retailers wiring money in

11    even though he knew that that was the business model.

12            He knew that PCI had refused to give financial

13    information to the bank even though they were a longstanding

14    customer.

15            He never pitched the idea of BMO lending money to

16    PCI's businesses even though he testified that's how they

17    made their money, which is highly relevant to his mental

18    state.

19            And, finally, Your Honor, was the sham DACA

20    agreement, which was highly unusual.  He had never done it

21    before.  He worked with a felon's lawyer, who happened to be

22    the same money launderer who had introduced PCI to him back

23    in 2002, and knew that it was a sham agreement because he

24    never got any type of transaction list, didn't ask for any

25    compensation, and never set forth any procedures to follow

1    up on that.

2            So that there, Your Honor, is strong evidence --

3    circumstantial evidence of knowledge and it's evidence of

4    willful blindness.

5            Similarly, Your Honor, we put in evidence relating

6    to Mr. Jambor.  Mr. Jambor actually did access the account.

7    He accessed it many times and saw billions of dollars

8    flowing through, all in suspicious pattern, same-sized

9    ingoing, outgoing payments and round numbers.  He saw all

10   that and didn't do anything about it.  Again, strong

11   evidence of willful blindness, which even under your

12   standards, Your Honor, that you articulated is -- the jury

13   can infer fraud from.

14           He knew that there were no retailer payments going

15   in.  He knew -- and this is not circumstantial evidence --

16   he knew about Deanna Coleman's million dollar checks coming

17   out of that account and was told by Mr. Petters that they

18   were for a house, even though this was not a payroll account

19   and no taxes were coming out.

20           He was involved in exceptions to the overdraft

21   policy.  He allowed Ms. Coleman to ghostwrite letters for

22   him, which is an extraordinary thing.  He knew about the

23   DACA requests.  And he knew the fact that Mr. Petters was

24   planning to use a small business checking account to

25   transmit billions of dollars to acquire a company, all of

1    which was extremely out of the ordinary.

2              And, finally, Your Honor, with respect to

3    knowledge evidence, we have the AML analysts, and I don't

4    want to go through that evidence in detail.  We talked about

5    it.  But Ms. Ghiglieri testified in detail about how

6    everything they did was ignoring suspicious activity, and

7    they engaged in a whole host of atypical practices.

8              And lest there be any doubt, afterwards they

9    decided to file a SAR.  And in that recommendation, they

10   relied on the very same evidence that they had before.

11   Clear evidence, Your Honor, of closing their eyes and

12   willful blindness.

13             So it is clear that our evidence satisfies the

14   standard.  One strong piece of circumstantial evidence is

15   atypical banking practices, and we have a litany of evidence

16   establishing that these banking practices were atypical, and

17   that, the courts have held, is strong circumstantial

18   evidence of knowledge.

19             Also, Your Honor, and I want to emphasize this, we

20   are not merely alleging that there were red flags that were

21   ignored.  This case is much stronger than that.  What we are

22   alleging is that the employees saw the red flags and

23   investigated.  And when they saw the ugly truth, they turned

24   the other way.

25             That is evident multiple times.  It's evident with

1    Mr. Jambor failing to follow up on the checks.  It's evident

2    every time one of the analysts looked at the 38 alarms that

3    went off in the money laundering system and turned a blind

4    eye each time.

5            Mr. Moheban referred to some self-serving

6    testimony by the people involved saying that they did not

7    have knowledge, but, Your Honor, on JMOL, as we've said, you

8    have to assume that the evidence -- the conflicts in the

9    evidence are resolved in our favor.

10           Setting aside the testimony, the other sort of

11   gotcha argument they have, Your Honor, is this argument

12   relating to Rule 608.

13           And if we could please put up slide 10.  This is

14   Rule 608, and it talks about when you open the door to a

15   witness's character for truthfulness.  And what it says is

16   it's when the witness's credibility has been attacked.

17           And there is a whole extensive library of

18   evidence -- I'm sorry, of case law that addresses when that

19   happens, and it has to do with whether you're attacking the

20   veracity of the witness's account of the facts in a specific

21   case or the witness's veracity in general.

22           If you look at the actual interaction that

23   happened at sidebar -- and we have it here, Your Honor, it's

24   slide 11 -- what Mr. Gleeson was arguing was that because

25   Christopher Flynn was the person who was accused of editing

1       the MIContact report, of destroying the document, that under

2       608 we had put his character into evidence.  And

3       Mr. Lawrence, if you look on the next page, contests that

4       and says that under the rules we have not opened the door to

5       this type of character evidence because of that.

6               So this was a very narrow assertion, and the

7       defendants try to expand that and claim that he was arguing

8       more broadly that we didn't -- we were not asserting that he

9       acted in bad faith under MUFA or that he acted with

10      knowledge under the aiding and abetting counts.

11              But, Your Honor, it is impossible, it is literally

12      impossible that Mr. Lawrence could have been making that

13      argument.  And the reason is that under Rule 608, it does

14      not depend on whether the underlying claims involved

15      dishonesty.  Even in a fraud case, if you accuse somebody of

16      fraud, it doesn't open the door to this kind of evidence

17      because it's not the conduct -- underlying conduct in the

18      case.  So Mr. Lawrence could not possibly have been making

19      that argument.

20              So with that, Your Honor, I would like to move

21      now -- since we've addressed all the knowledge issues, I

22      would like to move to the MUFA claim, which is the assertion

23      by the defendants that there are no duties in the DACA other

24      than -- they say there are no duties other than the specific

25      obligations that are undertaken in the DACA.

1            But, Your Honor, the Court -- Bankruptcy Court

2     specifically looked at this and held there were at least two

3     references in that agreement that the defendant would hold

4     funds for the benefit of PCI.  And the Court concludes,

5     therefore, that our allegations supported -- that our

6     allegations support an allegation that there were fiduciary

7     duties set forth in the agreement.

8            They also point to language about holding funds

9     for the benefit of in other paragraphs.  But if you look at

10    the motion to dismiss order that came out of the Bankruptcy

11    Court, they specifically examined this issue and said that

12    this agreement gave rise to fiduciary obligations in general

13    and therefore this notion that there was very limited duties

14    is simply false and has been found to be false by the

15    District Court.

16            Your Honor, I'm going to skip over punitive

17    damages because I think we've addressed that adequately in

18    our papers and I just want to touch on now, in the time I

19    have left --

20         (Plaintiff's counsel confer)

21            MR. MARDER:  And I'm told I only have ten minutes

22    left, so I am going to do this relatively briefly.  This has

23    to do with our motion for JMOL.

24            There are a whole host of defenses set forth in

25    the defendant's papers, most of which I'm going to skip over

1   because it's clear that they're not affirmative defenses at

2   all, and the defendants haven't even contested that.  They

3   just say we reserve the right to argue these legal

4   principles, but they contest that they are not legal

5   defenses -- or affirmative defenses.

6           So, with that, I really want to focus on a couple

7   of them.  One I want to focus on most heavily is the statute

8   of limitations.  The standard we all know, Your Honor, is

9   that for the statute of limitations to be a problem, they

10   would have to prove that there was compensable damages that

11   occurred within the statute.

12           And our expert, Mr. Martens, which you need to

13   credit in the context of a JMOL, was that no investors lost

14   money until the promissory notes that were executed in -- on

15   December 5th, 2007 came due.

16           Now, these notes were 120 days long, according to

17   the testimony.  So we are looking at April of 2008 before

18   anybody didn't get paid.  And the trustee wasn't even

19   appointed until shortly thereafter, and the case was filed

20   within the six years.  So it is clear that we have satisfied

21   the statute of limitations.

22           So what do the defendants say?  The defendants say

23   that Mr. Jarek testified that PCI was insolvent from a

24   balance sheet perspective by 1996, and then they equate

25   insolvency with an inability to pay debts.

1          Your Honor, for a number of reasons, this argument

2     makes absolutely no sense.  The first one is when you're

3     talking about a Ponzi scheme, these concepts of insolvency

4     aren't even applicable, and our expert so testified.  A much

5     more reasonable definition, which you find in the case law,

6     is insolvency is the inability to pay bills when due.

7          But regardless of how you define insolvency, the

8     question is not whether they were insolvent.  The question

9     is when were they unable to pay investors, because that's

10    the basis of our harm.

11         Mr. Jarek gave various earlier dates showing that

12    there were investor losses prior to -- going back beyond the

13    six years, but when pressed on cross-examination, he

14    admitted that those were the losses that investors would

15    have suffered if the scheme had fallen apart earlier.

16         But, Your Honor, it didn't fall apart earlier.

17    Even Mr. Jarek agreed that they were able to go out and get

18    new investors to pay the old investors, and it wasn't until

19    December 5th, 2007 that there were any investors who weren't

20    either paid or agreed to roll their notes.  Mr. Jarek

21    specifically admitted that.

22         And he specifically admitted that these earlier

23    losses he indicated were only losses that would have

24    surfaced if, and, again, if the scheme had fallen apart,

25    which it did not.  So it's very clear that there were no

1    compensable damage here any time before the -- any time

2    before the scheme fell apart.

3              I would like to save the rest of the time I have

4    for rebuttal, Your Honor.  So with regard to the other

5    affirmative defenses, I'm just going to rely on our papers.

6              THE COURT:  Thank you, Counsel.

7              MR. MOHEBAN:  Your Honor, I'll finish up on our

8    motion and then let Mr. Gants address the affirmative

9    defenses.

10              We've talked a lot about ignoring red flags in

11    this case.  And Mr. Marder, as you pointed out, ignored a

12    big red flag about his *McCartney* case.  It's an unpublished

13    decision.  So for Mr. Marder to come up here and declare

14    that as dispositive law, which is what he said, is just

15    simply wrong.

16              And I have a little bit of déjà vu, I have to say,

17    because ten years ago I was arguing about *McCartney* in front

18    of Judge Frank when I argued the *Buffets* case.  They made

19    all the same arguments about *McCartney*.  Judge Frank granted

20    summary judgment.  Judge Colloton affirmed it at the Eighth

21    Circuit.

22              *McCartney* is not the law.  *Rheinberger* is the law,

23    and *Rheinberger* says that bad faith does not exist if the

24    bank was acting honestly.  So this whole attempt to open the

25    door with *McCartney* should be rejected.  It's an unpublished

1      decision.  It should not be relied on to contradict

2      *Rheinberger*.

3              If we can go back to the slides, I would like to

4      go to the very last slide, which has to do with this notion

5      of willful blindness.  So this is not the law in Minnesota.

6      Counsel sort of danced around that.

7              But the cases that we cited on actual knowledge --

8      and I think the Court understands this based on the jury

9      instructions that we've seen -- the cases do not say willful

10     blindness, MUFA does not say willful blindness, no Minnesota

11     case applies willful blindness to the claims in this case.

12     And cases like *Zayed*, which is just like this case, enforce

13     that actual knowledge means what it says, actual knowledge,

14     not constructive knowledge, not willful blindness.

15             The one case that they have, this *Ariola* case, is

16     not, again, any of the claims that are at issue here.  It's

17     a wrongful death case.  It's not controlling.  It's just one

18     battle at the Minnesota Court of Appeals.

19             It's dicta because the court ultimately found

20     there was no evidence of willful blindness, so it never even

21     actually applied the standard that it talked about.  And it

22     referenced this U.S. Supreme Court case, *Global-Tech*, but it

23     didn't cite any Minnesota authority to support that dicta.

24             So as you well know, probably better than anyone,

25     having been in the Minnesota Appellate Courts, this is not

1     the court that creates new Minnesota law.  That's for the

2     Minnesota Supreme Court to decide.  And so willful blindness

3     is not the standard.

4            I want to mention on the adverse inference point,

5     I mean, I think we've covered that in terms of what they've

6     already told to the jury, but let's keep in mind the

7     allegations of spoliation have to do with e-mails prior to

8     two thousand -- March of 2005.

9            On this breach of fiduciary duty claim, all of

10    those communications took place in 2008.  There's no missing

11    documents relating to the DACAs.  So they can't use that as

12    a lever on that claim.  And, of course, they've already

13    disclaimed the notion that they were making a claim as to

14    actual knowledge on the other claims.

15           The reference to the Bankruptcy Court's decision,

16    of course, that was just a motion to dismiss, and the

17    language of that is clear that the court was just finding

18    we're not going to dismiss the claim.  It didn't -- now

19    we've had a trial, now we know what the evidence is, so

20    that's not controlling on that issue at all.

21           And then lastly I'll just say -- so I pressed

22    counsel:  Where is the evidence?  You know, didn't you

23    concede that you're not claiming actual knowledge?  And so

24    he then cites the rest of their quote, right?

25           I quoted the part about how we're not contending

1    that the BMO employees participated or were co-conspirators.

2    Let's give them the rest of their quote.  It doesn't allege

3    actual knowledge.  It says that BMO allowed wires and checks

4    to be drawn.

5            Well, banks allow wires and checks to be drawn

6    every day.  We saw the evidence.  These are automated

7    transactions.  People with checking accounts write the

8    checks they want to write.  To allow that doesn't mean

9    actual knowledge.

10           And then he just repeats the allegation; we're

11   alleging that the bank substantially assisted or encouraged

12   the fraud.  But, again, they don't -- that's an allegation,

13   but they don't support it with any evidence.

14           So I don't think that they -- all the list of

15   things that Mr. Marder read to you, none of those were

16   evidence of actual knowledge.  They were just random facts

17   about things that happened in the bank account.

18           So at this point I'll turn the matter over to

19   Mr. Gants to address the affirmative defenses.

20           THE COURT:  Thank you, Counsel.

21           MR. GANTS:  Good morning, Your Honor.  Brendan

22   Gants of Munger, Tolles & Olson on behalf of BMO Harris

23   Bank.

24           THE COURT:  Good morning.

25           MR. GANTS:  I'll keep any comments brief and

1    addressed largely to the points raised in the reply brief

2    that was filed on the affirmative defenses.  And I want to

3    start with the statute of limitations, which is what

4    plaintiff's counsel discussed when he argued these defenses.

5            As to the applicability of this affirmative

6    defense, Your Honor, the relevant facts are largely

7    undisputed.  Plaintiff does not dispute that PCI was

8    insolvent by at least 1996 and that it remained insolvent in

9    that it was unable to repay investors because its debts were

10   greater than its assets until the scheme was shut down in

11   2008.

12           In his reply brief, the plaintiff tries to relabel

13   the basic concept of insolvency as balance sheet insolvency

14   and apparently argues that PCI was not actually harmed by

15   the Ponzi scheme until it was shut down.  Your Honor, that

16   argument is fundamentally contrary to the theory on which

17   plaintiff has been permitted throughout this case to

18   maintain claims on behalf of PCI in at least two ways.

19           First, the notion that no damages accrued until

20   particular investors could not be repaid particular amounts

21   that they were owed could only make sense if the plaintiff

22   were permitted to stand in the shoes of the investors

23   themselves, which he is not.

24           Plaintiff's theory has been that PCI was harmed by

25   its insolvency and inability to repay creditors.  That's the

1        language from *Greenpond* that they have relied on.  In other

2        words, it was harmed by taking on unpayable debt.

3               Now, PCI was able to pay back certain notes over

4        the time period, but it was able to do that only by taking

5        on more unpayable debt.  So if the harm to PCI consisted of

6        taking on a debt the company could not repay, that occurred

7        every time PCI took on a new note and at that time, under

8        plaintiff's theory, the compensable damage to PCI would be

9        the amount that PCI was not able to repay.

10               If the scheme had been shut down earlier, then

11        different investors might have been harmed or they might

12        have been harmed in different amounts, but that has nothing

13        to do with PCI's injury as they've framed it throughout the

14        case.

15               Second, this argument is directly contrary to

16        plaintiff's causation argument and really to his entire

17        theory of the case.  Plaintiff's counsel has argued and

18        plaintiff himself testified that M&I caused harm to PCI

19        because it should have, but didn't report people to the

20        feds, in plaintiff's words, and let people know that PCI was

21        running a Ponzi scheme.

22               They've said that if M&I would have done things

23        differently, the FBI would have shown up at PCI's door.  But

24        there's no dispute that if the FBI had done that at any

25        point, then investors would not have gotten repaid because

1    PCI was insolvent.

2            Now they say because PCI was able to keep getting

3    new investor funds to pay old investors until 2008, then PCI

4    wasn't actually harmed until 2008.  But if that's the case,

5    then PCI's damages would not be caused by what M&I failed to

6    do, but by what plaintiff's argue M&I should have done.

7            In other words, according to this theory that

8    they've advanced solely on the statute of limitations

9    argument, the source of PCI's damages is that someone did go

10   to the feds and let people know about the Ponzi scheme,

11   which made it unable to repay the investors.

12           Plaintiff can't have it both ways.  It can't be

13   the case that he can pursue claims against M&I for allegedly

14   causing PCI's inability to repay investors by hiding the

15   Ponzi scheme and at the same time argue for statute of

16   limitations purposes that the Ponzi scheme being revealed is

17   what caused PCI's injury.

18           The only other argument that plaintiff raises in

19   his reply brief on the statute of limitations is about

20   fraudulent concealment, so I want to address that briefly.

21   And as to the statute of limitations, he raises that

22   fraudulent concealment issue only as to Count III, the

23   aiding and abetting fraud claim.

24           But, Your Honor, fraudulent concealment does not

25   apply to that claim or to any other claim when it comes to

1    the statute of limitations because, as trustee, plaintiff

2    stands in the shoes of PCI and is deemed to have knowledge

3    if PCI had knowledge, including for statute of limitations

4    purposes.

5          Now, we understand that the Court has drawn a

6    distinction throughout this case, which plaintiff's reply

7    brief ignores, between legal defenses and equitable

8    defenses.

9          If we go all the way back to the summary judgment

10   decision that's Docket Number 70, the Court noted, quote, A

11   trustee's ability to assert causes of action on behalf of

12   the bankrupt estate is subject to any equitable or legal

13   defenses that could have been raised against the debtor.

14   That's from *Grassmueck*.

15         The Court then went on to determine that under

16   Minnesota law, the receivership would defeat the application

17   of equitable defenses in this case.  So we understand that

18   Your Honor has made that determination as to the equitable

19   defenses, and we've preserved our arguments on that.

20         But that argument does not -- or that ruling does

21   not apply to the legal defenses.  A statute of limitations

22   is a legal defense.  And more than that, it's a rule imposed

23   by the Minnesota legislature that limits the pursuable

24   claims.

25         So if plaintiff could pursue claims on behalf of

1    the estate that would have been unavailable to the debtor

2    because of the statute of limitations, he would thereby

3    succeed to greater rights than the debtor possessed, which

4    is not allowed under bankruptcy law.

5             That argument, Your Honor, about the distinction

6    between legal and equitable defenses is relevant to several

7    of the other affirmative defenses that we've raised as well,

8    and I want to touch on just a few of those briefly.

9             One is consent and ratification.  Again, these are

10   legal defenses, not equitable defenses.  The plaintiff

11   doesn't dispute that.  The reply brief only cites two cases,

12   *German America Finance Corp.* and *Magnusson*.  And those cases

13   involved assertions of equitable defenses against receivers,

14   and they rejected those defenses, those equitable defenses

15   against receivers.

16            Plaintiff's argument is that in doing so, the

17   courts did not specifically draw a distinction with other

18   defenses, legal defenses, but those defenses were not at

19   issue in those cases.  And so the fact that the court did

20   not choose to comment on the issues not before it is not

21   only dicta, it's the weakest possible dicta.

22            I'll move on because those were the only arguments

23   raised in the reply brief on consent and ratification.  I'll

24   move to the UCC displacement issue.

25            The plaintiff contends in their reply brief that

1    UCC Section 3-307 is narrow, but he cannot deny that it was

2    adopted to, quote, comprehensively cover the issue of when

3    the taker of an instrument has notice of a breach of

4    fiduciary duty.  That language comes directly from

5    Section 3-307 itself, Comment 1.

6           Plaintiff tries to characterize his claims to get

7    around that language by saying at page 9 of their reply

8    brief that his claims are based on BMO's conduct -- this is

9    a quote -- BMO's conduct in willfully ignoring obvious

10   insider payments, unquote.

11          But that proves our point.  In the normal course,

12   a company is allowed to make obvious insider payments to its

13   officers using its own checking account.  Plaintiff's

14   contention that M&I is liable for allowing PCI to do so,

15   therefore, necessarily depends on the contention that M&I

16   had notice of a breach of fiduciary duty.  That's an element

17   of claims 1 and 4, and that is what Section 3-307

18   comprehensively covers.

19          Your Honor, the only Minnesota law authority, as

20   both parties have recognized here, is *Bradley*, and *Bradley*

21   relied on guidance from the Minnesota Supreme Court.  The

22   plaintiffs attempted in reply to relitigate the issues the

23   parties addressed in *Bradley*, but we respectfully submit the

24   Court of Appeal's resolution of those issues was thorough

25   and well-reasoned and it remains the best evidence of

1     Minnesota law on the issue.

2          The last issue I will touch on very briefly is the

3     contract limitations period.  Again, this issue -- this

4     defense also implicates the argument that I discussed

5     earlier about the distinction between legal and equitable

6     defenses, and this is a legal defense which defeats some of

7     their arguments in their reply brief.

8          They also assert in their reply brief that the

9     arguments are void because both parties supposedly entered

10    into them with intent to defraud.  But plaintiff points to

11    no evidence that either party had that intent.

12         As we argued, PCI cannot be considered both a

13    victim of the transaction and a defrauding party in it, as

14    plaintiff has suggested.  And the suggestion that M&I

15    entered into that agreement with intent to defraud is simply

16    not supported by any facts.

17         As to the other affirmative defenses and the other

18    arguments in our papers, we'll rely on those papers,

19    Your Honor.  Thank you.

20         THE COURT:  Thank you, Counsel.

21         MR. MARDER:  Your Honor, I'm just going to briefly

22    rebut what we just heard from the two counsel for the

23    defendant.

24         First one, some comments made by Mr. Moheban,

25    which is he cites earlier Supreme Court opinions saying the

1    ultimate issue on the MUFA statute is honesty.  But,

2    Your Honor, that is not inconsistent with the *McCartney* case

3    that we cited.  That case holds that when considering

4    honesty, you may consider whether there was a reckless

5    disregard or purposeful obviousness to facts, and that's

6    what we're relying on that opinion for.

7            The second point he made is the spoliation in this

8    case only relates to pre-2005 e-mails.  That also is

9    irrelevant.  First of all, the e-mails weren't the only part

10   of the documents that were destructed.  It was also the

11   attachments to the e-mails.  And whether they were before or

12   after 2005, the jury can still assume and presume that those

13   e-mails contained evidence of knowledge.

14           The final point he made, Your Honor, that I want

15   to contest is that in our brief we didn't address this issue

16   of actual knowledge in the second sentence I read.  The

17   second sentence I read did talk about substantial

18   assistance, and the reason it did is because we were

19   defining what we had meant in this question by what is a

20   participant.  We were clarifying that when we said that we

21   weren't alleging that participants knew is very different

22   from saying that people who substantially assisted knew.  So

23   that was the purpose of that sentence in the brief, and it

24   makes that perfectly clear.

25           Going now to the arguments on -- that were

1    asserted with regard to our JMOL argument, the first

2    argument that was made related to the statute of limitations

3    and that there was some kind of notion that what we were

4    arguing was inconsistent with our damages model.

5          And, Your Honor, I must emphasize that it

6    certainly was not.  Our damages model is and always has been

7    that the -- PCI was injured by virtue of being left unable

8    to pay its creditors.

9          Prior to December 5th, 2007 and then the 120-day

10   period on top of that, there is zero evidence in this case

11   that any investor was unable to be repaid, although they

12   were repaid with other investors' funds.  That is the very

13   nature of a Ponzi scheme, and that has always been our

14   argument since day one and it is the damages measure that

15   this Court has adopted since day one.

16         The next argument I would like to assert is the

17   one that relates to causation.  The defendants argue that we

18   have not established causation.  And to be perfectly frank,

19   Your Honor, I'm not even sure I understand the argument.

20         We have established, in great detail, the nature

21   of our causation case.  The nature of our causation case is

22   that the defendants substantially assisted with the scheme

23   from day one.  They were the only bank who was willing to

24   turn a blind eye.  The evidence showed that.

25         And had they not done that, this scheme would have

1   been shut down and these damages would not have occurred.

2   We know what would have happened had they identified this to

3   the police.

4           And how do we know that?  We saw Ms. Coleman on

5   the stand.  And when Ms. Coleman got on that stand, she said

6   that when she went to the FBI, she went back that very same

7   night wearing a wire to record Mr. Petters' concept --

8   conversations.  That's how fast the FBI acted.  And had they

9   done their job, the scheme would have been shut down much

10  earlier.

11          Next, Your Honor, I would like to deal with this

12  notion that -- several notions that were argued with regard

13  to this defense of consent and ratification.  And there are

14  two different issues that need to be considered when looking

15  at that defense.  The first is whose knowledge we're looking

16  at, and the second is whether the Court should even consider

17  that person's knowledge.

18          With respect to the first one, we submit,

19  Your Honor, that the person whose knowledge you would have

20  to look at is Mr. Kelley's, not the underlying people at

21  PCI.  And the reason we know that, Your Honor, is the exact

22  case law that you cited in connection with the -- just give

23  me one moment to grab that citation.

24      (Pause)

25          MR. MARDER:  The case law that you cited -- and

1    what I would like to do is put up slide 15, if I could.  You

2    cited in your opinion when you denied them the right to move

3    for summary judgment the relevant case law.  It's the

4    *Magnusson* case and the *German American Financial Corp.* case

5    and you quoted that language there, which is the rule in

6    Minnesota.

7          And what it says is that the receiver of an

8    insolvent corporation has no greater rights than the

9    corporation itself, but with respect to defenses, it's

10   equally true that when there's a fraud on the rights of the

11   creditors, that the receiver is not subject to those

12   defenses.

13         That language that you quoted, Your Honor,

14   although it's in the context of an argument relating to

15   affirmative defenses, applies to all defenses if you look at

16   the language of it.  That's the language from Minnesota, and

17   that language is broad enough to encompass not only

18   equitable defenses, but all defenses.

19         The second thing that they ignore, Your Honor, is

20   the case law that you relied upon in the jury

21   instructions -- it's the *Steigerwalt* line of cases -- which

22   says that they cannot rely on the *mens rea* of people who

23   were complicit in the fraud.

24         And in this instance, they're trying to contest

25   and address the issue of the statute of limitations by

1    looking at the knowledge of Mr. Petters and Ms. Coleman, the

2    two people who were complicitous in the fraud, and that is

3    improper under that line of cases.

4          With the time I have left, Your Honor, I would

5    like to very briefly address the UCC.  We have briefed that

6    exhaustively, Your Honor, and I don't want to subject you to

7    any more argument.

8          The key take-home point there, Your Honor, is that

9    the UCC provisions are geared to very particular types of

10   causes of action.  We cited in our briefs the controlling

11   case law on the wire transfers, which is 99 percent of the

12   damages that are at issue here, where the court in Minnesota

13   stated that these types of cause of action that don't arise

14   out of the processing of the transaction are simply not

15   preempted by the UCC -- I'm sorry, yeah, by the UCC.

16         Similarly, with the check transactions, the

17   defendants do cite case law that says that there is a

18   preemption for certain types of claims, I believe it was a

19   breach of contract claim and a negligence claim that had to

20   do with processing the checks.

21         And, again, this case doesn't arise out of who is

22   a holder in due course or who properly processed a check.

23   This case arises out of fraud that was perpetrated in this

24   case and the defendant's willful blindness in failing to

25   stop that fraud.

1          Finally, Your Honor, the last thing I would like

2     to address is these alleged contractual limitations.  You'll

3     notice that the defendants argued this issue of whether they

4     were void or not, but studiously avoided our two strongest

5     arguments.

6          The one is that when these are properly construed,

7     both of these agreements are limited to very particular

8     types of notice that had to be given for very particular

9     type of account problems.  And we've addressed that in our

10    brief, Your Honor, and I won't belabor that point.

11         More importantly, Your Honor, is that both of

12    those agreements are unenforceable because if they were

13    enforced, they would completely abrogate our right to bring

14    any cause of action whatsoever.

15         These cases could not have accrued, as we've said

16    in our statute of limitations argument, until there were

17    actual losses.  And these would have caused us to lose our

18    causes of action well before the statute of limitations

19    would have accrued.

20         And under the law of Minnesota, again, Your Honor,

21    these types of agreements are strictly construed and they

22    are unenforceable if they are unreasonable.  And under the

23    case law, they are unreasonable if they ameliorate your

24    cause of action even before you are able to bring it.

25         So with that, Your Honor, unless there are further

1    questions, that addresses our rebuttal.  Thank you,

2    Your Honor.

3              THE COURT:  Thank you, Counsel.

4              MR. MOHEBAN:  Your Honor, I think you have heard

5    enough, you've got it, and so we are not going to ask for

6    any more argument.

7              THE COURT:  Thank you, Counsel.  I will take the

8    matters under advisement and appreciate your judgment as to

9    whether to provide additional argument.

10             I will compliment counsel for both parties.  Your

11   briefing, so your written submissions, as well as the

12   arguments today are very thorough and very fact and law

13   bound and very helpful to the Court.  So I appreciate the

14   quality of the lawyering that I have had the benefit of

15   receiving in this case.  Thank you.

16             MR. MARDER:  Thank you, Your Honor.

17             MR. GLEESON:  Good morning, Your Honor.  John

18   Gleeson for BMO Harris Bank.

19             Before we break for lunch, there's a joint

20   application of the parties on which we'd like your blessing,

21   which is to enlarge the amount of time for each side's

22   summation to 75 minutes from 60.  Because it's joint, we

23   hope we can just get your blessing right off the bat.  If

24   not, we could go into why that's necessary, but let me await

25   the instruction.

1          THE COURT:  I always appreciate the why.

2          MR. GLEESON:  You know, it's remarkable,

3     Your Honor, you had a 12-trial-day trial, but you have got a

4     3,500-page record, which is a testament to how well you can

5     move a trial.  We sort of had three trials:  One is AML.

6     One is business bankers.  Another is spoliation related.

7          And I think without -- I didn't elaborate with

8     Mr. Marder on the plaintiff's side reasoning for this joint

9     request, but I'll bet it's the same as our reasoning, which

10    is there's so much going on in this case.

11         And even with 75 minutes, which we ask for, I'll

12    speak for myself, with some trepidation because we know how

13    you like to move the case, but even with 75 minutes, it's

14    very difficult to sum up all the pieces of this case.

15    There's a lot of exhibits in evidence.  There was a ton of

16    testimony.  It's a trial that had a duration that is masked

17    by how quickly you moved it along.

18         So for all of those reasons, we really need it,

19    and maybe I can invite my colleague across the bar to come

20    up and join me in that request because we discussed it

21    earlier today.

22         MR. MARDER:  Your Honor, I wish I was as

23    articulate as Mr. Gleeson.  I think he has already

24    articulated the position.  We agree.

25         THE COURT:  That matter is taken under advisement.

1          MR. GLEESON:  Thank you, Your Honor.

2          THE COURT:  Thank you.  I do appreciate the

3    complexity of the issues and I appreciate the arguments that

4    you made -- you are making about why it might be fruitful to

5    expand the amount of time for argument, and I will seriously

6    consider your request.

7          MR. GLEESON:  Thank you.

8          THE COURT:  Is there anything further before the

9    Court?

10         MR. MARDER:  Nothing further from us, Your Honor.

11         MR. MOHEBAN:  No, Your Honor.

12         THE COURT:  Thank you, Counsel.

13         LAW CLERK:  All rise.

14      (Lunch recess taken at 11:42 a.m.)

15                    *    *    *    *    *

16      (1:07 p.m.)

17                      **IN OPEN COURT**

18                   **(JURY NOT PRESENT)**

19         THE COURT:  So we are here for a charge conference

20   now in this matter.  And as the process that we've used in

21   this case, I e-mailed the parties copies of the Court's

22   proposed final jury instructions and verdict form for

23   today's charge conference.  I will file these drafts on ECF

24   at a later time so they will be made a part of the record.

25          I prepared these drafts after careful

1    consideration of the parties' proposed jury instructions and

2    arguments.  If either party proposed an instruction that's

3    not included in the charge conference draft, that is because

4    I either sustained an objection to the proposal or I have

5    rejected the proposal.

6         If either party objected to a proposed instruction

7    it is -- that is included in the charge conference draft,

8    that's because I have -- sorry, that's not included in the

9    charge conference draft, that's because I overruled the

10   objection.

11        Pursuant to -- let me just say that again.  If

12   either party objected to a proposed instruction that is

13   included in this charge conference draft, that's because I

14   have overruled the objection.

15        And also pursuant to our Federal Rule of Civil

16   Procedure 51(b)(2), I will now give the parties an

17   opportunity to object on the record to the inclusion,

18   content, or exclusion of particular instructions.

19        I'll follow my standard practice by going through

20   the charge conference draft instructions one by one and

21   allow the parties to succinctly note their objections or

22   nonobjections on the record.  And although you may renew

23   previously overruled objections for preservation purposes,

24   you should not use this as an opportunity to extensively

25   re-argue issues that have already been decided.

1          My hope and intention is that we will be

2    complete -- have completed this in an hour.  So let's move

3    on to the charge conference.

4          Jury Instruction 1, any objection?

5          MR. MOHEBAN:  Defense has no objection to

6    Instruction Number 1.

7          MR. MARDER:  We have no objection to Number 1,

8    Your Honor.

9          Just for clarification, is it okay if we just go

10   from our seats here so we don't --

11         THE COURT:  Yes, please.

12         MR. MARDER:  -- have to go back and forth from the

13   podium?

14         THE COURT:  Thank you.

15         MR. MARDER:  Thank you, Your Honor.

16         THE COURT:  Jury Instruction Number 2, any

17   objection?

18         MR. MARDER:  We have no objection, Your Honor, for

19   the plaintiff.

20         MR. MOHEBAN:  Did you say Number 2?

21         THE COURT:  Number 2.  Sorry if you aren't hearing

22   me.

23         MR. MOHEBAN:  May I just ask a question about the

24   form of all instructions?  I understand that we are seeing

25   them with authorities and footnotes, but am I correct that

1    the jury does not get the footnotes, so we don't have to

2    make any objections as to that?

3              THE COURT:  That is correct.

4              MR. MOHEBAN:  We have no objection to Instruction

5    Number 2.

6              THE COURT:  Jury Instruction Number 3.

7              MR. MARDER:  No objection for the plaintiff,

8    Your Honor.

9              MR. MOHEBAN:  No objection.

10             THE COURT:  And I am fine if you remain seated --

11             MR. MARDER:  Thank you, Your Honor.

12             THE COURT:  -- unless you want to get your

13   exercise.

14             Jury Instruction Number 4.

15             MR. MARDER:  No objection for the plaintiff,

16   Your Honor.

17             MR. MOHEBAN:  We don't have an objection, but we

18   do believe there are two exhibits that fall within the

19   category that are not included, and those are DX-40495 and

20   DX-50928.  Those are summaries of the ACE Reports and

21   summaries of policies and procedures.

22             MR. MARDER:  Would you have a copy of those handy?

23             MR. MOHEBAN:  Does anyone have a copy of them?

24             MS. MOMOH:  I can send one electronically.

25        (Plaintiff's counsel confer)

```
 1              MR. MARDER:  Your Honor, we have no objection to
 2     adding those.
 3              THE COURT:  Okay.  So those would be Exhibits?
 4              MR. MOHEBAN:  DX-40495 and DX-50928.
 5              THE COURT:  Okay.  And they are summary charts,
 6     and so it would be in the summary charts paragraph --
 7              MR. MOHEBAN:  Correct.
 8              THE COURT:  -- of Jury Instruction 4?
 9              MR. MOHEBAN:  Correct.
10              THE COURT:  In addition to -- or after 713?
11              MR. MOHEBAN:  Correct.
12              THE COURT:  Okay.  Thank you, Counsel.
13              Jury Instruction Number 5.
14              MR. MARDER:  No objection for the plaintiff,
15     Your Honor.
16              MR. MOHEBAN:  No objection.
17              THE COURT:  Jury Instruction Number 6.
18              MR. MARDER:  No objection for the plaintiff,
19     Your Honor.
20              MR. MOHEBAN:  No objection.
21              THE COURT:  Jury Instruction Number 7.
22              MR. MARDER:  No objection from the plaintiff,
23     Your Honor.
24              MR. MOHEBAN:  No objection.
25              THE COURT:  Jury Instruction Number 8.
```

1          MR. MARDER:  No objection for the plaintiff,

2     Your Honor.

3          MR. MOHEBAN:  No objection.

4          THE COURT:  Jury Instruction Number 9.

5          MR. MARDER:  Your Honor, for the plaintiff, we do

6     object.  And we'd just like to note for the record that we

7     proposed an alternative instruction, which was Closing

8     Instruction Number 3, and for preservation purposes we ask

9     that that instruction be read in its entirety.  And I

10    understand Your Honor has already rejected that, but just

11    for purposes of preserving the record, we wanted to say

12    that.

13         But, more importantly, Your Honor, we wanted to

14    address this instruction just in a little bit more detail,

15    the reason being that it has to do with some of the evidence

16    that came in at trial, and so we want to elaborate just on

17    one point.

18         And here it is.  On page 2 of the Bankruptcy Court

19    order, the court ordered an adverse inference that the

20    defendant intentionally destroyed and failed to preserve

21    documents.  On page 9 of your order, you summarized the

22    Bankruptcy Court order and stated that the Bankruptcy Court

23    had ordered precisely that sanction.  And then you affirmed

24    what the Bankruptcy Court order did on page 28 of your

25    spoliation order.

1          So, Your Honor, we respectfully suggest that this

2    instruction does not include the very sanction that the

3    Bankruptcy Court ordered, and that you affirmed, and

4    specifically an instruction that BMO intentionally destroyed

5    Minnesota e-mail backup tapes.

6          So we would object to this request, but think the

7    objection could be cured if there was a change to the

8    request and it would say instead of "You have heard evidence

9    that," it would read, "You are instructed that BMO

10   intentionally destroyed Minnesota e-mail backup tapes that

11   should have been preserved" in lieu of the first sentence.

12   Then it would just go on, "You may," and as it is now.

13         But, Your Honor, without that instruction, this

14   instruction would not include the very sanction that the

15   Bankruptcy Court ordered and that you affirmed.

16         And I would be remiss, Your Honor, and with all

17   due respect, I would suggest that what has happened to the

18   plaintiff here is a bit unfair in that we went through a

19   lengthy process in the Bankruptcy Court involving

20   evidentiary hearings and briefing and the like and were

21   given the sanction after we proved that they intentionally

22   destroyed documents.  During the trial they were given leave

23   to rebut that, which they had the right to do, and we

24   respect Your Honor's decision to allow them to do that.

25         But in us rebutting that, we couldn't put on our

1    full case because we were precluded from addressing the

2    conduct of counsel, which half -- half of our spoliation

3    case related to the conduct of counsel.  So we had to try

4    this with one hand tied behind our back.

5         And even with that, they weren't able to rebut the

6    presumption.  There was zero testimony relating to the

7    second set of destruction, the six tapes that were found in

8    2014.  They didn't rebut that in any way.  There was no

9    testimony whatsoever related to that.

10        So we're in a situation where the Bankruptcy Court

11   ordered a sanction.  You affirmed a sanction.  That sanction

12   is not present in the jury instruction.  They were given an

13   opportunity to rebut it, and they didn't rebut it.

14        And we weren't able to put in all the evidence

15   that we needed.  So we're left with a situation where we're

16   not being able to receive either the sanction that we asked

17   for or our ability to prove that documents were

18   intentionally destroyed.

19        So for all those reasons, Your Honor -- and I

20   apologize to belabor it, but it's very important to us and

21   it does relate to what happened at the trial -- for that

22   reason, we do object to this instruction.

23             THE COURT:  Counsel?

24             MR. MOHEBAN:  Your Honor, the defense does not

25   object to the instruction in light of your prior rulings.

1    This Court clearly has the authority and discretion to

2    determine how to instruct its jury.

3            And the instruction that you've provided in

4    Instruction Number 9 is the exact instruction that you

5    stated you would provide in your September 29th, 2022 order

6    at page 10 in which you stated you would give a permissive

7    adverse inference instruction.  You are doing exactly what

8    you said you were going to do before trial.

9            MR. MARDER:  Nothing further, Your Honor.

10           THE COURT:  The objection is overruled.

11           Jury Instruction 10.

12           MR. MARDER:  Nothing from the plaintiff,

13   Your Honor.

14           MR. MOHEBAN:  Your Honor, our only observation on

15   this is that it does not call out the punitive damages claim

16   as having a different standard of proof, which is clear and

17   convincing evidence.  So it could be confusing to the jury

18   that -- in contradiction to Instruction Number 25.  And we

19   think the potential for confusion can be eliminated by

20   simply stating that this Instruction Number 10 does not

21   apply to the punitive damages claim.  We would request that

22   modification.

23           MR. MARDER:  Your Honor, the plaintiff's position

24   would be that it's already addressed in the punitive damages

25   section, so it doesn't need to be addressed here.

1          THE COURT:  The objection is overruled.

2          Jury Instruction 11.

3          MR. MARDER:  No objection from the plaintiff,

4     Your Honor.

5          MR. MOHEBAN:  Your Honor, again, our observation

6     on Number 11 is that it identifies the claims by name, but

7     it does not identify the affirmative defenses by name.  So

8     to put things on equal footing, we would just ask that the

9     instruction be modified to refer to statute of limitations,

10    consent, and ratification as being the affirmative defenses

11    that are advanced by the defense.

12         MR. MARDER:  Your Honor, the plaintiff has no

13    objection to that clarification.

14         THE COURT:  And do you have specific language that

15    you wish to introduce?

16         MR. MOHEBAN:  Yes, if I can -- at the last

17    paragraph where it says, "In response to plaintiff's claims,

18    BMO asserts," I would just say "the following affirmative

19    defenses to liability," and then it could be a colon, and

20    then it could say, "statute of limitations, consent, and

21    ratification."

22         MR. MARDER:  Plaintiff has no objection to that,

23    Your Honor.

24         THE COURT:  I didn't hear you.

25         MR. MARDER:  Sorry.  Plaintiff has no objection to

1    that.

2              THE COURT:  Okay.

3              MR. MOHEBAN:  Your Honor, may I have one moment

4    just to confer with my colleagues on something?

5              THE COURT:  You may.

6         (Defendant's counsel confer)

7              MR. MOHEBAN:  Your Honor, what my colleagues have

8    asked me to clarify, going back to Instruction Number 9,

9    that when we say we are not objecting at this point, it's in

10   light of your prior rulings and with the understanding that

11   the Court does not want us to re-argue things that have

12   already been decided.

13             So, for the record, we object to any spoliation

14   instruction being given, but given your prior rulings, the

15   language of this -- we're not bringing up any particular

16   objection to how it's been written.

17             THE COURT:  And that is as to Jury Instruction

18   Number?

19             MR. MOHEBAN:  That has to do with Instruction

20   Number 9, which is the spoliation instruction.

21             THE COURT:  Okay.

22             MR. MOHEBAN:  My understanding from your prefatory

23   comments is that all of these instructions, to the extent

24   there's been prior rulings of the Court on a variety of

25   different issues, you are not looking for us to re-litigate

1    them.

2                THE COURT:  We are not re-litigating them.

3                MR. MOHEBAN:  Right.  But for preservation

4    purposes, we want to re-assert the prior positions that we

5    have taken just solely for preservation purposes, and that's

6    our intent throughout all of our responses to these

7    instructions today.

8                THE COURT:  Very well.

9                I believe then Jury Instruction Number 12.

10                MR. MARDER:  Your Honor, we only want to preserve

11    for the record our proposed Closing Instruction Number 26

12    and note that we object on the basis that it doesn't include

13    the language that was set forth in our Closing Instruction

14    Number 26.  We understand the Court has already rejected

15    that, but just for preservation of the record, we wanted to

16    note that.

17                THE COURT:  Thank you.

18                MR. MOHEBAN:  As to Instruction Number 12, we have

19    several objections.

20                The first is the use of the phrase "M&I had

21    knowledge."  As was argued this morning, and I do not

22    believe has been decided by the Court, which is this notion

23    of aggregate knowledge.  And our view is that this

24    instruction and all instructions that have to do with actual

25    knowledge require a showing that a particular M&I employee

3612

1          had the requisite knowledge.

2                  We further object because the instruction omits

3          from the statement of elements any reference to the

4          causation or damages, which are elements of this claim.

5                  Our third objection is that the instruction does

6          not make clear that each element must be satisfied as to the

7          same fiduciary, and that could be cured by editing the

8          second element to say "that PCI fiduciary" or "a PCI

9          fiduciary."

10                 And we also wish to preserve our objection that

11         MUFA claims apply only to transfers accomplished by

12         payment --

13                 THE COURT:  I just didn't hear the last part.  We

14         also want to preserve?

15                 MR. MOHEBAN:  Preserve our objection that a MUFA

16         claim applies only to transfers accomplished by payment of a

17         check.

18                 MR. MARDER:  Your Honor, our response is as

19         follows:

20                 With respect to the first one, which talks about a

21         particular employee, you have, I believe, accurately quoted

22         from the statute itself, which specifically says "the bank,"

23         and so I don't know how the instruction could be inaccurate

24         if it's just quoting the statutory language.

25                 The second issue was that it doesn't specifically

1    mention damages, but I think that's implied in all of these

2    elements that you have to have damages and those damages are

3    separately addressed at the end.

4              And, similarly, with regard to the language of

5    "that fiduciary," I don't believe that language is in the

6    statute.  I think this accurately quotes from the statute,

7    and so we'd object to that as well.

8              THE COURT:  I will take that under advisement.

9              Jury Instruction Number 13.

10             MR. MARDER:  Your Honor, again, for record

11   preservation purposes for appeal, we note that we addressed

12   many of the concepts in Jury Instruction 13 in our proposed

13   Closing Instructions 26, 27, 29, 32, 34, 38, 40, and 46.

14   And we respectfully understand that you've rejected those,

15   but we wanted to preserve those objections for the record,

16   that we request that the instruction be modified to be

17   consistent with our instruction.

18             Beyond that, Your Honor, we do have one very

19   particular objection, and that relates to something that was

20   discussed this morning.  This morning during the JMOL

21   argument, we put up that *McCartney* case where the Court of

22   Appeals in Minnesota specifically discussed the bad-faith

23   element and gave some language that we think ought to be in

24   the instruction.

25             And specifically the language is, quote, You may

1    find bad faith if you find that there was a reckless

2    disregard or purposeful obliviousness to the known facts

3    suggesting impropriety by Tom Petters or Deanna Coleman.  We

4    would respectfully request that that language be included

5    for all of the reasons we discussed this morning.

6            And, Your Honor, I do just want to follow up on

7    one question you had this morning about the red and yellow

8    flags.  During the lunch break I did look, and there was

9    only one opinion that gave negative treatment to *McCartney*,

10   and that's the *Buffets* opinion that we've already --

11           THE COURT:  You said one --

12           MR. MARDER:  -- discussed.

13           THE COURT:  I am not hearing you.  One case --

14           MR. MARDER:  Sorry.  There was only one case that

15   gave negative treatment to *McCartney*, and that was the

16   *Buffets* decision that we already discussed that doesn't

17   address the issue before us at all.  And those other flags

18   that were on there are on other cases outside of the

19   New Jersey case that the court cited with approval.  So I

20   just wanted to note that.

21           But, in particular, Your Honor, we do request that

22   that specific language from *McCartney* be added.  The only

23   case that we found, as I said, that gave negative treatment

24   to *McCartney* was that *Buffets* case, and that did not address

25   the issue before us.

1          MR. MOHEBAN:  Your Honor, to respond to that, of

2     course that's the unpublished decision that plaintiff

3     advanced this morning, which is not Minnesota law.  It's not

4     authority that should be considered by the Court.

5          The proper authority is the *Rheinberger* case,

6     which is reflected in your instructions, in terms of what

7     the definition of "bad faith" is under Minnesota law.  And

8     the *Buffets* case is squarely on point, contrary to counsel's

9     argument.

10          We do have our own several objections, and the

11     first one has to do with the statement about knowledge.  We

12     think that wherever these instructions refer to "knowledge,"

13     the term should be used as "actual knowledge" to be

14     consistent with the statute, which uses the term "actual

15     knowledge."

16          That's particularly important given that there are

17     statements in the instructions that say that knowledge can

18     be proven by direct or circumstantial evidence.  So we do

19     think that it should, in all cases, refer to the phrase

20     "actual knowledge."

21          The reference to "direct or circumstantial

22     evidence" here and elsewhere in the instructions is going to

23     be confusing in light of Instruction Number 3 where the

24     Court instructs the jury to not be concerned with terms such

25     as "direct or circumstantial evidence."

1          So we believe it would be less confusing and more

2     helpful to the jury if those references to "direct or

3     circumstantial evidence" are omitted throughout the

4     instructions in light of what you say in Instruction

5     Number 3.

6          MR. MARDER:  Your Honor, if -- I'm sorry.  Are you

7     done?

8          MR. MOHEBAN:  I have a couple more.

9          We do object to the definition of "fiduciary

10    duty," which -- because of PCI being insolvent at all times,

11    the fiduciary duty of an insolvent corporation does not

12    extend beyond the prohibition against self-dealing or

13    preferential treatment.  That's the *Helm* case, 212 F.3d

14    1076.  That's an Eighth Circuit case.  So we would ask that

15    the definition of "fiduciary duty" be made consistent with

16    that Eighth Circuit law.

17         And then, lastly, in the definition of

18    "fiduciary," the Court includes the phrase "an assignee for

19    the benefit of creditors," which we think would be confusing

20    to the jury in this case in light of the fact that the

21    relevant duties here are to PCI, not to PCI's creditors.

22         And given that the Court has taken pains to avoid

23    reference of duties to the investors or creditors in this

24    case, I think you can eliminate that portion of the

25    definition without losing anything and avoiding that

1    confusion.

2              THE COURT:  And let me make sure I understand your

3    position as to that.  It is what portion of the language

4    would you like to be relieved of?

5              MR. MOHEBAN:  There is -- on page 17 of the

6    instructions.  Have I got that right?  I'm sorry.  Page 14.

7              THE COURT:  Thank you.

8              MR. MOHEBAN:  For the definition of "fiduciary,"

9    there's a list of various parties who could be deemed a

10   fiduciary.  One of them is an assignee for the benefit of

11   creditors.  I think it's generally accurate, but in light of

12   what -- the issues in this case, I think the Court could

13   delete that and avoid confusion.  So it's just the language

14   in the "fiduciary" definition "an assignee for the benefit

15   of creditors."

16             MR. MARDER:  Your Honor, if I could respond to

17   those points?

18             THE COURT:  Just a minute, please.

19             MR. MARDER:  The first --

20             THE COURT:  I said, "Just a minute, please."

21             MR. MARDER:  Sorry.

22        (Pause)

23             THE COURT:  You may.

24             MR. MARDER:  Thank you, Your Honor.

25             With respect to the first point Mr. Moheban

1    mentioned with respect to willful blindness, I do have a

2    compromise position, Your Honor, that we would suggest.  If

3    you look in the footnote on page 14, you cite this *Mattingly*

4    case and say that "willful blindness may provide a mechanism

5    for inferring knowledge but may not substitute for

6    knowledge."

7            Your Honor, the jury is not going to see the

8    footnote, and the jury has heard over and over again the

9    concept of willful blindness in this case.  And I think to

10   not give the jury some insight as to the legal significance

11   of willful blindness would be confusing and unfair.

12           So with respect to that, our backup position,

13   Your Honor, and our compromise position is that you at least

14   move that up into the text so you at least instruct the jury

15   that willful blindness may be a cause for inferring

16   knowledge but isn't a substitute for knowledge.  We think

17   that would help clarify things a bit if you weren't inclined

18   to give us our full willful blindness instruction.

19           The second point Mr. Moheban made related to

20   actual knowledge.  But the prong of the statute that we are

21   working under is the prong that just says knowledge.  It's

22   the section that says the bank would have to have knowledge

23   of such facts such that M&I's wiring the funds or paying the

24   check amounted to bad faith, and that does not use the term

25   "actual."  So we would object to it for that.

1          We most certainly and strenuously object to the

2     notion that the fact that you can prove your case by

3     circumstantial evidence be removed.  That is the heart of

4     our case, and it's going to be the heart of our closing

5     argument, that the circumstantial evidence shows knowledge.

6     And to remove that I think would be very confusing to the

7     jury.

8          With regard to the next point, Mr. Moheban asked

9     that there be some instruction about the duty not extending

10    beyond self-dealing.  And what's going on here, Your Honor,

11    is something that is completely inconsistent with the law.

12          THE COURT:  When you're speaking to the duty, you

13    mean the breach of fiduciary duty?

14          MR. MARDER:  Yes, Your Honor.  Mr. Moheban

15    suggested that the breach of fiduciary duty should be

16    limited to issues of self-dealing because of an insolvent

17    corporation.  And what you need to understand, Your Honor,

18    is that the officers and directors of a corporation, as I'm

19    sure you're aware, always have a fiduciary duty to the

20    corporation.

21          In addition to that duty, when the company is

22    insolvent, it has extra duties to the creditors.  And it is

23    that extra duty that is subject, according to Mr. Moheban's

24    argument, to this limitation that it be limited to

25    self-dealing.

1            But the company, even when it's insolvent, the

2    company's officers always have a fiduciary obligation to the

3    company, and none of that is limited to the concept of

4    self-dealing.  And here you've already said that our breach

5    of fiduciary duty claim is -- relates to the duty to PCI.

6            So this alleged limitation that relates to an

7    additional duty to the creditors is completely irrelevant.

8    The duty here is the duty to PCI.  That is a duty that

9    exists in the law with respect to officers and directors and

10   has nothing to do with the insolvency of the corporation.

11           Finally, Your Honor, we would object to the

12   removal of the term "an assignee for the benefit of

13   creditors."  There's many things in this definition that

14   don't directly apply to this case, but it gives the jury a

15   flavor of the type of relationships that are subject to a

16   fiduciary duty.  And we don't see any reason why to single

17   that one out and think it should remain in the instruction.

18           THE COURT:  Let's move on to Jury Instruction

19   Number 14.

20           MR. MOHEBAN:  Your Honor, may I just speak to

21   counsel's proposed compromise language?

22           THE COURT:  Certainly.

23           MR. MOHEBAN:  So we do not accept that as being a

24   compromise.  That proposal is just simply inconsistent with

25   the law.  This *Mattingly* case is not a Minnesota MUFA case,

1    and there are direct authorities, numerous direct

2    authorities that make clear that actual knowledge under MUFA

3    means actual knowledge.  It cannot mean willful blindness.

4    That's the *Buffets* case.  That's the *Zayed* case.  That's

5    *Rheinberger*.

6            There simply is not a case in Minnesota that

7    construes MUFA beyond saying what it says, in other words,

8    actual knowledge is actual knowledge.  So we strongly resist

9    any notion that willful blindness is an element under MUFA.

10           MR. MARDER:  Your Honor, if I could just address

11   that very briefly.  First of all, Mr. Moheban mentioned the

12   actual knowledge standard.  Again, the prong of the MUFA

13   statute we're talking about is not the prong that requires

14   actual knowledge.  It's the prong that requires knowledge.

15           Secondly, Your Honor, the notion that the *Zayed*

16   case or any other case rejected the use of willful blindness

17   under MUFA is simply incorrect.  The *Zayed* case doesn't even

18   mention or consider the concept of willful blindness.

19           This case that you cited, *Mattingly*, is a

20   generally accepted principle under the common law that

21   willful blindness may provide a mechanism for inferring

22   knowledge.

23           And the jury has heard and will hear that they're

24   entitled to rely on circumstantial evidence.  This is a key

25   type of circumstantial evidence that we will be relying on

1    at trial, and they've heard about willful blindness over and

2    over again.  We think it would be prudent to at least

3    instruct them that they can use it to infer knowledge as a

4    matter of circumstantial evidence.

5              THE COURT:  Very well.

6              MR. MOHEBAN:  If I may, just because it is an

7    important point, this is not the place to make new Minnesota

8    law.  This is a statute that uses the term "bad faith."  Bad

9    faith has been construed by *Rheinberger* to mean acting

10   dishonestly.  Actual knowledge means what it says.

11             And so there's no authority that converts either

12   prong of MUFA into willful blindness.  The fact that they

13   wanted to make that part of their case doesn't make it part

14   of the law, and so the Court should not include any

15   instruction that has anything to do with willful blindness.

16   It's not the law in Minnesota.

17             THE COURT:  Let's move on, then, to Jury

18   Instruction Number 14.  I'll hear argument.

19             MR. MARDER:  Your Honor, the plaintiff has no

20   objections.

21             MR. MOHEBAN:  With respect to Instruction

22   Number 14 and consistent with the preamble to the

23   instruction, the first element we believe should read that,

24   "M&I owed a duty to PCI as a result of a Deposit Account

25   Management Agreement involving Palm Beach."  That's the way

1      this -- that's the way the plaintiff has narrowed its claim

2      in this case, and so the jury should be focused on what is

3      actually at issue.

4              Also, because we're dealing with different kinds

5      and different fiduciary duties going in different

6      directions, we believe that for clarity this instruction

7      should state that Count II involves an alleged fiduciary

8      duty owed from M&I to PCI; whereas, Count I involved an

9      alleged fiduciary duty owed to PCI from Petters, Coleman,

10     and White.  It just might be helpful to the jury to call out

11     that we've got the two different -- categorically different

12     types of fiduciary duty claims based on different fiduciary

13     duties.

14             THE COURT:  So that's an objection?

15             MR. MOHEBAN:  It's an objection, yes.

16             THE COURT:  It's taken under advisement.  Anything

17     more on that?

18             MR. MARDER:  Should we respond to that,

19     Your Honor?

20             THE COURT:  You may if you would like.

21             MR. MARDER:  I will respond very briefly.  I'll go

22     to the second point first.  I don't think it's necessary to

23     identify which fiduciary duty it is because in the body of

24     the instruction itself it mentions that M&I owed a duty to

25     PCI.

1          Also, Your Honor, with respect to these various

2    agreements, I think our Amended Complaint speaks for itself

3    and addresses all of these various different kinds of DACAs

4    and DAMAs.

5          THE COURT:  Jury Instruction Number 15.

6          MR. MARDER:  Your Honor, we have no specific

7    objection to Jury Instruction Number 15 other than to state

8    that we wish to preserve our objection to Instruction

9    Number 15 for the reasons stated in our proposed jury

10   instructions and that we request that the Court adopt the

11   plaintiff's proposed Closing Instruction Numbers 51 and 54.

12   But we respectfully understand that you have rejected those,

13   but for preservation of the record purposes, we wanted to

14   ask that our instructions be used instead.

15         THE COURT:  Understood.

16         Jury Instruction Number 15 for defendants.

17         MR. MOHEBAN:  Your Honor, defense objects to the

18   definition of "breach of fiduciary duty" as being -- what

19   the instruction says is when the "fiduciary fails to act in

20   the best interests of the principal."  We believe that

21   instruction is too vague to properly instruct the jury and

22   does not identify what the jury would have to find to

23   constitute a breach.

24         We believe the instruction should state, quote, To

25   prove that M&I breached a fiduciary duty under the Palm

1    Beach DAMA, plaintiff must show that M&I breached an

2    obligation it owed under the Palm Beach DAMA.

3              MR. MARDER:  Your Honor, our response would be the

4    same as it was last time, and we would object to the request

5    to limit it to one particular agreement when there were

6    multiple agreements at issue.

7              MR. MOHEBAN:  I would -- just in response to that,

8    I would just say whether you find this has to do with one

9    agreement, which we believe is plaintiff's position, or more

10   than one, the jury still has to have some definition about

11   what would constitute a breach.

12             And we think given that the allegation is that the

13   duties arise under a contract, it follows that to breach

14   those duties, you would have to breach a provision of the

15   contract.

16             To state otherwise or to leave that undefined

17   allows the jury to just speculate about what the duties may

18   have been and base its decision on things that are not

19   actual duties.  The jury can be instructed as to what a

20   breach would be.

21             MR. MARDER:  If I could just respond to that

22   briefly, Your Honor.

23             This is the same rehash of the same argument they

24   made before, that there were only specific duties under the

25   contract.  And it is our position that there was a general

1    fiduciary duty, and you've already instructed the Court

2    about -- I'm sorry.  You're already instructing the jury

3    about what their obligation is -- the bank's obligation was

4    in the context of a general fiduciary duty.  So we would

5    object to that.

6              THE COURT:  Understood.  Under advisement.

7              Jury Instruction Number 16.

8              MR. MARDER:  The plaintiff has no objection,

9    Your Honor.

10             MR. MOHEBAN:  Your Honor, the defense has several

11   objections on the instruction.

12             First, BMO objects to the instruction because it

13   fails to specify that the predicate fraud must be against

14   PCI.  The Court should make this clarification to avoid jury

15   confusion and a potential belief that this claim involves

16   fraud against investors.

17             The statement that "Petters, Coleman, and White

18   committed a fraud that caused injury to PCI" is not a proper

19   statement of the claim.  The instruction must state that

20   they committed a fraud against PCI that caused injury to

21   PCI.

22             So this is consistent with the Court's rulings

23   throughout the case that investor knowledge or duties to

24   investors is not part of the case, and so we just want this

25   instruction to be focused on it had to be a fraud against

1    PCI.

2           In addition, this is another place where we would

3    ask that a reference to "knowledge" be replaced with a

4    reference to "actual knowledge," as the cases require.

5           This is also a place where we would ask that the

6    instruction make clear that it had to be an individual M&I

7    employee with knowledge of the fraud and not the aggregate

8    knowledge of all employees of the bank, in other words,

9    there has to be an individual found to have aided and

10   abetted the fraud, consistent with the *Witzman* and *Zayed*

11   decisions that I believe the Court has relied on in the

12   instructions, as well as the *Varga* case.

13          MR. MARDER:  Your Honor, this first argument has

14   been before the Court many times.  It was before the Court

15   in the JMOL and it was discussed extensively in the proposed

16   jury instructions.  And you've already indicated that you

17   carefully considered those arguments and chose your language

18   carefully, and I believe that you did.

19          It is our position that in order for there to be

20   an underlying fraud, it has to be a fraud that caused injury

21   to PCI.  That's what we've said throughout this case and

22   that's all we have to prove and, therefore, we think that

23   the language is perfectly consistent and is good language

24   because it avoids any confusion by simply leaving it to the

25   jury to determine if there was a fraud that caused injury to

1    PCI, which is what we would have standing to assert.

2           The second objection has to do with whether it's

3    actual knowledge or knowledge.  Again, I think that would be

4    confusing to the jury.  If you look at the *Witzman* case,

5    when it lays out the elements of aiding and abetting, I

6    believe it just says "knowledge" and -- when it actually

7    lays out the elements.

8           And with respect to the individual, again, I don't

9    think that's necessary.  You've already included an

10   instruction that when an individual acts within their --

11   scope of their duties for a company, that that's attributed

12   to the company and, therefore, I think it's covered by that.

13           THE COURT:  Jury Instruction Number 17.

14           MR. MARDER:  Your Honor, this is one where we --

15   for record preservation purposes, we ask that the Court

16   adopt our proposed Closing Instruction Number 60, 61, and

17   62.  But with that being said, this is again one that

18   requires just a little bit more elaboration to succinctly

19   state our objection.

20           And, specifically, Your Honor, this now goes to

21   the *Ariola vs. Stillwater* case that we discussed during the

22   JMOL where the court in Minnesota specifically adopted the

23   *Global-Tech* Supreme Court opinion where it discusses willful

24   blindness being a substitute for actual knowledge.

25           So we would request, Your Honor, that you include

1    the willful blindness instruction that we had included

2    with our proposed closing instructions that I just

3    enumerated.

4            And, Your Honor, we would again request that if

5    you're not willing to do that, that you at least, as a

6    compromise position, put in the language that was in your

7    shaded footnote on page 14, that we can at least tell the

8    jury, since they heard about willful blindness so much, that

9    willful blindness may provide a mechanism for inferring

10   knowledge because that is clearly the law.

11           Mr. Moheban objected to that in the MUFA context,

12   saying that that's not part of the statute, but it is most

13   certainly part of the common law.  It is the common law as

14   articulated by the Supreme Court, and it is the common law

15   of Minnesota as adopted -- the Supreme Court's opinion was

16   adopted in the *Ariola vs. Stillwater* decision.

17           And, finally, Your Honor, we would request that

18   when discussing knowledge, there is particular language that

19   we had asked be included in our instruction, that knowledge

20   can be proved -- after saying that knowledge may be proved

21   by direct or circumstantial evidence, that we explain that

22   conducting business in an atypical or unusual way, such as

23   violating internal policies of a company, is evidence of

24   knowledge.  We would request that that language be

25   particularly included.

1              And those are our objections, Your Honor.

2              THE COURT:  Understood.

3              MR. MOHEBAN:  Your Honor, with respect to the

4    proposed language from plaintiffs, we do object to all of

5    that.  As we discussed this morning, the *Ariola* case has

6    nothing to do with this claim.  It's dicta.  And same thing

7    with *Global-Tech*.  The United States Supreme Court does not

8    establish Minnesota's common law.

9              The common law cases that are actually on point

10   for this claim use the term "actual knowledge," and no such

11   case has ever substituted "willful blindness" or the

12   "irregular business practice" language that plaintiffs

13   propose as a substitute for proving actual knowledge for

14   this claim.  So we don't agree with any of those proposed

15   revisions.

16             We do have a number of concerns about this

17   instruction and objections, and the first being that there's

18   an extensive outquote here of what happened in the Petters

19   case that was read to the jury during the trial.  It does

20   not need to be called out here again in this instruction.

21             And we think it's prejudicial to do that here

22   because there's language that talks about defrauding

23   investors, fake purchase orders, and other language that,

24   again, makes it sound like this is a claim where people are

25   defrauding investors and that that is the fraud; whereas,

1      this is not a situation where BMO can be liable for investor

2      losses.  It has to be a fraud against PCI.

3           And so we don't believe that this language is

4      necessary or needs to be in this instruction.  It raises

5      this investor knowledge and investor damages claim, which I

6      know the Court has sought to avoid.

7           In addition to that, there's a tandem instruction,

8      a definition that talks about the relationship between --

9      uses the term "general awareness," which we don't think is

10     an element of the claim.  We think that the language should

11     be "actual knowledge."  That is what is required for this.

12     There's nothing that really calls out the term "general

13     awareness."

14          This instruction also makes a reference to "direct

15     or circumstantial evidence," which we, as we noted earlier,

16     we think would be confusing because it's inconsistent with

17     your Instruction Number 3 that says that the jury should not

18     pay attention to direct or circumstantial evidence, that

19     those terms are not important.

20          It's, in our view, really important that this

21     instruction not imply in any way or suggest that this claim

22     relates to investor losses.  We think that would be a

23     serious error, and I know the Court is trying to -- has been

24     consistently trying to steer around that.

25          So we think it needs to be streamlined

1    considerably to eliminate the potential for making the jury

2    believe that the fraud on investors has something to do with

3    the fraud that's being considered here.

4         MR. MARDER:  Your Honor, I'll just briefly respond

5    to those points.

6         The first is I don't think it's problematic to

7    include an instruction that you've already given to the

8    jury, the reason being that these instructions are going to

9    go into the jury room with the jury so they can refer to

10   them and the instruction that you gave them early in the

11   case relating to the effect of the criminal convictions was

12   merely read to them.  So we think it's very important that

13   it be put in writing so they can bring it into the jury

14   room.

15        Second of all, once again, they are rehashing this

16   argument that you considered and rejected as to the nature

17   of who the underlying fraud has to be on.  This particular

18   instruction very clearly sets forth all of the facts that

19   are relevant to establishing the fraud that is at issue

20   here.

21        The third point is that they've asked that the

22   language about the general awareness of fraud be removed,

23   and there are two problems with that.  Number one, I believe

24   that's the language that's used in the case law.  And second

25   of all, the reason that's important -- and I think what this

 1    is referring to is the fact that the defendant need not be

 2    aware of every detail.  They don't have to know exactly that

 3    it was a particular type of Ponzi scheme and how it

 4    operated.  The standard is that when they do have to have

 5    knowledge, it's more of a general awareness that there was a

 6    fraud.  And so I think that's what that is trying to capture

 7    and, therefore, we would disagree with taking that language

 8    out.

 9          And, finally, Your Honor, we would certainly

10    object to taking out the notion that knowledge can be proven

11    by circumstantial evidence.  That's the very heart of our

12    case.

13          And we think rather than take that out, as we

14    stated earlier, it should be beefed up to explain that one

15    piece of circumstantial evidence they can use is to infer

16    from willful blindness that there was knowledge.

17          MR. MOHEBAN:  Your Honor, if I can respond just on

18    the point regarding general awareness?

19          THE COURT:  You may.

20          MR. MOHEBAN:  Thank you.

21          The *Witzman* and *Zayed* cases that discuss this type

22    of claim under Minnesota law, they don't use that phrase.

23    And it's -- you've already got elements of the claim that

24    talk about actual knowledge, and so this general awareness

25    concept seems to be lessening, it seems to be diluting the

1    plaintiff's burden of proof.  So that's another reason.  We

2    disagree with plaintiff's contention that this is somehow

3    what the law says should be the instruction.

4              THE COURT:  Understood.

5              Jury Instruction 18.

6              MR. MARDER:  Plaintiff has no objection,

7    Your Honor.

8              MR. MOHEBAN:  Our only objections are what we have

9    stated in the -- on prior instructions having to do with the

10   aggregate knowledge issue.

11             This is another place where we think the

12   instruction needs to say that an individual M&I employee had

13   knowledge of the breach of the fiduciary duty and aided and

14   abetted that.

15             And, again, where this instruction uses the term

16   "knowledge," we would ask that it say "actual knowledge" to

17   be consistent with the case law.

18             MR. MARDER:  Your Honor, we've already responded

19   to those points in the context of the previous instructions.

20   So we just incorporate those by reference.

21             THE COURT:  Thank you.

22             Jury Instruction 19.

23             MR. MARDER:  Your Honor, the plaintiff does

24   object.  And once again for record preservation purposes, we

25   object that the language is not consistent with our proposed

1     Closing Instruction Numbers 66 and 67.

2             Furthermore, Your Honor, this instruction is

3     nearly -- is very similar in nature to the one we discussed

4     earlier, which was the instruction for -- Number 13 --

5     sorry, Number 17, which was the other instruction relating

6     to an aiding and abetting charge.  So we have the same

7     comments here.

8             We respectfully request that you include here as

9     well the willful blindness instruction based on the case law

10    of *Ariola vs. Stillwater* and *Global-Tech*.  And once again,

11    Your Honor, we respectfully request that if you are not

12    willing to go that far, that you at least include as a

13    compromise position the language that you had in your

14    footnote that we discussed earlier.

15            And, finally, Your Honor, we ask for the same

16    language relating to knowledge be tacked on, specifically

17    that conducting business in an unusual or atypical way, such

18    as violating internal policies, is evidence of a company's

19    knowledge.

20            So also -- so we essentially adopt the same

21    objections that we did before with respect to Instruction

22    Number 17.

23            But I also believe, finally, Your Honor, that

24    there's a typographical error in your instruction, and that

25    has to do with on page 25 --

1           THE COURT:  Okay.

2           MR. MARDER:  -- it says, "The stronger the

3     evidence of a person's or entity's general awareness of

4     fraud."  I think that language carried over from Instruction

5     Number 17, but this one is a fiduciary duty instruction.  So

6     I think what you may have meant to say is the "general

7     awareness of the breach of fiduciary duty" rather than

8     "fraud," because this is an aiding and abetting fiduciary

9     duty claim.

10          THE COURT:  Okay.  Let me make sure that I'm

11    tracking your language that you have identified as

12    erroneous.  It's on page 25, did you say?

13          MR. MARDER:  Yes, Your Honor.  On page 25, the

14    second sentence, it says, "Therefore, the stronger the

15    evidence of a person's or entity's general awareness of

16    fraud."  I think that was supposed to say "general awareness

17    of a breach of a fiduciary duty," because that would put

18    this in context with this claim.  I believe that language

19    was copied from Number 17, which did deal with fraud, but

20    this one deals with breach of fiduciary duty.

21          THE COURT:  Counsel.

22          MR. MOHEBAN:  Your Honor, we caught the same typo

23    and were going to make the same comments.  So we agree that

24    that should say "fiduciary duty" -- "breach of fiduciary

25    duty" and not "fraud."

1          Our other objections, I can just carry over the

2     objections that we've had on prior instructions.

3          So this has the same issue regarding the use of

4     the term "general awareness" as opposed to "actual

5     knowledge."

6          It has the same issue regarding referencing

7     "direct and circumstantial evidence" in light of what you

8     say in Instruction Number 3.

9          And it has the same definition of "fiduciary duty"

10    that we objected to previously regarding where we reference

11    the *Helm* case and the limits of a fiduciary duty for an

12    insolvent corporation.

13         So we are just re-asserting those as we did on

14    prior instructions.

15         MR. MARDER:  Your Honor, we will just incorporate

16    our prior arguments when they made those arguments before.

17         And I would specifically, though, emphasize this

18    notion that limiting this to self-dealing or anything of

19    that nature would be completely incorrect given that we're

20    talking about a duty the officers owed to the company, and

21    the self-dealing is not a limit on that.

22         THE COURT:  Anything further on this instruction?

23         MR. MOHEBAN:  I will say to the extent that

24    plaintiff re-asserted their claims about what the language

25    should be and citing to I believe *Ariola* and some of the

1    prior arguments, we just re-assert the same responses we had

2    to those.

3              THE COURT:  Okay.  Jury Instruction 20.

4              MR. MARDER:  Your Honor, we do object to Jury

5    Instruction 20.  And for record reservation purposes and for

6    appeal, we would like to object on the basis that the

7    instruction does not include the language that we had in our

8    Closing Instruction Numbers 74, 75, and 76, but we recognize

9    that the Court has already considered and rejected that.

10   However, Your Honor, we do have three very particular

11   objections that we would like to make.

12             The first one is that in the context of aiding and

13   abetting fraud, there is an additional element and

14   specifically there is the discovery rule.  And we would

15   request that in the aiding and abetting fraud context, that

16   it would say that with respect to that cause of action,

17   quote, the plaintiff's claim for aiding and abetting fraud

18   accrues when the plaintiff discovers or by reasonable

19   diligence should have discovered the facts necessary to

20   support the claim, because that is an additional thing that

21   the defendant needs to prove in support of a statute of

22   limitations defense.

23             I do have two other objections.  One has to do

24   with the issue of -- actually, they both have to do with

25   this concept of fraudulent concealment, and I think there

1     needs to be two clarifications here on the fraudulent

2     concealment.

3              One is we would request that there be an

4     instruction that says when considering whether the

5     concealment was not and could not have been discovered by

6     reasonable diligence, you should consider whether the

7     plaintiff did and could not have discovered the concealed

8     facts by reasonable diligence, not PCI.

9              I think that needs to be clarified, Your Honor,

10    because at this point it doesn't say who it is has to have

11    acted diligently in order to give rise to this exception to

12    the statute of limitations.

13             And the reason why we say that this is the law,

14    Your Honor, has to do with that quote that we put up before,

15    where it talks about -- when you were reasoning about why

16    *in pari delicto* does not apply to this case, you cited the

17    *Magnusson* and the *German American* cases and said that the --

18    the fact that the receiver entity is the one that went into

19    bankruptcy cleanses the company and that affirmative

20    defenses cannot be asserted that relate to the conduct of

21    PCI once the receiver gets appointed.

22             And this is the very same concept, Your Honor,

23    that when you're considering whether there's fraudulent

24    concealment and you are looking at whether there's

25    reasonable diligence, you would look at the conduct of the

1      receiver and not of PCI.

2              Secondly, Your Honor, even if you were to look at

3      the conduct of PCI, in other contexts you had this language

4      that, based on the *Steigerwalt* case, that determined -- that

5      says that when considering -- and this is the proposed

6      language we would include -- when considering what was

7      discovered or could have been discovered by reasonable

8      diligence, you should not consider the knowledge of someone

9      acting to defraud PCI.  That's the language that you have in

10     your instruction relating to consent, and I think that same

11     language needs to belong here.

12              We are not to look at the conduct of Mr. Petters

13     and Ms. Coleman, for example, to determine whether they

14     acted with reasonable diligence because they were part of

15     the fraud and that should not be considered for purposes of

16     the statute of limitations.

17              So that would be our other objection for failing

18     to include that language, Your Honor.

19              MR. MOHEBAN:  Your Honor, the defense's objection

20     to Instruction Number 20 is that there just should be no

21     language at all about tolling of the statute of limitations

22     or anything about the discovery rule, and that's for the

23     plain fact that PCI was party to the fraud.  PCI was

24     convicted, pled guilty to the fraud.

25              These tolling concepts are based on the notion

1    that somehow PCI would be concealed from, that somehow PCI

2    would not know that these breaches were happening, that

3    these frauds were happening.  But no reasonable jury could

4    find that because at all relevant times PCI was part and

5    parcel of the fraud.  So there just isn't logically a way to

6    even argue concealment or discovery.

7         On the second point, you know, as has been true

8    throughout this case, the plaintiff stands in the shoes of

9    PCI and so to try to separate out the plaintiff from

10   Mr. Kelley from PCI is legally impossible.  They are one and

11   the same.

12        This cleansing notion that was applied for *in pari*

13   *delicto*, that is limited to that, but it does not limit

14   PCI's knowledge or the fact that at all relevant times it

15   knew about the fraud and that there could not have been

16   concealment.  Those are just plain facts of the case.  They

17   can't be undone by the fact that PCI went into bankruptcy.

18        So statute of limitations should be without any

19   reference to fraudulent concealment or equitable tolling of

20   any kind or a discovery rule.

21        THE COURT:  And do you have case law that you

22   would cite to support that?

23        MR. MOHEBAN:  Case law on which aspect of that?

24        THE COURT:  Both of your arguments.

25        MR. MARDER:  Your Honor, could I address that

1    first or -- I'm sorry.  Were you talking to me or were you

2    talking to Mr. Moheban?

3                THE COURT:  I was --

4                MR. MOHEBAN:  Just one moment and I will have that

5    for you.  It's cited in our --

6                THE COURT:  If it's cited in your written

7    materials to the Court --

8                MR. MOHEBAN:  It's the *Sussel* case.

9                THE COURT:  Okay.

10                MR. MOHEBAN:  It's in our proposed jury

11    instructions.  Do we know which one so we can tell the

12    Court?

13                MR. YOUNT:  We'll find it.

14                MR. MOHEBAN:  We will look for it while we're

15    going --

16                THE COURT:  That's quite all right.  I don't want

17    to detract you from doing other things.

18                MR. MARDER:  Could I respond, Your Honor?

19                THE COURT:  You may.

20                MR. MARDER:  Thank you.

21                Your Honor, what Mr. Moheban just articulated is

22    the exact reason why we need these instructions.  They are

23    going to argue that when looking at the issue of fraudulent

24    concealment, you should look at the fraudsters themselves.

25    And this is precisely why we need this clarification.

1           Both of these clarifications are already

2     clarifications that you have adopted in other contexts.  One

3     of them is that you can't look to the conduct of the

4     fraudsters themselves who are defrauding the company.

5     That's one that you have in your consent instruction, and it

6     should be included here.  It's a concept that you have

7     already agreed with, and it's set forth in the *Steigerwalt*

8     case.

9           The other one, which is the fact that the

10    receivership cleansed the company, is the very language we

11    put up before where you adopted that and specifically cited

12    the authority of the *German American* case and the *Magnusson*

13    case, both of which hold that the company is cleansed.

14          And you specifically rejected this argument, as

15    did the Bankruptcy Court, that somehow the fact that the

16    trustee was appointed and is governed by bankruptcy law, and

17    they cite all kinds of bankruptcy statutes, those were all

18    rejected, *in pari delicto* defense, and they should be

19    rejected here as well.

20          Finally, Your Honor, the *Sussel* case they are

21    referring to only has to do with one of these two concepts.

22    It has to do -- and let me rephrase.  This *Sussel* case is a

23    very narrow exception to the exception, and what it says is

24    that where there is one person who is both the entity and

25    the fraudster, this doctrine doesn't apply.

1          But that is not the situation here, Your Honor.

2     There were multiple employees in this company.  There were

3     multiple individuals who were not involved in the fraud that

4     worked at the company.  In fact, one of them testified here,

5     Ms. Lindstrom.

6          So the *Sussel* case does not apply, and both of

7     these doctrines that we're mentioning are doctrines that you

8     have already adopted for other defenses and we request that

9     they be adopted here.

10         MR. MOHEBAN:  Your Honor, I have the authority.

11         THE COURT:  Please.

12         MR. MOHEBAN:  It's *Sussel vs. First Federal*

13    *Savings & Loan*.  It's 402 F.3d -- I'm sorry, 307 Minn. 199,

14    203.  It's a 1976 case.

15         THE COURT:  Just a minute.

16         MR. MOHEBAN:  And just to clarify, so --

17         THE COURT:  Stop.

18         MR. MOHEBAN:  Yes.

19         THE COURT:  307 Minn. 199.

20         MR. MOHEBAN:  199, 203.

21         THE COURT:  Thank you.

22         MR. MOHEBAN:  There are cases where there are

23    principals within a company that are defrauding the company

24    and there's like this innocent part of the company.  That's

25    what Mr. Marder, I think, is trying to conjure up.  But

1      that's not the case here.

2              And this *Sussel* case, which is a Minnesota Supreme

3      Court case, deals with the sole actor doctrine and the fact

4      that if a person who controls the company is the fraudster,

5      as is the case here where Tom Petters controlled PCI, then

6      you really can't work that distinction that somehow there

7      was this innocent part of the company that could have been

8      defrauded.

9              Mr. Petters, it's undisputed, controlled PCI,

10     caused PCI to exist only for the purposes of committing the

11     fraud.  So there just isn't room here in this context to try

12     to endorse the fiction that somehow there was some company

13     that was being, you know, concealed from and that's why this

14     applies.

15             MR. MARDER:  Your Honor, if I could just respond

16     very briefly to that, there are two problems with the

17     argument.

18             Mr. Moheban said I conjured up a distinction in

19     that case.  I ask that you look at the case itself, and it

20     very particularly is limited to the narrow situation where

21     there is one principal and one agent and they are the same

22     person.

23             Secondly, Your Honor, the *Sussel* case, if you were

24     to see it as an exception, which you should not, it is --

25     only deals with this issue that you can't look at the

1    knowledge of the fraudster.

2            It does not deal with the other issue, which has

3    to do with the company being cleansed by virtue of the

4    receiver being appointed.  That is an issue of Minnesota

5    law, and that is an issue that you already agreed with in

6    the context of *in pari delicto*.  And by dismissing all the

7    other equitable defenses, you have already agreed that the

8    doctrine applies to the other defenses.

9            So this *Sussel* case is really just a rabbit hole

10   that doesn't do anything for the defendants.

11           THE COURT:  Thank you, Counsel.

12           Let's move on to Jury Instruction Number 21.

13           MR. MARDER:  Sorry, Your Honor.  If I could have

14   just one moment to find my place here?

15           THE COURT:  You may.

16       (Pause)

17           MR. MARDER:  Your Honor, with respect to Jury

18   Instruction Number 21, once again we want to preserve our

19   rights with regard to our original instructions, which were

20   Instructions Number 80 and 81.  And recognizing the Court

21   has rejected those, just for purposes of appeal, we wanted

22   to object on that basis.

23           Our second more specific objection, Your Honor, is

24   nearly identical to one of the objections that we asserted

25   in response to the prior instruction.  We would request that

1    you instruct the jury that when considering this affirmative

2    defense, you should only consider whether PCI consented or

3    ratified to the unauthorized act.  I'm sorry.  Let me

4    rephrase that.  I misspoke.

5            When considering this affirmative defense, you

6    should not consider whether PCI consented or ratified the

7    unauthorized act, but only whether the plaintiff consented

8    or ratified the unauthorized act.

9            As I said before in connection with the previous

10   instruction, there are two different doctrines that are

11   relevant here, there's the issue of being cleansed by the

12   receiver and there's the issue that you cannot look at the

13   conduct of the fraudsters themselves.

14           You already included within this instruction the

15   concept that you can't look at the knowledge of the

16   fraudsters themselves.  That's in there in the paragraph

17   where you talk about full knowledge of material facts.

18           But the other issue, the one that you adopted in

19   connection with *in pari delicto*, and the one that you

20   adopted in connection with all the other defenses that you

21   dismissed today is that the receiver -- by being appointed

22   before the bankruptcy and by the trustee stepping into the

23   shoes into that cleansed entity, that you cannot take into

24   account the conduct of PCI itself and only need to look at

25   whether the plaintiff consented or ratified the unauthorized

1   act.

2          So for that reason, Your Honor, we'd ask that that

3   additional language be included.

4          MR. MOHEBAN:  Your Honor, on Instruction

5   Number 21, Mr. Marder had it right the first time.  It is

6   the ratification and consent of PCI which is at issue here.

7   That's the party who during the course of the fraud would

8   have been in a position to ratify or consent to the fraud.

9   And so we actually think the instruction should be clarified

10  to make clear that it is PCI who would provide the consent

11  or the ratification.

12         The cleansing doesn't apply here, again, for the

13  reasons that we stated in the prior defense -- or prior

14  instruction, that is.

15         And then we have an issue regarding the definition

16  of "full knowledge of material facts," because -- in

17  Minnesota because of the sole actor rule, which imputes the

18  knowledge of an agent to the principal.  In this case,

19  everything that Tom Petters knew was known by PCI.  They are

20  effectively one and the same.  That's back to the *Sussel*

21  case.

22         So, again, the Court -- the jury can find consent

23  or ratification if it finds that PCI itself ratified or

24  consented to either the alleged fraud or the breach of the

25  fiduciary duty.

1           MR. MARDER:  We would object to that, Your Honor,

2      for -- I don't want to belabor the point.  It's all the

3      arguments we have already made, that there are two different

4      doctrines, there's the cleansing of the receiver and there's

5      the not looking at the knowledge of the fraudsters.  The

6      *Sussel* case does not -- only applies in narrow contexts and

7      only relates to one of those two doctrines.

8           THE COURT:  Let's move on to Jury Instruction

9      Number 22.

10          MR. MARDER:  You'll be happy to hear, Your Honor,

11     that plaintiff has no objections to 22.

12          MR. MOHEBAN:  Defense has no objections to

13     Instruction 22.

14          THE COURT:  I am happy.  Thank you.

15          Jury Instruction Number 23.

16          MR. MARDER:  We do have -- the plaintiff does have

17     an objection to Jury Instruction Number 23, Your Honor.  You

18     will recall in this case -- well, first of all, before I get

19     there, let me just say, as I have before, that we -- for

20     preservation purposes for appeal, we certainly request

21     that -- and object to the instruction for not incorporating

22     our proposed Closing Instruction Numbers 88, 89, and 90.

23          But beyond that, Your Honor, we do have an

24     objection to the description of the damages.  You will

25     recall that there was extensive briefing before the

1    Bankruptcy Court where standing came into issue, and the

2    Bankruptcy Court said that we had standing by virtue of the

3    fact that we were harmed and the nature of being subjected

4    to lawsuits from investors who did not get paid.

5         And that concept then carried over into summary

6    judgment and, once again, you agreed with that concept,

7    Your Honor, when you denied the defendant's leave to appeal

8    summary judgment.

9         Then there were multiple rounds of briefing on

10   various topics, all of which contemplated what our damages

11   were, which is that we were subjected to claims and couldn't

12   pay claims to our investors.

13        Then, Your Honor, most importantly, on the *Daubert*

14   decision, I believe it's pages 45 to 55, you very carefully

15   and extensively went through the measure of damage and you

16   agreed that our expert, Mr. Martens, had set forth the

17   correct measure of damages, which was, as of the time of the

18   bankruptcy, what were the net losses by the investors.

19        Having gotten those instructions by both the

20   Bankruptcy Court and this Court, we then proceeded with

21   that damages theory in mind and we presented that damages

22   theory.

23        The defendants proposed a different damages theory

24   at trial, which is completely inconsistent with the damages

25   theory that you alluded to on multiple occasions and most

1    recently in the *Daubert* order.

2            So we respectfully request, Your Honor, that this

3    be more detailed for several reasons.

4            One is the unfairness that would result to us from

5    proposing and utilizing the very damages measure that the

6    Court instructed us and that the Court gave its imprimatur

7    to.

8            Second of all, Your Honor, I think that this

9    damage instruction is very confusing because it doesn't give

10   the jury any guide whatsoever, any yardstick, or any measure

11   by how to measure damages.  It just says "fairly and

12   adequately compensate PCI," and we think that's very

13   problematic.

14           And also, Your Honor, you may recall that the

15   defendants proposed through their expert, Mr. Jarek, a

16   damages measure that had to do with the amount of money that

17   was a direct payment to the insiders; and that damages

18   measure is completely and totally inconsistent with

19   everything that's in the *Daubert* order.

20           And if this instruction goes through as written,

21   the defendants are going to argue that damages in this case

22   should be limited to whatever it is, the $78 million that

23   they claim was directly paid to the individuals, ignoring,

24   of course, all the other indirect damages.  And that also

25   would be very confusing to the jury and unfair to us and

1    inconsistent with the damages measure.

2          So, therefore, Your Honor, for all those reasons

3    we respectfully request that you, instead of the second

4    paragraph, you include an instruction that says as follows:

5          "You should award the plaintiff the amount PCI was

6    unable to pay its creditors, i.e., the lenders' net cash

7    losses as of the filing date of the PCI bankruptcy, which

8    was October 11th, 2008."

9          That would be -- that would have the charm of

10   being completely consistent with all the prior orders in

11   this case and it would also clarify for the jury what the

12   measure of damages is instead of leaving them to look at

13   this measure of damages and not really understand what

14   fairly compensates PCI for its harm.

15         MR. MOHEBAN:  Your Honor, on Number 23 counsel is

16   re-litigating the *Daubert* motion regarding Mr. Jarek that

17   went against him and is essentially telling you that you've

18   already directed a verdict on damages, which is certainly

19   not in any order that you've ruled on in this case.

20         What you have ruled on in, I think, a fair

21   statement is that the harm has to be to PCI and it's a

22   fact-finding mission for the jury to determine what that

23   fact -- what that harm was, if any.  That's the full extent

24   of how far you've gone.  You have not directed a verdict on

25   damages, and plaintiff shouldn't be allowed to try to get

1    that now.

2            The jury did hear evidence of a variety of damages

3    theories, right?  They've heard evidence that there are no

4    damages.  They've heard evidence that it's equal to the

5    investor losses.  They've heard evidence that the actual

6    harm to PCI was the money that was looted by the investors

7    because, as Mr. Jarek testified, although they hadn't --

8    although PCI had not paid back the loans, it had the money

9    that it borrowed.  The jury could validate that.

10           So we do think that that portion of the

11   instruction is a standard and proper instruction.

12   "'Damages' means a sum of money that will fairly and

13   adequately compensate PCI for any harm."  You should not

14   take that away from the jury.  You should not invite --

15   accept their invitation to make this a one-sided directed

16   verdict.

17           Beyond that, we had a couple, I guess, more

18   technical issues with the instruction.

19           One of the things that -- in the opening paragraph

20   it doesn't make any reference at all to affirmative

21   defenses.  So what it says right now is:  "Questions 5 and

22   6...are the damages question."  If you determine that

23   plaintiff has proved each of its elements, then you have to

24   decide damages.

25           But it's more than that.  If you have

1    determined -- the real inquiry for the jury is has the

2    plaintiff proved the elements of its claims and are the

3    affirmative defenses -- what's the ruling on that by the

4    jury.  Because only after you get past the affirmative

5    defenses that you would get to damages.  So we think that it

6    should be modified to account for the fact that they have to

7    make a decision on affirmative defenses.

8              We also believe that the affirmative defenses need

9    to be referenced in the special verdict form and that

10   they've been called out, you know, in the instructions and

11   there should be a place on the verdict form for the jury to

12   find whether or not there was a violation of statute of

13   limitations or consent or ratification.

14             We think that at the end of this instruction -- in

15   the first paragraph, the last sentence says, "when you

16   decide damages."  We think that is suggestive and unfair.

17   It should be "if you decide damages" because the way the

18   verdict form is set up, they don't answer damages unless

19   they find liability.  So by saying "when," that suggests to

20   the jury that they're going to find liability.  So we think

21   that should be changed to "if."

22             And then just to make more clear what the jury

23   should be finding is in this term "damages," the definition

24   of "damages," where it says "a sum of money that will fairly

25   compensate PCI for any harm," it should go on to say "for

1    any harm suffered by PCI."

2           That's consistent with your rulings throughout the

3    case.  It has to be harm.  By leaving it just with the word

4    "harm" right now, it raises the specter that the jury will

5    get into harm to investors, which we know is off limits and

6    should be avoided.

7           MR. MARDER:  Your Honor, I would like to respond

8    briefly to that.

9           The first point, Your Honor, is something that --

10   I don't want to use the word "disturbing," but completely

11   false.  We take strong exception to the characterization of

12   us having lost the *Daubert* motion.  In the *Daubert* motion

13   we -- they argued that our expert's assessment of what

14   damages is, which is exactly what we're proposing here, was

15   incorrect.

16          On pages 45 to 50 of your opinion you went through

17   Mr. Martens' damages measure.  And the name of that section

18   that you put in there, Your Honor, number 1, is "Consistency

19   with the Law."  You went through Mr. Martens' assessment of

20   damages and concluded that his assessment of damages and his

21   measure of damages was consistent with the law.

22          In no place in this *Daubert* order did you ever

23   hint or state in any way that this alternative measure of

24   monies that were paid from the company to the insiders was

25   ever appropriate.  There's nothing in that.

1            So we take strong exception to the notion that we

2      lost the *Daubert* motion and, in fact, the damages measure

3      that we are suggesting is exactly what you said Mr. Martens

4      had testified to -- will testify to as being consistent with

5      the law.

6            Secondly, Your Honor, the notion that we should

7      change the verdict form I think is incorrect.  The verdict

8      form very clearly says who do you find on each of these

9      elements.  That encompasses the concept that we prevailed on

10     our claim and that they didn't prevail on their affirmative

11     defenses.  It's subsumed within the question and it doesn't

12     need to be included.

13            I think, actually, those are the two points that

14     we wanted to raise in response to Mr. Moheban's comments.

15            MR. MOHEBAN:  Your Honor, if I may just very

16     briefly?

17            THE COURT:  You may.

18            MR. MOHEBAN:  Thank you.

19            I think Mr. Marder makes my point for me.  For you

20     to rule that their damages calculation is consistent with

21     the law doesn't mean it's the only damage calculation that's

22     consistent with the law.  The jury ought to be able to hear

23     the damages presentations of both parties, and there's been

24     evidence in the record to support a variety of different

25     damages calculations.

```
1              MR. MARDER:  Nothing further on that one,
2    Your Honor.
3              THE COURT:  Okay.  Jury Instruction Number 24.
4              MR. MARDER:  Did you say 24, Your Honor?  There's
5    no objection to 24.
6              MR. MOHEBAN:  Defense has no objection.
7              THE COURT:  Jury Instruction Number 25.
8              MR. MARDER:  No objection from the plaintiff,
9    Your Honor.
10             MR. MOHEBAN:  Defense objects to Number 25 because
11   it does not make clear that the jury cannot award punitive
12   damages unless it has found BMO liable on one or more of
13   plaintiff's claims.
14             We further object to the instruction because it
15   provides no definition of "clear and convincing evidence,"
16   or if it is, it may be that they're there and it's just not
17   tied together.  It talks about clear and convincing evidence
18   at one point and then there's language that you must be --
19   "You must have a firm belief or be convinced that there's a
20   high probability that BMO acted this way."  We think that
21   the instruction could be more clear if it just said "clear
22   and convincing evidence means" and then state what the Court
23   has determined the definition is.
24             MR. MARDER:  Your Honor, we don't have a comment
25   either way on the first objection.  Obviously you don't
```

1   reach punitive damages unless there is liability found

2   first.

3           So we don't have an objection to clarify this to

4   say if you find the plaintiff -- the defendant is liable,

5   but that's already in the jury instructions -- I mean, I'm

6   sorry, in the verdict form.  I believe you only get to the

7   question of punitive damages if you found for the plaintiff.

8   So I don't think that's really necessary.

9           The other point is we think that you've already

10  stated the clear and convincing standard and that that is

11  sufficient.  It says, "You must have a firm belief or be

12  convinced there's a high probability that BMO acted this

13  way," and that is the clear and convincing standard.  So I

14  think that standard is already in there.

15          THE COURT:  Let's move to on to Jury Instruction

16  Number 26.

17          MR. MARDER:  No objection by the plaintiff,

18  Your Honor.

19          MR. MOHEBAN:  Just one moment, Your Honor.

20      (Defendant's counsel confer)

21          MR. MOHEBAN:  Your Honor, with regard to

22  Instruction Number 26, we think that the instruction should

23  make clear that these are factors to determine the amount of

24  punitive damages.  It says "to award punitive damages" or

25  "to determine the amount."

1          MR. MARDER:  Your Honor, we think that's already

2     implicit and not necessary.

3          THE COURT:  Okay.  Jury Instruction Number 27.

4          MR. MARDER:  The plaintiff has no objection to

5     Jury Instruction 27, Your Honor.

6          However, I just want to note that there were three

7     closing instructions that we asked for that did not make it

8     into the jury instructions that don't relate to a particular

9     proposed instruction that you have, but we would just like

10    to state for the record that we would object to not

11    including our Closing Instruction Numbers 68, which had to

12    do with intervening cause; 69, which had to do with

13    comparative fault; and 70, which related to no *in pari*

14    *delicto*.

15         MR. MOHEBAN:  Defendant has no objection to

16    Instruction Number 27.

17         And as we're at the last instruction, I did want

18    to make clear we have not re-asserted all of our prior

19    positions in this hearing, but we do for preservation

20    purposes re-assert them all and incorporate them into this

21    discussion.

22         THE COURT:  Understood.

23         MR. MOHEBAN:  We do have a couple of comments on

24    the verdict form.

25         THE COURT:  Let me see if there is anything else

 1    from the plaintiffs as to this matter.

 2              MR. MARDER:  Your Honor, the plaintiff does have

 3    one thing with respect to the instructions before we get to

 4    the verdict form.

 5              You haven't said how you are going to resolve this

 6    issue of willful blindness, whether you will include a

 7    willful blindness instruction or at least this compromise

 8    that we suggested.  I'm assuming you are taking that under

 9    advisement --

10              THE COURT:  I am.

11              MR. MARDER:  -- and we will hear it shortly?

12              But I just want -- just so there's no objections

13    in our closing argument, we are going to be arguing that the

14    case should be -- can be established by circumstantial

15    evidence.

16              And just as you said in the footnote here, we are

17    going to be arguing that willful blindness -- we're relying

18    on that as a mechanism for inferring knowledge as part of

19    our circumstantial case.

20              So I just don't want to draw an objection and

21    interrupt, so I thought we might want to raise that now,

22    that given what you said in the footnote here is the case

23    law, we are at least going to argue to the jury that willful

24    blindness is one of the factors they can look at to

25    determine as part of the circumstantial evidence about

1    whether they should infer knowledge.  I just wanted to raise

2    that now in the event that there was any objection over

3    that.

4         MR. MOHEBAN:  We certainly do object.  They've

5    been trying every which way to get willful blindness into

6    this case because they know they can't prove actual

7    knowledge, as is required under Minnesota law.

8         We object to any form of a willful blindness

9    instruction.  There simply is no case in the state of

10   Minnesota relating to these claims that apply willful

11   blindness as a substitute for actual knowledge.

12        MR. MARDER:  Your Honor, we're not here arguing

13   for a willful blindness instruction.  We've already argued

14   that.  All we're saying here is that when we do our closing,

15   we're going to note as part of the circumstantial evidence

16   that the defendants looked the other way when faced with

17   clear evidence of wrongdoing by PCI, and that given the case

18   law that you have already cited in the footnote on 14 is

19   clearly an appropriate argument and that's all we wanted to

20   flag here.

21        MR. MOHEBAN:  If I may, Your Honor?

22        THE COURT:  You may.

23        MR. MOHEBAN:  We have not addressed the footnotes

24   because the footnotes are not going to the jury.  The Court

25   has its own reasons for including the footnotes.

1            But we object again to any form of a willful

2      blindness as a factor to be considered for anything.

3      There's no authority in Minnesota that supports that as a

4      substitute for actual knowledge or as evidence of actual

5      knowledge.  If they had authority on that, they would have.

6      The closest they came to was the *Ariola* case, which is dicta

7      involving other types of claims and not the claims here.

8            So we believe they should not be able to make an

9      argument about willful blindness because it's inconsistent

10     with Minnesota law.

11           MR. MARDER:  And just to be clear, Your Honor,

12     once again, we've already argued the *Ariola* issue.  Now what

13     we are saying is exactly what you said in the footnote, that

14     we can infer knowledge from -- as part of the circumstantial

15     case, which you have already said in your footnote is the

16     law.  So that's all we're going to be doing in our closing

17     argument.

18           THE COURT:  Okay.  I understand your position and

19     assume that counsel for BMO understands your position and

20     that is appropriate.

21           MR. MOHEBAN:  If I may -- I don't want to belabor

22     this.  May I further speak to that?

23           THE COURT:  You may speak to it.

24           MR. MOHEBAN:  We don't think that an argument can

25     misstate the law.  And so as things stand, without having a

1    ruling on that, we would be objecting in the closing to that

2    statement.  We think that the Court needs to provide us some

3    guidance in advance of the closings.

4         MR. MARDER:  Your Honor, I think Your Honor just

5    did provide us with guidance, so we have nothing further to

6    add.

7         THE COURT:  Agreed.

8         Anything further that we need to address?

9         MR. MOHEBAN:  We have some objections as to the

10   verdict form, and we have three or four specific

11   instructions that we just want to make a record of having

12   requested.

13        THE COURT:  Okay.  Do you want to do the

14   instructions and then we'll get to the verdict form?

15        MR. MOHEBAN:  So our Closing Instruction Number 21

16   with respect to corporate knowledge, our Closing Instruction

17   Number 36 regarding MUFA and actual knowledge, our Closing

18   Instruction Number 41 involving MUFA and bad faith, and our

19   Closing Instruction Number 63 regarding substantial

20   assistance are all instructions that we wish that the Court

21   would give in this case.

22        THE COURT:  Understood.

23        MR. MARDER:  Again, Your Honor, we object to all

24   of those.  Those are ones that have already been considered

25   and rejected.  I assume counsel is doing that to preserve

1      the record, just as we did with ours, and we don't really

2      have a response other than to say that those have already

3      been rejected.

4              THE COURT:  That's what I understood.

5              Anything further?

6              MR. MOHEBAN:  With regard to the verdict form, we

7      have a couple of objections.

8              First, as I noted earlier, there is not a place

9      for the jury to provide its decision as to affirmative

10     defenses.  And without having that in the verdict form,

11     there's a concern that the jury could assess liability

12     without ever considering the affirmative defenses.

13             The overall form of the questions on the verdict

14     form are suggestive in a way that's favorable to the

15     plaintiff.  The questions are posed as "Do you find in favor

16     of plaintiff," which suggests that they should find in favor

17     of plaintiff.

18             A more neutral way to pose the same questions

19     would be, for example, with respect to Count I, which

20     alleges a violation of the MUFA, "Do you find for plaintiff

21     or defendant?"  We'd ask that it be -- the questions that

22     the jury has to answer be presented in a more neutral

23     fashion.

24             With regard to Question Number 5, we think that

25     the term "plaintiff" is inaccurate.  This is not

1    compensation to Doug Kelley, who is the plaintiff.  This is

2    to compensate PCI.

3            So it should be "What sum of money will fairly and

4    adequately compensate PCI for any harm arising" -- "for any

5    harm to PCI arising from any claim or claims on which you

6    have found in favor of plaintiff?"

7            THE COURT:  Let me make sure I'm on the same page

8    you're on.  Please direct me to where you are reading.

9            MR. MOHEBAN:  Page 3 of the special verdict form.

10    It's Question Number 5.

11            THE COURT:  Thank you.

12            MR. MOHEBAN:  And the question is:  "What sum of

13    money will fairly and adequately compensate plaintiff."  We

14    think that should be replaced with "compensate PCI."  And

15    then it should go on to say "for any harm to PCI arising

16    from any claim or claims on which you have found in favor of

17    plaintiff."

18            MR. MARDER:  Your Honor, if I could respond to

19    this point?

20            Are you done, Mr. Moheban?

21            MR. MOHEBAN:  Just one moment.

22            THE COURT:  Let's take up that one while we're on

23    it.  Okay?  And then we'll come back to your other --

24            MR. MOHEBAN:  Yes, that's fine.

25            MR. MARDER:  Let me then address the three points

1     that Mr. Moheban made.

2             The first one is that it doesn't include the

3     affirmative defenses, but these --

4             THE COURT:  No.  I really want to focus on this

5     one and then we'll come back to the other two.

6             MR. MARDER:  Oh, okay.

7             Your Honor, it is axiomatic, I think, that the

8     person who is entitled to damages in a civil case is the

9     plaintiff.  Getting into compensating PCI is a can of worms

10    for multiple reasons.

11            One is that PCI doesn't really exist anymore.

12    It's a receivership entity or an entity in bankruptcy, and

13    it is the plaintiff who is bringing this case by virtue of

14    his standing, having been appointed as a trustee of the

15    litigation trust.

16            So putting in PCI as the plaintiff I think is

17    legally inaccurate or -- I'm sorry.  So substituting "PCI"

18    for the "plaintiff" would be legally inaccurate.

19            Second of all, this is really just a backdoor

20    attempt.  Throughout this whole series of jury instructions

21    the defendants keep trying to focus on PCI because they want

22    to argue that PCI was a wrongdoer and you shouldn't

23    compensate a wrongdoer, and that's what is driving this.

24            And I think it's inappropriate because this is a

25    civil case.  The plaintiff is Mr. Kelley in his capacity as

1    the trustee, and he's the one who is entitled to

2    compensation by virtue of that capacity.

3               MR. MOHEBAN:  Your Honor, if I may?

4               THE COURT:  Yes.

5               MR. MOHEBAN:  The very first thing that

6    plaintiff's counsel did in this case was stand in front of

7    the jury in voir dire and say that Doug Kelley was not going

8    to get a dollar.  That's how this case started.

9               So PCI is the party.  PCI is the party to whom

10   you've ruled they have to show was harmed and was damaged.

11   So we are going to have the word "plaintiff" in here at the

12   end because there is a plaintiff in this case and the claims

13   are brought by the plaintiff.

14              So it does say "on claims on which you have found

15   in favor of plaintiff."  That's accurate.  But the

16   compensation is for PCI, and I think that's just consistent

17   with all the rulings that you've had in this case.  It has

18   to be harm to PCI.

19              MR. MARDER:  Your Honor, if I could just elaborate

20   on one point?  When we said that in the -- whether it was

21   the opening or the voir dire, I'm not sure, but it was

22   referring to the fact that Mr. Kelley didn't have some kind

23   of contingency where he gets some portion of the recovery in

24   this case.

25              It was very clear through his testimony and

1     throughout the entire case that the nature of our damages is

2     the amount that PCI owed to its investors and that the sums

3     will then be circulated according to the bankruptcy order

4     that's in place.

5           So once again, Your Honor, injecting this concept

6     as to who has been harmed and where the money goes is

7     completely inappropriate.  The plaintiff in this case is

8     Mr. Kelley and that's what the compensatory damage question

9     accurately states.

10          And if you look at the very first page of the

11    verdict form, it says, "Douglas Kelley, in his capacity as

12    the trustee of the BMO Litigation Trust."  It's defined for

13    the jury.  So we just don't think this is necessary.

14          And please let me know, Your Honor, when you want

15    me to address his other two points.

16          THE COURT:  Okay.  I'm ready for you to address

17    the other two points.

18          MR. MARDER:  The first point he made, Your Honor,

19    related to affirmative defenses and claiming that the

20    affirmative defenses should be added.

21          I would respectfully suggest that this form you

22    prepared is fair and does just that, because it says, "Do

23    you find in favor of plaintiff and against defendant on

24    Count I."

25          And that contemplates that the jury has done two

1   things:  Number one, that we satisfied our burden of proof

2   that there was a violation of Count I and that the elements

3   are satisfied and, two, it subsumes the concept that they

4   did not find that the defendants prevailed on their

5   affirmative defenses.  That's already subsumed within the

6   question.

7          And within the jury instructions it's very clear

8   that they're instructed that they shouldn't find in our

9   favor if they find in their favor on one of the affirmative

10  defenses.  That's already been included in the jury

11  instructions.

12         And so adding that concept into the jury form

13  would promote all kinds of confusion because then you'd have

14  to first of all say have we satisfied our affirmative

15  elements by a particular burden of proof and then you would

16  have to put in another section that says if the defendant

17  satisfied the statute of limitations and have they satisfied

18  consent by their burden of proof, and this form would become

19  quite unwieldy where you have this whole kind of decision

20  tree that the jury has to go through.

21         And I think the trend is to avoid those kinds of

22  things because they are very confusing and all they do is

23  give the -- confuse the jury.  These are written very

24  simply, and I would say they are elegantly simple.  And

25  that's all the jury needs to find, is whether they are in

1    our favor or not, as they've been instructed in the jury

2    instructions.  I think they are written neutrally.

3              MR. MOHEBAN:  May I respond to that, Your Honor?

4              THE COURT:  You may respond.

5              MR. MOHEBAN:  Thank you.  We're dealing with a

6    six-question verdict form.  It's been exceptionally simple.

7    So I don't think we're at risk of complicating things beyond

8    all measure if we made it eight instead of six to account

9    for the affirmative defenses.

10             And I think we have to put ourselves in -- we all

11   have tried cases and we understand the law and we studied

12   the law.  Our jurors -- you know, we should not expect these

13   jurors to get to the verdict form and then go -- have to

14   think back to, well, what about those affirmative defenses

15   when they've been called out -- they've been told they've

16   got six things to decide.  They've got the four claims and

17   they've got the two affirmative defenses.

18             Now all of a sudden, when they have to write their

19   answers, they only see the claims and they don't see the

20   affirmative defenses.  It makes it sound like the

21   affirmative defenses don't matter.

22             And it will be easy to -- it's a potential

23   confusion.  It's a potential problem where they overlook the

24   affirmative defenses.  It's easily solved, and it's not

25   going to create too much complexity to add two questions.

1        MR. MARDER:  Once again, Your Honor, this has

2   already been resolved by the Court.  They submitted a

3   verdict form that included all those affirmative defenses.

4   The parties submitted objections to the various verdict

5   forms, under your procedures.  Your Court -- Your Honor

6   carefully considered those and chose this already, and

7   really they are just revisiting an issue that's already been

8   resolved by the Court.  We think that these are fair and we

9   think that the Court adopted the right procedure.

10       THE COURT:  It has been resolved by the Court.

11  And in resolving this issue as I have, I considered the

12  arguments that were made before and thought about the

13  complexity of the verdict form and what would be accessible

14  and understandable and complete.  And so the verdict form

15  will stay as it is.

16       Anything further?

17       MR. MARDER:  I think just the timing of the

18  closing argument, Your Honor, that was raised earlier, how

19  long that can be.

20       MR. MOHEBAN:  Before we get to that, Your Honor,

21  we do have one or two other things that we just want to make

22  a record for preservation purposes.

23       THE COURT:  Please, you may.

24       MR. MOHEBAN:  Thank you.  So we want to preserve

25  our objection to the Court's rejection of our proposed

 1    verdict form.

 2            We also -- in light of the discussion we've had

 3    today, we want to preserve our objection -- or our request

 4    that there be a proposed instruction regarding this notion

 5    of willful blindness.  It's a proposed additional

 6    instruction in the alternative that was among the

 7    instructions that we sought to submit earlier this week.

 8            And with respect to all those instructions, we

 9    understand the Court has denied our submission of those, but

10    we want to preserve our objection to that denial, I guess.

11            And I think that covers our issues with the

12    instructions and verdict form.

13            THE COURT:  Okay.  Very well.  And I know there's

14    a question regarding -- that's pending regarding the length

15    of closings.  I will respond to that shortly after the

16    hearing.

17            MR. MARDER:  Thank you, Your Honor.

18            THE COURT:  Anything further?

19            MR. REIF:  Your Honor, I had two housekeeping

20    issues, if I may?  I am so sorry to belabor this.

21            First is just to ask whether we'll have access to

22    the courtroom ahead of time tomorrow so that we can

23    rearrange the lectern and other things.  We're envisioning a

24    setup similar to opening arguments.  And so whenever the

25    court instructs us we can do that, I think we would be

1    looking for that.

2            Then, second, we've been working with defendant's

3    counsel on some suggestions they had about redactions to

4    exhibits, and I think that we've come to an agreement.  I

5    just wanted to flag a series of plaintiff's exhibits that we

6    will be uploading to Box with R's next to them to show that

7    we have redacted them.

8            And so these are -- it's the same list of exhibits

9    that we've discussed with defendant's counsel; and if the

10   Court is okay, I would like to list them right now for the

11   record.

12           THE COURT:  (Indicating.)

13           MR. REIF:  That would be P-20, P-21, P-26, P-48,

14   P-57, P-114, P-185, P-185-A, P-189, and P-411.  So we'll

15   upload versions of those that have redactions consistent

16   with the redactions for PII that defendant suggested and

17   those will be uploaded to Box.  They will be denoted with an

18   "R" at the end.  But otherwise should be ready for the jury.

19           MS. MOMOH:  Your Honor, there was an exhibit that

20   was identified by counsel for the plaintiff that was not on

21   the e-mail that I had sent plaintiff's counsel with respect

22   to redaction.  It was Plaintiff's Exhibit 185-A.

23           I was actually in the process of sending a

24   communication to chambers providing a status update.  I

25   still intend to send an e-mail, but before any sort of

1    confirmation is sent to the Court with respect to the

2    redaction of exhibits, defendant would like the time to

3    review the redactions by plaintiff's counsel and once --

4              THE COURT:  How much time do you need?

5              MS. MOMOH:  Excuse me?

6              THE COURT:  How much time do you need?

7              MS. MOMOH:  In the communication I was going to

8    send to chambers, I was going to suggest by the end of the

9    day today that we go through the exhibits and confirm that

10   the redactions that we have identified and proposed to be

11   done actually have been done.  And so we would send the

12   communication by this evening yet or at the latest tomorrow

13   morning by 7:00 a.m.

14             THE COURT:  Let's do it this evening.

15             MS. MOMOH:  Sure, Your Honor.

16             THE COURT:  Let's plan on 6:00 p.m.

17             MS. MOMOH:  Yes, Your Honor.

18             MR. REIF:  Nothing further.  Thank you, Your

19   Honor.

20             MS. MOMOH:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22             MS. MOMOH:  Your Honor, again, I do want to look

23   back at our records with respect to Exhibit 185-A because

24   again, that was not on our list.  I also want to make sure

25   that that is an admitted exhibit.

1          So we'll put all of the information in the

2     communication to chambers with respect to resolution of this

3     issue.

4          THE COURT:  Thank you very much.

5          MS. MOMOH:  Thank you, Your Honor.

6          THE COURT:  Is there anything else?

7          MR. MOHEBAN:  We just want to know what time we

8     should be here tomorrow.

9          THE COURT:  That's a cold call.

10     (The Court and law clerk confer)

11          THE COURT:  In light of it being a cold call, as

12     identified by the Court, what I would propose to do is

13     sending you a text that gives you the information.  And it

14     will be given to you before the end of the business day

15     today so you will have plenty of time to plan, but that

16     prevents me from being overly aggressive and giving you a

17     reasonable hour to arrive and be prepared to move forward.

18          MR. SCHAPER:  Your Honor, perhaps a last

19     housekeeping item.  We suggested to plaintiff's counsel

20     that, as we've done the evening before other court days,

21     that we exchange slides, demonstratives to be used in the

22     closing at 7:00 p.m. today and let the Court know of any

23     objections at 7:00 a.m. tomorrow, consistent with practice.

24          I understand Mr. Marder has been busy, so hasn't

25     yet sort of gotten back to us, but I just wanted to raise

1    that with the Court.  Hopefully we will be able to work that

2    out and we'll just go that way, but I didn't want to be

3    raising it for the first time with the Court, you know, by

4    e-mail or something if we don't have an agreement.

5            MR. MARDER:  Your Honor, I have had a chance to

6    think about this.  Closing slides are not like opening

7    slides.  With opening slides you're not allowed to argue

8    because it's an opening statement.  This is closing

9    argument.

10           And it seems to me that there's no need to

11   exchange the slides, that we know -- the parties all know

12   their obligation is to only refer to the evidence, and if

13   that -- if it comes up in the context of the argument that

14   we're not referring to the evidence or referring to some

15   exhibit that was objected to and not put into evidence, they

16   can object at that time.  We don't intend to refer to any

17   evidence that's not been admitted into the court.

18           And so this being closing argument, we don't want

19   to obviously tip our hand.  This is an advocacy process and

20   don't think it's necessary for the parties to exchange and

21   comment on each other's slides.  It's closing argument.

22           So I think -- having considered it, I think we

23   would object to the notion of having to exchange our slides,

24   but obviously we defer to the Court's guidance on that.

25           MR. SCHAPER:  Your Honor, I think the

1  demonstratives were handled the same way; those were

2  exchanged beforehand.  There were numerous instances, the

3  Court knows, where one side or the other thought something

4  was inaccurate or misleading and objections were made and

5  ruled upon in advance so that witness examinations, for

6  example, proceeded more smoothly.

7         I don't think it benefits either party, the Court,

8  or the jury for tomorrow's closings to be littered with

9  objections that could have been resolved in advance.  Plus,

10 I think there's some prejudice to only having an objection

11 dealt with when something is up on the screen if one side or

12 the other feels that it's objectionable.

13         So we think that, consistent with the practice so

14 far in the case, including before the openings, that we

15 should follow the same procedure in advance of the closings.

16         MR. MARDER:  I just respond by saying that closing

17 slides are inherently different.  They're not like opening

18 slides where you can't argue and they're not like when a

19 witness is testifying where you have a demonstrative in

20 front of the jury.

21         This is our opportunity to be advocates and we're

22 going to be advocating in the slides.  I can't think of an

23 instance in the last ten years trying cases where I've had

24 to exchange the closing slides.

25         We would prefer not to, but, again, we defer to

1   you, Your Honor.

2           THE COURT:  And I have to hearken back to my own

3   experience as a litigator, and I respect the lawyers in this

4   case and respect you all to be playing in bounds and not out

5   of bounds.  And zealous advocacy is appropriate and a

6   preview of slides is not necessary.  And so it is with that

7   that I will not be ruling on exchanging slides.

8           Everyone knows what's appropriate and what's not.

9   Everybody knows what evidence has been admitted and what has

10  not been admitted.  And I expect you to comply with the

11  Court's orders and the rules of the Court.  Okay?

12          Anything further?

13          MR. MARDER:  Not from the plaintiff, Your Honor.

14          MR. MOHEBAN:  No, Your Honor.

15          THE COURT:  Good evening.  We are in recess.

16      (Court adjourned at 2:56 p.m.)

17                       *     *     *

18          We, Lori A. Simpson and Erin D. Drost, certify that
    the foregoing is a correct transcript from the record of
19  proceedings in the above-entitled matter.

20          Certified by:  *s/ Lori A. Simpson*
                           Lori A. Simpson, RMR, CRR
21
            Certified by:  *s/ Erin D. Drost*
22                         Erin D. Drost, RMR, CRR

23

24

25