1               UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3    -----------------------------------------------------------
                          )
    Douglas A. Kelley, in his    )   File No. 19-cv-1756
4    capacity as the Trustee of the  )       (WMW)
    BMO Litigation Trust,        )
5                          )
           Plaintiff,      )   St. Paul, Minnesota
6                         )   November 4, 2022
    vs.                    )   8:37 a.m.
7                         )
    BMO Harris Bank N.A., as     )
8    successor to M&I Marshall and   )
    Ilsley Bank,            )
9                          )
           Defendant.      )
10   -----------------------------------------------------------

11

12

13       BEFORE THE HONORABLE WILHELMINA M. WRIGHT
          UNITED STATES DISTRICT COURT JUDGE
14
        **(JURY TRIAL PROCEEDINGS - VOLUME XV)**
15

16

17

18

19

20

21

22

23

24
     Proceedings reported by certified court reporter;
25   transcript produced with computer.

```
 1     APPEARANCES:
          For the Plaintiff:        Robins Kaplan, LLP
 2                                   MICHAEL A. COLLYARD, ESQ.
                                     DAVID E. MARDER, ESQ.
 3                                   PETER C. IHRIG, ESQ.
                                     MORGIA D. HOLMES, ESQ.
 4                                   MICHAEL D. REIF, ESQ.
                                     800 LaSalle Avenue
 5                                   Suite 2800
                                     Minneapolis, Minnesota 55402
 6
                                     Anthony, Ostlund, Louwagie,
 7                                   Dressen, Boylan, P.A.
                                     JOSEPH W. ANTHONY, ESQ.
 8                                   JOSEPH R. RICHIE, ESQ.
                                     RYAN M. LAWRENCE, ESQ.
 9                                   90 South Seventh Street
                                     Suite 3600
10                                   Minneapolis, Minnesota 55402

11       For the Defendant:         Stinson, LLP
                                     KEITH S. MOHEBAN, ESQ.
12                                   ADINE S. MOMOH, ESQ.
                                     50 South Sixth Street
13                                   Suite 2600
                                     Minneapolis, Minnesota 55402
14
                                     Debevoise & Plimpton, LLP
15                                   JOHN GLEESON, ESQ.
                                     MICHAEL SCHAPER, ESQ.
16                                   SUSAN REAGAN GITTES, ESQ.
                                     MORGAN A. DAVIS, ESQ.
17                                   919 Third Avenue
                                     New York, New York 10022
18
                                     Mayer Brown, LLP
19                                   JOSHUA D. YOUNT, ESQ.
                                     71 South Wacker Drive
20                                   Chicago, Illinois 60606

21                                   Mayer Brown, LLP
                                     RICHARD A. SPEHR, ESQ.
22                                   GINA PARLOVECCHIO, ESQ.
                                     1221 Avenue of the Americas
23                                   New York, New York 10020

24       Court Reporter:            LORI A. SIMPSON, RMR-CRR
                                     316 North Robert Street
25                                   St. Paul, Minnesota 55101
```

1                          **I N D E X**

2                                                              PAGE

3    DEFENDANT RESTS                                           3682
     CLOSING ARGUMENT BY MR. GLEESON                           3682
4    CLOSING ARGUMENT BY MR. COLLYARD                          3726
     JURY CHARGE                                               3780

DEFENDANT RESTS — 3682
CLOSING ARGUMENT BY MR. GLEESON — 3682
CLOSING ARGUMENT BY MR. COLLYARD — 3726
JURY CHARGE — 3780

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(JURY PRESENT)**

1

2

3

4          THE COURT:  Counsel, are we ready to proceed?

5          MR. GLEESON:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. GLEESON:  Good morning, Ladies and Gentlemen.

8          THE COURT:  Counsel.

9          MR. GLEESON:  Judge, we haven't formally rested

10    our case.

11          THE COURT:  That was just about what I was to ask.

12          MR. GLEESON:  The defense rests its case.

13          THE COURT:  Thank you, Counsel.

14          MR. GLEESON:  Thank you, Judge.

15          THE COURT:  You may proceed with closing

16    arguments.

17          MR. GLEESON:  Thank you.

18          Good morning again.  When I spoke to you during

19    our opening statement three weeks ago, I told you you'd hear

20    from the hardworking people at M&I Bank, the employees who

21    were engaged in the events that this trial was all about.

22    You did hear from them.  Here are some of them on the

23    screen.

24          You heard from each of them.  They did their jobs

25    honorably.  They did them well.  They were dedicated to

1    their jobs.  They made decisions based on information that

2    they had before them at the time.

3           You heard about their shock when they first heard

4    the news that PCI was a massive Ponzi scheme and Tom Petters

5    was a massive fraud.  You heard that none of them got a

6    single benefit, no cars or bribes or anything.

7           And you heard that if they had actually done what

8    the plaintiff in this case claims that they did, they would

9    have lost their jobs, disgraced their families, put their

10   own liberty at risk, gone to prison perhaps.

11          And I asked you then to consider them and their

12   actions during the time in which they acted, 14 to 20 years

13   ago, and to put yourself in their shoes back then before

14   Deanna Coleman went to the FBI and told the FBI what PCI

15   really was; before Mr. Martens and all of his accountants at

16   PwC dug through 560,000 boxes of data; back when Tom Petters

17   was still a respected, highly respected, prominent

18   businessman presiding over an empire; back when he was a

19   pillar of this community, photographed alongside celebrities

20   and politicians, on the cover of his own magazines like

21   Oprah.

22          We also told you that you would hear from Deanna

23   Coleman herself, who would testify that no one at M&I Bank

24   even suspected, let alone knew, that PCI was a Ponzi scheme.

25   And Ms. Coleman told you about the lies that she and Petters

1    and Bob White and others told to keep M&I and the rest of

2    the world in the dark about PCI being the Ponzi scheme that

3    it was.

4            In short, we've let the people who worked at M&I

5    Bank speak for themselves.  That's what trials are all

6    about.

7            We also brought in people from PCI itself, Deanna

8    Coleman, Sandy Indahl, to tell you about what they knew and

9    saw and believed at the time.

10           And I submit to you -- you're the finders of fact.

11   You'll find the facts based on the evidence before you.  I

12   submit to you that you'll conclude that plaintiff hasn't

13   shown even a whisper of the kind of evidence that you should

14   have expected to see in this trial if they knew or even

15   suspected that PCI was the Ponzi scheme that it was.

16           I have 75 minutes before you this morning, and let

17   me tell you how I plan to spend it.  I want to walk through

18   the specific things that the plaintiff has to prove and why

19   the evidence that you've heard has failed to prove them.

20           You are going to get the law from Judge Wright,

21   not from us.  She will explain each of the four claims and

22   each of the elements, as we call them, of the claims in

23   detail.  And, as I say, you'll take the law from her.

24           But at a high level, plaintiff has to prove

25   knowledge of the fraud or for one of the claims you'll hear

1    about bad faith.  He has to prove that M&I Bank actually

2    took some kind of wrongful action.  And, third, he has to

3    prove that any such wrongful action actually caused harm to

4    PCI.  These are all very important principles.  I'm going to

5    cover all of them.

6            At the end of my remarks I'm going to walk through

7    the verdict form that Judge Wright will give you at the

8    outset of your deliberations and explain why Mr. Kelley has

9    not proven the things he needs to prove in order to succeed

10   on any of his claims.

11           So for the first requirement you'll hear from the

12   Court that Mr. Kelley has to prove knowledge of the fraud or

13   bad faith.  More about bad faith in just a moment.  It

14   requires dishonesty.  It's so important for you to have seen

15   the witnesses and sized them up.  That's what trials are all

16   about.  You get to see them, listen to them.

17           And bad faith requires dishonesty.  You are going

18   to be instructed that if the M&I employees acted honestly,

19   even if you conclude their actions were negligent, that

20   cannot be bad faith under the law and it certainly can't be

21   actual knowledge.

22           You're also going to be instructed that

23   corporations, any corporation -- M&I is no exception -- acts

24   through its employees.  So you should expect to have seen,

25   and you didn't, real evidence that an individual employee at

1    M&I Bank actually had knowledge of the fraud or acted in bad

2    faith.

3            Importantly, Mr. Kelley himself, who as you recall

4    testified, answered the knowledge question for you already.

5    After he sat through much of this trial, after he watched,

6    as you did, the testimony of those AML witnesses, those AML

7    analysts, and the M&I bankers, he took the stand and

8    admitted to you that he's not claiming that anyone at M&I

9    Bank had knowledge of the fraud.

10           Here's his testimony in response to his own

11   lawyer's question:

12      "And whether they testified or not, are you claiming

13   that any M&I Bank employees took a bribe or was a

14   participant -- who knew that there was a Ponzi scheme that

15   was going on?"

16      Answer:  "No."

17           In a very important way Mr. Kelley's answer to

18   that question tells you just about everything you need to

19   know to decide this case.

20           But the answer raises another question.  What

21   exactly is he claiming M&I did?  And you got that from his

22   questioning by his counsel as well.  "What did BMO do or

23   didn't do in general terms that you think caused losses to

24   PCI?"  Mr. Kelley didn't say that M&I knew or acted

25   dishonestly.  He gave only a "should have."  He said, "I

1      think they should have investigated much more fully."

2              And that was also the theme.  You'll recall this,

3      I'm sure, of their cross-examination of our AML expert,

4      Charles Grice.  Plaintiff's counsel suggested that the AML

5      analysts you met were just lazy or sloppy when they went

6      about reviewing the many AML alerts you heard about, in

7      other words, that they were negligent.

8              Those M&I employees were not lazy.  You saw that.

9      I have no doubt you'll conclude that.  They were not sloppy.

10     They did precisely what they were supposed to do under the

11     policies in place at the time with the information that was

12     available to them at the time they did their jobs.

13             But here's the thing.  Here's a very important

14     thing.  Even if you agree with Mr. Kelley's lawyers that M&I

15     employees should have investigated more fully or could have

16     figured out the fraud, that is not knowledge and that is not

17     bad faith.  And that's the insurmountable problem for

18     plaintiffs in this case.  He has to prove knowledge or bad

19     faith.  That's what the Court will instruct you the law

20     requires.

21             We have no doubt that plaintiff's counsel will go

22     to great lengths to try to walk back Mr. Kelley's own

23     testimony.  Don't let them.  That testimony is clear as day.

24     You saw and heard it for yourself.  Don't let his lawyers

25     try to twist it into something different than what he told

1    you directly.

2            We expect you'll hear a lot, as you did during the

3    trial, about so-called "willful blindness."  They'll

4    probably show a slide from the AML presentations that you

5    saw frequently during the trial that references "willful

6    blindness."

7            This point should be obvious, but I'm going to

8    make it as clear as I can.  Those AML policy trainings are

9    not the law.  The Court will instruct you that the plaintiff

10   has to prove that M&I Bank, that one of its employees knew

11   about the fraud to satisfy this knowledge element of these

12   claims.  The Court will not use the phrase "willful

13   blindness."

14           Mr. Kelley's lawyers are going to shade that

15   testimony, that very critical testimony, that was compelled

16   by the testimony you and he saw of those AML witnesses and

17   those AML bankers.  Don't let them do that.

18           Of course you're going to hear a lot in the

19   plaintiff's summation after I speak to you this morning

20   about red flags, these so-called red flags.  We disagree

21   that any of those things, which I'm going to go through with

22   you in a moment, actually generated any real suspicion based

23   on what the M&I employees knew at the time.

24           But, again, even if Mr. Kelley is right about

25   these red flags, the most that gets them, even if they can

1     prove them, and I'm going to demonstrate to you -- I'm going

2     to show to you what the evidence really showed about those

3     so-called red flags.  Even if they showed to you that the

4     M&I employees should have done something differently, that

5     doesn't do it.  Negligence is not the standard here.

6     Plaintiff is seeking $1.9 billion because of complicity in a

7     Ponzi scheme.

8          Let's start with the retailer payments.  You heard

9     a lot about them in the case, that plaintiffs focused on the

10    fact that retailers like Sam's Club and Costco weren't

11    making payments directly into the PCI account.

12         But there's no evidence that anyone at M&I Bank

13    understood that was supposed to be happening at the time.

14    There's also no evidence that even if they had known that

15    was supposed to be happening, that that would -- that an

16    awareness that it wasn't happening would mean they were

17    aware of the fraud.

18         Here are the two documents that plaintiffs point

19    to in this regard about the retailer payments.  They both

20    relate to the Opportunity Finance matter that never got off

21    the ground back in 2003.  They both reference payments from

22    retailers.  But neither one says anything about those

23    retailer payments being made directly into PCI's account as

24    opposed through other entities.

25         And anyway, Mr. Jambor testified that he didn't

1   even know who was making payments into the account.  That

2   was not information that regularly came across his desk.

3   There was no evidence that any AML analyst would have had

4   any access to these e-mails.

5        When asked whether she could recall -- we called

6   Deanna Coleman.  When asked whether she could ever recall

7   discussing with Mr. Jambor whether retailer payments would

8   be made directly into the account, Deanna Coleman said, "Not

9   that I recall."

10        You may remember that after Ms. Coleman's

11   testimony plaintiff's counsel claimed, when examining other

12   witnesses, that she told Mr. Jambor about the retailer

13   payments.  But that's the opposite of what she said.

14        The question I expect that plaintiff will point to

15   is on the screen.  You see it there.  But look at what comes

16   directly after that.  Plaintiff's counsel asked Ms. Coleman

17   to explain and she said, "I told M&I Bank or Shari," meaning

18   Shari Rhode, Ed Jambor's boss, "Shari and Ed that we

19   couldn't do that because we could not have the retailers

20   send the money directly to M&I Bank."

21        Ms. Coleman confirmed later in her testimony that

22   Ed Jambor didn't look at who was wiring funds into the

23   account; and that if he had asked questions about direct

24   payments from big-box retailers, she would have lied to keep

25   the scheme going.

 1              If plaintiff's counsel tries to tell you that this

 2       testimony helps his case, think about this.  Plaintiffs

 3       chose not to call Deanna Coleman.  She began cooperating

 4       with Mr. Kelley's lawyers back in 2008, immediately after

 5       she went to the FBI.  She cooperated with them.

 6              They did not call -- Mr. Kelley's lawyers did not

 7       call her because they knew she would not help their case.

 8       We called her as a witness because we wanted you to hear

 9       directly from the insider who cooperated all the facts that

10       make clear that no one at M&I Bank knew about the fraud.

11              And remember Ms. Coleman also testified that she

12       never observed anything that made her think Ed Jambor or

13       Chris Flynn or anyone at M&I Bank were even suspicious, let

14       alone knowledgeable, about the fraud.  She answered nothing

15       to all three of those questions.  The very last thing that

16       the plaintiff's lawyers wanted you to hear from -- wanted

17       you to hear was Deanna Coleman's testimony.

18              Plaintiff's whole theory of this case is premised

19       on -- the transaction data in this case is premised on a

20       fundamentally false assumption that the scheme was simple.

21       Remember that's what you got told in the plaintiff's opening

22       statement, that the scheme worked like this (indicating).

23              They want you to think it was that simple because

24       that enables them to argue that the bank should have figured

25       it out, even though "should have" is not part of this case

1     and doesn't get them where they need to go.

2            But during the trial their own expert,

3     Mr. Martens, showed us just how one aspect of the scheme

4     really worked.  Look at this diagram.  This isn't even the

5     whole scheme.  It shows that PCI was never going to pay

6     directly for goods from its account at M&I Bank.  The money

7     would go through these -- remember this -- these SPEs,

8     special purpose entities, that you heard about.  This

9     diagram leaves no doubt that Petters' scheme was much more

10    complicated than the plaintiffs wanted you to believe.

11           Remember when Mr. Martens wrote his report in

12    2010.  He wrote that, "The sheer complexity of the Petters

13    Ponzi scheme is staggering, involving dozens of Petters

14    entities and hundreds of bank accounts."

15           Plaintiffs spent a lot of time talking about

16    Nationwide and Enchanted.  You recall those.  The claim from

17    the plaintiff was that M&I Bank somehow knew that Nationwide

18    and Enchanted were supposed to be wholesalers.  Then they

19    claim that those companies making payment into the account

20    must have tipped the M&I bankers or AML analysts off to the

21    fraud.  That's wrong for multiple reasons.

22           First, M&I employees didn't even understand what

23    Nationwide and Enchanted were, let alone that they were

24    supposed to be wholesalers.

25           Second, there was no reason for the AML analysts

1    to do research to try to figure out what Nationwide and

2    Enchanted were.  As Mr. Grice told you, at the time there

3    was no such thing as KYCC, "know your customer's customer."

4         And then their expert, Ms. Ghiglieri, couldn't

5    point to any evidence that anyone at M&I actually knew

6    about Nationwide and Enchanted.  All she had was the PwC

7    report.

8         This is critical testimony.  Plaintiff's own

9    expert had to rely on information that came out after the

10   two thousand -- September 2008 raid of Petters' offices.

11   She had to rely on that PwC report.  Why would the M&I

12   employees be any different than her?  The evidence shows

13   that they weren't.

14        The plaintiff is likely to emphasize that the M&I

15   Bank had transaction data from the account.  Of course they

16   had transaction data from the account.  But you heard Mary

17   Pesch's testimony.  In October of 2008, after the arrest,

18   after the news reports about Nationwide and Enchanted and

19   Metro Gem, she was finally able -- you know, a little window

20   in that vignette, right?  The scheme is revealed.  What does

21   M&I Bank do?

22        Mary Pesch, who you heard, you heard testify,

23   immediately went back and looked in to see to look for

24   clues, armed with information that nobody had about

25   Nationwide, Enchanted, and Metro Gem.

1              She was able to put together these -- this diagram

2       (indicating) at the time.  She could only do that after she

3       learned about those companies by reading news reports that

4       allowed her to piece together how the scheme operated.

5              And even if an M&I employee had known that

6       Nationwide and Enchanted were supposed to be wholesalers,

7       that wouldn't mean that PCI would have been revealed to them

8       as a fraud.

9              As Mr. Grice, our expert, showed you, instead of

10      paying directly into the PCI account, the retailers could

11      have been transacting with Nationwide and Enchanted, who

12      would have sent the money to PCI.

13             And do you know what?  You're forgiven if you

14      don't remember this.  A lot of witnesses in the trial.

15      That's exactly -- the payments to Nationwide and Enchanted

16      by retailers is exactly what Bob White told Sandy Indahl.

17      Do you remember her?  She was PCI's own in-house accountant.

18             She testified here that she was told by Bob White

19      that the retailer payments were being made to Nationwide and

20      Enchanted.  Even she, the insider accountant at PCI, didn't

21      understand, didn't know from that fact that there was some

22      kind of problem.  Even she was fooled.

23             Frank Vennes.  Plaintiff's counsel kept saying

24      that M&I's AML analysts knew that Frank Vennes was a

25      convicted money launderer and that PCI was doing business

1  with him.  This is such a distortion of the facts that are

2  now before you.

3          As you heard, back in 2002, five years before

4  Chris Flynn took over the PCI account, he met with Vennes

5  because Vennes wanted a loan from M&I so he could invest.

6  Here's the MIContacts memo that Chris wrote about the

7  meeting with Vennes.  There's nothing in here about Vennes's

8  conviction being for money laundering.  There's no evidence

9  that any AML analyst knew about this memo at all or that it

10  was even linked to the PCI account.  It says, "Metro Gem" at

11  the top.

12          Here's the most important thing you need to

13  remember about this.  Chris Flynn and M&I Bank decided not

14  to do business with Frank Vennes precisely because of his

15  felony conviction.  Talk about heads I win, tails you lose.

16  It's another example of the bank doing exactly the right

17  thing.

18          Just imagine what the arguments would be if they

19  had made the loan to Frank Vennes.  There were two choices,

20  you make the loan to him or you don't because he's a

21  convicted felon.  They made the right choice and now that's

22  twisted into something sinister.  It's not right.  It's not

23  fair.

24          And then there's this laundry list of supposed red

25  flags I told you I'd get into -- and I will -- that the

 1     plaintiff's AML expert, Ms. Ghiglieri, claimed should have

 2     prompted more inquiry.  Again, it bears repetition, "should

 3     have" is not enough no matter what.  It doesn't come close

 4     to the knowledge or bad faith that the plaintiff has to

 5     prove in this case.  But Ms. Ghiglieri's red flags were not

 6     red flags at all.  Let's walk through them quickly.

 7             You heard a lot about the billions of dollars that

 8     flowed in and out of the account over the years.  That's

 9     right, lots of money went through the account.  And AML

10     analysts could see that.  We don't shy away from that.

11             But, as you heard, those analysts believed, based

12     on the research and information they had at the time, that

13     they did at the time and information they had at the time,

14     that PCI was part of a group of about 20 companies.  They

15     saw Petters on the cover of magazines.

16             Why would they be surprised that lots of money was

17     moving in and out of an account used by a business that said

18     it bought and sold large numbers and amounts of electronics

19     on a huge scale?

20             Now, plaintiff's counsel pointed out that PCI was

21     not formally the parent company for all of Petters other

22     companies.  But so what?  Mr. Grice explained that from an

23     AML perspective that didn't matter because Petters owned all

24     of them.  Petters' counsel themselves referred to Petters'

25     companies as his empire.

1           Plaintiff pointed to the 39 Searchspace alerts.

2    As we told you in the opening, as Mr. Grice told you in his

3    testimony, as the AML analysts told you, alerts don't mean

4    suspicious activity.  An alert is just that, it's an alert,

5    an opportunity to review that activity.

6           And every single alert was reviewed regardless of

7    its score in Searchspace, and that was in line with M&I's

8    policies and the industry standards at the time.  All of the

9    decisions to close those alerts included a statement in the

10   comments about why the activity was not suspicious.  That's

11   what was required.  That's what happened.  You saw those

12   dedicated AML analysts for yourselves.

13          We have examples here.  Analyst explained that the

14   activity appears consistent and expected for this customer

15   and type of business.  That's exactly in line with what they

16   were trained to do, what they were trained to look for when

17   an alert happened.

18          Mr. Grice explained that this level of detail is

19   perfectly appropriate given industry custom and practice at

20   the time.

21          Plaintiff complains that these notes weren't

22   detailed enough for his lawyers, but, you know, think about

23   the hindsight bias that inheres in that.  The intended

24   audience for these comments when they were written back in

25   2005 and 2008 was not plaintiff's lawyers a decade and a

1    half later.  It was someone else in the AML Group or perhaps

2    a regulator coming in around that time to evaluate the

3    soundness of the AML program.

4            There's no evidence that any of the actual

5    audience, the important audience of these notes, found them

6    lacking or concluded they were inadequate in any way.

7            One of the things you heard in the trial, and I'll

8    bet you hear it again in summation by my adversary, is that

9    the AML analysts needed to determine the lawful purpose of

10   each PCI transaction.  Be very careful with that.  It twists

11   the standard.

12           The AML trainings say that the analysts -- they

13   don't say that they're required to investigate for a lawful

14   purpose.  They're supposed to look for transactions that

15   appeared unlawful.  That's a big difference.  They are AML

16   analysts.  They look for what's apparently unlawful.

17   They're not required or expected to investigate for a lawful

18   purpose for every transaction.  Nothing appeared unlawful in

19   these transactions at the time.

20           You heard a lot about how there were similar

21   amounts of money moving in and out of the account.  As

22   Mr. Grice told you, similar amounts of money moving in and

23   out of a checking account just isn't suspicious.

24           You heard Kelley Maltsch.  She explained to you

25   that this was consistent with what any sophisticated

1    business would do.  They don't hold on to their money in

2    checking accounts.  They use checking accounts for business

3    purposes.  Here that was supposed to be buying and selling

4    large quantities of electronics.

5           Think about your own checking accounts.  Roughly

6    equal amounts of money go in and out each month.  That's not

7    suspicious activity.

8           As you heard, high amounts were consistently --

9    this is the key fact -- high amounts were consistently

10   moving in and out of the account.  As Mr. Grice explained to

11   you, consistent activity is the opposite of what AML

12   analysts were trained to focus on at the time.

13          The same is true with this claim that round number

14   transactions were some kind of red flag.  Mr. Grice and

15   Mandy Ramlow both explained to you that from a regulatory

16   perspective, the round number issue was related to cash, not

17   wires or checks.  It was about individuals with large

18   amounts of cash in round numbers, and that was just not an

19   issue in the PCI account.

20          The next red flag were these supposed overdrafts

21   that Ms. Ghiglieri said became loans.  She highlighted seven

22   transactions over six-plus years.  And as Jeanne Crain,

23   formerly the manager of business banking at M&I, now the CEO

24   of Bremer Bank, explained, these weren't overdrafts even,

25   let alone loans.  Under bank policy or under the law, they

1    were all covered by midnight or the following day.

2           We also saw the large checks written to Coleman

3    and White.  But there's nothing wrong with a business paying

4    money, even lots of money, to its employees from a general

5    business checking account like this one.  It's the

6    business's money.  There's nothing wrong with that.  Again,

7    Charles Grice told you that as well.

8           The one time any question about these checks came

9    up was with Mr. Jambor, and he got a call from someone in

10   operations.  Two checks written close in time to one another

11   by Deanna Coleman to Deanna Coleman.  What's up with this?

12   Again, he did exactly the right thing.  He called the owner

13   of the company.  He called Tom Petters, the other signatory

14   on the account, to verify the checks were okay.  He reported

15   that back to operations.  What Tom Petters told him is, yes,

16   they're okay.  These are bonus checks.

17          It's not either their responsibility or even their

18   job, it's not even appropriate to inquire into that once

19   those checks were given the imprimatur by the owner of the

20   company.

21          We also heard about this letter that Mr. Jambor

22   received.  This is supposed to be a red flag?  It's a letter

23   from a stranger asking for private information about Ed

24   Jambor's customer, claims to have authority to -- for Jambor

25   to disclose PCI's confidential business information to this

1       stranger.  Of course he didn't do that.  He did exactly the

2       right thing.  He e-mailed a copy of the letter to his

3       customer.  Once again, the exact right conduct is twisted

4       into something sinister.  It's not right.  It's not fair.

5               Finally, you heard a lot about how Mr. Petters

6       might have bought a yacht.  Here again, Mandy Ramlow did

7       exactly the right thing.  She looked into it.  She

8       documented the information she found out about that firm

9       that the payment went to.

10              Even assuming it was to purchase a yacht, there's

11      nothing suspicious about a rich person who presides over the

12      empire Tom Petters presided over to use his money to buy a

13      yacht, assuming that happened.

14              Nothing suspicious about buying real estate or

15      building a home.  None of these red flags was suspicious in

16      the parlance of an AML analyst at all.

17              I'm sure plaintiff is going to try to tell you

18      that these red flags mean that knowledge has been proven

19      through circumstantial evidence.  Don't be fooled by that.

20      We told you in our opening to look for, because you would

21      not see them, indicia, circumstantial evidence of the sort

22      you should expect to see if these allegations were true.

23              You heard from Mr. Grice about this.  Someone in a

24      Ponzi scheme, someone who is participating in a Ponzi

25      scheme, you'd expect to see them trying to hide the scheme,

1    right?  Keep it to themselves.  Don't want other people in

2    the bank knowing that you're part of a Ponzi scheme.  You

3    saw the opposite of that here.

4              Here are a few examples you heard about during the

5    trial.  Far from trying to avoid other people's knowledge

6    about PCI, at every turn M&I business bankers took steps

7    that would actually have resulted in the bank getting more

8    information about PCI's business, getting more people at the

9    bank involved in the PCI account, proposing trust accounts,

10   trying to cross-sell loans -- cross-selling, again, every

11   banker does it in every bank in the United States and that's

12   twisted into something sinister -- bring other employees

13   into the customer relationship.  Ed Jambor and Chris Flynn

14   did everything the opposite from the circumstantial evidence

15   you should be looking for.

16             You know from Deanna Coleman that PCI couldn't

17   take Ed and Chris up on any of these offers or the other

18   bankers they brought with them to visit Petters because, as

19   she told you, providing more information could have exposed

20   the fraud at PCI.  If they knew about the fraud and wanted

21   to keep it a secret, why would they have done these things?

22             As you think about the evidence that the plaintiff

23   has presented, the kind of "should haves," "could haves,"

24   weren't precluded from learning -- remember during my

25   opening statement we talked about how plaintiff's case is

1    kind of like someone who reads the last chapter of the true

2    crime book, sees that Petters is the fraud, and then goes

3    back through and combs the evidence for signals.

4           Hindsight bias has been a theme throughout this

5    trial.  Ms. Ghiglieri's opinions were completely infected

6    with hindsight bias.  You may remember this from the

7    cross-examination.  Here's all the information she had.  I'm

8    not going to list it all.  You see it.  It's all the

9    information she had and she relied upon for her opinions

10   that M&I Bank didn't have at the time.

11          And, remember, every year the Federal Reserve

12   reviewed M&I's policies and how they were implemented,

13   including -- and this is important -- including the actual

14   wire transfer data.  The Federal Reserve reviewed that

15   information every year.

16          You're going to hear from Judge Wright that you

17   can consider that evidence in assessing the credibility and

18   the accuracy of both Mr. Grice's testimony and

19   Ms. Ghiglieri's testimony.

20          In all but 2003, as you see from this chart, the

21   fed found the program to be adequate or satisfactory.

22   There's improvement after 2003.

23          Here's another thing.  We absolutely own that

24   CEO's video.  Compliance culture is from the top down.  Just

25   imagine what they would be arguing if there weren't a

1    message from the CEO that we care a lot about AML, we care a

2    lot about doing it right.  That's our evidence.  We own that

3    evidence.  We're proud of that evidence.  It produces people

4    like the AML folks you saw in this trial.

5         Every year you saw this progression of fed

6    analyses of the AML program, and somehow Ms. Ghiglieri

7    concluded that the same programs were not just flawed, but

8    severely flawed, she said.

9         And when you're thinking about how to weigh these

10   conflicting experts' testimony, remember that what they told

11   you about their history as experts.  Ms. Ghiglieri only

12   testifies against banks, never for them.  Mr. Grice has

13   testified both for and against banks.

14        And here's the really important part.  Mr. Grice

15   has turned down assignments when he was not comfortable with

16   the opinion he was retained to provide.  There's no evidence

17   Ms. Ghiglieri has ever done that.  As she told you -- you

18   see her testimony right here -- she has never once

19   determined as an expert that a bank's AML program was

20   adequate.

21        Let me turn now to the second thing that

22   Mr. Kelley has to prove that I mentioned to you at the

23   outset.  Even if he could show that M&I Bank employees knew

24   PCI was a fraud, which he can't, which he hasn't, he says

25   that they didn't know.

1            He still has to prove that the M&I Bank employees

2       actually did something, acting with knowledge or bad faith,

3       that they actually took some action to help the scheme

4       succeed.  And the evidence has proved no such thing.

5            Instead, what the plaintiff relies on are things

6       M&I Bank didn't do, right?  The "should haves," "could

7       haves," you weren't precluded from finding out.  That's not

8       action.  That's not what the law requires Mr. Kelley to

9       prove.

10           He claims that M&I employees gave PCI special

11      treatment.  There's no evidence of that.  They gave PCI good

12      customer service, the same kind of service they gave to all

13      their business banking and commercial banking customers.

14      That's not an affirmative step to assist a fraud.

15           Mr. Jambor sent a letter to the board of directors

16      of Polaroid.  That's not special treatment.  Everything he

17      said in that letter was true.  It's another instance of

18      perfectly legitimate conduct.  Good standing letters are

19      routine in the banking industry.  Mr. Grice told you that.

20      And Deanna Coleman certainly didn't think it was some kind

21      of favor.  Nothing wrong with that letter.  Not special

22      treatment.

23           The Deposit Account Agreements were not special

24      accommodations for PCI.  These types of agreements have been

25      used in the banking industry for years, as Ms. Crain and

1    Mr. Grice both explained to you.

2         PCI knew where to go when it wanted special

3    treatment from a banker and it was not M&I Bank.  Deanna

4    Coleman, she told you she got favors from bankers and they

5    were not Ed Jambor or Chris Flynn.  They were from Crown

6    Bank and Associated Bank.  She asked someone from Associated

7    Bank to lie to investors for her.  They did.  She told you

8    Crown Bank would wire funds or give Tom Petters a cashier's

9    check without sufficient funds in the account.

10        So it's not like the fraudsters at PCI never got

11   special favors from bankers.  They did.  But they never got

12   them from M&I Bank.  They kept Ed Jambor and Chris Flynn at

13   a distance.

14        One final point on the issue of M&I's conduct.  I

15   ask you, please, when you go back to the jury room and

16   deliberate, ask yourselves this question:  Why?  Why on

17   earth would an M&I employee help the scheme?  They had no

18   motive whatsoever to do it.  These are good, honest, decent,

19   hardworking people.

20        Plaintiff is going to try to convince you there's

21   circumstantial evidence that adds up to their guilty

22   knowledge or bad faith and, again, real circumstantial

23   evidence or payments, hiding the scheme.  You don't see any

24   of that.  There's zero evidence of that here.  Zero evidence

25   of any benefit.  PCI wasn't even a highest profitable

1     customer even in Ed Jambor's own portfolio, let alone the

2     bank writ large.

3             And finally, really, instead of talking about what

4     motive there hasn't been proved, let's look at what their

5     motive really was.  They told you.  They sat on the witness

6     stand and they told you.  They wanted to do the best they

7     could for their customers, to provide good service.

8             And the AML people in particular -- do you

9     remember Pat Currie-Smotherman?  She took that job so she

10    could play a part in combatting terrorism.  That's what

11    their motive was.

12            I told you in our opening statement that because

13    you would not see the sort of evidence you should expect to

14    see, you would see other stuff, including this claim that

15    M&I Bank intentionally destroyed evidence.

16            There's no doubt about it there was a server

17    consolidation at M&I Bank by the IT folks in Milwaukee back

18    in 2010 and 2011.  And because of that the Court is going to

19    instruct you that you may, but you're not required to,

20    assume that the contents of the destroyed e-mail backup

21    tapes would have been adverse or detrimental to BMO.

22            So it's your decision.  You are the finders of

23    facts.  And you should not assume any such thing, I submit

24    to you, because the evidence showed you that the recycling

25    of those tapes was completely innocent.  And it also showed

1     you that there's no reason to believe that the information

2     on those tapes would be harmful rather than helpful to M&I

3     Bank.

4                You heard from John Vanderheyden -- there you see

5     him again -- about why those tapes were recycled back in

6     2010 and 2011.  It was -- had nothing to do with Petters or

7     PCI.  It was part of a long-planned server consolidation

8     project, very typical in any big institution.

9                Mr. Vanderheyden told you about the many steps his

10    IT group took to retain documents related to PCI.  He

11    thought that the relevant e-mails had been retained by the

12    Legato system, which since March of 2005 had captured every

13    single e-mail and every single attachment sent and received

14    by all M&I employees, beginning way back then in March of

15    2005.

16               He admitted that the IT department made a mistake,

17    they shouldn't have recycled those backup tapes, but it was

18    an innocent mistake.  No one even knew what was on the

19    backup tapes.  No reason to think the information on those

20    tapes would have been harmful to M&I as opposed to helpful,

21    like all the other documents in this case.

22               But there was nothing improper about the 2010

23    server consolidation project.  Plaintiffs focus on the

24    backup tapes that were found in 2014 and claim that they

25    were destroyed, but plaintiff doesn't have any evidence of

1        anything being intentionally deleted then either.

2              Here's the evidence you heard in the course of

3        this trial.  In 2014 M&I was looking for pre-2005 backup

4        tapes, looking for them obviously is the opposite of hiding

5        them.  They didn't find any tapes that old.  The oldest one

6        that was found was labeled "MSP105 Aug 2007."  You see that

7        from the -- on the left from the e-mail on the left.

8              When the question came up again in 2017, they went

9        looking again for tapes.  Again, the opposite of hiding

10       tapes.  Found a set where one of them had exactly the same

11       label, "MSP105."  As Mr. Vanderheyden told you, there would

12       not be two tapes with the same label.  Mr. Stroble testified

13       that the tapes found in 2017 were later restored.

14             None of this made any difference to plaintiff's

15       case.  Plaintiff had access to a huge volume of documents,

16       including from before March 2005, all the documents after

17       March of 2005.  You saw all the MIContacts.  None of them

18       were involved in this backup tape issue.  Not a single one

19       of those documents shows that anyone at M&I did anything

20       wrong.  So there's no reason to think the documents on the

21       backup tapes from pre-March of 2005 would have been any

22       different.

23             The issue of these backup tapes, I submit to you,

24       is similar to the way Mr. Kelley's lawyers accused Chris

25       Flynn of editing a MIContacts entry.  It shows you how

1    desperate they are to distract you from the evidence that

2    they don't have, distract you from what this case is really

3    about.

4            Remember this?  Mr. Kelley's lawyers claim that

5    because the edit date -- remember he forwarded a MIContact

6    in 2008.  Because the edit date changed, that all of a

7    sudden became, in the questioning of Chris Flynn, that he

8    tampered with the entry in that MIContact report.  And

9    plaintiff's own exhibit proved that dead wrong.

10           You saw both entries.  They're right there.

11   They're identical in substance.  They both had Chris Flynn's

12   name.  He got accused of hiding a DACA from Jeanne Crain,

13   doing that on his own.  He got accused of destroying a DACA.

14           This seems like a small point, but it's not.  It

15   shows you what Mr. Kelley and his lawyers are trying to do

16   throughout this trial.  They twist innocent facts into

17   sinister ones, all to try to distract you from the fact that

18   they have not proved anywhere close to the case they need to

19   prove.  You shouldn't give any weight to this misdirection

20   about deleted documents.

21           Let me turn to the third of the important topics I

22   wanted to address with you and it's causation.  I told you

23   at the outset that plaintiff would not prove anything that

24   showed that M&I actually caused harm to PCI, and let's set

25   the stage here because it's kind of important.

1        Mr. Kelley acknowledged he can only bring claims

2    for harm to PCI, the entity you've heard about throughout

3    this trial as the criminal enterprise, right, conspired with

4    Petters and Coleman and White to commit a 14-year-long Ponzi

5    scheme.

6        He also acknowledged that he cannot bring a claim

7    on behalf of any investor in PCI.  He's not bringing such a

8    claim because he can't, and it's very important.  This case

9    is about harm not to investors.  It's about harm to PCI.

10       So it's now here saying that M&I Bank -- could you

11   take that down from the screen for just a second, Jeff?  I

12   want to make a point and then I will come to this last

13   slide.

14       PCI is here saying M&I Bank caused PCI to be

15   unable to pay back the money that PCI owed its hedge fund

16   investors and that M&I Bank should foot the bill for PCI's

17   fraud.

18       And I want to just take a moment to think about

19   the audacity of the lawsuit, right?  Plaintiff admits that

20   PCI lied to M&I Bank.  We showed you that in the opening

21   statement.  Before the trial he admitted lied to M&I Bank.

22   Admitted misled M&I Bank.  He testifies on the witness stand

23   M&I Bank didn't know about the fraud.  It's just they should

24   have done more.

25       But here's the claim in this case.  We're supposed

1     to -- M&I Bank is supposed to pay PCI's debts because we

2     didn't catch them at their -- catch PCI at its fraud.

3     That's what this case is all about.

4            Jeff, you can put it back up.

5            When it comes to causation, there are some basic

6     fundamental realities.  M&I Bank did not make PCI a Ponzi

7     scheme.  We didn't take the money from the investors.  M&I

8     did not make PCI unable to pay its investors, and it didn't

9     cause PCI to file for bankruptcy.

10           The claim here is we should have asked more

11    questions.  But even at that, that doesn't prove anything.

12    Even if established, that doesn't prove anything but

13    negligence.

14           But think about what would have happened from a

15    causation standpoint if they had asked more questions.

16    First of all, the wire department asked Coleman about PCI's

17    business and she lied to them, as she would lie to everyone

18    during those 14 years.

19           If they had asked questions, for example, about

20    Nationwide and Enchanted, Mr. Kelley and Ms. Coleman made

21    clear what would have happened, PCI would have lied then

22    too.  Here's Mr. Kelley's own words, "Petters lied a lot."

23           Mr. Kelley also admitted that PCI couldn't pay its

24    debts for years before ever even having an account at

25    National City Bank and then M&I Bank.  That means PCI was

1    always in debt to its hedge funds investors.  M&I Bank did

2    not cause that.

3            Defendant's [sic] expert, Mr. Martens, didn't

4    offer any connection between the amounts owed to the hedge

5    funds by PCI and anything M&I actually did.  He just assumed

6    it because he was told to by Mr. Kelley's lawyers.

7            Plaintiff is going to suggest to you that if M&I

8    Bank had just picked up the phone to call the authorities or

9    close the account, the scheme would have just collapsed in a

10   minute, like it did after Deanna Coleman turned herself in.

11           But the big problem with that argument is it

12   assumes that someone at the bank actually knew something was

13   wrong.  They didn't, as we've talked about already.  They

14   never even suspected it.  And they certainly didn't have the

15   information that Coleman told the FBI about Petters and

16   Nationwide and Enchanted.

17           It boils down to this, Members of the Jury.

18   Mr. Kelley is here only to bring claims for harm to PCI, but

19   the evidence has shown that PCI and its co-conspirators,

20   Petters, Coleman, White, did that harm themselves.

21           It pains me to turn to damages because you should

22   not be considering damages, I respectfully suggest to you,

23   but let me talk about that for a minute.

24           Plaintiff claims that M&I Bank should pay billions

25   of dollars that eight hedge funds investors loaned to PCI

1    and didn't get paid back.  Did Mr. Martens show you how he

2    calculated what each investor lost?  No.  All he did was put

3    that big red number up there and said that's what the bank

4    should pay.  I'm sorry.  That's just not expert testimony.

5    That's arithmetic.  He added eight numbers his lawyers --

6    that Mr. Kelley's lawyers told him to add up.

7            You know from your own common sense, but you also

8    heard it from Karl Jarek, why Mr. Martens is wrong.  First,

9    there was no harm suffered by PCI by being unable to repay

10   its investors.  Receiving a loan -- Mr. Jarek walked us

11   through this -- doesn't cause harm.

12           Think about it.  Are you harmed when you get a

13   loan from the bank?  No.  You have more money than you had

14   before the loan was made to you.  If an investor lends PCI

15   $100, it's true that PCI is obligated to repay the investor,

16   but PCI got something in return, the $100.  That's a benefit

17   to PCI.

18           Amounts that PCI owes to the hedge funds can't be

19   harm to PCI, and they certainly can't be harm that those

20   M&I employees who you heard testify could possibly have

21   caused.

22           But for all the reasons I've discussed with you

23   this morning and based on all the evidence you heard during

24   the trial, BMO Harris Bank is not liable here and Mr. Kelley

25   shouldn't receive a penny.

1          Should you decide otherwise, Mr. Jarek actually

2     gave you the method for thinking about damages and that

3     method is the payments that Petters and Coleman and other

4     insiders gave to themselves -- right? -- the checks, many of

5     which you saw during the trial.

6          Don't get me wrong.  I submit to you there's

7     nothing wrong with those checks.  You know that based on the

8     lay and the expert testimony you heard.  But it's not the

9     bank's job to police how the money in this account was

10    spent.

11          But if you conclude that any amount should be

12    awarded here, Mr. Jarek explained why those amounts should

13    be the amounts paid to the insiders.  That is conceivably

14    harm to PCI, right?  That's the only claim that's brought

15    here, harm to PCI.  And I'll suggest to you that Mr. Jarek's

16    methodology is the only correct one that you heard.

17          Plaintiff's expert, Ms. Ghiglieri, calculated the

18    payments to the insiders at 63 million.  That's because she

19    only added up the payments to Petters, Coleman, and White.

20          Mr. Martens' total for the checks came to 11

21    million because he only counted certain checks.  Mr. Jarek's

22    calculation was 78.1 million, you'll recall that from his

23    testimony -- if not, I'm telling you now -- because his

24    number included payments to all of the PCI insiders.

25          But there's -- the plaintiff faces a different

1      problem, another problem besides the failure of meeting the

2      burden of proof when it comes to this, and it's called the

3      statute of limitations.  You know about statute of

4      limitations, I'm sure.

5             In this case the statute of limitations for this

6      claim is six years.  So under the law Mr. Kelley can't

7      recover for any harm to PCI before November 15th, 2006, and

8      that's because that's six years before he filed this

9      lawsuit.

10            As Mr. Jarek explained, the only financial harm to

11     PCI, only harm that PCI itself experienced after -- assuming

12     you find liability -- after November 15, 2006 is $800,000.

13     Because the statute of limitations indisputably applies,

14     that means Mr. Kelley's damages can't be more than 800,000,

15     although, as I say, it pains me to even to talk to you about

16     this because we suggest to you that you should conclude that

17     M&I did nothing wrong.

18            Okay.  Before I talk to you about the verdict

19     form, touch on a few other -- a couple of other points.  The

20     first is punitive damages.

21            The Court is going to instruct you that Mr. Kelley

22     is seeking punitive damages.  That's a completely different

23     ballpark.  It requires the plaintiff to show by clear and

24     convincing evidence a much higher standard of proof than the

25     rest of the case requires him to prove.  He has to show by

1    clear and convincing evidence that the bank acted -- you'll

2    listen carefully to the instructions -- that the bank acted

3    with deliberate disregard for the rights or safety of others

4    and that a manager, someone with authority, knew about that.

5           Again, it's a very high standard of proof, a very

6    high bar, deliberate disregard for the rights or safety of

7    others.  He says they didn't even know about the fraud.

8    They just should have done more.  Based on this case of

9    "should haves" and "could haves," the plaintiff comes

10   nowhere near the very stringent high standard for punitive

11   damages.

12          The other point I want to -- two other points I

13   want to touch on.  One I've already done, that statute of

14   limitations.  I've already mentioned that to you.

15          The other is one that ends this case altogether

16   very quickly and the plaintiff has simply ignored it, and

17   that is an affirmative defense that you'll hear about from

18   Judge Wright called consent or ratification.  An affirmative

19   defense fits this case exactly because the plaintiff in this

20   case, the interest in this case, PCI, is a wholly criminal

21   interest.

22          The judge is going to instruct you on this.  It

23   refers to the fact that PCI consented to or agreed to

24   everything that it claims through its representative,

25   Mr. Kelley, M&I did.  The reason that plaintiff has ignored

1    this defense is because it completely destroys his claims.

2    It ends this case by itself on its own.

3            So you heard from Ms. Coleman no one at M&I -- no

4    one at PCI, excuse me, ever complained about the

5    transactions going through the PCI account.  PCI agreed to

6    those actions.  Everything that M&I Bank did was consented

7    to, ratified by PCI.  PCI, through its representative, can't

8    come in and complain about those actions on PCI's behalf

9    now, and it defeats all of plaintiff's claims.

10           Listen to the instruction carefully from Judge

11   Wright.  You'll listen to all of her instructions carefully.

12   If you do and you apply it, you will see that you can make

13   short work of this case on that affirmative defense alone.

14           Okay.  We've discussed all the reasons why the

15   plaintiff has failed to prove his case, why you should not

16   find BMO Harris Bank liable.

17           After closing arguments are done, Judge Wright is

18   going to instruct you on the law, give you a verdict form to

19   fill out.  And before my time with you is up, which will be

20   soon, I just want to give you a sense of how everything we

21   just talked about fits into that verdict form.

22           You'll be instructed that there are four separate

23   claims in the case.  One is under a statute called MUFA.

24   The verdict form will have one question on it.  You see the

25   question at the top, the typewritten question.  It will ask

1   you whether the plaintiff has met his burden of proof on

2   that claim.

3           You'll get instructions about what we call

4   elements of the claim, ingredients of a claim, that

5   Mr. Kelley has to prove to be able to -- for you to be able

6   to find in the plaintiff's favor.  I just want to emphasize

7   a few pieces of this.

8           First, the Court is going to tell you that

9   plaintiff has to prove that M&I knew or acted in bad faith

10  with respect to Petters, Coleman, or White using PCI to run

11  a Ponzi scheme.

12          This is very important.  Even if M&I was

13  negligent, if it could have or should have done better,

14  which is really what this case is all about, that's not

15  enough for actual knowledge or bad faith.  These were honest

16  people; and if you find they were honest, that ends the

17  inquiry.

18          Second, this knowledge has to be about a specific

19  transaction.  And, again, plaintiff hasn't even tried to

20  identify for you any specific wire or check at M&I Bank or

21  any specific person who processed that wire or check.

22          So we respectfully suggest to you that you should

23  check "no" on this claim.

24          The second claim is for breach of fiduciary duty.

25  Again, you'll have a single "yes" or "no."  This is a unique

1    claim in a way in that it relates solely to those Deposit

2    Account Agreements at PCI and M&I entered into in 2008.

3    Plaintiff has to prove three things to win on this claim,

4    you'll learn from Judge Wright.

5          The first is that M&I Bank even owed what we call

6    a fiduciary duty to PCI as a result of those Deposit Account

7    Agreements.  They have to show that those agreements created

8    a special relationship between PCI and M&I Bank in which PCI

9    trusted and relied on the bank.

10          The evidence shows exactly the opposite.  Deanna

11   Coleman testified that PCI lied to M&I employees.  They

12   didn't rely on M&I employees.  They kept them at a distance.

13          And even more importantly, when it comes to these

14   Deposit Account Agreements themselves, you saw in the

15   agreements, you heard the testimony, you heard from

16   Ms. Crain, each party, PCI, M&I Bank, and those three hedge

17   fund investors, were each represented by their own lawyers.

18   You remember those two agreements in the Palm Beach Deposit

19   Account Agreement.  No one was relying on M&I Bank.  There

20   was no special relationship.  That defeats that claim.

21          But the second thing that plaintiff has to prove

22   in connection with that claim, even if there were a special

23   relationship, is a breach of that fiduciary duty.  And there

24   was no breach.

25          The only obligations M&I Bank had under those

1    agreements was if money was directed to them to put in the

2    special accounts, and that never happened.  They couldn't

3    possibly have breached a duty even if one existed.

4        The third thing that plaintiff has to prove is

5    that M&I's breach of that fiduciary duty we call proximately

6    caused, caused the harm to PCI.  And for all these claims,

7    as I've already gone over, there's no causation, there's no

8    causal link.

9        You can't just, as Mr. Martens said, say they

10   couldn't pay the hedge funds, their hedge fund investors

11   this much money; therefore, M&I caused it.  That's not the

12   way it works.  So you should check "no" for that box as

13   well.

14       The third claim is aiding and abetting a fraud.

15   And the fourth claim is for aiding and abetting a breach of

16   fiduciary duty, a different one this time, owed by Petters,

17   Coleman, and White to PCI.

18       Both of these claims require the plaintiff to

19   prove two key things, among others.  The Court is going to

20   instruct you that on these claims the plaintiff has to prove

21   that M&I Bank knew that Petters, Coleman, and White were

22   committing a fraud that harmed PCI or were breaching their

23   duties to the corrupt enterprise that was their

24   co-conspirator, PCI.  Bad faith is not enough for these

25   claims.

1           For all the reasons we have discussed, the

2    plaintiff hasn't come close to proving knowledge and, in

3    fact, Mr. Kelley has testified that he doesn't even claim

4    it.  So you should check "no" on this claim, this count, as

5    well.

6           Also don't forget, even if you find that the

7    plaintiff has met his burden on any of these claims, don't

8    forget the affirmative defenses are not on the verdict

9    sheet, but you're going to be instructed about them.  You

10   should consider whether PCI consented to and ratified the

11   transactions about which PCI, through its representative

12   Mr. Kelley, complains.

13           Finally, there's the issue of damages.  You're

14   going to be instructed that the term "damages" means a sum

15   of money that will fairly and adequately compensate

16   plaintiff for any harm that M&I Bank caused to PCI.

17           Plaintiff has an obligation to prove the nature,

18   extent, duration, and consequences of the alleged harm.  As

19   you know, we respectfully submit to you that the plaintiff

20   hasn't proven any harm on the part of PCI here, certainly no

21   harm caused by M&I Bank.

22           The loans it got from investors were benefits to

23   PCI, money that the investors gave it, and the bank didn't

24   have anything to do with PCI owing that money to the hedge

25   funds.  So we respectfully submit to you that even if you

1    find BMO Harris is liable in any dimension, the amount of

2    damages should be zero.

3            Okay.  I'm going to leave you with a few thoughts

4    to take with you.  Just about done.

5            THE COURT:  Counsel, I am mindful of your time.

6            MR. GLEESON:  I have about two minutes.  Finishing

7    it up.  Thank you, Judge.

8            As I mentioned in my opening statement, remember

9    the human dimension of the case.  Trials are always about

10   people.  Finally stop with the documents.  Come in here

11   about people.  You got the chance to see the people, size

12   them up for yourselves, hardworking people.  They did their

13   jobs.  They did them well.  They are decent.  They cared

14   about the bank.  They cared about their communities.  They

15   had every incentive to do the right thing and they did.

16           Here they were at this trial, from 14 to 20 years

17   later, everything they did under a microscope, right?  You

18   wrote "previous" this time.  You wrote "last" last time.

19   What was that all about?  Put yourself in that position.

20           They did what they did based on what they knew at

21   the time.  You heard from Deanna Coleman and Sandy Indahl.

22   One of them kept people in the dark.  The other was kept in

23   the dark.  We brought them to you so you could see all the

24   facts.

25           If you put aside what everybody learned after

1    Petters' arrest, you're going to conclude that M&I Bank did

2    nothing wrong.  All that's left is the "should haves," the

3    "could haves."  That's what Mr. Kelley said himself.  They

4    should have investigated more fully.  That's not enough for

5    any damage award, let alone the outlandish damages that this

6    lawsuit seeks.

7         If you hear someone say during your deliberations

8    that Ed Jambor or Mary Pesch or any of those folks whose

9    testimony you heard should have known something, could have

10   done something, was not precluded from doing something, your

11   first reaction should be, like, really?  Is that just

12   hindsight?  And then your second reaction ought to be, but

13   that's not enough even if it's right.  The law demands more,

14   and there's a good reason for it.  Billions are being sought

15   here.

16        You don't have to take my word or plaintiff's

17   counsel's word for anything.  You will have access to all

18   the documents and the evidence admitted in the case.  You

19   can hear the testimony.

20        Not all -- I've got one minute left.  Not all

21   jurors, not all juries are as engaged as this jury was.  You

22   took copious notes.  You obviously are doing your jobs

23   assiduously.

24        This is a great system.  Members of the community

25   lay aside their everyday lives, come into court.  You get

1    educated about a very serious dispute and you're empowered

2    to decide it.  Juries have enormous power in our system, and

3    that's good.  That's the way it ought to be.

4          But it includes the power and the responsibility,

5    after listening to the evidence, to say no; to conclude that

6    a plaintiff hasn't proved what he needed to prove.  You

7    know, even if you are just seeking $10,000, but especially

8    if you are seeking $1.9 billion, you have to prove your

9    case.  That hasn't happened here.

10         Everything that happened here, all of the actions

11   that resulted in PCI owing money to those hedge funds, were

12   done by PCI and those three co-conspirators at PCI.  We

13   respectfully appeal to your power to say no.  Say that PCI,

14   in whose shoes Mr. Kelley stands, has not proved its case

15   and to end this decade-long pursuit of a bank and its

16   employees who did nothing wrong.

17         Thank you.

18         THE COURT:  Members of the Jury, we will take our

19   midmorning break.

20         During this recess, as with every other recess you

21   have taken, you must not discuss this case with anyone.  Do

22   not do any research with this case.  Do not allow anyone to

23   discuss the case with you or within your hearing.

24         We will take a 15-minute break.  Let's plan to

25   return to the courtroom at 10:05.  Have a good break.

```
1            (Jury excused)
2                       IN OPEN COURT
3                     (JURY NOT PRESENT)
4            THE COURT:  We'll plan to resume at 10:05.
5       (Recess taken at 9:49 a.m.)
6                  *    *    *    *    *
7       (10:10 a.m.)
8                       IN OPEN COURT
9                     (JURY PRESENT)
10           THE COURT:  Please be seated.  Counsel, are you
11      ready to proceed?
12           MR. COLLYARD:  I am, Your Honor.
13           THE COURT:  You may.
14           MR. COLLYARD:  May it please the Court, Counsel,
15      Women and Men of the Jury.  Good morning.
16           Thank you for your service.  I thank you.
17      Mr. Kelley thanks you.  My entire team thanks you.  And
18      thank you for all the time that you have given here during
19      this trial.  We really do appreciate all the time and
20      attention that you've given this.
21           I told you in opening statements that it's going
22      to be up to you to determine justice in this case and only
23      you hold the power to be able to do that.  And that time has
24      come.  That responsibility is now in your hands.
25           And jury verdicts matter in this country.  And
```

1    every now and then in life you get a chance to do something

2    to make a difference, and you have that chance now because

3    you can make sure that something like this never happens

4    again.

5            The evidence in this case has shown that BMO

6    Harris Bank is responsible and that BMO Harris Bank needs to

7    be accountable for its part, and I want to make sure that in

8    this closing statement that I give you the tools to go back

9    in that room and fight for that, fight for that type of

10   justice.

11           So what I want to do with my hour and 10, hour and

12   15 minutes, I really want to break it up into three parts.

13   I want to talk about the story, I want to talk about the

14   evidence, and then I want to talk about the verdict form and

15   go through the verdict form.

16           Let's start with the story.  You heard Deanna

17   Coleman testify and say that it took PCI and Tom Petters ten

18   years to find a bank that it could work with, and then you

19   heard BMO's own damages expert tell you what happened when

20   BMO [sic] found that bank in 2001 and they put up this

21   chart.

22           And that showed that as soon as BMO took control

23   of the Petters Company account, the account exploded.  It

24   started out as just this little $500,000 scheme and then it

25   grew to be bigger and bigger and bigger and turned into a

1    multi-billion dollar scheme by 2008.

2            And that was all under BMO's watch, and BMO's

3    damages expert admitted it, that if the scheme would have

4    stopped, if the bank would have just shut it down in 2001,

5    the losses would have been $500,000.  And that's what would

6    have happened if the bank would have done its job and if the

7    bank would have lived up to its responsibility.

8            You heard from Doug Kelley, Mr. Kelley, and what

9    his job has been.  Mr. Kelley has spent years in public

10   service.  He served his country in the military.  He served

11   in the Army.  He was an Army Ranger.  He was a Green Beret.

12   He served as an Assistant U.S. Attorney.

13           And for the last 14 years Mr. Kelley was appointed

14   by the Federal District Court here to be the receiver and

15   later by the Federal Bankruptcy Court to be the

16   court-appointed trustee to bring these claims, to bring this

17   case against BMO Harris Bank.

18           You heard about Mr. Kelley's background.  He has

19   spent his entire career trying to do the right thing, and he

20   brought this case to do the right thing and he's asking you

21   to do the right thing.  He's asking for justice, Ladies and

22   Gentlemen, and that's why we are here.

23           As part of that, Mr. Kelley is asking to be

24   awarded -- that Petters Company, Inc. be awarded

25   $1.926 billion, and those are the damages that BMO Harris

1    Bank caused.  Those are the damages that BMO Harris Bank is

2    responsible for.  And those are the damages, Ladies and

3    Gentlemen, the money that Petters Company, Inc. owes its

4    investors.

5          I told you when I stood up here during opening

6    statements that this was a simple case and it was as simple

7    as this four-letter word because BMO Harris Bank was

8    required to know whether the billions of dollars going in

9    and out of that account made sense for the Petters Company

10   business.

11         And the bank could see that none of it made sense.

12   The bank knew that none of it was right and therefore they

13   knew that it was fraudulent.  Instead of stopping it or

14   reporting it like they were required to do, the bank turned

15   a blind eye and they allowed Tom Petters to continue to use

16   that account over and over and over again to carry out that

17   fraud.  And the fraud exploded under their watch.

18         This is Bernita Hile.  Okay?  She is the manager

19   in the Anti-Money Laundering Group.  She was the boss of

20   those Anti-Money laundering analysts who came in and

21   testified.  BMO did not bring her to trial, and she was an

22   incredibly important witness in this case.  I had to play

23   her videotape.

24         And she said something at the outset that is very

25   important.  And what she said is when you're looking for

1    money laundering and you're looking for suspicious activity,

2    you look to see if the sources of the money going in and out

3    of that account, if they make sense for the business.

4    Here's what she said.

5         (Recorded testimony played)

6              "The source of the money is to determine if it's a

7    legal source or not."

8              "What do you mean by that?"

9              "Well, money laundering is where you're taking

10   dirty money and trying to make it clean.  So the source of

11   the money is is it dirty or not?"

12             "And how would you know that?"

13             Well, you would know that by determining if it

14   makes sense for the business."

15        (End of recorded testimony)

16             MR. COLLYARD:  "If it makes sense for the

17   business."  The bank could see that none of the billions of

18   dollars going in and out of that account made sense for the

19   business.  Anybody could see that.

20             And the bank knew it, Ladies and Gentlemen,

21   because this was the business model (indicating) that the

22   bank did know.  It was this simple.  And it was that Petters

23   would borrow money from investors.  He would use that money

24   to go and buy TVs from wholesalers, turn around and sell

25   them to big-box retailers like Costco and Walmart.  And

1    after they -- after Costco and Walmart wired money into that

2    account, take that money and supposedly pay back the

3    investors.  That's how the bank understood the business

4    model.  It was not complex.  It was that simple.

5         And they all testified that they understood it

6    that way.  Mr. Flynn testified he understood it that way.

7    Mr. Jambor said he understood it that way.  And Bernita

8    Hile, the manager in the Anti-Money Laundering Group, even

9    she testified that she understood that what Petters would do

10   is he would buy TVs, consumer electronics, sell them to

11   big-box retailers.  And the bank knew that big-box retailers

12   were supposed to wire money into that account.

13        This is Plaintiff's Exhibit 4.  This is back in

14   2003, and this is that e-mail communication from Jon Sabes

15   to Ed Jambor where Mr. Sabes tells Mr. Jambor that retailers

16   are wiring money into that account, and that exact process

17   happens every single day.

18        BMO's counsel got up here and suggested that

19   there's no evidence that retailers are supposed to wire

20   money directly into the account, suggesting somehow that

21   Walmart and Costco would have somebody else wire billions of

22   dollars into an account.  They're some of the most

23   sophisticated businesses in the world.  They would never

24   have anybody wiring billions of dollars on their behalf.

25   They know how to do it themselves.

1           Mr. Flynn, he talked about, too, how he knew

2     Nationwide, for example, was a wholesaler.  And he said it

3     right here.  He said PCI was the purchaser and Nationwide

4     was the seller.

5           They understood the business, Ladies and

6     Gentlemen, and they knew and they could see every single day

7     that it did not work that way because they could see three

8     things.  In opening statements I talked about them as the

9     three fingerprints of the fraud, and here they are.  This is

10    what they could see.

11          One, they could see that no retailer ever wired a

12    cent into that account.

13          Two, they could see that instead nearly all the

14    money came in from Nationwide and Enchanted, those two

15    wholesalers who he was supposed to buy the TVs from, and we

16    know now they were all part of the fraud with Petters.

17          And three, Ladies and Gentlemen, they could see

18    that tens of millions of dollars were going out of that

19    account and directly into the pockets of Tom Petters, Deanna

20    Coleman, and Bob White.

21          And they knew there was no legitimate business

22    purpose for it.  Bring it back to Bernita Hile.  Does it

23    make sense for the business?  They knew that made no sense

24    for the business.

25          And along the way as part of that, you saw and you

1    heard testimony in evidence that money laundering alarms

2    were sounding off for three and a half years, for 39 months,

3    telling them, telling them that all the billions of dollars

4    going in and out of that account was all potentially

5    suspicious.  It was all potentially fraudulent and they

6    needed to investigate it and they did.  They looked at every

7    single cent.

8            And even though they did that, they chose to close

9    every one of these alarms, even though nobody, nobody was

10   able to come here and testify and tell you what the

11   legitimate business purpose was for any of it or why or how

12   any of it made sense for the Petters Company business.  And

13   that includes the billions of dollars that were wired in

14   from Nationwide and Enchanted.

15           They also saw this (indicating) as part of all

16   those alarms and they saw this from day one with the

17   account.  What this is, this is Plaintiff's Exhibit 713.

18   Okay?  This shows all of the billions of dollars for those

19   alerts that went in and out of the account, and they were

20   all for similar amounts of money.

21           If you just take a look at it here just real

22   quickly, it was a consistent pattern always.  2.5 billion

23   in, 2.5 billion out.  1.7 billion in, 1.7 billion out.

24   Okay?  It didn't happen once.  It happened every single

25   time.  And you can go in and you can look at this and you

1      can see all of the billions of dollars that were wired in

2      from Nationwide and Enchanted again.

3              Why is that important?  Because they looked for

4      patterns.  Here they are.  These are the anti-money

5      laundering analysts and their testimony, and they testified

6      they look for patterns.

7              And we know that they look for this exact pattern

8      because after they went back, after they went back -- after

9      2008, they went back and they reviewed the activity that

10     they once concluded was not suspicious for 2008, and then

11     they found that that same exact activity showed that it was

12     suspicious.

13             Here's what they looked at.  This is Plaintiff's

14     Exhibit 333, and this was the analysis that they did where

15     they mapped it out and they did the chart that shows.  They

16     looked to see exactly those patterns of 2.8 billion in,

17     2.8 billion out.  And they even noted and made a big point

18     of it, of how it was only $189,000 difference.  This is what

19     they looked at, and they testified that they could have done

20     this any time and this is what they would have done on those

21     alerts, Ladies and Gentlemen.

22             Cathy Ghiglieri, Ms. Ghiglieri, Mr. Kelley's

23     damages -- I'm sorry, banking expert, she explained that you

24     can't carry out a multi-billion dollar fraud like this

25     without a bank.

1         And she even talked about if the bank would have

2   just done what it was supposed to do, if it would have

3   filled out the form, wrote down what it could see and what

4   it knew, and if it wrote down that the activity was for a

5   billion dollars like Mr. Anthony wrote down, the fraud would

6   have ended.  We wouldn't be here today because, as she

7   testified, the FBI would have been on the front doorstep of

8   the bank.

9         Just like how when Deanna Coleman did go into the

10  United States Attorney's Office, she went in when she blew

11  the whistle, they immediately put a wire on her.  Within

12  days they went and shut down that fraud.  And that would

13  have happened too if the bank would have lived up to its

14  responsibility.

15        Deanna Coleman herself testified, and she told you

16  that if the bankers would have just dug into the absence of

17  the retailer payments, the scheme wouldn't have continued,

18  we wouldn't be here today.

19        Let's pause for just a second and let's talk about

20  Sara Johnson.  Okay?  BMO Bank did not bring Sara Johnson to

21  this courtroom either, and she was an incredibly important

22  witness.  Do you know why?  Because Ms. Johnson closed more

23  alerts than anybody.  She closed $27 billion in alerts.  She

24  was a manager in the Anti-Money Laundering Group.  She

25  taught people how to look for money laundering suspicious

1    activity.

2          And Ms. Johnson, if you remember, I played her

3    video and she testified under oath and she told you over 200

4    times that she didn't know basic facts and she said that she

5    didn't know certain things about whether or not they were

6    even looking for money laundering.

7          Here's a one-minute clip of what you heard from

8    Ms. Johnson.

9       (Recorded testimony played)

10          "Did you have an understanding that as an AML

11    analyst one of the things you were trying to do is figure

12    out whether or not there was money laundering going on with

13    activity pertaining to an account?"

14          "I don't remember."

15          "Did you understand that that was the function of

16    the Anti-Money Laundering Group?"

17          "I don't remember."

18          "What did you understand the function of the

19    Anti-Money Laundering Group was while you were at M&I Bank?"

20          "I don't remember."

21          "You can't describe for the jury a single function

22    of what the Anti-Money Laundering Group was trying to

23    accomplish?"

24          "I don't remember."

25       (End of recorded testimony)

1           MR. COLLYARD:  Ms. Johnson was at BMO Harris Bank

2     until 2017.  I took that deposition in January of 2018.  So

3     this wasn't some memory test.  This wasn't going back

4     20 years, like BMO's counsel has suggested.

5           If you just think about this for a second, okay,

6     when that fraud in 2008 was revealed to the world, was

7     revealed to us, okay, at that time that was the biggest

8     money laundering fraud in American history.

9           These people who were involved in the Petters

10    Company, Inc. account and had worked on it, they would have

11    heard about it then and they talked about how shocked they

12    were.  They would have known.  They would have gone back, if

13    that was really the case, and they would have said and they

14    would have done and figured out how in the world did this

15    happen under my watch, and they would have known that.

16          So for anybody to come to this courtroom and

17    suggest that they don't know basic facts about what they

18    knew or what they did about that because it was so long ago

19    or they don't know basic facts about their job, okay, do you

20    know what that is?  That is courtroom spin.  That is

21    lawyer-rehearsed testimony.

22          Mr. Kelley didn't do that in this courtroom.  His

23    expert, Ted Martens, he didn't do that in this courtroom.

24    And Ms. Ghiglieri certainly didn't do that in this

25    courtroom.

1           Let's talk about people for a moment, okay,

2     because BMO's counsel put up the chart and were talking

3     about all the people at the bank.  Okay?  This is not a case

4     about bank employees taking Vikings tickets or taking

5     under-the-table bribes or sitting in some back room with Tom

6     Petters and conspiring with him about the details of the

7     Ponzi scheme.  That is not what this case is about.  You

8     didn't hear me asking people questions about that.

9           What this case is about is BMO Harris Bank and its

10    refusal to live up to its responsibility, seeing in and out

11    every single day, year after year all of the suspicious

12    activity and turning a blind eye from taking action.  That's

13    what this case is about and that is willful blindness,

14    Ladies and Gentlemen.

15          And when you go back in that room and you look at

16    that verdict form, just know that with willful blindness,

17    when things -- when the bank is willfully blind, you can and

18    you should infer, infer that that means that they had

19    knowledge.

20          Now, I want to spend the rest of the time going

21    through the evidence and then I want to talk about the

22    verdict form.  But before we do that, I again need to talk

23    about and show you the evidence that isn't here because BMO

24    Harris Bank intentionally destroyed it.

25          When I first stood up here I told you, I told you

1    that BMO Harris Bank turned around and intentionally

2    destroyed key evidence in this case to try to cover up

3    everything it knew and to try to hide everything that it had

4    done, and that's exactly what happened, Ladies and

5    Gentlemen.

6              BMO destroyed tens of millions, tens of millions

7    of pages of e-mails and documents.  And as Judge Wright will

8    instruct you, you will be able to take that information and

9    you will be able to assume that the documents that they

10   destroyed, that they were adverse and that they were

11   detrimental to BMO and that they were helpful to Doug Kelley

12   proving this case.

13             Here's the instruction that you're going to see.

14   It says it right here.  "You may assume that the contents of

15   the destroyed e-mail backup tapes would have been adverse or

16   detrimental to BMO."  And you should, Ladies and Gentlemen.

17             Let's go back and let me tell you what BMO did.  I

18   showed you this in opening statement as well.  This is --

19   you saw it in this case.  It's Plaintiff's Exhibit 554.

20   Okay?  After the FBI went and shut down the fraud, federal

21   court here in Minnesota, Judge Ann Montgomery, she issued

22   this order.  This is an injunction and this required, this

23   required BMO Harris Bank to keep all of its e-mails, all of

24   its documents, all of its records pertaining to Tom Petters

25   and Petters Company, Inc. account.

1      And the bank didn't do that.  The bank ignored it

2   and they went ahead and they intentionally destroyed massive

3   backup tapes.  And they did it in 2010, they did it in 2011,

4   and then they did it again, and most importantly probably,

5   most importantly, they did it in 2014; and that was after

6   BMO Harris Bank had bought M&I Bank and that was after Doug

7   Kelley filed this lawsuit.

8      So let me show you this, and I showed you this in

9   opening and I will show it to you again.  This is

10  Plaintiff's Exhibit 325.  This is an e-mail from John

11  Vanderheyden, where he says:  "Dave looked in all the nooks

12  and crannies and found six backup tapes from the Minnesota

13  server."

14     And the reason why they were looking for these

15  tapes, this wasn't out of the goodness of BMO Harris Bank's

16  heart.  They were looking for these backup tapes because

17  they were required to.  They were being sued in Florida.

18  And because of what they had done in 2010 and 2011, they had

19  to go and look for these backup tapes and they found them.

20     If you remember, I talked with Mr. Vanderheyden

21  about these things called legal holds and the legal

22  responsibility you have when you're on legal hold, and he

23  admitted that when you're on legal hold you need to keep the

24  evidence, you cannot destroy it.

25     Regardless of whatever systematic erasing plan

1    that they had in place, that didn't matter.  What mattered

2    was they were on legal hold.  They were involved in

3    lawsuits, and they needed to keep that evidence so that that

4    evidence could be used in lawsuits just like this one.

5          Nobody from BMO can say what was on those tapes

6    because when BMO found them, they didn't look at them.  They

7    didn't tell anybody about them.  They just destroyed them.

8    So they can't come here and say that those tapes had

9    anything on them other than information that was adverse or

10   detrimental to them.

11         Now, give this some context.  Okay?  This is

12   Mr. Scherer.  He is the Dave in that e-mail that I just

13   showed you, and he worked for BMO and you heard a short

14   video testimony from him during this case.

15         And what happened was after Mr. Scherer found

16   those tapes in 2014 that had tens of millions of e-mails on

17   them, after he found them BMO destroyed them; and there was

18   a court hearing about that in 2018.

19         And I had asked Mr. Scherer questions about what

20   BMO had found and what BMO had done at that hearing, and he

21   didn't tell me and he didn't tell the Court that BMO found

22   those tapes or that they destroyed them.  Here's just a

23   little clip of that.

24       (Recorded testimony played)

25           "And you knew then at that hearing that the

1    hearing involved the discovery of backup tapes; is that also

2    correct?"

3           "Yes."

4           "And certainly you knew when I was asking you

5    questions that the hearing involved the discovery of backup

6    tapes, right?"

7           "I vaguely remember you asking me about that,

8    yes."

9           "And I'll show you some of that in a second.  But

10   you did not tell me at the hearing that you found backup

11   tapes in August of 2014, did you?"

12          "I did not."

13          "Did you want to disclose at the evidentiary

14   hearing that you had found those backup tapes back in August

15   of 2014?"

16          "It didn't cross my mind."

17      (End of recorded testimony)

18          MR. COLLYARD:  It didn't cross his mind and it

19   didn't cross BMO's mind to tell me or the Court that they

20   had found these backups tapes or that they had destroyed

21   them.

22          And those backup tapes were critical to this case

23   because, again, they had tens of millions of pages,

24   according to John Vanderheyden's own testimony.  And this is

25   what Mr. Vanderheyden said.  He said the best evidence, the

1     best evidence of what existed in real life, it was on those

2     backup tapes, because he was talking about that Legato

3     system and how the bank claims Legato kept everything, and I

4     showed him an e-mail of his own from Legato where it was

5     completely wrong and he couldn't believe it and he didn't

6     have an explanation for it.  And that's when he admitted if

7     we need to go back and we need to get what was done in real

8     life, you need to go back to those backup tapes.

9          So let's just talk about common sense for just a

10    moment on this.  Okay?  Because I believe BMO's counsel

11    suggested that that evidence would have been helpful to

12    them.

13         Okay.  Think about this.  Banks don't destroy

14    records that are helpful to them.  How many times have you

15    had your mortgage destroyed or how many times have you had

16    student loan payments that were destroyed or credit card

17    bills that were destroyed?  Banks don't do that.

18         In the moment that you owe money to a bank and you

19    don't pay, okay, they know immediately.  And they know

20    within seconds, Ladies and Gentlemen.  They are the masters,

21    they are the masters of keeping records that help them.  And

22    if they really thought that that evidence would have helped

23    them, they certainly would have kept it.

24         Let me give you a real-life example of what

25    that meant in this trial.  Okay?  This is Plaintiff's

1     Exhibit 104.  This is the 2003 e-mail where Ed Jambor knows

2     that retailers are supposed to be wiring money into the

3     account.  Okay?

4          This document here, BMO Harris Bank didn't have

5     it.  They didn't produce it.  They didn't have it in their

6     files because they had destroyed it.  The only way, the only

7     reason that I was able to bring this into this courtroom and

8     show it to you is because we were lucky enough that somebody

9     else, a third party on this e-mail, they had kept it and we

10    got it from them.

11         This is just one example, Ladies and Gentlemen, of

12    the type of evidence that would have been in that pile of

13    information that they would have destroyed to keep out of

14    this courtroom.

15         Let's be clear.  Mr. Kelley is not blaming any

16    individual for this.  He is blaming BMO Harris Bank as the

17    institution.  BMO Harris Bank made the decision to destroy

18    that evidence so that it could not be brought into this

19    courtroom.

20         And you need to consider that when you determine

21    your verdict in this case.  When you go back into that room

22    and you determine, going through the verdict form, whether

23    these claims have been proven, you need to think about that

24    evidence, the tens of millions of pages of e-mails and

25    documents that were not able to come here because of what

1    they did.

2           And you need to think about it on every issue,

3    whether you're thinking about whether or not BMO was

4    willfully blind, whether or not there was evidence that BMO

5    knew there was fraudulent activity, or whether or not it

6    goes to the evidence of how BMO assisted Tom Petters.  You

7    need to be thinking about that evidence.

8           And that is the only way, Ladies and Gentlemen,

9    that is the only way that you could reach a fair verdict and

10   that is the only way that justice could rightfully be done

11   in this case if you do that.

12          Let's talk about the evidence that BMO didn't

13   destroy.  I want to break that out really into three

14   different categories.  I want to talk about the bank's

15   responsibilities, I want to talk about what the bank knew

16   and what the bank did, and then I want to talk about those

17   $1.926 billion in losses.

18          Let's talk about the bank's responsibility.  I

19   think one of the first things I told you when I stood up

20   here before was BMO Harris Bank has an absolute

21   responsibility to detect and prevent suspicious activity on

22   their accounts.  And they can't allow anyone, not even Tom

23   Petters, to use their account to carry out illegal activity.

24          Let's just pause there for a moment and put it in

25   the context of Ponzi schemes.  Okay?  Because we keep

1    talking about the bank wasn't looking exactly for Ponzi

2    schemes and it wasn't on a box for them to check and things

3    like that.

4          Well, I think someone even testified, maybe it was

5    Patricia Currie-Smotherman, that she had never heard of the

6    word "Ponzi scheme" before the year 2008.  That's simply not

7    right, Ladies and Gentlemen.  It's not right.

8          This is Plaintiff's Exhibit 239.  This goes back

9    to November of 2004, and this is when the higher-ups were

10   talking about what types of topics they need to educate

11   people on so there's consistency across the bank.  And look

12   what they're talking about.  They're talking about Ponzi

13   schemes.

14         And what really -- if you want to know what Ponzi

15   schemes really are, they are a form of money laundering.

16   And that is why when I asked the AML analysts on the stand,

17   I asked them if they were looking for activity that was

18   indicative of money laundering, if they were looking for

19   activity that was indicative of Ponzi schemes.  Those are

20   the exact words I used, and they all said "yes."

21         So think about money laundering for a second,

22   because the bank knew, the bank knew, that the bank was the

23   first line of defense -- that's what they called it -- for

24   looking for things like money laundering and other

25   suspicious activity.  And it wasn't looking for the ins and

1    outs of Ponzi schemes.  It's looking for money laundering,

2    looking for suspicious activity.

3         And I think the best way to understand this is you

4    think about the security guard at the bank.  Okay?  The

5    security guard at the bank's job is to look for things that

6    are suspicious, to be on the lookout.  The guard doesn't

7    know exactly what crime is going to be committed.  They

8    don't know if the bad guy is going to come in through the

9    roof or someone is going to drive a truck through the front

10   door or someone is going to hide weapons under a jacket.

11   But what they're trained to do is they're trained to look

12   for things that don't feel right, that don't make sense.

13   And if they see it, they're supposed to do something about

14   it.  They pick up the phone, they call law enforcement to

15   come in and handle it.  That's what they're trained to do,

16   and that's no different than how the bank trained its

17   people.

18        I'll show you this.  This is the bank's training

19   materials on this for what they were actually supposed to do

20   to find out if there's money laundering or suspicious

21   activity.  This is their exhibit.  This is Defendant's

22   Exhibit 40067.

23        And these are those basic concepts.  And it comes

24   down to if it sounds too good to be true, if it's

25   interesting or unusual, if you're in doubt, fill out the

1    log, better to be safe than sorry.  It was that basic to do.

2          And you saw that they couldn't ignore it, that

3    they couldn't be willfully blind to it.  How many times did

4    we use this exhibit during this trial?  This is Plaintiff's

5    Exhibit 5.  This is willful blindness.

6          The bank knew it couldn't be willfully blind to

7    this activity, and the bank even described willful blindness

8    like this.  This is their own exhibit, Defendant's Exhibit

9    40067 again, where they say, "Willful blindness means

10   looking the other way."  That's what it means.

11         And, again, when you're determining knowledge in

12   this case, if there's willful blindness you can and you

13   should infer that that means that they had knowledge.

14         Let's talk about what BMO knew and did, and I want

15   to break this out just in three short chapters.  I want to

16   talk about the $37 billion that went in and out of the

17   account, I want to talk about how none of that made sense

18   for the Petters Company business, and then I want to talk

19   about how BMO assisted Petters with it.

20         Let's start with the money and let's start with

21   common sense.  Okay?  $37 billion went in and $37 billion

22   went out of this small business checking account.  If you

23   want to see the money, it's Plaintiff's Exhibit 767.  You

24   can go there and you can see every cent that went in and

25   out.

1          That is an enormous amount of money.  Okay?  So

2     enormous that everybody at the bank testified that they had

3     never seen anything like it in their entire life.  No one

4     could name another account where there was billions of

5     dollars going in and out.  Nobody could name another alarm

6     that they looked at or investigated where billions of

7     dollars are going in and out.  And surely nobody could say

8     that they ever saw billions of dollars for the same amounts

9     or similar amounts going in and out for years and years.  It

10    didn't happen and it didn't happen for a reason, because it

11    wasn't realistic, it was completely unusual.

12         And you heard the bank people come here and they

13    testified, and they all suggested that they didn't really

14    know that there was billions of dollars going in and out of

15    the account when they could all see it.

16         Take Ed Jambor, for example.  Mr. Jambor, he knew

17    there was billions of dollars going in and out of the

18    account.  He even talked about it in documents -- this is

19    Plaintiff's Exhibit 37 -- how he monitored the account and

20    he saw that the account, that it ran in the nine figures

21    every month.

22         He testified at Petters' criminal trial and on

23    behalf of the government to put Tom Petters away for more

24    than 50 years.  That would have been a life-changing event

25    for Mr. Jambor and he would have known darn well what he

1    testified to at that trial.

2         But when we asked him here if he knew that there

3    was billions of dollars going in and out of the account, at

4    first he denied it.  Then we had to refresh his recollection

5    and this is what he said.  He said, "Oh, it must have

6    slipped my mind."

7         He knew there was billions of dollars going in and

8    out of that account and he knew how unusual it was.  And you

9    can check him against Mr. Raymond Neufeldt.  You can check

10   all of them on what they said about that against

11   Mr. Neufeldt because Mr. Neufeldt was the wire guy.

12        And Mr. Neufeldt said that you could see the

13   account analysis.  You could look and know what the various

14   volumes of the checks and the wires going in and going out

15   of that account, and they could see what was there.  They

16   could see what was going on and they did.

17        Let's talk about how the bank knew that the money

18   going in and out did not make sense.  Let's start with how

19   the bank first learned the business.  This is how they knew

20   the business model was, and they first learned it from

21   convicted money launderer Frank Vennes.

22        And this is significant, Ladies and Gentlemen,

23   because they learned it from Mr. Vennes when Mr. Vennes

24   taught them the business model because he wanted a loan from

25   the bank.  He wanted the bank to give him a loan so he could

1    invest that money in Petters Company, Inc.  And the bank

2    told him that they weren't willing to put up their own money

3    to be invested in Petters Company, Inc., one of their top

4    clients.

5         And they knew he was a convicted money launderer.

6    Plaintiff's [sic] counsel just showed this document, but he

7    left out the most important part, okay, where it says they

8    had all this detail on the background of his conviction.

9    They knew he was a convicted money launderer going back to

10   2002.

11        Jeanne Crain even testified, for example, that if

12   your customer is doing business with a convicted money

13   launderer, that would be suspicious.

14        Cathy Ghiglieri talked about the last person that

15   you want your customer to be doing business with is a

16   convicted money launderer.  The bank knew that that was

17   suspicious from the start, going all the way back to 2002.

18        So let's talk about how the bank could see every

19   single day from this.  This is what I call the line of

20   sight.  This is the transaction activity.  The bank could

21   see every single day from this that that money going in and

22   out of the account did not make sense.

23        We'll start with the Anti-Money Laundering Group

24   and then we'll talk about the business bankers.

25        Let's start with the two witnesses, Bernita Hile

 1    and Sara Johnson.  Again, BMO didn't bring them to testify

 2    at this trial.  They were the most important anti-money

 3    laundering witnesses in this trial.  Bernita Hile was the

 4    boss and Ms. Johnson, she was the face of the Petters

 5    Company, Inc. account alerts because she closed the most of

 6    them.  She handled them, 27 billion dollars' worth.  Let's

 7    start with Ms. Hile.

 8            The anti-money laundering analysts and their

 9    banking expert, Mr. Grice, they suggested that this was all

10    about -- the entire Anti-Money Laundering Group was about

11    high-risk wires or terroristic activity.  Okay?  They have

12    been looking for money laundering and looking for suspicious

13    activity way before 9/11.  Of course, in 9/11 that was added

14    onto it, but that wasn't the focus.  That wasn't it, Ladies

15    and Gentlemen.

16            Bernita Hile testified to this and what did

17    Bernita Hile say?  It's anything.  Here she is.

18        (Recorded testimony played)

19            "So if an analyst has a question in their mind

20    about whether or not wire transfer activity is suspicious,

21    they should do a full case review?"

22            "If there's a question in your mind about any

23    activity.  I wouldn't key in specifically on anything.  It's

24    anything, not just wire activity."

25            "Okay.  So it's broader than wire activity?"

1          "Yes."

2          (End of recorded testimony)

3          MR. COLLYARD:  If they come across anything when

4    they're doing those alarms, anything, they have to do

5    something about it.  They have to research it.  They have to

6    look into it and figure it out.

7          The anti-money laundering analysts and BMO's

8    banking expert also said this.  They suggested on the

9    Petters Company, Inc. account, and I think counsel said it

10   too, is if they saw that billions of dollars were being

11   wired in in the past, that all they had to say was, Oh,

12   we've seen that he's wired in billions of dollars before and

13   so that makes sense, that's expected for the business.

14         That's not what Ms. Hile said.  Ms. Hile said it's

15   much more than that.  You can't just say, Oh, they've had

16   similar value and volume of billions of dollars in the past,

17   so this isn't suspicious and we don't have to look further.

18   Okay?

19         And what Ms. Hile's testimony was was consistent

20   with even their most basic policies.  You remember these.

21   This is Defendant's Exhibit 400067 again, where they talk

22   about how being familiar with the customer isn't enough.

23   You cannot say things like, Oh, yeah, does it all the time.

24   You can't do that.

25         And that's why, Ladies and Gentlemen, also they

1    said you can't make assumptions of legitimacy.  You have to

2    actually go and figure it out, and you have to do it every

3    time for every one of those alerts.  And that's what

4    Ms. Hile said.

5            Here's what Ms. Hile testified to.  And this is

6    important because it goes back to the first video that I

7    played for you where she talks about how you look at the

8    source to see if it makes sense for the business.  The only

9    way you can do that is to look at the purpose of the money,

10   so understand what the purpose of the incoming wires were

11   for, investigate those entities who are wiring money into

12   the account to see if you can figure out something about

13   them, to see if you can figure out why or how that makes

14   sense for the business.

15           And that means investigating Nationwide and

16   Enchanted.  Okay?  Investigating Nationwide and Enchanted,

17   who wired in 75 percent of all of the billions of dollars

18   coming into that account at times, nearly all of the

19   billions of dollars.  If Nationwide and Enchanted was doing

20   that, you would look at Nationwide and Enchanted, figure out

21   who the heck they are and what the purpose of those wires

22   are for.  And that's consistent with the bank's policies.

23           The bank didn't mention its own policy, which is

24   the most important policy that they had.  And here it is.

25   It's Plaintiff's Exhibit 398.  And I won't go through the

1    whole thing.  I will just show you this part.  But if you

2    look at 398, that talks about how you have to explain, you

3    have to ensure you explain what's going on.  You document

4    the source and the use of the funds for incoming wires, for

5    example.

6              And this is why Ms. Hile's testimony was critical

7    to this case.  She said this, and this is the truth.  When

8    you're looking at these alerts and you decide to close them

9    as an analyst, you have to write down in detail enough

10   information to convince the reader that the activity is not

11   suspicious.  That's what Ms. Hile said.

12             Here's her testimony on this.  She said that it's

13   so important that the analyst can't keep it in their head.

14   They have to actually write it down and they have to

15   document it.

16             And if we go back to this, Ladies and Gentlemen,

17   the reason why, the reason why, it's not -- it's to prevent

18   this thing called hindsight bias that counsel keeps talking

19   about.  You document it at the time to prove, to prove that

20   you actually knew that it was not suspicious and to prove

21   that you did not ignore it.  That's the whole purpose of

22   these policies.

23             And so let's apply the policy to the testimony.

24   This is Sara Johnson again, and let's look at Sara Johnson's

25   why on why she closed alerts and what she thought about

1    reading her own words to see if she was convinced that the

2    activity was not suspicious.

3           This is Alert 55878.  You saw this during the

4    testimony.  This is Plaintiff's Exhibit 183 and this is what

5    an alert looks like.  And remember, all of these alerts were

6    alerting for incoming and outgoing wires.

7           And this is Ms. Johnson's why.  This is why she

8    concluded the activity was not suspicious.  And what she

9    says is, "Wires to and from various businesses.  Activity

10   does not appear suspicious.  Activity is consistent and

11   expected for type of business customer."

12          And I went through that in detail with her and

13   asked her all about what do you mean by "consistent," what

14   do you mean by "expected," what do you mean by "type of

15   business."  She couldn't answer any of it.

16          And so I want to play for you her explanation on

17   her why and what she knew by reading that and to see if she

18   was convinced that it was not suspicious.  Here's what she

19   said.

20       (Recorded testimony played)

21          "It says, 'Activity does not appear suspicious.

22   Activity is consistent and expected for the type of business

23   customer.'  Do you see that?"

24          "I do."

25          "Why are you concluding that the activity does not

1    appear suspicious?"

2              "I don't remember."

3         (End of recorded testimony)

4              MR. COLLYARD:  She couldn't read her own words and

5    explain why she concluded the activity was suspicious when

6    the policies require them to detail it enough so that they

7    can be convinced that it's not suspicious.

8              So I showed that same alert to Ms. Hile, and

9    here's what Ms. Hile said about it.

10        (Recorded testimony played)

11             "She said, 'Activity does not appear suspicious.'

12   Do you see that?"

13             "Yes."

14             "Can we look at her comments and conclude why she

15   believes that the activity was not suspicious?"

16             "I don't -- I don't know.  I don't know -- well,

17   you're saying from her comments?"

18             "Yeah.  Does she explain why she believes the

19   activity is not suspicious?"

20             "Not really, no."

21        (End of recorded testimony)

22             MR. COLLYARD:  I believe Mr. Grice testified on

23   behalf of the bank and he said, "It's between the analysts

24   and their supervisor."  So there's the supervisor reading

25   their own words for why it's not suspicious and she can't

1    even tell.

2            This episode with this alert that I just showed

3    you, that's just a little example of it.  Okay?  This wasn't

4    some glitch in the system.  This wasn't some one-off thing.

5    This was exactly how that bank handled all of these alerts,

6    all of them.

7            Nobody could come here and explain why or how they

8    concluded any of that activity made sense for the business

9    or why it wasn't suspicious, and that happened for three and

10   a half years, Ladies and Gentlemen, on 39 of these alerts.

11           The bank chose to close every one of those alarms

12   that I showed you, even though they can't explain that.  And

13   the fact that they did it and the fact that they did it

14   without explaining it, that is willful blindness and you can

15   and you should infer knowledge from that.

16           If we just go a little bit more detail on some of

17   these so I can show you some more about this, this is

18   Alert 60827, again, Plaintiff's Exhibit 183.  And you can

19   see on this one, just like all of them, you can look at

20   these and you are going to see the same pattern always, two

21   and a half billion dollars in, two and a half billion

22   dollars out, almost the same amount of money.  Okay?

23           And the bank mentions Enchanted.  Doesn't explain

24   anything about Enchanted, but it mentions it.  And doesn't

25   even bother mentioning Nationwide.  So put this on pause and

1      I will go to this exhibit and I will come back to this.

2              Again, this is Plaintiff's Exhibit 713.  This

3      shows you all the answers to who wired the money in.  And if

4      you look at this exhibit for this alert, Nationwide and

5      Enchanted wired in $1.9 billion out of the 2.5.  Enchanted

6      alone wired in over a billion dollars.  Nationwide wired in

7      895 million, and they don't even bother mentioning them.

8              If we go back again, you don't see anything

9      specifically about the purpose of those wires or Nationwide

10     and Enchanted.  Instead what do you see?  You see checks for

11     concert tickets and checks for utilities.  Okay?

12             If nearly $2 billion are being wired in from two

13     entities, again, you have to explain the purpose.  You have

14     to explain what's going on with that and why it's not

15     suspicious.

16             And the reason why, Ladies and Gentlemen, if we

17     just think about this common sense again, if something makes

18     sense, it makes sense.  You can explain it.  You can write

19     it down.  You can describe it.  The reason why they didn't

20     write this down is because it doesn't make sense.  It's

21     because they did not have an explanation for it.

22             Think about it this way.  If they would have

23     documented the truth, okay, let's say if they would have

24     done this -- because the only evidence in this case is that

25     Nationwide and Enchanted, that they were being held out to

1   the outside world as wholesalers, wholesalers who Petters

2   would buy the TVs from.  That's the only evidence in this

3   case.

4           And if they would have written down in their

5   comments this, they would have said Nationwide and Enchanted

6   wired in $1.9 billion and they were the two wholesalers who

7   Petters was supposed to be buying the TVs from.  Okay?  They

8   couldn't close the alert because that wouldn't make sense

9   for the business.

10          Let me do it a different way.  If they would have

11  said Nationwide and Enchanted wired in $1.9 billion and we

12  looked into them, we looked in the purpose, like Ms. Hile

13  says we're supposed to do, but we couldn't find anything out

14  about them, they couldn't close the alert.  They could not

15  close the alert.

16          The fact that the bank went ahead and chose to not

17  write down, not explain anything about Nationwide and

18  Enchanted shows that they were willfully blind and you may

19  and you can infer knowledge from that.

20          What else is missing from just this alert, this

21  alert on 60827?  We know that they looked at checks.  We

22  know that they looked at outgoing wires.  They don't say a

23  word in here about the fact that on this particular alert

24  there was $20 million in checks and wires to insiders.

25  Again, they mention concert tickets and utilities, but they

1    don't mention that.

2            I'll just show you this.  These are copies of the

3    checks.  It's Plaintiff's Exhibit 185A.  I won't go through

4    all of them.  I have made a little chart here to show you.

5    But you will be able to see the checks were like this to the

6    insiders:  Two and a half million dollars Deanna Munson to

7    Deanna Munson or Deanna Coleman to Deanna Coleman, a million

8    dollars, three and a half million dollars in a day, another

9    $500,000 to Deanna Coleman, another $1.3 million to Bob

10   White.  Okay?

11           When they're seeing these things and they're

12   seeing this many of them, Ladies and Gentlemen, they have to

13   explain it.  They have to in their alarms or in their

14   alerts, in those summaries explain there's all these checks

15   for all these millions of dollars of wires going to these

16   people and here's why.  And they didn't do it.

17           Same thing with wires.  There's many, many wires

18   on this same alert, not just overall, on this same exact

19   alert.  This is in Plaintiff's Exhibit 660.  I'll just show

20   you some of these, a chart of them.

21           You've got an $8 million wire to Tom Petters, a

22   $2 million wire to Tom Petters, a million dollars to Bob

23   White, a million dollars to Deanna Coleman, another, if you

24   add them up, million and a half to Bob White, all on the

25   same exact alert.  Again, none of it is mentioned.  They

1     give more detail to these things like concert tickets than

2     they did for that.

3             Let me show you exhibit -- I'm sorry, Alert 64556.

4     This is the Disney on Ice one.  Again, $1.4 billion in,

5     $1.4 billion out.  They mention this time Enchanted and

6     Nationwide both.  They don't say anything about it.  They

7     don't mention the fact that Enchanted and Nationwide wired

8     in over a billion dollars on this alert.  Don't explain what

9     the purpose of any of it was or how in the world that makes

10    sense for the business.  But they explain that there was

11    checks for Disney on Ice.

12            Again, the bank chose to close this alert without

13    explaining the most critical part of it.  That was willful

14    blindness, and you can and you should infer knowledge.

15            I'll show you another one.  This is Alert 69663.

16    This is the yacht.  1.2 billion in, 1.2 billion out.  Again,

17    similar pattern always, similar amounts of billions of

18    dollars going in and going out of this account.

19            And this one says that there was a $10 million --

20    the largest wire going out was for $10 million even and it

21    was to somebody in the yachting industry.  Doesn't explain

22    at all how a $10 million wire to somebody in the yachting

23    industry had anything to do with the Petters Company, Inc.

24    business, a business who is buying and selling TVs.  And

25    they're trained to look for this very thing.  This is the

1      most basic that it gets.

2              This is Plaintiff's Exhibit 5 again.  I walked

3      them through the integration process of money laundering on

4      the basics of what they're trained on, and you heard all

5      about what criminals do and what they're trained to look for

6      is criminals put their money in banks to try to clean it and

7      they try to put their money into things to make it look

8      legitimate.  And they train their people to look for these

9      basic things.  They buy cars.  They buy houses.  And this is

10     why I asked Ms. Pesch if we could add yachts to the list,

11     and she said sure.

12             This is the most basic, the most basic evidence of

13     money laundering, and they had it right in front of them,

14     Ladies and Gentlemen, and they chose to ignore it.  That's

15     willful blindness and you can infer knowledge from it.

16             Let's do one more.  This is Alert 83853.  This was

17     1.7 billion in and $1.7 billion out.  Again, comments

18     mention Nationwide.  Don't say anything about Enchanted, who

19     wired in $700 million on this alert.  Consistently, same

20     exact thing, consistent failures to identify the purpose or

21     explain the legitimate business purpose.

22             And I point this one out to you because, again,

23     another outgoing wire for $10 million even, just like the

24     last one.  It doesn't say anything about who it's to or what

25     it's for or how it makes sense.

1          And do you know who it was to?  Here it is.  Tom

2     Petters.  Comments don't mention anything about it or how

3     that made sense for Petters Company, Inc. as a business, yet

4     they still chose to close that alert without explaining it.

5     That is willful blindness, and you can and you should infer

6     knowledge from that.

7          Let's talk about the business bankers and what

8     they knew, because they could see from this transaction

9     activity too, these three things.  They could see too that

10    this activity wasn't right and that it didn't make sense.

11         Let's just stick on checks real quickly.  I'll

12    just address this and talk about Mr. Jambor, because the

13    operations department did reach out to Mr. Jambor and did

14    ask him about why in the world is Deanna Munson or Deanna

15    Coleman writing million dollar checks to herself.  That is a

16    total red flag.  And Mr. Jambor did find out that the reason

17    why was Ms. Coleman was building a house.

18         What does building a house have to do with the

19    Petters Company, Inc. business?  There's absolutely no

20    legitimate business purpose for that at all.  I think

21    counsel told you that Mr. Jambor reached back out and told

22    the operations group that.  That's not what Mr. Jambor

23    testified to.  He testified to he doesn't know what he told

24    the operations group.  We don't know what he told the

25    operations group and there's absolutely no evidence of that.

1           And, again, Mr. Jambor was trained on the basics,

2     the process of integration.  What do criminals do?  They

3     turn the money into things like houses.  This is the most

4     basic form of money laundering, and they could see it and

5     they knew it.

6           And the fact that Mr. Jambor didn't escalate it or

7     he didn't fill out the Suspicious Activity Log at this point

8     in time, that was willful blindness and you can and you

9     should infer knowledge.

10          And if the operations group reached out to

11    Mr. Jambor on two $1 million checks, all of the other checks

12    that were out there -- and these are just more checks and

13    these are more wires -- you can only imagine the

14    conversations that they had.  Imagine the e-mails on this

15    type of thing that we don't have because they destroyed

16    them.

17          Here's just examples of more checks from this time

18    period.  This is 2004.  A million dollars to Deanna Munson,

19    another million dollars to Deanna Munson, another million

20    dollars to Deanna Munson.  This is -- these are wires,

21    because at the same time all these wires are going out.

22    $8 million to Petters, $5 million to Bob White, 3.3 million

23    to Petters, 2.875 million to Petters, 2 million to Petters,

24    $1.6 million to Bob White.  Time and time and time again for

25    years, Ladies and Gentlemen, this is the activity that they

 1    could see and nobody explained how or why this made sense.

 2            So let's bring it to the test, and what I will

 3    call the test is Plaintiff's Exhibit 399.  And you heard me

 4    ask Ms. Hile about this and you heard me ask the anti-money

 5    laundering analysts about this, and they all admitted it.

 6    The test is this.  If the bank knows or suspects or even

 7    just has reason to suspect that there's suspicious activity,

 8    they have to report it, they have to file a SAR.  It's right

 9    here.

10            And just like how the guard would report it, just

11    like how the guard would call in for law enforcement, that's

12    exactly the purpose of this policy.  The bank completely

13    ignored all of those things that I just showed you about,

14    Ladies and Gentlemen, all of those things that gave the bank

15    at least reason to suspect that there was suspicious

16    activity and they ignored it.  That was willful blindness.

17    You can and you should infer knowledge from that.

18            Let's talk about how the bank assisted Petters.

19    Talk about the ghostwritten letters.  Okay?  Do you remember

20    Deanna Coleman testified -- or we asked Mr. Jambor about

21    these letters that Deanna Coleman wrote for Ed Jambor.  She

22    actually wrote a letter to give to Ed Jambor and told him,

23    Go ahead and put your letterhead on this and sign it as if

24    you wrote it.  And he did.

25            This is Plaintiff's Exhibit 55, Plaintiff's

1    Exhibit 66.  He copied and pasted it.  He didn't even bother

2    to fix the typo in the first sentence on the word "please."

3    Okay?

4             This doesn't happen in real life.  You don't get

5    to just call up our bank and say, Hey, I have a depository

6    account with you.  So what I've done is I've written this

7    letter that I want you to put on your letterhead as my

8    banker and then sign it and give it back to me and I'm going

9    to do whatever I want to do with it.  That doesn't happen,

10   Ladies and Gentlemen.  That is why Cathy Ghiglieri testified

11   that is completely atypical banking practice.  And

12   Mr. Jambor did it to assist Petters with it and that's why

13   it was done.

14            Let's talk about those Document Account Control

15   Agreements or the DAMA that Christopher Flynn signed.  This

16   agreement, you heard testimony on it, contemplated, for

17   example, Costco wiring money into the account.

18            Mr. Flynn knew that he was never going to have to

19   do anything on this agreement because he knew that there had

20   never been a single retailer in the history of this account

21   who had ever wired money into the account.  And he went

22   ahead and signed it anyways.  He himself called it special

23   handling.  This is Plaintiff's Exhibit 20.

24            And we know the real reason why he did it was to

25   accommodate the convicted money launderer Frank Vennes.

1    Okay?  Banks don't do that.  Banks don't go out of their way

2    to sign agreements that they've never had any experience

3    with to accommodate convicted money launderers or to

4    accommodate their customers who are doing business with

5    convicted money launderers.

6          And this agreement was signed in 2008.  So you

7    know that he met with him in 2002.  You knew he was a

8    convicted money launderer.  He wouldn't give him a loan.  He

9    knows that they've been doing business with him all the way

10   up to 2008.  Even though he is not willing to put his own

11   money into it or the bank's own money into it to give him a

12   loan, he's willing to sign an agreement to accommodate him

13   in 2008.  That's not right, Ladies and Gentlemen.  Banks

14   don't do that.  That's exactly why Ms. Ghiglieri confirmed

15   that is an atypical banking practice.

16         And if we just talk about atypical banking

17   practices and look at volumes on the Petters Company, Inc.

18   account for a second, because over $74 billion in wires were

19   processed on the account and the bank could see it and the

20   bank knew it.

21         If you look at -- the bank took 10,000, 10,000

22   phoned-in wires.  So they had 10,000 conversations with

23   Deanna Coleman.  Just imagine picking up your phone 10,000

24   times.  Okay?  That's what happened on this account.

25         Ms. Coleman was wiring in and calling in wires six

1    times a day.  That means on a normal day she's calling in a

2    wire about every hour and 20 minutes.  So three in the

3    morning, three in the afternoon, going on all day long.

4    That doesn't happen, Ladies and Gentlemen.  That is atypical

5    banking practices.

6            They also processed, the bank also processed

7    nearly $100 million in checks and wires to insiders without

8    saying a word about it.  Again, atypical.  Doesn't happen.

9            Let's talk about opportunity for just a moment,

10   because Petters was a big opportunity for this bank.  Just

11   take the Polaroid example.  Remember how the bank tried to

12   get in on the Polaroid deal?  They didn't get it and they

13   talked about how mad they were about not getting it and they

14   called it all a bunch of BS because they weren't able to be

15   the bank on it, but they still tried and they kept trying

16   over and over and over to seize on these opportunities that

17   they had with Petters.

18           I think Mr. Grice talked about how M&I Bank was

19   trying to gain a big presence here in Minnesota.  Well, what

20   better opportunity to gain presence in Minnesota than to go

21   and work with a guy who was supposedly very well known?

22           And that's why Mr. Flynn himself took over that

23   customer when Mr. Jambor left the bank.  He wasn't in the

24   business of taking over customers at that point in time.

25   That wasn't part of his role.  But he chose to take over

3770

1      this customer because it was a big opportunity.

2              Let me flip this around, okay, and talk about the

3      one opportunity that the bank didn't pursue, and this is

4      incredibly important for the bank's knowledge.  Okay?

5      What's the one thing that they didn't try to sell Tom

6      Petters?  We heard all about how, you know, where the bank

7      really makes its money?  It makes its money by giving loans.

8      That is the bread and butter of banking, and you heard all

9      about it.

10             But neither Mr. Flynn nor Mr. Jambor seriously

11     thought about pursuing Tom Petters, asking him if the bank

12     could loan him money for his business.  They knew the

13     business depended on borrowing money.  They knew the

14     business depended on being willing to pay high interest

15     rates.  This is what Mr. Flynn said about it, never once

16     pitched to PCI the idea of the bank funding any of these

17     sales of electronics from wholesalers to retailers.

18             Okay.  Think about this.  If you have a top

19     customer and the bank seriously thinks it's got a legitimate

20     customer where billions of dollars are going in and out of

21     that customer's account and their business depends on

22     borrowing money and paying high interest rates, where are

23     you going to focus your efforts on selling them?  It's going

24     to be on giving loans, and the bank didn't do that.

25             Let me bookend it for you.  I'll put this all

1    together for you.  We've got 2002 where you've got the bank

2    wouldn't loan Frank Vennes money to invest in Petters

3    Company, Inc.

4         You also heard testimony from Mr. Flynn about this

5    wealthy individual named Paul Taunton.  In 2008 Paul Taunton

6    reaches out to the bank and he wants a loan to invest in

7    Petters Company, Inc. and the bank says, no, we're not going

8    to give that you loan.

9         So you've got 2002, you've got 2008, both saying

10   we're not going to put up our money for anybody to be

11   investing in Petters Company, Inc.  And in between, what do

12   they do?  They don't sell him the one opportunity where they

13   make their money.  And that's telling, Ladies and Gentlemen.

14        Let's talk about Ms. Ghiglieri for a minute.

15   Ms. Ghiglieri was the first woman bank commissioner in

16   Texas.  She was a former bank examiner.  And unlike any of

17   BMO's experts, she actually went through all the

18   transactions herself.  She looked at every wire transaction.

19   She looked at every bank statement.  She looked at every

20   check to figure out what was going on and giving her opinion

21   how this was all completely unusual and how the bank didn't

22   do what it was supposed to do.

23        The bank's expert, Mr. Charles Grice, he testified

24   too.  And what he basically said is the bank didn't do

25   anything wrong, the bank did everything right.  That was

1    basically his testimony.  In fact, under the standards that

2    Mr. Grice testified to, I don't know how any bank is ever

3    going to find suspicious activity on any account based on

4    what he said.

5           And if what Mr. Grice says is true, that the bank

6    did everything right and did nothing wrong, then how in the

7    world -- ask yourself this question -- how in the world did

8    they miss billions of dollars coming into that account the

9    wrong way from Nationwide and Enchanted?  How in the world

10   did they miss or not even bother to address the fact that

11   nearly $100 million went out of that account to insiders?

12          This was the scorecard that Mr. Anthony showed

13   Mr. Grice and talked with him about.  This shows the

14   difference between Ms. Ghiglieri and Ms. Grice -- or

15   Mr. Grice.  And on the left is what Ms. Ghiglieri said her

16   work revealed about the bank's practices that allowed

17   Petters to perpetuate the scheme.  We have talked about

18   nearly all of these.

19          And as Ms. Ghiglieri testified, if the bank hadn't

20   turned a blind eye to these things right here, Ladies and

21   Gentlemen, these activities, the PCI account would have been

22   shut down and Mr. Kelley would not be in the position of

23   coming here and trying to collect the $1.926 billion to

24   investors who lost that money.

25          That brings us to damages.  Let's talk about

1     damages.  Let's talk about Mr. Kelley's damages expert, Ted

2     Martens.  Mr. Martens was an accountant who worked at one of

3     the biggest accounting firms in the world,

4     PricewaterhouseCoopers.

5           Mr. Martens was also approved by the court,

6     approved by the court in 2008 to come in and work with

7     Mr. Kelley to do a forensic accounting of the fraud and to

8     map out all of the money that went in and out of the

9     account.  He tracked every cent.  He tracked every cash

10    transaction, every wire, every note.

11          And in this case he tracked all of the money that

12    the investors loaned to Petters Company, Inc. and he was

13    able to do that.  And those debts, those debts that he

14    tracked, those are the debts that investors are owed and

15    that amount is $1.926 billion.

16          BMO's damages expert, Mr. Jarek, he found

17    absolutely no errors in Mr. Martens' report and he admitted

18    it.  He even relied on Mr. Martens' work to form his

19    opinions.  And Mr. Jarek agreed, he agreed on the stand that

20    the amount that the investors lost was $1.926 billion.

21          I just want to talk for a second about burden of

22    proof and then I want to go to the verdict form.  Some of

23    you have maybe seen on TV or if you've watched any of the

24    criminal trials over the last couple of years here in

25    Minnesota, you've heard about the burden of proof being

1    beyond a reasonable doubt.  Okay?  And as Judge Wright will

2    instruct you, that is not the burden in this case.

3           The burden in this case is much, much less.  The

4    burden in this case is called preponderance of the evidence.

5    I want to show what you that means because if you think of

6    these two stacks of paper right here as the scales of

7    justice, okay, what Mr. Kelley's burden is in proving these

8    claims that we're about to go through, this (indicating) is

9    Mr. Kelley's burden.  This is it.  Okay?  It's more likely

10   than not.  Just a little bit.  Mr. Kelley proves that, you

11   find in favor of Mr. Kelley.

12          And I ask that when you go back in that room and

13   you decide on your verdict, Ladies and Gentlemen, that when

14   you're considering whether or not Mr. Kelley has met his

15   burden, you consider the tens of millions of pages of

16   e-mails and documents that were intentionally destroyed that

17   you should assume were adverse and detrimental to BMO.

18          Let's go to the verdict form.  I think I have

19   about ten minutes left.  I want to show you how to fill out

20   the verdict form.  Here it is.  This is what you are going

21   to see when you go back in the room.

22          The first question you're going to be asked is

23   going to be:  "Do you find in favor of the plaintiff for the

24   violation of the Minnesota Uniform Fiduciaries Act?"  The

25   answer to that question is "yes."

1          This is going to be the jury instruction that you

2     get that will lay out the elements, and I will just tell you

3     real quickly how we met this.  We have met every one of

4     these elements, and there are four elements:

5          Petters and Coleman were fiduciaries and the bank

6     knew it.

7          The bank let them make thousands of wires and

8     checks on the account.

9          Petters and Coleman breached their fiduciary

10    duties by sending these checks and wires.

11         And the bank knew enough to know that allowing

12    checks and wires was bad faith.  And when you're thinking

13    about that and you're thinking about willful blindness, you

14    can and you should infer knowledge from that.

15         Let's go to the next question that you will be

16    asked to answer.  "Do you find in favor of plaintiff for

17    breach of fiduciary duty?"  The answer to that is "yes."

18         And the jury instruction will be Jury Instruction

19    Number 14.  It will lay out three elements, and we've proved

20    every one of those and here they are:

21         The bank owed Petters Company, Inc. a fiduciary

22    duty because the bank signed those Control Agreements that

23    we talked about.

24         And they agreed to act as a custodian of Petters

25    Company, Inc.'s account for the benefit of Petters Company,

1       Inc.

2               And the bank breached that duty by not taking any

3       actions to protect the funds in the Petters Company, Inc.

4       account, including the billions of dollars that were

5       transferred out after the bank assumed that duty and those

6       breaches, Ladies and Gentlemen, those breaches harmed

7       Petters Company, Inc.

8               The third question you'll have to answer is:  "Do

9       you find in favor of plaintiff on aiding and abetting

10      fraud?"  The answer to that is "yes."

11              The jury instruction that will give you the proof

12      for the elements is Jury Instruction Number 16.  There's

13      four elements and Mr. Kelley proved them all.

14              Petters and Coleman ran a massive fraud and that

15      left Petters Company unable to pay its investors.

16              Second, the bank turned a blind eye.  It was

17      willfully blind to the fraud.  And you can and you should

18      infer knowledge from that.

19              Third, the bank helped Petters and Coleman keep

20      the fraud going.  You heard all about it.

21              Fourth, the bank played a substantial role in

22      harming Petters Company, Inc.  This fraud could not have

23      happened, it could not have been carried out without a bank

24      who was willing to let that happen.

25              Fourth question you'll have to answer is:  "Do you

1      find in favor of the plaintiff for aiding and abetting

2      breach of fiduciary duty?"  The answer to that is "yes."

3              The elements are in Jury Instruction Number 18.

4      There's four elements, and we met them all.

5              Petters and Coleman breached their fiduciary duty

6      to Petters Company, Inc. by running the Ponzi scheme through

7      Petters Company, Inc., writing checks and wiring millions

8      and millions and millions of dollars to themselves.

9              Second, the bank willfully blinded itself to

10     thousands of suspicious transactions conducted by Petters

11     and Coleman.  You can infer that the bank knew there was

12     fraud from their willful blindness.

13             Third, the bank helped Petters and Coleman breach

14     their fiduciary duties.

15             And, fourth, the bank played a substantial part in

16     Petters and Coleman breaching their duties.  Without the

17     bank's help, they couldn't have run the Ponzi scheme and

18     they could not have continued to steal the money.  It just

19     couldn't be done.

20             If you answer "yes" to any of those questions, no

21     matter which one, you go to damages.  And the damages in

22     this case are the same for every single one of those claims,

23     and the damages are the $1.926 billion.  It's always the

24     debts.  It's always the debts owed to Petters Company, Inc.

25     investors.  It's always going to be that amount of money for

1    every single answer.

2              Counsel talked about two affirmative defenses that

3    I will just touch on real quickly.

4              Statute of limitations first.  All you need to

5    know about that is, as you heard Mr. Martens say, there were

6    no damages until after two thousand -- December of 2007.

7    That's when that period would run.

8              He also talked about this consent and

9    ratification.  Okay?  That's a big nothing.  You shouldn't

10   consider the conduct of the fraudsters.  And certainly

11   Mr. Kelley didn't consent to anything when you get to that

12   part.

13             Talk about punitive damages for a moment.  You

14   have the opportunity to award punitive damages in this case,

15   and the purpose of punitive damages is to punish and

16   discourage wrongful conduct.  Okay?

17             So the question you have to ask yourself is should

18   BMO be punished to prevent this from happening again, and

19   the simple answer to that is yes.

20             In making your decision, you get to consider --

21   you will have a host of factors to consider, but two things

22   that you consider is the conduct of BMO, what BMO did, and

23   its ability to pay.  Okay?

24             And if you talk about the conduct of BMO, of

25   course you look at the fact that this scheme went on and

1    exploded from 2001 until 2008 and became a massive

2    multi-billion dollar Ponzi scheme under their watch because

3    they were willfully blind to that activity that they knew

4    was suspicious and didn't stop.

5           But also factor in that they intentionally

6    destroyed tens of millions of pages of e-mails and documents

7    so that you couldn't see them in this courtroom.  And BMO

8    needs to know that that type of conduct is not right and it

9    cannot be tolerated, and that's really all that needs to be

10   said about that.

11          In determining BMO's ability to pay, I'll just

12   show you some financials for BMO.  BMO Harris Bank is part

13   of the Bank of Montreal of Canada, and the Bank of Montreal

14   is the parent company and they have $988 billion in Canadian

15   assets.  BMO Harris Bank has about $166 billion in American

16   assets.  And you can consider that when you're determining

17   punitive damages.

18          So the question is for you:  If you decide to

19   award punitive damages, what number represents justice?  And

20   whatever number you decide to put in needs to speak to BMO.

21          I'll leave with you this, Ladies and Gentlemen.

22   Mr. Kelley's request after this 14-year-long journey that

23   he's been on is simple, it's that you find justice, it's

24   that you do what's right, and that you return a verdict in

25   Mr. Kelley's favor.

1          I thank you so much for your service.  I thank you

2    so much for all the time that you've given.  I wish you all

3    well in life.  Thank you so much.

4          Thank you, Your Honor.

5          THE COURT:  Members of the Jury, we will break now

6    for our lunch break.  Please continue to abide by the

7    instructions that I have given you before, not to discuss

8    the case with anyone, not to allow anyone to discuss the

9    case with you, not to do any research of any kind about the

10   case.

11         We will plan to resume with final jury

12   instructions at 12:30 p.m.  I hope you have a good lunch.

13   All rise.

14        (Jury excused)

15                         **IN OPEN COURT**

16                      **(JURY NOT PRESENT)**

17         THE COURT:  We'll be in recess until 12:30.  Thank

18   you, Counsel.

19        (Lunch recess taken at 11:23 a.m.)

20                     *    *    *    *    *

21        (12:31 p.m.)

22                         **IN OPEN COURT**

23                       **(JURY PRESENT)**

24         THE COURT:  Good afternoon.  Please be seated.

25         We are ready for our final jury instructions.

1          Members of the Jury, the instructions that I gave

2    at the beginning of the trial and during the trial are still

3    in effect, and I will now give you additional instructions.

4          You must follow all of my instructions, the ones I

5    gave you earlier, as well as those I give you now.  Do not

6    single out some instructions and ignore others, because they

7    all are important.  This is true even though I will not

8    repeat some of the instructions that I gave you at the

9    beginning of or during the trial.

10         Now, in the jury room you will have copies of the

11   instructions I am about to give you now.  Remember, you have

12   to follow all of the instructions, no matter when I give

13   them, whether or not you have received them in written

14   copies or not.  So whether or not you have written copies.

15         BMO Harris Bank N.A. or BMO is a corporation, and

16   M&I Marshall & Ilsley Bank (M&I) and Petters Company, Inc.

17   (PCI) were corporations.  A corporation is entitled to the

18   same fair trial as a private individual.  All litigants,

19   including corporations and other organizations, stand equal

20   before the law and are to be treated as equals in a court of

21   justice.

22         A corporation acts only through its agents or

23   employees, and any agent or employee of a corporation binds

24   the corporation when acting within the scope of his or her

25   duties as an employee of the corporation.

1            As a general rule, when corporations merge the

2      surviving corporation takes on the obligations of the

3      non-surviving corporation.  You have been told or seen

4      evidence that M&I merged into the Harris Bank N.A. to form

5      BMO Harris Bank N.A.  Therefore, as a result of this merger,

6      BMO is responsible for all of M&I's liabilities.

7            Now, when I use the word "evidence," I mean the

8      testimony of witnesses -- I'm sorry, I mean the testimony of

9      witnesses, documents and other things I received as

10     exhibits, facts that I told you the parties have agreed are

11     true, and any other facts that I told you to accept as true.

12            Some things are not evidence, and I will tell you

13     now what is not evidence.

14            Lawyers' statements, arguments, questions, and

15     comments are not evidence.

16            Documents or other things that might have been in

17     court or were talked about but that I did not receive as

18     exhibits are not evidence.

19            Objections are not evidence.  Lawyers have a right

20     and sometimes a duty to object when they believe something

21     should not be part of the trial.  Do not be influenced one

22     way or the other by objections.  If I sustained an objection

23     to a question or an exhibit, that means the law does not

24     allow you to consider the information.  When that happens,

25     you have to ignore the question or the exhibit and you must

1      not try to guess what the information might have been.

2           Testimony and exhibits that I struck from the

3      record or told you to disregard are not evidence and you

4      must not consider them.

5           And anything you saw or heard about this case

6      outside the courtroom is not evidence and you must not

7      consider it.

8           Some of you may have heard the terms "direct

9      evidence" and "circumstantial evidence."  You should not be

10     concerned with those terms, as the law makes no distinction

11     between the weight to be given to direct and circumstantial

12     evidence.

13          Now, certain charts, graphics, and summaries have

14     been shown to you but not admitted into evidence in order to

15     help explain the facts disclosed by the books, records, or

16     other underlying evidence in the case.

17          Those charts, graphics, and summaries are used for

18     convenience.  They are not themselves evidence or proof of

19     any facts.  If they do not correctly reflect the facts shown

20     by the evidence in the case, you should disregard these

21     charts, graphics, and summaries and decide the facts from

22     the books, records, or other underlying evidence.

23          Now, certain summaries and charts were admitted in

24     evidence as Exhibits 703, 705, 706, 713, 40495, and 50928.

25     You may use those summaries and charts as evidence, even if

1     the underlying documents and records are not here.

2            However, the accuracy of those summaries and

3     charts has been challenged.  It is for you to decide how

4     much weight, if any, you will give to them.  In making that

5     decision, you should consider all of the testimony you heard

6     about the way they were prepared.

7            Now, in deciding what the facts are, you may have

8     to decide what testimony you believe and what testimony you

9     do not believe.  You may believe all of what a witness said

10    or only part of it or none of it.

11           You may consider a witness's intelligence; the

12    opportunity the witness had to see or hear the things

13    testified about; a witness's memory, knowledge, education

14    and experience; any reasons a witness might have for

15    testifying a certain way; how a witness acted while

16    testifying; whether a witness said something different at

17    another time; whether a witness's testimony sounded

18    reasonable; and whether or to what extent a witness's

19    testimony is consistent with other evidence you believe.

20           In deciding whether to believe a witness, remember

21    that people sometimes hear or see things differently and

22    sometimes forget things.  You will have to decide whether a

23    contradiction is an innocent misrecollection or a lapse of

24    memory or an intentional falsehood.  That may depend on

25    whether it has to do with an important fact or only a small

1    detail.

2              You have heard testimony from experts, Cathy

3    Ghiglieri, Theodore Martens, Karl Jarek, and Charles Grice,

4    who testified to opinions and the reasons for the opinions.

5    This opinion testimony is allowed because of the education

6    or experience of these witnesses.

7              You should judge this opinion testimony just as

8    you would any other testimony.  You may accept it or reject

9    it and give it the weight you think it deserves, considering

10   the witness's education and experience, the reasons given

11   for the opinion, and all other evidence in this case.

12             You have seen and heard evidence pertaining to

13   examinations conducted by the Federal Reserve Bank of

14   Chicago.  This evidence may be considered by you only for

15   the purpose of evaluating the accuracy and credibility of

16   the opinions and testimony of Catherine Ghiglieri and

17   Charles Grice.  This evidence may not be considered for any

18   other purpose.

19             You have heard evidence that a witness, Deanna

20   Coleman, also referred to as Deanna Munson, has been

21   convicted of crimes.  You may use that evidence to help you

22   decide whether to believe the witness and how much weight to

23   give her testimony.

24             You have heard evidence that BMO destroyed e-mail

25   backup tapes that should have been preserved.  You may, but

1   are not required to, assume that the contents of the

2   destroyed e-mail tapes would have been adverse or

3   detrimental to BMO.

4          The burden is on the plaintiff in a civil action,

5   such as this, to prove every essential element of his claims

6   by the greater weight of the evidence.  If the proof should

7   fail to establish any essential element of a claim by the

8   greater weight of the evidence in the case, the jury should

9   find for the defendant as to that claim.

10          At the same time, the burden is on the defendant

11   to prove every essential element of its affirmative defenses

12   by the greater weight of the evidence.  If the proof should

13   fail to establish any essential element of an affirmative

14   defense by the greater weight of the evidence in the case,

15   the jury should find for the plaintiff as to that

16   affirmative defense.

17          You must decide whether certain facts have been

18   proved by the greater weight of the evidence.  A fact has

19   been proved by the greater weight of the evidence if you

20   find that it is more likely true than not true.  You decide

21   that by considering all of the evidence and deciding what

22   evidence is more believable.

23          You have probably heard the phrase "proof beyond a

24   reasonable doubt."  That is a stricter standard than more

25   likely true than not true.  It applies in criminal cases,

3787

1    but not in this civil case.  It does not apply here.

2            Now, let me turn to the four claims asserted by

3    Plaintiff Douglas A. Kelley, in his capacity as the Trustee

4    of the BMO Litigation Trust, in this case and what he must

5    prove to prevail on each of them.  In order to prevail on

6    any claim, plaintiff must prove each of the elements of that

7    claim by a greater weight of the evidence.

8            Plaintiff Kelley is what is known as a litigation

9    trustee, and he is here bringing claims for harm that he

10   alleges was done to PCI by BMO.  Plaintiff alleges four

11   claims or counts against BMO:

12           Count I, violation of the Minnesota Uniform

13   Fiduciaries Act (MUFA), Minnesota Statute Section 520.08;

14   Count II, Breach of Fiduciary Duty; Count III, Aiding and

15   Abetting Fraud; Count IV, Aiding and Abetting Breach of

16   Fiduciary Duty.

17           In response to plaintiff's claims, BMO asserts

18   affirmative defenses to liability: statute of limitations,

19   consent and ratification.  I will now instruct you as to the

20   legal elements of each claim and each affirmative defense.

21           In Count I plaintiff claims that BMO violated the

22   Minnesota Uniform Fiduciaries Act.  To satisfy his burden of

23   proof as to this claim, plaintiff must prove, with respect

24   to each individual transfer that he alleges violated this

25   law, the following four elements:

1          First, M&I knew it was dealing with a fiduciary of

2    PCI who was empowered to wire funds from the PCI account or

3    write a check against the PCI account;

4          Second, M&I allowed a PCI fiduciary to wire funds

5    from the PCI account or write a check against the PCI

6    account;

7          Third, by wiring funds from the PCI account or

8    writing a check against the PCI account, the PCI fiduciary

9    breached a fiduciary duty owed to PCI; and

10         Fourth, either M&I had actual knowledge that the

11   PCI fiduciary was committing a breach of an obligation as a

12   fiduciary in completing a specific wire transfer or writing

13   a specific check or M&I had knowledge of such facts so that

14   M&I's actions in writing -- I'm sorry, in wiring the funds

15   or paying the check amounted to bad faith.

16         The following instructions apply to Count I:

17         Fiduciary.  A fiduciary includes a trustee under

18   the trust, expressed, implied, resulting or constructive, an

19   executor, an administrator, a guardian, a conservator, a

20   curator, a receiver, a trustee in bankruptcy, an assignee

21   for the benefit of creditors, a partner, an agent, an

22   officer of any corporation public or private, a public

23   officer, or any other person acting in a fiduciary capacity

24   for any person, trust or estate.

25         Here the parties have agreed that Tom Petters,

1    Deanna Coleman, and Robert White each had a fiduciary duty

2    to PCI.  You may accept these fiduciary duties as proven.

3         Breach of fiduciary duty.  A fiduciary breaches

4    his or her fiduciary duty if the fiduciary fails to act in

5    the best interests of the principal and with the care an

6    ordinary prudent person in a like position would exercise

7    under similar circumstances.

8         Knowledge.  Knowledge may be proven by direct or

9    circumstantial evidence.

10        Bad faith.  An act done with dishonesty of belief,

11   purpose, or motive constitutes bad faith.  An act that is

12   done honestly, even if it was done negligently, cannot

13   support a finding of bad faith.

14        In Count II plaintiff claims that M&I breached a

15   fiduciary duty which plaintiff alleges M&I owed to PCI as a

16   result of the Deposit Account Control Agreements and Deposit

17   Account Management Agreement about which you heard evidence

18   in this case.  To satisfy his burden of proof as to this

19   claim, plaintiff must prove the following three elements:

20        First, M&I owed a fiduciary duty to PCI; second,

21   M&I breached the fiduciary duty; and, third, M&I's breach of

22   that fiduciary duty proximately caused harm to PCI.

23        The following instructions apply to Count II:

24        Fiduciary duty.  A bank owes its depositor a

25   fiduciary duty if a bank and its depositor have what is

1    known as a special relationship.  A party seeking to

2    establish the existence of a special relationship must prove

3    that:

4            One, a bank knew or had reason to know that its

5    depositor was placing a high level of trust and confidence

6    in the bank and relying on the bank to counsel and inform

7    it;

8            Two, a depositor, in fact, placed a high level of

9    confidence in its bank, which resulted in the bank

10   exercising superiority and influence over the depositor;

11           Three, a bank and its depositor had a confidential

12   relationship and the bank had greater access to relevant

13   facts and legal resources than the depositor; or

14           Four, a bank and its depositor had different

15   levels of business experience and the bank invited the

16   depositor to place its confidence in the bank.

17           Breach of fiduciary duty.  A fiduciary breaches

18   the fiduciary duties if the fiduciary fails to act in the

19   best interests of the principal and with the care an

20   ordinarily prudent person or entity in a like position would

21   exercise under similar circumstances.

22           Proximate cause.  A proximate cause is a cause

23   that has a substantial part in bringing about the alleged

24   harm.  There may be more than one proximate cause that

25   contributes to a harm.

1      Instruction 16.  In Count III plaintiff claims

2      that M&I aided and abetted fraud by providing substantial

3      assistance to Tom Petters, Deanna Coleman, and/or Robert

4      White with knowledge of their fraud.  To satisfy his burden

5      of proof as to this claim, plaintiff must prove the

6      following four elements:

7           First, that Tom Petters, Deanna Coleman, and/or

8      Robert White committed a fraud that caused harm to PCI;

9           Second, that M&I knew that the conduct of Tom

10     Petters, Deanna Coleman, and/or Robert White constituted a

11     fraud;

12          Third, that M&I substantially assisted or

13     encouraged Tom Petters, Deanna Coleman, and/or Robert White

14     in committing the fraud; and

15          Fourth, that M&I's substantial assistance or

16     encouragement was a proximate cause of PCI's harm.

17          Instruction 17.  The following instructions apply

18     to Count III:

19          Fraud.  Fraud occurs if an individual (1) falsely

20     represents a past or present material fact to another person

21     or entity; (2) at the time the representation was made, the

22     individual knew that his or her representation of the

23     material fact was false; (3) the individual made the false

24     representation with the intent that the other person or

25     entity would rely on it; (4) the other person or entity

1   reasonably relied and acted on the false representation; and

2   (5) the other person or entity was harmed as a result of

3   relying on the false representation.

4           The parties have introduced into evidence the

5   criminal convictions of PCI, Thomas Petters, Deanna Coleman,

6   and Robert White.  Under the Federal Rules of Evidence,

7   evidence of a final judgment of conviction can be used to

8   prove any fact essential to the judgment.

9           I am instructing you that the following facts were

10  essential to those convictions.  In other words, you may

11  infer that, when finding Petters, Coleman and White guilty,

12  the following facts were either admitted by those criminal

13  defendants or proven beyond a reasonable doubt:

14          Through September 2008 Thomas J. Petters was the

15  owner, director, and CEO of Petters Company, Inc. (PCI), and

16  Deanna Coleman and Robert White were corporate officers of

17  PCI.  During that time Petters, Coleman and White used PCI

18  to operate a criminal scheme to defraud investors, also

19  known as a Ponzi scheme.  Specifically, PCI obtained

20  billions of dollars in money and property based on false

21  statements to investors that PCI was purchasing consumer

22  electronic goods from two supplier companies and then

23  selling those goods to big-box retailers.

24          In connection with this scheme, Petters, Coleman,

25  and White used fake purchase orders, invoices, and other

1    documents to fraudulently induce investors to loan money to

2    PCI.  But rather than using the loan proceeds to purchase

3    consumer goods for sale to retailers, Petters and PCI used

4    the funds to, among other things, make lulling payments to

5    investors and to pay themselves.  In connection with the

6    fraud, Petters or his co-conspirators caused money to be

7    transferred to and from PCI's bank accounts.

8          Material Fact.  A material fact -- I'm sorry.  A

9    fact is material if it would have influenced the other

10   person's judgment or decision had the other person known

11   about it.

12         An omission of a material fact is treated as a

13   misrepresentation when the person who omitted the material

14   fact had a fiduciary duty to the person from whom it was

15   omitted.

16         Here Petters, Coleman, and White had a fiduciary

17   duty to the creditors.

18         Knowledge.  Knowledge may be proven by direct or

19   circumstantial evidence.

20         Substantial Assistance.  Substantial assistance is

21   an affirmative step that is a substantial factor in bringing

22   about an end result.

23         Knowledge and substantial assistance evaluated in

24   tandem.  For aiding-and-abetting claims, knowledge and

25   substantial assistance are evaluated in tandem.  Therefore,

1    the stronger the evidence of a person or entity's general

2    awareness of fraud, the less evidence of that person's or

3    entity's substantial assistance is required.  Similarly, the

4    stronger the evidence of a person or entity's substantial

5    assistance, the less evidence of general awareness is

6    required.

7              Proximate cause.  A proximate cause is a cause

8    that had a substantial part in bringing about the harm at

9    issue.  There may be more than one proximate cause that

10   contributes to a harm.

11             We're at Jury Instruction 18.  Count IV alleges

12   that M&I aided and abetted a breach of fiduciary duty.  To

13   satisfy his burden of proof as to this claim, plaintiff must

14   prove the following four elements:

15             First, that Tom Petters, Deanna Coleman, or Robert

16   White breached a fiduciary duty they owed to PCI;

17             Second, that M&I knew that the conduct of Tom

18   Petters, Deanna Coleman, or Robert White constituted a

19   breach of fiduciary duty to PCI;

20             Third, that M&I substantially assisted or

21   encouraged Tom Petters, Deanna Coleman or Robert White in

22   committing their breach of a fiduciary duty owed to PCI;

23             Fourth, that M&I's substantial assistance or

24   encouragement was a proximate cause of PCI's harm.

25             The following instructions apply to Count IV:

1    Fiduciary duty.  Here the parties agree that Tom Petters,

2    Deanna Coleman, and Robert White each had a fiduciary duty

3    to PCI.  You may accept these fiduciary duties as proven.

4              Breach of fiduciary duty.  A fiduciary breaches

5    his or her fiduciary duty if the fiduciary fails to act in

6    the best interests of the principal and with the care an

7    ordinarily prudent person in a like position would exercise

8    under similar circumstances.

9              Knowledge.  Knowledge may be proven by direct or

10   circumstantial evidence.

11             Substantial assistance.  Substantial assistance is

12   an affirmative step that is a substantial factor in bringing

13   about an end result.

14             Knowledge and substantial assistance evaluated in

15   tandem.  For aiding-and-abetting claims, knowledge and

16   substantial assistance are evaluated in tandem.  Therefore,

17   the stronger the evidence of a person's or entity's general

18   awareness of breach of fiduciary duty, the less evidence of

19   that person's or entity's substantial assistance is

20   required.  Similarly, the stronger the evidence of

21   substantial assistance, the less evidence of general

22   awareness is required.

23             Proximate cause.  A proximate cause is a cause

24   that had a substantial part in bringing about the harm at

25   issue.  There may be more than one proximate cause that

1    contributes to a harm.

2              Jury Instruction 20.  BMO's first affirmative

3    defense alleges that plaintiff's claims are barred by the

4    statute of limitations.  Your verdict must be for BMO and

5    against plaintiff on any counts for which you find that BMO

6    has proved this affirmative defense by the greater weight of

7    the evidence.

8              Plaintiff's claims have a six-year statute of

9    limitations.  This means that such claims must be brought

10   within six years of the date the claims accrued.  This

11   lawsuit commenced on November 15, 2012.  Plaintiff's claims

12   accrued when the relevant facts supporting each element came

13   into existence, including damages.  Facts supporting damages

14   exist when some nonspeculative, compensable harm occurs.

15             You must decide for each of plaintiff's claims

16   whether BMO has proven by the greater weight of the

17   evidence that the claim accrued more than six years before

18   November 15th, 2012.

19             If you find that BMO has proven that a claim

20   accrued more than six years before November 15th, 2012, you

21   must also determine whether any action by M&I or BMO

22   suspended the statute of limitations for that claim.  In

23   order to find any such suspension of the statute of

24   limitations, plaintiff must prove by the greater weight of

25   the evidence:

1          First, that fraudulent or intentional concealment

2     of the facts establishing a claim occurred.  If you find

3     such concealment, plaintiff must also prove that the

4     concealment was affirmative, unless you find that the

5     concealment occurred in a fiduciary relationship;

6          Second, that the concealment was not and could not

7     have been discovered by plaintiff, exercising reasonable

8     diligence, within six years of November 15th, 2012;

9          Third, that the concealment was not the result of

10    plaintiff's own negligence.

11         If you find that plaintiff has proved suspension

12    of the statute of limitations, then BMO has not proved its

13    statute of limitations defense.

14         Jury Instruction Number 21.  BMO's second

15    affirmative defense alleges that plaintiff's claims are

16    barred by consent or ratification.  Your verdict must be for

17    BMO and against plaintiff on any counts for which you find

18    that BMO has proved this defense by the greater weight of

19    the evidence.

20         Consent.  Consent occurs when someone, having full

21    knowledge of all material facts related to an otherwise

22    unauthorized act, expressly or implicitly agrees to the act.

23         Ratification.  Ratification occurs when someone,

24    having full knowledge of all material facts related to an

25    otherwise unauthorized act, approves or affirms the act.

1              Full knowledge of material facts.  A person or

2     entity cannot be charged with full knowledge of the material

3     facts related to an otherwise unauthorized act based on the

4     knowledge of someone acting to defraud that person or

5     entity.

6              Jury Instruction 22.  I will now instruct you on

7     the issue of compensatory damages.

8              The fact that I am about to instruct you as to the

9     proper measure of damages should not be considered as

10    suggesting any view of mine as to which party is entitled to

11    your verdict in this case.  Instructions as to the measure

12    of damages are given for your guidance in the event that you

13    find in favor of plaintiff from the greater weight of the

14    evidence in the case in accordance with the other

15    instructions.

16             Questions 5 and 6 in the verdict form are the

17    damages questions.  And this is Jury Instruction 23.  If

18    your verdict is for plaintiff and against BMO on any count,

19    you must decide what damages to award.

20             When you decide damages, do not consider the

21    possible effect of your answers as to other -- answers to

22    other questions.  Let me say that again.  When you decide

23    damages, do not consider the possible effect of your answers

24    to other questions.

25             The term "damages" means a sum of money that will

1    fairly and adequately compensate PCI for any harm.

2           A party asking for damages must prove the nature,

3    extent, duration, and consequences of all the alleged harm.

4    You must not decide damages based on speculation or guess.

5           Jury Instruction 24.  Plaintiff may not recover

6    compensatory damages twice under two different counts in the

7    same case for the same harm.  Therefore, if you find that

8    plaintiff is entitled to a verdict on more than one of its

9    counts, you should take care to avoid awarding duplicative

10   damages.

11          Jury Instruction Number 25.  If your verdict is

12   for plaintiff and against BMO on any count and if you find

13   that there is clear and convincing evidence that BMO acted

14   with deliberate disregard for the rights or safety of

15   others, then you can award plaintiff additional damages.

16          These punitive damages are intended to punish BMO

17   and discourage others from behaving in a similar way.

18   Punitive damages may not be used to punish BMO for harm to

19   persons other than PCI in this case, however.

20          The evidence must convince you that BMO acted with

21   deliberate disregard for the rights of others.  You must

22   have a firm belief or be convinced there is a high

23   probability that BMO acted this way.

24          Clear and convincing evidence.  Clear and

25   convincing evidence means that the thing to be proved is

1   highly probable or reasonably certain.  Clear and convincing

2   evidence requires a higher standard of persuasion than the

3   greater weight of the evidence.

4          Deliberate disregard.  Deliberate disregard means

5   that BMO:

6          1.  Knew about facts or intentionally ignored

7   facts that created a high probability of harm to the rights

8   or safety of others; and

9          2.  Deliberately acted with, (a) conscious or

10  intentional disregard or (b) indifference to the high

11  probability of harm to the rights of others.

12         Jury Instruction 26.  When considering punitive

13  damages, you may award punitive damages against a principal

14  because of an act done by an agent of that principal only

15  if:

16         1.  The principal authorized the performance of

17  the act and the manner in which the act was performed;

18         2.  The agent was unfit and the principal

19  deliberately disregarded a high probability that the agent

20  was unfit;

21         3.  The agent was employed in a managerial

22  capacity with authority to establish policy and make

23  planning-level decisions for the principal and was acting in

24  the scope of that employment; or

25         4.  The principal or a managerial agent of the

1    principal, described in clause 3 above, ratified or approved

2    the act while knowing of its character and probable

3    consequences.

4         Jury Instruction No. 27.  If you decide to award

5    punitive damages, consider, among other things, the

6    following factors:

7         1.  The seriousness of the hazard to the public

8    that may have been or was caused by any misconduct by M&I;

9         2.  The profit M&I made as a result of the

10   misconduct;

11        3.  The length of time of the misconduct and if

12   M&I had it;

13        4.  The amount M&I knew about the hazard and of

14   its danger;

15        5.  The attitude and conduct of M&I when the

16   misconduct was discovered;

17        6.  The number and level of employees involved in

18   causing or hiding the misconduct;

19        7.  The financial state of BMO; and

20        8.  The total effect of other punishment likely to

21   be imposed on BMO as a result of the misconduct.  This

22   includes compensatory and punitive damage awards to PCI and

23   other persons.

24        Turning to Jury Instruction 28.  There are rules

25   you must follow when you go to the jury room to deliberate

1     and return your verdict.

2              First, you will select a foreperson.  That person

3     will preside over your discussions and speak for you here in

4     court.

5              Second, your verdict must be the unanimous

6     decision of all jurors.  Therefore, it is your duty, as

7     jurors, to discuss this case with one another in the jury

8     room.  You should try to reach agreement if you can do this

9     without going against what you believe to be true.

10             Each of you must come to your own decision, but

11    only after you have considered all the evidence, discussed

12    the evidence fully with your fellow jurors, and listened to

13    the views of your fellow jurors.

14             Do not be afraid to change your mind if the

15    discussion persuades you that you should, but do not come to

16    a decision just because other jurors think it is right or

17    just to reach a unanimous verdict.

18             Remember you are not for or against any party.

19    You are judges, judges of the facts.  Your only job is to

20    study the evidence and decide what is true.

21             Third, during your deliberations, including during

22    any recess taken during your deliberations, you must not

23    directly or indirectly communicate with or provide any

24    information to anyone by any means or by any medium about

25    anything relating to this case until I accept your verdict

1    and discharge you from further service in this case.

2            Fourth, as stated in my instructions at the

3    beginning of the trial, you may not in any manner seek out

4    or receive any information about the case from any source

5    other than the evidence received by the Court and the law of

6    the case I have provided to you.

7            You are only permitted to discuss the case with

8    your fellow jurors during deliberations because they have

9    seen and heard the same evidence you have.  In our judicial

10   system, it is important that you are not influenced by

11   anything or anyone outside of this courtroom.  Otherwise,

12   your decision may be based on information known only by you

13   and not your fellow jurors or the parties in the case.  This

14   would unfairly and adversely impact the judicial process.

15           Fifth, if you need to communicate with me during

16   your deliberations, send me a note signed by one or more of

17   you.  Give the note to the court security officer and I will

18   answer you as soon as I can, either in writing or here in

19   court.  While you are deliberating, do not tell anyone,

20   including me, how many jurors are voting for any side.

21           Sixth, nothing I have said or done was meant to

22   suggest what I think your verdict should be.  The verdict is

23   entirely up to you.

24           And, finally, the verdict form is your written

25   decision in this case.  You will take this form to the jury

1    room and when you have all agreed on the verdict, your

2    foreperson will fill in the form, sign and date it, and tell

3    the court security officer that you are ready to return to

4    the courtroom.

5              I will read the verdict form to you now.

6              United States District Court, District of

7    Minnesota.  Douglas A. Kelley, in his capacity as the

8    Trustee of the BMO Litigation Trust, Plaintiff, vs. BMO

9    Harris Bank N.A., as successor to M&I Marshall & Ilsley

10   Bank, Defendant.  Case number 19-cv-1756 (WMW).

11             Special Verdict Form.

12             We, the jury in this case, unanimously make these

13   answers to the following questions:

14             Count I, Minnesota Uniform Fiduciaries Act.

15   Question Number 1:  Do you find in favor of plaintiff and

16   against defendant on Count I, which alleges a violation of

17   the Minnesota Uniform Fiduciaries Act?  Answer:  "Yes" and a

18   blank.  "No" and a blank.

19             Count II:  Breach of Fiduciary Duty.  Question

20   Number 2:  Do you find in favor of plaintiff and against

21   defendant on Count II, which alleges breach of fiduciary

22   duty?  Answer:  "Yes," blank.  "No," blank.

23             Count III:  Aiding and Abetting Fraud.  Question

24   Number 3:  Do you find in favor of plaintiff and against

25   defendant on Count III, which alleges aiding and abetting

1    fraud?  Answer:  "Yes," blank.  "No," blank.

2              Count IV:  Aiding and Abetting Breach of Fiduciary

3    Duty.  Question Number 4:  Do you find in favor of plaintiff

4    and against defendant on Count IV, which alleges aiding and

5    abetting breach of fiduciary duty?  Answer:  "Yes" and a

6    blank.  "No," blank.

7              Answer Question Numbers 5 and 6 only if you

8    answered "Yes" to at least one of the previous four

9    questions (Question Numbers 1, 2, 3 or 4).

10             If you answered "No" to all of the previous

11   questions (Question Numbers 1, 2, 3 and 4), do not answer

12   any more questions on this Special Verdict Form.  Have your

13   foreperson sign and date this form on page 5.

14             Compensatory Damages.  Question Number 5:  What

15   sum of money will fairly and adequately compensate plaintiff

16   for any harm arising from any claim or claims on which you

17   have found in favor of plaintiff?  And there's a blank and

18   you are to state the amount or, if none, write the word

19   "none."

20             Punitive Damages.  You may not award punitive

21   damages against the defendant unless you have first found

22   against the defendant on at least one of plaintiff's claims

23   by answering "Yes" to at least one of the first four

24   questions (Question Numbers 1, 2, 3 or 4) and you have

25   provided an answer to Question Number 5.

1        If you answered "No" to all of the first four

2   questions (Question Numbers 1, 2, 3 and 4) and you have not

3   provided an answer to Question Number 5, do not answer

4   Question Number 6.  Have your foreperson sign and date this

5   form on page 5.

6        Question Number 6:  We assess punitive damages

7   against defendant in the amount of, and there's a blank and

8   state the amount or, if none, write "none."

9        On the fifth page is the foreperson's signature.

10   We, the jury, have answered the foregoing questions as

11   indicated and return the same to the Court as our verdict.

12   There's a line for the date and a line for the signature of

13   the foreperson.

14        At this time I'll ask that the CSO be sworn in.

15        THE CLERK:  Please raise your right hand.

16     (Court security officer sworn)

17        THE COURT:  Members of the Jury, you are free to

18   set your own schedule for deliberations, but please let

19   Ms. Eckroad, Mona Eckroad, know what that schedule is so

20   that we can ensure that court security and I am here at the

21   courthouse while you are deliberating.

22        Also, you are excused to deliberate now and we

23   will deliver to you the exhibits shortly to the jury

24   deliberation room.

25        So all rise for the jury.

1    (Jury excused)

2                        **IN OPEN COURT**

3                     **(JURY NOT PRESENT)**

4              THE COURT:  You may be seated.

5              I will ask that, Counsel, you remain within

6    15 minutes of the courtroom while the jury is deliberating.

7    And you will be notified when they end their deliberations

8    for the day.

9              We are adjourned.  Thank you, Counsel.

10    (Recess taken at 1:27 p.m.)

11                    *    *    *    *    *

12              We, Lori A. Simpson and Carla R. Bebault, certify
     that the foregoing is a correct transcript from the record
13    of proceedings in the above-entitled matter.

14              Certified by:   *s/ Lori A. Simpson*
                                Lori A. Simpson, RMR, CRR
15
                Certified by:   *s/ Carla R. Bebault*
16                              Carla R. Bebault, RMR, CRR, FCRR

17

18

19

20

21

22

23

24

25