```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------------
                                    )
       Douglas A. Kelley, in his    )   File No. 19-cv-1756
 4     capacity as the Trustee of the )          (WMW)
       BMO Litigation Trust,        )
 5                                   )
               Plaintiff,            )   St. Paul, Minnesota
 6                                   )   October 13, 2022
       vs.                           )   8:09 a.m.
 7                                   )
       BMO Harris Bank N.A., as      )
 8     successor to M&I Marshall and )
       Ilsley Bank,                  )
 9                                   )
               Defendant.            )
10     ------------------------------------------------------------

11

12

13           BEFORE THE HONORABLE WILHELMINA M. WRIGHT
                UNITED STATES DISTRICT COURT JUDGE
14
          *   *   *   REDACTED TRANSCRIPT   *   *   *
15

16            (JURY TRIAL PROCEEDINGS - VOLUME II)

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25     transcript produced with computer.
```

```
1       APPEARANCES:
          For the Plaintiff:        Robins Kaplan, LLP
2                                   MICHAEL A. COLLYARD, ESQ.
                                    DAVID E. MARDER, ESQ.
3                                   PETER C. IHRIG, ESQ.
                                    MORGIA D. HOLMES, ESQ.
4                                   MICHAEL D. REIF, ESQ.
                                    800 LaSalle Avenue
5                                   Suite 2800
                                    Minneapolis, Minnesota 55402
6
                                    Anthony, Ostlund, Louwagie,
7                                   Dressen, Boylan, P.A.
                                    JOSEPH W. ANTHONY, ESQ.
8                                   JOSEPH R. RICHIE, ESQ.
                                    RYAN M. LAWRENCE, ESQ.
9                                   90 South Seventh Street
                                    Suite 3600
10                                  Minneapolis, Minnesota 55402

11        For the Defendant:        Stinson, LLP
                                    KEITH S. MOHEBAN, ESQ.
12                                  ADINE S. MOMOH, ESQ.
                                    50 South Sixth Street
13                                  Suite 2600
                                    Minneapolis, Minnesota 55402
14
                                    Debevoise & Plimpton, LLP
15                                  JOHN GLEESON, ESQ.
                                    MICHAEL SCHAPER, ESQ.
16                                  SUSAN REAGAN GITTES, ESQ.
                                    MORGAN A. DAVIS, ESQ.
17                                  919 Third Avenue
                                    New York, New York 10022
18
                                    Mayer Brown, LLP
19                                  JOSHUA D. YOUNT, ESQ.
                                    71 South Wacker Drive
20                                  Chicago, Illinois 60606

21                                  Mayer Brown, LLP
                                    RICHARD A. SPEHR, ESQ.
22                                  GINA PARLOVECCHIO, ESQ.
                                    1221 Avenue of the Americas
23                                  New York, New York 10020

24        Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                    316 North Robert Street
25                                  St. Paul, Minnesota 55101
```

1                        **I N D E X**

2                                                              PAGE

          PLAINTIFF'S WITNESSES:
3
          **SARA JOHNSON**
4            Deposition Transcript Played                      250

5         **BERNITA HILE**
             Deposition Transcript Played                      332
6
          **ZACHARY KIEFER**
7            Direct Examination by Mr. Anthony                 426
             Cross-Examination by Ms. Gittes                   478
8            Redirect Examination by Mr. Anthony               488

9         **MARY PESCH**
             Cross-Examination by Mr. Collyard                 500
10

11

12        PLAINTIFF'S EXHIBITS                                 REC'D
             4                                                 556
13           4A                                                559
             177                                               505
14           179                                               527
             181                                               327
15           182                                               327
             185                                               326
16           185A                                              326
             249                                               327
17           255                                               327
             398                                               327
18           399                                               331
             767                                               435
19           769                                               243

20

21

22

23

24

25

                    LORI A. SIMPSON, RMR-CRR
                         (651) 848-1225

1              **P R O C E E D I N G S**

2                  **IN OPEN COURT**

3                **(JURY NOT PRESENT)**

4              LAW CLERK:  The case before the Court is Case

5       Number 19-1756.

6              Counsel, please make your appearance for the

7       record.

8              MR. COLLYARD:  Good morning, Your Honor.  Mike

9       Collyard on behalf of the plaintiff.

10             THE COURT:  Good morning, Mr. Collyard.

11             MS. DAVIS:  Good morning, Your Honor.  Morgan

12      Davis on behalf of the defendant.

13             THE COURT:  Thank you.  Good morning, Ms. Davis.

14             I understand that there are matters that we need

15      to address outside the presence of the jury, and they relate

16      to exhibits, plaintiff's objections to Defendant's DX-00002

17      and DX-80021.

18             MR. REIF:  Good morning, Your Honor.  Michael Reif

19      for Robins Kaplan for the trustee.

20             THE COURT:  Good morning.

21             MR. REIF:  Your Honor, we laid out our brief

22      arguments in the e-mail that I sent over this morning.  The

23      exhibits that were disclosed appear, on their face, to be

24      hearsay.  We're talking about an article from the *St. Cloud*

25      *Times*.

1              COURT REPORTER:  *St. Cloud Times*?

2              MR. REIF:  Yes.  *St. Cloud Times* derived from

3    newspapers.com, that out-of-court statement offered for the

4    truth of the matter asserted.  That's DX-80002 and then

5    DX-80021 is a copy of Petters Group magazine from Winter

6    2006.  Same issues apply there, Your Honor.

7              THE COURT:  Okay.  And so you're objecting because

8    it is offered for the truth of the matter asserted; is that

9    correct?

10             MR. REIF:  That's correct.

11             THE COURT:  Okay.

12             MS. MOMOH:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MS. MOMOH:  Adine Momoh on behalf of the defendant

15   BMO Harris Bank.

16             With respect to the two exhibits that plaintiff

17   has objected to, I just want to clarify for the record.

18             The first exhibit is Defendant's Exhibit DX-8002;

19   and then the second exhibit, which I believe was stated

20   correctly, is DX-80021.

21             With respect to the first exhibit, I request that

22   we table that issue perhaps until it's offered with respect

23   to the witness that they intend to call today, Ms. Mary

24   Pesch, and then I can resolve that before the jurors come at

25   that time, Your Honor.

 1              With respect to the --

 2         THE COURT:  What does that mean, you can resolve

 3    it at that time?  What needs to be done?  What else will

 4    happen between now and then that will allow us to better

 5    understand this issue?

 6         MS. MOMOH:  Well, it may be a moot issue by the

 7    time that Ms. Pesch is called.  I may not share this exhibit

 8    with her is the issue; but in case I do, my response to

 9    their objection with respect to hearsay is that it's not

10    hearsay, Your Honor.

11              That we are not asserting it for the truth of the

12    matter that's stated in the document.  It's really with

13    respect to the impact on the reader, the reader in this

14    instance being the witness, Ms. Mary Pesch.

15              Same analysis applies to Exhibit DX-80021.  This

16    is a magazine, Petters Group magazine, Winter 2006 Edition.

17    Again, we are not offering that exhibit for purposes of

18    what's stated therein.  The purpose of it is not hearsay.

19    It's the impact on the reader at the time that the document

20    was reviewed.

21         THE COURT:  Thank you.

22         MS. MOMOH:  Thank you, Your Honor.

23         MR. REIF:  Your Honor, Michael Reif again.

24              I don't have a whole lot more on this other than

25    to say we still have authenticity issues with both of these,

1    and so even if we're arguing about potential impact, there's

2    an issue with what she is reacting to and what she is

3    reacting to is hearsay.

4         We've got Eighth Circuit precedent saying that

5    newspaper articles, something like this magazine, are rank

6    hearsay.  We have cited that to you.  Thank you, Your Honor.

7         THE COURT:  Don't we need to address what it's

8    offered for?  So if it's not offered for the truth of the

9    matter asserted, it's not hearsay, correct?

10        MR. REIF:  We understand, Your Honor, but there

11   may be some exceptions to it, and in the vacuum that we're

12   in --

13        THE COURT:  There may be some exceptions to what?

14        MR. REIF:  To whether there are exceptions to

15   hearsay.  We understand that, Your Honor.

16        THE COURT:  And so what is the exception that you

17   are relying on?

18        MR. REIF:  It's not my --

19        THE COURT:  It's not hearsay if it's not offered

20   for the truth of the matter asserted.

21        MR. REIF:  Right.  I understand that, Your Honor.

22        THE COURT:  And so your objection is what?

23        MR. REIF:  My objection is that in the vacuum

24   right now, until we know exactly how they're presenting it,

25   it appears on its face to be hearsay.  So that's what we

1    have right now.

2              THE COURT:  Thank you.

3              MR. REIF:  Thank you, Your Honor.

4              THE COURT:  Then we have Exhibits 768, 777, and

5    781, to which there are objections.

6              MS. DAVIS:  Yes, Your Honor.  Morgan Davis again

7    for defendant.

8              THE COURT:  And you may adjust the height as well

9    if you would like.

10             MS. DAVIS:  Yeah.  It will be a necessity

11   throughout trial.

12             MR. ANTHONY:  Your Honor, may I interrupt, because

13   I think we can shorten this?

14             We are not going to offer 781 through Mr. Kiefer,

15   so you can take that off your plate for argument purposes.

16             MS. DAVIS:  All right.

17             THE COURT:  Thank you.

18             MS. DAVIS:  Thank you very much, Mr. Anthony.

19             So we still do object to Exhibit P-768 and P-777

20   as improper 1006 exhibits.  As Your Honor surely knows, 1006

21   exhibits are meant to summarize voluminous data, but these

22   exhibits go far beyond that.

23             So we understand that the underlying source

24   material that Mr. Kiefer reviewed was a very large

25   spreadsheet that was produced by BMO.  That spreadsheet was

1    created after this scheme was revealed in 2008.  That

2    spreadsheet is Exhibit P-769.  But that spreadsheet contains

3    no information whatsoever about AML alerts.  And as far as

4    we're aware, Mr. Kiefer, who is a witness from PwC, could

5    have no knowledge of AML alerts.

6            So as you can see from P-777 here, this juxtaposes

7    data which we understand is from the underlying spreadsheet

8    with AML alerts, the date and number of AML alerts, that we

9    don't believe Mr. Kiefer has reviewed.

10           And even if he has, Your Honor, this exhibit and

11   P-768 are -- Sure.  Would Your Honor like me to hand up a

12   copy?

13           THE COURT:  I just want to make sure that I don't

14   already have one.  I do have it.  Thank you.

15           MS. DAVIS:  So I suppose there's no need for me to

16   do show-and-tell here with this.

17           THE COURT:  Well, I would like to know which one

18   you are referring to.  So you are referring to at this

19   point -- I have two exhibits.  I have P-777 and P-768.

20           MS. DAVIS:  That's correct, Your Honor.  And they

21   have the same problem with them.

22           So, again, we understand that the underlying data

23   in the columns on the right-hand side of the spreadsheet all

24   come from a spreadsheet produced by BMO.  And so we don't

25   object at this point in time, obviously reserving objection

1    to see how it comes in with Mr. Kiefer, we don't object to

2    that data.  What we object to is the juxtaposition of that

3    data with information about AML alerts that Mr. Kiefer

4    hasn't reviewed.

5           And the juxtaposition is also misleading,

6    Your Honor, because the spreadsheet that all of this data on

7    the right-hand side of the spreadsheet comes from, all of

8    these numbers here, comes from a spreadsheet that BMO

9    created in 2008 and sent to the IRS in 2008.  There will be

10   no evidence that any AML analyst ever reviewed that

11   spreadsheet or ever looked at the data in this manner.

12          So by juxtaposing the alert numbers and the months

13   where the alerts were reviewed with this data, these

14   exhibits improperly suggest that AML analysts reviewed the

15   data in this manner in connection with reviewing the alerts.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. ANTHONY:  May it please the Court, Your Honor.

19   Joe Anthony --

20          THE COURT:  Good morning.

21          MR. ANTHONY:  -- for plaintiff.

22          I appreciate counsel acknowledging and admitting

23   that Exhibit 769 is the BMO Excel spreadsheet that's

24   authentic; and in order to move things along, I would ask

25   that they stipulate to -- we will offer as Exhibit 769 now

1    and ask that they stipulate to its admission so we don't

2    have to go through that process with the witness.

3                THE COURT:  Is there any objection?

4                MS. DAVIS:  Yes, Your Honor, there is an objection

5    for the same reason we already articulated.

6                MR. ANTHONY:  769 is the underlying data.

7                MS. DAVIS:  Oh, I'm sorry, Mr. Anthony.  I

8    misheard you.  769, I believe, we stipulated to as an

9    authentic BMO record, yes.

10               MR. ANTHONY:  So we will offer Exhibit 769,

11   Your Honor.

12               THE COURT:  Okay.

13               MR. ANTHONY:  I assume it's received?

14               THE COURT:  The matter is moot, correct?  There is

15   no objection.

16               MR. ANTHONY:  No objection.

17               MS. DAVIS:  There is no objection to 769.

18               THE COURT:  769 is received.

19               MR. ANTHONY:  So what 769 is, Your Honor, and you

20   will hear it from Mr. Kiefer, who has been with PwC since

21   2009 working on this matter, it is a 23,000-line Excel

22   spreadsheet produced by a bank, and 23,000 lines I can't

23   measure how many pages that might consist of.  It's a

24   voluminous record.

25               What 768 is is a summary of the information in the

1   23,000-line Exhibit 769.  He is summarizing some of that

2   data, you know, how they can sort it and they can show it

3   and he summarized it in Exhibit 768.

4        And 768 is based not only on 769, but it also

5   includes information from a voluminous document, which is

6   also already in evidence, which is Exhibit 183, Plaintiff's

7   183.  And I have it in my hand, and it's about -- I don't

8   know, about 50, 60 pages.

9        And what Exhibit 768 is is a summary that takes

10  the information that appears in the 50-, 60-page Exhibit 183

11  and an extraction of the -- some of the voluminous lines of

12  769 and puts them together, and it's reflected on 768 and on

13  777 in a slightly different format.

14       So basically what he does on 768 is he takes the

15  alert numbers and the dates from Exhibit 183, and he

16  combines it with the underlying authentic data from the bank

17  records, which is 769.  That's all he's doing.  He is not

18  going to testify, give any opinions as to who saw it.  He is

19  just going to say these are the bank records.  I have

20  summarized them fairly and accurately, and here's what the

21  information is on them.  He's not going to opine that any

22  analyst saw this information.  He's not here for that

23  purpose.

24       In anticipation that they were going to be

25  objecting to these summaries, we flew him in from New Jersey

1    yesterday so he could do this precise procedure.

2            So I really don't think they are going to be

3    objectionable when you hear him say what he did, and how he

4    reviewed it and fairly and accurately reflects the

5    voluminous data.

6            I think it's a fair summary.  Thank you.

7            THE COURT:  Thank you, Counsel.

8            MS. DAVIS:  May I respond?

9            THE COURT:  Yes.

10           MS. DAVIS:  So, to be clear, we have no objection

11   to Mr. Kiefer coming and offering 1006 exhibits.

12           The issue is with this particular 1006 exhibit,

13   which as Mr. Anthony just said, juxtapose data that has been

14   summarized from two separate documents which have no

15   relationship to each other.  And the clear implication, the

16   visual implication to the jury here is that these have

17   something to do with each other.  That the AML alerts were

18   somehow at some point in time matched up with all this data

19   from a completely separate spreadsheet, which was not

20   produced through any AML witness.  It was an after-the-fact

21   spreadsheet produced by BMO created in 2008.

22           So, again, if Mr. Kiefer were just to summarize

23   those separate documents, we would agree that's a proper

24   1006 exhibit, but the juxtaposition here is improperly

25   argumentative and suggestive to the jury as something that

1    didn't happen.

2              THE COURT:  So if this were presented on separate

3    sheets of paper, each column, you're saying, it would not be

4    a problem, it's just the fact that it is a summary of all of

5    this together?

6              MS. DAVIS:  That's correct, Your Honor.

7              So, for example, plaintiffs have offered a

8    different summary of P-769, which just summarizes the data

9    contained in P-769, and we don't have an objection to that.

10   Likewise, we would not have an objection -- again, speaking

11   on the face without regard to how it's actually offered --

12   to summarizing AML data.

13             It's the juxtaposition that puts these together in

14   the minds of the jury without any foundation for doing so

15   that we object to.

16             THE COURT:  What foundation is necessary for

17   putting them together?

18             MS. DAVIS:  Well, first Mr. --

19             THE COURT:  I mean lawfully.  I'm just trying to

20   understand your argument.

21             MS. DAVIS:  Well, as we understand it, 1006 is

22   meant to summarize voluminous data.  It's not meant to

23   present an argument about how that data relates to other

24   data in the case.

25             THE COURT:  So if this were on two separate sheets

1    of paper, you would not be objecting?

2              MS. DAVIS:  That's correct, Your Honor.

3              Thank you.

4              MR. ANTHONY:  Brief response, Your Honor.

5              When you have a -- actually, it's an 107-page

6    Exhibit 183 and a 23,000-line Exhibit 769, it makes perfect

7    sense to not expect the jurors with electronic devices to

8    try to go through the 23,000 lines and figure out which of

9    the 23,000 lines matches up with the, you know, alerts that

10   show up in Exhibit 183 and try to match them up.

11             This is a summary of those two documents so that

12   it aids the jury to understand the information that's on 769

13   and the information on 183 in a convenient place and

14   location for them.  And especially in what we are attempting

15   to do here with the electronic review of documents, I think

16   it makes really good sense to --

17             THE COURT:  Thank you, Counsel.

18             MR. ANTHONY:  Your Honor, one other thing I would

19   like to point out to the Court, and I am as guilty of it as

20   anybody, and so I am raising it and I am not casting

21   dispersions, but I have noticed that from time to time when

22   we have sidebars, lawyers walking away say thank you to the

23   Court.  I think, you know, it's probably inappropriate, and

24   I would just like to invite counsel, all counsel, not to be

25   doing that.  We shouldn't be appearing to be thanking -- in

1    our effort to be grateful to the Court for all the things

2    you do, saying something like thank you when you're walking

3    away from a sidebar might create the impression that

4    something happened other than what actually happened.  And I

5    just wanted to point that out, that I have seen that

6    happening; and I won't do it and I would ask that other

7    counsel not do it as well.

8              THE COURT:  So you are saying that you object to

9    counsel saying thank you to the Court when counsel is not at

10   sidebar?

11             MR. ANTHONY:  No.  Only when they leave sidebar,

12   after you have made a ruling, you shouldn't be thanking the

13   Court for a ruling or make it appear as you are thanking the

14   Court for a ruling.

15             THE COURT:  So you are saying it's the location of

16   the individual who is saying thank you --

17             MR. ANTHONY:  Yes.

18             THE COURT:  -- as opposed to it being a sidebar

19   conversation that is not overheard by the jury, it is a

20   conversation that is or a statement that is heard by the

21   jury because it's not at sidebar?

22             MR. ANTHONY:  Yes.  I think you can say thank you

23   to the Judge at sidebar for whatever, but I don't think you

24   can walk away from the sidebar and announce a thank you so

25   that the jury hears it.  That's all I'm saying.  And I won't

1    do it.  I will ask that other counsel not do it as well.  I

2    think it's not the proper way to proceed.

3              Thank you, Your Honor.

4              MS. DAVIS:  Your Honor, may I make just a very

5    brief point?

6              THE COURT:  Yes, you may.

7              MS. DAVIS:  Thank you, Your Honor.

8              I think Mr. Anthony just made our argument for us.

9    The point of these exhibits appears to be to make an

10   argument to the jury.  To juxtapose separate data and

11   present it to the jury in that fashion, that's an improper

12   use of a 1006 exhibit.

13             If plaintiff would like to get that information in

14   in front of the jury, they can do so through a witness, but

15   Mr. Kiefer is not an expert witness.  He is not a fact

16   witness.  He is just a 1006 exhibit witness.  Thank you.

17             THE COURT:  And when will this be offered?

18             MR. ANTHONY:  He will be the first witness after

19   the video depositions are played, Your Honor.

20             THE COURT:  Okay.  And how many -- are we finished

21   with the deposition videos?

22             MR. ANTHONY:  It's probably a couple hours.

23             THE COURT:  Okay.  So I will reserve my ruling,

24   then.

25             MR. ANTHONY:  There is Sara Johnson and then

```
 1   there's Bernita Hile, so I think it's a couple hours.
 2           THE COURT:  Okay.  Thank you.  Very good.
 3       (8:30 a.m.)
 4                       IN OPEN COURT
 5                       (JURY PRESENT)
 6           THE COURT:  Good morning.  Please be seated.
 7           And, Counsel, are we ready to proceed?
 8           MR. COLLYARD:  Yes, Your Honor.  We will continue
 9   playing the videotape deposition of Ms. Sara Johnson.
10           THE COURT:  Thank you.
11                       (Sara Johnson)
12               DEPOSITION TRANSCRIPT PLAYED
13   BY MR. COLLYARD:
14   Q.  And if they didn't know certain information, they had
15   the ability to reach out to the customer and ask them
16   questions; is that right?
17   A.  I don't remember.
18   Q.  You don't recall that being part of the general process
19   that happened at M&I Bank?
20   A.  I don't know.
21   Q.  Tell me what you were doing at BMO Harris Bank from,
22   let's say, 2012 to 2015.
23   A.  2012.  I would have been a lead analyst, a lead
24   investigator.
25   Q.  And being a lead investigator, would you have, for
```

1    example, looked at alerts for incoming and outgoing wires?

2    A.  I don't remember.

3    Q.  Did the investigators review alerts for incoming and

4    outgoing wires?

5    A.  They would have reviewed cases.

6    Q.  Is a case different than an alert?

7    A.  It is.

8    Q.  Okay.  What's the difference?

9    A.  An alert starts off with an analyst; and when they deem

10   something potentially suspicious, but they're not quite

11   sure, they move it to a case, and that's when an

12   investigator reviews.

13   Q.  Would an investigator have an understanding as to what

14   the analyst had reviewed or looked into with respect to an

15   incoming wire that had alerted?

16   A.  Not necessarily.

17   Q.  Okay.  What was your job then as lead analyst?

18   A.  My job was to take almost a second look at what they

19   were doing, but it was not my decision.  I -- as a lead

20   analyst, I did not have the final decision.

21   Q.  To take a look and see what they were doing, you had to

22   have an understanding as to what they were supposed to do,

23   correct?

24   A.  Yes.

25   Q.  So what exactly were you doing to review the

1   investigators' work on a case?

2   A.  I don't remember.

3   Q.  And even though you were the one who was in charge of

4   doing a double-check on the investigators' work, you can't

5   recall any general practices that the investigators would

6   have for investigating an incoming or outgoing wire?

7   A.  I don't remember.

8   Q.  So do you know who Deanna Munson is?

9   A.  No.

10  Q.  Do you know who Deanna Coleman is?

11  A.  No.

12  Q.  Do you know who Bob White is?

13  A.  No.

14  Q.  Do you know who Edward Jambor is?

15  A.  No.

16  Q.  Christopher Flynn?

17  A.  No.

18  Q.  Do you know who Shari Rhode is?

19  A.  No.

20  Q.  Do you know who Barbara Bergquist is?

21  A.  No.

22  Q.  Do you know who Barbara Nieland is?

23  A.  No.

24  Q.  Ever heard of Frank Vennes?

25  A.  No.

1    Q.  When you were reviewing alerts within Searchspace, did

2    you have an understanding that one of the things you were

3    trying to do is determine the source and use of the funds

4    that were coming in and going out of an account?

5    A.  I don't know.

6    Q.  Okay.  So do you know what source and use means?

7    A.  I have a definition for source and use, yes.

8    Q.  What's your definition of source and use?

9    A.  Source would be the -- how the funds came in, and then

10   the use would be how they went out.

11   Q.  And do you recall looking into the source and use of

12   funds when you were an analyst at M&I Bank?

13   A.  Yes.

14   Q.  And how would you determine the source of the funds

15   coming in?

16   A.  It would depend on the alert.

17   Q.  So if the alert was for incoming wires, for example, how

18   would you determine the source of the funds?

19   A.  I don't remember.

20   Q.  Does source mean something more than just identifying

21   the name that's given to you in Searchspace?

22   A.  I don't remember.

23   Q.  Do you have an understanding that as part of identifying

24   the source of the funds coming in, you'd try to figure out

25   the purpose of the funds?

1    A.  I don't remember.

2    Q.  Your job as an AML analyst was to try and determine

3    whether or not there was suspicious activity pertaining to

4    wires, for example; is that right?

5    A.  I don't remember.

6    Q.  You don't remember if during all the years that you were

7    an AML analyst if your job was to determine whether or not

8    there was suspicious activity with respect to incoming or

9    outgoing wires?

10   A.  There were so many different alerts that I don't

11   remember every single alert that I ever worked on and what

12   it was for.

13   Q.  And I'm not -- Ms. Johnson, I'm not asking you about any

14   particular alert.  I'm asking if generally that you

15   understood as part of your job duties that your job was to

16   identify potentially suspicious activity on incoming and

17   outgoing wires.

18   A.  Not necessarily.

19   Q.  What was your job as an AML analyst?

20   A.  It was to investigate the activity in the customer's

21   account.

22   Q.  What was the purpose of doing that?

23   A.  There's many different purposes.  I mean, I don't

24   remember every single thing that we looked at.

25   Q.  Why don't you tell me what some of the purposes were.

Johnson - Deposition

1    A.  It would depend.  It would depend on what they were

2    alerting for.

3    Q.  Okay.  If they were alerting for incoming and outgoing

4    wires, what would be the purpose of looking -- what would be

5    the purpose of looking into that?

6    A.  I don't remember.

7    Q.  What was your role with respect to the SAR group again?

8    A.  I was the manager of the SAR group.

9    Q.  Was part of your role as an AML analyst to determine

10   whether or not activity was suspicious enough to recommend

11   that a SAR be filed?

12          MS. DEL TAT TO:  Object to form.

13          THE WITNESS:  Yes.

14   BY MR. COLLYARD:

15   Q.  And as part of doing that, are you trying to make a

16   determination as to whether or not there's suspicious

17   activity?

18   A.  Not necessarily.  I think there's many aspects that we

19   were looking for.

20   Q.  A SAR is a Suspicious Activity Report, correct?

21   A.  Correct.

22   Q.  And to file a Suspicious Activity Report, the bank needs

23   to believe or suspect or have reason to know that there is

24   suspicious activity; is that right?

25   A.  Correct.

1    Q.  For example, to file a SAR, it is not required that the

2    bank actually know that there's illegal activity, correct?

3    A.  Correct.

4    Q.  If the bank has reason to suspect that there is

5    suspicious activity, that is enough to trigger a SAR,

6    correct?

7    A.  It depends on the situation.

8    Q.  So back at M&I -- back at M&I Bank, if an analyst did an

9    investigation and at the end of their investigation

10   concluded there was still reason to suspect that there was

11   suspicious activity on the account, one of the things they

12   could do is recommend that a SAR be filed; is that right?

13   A.  Correct.

14   Q.  And in order to do that, the analyst would have

15   investigated the activity, for example, incoming and

16   outgoing wires, and made the determination that there's

17   potentially suspicious activity, correct?

18   A.  Not necessarily.

19   Q.  Would that be one of the things that an analyst was

20   doing?

21   A.  Not necessarily.

22   Q.  Okay.  So would an analyst never review incoming and

23   outgoing wires to determine whether or not there was

24   potentially suspicious activity on the account?

25   A.  Not necessarily.

1    Q.  My question is:  Yes or no, okay?

2    A.  Could you please repeat the question?

3    Q.  Yes.  So what -- let's do it this way.

4    A.  Okay.

5    Q.  One of the things that an analyst was doing on an alert

6    for incoming and outgoing wires was to make a determination

7    as to whether or not there was potentially suspicious

8    activity with respect to those wires.  Yes or no?

9    A.  I don't know.

10   Q.  Then how in the world would an analyst ever recommend

11   that a SAR be filed if they weren't trying to figure out

12   whether or not there was potentially suspicious activity?

13   A.  I don't know.

14   Q.  Did you have an understanding that as an AML analyst one

15   of the things you were trying to do is figure out whether or

16   not there was money laundering going on with activity

17   pertaining to an account?

18   A.  I don't remember.

19   Q.  Did you understand that that was the function of the

20   Anti-Money Laundering Group?

21   A.  I don't remember.

22   Q.  What did you understand the function of the Anti-Money

23   Laundering Group was while you were at M&I Bank?

24   A.  I don't remember.

25   Q.  You can't describe for the jury a single function of

1    what the Anti-Money Laundering Group was trying to

2    accomplish?

3    A.  I don't remember.

4    Q.  Ms. Johnson, I'm handing you what's been previously

5    marked as Exhibit 180.  It's a document entitled, "Marshall

6    & Ilsley Corporation, Suspicious Activity Monitoring and

7    Reporting.

8           Do you have an understanding that this is a

9    procedure that was implemented at M&I Bank with respect to

10   how AML analysts would go about reviewing or investigating

11   alerts in Searchspace?

12   A.  I don't remember.

13   Q.  Do you recall ever seeing a document like this?

14   A.  I don't remember.

15   Q.  Can you turn to page 14, Bates ending in 013, please.

16          At the top, you see there's a number 4, and it

17   says, "Closed-Expected/Explainable Activity State.

18   A.  Yes.

19   Q.  It says, "In addition to the Quick Close filters used by

20   the AML Monitoring Group, an additional state has been

21   created to hold alerts that exhibit expected activity levels

22   for the customer in question or for activity that can be

23   explained.  Do you see that?

24   A.  I do see that.

25   Q.  And then Part A reads, "If the activity reported in the

1    alert is for a business customer and is the type of activity

2    expected for that customer within the product type of the

3    account and in comparison with the entire customer profile,

4    the alert can be closed.  Do you see that?

5    A.  I do.

6    Q.  Do you know what is meant by "product type of the

7    account"?

8    A.  I don't.

9    Q.  And do you know how it is determined that -- if activity

10   is expected for that customer?

11   A.  I don't.

12   Q.  Do you recall ever trying to figure out while you were

13   investigating an alert within Searchspace to determine

14   whether or not the activity was expected for that customer?

15   A.  I don't remember.

16   Q.  In order to do that, would you have to have an

17   understanding of the customer's business?

18   A.  I don't remember.

19   Q.  Do you believe that in order to determine whether or not

20   activity was expected for that particular customer, that

21   you'd have to have an understanding of the customer's

22   business?

23   A.  Not necessarily.

24   Q.  Do you think that you could have an understanding as to

25   whether or not activity was expected for the customer

1    without knowing what the customer's business was?

2    A.  Not necessarily.

3    Q.  Okay.  So let's go back to the first question I asked

4    you, then.

5            Do you believe that as part of understanding

6    whether or not activity was expected for the customer, that

7    the analyst would have to have an understanding as to the

8    type of business the customer was in?

9    A.  I don't remember how we went about our investigations

10   exactly.

11   Q.  Do you know if one of the things the AML analysts were

12   trying to do in determining whether or not activity was

13   expected for the customer was trying to have an

14   understanding as to what the customer's business was?

15   A.  I don't remember.

16   Q.  Does that seem like a reasonable process to you if the

17   AML analyst is trying to figure out whether or not there's

18   suspicious activity on an account?

19   A.  I don't know.

20   Q.  See down below it says, "On a monthly basis, the AML

21   Group manager or lead analyst will review a random sample of

22   all alerts closed to the expected/explainable activity state

23   to ensure consistency and adherence to departmental

24   procedures."  Do you see that?

25   A.  I do.

Johnson - Deposition

1   Q.  Where it says "lead analyst," is that referring to the

2   position that you had?

3   A.  At this time, no.

4   Q.  Well, I understand that you were not a lead analyst in

5   2005, but eventually you were, correct?

6   A.  Eventually, yes.

7   Q.  As part of your roles and responsibilities as a lead

8   analyst, would you review random samples of alerts that were

9   closed to see if they were in compliance with procedures?

10  A.  I don't remember how we did it once I became a lead

11  analyst.

12  Q.  Ms. Johnson, I'm handing you what's been previously

13  marked as Exhibit 223.

14          This is another procedure, and this one is

15  entitled, "Marshall & Ilsley Corporation, Suspicious

16  Activity Monitoring and Reporting."  And up in the

17  right-hand corner this one says, "Revised April of 2007."

18  Do you see that?

19  A.  I do.

20  Q.  Are you familiar at all with this document?

21  A.  I don't remember.

22  Q.  So you have no recollection as to when this particular

23  procedure was put in place at M&I?

24  A.  I don't remember.

25  Q.  If we turn to page 15, Bates ending in 076.

1   A.   Okay.

2   Q.   At the top it's number 4, and it reads, "Qualified

3   Accounts for Peer-Only Review."  Do you see that?

4   A.   I do.

5   Q.   This is the expedited review process that we were

6   talking about earlier; is that right?

7   A.   Correct.

8   Q.   And do you remember at all how the expedited review

9   process came about or why it was implemented?

10  A.   I don't remember.

11  Q.   Can you tell us at all any procedures that you would

12  follow with respect to completing an expedited review?

13  A.   I don't remember.

14  Q.   Do you recall ever seeing documentation as to whether or

15  not -- or do you recall seeing documentation as to why a

16  customer had been placed on the expedited review list, for

17  example?

18  A.   No.

19  Q.   Did you ever approve customers for being put on the

20  expedited review list?

21  A.   No.

22  Q.   If you turn to page 20 for me, please, Bates ending in

23  081.  And at the top again we see there's a Part 4 with the

24  heading, "Closed-Expected/Explainable Activity State."  Do

25  you see that?

263

1    A.  Yes --

2    Q.  And down on Part E we have "Peer-only alerts"; is that

3    right?

4    A.  Correct.

5    Q.  That's the expedited review process, correct?

6    A.  According to this it would be, yes.

7    Q.  And it says, "Process to Follow for Expedited Review."

8    Do you see that about the middle of the page?

9    A.  I do.

10    Q.  It says, "All months that -- all months that alert must

11    be reviewed."  Do you see that?

12    A.  I do.

13    Q.  What does that mean?

14    A.  I don't remember exactly what it meant at the time, but

15    if I'm reading it right now, to me that would say if they

16    alerted for three months, you would alert -- you would

17    review all three months that they alerted.

18    Q.  Ms. Johnson, I'm handing you what's been previously

19    marked as Exhibit 248.  This is yet another procedure

20    entitled, "Marshall & Ilsley Corporation, Suspicious

21    Activity Monitoring and Reporting."  And in the right-hand

22    corner it says, "Revised 4/08."  Do you see that?

23    A.  I do.

24    Q.  Do you have an understanding as -- or are you familiar

25    with this document?

CASE 0:19-cv-01756-WMW  Doc. 430  Filed 01/08/23  Page 32 of 333

1    A.  I don't remember.

2    Q.  If you'd turn to page 14, Bates ending in 013, we see at

3    the top we have number 3, Quick Close Filters.  Do you see

4    that it?

5    A.  I do.

6    Q.  And now we have some quick close filters listed on this

7    page.  Do you see that?

8    A.  I do.

9    Q.  And instead of having Filters 1 through 7, we have

10   Filter 1, 4, 6, 7, and 8.  Do you see that?

11   A.  I do.

12   Q.  And do you see Filter Number 8 is a different filter

13   from the last documents we looked at?

14   A.  I do.

15   Q.  And Filter Number 8 says, "The alert qualifies under the

16   Peer-Only Review procedure for an expedited review and no

17   unusual or suspicious activity was identified."  Do you see

18   that?

19   A.  I do.

20   Q.  This is the QAPOR procedures; is that right?

21   A.  I believe so.

22   Q.  Or the expedited review procedure?

23   A.  I believe so.

24   Q.  If we turn to page 15, please, Bates ending in 014.

25   Again we have a number 4 for "Qualified Accounts for

1    Peer-Only Review."  And then we have down below the process

2    to follow for expedited review.  Do you see that?

3    A.  I do.

4    Q.  And if we see that, again that second sentence in the

5    third bullet, it says, "Transactions that event at the peer

6    level with a score of 15 or less do not need to be reviewed

7    or explained."  Do you see that?

8    A.  I do.

9    Q.  Again, do you have an understanding that if transactions

10   evented at a peer level with a score of 16 or greater, they

11   did need to be reviewed and explained?

12   A.  I don't remember.

13   Q.  And do you have any understanding as to what is meant by

14   "reviewed" or "explained"?

15   A.  I don't remember.

16   Q.  Ms. Johnson, I'm handing you what's been previously

17   marked as Exhibit 183, and I'll tell you what this is.

18   These are printouts of the audit trails with respect to the

19   alerts in Searchspace for the PCI account.  And this is --

20   these are all of the ones that have been produced by the

21   lawyers in this case.  And what we've done is we've tabbed

22   them so we can have easy reference to the ones that I want

23   to take you to.  Do you see that?

24   A.  I do.

25   Q.  Okay.  Are you familiar with what the audit trails are?

Johnson - Deposition

```
 1    A.  Yes.

 2    Q.  And what are those?

 3    A.  The audit trails will show the different states that the

 4    alert went in during its life cycle.

 5    Q.  And in Searchspace, the AML analyst put comments in the

 6    Searchspace; is that right?

 7    A.  Correct.

 8    Q.  Do you have an understanding that one of the things that

 9    an AML analyst was doing between 2005 and 2008 was

10    explaining why they concluded certain things within

11    Searchspace?

12    A.  I know that comments went in, but I can't speak to the

13    comments that were put into Searchspace.

14    Q.  I'm asking you a particular question, and I want to know

15    if it's your understanding that what you were supposed to be

16    doing as an AML analyst was explaining why you reached

17    certain conclusions in the comments section in Searchspace.

18    A.  I don't remember exactly what we were supposed to be

19    doing.

20    Q.  So, for example, if an AML analyst concluded that there

21    was no suspicious activity, explaining why the analyst

22    believed that was important.  Do you have that

23    understanding?

24    A.  I don't remember.

25    Q.  You don't know one way or the other whether or not an
```

1    AML analyst had to explain why they were reaching certain

2    conclusions?

3    A.  I don't remember.

4    Q.  And you don't know one way or another whether or not the

5    why portion of that was an important aspect to put in the

6    comments section in Searchspace?

7    A.  I don't remember.

8    Q.  Does that sound like a reasonable conclusion?

9    A.  I don't know.

10   Q.  Do you think it sounds reasonable that the AML analyst

11   should explain why they were reaching their conclusions?

12   A.  I don't remember.

13   Q.  I'm asking you now as you're sitting here today, does

14   that sound like a reasonable expectation, that the AML

15   analyst would explain why they reached certain conclusions?

16   A.  I don't know.

17   Q.  Do you understand that as part of the comments in

18   Searchspace that the AML analysts were supposed to convince

19   the reader of those comments, that there was no suspicious

20   activity?

21   A.  I don't remember.

22   Q.  Okay.  Let's take a look at Exhibit 183.

23   A.  Okay.

24   Q.  I'm going to take you to Alert 055878.

25   A.  Okay.

1    Q.  And the first page of this alert appears with a Bates

2    ending in 15685.

3    A.  Okay.

4    Q.  And do you see up at the top of this page it says,

5    "Alert 55878"?

6    A.  Yes.

7    Q.  And it says, "Closed-Expected Activity."  Do you see

8    that?

9    A.  Yes.

10   Q.  What does that mean?

11   A.  It means it was closed to expected activity.  It didn't

12   go any farther.  It was closed after the initial review.

13   Q.  So -- and if we look, it says in the right-hand corner

14   there, "Assigned to S. Johnson."  Do you see that?

15   A.  I do.

16   Q.  That's you, correct?

17   A.  That's me.

18   Q.  And so you would have closed this alert in the closed to

19   expected activity state; is that right?

20   A.  Yes.

21   Q.  And if we look down, we see you have put comments into

22   this audit trail; is that right?

23   A.  Correct.

24   Q.  And your first comment appears on August 5th, 2005, at

25   11:09.  Do you see that?

1    A.  I do.

2    Q.  And what you're saying here is -- well, if we go back up

3    to the top, the alerted month is for June of 2005.  Do you

4    see that?

5    A.  I do.

6    Q.  Where it says on the first page, "Customer has a

7    collection of nearly 20 companies that make and market a

8    variety of consumer products worldwide," what customer are

9    you referring to there?

10   A.  I don't remember.

11   Q.  If this is an alert for Petters Company, Inc. and the

12   Petters Company, Inc. account, are you referring to Petters

13   Company, Inc.?

14   A.  I don't remember.

15   Q.  Would it make sense that you would be referring to any

16   other customer other than Petters Company, Inc.?

17   A.  I don't remember.

18   Q.  I'm not asking if you remember.  I'm asking you if it

19   makes sense.

20   A.  I don't know.

21   Q.  Do you know how you came up with this information that

22   customer has a collection of nearly 20 companies?

23   A.  I don't.

24   Q.  If you turn the page on the second page, we'll continue

25   reading from the comments where I was reading before.  It

1    says, "For more info, please refer to MIContacts."  Do you

2    see that?

3    A.  I do.

4    Q.  Do you remember what MIContacts are?

5    A.  I have a vague recollection of MIContacts.

6    Q.  In MIContacts was a database where information was kept

7    about customers; is that right?

8    A.  Generally, yes.

9    Q.  And you could go in -- you, as an AML analyst, could go

10   into MIContacts and see information about a customer; is

11   that right?

12   A.  If it was available.  No, I'm sorry, if the information

13   on a customer was available.

14   Q.  Sure.  And this is suggesting to us that you went to

15   MIContacts and looked at information for Petters Company,

16   Inc.; is that right?

17   A.  I don't remember if I did.

18   Q.  I'm not asking if you remember.

19   A.  Oh.

20   Q.  I'm saying your comments here are suggesting that you

21   went to MIContacts to determine information about Petters

22   Company, Inc.; is that correct?

23   A.  I don't know.

24   Q.  You can't read your comments here and determine whether

25   or not you're -- the reason why you're saying "See or refer

1    to MIContacts for more info" was because you, yourself, had

2    gone to MIContacts to pull information about this customer?

3    A.  I don't know.

4    Q.  So it says -- right below that it says, "Reviewed May

5    through July '05."  Do you see that?

6    A.  I do.

7    Q.  What does that mean?

8    A.  That would be the review period that I reviewed the

9    customer.

10   Q.  So you were looking at the activity during those months?

11   A.  Correct.

12   Q.  It says, "Customer's average incoming/outgoing wires is

13   500 million"?

14   A.  That's what it says.

15   Q.  And it says, "Incoming."  Then you list the number of

16   incoming wires with amounts for both May -- or for May,

17   June, and July.  Do you see that?

18   A.  I do.

19   Q.  And each one of those is somewhere around 560 million up

20   to 585 million, right?

21   A.  Yes.

22   Q.  Why were you determining what the average incoming and

23   outgoing wires were for those months?

24   A.  I don't remember.

25   Q.  Can you tell me by looking at this what the source or

1    use of the funds was for the incoming wires?

2    A.  I don't know.

3    Q.  Do you know who was wiring in these wires that you're

4    referencing?

5    A.  I don't remember.

6    Q.  And we can't look at the comments and determine that,

7    can we?

8    A.  The comments do not list names.

9    Q.  Do you know what the purpose of the incoming wires was

10   for this alert?

11   A.  I don't remember.

12   Q.  And can you look at the comments and determine what the

13   purpose of the incoming wires was?

14   A.  My comments do not specifically say the purpose is.

15   Q.  If we go to the next part, you say "outgoing," and then

16   you list the outgoing number of wires and the value of the

17   wires for May, June, and July.  Do you see that?

18   A.  I do see that.

19   Q.  Again, they're somewhere around the 560 million to 585

20   million dollar range, right?

21   A.  Correct.

22   Q.  So you've got a similar amount of money coming into the

23   account and similar amount of money going out of the

24   account, right?

25   A.  Correct.

1    Q.  As an AML analyst, would you look for patterns, for

2    example, to see if there was a similar amount of money going

3    into an account and going out of an account?

4    A.  I don't remember.

5    Q.  Down below that you say, "Wires" -- well, let's stick

6    on -- I'm sorry, let's go back to the outgoing wires.  We

7    don't know who the wires were going to, correct?

8    A.  Not necessarily.  They're not in the comments, but the

9    comments do state various businesses.

10   Q.  We can't -- can you name any of the businesses that the

11   wires were going to?

12   A.  No.

13   Q.  Can you describe what the use of the funds were for

14   those particular wires?

15   A.  I don't remember.

16   Q.  And you can't look at your comments and determine that,

17   right?

18   A.  I don't know.

19   Q.  Down below that it says, "Wires to and from various

20   businesses."  Do you see that?

21   A.  I do see that.

22   Q.  What kind of businesses were the wires to and from?

23   A.  I don't remember.

24   Q.  You can't tell by looking at these comments?

25   A.  No.

1    Q.  Do you know why you're stating that wires are to and

2    from various businesses?

3    A.  I don't remember.

4    Q.  It says, "Activity does not appear suspicious.  Activity

5    is consistent and expected for the type of business

6    customer."  Do you see that?

7    A.  I do.

8    Q.  Why are you concluding that the activity does not appear

9    suspicious?

10   A.  I don't remember.

11   Q.  It says, "Activity is consistent and expected for type

12   of business customer."  Do you see that?

13   A.  I do.

14   Q.  What does that mean?

15   A.  I don't know.

16   Q.  What is -- for example, what is the activity consistent

17   with?

18   A.  I don't know.

19   Q.  Are you saying that the activity is consistent with

20   previous activity from this customer?

21   A.  I don't remember.

22   Q.  Are you saying that you compared this activity with

23   other similar types of businesses?

24   A.  I don't know.

25   Q.  Do you believe that you would have had to have an

1    understanding as to what the Petters Company business was in

2    order for you to make the determination that the activity is

3    consistent and expected for the type of business customer?

4    A.  I don't remember.

5    Q.  And when you say "for type of business customer," are

6    you talking about Petters Company, Inc.'s business?

7    A.  I don't remember.

8    Q.  Can you explain at all what you're talking about where

9    you say, "expected for the type of business customer"?

10   A.  I don't remember.

11   Q.  Did you ever have an understanding, Ms. Johnson, that

12   part of the Petters Company business was to buy consumer

13   electronics from wholesalers?

14   A.  I don't remember.

15   Q.  And do you -- do you know if part of the Petters Company

16   business was to then take those consumer electronics and

17   sell them to big-box retailers?

18   A.  I don't remember.

19   Q.  Did you ever have an understanding that in order for

20   Petters Company to buy consumer electronics, it borrowed

21   money from investors to be able to do that?

22   A.  I don't remember.

23   Q.  And then Petters Company could take the proceeds of the

24   sales to big-box retailers and use that money to repay its

25   investors?

1    A.  I don't know.

2    Q.  And do you know if, for example, that Petters Company,

3    Inc. was buying the consumer electronics from two

4    wholesalers in particular?

5    A.  I don't know.

6    Q.  Are those things that you would look into or try and

7    figure out when you were an AML analyst at M&I Bank?

8    A.  I don't remember.

9    Q.  Would you look in to see, for example, on incoming wires

10   if -- let's say 70 to 80 percent of the value of those wires

11   was from two entities.  Would you look to see information

12   about those two entities?

13   A.  I don't remember.

14   Q.  Do you recall if you had looked to determine why

15   consistently 70 to 80 percent of the value of the incoming

16   wires was from two entities?

17   A.  I don't recall.

18   Q.  Do you think that type of information would be helpful

19   to understand whether or not the wire activity was

20   potentially suspicious?

21   A.  I don't know.

22   Q.  What if I told you that with respect to the Petters

23   Company, Inc. account, 70 to 80 percent of the wires at

24   times were coming from two entities, and those two entities

25   were actually the two wholesalers who Petters Company, Inc.

1    was supposedly buying the products from.  Would that

2    information have been helpful to help determine whether or

3    not the wire activity was potentially suspicious?

4    A.  I don't know.

5    Q.  See down below it says, "Case reviewed.  The activity is

6    expected and consistent with business type."  Do you see

7    that?

8    A.  I do.

9    Q.  That's a comment by Bernita Hile; is that right?

10   A.  Correct.

11   Q.  Do you recall ever talking with Bernita Hile about the

12   Petters Company, Inc. account?

13   A.  I don't remember.

14   Q.  Do you know how Ms. Hile reached her conclusion?

15   A.  I don't know.

16   Q.  Do you know, Ms. Johnson, that out of all of the alerts

17   that were reviewed in Searchspace for the Petters Company,

18   Inc., you reviewed the most alerts?

19   A.  I did not know that.

20   Q.  Do you have any idea as to why you would have reviewed

21   most alerts in the Petters Company, Inc. account?

22   A.  I have an idea.

23   Q.  Why is that?

24   A.  Because they were on the peer-only, and one of my jobs

25   was to clear the peer-only alert list.

1    Q.  So you were specifically tasked with the peer-only

2    reviews?

3    A.  I was one of the people that cleared the peer-only

4    review alerts, yes.

5    Q.  So let me see if I understand this.  Out of the

6    analysts, there was a subset of analysts who did expedited

7    reviews; is that right?

8    A.  I don't remember exactly.

9    Q.  Well, what do you remember about that?

10   A.  I remember there being the peer-only review list, and I

11   remember that I closed a lot of the accounts that were on

12   the peer-only review list.

13   Q.  And why were you closing the accounts on the expedited

14   review list?

15   A.  I don't remember.

16   Q.  Did you have a particular understanding of the expedited

17   review process?

18   A.  I don't remember.

19   Q.  Did you have a better understanding of the expedited

20   review process than other analysts?

21   A.  I don't remember.

22   Q.  Did you have a better understanding of the Petters

23   Company, Inc. account than the other analysts?

24   A.  I don't remember.

25   Q.  Okay.  If we go to Alert 057894.

1    A.  Okay.

2    Q.  And this alert, 57894, was for the alert the month of

3    August of 2005.  Do you see that?

4    A.  I do.

5    Q.  And this was an alert that you closed in the

6    closed-expected activity state; is that right?

7    A.  Yes.

8    Q.  And if we just take a look down at the comments and tell

9    me if you believe this is true.  You did your review for --

10   is it for August through November of 2005?

11   A.  August through October, it says.

12   Q.  So let me back up.  So for the Alert 57894 in the months

13   of August, September, and October, the alerts were for

14   incoming and outgoing wires; is that right?

15   A.  According to these comments, yes.

16   Q.  All right.  You say -- below that you say, "Also work

17   with existing brands through license agreements.  This is to

18   further extend those brands into new product line and

19   markets.  For more info, please refer to MIContacts."

20   Again, you're referring to MIContacts, right?

21   A.  I did, yes.

22   Q.  And do you know why you're referring to MIContacts?

23   A.  I don't.

24   Q.  When you say, "Please refer to MIContacts," who are you

25   talking to?

Johnson - Deposition

1    A.  I don't know.

2    Q.  Who reads these comments in Searchspace?

3    A.  I don't know the full extent, but other analysts can see

4    these, the managers.  You know, if we were ever audited, the

5    auditors can see that if it was one of the alerts they

6    pulled.

7    Q.  So the audience of these comments would be analysts,

8    managers, or potentially auditors?

9    A.  There could possibly be more, but it's my under -- I

10   know of those.

11   Q.  And do you know that auditors did read the comments in

12   Searchspace?

13   A.  I don't remember.

14   Q.  Okay.  You go on to say here at 11:35, "Customer sent

15   507 wires, range from," then you give a range.  And then you

16   say, "Received 536 wires" and then you give a range.  Do you

17   see that?

18   A.  I do.

19   Q.  You say, "Wires were for business purposes."  Do you see

20   that?

21   A.  I do.

22   Q.  So you're talking about the customer sending out wires

23   and receiving wires, correct?

24   A.  In those comments, yes.

25   Q.  But you do not list any of the entities who either sent

1    in the wires or who the wires were going to, correct?

2    A.  I do not list separate -- I do not list individual

3    entities.

4    Q.  And you do not describe what the purpose of the incoming

5    wires was, correct?

6    A.  Here I say business purposes.  That's what my comment

7    says, "business purposes."

8    Q.  Yeah, I'm talking about in particular you don't describe

9    what the actual purpose for any given wire was, do you?

10   A.  My comments just say, "business purposes."

11   Q.  So, again, you don't describe what any purpose for any

12   particular incoming wire is, correct?

13   A.  I do not say that every individual wire.  I think I made

14   a general comment, "business purposes."

15   Q.  What were the business purposes?

16   A.  I don't remember.

17   Q.  And how did you conclude that the wires were for

18   business purposes?

19   A.  I don't remember.

20   Q.  And are you saying both the incoming and outgoing wires

21   were for business purposes, or are you just referring to

22   incoming wires or outgoing wires specifically?

23   A.  I don't remember.

24   Q.  Can you tell by reading that?

25   A.  I don't know.

1    Q.  And can you tell what wires in particular you're talking

2    about?

3    A.  I don't know.

4    Q.  You then go on and say, "Deposits consisted of checks

5    from various businesses and individuals."  Do you see that?

6    A.  I do.

7    Q.  Why were you looking into that?

8    A.  I don't remember.

9    Q.  You say, "Also checks were deposited from the customer's

10   other business accounts with M&I."  Do you see that?

11   A.  I do.

12   Q.  And what are you referring to there?

13   A.  I don't remember.

14   Q.  Are you suggesting that Petters Company, Inc. had other

15   business accounts with M&I?

16   A.  I don't know.

17   Q.  Do you know why you would be describing that

18   information?

19   A.  No.

20   Q.  Are you identifying this information, these comments,

21   because you believed it was important to determine whether

22   or not there was potentially suspicious activity?

23   A.  I don't remember.

24   Q.  It says, "Checks cleared the account for business

25   purposes."  Do you see that?

Johnson - Deposition

1    A.  I do.

2    Q.  And how did you determine that?

3    A.  I don't remember.

4    Q.  Do you know why you would be explaining that checks

5    cleared the account for business purposes?

6    A.  I don't remember.

7    Q.  Down below at 11:42 you say, "Activity does not appear

8    suspicious and is consistent and expected for the business

9    customer."  Do you see that?

10   A.  I do.

11   Q.  Again, do you know how it was that you concluded that

12   the activity did not appear suspicious?

13   A.  I don't.

14   Q.  And do you know what activity you're talking about?

15   A.  I don't.

16   Q.  And do you know why or how you concluded that the

17   activity is consistent and expected for the business

18   customer?

19   A.  I don't remember.

20   Q.  And when you say "business customer," are you referring

21   to Petters Company, Inc.?

22   A.  I don't remember.

23   Q.  And, again, Ms. Johnson, do you believe that it would

24   have been helpful in your investigation to know that with

25   respect to this alert in the months that you reviewed, that

Johnson — Deposition

1    77 percent of the value of the incoming wires was coming

2    from two wholesalers that Petters Company, Inc. was

3    supposedly buying the consumer electronics from?

4    A.  I don't know.

5    Q.  This is -- this is an alert that you did for the alerted

6    month of December 2006, correct?

7    A.  I'm just reading my comments, and it looks like I did it

8    for December 2006 and January 2007.

9    Q.  Those are the months that you reviewed, correct?

10   A.  It appears so, yes.

11   Q.  And the alerted month was December 2006; is that right?

12   A.  For this particular alert, yes.

13   Q.  And you closed this alert in the closed to expected

14   activity state; is that correct?

15   A.  Correct.

16   Q.  If you look down at the very bottom of the page in

17   the -- on the alert there, you say, "Customer alerted for

18   incoming and outgoing wire activity."  Do you see that?

19   A.  I do.

20   Q.  So, again, this alert was for incoming and outgoing

21   wires; is that right?

22   A.  Correct.

23   Q.  You say, "Peer value/volume."  And what you're talking

24   about there is the number of wires and the amount of the

25   wires is why the alerts alerted; is that correct?

Johnson - Deposition

1    A.  Correct.

2    Q.  You say, "This account appears on the Qualified Account

3    for Peer Only (QAPOR) list.  This is an expedited review for

4    December '06 and January '07."  Do you see that?

5    A.  I do.

6    Q.  Okay.  So now you're looking at the expedited review

7    list; is that right?

8    A.  Correct.

9    Q.  Okay.  So do you know what you would have done to review

10   this alert?

11   A.  I don't remember.

12   Q.  Would one of the first things that you would have done

13   is gone to the expedited review list and make sure that

14   Petters Company, Inc. is on there?

15   A.  I don't remember.

16   Q.  Would you have looked at any documentation to determine

17   why Petters Company, Inc. was on the expedited review list?

18   A.  I don't remember.

19   Q.  Do you recall ever seeing any documentation about why

20   Petters Company, Inc. was on the expedited review list?

21   A.  I don't remember.

22   Q.  You say, "Customer received 591 wires," and then you

23   give a range, "for a total of 1.772 billion."  Do you see

24   that?

25   A.  I do.

1    Q.  So Petters Company, Inc. received about $1.772 billion

2    in incoming wires; is that right?

3    A.  Yes, according to these comments.

4    Q.  Okay.  And then you say, "Wires were from," and then you

5    list some names there, right?

6    A.  Yes, there are some names.

7    Q.  And you list Acorn Capital Group, Enchanted Family,

8    Fidelis, Metro Gem, Nationwide International Resources,

9    Thousand Oaks, Palm Beach, et cetera.  Do you see that?

10   A.  I do.

11   Q.  Why are you listing those companies?

12   A.  I don't remember.

13   Q.  Do you know why you are listing those companies in this

14   particular alert, but you didn't list any companies in the

15   other alerts that we looked at?

16   A.  I don't remember.

17   Q.  Was it your practice to identify who the wires were

18   from?

19   A.  I don't remember.

20   Q.  Can you look at that list and tell me what any -- tell

21   me who any of those entities are or what they did?

22   A.  I don't remember.

23   Q.  I'm asking you if you can look at the list and determine

24   what any of those entities did.

25   A.  No.

Johnson - Deposition

1    Q.  Or what type of business they were involved in.

2    A.  No.

3    Q.  And then you say, "Customer sent out 471 wires," and

4    then you give a range, "for a total of 1.778 billion."  Do

5    you see that?

6    A.  I do.

7    Q.  So, again, we've got a similar number coming in and a

8    similar number going out, right?

9    A.  Correct.

10   Q.  So 1.7 billion coming in and 1.7 billion going out; is

11   that right?

12   A.  According to these comments, yes.

13   Q.  Again, is that something that you would have looked at

14   to determine whether or not the activity was potentially

15   suspicious?

16   A.  I don't remember.

17   Q.  Then you list some entities who the wires were sent to,

18   including Metro Gem, Inc.  Do you see that?

19   A.  I do.

20   Q.  And I see that wires came in from Thousand Oaks and

21   wires went to Thousand Oaks.  Do you see that?

22   A.  I do.

23   Q.  Do you know why wires were coming in and going out to

24   the same entity?

25   A.  I don't.

1    Q.  Can you explain what -- let me back up.  For any of

2    these entities on the outgoing wires, can you tell us what

3    business any of those entities were involved in?

4    A.  I can't.

5    Q.  Can you tell us what the use of any of those particular

6    funds were for those outgoing wires?

7    A.  I don't know.

8    Q.  If we go back up to the incoming wires, can you tell us

9    what the purpose of any of those incoming wires was for?

10   A.  I don't know.

11   Q.  And do you know why you are listing out this information

12   pertaining to these entities when you're doing an expedited

13   review?

14   A.  I don't remember.

15   Q.  Down below it says, "Additional account activity as well

16   as the incoming and outgoing wire activity appears

17   consistent with the last review and expected for the type of

18   business."  Do you see that?

19   A.  I do.

20   Q.  You're talking about additional account activity.  Do

21   you see that?

22   A.  Yes.

23   Q.  What does that mean?

24   A.  I don't know exactly what that means.

25   Q.  Then you say, "As well as the incoming and outgoing wire

1    activity appears consistent with the last review."  What do

2    you mean by "last review"?

3    A.  I don't know.

4    Q.  Is last review the last review that an analyst did or is

5    it the last review that you did?

6    A.  I don't know.

7    Q.  Then you say, "And expected for the type of business."

8            Do you know why it is or how it is that you

9    concluded that the wire activity was expected for the type

10   of business?

11   A.  I don't remember.

12   Q.  And do you know what is meant by the "type of business"?

13   A.  I don't.

14   Q.  Again, Ms. Johnson, you mentioned Enchanted Family and

15   you mentioned Nationwide International Resources with

16   respect to the incoming wires, right?

17   A.  They're listed in my comments, yes.

18   Q.  So would you have actually have looked at the incoming

19   wires for those two entities?

20   A.  I don't remember.

21   Q.  You certainly had the ability to look at the wires for

22   those two entities, correct?

23   A.  Yes, the ability would have been -- yes.

24   Q.  And if I told you that the value of the incoming wires

25   for those two entities was 77 percent of the value of all

1   incoming wires for this alert, do you believe that would

2   have been helpful information to determine whether or not

3   there was potentially suspicious activity?

4   A.  I don't know.

5   Q.  And certainly you had the ability to go and look at

6   those wires and add those wires up and make the

7   determination as to the percentage of the value of those

8   wires compared to the overall incoming wires, correct?

9   A.  I would have been able to do that, yes.

10  Q.  Had you done that in the past with respect to reviewing

11  alerts?

12  A.  I don't remember.

13  Q.  Does that sound like something you would have done?

14  A.  I don't remember.

15  Q.  Okay.  Let's go to Alert 08663.

16  A.  Okay.

17  Q.  This is an alert that you reviewed and closed in the

18  closed-expected activity state; is that correct?

19  A.  Correct.

20  Q.  It was for the alerted month of May of 2007.  Do you see

21  that?

22  A.  I do.

23  Q.  And what months did you review here?

24  A.  According to my comments, I looked May to June 2007.

25  Q.  And you say -- down below on the first page you say,

1    "This account appears on the Qualified Account for Peer-Only

2    Review (QAPOR) list.  This is an expedited review for May

3    through June of '07."  Right?

4    A.  Correct.

5    Q.  So this is an expedited review where you closed the

6    alert in the closed to expected activity state, correct?

7    A.  Correct.  Correct.

8    Q.  So what procedures would you have followed to do this

9    alert?

10   A.  I don't remember.

11   Q.  Would you have followed the procedures for closed to

12   expected activity?

13   A.  I don't remember exactly.

14   Q.  Because if you closed the alert in the closed to

15   expected activity state, it makes sense that you would have

16   followed the procedures pertaining to closed to expected

17   activity, does it not?

18   A.  I don't remember what the procedures were at this time.

19   Q.  Does that sound like a reasonable conclusion to you?

20   A.  It says "qualified only" -- it says "QAPOR list" and it

21   says "expedited review," but I don't know the procedures

22   that I followed for this one.

23   Q.  So you don't know whether you would have followed the

24   procedures laid out in the closed to expected activity state

25   in order to close this alert in that state?

1    A.  Correct, I don't remember.

2    Q.  Okay.  The second page of the alert says -- or you

3    write, "Customer received 640 wires ranging from," and then

4    you gave a range, "for a total of 2 billion."  Do you see

5    that?

6    A.  I do.

7    Q.  Then down below you say, "Customer sent out 493 wires,"

8    then you give a range, but you don't list what the total

9    was, correct?

10   A.  No total is listed.

11   Q.  Do you know why you're listing the total of the incoming

12   wires but not the total of the outgoing wires?

13   A.  I don't.

14   Q.  On the incoming wires you say, "Wires were from," and

15   then you list out Acorn Capital, Enchanted Family, PAC

16   Funding, et cetera.  Do you see that?

17   A.  I do.

18   Q.  And are you just listing a subset of the incoming -- the

19   entities you were wiring the money into the account?

20   A.  I don't remember.

21   Q.  Do you know why you would have chosen to list those

22   particular entities?

23   A.  No.

24   Q.  And for those incoming wires, can you describe what the

25   purpose of any of those incoming wires was?

1    A.  No.

2    Q.  And you don't know who any of those entities are or what

3    they did?

4    A.  I don't remember.

5    Q.  And you don't -- you don't know what relation they had

6    at all to the Petters Company business, do you?

7    A.  I don't remember.

8    Q.  You say, "Customer sent out 493 wires.  Wires were sent

9    to," and then you list, Metro Gem, PAC Funding, Thousand

10   Lakes, et cetera.  Do you see that?

11   A.  I do.

12   Q.  Do you know why you chose to identify those entities for

13   outgoing wires?

14   A.  I don't.

15   Q.  And, again, you don't know what any of those entities

16   were or what they did?

17   A.  I don't remember.

18   Q.  And you don't know what their relation was to Petters

19   Company, Inc.?

20   A.  I don't remember.

21   Q.  And you can't read this and determine what the use of

22   any of the funds were that were being wired to those

23   entities, can you?

24   A.  I don't know.

25   Q.  It says, "And appear to be for business purposes."  Do

Johnson - Deposition

```
1    you see that?

2    A.  I do.

3    Q.  What do you mean by "appear to be"?

4    A.  I don't remember.

5    Q.  And, again, can you tell me what business purposes these

6    wires were for?

7    A.  I don't know.

8    Q.  Then again you say, "Additional account activity as well

9    as the incoming and outgoing wire activity appears

10   consistent with the last review and expected for the type of

11   business."  Do you see that?

12   A.  I do.

13   Q.  Do you know what additional account activity you're

14   talking about?

15   A.  I don't.

16   Q.  Do you know how it is that you concluded that the

17   incoming and outgoing wire activity appears consistent?

18   A.  I don't.

19   Q.  Do you know what you're saying it was consistent with?

20   A.  I don't.

21   Q.  Do you know what you meant by "last review"?

22   A.  I don't.

23   Q.  Do you believe you're talking about the last review you

24   did or the last review some other analyst did?

25   A.  I don't remember.
```

1    Q.  And then the part where you say, "Expected for the type

2    of business," do you know what you meant by "type of

3    business"?

4    A.  I don't.

5    Q.  And can you read these comments and determine how it is

6    that you concluded that this activity was expected for the

7    type of business?

8    A.  I don't know.

9    Q.  If Nationwide and Enchanted had accounted for 78 percent

10   of the value of the total incoming wires for this alert in

11   this time period, would that information have been helpful

12   to know in determining whether or not the activity on this

13   account was potentially suspicious?

14   A.  I don't know.

15   Q.  And if Nationwide had approximately 45 percent of the

16   value of the incoming wires for this particular alert, is

17   Nationwide an entity who you would have looked into?

18   A.  I don't remember.

19   Q.  If Nationwide had accounted for 45 percent of the value

20   of the incoming wires, is Nationwide an entity who would

21   have been worthy of listing in your comments section?

22   A.  I don't know.

23   Q.  Okay.  Let's go to Alert 092227.  This is another alert

24   that you did where you closed the alert in the closed to

25   expected activity state; is that correct?

1    A.  Correct.

2    Q.  And this was for the alerted month of July 2007?

3    A.  Correct.

4    Q.  And what months did you review for this alert?

5    A.  The comments say July through August '07.

6    Q.  And, again, it says that, "Petters Co., Inc. alerted for

7    incoming and outgoing wire activity (peer value/volume)."

8    Right?

9    A.  Yes.

10   Q.  And so, again, this alert is for the number and amounts

11   of both incoming and outgoing wires; is that right?

12   A.  That's correct.

13   Q.  And this is another alert that was part of the expedited

14   review process; is that right?

15   A.  My comments state that it's on the Qualified Account for

16   Peer-Only Review, yes.

17   Q.  So this was an expedited review; is that right?

18   A.  It appears so, yes.

19   Q.  Then on the next page you say, "Customer received 502

20   wires," and then give a range, for a total of approximately

21   1.464 billion, right?

22   A.  Correct.

23   Q.  And then down below you say, "Customer sent out 423

24   wires," and you give a range, for a total of again

25   approximately 1.467 billion, right?

1    A.  Correct.

2    Q.  So we've got another similar amount coming in and a

3    similar amount going out, right?

4    A.  Correct.

5    Q.  And you don't know, Ms. Johnson, after having reviewed

6    several of these alerts where there are similar amounts

7    coming in and going out and those amounts are for billions

8    of dollars, if that would have been something that you would

9    have looked into to determine whether or not there was

10   potentially suspicious activity?

11   A.  I don't remember.

12   Q.  On the incoming wires you say, "Wires were from various

13   entities, such as, Acorn Capital, Enchanted Family, Metro

14   Gem, Nationwide International, Thousand Lakes, et cetera,

15   and appear to be for business purposes."

16   A.  Yes.

17   Q.  Again, this is an expedited review.  Do you know why

18   you're listing out these entities in the comments in

19   Searchspace for this expedited review?

20   A.  I don't.

21   Q.  And we can't look at your comments here and determine

22   what the purpose of any of the incoming wires was for, can

23   we?

24   A.  It doesn't appear so.

25   Q.  And you don't know who any of these entities were or

Johnson - Deposition

1    what they did at this time?

2    A.  I don't remember.

3    Q.  Okay.  On the outgoing wires again you list some of the

4    similar entities that you listed before, including Metro

5    Gem, PAC Funding, et cetera.  Do you see that?

6    A.  I do.

7    Q.  Do you know why it is you're choosing to call out those

8    entities?

9    A.  I don't.

10   Q.  You say, "Appear to be for business purposes."  Do you

11   see that?

12   A.  I do.

13   Q.  And, again, can you explain what the business purposes

14   were?

15   A.  I can't.

16   Q.  Down below again you use very similar language and you

17   say, "Additional account activity as well as the incoming

18   and outgoing wire activity appears consistent with previous

19   reviews and expected for the type of business."  Do you see

20   that?

21   A.  I do.

22   Q.  Now, this time you say consistent with previous reviews

23   instead of the last review.  Do you see that?

24   A.  I do.

25   Q.  So do you know why you're using the terminology

1    "previous reviews" instead of "last review"?

2    A.  I don't.

3    Q.  Do you know what is meant by "previous reviews"?

4    A.  I don't.

5    Q.  And you don't know what is meant by "additional account

6    activity"?

7    A.  I don't.

8    Q.  And you don't know how it is you concluded that the

9    incoming and outgoing wire activity appears consistent with

10   these previous reviews?

11   A.  I don't remember.

12   Q.  And you don't know how you concluded that the activity

13   was expected for the type of business?

14   A.  I don't remember.

15   Q.  And you don't know what type of -- what you mean by

16   "type of business"?

17   A.  I don't.

18   Q.  Let's go to Alert 093952.  Ms. Johnson, are you there?

19   A.  Yes.

20   Q.  This is another alert that you did, and you closed the

21   alert in the closed to expected activity state; is that

22   right?

23   A.  Correct.

24   Q.  And alerted month is September of 2007?

25   A.  Correct.

1    Q.  And if you look on the second page, you say, "This is an

2    expedited review for September through October of 2007."  Do

3    you see that?

4    A.  Yes, I do.

5    Q.  So you reviewed the months September and October of

6    2007; is that right?

7    A.  According to these comments, yes.

8    Q.  And, again, this is another expedited review, correct?

9    A.  Correct.

10   Q.  You say, "Customer received 516 wires totaling

11   approximately $1.46 billion."  Do you see that?

12   A.  I do.

13   Q.  And then down below you say, "Customer sent out 419

14   wires totaling approximately $1.46 billion."  Correct?

15   A.  Correct.

16   Q.  So, again, we have similar amounts coming in and similar

17   amounts going out; is that right?

18   A.  That is correct.

19   Q.  You say, "The wires were for various entities and appear

20   to be for business purposes."  Do you see that?

21   A.  I do.

22   Q.  Now, here, unlike the last couple of expedited reviews

23   that we saw, you don't list any of these entities that are

24   affiliated with the incoming wires, do you?

25   A.  They're not listed here, no.

Johnson - Deposition

1   Q.  Do you know why you didn't list any of the entities who

2   were wiring the money in?

3   A.  I don't remember.

4   Q.  And we can't tell from your comments here what the

5   purpose of any of those particular incoming wires was for,

6   can we?

7   A.  No.

8   Q.  Then you say, "Customer sent out wires."  And, again,

9   unlike your previous expedited reviews, you don't list who

10  the wires were going to, do you?

11  A.  I don't.

12  Q.  And do you know why that is?

13  A.  I don't remember.

14  Q.  We can't look at your comments and determine what the

15  use of any of those particular funds were for the outgoing

16  wires, can we?

17  A.  No.

18  Q.  You say below, "Wires were sent to various entities and

19  appear to be for business purposes."  Again, can you tell me

20  what the business purposes were for any of the wires?

21  A.  I don't remember.

22  Q.  You say, "Additional account activity as well as the

23  incoming and outgoing wire activity appears consistent with

24  the last review and expected for the type of business."

25            Now, this time you used the terminology "last

1    review," and last time you used some different terminology.

2    Do you know why you are using the terminology "last review"?

3    A.  I don't remember.

4    Q.  And you don't know what "last review" means?

5    A.  I don't remember.

6    Q.  And you say, "And expected for the type of business."

7    And, again, you don't know how you concluded that the

8    activity is expected for the type of business?

9    A.  I don't remember.

10   Q.  And you don't know what you mean by "type of business,"

11   correct?

12   A.  I don't remember.

13   Q.  We're almost done going through these alerts.  We've got

14   a few more, and I'm sorry I have to keep asking you this

15   just so I can exhaust your knowledge on these things.

16          But is there anything, Ms. Johnson, that you have

17   available to you that you could look at that would help

18   refresh your recollection or help you remember some of the

19   things that I'm asking you here today?

20   A.  Nothing comes to my mind.  I mean, we're working with

21   something that's ten years ago, and these were not the only

22   alerts that I cleared during the time, so it's very -- I

23   don't have a great recollection of exactly what I did or my

24   thought process.

25   Q.  Okay.  We're at Alert 97174.  Are you there?

Johnson - Deposition

```
1    A.  I'm here.

2    Q.  This is another alert that you closed in the closed to

3    expected activity state.  Do you see that?

4    A.  I do.

5    Q.  This was for the alerted month of November 2007?

6    A.  I see that, yes.

7    Q.  If you look down below, you say, "Petters Company, Inc.

8    reported in Searchspace for incoming and outgoing wire

9    activity (peer value/volume)."  You see that?

10   A.  I do.

11   Q.  So, again, this is -- this alert is for the value and

12   volume of both incoming and outgoing wires; is that right?

13   A.  Correct.

14   Q.  And then on the next page you say, "This account appears

15   on the Qualified Account for Peer-Only Review.  This is an

16   expedited review for November through December of '07."  Do

17   you see that?

18   A.  I do.

19   Q.  So you reviewed the months November 2007 and December

20   2007, correct?

21   A.  Yes, according to these comments.

22   Q.  Then you say, "Customer received 338 wires," then you

23   give a range, for a total of $991 million, approximately.

24   Do you see that?

25   A.  I do.
```

1    Q.  And then say, "Customer sent out 315 wires," and you

2    gave a range, for a total of $989 million, approximately.

3    Do you see that?

4    A.  I do.

5    Q.  So, again, we have similar amount going in and similar

6    amount going out, right?

7    A.  Correct.

8    Q.  You say, "Incoming and outgoing wires were from/to

9    various entities and appear to be for business purposes."

10   Do you see that?

11   A.  I do.

12   Q.  And like the last alert that we saw, you don't list any

13   of the entities who sent the money in or who the money was

14   going to, do you?

15   A.  I don't.

16   Q.  Do you know why you chose to not provide that

17   information?

18   A.  I don't.

19   Q.  And we can't look at your comments and determine what

20   the purpose of any of the incoming wires was for, can we?

21   A.  No.

22   Q.  And we can't look at your comments and determine what

23   the use of the funds were for the outgoing wires, can we?

24   A.  No.

25   Q.  And where you say that the wires were from/to various

1    entities and appear to be for business purposes, can you

2    tell us what the business purposes were?

3    A.  I don't remember.

4    Q.  And again, Ms. Johnson, you can't tell us what is meant

5    by "additional account activity"?

6    A.  I can't.

7    Q.  And you can't tell us how it is you concluded that the

8    outgoing wire activity appears consistent with the last

9    review?

10   A.  I can't.

11   Q.  You don't know what is meant by "last review"?

12   A.  I don't.

13   Q.  And where it says, "And expected for the type of

14   business," you don't know how it is you concluded that the

15   wire activity was expected for the type of business?

16   A.  I don't remember.

17   Q.  You don't remember what -- or you don't know what "type

18   of business" means?

19   A.  I don't.

20   Q.  Okay.  And let's just remember that the time period for

21   that alert, for Alert 97174, was December of 2007.

22   A.  Okay.

23   Q.  Let's go to the next alert that you did, which is

24   099565.  Are you there?

25   A.  I'm at 99565.

```
 1    Q.  99565, yes.

 2    A.  Yes.

 3    Q.  And this is for the alert of February of 2008?

 4    A.  I see that, yes.

 5    Q.  And this is an alert that you again closed in the closed

 6    to expected activity state.  Do you see that?

 7    A.  Yes.

 8    Q.  Now, the last one that we talked about was for the month

 9    December of 2007.  This alert is for February of 2008.  And

10    the last alert that you did, you did an expedited review,

11    but this alert you did not do an expedited review; is that

12    correct?

13    A.  There's no comments that I did an expedited review for

14    this one.

15    Q.  Do you know why, if you did an expedited review in

16    December of 2007, why you would not have done an expedited

17    review in February of 2008?

18    A.  I don't remember.

19    Q.  Do you know whether or not you did do an expedited

20    review for this alert?

21    A.  I don't remember.

22    Q.  It would have been your practice if you were doing an

23    expedited review to state that you were doing an expedited

24    review; is that right?

25    A.  It would have been my practice -- I would have -- it
```

1   would have been my practice to state it.

2   Q.  If we look down in the middle of the page at 10:58 you

3   say, "Petters Co., Inc. reported in Searchspace for incoming

4   wire activity (peer value) and for outgoing wire activity

5   (peer value/volume)."  Do you see that?

6   A.  I do.

7   Q.  Now, you say, "incoming wire activity (peer value)."

8   A.  Um-hmm.

9   Q.  And then for outgoing wire activity, you say, "(peer

10  value/volume)."

11  A.  Okay.

12  Q.  So are you saying that the alert only alerted on the

13  incoming wire activity for the amount of the incoming wires

14  and not the number of incoming wires?

15  A.  According to these comments, in February they would have

16  only alerted for the amount, not value, so the total amount.

17  Q.  And if you believed that they were also alerting for the

18  volume of incoming wires, would you have noted that?

19  A.  Yes, I would have noted it.

20  Q.  Okay.  Down below you say, "Petters Company, Inc. is a

21  collection of companies that make and market a variety of

22  consumer products nationwide."  See that?

23  A.  Yes.

24  Q.  You changed your language a little bit from the previous

25  alerts that we saw where you -- here you don't list anything

1    about the number of entities that you believe they're a

2    collection of.  Do you know why you did that?

3    A.  I don't remember.

4    Q.  And then you -- on the next page you say, "Office

5    locations are in South America, Asia, UK, and six locations

6    in the U.S.," and then you have in parentheses

7    (www.pettersgroup.com).  Do you see that?

8    A.  I do.

9    Q.  So what are you referring to there?

10   A.  I don't remember.

11   Q.  Are you saying that Petters Company, Inc. had office

12   locations in those areas?

13   A.  I don't remember.

14   Q.  Or are you saying Petters Group dot -- or Petters Group

15   had offices in those locations?

16   A.  I don't remember.

17   Q.  Do you know who Petters Group is?

18   A.  I don't remember.

19   Q.  And you don't have any understanding as to whether or

20   not Petters Group was affiliated in any way with Petters

21   Company, Inc. or whether or not they were completely

22   separate?

23   A.  I don't remember.

24   Q.  Would this have been information that you would have

25   found out, or is this information that maybe you had found

1    out through comments that other analysts had made?

2    A.  I don't remember.

3    Q.  Okay.  And then down below you say, "Customer received

4    232 wires," then you give a range, for a total of

5    approximately 843 million.  Do you see that?

6    A.  I do.

7    Q.  Then down below where you talk about the outgoing wires,

8    you don't give a total, do you?

9    A.  I don't.

10   Q.  Do you know why that is?

11   A.  I don't.

12   Q.  Going back to the incoming wires, you say, "Additional

13   wires were from various entities and appear to be for

14   business purposes."  Do you see that?

15   A.  I do.

16   Q.  Now, you do list -- you say, "The larger wires were from

17   Ritchie Special Credit Investments."  Do you see that?

18   A.  I do.

19   Q.  But you don't list any other entities for incoming

20   wires, do you?

21   A.  I don't.

22   Q.  Do you know why you're calling out Ritchie Special

23   Credit Investments?

24   A.  I don't.

25   Q.  Do you know why you're making note of who the larger

Johnson - Deposition

1    wires were from in this particular comment?

2    A.  I don't remember.

3    Q.  And this is the first time that I've seen you make a

4    statement like this in your comments where you're pointing

5    out the larger -- who the larger wires were from.

6          You didn't point out in the other alerts that we

7    looked at who the larger wires were from, did you?

8    A.  According to the comments, no.

9    Q.  And do you know why that is?

10   A.  I don't remember.

11   Q.  Had your practice changed?

12   A.  I don't remember.

13   Q.  Was it part of your practice to identify who the larger

14   wires were from?

15   A.  I don't remember.

16   Q.  And where it says, "The additional wires," and you're

17   talking about the incoming wires, "appear to be for business

18   purposes," do you know how it is you concluded that those

19   incoming wires were for business purposes?

20   A.  I don't remember.

21   Q.  And do you know what business purposes you're talking

22   about there?

23   A.  I don't.

24   Q.  Down below where you say, "Wires were sent to various

25   entities and appear to be for business purposes," is your

1    answer the same, that you don't know what is meant by

2    "business purposes"?

3    A.  Correct, I don't remember.

4    Q.  And we can't look at your comments about the incoming

5    wires and determine what the purpose of any of the incoming

6    wires was for, can we?

7    A.  No.

8    Q.  And we can't look at your comments with respect to the

9    outgoing wires and determine what the use of the funds were

10   for the outgoing wires, correct?

11   A.  No.

12   Q.  In the middle of the page you write, "Additional account

13   activity:  Credit activity consists of check deposits and

14   transfers."  Do you see that?

15   A.  I do.

16   Q.  Do you know why you're referencing that information?

17   A.  I don't remember.

18   Q.  You say, "Debit activity consists of auto w/ds to

19   American Express."  Do you see that?

20   A.  I do.

21   Q.  What does "w/ds" mean?

22   A.  Withdrawals.

23   Q.  Do you know why you're referencing that information?

24   A.  I don't remember.

25   Q.  Was that information important to you in determining

1   whether or not there was suspicious activity pertaining to

2   this alert?

3   A.  I don't remember.

4   Q.  You say, "The reported incoming and outgoing wire

5   activity does not appear suspicious."  Do you see that?

6   A.  I do.

7   Q.  Can you tell us how it is that you concluded that the

8   incoming and outgoing wire activity does not appear

9   suspicious?

10  A.  I don't remember.

11  Q.  Can you tell us why you believed that?

12  A.  I don't remember.

13  Q.  We can't read your comments and determine why you

14  believed that?

15  A.  I don't know.

16  Q.  Well, can you?

17  A.  My comments state that they're for business purposes, so

18  I would think that they were for business purposes.

19  Q.  Other than just reading the "for business purposes"

20  part, you can't determine why it is you concluded that the

21  wire activity does not appear suspicious?

22  A.  I don't remember.

23  Q.  It says, "The overall activity appears consistent and

24  expected for the type of business."  Do you see that?

25  A.  I do.

1    Q.  And what are you talking about there?

2    A.  I don't remember.

3    Q.  Can you tell us what activity you're talking about?

4    A.  No, I can't, because I don't remember.

5    Q.  Can you tell us why it is you concluded that the

6    activity was consistent and expected for the type of

7    business?

8    A.  I don't remember.

9    Q.  Can you tell us what is meant by "type of business"?

10   A.  I don't remember.

11   Q.  In determining if an incoming wire was for business

12   purposes, do you know if your practice was to simply look to

13   see if the wire came from a business as opposed to an

14   individual?

15   A.  I don't remember.

16   Q.  Again, Ms. Johnson, with this -- with this particular

17   alert and when you closed it in the closed to expected

18   activity state, do you think it would have been helpful to

19   know if you didn't that the value of the incoming wires --

20   74 percent of the value of the total incoming wires was from

21   Enchanted and Nationwide?

22   A.  I don't know.

23   Q.  And do you believe if -- that that information would

24   have been important to identify in the comments in

25   Searchspace?

1    A.  I don't know.

2    Q.  Ms. Johnson, let's go to Alert 101318.

3    A.  Okay.

4    Q.  This is alert that you closed in the quick close state.

5    Do you see that?

6    A.  I do.

7    Q.  And this is for the alerted month of April 2008.  Do you

8    see that?

9    A.  I do.

10   Q.  And if we look down below, you say, "Petters Co., Inc.

11   reported in Searchspace for incoming wire activity (peer

12   value) and for outgoing wire activity (peer value/volume) in

13   April and May of 2008."  Do you see that?

14   A.  I do.

15   Q.  "This account appears on the Qualified Account for

16   Peer-Only Review list.  This is an expedited review for

17   April through May 2008," correct?

18   A.  Correct.

19   Q.  So you reviewed the months of April and May; is that

20   right?

21   A.  According to the comments.

22   Q.  And you did an expedited review for this one, correct?

23   A.  According to the comments, yes.

24   Q.  You say, "Customer received 175 wires," and then you

25   give a range, for a total of 1 billion -- it's around a

1   billion dollars, right?

2   A.  Right.

3   Q.  And if you look down below, the outgoing wires for

4   almost that exact same amount for nearly -- for

5   approximately a billion dollars, correct?

6   A.  I see, yes.

7   Q.  And, again, do you know if you looked to see why there

8   was such similar amounts of money going in and out of the

9   account?

10  A.  I don't remember.

11  Q.  Here you say, "The larger wires were from Thousand

12  Lakes, LLC."  Do you see that?

13  A.  Yes, I see that.

14  Q.  Do you know why you're pointing out the fact that the

15  larger wires were from Thousand Lakes, LLC?

16  A.  I don't remember.

17  Q.  Was that information that was helpful for you to

18  determine whether or not there was potentially suspicious

19  activity on the account?

20  A.  I don't remember.

21  Q.  And, again, do you know why you're identifying large --

22  which entity had the larger incoming wires for this

23  expedited review, but you did not do that on previous

24  reviews?

25  A.  I don't remember.

Johnson - Deposition

1    Q.  And other than identifying that the larger wires were

2    from Thousand Lakes, LLC, you don't identify any of the

3    other entities for the incoming wires, do you?

4    A.  Not specifically.

5    Q.  And we can't tell by reading the comments here what the

6    purpose was for any particular incoming wire, correct?

7    A.  Not for any particular wire, correct.

8    Q.  You say, "The additional wires were from various

9    entities and appear to be for business purposes."

10           Again, can you tell us how it is that you

11   concluded that those wires appeared to be for business

12   purposes?

13   A.  I don't remember.

14   Q.  And can you tell us what you meant by "business

15   purposes"?

16   A.  No.

17   Q.  On the outgoing wires you say, "The larger wires were

18   sent to Thousand Lakes, LLC."  Do you see that?

19   A.  Yes.

20   Q.  So the larger wires were coming in from Thousand Lakes

21   and the larger wires were going to Thousand Lakes; is that

22   right?

23   A.  According to the comments.

24   Q.  Do you know why you were identifying that?

25   A.  I don't remember.

1    Q.  Do you know what you did to determine whether it made

2    sense for the larger wires to be coming in from Thousand

3    Lakes and to be going to Thousand Lakes?

4    A.  I don't remember.

5    Q.  Do you recall if you did any investigation at all as to

6    why the larger wires were coming in from Thousand Lakes and

7    going to Thousand Lakes?

8    A.  I don't remember.

9    Q.  You say, "The additional outgoing wires were sent to

10   various entities and appear to be for business purposes."

11   Do you see that?

12   A.  I do.

13   Q.  Again, we can't read your comments and determine what

14   the use of the funds were for any of the outgoing wires, can

15   we?

16   A.  No.

17   Q.  You chose to not identify any of the entities with

18   respect to the outgoing wires that you're mentioning,

19   correct?

20   A.  Except for the Thousand Lakes.

21   Q.  I understand.

22   A.  Okay.  No, I did not say any other specific ones.

23   Q.  And what I'm referring to is the part where you say,

24   "Additional outgoing wires were sent to various entities."

25   A.  Okay.

1   Q.  And my question is:  You did not identify any of those

2   entities for those outgoing wires, correct?

3   A.  Correct, I did not.

4   Q.  Then you say, "Additional account activity as well as

5   the incoming and outgoing wire activity appears consistent

6   with previous reviews and expected for the type of

7   business."  Do you see that?

8   A.  Yes.

9   Q.  Can you tell us with respect to this alert what is meant

10  by "additional account activity"?

11  A.  I don't remember.

12  Q.  Can you tell us what additional account activity you

13  would have looked into?

14  A.  I don't remember.

15  Q.  And then you say, "As well as incoming and outgoing wire

16  activity appears consistent with previous reviews."  Can you

17  tell us how it is that you concluded that the incoming and

18  outgoing wires appeared consistent with previous reviews?

19  A.  I don't remember.

20  Q.  And here you're using the terminology "previous reviews"

21  instead of "last reviews."  Do you know why you're using

22  that terminology instead of "last reviews"?

23  A.  I don't remember.

24  Q.  And you can't tell us what is meant by "previous

25  reviews"?

```
1    A.  No.
2    Q.  And where it says, "That the activity was expected for
3    the type of business," can you tell us how it is or why it
4    is you concluded that the activity was expected for the type
5    of business?
6    A.  I don't remember.
7    Q.  And can you tell us what you meant by "type of
8    business"?
9    A.  No.
10   Q.  If we go -- can you go to Alert 104127, please.
11   A.  Okay.
12   Q.  This is was an alert that you did; is that right?
13   A.  That's correct.
14   Q.  And you closed it in the quick close state?
15   A.  Correct.
16   Q.  This was for the alerted month June of 2008?
17   A.  Correct.
18   Q.  You say, "Petters Co., Inc. reported in Searchspace for
19   incoming and outgoing wire activity (peer value/volume)."
20   Right?
21   A.  Correct.
22   Q.  "This account appears on the QAPOR list.  This is an
23   expedited review for June through July 2008," correct?
24   A.  Correct.
25   Q.  So you reviewed the months June and July of 2008?
```

1    A.  Correct, according to the comments.

2    Q.  You say, "Customer received 215 wires," you give a

3    range, and the total of approximately $710 million, right?

4    A.  Correct.

5    Q.  And then on the outgoing wires you say, "Customer sent

6    out 210 wires," you give a range, and a total of

7    approximately $707 million, correct?

8    A.  Correct.

9    Q.  Again, similar amount in and similar amount out, right?

10   A.  Correct.

11   Q.  On the incoming wires you say, "The larger wires were

12   from Thousand Lakes, LLC," and on the outgoing wires you

13   say, "The larger wires were sent to Thousand Lakes, LLC and

14   Petters, Co."  Do you see that?

15   A.  I do.

16   Q.  Do you know why you were pointing that out?

17   A.  I don't -- I don't remember.

18   Q.  Was that information helpful in determining whether or

19   not the activity was potentially suspicious?

20   A.  I don't remember.

21   Q.  Again, do you know why you're identifying the larger

22   wires in this expedited review but you did not do that when

23   you were doing reviews in the closed to expected activity

24   state?

25   A.  I don't remember.

1    Q.  Or when you were doing reviews that were not part of the

2    expedited review?

3    A.  I don't remember.

4    Q.  And, again, we can't look at the information you have in

5    the comments in Searchspace here on the incoming wires and

6    determine what the purpose of any of those particular wires

7    was for, can we?

8    A.  I do not list out the specific -- other than Thousand

9    Lakes, I don't list out specific wires.

10   Q.  My question is:  You can't look at the comments in

11   Searchspace and determine what the purpose of any of the

12   particular incoming wires was for, correct?

13   A.  No.

14   Q.  And you can't look at the comments in Searchspace and

15   determine what the purpose of the Thousand Lakes wires were

16   for, correct?

17   A.  No.

18   Q.  You can't look at the comments in Searchspace and

19   determine what the use of the funds were for the outgoing

20   wires, correct?

21   A.  No.

22   Q.  For the incoming wires you say, "The additional wires

23   were from various entities and appear to be for business

24   purposes."  Correct?

25   A.  Yes.

1  Q.  What are the business purposes that you're talking

2  about?

3  A.  I don't remember.

4  Q.  For the outgoing wires you say, "Additional outgoing

5  wires were sent to various entities and appear to be for

6  business purposes."  Do you see that?

7  A.  Yes.

8  Q.  What are the business purposes you're talking about

9  there?

10  A.  I don't remember.

11  Q.  And can you tell us how you concluded that either the

12  incoming wires or the outgoing wires were for business

13  purposes?

14  A.  I don't remember.

15  Q.  You say on the second page of the alert, "Additional

16  activity as well as the incoming and outgoing wire activity

17  appears consistent with previous reviews and expected for

18  the type of business."  Do you see that?

19  A.  I do.

20  Q.  Again, can you tell us what you meant by "additional

21  account activity"?

22  A.  I don't remember.

23  Q.  Can you tell us how it is that you concluded that the

24  incoming and outgoing wire activity appears consistent with

25  previous reviews?

```
1    A.  I don't remember.

2    Q.  Can you tell us why you concluded that the incoming and

3    outgoing wire activity was expected for the type of

4    business?

5    A.  I don't remember.

6    Q.  Can you tell us what you meant by "type of business"?

7    A.  No.

8    Q.  Ms. Johnson, do you know who Elliot Berman is?

9    A.  Yes.

10   Q.  Who is Elliot Berman?

11   A.  Elliot was an interim manager at the time that I started

12   until Bernita Hile took over.

13   Q.  Did Mr. Berman train you in or help with any training

14   that you did to become an AML analyst?

15   A.  Not that I recall.

16   Q.  Do you remember working with Mr. Berman while you were

17   an AML analyst?

18   A.  Yes.

19   Q.  And how would you work with him?

20   A.  We would ask him questions if we needed.  We would -- we

21   might talk over a case with him.

22   Q.  And at some point in time Mr. Berman was no longer the

23   interim manager and Bernita Hile stepped in and she became

24   the manager of the AML Group; is that right?

25   A.  That's correct.
```

```
1    Q.  After that point in time, was Mr. Berman still available
2    to you for questions?
3    A.  I don't remember.
4    Q.  Do you recall working with Mr. Berman on any alerts?
5    A.  I don't remember.
6    Q.  Do you remember talking with Mr. Berman about the
7    Petters Company, Inc. account or any alerts pertaining to
8    the Petters Company, Inc. account?
9    A.  I don't remember.
10   Q.  Did you talk with any former M&I employees or any BMO
11   employees to prepare for your deposition?
12   A.  We spoke, but not to prepare for it.  Just a, Hey, I'm
13   being deposed today; Hey, you're being deposed today.
14   Q.  Who did you talk to?
15   A.  I talked to Mandy Ramlow, Mary Pesch, and Pat
16   Currie-Smotherman.
17   Q.  Do you still stay in contact with some of these folks?
18   A.  I do.
19   Q.  Mandy Ramlow, for example?
20   A.  I do.
21   Q.  Did you talk with Mandy Ramlow about her deposition?
22   A.  Yes.
23   Q.  And what did you talk with her about?
24   A.  She -- I don't -- there was nothing very specific, just,
25   you know, kind of -- we didn't go over any questions.  It
```

Johnson - Deposition

1    was, you know -- I can't even say for certain.  It was just

2    like it wasn't that bad.  This is how it -- how it went.  I

3    wasn't there for that long, you know.

4    Q.  Did you talk with Patricia Currie-Smotherman about her

5    deposition?

6    A.  We just generally texted about the deposition, and she

7    just said, I got there at noon.  Mandy was just finishing

8    and I was going in, and I was done by -- I can't remember

9    what time she said.  Maybe 4:00 or something.

10   Q.  Did you talk with her about the substance of her

11   deposition at all?

12   A.  No.

13   Q.  I have no further questions.  Thank you.

14              THE COURT:  Counsel.

15              MR. COLLYARD:  Thank you, Your Honor.

16              At this point in time we'd like to call our next

17   witness.

18              Plaintiff calls through playing videotape

19   adversely Bernita Hile, who was a manager of BMO Harris

20   Bank's Anti-Money Laundering Monitoring Group, and that

21   included the analysts that received anti-money laundering

22   alerts or reviewed anti-money laundering alerts raised on

23   Petters Company, Inc.'s account.

24              We have various exhibits, Your Honor, that will go

25   along with the video that we would like to admit into

1    evidence.  And there's one particular exhibit that I would

2    like to start with.  It's Exhibit 185.  I would like to

3    offer Exhibit 185.

4              MS. GITTES:  No objection.

5              THE COURT:  Exhibit 185 is received.

6              MR. COLLYARD:  And I will tell you what 185 is.

7    It's copies of the checks that were written on the account,

8    and that the copies are not very good.  And we have been

9    able to find a better version of those checks, which we've

10   made into Exhibit 185-A, and we have asked counsel to

11   stipulate that 185-A can be entered into evidence as well.

12   And I would offer 185-A into evidence.

13             THE COURT:  And Ms. Gittes, is 185-A -- is there

14   any objection?

15             MS. GITTES:  No objection, Your Honor.

16             THE COURT:  Thank you.

17             MR. COLLYARD:  And just for clarification,

18   Your Honor, Exhibit 185 will be talked about in the

19   deposition, but we will be substituting Exhibit 185-A on the

20   screen when we play it, if that is okay, Your Honor.

21             THE COURT:  Is there any objection, Ms. Momoh?

22             MS. MOMOH:  No objection, Your Honor.

23             THE COURT:  Okay.  That is fine.  So Exhibit 185

24   and Exhibit 185-A are received in evidence.  You may

25   proceed, Counsel.

1           MR. COLLYARD:  I would like to note, Your Honor,

2     that this video also include admitted exhibits, Plaintiff's

3     Exhibit 180, Plaintiff's Exhibit 183, Plaintiff's Exhibit

4     223, and Plaintiff's Exhibit 248.

5           And then in addition to offering Exhibit 185,

6     Your Honor, we would like to offer Plaintiff's Exhibit 181.

7           MS. GITTES:  No objection.

8           THE COURT:  Exhibit 181 is received.

9           MR. COLLYARD:  I would offer Plaintiff's Exhibit

10    182.

11          MS. GITTES:  No objection.

12          THE COURT:  182 is received.

13          MR. COLLYARD:  Thank you, Your Honor.

14          Offer Plaintiff's Exhibit 249.

15          MS. GITTES:  No objection.

16          THE COURT:  Exhibit 249 is received.

17          MR. COLLYARD:  I'd offer Plaintiff's Exhibit 255.

18          MS. GITTES:  No objection.

19          THE COURT:  Exhibit 255 is received.

20          MR. COLLYARD:  I offer Plaintiff's Exhibit 398.

21          MS. GITTES:  No objection.

22          THE COURT:  Exhibit 398 is received.

23          MR. COLLYARD:  And I offer Plaintiff's Exhibit

24    399.

25          MS. MOMOH:  Your Honor, we object with respect to

1    this exhibit in how it would be used.  We just ask that when

2    they offer the exhibit, that they have to go through the

3    proper steps to lay the proper foundation for it being used.

4    If they are using it for purposes of this video with this

5    particular witness, Ms. Bernita Hile, we object to that,

6    Your Honor.

7             THE COURT:  So is it being offered for admission

8    into evidence?

9             MR. COLLYARD:  Yes, Your Honor, for this

10   particular videotaped deposition.

11            THE COURT:  Okay.  And you object?

12            MS. MOMOH:  We do, Your Honor, with respect to

13   this particular witness.

14            THE COURT:  Okay.  And the basis for the

15   objection?  Do we need a sidebar?

16            MS. MOMOH:  Yes, Your Honor.

17            THE COURT:  Okay.  Members of the jury, please

18   feel free to stand up and talk among yourselves.

19            **(At sidebar)**

20            MR. COLLYARD:  Your Honor, we understand that you

21   have already ruled on all of the objections over the video.

22            MS. MOMOH:  Over the video, not with respect to

23   the exhibits that are used in the video.  So what we're

24   talking about now, is it Plaintiff's Exhibit 398?

25            MR. COLLYARD:  399.  I'm sorry.  Your objection

1    was to 399.

2              MS. MOMOH:  Correct.  We are --

3              THE COURT:  How do you intend to use this exhibit

4    in the video?

5              MR. COLLYARD:  Exactly how it appears in the

6    video.

7              THE COURT REPORTER:  I'm sorry.  I can't hear you.

8    Can you get closer to the microphone?

9              MR. COLLYARD:  Using the exhibit in the video

10   exactly how it appears.  I show the witness the exhibit and

11   lay the foundation for it and talk about the exhibit, just

12   as if I was cross-examining her.  That's how it's done.

13             MS. MOMOH:  I need to see.  Do you mind, if you

14   can show me the deposition transcript so I can review how

15   you laid the foundation for it?

16             MR. IHRIG:  The parties have already submitted the

17   deposition designations --

18             THE COURT REPORTER:  I'm sorry.  Can you remind me

19   of your name again?

20             MR. IHRIG:  I'm Peter Ihrig, I-h-r-i-g, for the

21   plaintiff.

22             The parties have already submitted their

23   deposition designations and objections, and I believe the

24   Court has already ruled on those.

25             MR. COLLYARD:  Yes.

1          THE COURT:  Is this in addition?

2          MS. MOMOH:  Your Honor, may I have a moment --

3          THE COURT:  Yes, you may.

4          MS. MOMOH:  Thank you.

5      (Pause)

6      **(In open court.)**

7          THE COURT:  This is a bit unorthodox.  I am going

8   back on the record just for the purpose of giving the jury

9   your midmorning break.

10         So please be prepared to come back into the

11  courtroom at 10:15, and please remember the instructions

12  that I have given you, not to discuss the case or any of the

13  information that you've received, and don't let anyone speak

14  to you about the case.

15         Thank you for your service, and we'll take your

16  break now.

17     (Jury excused)

18                      **IN OPEN COURT**

19                  **(JURY NOT PRESENT)**

20         THE COURT:  We can go back to the podium now that

21  the jury is outside of the hearing of this matter, and

22  everyone may be seated.  Ms. Momoh.

23         MS. MOMOH:  Thank you, Your Honor.  After our

24  brief caucus, our objection is withdrawn to Exhibit 398,

25  Plaintiff's Exhibit 398.

```
 1                THE COURT:  Okay.  So Exhibit 398 is received in

 2      evidence.

 3                MS. MOMOH:  Yes, Your Honor.  Thank you.

 4                THE COURT:  Oh, apparently it was 399 --

 5                MR. COLLYARD:  It's 399, Your Honor.

 6                THE COURT:  -- that's at issue.

 7                MR. COLLYARD:  398 was already admitted into

 8      evidence, and then I asked to admit 399 and that raised the

 9      objection.

10                THE COURT:  Okay.  And is there any objection?

11                MS. GITTES:  No, Your Honor.  Thank you.

12                THE COURT:  So 399 is received.

13                Thank you for clarifying that matter on the

14      record, and we will plan to resume at 10:15 then.

15                MR. COLLYARD:  Thank you, Your Honor.

16                MS. MOMOH:  Thank you, Your Honor.

17                THE COURT:  You're welcome.

18                LAW CLERK:  All rise.

19          (Recess taken at 10:04 a.m.)

20                        *   *   *   *   *

21          (10:27 a.m.)

22                          IN OPEN COURT

23                        (JURY NOT PRESENT)

24                THE COURT:  Counsel, we are here outside the

25      presence of the jury.  Is there anything to be addressed?
```

```
1                MS. MOMOH:  No, Your Honor.

2                THE COURT:  All issues have been resolved?

3                MS. MOMOH:  That is my understanding, Your Honor.

4                MR. COLLYARD:  Plaintiff has no issues,

5      Your Honor.

6                THE COURT:  Okay.  Then we will proceed.

7                MS. MOMOH:  Thank you, Your Honor.

8           (10:28 a.m.)

9                            IN OPEN COURT

10                           (JURY PRESENT)

11               THE COURT:  Counsel, are we ready to proceed?

12               MR. COLLYARD:  Yes, Your Honor.  Thank you.  At

13     this time we'll play the videotaped deposition of Bernita

14     Hile.

15                          (Bernita Hile)

16                    DEPOSITION TRANSCRIPT PLAYED

17     BY MR. COLLYARD:

18     Q.  Can you please state your full name for the record.

19     A.  Bernita Hile.

20     Q.  At some point in time you worked at M&I Bank; is that

21     right?

22     A.  Yes.

23     Q.  When was that?

24     A.  I started in 2005, and I worked at M&I until they became

25     BMO, and then I worked for BMO.
```

Miller - Deposition

1    Q.  When you joined M&I Bank in 2005, what was your title?

2    A.  It was AML monitoring manager.

3    Q.  And how long were you the manager of the AML Monitoring

4    Group?

5    A.  Well, I was the manager from -- I continued that job --

6    pretty much the same job until I left in 2013.  I mean,

7    there were some changes when it became BMO.

8    Q.  So you continued in that same job as the AML monitoring

9    manager when BMO Harris Bank acquired M&I?

10   A.  Yes.  There were some changes, but.

11   Q.  Do you remember when BMO acquired M&I?

12   A.  I believe it was -- I think the acquisition was in 2011.

13   Q.  Tell me from just a high level to start with what were

14   your roles and responsibilities as the AML monitoring

15   manager.

16   A.  I had people reporting to me who were analysts who

17   reviewed alerts that came out of our automated system and

18   were reviewing them for suspicious activity.

19   Q.  Did you have a role in reviewing and understanding

20   alerts based on suspicious activity?

21   A.  I would say yes.

22   Q.  And you reviewed the work product of your analysts; is

23   that right?

24   A.  Yes.

25   Q.  Did you take on actual reviews yourself?

```
1    A.  On occasion.

2    Q.  What would trigger something like that to happen?

3    A.  I would do an alert on occasion if we -- just to make

4    sure I recalled how to do it.  And sometimes when we had

5    situations where we needed to get a lot of alerts completed,

6    I would maybe do -- perform a review of an alert or two just

7    to help the group.

8    Q.  Would you jump in and pick up the slack a little bit?

9    A.  Somewhat.

10   Q.  During the time that you were managing the AML

11   Monitoring Group, were there procedures and guidelines in

12   place for the analysts to follow with respect to the reviews

13   and investigations they were doing on alerts?

14   A.  Yes.

15   Q.  And you were familiar with those procedures and

16   guidelines?

17   A.  Yes.

18   Q.  Did you help draft or have input into those procedures

19   and guidelines?

20   A.  I helped -- I would say that I had input into them, yes.

21   Q.  What do you mean by "input"?

22   A.  I worked with the people that put them together and

23   perhaps provided some of the text that was in the procedures

24   and guidelines.  As I recall -- I don't exactly recall

25   what -- how that came together, but I believe that I
```

Miles - Deposition

```
 1    provided input.
 2    Q.  At the time that you were managing that group, did you
 3    have final say in those procedures and guidelines?
 4    A.  I don't -- I don't recall exactly if I had final say.
 5    Q.  Could you just give me a high level understanding of
 6    this.  Was there a group of folks who were involved in
 7    putting those guidelines and procedures together?
 8    A.  There probably -- as I recall, there was more than one
 9    person.
10    Q.  When you joined M&I Bank, was Searchspace already in
11    place?
12    A.  Yes.
13    Q.  And you had an understanding of how Searchspace worked,
14    obviously?
15    A.  I learned Searchspace when I came on.
16    Q.  Sure.  And during your time that you were managing the
17    group, you were -- you became very familiar with
18    Searchspace; is that right?
19    A.  Yes.
20    Q.  You told me that there were procedures and guidelines in
21    place for the analysts to follow with respect to doing
22    reviews and investigations on AML alerts.  Do you remember
23    that?
24    A.  Yes.
25    Q.  Okay.  Did you ever provide -- do you know if M&I ever
```

Miller - Deposition

1    provided any of those procedures or guidelines to the

2    Federal Reserve?

3    A.  I believe -- my recollection is that they -- the

4    procedures were provided to the fed, Federal Reserve.

5    Q.  Was that done on an annual basis, to the best of your

6    recollection?

7    A.  I don't -- I don't recall.

8    Q.  What would be the purpose for providing them to the

9    Federal Reserve?

10   A.  So that they could ensure that they were good procedures

11   that were following the law and that we were adhering to the

12   procedures.

13   Q.  Would they provide feedback to M&I?

14   A.  I -- I would say yes.

15   Q.  When you were in charge of the AML Monitoring Group, did

16   you have an understanding that the analysts did reviews and

17   investigations on the Petters Company, Inc. account at M&I

18   Bank?

19   A.  Yes.

20   Q.  Do you know who Petters Company, Inc. is?

21   A.  I know who Tom Petters is.

22   Q.  Do you know who --

23   A.  I would have known what Petters Company, Inc. account

24   was at the time.  I don't recall -- I couldn't recall right

25   now what Petters Company, Inc. was.

```
 1     Q.  Do you understand that you're here today because there's
 2     a lawsuit against BMO Harris Bank?
 3     A.  Yes.
 4     Q.  Do you have an understanding that this lawsuit pertains
 5     to a Petters Company, Inc. depository account that was held
 6     at M&I Bank?
 7     A.  Yes.
 8     Q.  So I'll refer to Petters Company, Inc. or PCI throughout
 9     the day.  And if I do so, will you know who I'm talking
10     about?
11     A.  Yes.
12     Q.  And I'll also refer to it as the Petters Company, Inc.
13     account or the PCI account.  And when I do that, I'm
14     referring to the depository account that was held at M&I
15     Bank.  Will you understand that?
16     A.  Yes.
17     Q.  Do you have an understanding that billions of dollars
18     were run in and out of the PCI account at M&I Bank?
19     A.  No.
20     Q.  Is this the first time you're hearing that?
21     A.  Yes.
22     Q.  So you had no understanding that, for example, $38
23     billion was run in and out of the depository account that
24     PCI had at M&I Bank?
25     A.  No.
```

1    Q.  Let's talk about -- go back to the time period when you

2    were managing the AML Monitoring Group.

3            At that point in time did you have an

4    understanding as to what Petters Company, Inc. was or what

5    they did as a business?

6    A.  Yes.

7    Q.  And what was your understanding as to what they did?

8    A.  Well, as I recall -- this is going back quite a ways --

9    they -- they bought and sold electronics and they owned a

10   number of different companies.  That's my recollection.

11   Q.  And that's your recollection of what you believed back

12   in the --

13   A.  Yes.

14   Q.  -- 2005 to 2008 time period?

15   A.  Yes.

16   Q.  Did you have an understanding that Petters Company, Inc.

17   Bought and sold consumer electronics from wholesalers?

18   A.  I believe that's what I recalled, yes.

19   Q.  And that they would then sell those consumer electronics

20   to big-box retailers?

21   A.  That's what I recall from back in the -- that sounds

22   correct of my recollection.

23   Q.  You told me earlier that you know who Tom Petters is?

24   A.  Yes.

25   Q.  And did you know who Tom Petters was back when you were

Mike - Deposition

1   managing the AML Monitoring Group?

2   A.  I believe so, yes.

3   Q.  Who did you understand Tom Petters to be?

4   A.  I don't recall that.  I'm sure I knew at the time.

5   Q.  And you understand that Tom Petters is now in jail for

6   this Ponzi scheme; is that right?

7   A.  Yes, I understand that.

8   Q.  Are you familiar with the concept "know your customer"?

9   A.  I've heard of the concept "know your customer" as it

10  relates to banking.

11  Q.  And what does that mean to you?

12  A.  It means that in having an account for a customer, that

13  you have to get specific information on the customer so that

14  you know who they are.

15  Q.  Sure.  Do you have an understanding that part of the

16  "know your customer" concept was understanding your

17  customer's transaction and business activities?

18  A.  No.  No.  No.

19  Q.  Okay.

20  A.  Not -- no.

21  Q.  No.  You think I'm incorrect?

22  A.  I -- I think I would agree with part of that statement,

23  not all of it.

24  Q.  And which part do you agree with and which part do you

25  disagree with?

Miller Deposition

```
 1     A.  I would say you need to know your customer's business.

 2     Q.  And what does that mean?

 3     A.  What kind of business they're in.

 4     Q.  Would you need know what type of business activities

 5     they were involved in?

 6     A.  I think you would need to know the type of business that

 7     they're in.

 8     Q.  And what would be a type of business?

 9     A.  Well, let's say it's a company that does -- a title

10     company.  You would need to know that they are a title

11     company, and that would help you to understand, based on the

12     fact that they're a title company, what kind of activity

13     would be in the account.

14     Q.  You'd want to understand what that activity was?

15     A.  Well, I think knowing that it's a title company would

16     help you to understand the activity.

17     Q.  And would you want to be able to have some understanding

18     of that activity to help you understand whether or not there

19     would be potentially suspicious activity on an account, for

20     example?

21     A.  If you understood the type of business, you would then

22     be able to understand the activity.

23     Q.  Do you agree with the concept that the more you know

24     about your customer and their business, the better you are

25     able to identify whether or not there's potentially
```

1    suspicious activity on an account?

2    A.  Yes.

3    Q.  When you joined M&I Bank in June of 2005, did you have

4    an understanding that by that time, M&I had launched an

5    initiative to help educate its employees on their roles and

6    responsibilities to potentially -- to identify potential

7    suspicious activity?

8    A.  I knew that they did educate employees.

9    Q.  And do you have an understanding that there were a

10   number of training sessions taking place to help educate the

11   employees?

12   A.  I attended a training session, and I know that other

13   people attended training sessions.

14   Q.  Do you have an understanding that people like the

15   frontline banking officers were being trained --

16   A.  Yes.

17   Q.  -- on the importance of identifying potential suspicious

18   activity?

19   A.  Yes.

20   Q.  And that the AML Group members were also being trained

21   on that concept?

22   A.  Yes.

23   Q.  Ms. Hile, I'm handing you what's been previously marked

24   as Exhibit 399.  Can you please take a look at it and tell

25   me if you're familiar with this document.

Miller Deposition

1    A.  I'm vaguely familiar with it.

2    Q.  Okay.

3    A.  I don't recall the contents.

4    Q.  What do you understand this document to be?

5    A.  It's the Bank Secrecy Act Anti-Money Laundering

6    Compliance Program.

7    Q.  Is this a document that you had access to while you were

8    at M&I Bank?

9    A.  I believe so, yes.

10   Q.  So we're on the second page.  It's Bates ending in 001,

11   do you see that?

12   A.  Um-hmm.

13   Q.  And up at the top it says "Overview."  Do you see that?

14   A.  Yes.

15   Q.  It says, "Everyone has secrets and criminals are no

16   exception.  One of the secrets criminals closely guard is

17   the source of their money."  Do you see that?

18   A.  Yes.

19   Q.  Do you have an understanding that that was true?

20   A.  Do I have an understanding that that was true?  Yes.

21   Q.  And where it says, "Source of their money," do you have

22   an understanding as to what is being referred to there?

23   A.  Yes.

24   Q.  And what is being referred to there?

25   A.  Where their money comes from.

Miller - Deposition

1    Q.  Is it where their money comes from and why it's coming

2    from them?

3    A.  I would say it's where their money comes from.

4    Q.  So it's just the name of who is -- who is associated

5    with the money?

6    A.  I think it's more complex than that potentially.

7    Q.  Can you explain that to me?  Why do you believe it's

8    more complex than that?

9    A.  Well, the source of the money is to determine if it's a

10   legal source or not.

11   Q.  What do you mean by that?

12   A.  Well, money laundering is where you're taking dirty

13   money and trying to make it clean.  So the source of the

14   money is is it dirty or not.

15   Q.  And how would you know that?

16   A.  Well, you would know that by determining if it makes

17   sense for the business.

18   Q.  So it's more than knowing the name -- let's take a wire

19   transaction, for example.  Understanding the source of the

20   money is more than just identifying the name of who's wiring

21   the money in; is that correct?

22   A.  It could be.

23   Q.  In those instances, if you're trying to identify whether

24   wire transactions are potentially suspicious activity, it

25   would be helpful to know not only the name of who's wiring

Miles - Deposition

1    the money in, but why they're wiring the money in, correct?

2    A.  It could be helpful, yes.

3    Q.  It would also be helpful to have some understanding as

4    to what that business is or why they're doing what they're

5    doing; is that right?

6    A.  It could be helpful, yes.

7    Q.  Would it be more helpful to just know the name of the

8    entity wiring the money in, or would it be more helpful to

9    know not only the name of who's wiring the money in, but

10   also what business they are in and why they're wiring the

11   money in?

12   A.  It would be helpful to know as much information as

13   possible.

14   Q.  So the second example that I gave you would contain more

15   helpful information than the first example I gave you; is

16   that right?

17   A.  Probably.

18   Q.  Do you see in the second paragraph there, going back to

19   Exhibit 399 on that second page.  The second paragraph,

20   middle of the paragraph reads, "In many ways we are

21   experiencing a true banking culture change in how we

22   approach our legal responsibilities under BSA and

23   AML-related laws."  Did you understand that to be true as

24   well?

25   A.  And this is written in 2008?

Miles - Deposition

1    Q.  It says, "In many ways we are experiencing a true

2    banking culture change in how we approach our legal

3    responsibilities under BSA and AML-related laws."

4            Did you understand that concept to be true during

5    the time period of 2005 to 2008?

6    A.  I think there were changes, yes.

7    Q.  Okay.  And then the next sentence reads, "We must

8    integrate BSA/AML compliance into virtually every function

9    we perform by making it as fundamental in our work

10   environment as greeting customers and asking for their

11   business."  Do you see that?

12   A.  Yes.

13   Q.  Do you also agree that that concept was true in the time

14   period 2005 to 2008?

15   A.  Yes.

16   Q.  Down below, the fourth paragraph, it reads, "Identifying

17   and reporting large dollar cash transactions and

18   identifying, monitoring, and reporting suspicious activity

19   are two cornerstones of the Bank Secrecy Act, anti-money

20   laundering regulations, and the government's campaign to

21   detect and prevent financial crimes and terroristic

22   activity."  Do you see that?

23   A.  Yes.

24   Q.  Did you understand that concept to be true during the

25   time period of 2005 to 2008?

1   A.  Yes.

2   Q.  Okay.  When we go down below in the paragraph it reads,

3   "We are being held to the strictest standards in the letter

4   of the law, and we are committed to fulfilling all that is

5   required and expected of us."  Do you see that?

6   A.  Yes.

7   Q.  The concept of being held to the strictest standards in

8   the letter of the law, did you have that understanding as

9   well during the time period 2005 to 2008?

10  A.  I would say yes.

11  Q.  Let's go to -- I believe it's the sixth page of this

12  document ending in Bates 005.  And I want to bring you down

13  to the bottom of the page.  I think it's the third to last

14  paragraph where it starts in quotes "knowing."  Do you see

15  that?

16  A.  Um-hmm.

17  Q.  Is that a yes?

18  A.  Yes.

19  Q.  It reads, "Knowing customers is a bank's most effective

20  weapon against unwittingly being used to launder money or

21  support terrorist financing.  Knowing the customer, both

22  personal and business customers, whether depositors,

23  borrowers, or other uses of the bank's services, involves

24  requiring proper identification, validating the customer's

25  identity and being familiar with the customer's normal

1    routines and activities."  Do you see that?

2    A.  Yes.

3    Q.  Did you believe that concept to be true during the time

4    period 2005 to 2008?

5    A.  Yes.

6    Q.  So I'm asking you with respect to the concept of knowing

7    your customer where it says, "Being familiar with the

8    customer's normal routines and activities."  What I'm asking

9    you is:  What do you believe is meant by "customer's normal

10   routines and activities"?

11   A.  The type of the account and the activity in the account.

12   Q.  What do you mean by "the activity in the account"?

13   A.  The activity in the account, the deposits, the

14   withdrawals, that type of thing.

15   Q.  Is this referring to the type of business that the

16   customer is in?

17   A.  Yes.

18   Q.  And is it referring to how the customer does business,

19   for example?

20   A.  I would think so.  It's hard for me to know exactly what

21   this means.  I did not write it.

22   Q.  Did you have an understanding while you were the manager

23   of the Anti-Money Laundering Monitoring Group that this

24   concept also referred to having an understanding as the type

25   of business activity that the customers were involved in?

Mile - Deposition

1    A.  Yes.

2    Q.  Down below in the next paragraph, the last sentence

3    reads, "Knowing our customers is not something we do simply

4    for our own peace of mind.  It is a strict legal mandate."

5    Do you see that?

6    A.  Yes.

7    Q.  And did you understand that concept to be true between

8    the time period of 2005 and 2008?

9    A.  Are you saying did I understand it to be true for the

10   bank or for any specific person, or what are you saying --

11   who are you applying this to?

12   Q.  Let me re-ask it.

13   A.  Pardon me?

14   Q.  Let me re-ask the question.

15          Did you understand that concept to be true

16   pertaining to M&I Bank between the time period 2005 to 2008?

17   A.  I would say yes.

18   Q.  Go to page 14, Bates ending in 013.

19          Do you see down at the bottom where it's got a

20   Part F, "Suspicious Activity Monitoring and Reporting."  Do

21   you see that?

22   A.  Yes.

23   Q.  I'm just asking with respect to monitoring suspicious

24   activity and reporting that activity, that's what your group

25   was doing --

Miller Deposition

```
 1    A.  Yes.

 2    Q.  -- that you were managing, correct?

 3    A.  Yes.

 4    Q.  It reads in that box, "If M&I has information about any

 5    customer or transaction that caused us to know, suspect, or

 6    have reason to suspect suspicious activity, a SAR must be

 7    filed with FinCEN."  Do you see that?

 8    A.  Yes.

 9    Q.  Where it says, "Have reason to suspect suspicious

10    activity," do you see that?

11    A.  Um-hmm.

12    Q.  Did you have an understanding that that was -- that if

13    M&I had reason to suspect there was suspicious activity on

14    an account, that they were to file a SAR?

15    A.  Yes.

16    Q.  Go to the next page, please, page 15 ending in Bates

17    014.

18             And you see in the middle of the page it reads,

19    "Suspicious Activity Reporting Requirements."  Do you see

20    that?

21    A.  Yes.

22    Q.  Then in that first bullet it reads, "Insider abuses.

23    For this purpose, insiders include directors, officers,

24    employees, or agents that have committed or aided in the

25    criminal act."  Do you see that?
```

Miles - Deposition                                                    350

1    A.  Yes.

2    Q.  Do you have an understanding between the time period of

3    2005 to 2008 that if M&I had reason to suspect that

4    directors or officers of their customer had been engaged in

5    or aided in a criminal act, that they would have to file a

6    SAR?

7    A.  Yes.

8    Q.  Turn to the next page, please, page 16, Bates ending in

9    015.

10             Down below Number 6 where it says, "Corporate

11   Compliance Responsibilities," do you see that?

12   A.  Yes.

13   Q.  There's a Part A, and it says, "Methods of Identifying

14   Potentially Suspicious Activity."  Do you see that?

15   A.  Yes.

16   Q.  And the first subpart reads, "Frontline and central

17   business unit affiliate company personnel report unusual

18   activity to the AML Monitoring Group on suspicious activity

19   logs."  Do you see that?

20   A.  Yes.

21   Q.  And then the next subpart reads, "M&I has deployed the

22   Searchspace software from Fortent, Inc. to serve as the

23   primary automated tool for the monitoring of suspicious

24   customer transactions."  Do you see that?

25   A.  Yes.

Miller - Deposition

1    Q.  Did you have an understanding between 2005 and 2008 that

2    two -- there were two primary methods of identifying

3    suspicious activity, and that was from the frontline banking

4    officers and through doing investigations and review through

5    Searchspace that was done in the AML Monitoring Group?

6    A.  That's my understanding.

7    Q.  And where it says, "Frontline and central business unit

8    affiliate company personnel," that's referring to

9    individuals, for example, who were business bankers; is that

10   right?

11   A.  That's part of it.

12   Q.  And it was referring to, for example, those business

13   bankers who were managing the customer relationship with the

14   customer; is that right?

15   A.  That would be part of it.

16   Q.  Do you know who Edward Jambor is?

17   A.  No.

18   Q.  Have you ever heard of him?

19   A.  I don't recall.

20   Q.  Do you recall ever knowing who Christopher Flynn is?

21   A.  Yes.

22   Q.  Who is Christopher Flynn?

23   A.  I believe -- my recollection is that he was the account

24   officer on the Petters, Inc. account.

25   Q.  Did you ever have communications or interaction with

Miles - Deposition

1    Mr. Flynn?

2    A.  I don't recall specifically if I had communication or

3    interaction with him.

4    Q.  Did you work with Mr. Flynn at all in any way?

5    A.  I don't recall.

6    Q.  Do you know how it is that you remember his name?

7    A.  His name was associated with the account, and I believe

8    that there were -- there was information in the system that

9    he had provided.

10   Q.  What do you mean by that?

11   A.  There was a program that we reviewed where account

12   officers could put comments in.  I think it was called

13   MIContacts, and I believe that his name was in there with

14   comments on Petters Company, Inc.

15   Q.  And do you recall -- did you review MIContacts?

16   A.  Yes.

17   Q.  Do you remember when you would have done that or why you

18   would have done that?

19   A.  I don't remember when.  It was part of our process when

20   we reviewed an alert.

21   Q.  Did you review alerts on Petters Company, Inc.?

22   A.  Yes.

23   Q.  You did the actual review and investigation of an alert?

24   A.  I did the review of the analyst's review.

25   Q.  Do you know who Shari Rhode is?

1    A.   No.

2    Q.   Barbara Nieland?

3    A.   No.

4    Q.   Barbara Bergquist?

5    A.   No.

6    Q.   What about Erik Anderson?

7    A.   No.

8    Q.   Ms. Hile, you have been handed what's been marked as

9    Exhibit 181.  Can you take a look at it and tell me if you

10   recognize what that document is.

11   A.   Yes.

12   Q.   Have you seen that document before?

13   A.   Yes.

14   Q.   Okay.  Go back to Exhibit 181, and I was asking you if

15   you were familiar with this document.  What is this

16   document?

17   A.   It's the Bank Secrecy Act/Anti-Money Laundering

18   Examination Manual from the FFIEC.

19   Q.   This is a document that you had access to while you were

20   employed at M&I Bank; is that right?

21   A.   Yes.

22   Q.   You are familiar with the -- generally the contents of

23   this document?

24   A.   Generally, yes.

25   Q.   It says up on the second page here, which is page F-1,

1    Bates ending in 313, the top reads, "Appendix F:  Money

2    Laundering and Terrorist Financing 'Red Flags.'"  Do you see

3    that?

4    A.  Yes.

5    Q.  And it reads, "The following are examples of potentially

6    suspicious activities or red flags for both money laundering

7    and terrorist financing."  Do you see that?

8    A.  Yes.

9    Q.  Do you know what is meant by "red flags" with respect to

10   money laundering?

11   A.  Yes.

12   Q.  And can you just describe for the jury what your

13   understanding of red flags for money laundering is.

14   A.  Things that you should -- that would trigger additional

15   review.

16   Q.  If you come across information that you believe is

17   unusual, for example, would that be a red flag?

18   A.  Possibly.  Potentially.

19   Q.  So if you come across something that appears to be

20   unusual activity, that is likely something you would look

21   into to determine whether or not it is potentially

22   suspicious or not, right?

23   A.  Not necessarily.  It would depend on what kind of

24   activity it was.

25   Q.  So if, for example, while you were doing a review and an

Mike - Deposition

1    investigation on an AML alert and you came across activity

2    that you thought was unusual, is it your testimony that you

3    may not look into that activity any further?

4    A.  Possibly, no.  I would -- I'm trying to reply to that

5    correctly based on how you phrased it.  Not all unusual

6    activity would be looked into.

7    Q.  Can you give me an example of what activity that you

8    would believe to be unusual that you would not look into?

9    A.  For example, if a customer just writes a lot of checks,

10   maybe more checks than the normal person would write, that

11   doesn't make it something that we would look into.

12   Q.  Can you give me another example?

13   A.  If they make a lot of check deposits, maybe we

14   wouldn't -- it's more than the norm for that account, we

15   wouldn't necessarily look into that.

16   Q.  If you go back to this exhibit and you take a look at

17   the second paragraph, it reads, "The following examples are

18   red flags that when encountered may warrant additional

19   scrutiny."  Do you see that?

20   A.  Where are you on the page?

21   Q.  It's the second paragraph.

22   A.  Okay.  Yes, I see that.

23   Q.  And then it gives a list below of potentially suspicious

24   activity that may indicate money laundering.  Do you see

25   that?

Miller Deposition

```
1    A.  Yes.

2    Q.  And this document provides examples of red flags, but it

3    is not necessarily an exhaustive list of potential red

4    flags; is that right?

5    A.  Yes.  I think that's what it means.  I didn't write it,

6    but I think that's what it means.

7    Q.  Would an example of a "red flag" with respect to wire

8    activity be large wires going in and out of an account

9    consistently?

10   A.  Potentially.  Not necessarily.

11   Q.  So, for example, if a customer has a billion dollars in

12   wires going in and out of the account consistently for

13   months on end, would that be a red flag?

14   A.  Not necessarily.  Not without -- not necessarily.

15   Q.  And what would that depend on?

16   A.  It would depend on other activity in the account.

17   Q.  Like what?

18   A.  Other transactions.

19   Q.  What if the only transactions were -- or what if the

20   primary transactions in the account were just wires?

21   A.  It would depend on the type of account and what else we

22   knew about the account.

23   Q.  Okay.  Well, if it was a depository account and the

24   primary transactions were wires, and let's say there were

25   several months where billions of dollars were being wired in
```

Miller - Deposition

```
 1    and out of the account, could that potentially be a red
 2    flag?
 3    A.  It would depend on what we knew about the account and
 4    what other activity occurred in the account.
 5    Q.  And what would you need to know about the other activity
 6    in the account?
 7    A.  We would need to know what other activity there was and
 8    if it was -- if it was considered normal for that type of
 9    business based on what we knew about the business.
10    Q.  When you say "other activity," what are you referring
11    to?
12    A.  Well, if there's other activity in the account besides
13    wires, if the wires coming in, if the wires going out makes
14    sense for the business.
15    Q.  And let's focus on other activity.  What do you
16    specifically mean by "other activity"?
17    A.  Like deposits, withdrawals, checks, automatic transfers.
18    Q.  Okay.  And in my hypothetical that I gave you, I told
19    you that the primary, let's say 90 percent or 95 percent of
20    the activity in the account was wire transfer activity, and
21    if there's a pattern of a billion dollars going in and out
22    of the account for several months, could that potentially be
23    a red flag?
24    A.  Again, it depends.  Even though you're saying it's
25    95 percent, we would have to look at that other 5 percent.
```

Mike - Deposition

1   Q.  And would you have to look at that other 5 percent to

2   understand why -- what money was going in and out of the

3   account and why?

4   A.  Yes.

5   Q.  Do you see where it says, "funds transfers"?

6   A.  Yes.

7   Q.  It says, "Many transfers are sent in large, round

8   dollar, hundred dollar or thousand dollar amounts."  Do you

9   see that?

10  A.  Yes.

11  Q.  What is meant by "round dollar"?

12  A.  I'm not exactly sure what's meant by "round dollar."

13  Q.  Does that mean ending in zero?

14  A.  Maybe.

15  Q.  Did you have an understanding while you were managing

16  the AML Monitoring Group that an indicator of potentially

17  suspicious activity with respect to money laundering would

18  be large wire transactions with round dollars?

19  A.  It could be one indicator.  Because I don't exactly

20  recall what round dollar means, I'm not -- I don't know if

21  that means no cents.  Hundred dollar or thousand dollar

22  amounts, I guess I understand what that means, but.

23  Q.  Would large wires in hundred dollar or thousand dollar

24  amounts potentially be red flags with respect to money

25  laundering?

1    A.  Potentially.

2    Q.  And you said you didn't know if round meant ending in no

3    cents, so let me ask you about no cents.  If there was high

4    wire transfers that ended in no cents, could that be a

5    potential indicator --

6    A.  I would think that would be.

7    Q.  -- of suspicious activity with respect to money

8    laundering?

9    A.  I would think that would be less of an indicator.

10   Q.  Less of an indicator than hundred dollar or thousand

11   dollar amounts?

12   A.  Yeah.

13   Q.  Let's say $10 million.

14   A.  Potentially.

15   Q.  And would amounts such as $10 million be a bigger

16   indicator or a less indicator than hundred dollar amounts?

17   A.  It would depend.

18   Q.  What would it depend on?

19   A.  It would depend on the type of account and what other

20   activity was going on in the account and what we knew about

21   the account.

22   Q.  And in order to make that determination, you'd have to

23   have an understanding as to what the purpose of the money

24   was for, right?

25   A.  I think it would be more the type of business that it

1    was.

2    Q.  And what do you mean by "type of business"?

3    A.  Well, if the business model indicated that that type of

4    transaction would be normal for that type of business.

5    Q.  So you'd have to have an understanding of the business

6    model for that customer?

7    A.  The type of business that they were in.

8    Q.  And would that include at least some general

9    understanding as to what they do for business?

10   A.  What they do for business, I'm not sure I know what you

11   mean by "what they do for business."

12   Q.  Would that include, for example, having some

13   understanding as to how their business worked, who they did

14   business with?

15   A.  It could.  It could also include what their business was

16   and what kinds of things they participated in.

17   Q.  What do you mean "what kinds of things they participated

18   in"?

19   A.  Well, like they're doing -- I think previously we talked

20   about what kind of business it was and that they bought and

21   sold electronics to various businesses.  I don't recall

22   exactly what you -- how you stated that, but that's the kind

23   of business that they were in.  And there were a few

24   other -- they owned other large companies and things like

25   that.

1    Q.  All right.  So let's talk about Petters Company, Inc.

2    for a second.  What type of business did you understand

3    Petters Company, Inc. to be in?

4    A.  My understanding, based on the conversation we had

5    earlier and what I can recollect, was that they bought and

6    sold electronic equipment and that they also owned several

7    large companies.

8    Q.  You told me you'd have to understand the type of

9    business that they're in.

10   A.  Um-hmm.

11   Q.  And I'm trying to figure out how somebody in the AML

12   Group would determine the type of business if they had the

13   understanding that the customer was engaged in buying and

14   selling consumer electronics.

15   A.  They would have that gotten information from the account

16   opening and from the account officer's comments.  I don't

17   recall exactly what the business was at this point, but we

18   would have gotten that information from the account-opening

19   documents or the account officer's comments.

20   Q.  And to have that understanding of what type of business

21   they were in, would they have to have some understanding as

22   to the type of products they were buying and selling?

23   A.  The specific types of products?

24   Q.  Generally.

25   A.  I think the -- I don't know the level of specifics that

1    they had.  They had electronic -- well, whatever they had, I
2    think it was indicated and that's what we knew.
3    Q.  So, for example, the AML members may -- would have to
4    know that Petters Company, Inc. was in the business of
5    buying and selling consumer electronics, but they wouldn't
6    necessarily need to know that they were in the business of
7    buying and selling 52-inch TVs?
8    A.  They probably would not know that.
9    Q.  Right.  But they would have to have some understanding
10   that Petters Company, Inc. was in the business of buying and
11   selling consumer electronics; is that right?
12   A.  They -- I believe that we did know that.
13   Q.  And I'm asking you if in determining the type of
14   business, the AML Group members would need to know that
15   Petters Company, Inc. was in the business of buying and
16   selling consumer electronics?
17   A.  We -- we knew that.  I think that we knew that.  Is that
18   what you're asking?
19   Q.  Yeah.  Would you need to know that to understand the
20   type of business Petters Company, Inc. was in?
21   A.  We always tried to know the type of business that the
22   customer was in.
23   Q.  And what I'm trying to do, Ms. Hile, is help the jury
24   understand what you mean by "type of business."  And I'm
25   trying to understand if that means, for example, with PCI or

Hile - Deposition

1    Petters Company, Inc. it means buying and selling consumer

2    electronics.

3    A.  That would be a type of business, yes.

4    Q.  All right.  Handing you what's been marked as

5    Exhibit 180, it's a document entitled, "Marshall & Ilsley

6    Corporation, Suspicious Activity Monitoring and Reporting."

7    Are you familiar with this document, Ms. Hile?

8    A.  Yes.

9    Q.  And how is it that you're familiar with this document?

10   A.  This is a procedures document, I believe, that we used

11   in our -- that we used in our group.

12   Q.  When you say "we," are you referring to the AML analysts

13   as well?

14   A.  Yes.

15   Q.  And the AML analysts were supposed to know the contents

16   and information in this document; is that right?

17   A.  That's my recollection, yes.

18   Q.  And they were supposed to follow that; is that right?

19   A.  That's my recollection, yes.

20   Q.  Let's just take a look at it real quick.  Turn to --

21   let's go to page 7, Bates ending in 006.  Do you see a Part

22   G there for Searchspace alerts?

23   A.  Yes.

24   Q.  It says, "M&I has deployed software from Searchspace,

25   Inc. to serve as the primary automated tool for the

Miller - Deposition

1    monitoring of suspicious customer transactions.  In first

2    phase of implementation, the following bank data is being

3    fed into Searchspace for monitoring."  Do you see that?

4    A.  Yes.

5    Q.  And it talks about, "All transactions posted to all

6    deposit accounts, all wire activity."  Do you see that?

7    A.  Yes.

8    Q.  So the information that was being fed into Searchspace

9    was all of the activity on the account; is that right?

10   A.  It states, "All transactions posted to all deposit

11   accounts and all wire transfer activity."  That's what was

12   entered into Searchspace.

13   Q.  And if we just explain what that means, what that means

14   with respect to a depository account was it was fed all

15   checks, all cash deposits, all wire transfer activity; is

16   that right?

17   A.  I believe so.

18   Q.  Is there anything else that would be fed into

19   Searchspace other than that?

20   A.  Well, the -- there's three other categories there that

21   were fed in.

22   Q.  Go to the next page on page 8, Bates ending in 007.  It

23   reads, "The Account Security Blanket is the most basic level

24   of threshold set for each grouping of events.  Our current

25   setting of the account security blanket threshold is 75."

1    Do you see that?

2    A.  Yes.

3    Q.  "In order for any event or group of events to trigger an

4    alert, the score of the events must break a 75."  Do you see

5    that?

6    A.  Yes.

7    Q.  What is being described there?

8    A.  It's the algorithm that Searchspace uses to create

9    alerts.

10   Q.  And according to this, when -- the algorithm creates

11   what is called an event; is that right?

12   A.  Yes.

13   Q.  And if those events are greater than -- added up are

14   greater than 75, an alert is created; is that right?

15   A.  That's my recollection.

16   Q.  Then it reads, "Part 4, Closed-Expected Explainable

17   Activity State."  Do you see that?

18   A.  Yes.

19   Q.  And Part A says, "If the activity reported in the alert

20   is for a business customer and is the type of activity

21   expected for that customer within the product type of the

22   account and in comparison with their entire customer

23   profile, the alert can be closed."  Do you see that?

24   A.  Yes.

25   Q.  In order to make that determination, there needs to be

Miles - Deposition

1   some understanding as to the type of business that the

2   customer is in, right?

3   A.  Yes.

4   Q.  And there would need to be some understanding as to why

5   the particular wires, for example, were coming into the

6   account or going out of the account; is that right?

7   A.  That would be helpful.

8   Q.  Can you just explain just generally what that Part A

9   means.

10  A.  It means that if the alert is for a business customer,

11  and when reviewing the activity it looks like the activity

12  is expected for that customer within the type of account

13  that they -- that it is, and I think by the product type

14  they mean is it a savings account or a checking account or

15  what kind of account it is, and in looking at their -- the

16  customer profile, is that activity expected; and if it is,

17  then the alert can be closed.

18  Q.  In understanding whether or not the customer qualified

19  for that or whether that -- the alert could be closed for

20  this particular type of state, they'd have to have some

21  understanding as to the source and the use of those wires;

22  is that right?

23  A.  I think source and use are -- were two things that we

24  looked at.

25  Q.  Now I'm asking you:  They have to have some

1    understanding of the source and use of the funds for those

2    wires, right?

3    A.  The source and the use of funds are something that we

4    looked at, yes.

5    Q.  So would the AML Group member have to have some

6    understanding of the source and use of the funds in order to

7    make that determination?

8    A.  Yes.

9    Q.  And let me -- let me make it as basic as we can possibly

10   make it for the jury.  Okay?  And I'm trying to understand.

11         Let's say the only conclusion that the AML member

12   could draw is, Oh, they had similar value and volume of

13   wires in the past.  And knowing nothing else, would that be

14   enough to do a closed to expected activity state?

15   A.  My recollection is that they would have to provide more

16   information than that.

17   Q.  In looking at -- in this closed to expected activity

18   state, you told me before one of the things that they'd look

19   at is the source and use of the funds of the incoming and

20   outgoing wires, right?

21   A.  Um-hmm.

22   Q.  Is that a yes?

23   A.  Yes.

24   Q.  Sorry.

25         In doing that, the analysts would look to see

Miller - Deposition

1   who's wiring the money into the account; is that right?

2   A.  Yes.

3   Q.  And they would have an understanding as to what the

4   purpose of the incoming wires was; is that correct?

5   A.  Yes, generally, I think.

6   Q.  And, in fact, analysts would actually do some type of

7   review or investigation into entities who were wiring money

8   into the account; is that right?

9   A.  Yes, that was part of the process, to see if they could

10  find something else out about the entities.

11  Q.  Now let's talk about the tools that the AML analysts

12  would use to figure out information about the entities

13  wiring the money into the account.  How would they search

14  for information about those entities?

15  A.  They would do internet searches, look at the customer's

16  website, see if there was information on the wire.  I don't

17  recall at this point exactly what other things were done.

18  Those were just some things that I remember.

19  Q.  Would the analyst, for example, search Secretary of

20  State's websites to determine whether or not entities wiring

21  money into the account were registered to do business?

22  A.  I think the Secretary of State website was something

23  they had access to.

24  Q.  And one of the things that the analysts could do as well

25  is pick up the phone and call the banking officers who

Hile - Deposition

1    manage the customer relationship and ask them questions,

2    right?

3    A.  They could, yes.

4    Q.  And that was done, right?

5    A.  I don't know.  I don't -- I don't recall.

6    Q.  You have an understanding that that was a practice that

7    was at M&I Bank?

8    A.  That was something they could do.  I don't know

9    necessarily that that was done.  I believe that there were

10   comments in MIContacts from the account officer that were

11   reviewed.

12   Q.  Did you ever do that in the past?

13   A.  For this account?

14   Q.  For any account.

15   A.  Oh.  Yes, I did.

16   Q.  And why did you do that?

17   A.  Why did I call an account officer?  To get additional

18   information.

19   Q.  And one of the things that can happen is an AML analyst

20   can call the account officer to get additional information

21   and if the account officer doesn't know the answer to the

22   question, then the account officer can reach out to the

23   customer and ask them questions about it; is that true?

24   A.  I believe that's true.  You know, I don't know exactly

25   what the account officer does.

Mike - Deposition

1    Q.  Did you ever work with an account officer, for example,

2    who had to get back to you on a question about a customer?

3    A.  I think so.  I don't recall specifically.

4    Q.  It seems like a reasonable path to acquire information,

5    right?

6    A.  It's a process that we followed, yes.

7    Q.  Go back to Exhibit 180.  We're on page 14, Bates ending

8    in 013.

9          At the bottom of that Section 4 it says, "On a

10   monthly basis, the AML Monitoring Group manager or lead

11   analyst will review a random sample of all alerts closed to

12   the expected/explainable activity state to ensure

13   consistency and adherence to departmental procedures."  Do

14   you see that?

15   A.  Yes.

16   Q.  Where it says "AML Monitoring Group manager," is that

17   referring to you?

18   A.  Yes.

19   Q.  And did you, on a monthly basis, review random samples

20   of alerts closed to the expected/explainable activity state?

21   A.  I believe I did, yes.

22   Q.  What was the process that you followed to do that?

23   A.  I would review the alert and determine if the analyst

24   followed the correct procedures and that it made -- it made

25   sense that the alert was closed to the end state that it

Miles - Deposition

1    was.

2    Q.  How would you try and determine whether or not the

3    analyst followed the procedures?

4    A.  I would look at their comments, and sometimes I would

5    talk to the analyst about it, about what they did.

6    Q.  And were the analysts required to explain, for example,

7    information about the source and use of incoming wires in

8    their comments?

9    A.  They were asked to explain the source and the use of

10   funds, yes.

11   Q.  And that's something you would look for in their

12   comments?

13   A.  Yes, um-hmm.

14   Q.  And if they didn't have that, would you ask them to

15   include that?

16   A.  Yes.

17   Q.  Would the analysts also have to explain why they were

18   making conclusions as to whether or not there was suspicious

19   activity?

20   A.  Yes.

21   Q.  And explain why they believed there was no suspicious

22   activity was an important aspect of the comments; is that

23   right?

24   A.  Yes.

25   Q.  Was it important for the analyst to, in their comments,

Mike - Deposition

```
1    have information that was complete and accurate?

2    A.  Yes.

3    Q.  Did analysts ever talk to one another about alerts that

4    they may have done?

5    A.  Sometimes, yes.

6    Q.  If they needed further clarification on something,

7    that's something that was available as well?

8    A.  Yes, it was available.  I couldn't state that -- you

9    know, how often it was done.

10   Q.  And so we see back in Exhibit 223 on page 15, Bates

11   ending 076, under the Qualified Accounts for Peer-Only

12   Review, this is also referred to as QAPOR or expedited

13   review; is that right?

14   A.  Yes.

15   Q.  And you're familiar with QAPOR and expedited review; is

16   that right?

17   A.  Yes.

18   Q.  Tell us just from a high level, what is QAPOR or

19   expedited review.

20   A.  There are accounts that alerted in Searchspace on an

21   almost monthly basis only at the peer level.  And the peer

22   level is that the activity is out of the norm for other

23   accounts in that peer group.  And this is because their

24   activity is on the very high end of their assigned peer

25   group.
```

Miles - Deposition

1               And these accounts were alerting very frequently,

2      and it was determined that an expedited review could be done

3      for those accounts because they had been reviewed and

4      found -- the activity had been found not to be suspicious

5      and that we didn't need to look at them in great detail

6      every time they reviewed -- every time they alerted.

7      Q.  You said peer group?

8      A.  Yes.

9      Q.  Can you describe what is meant by "peer group."

10     A.  Peer group is a group of accounts that are all of the

11     same or similar type.  I don't recall exactly what the peer

12     groups were, but, for example, there would be a different

13     peer group for business customers than personal accounts.

14     Q.  If there was a small business peer group, how would it

15     be determined whether someone fits in the small business

16     peer group or someone fits in the large business peer group?

17     A.  It was based on the -- when the account was opened, what

18     product type they were put into.

19     Q.  Who created the expedited review process or QAPOR?

20     A.  The procedures?  Do you mean the procedures?

21     Q.  Well, let's start with the concept first.  Who came up

22     with the concept expedited review or QAPOR?

23     A.  I -- my recollection is that there was a group of people

24     that worked on -- worked on coming up with ways to expedite

25     the review -- or the reviews in general, and that this is

Mike - Deposition

1      one of the things that came out of that group.  I couldn't

2      tell you specifically who that group was.

3      Q.  Well, so it was M&I Bank who came up with the concept,

4      not Searchspace?

5      A.  Correct.

6      Q.  And why was the bank trying to come up with ways to do

7      faster reviews?

8      A.  Well, I think -- the reason we were looking at expedited

9      reviews was because we were -- we had accounts that were

10     alerting at the peer-only level consistently, and they were

11     being closed to the expected activity state.  And we were

12     spending a lot of time looking at the same activity every

13     month, and we felt that if we could expedite that review,

14     our time could be better spent on looking at alerts that had

15     more of a chance of actually being suspicious, since these

16     alerts were continually being closed to the closed to

17     expected state every month.

18     Q.  So this was an idea to have -- this was to find a way to

19     get through alerts faster; is that right?

20     A.  It was to -- it was to give us more time to work on

21     alerts that had more of a probability of having something

22     suspicious in them.

23     Q.  Now, you said that a group of people at M&I had worked

24     to come up with this QAPOR or expedited review concept; is

25     that right?

1   A.  Yes.

2   Q.  Were you part of that group?

3   A.  Yes.

4   Q.  So were you part of developing the procedures for doing

5   an expedited review?

6   A.  Yes.

7   Q.  Do you recall if you had a substantive or significant

8   involvement in developing those procedures?

9   A.  As the AML Monitoring Group manager, I think I had a

10  substantive part in it.

11  Q.  Do you recall which portions you contributed to?

12  A.  Not specifically.

13  Q.  The next bullet reads, "Documentation must be kept

14  supporting the placement."  Do you see that?

15  A.  Yes.

16  Q.  Did you have an understanding that the decision to place

17  a customer on the expedited review or QAPOR list needed to

18  be documented and explained?

19  A.  Yes.

20  Q.  Do you know if there was -- you told me before that

21  Petters Company, Inc. was eventually put on the expedited

22  review list; is that right?

23  A.  Yes.

24  Q.  We'll talk about that.  But do you know whether or not

25  there was documentation about the reasons why and supporting

Miller - Deposition

1    the reason for placing Petters Company, Inc. on the

2    expedited review list?

3    A.  I don't recall if there was.

4    Q.  Would you expect that there would have been?

5    A.  Yes.

6    Q.  And that's because it's a requirement of this procedure?

7    A.  Yes.

8    Q.  The next bullet reads, "Placement must be approved by

9    AML management."  Do you see that?

10   A.  Yes.

11   Q.  Were you the one who approved who would be put on the

12   expedited review list or was it a group of people?

13   A.  I believe it was me.

14   Q.  Then the last bullet reads, "Accounts will be reviewed

15   annually to determine if they should remain on the list."

16   Do you see that?

17   A.  Yes.

18   Q.  Do you recall any part of any process or procedure that

19   was done to do the annual review?

20   A.  I believe that there was a list, and the list was

21   reviewed to ensure that the accounts were still open and

22   that they were still alerting in Searchspace.  But beyond

23   that, I don't recall what was done.

24   Q.  Was there documentation pertaining to that annual

25   review?

1    A.  I don't recall.

2    Q.  Do you recall if whether or not Petters -- I'm sorry,

3    Petters Company, Inc. was ever reviewed annually to

4    determine whether they should remain on the expedited review

5    list?

6    A.  I don't recall specifically.

7    Q.  Do you remember if you ever were participating in any

8    type of annual review with respect to whether Petters

9    Company, Inc. should remain on the expedited review list?

10   A.  I don't recall specifically.

11   Q.  Would an analyst do further investigation and review of

12   the alert to determine the level of explanation and

13   documentation that was required by them in the comments

14   section in Searchspace if they closed the alert based on

15   closed to expected activity?

16   A.  I think what you're asking me is was additional review

17   and analysis necessary if the account was closed to

18   expected/explainable activity, and the answer -- more so

19   than if it was closed to the peer-only alert, and that

20   answer would be yes.

21   Q.  Let me ask a more basic question.  Let's just do this.

22   If the analyst determines that the customer that they're

23   doing the investigation on is on the expedited review list,

24   what does the analyst do next?

25   A.  They would follow the procedures for -- which are listed

Hile - Deposition

1    here for the expedited review.

2    Q.  Okay.  So they would take a look at the process to

3    follow for expedited review procedures; is that right?

4    A.  Yes.

5    Q.  And we're on page 20 again, Bates ending in 081, and

6    underneath that heading there is a series of bullets, right?

7    A.  Yes.

8    Q.  It says, "All months that alert must be reviewed."

9    Right?

10   A.  Yes.

11   Q.  So even if a customer is on the expedited review list,

12   the analyst needs to review all months that alert, correct?

13   A.  Correct.

14   Q.  Then the next bullet reads, "In the expedited review,

15   only the transactions that event need to be reviewed and

16   explained in the Searchspace comments;" is that right?

17   A.  Yes.

18   Q.  This says, "In the expedited review, only the

19   transactions that event need to be reviewed and explained in

20   the Searchspace comments."  Do you see that?

21   A.  Yes.

22   Q.  What would an analyst do to determine that?

23   A.  They would -- they would look at the alert and the alert

24   would tell them what transactions evented.

25   Q.  And they would know that if those transactions evented,

Mile - Deposition

1    that they would need to review and explain their

2    investigation and review of that particular alert, right?

3    A.  Correct.

4    Q.  So we talked earlier about the requirements of the

5    analysts reviewing or explaining the reasons why they

6    conclude there's no suspicious activity in the comments

7    section, right?

8    A.  Yes, I think I recall that.

9    Q.  Okay.  And that's what they would have to do for these

10   particular transactions that event, right?

11   A.  I believe that the comment -- well, the comment -- that

12   isn't quite correct.

13   Q.  Tell me how it's incorrect.

14   A.  They need to state that the activity is not -- that the

15   activity is not suspicious.  I don't believe that this

16   states that they have to do that for every event.

17   Q.  For every -- for every event that they review?

18   A.  They need to put it -- they need to state it as a whole

19   for the alert.  I think that's what this says.

20   Q.  And part of that would be explaining why they conclude

21   that the activity is not suspicious, right?

22   A.  They would -- yes, they would state that.  I guess where

23   I'm going is I don't think it says that they need to state

24   that for every event.

25   Q.  And when you say "for every event," what are you talking

1    about?

2    A.  Only the transactions that event.  I mean, in the alert,

3    events are listed, and I don't think they need to explain

4    every event as to whether that particular event for those

5    transactions.  It would be more summarized at the end.

6    Q.  And as part of that explanation, they would need to

7    include the explanation for why they believe there was no

8    suspicious activity; is that right?

9    A.  As part of the alert, yes.

10   Q.  And in doing the review on those alerts, they would need

11   to look at the source and use of the funds for the incoming

12   and outgoing wires, correct?

13   A.  Yes.

14   Q.  And they would explain that information as well,

15   correct?

16   A.  Yes.

17   Q.  I'll read it again.  Sorry.  It says, "Transactions that

18   event at the peer level with a score of 15 or less do not

19   need to be reviewed or explained."  Is that correct?

20   A.  Yes.

21   Q.  So those transactions that event at 16 or higher do need

22   to be reviewed and explained; is that right?

23   A.  Yes.

24   Q.  And, again, that would include the source and use of the

25   funds, right?

Mile - Deposition

1    A.  Yes.

2    Q.  Now, the part where it says -- I'm sorry.  Go down to

3    the next bullet.  Yeah, go down to the next bullet.

4          It says, "Transactions should be reviewed in the

5    monthly summaries to determine if they are substantially

6    similar to the previous review and remain in line with

7    activity that would normally be expected for the customer."

8    Do you see that?

9    A.  Yes.

10   Q.  What is meant "by substantially similar to the previous

11   review"?

12   A.  Substantially similar.

13   Q.  Is there more part of that they need to look at?

14   A.  That would be -- you said incoming wires, correct?

15   Q.  Yeah.  So if the alert is for incoming and outgoing

16   wires for both value and volume.

17   A.  Um-hmm.  So that's part of the review, to look to see if

18   they're substantially similar in value and volume.

19   Q.  What other parts of the review would they need to do?

20   A.  Well, then it says, "Remain in line with activity that

21   would normally be expected for the customer."

22   Q.  What does that mean?

23   A.  It means that based on the customer's business and

24   whatever else we know about them, is that activity that

25   would normally be expected.

1    Q.  And they would make a comment in Searchspace about why

2    they believe the activity was expected, correct?

3    A.  Yes.

4    Q.  And so do I -- let me -- I just want to make sure I

5    understand this, Ms. Hile.

6          The substantially similar part, is it enough for

7    the analyst to just say with respect -- let me give you the

8    hypothetical again, where's it's an alert on wire

9    transactions for incoming and outgoing, both on value and

10   volume, is it enough in this instance for the analyst to

11   just say, Oh, they did that same value or similar value and

12   volume in previous review?

13   A.  As it -- as part of their conclusion?

14   Q.  Yes.

15   A.  Normally there would be more than that.

16   Q.  So it would not be enough to just say, Oh, they had

17   similar value and volume for wires in the past review?

18   A.  We would require probably an additional comment besides

19   that.

20   Q.  And that additional comment would need to explain the

21   reasons why they believe, for example, that the activity is

22   expected for that particular customer?

23   A.  It would probably say a little bit more than that.

24   Q.  Like what?

25   A.  I couldn't tell you exactly, but it would probably

1    explain it a little bit more than that.

2    Q.  And it would be something more than just saying, this

3    appears to be expected activity?

4    A.  Not necessarily.

5    Q.  Would that be an appropriate comment to just say, this

6    is expected activity?

7    A.  I believe that we would say something a little bit more

8    than that, but I couldn't tell you what the exact wording

9    would be.

10   Q.  So would it be enough, under my hypothetical, for the

11   analyst to say, Customer had similar value and volume of

12   wires in the previous view, and this is the activity that is

13   expected for this customer?

14   A.  That potentially could be enough based on -- or that

15   could potentially be enough.

16   Q.  In that particular example, you would also expect that

17   the analyst would explain what the source and use of the

18   funds were for the incoming and outgoing wires, correct?

19   A.  Yes.

20   Q.  Ms. Hile, I'm handing you what's marked as Exhibit 248.

21        This is another document entitled, "Marshall &

22   Ilsley Corporation, suspicious Activity Monitoring and

23   Reporting."  Do you see that?

24   A.  Yes.

25   Q.  And this one says, "Revised of April 2008."  Do you see

Mile -- Deposition                                                    384

1    that?

2    A.  Yes.

3    Q.  Are you familiar with this document?

4    A.  It's similar to the other ones.

5    Q.  In April of 2008, you were still the manager of the

6    Anti-Money Laundering Group at M&I Bank, correct?

7    A.  Yes.

8    Q.  And I'll just show you some quick changes here in this

9    procedure from the last one.  If you go to page 14, and we

10   see we have the quick close filters.  Do you see that?

11   A.  Yes.

12   Q.  And it looks like the quick close filters are different

13   from what they used to be; is that right?

14   A.  It looks that way, yes.

15   Q.  And in the previous filters that we looked at in the

16   other procedures, there was not a Filter Number 8, correct?

17   A.  Correct.

18   Q.  And it looks like now the QAPOR or expedited review

19   process has been turned into a Filter Number 8 in the quick

20   close filters, right?

21   A.  Correct.

22   Q.  So if we go to Section 4 on page 5 -- or page 15 ending

23   in Bates 014, up at the top, Section 4 reads, "Qualified

24   Accounts for Peer Only."  Do you see that?

25   A.  Yes.

Miller - Deposition

1    Q.  And this again appears similar to the procedures that

2    were outlined in the previous exhibit; is that right?

3    A.  I couldn't tell you if they were exactly the same.

4    Q.  Okay.  Let's just take a look at some of them.

5         We have the process for placing an account on the

6    expedited review list, correct?

7    A.  We have that process that's on here, yes.

8    Q.  And if we look at some of the bullets, we see, again,

9    the customer cannot appear on the high-risk customer list,

10   right?

11   A.  Correct.

12   Q.  And that was true in the previous exhibit, correct?

13   A.  Um-hmm, yes.

14   Q.  And documentation must be kept supporting the placement

15   on the expedited review list, right?

16   A.  Yes.

17   Q.  And that was also a requirement in the previous exhibit,

18   right?

19   A.  Yes.

20   Q.  And then the next bullet reads, "Placement must be

21   approved by AML management."  Do you see that?

22   A.  Yes.

23   Q.  And that was a requirement in the previous exhibit,

24   right?

25   A.  Yes.

Miller - Deposition

1    Q.  And then the last bullet reads, "Accounts will be

2    reviewed annually to determine if they should remain on the

3    list."  Do you see that?

4    A.  Yes.

5    Q.  And, again, that was a requirement in the previous

6    exhibit, correct?

7    A.  Yes.

8    Q.  Now, let's just go up for a second.  The third bullet

9    point reads, "In the last 12 months, account has had at

10   least three 'closed to expected' reviews and at least three

11   alerts for 'peer-only' events (where all events with a score

12   greater than 6 are for 'peer' only)."  Do you see that?

13   A.  Yes.

14   Q.  The part that's in parentheses where it reads, "Where

15   all events with a score greater than 6 are for 'peer' only,"

16   is that applicable to there being three alerts -- or having

17   at least three alerts for peer-only events?

18   A.  Yes.

19   Q.  Does that apply at all to the account has had at least

20   three closed to expected reviews?

21   A.  I'm -- I don't know.

22   Q.  So let me ask you this:  So if in the -- and this

23   section is talking about qualifying -- whether a

24   commissioner qualifies to be on the list of expedited

25   review; is that right?

```
1    A.  Yes.
2    Q.  And if within the last 12 months the customer had an
3    account level alert greater than 6 in a peer-only event,
4    would the customer qualify to be placed on the expedited
5    review list?
6    A.  I don't know.  I don't know.  I've been away from it for
7    too long.  I don't know the answer to that.
8    Q.  I mean, when we read what it says here, if that were the
9    case, the customer would not qualify for the expedited
10   review list; is that right?
11   A.  I'm not -- I'd have to look at this.  I'm not exactly
12   sure.  I don't know.
13   Q.  So, Ms. Hile, how long did you manage the AML Monitoring
14   Group?
15   A.  From 2005 to 2013.
16   Q.  And is it your testimony to the jury that with that
17   level of experience, you can't look at the procedure in
18   Bullet Point Number 3 and tell me if in the last 12 months
19   if there was an account level alert at the peer-only -- with
20   a peer-only event of greater than 6, whether that would
21   preclude the customer from being put on the expedited review
22   list?
23   A.  I can't answer that.  I don't know.
24   Q.  Does that sound like a reasonable conclusion?
25   A.  Yes.
```

1    Q.  Let's go back to this part in Exhibit 248 that talks

2    about how to qualify for expedited review.

3               So, again, similar to the procedure we discussed

4    on the last exhibit, 223, the analyst would first go and

5    look to see if the customer is on the list; is that right?

6    A.  Okay.  Where are you?  Are you somewhere in this

7    document?  Are you talking about somewhere in here?  Where

8    are you?

9    Q.  Yep.  I'm on page 15.

10   A.  Okay.

11   Q.  At the part where it says, "How to qualify for expedite

12   review."

13   A.  Okay.

14   Q.  And then the next bullet where it talks about,

15   "Transactions that event at the peer level with a score of

16   15 or less do not need to be reviewed or explained," that

17   was in the previous exhibit as well, correct?

18   A.  Yes.

19   Q.  And, again, what that means is if transactions event at

20   the peer level with a score greater than 15, then they do

21   need to be reviewed and explained; is that right?

22   A.  Yes.

23   Q.  That didn't change, correct?

24   A.  Correct.

25   Q.  And then we also talked about the last bullet here where

Miller - Deposition

1    it says, "Transactions should be reviewed in the monthly

2    summaries to determine if they are substantially similar to

3    the previous review and remain in line with activity that

4    would normally be expected for the customer."  Do you see

5    that?

6    A.  Yes.

7    Q.  And, again, that's -- that was in Exhibit 223 as well,

8    right?

9    A.  Yes.

10   Q.  So these particular procedures to follow didn't change

11   at all from Exhibit 223, did they?

12   A.  It looks like they're the same, from what I can tell.

13   Q.  And what level of explanation would be required in the

14   quick close state if there was a conclusion that there was

15   no suspicious activity after conducting the necessary review

16   on those alerts that evented for greater than 15?

17   A.  What explanation would be required?

18   Q.  Yes.

19   A.  The explanation that it wasn't suspicious and why.

20   Q.  So the analyst would need to explain why they believed

21   the activity was not suspicious?

22   A.  Yes.

23   Q.  Would the analyst also need to explain what the source

24   and use of the funds were, for example?

25   A.  I believe so.

Hile - Deposition

1    Q.  The explanation of the source and the use of the funds

2    was the analysts were always doing that to the best of your

3    recollection, correct?

4    A.  Yes.

5    Q.  Ms. Hile, I'm handing you what's been marked as

6    Exhibit 249.  It's an e-mail dated December 12th, 2006 from

7    Shandra Roehrig to you.  Do you see that?

8    A.  Yes.

9    Q.  And Ms. Roehrig writes, "Please review Petters Co., Inc.

10   for addition to our Qualified Account Review."  Do you see

11   that?

12   A.  Yes.

13   Q.  What is the purpose of Ms. Roehrig writing this to you?

14   A.  She was asking me to review the account to see if it

15   qualified for the peer account expedited review.

16   Q.  So is this how -- was this the initial request to put

17   Petters Company, Inc. on expedited review?

18   A.  It appears to be that, yes.

19   Q.  And then do you recall that you went and looked into

20   whether or not you believed Petters Company could qualify

21   for expedited review?

22   A.  Yes.

23   Q.  Do you remember what you did to make that determination?

24   A.  I reviewed the account activity and other information

25   that was available on the account.

Miller - Deposition

```
1    Q.  So, for example, what would you have reviewed?
2    A.  I would have reviewed the account activity.  I would
3    have looked at comments that were made within Searchspace
4    for different reviews that were done.  I would have probably
5    reviewed the MIContacts information.  I don't recall exactly
6    what I reviewed.
7    Q.  Is that common with your procedure for looking at
8    whether or not somebody should be on the expedited review
9    list, to look at the comments in Searchspace on alerts to
10   determine or rely on that information in making your
11   decision?
12   A.  I would have looked at the comments, as well as I
13   believe I would have looked at the activity myself.
14   Q.  And just because the jury is not in the AML Group and
15   I'm not in the AML Group, can you tell us what you mean by
16   activity that you looked at.
17   A.  Within Searchspace you can open up a screen and it will
18   show you the activity on the account, and you can also, you
19   know, sort that in different ways so that you can see the
20   different activity that's going on for different time
21   periods.
22   Q.  And when you say "activity," that means the wires going
23   in --
24   A.  Yes.
25   Q.  -- the wires going out?
```

Miles - Deposition

```
 1    A.  Yes.
 2    Q.  That means checks that PCI wrote on the account; is that
 3    right?
 4    A.  Yes.  Yes.
 5    Q.  Why would you have looked at that wire activity then?
 6    A.  Well, as I recall, that's the main activity on the
 7    account.
 8    Q.  You're in Exhibit 248, and you're at Section 4 of the
 9    Qualified Accounts for Peer-Only Review --
10    A.  Yes.
11    Q.  -- on page 15 with Bates ending in 014; is that right?
12    A.  Yes.
13    Q.  Okay.
14    A.  Where it says, "Process for placing an account on the
15    Qualified Account for Peer-Only Review list, these are the
16    procedures that we followed."  And when it says that
17    document -- or "placement must be approved by AML
18    management," my review was to determine that all of these
19    things were in place before we put it on the expedited
20    review list.
21    Q.  Okay.  So you wouldn't -- so let's just go and see what
22    that means.  Okay?
23         Does that mean that in determining whether or not
24    Petters Co., Inc. should be placed on the expedited review
25    list, you would not have gone into Searchspace and looked at
```

Miller - Deposition

1    the account activity?

2    A.  I would have from -- only from the perspective to make

3    sure that these things were followed, these items were

4    followed.

5            Now, there is something in here that says, "Three

6    closed to expected reviews at least three alerts for

7    peer-only events."  I would have to go into Searchspace to

8    see that.  So this is what I would have done.  I would have

9    verified that this had been followed.

10   Q.  And that would have been the extent of your review of

11   the activity within Searchspace?

12   A.  Yes.

13   Q.  And you would have made sure that there was

14   documentation that supported the decision to place PCI on

15   the expedited review list; is that right?

16   A.  Yes.

17   Q.  Okay.  Let me go back to the question I was asking you,

18   though.  I just want to figure out if this would have been

19   helpful or not for M&I to know.  Okay?

20           And, by the way, there was an initial decision to

21   put Petters Company, Inc. on the list, and then that

22   decision was reviewed annually, right?

23   A.  That's correct.

24   Q.  So I guess -- so my questions will apply at any stage,

25   whether it was helpful to put them on the list in the first

Miles - Deposition

1    place or whether it was helpful to keep them on the list.

2    Okay?

3    A.  Okay.

4    Q.  So in making that determination, would it have been

5    helpful to know that the majority of the incoming wires on

6    the Petters Company, Inc. account were from two entities?

7    A.  No.  No.

8    Q.  In determining whether to keep Petters Company, Inc. on

9    the expedited review list, would it have been helpful to

10   know that the value of 70 to 80 percent of the incoming

11   wires on the Petters Company, Inc. account were coming from

12   the two entities that Petters Company, Inc. was supposedly

13   buying the consumer electronics from?

14   A.  I'm going to say no.

15   Q.  That wouldn't have been helpful to determine whether to

16   keep Petters Company, Inc. on the expedited review list?

17   A.  I think -- well, we were still looking at the account.

18   It was just in a different place.  So if we knew that there

19   was some kind of suspicious activity on the account, I think

20   that's something we would want to know.

21   Q.  Okay.  Well, let me ask you this question:  If you would

22   have known that the value of 70 to 80 percent of the wires

23   coming into the Petters Company account were consistently

24   from the two wholesalers who Petters Company, Inc. was

25   supposedly buying the consumer electronics from, would you

Mile - Deposition

```
1    have found that to have been unusual activity?

2    A.  It depends.  It depends on what else was going on.  I

3    can't answer that now.

4    Q.  I'll give you a little bit more.  Okay?

5            I'll tell you that the alerts -- and we can look

6    at some of the alerts later.  I'll tell you that the alerts

7    were alerting for value and volume of incoming wires.  And

8    if you knew that 70 to 80 percent of the value of those

9    incoming wires were from the very two wholesalers who

10   Petters Company, Inc. was supposedly buying the consumer

11   electronics from, would you have felt that that was unusual

12   activity on this depository account?

13   A.  I can't answer that in -- I can't answer that.  I don't

14   know.

15   Q.  Does that sound like something that would have been

16   interesting to you?

17   A.  Not without knowing more.

18   Q.  Is that something that you think you would have looked

19   into further?

20   A.  I can't -- I don't know.

21   Q.  What else would you need to know?

22   A.  I don't know.  It would -- it depends on the situation.

23   Q.  Okay.

24   A.  And I don't know back then -- I mean, we're talking a

25   long time ago -- what I would have needed to know.
```

1    Q.  As you're sitting here today, can you think of other

2    things that you would have wanted to know?

3    A.  No.

4    Q.  What was the documentation that supported the Petters

5    Company, Inc. -- Petters Company, Inc.'s placement on the

6    QAPOR list?

7    A.  I don't recall.

8    Q.  All right.  Let's go back to what we were talking about

9    before.  And just to remind the jury, we were talking about

10   Exhibit 249, which was the Shandra Roehrig e-mail to you; is

11   that right?

12   A.  Yes.

13   Q.  And we talked about before the fact that this appears to

14   be how Petters Company, Inc. was first considered to be on

15   the expedited review list; is that right?

16   A.  Yes.

17   Q.  And the date is December 12th of 2006; is that correct?

18   A.  Yes.

19   Q.  Ms. Hile, I'm handing you what's been previously marked

20   as Exhibit 398.  It's a document entitled, "Additional

21   Guidelines for Analysis and Investigation of Alerts in

22   Searchspace."  Do you see that?

23   A.  Yes.

24   Q.  Are you familiar with this document?

25   A.  Yes.

1    Q.  Do you know when this guideline was put in place?

2    A.  Well, it says it was revised in June of '06.  I do not

3    know exactly when it was put in place.

4    Q.  What is the difference between an additional guideline

5    and the three procedures that we looked at today?

6    A.  I believe this was guidelines, where the others were

7    more formalized procedures.

8    Q.  So is a guideline just something that is helpful for the

9    analyst to refer to?

10   A.  Yes.

11   Q.  Help guide them in their review and investigation --

12   A.  Yes.

13   Q.  -- of an alert?

14   A.  Um-hmm.

15   Q.  Are the guidelines something that the AML analysts had

16   handy and referred to?

17   A.  Yes.

18   Q.  Did you have input into this guideline?

19   A.  Yes, I'm sure -- well, I think I did, yeah.  It's June

20   of '06.  I would have.

21   Q.  Did you help train AML analysts on this guideline?

22   A.  I don't recall that.

23   Q.  Let's turn to page 5, Bates ending in 004.

24            There's a Section F at the top for closed to

25   expected or explainable activity.  Do you see that?

1    A.  Yes.

2    Q.  And it says, "If there's a question in your mind, a full

3    case review should be done as a no SAR."  Do you see that?

4    A.  Yes.

5    Q.  Where it says, "if there is a question in your mind,"

6    what is being referred to there?

7    A.  If you're not sure if it's suspicious or not.

8    Q.  So if there is -- if you have any uncertainty whatsoever

9    as to whether or not wire transfer activity is suspicious or

10   not, you should do a full case review; is that right?

11   A.  It doesn't say that.

12   Q.  Is that what is meant by that?

13   A.  It says, "if there is a question in your mind."

14   Q.  Is there any difference from what I just said?

15   A.  Yes.

16   Q.  How so?

17   A.  If there's a question in your mind.  It doesn't give

18   specifics.

19   Q.  And so if an analyst has a question in their mind about

20   whether or not wire transfer activity is suspicious, they

21   should do a full case review?

22   A.  If there's a question in your mind about any activity.

23   I wouldn't key in specifically on anything.  It's anything,

24   not just wire activity.

25   Q.  Okay.  So it's broader than wire activity?

Miller - Deposition

1    A.  Yes.

2    Q.  And certainly if an analyst was reviewing an alert that

3    was alerted because of wire activity and there was a

4    question in that analyst's mind as to whether or not

5    activity was potentially suspicious, they should do a full

6    case review; is that right?

7    A.  I believe it's if the -- if you feel -- if you're not

8    sure if it's suspicious enough to make it a SAR, if there's

9    some question as to whether it's suspicious enough to make

10   it a SAR, if you're not sure, then you would do it as a no

11   SAR.

12   Q.  So you err on the side of doing a full case review?

13   A.  If it meets that criteria, yes.

14   Q.  And what I'm asking specifically -- there are alerts in

15   Searchspace just based on wire activity, right?

16   A.  I don't know offhand, but there might be.

17   Q.  Okay.  You know that there were alerts, for example, for

18   incoming and outgoing wires, right?

19   A.  Yes.

20   Q.  And so if an analyst was reviewing that type of alert

21   for incoming or outgoing wires and they had a question in

22   their mind as to whether or not that activity was

23   suspicious, they should do a full case review as a no SAR;

24   is that right?

25   A.  If they couldn't get their question resolved any other

Miller - Deposition

1    way, if it was an open question.

2    Q.  Is that correct?

3    A.  Yes.

4    Q.  Then it says, "Comments in Searchspace for closed to

5    expected or explainable activity alerts."  Do you see that?

6    A.  Yes.

7    Q.  It says, "The following points should be covered in the

8    comments section of Searchspace when closing an alert to

9    expected or explainable activity."  Do you see that?

10   A.  Yes.

11   Q.  And then it gives several items that should be covered

12   in the comments section; is that right?

13   A.  Yes.

14   Q.  So, for example, the second one says, "Who is customer?

15   What kind of business?"  Do you see that?

16   A.  Yes.

17   Q.  They would explain that type of information in the

18   comments section in Searchspace?

19   A.  Yes.

20   Q.  And then I think it's the fifth box down it says, "What

21   activity was found?  How many cash-in deposits or cash-out

22   withdrawals, range of dollar amounts for the type of

23   activity reported for time period reviewed?"  Do you see

24   that?

25   A.  Yes.

Mile - Deposition

1    Q.  That's the type of information that they would also

2    include in the comments sections in Searchspace?

3    A.  Yes.

4    Q.  And then down below you see the box where it says,

5    "Describe analysis completed."  Do you see that?

6    A.  Yes.

7    Q.  What is meant there?

8    A.  Discussion with account officer, information found on

9    the internet, information found through looking at copies of

10   checks, information found from looking at other accounts of

11   the customer.

12   Q.  So is that saying that the analyst should describe the

13   analysis that they actually did --

14   A.  Yes.

15   Q.  -- to make their conclusions?

16   A.  Yes.

17   Q.  And one of the things -- or one of the examples -- this

18   is a nonexhaustive list of things to discuss, right?

19   A.  Yeah, it's an example.

20   Q.  One of the examples is discussion with account officer;

21   is that right?

22   A.  Um-hmm.

23   Q.  So if, for example, an analyst was doing an alert and

24   closed the alert in the closed to expected state and during

25   that time period they had asked questions of the account

Miller - Deposition

1  officer, they would document that conversation in the

2  comments section in Searchspace, correct?

3  A.  They should.

4  Q.  In the very last box, the very last sentence reads,

5  "Make sure that a conclusion is reached and supported in

6  your comments."  Do you see that?

7  A.  Yes.

8  Q.  And remember we talked about the analysts being required

9  to explain why they were making the conclusion, for example,

10  that the activity was not suspicious?

11  A.  Do I remember talking about that?

12  Q.  Yes.

13  A.  Yes.

14  Q.  That's what this box is referring to, correct?

15  A.  Yes.

16  Q.  If you turn the page, it's page 6, Bates ending in 005,

17  at the top, Part 2, it says, "Closed to expected expedited

18  review for analysts who have been removed from manager

19  review."  Do you see that?

20  A.  Yes.

21  Q.  Then down below, kind of in the middle of the page, it

22  says, "Ensure that you understand and explain what is going

23  on in the account."  Do you see that?

24  A.  Yes.

25  Q.  And, again, the part where it says, "and explain what is

Miles - Deposition

1    going on in the account," is that where the analyst needs to

2    provide information about why they are making certain

3    conclusions?

4    A.  I think there's examples that indicate -- I'm just

5    reading here.  Just a minute.  Okay.  What was your question

6    again?

7    Q.  I was focusing on the part that, "Ensure that you

8    understand and explain what is going on in the account," and

9    I'm trying to figure out if what is being conveyed there is

10   telling the analyst to explain why they were reaching

11   conclusions.

12   A.  Yes.

13   Q.  And you said there are some examples, right?

14   A.  Yeah, I was just -- it says there are examples, so I was

15   looking at them.

16   Q.  Right.  So it gives some examples, correct?

17   A.  Yes.

18   Q.  One of the examples is -- it gives is an example for

19   incoming wires; is that right?

20   A.  Yes.

21   Q.  And it says, "For incoming wires, documentation would be

22   needed for the source of the incoming wires and what the

23   funds appeared to be used for."  Is that right?

24   A.  Yes.

25   Q.  That's information that needs to be explained in the

Miller - Deposition

1    comments section in Searchspace, correct?

2    A.  Yes.

3    Q.  Then if we turn to the next page, page 7, Bates ending

4    in 006, Number 3, "Reminders."  Do you see that?

5    A.  Yes.

6    Q.  It says, "Remember to ask yourself the following

7    questions when closing an alert to expected activity."  Do

8    you see that?

9    A.  Yes.

10   Q.  And this is a checklist of things that you're supposed

11   to look for; is that right?

12   A.  Yes.

13   Q.  And it says, "Ask yourself do I know where the funds

14   came from?"  Do you see that?

15   A.  Yes.

16   Q.  This part where it says, "Do I know where the funds came

17   from," is that telling the analyst to determine which

18   entity, for example, is wiring the money into the account?

19   A.  Yes.

20          THE COURT:  Counsel, we have reached a point when

21   we need to take our midday break.  And so we will resume our

22   trial at 1:00.

23          Members of the jury, please remember the

24   instructions that I have given you and not discuss the case

25   with -- among yourselves or with anyone else and not to do

Miller - Deposition

```
 1    any research or anything else about this case, and don't let

 2    anyone discuss the case within your earshot as well.

 3            We will take a one-hour break for our lunch, so

 4    please be ready to come back into the courtroom at 1:00.

 5    Thank you.  And have a good lunch.

 6        (Jury excused)

 7                          IN OPEN COURT

 8                        (JURY NOT PRESENT)

 9            THE COURT:  Counsel, please be ready to resume at

10    1:00.

11            COUNSEL:  Thank you, Your Honor.

12        (Recess taken at 12:02 p.m.)

13                      *    *    *    *    *

14        (1:05 p.m.)

15                          IN OPEN COURT

16                         (JURY PRESENT)

17            THE COURT:  You may be seated.

18            All right.  Are we ready to proceed, Counsel?

19            MR. COLLYARD:  Yes, Your Honor.  We'll continue

20    playing the rest of the videotape.

21            THE COURT:  You may.

22    Q.  And then it says do I know where --

23            THE COURT:  Let's make sure we have our audio and

24    video.

25    Q.  And then it says, "Do I know where the funds went to?"
```

Hile - Deposition

1    And Is that telling the analyst to ask themselves whether or

2    not they know who the wires are going to?

3    A.  Yes.

4    Q.  And then the last one says, "Do the comments provided

5    convince the reader that the alert is not suspicious?"  Do

6    you see that?

7    A.  Yes.

8    Q.  And the analyst had to provide sufficient information

9    and explanation to convince the reader that the alert is not

10   suspicious; is that right?

11   A.  Yes.

12   Q.  It wasn't enough for the analyst to have that

13   information in their head, they had to explain it and show

14   it in the comments section in Searchspace; is that right?

15   A.  Yes.

16   Q.  Ms. Hile, I'm handing you what's been marked as

17   Exhibit 255.  It's another Additional Guidelines for

18   Analysis and Investigation for Alerts in Searchspace.  Do

19   you see that?

20   A.  Yes.

21   Q.  All right.  Let's go to page 3, Bates ending in 02.  I

22   guess let's go to page 2 just to give this some context.

23   It's page 2, Bates ending in 001, and it's talking about

24   Section 5, Alert Closings.  Do you see that?

25   A.  Mm-hmm.

1    Q.  It says, "There's seven alert closing states," and then

2    it lists them out.  Do you see that?

3    A.  Yes.

4    Q.  And then at the bottom of page 2, it starts talking

5    about the quick close state again.  Do you see that?

6    A.  Yes.

7    Q.  And if we turn to page 3, we see there's that filter

8    number 8 again?

9    A.  Yes.

10   Q.  And that's for the expedited review; is that right?

11   A.  Yes.

12   Q.  And, again, as part of qualifying for filter number 8 on

13   expedited review, the alert qualifies under the peer only

14   review procedure for an expedited review and no unusual or

15   suspicious activity is identified.  Do you see that?

16   A.  Yes.

17   Q.  So, again, the requirement of filter number 8 that there

18   is no unusual or suspicious activity is part of this

19   document as well; is that correct?

20   A.  Yes.

21   Q.  Now, below that is a paragraph that says, "Comments in

22   for Searchspace for quick closes should include who the

23   customer is, type of business, what kind of activity they

24   alerted for, and why the activity is not suspicious.  Do you

25   see that?

Hile - Deposition

```
1    A.  Yes.

2    Q.  Again, even for the quick close states, the analyst

3    needed to explain why the activity was not suspicious; is

4    that true?

5    A.  Yes.

6    Q.  So I'm handing you Exhibit 182, and what this is is a

7    printout of information pertaining to alerts on the Petters

8    Company, Inc. account.  If you'd please turn to Bates ending

9    08016.  Are you there, Ms. Hile?

10   A.  Yes.

11   Q.  Do you agree with me that this appears to be a printout

12   pertaining to alerts on the Petters Company, Inc. account?

13   A.  Yes.

14   Q.  And this particular page identifies an Alert

15   Number 63517.  Do you see that?

16   A.  Yes.

17   Q.  And if we look at the top, it's for the alerted month of

18   February of 2006.  Do you see that?

19   A.  Yes.

20   Q.  Have you seen this document before?

21   A.  You mean in the last 10 years?

22   Q.  Do you recall seeing this document --

23   A.  When it occurred, probably.  I don't recall it really,

24   but okay.

25   Q.  Is this one of the documents you looked at in
```

Mike - Deposition

```
1    preparation for your deposition?

2    A.  No.

3    Q.  All right.  Let's just take a look at what this tells

4    us.  If we look down below, it says, "Alert Events, Alerted

5    Month."  Do you see that?

6    A.  It says what?  Oh, alert events, yes.

7    Q.  And then it has event types, right?

8    A.  Yes.

9    Q.  And then it shows us, for example, that there were

10   events for incoming and outgoing wires both based on value

11   and volume of those wires; is that right?

12   A.  Yes.

13   Q.  And if we look way to the right, there is an event score

14   for those particular events; is that right?

15   A.  Yes.

16   Q.  And if you add up all of those events, that gives us a

17   score, correct?

18   A.  Yes.

19   Q.  And we talked about there being a threshold of 75.  Do

20   you remember that?

21   A.  Yes.

22   Q.  So if all these events added up -- equaled more than 75,

23   that would generate an alert; is that correct?

24   A.  Right, yes.

25   Q.  And this particular alert has a score of 252; is that
```

410

1     right?

2     A.  Yes.

3     Q.  Handing you what's been marked as Exhibit 183, and what

4     these are, Ms. Hile, is these are printouts of the audit

5     trails for the alerts on the Petters Company, Inc. account.

6     Why don't you go to Alert 55878.  Are you there?

7     A.  Yeah -- yes.

8     Q.  And this is an alert that Sara Johnson reviewed and

9     investigated; is that right?

10    A.  Yes.

11    Q.  And that was for the alerted month of June 2005.  Do you

12    see that?

13    A.  Yes.

14    Q.  And this alert had a score of 237.  Do you see that?

15    A.  Yes.

16    Q.  And that's a high score, right?

17    A.  Higher than 75, yes.

18    Q.  And if we go to the second page of the alert, down

19    towards the bottom it says, "AML manager review."  Do you

20    see that?

21    A.  Yes.

22    Q.  And then in the action for August 24th of 2005 it says,

23    "Commented" and it says, "B. Hile.  Do you see that?

24    A.  Yes.

25    Q.  It said, "Case reviewed, the activities expected and

Miles - Deposition

1    consistent with business type."

2    A.  Yes.

3    Q.  Do you see that?

4    A.  Mm-hmm.

5    Q.  Is that a notation that you made?

6    A.  Yes.

7    Q.  And how did you conclude that the activity is expected

8    and consistent with business type?

9    A.  Well, I don't recall exactly, but I reviewed the

10   comments and perhaps other things that I don't recall.

11   Q.  Would you have reviewed MiContacts, for example?

12   A.  Possibly.

13   Q.  Is this -- this level of explanation that you give, is

14   that the level of explanation that was commonly given for an

15   AML manager review comments?

16   A.  Yes.

17   Q.  Just let me ask you a few questions.  If you turn to the

18   first page of the alert, the very bottom on August 22nd,

19   2005 at 9:30, Ms. Johnson writes, "Customer alerted for

20   incoming/outgoing wires."  Do you see that?

21   A.  Mm-hmm, yes.

22   Q.  So the reason for this alert was incoming and outgoing

23   wires; is that right?

24   A.  Yes.

25   Q.  It says, "Customer has a collection of nearly 20

Miller - Deposition

1    companies that make and market a variety of consumer

2    products worldwide."  Do you see that?

3    A.  Yes.

4    Q.  Do we know how Ms. Johnson concluded that?

5    A.  I don't know.  I don't know.

6    Q.  We can't tell by looking at the comments?

7    A.  No.

8    Q.  Ms. Johnson concluded that Petters Company, Inc. had a

9    collection of nearly 20 companies that make and market a

10   variety of consumer products worldwide.  Do you see that?

11   A.  Yes.

12   Q.  And we can't tell what type of business those companies

13   were in, right?

14   A.  We can't tell from this -- these comments?

15   Q.  Yes.

16   A.  Correct.

17   Q.  And if you say that -- she says that, "Also work with

18   existing brands through licensing agreements to further

19   extend those brands into new product lines and markets."  Do

20   you see that?

21   A.  Yes.

22   Q.  We can't tell by looking at these comments why she

23   concluded that, can we?

24   A.  I can't -- I can't tell that now, no.

25   Q.  And then she says, "For more info, please refer to

Mile - Deposition

1   MiContacts."  Do you see that?

2   A.  Yes.

3   Q.  The analysts used MiContacts frequently; is that right?

4   A.  Yes.

5   Q.  She says, "Reviewed May through July '05."  That just

6   means that she reviewed the activity in the account for May

7   through July of 2005; is that right?

8   A.  Yes.

9   Q.  She said, "Customer's average incoming/outgoing wires is

10  500,000."  Do you see that?

11  A.  500 million?

12  Q.  I'm sorry.  500 million?

13  A.  Yes.

14  Q.  Do you know why she's including that information?

15  A.  She needed to include the information on the wires

16  because they were what evented.

17  Q.  And that 500 million is a round number?

18  A.  The average is incoming wires is 500 million.

19  Q.  That 500 million is a round number?

20  A.  Are you asking me?

21  Q.  Yeah, I'm asking you if that's an example of a round

22  number.

23  A.  Yes.  Yes.

24  Q.  It says, "May, 173," and then it provides a $585 million

25  number, right?

Miller - Deposition

```
1    A.  Yes.

2    Q.  And then June, 174, and it provides a $568 million

3    number?

4    A.  Yes.

5    Q.  It says, "July, 154," and it provides a $562 million

6    number.  Do you see that?

7    A.  Yes.

8    Q.  And then it provides similar information for outgoing

9    wires --

10   A.  Yes.

11   Q.  -- is that right?

12            And the incoming wires and the outgoing wires are

13   very similar, are they not?

14   A.  Yes.

15   Q.  And then she says, "Wires to and from various

16   businesses."  Do you see that?

17   A.  Yes.

18   Q.  We can't read her comments and determine who the source

19   of the incoming wires is, can we?

20   A.  The -- no.

21   Q.  And we can't read her comments and figure out what the

22   purpose of the incoming wires was for, can we?

23   A.  It doesn't appear that way.

24   Q.  And we can't look at the outgoing wires and determine

25   what the use of the funds was for, can we?
```

Miler - Deposition

1   A.  No.

2   Q.  And she doesn't identify any of the entities who were

3   involved in the wires, does she?

4   A.  Not in the comments, no.

5   Q.  And you would have expected her to do that, right?

6   A.  This was from August of '05, and I don't know that those

7   procedures were in place at this time to be so -- to be that

8   specific.

9   Q.  Was there a time that you know for a fact that the

10  analyst did not have to identify the source and the use of

11  the funds?

12  A.  No, I don't.

13  Q.  She said, "Activity does not appear suspicious."  Do you

14  see that?

15  A.  Yes.

16  Q.  Can we look at her comments and conclude why she

17  believes that the activity was not suspicious?

18  A.  I don't -- I don't know.  I don't know -- well, you're

19  saying from her comments?

20  Q.  Yeah.  Does she explain why she believes the activity is

21  not suspicious?

22  A.  Not really, no.

23  Q.  And she says, "Activity is consistent and expected for

24  type of business customer."  Do you see that?

25  A.  Yes.

1    Q.  What type of business is she referring to there?

2    A.  She's referring to how she -- what she said the business

3    was in the beginning.

4    Q.  What business did she say PCI was in the beginning?

5    A.  She says that they make and market a variety of consumer

6    products worldwide, and they work with existing brands

7    through licensing agreements to further extend those brands

8    into new product lines and that there's more information in

9    MiContacts.

10   Q.  And is she referring to Petters Company, Inc. as a

11   business or is she referring to those nearly 20 companies

12   that she believes Petters Company, Inc. is a collection of?

13   A.  I don't know.

14   Q.  We can't tell, can we?

15   A.  No.

16   Q.  Do you recall talking with Ms. Johnson about this review

17   or having any questions for why she provided the level of

18   detail that she provided in these comments?

19   A.  I don't recall.

20   Q.  With respect to this alert, if you had known, Ms. Hile,

21   that -- based on what Ms. Johnson says here in her comments,

22   if you had known that approximately 76 percent of the value

23   of those incoming wires that she's referencing came from the

24   two entities who were supposedly the wholesalers that

25   Petters Company, Inc. was buying its consumer electronics

1    from, would that have been helpful information to determine

2    whether or not these incoming wires were potentially

3    suspicious?

4    A.  I can't really answer that.  I don't know.  I don't

5    know.

6    Q.  And if you had an understanding that Petters Company,

7    Inc. business was selling consumer electronics to big-box

8    retailers and that those big-box retailers were supposed to

9    be wiring money into the Petters Company, Inc. account and,

10   in fact, they had not wired any money into the Petters

11   Company, Inc. account, would that have been information that

12   would have been helpful in determining whether the incoming

13   wires were potentially suspicious?

14   A.  There's so much hypothetical in there that I just -- I

15   don't know.  I can't answer that.

16   Q.  Does that sound like something that you as the manager

17   of this group, if you would have known that information,

18   that you would have wanted to look into that further?

19   A.  Again, you're talking about something that happened a

20   long time ago and you're trying to put me back to that, and

21   I just don't know.

22   Q.  Let's go to Alert 60827.  Are you there, Ms. Hile?

23   A.  Yes.

24   Q.  This is an alert that Mary Drewiske or Mary Pesch did;

25   is that right?

Mile - Deposition

```
1    A.  No.  It looks like Sara Johnson.  Oh.  So I didn't go

2    far enough.  All right.

3    Q.  I'm sorry.  Are we on Alert 60827?

4    A.  Yeah -- yes.  I didn't go to the next page.  Yes, I see

5    Mary Drewiske in it.

6    Q.  Mary Drewiske.  And you understand that Mary Drewiske is

7    now Mary Pesch?

8    A.  Yes.

9    Q.  And this was for the alerted month of November of 2005;

10   is that right?

11   A.  Yes.

12   Q.  And if we look down below in the comments section, it

13   looks like there were other alerts that were closed for

14   multiple; is that right?

15   A.  Mm-hmm.

16   Q.  And so when Ms. Drewiske or Ms. Pesch did her review of

17   this alert, she actually looked at those months as well; is

18   that right?

19   A.  Yes.

20   Q.  So she looked at, for example, the months of November

21   through February -- November 2005 to February 2006; is that

22   right?

23   A.  Yes.

24   Q.  Now, if we turn to the third page, down below, an entry

25   on March 22nd of 2006 at 11:56, Ms. Pesch makes reference to
```

Mike - Deposition

1    checks clearing the account were for loan payments,

2    utilities, investments, companies, and law firms.  Do you

3    see that?

4    A.  Yes.

5    Q.  Any idea why she's referring to those checks?

6    A.  No.

7    Q.  As part of Ms. Pesch's investigation into the alert on

8    this account, would she have looked at the checks clearing

9    the account?

10   A.  What's your question?  Would she have?

11   Q.  Yes.

12   A.  Well, she did.

13   Q.  In reviewing an alert, does the analyst look at all of

14   the activity on the account?

15   A.  Sometimes.

16   Q.  And that would include checks clearing the account?

17   A.  It can.

18   Q.  Can you look at Ms. Pesch's comments and determine why

19   she's looking at checks clearing the account?

20   A.  I can't -- I can't tell from this.

21   Q.  So she says, "Checks clearing the account were for loan

22   payments, utilities, investment companies, and law firms,

23   right?

24   A.  Yes.

25   Q.  Can we look at her comments and determine how she

Miller - Deposition

1    concluded that?

2    A.  Well, the activity would be -- she could -- she could

3    review the activity.  The activity would be out there.

4    Q.  Can you look at her comments to determine how she

5    concluded that the checks clearing the account were for loan

6    payments, utilities, investment companies, and law firms?

7    A.  Well, she had to have looked at them, looked at the

8    checks.

9    Q.  I understand that, but can you read the comments and

10   tell us how she came up with her conclusion that that's who

11   the checks were from -- I'm sorry, that that's who the

12   checks were written to?

13   A.  Well, I don't know how else she would have learned that

14   information, unless she --

15   Q.  She doesn't -- she doesn't tell us anything in her

16   comments other than she believes the checks were from those

17   particular types of entities, right?

18   A.  Checks -- they were to those entities, but that's

19   presumed.  There isn't any other way to know that.

20   Q.  Other than us making the assumption of that, is there

21   any comments that explained how she concluded or why she

22   concluded that?

23   A.  No.

24   Q.  And there's no information about those particular

25   entities that she's referencing, right?

1    A.  No.

2    Q.  So this alert, remember, Ms. Hile, is from the time

3    period November 2005 to February of 2006; is that right?

4    A.  Yes.

5    Q.  Handing you what's been marked as -- previously marked

6    as Exhibit 185, which is a copy of a number of checks

7    written on the PCI account at that particular time period.

8    I just want to draw your attention to a few of them.

9            Take a look at about eight pages in.  You'll see

10   Bates ending in 849, and at the top it says, "Page 46 of

11   54."

12   A.  I don't have that page.  Oh, okay.  Here, I got it now.

13   Q.  It was a check written to Deanne Munson signed by Deanne

14   Munson for $500,000 on December 27th of 2005.  Do you see

15   that?

16   A.  Yes.

17   Q.  That's -- $500,000 is a round number, right?

18   A.  Yes.

19   Q.  And do you know that Deanna Munson went to jail --

20   A.  No.

21   Q.  -- for the Ponzi scheme?

22   A.  No.

23   Q.  The fact that Deanna Munson is writing herself a check

24   for half a million dollars, is that something that the

25   analysts would have looked at and considered in determining

Mike - Deposition

1   whether or not there was suspicious activity on the account?

2   A.  I don't know.

3   Q.  Would you expect them to do that?

4   A.  Potentially.  I don't know.  That -- it would depend.

5   Q.  What if there was a pattern or a series of checks

6   written to individuals in round numbers during this time

7   frame for this alert, would that have been something that

8   the analyst, Mary Pesch, should have looked into?

9   A.  Not necessarily.

10  Q.  Let me show you a few more checks.  Go two more pages

11  down at Bates ending in 848.

12  A.  Yes.

13  Q.  Do you see a check to Jim Wehmhoff for $1 million --

14  A.  Mm-hmm.

15  Q.  -- from Deanna Munson?

16  A.  Mm-hmm.

17  Q.  That's another round number, right?

18  A.  Yes.

19  Q.  Go another couple pages, Bates ending in 5855.  Do you

20  see a check to Bob White?

21  A.  Yes.

22  Q.  For $700,000 on December 27th, 2005?

23  A.  Yes.

24  Q.  Do you know who Bob White is?

25  A.  No.

Miller - Deposition

```
 1    Q.  Do you have an understanding that Bob White went to jail

 2    for the Ponzi scheme that was affiliated with the M&I Bank

 3    account?

 4    A.  No.

 5    Q.  Go to the next page, Bates ending in 572, another check

 6    written to Jim Wehmhoff for $1 million on January 2nd of

 7    2006.  Do you see that?

 8    A.  Yes.

 9    Q.  Do you know who Jim Wehmhoff is?

10    A.  No.

11    Q.  Go to the next page, Bates ending in 588, there's a

12    check to Deanna Munson again.  Do you see that?

13    A.  Yes.

14    Q.  That was for $1 million?

15    A.  Yes.

16    Q.  That was on January 3rd of 2006; is that right?

17    A.  Yes.

18    Q.  And on the next page, again on January 3rd of 2006, we

19    see a check for $2.5 million that Deanna Munson wrote to

20    herself; is that right?

21    A.  Yes.

22    Q.  So that's $3.5 million in one day to Deanna Munson; is

23    that right?

24    A.  Yes.

25    Q.  Again, all round numbers, right?
```

Hile - Deposition

1    A.  Yes.

2    Q.  The next page, Bates ending In 596, a check written to

3    Bob White again on February 16 of 2006 for half a million

4    dollars; is that right?

5    A.  Yes.

6    Q.  More round numbers, correct?

7    A.  Yes.

8    Q.  So if Ms. Pesch is reviewing checks to utility companies

9    and making reference to those, wouldn't you expect Ms. Pesch

10   to be looking at checks for millions and millions of dollars

11   written out to individuals at the Petters Company, Inc.

12   company to determine whether or not that activity was

13   potentially suspicious or whether somebody should look into

14   that further?

15   A.  I really can't answer that with knowing -- without

16   really knowing the whole situation, and I just don't know

17   what was happening at that point in time.

18   Q.  And this is -- again, if we look at the last page of the

19   alert in Exhibit 183 for Alert 60827, it looks like you

20   reviewed and approved Ms. Pesch's decision that the activity

21   in this alert was not suspicious, right?

22   A.  Yes.

23   Q.  And while doing that, Ms. Hile, would it have been

24   helpful to know that these types of checks for these types

25   of amounts were written to individuals?

1    A.  Again, it depends on the situation and what else was

2    happening in the account.

3    Q.  Would you -- would you wanted to have known that

4    information?

5    A.  I could have known that information, along with a lot of

6    other things.

7    Q.  So you're saying that you may have known that these

8    checks for millions of dollars were written to these

9    individuals?

10   A.  No.  No, I'm not saying that.

11   Q.  Would it have been helpful for you to know that

12   information when you were reviewing this account to

13   determine whether or not there was suspicious activity?

14   A.  It would -- it depends.  It's totally taken out of

15   context, and I just can't say "yes" or "no" not knowing the

16   whole situation.  I mean, there's a lot of variables here.

17   Q.  We see that Ms. Pesch reviewed checks to utility

18   companies, right?

19   A.  Yes.

20   Q.  And these checks were at the same time period, correct?

21   A.  It looks that way.

22   Q.  So how is it taken out of context?

23   A.  I don't know.

24        MR. COLLYARD:  I have no further questions,

25   Ms. Hile.  Thank you.

 1              MR. ANTHONY:  May it please the Court, the

 2     plaintiff calls Zachary Kiefer as its next witness.

 3              THE COURT:  Very well.

 4              COURT REPORTER:  Counsel, could you identify

 5     yourself, please.

 6              MR. ANTHONY:  Oh, I'm sorry.  Joe Anthony

 7     representing the plaintiff.

 8              THE COURT:  Please step forward and raise your

 9     right hand.

10        (Witness sworn)

11              THE COURT:  Please have a seat.  Please state your

12     full name and spell your last name.

13              THE WITNESS:  Full name is Zachary Kiefer.  Last

14     name is K-i-e-f-er.

15              THE COURT:  Thank you.  And would you adjust your

16     microphone so we can hear you better, and you may move the

17     base if that's easier for you.

18              THE WITNESS:  Okay.  Is that better?

19              THE COURT:  Thank you.

20                         **(Zachary Kiefer)**

21                        **DIRECT EXAMINATION**

22     BY MR. ANTHONY:

23     Q.  Good afternoon, Mr. Kiefer.

24     A.  Good afternoon.

25     Q.  Now, when you came up here, it looked like you didn't

Kiefer - Direct

1    know which way to go to the witness box.  Is this your first

2    time testifying?

3    A.  Yes, it is.

4    Q.  Okay.  Well, welcome.  Where are you from?

5    A.  I currently live in Freehold, New Jersey.

6    Q.  Okay.  How old are you, sir?

7    A.  34.

8    Q.  Are you married?

9    A.  I am married.

10   Q.  Okay.  Any children?

11   A.  Yes.  A two-month old boy that my wife and I just

12   welcomed.

13   Q.  Okay.  Congratulations.

14   A.  Thank you.

15   Q.  So this is a three-month old?

16   A.  Almost, yes.

17   Q.  All right.  So where do you work?

18   A.  Currently employed at PwC.

19   Q.  And tell the jury what PwC is.

20   A.  PwC is one of the big four accounting firms.  It's --

21   the full name is PricewaterhouseCoopers.

22   Q.  Okay.  When you say one of the big four accounting

23   firms, just give us a little context, just size.  You don't

24   have to get too detailed.

25   A.  You know, Nationwide, all over the country, as well as

Kiefer - Direct

1    international.  Works on most of the largest audits in the

2    world.  Tax work as well as consulting work.

3    Q.  Okay.  When did you start working there?

4    A.  I started as a summer intern in 2009 while I was still

5    in college and joined full-time in 2010 after I had

6    graduated.

7    Q.  Okay.  Where did you go to school?

8    A.  Rutgers University in New Jersey.

9    Q.  And did you get a degree?

10   A.  Yes.  I got a bachelor's degree in accounting.

11   Q.  So from 2009, when you started there, until the present,

12   what has been your affiliation or association with the

13   Petters bankruptcy or the Petters receivership?

14   A.  So really my first day as an intern, I was brought on to

15   the Petters investigation, flown out to Minnesota.  And

16   really for the entire six weeks of my internship I spent the

17   entire time in the basement of the Petters headquarters in

18   Minnetonka in what we referred to as "the cage."

19             It actually -- and the reason we called it that,

20   it actually had a metal door that was locked each night,

21   where -- there were documents that were held down there in

22   the basement.  It was roughly between 900 and a thousand

23   Bankers Boxes full of hardcopy documents.

24             And it was myself and another intern who were

25   tasked initially with going through all the pages of records

1    that were in those boxes and really looking to identify
2    certain key documents, promissory notes with investors, bank
3    documents, so -- monthly bank statements, canceled check
4    copies, wire transfer detail sheets, things of that nature.
5    And so really I spent the entire summer doing just that.
6    The rest of the team was also there on site with us.
7    Q.  Let me stop you there.
8    A.  Yeah.
9    Q.  I should have asked you:  Had PwC been hired by
10   Mr. Kelley, the trustee, to represent the bankruptcy estate
11   at that time?
12   A.  Yes, that's correct.
13   Q.  And were you in charge of this assignment or were you
14   reporting to someone?
15   A.  No, no, I was not.  I was reporting to Ted Martens, who
16   was the lead engagement partner on the engagement.
17   Q.  Is he in the courtroom today?
18   A.  Yes, he is.
19        MR. ANTHONY:  Mr. Martens, I think you've been
20   identified, but could you just stand up and show the jury
21   who you are again.
22   BY MR. ANTHONY:
23   Q.  So he was your boss?
24   A.  Yes.
25   Q.  And just tell the jury what his role generally was in

1    the Petters assignment that you were working on.

2    A.  Sure.  So, like I mentioned, he was the lead engagement

3    partner on the project.  In general he had oversight over

4    everything that we were doing.  He was -- you know, I will

5    say he was very much present.  Even during the internship

6    while I was down in the cage, Ted made sure to come down and

7    check in on us at least a couple times a day.  And I think

8    he was, you know, in that case very interested in the

9    documents we were finding as well.  But in general, you

10   know, always working under Ted's direction.

11   Q.  And I neglected to ask you:  Over the years, has your

12   career progressed at PwC?

13   A.  Yes.

14   Q.  Just give the jury an idea of the different positions

15   you've held over the 13 years you've been there.

16   A.  Sure.  So, as I mentioned, I started as a summer intern,

17   but over the years working on the Petters engagement I was

18   promoted from -- beginning full-time from what was the

19   associate level up to senior manager in 2019.  At that point

20   I changed roles.  I am currently a director at the firm

21   working in our ethics compliance office.  But, as Joe

22   mentioned, during those first 12 years I primarily worked on

23   the Petters investigation.

24   Q.  Now, I'm going to -- I'm going to show you a document

25   that's already in evidence.  It's going to be Plaintiff's

Kiefer - Direct

1    Exhibit 769, and I'm going I'm going to tell you I can show

2    you that document because it's in evidence.

3          And then we're going to go through documents that

4    aren't in evidence, and we're going to follow a different

5    procedure.  I'm not going to be able to show them to the

6    jury until they're admitted into evidence.

7          So I just want to lay out for you the process so

8    there's no mystery to you or the jury why you will be seeing

9    something, counsel will be seeing something, the Judge will

10   be seeing something, but the jury won't until the Judge

11   either admits it into evidence or not.

12         Okay?  Are you ready?  Are you with me?

13   A.  It makes sense.

14         MR. ANTHONY:  So, Ms. Ellig, who's operating

15   TrialDirector there, would you bring up Exhibit 769, which

16   is already an exhibit.

17   BY MR. ANTHONY:

18   Q.  And would you tell the jury what Exhibit -- first, what

19   is Exhibit 769?

20   A.  Sure.  So this is an Excel spreadsheet that was produced

21   by BMO.  What it includes is a list of all the wire

22   transfers -- incoming and outgoing wire transfers for the

23   PCI M&I account, and so that's account number ███9018.

24   Q.  Okay.  So let me ask you this:  An Excel spreadsheet,

25   what is an Excel spreadsheet?

1    A.  So it's really just more of a computer version of what

2    would have been -- could have been hardcopy records.  So,

3    for example, if you were to receive, you know, a monthly

4    bank statement or a wire that showed the amount, the date of

5    that transaction, the payor or payee, this is an electronic

6    version of that same information.

7    Q.  So give the jury an idea of how big this Excel

8    spreadsheet, Exhibit -- Plaintiff's Exhibit 769, is, please.

9    A.  So this file specifically, it covers the time period

10   January 2002 through September 30th, 2008.  And there are

11   just over 23,000 wire transfers in here.  So over 23,000

12   rows, it should be.

13   Q.  Okay.  So in terms of pages -- I mean, I think in terms

14   of pages, not rows -- is that 2,000 pages?

15   A.  I couldn't say, but it would be a significant number.

16   Q.  Okay.  So it's pretty voluminous?

17   A.  Yes.

18   Q.  All right.  And let's talk about -- again, this shows --

19            MR. ANTHONY:  And maybe, Ms. Ellig, if you could

20   just pause there.

21   BY MR. ANTHONY:

22   Q.  And, Mr. Kiefer, if you can just pick a line and just

23   give the jurors an idea of what a line looks like of these

24   23,000 lines.

25   A.  Sure.  So the first full row that I could see here, it's

Kiefer - Direct

1    Row 23040, basically what you see there, the first row is

2    showing the transaction date.  So if I can read this

3    correct, that's -- it would be August 26th, 2008.

4              And then each of the other rows here are

5    representing information related to that wire transaction,

6    to include the account number that it's going to or from,

7    the payor and payee of that transfer, the amount of that

8    transfer, things of that nature.

9    Q.  And so this is a BMO record, a bank record?

10   A.  Yes.

11   Q.  And it runs across a number of lines, and if and when

12   the jury is in the deliberation room and it wants to pull it

13   up electronically, they'll know that Exhibit 769 is this

14   23,000-line Excel spreadsheet, correct?

15   A.  Correct.

16   Q.  Now, I'm going to ask -- I'm going to ask Ms. Ellig to

17   put up for your -- for the Court, for you, and opposing

18   counsel Exhibit 767 so you can see it.  I'm going to ask you

19   to authenticate it.

20             MR. ANTHONY:  Can you put it on his screen,

21   Ms. Ellig?

22             MS. ELLIG:  He has a binder.

23   BY MR. ANTHONY:

24   Q.  You have a binder in front of you?

25   A.  I have a copy here, yes.

Kiefer - Direct

434

1   Q.  Take a look at Exhibit 767, please, and just identify

2   that, please, for the Court.

3   A.  So this is -- it's a summary schedule that reflects --

4   it's sourced from the Excel spreadsheet that we were just

5   looking at.

6   Q.  That's Exhibit 769?

7   A.  Yes.

8   Q.  So 767 is based on 769?

9   A.  Correct.

10  Q.  Go ahead.

11  A.  And really what it shows is a summary of the incoming

12  wire transfer totals and outgoing wire transfer totals by

13  month.  So whereas the Excel spreadsheet, every wire

14  transfer was on a separate row, here it's summarized by

15  month.

16          The spreadsheet also shows -- it has a couple

17  other columns.  It shows the difference between the incoming

18  and outgoing wire totals, what amount of the total incoming

19  wire transfer amounts came from Nationwide and Enchanted.

20          And then also at the end of it, the schedule, it

21  shows the total incoming wire amount and outgoing wire

22  amount from Metro Gem, again, on a monthly basis.

23  Q.  Now, have you reviewed the information in Plaintiff's

24  Exhibit 767 to determine if it fairly and accurately

25  summarizes the information that was taken from Plaintiff's

435

1    Exhibit 769?

2    A.  Yes, I have.

3    Q.  And does it -- does Plaintiff's Exhibit 767 fairly and

4    accurately summarize the information that's summarized from

5    Plaintiff's 769?

6    A.  Yes, it does.

7            MR. ANTHONY:  We offer Plaintiff's 767, Your

8    Honor.

9            MS. GITTES:  No objection.

10           THE COURT:  Exhibit 767 is received in evidence.

11           MR. ANTHONY:  Now may I publish it, Your Honor?

12           THE COURT:  You may.

13           MR. ANTHONY:  Thank you.

14   BY MR. ANTHONY:

15   Q.  So we now see Exhibit 767, and you mentioned that it

16   shows volume and percentages of incoming wires.  And what

17   I'd just like you to do is go across the top and tell the

18   jury what is in each column so that, if and when they look

19   at this 767, which summarizes that voluminous document,

20   they'll know what they're looking at.  Okay?

21   A.  Sure.

22   Q.  So what's in the first column?

23   A.  The first column is the month.  So in this case, if we

24   look at the first row, January 2022 -- or, sorry, 2002.

25   Q.  Okay.  And so you've taken it from 2002 to 2006 on the

Kiefer - Direct

1    first page, and it goes all the way on the second page to

2    two thousand -- to September 2008, correct?

3    A.  Correct.

4    Q.  All right.  Let's look at this first column, then.

5    A.  Next column is the total incoming wire amount.  So this

6    would show for each of the months, in the first column, the

7    total amount of incoming wire transfers.

8    Q.  Okay.

9            MR. ANTHONY:  And I'm not going to go to,

10   Ms. Ellig, the first and second pages.  We're just going to

11   go through the first page here right now so we can get each

12   of these columns identified.

13   BY MR. ANTHONY:

14   Q.  And what's the second column?

15   A.  The second column is the total of the outgoing wire

16   transfer amounts in each month.

17   Q.  And then the third column is what?

18   A.  That's just a -- it's the difference between the two.

19   So it would be the absolute value of -- you know, the

20   calculation of the total incoming less the total outgoing.

21           MR. ANTHONY:  So leave that up for a second,

22   Ms. Ellig.

23   BY MR. ANTHONY:

24   Q.  Because there's a little what, I guess, is a delta,

25   right?  Is what that is up at the top?

1   A.  Yes.

2   Q.  And that means difference?

3   A.  Difference, correct.

4   Q.  So Column 3 is the difference between the incoming and

5   outgoing wires, correct?

6   A.  Correct.

7   Q.  All right.  Let's look at the next column, please.

8   A.  So the next column is the amount of the incoming wires

9   that came specifically from the payor, Nationwide.  So it's

10  a subset of the total incoming wire amount in the column

11  that's Column A.

12  Q.  Okay.  So Column A is all incoming wires; Column D is

13  the wires from Nationwide?

14  A.  Correct.

15  Q.  Okay.  Let's look at the next column, please.

16  A.  The next column, it's a percentage of the incoming wires

17  that total in A, the percentage that's coming from

18  Nationwide.  So in this case, in January of 2002, 37 percent

19  of the incoming total came from Nationwide.

20  Q.  Okay.  And then let's look at the next column, F.

21  A.  And so this is, once again, total incoming wires, but

22  specifically for the payor Enchanted.

23  Q.  And we've heard some testimony so far about Nationwide

24  and Enchanted.  And as I look at this column, let's -- so if

25  you go down this column, it goes from 10,258,000 and then,

1    like, the fourth or fifth line up from the bottom it's up to

2    420 million.  It goes from 10 million to 420 million, is

3    that -- am I reading that right?

4    A.  Yes, that's correct.

5    Q.  So 10 million to 420.

6         And if I go to the second page, we'll be able to

7    see in that Enchanted column also a similar progression of

8    numbers, correct?

9    A.  Correct.  It was higher in certain months, lower in

10   other months.  In this case, on the second page it does

11   decrease slightly towards the end there.

12   Q.  Okay.  Let's go back to the first page.  The next

13   column, G, what is Column G?

14   A.  So Column G, it's the percentage of the total incoming

15   wire amount that's in Column A that's coming from the payor

16   Enchanted.  Similar to the calculation with Nationwide, what

17   is the percentage of the total that's coming from Enchanted.

18   Q.  Okay.  So I'm getting it now.  You've got the Nationwide

19   percentage, the Enchanted percentage of each of the incoming

20   wires, correct?

21   A.  Right.

22   Q.  So now let's go to Column H.

23   A.  So Column H, it's a sum of the Nationwide and Enchanted

24   columns.  So this is just showing the total incoming wire

25   amounts from those -- from both of them.

1    Q.  So Column H, if I'm reading your mathematical equation,

2    H equals D plus F.  So you're taking Columns D and F and

3    adding them together and you come up with Column H, correct?

4    A.  Correct.

5    Q.  And this is the total combined incoming wires from

6    Nationwide and Enchanted for the period January 2002 to

7    September of 2008, correct?

8    A.  That's correct.

9    Q.  And if I look at the next column, that will give us the

10   percentages, will it, of the total incoming wires that

11   Nationwide and Enchanted represent?

12   A.  Correct.

13   Q.  So it starts somewhere around 47 percent, goes up and

14   down, and then by the time you get to what looks like

15   October or so of 2005, it's up to -- or maybe even sooner

16   than that, 2004 -- it goes to 60, 70, 80 percent, correct?

17   A.  Correct.

18   Q.  All right.  And then let's look at the next two columns,

19   please.

20   A.  The next two columns, so these are the total incoming

21   and outgoing wire amounts for Metro Gem.

22   Q.  Now, did I also ask you to search Exhibit 769, the

23   23,000 lines, to see if you could find any wire payments

24   from a payor by the name of Walmart?

25   A.  Yes, you did.

Kiefer - Direct

```
1    Q.  Did you find any?

2    A.  No.

3    Q.  Did I ask you to search for a record in the bank's

4    records of any payment from Target?

5    A.  Yes.

6    Q.  Did you find any?

7    A.  No.

8    Q.  Did I ask you to search for a record of any wire payment

9    from Best Buy?

10   A.  Yes.

11   Q.  Did you find any?

12   A.  No, no wires from Best Buy.

13   Q.  Did I ask you to search for a wire payment from Costco?

14   A.  Yes, you did.

15   Q.  Did you find any?

16   A.  No.

17   Q.  How about Sam's Club?

18   A.  No.

19   Q.  How about a company by the name of Boscov's?

20   A.  Boscov's, no.

21   Q.  Boscov's.  Thank you.

22          How about BJ's, did you find any wire payments

23   from BJ into this account at M&I Bank --

24   A.  No.

25   Q.  -- BMO Bank?
```

Kiefer - Direct

1    A.  Nothing from them as well.

2    Q.  So if we look back at 767, just to -- did you -- are

3    these columns on 767 totaled up at the -- on the bottom of

4    the second page?

5    A.  Yes.

6              MR. ANTHONY:  And, Ms. Ellig, are you able to draw

7    out a total line?

8    BY MR. ANTHONY:

9    Q.  So, Column D, which is the percentage of wires coming

10   in from Nationwide and Enchanted, comes to roughly

11   24 million -- 24,834,863,807.16, correct?

12   A.  Yes.  It would be in Column H, yes.

13   Q.  And what is the percentage of total wires that that

14   represents?

15   A.  In this case, 67 percent.

16   Q.  Okay.  Now, in the --

17             MR. ANTHONY:  You can take that down, please,

18   Ms. Ellig.

19   BY MR. ANTHONY:

20   Q.  And in the book before you there's a document marked as

21   Exhibit 768, Plaintiff's 768.  Do you have that in front of

22   you?

23   A.  Yes, I do.

24   Q.  Without telling us any of the details of what's on that

25   document, can you tell us what the document is intended to

Kiefer - Direct

```
1    show?

2               MS. GITTES:  Objection.

3               THE COURT:  Overruled.

4               THE WITNESS:  So this -- essentially, it's a

5    summary also showing the total wire amounts in the account,

6    but it's showing it for the date ranges of AML alerts versus

7    monthly.

8    BY MR. ANTHONY:

9    Q.  Okay.  Where did that information come from?

10   A.  The information came from the same Excel spreadsheet

11   that -- the wire totals came from the same Excel

12   spreadsheet.

13   Q.  That's Exhibit 769?

14   A.  Correct.

15   Q.  Which is already in evidence?

16   A.  Correct.

17   Q.  Now, did you also -- to get the dates of the alerts and

18   the time of the alerts, did you look at another document

19   that's in evidence?

20   A.  Yes.

21   Q.  And I'm -- we've seen Exhibit 183, which are the alerts.

22   In fact, we've seen them in these videos for the last day

23   and a half or so and we've seen witnesses talking about

24   them.

25               Is Exhibit 183, the one that's in evidence, the
```

Kiefer - Direct

1    100-page document that you draw -- that drew the dates for

2    the alerts and the numbers for the alerts from?

3    A.  Yes, that's correct.

4    Q.  So does your Exhibit 768 have the alert number, the date

5    for the alert, and information drawn from Exhibit 769 to

6    show which wires came in and which months when there were

7    alerts?

8    A.  That's correct.

9    Q.  And does Exhibit 768 fairly and accurately summarize the

10   information in Plaintiff's Exhibit 769 and Plaintiff's

11   Exhibit 183?

12   A.  Yes, it does.

13           MR. ANTHONY:  We offer Plaintiff's Exhibit 768

14   pursuant to Rule 1006 of the Federal Rules of Evidence.

15           MS. GITTES:  Defendants object.  Could we

16   approach, Your Honor?

17           THE COURT:  You may.

18           Members of the Jury, you're free to talk among

19   yourselves or take a stretch break while counsel is at

20   sidebar.

21       **(At sidebar)**

22           MS. GITTES:  So this is obviously the same issue

23   we've raised earlier, but the specific question, now that

24   we've looked at these, is the alerts cover, according to

25   this, multiple months and it's -- it requires interpretation

Kiefer - Direct

1   of these documents to figure out how to match them up.

2           And, for example, there are months where

3   there's -- they're represented in two rows and then there's

4   a month missing.  March, April -- I can find it as we're

5   talking.

6           So, Your Honor, my -- I would just expand upon the

7   objection we made this morning.  This is -- this requires

8   analysis of these AML alerts that Mr. Kiefer -- he's here as

9   a 1006 witness.  He's not here to testify as to the overlay

10  of AML with the wire transfers.

11          And if they want to use it as a demonstrative, I

12  think -- or separate it, as Your Honor suggested, but to put

13  it together in this way as a 1006 exhibit I think

14  requires -- we're not able to cross-examine him effectively

15  because he doesn't have the AML knowledge in order to match

16  the two up.  And 1006 is clear that you need to have the

17  ability to effectively cross-examine in order for it to be

18  admitted.

19          MR. ANTHONY:  He just took the dates off the AML

20  alerts as they exist.  And if they want to say he overlapped

21  them or didn't get them right, they can say ask him that,

22  but he --

23          MS. GITTES:  But he doesn't have -- I apologize.

24  Go ahead.  Sorry.

25          MR. ANTHONY:  It's okay, Susan.

Kiefer - Direct

1          He just took the information off the two exhibits

2     and put them together.  If we separate them -- I don't think

3     we should because I think it's just going to add more

4     confusion for the jury -- what they will then have is a

5     separate document with AML alerts and a date here and then a

6     separate document with the other information.  We'll have to

7     put the two documents together, which will be very difficult

8     to do electronically on the screen in the jury room.  That's

9     why you put it together.

10          They can -- they can cross-examine him.  They can

11     put their own expert up.  They can bring in someone else to

12     say, no, this is the way it should look.  But this is a fair

13     summary of the evidence, and it's designed to avoid the jury

14     having to look at 23,000 lines and 100 pages and try to

15     match them up themselves.

16          MS. GITTES:  And, Mr. Anthony, that's why we

17     didn't object to the summary exhibit, and I can cross him

18     effectively on that.  The problem is alerts can span

19     multiple months.  He's not qualified to speak to that.

20          MR. ANTHONY:  You can ask -- I'm sorry.  I'm

21     sorry.

22          MS. GITTES:  And so, as a result, he's allowed to

23     bring in and create as an exhibit something that involves

24     kind of a foundational issue he's not qualified to testify

25     about.

Kiefer - Direct

 1          MR. ANTHONY:  Well, that would be something I

 2     think you could show, that he took the wrong dates and put

 3     them on the schedule and then you'd impeach him with that.

 4          MS. GITTES:  It's not even he took the wrong

 5     dates.  It's that they span multiple months and it involves

 6     how alerts get combined.  And so it's just misleading to say

 7     that the way the alerts come in is how they're represented

 8     here.  I think that's our issue, is that as 1006 it's

 9     supposed to be a summary, not a kind of persuasive piece.

10          MR. ANTHONY:  Well, it's --

11          THE COURT:  It can be offered for demonstrative

12     purposes, it is not in evidence, without the foundational

13     background purposes of establishing its authenticity and

14     accuracy.

15          MR. ANTHONY:  So our -- in anticipation of their

16     objection, we came up with a number --

17          THE COURT:  So the objection is sustained.

18          MS. GITTES:  Thank you, Your Honor.

19          MR. ANTHONY:  Here is the breaking them apart,

20     which is what they suggested, and it shows the date range

21     that's in the alerts.  And so if they have an objection that

22     somehow we were saying it was -- it shows date ranges from

23     the alerts, there's no interpretation.  We would offer that

24     exhibit.

25          MS. GITTES:  Your Honor, first of all --

Kiefer - Direct

```
 1                MR. ANTHONY:  Excuse me.

 2                MS. GITTES:  Oh, I thought you were done.

 3                MR. ANTHONY:  No, I'm not.

 4                MS. GITTES:  Okay.

 5                MR. ANTHONY:  And then the next exhibit, Your

 6      Honor, would be 805, which would be the -- Mike, would you

 7      hold that, please?

 8                MR. COLLYARD:  You bet.

 9                MR. ANTHONY:  805 would be the information from

10      Exhibit 169 -- or 769.  Here you go, Susan.  And the jurors

11      would be -- all they have to do is put them side by side,

12      Your Honor, and they will see that one -- that's how they

13      go, side by side, and that cures their problem that he

14      somehow created some persuasive exhibit that isn't accurate.

15      That's the way they suggested we do it and that's --

16                THE COURT:  Who is "they"?  I don't understand

17      what you're arguing.

18                MR. ANTHONY:  I'm sorry.  That's the way the

19      defendant suggested this morning that we -- when you asked

20      if you put them on two separate exhibits, would that cure

21      your objection, I think it was Ms. Davis said yes.  And so

22      that's what we did during the break, is put them on two

23      exhibits to cure their foundational objection.

24                MS. GITTES:  We continue to object because this

25      same issue applies as to Mr. Kiefer.  He can't lay a
```

Kiefer - Direct

```
1       foundation as to how these alerts match with time.

2               And the same problem applies here because, as you

3       see, one is March.  This one -- line 2 and 3 have May

4       overlapping.  I can't cross-examine him effectively on why

5       that happened.  He's not an AML expert.

6               This is something you could have done through

7       expert testimony.  You didn't.  And so I -- I have no

8       problem with the other exhibits.  If he wants to testify to

9       just the compilation of this, I mean --

10              THE COURT:  When you say "the compilation of

11      this," you mean?

12              MS. GITTES:  Yes, Your Honor.

13              THE COURT:  Exhibit 804?

14              MS. GITTES:  Which we just saw, so we haven't had

15      a chance to look at until now.  But I think the same issue

16      applies.  He's conflating alerts.  There are more alerts

17      than this in this case, and I can't effectively

18      cross-examine him on that.

19              MR. ANTHONY:  From a foundational standpoint,

20      let's -- where do you see more alerts than appear?

21              THE COURT:  So there are more than 19 alerts, is

22      what you're arguing?

23              MS. GITTES:  Yes.  There are -- that's the reason

24      why these time periods -- and, again, this is not what I

25      understand from the witness.  This is what I understand from
```

Kiefer - Direct

1    my colleagues.

2              For instance, these span different time periods.

3    So some are one month.  Some are two months.  And that's

4    because of the way -- I'm sorry, I'm looking at the other

5    exhibit -- it's because of the way they combined the

6    information.

7              And, again, I'm -- there are witnesses with whom

8    they could put this on, I don't doubt that, but it's not

9    Mr. Kiefer.

10             MR. ANTHONY:  As a summary, I think it's a fair

11   summary of the two exhibits.  And I think he can be

12   questioned about if they think he's got the wrong

13   information.

14             THE COURT:  I just -- what does Kiefer testify

15   about?  He can testify about this?  He has personal

16   knowledge about this?

17             MR. ANTHONY:  That it's taken from the records,

18   yes.

19             THE COURT:  He has personal knowledge about this?

20             MS. GITTES:  I don't believe he does.  He created

21   the document, but the same problem --

22             MR. ANTHONY:  No, we don't have -- I don't think

23   we have the --

24             MS. GITTES:  Well, it's the way you're grouping

25   the time periods has the same issue.

1          MR. ANTHONY:  He's going to say this accurately

2     reflects what's in 183 and 769.

3          THE COURT:  I -- does it accurately reflect?

4          MS. GITTES:  I haven't had a chance to go back in

5     this format.  The problem is, Your Honor, what he's doing is

6     taking timeframes, so it's April 2005, May 2005 -- to

7     understand how he's splitting the difference there, I have

8     to go into the AML alerts, but he's not qualified to testify

9     about the AML alerts.  And the dates here, there's

10    multiple --

11         THE COURT:  Why isn't he qualified to testify

12    about the AML alerts?

13         MS. GITTES:  He's a 1006 witness who's testifying

14    as to the summary of information.  Let's look at the alerts.

15         THE COURT:  Okay.

16         MS. GITTES:  There's multiple alerts for each

17    month.  There's more alerts here (indicating) than are on

18    here (indicating).  And so, frankly, I don't see how we --

19    this has alerts for every month.  This is separate.  It's

20    contextualizing in a way that -- it requires AML expertise

21    that Mr. Kiefer just doesn't have.

22         MR. ANTHONY:  I don't think it requires AML

23    expertise.  He's taken periods of time from Exhibit 183, and

24    he set it here from 2002 to 2008, and he's taken those

25    months and all he's done is taken these months and said

1    these are the wire transfers that have occurred in these

2    months.

3              If you think they're inconsistent -- excuse me.

4    If you think they're inconsistent with the AML alert

5    information, he's taken the wrong information and this

6    falsely is not a fair summary, then I think it's proper

7    examination; Mr. Kiefer, this is not fair and here's why.

8    And then he can either explain it or he can't.

9              MS. GITTES:  I think the same problem applies,

10   Your Honor.  For instance, this is Alert -- let's look at

11   this one.  This is Alert 56795.  I don't see Alert 56795 on

12   here (indicating).

13             And so this is not something where I can

14   effectively cross-examine him in a way that's going to make

15   any sense to the jury.

16             I think we're kind of handcuffed because he

17   obviously -- and I understand he's a 1006 witness, but he's

18   knowledgeable about the things you want him to be

19   knowledgeable about.

20             But if I stand up there and say, well, there's

21   multiple alerts, then he's not going to be able -- either

22   he's going to do it or he's going to do it based on his

23   information having worked on this case for ten years and --

24             MR. ANTHONY:  And you can -- I'm sorry.  I'm

25   sorry.

1          MS. GITTES:  And so I don't think we can fairly

2    cross-examine him given -- this isn't just a summary

3    exhibit.  It involves a compilation and a qualitative

4    pairing of information related to the alerts.

5          And, frankly, as we said this morning, it goes to

6    the bedrock of their case.  This AML alert issue is

7    something that these fact witnesses are testifying to.  I

8    think, frankly, it would be far less confusing to the jury

9    and far less prejudicial to us to be able to do it through

10   that witness -- through another witness.  You're going to

11   get other AML witnesses.  Mr. Kiefer, he's not that person.

12         MR. ANTHONY:  Yeah, the summary -- it's a summary

13   of the time period.

14         MS. GITTES:  But it's --

15         MR. ANTHONY:  Excuse me, Susan.  It's a summary of

16   a time period.  If you think he has mischaracterized either

17   the alerts or the time period in his summary, then that's

18   fertile grounds for a cross-examination.

19         THE COURT:  It seems to me there needs to be

20   foundation that establishes the accuracy of the evidence

21   that's being presented.  Can he provide the foundation for

22   the accuracy of the evidence that can be presented?  And if

23   he can't, then another witness can do it and then he can do

24   his summary analysis.  But you can't put the cart before the

25   horse because it will be confusing to the jury.

Kiefer - Direct

1              MR. ANTHONY:  So what I will do is I will ask him

2      where he got this information.  And if he says he got it

3      from the AML alerts, and that's what the source is of the

4      document in evidence, that he used that to create this list

5      and that this list is from 769, then I think he's met the

6      foundational requirements.

7              THE COURT:  Why is that not true if the AML alerts

8      are in evidence?

9              MS. GITTES:  The AML alerts are in evidence.  What

10     isn't in evidence is how he's combining under one alert, for

11     example, 60827, November 2005 to February 2006.  I know

12     there are witnesses who can testify to how these things come

13     together.  But if we look at these alerts, they don't match.

14     November 2005, 60827, but then December 2005, 61806, but

15     that's included here.

16             So, from my perspective, to try to cross

17     Mr. Kiefer on this involves an understanding of how AML

18     alerts work, and that's outside the scope of his testimony.

19             MR. COLLYARD:  Could I see your 60827?  I'm sorry.

20     I want to show Mr. Anthony.

21             THE COURT:  And my question is why he can't be

22     called after there's proper foundation laid for the purpose

23     of this question or this type of evidence that you're trying

24     to put in.  Maybe that's all you want him to do.  Okay.  So

25     then it seems to me he may have to come back another time.

Kiefer - Direct

```
 1              MR. COLLYARD:  Here's the alerts that this is
 2    closed under, 60827.  They've got the dates and --
 3              MR. ANTHONY:  So here's how it works.  Susan, I
 4    didn't get your last name.
 5              MS. GITTES:  Gittes.
 6              MR. ANTHONY:  Ms. Gittes, what Mr. Kiefer did was
 7    is he went to this alert, and it has all these other alerts
 8    that are closed within this alert.  So rather than breaking
 9    this alert out, which is one of these here, into three or
10    four or five, thereby making it more confusing, he took the
11    one alert that was closed out and the month that it was
12    closed out and he listed it here.
13              And they can point that out and say, well, you
14    didn't take all five alerts.  And he's going to say I took
15    the one alert that got closed out that contained the other
16    alerts and that's how I listed it.
17              THE COURT:  What's the significance of it being
18    closed out?
19              MR. ANTHONY:  Because the ones that were --
20    existed all get rolled up into the one alert.
21              MR. COLLYARD:  Like this one (indicating).
22              MR. ANTHONY:  Like this one here (indicating).
23              MS. GITTES:  Are you done?
24              And that's the foundational point that he's not
25    qualified to testify to.  They can ask an AML witness about
```

Kiefer - Direct

1    that.  They can ask their expert about that.  But

2    Mr. Kiefer, then he's providing a substantive analysis of

3    what's in this document in order to make that chart, and I

4    don't think that's what -- that's far beyond the bounds

5    of --

6           MR. ANTHONY:  I don't think he's making any

7    analysis.  He's taking this alert, which is an alert that

8    closed out.  Whatever is on here, he's saying I take this

9    alert on this date and I closed -- it was closed out, I put

10   it on here, and this was the wires for that month.

11          THE COURT:  It seems to me there's a foundational

12   problem, though, and it goes to the sequence of the evidence

13   that's being presented.  There isn't the underlying evidence

14   and someone who can offer that underlying evidence so that

15   he can then do the summary analysis that explains it to the

16   jury.

17          MR. ANTHONY:  And so I -- what I hear you saying,

18   Judge, is that we need -- and I think for foundational

19   purpose, I'm always entitled to ask what's missing of

20   Ms. Gittes.

21          And so the foundation that we think appears to be

22   missing is that someone has to come in and say whatever

23   alert number he's got here consists of these three alerts

24   that have been closed out, rolled up and consolidated into

25   this alert.

Kiefer - Direct

1              THE COURT:  Someone has --

2              MS. GITTES:  And --

3              MR. ANTHONY:  Okay.  Is that what you're saying,

4    Ms. Gittes?

5              MS. GITTES:  I didn't realize you were speaking,

6    Your Honor.

7              THE COURT:  It seems to me, as a principle matter,

8    someone has to say that and they have to have the authority

9    to be able to say it.

10             MS. GITTES:  Well, but --

11             THE COURT:  And so maybe it's a question of the

12   order in which the witnesses are called.

13             MS GITTES:  The other -- my apologies.

14             MR. ANTHONY:  And so I think Mr. Collyard, who was

15   doing the first two witnesses, says that this has already

16   been covered in the alerts thus far.

17             MS. GITTES:  I don't -- I don't believe that's

18   true.

19             I also believe that when you -- you need someone

20   to testify to this (indicating) who actually understands

21   these alerts.  You can put Ms. Ghiglieri up.  You can do it

22   through your expert.  But this --

23             THE COURT:  Let's make a clear record.  You need

24   someone to --

25             MS. GITTES:  I apologize, Your Honor.  Thank you.

1          THE COURT:  -- testify as to proposed --

2          MS. GITTES:  As to --

3          THE COURT:  -- Exhibit P-805.

4          MS. GITTES:  As to proposed Exhibit P-805 in order

5     to explain how you are proposing to summarize a single alert

6     under multiple alerts and --

7          MR. ANTHONY:  Okay.

8          MS. GITTES:  And the reason I say that is that it

9     involves questions that go to the substance of the alerts

10    that are at the core of your -- at the core of your case.

11         And so I think that is -- it's not just that these

12    alerts get rolled up into one.  You've got to be able to

13    explain how they come together, and then we need to be able

14    to cross-examine someone on the fact that this information

15    was not going to AML analysts in this form at that time.

16         So I think you are exceeding the bounds of what

17    Mr. Kiefer can do given what you want to use this for.

18         MR. ANTHONY:  So if we can have someone explain

19    how these various alerts get rolled up into here, then it

20    meets your objection?

21         MS. GITTES:  Well, my point is if you can have

22    someone explain this (indicating) who is not Mr. Kiefer,

23    someone who understands AML and who can speak to that

24    factually, then Mr. Kiefer -- and maybe we would stipulate

25    to it, I don't know, or maybe we can talk about whether it

Kiefer - Direct

 1    would be a demonstrative -- can talk about how the two might

 2    come together.  But this (indicating) involves the substance

 3    of --

 4              THE COURT:  Let's say what "this" is.

 5              MS. GITTES:  P-804 involves the substance of the

 6    alerts that are the subject of testimony for many AML

 7    analysts and other witnesses that are coming over the next

 8    few days, how these two things come together and what

 9    amounts of funds that would have come within these wire

10    amounts, these alert amounts.

11              MR. ANTHONY:  We think that Ms. Pesch can lay that

12    foundation.

13              MR. COLLYARD:  Yes.  And the other two witnesses

14    have testified to [inaudible] --

15              COURT REPORTER:  I'm sorry.  I can't hear you.

16              MR. COLLYARD:  Is it okay if I speak, Your Honor?

17              THE COURT:  Yes, it is.

18              MR. COLLYARD:  Because I know we're supposed to

19    have one attorney speaking.

20              THE COURT:  At this point on this particular

21    issue, I very much appreciate it.

22              MR. COLLYARD:  Okay.  Thank you.

23              THE COURT:  Respecting the rules that I have laid

24    out, but this is an exception.  Don't consider it an

25    exception for the entire trial.

1          MR. COLLYARD:  Understood.  Understood.

2          THE COURT:  It is an exception under these

3     circumstances.

4          MR. COLLYARD:  Okay.  Understood.

5          THE COURT:  Okay.  Thank you.

6          MR. COLLYARD:  If I can just give you one second

7     of background.

8          What we've heard already from Ms. Hile is I

9     brought her through the alerts and she talked about the

10    closed and multiple stages.  So did Ms. Johnson.

11         And the way that these alerts are closed -- so,

12    for example, Ms. Pesch would testify because this is an

13    alert she closed.  60827 closes, and when she reviewed the

14    alerts, there were four underlying alerts that she reviewed

15    with it and closed it.  And you'll see here it's called the

16    closed to expected activity state.  They're closed as

17    multiple alerts.  And these -- see, closed multiple alerts

18    state.  And she's referencing the underlying alert.  She's

19    referencing the underlying alert.  She does that.

20         And so what Mr. Kiefer did is actually completely

21    accurate because he's following their own -- their own

22    evidence and he says 60827 includes these three or four

23    alerts that are closed underneath it.  And that's why in

24    that chart he lists 60827 with the money going in and out

25    for that particular alert, exactly how the evidence is.  So

1    he's actually being true to the evidence when he's doing it.

2              MS. GITTES:  My point is that P-804 involves an

3    analysis, a substantive analysis, of these documents that is

4    beyond the scope of what Mr. Kiefer can do here.  It

5    involves a -- explaining what underlies each alert.  It

6    involves questions of why this is May 2005 on both sides,

7    why multiple months are spanned.  I don't think Mr. Kiefer

8    can testify to that.

9              And I think if this comes in through Mr. Kiefer,

10   that we are disadvantaged to be able to call someone who

11   knows AML who can talk about the way this was done, because

12   it -- I don't think this is true.  This is one view of how

13   the alerts came in, but it's a -- it's a more complicated

14   story and I don't think we have all those facts.

15             MR. COLLYARD:  And, I'm sorry, but Ms. Johnson and

16   Ms. Hile already testified to these columns.  You've heard

17   the testimony.

18             MS. GITTES:  I don't think we did hear that

19   testimony.  And from my perspective, the point --

20             THE COURT:  Wait.  Tell me more about how this

21   has --

22             MR. COLLYARD:  Sure.

23             THE COURT:  -- already been testified to, because

24   if the issue is that we've already had testimony that

25   supports this summary, then it is admissible.

Kiefer - Direct

1          MR. COLLYARD:  So Ms. Johnson testified to the

2     closed and multiple states alerts when I brought her through

3     the various alerts that she closed and there was evidence

4     not on 60827 because this is Mary Pesch, but on the ones

5     that Ms. Johnson did and I brought her through.

6          The last witness, Ms. Hile, I brought her through

7     this exact -- I brought her through this exact alert as

8     well.  I can't remember if she talked about the closed and

9     multiple states or not, but Ms. Hile had reviewed this as

10    well.

11         But I know Ms. Johnson has the testimony when I

12    walked her through:  Here's the alert.  We saw it pop up.

13    Here's how it was closed.  It included these alerts

14    underneath it.  It was closed in the closed to expected

15    activity state.  That's how it's done.

16         THE COURT:  Okay.  So, then, for those that have

17    already been testified about, there can be questioning about

18    that and there can be an exhibit showing those, but we need

19    to have an exhibit that reflects what the foundational

20    testimony has provided such that the exhibit can come in as

21    an illustrative.

22         MR. COLLYARD:  Okay.

23         THE COURT:  And that's not what this.  It seems to

24    me this has more information, based on what I understand the

25    argument is, than has been provided for purposes of its

1    admissibility.

2              MR. COLLYARD:  So what I would have to do, then,

3    is I would have to go through every one of these alerts in

4    Exhibit 183 and we would have to sit there and I would say,

5    okay, Ms. Pesch, this one was closed.  It's 60827.  It was

6    closed in the closed-expected activity state.  That included

7    this alert number, that alert number, that alert number.

8    Let's go to the next one.  This alert was closed.  It

9    included this number.  It's going to take me an hour and a

10   half to do that, Your Honor.

11             MR. ANTHONY:  A good point he made, Your Honor,

12   was this alert is closed at a specific time and it reflects

13   the alerts within it.  That's the simple way it's done.

14             And we have these alerts.  He took it from their

15   records, not his records.  He took their records and

16   summarized what's in there.  Now they're trying to say he

17   has to interpret their records to take what's facially on

18   them and not put them on a summary because he can't

19   interpret their records.  He doesn't have to interpret their

20   records.  He can take the information that's on the records,

21   summarize it in an intelligent form.

22             THE COURT:  Is there testimony that is consistent

23   with his analysis of what has happened?

24             MS. GITTES:  My understanding is that -- I don't

25   understand -- it is not clear to me how he's bridging these

Kiefer - Direct

```
 1    dates, because if I look at 60827, it says November, but
 2    then it goes all the way to February.  And so my --
 3                MR. COLLYARD:  I can show her.
 4                MR. ANTHONY:  On 183?
 5                MR. COLLYARD:  May I show you?
 6                MR. ANTHONY:  Maybe you could show her.
 7                MR. COLLYARD:  May I?
 8                THE COURT:  Yes.
 9                MR. COLLYARD:  I need your exhibit.  I'm sorry.
10    So this says -- it starts out and it says that's when the --
11    so she's looking at December.  So it's November.  It's
12    December.  And when I see the last one, it's February.  And
13    that's how you get -- that's how you get the Alert 60827,
14    you said.  So you've got November 2005, November 2005 to
15    February 2006, and that's where it says occurred in February
16    '06.  And each one of these alerts matches this
17    (indicating).  60827 was looked at and closed, but 60827
18    sits on top of these other ones because it [inaudible] --
19                THE COURT:  Let me ask you --
20                COURT REPORTER:  I'm sorry.  I'm having a hard
21    time hearing you.
22                MR. COLLYARD:  I had my sleeve over the
23    microphone.
24                COURT REPORTER:  Yes, that doesn't help.
25          (In open court)
```

Kiefer - Direct

```
1              THE COURT:  I'm going to ask -- we're having a

2    sidebar at this time, and it's very difficult for me to hear

3    counsel at sidebar because of the volume of the conversation

4    that's going on in the courtroom.

5              And so I will certainly ask everyone in the

6    audience to please speak in whispers so that I can't hear

7    you and I'll ask the jurors -- I think, frankly, at this

8    point we will excuse the jurors so that you can sit more

9    comfortably in another room while we resolve this issue.

10             Please remember my instructions.  Just leave

11   everything here.  We will resume, but I think it's more

12   comfortable for you to be in the jury room than it is here

13   waiting for us to resolve this issue.

14        (Jury excused)

15                        IN OPEN COURT

16                      (JURY NOT PRESENT)

17             THE COURT:  Okay.  Counsel, I'm prepared to hear

18   your arguments.

19             MS. GITTES:  I think where we left off, Your

20   Honor, is that we were looking at both plaintiff -- oh.

21   Should the witness be excused?

22             THE COURT:  Sir, you are excused for now.

23             THE WITNESS:  Okay.

24             THE COURT:  You're welcome.  But please don't go

25   far.  Thank you.
```

Kiefer - Direct

1        MS. GITTES:  So, Your Honor, may I?

2        THE COURT:  Yes, you may.  And to the extent you

3    need to, let's use the ELMO so that we're all looking at the

4    same document and on the same page and can track your

5    argument.

6        MS. GITTES:  Sure.  Thank you.  Oh, here we go.  I

7    think we want to zoom out, actually.  Oh, there we go.  Yep.

8    Thank you so much.  I really appreciate it.

9        Okay.  So this, just so we have it, is

10   Plaintiff's 805.  And this is Plaintiff's -- let's start

11   with Plaintiff's 804 because I think that's the one we were

12   discussing before.

13       So the issue with Plaintiff's 804 is that in our

14   view Mr. Kiefer cannot -- he does not have the substantive

15   knowledge, given that he is a 1006 witness, to collate the

16   alerts in this way because, in our view, that requires AML

17   expertise that Mr. Kiefer does not have.

18       If plaintiffs would have -- they could have done

19   this through their expert, they could have done this with

20   another witness potentially, but Mr. Kiefer cannot be

21   adequately cross-examined on how alerts come together.

22       And I confess, I was -- I don't have a total

23   mastery of the evidence that came in about how alerts are

24   closed, but we would submit that the inclusion of one alert

25   here and the aggregation of information, which I'll show

1    you, which is clearly what they're trying to do here -- so

2    you have these alerts by time, and that involves knowledge

3    of how AML alerts work.

4              THE COURT:  Okay.  And let's --

5              MS. GITTES:  Yep.

6              THE COURT:  -- make a clear record.

7              MS. GITTES:  Yes.

8              THE COURT:  So I'm a former appellate Judge, and

9    so I'm looking at what this looks like in a transcript

10   should there be an appeal.

11             MS. GITTES:  Understood, Your Honor.

12             THE COURT:  And so let's identify the document.

13   Let's describe what you're talking about.  If you're talking

14   about a particular row, let's make it clear what you're

15   talking about.

16             MS. GITTES:  Okay.  Apologies, Your Honor.

17             THE COURT:  That's quite all right.

18             MS. GITTES:  So for plaintiff's proposed 804,

19   which we received at sidebar, what I understand from

20   plaintiff's counsel is that they believe that this reflects

21   the closing and sort of aggregation of alerts based on the

22   documents that are Plaintiff's Exhibit 183.

23             Defendant's objection is that Mr. Kiefer -- that

24   this goes beyond the scope of what a 1006 witness can fairly

25   do because it involves substantive analysis of the way

Kiefer - Direct

1    alerts work and come together and in a way that, in our

2    view, is beyond the scope of what 1006 permits.

3             Because if I'm going to cross-examine Mr. Kiefer,

4    as Rule -- as 1006 contemplates, I would have to ask him

5    about the substance of AML alerts and how they're closed in

6    a way that he should not be testifying here.  He's a 1006

7    witness.

8             And then I'll move on, if it's okay with the

9    Court --

10            THE COURT:  Yes.

11            MS. GITTES:  -- to the second proposed -- I think

12   this is the other fill-in demonstrative.  Oh, gosh, that's

13   small, I apologize.  And this, Your Honor, connects those

14   same time periods.

15            THE COURT:  And let's turn it so that it --

16            MS. GITTES:  Oh, yeah, sure.  Not my forte.  I

17   apologize.

18            Okay.  So this is Plaintiff's 805, and I think the

19   same issue applies here where it is -- these are being put

20   together for -- with date ranges that are, in my view,

21   confusing.  And 1006 requires things to be clear and

22   actually help the jury.

23            And so there are examples of the way this has come

24   together, including, for example, that in Rows 2 and 3

25   May is split between the two months.  And so that's going to

1    involve an analysis of how the AML alert broke, I guess,

2    across the month.  I don't know.  But I think that's the

3    kind of issue that's raised by this demonstrative -- sorry,

4    this proposed exhibit that is confusing.

5              And the second thing I'll say is it remains

6    prejudicial to defendants to group the alerts in this way

7    because, as Your Honor has heard today, there's a great deal

8    of testimony and plaintiff's apparent theory of the case is

9    very much based on these alerts.

10             And so by aggregating them in this way, when, in

11   fact, there are separate subalerts -- because it's pretty

12   thinly veiled at this point that the time periods have no

13   other meaning, but that they are connected to this -- to the

14   time periods and alert chart on page -- on 804.  For

15   instance, they don't say May 15th, 2005.  They don't explain

16   that.

17             And so -- and they don't -- you know, by

18   aggregating months -- and that may be the way the alerts

19   were dealt with at the moment.  I think plaintiffs have

20   started to elicit testimony and continue to do that.

21             But by putting the information together in this

22   way, it is -- and he already has, Your Honor, the time

23   periods.  The using of these months in plaintiff's proposed

24   805 is tied solely to the AML alerts.

25             He already has -- excuse me.  I have to find it.

1    We did not object, Your Honor, to what is a proper 1006

2    exhibit, which is 767.  That includes the alerts by time

3    period.  And so in our view -- excuse me.  That's the proper

4    1006 exhibit.

5           And the use of these time periods from

6    Plaintiff's 804 and the combining of them is confusing and

7    argumentative in a way that, you know, 1006 exhibits are not

8    supposed to be.

9           And I think that given the number of issues we

10   have moving around here, it is prejudicial to the defendants

11   both to compile the data this way, but also to try to get

12   this exhibit in through someone who is both a 1006 witness,

13   but also, as we heard, worked for PwC for a long time.  He's

14   not supposed to be here in his capacity as a fact witness

15   testifying about this.

16          He was disclosed to us last week.  But if I start

17   probing into what he understands about alerts, I don't know

18   what I'm going to get because we -- you know, he was

19   disclosed to us a few days ago.

20          And so I think defendant's hands are really tied

21   by the amount of information they're trying to tie together

22   here, especially when, Your Honor, this is an exhibit.  It's

23   not a demonstrative.

24          I think if we were talking about a demonstrative,

25   we could have a -- you know, I'd have to look at what they

Kiefer - Direct

1    propose, but I think that could be a different situation.

2    But where you have an exhibit that's going to go back with

3    the jury when they deliberate, there's prejudice and real

4    risk of confusion here.

5              THE COURT:  I understood your argument.

6              MS. GITTES:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              MS. GITTES:  Oh, this is yours.

9              MR. COLLYARD:  Are you giving that to me?

10             THE COURT:  Counsel.

11             MR. COLLYARD:  Yes, Your Honor.  I'll just explain

12   just real quickly what I was explaining up at sidebar, is

13   the way that these alerts are done -- and we were talking

14   about Alert 60827, so I'm going to use that alert as an

15   example.

16             If we put this up here, the way that these are

17   done, and this is what --

18             THE COURT:  And this is -- and you're putting up

19   what?

20             MR. COLLYARD:  This is Exhibit 183, Your Honor.

21             THE COURT:  Thank you.

22             MR. COLLYARD:  And Exhibit 183 is in evidence, and

23   both Ms. Johnson testified to it already and Ms. Hile

24   testified to it already.

25             And what you'll see is in Exhibit 183 -- and

Kiefer - Direct

1      they're not going to dispute this; this is in the record --

2      is Alert 60827, for example.  When the alarms are closed or

3      when the alerts are closed, they close them in one single

4      number.  Now, 60827 has a series of multiple months.

5              And if we go down, it says, "61806" and it talks

6      about how it's closed in the multiple alert state.  And the

7      next one down, 62728, closed in the multiple alert state.

8      And so each one of these -- some of these alerts have

9      multiple alerts underneath it, but they're closed in one

10     alert.

11             So, for example, there are 39 alerts that go off

12     up to this time period that we're talking about.  They are

13     closed in 19 alerts.  Those 19 alert closures are reflected

14     in Mr. Kiefer's summary.

15             And I'll just show you real quickly, Judge, for

16     example, in 60827, when the analysts write it in those

17     alerts -- I'll show you.  And this is also in other alerts,

18     as has been testified to already.  You see Ms. Pesch talks

19     about the incoming wires of $2.562 billion.

20             If you go to Plaintiff's Exhibit 805 and if you

21     look for that month period that we're talking about that

22     Mr. Kiefer has, he's got $2.562 billion.  It matches right

23     up with the alerts.

24             And so what Mr. Kiefer did is all he did was he

25     went to their very own documents, their very own evidence in

Kiefer - Direct

1    this case, and he just simply took the months for those

2    particular alerts and put them into whatever that time

3    period is because that's how the alerts were closed in 19

4    alerts.  And he has 19 entries for that.  It matches up

5    perfectly.  And that's why it's an accurate summary of the

6    evidence.

7            THE COURT:  Anything further on this?

8            MS. GITTES:  I would just make two points briefly,

9    Your Honor.

10           One is I think the amount of explanation it

11   required for Mr. Collyard sort of makes our point for us.  I

12   mean, we've been listening to the testimony, but I don't

13   believe it was clear -- nearly that clear.  And to say

14   there's 19 alerts, I think that really illustrates the

15   problems with Mr. Kiefer trying to be the one to put this

16   evidence in.

17           The second thing I'll say, Your Honor, again, I

18   think the point that may be getting lost here, they have in

19   Plaintiff's 767 a list of months -- oops, sorry, a list of

20   months and amounts, and they did their analysis on that and

21   it includes Nationwide and Enchanted.  They have that.  That

22   gives them most of what they've been asking for here.

23           The thing that is different about proposed

24   Exhibit -- excuse me, I want to make sure I'm looking at the

25   right one -- 805 is that you're combining time periods that

Kiefer - Direct

1    are entirely based on AML alerts and have no other -- you

2    know, it's not clear exactly which days, why they cover

3    which months.

4         And then it also is prejudicial in the sense that

5    you're combining time periods that are solely for AML --

6    excuse me, I apologize, I've got a cut on my finger, that's

7    embarrassing -- the time periods that are particular to AML

8    alerts with this analysis of the incoming wires and the

9    percentages from the entities that are the focus of

10   plaintiff's arguments here.

11        And so our view is that they have everything they

12   need through Plaintiff's 767.  That is the proper 1006

13   exhibit.  This is prejudicial and that Mr. Kiefer doesn't

14   have the necessary information to bring all of this

15   together.

16        Thank you, Your Honor.

17        THE COURT:  I am prepared to rule.  Is there any

18   further --

19        MR. COLLYARD:  No.  Thank you, Your Honor.

20        THE COURT:  The objection is sustained.

21        Are we ready to proceed?

22   (Pause)

23                        **IN OPEN COURT**

24                       **(JURY PRESENT)**

25        THE COURT:  You may be seated.

Kiefer - Direct

 1            And, Members of the Jury, thank you for your
 2     patience.  We were working on legal issues in your absence
 3     from the courtroom.  Thank you.
 4            MR. ANTHONY:  May I proceed, Your Honor?
 5            THE COURT:  Yes, you may.
 6            MR. ANTHONY:  Thank you.
 7            Ms. Ellig, would you bring up Exhibit 769, please.
 8     BY MR. ANTHONY:
 9     Q.  I neglected to ask you about -- a few questions on 769.
10     Now, about midway down on I think it's -- if I'm looking at
11     the right-hand side, there's a reference to where it says,
12     "CDT Name."  What does CDT name refer to?  Name 2, is that a
13     payee, a payor?  Can you tell from that?
14            MS. GITTES:  Objection.
15            THE COURT:  Overruled.
16            THE WITNESS:  I can't tell specifically if it's a
17     payor or payee in this case.
18     BY MR. ANTHONY:
19     Q.  Okay.  Does Exhibit 769 have information from which the
20     jury -- this is the 23,000 lines -- can determine who's a
21     payor and a payee?
22     A.  Yes, it does.
23            MR. ANTHONY:  Bring up Exhibit 767, please,
24     Ms. Ellig.
25     BY MR. ANTHONY:

1   Q.  And this is the just the last couple of questions and

2   then we're going to let you go back to New Jersey.

3            You have the dates and the months on the left-hand

4   side.  Do you see that?

5   A.  Yes.

6   Q.  Now, we heard some testimony about alerts that went off

7   at various points in time.  You weren't here for that

8   testimony.

9            Can -- a review of Exhibit 767, does this show

10  wires that came in and out from Enchanted and Nationwide

11  during the period January 2002 to the end of September 2008

12  when this -- there were Searchspace alerts going off in this

13  account?

14  A.  It does --

15           MS. GITTES:  Objection, Your Honor, both form and

16  foundation.

17           THE COURT:  Overruled.

18  BY MR. ANTHONY:

19  Q.  You may answer.

20  A.  So, yes, it does show that.  The one thing I would -- so

21  you did mention does it show outgoing amounts for Nationwide

22  and Enchanted.  Those wouldn't be in a specific column

23  except for Column B, which shows outgoing wires in total.

24  This particular schedule shows the total incoming amounts

25  from Nationwide and Enchanted.  But, yes, those are -- those

Kiefer - Direct

1    would be included as well in the total outgoing by month

2    here.

3    Q.   Okay.  So, for example, turn to the second page of

4    Exhibit 767, please, Column D, which is -- again, I'm sorry,

5    Column H, which is D plus F.

6    A.   Yes.

7    Q.   And if we go down to the month of March of 2007, if

8    I'm -- I just want to make sure I'm reading this right.

9    1,64 -- why don't you tell us what that number is.  That's a

10   lot of commas.

11   A.   You said for March 2007?

12   Q.   Yes, the incoming wires.

13   A.   So the total incoming amount from Nationwide and

14   Enchanted would be $866,684,854.77.

15   Q.   And then three months earlier -- it reflected what

16   percent of the total incoming wires?

17   A.   82 percent, and that's in the next column.

18   Q.   And then if I go up to December of '06, if I'm reading

19   it right, it's $847,138,356.51?

20   A.   That's correct.

21   Q.   And it's 81 percent for that time period?

22   A.   Of the total incoming wire amount, yes.

23   Q.   And I think the last area I want to ask you about is

24   these incoming wires from Enchanted.  On the first page of

25   Exhibit 767, it's Column F.

Kiefer - Direct

```
1    A.  Yes.

2    Q.  Okay.

3              MR. ANTHONY:  Can you enlarge that, please,

4    Ms. Ellig?

5    BY MR. ANTHONY:

6    Q.  And it -- and as I look at it, it goes from 10 million,

7    and then sometime in October the number increases to

8    115 million.  Then by March of '04 it's 109 million.  Then

9    by March of 2005 it's 211 million.  July of -- August of

10   '05, 275 million.  It eventually gets up to 420 million

11   there on that first page.

12             I haven't asked you -- let me -- I haven't asked

13   you to look for an explanation as to why it jumped like

14   that, have I?

15   A.  No.

16   Q.  And you wouldn't be the person to answer that question

17   in any event, correct?

18   A.  No.

19   Q.  That's not what you're here to talk about, why it jumped

20   so much at that time?

21   A.  That's correct.

22             MR. ANTHONY:  I have nothing further at this time,

23   Your Honor.

24             MS. GITTES:  Just one moment.  May I proceed?

25             THE COURT:  Yes, you may.
```

1                        **CROSS-EXAMINATION**

2     BY MS. GITTES:

3     Q.  Good morning -- afternoon, Mr. Kiefer.

4     A.  Good afternoon.

5     Q.  My name is Susan Gittes.  I'm one of the lawyers for BMO

6     Harris.

7     A.  Nice to meet you.

8     Q.  You testified that you're employed by PwC; is that

9     right?

10    A.  That's correct.

11    Q.  And you said PwC works for Mr. Kelley in this matter; is

12    that right?

13    A.  Yes, we were engaged by Mr. Kelley.

14    Q.  And PwC is being paid for its work on this matter by

15    Mr. Kelley?

16    A.  That's correct.

17    Q.  And you testified a few minutes ago about a series of

18    documents you created; is that right?  Or at least maybe one

19    or two.

20    A.  Yes.  Though I will say these exact documents I didn't

21    create.  There were portions of the documents I helped

22    create.  It wasn't these exact copies.  There were -- what I

23    mean by that, there were a couple columns that were added

24    after the fact.

25                MS. GITTES:  Can I -- well, let's -- can we

Kiefer - Cross

1    please, Mr. Herzka, put up Plaintiff's Exhibit 769, which I

2    believe is the spreadsheet we were just looking at.

3    BY MS. GITTES:

4    Q.  Okay.  And so you testified that this was a spreadsheet

5    produced by BMO Harris in this case; is that right?

6    A.  That's my understanding, yes.

7    Q.  And you used this document to create the chart we -- you

8    were speaking about with Mr. Anthony a few minutes ago?

9    A.  Yes, that's correct.

10   Q.  And this Excel spreadsheet, Plaintiff's 769, you

11   testified it contains data all the way until September of

12   2008; is that right?

13   A.  That's my understanding, yes.

14   Q.  And so you'd agree it wouldn't have been created before

15   September of 2008?

16   A.  I would agree to that.

17   Q.  And you didn't help make this spreadsheet, right?

18   A.  No.

19   Q.  Okay.  And so you testified on direct that you were able

20   to isolate payments from -- or payments into the PCI account

21   from, for example, Enchanted; is that right?

22   A.  Correct.

23   Q.  And is it correct that that information is reflected in

24   Column X with the heading ORP Name?

25   A.  Yes, for the incoming wires on this spreadsheet,

Kiefer - Cross

1    Column X would show the payor information.

2    Q.  And so -- and I'll ask you the same question.

3    Exhibit -- sorry.  Column Y, that includes the recipient of

4    funds going out of the PCI account.  Is that consistent with

5    your analysis?

6    A.  That's my understanding.

7    Q.  And so if I can direct you to Row 2 -- oh, excuse me,

8    Row 3, that says, "Epsilon Global Master Fund," right, on

9    Column X?

10   A.  Yes, correct.

11   Q.  And if we look I believe it's Row 6, it says, "Jaysport

12   International"?

13   A.  Row 7, yes.

14   Q.  Oh, yes.  Thank you.

15            And so if I can direct you one more to Row 58.  If

16   we move over to Column X -- oh, too far, excuse me -- that

17   means that the -- based on the analysis of this document

18   that you did, that means that Redtag Business, Inc.

19   operating account sent money into the PCI account; is that

20   right?

21   A.  That's correct.

22   Q.  And just, you know, to draw your attention to the

23   numbers -- to Column Z briefly, are those the -- am I

24   correct that those are the amounts of the wires?

25   A.  So if you scroll back a few columns, if you keep going,

1    there's a -- there's another column that shows the amount.

2    It's Column J.

3    Q.  Column J.  Thank you.  And so, if I'm right, that

4    777,000 in Row 43, that would be the amount of that wire; is

5    that correct?

6    A.  $779,333.33, that's correct.

7    Q.  That's why you work at PwC and I don't.  Thank you.

8              So if -- and those aren't -- so if I looked down

9    Column J, there's some round numbers in Column J; is that

10   right?

11   A.  Yes.

12   Q.  But there are numbers that aren't round numbers, too,

13   right?

14   A.  Correct.

15   Q.  And so do you know what -- I'm going to guess you do --

16   filtering an Excel spreadsheet --

17   A.  Yes.

18   Q.  -- is?

19             Okay.  And you use filtering, correct, in order to

20   perform the analysis that you discussed with Mr. Anthony?

21   A.  Yes.

22   Q.  And as part of your analysis that Mr. Kelley's counsel

23   asked you to undertake, you didn't calculate how many

24   different entities or people in total sent money into the

25   PCI account; is that right?

1    A.  No, that's correct, I did not.

2    Q.  You did not?

3    A.  Yes.

4    Q.  Thank you.

5         And you also didn't calculate how many entities or

6    people sent -- received money from the PCI account; is that

7    right?

8    A.  That's correct.

9    Q.  Because Mr. Kelley's counsel didn't ask you to do that;

10   is that right?

11   A.  Correct.  Not in this case, yes.

12   Q.  Now, to go back to filtering, if I can direct you to --

13   back to Column X, which, as we discussed a minute ago, is

14   the entities that would have been wiring money into the PCI

15   account; is that correct?

16   A.  Correct.

17   Q.  Okay.  And so I'm going to ask my colleague -- and

18   you're going to make sure he does it right, Mr. Kiefer -- to

19   filter Column X.

20   A.  And if I could just make one clarifying point?  So

21   Column X is always going to show the payor information.  So

22   there are also outgoing wires on this schedule.  So

23   sometimes what's in Column X might not be showing who sent

24   money into the PCI account.  It could also say "PCI" if it

25   were in the case of an outgoing wire.

1          So just to clarify, to only see the incoming

2    amounts, for example, we would need to sort Column U first,

3    which for the, let's say, the PCI M&I account, 1959108, that

4    would then show only incoming wire transfers.  And so

5    everything in that Column X would be the payor who sent it.

6    Q.  Okay.

7          MS. GITTES:  And I'm going to ask Mr. Herzka to do

8    this slightly differently, if he doesn't mind.  Can you

9    filter such that you're right clicking on Column Y such

10   that -- or Column X or Column Y, so that you can pull up the

11   little menu?  I can do it if -- one moment, Your Honor.

12   Will you mind?

13         THE COURT:  Yes, you may.

14         MS. GITTES:  I apologize, Your Honor.  Thank you.

15      (Pause in proceedings)

16         MS. GITTES:  Thank you, Your Honor.

17   BY MS. GITTES:

18   Q.  I apologize, Mr. Kiefer.

19   A.  You're okay.

20   Q.  So if you look at the screen, what I've done is run a

21   filter so that you can see all the different names of

22   entities that appear in Column Y; is that correct?

23   A.  Correct.

24         MS. GITTES:  Can you put that back up, Mr. Herzka.

25   BY MS. GITTES:

1    Q.  And you didn't do this analysis when you were performing

2    your work for this case?

3    A.  I did not -- I did not do any analysis to look for the

4    number of entities, no.

5    Q.  Okay.

6           MS. GITTES:  And so if I can ask Mr. Herzka to

7    scroll down just within that little box there.

8    BY MS. GITTES:

9    Q.  You agree with me there's a large number of entities

10   that are sending money into the PCI account, correct?

11   A.  Yes.  In this case, though, this is Column Y.  This is

12   the beneficiary party.

13   Q.  Oh.

14   A.  So it would be Column X.

15   Q.  Thank you very much.  That's an important clarification.

16           So this is Column Y, which is the money that

17   came -- that went out of the PCI account; is that right?

18   A.  That's correct.

19   Q.  And so all of these names --

20           MS. GITTES:  If we keep scrolling, Mr. Herzka.

21   BY MS. GITTES:

22   Q.  All of these entities would have sent money out of the

23   PCI account; is that correct?

24   A.  They were receiving money out of the PCI account, yes.

25   Q.  Thank you for the clarification.

1              You didn't count them up, correct?

2    A.  No.

3    Q.  Would you disagree with my count if it was over 300?

4    A.  I wouldn't be sure, to be honest.

5    Q.  You -- do you have any reason to doubt my math?  I think

6    we can probably avoid sitting here and counting.

7    A.  No reason to doubt it.

8    Q.  Thank you.

9              MS. GITTES:  And let's do the same for --

10   Mr. Herzka, can we filter Column X.

11   BY MS. GITTES:

12   Q.  Which, as you very helpfully explained, Mr. Kiefer, is

13   the parties that were sending money into the PCI account; is

14   that right?

15   A.  That's correct.

16   Q.  And so Mr. Herzka is going to do the same thing.

17             MS. GITTES:  And click on that little arrow on the

18   top.

19   BY MS. GITTES:

20   Q.  And that -- so what's in that scrolling list are all

21   entities or businesses or people who would have been sending

22   money into the account, correct?

23   A.  Correct.

24   Q.  By my math, there's more than 200.  Does that sound --

25   do you have any reason to disagree with me there?

Kiefer - Cross

1    A.  No reason to disagree.  The only thing I would add is

2    there are probably duplicate entities here because sometimes

3    you can see as you're scrolling through they're spelled

4    slightly different, but they likely refer to the same

5    entity.

6    Q.  Thank you.

7            And now can we please turn to Plaintiff's

8    Exhibit 767.  Do you have that, Mr. Kiefer?

9    A.  Yes.

10   Q.  Thank you.  And is this the document you were -- when

11   you were testifying a few minutes ago where you said you

12   didn't create all the columns on the document?

13   A.  Yes.

14   Q.  And can you explain what you mean by that.

15   A.  Yeah.  So when I initially prepared this schedule, it

16   included -- and I'll just go through the columns -- it

17   included the month, the total incoming and outgoing wires,

18   the total incoming amount from Nationwide, the percentage of

19   that, the incoming amount from Enchanted and the percentage

20   of that, the total VAL percentages as it's represented here.

21           What was added is the -- so Column C, the

22   difference between the incoming and the outgoing wires, as

23   well as the incoming amounts from Metro Gem and the outgoing

24   amounts from Metro Gem.

25   Q.  So you didn't do that analysis here?

Kiefer - Cross

1    A.  I didn't do that analysis, but I did go through this

2    schedule and verify that the amounts that are here are

3    correct and are accurate, and they are.

4    Q.  And so for Plaintiff's Exhibit 767 -- I think we've

5    already covered this -- you created this document at the

6    direction of Mr. Kelley's counsel; is that right?

7    A.  That's correct.

8    Q.  And they told you what fields they wanted to include and

9    which fields they wanted to leave out; is that right?

10   A.  Yes.

11   Q.  So if I can direct you to Column D, and I think you

12   talked about this with Mr. Anthony, which is incoming wires

13   from Nationwide --

14   A.  Yes.

15   Q.  -- what you did was you searched the Excel document that

16   we looked at a few minutes ago for Nationwide at Mr. -- at

17   the request of counsel for Mr. Kelley and you totaled all

18   those up by month; is that correct?

19   A.  That's correct.

20   Q.  And you did the same thing for Enchanted, and you didn't

21   do it for Metro Gem?

22   A.  That's correct.

23   Q.  But as we talked about a few minutes ago, there were a

24   large number of entities other than Enchanted and Nationwide

25   and Metro Gem that were wiring money into the account,

```
 1    right?

 2    A.  Yes.  There were other entities, yes.  There were other

 3    entities, yes.

 4    Q.  And you didn't do any calculation of those amounts; is

 5    that right?

 6    A.  That's correct.

 7    Q.  Because Mr. Kelley's counsel didn't ask you to do that?

 8    A.  Correct.

 9            MS. GITTES:  That's all I have.  Thank you, Your

10    Honor.  Thank you, Mr. Kiefer.

11            THE WITNESS:  Thank you.

12            MR. ANTHONY:  Thank you, Ms. Ellig.

13                      REDIRECT EXAMINATION

14    BY MR. ANTHONY:

15    Q.  Mr. Kiefer, this will be brief.  You were shown some

16    filtering.  I think they call it filtering.  Bear with me --

17    A.  Filtering and sorting, yes.

18    Q.  Filtering and sorting?

19    A.  Yes.

20    Q.  And I think you were asked were there 300 companies or

21    so wiring money in?  Was that it?  Was it 200 or 300?  Do

22    you remember?

23    A.  I believe it was 300 I was asked, roughly 300.

24    Q.  Okay.  And did -- I didn't hear counsel ask you when you

25    were doing the filtering, but did you see in all the
```

1    filtering when they were scrolling through all these

2    companies, did you see any big-box retailers wiring money

3    into the account?

4             MS. GITTES:  Objection.

5             THE COURT:  Overruled.

6             THE WITNESS:  No, I did not.

7    BY MR. ANTHONY:

8    Q.  And the last thing I want to ask you is then you were

9    asked by counsel about Exhibit 767.

10            MR. ANTHONY:  And would you put that up, please,

11   Ms. Ellig.

12   BY MR. ANTHONY:

13   Q.  You were asked whether you were -- you were asked about

14   other entities or companies or people who had wired money

15   into the account, I think that's what you were asked.  Do

16   you recall that?

17   A.  Yes.

18   Q.  Okay.  And in all the work you've done here in creating

19   767 and looking at 769, Plaintiff's 767 and 769, did you see

20   any other companies other than Enchanted and Nationwide that

21   wired in as much money as those two companies?

22   A.  Not to my recollection, no.

23   Q.  Did you see -- is there anything in the 200 or so that

24   you saw as they were scrolling through the sorting that

25   suggested that there were other companies wiring in this

Kiefer - Redirect

```
 1    much money?

 2    A.  No.

 3            MR. ANTHONY:  I have nothing further.  Thank you,

 4    sir.  Thank you for coming out here.

 5            THE WITNESS:  Thank you.

 6            THE COURT:  May this witness be excused?

 7            MS. GITTES:  Yes, Your Honor.

 8            THE COURT:  Sir, you are excused.

 9            THE WITNESS:  Thank you.

10            THE COURT:  We'll take our midafternoon break.

11            Members of the Jury, please be ready to come back

12    at 3:15, and please remember my instructions about not

13    discussing the case amongst yourselves.

14    (Recess taken at 3:01 p.m.)

15                         *   *   *   *   *

16        (3:24 p.m.)

17                        IN OPEN COURT

18                      (JURY NOT PRESENT)

19            THE COURT:  We are here outside the presence of

20    the jury.  I understand there's an issue that needs to be

21    addressed.

22            MS. MOMOH:  Thank you, Your Honor.  Again, Adine

23    Momoh on behalf of the defendant, BMO Harris Bank.

24            One of the issues that I wanted to raise with you

25    at this time is an issue that we had identified in our
```

1    morning disclosure to this Court, but it wasn't covered, it

2    wasn't addressed.

3            It would have been the first item in my e-mail

4    from this morning, item A, and it concerns the treatment of

5    exhibits and examinations regarding and related to SAR

6    filings.

7            So in this case there are discussions -- there's

8    been evidence surrounding the issues of SARS.  What are

9    SARs?  SARs are Suspicious Activity Report.  So S-A-R.

10           So we, BMO, have been in a predicament where

11   because of the federal regulations at issue, federal

12   regulations under FinCEN, Financial Crimes Enforcement

13   Network, and the OCC, the Office of the Comptroller of the

14   Currency, there are certain sorts of information that we

15   simply can't disclose, whether publicly or otherwise.

16           And this has been an issue that was raised even at

17   the bankruptcy court stage, Your Honor, with respect to

18   certain documents that were the subject of discovery so many

19   years ago.  Okay?  Now we are at trial and the documents are

20   at issue yet again, especially today beginning with the

21   witness -- the first live witness from BMO who will be

22   called today, Ms. Mary Pesch.

23           Our concern is that BMO, according to the regs, is

24   not in a position to disclose whether a SAR was filed with

25   respect to any of its customers, and that includes even a

1    customer that may pertain to this very case.

2            Even if that customer happens to be related to the

3    issues that are in dispute in this case, we simply cannot

4    disclose or talk about a SAR having been filed.  We can't

5    disclose the existence of a SAR.  And to err on the side of

6    caution with respect to the SAR's existence at all, we have

7    been very reluctant to discuss that certainly even in open

8    court, Your Honor.

9            The issue came up in several depositions where

10   witnesses didn't know if they had to disclose the

11   information or not.

12           THE COURT:  Let me ask you this.

13           MS. MOMOH:  Yes, Your Honor.

14           THE COURT:  We have a jury that is waiting to do

15   its work.

16           MS. MOMOH:  Yes.

17           THE COURT:  And so does this issue need to be

18   resolved now --

19           MS. MOMOH:  Yes, it does.

20           THE COURT:  -- while the jury is waiting.

21           MS. MOMOH:  It does, Your Honor.

22           THE COURT:  Is it an issue that just came up

23   during the course of this time that we've been away?

24           MS. MOMOH:  Been away from today, you mean, or

25   during --

```
 1              THE COURT:  This break.

 2              MS. MOMOH:  We disclosed it this morning, Your

 3    Honor.  We had disclosed it previously over the course of

 4    several communications with opposing counsel.

 5              We also proposed that we at least redact the

 6    documents that are at issue for -- in particular to this

 7    witness, as well as others, Your Honor, and we had exchanged

 8    those proposed redacted documents with opposing counsel this

 9    morning, Your Honor, so that when they were to be used, that

10    we would have the redacted versions in place.

11              THE COURT:  Let me just make it clear that I do

12    not like keeping a jury waiting.

13              MS. MOMOH:  Understood, Your Honor.

14              THE COURT:  So when issues like this arise, they

15    need to be dealt with either over the lunch hour, before we

16    begin, or after we end for the day.

17              I'm fine with staying late, but I do not

18    appreciate the fact that we have jurors in a jury room

19    waiting to do their work and this issue is being brought up

20    while they wait.  That's not a good use of our citizens'

21    time.

22              MS. MOMOH:  I understand, Your Honor.

23              THE COURT:  Can they be resolved outside of the

24    presence of the jury at another time?

25              MS. MOMOH:  Your Honor, I just ask that for
```

1    purposes of the discussions that we'll have tomorrow morning

2    or perhaps even later today, that we can address this at

3    this time.  Again, I put on the record that we --

4              THE COURT:  You said discussions with whom?

5              MS. MOMOH:  With you, Your Honor, to resolve this

6    issue.  If you --

7              THE COURT:  Well, we're not going to do it while

8    the jury is waiting.  Can we proceed with the case, or no?

9    Does this prevent us from moving forward with the evidence

10   portion of this case?

11             MS. MOMOH:  It's an issue, Your Honor, that we

12   would prefer to have clarity on and before the examination

13   proceeds.

14             Given where we are with the time, Your Honor, I

15   think both sides can make their case within 15 minutes if

16   we're able to.

17             With respect to the exhibits --

18             THE COURT:  Is it with regard to a witness that is

19   about to testify?

20             MS. MOMOH:  Yes, Your Honor, it is.  There are --

21   if I may, there are two exhibits that are specifically at

22   issue with respect to this witness, Exhibit DX-50722 and

23   then the second exhibit that defendants would offer at some

24   point in trial, DX-50728.

25             THE COURT:  So 50728 does not relate to this

1    witness, correct?

2              MS. MOMOH:  Both do, Your Honor, both do.

3              THE COURT:  Well, you said sometime in trial, so I

4    didn't understand what you meant.

5              MS. MOMOH:  I'm not -- well, I am expected to

6    examine Ms. Pesch today, correct?  But given the time, I

7    don't know if I'll be getting to her or not, depending on --

8              THE COURT:  Because we're going to be taking time

9    dealing with this issue?

10             MS. MOMOH:  No, Your Honor.  I do not know how

11   long plaintiff's examination of Ms. Pesch is going to be.

12             THE COURT:  Plaintiffs, how long will your

13   examination of Ms. Pesch be?

14             MR. COLLYARD:  Your Honor, I don't know.  It could

15   be four hours.  It could be five hours.  If it's shorter,

16   it's shorter, but I don't know.

17             I could -- if you allow me, I could briefly

18   address what the issue might be and see if we can resolve

19   it.  I know one exhibit that she's raising I can just --

20             COURT REPORTER:  Can you speak into the

21   microphone?

22             MR. COLLYARD:  I'll wait for Your Honor's

23   guidance.

24             THE COURT:  Can we begin Ms. Pesch's testimony

25   without resolving this issue?

1          MR. COLLYARD:  I believe we can, Your Honor.  I

2     believe they think that I'm going to use an exhibit and

3     they're worried about me using the exhibit and that's why

4     they're raising it now.  Now, the exhibits they're talking

5     about are their own exhibits that they're objecting to.

6          THE COURT:  Well, let me ask you:  Do you plan to

7     use the exhibit in the next hour and a half?

8          MR. COLLYARD:  I don't know.  I have to see how it

9     goes with Ms. Pesch.  I think we can resolve this issue as

10    it comes up.

11         MS. MOMOH:  And, Your Honor, if I may, again, the

12    issue is not just solely with respect to the exhibits, to

13    which Mr. Reif on behalf of the plaintiff did say with

14    respect to Exhibit DX-50722, there's no issue with respect

15    to the proposed redaction there.  My understanding is that

16    they do object to our proposed redactions under DX-50728.

17         But even then, Your Honor -- again, the issue is

18    not just the exhibits and the use of the exhibits.  It's any

19    argument, it's any examination with respect to a SAR being

20    filed.  I, unfortunately, can't go any more in detail with

21    respect to that given the confidentiality issues that we are

22    under for the regs that I mentioned earlier.

23         All we're asking, Your Honor, is that the issue

24    with respect to SARs -- there's contextual information that

25    certainly both sides can have witnesses throughout this

1       trial testify about.  What is a SAR?  How does it work?

2       When is it filed?  The general areas of a SAR, absolutely,

3       that's fair game for both sides, there's no dispute there.

4               What's at issue, per the regs, is the filing of a

5       SAR with respect to a particular customer of the bank.  We

6       are prohibited from disclosing any information with respect

7       to a far -- a SAR being filed, including even the existence

8       of a SAR with respect to a customer.

9               And, Your Honor, just for the benefit of the

10      record, we have been having discussions with the federal

11      regulators at issue here.  They have disclosed to us as of

12      yesterday that we are obligated to maintain the

13      confidentiality of the SAR.

14              THE COURT:  That seems to be an issue for a motion

15      in limine that should have been at the Court -- you knew

16      this witness was going to be testifying, correct, prior to

17      the day we started trial?

18              MS. MOMOH:  Your Honor, we did and the issue --

19              THE COURT:  And you knew the subject of the

20      testimony?

21              MS. MOMOH:  Your Honor, there's -- it's a little

22      complicated, too, because we still have a joint motion for

23      continued sealing of certain documents that touches onto a

24      different privilege issue.  My understanding is that joint

25      motion hasn't been ruled on yet either.  So it --

1        THE COURT:  So the motion related to the SAR is

2   before me now -- I mean has been and I have had notice of

3   it?

4        MS. MOMOH:  It's related, Your Honor, but not with

5   respect to the specific SAR issue.  The issue has been

6   raised several times, though, throughout the case.

7        (Pause in proceedings)

8        THE COURT:  We're not going to take this up at

9   this time.  We're going to proceed with the evidence portion

10  of the trial and we will stay away from that issue.  If we

11  have to re-call a witness, we will re-call a witness, but we

12  are not going to spend the kind of time necessary to address

13  this issue with a jury waiting to do its work.

14        MS. MOMOH:  Understood.

15        THE COURT:  And I will let counsel know now I am

16  not happy with the manner in which this is being presented,

17  and I want to run a very efficient trial and an efficient

18  trial is a trial that does not waste the jury's time.

19        And so as all counsel should know, you should be

20  planning.  You know what issues you have to deal with.  You

21  know what's contentious.  You need to be planning

22  accordingly.  You need to be communicating with the Court

23  before the time that we're about to come in from a recess at

24  the midafternoon break with a jury waiting to do its work.

25  And that's for all counsel --

1           MS. MOMOH:  Understood.

2           THE COURT:  -- to be mindful of.

3           MS. MOMOH:  Understood, Your Honor.

4           If I may briefly, in the event that counsel for

5    the plaintiff happens to ask a question related to this

6    protected issue and territory that we're speaking of, may I

7    still make an objection on the record?  And if there's a

8    need for a sidebar, so be it, but at least make the

9    objection and then --

10          THE COURT:  You make the objection.  I will rule

11   on the objection.  If we have to have a sidebar, we'll have

12   a sidebar.

13          MS. MOMOH:  Thank you, Your Honor.

14          THE COURT:  If you need to re-call the witness

15   after the issue is resolved in a timely fashion that does

16   not waste the time of the jury, then we will re-call the

17   witness to address the issue.

18          MS. MOMOH:  Understood, Your Honor.  Thank you.

19          THE COURT:  You're welcome.

20                        **IN OPEN COURT**

21                        **(JURY PRESENT)**

22          THE COURT:  You may be seated.

23          Members of the Jury, I want to thank you for your

24   patience.  Clearly, the amount of time that you have been

25   away on your break was longer than I expected and had

Pesch - Cross

```
 1    promised.  Your time is very valuable, and I respect that.

 2    I apologize for the delay, and we will work very hard not to

 3    have similar delays like this one.  Thank you.

 4              MR. COLLYARD:  Your Honor, plaintiff calls

 5    adversely Mary Pesch.

 6              THE COURT:  Okay.

 7              MR. COLLYARD:  And, Your Honor, we have books for

 8    you, if you would like them, exhibit books.

 9              THE COURT:  You may.

10              Please step forward.  Please raise your right

11    hand.

12         (Witness sworn)

13              THE COURT:  Thank you.  Please be seated.  And

14    would you please tell us your name and spell your last name.

15              THE WITNESS:  Mary Pesch, P-e-s-c-h.

16              THE COURT:  Thank you.

17              You may proceed, Counsel.

18              MR. COLLYARD:  Thank you, Your Honor.
```

**(Mary Pesch)**

**CROSS-EXAMINATION**

```
21    BY MR. COLLYARD:

22    Q.  Good afternoon, Ms. Pesch.

23    A.  Good afternoon.

24    Q.  You and I have met before; is that right?

25    A.  Yes.
```

Fesch - Cross

1   Q.  And we met in Milwaukee when I took your deposition; is

2   that correct?

3   A.  Yes.

4   Q.  I wanted to maybe dispel some myths that you might be

5   thinking.  I'm not here to drag you through the mud.  I'm

6   not here to besmirch you at all.

7          THE COURT:  Counsel, we'll have a sidebar.

8          **(At sidebar)**

9          THE COURT:  I don't know what kind of circus we

10  think we're in, but this is a courtroom and you are to

11  operate in a respectful manner.  That kind of commentary and

12  showboating is inappropriate for any jurors to have to see,

13  let alone for me to have to preside over.

14         MR. COLLYARD:  Mr. Gleeson in his opening

15  [inaudible] --

16         COURT REPORTER:  I'm sorry.  I can't hear you.

17         MR. COLLYARD:  I'm sorry, Your Honor.  I'll move

18  on.  I'll move on.

19         MS. MOMOH:  You need to repeat what you just said.

20         MR. COLLYARD:  I said Mr. Gleeson in his opening

21  statement said that I would do these very things, and he

22  accused me of it multiple times.  And he accused Mr. Kelley

23  of doing it too.

24         THE COURT:  Well, I am sick and tired of these

25  shenanigans, the actions among counsel that's inappropriate

1    and not fit for anything in this courtroom before a judge

2    and certainly before a jury.  And so, Counsel, I expect your

3    conduct to change --

4            MR. COLLYARD:  Understood, Your Honor.

5            THE COURT:  -- and to be improved --

6            MR. COLLYARD:  Understood.

7            THE COURT:  -- and to be respectful of this

8    institution, let alone the people who are spending their

9    time, mainly the jurors --

10           MR. COLLYARD:  Understood.

11           THE COURT:  -- to do this important work.

12           MR. COLLYARD:  Understood.  Yes.  Thank you.

13       **(In open court)**

14           THE COURT:  Counsel, you may proceed.

15           MR. COLLYARD:  Thank you, Your Honor.

16   BY MR. COLLYARD:

17   Q.  Now, Ms. Pesch, you have some binders up there with you,

18   and those will be the exhibits that we'll be talking about

19   today and you'll have them handy.  I think you have two

20   volumes.  I'm going to do my best to tell you which volume

21   you're in as we go along.  So if you're comfortable with

22   both of them like that, that's fine.  If you want to move

23   one, you can do that, too, just so you know.

24           What I'd like to do is ask you first:  Are you

25   still working at BMO Harris Bank?

Fesch - Cross

```
 1    A.  Yes.

 2    Q.  And what is your current role?

 3    A.  AML manager.

 4    Q.  Okay.  Can you go to Exhibit 177 for me, please.  That

 5    should be in your Volume I up there.

 6    A.  Could you repeat the number?

 7    Q.  Yes.  It's P-177.  Can you please take a look at it and

 8    tell me if that's a copy of your LinkedIn profile.

 9    A.  Yes.

10    Q.  Does that appear to be accurate to you?

11    A.  It looks like a slightly out-of-date one.

12    Q.  I'm sorry?

13    A.  It looks slightly out of date.

14    Q.  Correct.  So let's just back up.  This would have

15    been -- I would have shown you this LinkedIn one during your

16    deposition and I took your deposition in 2017.  And it ends

17    at 2017; is that fair?

18    A.  I thought my deposition was in January 2018.

19    Q.  You're correct, it was.  Yes, it was in January of 2018.

20    This was printed out slightly before that, so it ended in

21    2017.  With that exception, is it correct?

22    A.  Probably.

23              MR. COLLYARD:  Your Honor, I offer Plaintiff's

24    Exhibit 177.

25              MS. MOMOH:  Your Honor, we object, lack of
```

Pesch - Cross

1    foundation.

2              THE COURT:  Establish the foundation.

3              MR. COLLYARD:  Okay.

4    BY MR. COLLYARD:

5    Q.  Ms. Pesch, how long have you been working at BMO Harris

6    Bank?

7    A.  Since 2005.

8    Q.  And you started in 2005 as an AML intern; is that right?

9    A.  Yes.

10   Q.  And then about a year or so after that you became an AML

11   analyst; is that correct?

12   A.  Yes.

13   Q.  And then after that you were an AML investigator; is

14   that right?

15   A.  Yes.

16   Q.  And then ultimately after that you became an AML

17   investigator manual monitoring in the BMO Financial Group in

18   2012; is that true?

19   A.  Yes.

20   Q.  And then after that you became a senior anti-money

21   laundering investigator in the Specialized Investigation

22   Unit in November of 2013; is that also correct?

23   A.  Yes.

24             MR. COLLYARD:  Your Honor, I offer Plaintiff's

25   Exhibit 177.

Pesch - Cross

```
 1                   MS. MOMOH:  No objection, Your Honor.

 2                   THE COURT:  Exhibit 177 is received.

 3                   MR. COLLYARD:  Thank you, Your Honor.

 4      BY MR. COLLYARD:

 5      Q.  Now, Ms. Pesch, if we can go back to where it says you

 6      were an AML intern, you have it listed there as BMO.

 7                   MR. COLLYARD:  If we can go to the next page,

 8      please.

 9      BY MR. COLLYARD:

10      Q.  Down at the bottom it says -- are you there,

11      Ms. Pesch -- it says, "AML intern," and it says you were

12      doing that from January 2005 to December of 2005.  Do you

13      see that?

14      A.  Yes.

15      Q.  And it says you adjudicated alerts and reviewed

16      potentially suspicious activity.  Do you see that?

17      A.  Yes.

18      Q.  Can you explain what you were doing there?

19      A.  I was working transaction monitoring alerts.

20      Q.  You were investigating and reviewing alerts on accounts;

21      is that right?

22      A.  Yes.

23      Q.  And you were looking at alerts to determine whether or

24      not there was potentially suspicious activity?

25                   THE COURT:  Counsel, is this cross-examination?
```

Pesch - Cross

```
 1              MR. COLLYARD:  Yes, Your Honor.  Yes.  I'm sorry.
 2      We've called Ms. Pesch adversely.
 3              THE COURT:  Okay.
 4              MR. COLLYARD:  Yes.  Sorry.
 5              THE WITNESS:  Could you repeat your question?
 6      BY MR. COLLARD:
 7      Q.  Yes.  You were reviewing and investigating alerts that
 8      had alerted in your Searchspace system, correct?
 9      A.  That was the type of alert that we reviewed, yes.
10      Q.  So you were an AML intern and then you became an AML
11      analyst shortly after; is that right?
12      A.  Yes.
13      Q.  And that took you up to March of 2008, when you were an
14      AML analyst; is that right?
15      A.  Yes.
16      Q.  And there wasn't really a difference from what you were
17      doing as an AML intern compared to an AML analyst; is that
18      right?
19      A.  Most of the duties were the same.
20      Q.  So as an AML analyst you were investigating and looking
21      for suspicious activity on alerts that had alerted within
22      your Searchspace system, for example?
23      A.  Yes.
24      Q.  And then after that, in April of 2008 you became an
25      anti-money laundering investigator; is that right?
```

1    A.  Yes.

2    Q.  And, again, as an anti-money laundering investigator,

3    you were looking at, analyzing, reviewing alerts that had

4    alerted in your Searchspace system; is that correct?

5    A.  Yes.

6    Q.  Now, on your -- I'll just ask you this:  On your

7    LinkedIn, from 2005 up through 2008 -- let's just go with

8    that time period -- you were working at M&I Bank; is that

9    true?

10   A.  Yes.

11   Q.  And you have it here listed here as BMO, right?

12   A.  Yes.

13   Q.  And is that because BMO acquired M&I and you refer to

14   BMO and M&I as the same thing?

15   A.  Yes.

16   Q.  What I want to do, Ms. Pesch, is I want to talk just

17   high level.  Well let's talk about really four categories is

18   what we're going to talk about here.  Okay?  And what I want

19   to do is talk generally about a high level of how you

20   reviewed and investigated alerts.  Okay?

21   A.  Okay.

22   Q.  And then I want to talk a little bit about the

23   Anti-Money Laundering Group and what your role was role

24   particularly as an anti-money laundering analyst.  Is that

25   okay?

Fesch - Cross

1    A.  Okay.

2    Q.  And then I want to talk about how the bank went and

3    trained its personnel to look for, identify potentially

4    suspicious activity.  Okay?

5    A.  Okay.

6    Q.  And then I want to talk about some of the alerts that

7    you adjudicated.  Is that okay with you?

8    A.  Okay.

9    Q.  And when you say -- you said here in your LinkedIn, you

10   said "adjudicated alerts."  And really what "adjudicated"

11   means is review and investigate; is that right?

12   A.  That could be one explanation for it.

13   Q.  That's how you refer to it internally, as "adjudicated"?

14   A.  I would say "adjudicated" meant we worked through the

15   alerts to closure.

16   Q.  Let's talk about just high level, then, what you were

17   doing to look at these alerts and investigate and review

18   them.

19        Can you tell me this real quickly, what the

20   Searchspace system is.

21   A.  It was a transaction monitoring system.

22   Q.  And within Searchspace, would Searchspace look at

23   incoming and outgoing wires, for example, and determine

24   whether or not there were patterns of unusual or potentially

25   suspicious activity?

1    A.  Could you repeat your question?

2    Q.  Sure.  Would Searchspace look at patterns of incoming

3    and outgoing wires to determine, using an algorithm, for

4    example, whether or not there were patterns that would be

5    indicative of potential suspicious activity?

6    A.  I wouldn't say Searchspace looked at wires.

7    Q.  What would you say?

8    A.  I would say it identified wires that potentially needed

9    review.

10   Q.  And you, as an anti-money laundering analyst, would get

11   that information and be signed an alert, for example, to

12   review; is that right?

13   A.  Yes.

14   Q.  And you reviewed -- let me back up.  Do you remember the

15   Petters Company, Inc.?

16   A.  Yes.

17   Q.  And do you remember that Petters Company had an account

18   called the Petters Company, Inc. account at M&I Bank?

19   A.  I remember there was an account titled under that name.

20   Q.  Do you remember that you reviewed and closed alerts that

21   had been triggered through the Searchspace system on the

22   Petters Company, Inc. account?

23        MS. MOMOH:  Objection, Your Honor, vague as to

24   time.

25        THE COURT:  Sustained.

Fesch - Cross

1    BY MR. COLLYARD:

2    Q.  Let's go with the 2005 up to September of 2008 time

3    period.  Did you review and investigate alerts that had been

4    triggered on the Petters Company, Inc. account?

5    A.  Yes.

6    Q.  And do you remember that the alerts that you reviewed,

7    you closed those alerts?

8    A.  I don't remember working individual alerts, but I know

9    they were closed.

10   Q.  Let me ask you just generally, and not stepping outside

11   of even the Petters Company, Inc. account alert, just ask

12   you generally, when you're investigating alerts in

13   Searchspace, you agree that when you were investigating

14   anti-money laundering alerts you were trying to figure out

15   if that activity that was triggered was potentially

16   suspicious; is that true?

17   A.  Yes.

18   Q.  And just speaking generally, when you were reviewing and

19   investigating those alerts, as an anti-money laundering

20   analyst you would look to see if the transaction activity

21   made sense for the business; is that right?

22            MS. MOMOH:  Objection, Your Honor, vague.

23   Sidebar?

24            THE COURT:  I'm going to overrule the objection.

25            THE WITNESS:  Could you repeat the question?

Pesch - Cross

1    BY MR. COLLYARD:

2    Q.  Sure.  When you were looking and investigating an alert

3    in Searchspace, as an AML analyst you would look to see if

4    the transaction activity that had been alerted, you'd look

5    to see if that made sense for the customer or the business?

6    A.  That's one thing that could be considered.

7    Q.  And in determining if the activity was potentially

8    suspicious, I mean, it really came down to whether or not

9    that activity made sense for the customer as you understood

10   it; is that correct?

11   A.  There are many different reasons something could be

12   suspicious.  I wouldn't limit it to one thing.

13   Q.  Sure.  Let me try again, Ms. Pesch.  Maybe I'm not being

14   clear.

15          In determining if the activity was potentially

16   suspicious, was one of the main reasons in determining

17   whether or not it was suspicious whether or not the activity

18   made sense for the customer or the business?

19          MS. MOMOH:  Objection, Your Honor, vague.

20   There's -- it's vagueness with respect to "customer or

21   business."

22          THE COURT:  Overruled.  You may answer if you

23   understand the question.

24          THE WITNESS:  Could you repeat it again, please?

25   BY MR. COLLYARD:

Pesch - Cross

1    Q.  I'll try.  I'm trying to figure out if when you're

2    reviewing and investigating these alerts, if really what it

3    came down to, if one of the main things that it came down to

4    for you to make your decision as to whether or not it was

5    suspicious or not was whether the activity made sense for

6    the customer?

7    A.  Like I said before, there are many different reasons why

8    something could be suspicious.  There's not one main reason

9    that you would look for something to be suspicious.

10   Q.  Do you agree, Ms. Pesch, that understanding where the

11   money comes in from and where it goes to and for what reason

12   was important when you were adjudicating alerts in

13   Searchspace?

14   A.  Could you clarify the time frame?

15   Q.  I'll -- yes.  I will just -- we'll just stick on the

16   time frame of 2005 up to September of 2008; and if I'm going

17   to ask anything beyond that, I'll be sure to let you know.

18   Is that okay?

19   A.  Yes.

20   Q.  Okay.  Let me try to -- let me try to ask it again.

21        Do you agree that understanding where the money

22   comes in from and where the money goes to and for what

23   reasons was important when you were trying to figure out

24   whether or not there was suspicious activity on an account?

25   A.  We didn't always have that information available during

1    that time frame, so I would not agree with that.

2    Q.  You would not agree with that.

3            MR. COLLYARD:  Your Honor, may I approach the

4    witness?

5            THE COURT:  Yes, you may.

6    BY MR. COLLYARD:

7    Q.  Ms. Pesch, I'm going to hand you a copy of your

8    deposition, which you correctly told me that --

9            THE COURT:  Counsel, you may give her the

10   deposition, but you may not stand in front of the witness --

11           MR. COLLYARD:  Okay.  Thank you, Your Honor.

12           THE COURT:  -- at the witness stand and question

13   her.

14           MR. COLLYARD:  Thank you, Your Honor.

15   BY MR. COLLYARD:

16   Q.  What you correctly told me, it was taken on January 5th

17   of 2008.  Do you remember that?

18   A.  I just said January 2018.  I didn't remember the exact

19   date.

20   Q.  Sure.  Fair enough.  Could you go to page 95, please,

21   and I'll -- I won't read it out loud.  I'll just let you

22   read it to yourself.  It's on page 95.  And if you -- when

23   you get there, if you look up at the line numbers, you see a

24   line number 2 and there's a question that I asked you.  Do

25   you see that?

1    A.  Yes.

2    Q.  Does that help refresh your recollection, Ms. Pesch,

3    that understanding where the money comes from and where it

4    goes to and for what reasons is important?

5    A.  Like I said before, we didn't always have all of that

6    information available during that time frame that you

7    referenced.

8    Q.  Okay.  Well --

9    A.  So -- sorry.

10   Q.  I'm sorry.  Did you want to finish?

11   A.  No, it's okay.

12   Q.  Well, I asked you the question at your deposition and I

13   said, "And understanding where the money comes from and

14   where it goes to and for what reasons is important?"  And

15   you answered, "Correct."  Is that right?

16          MS. MOMOH:  Your Honor, objection.  If I may,

17   sidebar, please?

18          THE COURT:  Yes.

19          MS. MOMOH:  Thank you.

20     **(At sidebar)**

21          MS. MOMOH:  Your Honor, I'm trying to sit down on

22   this.  I recognize the jury is right there.  Okay?

23          THE COURT:  Let's keep our voices down.  That's my

24   main concern.

25          MS. MOMOH:  It's also a compound question.  There

Fesch - Cross

1     was an objection to form that was made at the time of the

2     deposition and now he's asking her to give the answer.  He's

3     not acknowledging the fact that there was an objection at

4     that time.  I have already objected with respect to

5     vagueness.  I could object as to [indiscernible] --

6              COURT REPORTER:  Please slow down, because I can't

7     understand what you're saying.

8              MS. MOMOH:  The objection is this is improper

9     impeachment.  He is going over the question with the

10    witness.  He is asking the question as to what her response

11    was.  He's not acknowledging the fact that there was an

12    objection that was made on the record at the time of the

13    deposition after she had answered.  We have not waived that

14    objection, Your Honor, to this particular question.

15             MR. COLLYARD:  Would you like me to note the

16    objection as I read it for impeachment purposes?

17             MS. MOMOH:  I still would like you to break out

18    the question as well.

19             THE COURT:  What is the question?  I don't

20    understand --

21             MR. COLLYARD:  Your Honor, I'm sorry.  This is the

22    question.  I just asked her that question and that was her

23    answer (indicating).

24             THE COURT:  Okay.  So there was an objection and

25    then she answered?

Fesch - Cross

1                    MR. COLLYARD:  Yes.

2                    THE COURT:  So you can make -- either you can ask

3          her the question and ask her what she answered or isn't it

4          true I asked you this and you answered that.

5                    MR. COLLYARD:  That's what I did, Your Honor.

6                    THE COURT:  Or you can -- and then you can

7          cross-examine and say you objected to that.

8                    MS. MOMOH:  Sure.

9                    THE COURT:  But that's cross-examination.

10                   MS. MOMOH:  Mm-hmm.

11                   THE COURT:  You understand?

12                   MS. MOMOH:  Yes, Your Honor.

13                   THE COURT:  It's not that you get to object now.

14                   MS. MOMOH:  Mm-hmm.

15                   THE COURT:  Because this is an asked and answered

16         question.

17                   MS. MOMOH:  Understood.

18                   THE COURT:  Okay.

19                   MS. MOMOH:  Thank you.

20                   THE COURT:  And so you're asking whether she said

21         it at a prior time?

22                   MR. COLLYARD:  That's right, yes.

23                   THE COURT:  Are you objecting to the question

24         then?

25                   MS. MOMOH:  Her response to his initial question

Tesch - Cross

1       was -- he has to show that there was a prior inconsistent

2       statement in order for him to bring this in.  She didn't say

3       that she didn't say this.  In fact, she didn't -- she never

4       acknowledged that she understood the question that he's

5       asking.  So now he brought out the deposition transcript.

6       This is simply improper impeachment.  He has to show that

7       there is a prior inconsistency.

8               MR. COLLYARD:  Your Honor, I asked her the

9       question.  I asked her if she answered.  I asked her -- I

10      showed it to her.  I tried to refresh her recollection on

11      it.  Then I asked her the exact question that I asked, and

12      then I said, And your answer was "correct"?  That raised the

13      objection.

14              THE COURT:  Did she answer the question?

15              MS. MOMOH:  No, she did not.

16              THE COURT:  Just ask her the question now and have

17      her answer it.

18              MR. COLLYARD:  Okay.  I --

19              THE COURT:  And then if you need to refresh her

20      recollection because she answers differently, then do that.

21              MR. COLLYARD:  Okay.

22              THE COURT:  Are you objecting to the question

23      being asked?

24              MS. MOMOH:  No, I am not, Your Honor.

25              MR. COLLYARD:  That's what --

Pesch - Cross

```
 1                    MS. MOMOH:  Just the manner in which --
 2                    MR. COLLYARD:  -- we did, but -- I don't want to
 3      -- okay.
 4                    MS. MOMOH:  Thank you, Your Honor.
 5            (In open court)
 6      BY MR. COLLYARD:
 7      Q.  Sorry, Ms. Pesch.  Let me try it this way.  Do you agree
 8      that understanding where the money comes from and where it
 9      goes to and for what reasons is important?
10      A.  It can be.
11      Q.  And that's because understanding if activity makes sense
12      for the customer is important; is that correct?
13      A.  That's one thing that you consider.
14      Q.  Now, let's talk about incoming wires.  Okay?  So let's
15      just talk about when you're investigating and reviewing
16      alerts for incoming wires.
17                    And when you're investigating incoming wires that
18      alerted, you agree that you were expected to have an
19      understanding as to generally what the wires were for,
20      correct?
21      A.  Can you repeat your question?
22      Q.  Sure.  I'll try.  When investigating incoming wires that
23      alerted, you agree that you were expected to have an
24      understanding as to generally what the wires were for?
25      A.  During that time frame, that information wasn't always
```

1    available.

2    Q.  Do you agree or do you disagree, Ms. Pesch?

3    A.  I agree it would be helpful if the information is

4    available.

5    Q.  I'm sorry.  Let me ask you this way:  Do you agree that

6    when you're investigating those incoming wires, do you agree

7    that you were expected, expected to have an understanding as

8    to generally what the wires were for in order to be able to

9    adjudicate the alert?

10   A.  If the information wasn't available, I have trouble

11   seeing how we would have been expected to know that.

12   Q.  Ms. Pesch, can you please go to your deposition again.

13   Turn to page 339.  And, Ms. Pesch, I'm sorry, just let me

14   back up.  When you were deposed on January 5th of 2018, you

15   took an oath and swore to tell the truth, correct?

16   A.  Yes.

17   Q.  I asked you on page 339, I asked you the question, "You

18   were expected to have an understanding as to generally what

19   the wires were for?"  And you answered, "Yes."  Did I read

20   that correctly?

21   A.  Yes.

22   Q.  And that was truthful testimony at the time you gave it?

23   A.  Based on my understanding of the question, yes.

24   Q.  And you agree, Ms. Pesch, that when you were

25   investigating alerts and they're on incoming wires,

1   investigating alerts on incoming wires, that you care about

2   the purpose of the wires coming into the account because

3   that explains the reason for the wires?

4           MS. MOMOH:  Objection, vague with respect to the

5   term "purpose."

6           THE COURT:  Overruled.

7           THE WITNESS:  Can you repeat it one more time?

8   BY MR. COLLYARD:

9   Q.  I will try.  You agree that when investigating alerts

10  for incoming wires, you care about the purpose of the

11  incoming wire because that explains the reason for that wire

12  coming into the account?

13  A.  If it's available.

14  Q.  If it's available, you agree; is that right?

15  A.  I agree it would be helpful information.

16  Q.  Okay.  And what if it wasn't available, then what would

17  you do?

18  A.  It would depend on the nature of the alert.

19  Q.  But you would seek and search to figure out the purpose,

20  right?

21  A.  Again, it would depend on the nature of the alert, what

22  was in the alert.

23  Q.  Well, I'm talking about an incoming wire.  If you just

24  take an incoming wire that's alerted and it's alerted as

25  potentially suspicious in your Searchspace system, you would

1    look at the incoming wire to try to figure out what the

2    purpose of the wire is, correct?

3              MS. MOMOH:  Objection, Your Honor, asked and

4    answered.

5              THE COURT:  Overruled.

6              THE WITNESS:  Can you repeat it one more time?

7    BY MR. COLLYARD:

8    Q.  Yeah.  Okay.  Let's back up.  For an incoming wire that

9    you were investigating that had alerted, you would look to

10   determine what the purpose of the wire was to try to figure

11   out if it was potentially suspicious, correct?

12   A.  Not for every wire or in every alert.

13   Q.  Let me -- let me try it this way.  I'll try it one more

14   time and see if I can get it right this time.

15             When investigating alerts for incoming wires, you

16   care about the purpose of the wires coming into the account

17   and you would try to figure out the purpose for the wires?

18   A.  If the information was available.

19   Q.  And the reason why you were doing that is you were

20   trying to figure out -- you were trying to get the

21   explanation for the reason of the wire; is that right?

22   A.  That's why -- if we were looking for that information,

23   that would be why.

24   Q.  And if you couldn't determine what the purpose of the

25   wire was, you wouldn't close that particular alert, correct?

Fesch - Cross

1    A.  I couldn't tell if you said could or couldn't.  Can you

2    repeat that more clearly?

3    Q.  Couldn't.

4    A.  Could not?

5    Q.  Yeah.  Let me try it again.  If you couldn't determine

6    what the purpose of the wire was for, what the funds were

7    being used for on the incoming wires, you couldn't close the

8    alert, correct?

9    A.  That's not true.

10   Q.  That's not true?

11          Okay.  Let's try it your way, then.  If you

12   could -- if you couldn't determine what the funds were being

13   used for in incoming wires, you wouldn't close an alert; is

14   that right?

15   A.  There were many wires that we didn't know the purpose

16   of; and if that information wasn't available, we would

17   review other factors to determine if there was additional

18   research that was needed.

19   Q.  Okay.  And if after doing all that you still couldn't

20   determine what the use of the funds were for, what the

21   purpose of the wire was, you wouldn't close the alert, would

22   you?

23          MS. MOMOH:  Objection, Your Honor, compound

24   question.

25          THE COURT:  Overruled.  You may answer if you can.

1       THE WITNESS:  Can you repeat it one more time?

2   BY MR. COLLYARD:

3   Q.  Let me try it this way.  If you couldn't determine what

4   the funds were being used for, you would not close the

5   alert?

6   A.  That's not true.

7   Q.  Okay.  If after doing all of your other work to look to

8   see and you couldn't find out at the end of the day what the

9   funds were used for, you would not close the alert, correct?

10  A.  We were not required to know what the funds were used

11  for for every alert -- excuse me, for every wire.

12  Q.  Okay.  If you at the end of the day you couldn't

13  determine what the funds were used for and you had any type

14  of concern about it, you wouldn't close the alert; is that

15  correct?

16  A.  Correct.

17  Q.  Can you please go to Plaintiff's Exhibit 180.

18       MR. COLLYARD:  And 180 is in evidence already,

19  Your Honor.

20       THE WITNESS:  It was 180 what?

21  BY MR. COLLYARD:

22  Q.  Plaintiff's Exhibit 180.  It should be in your Volume I.

23  A.  I just want to clarify.  1-8-0?

24  Q.  Yes, 1-8-0.  Do you have it, Ms. Pesch?

25  A.  Yes.

524

```
 1              MR. COLLYARD:  Can we pull it up, please.
 2    BY MR. COLLYARD:
 3    Q.  Are you familiar with this document?
 4    A.  Yes.
 5    Q.  And if you look down in kind of the middle of the page
 6    where it says, "Summary of Corporate Processes," do you see
 7    that?
 8    A.  Yes.
 9    Q.  And then down below under Division it says, "Corporate
10    Compliance AML monitoring group."  Do you see that?
11    A.  Yes.
12    Q.  And I want to just highlight kind of the first couple
13    sentences of that under where it says, "General."  It says,
14    "The AML monitoring group was established in June 2004.  The
15    group is staffed with six analysts and a manager."  And this
16    is the part I want to focus on right here, Ms. Pesch.  It
17    reads, "The primary responsibility of this group is to
18    detect, review, and investigate all suspicious activity
19    identified through Searchspace and other suspicious activity
20    reported in the corporate divisions and affiliated
21    companies."  Do you see that?
22    A.  Yes.
23    Q.  Does that basically describe what the responsibility of
24    the Anti-Money Laundering Group had at M&I Bank?
25    A.  Yes.
```

Pesch - Cross

1    Q.  And does that basically describe -- does it actually

2    describe the role of an anti-money laundering analyst, for

3    example?

4    A.  On a high level, yes.

5    Q.  And you agree, Ms. Pesch, that the function of the

6    Anti-Money Laundering Group was to establish suspicious

7    activity on accounts; is that right?

8    A.  Yes.

9    Q.  And one of your responsibilities when you were an

10   anti-money laundering analyst was to detect money

11   laundering; is that true?

12   A.  Yes.

13   Q.  And that responsibility included identifying activity

14   that was indicative of money laundering.  Do you agree?

15   A.  Could you clarify what you mean by that?

16   Q.  Sure.  If you came across activity that was indicative

17   of money laundering -- or, I'm sorry, let me back up.

18          You would actually look for activity that could

19   lead to money laundering, for example; is that right?

20   A.  Activity that could lead to money laundering?

21   Q.  Yeah.  Well, do you understand what I mean by

22   "indicative"?

23   A.  Could you explain it?

24   Q.  Do you know what I'm -- do you know what I mean?

25   A.  I just asked you to explain it --

Fesch - Cross

1    Q.  Okay.

2    A.  -- just to make sure I have the same understanding of

3    the word as you.

4    Q.  I get -- okay.  If you -- when you were -- one of your

5    responsibilities was to look for activity that could be

6    possibly related to money laundering?

7    A.  Yes.

8    Q.  And your responsibilities in the Anti-Money Laundering

9    Group as an anti-money laundering analyst also included

10   identifying activity that is indicative of there being a

11   Ponzi scheme; is that correct?

12   A.  We were looking for activity that could involve

13   financial crimes.

14   Q.  That includes a Ponzi scheme?

15   A.  Yes.

16   Q.  And that was back in the 2005 to 2008 time frame,

17   correct?

18   A.  Yes.

19   Q.  All right.  Can you please go to, in your booklet there,

20   Plaintiff's Exhibit 179.  I just want to talk a little bit

21   more about the role of the anti-money laundering analyst and

22   your job as an anti-money laundering analyst.

23           Can you please take a look at Plaintiff's

24   Exhibit 179 and tell me if that is a description for a job

25   as an anti-money laundering analyst at M&I Bank.

```
 1    A.  Yes.

 2    Q.  Are you familiar with this document?

 3    A.  I don't remember it.

 4    Q.  Are you familiar with the content of it?

 5    A.  Can I have a moment to read it?

 6    Q.  Of course.

 7        (Pause)

 8    Q.  Are you done?

 9    A.  Yes, I'm done.

10    Q.  Does this accurately describe what an anti-money

11    laundering analyst was doing at M&I Bank back in 2005 to

12    2008?

13    A.  From what I can recall, yes.

14            MR. COLLYARD:  Your Honor, I offer Plaintiff's

15    Exhibit 179.

16            MS. MOMOH:  No objection, Your Honor.

17            THE COURT:  Exhibit 179 is received.

18    BY MR. COLLYARD:

19    Q.  Ms. Pesch, do you see in the -- if we go to essential

20    duties there, you see a number 1?

21    A.  Yes.

22    Q.  And it reads, "Utilize various M&I automated systems and

23    reports to evaluate customer transaction activity."  Do you

24    see that?

25    A.  Yes.
```

Tesch - Cross

1    Q.  And transaction activity is talking about activity

2    within an account, correct?

3    A.  It could be, yes.

4    Q.  Transaction activity would be money going in and money

5    going out of an account, for example?

6    A.  It could be.

7    Q.  It could be other things too?

8    A.  Yes.

9    Q.  What other things could it be?

10   A.  A noncustomer could bring a check that was drawn on a

11   client of the bank's to cash and they would not have an

12   account.

13   Q.  And that would be something that the Anti-Money

14   Laundering Group would be evaluating?

15   A.  Potentially.

16   Q.  And then it says, "For unusual activity that may be

17   indicative of money laundering or other illegal activity";

18   is that right?

19   A.  Yes.

20   Q.  So, again, an anti-money laundering analyst was looking

21   for activity that may be indicative of money laundering,

22   correct?

23   A.  It appears so, yes.

24   Q.  And when it says "unusual activity," do you have any

25   understanding as to what that means?

1    A.  It's hard to remember -- I mean, our understanding of

2    certain words has evolved over time.  I don't know if I

3    remember clearly exactly how we defined "unusual" at that

4    time.

5    Q.  Well, it could mean, for example, unusual flow of funds;

6    is that right?

7    A.  Potentially.

8    Q.  And flow of funds is really the money going in and money

9    going out of the account and the reasons why; is that true?

10   A.  It could be.

11   Q.  And one of the things that an anti-money laundering

12   analyst then was doing was looking at the flow of funds to

13   see if it was unusual to determine whether or not it was

14   potentially suspicious, correct?

15   A.  That is one thing that would be reviewed.

16   Q.  And then down below in number 2, it -- the part where it

17   says, "For identified unusual transactions, perform research

18   on the customer activity," do you see that?

19   A.  Yes.

20   Q.  And one of the things that the Anti-Money Laundering

21   Group and the anti-money laundering analysts in particular

22   were doing was researching the activity; is that also true?

23   A.  What do you mean by "researching"?

24   Q.  Well, you would look into the activity, for example?

25   A.  Yes.

Fesch - Cross

1    Q.  So to just be more -- to break it out even more, if

2    there were incoming wires, for example, you would look at

3    who was wiring the money into the account, correct?

4    A.  We would look at the names, yes.

5    Q.  And you would actually do research on those entities at

6    some points, correct?

7    A.  Maybe sometimes.

8    Q.  You've done it in the past, right?

9    A.  Yes, I have.

10   Q.  You have actually taken an entity that wired money into

11   an account on an alarm that triggered for incoming wires and

12   you researched that particular entity, true?

13   A.  Yes.

14   Q.  And you would do the same thing for the entities that

15   money was going to; is that also right?

16        MS. MOMOH:  Objection, Your Honor, vague as to

17   time.

18        THE COURT:  Overruled.

19   BY MR. COLLYARD:

20   Q.  And, again, my time period is always, right now, 2005 to

21   2008, September of 2008, unless I say otherwise.

22        MS. MOMOH:  Your Honor, briefly, if I may sidebar

23   with that particular statement, please?

24        **(At sidebar)**

25        MS. MOMOH:  Your Honor, time period is crucial in

1    this case, especially in September of 2008.  In September of

2    2008, that was when there was the FBI raid on PCI, Petters

3    Company, Inc., and at that time the world essentially

4    changed for BMO and its employees.

5            So it's imperative when he's giving a time period

6    that he can't simply say from 2005 to September of 2008.

7    The FBI raid was in September of -- September 24th of 2008.

8    He needs to clarify the specific period of time that he's

9    talking about.  He cannot simply reference September of 2008

10   for that reason.

11           MR. COLLYARD:  Your Honor, I have no idea why it

12   wouldn't be -- this is the most relevant -- that is the

13   relevant time period in this case.  Mr. Petters wasn't

14   arrested and nothing happened until October.  I'm staying

15   away from her -- I'm intentionally trying to stay away from

16   this issue that she's raising right now about a SAR because

17   nothing happens until October of 2008, and that's why I'm

18   trying to be lenient with this, actually, by going above and

19   beyond and explaining -- limiting my time period.

20           MS. MOMOH:  And, Your Honor, and, respectfully,

21   Mr. Collyard, unfortunately, the record does not reflect

22   that.  We have e-mails that were sent between and among BMO

23   employees right at the period of September --

24           THE COURT:  When?

25           MS. MOMOH:  Mid-September 2008, including e-mails

Pesch - Cross

1    concerning Ms. Pesch.  I'm happy to bring one to you so you

2    can see specifically what I'm referring to.

3                THE COURT:  Can you address a more specific period

4    of time?

5                MR. COLLYARD:  Your Honor, there should -- Your

6    Honor, I have a case to prove.  Deanna Munson didn't even

7    tip off the FBI until late September of 2008.  There's

8    nothing in this case that should be restricted to the month

9    of September of 2008.  There just isn't.

10               MS. MOMOH:  And, Your Honor, that comment

11   demonstrates it.  If I may, I'm happy to put forth the

12   e-mail that I'm referring to that puts the date in question

13   and why I'm raising this objection.

14               THE COURT:  Okay.

15               MS. MOMOH:  Thank you, Your Honor.

16       (Pause in proceedings)

17               MS. MOMOH:  Here's the first e-mail, Your Honor,

18   September 26th of 2008 from Shandra Roehrig to Mary

19   Drewiske, who is Ms. Pesch.  This is her maiden name.

20               THE COURT:  Mm-hmm.

21               MS. MOMOH:  And we do have a copy of this for you.

22   I just haven't brought it up yet because my examination --

23               MR. COLLYARD:  It's on my exhibit list.

24               MS. MOMOH:  He's been shown this.

25               THE COURT:  Your objection is?

1              MS. MOMOH:  My objection is that when he's -- with

2       respect to vagueness as to time, he cannot lump a time

3       period of 2005 to September of 2008 because in September of

4       2008 the way that business was conducted at the bank changed

5       for the reasons that are disclosed in this document.

6              MR. COLLYARD:  Your Honor, no, that's just simply

7       not true.  There's no SAR that's been filed.  There's no

8       issue about a SAR.  They're looking and they're

9       investigating account activity based on the fact that they

10      read stuff in the paper.  That's what they're doing.

11             THE COURT:  When is the SAR?

12             MR. COLLYARD:  I don't know when the SAR --

13             MS. MOMOH:  I can't --

14             MR. COLLYARD:  I don't have a SAR, Your Honor.

15      I'm sorry, Ms. Momoh.

16             MS. MOMOH:  Sure.

17             MR. COLLYARD:  Your Honor, I have to preview this

18      issue, then.  So they're concerned about me mentioning in

19      their documents information about a SAR.  Okay?  I put up in

20      my opening the slides where I went through -- and this very

21      analysis that they did, I put that in my opening.  They

22      didn't object to it at all.  They didn't object to the

23      slide.  I said it in opening statement.  And it says this

24      activity merits that a SAR be filed.

25             And this is the -- so today or last night, I

1    can't remember, was the first time we've heard of this

2    objection.  This is news to us.  I've already told the jury

3    about this.

4         So now they're trying to prevent me from

5    mentioning anything about any investigation that they did

6    leading up to their decision as to whether or not to file a

7    SAR.  I don't have a SAR.  There's no SAR produced in this

8    case.

9         MS. MOMOH:  Your Honor, my concern with the time

10   period is just that.  It has nothing to do with the SAR.

11   He's asking Ms. Pesch questions about how she reviewed

12   alerts.  And what I'm trying to explain here, without

13   getting into the substance of the document, is that the way

14   reviews of alerts were conducted changed for Ms. Pesch in

15   particular when she received this e-mail in the middle of

16   September of 2008.

17        THE COURT:  I'm going to overrule the objection

18   and you can cross-examine or otherwise question the witness.

19   BY MR. COLLYARD:

20   Q.  I'm sorry, Ms. Pesch.

21        MR. COLLYARD:  Can we put back Plaintiff's

22   Exhibit 179.

23   BY MR. COLLYARD:

24   Q.  And I believe we were talking about unusual activity,

25   Ms. Pesch.  We were talking about the flow of funds.  Do you

Fesch - Cross

1   remember that?

2   A.  I can't remember the last thing we said, I'm sorry.

3   Q.  Okay.  When you were looking to determine whether or not

4   there was suspicious activity on accounts, you were looking

5   at the flow of funds going in and out of the account,

6   correct?

7   A.  Yes.

8   Q.  And we were talking about how you actually researched

9   entities who had wired money into an account when there was

10  an alert for incoming wires, correct?

11  A.  Yes.  You asked if I had ever done that and I said yes.

12  Q.  And when you would research entities wiring money into

13  an account, you would look to see who that entity was and

14  what kind of business they were in, for example, right?

15  A.  In some circumstances.

16  Q.  Well, you've done it in the past, correct?

17  A.  Yes.

18  Q.  And the reason why you were doing that is you were

19  trying to figure out why they were wiring the money into the

20  account, right?

21  A.  That may have been one of the considerations.

22  Q.  And what you were doing is you were trying to figure out

23  whether or not that wire made sense for the customer; is

24  that right?

25  A.  We were looking -- usually there was more than one

Pesch - Cross

1    transaction.  So we were looking at the account activity.

2    Q.  I'm sorry, Ms. Pesch, I'm trying to ask you if you would

3    actually research an entity to try to figure out what that

4    entity did or who they were so you could figure out if that

5    entity's wires coming into the account made sense for the

6    customer.

7    A.  We didn't do that for every party.

8    Q.  Have you done it in the past?

9    A.  Yes.

10   Q.  And then it says -- and sticking to number 2, it says,

11   "Review and analyze customer transaction history as well as

12   specific transactions."  And it says, "Wire transfer."  Do

13   you see that?

14   A.  Yes.

15   Q.  An AML analyst would actually go in and they would look

16   at the actual wires that were alerted; is that true?

17   A.  We would look at the wire data that was on Searchspace.

18   Q.  Did you have access to the actual wires?

19   A.  Initially we did not have access to the full wire data,

20   no.

21   Q.  During the time period of 2005 up through September of

22   2008, did the Anti-Money Laundering Group have access to the

23   wires?

24   A.  We had access to the wire data in Searchspace for the

25   entirety that Searchspace was up and operating.  I did not

1    remember when we got access to be able to pull copies of

2    wires.

3    Q.  At some point in time you were able to access the wires;

4    is that right?

5    A.  Yes.

6    Q.  Now, when you were in Searchspace and you said you got

7    wired data, wired data meant -- let me back up.  Did wire

8    data include who was wiring the money in; is that right?

9    A.  Most of the time.

10   Q.  Well, Searchspace fed you names, for example, of who was

11   wiring money into the account, right?

12   A.  It would show up in the transactions within the alert.

13   Q.  And you could actually see the name and you could

14   actually see information about the entity, right?

15   A.  If that data passed through, yes.

16   Q.  So, for example, could you see an address associated

17   with the entity who was wiring money into the account?

18   A.  No.

19   Q.  Did you have access to the transaction activity data?

20   A.  I had access to the transaction data -- well, I guess,

21   what do you mean by "data"?

22   Q.  Did you have access where you could actually go -- did

23   the wire data include who was wiring the money in and how

24   much the wires were for?

25   A.  The wire data in Searchspace included a place to

Pesch - Cross

```
1    identify the originator and it also included the value, but
2    that doesn't mean that the data always populated through.
3    Q.  When alerts would be generated in Searchspace, it would
4    generate data about the wire and that wire would include,
5    for example, the name of who was wiring the money in and
6    perhaps an address associated with that entity; is that
7    right?
8    A.  No.
9    Q.  You could not see that in Searchspace?
10   A.  We never saw addresses for parties on wires in
11   Searchspace --
12   Q.  Okay.
13   A.  -- from what I can recall.
14   Q.  Can you go to Exhibit 333, please, Ms. Pesch.
15   A.  Is that in the deposition?
16   Q.  No, Exhibit 333.  Should be in your second volume.  And
17   if you could take a look at Exhibit 333, can you tell me
18   what it is.
19   A.  Can I look at it for a moment?
20   Q.  Sure.
21   A.  Okay.
22   Q.  What is Exhibit 333?
23   A.  This is a case I wrote.
24   Q.  This is a case you wrote on the Petters Company account?
25   A.  Yes.
```

Fesch - Cross

1    Q.  And this was a case that you wrote in September of 2008;

2    is that right?

3    A.  I started it in September of 2008.

4    Q.  And when did you complete it?

5    A.  It appears it's dated October 14th, 2008.

6    Q.  And the purpose of this report was to go back and look

7    at activity from the 2008 time period; is that right?

8    A.  Yes.

9         MR. COLLYARD:  Your Honor, I offer Plaintiff's

10   Exhibit 333.

11        MS. MOMOH:  Your Honor, we have no objection with

12   the document itself except for the issues that we disclosed

13   on the record previously.

14        THE COURT:  Let's have a sidebar.

15        **(At sidebar.)**

16        THE COURT:  So your objection is to?

17        MS. MOMOH:  This document references that

18   (indicating).  And that's the issue -- that's why I was

19   asking that we have this document redacted.

20        MR. COLLYARD:  That was the document I put up in

21   opening statement, Your Honor, that there was no objection

22   to.  And it's on their exhibit list too.

23        MS. MOMOH:  This document wasn't identified in

24   full for purposes of the opening.  I believe it was just a

25   snippet of it.

```
 1              MR. COLLYARD:  Your Honor, this was -- this was my
 2     slide.  This is actually my slide.  It is that portion
 3     (indicating) and that portion (indicating).  Aside
 4     from this, this was actually in my opening statement.
 5              MS. MOMOH:  I'm sorry, Mr. Collyard, I don't
 6     recall that.
 7              THE COURT:  So the jury has already seen it.
 8              MS. MOMOH:  I don't know if that's the case, in
 9     all.  I don't know if we can review it.  If that's the case,
10     then I can go back to my client and explain that, but that's
11     not my understanding, that this particular language has
12     already been shown to the jury.
13              THE COURT:  What is the nature of your objection?
14              MS. MOMOH:  It's with respect to the SAR issue
15     that I had raised outside of the presence of the jury.  And
16     our proposal is that the plaintiffs basically swap out this
17     document with a redacted version of it and that the jurors
18     only have access to the redacted version of it.
19              THE COURT:  And why --
20              MS. MOMOH:  On this particular document the
21     redaction would simply be this portion right here
22     (indicating).  And then there may be additional --
23              THE COURT:  And why is that necessary?
24              MS. MOMOH:  Because under the federal regulator --
25     the regulations that the bank operates under with respect to
```

Fesch - Cross

1    FinCEN and then the OCC, we can't waive any confidentiality

2    issues with respect to the filing or the existence of a SAR.

3    And our concerns are that with this document being offered

4    and received in its form as it exists, this is a 400-page

5    document, that we will be running afoul, essentially, of

6    this language.

7              MR. COLLYARD:  Your Honor, it was produced in the

8    case.  It's on their own exhibit list.  I've used it in

9    opening statement.  There's been no objection until this

10   day.  In fact, this was produced years ago.

11             MS. MOMOH:  We've raised objections to this very

12   issue, Your Honor, throughout the extent of this case, with

13   respect to the issue of -- and we have correspondence with

14   respect to the fed.  And we have correspondence with respect

15   to the FinCEN where we've brought this very issue up.

16             THE COURT:  And what is the evidentiary objection?

17             MS. MOMOH:  Based -- it would be privilege.

18             THE COURT:  And what is the privilege and why

19   isn't it waived?

20             MS. MOMOH:  The privilege would be the

21   confidentiality regulations under FinCEN and the OCC.

22             THE COURT:  And the what?

23             MS. MOMOH:  OCC.

24             THE COURT:  And those are -- I guess I'm not

25   following --

Fesch - Cross

```
1              MS. MOMOH:  I can send you the authority.  I have
2     it, but just not with me.
3              THE COURT:  So you have authority that says that
4     this is not admissible evidence?
5              MS. MOMOH:  I have authority that says that we, as
6     the bank, are not supposed to provide a documentation that
7     pertains to this.
8              And, Your Honor, this very issue came up in
9     bankruptcy court before Judge Sanberg.  It's been fully
10    briefed.  We even had the regulators, a number of the
11    federal -- the fed basically come and speak to this issue.
12             So I ask, you know, that I, you know, confer with
13    my team and my client as well with respect to this before
14    you rule on this matter.
15             THE COURT:  Why are we just getting this in now?
16             MR. COLLYARD:  Your Honor, I can't undo this.
17    This is on their own exhibit list.  I used it in opening
18    statement.
19             MS. MOMOH:  And, Your Honor, let me -- let me --
20    if I may?  We raised an issue with respect to -- well, I
21    think we want to cover this, too, because we raised an issue
22    with respect to --
23         (Pause in proceedings)
24             THE COURT:  So I need to do some more work and
25    address whether or not this needs to be redacted.
```

543

```
1              MR. COLLYARD:  Okay.

2              THE COURT:  And so I'm going to allow you to ask

3    any --

4              MR. COLLYARD:  I'm sorry.  Go ahead.

5              THE COURT:  Ask any questions that you need, but

6    it's not going to be admitted as an exhibit as of yet

7    without it being redacted.

8              It may be the fact -- case that it doesn't get

9    redacted, but at this point it's not going to be admitted.

10   You can ask questions and move on or ask questions that

11   don't implicate the privacy concerns.

12             MR. COLLYARD:  What I intend to do right now is

13   ask questions that don't even involve this issue.

14             THE COURT:  Okay.

15             MR. COLLYARD:  I just want to ask some questions

16   about some of the other information and that's my point in

17   using it right now.

18             THE COURT:  Okay.  Let's do that.  And then there

19   will be more clarification after we recess for tomorrow.

20             MS. MOMOH:  And, Your Honor, if I may clarify?  So

21   this won't be published to the jurors then today?

22             THE COURT:  Not today.

23             MS. MOMOH:  Thank you.

24             MR. COLLYARD:  Well, I'm sorry, Your Honor.  There

25   will be other portions that I need to publish to the jury,
```

```
 1    but not this.  I will not go to that page.
 2              MS. MOMOH:  What do you mean?  Well, we have a
 3    redacted version that we sent to Mr. Collyard and his
 4    counsel.  They do not --
 5              THE COURT:  What portions that -- what portions
 6    are of this document are you concerned about publication?
 7              MS. MOMOH:  There are additional pages besides
 8    just the language.
 9              MR. COLLYARD:  I don't plan on publishing that
10    today at all.  I plan on publishing transactional data and
11    things like that --
12              MS. MOMOH:  That's what I asked.
13              MR. COLLYARD:  -- that are attached to this.
14              MS. MOMOH:  That are attached to this?
15              MR. COLLYARD:  That are part of this, yes.
16              MS. MOMOH:  I mean, this is a 400-page document.
17              MR. COLLYARD:  Your Honor, I've asked her
18    questions just now about what they review when they look at
19    this stuff.  I'm about to ask her and show her data that she
20    reviewed that she can testify to.
21              THE COURT:  Is it related to this issue?
22              MR. COLLYARD:  No, it's not.
23              MS. MOMOH:  If he's able to flag to me the pages
24    that he specifically wants to show her.
25              MR. COLLYARD:  Anything after this.
```

```
 1              MS. MOMOH:  I can't guarantee that in a 400-page
 2     document without having --
 3              THE COURT:  I think you can -- you are an officer.
 4              MR. COLLYARD:  Yes, I'll represent -- yes.
 5              THE COURT:  Okay.
 6              MR. COLLYARD:  I'm not going to do that.
 7              THE COURT:  You're making a representation to the
 8     Court?
 9              MR. COLLYARD:  Yes.
10              THE COURT:  And I'm going to trust your
11     representation.  And I think we both know --
12              MR. COLLYARD:  Yes.
13              THE COURT:  -- all of us know the confines --
14              MS. MOMOH:  Mm-hmm.
15              THE COURT:  -- that you are making a
16     representation about.
17              MR. COLLYARD:  Right.
18              MS. MOMOH:  Mm-hmm.
19              THE COURT:  Is there any clarification that's
20     necessary?
21              MR. COLLYARD:  No, that's fine.
22              THE COURT:  Okay.
23              MR. COLLYARD:  That's totally fine.  We're good.
24              MS. MOMOH:  All right.
25           (In open court.)
```

```
1              THE COURT:  You may proceed, Counsel.

2              MR. COLLYARD:  Thank you, Your Honor.

3    BY MR. COLLYARD:

4    Q.  Ms. Pesch, if you go to the -- more towards the end of

5    your booklet, and you'll see on the bottom kind of in the

6    middle this time, there's numbers.  And it's Plaintiff's

7    Exhibit 333.  You'll see 0206.  So it's Plaintiff's

8    Exhibit 333 --

9    A.  I'm sorry.  Within Volume II?

10   Q.  Yeah.  Have you found 333 yet?

11   A.  Yes.

12   Q.  I'm sorry.  Let's back up.  You and I were just talking

13   about Plaintiff's Exhibit 333.  Now what I'd like to do is

14   bring you to a particular page in Plaintiff's Exhibit 333.

15            And if you look to the bottom, you'll see in the

16   middle of the page there's -- how we used to talk about

17   Bates numbers during your deposition.  Do you see that?

18   Those?

19   A.  I see numbers.

20   Q.  Okay.  Those are the page numbers.  So if you look at --

21   if you turn to page 206.  So the way it would read for you

22   is going to be P-333-0206.  Does that make sense?

23   A.  Yes.

24   Q.  Are you there?

25   A.  Yes.
```

1          MR. COLLYARD:  Publish page 206 from Exhibit 333.

2    BY MR. COLLYARD:

3    Q.  And if you take a look at that, Ms. Pesch, at the top it

4    says, "Transaction Detail Report."  Do you see that?

5    A.  Yes.

6    Q.  And there's an entity called Enchanted Family Buying

7    Company.  Do you see that?

8    A.  Yes.

9    Q.  You're familiar with who Enchanted Family Buying Company

10   is, correct?

11   A.  I remember the name.

12   Q.  And up on top there, there has -- it's an amount.  Do

13   you see an amount for $6.979 million; is that correct?

14   A.  Yes.

15   Q.  Is that an incoming wire?

16   A.  It appears to be.

17   Q.  And this is -- this is actually information that you had

18   access to and that you looked at; is that right?

19   A.  At the time I prepared this case, yes.

20   Q.  This was information you went out and gathered, correct?

21   A.  Yes.

22   Q.  And it shows an address there for Enchanted Family

23   Buying Company; is that right?

24   A.  Yes.

25   Q.  And it says, "PMB223."  Do you know what that is?

Pesch - Cross

1   A.  No.

2   Q.  Is that a personal mailbox?  Have you ever heard of a

3   personal mailbox or a PMB address?

4   A.  No.

5   Q.  No?  And this shows that the -- this shows the date of

6   the wire; is that right?

7   A.  Yes.

8   Q.  And what's the date of the wire?

9   A.  I don't remember the date sequencing.

10  Q.  I think I can help -- I think I can help you out.

11  A.  I see under send date, "080604."  I don't remember which

12  part was the year, the month, and the date.

13  Q.  You prepared this report in 2008; is that correct?

14  A.  Yes.

15  Q.  So would it make sense to you that that -- that the date

16  of the wire is June 4th of 2008?

17  A.  Could be.

18  Q.  If we go to the next page, which is page 207, and you

19  look down, you'll see an entity called Nationwide

20  International Resources, Inc.  Do you see that?

21  A.  Yes.

22  Q.  And you're familiar with who Nationwide International

23  Resources is, correct?

24  A.  I remember the name.

25  Q.  And if you look up above, this shows an incoming wire

Fesch - Cross

1    for $4.407 million, correct?

2    A.  Yes.

3    Q.  And then this is on that same date of June 4 of 2008.

4    Is that also right?

5    A.  Yes.

6    Q.  And then, again, this has information about the entity

7    Nationwide, correct?

8    A.  What do you mean by "information"?

9    Q.  It has their address, for example.

10   A.  Yes.

11   Q.  It has the amount of the wire; is that right?

12   A.  Yes.

13   Q.  It has information about where the money -- where the

14   wire is being sent from; is that true?

15   A.  In terms of the beneficiary -- or, excuse me, the

16   originator, yes.

17   Q.  And this is the type of information that you had access

18   to as an anti-money laundering analyst, correct?

19              MS. MOMOH:  Objection, Your Honor, vague as to

20   time.

21              THE COURT:  Overruled.  You may answer it if you

22   can.

23              THE WITNESS:  This isn't information that appeared

24   in Searchspace.  This was from a separate system.

25   BY MR. COLLYARD:

Fesch - Cross

1    Q.  This was information that you had access to as an

2    anti-money laundering analyst, correct?

3    A.  At the time I did this case, yes.

4    Q.  When was the first time that you had access to this type

5    of information?

6    A.  I don't remember.

7    Q.  2005?

8    A.  I don't remember.

9    Q.  You could have had access to this type of information in

10   2005, you just don't remember if you did; is that fair?

11   A.  We did not have access to this system when I first

12   started.  I don't remember when we got access.

13   Q.  Could it have been in 2005 is my question?

14             MS. MOMOH:  Objection, Your Honor, asked and

15   answered.

16             THE COURT:  Calls for speculation.  Sustained.

17   BY MR. COLLYARD:

18   Q.  You have no reason to disagree that you would have had

19   access to this information, for example, in 2006?

20   A.  I don't remember when we got access to it.

21   Q.  Let's go back to Plaintiff's Exhibit 179, which is what

22   we were talking about before.  And go back to the --

23   A.  Just a minute.  Can you help me find that?

24   Q.  Sure.  Go to your first volume -- go to your first

25   volume.  You've got to switch volumes, probably.

1      A.  Okay.

2      Q.  If you go to number 3, it says, "Interact with other M&I

3      employees to fully investigate unusual transactions."  Do

4      you see that?

5      A.  Yes.

6      Q.  And what that's talking about, for example, is you could

7      talk to other anti-money laundering analysts; is that right?

8      A.  Yes.

9      Q.  You could talk to business bankers, for example; is that

10     right?

11     A.  Yes.

12     Q.  In fact, you could pick up a phone and ask a customer

13     relationship manager or business banker any question that

14     you had as you were investigating or reviewing alerts in

15     Searchspace; is that true?

16     A.  Potentially, yes.

17     Q.  You've actually done that in the past, haven't you?

18     A.  Yes.

19     Q.  And you've done that because it was helpful to try to

20     figure out, for example, questions you had on the customer's

21     transaction activity; is that right?

22     A.  Yes.

23     Q.  And then number 5 says, "Maintain complete and accurate

24     documentation of all monitoring and investigation efforts."

25     Do you see that?

1    A.  Yes.

2    Q.  One of the roles that the anti-money laundering analyst

3    had was to maintain accurate and complete documentation of

4    the investigations they were doing; is that right?

5    A.  Did you say it was one of the roles?

6    Q.  One of the roles.  I'm sorry.

7    A.  Um --

8    Q.  Let me ask again.  Did an anti-money laundering analyst

9    have the responsibility to maintain documentation with

10   respect to the investigation efforts that that anti-money

11   laundering analyst was undertaking?

12   A.  Based on the expectations of the time, yes.

13   Q.  Then if we could just go down below where it says,

14   "knowledge, skills, and abilities required."

15            MR. COLLYARD:  Pull that up.

16   BY MR. COLLYARD:

17   Q.  Number 2 reads, "Effective analysis and investigation

18   skills."  Do you see that?

19   A.  Yes.

20   Q.  And the reason why those skills were required of an

21   anti-money laundering analyst is because you were actually

22   investigating transaction activity; is that correct?

23   A.  Yes.

24   Q.  And you were actually trying to figure out what was

25   going on with wires going in and out of an account, for

1    example?

2    A.  What do you mean, "figure out"?

3    Q.  Determine the reasons, determine the purpose, for

4    example.

5    A.  Like I said before, we didn't always have access to that

6    full wire data, which would give us the purpose.

7    Q.  My question --

8    A.  If -- if it was in the wire data to begin with.

9    Q.  My question is just a little bit different, Ms. Pesch.

10   Let me try it again.

11           The reason why AML analysts -- or, I'm sorry, the

12   reason why it was helpful to have effective analysis and

13   investigation skills was because AML analysts were

14   investigating and looking at wires going in and out of an

15   account; is that right?

16   A.  Yes.

17   Q.  All right.  Let's step away for a moment from your job

18   and roles in the Anti-Money Laundering Group.  We'll come

19   back to that in a little bit.

20           Let me skip ahead.  I want to -- can you go to

21   Plaintiff's Exhibit 4?  And, Ms. Pesch, I don't know if you

22   can see, but are the exhibits popping up on your screen when

23   I'm showing them to you?

24   A.  Sometimes.

25   Q.  Okay.  If there's ever a time where you don't see it on

Pesch - Cross

554

```
 1    your screen and you want it on your screen, will you please

 2    let me know?

 3    A.  Yes.  Will it appear -- I've noticed highlighting

 4    sometimes.  Is it always going to highlight what you're

 5    referring to?

 6    Q.  If I'm highlighting it, it will show you exactly what

 7    I'm doing, yes.

 8    A.  Okay.

 9    Q.  All right, Ms. Pesch.  Take a look at Exhibit Number 4.

10    And if you could please tell me if you are familiar with

11    this document.

12    A.  Yes.

13    Q.  You've seen this document before, right?

14    A.  Yes.

15              MR. COLLYARD:  Your Honor, I offer Plaintiff's

16    Exhibit 4.

17              MS. MOMOH:  Your Honor, the objection is just lack

18    of foundation.

19              THE COURT:  Can you establish more foundation?

20              MR. COLLYARD:  Sure.

21              THE COURT:  Sustained.

22    BY MR. COLLYARD:

23    Q.  You've seen this document before, correct?

24    A.  Yes.

25    Q.  You understand the content in it, correct?
```

Pesch - Cross

1    A.  I understand what the document is.

2    Q.  If you -- okay.  If you flip through the -- if we flip

3    through the documents, for example, if you go to page 007,

4    go to page 7 of Exhibit 4.  It has some terminology there,

5    right?

6    A.  Yes.

7    Q.  It says, "Basic terminology.  Anti-money laundering."

8    Right?

9    A.  Yes.

10   Q.  You're familiar with that kind of content, correct?

11   A.  Yes.

12   Q.  And if you look at page 6 --

13              MS. MOMOH:  Your Honor, objection.  If I may?

14   Sidebar?

15              THE COURT:  You may.

16        **(At sidebar)**

17              MS. MOMOH:  My issue here is just lack of

18   foundation.  He was questioning the witness on information

19   that's in the document without even having laid the proper

20   foundation that she can testify as to it.

21              MR. COLLYARD:  I'm asking her if she's familiar

22   with the information in the document.  She's telling me she

23   is and she can actually testify to it and she's seen the

24   document.

25              MS. MOMOH:  Your Honor, he hasn't asked her when

Pesch - Cross

1    she saw it, when was the last time she saw it.  Our

2    objection is still lack of foundation.

3                THE COURT:  Overruled.

4                MR. COLLYARD:  Thank you.

5           **(In open court)**

6    BY MR. COLLYARD:

7    Q.  I'm sorry, Ms. Pesch.  If we go to page 6 of Exhibit 4,

8    it says, "Basic terminology.  Money laundering."  Do you see

9    that?

10   A.  Yes.

11   Q.  And you're familiar with that concept, right?

12   A.  Yes.

13               MR. COLLYARD:  Your Honor, I offer Plaintiff's

14   Exhibit 4.

15               MS. MOMOH:  Your Honor, objection.  Same

16   objection, lack of foundation.

17               THE COURT:  Overruled.

18   BY MR. COLLYARD:

19   Q.  Ms. Pesch, do you remember back in the 2005 time period,

20   for example, when you had just joined M&I Bank, do you

21   remember if there was an initiative to educate employees on

22   detecting and identifying suspicious activity?

23   A.  I remember being told that before I had joined there was

24   a big effort to train M&I employees on AML.

25   Q.  And even when you joined, you went to training sessions

1    on that, correct?

2    A.  Yes.

3    Q.  And the type of content that I've showed you here in

4    Exhibit 4, you're familiar with that because that's the type

5    of training -- that's the type of content that was in

6    training materials that you went to; is that right?

7    A.  Yes.

8    Q.  I'm going -- I want to go to Plaintiff's Exhibit 4-A.

9    And this is going to be a video that I'd like you to watch

10   with me.

11              MR. COLLYARD:  Your Honor, I believe it's about

12   four minutes long.

13              THE COURT:  And this has not been admitted into

14   evidence, correct?

15              MR. COLLYARD:  This is part of Exhibit 4.  It is a

16   part of Exhibit 4.  It's a video embedded in Exhibit 4.

17              THE COURT:  Let's have a sidebar.

18         **(At sidebar)**

19              MR. COLLYARD:  It's a piece -- it's a piece of

20   Exhibit 4.  It's 4-A because it's a video, but it's part of

21   the training material that Ms. Pesch is familiar with.

22              MS. MOMOH:  Your Honor, this was disclosed to us

23   as a completely separate exhibit, Exhibit 4 and Exhibit 4-A.

24   The objection is the same, lack of foundation.

25              THE COURT:  Okay.  What's the foundation for

```
 1    Exhibit 4-A?

 2               MR. COLLYARD:  She's seen the video.  I've shown

 3    it to her.  She can speak to it.

 4               MS. MOMOH:  When?

 5               MR. COLLYARD:  She testified about it at her

 6    deposition.

 7               MS. MOMOH:  Exactly.  So same objection.

 8               MR. COLLYARD:  I'll try to lay some foundation for

 9    it, but.

10               THE COURT:  You may lay the foundation for it or

11    you can try to lay the foundation.  If you can lay the

12    foundation for it --

13               MR. COLLYARD:  Sure.

14               THE COURT:  -- then I will rule on it.  It won't

15    be seen today.

16               MR. COLLYARD:  Okay.  Got it.

17               THE COURT:  But you can go ahead and address that.

18               MR. COLLYARD:  Sure.  Okay.

19          (In open court)

20    BY MR. COLLYARD:

21    Q.  Ms. Pesch, as part of the -- as part of the training

22    that was happening at M&I Bank, do you remember seeing a

23    video by Dennis Kuester, for example, on the importance of

24    identifying and reporting suspicious activity?

25    A.  Yes.
```

```
 1                    MR. COLLYARD:  Your Honor, I would offer
 2       Exhibit 4-A, which is a video attached to Exhibit 4.
 3                    THE COURT:  And help me understand the basis for
 4       the foundation.
 5                    MR. COLLYARD:  It is a -- it is a video from
 6       Dennis Kuester that Ms. Pesch says that she is familiar
 7       with.
 8                    The only way I could do it is if I showed her the
 9       video somehow privately outside of it playing in front of
10       the jury.
11                    THE COURT:  Ms. Momoh?
12                    MS. MOMOH:  Your Honor, no objection.
13                    THE COURT:  And how long is the video?
14                    MR. COLLYARD:  It's four minutes.  We can play it
15       tomorrow, Your Honor.
16                    THE COURT:  No, that's fine.  You may play it for
17       four minutes and then we'll conclude.
18                    MR. COLLYARD:  So just for clarity, Your Honor, I
19       offer Plaintiff's Exhibit 4-A.  Is that admitted?
20                    THE COURT:  Yes.
21                    MR. COLLYARD:  Thank you.
22                    THE COURT:  It is received.
23       BY MR. COLLYARD:
24       Q.  And then, Ms. Pesch, we'll play for you Exhibit 4-A.
25                    (Exhibit 4-A played as follows:)
```

1              "Hello.  I am Dennis Kuester, President and CEO of

2      the Marshall & Ilsley Corporation.  Welcome to today's

3      training programming regarding anti-money laundering and the

4      identification and reporting of suspicious activity.

5              "Today you'll learn more about this critical

6      compliance matter that affects our corporation, our

7      customers, our employees, and ultimately our nation.

8              "Ever since 9-11 the Bank Secrecy Act and the

9      Anti-Money Laundering Regulations have received increased

10     attention as financial institutions work to prevent criminal

11     activity, including money laundering schemes and terrorist

12     financing activities.

13             "At M&I we have always been diligent in our

14     efforts, recognizing that compliance with these regulations

15     is not just a regulatory requirement, it's the right thing

16     to do.

17             "You're here today because you played a key role

18     in ensuring M&I is not used as conduit for illegal activity.

19     It is a responsibility we all share, regardless of where we

20     work, what we do or the level of customer contact we have on

21     a daily basis.

22             "Compliance with the Bank Secrecy Act and

23     Anti-Money Laundering Regulations must be integrated into

24     virtually every function we perform, making it as

25     fundamental in our work environment as greeting customers

Fesch - Cross

1    and asking for their business.

2            "Today you'll learn how to identify potential

3    criminal acts by knowing your customers well and being

4    diligent in identifying suspicious transactions or

5    activities.

6            "By following some common sense practices and

7    being conscientious about adhering to proper procedures, you

8    can help ensure that we not only meet or exceed the

9    requirements of these regulations, but that we also prevent

10   criminal acts from taking place, criminal acts that could

11   have destructive effects on our economy, our institutions,

12   and our country.

13           "The importance of complying with the bank secrecy

14   and anti-money laundering requirements cannot be overstated.

15   Noncompliance penalties are severe for banks and for

16   employees who facilitate money laundering events.

17           "Institutions that don't comply can put their

18   entire corporate reputation at risk and significant criminal

19   and civil penalties can be levied against a bank for

20   noncompliance.  In extreme circumstances, a bank's charter

21   can even be revoked.  Therefore, the role we play as a

22   corporation and as individuals is critical.

23           "Fortunately, you have an excellent resource at

24   your fingertips.  The team of experts that make up M&I's

25   corporate compliance department are available to answer

Pesch - Cross

1    questions about the Bank Secrecy Act, Anti-Money Laundering

2    Regulations, and other compliance issues should they arise.

3                "Thank you for your continued diligence.  Your

4    commitment and dedication to this effort are key to M&I's

5    success."

6    BY MR. COLLYARD:

7    Q.  Let's talk just a moment, Ms. Pesch, about Mr. Kuester's

8    message, that's why I want to ask you some questions about

9    it.

10               THE COURT:  Counsel, it is 5:03.

11               MR. COLLYARD:  We can conclude, Your Honor.

12               THE COURT:  We will conclude now.

13               Members of the Jury, you must not discuss this

14   case with anyone, including other jurors, members of your

15   family, people involved in the trial or anyone else.  And do

16   not allow anyone to discuss the case with you or within your

17   hearing.

18               And when I say you must not discuss the case with

19   anyone, I mean you also must not e-mail or text about it or

20   look at blogs or send blogs or engage in any other kind of

21   written or oral or electronic communication, as I've

22   instructed you before.

23               And also do not read any newspaper or other

24   written account or watch any televised account or listen to

25   any radio or other programs about this trial.

1           Also, do not do any internet research or consult

2     any other sources about the case, about the people involved

3     in the case, or about the general subject matter of the

4     case.

5           And, as you know, you must keep an open mind

6     that's free from outside information as it would be a

7     violation of your oath for you to base your decision on i

8     nformation that you did not receive here in this courtroom.

9           We will plan to resume tomorrow morning at the

10    regular time.  And thank you very much for your service.

11    It's been a long day.  I appreciate the hard work that

12    you've been doing, so thank you.

13        (Jury excused)

14                      **IN OPEN COURT**

15                    **(JURY NOT PRESENT)**

16        THE COURT:  You may be seated.  Do we have

17    anything else to address at this time?

18        MS. MOMOH:  Your Honor, if I may?

19        THE COURT:  You are excused for today.  It is,

20    though, as if you're on the witness stand when you leave the

21    witness stand, so please do not discuss this case or any of

22    the work -- or anything about the case during the course of

23    your evening.  But I hope you have a good evening without

24    thinking about this case.

25        THE WITNESS:  Thank you.

```
 1              THE COURT:  Sure thing.  And you may leave that
 2      right there at the witness stand.
 3              THE WITNESS:  Okay.
 4              MS. MOMOH:  Thank you, Your Honor.
 5              THE COURT:  You're welcome.
 6              MS. MOMOH:  With respect to the SARs issue, in the
 7      manner in which it was discussed this afternoon, I
 8      respectfully request that the parties be permitted to submit
 9      briefing on the issue, Your Honor.
10              THE COURT:  You may.  Overnight?
11              MS. MOMOH:  Yes.  Yes, Your Honor.
12              THE COURT:  Okay.
13              MS. MOMOH:  And by when would you want us to
14      submit our briefing on the matter?
15              THE COURT:  7:00 a.m. tomorrow morning.
16              MS. MOMOH:  7:00 a.m. tomorrow morning.  Any page
17      limits?
18              THE COURT:  15.
19              MS. MOMOH:  15.  Thank you, Your Honor.
20              THE COURT:  You're welcome.
21              Anything further?
22              MR. COLLYARD:  Nothing from plaintiff, Your Honor.
23              THE COURT:  Okay.
24              MS. MOMOH:  Nothing further, Your Honor.  Thank
25      you.
```

1          THE COURT:  Thank you.  Have a good evening.

2          MS. MOMOH:  You too.  Thank you.

3     (Court adjourned at 5:07 p.m.)

4               *          *          *

5          I certify that the foregoing is a true and correct
    copy of the transcript originally filed on 12/05/2022 and
6   incorporating redactions requested by Attorney Adine S.
    Momoh.

7
               Certified by:   *s/ Lori A. Simpson*
8
                          Lori A. Simpson, RMR-CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25