1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                  )
     Douglas A. Kelley, in his    )   File No. 19-cv-1756
4    capacity as the Trustee of the )          (WMW)
     BMO Litigation Trust,        )
5                                 )
              Plaintiff,          )   St. Paul, Minnesota
6                                 )   October 14, 2022
     vs.                          )   8:38 a.m.
7                                 )
     BMO Harris Bank N.A., as     )
8    successor to M&I Marshall and )
     Ilsley Bank,                 )
9                                 )
              Defendant.          )
10   ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE WILHELMINA M. WRIGHT
              UNITED STATES DISTRICT COURT JUDGE
14
          *   *   *   **REDACTED TRANSCRIPT**   *   *   *
15

16                 **(JURY TRIAL VOLUME III)**

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25   transcript produced with computer.

                    LORI A. SIMPSON, RMR-CRR
                        (651) 848-1225

```
 1        APPEARANCES:
            For the Plaintiff:          Robins Kaplan, LLP
 2                                       MICHAEL A. COLLYARD, ESQ.
                                         DAVID E. MARDER, ESQ.
 3                                       PETER C. IHRIG, ESQ.
                                         MORGIA D. HOLMES, ESQ.
 4                                       MICHAEL D. REIF, ESQ.
                                         800 LaSalle Avenue
 5                                       Suite 2800
                                         Minneapolis, Minnesota 55402
 6
                                         Anthony, Ostlund, Louwagie,
 7                                       Dressen, Boylan, P.A.
                                         JOSEPH W. ANTHONY, ESQ.
 8                                       JOSEPH R. RICHIE, ESQ.
                                         RYAN M. LAWRENCE, ESQ.
 9                                       90 South Seventh Street
                                         Suite 3600
10                                       Minneapolis, Minnesota 55402

11      For the Defendant:             Stinson, LLP
                                         KEITH S. MOHEBAN, ESQ.
12                                       ADINE S. MOMOH, ESQ.
                                         50 South Sixth Street
13                                       Suite 2600
                                         Minneapolis, Minnesota 55402
14
                                         Debevoise & Plimpton, LLP
15                                       JOHN GLEESON, ESQ.
                                         MICHAEL SCHAPER, ESQ.
16                                       SUSAN REAGAN GITTES, ESQ.
                                         MORGAN A. DAVIS, ESQ.
17                                       919 Third Avenue
                                         New York, New York 10022
18
                                         Mayer Brown, LLP
19                                       JOSHUA D. YOUNT, ESQ.
                                         71 South Wacker Drive
20                                       Chicago, Illinois 60606

21                                       Mayer Brown, LLP
                                         RICHARD A. SPEHR, ESQ.
22                                       GINA PARLOVECCHIO, ESQ.
                                         1221 Avenue of the Americas
23                                       New York, New York 10020

24                                       LORI A. SIMPSON, RMR-CRR
            Court Reporter:              316 North Robert Street
25                                       St. Paul, Minnesota 55101
```

1                              **I N D E X**

2                                                             PAGE

3      **MARY PESCH**
            Continued Cross-Examination by Mr. Collyard        574
4           Direct Examination by Ms. Momoh                    781

5

6      PLAINTIFF'S EXHIBITS                                   REC'D
            5                                                  580
7           178                                                631
            188                                                712
8           189                                                716
            234                                                651
9           296                                                840
            333                                                742
10          411                                                764
            667                                                840
11          668                                                840

12

13     DEFENDANT'S EXHIBITS                                   REC'D
            50711                                              831

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(JURY NOT PRESENT)**

1
2
3
4          LAW CLERK:  The matter before the Court is Case

5   Number 19-1756, Kelley vs. BMO Harris Bank.

6          Counsel, please stand and make your appearance for

7   the record.

8          MR. COLLYARD:  Good morning, Your Honor.  Mike

9   Collyard on behalf of the plaintiff.

10          THE COURT:  Thank you.  Good morning,

11   Mr. Collyard.

12          MR. GLEESON:  Good morning, Judge.  John Gleeson

13   on behalf of BMO.

14          THE COURT:  Thank you.  Good morning, Mr. Gleeson.

15   Are we ready to proceed?

16          MS. PARLOVECCHIO:  Good morning, Your Honor.  Gina

17   Parlovecchio for BMO Harris.  We just had one very quick

18   issue to address with Your Honor in regard to the order that

19   was issued this morning.

20          First, just seeking some clarification from the

21   Court.  First, Your Honor expressed some consternation

22   yesterday and again expressed in the order about the timing

23   of this issue being raised, and so we just wanted to make a

24   brief record about the timing of this issue.

25          The SARs issue --

```
 1              THE COURT:  Is that necessary --

 2              MS. PARLOVECCHIO:  It is for the record.

 3              THE COURT:  -- for the decision?

 4              MS. PARLOVECCHIO:  It is just to clarify for the

 5     record, Your Honor, very briefly.

 6              THE COURT:  What's the purpose -- why does the

 7     record need to be clarified?

 8              MS. PARLOVECCHIO:  Because we had a question about

 9     the order and the basis on which the Court is issuing its

10     order, Number One; and, Number Two, just wanted to make the

11     record the manner in which the Court -- the manner in which

12     BMO Harris attempted to resolve this issue before trial.

13              THE COURT:  And that's relevant because?

14              MS. PARLOVECCHIO:  It's relevant as to the

15     resolution of this issue, Your Honor, to make our record.

16              THE COURT:  Very well.

17              MS. PARLOVECCHIO:  In regard to the basis for the

18     Court's order, I know that the Court issued its order based

19     on the bank examiner's privilege, and BMO Harris wanted to

20     just get clarification as to whether the Court's order is

21     also based on Title 31, the Bank Secrecy Act, which

22     prohibits disclosure of SARs, the fact that a SAR was

23     issued.  And so we are seeking clarification from the Court

24     on that issue, because it is a categorical prohibition, and

25     it also carries civil and criminal penalties for the bank
```

1    and its officers and employees for disclosing that type of

2    information.  So that was our first issue.

3                THE COURT:  Is that necessary for the decision

4    that has been made?

5                MS. PARLOVECCHIO:  It is necessary to clarify it

6    for the record, Your Honor.

7                THE COURT:  I'm asking why.

8                MS. PARLOVECCHIO:  Because the bank would be

9    subject to criminal and civil penalties as a result of

10   disclosing information about the fact that a SAR was filed,

11   the fact of the SAR itself, and entering that into evidence

12   and making that publicly disclosed.

13               THE COURT:  And doesn't the order take care of

14   that?

15               MS. PARLOVECCHIO:  It doesn't directly address

16   that issue, Your Honor.  The order only addresses the issue

17   as to the bank examiner's privilege, which is a slightly

18   different -- it is a completely different concept actually.

19   It's under the regs.  The issue that we raised was under

20   Title 31 of the Bank Secrecy Act, which actually

21   categorically prohibits disclosure.

22               THE COURT:  And is there any expectation that

23   there will be disclosure in light of the ruling that I have

24   made?

25               MS. PARLOVECCHIO:  Yes, Your Honor.

1            THE COURT:  Why?

2            MS. PARLOVECCHIO:  Because Mr. Collyard can ask

3    Ms. Pesch, based on the Court's ruling, whether or not a SAR

4    was filed as a result of her analysis of the transactions

5    that have proceeded prior to 2008.  And if she answers

6    affirmatively, that would subject her and other members of

7    the BMO Harris team to potential civil and criminal

8    penalties.

9            THE COURT:  Okay.  I understand your position.

10            MS. PARLOVECCHIO:  And just briefly, Your Honor,

11    it will take one second, just to clarify the record as to

12    the manner in which the bank approached this issue.

13            We just wanted to clarify for the Court the fact

14    that BMO Harris had raised this issue to the regulators on

15    multiple occasions leading up to trial.  We anticipated this

16    would be an issue.

17            And while we did get clarity from our regulators

18    in regard to certain SAR-related issues and certain

19    regulatory documents that we anticipated may come into

20    evidence during trial, the one issue that remained

21    unresolved was the SAR issue.  And we literally just got

22    notice from a regulator the day before yesterday.

23            THE COURT:  So you literally got what?  I just

24    didn't hear you.

25            MS. PARLOVECCHIO:  I'm sorry.  Notice from the

1    regulator the day before yesterday that they would not

2    permit disclosure of SAR -- the SAR or SAR-related

3    information in this trial.

4              THE COURT:  Okay.  Thank you.

5              MS. PARLOVECCHIO:  Thank you, Your Honor.

6              THE COURT:  Counsel.

7              MR. COLLYARD:  Yes, Judge.  You had asked if we

8    were ready to proceed, and I am ready to proceed.

9              THE COURT:  Okay.  We are.

10             MR. COLLYARD:  Thank you.

11        (Pause)

12                        **IN OPEN COURT**

13                       **(JURY PRESENT)**

14             THE COURT:  Good morning.  Please be seated.

15             Counsel, you may proceed.

16             MR. COLLYARD:  Thank you, Your Honor.  We would

17   like to continue with the examination of Ms. Mary Pesch.

18             MR. GLEESON:  She's on the way, Judge.

19             THE COURT:  Thank you.

20        (Pause)

21             MR. GLEESON:  Judge, she's in the restroom.

22   Sorry.

23             THE COURT:  Okay.

24        (Pause)

25             THE COURT:  Good morning.  Please be seated.

1          I will simply remind you that you are under oath.

2     Okay?

3          You may proceed.

4          MR. COLLYARD:  Thank you, Your Honor.

5                    **(Mary Pesch)**

6               **CONTINUED CROSS-EXAMINATION**

7     BY MR. COLLYARD:

8     Q.  Good morning, Ms. Pesch.

9     A.  Good morning.

10    Q.  Welcome back.

11    A.  Thank you.

12    Q.  We left yesterday watching a video from M&I CEO back in

13    the 2004 time period, Dennis Kuester.  Do you remember that?

14    A.  Yes.

15    Q.  And you had seen that video before, haven't you?

16    A.  Yes.

17    Q.  I just want to ask you a few questions of what you

18    believe the message to be from that video.  Okay?

19          THE COURT:  I didn't hear your response.

20          THE WITNESS:  Okay.  Yes.

21    BY MR. COLLYARD:

22    Q.  You agree that part of Mr. Kuester's message was that

23    anti-money laundering work is important?

24    A.  Yes.

25    Q.  You agree that part of Mr. Kuester's message was that

1    anti-money laundering work is the responsibility of everyone

2    at the bank?

3    A.  Yes.

4    Q.  And you agree that Mr. Kuester's message -- or part of

5    Mr. Kuester's message was that anti-money laundering work is

6    something that the bank had to do to protect our

7    communities?

8    A.  Yes.

9    Q.  And you agree that part of Mr. Kuester's message was

10   that anti-money laundering work was something that the bank

11   had to do to protect our country?

12   A.  I don't remember his exact words when he talked about

13   the country.

14   Q.  Do you agree, Ms. Pesch, that anti-money laundering work

15   is something that the bank had to do to protect our country?

16   A.  I agree that the bank had to do it, and it protected the

17   country.

18   Q.  And do you agree that the bank's anti-money laundering

19   work was supported all the way up through top management at

20   the bank?

21   A.  Yes.

22   Q.  Mr. Kuester said, if you remember, he said, "You play a

23   key role in ensuring that M&I is not used as a conduit for

24   illegal activity."  Do you agree with that statement?

25   A.  Yes.

Pesch - Cross

1    Q.  And do you agree with the concept that that was supposed

2    to be recognized across the bank?

3    A.  Yes.

4    Q.  And you understood that concept to be true at the time

5    that you were working at M&I Bank?

6    A.  Yes.

7    Q.  And that was something that was being taught to the bank

8    personnel through these types of training sessions, correct?

9    A.  Yes.

10   Q.  Do you also agree with Mr. Kuester's statement that

11   anti-money laundering compliance is a responsibility that

12   was shared across the bank regardless of where personnel

13   worked, what they did, or the level of customer contact they

14   had?

15   A.  Yes.

16   Q.  And, Ms. Pesch, you also agree that recognizing and

17   complying with the Bank Secrecy Act and anti-money

18   laundering regulations was, as Mr. Kuester said, the right

19   thing to do?

20   A.  Yes.

21   Q.  I want to talk for a second a couple concepts.  I want

22   to talk about the concept of willful blindness, and I want

23   to talk about a concept called "know your customer."  Are

24   you familiar with both of those concepts?

25   A.  I couldn't hear -- I heard willful blindness.  Can you

Pesch - Cross

 1    say clearly the second part.

 2    Q.  "Know your customer."

 3    A.  Yes.

 4    Q.  You are familiar with the concept of "know your

 5    customer"?

 6    A.  Yes.

 7    Q.  Let's talk about willful blindness for a second.  You've

 8    heard of the term "willful blindness," right?

 9    A.  Yes.

10    Q.  And do you agree that willful blindness is a term that

11    the Anti-Money Laundering Group used?

12    A.  It was a term we needed to know, yes.

13    Q.  That was a term that would be spoken about within the

14    Anti-Money Laundering Group, correct?

15    A.  Yes.

16    Q.  And you agree that willful blindness means that if

17    something was unusual and you didn't do extra research to

18    try to understand it, that would be willful blindness?

19              MS. MOMOH:  Objection, Your Honor, calls for a

20    legal conclusion.

21              THE COURT:  Overruled.

22              THE WITNESS:  That's not exactly how I would

23    define "willful blindness."

24    BY MR. COLLYARD:

25    Q.  If you can go to your deposition transcript, please,

1    Ms. Pesch.

2            MR. COLLYARD:  Counsel, it's going to be on page

3    61 to 62.

4    BY MR. COLLYARD:

5    Q.  And, Ms. Pesch, if you go to the very bottom of page 61,

6    do you see line 25?

7    A.  Yes.

8    Q.  I asked you the question:  "I'm asking you if you agree

9    that willful blindness is also where you know something

10   seems unusual, but you choose to not look into it?"  Do you

11   see that?

12   A.  Yes.

13   Q.  And can you read your answer to me.

14   A.  "If something was unusual and you didn't do extra

15   research to try to understand it, that would be willful

16   blindness."

17   Q.  And that was your testimony, correct?

18   A.  Yes.

19   Q.  Do you also agree that willful blindness means that --

20   let me back up.

21           Do you agree that willful blindness also means

22   that intentionally not looking into something that you think

23   might be suspicious, that would be willful blindness?

24   A.  Yes.

25   Q.  And you also agree that the practice of ignoring red

Pesch - Cross

```
1    flags is willful blindness?

2    A.  Today I would describe willful blindness as suspecting

3    something was wrong and turning -- ignoring it.

4    Q.  Go to Plaintiff's Exhibit 5.  Are you there, Ms. Pesch?

5    A.  Yes.

6    Q.  Can you take a look at the first part of it.  It's the

7    Bank Secrecy Act and Anti-Money Laundering Compliance 2004

8    Training Session.  Do you see that?

9    A.  Yes.

10   Q.  Is this another example of the training sessions that

11   M&I was putting on to educate its employees about anti-money

12   laundering work?

13   A.  Yes.

14   Q.  And Bank Secrecy Act compliance?

15   A.  Yes.

16   Q.  And it says here that Kelley Maltsch -- do you see where

17   it says, "Kelley Maltsch"?

18   A.  Yes.

19   Q.  Who is Kelley Maltsch?

20   A.  She worked in the compliance department at M&I.

21   Q.  And you knew who she was?

22   A.  Yes.

23   Q.  You worked with her?

24   A.  Yes.

25   Q.  And --
```

1          MR. COLLYARD:  Your Honor, I offer Plaintiff's

2    Exhibit 5.  It's my understanding that defendants have no

3    objection to the authenticity of this document, and that

4    it's a business record.

5          THE COURT:  You offer it, you said?  Is that --

6          MR. COLLYARD:  Yes, I offer Plaintiff's Exhibit 5.

7          MS. MOMOH:  No objection, Your Honor.

8          THE COURT:  Plaintiff's Exhibit 5 is received.

9          MR. COLLYARD:  Thank you, Your Honor.

10   BY MR. COLLYARD:

11   Q.  Ms. Pesch, we are going to turn what I will call

12   slide 30, and it's on page number 30 of this exhibit.  You

13   have it on your screen too if that's easier.

14          And you see at the top it says, "Willful

15   Blindness"?

16   A.  Yes.

17   Q.  And it reads, "The practice of ignoring potential

18   criminal activity is referred to as willful blindness."  Is

19   that right?

20   A.  Yes.

21   Q.  And you agree with that, right?

22   A.  Yes.

23   Q.  And you agree that the law requires that banks have

24   policies and procedures in place to identify and report

25   suspicious activity; is that right?

Pesch - Cross

1    A.  Yes.

2    Q.  And you agree that the bank wasn't allowed to be

3    willfully blind to suspicious activity?

4    A.  Yes.

5    Q.  Put that aside, but we are going to come back to it here

6    in a little bit.

7            I talked about willful blindness.  Now I want to

8    talk to you about "know your customer."  You told me that

9    you were familiar with the concept of "know your customer,"

10   right?

11   A.  Yes.

12   Q.  "Know your customer" is a term that was used at M&I Bank

13   from 2005 up through 2008; is that right?

14   A.  Yes.

15   Q.  And you agree that "know your customer" means that you

16   have to understand who your customer is, and then it will

17   help you determine if the transaction activity makes sense

18   for the customer; is that right?

19   A.  Sorry.  That was kind of long.  Can you go slower or

20   break it up?

21   Q.  I will.

22           Do you agree that what -- do you agree that "know

23   your customer" means that you have to understand who your

24   customer is, and then it will help you determine if the

25   transaction activity makes sense for the customer?

```
1    A.  We had to have a reasonable understanding of who the

2    customer was.

3    Q.  Can you go to your deposition, please.

4         MR. COLLYARD:  Counsel, it is going to be page 21.

5    BY MR. COLLYARD:

6    Q.  If you look at page 21 towards the bottom, line 17,

7    Ms. Pesch, I ask you the question of:  "Have you heard the

8    concept of 'know your customer'?"  Do you see that?

9    A.  Yes.

10   Q.  And you responded, "Yes."  Do you see that?

11   A.  Yes.

12   Q.  And I said, "What does that mean?"

13        Can you read your answer.

14   A.  "It means you have to understand who your customer is,

15   and it will help you determine if the activity makes sense

16   for that customer."

17   Q.  Okay.  And the activity you are talking about --

18        MS. MOMOH:  Objection, Your Honor.  Sidebar,

19   please?

20        (At sidebar)

21        MS. MOMOH:  He's using the deposition transcript

22   to refresh her recollection, but he can't have her read her

23   testimony that was in the deposition transcript.  That would

24   be hearsay, unless he's trying to impeach her with a prior

25   inconsistent statement.  And based on his lines of
```

Pesch - Cross

1    questions, it sounds as though he is just trying to refresh

2    her recollection.  If it's for impeachment purposes, I would

3    prefer that is it is clarified for the record so I

4    understand the purpose of the use of this transcript.

5              MR. COLLYARD:  I'm asking her proper impeachment,

6    Judge.  I asked her the question, she says differently, and

7    I go and show her the question and I ask her to read it.

8              THE COURT:  The proper way to do it is for you to

9    read it and say:  Isn't it true that you said at this time

10   and this occasion and you state what she said and then ask

11   her if that is, in fact, what she said.  That's the proper

12   impeachment.

13             MR. COLLYARD:  Okay.  So you want me to ask her

14   the question and then do the answer myself and ask her if

15   that's what she said instead of asking her to read the

16   question?

17             THE COURT:  That's how you impeach the witness

18   with the prior inconsistent statement if that's what you are

19   trying to do.

20             MR. COLLYARD:  Okay.  Thank you.

21             THE COURT:  You're welcome.

22             MS. MOMOH:  Thank you, Your Honor.

23        **(In open court)**

24   BY MR. COLLYARD:

25   Q.  Ms. Pesch, do you agree that understanding who your

Pesch - Cross

1    customer is as part of the concept of "know your customer"

2    means understanding what type of business your customer is

3    in?

4    A.  Yes.

5    Q.  And in the Anti-Money Laundering Group, you were charged

6    with knowing who your customers were and their business

7    transaction activities, correct?

8    A.  What do you mean know their business transactions?

9    Q.  Let me back up.  You were charged with knowing the

10   customers that you were reviewing and investigating their

11   transaction activity; is that right?

12   A.  Yes.

13   Q.  And you agree that it's important to know your

14   customer's business for anti-money laundering purposes?

15   A.  To understand what business they're in, yes.

16   Q.  And that was important for reviewing and analyzing

17   transaction activity to determine whether or not that

18   activity was indicative of money laundering, correct?

19   A.  Yes.

20   Q.  Let's go to -- we talked about Plaintiff's Exhibit 4

21   yesterday.  Can we go back to Plaintiff's Exhibit 4, please.

22          And, again, to remind us what Exhibit 4 is, this

23   is a training -- PowerPoint from a training session,

24   correct?

25   A.  Yes.

Pesch - Cross

1   Q.  And this is, again, where the bank was teaching its

2   personnel about how to recognize suspicious activity; is

3   that right?

4   A.  Yes.

5   Q.  Okay.  Can we go to slide 19, please, which is

6   Plaintiff's Exhibit 4, page 19.

7           You see up at the top there, Ms. Pesch, it reads,

8   "Don't Make Assumptions of Legitimacy.  Know Your Customer

9   Well."  Do you see that?

10  A.  Yes.

11  Q.  And you agree that the bank was not supposed to make

12  assumptions of any customer activity being legitimate?

13  A.  Yes.

14  Q.  And down below it says (as read), "Be 'familiar' with

15  the customer isn't enough."  Do you see that?

16  A.  Yes.

17  Q.  And then it reads, "Oh yeah, he does that all the time."

18  Do you see that?

19  A.  Yes.

20  Q.  And do you agree that saying, for example -- or the

21  concept of, oh, yeah, he does it all the time, that was not

22  a suspicious -- or that was not a sufficient justification

23  for ignoring potential suspicious activity?

24  A.  We wouldn't ignore potentially suspicious activity, but

25  that by itself would -- just because it was done all the

1   time would not be a reason by itself to say something was

2   okay.

3   Q.  Down below it says, "Be careful of 'best customer'

4   syndrome."  Do you see that?

5   A.  Yes.

6   Q.  And is that an acknowledgement, Ms. Pesch, that anyone

7   could potentially be involved in money laundering, even

8   customers that the bank considered to be good customers?

9   A.  Yes.

10  Q.  Then down below it says, "If it sounds too good to be

11  true - it probably is."  Do you see that?

12  A.  Yes.

13  Q.  And what is meant by that concept?

14  A.  I would say exactly what it says.  I don't know how to

15  explain it better.

16  Q.  Okay.  You know it when you see it?

17  A.  I don't understand what you're saying.

18  Q.  I'm asking you if that means you know suspicious

19  activity when you see it.  If it sounds too good to be true,

20  then it probably is, and that means you know suspicious

21  activity when you see it?

22          MS. MOMOH:  Objection, Your Honor,

23  mischaracterizes the statement in the document.

24          THE COURT:  It's a question.  You may answer the

25  question if that is -- so there's not a mischaracterization.

Pesch - Cross

1   There's a question pending.  You can repeat the question.

2            THE WITNESS:  Yeah, can you repeat it, please?

3   BY MR. COLLYARD:

4   Q.  Sure.  I'm trying to -- let me ask you:  What do you

5   take that to mean, if it sounds too good to be true, it

6   probably is?  What does that mean when you're looking for

7   suspicious activity?

8   A.  I would say exactly what it says.  If it sounds too good

9   to be true, it probably is.  I don't know how to say it

10  better than that.

11  Q.  And do you agree, Ms. Pesch, that knowing your customer

12  and understanding their activities was an important concept

13  in the Anti-Money Laundering Group?

14  A.  Having a reasonable understanding of who our customer

15  was to see if that activity made sense for the customer,

16  yes.

17  Q.  Let's go to -- back to Plaintiff's Exhibit 5, and we're

18  going to go to slide 31.  And at the top it reads, "Know

19  Your Customer, Understand Their Activities."  Do you see

20  that?

21  A.  Yes.

22  Q.  And down below it reads, "Be familiar with the types of

23  transactions typically conducted by similarly-situated

24  customers."  Do you see that?

25  A.  Yes.

Pesch - Cross

1    Q.  And that was a concept that the bank was teaching its

2    personnel, correct?

3    A.  Yes.

4    Q.  And as part of your job, you were supposed to be

5    familiar with the types of transactions that were typically

6    conducted by a similarly-situated customer; is that right?

7    A.  I was not expected to be an expert on every type of

8    business that the bank had as a client, so I don't -- I

9    could ask questions, but I wasn't expected to know

10   everything about every type of client.

11   Q.  As part of your job, Ms. Pesch, being an anti-money

12   laundering analyst, you were supposed to be familiar with

13   the types of transactions typically conducted by

14   similarly-situated customers, correct?

15   A.  If I wasn't familiar with it, I could ask questions, but

16   I did not know everything about every type of client the

17   bank had.

18   Q.  In analyzing whether or not activity was potentially

19   suspicious, it would have been helpful in doing that to be

20   familiar with types of transactions that were typically

21   conducted by customers similar to the customer that you were

22   investigating; is that true?

23   A.  It would have been helpful, yes.

24   Q.  Go back to the Petters Company, Inc.  We talked about

25   the Petters Company business just for a second yesterday.

Pesch - Cross

1    Do you remember that?

2    A.  Yes.

3    Q.  Are you aware of any customer at M&I Bank that was

4    similarly situated to the Petters Company, Inc.?

5    A.  I don't remember.

6    Q.  Let's talk for a second about money laundering.  We're

7    going to stay on these two documents just for a moment.  I'm

8    going to try to keep us on Exhibit 5 here.

9          Let's go to slide 12, which is Plaintiff's Exhibit

10   5, page 12.  And do you see on the slide where it says,

11   "Money launderers 'clean' their 'dirty' money through:

12   Brokerage firms, banks, investment professionals"?

13   Do you see that?

14   A.  Yes.

15   Q.  And that was how the bank taught its personnel about

16   money laundering, right?

17   A.  That was a piece of this training, yes.

18   Q.  And the bank taught -- taught its personnel that money

19   laundering is the process of converting dirty money obtained

20   from illegal activities into assets that appear to be clean

21   or legitimate, right?

22   A.  Yes.

23   Q.  And that would mean what they do is they use the bank to

24   make the money look legitimate; is that correct?

25   A.  That's one way it could be done.

Pesch - Cross

1    Q.  And making the money look -- for example, making the

2    money look legitimate would be turning that money into, for

3    example, purchases; is that right?

4    A.  It could be.

5    Q.  And purchases could be things like cars or houses; is

6    that right?

7    A.  Yes.

8    Q.  And the reason why the bank is teaching its personnel

9    about money laundering is because criminals use banks to

10   launder money, right?

11   A.  That's one way of laundering money, yes.

12   Q.  Please go real quickly to Plaintiff's Exhibit 5.  Let's

13   go -- stay on 5.  Let's go to slide 24.  And this is what we

14   were just talking about, the process of integration.  Is

15   that right?

16   A.  Yes.

17   Q.  And the process of integration is when a criminal uses

18   the bank to run its money through the bank to have it look

19   legitimate and have it come out through purchases; is that

20   right?

21   A.  That sounds like the whole scope of money laundering.

22   Integration is just the last part.

23   Q.  Describe the integration piece.

24   A.  It's where you can no longer tell if the money is

25   legitimate or dirty and it's used for potentially normal

1    purchases, such as those listed.

2    Q.  Sure.  You have cars and real estate listed there,

3    right?

4    A.  Yes.

5    Q.  And then you see financial investments?

6    A.  Yes.

7    Q.  Describe how a money launderer would complete the

8    process of integration through financial investments.

9    A.  Just as anyone else would.  They would purchase an

10   investment.

11   Q.  One of the ways that a criminal could do that is they

12   could take money and put it into other businesses, correct?

13            MS. MOMOH:  Objection, calls for speculation.

14            THE COURT:  Overruled.  You may answer if you can.

15            THE WITNESS:  Potentially.

16   BY MR. COLLYARD:

17   Q.  And when you were looking for activity indicative of

18   money laundering or looking at suspicious activity, that's

19   one of the things that you would look for, right?

20   A.  Yes.

21   Q.  That would certainly be among the list, if a customer

22   was taking money and wiring it into other businesses,

23   correct?

24   A.  Could you repeat your question?

25   Q.  Sure.  I said that would certainly be among the list, if

1    a customer was taking money and wiring it into other

2    businesses, correct?

3    A.  Sorry.  That was building on an earlier question.  Can

4    you put them together so I --

5    Q.  Sure.  When you're investigating and looking for money

6    laundering or suspicious activity, one of the things that

7    you would do is you would look to see if the customer was

8    taking money and wiring it into other businesses?

9    A.  Not that necessarily.  We were just looking for overall

10   suspicious activity.

11   Q.  That would be one of the factors that could lead to

12   being indicative of suspicious activity?

13   A.  That by itself would not necessarily be suspicious.

14   There would probably be other factors.  Wiring money to

15   another business is not necessarily suspicious.

16   Q.  Ms. Pesch, I'm just asking if that would be one of the

17   factors that you would be considering when you were look at

18   the transaction activity to determine whether or not it was

19   potentially suspicious.

20        MS. MOMOH:  Objection, Your Honor, asked and

21   answered.

22        THE COURT:  Overruled.  You may answer.

23        THE WITNESS:  Wiring money to another business is

24   a normal business transaction, so that by itself would not

25   be suspicious.

1    BY MR. COLLYARD:

2    Q.  Okay.  Let's back up, then.  If the customer was taking

3    money and wiring it to a different business that the

4    customer has, would that be one of the factors you would

5    determine as to whether or not there could be potentially

6    suspicious activity?

7    A.  There could be a lot of legitimate reasons for that, so

8    that by itself would not be suspicious.

9    Q.  What I'm asking, Ms. Pesch, if that's one of the things

10   that you would consider when you were looking at that type

11   of activity.

12   A.  Sending money to a related business is not suspicious in

13   and of itself.  So that's -- there would have to be other

14   factors.

15   Q.  If there were large wires, for example, going from a

16   customer to a customer's other businesses, would that be one

17   factor that the Anti-Money Laundering Group would be

18   considering in determining whether the transaction activity

19   could potentially be suspicious?

20   A.  Like I said, that by itself, transfers between related

21   companies, would not be suspicious.  There would have to be

22   other factors.

23   Q.  What would those other factors be?

24   A.  It could be many varieties of things.

25   Q.  Can you name any?

1    A.  It really depends on the situation.  People are free to

2    make their own choices and every alert in a case is

3    different.

4    Q.  So is it your testimony that if you were investigating

5    transaction activity and you saw that the customer who you

6    were investigating was making wires to other businesses that

7    that customer had owned or was involved in, that is not

8    something that you would consider in your analysis as to

9    whether or not that activity was potentially suspicious?

10            MS. MOMOH:  Objection, Your Honor,

11    mischaracterizes the testimony of the witness.

12            THE COURT:  Overruled.  You may answer the

13    question.

14            THE WITNESS:  We would look at the transactions as

15    part of the alert, but, like I said, transfers between

16    related businesses is not necessarily suspicious.

17    BY MR. COLLYARD:

18    Q.  And, Ms. Pesch, I'm not suggesting that that alone is

19    suspicious.  What I am asking you, that would be one of the

20    factors that you would be looking into to consider whether

21    or not it's potentially suspicious?

22    A.  No, transfers between related businesses are not

23    necessarily suspicious.

24    Q.  Okay.  Let's go to Plaintiff's Exhibit 4.  We are going

25    to go to slide 21, it's Plaintiff's Exhibit 4, page 21.

Pesch - Cross

```
 1              And it says up at the top, Ms. Pesch, "How is
 2      Money Laundering Done?", and it gives a three-step process.
 3      Do you see that?
 4      A.   Yes.
 5      Q.   Can you just describe what this slide is showing.
 6      A.   Placement, that's where the illegal funds would be put
 7      into the financial system.  In this case they show a person
 8      with a suitcase full of cash running to the bank.
 9              Then Step Two is "Layering.  Funds are further
10      separated from the illegal activity."  So it looks like they
11      have a number of potentially different ways of conducting
12      transactions.
13              And then three is integration, where the "Funds
14      re-enter the economy creating the appearance of legitimate
15      funds."
16      Q.   And the integration piece is the part that we just
17      talked about where the bad guy, the criminal, would use the
18      money to buy things like cars and houses, right?
19      A.   Yes.
20      Q.   Can you add yachts to that list?
21      A.   Sure.
22      Q.   And this is how the bank taught its personnel about
23      money laundering?
24      A.   This was part of the money laundering -- AML training.
25      Q.   Stay on Exhibit 4, and let's go to slide 50.  Are you
```

Pesch - Cross

1    there, Ms. Pesch?

2    A.  Yes.

3    Q.  Okay.  It says at the top, "Summary of Key Points.  Do

4    your part!"  Do you see that?

5    A.  Yes.

6    Q.  It says, "Know your customer and understand their

7    activities."  Do you see that?

8    A.  Yes.

9    Q.  And what is meant by "understand their activities," that

10   is talking about their business activities, correct?

11   A.  I didn't create this material, so I'm not exactly sure

12   what the exact definition of what they meant by "understand"

13   was there.

14   Q.  Well, Ms. Pesch, under the concept of "know your

15   customer," you agree that you understand your customer's

16   business activities, for example, right?

17   A.  A reasonable understanding.

18   Q.  And that would include what the business is?

19   A.  Yes.

20   Q.  What type of business the customer is in; is that right?

21   A.  Yes.

22   Q.  And it could also include, too, who the customer is

23   doing business with; is that right?

24   A.  As part of understanding their business, potentially.

25   Q.  And you agree, Ms. Pesch, that -- I'm sorry.  Let me go

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

Pesch - Cross

1    to the bottom or the next one.  It says, "Be aware and

2    curious about interesting transaction activity.  Discuss

3    identified unusual activity with your supervisor."  Do you

4    see that?

5    A.  Yes.

6    Q.  Was the bank teaching its bank personnel that if they

7    came across something that might be unusual activity, that

8    they should escalate it?

9    A.  Yes.

10   Q.  That they should report it to a supervisor, for example?

11   A.  It depends on the role of the employee.

12   Q.  Well, you agree, Ms. Pesch, let's put it this way, that

13   what that means there is that if somebody believes there is

14   potentially a red flag, for example, they should escalate

15   that to a supervisor?

16   A.  This says, "Discuss identified unusual activity with

17   your supervisor."

18   Q.  I'm asking you a different question, Ms. Pesch.  I'm

19   asking you if you agree that what that means is if somebody

20   believes there is potentially a red flag, they should

21   escalate that to a supervisor?

22   A.  Not necessarily.

23   Q.  Let's go back to your deposition, please.

24           MR. COLLYARD:  We're going to go to page 58,

25   Counsel.

1    BY MR. COLLYARD:

2    Q.  And if you look, Ms. Pesch, on page 58, it's line 11.  I

3    asked you the question:  "Does that mean if somebody

4    believes that there's potentially a red flag, that they

5    should escalate that to their supervisor?"  Do you see that?

6    A.  Can I read a little before that for context, please?

7    Q.  You may.

8            Are you ready?

9    A.  Yes.

10   Q.  Okay, Ms. Pesch, I asked you the question:  "Does that

11   mean if somebody believes that there's potentially a red

12   flag, that they should escalate that to their supervisor?"

13   Do you see that?

14   A.  Yes.

15   Q.  And you answered:  "Yes."  Do you see that?

16   A.  Yes.

17   Q.  And that was truthful testimony at the time you gave it?

18   A.  Yes.

19   Q.  Let's stay on Plaintiff's Exhibit 4, and let's go to

20   slide 44.  What I would like to do is talk about how the

21   bank taught its --

22   A.  Sorry.  Could you -- I missed the exhibit number.

23   Q.  I'm sorry.  It's Plaintiff's Exhibit 4.  You're on it.

24   A.  Okay.

25   Q.  I can see.  If you can go to slide 44, I want to talk

Pesch - Cross

1    about how the bank would teach its personnel to look for

2    suspicious activity.

3              Are you there, Ms. Pesch?

4    A.  Um-hmm.

5    Q.  Okay.  At the top -- I'm sorry.  Was that a yes?

6    A.  Yes.

7    Q.  It reads up at the top, "Recognizing Suspicious

8    Activity."  Do you see that?

9    A.  Yes.

10   Q.  And then the second bullet point, "What is 'interesting'

11   or 'unusual.'  It just doesn't feel right to you."  Do you

12   see that?

13   A.  Yes.

14   Q.  And you were trained, Ms. Pesch, that if something was

15   interesting or unusual, that you should look into it

16   further; is that right?

17   A.  Yes.

18   Q.  And the bank was teaching its personnel that if they

19   came across activity that was interesting or unusual, that

20   they should look into it further, correct?

21   A.  At the time that this training material was created,

22   those were the terms that were used, yes.

23   Q.  And activity that was interesting or unusual, that could

24   be an indicator that could -- that that activity could lead

25   to being suspicious; is that right?

1    A.  It could, yes.

2    Q.  And these are certain tests that you would follow,

3    correct?

4    A.  I would keep that in consideration.

5    Q.  Are these -- would you follow these?

6    A.  I would follow this, but I wouldn't call it a test.

7    Q.  What would you call them?  Concepts?

8    A.  I would consider it something to keep in mind as you're

9    reviewing transaction activity.

10   Q.  So do you agree or do you disagree, Ms. Pesch, that

11   these are certain tests that you would follow?

12   A.  I don't know if I would use the word "test" today, but

13   it's something that we would consider when reviewing

14   transaction activity.

15   Q.  Go back to your transcript, page 39.  If you look on

16   page 39 at line 4, I asked you:  "And these are just certain

17   tests that you would follow, right?  If something didn't

18   feel right to you, you would look into it more; is that

19   right?"  Do you see that?

20   A.  Yes.

21   Q.  And then you answered:  "Correct."  Is that right?

22            MS. MOMOH:  Objection, Your Honor.  Sidebar?

23            THE COURT:  What's your objection?

24            MS. MOMOH:  It's an objection that I had raised

25   yesterday, Your Honor, with respect to the use of the

Pesch - Cross

```
 1    deposition transcript, and I objected as well to that
 2    earlier today, Your Honor.
 3                THE COURT:  We'll have a sidebar.
 4                MS. MOMOH:  Thank you.
 5                THE COURT:  Members of the jury, you may stand and
 6    stretch and talk among yourselves if you would like.
 7         (At sidebar)
 8                MS. MOMOH:  I will be brief on this.  It's just
 9    the fact that there's an objection that was raised at the
10    time.  So I can object.  I'm trying not to.  I want the
11    examination to proceed as it needs to, but it's just
12    challenging when he is asking her questions that were
13    already objected to during the deposition, and I just don't
14    want it to appear to the jurors that -- I just kind of --
15                THE COURT:  It's fine that you objected to them
16    during the deposition.  We are in trial now.  If it's an
17    objectionable question, then I would rule on it.
18                MS. MOMOH:  Yes.  Understood.
19                THE COURT:  So if you need to ask her whether or
20    not you objected, if that's relevant, at the deposition when
21    you -- or when you take up her examination, you may do so.
22                MS. MOMOH:  Understood.  Thank you.  So,
23    Your Honor?  So with that, the objection is withdrawn.
24                THE COURT:  Okay.
25         (In open court)
```

Pesch - Cross

602

```
 1              THE COURT:  Would you repeat the question.  There
 2      was a question pending, I believe.
 3              MR. COLLYARD:  I'm sorry, Your Honor?  I did not
 4      hear that at all.
 5              THE COURT:  I said would you repeat the question.
 6      I believe there was a question pending?
 7              MR. COLLYARD:  Yes.  Thank you.
 8      BY MR. COLLYARD:
 9      Q.  I am going to go back, Ms. Pesch, on page 39, line 4,
10      and I am going to read it because the question didn't fully
11      come out.
12              I asked you:  "And these are just certain tests
13      that you would follow, right?  If something didn't feel
14      right to you, you would look into it more; is that right?"
15      Do you see that?
16      A.  Yes.
17      Q.  And you answered:  "Correct."  Is that right?
18      A.  Yes.
19      Q.  And, Ms. Pesch, just so we're clear here, activity
20      doesn't actually need to be suspicious for you to be looking
21      into it further, correct?
22      A.  Technically all the activity that we receive is not
23      suspicious until we do our analysis.
24      Q.  And these indicators of if it's interesting or unusual,
25      those are the triggers that will lead you to look into it
```

 1   more; is that right?

 2   A.  They could.

 3   Q.  Well, they would, right?

 4   A.  Like I said, that's one thing we would consider.

 5   Q.  And if we go to the next bullet, it says, "Focus more on

 6   the activity than on the customer."  Do you see that?

 7   A.  Yes.

 8   Q.  And you understood that you were supposed to do that,

 9   right?

10   A.  Yes.

11   Q.  And you understood that the bank was teaching its

12   personnel to focus on the actual activity, not on who the

13   customer is, for example; is that true?

14   A.  That's what's in this training.

15   Q.  Because really what you're doing is you're analyzing the

16   transaction activity; is that correct?

17   A.  That's a part of what we did, yes.

18   Q.  And this concept here, "Focus more on the activity than

19   on the customer," that goes back to the best customer

20   syndrome, right?

21   A.  Yes.

22   Q.  You focus on the customer's activity instead of focusing

23   on who the customer actually is, correct?

24   A.  Yes.

25   Q.  Let's stay on Plaintiff's Exhibit 4, and let's go to

Pesch - Cross

1    slide 47.  At the top it reads, "Interacting with the
2    Customer."  Do you see that?
3    A.  Yes.
4    Q.  And then it says, "It is appropriate to discuss the
5    unusual activity with the customer to determine whether
6    there is a legitimate business purpose for the activity."
7    Right?
8    A.  Yes.
9    Q.  What that -- is what that is talking about is if you had
10   any question or you had any concern that the activity was
11   for a legitimate business purpose, you could actually ask
12   the customer, correct?
13   A.  This went out to all bank personnel.  All bank personnel
14   wouldn't personally contact a customer, but we could request
15   that the customer be questioned.
16   Q.  Sure.  So, for example, if you were looking at activity
17   and you wanted an answer by the customer as to whether or
18   not certain activity was for a legitimate business purpose,
19   you could contact the customer relationship manager or the
20   business banker and have them ask, correct?
21   A.  Yes.
22   Q.  And they would -- they could certainly do that, right?
23   A.  Yes.
24   Q.  And if that business banker or that customer
25   relationship manager, if they themselves saw something or

1    had a question as to whether or not the activity was for a

2    legitimate business purpose, they could themselves ask the

3    customer, right?

4    A.  Yes.

5    Q.  And there was a system in place at the bank where let's

6    say a business banker or a customer relationship manager did

7    that and the answer that they got back from the customer led

8    them to think that there was something unusual or something

9    interesting about that activity, that customer relationship

10   manager could provide a form that would go to the Anti-Money

11   Laundering Group; is that right?

12   A.  Yes.

13   Q.  And that's called a Suspicious Activity Log?

14   A.  Yes.

15   Q.  And that would be the process for those kind of

16   front-facing customer people to identify potentially

17   suspicious activity to the Anti-Money Laundering Group for

18   the Anti-Money Laundering Group to then go and investigate;

19   is that right?

20   A.  Yes.

21   Q.  And stay on this concept for just a second, Ms. Pesch.

22   If that happened, let's say the customer -- let's say the

23   business banker or the customer relationship manager had a

24   question about whether or not there was a legitimate

25   business purpose and asked the customer about it and

Pesch - Cross

1    reported information back to the Anti-Money Laundering

2    Group, okay?

3    A.   Okay.

4    Q.   The Anti-Money Laundering Group would then make a

5    decision as to whether or not that potential -- that

6    activity could be for a legitimate business purpose or not?

7    A.   After reviewing it, yes.

8    Q.   And in reviewing it, you would actually look into it and

9    research it, correct?

10   A.   Yes.

11   Q.   And the phrase "legitimate business purpose," that's a

12   concept that was talked about at the bank; is that right?

13   A.   Yes.

14   Q.   And determining whether something is for a legitimate

15   business purpose is one of the things that you would

16   consider when you were investigating and reviewing activity

17   on an account, correct?

18   A.   That's something we would consider, yes.

19   Q.   And when you were looking at, for example, the flow of

20   funds in and out of an account, you would be looking to see

21   if there was a legitimate business purpose for that, right?

22   A.   Yes.

23   Q.   So, for example, one of the things that could trigger

24   for potentially suspicious activity would be checks, right?

25   A.   Potentially.

1    Q.  You, yourself, have reviewed and investigated checks on

2    an account to determine whether or not they were potentially

3    suspicious, right?

4    A.  Yes.

5    Q.  You'd actually review the checks and look at them and

6    see if you could figure out what the purpose of the checks

7    was?

8    A.  Yes.

9    Q.  And the reason why you were doing that is you were

10   trying to figure out if there was a legitimate business

11   purpose for the check, right?

12   A.  We were trying to identify potentially suspicious

13   activity.

14   Q.  I understand.  But as part of that, you were trying to

15   figure out whether there was a legitimate business purpose

16   for the checks that you were investigating, correct?

17   A.  That's one thing we would consider.

18   Q.  That would certainly go into your analysis, correct?

19   A.  Can you clarify what you mean?

20   Q.  Sure.  When you're reviewing checks to determine whether

21   or not they're potentially suspicious, one of the things

22   that you would be considering in making your determination

23   would be is there a legitimate business purpose for the

24   check?

25   A.  If it didn't look like there was a legitimate -- if

Pesch - Cross

1    something didn't look right, then we would include that in

2    our review.

3    Q.  And I'm asking -- I'm sorry, Ms. Pesch.  I'm asking you

4    just a little bit more specifically.  In doing an

5    analysis -- and you have done this in the past -- right? --

6    where you have tried to look at checks to see if there was a

7    legitimate business purpose for them?

8    A.  Yes, I've done that.

9    Q.  Now, let's -- at the end of looking at -- let's go back.

10            At the end of -- and I am talking just high level.

11   At the end of doing your analysis as to whether or not

12   there's potentially suspicious activity on an account, if

13   you had reason to suspect that that activity was suspicious,

14   you would take action on that activity, right?

15   A.  Yes.

16   Q.  And the test wasn't that you actually had to know that

17   it was suspicious, right?

18   A.  We had to suspect.

19   Q.  I'm asking you just a little bit different.  I'll make

20   it a little more broad.  The test -- you didn't have to

21   actually know or believe that the activity was actually

22   suspicious, correct?

23   A.  Correct.

24   Q.  If you just had reason to suspect that it was

25   suspicious, that would be enough to trigger action; is that

Pesch - Cross

```
1    right?

2    A.  Yes.

3    Q.  And one of the things you could do, if that was the

4    case, is you could -- could you stop the activity on the

5    account?

6    A.  I personally could not.

7    Q.  Okay.  Fair enough.

8            Could you recommend that the activity be stopped

9    on an account?

10   A.  That wouldn't have been a decision or a recommendation

11   made by me.

12   Q.  Do you understand that the bank has the ability to stop

13   activity on an account?

14   A.  Yes.

15   Q.  And they can do that at any time, correct?

16           MS. MOMOH:  Objection, Your Honor, lack of

17   foundation.

18           THE COURT:  Overruled.  You may answer if you can.

19           THE WITNESS:  I know it's a possibility.  I don't

20   know what the rules are about that.

21   BY MR. COLLYARD:

22   Q.  Fair enough.

23           Now, going back to the Anti-Money Laundering

24   Group, for example, if the Anti-Money Laundering Group or

25   you as an AML analyst came across activity that you had
```

Pesch - Cross

1    reason to suspect was potentially suspicious, one of the

2    things that you could do is recommend that a report be filed

3    to the federal government, correct?

4    A.   Could you repeat your question?

5    Q.   Sure.  If when you were reviewing or analyzing

6    transaction activity, meaning money going in and money going

7    out of the account, for potentially suspicious activity, and

8    you had reason to suspect that that activity was potentially

9    suspicious, one of the things you would do is recommend or

10   suggest that a report be filed with the federal government?

11   A.   Yes.

12   Q.   And that report is called a Suspicious Activity Report,

13   correct?

14   A.   Yes.

15   Q.   And that's also called a SAR, right?

16   A.   Yes.

17   Q.   And SAR is up on the screen.  It's S-A-R, right?

18   A.   Yes.

19   Q.   Go -- sorry.  Let's go to Plaintiff's Exhibit 5, and

20   we'll just talk real quickly about SARs.  We are on

21   Plaintiff's Exhibit 5, page 13, slide 13.  You see at the

22   top, Ms. Pesch, it says, "Financial Crimes Enforcement

23   Network (FinCEN)."  Do you see that?

24   A.   Yes.

25   Q.   You know who FinCEN is; right?

Pesch - Cross

```
 1    A.   Yes.

 2    Q.   And who is FinCEN?

 3    A.   The Financial Crimes Enforcement Network.

 4    Q.   What do they do?

 5    A.   They receive SARs.

 6    Q.   So if we just back up, if the bank has reason to suspect

 7    that there's suspicious activity on an account and they

 8    determine to file a Suspicious Activity Report with the

 9    federal government, they file it with FinCEN; is that right?

10    A.   That's where it goes.

11    Q.   And then FinCEN takes -- do you know what FinCEN does

12    when it gets a Suspicious Activity Report?

13    A.   I could not speak to that.

14    Q.   Do you have any understanding of that process at all?

15    A.   I have some.  What they do today I can't say.

16    Q.   Well, let's go with a general understanding.  Is it your

17    general understanding that what FinCEN does is they receive

18    Suspicious Activity Reports, and then FinCEN does an

19    analysis onto it whether they need to work with other

20    authorities to bring them involved, for example; is that

21    right?

22    A.   I know the SARs can be made available to other

23    governmental bodies.  I don't know the process for how that

24    happens.

25    Q.   Okay.  This first bullet, if we just take a look at
```

Pesch - Cross

1    that, it says, "FinCEN has worked to maximize information

2    sharing among law enforcement agencies and its other

3    partners in the regulatory and financial communities to

4    fight the complex problem of money laundering."  Do you see

5    that?

6    A.  Yes.

7    Q.  Do you have a general understanding, Ms. Pesch, that

8    what that means or what FinCEN does, for example, is it

9    could take the Suspicious Activity Report, make an analysis,

10   and then share that information with other governmental

11   authorities like the U.S. Attorney's Office, for example?

12              MS. MOMOH:  Objection, Your Honor, lack of

13   foundation, calls for speculation.

14              THE COURT:  Overruled.  You may answer if you

15   know.

16              THE WITNESS:  Like I said before, I don't know how

17   FinCEN works.  I just know that after the SARs are filed,

18   they can be made available to other governmental agencies.

19   BY MR. COLLYARD:

20   Q.  In your work as an anti-money laundering analyst, part

21   of your role was to recommend whether a SAR be filed; is

22   that right?

23   A.  Yes.

24   Q.  And there is committees at the bank that actually

25   determine whether a Suspicious Activity Report should be

Pesch - Cross

```
1    filed with FinCEN; is that right?
2    A.  Yes.
3    Q.  And you would participate in those committees, right?
4    A.  I would present cases that I wrote at that committee.
5    Q.  Let's talk about that.  You would present cases that you
6    wrote?
7    A.  Yes.
8    Q.  And what you mean by that is after doing your
9    investigation/analysis to determine whether or not something
10   was potentially suspicious, you would make a determination
11   as to whether there should be a recommendation that a SAR
12   should be filed; fair enough?
13   A.  I would make a recommendation, yes.
14   Q.  And you called it a case; is that right?
15   A.  Yes.
16   Q.  And if you made the recommendation, then you would open
17   up what you're calling a case.  Do I have that right?
18   A.  Could you repeat that?
19   Q.  Yeah.  If you were making a recommendation that a SAR be
20   filed, you would open up what you call a case?
21   A.  I would have opened the case first and then, after my
22   research, made a recommendation.
23   Q.  Okay.  So if you're determining whether there was reason
24   to suspect that there was suspicious activity and you
25   believed that there was, then you would open up a case; is
```

Pesch - Cross

1    that right?

2              MS. MOMOH:  Objection, Your Honor,

3    mischaracterizes the testimony of the witness.

4              THE COURT:  Overruled.  You may answer if that's

5    correct or not.

6              THE WITNESS:  Can you repeat it one more time?

7    BY MR. COLLYARD:

8    Q.  Sure.  I'm trying to figure out, Ms. Pesch, that when

9    you've -- let me back way up.  Okay.

10             So if you've reviewed transaction activity and you

11   have determined that there's reason to suspect that that

12   activity is potentially suspicious or is suspicious, the

13   next step in your process would be to open up a case?

14   A.  Yes.

15   Q.  And you would take the case and you would do further

16   investigation, maybe?

17   A.  Yes.

18   Q.  Okay.  And once you were done completing your case, then

19   you would recommend that a SAR be filed; is that also true?

20   A.  I could recommend that a SAR be filed or a SAR not be

21   filed.

22   Q.  Sure.  Okay.  So one of the things that after doing your

23   case, is you could recommend, if you thought it was

24   appropriate, that a SAR be filed, true?

25   A.  Yes.

1    Q.   Now, now that we're there, does that go to a committee?

2    A.   Yes.

3    Q.   Is that called a SAR committee?

4    A.   It was the SAR Review Committee.

5    Q.   And you were part of the SAR -- you would participate in

6    the SAR Review Committee?

7    A.   I was not part of the committee, but I would present the

8    cases I wrote to the committee.

9    Q.   And what you would do is you would justify whether or

10   not the SAR should be filed?

11   A.   I would present my case, which included my

12   recommendation at the end.

13   Q.   And your recommendation would be based on your research

14   and your analysis that you would have done to reach the

15   conclusion that there was at least reason to suspect that

16   that activity was suspicious?

17   A.   Yes.

18   Q.   Now, let's -- if the committee agrees with you that a

19   SAR should be filed, what happens next?

20   A.   Then the lead analyst would file the SAR.

21   Q.   And the SAR would go to FinCEN?

22   A.   Yes.

23   Q.   What do you know happens then after it goes to FinCEN?

24   A.   I don't know the process after that.

25   Q.   Is there any interaction between FinCEN and the

Pesch - Cross

1   Anti-Money Laundering Group after the SAR has been filed?

2   A.  I understand that law enforcement could contact the bank

3   about the SAR.

4   Q.  So, for example, if FinCEN forwarded -- worked with the

5   United States Attorney's Office -- have you ever been

6   involved in an instance where FinCEN has worked with the

7   United States Attorney's Office and the United States

8   Attorney's Office has reached back to the bank for any

9   questions that they had?

10  A.  I don't remember personally being involved in that

11  situation.

12  Q.  Are you aware of situations where the bank was involved

13  in that type of situation?

14  A.  I know law enforcement reached out to the bank about

15  SARs that had been written.  I don't remember which groups.

16  Q.  And why is the bank filing a Suspicious Activity Report

17  with FinCEN?  What's the purpose of that?

18  A.  There's a regulatory requirement.

19  Q.  The bank is -- I'm sorry.

20  A.  Oh.  There's a regulatory requirement.

21  Q.  The bank is required to do it?

22  A.  Yes.

23  Q.  And that's the bank's responsibility?

24  A.  Yes.

25  Q.  All right.  I think we can put 4 and 5 aside, at least

Pesch - Cross

```
 1   for now.
 2              Let's go to Plaintiff's Exhibit 180 now.
 3   A.  1-8-0?
 4   Q.  Yes.
 5              And if you remember, Ms. Pesch, I asked you about
 6   this exhibit yesterday.  Do you recall that?
 7   A.  Yes.
 8   Q.  And yesterday we had talked about how this described the
 9   responsibility of the Anti-Money Laundering Group to detect,
10   review, and investigate suspicious activity.  Do you
11   remember that?
12   A.  Sorry.  Could you repeat that?
13   Q.  Sure.  Yesterday we had talked about how this described
14   the responsibility of the Anti-Money Laundering Group to
15   detect, review, and investigate suspicious activity.  Do you
16   remember that?
17   A.  I remember discussing this.  I don't remember the exact
18   questions you asked me.
19   Q.  Do you also remember that we talked a little bit about
20   Searchspace and wires?
21   A.  Yes.
22   Q.  If you go to page 7 of this exhibit, there's a Heading
23   G.  It says, "Searchspace Alerts."  Do you see that?
24   A.  Yes.
25   Q.  And it reads, "M&I has deployed software from
```

Pesch - Cross

```
1    Searchspace to serve as the primary automated tool for the

2    monitoring of suspicious customer transactions."  Did I read

3    that correctly?

4    A.  Yes.

5    Q.  And then it says, "In the first phase of implementation,

6    the following bank data is fed into Searchspace for

7    monitoring."  Do you see that?

8    A.  Yes.

9    Q.  And you understand what it means for monitoring, right?

10   A.  That it was included within Searchspace, yes.

11   Q.  And it lists the activity that's included into

12   Searchspace, right?

13   A.  Yes.

14   Q.  And the second -- I'm sorry.  We'll just start at the

15   top.  The first piece of data that's entered into

16   Searchspace is "All transactions posted to all deposit

17   accounts."  Do you see that?

18   A.  Yes.

19   Q.  What is meant by "deposit accounts"?

20   A.  Like a checking or savings account.

21   Q.  That's what the Petters Company, Inc. account was,

22   right?

23   A.  Yes.

24   Q.  You called it a depository account.  Is that the

25   technical term for it?
```

Pesch - Cross

```
1    A.   Yes.

2    Q.   And that just basically means it's a checking account?

3    A.   An account you can deposit funds into, yes.

4    Q.   When you're saying you can deposit funds in it, because

5    you're talking about like how I have a checking account and

6    you have a checking account, you can also make wires into an

7    account or wire out of an account; is that right?

8    A.   Can you repeat that?

9    Q.   Sure.  Just like -- do you have a checking account?

10   A.   Yes.

11   Q.   I still do too.  So in my checking account, I can write

12   checks out of the account, right?

13   A.   I'm assuming you can do that, yes.

14   Q.   Still do that.  And I can make wires.  I could wire

15   money out of the account or I could receive a wire into an

16   account, right?

17   A.   I don't know where your bank is.  I don't know what the

18   rules are for your account, but, in theory, you could do

19   that out of an account.

20   Q.   And that same exact thing happened with Petters Company,

21   Inc., right?

22   A.   They wired money into your account?

23   Q.   No.  I'm sorry.

24        (Laughter)

25   BY MR. COLLYARD:
```

1    Q.  I'm not being clear.  Yeah, they definitely did not, but

2    let me be clear.  Okay?

3              What I'm trying to do is just establish,

4    Ms. Pesch, that the Petters Company, Inc. account, it's

5    called a depository account, and I'm trying to get rid of

6    the fancy names and I am just trying to understand, that's

7    just a checking account?

8    A.  They had a checking account, yes.

9    Q.  And as part of that checking account, I'm just trying to

10   understand that checks could be written out of the account,

11   right?

12   A.  Yes.

13   Q.  And it could accept wires; is that right?

14   A.  I don't remember what all of the rules were for accounts

15   at M&I, but they could potentially, I believe, accept wires.

16   Q.  And I'm sorry.  I'm talking about the Petters Company,

17   Inc. account.  You know that the Petters Company, Inc.

18   account received billions of dollars of wires, right?

19   A.  I know they received wires in their account, yes.

20   Q.  And you know that billions was dollars were wired out of

21   that account too, right?

22   A.  I know a lot of money was wired out of that account.  I

23   don't know the exact total.

24   Q.  Do you agree that billions of dollars is a lot of money?

25   A.  Yes.

Pesch - Cross

1     Q.  All right.  Go back to this.  So I think I got us all

2     messed up on deposit accounts.  Let's go to the next bullet.

3     All wire transfer activity is fed into Searchspace.  Do you

4     see that?

5     A.  Yes.  I see that it says that.

6     Q.  And that's what was supposed to be being fed into

7     Searchspace; do you agree?

8     A.  I was not involved with setting up Searchspace.  I can

9     only say what this says, and that says all wire transaction

10    activity was fed into Searchspace.

11    Q.  Fair enough.

12         Let's talk about -- let's go back to, then -- I

13    want to talk about transaction activity that is fed into

14    Searchspace.  And transaction activity is money going in and

15    out of the account; is that right?

16    A.  It could be.

17    Q.  And, again, that could include wires?

18    A.  Yes.

19    Q.  And it could include checks, just like what we've been

20    talking about, right?

21    A.  Yes.

22    Q.  And when the anti-money laundering analysts were

23    investigating alerts in Searchspace, they had copies, for

24    example, of bank statements, right?

25    A.  It was something that could be pulled, but we didn't

Pesch - Cross

1   automatically have that.

2   Q.  I'm just asking if they had copies, if that was an

3   availability?

4   A.  They were available.

5   Q.  Let me ask you this way:  The anti-money laundering

6   analysts, when they're investigating potentially suspicious

7   activity in Searchspace, they would have copies of the bank

8   statements so you could see everything that was going in and

9   out of the account?

10  A.  The bank statements were not included in Searchspace.

11  Q.  They would be in addition to Searchspace?

12  A.  They were not added to Searchspace.

13  Q.  Did the anti-money laundering analysts also have copies

14  of bank statements when they were analyzing transaction

15  activity?

16  A.  They were available, but we did not automatically have

17  them.

18  Q.  Okay.  But they were available for you to get, right?

19  A.  Yes.

20  Q.  And what that did -- what bank statements do is they

21  make -- they allow for you to see everything that was going

22  in and out of the account; is that right?

23  A.  They show the debits and credits to the account.

24  Q.  Okay.  So an analyst has the information available in

25  Searchspace, which is all wire transaction activity,

Pesch - Cross

1    correct?

2    A.  Sorry.  Can you repeat that?

3    Q.  Yes.  The anti-money laundering analyst in Searchspace,

4    they have the transaction activity available to them, which

5    includes all wire transfer activity, correct?

6    A.  Yes.

7    Q.  And then -- just give me one second.  And then in

8    addition to that, they had the ability to get bank

9    statements, right?

10   A.  Yes.

11   Q.  And the analysts would have copies of the bank

12   statements so they could see everything that was going in

13   and out of the account, if they so wanted those statements?

14   A.  If the statements were pulled, yes, they would be able

15   to review the activity in the account.

16   Q.  And the statements we're talking about, if we go back to

17   you and me, it's just like what we would have, for example,

18   on a credit card statement, right?

19   A.  It's been a long time since I've seen an M&I Bank

20   statement, but I believe it showed all of the account

21   activity.

22   Q.  It would show who the wires were coming in from and it

23   would show any activity on the account, right?

24   A.  I do not remember it showing originators of wires, just

25   that a wire showed up on the account.

Pesch - Cross

1    Q.  All right, Ms. Pesch.  Do you have any reason to

2    disagree with me that it would also show the incoming wires?

3    A.  The wires would appear in the bank statement, I believe.

4    Q.  Okay.  So the AML analysts would have access to those

5    incoming wires, right?  Or I'm sorry, the activity that

6    showed the money coming into the account and information

7    about that money coming into the account, the AML analysts

8    would have access to that through the bank statements,

9    correct?

10   A.  They would have access to the information about the

11   transactions that was listed in Searchspace and in the bank

12   statement.

13   Q.  Yes.  And the bank statements would show, for example,

14   the information about the money going in and out of the

15   account, correct?

16   A.  It would show the transaction type, the value, and the

17   date.  Beyond that, I don't remember like originator

18   information about the wire being in statements.

19   Q.  And the bank statements that the AML analysts had access

20   to, would that include anything other than wires or checks?

21   A.  Like I said, it's been a long time since I've seen an

22   M&I Bank statement, but potentially there could be other

23   transaction types in there.  It depends on the activity in

24   the account.

25   Q.  Do you agree, Ms. Pesch, that if the analysts was

Pesch - Cross

1     looking at the bank statements, that they would see

2     everything that was going on in the account?

3     A.  What do you mean everything going on in the account?

4     Q.  I mean everything.  They could see the account activity.

5     A.  They would see the transactions.

6     Q.  And that would include the money going in and out of the

7     account, correct?

8     A.  Yes.

9     Q.  In going back to Searchspace, Ms. Pesch, would

10    Searchspace include the checks written on an account?

11    A.  Yes.

12    Q.  And so Searchspace would actually have the checks that

13    are being written on an account and checks being deposited

14    into an account; is that right?

15    A.  Yes.

16    Q.  And you could actually use Searchspace to go in and see

17    those checks?

18    A.  We could not see images of the checks in Searchspace.

19    Q.  So how would you have access to the checks, then?

20    A.  We had to access them through a different system.

21    Q.  And what's that called?

22    A.  I don't remember the name of the system.

23    Q.  So what would Searchspace tell you about the checks?

24    A.  I remember it telling us the date, the transaction type,

25    and the amount.

1    Q.  And then from there you could go and get the actual

2    checks and look at the actual checks; is that right?

3    A.  Yes.

4    Q.  And when you were reviewing alerts that were created,

5    let's say, for incoming wires in Searchspace, you would

6    review -- you would review the incoming wires for sure and

7    anything else that you determined you needed to understand

8    the activity, right?

9    A.  Could you clarify what time you're talking about?

10   Q.  Yeah.  So let's go back to -- I'm sorry.  Let's go back

11   to 2005 to 2008.  Okay?  And you are reviewing alerts for

12   incoming wires, for example.  Are you with me?

13   A.  Um-hmm.

14   Q.  If you were doing that, you would review the incoming

15   wires for sure and anything else that you determined you

16   needed to understand the activity; is that right?

17   A.  Yes.

18   Q.  And so you're reviewing the internal wires, and when

19   you're doing that, you're trying to make a decision as to,

20   do I need to know more about this, do I need to look into

21   this further, do I need to get any more information to make

22   my determination or do my analysis; is that true?

23   A.  What do you mean by "internal wires"?

24   Q.  I'm sorry.  Incoming wires.

25   A.  Could you repeat your question?

Pesch - Cross                                                627

1    Q.  Sure.  When you're looking at incoming wires and you're

2    doing your analysis to see if those wires are potentially

3    suspicious, you're also thinking about is there any other

4    information that I need to be looking at to make my

5    determination as to whether these incoming wires are

6    potentially suspicious?

7    A.  Sorry.  Could you repeat that one more time?  That was

8    very long.

9    Q.  Okay.  Sorry.  Let me do it this way:  When you were

10   investigating the incoming wires to determine whether or not

11   they were potentially suspicious, as you were doing that and

12   thinking about it, you would also make a determination as to

13   whether or not you needed to know or wanted to see any

14   additional information to be able to analyze whether those

15   incoming wires were potentially suspicious?

16   A.  Yes.

17   Q.  You mentioned yesterday something about whether wires

18   were populated in Searchspace.  Is that right?

19   A.  Yes.

20   Q.  And assuming the data was populated, the Searchspace

21   system would include the name of the sender and the

22   recipient of a wire; is that right?

23   A.  I don't remember the exact wording that I used, but it

24   had to do with how the data from the wire was populated and

25   showed up in Searchspace.

Pesch - Cross

1    Q.  And if it was populated, that would include that

2    information, correct?

3    A.  If it was populated correctly.

4    Q.  For example, assuming the data was populated correctly,

5    it would include the date of the wire; is that right?

6    A.  Yes.

7    Q.  And assuming the data was populated correctly, it also

8    included the amount of the wire; is that right?

9    A.  Yes.

10   Q.  And it would also include the name of the sender and the

11   recipient of the wire; is that true?

12   A.  I believe so.

13   Q.  And the data that was populated in Searchspace, it was

14   populated -- the default was it was populated; is that true?

15   Is that a fair way of saying it?

16   A.  Most of the data carried through and populated into the

17   correct fields.

18   Q.  And on the Petters Company, Inc. account, for example,

19   Ms. Pesch, the data in Searchspace was populated, right?

20   A.  I don't remember all the data and the transactions and

21   all the alerts, so I couldn't make a general statement about

22   that.

23   Q.  That's fair.  You have no reason to suggest or believe

24   that the incoming -- the data in Searchspace for the Petters

25   Company, Inc. account was not populated?

Pesch - Cross

1    A.  When it would happen, it would have to do -- when there

2    were issues, it had to do with individual wires.  It wasn't

3    for entire accounts.  So there's the possibility that there

4    were wires that weren't filled out correctly on the wire

5    form where you didn't receive 100 percent of the information

6    in Searchspace.

7    Q.  And I get that, and what I'm asking is:  You have no

8    reason to believe that that happened for any particular wire

9    on the Petters Company, Inc. account; is that right?

10   A.  I don't remember the data.  For the amount of

11   transaction activity they had, I can't say for sure whether

12   all of the data carried through 100 percent correctly.

13   Q.  You said the amount of transaction data that they had?

14   A.  There were a lot of wires in the account.

15   Q.  There was a lot of wires, and there was a lot of value

16   of wires going in and out of the account, right?

17   A.  Yes.

18   Q.  And so all I'm trying to do, Ms. Pesch, is figure out if

19   you have any basis or if you actually have any reason to say

20   that any of those wires, even though I know it's enormous,

21   if any of those wires were not populated on the Petters

22   Company, Inc. account?

23   A.  I can't say based on -- I don't have the activity in

24   front of me, so I could not make a comment on that.

25   Q.  I appreciate that.

1            MR. COLLYARD:  I want to turn just real quickly to

2     a new exhibit that has not been offered into evidence

3     already, Your Honor.  Plaintiff's Exhibit 178.

4     BY MR. COLLYARD:

5     Q.  Are you there, Ms. Pesch?

6     A.  I have 178 up.

7     Q.  If you could just kind of flip through it and tell me if

8     you understand this to be your personnel file at M&I Bank.

9          (Witness reviews document)

10    BY MR. COLLYARD:

11    Q.  And I will help you out.  I know you've got a lot of

12    pages there.  Let me try to help you out.  If you can go to

13    page 65, for example, and just take a look at that; and even

14    if you look at page 64, you will see a signature.

15         (Witness reviews document)

16    BY MR. COLLYARD:

17    Q.  Is that your signature on page 64, Ms. Pesch?

18    A.  Yes.

19    Q.  And then we can do another one too.  If you go to page

20    72, is that your signature on page 72?

21    A.  Yes.

22    Q.  Does this look like it's your personnel file at M&I

23    Bank?

24    A.  I never saw my H and R -- or my human resources file, so

25    I couldn't say what the file looked like, but these are

1    documents about me.

2    Q.  Right.  And you signed them, right?

3    A.  Yes.

4    Q.  So you saw them?

5    A.  I don't remember them, but it appears that I saw them

6    because I signed them.

7             MR. COLLYARD:  Your Honor, offer Plaintiff's

8    Exhibit 178.

9             MS. MOMOH:  No objection, Your Honor.

10            THE COURT:  Exhibit 178 is received.

11   BY MR. COLLYARD:

12   Q.  Ms. Pesch, I just want to go through a few of these just

13   real quickly.  If we go to page 65, we are going to do these

14   kind of out of order.

15            I'm sorry, Ms. Pesch.  Are you at page 65?

16   A.  Yes.

17   Q.  If we look up at the top, it says, "Time Frame Covered,"

18   and it gives the January of 2008 to December of 2008 time

19   period.  Do you see that?

20   A.  Yes.

21   Q.  And then over to the left it lists, "Employee Name."  It

22   says, "Mary Pesch."  Do you see that?

23   A.  Yes.

24   Q.  I guess up at the top it reads, "Performance Review

25   Form."  Do you see that?

Pesch - Cross

```
 1    A.  Yes.

 2    Q.  All right.  If you look down below, we're going to go to

 3    the middle -- I am going to take you to the middle of the

 4    page where it says procedure -- I'm sorry, "Produces work

 5    that is accurate and thorough."  I am going to highlight

 6    that underlined paragraph.  I'm going to take you to it

 7    looks like the third sentence, and it reads, "Mary has been

 8    given some of our very complex alerts and has done an

 9    excellent job with them.  She has created very complex

10    flowcharts to explain funds going in and out.  She does not

11    stop researching until she has found information to resolve

12    her questions."  Do you see that?

13    A.  Yes.

14    Q.  On the complex flowcharts, do you recall that when you

15    were analyzing or researching or looking into potentially

16    suspicious activity on an account, you would do complex

17    flowcharts mapping out the money going in and the money

18    going out of an account, for example?

19              MS. MOMOH:  Objection, Your Honor, vague as to

20    time.

21              THE COURT:  Overruled.  You may answer.

22              THE WITNESS:  There were a few situations that I

23    did that.  It was not my general practice to do that.

24    BY MR. COLLYARD:

25    Q.  It was your general practice to look at the money going
```

```
 1    in and out of the account if the wires were alerting for

 2    incoming and outgoing wires, right?

 3    A.  Yes.

 4    Q.  And we talked about that yesterday, that's called the

 5    flow of the funds, right?

 6    A.  Yes.

 7    Q.  And flow of the funds -- understanding the flow of the

 8    funds is important to understanding whether or not there's

 9    potentially suspicious activity on an account, correct?

10    A.  What do you mean by "understanding"?

11    Q.  Understanding the flow of the fund.  You know what I

12    mean by "understanding the flow of the funds," don't you?

13              THE COURT:  Counsel.

14              MR. COLLYARD:  I'm sorry.  I'm sorry.  Let me --

15              THE COURT:  The question is argumentative.

16              MR. COLLYARD:  Withdrawn, Your Honor.

17    BY MR. COLLYARD:

18    Q.  Sorry.  Flow of funds, do you understand what I mean by

19    "flow of funds"?

20    A.  Yes.

21    Q.  And do I have it correctly that what that means is money

22    going in and money going out of the account?

23    A.  Yes.

24    Q.  And when you were researching or analyzing the money

25    going in and the money going out of the account, for example
```

1    you would look to determine who the money was coming in for

2    and for what purposes, correct?

3    A.  We would look at who was -- where it was coming from,

4    but like I said yesterday, we didn't always have the

5    information about the purpose.

6    Q.  In the past you have looked to see who the money was

7    coming in from and for what purpose, right?

8    A.  When it was available, if it was available, that was

9    something that we would look at.

10   Q.  And you actually have done that in the past, right?

11   A.  I have.

12   Q.  Okay.  And then for the money going out of the account,

13   same thing, you have looked to see who the money was going

14   to and to try to figure out what the use of those funds

15   were; is that fair enough?

16   A.  Again, if the purpose information was available, then we

17   would include that.

18   Q.  And you've done that in the past, though, right?

19   A.  Yes.

20   Q.  And what this is saying is in doing that and

21   understanding the flow of the funds, you've actually made

22   complex flowcharts to be able to explain that type of

23   situation, right?

24   A.  Yes, I have.

25   Q.  So this was 2008.  If we go to the next page, please,

 1     Ms. Pesch, towards the top, where it says,

 2     "Comments/Examples."  Do you see that?

 3     A.  No.

 4     Q.  It's at the bottom.  It's that last section on there

 5     that's up on your screen where it says, "Mary does a good

 6     job of preventing [sic] in SAR review."

 7     A.  Just a second.  I'm trying to find it on here.

 8     Q.  I'm sorry.  Let's do this:  Let's just go to the top

 9     where it says, "Problem Solving/Decision."  Right at the

10     top, do you see that?

11     A.  Yes.

12     Q.  Let's just start there.  And then do you see the

13     underlined portion?

14     A.  Yes.

15     Q.  It says, "Mary uses good judgment in her decisionmaking.

16     Her research and analysis skills are strong and reinforce

17     her decisions."  Do you see that?

18     A.  Yes.

19     Q.  And then it reads, "She is able to back up her decisions

20     with appropriate research and documentation."  Do you see

21     that?

22     A.  Yes.

23     Q.  And when you were an anti-money laundering analyst, you

24     would document your research and your reasonings for your

25     conclusions; is that true?

Pesch - Cross

1    A.  Based on the requirements at the time for the type of

2    activity we were reviewing, whether it was an alert or a

3    case, yes, according to the procedures from that time.

4    Q.  And then down below, that next portion where it says,

5    "Mary does a good job," do you see that?

6    A.  Yes.

7    Q.  And that, "Mary does a good job at presenting in SAR

8    review."  Is that what we talked about earlier when you

9    would do your case and then you would go and present your

10   case to the SAR committee; is that right?

11   A.  Yes.

12   Q.  And during that process, you would have articulated or

13   documented your reasoning and explanation for your

14   recommendation that the activity was suspicious; is that

15   true?

16   A.  Yes.

17   Q.  Let's go to page 69, please, and if we look at the top

18   in the upper right-hand corner again, Ms. Pesch, this one

19   says that it's the time period from January of 2007 through

20   December of 2007.  Do you see that?

21   A.  Yes.

22   Q.  And then if we go down towards the middle of the page

23   again on, "Produces work that is accurate and thorough,"

24   that portion, again I'll just take you to kind of the middle

25   of that paragraph.  Do you see where it says, "Mary is often

1    given especially complicated cases"?

2    A.  Yes.

3    Q.  All right.  It reads, "Mary is often given especially

4    complicated cases because she is so thorough and does such a

5    high-quality job."  Do you see that?

6    A.  Yes.

7    Q.  And then it goes on and says, "She is a 'step above' on

8    the research and analysis, providing complicated flowcharts

9    in several situations to explain account activity."  Do you

10   see that?

11   A.  Yes.

12   Q.  And, again, this is talking about the flowcharts that

13   you would create to understand the flow of the funds; is

14   that right?

15   A.  It says, "Complicated flowcharts...to explain account

16   activity."  I don't remember the flowcharts that she's

17   referring to in that timeframe.  I don't remember what

18   exactly they showed, but it apparently was account activity.

19   Q.  Okay.  And if we look at the next sentence, it reads,

20   "Mary created the flowcharts on her own, and they have

21   proven to be a valuable tool in understanding the flow of

22   funds."  Right?

23   A.  That's what it says, yes.

24   Q.  And the purpose of your flowcharts were to understand

25   the flow of the funds, correct?

```
 1    A.  To display it.
 2    Q.  Is there a difference -- I'm sorry.  Is there a
 3    difference between -- you said display?
 4    A.  Display.  It was a visual aid.
 5    Q.  Oh, sure.  So you drew it out; is that right?
 6    A.  I don't remember the flowcharts in question.  I don't
 7    remember how -- from 2000 -- January 2007 to December 2007,
 8    I don't remember how I made those.
 9    Q.  Do you recall at all if you did it on your computer or
10    if you drew out the money going in and out of the accounts?
11    A.  I remember some that I made on the computer.  I don't
12    remember these specific ones in question, so I can't tell
13    you how I made those.
14    Q.  So you displayed them --
15    A.  From January 2007 through December 2007.
16    Q.  Sure.  But you displayed them, and you did that to
17    understand the flow of the funds.  Do you agree with that?
18    A.  To provide support to help understand it, yes.
19    Q.  So that others could understand the flow of funds?
20    A.  Yes.
21    Q.  Okay.  We can put that one aside for now.
22              Let's go to Exhibit 398, Ms. Pesch.
23    A.  Which binder was that?
24    Q.  It would be -- it's got to be your Volume II.
25              MR. COLLYARD:  Your Honor, am I okay to keep going
```

1    for a little bit?

2              THE COURT:  We'll take our break at 10:30.

3              MR. COLLYARD:  Thank you.

4    BY MR. COLLYARD:

5    Q.  All right, Ms. Pesch.  Let's go to Exhibit 398.

6              Can you please take a look at it.  Tell me if you

7    recognize this document.

8         (Witness reviews document)

9              MR. COLLYARD:  I'm sorry, Your Honor, for the

10   record, Exhibit 398 is admitted into evidence.

11             THE COURT:  Thank you.

12   BY MR. COLLYARD:

13   Q.  If you look at the top, Ms. Pesch, it says, "Additional

14   Guidelines for Analysis and Investigation of Alerts in

15   Searchspace."  Do you see that?

16   A.  Yes.

17   Q.  And do you understand what this document is?

18   A.  Yes.

19   Q.  This is a guideline that AML analysts would have to

20   follow when they were reviewing and making -- reviewing

21   alerts in Searchspace and making their determination as to

22   whether or not activity is potentially suspicious; is that

23   right?

24   A.  Yes.

25   Q.  If we turn to page 5, please, up at the top it reads,

Pesch - Cross

1    "Closed to Expected or Explainable Activity."  Do you see

2    that?

3    A.  Yes.

4    Q.  And that's a state?  Is that called a state, in which an

5    analyst could close an alert; is that right?

6    A.  Yes.

7    Q.  And then is it fair, Ms. Pesch, to say that what this

8    document does is it provides guidance to the anti-money

9    laundering analysts as to what kind of documentation they

10   should have if they so choose to close an alert; is that

11   right?

12   A.  It documents the steps to take and some things to

13   consider when working an alert.

14   Q.  In some of the things to consider, does it also -- do

15   you also agree that it includes the type of documentation

16   that should be done or could be done when closing an alert?

17   A.  It would provide guidance for that.

18   Q.  I am going to make my screen a little bit bigger.  I'm

19   going to go to the part where it says, "Comments in

20   Searchspace for 'closed to expected or explainable

21   activity,'" and I'm going to highlight the paragraph that

22   says, "The following points" -- the portion that says, "The

23   following points" for you.

24         MS. MOMOH:  I'm sorry.  Counsel, what page are

25   you?

Pesch - Cross

```
 1                    THE COURT:  Thank you.

 2                    MR. COLLYARD:  I'm sorry.  I'm on page 5.

 3         BY MR. COLLYARD:

 4         Q.  And on page 5 underneath the Heading 1, "Comments in

 5         Searchspace," it reads, "The following points should be

 6         covered in the comments section of Searchspace when closing

 7         an alert."  Do you see that?

 8         A.  Yes.

 9         Q.  And then down below it, it provides a checklist, right?

10         A.  It provides a list.

11         Q.  Okay.  It provides a list, and these are some of the

12         things that should be covered when closing an alert in

13         Searchspace, right?

14         A.  Yes.

15         Q.  And this is not -- this is not an exhaustive list,

16         correct?

17         A.  Like I said before, every alert could be different.  You

18         can't account for every possible step you might possibly

19         need to take.  So, yes, there could be additional things you

20         would want to consider.

21         Q.  So, for example, at the top of our checklist, it says,

22         "Why did customer alert?"  Do you see that?

23         A.  Yes.

24         Q.  And the analyst would explain why the customer alerted?

25         A.  Yes.
```

1    Q.  And then down below it says, "Who is the customer?  What

2    kind of business"; is that right?

3    A.  That's what it says, yes.

4    Q.  As part of documenting information when closing an

5    alert, the analyst would actually explain who the customer

6    is and what kind of business the customer is in; is that

7    right?

8    A.  Yes.

9    Q.  And then a couple down below it says, "What activity was

10   found?"  Do you see that?

11   A.  Yes.

12   Q.  And in explaining what activity was found, the analyst

13   would actually document or put in their comments, for

14   example, the range of the wires, right?

15   A.  For an analyst that was following these steps, yes.

16   Q.  And that would be range of dollar amounts for the type

17   of -- or for the wires that were being alerted; is that

18   right?

19   A.  Yes.

20   Q.  And it would also identify the type of activity, so, for

21   example, if there were checks; is that right?

22   A.  Yes.

23   Q.  Then a couple below that, it reads, "Describe analysis

24   completed," and it gives an example.  Do you see that?

25   A.  Yes.

Pesch - Cross

1    Q.  And the example is "Discussion with account officer."

2    Do you see that?

3    A.  Yes.

4    Q.  And is that talking about documenting, for example, the

5    communication with the business bankers or the customer

6    relationship manager if the analyst had reached out to ask a

7    question about whether or not there was a legitimate

8    business purpose for some of the activity?

9    A.  It would document if you had reached out, yeah.

10   Q.  And I'm sorry.  Just to be even more specific, it says

11   the analyst would actually document the discussion that they

12   had with the officer; is that right?

13   A.  That's an example that's given.

14   Q.  And other things that the analyst could document was

15   they could document the research that they did on the alert;

16   is that right?

17   A.  Yes.

18   Q.  So looking on the internet, for example, or looking at

19   copies of checks; is that true?

20   A.  Yes.

21   Q.  They would also document or could document information

22   they learned from looking at other accounts that the

23   customer had at the bank; is that right?

24   A.  Yes.

25   Q.  And if we go way down to the bottom of the checklist,

1    the last sentence there reads, "Make sure that a conclusion

2    is reached and supported in your comments."  Do you see

3    that?

4    A.  Yes.

5    Q.  And the analysts were documenting the conclusions and

6    the reasons why they were making their decision; is that

7    fair?

8    A.  Again, for the analysts that had to follow this part of

9    the directions, yes.

10   Q.  If we go to the next page, page 6, Part 2 where it

11   reads, "Closed to Expected," you see a couple paragraphs

12   down below that it says, "The focus for the closed alerts

13   will be explaining the reason for the alert."  Do you see

14   that?

15   A.  Yes.

16   Q.  And it reads, "Analysts will be required to look at

17   everything, but only document what alerted AND the source or

18   use of funds."  Do you see that?

19   A.  Yes.

20   Q.  And when it's saying analysts are required to look at

21   everything, does that mean, for example, if the alert was

22   for incoming and outgoing wires, the analyst would still

23   look at checks on an account, for example?

24   A.  Yes.

25   Q.  Would there be anything else, like cash or anything else

 1    that they would look at?

 2    A.  They would look at everything in the account.

 3    Q.  Am I missing -- am I missing anything?  So it would be

 4    wires.  It would be checks.  It would be cash.  Is there

 5    anything else?

 6    A.  I don't have a full recollection of every transaction

 7    type that was in Searchspace.

 8    Q.  And then the last part of it reads, "Of course, if other

 9    unusual activity is identified, that should be commented on

10    as well."  Is that right?

11    A.  That's what it says.

12    Q.  And so if the alert was for incoming and outgoing wires

13    and the analyst -- while looking at everything, the analyst

14    was looking at checks and determined that there was

15    something unusual about the checks, they would comment on

16    that; is that right?

17    A.  Yes.

18    Q.  Then down below towards the middle of the page, it

19    reads -- where it says, "Ensure," "Ensure that you

20    understand and explain what is going on in the account."  Do

21    you see that?

22    A.  Yes.

23    Q.  And then it gives an example for a wire.  Do you see

24    that?

25    A.  Yes.

1   Q.  It says, "Customer alerts for incoming wires."  Do you

2   see that?

3   A.  Yes.

4   Q.  And this is an example for what they would document or

5   explain with an incoming wire; is that right?

6   A.  Yes.

7   Q.  And it reads, "Documentation would be needed for the

8   source of the incoming wires AND what the funds appeared to

9   be used for."  Is that right?

10  A.  Yes.

11  Q.  And the analyst would document in the comments section

12  the source of the incoming wires and what the funds were

13  used for in following this particular example; is that true?

14  A.  That's how it's listed in this example.

15  Q.  And you agree, Ms. Pesch, that when analysts are looking

16  for money laundering, for example, the source and use of the

17  funds is an important factor in determining that?

18  A.  Yes.

19  Q.  And do you agree that when analysts are looking for

20  unusual activity, the source and the use of the funds is an

21  important factor in determining that as well?

22  A.  Yes.

23  Q.  If we go to the next page, page 7, where it says,

24  "Reminders," it says, "3, Reminders."  "Remember to ask

25  yourself the following questions when closing an alert to

1    expected activity."  Do you see that?

2    A.  Yes.

3    Q.  We've got another checklist, right?

4    A.  Another list, yes.

5    Q.  It reads, "Do I know where the funds came from?"  Right?

6    A.  Yes.

7    Q.  And that's one of the questions that the analysts should

8    ask themselves when closing an alert, right?

9    A.  Yes.

10   Q.  And then, "Do I know where the funds went?"  That means

11   where the wires are going to, right?

12   A.  Yes.

13   Q.  So who is wiring the money in and who is getting the

14   money; is that a fair way to say it?

15   A.  Yes.

16   Q.  And then it reads, "Do the comments provided convince

17   the reader that the alert is not suspicious?"  Do you see

18   that?

19   A.  Yes.

20   Q.  And you agree that the anti-money laundering analysts

21   were supposed to provide enough information in the comments

22   section in Searchspace to convince the reader the alert is

23   not suspicious?

24   A.  Yes.

25           MR. COLLYARD:  Your Honor, I'm done with this

Pesch - Cross

```
1    document.

2              THE COURT:  It's time for our midmorning break as

3    well.  And so, Members of the Jury, we'll take our

4    midmorning break now.  Please be prepared to come back to

5    the courtroom at 10:45, and please remember the instructions

6    that I have given you, not to discuss the case, any research

7    on the case, or anything else about the case or the people

8    involved.  We're in recess.

9         (Jury excused)
```

**IN OPEN COURT**

**(JURY NOT PRESENT)**

```
12             THE COURT:  Is there anything that needs to be

13   addressed outside of the presence of the jury?

14             MR. COLLYARD:  Not by plaintiff, Your Honor.

15             MR. GLEESON:  I have two brief applications,

16   Judge.  I can do them now or at the beginning of the lunch

17   hour.  Your call.

18             THE COURT:  Let's do it at the beginning of the

19   lunch hour, okay.

20             And you are free to leave the courtroom.  Please

21   remember it's as if you are on the witness stand, however,

22   during this break, so please don't discuss the case with

23   anyone or let anyone discuss the case with you.  Okay?

24             THE WITNESS:  (Nodding.)

25             THE COURT:  We'll be back.
```

1              MR. COLLYARD:  Thank you, Your Honor.

2              MS. MOMOH:  Your Honor, if I may briefly, can we

3     excuse the witness and then I can make a comment?

4         (Witness excused from courtroom)

5              THE COURT:  Please be seated.  We will be back in

6     session.

7              MS. MOMOH:  Thank you, Your Honor.  I just want to

8     clarify for the record and then clarify the understanding

9     among counsel from both sides.  As you know, plaintiff is

10    calling Ms. Pesch adversely in their case-in-chief.  The

11    parties have reached an agreement that with respect to BMO's

12    examination of Ms. Pesch, it's essentially going to be

13    similar to a direct examination.  And so I just wanted to be

14    clear on the record that with respect to my examination of

15    Ms. Pesch, that I am not tied with respect to scope as to

16    the questions that were raised in her direct or

17    cross-examination by plaintiff's counsel.

18             THE COURT:  So you are calling her as a witness

19    and wish to conduct direct examination?

20             MS. MOMOH:  Following Mr. Collyard's examination,

21    Your Honor, yes, just so that we don't have to burden the

22    witness and call her separately in our case-in-chief, which

23    at this point we don't know when we will be presenting our

24    case-in-chief.

25             THE COURT:  Is there any objection?

```
 1              MR. COLLYARD:  For efficiency purposes,

 2     Your Honor, we would be glad to do it.

 3              THE COURT:  Very well.

 4              MR. COLLYARD:  And then I would just be able to

 5     cross-examine at the conclusion.

 6              THE COURT:  Absolutely.

 7              MS. MOMOH:  Thank you, Your Honor.

 8              THE COURT:  Thank you.

 9         (Recess taken at 10:32 a.m.)

10                        *    *    *    *    *

11         (10:51 a.m.)

12                         IN OPEN COURT

13                        (JURY PRESENT)

14              THE COURT:  Please be seated.  Counsel, are you

15     ready to proceed?

16              MR. COLLYARD:  I am, Your Honor.  We would like to

17     proceed with the testimony of Ms. Pesch.

18              THE COURT:  You may.

19              Yes, please.  If you would like, you may pull the

20     base of the microphone closer to you if you would like to.

21     Otherwise, it's fine.

22              Okay.  Counsel, you may proceed.

23              MR. COLLYARD:  Thank you, Your Honor.

24     BY MR. COLLYARD:

25     Q.  Ms. Pesch, I would like you to go to Exhibit 234.  If
```

1    you can please tell me -- I'm sorry.  If you can please look

2    at it and tell me whether this is another additional

3    guideline that the anti-money laundering analyst would

4    follow when investigating and closing an alert in

5    Searchspace.

6    A.  This was another version of that document.

7    Q.  Are you familiar with this document as well?

8    A.  I remember there were multiple versions.  I don't have

9    them memorized, so I'm not sure what you mean by "familiar."

10   Q.  The content in this document looks familiar to you; is

11   that right?

12   A.  Yes.

13   Q.  And this is another version of what we saw in Exhibit

14   398; is that right?

15   A.  I don't remember the exhibit number, but one of the

16   previous exhibits, yes.

17   Q.  It was the last exhibit that we were just talking about?

18   A.  Yes.

19            MR. COLLYARD:  Your Honor, offer Plaintiff's

20   Exhibit 234.

21            MS. MOMOH:  No objection, Your Honor.

22            THE COURT:  Exhibit 234 is received.

23   BY MR. COLLYARD:

24   Q.  Again, Ms. Pesch, this is a similar document to Exhibit

25   398, and I just want to take you to a page and just -- page

Pesch - Cross

1    3, if you will.  And if you remember, I don't know if you

2    remember, but the last exhibit in Exhibit 398, it was Number

3    3 and then it listed reminders.  Do you recall that, that we

4    just talked about before --

5    A.  Number 3?

6    Q.  Yeah.  I'm sorry.  You can actually go to 3 -- let's

7    just go to 398.  I'll just show it to you this way.

8            If we go to page 7 in 398, if you recall I was

9    asking you about the reminders, and it was under Heading

10   Number 3.  Do you see that?

11   A.  Yes.

12   Q.  Now if we go to Exhibit 234 and we look at page 3 and we

13   go to the bottom, it says, Number 2, "Reminders."  Do you

14   see that?

15   A.  Yes.

16   Q.  And if we go to the -- this is, "Remember to ask

17   yourself the following questions when closing an alert to

18   expected activity."  Do you see that?

19   A.  Yes.

20   Q.  And if we have got to go to page 4 at the very top, and

21   at the very top of page 4, it says, "Do the comments

22   provided convince the reader that the alert is not

23   suspicious?"  Do you see that?

24   A.  Yes.

25   Q.  And that's the same exact reminder that was in Exhibit

Pesch - Cross

1    398; is that true?

2    A.  It looks like the same message.

3    Q.  And, again, anti-money laundering analyst was supposed

4    to provide enough information in the comments section in

5    Searchspace under this guideline and document as well to

6    convince the reader that the alert is not suspicious; is

7    that true?

8    A.  Could you repeat that?

9    Q.  Yes.  The anti-money laundering analyst was supposed to

10   provide enough information in the comments in Searchspace to

11   convince the reader that the alert is not suspicious; is

12   that true?

13   A.  It said, "Do the comments provided convince the reader

14   that the alert is not suspicion?"

15   Q.  I'm asking you, Ms. Pesch, if you agree that the

16   anti-money laundering analyst was supposed to provide enough

17   information in the comments section in Searchspace to

18   convince the reader that the alert is not suspicious?

19   A.  Yes.

20   Q.  We can put 234 aside.

21            Let's go to Exhibit 183.

22   A.  Is that in the other binder?

23   Q.  Exhibit 183 -- your Exhibit 183 is going to be in your

24   Volume I if you would like the hard copy version.

25            Okay.  I have -- you see my Exhibit 183 just to

Pesch - Cross

654

1   see what it looks like.  Can you take a look at yours.

2   A.  Look at the entire thing?

3   Q.  No.  Do you have the entire exhibit available so we can

4   flip through it?

5   A.  I have this whole section (indicating).

6   Q.  Yes.  Right, okay.  You have it.

7           Can you take a look at the beginning of Exhibit

8   183 and tell me if you agree that these are audit trails for

9   the alerts on the Petters Company, Inc. account that were

10  closed in Searchspace.

11  (Witness reviews document)

12          MR. COLLYARD:  As Ms. Pesch is doing that,

13  Your Honor, I'm going -- I'll publish Exhibit 183, which is

14  already in evidence.

15          THE COURT:  You may.

16  BY MR. COLLYARD:

17  Q.  Ms. Pesch, I'll help you out too.  If you can -- if you

18  want to flip to page 26 for an Alert Number 60827.  Are you

19  there?

20  A.  Yes.

21  Q.  And do you agree that these are the audit trails for

22  alerts that were closed on the Petters Company, Inc. account

23  in Searchspace?

24  A.  I haven't had a chance to look through all of them, but

25  this one and the ones I have seen are alert histories.

Pesch - Cross

```
1    Q.  And this particular one, Alert 60827, is an alert that

2    you reviewed and investigated and close; is that right?

3    A.  Yes.

4    Q.  If we look at the top, it says, assigned to "MDrewiske."

5    A.  Drewiske.

6    Q.  Drewiske.  That's your name?

7    A.  That was my maiden name.

8    Q.  So when we see Drewiske, that means you?

9    A.  Yes.

10   Q.  And so this alert was for the time period of November of

11   2005.  Do you see that?

12   A.  Yes.

13   Q.  And I'm going to expand this a little bit more to go

14   down to the comments.

15        Now, are these -- is this documentation, are these

16   considered comments in Searchspace that would be the

17   comments that we were talking about that would be entered

18   with respect to Exhibits 398 and 234 that we just talked

19   about; is that right?

20   A.  Yes.

21   Q.  And this is essentially the reasons or the justification

22   for closing the alert; is that right?

23   A.  That would be included in it.

24   Q.  Is that what the purpose of this documentation was?

25   A.  The purpose of the documentation was documenting the
```

1    review of the alert.

2    Q.  Including documenting the reasons for why the alert was

3    closed?

4    A.  Yes.

5    Q.  And this documentation includes, for example, why the

6    activity was alerted; is that right?

7    A.  Yes.

8    Q.  So what we will find in here is information about

9    whether it alerted for incoming and outgoing wires, for

10   example; is that right?

11   A.  That was the process.  I haven't had a chance to read

12   through everything yet for this alert.

13   Q.  If we take a look at this document, I just want to --

14   I'm sorry.  I want to go back up to the Alert 60827 and

15   focus on that for a second.  So this is Alert 60827.  Now if

16   we go back down and we look at the first entry kind of in

17   the boxes there where it reads, "Alert 61806 for Petters

18   Company, Inc. has been moved to the Closed-Multiple Alerts

19   state."  Do you see that?

20   A.  Yes.

21   Q.  Can you explain what's happening there?

22   A.  It means there was another open alert while this alert

23   was opened, so they were linked together to be reviewed

24   together.

25   Q.  So if we took Alert 61806, that is also an alert that

1   had alerted, correct?

2   A.  Yes.

3   Q.  And you had reviewed it and closed it with 60827, the

4   title of this alert, right?

5   A.  I didn't close that alert, but I included the activity

6   from that alert in my review of this alert.

7   Q.  You did not -- when you say you didn't close that alert,

8   meaning what?

9   A.  That alert, 61806, was closed to the multiple state by

10  Sara Johnson.

11  Q.  So would you have reviewed the activity for the Alert

12  61806 to make a determination as to whether or not that

13  alert should be closed?

14  A.  Yes.

15  Q.  And you would have included your documentation for

16  closing Alert 61806 in this alert, which is 60827; is that

17  right?

18  A.  Typically when we had alerts closed in multiples, we

19  wouldn't break them out individually.  We would review them

20  together.

21  Q.  Right.

22  A.  So there would be one set of comments for the combined

23  alerts.

24  Q.  I gotcha.  So what you were doing is you would take --

25  and let's just go down one more.  I will just show you

1    another one.  You have Alert 62728 as well, right?

2    A.  Yes.

3    Q.  So that's another alert that you would have been

4    reviewing -- you would have been reviewing the activity on

5    while you were making your determination in 60827, and they

6    were combined and you closed them as one in 60827; is that

7    fair?

8    A.  Yes.

9    Q.  So for this particular alert, it's from November of

10   2005, which it says it up at the top, right?

11   A.  Yes.

12   Q.  And then down below we've already talked about two

13   alerts.  So you've got 61806 in the first entry, and then

14   the next entry you've got Alert 62728.  Do you see that?

15   A.  Yes.

16   Q.  And at the very bottom of the page it starts out another

17   alert, and that is Alert 63517.  Do you see that?

18   A.  Yes.

19   Q.  And then if we go to the next page, which is page 27,

20   and at the top it reads, "This alert was an AML Monthly

21   Alert created for activity that occurred in February of '06

22   and must be reviewed in conjunction with the current alert."

23   Do you see that?

24   A.  Yes.

25   Q.  So we've got four alerts really that you are

Pesch - Cross

1    investigating and analyzing; is that true?

2    A.  Yes.

3    Q.  And the four alerts are 61806, 62728, 63517, and the

4    original alert of 60827.  Do I have that right?

5    A.  Yes.

6    Q.  And the time period that you reviewed the activity for

7    was November 2005 through February of 2006.  Do I have that

8    right?

9    A.  Based on the comments entered here, yes.

10   Q.  Now, if we look down -- and, by the way, I'm sorry, each

11   one of those alerts were closed in 60827; is that true?

12   A.  What -- those individual alerts were closed in multiple,

13   but the transaction activity that I reviewed combined with

14   this 60827 alert was closed.

15   Q.  In 60827?

16   A.  Yes.

17   Q.  So let's go to -- we're on page 27, and down towards the

18   bottom, it's the second to the last block, where it says,

19   "See MIContacts," that block.  And kind of in the middle of

20   it, it says, "Business checking account ████9018 was reported

21   in 11/05, 12/05, 1/06, and 2/06."  Do you see that?

22   A.  Yes.

23   Q.  And the ████9018 account number, that's the Petters

24   Company, Inc. account number, right?

25   A.  Sorry.  I have to compare the number just to make sure.

1    Yes.

2    Q.  And what this is saying is the business checking account

3    for the Petters Company, Inc. account reported or was

4    alerted for these particular months; is that right?

5    A.  Yes.

6    Q.  And the alerts were for peer volume and value of

7    incoming and outgoing wires; is that true?

8    A.  Based on what's written, yes.

9    Q.  And what that means is the alerts were sounding off --

10   or I'm sorry, the alerts were going off for the value of the

11   incoming and outgoing wires, for example, right?

12   A.  That was one of the factors.

13   Q.  And what that simply means is the amount of money coming

14   in and going out of the account?

15   A.  Through wires, yes.

16   Q.  And volume means just the number of wires; is that

17   right?

18   A.  Yes.

19   Q.  So the alert is going off for the number of wires going

20   in; is that right?

21   A.  That was part of it.

22   Q.  The number of wires going out; is that right?

23   A.  Yes.

24   Q.  And then the alerts are going off as well for the amount

25   of money being wired into the account; is that right?

1   A.  Yes.

2   Q.  And the amount of money being wired out of the account;

3   is that also true?

4   A.  Yes.

5   Q.  Now, if we flip to the next page, up at the very top,

6   that first block, I'll pull that up, and it reads, "There

7   were 817 incoming wire deposits that totaled $2.562.3

8   billion.  Do you see that?

9   A.  Yes.

10  Q.  And the $2.562 billion, that was the amount of money

11  that had alerted for the incoming wires?

12  A.  That was the amount of the total wires during the

13  timeframe.

14  Q.  That had alerted, correct?

15  A.  I don't have the data in front of me.  What the comments

16  said is I gave the number, total number, and the total

17  value.

18  Q.  So if you took the four alerts that were mentioned

19  earlier and you took the value of the money being wired into

20  the account for those four alerts and you combined them, it

21  was $2.562 billion; is that a good way of saying it?

22  A.  Yes.

23  Q.  And then you list, "Incoming wires were from."  Do you

24  see that?

25  A.  Yes.

1    Q.  And you list a few entities, right?

2    A.  Yes.

3    Q.  One of them is Enchanted Family Buying Company.  Do you

4    see that?

5    A.  Yes.

6    Q.  Another one is Metro Gem.  Do you see that?

7    A.  Yes.

8    Q.  Now you do not list in here an entity called Nationwide

9    International Resources, do you?

10   A.  I don't see that in the comment --

11   Q.  Do you remember --

12   A.  -- this comment in question.

13   Q.  I'm sorry, Ms. Pesch.  Do you remember investigating and

14   reviewing this particular alert?

15   A.  No.

16   Q.  Do you remember, for example, when you were

17   investigating this alert what you knew or what you looked

18   into about Enchanted Family Buying Company?

19   A.  For this particular alert, no.

20   Q.  If you -- let's go down a couple blocks where it says,

21   "There were several transfers from account number."  And it

22   says, "The majority of the checks deposited appear to be for

23   employee purchases of event tickets (such as concert

24   tickets) through the company."  Do you see that?

25   A.  Yes.

1    Q.  And you're noting that the majority of the checks that

2    were deposited into the account were for concert tickets?

3    A.  That's what the comment says.

4    Q.  And when you say "majority," majority has significance

5    to you?

6    A.  What do you mean by "significance"?

7    Q.  Why are you noting the majority of the checks?

8    A.  That it was a large portion of the activity of the

9    checks.

10   Q.  And why is majority important to you?

11   A.  It was an easy way to summarize the activity.

12   Q.  Were you actually looking for, for example, what the

13   majority of certain activity would have been?

14   A.  Can you clarify that, please?

15   Q.  Sure.  Are you actually looking to see like where are

16   the majority of the checks coming in from?

17   A.  I was looking at all the checks.

18   Q.  What I'm trying to figure out is why you're noting

19   majority and what significance that has.

20   A.  It was an easy way to summarize the activity.

21   Q.  And you're noting here majority because does majority,

22   for example, signify a pattern?

23   A.  I would say it identifies a large portion.

24   Q.  And you thought that was significant to note in these

25   comments, correct?

664

1    A.  It was my practice to summarize activity, and it was an

2    easy way to summarize the activity.

3    Q.  Did you think it was important enough to mention

4    majority in your comments?

5    A.  I don't remember working this alert.  I don't remember

6    what I was thinking at the time.

7    Q.  Ms. Pesch, I'm sorry, I am going to try to ask you a yes

8    or no question.  And I would appreciate it if you would try

9    to answer it yes or no.  My question is:  You determined

10   that it was significant enough to write the term "majority"

11   when you were considering the checks on the account,

12   correct?

13   A.  I can't answer that as a yes or no because I don't

14   remember working this specific alert.

15   Q.  Let me ask it this way:  So you note that the majority

16   of the checks were for concert tickets, right?

17   A.  Yes.

18   Q.  And you've got -- if you step back up to the incoming

19   wires, we've got $2.562 billion of incoming wires, right?

20   A.  Yes.

21   Q.  You don't say what those wires are for, do you?

22   A.  No.

23   Q.  You don't say who the majority or what the majority of

24   the wires are for, do you?

25   A.  I did not use that word.

Pesch - Cross

1    Q.  And you don't note who the majority of the wires came in

2    from, do you?

3    A.  Today sitting here, no, I don't.

4    Q.  No, I'm asking you -- I'm sorry.  You don't note that in

5    your comments, do you?

6    A.  I did not use the word "majority."

7    Q.  And if you -- let me ask you this:  How you figured out

8    that the majority of checks deposited appear to be for

9    employee purchases such as concert tickets, okay, you would

10   try to figure out what the majority of the wires being used

11   for like you did with checks, correct?

12   A.  I don't remember why I chose these specific words for

13   entering the comments or how -- what I was thinking when I

14   was adjudicating this alert, so I can't really say.

15   Q.  My question, Ms. Pesch, is:  You would also try and

16   figure out what the majority of the $2.56 billion was being

17   used for like you did with these checks from employees,

18   correct?

19   A.  I would look to see if there were wire originators that

20   sent lots of wires, yes.  In terms of beyond that, I don't

21   know what I was thinking when I wrote this.

22   Q.  Ms. Pesch, if you can turn to page 234 of your

23   deposition.  And if you go towards the bottom, line 24, I am

24   going to read it to you.  I asked you the question:  "Would

25   you also try and figure out, then, what the majority of the

1    $2.56 billion was being used for like you did with these

2    checks from employees?"  Do you see that?

3    A.  Yes.

4    Q.  And you answered:  "That would be part of the source and

5    use analysis, yes."  Did I read that correctly?

6              MS. MOMOH:  Objection, Your Honor, improper

7    impeachment.  Sidebar?

8              THE COURT:  Overruled.

9              MS. MOMOH:  Your Honor, sidebar, please, if I may?

10             THE COURT:  (Indicating).

11        **(At sidebar)**

12             MS. MOMOH:  Thank you.  One moment.

13        (Pause)

14             MS. MOMOH:  So he's reading this question right

15   here (indicating), and this is her response and -- to this

16   question here.  "My question, Ms. Pesch, is you would also

17   try and figure out what the majority of the 2.56 billion was

18   being used for like you did with these checks from

19   employees, correct?"  That's what he asked her today at

20   trial, Your Honor.  Her response was:  "I would look to see

21   if there were wire originators that sent lots of wires, yes.

22   In terms of beyond that, I don't know what I was thinking

23   when I wrote this."  That was her response.

24             And then he attempted to impeach her with her

25   deposition testimony without getting her to confirm that her

Fesch - Cross

1    response was different than what she had testified to

2    previously.  Her response at the time of the deposition was

3    as follows (indicating):  Her response here was simply "I

4    don't know."

5              THE COURT:  So you want him to use a different

6    form of impeachment?

7              MS. MOMOH:  At this point if she says "I don't

8    know," the proper form would be to clarify what is it that

9    you don't know.  But right now she hasn't testified to

10   anything that's inconsistent.

11             THE COURT:  We are not going to have sidebars

12   every time the exact manner of cross-examination does not

13   comport with the model/manner of cross-examination.

14             MS. MOMOH:  And, Your Honor, it's not really with

15   respect to form and technique.  It's just simply improper.

16   I mean, he's using this, and he's already stating this into

17   the record for the jurors to hear without him properly

18   establishing that there is an improper -- an inconsistent

19   statement.

20             As I see what she testified to and to what she

21   testified here (indicating), there's no inconsistency.  It's

22   an "I don't know" versus a response she provided at the time

23   of her deposition.

24             THE COURT:  So you want her to look at it and

25   see -- and have him ask if she answered differently before?

```
 1          MS. MOMOH:  Yes, please, Your Honor.  Yes.

 2          THE COURT:  We are not going to stand up as to the

 3     form of the question and have objections every time there is

 4     some minor difference in the formal way of

 5     cross-examination.  Do you understand that?

 6          MS. MOMOH:  Yes, Your Honor, but if I may, again,

 7     this is not with respect to form.  This is not with respect

 8     to it being a minor issue, Your Honor.  What I'm trying to

 9     prevent is an issue where there's a question of substance

10     and the question of substance and how it is answered by

11     Mr. Collyard instead of by the witness is what the jurors

12     are hearing.  It's not a minor point, Your Honor.  And this

13     goes to a key point in this case, otherwise, I wouldn't be

14     objecting.

15          MR. COLLYARD:  Your Honor, if I may?  Ms. Momoh is

16     totally fine asking these questions again when you are going

17     to call your witness and you can point out if I have done

18     something that you think did not comport with the testimony

19     and she can say it.  I believe what I am doing is proper

20     impeachment.

21          THE COURT:  You can impeach with a prior

22     inconsistent statement.  Is that what you are doing?

23          MR. COLLYARD:  That's what I am doing, yes.

24          MS. MOMOH:  So I think you have already provided

25     the instruction as to how he should proceed, to clarify what
```

1    she had testified to, to compare it to what she testified to

2    in her deposition without the language first coming out.  He

3    has --

4             THE COURT:  We don't need your tutorial on this.

5             MS. MOMOH:  Understood, Your Honor.

6             THE COURT:  I have spoken.  Both of you understand

7    English, and I think you, as officers of the court --

8             MS. MOMOH:  Yes, Your Honor.

9             THE COURT:  -- will abide by my rulings.

10            MS. MOMOH:  Yes, Your Honor.  Yes, Your Honor.

11   **(In open court)**

12            THE COURT:  Counsel, you may proceed.

13            MR. COLLYARD:  Thank you, Your Honor.

14   BY MR. COLLYARD:

15   Q.  Ms. Pesch, I'm sorry.  I don't believe we got the last

16   part of that answer.  I was reading your answer and your

17   answer was:  "That would be part of the source and use

18   analysis, yes."  Did I read that correctly?

19   A.  I don't remember what line we're on.  Can you --

20   Q.  I'm sorry.  We're on page 235, line 3.  You answered my

21   question:  "That would be part of the source and use

22   analysis, yes."  Do you see that?

23   A.  Yes.

24   Q.  And that's how you answered it when I took your

25   deposition; is that right?

Pesch - Cross

```
1    A.  That's how it was recorded.

2    Q.  And that was truthful and accurate testimony at that

3    time, correct?

4    A.  Yes.

5    Q.  And so, Ms. Pesch, when you try to figure out what the

6    majority of the wires were being used for like you did with

7    the checks, what exactly would you do to go and try and

8    figure that out?

9    A.  I would export the wires into Excel, and I could sort

10   the wires.

11   Q.  And then you would go and look at the wires?

12   A.  Yes.

13   Q.  And you would try to figure out what they were being

14   used for, correct?

15   A.  We didn't have purpose information in Searchspace from

16   what I can recall.

17   Q.  When you were trying to figure out what the majority of

18   the wires were being used for, you would try to figure out

19   what they were actually being used for, correct?

20   A.  We would look at who they went to.

21   Q.  I'm sorry.  These incoming wires.

22   A.  Okay.  Could you repeat your question then?

23   Q.  Yes, Ms. Pesch, I will back up.  I know it got a little

24   muddled in there.

25          I had asked you if you had tried to figure out
```

Pesch - Cross

1    what the majority of the wires were being used for like you

2    did with checks.  And we went through and established that,

3    and you told me, yes, that would be part of the source and

4    use analysis, right?

5    A.  Are you referring to what was in -- recorded in the

6    deposition?

7    Q.  Yes, and what I just asked you.  I'm asking you if you

8    remember that.

9    A.  I remember that we just went over that.

10   Q.  Okay.  And so when -- then when you were trying -- what

11   I am doing now is stepping back, and I am trying to figure

12   out when you were actually doing your investigation and when

13   you were trying to figure out what the majority of the wires

14   were being used for, just like you did with checks, I'm just

15   simply asking you what you would actually do to do that.

16   A.  Well, the use of an incoming wire would have been where

17   the money moved to, so that's why I answered in reference to

18   debit-type activity.

19   Q.  That's what you would have done to figure out what the

20   majority of the money of the $2.56 billion being wired into

21   the account was used for?

22   A.  Based on how you worded that question, yes.

23   Q.  And you have looked at the incoming wires, for example,

24   to see if they made sense for the Petters Company, Inc.

25   business, correct?

Pesch - Cross

```
1    A.  Based on my understanding of the company, yes.

2    Q.  And you would have done that analysis in determining and

3    figuring out what the majority of the wires were being used

4    for like you did with checks; isn't that true?

5    A.  Again, use wouldn't have been the money coming in, so

6    I'm confused by how you are wording this.

7    Q.  Ms. Pesch, I am going off of your own testimony where

8    you testified that you would figure out what the majority of

9    the wires were being used for like you did with checks.

10   A.  Let me grab it so I can...

11   Q.  And I am asking you, Ms. Pesch, is one of the things

12   that you would do is you would have looked at the incoming

13   wires to see if those incoming wires made sense for the

14   Petters Company, Inc. business based on your understanding?

15   A.  Can you give me a minute to read a few lines above this,

16   please?

17   Q.  Ms. Pesch, I'm not asking you about that.  I'm asking

18   you a simple question.

19              THE COURT:  Counsel.

20              You may take your time to prepare yourself to

21   answer the question.

22              THE WITNESS:  Thank you.

23        (Witness reviews document)

24   A.  Based on what I am reading in here, you had discussed

25   source and use separately, and I feel like your question is
```

1    combining them.  So could you please rephrase your question?

2    Q.  I'm going to ask you this question, Ms. Pesch.  And my

3    question is:  Would you have looked at the incoming wires to

4    see if they made sense for the Petters Company, Inc.

5    business based on your understanding of the Petters Company

6    business?

7    A.  Yes.

8    Q.  Now, if we go back to these entries here in Exhibit 183,

9    and if we go down two more blocks where it reads, "There

10   were 715 wires totaling 2.55 billion."  Do you see that?

11   A.  Yes.

12   Q.  It reads, "There were 715 wires totaling $2.55 billion."

13   Those are the outgoing wires; is that right?

14   A.  It appears so.

15   Q.  And you say, "Many outgoing wires were sent to accounts

16   held by the Petters Companies at other financial

17   institutions."  Do you see that?

18   A.  Yes.

19   Q.  So what you're saying there is many of the outgoing

20   wires from the $2.55 billion were being sent to other

21   Petters businesses; is that right?

22   A.  That's what I wrote.

23   Q.  And then you -- it says, "Other wires were sent to," and

24   then you list some entities, right?

25   A.  Yes.

Pesch - Cross

1    Q.  And you list Metro Gem.  Do you see that?

2    A.  Yes.

3    Q.  Now, you listed Metro Gem as having incoming wires,

4    correct?

5    A.  Yes.

6    Q.  And you list Metro Gem as having outgoing wires; is that

7    right?

8    A.  Yes.

9    Q.  And you don't mention why or what the reason for there

10   being incoming and outgoing wires from Metro Gem, do you?

11   A.  It doesn't appear so.

12   Q.  Then down below that you talk about more checks.  If we

13   go to the next column below that it reads, "Other debits

14   were transfers for Euro Sweeps and checks."  Do you see

15   that?

16   A.  Yes.

17   Q.  "Checks clearing the account were for loan payments,

18   utilities, investment companies, and law firms."  Do you see

19   that?

20   A.  Yes.

21   Q.  And that's an example of the use of the funds?

22   A.  Yes.

23   Q.  And the example you gave me earlier where you noted that

24   there was checks for things like concert tickets, that's use

25   of the funds?

1    A.  The checks referencing concert tickets were deposited to

2    the account.

3    Q.  Okay.

4    A.  So for the account in question, that would be considered

5    a source because it's coming in.

6    Q.  And you -- okay.  Let me see if I understand this.  So

7    where you're saying the checks that were deposited in for

8    things like concert tickets, that's the source of the funds?

9    A.  For the funds from the checks, yes.

10   Q.  And you're explaining what the reasons were for those

11   checks, right?

12   A.  Yes.

13   Q.  Now, you don't list any particular employee who the

14   checks are coming in from, do you?

15   A.  No.

16   Q.  But mention employees, right?

17   A.  Yes.

18   Q.  So in your definition of source, it's who was depositing

19   the checks in and what those checks were being used for; is

20   that correct?

21   A.  The person making the deposits to the account is who?

22   Who was depositing the checks?

23   Q.  You told me that the checks being deposited in the

24   account were the source, correct?

25   A.  Right, but your wording was a little confusing about who

Fesch - Cross

1    was depositing.

2    Q.  You say employees deposited the checks; isn't that

3    right?

4    A.  No.  I said the checks deposited appear to be employee

5    purchases.  I didn't say employees were making deposits.

6    Q.  Okay.  I gotcha.

7            So the checks -- the reason for the checks -- so

8    you have got the reason for the checks, which are employees

9    making purchases of event tickets, right?

10   A.  Yes.

11   Q.  And is it reasonable to conclude that employees were

12   writing checks into the Petters Company, Inc. account to pay

13   for concert tickets?

14   A.  Based on these comments, they were writing checks that

15   were deposited.  I don't know sitting here who made the

16   deposits.

17   Q.  So you can't tell if it was employees writing checks

18   into the account to purchase concert tickets?

19   A.  I can see what the comments say, and it appears that the

20   checks were from employees to purchase concert tickets.

21   Q.  So --

22   A.  I'm saying I don't know who physically made the deposit.

23   It wasn't clear based on how you were asking the question.

24   Q.  Okay.  So let me back up.  I'm sorry.  I may have

25   confused myself.

Pesch - Cross

```
1              Let's talk about this.  So you told me that the
2    checks being deposited into the account was the source of
3    the funds, right?
4    A.  The source of the funds for the checks, yes.
5    Q.  Yes, for the checks.  Do I have that right?
6    A.  Yes.
7    Q.  So the checks coming into the account are the source of
8    the funds for the checks?
9    A.  Yes.
10   Q.  And the source of the funds includes the employees who
11   are depositing the checks into the account?
12   A.  The checks were -- appeared to be from employees.
13   Q.  Is that part of the source of the checks?
14   A.  Yes.
15   Q.  And then you talk about what the checks were actually
16   used for, correct?
17   A.  Which checks are you talking about?
18   Q.  I'm talking about the checks that were -- that you're
19   talking about.  I'm talking about the checks that were
20   deposited that appear to be for employee purchases of things
21   like concert tickets.
22   A.  I'm sorry.  I'm still confused by your wording.
23   Q.  You told me that the checks deposited for concert
24   tickets by employees is the source, the source of the
25   checks, right?
```

Fesch - Cross

1     A.  The checks were the source of the money coming in, and

2     the checks were from -- appeared to be from employees.

3     Q.  So included within source we have the employees who are

4     writing the checks to purchase the tickets, right?

5     A.  Yes.

6     Q.  And we have your explanation for what those checks were

7     used for, which is concert tickets, right?

8     A.  Yes.

9     Q.  Okay.  Now, having understood -- now that I understand

10    source, I will pause there because you were telling me that

11    the way I'm asking my questions is confusing in the AML

12    analyst's world because I am talking about use of funds,

13    right?

14    A.  It wasn't clear, yes.

15    Q.  So source is the money coming in and the reasons for the

16    money coming in -- is that fair? -- based on what we just

17    talked about with checks?

18    A.  Source would be the money coming in.

19    Q.  Okay.  And then use of the funds is going out of the

20    account; is that what we were talking about?

21    A.  Yes.

22    Q.  Okay.  So now that we have our definition of source, go

23    back to the $2.562 billion in incoming wires.  And what you

24    would have done is you would have taken -- you would have

25    gone back to the $2 .562 billion in incoming wires, and you

Fesch - Cross

```
1    would have tried to figure out what the majority of -- I
2    don't want to use used.  Do I say what the majority of the
3    source of the wires was being used for?
4    A.  That terminology is better.  I don't remember what
5    exactly I was thinking when I worked this alert, but, yes,
6    we would have reviewed the incoming wires and who they came
7    from.
8    Q.  And like you did with checks, where you figured out the
9    reason for the checks, as part of your analysis, too, is you
10   would have looked to see if you could determine what the
11   reason for those wires -- however you want to describe it,
12   as source or whatever you want to say -- what the reason of
13   those wires was for, correct?
14   A.  Like I said before, that use information wasn't in
15   Searchspace.  And I don't remember when we got access to the
16   wire system.  When you look at checks, there's a memo line.
17   And we had access to that other system where we could pull
18   up checks; and if it was written on the check, it was easy
19   to see what that check -- it was easy to read the memo on
20   that check.
21   Q.  In your experience as an anti-money laundering analyst,
22   when you were looking at incoming wires you would have at
23   times gone back and looked for the reason for the incoming
24   wires, as we've already talked about, correct?
25   A.  Can you clarify the time frame?
```

Pesch - Cross

1    Q.  2005 up to whenever you would like it.

2    A.  If it was available, that was something we looked at.

3    Q.  And, in fact, you told me -- now you told me that the

4    checks sometimes have some notations in them, right?

5    A.  Yes.

6    Q.  If we look down below in the next box and we are talking

7    about incoming -- we've got to go back to the incoming

8    wires.  Okay?  So up at the top, where it's got 817 incoming

9    wires.  I am going to look at the following box as well.

10            Okay.  So you told me, Ms. Pesch, that the checks

11   had some reference on them and you could figure out some

12   information by looking at the checks.  Do you remember that?

13   A.  Yes.

14   Q.  Now, down below it reads, "Some wires reference note

15   numbers."  Do you see that?

16   A.  Yes.

17   Q.  So wires have information on them as well, correct?

18   A.  The wire data -- the wire data does, yes.

19   Q.  These particular wires reference note numbers, true?

20   A.  I don't remember how I researched these.  I don't know

21   if I had access to that other system.

22   Q.  I understand that you may not remember, but if you just

23   look at your own comments, is it reasonable to conclude that

24   the wires were referencing note numbers on them?

25   A.  Yes.

1    Q.  And you thought that was significant to note in your

2    comments section, right?

3    A.  Yes.

4    Q.  And that would be an indication as to some information

5    about what the wires may have involved or the reasons for

6    the wires; is that also accurate?

7    A.  Yes.

8    Q.  Now, you've got the incoming wires for $2.562 billion

9    coming in.  And then if we go down, I just want to compare

10   the amount of the outgoing wires.  You've got $2.55 billion

11   going out.

12             So 2.56 billion in and 2.55 billion out, right?

13   A.  Yes.

14   Q.  And you agree that those are similar numbers, right?

15   A.  Yes.

16   Q.  And as part of doing investigations and analysis as to

17   whether or not activity was potentially suspicious, one of

18   the things that you would do as an anti-money laundering

19   analyst is you would look to see if there were patterns, for

20   example, of similar amounts of money going in and out of an

21   account; isn't that right?

22   A.  We would look for unusual activity.  I don't -- we would

23   look for unusual activity.

24   Q.  And as part of looking for unusual activity, you would

25   look and see if similar amounts of billions of dollars are

1    going in and out of an account, right?

2    A.  That by itself I wouldn't say is necessarily suspicious.

3    Q.  Okay.  But if it's not by itself necessarily suspicious,

4    you would -- you have considered -- you would consider in

5    the past similar amounts of money going in and going out of

6    an account as one of the indicators that you would look into

7    that activity further; is that fair to say?

8    A.  It could be.

9    Q.  And, in fact, one of the things that you would do

10   when -- and tell me if you've done this -- is when you're

11   looking at activity in the past and it's similar amounts of

12   big numbers going in and out, you would actually look and

13   see what the difference was between the in and outs, right?

14   A.  Can you clarify the time frame you're talking about?

15   Q.  We'll go 2005 to 2008.

16   A.  Sometimes.

17   Q.  And you're looking at the difference because you're

18   looking to see if the difference was small, correct?

19   A.  I get -- we were just looking to see what the difference

20   was if we did that analysis.

21   Q.  And looking to see if large amounts of money are coming

22   into an account and going directly out of an account with a

23   small difference would be one of the things, even though it

24   may not be the only thing, would be one of the things that

25   you would consider and you would look at as you were trying

Pesch - Cross

1    to determine whether or not activity was suspicious on an

2    account, correct?

3    A.  It could be something you would conclude, but by --

4    include, excuse me.  But by itself, that wouldn't be

5    suspicious.

6    Q.  But it would be part of your overall analysis, correct?

7    A.  If there were other suspicious factors and that was

8    present, you could include that.

9    Q.  Do you recall, Ms. Pesch, during the time period of 2005

10   through 2008 how many times on alerts you would see multiple

11   billions of dollars for similar amounts going in and out of

12   an account outside of the Petters Company, Inc. account?

13   A.  I don't remember.

14   Q.  Can you name one client where you reviewed activity on

15   an account and there was multiple billions of dollars on an

16   alert going in and out for similar amounts of money?

17   A.  I don't remember.

18   Q.  I want to pause on 60827 and I want to go to -- we are

19   going to come back to it, but I want to go to a different

20   alert that you closed, which is 64556, and I will find that

21   for you.  It's on page 37.

22           If we're at page 37, Ms. Pesch, if we look up to

23   the right, do you see this alert for 64556 was assigned to

24   you, correct?

25   A.  Yes.

Fesch - Cross

1    Q.  And this alert month was March of 2006.  Do you see

2    that?

3    A.  Yes.

4    Q.  I am going to expand below and capture that first box.

5    In that first box it reads, "May of 2006.  Alert 66209" --

6    just give me a second here -- "Alert 66209 has been moved to

7    the Closed-Multiple Alerts state."  Do you see that?

8    A.  Yes.

9    Q.  And then down below it reads this is "activity that

10   occurred in April of 2006 and must be reviewed in

11   conjunction with the current alert."  Do you see that?

12   A.  Yes.

13   Q.  So do I understand this correctly that what was

14   happening here was you reviewed two alerts again at the same

15   time, which was 64556 and 66209, and both of those alerts

16   were ultimately closed as Alert 64556?

17   A.  Yes.

18   Q.  And this would have covered the months of March of 2006

19   up through April of 2006; is that right?

20   A.  Yes.

21   Q.  Now, if we flip to the next page, we are going to go

22   fourth block down, where it reads, "Account number."  Right

23   there.

24        It reads, "Account number ████9018 alerted in March

25   of '06 and April of '06."  Do you see that?

1    A.  Yes.

2    Q.  This is for peer volume and value of incoming and

3    outgoing wires.  Do you see that?

4    A.  Yes.

5    Q.  So, again, this alert that we're looking at for 64556

6    alerted for the amount of incoming and outgoing wires,

7    correct?

8    A.  That was part of it.

9    Q.  And the other part of it was the number of wires coming

10   in and going out of the account; is that true?

11   A.  Yes.

12   Q.  And if we look down below, we're going to highlight the

13   total of the incoming wires was $1.463 billion.  Do you see

14   that?

15   A.  Yes.

16   Q.  And then we're going to jump down below a few blocks and

17   look at the outgoing wires just to compare them.  And the

18   outgoing wires, there was 386 of them and those wires

19   totaled $1.456 billion, right?

20   A.  Yes.

21   Q.  So, again, we have pretty close amounts of billions of

22   dollars going in and out of the account, right?

23   A.  Yes.

24   Q.  Is this a pattern that you're seeing, where in the alert

25   before for the four months total you had the 2.5 billion

Pesch - Cross

```
1    going in and out and now for these two months you've got
2    $1.4 billion going out?
3    A.  It's similar activity.
4    Q.  And looking at the patterns like that of similar amounts
5    of high value of numbers going in and out an account for
6    multiple -- for a period of time could be indicative of a
7    pattern, right?
8    A.  It could be.
9    Q.  And are patterns of potentially unusual activity, that's
10   something that the analysts were looking for in determining
11   whether or not transaction activity could potentially be
12   suspicious?
13   A.  Could you repeat that?
14   Q.  Sure.
15   A.  It was kind of long.
16   Q.  I'll go slower.  I'm sorry.  Patterns of potentially
17   unusual activity is something that the analysts were looking
18   for in determining whether activity could be potentially
19   suspicious?
20   A.  Yes.
21   Q.  Ms. Pesch, do you agree that in a checking account, a
22   small business checking account, like Petters Company, Inc.
23   had, if there was multiple months where billions of dollars
24   for similar amounts of money going in and out of the
25   account, is that something that would at least be
```

1    interesting to you as you were determining whether or not

2    that activity that had alerted was potentially suspicious?

3    A.  Yes.

4    Q.  And do you agree that on a small business checking

5    account like the Petters Company, Inc. account, where

6    billions of dollars for similar amounts were going in and

7    out of the account, that that would be something that you

8    may think was unusual when you were determining whether or

9    not the activity was potentially suspicious?

10   A.  I don't remember if I knew it was a small business

11   checking account.  Sitting here today, I don't remember

12   that.

13   Q.  Let's talk about it as a depository account.  Is there a

14   difference in your mind between a small business checking

15   account and a depository account?

16   A.  I would say a small business account is a type of

17   checking account.

18   Q.  At M&I Bank did they distinguish between a small

19   business checking account and a different checking account?

20   A.  I don't remember.

21   Q.  Okay.  So let me -- I will ask the question, then, with

22   respect to it being a depository account.  Okay?

23   A.  Okay.

24   Q.  The Petters Company, Inc. checking account was a

25   depository account, correct?

Pesch - Cross

1    A.  Yes.

2    Q.  Okay.  So knowing that it's a depository account, would

3    seeing billions of dollars going in and out of an account

4    for similar amounts of money over a period of months and

5    months, do you agree with me that that would be something

6    that you would potentially consider to be unusual for you to

7    look into it further when you were investigating and

8    reviewing those very alerts that alerted for incoming and

9    outgoing wires?

10   A.  That by itself, without other factors, if there was no

11   other factors and it was just large transactions, that by

12   itself I wouldn't say is suspicious by itself.

13   Q.  Ms. Pesch, would it feel right to you -- if looking at

14   an account for extended periods of months that similar

15   amounts of billions and billions of dollars are going in and

16   out of a depository account, would that feel right to you?

17   A.  There would be other things that we would look into; and

18   if we didn't see any other concerning activity or factors,

19   then, no, we might not have concerns with that.

20   Q.  And, again, we're talking billions of dollars here.  And

21   I am trying to figure out if when you were investigating

22   alerts on accounts, had you seen billions and billions of

23   dollars going in and out of a depository account before at

24   M&I Bank from 2005 through 2008?

25   A.  I don't remember.

Pesch - Cross

1   Q.  Let's stick on 6455 -- I'm sorry, 64556.  Let's go to

2   page 39, and I'm going to focus on the second block down

3   from the top, which says, "The majority of checks."

4           So this time, Ms. Pesch, you write and you say,

5   "The majority of checks deposited appear to be employee

6   purchases of event tickets through the company (such as

7   Disney on Ice.)  Do you see that?

8   A.  Yes.

9   Q.  Again, you're writing "majority."  Do you see that?

10  A.  Yes.

11  Q.  So why are you writing "majority"?

12  A.  Again, it was an easy and concise way of summarizing the

13  activity.

14  Q.  And that was a pattern that you noticed, correct?

15  A.  I would say it was an observation that allowed me to

16  summarize the activity easily.

17  Q.  And you thought it was significant enough to write down

18  the term "majority"; is that right?

19  A.  I don't remember why I wrote "majority" other than I

20  would try to summarize activity.

21  Q.  And you thought noting that checks for things like

22  purchasing tickets for Disney on Ice was significant when

23  there was 1.4 -- 1.5 billion dollars going in and out of the

24  account, right?

25  A.  I thought it was a way to summarize the activity that I

1    was writing about, which was the checks.

2    Q.  Now, if we go back to the previous page, which is

3    page 38, we are going to go to the middle of the page where

4    it says, "Most of the wires" -- or "most wires," and if we

5    can -- I am going to grab the block above it too to have the

6    $1.463 billion included.  Let's just talk about this for a

7    second, Ms. Pesch.

8            So we've got the $1.463 billion coming into the

9    account through wires, right?

10   A.  Yes.

11   Q.  And this time you write and you say, "Most wires were

12   from Enchanted Family Buying Company, Nationwide

13   International Resources."  Do you see that?

14   A.  Yes.

15   Q.  And you list a few more entities, right?

16   A.  Yes.

17   Q.  And there you are noting that most of the wires came in

18   from Enchanted, Nationwide, and then you list the other

19   entities, correct?

20   A.  Yes.

21   Q.  And so you were actually looking at the wires and you

22   were determining that most of them were coming in from these

23   entities, true?

24   A.  And I don't remember working this alert.  I can only see

25   what comments I wrote.

1    Q.  And based on your comments, am I right?

2    A.  Could you repeat your question, then, so I can answer

3    that?

4    Q.  I said:  "So you were actually looking at the wires and

5    you were determining that most of them were coming in from

6    these entities, true?"

7    A.  That's what I wrote, so I think so.

8    Q.  And based on looking at your comments, you wrote down

9    "most" and that had significant -- that had some

10   significance to you in order to write down "most wires,"

11   right?

12   A.  I would say it was a way of summarizing the activity.

13   Q.  And before, with checks, you said "majority."  Do you

14   remember that?

15   A.  Yes.

16   Q.  And this time you said "most," right?

17   A.  Yes.

18   Q.  Would you -- do you know if you would have looked at the

19   wires to see who the majority of the wires were coming from?

20   A.  Again, I don't remember working the alert.  I can only

21   go off of the comments.

22   Q.  And the checks you noted, that they were for purchases

23   for Disney on Ice, right?

24   A.  The checks deposited, yes.

25   Q.  Checks deposited are checks coming into the account,

1    right?

2    A.  Yes.

3    Q.  And incoming wires are wires coming into the account,

4    right?

5    A.  Yes.

6    Q.  And so do you explain what the source or the reasons

7    for the wires coming into the account were for the

8    $1.463 billion?

9    A.  I summarized the source.

10   Q.  Do you explain the reasons for any of the wires?

11   A.  Give me a second to read through the comments.

12        (Witness reviews document)

13   A.  No, it doesn't appear that for the incoming wires I

14   discuss what they were -- the purpose of the wires.

15   Q.  And do you agree with me that you give more level of

16   detail for the reason the checks for Disney on Ice came into

17   the account than you do for the $1.463 billion in wires that

18   came into the account?

19   A.  Yes, the checks have the reference to Disney on Ice and

20   event tickets.

21   Q.  If we go back to page 39, we'll go down below the block

22   for Disney on Ice and I am going to keep part of the block

23   on Disney on Ice and I'm going to show you the next block.

24        It reads that checks clearing the account were for

25   utilities, to investment companies and law firms and for

1    other business expenses.  Do you see that?

2    A.  Yes.

3    Q.  And those are checks going out of the account, right?

4    A.  Yes.

5    Q.  And that's an example of what the use of the funds was;

6    is that true?

7    A.  For the checks, yes.

8    Q.  Now, if we go back, go back to the previous page, on

9    page 38, we're going to look at the outgoing wires and so we

10   will highlight the outgoing wires of $1.456 billion.  And if

11   we look at those, you write, "Many wires were to," and then

12   you list some entities, right?

13   A.  Yes.

14   Q.  And one of the entities you list is Metro Gem, right?

15   A.  Yes.

16   Q.  And then you list Petters Limited, right?

17   A.  Petters Limited, yes.

18   Q.  That tells you that some of the outgoing wires out of

19   the $1.456 billion were going to another Petters business;

20   is that true?

21   A.  Yes.

22   Q.  You don't explain what the use of the funds were for the

23   $1.456 billion, do you?

24   A.  I give a summary of where they went.

25   Q.  You don't explain what the use of the funds was, meaning

```
1    the reason for the outgoing wires, correct?

2    A.  I don't explain the reason.

3    Q.  And if you just go back to -- on the next page, I'm just

4    going to look at the checks on the next page for -- the

5    reason was for utilities, investment companies and law firms

6    and other business expenses.  Do you see that?

7    A.  Yes.

8    Q.  And you agree that you gave more level of detail to

9    those particular checks going out of the account than you do

10   for the $1.456 billion in wires going out of the account?

11   A.  Can you explain what you mean by "level of detail"?

12   Q.  Sure.  If we look at the checks going out of the

13   account, you actually explained what they were for, right?

14   A.  I give a summary of some of them, yes.

15   Q.  And is that what -- Ms. Pesch, is that you were trying

16   to do, was explain what they were being used for?

17   A.  I was explaining the purpose of the check that I could

18   read on that memo line.

19   Q.  And I'm just going back to the outgoing wires and I am

20   just looking at the outgoing wires for the $1.456 billion.

21   You don't explain what the purpose or the reason was for any

22   of the outgoing wires, do you?

23   A.  No.

24              MR. COLLYARD:  Your Honor, would you like me to

25   stop?
```

1          THE COURT:  We have five more minutes.  So if you

2      are moving to a different subject or manner of questioning,

3      then this is a good time to stop.

4          MR. COLLYARD:  I would be shifting gears.

5          THE COURT:  Okay.  Then, Members of the Jury, we

6      will take our lunch break now.  Please be ready to come back

7      to the courtroom at 1:00.

8          Please remember my instructions.  I won't repeat

9      them this time.  But please don't discuss this case with

10      anyone.  Don't let anyone discuss this case with you or

11      within your hearing.  And I hope you have a great lunch.

12          All rise for the jury.

13      (Jury excused)

14                          **IN OPEN COURT**

15                        **(JURY NOT PRESENT)**

16          THE COURT:  And you are free to have a lunch -- a

17      good lunch too.  It is as if you were on the witness stand,

18      however, during that lunch break.  So you are not to discuss

19      your testimony with anyone during that period of time.

20      Okay?  And so you are free to go.

21          I will ask counsel where we are with regard to our

22      afternoon session.  And so everyone may be seated.  I will

23      get an understanding of what to expect.  Counsel?

24          MR. GLEESON:  I don't know where we are with

25      regard to our afternoon session, but I did have an

```
 1    application.  Is that what the Court wanted me to address?
 2                 THE COURT:  Pardon me?
 3                 MR. GLEESON:  Did you want me to address the
 4    application that I mentioned earlier?
 5                 THE COURT:  I want to address the application, and
 6    I also want an understanding of what we expect for the rest
 7    of the day.
 8                 MR. GLEESON:  On the latter point, maybe we should
 9    hear first from Mr. Collyard.  I don't know how much more he
10    has with regard to -- and we would like to -- we've got a
11    couple of witnesses here from Milwaukee who have been here a
12    couple of days.  So it would be nice for us to know if we
13    can cut one or both of them loose.
14                 But let me -- I think it best if we hear first
15    from Mr. Collyard, Judge.
16                 THE COURT:  Very well.
17                 MR. COLLYARD:  My best estimation, Judge, is
18    probably another two hours.
19                 THE COURT:  You said another two hours?
20                 MR. COLLYARD:  Another two to two and a half hours
21    with this witness, yes.  I would hope to be able to get it
22    done sooner, but it may take that long, depending on how it
23    goes.
24                 Thank you.
25                 MR. GLEESON:  And, Judge, on that score, we'll
```

Pesch - Cross

```
 1    have -- Ms. Momoh will have an examination.  I do think --

 2    maybe I should defer to her at the moment.  I think it's

 3    almost inconceivable we get to the end of the day and

 4    Ms. Pesch is off the stand.

 5              So we very much would like to have these two other

 6    AML witnesses be able to return to Milwaukee.  They are

 7    going to have to come back.

 8              THE COURT:  Okay.  I'll allow you to consult with

 9    each other about whether that is a reasonable --

10              MR. GLEESON:  We will.

11              THE COURT:  -- request and explanation for what

12    should come next and who should be released at least for

13    today, and you can advise me at 1:00.

14              MR. GLEESON:  Great.  Do you want to hear this

15    application?  It's brief.

16              THE COURT:  Pardon me?

17              MR. GLEESON:  Do you want to hear the application

18    I wanted to make?

19              THE COURT:  Yes, please.

20              MR. GLEESON:  It's just with regard to "willful

21    blindness," Judge, a term that's kind of prominent in the

22    case.  And it wears two hats.

23              It's obviously part of the evidence.  It's

24    referenced in the training for the AML folks.  It comes up

25    in the testimony.  We haven't objected because it's fair
```

1      ground.

2              But another hat that it wears is it's bound up in

3      the *mens rea*, in the mental state that's required in order

4      for Mr. Kelley to prevail on its claim -- in his claim.

5              And as the witnesses testify as to their

6      understanding about willful blindness, that's fine, but to

7      the degree that willful blindness wears, like, a legal hat

8      and is part of and is bound up in the bad-faith instruction

9      with regard to the *mens rea* for the MUFA claim, to the

10     extent it describes the mental state that needs to be proved

11     by Mr. Kelley, that's -- with respect, that's the Court's

12     business and you will instruct the jury at the end of the

13     case.

14             All we ask for is that -- a brief instruction now

15     to tell that to the jury, and I'll just state quickly what

16     we suggest.  I don't think there's any magic to any

17     language, but the gist of what we want you to tell the jury

18     now, as it hears so many witnesses address it, is as

19     follows:

20             You've heard testimony about willful blindness.

21     That's a term used in AML training, and so it is a proper

22     ground for testimony and it's related to the facts of the

23     case.

24             But willful blindness is also a legal term.  It's

25     closely related to the state of mind Mr. Kelley must prove

1    in his case.  I'll give you instructions at the end of the

2    case about what the legal phrase means.  The testimony of

3    witnesses about their understanding of willful blindness

4    cannot properly be viewed by you as stating the law.

5           We just want that clarity because we think there

6    is confusion that inheres in willful blindness being both a

7    factual dimension in the case and a legal dimension.  That's

8    my application.

9           Thank you.

10          MR. MARDER:  Good afternoon, Your Honor.  David

11   Marder responding very briefly.

12          THE COURT:  Good afternoon.

13          MR. MARDER:  Your Honor, at the conclusion of the

14   case the Court is going to instruct the jury about all the

15   relevant legal principles that are at issue in this case.

16   We see no reason why willful blindness is a particular topic

17   that needs to be raised mid trial.  There are many legal

18   issues that are at issue, and they can all be raised at the

19   end of the case.

20          This is the first time we're hearing this

21   instruction, so it's hard for us to address it or respond to

22   it on the fly, but we just don't see the need to have an

23   interim instruction when the parties have submitted

24   instructions for the closing and that the Court will

25   consider them in due course.

Pesch - Cross

```
1              THE COURT:  Thank you, Counsel.  I have heard your
2      positions on the matter and will rule before the jury
3      returns.
4              Have a good lunch.
5              COUNSEL:  Thank you, Your Honor.
6         (Lunch recess taken at 12:04 p.m.)
7                        *    *    *    *    *
8         (1:15 p.m.)
9                            IN OPEN COURT
10                           (JURY PRESENT)
11             THE COURT:  You may be seated.  And good
12     afternoon.
13             Counsel, are we ready to proceed?
14             MR. COLLYARD:  We are, Your Honor.
15             THE COURT:  You may do so.
16             MR. COLLYARD:  Thank you, Your Honor.
17             THE COURT:  You're welcome.  Counsel, you may
18     proceed.
19     BY MR. COLLYARD:
20     Q.  Good afternoon, Ms. Pesch.
21     A.  Good afternoon.
22     Q.  Welcome back.
23     A.  Thank you.
24     Q.  What I'd like to do is I would like to go back to the
25     alert we were looking at in Exhibit 183, and it's
```

Tesch - Cross

 1    Alert 60827.  And on Exhibit 183, we're going to go to

 2    page 28.

 3    A.  Just a moment.  60827?

 4    Q.  Yeah.  So it's Exhibit 183 and it's page number 28 for

 5    the alert of 60827.

 6             You remember you and I were talking about checks

 7    that were written on the account; do you remember that?

 8    A.  Yes.

 9    Q.  And if we go down below towards the bottom of the page

10    there, that second to last box where it says, "Other

11    debits."

12             "Other debits -- "Checks clearing the account were

13    for loan payments, utilities, investments companies and law

14    firms."  Do you see that?

15    A.  Yes.

16    Q.  And as we talked about, those were checks that were

17    being written on the account, right?

18    A.  Yes.

19    Q.  So those checks were going out of the account and going

20    to those entities or for those purposes, right?

21    A.  Yes.

22    Q.  Now, you don't mention in this alert for 60827 that

23    there were any checks that were being written out of the

24    account going to individuals, do you?

25    A.  In this alert?  No.

Fesch - Cross

1    Q.  And this entry here shows that you had looked at these

2    checks, correct?

3    A.  I wrote about the checks.

4    Q.  And you wrote about the checks that you had reviewed and

5    studied and looked at, right?

6    A.  About the checks I looked at.  I don't think I would use

7    the word "studied."

8    Q.  Okay.  Would you use the word "analyzed"?

9    A.  Sure.

10   Q.  Now, I had mentioned at the beginning of 60827 that the

11   alert was for incoming and outgoing wires, right?

12   A.  Yes.

13   Q.  Was the alert for checks?

14   A.  No.

15   Q.  And why was it that you were looking at checks on the

16   account?

17   A.  We were supposed to look at all of the account activity.

18   Q.  So even though the alert was for billions of dollars

19   going in and out of the account, you went and looked at

20   checks too?

21   A.  Yes.

22   Q.  And when we were talking earlier, we were talking about

23   from -- I believe it was from Exhibit 398 how you look at

24   everything.  Do you remember that?

25   A.  Yes.

Pesch - Cross

1    Q.  And when you are looking at everything, you don't just

2    look at what is being alerted.  So, for example, if it

3    was -- if the alert was for incoming and outgoing wires, you

4    would look at everything, including checks; is that right?

5    A.  Yes.

6              THE COURT:  Ms. Pesch, would you move the base of

7    the microphone a little closer so that -- I'm having trouble

8    hearing you.

9              THE WITNESS:  Is that better?

10             THE COURT:  That's must better.  Thank you.

11             MR. COLLYARD:  Can you hear me okay, Your Honor?

12             THE COURT:  I can hear you.  I want to make sure

13   that I can hear and everyone else can hear Ms. Pesch.  Thank

14   you.

15             MR. COLLYARD:  Thank you.

16   BY MR. COLLYARD:

17   Q.  Ms. Pesch, let's go to Exhibit 185-A.  So that would be

18   in your second volume.  Are you there, Ms. Pesch?

19   A.  Yes.

20   Q.  Now, before I talk about this exhibit, let's just back

21   up.  For Alert 60827, if you remember, the time period for

22   that alert, where you were reviewing the activity, was from

23   November of 2005 up through February of 2006.  Do you recall

24   that?

25   A.  I'm sorry.  For which alert?

Pesch - Cross

1    Q.  60827.

2    A.  Okay.  Yes.

3    Q.  If you take a look at Exhibit 185, tell me if you agree

4    that these are copies of checks that were written on the

5    Petters Company, Inc. account.

6            And, for example, if we just turn to page 9 of

7    Exhibit 185-A -- are you there, Ms. Pesch?

8    A.  Yes.

9    Q.  -- is this a check, that appears in Exhibit 185-A at

10   page 9, a check that was written on the Petters Company,

11   Inc. account?

12   A.  Sorry.  Can you repeat all that again?

13   Q.  Yes.  Sorry.  Is this a check that was written on the

14   Petters Company, Inc. account?

15   A.  Yes.

16   Q.  And this check is dated December 27th of 2005; is that

17   right?

18   A.  Yes.

19   Q.  And that falls within the time period that you reviewed

20   alert activity and checks for Alert 60827; is that correct?

21   A.  Yes.

22   Q.  And this is a check written from Deanna Munson and

23   signed by Deanna Munson.  Do you see that?

24   A.  It's not from Deanna Munson.  I would say it was written

25   by Deanna Munson.

Pesch - Cross

1    Q.  I'm sorry.  Thank you for that.  It was written by

2    Deanna Munson to Deanna Munson and signed by Deanna Munson;

3    is that true?

4    A.  Yes.

5    Q.  And it was for $500,000?

6    A.  Yes.

7    Q.  And you didn't mention this check in your alert for

8    60827, did you?

9    A.  No.

10   Q.  If we go to page 14, I'll show you another check.  This

11   is a check dated December 27th of 2005; is that right?

12   A.  Yes.

13   Q.  And this is a check that was written to a Robert White

14   signed by Deanna Munson; is that true?

15   A.  Yes.

16   Q.  And that's for $700,000?

17   A.  Yes.

18   Q.  You didn't mention this check in your alert for 60827

19   either, did you?

20   A.  No.

21   Q.  And by looking at this check, Ms. Pesch, you can't

22   determine by looking at this check what the legitimate

23   business purpose was for this check, can you?

24   A.  I see that it's at the end of the calendar year for an

25   individual.

Pesch - Cross

1    Q.  Can you tell what the legitimate business purpose is for

2    this check?

3    A.  With certainty, no.

4    Q.  And this is a check for $700,000 in cash, correct?

5    A.  It's a check for $700,000, not cash.

6    Q.  Not cash because it's a check?

7    A.  Yes.  And written out to Robert White, not cash.

8    Q.  If we go to page 16, this check was dated January 3rd of

9    2006, correct?

10   A.  Yes.

11   Q.  You told me the other one was written at the end of the

12   year.  This one is written at the beginning of the year,

13   right?

14   A.  Yes.

15   Q.  And this one is written to Deanna Munson and signed by

16   Deanna Munson, correct?

17   A.  It looks like there's an additional signature, but it

18   appears Deanna's signature is also on there.

19   Q.  And this check is for $1 million, right?

20   A.  Yes.

21   Q.  Now, you said it looks like there's an additional

22   signature.  And if you look where that additional signature

23   is, can you read what it says?

24   A.  No.

25   Q.  Does it say, "Two signatures required over $5,000"?

Fesch - Cross

```
 1   A.  It appears to, but part of it is covered.

 2   Q.  And you understand that when companies have a depository

 3   account or a checking account, sometimes it's required that

 4   two signatures are on a check that is for $5,000 or more; is

 5   that right?

 6   A.  I guess if the check says so.

 7   Q.  Well, you understand that that is actually a procedure

 8   that goes in place at the bank sometimes, right?

 9   A.  I don't remember that.

10   Q.  Have you ever encountered that, where there needs to be

11   two signatures on a check for a certain amount, in a

12   depository account?

13   A.  Yes.

14   Q.  And this would be consistent with that requirement,

15   right?

16   A.  If the requirement was for two signatures over a certain

17   amount and there were two signatures, that would be

18   consistent with that requirement.

19   Q.  And what the bank -- and correct me if I'm wrong, but

20   what the bank has, is it has a policy for that to happen

21   if -- I'm sorry.  Let me back up.

22           Do you know what a signature card is?

23   A.  Yes.

24   Q.  What is a signature card?

25   A.  A signature card lists the people who are authorized to
```

Fesch - Cross

1    conduct transactions on that account.

2    Q.  So if Petters Company, Inc., the checking account or the

3    depository account, they signed a signature card that

4    required two checks -- or two signatures on the account,

5    there would be a requirement that there be two signatures

6    for over a certain amount; is that right?

7    A.  I don't remember the requirements for signature cards at

8    M&I.

9    Q.  But if that were the case, would I be correct?

10   A.  If that were the case, yes, but I don't remember the

11   requirements for signature cards.

12   Q.  Okay.  Well, we'll come back to that in a little bit.

13          Let me show you -- let me show you another check.

14   Let's go to page 17.  And this is a check again dated

15   January 3rd, 2006, right?

16   A.  Yes.

17   Q.  And the last check that we looked at for $1 million was

18   dated January 3rd of 2006, correct?

19   A.  Yes.

20   Q.  Now, this check is also written to Deanna Munson and

21   signed by Deanna Munson for $2.5 million, right?

22   A.  Yes.

23   Q.  So we've got $3.5 million in one day in checks that

24   Deanna Munson has written to herself, correct?

25   A.  It appears so.

Pesch - Cross

1    Q.  You did not note this check in your Alert 60827, did

2    you?

3    A.  No.

4    Q.  And you didn't note the fact that Deanna Munson had

5    written $3.5 million to herself in checks on the same day,

6    correct?

7    A.  I would have to go back and check the date of the first

8    check to see if -- I thought it was the month before.

9    Q.  Well, I'll help you out.  It's page 16.  And the date is

10   January 3rd of 2006, right?

11   A.  Uh-huh.

12   Q.  For $1 million?

13   A.  Yes.

14   Q.  And then the next check that we were just talking about

15   is on page 17.  That's January 3rd of 2006 for $2.5 million,

16   right?

17   A.  Yes.

18   Q.  And my question was:  You didn't note in your comments

19   in Alert 60827 that there happened to have been $3.5 million

20   of checks written on the account where Deanna Munson wrote a

21   check to herself for that amount of money, correct?

22   A.  Sorry.  I thought you said three checks.  No, I did not

23   note these checks.

24   Q.  If we go to page 18, this check is dated February 16th

25   of 2006, correct?

```
1     A.  Yes.
2     Q.  And it's a check written to Bob White and signed by
3     Deanna Munson, correct?
4     A.  Yes.
5     Q.  And that's for half a million dollars?
6     A.  Yes.
7     Q.  And you did not note that check in your comments on
8     60827 either, did you?
9     A.  No.
10    Q.  And, again, this one has the requirement of two
11    signatures over $5,000.  Do you see that?
12    A.  Yes.
13    Q.  And this is for the time period of February of 2006.
14    The last checks that we saw were for January of 2006.  But
15    there's only one signature.  Do you know why that would be?
16    A.  No.
17    Q.  This is the same exact checking account, correct, for
18    both sets of checks?
19    A.  It's the same checking account.  It looks like they
20    could be from different checkbooks.
21    Q.  Go to page 11.  Now we're back to that December 27th
22    date of 2005.  Do you see that?
23    A.  Yes.
24    Q.  There's a check written to Jim Wehmhoff for $1 million.
25    Do you see that?
```

1    A.  Yes.

2    Q.  Signed by Deanna Munson; is that right?

3    A.  Yes.

4    Q.  You didn't note this check in your alert for 60827

5    either, did you?

6    A.  No.

7    Q.  Ms. Pesch, if you would have seen checks where Deanna

8    Munson was writing millions of dollars in checks to herself,

9    would you have at least thought that that was interesting

10   enough to have noted or to potentially look into?

11   A.  I don't remember this alert or all the other activity in

12   the account that I was looking at, so I can't say.

13   Q.  Does a person writing checks to themselves for millions

14   of dollars on a depository account when it's not a payroll

15   account, would that strike you as something that would be

16   unusual enough that you'd want to go and look into it?

17   A.  I guess I had no indication that these weren't payroll,

18   so I guess, no, I wouldn't agree.

19   Q.  Well, do you have any indication that these are payroll?

20   A.  It doesn't say payroll.

21   Q.  And you wouldn't assume that it's payroll, right?

22   A.  I don't -- I'm not sure.  I don't remember working this

23   alert.

24   Q.  Well, do you remember earlier when I showed you those

25   PowerPoints and the PowerPoints talked about how don't make

1    assumptions of legitimacy; do you remember that?

2    A.  Yes.

3    Q.  You wouldn't assume that this would be a payroll

4    account, right?

5    A.  I don't remember what I was thinking when working this

6    alert.

7    Q.  You can put that one aside, Ms. Pesch.  Let's go to

8    Exhibit 188.  That would be in your second volume.

9            If you take a look at -- can you please take a

10   look at Exhibit 188 and tell me if that's an e-mail exchange

11   that you are on.

12   A.  Yes.

13   Q.  And if you take a look at page 2, tell me if that's an

14   e-mail from Shandra Roehrig to you.

15   A.  Yes.

16   Q.  And it's dated September 26th of 2008, correct?

17   A.  Yes.

18           MR. COLLYARD:  Your Honor, I offer Plaintiff's

19   Exhibit 188.

20           MS. MOMOH:  No objection, Your Honor.

21           THE COURT:  Exhibit 188 is received.

22   BY MR. COLLYARD:

23   Q.  Let's put up page 2.  Who's Shandra Roehrig?

24   A.  She was the lead analyst.

25   Q.  She was an analyst or she was a manager?

1    A.  I remember her being a lead analyst.  She wasn't the

2    manager.

3    Q.  So Ms. Roehrig is writing to you on September 26, 2008

4    and asking you to do something, right?

5    A.  Yes.

6    Q.  And I'll just go through it here real quickly.  She

7    says, "I have assigned an alert to you for Petters Company,

8    Inc.  This is a customer for whom we have reviewed almost on

9    a monthly basis since 2005 and have always closed the alert

10   to expected or quick close for Qualified Peer review."  Do

11   you see that?

12   A.  Yes.

13   Q.  And then she says -- by the way, if Ms. Roehrig was a

14   lead analyst, would she be assigning you work like this?

15   A.  She could.

16   Q.  In the next paragraph Ms. Roehrig says, "A subpoena was

17   received for Petters Company, Inc. with specific interest in

18   activities performed by Tom Petters himself."  Do you see

19   that?

20   A.  Yes.

21   Q.  And it says, "On September 24 the headquarters was

22   raided by the federal agents."  Do you see that?

23   A.  Yes.

24   Q.  And it says "the account were seized."  Do you see that?

25   A.  The -- I see "the funds in the account were seized."

Tesch - Cross

1    Q.  Oh, I'm sorry.  You're right.

2            "On Thursday, September 25, the funds in the

3    account were seized."  Do you see that?

4    A.  Yes.

5    Q.  And what is meant by "seized"?

6    A.  I think, like, frozen.

7    Q.  They were seized by the federal government?

8    A.  I guess I don't remember exactly what that meant.

9    Q.  Okay.  Well, in the next paragraph she makes a request

10   to you, right?

11   A.  Yes.

12   Q.  And she's asking you in this paragraph to go back and

13   revisit the account for review, right?

14   A.  Yes.

15   Q.  And she says, "I realize we have already closed alerts

16   covering activity for the past three months, but we'd like

17   to take a second look at the wire activity."  Do you see

18   that?

19   A.  Yes.

20   Q.  So what's she's saying is she's saying there were alerts

21   that were already closed over the last three months, but she

22   wants you to go back to those same alerts and take a look at

23   that same exact activity, correct?

24   A.  Yes.

25   Q.  And she says, "specifically looking for any unusual or

1     identifiable patterns of payees or flow of funds."  Do you

2     see that?

3     A.  Yes.

4     Q.  And what did you understand her to be asking you to do?

5     A.  To look for unusual activity.

6     Q.  And patterns of flow of funds?

7     A.  Yes.

8     Q.  And then she tells you that you should -- you can start

9     with three months to see if there are any patterns you

10    identify have been ongoing, right?

11    A.  Yes.

12    Q.  And when you were going to look for patterns, you'd be

13    looking at, for example, whether or not there were similar

14    amounts of large dollars of money going in and out of the

15    account, correct?

16    A.  That wasn't specified in this e-mail.

17    Q.  I understand that she doesn't specifically say any

18    patterns, but would that have been one of the patterns that

19    you would have looked for?

20    A.  I was looking for any unusual activity, including

21    potential patterns.

22    Q.  And would that have been one of the potential patterns?

23    A.  Potentially.

24    Q.  And then Ms. Roehrig tells you that you're free to

25    expand the time period if you feel it's necessary, right?

Pesch - Cross

 1    A.  Yes.

 2    Q.  And you actually went and did this, correct?

 3    A.  Yes.

 4    Q.  All right.  Let's go to Exhibit 189, and if you can

 5    please take a look at Exhibit 189 and tell me if that's a

 6    document that you wrote.

 7    A.  It appears so.

 8    Q.  Is this the analysis that you did at Ms. Roehrig's

 9    direction?

10    A.  A draft of that analysis.

11    Q.  Okay.  This is a draft of that analysis.

12             And you're familiar with this analysis and

13    document, right?

14    A.  Yes.

15             MR. COLLYARD:  Your Honor, I offer Plaintiff's

16    Exhibit 189.

17             MS. MOMOH:  No objection, Your Honor.

18             THE COURT:  Exhibit 189 is received.

19    BY MR. COLLYARD:

20    Q.  So, Ms. Pesch, what I'd like to do is just cover some of

21    the points on the first page.  I don't want to sit and read

22    the whole document, but I want to cover some of the points

23    on it to give us some context.  Then I want to look at some

24    of the analysis that you did.  Okay?

25    A.  Okay.

Pesch - Cross

1    Q.  So let's just go to the second paragraph.  It reads,

2    "According to Forbes, Petters Group is a private has

3    purchased several distressed companies and tries to turn

4    them around."  Do you see that?

5    A.  Yes.

6    Q.  That's talking about Petters Group and not Petters

7    Company, Inc., correct?

8    A.  Yes.

9    Q.  And it says, "Their holdings and subsidiaries include

10   Polaroid, Sun Country Airlines and Fingerhut," right?

11   A.  Yes.

12   Q.  And, again, that's talking about Petters Group, not

13   Petters Company, Inc.?

14   A.  Yes.

15   Q.  In the next paragraph you say, "Petters Company, Inc.

16   has held a business checking account at M&I Bank since

17   1999," right?

18   A.  Yes.

19   Q.  And then you say, "Signers on the account are Tom

20   Petters and Deanna Coleman," right?

21   A.  Yes.

22   Q.  So that would mean they would have been authorized, both

23   of them would have been authorized to sign checks on the

24   account?

25   A.  At the time that I wrote this, yes.

Pesch - Cross

1    Q.  And then you say, "The account is being reviewed from

2    January 1 through August 31 at the request of M&I Corporate

3    Compliance."  Do you see that?

4    A.  Yes.

5    Q.  And so before Ms. Roehrig had asked you to go back for

6    three months, and it looks like you're going back for eight

7    months in 2008; is that right?

8    A.  Yes.

9    Q.  Was that your decision or did somebody else tell you to

10   go back eight months instead of three months?

11   A.  I don't remember.

12   Q.  In the next paragraph it explains that, "Mr. Petters and

13   Petters Company, Inc. are being investigated for a

14   multi-billion dollar fraud scheme.  The goal of the scheme

15   was to get investors to provide money and financing for

16   Petters Company, Inc."  Do you see that?

17   A.  Yes.

18   Q.  And that was information that you went out and

19   researched and found on the internet; is that what you did?

20   A.  Based on how this was written, yes.

21   Q.  And then down below, the next paragraph, you say, "The

22   scheme entailed soliciting investors to PCI by promising

23   that their investments were secured in property, principally

24   retail goods, which were purchased at wholesale from vendors

25   such as Nationwide International Resources and Enchanted

Fesch - Cross

```
 1    Family Buying Company."  Do you see that?

 2    A.  Yes.

 3    Q.  And then you go on to explain that those were sold --

 4    supposedly sold to retailers such as Walmart and Sam's Club

 5    for profit, right?

 6    A.  Yes.

 7    Q.  The analysis that you were doing, were you basing your

 8    analysis on this being the business model?

 9    A.  What analysis?

10    Q.  The analysis that you did when you went back and looked

11    at the account activity from January 1 through August 31 of

12    2008.

13    A.  I was reporting what I found in the news articles.  I

14    haven't done any analysis in the case at this point.

15    Q.  Was this a draft of your analysis?

16    A.  An incomplete draft, yes.

17    Q.  When you did your analysis, did you base your analysis

18    off what I just described here as the business model of

19    Petters Company, Inc.?

20    A.  I used the information in the articles and applied it to

21    what I was seeing in the transaction account.

22    Q.  And when you say "what I was seeing in the transaction

23    account," you're talking about looking at the incoming and

24    outgoing wires, for example?

25    A.  Yes.
```

Pesch - Cross

1    Q.  Or any checks that were written on the account, right?

2    A.  Yes.

3    Q.  Then down below that you say, "However, the purchase

4    orders and the sales orders were phony and the transactions

5    never occurred.  The affidavit said that Petters used the

6    money raised through PCI for other business ventures and to

7    support an extravagant lifestyle."  Do you see that?

8    A.  Yes.

9    Q.  Would that activity that you are describing there be

10   consistent or indicative of money laundering?

11   A.  It could, yeah.

12   Q.  Let's go to the next page.  I just want to talk about

13   some of your analysis here.  So we're on page 2 of

14   Exhibit 189, and in the middle of the page you say -- where

15   it says, "The monthly values" and you provide a chart, and

16   down below that you have a box for "difference."  Do you see

17   that?

18   A.  Yes.

19   Q.  Let's talk about this.  You say, "The monthly values of

20   credits and debits to the account during the review period

21   are shown below."  Do you see that?

22   A.  Yes.

23   Q.  And then you've got these columns where you say, "Total

24   Value of Credits" and "Total Value of Debits," right?

25   A.  Yes.

Pesch - Cross

1    Q.  And then you are listing all of the months from January

2    of -- January to August of 2008, correct?

3    A.  Yes.

4    Q.  And, by the way, if we just pause here for one second,

5    alerts on the Petters Company, Inc. account had gone off

6    during this entire time period, correct?

7    A.  I don't remember the timing of all the alerts, so I

8    couldn't say that for certainty without being able to refer

9    to documentation.

10   Q.  Is that what you believe as you're sitting here today,

11   that alerts had gone off during this time period and you

12   were going back and looking at the transaction activity on

13   those alerts?

14   A.  Yes, I believe they were alerts during that time period.

15   Q.  And what you're doing here, Ms. Pesch, is you're looking

16   at the monthly values of the money going in and the money

17   going out, right?

18   A.  Yes.

19   Q.  And from this particular time period, it's 2.869 billion

20   going in and 2.869 billion going out, right?

21   A.  Yes.

22   Q.  Very similar amounts of money, correct?

23   A.  Yes.

24   Q.  And you actually note that down below, don't you?

25   A.  Yes.

Pesch - Cross

1   Q.  And you actually call out that the difference was 189

2   grand, right?

3   A.  Yes.

4   Q.  And then if we go down to just the next part of this to

5   show that as well, and what I'd like to do is have the end

6   of the day balance showing with the graph.  There we go.

7          And you say, "The end of the day balance in the

8   account during the review period never exceeded

9   $1.7 million."  Do you see that?

10  A.  Yes.

11  Q.  And what are you explaining there?

12  A.  How much money was in the account at the end of the

13  business day.

14  Q.  And so when you are saying -- what you are saying here

15  is you're looking at all the money going in and out of the

16  account.  At the end of the day there was only $1.7 million

17  left in the account; is that right?

18  A.  Yes.

19  Q.  And, Ms. Pesch, do you agree that when there's large

20  amounts of money going in and out of an account and there's

21  a low account balance at the end of the day, that that could

22  be indicative of suspicious activity?

23  A.  Not necessarily by itself.

24  Q.  Sure, I understand, but that could be one of the factors

25  that leads an analyst to conclude that that activity could

1    be interesting, right?

2    A.  By itself, that is not suspicious.

3    Q.  I'm sorry.  Let me try it again.

4         When you have large amounts of money going in and

5    out of an account and at the end of the day the balance is

6    low, that could be one of the factors that goes into an

7    analysis as to whether or not that activity is potentially

8    suspicious?

9    A.  If there were other suspicious factors present that you

10   were aware of, that could be included if it made sense based

11   on the review.

12   Q.  And right up above here you say, "Difference between

13   credits and debits."

14        The difference between the credits and debits of

15   the money going in and out of the account, if that

16   difference is small, that could be one of the factors that

17   would go into being indicative of potentially suspicious

18   activity, right?

19   A.  By itself, I would say no.

20   Q.  And it could be one of the factors that goes into your

21   analysis; is that right?

22   A.  In some cases you could include that with other

23   suspicious factors.

24   Q.  So, for example, if the difference -- if there's

25   billions of dollars going in and out of the account and the

1   difference is small, and in addition to that the -- you have

2   at the end of the day a low balance, those could be added

3   together and be part of the analysis that goes into whether

4   or not there was potentially suspicious activity, right?

5   A.  If there were other suspicious factors present, they

6   could be included in some circumstances.

7   Q.  And I want to -- while I have these two pieces

8   highlighted, I want to include the rest of the graph.

9            And, Ms. Pesch, this is -- you were looking at

10   this particular activity, right?

11   A.  Yes.

12   Q.  And you were doing that for a reason, right?

13   A.  Yes.

14   Q.  And one of the reasons was because Ms. Roehrig had asked

15   you to look for unusual patterns of activity, correct?

16   A.  Yes.

17   Q.  And this is what you chose to do, right?

18   A.  That's one of the things I did in this case review.

19   Q.  Now, how you have the numbers here, this is something

20   that you could have done, for example, back when you did

21   your analysis on your alerts for 60827 and 64556, right?

22   A.  This is the type of analysis you would do at the case

23   level if you had suspicious factors that led you to escalate

24   the alert.  This isn't the type of analysis you would do for

25   an alert.

Pesch - Cross

```
 1    Q.  You could have done this for an alert, right?
 2    A.  It wasn't our practice to do this for an alert if there
 3    weren't other suspicious factors present.
 4    Q.  Ms. Pesch, I'm just asking if you could have done it for
 5    those alerts.
 6    A.  It was --
 7            MS. MOMOH:  Objection, Your Honor, vague as to
 8    time frame.
 9            THE COURT:  Overruled.
10            MS. MOMOH:  And asked and answered, Your Honor.
11            THE COURT:  Overruled.  You may answer if you can.
12            THE WITNESS:  Can you repeat the question?
13    BY MR. COLLYARD:
14    Q.  Sure.  You could have done this very analysis for when
15    you reviewed your alerts on 60827 and 64556?
16    A.  This was not our practice to do at the alert level if
17    there weren't other suspicious factors that made us escalate
18    that alert.
19    Q.  Let me ask it a little bit differently.  Was it
20    possible, if you had wanted to, to do this very analysis on
21    Alerts 60827 and 64556?
22            MS. MOMOH:  Same objection, Your Honor, vague as
23    to time, calls for speculation.
24            THE COURT:  Overruled.  You may answer.
25            THE WITNESS:  This wasn't something that we would
```

1    have done for an alert without the presence of suspicious

2    factors.

3    BY MR. COLLYARD:

4    Q.  So I'm going to ask you it -- I'm going to try to ask

5    you my question a little bit differently, Ms. Pesch, just to

6    make sure that -- I'm trying to be as clear as possible, and

7    I'm sorry if I'm not.  And I'm going to try to do this in a

8    "yes" or "no" fashion, so I'm going to try and phrase my

9    question that will call for a "yes" or "no" response.

10           My question is:  You could have done this same

11   exact analysis, as you have written here, for Alert 60827

12   and 64556?  "Yes" or "no," Ms. Pesch.

13           MS. MOMOH:  Objection, Your Honor.

14           THE COURT:  Sustained.  You may answer the

15   question.

16           THE WITNESS:  What do you mean by "could have

17   done"?

18   BY MR. COLLYARD:

19   Q.  It would have been possible for you to do it?

20   A.  Yes.

21   Q.  And all of this type of information that you list here,

22   that type of information was available back for Alert 64556

23   and 60827?

24   A.  No.

25   Q.  The information for the values going in and going out of

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

Pesch - Cross

1    the account during that time period, for example?

2    A.  You didn't clarify the information.  You just said all

3    the information.  Most of this information that we've looked

4    at came out after the raid at the end of September 2008.

5    Q.  I'm sorry.  I'm sorry, Ms. Pesch.  I'm just focused

6    on -- when I say "all this" -- I'm sorry.  You're right.

7              This information, these numbers, these types of

8    numbers, the chart that you did, what I'm saying is that

9    type of information, that very type of information would

10   have been available for you to go and gather when you were

11   doing Alerts 60827 and 644 -- 64556, for those particular

12   alerts?

13   A.  The values were available.

14   Q.  And you could have compared the difference between the

15   credits and debits, for example, right?

16   A.  It was possible.

17   Q.  And you could have also looked to see what the end of

18   the balance was at the end of the day for the values going

19   in and out of the account during those time periods for

20   those alerts?

21   A.  Yes.

22   Q.  So let's flip the page.  We'll talk more about some more

23   analysis you did.

24              Now, this is page 3, Exhibit 189, page 3.  I'll go

25   to the middle of the page where you see "Enchanted Family

1   Buying Company."  Do you see that, Ms. Pesch?

2   A.  Yes.

3   Q.  I'm sorry.  Are you there?

4           And what you did here is you looked at the

5   incoming wires from Enchanted Family Buying Company, right?

6   A.  Yes.

7   Q.  And you noted both the number of wires coming in and how

8   much those wires were for, right?

9   A.  I'm really not comfortable verifying information in this

10  document because this was a draft, an incomplete draft, and

11  I -- there were changes that were made and I don't remember

12  what the changes were between this and the final.

13  Q.  Did it appear to you that what you did was you noted the

14  number of wires and the total value of the wires for

15  Enchanted Family Buying Company during this period of time?

16  A.  Yes.

17  Q.  And that added up to about $370 million; is that right?

18  A.  In this draft, yes.

19  Q.  And I'm not going to quibble with you about whether or

20  not the exact cents or numbers are correct, but this type of

21  information also would have been available to you when you

22  did your alerts for 60827 and 644 -- 64556, right?

23  A.  Yes.

24  Q.  And if you go down below, let's just do the same thing

25  with Nationwide.  It lists Nationwide International

Pesch - Cross

1    Resources, right?

2    A.  Yes.

3    Q.  And then same exact thing, you looked at the number of

4    wires that Nationwide wired into the account and you looked

5    at the value of those wires that Nationwide wired into the

6    account, right?

7    A.  Yes.

8    Q.  And it just happens that during this time period, it was

9    $282 million, right?

10   A.  That's what I recorded in this draft of the document.

11   Q.  And you say there's -- this was a draft.  Do you know

12   that you had a final version of this?

13   A.  Yes.

14   Q.  And, Ms. Pesch, in order to get this information on the

15   value of wires, you would have had to have been able to get

16   information on those wires, correct?

17   A.  Can you clarify what information?

18   Q.  Sure.  You'd have to see the -- you'd have to know or

19   you'd have to have information about the value of the wires

20   to be able to make your chart, right?

21   A.  Yes.

22   Q.  Is this one of those examples that you're doing here,

23   where you are looking at the money going in and the money

24   going out and making a chart?  Is that one of those flow of

25   funds charts that you would make back when you were an

Pesch - Cross                                                            730

1    analyst?

2    A.  Yeah, this could be.

3    Q.  Now, if we stick on incoming wires just real quickly,

4    I'll be done with this in just a minute before we go on to

5    the next one.

6              I just want to show you Metro Gem.  Let's go to

7    page 4.  It's Exhibit 189, page 4.  And the two boxes up

8    there for Metro Gem, I want to highlight those or bring

9    those up.

10             And what you did here, Ms. Pesch, is you looked at

11   incoming wires from the Metro Gem entity; is that right?

12   A.  Yes.

13   Q.  And here you did the same thing, you looked at the

14   number of wires and the value of wires, right?

15   A.  Yes.

16   Q.  And if you add up the 85 million and the 104 million,

17   it's about 190 million, correct?

18   A.  Yes.

19   Q.  Now, if we go to -- if we go to -- I'll show you this

20   real quickly.  First we have to go to page 7 of Exhibit 189,

21   and it says, "Outgoing wires."  Do you see that?

22   A.  Yes.

23   Q.  So now you did the same exact analysis for outgoing

24   wires, correct?

25   A.  Yes.

1    Q.  And we'll just go to the Metro Gem ones for outgoing, if

2    we go to page 8.  If we go to the Metro Gem box and bring

3    that up, these were the outgoing wires to Metro Gem,

4    correct?

5    A.  Yes.

6    Q.  And it was for $190 million, according to your math

7    here, right?

8    A.  In this draft, yes.

9    Q.  So in this draft you have 190 million coming in from

10   Metro Gem and you have 190 million going out to Metro Gem,

11   right?

12   A.  Approximately.

13   Q.  Similar amounts of money going in and similar amounts of

14   money going out, correct?

15   A.  Yes.

16   Q.  And, again, you could have done that type of math or

17   that type of analysis for those Metro Gem wires that we

18   talked about in Alert 60827 and 64556?

19   A.  Yes.

20   Q.  Let's go to page 10 and go to the bottom where it says,

21   "The incoming and outgoing wires."  You say, "The incoming

22   and outgoing wires involve Nationwide International

23   Resources, Enchanted Family Buying, and Deanna Coleman."  Do

24   you see that?

25   A.  Yes.

1    Q.  What are you indicating there?

2    A.  I don't know.  This is an incomplete sentence and an

3    incomplete draft.

4    Q.  Okay.  Let's put that one aside, Ms. Pesch.

5            Let's go to Exhibit 333.  Are you at Exhibit 333?

6    A.  Yes.

7    Q.  Can you take a look at Exhibit 333 and tell me if that

8    was your final analysis that you did.

9    A.  Yes.

10   Q.  If we can -- and you are familiar with Exhibit 333,

11   right?

12   A.  Yes.

13   Q.  And if you go to -- I'm sorry.  Let me do this first.

14           MR. COLLYARD:  Your Honor, I offer Plaintiff's

15   Exhibit 333.

16           MS. MOMOH:  Objection, Your Honor.  Sidebar?

17           THE COURT:  You may.

18           Members of the Jury, if you would like to stand

19   and speak among yourselves, you may.

20           MS. MOMOH:  Thank you, Your Honor.  So this

21   particular exhibit is what is at issue with the trial brief

22   that we submitted this morning with respect to the issue

23   that we raised yesterday.  This is the case that Ms. Pesch

24   had written with the information that we are seeking to have

25   redacted.

Pesch - Cross

1           And my colleague and co-counsel will explain for

2      the record the basis of our objection and the authority for

3      our objection, Your Honor.

4           THE COURT:  Would you note your appearance.

5           MS. PARLOVECCHIO:  Yes, Gina Parlovecchio.

6           THE COURT:  Thank you, Ms. Parlovecchio.

7           MS. PARLOVECCHIO:  Thank you.  So this is the

8      document that presents the SAR disclosure issue.  It

9      indicates that Ms. Pesch ultimately recommended that this be

10     elevated for SAR review and that a SAR be filed.

11          This goes to the same Bank Secrecy Act Title 31

12     issue that we put on the record this morning, which

13     prohibits disclosure of the existence of a SAR, the contents

14     of a SAR, the fact that a SAR exists.

15          And so there's several different places throughout

16     the document where it creates -- it not only creates the

17     impression, but it says that a SAR is being recommended for

18     filing.

19          So that is the issue that we put on the record

20     today.  And to the extent, Your Honor -- well, first, we

21     would just request two different alternate instructions,

22     which I'll read.

23          One is:  We have requested the Court instruct

24     Mr. Collyard that he not ask Ms. Pesch whether or not she

25     recommended filing a SAR or whether a SAR was filed and

Pesch - Cross

1       instruct the jury that this can't be disclosed pursuant to

2       federal law.

3              The reason we're requesting that, Your Honor, is

4       because, as a member of the Anti-Money Laundering Compliance

5       Group, they are trained on the fact that they can't disclose

6       this type of information, that they'll be subject to civil

7       and criminal penalties.  So she -- any time that question is

8       going to come up, she's going to be concerned that she's

9       going to be subject to criminal penalties.

10             This is an issue that comes up in criminal trials

11      too, even if it's a money laundering case.  The fact that a

12      SAR exists cannot be disclosed to the public, to a jury even

13      if that's the subject of the criminal charge at issue.

14             The only thing that can be presented in court is

15      the documents and the facts that comprise what ultimately

16      went into the SAR, but not the SAR itself, not that a SAR

17      exists.  Even, you know, law enforcement officers aren't

18      allowed to disclose that in the public.

19             So that's the reason why this is such a grave

20      issue for Ms. Pesch and then also for the bank.

21             MS. MOMOH:  And counsel.

22             MS. PARLOVECCHIO:  And counsel.

23             MR. COLLYARD:  Your Honor, I read your order.  I'm

24      going to comply with your order.  Under the order I'm not

25      going to say that a SAR was filed.  I'm going to talk about,

1    though, the fact that it merits filing a SAR, which is

2    totally appropriate under your order.

3            Your order restricts me, as I understand it, to

4    just mention that a SAR -- an actual SAR was filed.  This is

5    not the SAR.  This just says a SAR was filed.  I don't have

6    the SAR.  I'm not going to ask if a SAR was filed or

7    anything like that.

8            THE COURT:  You said you're going to say a SAR was

9    filed, but you are not going to ask --

10           MR. COLLYARD:  No.

11           THE COURT:  -- whether a SAR was filed.

12           MR. COLLYARD:  I'm sorry.  No.

13           THE COURT:  That's what I just heard you say.

14           MR. COLLYARD:  No.  So you see the document says,

15   "The activity merits the filing of a SAR."

16           THE COURT:  Okay.

17           MR. COLLYARD:  So this is their conclusion.  I'm

18   not going to say:  Was a SAR actually filed?  That's how I

19   understand I'm restricted under your order.  That was what

20   we had proposed in our motion, which was the basis for your

21   order, as I understand it.

22           We tried to agree that we would redact that

23   portion and not ask that portion, but that doesn't mean that

24   the ultimate conclusion that they make, that the activity is

25   suspicious or that it merits filing a SAR, that's still fair

Pesch - Cross

1    game for me to talk about.

2              MS. PARLOVECCHIO:  The problem with that issue,

3    Your Honor, is that it leaves in the jury's -- the question

4    in the jury's mind was a SAR filed.  And we can't offer any

5    facts to clarify whether or not a SAR was filed.

6              It leaves the impression that the bank wasn't

7    following its own policies and procedures in filing a SAR

8    once suspicious activity was identified, and so it would

9    mislead the jury and create a 403 problem, Your Honor.

10             MR. COLLYARD:  Your Honor, you ruled on this.

11   That is beyond your ruling.

12             THE COURT:  Right.

13             MR. COLLYARD:  I fully intend to comply with your

14   ruling as an officer of the court.  I understand the order.

15             THE COURT:  That is right, and so I expect you to

16   comply with the ruling that I have made and that issue has

17   been disposed of by that ruling.

18             MS. PARLOVECCHIO:  I understand, Your Honor.  I

19   would just ask that, since we're going to proceed in this

20   manner, if Your Honor would offer an instruction to the jury

21   that -- and instruct Ms. Pesch that she's permitted to

22   answer that question and just let her know that there are --

23   you know, she can forego the prohibitions under the Bank

24   Secrecy Act that prohibit her from saying whether she

25   recommended that it merited filing a SAR.

```
1              MS. MOMOH:  Pursuant to the order that was issued

2    today.

3              MS. PARLOVECCHIO:  Exactly.

4              MR. COLLYARD:  May I, Your Honor?

5              THE COURT:  (Indicating.)

6              MR. COLLYARD:  Yeah, there's no need for an

7    instruction.  There's no need to raise anything to the jury

8    that I'm not going to talk about.  So I'm not going to

9    mention that a SAR was filed.  There's no mention.

10             If I ask a question about -- asking about whether

11   or not a SAR was filed, you can object, we can have a

12   sidebar, we can deal with it.  I'm not going to do that.  So

13   there would be no need for confusing the jury based on some

14   instruction that is unnecessary.

15             MS. MOMOH:  And, Your Honor, if I may be heard on

16   that?

17             It's not even with respect to his examining of the

18   witness or others that he may examine throughout the course

19   of this trial.  He's also about to -- he already has offered

20   this document into evidence.

21             And as my colleague, Ms. Parlovecchio, has already

22   articulated, the information and the statements that are

23   made still raise the question as to what impression would be

24   left on the jurors when his questions are asked.

25             Whether or not he asks about the SAR actually
```

1    being filed, the document, as we are objecting -- we are

2    objecting to its admissibility.  If the document comes in

3    and this language remains, we still have the issue.

4             So it's not just your questions.  It's also the

5    information in the document that we're concerned about.

6             THE COURT:  Are you offering the document with the

7    information In it that a SAR has been filed?

8             MR. COLLYARD:  No.  We've redacted that portion of

9    the document.

10            THE COURT:  That's what I understood from your

11   statement.

12            MR. COLLYARD:  To be clear, Your Honor --

13            MS. MOMOH:  Well --

14            MR. COLLYARD:  I'm sorry, Ms. Momoh.

15            THE COURT:  No.  One at a time.

16            MS. MOMOH:  Thank you, Your Honor.

17            THE COURT:  I want to hear him --

18            MS. MOMOH:  Understood.

19            THE COURT:  -- and then you will have your turn.

20            MS. MOMOH:  Understood.

21            MR. COLLYARD:  Remember, Your Honor, I raised this

22   before, that this is the exact line I had up in my opening

23   statement with my slide that was not objected to.  It said,

24   "The activity merits the filing of the SAR."

25            So, again, this is all -- this is fully within

```
 1    your order to be able to do those things and talk about

 2    that.  What I cannot do -- what I cannot say:  Was a SAR

 3    filed or do you know that a SAR was filed?  And I have no

 4    intention of doing that.

 5              THE COURT:  Has the witness been instructed as to

 6    the limitations of my order?

 7              MR. COLLYARD:  I have not -- it's not my witness.

 8    I can't talk to her.

 9              MS. MOMOH:  And we haven't been able to because

10    she's been sequestered since she's been on the stand, so we

11    haven't been able to articulate anything to her.

12              THE COURT:  We'll take a break and you can address

13    that issue and you can tell her what I have ruled and the

14    limitations on that.

15              I'm not going to make another ruling.  My ruling

16    stands.  There's no need to amend the ruling.  You need to

17    explain to the witness what the limitations are of her

18    testimony based on the ruling.  I have representations from

19    counsel that they are not going to elicit that information.

20              MS. MOMOH:  And, Your Honor, I wasn't trying to

21    cut Mr. Collyard off in his discussion.  When he had

22    referenced the document and the language that it existed, I

23    was simply trying to clarify which version of the document

24    that is at issue.  I understand that --

25              THE COURT:  That's been clarified, correct?
```

1          MS. MOMOH:  No, it has not.  So that's what I was

2     trying to do.  I understand they had a proposed redacted

3     version of this document, for the record, Plaintiff's

4     Exhibit P-333, that was exchanged via e-mail, but I wasn't

5     sure as to the document he'd be sharing with the witness

6     today, if that was the redacted version.

7          THE COURT:  Let's clarify that.

8          MS. MOMOH:  Because with the binder that I

9     currently have, Your Honor, it's still the unredacted.  So I

10    didn't want to presume what was going to be offered in court

11    today.

12         THE COURT:  Understood.  Let's clarify that.

13         MR. COLLYARD:  Yes.  So the version that will pop

14    up on the screen will have that redacted, that it --

15         THE COURT:  What does that say?

16         MR. COLLYARD:  Sorry.

17         THE COURT:  We have an appellate court --

18         MR. COLLYARD:  Gotcha.

19         THE COURT:  -- that will likely look at this, or

20    could?

21         MR. COLLYARD:  Yes.  Thank you, Your Honor.  Thank

22    you for doing that.

23         "SAR filed by" is blocked out, redacted.  I

24    believe -- Mr. Reif will correct me if I'm wrong -- the

25    signature is still there.

```
 1                    MR. REIF:  Yes.

 2                    MR. COLLYARD:  But the "SAR file date" is gone

 3        and -- "SAR file date" and "SAR filed by" are both gone.

 4                    MR. REIF:  Correct.

 5                    MR. COLLYARD:  That's blocked out.  That's in the

 6        system.  When I show the exhibit -- if I show this page,

 7        you'll see that's (indicating) blocked out, but you'll still

 8        see this (indicating), is what will happen.  That's the only

 9        redaction, in my understanding.

10                    MS. MOMOH:  Understood.

11                    THE COURT:  And I appreciate this.  I appreciate

12        you making the objection.  I appreciate you addressing the

13        issue.

14                    I don't want to have lots of sidebars over things

15        that you all can discuss outside of the presence of the jury

16        when we're not in court and we are not wasting the jurors'

17        time, to address whether there are issues that need to be

18        brought to my attention, because this is one that does

19        because it has been resolved.

20                    Understood?

21                    MR. COLLYARD:  Understood by us, Your Honor.

22                    MS. MOMOH:  Yes, Your Honor.

23            (In open court.)

24                    THE COURT:  Counsel, you may proceed.

25                    MR. COLLYARD:  Thank you, Your Honor.  Your Honor,
```

1      I offer Plaintiff's Exhibit 333.

2              MS. MOMOH:  The objection is withdrawn,

3      Your Honor.

4              THE COURT:  333 is received.

5      BY MR. COLLYARD:

6      Q.  Ms. Pesch, let's go to Plaintiff's Exhibit 333.

7              MS. MOMOH:  Excuse me, Your Honor.  If I may?

8      Well, for the reasons that we discussed at sidebar, the

9      objection is maintained.  So, still, we continue to object

10     to this exhibit.

11             THE COURT:  The objection is overruled.

12             MR. COLLYARD:  Thank you, Your Honor.

13             THE COURT:  You may proceed --

14             MS. MOMOH:  Thank you, Your Honor.

15             THE COURT:  -- as instructed.

16             MR. COLLYARD:  Thank you, Your Honor.

17     BY MR. COLLYARD:

18     Q.  Ms. Pesch, if you can -- let's go to the -- let's go to

19     page 2.  If you can just please tell me what the purpose of

20     this document was.

21     A.  This is a case.

22     Q.  This is a case?

23     A.  Yes.

24     Q.  Okay.  So we talked about Exhibit 189 before, right?

25     You told me that was a draft of your analysis that you did

Pesch - Cross

1    when you went back and you looked at that activity from

2    January of 2008 through August of 2008, correct?

3    A.  Yes.

4    Q.  Now, this case, as you call it, in Exhibit 333, this is

5    the final version of that, right?

6    A.  Yes.

7    Q.  And you were questioning whether or not the numbers in

8    Exhibit 189 were accurate or not.  Do you remember that?

9    A.  It was just the general content of the case.  It wasn't

10   in a final form, so, yes, I had trouble testifying to a

11   draft that I -- wasn't my final version.

12   Q.  I understand.  If we go to page 5, for example, and if

13   we pull up that chart on page 5.  Now if we can go to

14   Exhibit 189 and pull up Exhibit 189, page 2, and put the

15   chart next to each other, we can see them.

16          And so, Ms. Pesch, what we have is on the left we

17   have Exhibit 333 and on the right we have Exhibit 189.  And

18   they are the same exact numbers, correct?

19   A.  It appears so, yes.

20   Q.  Both of them are for $2.869 billion, right?

21   A.  Yes.

22          MS. MOMOH:  I'm sorry, Your Honor.  Just for

23   purposes of the record, I need to see the page numbers of

24   the documents that are being compared for both sides.

25          MR. COLLYARD:  It's Exhibit -- I'll do that,

Pesch - Cross

1    Your Honor.  That's fine.

2                THE COURT:  Thank you.

3                MR. COLLYARD:  It's Exhibit 189, page 2, on the

4    left and Exhibit 333, page 5, on the right.

5    BY MR. COLLYARD:

6    Q.  Now, if we go -- let's go back just for a second just to

7    give us some context.  I'm going to look at some more of the

8    analysis that you did in this, but I'll just go back to some

9    of the descriptions on page 4 of Exhibit 333.

10               And if we go back up to Petters Group Worldwide,

11   look at your entry there -- it's the second paragraph,

12   yes -- it reads, (As read) "Petters Group Worldwide is a

13   recognized leader in creating, developing and investing in

14   companies that manufacture and market merchandise solutions

15   for growth markets."  Do you see that?

16   A.  Yes.

17   Q.  And it says, "Petters Group is a privately held company

18   with ownership or investments in over 60 companies around

19   the world, actively managing 20."  Do you see that?

20   A.  Yes.

21   Q.  And that's a description for Petters Group Worldwide,

22   right?

23   A.  Yes.

24   Q.  That is not describing Petters Company, Inc., is it?

25   A.  No.

Pesch - Cross

1    Q.  Why, Ms. Pesch, are you talking about Petters Group

2    Worldwide in analysis on account activity for Petters

3    Company, Inc.?

4    A.  It's part of the overall case.  It helps understand the

5    context of the activity in this case.

6    Q.  What does the activity of Petters Group Worldwide have

7    to do with Petters Company, Inc.?

8    A.  It helps understand -- when we get into the discussion

9    of the fraud, it helps to put everything into context.

10   Q.  Okay.  The Petters Company, Inc. account was owned by

11   the Petters Company, Inc., right?

12   A.  That's the business it was titled to.

13   Q.  So when there -- when an account is titled to a

14   business, it's the business's account, correct?

15   A.  Yes.

16   Q.  It was not the Petters Group Worldwide account, right?

17         MS. MOMOH:  Objection, Your Honor, lack of

18   foundation.

19         THE COURT:  Overruled.  You may answer if you can.

20         THE WITNESS:  No, it wasn't.

21   BY MR. COLLYARD:

22   Q.  And if we just go down to the fourth paragraph where it

23   reads, "Mr. Petters and business associates," we'll just pop

24   that up Just really quickly.  And I'll go through this

25   pretty quickly, Ms. Pesch.

Pesch - Cross

1              "Mr. Petters and business associates Deanna

2    Coleman, Bob White, Michael Catain, and Larry Reynolds were

3    arrested."  Do you see that?

4    A.  Yes.

5    Q.  Do you understand that Michael Catain was affiliated

6    with Enchanted Family Buying Company?

7    A.  Today I don't remember how he was involved.

8    Q.  Well, if you look down below -- I'm sorry.  Let's go to

9    page -- we're on page 4, so let's just look down below,

10   then, on your analysis.  And you see those bullet points?

11   A.  Yes.

12   Q.  And it says, the fourth bullet point -- or the third

13   bullet point down, I'm sorry, it says, "Michael Catain, who

14   ran Enchanted Family Buying Company," right?

15   A.  Yes.

16   Q.  You understand that Michael Catain now was affiliated

17   with Enchanted Family Buying Company, right?

18   A.  Yes.

19   Q.  And he was arrested, right?

20   A.  That's what it says, yes.

21   Q.  And then the bullet below that reads, "Larry Reynolds

22   of Nationwide International Resources," right?

23   A.  Yes.

24   Q.  And your analysis says that Mr. Reynolds was arrested as

25   well, correct?

1    A.  Yes.

2    Q.  And if we just go back to the fifth paragraph, it reads,

3    "According."  Let's pull that up.  And this is similar to

4    what you said before.

5             You said, "The scheme entailed soliciting

6    investors to PCI by promising that their investments were

7    secured in property, principally retail goods."  Do you

8    remember that?

9    A.  Yes.

10   Q.  And that didn't change from your other analysis,

11   correct?

12   A.  Correct.

13   Q.  And you say, "which were purchased at wholesale from

14   vendors such as Nationwide International Resources and

15   Enchanted Family Buying Company and sold to retailers such

16   as Walmart and Sam's for profit," right?

17   A.  I said that in the context of the article I was citing,

18   yes.

19   Q.  That was the same -- similar language to what you had

20   used in your draft earlier, right?

21   A.  Yes.

22   Q.  That didn't change, correct?

23             Then I'll just touch on one more.  It's down below

24   where it starts, "If payments."  If we pull that up, it

25   reads, "If payments were made by PCI to its lenders or

1    investors, it was with funds obtained from other victim

2    lenders who were also fraudulently induced to fund the

3    investment scheme."  Do you see that?

4    A.  Yes.

5    Q.  That activity there that you're talking about there, is

6    that indicative of a Ponzi scheme?

7    A.  It sounds like it.

8    Q.  Do you agree with me?

9    A.  Yes.

10   Q.  Okay.  So let's take and just -- let's go to page 15 of

11   this, and I want to talk about checks just real quickly.

12           And if we go to page 15, it's the fifth paragraph

13   down where it reads, "Additional debits."  It says,

14   "Additional debits to the account consisted of numerous

15   checks payable to Mr. Petters and related companies."  Do

16   you see that?

17   A.  Yes.

18   Q.  And there's a sentence there that reads, "There were

19   several checks totaling."  "There were several checks

20   totaling $233,709 payable to Bob White," right?

21   A.  Yes.

22   Q.  "And numerous checks payable or referencing Deanna

23   Coleman," correct?

24   A.  Yes.

25   Q.  And you considered those checks in doing your analysis,

Tesch - Cross

1    correct?

2    A.  At the case level, which is more comprehensive, yes.

3    Q.  But you considered those checks, right?

4    A.  Yes.

5    Q.  And, by the way, let's just jump to your conclusion.  I

6    should have done that right away.  If we go to page 15 --

7    we're still at page 15, but at the bottom of page 15, that

8    starts your conclusion, right?

9    A.  Yes.

10   Q.  And let's just go through that just real quickly.  You

11   say -- let's pop up that.  You say, "Based on the review,

12   transactions similar to those detailed in various articles

13   regarding the investment scam can be seen in Petters

14   Company, Inc.'s account during the review period," correct?

15   A.  Yes.

16   Q.  And what you are talking about when you say "the Petters

17   Company, Inc.'s account," you are talking about the

18   transaction activity in the account, right?

19   A.  Yes.

20   Q.  And you are talking about the money going in and the

21   money going out of the account, right?

22   A.  I just generally say the transactions.

23   Q.  Okay.  Well, the next sentence you say, "The incoming

24   and outgoing wires and funds transferred through checks

25   between companies and individuals known to have been

Fesch   Cross

1    involved in the fraud, such as Enchanted Family Buying

2    Company, Nationwide, Deanna Coleman, Bob White."  Do you see

3    that?

4    A.  Yes.

5    Q.  And you are talking about your analysis that you did on

6    transactions pertaining to those companies and those

7    individuals, right?

8    A.  Yes.

9    Q.  And, again, that would have been the same exact

10   transaction activity during the time period of January 2008

11   to August of 2008 for other alerts that had alerted on the

12   Petters Company, Inc. account, true?

13   A.  Yes.

14   Q.  So if we -- I've got to get the rest of that just to

15   make it make sense.  It reads, "and Metro Gem through its

16   connection to Frank Vennes as well as several of the

17   companies that have claimed to be victims of the investment

18   scam" -- going on to the next page -- "appear suspicious."

19   Do you see that?

20   A.  Yes.

21   Q.  And what your conclusion is is the transaction data that

22   you looked at appears to be suspicious?

23   A.  Yes.

24   Q.  Then it reads, "It also appears suspicious that the

25   Petters companies have business relationships at numerous

1    banks as it appears this may have been intended to layer and

2    conceal the nature of the transactions."  Do you see that?

3    A.  Yes.

4    Q.  Do you remember earlier this morning when I was asking

5    you -- when we were talking about financial investments and

6    I was asking you if one of the things you would look at is

7    whether or not a company would wire money to another company

8    that it owns; do you remember that?

9    A.  Yes.

10   Q.  Could that be indicative of what you are calling

11   layering here?

12   A.  It could be.

13   Q.  Well, that's -- I'm sorry.  Is that what you are

14   actually referring to, the fact that Petters Company, Inc.

15   was wiring money to other Petters businesses and you are

16   mentioning that that is indicative of layering?

17   A.  Yes.

18   Q.  And layering is a concept of money laundering, right?

19   A.  Yes.

20   Q.  And companies like that, they try -- or, I'm sorry,

21   fraudsters do that to try to hide their money, correct?

22   A.  Yes.

23   Q.  And they try to make it look legitimate by doing that;

24   is that also right?

25   A.  Yes.

1    Q.  And those are the types of things that the anti-money

2    laundering analysts in the Anti-Money Laundering Group are

3    actually looking for to determine whether that activity is

4    potentially suspicious; am I right about that?

5    A.  Yes.

6                MS. MOMOH:  Your Honor, if I may, I object to the

7    display of the information that's currently highlighted on

8    the screen on the basis of Title 31 of the Bank Secrecy Act.

9                THE COURT:  Overruled.

10   BY MR. COLLYARD:

11   Q.  Then the last part of this, Ms. Pesch, is:  "This

12   activity merits the filing of a SAR."  Do you see that?

13   A.  Yes.

14   Q.  And that was your conclusion, right?

15               MS. MOMOH:  Objection, Your Honor, same objection.

16               THE COURT:  Overruled.

17               THE WITNESS:  That's what's written.

18   BY MR. COLLYARD:

19   Q.  Was that your conclusion?

20   A.  I wrote the conclusion.

21   Q.  Okay.  Let's -- I want to just touch on some of the

22   things that you looked at when you made your conclusion that

23   this merits the filing of a SAR.

24               Let's go to -- I want to look at, for example --

25   let's look at page 92, and it's going to be goofy.  You are

Pesch - Cross

1     going to have to turn your exhibit to be able to read it.

2     Let me see if I have this correct.  Is page 92 a graph that

3     you did reflecting the incoming wires from the time period

4     of September of 2007 up through August of 2008 on the

5     Petters Company, Inc. account?

6     A.  It's a graph that shows the incoming wires from

7     September 2007 to August 2008.

8     Q.  So, for example, in October of 2007 it shows incoming

9     wires somewhere around $800-plus million, right?

10    A.  Yes.

11    Q.  And the purpose of this graph is to do what?

12    A.  Display transaction activity.

13    Q.  So if you see down below, it's really close to the

14    bottom of the graph, there's this line that kind of goes

15    across.  Do you see that?

16    A.  Yes.

17    Q.  And there's some writing there.  It's hard to read, but

18    it says, "Peer average."  Do you see that?

19    A.  I see that there's writing there.  I can't read what it

20    says.

21    Q.  Well, Ms. Pesch, you know that what you are doing here

22    is you are taking the incoming wires and you are comparing

23    them to the peer average, correct?

24    A.  I don't see that titled on this graph.

25    Q.  Are you familiar with what this graph was when you

Fesch - Cross

1    created it?

2    A.  I didn't create this.

3    Q.  Were you familiar with it when you used it in your

4    analysis?

5    A.  I would have been then, yes.

6    Q.  Okay.  Do you understand what "peer average" means?

7    A.  I remember that that was a category in Searchspace.  I

8    couldn't probably completely define it today.

9    Q.  Well, if we step back to Searchspace, do you understand

10   that how Searchspace worked was it would take incoming and

11   outgoing wires, for example, and it would compare them to

12   the peer average to get information to determine whether or

13   not those wires were indicative of unusual activity?  Do you

14   have that understanding?

15   A.  Searchspace didn't show us or tell us that something was

16   suspicious.  It just alerted activity that should be looked

17   at.

18   Q.  And I'm more -- I'm actually kind of behind the scenes

19   inside of Searchspace.  Searchspace uses an algorithm,

20   right?

21   A.  I believe so.

22   Q.  And what Searchspace did is it took the incoming and

23   outgoing wires and it compared them to averages at the peer

24   level to determine whether there was an event, right?

25   A.  I don't know if I remember enough to be able to answer

755

1    that today.

2    Q.  You do know what an event is?

3    A.  Yes.

4    Q.  And the way that scores were created, for example, in

5    Searchspace was comparing the incoming and outgoing wires to

6    a peer average to create an event and whether the events

7    added up to a certain amount, that would create a score,

8    right?

9    A.  I remember that scores were created for events.  I don't

10   remember all of the things that went into creating it or

11   generating it.

12   Q.  And you can't tell by looking at your -- the document

13   that you used in your analysis if what you are trying to do

14   here, for example, in October of 2007 is compare the

15   incoming wires, which were more than $800 million, to what

16   the peer average would be for other potential customers that

17   fell into that peer group?

18   A.  When I was working this case, I would have been familiar

19   with this graph.  Today I don't remember and I can't -- most

20   of those words are covered.  I can't read it.

21   Q.  Does that sound like a reasonable explanation to you?

22            MS. MOMOH:  Objection, Your Honor, argumentative.

23            THE COURT:  Sustained.

24   BY MR. COLLYARD:

25   Q.  So you can't tell by looking at this graph whether what

Pesch - Cross

1    you are doing is comparing it to the peer averages of other

2    customers?  Do I understand your testimony correctly?

3    A.  When we were looking at activity -- or graphs from

4    Searchspace, I remember them being titled and I don't see a

5    title on this graph.

6    Q.  Okay.  Well, I've got another document that I can show

7    you.  I'll do that.  I'll do that now -- in a little bit.

8    Hold off and I'll show you that.

9         But did you use this graph in doing your analysis,

10   for example, of how you determined that the activity or the

11   transaction activity was potentially suspicious or what --

12   A.  Yes.

13   Q.  Yes.  Okay.

14        Now, if we go to page 100 --

15        THE COURT:  Counsel, would you identify the

16   exhibit number again?

17        MR. COLLYARD:  Sorry, Your Honor.  It's

18   Exhibit 333, page 100.

19        THE COURT:  Thank you.

20   BY MR. COLLYARD:

21   Q.  And what we have here, Ms. Pesch, are copies of checks

22   written on the account, right?

23   A.  Yes.

24   Q.  And if we focus on the check on the bottom there, that's

25   a check that Deanna Munson wrote to herself for $25,000,

Fesch - Cross

1   right?

2   A.  Yes.

3   Q.  And do you see it says something about "Repayment for

4   Tom - cash"; do you see that?

5   A.  Yes.

6   Q.  And that would be an indication that it's for cash; is

7   that right?

8   A.  Not necessarily.

9   Q.  Fair enough.  It's for repayment for cash for Tom

10  Petters?

11  A.  I can only read what it says.  It -- this was a check

12  and not cash.

13  Q.  This was a check that you analyzed and you looked at

14  when you did your review and analysis to determine that the

15  activity was suspicious, correct?

16  A.  Yes.

17  Q.  And this check is for 25 grand, right?

18  A.  Yes.

19  Q.  Now, let's talk about round numbers for a second.  This

20  check is for $25,000.  Is that a round number?

21  A.  Yes.

22  Q.  And round numbers, you understand -- or let me back up.

23  Do I have it correctly that the Anti-Money Laundering Group

24  looks at round numbers to -- as one of the factors that

25  could go into the analysis as to whether or not activity is

Tesch - Cross

1    potentially suspicious?

2    A.  Yes.

3    Q.  And certainly $2.5 million is a round number, right?

4    A.  Yes.

5    Q.  And $1 million is a round number; is that right?

6    A.  Yes.

7    Q.  So you considered this check for 25,000 and these other

8    checks that are listed in this document in making your

9    determination that the activity was actually suspicious,

10   correct?

11   A.  Based on the new information from the articles, yes.

12   Q.  So let me show you -- I'll just show you a couple more.

13   If we go to page 120 of Exhibit 333, this time we're going

14   to go to the upper left-hand corner.

15   A.  Did you say 120?

16   Q.  Yes, page 120 of Exhibit 333.  And this is a check that

17   Deanna Coleman wrote to Deanna Coleman for $10,000, right?

18   A.  Yes.

19   Q.  Yet another round number; is that right?

20   A.  Yes.

21   Q.  And this is one of the checks that you determined -- or

22   that you used to determine that the activity appeared

23   suspicious, correct?

24   A.  Based on the new information in the articles, yes.

25   Q.  If we go to -- go to page 207.  And, by the way,

Pesch -- Cross

1    Ms. Pesch -- I'm sorry.  Go ahead.

2    A.  Thank you.

3    Q.  The checks that we just looked at, for example, those

4    checks would have been available for the anti-money

5    laundering analysts to look at during the time period when

6    those alerts had alerted for that particular activity,

7    right?

8    A.  If they were from the time frame reviewed in those

9    alerts, yes.

10   Q.  So the very checks that you looked at, the analysts who

11   reviewed and closed those alerts during that time period

12   could have also looked at those same checks, correct?

13   A.  Yes.

14   Q.  Now, I asked you about this particular page, I think,

15   yesterday.  So I'm on page 207 in Exhibit 333.  And this is

16   a wire -- an incoming wire from Nationwide, right?

17   A.  Yes.

18   Q.  I want to focus on a few of these Nationwide wires and

19   ask you a few questions about them.

20         You see this one was for $4,407,800; do you see

21   that?

22   A.  Yes.

23   Q.  So the $800 portion of that, that's a round number,

24   right?

25   A.  You could make an argument it could be.

Fesch - Cross

1    Q.  Let me go to the next page, and I want -- and when I'm

2    asking about Nationwide and Enchanted, I want to focus on

3    the ending of the numbers to see if you see a pattern.

4            You see on page 208 of Exhibit 333, there's

5    another wire, incoming wire, from Nationwide, right?

6    A.  Yes.

7    Q.  And up above we see the wire amount and this time it's

8    for $3,338,300, right?

9    A.  Yes.

10   Q.  So you've got -- before you had $800, now you have $300,

11   right?

12   A.  Yes.

13   Q.  No cents, correct?

14   A.  Correct.

15   Q.  Let's go to the next page, page 209 of Exhibit 333.  You

16   have another incoming wire from Nationwide, correct?

17   A.  Yes.

18   Q.  And if we look at the amount, it's $2,423,800, right?

19   A.  Yes.

20   Q.  So we've had 800, 300, 800, right?

21   A.  Yes.

22   Q.  All no cents, correct?

23   A.  Correct.

24   Q.  I'll just do a couple more.  Page 210 in Exhibit 333,

25   you've got another incoming wire from Nationwide, right?

Pesch - Cross

1    A.  Yes.

2    Q.  And that one was for $1,874,000 even, right?

3             MS. MOMOH:  Objection, Your Honor, 403,

4    cumulative.

5             THE COURT:  Overruled.

6             THE WITNESS:  Could you repeat your question?

7    BY MR. COLLYARD:

8    Q.  Yes.  That wire is for $1,874,000 even, correct?

9    A.  Yes.

10   Q.  Again, no cents at all, right?

11   A.  Correct.

12   Q.  All round numbers?

13   A.  This one I would say is more clearly a round number, but

14   you could make an argument that the rest of them were.

15   Q.  Do you agree with me, Ms. Pesch, that what I just showed

16   you on these Nationwide wires, how they all end in hundred

17   dollar round figures, is -- could be a pattern that would

18   be -- that could be one of the factors that you would

19   consider in determining whether or not activity is

20   potentially suspicious?

21   A.  Yes.

22   Q.  And these wires in particular from Nationwide were wires

23   that you considered when you determined that the activity

24   did appear to be suspicious, correct?

25   A.  Could you repeat that one more time?  Sorry.

1    Q.  Yes.  These wires from Nationwide, these were wires that

2    you actually looked at in making your analysis, in making

3    your determination that that activity from two thousand

4    and -- during 2008 did appear to be suspicious?

5    A.  Yes.

6    Q.  Give me one second.  I have one more to show you.

7         This one is going to test our vision.  Let's go to

8    page 21, and this is going to be another one of those,

9    Ms. Pesch, where you are going to have to turn your book

10   because of the way it lays out.

11        Now, this page 21, Ms. Pesch, is how it was

12   provided to us in the case, so I can't do anything about the

13   clarity of this.  Okay?  So we're going to have to do our

14   best.

15   A.  Okay.

16   Q.  Looking at this document, you know what this is, right?

17   A.  Yes.

18   Q.  And if -- I'm going to do our best so I can see it so I

19   can talk about it.  What I'm going to do is I'm going to

20   have the Petters -- you see a box in the middle that says,

21   "Petters Company, Inc." account, right?

22   A.  Yes.

23   Q.  So I'm going to have the Petters Company, Inc.

24   account -- we're going to have to make it smaller so we can

25   see it, and then if we can talk about the stuff on the

Pesch - Cross

1    right, the information on the right, if there's a way to

2    show that.  We're going to do our best here.

3                And what you are doing here, Ms. Pesch, is you're

4    identifying the relationship and flow of suspicious funds,

5    right?

6    A.  Yes.

7    Q.  And you are actually mapping out and drawing out the

8    flow of funds, correct?

9    A.  Yes.

10   Q.  And you're looking at the money going in and the money

11   going out for these particular people or entities, right?

12   A.  Yes.

13   Q.  Now, let's just pause here for one second.  I'm going to

14   try to help us out here.  Can you go to Exhibit -- we're

15   going to try to keep this, but we're going to go to

16   Exhibit 411.  Do you see it, Ms. Pesch?

17   A.  Exhibit 411?

18   Q.  Yes.

19   A.  Yes.

20   Q.  And this is, again, relationships and flow of suspicious

21   funds diagram for the Petters Company, Inc. account, right?

22   A.  Yes.

23   Q.  But this one we can actually read, can't we?

24   A.  I can.

25   Q.  I can too.

Pesch - Cross

```
 1    A.  Okay.

 2    Q.  If we look at it, does it appear to you, Ms. Pesch --

 3    I'm sorry.  Ms. Pesch, is this a diagram that you drafted?

 4    A.  Yes.

 5              MR. COLLYARD:  I offer Plaintiff's Exhibit 411.

 6              MS. MOMOH:  No objection, Your Honor.

 7              THE COURT:  Exhibit 411 is received.

 8    BY MR. COLLYARD:

 9    Q.  I'm going to try to save our hard work on that one, but

10    I'm going to pop up 411 and then come back to this one.

11              So now we have -- if we could make 411 a little

12    bit -- there we go -- a little bit bigger in the middle and

13    to the right, now we can see what we were trying to look at

14    in Exhibit 21, correct?

15    A.  I believe so, yes.

16    Q.  Yes.  And this is the flow of funds diagram that you

17    drafted, correct?

18    A.  Yes.

19    Q.  And on the right you have "Involved in Fraud"; is that

20    true?

21    A.  Yes.

22    Q.  And then below that you list "Tom Petters," "Deanna

23    Munson," "Bob White."  Do you see that?

24    A.  Yes.

25    Q.  And then you list "Larry Reynolds NIR, Inc."  Do you see
```

Pesch - Cross

```
 1    that?
 2    A.  Yes.
 3    Q.  And that's Nationwide International Resources again,
 4    right?
 5    A.  Yes.
 6    Q.  And you described them as "sold fake merchandise to
 7    PCI," correct?
 8    A.  Yes.
 9    Q.  And then down below that you have "Michael Catain
10    Enchanted FB."  Do you see that?
11    A.  Yes.
12    Q.  And that means Enchanted Family Buying Company; do you
13    agree with me?
14    A.  Yes.
15    Q.  And then you describe that as "sold fake merchandise to
16    PCI," right?
17    A.  Yes.
18    Q.  Okay.  Now what you are doing in your analysis is you
19    are looking to see the money that was being wired in from
20    them and to see if any money was going to them, right?
21    A.  Yes.
22    Q.  Now that we know that, let's bring over the one on the
23    left.  Let's see if we can see that to match it up and do
24    our best to read what you have written there.
25               And what you did, Ms. Pesch -- tell me if this is
```

Fesch - Cross

```
1    true -- is you took those numbers, for example, from
2    Exhibit 333, the numbers that we were talking about earlier,
3    for example, which was on page 6 for Enchanted Family Buying
4    Company, and then you put that number into this flow of
5    funds, correct?
6    A.  Just a minute.  Let me find page 6.
7        (Pause)
8    A.  So this flowchart is potentially any money flowing back
9    and forth, not exclusive to wires.
10   Q.  Do you see the total for Enchanted Family Buying Company
11   on page 6?  It's $307 million.  Do you see that?
12   A.  I can't read the value.
13   Q.  I'm sorry.
14   A.  Sorry.
15   Q.  On page 6, do you see your chart --
16   A.  Oh.
17   Q.  -- that says $307 million?
18   A.  Yes.
19   Q.  Then if we go to Enchanted on your graph there, where
20   you have the arrow pointed towards the Petters Company,
21   Inc., do you see that it says $307 million?
22   A.  I can't read it exactly, but it looks like it could
23   possibly say that number, yes.
24   Q.  And then the money going into -- the money going to
25   Enchanted, do you see that, on your flowchart in
```

1    Exhibit 333?

2    A.  I can't read it.

3    Q.  Does it look like zero?

4    A.  On the screen it looks more like zero than in my copy,

5    so yes.

6    Q.  Do you agree with me that you are saying that

7    $307 million was being wired in from Enchanted and zero

8    money was going to Enchanted, is what you are trying to

9    articulate, right?

10   A.  It looks like that's what I had written on this

11   flowchart.

12   Q.  And then if you stay on Exhibit 6, I'll give you the

13   number -- or, I'm sorry Exhibit 333, page 6 and 7 for your

14   numbers on Nationwide.  And your number for Nationwide is

15   $282 million.  Do you see that?

16   A.  Yes.

17   Q.  Now, if you look up for Nationwide right above it, you

18   do the same thing, right, where you try to fill in the

19   money; is that right?

20   A.  To show the flow of funds, yes.

21   Q.  And so you've got the money going into the account from

22   Nationwide.  Do you see that?

23   A.  Yes.

24   Q.  And you've got 282, right?

25   A.  It looks like it.

Pesch - Cross

1    Q.  But you say billion, right?

2    A.  It looks like it.

3    Q.  Is that a -- you said billion on your chart, but it's

4    really 282 million on the math, right?

5    A.  Yes.

6    Q.  So what you have -- what you have written there is

7    $282 billion going into the account and you have zero

8    dollars going to Nationwide; is that accurate?

9    A.  That's what's written on here.

10   Q.  And this, Ms. Pesch, is a type of flow of fund analysis

11   that you drafted, correct?

12   A.  Yes.

13              THE COURT:  Counsel, let's clarify what exhibit

14   you're referring to when you say "this."

15              MR. COLLYARD:  Yes.  Sorry, Your Honor.

16   BY MR. COLLYARD:

17   Q.  So for both Exhibit 333, page 21, which is on your left,

18   and Exhibit 411, which is appearing on the screen to your

19   right, both of those are flow of funds diagrams that you

20   drafted to understand the transaction activity going in and

21   out of the account, correct?

22   A.  They are both versions of that flow of funds diagram,

23   yes.

24   Q.  Okay.  Now I want to just ask you quickly -- I told you

25   I'd talk about events.  I just want to ask you about events

Pesch - Cross

```
1    real quickly.  If we can go to Exhibit 182 while I grab

2    mine.

3         (Pause)

4    Q.  Ms. Pesch, I'm sorry.  I forgot to ask you something

5    about the flow of funds charts that you drafted.  Those flow

6    of funds charts that you drafted were helpful for you to

7    understand the transaction activity, correct?

8    A.  Yes.

9    Q.  Okay.  Now let's go to Exhibit 182 and let's go to --

10             MR. COLLYARD:  Exhibit 182 is already in evidence,

11   Your Honor.

12   BY MR. COLLYARD:

13   Q.  Let's go to page 24 of Exhibit 182 and tell me,

14   Ms. Pesch, if you remember these being the alerts on the

15   Petters Company, Inc. account.

16   A.  I don't remember it, but I can read that Petters

17   Company, Inc. is the customer identified.

18   Q.  This is a reflection of the alert, for example on

19   Alert 60827, correct?

20   A.  Yes.

21   Q.  Now, I was asking you about events and I was talking

22   about Searchspace and the algorithm and getting to a score,

23   right?

24   A.  Yes.

25   Q.  So I want to just do that for a few of these so we can
```

1    see what that means and understand what the score means.

2    Okay?

3    A.  Okay.

4    Q.  So what we've got here -- let's just do it from the

5    beginning.  We've got 60827, which is the month of two

6    thousand -- I'm sorry, the month of November for 2005,

7    correct?

8    A.  Yes.

9    Q.  And it says the alert was assigned to you, right?

10   A.  Yes.

11   Q.  And then on the left-hand side it gives a score of 237.

12   Do you see that?

13   A.  Yes.

14   Q.  And what we have below here for alert events is the

15   making of the score, correct?

16   A.  It appears it could be cumulative to add up to the

17   score.

18   Q.  That's -- this is how the scores are made, correct?

19   A.  I don't remember, but it look like it contributed to the

20   score.

21   Q.  So if we take a look at the very top one, down under

22   Alert Events, it says, "Incoming Wire Deposit," right?

23   A.  Yes.

24   Q.  So this tells us that the incoming wires were for

25   $606.4 million, right?

Fesch - Cross

```
1    A.  Yes.

2    Q.  And then if you look to the right of it, it says,

3    "Average Value or Volume."  Do you see that?

4    A.  Yes.

5    Q.  And what do you understand that to be?

6    A.  I don't remember what I -- I don't remember.

7    Q.  Well, if you look to the left, it says, "Peer Monthly

8    Value Event," right?

9    A.  Uh-huh, yes.

10   Q.  And you have a general understanding as to what "peer"

11   means, right?

12   A.  Yes.

13   Q.  And what does that mean?

14   A.  Similar type businesses or similar businesses.

15   Q.  A similar type business is what you are saying, right?

16   A.  Similar business, yes.

17   Q.  And if you go to the average, then, what this is doing

18   is it's looking at the $606 million coming in and it's

19   comparing it to the average of what a similarly-situated

20   customer would be in the business banking group, right?

21   A.  I don't remember.

22   Q.  Does that appear to be what is happening here?

23   A.  It doesn't clarify whose average, so I can't say for

24   sure because I don't remember.

25   Q.  Does it make sense to you that that's the peer average?
```

1    A.  I don't see it identified there.  It just says

2    "average."

3    Q.  What other average could it be?

4    A.  The customer's average?  I'm not sure.  I don't remember

5    and it's not identified.

6    Q.  Does it appear to you, Ms. Pesch, that what is happening

7    here for these events is it's taking the incoming wire,

8    comparing it to the average of the peer, which would be

9    606 million compared to 5.8 million, and then comparing that

10   to a threshold?  Do you see that?

11   A.  I see "Threshold," yes.

12   Q.  And this indicates that in this particular instance for

13   this particular wire, it was half a billion dollars more

14   than the threshold, right?

15   A.  Can you repeat that?

16   Q.  In this particular instance for the incoming wires for

17   this month of November of 2005, the $606 million being wired

18   in was over a half a billion dollars more than the

19   threshold, correct?

20   A.  I really don't remember how these events were created or

21   scored.

22   Q.  Do you have any reason to disagree with my analysis?

23           MS. MOMOH:  Objection, Your Honor, calls for

24   speculation.

25           THE COURT:  Overruled.  You may answer if you can.

```
1              THE WITNESS:  I really don't remember about the

2      events.

3      BY MR. COLLYARD:

4      Q.  Well, then if you look to the right, it gives a score of

5      70, right?

6      A.  Yes.

7      Q.  And then if you add up the scores on the right, that

8      equals 237, correct?

9      A.  I'm not very good at doing math on the spot --

10     Q.  Neither am I.

11     A.  -- but it's possible.

12     Q.  That's perfectly okay.  Do you have any reason to

13     disagree with me that if you add up those numbers it's 237?

14     A.  I suspect that if you add them up, you'll get the score.

15     Q.  And then if you look -- and by the way -- let's step

16     back.  When you were an anti-money laundering analyst, you

17     had access to this information, didn't you?

18     A.  Yes.

19     Q.  And if we just go to the one below it, it does it again

20     for the outgoing wires, right?

21     A.  Yes.

22     Q.  And, again, that indicates to us that there was

23     $606 million in incoming wires and 600 million in outgoing

24     wires, right?

25     A.  Yes.
```

Tesch - Cross

1    Q.  Very similar numbers again, correct?

2    A.  Yes.

3    Q.  And then this compares it to the threshold, and this

4    time the outgoing wires are $415 million more than the

5    threshold, right?

6    A.  It looks like it might say that.

7    Q.  And then it gave it the score of 69, correct?

8    A.  Yes.

9    Q.  Now, if we just do the next two below it, just to make

10   sure that this all makes sense, it says, "Incoming Wire

11   Deposit."  Do you see that?

12   A.  Yes.

13   Q.  And now is what it's doing is taking the number of wires

14   and doing an analysis on the number of wires?

15   A.  Yes.

16   Q.  And down below that it does the same thing for the

17   number of outgoing wires, right?

18   A.  Yes.

19   Q.  And it gives us scores, correct?

20   A.  Yes.

21   Q.  Remember when we were talking about -- in 60827 and

22   64556 we had the little block that said reported or alerted

23   for value and volume of incoming and outgoing wire.  Do you

24   see that -- do you remember that?

25   A.  Can you repeat that, please?

Pesch - Cross

```
1    Q.  Yes.  When we were talking about your comments in

2    Searchspace where you had listed that the alert had reported

3    or alerted for value and volume of both incoming and

4    outgoing wires --

5    A.  Yes.

6    Q.  -- correct?

7              MS. MOMOH:  For the record, objection, Your Honor.

8    If counsel is referring to a document, I ask that he show

9    her the document that he's referring to in his question.

10             THE COURT:  I believe we have a response that

11   said, "Yes."  Is that correct?

12             MR. COLLYARD:  Yes, Your Honor.

13             THE COURT:  Okay.  You may proceed with your

14   question.

15   BY MR. COLLYARD:

16   Q.  And, Ms. Pesch --

17             THE COURT:  And the objection is overruled.

18             MR. COLLYARD:  Sorry, Your Honor.

19   BY MR. COLLYARD:

20   Q.  And, Ms. Pesch, what this is doing here in this, what we

21   see on page 24 of Exhibit 182 -- when I say "this," that's

22   what I mean -- the scores that are being created in these

23   events, what that is doing is it's showing us that this

24   particular alert for a score of 237 is alerting for both

25   value, meaning the amount, and volume, meaning the number,
```

Fesch - Cross

1   of incoming and outgoing wires, correct?

2   A.  Yes.

3   Q.  And when you were doing your comments in Searchspace, if

4   you wanted to, you could have gone and looked at

5   Exhibit 182, page 24, and seen this exact information,

6   correct?

7   A.  Yes.

8             MR. COLLYARD:  Your Honor, are we close to our

9   break where I --

10            THE COURT:  We are.

11            MR. COLLYARD:  -- could try to clean some things

12  up?

13            THE COURT:  Pardon me?

14            MR. COLLYARD:  Where I could try to clean some

15  things up to move things along.

16            THE COURT:  We will break at 3:00.

17  BY MR. COLLYARD:

18  Q.  Let's go back to Exhibit 183 and go back to Alert --

19  let's do -- I'm sorry.  Let's go to Alert 64556.

20  A.  Could you provide the page number?

21  Q.  Yes.  I'm just trying to find it myself.  It's

22  Exhibit 183 at page 37.  Let's just focus on that first page

23  there, go down to that bottom block.  I'll blow that up.

24            You say, "Petters Company, Inc. is a collection of

25  nearly 20 companies that make and market a variety of

 1    consumer products worldwide."  Do you see that?

 2    A.  Yes.

 3    Q.  Now, that sounds very similar to the description that

 4    you gave about Petters Group Worldwide in Exhibit 333,

 5    correct?

 6              MS. MOMOH:  Objection, Your Honor.  As I stated

 7    before, if counsel is referring to a document when asking

 8    questions of Ms. Pesch, I ask that he show her the document.

 9              THE COURT:  Ms. Pesch, do you know from

10    recollection?

11              THE WITNESS:  I would like to double-check against

12    the document.

13              MR. COLLYARD:  I will be glad to show Ms. Pesch

14    the exhibit.

15              THE COURT:  You may.

16    BY MR. COLLYARD:

17    Q.  If we go back to --

18              MR. COLLYARD:  I'm trying to ask my questions and

19    be mindful of the break too, Your Honor.

20         (Pause)

21              THE COURT:  We'll take our midafternoon break now.

22              Members of the Jury, please be prepared to return

23    to the courtroom at 3:15.

24              And please remember and abide by the instructions

25    that I have given you before to not discuss the case.  You

Pesch - Cross

1    know a little bit more about the case each time I ask you

2    not to.  And don't do any kind of research or anything like

3    that, and also don't allow anyone to discuss the case with

4    you or near you.

5           So I hope you have a good break, and we'll be

6    ready to return at 3:15.  Thank you.

7       (Jury excused)

8                          **IN OPEN COURT**

9                       **(JURY NOT PRESENT)**

10          THE COURT:  We will be in recess.  You certainly

11   may leave the witness stand.  Because you are on the witness

12   stand and continuing to testify, you are not to discuss your

13   testimony with anyone during this break.  Okay?  Thank you.

14          MS. MOMOH:  Your Honor, if I may?  Mr. Collyard,

15   do you mind?

16          MR. COLLYARD:  I don't mind.

17          MS. MOMOH:  Thank you, Your Honor.  During the

18   prior sidebar you had given counsel permission to speak with

19   Ms. Pesch pursuant to the instructions.  We didn't have a

20   chance to caucus with her given the quickness of the recess.

21   Do you mind if we do that now briefly?

22          THE COURT:  You may do so within the bounds of the

23   discussion that we had at sidebar.

24          MS. MOMOH:  Absolutely.  Should we do it here,

25   Your Honor, or does it matter where we --

Pesch - Cross

1           THE COURT:  The jury is not here.  I don't want

2     the jury to overhear your conversation.  Where you have it

3     is your decision.

4           MS. MOMOH:  Thank you, Your Honor.

5           THE COURT:  Everyone is free to leave the

6     courtroom.

7           MS. MOMOH:  Understood.  Thank you, Your Honor.

8           THE COURT:  You're welcome.

9        (Recess taken at 3:02 p.m.)

10                        *   *   *   *   *

11        (3:18 p.m.)

12                      **IN OPEN COURT**

13                     **(JURY PRESENT)**

14           THE COURT:  Please be seated.  Thank you.

15           You may proceed.

16           MR. COLLYARD:  Thank you, Your Honor.

17     BY MR. COLLYARD:

18     Q.  Ms. Pesch, let's go to Exhibit 183 and go to page 38,

19     this is the alert for 64556.  And if we just go to the -- go

20     back to the incoming wires, down towards the middle of the

21     page where it says, "Most wires" and above it with the

22     $1.463 billion.

23           MR. COLLYARD:  Can we pop up a little bit to

24     get -- to show the incoming wires totaling?

25     BY MR. COLLYARD:

Pesch - Cross

1    Q.  I just want to make sure you have this, Ms. Pesch, so

2    you can see it.

3              You say, "There were 443 incoming wires totaling

4    $1.463 billion," right?

5    A.  Sorry.  Just a minute.  I'm trying to -- okay.  Yes.

6    Q.  You can't tell by looking at your comments why the

7    $1.463 billion was being wired into the Petters Company,

8    Inc. account, can you?

9    A.  No.

10             MR. COLLYARD:  I have no further questions,

11   Your Honor.

12             THE COURT:  Anything further for this witness?

13        (Pause)

14             THE COURT:  May the witness be excused?

15             MS. MOMOH:  Your Honor, Defendant BMO Harris Bank

16   would like to examine Ms. Pesch.  If I could just have a

17   minute, please?

18             THE COURT:  You may.

19             MS. MOMOH:  And before we begin, Ms. Pesch, if you

20   can bring the documents that you were looking at previously

21   from the plaintiff's counsel, you might want to keep those

22   handy.

23             THE WITNESS:  Oh.

24             MS. MOMOH:  Your Honor, permission to approach the

25   bench?

```
 1                   THE COURT:  You may.

 2          (Document handed to the Court)

 3                   THE COURT:  Thank you.

 4              MS. MOMOH:  You're welcome.

 5              I have one for your law clerk if you'd like.

 6                   THE COURT:  That's wonderful.  Thank you.

 7              MS. MOMOH:  You're welcome.

 8          (Pause)

 9                   THE COURT:  I will just remind all counsel that

10      exhibits are not to be published until they are admitted.

11              MS. MOMOH:  Thank you, Your Honor.

12          (Pause)

13              MS. MOMOH:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15      BY MS. MOMOH:

16      Q.  Good afternoon, Ms. Pesch.

17      A.  Good afternoon.

18      Q.  My name is Adine Momoh.  I am counsel on behalf of

19      Defendant BMO Harris Bank.  It's nice to see you again.

20      A.  You too.

21      Q.  Now, before we begin, I just want to follow up on some

22      questions that counsel for the plaintiff, Mr. Collyard, had

23      asked you before our break at a point.

24              To set the stage a little bit, describe for the

25      jurors what sort of information would be available to you as
```

1    an analyst through Searchspace during the 2005 to 2008

2    period if you were looking at checks.

3    A.  It would give you the date and the value and that the

4    transaction type was a check.

5    Q.  Okay.  And now describe for the jurors what sort of

6    information would be available to you during that same

7    period of time, 2005 to 2008, if you were reviewing wires.

8    A.  It would show you the transaction date and the

9    transaction amount, and there were fields for the originator

10   and beneficiary, names.

11   Q.  With respect to checks, who would be the parties to a

12   check that you could see in Searchspace during that same

13   period of time?

14   A.  You would -- the only party you would know from

15   Searchspace for a check is in relation to the account you

16   were looking at.  So if there were checks drawn on the

17   account, you would have known who was writing the check

18   and -- that's all you would know from Searchspace.

19   Q.  With respect to wires, who would be the parties to a

20   wire that you could see in Searchspace?

21   A.  The name of the originator and the beneficiary.

22   Q.  And when you say "originator," what do you mean?

23   A.  The party that the wire was sent from.

24   Q.  What would be an example of an originator?

25   A.  Like if I were to send a wire to you, I would be the

Pesch - Direct

1    originator.

2    Q.  Okay.  And you used the term "beneficiary."  What do you

3    mean by that?

4    A.  The party that received the wire.

5    Q.  Okay.  So, in your example, whoever had received the

6    funds would be the beneficiary?

7    A.  Yes.

8    Q.  Would you, as an analyst, during the 2005 to 2008 period

9    with respect to funds that were received by a beneficiary,

10   would you have been able to see how that beneficiary used

11   those funds?

12   A.  Sorry.  Could you repeat that one more time?

13   Q.  Sure.  So you testified that you were an analyst during

14   the period of 2005 to 2008, correct?

15   A.  Yes.

16   Q.  My question is with respect to Searchspace still.  Okay?

17   So in Searchspace, with respect to funds that would have

18   been received by a beneficiary, would you be able to see how

19   the beneficiary used those funds in Searchspace?

20   A.  If a client received funds, you could see debits to the

21   account.

22   Q.  Is there anything else you could see?

23   A.  I guess, like, with the wire example, you would see the

24   name of the beneficiary.

25   Q.  And nothing else?

1    A.  Right.

2    Q.  Ms. Pesch, when did you learn that Tom Petters and his

3    entities, including PCI, were involved in the PCI Ponzi

4    scheme?

5    A.  September 29th [indiscernible].

6            THE COURT REPORTER:  I'm sorry.  What was the

7    year?

8            THE WITNESS:  2008.

9            THE COURT REPORTER:  Thank you.

10   BY MS. MOMOH:

11   Q.  Besides the Ponzi scheme being discovered at that time,

12   does this period stick out to you for any other reason?

13   A.  Yes.

14   Q.  Why do you say that?

15   A.  I was married in September of 2008.

16   Q.  Explain to the jurors -- you just mentioned that you

17   were married in September of 2008, and you said at that

18   period of time is also when you had learned about the PCI

19   Ponzi scheme.  Explain to the jurors the significance of

20   that time period to you.

21   A.  I -- after I was married, I went on my honeymoon; and

22   when I returned, that's when I found out about the Ponzi

23   scheme.

24   Q.  When you returned where?

25   A.  Returned to work.

Tesch - Direct

1    Q.  How did you find out about the Ponzi scheme?

2    A.  When I walked to my desk, there was a large folder on

3    the desk and I had an e-mail.

4    Q.  So that was probably not the honeymoon gift that you

5    were expecting, right?

6    A.  No.

7    Q.  You just mentioned that there was a large packet of

8    documents that were on your desk, correct?

9    A.  Yes.

10   Q.  And, again, this was in that late September -- you said

11   September 29th, 2008?

12   A.  Yes.

13   Q.  Now, we'll return to this moment that you are describing

14   about this large packet of documents that you received later

15   today, but before we -- or later, at some point, but before

16   we do that, generally describe what was in that large packet

17   of documents.

18   A.  It was some articles that were printed out and some

19   printouts from CIS.

20   Q.  You say "some articles."  What articles are you

21   referring to?

22   A.  Articles that detailed the FBI raid and the fraud.

23   Q.  Would those articles detailing the FBI raid on PCI have

24   been made available to you before September 29th of 2008?

25   A.  No.

Pesch - Direct

1    Q.  Are you aware now, today, that eventually Tom Petters,

2    Deanna Coleman, and a number of other people went to jail

3    for their role in the PCI Ponzi scheme?

4    A.  Yes.

5    Q.  Do you know now that PCI pled guilty to its role in the

6    PCI Ponzi scheme?

7    A.  Yes.

8    Q.  Were you interviewed by law enforcement with respect to

9    the PCI Ponzi scheme?

10   A.  No.

11   Q.  Did you know that there was a Ponzi scheme happening by

12   PCI before it was discovered by the authorities in 2008?

13   A.  No.

14   Q.  Now, you now know that the defendant, BMO, is being

15   accused as somehow being involved in the PCI Ponzi scheme

16   and your work at M&I during that 2005 to 2008 period is now

17   being called into question.  How does that make you feel?

18             MR. COLLYARD:  Objection, Your Honor.

19             THE COURT:  Sustained.  Irrelevant.

20   BY MS. MOMOH:

21   Q.  Well, when you learned that your work was now being

22   called into question, how did you respond to that?

23   A.  I was hurt.

24   Q.  Why do you say that?

25   A.  Because the work we were doing was to try to prevent

1    something or to catch something like that.

2              MR. COLLYARD:  Objection, Your Honor, relevance.

3              THE COURT:  Sustained.

4    BY MS. MOMOH:

5    Q.  Ms. Pesch, do you need a moment?

6    A.  Yes.

7    Q.  Okay.

8        (Pause)

9    A.  Okay.

10   Q.  Okay.  Now, I know this is challenging and difficult for

11   you, but let's shift and talk about the period of time

12   before these events in question really took place.

13            The last time that Mr. Collyard had deposed you

14   was in January of 2018, correct?

15   A.  Yes.

16   Q.  And at that time you were living in Wisconsin, correct?

17   A.  Yes.

18   Q.  Do you still live in Wisconsin?

19   A.  Yes.

20   Q.  What city?

21   A.  Muskego.

22   Q.  Are you from Wisconsin?

23   A.  No.

24   Q.  Where are you from?

25   A.  I grew up in the Twin Cities.

Pesch - Direct

```
1    Q.   Where in the Twin Cities did you grow up?

2    A.   Chanhassen.

3    Q.   Where did you go to high school?

4    A.   Benilde-St. Margaret's in St. Louis Park.

5    Q.   Now, I noticed that plaintiff's counsel showed you some

6    documents during the relevant period of 2005 to 2008 and

7    your name was identified as Drewiske.  Is Drewiske your

8    maiden name?

9    A.   Yes.

10   Q.   Do you and your husband have children?

11   A.   Yes.

12   Q.   How many?

13   A.   Three.

14   Q.   What are their ages?

15   A.   Twin 11-year-olds and a 4-year-old.

16   Q.   So you have your hands full, huh?

17   A.   Yes.

18   Q.   Tell us about your post high school education.  Where

19   did you graduate from college?

20   A.   Marquette University in Milwaukee, Wisconsin.

21   Q.   What degrees did you receive?

22   A.   I doubled majored in business economics and finance.

23   Q.   When did you graduate from college?

24   A.   December 2005.

25   Q.   My understanding is that your first experience in the
```

1    banking industry was with M&I starting in January of 2005.

2    What sort of employment experiences did you have before

3    entering the banking industry?

4    A.  I did a lot of babysitting and nannying.  I worked at

5    the Chanhassen Dinner Theatre as a host.  At Byerlys

6    restaurant in Chanhassen as a waitress and a host.  I had a

7    summer job at Edina Realty Mortgage, a summer at a dry

8    cleaners in Chanhassen.  Holidays from college at the Target

9    in Chanhassen.

10   Q.  When you joined M&I in January of 2005, what was your

11   role?

12   A.  AML analyst.

13   Q.  And we know that AML stands for anti-money laundering,

14   correct?

15   A.  I'm sorry.  Could you repeat your question?

16   Q.  Sure.  When you had joined M&I in January of 2005, what

17   was your role?

18   A.  I was actually an AML intern at that time.  I'm sorry.

19   Q.  Understood.  But AML still stands for anti-money

20   laundering?

21   A.  Yes.

22   Q.  What led you to pursue a career in the banking industry?

23   A.  I met with people at M&I at a career fair at Marquette

24   and I -- they asked me what my favorite class was, and I was

25   very excited about an economics and law class at the time.

Pesch - Direct

```
 1    I gave them my resumé, we talked some more, and a few weeks
 2    later they offered me a job and I took it.
 3    Q.  Why did you choose M&I Bank as the place to start your
 4    career?
 5    A.  It had a good reputation and I liked the fact that it
 6    was based in Milwaukee, where I was going to school, and
 7    they had a strong presence in the Twin Cities in case I
 8    wanted to come home.
 9    Q.  How long were you an AML intern?
10    A.  A year.
11    Q.  Who did you report to while you were an AML intern at
12    M&I?
13    A.  Kelley Maltsch.
14    Q.  Can you spell the last name -- first name and last name?
15    A.  I believe it's K-e-l-l-e-y, M-a-l-t-s-c-h or something
16    very similar to that.
17    Q.  What was your next role after you were an AML intern?
18    A.  AML analyst.
19    Q.  Over what period of time were you an AML analyst?
20    A.  Approximately December 2005 through 2008.
21    Q.  And during that period of time, who did you report to
22    while you were an AML analyst?
23    A.  Bernita Hile.
24    Q.  After being an AML analyst, did your job change?
25    A.  Do you mean when I moved from being an analyst to an
```

Pesch - Direct

1    investigator -- or, excuse me, an intern?  Can you clarify?

2    Q.  My understanding is that after you were an AML analyst,

3    your job title switched slightly to become an AML

4    investigator; is that correct?

5    A.  Yes.

6    Q.  From when to when were you an AML investigator?

7    A.  I believe it was approximately 2008 to 2012.

8    Q.  What's the distinction between an AML analyst and an AML

9    investigator?

10   A.  That's kind of evolved over time.  Back at that time, it

11   wasn't quite as clearly defined, but an investigator was

12   more experienced.

13   Q.  And you were an AML investigator from March of 2008 to

14   2012?

15   A.  Yes.

16   Q.  When you were an AML investigator, who did you report

17   to?

18   A.  Bernita Hile.

19   Q.  My understanding is that you are currently employed at

20   BMO Financial Group, correct?

21   A.  Yes.

22   Q.  What is your current job title?

23   A.  AML manager.

24   Q.  In global asset management?

25   A.  Yes.

1    Q.  What are your current job responsibilities?

2    A.  The group that I manage, we conduct KYC reviews when

3    onboarding new clients and conduct risk scoring, enhanced

4    due diligence as necessary for clients involved.

5    Q.  You said that you conduct KYC reviews.  KYC stands for

6    "know your customer"?

7    A.  Yes.

8    Q.  How long have you been in that role?

9    A.  About five years.

10   Q.  Where are you based?

11   A.  Milwaukee.

12   Q.  When working for M&I, now BMO, have you always worked

13   out of Milwaukee?

14   A.  Milwaukee or a suburb of Milwaukee.

15   Q.  Now, I want to focus your time as an AML analyst and AML

16   investigator while at M&I.

17           Let's start off with your general training.  What

18   sort of certifications or other trainings have you received

19   with respect to anti-money laundering?

20   A.  I have my ACAMS certificate, and I have gone through

21   numerous AML trainings over my career.

22   Q.  Let's start with your ACAMS certificate.  What does

23   ACAMS -- what does that stand for?

24   A.  Association of Certified Anti-Money Laundering

25   Specialists.

Fesch - Direct

1    Q.  Why did you become certified as an AML specialist?

2    A.  I thought it would help me perform better in my job, as

3    well as move up in my career.

4    Q.  And what would have been required for you to receive

5    your ACAMS certification?

6    A.  There were some requirements you had to meet, like

7    number of years in a related field.  There was a self-study

8    exam, and you would need to pass the exam in order to be --

9    to receive the certification.

10   Q.  When did you become certified?

11   A.  I think in 2012.

12   Q.  Are you still certified as an ACAMS specialist?

13   A.  Yes.

14   Q.  Let's focus -- with respect to training, let's focus on

15   external.  And by "external," I mean trainings that were

16   offered outside the bank, in other words, by an organization

17   not associated with M&I or BMO Harris Bank.  Do you

18   understand my -- --

19   A.  Yes.

20   Q.  -- preference?

21           Okay.  So let's focus on training.  Did you attend

22   any sort of conferences for training purposes?

23   A.  Yes.

24   Q.  Did you attend these sorts of conferences during the

25   period of 2005 to 2008?

Tesch - Direct

```
 1    A.  Yes.
 2    Q.  Okay.  So let's focus on that period of time.  What sort
 3    of topics would have been covered during that period for
 4    purposes of AML training?
 5    A.  Back then I remember it being pretty broad AML topics,
 6    but there was heavy emphasis and focus on cash structuring,
 7    cash-intensive businesses.
 8    Q.  Why were you attending these sorts of conferences during
 9    the 2005 to 2008 period?
10    A.  To learn more about AML.
11    Q.  How would you bring that sort of information from the
12    conferences back to your colleagues at the bank at that
13    time?
14    A.  We would have the people that attended these training
15    sessions or conferences prepare a summary and then go over
16    it to the team, usually at staff meetings.
17    Q.  Why?  Why would you be bringing this sort of information
18    back to your colleagues at the bank at this time?
19    A.  So that everyone had access to similar training.
20    Q.  So -- again, so far we've been talking about external
21    opportunities for training with respect to AML.  Now I want
22    to shift and focus on internal trainings, and by that I mean
23    trainings that were offered by the bank, and I want to focus
24    on the period of time of 2005 to 2008.
25         Did you receive training from M&I during the 2005
```

1    to 2008 period?

2    A.  Yes.  Yes.

3    Q.  What sort of training did you receive?

4    A.  There was annual AML compliance training that all bank

5    employees had to take, and then there were some topics that

6    more -- our senior members of the AML team would provide

7    training on.

8               MS. MOMOH:  Mr. Herzka, if you can put up

9    Exhibit -- Plaintiff's Exhibit 004.  This is an admitted

10   exhibit.

11   BY MS. MOMOH:

12   Q.  Ms. Pesch, I'm showing you what's already been admitted

13   into evidence Plaintiff's Exhibit Number 4.  You were asked

14   questions about this at some point today or yesterday.  Do

15   you recall?

16   A.  Yes.

17   Q.  Describe for the members of the jury how this sort of

18   training material -- you see that it's a PowerPoint slide

19   deck, correct?

20   A.  Yes.

21   Q.  Describe for the jury how this sort of training material

22   would have been presented to you during this 2005 to 2008

23   period.

24   A.  This training was dated 2004, so I did not attend the

25   in-person session for this, but I was told that Kelley

Fesch - Direct

```
1    Maltsch and some other senior members of the AML team went

2    around and provided this training in person.  I received a

3    copy of this PowerPoint to review when I started.

4    Q.  How frequently were you trained on material like this

5    during the 2005 to 2008 period?

6    A.  We received similar training to this at least on an

7    annual basis.

8    Q.  And this is -- these are just training materials, but I

9    want to ask you a question with respect to policies and

10   guidelines.  So not the PowerPoint deck, right?  But I want

11   to talk to you about policies and guidelines.

12            With respect to policies and guidelines during the

13   2005 to 2008 period, how frequently would you have been

14   trained on those materials?

15   A.  I would say whenever there were updates or they felt

16   things needed to be refreshed.

17   Q.  And can you give me a period of time?  Are we talking

18   monthly?  Annually?

19   A.  I would say we frequently talked about AML procedures

20   and guidelines in staff meetings.

21   Q.  How long would these training sessions generally last?

22   A.  I would say -- I'm sorry.  Like the annual training or

23   in the staff meetings?

24   Q.  Let's start with the annual trainings.

25   A.  That was about an hour, typically.
```

Pesch - Direct

1    Q.  Staff meeting training, how long would that last?

2    A.  I would say it depended on the topic being presented and

3    how familiar we were with it.

4    Q.  I'm sorry.  Can you repeat that, please?

5    A.  In the staff meetings, it would depend on the topic

6    being presented and how familiar we were with it.  If it was

7    something new, it could take a lot longer than something

8    that was -- we were just covering as a refresher or

9    reminders.

10            MS. MOMOH:  Mr. Herzka, if you could put up

11   page 10 of Plaintiff's Exhibit 004.

12   BY MS. MOMOH:

13   Q.  Okay, Ms. Pesch, do you see slide 10 in front of you?

14   A.  Yes.

15   Q.  And just so you know, you're looking at the screen, but

16   you can also look at the binder that is near you.  So you

17   see that I have exhibits that are in the binder, and then

18   Mr. Collyard had given you some exhibits as well.

19   Defendant's exhibits begin DX, D as in David, X as in x-ray,

20   and then the other set of binders is with respect to

21   documents beginning with P, as in Patrick.

22            Right now you can look at that binder from

23   plaintiff and if you could go to slide 10, please, page 10.

24   Okay?

25   A.  Yes.

Fesch - Direct

1    Q.  Now can you read out loud the -- where it says,

2    "Suspicious Activity" and then the text that follows, do you

3    mind reading that out loud, please?

4    A.  Uh-huh.  "Suspicious Activity.  A transaction:  Is

5    structured to avoid reporting or recordkeeping requirements.

6    Has no apparent lawful purpose.  Is not the sort the

7    customer would normally be expected to conduct."

8    Q.  Suspicious activity, is that one of the concepts that

9    you would have been trained on during the relevant period of

10   2005 to 2008?

11   A.  Yes.

12   Q.  Again, the word "suspicious activity," what did that

13   phrase mean to you during this period of 2005 to 2008?

14   A.  Activity that didn't appear lawful or expected for the

15   customer.

16   Q.  Did your training during this period of time focus on

17   particular types of customer transactional activity that

18   would be suspicious?

19   A.  Yes.

20   Q.  What types of transactional activity would have been

21   focused on during the 2005 to 2008 period?

22   A.  There was a lot of focus on cash.

23   Q.  You said there would be a lot of focus on cash.  What

24   would be an example of suspicious activity related to cash

25   during the relevant period from 2005 to 2008?

1    A.  Cash deposits or withdrawals that were structured to

2    avoid the CTR reporting threshold.

3    Q.  You just stated "that were structured to avoid the CTR

4    reporting threshold.  What does CTR stand for?

5    A.  Currency Transaction Report.

6              MS. MOMOH:  Mr. Herzka, if you could go to page 33

7    of the same document.

8    BY MS. MOMOH:

9    Q.  And, Ms. Pesch, take your time if you want to review the

10   slide before I ask you a question and then let me know when

11   you have reviewed it.

12             (Witness reviews document)

13   A.  Okay.

14   Q.  All right.  Now we're looking at page 33 of Exhibit 4

15   from plaintiff, and at the top you see, "Customer

16   Identification Program (CIP)."  Do you see that?

17   A.  Yes.

18   Q.  Is this another concept that you would have been trained

19   on during the relevant period of 2005 to 2008?

20   A.  Yes.

21   Q.  The concept of Customer Identification Program, CIP,

22   what did that mean to you during that period?

23   A.  Verifying that the customer was who they said they were.

24   Q.  If you could go to page 16 of the same document.  Now,

25   if you can read the slide to yourself, the topic -- at the

Pesch - Direct

1    top the title is "Risks of Non-Compliance."  Okay?

2    A.  Yes.

3    Q.  Now, do you remember being trained on the risks of

4    noncompliance with respect to anti-money laundering

5    policies?

6    A.  Yes.

7    Q.  What were those risks?

8    A.  Reputation risk for the bank, civil and criminal

9    penalties and fines for the financial institution as well as

10   their employees, and it could --

11   Q.  The -- go ahead.

12   A.  Oh.  And it could impact the bank's strategic plan --

13   Q.  So I'm going just going to read --

14   A.  -- or charter.

15   Q.  I'm just going to read the second bullet point where it

16   says, "Civil and criminal penalties and fines against

17   financial institutions and their employees are possible."

18          Okay.  So when you were trained on this concept,

19   what sort of impact did it have on you to know that you

20   personally could be facing civil and criminal penalties and

21   fines for noncompliance?

22   A.  It made me realize that it was very serious work.

23   Q.  That what was very serious work?

24   A.  AML work.

25   Q.  Now, you've been an employee of M&I and now BMO for over

Pesch - Direct

 1    17 years, correct?

 2    A.  Yes.

 3    Q.  Did your understanding of the risks of noncompliance

 4    ever change?

 5    A.  No.

 6    Q.  During the 2005 to 2008 period, what were your

 7    observations of managers at M&I with respect to whether they

 8    upheld the importance of compliance of these AML policies?

 9    And to be clear, I'm not asking you what did management at

10    M&I say during this time.  I'm asking you:  What were your

11    observations of managers with respect to the risks of

12    noncompliance?

13    A.  I always --

14              MR. COLLYARD:  Objection, Your Honor, lack of

15    foundation, speculation.

16              THE COURT:  Overruled.

17              THE WITNESS:  I --

18    BY MS. MOMOH:

19    Q.  Would you like me to repeat the question?

20    A.  Yes.

21    Q.  So, again, during this 2005 period, what were you

22    observations of managers at M&I with respect to whether they

23    upheld the importance of compliance of these AML policies?

24    A.  I observed managers placing importance on it, and they

25    reiterated it in the messages they gave.

1    Q.  How so?

2    A.  I remember Peter Janczak in particular repeatedly saying

3    it's not only a requirement, it's the right thing to do.

4              MR. COLLYARD:  Objection, Your Honor, hearsay.

5              THE COURT:  Sustained.

6              MR. COLLYARD:  Move to strike as well, Your Honor.

7              MS. MOMOH:  Your Honor, if I may, the witness has

8    already testified after I asked my question.

9              THE COURT:  There's a motion to strike.

10             MR. COLLYARD:  Move to strike, Your Honor.

11             THE COURT:  Granted.

12   BY MS. MOMOH:

13   Q.  Ms. Pesch, based on your time at M&I during the 2005 to

14   2008 period, what was your understanding of management's

15   position as it relates to AML policy compliance?  And,

16   again, I'm not asking you with respect to what management

17   said, but what was your understanding of management's

18   position as it relates to AML policy compliance?

19   A.  That it was something that needed to be followed.

20   Q.  Why?

21   A.  Because it was a requirement and the right thing to do.

22   Q.  Ms. Pesch, we just talked about the various ways you

23   were trained as an AML analyst at M&I.  What were your

24   specific job responsibilities as an AML analyst?

25   A.  My primary responsibility was to conduct transaction

Pesch - Direct

1    monitoring.

2    Q.  Can you just briefly describe what you mean by

3    "transaction monitoring."

4    A.  We would review activity that alerted in Searchspace and

5    review the transactions to determine if there was

6    potentially suspicious or suspicious activity.

7            MS. MOMOH:  Mr. Herzka, if you can put up what's

8    been admitted as Plaintiff's Exhibit P-0179, and if you can

9    call out the top of the document all the way until the end

10   of the word "applicable regulatory reports" under "Primary

11   Function."

12   BY MS. MOMOH:

13   Q.  Ms. Pesch, you remember seeing this document and being

14   shown it by Mr. Collyard, correct?

15   A.  Yes.

16   Q.  And you see that this is a job description for the

17   anti-money laundering analyst position?

18   A.  Yes.

19   Q.  What is an alert?

20   A.  An alert is activity that was flagged in Searchspace as

21   requiring review.

22   Q.  When you're reviewing an alert -- and we'll get into

23   this -- there were policies and guidelines that applied,

24   correct?

25   A.  Yes.

Tesch - Direct

1    Q.  Would those guidelines and policies, would they be

2    static in the sense that they wouldn't change or would they

3    evolve over time?

4    A.  They evolved over time.

5    Q.  What is a SAR, S-A-R?  What is a SAR?

6    A.  Suspicious Activity Report.

7    Q.  Now, the alert adjudication process, right -- you

8    mentioned reviewing an alert.  Another way to call that is

9    alert adjudication, correct?

10   A.  Yes.

11   Q.  Would the process with respect -- and let's be general.

12   Give me a general description as to how you would adjudicate

13   an alert in the 2005 to 2008 period.

14   A.  We would open the alert, see who the customer was, what

15   they alerted for.  We would look to see if they had any

16   related alerts.  We'd go and open those, do the same thing,

17   verify it was the same customer, see what they alerted for,

18   look for previous alerts, see what type of activity alerted,

19   and then we would go into the alert and review the

20   transactions.

21   Q.  And part of this was done -- all of this would have been

22   done through Searchspace?

23   A.  Yes.

24   Q.  The alert adjudication process that you just described,

25   was that the same for wires and checks?

Pesch - Direct

 1    A.  Yes.

 2    Q.  You would process an alert with respect to wires and

 3    checks in the same way?

 4    A.  Well, for a wire alert we would focus more on the wires.

 5    And for an alert for checks, we would focus more on the

 6    checks.

 7    Q.  Okay.  So there was a difference, then, between how you

 8    would review an alert for a wire as opposed to a check,

 9    correct?

10    A.  Yes.

11    Q.  Okay.  How would you alert -- how would the alert

12    adjudication process differ with respect to checks?

13    A.  For checks you could not see anything in Searchspace

14    other than the date and the value, so you were required to

15    go to another system to view the checks.

16    Q.  How would that process compare to when you're reviewing

17    a wire?

18    A.  With wires you could typically see who the originator

19    and beneficiary was within Searchspace.

20    Q.  Now, you had said that you were previously an AML

21    analyst and an AML investigator during the 2005 to 2008

22    period, correct?

23    A.  Yes.

24    Q.  Were both positions part of M&I's AML Monitoring Group?

25    A.  Yes.

1    Q.  Okay.  So let's go into more detail as to how would

2    adjudicate an alert in Searchspace.  Who would assign the

3    alert to you as an AML analyst?

4    A.  Typically the lead analyst.

5              MS. MOMOH:  Mr. Herzka, if you could put up

6    Plaintiff's Exhibit 0234.  Okay.  Mr. Herzka if you can cull

7    out the language where it says "Initial Action," the entire

8    section under Roman numeral I, please.

9    BY MS. MOMOH:

10   Q.  Okay.  Ms. Pesch, are you looking at page 1 of

11   Exhibit 0234?

12   A.  Yes.

13   Q.  Okay.  Looking at plaintiff's exhibit, do you see where

14   the document says, "Initial Action"?

15   A.  Yes.

16   Q.  And after it -- it says, "Initial Action.  Review past

17   alert activity and comments in Searchspace."

18              Okay.  So focusing on the 2005 to 2008 period,

19   once an alert was assigned to an AML analyst, what would the

20   analyst have done next to begin to review the alert?

21   A.  They would have looked for previous alerts in the

22   comments.

23   Q.  Then what would the analyst do with respect to reviewing

24   the alert?

25   A.  Look and see if there were any other open alerts for

Fesch - Direct

1    that same customer.

2    Q.  So with respect to looking to see if there were any

3    other open alerts for the same customer, why would you have

4    been doing this?  Why would the AML analysts have been doing

5    this?

6    A.  To make sure that we reviewed any current activity that

7    had been flagged together.

8    Q.  So after you had looked at the current activity that had

9    been flagged together, what would have been the next

10   process?

11            Let's focus on the research that would have been

12   involved when you were adjudicating an alert during the 2005

13   to 2008 period.

14            So when you would have been researching a bank

15   customer, what sort of steps would you have taken to

16   research the customer transactional activity that had

17   alerted?

18   A.  We would conduct internet research to try to figure out

19   who the customer was, look for a website, go to the

20   Secretary of State websites perhaps to verify they were a

21   legitimate business.  We used a variety of internet search

22   engines, like Google and Yahoo, and I think Ask Jeeves

23   was -- I remember using that a few times or sometimes.

24   Hoovers.  There was more stuff you could access without

25   having a subscription back then, like Hoovers.

Fesch - Direct

1   Q.  What's Hoovers?

2   A.  It was a website that gave information on companies.

3   Q.  During the 2005 to 2008 period, why would you have been

4   using Hoovers to research customer transactional activity

5   that had alerted?

6   A.  To help us understand what business they were in.

7   Q.  "To help us understand what business they were in."  Who

8   is the "they" that you are referring to?

9   A.  The client.

10  Q.  The client being the customer of the bank?

11  A.  Yes.

12  Q.  And to be clear, not the entity that the customer of the

13  bank is interacting with, correct?

14  A.  Correct.

15  Q.  You mentioned external sources of research tools that

16  you would use.  You mentioned the internet.  You mentioned

17  Hoovers.  You mentioned the Secretary of State as well.

18          Let's talk about Secretary of State.  With respect

19  to the Secretary of State website, why would you have been

20  using that as a tool to conduct research with respect to

21  customer transactional activity that had alerted during the

22  period of 2005 to 2008?

23  A.  It could prove that they were registered with the State

24  to do business, that they were a legitimate company.

25  Q.  And, again, you said, "It could prove that they were

Fesch - Direct

1    registered with the State to do business."  Who is the

2    "they"?

3    A.  The client.

4    Q.  The client being the customer of the bank?

5    A.  Yes.

6    Q.  And you said, "that they were a legitimate company."  By

7    "they," again, you're referring to the customer of the bank?

8    A.  Yes.

9    Q.  And not the entity that the customer would be dealing

10   with, correct?

11   A.  Yes.

12   Q.  So we were talking about internal -- we were talking

13   about external research tools.  I want to focus on an

14   internal tool.

15           What about MIContacts?  Are you familiar with

16   MIContacts?

17   A.  Yes.

18   Q.  What is MIContacts?

19   A.  It was a resource that was available to M&I employees

20   where employees that had customer interaction could go in

21   and create notes about their meetings or discussions with

22   the customers.

23   Q.  You said that it was available to M&I employees who

24   were -- who had customer interaction.  Is that what you

25   said?

Pesch - Direct

1    A.  Yes.

2    Q.  Who would have been employees at M&I Bank that would

3    have had customer interaction?

4    A.  That would have been the bankers or relationship

5    managers, I think potentially the people that worked at the

6    branches, so like the tellers.

7    Q.  Would it include members of the AML Monitoring Group?

8    A.  We could view it.  I don't remember being able to add

9    comments.

10   Q.  Okay.  So, just to be clear, members of the AML

11   Monitoring Group, were they members of the frontline

12   business at the bank?

13   A.  No.

14   Q.  Why would an analyst be using MIContacts as a research

15   tool during the 2005 to 2008 period to research an alert

16   with respect to customer transactional activity?

17   A.  The people that were leaving the notes were the ones

18   that interacted with the customers, they knew the customer

19   and the relationship, and they were a good resource to get

20   information about what that client might have been doing at

21   that time.

22   Q.  During the 2005 to 2008 period, did analysts in the AML

23   Monitoring Group interface directly with customers as part

24   of their research when adjudicating alerts?

25   A.  No.

1    Q.  Why not?

2    A.  We didn't have the relationship with the customer.

3    Q.  Any other reason?

4    A.  Depending on what was going on, if there was potentially

5    suspicious activity, it could tip them off.

6    Q.  And that would be a reason why not to contact the

7    customer directly?

8    A.  Yes.

9    Q.  To your knowledge, has this changed since September of

10   2008?

11   A.  No.

12   Q.  During the 2005 to 2008 period, would you ever have

13   contacted the bankers or the frontline business associates

14   as part of your research when adjudicating an alert?

15   A.  Yes.

16   Q.  Under what circumstances would you have done that during

17   the relevant period?

18   A.  If there was activity that we felt was potentially

19   suspicious and we couldn't find an explanation for.

20   Q.  What would be an example of when this might have

21   occurred?

22   A.  Like if a customer had a huge cash withdrawal that was

23   unusual for them.

24   Q.  Why would you find the need to contact a frontline

25   business worker at this time?

```
1    A.  They might know why the customer did it.

2    Q.  And in the example that you gave, you said, "Like" --

3    I'm just quoting you -- "Like if a customer had a huge cash

4    withdrawal that was unusual for them."  What do you mean by

5    "unusual"?

6    A.  Not something they would typically do.

7    Q.  So in your example, if the transaction had not been

8    unusual, would the analyst have contacted the frontline

9    business worker?

10   A.  Sorry.  Can you repeat that?

11   Q.  Sure.  So just using your example, you had said that the

12   transaction was unusual for the customer.  So I'm saying if

13   the activity for the customer was not unusual in your

14   example, would the analyst have gone to the frontline

15   business worker in that scenario?

16   A.  No.

17             MR. COLLYARD:  Objection, Your Honor.

18             THE COURT:  The basis?

19             MR. COLLYARD:  Speculation and leading.

20             THE COURT:  Overruled.

21   BY MS. MOMOH:

22   Q.  If I can ask my question again, using your example --

23   okay? -- you had said that if there was an unusual customer

24   activity that you would -- an analyst could go to a

25   frontline business worker.  Okay?
```

Resch - Direct

```
1              And so I'm saying if the activity of the customer
2     had not been unusual under that example, would the analyst
3     then go to the frontline business worker of the bank?
4     A.  No.
5     Q.  Was it ever a requirement in the banking industry for
6     the AML Monitoring Group to reach out to those bankers or
7     frontline business associates for alert adjudication
8     purposes?
9              MR. COLLYARD:  Objection, Your Honor --
10             THE WITNESS:  No.
11             MR. COLLYARD:  -- lack of foundation.
12             THE COURT:  Overruled.
13             MS. MOMOH:  Your Honor, may I ask the question
14    again and then get the answer so it's clear for the record?
15             THE COURT:  You may.
16             MS. MOMOH:  Thank you, Your Honor.
17    BY MS. MOMOH:
18    Q.  Was it ever a requirement in the banking industry for
19    the AML Monitoring Group to reach out to those bankers or
20    frontline business associates for alert adjudication
21    purposes?
22    A.  No.
23    Q.  To your knowledge, has this changed since September of
24    2008?
25    A.  No.
```

Fesch - Direct

1    Q.  Okay.  So we've been talking about research, and we

2    discussed some internal and external tools for review.

3              After you would finish this research, then what

4    would an AML analyst do during this 2005 to 2008 period?

5    A.  Start putting comments together to summarize the alert.

6    Q.  You mentioned comments, and plaintiff had shown you some

7    alerts in Plaintiff's Exhibit 333.  Are those the comments

8    that you are referring to?

9    A.  Yes.

10   Q.  Now, we've seen some of the alerts over the course of

11   these two days.  Explain to the jurors what your review of

12   the transactional activity would look like in Searchspace.

13   Just paint a picture for the -- because we don't have a

14   computer in front of us, at least the jurors don't, so if

15   you could paint a picture as to what the analyst would

16   actually see when you are now reviewing the transactional

17   activity after you have finished your research.

18   A.  We would see a list of data that listed all of the

19   transactions.  It -- in order to sort it or rearrange it,

20   you would need to get it out of Searchspace into Excel.

21   Q.  What fields would have been available to you?

22   A.  You would have seen the transaction date, the value, the

23   transaction type, and then depending on the type of

24   transaction -- so like the incoming wires, you could also

25   see the originator and beneficiary or there were fields for

1    that data.

2    Q.  So, again, when we were talking about reviewing an alert

3    through Searchspace during this 2005-2008 period, the

4    analyst would be assigned an alert, the analyst would

5    research that alert, and then the analyst would turn to

6    transactional activity.  What time frame would the analyst

7    be reviewing with respect to reviewing the alert that they

8    were assigned to?

9              MR. COLLYARD:  Objection, Your Honor, lacks

10   foundation with respect to other analysts.

11             THE COURT:  Sustained.

12   BY MS. MOMOH:

13   Q.  Okay.  Ms. Pesch, you were an analyst during the period

14   of 2005 to 2008, correct?

15   A.  Yes.

16   Q.  Okay.  So let's -- I'll direct my attention to you.

17   Okay?  And just to be clear for the record, counsel, he

18   showed you various comments that were reviewed and entered

19   into by various AML analysts over the period of 2005 to

20   2008, correct?

21   A.  Yes.

22   Q.  And those comments by the other analysts were in

23   Plaintiff's Exhibit 0333, correct?

24             MR. COLLYARD:  Objection, leading, Your Honor.

25             THE COURT:  Sustained.

1      BY MS. MOMOH:

2      Q.  Let's just focus on you, Ms. Pesch.  So, again, we're

3      talking about the 2005 to 2008 period with respect to

4      adjudication of an alert.

5              And my question with respect to you being an AML

6      analyst in that period of time, what would have been the

7      time frame with respect to alerts that were reviewed at that

8      time?

9      A.  We would have taken all of -- we would have looked at

10     the months that they alerted, and we would have taken that

11     through the end of the most current month of data available.

12     Q.  And in your review of the transactional activity in the

13     account over that period of time, if nothing in the account

14     looked unusual, then what?

15     A.  Then we would write up our comments, submit them in

16     Searchspace, and close the alert.

17     Q.  What do you mean, "close the alert"?

18     A.  We would select the alert end state of closed to

19     expected.

20     Q.  Okay.  So we just talked about a circumstance where

21     there would have been nothing in the account that looked

22     unusual.

23              So, alternatively, if you had found something that

24     was suspicious in the account, then what would you, as an

25     analyst, do during this 2005 to 2008 period?

Fesch - Direct

```
1    A.  If you were still in training, you would send it to the

2    manager.  If you weren't, then you would escalate it to a

3    case.

4    Q.  Without identifying any sort of customer information,

5    what would be an example of a time when you, you personally,

6    when you would have escalated an alert for further review

7    during the 2005 to 2008 period?  And to be clear, let's say

8    before September of 2008.

9    A.  I remember one alert that I escalated to case involved a

10   client who had a number of large wires to the Philippines

11   and there was -- they involved jewels or precious stones.

12   Q.  Why would you have escalated this alert for further

13   review?

14   A.  Because it involved two high-risk factors.

15   Q.  Which two high-risk factors?

16   A.  Wires involving foreign countries, and precious metals

17   and stones is considered a high-risk industry type.

18   Q.  So you mentioned two high-risk factors.  Let's start

19   with the first.  The first high-risk factor you mentioned

20   was foreign countries, okay.

21          Now, counsel for plaintiff, Mr. Collyard, had

22   asked you questions about the PCI account, correct?

23   A.  Yes.

24   Q.  PCI was a customer of M&I?

25   A.  Yes.
```

Fesch - Direct

1    Q.  PCI was a customer of M&I during the 2005 to 2008

2    period?

3    A.  Yes.

4    Q.  During that period of time, did PCI ever -- was it ever

5    involved with respect to -- did any of the transactions with

6    respect to PCI ever involve foreign countries?

7    A.  Not that I can recall.

8    Q.  Okay.  And you mentioned another risk factor, precious

9    metals and stones.  During that period of time, did PCI ever

10   engage in transactions involving precious metals and stones?

11   A.  Not that I can remember.

12   Q.  What response did you receive from the AML Monitoring

13   Group when you would have escalated an alert for further

14   review?

15   A.  I would have escalated it to the manager, not the group.

16   Sorry.

17   Q.  Understood.  So you would have escalated it to the lead

18   analyst, or who would you have escalated it to?

19   A.  That evolved over time.  I think initially it just went

20   to the manager, and then at some point the lead analyst also

21   got involved in that.

22   Q.  Okay.  Let's focus on the manager, then.  And the

23   manager was a member of the AML Monitoring Group, correct?

24   A.  Yes.

25   Q.  Okay.  So let me tailor my question, then.  So what sort

Pesch - Direct

1    of response would you receive from the manager when you

2    would have escalated an alert for further review?

3    A.  Typically it would have involved feedback, like

4    additional things to look into or areas that needed to

5    clarify, and then ultimately they would -- or, excuse me,

6    the manager would approve it being escalated to a case or --

7    excuse me.  Yeah, to the case.

8    Q.  Escalating an alert for further review, would that have

9    any sort of bearing on your performance appraisal?  In other

10   words, was that ever considered as far as a metric or a goal

11   with respect to your work as an AML analyst?

12   A.  No.

13   Q.  And let's talk about it from the flip side.  So what

14   response did you receive from a manager that would have been

15   a member of the AML Monitoring Group over the 2005 to 2008

16   period when you would have closed an alert?

17   A.  Sorry.  Could you repeat your question?

18   Q.  I'm just asking you to compare.  So you already

19   mentioned that if you had escalated a review during the 2005

20   to 2008 period with respect to the manager and the manager

21   reviewing your work, you testified that it had no impact on

22   your evaluation of work during that period, correct?

23   A.  Correct.

24           MR. COLLYARD:  Objection, Your Honor, leading.

25           THE COURT:  Overruled.

1    BY MS. MOMOH:

2    Q.  Correct?

3    A.  Yes.

4    Q.  So I'm asking you to compare that to a scenario where an

5    alert had been closed.  Do you understand my question?

6    A.  Yes.

7    Q.  Okay.  So how would the two have compared?  The sort of

8    response that you would have received from a manager,

9    comparing it to an alert being escalated compared to an

10   alert being closed, what sort of response would you have

11   received from the manager with respect to your performance

12   appraisal?

13            MR. COLLYARD:  Objection, Your Honor, speculation

14   and overly broad, no foundation.

15            THE COURT:  Overruled.  You may answer if you can.

16            THE WITNESS:  That wasn't considered a factor in

17   our performance review.

18   BY MS. MOMOH:

19   Q.  So, in other words -- you just said it, right?  So let

20   me ask you this:  Why do you say that?

21   A.  Because we didn't have thresholds where we had to find a

22   certain amount of suspicious activity or not.  We were

23   expected to review each alert based on the merit of the

24   alert.

25   Q.  "Based on the merit of the alert," what do you mean?

1    A.  The activity included within that alert for that client.

2    Q.  So we were just talking about performance appraisals,

3    Mr. Collyard had shown you performance appraisals for you

4    over the period of 2005 to 2008.  Did you ever have any sort

5    of concerns about escalating or not escalating alerts during

6    the 2005 to 2008 period?

7    A.  No.

8    Q.  How many alerts would you, as an analyst, during the

9    2005 to 2008 period have reviewed?

10   A.  It would depend on what was in each alert, but on

11   average, probably about four a day.

12   Q.  You say it could depend.  Why do you say that?

13   A.  If we found suspicious activity or potentially

14   suspicious activity and had to write a case, that would take

15   more time.

16   Q.  I want to focus on Searchspace, and I want to show you

17   what's been admitted as Plaintiff's Exhibit P-0234.  And I'm

18   just going to show you these pretty quick and then we're

19   going to take them step by step.  Okay?

20   A.  Okay.

21   Q.  And I'm going to show you four documents.  One of the

22   four is not -- has not been admitted by the plaintiff.  So

23   you're going to have to have two sets of binders up with

24   you.  Okay?  So you can have plaintiff's binder and then you

25   can have defendant's binder.

Fesch - Direct

1              Okay.  So you see the first one that's been

2      admitted, Plaintiff's Exhibit 234?

3      A.  Yes.

4      Q.  And then I want to show you what's been admitted as

5      Plaintiff's 0398.

6      A.  Yes.

7      Q.  Okay.  And, actually, can you go back to the first one,

8      please.  You recognize this --

9      A.  All right.  Can you remind me of the number?  I closed

10     it.

11     Q.  0234.

12     A.  Okay.

13     Q.  And you recognize this document --

14     A.  Yes.

15     Q.  -- that you were shown by Mr. Collyard?

16     A.  Yes.

17     Q.  And I want to draw your attention to the bottom of that

18     document.  What's the date that's there?

19     A.  January 12th, 2006.

20     Q.  Okay.  I want to show you the other exhibit, Plaintiff's

21     Exhibit P-0398.  Okay.  And then do you see -- do you

22     remember being shown this document?

23     A.  Yes.

24     Q.  Okay.  And then if you could look at the bottom left,

25     there's a date.  Do you see that?

Tesch - Direct

```
 1    A.  Yes.

 2    Q.  And which date do you see?

 3    A.  June 7th, 2006.

 4           MS. MOMOH:  Your Honor, if I could have a moment

 5    to confer with opposing counsel?

 6           THE COURT:  You may.

 7       (Ms. Momoh and Mr. Collyard confer)

 8    BY MS. MOMOH:

 9    Q.  Okay.  So you can turn to my binder.  Actually, before

10    we do that, let's -- let me wait.  Let's focus on the first

11    two.

12           So you saw the first document that had a date of

13    January of 2006?

14    A.  Yes.

15    Q.  And then the other one had a date of June 7th of 2006?

16    A.  Yes.

17    Q.  My understanding is that the guidelines for Searchspace

18    evolved over time; is that correct?

19    A.  Yes.

20    Q.  Okay.  So I want to focus on the guidelines that existed

21    during the period of 2005 to 2008.  Okay?

22    A.  Yes.

23    Q.  So I will be showing you four versions of this document

24    and, again, two of them have already been admitted by

25    plaintiff.  I'm going to be attempting to show you two from
```

1    our set.  So, again, you're going to be working with two

2    different binders for the time being.

3              Okay.  So, generally speaking, how would you as an

4    AML analyst have used these sorts of Searchspace guidelines

5    during the period of 2005 to 2008?

6    A.  I remember referring to this very frequently as I was

7    working alerts.  Oftentimes I had it right next to my

8    keyboard.

9    Q.  And during that period of time, why would you have been

10   referring to these additional guidelines for Searchspace so

11   frequently?

12   A.  Because there was a lot covered in here and a lot of

13   different possible outcomes for alerts.

14   Q.  Let's go to Plaintiff's Exhibit 398, page 7.  Okay.  Do

15   you see this page, Ms. Pesch?

16   A.  Yes.

17   Q.  Do you see where it says, "Reminders" towards the top?

18   A.  Yes.

19   Q.  Okay.  So let's read this.  It says, "Reminders.

20   Remember to ask yourself the following questions when

21   closing an alert to expected activity.  Do I know where the

22   funds came from?  Do I know where the funds went?  Do the

23   comments provided convince the reader that the alert is not

24   suspicious?"

25              Let's focus on the first question, "Do I know

Pesch - Direct

1    where the funds came from"?  What does this mean?

2    A.  What was the source of the funds.

3    Q.  And earlier Mr. Collyard had questioned you with respect

4    to the concept of source or use of funds, correct?

5    A.  Yes.

6    Q.  So with respect to the question "Do I know where the

7    funds came from?" that is the same as source of funds?

8    A.  Yes.

9    Q.  What does that mean?

10   A.  It means how the money came into the account.

11   Q.  What sort of information would an AML analyst, you,

12   during the 2005 to 2008 period have needed to know to answer

13   this question, "Do I know where the funds came from?"

14              MR. COLLYARD:  Objection, lacks foundation as to

15   other analysts.

16              THE COURT:  Overruled.  You're asking about what

17   an analyst would need to know?

18              MS. MOMOH:  I asked Ms. Pesch with respect to her

19   as an analyst during this 2005 to 2008 period, what

20   information would you, as an AML analyst, have needed to

21   know during this period to have answered the question "Do I

22   know where the funds came from?"

23              THE COURT:  As I said, the objection is overruled.

24              MS. MOMOH:  Thank you.

25              THE COURT:  You may answer.

Fesch - Direct

1           THE WITNESS:  You would need to know the types of

2    transactions that the money came in through.

3    BY MS. MOMOH:

4    Q.  So what would be an example, then, of source of funds to

5    answer this question?

6    A.  Like if credits to the account were cash.

7    Q.  How does that answer the question "Do I know where the

8    funds came from?"

9    A.  The money coming into the account that -- the credits

10   were cash.

11   Q.  Let's look at this same page here where it says, "Do I

12   know where the funds went?"  Okay.  What does this mean?

13   A.  It means that if the money went out of the account, how

14   it went out of the account.

15   Q.  Okay.  So we're talking about the concept of source or

16   use of funds.  So with respect to the question "Do I know

17   where the funds went?" is that the same as use of funds?

18   A.  Yes.

19   Q.  What sort of information would you, as an AML analyst,

20   have needed during the 2005 to 2008 period to answer the

21   question "Do I know where the funds went?"

22   A.  It would probably depend on the transactions involved.

23   Q.  How so?

24   A.  Because that's how you would explain the funds leaving

25   the account.

Pesch - Direct

1    Q.  What would be an example of use of funds?

2    A.  If the funds were withdrawn and used to purchase an

3    official check.

4    Q.  And you're talking about checks.  What would you have

5    needed to know to answer this question with respect to wire

6    transfers?

7    A.  You would have needed to know that the funds went out in

8    wires and any other potential transactions that may have

9    been included.

10   Q.  So we're talking about use of funds.  Is use of funds

11   the same as purpose of funds?

12   A.  No.

13   Q.  Why do you say that?

14   A.  Because purpose would be what they were used for.

15   Q.  "What they were used for."  "They" being what?

16   A.  So, like, if it was a wire -- sorry.  Can you repeat?

17   Q.  Let me ask the question differently, then.  During the

18   period of 2005 to 2008 -- because you just said that source

19   of funds does not equate to purpose of funds, right?

20   A.  Uh-huh.

21   Q.  So let's say an analyst -- let's say you were reviewing

22   a wire -- you're reviewing wire activity in a customer

23   account because there was activity that alerted.  Would you,

24   as an analyst, have been required to understand the business

25   activity of the beneficiary of the wired funds or not?

Pesch - Direct

1    A.  No.

2    Q.  Would you, as an analyst, during that same period would

3    you have been required to understand how the beneficiary

4    ultimately used those wired funds or not?

5    A.  No.

6    Q.  And, again, with respect to beneficiary, that would be

7    the entity that had received the funds from the customer of

8    the bank?

9    A.  Yes.

10   Q.  And, Ms. Pesch, again, it's my understanding that the

11   Searchspace guidelines continued to evolve over time, so I

12   want to show you another page of Plaintiff's Exhibit 0234.

13   If we can look at pages 1 to 2.

14              Okay.  Do you see at the bottom where it begins,

15   "Alert Closing"?

16   A.  Yes.

17   Q.  Okay.  So let's look at this page together.  And it

18   says -- and, again, you see the revised date at the bottom

19   here and it's January 12th, 2006?

20   A.  Yes.

21   Q.  You can see here that it says that there are five alert

22   closing states, correct?

23   A.  Yes.

24   Q.  So during the period of time, at least with respect to

25   this particular guideline, what were the five closing states

1    that existed?

2    A.  They were quick close, close to security, close to check

3    fraud, close to expected, and full case review/close to SAR

4    Committee review.

5    Q.  Briefly, can you explain, what does "quick close" mean?

6    A.  Quick close was a quicker way of documenting an alert

7    that was closed.

8    Q.  And before we even get there, explain generally, what

9    are alert closing states?

10   A.  They were ultimately, like, decisions where you would

11   move the alert to to close it.

12   Q.  Okay.  So you just described the quick close.  What

13   about close to security?

14   A.  That meant you identified activity that was potentially

15   concerning, but it didn't have a -- it wasn't AML related,

16   it was more of a security issue.  So we would refer it to

17   the security group at M&I.

18   Q.  When you say "security," what do you mean?

19   A.  The M&I security team.  So they handled physical

20   security for M&I locations as well as, from what I can

21   recall, like criminal-type situations, robberies, things

22   like that.

23   Q.  Then the next one, "Close to Check Fraud," what would be

24   that closing state?

25   A.  That would be for activity that appeared to be

1   fraudulent that was conducted through checks.  M&I had a

2   separate group that reviewed that.

3   Q.  And to be clear, that was not within the AML Monitoring

4   Group?

5   A.  Correct.

6   Q.  "Close to Expected" is number 4.  What is that closing

7   state?

8   A.  "Close to expected" meant that the activity wasn't

9   considered suspicious.

10  Q.  And then the last one, "Full Case Review/Close to SAR

11  Committee Review," what does that consist of?

12  A.  That means a full case review was completed and it went

13  to the SAR Review Committee.

14  Q.  Okay.  Now, I want to compare that to another guideline.

15  It's --

16          MS. MOMOH:  But before we discuss it, Mr. Herzka,

17  if we can take this down.

18  BY MS. MOMOH:

19  Q.  I'm going to be showing you, Ms. Pesch, an exhibit that

20  has not been admitted yet.  It is Defendant's Exhibit

21  DX-50711.

22  A.  50711?

23  Q.  Correct.

24          Okay.  Do you see it?

25  A.  Yes.

Pesch - Direct

1    Q.  Have you -- do you recognize this document?

2    A.  Yes.

3    Q.  How?

4    A.  This was another version of those guidelines that we

5    would use when adjudicating Searchspace alerts.

6    Q.  Now, do you see at the bottom of this document there is

7    a date there?

8    A.  Yes.

9    Q.  And it says, "Revised" and then there's a date, correct?

10   A.  Yes.

11   Q.  What's the revised date on this document?

12   A.  September 2008.

13   Q.  Now, even though the revised date on this document says,

14   "09/2008," when do you recall using these sets of

15   guidelines -- and, again, take the time to review the

16   document -- but when do you recall using these sets of

17   guidelines while you were an analyst during the 2005 to 2008

18   period?

19   A.  I don't remember exactly when this would have started,

20   but I know it would have been before September 2008.

21   Q.  Okay.

22            MS. MOMOH:  Your Honor, defendants offer

23   Defendant's Exhibit DX-50711.

24            MR. COLLYARD:  No objection, Your Honor.

25            THE COURT:  Exhibit DX-50711 is received in

 1    evidence.

 2              MS. MOMOH:  Thank you, Your Honor.

 3              If we could go to page 2 of this document,

 4    Mr. Herzka, and I want to focus on the section that says,

 5    "Alert Closing."

 6    BY MS. MOMOH:

 7    Q.  Okay.  So do you see where it says, "There are seven

 8    alert closing states"?

 9    A.  Yes.

10    Q.  And before we were looking at five closing states,

11    correct?

12    A.  Yes.

13    Q.  Which two were added?

14    A.  It looks like "Of No Value and "Early Close."

15              MS. MOMOH:  Okay.  Mr. Herzka, you can take that

16    down.

17    BY MS. MOMOH:

18    Q.  Now, you see that the guidelines reference specific

19    reasons that allow an analyst to close an alert.  What is

20    the term in Searchspace used to describe these sorts of

21    specific reasons?

22    A.  We used the term "filter."

23    Q.  Okay.  I'm going to ask you a series of questions

24    regarding the various alert closing states, and all of my

25    questions are going to be with respect to the 2005 to 2008

Tesch - Direct

1    period unless I say otherwise.  Okay?

2    A.  Okay.

3    Q.  Now, under what circumstances would an alert qualify for

4    the close to expected state?

5    A.  That would have been for activity that wasn't

6    suspicious.

7    Q.  And under what circumstances would an alert qualify for

8    the full case review/close to SAR Committee review state?

9    A.  That would be when it was obviously suspicious or we

10   suspected it was suspicious.

11   Q.  What about for alerts under the quick close state?  Did

12   the circumstances -- so, again, in this question I'm just

13   not asking about -- I'm not grouping it into 2005 to 2008.

14         So for alerts under the quick close state, did the

15   circumstances under which an alert would qualify for the

16   quick close state change over time?

17   A.  Yes.

18   Q.  Okay.  Let's look at page 2 of Plaintiff's Exhibit 0234.

19   Okay.  Now, how many filters were there that would allow an

20   analyst to close an alert as you can see in this document?

21   A.  Seven.

22         MS. MOMOH:  Okay.  And if you could back out to

23   show again the date on the document, the revised date.

24   Okay.  So if you can go back and zoom in on the seven

25   filters, Mr. Herzka.

1    BY MS. MOMOH:

2    Q.  Ms. Pesch, generally, please tell the jurors what those

3    filters were.

4    A.  It was for activity involving a governmental unit;

5    activity that involved an M&I internal account; activity for

6    a customer on the exempt customer list with Phase One

7    exemption; for a single large cash transaction less than

8    $9,000 with no other unusual activity; activity that was a

9    result of bank service procedures, such as, cash limitation;

10   activity that was a result of seasonal business activity; or

11   activity that was reversed by the customer as not needed for

12   the purpose intended.

13   Q.  Okay.  So you just described the seven filters that

14   applied at this time.  So, to be clear, these were the only

15   circumstances under which an alert could be subject to the

16   quick close state?

17   A.  At the time that this was the current guidelines, yes.

18   Q.  And just because an alert was subject to quick close,

19   would that alert have received any sort of review or no

20   review at all?

21              MR. COLLYARD:  Objection, Your Honor --

22              THE WITNESS:  It would have been reviewed.

23              MR. COLLYARD:  -- leading.

24              THE COURT:  I'm sorry?

25              MR. COLLYARD:  Objection, leading.

Fesch - Direct

1          THE COURT:  Overruled.

2          THE WITNESS:  The alert would still be reviewed.

3    BY MS. MOMOH:

4    Q.  The alert would still be reviewed?

5    A.  Yes.

6          MS. MOMOH:  Mr. Herzka, if you could put up

7    Defendant's Exhibit 50711 and if we could look at pages --

8    at just page 2.

9    BY MS. MOMOH:

10   Q.  And according to this document, there are how many

11   filters that are subject to the quick close?

12   A.  Five.

13   Q.  Please tell the jurors -- because I see the numbers have

14   switched, right?  We see filter 1, 4, 6, 7, and 8, correct?

15   A.  Yes.

16   Q.  And before we saw filters 1 through 7, correct?

17   A.  Yes.

18   Q.  So we have five.  So there's been an addition with

19   respect to filter 8, right?

20   A.  Yes.

21   Q.  And then there's been some removals.  Tell the jurors,

22   please, what changes did you see between these filters

23   between the prior document that we had reviewed at P-0234

24   compared to Exhibit 50711.

25   A.  A few of the filters were removed and filter 8 was

Fesch - Direct

1    added.

2    Q.  A new filter was added, filter 8.  What is filter 8?

3    A.  The alert qualifies under the peer-only review procedure

4    for an expedited review and no unusual or activity --

5    suspicious activity was identified.

6    Q.  Okay.  Now I want to focus in on the period of 2006.

7    Okay?  What was the peer-only review in the period of 2006?

8    A.  It was a review option that was available for clients

9    that were on an approved list if the alert met certain

10   qualifications.

11        THE COURT:  Counsel, we're at a point where we

12   need to begin to wrap up for our day, and I need to give our

13   jury their instructions so that they can finish their day on

14   time.

15        So we will continue with this examination tomorrow

16   morning, and I will tell our witness --

17        MS. MOMOH:  Your Honor, you mean Monday?

18        THE COURT:  Monday morning.  I apologize.  Thank

19   you for the roar.  I've lost track of the days.

20        MS. MOMOH:  Sure.

21        THE COURT:  Monday morning.  So it is as if you

22   are on the witness stand, however, for the weekend.  So you

23   are not to have any discussions about your testimony during

24   the course of the weekend.  But, otherwise, you're free to

25   have a great weekend.  And please be prepared to come back

1    to court on Monday and return and resume your testimony.

2    Okay?

3              And, Members of the Jury, I will instruct you --

4    first of all, I'll begin by instructing you to have a great

5    week and don't come here tomorrow.  Unless you want to, but

6    we won't be here.

7              And during this recess, as with every other

8    recess, you must not discuss this case with anyone, and that

9    includes other jurors, members of your family, people

10   involved in this trial or anyone else.  And do not allow

11   anyone to discuss the case with you or within your hearing.

12             As you know, only you have been chosen for this

13   important role of being jurors in this case, and only you

14   have been selected to -- and sworn to uphold the law.  No

15   one else has been chosen to do this important work.

16             And when I say you should not discuss this case,

17   you should not even discuss this case among yourselves or --

18   and not discuss among yourselves anything that you have

19   heard until all of the evidence has been heard and the case

20   has been submitted to you by me for your deliberations

21   because it may affect your final decision.

22             And, of course, if anyone tries to talk to you

23   about this case, please let me know that immediately.

24             And when I say not to discuss this case, I also

25   mean not to e-mail, not to send any kind of texts or

1    blogging or engage in any other kind of written or oral or

2    electronic communication, as I've instructed you before.

3              I don't know whether there will be accounts about

4    this in the media, but do not read any newspaper or written

5    account or watch any television account or listen to any

6    radio program about this trial.

7              And do not do any internet research or consult

8    with any other sources about this case, about the people

9    involved in the case, or the general subject matter of the

10   case.

11             As you know, you must keep an open mind.  That's

12   one that's free of outside information.  And only in this

13   way will you be able to decide the case fairly based solely

14   on the testimony, based on the evidence that's presented in

15   this courtroom, and based on my instructions on the law.

16             And if you were to decide this case on anything

17   else, it would be an injustice and it would violate your

18   oath.  So it's very important that you continue to follow

19   these instructions.

20             I want to thank you for your service and wish you

21   a great weekend, and you are excused for the day.  Thank

22   you.

23                       **IN OPEN COURT**

24                     **(JURY NOT PRESENT)**

25             THE COURT:  And for purposes of your testimony, it

1   is as if you were on the witness stand all weekend.  Now

2   only for purposes of your testimony -- I hope you have a

3   great weekend -- but please do not discuss your testimony

4   with anyone during the course of the weekend until you

5   return to the witness stand.  Thank you.

6            THE WITNESS:  Thanks.

7            THE COURT:  Okay.  And you are excused.

8            You may be seated.  I will ask counsel if there

9   are any issues that we need to take up either today or

10  before we begin on Monday?

11           THE COURT REPORTER:  Can I get your name?

12           MR. MARDER:  Sure.  This is David Marder, counsel

13  for the plaintiff.

14           Very briefly, Your Honor, I just want to report on

15  a stipulation that we reached with respect to certain

16  documents.  You may recall there was a motion in limine

17  relating to the defendant's financial condition and the

18  financial statements.

19           Mr. Gleeson can correct me if I'm wrong, but we

20  have stipulated to the admissibility of Exhibits 296, 667,

21  and 668 with the caveat that the defendant reserves and

22  preserves all of the objections that they asserted in the

23  motion in limine.  But with that caveat, those three

24  exhibits would be going into evidence, 296, 667, and 668.

25           MS. DAVIS:  Yes, Your Honor, just for the sake of

1    the record, we object, preserve our arguments in our motion

2    in limine filed at ECF 204, but we understand that was

3    decided by the Court.

4              THE COURT:  Thank you.  Very well.

5              MS. DAVIS:  Morgan Davis on behalf of BMO.  Thank

6    you.

7              MR. MARDER:  So those are received into evidence,

8    then?

9              THE COURT:  I didn't hear you.

10             MR. MARDER:  I just confirmed those were received

11   into evidence.

12             THE COURT:  That's right.  There has been an

13   objection, the objection is noted, and they are received

14   into evidence.

15             MR. MARDER:  Thank you, Your Honor.

16             THE COURT:  Anything further that needs to be

17   addressed at this time?

18             MS. MOMOH:  Not from us, Your Honor.  Thank you.

19             MR. COLLYARD:  No, Your Honor.  Thank you.

20             THE COURT:  Thank you, Counsel, and I look forward

21   to seeing you on Monday.  I hope you all have a great

22   weekend.  Thank you.

23             (Court adjourned at 5:00 p.m.)

24                        *      *      *

25

1        I certify that the foregoing is a true and correct
copy of the transcript originally filed on 12/05/2022 and
2   incorporating redactions requested by Attorney Adine S.
Momoh.
3
            Certified by:  *s/ Lori A. Simpson*
4
                    Lori A. Simpson, RMR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25