1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------
                                    )
    Douglas A. Kelley, in his       )   File No. 19-cv-1756
4   capacity as the Trustee of the  )           (WMW)
    BMO Litigation Trust,           )
5                                   )
            Plaintiff,              )   St. Paul, Minnesota
6                                   )   October 17, 2022
    vs.                             )   8:31 a.m.
7                                   )
    BMO Harris Bank N.A., as        )
8   successor to M&I Marshall and   )
    Ilsley Bank,                    )
9                                   )
            Defendant.              )
10  ------------------------------------------------------------

11

12

13          BEFORE THE HONORABLE WILHELMINA M. WRIGHT
               UNITED STATES DISTRICT COURT JUDGE
14
          *   *   *   **REDACTED TRANSCRIPT**   *   *   *
15

16          **(JURY TRIAL PROCEEDINGS - VOLUME IV)**

17

18

19

20

21

22

23

24
        Proceedings reported by certified court reporter;
25  transcript produced with computer.

```
 1     APPEARANCES:
           For the Plaintiff:          Robins Kaplan, LLP
 2                                      MICHAEL A. COLLYARD, ESQ.
                                        DAVID E. MARDER, ESQ.
 3                                      PETER C. IHRIG, ESQ.
                                        MORGIA D. HOLMES, ESQ.
 4                                      MICHAEL D. REIF, ESQ.
                                        800 LaSalle Avenue
 5                                      Suite 2800
                                        Minneapolis, Minnesota 55402
 6
                                        Anthony, Ostlund, Louwagie,
 7                                      Dressen, Boylan, P.A.
                                        JOSEPH W. ANTHONY, ESQ.
 8                                      JOSEPH R. RICHIE, ESQ.
                                        RYAN M. LAWRENCE, ESQ.
 9                                      90 South Seventh Street
                                        Suite 3600
10                                      Minneapolis, Minnesota 55402

11         For the Defendant:          Stinson, LLP
                                        KEITH S. MOHEBAN, ESQ.
12                                      ADINE S. MOMOH, ESQ.
                                        50 South Sixth Street
13                                      Suite 2600
                                        Minneapolis, Minnesota 55402
14
                                        Debevoise & Plimpton, LLP
15                                      JOHN GLEESON, ESQ.
                                        MICHAEL SCHAPER, ESQ.
16                                      SUSAN REAGAN GITTES, ESQ.
                                        MORGAN A. DAVIS, ESQ.
17                                      919 Third Avenue
                                        New York, New York 10022
18
                                        Mayer Brown, LLP
19                                      JOSHUA D. YOUNT, ESQ.
                                        71 South Wacker Drive
20                                      Chicago, Illinois 60606

21                                      Mayer Brown, LLP
                                        RICHARD A. SPEHR, ESQ.
22                                      GINA PARLOVECCHIO, ESQ.
                                        1221 Avenue of the Americas
23                                      New York, New York 10020

24         Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                        316 North Robert Street
25                                      St. Paul, Minnesota 55101
```

1                        **I N D E X**

2                                                          PAGE

3    **MARY PESCH**
         Direct Examination (Continued) by Ms. Momoh        844
4        Recross-Examination by Mr. Collyard                 887

5    **MANDY RAMLOW**
         Cross-Examination by Mr. Collyard                   952
6        Direct Examination by Ms. Parlovecchio             1036
         Recross-Examination by Mr. Collyard                1083

7
     **PATRICIA CURRIE-SMOTHERMAN**
8        Cross-Examination by Mr. Collyard                  1100

9

10

11   PLAINTIFF'S EXHIBITS                                  REC'D
         186                                                 916

12

13   DEFENDANT'S EXHIBITS                                 REC'D
         40067                                               964
14       50017                                              1079
         50718                                               870
15       50725                                               874

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(JURY PRESENT)**

1
2
3
4        THE CLERK:  The case before the Court is

5    19-cv-1756, Kelley vs. BMO Harris.

6        Counsel, please stand and note your appearances

7    for the record.

8        THE COURT:  You may be seated, Members of the

9    Jury.

10        MR. COLLYARD:  Good morning, Your Honor.  Mike

11    Collyard on behalf of the plaintiff.

12        THE COURT:  Good morning.

13        MS. MOMOH:  Good morning, Your Honor.  Adine Momoh

14    on behalf of the defendant, BMO Harris Bank.

15        THE COURT:  Thank you.  Good morning, Ms. Momoh.

16        MS. MOMOH:  Good morning.

17        THE COURT:  Counsel, are we ready to proceed?

18        MS. MOMOH:  Yes, Your Honor.

19        THE COURT:  Good morning.

20        THE WITNESS:  Good morning.

21        THE COURT:  You may take your seat.  I will simply

22    remind you that you remain under oath.

23
24
25

1                        **(Mary Pesch)**

2              **DIRECT EXAMINATION** (Continued)

3    BY MS. MOMOH:

4    Q.  Good morning, Ms. Pesch.

5              THE COURT:  Counsel, you may proceed when you are

6    ready.

7              MS. MOMOH:  Thank you, Your Honor.

8    BY MS. MOMOH:

9    Q.  Good morning and welcome back.

10   A.  Thank you.

11   Q.  Again, Adine Momoh on behalf of defendant BMO Harris

12   Bank.

13             I saw you put some binders back.  You might want

14   to have them ready again for purposes of our discussion this

15   morning.

16   A.  Okay.

17   Q.  Now, during Mr. Collyard's examination on Thursday and

18   Friday -- and remember Mr. Collyard represents the plaintiff

19   in this case -- you testified that you reviewed alerts for

20   the PCI account to which you were assigned.  Do you remember

21   that discussion?

22   A.  Yes.

23   Q.  Before September of 2008, over what period of time did

24   you review the PCI account?

25   A.  I would say any time between the period of January 2005

1    to up to September 2008 where alerts would have been

2    assigned to me that were for PCI.

3    Q.  And you testified earlier about the different

4    information that would have been available in Searchspace

5    with respect to checks compared to wires.  Do you recall

6    that?

7    A.  Yes.

8    Q.  You mentioned that checks had a memo field.  Can you

9    remind the jurors what that refers to and what information

10   might be contained in there.

11   A.  The memo field is a line on a check where the person who

12   is writing the check can add a note of their choice.

13   Oftentimes that's used to identify or give information about

14   the purpose of the check.

15   Q.  Did wire transfers have a memo field or similar

16   information available about them?

17   A.  Can you clarify if you mean in Searchspace or within the

18   wire form?

19   Q.  With respect to Searchspace.

20   A.  No, that information was not available in Searchspace.

21   Q.  Okay.  So bringing your memory back to last Friday,

22   Mr. Collyard had shown you a series of checks and there was

23   a discussion about a check involving Disney on Ice.  Do you

24   recall that?

25   A.  Yes.

1    Q.  With respect to Searchspace, I believe you had looked at

2    a check and the memo field had "Disney on Ice."  Is that

3    correct?

4    A.  Yes.

5    Q.  Would that information, that memo with respect to Disney

6    on Ice, would that have been available to analysts in

7    Searchspace?

8    A.  No.

9    Q.  You also provided an overview of the process that you

10   would follow when adjudicating alerts from the assigning of

11   an alert to the research of an alert, all the way to the

12   alert being closed or escalated for further review.  Is

13   there any reason to think that you would deviate from the

14   process that you described during this 2005 to 2008 period?

15   A.  It was my practice to refer to the guidelines and follow

16   them when adjudicating alerts.

17   Q.  So generally speaking, how would the process that you

18   described compare to the approach that you would take with

19   respect to the alerts that you would review during the 2005

20   to 2008 period?

21   A.  It would have been the same.  I would have used the

22   guidelines to -- as reference when I was working through

23   alerts.

24   Q.  Focusing on that period of time, before September of

25   2008, what sort of information did you find when reviewing

```
 1    the PCI account?

 2    A.  Sorry.  Could you repeat your question?

 3    Q.  Sure.  So I want to focus on the period before September

 4    of 2008, so before the FBI raid -- right? -- in September of

 5    2008.  When you were adjudicating alerts with respect to PCI

 6    specifically, what information did you find when researching

 7    information related to the PCI account?

 8    A.  As regards internet research, the information was all

 9    positive about all the Petters companies and Tom Petters.

10    Q.  You said that the information was all positive.  What

11    sort of information are you referring to?

12    A.  There was news articles, information on their website,

13    interviews that various media groups had done on him,

14    profiles on him and his companies.

15    Q.  I would like to show you an exhibit that has not been

16    admitted yet.

17            MS. MOMOH:  Mr. Herzka, if you could put up

18    Defendant's Exhibit DX-80020.

19            THE WITNESS:  Could you repeat the number for me?

20            MS. MOMOH:  80020.

21            Your Honor, if I may have a moment?

22            THE COURT:  You may.

23        (Mr. Gleeson and Ms. Momoh confer)

24            MS. MOMOH:  And, Your Honor, this is not in the

25    binder.  Your Honor, if we may go off the record for a
```

Pesch - Direct

```
 1      moment and may I approach the court reporter, please?

 2              THE COURT:  You may.

 3          (At sidebar)

 4              THE COURT:  Are you speaking to me or to my court

 5      reporter?

 6              MS. MOMOH:  My understanding was with respect to

 7      showing the witness exhibits that had not been offered yet,

 8      that it would still be available on her screen, but not

 9      available on this screen or on counsel table's screens.

10              THE COURT:  Are you planning to admit it into

11      evidence?

12              MS. MOMOH:  Yes, yes.  So I don't --

13              MR. COLLYARD:  I don't have a copy of her exhibit.

14      I don't know what copy she is actually talking abut.  It's

15      not in my book that she handed out.

16              MS. MOMOH:  It's not in the book, but it was

17      disclosed.  This was the --

18              THE COURT:  Okay.  Well, you need to provide a

19      copy to counsel, to the witness and it can be reviewed

20      before the witness is asked to address it.

21              MS. MOMOH:  So with this particular document, I am

22      showing her electronically so it wouldn't have been provided

23      in her binder, but it was disclosed to the other side as to

24      the exhibits that I was going to be using during her

25      examination.
```

Pesch - Direct

```
 1                 THE COURT:  So can you show it to -- I don't know
 2       what our capability is.
 3                 MS. MOMOH:  I can --
 4                 THE COURT:  Are you capable of showing it to
 5       counsel?
 6                 MS. MOMOH:  Absolutely.  But my understanding
 7       still is that she would be able to see it on her screen.
 8                 THE COURT:  She can --
 9                 MS. MOMOH:  No.  Yeah, I thought she would be able
10       to see it on her screen even though it's not admitted yet so
11       that I can go through the pages and discuss it with --
12                 THE COURT:  You've got to address -- right.  You
13       have to be able to establish foundation.
14                 MS. MOMOH:  Correct.
15                 THE COURT:  And in order to establish foundation,
16       I think --
17                 MS. MOMOH:  Absolutely.  Absolutely.
18                 THE COURT:  -- you have to -- are you trying to
19       establish foundation and that is why you are questioning her
20       as she looks at it --
21                 MS. MOMOH:  Correct.
22                 THE COURT:  -- without it being --
23                 MS. MOMOH:  Correct, absolutely.
24                 THE COURT:  -- without it being admitted?
25                 MS. MOMOH:  Absolutely.
```

Pesch - Direct

```
1              THE COURT:  Then your plan is to admit the --

2              MS. MOMOH:  Correct, yes.  I just want to make

3    sure that she has it on her screen, and I can't tell right

4    now.  So I can ask her if it's on her screen, and I can show

5    you that again.  This was one of the documents that was

6    disclosed in my e-mail to your team, and we argued it

7    actually on the first trial day that she would have been

8    called.

9              THE COURT:  And you are familiar with this

10   exhibit?

11             MR. COLLYARD:  I'm not familiar with this exhibit.

12             MS. MOMOH:  It's the Petters magazine document

13   that I had argued with Mr. Reif in the morning during one of

14   the 8:00 sessions.  I think it was Friday morning when I had

15   argued that issue.  So they made an objection on the record

16   that it was inadmissible hearsay.  So they've already seen

17   it, we have already argued it.  I'm just trying to lay the

18   proper foundation.  In order to do that, she needs to see

19   the document.  That's what I am trying to do.

20             MR. COLLYARD:  I just would like to see it.

21             MS. MOMOH:  Yeah, that's fine.

22             THE COURT:  And whenever we are addressing

23   documents with witnesses, they need to be -- counsel needs

24   to be able to see it for purposes of determining if there's

25   a valid objection for purposes --
```

Pesch - Direct

```
1                    MS. MOMOH:  Yes, absolutely, absolutely.

2                    THE COURT:  Okay.

3             (In open court)

4     BY MS. MOMOH:

5     Q.  Ms. Pesch, do you see a document on your screen?

6     A.  Yes.

7     Q.  Okay.  Thank you.  So what I'm showing you again is an

8     exhibit that has not been admitted yet.  It's Defendant's

9     Exhibit DX-80020.  I would like you to look at page 1 of

10    this document.  Do you recognize it?

11    A.  Yes.

12    Q.  How do you recognize it?

13    A.  This was something I reviewed while working alerts on

14    the case.

15    Q.  Okay.  And I want to show you another exhibit that

16    hasn't been admitted yet, Defendant's Exhibit DX-80021.  And

17    here you are looking at the first page of this document.  Do

18    you recognize this document?

19    A.  Yes.

20    Q.  How?

21    A.  Just like the last one, this was something I had

22    reviewed while reviewing the alerts.

23                   MS. MOMOH:  Your Honor, defendants offer into

24    evidence Defendant's Exhibit DX-80020 and DX-80021.

25                   MR. COLLYARD:  Your Honor, objection as to hearsay
```

1    and authenticity.

2         THE COURT:  What is the exhibit being offered for?

3         MS. MOMOH:  Your Honor, this is not hearsay.  This

4    document and the other document are not being admitted for

5    the truth of the matter that is asserted therein.  They are

6    being offered for purposes of state of mind and the impact

7    upon the reader, the reader being Ms. Pesch, as she reviewed

8    these documents as part of her research for the PCI account.

9         THE COURT:  Okay.  I am going to sustain the

10   objection.  You may question her about her state of mind and

11   perhaps there's a basis for admitting the exhibit at some

12   other time.

13        MS. MOMOH:  Your Honor, at this point may we use

14   the exhibit as a demonstrative?

15        THE COURT:  For what purpose?

16        MS. MOMOH:  For her to explain and to demonstrate

17   what she was seeing as she was reviewing the magazines.

18        MR. COLLYARD:  Your Honor, objection.  Under your

19   rule, we're not to publish any exhibits unless they're

20   admitted in evidence, and I maintain my same objections.

21        MS. MOMOH:  And, Your Honor, at this point I'm not

22   seeking to admit it.  We may try to do that at another time,

23   but for purposes of this, just as a demonstrative.

24        THE COURT:  Overruled -- I'm sorry.  The objection

25   is sustained.

Pesch - Direct

1    BY MS. MOMOH:

2    Q.  Ms. Pesch --

3              MS. MOMOH:  Your Honor, quick sidebar for a moment

4    just so I understand what I am able to ask about them?

5              THE COURT:  (Indicating).

6         **(At sidebar)**

7              MS. MOMOH:  Am I allowed to at least ask her to

8    describe what she's seen without putting a document up?

9              THE COURT:  What is the purpose of that?  I don't

10   understand your question.

11             MS. MOMOH:  Sure.

12             THE COURT:  What is the purpose of your question?

13             MS. MOMOH:  Absolutely, so -- and I will --

14             THE COURT:  Keep your voice down so that the jury

15   does not hear you.

16             MS. MOMOH:  Absolutely.

17             THE COURT:  I can hear you.

18             MS. MOMOH:  So the purpose of showing the

19   magazines, these two in particular, is that Ms. Pesch just

20   testified that when she was adjudicating alerts with respect

21   to PCI prior to the FBI raid, so this would have been 2005

22   to 2008, she had said that as part of her research, that she

23   had reviewed various newsletters, magazines, and other

24   internet; and this is an example of what she had found on

25   the internet when she was researching PCI back in the 2005

Pesch - Direct

 1    period.  And I was --

 2            THE COURT:  Why is this relevant?

 3            MS. MOMOH:  It's the impact upon the reader with

 4    respect to what was her understanding of Petters in the

 5    community at the time that she was adjudicating the alerts

 6    and what was her understanding of PCI and the various

 7    entities that Tom Petters had operated during that period of

 8    time; all of that which was considered in her review of the

 9    alerts, which is what I will get into when I ask her the

10    questions.

11            THE COURT:  So I think -- go ahead.

12            MR. COLLYARD:  Your Honor, I maintain my

13    objections.  She doesn't need a magazine from 2005 to be

14    talking about that.

15            THE COURT:  Well, she can use it to refresh her

16    recollection, but she needs to testify about what she did

17    and why she did it.  It's not about testifying about what's

18    in the magazine.

19            MS. MOMOH:  There's no doubt about that,

20    Your Honor.  Our purpose in showing the magazine is for the

21    jurors to understand and to also see what Mary Pesch herself

22    saw in 2006.  These two magazines are from 2006.  One, I

23    believe, is from fall -- or spring of 2006.  The other is

24    from winter of 2006.  Mr. Collyard had shown Ms. Pesch on

25    Thursday and Friday alerts that she had reviewed and

1    comments that she, herself, had inserted as an analyst with

2    respect to her review of the PCI account.

3           And what we're trying to establish is that she

4    also, as part of her research -- what she just testified to

5    was that she conducted internet research; and in her

6    research, she had found these PCI newsletters and magazines

7    and that had an impression upon her.

8           THE COURT:  So she can --

9           MS. MOMOH:  We want to show that --

10          THE COURT:  -- testify to all of that, but she

11   does not get to show what the newsletters say or publish the

12   newsletters --

13          MS. MOMOH:  Well, the --

14          THE COURT:  -- or the articles.

15          MS. MOMOH:  -- the newsletters, the first part is

16   a picture.  It's just a picture, and then the other pages

17   I'm going to show are pictures.  Not the content in the

18   magazine itself, it's just pictures.  Again, it's an

19   illustration.

20          So as I was saying, even if we can't admit it

21   today, I would at least like to show it as a demonstrative

22   with respect to the images that are in the magazines.

23          MR. COLLYARD:  Your Honor, this isn't even a

24   document that was produced in this case.  Those alerts that

25   we're talking about, she can go through and talk about what

 1    she did to adjudicate, review, and investigate.  She doesn't

 2    mention anything about magazines or anything like that.

 3            And there's absolutely -- there's authenticity

 4    issues.  They are pulling up a magazine that they went and

 5    found on the internet themselves, and now they are going to

 6    try to establish that Mary Pesch saw that and that somehow

 7    had an impact on her.

 8            THE COURT:  Right.  The objection is sustained.

 9    The line of questioning is improper.

10            MR. COLLYARD:  Thank you, Your Honor.

11            MS. MOMOH:  But --

12        **(In open court)**

13    BY MS. MOMOH:

14    Q.  So Ms. Pesch, we were talking about the information that

15    you had found when you were researching the PCI company, as

16    well as Tom Petters, during the 2005 to 2008 period when you

17    were adjudicating alerts, correct?

18    A.  Yes.

19    Q.  And you had mentioned that you had found newsletters and

20    magazines as part of your research, correct?

21    A.  Yes.

22    Q.  Describe for the jurors, please, what you saw with

23    respect to the magazines related to Tom Petters or PCI.

24    A.  I remember that Tom Petters was on the cover of each of

25    the magazines; and within the magazines there were articles

1    detailing things their businesses had done, their

2    accomplishments, events.  They had attended, like, trade

3    shows with pictures of their stand and involvement in those

4    events, as well as things like charitable events,

5    fundraisers, and things like that.  I remember lots of

6    pictures with business leaders and some celebrities.

7    Q.  Which celebrities do you recall seeing?

8    A.  I remember David Spade in some of the pictures.

9    Q.  Who is David Spade?

10   A.  A comedic actor.

11   Q.  Do you remember seeing any other celebrities?

12   A.  Possibly Bill Cosby, I think.  There were a number.  I

13   guess without being able to look at it, I'm not sure who

14   else.

15   Q.  And you said celebrities such as David Spade and Bill

16   Cosby.  Who were they pictured with in the magazine?

17   A.  Oftentimes with Petters and other -- maybe his family

18   members and some other business leaders.

19   Q.  "Petters" being Tom Petters?

20   A.  Yes.

21   Q.  You mentioned in your review of the magazines that you

22   would see information with respect to Tom Petters' and PCI's

23   charitable events?

24   A.  Yes.

25   Q.  Tell me more about that, please.

```
1     A.  I remember galas they -- from the pictures and what was

2     written, they appeared to be major events; very large, lots

3     of attendance.

4     Q.  So you just described what you had seen in these

5     magazines.  With the first magazine, tell me what was the

6     period of the magazine?

7     A.  I don't remember offhand.

8          MS. MOMOH:  If you can -- Mr. Herzka, again, I am

9     showing the witness an exhibit that has not been admitted.

10    If you can pull up first Exhibit DX-80020.

11    BY MS. MOMOH:

12    Q.  And, Ms. Pesch, please review it and let me know if that

13    refreshes your recollection as to the date of this magazine.

14    A.  It's dated Summer 2006.

15    Q.  Summer of 2006?

16    A.  Yes.

17    Q.  Okay.

18          MS. MOMOH:  Mr. Herzka --

19    BY MS. MOMOH:

20    Q.  Again, I'm going to show you an exhibit that has not

21    been admitted.  This is DX-80021.  If you can review that,

22    does that refresh your recollection as to the date of this

23    magazine?

24    A.  That says Winter 2006.

25    Q.  Winter of 2006?
```

Pesch - Direct

1    A.   Yes.

2    Q.   Thank you.

3              When would you have reviewed these magazines?

4    A.   Any time after they were published that I was working

5    alerts.

6    Q.   What year, then?

7    A.   2006 and beyond.

8    Q.   What impact did your review of the information that you

9    just discussed, the celebrities that were pictured with Tom

10   Petters, the charitable events and givings that Tom Petters,

11   PCI had identified in the magazine, what impact did all of

12   this have on you as you were reviewing the alerts with

13   respect to the PCI account during that 2005 to 2008 period?

14   A.   This would have -- this type of material made me feel

15   that it was a large family of businesses.  They were

16   involved in major business activities and were well

17   respected in the community by business leaders and people in

18   the community, and he was very involved and helped out a lot

19   of people and groups.

20   Q.   My apologies.  You may finish.

21   A.   Sorry.  I was finished.

22   Q.   Thank you.  I just want to focus on the first part of

23   your response.  You said, "This type of material made me

24   feel that it was a large family of businesses."  Who is the

25   "it" that you were referring to?

Pesch - Direct

1    A.  The companies owned by Tom Petters.

2    Q.  Would that include PCI?

3    A.  Yes.

4    Q.  On Friday plaintiff's counsel, Mr. Collyard, asked you

5    several questions about Exhibit P-0234 and P-0398, the

6    additional guidelines for Searchspace.  Do you recall those

7    questions?

8    A.  I recall discussing it.  I don't remember the specific

9    questions.

10           MS. MOMOH:  Mr. Herzka, if you could pull up

11   what's been admitted as P-0398.  If you could go to page 5.

12   BY MS. MOMOH:

13   Q.  Ms. Pesch, Mr. Collyard showed you page 5 of P-0398

14   where it says, "The following points should be covered in

15   the comments section of Searchspace when closing an alert to

16   expected or explainable activity."  Do you remember that?

17   A.  Yes.

18   Q.  I just want to draw your attention here to the screen

19   and the information that follows the sentence that I just

20   read.  Mr. Collyard referred to the information here on page

21   5 as, quote, checklists, end quote.  Do you remember that?

22   A.  Yes.

23   Q.  Now, you replied multiple times that the guidelines he

24   was showing you here on page 5 were lists.  Do you recall

25   that testimony?

1    A.  Yes.

2              MR. COLLYARD:  Objection, argumentative and

3    leading.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes, I remember that.

6    BY MS. MOMOH:

7    Q.  Please explain to the jury what you meant when you said

8    they were lists as opposed to checklists.

9    A.  Because every alert is different, you can't have a list

10   that has everything that you should do for each alert.  It

11   wouldn't all be the same.  You would do what applies for the

12   alert in question.

13   Q.  Remember our discussion on Friday about closing states,

14   filters, and comments in Searchspace?

15   A.  Sorry, can you repeat your question?

16   Q.  Sure.  Do you remember our discussion also -- before I

17   was talking to you about questions that Mr. Collyard had

18   asked you, but now I want to talk about our discussion that

19   we had on Friday with respect to closing states, filters,

20   and comments in Searchspace.

21             MS. MOMOH:  Mr. Herzka, if you can show what's

22   been admitted as DX-50711.

23   BY MS. MOMOH:

24   Q.  And you remember that this is another variation of the

25   additional guidelines and analysis and investigation of

Pesch - Direct

```
1   alerts in Searchspace, correct?

2   A.  Yes.

3         MS. MOMOH:  Mr. Herzka, if you could go to page 6,

4   please, of this document.

5   BY MS. MOMOH:

6   Q.  Ms. Pesch, if you can read the paragraph on page 6 out

7   loud that begins, "The focus for closed to expected alerts."

8   A.  "The focus for closed to expected alerts will be on

9   explaining the reason for the alert.  Analysts will be

10  required to look at everything, but only document what

11  alerted and the source or use of funds.  Of course, if other

12  unusual activity is identified, that should be commented on

13  as well."

14  Q.  I just want to focus on the second sentence here in this

15  paragraph, "Analysts will be required to look at everything,

16  but only document what alerted and the source or use of

17  funds."  What does that second sentence that I just read

18  mean?

19  A.  It means we had to look at all the transaction activity

20  in the alert but only comment on why the alert was created

21  and the source or use of funds depending on the alert

22  reason, the creation reason.

23        MS. MOMOH:  Mr. Herzka, if you can highlight the

24  example at the bottom where it says, "Wire Example."

25  BY MS. MOMOH:
```

Pesch - Direct

1    Q.  Plaintiff's counsel asked you a series of questions with

2    respect to various comments that you and the other AML

3    analysts wrote during the 2005 to 2008 period.  Do you see

4    the example on page 6 here that says, "Wire Example"?

5    A.  Yes.

6    Q.  I want to draw your attention to the words

7    "documentation" and "comments."  Do you see "comments" in

8    the third row here towards the end?

9            Based on your experience and training as an AML

10   analyst, what is your understanding of what sort of comments

11   would have been required for an analyst with respect to the

12   closed to expected expedited review and no longer under the

13   manager review?

14   A.  That you would comment on the reason for the alert and

15   what the funds were used for in this example.

16   Q.  And can you read the last sentence here in this example

17   out loud, please.

18   A.  "Other activity must be reviewed for anything unusual

19   but comments in Searchspace only need to state something

20   like, 'other activity appears consistent and expected for a

21   personal account.'"

22   Q.  That last sentence, what does that mean to you?

23   A.  That we did not need to comment on other activity in the

24   account other than to apply a general comment stating that

25   it didn't appear suspicious if that was the conclusion we

1    reached after reviewing.

2    Q.  So to be clear, even if applying the filters during the

3    2005 to 2008 period meant that an alert would be subjected

4    to the closed to expected state, would the transactional

5    activity that alerted still have been reviewed?

6    A.  Can you repeat your question?

7    Q.  Sure.  So even if applying the filters during the 2005

8    to 2008 period meant that an alert would be subjected to the

9    closed to expected state, would the transactional activity

10   that alerted still have been reviewed by an analyst?

11   A.  Yes.

12   Q.  So same period of time, even if applying the filters

13   during the 2005 to 2008 period meant that an alert would be

14   subjected to the quick closed state, would the transactional

15   activity that alerted still have been reviewed by an

16   analyst?

17   A.  Can you repeat your question?

18   Q.  Sure.  So I am just asking a different question.  Before

19   I had asked you about review of transactional activity that

20   would have been subjected to the closed to expected state.

21   So let's switch it.  Let's say we're talking about

22   transactional activity that would be subjected to the quick

23   closed state because of the applicable filters that applied

24   during the 2005 to 2008 period.  My question is:  Would the

25   transactional activity that alerted in the first place still

Pesch - Direct

1    have been reviewed by an analyst?

2    A.  Yes.

3    Q.  Okay.  Let's switch gears.  When reviewing alerts in

4    2005 to 2008, would you review alerts for higher-risk

5    customers?

6    A.  Yes.

7    Q.  When you were an analyst during the 2005 to 2008 period,

8    was it within your job responsibility as an AML analyst to

9    identify which customers constituted, quote, unquote,

10   higher-risk businesses to M&I?

11   A.  Yes.

12   Q.  It would have been within your job responsibilities to

13   designate businesses as high risk?

14   A.  Sorry.  I misunderstood your question.  No, I did not

15   add customers to the high-risk customer list myself.

16   Q.  You said that you would not make the determination as to

17   customers to be added to the high-risk customer list.  Who

18   would have made that determination then at M&I?

19   A.  That list was managed by, and I don't remember the exact

20   name of the group, but it was something like the AML

21   compliance team or compliance -- AML Compliance.

22            THE COURT:  I didn't hear the last part of your

23   response.  Would you just say that again.

24            THE WITNESS:  Oh, I don't remember the exact name

25   of the group, but it was something like AML Compliance.

1    BY MS. MOMOH:

2    Q.   To be clear, though, that would not have been -- okay,

3    let me ask it this way:   Would the AML Compliance that you

4    just mentioned, would that have been part of the AML Analyst

5    Monitoring Group?

6    A.   No, it wasn't part of the Transaction Monitoring Group.

7    Q.   Did you have a general understanding as to which

8    customers would have been designated as higher risk during

9    the 2005 to 2008 period?

10   A.   Can you clarify if you mean if they were in a

11   higher-risk industry type or if they were actually

12   identified as a higher-risk customer?

13   Q.   The former.   So with respect to general business type,

14   did you have a general understanding as to which customers

15   could have been designated as higher risk during the 2005 to

16   2008 period?

17   A.   Yes.

18   Q.   How would you describe the sorts of customers that were

19   designated as higher risk during the 2005 to 2008 period?

20   A.   They would have operated in an industry type that was

21   designated as higher risk.

22   Q.   They would have operated in an industry type that was

23   designated a higher risk.

24        Let's say with respect to business type, then,

25   what sort of -- what's an example of a business -- and I'm

Pesch - Direct

1    not asking for a specific bank customer, but just generally

2    an example.  What would be an example of a bank customer

3    that would be deemed higher risk because of its business

4    type?

5    A.  A cash-intensive restaurant -- excuse me, a

6    cash-intensive business like a restaurant.

7    Q.  And same question, but this time with respect to

8    geography.  What would be an example of a customer of the

9    bank that would be deemed higher risk because of its

10   geography?

11   A.  That could be a company that's registered in or operates

12   in a foreign country.

13   Q.  What countries?  Could you give an example?

14   A.  M&I had a high-risk country list, so a country listed on

15   that list.

16   Q.  Based on your understanding of higher-risk businesses

17   during the 2005 to 2008 period, would PCI have been

18   considered a higher-risk business?

19   A.  No.

20   Q.  Why do you say that?

21   A.  It didn't operate in a higher-risk industry type.  It

22   didn't -- it wasn't in a high-risk jurisdiction.  I don't

23   remember them having high-risk products either.

24   Q.  Recall that on Friday during our discussion you

25   testified that September of 2008 was memorable to you not

1    only because you were married in that month and you were on

2    your honeymoon, but because when you returned to work from

3    your honeymoon, you were greeted by a large stack of

4    documents waiting for you.  Do you remember that discussion?

5    A.  Yes.

6    Q.  Remind the jurors as to what those documents were that

7    were waiting for you.

8    A.  It was a folder of printouts that included news articles

9    that had come out in the last week, as well as printouts

10   from CIS, the Customer Information System at M&I.

11   Q.  Ms. Pesch, I'm going to show you an exhibit that has not

12   been admitted yet.  It is exhibit -- Defendant's Exhibit

13   DX-50718.  You can review the document and let me know when

14   you've finished.

15        (Witness reviews document)

16   A.  Okay.

17   Q.  What are we looking at?

18   A.  It's a series of e-mails that I received from Shandra

19   Roehrig.

20   Q.  Who is Shandra Roehrig?

21   A.  She was the lead analyst, although it looks like her

22   exact title at that time was AML assistant manager.

23   Q.  What's the date of this e-mail communication?

24   A.  They are both dated September 26, 2008.

25   Q.  And you said this e-mail was from Shandra Roehrig.  Who

Pesch - Direct

1      does she send this e-mail to?

2               Let me rephrase.  This is an exhibit -- is this an

3      e-mail that Shandra Roehrig had sent to you?

4      A.  Yes.

5      Q.  Prior to today, did you recognize this document?

6      A.  I would have, yes.

7               MS. MOMOH:  Your Honor, defendants offer into

8      evidence Exhibit DX-50718.

9               MR. COLLYARD:  No objection, Your Honor.

10              THE COURT:  DX-50718 is admitted in evidence.

11     BY MS. MOMOH:

12     Q.  Ms. Pesch, if you can turn to page 2, please.

13     A.  Okay.

14     Q.  And I would like you to read the third paragraph out

15     loud, the third paragraph that begins, "I spoke with

16     Kelley."

17     A.  "I spoke with Kelley and Peter, and they agreed we would

18     like to revisit the account for review.  I realize we have

19     already closed alerts covering activity for the past three

20     months, but we would like to take a second look at the wire

21     activity, specifically looking for any unusual or

22     identifiable patterns of payees or flow of funds.  Please

23     begin with the most recent 3 months for your review, looking

24     historically to see if any patterns you identify have been

25     ongoing.  Feel free to expand the time period if you feel

Pesch - Direct

1     it's necessary."

2     Q.  So the last two sentences, "Please begin with the most

3     recent 3 months for your review, looking historically to see

4     if any patterns you identify have been ongoing.  Feel free

5     to expand the time period if you feel it is necessary."  Who

6     is the Kelley that is referred to here?

7     A.  Kelley Maltsch.

8     Q.  What was her role at this time in September of 2008?

9     A.  I don't remember her exact title at the time, but she

10    managed that AML Compliance Group.

11    Q.  Who is Peter that's identified here?

12    A.  Peter Janczak.

13    Q.  What was his role at this time in September of 2008?

14    A.  Compliance officer.

15    Q.  Now, on Friday, Mr. Collyard, counsel for plaintiff,

16    showed you a case that you wrote with respect to the PCI

17    account following the FBI raid in 2008.  Take the jurors

18    back to this moment in 2008.  You got this e-mail.  You

19    received this e-mail from Shandra Roehrig.  So take us back

20    to that moment.  What were you being asked to do?

21    A.  I was being asked to review the subpoena and the news

22    articles that Shandy had printed out and to look back at

23    that transaction activity in light of the new information.

24    Q.  In light of the new information.  Which information?

25    A.  From the FBI raid and that was contained in the subpoena

Pesch - Direct

```
1    and news articles.

2    Q.  Why do you say "new"?

3    A.  Because that information was not available before that

4    time.

5    Q.  What did you ultimately do?

6    A.  I reviewed the case; and based on what I read in the

7    articles and what I saw in the transaction activity, I

8    quickly escalated it to a case and talked to Shandy and

9    expanded the review period.

10   Q.  By "Shandy," you mean Shandra Roehrig?

11   A.  Yes.

12            MS. MOMOH:  Mr. Herzka, if you could pull up

13   what's been admitted as Plaintiff's Exhibit P-249.

14   Mr. Herzka, if you could go to the second page of this

15   document, please.  If I could have a moment.

16            THE COURT:  You may.

17       (Pause)

18   BY MS. MOMOH:

19   Q.  I am going to show you a different exhibit.  I am going

20   to show you an exhibit that has not been admitted into

21   evidence.  This is in defendant's binder.  It is DX-50725.

22   And review this document, please, before we go on, and let

23   me know when you've had a chance to look at it.

24       (Witness reviews document)

25   A.  Okay.
```

 1    Q.  I want to draw your attention to the middle of this

 2    document.  Do you -- you see that there's -- it's an

 3    e-mail -- right? -- and then there's an e-mail within it; is

 4    that correct?

 5    A.  Yes.

 6    Q.  With respect to the e-mail within the chain, what is

 7    this?  What is this that we're looking at?

 8    A.  Shandy was forwarding an e-mail that I had sent her, and

 9    the e-mail from myself lists a few links --

10    Q.  Sorry.  Before we talk about the document, I just want

11    to draw your attention to the e-mail chain and the e-mail

12    that you had forwarded, correct?

13    A.  Yes.

14    Q.  Okay.  And what's the date of the e-mail that you had

15    sent to Shandra Roehrig?

16    A.  September 29th, 2008.

17    Q.  And, again, Shandra Roehrig, that's the same individual

18    that we had talked about earlier?

19    A.  Yes.

20    Q.  Do you recognize this e-mail?

21    A.  Yes.

22    Q.  How do you recognize it?

23    A.  I remember sending it.

24            MS. MOMOH:  Your Honor, defendants offer into

25    evidence Exhibit DX-50725.

1          MR. COLLYARD:  No objection, Your Honor.

2          THE COURT:  DX-50725?

3          MS. MOMOH:  50725.

4          THE COURT:  Thank you.  DX-50725 is admitted in

5     evidence.

6     BY MS. MOMOH:

7     Q.  I want to draw your attention to the first paragraph of

8     this e-mail, and it reads, "Here are a few articles Mary has

9     found on the Petters case."  Do you see that?

10    A.  Yes.

11    Q.  And then if you could read the second paragraph, please.

12    A.  "The articles mention certain entities within the

13    Petters family of companies:  Enchanted Family Buying

14    Company, Nationwide International Resources, and Metro Gem

15    as shell companies in which he was using to lure investors.

16    In my brief review of the account for wire activity last

17    spring, I saw wire transfers involving all three.  Metro Gem

18    is the company the article mentions as having CEO Frank

19    Vennes who had a money laundering conviction in 1987."

20    Q.  And to be clear, the language that you were reading

21    here, that's not your language, correct?

22    A.  Correct.

23    Q.  Who wrote that?

24    A.  Shandy.

25    Q.  And if you could look below, what is it that we're

Pesch - Direct

1    looking at here?

2    A.  The e-mail that I sent to Shandy.

3    Q.  You identified in your e-mail to Shandra Roehrig three

4    articles, including an article from the *Star Tribune* and an

5    article from Minnesota Public Radio, correct?

6    A.  Yes.

7    Q.  And in your e-mail, what's the body -- besides the links

8    that are provided here, what does the body of your e-mail

9    say?

10   A.  "Articles describing Tom Petters and Petters Company,

11   Inc. fraud case."

12   Q.  To be clear, were these articles that you identified in

13   your e-mail here at Exhibit 50725 available before the PCI

14   Ponzi scheme being uncovered in September of 2008?

15   A.  No.

16   Q.  How did you conduct your research?

17   A.  I did a lot of internet searches where I was searching

18   the name of Tom Petters, his businesses, and individuals or

19   companies that I found identified in either the subpoena or

20   the materials Shandy had provided to me.

21   Q.  And to be clear, the research that we're talking about

22   now is the research that you conducted after the FBI raid of

23   PCI in September of 2008, correct?

24   A.  Yes.

25   Q.  What did you find during this research?

1    A.  A lot of information detailing the fraud scheme.

2    Q.  Such as what?

3    A.  The information that law enforcement had as a result of

4    Deanna Coleman's cooperation.

5    Q.  You said "Deanna Coleman."  Based on what you know, who

6    is Deanna Coleman?

7    A.  She was an executive with the Petters companies.

8    Q.  How would you compare the nature of the information that

9    you saw as part of your research for PCI in 2006 with the

10   information that you saw in 2008 after the FBI raid of PCI?

11   A.  Can you repeat that?

12   Q.  Sure.  So I would like you to compare two different

13   periods of time -- okay? -- with respect to the research

14   that you did on the PCI account.  How would you compare the

15   information that you found and read in 2006 related to the

16   PCI account to the information you saw and read in 2008

17   after the FBI raid?

18   A.  It was very different.

19   Q.  How so?

20   A.  Before the raid, the information was all positive.  It

21   focused on Tom Petters' entrepreneurial skills and how he

22   was building this empire of successful businesses and they

23   were growing.  And, afterwards, it was all the very

24   extensive negative information about the fraud.

25   Q.  After you completed your research pursuant to Shandy

Pesch - Direct

1    Roehrig's instructions, what did you do next?

2    A.  I did a lot of research.

3    Q.  What do you mean?

4    A.  As I -- it looks like I started with these articles, and

5    as I was reading more, I was researching more of the parties

6    that I found and trying to connect them with what was being

7    described in the articles trying to see if I could verify

8    what was being said in the articles and comparing it to the

9    transaction activity.

10   Q.  When you completed the adjudication of your assigned

11   alert during this post-FBI-raid period, what did you

12   ultimately conclude?

13   A.  That the activity looked suspicious and needed to be

14   escalated.

15   Q.  "That the activity looked suspicious," what do you mean?

16   A.  The activity in the account appeared similar to what was

17   being described for the fraud.

18   Q.  Just so that we can understand the terminology here,

19   you -- as an AML analyst, you understand the terminology of

20   "suspicious activity"?

21   A.  Yes.

22   Q.  What is suspicious activity?

23   A.  Activity that doesn't appear to have a lawful purpose.

24   Q.  And so when you said that the activity that you were

25   reviewing after the FBI raid looked suspicious, I will ask

Pesch - Direct

1    the question again, what do you mean?

2    A.  I'm sorry.  Can you repeat that one more time?

3    Q.  Sure.  You had used the word "suspicious" before.  You

4    just defined "suspicious activity" with respect to your role

5    as an AML analyst.  So with respect to the activity that you

6    had concluded was suspicious after the FBI raid of 2008,

7    what do you mean?

8    A.  That that activity should be escalated to a case.

9             MS. MOMOH:  Mr. Herzka, if you could put up what's

10   been admitted as Plaintiff's Exhibit P-333.

11   BY MS. MOMOH:

12   Q.  Ms. Pesch, I am showing you what Mr. Collyard,

13   plaintiff's counsel, had shown you last week, the case that

14   you prepared with respect to the PCI account in October of

15   2008.

16            After you reached your conclusion that there was

17   suspicious activity in the PCI account during the time

18   period you were asked to review, then what did you do?

19   A.  I'm sorry.  Can you repeat that one more time?

20   Q.  Sure.  So we know that you prepared a case, correct?

21   A.  Yes.

22   Q.  When did you prepare this case?

23   A.  After I reviewed the activity in the alert, I determined

24   it looked suspicious.  I escalated it to a case.  I reviewed

25   the activity in the case right after that.

Pesch - Direct

1   Q.  Do you recall how many pages were this case?

2   A.  It was a very large case.  I don't know the exact

3   number, but we had case folders, and that was completely

4   full to the point where I couldn't put any more in there;

5   and I had an expandable folder that was also almost entirely

6   full with supporting documentation (indicating).

7           MS. MOMOH:  Let the record reflect that Ms. Pesch

8   was using her hands to describe the volume of the documents

9   that were in the folder of materials that she had collected

10  at the time.

11  BY MS. MOMOH:

12  Q.  Ms. Pesch, please walk the jurors through the steps that

13  you took to prepare the October 2008 case.

14  A.  In addition to the research -- the internet research

15  that I talked about where I did a lot of reading and

16  searching for news reports detailing the fraud and some

17  articles focused more specifically on certain parties, so I

18  tried to get as many of those as I could covering parties

19  that I saw within the transaction activity.

20          And then I exported the wires from Searchspace and

21  started organizing them to review and get totals per party

22  or per other parties on the wires, so other originators or

23  beneficiaries.

24          Got the totals for those, and then went and tried

25  to supplement that information with -- or document that

1    information with what I had found in the articles about the

2    different parties, and printing out all of my research to

3    add as supporting evidence.

4    Q.  I want to show you a document that you were shown on

5    Friday.

6              MS. MOMOH:  Mr. Herzka, if we could compare page

7    21 of Plaintiff's Exhibit 333 to Plaintiff's Exhibit P-0411.

8    BY MS. MOMOH:

9    Q.  Ms. Pesch, do you see these two documents?

10   A.  Yes.

11   Q.  Now, you were shown these on Friday.  They were zoomed

12   in a little bit more so you could see the language on the

13   left a little bit clearer, correct?

14   A.  Yes.

15   Q.  What are we looking at, generally speaking?

16   A.  A document that I created as a visual aid to try to show

17   the flow of funds within this case.

18   Q.  Explain to the jurors the distinction.  It looks like

19   the document on the left that's at page 21 of Plaintiff's

20   Exhibit P-333 has text, handwritten text, compared to the

21   same diagram that you can see in Plaintiff's Exhibit 411 at

22   page 1 without the handwritten text.  What's the difference?

23   A.  So they're different drafts of the same visual aid where

24   I was trying to display the parties involved and group them

25   into categories with arrows that show the direction of the

Pesch - Direct

1      funds.

2      Q.  What steps did you take to put the diagrams together?

3      A.  First I had to try to find a program -- well, actually,

4      first I was writing it out trying to figure out the best way

5      to make sense of it myself.  And then after a few drafts,

6      then I was trying to find a program that I could display

7      this in.  And ultimately I ended up on PowerPoint because I

8      knew how to add boxes and shapes and arrows.

9             And then after -- I used my research of all of the

10     wire data and what I had found in my research and tried to

11     group the parties into different categories, like parties

12     that were identified as investors or victims, parties that

13     were included in the fraud, parties that were part of the

14     Petters companies, and then a group where I wasn't quite

15     sure if they were involved or victims.

16     Q.  How long did it take you to put these diagrams together?

17     A.  This took a couple days.

18     Q.  Please explain to the jurors what these documents show.

19     A.  It shows the major parties involved for the majority of

20     the fund transfers for this case.

21     Q.  Who was the audience for these diagrams?  What was the

22     purpose of you preparing this?

23     A.  I realized as I was writing the case that it was

24     extremely data heavy and overwhelming, and for -- the visual

25     aid helped me understand it, and so I created a more

Pesch - Direct

```
 1    polished version to include in my presentation to the SAR

 2    Review Committee.

 3    Q.   What's the SAR Review Committee?

 4    A.   It's the committee that we would present cases at.

 5    Q.   On Friday Mr. Collyard asked you questions about your

 6    creation of flowcharts when reviewing some alerts during the

 7    period of 2005 to 2008.  Do you recall those questions?

 8    A.   I recall that he asked me questions but not the specific

 9    questions.

10    Q.   Now, Mr. Collyard did not ask you about the

11    circumstances under which you would create those flowcharts.

12    Please explain to the jury the circumstances of when you

13    would take the step of creating a flowchart.

14    A.   A flowchart is only something I would do for complex

15    cases where it was hard to visualize what was going on in

16    the activity without a visual aid.

17    Q.   At what step would you be creating the flowchart?

18    A.   As part of the case.

19    Q.   As part of the case.  So, again, we talked about

20    adjudication.  So would this have been once the adjudication

21    of the alert had completed and then the decision would have

22    been to escalate the alert to a case?

23    A.   Yes.

24    Q.   Were you able to do this sort of flowchart analysis for

25    every alert that you reviewed?
```

Pesch - Direct

1    A.  No.

2    Q.  Why not?

3    A.  That would have taken too long, and we were supposed to

4    make risk-based decisions.

5    Q.  What do you mean?

6    A.  Risk-based decisions.

7    Q.  Same question.  What do you mean?

8    A.  That the amount of research and work we would do on a

9    case would be related to how suspicious it was.

10   Q.  So we talked about how long it took you to prepare the

11   diagram that we're looking at.  How long did it take you to

12   prepare the entire case write-up?

13   A.  A week.

14   Q.  Looking at the diagram again, Plaintiff's Exhibit 333 at

15   page 21 and again at Plaintiff's Exhibit 411 at page 1,

16   could you have prepared the diagram without having the

17   information about the Ponzi scheme that became public in

18   late September 2008?

19   A.  No.

20   Q.  After you completed your case write-up, tell the jurors

21   what steps you took next.

22   A.  I sent it for manager review and spoke to Bernita about

23   the case.

24   Q.  What's manager review?

25   A.  That's the step where any case, before it would go to

Pesch - Direct

```
1    the SAR Review Committee, would be reviewed by the manager.

2    Q.  How did the SARs Committee react to your case report?

3    To be clear, I'm not asking you what anyone said.  I'm

4    asking you how did the SAR Committee react to your case

5    report.

6    A.  So I read my case and discussed the visual aids that I

7    had made, and there was complete silence, just shock.

8    Q.  What do you mean that there was shock?

9    A.  They were shocked at how complex and large the activity

10   within the case was.

11   Q.  What information do you know now that you did not know

12   when you were previously adjudicating the PCI alerts before

13   the FBI raid in 2008?

14   A.  All of the information that came out about the fraud.

15   Q.  The PCI fraud?

16   A.  Yes.

17   Q.  Based on the information that was available to you as an

18   AML analyst between 2005 and 2008 before the FBI raid, would

19   the outcome of the alert review had been any different?

20   A.  Can you repeat that?

21   Q.  Sure.  So based on the information that was available to

22   you as an analyst before the FBI raid in September of 2008,

23   would the outcome of the alert review of transactional

24   activity related to the PCI account had been any different?

25             MR. COLLYARD:  Objection.
```

```
 1                    THE WITNESS:  No.

 2                    MR. COLLYARD:  Speculative.

 3                    THE COURT:  Overruled.  She may answer if she can.

 4                    THE WITNESS:  No.

 5      BY MS. MOMOH:

 6      Q.  Why do you say this?

 7      A.  Because what made it suspicious was the information

 8      about the fraud.

 9      Q.  Because what made it suspicious was the information

10      about the fraud.  Because it made it suspicious.  What's the

11      "it"?

12      A.  The transaction activity.

13      Q.  Ms. Pesch, to your knowledge, was anyone in the AML

14      Monitoring Group ever arrested or charged with involvement

15      in the PCI Ponzi scheme?

16      A.  No.

17      Q.  And, again, you were a member of the AML Monitoring

18      Group at the time, right?

19      A.  Yes.

20      Q.  To your knowledge, was anyone in the AML Monitoring

21      Group at M&I or BMO involved in the PCI Ponzi scheme?

22      A.  No.

23      Q.  To your knowledge, did anyone in the AML Monitoring

24      Group know there was a Ponzi scheme happening before it was

25      discovered by the authorities in 2008?
```

Pesch - Direct

```
 1                MR. COLLYARD:  Objection, speculation, Your Honor.
 2                THE WITNESS:  No.
 3                THE COURT:  Overruled.  You may reframe the
 4      question.  I'm sorry.  Sustained.  You may reframe the
 5      question.
 6      BY MS. MOMOH:
 7      Q.  Ms. Pesch, are you aware of anyone at M&I or BMO being
 8      involved in the PCI Ponzi scheme?
 9      A.  No.
10      Q.  To your knowledge, are you aware of anyone at M&I or BMO
11      knowing that there was a PCI Ponzi scheme happening before
12      it was discovered by the authorities in 2008?
13      A.  No.
14                MR. COLLYARD:  Objection, speculation, Your Honor.
15                THE COURT:  Overruled.  She is testifying about
16      what her knowledge is.
17                MS. MOMOH:  If I may repeat the question,
18      Your Honor, and then the answer?
19                THE COURT:  I don't think there's a need for
20      repetition --
21                MS. MOMOH:  Sure.
22                THE COURT:  -- so, no.
23      BY MS. MOMOH:
24      Q.  Ms. Pesch, what is your answer to my question as to
25      whether, based on your knowledge, did anyone at M&I or BMO
```

Pesch - Direct

```
 1    know that there was a PCI Ponzi scheme happening before it
 2    was discovered by the authorities in 2008?
 3    A.  No.
 4    Q.  What, if anything, did you ever receive of monetary
 5    value from the PCI Ponzi scheme?
 6    A.  Nothing.
 7    Q.  Remember when Mr. Collyard showed you a group of checks
 8    on Friday?
 9    A.  Yes.
10    Q.  Did Mr. Collyard show you any checks or wire transfers
11    that went from PCI to M&I?
12    A.  No.
13    Q.  Did Mr. Collyard show you any checks or wires that went
14    from PCI to any M&I or BMO employee?
15    A.  No.
16              MS. MOMOH:  Your Honor, I have no further
17    questions for the witness at this time.
18              THE COURT:  Are there any further questions for
19    this witness?
20              MR. COLLYARD:  Yes, Your Honor.
21                       RECROSS-EXAMINATION
22    BY MR. COLLYARD:
23    Q.  Good morning, Ms. Pesch.
24    A.  Good morning.
25    Q.  I welcome you back too.
```

Pesch - Recross

1    A.  Thank you.

2    Q.  Just talk a little bit about the analysis that you did

3    after Tom Petters was arrested.  You were just talking with

4    your counsel about it.

5            Do I understand this correctly that you based your

6    information as to whether or not the activity was suspicious

7    on the fact, for example, that Nationwide and Enchanted were

8    wholesalers who were supposedly selling fake products to

9    Petters Company, Inc.?

10   A.  Can you repeat your question, please.

11   Q.  Yeah.  Was one of the reasons why you concluded that the

12   activity was suspicious when you did your analysis after Tom

13   Petters was arrested the fact that Nationwide and Enchanted,

14   the two wholesalers, were supposedly selling Tom Petters --

15   or Tom Petters was supposedly buying TVs, for example, from

16   those two wholesalers and those were phony transactions?

17   A.  That was a part of the information -- the new

18   information that we found.

19   Q.  And the reason why also you concluded that the activity

20   was suspicious was because it had been revealed to the world

21   that there was a Ponzi scheme; is that right?

22   A.  There -- sorry, can you repeat that.

23   Q.  Yes.  Was another reason why you concluded that that

24   activity was suspicious because it had been revealed to the

25   world that there was a Ponzi scheme and you had seen that in

```
1     articles and news media coverage; is that right?

2     A.  That was part of it, yes.

3     Q.  The transaction data that you looked at when you looked

4     at the transaction data from January of 2008 up through

5     August of 2008, that data didn't change, did it?

6     A.  No, it did not.

7     Q.  All of that data was exactly the same, correct?

8     A.  All the transaction data was the same.

9     Q.  So your analysis was based on the same exact transaction

10    data that M&I once concluded was not suspicious, correct?

11    A.  That was part of the analysis.

12    Q.  And you said that you presented this to the SAR

13    Committee and they were just shocked over how big it was and

14    the volume of it, right?

15    A.  How complex it was.

16    Q.  I'm talking about the data.  Were they shocked over how

17    big the data was?

18    A.  They were shocked over how complex it was.

19    Q.  How complex the scheme was?

20    A.  Yes.

21    Q.  Okay.  Were they shocked at how big the data was?

22    A.  That's not how I remember it.

23    Q.  Because you had access to all the data, right?

24    A.  I had access to the transaction data.

25    Q.  Is there a difference between the data and the
```

Pesch - Recross

1    transaction data?

2    A.  The information in the articles and the subpoena is

3    different than the transaction data, yes.

4    Q.  I understand.  Put what the world found out and the

5    media aside.  M&I Bank, BMO Bank now, had access to all of

6    the billions of dollars going in and out of that account,

7    right?

8    A.  We had access to the transaction data, yes.

9    Q.  What was the committee's comment when they looked at the

10   data and learned that billions and billions and billions of

11   dollars were going in and out of the account?

12   A.  I don't remember specific comments on that.

13   Q.  Other than the fact that there was a Ponzi scheme

14   revealed to the world -- okay? -- was there anything else

15   that made you conclude that that activity that you could see

16   every single day was suspicious?

17   A.  There was a lot of information about the parties

18   involved and how they interacted with each other to commit

19   the fraud that was not available before.

20   Q.  I'm asking you:  Other than the information that was

21   revealed to the world about the Ponzi scheme, was there

22   anything else that you used to conclude that that activity

23   that you could see every single day for the billions of

24   dollars going in and out was suspicious?

25   A.  I feel like I remember that prior to the raid -- or the

1    raid and the new information coming out, like I said, all

2    the information that we were finding online was positive;

3    and after that, in addition to the information about the

4    fraud, there was additional information that was brought to

5    light about other negative things in Tom Petters' past or

6    his business associates' past.

7    Q.  So you made your conclusions based on what you learned

8    in the media about what was happening with the fraud, not on

9    the transaction data that was in front of you; is that what

10   you're saying?

11   A.  We made our decision that it was suspicious based on the

12   new information when we used that to look at -- combined

13   with the transaction activity.

14   Q.  And one of the pieces of information was who Nationwide

15   and Enchanted were and what they were doing, correct?

16   A.  That was included in the information.

17   Q.  And when you were back looking at that transaction data,

18   at any time from 2005 through 2008, you could have figured

19   out and known who Nationwide and Enchanted were and what

20   they were doing, correct?

21            MS. MOMOH:  Objection, Your Honor, argumentative

22   and speculative.

23            THE COURT:  Sustained.

24   BY MR. COLLYARD:

25   Q.  Let me back up, then.  During 2005 through 2008, could

 1    you have researched Nationwide?

 2    A.  Yes.

 3    Q.  Could you have researched Enchanted?

 4    A.  Yes.

 5    Q.  And could you have asked the business bankers, for

 6    example, any question about why billions of dollars were

 7    coming in from Nationwide, for example?

 8    A.  Yes.

 9    Q.  And could you have asked the business bankers any

10    question as to why billions of dollars were coming in from

11    Enchanted, for example?

12    A.  Yes.

13    Q.  All of that information you had the ability to go out

14    and seek, right?

15    A.  Yes.

16    Q.  And let me ask you this:  Did you know -- let me ask you

17    this:  What specifically did you know about Enchanted and

18    Nationwide when you were adjudicating your alerts on the

19    Petters Company, Inc. account?

20    A.  I don't remember.

21    Q.  What specifically did you do to go out and look and see

22    who Enchanted was, for example?

23    A.  I don't remember.

24    Q.  What specifically did you do to go out and look and see

25    who Nationwide was, for example?

1    A.  I don't remember.

2    Q.  And you had the ability to ask any questions you wanted

3    about any of that, right?

4    A.  Can you clarify what you mean by "that"?

5    Q.  Yes.  You had the ability to go and do additional

6    research or ask additional questions about any one of those

7    entities at any time, correct?

8    A.  I'm -- can you please clarify what you're asking in

9    regards to questions?  Who would I be questioning?

10   Q.  Who could you question if you had a question about

11   Nationwide or Enchanted?

12   A.  They weren't clients of the bank.

13   Q.  Let's back up.  You just told me that you could have

14   picked up the phone and called the business bankers and

15   asked questions about Nationwide and Enchanted, right?

16   A.  I don't -- I don't remember the exact wording of your

17   question or how I answered it, but if they were not clients,

18   that doesn't mean that the bank would have information about

19   them.

20   Q.  I'm sorry, Ms. Pesch.  I'm not -- let me be more clear

21   on my question.  And I am trying to not duplicate some of

22   the things we've talked about, but I may have to do a little

23   bit of duplication to give you the comfort level that you

24   are asking me for, okay?

25            What I'm talking about is from 2005 up through

Pesch - Recross

1    2008, you saw that there were billions of dollars in wires

2    from Nationwide and Enchanted, right?

3    A.  Yes.

4    Q.  And you could have picked up the phone, for example, and

5    called the business banker or the customer relationship

6    manager for the Petters Company, Inc. account and asked them

7    anything you wanted to know about Nationwide or Enchanted,

8    true?

9    A.  I could have questioned them about their client and

10   their client's activity.

11   Q.  I'm sorry, Ms. Pesch.  You could have picked up the

12   phone and called the business banker and asked, for example,

13   who is Nationwide, right?

14          MS. MOMOH:  Objection, Your Honor, asked and

15   answered, argumentative.

16          THE COURT:  Overruled.  You may answer if you can.

17          THE WITNESS:  I could have asked the banker about

18   their client and their client's transaction activity.

19   BY MR. COLLYARD:

20   Q.  You could have asked them -- my specific question,

21   Ms. Pesch is:  You could have asked who is Nationwide,

22   right?

23          MS. MOMOH:  Objection, Your Honor, asked and

24   answered, argumentative.

25          THE COURT:  Overruled.

1              THE WITNESS:  We would ask questions about the

2    client and their transaction activity, not about parties

3    that weren't clients of the bank.

4    BY MR. COLLYARD:

5    Q.  Ms. Pesch, I'm just asking you if it's something that

6    you could have done.  We'll use Enchanted, for example.

7    Could you have picked up the phone and called the business

8    banker and said, Who is Enchanted?

9    A.  They weren't a client of the bank.  We would -- if we

10   contacted the banker, we would have asked about their client

11   or their transaction activity --

12   Q.  Ms. Pesch --

13   A.  -- not about a party that's not a client.

14   Q.  -- is it possible, is it possible that you could have

15   picked up the phone and called the business banker and

16   asked, Who is Enchanted?

17   A.  If you're asking if I could have spoken the words, I

18   could have spoken the words, but they were not a client of

19   the bank.  We would have asked about their client or the

20   client's transaction activities.

21   Q.  You could have also picked up the phone and asked, What

22   does Enchanted do?  Right?

23   A.  We would have asked them about their clients or the

24   client's transaction activities, not parties that were not

25   clients of the bank.

Pesch - Recross

```
 1    Q.  I'm sorry, Ms. Pesch.  Let me -- maybe I'm not being

 2    clear.  Let me try this like this:  While you were reviewing

 3    your transaction activity and you were seeing the billions

 4    of dollars from Enchanted, you could have, if you were

 5    questioning anything about those wires, called the business

 6    banker and just simply asked the business banker, Do you

 7    know what Enchanted does or who they are?

 8    A.  We could have --

 9              MS. MOMOH:  Objection, Your Honor, asked and

10    answered, argumentative, vague as to time.

11              THE COURT:  Overruled.  You may specify the time.

12              MR. COLLYARD:  The time frame is 2005 to 2008.

13    I'm sorry, Your Honor.

14    BY MR. COLLYARD:

15    Q.  Could you have done that, Ms. Pesch?

16    A.  We would have -- if we contacted a banker, it would have

17    been to discuss their client or the client's transaction

18    activities, not parties that were not clients of the bank.

19    Q.  Did anything preclude you from picking up the phone and

20    calling a business banker and saying, What does Enchanted

21    do?  They are wiring billions of dollars in.

22    A.  We could have asked about specific transactions.

23    Q.  Did anything preclude you from specifically asking the

24    business banker, What does Enchanted do?

25    A.  It was not our practice to ask a banker about parties
```

1     that were not clients of the bank.

2                    MR. COLLYARD:  Your Honor, move to strike.

3                    THE COURT:  Overruled.  Denied.

4     BY MR. COLLYARD:

5     Q.  Could you have picked up the phone and asked the

6     business bankers why it is that Enchanted or Nationwide were

7     wiring in all of this money?

8     A.  It was not our practice to ask a banker about parties

9     that were not clients of the bank.

10    Q.  Was it possible for you to pick up the phone and ask

11    that simple question?

12    A.  I could have spoken those words if that's what you're

13    asking, but that was not -- it was not our practice to ask a

14    banker about parties that were not clients of the bank.

15    Q.  In the past when you were reviewing or adjudicating

16    other alerts, you had actually picked up the phone and

17    called business bankers or customer relationship managers to

18    ask specific questions, right?

19    A.  Yes.

20    Q.  And, in fact, in the past you have asked questions about

21    who was wiring money into an account before, haven't you?

22    A.  We've asked about specific transactions on accounts,

23    yes.

24    Q.  Okay.  And so let's bring it back, then.  Looking at --

25    I'll bring it back to the transactions on the two alerts

1   that you did on 60827 and 64556.  You saw that billions of

2   dollars were coming in from Nationwide and Enchanted.  You

3   could have picked up the phone and called the business

4   bankers and asked the business bankers specific questions

5   about those transactions, including information about why

6   Enchanted and Nationwide were wiring that money in, correct?

7   A.  We -- there's multiple parts to that.  Could you break

8   it up, please?

9   Q.  Let me ask you -- let's just pause here for a second,

10  okay.  If the business banker or the customer relationship

11  manager didn't have the answer to the question that you were

12  reaching out and asking about -- okay? -- the business

13  relationship manager could then ask the customer questions,

14  correct?

15  A.  Yes.

16  Q.  And the customer then would get back to the business

17  banker, right?

18  A.  Yes.

19  Q.  And then the business banker would get back to you with

20  your answers, right?

21  A.  Yes.

22  Q.  And that was a process that you followed at the bank,

23  correct?

24  A.  Yes.

25  Q.  You actually did that in real life when reviewing and

Pesch - Recross

1   adjudicating alerts, didn't you?

2   A.  When applicable, yes.

3   Q.  And so now if you want me to bring it back, now we'll

4   unpack it.  In this particular case, if we follow those

5   three steps, you could have called the business bankers and

6   asked them questions about the activity you were seeing with

7   respect to Nationwide and Enchanted, right?

8   A.  Can you repeat that?

9   Q.  Yes.  You could have -- I'm not saying you did.  I'm

10  just asking:  You could have called the business bankers and

11  asked them questions about the transaction activity with

12  respect to Nationwide and Enchanted, right?

13  A.  Yes.

14  Q.  And then they could have picked up the phone and called

15  Tom Petters and asked Tom Petters any questions that you

16  actually wanted answered about Enchanted and Nationwide,

17  right?

18  A.  Yes.

19  Q.  And then business bankers could have gotten back to you

20  and said, Here's what Tom says, right?

21  A.  Yes.

22  Q.  Now, in that particular situation, then you analyze --

23  you being the AML analyst, you analyze, Hmm, is there a

24  legitimate business purpose for this, does this feel right,

25  is this interesting; am I right?

Pesch - Recross

1    A.  Those are questions that could be considered.

2    Q.  And you as the AML analyst, you actually make the

3    decision and you actually make the determination as to

4    whether or not that is a legitimate explanation or if it

5    leads to having reason to suspect that there's suspicious

6    activity, right?

7    A.  Yes.

8    Q.  And that is your decision to make, correct?

9    A.  Yes.

10   Q.  So let's say the business bankers come back to you and

11   they say, Here's what Tom says.  Here's what I think.  Okay?

12   Are you with me?

13   A.  I'm sorry.  Can you repeat that?

14   Q.  Yeah.  Let's say you've asked the business banker the

15   questions.  They've reached out to Tom Petters.  Tom Petters

16   comes back to the business bankers, and the business banker

17   says to you, Here's what I think.  Okay?

18   A.  Okay.

19   Q.  You don't take that at face value.  You actually then

20   analyze it and you actually make the determination, correct?

21   A.  Yes.

22   Q.  Now, if you can go back to -- go back to Exhibit 183.

23   So you are going to have to find my exhibits now out of the

24   binders.

25            And just to remind you that Exhibit 183 are the --

1    it's the audit trails or the comments that you had put in

2    when you closed exhibit -- or when you closed Alert 60827

3    and 64556, for example.  Do you see that?

4    A.  Can you give me the page number, please?

5    Q.  I will.  We will go to Alert 60827 to start.  It's

6    Exhibit 183, page 26.  Are you there?

7    A.  Yes.

8    Q.  Okay.  Now, you talked about with your counsel how you

9    distinctly remember back in 2005 seeing a magazine article;

10   is that right?

11   A.  That was not the year.

12   Q.  So the magazine article that you were being questioned

13   about, you didn't see that in 2005 or 2006?

14   A.  It was dated 2006.

15   Q.  You remember as you're sitting here today you actually

16   going back and seeing a magazine article from 2006 about Tom

17   Petters?

18   A.  I do.

19   Q.  Now, did you use -- and you talked about how that talked

20   about the Petters family of businesses and things like that;

21   is that right?

22   A.  Yes.

23   Q.  The Petters Company, Inc. account -- I had asked you a

24   question about this before.  And the Petters Company, Inc.

25   account belongs to the Petters Company, Inc., right?

```
 1                    MS. MOMOH:  Objection, Your Honor, vague as to
 2        time.
 3                    THE COURT:  Overruled.  You may answer if you can.
 4                    THE WITNESS:  Can you repeat your question?
 5        BY MR. COLLYARD:
 6        Q.  Yes.  The Petters Company, Inc. account belongs to the
 7        Petters Company, right?
 8        A.  Yes.
 9        Q.  It does not belong to any other Petters businesses,
10        right?
11        A.  Correct.
12        Q.  And the alerts that you were reviewing and investigating
13        were for the Petters Company, Inc. business, correct?
14        A.  I believe multiple of his companies alerted.
15        Q.  Ms. Pesch, I'm talking about in Exhibit 183, the alerts
16        that you adjudicated for 60827 and 64556, those were on the
17        Petters Company, Inc. account, right?
18        A.  For those alerts, yes.
19        Q.  For all of Exhibit 183, this is the Petters Company,
20        Inc. account, correct?
21        A.  I have not looked through every alert on here in this
22        exhibit.
23        Q.  Okay.  I don't want us to spend time going through every
24        single alert on here.  Let's just stick on the two that you
25        did right now.  You agree with me that you're only looking
```

1    at alerts on the Petters Company, Inc. account, right?

2    A.  For these alerts, yes.

3    Q.  Now, when you're looking at alerts for the company where

4    the alerts are generated, you consider that company, right?

5    A.  Yes.

6    Q.  And that's the best practice is to consider the company

7    that alerted, not some other company that the client could

8    be affiliated with, correct?

9    A.  Depends on what's in the alert.

10   Q.  When you adjudicate the alerts, you adjudicate it based

11   on the company that alerted; am I right?

12   A.  That would be the focus, but it could expand based on

13   what's in the alert.

14   Q.  Now, you remember seeing an article back in 2006.  Do

15   you remember adjudicating these alerts?

16   A.  No.

17   Q.  Do you remember what you thought when you adjudicated

18   these alerts?

19   A.  No.

20   Q.  So really all you're talking about is you had an

21   impression of Tom Petters back in 2006; is that right?

22   A.  I remember those magazines specifically because he was

23   on the cover of every magazine and it reminded me of Oprah

24   and Oprah's magazines, so that stuck out in my mind.

25   Q.  I got it.  But you didn't use that information for the

1    basis of concluding that the activity in the alerts for

2    60827 and 64556 was not suspicious, did you?

3    A.   The fact that he was on the covers and it reminded me of

4    Oprah, no, I did not include that in any analysis.

5    Q.   The thought of Petters being this big guy and having all

6    these companies, that didn't go into your analysis to

7    conclude that the activity was or was not suspicious?

8    A.   Sorry.  Can you repeat that?

9    Q.   Yes.  The information about Tom Petters and the impact

10   it had on you as to what type of companies he was involved

11   in or how big of a role he had as a businessman, that did

12   not go into your analysis when you determined whether or not

13   the activity on 60827 or 64556 was suspicious?

14   A.   I remember those magazines covering multiple Petters

15   companies.

16   Q.   Sure.  And all I'm asking, Ms. Pesch, is:  You didn't

17   use that as any basis to conclude whether or not the alerts

18   for these two alerts, 60827 or 64556, were or were not

19   suspicious?

20   A.   I used that as -- when I was researching the owner of

21   the companies, that was information that I took into

22   consideration about the legitimacy of those companies.

23   Q.   Did you use your magazine articles or anything that you

24   learned about Petters Company, Inc. through your magazines

25   to determine whether or not the alerts on 60827 or 64556

1     were or were not suspicious?

2     A.  I would have used those magazines in combination with

3     other research to determine if I felt they were legitimate

4     companies.  So, yes, I would have included that as part of

5     my consideration in working alerts.

6     Q.  Did you -- I'm asking you very specifically:  Did you

7     use that information to conclude that the activity in these

8     alerts were not suspicious?

9     A.  I don't remember these specific alerts, so I guess I --

10    I don't remember in relation to these specific alerts what I

11    looked at.

12    Q.  And you don't mention -- if you go to 60827, for

13    example, you don't mention anything about the magazine

14    article that you saw, right?

15    A.  No.

16    Q.  And if you would have relied on that or used that, you

17    would have mentioned that in your comments section, right?

18    A.  Not necessarily.

19    Q.  Well, do you believe it would be important to list the

20    things that you would consider in making your determination

21    as to whether or not the activity is suspicious or not?

22    A.  I list "See Petters.com for more information," and I

23    remember getting those magazines from the company's website.

24    Q.  Okay.  But you don't list anything about the magazines

25    in your comments, do you?

1    A.  Specifically, no.

2    Q.  And this is Petters.com, not PettersCompanyInc.com,

3    right?

4    A.  Yes.

5    Q.  And, in fact, you remember that we had this -- the

6    PowerPoint presentation that we went through -- and it was

7    Exhibit 4 -- where we were talking about best customer

8    syndrome.  Do you remember that?

9    A.  Yes.

10   Q.  And specifically you focus on the activity and not on

11   the customer.  Do you remember that?

12   A.  Yes.

13   Q.  And that is a principle that is followed in the

14   Anti-Money Laundering Group, correct?

15   A.  Yes.

16   Q.  When you're determining whether or not something is

17   potentially suspicious, you actually look at and dig into

18   the activity instead of focusing on who the customer is,

19   right?

20   A.  You look into both, but you can't only focus on who the

21   customer is.

22   Q.  And focusing on the activity is a heck of a lot more

23   important than focusing or saying, Oh, he's a big customer,

24   or, He's a well-known guy, right?

25   A.  I would say learning about the customer is important, as

1    is the transaction activity.

2    Q.  So you don't remember specifically what you did to

3    investigate 60827; is that right?

4    A.  In relation to the specific alert, no.

5    Q.  Do you remember -- if you turn to 64556, it's on page 37

6    of Exhibit 183.  Do you remember what you did specifically

7    at all or just generally to review the alert for 64556?

8    A.  I remember that it was my practice when reviewing alerts

9    to review the parties.  So generally, as my practice, I

10   remember that; but in terms of this specific alert, I don't

11   remember what I did to work that alert.

12   Q.  And you don't remember how you came to reach any of your

13   conclusions in Alert 60827 or 64556?

14   A.  Beyond what's written, no, I don't remember.

15   Q.  Let's go to -- I want to go back to -- I believe it was

16   on Friday you had talked with your counsel about information

17   in Searchspace.  Do you remember talking about the

18   transaction data that you had access to in Searchspace?

19   A.  Yes.

20   Q.  Is that right?  I just want to be clear and make sure I

21   understand is that you have access to other information

22   outside of Searchspace as well when you're reviewing and

23   adjudicating an alert, right?

24   A.  Yes.

25   Q.  Including we talked about -- we were talking about how I

Pesch - Recross

1   have a checking account and credit card statements.  You had

2   access to the bank statements for the customer as well,

3   correct?

4   A.  Yes.

5   Q.  And those bank statements gave information about who was

6   wiring the money in, for example, and other additional

7   information, like note numbers, right?

8   A.  Not that I remember.

9   Q.  You don't remember that?

10  A.  I don't remember originators being listed on bank

11  statements.

12  Q.  Let's -- I'm sorry, let's go back to -- let's stick on

13  Exhibit 183, then.  Let's go to page 26, just so we can get

14  there, if I can find this.

15          Now that we've got that alert up, let's go to page

16  28, and we're going to go to the top box where we're talking

17  about the incoming wires, and I'm going to blow that up.

18  And then we're going to get the box below it as well just so

19  we can see it.

20          Okay.  So let's just refresh a little bit what we

21  were talking about before, Ms. Pesch.  We've got incoming

22  wires totaling $2.5 billion, right?

23  A.  Yes.

24  Q.  And then you list some of the names, including

25  Enchanted, correct?

1    A.  Yes.

2    Q.  Now you say, "Some wires reference note numbers."  Do

3    you see that?

4    A.  Yes.

5    Q.  So how would you access wires that reference note

6    numbers?

7    A.  Through wire data from the system that I referenced last

8    week that -- where you could get that more comprehensive

9    wire information.

10   Q.  Ms. Momoh was asking you questions earlier about checks

11   that have memos in them, right?

12   A.  Yes.

13   Q.  And this would be similar to the wire that has a memo in

14   it.  Would that be a fair way of saying that?

15   A.  Yes.

16   Q.  So in this particular alert, you actually, when you were

17   looking at the $2.5 billion coming in, you actually would

18   have done some other analysis to see, for example, that the

19   wires had note numbers; is that fair?

20   A.  Yes.

21   Q.  Do you recall what those note numbers were?

22   A.  No.

23   Q.  Do you recall why you were referencing the note numbers

24   here in your comments?

25   A.  No.

1   Q.  You also talked about how you populated a spreadsheet.

2   When you were -- let me back up.  I think it was in respect

3   to Alert 64556, if we can go to that alert on page 37.  Are

4   we there?

5   A.  Page 37, yes.

6   Q.  Yes.  Your counsel was asking you questions about what

7   could you see in your computer and what could you review and

8   have access to.  Do you remember that?

9   A.  I don't remember the exact wording of the question.

10  Q.  Do you remember questions along those lines?

11  A.  Yes.

12  Q.  And I believe you said that you would see a list of data

13  that listed all the transactions, and you would need to get

14  it out of Searchspace into an Excel spreadsheet.  Do you

15  recall that?

16  A.  Yes.

17  Q.  And that's what you would do, is you would take

18  information out of Searchspace and put it into a

19  spreadsheet?

20  A.  We would export it out of Searchspace and it would go

21  into Excel.

22  Q.  Let's go to Exhibit 186, please.

23          I'm sorry, Ms. Pesch, because we're going to --

24  I'm going to ask you about dates and then we're going to

25  have to go back.  So let me just first do the dates, and

1    then we'll go to this exhibit.  Sorry.

2            If you look at the alert for 64556, and let's get

3    our dates right, so it's Exhibit 183, page 37.

4    A.  Okay.

5    Q.  And if we look at the top there, it's March of 2006.  Do

6    you see that?

7    A.  Yes.

8    Q.  And then you also in the first box, if we go down below

9    to the first box, you also included another alert for 66209

10   for the month of April of '06, right?

11   A.  Yes.

12   Q.  The alerted period or review period was March of '06

13   through April of '06; is that true?

14   A.  Yes.

15   Q.  Okay.  Now let's go to Exhibit 186.  Are you at 186 yet?

16           MS. MOMOH:  Your Honor, may we have a sidebar,

17   please?

18           THE COURT:  You may.

19           **(At sidebar)**

20           MS. MOMOH:  I don't believe Exhibit 186 is in

21   evidence.

22           MR. COLLYARD:  It's not.  I am going to admit it

23   into evidence.

24           MS. MOMOH:  But you just flashed it on the screen.

25           MR. COLLYARD:  I did not.  It was 183 that we put

Pesch - Recross

```
 1    up on the screen.  We haven't gone to 186.
 2              MS. MOMOH:  I just saw 186 on the screen,
 3    Your Honor.
 4              MR. COLLYARD:  Oh, well, I didn't see that.  I'm
 5    sorry.  I'll make sure that it's not published until it's
 6    admitted.
 7              THE COURT:  Counsel --
 8              MS. MOMOH:  It was published.
 9              MR. COLLYARD:  Yeah, I didn't mean to.
10              THE COURT:  -- do not publish the exhibits until
11    they are admitted into evidence.
12              MR. COLLYARD:  Yeah, absolutely.
13              THE COURT:  Listen to me, both of you, that's --
14              MR. COLLYARD:  Yeah.  Yes.
15              THE COURT:  -- improper.
16              MR. COLLYARD:  Absolutely, yes.
17              THE COURT:  Okay.
18              MR. COLLYARD:  Yeah.
19              MS. MOMOH:  Will there be some sort of correction
20    for the jurors for seeing this?
21              THE COURT:  I think we are not going to draw
22    additional attention to this matter --
23              MS. MOMOH:  Understood.
24              MR. COLLYARD:  Okay.
25              THE COURT:  -- so, no.
```

1          **(In open court)**

2                    MR. COLLYARD:  May I proceed, Your Honor?

3                    THE COURT:  You may.

4     BY MR. COLLYARD:

5     Q.  Okay, Ms. Pesch, we are going to go to Exhibit 186.

6     You're going to be able to see it in front of you.  You're

7     going to be able to see it on the screen.  I am not going to

8     put it up on the screen just yet.  Can you take a look at

9     Exhibit 186 and tell me what that is?

10    A.  It looks like transaction activity from Searchspace.

11    Q.  Does this look like the Excel spreadsheet that you would

12    have exported from Searchspace?

13    A.  Yes.

14    Q.  And if we look down below in the lower left bottom

15    there, it says, "Petters incoming wires.Csv."  Do you see

16    that?

17    A.  Yes.

18    Q.  And CSV is a type of file; is that right?

19    A.  Yes.

20    Q.  What does that mean?

21    A.  I don't remember what it stands for.

22    Q.  This Exhibit 186 is an example of the Excel spreadsheet

23    that you would create; is that right?

24    A.  That I would export out of Searchspace.

25    Q.  That you would export out of Searchspace, yes?

 1    A.  Yes.

 2    Q.  Sorry.  I am going to keep screwing that up.

 3             Did you create Plaintiff's Exhibit 186?

 4    A.  I don't know.

 5    Q.  You may have?

 6    A.  I don't remember.

 7    Q.  It certainly looks like a spreadsheet that you would

 8    have exported out of Searchspace, correct?

 9    A.  It looks like transaction activity exported out of

10    Searchspace, and I would export transactions out of

11    Searchspace.

12    Q.  If we go to the upper right-hand corner, do you see

13    there's a "Tran Date"?  Do you see that?

14    A.  Yes.

15    Q.  It lists a date for March 1st of 2006, for example; is

16    that right?

17    A.  It looks like it.

18    Q.  Yes.  If you go to the left, it's got originator and

19    beneficiary information; is that right?

20    A.  Yes.

21    Q.  And then to the left of that it has "Credit Party Name,"

22    and it says, "Petters Company, Inc"; is that right?

23    A.  Yes.

24    Q.  Okay.

25             MR. COLLYARD:  Your Honor, offer Exhibit 186.

```
 1              MS. MOMOH:  Objection, Your Honor, lack of

 2    foundation.

 3              THE COURT:  Overruled.

 4              MS. MOMOH:  Your Honor, objection -- withdrawn.

 5              MR. COLLYARD:  Permission to publish, Your Honor?

 6              THE COURT:  Let me ask you, how much more are we

 7    going to do with this exhibit and this witness?  I'm asking

 8    just for the break purposes.

 9              MR. COLLYARD:  Oh.

10              THE WITNESS:  Either we will go now or we will go

11    at 10:30?

12              MR. COLLYARD:  Oh, we're going to start to get

13    into this exhibit a little bit if you would like to go now,

14    Your Honor.

15              THE COURT:  Members of the Jury, we will take our

16    midmorning break now.

17              THE CLERK:  All please rise for the jury.

18              THE COURT:  Please remember my instructions, and I

19    know you will follow them.  Thank you.  Let's be prepared to

20    return at 10:35.

21         (Jury excused)

22                         IN OPEN COURT

23                       (JURY NOT PRESENT)

24              THE COURT:  And to our witness, you are free to

25    take a break as well from your testimony.  Please, though,
```

 1     because you are on the stand giving testimony, you are not

 2     to consult about your testimony during the break.  Okay?

 3                We are in recess.

 4         (Recess taken at 10:22 a.m.)

 5                          *   *   *   *   *

 6         (10:39 a.m.)

 7                           **IN OPEN COURT**

 8                           **(JURY PRESENT)**

 9                THE COURT:  You may be seated.

10                Counsel, there's one issue we need to address

11     before we resume the questioning of this witness.  Exhibit

12     186 is not in evidence, is it?

13                MR. COLLYARD:  I had offered it, Your Honor, and

14     then we paused for the break.

15                THE COURT:  I didn't hear you.

16                MR. COLLYARD:  I had offered it into evidence and

17     then we paused for the break.

18                THE COURT:  Okay.  Exhibit 186 is received.

19                MR. COLLYARD:  Thank you, Your Honor.

20     BY MR. COLLYARD:

21     Q.  Ms. Pesch, if we can take a look at Exhibit 186, we'll

22     pull it up here.  And this is the spreadsheet -- this is an

23     Excel spreadsheet that was exported from Searchspace; is

24     that right?

25     A.  Yes.

1    Q.  And if we can just get familiar a little bit with it, if

2    we look up at the top, we see the originator and

3    beneficiary.  Do you see that?

4    A.  Yes.

5    Q.  And if we go down a little bit and just highlight kind

6    of the first block of entries there, are these -- is this

7    showing that there were incoming wires from Enchanted Family

8    Buying Company and Nationwide International Resources, for

9    example?

10   A.  Yes.

11   Q.  And if we look to the right, it shows the amounts; is

12   that right?

13   A.  Yes.

14   Q.  And we talked before about transaction data and we were

15   talking about picking up the phone and calling the business

16   bankers to ask them questions, and you told me you could ask

17   them questions for sure about the transaction data.  Do you

18   remember that?

19   A.  Yes.

20   Q.  And this would be the transaction data, right?

21   A.  Yes.

22   Q.  So if we see up at the top, we've got Enchanted for a

23   wire of $15.7 million; is that right?

24   A.  Yes.

25   Q.  And the date of that wire is March 1st of 2006; is that

1    correct?

2    A.  It looks like it, yes.

3    Q.  And you remember I told you before we'd go to this.

4    We've got to get the dates figured out on the Alert 64556.

5    Do you remember that?

6    A.  Yes.

7    Q.  And the dates for the Alert 64556 was March and April of

8    2006.  Do you remember that?

9    A.  Yes.

10   Q.  And so these wires here would be reflective of the wires

11   that were adjudicated and reviewed in Alert 64556, correct?

12   A.  Can you give me a minute, please?

13   Q.  Sure.

14       (Witness reviews document)

15   A.  Yes, they look like wires from that time frame.

16   Q.  And so what we have here, these are all for March 1st of

17   2006.  Let's just go through a few of these just so we can

18   get a feel of this.  We'll add some more in.  Let's go to

19   March 2nd, for example, and we'll just get a feel for what

20   you could see.

21           And then this is -- if we see here that the second

22   block that we just put up, the top couple are from

23   Enchanted, right?

24   A.  Can you please clarify which --

25   Q.  Yes, the second block, the block that I just put up with

1    all of the Enchanted and Nationwide wires.  Do you see that?

2    A.  Yes.

3    Q.  And if we look to the right -- I am just trying to get

4    the dates.  We see the first block dealt with March 1st.

5    Then this block deals with March 2nd; is that correct?

6    A.  It appears so.

7    Q.  So these are all wires that you could -- these are all

8    wires from March 2nd that came in from Enchanted and

9    Nationwide, right?

10   A.  Yes.

11   Q.  And to the far right, if we look -- sorry -- if we back

12   up and just take the first two from Enchanted and then we

13   look to the right, we see Enchanted wired in on that day $25

14   million even, correct?

15   A.  Yes.

16   Q.  And then down below, the next one Enchanted wired in $13

17   million even, right?

18   A.  Yes.

19   Q.  And those are round numbers, right?

20   A.  Yes.

21   Q.  Now, if we go to the Nationwide ones, we see the first

22   one Nationwide wired in 8.8 million, right?

23   A.  Yes.

24   Q.  And then the next one is for 5 million; is that right?

25   A.  Yes.

```
 1    Q.  And then we see a series below for 4.5 million; is that

 2    true?

 3                THE COURT:  I didn't hear your answer.

 4                THE WITNESS:  You're close.  Those aren't the

 5    exact values, but they're close.

 6    BY MR. COLLYARD:

 7    Q.  Do you see the one down there for $4.54 million?  Do you

 8    see that?

 9    A.  Yes.

10    Q.  And then the one below is $4.484 million.  Do you see

11    that?

12    A.  Yes.

13    Q.  Okay.  Do you remember yesterday -- I think it was

14    yesterday.  It might have been the day before.  I'm sorry.

15    It was not yesterday.  It would have been Monday -- it would

16    have been Friday.  I'm so sorry.  It would have been Friday.

17                I told you about Nationwide and I said, Hey, if we

18    look at the way that the Nationwide numbers are, they are

19    always ending in hundred dollar values.  Do you see that?

20    Do you remember us talking about that?

21    A.  I remember discussing round transactions.  I don't

22    remember the specifics.

23    Q.  On all the Nationwide numbers that you see on the

24    screen, are they all ending in hundred dollar values?

25    A.  Yes.
```

Pesch - Recross

1    Q.  None of them have any cents, correct?

2    A.  Correct.

3    Q.  If we just stick on -- I'm just going to do a few more

4    of these just to get a sense.  If we go down to -- we will

5    bring in March 3rd now.  Now we have March 3rd.  We have an

6    Enchanted wire on March 3rd for $40,617,542.83, correct?

7    A.  Yes.

8    Q.  These are wires or this is the transaction data that you

9    had and you could see, correct?

10   A.  Yes.

11   Q.  And this is how it appeared in the spreadsheet that you

12   would look at when you were determining whether or not this

13   activity was potentially suspicious?

14   A.  It was similar to this.  I don't remember this specific

15   file and how it specifically was used, but this is an

16   example of the wire data, yes.

17   Q.  And then on the bottom of the page we have another one

18   from Nationwide for $3.153 million; is that right?

19   A.  Yes.

20   Q.  And if we just -- let's just do another.  Let's go to --

21   let's skip ahead to March 9th, if we can find that.  It's on

22   Exhibit 186, page 2 at the very bottom.  I'm going to go

23   down to the bottom on that page, Ms. Pesch, and grab the

24   ones from March 9th and see if we can pop them up.

25              Do you see there's Enchanted wiring in on March

1      9th $27.9 million?  Do you see that?

2      A.  Yes.

3      Q.  And then again Nationwide, Nationwide, and Nationwide.

4      Do you see those?

5      A.  Yes.

6      Q.  Those are for 5.3 million, 5.2 million, and 4.87

7      million, right?

8      A.  Yes.

9      Q.  And, again, those Nationwide wires all end in hundred

10     dollar values, correct?

11     A.  Yes.

12     Q.  Does that appear to be a pattern?

13     A.  Possibly.

14     Q.  Let's jump ahead to March 15th, which is going to be

15     Exhibit 186, page 3, towards the middle.  If we can just

16     grab some of those.  And we see Enchanted has a wire on

17     March 15th for 23.5 million; is that right?

18              MS. MOMOH:  Your Honor, may we have a sidebar,

19     please?

20              THE COURT:  What's the grounds for the objection?

21              MS. MOMOH:  Beyond the scope of defendant's

22     examination, cumulative, and is prejudicial under 403.

23              THE COURT:  Counsel?

24              MR. COLLYARD:  Your Honor, Ms. Pesch testified to

25     counsel's own questions about a spreadsheet and talked about

1     the data that she could see; the data in Searchspace, the

2     data outside of Searchspace.  It was a big topic that

3     counsel raised, so I am asking to look at the data that

4     Ms. Pesch testified to.

5              MS. MOMOH:  And, Your Honor, if I may be heard, I

6     did not question Ms. Pesch on any sort of spreadsheet, and I

7     certainly did not show this exhibit to her.  And, in fact,

8     we never offered it during my examination.  Sidebar?

9              THE COURT:  Yes.

10             **(At sidebar)**

11             MS. MOMOH:  So, again, under 403, this is

12    prejudicial.  It's cumulative.  We will be here until

13    Thanksgiving if he continues with this line of questions.

14    The document speaks for itself.

15             MR. COLLYARD:  Your Honor, Ms. Momoh made a point

16    to go through and talk to her about what she could see and

17    what she couldn't see.  I have the ability to cross-examine

18    her on what she testified to that she actually can see and

19    what she did.  She testified to this spreadsheet.  She did

20    it herself.

21             THE COURT:  And the spreadsheet is in evidence.

22    The objection is overruled.  I will ask counsel to be

23    mindful of the amount of time that the questioning is taking

24    and the effect on the jury.

25             MR. COLLYARD:  Understood.  And I don't plan on

1    spending too much time to it, but I'm going to loop this

2    back into a crucial part of the case.

3              THE COURT:  That's fine.  I'm not preventing you

4    from doing anything.  I'm offering --

5              MR. COLLYARD:  I'll be mindful, yes.

6              THE COURT:  -- advice and letting you know that

7    the jury has -- we are asking members of this community

8    to --

9              MR. COLLYARD:  Understood, Your Honor.

10             THE COURT:  -- spend a lot of time here, and let's

11   use it wisely.

12             MR. COLLYARD:  Yes.  Thank you.

13        **(In open court)**

14   BY MR. COLLYARD:

15   Q.  I'm sorry, Ms. Pesch.  We are going to go back to

16   Exhibit 186 on page 3, and we were looking at March 15th for

17   the Enchanted wire of $23.5 million.  Do you see that?

18   A.  Yes.

19   Q.  And, again, that is the information that you had access

20   to, right?

21   A.  Yes.

22   Q.  I'll just do -- I will just do two more quick ones here.

23   If we just jump to March 23rd, which is on page 4 of Exhibit

24   186 at the very bottom or towards the bottom, and do you see

25   that these are wires on March 23rd for Enchanted for 34.4

 1   million?  Do you see that?

 2   A.  Yes.

 3   Q.  And then again we have the Nationwide wires all ending

 4   in hundred dollar values, correct?

 5   A.  Yes.

 6   Q.  Those are for millions of dollars, right?

 7   A.  Yes.

 8   Q.  Do one more.  Skip to page 8, it's at the very bottom,

 9   and it's for April of '06, just so we can cover the time

10   frame for Alert 64556.  We see we have an Enchanted wire for

11   $24.9 million, right?

12   A.  Yes.

13   Q.  And then down below we've got Nationwide wire for $9.27

14   million.  If I can just move my blue arrow out of the way so

15   you can see it.  We have another Nationwide wire for 3.3

16   million, correct?

17   A.  Yes.

18   Q.  And, again, all ending in hundred dollar values, right?

19   A.  For which party?

20   Q.  For Nationwide.

21   A.  Yes.

22   Q.  Again, so this was the transaction information that you

23   had that you could look into further if you chose, correct?

24   A.  If we determined to, yes.

25   Q.  Now, if we added up all of these numbers in this

1  spreadsheet -- and I actually have the native file.  If we

2  need to do this, we could do this.  If we added up all of

3  the numbers in the spreadsheet, Ms. Pesch, do you know what

4  the total would be if we added up all the numbers in the

5  spreadsheet?

6  A.  I don't know.  I have not reviewed all the numbers.

7  Q.  If I told you that's $1.46 billion, would that help

8  refresh your recollection?

9  A.  I still wouldn't remember, no.

10 Q.  Do you have any reason to disagree with me if I told you

11 that it was $1.46 billion?

12 A.  I would go back to the alert comments to check.

13 Q.  I'm just asking you if you would have any reason to

14 disagree -- if we added up these totals, if you would have

15 any reason to disagree that this would show that there was

16 $1.46 billion of incoming wires coming into the account?

17 A.  You told me the last time we met you weren't good at

18 math, so I would probably want to double-check.

19     (Laughter)

20 Q.  You want to check it.  I actually have the native file

21 and we can do this in just a few minutes, and it will go to

22 some more questions that I have about Enchanted and

23 Nationwide so it's probably helpful if we do that.  I can do

24 it really quickly.  The native file was produced by

25 defendants in this case.  We have it, and I can show you

Pesch - Recross

 1    that.

 2              So what I would like to do is then take you to the

 3    native file, which we will call Exhibit 186-A, and I will

 4    check your math with you -- or we will check my math.

 5    Sorry.

 6              MS. MOMOH:  Your Honor, we object to this.  This

 7    exhibit was not disclosed to us.  We haven't had a chance to

 8    review it.  I'm also not familiar with what he is referring

 9    to as far as a native file for this exhibit.

10              MR. COLLYARD:  It's the native file that the

11    defendants produced in this case, Your Honor; that this is a

12    PDF of it is essentially what it is.  This being Exhibit 186

13    is a PDF.  We can't manipulate the PDF.  So we have the

14    native file, which is what the defendants produced in the

15    case, and I can pull the native file up right here and just

16    do a quick calculation to show these numbers to speed it up.

17              MS. MOMOH:  Your Honor, we still object.  This was

18    not disclosed to us as one of the exhibits that plaintiff

19    would be showing or offering or using for purposes of

20    Ms. Pesch's examination.

21              THE COURT:  The objection is sustained.  The

22    testimony stands.

23    BY MR. COLLYARD:

24    Q.  Ms. Pesch, if you added up -- if we can go back to

25    Exhibit 186 and we added up all of the incoming wires from

Pesch - Recross

```
 1    Enchanted and Nationwide, do you know how much money
 2    Enchanted and Nationwide wired in during this time period?
 3    A.  No.
 4    Q.  If I told that you that it was a billion dollars, would
 5    that help refresh your recollection?
 6    A.  No.
 7    Q.  And if I told you it was -- that your spreadsheet here,
 8    if we added up the Enchanted and Nationwide numbers, if that
 9    totaled a billion dollars, would you have any reason to
10    disagree with me?
11    A.  Something I would probably like to do on my own, but I
12    can't add that up on my own here sitting here.
13              MR. COLLYARD:  Your Honor, I can just show it to
14    her and I can do it with her real quickly without publishing
15    it to the jury.
16              MS. MOMOH:  Your Honor, I would object to that as
17    well.
18              THE COURT:  The witness's answer stands.
19    BY MR. COLLYARD:
20    Q.  Ms. Pesch, if Enchanted -- I'm sorry.  I told you before
21    if we added it up it would be $1.46 million total.  Do you
22    remember that?
23    A.  If we added what up?
24    Q.  If you added up all the numbers in your chart here, if
25    it would be $1.46 billion.  Do you remember I told that you?
```

Pesch - Recross

1    A.  Okay, yes.

2    Q.  Let's take that number and let's just check my math a

3    little bit, and let's go to your Alert 64556 and go to --

4    it's Exhibit 183, and it's page 38.  And it's in the middle

5    of the page there in that block where it starts out,

6    "Account Number █████9018."  And that's the incoming wires, do

7    you see, listed for $1.463,587 billion, right?

8    A.  Yes.

9    Q.  And so you would have -- would you have gotten that

10   number that you wrote in these comments from this

11   spreadsheet?

12   A.  Yes.

13   Q.  And so then you could have also taken this spreadsheet

14   and added up the Enchanted and Nationwide numbers very

15   quickly, right?

16            MS. MOMOH:  Objection, Your Honor, asked and

17   answered, argumentative.

18            THE COURT:  Overruled.  You may answer if you can.

19            THE WITNESS:  Can you repeat the question?

20   BY MR. COLLYARD:

21   Q.  Sure.  You list here the incoming wires, and you

22   actually list Enchanted and Nationwide.  If we just bring in

23   the block below, I will show you.  You actually say, "Most

24   wires were from Enchanted, Nationwide."  Do you see that?

25   A.  Yes.

Pesch - Recross

1    Q.  And what I'm asking is:  You could have gone to your

2    spreadsheet that we just talked about in Exhibit 186 and

3    added up the transaction data from Enchanted and Nationwide

4    to see that they had wired in a billion dollars, correct?

5    A.  Yes.

6    Q.  And you didn't note anywhere in here that Enchanted and

7    Nationwide wired in a billion dollars, did you?

8    A.  No.

9    Q.  And I'll tell you I'm at least as good at math to say

10   that 1 billion out of 1.463 is about 75 percent.  Do you

11   trust me on that?

12           MS. MOMOH:  Objection, Your Honor, calls for

13   speculation, argumentative.

14           THE COURT:  Overruled.  If she can answer, she

15   will answer.

16           THE WITNESS:  I couldn't tell you the percentage,

17   exact percentage.

18   BY MR. COLLYARD:

19   Q.  Well, you said most of the wires were from Enchanted and

20   Nationwide, right?

21   A.  Yes.

22   Q.  And you agree that 1 billion out of 1.46 billion would

23   be most; is that right?

24           MS. MOMOH:  Objection, Your Honor.  Same

25   objection.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  Could you repeat your question?

3    BY MR. COLLYARD:

4    Q.  Yes.  Sorry.  I'm just trying to figure out if you agree

5    with me that if Enchanted and Nationwide were wiring in $1

6    billion and you've listed the total of $1.463 billion, you

7    would agree with me that Enchanted and Nationwide had wired

8    in most of the money?

9    A.  Yes.

10   Q.  And if Enchanted and Nationwide are wiring in most of

11   the money for a billion dollars, would that have been at

12   least activity that would have been interesting for you to

13   go and look at further, Ms. Pesch?

14   A.  I don't remember all the details of this case or what I

15   was thinking at the time of this case, so I can't say.

16   Q.  So you can't say whether or not you actually looked at

17   the fact that most of the wires were coming in from

18   Nationwide and Enchanted and thought that could be a pattern

19   of unusual activity that I should look into a little bit

20   further?

21   A.  I don't remember the exact steps that I took when

22   reviewing this alert.

23   Q.  And do you remember how we talked about checks, and you

24   were talking about how -- you used the term "majority of the

25   checks deposited appear to be for Disney on Ice," and
```

Pesch - Recross

```
1     Ms. Momoh asked you about Disney on Ice?  Do you remember

2     that?

3     A.  Yes.

4     Q.  And just like how you said that the majority of checks

5     appeared to be for Disney on Ice, you certainly could have

6     said that most of the wires or the percentage of wires came

7     in from Nationwide and Enchanted and provided information

8     about Nationwide and Enchanted, right?

9     A.  Well, I did say most of the wires were from Enchanted

10    and Nationwide, as well as a couple other businesses.

11    Q.  Do you say what the wires were for from Enchanted or

12    Nationwide?

13    A.  No.

14    Q.  But you gave more information, for example, on the

15    checks about them being for Disney on Ice than you did for

16    the majority of the wires coming in or the billion dollars

17    that was coming in from Enchanted and Nationwide, right?

18    A.  I wouldn't necessarily agree with that.

19    Q.  Well, on the checks you explain that they were for

20    Disney on Ice, right?

21    A.  Yes.

22    Q.  What are the wires from Enchanted and Nationwide for?

23    A.  That's not detailed, but I listed a number of the

24    originators of the wires and I did not list the originators

25    of the checks.
```

1   Q.  I understand.  I'm just simply asking if you agree that

2   you gave more detail for what the checks were being used for

3   than you did for what the incoming wires were for.

4   A.  Yes.

5   Q.  Nothing precludes an AML analyst from going in and

6   explaining more information on the incoming wires, correct?

7   A.  It was our practice to make risk-based decisions about

8   how much information to add.

9   Q.  Nothing precluded you from adding more information,

10  correct?

11  A.  Again, we would make risk-based decisions regarding

12  adding extra comments.

13  Q.  Was there some preclusion or did something prohibit you

14  from explaining more about what those wires were for?

15  A.  It was our practice to make risk-based decisions when

16  adding extra comments.

17  Q.  Okay.  But on top of that, I'm just trying to figure out

18  if there was anything that said you can't do that.  Was

19  there anything that said you can't go on and explain, for

20  example, if there's a billion dollars in wires, you can't go

21  on and explain why there's actually a billion dollars of

22  wires coming in?

23  A.  No.

24  Q.  And when you say it's all "risk based," what do you mean

25  by that?

Pesch - Recross

1    A.  That we would take additional steps based on identifying

2    suspicious factors.

3    Q.  And if a billion dollars was coming into an account from

4    two entities, would that go into your risk analysis as to

5    whether or not that would be something interesting enough to

6    maybe take a little bit further look into?

7    A.  That would be included.

8    Q.  And did you do that here?

9    A.  I don't remember what I did here.

10   Q.  You could have done that?

11   A.  Yes.

12   Q.  And if you would have -- let me ask you this:  So this

13   is Alert 64556, and this is March and April of 2006, right?

14   A.  Yes.

15   Q.  Now, you had access to all of the alerts before that too

16   when you were doing this alert, correct?

17   A.  Yes.

18   Q.  And you would actually go and look at all of those

19   alerts before this one, right?

20   A.  Yes.

21   Q.  That was part of the procedures that you would follow,

22   would be to go and look at and see and understand the other

23   alerts, true?

24   A.  Yes.

25   Q.  And so if you would have seen that there were billions

1    and billions of dollars in those other alerts, and then in

2    the alerts that you did you could see that billions of

3    dollars were coming in from two entities, would that have

4    added to your risk-based analysis as to whether or not

5    something was interesting or unusual to look into it

6    further?

7    A.  Can you repeat that?

8    Q.  Sure.  If you had seen billions and billions and

9    billions of dollars from the other alerts, and you would

10   have seen that there were billions of dollars coming in from

11   two entities on your alerts as well, would that have gone

12   into your risk-based analysis as to whether or not that type

13   of activity was at least interesting or unusual enough to

14   look into further?

15             MS. MOMOH:  Objection, Your Honor, compound

16   question with respect to the use "interesting" or "usual" --

17             THE COURT:  Overruled.  You may answer if you can.

18             THE WITNESS:  I would have been going off of the

19   comments and analysis entered in the previous alerts.  So if

20   that wasn't in the alerts, I likely wouldn't have noticed

21   it.

22   BY MR. COLLYARD:

23   Q.  Did you have access to the transaction data going back

24   for the other alerts as well?

25   A.  I don't remember how far the transaction data went back

 1    in Searchspace.

 2    Q.  You don't know if it went back to 2005?

 3    A.  I don't remember how long -- I know it was a rolling

 4    period of time.

 5    Q.  Well, if you go to Alert 53247, and it's Exhibit 183,

 6    page 6, do you see that?  Are you there, Ms. Pesch?

 7    A.  Yes.

 8    Q.  If we look at the top, it says March of 2005.  Do you

 9    see that?

10    A.  Yes.

11    Q.  Do you have an understanding that this was the first

12    alert that was alerted on the Petters Company, Inc. account?

13    A.  I don't remember.

14    Q.  Do you agree with me that this is an alert on the

15    Petters Company, Inc. account for the alerted month of March

16    of 2005?

17    A.  Yes.

18    Q.  And if we just look down below, grab the first two

19    blocks, just take a quick look at it, pull those up, and you

20    see the name P. Currie-Smotherman.  Do you see that?

21    A.  Yes.

22    Q.  That's Patricia Currie-Smotherman; is that right?

23    A.  Yes.

24    Q.  She was an anti-money laundering analyst in the group;

25    is that right?

Pesch - Recross

```
 1    A.  Yes.

 2    Q.  And then if you look to -- let's just go to the second

 3    block where it says, "Wire activity does not appear

 4    suspicious."  Do you see that?

 5              MS. MOMOH:  Objection, Your Honor, beyond the

 6    scope of my examination with Ms. Pesch.

 7              THE COURT:  Overruled.

 8    BY MR. COLLYARD:

 9    Q.  Do you see that, Ms. Pesch?

10    A.  Yes.

11    Q.  And in order to adjudicate this alert, there would have

12    to have been transaction data available, right?

13              MS. MOMOH:  Objection, Your Honor, calls for

14    speculation.

15              THE COURT:  Overruled.

16              THE WITNESS:  At the time this alert was worked,

17    that transaction data would have been available.  I don't

18    remember how long that transaction data was kept in

19    Searchspace, so at the time of subsequent alerts, I can't

20    say what transaction data would have been available to me at

21    that time.

22    BY MR. COLLYARD:

23    Q.  If I'm hearing you correctly, is what you're saying is

24    you think it may be possible that there was transaction data

25    available to adjudicate the alert in March of 2005, but that
```

1   transaction activity data would have somehow been gone by

2   the time you got to your alerts in November of 2005?

3   A.  I remember the transaction data being available for a

4   rolling period of time.  So I would have had access to old

5   comments through an alert history like this, but I wouldn't

6   have access to all the transaction data over the history of

7   the account.

8   Q.  Would you have access to this audit trail or these

9   comments in Searchspace?

10  A.  Yes.

11  Q.  So you could have seen then, for example, this is the

12  first alert that it says, "Wire activity does not appear

13  suspicious."  Right?

14  A.  Yes.

15  Q.  Thank you.  Can you tell how or -- I'll keep it single

16  questions.  Can you tell how it was that

17  Ms. Currie-Smotherman determined that the wire activity does

18  not appear suspicious?

19          MS. MOMOH:  Objection, Your Honor, calls for

20  speculation.

21          THE COURT:  Overruled.  She may answer if she can.

22          THE WITNESS:  I would have to go off the comments

23  entered in this alert.

24  BY MR. COLLYARD:

25  Q.  And going off the comments entered into this alert by

1    reading these comments right here, can you tell how it was

2    that Ms. Currie-Smotherman determined that the activity was

3    not suspicious?

4    A.  Can you give me a moment to read it?

5    Q.  Sure.

6        (Witness reviews document)

7    A.  Okay.  Can you repeat your question now?

8    Q.  Yes.  Can you determine by reading the comments in this

9    alert how Ms. Currie-Smotherman determined that the activity

10   does not appear suspicious?

11   A.  I can read her comments, but I can't see what she was

12   thinking.

13   Q.  So you can't -- it's okay, Ms. Pesch.  I'm not trying to

14   quibble with you on this.  I'm just trying to see if you can

15   read her comments and tell me how it is that she concluded

16   that the activity does not appear suspicious.

17           THE COURT:  Counsel, the question has been asked

18   and answered.  Move on.

19   BY MR. COLLYARD:

20   Q.  Can you tell by reading these comments why, why the

21   activity does not appear suspicious?

22   A.  It appears that she's listing details about the wires

23   and using that to make her decision.

24   Q.  Are there any details about the wires that we can read

25   from these comments?

1    A.  Who the wires are going to and from.

2    Q.  And is there any more specifics beyond that?

3    A.  No.

4    Q.  Just beyond reading then these particular words, we

5    can't determine as the reader of these comments why the

6    activity does not appear to be suspicious; is that fair?

7    A.  I would say she gives information and -- including who

8    the wires are from and going to, and that -- through that

9    she's decided that it's not suspicious.

10   Q.  And is that all we have to go off of, based on these

11   comments?

12   A.  Based off of what's written.

13   Q.  And, again, this is what you would have had access to

14   when you were reviewing your alerts, and you actually would

15   have reviewed this, right?

16   A.  I would have had access to this, yes, and reviewed

17   things like this.  I don't remember what I looked at when I

18   worked my alert.

19   Q.  So then we got here because we were talking about how

20   you would do your risk-based analysis.  Do you remember

21   that?

22   A.  Yes.

23   Q.  And so these comments here, would that factor into -- so

24   we've got these comments here and we've got the fact that

25   you could see billions of dollars were coming in on the

Pesch - Recross

1    alerts that you did.  Would all of that come together into

2    your risk-based analysis as to whether or not you would

3    think looking into the -- looking more into the Nationwide

4    and Enchanted wires that were for billions of dollars, would

5    that be a factor in that?

6    A.  That would be potentially part of it, but not all of it.

7    Q.  So let's just go back, then, to -- just a couple more

8    questions on your alerts and we'll close this up.

9              But if we go back to Alert 64556.

10   A.  Page number, please?

11   Q.  Yes.  I'm sorry.  Exhibit 183, page 37.  Thank you.

12             I had asked you -- I believe we had talked about

13   the use of the funds of the money going out of the account,

14   and I want to ask you now based on what you have just

15   testified to about the money coming into the account.  If we

16   go back on page 38 to the $1.463 billion of incoming wires,

17   can you tell, Ms. Pesch, by reading your comments, why the

18   $1.46 billion is being wired into the account?

19   A.  Can you clarify what you mean by "why"?

20   Q.  Yeah.  The reasons for why the $1.46 billion is being

21   wired into the account.

22   A.  I don't see the purpose of the wire.

23   Q.  So, again, is it just beyond the comments -- beyond the

24   comments that are written here, you can't tell the jury why

25   the $1.46 billion is being wired into the account; is that

1    true?

2    A.  Based on what's written here, no.

3    Q.  Ms. Pesch, a few questions just on Nationwide and

4    Enchanted again.

5           Do you know what the legitimate business purpose

6    was for any wire from Enchanted, for example?

7    A.  I don't --

8           MS. MOMOH:  Objection, Your Honor, vague as to

9    time.

10          THE COURT:  Overruled.

11          THE WITNESS:  Can you repeat that?

12   BY MR. COLLYARD:

13   Q.  Yes.  Do you know what the legitimate business purpose

14   was for any wire that came in from Enchanted?

15   A.  I don't remember.

16   Q.  Do you know if you figured out whether or not there was

17   a legitimate business purpose for any wire coming in from

18   Enchanted?

19   A.  I don't remember.

20   Q.  And do you know what the legitimate business purpose was

21   for any wire coming in from Nationwide?

22   A.  I don't remember.

23   Q.  And do you know if you tried to figure out what the

24   legitimate business purpose was for any wire coming in from

25   Nationwide?

Pesch - Recross

1    A.  I don't remember.

2    Q.  I want to go -- we can go off of this right now and

3    let's go to Exhibit 398.  It's Plaintiff's Exhibit 398.  Are

4    you there, Ms. Pesch?

5    A.  Yes.

6    Q.  If we go to -- just generally on Plaintiff's Exhibit

7    398, counsel had asked you questions about these guidelines

8    in Exhibit 398.  Do you remember that?

9    A.  Which counsel?

10   Q.  Ms. Momoh.

11   A.  Yes.

12   Q.  And you had testified, and I believe this is what you

13   said, on Exhibit 398 you said, "I remember referring to this

14   very frequently as I was working alerts.  Oftentimes I had

15   it right next to my keyboard."  Do you remember saying that?

16   A.  Yes.

17   Q.  So you're familiar with Exhibit 398, correct?

18   A.  I don't have it memorized, but I'm familiar with it,

19   yes.

20   Q.  Do you remember when I was asking you questions about --

21   I had showed you -- I had shown you Exhibit 182 and we were

22   trying to figure out what "peer" meant, and we were showing

23   the comparison between the money that was being wired in

24   compared to the peer averages?

25   A.  Can you please show me 182 again?

Pesch - Recross

```
1    Q.  Sure.  Are you at Exhibit 182?

2    A.  I see it on the screen.

3    Q.  Oh, good.  So let's go to -- we'll stick on our Alert

4    64556, just to do it that way, and it's Exhibit 182, page

5    42.  Is that on your screen?

6              And if you recall, I was asking you questions

7    trying to figure out the money being wired in compared to

8    the average.  Do you see that?

9              I will describe it better for the jury and for the

10   record.  If we go down, do you see the -- let's focus on the

11   incoming wire deposit.  Do you see that?

12   A.  I see the words "Incoming Wire Deposit."

13   Q.  And to the right of it, it has a value of

14   $839.6 million, right?

15   A.  Yes.

16   Q.  And that would be the total of the incoming wires that

17   were alerted for your Alert 64556 for the month of March of

18   2006, correct?

19   A.  Probably.

20   Q.  Any reason to disagree with me?

21   A.  Other than the fact that I haven't looked at Searchspace

22   alerts or worked with them in a long time, that's roughly

23   what I remember.  But -- I guess I'm not entirely certain.

24   Q.  I am going to expand my screen so I can get the

25   left-hand side of it to see where it says, "Peer Monthly
```

1    Value Event."  Do you see that?

2    A.  Yes.

3    Q.  Now if we look to the right -- so if we look to the

4    right of the $839 million and you see the average of 5.78

5    million, do you see that?

6    A.  Yes.

7    Q.  Do you have an understanding that what this document is

8    doing is it's taking the actual incoming wires and comparing

9    it to the average of the peers?

10   A.  I don't remember exactly how I would read and understand

11   this information.  When I look at this, I just see "Average

12   Value/Volume."  It doesn't clarify whose average value or

13   volume.

14   Q.  Does it make sense that what this is doing is taking the

15   wires coming in and comparing it to the average peers?

16   A.  It's hard to say when that's not titled.  It just says,

17   "Average Value/Volume."

18   Q.  So if we go back to Exhibit 398, then, your guideline

19   that you had by your keyboard, and take a look at page 5 of

20   Exhibit 398.  If we go down to the -- Ms. Momoh was asking

21   you if this was a list or a checklist.  Do you remember

22   that?

23   A.  Yes.

24   Q.  And if we go down to the second to the last -- what do

25   you want to call it?  Should we call it an item?

```
1    A.  Okay.

2    Q.  Okay.  We'll highlight that.  It says, "If the account

3    is a security blanket alert and it is alerting at the peer

4    level."  Do you see that?

5    A.  Yes.

6    Q.  And it says, "make sure the difference in activity in

7    that time period for the customer as compared to other

8    customers in the peer group is addressed."  Do you see that?

9    A.  Yes.

10   Q.  And is what that is talking about is taking the, for

11   example, the incoming wires and comparing it to the peer

12   group?

13   A.  Yes.

14   Q.  And what are the -- what is the peer group?

15   A.  Similar customers.

16   Q.  And what were the similar customers -- what customers at

17   M&I Bank were similar to Petters Company, Inc.?

18   A.  I don't remember.

19   Q.  Do you remember how the peer group was defined?

20   A.  No.

21   Q.  Was it just any other customer in the business banking

22   group?

23   A.  I don't remember.

24   Q.  And what this is saying is you have to explain what the

25   difference is between the wires compared to the peers,
```

Pesch - Recross

1      right?

2      A.  If they alerted for wires, yes.

3      Q.  So if we take it back, then, to Exhibit 183, which would

4      be your alert, and we will go to Alert 64556 again just to

5      keep using that as our example -- sorry.  It's Alert 64556.

6      And if we go to page 39 in Plaintiff's Exhibit 183.

7      A.  Okay.

8      Q.  If we go to the very bottom block there, are you with

9      me, Ms. Pesch?

10     A.  Yes.

11     Q.  Okay.  And it says, "Based on the review and analysis,

12     even though the incoming and outgoing wires are greater than

13     that of the other customers in the same peer group, the

14     activity is consistent and expected for this customer."  Do

15     you see that?

16     A.  Yes.

17     Q.  And if we go back to Exhibit 182, then, at page 42, and

18     we will just pop that up again real quickly and look at the

19     incoming wires, just for the incoming wire portion with the

20     $839 million going in, is that what you would have looked at

21     to make the determination in Plaintiff's Exhibit 183 that

22     the incoming wires are greater than the other customers in

23     the peer group?

24     A.  I don't remember.  Possibly.

25     Q.  And if that's the case, Ms. Pesch, it's not -- you agree

Pesch - Recross

```
 1    that back to your comments, then, in Exhibit 183, page 39,
 2    if we go to Exhibit 183, page 39, in that last block, based
 3    on what we just saw in Exhibit 182, it's not only that the
 4    difference is greater, it's greater by 800 and something
 5    million dollars, correct?
 6    A.  I couldn't tell you the amount that it's greater.
 7    Q.  And do you -- if in Exhibit 398, if you are supposed to
 8    explain the difference, what is the explanation for the
 9    difference in the incoming wires compared to the peer group
10    for this particular alert?
11    A.  Can you repeat your question?
12    Q.  Yes.  If Exhibit 398 requires you to explain the
13    difference or address the difference, what is the difference
14    between the amount of the incoming wires compared to the
15    peer group that is being compared to the Petters Company,
16    Inc.?
17    A.  I don't remember.
18    Q.  And when you say in this last block, Ms. Pesch, how
19    the -- when you say, "The activity is consistent and
20    expected for this customer," do you see that?
21    A.  Yes.
22    Q.  How are you concluding that the activity is consistent
23    and expected?
24    A.  Beyond what's written in the comments, I don't remember.
25    Q.  And you can't say why you're concluding that the
```

 1     activity is consistent and expected for Petters Company,

 2     Inc., correct?

 3     A.   Sitting here today, I don't remember.

 4               MR. COLLYARD:   I have no further questions,

 5     Your Honor.

 6               THE COURT:   Anything further for this witness?

 7     Anything further for this witness?

 8               MS. MOMOH:   Your Honor, I have no further

 9     questions for the witness, but at this time I re-offer the

10     exhibits Defendant's Exhibit DX-80020 and Exhibit DX-80021

11     based on the redirect examination by Mr. Collyard,

12     plaintiff's counsel.

13               MR. COLLYARD:   Same objection.

14               THE COURT:   Let me just excuse the witness at this

15     time.  She's excused.

16               MS. MOMOH:   Sure.

17               THE COURT:   Thank you.

18               THE WITNESS:   Thank you.

19               THE COURT:   Counsel, do you wish to be heard?

20               MR. COLLYARD:   Oh, I'm sorry, Your Honor.  Same

21     objections.

22               THE COURT:   Sidebar.

23          **(At sidebar)**

24               THE COURT:   Your objection post redirect?

25               MR. COLLYARD:   I'm sorry, Your Honor?

1            THE COURT:  Your objection post redirect?

2            MR. COLLYARD:  Yes.  I maintain the same

3    objections that I made when it was addressed, yes.

4            MS. MOMOH:  I'm sorry.  I didn't hear your

5    question.

6            THE COURT:  I asked him the same objections post

7    redirect.  Do you wish to be heard?

8            MS. MOMOH:  Yes, Your Honor.  I'm not trying to

9    examine the witness with respect to these two exhibits.  As

10   I said, my only purpose is to re-offer these documents into

11   evidence based on the questions that Mr. Collyard had

12   already asked of Ms. Pesch.  He asked her several questions

13   with respect to these two Petters Group magazines as to what

14   she saw, what impression it had made of her, why did she say

15   this with respect to celebrities, and whether she considered

16   the fact that there were celebrities in the magazine

17   impacting her decision when she was adjudicating the alerts

18   back in 2006.

19           He asked her several questions with respect to

20   that, Your Honor, and the content of these magazines, which

21   I actually did not even go into.  So because he asked her

22   those questions, that opened the door to -- our position is

23   that it opened the door to the jurors being allowed to now

24   see these magazines because he asked her questions specific

25   with respect to what was in the magazines themselves.

1          MR. COLLYARD:  I simply asked her questions based

2     on her testimony.  I didn't show her the magazines.  I

3     didn't talk to her anything beyond what she testified to.

4     She was allowed to talk about what she saw and you

5     established that with her when you asked her questions on

6     that, and I was simply responding to her answers.

7          THE COURT:  And so you're seeking to have the

8     magazines themselves admitted into evidence?

9          MS. MOMOH:  Yes, Your Honor.

10          THE COURT:  That motion is denied.  They are not

11     admitted into evidence.

12          MR. COLLYARD:  Thank you, Your Honor.

13          **(In open court)**

14          MR. COLLYARD:  Your Honor, plaintiff calls

15     adversely Mandy Ramlow, an employee of BMO Harris.

16          MS. PARLOVECCHIO:  It will be just one moment,

17     Your Honor.  She is indisposed.

18          (Pause)

19          COURT REPORTER:  Please stand and raise your right

20     hand.

21          (Witness sworn)

22          COURT REPORTER:  Could you state your name and

23     spell your first and last name.

24          THE WITNESS:  Sure.  My name is Mandy Ramlow.

25     First name is M-a-n-d-y.  Last name is R-a-m-l-o-w.

1          THE COURT:  Counsel, you may proceed.  Good

2     morning.

3          MR. COLLYARD:  Thank you, Your Honor.

4                    **(Mandy Ramlow)**

5                    **CROSS-EXAMINATION**

6     BY MR. COLLYARD:

7     Q.  Good morning, Ms. Ramlow.

8     A.  Good morning.

9     Q.  We've met before, right?

10    A.  We have.

11    Q.  That was when I took your deposition in Milwaukee?

12    A.  Correct.

13    Q.  Are you currently still employed at BMO Harris Bank?

14    A.  I am.

15    Q.  And what is your current role?

16    A.  Current role is managing director of the AML systems,

17    data, innovation, and operations teams.

18          THE COURT:  Ms. Ramlow, I'm going to ask you to

19    move the base of the microphone closer to you so that we can

20    hear you a little bit better.  And if you move the base,

21    then the mic will be closer as well.

22          THE WITNESS:  Oh, sure.  No problem.  Is that

23    better?

24          THE COURT:  Yes.  You can move the base and then

25    you will be more comfortably seated I think.

```
1              THE WITNESS:  Okay.  No problem.

2    BY MR. COLLYARD:

3    Q.  You have been working at the bank -- and I will call the

4    bank "bank" or "BMO Harris Bank," including "M&I" -- going

5    back to 1996; is that right?

6    A.  January of 1996.

7    Q.  You started working in the Anti-Money Laundering Group

8    in 2004, if I remember?

9    A.  In June of 2004.

10   Q.  You became an anti-money laundering analyst then?

11   A.  Correct.

12   Q.  And you worked in the Anti-Money Laundering Group from

13   2004 at least up through the time period of 2008; is that

14   right?

15   A.  Yes.

16   Q.  So let me just pause there.  Did you go on and continue

17   to work in the Anti-Money Laundering Group at BMO Harris

18   Bank?

19   A.  I did.

20   Q.  What were your different roles in the Anti-Money

21   Laundering Group?

22   A.  So I have been an analyst, a lead analyst, an

23   investigations unit manager.  In 2014, I was a managing

24   director of the Financial Intelligence Unit for BMO Harris.

25   In 2018-'19, I became a managing director of the Financial
```

1    Intelligence Unit for the U.S. and Canada.  And then most

2    recently in April of this year, I took on the new role.

3    Q.  If we step back to the 2005 to 2008 time frame, you were

4    an AML analyst and a lead analyst; is that right?

5    A.  So an AML analyst starting in June of 2004.  By 2007, I

6    was a lead analyst; and then by 2008, I was a supervisor.

7    Q.  In 2008, you were a supervisor in the Anti-Money

8    Laundering Group?

9    A.  Yes.

10   Q.  Who did you report to?

11   A.  Bernita Hile.

12   Q.  Was Bernita Hile also your boss when you were an

13   anti-money laundering analyst?

14   A.  Yes.

15   Q.  Was Bernita Hile the boss of all the anti-money

16   laundering analysts from 2005 to 2008?

17   A.  When I took on the supervisor role, I had some of my own

18   directs that reported to me.

19   Q.  Did Sara Johnson report to you?

20   A.  In that period, I don't remember.

21   Q.  Who reported to you?

22   A.  I don't remember the names.

23   Q.  So if we step back to 2005 to 2008, was the Anti-Money

24   Laundering Group five or six people?

25   A.  In 2004, it was about three or four people.  By 2008, it

1    was probably around 10 or 12 people.

2    Q.  And do you remember -- do you know who Sara Johnson is,

3    for example?

4    A.  Yes.

5    Q.  You worked closely with Sara Johnson?

6    A.  She was one of the analysts in the group.

7    Q.  Did you work closely with her?

8    A.  In what way?

9    Q.  For example -- let me back up.  Would the anti-money

10   laundering analysts, would they bounce ideas off of each

11   other and talk to each other about reviewing alerts and

12   their analysis?

13   A.  We would talk to each other, yes.

14   Q.  Did you ever talk with Sara Johnson, for example, about

15   any analysis that she was doing?

16   A.  I would talk to her about work that she was doing at

17   times, yes.

18   Q.  Do you recall if you ever talked to Sara Johnson about

19   doing alerts on the Petters Company, Inc. account?

20   A.  No.

21   Q.  You know that from 2005 up through 2008 that the

22   Anti-Money Laundering Group reviewed about 39 months' worth

23   of alerts on the Petters Company, Inc. account, right?

24   A.  I don't know how many months it was.

25   Q.  Do you have an understanding that it was about

1    three-and-a-half years long of alerts that you reviewed?

2    A.  Do I understand how long three-and-a-half years is?

3    Q.  Do you understand that there were about three-and-a-half

4    years of alerts going off on the Petters Company, Inc.

5    account?

6    A.  I don't remember.

7             THE COURT:  I'm having trouble hearing you, and

8    that's probably my problem, but it's an important problem

9    for me.  So may I have you move the base so that --

10            THE WITNESS:  Sure.  Is this far enough?

11            THE COURT:  That's much better.  Thank you.

12   BY MR. COLLYARD:

13   Q.  You're familiar with the Petters Company, Inc. account,

14   right?

15   A.  Yes.

16   Q.  And you're familiar with the Petters Company business?

17   A.  What they were?

18   Q.  Sure, what they were.

19   A.  I remember what I thought they were at the time.

20   Q.  And you remember what you thought they were from 2005 up

21   through 2008?

22   A.  Yes.

23   Q.  Do you have an understanding that billions of dollars

24   were going in and out of the account from 2005 through 2008?

25   A.  I do now.

1    Q.  You didn't know back then?

2    A.  No, I didn't.

3    Q.  That's a surprise to you?

4    A.  Is it a surprise to me?  No.

5    Q.  I'm sorry.  From the time period -- back when you were

6    in the Anti-Money Laundering Group from 2005 through 2008,

7    did you know that billions of dollars were being wired in

8    and out of the Petters Company, Inc. account?

9    A.  I don't remember how much it was.

10   Q.  Do you recall that it was in the area of billions of

11   dollars?

12   A.  I don't remember.

13   Q.  Do you recall that there were large amounts of money

14   going in and out of the account?

15              MS. PARLOVECCHIO:  Objection, vague.

16              THE COURT:  Sustained.

17   BY MR. COLLYARD:

18   Q.  You don't recall any amount of money going in and out of

19   the Petters Company, Inc. account from 2005 through 2008?

20   A.  I don't remember all the values, no.

21   Q.  Do you remember any values?

22   A.  Not really.

23   Q.  Do you know, Ms. Ramlow, that you, yourself, closed

24   alerts on the Petters Company, Inc. account?

25   A.  Yes.

1    Q.  Do you understand that you closed seven alerts?

2    A.  I don't remember how many.

3    Q.  And do you have any understanding -- well, do you know

4    what the value of the incoming and outgoing wires were that

5    you, yourself, closed?

6    A.  I don't remember them all.

7    Q.  If I told you it was $9.1 billion, would that help

8    refresh your recollection?

9    A.  No.

10             MS. PARLOVECCHIO:  Objection.

11             THE COURT:  The answer stands.

12   BY MR. COLLYARD:

13   Q.  I'm sorry.  Did you say no?

14   A.  No, I don't remember all the values.

15   Q.  If I told you that it was $9.1 billion of alerts that

16   you closed, would you have any reason to disagree with me?

17             MS. PARLOVECCHIO:  Objection.

18             THE COURT:  Overruled.

19             THE WITNESS:  Can you ask the question again?

20   BY MR. COLLYARD:

21   Q.  Sure.  If I told you that you had actually reviewed and

22   closed $9.1 billion of alerts on the Petters Company, Inc.

23   account, would you have any reason to tell me I'm wrong or

24   to disagree with me?

25   A.  No.

```
 1     Q.  Do you agree, Ms. Ramlow, that one of the functions of
 2     the Anti-Money Laundering Group was to identify suspicious
 3     activity?
 4     A.  Correct.
 5     Q.  And included within identifying suspicious activity
 6     would be identifying activity that would be indicative of
 7     money laundering?
 8     A.  It would be looking for activity that would be
 9     indicative, yes.
10     Q.  And do you also agree with me that in identifying
11     whether or not there's suspicious activity, that could
12     include activity that could be or would be indicative of a
13     Ponzi scheme?
14     A.  Could you state that again?
15     Q.  Sure.  When the -- as part of the Anti-Money Laundering
16     Group's function to identify suspicious activity, is part of
17     that also looking for activity that could be indicative of,
18     for example, Ponzi schemes?
19               MS. PARLOVECCHIO:  Objection as to time frame.
20               THE COURT:  Sustained.  Set the time frame.
21               MR. COLLYARD:  I will.  Thank you, Your Honor.
22     BY MR. COLLYARD:
23     Q.  So what I'm going to do is I will set the time frame
24     right now from 2005 up through 2008, and I am going to stick
25     in that time frame unless I tell you otherwise.  Is that
```

1    fair enough?

2    A.  Sure.

3    Q.  So from 2005 through 2008, as part of the Anti-Money

4    Laundering Group's roles and responsibilities, was the

5    Anti-Money Laundering Group looking for, for example,

6    activity that could be indicative of a Ponzi scheme?

7    A.  That would be a pattern that we would -- should be

8    looking for, yes.

9    Q.  And do you -- and you know, Ms. Ramlow, that the Petters

10   Company, Inc. at one point in time had been found to -- Tom

11   Petters had been found to have been involved in a Ponzi

12   scheme?

13   A.  I know now.

14   Q.  When did you first find that out?

15   A.  In the 2008 time frame.

16   Q.  And, Ms. Ramlow, you don't recall what your reaction was

17   to first learning that, do you?

18   A.  I believe I was likely shocked, confused.

19   Q.  Ms. Ramlow, you don't remember what your reaction was

20   when you found out, do you?

21   A.  I don't remember that day or that moment 16 or 18 years

22   ago.

23   Q.  Have you heard of the term "willful blindness"?

24   A.  Yes.

25   Q.  You know what that means, right?

1     A.  Yes.

2     Q.  And that's a term that the Anti-Money Laundering Group

3     uses, correct?

4     A.  It's a term used in the anti-money laundering industry,

5     yes.

6     Q.  It's also a term used in the banking industry, true?

7     A.  I don't know that.

8     Q.  You don't know if, for example, the bank educates its

9     personnel on the concept of willful blindness?

10    A.  Yes.

11    Q.  The bank does educate its personnel on the concept of

12    willful blindness?

13    A.  It's AML stuff, yes.

14    Q.  Do you agree that willful blindness is if you see

15    something that's unusual and you don't look into it?

16    A.  If you see something unusual and you don't look into it

17    and escalate it up and report it appropriately.

18    Q.  Let me ask you it this way:  Do you agree that willful

19    blindness is if you see something that's unusual and you

20    don't look into it, nothing else?

21              MS. PARLOVECCHIO:  Objection, asked and answered.

22              THE COURT:  Overruled.  You may answer.

23              THE WITNESS:  Could you ask that question again?

24    BY MR. COLLYARD:

25    Q.  I will.  Do you agree that willful blindness is if you

1    see something that's unusual and you don't look into it,

2    nothing else?

3    A.  Sure.

4    Q.  Is that a yes?

5    A.  Yes.

6    Q.  Sorry.  I want to hand you or show you -- this is a

7    defendant's exhibit that I want to show you, and if we go

8    to -- you should have a binder there, and it should be at

9    the beginning of your binder.  I want to bring you to

10   Exhibit DX-40067.

11   A.  What was the number again?

12   Q.  It's DX-40067.

13   A.  I think I have it.  DX-40067-0003?

14   Q.  Yeah, you should have -- you should have, if you turn

15   that page on your left, I'm sorry, if you take it -- nope,

16   go back and grab the one before that.  There you go.  Take a

17   look at that.  Now do you see that it's DX-0067-01 [sic] on

18   the bottom?

19   A.  Yes.

20   Q.  Okay.  Now if you turn the page to page 2, you see

21   there's a PowerPoint or a slide presentation there, right?

22   A.  I do.

23   Q.  And it's called, "Bank Secrecy Act & Anti-Money

24   Laundering Compliance, Recognizing and Reporting Suspicious

25   Activity."  Do you see that?

 1    A.  I do.

 2    Q.  Do you understand that there was an initiative at the

 3    bank back in the 2004-2005 time period while you were in the

 4    Anti-Money Laundering Group to educate employees on the

 5    responsibilities or the importance of identifying and

 6    reporting suspicious activity?

 7    A.  I do remember.

 8    Q.  What was the reason for that?

 9    A.  I don't remember.

10    Q.  Do you recall that the Federal Reserve Bank of Chicago

11    had criticized the anti-money laundering program at the bank

12    back in 2003 or so?

13              MS. PARLOVECCHIO:  Objection, foundation.

14              THE COURT:  Sustained.

15    BY MR. COLLYARD:

16    Q.  Do you know, Ms. Ramlow, that there was any -- do you

17    know that there was any commentary by the Federal Reserve

18    back in 2003 about the bank's anti-money laundering program

19    at the time?

20    A.  I was an analyst, so I wasn't in on all those

21    conversations to know.

22    Q.  And you don't know what led to the effort that the bank

23    put into to go out and educate its employees on the

24    importance of identifying and reporting suspicious activity

25    after 2003?

```
 1    A.  No.

 2    Q.  Nobody ever told you about that?

 3    A.  Not that I remember.

 4    Q.  If you take a look at this slide, let's just take a look

 5    at it.  If you go to, for example, page 5, it says, "Basic

 6    Terminology."  Do you see that?

 7    A.  I do.

 8    Q.  If you go to the next page, page 6, and it says, "Basic

 9    Terminology, Bank Secrecy Act."  Do you see that?

10    A.  I do.

11    Q.  You're familiar with these concepts, right?

12    A.  I am.

13    Q.  And you attended training back in the 2004 and 2005 time

14    period, right?

15    A.  Yes, I would have.

16    Q.  This is the type of training materials that you saw when

17    you attended that training session -- those training

18    sessions.  Do you recall that?

19    A.  I do.

20           MR. COLLYARD:  Your Honor, offer Defendant's

21    Exhibit DX-40067.

22           MS. PARLOVECCHIO:  No objection.

23           THE COURT:  Defendant's Exhibit 40067 is received

24    into evidence.

25    BY MR. COLLYARD:
```

1   Q.  We'll just go and we'll pull up the first page just

2   again to take a look at it to get us oriented here.  This

3   was -- this is a PowerPoint for a training session to teach

4   about recognizing and reporting suspicious activity, right?

5   A.  Yes.

6   Q.  And back in -- we talked about the duties and the

7   responsibilities of the Anti-Money Laundering Group, and we

8   talked about how one of the functions was to identify

9   suspicious activity.  Do you remember that?

10  A.  I do.

11  Q.  And another function was to actually report suspicious

12  activity; is that right?

13  A.  Correct.

14  Q.  And if we go to page 11, we have a slide that says,

15  "Basic Terminology, Suspicious Activity."  Do you see that?

16  A.  I do.

17  Q.  In the middle bullet, "Has no apparent lawful purpose."

18  Do you see that?

19  A.  Yes.

20  Q.  And you understood while you were in the Anti-Money

21  Laundering Group that if there was transaction activity that

22  did not have an apparent lawful purpose, that that would be

23  activity that could potentially at least be suspicious,

24  right?

25  A.  That was one item.

1    Q.  And this PowerPoint actually has some notes that go

2    along with it, and I just want to take a look at the notes.

3    If we go down and we focus on the notes with this, we see

4    where it says, "We'll also use the terms 'interesting' or

5    'unusual activity.'"  Do you see that?

6    A.  Yes, I see it on the bottom of the page of the slide.

7    Q.  And, Ms. Ramlow, you understand that the terms

8    "interesting" or "unusual" were common terms used with

9    identifying potentially suspicious activity, right?

10   A.  It could be used.  "Interesting" was not the same as

11   "suspicious," though.

12   Q.  Was the term "interesting" used with the concept of

13   identifying potentially suspicious activity back in the

14   Anti-Money Laundering Group, to the best of your knowledge?

15   A.  I don't remember using the word "interesting."

16   Q.  You don't remember if something was interesting -- let

17   me back up.  You don't remember that bank personnel were

18   taught that if something was interesting, that they should

19   think about looking into it further or look into it further?

20   A.  I don't remember the training.

21   Q.  What about the term "unusual?"  If -- do you remember

22   that bank personnel were taught that if there was something

23   that appeared to be unusual, that that would be something

24   that they should look into further?

25   A.  I do.

1    Q.  Let's jump to page 16.  I'm sorry.  I'm on slide 16.

2    Let's jump to page 17, page 17 of the document, slide 16.

3    Do you see up at the top it says, "Risks of Non-Compliance"?

4    Do you see that?

5    A.  I do.

6    Q.  Let's go down to the notes.  I just want to talk to you

7    about one of the notes again, just to clarify this.  If we

8    pull it up in the middle there it says, "Explain willful

9    blindness."  Do you see that?

10   A.  I see it in the notes, yes.

11   Q.  And the notes say, "Explain willful blindness -looking

12   the other way."  Do you see that?

13   A.  I do.

14   Q.  And do you agree that another way to define willful

15   blindness is looking the other way?

16   A.  Looking the other way and not reporting, yes.

17   Q.  Let's go to page 20.  This is slide 19.  We'll just

18   start with the slide and then we'll focus on the comments.

19   And it says, "Don't Make Assumptions of Legitimacy - Know

20   Your Customer Well."  Do you see that?

21   A.  Yes.

22   Q.  And you're familiar with the concept of "know your

23   customer," right?

24   A.  In what context?

25   Q.  In the context of banking, for example.

1    A.  In what way?

2    Q.  Well, did the bank have to know its customers?

3    A.  It does as to follow "know your customer" procedures.

4    Q.  And that's part of the AML Group.  The AML Group has to

5    know their customers, right?

6    A.  The AML Group?  The bank has had to know their customers

7    when they're onboarding, and the AML Group had to understand

8    to the best of what was available to them.

9    Q.  Ms. Pesch called it KYC.  Do you know what KYC means?

10   A.  "Know your customer."

11   Q.  That's how you commonly referred to it at the bank is

12   KYC?

13   A.  Correct.

14   Q.  And you see that first topic there, it says, "Being

15   'familiar' with the customer isn't enough - 'Oh yeah, he

16   does that all the time.'"  Do you see that?

17   A.  I do.

18   Q.  And that -- what is being taught there, you understand,

19   and you can tell me if you disagree, is that it's not good

20   enough just to be familiar with your customer and say, Oh,

21   they do it all the time.  You can't make assumptions about

22   that.  You have to actually look into it?

23   A.  That's correct.

24   Q.  And if we go down to the notes section, then.  We will

25   do the first note that will -- we'll do the first note and

1    the last note.  So we'll start with the first one.  And it

2    says, this is the speaker notes, and it says, "Being

3    familiar is not the same as knowing your customer and what

4    their legitimate and expected activities are."  Do you see

5    that?

6    A.  I do.

7    Q.  And as part of your work in the Anti-Money Laundering

8    Group, you would have to know what your customer's

9    legitimate and expected activities are, correct?

10   A.  We would have to understand their activity, yes.

11   Q.  And their activity is their business activity, correct?

12   A.  It could be an individual or a business.

13   Q.  Right.  So if it was a business, it would be their

14   business activities, correct?

15   A.  Yes.

16   Q.  Petters Company, Inc. was a business, right?

17   A.  It was a business.

18   Q.  So under this notion, you would understand Petters

19   Company, Inc.'s business activities, correct?

20   A.  To the best of our ability, yes.

21   Q.  And we'll go down to the last note and we'll pull that

22   one up.  And it reads, "Watch out for cases of promised 'big

23   deposits' or wires."  Do you see that?

24   A.  I do.

25   Q.  And it says, "Where is the money coming from and why is

1    it coming to us?"  Do you see that?

2    A.  I see it.

3    Q.  And those were concepts that were being taught to bank

4    personnel at the bank, right?

5    A.  It was part of the training that was presented here.

6    Q.  Was the training to teach the bank personnel these

7    concepts?

8    A.  From the notes, yes.

9    Q.  And you understood that there were times where, as in

10   the Anti-Money Laundering Group, you had to understand where

11   the money was coming in from and why it was coming in,

12   correct?

13            MS. PARLOVECCHIO:  Objection, form.

14            THE COURT:  Overruled.

15            THE WITNESS:  Can you ask it again?  Sorry.

16   BY MR. COLLYARD:

17   Q.  Sure.  You understand that while you were working in the

18   Anti-Money Laundering Group, there were times when you were

19   looking at activity and you had to understand, for example,

20   if it was wire activity, where the money was coming from and

21   why it was coming to the bank?

22   A.  Have to understand where it's coming from, yes.

23   Q.  And there were times, just like it's being taught here,

24   Ms. Ramlow, where you actually have to figure out why the

25   wires were coming into the bank, correct?

1    A.  If there was reason to need to do that.

2    Q.  If there was reason to understand why the money was

3    coming into the bank?

4    A.  Correct.

5    Q.  Let's go to page 31 in DX-40067.  This slide at the

6    top -- I'll just read it -- it says, "Your Responsibilities

7    with Wire Transfer Transactions."  Do you see that?

8    A.  I do.

9    Q.  If we go down to the notes section, give it more

10   clarity, we'll just look at the bottom part of the notes

11   here where it says, "We are improving."  It reads, "We are

12   improving our automated monitoring capabilities - but you

13   all need to remain vigilant and consider when certain wires

14   conducted by customers don't make sense."  Do you see that?

15   A.  I do.

16   Q.  And that was the concept of -- being vigilant and

17   considering when certain wires don't make sense was a

18   concept that was being taught to bank personnel; is that

19   right?

20   A.  From the training it appears so, yes.

21   Q.  And in the anti-money laundering world that you were

22   living in at the bank, one of your roles was to determine

23   whether or not wire activity made sense for the customer,

24   correct?

25   A.  Yes.

1    Q.  And isn't that really the fundamental basis for what the

2    Anti-Money Laundering Group was trying to do at the end of

3    the day when they were investigating or analyzing activity

4    going in or out of an account was to determine whether or

5    not that activity made sense for the customer?

6    A.  Yes.

7    Q.  Let's jump to page 38.  This slide is at the top, I'll

8    just read it, "Enhanced Due Diligence."  Do you see that?

9    A.  Yes.

10   Q.  Go to the bottom where the notes are.  I am just going

11   to take kind of the bottom portion of the notes where it

12   reads, "It's not always."  I'll blow that up, and this

13   reads, "It's not always easy to ask the tough questions to

14   make sure we understand the customer and their activity."

15   Do you see that?

16   A.  Yes, I read it.

17   Q.  And that's -- what that's talking about is teaching its

18   bank personnel that sometimes it's not all that easy to

19   actually reach out to the customer and question the customer

20   on their activity; is that right?

21   A.  Sorry.  Say the question again.  I was reading.

22   Q.  The concept that's being taught here is telling bank

23   personnel that it's not always easy to reach out to the

24   customer to question their customer about their activity; is

25   that right?

1    A.  It says it's not always easy, yes, to ask the tough

2    questions.

3    Q.  So you agree with me?

4    A.  What's on the paper, yes.

5    Q.  Then the next line reads, "The more you know about a

6    customer, the better you can serve your customers."  Do you

7    see that?

8    A.  I do.

9    Q.  And that's just a basic concept that was being taught to

10   bank personnel, right?

11   A.  For this training, yes.

12   Q.  And it's just common sense that if you know more about

13   your customer, the better you can serve them, right?

14   A.  Yes.

15   Q.  Then the last line is, "The more complex the business -

16   the more we need to know about the customer."  Do you see

17   that?

18   A.  I do.

19   Q.  And what is being addressed there?

20   A.  Well, this slide is about enhanced due diligence.  So

21   depending on if the customer was a certain customer type,

22   you may require more additional information to understand

23   the complexity of the business.

24   Q.  And if the business is more complex, you've got to look

25   into it more than you would if it was a simple business; is

1     that right?

2     A.  For enhanced due diligence, if that was required for

3     that customer type.

4     Q.  Do you know if Petters Company, Inc. was considered --

5     did you consider Petters Company, Inc. to be a complex

6     business or a simple business?

7               MS. PARLOVECCHIO:  Objection.

8               THE COURT:  Overruled.  You may answer if you can.

9               THE WITNESS:  In what context, complex?  Simple?

10    BY MR. COLLYARD:

11    Q.  In the context of the banking world where you are trying

12    to figure out if it's a customer you need to look into

13    further, would you have considered, based on what you knew

14    about Petters Company, it to be a complex business or a

15    simple business?

16    A.  From what I understood about them, I didn't see them as

17    fitting into the complex.

18    Q.  You thought it was a simple business?

19    A.  I wouldn't say simple, but for enhanced due diligence

20    that was required from an AML perspective, I don't remember

21    them falling into a complex bucket.

22    Q.  What exactly do you recall the Petters Company, Inc.

23    business was from 2005 to 2007, let's say?

24    A.  What was the business type?  What were they doing?

25    Q.  Yeah, what was the business?

 1    A.  They were, what I remember, is a number of -- and

 2    well-known companies, global companies, companies that we

 3    may have been consumers of, like Polaroid or Sun Country or

 4    Fingerhut, that fell under a larger group of companies that

 5    he was running.

 6              THE COURT:  Counsel, we are going to take our

 7    lunch break now.

 8              Members of the Jury, please remember the

 9    instructions that you have received and please be ready

10    to -- and please continue to follow them.  Please be ready

11    to return to the courtroom at 1:00, and I hope you have a

12    good lunch.  All rise for the jury.

13         (Jury excused)

14                        **IN OPEN COURT**

15                      **(JURY NOT PRESENT)**

16              THE COURT:  And you are excused for lunch.  Please

17    be prepared to return at 1:00 and be ready to resume your

18    testimony.  Thank you.

19              THE WITNESS:  Thanks.

20              THE COURT:  Anything further from counsel?

21              MR. COLLYARD:  No, Your Honor.

22              MS. PARLOVECCHIO:  No, Your Honor.

23              MR. GLEESON:  One thing, Judge, please.

24              THE COURT:  You are excused.  The witness is

25    excused.

```
1                THE WITNESS:  Oh, I'm sorry.

2                THE COURT:  I don't want to delay your lunch.

3           You may be seated.

4                MR. GLEESON:  One miscellaneous thing that I

5      just --

6                THE COURT:  Please, let's wait.

7                MR. GLEESON:  I'm sorry.  One miscellaneous --

8                THE COURT:  You may proceed.

9                MR. GLEESON:  Sorry, Judge.  A miscellaneous item

10     I forgot to mention on Friday was the withdrawal of the

11     motion made at the beginning of the lunch session Friday

12     with regard to this willful blindness.  I made the

13     application.  The Court retired to -- at the lunch hour to

14     consider it.  I informed one of your law clerks, one of your

15     staff, it was withdrawn.

16          I just wanted to reconfirm that that one

17     application that I made at the beginning of the lunch break

18     Friday was withdrawn.

19               THE COURT:  So it is on the record now --

20               MR. GLEESON:  Thank you.

21               THE COURT:  -- that it is withdrawn.

22               MR. GLEESON:  Judge, I have two related matters.

23          One is just -- it's really just guidance, and it

24     relates to both we don't want to unnecessarily object.  We

25     want to move the trial as much as the Court does, and
```

1    because it affects scheduling.

2            And the issue is we know that because our

3    witnesses are being called in the plaintiff's case,

4    witnesses we intended to call, we have no kind of outside

5    the scope limitations on our examination.  We don't want to

6    unnecessarily object to outside the scope on the redirect

7    examination.  And if the Court is inclined to give us a

8    little guidance in that, it would be useful because then we

9    will understand and we won't object maybe as often as we

10   have.

11           It's related to scheduling because we're in this

12   position -- we know you don't want to have any dead air time

13   at the end of the day.  Many of the witnesses are witnesses

14   we're bringing to court.  We were told to have -- you know,

15   so we had questioning here about what one witness thought

16   Pat Currie-Smotherman was thinking when she closed out an

17   alert.

18           Pat Currie-Smotherman has been here for three

19   days, as have Ms. Ramlow, Mr. Jambor, who works in the area.

20   Those two witnesses are from --

21           THE COURT:  Counsel, what is your point?

22           MR. GLEESON:  My point is we can't rely --

23           THE COURT:  What do you want to do?

24           MR. GLEESON:  I would like some guidance on

25   outside the scope.  And I also, Judge, to the extent -- we

1    don't think it's reasonable for us to be expected, just

2    because plaintiff's counsel says they're going to be called

3    the next day, to require people, for example, from Milwaukee

4    to spend three days here.

5         So we're just trying to figure out a way so that

6    we're not inflicting unnecessary inconvenience on our

7    witnesses.  Part of it will be us predicting how long

8    counsel will actually take, but I think the Court

9    understands -- I sense your impatience with me.  I am just

10   trying to minimize the serious inconvenience to our

11   witnesses.

12        THE COURT:  I am not impatient with you at all.

13        MR. GLEESON:  Okay.

14        THE COURT:  You are raising issues with me that

15   should be raised with your opposing counsel such that you

16   can try to coordinate the time frame for bringing witnesses

17   in and perhaps reach agreements as to calling witnesses out

18   of order if necessary.

19        The Court is not going to interject herself into

20   this matter.  Counsel can resolve this matter.

21        MR. GLEESON:  Fair enough, Judge.  Although I

22   understand -- I am not blaming them to the extent that I

23   know they need to identify the witnesses that are coming in.

24   I understand the Court.

25        THE COURT:  Counsel can meet and confer about what

```
 1    their plans are for the witnesses that they expect to be

 2    calling and that should provide enough information to both

 3    sides.  And I am speaking to counsel, and that is all

 4    counsel, because the same issues will arise when --

 5              MR. GLEESON:  Which is why --

 6              THE COURT:  -- I expect, the rest of the case is

 7    proceeding.  And so I expect cooperation from members of the

 8    bar such that we can address an important matter in a timely

 9    way, being respectful of the witnesses, the Court, and the

10    lawyers.

11              MR. GLEESON:  Forgive me for interrupting the

12    Court.  We will try to work it out with plaintiff's counsel.

13    Thank you.

14              THE COURT:  Does plaintiff's counsel wish to be

15    heard?

16              MR. COLLYARD:  No, Your Honor.  Thank you.

17              THE COURT:  Okay.

18              LAW CLERK:  All rise.

19         (Lunch recess taken at 12:07 p.m.)

20                         *   *   *   *   *

21         (1:04 p.m.)

22                         IN OPEN COURT

23                         (JURY PRESENT)

24              THE COURT:  Please be seated.

25              Okay.  Counsel, are you ready to proceed?
```

1              MR. COLLYARD:  I am, Your Honor.  Thank you.

2              THE COURT:  You may.

3         (Pause)

4              THE COURT:  Good afternoon.  Sorry, it's a small

5    desk.

6              THE WITNESS:  It's a little tight up here, so I'm

7    just going to --

8              THE COURT:  You can take some things off as well.

9              THE WITNESS:  Can I get a thing of water?  Is that

10   okay?  Kind of busy up here.

11             THE COURT:  I'll leave that for you to --

12             THE WITNESS:  Thank you.  Much better.

13             THE COURT:  Okay.  Counsel, you may proceed.

14             MR. COLLYARD:  Thank you, Your Honor.

15   BY MR. COLLYARD:

16   Q.  Ms. Ramlow, before we took our lunch break, I was asking

17   you about the Petters Company, Inc. and I was asking you if

18   you could tell me exactly what you thought the Petters

19   Company, Inc. business was from 2005 up through 2008.

20   A.  Oh.  So that's a question?

21   Q.  Yeah, I'm sorry.  What exactly did you think the Petters

22   Company, Inc. business was from 2005 up to 2008?

23   A.  So I remember it being just a large group of companies

24   that Mr. Petters owned, including large companies like

25   Fingerhut, Polaroid, Sun Country that came to mind.

1    Q.  And you believed that Petters Company, Inc. owned

2    Polaroid?

3    A.  I believed they were all related.

4    Q.  My question is:  Do you believe that the -- did you

5    believe that Petters Company, Inc. owned Polaroid or

6    Fingerhut?

7    A.  I don't remember the ownership structure.

8    Q.  So it could have been that another company, like, for

9    example, Petters Group, owned Polaroid or Fingerhut; is that

10   right?

11   A.  I don't remember.

12   Q.  So you don't really have a specific recollection that

13   you believed Petters Company, Inc. actually owned any of

14   those entities, right?

15   A.  No, I believed they were all related.

16   Q.  Related in that Petters Company, Inc. was also a company

17   that Tom Petters had?

18   A.  Yes.

19   Q.  But what I'm trying to figure out is if you have a

20   specific recollection that you actually believed Petters

21   Company, Inc. owned Polaroid.

22           MS. PARLOVECCHIO:  Objection, asked and answered.

23           THE COURT:  Overruled.  You may answer.

24           THE WITNESS:  Okay.  Ask it again.

25   BY MR. COLLYARD:

1    Q.  Yeah.  Let's back up.  You understand that Petters had

2    an empire of businesses; is that fair to say?

3    A.  Yes.

4    Q.  And you understand that he had a big business called

5    Petters Group Worldwide.  Do you remember that?

6    A.  I remember the name.

7    Q.  And do you understand that Petters Group Worldwide

8    actually owned those entities that you have been talking

9    with me about?

10   A.  I don't remember the entire ownership structure.  I just

11   remember them being under the ownership of Petters.

12   Q.  Now, if we just pull Petters Company, Inc. out of it --

13   and I'm trying to figure out if you had a belief that

14   Petters Company, Inc. owned any of those other companies,

15   like Sun Country or Polaroid or Fingerhut.

16   A.  I don't remember those specifics.

17   Q.  How did you reach your conclusion as to what you

18   believed the Petters empire or the Petters Group of

19   companies owned?

20   A.  From looking at the information we had available at the

21   time.

22   Q.  And what would that have been?

23   A.  That would have been information in the customer

24   systems, the banker notes, the activity we looked at when we

25   were reviewing them.

1    Q.  So let's unpack that a little bit.  When you say "the

2    company systems," are you talking about, for example, the

3    MIContacts database?

4    A.  That would have been one place to go.

5    Q.  And what do you understand the MIContacts database to

6    be?

7    A.  It was a database where bankers, so bankers who were on

8    the front line talking to customers, could actually put

9    notes about their -- the conversations that they were having

10   with their clients, whether it was an interest in a product

11   or any other notable information they wanted to put in

12   there.

13   Q.  So the MIContacts system is where bankers could put

14   information about the customer or their clients or their

15   communications with their customers; is that right?

16   A.  It was.

17   Q.  And the AML folks could go and they could actually look

18   at that database to learn more information about the actual

19   company; is that right?

20   A.  Yes.

21   Q.  And so, for example, the AML Group from 2005 to 2008

22   could go to the MIContacts database, look in the Petters

23   Company, Inc. portion of the MIContacts to see what they

24   could learn about the business; is that right?

25   A.  I don't remember exactly where you'd look under for what

1    name, but that's the place where comments would be on

2    companies or individuals.

3    Q.  And you could actually go in the database and search,

4    right?

5    A.  I don't remember how we searched, but, yes, you would

6    search it somehow.

7    Q.  Do you remember, for example, that -- so let's say

8    Petters Company, Inc. was doing business with a company

9    called Metro Gem -- that you could actually go in and type

10   in "Metro Gem" and see if there were any MIContacts for

11   Metro Gem?

12   A.  If they were a client, you would find something.

13   Q.  And you could -- do you remember you could actually type

14   in the words "Metro Gem" and search for that?

15   A.  I don't remember how the search function worked, but you

16   could look for the -- you could look and see if there was

17   client information on who you were looking at, that client

18   of the bank.

19   Q.  And if you were looking in the MIContacts database to

20   find out information about Petters Company, Inc. and you had

21   any questions about what you were seeing, could you pick up

22   the phone and call the customer relationship manager to ask

23   the customer relationship manager or the business bankers

24   questions about what you were seeing?

25   A.  I don't remember the contact channels, but I'm sure

1   there was some way within the group to reach out to a banker

2   if it was necessary.

3   Q.  And I'm not going to ask you about any particular

4   instance right now, but you know that when you were an

5   anti-money laundering analyst you actually picked up the

6   phone and had reached out to business bankers to ask them

7   questions, right?

8   A.  Probably did at some point.

9   Q.  That was part of the practice in the Anti-Money

10  Laundering Group, correct?

11  A.  There was channels that you could go through.  You could

12  either have the manager call or -- if it was necessary, but

13  you tried to avoid that to tip anybody off on what you were

14  looking at.

15  Q.  Well, you would have -- it was perfectly fine -- let's

16  make sure we talk about that, because it was perfectly fine

17  for the anti-money laundering analyst to reach out to the

18  business banker, right?

19  A.  I don't remember the protocols.

20  Q.  What you mean by tip somebody off, you mean tip off the

21  customer that you were looking into their activity; is that

22  what you're talking about?

23  A.  Yes.

24  Q.  Now, let me see if I have this right.  You could reach

25  out to the business banker and if the business banker

```
 1   couldn't answer your question, the business banker could

 2   actually ask the customer questions.  It's just that they

 3   couldn't tip them off that the Anti-Money Laundering Group

 4   was looking into it.  Is that fair to say?

 5   A.  Yes.

 6   Q.  And that was actually a process that the Anti-Money

 7   Laundering Group followed and practiced; isn't that true?

 8   A.  I don't remember all the contact practices.

 9   Q.  Well, why would you have been calling a business banker,

10   for example?

11   A.  I don't remember.

12   Q.  Well, would it have been to get more information about a

13   customer or the customer's activity?

14   A.  If it was necessary.

15   Q.  Do you recall actually doing that?

16   A.  I don't remember.

17   Q.  You could have done that, you just can't remember as

18   you're sitting here right now?

19   A.  I don't remember during that time frame.

20   Q.  Did you ever do any training of anti-money laundering

21   analysts as to how to properly investigate an alert as they

22   were adjudicating an alert?

23   A.  I'm sorry.  Ask the question again.

24   Q.  Were you involved in any training of anti-money

25   laundering analysts as to how to properly adjudicate an
```

1    alert?

2    A.  I did help with coaching, yes.

3    Q.  And during that training, one of the things that you

4    would have talked with anti-money laundering analysts about

5    would be to pick up the phone and call somebody if you had

6    questions, right?

7    A.  We would talk about if it was necessary, what were the

8    practices to talk to them.

9    Q.  Go back to the Petters Company, Inc. Real quick.  Do you

10   know what "peer" means in the anti-money laundering world?

11   A.  "Peer" means someone who does -- you know, is similar to

12   you.

13   Q.  And is one of the things that would happen in the

14   Anti-Money Laundering Group is you would look at your

15   customer's activity, for example, the value and volume of

16   wires, and compare it to the peers, their value and volume

17   of wires?

18   A.  I wouldn't be comparing it to their other customers.  We

19   would be looking at their activity.

20   Q.  So let me back up.  The Anti-Money Laundering Group,

21   there were segments where they identified a peer group, for

22   example, right?

23   A.  Can you give me more context?

24   Q.  Do you know what a peer group is?

25   A.  Peer group was one of the ways in which they set up the

1    monitoring.

2    Q.  So if incoming wires, for example, are being alerted

3    within the systems at the bank, those incoming wires are

4    being compared to a peer group, right?

5    A.  I don't remember how it was all set up, but there was --

6    it was compared to a peer group, yes, value and volume.

7    Q.  And do you know what the peer group was for the business

8    banking group in 2005 to 2008 that the Petters Company, Inc.

9    checking account was in?

10   A.  I don't remember.

11   Q.  Would it be other businesses?

12   A.  I don't know.

13   Q.  Does that make sense to you, that it would be other

14   businesses?

15   A.  I don't understand your question.

16   Q.  Do you have any understanding as to how alerts were

17   created in the Searchspace system, for example?

18   A.  There -- they would alert if there was additional --

19   like if they were alerting out of their -- compared to their

20   peers for value and volume.

21   Q.  So that is the process that I'm trying to talk about.

22   So that's what I'm trying to talk about, is they were

23   compared to their peers for value and volume.  Is that what

24   you said?

25   A.  For the peer group.

1    Q.  And what was the peer group that Petters Company, Inc.

2    was compared to?

3    A.  I don't remember.

4    Q.  Is it -- do you know if it was just any business in the

5    business banking group or was it specific businesses?

6    A.  I don't know how it was set up.

7    Q.  Do you -- are you familiar with this concept of "know

8    your customer," of being familiar with similarly-situated

9    customers?

10   A.  No.

11   Q.  No, you're not --

12   A.  I understand "know your customer."  I just don't

13   understand your question.

14   Q.  As part of the "know your customer" concept, as part of

15   knowing your customer --

16   A.  Um-hum.

17   Q.  -- are bank personnel taught to be aware of or familiar

18   with similar customers?

19   A.  No.

20   Q.  That doesn't make sense in the anti-money laundering

21   world, to know that?

22   A.  Not in the context that you're asking it.

23   Q.  Have you heard of the term "similarly-situated

24   customers"?

25   A.  No.

1    Q.  Are you -- do you know of or can you name any customer

2    at the bank back in 2005 through 2008 that was similar to

3    Petters Company, Inc.?

4    A.  Not that I remember.

5    Q.  Is that anything that the AML Group ever talked about,

6    sat around and talked about and said we have billions of

7    dollars coming in from Petters Company, Inc., is there any

8    other customer like this in the bank?

9              MS. PARLOVECCHIO:  Objection, calls for hearsay.

10             THE COURT:  Overruled.  If you remember hearing

11   that.

12             THE WITNESS:  No.

13   BY MR. COLLYARD:

14   Q.  Let me ask you this:  Can you name any other customer

15   that you were reviewing or adjudicating alerts on from 2005

16   through the 2008 time period where you were reviewing alerts

17   that involved billions of dollars going in and out of the

18   account?

19   A.  I don't remember.

20   Q.  Can you tell me what -- like a big alert would be for

21   you?

22             MS. PARLOVECCHIO:  Objection, vague.

23             THE WITNESS:  Big in what context?

24             THE COURT:  Sustained.

25             MR. COLLYARD:  Let me fix that.

1    BY MR. COLLYARD:

2    Q.  I'm trying to get a sense of how unique or how unusual

3    it was that the Petters Company, Inc. alerts were going off

4    for billions of dollars.  I'm trying to put that into

5    context as to what you would see at the bank and if this was

6    something that you were doing every day, where you were

7    seeing billions of dollars in other customers, or if you can

8    give me a sense as to what a large volume or large value

9    would be just has an average for the types of alerts that

10   you were reviewing.

11              MS. PARLOVECCHIO:  Objection, form.

12              THE COURT:  Sustained.

13   BY MR. COLLYARD:

14   Q.  Can you give me any -- can you tell the jury any

15   information at all about alerts that you would have

16   reviewed -- let me do it this way.  Can you describe any

17   alert, for example, where you reviewed alerts were there

18   were hundreds of millions of dollars going in and out of an

19   account on a monthly basis?

20   A.  I don't remember.

21   Q.  And can you describe for the jury any example or any

22   instance where you reviewed alerts where there was billions

23   of dollars going in and out of an account on a monthly or

24   bimonthly basis?

25   A.  It was 16 years ago.  I've reviewed hundreds of alerts.

1      No, I don't remember.

2      Q.  Does the -- so in the Anti-Money Laundering Group, do

3      you understand that one of the things you're doing is you're

4      looking for unusual patterns of activity?

5      A.  Yes.

6      Q.  And as part of looking for unusual patterns of activity,

7      would the value of wires going in and out of the account go

8      into that analysis?

9      A.  It would depend on what they are alerting on, but, yes,

10     you would look at -- because that's why they were alerting,

11     value and volume.

12     Q.  And as part of that, you would consider the -- if it was

13     a large value, you would also consider on top of that

14     whether there were similar numbers or similar amounts going

15     in and out of an account?  Would that go into your analysis?

16     A.  What do you mean, "similar amounts"?

17     Q.  So, for example, If there was $1.5 billion going in and

18     $1.51 billion going out, would that be something that you

19     would be considering in your analysis as to whether

20     something was potentially unusual that should be looked into

21     further?

22     A.  I don't remember that specifically.

23     Q.  Does that sound like a reasonable conclusion that -- as

24     an anti-money laundering analyst, that that would be one of

25     the factors that you would consider?

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    A.  It depends on what activity they were doing.

2    Q.  And how would you know what activity they were doing?

3    A.  By looking at the transactions.

4    Q.  What, specifically, would you be looking for?

5    A.  Be looking at their activity.  Does it look like they

6    have done this activity before?  Like, what's your baseline?

7    Does it look like something that they have -- you would

8    expect for the customer?  And then looking for anything that

9    would be anomalous after that.

10   Q.  So in order to understand whether or not it made sense

11   for the customer that billions of dollars were coming in on

12   an alert for a customer, you would have to understand the

13   customer's transaction activity, correct?

14   A.  Yes.

15   Q.  And you'd have to understand some information about why

16   billions of dollars are being wired into the account,

17   correct?

18   A.  You wouldn't know why from every wire.  That wasn't

19   visible to the analyst.

20   Q.  I understand.  I'm just asking if you had -- let's even

21   make it more specific.  If billions of dollars were coming

22   into the account and 75 percent of those billions of dollars

23   were coming in from a couple of entities, you would want to

24   know -- it would make sense to know more about those

25   entities and why they were wiring that money into the

1    account to see if that activity made sense for the customer,

2    right?

3              MS. PARLOVECCHIO:  Objection, form.

4              THE COURT:  Sustained.

5    BY MR. COLLYARD:

6    Q.  If there were billions of dollars coming in from a

7    couple of entities, Ms. Ramlow, what would you do to

8    determine whether or not that activity made sense for the

9    customer?

10   A.  You would be looking at the activity across the account,

11   what was the activity, what had they done, have you seen the

12   same, you know, type of volume or originator, beneficiaries

13   before, what information could you find in your systems.

14   The tools that we had, just kind of bring the picture

15   together.

16   Q.  And then that would lead you to the analysis as to

17   whether or not you should look into those entities more; is

18   that right?

19   A.  Which entities more?

20   Q.  The entities wiring the money into the account.

21   A.  We would only have what was visible to us.

22   Q.  And taking what was visible to you and looking at all

23   the money coming into the account and looking at the

24   transaction data, would that then go into the analysis as to

25   whether or not you should look into those entities who are

1    wiring most of that money in?

2              MS. PARLOVECCHIO:  Objection, form.

3              THE COURT:  Overruled.  You may answer.

4              THE WITNESS:  Oh, okay.  Can you ask the question

5    again?

6    BY MR. COLLYARD:

7    Q.  Sure.  I'm just trying to figure out, Ms. Ramlow, if you

8    have billions of dollars coming in from a couple of entities

9    and you can see that the billions of dollars are coming in

10   and they are for similar amounts, I'm trying to figure out

11   then how do you take the next step to determine whether you

12   should look into those entities further.

13   A.  Without having all the information in front of me today,

14   you're doing an analysis and looking at the wholistic review

15   of the customer, their activity and what's available.

16   Q.  And when you say "wholistic," you're talking about

17   you're looking at all of the activity, right?

18   A.  Yes.

19   Q.  And you're looking at all of the wires; is that right?

20   A.  Looking at wires and other ancillary-type transactions.

21   Q.  And when you're doing your investigation like that, you

22   actually look to see like -- you actually look to see what

23   are the majority of the wires coming in or where are the

24   wires primarily coming in from; is that right?

25   A.  You would look and you would sample and see where the

1    wires are coming from, yes.

2    Q.  And for incoming wires -- you mentioned wholistically.

3    For incoming wires, you would wholistically look at the

4    transaction activity to try to determine why that entity was

5    wiring in money, correct?

6    A.  No, we wouldn't know why they were wiring in money.

7    Q.  Would you ever try to figure out or determine why an

8    entity, for example, was wiring money into the account?

9    A.  If it was necessary.

10   Q.  And in doing that, you would try to figure out why that

11   particular entity was wiring in money if you were looking

12   into that particular entity; is that right?

13   A.  If it was necessary.

14   Q.  And that is something you actually remember doing,

15   right?

16   A.  For?

17   Q.  During your time as an anti-money laundering analyst, in

18   your experience, you had actually looked into and researched

19   why entities were wiring money into an account on an alert?

20   A.  We wouldn't know why they would be wiring.  We could see

21   the account number, the name, the beneficiary, but it

22   doesn't tell you why someone is sending it in.

23   Q.  I'm just asking, Ms. Ramlow, if in your experience --

24   and either you have or you haven't, but in your experience,

25   you have actually researched entities wiring money into an

1    account to see why they were wiring money into the account,

2    correct?

3    A.  And how would we research the why?

4    Q.  I'm asking you if you have actually done that.

5    A.  I don't remember.

6    Q.  And I'll just try this one more time, then, to ask it a

7    different way.  When you were investigating incoming wires,

8    you would try and figure out why that particular entity was

9    wiring in money if you were looking into that particular

10   wire, right?

11   A.  I wouldn't know why they were wiring in the money.

12   Q.  And you would -- what you would do is you would

13   wholistically look at all the activity for the client to try

14   to make that determination as to why that entity was wiring

15   in the money, right?

16   A.  I wouldn't know why they were wiring in the money.

17              MR. COLLYARD:  Your Honor, permission to approach?

18              THE COURT:  You may.

19              MS. PARLOVECCHIO:  Can I see what it is?

20              MR. COLLYARD:  Deposition transcript.

21              MS. PARLOVECCHIO:  All right.  Well --

22   BY MR. COLLYARD:

23   Q.  Ms. Ramlow, I asked you that question at your

24   deposition.  Do you remember --

25              MS. PARLOVECCHIO:  Objection, improper

1     impeachment.

2              THE COURT:  Overruled.

3     BY MR. COLLYARD:

4     Q.  I'm sorry, Ms. Ramlow.  Do you remember when I took your

5     deposition on January 18th of 2018?

6     A.  Yes.

7     Q.  You have the -- what you have in front of you is your

8     transcript from that deposition.

9     A.  Okay.

10    Q.  Do you see that?

11    A.  Okay.

12    Q.  And do you remember giving truthful and accurate

13    testimony at your deposition?

14    A.  I do.

15    Q.  If you can just please turn to page 64.  And if you see

16    that there's line numbers there, you see line 5.  And I

17    asked you the question, Ms. Ramlow:  "And you would try and

18    figure out why that particular entity was wiring in money if

19    you were looking into that particular wire, right?"  Do you

20    see that?  Did I read that correctly?

21    A.  I do.

22    Q.  And you answered, "We would wholistically look at all

23    the activity for the client to try to make that

24    determination."  Did I read that correctly?

25    A.  Yes.

1    Q.  And what you would do, Ms. Ramlow, is you would try to

2    figure out how that entity wiring money into the account fit

3    into the context of the activity by doing your wholistic

4    review, correct?

5         (Witness reviews document)

6    A.  I'm just reading it.  Is that okay?

7    Q.  I'm -- we're off of that now, Ms. Ramlow.  I'm asking

8    you a separate question.

9    A.  Okay.  Can you ask the question again?

10   Q.  Yes.  And what you would try to do is you would try to

11   figure out how the entity wiring money into the account fit

12   into the context of the activity by doing your wholistic

13   review?

14   A.  We would wholistically look at the client and all the

15   activity, is what we would do.

16   Q.  And in the instance of an incoming wire is you would do

17   that to try to figure out how the wires coming into the

18   account fit into the activity for the customer, correct?

19   A.  What do you mean, how they fit in?

20   Q.  How it made sense for the customer.

21   A.  That's right.

22   Q.  That's correct?

23   A.  Yes.

24   Q.  And you agree with me, then, Ms. Ramlow, that you would

25   wholistically be making a decision, based on all the

1  activity that you could see, to make the determination, the

2  ultimate determination, if it makes sense for the customer?

3  A.  Yes.

4  Q.  You mentioned that you accessed MIContacts.  What other

5  type of information did you access when you were

6  investigating and reviewing alerts?

7  A.  We would look at the internet.  We would look at check

8  images of checks clearing the account we could look at or

9  the deposits that were coming in.

10  Q.  Were there -- did you have access to, for example, bank

11  statements for the customer?

12  A.  I believe we did.

13  Q.  And what would the bank statements show?

14  A.  They would just show high level the transactions moving

15  in and out on the account, so a wire, the amount; a deposit,

16  the amount.

17  Q.  The name of who was wiring the money in?

18  A.  I don't remember that being in a bank statement.

19  Q.  Were you able to access -- do you remember being able to

20  access information, for example, on incoming wires, the name

21  and the addresses of who was wiring the money into the

22  account?

23  A.  Yes, we could see the account number and name and

24  address.

25  Q.  And sometimes wires would make reference to the reasons

1    for the wires; is that right?

2    A.  They might.

3    Q.  So, for example, if they referenced note numbers or they

4    referenced a particular reason for the wire, you could see

5    that information too, correct?

6    A.  If it was available and they put it in the wire.

7    Q.  And how would you access that information?

8    A.  I can't remember the name of the wire system, but there

9    was a wire database that we could look at that had just the

10   name -- you know, the account and the name and the address.

11   Q.  Does that go into the bucket of transaction -- when we

12   talk about transaction activity, does that go in the bucket

13   of transaction activity?

14   A.  Well, that would have been -- yes, because it's a wire

15   we would have been looking at it.

16   Q.  Are wires generally more high risk than other

17   transactions?

18   A.  In what context?

19   Q.  Just a wire -- did the Anti-Money Laundering Group or

20   the bank consider wires to be just more high risk in general

21   than other transactions?

22   A.  Not necessarily.

23   Q.  Go back to -- let's go back to Defendant's

24   Exhibit DX-40067 and we're going to go to page 30 of this

25   exhibit.  And if you see at the top there, it says, "BSA

1    Reporting and Recordkeeping Requirements."  Do you see that?

2    A.  Yep.

3    Q.  And then down below it highlights "Wire Transfer

4    Transactions."  Do you see that?

5    A.  Yes.

6    Q.  And that's talking about wires, right?

7    A.  Yes, it's talking about wires.

8    Q.  And if we go down below to the notes section so we can

9    see what the bank was actually saying about it, we'll look

10   at the first comment there.  Do you see that?

11   A.  Yes.

12   Q.  And it says, "Generally wires are considered higher risk

13   transactions - especially international wires."  Do you see

14   that?

15   A.  I do.

16   Q.  And my comment, then, you agree that generally wires are

17   considered to be higher risk transactions, right?

18   A.  They can be, but it's not as -- it doesn't mean that

19   cash isn't as high risk either.

20   Q.  Cash is also high risk?

21   A.  Yeah.

22   Q.  Checks, like, for example, people writing checks to

23   themselves out of a business account could be something that

24   would require higher level of scrutiny; is that right?

25   A.  No.

1    Q.  If you had officers of a small business checking account

2    writing checks to themselves, do you believe that that would

3    require a higher level of scrutiny if they were large

4    checks?

5    A.  If it's their business, they could write checks to

6    whoever they wanted to.

7    Q.  And the Anti-Money Laundering Group wouldn't look into

8    that?

9    A.  I didn't say that.  Depends on who the check is to, are

10   there any notes on the check.

11   Q.  If there were no notes on the check and it was a check

12   written by an officer of the company out of just a small

13   business checking account for millions of dollars, would

14   that require a higher level of scrutiny?

15   A.  It would be interesting.

16   Q.  Would it be unusual?

17   A.  Potentially.

18   Q.  Let's go --

19            MR. COLLYARD:  We can take this one down.

20   BY MR. COLLYARD:

21   Q.  Do you remember, Ms. Ramlow, adjudicating the alerts

22   that you adjudicated or reviewed and closed on the Petters

23   Company, Inc. account?

24   A.  No, I don't.

25   Q.  When you found out about the Petters Ponzi scheme, did

```
1     you go back and look at any of your alerts that you had

2     closed?

3     A.  I don't remember what I did.

4     Q.  You didn't go back and look to see what you did or how

5     you ended up closing alerts when there was a Ponzi scheme?

6     A.  I don't remember what I did.

7     Q.  Let's go to -- if you can find for me, please,

8     Exhibit 183.  We're going to go to page 49 of Exhibit 183.

9     If you can just take a look at that page, Ms. Ramlow, and

10    tell me if you agree that these are the audit trails or the

11    comments that would go into Searchspace for an alert when

12    it's closed.

13    A.  Yes.

14    Q.  And you're familiar with this document, right?

15    A.  We have been through it before, yes.

16    Q.  And if you take a look up at the top, it says, "Alerted

17    month:  July of 2006."  Do you see that?

18    A.  Yes, I see it.

19    Q.  Up in the left-hand corner, it's Alert 69663, right?

20    A.  Yes.

21    Q.  And over to the right it says, "Assigned to:" and it's

22    got "mramlow."  Do you see that?

23    A.  I do.

24    Q.  And that's you, right?

25    A.  Correct.
```

1    Q.  So this is an alert that you closed on the Petters

2    Company, Inc. account; is that true?

3    A.  Yes.

4    Q.  And the time period for this alert, can you look to see

5    the time period and see if you agree with me that the time

6    period is from July through August of 2006?

7    A.  That's correct.

8    Q.  So there were two months -- there were two alerts in two

9    months and you closed them under the number of 69663; is

10   that fair?

11   A.  Yes.

12   Q.  If we can just get a sense of this, we'll go to the

13   second page.  And you agree that this was an alert for

14   incoming and outgoing wires for both value and volume,

15   right?

16   A.  It was for value.

17   Q.  It was for value of both incoming and outgoing wires?

18   A.  Yes.

19   Q.  So let's go to page 50.  And if we just take a look

20   here, I'll show you these two.  It says, "There were 418

21   incoming wires," and then it gives those dates we just

22   talked about, "ranging from," and it gives a range, right,

23   with the biggest wire being $34.8 million.  Do you see that?

24   A.  Yes.

25   Q.  And then a total of $1.23 billion, right?

1    A.  Yes.

2    Q.  And then you list the outgoing wires, correct?

3    A.  (No response.)

4    Q.  And you list -- I'm sorry.  Is that correct?

5    A.  Yes, I list the outgoing wires.

6    Q.  And the outgoing wires were for $1.237 billion, right?

7    A.  That's correct.

8    Q.  And you agree those are -- the incoming and outgoing

9    wires for $1.23 billion are similar numbers, right?

10   A.  Say that again?  Sorry.

11   Q.  Do you agree that the incoming -- that the incoming and

12   outgoing wires for $1.23 billion are similar numbers?

13   A.  They are -- they are close, yes.

14   Q.  And if we just take a look at the outgoing wires, you

15   give a range there as well, right?

16   A.  Yes.

17   Q.  And the largest wire going out of the account, you say,

18   is $10 million even, right?

19   A.  That's correct.

20   Q.  That's a round number, right?

21   A.  $10 million is a round number.

22   Q.  And as an anti-money laundering analyst, you're trained

23   to look for round numbers, correct?

24   A.  We do look for round numbers, but in and of themselves

25   they are not -- you have to look at everything around it.

1    Q.  Okay.  Well, if we look at everything around it, let's

2    see what the $10 million was for.  If you look down, it

3    says, "The largest wire was to Kurt Bosshardt & Associates,

4    who are attorneys, accountants, and brokers who focus on the

5    yachting industry."  Do you see that?

6    A.  I do.

7    Q.  We have a $10 million round or even wire going to

8    attorneys, accountants, and brokers in the yachting

9    industry, correct?

10   A.  Yes.

11   Q.  Do you have any idea, Ms. Ramlow, why $10 million was

12   going to -- out of the Petters Company, Inc. account to

13   attorneys, accountants, and brokers in the yachting

14   industry?

15   A.  No.

16   Q.  Do you remember how you determined that this $10 million

17   was going to attorneys, accountants, and brokers in the

18   yachting industry?

19   A.  I don't remember.

20   Q.  Did you conclude, Ms. Ramlow, that this activity was or

21   was not suspicious?

22   A.  I did.

23   Q.  And you concluded it was not suspicious?

24   A.  That's correct.

25   Q.  How did you -- what did you make your determination on?

1    A.  It was a wire to a law firm.

2    Q.  Do your comments -- can you look at your comments and

3    explain how or why you concluded that the $10 million wire

4    to somebody in the yachting industry was not suspicious?

5    A.  It wasn't necessary to explain your rationale or

6    thinking for every single wire in the narrative.

7    Q.  I'm just asking if you can look at your comments and

8    tell the jury why or how you concluded that that wire was

9    not suspicious.

10   A.  Again, it was to a law firm.  I don't remember doing the

11   alert or what I was looking at.

12   Q.  Can you read your comments and tell why you concluded it

13   wasn't suspicious?

14   A.  Which part of the comments?

15   Q.  Just the comments about the $10 million wire going to

16   associates, attorneys, accountants, brokers who focus on the

17   yachting industry.

18   A.  I didn't have to explain why.

19   Q.  I understand, Ms. Pesch [sic].  I'm just asking if you

20   can read your comments and tell us why, why you concluded

21   that that activity was not suspicious.

22   A.  I can't go back to that day and tell you why.

23   Q.  And you don't know, as you're sitting here today, why or

24   how you actually concluded it was not suspicious?

25   A.  I don't remember doing the alert, no.

1    Q.  Now, are there certain areas that are high risk or

2    higher risk?

3    A.  Areas?

4    Q.  Yes.

5             MS. PARLOVECCHIO:  Object to form, vague.

6             THE COURT:  Overruled.  You may answer if you can.

7             THE WITNESS:  I don't know what you mean by

8    "areas."

9    BY MR. COLLYARD:

10   Q.  Are there categories that the Anti-Money Laundering

11   Group considers to be more high-risk categories?  So I'll

12   give you an example.  Like a large vehicle dealer, could

13   that fall into a category of an area that would be higher

14   risk for wires?

15   A.  I don't remember off the top of my head.

16   Q.  Let's go to Plaintiff's Exhibit -- hold on to this for a

17   second -- go to Plaintiff's Exhibit 212.  Can you go to

18   Plaintiff's Exhibit 212 for me, Ms. Ramlow.  Actually, you

19   don't have it.  I need to approach.

20            MR. COLLYARD:  May I approach, Your Honor?

21            THE COURT:  You may.

22            MS. PARLOVECCHIO:  I don't have it either.  Is

23   this on the list?

24        (Document handed to Ms. Parlovecchio)

25            MS. PARLOVECCHIO:  Thank you.

```
1              MR. COLLYARD:  You're welcome.

2              May I approach the bench, Your Honor, and give you

3      one?

4              THE COURT:  Yes, you may.

5          (Document handed to the Court)

6              MS. PARLOVECCHIO:  Your Honor, this exhibit was

7      not previously disclosed to us.

8              THE COURT:  I didn't hear what you said.

9              MS. PARLOVECCHIO:  I'm sorry.  This exhibit was

10     not previously disclosed to us on the list.  May we just

11     have a moment to review?

12             THE COURT:  You may.

13         (Pause)

14             MS. PARLOVECCHIO:  We've clarified the issue, Your

15     Honor.  Thank you.

16             THE COURT:  You're welcome.

17     BY MR. COLLYARD:

18     Q.  Ms. Ramlow, if you can take a look at Plaintiff's

19     Exhibit 212, it's titled 2005 AML/BSA Core Module.  Do you

20     see that?

21     A.  Yes.

22     Q.  And it says, "Welcome to the AML/BSA Core module."  Do

23     you see that?

24     A.  I do.

25     Q.  This is another training material that the bank put on;
```

1    is that right?

2    A.  It appears so.  I don't remember looking at this, but

3    okay.

4    Q.  You don't remember looking at this particular training

5    presentation?

6    A.  I don't remember from --

7    Q.  Do you know -- I'm sorry.

8    A.  Sorry, I didn't mean to talk over you.  But, no, from

9    2005, no.

10   Q.  I was talking over you.  I apologize.

11         So from -- can you look at this document and tell

12   me if you're familiar with these concepts?

13   A.  Which slide are you looking at?

14   Q.  Well, are you familiar with the -- so M&I's corporate

15   commitment to compliance, for example?

16   A.  I don't remember what that was.

17   Q.  You don't remember what that was?

18   A.  Not specifically, no.

19   Q.  What about suspicious activity identification and

20   reporting?

21   A.  These -- I'm sorry.  These are titles, so I don't know

22   what the context is to what's under here.

23   Q.  Let's go to -- let's flip to page 15, if you will.  I'm

24   sorry.  It's better to go to page 14.  Are you with me?

25   A.  Yes.

```
1    Q.  It talks about the United States PATRIOT Act.  Do you

2    see that?

3    A.  Oh.  13 is the USA PATRIOT Act?

4    Q.  Yes.

5    A.  Yes.

6    Q.  And then down below it talks about How M&I --

7              MS. PARLOVECCHIO:  Objection, Your Honor, this is

8    not yet in evidence.  If he wants to ask her generally

9    whether she's familiar with the concepts, we would have no

10   objection, but he's proceeding to read from the document.

11             MR. COLLYARD:  I'm trying to identify the topics

12   to ask her because she's asked me -- she asked me a

13   clarifying question, so I'm getting to the topic to ask her.

14             THE COURT:  Counsel, ask a question regarding the

15   matter and properly examine the witness.

16   BY MR. COLLYARD:

17   Q.  Are you familiar with, in all of your experience,

18   Ms. Ramlow, being in the Anti-Money Laundering Group for all

19   of the years that you have been there, areas that have been

20   identified as business types that are at greater risk for

21   money laundering and terrorist financing?

22   A.  There are higher-risk business types that are high-risk

23   customers, yes.

24   Q.  And are some of those business types, for example, large

25   vehicle dealers?
```

1   A.  I don't remember that one specifically.

2   Q.  Are some of those areas professional service providers,

3   for example?

4   A.  Yes.

5   Q.  And that would include accountants and attorneys, right?

6   A.  I believe so.

7   Q.  And if we just step back to the concept of money

8   laundering, you understand that as part of the concept of

9   money laundering, that one of the things that money

10  launderers do is they use banks to clean their money, right?

11  A.  Yes.

12  Q.  And as part of money laundering, the process of

13  integration, money launderers buy things to make it look

14  legitimate, correct?

15  A.  Yes.

16  Q.  And that would include things like houses, right?

17  A.  Could be a house.

18  Q.  Cars, correct?

19  A.  Sure.

20  Q.  And yachts, right?

21  A.  Don't know.  Sure.

22  Q.  Well, yachts would fall on the list, right?

23  A.  They could buy a yacht, they could call a boat, sure.

24  Q.  And that would be one of the things that the Anti-Money

25  Laundering Group was looking for, would be those types of --

1    that type of activity could potentially be interesting or

2    unusual to look into, correct?

3    A.  If you were looking at a lawyer's account, yes.

4    Q.  And if we go back to Plaintiff's Exhibit 183, page 50,

5    do you agree with me, Ms. Ramlow, that $10 million to

6    somebody who falls into these categories of accountants and

7    brokers in the yachting industry would fall into that

8    category of being potentially unusual or interesting to look

9    into?

10   A.  Can you say it again?

11   Q.  Do you agree with me that a $10 million wire to

12   attorneys or accountants who fall in this high-risk category

13   pertaining to the yachting industry could fall into your

14   category of potentially being unusual or interesting?

15           MS. PARLOVECCHIO:  Objection, misstates the

16   testimony.

17           THE COURT:  Overruled.  You may answer.

18           THE WITNESS:  Okay.  You'd have to look at all the

19   other activity in context.  It was a wire to a law firm.

20   BY MR. COLLYARD:

21   Q.  Well, was it -- I'm sorry, Ms. Ramlow.  I'm reading your

22   notes.  It was a wire to Kurt Bosshardt, who are attorneys,

23   accountants, and brokers in the yachting industry, correct?

24   A.  Yes.

25   Q.  And when you say you would have to consider all of the

1    other activity, how would you consider that in the context

2    of all of the other activity in the Petters Company, Inc.

3    account to determine whether or not a $10 million wire going

4    to somebody in the yachting industry would be something that

5    you would think would be unusual enough to look further

6    into?

7    A.  Well, I didn't think that the other activity was unusual

8    that Mr. Petters was laundering.

9    Q.  Do you recall at all what you thought about this

10   particular wire?

11   A.  It was 16, 17 years ago.

12   Q.  With all of your experience in the Anti-Money Laundering

13   Group from 2005 to 2008, do you agree that it would be at

14   least interesting that a $10 million is going to attorneys,

15   accountants, and brokers in the yachting industry?

16   A.  Again, when I was looking at Mr. Petters and his

17   accounts, I don't remember what I thought about this wire.

18   I just indicated that it went to the attorneys.

19   Q.  And you don't -- and do you agree with me, Ms. Ramlow,

20   that a $10 million wire to attorneys, accountants, and

21   brokers in the yachting industry would at least be unusual?

22   A.  Not for a company or business that was involved in all

23   sorts of global services.

24   Q.  What about a company that was involved in the business

25   of buying and reselling TVs?

```
1    A.  No.

2    Q.  It wouldn't be unusual?

3    A.  Would it be unusual?

4    Q.  Yes.

5    A.  Just -- if they were just being TVs and they bought a

6    yacht?  It might be interesting.

7    Q.  Let's go back to -- let's go back up to the top to

8    incoming wires and look at the $1.232 billion of incoming

9    wires, and this time if we just take that block for incoming

10   wires and grab the block below it talking about where the

11   wires were from.

12         So what I'm going to do is focus on what you wrote

13   about the incoming wires, Ms. Ramlow, and what you said was,

14   "The remaining wires" -- I'm sorry.  I've got to go back up.

15   You said, "The largest wire was from the Enchanted Family

16   Buying Company."  Do you see that?

17   A.  Yes.

18   Q.  So this tells us that Enchanted was the one who wired in

19   the $34.8 million, right?

20   A.  It appears to be, yes.

21   Q.  And in order to determine that, you would have had to

22   have seen that wire and you would have looked at it,

23   correct?

24   A.  I would have looked at the information available on the

25   wire.
```

1    Q.  And the information on the wire would have told you that

2    Enchanted was wiring in $34 million, correct?

3    A.  I would have seen the amount of the wire and that it was

4    coming from them.

5    Q.  And then down below you say the remaining wires were

6    primarily from Enchanted, Nationwide and then you list some

7    more, right?

8    A.  Yes.

9    Q.  And why are you saying that they were primarily from?

10   A.  I used the word "primarily" when that means probably the

11   majority or a large portion.

12   Q.  And do you know, Ms. Ramlow, for example, out of the

13   $1.23 billion that were wired in, do you know how much

14   Enchanted and Nationwide wired in to reach your conclusion

15   that they fall in the primary category?

16   A.  I don't remember.

17   Q.  Did you have -- is that information that you had

18   available to you?

19   A.  The wire activity and how many there were?  Yes.

20   Q.  And do you recall -- if I told you, Ms. Ramlow, that

21   Enchanted and Nationwide wired in $877 million out of the

22   $1.23 billion, would that help refresh your recollection?

23   A.  I don't remember working the wire.

24   Q.  That doesn't refresh your recollection?

25   A.  No.

1    Q.  Would you have any reason to disagree with me if I told

2    you that Nationwide and Enchanted wired in $877 million out

3    of the $1.23 billion?

4    A.  I don't have that activity in front of me to say

5    otherwise.

6    Q.  And if that were the case, if Nationwide and Enchanted

7    had been wiring in more than 70 percent of the incoming

8    wires, is that something that would have triggered you to

9    look into those entities a little bit more?

10   A.  No.  I would have been looking at the entirety of the

11   account activity.

12   Q.  The other 30 percent?

13   A.  No.  And their history and if it was normal for them to

14   see this activity or not.

15   Q.  So if I'm a money launderer, is what I want to do is I

16   just want to keep wiring in the vast majority of money from

17   a couple of entities; is that how I get around it?

18   A.  No, sir.

19   Q.  In fact, the fact that wires are coming in for millions

20   and millions of dollars or hundreds of millions of dollars,

21   that would at least be something that you would think would

22   be interesting or unusual enough to look into further,

23   right?

24   A.  It wasn't unusual for them.

25   Q.  What wasn't unusual for them?

1   A.  The incoming wires, the originators.

2   Q.  So it wasn't unusual for Petters Company -- is your

3   testimony that it wasn't unusual for Petters Company, Inc.

4   to have wired in or to have -- sorry.  Let me back up.  Is

5   your testimony that it wasn't unusual or interesting that

6   Enchanted and Nationwide were wiring in nearly a billion

7   dollars because they had wired in hundreds of millions of

8   dollars before?

9           MS. PARLOVECCHIO:  Objection.

10          THE COURT:  Overruled.

11          THE WITNESS:  No, that's not my testimony.  My

12  testimony is as originators coming into the account, that

13  wasn't unusual to see them coming in.

14  BY MR. COLLYARD:

15  Q.  To see Nationwide and Enchanted coming in?

16  A.  That's correct.

17  Q.  My question is if it's unusual -- at least if it's

18  unusual or interesting that two entities are wiring in

19  nearly a billion dollars out of $1.23 billion, if that's

20  interesting or unusual enough for you to look into those

21  entities further.

22  A.  Again, I don't remember looking at the alert.

23  Q.  Now, when you say Enchanted had the largest wire -- for

24  $34.8 million, right?

25  A.  The largest wire was from Enchanted, is that what you

1    said?

2    Q.   Yes.

3    A.   Yes.

4    Q.   That's what you said in your comments, right?

5    A.   Yes.

6    Q.   Did you look into Enchanted at all?

7    A.   I don't remember.

8    Q.   Do you remember anything about what you knew about who

9    Enchanted was or what Enchanted did?

10   A.   I don't remember.

11   Q.   Do you recall if you did any effort to look into who

12   Nationwide or Enchanted was?

13   A.   I don't remember.

14   Q.   Do you believe that you did look into who Nationwide and

15   Enchanted were?

16   A.   I don't remember.

17   Q.   Is that something that sounds like you would do?

18   A.   I would look into the activity that I felt was warranted

19   for the alert, but I don't remember working the alert.

20   Q.   Can you describe, Ms. Ramlow, what the legitimate

21   business purpose was for any wire from Enchanted?

22   A.   I'm sorry.  Say that again.

23   Q.   Yeah.  Can you look at your comments and determine

24   whether or not any of the wires coming in from Enchanted

25   were for a legitimate business purpose?

1    A.  I'd say overall, based on my comments that I closed,

2    that the activity was expected and legitimate for the

3    business.

4    Q.  And I'm trying to figure out:  What was the legitimate

5    business purpose for the wires from Enchanted?

6    A.  I don't remember.

7    Q.  What was the legitimate business purpose for the wires

8    from Nationwide?

9    A.  I don't remember.

10   Q.  And can you look at your comments and say how or why the

11   wires coming in from Enchanted or Nationwide made sense for

12   the Petters Company, Inc. business?

13   A.  No, I don't remember and it's not in the comments.

14   Q.  If you'd go to page 51 of Exhibit 183, which would be

15   the last page of the alert, Ms. Ramlow.

16   A.  You said page 51?

17   Q.  Yes, page 51.

18   A.  Yes.

19   Q.  And just take a look at that last block.  We'll just do

20   this one quickly.  And it reads, "Based on the activity

21   reviewed."  Do you see that?

22   A.  Yes.

23   Q.  What are you talking about there?

24   A.  The activity that I reviewed.

25   Q.  So you would have reviewed the incoming and outgoing

Ramlow - Cross

```
1    wires?

2    A.  Yes.

3    Q.  It says, "although this customer's wire activity value

4    and volume continues to be greater than their peers."  Do

5    you see that?

6    A.  I do.

7    Q.  "The activity does not appear unusual and is that which

8    would be expected from a large multi-national company."  Do

9    you see that?

10   A.  I do.

11   Q.  Now, when you say "greater than their peers," do you

12   know how or why you concluded that?

13   A.  Because they alerted.

14   Q.  Do you know how or why you concluded that the activity

15   was greater than Petters Company, Inc.'s peers?

16   A.  Because they -- I'm talking about the peer group they

17   alerted in.

18   Q.  And you understand, Ms. Ramlow, that it wasn't just

19   greater than the peers, it was hundreds and hundreds of

20   millions of dollars greater than the peers, right?

21   A.  I don't know that.

22   Q.  Is that something that you would have compared and

23   looked at?

24   A.  We're comparing them against themselves.  I wouldn't be

25   looking at all the other customers of the bank.
```

1    Q.  You would be comparing Petters Company, Inc. against the

2    peer group, right?

3    A.  I would be looking at Petters against what their

4    activity is.

5    Q.  Let's go to Exhibit 182 just real quickly.  Can you go

6    to Exhibit 182 for me, please, and if you can turn to

7    page 67 of Exhibit 182.

8    A.  I have it.

9    Q.  Are you familiar with this document, Ms. Ramlow?

10   A.  It's an excerpt from Searchspace.

11   Q.  And this is the alert for 69663, correct?

12   A.  It is.

13   Q.  And if you'd take a look where it says, "Incoming Wire

14   Deposit."  Do you see that?

15   A.  I do.

16   Q.  It shows the value of the incoming wires to be

17   $552 million for the month of July; is that right?

18   A.  Yes.

19   Q.  And to the left it says, "Peer Monthly Value Event."  Do

20   you see that?

21   A.  I do.

22   Q.  And then if you look to the right of the $552 million,

23   it's comparing it to an average, right?

24   A.  It is.

25   Q.  And that average is the peer group, correct?

1    A.  Yes.

2    Q.  So the peer group, the average for the peers in the

3    business banking group that Petters Company, Inc. is being

4    compared to, had average value of wires for $5.6 million,

5    right?

6    A.  That's correct.

7    Q.  So, now, if we go back -- now, do you agree with me when

8    you say that it was -- that the value continues to be

9    greater than their peers, it's not only greater, it's

10   greater by half a billion dollars?

11   A.  Yes.

12   Q.  And if we just go back to Exhibit 183 on page 51 and

13   pull up that -- pull up that bottom block again, it says,

14   "the activity does not appear unusual."  Do you see that?

15   A.  Yes.  Can you tell me what number it was under again on

16   the exhibits?

17   Q.  Yes, Exhibit 183, page 51.

18   A.  Okay.  I have it.

19   Q.  Now, Ms. Ramlow, you can't tell us why you concluded or

20   how you concluded that the activity does not appear unusual,

21   can you?

22          MS. PARLOVECCHIO:  Objection, vague as to what

23   activity.

24          THE COURT:  Overruled.  She may answer.

25          THE WITNESS:  I have my comments here.  It's based

1    on the activity that I looked at, it doesn't appear unusual

2    for the client.

3    BY MR. COLLYARD:

4    Q.  So other than what is said in the highlighted words, can

5    you tell the jury any other reason for how or why you

6    concluded that the activity does not appear unusual?

7    A.  No.

8    Q.  Let's stay on Exhibit 183 and let's go to Alert 67366,

9    which is on page 43.  And if we go to second page of the

10   alert, which is page 44 of Exhibit 183, if we go to the

11   middle section, we see that for this alert, Ms. Ramlow,

12   there is 410 incoming wires for a total of 1.249 billion,

13   right?

14   A.  Yes.

15   Q.  And if we look at the outgoing wires, the outgoing wires

16   that were alerted were for $1.254 billion, right?

17   A.  That's correct.

18   Q.  And those are similar numbers, right?

19   A.  They are close.

20   Q.  And if we go back to the middle of the page underneath

21   the incoming wires and bring in the block describing the

22   incoming wires, we see another entry where it says the wires

23   were primarily from Enchanted, Nationwide, and you list a

24   couple others, right?

25   A.  Yes.

1   Q.  And, again, you're using the word "primarily" because

2   that signifies that those wires were the most wires coming

3   into the account, right?

4   A.  Yes, they were primarily the wires coming in.

5   Q.  And you were documenting what you saw and what you

6   researched, correct?

7   A.  Correct.

8   Q.  Do these comments -- do you explain in your comments

9   anything about who Nationwide or Enchanted was or why they

10   were wiring in the money they were wiring in?

11   A.  No, not in these comments.

12   Q.  And, Ms. Ramlow, do you remember how much or what the

13   value was from the wires coming in from Nationwide and

14   Enchanted?

15   A.  I don't remember.

16   Q.  If I told you that it was $977 million out of

17   $1.24 billion, does that help you refresh your recollection?

18   A.  I don't remember.

19   Q.  And that would be -- if that were the case, Ms. Ramlow,

20   that would be 78 percent of the incoming wires, right?

21   A.  Math-wise it sounds -- I don't know.

22   Q.  And if you have nearly a billion dollars coming in from

23   two entities, do you agree with me that that would at least

24   be interesting or unusual that would require you to go and

25   look a little bit further as to why that was?

1    A.  Again, I don't remember working the alerts.  So that

2    doesn't mean I didn't.

3    Q.  And this alert has $1.2 billion coming in and out, and

4    the last alert we looked at had $1.2 billion going in and

5    out, right?

6    A.  I believe so.

7    Q.  Is that a -- do you agree that that could be part of a

8    pattern of billion dollar wires going in and out of an

9    account?

10   A.  I think that would be it looks like it was expected for

11   the client for that type of value every month.

12   Q.  And is that something that would have been interesting

13   or unusual, then, to look at, to see why, to see why there

14   continues to be billions of dollars for the same amount

15   going in and out of an account?

16   A.  I don't remember working the alert.

17   Q.  I mean, the job of an anti-money laundering analyst was

18   to look for patterns of activity, right?

19   A.  Yes.

20   Q.  And if you go back to what Searchspace did, what

21   Searchspace did is it fed -- what Searchspace did is it fed

22   the anti-money laundering analysts certain information about

23   the wires, correct?

24   A.  Searchspace consumed the wire information.

25   Q.  And Searchspace would provide information about the wire

1    activity to the analyst, correct?

2    A.  It would trigger an alert.

3    Q.  And included in that, it would tell the analysts or the

4    Anti-Money Laundering Group the value of the wires, right?

5    A.  In the alert description, yes.

6    Q.  It would give the analysts or the Anti-Money Laundering

7    Group the number of the wires, right?

8    A.  For that month there would be alert details.  I can't

9    remember everything that was in there.

10   Q.  And it would also include the names, the names on the

11   wires, right?

12   A.  Yes.

13   Q.  Okay.  So the Anti-Money Laundering Group or the

14   anti-money laundering analysts could see how much was coming

15   in, how many wires there were, and who was wiring the money

16   in, right?

17   A.  They could see the originators and beneficiaries, yes.

18   Q.  And then from that, the anti-money laundering analysts

19   had to look at that information to determine whether or not

20   it needed to be looked into further; is that right?

21   A.  When they looked at all of the activity together, yes.

22   Q.  Would you describe the role of an anti-money laundering

23   analyst to be a research-intensive job?

24   A.  Yes, you are investigating.

25   Q.  Let's go to -- stick on Exhibit 183.  Let's go to the

1    last alert that you did.  That's Alert 80215.  It's on

2    page 55 of Exhibit 183.

3              And if we just take a look at the top, just to

4    orient ourselves, this was September of 2006.  Do you see

5    that?

6    A.  I do.

7    Q.  And this is an alert that you closed, correct?

8    A.  Yes.

9    Q.  And this one covers the time period of September through

10   November of 2006; is that right?

11   A.  This is September, October, and November.

12   Q.  Okay.  So it covers September through November of 2006;

13   is that right?

14   A.  Correct.

15   Q.  And if we just take a look on page 56 and we start with

16   the top there where it says -- you agree that this is an

17   alert for incoming and outgoing wires for both value and

18   volume.  Do you see that?

19   A.  Yes, it was value and volume.

20   Q.  Okay.  And then if we look at the actual wires, you list

21   here -- for the incoming wires you give a range, right?

22   A.  I do.

23   Q.  But you don't give the total for the amount of incoming

24   wires coming in, do you?

25   A.  No.

1    Q.  And you do the same thing for the outgoing wires, you

2    list a range, but you don't list the totals, correct?

3    A.  No.

4    Q.  Do you know why you did that?

5    A.  I don't remember.

6    Q.  Would there be any reason for not including the totals?

7    A.  No.  This appears to be also under the QAPOR review

8    process, but I don't remember why I didn't put a total.

9    Q.  Do you understand what the QAPOR process is?

10   A.  The QAPOR process was a review that -- for alerts

11   where -- if it was a client that had frequently alerted,

12   where we could put them -- they would have analysis, so they

13   would go through a manager review.  You would have to look

14   at other criteria for this, but allow them to have a

15   condensed review.  It didn't mean that you didn't look at

16   all the activity.  You looked at all the activity, but you

17   had the ability to condense your comments.

18   Q.  Well, one of the first things that you did on a QAPOR

19   review is you had to go and look to see what the events were

20   and what the scores were, right?

21   A.  I don't remember.

22   Q.  You don't recall that?

23   A.  I don't remember the exact process.

24   Q.  Do you recall that you had to go and you had to look at

25   the actual events to see if the scores were at a certain

1    level and that determined the level of explanation and

2    documentation that you had to make in the comments section

3    in Searchspace?

4    A.  Can you say that again?

5    Q.  Yes.  Do you know that as part of the QAPOR review, one

6    of the first things that an anti-money laundering analyst

7    had to do was go and look at the events that were alerted?

8    A.  Yes, you do that for every review.

9    Q.  And then you would have to figure out if those events

10   were for a certain amount, that would determine the level of

11   documentation and review that you would give in the comments

12   section of Searchspace?

13   A.  No.  It would depend if they were on the list or not.

14   Q.  So your understanding for QAPOR is that you did not have

15   to go and look to see --

16   A.  No.

17   Q.  I'm sorry.  -- if there were certain events numbers and

18   if those event numbers triggered at a certain amount, that

19   would determine the level of explanation that you gave?

20   A.  I'm not understanding your question.  I'm sorry.

21   Q.  Do you recall, Ms. Ramlow, that there was a process to

22   follow when -- under the QAPOR expedited review process?

23   A.  There was a review process.  I don't remember it off the

24   top of my head.

25   Q.  Do you recall how that process worked?

1    A.  In what way?

2    Q.  In how you would go about reviewing an alert under the

3    QAPOR process.

4    A.  I don't remember every stp.

5    Q.  Okay.  I'm sorry.  We'll just do this real quick.  I'll

6    just show you something.

7    A.  Sure.

8    Q.  If you'd go to Exhibit 182.  And we'll come back to

9    this.

10   A.  Okay.

11   Q.  And we go to page 79 of Exhibit 182, this is the alert

12   score for -- this is the alert for 80215, right?

13   A.  Yes.  These are the events.

14   Q.  These are the events, correct?

15   A.  Correct.

16   Q.  Do you have an understanding that as part of the QAPOR

17   process, one of the things you would do is you would go and

18   look at the events scores to see if those scores were

19   greater than 15?

20   A.  I don't remember that process.

21   Q.  And do you have an understanding that if the scores were

22   greater than 15, you have to do the same level of

23   explanation and review as you would do for the closed to

24   expected activity state?

25   A.  Again, I don't remember the whole process.

1    Q.  Okay.  Let's go back to Exhibit 183, page 56.  I was

2    asking you about the ranges and then you noted that it was a

3    QAPOR review.  Do you remember that?

4    A.  Um-hum, yes.

5    Q.  And I was asking you if you recall why you did not list

6    the total value of the incoming wires and the outgoing

7    wires.  Do you remember that?

8    A.  I do.

9    Q.  Do you remember for this particular alert what the total

10   value of the incoming and outgoing wires were?

11   A.  No.

12   Q.  If I told you that the incoming wires were for

13   $2.1 billion, would that help refresh your recollection?

14   A.  I don't remember.

15   Q.  Would you have any reason to disagree with me?

16   A.  No, but I don't have the information in front of me.

17   Q.  If I told you that the outgoing wires -- the value of

18   the outgoing wires was for $2.106 billion, would that help

19   refresh your recollection?

20   A.  Again, I don't remember working the alert.

21   Q.  Do you recall how much money Enchanted and Nationwide

22   wired in on this alert?

23   A.  No, I don't remember.

24   Q.  If I told you that -- to speed it up, if I told you that

25   Nationwide and Enchanted together wired in $1.6 billion out

1    of the $2.1 billion, would that help refresh your

2    recollection?

3              MS. PARLOVECCHIO:  Objection as to the improper

4    form of refreshing recollection.

5              THE COURT:  Overruled.  You may answer if you can.

6              THE WITNESS:  I don't remember.

7    BY MR. COLLYARD:

8    Q.  If Enchanted and Nationwide were wiring in $1.6 billion

9    out of $2.1 billion, would that be something that you would

10   think would at least fall in the category of being

11   interesting or unusual enough to look into further?

12   A.  Based on my comments, I did not think any further review

13   was necessary.

14   Q.  And can we look at your comments and determine what any

15   legitimate business purpose was for any wire from Enchanted

16   or Nationwide?

17   A.  Not from the comments, but you weren't required in a

18   general review to put a comment for every single purpose use

19   for every wire that you looked at --

20   Q.  Nothing --

21   A.  -- in a review.

22   Q.  I'm sorry.  Are you done?

23   A.  Yes.

24   Q.  Nothing prevented you or precluded you from explaining

25   what the legitimate business purpose was for Enchanted or

1   Nationwide wiring in $1.6 billion, correct?

2   A.  Ask that again.  Sorry.

3   Q.  Nothing prevented you or precluded you from explaining

4   why you thought there was a legitimate business purpose for

5   $1.6 billion coming in from Nationwide and Enchanted?

6   A.  I don't remember.

7   Q.  And then if we just go down to the very bottom on

8   page 56 of Exhibit 183, I just want to ask you this,

9   Ms. Ramlow:  The part where you say -- you say, "The wire

10  activity is consistent with previous reviews, with similar

11  beneficiaries and originators, and is expected for this type

12  of business."  Do you see that?

13  A.  I do.

14  Q.  You can't look at your comments here and understand what

15  type of business Petters Company, Inc. is in, can we?

16  A.  Not from the comments.

17          MR. COLLYARD:  I have no further questions, Your

18  Honor.  Thank you, Ms. Ramlow.

19          THE COURT:  Members of the Jury, as we're making

20  this transition, you may stand up at your seat, take a

21  stretch break if you would like.  And our plan is to take a

22  break at 3 o'clock.

23      (Pause)

24          THE COURT:  Okay.

25          MS. PARLOVECCHIO:  May I proceed, Your Honor?

Ramlow - Direct

```
 1                THE COURT:  You may proceed.
 2                MS. PARLOVECCHIO:  Thank you, Your Honor.
 3                THE COURT:  You're welcome.
 4                      DIRECT EXAMINATION
 5     BY MS. PARLOVECCHIO:
 6     Q.  Good afternoon, Ms. Ramlow.
 7     A.  Hi.
 8     Q.  Now, when did you learn that Tom Petters and his
 9     entities, including PCI, were involved in a Ponzi scheme?
10     A.  In the 2008 time frame.
11     Q.  And do you recall how you learned about it?
12     A.  I think I remember learning about it through the news.
13     Q.  Did you know there was a Ponzi scheme happening before
14     you learned about it from the news in 2008?
15     A.  No, I did not.
16     Q.  Now, you testified under questioning by plaintiff's
17     counsel that you were likely shocked and confused when you
18     learned about the Petters Ponzi scheme.  What did you mean
19     by that?
20     A.  I meant that I was confused given we had an
21     understanding of what we thought Mr. Petters was operating
22     legitimately in through many companies that were familiar to
23     us even as consumers.  So it was confusing to hear the news.
24     Q.  Now, I just want to take a step back for a moment and
25     ask you a bit more about your background in addition to what
```

```
 1    plaintiff's counsel covered.
 2              Can you just tell us where you currently live
 3    right now.
 4    A.  I live in Greendale, Wisconsin.
 5    Q.  And can you please tell the jury where you grew up.
 6    A.  I grew up in Sydney, Australia.
 7    Q.  And what brought you to Wisconsin?
 8    A.  I came to visit my father, who is from here, and decided
 9    to stay.
10    Q.  Are you married?
11    A.  I am married.
12    Q.  And any children?
13    A.  I have one daughter.
14    Q.  And how old is she?
15    A.  She's 18.
16    Q.  Now, can you tell us about your post high school
17    education.
18    A.  Sure.  My post high school?  I went to the University of
19    Wisconsin.  I have a bachelor's degree in sociology.  And I
20    most recently got my master's in business administration
21    this year.
22    Q.  Congratulations.
23              And when did you graduate college?
24    A.  I think my bachelor's was in 2003.
25    Q.  Do you have any professional certifications?
```

1    A.  I do.  I am a certified anti-money laundering specialist

2    and -- sorry.  Go ahead.

3    Q.  Go ahead.

4    A.  And I'm also an advisory board member on the Center for

5    Financial Professionals as well.

6    Q.  What do you do in that capacity?

7    A.  So for the advisory board, I provide them with input on

8    industry trends that we maybe need to talk about at

9    conferences or in other literature that they publish.  And

10   then if they need to publish documents and need input on

11   trends in the industry, they will ask for my input.

12   Q.  And you testified that you are a certified anti-money

13   laundering specialist.  Can you just describe for the jury

14   how you obtained that certification.

15   A.  Sure.  You study and you take a test.

16   Q.  And who issues that certification?

17   A.  The Association of Certified Anti-Money Laundering

18   Specialists.

19   Q.  Have you ever spoken at a banking or AML-related

20   conference?

21   A.  I have.

22   Q.  Approximately how many times?

23   A.  At least five or more times.

24   Q.  And what topics have you covered?

25   A.  Covered topics on trends in AML, business practices for

1    SARs or Suspicious Activity Reports or even technology in

2    the industry, what's evolving, what are we using.

3    Q.  Did M&I and later BMO require you to take any sort of

4    educational hours as part of your job?

5    A.  We were required to take training hours every year, yes.

6    Q.  Do you recall how many hours?

7    A.  It was like 12 to -- I think 12 to 18 hours, so one

8    credit per hour.

9    Q.  And what's your understanding of why the bank required

10   you to take that type of training?

11   A.  It was required because they wanted to make sure that

12   you understood what was expected of you as an employee when

13   it came to the Bank Secrecy Act, and they wanted to make

14   sure that you understood, too, that those of us who were in

15   AML were keeping up with AML trends.

16            Sorry.

17   Q.  No worries.

18   A.  Go ahead.

19   Q.  Can you tell the jury why you decided to pursue a career

20   in the banking industry.

21   A.  Well, I started as a teller, and I joined because I'd

22   always been interested in banking operations and I wanted to

23   learn more about how banks worked and so that's why I joined

24   banking.

25   Q.  You previously testified that you started at M&I Bank in

1    January 1996.  Could you just tell us what your position was

2    when you started there?

3    A.  Sure.  I was a teller in the branch in 1996.

4    Q.  Now I want to direct your attention to 2001.  What was

5    your role in the bank at that time?

6    A.  By that time I was what they called an internal review

7    analyst.  So I worked for a group called Internal Review and

8    Control under M&I support services, is what the company was

9    called, and we reviewed processes in the bank operations.

10   So we made sure that they were running appropriately, if

11   there was recommendations for process or anything was out of

12   compliance from a bank operations perspective.

13   Q.  Now, you testified that you became an analyst in 2004;

14   is that right?

15   A.  That's right, June of 2004.

16   Q.  And you became a lead analyst after that?

17   A.  Yes, in 2007.

18   Q.  And what was your next role after you were a lead

19   analyst?

20   A.  By 2008 sometime I was a supervisor for the AML

21   Monitoring Group.

22   Q.  Now, you testified during your testimony under

23   plaintiff's counsel's questioning that you had served in

24   multiple different rules in anti-money laundering over the

25   years --

1    A.  Um-hum.

2    Q.  -- at M&I Bank and then BMO.  In total, how long has

3    your role at the bank involved BSA and AML programming?

4    A.  About 18 years.

5    Q.  Now, you testified that you're currently the managing

6    director of AML systems, data, innovation, and operations

7    for BMO.  Do I have that right?

8    A.  That's correct.

9    Q.  And what are your duties in that role?

10   A.  So for this role, I oversee the teams that monitor and

11   manage our AML systems, so the systems that our

12   investigators use.  They also validate and make sure our

13   data is quality.  I have teams that innovate or create

14   reporting solutions for the investigators to help them

15   investigate.  And I also have the operations team that's

16   responsible for employee engagement, budgeting, things like

17   that.

18   Q.  Now, just turning your attention back to June 2004 when

19   you became an AML analyst, what prompted you to join that

20   group?

21   A.  It was really 9/11.  So 9/11 happened in 2001.  I wanted

22   to be part of something.  I wanted to be something that I

23   could make a difference and it was exciting to be part of

24   this new group, and so that's why I joined AML.

25   Q.  Could you just describe for us the culture of the AML

```
 1    Group when you joined in June 2004.

 2    A.  It was exciting.  It was people from different areas of

 3    the bank.  We all wanted to learn more about AML, evolve the

 4    program, and we were excited to be there and just to

 5    continue to learn and evolve.

 6    Q.  How, generally, would you describe the organizational

 7    structure of M&I's BSA and AML program in the 2004 to 2008

 8    time frame?

 9    A.  So it was really, you know, BSA officer -- I'm sorry.

10    You asked for organizational structure?

11    Q.  Yes.

12    A.  So BSA officer would sit at the top and then you would

13    have other compliance teams for all the other regulations,

14    but then there were AML committees for all the policies that

15    were discussed.  And there was also the AML Monitoring Group

16    team, which is what I was in, which sat below that.

17              MS. PARLOVECCHIO:  Mr. Herzka, could I have

18    Defendant's DD-3, please.

19              And, Your Honor, I'm just offering this as an aid

20    to the jury, not as an exhibit.

21    BY MS. PARLOVECCHIO:

22    Q.  So, Ms. Ramlow, I'm showing you what's marked for

23    identification as DD-3.  Can you please describe for the

24    jury what we're looking at here.

25    A.  So, again, this is a really high-level view of our
```

1    organization.

2           So we had a compliance officer, which is, you

3    know, a core part of your AML program.

4           We had a Corporate AML Committee, so that had

5    representation of different leaders across the bank who were

6    all responsible for having some say about AML.

7           And then an SAR Committee, where we would review

8    our Suspicious Activity Reports.

9           Followed by other compliance individuals, AML

10   subject matter experts that would do other AML work outside

11   of monitoring like our team was doing.

12          And then the AML Monitoring Group, which is what I

13   was in.

14   Q.  And can you just demonstrate for the jury using your

15   screen -- you actually, I believe, can mark it -- where your

16   role would have been situated on this chart.

17   A.  Do you want me to just point up there or down here

18   (indicating)?

19   Q.  You can try to circle it on your screen.  There you go.

20   A.  Down here (indicating).

21   Q.  All right.  So what were the responsibilities of AML

22   analysts in the 2004 to 2008 time frame?

23   A.  Their primary responsibility were to adjudicate the

24   alerts that were coming out of Searchspace to determine if

25   there was activity that should be escalated for further

1  review and potential suspicious activity reporting or

2  filing.

3  Q.  And what were the actual roles that were inhabited in

4  that AML Monitoring Group?

5  A.  So the roles started out at an analyst.  You could be an

6  analyst, a lead analyst.  There was a supervisor, I believe

7  an assistant manager, and a manager.

8  Q.  Approximately how many AML analysts were actually in the

9  AML Monitoring Group in the 2004 to 2008 time frame?

10  A.  So when we started in 2004, I think it was only three or

11  four of us.  By 2008 it was probably 10, 12, 15 of us or

12  more.

13  Q.  How did you view your job when you worked as an AML

14  analyst?

15  A.  I loved it.

16  Q.  What did you love about it?

17  A.  I loved investigating.  I loved being a part of the team

18  and a part of the program.

19  Q.  Now, focusing you on the lead AML analyst role, what

20  were the responsibilities of the lead AML analyst during

21  this 2004-2008 time frame?

22  A.  So as a lead analyst, you are not so much working alerts

23  anymore; you are managing the work flow.  So Searchspace,

24  which was our monitoring tool, you had to assign alerts to

25  the other analysts so they could work them and you had to

 1    work them by a particular time frame.  That was what was

 2    required under the law.

 3              And so the lead analyst is making sure that those

 4    alerts are getting assigned, that they are getting it done

 5    timely.  Also helping with coaching, maybe a little bit of

 6    training.  And then also assisting the managers with any

 7    support they needed.

 8    Q.  I noticed you used the term "coaching."  What do you

 9    mean by that?

10    A.  It just means providing guidance.  So if they have --

11    analysts had questions or they didn't know where to look for

12    a particular research item or they weren't sure which

13    direction maybe to go through next, you could kind of sit

14    down and talk it through with them on -- and try to

15    understand and give them guidance on maybe next steps for

16    them to consider.

17    Q.  Could you describe for us the responsibilities of the

18    AML manager during this time frame.

19    A.  So the AML manager was primarily responsible for the HR

20    or the human resource aspect, so they had the analysts

21    reporting to them.  And then they were also reviewing the

22    majority of the Suspicious Activity Reports or cases that

23    were coming through for filing.  They also would have input

24    to procedures and be on the other committees that we have

25    shown on the screen here.

Rainbow - Direct

1   Q.  Now, you previously testified that you received training

2   at M&I Bank.  How frequently did the AML Monitoring Group

3   undergo training during the relevant 2004 to 2008 period?

4   A.  It was quite frequently, and the training could be

5   internal or it could be external.  We were able to -- you

6   know, if somebody was able to go to a conference and bring

7   that information back and share it with the team, we would

8   do that; or we would have team meetings and do training that

9   way.

10  Q.  And can you just give a general overview about what

11  these trainings covered.

12  A.  So externally the trainings were on, you know, the top

13  trends that the AML or fraud industry was seeing, maybe it

14  was best practices with Suspicious Activity Report filing,

15  like what did law enforcement want to see, what were

16  keywords and things that you would want to put in your

17  narrative; or it might be new policy and legislation coming

18  down.  So that was the sort of external training that was

19  brought in.

20  Q.  Now, as to the internal training you mentioned, who

21  would generally conduct those trainings?

22  A.  It would depend.  I mean, it might be the manager.  It

23  could be a lead.  Sometimes if a case was interesting, we'd

24  have an investigator present that so that the other

25  investigators could see what that investigator had found and

1     we could learn from it and train others to look for it.  So

2     it really depended on the topic.

3     Q.  How would you describe the tone of those in-house

4     trainings that you attended during the relevant period?

5     A.  We were engaged, the team was engaged.  It was --

6     everybody wanted to learn more or have as many tools as

7     possible that we could learn from others, peer banks or

8     others in the industry, in addition to whatever other staff

9     members were seeing.  So we were engaged in -- as part of

10    the training.

11    Q.  Now, you testified that as to the external trainings you

12    attended, that sometimes people in the AML Group would bring

13    the information back from those trainings.

14          Were you able to observe what the AML analysts did

15    with the information that was conveyed at those external

16    conferences and brought back?

17    A.  They would -- we'd either -- you know, I don't remember

18    off the top of my head, but they would -- you know, we'd

19    either update our procedures or we'd have further training

20    on it and make sure that they were applying it in their

21    cases as they went forward.

22    Q.  Now, based on these trainings from the 2004 to 2008

23    period, what was your understanding about the principal

24    crimes that were related to money laundering that analysts

25    were supposed to be looking at during that time frame?

1    A.  I would say that anything particularly with cash, but

2    definitely drug trafficking; terrorist financing was

3    certainly top of mind, especially given it was still really

4    raw with 9/11; and cash structuring, I would say, in

5    particular.

6    Q.  And could you just describe for the jury what

7    structuring is.

8    A.  So structuring is when a customer evades currency

9    transaction reporting.  So every time that you come into the

10   bank and you deposit or you withdraw cash over $10,000, you

11   have to fill out a form.  If you don't want to fill out the

12   form and you walk away or you change your transactions to

13   avoid that form, which goes to the IRS, that's called

14   structuring.

15   Q.  Now, you previously testified that you're trained on the

16   Bank Secrecy Act.  Can you describe briefly what the Bank

17   Secrecy Act is.

18   A.  So the Bank Secrecy Act is legislation/law that was

19   passed in the 1970s primarily at that time for the purpose

20   of making sure that banks, financial institutions put in

21   controls to detect tax evasion and money laundering.

22   Q.  Now I want to direct your attention to what's in

23   evidence as Plaintiff's Exhibit 4 and I'm going to focus you

24   on slide 16.  And can you just read the title here.

25   A.  "Risks of Non-Compliance."

1    Q.  And what does the second bullet say?

2    A.  "Civil and criminal penalties and fines against

3    financial institutions and their employees are possible."

4    Q.  What was your understanding of this concept during the

5    relevant time frame?

6    A.  It meant that if we didn't escalate, if we didn't report

7    activity, we could be liable not only as an institution, but

8    as an individual to civil and criminal penalty.

9    Q.  Now, did your training also include discussions of the

10   USA PATRIOT Act?

11   A.  It did.

12   Q.  Can you briefly describe for the jury what the USA

13   PATRIOT Act is.

14   A.  So the USA PATRIOT Act is legislation that was passed

15   shortly after 9/11, and its job was to enhance the ability

16   of law enforcement and financial institutions to share

17   information between each other, in addition to other

18   enhancements to the Bank Secrecy Act.

19   Q.  And what was that -- the purpose behind that increased

20   ability to share information?

21   A.  So we could find -- we could talk to each other more

22   frequently, easier to find the activity, especially for

23   terrorist financing.

24   Q.  I want to focus you back on Plaintiff's Exhibit 4 and

25   now looking at slide 12.  And just generally, what do we see

Rainbow - Direct

1    on this slide?

2    A.   So this slide is representing the -- I would say the

3    history or how the Bank Secrecy Act has evolved over the

4    course of time.

5    Q.   And just focusing you on that last bullet, what is this

6    referring to?

7    A.   So this is the USA PATRIOT Act, which was passed after

8    9/11, especially for the purpose of enhanced detection for

9    terrorist financing.

10   Q.   Now, you previously testified you were also trained on

11   the concept of suspicious activity?

12   A.   Yes.

13   Q.   What, if any, suspicious activity became the focus of

14   anti-money laundering review following the passage of the

15   USA PATRIOT Act?

16   A.   So you're looking for just examples?

17   Q.   Well, suspicious activity as it -- suspicious activity

18   that became the focus after the USA PATRIOT Act was passed.

19   A.   Oh, I see what you're saying.  Terrorist financing in

20   particular, which during 9/11 it was, you know, smaller --

21   there was cash, there was checks, there was wires, but it

22   was primarily cash that we were looking and really focused

23   on as well.

24   Q.   Now, was an AML analyst's role to look specifically for

25   money laundering?

1    A.  No.

2    Q.  What were you looking for?

3    A.  We were looking for activity that could be indicative of

4    potential money laundering.

5    Q.  Now, based on your training and experience as an AML

6    analyst, who would be responsible for actually going out and

7    looking for money laundering?

8    A.  Law enforcement would be responsible for the actual

9    investigation and making that determination.

10   Q.  Did your BSA/AML trainings include discussions of "know

11   your customer"?

12   A.  They did.

13   Q.  And can you describe for the jury what "know your

14   customer" meant in the 2004 to 2008 time frame for you as an

15   analyst.

16   A.  As an analyst, it was really about the collection of

17   information at onboarding, knowing who they were in terms of

18   identifying information.

19   Q.  Now I'd like to show you what's already in evidence as

20   Plaintiff's Exhibit 5 and I'm going to direct you to

21   slide 31.  And this is entitled Know Your Customer

22   Understand Their Activities.  Do you see that?

23   A.  Yes.

24   Q.  What is your general understanding of what this slide is

25   describing here?

1    A.  For "know your customer," it's about asking questions

2    that might be unusual and trying to figure out what would be

3    unusual for that client.

4    Q.  Could you just, please, read the second bullet.

5    A.  Sure.  "Ask questions when encountered by transactions

6    that are unusual for that particular customer."

7    Q.  So let's just break that down a bit.  First, what is the

8    term "unusual activity" mean for an AML analyst during this

9    time frame?

10   A.  So unusual is something -- activity can be unusual

11   versus -- maybe I'll break it down this way -- versus

12   suspicious.  So you can do something unusual, so I could --

13   you know, maybe it's unusual for me to withdraw $2,000 in

14   cash because usually I just use my debit card.  But when you

15   look at my payroll, you would be like it's not suspicious

16   because you can see what's coming into the account.  So

17   unusual versus suspicious is too different definitions, I

18   would say.

19   Q.  Now, what is your understanding, based on this slide,

20   about what you were supposed to know about a customer when

21   you were an analyst back in that time frame?

22   A.  You're supposed to understand, with the information that

23   you have available to you, what type of customer or what

24   type of business and who they are and what transactions we

25   might expect.

1          MS. PARLOVECCHIO:  You can take that down,

2     Mr. Herzka.  Thank you.

3          May I please have what's in evidence as

4     Defendant's Exhibit 40067.

5     BY MS. PARLOVECCHIO:

6     Q.  And focusing you on slide 37, which I believe is

7     page 38.  Now, under questioning by plaintiff's counsel, you

8     were asked questions about this slide.  Do you recall those

9     questions?

10    A.  I do.

11    Q.  Does the Anti-Money Laundering Group handle enhanced due

12    diligence?

13    A.  We don't.  We're not collecting it.  But we can -- if

14    it's available, we can review it, but that is performed by

15    the first line of the bankers.

16    Q.  So, to be clear, that's not a responsibility --

17    A.  No.  No, we don't collect it.

18    Q.  I want to focus you on the second bullet here that says,

19    "Perform enhanced due diligence for higher-risk customers."

20          To your understanding, was PCI considered a

21    higher-risk customer?

22    A.  No.

23    Q.  Now, are "know your customer" standards the same today

24    as they were back in the 2004 to 2008 time period?

25    A.  I would say they have evolved.

1    Q.  And just to be clear, in the 2004 to 2008 time frame was

2    an AML analyst supposed to collect additional information

3    about their customer and business?

4    A.  An AML analyst was not doing that, no.

5             MS. PARLOVECCHIO:  Thank you, Mr. Herzka.

6    BY MS. PARLOVECCHIO:

7    Q.  Now, I want to turn your attention to the period when

8    you joined the AML Group in 2004.  At that time how did AML

9    analysts review transactional activity to detect suspicious

10   transactions?

11   A.  In the two thousand --

12            MR. COLLYARD:  Objection, Your Honor, as to AML

13   analysts as opposed to what Ms. Ramlow did.

14            THE COURT:  Overruled.  You may answer if you

15   know.

16            THE WITNESS:  I'm sorry.  Can you ask the question

17   again?

18   BY MS. PARLOVECCHIO:

19   Q.  Sure.  So when you joined the group back in 2004 --

20   A.  Yes.

21   Q.  -- at that time how did AML analysts review

22   transactional activity to detect suspicious transactions;

23   what was the method?

24   A.  It was in paper form, so it was actually very manual.

25   We had a report that was produced monthly and it focused

1    primarily on cash transactions.  And when the report came

2    out monthly, you would -- you know, as an analyst, you would

3    go through each piece of paper, looking at each client and

4    reviewing them.

5    Q.  What type of transactions were the focus of this manual

6    review process that you have just described?

7    A.  Cash.

8    Q.  Did the manual review also involve review of wire

9    transfers?

10   A.  I don't remember.

11   Q.  How, if at all, did the process for reviewing

12   transactions change after 2004?

13   A.  After 2004, by 2005 we had implemented the Searchspace

14   automated monitoring system.

15   Q.  And could you just clarify for the jury how Searchspace

16   actually worked.

17   A.  Sure.  So Searchspace was like a database or think of

18   it, you know, like a system that would consume the

19   customer's transactions and then there were parameters

20   placed around looking for certain activity and then an alert

21   would be produced.

22   Q.  And would AML analysts then review those alerts?

23   A.  Yes.

24   Q.  Now, did a -- what, if any, scoring system existed in

25   the Searchspace system?

Rainbow - Direct

```
1    A.  I don't remember the scoring system.

2    Q.  Do you recall that a scoring system existed in the

3    Searchspace system?

4    A.  Yes.

5    Q.  Did the scores at Searchspace applied to alerts have any

6    significance to you in terms of how you would review an

7    alert back when you were an AML analyst?

8    A.  No.

9    Q.  What if the score was well above the score threshold

10   that would trigger an alert, would that affect what you

11   would do?

12   A.  It wouldn't change the review process.

13   Q.  Can you describe for the jury the process that an AML

14   analyst, such as yourself, back in that time frame would

15   follow once an alert was triggered in Searchspace.

16   A.  Sure.  So you would go into Searchspace.  You would open

17   up your queue.  You'd select an alert to look at.  You would

18   click on it, open it up, see the events that you should be

19   focusing on or the transactions that you should be focusing

20   on, and then you could see all the transactions in

21   Searchspace.

22          From there you could use the other tools that

23   we've discussed, like the MIContacts or additional details

24   that might be in the wire system or a check image system, to

25   kind of look at that activity.
```

1    Q.  Okay.  So I want to just break that down a bit.  First,

2    how would an analyst come to start looking at an alert?

3    Would it be assigned?

4    A.  It would be assigned to them, yes.

5    Q.  And who would do that assigning?

6    A.  Usually a lead.

7    Q.  And was there any reason why an alert would be assigned

8    to a particular analyst?

9    A.  No.

10   Q.  Was it random?

11   A.  Yes, that's how I remember it.

12   Q.  Approximately how long would it take an analyst to

13   review an alert?

14   A.  On average it could take 30, 45 minutes to an hour.  It

15   depended on the complexity of what they needed to look at.

16   Q.  Were there any incentives from M&I Bank for AML analysts

17   to close alerts?

18   A.  No.

19   Q.  Now, you also testified that AML analysts would review

20   an alert using various tools.  What sorts of resources did

21   AML analysts consult when they would review an alert?

22   A.  Sure.  So, again, they would look at -- tool-wise, they

23   would have MIContacts, the check imaging system, the

24   internet, and the wire system that we had access to.

25   Q.  Now, you mentioned the internet.  What kinds of

1    resources on the internet would an analyst consult during

2    this era?

3    A.  It was -- I don't know that we had Google back then.  It

4    was whatever search engine was available at that time back

5    in 2004 or '05.  We would use that to search for the client

6    for any adverse information or any other information, maybe

7    a website.

8            You could also use the internet to look for -- in

9    some states they had court information that would be

10   available actually to anyone that you could go in and look

11   at.  So if you wanted to see if someone had any court

12   proceedings ahead of them or any tickets or anything like

13   that, you could look into those sorts of things in the

14   internet at the time.

15   Q.  Now, as an analyst, when you're conducting your review,

16   would you focus on one piece of information or multiple

17   pieces of information?

18   A.  Multiple.

19   Q.  And what was the purpose of looking at multiple pieces

20   of information?

21   A.  To make sure you vetted and you understood everything

22   that was available to you to help you make the decision.

23   Q.  If a transaction alerts in Searchspace, does that mean

24   that automatically the activity is unusual?

25   A.  No.

1    Q.  And you testified earlier about the training you

2    received as an analyst.  Can you provide some examples of

3    what factors would cause an AML analyst to identify

4    transaction activity as potentially suspicious as opposed to

5    unusual.

6    A.  Sure.  So suspicious could be, for example, a grocery

7    store, you'd expect them to deposit cash and to have change

8    that would go with that cash.  So if they are depositing

9    cash but they never go over that $10,000 threshold and it's

10   round dollars in cash, that would be suspicious as to why

11   they are not going over that threshold and why there's no

12   change.

13          You could have someone who has no connection maybe

14   to a foreign jurisdiction and they are wiring funds to a

15   country that is predominantly a tax haven, such as, you

16   know, the British Virgin Islands or Panama or somewhere like

17   that.

18   Q.  Now, you previously testified that suspicious activity

19   is not the same thing as unusual activity?

20   A.  Right.

21   Q.  Could you give an example of how you would distinguish

22   the two.

23   A.  So an unusual activity, it's a trigger to look at it,

24   but it might not be suspicious until you look at it.

25          So unusual might be someone who opens an account

1  and they bring in a check, and then within the next ten days

2  they withdraw it all in cash right away.  So that is

3  unusual, but you need to make a determination as to -- you

4  know, looking at what funded it and does it, you know, make

5  sense.

6         The other one might be someone or a business or

7  even an individual who is getting wires or cash into their

8  account and they -- you don't have employment information on

9  them or they look like they are unemployed or a student.

10  That would be unusual.

11  Q.  Now, did your training include guidance about what a red

12  flag is?

13  A.  Yes.

14  Q.  What is a red flag?

15  A.  So a red flag is like an indicator or sort of a flag or

16  a warning of sorts to say this could be a pattern, something

17  maybe that you should look into.

18  Q.  What were the most significant red flags that AML

19  analysts were trained to look for during the 2004 to 2008

20  period?

21  A.  Well, we certainly were looking at, you know, certain

22  transactions or activities with cash, as I have spoken to

23  before, and also just even wires to foreign jurisdictions.

24  Q.  And based on what you knew at the time from 2004 to

25  September 2008, are you aware of whether any of these red

1    flags were present with respect to the PCI account?

2    A.  No, I don't remember.

3              MR. COLLYARD:  Object to form.

4              THE COURT:  I didn't hear what you said.

5              MR. COLLYARD:  Objection, Your Honor.  She's

6    talking about all of the accounts in the PCI account.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't remember.

9    BY MS. PARLOVECCHIO:

10   Q.  Would high value wires going in and out of an account

11   qualify as a red flag?

12   A.  Not necessarily.

13   Q.  Why not?

14   A.  Because you have to look at the activity for that client

15   wholistically.  Maybe you would expect high value.  You'd

16   have to look at everything that you have information-wise

17   and all the other transactions around the account to make

18   that decision.

19   Q.  Are suspicious activity and red flag the same thing?

20   A.  No.

21   Q.  Why not?

22   A.  So a red flag is kind of an indicator that you should

23   look to see if it's going -- if it's indicative of, you

24   know, something that is suspicious, but it's not saying that

25   it's suspicious yet.

1    Q.  Now, you testified that an AML analyst would either

2    close or escalate an alert after they completed their

3    review.  What does it mean for an AML analyst to close an

4    alert?

5    A.  It would mean that they would clear it and close the

6    alert.

7    Q.  And would it mean that they didn't -- it didn't require

8    any review?

9    A.  Oh, sorry.  So they would -- what it meant to clear an

10   alert meant that they hadn't -- they have determined that

11   nothing -- the activity that they are seeing is expected,

12   isn't unusual, and they can clear the activity and close it

13   down.

14   Q.  What information was available to an AML analyst --

15   withdrawn.

16          What information did an AML analyst have to record

17   in the Searchspace comments to be able to close an alert?

18   A.  They would -- in the comments they would put in, you

19   know, the name of the client or the name of the customer,

20   what they alerted for, the months that they alerted for, and

21   then the activity that they had reviewed.

22   Q.  To your understanding, who is the intended audience for

23   the comments that you were writing down in Searchspace?

24   A.  So it would have been other AML analysts who were going

25   to maybe review or look at that as a history item down the

1    road.  It would be a manager, perhaps, looking at it.  Audit

2    would come in and look at that information.  So would

3    regulators.

4    Q.  Now, in reviewing the Searchspace comments, would those

5    individuals also have access to other information on M&I's

6    systems?

7    A.  Yes, they would.

8    Q.  Did M&I's policies and procedures require AML analysts

9    to record all of the research they conducted before closing

10   an alert?

11   A.  No.

12   Q.  According to your understanding of M&I's policies and

13   procedures, what was an AML analyst required to record in

14   Searchspace comments before they closed the alert?  Was it

15   everything?

16   A.  No, it wasn't everything.  You put down who they were,

17   so why they alerted and the activity, but all of that

18   information that you were researching, that you could see

19   all of those transactions, that was all available in those

20   systems and could be pulled for record to see that -- if

21   somebody else came in and wanted to look at that.  So you

22   only had to summarize in your comments what you looked at.

23   Q.  Now, were there instances where you escalated an alert

24   as an analyst?

25   A.  Yes.

Rainbow - Direct

1    Q.  On what occasions would you escalate an alert?

2    A.  For what type of activity or?

3    Q.  Just generally.

4    A.  Oh, if I found the activity to be potentially

5    suspicious, I would escalate it up and we would put it to --

6    potentially putting it at a case level for review.

7    Q.  And would an AML analyst on her own decide what

8    transaction activity in a customer's account was suspicious?

9    A.  No.  It would be reviewed with either -- a manager at a

10   manager level before it would be filed.

11   Q.  So if an AML analyst together with a manager determined

12   that a transaction is suspicious, what happens next?

13   A.  Once they make that decision, they would then put it

14   through the process of actually filling out the Suspicious

15   Activity Report.

16   Q.  Now, when you were an AML analyst, were you ever

17   pressured to close an alert that you thought had suspicious

18   activity in it?

19   A.  No.

20   Q.  Did you have an understanding in general that AML

21   analysts were ever pressured to close alerts that they may

22   have thought were suspicious?

23   A.  No.

24   Q.  Was there ever an incentive to ignore red flags?

25   A.  No.

1    Q.  Did you ever have an understanding that anyone at M&I

2    encouraged AML analysts to ignore alerts on certain

3    customers?

4    A.  No.

5    Q.  Did you ever have an understanding that anyone at M&I

6    encouraged AML analysts to turn a blind eye to the activity

7    in the PCI account?

8    A.  No.

9    Q.  Now, during plaintiff's counsel's examination, he asked

10   you some questions about source and use of wire funds that

11   came up during your testimony.  Do you recall that?

12   A.  Yes.

13   Q.  Can you just explain in your own words what you

14   understood "source" and "use" to mean when you were an AML

15   analyst.

16   A.  Sure.  So for an AML analyst, knowing what was available

17   to us, source of funds was what was credited to the account.

18   So is it a check that came in.  Is it, you know.  Payroll.

19   It's the credits that are coming in.

20          And the use of funds is where the money went.  So

21   when they debited it from their account, what was it?  Was

22   it cash?  Did they write a check?  Did they send a wire?

23   That would be use of funds.

24   Q.  When an AML analyst looks at wire transaction activity

25   in a customer's account, what information is available about

 1    the source of the wire?

 2    A.   There was no information on the source of the wire.

 3    Q.   Would there be any information about an originator's

 4    name?

 5    A.   You would see the originator's name.

 6    Q.   Anything else?

 7    A.   You might see an address and the account number at their

 8    bank on the wire.

 9    Q.   When an AML analyst looked at the wire transaction

10    activity in a customer's account during the relevant period,

11    was there information about the type of business the

12    originator would be in?

13    A.   No.

14    Q.   Can an AML analyst tell, from looking at the wire

15    transaction activity in a customer's account, the precise

16    reason why the originator is sending the money to the

17    customer's account?

18    A.   No, they can't see that.

19    Q.   Was that information necessary to an AML analyst's

20    determination whether the transaction activity being

21    reviewed was suspicious?

22              MR. COLLYARD:  Objection, Your Honor.

23              THE COURT:  Overruled.

24              THE WITNESS:  I'm sorry.  Can you ask that again?

25    BY MS. PARLOVECCHIO:

1    Q.  Sure.  Was that information necessary to an AML

2    analyst's determination about whether the transaction

3    activity being reviewed is suspicious?

4    A.  It wasn't necessary to obtain it, no.

5    Q.  When an AML analyst looked at the wire transaction

6    activity in a customer's account, what information is

7    available about the use of the wire?

8    A.  There's no information about the use of the wire.

9    Q.  If the wire went to a particular beneficiary, what type

10   of information would an AML analyst be able to see?

11   A.  You would just see the beneficiary name and maybe an

12   address and their account number at the other bank on the

13   wire.

14   Q.  By looking in the customer's account, would the AML

15   analyst be able to determine the precise reason why the

16   customer is sending the money to a particular beneficiary's

17   account?

18   A.  No.

19   Q.  Was that information necessary to an AML analyst's

20   determination whether the wire transaction activity being

21   reviewed is suspicious?

22   A.  No.

23   Q.  Now, during the relevant period, what could an AML

24   analyst actually see in Searchspace when looking at an alert

25   in regard to the type of business a beneficiary is in?

1    A.  Like the account type?

2    Q.  Simply the business type of the beneficiary.

3    A.  The business type wasn't in Searchspace.

4    Q.  Now, if the AML analyst can't obtain information about

5    the originator or the beneficiary's business type from the

6    available transaction activity information, how could the

7    analyst find that information?

8    A.  So they would go look at the Customer Information

9    System.

10   Q.  And what if that originator or beneficiary isn't a

11   customer of the bank?

12   A.  Then they won't have that information.

13   Q.  Now, based on the information about the transaction

14   activity in the customer's account, what was available to

15   the AML analyst during this relevant time period?  Would the

16   AML analyst actually have details about how the customer

17   used the money going into the account?

18   A.  No.

19   Q.  Were AML analysts required to add up wire transactions

20   for a particular originator or beneficiary as part of their

21   general review process?

22   A.  No.  They had some leeway on how they could write it

23   down.  It wasn't a specific way that you had to put, you

24   know, a percentage or a number in.

25   Q.  And were AML analysts required in any way to record the

1  percentage of wire transactions from a particular originator

2  or beneficiary?

3  A.  No, it wasn't required.

4  Q.  When reviewing an alert related to wire activity when

5  you were an AML analyst, what was the information that you

6  considered when determining whether wire activity needed to

7  be elevated for further review?

8  A.  Again, I would look at the entirety of the customer

9  relationship; and if it wasn't expected or out of their

10  norm, to make a determination if we needed to ask additional

11  questions.

12          MS. PARLOVECCHIO:  Your Honor, I'm about to move

13  to another topic.  I see it's after 3:00.  This would be a

14  good time for a break if you --

15          THE COURT:  I appreciate you alerting me to your

16  change in topic.  It is a good time for a break.

17          So, Members of the Jury, we will take a 15-minute

18  break.  Please be ready to return to the courtroom at 3:25.

19  And please remember the instructions that I have given you

20  and continue to follow them.  Thank you.

21          All rise for the jury.  And have a good break.

22      (Jury excused)

23                      **IN OPEN COURT**

24                    **(JURY NOT PRESENT)**

25          THE COURT:  Please be prepared to return to the

```
 1    courtroom and continue your testimony.  Thank you.

 2            We are in recess.

 3            MS. PARLOVECCHIO:  Thank you, Your Honor.

 4        (Recess taken at 3:11 p.m.)

 5                        *    *    *    *    *

 6        (3:31 p.m.)

 7                        IN OPEN COURT

 8                        (JURY PRESENT)

 9            THE COURT:  You may be seated.  Good afternoon.

10            Counsel, you may proceed.  Good afternoon.

11            MS. PARLOVECCHIO:  Thank you, Your Honor.

12    BY MS. PARLOVECCHIO:

13    Q.  Good afternoon.

14    A.  Good afternoon.

15    Q.  Now, before the break plaintiff's counsel asked you some

16    questions about an alert you completed on the PCI account,

17    Alert 67366.  Do you recall those questions?

18    A.  Yes.

19            MS. PARLOVECCHIO:  And, Mr. Herzka, could we have

20    that alert, please.

21    BY MS. PARLOVECCHIO:

22    Q.  Now, Ms. Ramlow, do you specifically recall completing

23    this alert?

24    A.  No, I don't.

25    Q.  And to be clear, when was this alert completed?
```

Ramlow - Direct

1    A.  Can you flip it to the final comment note?  So in August

2    of 2006.

3    Q.  And how many alerts have you completed since August

4    2006, would you say?

5    A.  Probably hundreds.

6    Q.  And could you just remind the jury what this activity

7    was based on, why this alerted.

8    A.  It alerted for -- thank you -- incoming and outgoing

9    wire activity.

10   Q.  And, Ms. Ramlow, for your reference, too, you also have

11   a hard copy in front of you if you would like to use that

12   instead.

13   A.  Sure.  Okay.

14         MS. PARLOVECCHIO:  I'm sorry.  Can we have

15   Plaintiff's Exhibit, please, 183.

16   BY MS. PARLOVECCHIO:

17   Q.  So, Ms. Ramlow, based on your typical process at the

18   time, what steps would you have taken with respect to an

19   alert for incoming and outgoing wires, such as this one?

20   A.  I'm sorry.  What would be the steps?

21   Q.  Your typical process that you would have applied.

22   A.  Oh, typical process.  Sure.  You would open that up,

23   look to see what it alerted for, and then begin your review

24   of looking at the activity.

25   Q.  And based on your comments here, was this activity in

 1    line with the normal activity for the PCI account as you

 2    observed it at that time?

 3    A.  Yes.

 4    Q.  Now, plaintiff's counsel asked you about the description

 5    of the PCI business in this alert.  Do you recall that

 6    testimony?

 7    A.  Yes.

 8    Q.  And you had noted, "Petters Company, Inc. is a

 9    collection of 19 companies that make and market a variety of

10    consumer products worldwide."  Do you recall that testimony?

11    A.  Yes.

12    Q.  Now, to be clear, back in 2006 what did you understand

13    Petters' business to be?

14    A.  A collection of companies owned by Mr. Petters that were

15    involved in a number of different industries, like -- but

16    particularly I remember the companies of, you know, like a

17    Fingerhut or a Polaroid.

18    Q.  Now, plaintiff's counsel also asked you questions about

19    the fact that you didn't include details about the types of

20    businesses of the originators and the beneficiaries of the

21    wires.  Do you recall that testimony?

22    A.  Yes.

23    Q.  Why didn't you include that information about the

24    originators and the beneficiaries in this -- in these

25    comments?

Rainbow - Direct

1    A.  It wasn't necessary to include information about all the

2    originators and beneficiaries of a wire in your review.

3    Q.  Would you have necessarily researched all the

4    beneficiaries and the originators for wires when you're

5    conducting a review?

6    A.  For all wires, no.

7    Q.  Based on the information you had available to you at the

8    time, was there any reason you would have researched the

9    originators or beneficiaries that are noted in this alert?

10   A.  No, not that I remember.

11   Q.  And just to be clear, were you actually required to

12   record in the Searchspace comments the type of business an

13   originator or beneficiary of a wire was in at the time?

14   A.  No.

15   Q.  What were you required to record in the Searchspace

16   comments about originators and beneficiaries of the wires?

17   A.  The names of where it was going to and where it was

18   coming from.

19   Q.  And were you required to record anything beyond that?

20   A.  No.  That --

21            MS. PARLOVECCHIO:  Objection, Your Honor, vague as

22   to which policy she's talking about for requirements.

23            THE COURT:  Overruled.  You may answer if you can.

24            THE WITNESS:  I'm sorry.  Can you ask again?

25            MS. PARLOVECCHIO:  Sure.

1    BY MS. PARLOVECCHIO:

2    Q.  According to the policies and procedures as you

3    understood at M&I, were you required to record anything

4    beyond the name of the beneficiary and the originators of

5    the wires?

6    A.  No.  It was up to the analysts how much information they

7    wanted to -- they thought was required.

8    Q.  Now, you testified that you closed the alert -- excuse

9    me.  Withdrawn.

10              If you had detected any suspicious activity on

11   this alert, would you have closed it?

12   A.  No.

13   Q.  Now, plaintiff's counsel also asked you whether sitting

14   here today you could read your comments in Searchspace and

15   determine how you reached your conclusion that the wire

16   activity wasn't suspicious.  Do you remember that question?

17   A.  I do.

18   Q.  Can you just please explain to the jury how your

19   comments support your conclusion that the alert could be

20   closed.

21   A.  And where -- we're looking at 67 -- I'm sorry.  I just

22   want to make sure I'm on the right alert.

23   Q.  The same one.

24   A.  It's the same one?

25   Q.  Yes.

 1                THE COURT:  What one is that, for the record?

 2                MS. PARLOVECCHIO:  It's 67 -- I want to make sure

 3        I get this right.  67366, Your Honor.

 4                THE COURT:  Thank you.

 5                THE WITNESS:  So based on the comments that I

 6        wrote, it was not unusual for this particular client and was

 7        expected, which is why we closed it.

 8        BY MS. PARLOVECCHIO:

 9        Q.  And what was expected?

10        A.  To see these -- the wire activity that we were seeing in

11        the account.

12        Q.  Does the level of detail in your notes include every

13        step that you took in your analysis?

14        A.  No.

15        Q.  And why is that?

16        A.  Because you're not required to document everything that

17        you looked at or every system that you touched.  It's a

18        summary of your investigation that you're required to put in

19        there.

20        Q.  Now, I'd like to turn your attention to Plaintiff's

21        Exhibit 183 and we're going to look at Alert 69663, which I

22        believe is page 49.

23            (Pause)

24        Q.  Do you have it, Ms. Ramlow?

25        A.  Yes.  Sorry.  I have it.

1    Q.  Now, plaintiff's counsel asked you some questions about

2    Alert 69663.  Do you recall those questions?

3    A.  Yes.

4    Q.  And, again, to be clear, do you recall completing this

5    specific alert?

6    A.  I don't remember completing this specific alert.

7    Q.  Would your process for reviewing this alert be different

8    from the process that you followed for the previous alert we

9    just reviewed?

10   A.  No.

11   Q.  Now, based on your comments here, was this activity in

12   line with the normal activity for PCI?

13   A.  It was.

14   Q.  Now, I want to direct your attention to the bottom of

15   page 2 of this alert.

16   A.  Okay.  Yes.

17   Q.  Now, plaintiff's counsel asked you a lot of questions

18   about the $10 million wire that was sent from a law firm

19   comprised of attorneys, accountants, and brokers.  Do you

20   recall those questions?

21   A.  Yes.  The wire that was sent to the attorney, yes.

22   Q.  Why would you have recorded that level of detail right

23   here, to your recollection?

24   A.  I don't remember.  I must have had the information -- I

25   must have found the information and it was the largest wire,

1    so I thought it was pertinent to add it.

2    Q.  Plaintiff's counsel also asked you questions about the

3    fact that there was a round dollar wire here.  Do you recall

4    those questions?

5    A.  Yes.

6    Q.  In what circumstances do you find round dollar amounts

7    concerning?

8    A.  If there's a pattern of round dollar.  And not

9    necessarily with wires.  It could be with, you know, cash.

10   It could be multiple checks.  But one wire in and of itself

11   doesn't -- that's round dollar doesn't make it unusual.

12   Q.  And based on the information available to you at the

13   time, would you have done anything differently in regard to

14   this alert?

15   A.  No.

16   Q.  And if you had detected any suspicious activity, would

17   you have closed it?

18   A.  No.

19   Q.  Now, I'd like to turn your attention to another alert

20   that plaintiff's counsel asked you about and we'll go to

21   Plaintiff's Exhibit 183, Alert 80215.  Now plaintiff's

22   counsel asked you several questions about this as well.  Do

23   you recall those questions?

24   A.  I do.

25   Q.  And specifically you testified about the fact that this

1    alert was being reviewed under the procedures for QAPOR.  Do

2    you recall those questions as well?

3    A.  I do.

4    Q.  Can you just briefly describe for the jury what QAPOR

5    is.

6    A.  QAPOR was a review that -- for particular customers that

7    frequently alerted and they were -- as an analyst, you could

8    perform a condensed review.

9    Q.  Now, the term "expedited" has been used in connection

10   with QAPOR.  Could you just clarify what the expedited part

11   of the QAPOR process actually is.

12   A.  The expedited part was the actual comments, entry

13   comments by the analyst.  So being allowed to not -- they

14   would review everything, but they could condense their

15   comments and that's what expedited it.

16   Q.  So setting aside the comments, would your review process

17   for an alert be different in any way under QAPOR?

18   A.  No.

19   Q.  I now want to show you what's marked for identification

20   as Defendant's Exhibit 50017, and that will be tab 1 in your

21   binder.

22   A.  I have it.

23   Q.  Ms. Ramlow, what is this?

24   A.  This is the list of customers that were on the QAPOR

25   list.

1    Q.  And how do you recognize it?

2    A.  It was part of our procedures and process.

3    Q.  And was this document made and maintained in the regular

4    course of M&I's business?

5    A.  Yes.

6              MS. PARLOVECCHIO:  Your Honor, at this time the

7    defendant offers Defendant's Exhibit 50017.

8              MR. COLLYARD:  No objection.

9              THE COURT:  Exhibit 50017 is received.

10             MS. PARLOVECCHIO:  Thank you, Your Honor.  And

11   just publishing to the jury.

12   BY MS. PARLOVECCHIO:

13   Q.  Ms. Ramlow, generally what are we looking at here?

14   A.  We are looking at the list of clients who had gone

15   through the process of being confirmed to go on the QAPOR

16   list.  So that was the list.

17   Q.  And what is your understanding, generally, of why these

18   customers were placed on this list?

19   A.  So they were alerting frequently and had been determined

20   to be not unusual.  And this -- on this list you could go

21   through a -- once they were placed on this list, which

22   certain criteria was looked at in addition to the actual

23   review of the activity, including a manager who would look

24   at it, they would go on the list so that an analyst could

25   do -- follow the process for a QAPOR review.

```
 1    Q.  Now, I want to direct your attention to page 2 of this
 2    document.  And what is the customer listed at the top of
 3    this page?
 4    A.  Petters Co., Inc.
 5    Q.  And can you please just read for the jury the
 6    information listed in the next column under "Type of
 7    business."
 8    A.  "Worldwide consumer products."
 9    Q.  And what was your understanding of the type of business
10    that PCI was involved in in the 2005 to 2008 time frame?
11    A.  They were a global company involved in various product
12    sales.
13    Q.  And do you see the column that says, "Date added"?
14    A.  I do.
15    Q.  What does that signify?
16    A.  That's the date that they were added to the list so that
17    an analyst could use that list for a QAPOR review.
18    Q.  Now, based on your review of alerts --
19          MS. PARLOVECCHIO:  Actually, just taking a step
20    back, can we go to page 1 again, Mr. Herzka.
21    BY MS. PARLOVECCHIO:
22    Q.  I just want to direct your attention to some of the
23    other customers listed on this QAPOR list.
24          And specifically drawing your attention to line 4,
25    what company is named there?
```

Ramlow - Direct

1    A.  It's Aurora Health Care.

2    Q.  And just generally, what type of company is that?

3    A.  They are a healthcare provider.

4    Q.  And directing your attention down to line 42.

5    A.  Missoula Mac, Inc.

6    Q.  And what type of company is that?

7    A.  It was a McDonald's.

8    Q.  Now, based on your review of alerts under the QAPOR

9    process, do customers on the QAPOR list receive more or less

10   scrutiny than other customers of the bank?

11   A.  You could almost say that it was additional scrutiny

12   because not only were you reviewing them as an analyst, but

13   they were also being reviewed by the manager to get on the

14   list and that included going through certain criteria before

15   it could be approved to be put on the list, annually that

16   they had to be looked at.

17   Q.  So, to be clear, once a customer made it onto the QAPOR

18   list, what did it have to do or what would have to happen

19   for it to stay on the QAPOR list?

20   A.  A manager would have to review it annually to make sure

21   that the criteria was still being met for it -- to enable it

22   to stay on the list.

23   Q.  And, Ms. Ramlow, you've testified a lot about the

24   reviews you did of PCI alerts.  Did you ever actually

25   directly interact with PCI or Tom Petters?

Rainbow - Direct

1    A.  No.

2    Q.  Would M&I's policies and procedures permit an AML

3    analyst to interact directly with PCI or Tom Petters?

4    A.  No.

5    Q.  Why not?

6    A.  Because we, as a second line AML, didn't need to be

7    interacting with clients.  And it could potentially tip them

8    off as well if we were looking at them.

9    Q.  And was there any policy prohibiting or counseling

10   against analysts directly interacting with customers?

11   A.  Not that I remember.

12   Q.  Now, when reviewing the PCI account, did you ever see

13   any checks or wires going from PCI to M&I employees?

14   A.  No.

15   Q.  Have you ever received any money or things of value from

16   any PCI personnel?

17   A.  No, I haven't.

18   Q.  Did you receive any favors from PCI personnel?

19   A.  No, I did not.

20   Q.  Did you get any benefit if a business banker was able to

21   sell more banking services to PCI?

22   A.  No.

23   Q.  Prior to September 2008, did you have any reason to

24   suspect at all that PCI was engaged in a Ponzi scheme?

25   A.  No.

1   Q.  What was your understanding of what would happen to you

2   if you looked the other way and intentionally didn't file a

3   SAR when you thought there was suspicious activity if you

4   thought there was suspicious activity in the PCI account?

5   A.  Well, first, I wouldn't be doing my job and there is the

6   liability of criminal and civil penalties for not escalating

7   activity that was suspicious.

8            MS. PARLOVECCHIO:  May I have a moment, Your

9   Honor?

10           THE COURT:  Yes, you may.

11      (Defendant's counsel confer)

12           MS. PARLOVECCHIO:  No further questions, Your

13   Honor.

14           THE COURT:  Anything further for this witness?

15           MR. COLLYARD:  Yes, Your Honor.

16                    **RECROSS-EXAMINATION**

17   BY MR. COLLYARD:

18   Q.  Ms. Ramlow, I just have a few questions for you.

19           First of all, you talked about the fact that AML

20   folks could not reach out to customers, right?

21   A.  I don't think I said that.

22   Q.  Didn't your counsel just ask you questions about whether

23   or not the AML Group could reach out to customers and ask

24   questions of customers?

25   A.  Well, there was -- yes, you didn't want to reach out to

1    customers in case you were tipping them off.

2    Q.  So what the AML Group did is they reached out to the

3    business bankers, for example, with their questions, right?

4    A.  There was a process, yes, where they could do that if

5    they needed to.

6    Q.  Yes.  And then the business bankers reached out to the

7    customers to ask questions, right?

8    A.  They could.

9    Q.  That was the process?

10   A.  Yes.

11   Q.  QAPOR, let's talk about QAPOR.  You said that Petters

12   was put on the QAPOR list; is that right?

13   A.  They were on the list, yes.

14   Q.  And you said that this was the list of customers that

15   was determined to not be unusual; is that what you said?

16   A.  They were cleared and determined not to be unusual, yes.

17   Q.  How was it that Petters Company, Inc. was determined to

18   not be unusual?

19   A.  It was based on the closed to expected alerts that were

20   reviewed.

21   Q.  Who made that decision?

22   A.  The AML manager at the time went through the process of

23   making the determination.

24   Q.  Do you know what the analysis was to determine that

25   Petters Company, Inc. -- the activity on the Petters

 1    Company, Inc. account was not unusual to put it on the QAPOR

 2    list?

 3    A.   Could you say that again?

 4    Q.   Yeah.  Do you know specifically what was determined as

 5    to how it was concluded that the activity on the Petters

 6    Company, Inc. account was not unusual for it to go on the

 7    QAPOR list?

 8    A.   It would have been based on the parameters.  One of

 9    those would have been that the alerts were cleared.

10    Q.   You don't know specifically what was decided to put

11    Petters Company, Inc. on the QAPOR list, do you?

12    A.   I didn't review it to put it on the list, so no.

13    Q.   And you have no knowledge as to what went into putting

14    Petters Company, Inc. on the list, right?

15    A.   I know there was a process.

16    Q.   Do you know that Ms. Bernita Hile handled that process?

17    A.   She did.

18    Q.   And you were shown a list of companies on the QAPOR

19    list, including McDonald's, right?

20    A.   Correct.

21    Q.   And it had Petters Company, Inc. and it listed what

22    Petters Company, Inc. did, right?

23    A.   What their business type was, yes.

24    Q.   What products did Petters Company, Inc. buy or sell?

25    A.   They sold products out of their Fingerhut business and

1    Polaroid.  Those are the two that I remember.

2    Q.  We talked before about the fact that and you testified

3    that you didn't know if Petters Company, Inc. owned Polaroid

4    or Fingerhut.  Do you remember that?

5    A.  No.  I think I said --

6               MS. PARLOVECCHIO:  Objection, mischaracterizes the

7    testimony.

8               THE COURT:  Overruled.  You may answer.

9               THE WITNESS:  I think I said I knew that they were

10   under the group of Petters companies.

11   BY MR. COLLYARD:

12   Q.  Right.  And I just want to make sure I'm clear -- that I

13   understand this correctly.  You're not saying that Petters

14   Company, Inc. owns Polaroid, correct?

15   A.  Again, I don't know the exact ownership structure.

16   Q.  And you're not saying -- it's not your testimony that

17   Petters Company, Inc. owns Fingerhut either, right?

18   A.  They were a company of the Petters family.

19   Q.  I understand Petters Company, Inc. was a company of the

20   Petters family, but what I'm asking you is if it's your

21   testimony that Petters Company, Inc. owned Fingerhut.

22   A.  I thought they were related, yes.

23   Q.  Is it -- do you have knowledge, do you have belief that

24   Petters Company, Inc. owned Fingerhut?

25   A.  I don't know the ownership structure.

1    Q.  And it could be, Ms. Ramlow, that some other entity of

2    Petters owns Fingerhut or owns Polaroid, correct?

3    A.  Again, I don't know.

4    Q.  You can't testify or speak to that?

5    A.  No.

6    Q.  Can you name one product that you know Petters Company,

7    Inc. bought or sold?

8    A.  I can't remember.

9    Q.  Now, go back, please, to Exhibit 183, Plaintiff's

10   Exhibit 183, where you were asked questions about the

11   alerts.

12          And if we go to page 43 of Exhibit 183, I'll just

13   take you to the alert.  This is Alert 67366.  Do you

14   remember just testifying to this alert?

15   A.  Yes.

16   Q.  And you were asked a question about why you closed the

17   alert.  Do you remember that?

18   A.  Yes.

19   Q.  And I had asked you a question earlier about why you had

20   closed the alert to the expected state, right?

21   A.  I think so.

22   Q.  And you told me that you didn't remember or you didn't

23   know, right?

24   A.  I don't remember saying that.

25   Q.  Counsel just asked you why you closed it and you said it

1   was expected activity.  Do you remember that?

2   A.  Yes, because I was reading off the comments.

3   Q.  And you said what that means is essentially -- so let me

4   ask you about that.  What is meant by "expected"?  Are you

5   saying that the reason why you closed this alert is because

6   you were saying that Petters essentially does it all the

7   time?

8   A.  No.

9   Q.  Then what exactly did you mean by "expected"?

10  A.  From what I understood for the client, it was -- with

11  the activity that I reviewed, it was expected and not

12  unusual.

13  Q.  What activity was expected?

14  A.  The activity that I saw in the account.

15  Q.  Which activity?

16  A.  All of it.

17  Q.  So are you saying that you're closing it because it's

18  expected that, for example, Nationwide and Enchanted are

19  wiring in nearly a billion dollars?

20  A.  No.

21  Q.  Okay.  Then what is expected about it?

22  A.  Again, I'm reading off my comments, but it's the

23  activity that I reviewed wholistically, putting it together,

24  looking at the history of the client, what they had done in

25  the past as well, because that is part of the review

1    process, that it appears explainable and expected.

2    Q.  And just so I'm clear, Ms. Ramlow, you can't say what

3    the reason or purpose was for any particular wire, right?

4    A.  Not that I remember.

5    Q.  Okay.  So then I'm trying to figure out, when you say

6    it's expected, what is expected?

7    A.  That that is --

8            MS. PARLOVECCHIO:  Objection, asked and answered.

9            THE COURT:  Overruled.  You may answer if you can.

10           THE WITNESS:  It's the state that it went to.

11   BY MR. COLLYARD:

12   Q.  I'm sorry?

13   A.  Ask your question again.  I'm sorry.

14   Q.  Yes.  I'm trying to figure out exactly what you mean by

15   you closed this because it was expected.  What was expected?

16   A.  It was explainable for the customer that I was looking

17   at based on a wholistic review of the client.

18   Q.  And I'm trying to figure out what is explainable if --

19   I'm sorry.  So if we just back up, we can't tell from the

20   comments what any of the wires were for, right?

21   A.  I don't have all that information in front of me back

22   from 2006.

23   Q.  So can you actually -- can you say, Ms. Ramlow, why

24   exactly it was expected that this activity -- that the

25   activity was expected for the Petters Company, Inc.

1    business?

2    A.  From what we knew about the client and the activity that

3    we could see, it was not unusual and that's why I closed it.

4    Q.  And what exactly did you know about the client that led

5    it to be expected?

6    A.  I think the activity that I looked at and who they were

7    and all the information that was available to me to make the

8    conclusion in the comments.

9    Q.  And are you saying something different than, oh, there's

10   been billions and billions of dollars wired in from these

11   entities in the past?

12   A.  No, that's not what I'm saying.

13   Q.  You say, "expected from a business."  Do you see that at

14   the very -- on page 45?

15   A.  Yes.

16   Q.  What business?

17   A.  Their business.

18   Q.  When you say, "from a business," is that referring to

19   Petters Company, Inc. or is that referring to a business

20   generally?

21   A.  From the client, who is a business.  They weren't an

22   individual, so I clearly said they were a business.

23   Q.  And other than saying based on looking at all the

24   transaction activity wholistically, you can't specifically

25   say why, why this activity was expected?

1   A.  Again, from my comments, looked at the activity

2   wholistically and it was expected for the client and that's

3   why I closed it.

4   Q.  Can you explain any more specifically than that?

5   A.  No.

6   Q.  Let's go to the other alert you just testified to.  It's

7   Alert 69663.  It's Exhibit 183, page 49.  And this one I

8   believe you answered your counsel's question and you said

9   the reason -- well, first, let's back up.  You don't

10  remember reviewing this alert, do you?

11  A.  No.

12  Q.  You don't remember anything you did to adjudicate the

13  alert, right?

14  A.  I don't remember sitting there and working the alert,

15  but I remember high level what the process was for an

16  analyst.

17  Q.  Understood that you remember your process, but you don't

18  remember anything about what you did with respect to this

19  alert?

20  A.  On that particular day?  No.

21  Q.  And you don't recall this particular alert from back in

22  2006, right?

23  A.  I don't remember it, no.

24  Q.  You were asked why you closed and you said it was in

25  line with normal activity.  Do you remember saying that?

1    A.  Yes.

2    Q.  And, again, I just want to know what that means.  Are

3    you referring to the reason why you believe it was in line

4    with normal activity for Petters Company, Inc. because there

5    were billions of dollars coming in and out of the account?

6    A.  It wasn't because of the billions of dollars.  It was

7    looking at the wholistic relationship in all of their

8    activity to make the comment to close it.

9    Q.  But, again, for this alert, we don't know why any of the

10   wires were coming in or going out of the account, right?

11   A.  Not from the comments, but we weren't required to

12   document them.

13   Q.  So other than the -- if we don't know what the wires

14   were for and it's not about the billions of dollars coming

15   in, then what is it that makes it in line with the normal

16   activity for Petters Company, Inc.?

17   A.  So the comments that I have in -- there again, I looked

18   at them.  It was in line with what we had seen and what we

19   knew about the client, and there was no other unusual

20   activity.

21   Q.  And when you say what we had seen and what we had known

22   about the client, what specifically are you referring to?

23   A.  Their activity.

24   Q.  "Their activity" meaning the billions of dollars?

25   A.  All of their activity.

1   Q.  Can you name any specific activity that you're referring

2   to that led to your conclusion that it was in line with

3   normal activity?

4   A.  No.

5   Q.  You also talked about the $10 million wire to the

6   yachting industry, right?

7   A.  Yes.

8   Q.  And you were asked questions about whether or not it was

9   round, right?

10  A.  Yes.

11  Q.  And you said something along the lines of you would look

12  at patterns of round dollars; is that right?

13  A.  Yes, you can.

14  Q.  Okay.  So, for example, if Enchanted or Nationwide had

15  wired in patterns of round dollar wires -- or, I'm sorry, if

16  Enchanted, for example, had wired in multiple times,

17  multiple times large wires that were round, would that be

18  considered a pattern?

19  A.  It depends on the frequency of it.

20  Q.  What frequency makes it a pattern?

21  A.  It depends.  I would have to be looking at it to explain

22  it.

23  Q.  You don't have any particular gauge on it?

24  A.  No.

25  Q.  Now, you testified that -- I don't know if I heard this

1    correctly, but you said something along the lines of when

2    you were closing alerts and putting in your comments, that

3    it was up to the analysts what to explain in the comments.

4    Is that what you testified to?

5    A.  Yes.  Once they are following the procedures and

6    guidelines, how they -- how they wanted to write about what

7    they were seeing, they had some ability to decide how to

8    explain that.

9    Q.  Well, the analyst couldn't just make up -- decide what

10   they put in the comments, right?

11   A.  No.

12   Q.  They had to follow the procedures?

13   A.  Correct.

14   Q.  So if we go to Plaintiff's Exhibit 398 -- I want to show

15   you Plaintiff's Exhibit 398.

16   A.  Sorry.  What number, again?

17   Q.  You're going to have to go to my booklet.  Do you have

18   an Exhibit 398 in there, Ms. Ramlow?

19   A.  Yep.

20   Q.  Okay.  Can you please take a look at Exhibit 398.

21   A.  I see it.

22   Q.  These are additional guidelines for anti-money

23   laundering analysts to use while they are investigating

24   alerts; is that right?

25   A.  It appears so.

1    Q.  And you're familiar with this document, correct?

2    A.  I'm familiar with various levels of this document that

3    evolved.

4    Q.  Okay.  If we turn to page 5 of Exhibit 398 --

5    A.  I see it.

6    Q.  -- look to the heading there where it reads, "Comments

7    in Searchspace for 'closed to expected or explainable

8    activity.'"  Do you see that?

9    A.  Yes.

10   Q.  And this provides a list of things that the anti-money

11   laundering analysts were supposed to address when they were

12   closing an alert, right?

13   A.  Correct.

14   Q.  So, for example, if you go down -- halfway down through

15   the page where it says, "Describe analysis completed," and

16   it says, for example --

17   A.  Yes.  Yep, I see it.

18   Q.  Thank you.  It says, "discussion with account officer,

19   information found on the internet, information found through

20   looking at checks."

21   A.  Yep.

22   Q.  Do you see that?

23   A.  Yeah.

24   Q.  And that's the type of information that you would

25   describe in the comments section, just as an example, right?

1    A.  Correct.

2    Q.  Now, this wasn't an exhaustive list, that analysts could

3    choose to go on and explain more; is that right?

4    A.  They could.

5    Q.  And then at the last -- at the bottom, the last item

6    reads, the very last sentence, it reads, "Make sure that a

7    conclusion is reached and supported in your comments."

8    Right?

9    A.  That's correct.

10   Q.  And that was important to do, right?

11   A.  Yes.

12   Q.  And then if we go to the next page, page 6, towards the

13   top there where it reads, "The focus for close to expected

14   alerts," it says, "The focus for closed to expected alerts

15   will be on explaining the reason for the alert."  Do you see

16   that?

17   A.  Yes.

18   Q.  And "Analysts will be required to look at everything,

19   but only document what alerted AND the source or use of

20   funds."  Do you see that?

21   A.  I do.

22   Q.  And then it says that, "If other unusual activity is

23   identified, that should be commented on as well."  Right?

24   A.  Correct.

25   Q.  Those were some of the things that were supposed to be

Rainbow - Recross

1    in the comments section, right?

2    A.  Yes.

3    Q.  And, in fact, if we move down just a little bit, where

4    it says, "Ensure," it reads, "Ensure that you understand and

5    explain what is going on in the account."  Do you see that?

6    A.  Yes.

7    Q.  And you understood that analysts were supposed to

8    understand and then explain what was going on in the

9    account, right?

10   A.  Yes.  To the best of their ability, yes.

11   Q.  And then it gives us an example for -- a wire example,

12   right?

13   A.  Yes.

14   Q.  And that's for an incoming wire, right?

15   A.  Yes.

16   Q.  And it reads, "Documentation would be needed for the

17   source of the incoming wires AND what the funds appeared to

18   be used for."  Do you see that?

19   A.  Correct.

20   Q.  That's not just the names, right?

21   A.  That's what would be available to the analyst to see to

22   document.

23   Q.  And when you document the incoming wires, you're not

24   only documenting who is wiring the money in, but you're also

25   documenting what the funds appeared to be used for, correct?

1   A.  Where they were sent, yes.

2   Q.  And if you have information about why those wires are

3   coming in or what they are being used for, you document that

4   in the comments section, right?

5   A.  If that was available to the analyst, but it wasn't.

6   Q.  Let's go to the next page, page 7, under "Reminders,"

7   part 3.  And this is a checklist when you're closing the

8   alert, right?

9   A.  I wouldn't call it a checklist.

10   Q.  You would call these reminders?

11   A.  Sure.

12   Q.  Okay.  It says, "Remember to ask yourself the following

13   questions when closing an alert to expected activity."  And

14   then the third one says, "Do the comments provided convince

15   the reader that the alert is not suspicious?"  Do you see

16   that?

17   A.  I do.

18   Q.  And do you agree that the analyst is supposed to provide

19   enough information in the comments section when they closed

20   the alert to convince the reader that the alert is not

21   suspicious, right?

22   A.  Yes, they were supposed to give enough information so

23   that the reader understood how they came to their

24   conclusion.

25   Q.  And the reader of these comments are anti-money

1    laundering analysts, correct?

2    A.  Yes.

3    Q.  Managers, correct?

4    A.  Yes.

5    Q.  Auditors?

6    A.  Yes.

7    Q.  Regulators?

8    A.  Yes.

9    Q.  And that level of detail in the comments was supposed to

10   convince them that the alert was actually not suspicious,

11   right?

12   A.  Yes, but they would have additional information and

13   resources available to them that the analysts could see if

14   they required additional detail to understand that reason as

15   well.

16   Q.  This says the comments provided must convince the reader

17   that the alert is not suspicious, right?

18   A.  Yes.

19               MR. COLLYARD:  No further questions, Your Honor.

20               Thank you, Ms. Ramlow.

21               THE COURT:  Anything further for this witness?

22               MS. PARLOVECCHIO:  Your Honor, no questions for

23   this witness.

24               THE COURT:  May this witness be excused?

25               MS. PARLOVECCHIO:  Yes.

Currie-Smotherman - Cross

```
 1                    THE COURT:  You are excused.

 2                    THE WITNESS:  Thanks.

 3                    MR. COLLYARD:  Your Honor, plaintiff will call its

 4       next witness adverse, Patricia Currie-Smotherman.

 5                    THE COURT:  Thank you.

 6          (Pause)

 7                    THE COURT:  Before you're seated, please state

 8       your full name and spell your last name.

 9                    THE WITNESS:  Patricia Currie-Smotherman,

10       C-u-r-r-i-e, hyphen, S-m-o-t-h-e-r-m-a-n.

11          (Witness sworn)

12                    THE COURT:  Thank you.  Please be seated.

13                    Counsel, you may proceed when you are ready.

14                    MR. COLLYARD:  Thank you, Your Honor.
```

**(Patricia Currie-Smotherman)**

**CROSS-EXAMINATION**

```
17       BY MR. COLLYARD:

18       Q.  Good afternoon, Ms. Currie-Smotherman.

19       A.  Good afternoon.

20       Q.  You and I have met before, right?

21       A.  Yes.

22       Q.  That was in Milwaukee when I took your deposition; is

23       that right?

24       A.  Yes.

25       Q.  I want to start out by asking you,
```

1    Ms. Currie-Smotherman:  Are you still employed at BMO Harris

2    Bank?

3    A.  Yes.

4    Q.  And what is your current role?

5    A.  An AML investigator.

6    Q.  And from two thousand -- let's go back to the 2005 to

7    2008 time period.  You were an anti-money laundering analyst

8    and an anti-money laundering investigator; is that right?

9    A.  An analyst, an AML analyst, yes.

10   Q.  You were an AML analyst?

11   A.  Yes.

12   Q.  Were you --

13          THE COURT:  Ms. Currie-Smotherman, I'm going to

14   ask you to pull the base of the microphone closer to you.

15   I'm having trouble hearing you.

16          THE WITNESS:  Is that better?

17          THE COURT:  It is better.

18   BY MR. COLLYARD:

19   Q.  I am sorry.  Were you an anti-money laundering analyst

20   and an anti-money laundering investigator during that time

21   period?

22   A.  My job title was AML analyst.

23   Q.  Okay.  Do you remember, Ms. Currie-Smotherman, the

24   Petters Company, Inc. account?

25   A.  Yes.

Currie-Smotherman - Cross

1    Q.  Do you remember that the Anti-Money Laundering Group

2    from 2005 up through 2008 had investigated and closed alerts

3    on the Petters Company, Inc. account?

4    A.  Yes.

5    Q.  And do you recall that you yourself had reviewed and

6    investigated alerts on the Petters Company, Inc. account?

7    A.  Yes.

8    Q.  And do you recall, Ms. Currie-Smotherman, that you

9    reviewed and closed four AML alerts on the account?

10   A.  No, I do not recall how many.

11   Q.  Do you recall that the alerts that you closed for --

12   were for incoming and outgoing wires?

13   A.  Yes.

14   Q.  And do you recall that the value of the incoming and

15   outgoing wires was about $5.7 billion?

16   A.  No, I do not recall the amount.

17   Q.  In your job as an anti-money laundering analyst,

18   Ms. Currie-Smotherman, had you -- you had -- you have looked

19   at or investigated incoming wires, right?

20   A.  Yes.

21   Q.  And as part of that, you have done research, for

22   example, on entities wiring money into the account, right?

23   A.  Could you rephrase that, please?

24   Q.  Yes.  In your experience as an anti-money laundering

25   analyst in the Anti-Money Laundering Group from 2005 through

1    2008, you have researched or analyzed entities wiring money

2    into an account on alerts that you were adjudicating?

3    A.  Yes, but that was not a requirement.

4    Q.  I understand, but you have done it, correct?

5    A.  Yes.

6    Q.  And in order to research entities wiring money into the

7    account, one of the things that you would do is you could go

8    on the internet and look for those, look for information

9    about those entities; is that right?

10   A.  Yes, I could, but that was not a requirement.

11   Q.  And I'm not asking you about requirements right now.

12   I'm just asking you if that is something that you could do.

13   A.  Yes.

14   Q.  And that is something that you actually have done in

15   your experience, right?

16   A.  Yes.

17   Q.  Now, what about using databases, like the Secretary of

18   State's website?  Have you gone onto the Secretary of

19   State's websites, for example, to look up information about

20   entities wiring money into an account?

21   A.  Not during that time frame, no.

22   Q.  Do you know for sure that you have never done that?

23   A.  During that time frame?  I don't recall doing that.

24   Q.  Something you certainly could have done?

25   A.  Could have, yes.

Currie-Smotherman - Cross

```
 1    Q.  What other databases did you have available for you to
 2    research entities wiring money into the account?
 3    A.  What other databases?
 4    Q.  Yes.
 5    A.  The internet, any search engines.
 6    Q.  What about LexisNexis, for example?
 7    A.  Yes, I believe we used LexisNexis during that time
 8    frame.
 9    Q.  And certainly LexisNexis -- is that a database where you
10    could go in and plug in information about a company and
11    learn information about a company?
12    A.  Yes.
13    Q.  What about Hoovers?  Do you know what Hoovers is?
14    A.  Yes.
15    Q.  What is Hoovers?
16    A.  I believe it's a business database.
17    Q.  Is that a database that you had access to, where you
18    could plug in information on a company wiring money into an
19    account to find out more information about that company?
20    A.  Not that I recall.  I mean, we were doing a Google
21    search.  Then if something came up within the -- with the
22    Hoovers, then yes.  But, no, it wasn't something that we
23    were required to use or that we used on a regular basis.
24    Q.  And, again, I'm not talking about whether you're
25    required to do it.  I'm asking:  Is that a database that you
```

1    had access to that you could use to research an entity

2    wiring money into an account?

3    A.  Not that I recall.

4    Q.  Did you use the Hoovers database?

5    A.  No.

6    Q.  That's not something you used?

7    A.  No.

8    Q.  Did you understand, Ms. Currie-Smotherman, that as part

9    of the process, if you were gathering information on an

10   entity wiring money into an account, that one of the things

11   you could do is ask the business banker certain information

12   about -- if they knew information about that entity?

13   A.  Yes.

14   Q.  And that's something that you had done in the past as

15   well, right?

16   A.  Yes.

17   Q.  And do you understand that, as part of that process,

18   business bankers then could ask the customer questions and

19   then get back to you?

20   A.  Yes, that was a process.

21   Q.  Let's go to Exhibit -- Plaintiff's Exhibit 183.  So

22   you've got a binder in front of you and you can go to that.

23   We're also going to show it to you on the screen by you.  So

24   you'll have your choice.

25   A.  Okay.

1    Q.  And if you take a look at Exhibit 183, I'll just bring

2    you to page 6, which is Alert 53247.  Are you there?

3    A.  Yes.

4    Q.  Are you familiar with Exhibit 183?

5    A.  Yes.

6    Q.  And these are -- is this -- are these the audit trails

7    or the comments from -- in Searchspace that were generated

8    on alerts that were closed on the Petters Company, Inc.

9    account?

10   A.  Yes.

11   Q.  And this alert here, Alert 53247, if we go to the top,

12   it was -- the alerted month is March of 2005.  Do you see

13   that?

14   A.  Yes.

15   Q.  Now, do you understand, Ms. Currie-Smotherman, that this

16   was the first substantive alert that was closed on the

17   Petters Company, Inc. account?

18   A.  No.

19   Q.  You don't have that understanding?

20   A.  Well, I do -- I know that it was now, but yes.

21   Q.  Okay.

22   A.  This was the first alert that was closed, yes.

23   Q.  Okay.  And if we look down below, we're going to see

24   some entries in here and it lists your name, right?

25   A.  Yes.

1   Q.  And do you recall that you closed this alert?

2   A.  Yes.

3   Q.  And if we just take a look at your comments here, the

4   second block down -- let me back up.  Do you -- was this

5   alert for both incoming and outgoing wires for volume and

6   value?

7   A.  Yes.

8   Q.  And if we go to the second block down, it says, "Wire

9   activity does not appear suspicious."  Do you see that?

10  A.  Yes.

11  Q.  Do you remember why you concluded that?

12  A.  It would have been based on my research.

13  Q.  Do you remember, as you're sitting here today, anything

14  specifically about why or how you concluded the activity did

15  not appear suspicious?

16  A.  Could you rephrase your question, please?

17  Q.  Sure.  I'm just trying to -- I'm just trying to figure

18  out, as you're sitting here today, if you remember -- let me

19  back up.  Do you remember adjudicating this alert?

20  A.  I remember closing the alert, saying the activity was

21  not suspicious, based on having reviewed it again, yes.

22  Q.  Do you remember specifically what you did to investigate

23  or analyze this alert?

24  A.  Specific details, no, but what our standard procedure

25  was.

1  Q.  So you don't remember actually reviewing or

2  investigating this particular alert?

3  A.  No, I do not.

4  Q.  If we just go back to that comment there where it reads,

5  "Wire activity does not appear suspicious," can you read

6  your comment and determine why or how it is that you

7  concluded that the activity does not appear suspicious?

8  A.  I didn't -- could you repeat your question, please?

9  Q.  Sure.  Can you read your comment there where it says,

10  "Wire activity does not appear suspicious" and know from

11  reading that how or why you concluded that the wire activity

12  did not appear suspicious?

13  A.  I know that in my research I would have looked at who

14  was sending -- the originators of the wires, the beneficiary

15  of the wires, and if that was -- if that seemed logical for

16  that customers and what he would normally receive for

17  incoming and outgoing wires.  But the specific details of

18  exactly, no.

19  Q.  Okay.  Do you remember -- let's back up.  You remember

20  the Petters Company, Inc. account, right?

21  A.  I remember working the alerts on the Petters Company,

22  yes.

23  Q.  Do you know that -- do you remember that the Petters

24  Company, Inc. account was a checking account?

25  A.  Yes.

1    Q.  Do you remember that that was in the business banking

2    group or the small business banking group?

3    A.  No.

4    Q.  Do you recall what Petters Company, Inc. business did?

5    A.  I do not.

6    Q.  You don't know of any products or -- that it was buying

7    or selling, for example?

8    A.  I don't recall.

9    Q.  If I told you that Petters Company, Inc. was in the

10   business of buying and reselling consumer electronics or

11   TVs, would that help refresh your recollection?

12           MS. PARLOVECCHIO:  Objection, improper refreshing

13   of recollection.

14           THE COURT:  Sustained.

15   BY MR. COLLYARD:

16   Q.  If I told you that Petters Company, Inc. was in the

17   business of buying or selling consumer electronics,

18   including TV, does that refresh your recollection?

19           MS. PARLOVECCHIO:  Objection.  Same objection,

20   Your Honor.

21           THE COURT:  Sustained.

22           THE WITNESS:  It does not.

23   BY MR. COLLYARD:

24   Q.  It does not.  Thank you.

25           Now, if we go to the -- if we go to page 7 and if

Currie Smotherman - Cross

1    we look in the middle of the page, there's an entry there

2    that says, "Activity of the type expected for this

3    customer."  Do you see that?

4    A.  Yes.

5    Q.  And it's got a name next to it, "eberman."  Do you see

6    that?

7    A.  Yes.

8    Q.  Is that Elliot Berman?

9    A.  Yes.

10   Q.  And who was Elliot Berman?

11   A.  He was our acting interim manager at the time.

12   Q.  Was Elliot Berman a lawyer at a law firm?

13   A.  Yes.

14   Q.  And Elliot Berman was a lawyer who had advised M&I Bank

15   on legal matters; is that right?

16   A.  Yes.

17   Q.  And then Mr. Berman stepped in to act as an interim

18   manager for a certain period of time in the AML Group; is

19   that right?

20   A.  Yes.

21   Q.  And Mr. Berman writes, "Activity of the type expected

22   for this customer."  Do you know why -- you don't know why

23   Mr. Berman concluded that, do you?

24   A.  Except for that in our normal process he would have more

25   than likely did the same basic research that I did to come

1    to that conclusion.

2    Q.  But you can't read those comments and explain why

3    exactly Mr. Berman concluded that, right?

4    A.  No.

5    Q.  And you don't know from reading these comments what

6    Mr. Berman based that on when he made that conclusion,

7    right?

8    A.  He was basing it on my comments and if it aligned with

9    what he had actually found.  I moved it to manager review

10   for him to take a look to see if he agreed with my

11   conclusion.

12   Q.  But you don't know specifically what Mr. Berman did to

13   conclude that the activity is of the type expected for the

14   customer or why he believed that?

15   A.  You're question was somewhat two parts.  Could you re --

16   Q.  Sure.  I will just focus on the last part.  We can't

17   read Mr. Berman's comments here and understand why he

18   actually concluded that, right?

19   A.  Not from the comment, no.

20   Q.  And then if we just go down below where you say,

21   "Activity of the type expected for this customer."  Do you

22   see that?

23   A.  Yes.

24   Q.  We can't read your comment right now,

25   Ms. Currie-Smotherman, and understand why you concluded

1    that, right?

2    A.  Based on my comments above.

3    Q.  So all we know is what is written in these comments

4    right here, right?

5    A.  Yes.

6    Q.  We can't glean from this language in particular why you

7    believed that the activity was of the type expected for the

8    customer, correct?

9    A.  From the comments, no.

10   Q.  And as you're sitting here today, can you say why

11   exactly the activity was expected for the customer?

12   A.  Because, based on my research, I would have looked at

13   statements to see if this was normal for the customer to

14   receive incoming wires from these particular customers or

15   outgoing wires to those particular customers.  So, based on

16   that, that would have been activity that the customer

17   normally would conduct.

18   Q.  And is the basis for you saying that that, oh, they had

19   wires from similar entities coming in and wires going to

20   similar entities?

21   A.  I'm sorry.  Could you repeat your question or rephrase

22   it?

23   Q.  Sure.  I'm trying to figure out what you're trying to

24   say about expected and I'm trying to understand if your

25   basis for saying it's expected is that you had seen similar

1    wires from similar companies coming into the account and

2    similar wires going to similar companies going out of the

3    account.

4    A.  Yes.

5    Q.  And is that really -- that's it?  Is that's the

6    analysis?

7    A.  Could you rephrase your question, please?

8    Q.  Sure.  Is that -- can you think of anything more of what

9    the analysis was other than that?

10   A.  The wires didn't appear suspicious because that was the

11   customer's normal pattern of activity, to send outgoing

12   wires and receive incoming wires from their potential

13   customers, so that's what my research was stating.

14   Q.  Ms. Currie-Smotherman, do you understand that in the

15   concept of identifying suspicious activity, you can't use as

16   a basis for saying something is not suspicious that the

17   customer has done that same thing in the past?

18          MS. PARLOVECCHIO:  Objection, misstates evidence

19   in the record.

20          THE COURT:  Overruled.  You may answer the

21   question if you can.

22          THE WITNESS:  Could you repeat the question?

23          THE COURT:  And I'm going to ask you -- I'm having

24   trouble hearing you.  So would you just move the base so I

25   can hear you better?

1        THE WITNESS:  Could you repeat your question,

2   please?

3        THE COURT:  Thank you.

4        MR. COLLYARD:  That's much louder.  I can hear you

5   better, too.

6   BY MR. COLLYARD:

7   Q.  Do you understand that one of the concepts in

8   identifying and reporting suspicious activity that was

9   taught to bank personnel was you can't ignore suspicious

10  activity or you can't base findings on suspicious activity

11  off of the notion of, oh, the customer does that all the

12  time?

13  A.  Yes.  And that's not what my conclusion was.  The

14  customer does that all the time and that's the reason it

15  wasn't suspicious, that was not my conclusion.

16  Q.  Did you base your analysis on the fact that the incoming

17  wires had come in from similar entities?

18  A.  Could you repeat it, please?

19  Q.  Did you base your analysis on the fact that wires came

20  in from similar entities who had previously wired money to

21  the account?

22  A.  I based it on the fact that that was the customer's

23  normal pattern of activity and from the customers that he

24  normally received incoming and outgoing wires to, not that

25  he does it all the time.

1   Q.  Do you know, Ms. Currie-Smotherman, on this

2   particular -- where you mentioned Nationwide and Enchanted,

3   do you see that?

4   A.  Yes.

5   Q.  Do you know who Nationwide or Enchanted is?

6   A.  No, not at this moment, I do not know who they are.

7   Q.  Did you look into who Nationwide or Enchanted was back

8   when you reviewed this alert?

9   A.  I don't recall.

10  Q.  Would you have looked to see what type of information

11  you could find out about Nationwide and Enchanted in making

12  your determination whether or not their wires coming into

13  the account were expected?

14  A.  It's possible we would do a sampling of originators and

15  beneficiaries.

16  Q.  Let's go to a different alert.  This is on page 67.  And

17  if we take a look at this alert, Ms. Currie-Smotherman, it's

18  Alert 83853.  Do you see that?

19  A.  Yes.

20  Q.  And this is for the alerted month of February of 2007;

21  is that right?

22  A.  Yes.

23  Q.  And this was an alert that you closed; is that correct?

24  A.  Yes.

25  Q.  And if you go to the next page, on page 68 you talk

Currie-Smotherman - Cross

1   about the incoming and outgoing wires.  Do you see that?

2   A.  Yes.

3   Q.  And if I can just take those blocks and kind of bring

4   them up, highlight the incoming wires, we see that the

5   incoming wires that were received were for a total of

6   $1.750 billion, right?

7   A.  Yes.

8   Q.  Now, if we go to the outgoing wires and take a look at

9   them, the outgoing wires were for $1.748 billion, right?

10  A.  Yes.

11  Q.  And if I put the two blocks together so we can see the

12  incoming and outgoing wires, that's a similar amount of

13  money going in and out of the account, right?

14  A.  Yes.

15  Q.  Now, on the outgoing wires you give a range, right?

16  A.  Yes.

17  Q.  And you have the largest wire for $10 million even,

18  correct?

19  A.  Yes.

20  Q.  Do you know what that wire was for?

21  A.  No.

22  Q.  Do you know if that wire was to an individual?

23  A.  Sitting here today, no, I have no way of knowing that

24  from looking at that.

25  Q.  If you would have saw a $10 million wire like that,

1   would you have looked at it?

2   A.  It's possible.

3   Q.  And if it was to an individual, what would you have

4   done?

5   A.  I can't answer what I would have done.  Again, we review

6   the wires and we review a sampling of the wires.

7   Q.  And you told me that you knew what your standard

8   procedure was for reviewing and investigating the wires,

9   right?

10  A.  Yes.

11  Q.  Did you have a standard or procedure for if there were

12  wires, for example, in the range of $10 million to

13  individuals what you would actually do to investigate that

14  if it was on a business account?

15  A.  Well, because it's a business account didn't mean it

16  couldn't go to an individual.

17  Q.  Did you have a procedure that you would follow to look

18  into large wires, like $10 million, that went to officers of

19  a company, for example?

20  A.  No.

21  Q.  Would that be something that you didn't see very often?

22  A.  Oh, I don't recall if it would -- if it was something

23  that I'd seen often or not.  I don't think so.

24          THE COURT:  Did you say, "I don't think so"?

25          THE WITNESS:  I don't think -- no, I don't think

1    it was something that we didn't have a procedure to look

2    into.

3    BY MR. COLLYARD:

4    Q.  What about -- so we see here that you're reviewing

5    alerts that are nearly $2 billion in and nearly $2 billion

6    out, right?

7    A.  Yes.

8    Q.  Was that something in 2005 to 2008 that you came across

9    often?

10   A.  I don't recall.

11   Q.  Can you think of another entity that had billions of

12   dollars in wires that were being alerted that you had to

13   review and investigate?

14   A.  I don't recall.

15   Q.  Can you think of any customer that you reviewed or

16   investigated during that time period that had billions of

17   dollars of wires going in and out?

18   A.  I don't recall.

19   Q.  Do you remember if, when you were in the Anti-Money

20   Laundering Group, if you ever talked to the other analysts

21   about the Petters Company, Inc. alerts?

22   A.  I'm sorry.  Could you repeat your question, please?

23   Q.  Sure.  Do you remember if you ever talked with the other

24   analysts about the Petters Company, Inc. alerts?

25   A.  No, I don't recall.

1    Q.  Do you remember if the anti-money laundering analysts

2    ever sat around and talked about how there had been billions

3    and billions of dollars and these would have been the

4    largest wire transaction activities that they would have

5    seen while they were doing their job?

6            MS. PARLOVECCHIO:  Objection, calls for hearsay.

7            THE COURT:  Overruled.  You may answer the

8    question.

9            THE WITNESS:  Could you repeat the question,

10   please?

11   BY MR. COLLYARD:

12   Q.  I'm trying to figure out if -- it was a small group,

13   right?  It was five or six money laundering analysts; is

14   that right?

15   A.  At one point, yes, there were -- it was a smaller group.

16   Q.  From 2005 to 2007, for example, it was about five or six

17   people, right?

18   A.  Yeah, about that many, possibly.

19   Q.  And I'm just trying to figure out if you would sit

20   around and say, oh, my gosh, the Petters Company, Inc.

21   account has billions of dollars going in and out of it, if

22   that was a topic that was ever raised?

23   A.  I don't recall.

24   Q.  Do you agree with me that it would be uncommon during

25   that time period to see any client who had billions of

1    dollars going in and out of an account on wires for value on

2    incoming and outgoing wires?

3    A.  Could you repeat your question, please?

4    Q.  Do you agree with me that it was unusual, it was unique

5    for an account to have billions of dollars going in and out

6    of it that was consistently alerting for incoming and

7    outgoing wires?

8    A.  No, I don't agree with you.

9    Q.  And why don't you agree with me?

10   A.  Because I can't recall every account or customer that I

11   looked at or what the activity was, so I can't agree with

12   something that I don't recall.

13   Q.  But can -- but you're not aware of any other client or

14   customer that had billions of dollars going in and out of

15   it?

16   A.  I don't recall.  I don't know if there were other

17   customers that had that amount in and out of the account.

18   Q.  In your experience as a -- in the Anti-Money Laundering

19   Group, do you see billions of dollars going in and out of

20   the account for similar amounts of money?

21   A.  I could -- I might see that amount.  I don't know.  I

22   don't recall the amounts.  I mean, we work hundreds and

23   hundreds of different alerts.  So for me to sit here and say

24   I recall the exact dollar amounts, I don't recall that.

25   Q.  But can you -- in your experience as an anti-money

 1    laundering analyst, have you actually seen other accounts

 2    where billions of dollars have gone in and out for similar

 3    amounts and that account was being alerted for incoming and

 4    outgoing wires?

 5                MS. PARLOVECCHIO:  Objection, vague as to time

 6    frame.

 7                THE COURT:  Sustained.  You may establish the time

 8    frame if you can.

 9    BY MR. COLLYARD:

10    Q.  I'll say from 2005 up until today, is it your experience

11    as an anti-money laundering analyst that you have seen

12    billions of dollars go in and out of an account for similar

13    amounts of money on alerts for incoming and outgoing wires?

14    A.  And, again, I don't recall.

15    Q.  If we stay -- we are still on Alert 83853 and if we look

16    at -- for the incoming wires you list Nationwide, right?

17    A.  Yes.

18    Q.  But you don't list Enchanted, correct?

19    A.  No.

20    Q.  Do you have any idea how much money Enchanted had wired

21    into the account during this time period?

22    A.  No.

23    Q.  If I told you that it was $706 million, would that help

24    refresh your recollection?

25                MS. PARLOVECCHIO:  Objection, improper refreshing

```
 1    recollection.
 2              THE COURT:  Sustained.
 3    BY MR. COLLYARD:
 4    Q.  Can you say what the business purpose was for any wire
 5    from Nationwide?
 6    A.  I didn't hear your question.
 7    Q.  Yes.  For this alert can you say what the legitimate
 8    business purpose was for any wire from Nationwide?
 9    A.  No.
10    Q.  And from your comments here, can you explain what the
11    business purpose was for any of the wires that are listed?
12    A.  That was not a requirement.  I was looking at the
13    customer was receiving incoming wires from their potential
14    clients, and it was not a requirement for me to know what
15    the business purpose was, if they were paying invoices or
16    making purchases.  So it was not a requirement to know.
17    Q.  Do you know how, for example, it made sense that
18    Nationwide International Resources was wiring money into the
19    Petters Company, Inc. account?
20    A.  Could you repeat your question?
21    Q.  Sure.  Do you know how it made sense, for the Petters
22    Company, Inc. business, that Nationwide International
23    Resources was wiring money into the Petters Company, Inc.
24    account?
25    A.  That they would have been a client of that customer.
```

Currie-Smotherman - Cross

1    Q.  And do you know that for a fact?

2    A.  The fact that they were sending wires is what I based

3    that on, that it was a client of PCI.

4    Q.  Other than -- did you research Nationwide and Enchanted?

5    A.  I don't recall.

6    Q.  Could you have researched Nationwide and Enchanted?

7    A.  Yes.

8    Q.  You just don't remember if you actually did it or not?

9    A.  Correct.

10   Q.  Did you make a determination as to whether or not the

11   wires coming in from Nationwide and Enchanted made sense for

12   the Petters Company, Inc. business?

13   A.  Made sense as in other than it was their client sending

14   them money?  That was what I was -- that was my research,

15   the fact that that was their client sending wires to them or

16   vice versa.

17   Q.  What do you mean by "it was their client"?

18   A.  So, for instance, if I were a business and someone was

19   paying me, sending money, then that's what -- it would

20   appear that they were paying invoices or sending money to

21   PCI.  That was their client.

22   Q.  Were you making that as an assumption?  Was that an

23   assumption that you made or did you actually have

24   information that told you that that was the case?

25   A.  Based on the fact that they were paying them, then that

1    would appear that it was their customer.

2    Q.  And if -- did you understand that Petters Company, Inc.

3    was in the business of buying TVs from vendors like

4    Nationwide?

5    A.  As I said, I don't recall what the business model was.

6    Q.  And if Petters Company, Inc. was supposed to be buying

7    TVs from Nationwide, would it make sense that Nationwide was

8    wiring in money into the Petters Company, Inc. account?

9    A.  It could.

10   Q.  So I'm just trying to figure out, Ms. Currie-Smotherman,

11   other than assuming, other than making assumptions -- well,

12   let me back up.  Did you base your determination on

13   assumptions you made about Nationwide?

14           MS. PARLOVECCHIO:  Objection, asked and answered.

15           THE COURT:  Overruled.  You may answer.

16           THE WITNESS:  I based my -- I based it on the

17   research that I did on the customer.  And, again, I don't

18   recall the details of the research, but my research is what

19   I used to come to the conclusion that the activity wasn't

20   suspicious or that that was their customer sending them

21   money in and out of the account.

22   BY MR. COLLYARD:

23   Q.  So you -- your testimony is that you would have done

24   some research on Nationwide to figure that out?

25           MS. PARLOVECCHIO:  Objection, misstates the

```
 1    testimony.

 2               THE COURT:  Overruled.

 3               THE WITNESS:  Your question, again?

 4    BY MR. COLLYARD:

 5    Q.  Sure.  Your testimony is that you would have done some

 6    research on Nationwide in order to figure that out?

 7    A.  I don't recall that I would have done specific research

 8    on that customer because, again, we did a sampling of

 9    customer -- of clients in and out of the account,

10    originators and beneficiaries, so I don't know which ones

11    that I would have done research on.

12    Q.  Would it have been part of your practice if the majority

13    or most of the money was coming in from a couple of entities

14    to at least focus in on those entities?

15    A.  No, that was not a requirement, to focus on who the

16    majority was from or the --

17    Q.  So it was just -- is it your testimony that was just a

18    random sample of wires that you had picked to see coming

19    into an account?

20    A.  A random sample, yes.

21    Q.  And would you look, when you're doing your sampling and

22    looking at the wires, to see, for example, if you noticed

23    that there was a pattern, where most of the wires were

24    coming from?

25    A.  Yes, it's possible.
```

1    Q.  Let's go to page -- let's go to the last alert you did,

2    which is 85596, and it's page 72.  Is this another alert

3    that you closed, Ms. Currie-Smotherman?

4    A.  Yes.

5    Q.  And if we turn to -- if we just go to the bottom of the

6    page and pull up the block, we can see that the incoming

7    wires for this alert were $524 million.  Do you see that?

8    A.  Yes.

9    Q.  And then if we go to page 73, we can see the outgoing

10   wires were for $526 million.  Do you see that?

11   A.  Yes.

12   Q.  And if we can bring them -- I'll bring them both

13   together for you so you can see it.  And do you agree,

14   Ms. Currie-Smotherman, that the incoming wires for

15   $524 million is a similar amount to the outgoing at

16   $526 million?

17   A.  Yes.

18   Q.  And so your last alert we saw similar amounts of

19   billions of dollars going in and out, right?

20   A.  Could you repeat it?

21   Q.  Yeah.  The last alert that we looked at, we saw that

22   there were similar amounts of billion -- $1.7 billion going

23   in and $1.7 billion going out, correct?

24   A.  Yes.

25   Q.  And now we have again here another similar amount of

```
 1    half a billion dollars going in and out, right?

 2    A.  Yes.

 3    Q.  Do you agree that that could be indicative of a pattern

 4    of activity?

 5    A.  That would be the customer's usual flow of activity,

 6    yes.

 7    Q.  Would that be indicative of a pattern?

 8              MS. PARLOVECCHIO:  Objection, asked and answered.

 9              THE COURT:  Overruled.

10              THE WITNESS:  Yes, it could be an example of a

11    pattern.

12              MR. COLLYARD:  I have no further questions, Your

13    Honor.

14              Thank you, Ms. Currie-Smotherman.

15              THE COURT:  Counsel, would you approach?  I want

16    to address scheduling.

17              MS. PARLOVECCHIO:  I'm sorry, Your Honor?

18              THE COURT:  I asked you to approach.  I want to

19    address scheduling.

20              MS. PARLOVECCHIO:  Yes, Your Honor.

21              THE COURT:  Members of the Jury, feel free to

22    stand up and stretch if you would like.

23         (At sidebar)

24              THE COURT:  How much do you have for this witness?

25    We have ten minutes left for the day.
```

1          MS. PARLOVECCHIO:  I probably have about 30 to

2     40 minutes, possibly a little more.

3          THE COURT:  So we will take our recess now and

4     then she will come back tomorrow.

5          MS. PARLOVECCHIO:  Okay.  Thank you, Judge.

6     **(In open court)**

7          THE COURT:  Members of the Jury, we are at a point

8     to take our evening recess, so I will give you my recess

9     instructions.  Please remember and abide by them during this

10    recess, as with every other recess.

11         You must not discuss the case with anyone,

12    including the other jurors, members of your family, or

13    people involved in the trial or anyone else.  And please do

14    not allow anyone to discuss the case within your hearing.

15         As you know, only you are selected and have been

16    chosen in this case to serve as jurors and only you have

17    been sworn to uphold the law.  No one else can do this

18    important work.

19         Also, please remember, do not talk among

20    yourselves.  Do not look at any news accounts, read any

21    newspapers or anything else, do any kind of research on your

22    own about this case.

23         And also, as you know, the reason why I give you

24    this instruction is because you must keep an open mind

25    that's free of outside information and only in this way will

1  you be able to decide the case fairly based solely on the

2  testimony that you've heard in this trial, the evidence

3  that's been presented in this courtroom, and the

4  instructions that I give you.  It would be a violation of

5  your oath to base your decision on anything other than that.

6       And so it's important for you to follow these

7  instructions.  I know that you have been and I know that you

8  will continue to do so.  I'm simply reminding you of that.

9       And so we will plan to reconvene tomorrow at 8:30,

10  our usual time.  Please come to the same location, and we'll

11  plan to begin promptly.  I want to thank you for your

12  service, and I hope you have a good evening.

13       All rise for the jury.  Not only do I want to

14  thank you, I thank you for your service.

15  (Jury excused)

16                        **IN OPEN COURT**

17                     **(JURY NOT PRESENT)**

18       THE COURT:  Please be seated.

19       And to our witness, you are free to leave.  Please

20  be prepared to come back to court tomorrow morning and to

21  resume your testimony.  It is as if you are on the witness

22  stand, however, during the course of this evening.  So

23  please do not discuss your testimony with anyone else during

24  this break.

25       THE WITNESS:  Okay.

1       THE COURT:  All right.  Anything further that we

2   need to address at this time?

3       MR. ANTHONY:  Your Honor, I have one thing.  Joe

4   Anthony on behalf of Doug Kelley.  Wednesday is Frank

5   Hermann's funeral.

6       THE COURT:  Let me ask you if we can excuse this

7   witness.

8       MR. ANTHONY:  Yes, you may.

9       THE COURT:  So you are excused for the day.

10      (Witness excused)

11      THE COURT:  And I understand that you would like

12  to address a scheduling issue.

13      MR. ANTHONY:  Yes.  Thank you, Your Honor.

14  Mr. Kelley would like to be excused to go to Frank Hermann's

15  funeral.  Frank passed away recently and his funeral is

16  Wednesday morning at 10:00.  I think it would be an hour or

17  so that Mr. Kelley would be absent.  We wanted to alert the

18  Court to that and ask the Court's permission for him to be

19  excused for that modest amount of time.

20      THE COURT:  Certainly.  And it is just for that

21  period of time that there's the expectation or a longer

22  period of time?

23      MR. ANTHONY:  Mr. Kelley says it may be a little

24  longer.  He's capable of addressing the Court himself, Your

25  Honor.

1    THE COURT:  Yes, Mr. Kelley.

2    MR. KELLEY:  Ms. Hermann has asked me if I would

3    speak a little bit afterwards, so it would be longer than an

4    hour, but I expect to be back to the Court in the afternoon.

5    And I'm perfectly happy to have things go on without me

6    being here, Your Honor.

7    THE COURT:  Okay.  Certainly.  And I will -- I

8    certainly understand that your time -- first of all, this is

9    an important reason for you not to be in the courtroom and a

10   sad reason, frankly.  But you are excused for that period of

11   time.  If it's possible that it is just the morning, that

12   would be ideal.  However, I want you to take the time that

13   you need.

14   MR. KELLEY:  Thank you, Your Honor.

15   THE COURT:  You're welcome.

16   MR. MARDER:  Your Honor, David Marder appearing

17   again.  I just have one minor housekeeping matter.

18   There were two exhibits, P-178 and P-333, and

19   defendant's counsel has asked us to substitute those two

20   exhibits with P-178R and P-333R.  Those are redacted

21   versions that have been where personal information, I think

22   it was Social Security numbers and the like, was excised.

23   So we're just going to replace those.  We just wanted to

24   inform the Court before we replace those exhibits.

25   THE COURT:  And the parties have agreed to --

```
 1              MR. MARDER:  We have agreed, yes.

 2              THE COURT:  Very well.  Thank you for agreeing and

 3      coming up with a good solution.

 4              Anything further that we need to address at this

 5      time?

 6              Okay.  Thank you, Counsel.  Oh, I'm sorry.  Is

 7      there something else?

 8              MR. GLEESON:  I was just saying no.

 9              THE COURT:  Okay.  Very well.  Thank you.  I

10      appreciate you standing to do so.

11              Thank you, Counsel.  This will conclude our

12      session for today and we'll see everyone tomorrow.

13              COUNSEL:  Thank you, Your Honor.

14          (Court adjourned at 4:59 p.m.)

15                          *     *     *

16              I certify that the foregoing is a true and correct
        copy of the transcript originally filed on 12/05/2022 and
17      incorporating redactions requested by Attorney Adine S.
        Momoh.

18              Certified by:   s/ Lori A. Simpson

19                              Lori A. Simpson, RMR-CRR

20

21

22

23

24

25
```