1        UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Douglas A. Kelley, in his      )   File No. 19-cv-1756
4    capacity as the Trustee of the )          (WMW)
     BMO Litigation Trust,          )
5                                   )
              Plaintiff,            )   St. Paul, Minnesota
6                                   )   October 18, 2022
     vs.                            )   8:33 a.m.
7                                   )
     BMO Harris Bank N.A., as       )
8    successor to M&I Marshall and  )
     Ilsley Bank,                   )
9                                   )
              Defendant.            )
10   ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE WILHELMINA M. WRIGHT
             UNITED STATES DISTRICT COURT JUDGE
14
          *    *    *    REDACTED TRANSCRIPT    *    *    *
15

16            (JURY TRIAL PROCEEDINGS - VOLUME V)

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25   transcript produced with computer.

**APPEARANCES:**

| | | |
|---|---|---|
| For the Plaintiff: | Robins Kaplan, LLP | |
| | MICHAEL A. COLLYARD, ESQ. | |
| | DAVID E. MARDER, ESQ. | |
| | PETER C. IHRIG, ESQ. | |
| | MORGIA D. HOLMES, ESQ. | |
| | MICHAEL D. REIF, ESQ. | |
| | 800 LaSalle Avenue | |
| | Suite 2800 | |
| | Minneapolis, Minnesota 55402 | |
| | | |
| | Anthony, Ostlund, Louwagie, | |
| | Dressen, Boylan, P.A. | |
| | JOSEPH W. ANTHONY, ESQ. | |
| | JOSEPH R. RICHIE, ESQ. | |
| | RYAN M. LAWRENCE, ESQ. | |
| | 90 South Seventh Street | |
| | Suite 3600 | |
| | Minneapolis, Minnesota 55402 | |

For the Defendant:      Stinson, LLP
                        KEITH S. MOHEBAN, ESQ.
                        ADINE S. MOMOH, ESQ.
                        50 South Sixth Street
                        Suite 2600
                        Minneapolis, Minnesota 55402

                        Debevoise & Plimpton, LLP
                        JOHN GLEESON, ESQ.
                        MICHAEL SCHAPER, ESQ.
                        SUSAN REAGAN GITTES, ESQ.
                        MORGAN A. DAVIS, ESQ.
                        919 Third Avenue
                        New York, New York 10022

                        Mayer Brown, LLP
                        JOSHUA D. YOUNT, ESQ.
                        71 South Wacker Drive
                        Chicago, Illinois 60606

                        Mayer Brown, LLP
                        RICHARD A. SPEHR, ESQ.
                        GINA PARLOVECCHIO, ESQ.
                        1221 Avenue of the Americas
                        New York, New York 10020

Court Reporter:         LORI A. SIMPSON, RMR-CRR
                        316 North Robert Street
                        St. Paul, Minnesota 55101

1                          <u>I N D E X</u>

2                                                              <u>PAGE</u>

3       **PATRICIA CURRIE-SMOTHERMAN**
            Direct Examination by Ms. Parlovecchio           1138
4           Recross-Examination by Mr. Collyard              1154

5       **EDWARD JAMBOR**
            Cross-Examination by Mr. Marder                  1163
6           Cross-Examination by Mr. Marder                  1163
            Voir Dire Examination by Mr. Gleeson             1300
7           Cross-Examination (Resumed) by Mr. Marder        1301
            Voir Dire Examination by Mr. Gleeson             1303
8           Cross-Examination (Resumed) by Mr. Marder        1305
            Direct Examination by Mr. Gleeson                1316

9

10

11      <u>PLAINTIFF'S EXHIBITS</u>                               <u>REC'D</u>
                1                                            1257
12              2                                            1175
                33                                           1173
13              35                                           1236
                36                                           1238
14              37                                           1240
                40                                           1243
15              41                                           1253
                45                                           1190
16              46                                           1189
                47                                           1202
17              48                                           1207
                51                                           1272
18              52                                           1276
                53                                           1278
19              55                                           1284
                56                                           1286
20              58                                           1314
                60                                           1295
21              104                                          1262
                162                                          1251
22              468                                          1247
                469                                          1248
23              618                                          1250
                628                                          1406

24

25

1          **I N D E X**  (Cont.)

2

DEFENDANT'S EXHIBITS                                        REC'D
3          40002                                           1182
           40031                                           1340
4          40033                                           1340
           40040                                           1340
5          40043                                           1340
           40048                                           1340
6          40051                                           1340
           40055                                           1340
7          40057                                           1340
           40061                                           1340
8          40064                                           1340
           40068                                           1340
9          40074                                           1340
           40076                                           1340
10         40078                                           1340
           40080                                           1340
11         40082                                           1340
           40084                                           1340
12         40086                                           1340
           40088                                           1340
13         40091                                           1340
           40093                                           1340
14         40095                                           1340
           40099                                           1340
15         40103                                           1340
           40114                                           1340
16         40124                                           1340
           40153                                           1340
17         40156                                           1340
           40158                                           1340
18         40161                                           1340
           40164                                           1340
19         40167                                           1340
           40170                                           1340
20         40172                                           1340
           40175                                           1340
21         40177                                           1340
           40179                                           1340
22         40182                                           1340
           40185                                           1340
23         40187                                           1340
           40189                                           1340
24         40191                                           1340
           40194                                           1340
25         40197                                           1340

1                    <u>**I N D E X**</u>  **(Cont.)**

2

<u>DEFENDANT'S EXHIBITS</u>                              <u>REC'D</u>
3          40199                                  1340
           40202                                  1340
4          40205                                  1340
           40207                                  1340
5          40209                                  1340
           40216                                  1340
6          40218                                  1340
           40221                                  1340
7          40223                                  1340
           40225                                  1340
8          40495                                  1340

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2                         IN OPEN COURT

 3                        (JURY PRESENT)

 4            THE COURT:  Good morning.  You may be seated.

 5            MS. PARLOVECCHIO:  Good morning, Your Honor.

 6            THE COURT:  Good morning.

 7            MS. PARLOVECCHIO:  We're just having the witness

 8    come on the stand.  It will just be one moment.

 9       (Pause)

10            THE COURT:  Good morning.  Please step forward and

11    resume your seat in the witness stand.

12            Good morning.

13            THE WITNESS:  Good morning.

14            THE COURT:  We are ready to proceed.

15            THE WITNESS:  Yes.

16            MS. PARLOVECCHIO:  Thank you, Your Honor.

17                   (Patricia Currie-Smotherman)

18                     DIRECT EXAMINATION

19    BY MS. PARLOVECCHIO:

20    Q.  Good morning, Ms. Currie-Smotherman.

21    A.  Good morning.

22    Q.  Now, you testified yesterday that you currently work for

23    BMO and that you previously worked for M&I Bank.  In total,

24    how many years have you worked for the bank?

25    A.  31 years.
```

Currie-Smotherman - Direct

1    Q.  And when did you start at M&I?

2    A.  In 1991.

3    Q.  What role did you have when you first started?

4    A.  I was a teller.

5    Q.  Now, before we get further into the roles that you

6    played at the bank, I just want to learn a little bit more

7    about you.

8              Where do you currently live?

9    A.  In Milwaukee, Wisconsin.

10   Q.  And does your whole family live in Milwaukee?

11   A.  Part of my family lives in Milwaukee, Wisconsin.  I live

12   there.  My daughter lives in Milwaukee, Wisconsin, with my

13   two grandchildren.  And then my mother lives with me.  She's

14   88 years old, and I'm her primary caregiver right now.  And

15   I have three siblings also who live there, nieces and

16   nephews.

17   Q.  Now, you testified that you started working at M&I in

18   1991 as a teller.  Before working at M&I Bank, did you have

19   any prior experience working in the banking industry?

20   A.  Yes.

21   Q.  And what was that experience?

22   A.  I worked for a bank in Tennessee.

23   Q.  And approximately how long did you work for that bank in

24   Tennessee?

25   A.  Approximately five years or maybe a little more.

1   Q.  Now, after you worked at M&I as a teller, did you take

2   on another role after that?

3   A.  Yes.  I became a vault teller, teller supervisor,

4   operations officer, several different roles.  That was

5   part -- those were part of my roles that I held at M&I.

6   Q.  I just want to direct your attention to 2004.  What

7   position did you hold at that time?

8   A.  In 2004, I was an AML analyst.

9   Q.  And why did you decide to become an AML analyst?

10  A.  There was a position open, and I had been through some

11  training courses that they offered.  And it was after 9/11;

12  and so based on some of the training that I had, it was a

13  job that interested me.

14  Q.  And what about 9/11 piqued your interest in the job?

15  A.  The fact that it was dealing with helping to combat

16  terrorist financing and money laundering and things to

17  protect our country.

18  Q.  What were your responsibilities in the AML analyst role

19  when you first joined the group?

20  A.  When I first joined the group as an AML analyst, my role

21  was looking at transactions and analyzing data to determine

22  if there was suspicious activity.

23  Q.  And did you take another role on after you were an AML

24  analyst?

25  A.  Yes.  Then I became an investigator.

1    Q.  And were you promoted to that position?

2    A.  Yes, I was promoted to an investigator.

3    Q.  And approximately when did you become an investigator?

4    A.  I don't remember the exact year that I became an

5    investigator.  Possibly 2000.  I don't recall the date.  I

6    don't recall the date.

7    Q.  Was it before or after 2008?

8    A.  It was after 2008.

9    Q.  And what are your duties as an AML investigator today?

10   A.  My duties as an AML investigator is analyzing

11   transactions, looking at the customer's accounts and

12   transactions -- debits and credits -- that goes through the

13   customer's account to determine if that activity is

14   suspicious and if we need to file a Suspicious Activity

15   Report.

16   Q.  Now, when you joined the AML Monitoring Group back in

17   2004, how would you describe the culture of the group?

18   A.  The culture of the group was it was a small group, so it

19   was very inviting and warm.  I was able to ask questions if

20   I had questions or seek assistance and guidance.  So it was

21   a small group, family oriented.

22   Q.  And how would you describe the environment that the

23   supervisors created in the AML Monitoring Group?

24   A.  Very open door.  We could ask questions, or I could

25   approach a supervisor for help if I needed assistance.

Currie-Smotherman - Direct

1    Q.  When you were an AML analyst, did you ever feel

2    pressured to close an alert that you thought showed evidence

3    of potentially suspicious activity?

4    A.  No.

5    Q.  When you first became an AML analyst in 2004, did you

6    receive training on AML and Bank Secrecy Act compliance?

7    A.  Yes.

8    Q.  What, if any, training was provided for new AML analysts

9    at that time?

10   A.  The training that was provided was basically one-on-one

11   training where another co-worker sat with you and walked you

12   through the process of what we needed to do, how to analyze

13   activity in transactions, and what to look for.

14   Q.  Was there additional training for AML analysts after

15   that first initial on-the-job training?

16   A.  Yes.  Training was ongoing.

17   Q.  And what topics generally were covered in those

18   trainings?

19   A.  Normally in the training it was different trends or

20   whatever was going on at the time.  So updates, you know,

21   for regulatory requirements where changes may have been made

22   or new regulatory changes.

23   Q.  When trainings were conducted in the AML Monitoring

24   Group, did you have an opportunity to observe the demeanor

25   of your co-workers?

1    A.  Yes.

2    Q.  And what did you observe?

3    A.  That we were -- for the most part, everybody -- it was a

4    very involved group.  We were listening and attentive to

5    what was being present.

6    Q.  Do the AML trainings that you attend today in your role

7    as AML investigator address the same issues and trends that

8    were presented back in the 2004 to 2008 time frame?

9    A.  No.

10   Q.  At a high level, what causes the issues to change?

11   A.  The issues change depending on what's happening in the

12   world, different regulatory requirements and the different

13   trends.

14   Q.  You mentioned changes in the world and different trends.

15   Can you just give the jury an example of some of the

16   different trends that you observed over the course of your

17   roles as AML analyst and investigator.

18   A.  Sure.  Some of the different trends, for example,

19   with -- human trafficking is one of the newer trends that

20   have exhibited.  And so with human trafficking, we had to be

21   trained on what to look for in a situation for human

22   trafficking, so that would be one of the things that --

23   trends that have happened.

24   Q.  And just to be clear, was human trafficking a money

25   laundering trend that you were trained to look out for in

1    the early 2000s?

2    A.  No.

3    Q.  When did banking activity associated with Ponzi schemes

4    become something that was on your radar as an AML analyst?

5    A.  I don't recall, but it wasn't on the radar when I first

6    started, so it definitely wasn't something that I was

7    trained to look for during my earlier years as an AML

8    analyst.

9    Q.  Were Ponzi schemes something that you were aware of

10   before 2008?

11   A.  No.

12   Q.  Now, turning your attention to internal M&I trainings,

13   did these trainings discuss particular areas of criminal

14   activity that banks were focused on at the time?

15   A.  Yes.

16   Q.  Ms. Currie-Smotherman, I'm going to direct your

17   attention to Plaintiff's Exhibit 4, which you also have in

18   front of you in that small binder right behind your

19   microphone.

20   A.  Okay.

21   Q.  And also it will be up on the screen.

22            Now, this is a training deck from 2004.  Do you

23   see that exhibit in front of you?

24   A.  Yes.

25   Q.  And are you familiar with the concepts discussed in this

Currie-Smotherman - Direct

1    training?

2    A.  Yes.

3    Q.  Now, I'd like to turn your attention to slide 20, and

4    this slide is entitled, "Can It Happen To Us?  YES!"  What

5    examples of crimes are being discussed here?

6    A.  Terrorist cell operations, drug trafficking.

7    Q.  And what is your understanding of why these particular

8    crimes, terrorist cell activity and drug trafficking, are

9    being highlighted during this time period?

10   A.  Because that was the trend of what was happening or

11   forefront on the radar, so to speak, so the trends.

12   Q.  Now I want to direct your attention to slide 17 of this

13   same exhibit, and does this list also give additional

14   examples of crimes?

15   A.  Yes.

16   Q.  And can you just read for the jury the specific crimes

17   that are listed on this slide.

18   A.  "Structuring transactions to avoid BSA reporting,

19   organized crime, drug kingpins, public corruption, obscure

20   crimes - illegal import of exotic animals."

21   Q.  Do you see Ponzi schemes mentioned on this list?

22   A.  No.

23   Q.  Do you recall Ponzi schemes coming up at all during

24   training sessions in the 2004 to 2008 period?

25   A.  No, I don't recall.

1    Q.  Now, let's turn to slide 38 of Plaintiff's Exhibit 4.

2    What does this slide show?

3    A.  A list of high-risk countries.

4    Q.  And could you just read two or three countries off of

5    this list, please.

6    A.  Sure.  Angola, Afghanistan.

7    Q.  What was your understanding as to why these were

8    considered high-risk countries back in 2004 to 2008?

9    A.  Because they were at higher risk of money laundering and

10   terrorist financing.

11   Q.  Now I would like to direct your attention to slide 10 of

12   this exhibit, and it says, "Suspicious Activity."  Do you

13   see that?

14   A.  Yes.

15   Q.  What is your understanding of the concept being

16   discussed here?

17   A.  Activity that could be considered suspicious; describing

18   transactions that would be considered suspicious activity.

19   Q.  And can you please read the third bullet point for the

20   members of the jury.

21   A.  "Is not the sort the customer would normally be expected

22   to conduct."

23   Q.  And could you please explain to the jury what this meant

24   to you back in 2004 to 2008.

25   A.  That concept meant to me if the customer was conducting

1    transactions they would not normally conduct, if it was

2    something outside of their pattern of normal activity.

3    Q.  Is unusual activity the same as suspicious activity?

4    A.  No.

5    Q.  Can you describe for us the difference between unusual

6    versus suspicious activity.

7    A.  Sure.  Unusual activity is activity -- well, an example

8    that I could use for unusual activity is something that a

9    customer normally would not conduct.  So, say, for instance,

10   a customer started to make a lot of cash deposits and

11   deposit a lot of cash, that would be unusual for that

12   customer.

13   Q.  And how is that different from suspicious activity?

14   A.  Suspicious activity would be activity that would be

15   potentially a red flag.  Say, for instance, an example using

16   cash again is if a customer came in and made a cash deposit

17   of $9,900, that would be considered suspicious.

18   Q.  And what is the significance of a cash deposit in the

19   amount of $9,900?

20   A.  Because in banking, any cash transaction that's over

21   $10,000 is reportable to the government.  So if a customer

22   comes in and deposits under in that amount, $9900 and

23   sometimes 9,999 or on consecutive days or the same day,

24   that's considered suspicious because that's considered

25   structuring a transaction to keep it under the reporting

1    requirement.

2    Q.  Now, you testified yesterday that you reviewed alerts

3    from Searchspace.  Did the fact that an alert was created in

4    Searchspace alone indicate that there was suspicious

5    activity?

6    A.  No.

7    Q.  Would a single alert be handled by several different

8    analysts or by the same analyst?

9    A.  The same analyst.

10   Q.  When you were an AML analyst and were assigned to review

11   an alert in Searchspace, what type of information would you

12   see about the alert?

13   A.  I would see the reason for the alert, what caused --

14   what type of transaction caused the alert.

15   Q.  And what information would you look at when reviewing an

16   alert for suspicious activity when that alert was generated

17   by Searchspace?

18   A.  We would focus on the alerted activity, what caused the

19   alert, but we would also have to look at all of the

20   transactions that went in and out of the account, the debits

21   and credits.

22   Q.  What, if anything, would you research about wire

23   transactions that you were reviewing?

24   A.  We would research the dollar -- we would look at the

25   dollar amounts, and we would research, like, a sampling of

1    the customers that was sending the wires in and out, so the

2    originators and beneficiaries, we would research a sampling

3    of those.

4    Q.  Were you required to conduct research on every entity

5    the customer transacted with when reviewing an alert?

6    A.  No.

7    Q.  Ms. Currie-Smotherman, when you were an AML analyst, did

8    you ever reach out to a business banker when you had a

9    question about a customer?

10   A.  Yes.

11   Q.  Why would you reach out to a business banker for that

12   purpose?

13   A.  I could reach out to a business banker for more

14   information on the customer.

15   Q.  Now, as an AML analyst, were you required to reach out

16   to a business banker if you had a question about a customer?

17   A.  No.

18   Q.  And you mentioned that you would reach out to a business

19   banker to get more information about a customer.  What was

20   your understanding about why business bankers had more

21   customer information than an AML analyst?

22   A.  Because the business banker had more direct contact with

23   the customer and so they were familiar with the customer

24   more or less, their business type and the activity that they

25   would be conducting and location and different things like

1    that.  So the business banker had one-on-one contact with

2    the customer.  As opposed to the AML Group, we could never

3    contact the customer.  They could never know that we were

4    looking at their activity.

5    Q.  When reviewing alerts, did you rely on any one piece of

6    account information to reach your conclusion, or did you

7    look at multiple pieces of information in making a

8    determination about how to treat an alert?

9    A.  I'm sorry.  Could you repeat your question?

10   Q.  Sure.  When you were reviewing alerts, did you rely on

11   one piece of account information to reach your conclusion

12   about an alert, or did you look at multiple pieces of

13   account information before making a conclusion?

14   A.  We looked at multiple activity on the account, so

15   everything.  So I did not rely on one piece of information

16   to make a decision.  So I made sure that we looked at

17   everything going in and out of the account.

18   Q.  And is this how you approached all of your alerts?

19   A.  Yes.

20   Q.  When conducting your review of an alert, how, if at all,

21   did you consider the customer's previous pattern of

22   activity?

23   A.  Based on our training, we looked at the activity to see

24   if it was in line with what -- the activity they normally

25   conducted.  So was that their normal, usual pattern of

1    activity.  So we did rely on that as the activity that would

2    be expected for that customer.

3    Q.  Standing alone, would the fact that a majority of the

4    incoming wires in a customer's account came from the same

5    entity be evidence of suspicious activity?

6    A.  No.

7    Q.  Why not?

8    A.  Because that's -- normally, when you are looking at

9    that, that does not specifically mean that it's suspicious

10   activity.  That is considered that customer's customer.  So

11   it would not be unusual for them to receive multiple

12   transactions from the same customer.

13   Q.  And could there be legitimate explanations for incoming

14   wires coming consistently from the same entity?

15   A.  Yes.

16   Q.  Now, if the value of the incoming or outgoing wires into

17   a customer's account were round numbers, is that fact alone

18   evidence of suspicious activity?

19   A.  No.

20   Q.  Why not?

21   A.  Because there could be a legitimate reason for it.  That

22   alone doesn't mean that it's suspicious, just because it's a

23   round dollar amount.

24   Q.  Ms. Currie-Smotherman, during the time that PCI was a

25   customer at M&I, did you receive any money or things of

1    value from any PCI personnel?

2    A.  No.

3    Q.  Did you receive any favors from PCI personnel?

4    A.  No.

5    Q.  Did any PCI personnel ever try to persuade you not to

6    file a required report?

7    A.  No.

8    Q.  During the time that PCI was a customer, did you ever

9    provide any special favors for PCI personnel?

10   A.  No.

11   Q.  Are you aware of any M&I employees who did?

12   A.  No.

13   Q.  In your time reviewing alerts in the PCI account, did

14   you ever see any checks or wires going from PCI to M&I

15   employees?

16   A.  No.

17   Q.  Before September 2008, did you have any reason to

18   suspect that PCI and Petters were involved in a Ponzi

19   scheme?

20   A.  No.

21   Q.  Did you have any incentive at all to look the other way

22   if you thought there was suspicious activity in the PCI

23   account?

24   A.  No.

25   Q.  Ms. Currie-Smotherman, can you explain to the jury your

Currie-Smotherman - Direct

1    understanding of the concept of willful blindness.

2    A.  Willful blindness would be seeing activity or something

3    that's suspicious and knowingly turning the other way or not

4    reporting that activity.

5    Q.  I want to show you what's in evidence as Plaintiff's

6    Exhibit 5, and I'm going to direct your attention to slide

7    32.  Could you please read the text under, "Civil and

8    Criminal Penalties."

9    A.  "Willful violations - large dollar fines can be assessed

10   upon the institution, any partner, director, officer, or

11   employee thereof.  In addition, willful violations by any

12   person are punishable by imprisonment.  Negligent -- "

13   Q.  Do you --

14   A.  I'm sorry.

15   Q.  Oh, I'm sorry.  You can stop there.  Thank you.

16           Do you recall being trained on these concepts in

17   2004?

18   A.  Yes.

19   Q.  What was your understanding of this concept?

20   A.  That by not reporting suspicious activity or ignoring

21   it, that I could be -- I could face penalties or

22   imprisonment or punishment, as well as my employer.

23   Q.  As an AML analyst, did you ever ignore suspicious

24   activity when reviewing an alert?

25   A.  No.

1    Q.  When you were an AML analyst, what did you understand to

2    be the consequences for ignoring activity that could

3    reasonably be identified as suspicious?

4    A.  That I could face punishment, crime, that I could be

5    sent to prison, as well as being -- having to pay penalties

6    and fines.

7    Q.  Was that a risk you were willing to take in your role as

8    an AML analyst?

9    A.  No.

10   Q.  Why not?

11   A.  That was not a risk that I was willing to take because I

12   consider myself to be a law-abiding, upstanding citizen, and

13   I would never knowingly do anything that would -- that's

14   wrong to cause or bring embarrassment or shame to my family,

15   myself, or my employer.

16           MS. PARLOVECCHIO:  Thank you.  No further

17   questions.

18           THE COURT:  Counsel.

19           MR. COLLYARD:  Thank you, Your Honor.

20                   **RECROSS-EXAMINATION**

21   BY MR. COLLYARD:

22   Q.  Good morning, Ms. Currie-Smotherman.

23   A.  Can I have a minute?

24   Q.  Oh, sorry.

25   A.  Good morning.

1    Q.  Good morning.  I just have a few questions for you.

2    A.  Okay.

3    Q.  Your counsel brought you to Plaintiff's Exhibit 4, and

4    you were going through the slides.  And I'm going to show

5    you a version of Plaintiff's Exhibit 4 that has some notes

6    in it.  So this is Plaintiff's Exhibit 4, if you remember.

7    Do you see that?

8    A.  Yes.

9    Q.  I'm going to take you to Defendant's Exhibit DX-40067.

10   And you may not have one up in your book there so I'm going

11   to hand one.

12        MR. COLLYARD:  Permission to approach the witness,

13   Your Honor?

14        THE COURT:  You may.

15        THE WITNESS:  Okay.

16        MR. COLLYARD:  I have one for you, Your Honor, if

17   I can approach?

18        THE COURT:  You may.

19      (Document handed to the Court)

20        THE COURT:  Thank you.

21   BY MR. COLLYARD:

22   Q.  I want to revisit, Ms. Currie-Smotherman, just a few of

23   the slides that your counsel just asked you about but this

24   time with the benefit of the bank's notes.

25        If we can go to slide 17, which is on page 18 of

1    Exhibit DX-40067, this is the slide where you were asked

2    about the broad application of money laundering laws.  Do

3    you remember that?

4    A.  Yes.

5    Q.  Let's just keep this slide up here for a second, but I

6    want to ask you about money laundering.

7              Do you agree, Ms. Currie-Smotherman, that as part

8    of your job as an anti-money laundering analyst from 2005

9    and up through 2008, you were looking for activity that

10   would be indicative of money laundering?

11   A.  Yes.

12   Q.  And do you agree that as part of your role and

13   responsibility in the Anti-Money Laundering Group, that you

14   were also looking for activity that could be indicative of

15   there being a Ponzi scheme?

16   A.  No.

17   Q.  You had never heard of the word "Ponzi scheme" until

18   after 2008?

19   A.  No, I don't recall that I had heard of Ponzi scheme

20   prior to 2008.

21   Q.  And if your fellow AML analysts testified that they

22   would be looking for activity indicative of a Ponzi scheme

23   during the time period of 2005 through 2008, would you have

24   any reason to disagree with that?

25              MS. PARLOVECCHIO:  Objection, misstates the

1     testimony.

2              THE COURT:  Sustained.

3     BY MR. COLLYARD:

4     Q.  If we go to this slide, you were asked to read those --

5     you were asked to read through that, right?  Do you remember

6     that?

7     A.  Yes.

8     Q.  Okay.  This list isn't meant to be the exclusive list of

9     the things that you were looking for as an anti-money

10    laundering analyst, right?

11    A.  Yes.

12    Q.  Yes in that you agree with me?

13    A.  Yes.

14    Q.  Okay.  So if we go down to the slide notes, I just want

15    to see this first part here where -- pull up this first line

16    where it says, "When regulators," and it says, "When

17    regulators and law enforcement talk about Money Laundering -

18    the crimes covered are quite broad."  Do you see that?

19    A.  Yes.

20    Q.  And really what that list is meant to do is to show how

21    broad the areas of money laundering can include, correct?

22              MS. PARLOVECCHIO:  Objection.

23              THE COURT:  Overruled.

24              THE WITNESS:  Could you repeat it, please?

25    BY MR. COLLYARD:

1    Q.  Yes.  The list that you read off to the jury, what is

2    meant by that list is to show how broadly the areas of money

3    laundering can be?

4    A.  Yes.

5    Q.  If we go down to the bottom notes section and pull that

6    up and have the benefit of the speaker's notes, it says,

7    "It's not that you can always recognize each of these events

8    occurring - but you should understand the scope of possible

9    illegal activities that can bring charges of 'money

10   laundering.'"  Do you see that?

11   A.  Yes.

12   Q.  And really the focus is on activities that could lead to

13   money laundering, right?

14   A.  Yes.

15   Q.  Now, after 2008 you're aware of the term "Ponzi scheme,"

16   right?

17   A.  Yes.

18   Q.  And you agree that Ponzi schemes are associated with

19   money laundering?

20   A.  Yes.

21   Q.  Let's do one more slide that you were asked about.

22   Let's go to page 11 in this document, which is slide 10 that

23   you were asked about.  And you were asked to read the slide

24   about suspicious activity, correct?

25   A.  Yes.

1    Q.  And you focused on the third bullet point, right?

2    A.  Yes.

3    Q.  So now let's go to the second bullet point.  And it

4    reads, "Has no apparent lawful purpose."  Do you see that?

5    A.  Yes.

6    Q.  And you understood during the time that you were in the

7    Anti-Money Laundering Group from 2005 through 2008, that if

8    there were transactions that did not appear to have a lawful

9    or legitimate business purpose, that that would be at least

10   indicative of suspicious activity, right?

11   A.  Yes.

12   Q.  Now if we go down and look at the speaker's notes, I

13   believe you were asked not to look at the speaker's notes,

14   but you were asked the question about what is unusual

15   activity.  Do you remember that?

16   A.  Yes.

17   Q.  And you were asked to talk about the difference between

18   unusual and suspicious activity.  Do you remember that?

19   A.  Yes.

20   Q.  Do you agree with me that what unusual activity is is

21   unusual activity is something that would trigger an

22   anti-money laundering analyst to look into that activity

23   further to determine whether it could potentially be

24   suspicious?

25   A.  Yes.

1    Q.  And the speaker also uses the term "interesting."  Do

2    you see that?

3    A.  Yes.

4    Q.  And do you agree with me as well that the term

5    "interesting" in the anti-money laundering world is also

6    used to describe activity that could lead the anti-money

7    laundering analyst to look into that activity further to

8    determine whether or not it's potentially suspicious?

9    A.  Yes.

10   Q.  You were asked by your counsel could there be a

11   legitimate explanation for the majority of wires coming into

12   an account, right?

13   A.  Yes.

14   Q.  And, Ms. Currie-Smotherman, can you say what the

15   legitimate explanation was for billions of dollars coming

16   into the account from Nationwide and Enchanted?

17            MS. PARLOVECCHIO:  Objection, exceeds the scope.

18            THE COURT:  Overruled.

19            THE WITNESS:  Could you repeat it, please?

20   BY MR. COLLYARD:

21   Q.  Can you say what the legitimate explanation was for the

22   majority -- for the majority of billions of dollars coming

23   into the account of the Petters Company, Inc. from

24   Nationwide and Enchanted?

25   A.  It being their customer sending payments to them or --

1    sending payments to them or receiving payments from them.

2    Q.  And can you say anything beyond that,

3    Ms. Currie-Smotherman, as to why that activity -- or why you

4    believed that there was a legitimate explanation for that?

5    A.  Other than I thought they were doing business with their

6    customers, and that those were legitimate transactions

7    between a customer and their client.

8    Q.  And, Ms. Currie-Smotherman, if Nationwide and Enchanted

9    were wholesalers who Petters Company, Inc. was supposedly

10   buying TVs from, would there be a legitimate explanation for

11   Nationwide and Enchanted wiring in billions of dollars into

12   the account on the alert that you were looking at?

13          MS. PARLOVECCHIO:  Objection, calls for

14   speculation.

15          THE COURT:  Overruled.

16          THE WITNESS:  Based on the information that I had

17   at that time, it made sense.

18   BY MR. COLLYARD:

19   Q.  Now, you also said that the Anti-Money Laundering Group

20   was small, and you could sit around and talk about issues.

21   It was that kind of environment where you would raise

22   issues, right?

23   A.  Yes.

24   Q.  And certainly you could have raised with the Anti-Money

25   Laundering Group the fact that you saw billions and billions

1   of dollars for similar amounts going in and out of the

2   Petters Company, Inc. account, right?

3   A.  Yes.

4   Q.  And you don't -- do you recall any discussion at all

5   amongst any of the other anti-money laundering analysts that

6   either you saw in alerts that billions of dollars were going

7   in and out or that they saw billions of dollars going in and

8   out of the account?

9   A.  I don't recall the conversations.  Whether they were had

10  or not, I just do not recall.

11  Q.  Thank you, Ms. Currie-Smotherman.

12          MR. COLLYARD:  I have no further questions,

13  Your Honor.

14          THE COURT:  Anything further for this witness?

15          MS. PARLOVECCHIO:  I don't have any questions for

16  this witness, Your Honor.  Thank you.

17          THE COURT:  You are excused.

18          MR. MARDER:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. MARDER:  We would next call Edward Jambor

21  adversely.

22          MR. MARDER:  Your Honor, may we approach the bench

23  and the witness to provide the binders of the exhibits?

24          THE COURT:  You may.

25          MR. MARDER:  Thank you, Your Honor.

 1          (Exhibit binders provided to Court and witness)

 2              COURT REPORTER:  Please come forward and stop in

 3      front of me.  Would you raise your right hand to be sworn,

 4      please.

 5          (Witness Sworn.)

 6              THE WITNESS:  Edward Jambor; E-d-w-a-r-d,

 7      J-a-m-b-o-r.

 8              THE COURT:  Counsel, you may proceed.

 9              Good morning, Mr. Jambor.

10              MR. MARDER:  Thank you, Your Honor.

11                          **(Edward Jambor)**

12                        **CROSS-EXAMINATION**

13      BY MR. MARDER:

14      Q.  Good morning, Mr. Jambor.

15      A.  Good morning.

16      Q.  My name is David Marder.  I am one of the lawyers for

17      the plaintiffs in this case, and I am going to be asking you

18      some questions this morning.

19              Have we ever met before?

20      A.  No, we have not.

21      Q.  You should have a couple of binders in front of you

22      there.

23      A.  Yes.

24      Q.  I just want to explain to you how the binders work to

25      speed things along.  So if you could open up Volume I there.

Jambor - Cross

1    Do you see the first four or five tabs?  Those are

2    transcripts of your prior testimony.  So if we refer to your

3    prior testimony, it is going to be in the front of the first

4    binder there.

5    A.  Okay.

6    Q.  And then after that we, have a couple of defendant's

7    exhibits.

8    A.  Yes.

9    Q.  And then after that, there's the first plaintiff's

10   exhibit.  And then in the second binder, you'll find all the

11   remainder plaintiff's exhibits that we are going to be using

12   today.

13   A.  Okay.

14   Q.  I also want to show you how the page numbers work, just

15   to make sure things go smoothly.  If you could turn to the

16   second binder.

17   A.  Volume II?

18   Q.  Yes.

19   A.  Okay.

20   Q.  And turn to P-4.

21   A.  Yes.

22   Q.  Do you see there at the bottom of the page, there's a

23   P0004-0001?

24   A.  Yes.

25   Q.  So when I refer to the page numbers of an exhibit, I'm

1    going to be referring to the digits after the dash, 0001,

2    0002, like that.  Do you see?

3    A.  Yes.

4    Q.  I may also be referring to something called a Bates

5    number.  Are you familiar with what a Bates number is?

6    A.  Is that the BMO0012172 on this page?

7    Q.  Right.

8    A.  Yes.

9    Q.  Do you see in the lower right-hand corner there's

10   another number, we refer to that as a Bates number.  That's

11   what I am talking about when I say "Bates number."

12   A.  Yes.

13   Q.  You see here that says BMO000.  In other words, that's a

14   stamp that the lawyers for BMO put on the document to

15   indicate that they produced it and that's their production

16   number.  Do you understand?

17   A.  Okay.

18   Q.  Okay.  Now, you were once employed at M&I Bank; is that

19   correct?

20   A.  Yes.

21   Q.  You left the bank in approximately January 2015?

22   A.  No.

23   Q.  When did you leave the bank?

24   A.  August of 2007.

25   Q.  I apologize.  So you left the bank in August of 2007,

 1     you said?

 2     A.  Yes.

 3     Q.  Okay.  Are you being compensated for your time today?

 4     A.  No, I'm not.

 5     Q.  And who represents you?  Do you have lawyers

 6     representing you?

 7     A.  Yes, I do.

 8     Q.  Is that the same lawyers who represent BMO Harris?

 9     A.  Yes.

10     Q.  And did you meet with them to prepare for today's

11     testimony?

12     A.  Yes.

13     Q.  But you didn't meet with us, right?

14     A.  No.

15     Q.  Now, prior to being employed by M&I Bank, you were

16     employed at a bank called National City Bank of Minneapolis;

17     is that correct?

18     A.  Yes, it is.

19     Q.  And your role at National City Bank was in retail

20     banking; is that right?

21     A.  Correct.

22     Q.  What was your position there?

23     A.  The branch manager, retail lender.

24     Q.  Sorry.  Branch manager what?

25     A.  Retail lender.

1    Q.  What did your responsibilities entail?

2    A.  Just kind of taking care of branch business and doing

3    retail loans to consumers.

4    Q.  When you were branch manager, were you actually running

5    the branch?

6    A.  Some of the branch stuff, yes, not all of it.

7    Q.  And you also engaged in consumer and commercial lending?

8    A.  Small business lending, yes.

9    Q.  So would you view yourself as a small business expert?

10   A.  When I was with National City Bank, no.

11   Q.  And at some point M&I Bank acquired National City,

12   correct?

13   A.  Correct.

14   Q.  That was somewhere around 2002?

15   A.  November of 2001 is when the conversion happened.

16   Q.  And when M&I Bank acquired National City, you stayed

17   with the bank, right?

18   A.  Yes, I did.

19   Q.  You were given a new role as a business banker?

20   A.  Correct.

21   Q.  And as a business banker, what you did was manage a

22   portfolio of small business accounts, right?

23   A.  Yes, I did.

24   Q.  And at M&I, small business meant businesses with annual

25   revenues somewhere in the area of $15 million or less,

Jambor - Cross

 1    correct?

 2    A.  20 million or less, yes.

 3    Q.  And if they were a bigger client, instead of being in

 4    the small business group, those were usually assigned to the

 5    commercial banking group; is that correct?

 6    A.  Generally, yes.

 7    Q.  And as a small business banker at M&I Bank, you managed

 8    business relationships that M&I had with particular

 9    individual customers, right?

10    A.  At M&I Bank you are referring to?

11    Q.  Yes.

12    A.  With individual businesses, yes.

13    Q.  Individual businesses, right.

14            And in managing those business relationships, you

15    were the customer's first point of contact, correct?

16    A.  Yes.

17    Q.  And at M&I Bank, you had a supervisor, correct?

18    A.  Yes.

19    Q.  That was Ms. Shari Rhode?

20    A.  For a time, yes.

21    Q.  She was your supervisor until some time in 2006?

22    A.  I don't remember when she was not my supervisor.

23    Q.  Roughly 2006?

24    A.  Somewhere in that area generally, yes.

25    Q.  And who was your supervisor after that time?

1    A.  Was it David Nash?  Or was he -- I can't remember if it

2    was him, if he was before Shari or after Shari.

3    Q.  When you became a business banker at M&I Bank in the

4    small business group, were you given the Petters

5    relationship as part of your portfolio?

6    A.  It was assigned to me, yes.

7    Q.  Who assigned it to you?

8    A.  I don't remember.

9    Q.  So you became the relationship manager for Tom Petters

10   and the business accounts that he held with the bank?

11   A.  The Petters Company accounts, yes.

12   Q.  And you managed the Petters Company relationship from

13   that point forward?

14   A.  Until August of 2007, yes.

15   Q.  And you were the main point of contact for Petters

16   Company, Inc., correct?

17   A.  Yes.

18   Q.  Okay.  Mr. Jambor, just for -- just to keep things

19   short, to the extent that's possible, I'm going to refer

20   to Petters Company, Inc. as PC--

21            MR. GLEESON:  I object to the preface to the

22   question.

23            THE COURT:  Sustained.  Counsel, let's leave the

24   commentary and ask the questions.

25            MR. MARDER:  Sure.

 1

 2      BY MR. MARDER:

 3      Q.  I am just going to refer to Petters Company, Inc. as

 4      PCI.  Do you understand?

 5      A.  Correct.  Okay.

 6      Q.  Now, you had conversations with Mr. Petters, right?

 7      A.  From time to time, yes.

 8      Q.  And you met with Mr. Petters in person?

 9      A.  Yes.

10      Q.  Can you describe your relationship with Mr. Petters.

11      A.  It was a customer business relationship.

12      Q.  You felt comfortable enough with Mr. Petters to ask him

13      to donate money to a charity of yours; is that right?

14      A.  I believe I sent him a letter requesting something to

15      that sort, yes.

16      Q.  So you had a cordial business relationship with him,

17      correct?

18      A.  Yes.

19      Q.  And when you managed the Petters relationship, you knew

20      that Tom Petters was the president and CEO of Petters

21      Company, Inc., correct?

22      A.  Yes.

23      Q.  And you knew, therefore, that Tom Petters was an officer

24      of PCI?

25      A.  Yes.

1    Q.  Are you familiar with someone named Deanna Munson?

2    A.  Yes.

3    Q.  That's the same person as Deanna Coleman, right?

4    A.  Yeah.  Yes, she got married.

5    Q.  Deanna Munson was her original name, and then Deanna

6    Coleman is her married name, right?

7    A.  Yes.

8    Q.  And she also worked at PCI, correct?

9    A.  Yes.

10   Q.  And while you were managing the Petters relationship,

11   you had an opportunity to work and interact with Ms. Munson?

12   A.  Yes, I did.

13   Q.  You were her first point of contact as well, correct?

14   A.  Yes.

15   Q.  You had phone conversations with her, correct?

16   A.  Yes.

17   Q.  You had e-mail exchanges with her?

18   A.  Yes.

19   Q.  And you had personal meetings with her?

20   A.  Yes.

21   Q.  And over the course of the time you managed the Petters

22   relationship, you got to know her, right?

23   A.  On a business side, yes.

24   Q.  And you knew that she was an officer of PCI, correct?

25   A.  I knew she worked for PCI.  I didn't know if she was an

 1   officer of the company or not.

 2   Q.  Sir, do you recall having your deposition taken in this

 3   case?

 4   A.  Yes.

 5   Q.  You went into a conference room and Mr. Collyard was

 6   able to ask you questions?

 7   A.  Yes.

 8   Q.  And prior to the time you began testifying, you were put

 9   under oath, correct?

10   A.  Yes.

11   Q.  And you swore to tell the truth?

12   A.  Yes.

13   Q.  And you testified truthfully, correct?

14   A.  To the best of my knowledge, yes.

15   Q.  If I could ask you to open up your binder there, and

16   specifically we're going to go to the testimony from

17   November 1st, 2017.

18   A.  Okay.

19   Q.  And if I could ask you to turn to page 111.

20   A.  The page number in the four-quadrant page numbers you

21   are referring to?

22   Q.  Yes.

23   A.  Okay.

24   Q.  You were asked at your deposition:  "And you knew that

25   Deanna Munson, as vice president of operations, was also an

1    officer of the company, right"?

2    A.  I guess I answered that, "Yes."

3    Q.  I would like you next to turn in your binder to a

4    document that was marked as Plaintiff's Exhibit 33.

5    A.  Yes.

6    Q.  This is the signature card for PCI, correct?

7    A.  Yes.

8    Q.  And if you look at the top of the document, you see

9    there it mentions the account number ▮9018?

10   A.  I see that, yes.

11   Q.  That was the PCI account number, correct?

12   A.  Yes.

13   Q.  And you're familiar with this document, correct?

14   A.  Yes.

15   Q.  Both Deanna Munson and Tom Petters signed it?

16   A.  Yes, they did.

17           MR. MARDER:  Your Honor, I would offer Plaintiff's

18   Exhibit 33 into evidence.

19           MR. GLEESON:  No objection.

20           THE COURT:  Exhibit 33 is received in evidence.

21   BY MR. MARDER:

22   Q.  Being authorized signers meant that Ms. Munson and

23   Mr. Petters could conduct transactions in the account,

24   correct?

25   A.  Yes.

1    Q.  And if you look at the top on the right-hand part of the

2    page, you see it says, "Number of Signatures Required"?

3    A.  Yes.

4    Q.  It says that, "2 ON CHECKS OVER $5,000"?

5    A.  Yes, I see that.

6    Q.  And when M&I acquired National City Bank, this became an

7    M&I business record, correct?

8    A.  I believe so, yes.

9    Q.  Are you familiar with a database called MIContacts?

10   A.  Yes.

11   Q.  It was a database through which bank employees would

12   document calls and meetings that they had with clients and

13   prospects, correct?

14   A.  Yes.

15   Q.  You would document calls and meetings with those people?

16   A.  Yes.

17   Q.  And bank employees were encouraged to document the

18   meetings that you had with respect to a customer in the

19   database, right?

20   A.  Yes.

21   Q.  So it was a regular practice of the bank to have its

22   employees fill these out, correct?

23   A.  Yes.

24   Q.  And in your experience with MIContacts, the entries in

25   there were accurate, right?

 1   A.  Yes.

 2              MR. MARDER:  Your Honor --

 3   BY MR. MARDER:

 4   Q.  I'm going to ask you next to turn to a document that's

 5   been marked as Plaintiff's Exhibit 2.

 6   A.  Okay.

 7   Q.  Do you recall you were shown this at your deposition?

 8   A.  I don't remember if I was or not.

 9   Q.  In any event, this is a collection of various MIContacts

10   reports, correct?

11   A.  Yes.

12              MR. MARDER:  Your Honor, I'd offer Plaintiff's

13   Exhibit 2 into evidence.

14              MR. GLEESON:  No objection.

15              THE COURT:  Plaintiff's Exhibit 2 is received.

16   BY MR. MARDER:

17   Q.  I'm going to ask you please to turn to page 35 of that

18   exhibit.

19   A.  Yes.

20              MR. MARDER:  And if we could just blow up the

21   entry itself in white.

22   BY MR. MARDER:

23   Q.  Actually, I apologize.  If you could turn to the next

24   page first, page 36.  Do you see this is an entry made by

25   Shari Rhode?

Jambor - Cross

1    A.  Yes.

2    Q.  And that was who your supervisor was?

3    A.  Yes.

4    Q.  Okay.  So let's go back to the previous page.  It says,

5    "Met with Bob White and Stuart Romenesko, both CFO of

6    Petter's companies."  Do you see that?

7    A.  Yes.

8    Q.  "They indicated they want to begin consolidating bank

9    relationships and have been more than pleased with our

10   service.  Because they have only been a deposit customer,

11   they have remained on the small business banking side

12   however."  Do you see that?

13   A.  Yes.

14   Q.  So you agree with me, don't you, that the employees at

15   the bank in your group referred to the group as the small

16   business banking group, right?

17   A.  Yes.

18   Q.  Now if I could ask you, please, to turn to page 32.

19   This is MIContacts -- strike that.

20          You see how there's an entry there that says,

21   "Reporting Person"?

22   A.  Yes.

23   Q.  That's the name of the individual who filled out the

24   report, correct?

25   A.  Correct.

1    Q.  And so this was a report that you filled out?

2    A.  Yes.

3    Q.  If we go to the next page, page 33, it says that you met

4    with Tom Petters, Deanna Munson, Jon Sabes, and Bob White,

5    right?

6    A.  Yes.

7    Q.  So this is an example of an instance in which you

8    actually had an in-person meeting with Mr. Petters, correct?

9    A.  Yes.

10   Q.  And this was in February of 2003?

11   A.  Yes, it looks that way, yes, the call date.

12   Q.  Bob White was employed by PCI, correct?

13   A.  Yes.

14   Q.  You knew him to be the CFO of the company, correct?

15   A.  Yes.

16   Q.  It says here on this entry that a Jon Sabes of

17   Opportunity Finance was also at the meeting.

18   A.  Yes.

19   Q.  Who did you understand Mr. Sabes to be?

20   A.  I wrote that he was with Opportunity Finance.

21   Q.  Okay.  You can put that away.

22        You understood that as part of the Petters

23   relationship, there were multiple different businesses that

24   had the Petters name in it, correct?

25   A.  Yes.

Jambor - Cross

1   Q.  And that Mr. Petters was also affiliated with other

2   businesses, like Polaroid, right?

3   A.  Yes.

4   Q.  But PCI, as we've been referring to it, was a separate

5   business from the other Petters businesses that were part of

6   the relationship, correct?

7   A.  Can you rephrase that?  I guess I'm --

8   Q.  Sure.  PCI was a separate company, right?

9   A.  Yes.

10  Q.  It had its own tax ID number, right?

11  A.  Yes, it did.

12  Q.  And the PCI account was a separate account for PCI that

13  wasn't shared by the other Petters businesses, right?

14  A.  Not to my knowledge, no.

15  Q.  And the PCI account, the 9018 account, was a depository

16  account, correct?

17  A.  Yes.

18  Q.  You understand, Mr. Jambor, when I say the PCI account,

19  I'm referring to that 9018 account that we talked about

20  earlier, right?

21  A.  Yes, I do.

22  Q.  And a depository account is an account that deposits go

23  into it -- right? -- like a checking account or a savings

24  account, correct?

25  A.  Correct.

Jambor - Cross

1    Q.  And in a depository account, you can also have wire

2    transfers going in and out of the account, correct?

3    A.  In a checking account, yes.

4    Q.  And the PCI depository account was a checking account,

5    right?

6    A.  Yes, it was.

7    Q.  It was not a payroll account, correct?

8    A.  It wasn't labeled a payroll account, no.

9    Q.  So it wasn't a payroll account?

10   A.  No.

11   Q.  Let's talk more about your role, then, as a business

12   banker.  Part of your job was to grow the business that M&I

13   had with a particular customer, right?

14   A.  Correct.

15   Q.  Loan production would be part of growing the business,

16   right?

17   A.  Yes.

18   Q.  Getting more deposits would be another part of that?

19   A.  Yes.

20   Q.  And customer service is another part of that, right?

21   A.  Correct, yes.

22   Q.  And part of your job responsibilities was to cross-sell

23   your customers with additional bank products and services,

24   right?

25   A.  Yes.

1    Q.  Can you explain for the jury what is meant by the term

2    "cross-selling."

3    A.  It's meeting with current customers and/or prospects to

4    offer other products and services the bank has to deepen the

5    relationship that's beneficial for the bank and for the

6    customer.

7    Q.  For example, if a client has a depository account, you

8    might want to cross-sell them loans, right?

9    A.  Yes.

10   Q.  Or you might want to cross-sell them cash management

11   products?

12   A.  Yes.

13   Q.  Depository accounts, loans, and cash management

14   products, were those the main three products that you would

15   try to cross-sell?

16   A.  Financial services also.

17   Q.  Let's talk about cash management products.  That

18   includes online banking, right?

19   A.  Correct.

20   Q.  And sweep accounts?

21   A.  Correct.

22   Q.  And treasury management services?

23   A.  Yes.

24   Q.  And when you were cross-selling products and services,

25   you would want to bring in people from other areas of the

Jambor - Cross

1    bank to cross-sell the other services offered by the bank,

2    correct?

3    A.  The experts in that area, yes.

4    Q.  For example, with M&I, you brought in treasury

5    management people to talk to them, right?

6    A.  Yes, I did.

7    Q.  Now, Mr. Jambor, you were evaluated periodically, right?

8    A.  Yes.

9    Q.  Ms. Shari Rhode, your supervisor, from time to time

10   would prepare performance reviews, right?

11   A.  Yes, when she was my supervisor.

12   Q.  And one of the things you were judged on in your

13   performance reviews was the extent to which you were

14   successfully cross-selling, correct?

15   A.  Part of it, yes.

16   Q.  I'd like you next, please, to turn to exhibit DX-40002

17   in your binder.  If you could look at the bottom of the page

18   there, the page is marked -0005.

19   A.  Yes.

20   Q.  That's your signature there, right?

21   A.  Yes.

22   Q.  And, again, if we turn two pages forward to page 7,

23   that's your signature as well?

24   A.  Yes, it is.

25   Q.  And then if we page forward to page 16, that's also your

1    signature, right?

2    A.  Yes.

3    Q.  So what we're seeing here is a collection of

4    personnel-related documents that you signed as part of your

5    personnel file, correct?

6    A.  Yes.

7          MR. MARDER:  Your Honor, I would offer Defendant's

8    Exhibit 40002 into evidence.

9          MR. GLEESON:  No objection.

10          THE COURT:  Exhibit 40002 is received.  It's

11    40002.

12          MR. MARDER:  Yes, Your Honor.

13    BY MR. MARDER:

14    Q.  Next, Mr. Jambor, I would ask you to turn to page 35.

15    This here is your evaluation, if we look on the top right of

16    the document, for the time period covering January 2006

17    through December of 2006, correct?

18    A.  Correct.

19    Q.  And if we flip to page 39, you signed this, correct?

20    A.  Yes, I did.

21    Q.  So you agree that this is your performance review for

22    the year 2006, correct?

23    A.  Correct.

24    Q.  And this was during the time frame that you were

25    managing the Petters relationship?

Jambor - Cross

1    A.  Yes.

2              MR. MARDER:  If we go back to page 35, I'd like to

3    blow up the "Comments/Examples" at the bottom of the

4    evaluation.  And if we could highlight the next sentence.

5    BY MR. MARDER:

6    Q.  It says, "Ed works closely with his key accounts to

7    maintain those relationships and cross-sell for additional

8    business."  Have I read that correctly?

9    A.  Yes.

10   Q.  This is an example where your supervisor was pointing

11   out your cross-selling skills in connection with your

12   evaluation, correct?

13   A.  Correct.

14   Q.  Now, if we flip to the next page, which is page 36, and

15   I want to blow up the second line of this document.  There's

16   a preprinted entry in the document where your supervisor

17   checks boxes to indicate whether you, quote, Cross-Sells all

18   M&I products and services to ensure that customers' needs

19   are met.  Have I read that correctly?

20   A.  Yes.

21   Q.  And you were given the highest rating of outstanding?

22   A.  Yes.

23   Q.  And since you signed this document, can we assume that

24   you agreed with this review?

25   A.  Yes, I did.

1    Q.  Now, at M&I, were you eligible for bonuses?

2    A.  Yes.

3    Q.  And your success in cross-selling your customer's

4    business was a component of the amount of bonuses that you

5    received at M&I, correct?

6    A.  Partially, yes.

7    Q.  In addition to being eligible specifically for

8    cross-selling, you were also eligible for an annual bonus

9    based on the number of loans that you referred out, right?

10   A.  Yes.

11   Q.  And you were also eligible for bonuses based on deposit

12   production, correct?

13   A.  Correct.

14   Q.  And you were also eligible for bonuses based upon your

15   customer service to your customers, right?

16   A.  Correct.

17   Q.  And all these three areas all look better when you're

18   growing the business that you have with a particular

19   customer, right?

20   A.  Yes, they do.

21   Q.  So you were financially incentivized to do things like

22   cross-selling your customers, right?

23   A.  Amongst other things, yes.

24   Q.  While we're on the performance review, if you could

25   please flip to page 38 of that review.  And just above

Jambor - Cross

```
 1    "Comments/Examples," if we could blow up that line there.
 2    You see it says, "Ensures compliance with bank policies and
 3    procedures, including, but not limited to, the Bank Secrecy
 4    Act and Anti-Money Laundering laws."  Do you see that?
 5    A.  Yes, I do.
 6    Q.  So another thing you were evaluated on was whether you
 7    ensured that the bank's policies and procedures relating to
 8    anti-money laundering were met, right?
 9    A.  Yes.
10    Q.  And that was also a component of your bonuses, correct?
11    A.  I mean, well, it was a component of my job, yes.
12    Q.  Okay.  If we could go to page 49 of this exhibit next,
13    this is another one of your evaluations, correct?
14    A.  Yes.
15    Q.  And it doesn't have a date on the first page, but maybe
16    if you could flip through to page 45.
17    A.  45, yes.
18    Q.  You see this is signed in April of 2006?
19    A.  I have 45 as something different.
20              MR. GLEESON:  I think you mean 52.
21    BY MR. MARDER:
22    Q.  Sorry.  52.
23    A.  Okay.  Thank you.
24              THE COURT:  Is this page 52 that you are referring
25    to?
```

1          MR. MARDER:  Yes, 52.

2     BY MR. MARDER:

3     Q.  You signed this on April 17th, 2004, correct?

4     A.  Correct.

5     Q.  So can we assume that this was your performance

6     evaluation for the year of 2003?

7     A.  That would be -- yes.

8     Q.  And you were managing the Petters relationship during

9     this time, correct?

10    A.  Yes.

11    Q.  If we could go back to page 52, I want to blow up the

12    "Comments/Examples."  It says, "Ed earned the role of one of

13    the top bankers in M&I and was honored as one of the CEO

14    Award winners."  Have I read that correctly?

15    A.  Yes.

16    Q.  And it says, "He has a volatile portfolio but still

17    managed to receive the top incentive pay possible."  Right?

18    A.  Yes.

19    Q.  What's meant by a "volatile portfolio"?

20    A.  It was a lot of moving parts in the portfolio.

21    Q.  And part of those volatile portfolio moving parts was

22    the Petters account, correct?

23    A.  The Petters account was in the portfolio, yes.

24    Q.  And that reference to incentive pay is a reference to

25    your bonus that you received, correct?

1  A.  Yes.

2  Q.  By the way, when you get -- got paid at M&I, you had

3  taxes taken out of your account, correct, your paychecks?

4  A.  Yes.

5  Q.  And that included when you got your bonus checks, right?

6  A.  Yes.

7  Q.  Now, I think you testified, then -- strike that.

8          Building relationships with your customers was

9  also part of your role as a business banker, right?

10  A.  Yes, it was.

11  Q.  As part of building the relationship, you were trying to

12  serve the customers so that you would be their main bank,

13  right?

14  A.  Yes.

15  Q.  And you were always trying to improve the relationship

16  that you had with your customer, right?

17  A.  I was always trying to maintain and be a solid banker

18  for them, yes.

19  Q.  And you would also use the current relationship you had

20  to try to forge relationships with other companies, right?

21  A.  Yes.

22  Q.  For example, if Tom Petters had a connection with

23  Polaroid, you might want to use the Petters relationship to

24  provide Polaroid banking services?

25  A.  Yes.

1    Q.  That was all part of using current relationships to

2    build new relationships, right?

3    A.  Yes.

4    Q.  And that was all done to grow the business that M&I had

5    and to get new business, right?

6    A.  Yes.

7    Q.  And the more business that M&I could get, the more money

8    M&I would make, right?

9    A.  Yes.

10   Q.  Now, let's set aside PCI for a moment.  Can you recall

11   any customers you had at M&I Bank that had revenues

12   exceeding $100 million?

13   A.  I don't remember.

14   Q.  Can you even identify any customer that had more than

15   $20 million of revenue?

16   A.  I don't remember.

17   Q.  As you sit here today, you can't identify one?

18   A.  I don't remember.

19   Q.  And PCI was one of your top clients, right?

20   A.  Yes.

21   Q.  You knew PCI was one of your top clients because every

22   month you would get a report that would list your clients

23   from top to bottom based upon how profitable they were,

24   right?

25   A.  Yes.

Jambor - Cross

1    Q.  I would like you to turn next in your binder, please, to

2    Plaintiff's Exhibit 46.  This is an example of one of the

3    Profitability Ranking Reports that you received on a monthly

4    basis, correct?

5    A.  Correct.

6    Q.  And what month is this one for?

7    A.  I'm sorry.  It says April.  I can't tell the year.  I'm

8    sorry.

9    Q.  But it was while you were managing the PCI relationship,

10   correct?

11   A.  Correct.

12           MR. MARDER:  I'd offer Plaintiff's Exhibit 46 into

13   evidence.

14           MR. GLEESON:  No objection.

15           THE COURT:  Exhibit 46 is received.

16   BY MR. MARDER:

17   Q.  This was also referred to within the bank as the ACE

18   Report, right?

19   A.  Correct.

20   Q.  And the purpose of this report was to help you determine

21   the profitability of your customers, right?

22   A.  Yes.

23   Q.  You wanted to know who your top customers were so that

24   you could make sure that you took care of them, right?

25   A.  Yes.

1    Q.  And if we could blow up the second group of rows, this

2    was the row -- rows relating to PCI, correct?

3    A.  Yes.

4    Q.  And then if we could go back to the full document, this

5    shows at this time, at least, that PCI was your second most

6    profitable client, correct?

7    A.  Correct.

8    Q.  I'd ask you next, please, Mr. Jambor, if you would, to

9    turn to Exhibit P-45.  We've placed in front of you now

10   another one of these so-called ACE Reports, right?

11   A.  Yes.

12   Q.  And this is another example of a regular business record

13   that you received while you were at M&I Bank on a monthly

14   basis?

15   A.  Correct.

16            MR. MARDER:  I would offer Plaintiff's Exhibit 45

17   into evidence.

18            MR. GLEESON:  No objection, Judge.

19            THE COURT:  Exhibit 45 is received.

20   BY MR. MARDER:

21   Q.  And it looks like this report is dated April 2003?

22   A.  Yes.

23   Q.  And, again, the purpose of this report was to help you

24   determine the profitability of your customers, correct?

25   A.  Correct.

1    Q.  And this document states that as of April 2003, PCI was
2    your top customer, right?
3    A.  For the month of April 2003, yes.
4    Q.  Okay.  And throughout the time that you managed the
5    relationship, the Petters relationship consistently remained
6    one of your top clients, correct?
7    A.  Yes.
8    Q.  It was one of your most profitable clients, correct?
9    A.  It was a profitable client, yes.
10   Q.  And it was an important client to the bank, right?
11   A.  Yes.
12   Q.  And having a banking relationship with one of the more
13   well-known businessmen in the Twin Cities was a good
14   relationship for the bank to have, right?
15   A.  I can't speak on behalf of the bank, but it was a good
16   relationship, yes.
17   Q.  And during the time that you managed this relationship,
18   you wanted to keep PCI happy, right?
19   A.  Them and a number of my other customers, yes.
20   Q.  You wanted them to be happy so they wouldn't leave the
21   bank, right?
22   A.  I wanted to make sure we were providing good service to
23   him, yes.
24   Q.  You wanted him to stay with the bank so the bank could
25   get more profits, right?

1    A.  The bank would -- yes, so the bank would make money,

2    yes.

3    Q.  And that helps with your bonuses, right?

4    A.  Partially, yes.

5    Q.  So you tried to assist PCI whenever you could, right?

6    A.  When they had -- when they came up with items that they

7    were needing, I assisted them, yes.

8    Q.  You wanted to make Mr. Petters feel like he was an

9    important client, right?

10   A.  Yes.

11   Q.  And growing the relationship with Mr. Petters and his

12   companies was one of the things you consistently tried to

13   do, right?

14   A.  I serviced them when they needed, when requests would

15   come up or when I met with them, yes.

16   Q.  I'm not talking about servicing them.  I'm talking about

17   growing the relationship.

18   A.  I always tried to provide them products and services as

19   needed, yes.

20   Q.  Including products and services that they weren't

21   already buying?

22   A.  Yes.

23   Q.  And you made several introductions of M&I Bank to your

24   colleagues at the bank, right?

25   A.  I'm sorry.  I don't understand the question.

1    Q.  You introduced several of your colleagues in different

2    divisions of the bank to PCI, correct?

3    A.  Yes, I did.

4    Q.  For example, you introduced Kevin Pleasant and Barbara

5    Bergquist to them?

6    A.  Yes.

7    Q.  They were in treasury management?

8    A.  Yes, they were.

9    Q.  And you also introduced to PCI people from M&I's

10   commercial division, right?

11   A.  Yes, I did.

12   Q.  Like Barbara Nieland?

13   A.  Yes.

14   Q.  And these introductions are all examples of

15   cross-selling and expanding the relationship, right?

16   A.  Correct.

17   Q.  I would like you to go back again to Plaintiff's

18   Exhibit 2.  I'd ask you, please, Mr. Jambor, to turn to

19   page 26 of Plaintiff's Exhibit 2.  This is an example of an

20   M&I contact that you prepared?

21   A.  Yes.

22   Q.  And it relates to a call on October 31st, 2002?

23   A.  Correct.

24   Q.  And if we go now to the next page, which is exhibit --

25   page 27, it says, "Type of Call," and it says, "In Person."

1    Right?

2    A.  Yes.

3    Q.  So just because it says "call," it doesn't mean a phone

4    call, it means you are calling on your client, right?

5    A.  It meant, yes, that we met in person.

6    Q.  It says, "Kevin and I met with Tom to get an overview of

7    Petters Company."  Have I read that correctly?

8    A.  Correct.

9    Q.  "Tom" is Tom Petters, right?

10   A.  Yes.

11   Q.  And you also discussed the Fingerhut purchase.

12   A.  I'm sorry.  I missed that.  I coughed.

13   Q.  No problem.  It says you also discussed the Fingerhut

14   purchase, correct?

15   A.  Correct.

16   Q.  Do you know who Fingerhut is?

17   A.  They were a consumer good product company.

18   Q.  They were a well-known company, right?

19   A.  They were well known in Minnesota, yes.

20   Q.  And Tom Petters was one of the owners of Fingerhut?

21   A.  I am not sure at this point if he had purchased them or

22   not.

23   Q.  Eventually he became an owner?

24   A.  Yes.

25   Q.  And the reason you were talking to Mr. Petters about

1    Fingerhut is because you thought that might be a good

2    opportunity for the bank, right?

3    A.  I was -- I don't remember what the conversation was

4    revolving around Fingerhut, but I am sure we did discuss it.

5    Q.  But the reason you wanted to discuss another Petters

6    Company was because you thought that would be a good

7    opportunity for the bank, right?

8    A.  It may have been, yes.

9    Q.  To possibly sell them banking services, right?

10   A.  Possibly.

11   Q.  This is all part of expanding the relationship, right?

12   A.  Correct.

13   Q.  And as we talked earlier, that's something that you were

14   financially incentivized to do, correct?

15   A.  Partially, yes.

16   Q.  It was in your evaluations and was part of your bonuses,

17   right?

18   A.  Yes, one of the parts of my evaluations and bonuses.

19   Q.  If you could please flip forward to page 70.  Again,

20   Mr. Jambor, this is an entry that you made, correct?

21   A.  Yes.

22   Q.  And this relates to an event on November 24, 2003?

23   A.  Yes.

24   Q.  This is while you were managing the Petters

25   relationship?

1    A.  Yes.

2    Q.  And this -- in this instance, what you were reporting on

3    was an in-person meeting; is that correct?

4    A.  Yes, it was.

5    Q.  I'm going to ask you to turn to page 71, please.  If we

6    could blow that up.  It says, "The M&I team met with Mark

7    Laumann to review the company DDA account and treasury

8    management services."  Do you see that?

9    A.  Yes.

10   Q.  "We discussed their needs."  Do you see that?

11   A.  Yes.

12   Q.  Who was Mark Laumann?

13   A.  I remember the name, but I don't remember what he did

14   with Petters Company.

15   Q.  In any event, he was one of the employees of PCI?

16   A.  I remember him as an employee, yes.

17   Q.  So this is an example of an occasion where you were

18   trying to sell the company treasury management services,

19   correct?

20   A.  Yeah, we discussed a few things it looks like.

21   Q.  Including treasury management services?

22   A.  Yes.

23   Q.  You were trying to expand into that?

24   A.  Correct.

25   Q.  Because that was something that you were financially

1    incentivized to do, right?

2    A.  It was part of my job, yes.

3    Q.  If I could ask you next to turn to page 73, this is

4    another MIContacts entry that you wrote, right?

5    A.  Yes.

6    Q.  And in this instance, this was a in-person meeting you

7    had with -- again with Mark Laumann of Petters Company?

8    A.  It's not on page 73.  I would have to --

9    Q.  Sure.  If you could flip to page 74.  Sorry.

10   A.  Yes, it says it was in person.

11   Q.  It says there that you had lunch?

12   A.  Yes.

13   Q.  And you discussed how the bank could assist Petters with

14   foreign wires.  Do you see that?

15   A.  Yes.

16   Q.  And also talks about how hedging may help them?

17   A.  Yes.

18   Q.  What is hedging?

19   A.  I'm not sure.

20   Q.  In any event, these foreign wires and hedging were

21   services that you were hoping the Petters companies would

22   use, right?

23   A.  Yes.

24   Q.  Because you thought that was a good opportunity for the

25   bank, right?

Jambor - Cross

1   A.  Yes, to offer more services and help the customer.

2   Q.  You were trying to show how the bank could help the

3   customer, right?

4   A.  Yes.

5   Q.  And, in fact, you said that Mark appreciated the meeting

6   and said -- talked about the value added piece the bank was

7   offering?

8   A.  Yes.

9   Q.  If I could ask you next to turn to page 76, this was a

10  MIContacts entry that was written by Ms. Nieland, correct?

11  A.  Yes.

12  Q.  But you were present on the call, right?

13  A.  Yes.

14  Q.  It says there that Petters is in the final stages --

15  sorry.  If we could go to page 77, we're going to blow that

16  up.  It says there, "Petters is in the final stages of

17  acquiring Polaroid for roughly $450 million."  Do you see

18  that?

19  A.  Yes.

20  Q.  And then it says, "They plan to wire the funds into

21  their account at M&I next week."  Do you see that?

22  A.  Yes.

23  Q.  Now, if we could go back to page 76, and do you see

24  where it says, "Last edited 12/29/2004"?

25  A.  Yes.

1   Q.  And underneath that it says, "Petters Company, Inc."?

2   A.  Yes.

3   Q.  So this was a meeting about PCI, right?

4   A.  I don't remember the meeting in detail, but Petters --

5   the entry is entered under Petters Company.

6   Q.  The entry was entered in the PCI section of MIContacts,

7   right?

8   A.  Yes.

9   Q.  Okay.  So if we could go to the next page now, looking

10  back at that second sentence again, it says, "They plan to

11  wire the funds into their account at M&I next week," that's

12  referring to the PCI account, right?

13  A.  I don't know what account it was referring to.

14  Q.  Are you aware of some other account that was discussed

15  during this call other than the PCI account for which the

16  entry was made?

17  A.  I don't remember the meeting, so, no.

18  Q.  Had you had situations in the past where one of your

19  customers you worked with used one of their accounts to

20  purchase a company for half a billion dollars?

21  A.  No.

22  Q.  And in your experience as a banker, had you ever heard

23  of a situation where a customer transferred half a billion

24  dollars to a small business checking account to purchase a

25  major U.S. corporation?

Jambor - Cross

1    A.  I'm sorry.  Can you repeat the question?

2    Q.  Sure.  In your experience as a banker, had you ever

3    heard of a situation where a customer transferred half a

4    billion dollars to a small business checking account to

5    purchase a major U.S. corporation?

6    A.  No, I have not experienced that.

7    Q.  After this meeting, did you pick up the phone and call

8    your boss, Ms. Rhode, and say, I have a small business

9    customer who is about to transfer half a billion dollars

10   into their checking account to buy a major U.S. corporation,

11   do you think that's a little strange?

12            MR. GLEESON:  Objection to form and it's

13   argumentative.

14            THE COURT:  Sustained.

15   BY MR. MARDER:

16   Q.  After this meeting, did you call up Ms. Rhode and ask

17   what she thought about this?

18            MR. GLEESON:  Objection.

19            THE COURT:  Overruled.

20            THE WITNESS:  I don't remember what I did.

21   BY MR. MARDER:

22   Q.  You have no memory of doing that?

23   A.  I don't have a -- no, I don't.

24   Q.  Isn't that something that would have stuck in your mind?

25   A.  I don't remember it.  I don't remember what I did after

Jambor - Cross

1   the meeting.

2   Q.  If we go down to the bottom of this document -- strike

3   that.

4              Sir, you now know that, from everything that's

5   come out, that the Petters business was a big Ponzi scheme,

6   right?

7   A.  As of now, yes.

8   Q.  And do you now know that in connection with this

9   Polaroid purchase, Mr. Petters was using investor funds and

10  buying Polaroid as part of a big money laundering operation?

11             MR. GLEESON:  Objection to foundation.

12             MR. MARDER:  I'm asking if he knows.

13             THE COURT:  Overruled.

14             THE WITNESS:  I don't know how he purchased

15  Polaroid.

16  BY MR. MARDER:

17  Q.  Sir, you had a reason why you didn't want to call

18  Ms. Rhode and talk to her about what was going on; isn't

19  that right?

20             MR. GLEESON:  Objection, mischaracterizes the

21  prior testimony.

22             THE COURT:  Overruled.  You may answer.

23             THE WITNESS:  Okay.  Can you repeat the question,

24  please?

25  BY MR. MARDER:

1   Q.  Sure.  You had a reason why you didn't want to call

2   Ms. Rhode and point out what was going on; isn't that right?

3   A.  I don't remember what I did after the call.

4   Q.  You wanted the bank to profit from the Polaroid deal,

5   didn't you?

6   A.  I wanted to help service my customers, yes.  That was my

7   job.

8   Q.  But specifically you wanted the bank to profit from the

9   Polaroid deal; isn't that right?

10  A.  I wanted to see if the bank could assist them, yes.

11  Q.  If we could go, please, to Exhibit 47.  If we look at

12  the first page of this, sir, this is an e-mail that you sent

13  to Mr. Hank Donatell?

14  A.  Yes.

15  Q.  Who is Mr. Donatell?

16  A.  He was an employee at M&I Bank.

17  Q.  And then if we look down the chain, those are e-mails

18  that you exchanged with Mr. Donatell, correct?

19  A.  Yes.

20  Q.  And you exchanged these e-mails on the dates listed here

21  in 2005?

22  A.  Yes.

23              MR. MARDER:  I'd offer Exhibit 47 into evidence.

24              MR. GLEESON:  No objection.

25              THE COURT:  Exhibit 47 is received.

```
1    BY MR. MARDER:
2    Q.  If we could look at -- go back in time to the
3    beginning -- or towards the beginning of the chain and look
4    at P-47, page 3.
5    A.  Okay.
6    Q.  You see there there's a line at the very bottom that
7    says, "Petters buys Polaroid for $426 million."
8    A.  Yes.
9    Q.  And then after that, on page 4 and 5, it's just a copy
10   of an article about the Polaroid transaction?
11   A.  Yes.
12   Q.  And if we turn to page 2 -- I'm sorry, page 3 and look
13   at the top of the page there, there's an e-mail that
14   Mr. Donatell sends to various people, including you, right?
15   A.  Yes.
16   Q.  It says, "Talked to Ed this morning."  Right?
17   A.  Yes.
18   Q.  "Apparently Polaroid is skeptical now about having
19   Petters utilize M&I to settle this transaction.  They have
20   stated a preference for Petters to utilize a national versus
21   regional bank.  A bunch of BS is you ask me."  Have I read
22   that correctly?
23   A.  Yes.
24   Q.  And then it says, "Ed is in daily contact with them, so
25   hopefully we will still get the deal, and given the press
```

1    release, it must be getting close.  We will keep you in the

2    loop on any further developments we become aware of."  Have

3    I read that correctly?

4    A.  Yes.

5    Q.  So in this e-mail, when Mr. Donatell says "it's a bunch

6    of BS if you ask me," he's expressing disappointment that

7    M&I didn't get to be involved in settling the transaction,

8    right?

9    A.  I'm sorry.  Repeat the question.

10   Q.  Sure.  When Mr. Donatell says "it's a bunch of BS if you

11   ask me," what he's saying is that he's frustrated that M&I

12   was not given a role in settling the Polaroid transaction,

13   right?

14   A.  He is frustrated that they're looking at other options,

15   yes.

16   Q.  So what the bank wanted at this point, when the Polaroid

17   deal was going on, was to be involved in settling the

18   transaction, right?

19   A.  They wanted to be involved, yes.

20   Q.  And that's something that would have been profitable for

21   the bank, right?

22   A.  Yes.

23   Q.  Do you know which entity actually ended up purchasing

24   Polaroid?

25   A.  No, I don't.

1    Q.  It wasn't PCI, was it?

2    A.  I don't know who purchased Polaroid.

3    Q.  In this section here it says, "Ed is in daily contact

4    with them."  Do you see that?

5    A.  Yes.

6    Q.  That's a reference to you, right?

7    A.  Yes.

8    Q.  You were in daily contact with the parties in this

9    transaction trying to get the bank to have a role in this

10   transaction, right?

11   A.  I'm sure I was in contact with them.  I don't know -- I

12   don't remember how frequently it was.

13   Q.  But it was near daily, right?

14   A.  It looks like it was frequent, yes.

15   Q.  And, again, that's because the bank was going to profit

16   from this deal -- right? -- if you had a role in settling

17   it?

18   A.  The bank would have profited from the deal, yes.

19   Q.  What does "settling a transaction" mean?

20   A.  Closing it, the purchase, closing the purchase.

21   Q.  And the bank would get fees for that?

22   A.  I don't know what the bank would have received for that.

23   Q.  And if you had complained that this transaction looked

24   suspicious and escalated this to management, that could have

25   interfered with that, right?

Jambor - Cross

```
1     A.  I'm sorry?  What?

2     Q.  If you had complained to management and said that this

3     transaction looked suspicious to you, that would have

4     interfered with the bank's ability to act in settling this

5     transaction, right?

6             MR. GLEESON:  Objection, speculation, Judge.

7             THE COURT:  Overruled.  You may answer if you can.

8             THE WITNESS:  I didn't think anything of it at the

9     time.

10    BY MR. MARDER:

11    Q.  If we could turn next to Plaintiff's Exhibit 48, please.

12    Exhibit 48 is an e-mail string, correct?

13    A.  Yes.

14    Q.  And if we look at the first page here, it has your

15    e-mail address there, correct?

16    A.  Yes.

17    Q.  And this was an e-mail addressed to Kevin Kane?

18    A.  Yes.

19    Q.  And he was also an M&I employee?

20    A.  Yes.

21    Q.  And this e-mail is dated April 20th, 2005?

22    A.  Yes.

23    Q.  That's the date it was sent, right?

24    A.  Correct.

25            MR. MARDER:  I would offer Exhibit 48 into
```

1    evidence.

2              MR. GLEESON:  No objection, Judge.

3              THE COURT:  Exhibit 48 is received in evidence.

4    BY MR. MARDER:

5    Q.  If we could go to the second page of this document,

6    please, and if we could blow up the first paragraph.  It

7    says, "Petters Company is a large deposit customer of mine.

8    Number two or three in profitability on my ACE Report."  Do

9    you see that?

10   A.  Yes.

11   Q.  Who is Mr. Kane?

12   A.  He was the head of the business banking area in

13   Minnesota for M&I Bank.

14   Q.  And in this e-mail, you were trying to make sure that

15   the manager of your department knew that the Petters Company

16   was one of your top clients, right?

17   A.  I started with that sentence, yes.

18   Q.  You wanted him to know that PCI was a good client of the

19   bank, right?

20   A.  Yes.

21   Q.  And you thought that was important information for

22   Mr. Kane to have, right?

23   A.  I must have, yes.

24   Q.  Go back, please, to Plaintiff's Exhibit 2, and I would

25   ask you to turn to the entry on page 92, if you would.

1        Actually, if we look at the previous page, we can

2    see that this was a MIContacts entry that you made, correct?

3    A.  Yes.

4    Q.  Now let's go to page 92.  This is a report of a contact

5    that you had with Tom Petters and Mr. Laumann, correct?

6    A.  Yes.

7    Q.  You met in person with Mr. Petters and Mr. Laumann to

8    sign some stock certificates, right?

9    A.  Yes.

10   Q.  What you were doing was going over to meet with them to

11   sign a signature guarantee on the stock certificate, right?

12   A.  I don't remember.  Probably something to that effect,

13   yes.

14   Q.  And that's not something that you typically did in your

15   daily job, right?

16   A.  Meet with customers?

17   Q.  Yeah.

18   A.  Yes, I met with customers as part of my daily job.

19   Q.  But it wouldn't be typical for you to go visit your

20   customer to sign a signature guarantee for them, would it?

21   A.  If I did do it, generally, they came to the bank; but,

22   yes, I have signed -- I've been assisted with signature

23   guaranties in the past prior to this.

24   Q.  But that's not something you typically did, was it?

25   A.  It was not a regular thing I did, signing signature

Jambor - Cross

1    guaranties, no.

2    Q.  It was something that -- an extra service you were

3    providing for a good customer, right?

4    A.  Yes.

5    Q.  And then at the bottom it says, "We are going to get

6    together for lunch to see how we can grow the relationship."

7    Right?

8    A.  Correct.

9    Q.  And, again, that's because you wanted the bank to be

10   able to provide additional services to PCI so that the bank

11   could get more profits, right?

12   A.  Continue to grow the relationship, yes.  That was part

13   of my job.

14   Q.  If we could next turn, please, to page 94.  This is

15   another MIContacts entry that you wrote, correct?

16   A.  Yes.

17   Q.  And if we look at the bottom of the page, it says this

18   is from May 30th, 2007, correct?

19   A.  Correct.

20   Q.  And that's while you were managing the Petters

21   relationship?

22   A.  Yes.

23   Q.  And on the next page, if we could blow up that entry,

24   you said you "Had lunch with Jim Wehmhoff and Mark Laumann

25   to discuss how to further our relationship."  Right?

1    A.  Yes.

2    Q.  Who is Jim Wehmhoff?

3    A.  I don't remember him.

4    Q.  He was a PCI employee?

5    A.  I don't remember him.

6    Q.  And, once again, this is an instance of where you are

7    trying to grow the relationship with the Petters companies,

8    right?

9    A.  Yes.

10   Q.  Because that's profitable to the bank, right?

11   A.  Yes, that's part of my job.

12   Q.  And it says here that, "They have a real estate project

13   in Aspen that they would like the bank to look at"?

14   A.  Yes.

15   Q.  What was the bank's role going to be in this real estate

16   project?

17   A.  I don't remember.

18   Q.  Well, it says you are going to have someone from CRE

19   contact Jim.  Do you see that?

20   A.  Yes.

21   Q.  That's the Commercial Real Estate Group, right?

22   A.  Yes.

23   Q.  So what you were trying to do is cross-sell commercial

24   real estate services to M&I, right -- I mean, to PCI, right?

25   A.  Yes, to Jim and Mark.

Jambor - Cross

1    Q.  Because that would have been profitable to the bank,

2    right?

3    A.  Yes.

4            MR. MARDER:  Your Honor, I am about to switch to a

5    completely different topic.  I don't know if this is an

6    appropriate time to take a break or if I should keep going.

7            THE COURT:  It is.  I was planning on 10:30, but

8    we will go at 10:25.

9            MR. MARDER:  Thank you, Your Honor.

10           THE COURT:  Members of the Jury, we will take our

11   15-minute break now.  And please be ready to come back into

12   the courtroom at 20 minutes until the hour, and please

13   remember the instructions that you have been given and

14   continue to follow them.  Thank you.  All rise for the jury.

15       (Jury excused)

16                        **IN OPEN COURT**

17                      **(JURY NOT PRESENT)**

18           THE COURT:  We are in recess.

19       (Recess taken at 10:26 a.m.)

20                    *    *    *    *    *

21       (10:51 a.m.)

22                        **IN OPEN COURT**

23                      **(JURY PRESENT)**

24           THE COURT:  Counsel, you may proceed.

25           MR. MARDER:  Thank you, Your Honor.

```
 1    BY MR. MARDER:
 2    Q.  Mr. Jambor, in your role as a business banker, it was
 3    important to know your customers, correct?
 4    A.  Yes.
 5    Q.  This term "know your customer" is something that you had
 6    heard around the bank, right?
 7    A.  Yes.
 8    Q.  Part of knowing your customer is to know their business,
 9    right?
10    A.  Yes.
11    Q.  In other words, if your client buys and sells goods or
12    services, you want to know what they're buying and what
13    they're selling, right?
14    A.  What their business is, yes, in general terms, yes.
15    Q.  And the more you understand about your customer's
16    business, the better you are at developing a relationship
17    with a client, right?
18    A.  You understand what they do, you can develop a
19    relationship, yes.
20    Q.  And the more you understand about your customer's
21    business, the more you can help them with different banking
22    products and services, right?
23    A.  Yes, understanding what they do, yes.
24    Q.  We spoke a few minutes ago about your performance
25    measures.  Do you recall that?
```

Jambor - Cross

1    A.  Yes.

2    Q.  And you recall one of the issues was whether you ensure

3    compliance with bank policies and procedures, including the

4    anti-money laundering laws, correct?

5    A.  Correct.

6    Q.  So you agree, then, that it's important to understand

7    your customer's business for anti-money laundering purposes,

8    right?

9    A.  To understand their business for multiple reasons, but

10   regulation is part of it, yes.

11   Q.  And you've heard of the concept of "know your customer"

12   specifically with respect to anti-money laundering, right?

13   A.  Yes.

14   Q.  And you went to training sessions that were required by

15   the regulators, right?

16   A.  Yes.

17   Q.  There was, for example, compliance training at least

18   annually?

19   A.  Yes.

20   Q.  And PowerPoints would be shown at those training

21   sessions?

22   A.  Yes.

23   Q.  And speakers would talk while they were delivering the

24   PowerPoint?

25   A.  There would be people leading the meetings, yes.

1    Q.  I'd ask you, please, to turn to Plaintiff's Exhibit 5.

2    If we could put up the first page of this.  This document is

3    in evidence.  Do you see there it says this is a "Bank

4    Secrecy Act and Anti-Money Laundering Compliance 2004

5    Training Session"?

6    A.  Yes.

7    Q.  I'd ask you, if you could, please, to turn to page 38.

8    Do you see there there's a "Summary of Key Points"?

9    A.  Yes.

10   Q.  And it says you should, "Read and understand the

11   company's policies and procedures"?

12   A.  Yes.

13   Q.  And then it said you should "know your customer," right?

14   A.  Correct.

15   Q.  And then it says you should "understand customer

16   activity."  Have I read that correctly?

17   A.  Yes.

18   Q.  And you understood during the time that you were

19   managing the Petters and PCI relationship, that it was

20   important, for anti-money laundering purposes, to understand

21   your customer's activity, right?

22   A.  Correct.

23   Q.  Now I'm going to show you what's been marked as

24   Plaintiff's Exhibit 4.  If you could please open that up.

25   That's also in evidence.  We are going to look at the first

1    page of that.  Do you see this is titled, "Bank Secrecy Act

2    and Anti-Money Laundering Compliance"?

3    A.  Yes.

4    Q.  If we flip to page 2, we can't see it, but you see there

5    there's a link to a video from Dennis Kuester?  How do you

6    pronounce that?

7    A.  Kuester, I believe.

8    Q.  Kuester.  Okay.

9            Do you recall there being a video from Mr. Kuester

10   shown at the compliance meeting?

11   A.  I was shown the video, yes.

12   Q.  And I'm not going to bore everybody with watching the

13   video again, but do you agree that all employees at the bank

14   ensured a key role that the bank was not being used as a

15   conduit for illegal activity?

16   A.  I believe he stated something to that effect in the

17   video.

18   Q.  And you agree with that, right?

19   A.  Yes.

20   Q.  And you understood that to be true at the time that you

21   were a small business banker at M&I, right?

22   A.  Yes.

23   Q.  And he also said it's a responsibility we all share

24   regardless of where we work, what we do, or the level of

25   customer contact we have on a daily basis.  Do you agree

Jambor - Cross

1    with that statement?

2    A.  Yes.

3    Q.  And you understood that at the time you were a small

4    business banker at M&I, correct?

5    A.  Correct.

6    Q.  Let's look at page 11 of this document.  At the top it

7    says, "Always Remember!,"  correct?

8    A.  Correct.

9    Q.  It says underneath that, "It's not just currency.  Wire

10   transfers, loans, CDs, and investment accounts all can be

11   manipulated for illegal purposes."  Do you see that?

12   A.  Yes.

13   Q.  And you understood that to be true at the time you were

14   an M&I small business banker, correct?

15   A.  Yes.

16   Q.  The third bullet point says, "You play a vital role in

17   the compliance process; don't assume that there is something

18   wrong -- that if there is something wrong with a

19   transaction, someone else will let you know."  Do you see

20   that?

21   A.  Yes.

22   Q.  And that's a rule that you followed at M&I Bank, yeah?

23   A.  Yes.

24   Q.  And you understood that if you saw something that you

25   believed to be unusual or suspicious with one of your

Jambor - Cross

1   customers, then you were supposed to take the initiative to

2   act on that suspicion?

3   A.  Yes.

4   Q.  Now, if I could ask you next, Mr. Jambor, to please turn

5   to Defendant's Exhibit 40067, which is already in evidence.

6   And just for your reference, sir, this is the same --

7   A.  I'm sorry.  Where are we at?

8   Q.  Sure.  It should be in your first binder there, right

9   after --

10   A.  Volume I?

11   Q.  Yes, Volume I, right after the depositions.

12   A.  Yep.  Sorry.  Thank you.

13   Q.  Sure.  And if you could please turn to page 12 of that

14   document, this was a page we looked at earlier, right?

15   A.  Yes.

16   Q.  But now we have the speaker's notes that indicate what

17   the speaker said during the presentation -- right? -- at the

18   bottom of the page?

19   A.  Is that the smaller type?

20   Q.  Yes.

21   A.  Okay.  Yes.

22   Q.  And I would like to look at the second line of that

23   document, of the speaker's notes.  It says, "Criminals are

24   more sophisticated, with more complex and involved loan

25   scheme" -- I'm sorry, "with more complex and more involved

1    schemes."  Do you see that?

2    A.  Yes.

3    Q.  And then it references "loan schemes."  Do you see that?

4    A.  Yes.

5    Q.  What did you understand in the 2004 time period what a

6    loan scheme was?

7    A.  Somebody just doing something falsified with loans.

8    Q.  And you now know that what Mr. Petters was doing was

9    exactly that, right?

10   A.  I didn't -- he was -- yes, we all know now that it was a

11   Ponzi scheme, yes.

12   Q.  That involved loans to his clients, right?

13   A.  I don't remember how -- I don't remember the particulars

14   of the scheme, sorry.

15   Q.  Let's go back to Plaintiff's Exhibit 4, please, and if

16   you would, please, turn to page 19.

17   A.  Yes.

18   Q.  You see where it says, "Don't Make Assumptions of

19   Legitimacy - Know Your Customer Well"?

20   A.  Yes.

21   Q.  And then it says, "Being familiar with the customer

22   isn't enough - 'Oh yeah, he does that all the time.'"  Do

23   you see that?

24   A.  Yes.

25   Q.  And you understood, while you were a business banker at

Jambor - Cross

```
1    M&I, that being familiar with a customer wasn't a sufficient
2    justification for ignoring suspicious activity, correct?
3    A.  Correct.
4    Q.  And then it says, "Be careful of 'best customer'
5    syndrome."  Right?
6    A.  Correct.
7    Q.  And you understood, when you were a small business
8    banker at M&I, that any customer could present money
9    laundering issues, even your top customers, right?
10   A.  Yes.
11   Q.  Even your top one or two customers, right?
12   A.  Yes.
13   Q.  And then the bottom bullet point says, "If it sounds too
14   good to be true - it probably is."  Right?
15   A.  That's what it says, yes.
16   Q.  And you understood that concept when you were an M&I
17   small business banker, right?
18   A.  Yes.
19   Q.  Now let's turn to page 44, please.  At the very top it
20   says, "Recognizing Suspicious Activity."  Do you see that?
21   A.  Yes.
22   Q.  Let's look at the second bullet point.  It says, "What,
23   is 'interesting' or 'unusual.'  It just doesn't feel right
24   to you."  Do you see that?
25   A.  Yes, I do.
```

1   Q.  That's one of the warning signs that activity could be

2   suspicious, right?

3   A.  Yes.

4   Q.  And then the next bullet point reads, "Focus more on the

5   activity than on the customer."  Do you see that?

6   A.  Yes.

7   Q.  And you understood that what you were supposed to do in

8   detecting suspicious or unusual activity while you were a

9   business banker at M&I was to focus more on the activity

10  than on the customer, right?

11  A.  It says that in the bullet point, yes.

12  Q.  And you agree with that?

13  A.  Yes.

14  Q.  Let's turn to page 46, please.  At the top of the page

15  it says, "Suspicious Activity Investigation and Reporting."

16  Right?

17  A.  Correct.

18  Q.  And the first bullet point on the slide says, "escalate

19  discussion of unusual activity to a supervisor/manager."

20  Have I read that correct?

21  A.  Yes.

22  Q.  So you understood, when you were a small business banker

23  at M&I, that if you came across unusual activity, you were

24  supposed to escalate that to a supervisor or manager, right?

25  A.  Yes.

1    Q.  And that was Ms. Shari Rhode?

2    A.  For some of the time, yes.

3    Q.  And then it says, "When in doubt, fill out the log!"  Do

4    you see that?

5    A.  Yes.

6    Q.  What's the log?

7    A.  I'm assuming it's the Suspicious Activity Log.

8    Q.  When you say "assuming," did you ever see a Suspicious

9    Activity Log?

10   A.  No.

11   Q.  Did you ever ask where it was?

12   A.  It was behind the teller line.

13   Q.  Did you fill it out ever?

14   A.  No.

15   Q.  Never put an entry into that log?

16   A.  No.

17            MR. GLEESON:  Objection, asked and answered.

18            THE COURT:  Sustained.

19   BY MR. MARDER:

20   Q.  But you understood the concept while you were an M&I

21   business banker that if you were in doubt, you were supposed

22   to go out and fill out the log, right?

23   A.  Yes.

24   Q.  Let's turn now to page 47.  First bullet point says,

25   "It's appropriate to discuss the unusual activity with a

1    customer to determine whether there is a legitimate business

2    activity" -- sorry, "a legitimate business activity" -- let

3    me try that again.

4         First bullet point says, "It is appropriate to

5    discuss the unusual activity with the customer to determine

6    whether there is a legitimate business purpose for the

7    activity."  Right?

8    A.  That's what it says, yes.

9    Q.  And you understood, when you were a small business

10   banker at M&I, that if you detected unusual or suspicious

11   activity, you were supposed to ask the customer to figure

12   out if there was a legitimate business purpose for the

13   activity, right?

14   A.  If I suspected that, yes.

15   Q.  And the only way you'd be able to understand if there

16   was a legitimate business purpose or not would be to have a

17   general understanding of your customer's business, right?

18   A.  Yes.

19   Q.  Let's go now to page 49.  It says there, "It's up to you

20   to help protect our corporate reputation **and** maintain our

21   compliance standards."  Do you see that?

22   A.  Yes.

23   Q.  And it appears to me, Mr. Jambor, that the words "you"

24   are in boldface.  Is that right?

25   A.  Yes, it is.

Jambor - Cross

```
1    Q.  And that was meant to -- that was meant to emphasize to

2    all the employees in the company that everybody had a role

3    in protecting the corporate reputation and maintaining the

4    corporate standards, correct?

5    A.  Yes.

6    Q.  If we could turn to page 50, please.  Do you see there

7    it says, "Do your part!"

8    A.  Yes.

9    Q.  And then what appears after the word "part"?

10   A.  Exclamation point.

11   Q.  So this is something that they really wanted to

12   emphasize to you, right?

13   A.  Yes.

14   Q.  And the very first line under that says, "Know your

15   customer and understand their activities."  Right?

16   A.  Yes.

17   Q.  And you understood at M&I that you were supposed to know

18   your customer and understand their activities, right?

19   A.  Yes.

20   Q.  And, once again, they're telling you to identify unusual

21   activity with your supervisor, right?

22   A.  Yes.

23   Q.  And as we discussed earlier, you understood that was

24   part of your duty too, right?

25   A.  I'm sorry?
```

1   Q.  As we discussed earlier, you understood that was part of

2   your duty as well, to bring your supervisor in if there was

3   the slightest doubt, right?

4   A.  Yes.

5   Q.  Let's go to page 19, please.  I'm sorry.  We're going to

6   turn now to Plaintiff's Exhibit 5.  If I could ask you,

7   please, to turn to Plaintiff's Exhibit 5, which was the

8   other presentation we had, and go to page 19.  Do you see

9   there the heading is, "Identifying and Reporting Suspicious

10  Activity"?

11  A.  Yes.

12  Q.  And underneath that, it mentions something called a

13  Suspicious Activity Report or SAR.  Do you know what that

14  is?

15  A.  It's just a report that you complete if you have

16  suspicious activity.

17  Q.  And who does that report go to?

18  A.  I don't remember.  Some area in the bank, I'm sure.

19  Q.  But that was something that you were supposed to fill

20  out if you saw something that you thought was suspicious?

21  A.  Anyone could fill it out.

22  Q.  Including relationship managers, right?

23  A.  Yes.

24  Q.  And then the second bullet point says, talking about

25  transactions, "That have no apparent lawful purpose or are

```
 1    not the sort the customer would normally be expected to

 2    conduct and the bank has no reasonable explanation for the

 3    transactions."  Do you see that?

 4    A.  Yes.

 5    Q.  And, again, in order to do that, you would have to have

 6    an understanding of the transactions that the customers are

 7    engaged in, right?

 8    A.  Generally, yes.

 9    Q.  Did you ever fill out a SAR report relating to the

10    Petters Company, Inc. account?

11              MR. GLEESON:  Objection on the grounds we

12    addressed earlier in the case at sidebar.

13              THE COURT:  Overruled.  You may answer if you can.

14              THE WITNESS:  I don't remember if I did or didn't.

15    I don't believe I did.

16    BY MR. MARDER:

17    Q.  Sir, Petters was one of your biggest clients, right?

18    A.  He was a client of mine, yes.  One -- he was a top

19    client, yes.

20    Q.  And if you had filled out a SAR report reporting them

21    for suspicious activity, that's something you would

22    remember, isn't it?

23    A.  Probably, yes.

24    Q.  Let's go to page 24.  This page talks about "The

25    Process - Integration."  You understood they're talking
```

1    about the different steps of money laundering, right?

2    A.  Yes.

3    Q.  And they're saying, "The final step is integration"?

4    A.  Yes.

5    Q.  And what integration means is that the illegal funds are

6    circulated into the economy to take on the appearance of

7    legitimacy, right?

8    A.  Yes.

9    Q.  And it gives examples of some of the kind of purchases

10   that could be made with laundered funds to take on the

11   appearance of legitimacy, right?

12   A.  I'm sorry?

13   Q.  It then gives you some examples of some of the kind of

14   purchases that could be made so that the laundered funds

15   could take on the appearance of legitimacy?

16   A.  Yes.

17   Q.  And the second one listed there is real estate, right?

18   A.  Yes.

19   Q.  And what did you understand that to mean?

20   A.  They would use the funds to buy real estate.

21   Q.  Okay.  I want to look at last pages, and then we will be

22   done with this document.  If you could go to page 28,

23   please.  If we look at the third bullet point, you see one

24   of the kinds of suspicious activity identified is

25   "transactions that have no apparent lawful purpose"?

Jambor - Cross

1   A.  Yes.

2   Q.  And then, lastly, if we could look at page 34.  This

3   lists some red flags, right?

4   A.  Yes.

5   Q.  What did you understand a red flag to be?

6   A.  Something out of the ordinary.

7   Q.  And the third bullet point identifies a red flag, right?

8   A.  Yes.

9   Q.  Something that you're supposed to be on alert for?

10  A.  Yes.

11  Q.  And one thing you're supposed to be on alert for is "a

12  customer who requests special treatment," right?

13  A.  Yes.

14  Q.  Okay.  You can set aside Exhibit 5 now.

15          Mr. Jambor, M&I had the ability to shut down a

16  depository account, right?

17  A.  Yes.

18  Q.  And, in fact, in the past, you have shut down a

19  depository account, you've done it?

20  A.  I don't remember, but probably.

21  Q.  Okay.

22  A.  I don't remember specific accounts.

23  Q.  If I could ask you to go back to your deposition of

24  November 1st, 2017.

25  A.  Yes.

```
1    Q.  And, again, you were under oath when you gave this
2    testimony, right?
3    A.  Yes.
4    Q.  And if I could draw your attention to page 335, please.
5              THE COURT:  Counsel, are you refreshing
6    recollection?
7              MR. MARDER:  No, Your Honor.  It's a prior
8    inconsistent statement.
9              THE WITNESS:  Yes.
10   BY MR. MARDER:
11   Q.  And if I could ask you to the look at line 22, it says,
12   "Did you ever shut down a depository account?"
13             MR. GLEESON:  Objection, Your Honor, it's an
14   improper use of the prior statements.  Not inconsistent,
15   Judge.
16             THE COURT:  The question needs to be made.
17             MR. MARDER:  Could we --
18             THE COURT:  Do you wish to approach sidebar?
19             MR. MARDER:  Yes, please.
20             THE COURT:  Yes, you may.
21          (At sidebar)
22             Mr. MARDER:  Your Honor, the witness is currently
23   testifying that he doesn't know if he's ever shut down a
24   depository account.  He says in his depo that he did.
25   That's a prior inconsistent statement.
```

```
 1                   MR. GLEESON:  He said, I don't remember.  I

 2      probably did, which is not inconsistent with that statement

 3      five years earlier.

 4                   MR. MARDER:  A qualified statement he probably did

 5      is inconsistent with an unqualified statement that he

 6      actually did.

 7                   THE COURT:  You may refresh his recollection.

 8                   MR. MARDER:  Thank you.

 9              (In open court)

10      BY MR. MARDER:

11      Q.  Sir, looking at page 335 of your deposition, can you

12      read to yourself there the testimony that you provided under

13      oath on lines 22 through 23.

14      A.  "Did you ever shut down" --

15      Q.  No.  Don't read it.  Just read it to yourself.

16                   THE COURT:  To yourself, sir.

17      A.  Okay.  Sorry.

18          (Witness reviews document)

19      Q.  Does that refresh your recollection?

20      A.  I said I probably did.  I don't remember specifics.

21      Q.  The wire department also had the ability to stop wires

22      from going out of depository accounts, right?

23      A.  Yes.

24      Q.  Now, you're aware that there's a whole separate group

25      within -- there was a whole separate group within M&I called
```

1    the Anti-Money Laundering Group, right?

2    A.  Yes.

3    Q.  And as you sit here today, can you remember any time

4    that anybody from the Anti-Laundering Group ever reached out

5    to you to ask you a question about PCI's business or

6    transaction activity?

7              MR. GLEESON:  Objection to form.

8              THE COURT:  Overruled.

9              THE WITNESS:  I don't remember talking to the

10   anti-money laundering department.

11   BY MR. MARDER:

12   Q.  If we could go back to Exhibit 5 again, I think I

13   actually missed one slide.  And I would ask you to turn to

14   page 30.  You see there there's a discussion of willful

15   blindness?

16   A.  Yes.

17   Q.  And if I could ask you to look at the third bullet

18   point, it says, "Financial institutions and their employees

19   can be implicated in a money laundering crime for being

20   willfully blind to activity that should have been reasonably

21   identified as suspicious."  Do you see that?

22   A.  Yes, I do.

23   Q.  And when you were a small business banker at M&I, you

24   understood the concept that's set forth in that bullet

25   point, right?

Jambor - Cross

1    A.  Yes.

2    Q.  Now, we talked earlier about the fact that you met with

3    Mr. Petters, right?

4    A.  Yes.

5    Q.  And you discussed his companies with him?

6    A.  I met with him -- we discussed a number of things, yes.

7    Q.  And you understood that PCI's business involved buying

8    and selling consumer electronics, right?

9    A.  Consumer goods, yes.

10   Q.  You understood that PCI's business was to be buying

11   overstock merchandise and then selling it, right?

12   A.  Yes.

13   Q.  And the concept behind PCI's business was that it would

14   purchase overstock items from wholesalers and then sell them

15   to big-box retailers, right?

16   A.  They would buy overstocked items and sell them, yes.

17   Q.  To retailers?

18   A.  Yes.

19   Q.  Did you ever ask why the retailers couldn't just buy the

20   products directly from the wholesalers?

21   A.  No.

22   Q.  Wasn't that something you might want to know to

23   understand your customer's business activity?

24   A.  I don't know.

25   Q.  Did it make sense to you that some of the largest

1    retailers in the country weren't sophisticated enough to go

2    buy the products from wholesalers directly?

3    A.  I don't know.

4    Q.  Did you ever ask why PCI just didn't go to banks to get

5    loans to finance the business instead of going to private

6    investors?

7    A.  I'm sorry.  What now?  Repeat the question.

8    Q.  How did you understand that PCI funded these purchases?

9    A.  From investors.

10   Q.  Did you ever ask why PCI didn't just go to banks and

11   borrow money instead of going to investors?

12   A.  No, I did not, not that I recall.

13   Q.  Isn't that something that would have been interesting to

14   you to understand your client's business?

15   A.  I don't know.

16   Q.  Now, you could have gone on to your computer and

17   accessed the activity on your customer's account --

18   right? -- you had that technical ability?

19   A.  Yes.

20   Q.  And you certainly could have done that if you wanted to

21   with respect to the PCI account, right?

22   A.  Yes.

23   Q.  You could go onto the computer and look at their

24   checking account statements, right?

25   A.  Their checking account activity, yes.

Jambor - Cross

1    Q.  And you could also access their wire activity, right?

2    A.  I don't remember if I had the ability to access their

3    wire activity.

4    Q.  Well, the customer's checking account statements showed

5    wires going in and out, right?

6    A.  Yes, it did.

7    Q.  And it also showed other deposits and checks being

8    written, right?

9    A.  Yes.

10   Q.  And it showed the daily activity on the account, right?

11   A.  Yes.

12   Q.  And they also have a summary of what the monthly

13   activity is, correct?

14   A.  On the system that I used, I don't know if there was a

15   summary included or not.

16   Q.  The statements did show the average balance, though,

17   right?

18   A.  The statements did, yes.

19   Q.  And there were times when you did access the activity on

20   PCI's account, right?

21   A.  Yes.

22   Q.  And you knew the PCI account was a very active account,

23   right?

24   A.  Yes.

25   Q.  And you knew at the time you managed the account that

1   there were large amounts of money going through that

2   account, right?

3   A.  It was a very active account, yes.

4   Q.  With large amounts of money?

5   A.  Yes.

6   Q.  Billions of dollars?

7   A.  I don't recall how much it was.

8   Q.  I'd ask you to turn to your testimony from November 9,

9   2009.  You testified at Mr. Petters' criminal trial, right?

10  A.  Yes.

11  Q.  And you were under oath during that testimony?

12  A.  Yes.

13  Q.  I want you to look at your testimony, please, at page

14  1453, and I would ask you, please, to look at lines 5

15  through 7 and read that to yourself.

16      (Witness reviews document)

17  A.  Yes.

18  Q.  Having refreshed your recollection, sir, do you now

19  remember that there were billions of dollars flowing through

20  the account?

21  A.  Yes.  I just -- it must have slipped my mind.

22  Q.  Did you ever -- how many people did you deal with from

23  PCI?

24  A.  I don't remember the total amount.

25  Q.  Roughly.

1    A.  Three or four.

2    Q.  And were you ever introduced to any other employees?

3    A.  Possibly.

4    Q.  Did you ever hear about any other employees?

5    A.  Possibly.

6    Q.  How many employees did you think worked at the company?

7    A.  I don't know.

8    Q.  Was it more than a handful?

9    A.  Yes.

10   Q.  How many did you think were there, roughly?

11   A.  Hundreds.

12   Q.  Did you ever see any of these -- I am talking about PCI

13   now.

14   A.  Yes.

15   Q.  Did you ever meet with any of these hundreds of people?

16   A.  Not all of them, no.

17   Q.  Did you ever get a list of their names?

18   A.  No.

19   Q.  If I could ask you next, please, to turn to Plaintiff's

20   Exhibit 35.  I would like -- sorry.  Before we put this into

21   evidence, let me just have you identify the document.  This

22   is an e-mail chain of e-mails between you and Mr. Donatell,

23   correct?

24   A.  Correct.

25   Q.  And they are dated from March of 2005, correct?

1    A.  Yes.

2              MR. MARDER:  I'd offer this document into

3    evidence.

4              MR. GLEESON:  Just a second, Judge.

5         (Mr. Marder and Mr. Gleeson confer)

6              MR. GLEESON:  No objection.

7              THE COURT:  Exhibit 35 is received in evidence.

8    BY MR. MARDER:

9    Q.  If we look at the second page, which is the oldest

10   e-mail there from Mr. Donatell, it said, "Moved 28 million

11   into the Bank on Friday into Euros.  Any idea what this may

12   have been the result of and how long we can anticipate it to

13   be here?"  Do you know why Mr. Donatell was asking you that

14   question?

15   A.  Because it's a large sum of money coming into the bank.

16   Q.  He was the vice president and controller?

17   A.  Yes.

18   Q.  And why is he concerned about large sums of money coming

19   into the account?

20   A.  Because he has to balance the accounts for the bank at

21   the end of the day.

22   Q.  And then the next page you respond.

23             MR. MARDER:  If we could blow up the language

24   there.  Thank you.

25   BY MR. MARDER:

1    Q.  It says, "The way they move money, probably not long."

2    Are those words that you wrote?

3    A.  Yes.

4    Q.  So you were familiar enough with the activity on the

5    account to understand their practices of how frequently they

6    moved money, right?

7    A.  Correct.

8    Q.  When you say "they," you are referring to PCI, right?

9    A.  Yes.

10   Q.  And then you say, (as read) "I see the account is down

11   to $10 million this morning.  A few wires have gone up [sic]

12   to bring the balance to 3.3 million as of 10:00 a.m."

13            So is it fair for us to conclude that you were

14   looking at PCI's account activity on your computer screen?

15   A.  Yes.

16   Q.  And you had done that enough times in the past to know

17   what their practices were about how fast they moved money

18   around, right?

19   A.  I guess so, yes.

20   Q.  I'd like you to turn next, please, Mr. Jambor, to

21   Exhibit 36.  This is another e-mail string between you and

22   Mr. Donatell, correct?

23   A.  Correct.

24   Q.  And this is your M&I e-mail address listed there?

25   A.  Yes.

1    Q.  And these e-mails were exchanged in September of 2006?

2    A.  Correct.

3            MR. MARDER:  I'd offer Plaintiff's Exhibit 36 into

4    evidence.

5            MR. GLEESON:  No objection, Judge.

6            THE COURT:  Exhibit 36 is received.

7    BY MR. MARDER:

8    Q.  I'd ask you, please, to turn to the third page of this

9    document, and now Mr. Donatell is saying that the balances

10   are down about $12 million.  Do you see that?

11   A.  Yes.

12   Q.  And he asks you:  "How much of this decline is DDA and

13   can we expect to get the balances back?"  Do you see that?

14   A.  Yes.

15   Q.  DDA is a demand deposit account?

16   A.  Correct.

17   Q.  What's that?

18   A.  A checking account.

19   Q.  And Mr. Donatell was asking you about activity in the

20   PCI account, right?

21   A.  Yes.

22   Q.  And at the bottom of page 2, you then respond to his

23   e-mail?

24   A.  Yes.

25   Q.  And then if we look at the top of page 2, if we could

1   blow that up, that's another response that you have in here,

2   right?

3   A.  I'm sorry.  Where?

4   Q.  The very top of page 2.

5   A.  Okay.

6   Q.  You say, "The balance really fluctuate over the sweep

7   amount on a daily basis based on the sales and purchases of

8   merchandise."  Do you see that?

9   A.  Yes.

10  Q.  What you're talking about in this sentence is the money

11  that's going in and out of the account based on the sales

12  and purchase of merchandise, right?

13  A.  Yes.

14  Q.  That's what you understood was happening while you were

15  managing the PCI relationship?

16  A.  Yes.

17  Q.  And in order to talk about that, you were, again, look

18  at the PCI account activity on your computer, right?

19  A.  Yes.

20  Q.  Which is something you did frequently?

21  A.  I looked at -- I looked at their account, yes.  I don't

22  remember how often I looked at their account.

23  Q.  But it was often enough that you were able to talk about

24  how their balances fluctuate?

25  A.  I was aware of how their balances fluctuated, yes.

1    Q.  Ask you next to please turn to Plaintiff's Exhibit 37.

2    A.  Yes.

3    Q.  This is a letter that you wrote, correct?

4    A.  It's my signature, yes.

5    Q.  You signed the letter?

6    A.  Yes.

7    Q.  And it's dated December 13th, 2004?

8    A.  Correct.

9    Q.  And if we look at the bottom of the page upsidedown,

10   there's -- do you remember how fax legends used to work?

11   A.  Yes.

12   Q.  It says that this was faxed on December 13th, 2004?

13   A.  Yes.

14   Q.  So this is a letter that you wrote to the board of

15   directors of Polaroid Holding Company, correct?

16   A.  Yes.

17   Q.  And you wrote it on behalf of Mr. Petters?

18   A.  Yes.

19               MR. MARDER:  Your Honor, I would offer this as

20   Plaintiff's Exhibit 37.

21               MR. GLEESON:  No objection.

22               THE COURT:  Plaintiff's Exhibit 37 is received.

23   BY MR. MARDER:

24   Q.  If we look at the second paragraph, you say that,

25   "Petters affiliates have been a customer with M&I Marshall &

1    Ilsley Bank for five years.  They have always handled their

2    accounts as agreed.  The size and scope of the monthly

3    activity through the bank runs in the nine figures.  We have

4    enjoyed the relationship with the company.  We look forward

5    to continuing the relationship."  Do you see that?

6    A.  Yes.

7    Q.  Why were you writing this letter?

8    A.  I don't remember specifically.

9    Q.  You say there that the size and the scope of the monthly

10   activity runs in the nine figures.  What did you mean by

11   that?

12   A.  Figures meaning in dollar size.

13   Q.  And what does nine figures mean?

14   A.  What would that be?  A hundred million, I believe.

15   Q.  In the hundreds of millions?

16   A.  Yes.

17   Q.  Right?

18   A.  Yes.

19   Q.  And you were familiar enough with the account to

20   understand that the monthly activity ran in the hundreds of

21   millions of dollars, right?

22   A.  Yes.

23   Q.  And you agreed with those words by signing this letter,

24   right?

25   A.  I did sign the letter, yes.

Jambor - Cross

1    Q.  And in order to do that, you had to be familiar with the

2    account transaction data, correct?

3    A.  Yes.

4    Q.  Up to this point in your career, had you ever written a

5    letter to the board of directors of a major corporation

6    vouching for the size of the monthly activity on a

7    customer's account?

8    A.  I don't recall, but I don't believe so.

9    Q.  And this is something that Mr. Petters asked you to do,

10   right?

11   A.  I don't remember who asked me to do it.

12   Q.  When whoever asked you to do this asked you, did you

13   call up Ms. Rhode and say, They're asking me to sign a

14   letter and send it to the board of directors of Polaroid, is

15   that okay?

16   A.  I don't remember if I did or if I didn't.

17   Q.  As you sit here today, you can't remember doing that,

18   right?

19   A.  I don't remember if I did or if I didn't.

20   Q.  If I could ask you next to turn to Plaintiff's

21   Exhibit 40.  Mr. Jambor, this is an e-mail that was sent to

22   you and others at M&I Bank in March of 2005, correct?

23   A.  Correct.

24   Q.  And it's an e-mail that was sent to you by Mr. Allen

25   Helvick?

1    A.  Yes.

2    Q.  Who was Allen Helvick?

3    A.  His title was senior financial analyst.

4    Q.  And the subject is, "Significant Fluctuations"?

5    A.  Yes.  It's "Significant Fluctuations."

6    Q.  You received this e-mail, correct?

7    A.  Yes, I did.

8            MR. MARDER:  I'd offer this -- Plaintiff's Exhibit

9    40 into evidence.

10           MR. GLEESON:  No objection.

11           THE COURT:  Exhibit 40 is received in evidence.

12   BY MR. MARDER:

13   Q.  It says there, if we could blow up the middle paragraph,

14   (as read) "For the week ending March 4th, 2005 below

15   represents the customer noted having net decrease in deposit

16   balances of 1 million or more."  Do you see that?

17   A.  Yes.

18   Q.  And then it says, (as read) "If you need further detail,

19   there's a listing of all transactions over $100,000."

20   Right?

21   A.  Um.

22   Q.  The last sentence.

23   A.  I'm sorry.  Oh, I'm sorry.  Yes.  Yes.

24   Q.  And then attached to this e-mail is something called a

25   Deposit Fluctuation Report, correct?

1    A.  Yes.

2    Q.  Now let's turn to page 15.  About halfway down you'll

3    see the date of February 28th and later, and there's a bunch

4    of entries for the Petters Company, Inc., right?

5    A.  Yes.

6    Q.  And the account number listed there, 59018, that's the

7    PCI account we've been talking about, right?

8    A.  Yes, it is.

9    Q.  So according to this report, there were a number of

10   outgoing wires and a number of incoming wires during this

11   time period, correct?

12   A.  Yes.

13   Q.  For example, if we look about halfway down the section

14   on Petters on February 28th, 2005, you see there there's an

15   incoming wire for $16 million?

16   A.  Yes.

17   Q.  And you understood that wires of this size were going in

18   and out of the PCI account, correct?

19   A.  Yes.

20   Q.  And if we go back to the e-mail itself, it says, (as

21   read) "For those customers of yours noted below, please note

22   a response by March 9, 2005 regarding the nature of the

23   activity noted."  So Mr. Helvick of the bank was asking you

24   to look at your customers' activity and describe to him the

25   nature of that activity, right?

1    A.  Yes.

2    Q.  And what he was asking you to determine was whether or

3    not this was normal customer behavior, right?

4    A.  Yes, or operational needs.

5    Q.  And in order to respond to this request, you had to

6    determine what was normal customer behavior, right?

7    A.  I -- I mean, I guess so, yes.

8    Q.  And, Mr. Jambor, you had the ability, in addition to the

9    account statements, to go into the computer system and

10   determine who the wires were coming from and who the wires

11   were going to on the depository accounts if you needed to,

12   right?

13   A.  I don't recall.  I don't know -- I don't believe I had

14   that ability, no.

15   Q.  You don't believe you had that ability?

16   A.  I don't remember having that ability to see who the

17   wires were coming from or going to.

18   Q.  Sir, I would ask you to take a look at your deposition,

19   and I would ask you, please, to turn to page 122.

20   A.  I'm sorry.  Which one?

21              MR. GLEESON:  Which one?

22   BY MR. MARDER:

23   Q.  Sorry.  This is your November 1st, 2017, deposition.

24       (Mr. Gleeson and Mr. Marder confer)?

25   BY MR. MARDER:

Jambor - Cross

```
1    Q.  I'd ask you to look at page 122 and read to yourself the
2    testimony on lines 5 through 11.
3         (Witness reviews document)
4    A.  Okay.
5    Q.  Do you agree, now having looked at this, that you are
6    sure you could get access to that activity if you needed to?
7    A.  Yeah, I said that, but you asked if I could get it
8    online or on the computer screen.  That's a different
9    question.
10   Q.  Oh, okay.  I'm sorry.  Let me rephrase.
11             If you needed to, you could get access to the data
12   showing who the senders and recipients were of the wires,
13   right?
14   A.  Yes, I'm sure I could have if I -- yes.
15   Q.  And wouldn't that be something important to know to
16   respond to the question from Mr. Helvick about whether this
17   was normal customer behavior?
18   A.  Just looking at the activity would have helped me
19   determine if it was normal activity.
20   Q.  And that activity included who the wires were to and
21   from, though, didn't it?
22   A.  Not necessarily, no.
23   Q.  Wouldn't that be something helpful to know?
24   A.  I don't know.  I'm not -- possibly, but not really, no.
25   Q.  I'd ask you next, please, to turn to Plaintiff's
```

1    Exhibit 468.  This is an e-mail to you -- I'm sorry.  This

2    is an e-mail from Vicky Washington to you; is that right?

3    A.  Yes.

4    Q.  And it also went to others at M&I Bank?

5    A.  Yes.

6    Q.  And it's an e-mail that you received on or about June

7    20th, 2005?

8    A.  Yes.

9    Q.  That's while you were managing the Petters relationship?

10   A.  Correct.

11   Q.  And this is on a similar topic to the one we just looked

12   at?

13   A.  Yes.

14          MR. MARDER:  I'd offer Plaintiff's Exhibit 468

15   into evidence.

16          MR. GLEESON:  No objection.

17          THE COURT:  Plaintiff's Exhibit 468 is received in

18   evidence.

19   BY MR. MARDER:

20   Q.  And what Ms. Washington is asking you is to provide a

21   response by June 22rd, 2005, regarding the nature of the

22   activity noted?

23   A.  Yes.

24   Q.  And it also says that it's okay if it's -- to respond

25   that it's normal customer behavior?

Jambor - Cross

1    A.  Correct.

2    Q.  Did you respond to this e-mail and say that this was

3    normal customer behavior?

4    A.  I don't remember, but probably.

5    Q.  So in order to do that, you would have to look at the

6    account activity, right?

7    A.  Yeah, I would have looked at the report.

8    Q.  And you would have to understand what the client had

9    done in the past to understand if this was normal, right?

10   A.  Correct.

11   Q.  I'd ask you, please, now to look at Exhibit 469.  Do you

12   have that in front of you, sir?

13   A.  Yes.  I'm sorry.

14   Q.  This is an e-mail that you wrote to Allen Helvick; is

15   that right?

16   A.  Yes.

17   Q.  And you sent this e-mail on or about July 26th, 2005?

18   A.  Yes.

19   Q.  Okay.

20           MR. MARDER:  I'd offer exhibit -- Plaintiff's

21   Exhibit 469 into evidence.

22           MR. GLEESON:  No objection.

23           THE COURT:  Exhibit 469 is received.

24   BY MR. MARDER:

25   Q.  And if we look at the bottom of this page, you were

Jambor - Cross

1    responding to Mr. Helvick's e-mail to you about the subject
2    of significant fluctuations in the account, right?
3    A.  Yes.
4    Q.  And if we look at the very top of the page, it says --
5    you write to Mr. Helvick and you say, "the money was wired
6    in one day and wired to another Petters account the next
7    day."  Right?
8    A.  Yes.
9    Q.  And in order to make that statement, you had to look at
10   M&I's data that showed who the wires were going to and from,
11   right?
12   A.  I would -- somehow I researched it and found out it went
13   to another Petters account.
14   Q.  You would have researched that by going to the data
15   that's available to you at M&I Bank, right?
16   A.  Yes.
17   Q.  I'd ask you next to please turn to Plaintiff's
18   Exhibit 618.  This is an e-mail that Ann Benson sent to Rich
19   Menczynski, is that right?
20   A.  Yes.
21   Q.  Who was Ann Benson?
22   A.  I worked with Ann Benson.  She was kind of my assistant.
23   Q.  And she bcc's you on this e-mail, right?
24   A.  Yes.
25   Q.  And this e-mail was sent on October 20th, 2005; is that

1   right?

2   A.  Yes.

3           MR. MARDER:  I'd offer Exhibit 618 into evidence.

4           MR. GLEESON:  No objection.

5           THE COURT:  October 20th -- I'm sorry.

6   Exhibit 618 is received.

7   BY MR. MARDER:

8   Q.  It says, "Hi Rich" -- this is on page 4.  "Hi Rich, I'll

9   watch for the incoming wire tomorrow, when I see it come

10  into your account."  Do you see that?

11  A.  Yes.

12  Q.  And how was your assistant, Ms. Benson, able to look for

13  incoming wires?

14  A.  I'm not sure how she did it.

15  Q.  She also had access to the bank account information,

16  right?

17  A.  Yes.

18  Q.  And it says that she will initiate the transfer and send

19  you confirmation upon completion, right?

20  A.  Yes.

21  Q.  So your assistant here was monitoring -- would have to

22  monitor the account activity for that, right?

23  A.  Yes.

24  Q.  I'd ask you next, please, to turn to Exhibit 162.  This

25  is a series of e-mails -- or actually an e-mail exchanged

1    between Ms. Benson and Mr. Menczynski dated April 12th,

2    2006, correct?

3    A.  Correct.

4    Q.  And you received a CC of this e-mail, right?

5    A.  Yes.

6              MR. MARDER:  I'd offer this document into

7    evidence.

8              MR. GLEESON:  No objection.

9              THE COURT:  Exhibit 162 is received.

10   BY MR. MARDER:

11   Q.  Do you know why you and Ms. Munson are cc'd on this

12   e-mail?

13   A.  I don't recall why we were, no.

14   Q.  Well, this relates -- the subject line says, "WT" on

15   4-14-06.  Do you see that?

16   A.  Yes.

17   Q.  WT refers to a wire transfer, right?

18   A.  I don't know for sure, but it makes sense.

19   Q.  And then in the body of the e-mail Rich writes, (as

20   read) "Ann, upon receipt of the deposit of $1.5 million into

21   the following account on Friday."  Do you see that?

22   A.  Yes.

23   Q.  And then the account is listed as the Petters Capital,

24   LLC and has an account number?

25   A.  Yes.

1    Q.  So Rich was asking Ms. Benson to effect a transfer to

2    that account?

3    A.  Transfer the funds from that account, yes.

4    Q.  And then if we look to page 5, you see the account

5    number listed up there?

6    A.  Yes.

7    Q.  That's the 9018 account?

8    A.  Correct.

9    Q.  Which is the account for Petters Company --

10   A.  Yes.

11   Q.  -- Inc.?

12          So this is an example of an instance where you

13   knew the amount of money being transferred into the account,

14   right?

15   A.  Yes.

16   Q.  And you knew the name of the entity sending the money to

17   the account?

18   A.  Well, Petters Capital, yes.

19   Q.  Next I would like you to look at Plaintiff's Exhibit 41.

20   This is another e-mail string that you were part of, right?

21   A.  Yes.

22   Q.  And these e-mails exchanged -- were exchanged between

23   you and Ms. Munson in April of 2006?

24   A.  Yes.

25   Q.  That's while you were managing the account, correct?

1    A.  I was managing the account, yes.

2              MR. MARDER:  I would offer Plaintiff's Exhibit 41

3    into evidence.

4              MR. GLEESON:  Just one second, Judge.  I'm trading

5    books here.

6         (Pause)

7              MR. GLEESON:  No objection.

8              THE COURT:  Exhibit 41 is received.

9    BY MR. MARDER:

10   Q.  I'd ask you to look at page 2 of this document, and at

11   the bottom of the page there's an e-mail there from you to

12   Ms. Munson, correct?

13   A.  Yes.

14   Q.  It's dated April 18, 2006?

15   A.  Yes.

16   Q.  And you say, "I was reviewing you checking account."  I

17   assume that means I was reviewing your checking account,

18   right?

19   A.  I am assuming it was a typo.

20   Q.  Typo, yeah.

21              And the account you were referring to was the 9018

22   account -- right? -- the PCI account?

23   A.  I don't remember.

24   Q.  Well, the account Ms. Munson was responsible for was the

25   PCI account, right?

1    A.  Yes.  One of them, I believe so.

2    Q.  And when you said you were reviewing your checking

3    account, do you mean you were looking at the data online?

4    A.  Yes, on the computer.

5    Q.  And that was something you did from time to time to

6    review the checking account on the computer, right?

7    A.  Yes.

8    Q.  Now is it fair to say that PCI had a higher level of

9    wire activity compared to your other customers?

10   A.  I don't know how much wire activity my other customers

11   have.  I don't remember.

12   Q.  You don't remember PCI having significantly more wire

13   activity than your other customers?

14   A.  I know they had quite a bit of wire activity, but I

15   don't remember how much wire activity my other customers

16   had.

17   Q.  Wasn't PCI unique in this respect?

18           MR. GLEESON:  Objection, asked and answered.

19           THE COURT:  Overruled.  You may answer.

20           THE WITNESS:  Like I said, I know they had a lot

21   of wire activity.  I just don't remember the specifics of my

22   other customers and how much wire activity they did.

23   BY MR. MARDER:

24   Q.  Sir, I'd ask you to look again at your deposition of

25   November 1st, 2017.  I'd ask you to draw your attention,

1    please, to page 84.  And I'd ask you to look on page 84 at

2    lines 12 through 19.  Do you see that?

3    A.  Yes.

4    Q.  And do you agree with me, sir, having refreshed your

5    recollection, that the wire activity in this account was

6    unique compared to your other customers?

7    A.  I answered yes.

8    Q.  And that's your best recollection today, right?

9    A.  Yes.

10   Q.  And in all the times that you looked at the account,

11   you're not aware of any wire that went into the PCI account

12   from a big-box retailer, are you?

13   A.  I am not.  I don't remember who the wires came from.

14   Q.  But as you sit here today, you can't identify any

15   instance in which you saw a wire going into the account from

16   a big-box retailer, correct?

17   A.  I don't remember seeing a big-box retailer wire coming

18   in, no.

19          MR. MARDER:  I'm at a natural breaking point -- I

20   think it's noon now -- if that works to break for lunch.

21          THE COURT:  It does work to break for lunch.  Are

22   you done questioning the witness?

23          MR. MARDER:  I am not.  I am about to switch to a

24   different topic.

25          THE COURT:  We will take our lunch break.  Members

 1    of the Jury, please remember the instructions that I have

 2    given to you and please aside by them.  We will take a

 3    one-hour break.  Please be prepared to return to the

 4    courtroom at 1:00.  Have a good lunch.

 5         (Jury excused)

 6                        **IN OPEN COURT**

 7                      **(JURY NOT PRESENT)**

 8              THE COURT:  And we'll be ready to resume at 1:00.

 9              MR. MARDER:  Thank you, Your Honor.

10              THE COURT:  You're welcome.

11         (Lunch recess taken at 12:01 p.m.)

12                    *    *    *    *    *

13         (1:03 p.m.)

14                        **IN OPEN COURT**

15                       **(JURY PRESENT)**

16              THE COURT:  You may be seated.

17              MR. MARDER:  May I proceed, Your Honor?

18              THE COURT:  Yes, you may, Counsel.

19              MR. MARDER:  Thank you.

20    BY MR. MARDER:

21    Q.  Good afternoon, Mr. Jambor.  I'd ask you, please, to go

22    to the -- Volume I of your binders, and I think the last

23    thing in there is Plaintiff's Exhibit 1.

24              Do you recall these are all the account statements

25    that we showed you at your deposition?

Jambor - Cross

1    A.  Yes.  These are account statements, yes.  I don't

2    remember them from my deposition, but I'm sure I saw them.

3    Q.  Yeah.  This is the account information data that M&I

4    maintained in its computer system, right?

5    A.  Yes.

6    Q.  And this data gets entered in real time by people at the

7    bank?

8    A.  It's entered into the computer system.  I'm not sure on

9    the mechanics of it.

10   Q.  But it happens on a daily basis?

11   A.  Yes.

12   Q.  And this data is kept in the course of the bank's

13   regularly conducted business activity?

14   A.  Yes.

15   Q.  And making this record was a regular practice of the

16   bank?

17   A.  Yes.

18   Q.  And you recognize this exhibit to be the information

19   from the PCI account, correct?

20   A.  Correct.

21              MR. MARDER:  Your Honor, I'd offer Plaintiff's

22   Exhibit 1 into evidence.

23              MR. GLEESON:  No objection.

24              THE COURT:  Exhibit 1 is received.

25   BY MR. MARDER:

1   Q.  If we go to the very first page on Exhibit 1, you see

2   there at the top it says, "Petters Company, Inc."?

3   A.  Yes.

4   Q.  And then if we look at the very top next to "Page 1 of

5   3," to the left of that, there's an account number that ends

6   in 59018?

7   A.  Yes.

8   Q.  So that's the Petters Company, Inc. account at issue,

9   right?

10  A.  Correct.

11  Q.  And then about a third of the way down the page we see,

12  "Statement Closing Date January 31st, 2002"?

13  A.  Correct.

14  Q.  And we show there being an opening balance at that time

15  of $1,429,436.64, right?

16  A.  Yes.

17  Q.  Okay.  Now, next to "Deposits and other additions," you

18  see there's a number of 112,203,092?

19  A.  Yes.

20  Q.  Those are the deposits that are going into the account,

21  correct?

22  A.  Correct.

23  Q.  And if we then look at the money going out of the

24  account, that's checks paid and other subtractions, right?

25  A.  Yes.

1    Q.  That's 113 million and some -- I'm sorry, $113,254,730,

2    right?

3    A.  Correct.

4    Q.  Those two amounts are only about a million dollars

5    apart?

6    A.  Yes.

7    Q.  And as we discussed earlier, you had access to this

8    data, right?

9    A.  I had it online, yes, on the computer system.

10   Q.  And you reviewed it from time to time?

11   A.  From time to time, yes.

12   Q.  Now let's flip to page 0607.

13   A.  Excuse me for a moment.  My binder popped open.

14       (Pause)

15   A.  My apologies.

16   Q.  If you go to page 0607, this is the statement for

17   August 2004, right?

18   A.  Correct.

19   Q.  And here we see 716 million going in the account and

20   716 million coming out of the account, correct?

21   A.  Correct.

22   Q.  The difference between the two amounts is only about

23   $20,000?

24   A.  Somewhere in that area, yes.

25   Q.  Okay.  Now let's go back to page 362, if we could.  This

Jambor - Cross

1   is a statement for December 2006, correct?

2   A.  I'm sorry.  What was the question again?

3   Q.  This is a statement for December 2006?

4   A.  Correct.

5   Q.  And you were managing the Petters relationship during

6   this time?

7   A.  Yes.

8   Q.  And here we see that in the month of December 2006 over

9   a billion dollars is going into this account, right?

10  A.  Yes.

11  Q.  And at the end of the month we see that almost that same

12  amount, a billion dollars, is going out of that account,

13  right?

14  A.  Correct.

15  Q.  The difference is less than a million dollars, right?

16  A.  Yeah, somewhere in that area.

17  Q.  Let's go now to Plaintiff's -- page 397.  This is the

18  account statement for March of 2007, right?

19  A.  Correct.

20  Q.  Again, we're seeing more than a billion dollars go in

21  the account and more than a billion dollars going out of the

22  account, right?

23  A.  Correct.

24  Q.  And the two amounts that are going in and out are only

25  about $30,000 apart, right?

1    A.  Correct.

2    Q.  And you were managing the Petters relationship at this

3    time, correct?

4    A.  Yes.

5    Q.  And as we discussed earlier, you were monitoring the

6    account activity from time to time, correct?

7    A.  As needed, yes.

8    Q.  Having looked at these statements, sir, and seeing just

9    the sheer number of wires going in and out, can you identify

10   any other client in the small business group that had this

11   many wires going in and out of their account?

12   A.  I don't remember specifics, but I don't recall any

13   others, no.

14   Q.  Do you recall me asking you this morning, sir, whether

15   you remembered there were billions of dollars flowing

16   through the account and after I refreshed your recollection

17   you said, "It must have slipped my mind"?  Do you recall

18   giving that testimony?

19   A.  Yes.

20   Q.  Here we're seeing a billion dollars going in and out of

21   the account during the very same month, right?

22   A.  Correct.

23   Q.  Do you remember that to be what was happening at this --

24   back in -- when you were managing the account?

25   A.  I don't remember the specific amount, no.

1    Q.  But do you remember that billions of dollars -- at least

2    a billion dollars was going in and out of the account in

3    individual months?

4    A.  I know it was a very active account.  I don't remember

5    the dollar amounts.

6    Q.  That slipped your mind also?

7    A.  Well, I just don't remember.

8              MR. GLEESON:  Objection.

9              THE COURT:  Sustained.

10             MR. GLEESON:  Move to strike.

11             THE COURT:  Sustained.

12   BY MR. MARDER:

13   Q.  Mr. Jambor, would you please turn next to Plaintiff's

14   Exhibit 104.  Sir, this is -- sorry.  Are you there?

15   A.  Yes, I am.  Thank you.

16   Q.  This was an e-mail from Jon Sabes and it's sent to you

17   and to your boss, Ms. Rhode, on Wednesday, February 16th,

18   2003, correct?

19   A.  February 19th.

20   Q.  Sorry.  February 19th, 2003?

21   A.  Yes.

22             MR. MARDER:  I'd offer Plaintiff's Exhibit 104

23   into evidence.

24             MR. GLEESON:  No objection.

25             THE COURT:  Plaintiff's Exhibit 104 is received.

1    BY MR. MARDER:

2    Q.  As we talked before, Mr. Jambor, Mr. Sabes was from

3    Opportunity Finance, right?

4    A.  Correct.

5    Q.  That's one of the people that was lending money to

6    Mr. Petters?

7    A.  I don't know what their business was or I don't remember

8    what their business was.

9    Q.  In the e-mail Mr. Sabes writes, "Shari and Ed, it was a

10   pleasure meeting with you today regarding our collective

11   efforts to implement a bank custodial mechanism to

12   accommodate Petters various lending structures."  Do you see

13   that?

14   A.  Yes.

15   Q.  So you actually had an in-person meeting with Mr. Sabes,

16   right?

17   A.  Yes.

18   Q.  And didn't he introduce himself as somebody that was

19   investing in the PCI business?

20   A.  I don't remember how he introduced himself.

21   Q.  It then says, "In reality, we are looking to have M&I

22   Bank act as custodian to receive retailer wire payments and

23   with the further direction of Deanna Munson at Petters

24   forward those moneys on to their appropriate bank accounts."

25   Do you see that?

1      A.  Yes.

2      Q.  Now, you testified earlier that you don't remember

3      seeing any retailer wire payments, right?

4      A.  I don't -- yes, I don't remember seeing any retailer

5      wire payments.

6      Q.  When you saw this, didn't you think that this was

7      unusual?

8      A.  I was -- I don't remember what I thought on this.  I

9      don't remember this meeting.

10     Q.  But weren't you concerned that people thought that

11     retailers were sending wire payments into the account when

12     you had never seen any evidence of that?

13              MR. GLEESON:  Objection to the form of the

14     question.

15              THE COURT:  Sustained.

16     BY MR. MARDER:

17     Q.  Were you alarmed that somebody else thought that

18     retailer wire payments were going into the account?

19              MR. GLEESON:  Objection.

20              THE COURT:  Overruled.

21              THE WITNESS:  I don't remember what I thought back

22     in 2003 at this time.

23     BY MR. MARDER:

24     Q.  Did you pick up the phone -- strike that.

25              Did you have a conversation with Ms. Rhode, who is

1    also on this same e-mail, and say, Shari, they're talking

2    about retailer wire payments, but I have never seen a

3    retailer wire payment?

4    A.  I don't remember the conversation that we had.

5    Q.  Isn't that something that would have stuck in your mind?

6    A.  I don't remember the conversation, if we had -- what the

7    conversation was around this e-mail.

8    Q.  You didn't fill out a SAR report at this point, did you?

9    A.  I don't remember.

10   Q.  Did you go back to that log that the company kept about

11   suspicious activity and write, "People think that retailer

12   monies are going into the account"?

13            MR. GLEESON:  Objection, misstates the testimony.

14            THE COURT:  Overruled.

15            THE WITNESS:  Can you repeat the question, please?

16   BY MR. MARDER:

17   Q.  Sure.  Did you go to that log that we saw described in

18   the compliance slides and write in there that people thought

19   that retailers were sending money into the PCI account?

20            MR. GLEESON:  Object to the form of the question.

21            THE COURT:  Overruled.

22            THE WITNESS:  I don't remember what I did.  If

23   I -- I don't remember doing it or not doing it.

24   BY MR. MARDER:

25   Q.  If we look further down, it says, "This exact process

Jambor - Cross

1    happens every day with Petters."  Right?

2    A.  Correct.

3    Q.  So you knew that Mr. Sabes thought retailers were

4    sending wire payments into the account every single day,

5    right?

6                MR. GLEESON:  Objection, Judge.

7                THE COURT:  Sustained.

8    BY MR. MARDER:

9    Q.  What did you think Mr. Sabes meant by "this exact

10   process happens every day"?

11               MR. GLEESON:  Objection.

12               THE COURT:  Overruled.

13               THE WITNESS:  I don't know what he thought.

14   BY MR. MARDER:

15   Q.  Were you seeing daily retailer wire payments into the

16   account?

17   A.  I didn't look at the account on a daily basis.

18   Q.  Then Mr. Sabes says, in the fourth paragraph, "I

19   envision something quite mechanical that allows M&I to

20   essentially act as custodian on behalf of Petters whereby

21   M&I receives payments in the current account and zeros out

22   that account each day by forwarding monies on to present

23   accounts per Petters' instructions."  Do you see that?

24   A.  Yes.

25   Q.  During the time that you managed the Petters

1   relationship, was M&I ever responsible for trying to figure

2   out who the money should be wired to on its own as opposed

3   to getting instructions from the client?

4           MR. GLEESON:  Objection to the form of the

5   question.

6           THE COURT:  Overruled.

7           THE WITNESS:  I'm not quite understanding your

8   question.

9   BY MR. MARDER:

10  Q.  Sure.  During the time that you managed the Petters

11  relationship, did M&I Bank ever have the discretion to

12  decide who should get money wired out of the account or did

13  you only act on instructions from the client?

14  A.  Generally -- my belief is we acted on instructions from

15  the client.

16  Q.  And M&I was never responsible for making sure that PCI's

17  creditors were getting paid, right?

18  A.  It was a checking account that they -- was in control --

19  the customer controlled.

20  Q.  It was a customer-controlled account, you're saying?

21  A.  Correct.

22  Q.  Had you ever seen, in all of your years in the banking

23  industry, anything similar to what Mr. Sabes was envisioning

24  in paragraph four?

25  A.  I had not, no.

1    Q.  So is it fair to say, sir, that this was a bit unusual?

2    A.  I just hadn't experienced it.

3    Q.  In light of Mr. Sabes' request, did you fill out a SAR

4    report?

5    A.  I don't remember.

6    Q.  Did you fill out anything on the log saying that this

7    unusual request was being made?

8    A.  I don't remember.

9    Q.  Sir, do you remember earlier we talked about what Bates

10   numbers are?

11   A.  In terms of the evidence?  Yeah.  Is that what you are

12   referring to?

13   Q.  The Bates numbers on the bottom right-hand side of the

14   page.

15   A.  Yes, yes.

16   Q.  Let's go out of the document and take a look at the

17   whole thing.  You see there there's no Bates number

18   indicating that this document was produced by BMO?

19            MR. GLEESON:  Objection.  Can we come to sidebar?

20            THE COURT:  Yes.

21        **(At sidebar)**

22            MR. GLEESON:  Judge, this --

23            THE COURT:  We're on Exhibit P-104?

24            MR. GLEESON:  P-104.  I just wanted [inaudible] --

25            THE COURT REPORTER:  I'm having trouble hearing.

1    Sorry.

2              MR. GLEESON:  I just wanted to get an offer of

3    proof from Mr. Marder because this obviously relates to who

4    produced it and if -- does this relate to spoliation; is

5    that where it's going?

6              MR. MARDER:  It most certainly does.

7              MR. GLEESON:  Okay.  I withdraw it.

8              THE COURT:  You withdraw your objection?

9              MR. GLEESON:  Yes.

10             THE COURT:  Okay.

11         **(In open court)**

12             THE COURT:  The objection is withdrawn.

13   BY MR. MARDER:

14   Q.  So I think I was asking about this document here.  You

15   see there's no Bates number indicating that this document

16   was produced by BMO?

17   A.  I don't totally know how to read the document.  I

18   apologize.

19   Q.  Okay.

20   A.  Just I'm not familiar with this Bates number.

21   Q.  Okay.  Do you know, sir, whether this document was

22   produced by BMO?

23             MR. GLEESON:  Object to foundation, Judge.

24             THE COURT:  Overruled.

25             THE WITNESS:  I don't know who produced this

 1    document.

 2    BY MR. MARDER:

 3    Q.  Do you know if BMO's version of this document was

 4    destroyed?

 5    A.  I don't know.

 6    Q.  The request that -- I think I asked you before about

 7    whether Mr. Sabes' request, you'd ever seen it before, but I

 8    have a different question for you.

 9            Would it be fair to say that his request was both

10    unusual and unique?

11    A.  It was something I hadn't experienced before at that

12    time, so it was new to me.

13    Q.  But would you use the words "unusual" and "unique"?

14    A.  I don't know if I used the words "unusual" and "unique."

15    At the time I may have used it.  I don't remember what I

16    said exactly.

17    Q.  Sir, I'm not asking what you remember what you said.

18    I'm asking if you would characterize this request as unusual

19    and unique.

20            MR. GLEESON:  Objection, asked and answered.

21            THE COURT:  Overruled.  You may answer if you can.

22            THE WITNESS:  I -- this was a new concept to me at

23    this time in 2003, so it was unique to me, yes.

24    BY MR. MARDER:

25    Q.  And unusual, right?

1    A.  I don't know if it was unusual or not because it was

2    unique to me.

3               MR. MARDER:  Your Honor --

4    BY MR. MARDER:

5    Q.  I'm sorry.  Mr. Jambor, if you could turn back to your

6    deposition of November 1st, 2017, and I'd ask you to turn to

7    page 247, please, and I'd ask you to look at lines 8

8    through 11.  I'm going to read the question and your answer.

9               MR. GLEESON:  Hang on one second, David, please.

10              MR. MARDER:  Sure.

11              MR. GLEESON:  What is it, 8 through 11?

12              MR. MARDER:  Uh-huh.

13              MR. GLEESON:  On what page?

14              MR. MARDER:  247.

15              MR. GLEESON:  Thank you.  Give me one sec.

16         (Pause)

17              MR. GLEESON:  Thank you.

18   BY MR. MARDER:

19   Q.  Do you see the question?  "It was an unusual request?"

20   There was an objection by your counsel.  And then you

21   responded, "Yes, it was an unusual, unique request."  Is

22   that the testimony you gave back in 2017?

23   A.  Yes.  If it's in the -- yes.

24   Q.  And you were under oath at the time you gave that

25   testimony, right?

Jambor - Cross

1   A.  Yes.

2   Q.  And that testimony was truthful?

3   A.  To the best of my knowledge, yes.

4   Q.  I'd like next, Mr. Sabes -- sorry, Mr. Jambor, to show

5   you a document that's been marked as Plaintiff's Exhibit 51.

6   A.  Yes.

7   Q.  And this is a letter that you wrote to Ms. Munson on

8   February 27th, 2003, correct?

9   A.  Yes, correct.

10  Q.  And you -- it looks like you faxed it to her, correct?

11  A.  It looks like it has the fax markings on it, yes.

12  Q.  And it's a letter that you signed on the bottom there?

13  A.  Yes.

14          MR. MARDER:  I'd offer Plaintiff's Exhibit 51 into

15  evidence.

16          MR. GLEESON:  No objection.

17          THE COURT:  Exhibit 51 is received.

18  BY MR. MARDER:

19  Q.  You say, "Shari and I enjoyed meeting with everyone on

20  February 19th, 2003."  That is the meeting we just talked

21  about, right?

22  A.  Yes.

23  Q.  "I want to say how much I enjoy working with you and

24  value the relationship Petters Company has with M&I."  Do

25  you see that?

1    A.  Yes.

2    Q.  Is that true?  Did you value that relationship?

3    A.  Yes, I did.

4    Q.  That was a profitable relationship?

5    A.  It was a profit -- yes.

6    Q.  And you wanted to expand the business so the bank could

7    make more profits, right?

8    A.  Correct.

9    Q.  You say there that you're summarizing the research you

10   did with respect to the Opportunity Finance request, right?

11   A.  Yes.

12   Q.  And you say you researched changing the checking account

13   type from a commercial checking account to a custodial

14   checking account or possibly establishing a Letter of

15   Credit, right?

16   A.  Correct.

17   Q.  So what you're trying to do is to think of some kind of

18   mechanism that's going to accommodate Mr. Sabes' concerns,

19   right?

20   A.  Trying to summarize -- yes, to help him satisfy his

21   request.

22   Q.  Satisfy his request relating to retailer wire payments,

23   right?

24   A.  Request to have the accounts monitored, yes.

25   Q.  The accounts monitored with regard to the retailer wire

1    payments, correct?

2              MR. GLEESON:  Objection, asked and answered.

3              THE COURT:  Sustained.

4    BY MR. MARDER:

5    Q.  Had you ever had a client before ask to turn their

6    checking account into a custodial checking account?

7    A.  I don't remember, but I don't believe so.

8    Q.  So this was a unique request, right?

9    A.  This was a unique request to me, yes.

10   Q.  And "unique" means it only happens once, right?

11   A.  "Unique" means it was the first time it happened to me,

12   yes.

13   Q.  So that would make it unusual, right?

14   A.  For me at the time, yes, it was unusual for me.

15   Q.  Did you fill out a SAR report at this time?

16   A.  I don't remember.

17   Q.  Did you put anything on the log about suspicious

18   activity?

19   A.  I don't remember.

20   Q.  Did you talk more to Shari about this?

21   A.  I don't remember.

22   Q.  Do you see there it says, "The Letter" --  this is the

23   last paragraph -- "The Letter of Credit possibility would

24   not require a new account number but due to the dollar size

25   of the relationship would move to the Commercial Banking

1   Department of the bank."  Do you see that?

2   A.  Yes.

3   Q.  But PCI told you that they didn't want to move to the

4   commercial banking division, right?

5   A.  I don't remember if they did or if they didn't.

6   Q.  Well, they never moved, did they?

7   A.  They did not.

8   Q.  Okay.  And did you ever consider the fact that the

9   reason they didn't want to move to the commercial banking

10  division is because it was staffed by more sophisticated

11  employees who were used to dealing with larger customers?

12  A.  I don't know why they didn't move.  We offered them

13  products and services.  It was their decision to see what

14  they wanted to do.

15  Q.  But the people in the commercial group, they are used to

16  dealing with large businesses with sophisticated

17  transactions, right?

18  A.  They deal with larger companies, yes.

19  Q.  And you were not, right?

20  A.  I was -- pardon?

21  Q.  And you were not used to dealing with that?

22  A.  This was the larger customer -- a large customer of mine

23  at the time, yes.

24  Q.  If we could turn next, please, to Plaintiff's

25  Exhibit 52.  Sir, I have placed in front of you now -- or

1    you should have in front of you now Plaintiff's Exhibit 52;

2    is that right?

3    A.  Yes.

4    Q.  And this is another e-mail from Jon Sabes, right?

5    A.  Yes.

6    Q.  It's to you and to Shari Rhode?

7    A.  Correct.

8    Q.  And Deanna Munson is also cc'd?

9    A.  Yes.

10   Q.  And that's your e-mail address?

11   A.  Yes.

12          MR. MARDER:  I'd offer this document into

13   evidence, Your Honor.

14          MR. GLEESON:  No objection.

15          THE COURT:  Exhibit 52, Plaintiff's Exhibit, is

16   received.

17   BY MR. MARDER:

18   Q.  Again, sir, if we look at the bottom right of this

19   document, do you see that -- any Bates number appearing

20   there with the number BMO at the very beginning of it?

21   A.  I don't -- no, I do not, not at the --

22   Q.  And --

23   A.  -- very beginning.

24          THE COURT:  Wait a minute.  I didn't hear you last

25   statement.

1        THE WITNESS:  Not at the very beginning.

2    BY MR. MARDER:

3    Q.  And do you know whether this document was destroyed?

4    A.  I do not know.

5    Q.  Mr. Sabes writes, "Ed, thank you for your letter dated

6    February 27th, 2003.  Can you please clarify as to whether

7    M&I would be able to provide the requested custodial

8    services if a new M&I account number was assigned and was

9    the recipient of the retailer payments?"  Do you see that?

10   A.  Yes.

11   Q.  So now -- this is now the second e-mail you've gotten

12   from Mr. Sabes where he is referencing these retailer

13   payments, right?

14   A.  He's -- yes.

15   Q.  At this point did you talk to Ms. Rhode and say,

16   "Mr. Sabes is referencing retailer payments, but I have

17   never seen any retailer payments"?

18   A.  I don't remember.

19   Q.  Did you go fill out a SAR report?

20   A.  Pardon?

21   Q.  Did you go fill out a SAR report?

22   A.  I don't remember.

23   Q.  Did you write anything in the Suspicious Activity Log?

24   A.  I don't remember.

25   Q.  Were you troubled at all by this?

1    A.  Pardon?

2    Q.  Were you troubled at all by this?

3    A.  I don't remember what I felt.

4    Q.  I'm going to ask you to go to the next document, please.

5           MR. GLEESON:  What's the exhibit number, please,

6    David?

7           MR. MARDER:  Exhibit 53.

8           MR. GLEESON:  Thank you.

9    BY MR. MARDER:

10   Q.  I'm now showing you a document, sir, that's been marked

11   Plaintiff's Exhibit 53.  Do you have that in front of you?

12   A.  Yes, I do.

13   Q.  The top e-mail is an e-mail sent by Sandy Indahl on

14   May 8, 2003 to your e-mail address, right?

15   A.  Yes.

16   Q.  With a cc to Bob White?

17   A.  Yes.

18   Q.  And this was an e-mail that you received on or about

19   May 8, 2003?

20   A.  Yes.

21          MR. MARDER:  I'd offer this document into

22   evidence, Your Honor.

23          MR. GLEESON:  No objection.

24          THE COURT:  Exhibit 53 is received.

25   BY MR. MARDER:

Jambor - Cross

1    Q.  The body of the e-mail says, "Bob White would like you

2    to take a look at the attached rough draft and give him his

3    [sic] comments."  Do you see that?

4    A.  Yes.

5    Q.  And who was Bob White?

6    A.  He was with Petters Company.

7    Q.  He's in jail now?

8    A.  I don't know.

9    Q.  And attached is this ACF agreement draft.  Do you see

10   that?

11   A.  Yes.

12   Q.  And then if we look at the attachment, there's a Deposit

13   Account Control Agreement?

14   A.  That's what it's titled, yes.

15   Q.  Let's take a look at that agreement.  You had never

16   entered into a Deposit Account Control Agreement before

17   this, had you?

18   A.  No, I had not.

19   Q.  Take a look at Section 2.  It says, "If at any time the

20   Depository shall receive an instruction from the Secured

21   Party directing disposition of the funds in the Deposit

22   Account, the Depository shall immediately comply with such

23   destruction" -- I'm sorry -- "with such instructions,

24   without any further consent by the Debtor or any other

25   person or entity."  Do you see that?

1    A.  Yes.

2    Q.  Did you understand that when you read it?

3    A.  I don't remember.

4    Q.  Do you understand it now?

5    A.  Basically -- I am not totally positive, no.

6    Q.  Weren't you concerned to be communicating with clients

7    about an agreement that you didn't understand?

8             MR. GLEESON:  Objection, there's no foundation for

9    that.

10            THE COURT:  Overruled.

11            THE WITNESS:  I don't remember what I was

12   thinking.

13   BY MR. MARDER:

14   Q.  Well, the debtor under this agreement is PCI, right?

15   A.  Yes.

16   Q.  And the depository is the bank where the monies are

17   deposited, right?

18   A.  Yes.

19   Q.  And the secured party is the investor, right?

20   A.  Yes, I -- yes.

21   Q.  So what this is saying is that the investor could direct

22   your customer's funds without your customer's consent,

23   right?

24   A.  Yes.

25            MR. GLEESON:  Judge, can we approach on this?

1          THE COURT:  You may.

2      **(At sidebar)**

3          MR. GLEESON:  This agreement was never executed

4   and he sent it to outside counsel because he doesn't know

5   anything about Deposit Account Control Agreements.  He's

6   asking him for a legal conclusion.  There's no foundation

7   for that, and it's grossly unfair given the context.  He did

8   exactly what he was supposed to do; he sent it to outside

9   counsel.  It also never got executed.

10          So I object to the foundation.  He's not in a

11  position to give testimony about the legal effect of this

12  agreement, this draft agreement that was never executed.

13          MR. MARDER:  Your Honor, I think that's a great

14  argument for closing argument.  But as an evidentiary

15  matter, I'm asking this witness what he understood about

16  this agreement and whether it was a red flag that should

17  have led him to believe that something suspicious was going

18  on.  So it's directly relevant to the bank's knowledge.

19          THE COURT:  Do you have anything else to say?

20          MR. GLEESON:  Just that he made my point for me.

21  He's not a lawyer.  He's asking him for a legal conclusion

22  about how Section 2 works.  He's not -- there's no

23  foundation to ask him for that.  And in context, it's an

24  unfair question given the other evidence.

25          THE COURT:  What's the basis for this witness

1    knowing what you are asking him about?

2              MR. MARDER:  What I'm doing is I'm showing him the

3    agreement and I'm asking him if he understood it, and then

4    I'm going to ask him if he was concerned about what the

5    agreement provided for.  If he doesn't understand it, he can

6    tell me he doesn't understand it.

7              THE COURT:  Did you ask him if he understood it?

8              MR. MARDER:  That's what I'm asking right now.

9    Mr. Gleeson objected.  That's what I'm going through right

10   now, to see if he understands it.

11             THE COURT:  So the question as to whether he

12   understands it may be asked and answered.

13        **(In open court)**

14   BY MR. MARDER:

15   Q.  Sir, I think my question to you is whether you

16   understand that this agreement is saying that the investor

17   could direct your customer's funds without your customer

18   consenting.

19   A.  In Section 2 it states, "without further consent by the

20   Debtor."

21   Q.  Okay.  And you are not familiar with ever having done

22   anything like this in the past, or have you?

23   A.  I have not -- up to this point, I had not done anything

24   like this, no.

25   Q.  So this was unusual, right?

Jambor - Cross

1    A.  It was unusual to me.

2    Q.  Did you fill out a SAR report at this time?

3    A.  I don't remember.

4    Q.  Did you fill out the -- anything in the Suspicious

5    Activity Log?

6    A.  I don't remember.

7    Q.  Sir, if you had filled out a SAR report or a Suspicious

8    Activity Log on one of your top clients, isn't that

9    something you'd remember?

10            MR. GLEESON:  Objection, he's arguing with the

11   witness.

12            THE COURT:  Sustained.

13   BY MR. MARDER:

14   Q.  Did you talk over with Ms. Rhode about whether this was

15   unusual?

16   A.  I don't remember what our discussion was.

17   Q.  Do you have any information, sir, about whether or not

18   this document was destroyed?

19   A.  I don't know.

20   Q.  Sir, I'd like you next to please look at Plaintiff's

21   Exhibit 55.  Again, sir, we have no -- strike that.

22            This is an e-mail that Ms. Munson sent to you on

23   May 16th, 2003, correct?

24   A.  Correct.

25            MR. MARDER:  I'd offer this document into

1    evidence, Plaintiff's Exhibit 55.

2              MR. GLEESON:  I have no objection, Judge.

3              THE COURT:  Exhibit 55 is received in evidence.

4    BY MR. MARDER:

5    Q.  And this is yet another document that doesn't have a

6    Bates number beginning with "BMO," correct?

7    A.  Correct.

8    Q.  And do you have any information on how or if this

9    document was destroyed?

10   A.  I don't know.

11   Q.  Now, let's put the date of this in context.  This

12   May 16, 2003, e-mail is after the e-mail that you got from

13   Mr. Sabes, right, that we saw earlier about the retailer

14   wire payments?

15   A.  Was that in 2003 also?

16   Q.  Would you like to see it?

17   A.  Yes, just to clarify my -- I know it was February, but I

18   can't remember the year.

19   Q.  If you could look at Exhibit P-104.

20   A.  Okay.  Yes.

21   Q.  This is dated after that, right?

22   A.  Correct.

23   Q.  Okay.  And it's after the May 8th e-mail where Sandy

24   Indahl attached the draft Depository Agreement, right,

25   Depository Account Control Agreement?

1    A.  Yes.

2    Q.  And Ms. Coleman says, "Ed, please fax the letter back,"

3    and she gives a number, right?

4    A.  Yes.

5    Q.  Now, if we go to the next page, P55-0002, there's a copy

6    of a draft letter, correct?

7    A.  Yes.

8    Q.  It's a letter for Tom -- to Tom Petters, right?

9    A.  Yes.

10   Q.  And the letter says, "Dear Mr. Petters:  Pursuant to our

11   recent discussions, we are pleased to inform you that upon

12   your direction and instruction, we are willing to open a new

13   account for you that is subject to a Deposit Account Control

14   Agreement."  Do you see that?

15   A.  Yes.

16   Q.  And then it says, "We understand that you are interested

17   in opening the account as soon as possible.  We stand ready

18   to provide draft documents and begin the internal

19   authorization and review procedure upon your request."  Do

20   you see that?

21   A.  Yes.

22   Q.  So what's happening here is that Ms. Munson is

23   ghostwriting a letter for you to sign and return to her,

24   right?

25   A.  She sent this to me, yes.

1    Q.  Okay.  I'd ask you now to turn to document --

2    Plaintiff's Exhibit 56.  This, sir, is the document that you

3    signed and returned to Ms. Munson, right?

4    A.  Yes, that's my signature.

5    Q.  Okay.

6          MR. MARDER:  I'd offer Plaintiff's Exhibit 56 into

7    evidence.

8          MR. GLEESON:  No objection, Judge.

9          THE COURT:  Exhibit 56 is received.

10          MR. MARDER:  If we could put up those two

11    documents side by side, 55 and 56, and blow up the text of

12    the two documents, please.

13    BY MR. MARDER:

14    Q.  So the one on the left was the one that you sent back to

15    Ms. Munson, that's Plaintiff's Exhibit 56, and the one on

16    the right is the one that Ms. Munson sent to you,

17    Plaintiff's Exhibit 55, right?

18    A.  Yes.

19    Q.  Okay.  Now, if you look at the very first sentence, you

20    see there's a typographic error there that says, "Pursuant

21    to our recent discussions, we are please to inform you," the

22    "d is" missing?

23          THE COURT:  Which exhibit are you referring to?

24          MR. MARDER:  Either one, 55 or 56.

25    BY MR. MARDER:

1   Q.  You see the word -- the "d" is missing from "pleased"?

2   A.  Yeah, I see a "d" is missing, yes.  It just says,

3   "please."

4   Q.  Okay.  And so -- and that's missing on both drafts,

5   right?

6   A.  Yes.

7   Q.  So with respect to the first two paragraphs, all you did

8   is copy and paste exactly what Ms. Coleman wrote for you,

9   right?

10              MR. GLEESON:  Objection, that doesn't accurately

11   state the prior testimony.

12              THE COURT:  You may answer.  Overruled.

13              THE WITNESS:  I don't remember what I did.

14   BY MR. MARDER:

15   Q.  Nonetheless, you signed and returned the agreement --

16   the letter, right?

17   A.  I did sign and return the letter, yes.

18   Q.  If we look at paragraph 56 -- I'm sorry Plaintiff's

19   Exhibit 56 and look at the third paragraph on Plaintiff's

20   Exhibit 56, it says, "We will work with you upon

21   satisfactory completion of Opportunity Finance West LB

22   facility."  Do you see that?

23   A.  Yes.

24   Q.  That's something that you added to the letter?

25   A.  I don't remember.

1    Q.  Can you ever recall prior to this time another situation

2    where another customer wrote a letter for you to attach your

3    signature block and send back to them?

4              MR. GLEESON:  Objection, mischaracterizes the

5    prior testimony.

6              THE COURT:  Overruled.

7              THE WITNESS:  I don't remember, no.

8    BY MR. MARDER:

9    Q.  You don't ever remember having that happen?

10   A.  I don't remember if it did or if it didn't.

11   Q.  You'd agree with me, sir, that what happened here was a

12   unique situation, right?

13   A.  It was unique to me, yes.

14   Q.  And "unique" means it never happened before, right?

15   A.  It never happened to me before, no, that I recall.

16   Q.  So this was unusual, right?

17   A.  It was unusual to me.  It was unique to me.

18   Q.  Did you fill out a Suspicious Activity Report?

19   A.  I don't remember.

20   Q.  Did you put an entry into the Suspicious Activity Log?

21   A.  I don't remember.

22   Q.  Did you call up Ms. Rhode to ask what she thought?

23   A.  I don't remember what I did.

24   Q.  To make sure I understand the process, Mr. Jambor, you

25   yourself had the authority to put something in the

1    Suspicious Activity Log, right?

2    A.  I believe so, yes.

3    Q.  Okay.  But you wouldn't actually fill out the SAR report

4    yourself, that's something another group would do?

5    A.  I don't remember.

6    Q.  If I could ask you to go -- now to go back to

7    Plaintiff's Exhibit 2 and if you could please look to

8    page 41.  Actually, let's start on page 42.  There's -- this

9    is a MIContacts report that was filled out by Mr. Anderson,

10   correct?

11   A.  Correct.

12   Q.  But you were present on the call, right?

13   A.  Yes.

14   Q.  And this was a follow-up on the discussions you were

15   having on Mr. Sabes' request, right?

16   A.  It was discussing a collateral pledge, yes.

17   Q.  You see there on the second line it says, "This

18   situation is complicated by the fact that there are four

19   lender groups that Petters works with."  Do you know what

20   that's a reference to?

21   A.  Other companies that Petters works with.

22   Q.  These are lender groups that lent him money for his

23   business?

24   A.  They are other companies that he works with.  I don't

25   know what they did.

1    Q.  Now let's go to page 62.  This is a MIContacts entry

2    that was prepared by Ms. Nieland, right?

3    A.  Yes.

4    Q.  But you were also in on this call, correct?

5    A.  Correct.

6    Q.  And I'd like to draw your attention to the second line

7    of this document where it says, "Petters would like to have

8    individual Control Agreements with each of their lenders,

9    and they do not want the lenders to know who the other

10   lenders are."  Do you see that?

11   A.  Yes.

12   Q.  Did you ask why Mr. Petters didn't want to know who --

13   didn't want the lenders to know who the other lenders were?

14   A.  I don't remember.

15   Q.  Did that sound a little concerning to you?

16   A.  I don't remember what I was thinking or what I thought.

17   Q.  Did you fill out anything in the Suspicious Activity

18   Log?

19              MR. GLEESON:  Judge, can we come to sidebar?

20              THE COURT:  Yes, you may.

21          **(At sidebar)**

22              MR. GLEESON:  This repetition at the end of

23   each --

24              THE COURT:  Are you objecting?

25              MR. GLEESON:  I am.

1           THE COURT:  Okay.

2           MR. GLEESON:  Good question.  I'm objecting

3    because I think we've got to the point where this

4    repetition -- I think it will be corrected because he can't

5    file a SAR, and I think Mr. Marder knows that.  But this

6    repetition of did you fill out any Suspicious Log, did you

7    destroy the document has become a bit of a show.  I think

8    it's -- on 403 grounds, I'm going to ask that the Court put

9    an end to it.

10          I think if there were questions asked that would

11   elicit whether he has any idea whether the documents here

12   were or were not part of the ones that were no longer

13   preserved on the backup tapes that were destroyed, it would

14   be clear that overall he has no idea whether these documents

15   were destroyed.

16          THE COURT:  So when you say, "403 grounds," you

17   mean more prejudicial than probative?

18          MR. GLEESON:  Yeah, it's -- the seriatim is more

19   of a summation show than, in my view, a real elicitation of

20   evidence.

21          THE COURT:  Why is this not more prejudicial than

22   probative?

23          MR. MARDER:  I'll tell you why, Your Honor,

24   because our whole case is premised upon the fact that

25   there's a series of suspicious facts that were provided to

1    this witness and on each occasion, when he got a suspicious

2    fact, he had a duty to fill out the SAR log -- or the

3    Suspicious Activity Log and he had a duty to bring it up

4    with his supervisor.

5         So it's incumbent to me to ask each time something

6    suspicious happened, whether he did those two things.  This

7    is not part of a show.  This is the heart of our case, that

8    he didn't do those things.

9         MR. GLEESON:  He's already testified he doesn't

10   recall putting anything in the Suspicious Activity Log.  If

11   the greater includes the lesser, then he hasn't done it with

12   respect to each of these documents.  So it really is just to

13   enhance the -- there's no probative value to this.  We

14   already have his answer.

15        MR. MARDER:  Your Honor, this is not -- this is

16   the most probative value of anything else in the case.  The

17   whole issue is what this witness did when he was confronted

18   with suspicious activity.  His duties were to fill out the

19   log and his duties were to talk with his supervisor.  So

20   each time he does that, I have to ask him if he did that on

21   each different occasion.

22        THE COURT:  I understood the arguments by both

23   parties.  I'll overrule the objection.

24        **(In open court)**

25   BY MR. MARDER:

1   Q.  Sir, I think when we broke a moment ago I was asking you

2   about the Suspicious Activity Log, but I have a different

3   question now, which is:  When you saw that Mr. Petters

4   stated that he didn't want the lenders to know who the other

5   lenders are, did you discuss that with Ms. Rhode?

6   A.  I don't remember.

7   Q.  Do you view that as an unusual request, to keep that

8   information confidential?

9   A.  Not super unusual, no.

10  Q.  Well, in banking circles, isn't it common for lenders to

11  ask who the other lenders are?

12  A.  Yes.

13  Q.  Sorry, I can't remember if I asked you this.  Did you

14  call up Mr. Petters and ask why he didn't want to know --

15  the lenders to know who the other lenders are?

16  A.  I don't remember.

17  Q.  That's something that you could have done, right?  You

18  had the ability to do that?

19  A.  I could have contacted Mr. Petters, yes.

20  Q.  Do you recall seeing in the compliance PowerPoint the

21  concept of escalation when you saw something suspicious?

22  A.  Yes.

23  Q.  What things could you do to escalate?

24  A.  Just report it to my supervisor.

25  Q.  Anything else?

1    A.  My supervisor's supervisor.

2    Q.  You've heard of the concept of a red flag, right?

3    A.  We discussed it previously, yes.

4    Q.  And the definition of a red flag is something unusual

5    that causes you to be concerned or that would cause you to

6    want to escalate, right?

7    A.  Yes.  That was in one of the slides, I believe.

8    Q.  If we could look next at Plaintiff's Exhibit 60.  And if

9    we look down in the middle of the first page, there's an

10   e-mail there from you to Ms. Munson, correct?

11   A.  There's I think -- let me see.  Where are you referring

12   to?

13   Q.  Sure.  The middle of page 60-0001.

14   A.  Yes.

15   Q.  About halfway down it says, "Original Message" and

16   there's a message from Edward.Jambor@micorp.com.  Do you see

17   that?

18   A.  Yes.

19   Q.  And it's to Ms. Munson?

20   A.  Yes.

21   Q.  And what you were doing was forwarding on to her a

22   letter of authorization that you had received from a third

23   party, correct?

24   A.  Yes.

25           MR. MARDER:  Your Honor, I'd offer Plaintiff's

1    Exhibit 60 into evidence.

2              MR. GLEESON:  No objection.

3              THE COURT:  Exhibit 60 is received.

4    BY MR. MARDER:

5    Q.  So let's make sure we -- make sure I understand this.

6    If you go to page 2, there's an e-mail to you from an e-mail

7    address immix@zianet.com.  Do you see that?  Sorry.  That's

8    at the bottom of page 1.

9    A.  Yeah, the bottom of page 1.

10   Q.  Right.

11   A.  Yes.

12   Q.  Okay.  And then the e-mail says, "Dear Edward Jambor,

13   Attached in a PDF format is a letter of authorization to

14   confirm funds.  I will call you shortly.  Best regards,

15   Mark A. Apostalon."  And then it has a title there, right?

16   A.  Yes.

17   Q.  And then he attaches a letter, correct?

18   A.  Correct.

19   Q.  Who was Mr. Apostalon?

20   A.  I don't remember.

21   Q.  If we could go to the letter he sent you, see there it

22   says, "To Whom It May Concern," right?

23   A.  Yes.

24   Q.  And it says, "We, the for mentioned account holder"?

25   A.  Yes.

Jambor - Cross

1   Q.  That's a typographic error, right?  It should be "We,

2   the aforementioned account holder"?

3   A.  I'm not a grammar czar, so I'm not sure.

4   Q.  Have you ever heard anyone say, "the for mentioned

5   account holder" before?

6   A.  I -- no.

7   Q.  Okay.  And then he says, "give you authority to disclose

8   to CJM Holding Corporation and/or their Banking Institution

9   details regarding our ability to enter into a Sales/Purchase

10  contract for the purchase of 100,000 units of Nokia 8910i

11  phones ($390 each) at a total cost of U.S. 39.25 million

12  payable."  Right?

13  A.  Yes, that's what it says.

14  Q.  And then it says, "by way of Standby Letter of Credit or

15  Blocked Funds."  Do you see that?

16  A.  Yes.

17  Q.  Do you know what blocked funds are in the banking

18  industry?

19  A.  I'm not familiar with that term.

20  Q.  Have you ever heard that term used in connection with

21  monies that are in foreign accounts that are blocked due to

22  foreign currency laws?

23  A.  No.

24  Q.  Did it make any sense to you that somebody would be

25  paying for Nokia phones using blocked funds?

1    A.  I didn't know what -- I didn't remember -- I didn't

2    remember what blocked funds were, so I don't know.

3    Q.  And it says, "Any information you can give, you do so

4    without prejudice and without any contractual or financial

5    involvement or recourse for whatsoever reason at our express

6    request."  Do you see that?

7    A.  Yes.

8    Q.  Okay.  Is that -- did he mean to say, "for whatever

9    reason"?

10   A.  I don't know what he meant to say.

11   Q.  And the last paragraph says, "Disclosure should only be

12   made against a requirement to satisfy Nokia of our ability

13   in entering into a contractural arrangement with them as

14   stated above and in any event on the protection of Integrity

15   as the agreed Password."  Do you see that?

16   A.  Yes.

17   Q.  And then "Integrity as the agreed Password" is in a

18   different font?

19   A.  Yes.

20   Q.  Sir, does that last sentence make any sense to you at

21   all?

22   A.  No.

23   Q.  Have you ever gotten one of those letters from some

24   prince somewhere asking for your bank account information,

25   these obvious scam letters?

1          MR. GLEESON:  Objection, relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  Can you -- I don't quite understand

4     your question.

5     BY MR. MARDER

6     Q.  Sure.  Have you ever received one of those scam letters,

7     an e-mail that's all full of typographic errors looking

8     for -- telling you they are going to send you money if you

9     give them your bank account information?

10    A.  Yes.

11         THE COURT:  Sustained.  I understand the question

12    now.  The objection is sustained.

13    BY MR. MARDER:

14    Q.  Sir, in your experience in the banking industry, you had

15    seen a lot of genuine banking documents, right?

16    A.  Yes.

17    Q.  Did a letter like this that was full of typographical

18    errors and didn't make any sense strike you as a genuine

19    banking document?

20    A.  I don't remember this document in specifics.

21    Q.  But you forwarded it on to Ms. Munson, right?

22    A.  Yes.

23    Q.  What did she say?

24    A.  I never -- I don't remember what her reply was.

25    Q.  Did it concern you that you were receiving a letter from

1    someone purportedly -- strike that.

2         Do you see at the bottom it says that this company

3    is an I.O.C. of the Petters Company, Inc.?

4    A.  Yes.

5    Q.  Did it concern you that you were -- strike that.

6         Did you have any concerns that you were receiving

7    a letter relating to the Petters Company business that

8    didn't make any sense?

9    A.  I don't remember what I thought with this letter.

10   Q.  Did you fill out anything in the Suspicious Activity

11   Log?

12   A.  I don't remember.

13   Q.  Did you raise this issue with Ms. Rhode?

14   A.  I don't remember.

15   Q.  You remember, sir, that Ms. Deanna Coleman wrote checks

16   to herself for millions of dollars?

17   A.  I remember seeing a couple of checks written to her,

18   yes.

19   Q.  You remember seeing two $1 million checks that

20   Ms. Coleman wrote to herself on the Petters Company account

21   in December of one year and then January the next year,

22   right?

23   A.  Yes.

24   Q.  I'd ask you to turn to Plaintiff's Exhibit 57, and you

25   see here that this is a collection of checks.  Do you see

1    that?

2    A.  Yes.

3    Q.  And they all bear that 9018 account number, right?

4    A.  The ones I reviewed, yes.

5    Q.  And these are photocopies of checks on the PCI account,

6    correct?

7    A.  Yes.

8             MR. MARDER:  I'd offer Plaintiff's Exhibit 57 into

9    evidence.

10            MR. GLEESON:  May I have a brief voir dire of the

11   witness with regard to the foundation?

12            THE COURT:  You may.

13            MR. GLEESON:  Thank you.  Excuse me, Mr. Marder.

14                    **VOIR DIRE EXAMINATION**

15   BY MR. GLEESON:

16   Q.  Hello, Mr. Jambor.  You just testified you saw two

17   checks, correct?

18   A.  Correct.

19   Q.  Okay.  And in the ordinary course, did you see checks as

20   they came into the bank written on your customers' accounts?

21   A.  No.

22   Q.  Okay.  Could you turn to page 95 of that exhibit.

23   What's the date on that check?

24   A.  October 3rd, 2007.

25   Q.  Were you gone from the bank then?

Jambor - Cross

```
 1    A.  Yes, I was.

 2    Q.  Flip through it, see if all the checks from page 95

 3    through 112 are written after the date you left M&I Bank.

 4        (Witness reviews document)

 5    Q.  My bad.  You don't have to go that slow.

 6    A.  Oh, I'm sorry.

 7    Q.  Does it look that way?

 8    A.  Yes, they appear that they are all dated after August of

 9    2007.

10    Q.  Do you have any idea whether the only two checks you saw

11    are even in that exhibit?

12    A.  I don't know.

13              MR. GLEESON:  I object on foundation grounds.

14              THE COURT:  The objection is sustained.

15                   CROSS-EXAMINATION (Resumed)

16    BY MR. MARDER:

17    Q.  Sir, let me point out two checks in particular in that

18    pile there.  I'd ask you to turn to page 21.  Do you recall

19    earlier telling us that the two million checks that you saw

20    were in December of one year and in January of the next

21    year?

22    A.  Correct.

23    Q.  And I'd ask you to please turn to page 21.

24    A.  Yes.

25    Q.  And you see that check there for a million dollars?
```

Jambor - Cross

1    A.  Yes.

2    Q.  And then --

3           MR. GLEESON:  Judge, it's not in evidence yet.

4    These aren't the checks that he saw either.  If I could do

5    another voir dire?  He's reading from a document --

6           THE COURT:  Let me -- I want to hear the rest of

7    the question.

8           MR. MARDER:  Let me rephrase the question.

9    BY MR. MARDER:

10   Q.  Is this one of the two checks you saw?

11   A.  I don't -- I remember seeing two checks.  I don't

12   remember the year.

13   Q.  Okay.  But one was in December and one was in January,

14   right?

15   A.  Yes.

16   Q.  And then now look at page 42.

17   A.  42.

18          MR. GLEESON:  I'm sorry, Mr. Marder.  What page?

19          THE COURT:  Page 42.

20          MR. MARDER:  Plaintiff's Exhibit 57, page 42.

21          MR. GLEESON:  42?

22          THE WITNESS:  Yes.

23   BY MR. MARDER:

24   Q.  Okay.  Do you see those two checks we're talking

25   about --

1     A.  Yes.

2     Q.  -- page 21 and 42?

3     A.  Yes.

4     Q.  Are those the two checks that you were testifying about?

5     A.   If it's the correct year, yes.

6          MR. MARDER:  Your Honor, if we could, I'd just

7     like to offer those two pages in.

8          MR. GLEESON:  Could I have just additional

9     questions on voir dire?

10         THE COURT:  You may.

11         MR. GLEESON:  Okay.

12         THE COURT:  And this is voir dire as to those two

13    checks, correct?

14         MR. GLEESON:  Yes.

15                   **VOIR DIRE EXAMINATION**

16    BY MR. GLEESON:

17    Q.  You were asked about the check that's in Plaintiff's 57

18    at page 21, correct?

19    A.  Correct.

20    Q.  What's the date of that check?

21    A.  December 23rd, 2004.

22    Q.  And the second one you were asked about, if I have the

23    page number correctly --

24         MR. GLEESON:  Mr. Marder, was it 51, the second

25    check you asked?

Jambor - Voir Dire

```
 1                   MR. MARDER:  21 and 42.

 2                   MR. GLEESON:  42.  Excuse me.

 3      BY MR. GLEESON:

 4      Q.  And the second check is page 42.  What's the date of

 5      that?

 6      A.  December -- excuse me, January 10th, 2005.

 7      Q.  Do you remember testifying against Thomas Petters in his

 8      criminal trial?

 9      A.  Yes.

10      Q.  You assisted the government in convicting him?

11      A.  Yes.

12      Q.  Okay.  Let me ask -- let me invite your attention to the

13      transcript from that trial, which is November 9, 2009, and

14      specifically page 1451.

15      A.  Yes.

16      Q.  Read to yourself, not out loud, please, lines 6

17      through 15 of that page.

18      A.  6 through 15?

19      Q.  Correct.

20      A.  Yes.

21      Q.  Take your time.  Let me know when you are done.

22      (Witness reviews document)

23      A.  Okay.

24      Q.  Does that refresh your recollection, sir, that the two

25      checks you saw from -- written out of that account, that PCI
```

1    account, were in December of '06 and January of '07?

2    A.  Yes, that's what I testified.

3              MR. GLEESON:  I renew my objection.

4              MR. MARDER:  Your Honor, I think we can

5    short-circuit this.  I don't need to rely on the checks

6    themselves.  We have his testimony.

7              THE COURT:  The objection is sustained.

8              **CROSS-EXAMINATION** (Resumed)

9    BY MR. MARDER:

10   Q.  Nonetheless, Mr. Jambor, setting aside whether the two

11   checks we looked at were the checks, you still remember the

12   incident whereby two million dollar checks were written by

13   Ms. Deanna Coleman on the PCI account one month apart in

14   December of one year and January in another year, right?

15   A.  Yes.

16   Q.  Okay.  When that happened, you were contacted by M&I's

17   operations area, correct?

18   A.  That -- yeah, someone in operations.  I'm not sure of

19   the exact area, but yes.

20   Q.  And the person from M&I's operations area was asking you

21   why there were two checks written a month apart on the

22   account to Ms. Coleman, right?

23   A.  She inquired about it, yes, or the person did.

24   Q.  And when that happened -- strike that.

25              After you got that call from M&I's operations

Jambor - Cross

1    area, you picked up the phone and you called Tom Petters,

2    right?

3    A.  Yes.

4    Q.  And Mr. Petters told you that those two million dollar

5    checks were for a house that Ms. Coleman was building,

6    right?

7    A.  Yes.

8    Q.  Let's go back now to Plaintiff's Exhibit 5 and we're

9    going to look at page 24 of this.

10   A.  Yes.

11   Q.  And you recall we looked at this before.  Do you

12   acknowledge that you were trained that during the

13   integration process of money laundering, one thing that

14   happens is that people buy real estate to take on the

15   appearance of legitimacy, right?

16   A.  That's what it states in the slide, yes.

17   Q.  When Mr. Petters told you that Ms. Coleman was taking

18   out $2 million out of the account to build a house, did you

19   fill out a Suspicious Activity Log?

20   A.  I don't remember.

21   Q.  Did you call Ms. Rhode and ask her what she thought

22   about that?

23   A.  I don't remember.

24   Q.  Did you escalate this in any way at all?

25   A.  I don't remember.

1   Q.  You knew that this was not a payroll account, right?

2   A.  It was their checking -- it was the Petters Company

3   checking account.

4   Q.  And you saw that no taxes were taken out of the checks,

5   right?

6   A.  I saw the checks.  I saw the net amount of the checks.

7   I wouldn't know what was behind it.

8   Q.  This was something that was quite unusual, wasn't it?

9   A.  I don't -- I was asked and I inquired on it and replied

10   back.

11            THE COURT:  I didn't hear what you said.

12            THE WITNESS:  I'm sorry.  I was asked to research

13   it, which I did, and I reported back to the operations area.

14   BY MR. MARDER:

15   Q.  That it was to buy a house?

16   A.  That it was -- I can't remember exactly what I told

17   them, but I replied back to them.

18   Q.  You thought that the checks that Deanna Coleman wrote to

19   herself raised a red flag, right?

20   A.  It was brought to my attention and I researched it.

21   Q.  That wasn't my question, sir.  My question is whether

22   you thought it raised a red flag.

23   A.  I don't remember if I thought it raised a red flag or

24   not.

25   Q.  Sir, you recall there was another piece of litigation

1    involving Palm Beach?

2    A.  I remember the name.

3    Q.  In fact, you had your deposition taken in that case,

4    right?

5    A.  I had my deposition taken a few times, so it was

6    probably -- yeah, I don't remember the specifics, but, yes,

7    I remember the company.

8    Q.  Okay.  I'd like you to turn, please, in your binder

9    there, we've got a transcript of the deposition that you

10   gave in the Palm Beach case dated September 20th, 2010.

11   Does this refresh your recollection that you had your

12   deposition taken in the Palm Beach case?

13   A.  Yes.

14   Q.  And just like in the deposition in this case, you took

15   an oath to tell the truth when you took that deposition --

16   when that deposition was taken, right?

17   A.  Yes.

18   Q.  And you told the truth when that deposition was taken,

19   right?

20   A.  Yes.

21   Q.  And the date of that deposition, which is back in 2010,

22   was a lot closer to the events than today is, right?

23   A.  Yes.

24   Q.  I'd like you to turn, please, to page 109 of that

25   deposition.  I'd like you to read to yourself the testimony

1    on lines 8 through 16 on page 109.

2         (Witness reviews document)

3    A.   Through what line?  I'm sorry.

4    Q.   Page 109, lines 8 through 16.

5    A.   Okay.

6    Q.   And do you agree with me, sir, that at the time you

7    thought that this check kind of raised a red flag?

8              MR. GLEESON:  Objection.  Can I approach?

9              THE COURT:  You may.

10             **(At sidebar)**

11             MR. GLEESON:  I would like the Court to direct him

12   to finish the sentence if he's going to read that part of

13   his testimony.

14             MR. MARDER:  I was trying to avoid reading the

15   testimony because the last time I did it and the witness

16   didn't remember, I was told I shouldn't read the question

17   and the answer, but I'm happy to read the whole question and

18   the whole answer if that's what Mr. Gleeson prefers.

19             MR. GLEESON:  That's what Mr. Gleeson prefers

20   because it grossly mischaracterizes what --

21             THE COURT:  Proper impeachment would be to say

22   isn't a fact that you said -- and isn't it a fact that you

23   were asked and isn't it a fact that you answered.  That's

24   proper impeachment of a prior inconsistent statement.  Is

25   that what you are trying to do?

1          MR. MARDER:  Understood, Your Honor, but because

2    he said he didn't remember, I was trying to refresh his

3    recollection, but now I'll use it as a prior inconsistent

4    statement.  Thank you, Your Honor.

5    BY MR. MARDER:

6    Q.  Sir, I'm going to read for the record what you said when

7    you were under oath.

8        The question was:  "Why did operations -- what was your

9    understanding as to why operations contacted you?"

10       And your answer was:  "Two large checks cleared the

11   account, one in December of the year and then in January the

12   following year, and it -- made out to Deanna, signed by

13   Deanna.  So it kind of raises a red flag, so I contacted Tom

14   to make him aware of it."

15          Do you see that?

16   A.  Yes.

17   Q.  So the reason that you contacted Mr. Petters was because

18   this raised a red flag for you, right?

19   A.  It raised a red flag for someone in operations and they

20   asked me to look into it, yes.

21   Q.  Okay.  And when Mr. Petters told you it was to buy a

22   house for Ms. Coleman, did that alleviate your concern about

23   the red flag?

24   A.  I don't remember what it did.

25   Q.  After you learned about these two million dollar checks

1    that Ms. Coleman wrote to herself, did you start monitoring

2    the account to see if any employees of PCI were getting

3    similar large checks?

4    A.  I don't remember.

5    Q.  I'd ask you, sir, please, to turn to Exhibit 185-A.  I

6    think these were omitted from the binders, so I need to --

7               MR. MARDER:  May I approach, Your Honor, to give

8    him copies?

9               THE COURT:  You may.

10              MR. MARDER:  Thank you, Your Honor.

11        (Document handed to witness)

12              MR. MARDER:  May I approach, Your Honor?

13              THE COURT:  Yes, you may.

14              MR. MARDER:  I'll provide you a copy as well.

15        (Document handed to the Court)

16              THE COURT:  Thank you.

17              Counsel, has this exhibit been admitted into

18   evidence?

19              MR. MARDER:  Yes, Your Honor.

20              THE COURT:  Thank you.

21   BY MR. MARDER:

22   Q.  I'll draw your attention, please, to page 9.  Do you see

23   the date of this check, December 27th, 2005?

24   A.  Yes.

25   Q.  That's while you were still at the bank, right?

1   A.  I was still at the bank, yes.

2   Q.  And you agree with me that this is a half a million

3   dollar check to Ms. Munson?

4   A.  Yes.

5   Q.  Did you become aware of this check?

6   A.  I don't remember this check.

7   Q.  Draw your attention to page 16.  Do you see there

8   there's another million dollar check written out to

9   Ms. Munson?

10  A.  Yes.

11  Q.  Did you become aware of this check?

12  A.  I don't remember this check.

13  Q.  Draw your attention to the next page, please.

14          MR. GLEESON:  I object on 403 grounds given his

15  prior testimony.  He's never seen these checks, Judge.

16          MR. MARDER:  That's what I'm asking, if he's seen

17  them.

18          MR. GLEESON:  He's already established that.

19  Object on 403.  It's more prejudicial.

20          THE COURT:  Overruled.

21          MR. GLEESON:  Thank you, Your Honor.

22  BY MR. MARDER:

23  Q.  We now have a check to Ms. Munson for $2.5 million,

24  right?

25  A.  Yes.

1    Q.  Did you become aware of this check?

2    A.  I don't remember seeing this check, no.

3    Q.  Did you monitor the account at all to see if this was

4    happening?

5    A.  I don't remember.

6    Q.  Do you agree, sir, that a check like this for

7    $2.5 million would be a red flag?

8    A.  Possibly.

9    Q.  Is it common for you to have customers write millions of

10   dollars of checks to themselves from a nonpayroll company

11   account?

12   A.  I don't know what -- I don't monitor my customers'

13   accounts that closely to know what kind of checks they are

14   writing to themselves.

15            THE COURT:  Counsel, are you finished with this

16   exhibit?

17            MR. MARDER:  I am, Your Honor.

18            THE COURT:  Then take it down.

19   BY MR. MARDER:

20   Q.  Lastly, sir, I want to look at Plaintiff's Exhibit 58.

21   A.  I'm sorry.  Plaintiff's Exhibit 58?

22   Q.  Yes.  If you can just give me a moment, I think there

23   may just be a mixup in the binder.

24       (Pause)

25            MR. MARDER:  I apologize, Your Honor.  I only have

```
 1    one copy of this document, but we can put it up on the

 2    screen.

 3              THE COURT:  Is it admitted into evidence?

 4              MR. MARDER:  It has not been admitted into

 5    evidence yet, no.

 6              MR. GLEESON:  I have no objection to it.

 7              MR. MARDER:  Your Honor, I'd offer Plaintiff's

 8    Exhibit 58 in evidence.

 9              THE COURT:  Exhibit 58 is received.

10              MR. MARDER:  May I approach, Your Honor?

11              THE COURT:  You may.

12    BY MR. MARDER:

13    Q.  In addition to these checks, were you aware that monies

14    were being wired out of the account and into the personal

15    accounts of PCI officers?

16    A.  I don't remember specifically doing that, but it appears

17    that that's what this request is.

18    Q.  This is a check -- sorry.  This is a fax to you from

19    Deanna Munson, right?

20    A.  Yes.

21    Q.  And she's asking you to wire money from the Petters

22    Company account, right?

23    A.  Yes.

24    Q.  The 9018 account?

25    A.  Yes.
```

Jambor - Cross

1  Q.  And she's asking you to wire the money to Mr. Petters'

2  personal account, right?

3  A.  It's an account titled in Mr. Petters' name, yes.

4  Q.  And when you got this, did you put an entry in the

5  Suspicious Activity Log?

6  A.  I don't remember.

7  Q.  Did you escalate this by contacting Ms. Rhode?

8  A.  I don't remember.

9          MR. MARDER:  I have nothing further, Your Honor.

10         MR. GLEESON:  Would you like me to start, Judge,

11 or do you want to take a break?  Your call.

12         THE COURT:  Let's have a sidebar about how long

13 this will take.

14         MR. GLEESON:  Sure.

15    **(At sidebar)**

16         THE COURT:  I'm planning to go to 3:00 until I

17 break.

18         MR. GLEESON:  Oh, I'm sorry.  I'm fine.  I'm going

19 to be a while with him.  So you want to take the break at

20 3:00?  It's just your call.  Sometimes judges want to break

21 between the exams.

22         THE COURT:  We'll take a break at 3:00.

23         MR. GLEESON:  Okay.

24    **(In open court)**

25         MR. GLEESON:  Judge, we've got some books of

```
 1    exhibits that my colleagues will pass out.
 2              THE COURT:  Members of the Jury, you may take a
 3    stretch break as this is going on --
 4              THE WITNESS:  Am I allowed to stand up?
 5              THE COURT:  -- if you wish.
 6              Yes, absolutely.  I apologize.  Yes.
 7         (Pause)
 8              THE COURT:  Are we ready to proceed?
 9              MR. GLEESON:  I think we're set.  Thanks for your
10    patience.
11              THE COURT:  You're welcome.
12                        DIRECT EXAMINATION
13    BY MR. GLEESON:
14    Q.  Good afternoon, Mr. Jambor.
15    A.  Good afternoon.
16    Q.  Where were you born?
17    A.  St. Paul.
18    Q.  Where were you raised?
19    A.  Oakdale.
20    Q.  Where did you go to high school?
21    A.  Tartan Senior High.
22    Q.  Do you still live in St. Paul?
23    A.  Yes, I do.
24    Q.  Have you lived here your whole life?
25    A.  The Twin Cities metro area, yes.
```

```
 1    Q.  And what year did you graduate high school?

 2    A.  1985.

 3    Q.  Did you go to college?

 4    A.  Yes.

 5    Q.  Where?

 6    A.  St. Thomas.

 7    Q.  What did you study?

 8    A.  Business management.

 9    Q.  And is that what you got your degree in?

10    A.  Yes.

11    Q.  What year did you get your college degree?

12    A.  1989.

13    Q.  Are you married, sir?

14    A.  Yes, I am.

15    Q.  What's your wife's name?

16    A.  Susan.

17    Q.  Does she work outside the home?

18    A.  Yes, she does.

19    Q.  What does she do, high level?

20    A.  Human resources.

21    Q.  Okay.  And do you have children, Mr. Jambor?

22    A.  Yes, I have a daughter.

23    Q.  Okay.  How old is she?

24    A.  23.

25    Q.  And what does she do?
```

1    A.  She's a chemical engineer.

2    Q.  Okay.  Here in St. Paul?

3    A.  Boston.

4    Q.  So you graduated college, you said, in 1989?

5    A.  Correct.

6    Q.  Okay.  What was your -- did you work after you graduated

7    college?

8    A.  Yes.

9    Q.  In what capacity?

10   A.  I worked at a -- I managed a video store that I worked

11   at during college for about six months after graduation.

12   Q.  Okay.  And there came a point when you left working in a

13   video store?

14   A.  Yes.

15   Q.  Where did you go from there?

16   A.  I went to a student loan servicing company.

17   Q.  Okay.  And did there come a point when you went into the

18   banking profession?

19   A.  Yes.

20   Q.  Okay.  When was that, Mr. Jambor?

21   A.  1992.

22   Q.  And where was it?

23   A.  Waterfield Mortgage.

24   Q.  Okay.  And what kind of banking work did you do at

25   Waterfield Mortgage?

```
1    A.  I originated mortgages for houses, for homes.

2    Q.  Okay.  So fair to say you were a mortgage banker?

3    A.  Yes.

4    Q.  Okay.  And you started your career in 1992, you said?

5    A.  Yes.

6    Q.  Are you still in banking now?

7    A.  Yes, I am.

8    Q.  And you worked continuously during that period in

9    banking or not?

10   A.  Yes.

11   Q.  Okay.  So you've been a banker for about 30 years?

12   A.  Correct.

13   Q.  Okay.  You say you were at Waterfield doing mortgage

14   banking, correct?

15   A.  Correct.

16   Q.  How long did you stay there?

17   A.  Not quite three years.

18   Q.  Okay.  And where did you go from there; do you recall?

19   A.  First Bank.

20   Q.  And did there come a point when you began working at

21   National City Bank?

22   A.  Yes.

23   Q.  When was that?

24   A.  March of 1997.

25   Q.  Okay.  That would mean you were -- I'm not good at this.
```

1   This is why I went to law school.  You were out of college

2   about eight years, correct?

3   A.  Yes, about eight years, yeah.

4   Q.  And how long had you been a banker when you first

5   started at National City Bank in 1997?

6   A.  Approximately five years.

7   Q.  Okay.  What was your position at National City Bank?

8   A.  Branch manager, retail lender.

9   Q.  What does that mean, "retail lender"?

10  A.  I was doing consumer loans, car loans, home equity lines

11  of credit.

12  Q.  And would that be considered retail banking?

13  A.  Yes.

14  Q.  Were there other tasks you performed as a retailer

15  banker besides the one you mentioned?

16  A.  I also kind of did some operations and stuff around the

17  branch.

18  Q.  Okay.  Where was your office when you were at National

19  City Bank, Mr. Jambor?

20  A.  Edina.

21  Q.  And there came a point -- did there come a point when

22  M&I Bank acquired National City Bank?

23  A.  Yes.

24  Q.  Do you recall when that was?

25  A.  2001.

1    Q.  Okay.  And at that time, at the time M&I Bank acquired

2    National City Bank, what was your position at National City

3    Bank?

4    A.  Branch manager, retail lender and I was doing some small

5    business lending.

6    Q.  Okay.  After the acquisition of National City Bank by

7    M&I Bank, did you move offices?

8    A.  Yes.

9    Q.  To where?

10   A.  Richfield.

11   Q.  Okay.  Did you move departments within the -- within the

12   M&I Bank after it acquired National City Bank?

13   A.  Yes, I moved to business banking.

14   Q.  Okay.  What's business banking as compared to retail

15   banking, Mr. Jambor?

16   A.  Business banking is mainly working with businesses and

17   the business owners.

18   Q.  Okay.  And there are other departments in the bank

19   besides business banking?

20   A.  Yes.

21   Q.  Okay.  Was one commercial banking?  You mentioned that

22   on your direct examination.

23   A.  Yes, commercial banking was another department.

24   Q.  Okay.  Is there a dividing line between customers that

25   are in the business banking department as opposed to the

Jambor - Direct

1    commercial banking department?

2    A.  Yeah, roughly 20 million in revenue or less was business

3    banking.  In excess of that, roughly, is commercial banking.

4    Q.  Okay.  And was that a hard-and-fast rule or were there

5    exceptions?

6    A.  There were exceptions.

7    Q.  Okay.  How did business banking -- withdrawn.

8           Is there greater activity in the accounts of

9    business banking as compared to the retail banking that you

10   did before you became a business banker?

11   A.  In terms of amount of checks and deposits?

12   Q.  Well, let's talk about loans.  Is there more loan

13   activity for a business banker than there is for a retail

14   banker?

15   A.  There's larger loan activity, yes.

16   Q.  Okay.  And is there loan activity in business banking,

17   correct?

18   A.  Yes.

19   Q.  Is there loan activity in commercial banking?

20   A.  Yes.

21   Q.  Okay.  Is the loan activity different in commercial

22   banking than it is in business banking?

23   A.  Generally you're dealing with larger loans in commercial

24   banking than in business banking.

25   Q.  Okay.  Now, while you're at National City Bank before it

Jambor - Direct

```
1    became -- it was acquired by M&I Bank, did you have any

2    interactions with Tom Petters?

3    A.  Yes.

4    Q.  Okay.  Once or more than once?

5    A.  I remember once.

6    Q.  Okay.  And was Mr. Petters a customer of National City

7    Bank at the time?

8    A.  Yes.

9    Q.  Okay.  And do you recall what type of account?  Was it

10   an individual account or a business account?

11   A.  It was a business account.

12   Q.  Okay.  Was your contact with Mr. Petters related to that

13   business account?

14   A.  Yes.

15   Q.  Okay.  Was he your customer?

16   A.  No, he was not.

17   Q.  But you say you had contact with him?

18   A.  Yes.

19   Q.  Was there a reason you had contact with him even though

20   he was not your customer?

21   A.  The account was overdrawn and the banker who was

22   assigned to the account wasn't around, so I reached out to

23   him about the overdraft in the account.

24   Q.  So he needed to be reached out to immediately?

25   A.  Yes.
```

Jambor - Direct

```
 1    Q.  Before the banker who had the customer relationship

 2    could return?

 3    A.  Yes.

 4    Q.  Okay.  You said the account was overdrawn?

 5    A.  Correct.

 6    Q.  Did you -- so you said you reached out for him, correct?

 7    A.  Correct.

 8    Q.  How?  By phone?  In person?

 9    A.  Telephone.

10    Q.  And did you get -- did you contact him?

11    A.  Yes.

12    Q.  What did you tell him?

13    A.  Just, you know, the account was overdrawn.  Could you

14    please cover it to pay the check -- or to pay the overdraft?

15    Q.  Okay.  And his response?

16    A.  I'll take care of it right away.

17    Q.  Did he?

18    A.  Yes.

19    Q.  Was this a typical type of call that bankers make to

20    customers?

21    A.  Yes.

22    Q.  Okay.  When customers are overdrawn in their account?

23    A.  Yeah, when they're overdrawn, you'd reach out to them.

24    Q.  Okay.  And he fixed the problem?

25    A.  Yes, he did.
```

```
 1    Q.  How did he treat you?

 2    A.  Fine.  Respectfully.

 3    Q.  Okay.  It doesn't sound like a major event.  Any reason

 4    you remember it?

 5    A.  Tom Petters was a well-known figure in the business

 6    area, you know, in the Twin Cities area.

 7    Q.  Okay.  And he was well known to you?

 8    A.  Well, I knew of his company, Petters Warehouse.

 9    Q.  Petters Warehouse?

10    A.  Yes.

11    Q.  What is that?

12    A.  It was a -- some retail stores that sold overstock

13    items.

14    Q.  Okay.  Did you know anything else at the time about

15    Petters that made him -- made the name recognizable to you?

16    A.  Mainly the retail stores.

17    Q.  Okay.  Did you know he had other businesses at the time?

18    A.  I wasn't aware of them, no.

19    Q.  Okay.  Did you know about his philanthropy at the time?

20    A.  I don't -- no, I don't believe so.

21    Q.  Okay.  During the period you were an M&I business

22    banker, was your performance evaluated on a regular basis?

23    A.  Yes.

24    Q.  Okay.  How regular?

25    A.  Annually.
```

Jambor - Direct

1    Q.  Okay.

2              MR. GLEESON:  Mr. Herzka, let me ask you to please

3    pull up Defendant's Exhibit 40002, please.  Could you pull

4    it down, please.

5              May I have a moment to confer with Mr. Marder?

6              THE COURT:  You may.

7         (Mr. Gleeson and Mr. Marder confer)

8              MR. GLEESON:  Judge, there's no objection to the

9    introduction of this if it's not already admitted.  Belt and

10   suspenders, I'll offer 40002 into evidence.

11             MR. MARDER:  No objection, Your Honor.

12             MR. GLEESON:  Thank you, Mr. Marder.

13             THE COURT:  40002 is received in evidence.

14             MR. GLEESON:  Okay.  Thank you, Mr. Herzka.

15   BY MR. GLEESON:

16   Q.  Okay.  I think you should have it in hard copy.

17   A.  Yes.

18   Q.  You're buried in documents over there.  You can feel

19   free to put the big binders that you had for Mr. Marder's

20   examination down.

21   A.  Okay.

22   Q.  I'll try not to make you pick them back up.

23        (Pause)

24   Q.  Okay?  You all set?

25   A.  Yes.

1    Q.  Do you recognize this document?

2    A.  It's a form I filled out.

3    Q.  Okay.  Oh, sorry.  Let's go to page 53 of that document.

4    A.  Okay.

5    Q.  Okay?

6    A.  Yes.

7    Q.  Do you recognize that?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's my performance evaluation form.

11   Q.  Okay.  For what year?

12   A.  2002.

13   Q.  Okay.  Is this the first time you've seen it in

14   20 years?

15   A.  No.

16   Q.  Okay.  You saw it before you came to court?

17   A.  I saw it before we came here, yes.

18   Q.  Okay.  Did you review this and the other evaluations

19   that were made of you at M&I Bank before you came to court?

20   A.  Yes.

21   Q.  Okay.  Who performed this review?  Can you tell from

22   this page?

23   A.  Yeah, Shari Rhode.

24   Q.  And who was she at the time?

25   A.  She was my supervisor.

```
 1    Q.  Okay.  And did your supervisor fill out all of your

 2    performance evaluations during the time you were at M&I

 3    Bank?

 4    A.  Yes.

 5    Q.  Okay.

 6              MR. GLEESON:  Mr. Herzka, if you could go to

 7    page 55.

 8    BY MR. GLEESON:

 9    Q.  You see that --

10    A.  Yes.

11    Q.  -- Mr. Jambor?

12              The supervisor line is Shari Rhode?

13    A.  Correct.

14    Q.  Okay.  And is that what you call your signature above

15    that?

16    A.  Yes, it is.

17    Q.  Okay.  So was there a practice of you signing the

18    performance evaluation at or about the same time as your

19    supervisor?

20    A.  Yes.

21    Q.  Okay.  These -- typically these performance evaluations,

22    what period of time would they cover?

23    A.  The previous year.

24    Q.  Okay.  Let's go to page 54, please, of this and let's

25    start with the punch line.  You see your overall performance
```

1    rating?

2    A.  Yes.

3    Q.  What is that?

4    A.  Exceeds expectations.

5    Q.  Okay.  And these are in evidence, so I'm not going to

6    make you read all of the -- everybody will be happy to hear

7    I'm not going to have you read all of them.

8         But on page 53, in one of the comments it says,

9    "Edward" -- let me try to help Mr. Herzka here.  No, that's

10   not it.  "Edward" -- let me get the document.  There it is.

11   It says, "Edward has transitioned from the retail banking to

12   business banking during this period.  He was professional

13   with the transition and adjusted nicely to the new

14   environment."

15        First, could you tell the jury why it is you

16   transitioned during that period from retail to business

17   banking.

18   A.  M&I Bank also acquired Richfield Bank & Trust, and a

19   couple of the business bankers at Richfield bank and trust

20   left, so I was brought in to help maintain the portfolio.

21   Q.  So you -- there was a vacancy, to put it that way --

22   A.  Yes.

23   Q.  -- in the business banking section?

24   A.  Yes.

25   Q.  And you were asked to fill it?

1    A.  Correct.

2    Q.  Okay.  The next sentence says, "He uses MIContacts

3    proficiently."  And then in the next entry it references

4    "MIContacts" again.

5            MR. GLEESON:  The next entry, Mr. Herzka.

6    BY MR. GLEESON:

7    Q.  "His calls in MIContacts" -- there we go, right in the

8    middle of that entry.  "His calls in MIContacts exceeds the

9    minimum required and he's always looking for new business."

10   Do you see that?

11   A.  Yes.

12   Q.  We know all about MIContacts already, but could you

13   briefly remind the jury what MIContacts was at M&I Bank.

14   A.  It was a call documentation program that we used to

15   document our calls with customers and prospects.

16   Q.  Okay.  And would it help you recall what happened in

17   connection with a particular contact?

18   A.  Yes.

19   Q.  Okay.  Other bankers had access to them?

20   A.  Yes.

21   Q.  Okay.  Did you use MIContacts frequently?

22   A.  Yes.

23   Q.  Did you use one -- did you fill out a MIContacts report,

24   or did one of your colleagues, every time you had contact

25   with a customer?

1   A.  Most of the time, yes.

2   Q.  Okay.  What was it that would make you determine to fill

3   out a MIContacts report?  The significance of the contact?

4   A.  Yes.

5   Q.  Okay.  What information did you put in them?

6   A.  Just highlighting of what happened during the meeting.

7   Q.  Okay.  And in relation to when a meeting would occur,

8   when would you fill out a MIContacts report?

9   A.  You try to do it fairly frequently, but sometimes you

10  got busy and it would happen slightly after the meeting.

11  Q.  Okay.  So you tried to do it right away?

12  A.  Yes.

13  Q.  But you didn't always succeed?

14  A.  No.

15  Q.  Okay.  Let's go to the 2003 review, which is at page 49.

16          MR. GLEESON:  And this is DX-40002, Judge, which I

17  think, without objection I offer into evidence.  These are

18  just the evaluation --

19          MR. MARDER:  No objection.

20          THE COURT:  It is received in evidence.

21  BY MR. GLEESON:

22  Q.  And it's at page 49, so let me get there.  Do you

23  recognize it, sir?

24  A.  Yes.

25  Q.  What is it?

 1   A.  My performance review.

 2   Q.  Up top it says, "Time Frame Covered," and it's blank,

 3   right?

 4   A.  Correct.

 5           MR. GLEESON:  So could you flip to page 52,

 6   Mr. Herzka, please.

 7   BY MR. GLEESON:

 8   Q.  See the signature block there?

 9   A.  Yes.

10   Q.  Who was your supervisor for this review?

11   A.  Shari Rhode.

12   Q.  Okay.  And she signed it --

13   A.  Correct.

14   Q.  -- April 17, '04?

15           Is that your signature above hers?

16   A.  Yes.

17   Q.  Same date, correct?

18   A.  Same date, correct.

19   Q.  Does that give you a clue as to what year, even though

20   the time covered was blank on the first page, what year this

21   performance review pertained to?

22   A.  2003.

23   Q.  Okay.  Again, right up above the signature block, the

24   overall performance rating was what?

25   A.  Exceeds expectations.

CASE 0:19-cv-01756-WMW   Doc. 433   Filed 01/08/23   Page 201 of 281

1    Q.  And then above that, the only comment on the page above

2    that says that you -- that, "Ed earned the role of one of

3    the top bankers in M&I and was honored as one of the CEO

4    Award winners."  Do you see that?

5    A.  Yes.

6    Q.  What's that award?

7    A.  It was an award that was given out to a number of the

8    top-performing employees for the year.

9    Q.  And what does it consist of?

10   A.  Just your performance, teamwork, meeting your goals.

11   Q.  I meant the award.

12   A.  Oh, the award was a trip to the Bahamas.

13        (Laughter)

14            MR. GLEESON:  Let's go to page 49 and could you

15   enlarge that comment, Mr. Herzka, please, at the bottom of

16   the page.

17   BY MR. GLEESON:

18   Q.  And the second half of that comment referring to you

19   says, "He continues to grow on the relationship side and has

20   strengthened his ability to recognize customer needs from

21   review of financials.  He works to enhance the relationship

22   but does not jeopardize the bank."  Do you see that?

23   A.  Yes.

24   Q.  What does it mean to "jeopardize the bank"?

25   A.  To put the assets of the bank at risk.

1    Q.  Can you give the jury an example of what -- an example

2    of conduct by a banker that might put the bank at risk.

3    A.  Originating a bad loan or a loan that goes bad that

4    doesn't pay.

5    Q.  Okay.  Going back to the part of the sentence that says

6    you strengthened your ability to recognize customer needs

7    from the review of financials, do you see that, Mr. Jambor?

8    A.  Yes.

9    Q.  What are financials in this context?

10   A.  Profit and loss statements, balance sheets, tax returns.

11   Q.  Okay.  Would you have that information -- withdrawn.

12           You had multiple customers in your portfolio?

13   A.  Yes.

14   Q.  Okay.  Would you have financials for all of those

15   customers?

16   A.  No.

17   Q.  For which ones would you have financials?

18   A.  Loan customers.

19   Q.  Okay.  Not for some other customers?

20   A.  If it was just a checking account or a depository

21   customer, we wouldn't collect financial information.

22   Q.  Okay.  And the PCI account was a depository account?

23   A.  Yes.

24   Q.  So you had no financials for them?

25   A.  No, I did not.

1    Q.  Why do you need them for customers with whom the M&I

2    Bank had a loan relationship?

3    A.  So you could analyze and make sure that they had the

4    ability to pay the loan back.

5    Q.  Loans create more risk?

6    A.  Yes.

7    Q.  Okay.  Than a deposit relationship?

8    A.  Yes.

9    Q.  Why is there less risk with respect to a customer that

10   has only a deposit relationship with the bank?

11   A.  Just you can -- the risk is if the account becomes

12   overdrawn and you don't collect the overdrawn amount, that's

13   the risk.  So it's generally not as large of a dollar

14   amount.  It's transactional, more transactional.

15   Q.  And not as large a risk as a customer that owes the bank

16   money?

17   A.  Yes.

18   Q.  Okay.  What information do -- and I should have said

19   this earlier.  I'm focusing on that period between the

20   acquisition of National City Bank -- okay? -- and when you

21   left M&I Bank, which we haven't established yet.  When was

22   that?

23   A.  Pardon?

24   Q.  When did you leave M&I Bank?

25   A.  August of 2007.

1    Q.  Okay.  So I'm focusing when I ask you these questions,

2    unless I tell you otherwise, on that period that you were at

3    M&I Bank until August of 2007.  Fair enough?

4    A.  Yes.

5    Q.  Okay.  During that period, what information would you

6    need if the customer had only a deposit relationship with

7    the bank?

8    A.  Articles -- for a business account, you'd get the

9    articles of the organization and verification of the signers

10   on the account.

11   Q.  Okay.  Do businesses have Social Security numbers?

12   A.  They have tax ID numbers.

13   Q.  Okay.  You need that too?

14   A.  Yes, you need verification of the tax ID number.

15   Q.  Okay.  You're a banker 30 years?

16   A.  Yes.

17   Q.  I've already expanded my questions beyond the 2002 to

18   2007, but let me ask you this:  As a general rule, are

19   deposit relationships in banking less complicated than loan

20   relationships?

21   A.  Generally speaking, yes.

22   Q.  Okay.

23            MR. COLLYARD:  Counsel, it's time for us to take

24   our midafternoon break.

25            Members of the Jury, please remember the

1   instructions and continue to follow them.  Please be

2   prepared to come back to the courtroom at 3:15.

3              THE LAW CLERK:  All rise for the jury.

4                      **IN OPEN COURT**

5                    **(JURY NOT PRESENT)**

6              THE COURT:  We will be in recess until 3:15.  You

7   certainly are free to leave.

8              THE WITNESS:  Thank you.

9      (Recess taken at 3:00 p.m.)

10                     *    *    *    *    *

11     (3:20 p.m.)

12                      **IN OPEN COURT**

13                    **(JURY PRESENT)**

14             THE COURT:  You may be seated.  Thank you.

15             MR. GLEESON:  May I continue, Judge Wright?

16             THE COURT:  You may.

17             MR. GLEESON:  Thank you.

18   BY MR. GLEESON:

19   Q.  When we left, I asked you whether -- before we left, I

20   asked you whether as a general rule deposit relationships

21   with banks were less complicated for bankers than loan

22   relationships.  You recall that question?

23   A.  Yes.

24   Q.  Okay.  And do they require less of your time, again, as

25   a general rule?

1    A.  General rule, yes.

2    Q.  Okay.  Let's go back to your 2003 performance review,

3    which is 40002, and I want to go to page 51, please.  And

4    the first comment says, among other things, that --

5    referring to you, "Is eager to follow up with prospect calls

6    and was very diligent" -- "is very diligent yet aware when

7    he's getting too pushy."  Let me stop there.

8              Is it important not to be too pushy when you are a

9    business banker, Mr. Jambor?

10   A.  Yes.

11   Q.  Why is that?

12   A.  Because you are trying to develop a relationship; and if

13   you come across as too pushy, they get a tendency to not

14   trust you.

15   Q.  So that's bad for the bank?

16   A.  Yes.

17   Q.  Is it bad for the customer if you are too pushy?

18   A.  Yes.

19   Q.  How so?

20   A.  Well, just that he feels like he's getting sold instead

21   of developing a long-term, beneficial relationship.

22   Q.  Got it.  He or she?

23   A.  He or she, yes.

24            MR. GLEESON:  Page 49 of the same review, please,

25   Mr. Herzka.

1    BY MR. GLEESON:

2    Q.  And the only comment there includes the words, "Edward

3    has gone the extra mile to meet client needs and demands as

4    was evidenced when he received one of the bank's largest

5    deposit customer."  See that?

6    A.  Yes.

7    Q.  Who is that?

8    A.  I believe this was for 2003?

9    Q.  Yes.

10   A.  I believe it was ███████████.

11   Q.  Okay.  And ███████████ at that point became your larger

12   deposit customer, or by that point, correct?

13   A.  Yes.

14   Q.  Did you get reports that informed you about the size of

15   the customers in your portfolio?

16   A.  Yes.

17   Q.  Was there a name you had for those reports?

18   A.  The ACE reports.

19   Q.  Okay.  Let me put before you again --

20            MR. GLEESON:  Judge, there's a bunch of these ACE

21   reports.  I've conferred with Mr. Marder, and there's no

22   objection to them coming into evidence.  The problem is

23   there's 54 of them, and I could read all the exhibit numbers

24   now.  I also have them on a sheet of paper I've shared with

25   counsel, which would spare us that ordeal.  The Court's

1    preference is mine.

2            THE COURT:  You may submit your list of those

3    exhibits and they are, as I understand it, not objected to;

4    is that correct?

5            MR. MARDER:  Not objected to, Your Honor.

6            THE COURT:  And the list is numerical; is that

7    correct?

8            MR. GLEESON:  It's numerical and I would -- if

9    they were consecutive, then I could do it, but they are not.

10   They jump around.

11           THE COURT:  Okay.

12           MR. GLEESON:  So I have this chart that I'm happy

13   to hand up to the Court and to your clerk.  My suggestion

14   is, in light of counsel's gracious stipulation, I just -- we

15   just deem this Defendant's Exhibit -- what's the highest

16   number we've got? -- 8000.  We don't have 8,000 exhibits,

17   but 8000.  And I'll offer the list in evidence as

18   Defendant's Exhibit 8000 and it will preserve for the record

19   the exhibit numbers of the 54 ACE reports.

20           THE COURT:  Very well.  Does -- is there any

21   objection to that?

22           MR. MARDER:  No objection to that procedure,

23   Your Honor.

24           MR. GLEESON:  Should I hand this up?

25           THE COURT:  Yes, you should.  It is received.

1      (Document handed to the Court)

2          MR. GLEESON:  Okay, Mr. Herzka, if you could pull

3      up Defendant's Exhibit 40074 in evidence.

4          MR. MARDER:  Just so the record is clear on

5      appeal, maybe tonight we could just have the court reporter

6      enter onto the transcript the actual numbers so there's no

7      dispute about what's into evidence.  Would that make sense?

8          THE COURT:  I think that is wise.

9          MR. MARDER:  Thank you, Your Honor.

10         THE COURT:  Thank you for the suggestion.  We will

11     do that.

12         MR. GLEESON:  Thank you.

13         THE WITNESS:  I'm sorry.  What's the number again,

14     please?

15     BY MR. GLEESON:

16     Q.  Sorry.  40074.  Okay.  You with us, Mr. Jambor?

17     A.  Yes.

18     Q.  What's that?

19     A.  This is my ACE report.

20     Q.  Okay.  Along the top, it includes that title, correct?

21     A.  Correct.

22         MR. GLEESON:  You can enlarge that a little bit,

23     Mr. Herzka.

24     BY MR. GLEESON:

25     Q.  It says, "ACE/RLP Profitability Ranking Report,"

1    correct?

2    A.  Correct.

3    Q.  "Relationship Ranking by Officer"?

4    A.  Yes.

5    Q.  Okay.  It says -- how do you know this is your report?

6    A.  I am the officer listed.

7    Q.  Okay.  And it also lists your supervisor, correct?

8    A.  Yes.

9    Q.  And at that point it was whom?

10   A.  Shari Rhode.

11   Q.  Okay.  When you were a business banker at M&I Bank, did

12   you receive these reports regularly?

13   A.  Yes, monthly.

14   Q.  Okay.  And did they cover all of the accounts in your

15   portfolio?

16   A.  Yes.

17   Q.  So all of the customers listed on your ACE report are

18   the ones with which you had the customer relationship,

19   correct?

20   A.  Correct.

21   Q.  Okay.  Did you review these reports on a regular basis?

22   A.  I glanced through them, yes.

23   Q.  Okay.  For what purpose or purposes?

24   A.  Just to see who were my top customers and how I can --

25   you know, what customers I may be able to expand upon the

1    relationship.

2    Q.  And it showed profitability, correct?

3    A.  Correct.

4    Q.  Was that important to you?

5    A.  Yes.

6    Q.  Okay.  Was there other data on these reports that was

7    important to you?

8    A.  Just number of accounts, deposit balances, loan

9    balances.

10   Q.  Okay.  What do you mean by "deposit balances, loan

11   balances"?  Are those two different things?

12   A.  Yes.

13   Q.  Okay.  What's a deposit balance?

14   A.  The amount of money they have on deposit with the bank.

15   Q.  So that would reflect a depository relationship,

16   correct?

17   A.  Correct.

18   Q.  And loan balances?

19   A.  The average balance of the [indiscernible] --

20              COURT REPORTER:  I'm sorry.  Can you say that

21   again?

22              THE WITNESS:  I'm sorry.  The average balance of

23   the loans that they had with the bank in my portfolio.

24   BY MR. GLEESON:

25   Q.  Okay.  So a customer with just a deposit relationship

1    would not have any loan balance; fair enough?

2    A.  Fair enough, yes.

3    Q.  Okay.  Why does average deposit balance matter to a

4    business banker or to a banker, for that matter?

5    A.  It matters -- it allows them to take those funds and

6    lend them out to companies and people that wish to have

7    loans taken out -- that want loans from the bank.

8    Q.  Okay.  And the money gets lent out?

9    A.  Yes.

10   Q.  Interest is charged?

11   A.  Yes.

12   Q.  And the money that gets lent out comes in part from

13   deposit accounts?

14   A.  Correct.

15   Q.  That's how banks make money off our checking accounts?

16   A.  Yes.

17   Q.  The -- are these listed in order of profitability on

18   these ACE reports?

19   A.  Yes.

20   Q.  Okay.  It's a little bit of a challenge, but let's see

21   if we can identify which customer -- what month is this for?

22   Remind the jury.

23   A.  January of '04.

24   Q.  Okay.  And which customer does this report identify as

25   the most profitable one in your portfolio?

```
1    A.  ████████.

2    Q.  Okay.  That's -- and where do you see the name ████████?

3    A.  If you look u  nder "Relationship Name" in the far upper

4    left corner.

5    Q.  It says, "████████, Inc."?

6    A.  Correct.

7    Q.  Okay.  And just to the right of that, and going down the

8    page, is a long list.  Do you see that?

9    A.  Yes.

10   Q.  It's highlighted there.  What is that?

11   A.  Those are all the accounts under the ████████

12   relationship.

13   Q.  Okay.  Why were there so many accounts under the

14   ████████ relationship?

15   A.  The company was -- they processed and distributed checks

16   for class action lawsuits.

17   Q.  Okay.  And was there a separate account for each

18   lawsuit?

19   A.  Yes.

20   Q.  Okay.  And some of those accounts --

21        MR. GLEESON:  If they can be enlarged just a

22   little bit, Mr. Herzka.

23   BY MR. GLEESON:

24   Q.  You can see things like "FTC vs Consumer Credit

25   Services," "FTC vs First Alliance."  Those are just two
```

Jambor - Direct

1    examples.  What do they reflect?

2    A.  The Federal Trade Commission winning a lawsuit against a

3    company.

4    Q.  Okay.  And ████████ would help distribute the proceeds

5    of either lawsuit settlements or lawsuit judgments?

6    A.  Yes.

7    Q.  Class actions?

8    A.  Generally class actions, yes.

9    Q.  Okay.  Now, the second column over --

10              MR. GLEESON:  If you could pull back a little,

11   please, Mr. Herzka.

12   BY MR. GLEESON:

13   Q.  The second column over from that list of names has, at

14   the top, "Net Profit."  Do you see that?

15   A.  Yes.

16   Q.  Okay.  And then below that, there are two kind of

17   subcolumns within "Net Profit."  Do you see that?

18   A.  Yes.

19   Q.  One says -- you tell us.

20   A.  "R12," and the other says, "Current month."

21   Q.  Okay.  What's R12?

22   A.  Rolling 12 months, so the previous 12 months.

23   Q.  So does that reflect the rolling profit for the past

24   12 months prior to the ACE report on which it's located?

25   A.  Yes.

Jambor - Direct

```
 1    Q.  Okay.  And the next one is the net profit for the
 2    current month, correct?
 3    A.  Correct.
 4    Q.  Does "current month" mean the previous month?
 5    A.  Yes.
 6    Q.  Okay.  What was the total profit on this one, January
 7    '04, for ████████ in the rolling 12-month column?
 8    A.  $1,438,224.
 9    Q.  Okay.  And for the current month?
10    A.  $112,752.
11    Q.  Okay.  And then if you go down to the second customer
12    listed on your ACE report.
13            MR. GLEESON:  And maybe you can make that easier
14    to read, Mr. Herzka, if possible.
15    BY MR. GLEESON:
16    Q.  You see which customer that is?
17    A.  Petters Company, Inc.
18    Q.  Okay.  All right.  And --
19            MR. GLEESON:  Oh, that's good.
20    BY MR. GLEESON:
21    Q.  You testified a moment ago the net profit for ████████
22    was $1,438,224 for the previous year, correct?
23    A.  Correct.
24    Q.  What's the rolling 12 net profit for PCI?
25    A.  $82,673.
```

```
 1   Q.  Okay.  So the ██████████ net profit for the previous year
 2   was like roughly 17 times higher than the profit for PCI?
 3   A.  Whatever the math is, yes.
 4   Q.  Okay.  Any reason to -- withdrawn.
 5            We can do the math --
 6   A.  Yes.
 7   Q.  -- once we're equipped with a calculator.
 8   A.  Correct.
 9   Q.  You testified a moment ago the current profit for the --
10   the monthly profit for ██████████ was 112,752, and you can
11   see it up there at the top of the chart.
12            What was the current month profit for the previous
13   month prior to January of '04 for PCI?
14   A.  $6,687.
15   Q.  Okay.  So roughly, like, 1/20th that of ██████████,
16   correct?
17   A.  Correct.
18   Q.  Now, you see there are four accounts under the PCI --
19   under Petters Company, Inc., correct?
20   A.  Correct.
21   Q.  Were they all deposit accounts?
22   A.  Yes.
23   Q.  What's the largest -- at least in terms of
24   profitability, what's the largest of them called?
25   A.  Petters Company, Inc.
```

1    Q.  And is that the account that's the subject of this case?

2    A.  Yes.

3    Q.  Okay.  I want to go back to the performance review for

4    2003, which is Defendant's Exhibit 40002, at page 51.  And

5    the last of the comments on that page under "Other" says,

6    "Good involvement in community such as Chamber and Rotary.

7    Was active with Race for the Cure, the Twin Cities marathon

8    organization, and the Richfield Swim meet."  Do you see

9    that?

10   A.  Yes.

11   Q.  Okay.  Did you do those things?

12   A.  Yes.

13   Q.  Did the bank support them financially?

14   A.  Yes.

15   Q.  Did you attend them?

16   A.  Yes.

17   Q.  Did this -- it's on your evaluation.  Did your

18   charitable work matter to your evaluation?

19   A.  Yes.  Community involvement was part of my job.

20   Q.  What's your understanding as to why?

21   A.  It was beneficial for the community and it also

22   benefitted the bank.

23   Q.  How did it benefit the bank?

24   A.  Just exposure and showing that they care about the

25   communities that they're involved in and they are involved

1    in the communities that they bank -- that they have branches

2    in.

3    Q.  So if it generates goodwill in the community, you might

4    get more customers?

5    A.  Yes.

6    Q.  And how does it benefit the community?

7    A.  Just, you know, involvement.  Race for the Cure was for

8    women's breast cancer.  Twin Cities Marathon is a major

9    marathon in the area.  Just, you know, community -- Just

10   overall community support of many activities.

11   Q.  Okay.  The bank supported worthy causes?

12   A.  Yes.

13   Q.  Do you still do community work now?

14   A.  Yes.

15   Q.  Can you give us an example.

16   A.  I'm on the board of directors for the Vadnais Heights

17   Economic Development Corporation.

18   Q.  And briefly, high level, what does that do?

19   A.  That is -- it is a little different, but it's basically

20   a Chamber of Commerce for the City of Vadnais Heights.

21   Q.  Okay.  Helps the companies, the corporations, the

22   businesses in that community?

23   A.  Yes.

24   Q.  Okay.  Do you enjoy your charitable work?

25   A.  Yes.

Jambor - Direct

1    Q.  Okay.  Let's go to the next -- the 2004 review, which is

2    at page 45 of the same exhibit, which is 40002.  What time

3    is -- what time period is covered by this?

4    A.  April 1st of 2004 to April 1st of 2005.

5    Q.  So it's a full year, correct?

6    A.  Correct.

7    Q.  But this time it's not a calendar year?

8    A.  Correct.

9    Q.  Okay.  And if you could, turn to page 48.  You signed

10   this?

11   A.  Yes.

12   Q.  Okay.  And Shari Rhode was still your supervisor --

13   withdrawn.

14            Who was your supervisor on March 31 of 2005?

15   A.  Shari Rhode.

16   Q.  Okay.  And you both signed the evaluation, correct?

17   A.  Correct.

18   Q.  The overall performance rating?

19   A.  Exceeds expectations.

20   Q.  And just above that is a comment that says, in the third

21   sentence, "We promoted him," referring to you, "to BB II in

22   July and meeting the new goals was not a real challenge for

23   Ed."  Do you see that?

24   A.  Yes.

25   Q.  What's BB II?

Jambor - Direct

1    A.  Business Banker II.  It's a promotion from a Business

2    Banker I.

3    Q.  You're still in business banking?

4    A.  Yes.

5    Q.  It was a promotion, came with a raise?

6    A.  Yes.

7    Q.  I want to touch on a few of the entries in this

8    evaluation.  The first is on page 47.  And the first comment

9    at the top of the page says, "Ed has the largest portfolio

10   in the business banking division and has done a good job of

11   maintaining the portfolio as well as working with prospects

12   and potential clients."  Do you see that?

13   A.  Yes.

14   Q.  What does "maintain a portfolio" mean?

15   A.  Just maintaining the customers in the portfolio, making

16   sure that they stay with the bank.

17   Q.  Okay.  And how do you maintain customers that are

18   already in your portfolio?

19   A.  Just you work with them, you meet with them, you make

20   sure you're satisfying what they need to help them run their

21   companies.

22   Q.  Okay.  Your customers ask you to do things?

23   A.  Yeah, they ask for -- yeah.

24   Q.  Customer service?

25   A.  Customer service, yes.

1    Q.  Okay.  And what does "working with prospects and

2    potential clients" relate to?

3    A.  Working with prospects and potential clients is working

4    with businesses that aren't currently customers of M&I Bank

5    and trying to make them customers of M&I Bank.

6    Q.  So this tells you you are good at maintaining the

7    portfolio and working to increase its size, correct?

8    A.  Correct.

9    Q.  All right.  Let's go back to the bottom of page 45, and

10   there's a section of the evaluation that's titled in bold

11   "Critical Linkages."  Do you see that?

12   A.  Yes.

13   Q.  What are critical linkages?

14   A.  Just basically working with other parts of the bank.

15   Q.  Okay.  To do what?

16   A.  To expand the relationships, use their expertise in

17   areas that you weren't, you know, in to expand and solidify

18   the relationship with the customer.

19   Q.  Okay.  And were you just expanding your relationship

20   with other people in the bank or were you doing something

21   else?

22   A.  Expanding the customer's relationship or with -- by

23   bringing in the people that were experts in the area that we

24   could help the customer with.

25   Q.  Okay.  Is that called cross-selling?

1    A.  Yes.

2    Q.  You were examined on direct about cross-selling.  Could

3    you tell us a little bit, Mr. Jambor, about the reason that

4    banks -- that you, as a banker, cross-sold, if that's a

5    word.

6    A.  Cross-sold?  To basically help them -- provide them with

7    additional products and services to help them run their

8    business, but also it helped them stay with the bank longer

9    because they had more products and services with the bank.

10   Q.  Okay.

11   A.  But mainly --

12   Q.  Sorry.

13   A.  -- to help them with the efficiency of the running of

14   their company.

15   Q.  Okay.  So let's just unpack that a little bit.

16             Cross-selling is good for the bank?

17   A.  Yes.

18   Q.  Okay.  How?

19   A.  It just expanded products and services so it kept the

20   customers at the bank.

21   Q.  Okay.  Kept them at the bank in what sense?

22   A.  We used to kind of like -- the more products and

23   services they have with the bank, the less likely they are

24   to leave for another bank.

25   Q.  You have heard the phrase or the term "sticky

1    relationship"?

2    A.  Yes.

3    Q.  What does that mean to you?

4    A.  Meaning they are sticky.  That means it's harder for

5    them to move, more complicated for them to move if they have

6    more products and services.

7    Q.  Got it.  That's good for the bank?

8    A.  Yes.

9    Q.  Is cross-selling good for the customers?

10   A.  Yes.

11   Q.  How so?

12   A.  It provides them with additional products and services

13   to help them run their companies better, more efficiently.

14   Q.  Okay.  Do you try to compete with your -- with other

15   banks in the area for the -- with respect to the products

16   that you offer to your customers?

17   A.  Yes.

18   Q.  Okay.  Roughly -- how many banks have you worked for,

19   roughly, in your 30 years?

20   A.  Five or six.

21   Q.  Okay.  Is cross-selling a big part of all of those

22   banks' work?

23   A.  Yes.

24   Q.  Okay.  And is it part of the everyday business of every

25   business banker, to your knowledge?

1    A.  Yes.

2    Q.  Every commercial banker?

3    A.  Yes.

4    Q.  Is it baked into your profession?

5    A.  Yes.

6    Q.  Is there anything wrong with trying to cross-sell the

7    products of the bank to the bank's customers?

8    A.  No.

9    Q.  Has anybody ever suggested that to you before now?

10   A.  No.

11   Q.  At the top of page 46 it says, "Ed is one of our top

12   referral sales bankers."  Do you see that?

13   A.  Yes.

14   Q.  What does that mean?

15   A.  I give out a lot of referrals to other areas of the

16   bank.

17   Q.  Just so the jury knows, what's a referral?

18   A.  It's basically providing a lead, you know, a lead from a

19   current customer or prospect to another area of the bank.

20   Q.  And if that lead is followed up on, the other person in

21   the bank might get some business?

22   A.  Yes.

23   Q.  Does the customer's business go to that fellow banker?

24   A.  Yes.  Well, depending on -- yes, but they get credit for

25   the sale, credit for the business.

1   Q.  Does it -- and if that sale -- whatever the product

2   happens to be, does the customer's relationship grow to

3   include another banker in the bank?

4   A.  Another touch point, yes.

5   Q.  On this page 46 it also says, "He has worked" --

6           MR. GLEESON:  It's the second sentence,

7   Mr. Herzka.

8   BY MR. GLEESON:

9   Q.  "He's worked with our largest account, ███████, and

10  introduced not only Treasury Management but also Mife and

11  retail bankers."  Do you see that?

12  A.  Yes.

13  Q.  Remind the jury what treasury management is.

14  A.  Those are cash management services, online banking, ACH,

15  deposited pay, those types of products and services.

16  Q.  ACH?

17  A.  Automatic clearinghouse.  It's if you get a direct

18  deposit of your payroll check into your checking account,

19  that's an ACH.  It's how it gets into your account.

20  Q.  And someone with just a deposit relationship could

21  benefit from treasury management services, correct?

22  A.  Yes.

23  Q.  Okay.  Do you recall introducing treasury management to

24  ██████?

25  A.  Yes.  Vaguely, yes.

1   Q.  Okay.  Is that a high maintenance account?

2   A.  Yes.

3   Q.  Was PCI a high maintenance account?

4   A.  No.

5   Q.  In that same entry, there's a mention of a weakness.

6   Sorry to bring this up to you.  It says, "His weakness in

7   this area is communication with the RCC" -- withdrawn.

8          Sorry.  I meant to ask you if you remember what

9   Mife is.

10  A.  I don't remember what Mife is, no.

11  Q.  Let's go back down to this.  "His weakness in this area

12  is communication with the RCC and BCC and needs to hone in

13  on his written communication skills.  When possible, he

14  should communicate with e-mail as his handwriting is

15  difficult to read, which has created frustration for both he

16  and the RCC."  Do you see that?

17  A.  Yes.

18  Q.  What was the RCC?

19  A.  It was another department inside M&I Bank.

20  Q.  Same with the BCC?

21  A.  Yes.

22  Q.  Okay.  Do you happen to remember what they stand for now

23  all these years later?

24  A.  I don't remember, no.

25  Q.  You were apparently communicating with them via

```
 1    handwritten notes?

 2    A.  I guess, yes.

 3    Q.  And we already saw your handwriting, correct?

 4    A.  Correct.

 5    Q.  Did you write other stuff the way you sign your name?

 6    A.  Somewhat similar, yes.

 7    Q.  Okay.  So you're being told here that your handwritten

 8    communication skills were less than -- they were of lesser

 9    strength, correct?

10    A.  Correct.

11    Q.  Okay.  Is handwritten communications -- withdrawn.

12              Were your colleagues in the same branch --

13    withdrawn again.

14              What branch were you in?

15    A.  Richfield.

16    Q.  Sorry?

17    A.  Richfield.

18    Q.  Okay.  And were there other business bankers at the

19    Richfield branch?

20    A.  Yes.

21    Q.  Was Shari Rhode there?

22    A.  I don't know if she officed there or not or if she was

23    still in Edina.  I don't remember.

24    Q.  Okay.  But there were other colleagues there, correct?

25    A.  Correct.
```

1    Q.  Okay.  Did you have ways of communicating with people in

2    your office other than through handwritten communications?

3    A.  Oh, yeah.  We'd meet in person or phone calls.

4    Q.  Okay.  When your weakness was pointed out to you, that

5    you weren't using e-mail enough, did you try to use e-mail

6    more often?

7    A.  Yes.

8    Q.  Okay.  And when was this that you were criticized for

9    not using e-mail enough?  Go to the last page of that

10   evaluation.

11   A.  2005.

12   Q.  What month?

13   A.  March of 2005.

14   Q.  Okay.  Let's go to your 2005 review, which is -- I want

15   you to turn to page 40, please, and it goes from 40 to 43 --

16   oops, to 44.  Okay?

17          So let's -- if you go back to -- we're on it.

18   This evaluation covers what year?

19   A.  2005.

20   Q.  It looks like it's a calendar year, correct?

21   A.  Yes.

22   Q.  Okay.  And if you turn to page 44, that's you, again, at

23   the top, right?

24   A.  Yes.

25   Q.  Okay.  And then that doesn't look like Shari Rhode as

1    your supervisor, correct?

2    A.  No.

3    Q.  So let's go back to the first page.  You got a new

4    supervisor?

5    A.  Yes.

6             MR. GLEESON:  That's page 40, Mr. Herzka.  Thank

7    you.

8    BY MR. GLEESON:

9    Q.  So this year you got a new supervisor, right?  Who's

10   that?

11   A.  David Nash.

12   Q.  Let's flip back and see the overall performance rating

13   on page 43.  What's that?

14   A.  Meets expectations.

15   Q.  You slipped down a notch that year, correct?

16   A.  Yes.

17   Q.  Okay.  Lower than the two years -- the years before that

18   we looked at?

19   A.  Yes.

20   Q.  Okay.  Let's turn to the first page of the evaluation,

21   page 40, and that first comment, "This has been a

22   challenging year for Ed with all the turmoil on the

23   ███████████ relationship.  The time commitment involved in

24   trying to fix the operational issues of this client as it

25   started to unwind took its toll on Ed's ability to meet his

```
1    goals and manage other relationships."  Do you see that?

2    A.  Yes.

3    Q.  It goes on to compliment you in other respects.

4         But do you recall now what the turmoil in the

5    ███████ relationship was?

6    A.  Exactly, no, I don't remember.

7    Q.  Okay.  But this -- as you mentioned earlier, that's a

8    high maintenance client?

9    A.  Yes.

10   Q.  Did you ever have issues with ███████ that rose --

11   that you had to bring to the attention at the highest levels

12   of the bank?

13   A.  I believe so, yes.

14   Q.  Including senior executives of M&I Bank?

15   A.  Yes.

16   Q.  Okay.  Let's go back to page 43.

17        MR. GLEESON:  And if you can enlarge that comment,

18   Mr. Herzka.  Thank you.

19   BY MR. GLEESON:

20   Q.  "Ed's scorecard was a challenge this year with the

21   ███████ balance volatility, so it's difficult to evaluate

22   his results from a financial contribution support [sic].

23   His loan and asset [sic] sales were excellent and he did

24   book a large deposit relationship at the end of the year

25   that will produce excellent balances in 2006."  It goes on.
```

```
 1                Do you recall what the large deposit relationship
 2      that you booked at the end of the previous year was?
 3      A.  I don't remember, no.
 4      Q.  But it was new?
 5      A.  I don't remember.
 6      Q.  Was it PCI or ███████████?
 7      A.  No.
 8      Q.  Okay.  Let's turn to the 2006 review, which is at
 9      page 035 of the same exhibit.  Do you see that?
10      A.  Yes.
11      Q.  Time frame covered is what?
12      A.  2006.
13      Q.  Okay.  Who was your supervisor at this point?
14      A.  Chris Flynn.
15      Q.  Okay.  And who was Chris besides your supervisor?
16      A.  He was -- he's another banker --
17      Q.  Okay.
18      A.  -- that worked at M&I Bank.
19      Q.  Had his own portfolio?
20      A.  I believe he had a portfolio.  I'm not sure.
21      Q.  Okay.  Was there a name they gave to the people who
22      supervised business bankers in the way Shari Rhode, Kevin
23      Nash, and Chris Flynn supervised you?
24      A.  I don't remember what it was, if there was one.
25      Q.  Okay.  If you turn to page 39, you signed this, correct?
```

Jambor - Direct

```
 1    A.  Yes.

 2    Q.  Is that you under -- next to "Employee," is that your

 3    signature?

 4    A.  Yes.

 5    Q.  And is that Flynn's signature below; do you know?

 6    A.  I believe so, yes.

 7    Q.  Okay.  He's on the front as your supervisor, correct?

 8    A.  Yes.

 9    Q.  Okay.  And you signed that when?

10    A.  April 5th, 2007.

11    Q.  All right.  So you testified earlier you left in August

12    of 2007?

13    A.  Yes.

14    Q.  About five months after this evaluation?

15    A.  Yes.

16    Q.  Okay.  Is this your last evaluation at M&I Bank?

17    A.  Yes.

18    Q.  Okay.  So let's start with the overall performance on

19    page 38.

20              THE COURT:  Counsel, please approach.

21              Members of the Jury, if you'd like to stand up and

22    take a stretch break, you may.

23         (At sidebar)

24              THE COURT:  I'm trying to understand the purpose

25    of this questioning and -- it appears to be running out the
```

1    clock.  Is that the purpose?

2            MR. GLEESON:  It is absolutely not the purpose.

3    I'm about done.  For example --

4            THE COURT:  I'm just asking you the purpose.  You

5    can --

6            MR. GLEESON:  Yeah, the purpose is to

7    contextualize within his experience at the bank the PCI

8    relationship.  It wasn't his most profitable.  You have

9    heard that there's an issue, just among the many issues --

10           THE COURT:  We don't need to go through what I've

11   already heard.  I'm just trying to understand the purpose of

12   this and --

13           MR. GLEESON:  For example, it indicates he didn't

14   use e-mail enough before March of 2005, which is the date

15   before which the e-mails are gone, so the prejudice to the

16   trustee with regard to the alleged spoliation is minimized.

17           The fact he left the bank in August of 2007, this

18   shows -- I'm about done with his evaluations, so the Court

19   knows.  But this shows that he left -- he was doing great

20   when he left the bank.

21           So to the degree there's some specter -- he's

22   alleged to have turned a blind eye to a Ponzi scheme.  So

23   these evaluations show that he was a very good business

24   banker who did his job well and left because -- as I'll

25   elicit in a minute, left for a better opportunity.

```
 1                  THE COURT:  Let's move along.  I want to be

 2        respectful of the jurors' time and attention.

 3                  MR. GLEESON:  Let's pull that back up, please,

 4        Mr. Herzka, page 38.

 5        BY MR. GLEESON:

 6        Q.  The overall performance evaluation?

 7        A.  Exceeds expectations.

 8        Q.  Okay.  And if you look at the last comment before the

 9        rating, it says, "Ed had a terrific sales year and when you

10        analyze his scorecard, you see solid growth in profitability

11        as well as loans and deposits.  He far exceeded his goals in

12        all those areas.  He should have another solid year in 2007

13        as the lingering effects of ██████████ should be diminished."

14        Do you see that?

15        A.  Yes.

16        Q.  What's your understanding of the lingering effects of

17        ██████████?

18        A.  I don't remember what they were.

19        Q.  Okay.  And it says, "Ed does a solid job of managing his

20        relationships, many of which are medium-sized businesses who

21        face a multitude of tough business issues."  Sorry.

22        Page 35.

23                  MR. GLEESON:  Sorry, Mr. Herzka.

24                  Sorry, Your Honor.

25        BY MR. GLEESON:
```

1    Q.  And then it says, "Ed works closely with his key

2    accounts to maintain those relationships and cross-sell for

3    additional business."  Do you see that?

4    A.  Yes.

5    Q.  Are you being praised for working closely with your key

6    accounts?

7    A.  Yes.

8    Q.  It also says that you have developed an expertise "with

9    leasing companies and uses the SBA to his advantage where

10   necessary."  Do you see that?

11   A.  Yes.

12   Q.  What's the SBA?

13   A.  The Small Business Administration.

14   Q.  Okay.  And was there a particular type of business that

15   your expertise with SBA enabled you to be a good banker for?

16   A.  Yes.  The SBA has a program called 7(a), which is

17   particularly useful for start-up companies to help them

18   maintain financing.

19   Q.  One more thing with regard to these evaluations, the

20   last thing.  If you could look at the end of that comment,

21   it says, "Very good work with Gassen to bring in that

22   extremely difficult" -- "to bring that extremely difficult

23   relationship to profitability."  Do you see that?

24   A.  Yes.

25   Q.  Okay.  What was Gassen?

Jambor - Direct

```
1    A.   Gassen is a property management company.

2    Q.   Okay.  So based on this evaluation, which you said was

3    five months before you left M&I Bank, it looks like you were

4    doing pretty well as of the spring 2007, correct?

5    A.   Yes.

6    Q.   Why did you leave the bank?

7    A.   I got another opportunity.

8    Q.   Okay.  Was it more attractive in any way?

9    A.   Yeah.  It was more money.  It was closer to home.

10   Q.   Okay.  And do you ever remember -- withdrawn.

11            You've had a chance to look at these reviews,

12   these performance evaluations before you came to court,

13   correct?

14   A.   Yes.

15   Q.   Do you remember PCI being mentioned in any of these

16   annual reviews?

17   A.   No, I don't.

18   Q.   Okay.  Several individual customers come up in your

19   reviews, correct?

20   A.   Yes.

21   Q.   High maintenance ones came up, correct?

22   A.   Yes.

23   Q.   Okay.  You can put those -- that review exhibit aside.

24            Let's turn to your experience with your customers

25   at M&I Bank.  You had a portfolio, you testified already?
```

1   A.  Yes.

2   Q.  Did the size of your portfolio in terms of the number of

3   customers vary over time?

4   A.  Yes.

5   Q.  Can you give us a ballpark, on average, how many

6   customers you had in your portfolio?

7   A.  A few hundred.

8   Q.  Okay.  And did you have touch points during the year

9   with all of those few hundred customers?

10  A.  No, I did not.

11  Q.  Okay.  Did you have touch points with any of them?

12  A.  Many of them, yes.

13  Q.  Okay.  Do you have more touch points with your larger

14  customers?

15  A.  Yes.

16  Q.  And PCI was among your larger customers?

17  A.  Yes, they were.

18  Q.  Okay.  Let's go back to your 2004 ACE report, DX-40074.

19  Let's talk about some of the other columns on these ACE

20  reports.

21          If you go across the top, do you see all the way

22  on the right-hand side at the very top, "Current Month

23  Balances"?

24          MR. GLEESON:  Let's see if we can enlarge that up

25  at the top, Mr. Herzka.  Do you see that?

1     BY MR. GLEESON:

2     Q.  Okay.  Under that heading is another one called "Avg

3     Deposit Balance."  Do you see that, Mr. Jambor?

4     A.  Under what?  ADP?

5     Q.  I think it stands for average.  "Average Deposit

6     Balance."

7     A.  Yes, I see that.

8     Q.  Do you see that?

9     A.  Yes.

10    Q.  And what does that represent for your customers that are

11    listed below?

12    A.  The average deposit balance in the account for the

13    previous month.

14    Q.  Okay.  And you testified earlier average deposit balance

15    is helpful because that relates to the money the bank can

16    lend out, correct?

17    A.  Correct.

18    Q.  Okay.  And then there's "Average Loan Balance."  Do you

19    see that?

20    A.  Yes.

21    Q.  What is that -- what do the numbers that are below that

22    represent on this ACE report?

23    A.  The average outstanding balance on a loan a customer

24    would have with the bank.

25    Q.  Okay.  And let's go to the end of the report, page 18 of

```
 1    40074.  And Mr. Herzka is highlighting a blue line.  Do you
 2    see that blue line?
 3    A.  Yes.
 4    Q.  It says, "Totals."  What is that?
 5    A.  That's the totals for all the columns above.
 6    Q.  Okay.  So it's the totals for all the accounts in your
 7    portfolio, correct?
 8    A.  Correct.
 9    Q.  What was your total R12, rolling 12-month, profit for
10    your entire portfolio for the previous 12 months?
11    A.  The net profit?
12    Q.  Yes.
13    A.  Yes.  Sorry.  $2,166,288.
14    Q.  Okay.  And for PCI, you testified earlier that it was
15    82,673.  Do you recall that?
16    A.  Yes.
17    Q.  Okay.  Fair to say less than 4 percent of your profit of
18    your portfolio was from the PCI account?
19    A.  If the math works out, yes.
20    Q.  Okay.  Your total average deposit balance for your
21    portfolio, do you see that there?  It's circled.  Sorry.  We
22    see it's circled.
23    A.  Yes.
24    Q.  You've got the hard copy.
25    A.  Yes.
```

1    Q.  Can you read what that is.

2    A.  $91,423,175.

3    Q.  Okay.  And we won't go back to it, but you testified

4    earlier from the first page of the ACE report that the PCI

5    average deposit balance was 6,129,456.  Do you recall doing

6    that?

7    A.  Yes.

8    Q.  Fair to say that's less than 7 percent of the total

9    average deposit balance in your portfolio?

10   A.  Yes.

11   Q.  Okay.  You mentioned ████████ was high maintenance,

12   correct?

13   A.  Yes.

14   Q.  Did you have a practice -- separate and apart from

15   ███████, just generally, did you have a practice when a

16   customer of yours asked for a particular type of service?

17   A.  I'm sorry.  I don't understand the question.

18   Q.  If -- you testified earlier you weren't familiar with

19   Deposit Account Agreements.  Do you recall that?

20   A.  Yes.

21   Q.  Did you have a practice -- if a customer of yours asked

22   you to do something with which you were unfamiliar or it was

23   difficult to solve, did you have a practice as to how to go

24   about serving the customer?

25   A.  Yes.

1   Q.  What was it?

2   A.  I would bring in someone within the bank that had

3   expertise or was familiar with that practice or service.

4   Q.  Okay.  And would you conduct research?

5   A.  Yes.

6   Q.  Okay.  Back to ████████, did ████████ ever present an

7   overdraft problem for you?

8   A.  Yes.

9   Q.  Okay.  And do you recall the amount of the overdraft?

10  A.  Not exactly, no.

11  Q.  Okay.  Did you ever -- do you recall waiving overdraft

12  charges in the ████████ account?

13  A.  Requesting waiving overdraft charges in the account,

14  yes.

15  Q.  Okay.  Could you -- and do you recall whether or not the

16  overdraft charges to ████████ were waived?

17  A.  Yes, they were waived.

18  Q.  Okay.  Do you recall the amount?

19  A.  It was a large amount.  I can't remember the exact

20  dollar amount.

21  Q.  Okay.  Could you look in your book at Defendant's

22  Exhibit 40109.  And in a moment I'll invite your attention

23  to a part of that document.  Tell me when you are there.

24  A.  Sorry.

25  Q.  Okay.

```
1    A.   401 -- I don't see 40149.

2    Q.   40109.

3    A.   09.  I'm sorry.  Okay.

4    Q.   And I want to -- take a moment to orient yourself to it,

5    but I want to invite your attention to the third paragraph

6    at the -- in the document.

7    A.   Yes.

8    Q.   Does that refresh your recollection as to the amount of

9    the overdraft charges in the ██████ account that the bank

10   waived?

11   A.   Yes.

12            MR. MARDER:  Your Honor.  I'm going to object to

13   this line of questioning as irrelevant.

14            MR. GLEESON:  Can I come up?

15            THE COURT:  Pardon me?

16            MR. GLEESON:  May I please approach the bench?

17            THE COURT:  You may.

18            MR. GLEESON:  Thank you.

19       (At sidebar)

20            MR. MARDER:  Your Honor --

21            MR. GLEESON:  Can I make an offer of proof as to

22   relevance?

23            THE COURT:  I would like to understand your

24   objection.

25            MR. MARDER:  This line of questioning appears to
```

1     be directed to whether there were overdraft charges on a

2     completely different account for a completely different

3     client.  And to be honest, Your Honor, I'm just lost as to

4     where we're headed here, much like with the -- we were with

5     the personnel file.

6               THE COURT:  So your objection is relevance?

7               MR. MARDER:  Yes, Your Honor.

8               MR. GLEESON:  One thesis of the case was this was

9     a really, really important customer, PCI.  The waiver of

10    this overdraft is a waiver of a fee.  I have one more

11    question on the topic.  It waives an overdraft fee that's

12    larger than the entire year's profit for PCI.  This was an

13    account that consumed his attention.

14              And the notion that these business bankers lived

15    for PCI because it was such an important customer is wrong.

16    And when you place it in context, you see that ████████ was

17    in terms of magnitude more profitable and as evidenced by

18    the fact that there's a waiver of an overdraft fee that is

19    more than an entire year's profit from the PCI account.

20              MR. MARDER:  Your Honor, this is so attenuated

21    that the tenuous relationship between this evidence and the

22    case is clear on its face, and I don't have any further

23    comment.

24              THE COURT:  I'm going to sustain the objection.  I

25    think it's likely to cause confusion for the jury.

1          MR. GLEESON:  Judge?  Mr. Marder, please -- can I

2     say one thing to the Court?  I would never run out the clock

3     on the Court.

4          THE COURT:  I understand that.  I'm ruling on the

5     objection.  I'm not ruling on allegations of running out the

6     clock.  I want us to use the jurors' time appropriately.

7          MR. GLEESON:  I understand.

8          THE COURT:  And I want us to focus on relevant

9     evidence so that the jury is not confused and they can make

10    a good decision in this case.

11         MR. GLEESON:  Can I be heard on the topic?

12         THE COURT:  Pardon me?

13         MR. GLEESON:  Can I be heard on the relevance a

14    little bit more, Judge?

15         THE COURT:  I have heard the arguments.  I've

16    ruled.

17        **(In open court)**

18    BY MR. GLEESON:

19    Q.  Separate and apart from ▮▮▮▮▮▮, from time to time for

20    certain customers would overdrafts be -- overdraft charges

21    be waived by the bank?

22    A.  Yes.

23    Q.  Ever recall having to do that for PCI?

24    A.  No, I don't.

25    Q.  Did you receive training while you were at M&I Bank,

1    Mr. Jambor?

2    A.  Training, yes.

3    Q.  Compliance training, anti-money laundering-type

4    training?

5    A.  Yes.

6    Q.  Okay.  You were questioned about some of this on direct

7    examination.  Do you recall that?

8    A.  Yes, I do.

9    Q.  Okay.  Was the training mandatory?

10   A.  Yes.

11   Q.  Was it regular?

12   A.  Yes.

13   Q.  Roughly, how regular?

14   A.  Annually.

15   Q.  Annually?

16   A.  Different regulations done throughout the year annually.

17   Q.  Say it a little louder.

18   A.  Different regulations were performed -- or training was

19   provided throughout the year on an annual basis.

20   Q.  Okay.  And from time to time did you receive trainings

21   more than annually?

22   A.  Rarely.

23   Q.  Okay.  When you -- let's pull up Plaintiff's 4.  Before

24   we do that, let's do another of the exhibits that you were

25   shown on direct, which is Plaintiff's 5.  Sorry to bounce

Jambor - Direct

```
1    you around there.  Okay.  Do you see that?

2    A.  Yes.

3    Q.  And if you look at page 6 of this document, do you see

4    that?  It asks for an insert.

5              And then turn to page 21.

6    A.  Yes.

7    Q.  Also calls for an insert.

8              And then page 39.

9    A.  Yes.

10   Q.  Okay.  It appears not to be a complete document,

11   correct?

12   A.  I don't know -- I don't see the inserts, no.

13   Q.  Yeah.  And -- but before we move from that to Exhibit 5

14   [sic], let me invite your attention to slide 19 of this,

15   Plaintiff's 5.

16             You were asked a number of questions on direct

17   regarding Suspicious Activity Log and also about Suspicious

18   Activity Reports.  Do you recall that?

19   A.  Yes.

20   Q.  Okay.  This is entitled "Identifying and Reporting

21   Suspicious Activity."  Correct?

22   A.  Correct.

23   Q.  Okay.  And then it says, "A Suspicious Activity Report

24   is used to report transactions."  Do you see that word?

25   A.  Yes.
```

Jambor - Direct

1    Q.  Okay.  To your mind, what's a transaction?

2    A.  Deposit or a check being cashed.

3    Q.  Into or out of the account?

4    A.  Yes.

5    Q.  Okay.  You were shown a letter from a Mr. Apostalon on

6    your direct examination.  Do you recall that?

7    A.  Vaguely, yes.

8    Q.  With the handwriting on it?

9    A.  Yes.

10   Q.  You were asked whether you -- If it looked kind of odd

11   to you?

12   A.  Yes, I remember that.

13   Q.  And was that a transaction?

14   A.  No.

15   Q.  Is a draft Deposit Account Agreement a transaction?

16   A.  No.

17   Q.  Is an executed one --

18   A.  No.

19   Q.  -- a transaction?

20   A.  No, it's not.

21   Q.  Was there any log for weird letters that you got from

22   people who weren't customers at the bank?

23   A.  Not that I'm aware of.

24   Q.  Okay.  All right.  Let's go to Exhibit 4, please.  And

25   you recall being examined about this on direct?

```
 1    A.  I'm sorry.  Wrong spot.  Yes.

 2    Q.  Okay.  This is a compliance training deck from 2004,

 3    right?

 4    A.  Yes.

 5    Q.  Okay.  And this -- it's in connection with this training

 6    that you were asked about Mr. Kuester's video?

 7    A.  Yes.

 8    Q.  Okay.  And you recalled seeing that video?

 9    A.  Yes.

10    Q.  Okay.  Mr. Kuester's video made it pretty clear the bank

11    cared a lot about complying with regulations, correct?

12              MR. MARDER:  Objection, leading.

13              THE COURT:  Sustained.

14    BY MR. GLEESON:

15    Q.  Okay.  What was your impression, when you saw the video

16    from Mr. Kuester, about the bank and anti-money laundering

17    compliance?

18    A.  It's a serious issue.

19    Q.  Okay.  Mr. Kuester occupied what position in the bank?

20    A.  At the time I believe he was CEO of M&I Bank.

21    Q.  Okay.  And the CEO was impressing everybody at the bank

22    with that video, correct?

23    A.  Correct.

24    Q.  Impressing on them what?

25    A.  The importance of monitoring the activities of our --
```

Jambor - Direct

```
 1    the bank.

 2    Q.  Have -- excuse me.  Were you finished?

 3    A.  Yes.

 4    Q.  Have you heard the term [indiscernible]?

 5              THE COURT REPORTER:  I'm sorry.  What was that?

 6    BY MR. GLEESON:

 7    Q.  Have you heard the phrase "tone from the top"?

 8    A.  I'm not familiar with that phrase, no.

 9    Q.  Okay.  Have you been at other -- you said you've been at

10    about half a dozen other banks?

11    A.  Yes.

12    Q.  Do you recall any instance in which the CEO of the

13    company created a video to impress upon everybody at the

14    bank how important anti-money laundering compliance is?

15              MR. MARDER:  Objection, leading.

16              MR. GLEESON:  No, it's not.

17              THE COURT:  Overruled.  And don't --

18              MR. GLEESON:  Sorry.  You're right.

19              THE COURT:  -- argue the objection.

20              MR. GLEESON:  You're right.

21              THE COURT:  That's completely improper.

22              MR. GLEESON:  I agree.  It was a reflex.  Forgive

23    me.  I'll suppress it.

24              THE COURT:  You're excused.

25              MR. GLEESON:  Thank you.
```

```
1              THE WITNESS:  I'm sorry.  Can you repeat the

2    question?

3    BY MR. GLEESON:

4    Q.  Sure.  Do you recall any other instance at any of the

5    banks you worked for besides M&I Bank where the CEO of the

6    company created a video to impress upon everybody in the

7    company the importance of Bank Secrecy Act and anti-money

8    laundering compliance?

9    A.  I don't recall seeing another video, no.

10   Q.  Okay.  Do you recall specifically this training program?

11   A.  I became re-acquainted with it, yes.

12   Q.  Okay.  And any -- you don't have any doubt that you

13   attended a training program consisting of this in 2004, do

14   you?

15   A.  No, I don't.

16   Q.  All right.  Over the years -- do you continue to get

17   compliance training?

18   A.  Yes.

19   Q.  Okay.  Over the years has the content of the compliance

20   training you've received changed?

21   A.  Slightly, yes.

22   Q.  Okay.  Changed -- does it adapt to new events, new

23   regulations?

24   A.  Somewhat, yes.

25   Q.  The -- I'm going to invite your attention to
```

1     Plaintiff's 4 at page 19.  Do you see that slide?

2     A.  On 19, yes.

3     Q.  Okay.  "Being 'familiar' with the customer isn't enough.

4     Be careful of 'best customer' syndrome.  If it sounds too

5     good to be true, it probably is."  Do you see that?

6     A.  Yes.

7     Q.  Do you disagree with any of those admonitions,

8     Mr. Jambor?

9     A.  No, I don't.

10    Q.  Okay.  Were you taught to look out for signs of

11    suspicious activity?

12    A.  Yes.

13    Q.  And did you do that?

14    A.  Yes.

15    Q.  Let's go to page 10 of the same exhibit.  "Basic

16    Terminology."  Suspicious activity is a transaction, right?

17    Remind the jury what a transaction is.

18    A.  It's a -- it's either a debit or a credit inside of an

19    account.

20    Q.  Okay.  "Is structured to avoid reporting or

21    recordkeeping requirements.  Has no unlawful" -- excuse me.

22    "Has no lawful purpose."  And, third, "is not the sort the

23    customer would normally be expected to conduct."  Do you see

24    those?

25    A.  Yes, I do.

1    Q.  Briefly, what does structuring mean to you?

2    A.  Just structuring -- structuring a transaction to avoid

3    reporting so it doesn't show up on any type of a report or

4    any type of tax return.

5    Q.  Okay.  And are there particular types of transactions

6    that require the bank to file a report?

7    A.  Yes.

8    Q.  Briefly, what kind?

9    A.  Generally, cash deposits.

10   Q.  Of any amount?

11   A.  Over $10,000.

12   Q.  Okay.  You ever see anything like that with the PCI

13   account?

14   A.  No, I did not.

15   Q.  Okay.  Did you ever see any signs of transactions in the

16   PCI account with no apparent lawful purpose?

17   A.  No, I did not.

18   Q.  Okay.  And did you ever see transactions in the PCI

19   account that were not the sort the customer would normally

20   be expected to conduct?

21   A.  No, I did not.

22   Q.  Okay.  Did you have any other customers like --

23   withdrawn.

24            Tom Petters owned more than one business, as far

25   as you knew?

1    A.  Yes.

2    Q.  How many?

3    A.  I don't know the exact amount.

4    Q.  Over the course of the -- of your tenure as the

5    relationship manager, did he acquire more companies?

6    A.  Yes.

7    Q.  Do you remember any off the top of your head?  Which

8    ones?

9    A.  Fingerhut and Polaroid.

10   Q.  Okay.  Fair to say he had kind of an empire of

11   companies?

12   A.  Yeah, he had a number of companies.

13   Q.  Okay.  And then if you turn to page 41, that says, "Wait

14   a second...  By those criteria, it seems like every customer

15   could conduct suspicious/unusual activity."  And then it

16   goes on to say, "Suspicious/unusual is when a person's

17   transactions vary from the type or size expected."  Do you

18   see that?

19   A.  Yes.

20   Q.  Did you observe any transactions with regard to the PCI

21   account that varied from the type or size expected?

22   A.  They were -- it was just a very active account with

23   regular activity in and out, yes.

24   Q.  And was it consistently so?

25   A.  Yes.

1    Q.  From the whole time that you were the relationship

2    manager for the PCI account?

3    A.  From what I recall, yes.

4    Q.  On page 44, titled "Recognizing Suspicious Activity,"

5    the bullet points:  "Out of character for customer or the

6    type of business they operate."

7    A.  Yes.

8    Q.  "What is 'interesting' or 'unusual.'  It just doesn't

9    feel right to you.  Focus more on the activity than on the

10   customer."  And then it mentions "Red Flags," "Examples."

11        When you applied those factors to the PCI account,

12   was there anything there that, in your view, was suspicious?

13   A.  No, I did not recognize anything suspicious.

14   Q.  And were they consistent with your understanding of the

15   business that PCI claimed to be in?

16   A.  Yes, at the time what they claimed to be in.

17   Q.  And what kind of business was that?

18   A.  Buying and selling of consumer goods.

19   Q.  Okay.  And were you aware of legitimate businesses in

20   which Petters or his companies sold consumer goods?

21   A.  Yes.

22   Q.  Where?

23   A.  Petters Warehouse was one that I recall.

24   Q.  Fair to say these trainings taught you and your

25   colleagues to look out for signs of criminal activity?

1    A.  Yes.

2    Q.  Some of them were crimes?

3    A.  Pardon?

4    Q.  Some of them were crimes -- sorry -- mentioned in the

5    training material itself?

6    A.  Yes.

7    Q.  Okay.  Let's turn to 17 of this exhibit, please.  Okay.

8    The first bullet point, under the "Over 200 crimes can

9    result in money laundering," is "Structuring transactions to

10   avoid BSA reporting."  Do you see that?

11   A.  Yes.

12   Q.  "BSA" stands for what?

13   A.  Bank Secrecy Act.

14   Q.  Okay.  Is -- the structuring of transactions, do you

15   associate that with any particular type of crimes?

16   A.  Well, it's generally cash, so drug dealing would come to

17   mind.

18   Q.  Okay.  And then it goes on to say, "Organized crime,

19   drug kingpins, public corruption, obscure crimes - illegal

20   import of exotic animals."  Right?

21   A.  Yes.

22   Q.  Okay.  And then let's move quickly through this.

23   Page 30, this is titled "OFAC Compliance."  What's OFAC?

24   A.  Office of Foreign Assets Control.

25   Q.  Okay.  And the bullet points under here include -- the

1    bullet points under here include, "Creates and maintains a

2    list of targeted entities and persons."

3            The -- and then if you go to page 36 and -- sorry.

4            MR. GLEESON:  37 and 38, if you can put them up

5    together, Mr. Herzka.

6    BY MR. GLEESON:

7    Q.  The -- what does this depict to you, briefly, high

8    level?

9    A.  High-risk countries.

10   Q.  Okay.  And those high-risk countries, that list relates

11   to the OFAC regulations, correct?

12   A.  Correct.

13   Q.  Okay.  Before the terrorist attacks on September 11,

14   2001 -- Mr. Jambor, you were a banker back then, right?

15   A.  Yes.

16   Q.  You started your banking career in 1997, you said?

17   A.  Yes, with National City Bank.

18   Q.  And 1992 was your first banking job?

19   A.  Yes.

20   Q.  Okay.  Before the terrorist attacks nine years after you

21   started as a banker, did you receive training?

22   A.  Yes.

23   Q.  Did those trainings ever focus your attention on

24   terrorism?

25   A.  I don't remember on them doing that.

 1    Q.  Okay.  You don't remember them focusing on terrorism?

 2    A.  No, I don't.

 3    Q.  Okay.

 4              MR. GLEESON:  And if you could just go back to 36,

 5    Mr. Herzka.

 6    BY MR. GLEESON:

 7    Q.  "What are some examples of high-risk businesses?  Money

 8    service businesses.  Cash intensive businesses.  Charities

 9    and foundations.  Offshore corporations located in tax

10    and/or secrecy havens."  Do you see that?

11    A.  Yes.

12    Q.  Were these the kind of things you were keeping an eye

13    out for --

14    A.  Yes.

15    Q.  -- back in the period between 2001 and 2008?

16    A.  Yes.

17    Q.  Okay.  And based on your understanding of what PCI

18    claimed it was doing, did it fit into any of those

19    categories of high-risk businesses?

20    A.  No, they did not.

21    Q.  You've had a chance to look at this training deck in its

22    entirety before you came to court, correct?

23    A.  Correct.

24    Q.  Okay.  Is there anything in there that focuses the

25    attention of you or any of your colleagues in the banking

1    industry, let alone at M&I Bank, on the signs of a Ponzi

2    scheme?

3    A.  No, it does not.

4    Q.  Any mention of a Ponzi scheme?

5    A.  No, it does not.

6    Q.  Okay.  Before the Petters -- do you recall when Tom

7    Petters was arrested?  Do you recall the moment?

8    A.  I -- vaguely, yes.  In 2008.

9    Q.  Okay.  You were gone from M&I Bank?

10   A.  Yes.

11   Q.  Okay.  Before it collapsed, did your trainings ever

12   focus your attention on Ponzi schemes?

13   A.  Not that I recall, no.

14   Q.  Before it collapsed had you ever heard the phrase "Ponzi

15   scheme"?

16   A.  I don't really remember the phrase "Ponzi scheme" prior

17   to that, no.

18   Q.  Okay.  In your 30 years of banking, do you know any

19   other bankers, other than the ones you worked with at M&I

20   Bank, who had a customer who engaged in a Ponzi scheme?

21   A.  No, I don't.

22   Q.  You mentioned that -- earlier that M&I -- that PCI

23   became part of your portfolio after a merger with Richfield

24   Bank and there was a vacancy in the business banking

25   section, correct?

1    A.  Correct.

2    Q.  Okay.  And do you remember who was responsible for the

3    account before you were?

4    A.  I don't remember, no.

5    Q.  You mentioned you spoke to Tom Petters about an

6    overdraft at National City Bank, correct?

7    A.  Yes.

8    Q.  Okay.  Other than that, did you have any contact with

9    him before PCI was moved into your portfolio?

10   A.  I don't remember any other interaction with him prior to

11   that, no.

12   Q.  And did you have a -- when you obtained a new business

13   in your portfolio, did you have a typical practice as to

14   what you would do?

15   A.  Yes.  I would go out and visit with them to introduce

16   myself.

17   Q.  Okay.  Let me turn your attention to Plaintiff's 2 at

18   page 23.  Okay.  What's this?

19   A.  A MIContacts report.

20   Q.  Okay.  And who prepared the report, Mr. Jambor?

21   A.  Kevin Pleasant.

22   Q.  Who is he?

23   A.  He was in treasury management with M&I Bank.

24   Q.  Okay.  And this report memorializes a meeting, correct?

25   A.  Correct.

Jambor - Direct

1    Q.  Okay.  It says, "Call Date."  Do you see that?

2    A.  Yes.

3    Q.  Okay.  What's the date?

4    A.  October 16th, 2002.

5    Q.  And Kevin Pleasant was in treasury management?

6    A.  Yes.

7    Q.  Okay.  And according to the report, who was present for

8    the meeting?

9    A.  I was.

10   Q.  Okay.  And let's scroll down, please.  It says in the

11   first sentence, "Ed and I met with Deanna" -- withdrawn.

12           Who is the contact set forth in the -- above this

13   in the report?

14   A.  Deanna Munson.

15   Q.  Okay.  And summary is:  "TMS Proposal - MTW and Euro

16   Sweep."  Do you recognize what those things are?

17   A.  Yes.

18   Q.  What are they?

19   A.  Euro Sweep is a -- it's a product that was offered to

20   deposit excess balances into an account to earn interest

21   overnight on the account.

22   Q.  Okay.  Is that a treasury management service?

23   A.  Yes.

24   Q.  Is that why Kevin Pleasant was there?

25   A.  Yes.

1    Q.  Okay.  It says in the first sentence, "Ed and I met with

2    Deanna to present our proposal for more efficient management

3    of the wire transfer activity and management of their excess

4    cash."  Do you see that?

5    A.  Yes.

6    Q.  Who is Deanna?  Is that Deanna Coleman?

7    A.  Deanna Munson, yes.

8    Q.  Deanna Munson, excuse me.  At some point her name became

9    Deanna Coleman, correct?

10   A.  Yes.

11   Q.  Okay.  And the services that are offered here -- that

12   are reflected here, they offered to all the business banking

13   customers that used wire transfers?

14   A.  Yes.

15   Q.  Okay.  And it says, in the second paragraph, that you

16   inquired about PCI's other banking relationships.  Do you

17   see that?

18   A.  Yes.

19   Q.  Okay.  Was that a common thing for you to do?

20   A.  Yes.

21   Q.  Why?

22   A.  Just to see where other banking -- were they banking

23   other places to see if maybe we can offer something better

24   for them.

25   Q.  Okay.  That would be good for M&I Bank, right?

Jambor - Direct

1    A.  Yes.

2    Q.  Would it be good for the customer as well?

3    A.  It could be, yes.

4    Q.  Why?

5    A.  It could make things more efficient for them.

6    Q.  Okay.  Below that it says, at the end, "Finally, met

7    briefly with Tom Petters and Ted Deikel, the new owners of

8    Fingerhut.  Tom would like to meet with Ed and I for lunch

9    in two weeks to review the Petters Group overall standing."

10   Do you see that?

11   A.  Yes.

12   Q.  Okay.  And Kevin Pleasant wrote this report, right?

13   A.  Correct.

14   Q.  Okay.  So the "Ed and I" is you and him planning to meet

15   with Tom Petters, correct?

16   A.  Correct.

17   Q.  Okay.  And it indicates here that by this point Tom

18   Petters had purchased Fingerhut?

19   A.  Yes, it looks that way.

20   Q.  Okay.  Let's pull up page 26 of the same exhibit,

21   please.  What's the date of this?

22   A.  October 31st, 2002.

23   Q.  Okay.  Who is the reporting person?

24   A.  I am.

25   Q.  Okay.  And you're with Kevin Pleasant, correct?

1    A.  Correct.

2    Q.  This is just about two weeks later -- two weeks after

3    the visit with Deanna Coleman we just -- you just testified

4    about, correct?

5    A.  Correct.

6    Q.  And it reflects a meeting with Petters.

7            MR. GLEESON:  If you could move it down, please,

8    Mr. Herzka.

9    BY MR. GLEESON:

10   Q.  It's kind of a brief report.  "Kevin and I met with Tom

11   to get an overview of Petters Company.  Discussed the

12   Fingerhut purchase.  Also met with Brian Smith about a

13   possible purchase of a title company."  Do you see that?

14   A.  Yes.

15   Q.  "Tom" is Tom who?

16   A.  Tom Petters.

17   Q.  Okay.  And is this the sort of meeting you would have at

18   the outset of a relationship -- a new relationship in your

19   portfolio?

20   A.  Yes.

21   Q.  Okay.  We can read what's on the screen.  Do you have an

22   independent recollection of this meeting with Tom Petters?

23   A.  I don't remember it, no.

24   Q.  Okay.  You met him at his office?

25   A.  Yes.

Jambor - Direct

```
 1    Q.  Okay.  Separate from this meeting -- do you recall what
 2    his office was like?
 3    A.  It was a standard business office.
 4    Q.  Okay.  Where was it?
 5    A.  This -- for this meeting, I believe it was Eden Prairie.
 6    Q.  Okay.  At a -- did there come a time when Petters
 7    Company, Inc. moved offices?
 8    A.  Yes.
 9    Q.  Okay.  At the Eden Prairie location, you went there
10    yourself?
11    A.  Yes.
12    Q.  Okay.  Could you describe just briefly for the jury what
13    the office looked like and were people there and the like.
14    A.  It was just a standard office in an office park, you
15    know, single-level office park.
16    Q.  Okay.  Multiple people there?
17    A.  Yes.
18    Q.  Did people look like they're working?
19    A.  Yes.
20    Q.  Okay.  Do you recall how many people were there?
21    A.  No, I don't.
22    Q.  All right.  Was your typical practice, before you met a
23    customer for the first time, to review anything?
24    A.  If they were a current customer, I would kind of glance
25    through what they had with the bank, what products and
```

Jambor - Direct

1    services they had with the bank.

2    Q.  Okay.  On occasion would you review financial

3    information in the customer's file with the bank?

4    A.  If we had some, yes.

5    Q.  Okay.  Would you have had any for PCI?

6    A.  No.

7    Q.  Why?

8    A.  They were just a depository customer.

9    Q.  Switching gears a little.  How often, Mr. Jambor, did

10   you meet or call upon representatives at PCI?

11   A.  A few times a year.

12   Q.  Okay.  Was it typical for your larger business banking

13   customers?

14   A.  Yeah.  Some were more.  Some were less.  But typical,

15   yeah.

16   Q.  Okay.  Did you have a main point of contact at PCI?

17   A.  Yes.

18   Q.  Who?

19   A.  Deanna Munson.

20   Q.  What about Petters?  Tell us about the -- how frequently

21   you would see Tom Petters.

22   A.  Not very frequently.  If -- not very frequently at all

23   after a while, after the couple initial meetings.

24   Q.  Okay.  Did you ever socialize with PCI employees outside

25   of work?

1    A.  No, I did not.

2    Q.  Were all your meetings with them business-related

3    meetings?

4    A.  Yes, they were.

5    Q.  Is that typical with your customers?

6    A.  Yes.

7    Q.  And broadly speaking, why would you go meet your

8    business banking customers?

9    A.  To see -- to make sure that they were happy with the

10   bank and to see how we could serve them better and sell them

11   more products and services.

12   Q.  Okay.  Did the PCI account take up a larger portion of

13   your time relative to your other large accounts at M&I Bank?

14   A.  No.

15   Q.  And you've mentioned meeting with customers.  Other than

16   that, how did you spend most of your time as a business

17   banker when you were back at M&I Bank?

18   A.  Meeting with customers or meeting with prospects or

19   reviewing loan presentations or community involvement.

20   Q.  Okay.  Did most of your wire customers use the wire

21   transfer services of the bank?

22   A.  Yes.

23   Q.  Did you review those individual wires?

24   A.  No.

25   Q.  Okay.  Why not?

```
 1     A.  Didn't have the time.
 2     Q.  Okay.  And in the ordinary course of your duties as a
 3     business banker, did you have a need to review the wires of
 4     the customers in your portfolio?
 5     A.  No.
 6     Q.  Did they get account statements?
 7     A.  Yes.
 8     Q.  And did you receive the account statements that your
 9     customers received in the normal course?
10     A.  No.
11     Q.  Were they available to you if you wanted to find them?
12     A.  Probably, yes.
13     Q.  They were in the bank's records?
14     A.  Yes.
15     Q.  You had access to them?
16     A.  Yes.  If I needed them, possibly, yes.
17     Q.  Okay.  Do you recall whether they showed the source of
18     incoming wire transfers?
19     A.  Well, the bank statements didn't.
20     Q.  Okay.  Did they show the destination of outgoing wire
21     transfers?
22     A.  On the bank statements, no.
23     Q.  Okay.  What did they show?
24     A.  They said incoming or outgoing wires.
25              MR. GLEESON:  Let's pull up Plaintiff's 1 at 19,
```

1    please.

2             THE WITNESS:  Which book am I in?

3    BY MR. GLEESON:

4    Q.  Can you see your screen to the left?

5    A.  Yes.

6    Q.  I think that will do.

7    A.  Okay.

8    Q.  Okay.  Do you recognize that?

9    A.  Yes.

10   Q.  Okay.  What is it?

11   A.  It's a bank statement.

12   Q.  Okay.  You testified you didn't receive those in the

13   normal course of your business?

14   A.  No.

15   Q.  Okay.  But if you had, is there any indication on

16   these -- on this bank statement of the -- where wires were

17   coming from when wires came into the account?

18   A.  No.

19   Q.  Any indication as to where they went when they left the

20   account?

21   A.  No.

22   Q.  Let's go to Plaintiff's 2 at page 35.  It's a MIContact

23   report?

24   A.  Yes.

25   Q.  What's the date on this one?

```
 1    A.  March 17th, 2003.
 2    Q.  Okay.  So this is roughly four and a half, almost five
 3    months from that meeting you had in October of 2002 that you
 4    testified about a moment ago, correct?
 5    A.  Yes.
 6    Q.  Okay.  And who was the author of this one?
 7    A.  Shari Rhode.
 8    Q.  Okay.  Kind of tough to tell, right?
 9    A.  Yes.
10    Q.  But if you go to page 36, you see it there?
11    A.  Yes.
12    Q.  Okay.  Oh, yeah, you've got the hard copy.  Good.
13         The MIContact report reflects a contact with whom?
14    A.  Deanna Munson.
15    Q.  But the body of it also says you met with Bob White and
16    Stuart Romenesko, both CFO of Petters' companies.  "They
17    indicated they want to begin consolidating bank
18    relationships and have been more than pleased with our
19    service."  Do you see that?
20    A.  Yes, I do.
21    Q.  What does "consolidating banking relationships" mean?
22    A.  Probably reducing the number of banks they are working
23    with.
24    Q.  By moving some of those relationships to M&I Bank?
25    A.  Yes.
```

1    Q.  All right.  Then it says, "Because they have only been a

2    deposit customer, they have maintained" -- remained," excuse

3    me, "on the small business banking side."  I'll stop there.

4    Do you see that?

5    A.  Yes.

6    Q.  It says -- was there a small business banking department

7    in M&I Bank?

8    A.  No.  It was just a business banking department.

9    Q.  Okay.  And then it says, "However, as they consolidate,

10   they want some lines of credit and now will need the

11   expertise of the commercial side."

12   A.  Yes.

13   Q.  Okay.  Lines of credit, is that a loan?

14   A.  Yes.

15   Q.  Okay.  Would larger -- would large deposit customers

16   sometimes stay in the business banking section of M&I Bank?

17   A.  Yes.

18   Q.  Why?

19   A.  Relationship they had with the banker.

20   Q.  Okay.  Were those relationships -- was a deposit

21   relationship simple compared to a loan relationship?

22   A.  Yes.

23   Q.  Okay.  Once they expand to include credit, does the

24   relationship move out of the business banking section if

25   it's a large customer?

Jambor - Direct

```
 1    A.  Yes.

 2    Q.  Is that what this indicates here?

 3    A.  Yes.

 4    Q.  "Now will need the expertise of the commercial side,"

 5    correct?

 6    A.  Correct.

 7    Q.  And this indicates that you mentioned that to White and

 8    Romenesko, right?

 9    A.  Correct.

10    Q.  "We discussed this with them."  Correct?

11    A.  Yes.

12    Q.  And do you need more information from a deposit customer

13    if the relationship is going to include lines of credit and

14    move to the commercial side?

15    A.  Yes, we would need more information.

16    Q.  What do you need?

17    A.  Financial statements, tax returns, personal financial

18    statements.

19    Q.  And why do you need that if it shifts over to the

20    commercial sides?

21    A.  Well, if it's a loan, just to document the ability to

22    repay the loan.

23    Q.  Okay.  And then it goes on to say, "and they," meaning

24    White and Romenesko, "were skeptical."  Do you see that?

25    A.  Yes.
```

Jambor - Direct

```
1    Q.  "But understood how the process works and we assured
2    them we would be there for them during the transition.
3    Edward will follow up on this and see the transaction
4    through."  Do you see that?
5    A.  Yes.
6    Q.  That's you, right?  You're the relationship banker?
7    A.  Yes.
8    Q.  Okay.  And it says they were -- after you mentioned the
9    expertise of the commercial side, it says, "they were
10   skeptical," right?
11   A.  Yes.
12   Q.  Did they ever follow up with consolidating the banking
13   relationships mentioned here?
14   A.  I don't recall they did.  I don't believe they did.
15   Q.  Did they ever open any lines of credit while you were
16   their relationship manager?
17   A.  No.
18   Q.  Okay.  That was March 17th, St. Patty's Day.  Let's
19   fast-forward to June 2005 and page 628 of Plaintiff's --
20   A.  I'm sorry.  Which page number?
21   Q.  I'm sorry.  My bad.  I want to invite your attention to
22   Plaintiff's 628.
23   A.  I don't have that.
24   Q.  Well, let's put it up on your screen.
25        (Mr. Marder and Mr. Gleeson confer)
```

```
1    A.  I go through 618.

2    Q.  No.  It's 628.

3              THE COURT:  Counsel, has this exhibit been

4    admitted?

5              MR. GLEESON:  It has not, so I will lay a

6    foundation and offer it in evidence and will not have it

7    pulled up on the screen until that happens.  Thank you,

8    Judge.

9              THE COURT:  Very well.

10   BY MR. GLEESON:

11   Q.  Do you have it before you --

12   A.  No, I don't.

13   Q.  -- Plaintiff's 628?  I think it's in the binder that I

14   told you to put down.

15             MR. GLEESON:  Right, it's in your binder from this

16   morning?

17       (Mr. Gleeson and Mr. Marder confer)

18   BY MR. GLEESON:

19   Q.  It's after --

20   A.  Here it is.  It's a yellow tab.

21   Q.  Yeah, it has a yellow sticker.  Okay.

22   A.  Sorry about that.

23   Q.  Okay.  Mr. Jambor, what is 628?

24   A.  It is an e-mail from Vicky Washington.

25   Q.  Okay.  And who is Vicky Washington?
```

1    A.  She was with M&I Bank.

2    Q.  Okay.  And is it to you, among others?

3    A.  Yes.

4    Q.  Okay.  What's the date?

5    A.  June 20th, 2005.

6    Q.  Okay.  And do you recall seeing an e-mail similar to

7    this in your direct examination?

8    A.  Yes.

9    Q.  Okay.  Did you receive e-mails like this regularly?

10   A.  From time to time.

11   Q.  Okay.  And the subject -- just the subject is what?

12   A.  "Significant Fluctuations - 2005 Deposits."

13            MR. GLEESON:  Okay.  And I offer it into evidence.

14            MR. MARDER:  No objection, Your Honor.

15            THE COURT:  The exhibit is received.

16   BY MR. GLEESON:

17   Q.  So you mentioned this is from Vicky Washington, correct?

18   A.  Yes.

19   Q.  Who's she?

20   A.  She was with M&I Bank.

21   Q.  Okay.  And do you remember what position she occupied

22   back then?

23   A.  I don't.  No, I don't.

24   Q.  All right.  And this exhibit is to --

25            MR. GLEESON:  Mr. Herzka, if you could enlarge the

 1   two -- there we go.  Okay.

 2   BY MR. GLEESON:

 3   Q.  So it's to Connie Tran, Colette Ingle, John -- I'm not

 4   going to try to pronounce that name -- David Bisbee, Linda

 5   Bannigan, Ed Jambor, correct?

 6   A.  Correct.

 7   Q.  Who are those folks?

 8   A.  They are other business bankers.

 9   Q.  And are they -- similar to the job you held, they are

10   business bankers in the M&I business banking group?

11   A.  Yes.

12   Q.  You mentioned this is -- did you get e-mails like this

13   regularly?

14   A.  Not regularly, but once in a while.

15   Q.  Okay.  And the -- it begins, "For the week ended 6-17-05

16   below represents the customers noted to have a net decrease

17   in deposit balances of a million or more," and it goes on.

18   A.  Yes.

19   Q.  Do you see that?

20           Okay.  What's a net decrease?

21   A.  Basically, deposit balances went down --

22   Q.  Okay.

23   A.  -- reduced.

24   Q.  I'm sorry?

25   A.  They were reduced --

1    Q.  All right.

2    A.  -- less.

3    Q.  And deposit balances matter to business bankers,

4    correct?

5    A.  Correct.

6    Q.  For the reasons you testified to earlier?

7    A.  Yes.

8    Q.  Okay.  Go back to the --

9            MR. GLEESON:  No, keep that up.

10   BY MR. GLEESON:

11   Q.  It says, "For those customers of yours noted below,

12   please provide a response by 6-22 regarding the nature of

13   the activity noted."  And then, "Responses of 'normal

14   customer behavior or operational needs, et cetera,' are

15   acceptable."  Do you see that?

16   A.  Yes.

17   Q.  So did you get similarly worded e-mails from Vicky

18   Washington on other occasions as well?

19   A.  Yes.

20   Q.  And were other business bankers also included on those

21   missives?

22   A.  Yes.

23   Q.  And it says, "For the customers of yours noted below,

24   please provide a response."

25           MR. GLEESON:  Can you pull out from that,

1    Mr. Herzka, and pull back to the regular document?

2    BY MR. GLEESON:

3    Q.  Inviting your attention to the lower left-hand corner,

4    are those the customers noted to have a net decrease?

5    A.  The bankers are listed --

6    Q.  Okay.

7    A.  -- and the dollar amounts.

8    Q.  And I guess, you know, it's redacted.  To the left of

9    the list of the bankers and the amounts, what's redacted in

10   there would be the names of the appropriate -- of the

11   relevant customers?

12   A.  Yes.

13   Q.  Okay.  And I'm not sure if this is the end of that list.

14              MR. GLEESON:  Could you flip to the back -- to the

15   next page, Mr. Herzka?  Yeah.

16   BY MR. GLEESON:

17   Q.  And there's Petters Company?

18   A.  Yes.

19   Q.  Okay.  Okay.  Now, that's one of the net decreases,

20   correct?

21   A.  Correct.

22   Q.  And that's your customer?

23   A.  Yes.

24   Q.  Okay.

25   A.  Was.

1    Q.  And there's an attachment to that.

2            MR. GLEESON:  Can we pull up the attachment?  Not

3    there?  Okay.

4    BY MR. GLEESON:

5    Q.  All right.  Thank you, Mr. Jambor.  Sorry.  I meant to

6    go back and -- no, withdrawn.

7            We'll move a little quicker through it.  Could you

8    turn to 2-901, please.  That's Plaintiff's 2, page 901.  I'm

9    sorry, Mr. Jambor.  You were questioned about this -- I said

10   901?  My bad.  91.  Excuse me.

11           THE COURT:  Counsel, is this a good time to break?

12           MR. GLEESON:  Yes.

13           THE COURT:  Okay.  Members of the Jury, during

14   this recess, as with every other recess, please remember

15   that you are not to discuss this case with anyone and not to

16   let anyone discuss the case with you or within your hearing.

17   Do not do any research about this case, about the

18   individuals who are involved in the case, or anything else

19   that relates to the case.

20           As you know, only you are selected to become the

21   fact-finders in this case and must use only the evidence

22   that is presented here in this court before you in order to

23   find those facts.

24           We will begin tomorrow at our regularly scheduled

25   time.  Thank you for your service, and we are in recess.

1    Have a good evening.

2              THE LAW CLERK:  All rise for the jury.

3                        **IN OPEN COURT**

4                      **(JURY NOT PRESENT)**

5              THE COURT:  You may be seated.  Counsel, if I may

6    have a preview for what is left with this witness and where

7    we'll be moving tomorrow?

8              MR. GLEESON:  I think I have a couple of more

9    hours with Mr. Jambor, and then I understand the plaintiffs

10   want to call and will call Shari Rhode following Mr. Jambor.

11             THE COURT:  Okay.  Very well.

12             Is there anything further that the Court needs to

13   address at this time, Counsel?

14             MR. MARDER:  Not from the plaintiffs, Your Honor.

15             THE COURT:  Okay.  I'm sorry?

16             MR. GLEESON:  No.  Thank you.

17             THE COURT:  Ms. Momoh, you may address me directly

18   if you'd like.

19             MS. MOMOH:  Yes.

20             THE COURT:  However you want to address it.

21             MS. MOMOH:  Yes, Your Honor.  The exhibit we had

22   offered as DX-8000, we want to replace that number with

23   Defendant's Exhibit 40495.

24             THE COURT:  And will you be relabeling, then, that

25   exhibit?

1          MS. MOMOH:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. MOMOH:  And disclosing it to plaintiff's

4    counsel as well?

5          MR. MARDER:  I have to admit I'm confused,

6    Your Honor, but okay.

7          MS. MOMOH:  These are the ACE reports that he had

8    submitted in bulk.

9          MR. MARDER:  Okay.  Thank you.

10          MS. MOMOH:  We're simply renaming it, Your Honor,

11    because we had already produced, as part of our, you know,

12    exhibit lists and exhibit submission to this Court, an

13    exhibit that had the number DX-8000.  So to avoid any

14    confusion, we've assigned it a new number at 40495.

15          THE COURT:  And has that been referred to in the

16    presence of the jury so does there need to be any sort of

17    instruction so that they are not confused?

18          MS. MOMOH:  Tomorrow morning, Your Honor, that

19    would be -- tomorrow morning, Your Honor, if you could make

20    that correction and instruction to the jurors.

21          THE COURT:  Okay.  I will ask counsel to submit to

22    me a statement of what you'd like the jury to be instructed

23    on that.  Please confer so that I understand that both

24    parties -- or all parties agree that that is the proper

25    instruction that should be given so that the jury is not

1    confused.  All right?

2            MS. MOMOH:  Understood, Your Honor.  Thank you.

3            THE COURT:  Thank you, Counsel.

4            THE LAW CLERK:  All rise.

5        (Court adjourned at 5:01 p.m.)

6                        *     *     *

7            I certify that the foregoing is a true and correct
     copy of the transcript originally filed on 12/05/2022 and
8    incorporating redactions requested by Attorney Adine S.
     Momoh.

9            Certified by:   *s/ Lori A. Simpson*

10                           Lori A. Simpson, RMR-CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25