1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3       ------------------------------------------------------------
                                    )
       Douglas A. Kelley, in his    )   File No. 19-cv-1756
4      capacity as the Trustee of the )        (WMW)
       BMO Litigation Trust,        )
5                                    )
              Plaintiff,            )   St. Paul, Minnesota
6                                    )   October 19, 2022
       vs.                          )   8:38 a.m.
7                                    )
       BMO Harris Bank N.A., as      )
8      successor to M&I Marshall and )
       Ilsley Bank,                 )
9                                    )
              Defendant.            )
10      ------------------------------------------------------------

11

12

13         BEFORE THE HONORABLE WILHELMINA M. WRIGHT
              UNITED STATES DISTRICT COURT JUDGE
14
         *   *   *   **REDACTED TRANSCRIPT**   *   *   *
15

16            **(JURY TRIAL PROCEEDINGS – VOLUME VI)**

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25      transcript produced with computer.

```
 1     APPEARANCES:
          For the Plaintiff:        Robins Kaplan, LLP
 2                                   MICHAEL A. COLLYARD, ESQ.
                                     DAVID E. MARDER, ESQ.
 3                                   PETER C. IHRIG, ESQ.
                                     MORGIA D. HOLMES, ESQ.
 4                                   MICHAEL D. REIF, ESQ.
                                     800 LaSalle Avenue
 5                                   Suite 2800
                                     Minneapolis, Minnesota 55402
 6
                                     Anthony, Ostlund, Louwagie,
 7                                   Dressen, Boylan, P.A.
                                     JOSEPH W. ANTHONY, ESQ.
 8                                   JOSEPH R. RICHIE, ESQ.
                                     RYAN M. LAWRENCE, ESQ.
 9                                   90 South Seventh Street
                                     Suite 3600
10                                   Minneapolis, Minnesota 55402

11        For the Defendant:         Stinson, LLP
                                     KEITH S. MOHEBAN, ESQ.
12                                   ADINE S. MOMOH, ESQ.
                                     50 South Sixth Street
13                                   Suite 2600
                                     Minneapolis, Minnesota 55402
14
                                     Debevoise & Plimpton, LLP
15                                   JOHN GLEESON, ESQ.
                                     MICHAEL SCHAPER, ESQ.
16                                   SUSAN REAGAN GITTES, ESQ.
                                     MORGAN A. DAVIS, ESQ.
17                                   919 Third Avenue
                                     New York, New York 10022
18
                                     Mayer Brown, LLP
19                                   JOSHUA D. YOUNT, ESQ.
                                     71 South Wacker Drive
20                                   Chicago, Illinois 60606

21                                   Mayer Brown, LLP
                                     RICHARD A. SPEHR, ESQ.
22                                   GINA PARLOVECCHIO, ESQ.
                                     1221 Avenue of the Americas
23                                   New York, New York 10020

24        Court Reporter:            LORI A. SIMPSON, RMR-CRR
                                     316 North Robert Street
25                                   St. Paul, Minnesota 55101
```

1416

1

<u>**I N D E X**</u>

2

<u>PAGE</u>

3

**EDWARD JAMBOR**
    Direct Examination (Continued)  by Mr. Gleeson        1418
4   Recross-Examination by Mr. Marder                     1490
    Redirect Examination by Mr. Gleeson                   1504

5

**CHRISTOPHER FLYNN**
6   Cross-Examination by Mr. Marder                       1507
    Voir Dire Examination by Mr. Moheban                  1617
7   Cross-Examination (Resumed) by Mr. Marder             1620
    Direct Examination by Mr. Moheban                     1626

8

9

10  <u>PLAINTIFF'S EXHIBITS</u>                             <u>REC'D</u>
         9                                                1556
11      11                                                1518
        17                                                1559
12      18                                                1561
        19                                                1562
13      20                                                1586
        21                                                1589
14      22                                                1593
        23                                                1591
15      26                                                1566
        57                                                1620
16     114                                                1583
       116                                                1608
17     117                                                1613
       145                                                1632
18     267                                                1554
       270                                                1569
19     554                                                1535
       645                                                1597

20

21

22

23

24

25

1417

1

**I N D E X**  (Cont.)

2

DEFENDANT'S EXHIBITS                                REC'D
3        40228                                        1487
         40255                                        1646
4        40273                                        1646
         40276                                        1646
5        40296                                        1615
         40304                                        1646
6        40307                                        1646
         40323                                        1646
7        40336                                        1646
         40408                                        1646
8        40431                                        1646
         40451                                        1646
9        40476                                        1646
         40477                                        1646
10       40478                                        1646

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3                   **(JURY PRESENT)**

4          THE COURT:  Please be seated.

5          There is one matter that I will address at this

6     time with the jury.

7          Yesterday, during the examination of Mr. Ed Jambor

8     by Defendant BMO Harris Bank's counsel, you were shown an

9     exhibit that defense counsel had offered.  It's Exhibit

10    DX-80000, and because that number, DX-80000, had already

11    been assigned to another document that defendant may or may

12    not offer into evidence, defendant has assigned a new number

13    to that exhibit.  And the new number is Exhibit DX-40495.

14         So any references to DX-80000 should have been and

15    going forward -- should have been made and going forward

16    will be DX-40495.  Okay?

17         Are we ready to proceed?

18         MR. GLEESON:  I am.  May I resume?

19                   **(Edward Jambor)**

20            **DIRECT EXAMINATION** (Continued)

21    BY MR. GLEESON:

22    Q.  Good morning, Mr. Jambor.

23    A.  Good morning.

24    Q.  Did you considering banking a service profession?

25    A.  Yes.

```
1    Q.  And did you seek to serve your customers?

2    A.  Yes, I did.  I do.

3    Q.  And you continue to do that today?

4    A.  Yes.

5    Q.  You were examined yesterday with regard to certifying a

6    signature of Mr. Petters on some stock certifications,

7    correct?

8    A.  Correct.

9    Q.  Okay.  Is that a -- was that a service you would provide

10   only to PCI?

11   A.  No.

12   Q.  You would provide similar services to your other

13   customers?

14   A.  As needed, yes.

15   Q.  Okay.  And was it your intention to serve the customers?

16   A.  Yes.

17   Q.  Was it your hope that by doing that well, you might

18   deepen the relationship on the part of the bank with those

19   customers?

20   A.  Yes.

21   Q.  Okay.  Mr. Marder asked you yesterday whether the

22   concept behind PCI's business was that it would purchase

23   overstock items from wholesalers and then sell them to

24   big-box retailers, and you agreed that that was the concept.

25   Do you recall that testimony, Mr. Jambor?
```

1     A.  Yes.

2     Q.  Okay.  And then he asked you, "Did you ever ask why

3     retailers couldn't just buy the products directly from the

4     wholesalers?"  Okay?  And you said, "No, you didn't ask."

5     Do you recall that?

6     A.  Yes.

7     Q.  You're a business banker, correct?

8     A.  Correct.

9     Q.  You've been a banker for 30 years?

10    A.  Yes.

11    Q.  Okay.  Are there businesses that act as intermediaries

12    between manufacturers and retailers in your experience?

13    A.  Yes.

14    Q.  Okay.  Did distributors, for example --

15    A.  Correct.

16    Q.  -- connect between the manufacturers and the retailers,

17    correct?

18    A.  Correct.

19    Q.  Okay.  Did you consider it part of your job to probe the

20    business model of your portfolio customers?

21    A.  No.

22    Q.  If you had questions about PCI's business, who would you

23    have asked?  Who was your contact as PCI?

24    A.  Deanna Munson.

25    Q.  Okay.  I want to talk to you about Deposit Account

 1   Control Agreements.  You testified yesterday that they were

 2   unusual for you back in the early part of -- back during the

 3   period that you were at M&I Bank, correct?

 4   A.  Correct.

 5   Q.  Okay.  Did you know what they were generally?

 6   A.  Generally, very vaguely, yes.

 7   Q.  Okay.  And, generally, what was your -- back then, what

 8   was your conception of Deposit Account Control Agreements?

 9   A.  It's just a way that a third party could help control

10   the depository account and what happens in it.

11   Q.  Okay.  Control the funds in PCI's account?

12   A.  Yes.

13   Q.  Okay.

14         MR. GLEESON:  And let's pull up, please,

15   Mr. Herzka, Plaintiff's Exhibit 2 at page 62.  Thank you,

16   sir.

17   BY MR. GLEESON:

18   Q.  This is -- do you recognize this?

19   A.  Yeah.  This is a MIContacts report.

20   Q.  And written by whom?

21   A.  Barbara Nieland.

22   Q.  Sorry.  I'm on the wrong page.  Who is Barbara Nieland?

23   A.  She was -- I don't know where she is now, but at the

24   time she was a commercial banker with M&I Bank.

25   Q.  Okay.  So she was in the commercial banking division?

Jambor - Direct

1    A.  Yes.

2    Q.  And you were questioned about this yesterday.  The first

3    sentence of this says, "Elliot Berman reviewed the outline

4    of a Deposit Account Control Agreement provided by Dave

5    Bauers of Petters."  Do you see that?

6    A.  Yes.

7    Q.  Is Elliot Berman an attorney used by M&I Bank?

8    A.  I don't remember Elliot Berman.

9    Q.  Okay.  It says, to read the next sentence, "Elliot made

10   some revisions which have been shared with Petters."  Do you

11   see that?

12   A.  Yes.

13   Q.  Does that indicate to you Elliot assisted in connection

14   with this Deposit Account --

15   A.  Yes.

16   Q.  -- Control Agreement?

17           Is a Deposit Account Agreement a contract?

18   A.  Yes.

19   Q.  Okay.  Did you come across, in your work as a business

20   banker at M&I Bank, contracts that were involved with

21   customers of the bank?

22   A.  Yes.

23   Q.  Okay.  Did you come across other legal documents as

24   well?

25   A.  Yes.

Jambor - Direct

1    Q.  Did you have a practice when it came to how to handle a

2    situation involving a contract with one of your customers?

3    A.  Well, I would seek out assistance if I didn't -- if it

4    wasn't a standard -- like a loan agreement is a contract.

5    That I understood, but if it was something I didn't

6    understand, I would go seek assistance.

7    Q.  Okay.  From whom?

8    A.  I would probably go to my supervisor and find out who

9    could assist me with it.

10   Q.  Okay.  And did that assistance include outside counsel

11   from time to time?

12   A.  Yes.

13   Q.  Okay.  And it goes on and says, "Petters would like to

14   have individual Control Agreements with each of their

15   lenders, and they do not want the lenders to know who the

16   other lenders are."  Do you see that?

17   A.  Yes.

18   Q.  So that indicates that PCI or Petters had more than one

19   lender, correct?

20   A.  Yes.

21   Q.  Okay.  And borrowed money from each of them?

22   A.  I guess, yes.

23   Q.  Okay.  And then it says it doesn't want the lenders to

24   know who the other lenders are.  Is there any reason,

25   Mr. Jambor, why a business might not -- that borrows money

1    from multiple lenders might not want those lenders to know

2    who each other -- who the other lenders are?

3              MR. MARDER:  Objection, calls for speculation.

4              THE COURT:  Overruled.  You may answer if you

5    know.

6              THE WITNESS:  Competition; knowing, you know --

7    trying to maybe steal the loan or steal the -- you know,

8    increase the business.

9    BY MR. GLEESON:

10   Q.  Okay.  Let's unpack that a little bit.  Competition

11   between whom?

12   A.  Between the lenders.

13   Q.  Okay.  The lenders are competing with each other for

14   what?

15   A.  More loans.

16   Q.  To whom?

17   A.  To, well, in this case, Petters.

18   Q.  Anything wrong with PCI not wanting those lenders to

19   know who each other were?

20   A.  No, not necessarily.

21   Q.  Okay.  And then it goes on to say, "Elliot thinks we

22   would be protected."  Let me just stop right there.  Elliot

23   is the person that advice is being sought from, correct?

24   A.  Correct.

25   Q.  And the "we" there is who?

1    A.   M&I Bank.

2    Q.   Okay.  And continuing, "If we have the same agreement

3    signed as a number of different individual agreements" --

4    stop there.  The individual agreements would be with the

5    lenders?

6    A.   Yes.

7    Q.   As opposed to a joint agreement with all of them?

8    A.   Yes.

9    Q.   Okay.  And continuing with that sentence, "As long as

10   the agreement discloses that there ARE multiple agreements

11   in place, and any one of the signers can institute a freeze

12   of the account."  Let me stop there.  "Any one of the

13   signers," meaning whom?

14   A.   The lenders.

15   Q.   Then it goes on to say, "Which would then apply to all

16   lenders."  And then, "Ed will share this info with Bob White

17   and then we will see where we go from here."  Who is Bob

18   White?

19   A.   Bob White was with Petters.

20   Q.   Okay.  So in this instance, the bank would accommodate

21   the request, correct?

22   A.   Yes.

23   Q.   Okay.  Lenders wouldn't know who each other were if this

24   happened, correct?

25   A.   Correct.

1   Q.  Okay.  So long as the lenders know there are not other

2   such agreements, so it protects the lenders, correct?

3   A.  Correct.

4   Q.  Okay.  Is it fair to all the lenders?

5   A.  Yes.

6   Q.  Fair to PCI?

7   A.  Yes.

8   Q.  Fair to the bank?

9   A.  Yes.

10  Q.  Okay.  To the best of your recollection, did anything

11  further happen of this?

12  A.  I don't remember, but I don't believe so.

13  Q.  Okay.  Do you recall if PCI had Control Agreements with

14  other banks?

15  A.  Yes, vaguely, yes.

16  Q.  Okay.  Do you recall Control Agreements PCI had with

17  Citigroup?

18  A.  Yes.

19  Q.  Let's pull up Defendant's Exhibit 402 -- excuse me,

20  40121.  Let me know when you get there.

21  A.  I go from 40114 to 40124.  And let me see if it's in

22  another --

23          MR. GLEESON:  Judge, can I approach to help him

24  find the exhibit?

25          THE COURT:  You may.

Jambor - Direct

```
 1                   MR. GLEESON:  Thank you.

 2                   MR. MARDER:  I don't believe this document is in

 3      evidence and it is placed on the screen there.

 4                   MR. GLEESON:  Oh, I'm sorry.  Forgive me.

 5      BY MR. GLEESON:

 6      Q.  Do you have it, Mr. Jambor?

 7      A.  Yes.  Just one moment, please.

 8      Q.  Okay.

 9      A.  Okay.  Thank you.

10      Q.  Okay.  Could you just identify this exhibit.  What is

11      it?

12      A.  It is an e-mail.

13      Q.  From whom?

14      A.  Eric Anderson.

15      Q.  Okay.  And then is that forwarded -- Eric Anderson to

16      whom?

17      A.  To me and --

18      Q.  And a bunch of others?

19      A.  A bunch of other people, yes.

20      Q.  And did you forward this e-mail?

21      A.  Yes, I did.

22      Q.  To whom?

23      A.  Shari Rhode.

24      Q.  Okay.  And does this e-mail concern Deposit Account

25      Control Agreement with Petters at M&I Bank?  Just briefly.
```

1     It's not in evidence.  Take a moment to look at it.

2         (Witness reviews document)

3     A.  Yes, it appears it's about setting up a Deposit Account

4     Control Agreement with M&I Bank.

5              MR. GLEESON:  Okay.  I offer it in evidence.

6              MR. MARDER:  I do object on relevance grounds,

7     Your Honor.  If I could just be heard briefly.

8              THE COURT:  You may.  You wish to be heard at

9     sidebar?

10             MR. MARDER:  Yes, please.

11             THE COURT:  You may.

12        **(At sidebar)**

13             MR. MARDER:  Your Honor, during the direct

14    examination, there was a bunch of testimony about Mr. Jambor

15    and what he knew or didn't know about Control Agreements

16    back in 2003.  This document here is dated two years later

17    in 2005 so it has no bearing on the relevant issue, which is

18    what Mr. Jambor knew in 2003.

19             MR. GLEESON:  This goes to the heart of our

20    defense.  A central theme -- one of the themes of the

21    plaintiff's case is that, in fact, these Deposit Account

22    Control Agreements are a subject of -- one of the causes of

23    action, exclusively a cause of action.  And they are

24    characterized by the defense as some way in which the

25    signatories to these Deposit Account Agreements are reaching

1        out for protection from PCI.

2              There's going to be some examination about these.

3        There already has been examination about them.  What this

4        testimony shows is that one of the accounts that's on those

5        ACE Reports under the Petters set of accounts is a Deposit

6        Account Agreement with Citigroup, and it's not a cry for

7        help.  It's not a red flag.  It was unusual for Ed Jambor.

8        A big theme yesterday was, this was unusual.  Did you report

9        it to Shari Rhode?  Did you --

10             THE COURT:  So this is an out-of-court statement

11       that you are offering for the truth of the matter asserted?

12             MR. GLEESON:  I am going to offer it as a business

13       record.  It's a relevance -- I was just explaining the

14       relevance, Judge.

15             This is a business record that reflects the use of

16       Deposit Account Agreements in just the same way yesterday

17       this witness was examined about Deposit Agreements.  Judge,

18       this is our defense.

19             MR. MARDER:  Your Honor, first of all, he hasn't

20       laid a foundation for it being a business record.  But,

21       second of all, setting aside any hearsay objection, this has

22       nothing to do with any issue in this case.

23             The issue with respect to Mr. Jambor is whether he

24       thought in 2003 these DACA agreements were unusual, and this

25       is an e-mail that he received two years later.  It's very

1    attenuated relevance once again.

2              MR. GLEESON:  Judge, it goes directly to his

3    intent.  He was examined --

4              THE COURT:  His intent at what time?

5              MR. GLEESON:  This is right in the middle of the

6    relationship -- his relationship with the bank.  So this is

7    2005.  It shows his -- the Opportunity Finance testimony you

8    heard yesterday was all about a Deposit Account Control

9    Agreement.

10             This is about it's unusual for him because he was

11   a business banker.  It shows his intent that there's nothing

12   suspicious about Deposit Account Control Agreements.  It was

13   yesterday cast as something that he ought to put in the

14   significant -- Suspicious Activity Log, that he ought to

15   report to his boss.  He reported this to his boss.  This is

16   the same issue.

17             It comes up again in 2007 with Chris Flynn with

18   these Deposit Account Control Agreements in 2008.  This goes

19   to the heart of our defense, Your Honor.

20             I will authenticate it as a business record, and

21   we can -- he didn't come up here on a foundation or an

22   admissibility ground.  The relevance of this could not be

23   more central to our defense about this relationship with PCI

24   and the hedge funds that wanted Deposit Account Control

25   Agreements.

Jambor - Direct

1      You'll hear testimony about those in 2008, without

2   a doubt, from Chris Flynn.  He was gone by August of 2007.

3   Deposit Account Control Agreements are a central feature of

4   this case, and they are demonized by plaintiff's counsel.

5   This demonstrates that they are an ordinary course -- not

6   ordinary course, but they come up from time to time.

7      THE COURT:  How does the actual exhibit show that

8   as -- I mean, you can have him testify whether they are or

9   not, but it seems to me you're offering this exhibit for the

10  truth of the matter asserted within it.

11     MR. GLEESON:  I'm proving it as it reveals his

12  intent and as it reveals the relationship of the bank with

13  PCI.  This is a business record.  These are events that

14  occurred 20 years ago, Judge.  You heard him yesterday.

15  It's hard for him to remember these --

16     THE COURT:  So why can't you refresh his

17  recollection as opposed to admitting the exhibit?

18     MR. GLEESON:  I -- because, with respect, I think,

19  just as the Court has admitted other testimony and exhibits,

20  to the extent -- it's not hearsay because it bears on his

21  state of mind in dealing with PCI and Deposit Account

22  Control Agreements.  It's going to be -- it's going to be --

23  I'm not saying you should let it in because it's going to be

24  cumbersome, but if I have to refresh his recollection with

25  these admissible, respectfully, admissible documents, it's

Jamboor - Direct

```
 1    going to take me all day because this is a process to enter

 2    into these.  And it bears directly, Judge, on the state of

 3    mind of the bank when it comes to Deposit Account Control

 4    Agreements.

 5               MR. MARDER:  Your Honor --

 6               MR. GLEESON:  One more thing, Judge.  The

 7    relevance -- this is admissible.  I am going to lay a

 8    foundation, and I have cases regarding how these e-mails are

 9    business records.  But the relevance bar is kind of -- is

10    not a high bar.  It's whether it tends to prove a fact

11    that's germane to our case.

12               What this tends to prove is that when the bank

13    deals with PCI in connection with Deposit Account

14    Agreements, they don't deal with them in a way that where

15    they -- the bank thinks it's some kind of protection that's

16    needed from PCI by later on the hedge funds.

17               One other thing, Judge, is you have precluded us

18    from -- and I am not seeking to revisit this, but you have

19    precluded us from eliciting evidence that in 2008 the

20    Deposit Account Control Agreements were actually a way the

21    hedge funds and PCI conspired to deceive the hedge funds'

22    investors.  That's out.  We can't do investor complicity.

23    But what we can do is establish that Deposit Account

24    Agreements were not common, but they were done.  That this

25    banker was extremely careful to make sure he ran it by the
```

1   lawyers, he ran it by his supervisors, he ran it by the head

2   of business banking.  Yesterday he was characterized as --

3              THE COURT:  Okay.  So I'm just -- this is a

4   Deposit Account Agreement?

5              MR. GLEESON:  No.  This is an e-mail that --

6   Judge, this is an e-mail pursuant to which the -- PCI is

7   asking M&I Bank to arrange for a Petters -- a PCI Deposit

8   Account Control Agreement to receive the funds from a

9   Petters Company sale.

10             THE COURT:  And are you offering it to show that

11  that's what they did?  Are you offering it for the truth of

12  the matter asserted?

13             MR. GLEESON:  I'm offering it -- well, I can

14  because it falls within -- I am doing both.  Under 803(6),

15  it is a business record, and I'll lay a foundation.  I have

16  cases for the Court.  So I can offer it for the truth of the

17  matter asserted.

18             I'm also offering it for a different reason, which

19  is to the extent it sheds light on the intent of this banker

20  and others at M&I Bank with respect to these Deposit Account

21  Agreements.  They are not, like, sinister.  They are not the

22  things that Mr. Marder yesterday, Judge, in those repetitive

23  questions, Did you report this to your supervisor?  There's

24  reasons --

25             THE COURT:  One second.

Jambor - Direct

1        MR. MARDER:  Your Honor, a couple of points.

2            First one is let's set aside for a moment whether

3     this is hearsay or not, and let's just talk about relevance.

4            What Mr. Gleeson is saying is that he is saying

5     that these documents relate to the state of mind of this

6     witness.  The state of mind of this witness is at issue in

7     2003 when he received the DACA agreement.  This document

8     here relates to something he learned in 2005.  You cannot

9     possibly put on evidence of something that happened in 2005

10    to explain what this person's state of mind was back in

11    2003.  And that's not only an issue for this document, but

12    he's about to get down this whole rabbit hole, I can see

13    from his other exhibits here, about what was going on in

14    2005, and that's simply not at issue with this witness.

15    This is, at least under 403, confusing, if not irrelevant.

16        MR. GLEESON:  The very next exhibit in the

17    sequence of events is an e-mail where this relates to -- the

18    temporal distance, I respectfully suggest, is not relevant.

19    But the next e-mail is Mr. Jambor saying, "A couple of years

20    ago Tom Petters purchased Fingerhut, and now Citigroup is

21    requesting a Control Agreement."  It ties right back to the

22    unusual, unusual for him, nature of Deposit Account

23    Agreements, and yesterday that was mischaracterized as this

24    being unusual to the bank.  This is a direct response to the

25    challenge made to Mr. Jambor's state of mind yesterday.

Jambor - Direct

```
 1              THE COURT:  Why isn't this -- why does an exhibit
 2       need to be admitted as opposed to testimony?  Are you
 3       seeking to just have testimony or an exhibit?
 4              MR. GLEESON:  No, I am seeking to have the
 5       exhibits.  They are business records that are directly
 6       germane to a central issue of our defense.  And there's --
 7       with respect, I'll lay a foundation.  I'll provide you
 8       Eighth Circuit cases.
 9              They are business records, and there's no reason
10       why -- respectfully, our position is we shouldn't be -- with
11       a witness 20 years later, I shouldn't be required, given the
12       admissibility of these documents, to spend a very long time
13       trying to refresh his recollection with each -- you will
14       see, there's a number -- several e-mails, all of which
15       result in one of the accounts in the PCI -- those ACE
16       Reports that list the PCI accounts, this establishes one of
17       those accounts.  It explains what's going on in this case.
18              MR. MARDER:  I have yet to hear any relevance
19       other than state of mind of the bank or state of mind of
20       this witness, and you can't prove state of mind of a person
21       in 2003 with a document from 2005.  At best, it's hearsay.
22       At worst, it's completely irrelevant and confusing to the
23       jury.
24              THE COURT:  Sustained.
25          (In open court)
```

1    BY MR. GLEESON:

2    Q.  Mr. Jambor, you testified that you recalled the Deposit

3    Account Agreement with Citigroup, correct?

4    A.  Correct.

5    Q.  Okay.  Do you recall what it was for?

6    A.  I don't remember, no.

7    Q.  Let me invite your attention to Defendant's Exhibit

8    40121.  Okay?  And if you could read just the first

9    paragraph of that e-mail, Mr. Jambor.

10              MR. MARDER:  Your Honor, I object.

11              THE COURT:  You may read it to yourself.

12              THE WITNESS:  Okay.

13              MR. GLEESON:  That's what I meant.  Excuse me.

14        (Witness reviews document)

15   BY MR. GLEESON:

16   Q.  Let me know when you're done.

17   A.  Yes, I have read the first page, so.

18   Q.  Does that refresh your recollection that the Citigroup

19   Deposit Account Agreement related to funds from the sale of

20   properties?

21   A.  Yes.

22              MR. MARDER:  Objection, Your Honor, relevance.

23              THE COURT:  Overruled.

24   BY MR. GLEESON:

25   Q.  And sale of properties, does that refresh your

Jambor - Direct

1   recollection that the sale of properties was going to be a

2   sale from Petters Group?

3   A.  It was a sale of -- okay.  The purchaser was FAC

4   Properties.

5   Q.  Okay.  Does this -- by the way, away from the document,

6   do you remember who contacted you about this Deposit Account

7   Control Agreement?

8   A.  Initially or with this e-mail?

9   Q.  With this e-mail.

10  A.  No, I don't.

11  Q.  Okay.  Could you take a look at the e-mail, and does it

12  refresh your recollection that you were contacted by a

13  lawyer from the Petters Group?

14  A.  It was a lawyer that represents the Petters Group, yes.

15  Q.  And do you recall the role, Mr. Jambor, of Citibank in

16  this transaction -- Citigroup, excuse me, in this

17  transaction?

18  A.  They were going to --

19            MR. MARDER:  I object again on the grounds of

20  relevance based on the sidebar just for the record.

21            THE COURT:  Overruled.  If you recall.

22            THE WITNESS:  It was a mortgage on some

23  properties.

24  BY MR. GLEESON:

25  Q.  Okay.  And Citigroup held the mortgage?  Does that

1    refresh your recollection that Citigroup held the mortgage?

2    A.  That Citigroup, yeah, or an affiliate of Citigroup was

3    holding a mortgage.

4    Q.  Okay.

5    A.  To a mortgage, yes.

6    Q.  And do you have a present recollection, Mr. Jambor, as

7    to whether Citigroup had Deposit Account Agreements with

8    Petters at other banks?

9              MR. MARDER:  Objection, again, Your Honor.

10             Could I just have a standing objection so I don't

11   have to keep interrupting to this whole line of questioning?

12             THE COURT:  You may.

13             MR. MARDER:  Thank you, Your Honor.

14   BY MR. GLEESON:

15   Q.  Go ahead, Mr. Jambor.

16   A.  In the e-mail it states that they --

17   Q.  No, don't say what it says.

18   A.  Okay.

19   Q.  Read it to yourself.  Read the sentence that begins

20   with, "Citi has previously" to yourself.

21      (Witness reviews document)

22   A.  Okay.

23   Q.  Does that refresh your recollection that Citi had

24   previously used a Control Agreement with Petters at

25   U.S. Bank?

1   A.  Yes.  Yes.

2   Q.  And do you recall whether when you were contacted by a

3   lawyer from Petters that you were provided with a draft

4   Control Agreement?

5   A.  Yes.  It's -- yes.

6   Q.  Does that refresh your recollection?

7   A.  Yes, it was.

8   Q.  Okay.  And the Control Agreement -- putting the document

9   aside for a second, your recollection as to what funds would

10  go into the Control Agreement proposed by this lawyer from

11  Petters would be proceeds of the sale of the real property?

12  A.  Yes.

13  Q.  Okay.  And, again, do you recall whether there was any

14  time concern, any issue regarding timing with respect to

15  this agreement?

16  A.  Yes.

17  Q.  Okay.  Was it -- what do you recall?

18  A.  That it was coming up at the end of -- at the end of

19  that week.

20  Q.  Okay.  You testified yesterday that these agreements

21  were unusual for you, correct?

22  A.  Correct.

23  Q.  Okay.  Was it new territory for you?

24  A.  Yes.

25  Q.  Was it unusual for the bank?

```
1    A.  I don't believe so.

2    Q.  Okay.  And did you -- when you heard from this lawyer

3    from Petters regarding this Deposit Account Control

4    Agreement, did you contact anybody?  Did you forward the

5    e-mail to anyone?

6    A.  Yes, I did.

7    Q.  Who?

8    A.  Shari Rhode.

9    Q.  Okay.  Who is she?

10   A.  She was my supervisor.

11   Q.  All right.  And do you recall how you responded?

12   A.  I don't remember, no.

13   Q.  Turn to Plaintiff's Exhibit 58 -- 48, excuse me.

14            MR. GLEESON:  Again, please don't put this up,

15   Mr. Herzka.

16            THE WITNESS:  Plaintiff's exhibit?  I'm sorry.

17   BY MR. GLEESON:

18   Q.  Yes, plaintiff's exhibit.

19   A.  Okay.  Thank you.

20   Q.  You were examined about this yesterday, and it was

21   offered into evidence and received.

22            MR. GLEESON:  So, Mr. Herzka, could you pull it

23   up, please.  And if you could go --

24   BY MR. GLEESON:

25   Q.  Before you go there, what is this?
```

Jambor - Direct

```
 1    A.  An e-mail.

 2    Q.  From whom to whom?

 3    A.  From me to Kevin Kane.

 4    Q.  Who is he?

 5    A.  He was the manager of the business division at the time.

 6    Q.  The manager of the business division of M&I Bank?

 7    A.  In Minnesota, yes.

 8    Q.  For the whole state?

 9    A.  For the state, yes.

10    Q.  Okay.  And you were examined about part of this document

11    yesterday and that is at the top of page 2, "Petters is a

12    large deposit customer of mine.  Number two or three in

13    profitability."  Do you recall that?

14    A.  Yes.

15    Q.  Okay.  Let me turn your attention to part of this

16    exhibit you were not examined on, which is the next -- start

17    with the next paragraph.

18              "A couple of years ago Tom Petters purchased

19    Fingerhut from Federated Department Stores to save the

20    business from shutting down.  The buildings in the purchase

21    are owned by FAC Acquisition, LLC.  FAC is selling the

22    building."  Okay.  Do you see that?

23    A.  Yes.

24    Q.  Okay.  And then it says, "Citigroup is requesting the

25    Control Agreement to set up the transaction."  Okay?
```

Jambor - Direct

1   A.  Yes.

2   Q.  Would that result in a separate account if this comes to

3   fruition, a separate account in the Petters account at M&I

4   Bank?

5   A.  Yes.

6   Q.  "The selling price for the building is around 10

7   million.  I don't know how much is going into the account or

8   how long the proceeds will stay in the account."

9          How long the proceeds will stay in the account, is

10  that relevant to you and to Mr. Kane?

11  A.  Yes.

12  Q.  Why?

13  A.  Because the longer the deposits, the funds stay in the

14  account, the more profitable it would be to the bank.

15  Q.  You say you spoke with Rich at Petters.  "He could not

16  offer me any insight."  Insight into how long the money

17  would stay in the account?

18  A.  Yes.

19  Q.  And then you wrote, "I'm not very familiar with Control

20  Agreements.  I've worked with Elliot Berman who represents

21  us in Milwaukee."  Let me stop there.

22          Does that refresh your recollection that Elliot

23  Berman was outside counsel for the bank?

24  A.  Yes.

25  Q.  "He can review the document for us.  I do not have the

1    authority to sign the agreement.  I want to make sure you're

2    OK with the agreement and account before I move forward.

3    They need a quick turnaround."  Do you see that?

4    A.  Yes.

5    Q.  Okay.  So you're telling the head of business banking

6    for the entire state you're not familiar with Deposit

7    Account Agreements, correct?

8    A.  Correct.

9    Q.  And that you will run it by the lawyer?

10   A.  Yes.

11   Q.  Did you ever get involved in a contract like this

12   without involving a lawyer?

13   A.  No.

14   Q.  Okay.  You forwarded to him an e-mail related --

15   attached to this -- not attached, but this is on top of a

16   forwarded e-mail, correct?

17   A.  Yes.

18   Q.  Okay.  And in there it's from -- the e-mail you forward

19   is from Eric Anderson at Fredlaw.com.  Do you see that?

20   A.  Yes.

21   Q.  Is he the lawyer for Petters?

22   A.  Yes.

23   Q.  And then there's other people.  We don't need to go

24   through all of them.  There's folks from Citigroup in there,

25   a couple of groups from Citigroup, some others from Petters

1    Group, correct?

2    A.  Yes.

3    Q.  And you mentioned that earlier you had forwarded an

4    e-mail to Shari Rhode, correct?

5    A.  Yes.

6    Q.  Your immediate supervisor?

7    A.  Correct.

8    Q.  About this same set of circumstances, correct?

9    A.  Yes, correct.

10   Q.  Did the -- do you know whether this FAC-related Control

11   Agreement ever got signed?

12   A.  I don't remember.

13          MR. GLEESON:  Mr. Herzka, could you pull up DX --

14   Defendant's Exhibit 40175.  It's an ACE Report, and could

15   you enlarge -- at the top it's "███████."  Could you go

16   down to Petters, please.

17   BY MR. GLEESON:

18   Q.  Take your time, Mr. Jambor.

19   A.  Okay.

20   Q.  Okay.  If you turn down -- we've got it highlighted on

21   the screen, but you can't see it, but if you turn down to

22   the Petters accounts on this ACE Report.

23   A.  Yes.

24   Q.  Are you there?

25   A.  Yes, I am.

Jambor - Direct

```
 1    Q.  Okay.  Did the -- is there anything on there that
 2    indicates to you whether the Deposit Account Control
 3    Agreement between M&I Bank and Petters, or PCI, and
 4    Citigroup actually got executed?
 5    A.  There's an account with FAC Acquisitions on the report.
 6    Q.  Okay.  And so Citibank got its separate account,
 7    correct, Citigroup?
 8    A.  Yes.
 9    Q.  Okay.  You were new to this, correct?
10    A.  Yes.
11    Q.  At the time did you think there was anything wrong with
12    this?
13    A.  No.
14    Q.  This request for the Control Agreement, did you regard
15    that as a red flag?
16    A.  No, I did not.
17    Q.  By the way, when you were in this -- during this
18    sequence of events, did you do anything to determine whether
19    you could find Control Agreements or draft Control
20    Agreements or a template within M&I Bank?
21    A.  I don't remember.
22    Q.  Okay.  Could you just look at Defendant's Exhibits 40126
23    and 40127.
24             MR. GLEESON:  These are not to be pulled up on the
25    screen, Mr. Herzka.
```

1    A.  Okay.

2    Q.  Okay.  Let me ask you this:  The person from whom you

3    heard it, who was representing Petters, was Eric Anderson,

4    correct?

5    A.  Correct.

6    Q.  Was there another Erik Anderson at the time at M&I Bank?

7    A.  Yes.

8    Q.  Okay.  Who is he?

9    A.  He was in the commercial department treasury management

10   team.

11   Q.  Okay.  And just read to yourself 40126 and then look at

12   40127.  You don't have to read all of 40127.

13   A.  Okay.  Yes.

14   Q.  Does that refresh your recollection regarding whether

15   you did anything to see whether within the bank there were

16   templates for Deposit Account Control Agreements?

17   A.  Yes.

18   Q.  Did you?

19   A.  Yes, I did.

20   Q.  And did you get a template from the other Erik Anderson?

21   A.  Yes, I did.

22   Q.  Could you go to P-36, please, Mr. Jambor.

23   A.  Yes.

24   Q.  What is this?

25   A.  An e-mail.

1    Q.  Okay.  From whom to whom?

2    A.  From Hank Donatell to me.

3    Q.  That's the last e-mail in the chain?

4    A.  Yes.

5    Q.  Okay.  That first e-mail in the chain is also from him

6    to you?

7    A.  Yes, from Hank to me also, yes.

8    Q.  And then in between there's a conversation?

9    A.  Correct.

10             MR. GLEESON:  I offer it into evidence.

11             MR. MARDER:  Your Honor, I believe this document

12   is already admitted into evidence.

13             MR. GLEESON:  Thank you, Mr. Marder.

14   BY MR. GLEESON:

15   Q.  If you could go to the last one, start at the end.  I

16   think you were questioned about this briefly.  Mr. Donatell

17   to you, "Noticed Petters' balances are down about 12 million

18   in average collected from July and August."  Then he asked

19   you, "How much of this decline is DDA and can we expect to

20   get the balances back?"  Do you see that?

21   A.  Yes.

22   Q.  What's DDA?

23   A.  A checking account.

24   Q.  Who is Mr. Donatell?

25   A.  He was the controller for M&I Bank.

1   Q.  Okay.  He kept an eye on the balances?

2   A.  Yes.

3   Q.  And then you respond in the next e-mail back to him,

4   "The funds were used to purchase 90-day treasuries with M&I

5   Investments per a Control Agreement we have with FAC and

6   Citigroup."  Do you see that?

7   A.  Yes.

8   Q.  So the funds were left -- that were put in the account

9   were used to buy bonds?

10  A.  Yes.

11  Q.  And that was pursuant to the Deposit Account Control

12  Agreement?

13  A.  Yes.

14  Q.  And then moving up in the chain, let's go to the bottom

15  of the first page, please.

16  A.  Yes.

17  Q.  It says, "The treasury purchase was for $12,344,430.55

18  was from FAC Acquisition."  Do you see that there?

19  A.  Yes.

20  Q.  "FAC is a household under Petters.  The account for FAC

21  is a Money Market Index."  Do you see that?

22  A.  Yes.

23  Q.  Then it says, "The Petter checking account is a Euro

24  Sweep, which has a peg balance of 1.2 million."  I will come

25  back to that in minute.  But then it says, "The balance

1    really fluctuate over the sweep amount on a daily basis

2    based on the sales and purchases of merchandise."  Do you

3    see that?

4    A.  Yes.

5    Q.  Okay.  What merchandise?

6    A.  I'm assuming the merchandise that Petters was selling.

7    Q.  Okay.  Was the activity in the account consistent with

8    the business that you were told PCI was in?

9    A.  Yes.

10   Q.  Back to the Euro Sweep, just for the jury's edification,

11   what does Euro Sweep refer to?

12   A.  That is an account where the funds sweep into an account

13   overnight to earn interest for the customer.

14   Q.  So they are funds in a particular account?

15   A.  Yes.

16   Q.  Okay.  Overnight they get swept into an

17   interest-bearing --

18   A.  An interest-bearing account, yes.

19   Q.  Is that a service provided for other business banking

20   customers?

21   A.  Yes.

22   Q.  Okay.  It's a way for them to earn interest on their

23   average deposit balance?

24   A.  Correct.

25   Q.  And what's the peg balance mean?

Jambor - Direct

```
1    A.  That is the minimum balance.  So anything in excess of

2    that -- a dollar amount would get swept into the sweep

3    account to earn interest.

4    Q.  Okay.  And then the last e-mail, which is the first one

5    on the document, is from you back -- is from Donatell back

6    to you, correct?

7    A.  Yes.

8    Q.  "That should do it.  Thanks, Ed."  Do you see that?

9    A.  Yes.

10   Q.  So he's satisfied with your explanation about the

11   activity in the account?

12   A.  Yes.

13   Q.  All right.  Let me switch topics and go back to a topic

14   that you were examined about yesterday, the deposit account

15   discussion among you and people at PCI and a fellow named

16   Jon Sabes.  Do you recall that yesterday?

17   A.  Yes.

18   Q.  And let's start with Plaintiff's Exhibit 2 at page 32.

19          MR. GLEESON:  And you can scroll down, please.

20   BY MR. GLEESON:

21   Q.  Is this where the back and forth regarding this

22   Opportunity Finance Control Agreement started, Mr. Jambor?

23   A.  Yes, I believe so.

24   Q.  Okay.  "And met with Tom Petters, Deanna Munson, Jon

25   Sabes and Bob White to discuss the account."  Do you see
```

1    that?

2    A.  Yes.

3    Q.  Okay.  Did you know who Sabes was?

4    A.  No.  No, I did not.

5    Q.  And did you associate -- did you know at the time he

6    worked -- he was affiliated with Opportunity Finance?

7    A.  Well, looking at the text, I was introduced that he was,

8    yes.

9    Q.  Okay.  Do you have an understanding as to what

10   Opportunity Finance's relationship was, if any, with PCI?

11   A.  No, I did not.

12   Q.  Okay.  And you mentioned -- it's mentioned at the end

13   that you are going to "research the two options and meet on

14   Monday, March 3rd, 2003."  Do you see that?

15   A.  Yes.

16   Q.  So you're going to follow up?

17   A.  Correct, yes.

18   Q.  And let's turn to P -- Plaintiff's Exhibit 104.

19           MR. GLEESON:  And this is in evidence.  You can

20   put it up, Mr. Herzka.

21   BY MR. GLEESON:

22   Q.  And this is an e-mail to you -- from Sabes to you and

23   Ms. Rhode?

24   A.  Correct.

25   Q.  From Sabes, correct?

1    A.  Correct.

2    Q.  cc:  Simon Root?

3    A.  Yes.

4    Q.  Who is Simon Root?

5    A.  I don't remember.

6    Q.  And it says, "It was a pleasure meeting with you today."

7    That refers to the meeting at PCI, correct?

8    A.  Correct.

9    Q.  Okay.  And it says, "In reality, we are looking to have

10   M&I Bank act as a custodian to receive retailer wire

11   payments and with further direction of Deanna Munson at

12   Petters, forward those monies on to their appropriate

13   accounts."  Correct?

14   A.  Correct.

15   Q.  You understood that generally to be the request from

16   Opportunity Finance?

17   A.  Yes.

18   Q.  Okay.  The meeting -- was Opportunity Finance a customer

19   of the bank?

20   A.  No, it was not.

21   Q.  Okay.  Was a customer of the bank involved in this?

22   A.  Yes.

23   Q.  And that was whom?

24   A.  Petters Company.

25   Q.  Okay.  Would you ever enter into an agreement with a

1    customer's customer except at the request of your customer?

2    A.  No, I would not.  If the customer requested it, yes.

3    But not just if the customer contacted me directly, no.

4    Q.  Okay.  So you would only do it if -- in this context if

5    PCI asked you?

6    A.  Yes.

7    Q.  Now, this -- it goes on to say, "This exact process" --

8         MR. GLEESON:  Same paragraph, Mr. Herzka.

9    BY MR. GLEESON:

10   Q.  It says, "The M&I Bank act as custodian to receive

11   retailer wire payments and with further direction of Deanna

12   Munson."  Do you see that?

13   A.  Yes.

14   Q.  Does this say that the payments from retailers in the

15   PCI -- in the business -- withdrawn.

16        As you understood it, the PCI business was what?

17   Would you repeat that.

18   A.  Buying and selling merchandise, consumer merchandise.

19   Q.  Okay.  And was it -- does this say that the retailer

20   wire payments would come directly from retailers?

21        MR. MARDER:  Objection, Your Honor, leading.

22        MR. GLEESON:  I'm asking what it's -- excuse me.

23        MR. MARDER:  We can all read the document,

24   Your Honor.

25        THE COURT:  Overruled.  You may answer.

Jambor - Direct

```
 1                  THE WITNESS:  Can you repeat the question, please?
 2    BY MR. GLEESON:
 3    Q.  Yeah.  Does this say that the retailer wire payments
 4    would come directly into the PCI account from retailers?
 5    A.  It says, "Retailer wire payments."  I don't know where
 6    they're coming from, no.
 7    Q.  Could they come from other sources?
 8    A.  Potentially, yes.
 9                  MR. MARDER:  Objection, calls for speculation.
10    Move to strike.
11                  THE COURT:  Overruled.
12                  MR. GLEESON:  Sorry.
13                  THE COURT:  You may answer if you can.
14                  THE WITNESS:  Potentially, yes.
15    BY MR. GLEESON:
16    Q.  Okay.  Like what other sources?
17    A.  Other funding sources.
18    Q.  Okay.  If there were an intermediary between the
19    manufacturers of the goods and the big-box retailers, any
20    reason why the retailer payments couldn't make it into the
21    PCI account through the intermediaries?
22                  MR. MARDER:  Objection, lack of foundation, calls
23    for speculation.
24                  THE COURT:  Sustained.
25    BY MR. GLEESON:
```

Jambor - Direct

1    Q.  In any event, did you understand from this that retailer

2    wire payments would come directly into PCI's account?

3    A.  No.

4            MR. MARDER:  Objection, Your Honor.

5            THE COURT:  Overruled.  What did you understand?

6            THE WITNESS:  I understand that they were

7    receiving wire transfers.

8    BY MR. GLEESON:

9    Q.  Did you understand that those wire transfers would

10   necessarily come directly from retailers?

11   A.  I did not know where they were coming from.

12   Q.  And from your vantage point, Mr. Jambor, did you have

13   any visibility as to -- in the ordinary course, as to where

14   the wires were coming from into the PCI account?

15   A.  No, I did not.

16   Q.  You researched the issue that came up when Mr. Sabes

17   made this request along with PCI Bank [sic]?

18   A.  Yes, I did.

19   Q.  Okay.

20           MR. GLEESON:  Can we pull up Plaintiff's 51 in

21   evidence.

22   BY MR. GLEESON:

23   Q.  Do you have it before you, Mr. Jambor?

24   A.  Yes, I do.

25   Q.  Okay.  This is a letter from you to Deanna Coleman,

Jambor - Direct

```
1    correct?

2    A.  Correct.

3    Q.  This was the results of the research into the requests

4    from Opportunity Finance?

5    A.  Yes.

6    Q.  You didn't send it to Opportunity Finance?

7    A.  No, I did not.

8    Q.  They're not your customer?

9    A.  They were not a customer.

10   Q.  You sent it to your customer?

11   A.  Correct.

12   Q.  And does this set forth the results of your research?

13   A.  Yes.

14   Q.  You testified that this was unusual for you.  This is

15   back in 2003, correct?

16   A.  Correct.

17   Q.  So did you seek assistance and do research in responding

18   to the request?

19   A.  Yes, I did.

20   Q.  Okay.  And the letter presents a couple of options,

21   correct?

22   A.  Correct.

23   Q.  One is reflected in paragraph three.  So let's look at

24   that.  "Regarding the issue of the checking account to a

25   custodial checking account.  The Petters account would be
```

1    required to move M&I Trust department -- required move to
2    M&I Trust department in order to meet the monitoring
3    requirements requested by Opportunity Finance.  This would
4    require at a minimum assigning a new account number."  Do
5    you see that?
6    A.  Yes.
7    Q.  Okay.  What is the trust department?
8    A.  It's another division of the bank.
9    Q.  Okay.  And the trust department has monitoring
10   requirements, correct?
11   A.  Correct.
12   Q.  Monitoring of whom if this agreement were to have been
13   executed?
14   A.  The account for Petters.
15   Q.  Okay.  And then the next paragraph addresses a second
16   option, correct?
17   A.  Correct.
18   Q.  It says, "The Letter of Credit possibility would not
19   require a new account number, but due to the size of the" --
20   "due to the dollar size of the request, the relationship
21   would move to the Commercial Banking Department of M&I Bank.
22   I spoke with a commercial banker to discuss the Letter of
23   Credit possibility.  If this interests you, a meeting can be
24   set up in early March to explore the information needed to
25   establish and structure the Letter of Credit."  Do you see

Jambor - Direct

1    that?

2    A.  Yes, I do.

3    Q.  Okay.  What kind of information is needed to establish a

4    Letter of Credit?

5    A.  It would be -- it's considered a loan, so financial

6    information on the company and the owners.

7    Q.  And does that require financials?

8    A.  Yes.

9    Q.  More information than the bank already had?

10   A.  Correct.

11   Q.  Now, you mentioned earlier you had a practice with

12   regard to agreements when -- other than simple loan

13   agreements.  You had a practice with regard to agreements,

14   contracts, correct?

15   A.  Correct.

16   Q.  And what was it?

17   A.  To seek assistance on them.

18   Q.  Okay.

19   A.  Yes.

20   Q.  From whom?

21   A.  Generally attorneys.

22   Q.  Okay.  Would you ever send a contract, like a Deposit

23   Account Agreement, to a customer that wasn't approved by

24   counsel for the bank?

25   A.  No, I would not.

1    MR. GLEESON:  Could you pull up Plaintiff's 56 in

2    evidence, please, Mr. Herzka.

3    BY MR. GLEESON:

4    Q.  You were examined about this yesterday.  This is about

5    three months later, and it's a letter from you to, not

6    Ms. Coleman, but Mr. Petters, correct?

7    A.  Correct.

8    Q.  "Pursuant to our recent discussions, we are pleased to

9    inform you that upon your direction and instruction, we are

10   willing to open a new account for you that is subject to the

11   Deposit Account Control Agreement."  Do you see that?

12   A.  Yes.

13   Q.  Okay.  You were also examined about a form of this

14   letter that Ms. Coleman, Ms. Munson, had sent to you, right?

15   A.  Yes.

16   Q.  Do you recall that?

17   A.  Yes.

18   Q.  Okay.  Who was your contact at PCI?

19   A.  Deanna Munson.

20   Q.  Okay.  Petters was her boss?

21   A.  Yes.

22   Q.  Okay.  She provided you with a draft letter that she was

23   asking you to send to her boss?

24   A.  Yes.

25   Q.  Okay.  And you recall that you were examined yesterday

1    about how that draft letter was changed, correct?  Do you

2    recall that?

3    A.  Yes.

4              MR. GLEESON:  If you highlight "we understand,"

5    Mr. Herzka.

6    BY MR. GLEESON:

7    Q.  "We understand that you're interested in opening this

8    account as soon as possible.  We will work with you upon

9    satisfactory completion of the Opportunity Finance/West LB

10   facility."  Do you see that?

11   A.  Yes.

12   Q.  Do you recall what that was?

13   A.  I don't remember, no.

14   Q.  Okay.  And when you suggested this, was this coming from

15   you or from counsel to M&I Bank?  Do you recall?

16   A.  I don't remember where this came from.

17   Q.  Okay.  Is -- the satisfactory completion of Opportunity

18   Finance/West LB facility was something that had to happen

19   before the Opportunity Finance Control Agreement would

20   happen?

21   A.  That's what it is stating, yes.

22   Q.  Okay.  Do you have any independent recollection of this?

23   A.  No, I don't.

24   Q.  All right.  To your knowledge, did the Opportunity

25   Finance Deposit Account Agreement ever get signed?

Jambor - Direct

```
 1    A.  I don't remember, but I don't think so.

 2    Q.  Okay.

 3              MR. GLEESON:  Okay.  Could we pull up Plaintiff's

 4    2 at 62, please.

 5    BY MR. GLEESON:

 6    Q.  That's a MIContacts report, right?

 7    A.  Yes.

 8    Q.  Who is it from?

 9    A.  Barbara Nieland is the writer.

10    Q.  The writer.  Excuse me.

11              It reflects a call, correct?

12    A.  Correct.

13    Q.  Who else was present?

14    A.  I was.

15    Q.  Okay.  And remind us who Barbara Nieland was.

16    A.  She was a commercial banker in the commercial banking.

17    Q.  At M&I Bank?

18    A.  At M&I Bank, yes.

19    Q.  Was she interested in deepening the relationship with

20    PCI as well?

21    A.  Yes, she was.

22    Q.  Were all the bankers at M&I Bank interested in deepening

23    relationships with PCI?

24    A.  Yes.  With all their customers.

25    Q.  And this is dated what?
```

1    A.  July 1st, 2003.

2    Q.  The first sentence says, "Elliot Berman reviewed the

3    outline of a Deposit Control Agreement provided by Dave

4    Petters -- Dave Bauers," excuse me, "of Petters."  Do you

5    see that?

6    A.  Yes.

7    Q.  Elliot is the outside counsel for M&I Bank?

8    A.  Yes.

9    Q.  "Elliot made some revisions which have been shared with

10   Petters."  Do you see that?

11   A.  Yes.

12   Q.  And then this goes on to say, so -- and I just want to

13   focus on the date.  This is related to the Deposit Account

14   Agreement that we examined earlier, correct --

15   A.  Yes.

16   Q.  -- the proposal?

17           Okay.  And when was this?

18   A.  July 1st, 2003.

19   Q.  Great.  Thank you.

20           Okay.  Let's change subjects and go to -- before

21   we go to it, from time to time would you try -- you

22   mentioned it's a service profession, correct?

23   A.  Yes.

24   Q.  You try to serve your customers?

25   A.  Yes.

Jambor - Direct

1    Q.  Do the best by them?

2    A.  Correct.

3           MR. GLEESON:  Okay.  Let's pull up Plaintiff's 41.

4    Before you do, Mr. Herzka, I just want to be sure this is in

5    evidence.  Yeah, it is.  Please pull it up.  Thank you.

6    BY MR. GLEESON:

7    Q.  Do you have that before you?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  An e-mail.

11   Q.  From whom to whom?

12   A.  Deanna Munson to me.

13   Q.  Okay.  That's the first one on the document but the last

14   in the chain, correct?

15   A.  Correct.

16   Q.  Okay.  So let's go to the first one in the chain, which

17   is the last one in the document.  Who is that an e-mail

18   from?

19   A.  From me to Deanna Munson.

20   Q.  Okay.

21          MR. GLEESON:  And could you -- I think there's

22   another one, Mr. Herzka, on this.  Yeah, there it is, on the

23   right.

24   BY MR. GLEESON:

25   Q.  Do you see the last e-mail on the chain?

```
 1              MR. GLEESON:  If you could enlarge that e-mail at

 2     the bottom right-hand page.  Thank you, sir.

 3     BY MR. GLEESON:

 4     Q.  This is from you to Deanna --

 5     A.  Correct.

 6     Q.  -- Munson?

 7     A.  Correct.

 8     Q.  "I was reviewing your checking account.  I noticed if

 9     you raise the dollar amount to be swept into the investment

10     account each night, you could lower the analysis fee on the

11     account."  Do you see that?

12     A.  Yes.

13     Q.  You referred to this sweep account earlier?

14     A.  Correct.

15     Q.  It's a treasury management service?

16     A.  Yes.

17     Q.  And what are you saying here to Ms. Munson?

18     A.  If we increased the peg balance or the amount that --

19     the minimum amount in the account, it would lower the fees

20     that were charged on the checking account.

21     Q.  Okay.  There's a fee related to a Euro Sweep account?

22     A.  Yes, and a checking account.

23     Q.  And a checking account as well.  And you say, "I

24     calculate" -- continuing with the e-mail.  "I calculate the

25     increase to be about 2 million.  If you give me the OK, I
```

1    will raise the peg balance to help you reduce your monthly

2    fees."  Do you see that?

3    A.  Yes.

4    Q.  Okay.  And were you trying to help PCI reduce its fees?

5    A.  Correct.

6         MR. GLEESON:  Could you go up one more e-mail,

7    please, Mr. Herzka, on this chain.  It's on the upper right.

8    BY MR. GLEESON:

9    Q.  Do you get a response from Ms. Munson?

10   A.  Yes.

11        MR. GLEESON:  It's a little lower, Mr. Herzka.  If

12   you can go down a little bit.

13   BY MR. GLEESON:

14   Q.  Her response?

15   A.  "Sounds good to me.  Let's raise it to 2 million."

16        MR. GLEESON:  Okay.  And then go up one more.

17   It's on the first page of the document, please, Mr. Herzka.

18   BY MR. GLEESON:

19   Q.  And you write another e-mail to Ms. Munson?

20   A.  Yes.

21   Q.  Okay.  "I wish to clarify my idea.  I need to raise the

22   peg balance by 2 million to 3.5 million."  Do you see that?

23   A.  Yes.

24   Q.  Okay.  And then she responds by asking you what?

25   A.  "Would we be better off collecting the interest on the

Jambor - Direct

1   extra 2 million or paying less in fees?"

2   Q.  Okay.  What was she asking you there?

3   A.  Which is better, to pay the fees or collect interest.

4   Q.  Okay.  Do you recall what your response was?

5   A.  I don't remember.

6   Q.  Is this the kind of service you provided for all of your

7   large business banking customers?

8   A.  Yes.

9   Q.  All right.  Let's go briefly to a document about what

10  you were examined yesterday.  I think we can do this

11  quickly.

12          MR. GLEESON:  Mr. Herzka, would you pull up,

13  please, Plaintiff's 60.

14  BY MR. GLEESON:

15  Q.  Have you got it, Mr. Jambor?

16  A.  Yes, I do.

17  Q.  This is a string, the top of which is Deanna Munson to

18  Stuart Romenesko and Tom Petters.  Do you see that?

19  A.  Yes.

20  Q.  Anybody there from M&I Bank?

21  A.  No.

22  Q.  Okay.  If you scroll down a little bit, the next thing

23  is a forwarding --

24          MR. GLEESON:  I am getting seasick watching this,

25  Mr. Herzka.  There you go.

1    BY MR. GLEESON:

2    Q.  A forwarding of an e-mail and an attachment from you to

3    Deanna, correct?

4    A.  Correct.

5    Q.  Deanna Munson, right?

6    A.  Yes.

7    Q.  And let's go to the attachment.  It's the last page.  Do

8    you recall being examined about this?

9    A.  Yes.

10   Q.  Okay.  Did you know who Mark Apostalon was?

11   A.  No, I did not.

12   Q.  Excuse me.

13   A.  I did not.

14   Q.  How about Integrity Marketing and Sales, LLP?

15   A.  I was not familiar with the company either.

16   Q.  Okay.  And then the handwritten next to that, is an

17   I.O.C. or I.D.C. of the Petters Company, right?

18   A.  Correct.

19   Q.  Do you know what that is?

20   A.  No, I don't.

21   Q.  Do you recognize the name Steve Ratliff?

22   A.  No, I do not.

23   Q.  The letter is -- the subject line says, "Authority to

24   disclose."  Do you see that?

25   A.  Yes.

Jambor - Direct

1    Q.   Okay.  Are you familiar with that phrase?

2    A.   Just, yeah, yeah, basically authorization to provide

3    information.

4    Q.   Okay.  And separate and apart from this, you've gotten

5    authority to disclose in your career as a banker, correct?

6    A.   Yes.

7    Q.   Who do they come from?

8    A.   Generally new vendors that are looking to see what the

9    account relationship is.

10   Q.   Okay.  And when you get them and they ask for you to

11   disclose information about a customer, do you just do that?

12   A.   No, I do not.

13   Q.   Why not?

14   A.   I verify with the customer that it's okay to do it.

15   Q.   This wasn't your customer?

16   A.   Integrity Marketing, no.

17   Q.   And asking you to disclose bank information from one of

18   your customers?

19   A.   Yes.

20   Q.   Okay.  As far as you knew, was this Steve Ratliff

21   authorized to direct you to release information about the

22   PCI account?

23   A.   No, I don't know Steve Ratliff.

24   Q.   Okay.  So who was authorized to allow to you disclose

25   information?

Jambor - Direct

1    A.  My contact, Deanna Munson.

2    Q.  So what did you do?

3    A.  I forwarded the e-mail to her.

4    Q.  Okay.  And was it your practice to ask a customer for

5    guidance when you got a request like this?

6    A.  Yes.

7    Q.  To your knowledge, did anything come of this?

8    A.  I don't remember.

9    Q.  Okay.  We could -- it's in evidence.  We could read the

10   top e-mail.  The jury can do that on its own time.  But

11   here's what I want to ask you:  Was there anything at all to

12   you remarkable about this missive from Steve Ratliff?

13   A.  No.  I just wanted to -- the whole point was when I saw

14   it or received it, I wanted to verify what I should do.

15   Q.  You checked with your customer?

16   A.  I checked with my customer.

17   Q.  Was this a transaction?

18   A.  The request --

19   Q.  Yeah?

20   A.  -- or the customer?

21   Q.  Yesterday I asked you what a transaction was.  What's a

22   transaction?

23   A.  It's just the credit or debit from a checking account.

24   Q.  Was this a transaction?

25   A.  No.

1    Q.  Was it suspicious?

2    A.  I don't remember what I thought of it.

3    Q.  But you sent it on to your customer, correct?

4    A.  Correct, yes.

5    Q.  Next is -- let's turn to the checks you were examined

6    about yesterday from Coleman.

7            You testified you were contacted about checks

8    drawn on the PCI account, two particular checks.  Do you

9    recall that?

10   A.  Yes.

11   Q.  And could you remind the jury by whom you were

12   contacted.

13   A.  Our operations area.

14   Q.  Okay.  What is that?

15   A.  It's just an area that handles the operations of the

16   bank, bank office.

17   Q.  You testified you didn't see the checks as they came in

18   to the account?

19   A.  Correct.

20   Q.  I take it operations did?

21   A.  Yes.

22   Q.  Okay.  And what was it that you were told by operations

23   in connection with these two checks you testified about?

24   A.  That two checks that cleared -- of the same dollar

25   amount that cleared fairly close to each other; one at the

1    end of one year and one at the beginning of one year -- yes,

2    the next year.

3    Q.  So one -- and you testified yesterday that your

4    recollection as refreshed was one was in December '06 and

5    the other January '07?

6    A.  Correct.

7    Q.  So they straddled the end of the calendar year, correct?

8    A.  Correct.  Yes.

9    Q.  Okay.  And was there anything else said to you about the

10   operation -- by the operations folks about these two checks?

11   A.  Just to verify what -- what the status was of them.

12   Q.  And what did you do?

13   A.  I contacted Mr. Petters.

14   Q.  Do you remember whether either of the checks was lacking

15   or required signature?

16   A.  I don't remember.

17   Q.  Okay.  Who are the two signatories on the account?

18   A.  I am trying to remember the checks.  I think that

19   one had two signatures and the other one --

20   Q.  Not on the checks.  Drop back to the account.  Do you

21   remember who the two signatories were who were authorized?

22   A.  Oh, yes.

23   Q.  Who were they?

24   A.  Thomas Petters and Deanna Munson.

25   Q.  Okay.  So what did you do when you heard from the

Jambor - Direct

1    operations person about these two checks?

2    A.  I contacted Mr. Petters.

3    Q.  Okay.  And what did you say to him?

4    A.  Just verifying that these are okay because they are two

5    large checks from Deanna and just wanted to verify that they

6    were okay and that she wasn't doing anything bad.

7    Q.  Okay.  Did you go visit him or call him?

8    A.  I called him.

9    Q.  What was the tone of the conversation?

10   A.  Professional.  Non -- just, you know, regular

11   conversation.

12   Q.  And your purpose in making this call about these two

13   checks was what?

14   A.  Just to make sure that the customer's account wasn't

15   being -- there wasn't fraud on the account.

16   Q.  Okay.  Fraud in the sense of these are unauthorized

17   checks?

18   A.  Correct.

19   Q.  He was the CEO of the company on whose account the

20   checks were drawn?

21   A.  Yes.

22   Q.  And what did he say to you?

23   A.  That they were okay.

24   Q.  Did he just say they are okay?  Did he say anything

25   further about them?

1    A.  Just some bonuses.  She was building a house.

2    Q.  Okay.  And you mentioned yesterday you had hundreds of

3    business banking customers, correct?

4    A.  Correct.

5    Q.  Okay.  Are your business banking customers allowed to

6    use their checking accounts to make payments to their

7    employees?

8    A.  Yes.

9    Q.  Okay.  You're familiar with payroll accounts, correct?

10   A.  Yes.

11   Q.  Okay.  Are business banking customers of any bank

12   required to use payroll accounts to pay bonuses to

13   employees?

14            MR. MARDER:  Objection, lack of foundation.

15            THE COURT:  Overruled.  You may answer if you can.

16            THE WITNESS:  They can use any checking account

17   they want to to write out checks on.

18   BY MR. GLEESON:

19   Q.  It's their money, right?

20   A.  Correct.

21   Q.  Is it -- you were asked about taxes.  Is it your

22   business, Mr. Jambor, as a banker to monitor whether your

23   business banking customers are withholding taxes

24   appropriately?

25   A.  No, it's not.

1    Q.  You've worked at half a dozen banks, yes?

2    A.  Correct, yes.

3    Q.  Have you ever run across anyone who thought it was the

4    business of a business banker or a commercial banker to

5    police the withholding of taxes from their employees?

6    A.  No.

7    Q.  Would it have been appropriate for you to inquire into

8    the size of the bonuses PCI and Tom Petters gave his

9    employees?

10   A.  No.

11   Q.  At the time did PCI appear to you to be a hugely

12   successful business?

13   A.  Yes, it did.

14   Q.  Okay.  Once you verified with Petters that the checks

15   were legitimately drawn on the account, was there anything

16   suspicious or problematic to you about those checks?

17   A.  No, there was not.

18   Q.  Anything further for you to do about those checks?

19   A.  Well, I reported back to operations my findings.

20   Q.  Fair enough.  They are the ones who asked you to contact

21   the customer?

22   A.  Yes.

23   Q.  Okay.  Let's turn to the Polaroid matter about which you

24   were examined yesterday.

25              MR. GLEESON:  Let's pull up Plaintiff's 37 in

Jambor - Direct

1   evidence, please, Mr. Herzka.

2   BY MR. GLEESON:

3   Q.  Do you recall this?

4   A.  Yes.

5   Q.  One of the questions you were asked yesterday was --

6   withdrawn.

7           Did you do this at the request of PCI?

8   A.  I don't remember.

9   Q.  Okay.  Would you have written this on your own on behalf

10  of a customer?

11  A.  Well, I guess only if they were to request it, yes.

12  Q.  Would you be permitted, under the regulations that

13  control business bankers, to provide information about a

14  customer without the customer's request?

15  A.  No, I would not.

16  Q.  Okay.  So you needed their approval?

17  A.  Yes.

18  Q.  Okay.  You wrote this to the board of directors of

19  Polaroid, correct?

20  A.  Correct.

21  Q.  And you were asked -- so is this customer service, by

22  the way, to comply with such a request?

23  A.  Yes, it is.

24  Q.  Okay.  You were asked by Mr. Marder whether you had ever

25  written a letter like this to the board of directors of a

Jambor - Direct

```
 1    company.  Do you recall that?
 2    A.  Yes.
 3    Q.  Okay.  You hadn't?
 4    A.  No.
 5    Q.  Have you ever done customer service like this for your
 6    other customers?
 7    A.  Yes.
 8    Q.  Can you give us an example.
 9    A.  The most common is kind of providing preapproval letters
10    to help them buy property.
11    Q.  Okay.  That's a customer service, correct?
12    A.  Correct.
13    Q.  It might help you generate more good will with your
14    customer?
15    A.  And more business, yes.
16    Q.  Okay.  Is this -- was this like a special service that
17    you performed for Tom Petters?
18    A.  It was a service I provided for all my customers.
19    Q.  Okay.  And it says in the second paragraph, "Petters
20    affiliates has been a customer with M&I Marshall & Ilsley,
21    Bank for five years.  They have always handled their
22    accounts as agreed.  The size and scope of the monthly
23    activity through the bank runs in the nine figures.  We have
24    enjoyed the relationship with the company.  We look forward
25    to continuing the relationship."  Do you see that?
```

Jambor - Direct

```
 1    A.  Yes.

 2    Q.  Was all that true?

 3    A.  Yes.

 4    Q.  Would you have written it if it weren't true?

 5    A.  No, I would not.

 6    Q.  Continuing -- no, withdrawn.

 7            And a Petters affiliate ultimately purchased

 8    Polaroid, correct?

 9    A.  Yes.

10    Q.  And it was the hope -- you were examined about this

11    yesterday.  It was the hope of M&I Bank that maybe M&I Bank

12    would get some business in relation to that purchase,

13    correct?

14    A.  Correct.

15            MR. GLEESON:  Okay.  Let's go to Plaintiff's 77,

16    please.

17            MR. MARDER:  Your Honor, this document is not in

18    evidence and it is on the screen.

19            MR. GLEESON:  Thank you, Mr. Marder.  It's because

20    I have it wrong.  Plaintiff's 47.  Is this in evidence?

21            MS. MOMOH:  Yes.

22            MR. GLEESON:  This is in evidence so, Mr. Herzka,

23    you can bring it up on the screen.

24    BY MR. GLEESON:

25    Q.  Are you there?
```

```
 1    A.  Yes.

 2              MR. GLEESON:  Let's go to the last e-mail on page

 3    3, Mr. Herzka, please.

 4    BY MR. GLEESON:

 5    Q.  This is from Doug Howe to Don Wilson, Michael Burke, Tom

 6    Mindy, John Sutorius.  Do you see that?

 7    A.  Yes.

 8    Q.  This is the -- the one e-mail on this chain that you are

 9    not included on.  We will get to the ones you are included

10    on.  Who is Doug Howe?

11    A.  I don't remember.  He was an employee of M&I Bank.

12    Q.  Don Wilson?

13    A.  I don't remember Don Wilson.

14    Q.  Okay.  These are all M&I Bank employees, correct?

15    A.  Correct, yes.

16    Q.  And Doug Howe writes in this e-mail, "This is the

17    depositor we're evidently still waiting on."  Right?

18    A.  Yes.

19    Q.  And attached to that, and you see the heading of it

20    right there, "Petters buys Polaroid for 426 million."

21    Correct?

22    A.  Yes.

23    Q.  That's the transaction the bank was hoping to get some

24    business from?

25    A.  Correct.
```

Jambor - Direct

1    Q.  All right.  And the -- it says, "The depositor we're

2    evidently waiting -- still waiting on."  That was going to

3    be Petters [sic], correct?

4    A.  Something from Petters, yes.

5    Q.  Petters, okay.  And you joined this chain in the next

6    line up.

7             I'm sorry.  I said Petters.  I meant Polaroid.

8    Did you understand it to be Polaroid?

9    A.  Yes.

10   Q.  The next one up is Tom Mindy to Hank Donatell.  Do you

11   see that?

12   A.  Yes.

13   Q.  Donatell is the controller?

14   A.  Correct.

15   Q.  Any news either way?  This is all in January of 2005,

16   correct?

17   A.  Correct.

18   Q.  Okay.  Shortly after the Polaroid acquisition was

19   announced, correct?

20   A.  Correct.

21   Q.  And then the next one is -- joins you.

22             MR. GLEESON:  It's at the bottom of page 2 and the

23   top of page 3, Mr. Herzka.

24   BY MR. GLEESON:

25   Q.  So it's Mindy to you.  Sorry.  Hank Donatell to Mindy,

Jambor - Direct

```
1    copied to you.  And then let's focus on this.  "Talked to Ed
2    this morning.  Apparently Polaroid is skeptical now about
3    having Petters utilize M&I to settle this transaction."  Do
4    you see that?
5    A.  Yes.
6    Q.  Settle the transaction meaning what?
7    A.  Close on the deal.
8    Q.  Okay.  Using an M&I account to hold the money to pay it?
9    A.  Yes.
10   Q.  "They have stated a preference for Petters to utilize a
11   national versus regional bank."  Do you see that?
12   A.  Yes, it was.
13   Q.  Was M&I a regional bank?
14   A.  Yes, it was.
15   Q.  And then he goes on to say, "A bunch of BS is you ask
16   me."  Do you see that?
17   A.  Yes.
18   Q.  And what was your understanding about that, that that
19   was a -- wasn't regarded as a legitimate reason not to use
20   M&I Bank?
21   A.  Yes.  Mr. -- whoever wrote the e-mail said that was not
22   a legitimate reason, yes.
23   Q.  Okay.  "Ed is in daily contact with them, so hopefully
24   we'll still get the deal and given the press release, it
25   must be getting close.  Will keep you in the loop on further
```

Jambor - Direct

1       developments."

2              Okay.  At the time were you in direct contact with

3       PCI and Polaroid?

4       A.  I don't remember, but -- I don't remember.

5       Q.  Okay.  Then the next one is from Hank Donatell to

6       Jambor, copy to Mindy, and it says, "But what does

7       'national' mean?  Are they at least aware of our size and

8       we're prettily highly rated?"  And it goes on to list the

9       ratings of Wells.  Do you see that?

10      A.  Hm-hmm.

11      Q.  Is that Wells Fargo?

12      A.  Yes.

13      Q.  U.S. Bank.  And then "we're" meaning M&I Bank?

14      A.  Correct.

15      Q.  "The ratings agencies, who do a lot of analysis, have us

16      relatively comparably related to the larger competition

17      there in the Twin Cities."  Do you see that?

18      A.  Yes.

19      Q.  Okay.  And then it goes on to say, (as read) "I think I

20      grabbed the most recent ones, but maybe you could have a

21      short conversation with Michael Burke about how we could

22      pitch this."

23              Pitch what?

24      A.  Our bank rating.

25      Q.  And then at the top, the top of that page is an e-mail

1482

Jambor - Direct

1    from Donatell to Doug Howe copied to you and it says, "I do
2    believe they are aware of our size, not sure if they know
3    our rating.  However, you know these seaboarders."  What
4    does that refer to, the seaboarders?
5    A.  I'm assuming people that lived on the coast.
6    Q.  New York and California?
7    A.  Yes.
8    Q.  Those seaboarders?
9    A.  Hm-hmm.
10   Q.  You never got this business, correct?
11   A.  I don't remember, no.
12   Q.  Did Marder -- excuse me, Mr. Marder yesterday asked you
13   whether you ever had a customer put money in an account to
14   buy another company, and you said you hadn't, correct?
15   A.  Correct.
16   Q.  In your -- at the time did you think there was anything
17   wrong --
18   A.  No, I did not.
19   Q.  Let me finish the question.
20          -- anything wrong with trying to get Petters to
21   use the PCI account for this transaction?
22   A.  No, I did not.
23   Q.  Okay.  And anything wrong with Petters seeking to use
24   his account to pay for Polaroid transaction?
25   A.  I did not.

1    Q.   The money is his, correct?

2    A.   Correct.

3    Q.   It's PCI's, correct?

4    A.   Correct.

5    Q.   And Mr. Marder kept referring to PCI -- not kept.  He

6    did it twice.  He referred to PCI as a small business

7    checking account.  Do you recall that?

8    A.   I'm sorry.  Where is that?

9    Q.   Yesterday Mr. Marder was referring to PCI's account at

10   M&I Bank as a small business checking account.  Do you

11   recall that?

12   A.   Yes.

13   Q.   Was it a small business checking account?

14   A.   It was a business checking account.

15   Q.   Okay.  Did the business of M&I Bank compete actually

16   with Wells Fargo?

17   A.   Yes.

18   Q.   With U.S. Bank?

19   A.   Yes.

20   Q.   There came a point when you left the bank, you testified

21   yesterday, correct?

22   A.   Correct.

23   Q.   When was that?

24   A.   August of 2007.

25   Q.   Okay.  And when you left the bank, what was your

Jambor - Direct

1    proximate salary?

2    A.   70-ish.

3    Q.   Okay.

4    A.   70-some thousand.

5    Q.   Yesterday you were examined about bonuses.  Do you

6    recall that?

7    A.   Yes.

8    Q.   And you were asked about whether cross-selling

9    contributed to your bonuses.

10   A.   Yes.

11   Q.   And whether customer service did.  Do you recall this

12   questioning from Mr. Marder?

13   A.   Yes.

14   Q.   Okay.  And he asked you whether deposit production

15   contributed to your bonuses, correct?

16   A.   Correct.

17   Q.   And whether adhering to the bank's policies and

18   procedures regarding money laundering, whether they were

19   followed, also contributed, correct?

20   A.   Correct.

21   Q.   Okay.  Let's talk about bonuses.  How often did you get

22   bonuses?

23   A.   Annually.

24   Q.   So it was one bonus per year?

25   A.   Correct.

Jamboor - Direct

1    Q.  Okay.  And as a percentage of your base salary, what
2    range were your bonuses when you were at M&I Bank?
3    A.  10 to 20 percent.
4    Q.  Okay.  So at 70,000, the range would be roughly 7 to 14
5    thousand dollars a year, correct?
6    A.  Correct.
7    Q.  You say you went to Anchor Bank?
8    A.  Correct.
9    Q.  I'm sorry.  Maybe you didn't.
10   A.  Yes, it was Anchor Bank, yes.
11   Q.  Okay.  And the year after you left M&I Bank, did you go
12   back into court in connection with the PCI fraud?
13   A.  I'm sorry.  I'm not following the question.
14   Q.  Did you testify against Tom Petters?
15   A.  Yes.
16   Q.  Who asked you to do that?
17   A.  I don't remember.  Well, the government.
18   Q.  Did you meet with FBI agents and prosecutors?
19   A.  Yes.
20   Q.  And did they ask you to testify?
21   A.  Yes.
22   Q.  At any point during that process did anyone ever suggest
23   to you that you had done anything improperly at M&I Bank
24   related to PCI?
25   A.  No, they did not.

1    Q.  When you -- you've moved from bank to bank, right?

2    A.  Correct.

3    Q.  Bankers do that, right?

4    A.  Yes, they do.

5    Q.  When you left M&I Bank, did you try to get business from

6    your old customers?

7    A.  Yes, I did.

8    Q.  So you were at Anchor Bank?

9    A.  Correct.

10   Q.  And did you write to some of your old customers?

11   A.  Yes.

12   Q.  Did you hope that you serviced them well enough they

13   might bring their business to Anchor Bank?

14   A.  Yes.

15   Q.  Okay.  Could you turn to Defendant's Exhibit 40228.

16            Do you recall now whether you wrote one of your

17   letters to former customers to Tom Petters?

18   A.  Yes.

19   Q.  Okay.  And do you recall when you did it?

20   A.  It was in September of 2007.

21   Q.  Okay.  So the month after you left, you wrote a letter

22   to Petters, correct?

23   A.  Correct.

24   Q.  Do you remember now what it is -- in essence, high

25   level, what you told him?

Jambor - Direct

1    A.  That I was at a new institution and a locally -- or

2    family-owned local bank and that I enjoyed working with you

3    and would like to work with you again.

4            MR. GLEESON:  I offer Defendant's Exhibit 40228 in

5    evidence.

6            MR. MARDER:  No objection, Your Honor.

7            THE COURT:  Exhibit 40228 is received.

8    BY MR. GLEESON:

9    Q.  Did you include your business card in the letters to

10   your former customers?

11   A.  Yes, I did.

12   Q.  That's it there, that's your Anchor Bank business card?

13   A.  Correct.

14           MR. GLEESON:  Okay.  Go to the letter itself,

15   please, Mr. Herzka.

16   BY MR. GLEESON:

17   Q.  "I am pleased to announce that I have joined the Anchor

18   Bank organization.  Anchor Bank is over a billion dollar

19   financial institution."  And you go on to talk about Anchor

20   Bank sharing your commitment to excellent customer service.

21   And you say you look forward to contacting him and setting

22   up an appointment, correct?

23   A.  Correct.

24   Q.  You hoped to receive business from Petters and PCI and

25   his companies?

Jambor - Direct

1    A.  Yes.

2    Q.  Did you ever get a response from this?

3    A.  No, I did not.

4    Q.  At the time you were at M&I Bank, Mr. Jambor, did you

5    ever have even an inkling that PCI was engaged in fraud?

6            MR. MARDER:  Objection, Your Honor, leading.

7            THE COURT:  Overruled.

8            THE WITNESS:  No, I did not.

9    BY MR. GLEESON:

10   Q.  Did you see any indication of any sort that any person

11   in the bank had any inkling that PCI was a fraud?

12   A.  No, I did not.

13           MR. MARDER:  Objection, calls for speculation as

14   to [inaudible].

15           COURT REPORTER:  I'm sorry.  I didn't hear you.

16   Calls for speculation as to what?  I just didn't hear you.

17           MR. MARDER:  I'm sorry, Your Honor.  I couldn't

18   hear.

19           THE COURT REPORTER:  That was me.  Sorry.  I

20   didn't hear you.  What did you say?

21           MR. MARDER:  I said, objection, calls for

22   speculation as to others.

23           THE COURT:  Overruled.

24           THE WITNESS:  No, I did not.

25   BY MR. GLEESON:

Jambor - Direct

```
1    Q.  Okay.  Would you ever knowingly participate in a Ponzi
2    scheme?
3    A.  No, I would not.
4    Q.  Okay.  Would you ever knowingly turn a blind eye to what
5    you thought was suspicious or criminal activity?
6    A.  No, I would not.
7    Q.  Had you seen it, what would you have done?
8    A.  I would have reported it to my supervisor.
9            MR. GLEESON:  Can I just check with my colleagues
10   for one second?
11           THE COURT:  You may.
12       (Defense counsel confer.)
13           MR. GLEESON:  Thank you, Mr. Jambor.
14           Thank you, Your Honor.  I have no additional
15   questions.
16           THE COURT:  We will take our midmorning break at
17   this time.
18           Members of the Jury, please be prepared to come
19   back to the courtroom at 10:30 and please remember the
20   instructions.  Continue to follow them.
21           LAW CLERK:  All rise for the jury.
22       (Jury excused)
23                      IN OPEN COURT
24                    (JURY NOT PRESENT)
25           THE COURT:  We are in recess.
```

```
 1        (Recess taken at 10:14 a.m.)

 2                         *    *    *    *    *

 3        (10:34 a.m.)

 4                         IN OPEN COURT

 5                         (JURY PRESENT)

 6             THE COURT:  You may be seated.  Are we ready to

 7   proceed?

 8             MR. MARDER:  I am, Your Honor.

 9             THE COURT:  You may.

10                    RECROSS-EXAMINATION

11   BY MR. MARDER:

12   Q.  Good morning, Mr. Jambor.

13   A.  Good morning.

14   Q.  Do you have the binders there from yesterday that we

15   provided you?

16             I want to begin by asking you some questions that

17   you testified about yesterday.

18             Do you recall in response to Mr. Gleeson's

19   questions you explained how it was important not to be too

20   pushy when you're a business banker, right?

21   A.  Yes.

22   Q.  But you're not suggesting, are you, that out of a desire

23   to avoid being pushy, you don't have to ask the client tough

24   questions when it comes to the issue of anti-money

25   laundering?
```

```
 1    A.  I'm not following the question.  I'm sorry.

 2    Q.  You understand that it is your duty to ask the client

 3    tough questions about anti-money laundering, right?

 4    A.  If I suspect something, yes.

 5              MR. MARDER:  If we could please put up Defendant's

 6    Exhibit 40067 on the screen and particularly Exhibit 38 --

 7    page 38.

 8         (Mr. Gleeson and Mr. Marder confer)

 9              THE WITNESS:  I'm sorry.  What page?

10    BY MR. MARDER:

11    Q.  38.

12              MR. MARDER:  And if we could blow up the third

13    line from the bottom.

14    BY MR. MARDER:

15    Q.  It says there, "It's not always easy to ask the tough

16    questions to make sure we understand the customer and their

17    activity."  Right?

18    A.  Yes.

19    Q.  So what the compliance people were telling you was that

20    even if it involves asking tough questions, you've got to

21    get to the bottom of understanding the customer and its

22    activity, right?

23    A.  Yes.

24    Q.  Yesterday your counsel asked you some questions about a

25    performance review where it was criticizing your
```

1    handwriting.  Do you recall that?

2    A.  Yes.

3    Q.  And you said you tried to use e-mail more after March

4    2005, right?

5    A.  Was that the date of the performance review?

6    Q.  Yes.

7    A.  Yes.

8    Q.  You're not suggesting that you didn't use e-mail before

9    March 2005, are you?

10   A.  No, I'm not.

11   Q.  You used e-mail regularly before 2005, right?

12   A.  Yes.

13   Q.  Yesterday you recall Mr. Gleeson showing you the

14   compliance slides and asking you if there's anything in

15   there that said that part of your duties relating to

16   anti-money laundering involved looking out for Ponzi

17   schemes.  Do you recall that?

18   A.  Yes.

19   Q.  We're going to go back again now to DX-40067 and we're

20   now going to look at page 12.  I'm going to blow up the

21   second line there.

22        Do you see there there's a particular warning

23   about loan schemes and investments, right?

24   A.  Yes.

25   Q.  And we've been talking throughout the last couple of

1    days about various lenders to Mr. Petters.  Do you recall

2    that?

3    A.  Yes.

4    Q.  And lenders are people who give loans, right?

5    A.  Yes.

6    Q.  And they are people who invest, right?

7    A.  Correct.

8    Q.  If I could ask you to turn to Plaintiff's Exhibit 4.

9    Ask you to turn to page 10, please.

10            Do you recall Mr. Gleeson showing you this page

11   yesterday?

12   A.  Yes.

13   Q.  And in response to his questions, you testified that you

14   never saw any signs of any transactions on the PCI account

15   that had no apparent lawful purpose, right?

16   A.  I'm sorry.  Can you repeat the question?

17   Q.  You told us yesterday that you never saw any signs in

18   the transaction activity of PCI's account that indicated

19   there was an apparently unlawful purpose, right?

20   A.  Yes.

21   Q.  And you never saw any transactions that were not the

22   sort that a customer would be normally expected to conduct,

23   right?  That's what you told Mr. Gleeson.

24   A.  I think normally that Petters would conduct, wasn't it?

25   Q.  I'd ask you now to turn to Plaintiff's Exhibit 58.  We

1    looked at this during your direct.  Do you recall -- I'm

2    sorry.  Do you have it in front of you?

3    A.  Sorry.  Let me grab it.  I have it in front of me.

4    Q.  Do you recall here that this is a $100,000 wire going

5    directly to Thomas J. Petters?

6    A.  Yes.

7    Q.  Can you tell me what the lawful business purpose of this

8    wire transfer is?

9    A.  I don't know why they did the wire.

10   Q.  Can you tell me why this was a transaction that this

11   customer would be normally expected to conduct?

12   A.  I don't know why they did it.

13   Q.  I'd next like you to turn, please, in your binder -- it

14   should be in Volume I -- to Plaintiff's Exhibit 1, the

15   collection of account statements.

16   A.  Yes.

17   Q.  Do you recall these are the account statements that you

18   testified about yesterday?

19   A.  Correct.

20   Q.  Turn to page 362, please.

21           Do you recall looking at this account statement?

22   We established it was a billion dollars going into this

23   account and a billion dollars going out of the account?

24   A.  Yes.

25   Q.  Did you ever do any research regarding those incoming

```
 1      and outgoing funds?
 2      A.  No.
 3      Q.  So as you sit here today, you can't tell us what the
 4      lawful business purpose of those transfers are, can you?
 5      A.  No.
 6      Q.  And you can't tell us why these transactions are ones
 7      that the customer would be normally expected to conduct, can
 8      you?
 9      A.  No.
10      Q.  Today you told us that the activity was consistent with
11      Petters' business.  Do you recall that?
12      A.  Yes.
13      Q.  Can you tell us why it would be consistent with Petters'
14      business for a billion dollars to be coming into the account
15      from an entity that was supposed to be -- that they were
16      supposed to be buying the products from?
17      A.  It was an active account.
18      Q.  That's your response?
19      A.  Yeah.  It was a very active account.
20      Q.  How can you testify there were no signs of transactions
21      in the PCI account that had an apparently unlawful purpose
22      if you never investigated the transactions to see who was
23      sending them and who was receiving them?
24      A.  I'm sorry.  I'm not following the question.
25      Q.  How can you testify to this jury that the activity in
```

1   the account was consistent with Petters' business when you

2   never looked at the entries in the account relating to the

3   wires to determine who sent them and who received them?

4           MR. GLEESON:  Objection to form.

5           THE COURT:  Sustained.

6   BY MR. MARDER:

7   Q.  You were asked by Mr. Gleeson yesterday about whether

8   the bank account statements showed the source of the

9   incoming and outgoing wire statements, right?

10  A.  Correct.

11  Q.  You told us that was not on the statements, right?

12  A.  Correct.

13  Q.  But as you also testified, you did have access to that

14  data, right?

15  A.  Yes.

16  Q.  But you never looked at it?

17  A.  No, not that I remember.

18  Q.  I think you testified today that this business account

19  was not -- strike that.

20          I think you testified today that the group that

21  you were in was called business banking as opposed to small

22  business banking; is that right?

23  A.  Correct.

24  Q.  But colloquially around the bank, this group was

25  referred to as the small business banking department, wasn't

1   it?

2   A.  I knew it as the business banking department.

3   Q.  If I could ask you to turn to Plaintiff's Exhibit 2.

4   I'd ask you, please, to turn to page 36.  This is a

5   MIContacts entry that Ms. Shari Rhode submitted, right?

6   A.  Yes.

7   Q.  If you'd go to the previous page where it has the

8   substance of that.  We're going to look at the third -- or

9   second sentence that begins with the word "because."  It

10  says, "Because they have only been a deposit customer, they

11  have remained on the small business banking side, however,

12  as they consolidate and they want some lines of credit and

13  now will need the expertise of the commercial side."  Do you

14  see that?

15  A.  Yes.

16  Q.  So what Ms. Rhode is saying is that the side that's not

17  called the commercial side is something that she refers to

18  as the small business banking side, right?

19  A.  Correct.

20  Q.  And you've heard other people around the bank use that

21  same term, right?

22  A.  I don't remember.

23  Q.  Ms. Rhode was your boss, right?

24  A.  Yes.  She was, I guess, yes.

25  Q.  I want to move to the topic of the checks now.  Let's

1    set aside the two million dollar checks that Mr. Gleeson

2    asked you about.

3              Did you investigate whether there was a lawful

4    business purpose for any of the other millions of dollars of

5    checks that went out of this account to PCI employees?

6    A.  No, I did not.

7    Q.  And you recall today testifying about the two $1 million

8    checks that Ms. Coleman wrote to herself at the end of

9    December of one year and the beginning of January the next

10   year.  Do you recall that?

11   A.  Yes.

12   Q.  Now, the people who contacted you about those checks

13   were the employees from the operations department, right?

14   A.  Correct.

15   Q.  That's different from the AML Group, correct?

16   A.  I don't know.

17   Q.  Well, you know that the AML Group is charged with

18   anti-money laundering, right?

19   A.  Yes.

20   Q.  Okay.  And that's not the same as the operations group,

21   is it?

22   A.  I don't know how the departments intermingled, if they

23   did.  I guess, yeah, they were probably more compliance than

24   operations.

25   Q.  So the focus of what the operations people were asking

1    you about was whether this check was genuine, whether the

2    company had really authorized it, right?

3    A.  Correct.

4    Q.  They weren't asking you about anti-money laundering

5    concerns, were they?

6    A.  They were asking me to verify if the checks were

7    legitimate.

8    Q.  In other words, that it was a real check that was really

9    signed?

10   A.  Correct.

11   Q.  Okay.  Mr. Gleeson asked you if it was your burden to

12   police your customers to see if they were withholding their

13   taxes.  Do you recall that question?

14   A.  Yes.

15   Q.  And you said it wasn't, right?

16   A.  Correct.

17   Q.  But it is your burden to look out for money laundering,

18   isn't it?

19   A.  Yes.

20   Q.  And the fact that no taxes were taken out of this check

21   and the fact that it didn't come from a payroll account was

22   a red flag for you, right?

23   A.  No.

24   Q.  Didn't you tell us yesterday this check was a red flag?

25   A.  I did, but I just saw the net amount of the check.

1  Q.  You recall when we first started this discussion this

2  morning you testified that you had to ask the tough

3  questions, right?

4  A.  Yes.

5  Q.  When Mr. Petters told you that he was giving this money

6  to Deanna Coleman so she could build a house, did you ask

7  the tough questions about why this money was coming from an

8  account that was not a payroll account?

9  A.  No, I did not.

10  Q.  Did you ask Mr. Petters the tough question of why no

11  taxes were indicated as coming out on this check?

12  A.  No, I did not.

13  Q.  And you had access to the checks themselves -- right? --

14  you could go look at checks if you wanted to?

15  A.  It was complicated, but I could have, yes.

16  Q.  And as you told us yesterday, you actually have no

17  memory if you went back and told the operations group, do

18  you?

19  A.  I believe -- I don't remember directly, but, yeah.

20  Q.  If we could go next, please, to Plaintiff's Exhibit 2

21  and ask you to turn to page 62.

22       MR. MARDER:  And I am going to ask that we please

23  highlight the sentence that starts with "Petters would

24  like."

25  BY MR. MARDER:

Jambor - Recross

1    Q.  Do you recall we talked about this indication that

2    Mr. Petters did not want the lender to know who the other

3    lenders are?

4    A.  Yes.

5    Q.  And you recall Mr. Gleeson asking you for some possible

6    explanations of that, right?

7    A.  Yes.

8    Q.  And one thing that you said was that Mr. Petters maybe

9    didn't want the lenders competing with each other, right?

10   A.  Yes.

11   Q.  Do you recall giving that testimony?

12   A.  Yes, I did.

13   Q.  Sir, if you're a borrower, isn't competition among

14   lenders exactly what you want?

15   A.  Not necessarily, no.

16   Q.  Well, if lenders are competing with each other, don't

17   they compete to give you a better rate?

18   A.  Rate is one of many things, yes.

19   Q.  Let's go to the topic of the DACAs.

20           You recall yesterday you and I talked about an

21   inquiry from Mr. Sabes from Opportunity Finance.  Do you

22   recall that?

23   A.  Yes.

24   Q.  And that was in the 2003 time period, right?

25   A.  Yes.

Jambor - Recross

```
1    Q.   Okay.  Now, today Mr. Gleeson showed you some e-mails --
2    or talked to you about some e-mails relating to DACAs
3    associated with Citibank, right?
4    A.   Yes.
5    Q.   And that was in 2005, right?
6    A.   Yes.
7    Q.   So those had nothing to do with Mr. Sabes' inquiry from
8    2003, correct?
9    A.   No.
10   Q.   And you said that in 2005 you forwarded a particular
11   e-mail relating to that DACA to Ms. Rhode.  Do you recall
12   that?
13   A.   Yes.
14   Q.   But you didn't do that in 2003, did you?
15   A.   I don't remember what I did with it in 2003.
16   Q.   And you testified how you sent out an e-mail telling
17   everybody you weren't familiar with DACAs.  Do you recall
18   that?
19   A.   Yes.
20   Q.   And that e-mail was dated 2005, correct?
21   A.   If you say so, yes.
22   Q.   And that's two years after 2003, right?
23   A.   Correct.
24   Q.   I would like you next to turn to page -- to Exhibit 104.
25   A.   I'm sorry.  I missed that.
```

Jambor - Recross

```
1    Q.  Exhibit 104, please, Plaintiff's Exhibit 104.

2              MR. MARDER:  And I'm going to ask if we could

3    please blow up the second paragraph.

4    BY MR. MARDER:

5    Q.  It says there, "In reality, we are looking to have M&I

6    Bank act as custodian to receive retailer wire payments and

7    with the further direction of Deanna Munson at Petters,

8    forward those monies on to their appropriate bank accounts."

9    Have I read that correctly?

10   A.  Yes.

11   Q.  Do you see anything in this e-mail that mentions any

12   intermediaries?

13   A.  No.

14   Q.  Did anybody tell you that there would be intermediaries

15   from the retailer wire payments into the bank?

16   A.  I don't remember.

17   Q.  As you sit here today, you can't identify any such

18   conversation, can you?

19   A.  No, I cannot.

20   Q.  And do you agree with me, sir, from all your years of

21   experience in the banking industry, that you know that

22   sophisticated customers know how to wire money into an

23   account?

24   A.  Yes.

25   Q.  Next, if we could please look at Plaintiff's Exhibit 52.
```

```
 1                   MR. MARDER:  Blow up the text of that, please.
 2       BY MR. MARDER:
 3       Q.  This is another e-mail from Mr. Sabes from Opportunity
 4       Finance?
 5       A.  Yes.
 6       Q.  Do you see there it says, "Can you please clarify as to
 7       whether M&I would be able to provide the requested custodial
 8       services if a new M&I account number was assigned and was
 9       the recipient of the retailer payments?"  Do you see that?
10       A.  Yes.
11       Q.  Does anything in this e-mail mention intermediaries
12       between the retailers and the bank?
13       A.  No.
14                   MR. MARDER:  Your Honor, that concludes my
15       examination.
16                   THE COURT:  Anything further for this witness?
17                   MR. GLEESON:  I have just a couple of -- maybe a
18       minute's worth of questions, if I may?
19                   THE COURT:  You may.
20                         REDIRECT EXAMINATION
21       BY MR. GLEESON:
22       Q.  In your AML training, you were trained to look for --
23       and this was alluded to on Mr. Marder's redirect
24       examination -- you were trained to look for apparently
25       unlawful transactions, correct?
```

1    A.  Correct.

2    Q.  And you testified you didn't see those, correct?

3    A.  Correct.

4    Q.  Is that still your testimony?

5    A.  Yes, it is.

6    Q.  Okay.  Were you required to investigate for lawful

7    business purposes of transactions that were not apparently

8    unlawful?

9    A.  No.

10   Q.  18 years later, you can't tell us -- that's with respect

11   to 2006, but -- or 2002.  But in a period 14 to 20 years

12   later, you now can't tell us what the lawful business

13   purposes were for all of the transactions of your customers?

14            MR. MARDER:  Objection to the form of the

15   question.

16            THE COURT:  Sustained.

17            MR. GLEESON:  Okay.

18   BY MR. GLEESON:

19   Q.  Is apparently unlawful different from lawful?

20   A.  Yes.

21   Q.  Okay.  And the fact that you don't know the lawful

22   purpose of the transactions of PCI, does that mean that any

23   of those transactions was apparently unlawful?

24   A.  No.

25            MR. GLEESON:  I have nothing further.

```
1              THE COURT:  Is there anything further?

2              MR. MARDER:  Nothing further from me, Your Honor.

3              THE COURT:  May the witness be excused?

4              You are excused.

5              THE WITNESS:  Thank you.  Thank you, Your Honor.

6              THE COURT:  You're welcome.

7              MR. GLEESON:  Can we do a little -- take a little

8     stretch while we just clear the beach?  It will only take us

9     two minutes.

10             MR. MARDER:  We need to rejigger for Mr. Flynn as

11    well, Your Honor.

12             THE COURT:  Okay.

13             MR. MARDER:  If we may have just a moment?

14             THE COURT:  You may.

15             Members of the Jury, if you would like to take a

16    stretch break, you may.

17             MR. MARDER:  Your Honor, may I approach the

18    witness stand to remove the old binders?

19             THE COURT:  You may.

20        (Pause)

21             MS. HOLMES:  Your Honor, may we approach?

22             THE COURT:  Yes, you may.

23        (Binders handed to the Court)

24             MR. MARDER:  Your Honor, the plaintiff next calls

25    adversely Christopher Flynn.
```

Flynn - Cross

```
 1              THE COURT:  Please step forward.

 2              COURT REPORTER:  Sir, if you would come forward,

 3    I'll swear you in.

 4              Stop right there and raise your right hand, I'll

 5    swear you in.

 6         (Witness sworn)

 7              COURT REPORTER:  Have a seat in the witness stand.

 8              THE WITNESS:  Right here?

 9              COURT REPORTER:  Yes.

10              If you can speak into the microphone spelling your

11    first and last name, please.

12              THE WITNESS:  Christopher Flynn;

13    C-h-r-i-s-t-o-p-h-e-r, F-l-y-n-n.

14              THE COURT:  Mr. Flynn, you may adjust the mic by

15    moving the base of it towards you if you need to.

16              THE WITNESS:  Thank you.

17              THE COURT:  You're welcome.

18              Counsel, you may proceed.

19              MR. MARDER:  Thank you, Your Honor.

20                          (Christopher Flynn)

21                          CROSS-EXAMINATION

22    BY MR. MARDER:

23    Q.  Good morning, Mr. Flynn.

24    A.  Good morning.

25    Q.  My name is David Marder.  I am one of the lawyers for
```

Flynn - Cross

1   the plaintiff in this case, and I am going to be asking you

2   some questions today.

3   A.  Okay.

4   Q.  You have in front of you a couple of binders.  In the

5   front of the binders, you'll find some prior deposition

6   transcripts.

7   A.  Okay.

8   Q.  And then you'll see all the exhibits we are referring to

9   are in there with tabs so you can look at them at your

10  leisure.

11  A.  Okay.  Thank you.

12  Q.  Let's start with your background, if we could.

13          You started working at National City Bank in 1999;

14  is that correct?

15  A.  Yes, that's right.

16  Q.  And around 2001, M&I acquired National City, correct?

17  A.  Yes.

18  Q.  At National City, you were a relationship manager; is

19  that right?

20  A.  That's correct.

21  Q.  And when M&I acquired National City, you became part of

22  the commercial banking unit, right?

23  A.  Yes, that's correct.

24  Q.  That was around 2001?

25  A.  Yes.

1    Q.  And you stayed on as a relationship manager?

2    A.  Yes, I did.

3    Q.  Can you please give us a feel of what a relationship

4    manager does.

5    A.  Essentially the relationship manager is the main point

6    of contact for the clients that we're serving, and we would

7    operate with a team around us; but, for the most part, we

8    were the main contact point for the client.

9    Q.  And can you tell us what the commercial banking division

10   was.

11   A.  Well, the clients in a commercial banking group are

12   businesses, any range of industries.  All businesses need a

13   banking relationship, so there's a lot of different

14   businesses that we would work with.

15   Q.  And what is the difference between the commercial

16   banking division and the business banking division?

17   A.  At the time the clients that would be in the commercial

18   banking group would be generally considered larger or more

19   complex.

20   Q.  And the clients in the business banking unit were

21   smaller and less complex, right?

22   A.  Generally.  Not always the case, but generally.

23   Q.  And, in fact, there was a general guideline in place,

24   wasn't always followed, but there was a general guideline

25   for revenues, right?

1    A.  Yes.

2    Q.  Approximately $10 million, was that the cutoff?

3    A.  I believe that's correct, yes.

4    Q.  So people below 10 million were generally in the

5    business division, right?

6    A.  Yes.

7    Q.  Now, at some point you moved out of the commercial unit

8    and went into a management role in the business banking

9    division; is that right?

10   A.  That's correct.

11   Q.  Let's set aside the Petters relationship for a moment

12   and talk about your other customers.

13          Are you aware of any other customer at M&I Bank in

14   the business division that had annual revenues of a billion

15   dollars or more?

16   A.  No, I'm not.

17   Q.  Can you even name any entity in the business banking

18   unit that had revenues of $35 million or more?

19   A.  I don't recall exactly.

20   Q.  You can't remember any today?

21   A.  No.

22   Q.  And what year was it that you moved out of the

23   commercial unit into the management role of the business

24   banking unit?

25   A.  If I recall, it was sometime between 2005 and 2006.

Flynn - Cross

```
1    Q.  And then in 2006, you were promoted to senior vice
2    president?
3    A.  I don't recall that specifically, but at some point that
4    occurred, yes.
5    Q.  And as part of that job, you managed business bankers in
6    the business banking division, right?
7    A.  That's correct.
8    Q.  You managed anywhere between five to seven people at any
9    given time?
10   A.  Yeah, I suppose that would be generally a good number.
11   Q.  And one of those people was Mr. Jambor, right?
12   A.  Correct.
13   Q.  Ed Jambor?
14   A.  Yes.
15   Q.  You managed him from 2006 to about August of 2007; is
16   that right?
17   A.  That sounds correct, yes.
18   Q.  And when you became a senior vice president, did your
19   role change?
20   A.  Not that I recall.
21   Q.  Well, you had the added responsibility of managing other
22   people, right?
23   A.  Yes.
24   Q.  But you also did -- you had some of your own clients as
25   well, correct?
```

Flynn - Cross

1    A.  That's correct, yes.

2    Q.  And as part of your job there in the business banking

3    division, one of your responsibilities included business

4    development, correct?

5    A.  Yes.

6    Q.  You were expected to develop business when you were at

7    the bank?

8    A.  That's correct.

9    Q.  And that continued when you became a manager, right?

10   A.  Yes.

11   Q.  Let's talk a moment about what a business banker does.

12   What is the role of a business banker?

13   A.  I would just consider it very similar to what we just

14   described with commercial banking.

15   Q.  You would manage and service a portfolio of customer

16   relationships; is that correct?

17   A.  Yes.

18   Q.  And as part of that, you would try to cross-sell

19   products and services and try to develop new relationships

20   and sell new products; is that right?

21   A.  That's correct.

22   Q.  And that was also the role of the folks that you were

23   managing, correct?

24   A.  Yes.

25   Q.  And the business bankers in the business banking unit at

Flynn - Cross

1    M&I were assigned to particular clients, correct?

2    A.  Yes.

3    Q.  And that person was identified to the client as the

4    person to whom the client should reach out to if they had a

5    question, correct?

6    A.  Usually, yes.

7    Q.  When Mr. Petters -- I'm sorry.  When Mr. Jambor left the

8    bank in 2006, you took on a personal role with managing the

9    Petters relationship; is that correct?

10   A.  Did you say left in 2006?  I believe he left in 2007.

11   Q.  I apologize.  When Mr. Jambor left in August of 2007,

12   you took on the Petter relationship directly, and you were

13   the manager for that account, right?

14   A.  Yes, that's correct.

15   Q.  You're familiar with the MIContacts database, correct?

16   A.  Yes, I am.

17   Q.  That's a database where people can put in information

18   about meetings with their clients and prospects?

19   A.  Yes.

20   Q.  That's something that you used?

21   A.  Yes.

22   Q.  And you encouraged the people who worked for you to use

23   it?

24   A.  Yes.

25   Q.  That way people can go into the computer and see what

Flynn - Cross

1    everybody is doing with the customers and the clients?

2    A.  Yes.

3    Q.  And when you did entries in MIContacts, you tried to

4    make it as accurate as possible, right?

5    A.  Yes.

6    Q.  And you wanted it to be complete, correct?

7    A.  Yes.

8    Q.  Once a person puts an entry into MIContacts, who can go

9    in later and edit that entry?

10   A.  I don't recall.

11   Q.  I would like you to go into your binder now and please

12   open up Plaintiff's Exhibit 2.

13   A.  Sorry.  I believe I have the right -- yes.

14   Q.  Okay.  And you see at the bottom of the page, Exhibit 2,

15   the very first page, there's a P0002-0001?

16   A.  Yes.

17   Q.  Okay.  I am going to be referring to pages within

18   exhibits, and when I refer to pages in exhibits, I am

19   referring to those last four digits.  Do you understand

20   that?

21   A.  Yes.  Thank you.

22   Q.  I'd like you, please, to turn to page 7, if you would.

23   A.  Okay.

24   Q.  And you see there there's a field for "Reporting

25   Person"?

1    A.  Yes.

2    Q.  Reporting person is the person who enters the

3    information into MIContacts, right?

4    A.  Yes, that's correct.

5    Q.  And this indicates that you were the person that created

6    this MIContacts entry, right?

7    A.  Yes.

8    Q.  I'd like you to turn to the next page, if you could.

9    A.  Okay.

10   Q.  It says there that, "Larry K. and I met with Frank

11   Vennes."  Do you see that?

12   A.  Yes, I do.

13   Q.  Who is Larry K.?

14   A.  He was another one of our banking staff.  Larry had a

15   role referred to as correspondent banking, which meant that

16   he would -- his customers were other banks and that was his

17   role.

18   Q.  And the purpose of this meeting was to talk with

19   Mr. Vennes about giving him a loan, right?

20   A.  Yes.

21   Q.  And you met with him at his house in March of 2002?

22   A.  That's correct.

23   Q.  And Mr. Vennes was looking for a line of credit of about

24   5 or 6 million dollars; is that right?

25   A.  I don't remember specifically the number, but if it's in

1    here, that would be correct.

2    Q.  And what Mr. Vennes asked was to use that line of credit

3    to finance transactions for the Petters Company, right?

4    A.  Yes.

5    Q.  Okay.  Just to speed things along, I'm going to use the

6    term "PCI."

7    A.  Sure.

8    Q.  You understand that's Petters Company, Inc.?

9    A.  Yes, I do.  Thanks.

10   Q.  So what Mr. Vennes wanted was for the bank to give him a

11   loan so he could invest money in PCI, right?

12   A.  Yes.

13             MR. MOHEBAN:  Objection, Your Honor, misstates the

14   language of the document.

15             THE COURT:  Overruled.  The answer stands.

16   BY MR. MARDER:

17   Q.  And Mr. Vennes was associated with a company called

18   Metro Gem.  Do you recall that?

19   A.  Yes.

20   Q.  Okay.  So it was actually Metro Gem that was asking for

21   the loan as opposed to him personally, right?

22   A.  That is my recollection, yes.

23   Q.  You say there, "I will be getting financial information

24   on Frank's company early next week and will assess, sketch a

25   structure and a prescreen with Scott Thorson."  Can you tell

1    me what a prescreen is?

2    A.  A prescreen is a meeting where you generally describe a

3    potential opportunity and, you know, basically talk it

4    through with others in the organization to determine if it's

5    potentially a fit.

6    Q.  And what is generally created is something called a

7    prescreen document that summarizes that information; is that

8    right?

9    A.  I don't remember specifically, but it wouldn't be

10   uncommon.

11   Q.  Okay.  If I could ask you, please, to go to your binder

12   and turn to Plaintiff's Exhibit 11.

13   A.  I'm sorry.  Which one was that?

14   Q.  Plaintiff's Exhibit 11.

15   A.  11.  Okay.  Thank you.

16       (Pause)

17   A.  Okay.  Thank you.

18   Q.  This is -- if you could actually turn to the second page

19   of that.

20   A.  Okay.

21   Q.  And that's an e-mail that you wrote, correct?

22   A.  Yes.

23   Q.  And you sent this e-mail to Ms. Glanner on December 1st,

24   2008?

25   A.  Yes, that's correct.

1    Q.  And attached to this is a prescreen document, right?

2    A.  There is an attachment, yes.

3    Q.  And it's a prescreen?

4    A.  That's what it's titled, yes.

5    Q.  And you wrote it?

6    A.  I don't specifically recall, but it appears that it was

7    a document that we had in the file.

8    Q.  And you forward -- and in your e-mail, you attach this

9    document and you forward it on to Ms. Glanner, correct?

10   A.  Yes.

11             MR. MARDER:  Your Honor, I would offer Plaintiff's

12   Exhibit 11 into evidence.

13             MR. MOHEBAN:  No objection, Your Honor.

14             THE COURT:  Plaintiff's Exhibit 11 is received.

15   BY MR. MARDER:

16   Q.  At the time you supervised Mr. Jambor, before you took

17   over the relationship yourself with PCI, you had an

18   understanding that there were several Petters businesses

19   within the Petters relationship, right?

20   A.  I'm sorry.  Did you say at the time I was managing Ed --

21   Q.  Yes.

22   A.  -- is your question?

23   Q.  Yes.

24   A.  Okay.  Yes, I do.

25   Q.  And you understand that PCI was one of the companies in

1    the Petters portfolio at M&I Bank?

2    A.  Yes.

3    Q.  But you understood that PCI was separate and different

4    from those other businesses, right?

5    A.  Yeah, each one was its own entity.

6    Q.  For example, there were other businesses, like Petters

7    Capital, LLC and Petters Group Worldwide.  Do you recall

8    that?

9    A.  Yes.

10   Q.  And you -- strike that.

11           You understood that there was a separate bank

12   account for PCI, right?

13   A.  Yes.

14   Q.  Again, just for brevity, I'm just going to refer to that

15   as Petters -- as the PCI account.

16   A.  Yes.  Thank you.

17   Q.  Do you recall that was -- I don't know if you remember

18   the number, but it was the 9018 account.  Does that sound

19   familiar?

20   A.  I don't remember specifically, but --

21   Q.  We will look at documents later that show that.

22   A.  Okay.  Thank you.

23   Q.  And the PCI account was a depository account, right?

24   A.  Yes, it was.

25   Q.  So it was an account where clients could deposit funds

Flynn - Cross

```
 1    and write checks and send wires and things of that nature,

 2    right?

 3    A.   Yes.

 4    Q.   Now, you also understood that Mr. Petters was involved

 5    with various other companies he had bought, like Polaroid

 6    and Sun Country and Fingerhut.  Do you recall that?

 7    A.   Yes, I do.

 8    Q.   And you thought of Mr. Petters as a high-profile

 9    individual?

10    A.   Yes.

11    Q.   Let's talk about PCI specifically.  When you were

12    supervising Mr. Jambor, you understood what PCI's business

13    was -- right? -- or should I say purported business?

14    A.   Yes.  Yes.

15    Q.   And you knew -- actually knew that going back to 2002,

16    right?

17    A.   I first learned of that through Mr. Vennes in 2002.

18    Q.   You understood that PCI was engaged in the business of

19    purchasing and reselling consumer goods, right?

20    A.   That was my understanding at the time.

21    Q.   And you know that PCI would borrow money from investors

22    to make purchases, right?

23    A.   That was my understanding.

24    Q.   Again, I'm not talking about what they actually did, I'm

25    asking about their purported business model.
```

```
1    A.  Yeah.  Thank you.

2    Q.  And you understand that PCI allegedly would take that

3    money and buy consumer electronics at wholesale discount

4    prices, right?

5    A.  Yes.

6    Q.  And then Petters would turn around and sell those

7    products to big-box retailers, right?

8    A.  That was my understanding.

9    Q.  And you understood that those products they were buying

10   from wholesalers were already pre-sold to the retailers,

11   right?

12   A.  That was my understanding at the time, yes.

13   Q.  In other words, there was already a deal in place to

14   sell the products to the big-box retailer?

15   A.  Yes.

16   Q.  Did you ever have any conversations with Mr. Petters

17   about whether the bank could loan Mr. Petters money instead

18   of the investors?

19   A.  I don't recall doing that.

20   Q.  Do you know why Mr. Petters never got loans from banks?

21   A.  I don't.

22        MR. MOHEBAN:  Object to the form, lack of

23   foundation.

24        THE COURT:  Overruled.

25   BY MR. MARDER:
```

1    Q.  Did you ever ask Mr. Petters why the retailers weren't
2    just buying the products directly from the wholesalers?
3    A.  I just don't recall.
4    Q.  How many individuals at PCI did you interact with?
5    A.  At PCI, just PCI, is that your question, sir?
6    Q.  Yes.
7    A.  Okay.  Not knowing specific roles, I can think of two.
8    Q.  Did you ever hear of any other employees?
9    A.  I don't recall.
10   Q.  Did you have a sense of how many employees worked at the
11   company?
12   A.  I don't recall.
13   Q.  Did you ever ask?
14   A.  I don't recall if I did.
15   Q.  Did you think it was odd that a company that was
16   selling -- strike that.
17          Did you think it was odd that you were only
18   interacting with two people in a company that was supposedly
19   selling billions and billions of dollars of electronics?
20   A.  It didn't strike me as odd, no.
21   Q.  When you met with Mr. Vennes in 2002, you had the
22   opportunity to ask him questions about the Petters
23   Company -- right? -- about PCI?
24   A.  Yes.
25   Q.  And I think as you told us earlier, this was the first

1    time that you actually got an understanding of what the

2    Petters business model was, right?

3    A.  As you said, purportedly.

4    Q.  Right.

5    A.  Yes.

6    Q.  You talked to Mr. Vennes about who the Petters

7    Company -- who PCI was selling the consumer goods to, right?

8    A.  Yes.

9    Q.  The big-box retailers, right?

10   A.  I don't specifically recall now, but I see what is

11   written here.

12   Q.  And, in fact, he gave you Costco and Walmart as

13   examples, right --

14   A.  Yes.

15   Q.  -- of the big-box retailers?

16          And do you recall when he talked -- Mr. Vennes

17   talked to you about who PCI purchased goods from, he

18   mentioned Sony as an example?

19   A.  I'm sorry.  I don't know if I've got it written in here

20   or not.  I don't specifically recall, but whatever my Call

21   Reports were would have been my understanding at the time.

22   Q.  Sure.  Well, you're on page 8, right?

23   A.  Sorry.  No.  Page 8?

24   Q.  Of Exhibit 2.  Are you there?  Oh, sorry.

25   A.  Sorry.  I was back on 11.  Sorry.  I didn't know we had

1    gone back.

2    Q.  No problem.  I apologize.  My mistake.

3    A.  Okay.  Okay.  Go ahead.

4    Q.  Did you want to look at that and see if that just

5    refreshes your recollection that Sony was one of the people

6    they identified as the retailers that they were buying from?

7    A.  Yes, I see that written here.

8    Q.  So from Mr. Vennes' description, you understood the

9    basic business of Petters Company was to take the money that

10   investors were loaning to PCI, buy consumer electronics from

11   wholesalers, and sell them to big-box retailers, that's

12   essentially what Mr. Vennes described to you?

13   A.  Yes.  That was my understanding at the time, yes.

14   Q.  I'd now like you to please turn to Plaintiff's Exhibit

15   2, and I'd like you to look at page 14.

16   A.  Okay.

17   Q.  I want to read this and then ask you some questions

18   about it.

19   A.  Okay.

20   Q.  It says, "Scott Thorson and I met with Frank Vennes to

21   discuss background issues related to prior felony

22   convictions."  So this is a second meeting that you had with

23   Mr. Vennes after the first meeting where he described the

24   business model to you, right?

25   A.  That appears to be the case, yes.

1    Q.  The date of this was May 2nd, 2002, right?

2    A.  Yes, it is.

3    Q.  And if you look at the previous page, we don't have to

4    put it on the screen, but you agree you're the person who

5    made this entry in MIContacts?

6    A.  Yes.

7    Q.  It says, "We were given extensive detail and Frank

8    followed up with court reports and documents from *Creighton*

9    *Law Review*."  Do you see that?

10   A.  I do.

11   Q.  And then it says, "While there were some shocking

12   examples of misconduct on behalf of the undercover IRS

13   agents, we may be challenged in entering into a business

14   relationship with Frank due to his prior problems."

15           What did you mean by that, we'd be challenged into

16   entering into a business relationship with Frank due to his

17   prior problems?

18   A.  As I think about it, the prior criminal history, the

19   bank would have said we're not going to proceed with a

20   relationship due to that criminal history.

21   Q.  It says there there's a reference to a *Creighton Law*

22   *Review* article.  Do you see that?

23   A.  I do.

24   Q.  That's a copy of a article from a law review that he

25   provided you, correct?

1  A.  I don't specifically recall, but I believe so, yes.

2  Q.  Well, that's what you wrote when this was fresh in your

3  memory, correct?

4  A.  Yes.

5  Q.  And you tried to make these entries as accurate as

6  possible, right?

7  A.  Yes.

8  Q.  Okay.  I'd ask you, please, to turn to Plaintiff's

9  Exhibit 570.

10  A.  That's P-5?

11  Q.  P-570, yeah.

12  A.  Page?  What page, sir?

13  Q.  For now we're just going to look at the first page.

14  A.  Okay.  Thank you.

15  Q.  Do you have Plaintiff's Exhibit 570 in front of you?

16  A.  Oh, I'm sorry.  I have 5.

17  Q.  Sorry.  570.

18  A.  570?

19  Q.  Yes.

20  A.  Okay.  Sorry about that.  Okay.  Got it.

21  Q.  You got it now?

22  A.  Yeah.  Thank you.

23  Q.  Okay.  Take a moment to look at this, please.

24       (Witness reviews document)

25  Q.  I'd ask you to look at the top of the second page.

1    A.  Okay.

2    Q.  Do you see it indicates what journal it is from?

3    A.  Yes, I do.

4    Q.  And then I'd ask you, please, to look at the fourth

5    page.

6    A.  Okay.

7    Q.  And you see there there's a middle paragraph in the

8    middle of the page?

9    A.  Yes, I do.

10   Q.  Can you just read that to yourself.

11       (Witness reviews document)

12   A.  Okay.  I've read it.

13   Q.  Okay.  Having looked at this document and seeing that

14   paragraph, can you identify this as the article that

15   Mr. Vennes gave you?

16   A.  I don't specifically recall.  I just don't recall.

17   Q.  Okay.  But you recall looking at an article that looked

18   like this?

19   A.  I really don't recall looking at an article.

20   Q.  Okay.  Fine.

21   A.  But thank you.

22   Q.  From your discussions with Mr. Vennes and the extensive

23   detail he gave you as you identified in your MIContacts

24   report and from the *Creighton Law Review* article he gave

25   you, you understood what Mr. Vennes' felony convictions were

1    for, right?

2    A.  Reading it here, I understand that, yes.

3    Q.  And that refreshes your recollection?

4    A.  I just -- sorry.  I just don't recall exactly.

5    Q.  Okay.  But you now know what the convictions were for,

6    right?

7    A.  Yes.

8    Q.  Okay.  They were for --

9            MR. MOHEBAN:  Objection, Your Honor, hearsay.

10   There's no foundation.

11           THE COURT:  Sustained.

12   BY MR. MARDER:

13   Q.  There's a document that's already been admitted into

14   evidence, which is Defendant's Exhibit 50725.

15           MR. MARDER:  Put that on the screen, please.  And

16   if we could blow up the paragraph there.

17   BY MR. MARDER:

18   Q.  This is a document that's already in evidence and you

19   see it's an e-mail.  It states, "In my brief review of the

20   account for wire activity last spring, I saw wire transfers

21   involving all three.  Metro Gem is the company the article

22   mentions as having CEO Frank Vennes, who had a money

23   laundering conviction in 1987."  Do you see that?

24   A.  Yes, I do.

25   Q.  Okay.  When you met with Mr. Vennes and he went into

1   extensive detail about his felony convictions and he gave

2   you that *Creighton Law Review* article, did you understand

3   that his conviction was for money laundering?

4   A.  I just don't specifically recall from that meeting.

5   Q.  You have no reason to believe you didn't?

6   A.  I just don't recall.  I'm sorry.

7   Q.  But you agree he gave you extensive detail, right?

8   A.  That's what I wrote.  I just don't remember what I was

9   given.

10  Q.  And that was accurate when you wrote it, right?

11  A.  Well, yeah, I wrote it.

12  Q.  And as we discussed earlier, this conversation you had

13  with Mr. Vennes was the first time you learned about the PCI

14  business model, right?

15  A.  I believe that's correct, yes.

16  Q.  Did the fact that the person who introduced you to the

17  PCI business model had been convicted of a felony conviction

18  before, did that give -- let me rephrase the question.  I'm

19  sorry.

20          Did the fact that the person who introduced you to

21  the PCI business model had been convicted of money

22  laundering -- strike that -- had been convicted --

23          MR. MARDER:  I apologize, Your Honor.  I am going

24  rephrase the question one more time.

25  BY MR. MARDER:

1    Q.  Did the fact that the person who introduced you to the

2    PCI business model had a felony conviction give you any

3    concerns about having PCI as a customer?

4    A.  I don't recall thinking that.

5    Q.  If we look at the -- go back, please, to the MIContacts

6    report again, which was Plaintiff's Exhibit 2, page 14.

7    A.  Okay.

8    Q.  Do you see there that Plaintiff's Exhibit 2, we are

9    going to go to page 14.  And if we could blow up the date of

10   the call.

11   A.  Yes.

12   Q.  Do you see there the date of the call is 5-2-2002?

13   A.  I do.

14   Q.  If I could ask you to turn to the previous page, please.

15   Do you see where it says, "Activity/Call Report last edited

16   December 4th, 2008."  Do you see that?

17   A.  I do.

18   Q.  That tells us that this was edited on December 4th,

19   2008, right?

20   A.  I don't specifically know what that refers to.

21   Q.  Well, you can read the words "last edited December 4th,

22   2008," can't you?

23   A.  I can.  I just don't know what editing specifically

24   means in this case.

25   Q.  If you could turn to page 21.

1    A.  Okay.

2    Q.  You see it says, "Call Date 9-12-2002"?

3    A.  I do.

4    Q.  And if we look in the upper right-hand corner, it says

5    it was last edited on 9-13-2002.  Do you see that?

6    A.  I do.

7    Q.  So here we're being told that it was edited the very day

8    after the communication, right?

9    A.  That's what appears here.

10   Q.  Okay.  Now let's go back to page 13 again.  And we see

11   that this was last edited on December 4th, 2008, right?

12   A.  I see that here, yes.

13   Q.  And that's six years after the meeting, right?

14   A.  That's correct.

15   Q.  So, sir, does this indicate to you that six years after

16   the meeting that you had with Frank Vennes, someone went

17   into the MIContacts system and edited that entry?

18   A.  I just don't know what it means by "edited," you know,

19   so I don't really know how to respond to your question.

20   Q.  Did you edit this entry?

21   A.  I don't recall ever doing that.

22   Q.  Are you aware, sir, that the Court issued an injunction

23   to the bank telling the bank they could not alter or destroy

24   documents that related to the Petters account?

25   A.  I don't specifically recall that.

Flynn - Cross

1    Q.  Was there some reason why in 2008 that you might want to

2    edit this entry?

3    A.  I can't think of why I would.

4    Q.  At this point the Ponzi scheme had been revealed to the

5    world, right?

6    A.  I believe that's correct.

7    Q.  I'd ask you, please, to turn to page 55 -- to

8    Plaintiff's Exhibit 554.

9    A.  Okay.  Thank you.

10   Q.  I'm going to ask you if you've seen this document

11   before.

12   A.  I don't specifically recall seeing it before.

13           MR. MARDER:  Your Honor, at this point I would

14   like to offer this into evidence, and I would ask the Court

15   to take judicial notice of an order that's been issued by

16   this Court.  If I could approach, Your Honor, and explain?

17           MR. MOHEBAN:  We do object, Your Honor.  And maybe

18   a sidebar is appropriate.

19           THE COURT:  Please.

20       **(At sidebar)**

21           MR. MARDER:  Your Honor, this document here is the

22   injunction order that was issued by the United States

23   District Court for the District of Minnesota, and it

24   provides that documents could not be destroyed or altered.

25   And under the Federal Rules of Evidence, you can take

1    judicial notice of filings from this [inaudible] --

2         COURT REPORTER:  I'm sorry.  I couldn't hear you.

3    Notice of filings from this what?

4         MR. MARDER:  Oh, can take judicial notice of

5    filings from this very Court, and so I'd ask that the Court

6    take judicial notice of this, and I would like to offer it

7    into evidence.

8         MR. MOHEBAN:  This document the witness can't lay

9    any foundation for.  This court order is hearsay.  There's

10   no hearsay exception that applies; and certainly with this

11   witness, he's already testified he hasn't seen it.  He

12   hasn't stated a basis for why the Court would need to take

13   judicial notice of this.  If there's some reason for -- he's

14   not going use it with this witness.  We could take this up

15   at a later time if he's got some witness that's going to

16   talk about it.

17        MR. MARDER:  Your Honor, first of all, a court

18   order ordering you not to destroy documents couldn't

19   possibly be hearsay.  We're not offering this for the truth

20   of the matter asserted.  We are offering this to show that

21   the Court did an official act which entered an injunction

22   enjoining this defendant from destroying documents.  And it

23   is -- it's clearly not hearsay, and it's clearly relevant

24   because I'm going to ask this witness to look at the terms

25   of this injunction and ask him if the bank complied with

1    that.

2              MR. MOHEBAN:  I don't know how he's going to

3    answer that if he says he hasn't even seen it, and he is

4    certainly not the person that would be responsible for

5    preserving documents.

6              The slim read that they have here is the idea that

7    somebody could have edited this one piece of MIContacts.

8    This is not a broad discussion with this witness about the

9    bank's preservation.  We're going to do that with the

10   spoliation witnesses.  There are witnesses who can speak to

11   that.

12             MR. MARDER:  Your Honor, first of all, this

13   witness was the one who made the entry.

14             Second of all, this is the witness who owned the

15   relationship during this time period.

16             And third of all, to say that our case is based on

17   the slender read when the Court has affirmed an order from

18   the Bankruptcy Court stating that the defendants

19   intentionally spoliated documents, grossly understates the

20   nature of the problem here.

21             MR. MOHEBAN:  The slender read is as to this

22   witness, and there's no foundation for that he entered into

23   anything.  He hasn't testified to that effect.

24             MR. MARDER:  That's what I want to ask him.

25             THE COURT:  The objection is overruled.

1          **(In open court)**

2                    MR. MARDER:  Your Honor, I would once again, just

3          for the record, I am offering Plaintiff's Exhibit 554 into

4          evidence.

5                    THE COURT:  The objection is noted.

6                    MR. MOHEBAN:  We continue to object.

7                    THE COURT:  Overruled.  Received.

8          BY MR. MARDER:

9          Q.  Sir, I would like you to turn -- first of all, do you

10         see this is something that issued from the United States

11         District Court for the District of Minnesota?

12         A.  Yes.

13         Q.  And you see there on the second page, this is an order

14         for the entry of preliminary injunction.  Do you see that?

15         A.  Yes.

16         Q.  Ask you to look at page 9, please.  Do you see there's a

17         section that says, "Recordkeeping and Business Operations"?

18         A.  Yes, I do.

19         Q.  You see there it says, "It is therefore ordered that the

20         defendants; their agents, including financial and banking

21         institutions," and I will stop there.  BMO is a banking

22         institution, correct?

23         A.  That is correct.

24         Q.  And M&I was a banking institution?

25         A.  That's correct.

1   Q.  "And other persons or entities having possession or

2   control of the defendants' assets; their officers; their

3   employees; and all persons in active concert or

4   participating with those defendants in their affairs must

5   maintain all business, corporate, foundation, banking,

6   financial, and/or accounting records in their possession

7   that could be material to this action -- to this cause of

8   action; and are enjoined and restrained from."  Do you see

9   that?

10  A.  Yes, I do.

11  Q.  And then A says, "Altering any business, corporate,

12  foundation, banking, financial, and/or accounting records in

13  their possession that could be material to this cause of

14  action."  Have I read that correctly?

15  A.  Yes.

16  Q.  At any point did you receive any kind of notification

17  from the powers that be at BMO or M&I telling you that an

18  injunction had been entered and that you were not to alter

19  documents?

20  A.  I don't recall.  It was -- what? -- 14 years ago?  I'm

21  sorry.  I don't recall.

22  Q.  When Mr. Jambor left the bank, who decided that you

23  would take over the Petters relationship?

24  A.  I believe it was me.

25  Q.  You made that choice?

1    A.  Yes.

2    Q.  And you started managing the Petters relationship right

3    from September 2007, right?

4    A.  That sounds correct, yes.

5    Q.  And you managed it all the way through to the time when

6    M&I terminated its relationship with Petters, right?

7    A.  Yes.

8    Q.  And you understood when you managed the Petters

9    relationship and Petters Company, Inc. or PCI, as we

10   described it, that tens of millions of dollars were going in

11   and out of the account, right?

12   A.  I don't specifically recall that.

13   Q.  Do you recall that there were billions of dollars

14   running through the account?

15   A.  I don't recall.

16   Q.  Sir, you had your deposition taken in this case,

17   correct?

18   A.  Yes.

19   Q.  And you recall that we had an opportunity, not me, but

20   the other lawyers from my office had an opportunity to ask

21   you questions?

22   A.  Yes.

23   Q.  And you recall that you were under oath when you

24   answered those questions?

25   A.  Yes.

1    Q.  And you tried to answer as truthfully and honestly as

2    possible, right?

3    A.  Yes.

4    Q.  I'm going to ask you, please, to turn to your first

5    deposition transcript.  It's the deposition from

6    October 30th, 2017.  See if you can find that.

7    A.  Okay.  I'm sorry.  What date, sir?

8    Q.  94.  I would like to read the question on line 17 --

9              THE COURT:  Counsel, there's a question as to what

10   date.

11   BY MR. MARDER:

12   Q.  Oh, the date.  I apologize.  It's the deposition from

13   October 30th, 2017.  I think it's probably the first one

14   there.

15   A.  Yes.  Got it.

16   Q.  And I would like to turn to page 94, please.  And I'll

17   read the question there on line 17 through 21.

18              Question is:  "Okay.  You know, Mr. Flynn, that

19   from 2002 up through 2008, that Mr. Petters ran billions of

20   dollars through the Petters Company account, is that right?"

21   There's an objection from your counsel, and you answered,

22   "Yes."  Right?

23   A.  I see that, yes.

24   Q.  And that testimony was truthful when you gave it, right?

25   A.  Yes.

Flynn - Cross

1    Q.  Can you identify any other customer of yours that during

2    this time period that had tens of millions of dollars going

3    in and out of the account?

4    A.  No.

5    Q.  And, again, you were the main contact for PCI once you

6    took over the account, right?

7    A.  That's correct.

8    Q.  And once you took over the Petters relationship, you

9    reached out to PCI to introduce yourself, right?

10   A.  Yes, I did.

11   Q.  You called Ms. Coleman?

12   A.  I don't remember who I called.  I remember talking to a

13   few different people within that group of companies.

14   Q.  But you certainly talked to Ms. Coleman on multiple

15   occasions?

16   A.  At some point, yes, I did.

17   Q.  That was through both telephone and e-mail, right?

18   A.  I believe so, yes.

19   Q.  And when you took over the Petters relationship, you

20   knew that Tom Petters was the president and CEO of PCI,

21   right?

22   A.  Yes.

23   Q.  So you knew that he was an officer of the company?

24   A.  Yes.

25   Q.  And is it fair to say that you only spoke with him one

Flynn - Cross

```
1    time?
2    A.  I only remember one conversation with Mr. Petters.
3    Q.  But you knew that he was an authorized signer on the PCI
4    account, right?
5    A.  I may have known that at the time.  I don't specifically
6    recall now.
7    Q.  I'd ask you to turn to page 97 of your deposition.
8    A.  Yes.
9    Q.  And please look at lines 21 through 23 there.
10   A.  Yes, I see those.
11   Q.  Okay.  Does that refresh your recollection that you knew
12   he was an authorized signer on the PCI account?
13   A.  Yes.
14   Q.  And you also know that Ms. Coleman was an authorized
15   signer on the PCI account, right?
16   A.  Yes.
17   Q.  And you believe that she was a officer of the company,
18   correct?
19   A.  Yes.
20   Q.  When you're managing the relationship with your
21   customer -- when you were managing the relationship with
22   your customer at M&I, you understood that it was important
23   to know your customer's business, right?
24   A.  Yes.
25   Q.  And you knew specifically that was important for
```

1    anti-money laundering purposes, right?

2    A.  Yes.

3    Q.  And in your business, that's -- the phrase for this is

4    called "know your customer"?

5    A.  Yes.

6    Q.  KYC?

7    A.  Yes.

8    Q.  And it's important because it allows you to determine if

9    your customer is engaged in illegal activities, right?

10   A.  Yes.

11   Q.  For example, you'd want to know if -- whether or not

12   there was a legitimate purpose for the customer's

13   activities, right?

14   A.  Yes.

15   Q.  And knowing a customer's business would assist with that

16   endeavor of understanding whether or not there's a

17   legitimate purpose, right?

18   A.  Yes.

19   Q.  And knowing your customer and understanding your

20   customer's activity with respect to their bank accounts is

21   an important part of being able to ascertain whether there's

22   unusual or suspicious activity relating to the customer,

23   correct?

24   A.  Yes.

25   Q.  And while you were at M&I Bank, you were evaluated on

Flynn - Cross

1    your ability to comply with anti-money laundering laws,

2    correct?

3    A.   We received training.

4    Q.   Not only did you receive training, but it was part of

5    your evaluation, correct?

6    A.   I don't specifically remember that.

7    Q.   Okay.  We'll look at your evaluations.

8    A.   Okay.

9    Q.   You mentioned training.  There was annual compliance

10   training, right?

11   A.   Yes.

12   Q.   And one of the topics addressed during your annual

13   compliance training was anti-money laundering, right?

14   A.   Yes.

15   Q.   That's abbreviated within the bank as AML, correct?

16   A.   Correct.

17   Q.   And during those training sessions, there would be

18   PowerPoint presentations, correct?

19   A.   I believe that's correct, yes.

20   Q.   And based on those -- based on that training, you

21   understood that you were supposed to take the initiative if

22   you saw something that was suspicious or that you believed

23   could have been associated with money laundering, correct?

24   A.   Yes.

25   Q.   And you were trained at M&I to understand that if

1    something was interesting or unusual or didn't feel right to

2    you, it could raise to the level of something called

3    suspicious activity, right?

4    A.  Possibly.

5    Q.  It could?

6    A.  It could.

7    Q.  It would at least make it something you'd want to look

8    into further, right?

9    A.  I don't know about that.

10   Q.  Okay.

11   A.  Maybe.

12   Q.  I'd ask you to turn back to your deposition transcript

13   again.

14   A.  Yes.

15   Q.  And I'd ask you to turn to page 55.

16   A.  Okay.

17   Q.  And, again, this is your deposition testimony, correct?

18   A.  Yes, it is.

19   Q.  And as we discussed earlier, you had sworn to tell the

20   truth before you gave this testimony?

21   A.  Yes.

22   Q.  I'm looking at page 55, line 5.

23          "And you were trained at M&I to understand that if

24   something was interesting or unusual or didn't feel right to

25   you, it could raise to the level of suspicious activity; is

Flynn - Cross

1     that right?"

2          And you said, "Correct."

3               Right?

4     A.  Yes.

5     Q.  Now, you understood that if you had a belief that there

6     was suspicious activity, you were supposed to raise that

7     issue with your supervisor or your manager, correct?

8     A.  Yes.

9     Q.  When you were supervising Mr. Jambor, was there ever an

10    occasion when he came to you and escalated something that he

11    had seen that he thought was unusual or interesting?

12    A.  Not that I recall, no.

13    Q.  When you were at M&I Bank, you understood that there was

14    something called a Suspicious Activity Log, right?

15    A.  I don't specifically remember that term.

16    Q.  Okay.  Let's go to Plaintiff's Exhibit 4.  This is the

17    compliance training from 2004, right?

18    A.  Yes.

19    Q.  And as we discussed, you attended these training

20    sessions, right?

21    A.  That's correct.

22    Q.  In fact, you were required to attend them, you didn't

23    have a choice, right?

24    A.  Correct.

25    Q.  And it was important that you attend these sessions so

1    you could keep up on what the latest compliance requirements

2    were, correct?

3    A.  Correct.

4    Q.  I'd ask you to turn, please, to page 46.  You see at the

5    bottom it says, "When in doubt, fill out the log!  Better to

6    be safe than sorry!"  Do you see that?

7    A.  I do.

8    Q.  When this presentation was given, did you raise your

9    hand and say, I don't understand what the log is?

10   A.  You know, this presentation is 18 years old, so I don't

11   really remember exactly what --

12   Q.  Well, does this -- sorry.  I don't mean to interrupt.

13   Are you done with your answer?

14   A.  Sure.  Go ahead.

15   Q.  Having looked at this now, does this refresh your

16   recollection that there was some type of log associated with

17   suspicious activity?

18   A.  I don't recall anyone in our role utilizing a log for

19   activity.  We wouldn't -- I just don't recall that, sir.

20   Q.  Well, what would -- what was your understanding of what

21   you were supposed to do if you saw suspicious activity?

22   A.  That's a difficult question to answer because, I mean,

23   what would you really say is suspicious activity?  I can

24   understand if you're talking about a transaction or

25   something like that, but I don't -- I don't really

Flynn - Cross

1    understand your question, I guess --

2    Q.  Okay.

3    A.  -- where you're going with that.

4    Q.  Did you have a -- who was your supervisor?

5    A.  Jeanne Crain.

6    Q.  And what was her role?

7    A.  She was the head of our business line.

8    Q.  And you understood that if you saw something suspicious,

9    you were supposed to escalate it to Jeanne, right?

10   A.  I don't know how we would -- what you would define as

11   suspicious necessarily.  I mean, in my own mind, I'm trying

12   to understand your question with -- a little more

13   specifically.

14           Is there an example or something that you would

15   like to put --

16   Q.  Well, let's look at the first bullet point.  You see

17   there it says, "Escalate discussion of unusual activity to a

18   supervisor/manager."  Do you see that?

19   A.  Yes.

20   Q.  Okay.  And your supervisor or manager was -- I'm

21   sorry -- Jeanne, what was her last name?

22   A.  Crain.

23   Q.  And that's what you were instructed to do, right?

24   A.  Yes.

25           MR. MARDER:  Your Honor, I think it's around noon.

1    I think it would be a good time for the break, if that's

2    okay with you, or would you like to keep going?

3              THE COURT:  You can keep going.  At noon we will

4    finish.

5              MR. MARDER:  All right.  I will rely on you then

6    to tell me when to stop.  Thanks.

7              THE COURT:  I'm here to do that.

8    BY MR. MARDER:

9    Q.  If I could ask you to turn to page 47.  I'm sorry.

10   We're on page 47.

11   A.  Yes.

12   Q.  So based on this slide, you understood that if something

13   raised to the level of suspicious activity, you were

14   expected to reach out and talk to the customer to figure out

15   if there was a legitimate purpose for that activity, right?

16   A.  Yes.

17             THE COURT:  Members of the Jury, we will take our

18   midday break.  Please remember the instructions that I have

19   given you in the past.  Do not discuss this case with

20   anyone.  Do not allow anyone to discuss the case with you.

21             As you know, you are the only ones who are chosen

22   to serve as jurors in this important matter.  And do not

23   discuss the case among yourselves or until your

24   deliberations.

25             And when I mention not discussing the case with

1    anyone, I also mean don't e-mail, don't send messages, don't

2    blog, don't engage in any other written or oral form of

3    communication as you've been instructed before.  And don't

4    consult any outside references, such as newspapers or

5    televised accounts of this case or anything relating to this

6    case.

7             We will take our break now.  I hope you have a

8    good lunch.  And we will plan to return at 1:00.  Thank you.

9             LAW CLERK:  All rise for the jury.

10       (Jury excused)

11                       **IN OPEN COURT**

12                     **(JURY NOT PRESENT)**

13            THE COURT:  Sir, you are excused from the witness

14   stand.  Please be prepared to resume your testimony at 1:00.

15            THE WITNESS:  Thank you, Your Honor.

16            THE COURT:  You're welcome.

17            We're in recess.

18            MR. MARDER:  Thank you, Your Honor.

19            THE COURT:  You're welcome.

20       (Lunch recess taken at 12:02 p.m.)

21                    *    *    *    *    *

22       (1:17 p.m.)

23                       **IN OPEN COURT**

24                      **(JURY PRESENT)**

25            LAW CLERK:  All rise for the jury.

1          THE COURT:  Thank you.  You may be seated.

2          Counsel, you may proceed.

3          MR. MARDER:  Thank you, Your Honor.

4   BY MR. MARDER:

5   Q.  Mr. Flynn, I think when we broke you were asking about

6   how I define certain terms, so I want to talk about that

7   next.

8          I'd like you, please, to open up the binder again

9   and look at Plaintiff's Exhibit 4, and I'd like you to turn

10  to page 42, if you could.

11  A.  42, you said?

12  Q.  Yes.

13  A.  Okay.  Thank you.

14  Q.  Do you see there on that slide the second bullet point

15  it's talking about things that have no apparent lawful

16  purpose or is not the sort the customer would normally be

17  expected to conduct and the bank has no reasonable

18  explanation for the transaction?

19  A.  Yes.

20  Q.  Okay.  Do you understand that's one definition of

21  "suspicious activity"?

22  A.  Yes.

23  Q.  Now, if you flip forward to page 44, this is a slide

24  that talks about recognizing suspicious activity, correct?

25  A.  Yes.

1    Q.  And what the compliance department says in the second

2    bullet point, it lists, "What is 'interesting' or 'unusual.'

3    It just doesn't feel right to you."  Do you see that?

4    A.  Yes, I do.

5    Q.  So the terms "interesting" and "unusual" were terms that

6    the compliance department used at M&I, correct?

7    A.  Yes.

8    Q.  Okay.  And when you attended these sessions, you had the

9    ability to ask questions if you didn't understand something,

10   right?

11   A.  I don't specifically remember the sessions.

12   Q.  If you'd turn to page 6 of Exhibit 4, please.

13   A.  Okay.

14   Q.  I'm not going to read this because the jury has seen it

15   many times before, but do you agree with this definition of

16   "money laundering"?

17   A.  Yes.

18   Q.  And you understood and were trained that wire transfers

19   could be used as part of money laundering, correct?

20   A.  Yes.

21   Q.  And you understood, as a result of your training, that

22   an explanation that your customer does something all the

23   time was not a sufficient justification for ignoring

24   suspicious activity, right?

25   A.  Is that on one of the slides here?  I'm just trying

1    to -- maybe you could rephrase it for me, please.

2    Q.  Sure.  Let's go to page 19.  Do you see there it says,

3    "Don't Make Assumptions of Legitimacy"?

4    A.  Yes.

5    Q.  And it says, "Being 'familiar' with the customer isn't

6    enough- 'Oh yeah, he does it all the time.'"

7    A.  Yes.

8    Q.  And that's a concept you understood when you were at M&I

9    Bank, correct?

10   A.  I don't specifically remember, but if I went through the

11   training, it would have been covered.

12   Q.  And you understood that you shouldn't give your

13   customers, even your top customers, the benefit of the

14   doubt, right?

15   A.  Yeah, I mean, I'm not going to argue with what's on the

16   slide there.  I'm not going to say that I don't agree with

17   any of that.

18   Q.  And you understood the concept if it sounds too good to

19   be true, it probably is, right?

20   A.  I understand that concept, yes.

21   Q.  And you understood that you were supposed to focus more

22   on the activity than on the customer, correct?

23   A.  Again, if it was on the slide, you know, I won't dispute

24   that it was covered.

25   Q.  So you knew when you were at M&I that you had to know

```
 1    your customer and to understand the activities that your

 2    customers were involved in, right?

 3    A.  Yes.

 4    Q.  I'd ask you next to turn, please, to Exhibit 5.

 5    A.  Okay.  Got it.

 6    Q.  I'd ask you to turn to page 34 of this document.

 7    A.  Yes.

 8    Q.  And you see there's an indication there of -- you see

 9    the word "Red Flags" appears there?

10    A.  Yes, I do.

11    Q.  Did you understand this to be an event that would

12    require further action?

13    A.  Not necessarily.

14    Q.  What did you understand a red flag to be?

15    A.  Something to possibly understand better.

16    Q.  And on this page it asks you to be alert to certain

17    things, right?

18    A.  Yes.

19    Q.  And the third bullet point was a customer who requests

20    special treatment, right?

21    A.  Yes.

22    Q.  And, finally, if you could turn to page 30, you see

23    there's a definition there of the term "willful blindness"?

24    A.  Yes.

25    Q.  And do you see how it says it's the practice of ignoring
```

1   potential criminal activity?

2   A.  Yes, I see that.

3   Q.  You agree with that statement, right?

4   A.  Potentially, yes.

5   Q.  During the time you managed the PCI account, do you

6   recall anyone from the AML Group contacting you to ask about

7   any activity in the PCI account?

8   A.  I don't remember that, no.

9   Q.  Do you remember anybody from the corporate compliance

10  department calling you?

11  A.  No, I don't remember that.

12  Q.  And you understood that M&I had the ability to shut down

13  a depository account for any reason at any time, right?

14  A.  Yes.

15  Q.  And you understood that M&I had the ability to prevent

16  wire transfers from going to PCI if it wanted to, right?

17  A.  Yes.

18  Q.  I ask you to turn to Exhibit 267, please.

19  A.  Yes.

20  Q.  Do you see this here is an e-mail from Wendy Donahue at

21  M&I?

22  A.  Yes.

23  Q.  And it's to you and Shirley Cunningham, right?

24  A.  Yes.

25  Q.  And attached to the e-mail is a Management Action Plan?

1   A.  I see that attachment, yes.

2   Q.  Okay.

3           MR. MARDER:  I'd offer Plaintiff's Exhibit 267

4   into evidence.

5           MR. MOHEBAN:  No objection Your Honor.

6           THE COURT:  Exhibit 267, Plaintiff's Exhibit, is

7   received.

8   BY MR. MARDER:

9   Q.  If I could draw your attention to the section on wire

10  transfers on the attachment on page 3.  Do you see, "It was

11  brought to our attention that there's been a recent change

12  in the requirement of needing a purpose for the wire"?  Can

13  you tell me what that means.

14  A.  It's just a general description of the activity, what

15  something is being paid for.

16  Q.  So a change was made to M&I's policy that going forward

17  all wire transfers have to state the purpose of the wire,

18  right?

19  A.  Yes.  I believe this is for branch employees who were

20  executing wires.

21  Q.  I want to take a moment to talk about the concept of

22  cross-selling.  I think, as we mentioned earlier, this

23  refers to identifying other needs the client might have so

24  that the bank might be of service to them in helping address

25  those additional needs, right?

1    A.  Yes, that's correct.

2    Q.  And part of your duties as a business banker at M&I was

3    to cross-sell, right?

4    A.  Yes.

5    Q.  For example, you could cross-sell depository services or

6    personal or private banking needs, that sort of thing?

7    A.  Yes.

8    Q.  And you would try to deepen your existing relationships

9    and create new relationships, right?

10   A.  That's correct.

11   Q.  And understanding your customer's business was important

12   for that task, right?

13   A.  Yes.

14   Q.  And the more the bank could sell, the more money the

15   bank would make, right?

16   A.  Sure.

17   Q.  And cross-selling was part of your bonus structure,

18   correct?

19   A.  Yes, I believe it was.

20   Q.  If I could ask you to take a look at Plaintiff's

21   Exhibit 9.

22   A.  Okay.  Got it.

23   Q.  Would you please take a look at that document for a

24   moment and familiarize yourself with it.

25   A.  Mm-hmm.

Flynn - Cross

1        (Witness reviews document)

2   Q.  This was the Business Banker Incentive Plan, correct?

3   A.  Yes.

4   Q.  And it sets forth the manner in which the business

5   bankers' incentive compensation was calculated, right?

6   A.  Yes.

7            MR. MARDER:  Your Honor, I'd offer Exhibit 9 into

8   evidence, Plaintiff's Exhibit 9.

9            MR. MOHEBAN:  No objection, Your Honor.

10           THE COURT:  Plaintiff's Exhibit 9 is received.

11  BY MR. MARDER:

12  Q.  If I could draw your attention to the third page of this

13  document.

14  A.  Yes.

15           MR. MARDER:  If we could blow up this box in the

16  middle with "Performance Categories."

17  BY MR. MARDER:

18  Q.  Do you see there there's a chart that shows the

19  different weights that are attributable to the different

20  performance categories for your bonus, right?

21  A.  Yes, that's correct.

22  Q.  And a number of completed referrals has a weight of

23  10 percent?

24  A.  Yes.

25  Q.  And what does that mean?

Flynn - Cross

1    A.  That would be introducing another business line to that

2    client for whatever that need might be that I -- my group

3    wouldn't handle directly.  It would be introducing someone

4    else in the organization to assist them.

5    Q.  And you recall earlier I asked you about whether you

6    were evaluated based upon cross-selling and you said you'd

7    need to see the evaluations; do you recall that?

8    A.  Yes.

9    Q.  So I'd ask you next to turn to Plaintiff's Exhibit 10,

10   and I'd like you to flip through there and verify that this

11   is your performance evaluations and other personnel

12   documents that you signed.

13       (Witness reviews document)

14   A.  There's quite a few documents.  My apologies.

15   Q.  Well, I'll tell you what.  Maybe just have you look at

16   one page to try to refresh your recollection and then we

17   don't have to put this into evidence.  If I could just ask

18   you to turn to page 52.

19   A.  Yes.

20   Q.  And I'd ask you to look at the critical linkages at the

21   bottom of that page --

22   A.  Yes.

23   Q.  -- and let me know if that refreshes your recollection

24   as to whether cross-selling was one of the elements of your

25   evaluations.

Flynn - Cross

1    A.  Yes, I would agree.

2    Q.  In terms of profitability, PCI was one of your largest

3    clients, right?

4    A.  I don't know if I would characterize it that way.  PCI,

5    you're saying, right?

6    Q.  Yes.

7    A.  And when you say "largest," could you define that a

8    little bit better for me?

9    Q.  It was one of your most profitable clients, wasn't it?

10   A.  They were a profitable client.  I don't know that I

11   would say they're one of my most.

12   Q.  Well, would you say in terms of their revenues they were

13   one of your largest clients?

14   A.  Yes, perceived revenues.

15   Q.  And you thought of PCI as an important, longstanding

16   customer, right?

17   A.  Sure.

18   Q.  I'd ask you to please turn to Plaintiff's Exhibit 17 in

19   your binder.

20   A.  Yes.  It's a little difficult to read, but I think I can

21   get through it.

22   Q.  Okay.  You're familiar with something called an ACE

23   Report, correct?

24   A.  Yes, I am.

25   Q.  And you were e-mailed ACE Reports periodically?

1    A.  Yes.

2    Q.  And if we look at this document, this is an e-mail that

3    was sent to you attaching one of the ACE Reports?

4    A.  Yes.

5    Q.  And this e-mail is dated June 20th, 2008?

6    A.  Yes, it is.

7              MR. MARDER:  I'd offer Plaintiff's Exhibit 17 into

8    evidence.

9              MR. MOHEBAN:  No objection.

10             THE COURT:  Plaintiff's Exhibit 17 is received.

11   BY MR. MARDER:

12   Q.  If we look at this document here, we see that the

13   Petters companies, collectively anyway, were your second

14   most profitable client, right?

15   A.  I don't know that that's correct.  I -- you know, with

16   the redactions there, I think each one of those groups of

17   lines represents an individual, distinct client.  But the

18   redactions are there, so I can't tell that for sure.  But I

19   don't think they were the second most profitable.

20   Q.  Okay.  Well, do you know who redacted this document?

21   A.  I don't.

22   Q.  Okay.  Are you aware that it was your counsel that

23   redacted it?

24   A.  I -- no, I'm not aware of that.

25   Q.  Doesn't each of these boxes refer to a different client

1    or collection of clients?

2    A.  Yes.

3    Q.  Okay.  And Petters -- the Petters Group is in the second

4    box, right?

5    A.  It's in the second box.  I don't know that that means

6    they're the second highest.

7    Q.  Well, isn't this listed in order of profitability?

8    A.  I believe -- I can't tell without -- with the redactions

9    that are in there, I can't tell.

10              MR. MOHEBAN:  Your Honor, may I confer with

11   counsel?  I might be able to help with this.

12              THE COURT:  You may.

13       (Mr. Moheban and Mr. Marder confer)

14   BY MR. MARDER:

15   Q.  I'll tell you what.  Your counsel is going to put

16   unredacted versions into evidence, so you can see those when

17   we get to that.  Okay?

18   A.  All right.  Thank you.

19   Q.  Well, there was another document you received monthly

20   that was called the Banker Performance Dashboard, right?

21   A.  I don't recall.

22   Q.  If I could ask you to look at Plaintiff's Exhibit 18 and

23   see if this refreshes your memory as to what this form

24   looked like.

25   A.  Okay.  Thank you.

Flynn - Cross

1      (Witness reviews document)

2   Q.  This document here, Plaintiff's Exhibit 18, is a Monthly

3   Banker Performance Dashboard for the rolling 12 months

4   through April 2009, correct?

5   A.  Yes.

6   Q.  And if we look in the upper left-hand corner, it says,

7   "Banker Name:  Chris Flynn"?

8   A.  That's correct, yes.

9           MR. MARDER:  Your Honor, I'd offer Plaintiff's

10  Exhibit 18 into evidence.

11          MR. MOHEBAN:  No objection.

12          THE COURT:  Plaintiff's Exhibit is 18 is received.

13          MR. MARDER:  If we could please blow up the box in

14  the lower right-hand corner.

15  BY MR. MARDER:

16  Q.  Do you see there it talks about your top deposit

17  customer relationships?

18  A.  Yes.

19  Q.  And Petters Group Worldwide, LLC is listed as second --

20  A.  Yes.

21  Q.  -- second place?

22  A.  I see that, yep.

23  Q.  Okay.  Do you see there's another section there called

24  "Rising Stars"?

25  A.  Yes.

1    Q.  Those are the relationships where the bank has seen the

2    most growth over the last 12 months, correct?

3    A.  I would guess so.  It's been a long time since I've seen

4    this.  But that appears to be what that's suggesting, a rise

5    in their average deposit balance --

6    Q.  Okay.

7    A.  -- as a variance.

8    Q.  I'd ask you next, Please, to look at Plaintiff's

9    Exhibit 19.

10   A.  Yes, I've got it.  Thank you.

11   Q.  This is a Monthly Banker Performance Dashboard for the

12   rolling 12 months through August 2009, correct?

13   A.  Yes, that's correct.

14           MR. MARDER:  I'd offer this document into evidence

15   as Plaintiff's Exhibit 19.

16           MR. MOHEBAN:  No objection.

17           THE COURT:  Exhibit 19 is received.

18           MR. MARDER:  And if we could put this on the

19   screen.  "Deposit Customer Relationships," if we could blow

20   that box up.

21   BY MR. MARDER:

22   Q.  Do you see there Petters Group Worldwide is listed among

23   the top three?

24   A.  I do.

25   Q.  And then if we --

```
 1              MR. MARDER:  Close that box.
 2    BY MR. MARDER:
 3    Q.  And look at the rising stars, top five rising stars.
 4    Petters is listed there as well, correct?
 5    A.  Yes.  And this is for the period of -- from September of
 6    2008 through August of 2009.
 7    Q.  Right, correct.
 8    A.  Okay.
 9    Q.  So you'd agree with me, though, that M&I had a
10    profitable relationship with PCI, right?
11    A.  Yeah, from these reports --
12    Q.  As to the time period --
13    A.  The balance -- there were balances.  Yeah, there was a
14    profit, yes.
15    Q.  Right.
16    A.  Yes.
17    Q.  And that was throughout the entire time period that you
18    managed the relationship, right?
19    A.  Yes.
20    Q.  And you believe that the Petters relationship had a
21    great deal of high-profile companies, right?
22    A.  Yes.
23    Q.  And as we discussed earlier, you're the one who actually
24    chose to take over the relationship, right?
25    A.  That's correct.
```

1    Q.  Was this the only client of Mr. Jambor's that you took

2    over?

3    A.  I don't recall.

4    Q.  Why did you -- one of the reasons you chose to take over

5    this relationship was because the PCI account was a big

6    account, right?

7    A.  "Big" is kind of a relative term, but certainly there

8    could be potential, you know, to grow that relationship.

9    Q.  And you believed there was an opportunity to use the

10   relationship to get more business, right?

11   A.  Yeah.

12   Q.  And you spent time trying to cross-sell and grow the

13   business that M&I had with PCI, right?

14   A.  Yes.

15   Q.  And you identified certain credit opportunities to

16   pursue for the Petters relationship?

17   A.  Yes, I did.

18   Q.  If I could ask you to turn back to Plaintiff's

19   Exhibit 2.

20   A.  Okay.

21   Q.  This is a -- if I could ask you to turn to page 0101,

22   101.

23   A.  101, okay.  Thank you.

24   Q.  This is a MIContacts report that you prepared from

25   September 2007, right?

Flynn - Cross

1    A.  Yes.

2    Q.  And it says you met with a Mark Laumann, Jim Wehmhoff,

3    and Tom Salmen.  Do you see that?

4    A.  Yes, I do.

5    Q.  Were those PCI people?

6    A.  They were part of the Petters relationship.

7    Q.  And we see here listed in this document a number of

8    different opportunities for the bank to extend credit to

9    various Petters entities, correct?

10   A.  Yes, that's correct.

11   Q.  And that included Tom Petters' personal mortgage?

12   A.  Yes.  Sorry.  It was on the next page.

13   Q.  Now if I could ask you to turn to Plaintiff's

14   Exhibit 26.

15           And before you do that, I just want you to note

16   the date of this MIContacts, which is September 13th, 2007,

17   right?  It's on page 101.

18   A.  Oh, yeah.  I'm sorry.  I'll go back and take a look.

19   September 13th, yes, sir.

20   Q.  Next I'd ask you to turn to Plaintiff's Exhibit 26.

21   A.  Yes.

22   Q.  This is an e-mail that you send to -- well, it says -- a

23   couple of e-mails between you and a Jeanne Crain.  Do you

24   see that?

25   A.  Yes, I do.

1    Q.  And it relates to this very same MIContacts entry?

2    A.  Yes.

3    Q.  And you sent these e-mails on September 14th, 2007,

4    right?

5    A.  Yes.

6    Q.  So a day after?

7    A.  Yes.

8              MR. MARDER:  I'd offer this into evidence as

9    Plaintiff's Exhibit 26.

10             MR. GLEESON:  No objection.

11             THE COURT:  Plaintiff's Exhibit 26 is received.

12   BY MR. MARDER:

13   Q.  If we could go to the second page of this document, can

14   you tell us, please, who Jeanne Crain was.

15   A.  Jeanne Crain was my direct supervisor.

16   Q.  Right.  And you write to her, "Some large dollar

17   opportunities."  Right?

18   A.  Yes.

19   Q.  These are -- you thought that these were things that you

20   could develop out of the Petters relationship that might

21   result in profits for the bank, right?

22   A.  Sure.

23   Q.  And then if we look at the top of the page, Jeanne

24   responds to you by saying, "Some good size stuff...thanks

25   for keeping me informed."  Right?

Flynn - Cross

1    A.  Right.

2    Q.  So you were keeping your boss informed about some things

3    you thought were a good opportunity for the bank to make

4    money, right?

5    A.  Yes, certainly.

6    Q.  And because of these types of opportunities like we just

7    saw, you thought the bank was an important customer that

8    could be used to generate more business for the bank,

9    right -- I'm sorry, that PCI was an important customer that

10   you thought could generate more business for the bank,

11   right?

12   A.  I would say the broader Petters relationship, not PCI

13   specifically, but the broader Petters relationship

14   represented potentially numerous opportunities.

15   Q.  And because of that, it was important for you to keep

16   PCI happy, right?

17   A.  Well, you want to keep all your clients happy.

18   Q.  If I could ask you to go back to Plaintiff's Exhibit 2

19   and look at Page 112.

20   A.  Yes, I've got it.  Thank you.

21   Q.  This is a MIContacts entry that you submitted after you

22   started managing the Petters Company -- the PCI

23   relationship, right?

24   A.  Yes.

25   Q.  You say, "Tom is courteously looking for additional

1    opportunities for M&I to be of service to the Petters

2    companies."  Do you see that?

3    A.  Yes, I do.

4    Q.  What did that mean?

5    A.  He was -- you know, he had a lot of things in motion and

6    if there was anything that, you know, he thought we could

7    help with, he would be happy to have that conversation with

8    us.

9    Q.  And so you met with Mr. Petters to talk with him about

10   potential opportunities for the bank to help him with his

11   business, right?

12   A.  That really wasn't the purpose of the meeting.

13   Q.  But that's something that was discussed at the meeting,

14   right?

15   A.  I don't recall specifically, but, you know, in general,

16   you know, you're meeting him for the first time and, you

17   know, you generally will say, Hey, if there's anything else

18   we can help with, let us know.

19   Q.  If I could ask you to turn to Page 133 of the document.

20   A.  Yes.

21   Q.  This is another MIContacts entry that you completed,

22   correct?

23   A.  That's correct.

24   Q.  And it reflects another cross-selling opportunity with

25   respect to the Petters relationship?

1    A.  Yes, that's correct.

2    Q.  If I could ask you to turn, please, to Plaintiff's

3    Exhibit 270.

4    A.  Yes.

5    Q.  This is an e-mail that Ms. Donnelly of the bank sent to

6    you on September 25th, 2007, correct?

7    A.  Yes.

8              MR. MARDER:  I'd offer Plaintiff's Exhibit 270

9    into evidence.

10             MR. MOHEBAN:  Can I just confer with counsel for a

11   minute?

12             THE COURT:  You may.

13        (Mr. Moheban and Mr. Marder confer)

14             MR. MOHEBAN:  No objection, Your Honor.

15             THE COURT:  Exhibit 230 -- I'm sorry, 270 is

16   received, Plaintiff's Exhibit.

17   BY MR. MARDER:

18   Q.  Can you tell us, please, who Lori Donnelly is.

19   A.  Lori Donnelly was one of our consumer mortgage

20   originators.

21   Q.  She was in the private mortgage banking division?

22   A.  I don't know exactly -- well, I guess that's what it's

23   titled here, yes.

24   Q.  So you had referred to her the business of the bank

25   refinancing Mr. Petters' personal mortgage rate?

1    A.  Yes.

2    Q.  And, again, this is another example of you trying to

3    grow the relationship with Mr. Petters and his companies,

4    right?

5    A.  Yes, sure.

6    Q.  Because that was profitable to the bank, right?

7    A.  Sure.

8    Q.  And because of this potential for cross-selling and

9    growing, this was a client, among your other clients, that

10   you wanted to keep happy, right?

11   A.  Yeah.  As I said, we like to keep all our clients happy

12   as best we can.

13   Q.  Did you ever wonder why somebody who owned companies

14   that had billions and billions of sales needed a mortgage on

15   their private house?

16   A.  I don't recall wondering that.

17   Q.  Then the last e-mail in this series is Plaintiff's

18   Exhibit 277.  If you could open that up, please.

19   A.  Mm-hmm.  Yes.

20   Q.  This is an e-mail that you sent to your -- I'm sorry.

21   At the very top we see this is an e-mail from your

22   supervisor, Jeanne Crain, to you; is that correct?

23   A.  Yes.

24   Q.  And this is an e-mail she sent on around June 11th,

25   2008?

1    A.  Yes, that's correct.

2    Q.  And underneath that is a series of additional e-mails

3    between you and Ms. Crain?

4    A.  Yes.

5            MR. MARDER:  I'd offer Plaintiff's Exhibit 277

6    into evidence.

7            MR. MOHEBAN:  We would object on the basis of

8    nondisclosure.

9            MR. MARDER:  We can skip this one, Your Honor.

10           THE COURT:  Objection is sustained.

11   BY MR. MARDER:

12   Q.  As a business relation manager for PCI, you had access

13   to certain information about activity in the account, right?

14   A.  What -- you know, what you presented, I would see, you

15   know, balance information regularly, yes.

16   Q.  And from that you understood that tens of billions of

17   dollars passed in and out of the account while you were at

18   M&I, right?

19   A.  I didn't understand that from the information I was

20   provided internally at that time.

21   Q.  You understand that now, though, right?

22   A.  I do understand that now.

23   Q.  One thing you would get was monthly reports that

24   dictated the average deposit balance?

25   A.  Yes.

Flynn - Cross

1    Q.  And if you wanted to, you could get access to account

2    statements, correct?

3    A.  Yes.

4    Q.  You could get access to information that showed the

5    money going into the account and the money going out of the

6    account, right?

7    A.  Yes.

8    Q.  And you could look up the account balances online on

9    your own computer, right?

10   A.  I believe so.

11   Q.  And at the end of each month you'd get a summary report

12   of your clients and the average loans outstanding, deposits

13   outstanding, and that sort of thing?

14   A.  Yes.

15   Q.  And that would also cover the average daily balances?

16   A.  That's correct.

17   Q.  Sorry.  I'm not sure if I asked you this, but you said

18   you had access to the account statements, right?

19   A.  They were not regularly provided.

20   Q.  But you had access --

21   A.  Could I request them?  Yes, I could.

22   Q.  You could also get access to the outgoing and the

23   incoming wires if you wanted to, right?

24   A.  I don't know.  I don't recall.

25   Q.  If I could draw your attention, please, to your

Flynn - Cross

1    deposition and it's the one dated October 30th, 2017.

2    A.  That's the other binder, right?  Okay.  Yes.

3    Q.  I want to draw your attention to page 211.

4        There's a question on line 9 that says, "And, again, if

5    you wanted to see any outgoing wires or the incoming wires,

6    you had access to this type of information, right?"

7        And you answered, "Yes."

8            Correct?

9    A.  I did answer "Yes" to that question, yes, I did.

10   Q.  And you believed that to be true at the time, right?

11   A.  I don't remember -- I believed it to be true because I

12   was under oath.  I just don't remember the specific

13   conversation in question.

14   Q.  And are you aware that it was typical for there to be a

15   billion dollars being deposited and removed from the account

16   in a single month?

17   A.  At that time, no.

18   Q.  You recall earlier when we talked about the importance

19   of knowing your customer?

20   A.  Yes.

21   Q.  And how it was important to understand your customers'

22   business activities so you could ascertain whether or not

23   there were anti-money laundering issues?

24   A.  Yes.

25   Q.  And didn't you think it was important to determine

1    whether or not billions of dollars was being deposited and

2    removed in a single month?

3    A.  I wasn't aware that that was happening.

4    Q.  What did you do to make yourself familiar with the

5    account activity?

6    A.  I'm sorry.  Could you repeat your question?

7    Q.  What did you do to make yourself familiar with the

8    account activity?

9    A.  Well, I was meeting with the client and they would

10   describe their businesses or -- some of the Call Reports

11   that you saw.

12   Q.  So you were focusing more on what the client told you

13   rather than what was in the company's -- your bank's own

14   computer system, right?

15   A.  I was learning about the client's business from the

16   client, yes.

17   Q.  If I could ask you to turn to Plaintiff's Exhibit 1.

18   A.  I don't believe it's in my binder.

19   Q.  You should have two binders.  Volume I -- at the back of

20   Volume I you should find Plaintiff's Exhibit 1.

21   A.  Oh.  Thank you.  Got it.

22   Q.  I'd ask you to turn, please, to Plaintiff's -- page 362.

23   A.  Yes.

24   Q.  You see there in this account statement for December of

25   2006 --

```
1              MR. MARDER:  I'm sorry.  Strike that.  I need to
2    confer with my co-counsel for just a moment.
3         (Plaintiff's counsel confer)
4    BY MR. MARDER:
5    Q.  Actually, I'm going to ask you to turn to a different
6    page, Exhibit -- on Exhibit 1, page 478.
7    A.  Okay.  Yes.
8    Q.  This is from October of 2007, right?
9    A.  Yes.
10   Q.  And this is when you were managing the Petters
11   relationship, correct?
12   A.  That's correct.
13   Q.  And we can see here that there's almost a billion
14   dollars going in the account and almost a billion dollars
15   going out of the account, right?
16   A.  Yes.
17   Q.  And as the manager of this -- strike that.
18              Do you agree with me, sir, that by any measure
19   that's an extraordinary amount of money?
20   A.  It's a lot of money, yes.
21   Q.  And as the manager of the relationship with Petters, you
22   had no idea that was happening?
23   A.  No, I did not.
24   Q.  Didn't you think it was your duty, as part of knowing
25   your customer and understanding your customer's business, to
```

1    take a look at the account statements and see how much money

2    was going in and out of the account?

3               MR. MOHEBAN:  Objection, asked and answered and

4    argumentative.

5               THE COURT:  Sustained.

6    BY MR. MARDER:

7    Q.  And don't you think that -- strike that.

8               Did you understand that as part of knowing your

9    customer, that it was -- an important part of that was

10   understanding the activity in your customer's bank accounts?

11   A.  I got the reports I got from -- that we covered.  This

12   was not regularly provided.

13   Q.  But did you think it was important for AML compliance

14   purposes to understand the activity in your client's

15   accounts?

16   A.  Of course you'd like to understand the activity in the

17   accounts.

18   Q.  That's an important part of being able to identify

19   whether there's unusual or suspicious activity, right?

20   A.  That is something that you should understand.

21   Q.  And it was something that you closed your eyes to,

22   right?

23               MR. MOHEBAN:  Objection, argumentative.

24               THE COURT:  Sustained.

25   BY MR. MARDER:

1    Q.  Have you ever heard of an entity called Enchanted Family

2    Buying?

3    A.  I have since being deposed.

4    Q.  Did you ever do any investigation to determine what

5    Enchanted Family Buying was?

6    A.  No.  I never felt like I had occasion to.

7    Q.  Were you familiar enough with the account to understand

8    that Enchanted was wiring billions and billions of dollars

9    into the account?

10   A.  No.

11   Q.  Are you aware of a single big-box retailer who wired

12   money into the PCI account?

13   A.  I'm not aware of wire activity in general as it was

14   occurring.

15   Q.  So you're not aware of any big-box retailer wiring money

16   into the account, right?

17   A.  That's correct.

18   Q.  When you took over the account, did you meet with

19   Mr. Jambor?

20   A.  I don't specifically recall.

21   Q.  At any point did Mr. Jambor tell you that billions and

22   billions of dollars were being wired in and out of this

23   account?

24   A.  I never recall that conversation ever happening.

25   Q.  Didn't you have some kind of transition meeting when he

1    left?

2    A.  It was 2007, so it was a long time ago.  I don't

3    remember specifically how that process took place.

4    Q.  Does the fact that billions and billions of dollars were

5    being transferred in and out of the account sound like

6    something you would have wanted to have known?

7              MR. MOHEBAN:  Objection, calls for speculation.

8              THE COURT:  Overruled.  You may answer.

9              THE WITNESS:  Thank you.  In hindsight, of course.

10   BY MR. MARDER:

11   Q.  You say, "In hindsight," but at the time you had certain

12   duties, right?

13   A.  Sure.

14   Q.  That included a duty to monitor the account for AML

15   purposes, right?

16   A.  My specific role -- there's always a function for

17   everybody in the organization to have some level of

18   awareness, but my specific role -- it was not my primary

19   function to be monitoring transactions on a daily basis.

20   Q.  But you still had to understand the account activity to

21   satisfy your AML duties, right?

22   A.  I would have to have an understanding generally of what

23   the account activity is.

24   Q.  Now I want to go forward to February of 2008.  You

25   recall Ms. Coleman sending you a draft Depository Control

CASE 0:19-cv-01756-WMW   Doc. 434   Filed 01/08/23   Page 166 of 273

1    Agreement?

2    A.  Yes, I do.

3    Q.  I'd like you to turn, please, to Plaintiff's

4    Exhibit 114.

5    A.  Okay.

6    Q.  This is an e-mail that Ms. Coleman sent to you, correct?

7    A.  Yes, it is.

8             COURT REPORTER:  I think your microphone got

9    turned off.

10            THE WITNESS:  I'm sorry.  The binder went on

11   there.  Is that better?

12            THE COURT:  Much better.

13            THE WITNESS:  Thank you.  Yes, the answer to your

14   question.

15   BY MR. MARDER:

16   Q.  So this is an e-mail indicating that Ms. Coleman sent to

17   you a Depository Control Agreement --

18            MR. MOHEBAN:  Objection.  Your Honor, the exhibit

19   is not in evidence.

20            MR. MARDER:  Strike that.

21   BY MR. MARDER:

22   Q.  This is an e-mail that you received from Ms. Coleman on

23   February 8, 2008, correct?

24   A.  Yes.

25   Q.  And then there's an attachment with it, right?

1        A.  Yes.

2               MR. MARDER:  I'd offer this into evidence as

3        Plaintiff's Exhibit 114.

4               MR. MOHEBAN:  We'd object, and I request a sidebar

5        on this.

6               THE COURT:  You may.

7               Members of the Jury, you may stand up and stretch.

8        **(At sidebar)**

9               MR. MOHEBAN:  So, Your Honor, up until now we've

10       had some general discussion about Deposit Control

11       Agreements, but we are about to move into what -- I expect

12       plaintiff is going to try to offer executed Deposit Control

13       Agreements that involve three investors: Palm Beach,

14       Interlachen, and Ritchie.

15              So, you know, we have your ruling on the motion in

16       limine, page 20 from your October 9th order, and you stated,

17       "What" -- "Whether or to what extent BMO Harris owed any

18       duties to PCI's investors has no relevance to the trustee's

19       remaining claims."  Then you go on to say it could be a 403

20       problem.  You go on to say, "Any evidence or argument that

21       directly pertains to duties that BMO Harris allegedly owed

22       to PCI's investors is inadmissible."

23              That's exactly what these agreements are; they're

24       contracts between M&I and their investors.  There are these

25       Control Agreements.  And so we think that based on your

1    motion in limine ruling, that these are no longer relevant

2    to the case.

3          It's a goose and gander issuance as well, because

4    if we were allowed to put in information about the

5    investors, we would put in testimony on convictions.  Most

6    of these investors went to jail.  They were part of the

7    Ponzi scheme.  So to the extent they want to, you know, put

8    in this evidence, it's unfair given the exclusions that

9    we've had on the evidence we would put in regarding

10   investors.

11         MR. MARDER:  Your Honor, counsel from BMO is

12   reading from page 20 of your order, which generally

13   discusses the topic of duty of disclosure.

14         What he's not showing you is the very next page of

15   your order where you specifically addressed the DACA

16   agreements.  And what you said was that, "According to the

17   trustee, such evidence includes testimony and exhibits

18   reflecting that M&I employees who managed PCI's account knew

19   PCI's purported business model" --

20         COURT REPORTER:  Excuse me, Counsel.  Could you

21   slow down?

22         MR. MARDER:  Sure.  -- "knew PCI's purported

23   business model, that PCI's account activity was inconsistent

24   with the purported business model, and that M&I entered into

25   sham Depository Account Control Agreements intended to

Flynn - Cross

1    mislead investors.  Such evidence is relevant to M&I's

2    knowledge, state of mind, and conduct."

3              So you specifically ruled on these DACA agreements

4    in your order and you said that they were admissible and

5    that they were relevant.  So this issue has already been

6    resolved --

7              MR. MOHEBAN:  Now --

8              MR. MARDER:  -- as the first point.  Excuse me.

9              MR. MOHEBAN:  I'm sorry.

10             MR. MARDER:  That's the first point I'd like to

11   make.

12             The second point is this has nothing to do with

13   investor knowledge.  What we argued in our brief and the

14   argument that you accepted is that this evidence directly

15   relates to M&I's knowledge because it shows that M&I entered

16   into sham Depository Account Control Agreements.  It has

17   absolutely nothing to do with investor knowledge, and you've

18   already ruled that these are admissible.

19             MR. MOHEBAN:  Yeah.  So when you read this part of

20   your order, you're saying there could be things that BMO

21   could have learned in the process of discussing these

22   agreements.  If they got information about the business

23   model, for example, that's information that goes to their

24   state of mind.

25             So we have not objected to general discussion

1    about information that M&I got about the business model as

2    part of this process.  What we're objecting to is the entry

3    of executed agreements and the argument that we somehow

4    misled investors, because you've quite clearly ruled here

5    that whether BMO owed any duties to PCI's investors has no

6    relevance.

7            MR. MARDER:  Your Honor, again, he's referring to

8    the first part of the sentence.  You then say that the fact

9    that they entered sham Deposit Control Agreements is

10   relevant because it goes directly to BMO Harris's mental

11   state.  So you've already ruled that these DAC agreements,

12   which we're putting in to show BMO Harris's mental state,

13   are relevant and admissible for that purpose.

14           MR. MOHEBAN:  I read your ruling as much narrower

15   as to specific evidence about what they learned about the

16   business, not about violating duties to investors.

17           THE COURT:  The record speaks for itself.  I

18   overrule the objection.

19       **(In open court.)**

20           THE COURT:  And just to clarify, the order speaks

21   for itself.

22           MR. MARDER:  Thank you, Your Honor.  Your Honor,

23   I'd offer Plaintiff's Exhibit 114 into evidence.

24           MR. MOHEBAN:  We have our objection.

25           THE COURT:  That objection is overruled.

1    BY MR. MARDER:

2    Q.  The agreement that -- strike that.

3            So what's happening here is Ms. Coleman is sending

4    you a copy of a Deposit Control Agreement, right?

5    A.  Yes.

6    Q.  And if you scroll to page 3, that's the agreement that

7    she sent you, correct?

8    A.  I can't say with certainty.  I assume this -- was this

9    an attachment from that e-mail?

10   Q.  Yes.

11   A.  Okay.

12   Q.  You see -- let's go to the previous page.  You see

13   there's an indication there's an attachment for a Deposit

14   Control Agreement?

15   A.  Yes.

16   Q.  Just for brevity, I'm going to refer to these Depository

17   Account Control Agreements as DACAs.  Okay?  DACA, D-A-C-A.

18   A.  Sure.  Thank you.

19   Q.  And this DACA related to a company called Palm Beach,

20   right?

21   A.  Are they named in this document?  But if this was the

22   first -- in this e-mail, I would say yes.

23   Q.  And you understand what Ms. Coleman was requested --

24   requesting was that the bank work with Petters so that

25   specific payments from PCI's customers would be broken out

1    and segregated for different lenders, like Palm Beach, for

2    example?

3    A.  Yes.

4    Q.  And Palm Beach wanted some type of agreement in place of

5    this nature?

6    A.  That's what I recall.

7    Q.  Next I'd ask that you turn to Plaintiff's Exhibit 20.

8    A.  Okay.  Yes.

9    Q.  And just to make sure we follow this, if we go to the

10   third page, that's an e-mail that you sent to Ms. Moline of

11   M&I Bank, correct?

12   A.  Yes.

13   Q.  And then what follows after that is a series of e-mails

14   that you exchange with Ms. Moline in February of 2008,

15   correct?

16   A.  Correct.

17   Q.  And who is Ms. Moline?

18   A.  She worked with -- was the team lead for the

19   administrative assistants.

20           MR. MARDER:  Your Honor, I'd offer into evidence

21   Plaintiff's Exhibit 20.

22           MR. MOHEBAN:  Your Honor, can we just maintain a

23   continuing objection for what we discussed?

24           THE COURT:  Yes, you may.

25           MR. MOHEBAN:  Thank you.

```
 1              THE COURT:  The objection is overruled.

 2    BY MR. MARDER:

 3    Q.  If we go to the third page of this document --

 4    A.  I'm sorry.  Which attachment is that again?  It's the

 5    same --

 6    Q.  Page 3 of Plaintiff's Exhibit 20.

 7    A.  Of the e-mails?  Okay.

 8    Q.  Yeah.

 9    A.  Thank you.

10              MR. MARDER:  And if we could blow up the very

11    first paragraph.

12    BY MR. MARDER:

13    Q.  You say, "Carolyn and Jane."  I think we already

14    discussed who Carolyn is.

15    A.  Yes.

16    Q.  That's Ms. Moline, right?

17    A.  Yes.

18    Q.  Who was Jane?

19    A.  I don't remember her exact role, but she was part of the

20    team at M&I.  I don't recall her specific role.

21    Q.  And you say, "Attached is a request from one of our

22    customers regarding some special handling for a new account

23    to be opened."  Do you see that?

24    A.  I do.

25    Q.  And then you say there's an urgency to get this handled
```

1   for the customer, Petters Company, right?

2   A.  Yes.

3   Q.  And the request you're attaching is the e-mail that we

4   just looked at in the previous exhibit from Ms. Coleman,

5   right?

6   A.  That's correct.

7   Q.  I'm going to focus on that language there.  Do you see

8   where it says, "some special handling"?

9   A.  Mm-hmm.

10  Q.  If we could go back to Plaintiff's Exhibit 5 and we're

11  going to turn to page 34, you see there's -- you recall we

12  looked at this list of red flags?

13  A.  I do, yes.

14  Q.  And one of the things to look out for, to be alerted to

15  was a customer who requests special treatment, right?

16          MR. MOHEBAN:  Objection, Your Honor, that question

17  misstates the full context of that sentence.

18          THE COURT:  Overruled.

19          THE WITNESS:  Okay.  I'm sorry.  Could you repeat

20  the question?

21  BY MR. MARDER:

22  Q.  It lists two things to look out for, right, special

23  treatment or exceptions to the documentation rules, right?

24  A.  Yes.

25  Q.  Let's go back to the exhibit now, Plaintiff's

1    Exhibit 20.  Ms. Moline responds to you after you send her

2    your e-mail, correct?

3    A.  Yes.

4    Q.  If we could look at the first paragraph of that e-mail,

5    you see about two-thirds of the way down in the paragraph

6    she says, "The problem is do we get fairly compensated to

7    take care of a situation like this."  Do you see that?

8    A.  I do.

9    Q.  So what she was expressing was that the bank would be

10   doing something and not get paid, right, that was her

11   concern?

12              MR. MOHEBAN:  Objection, foundation as to what --

13              THE COURT:  Sustained.

14   BY MR. MARDER:

15   Q.  What did you understand that to mean?

16   A.  Just trying to understand, you know, what the -- you

17   know what's being asked and what's being delivered.

18   Q.  But you understood that Ms. Moline was concerned that

19   the bank wasn't going to get paid, right?

20   A.  I mean, that's what's described in her e-mail, yes.

21   Q.  But you decided that you would enter into this

22   relationship without charging for this service, right?

23   A.  That's correct.

24   Q.  And that's because you wanted to accommodate the request

25   of a long-time customer, right?

Flynn - Cross

1   A.  Well, there's always that -- you know, you always want

2   to take care of your client.  At the same time you could --

3   you know, you could always revise that agreement.

4   Q.  Let's go to the bottom of Ms. Moline's e-mail back to

5   you.  Do you see there, the second to last line, she was

6   expressing -- she expressed to you that she was concerned

7   that the bank didn't have the staff or knowledge to take

8   care of this, right?

9   A.  Yes, that was her comment.

10  Q.  Now if we turn to Plaintiff's Exhibit 21, this is a

11  series of e-mails between you and various bank employees in

12  February of 2008 relating to this same DACA proposal, right?

13  A.  Yes.

14          MR. MARDER:  Your Honor, I'd offer into evidence

15  Plaintiff's Exhibit 21.

16          MR. MOHEBAN:  Pursuant to our standing objection.

17          THE COURT:  Overruled.  It is received.

18  BY MR. MARDER:

19  Q.  Let's look at the second page of this document.

20  A.  Mm-hmm.

21  Q.  And I want to focus on the e-mail at the bottom of the

22  page.  This is an e-mail from a Ms. Schwede, right?

23  A.  Yes.

24  Q.  Who was Ms. Schwede?

25  A.  I don't recall her role at the bank, but she had a role

1   related to whatever we were discussing here.  I just --

2   Q.  Sure.

3   A.  It's been a long time.

4   Q.  If you could please turn to page 3.  And you see there's

5   her signature line at the top and she's --

6   A.  Yes.

7   Q.  -- an assistant vice president, customer service

8   manager?

9   A.  Yes.  Thank you.

10  Q.  Okay.  So let's go to the previous page now, page 2, and

11  she says, "I don't think M&I wants to be responsible for

12  reconciling an account and transferring funds out."  Do you

13  see that?

14  A.  Yes, I do.

15  Q.  And then she states, "The client should reconcile and

16  transfer the funds."  Right?

17  A.  That is what she e-mailed, yes.

18  Q.  And "M&I does not want any responsibility in this area,"

19  she says.  Right?

20  A.  Yes.

21  Q.  So now you've had two different people within the bank

22  express concerns about the bank entering into this

23  agreement, right?

24  A.  Yes.  With the document the client provided, yes.

25  Q.  Plaintiff's Exhibit 23, an e-mail that you sent on

1    February 18th, 2008?

2    A.  Yes, I see it.

3             MR. MARDER:  Your Honor, I'd offer Plaintiff's

4    Exhibit 23 into evidence.

5             MR. MOHEBAN:  No objection to this exhibit.

6             THE COURT:  The exhibit is received, Exhibit 23.

7             MR. MARDER:  If we could blow up the e-mail

8    itself, please.  Thank you.

9    BY MR. MARDER:

10   Q.  You wrote this e-mail to Craig Howse, correct?

11   A.  Yes.

12   Q.  And you understood that he was the attorney who wrote

13   the draft DACA that Ms. Coleman sent you?

14   A.  Yes.

15   Q.  And you remember that Mr. Howse was someone who

16   represented Frank Vennes, right?

17   A.  I seem to recall that, yes.

18   Q.  And that's the same Frank Vennes that we talked about

19   earlier who was a convicted felon?

20   A.  Yes.

21   Q.  And you were directed by Mr. Petters to work with him,

22   right?

23   A.  I believe I was directed by Ms. Coleman.

24   Q.  It was PCI that directed you to work with -- to work

25   with Mr. Howse?

1   A.  Yes.

2   Q.  You say, "We approach this request in the spirit of

3   trying to help accommodate ou customer and your client along

4   with the other protected parties with the assurances you

5   feel" -- "you need to feel comfortable with the working of

6   the purchase order financing in which they are engaged."  Do

7   you see that?

8   A.  Yes, I do.

9   Q.  I read that correctly?

10  A.  Yes.

11  Q.  What you told Mr. Howse is that you were trying to help

12  accommodate a customer and the customer's client, right?

13  A.  Yes.

14  Q.  And by "customer" you meant PCI?

15  A.  Yes.

16  Q.  And by "client" you meant Palm Beach and Mr. Vennes,

17  right?

18          MR. MOHEBAN:  Objection, lack of foundation.

19          MR. MARDER:  He wrote --

20          THE COURT:  Overruled.  You may answer if you can.

21          THE WITNESS:  Okay.  Thank you.  I don't know if I

22  would have remembered Palm Beach specifically at that time

23  by name.

24          I was aware that Mr. Vennes was a client of

25  Mr. Howse and Howse had been -- and I referred to him -- or

1   referred to Vennes as his client.

2   BY MR. MARDER:

3   Q.  If I could ask you to turn to your deposition of

4   October 30th, 2017.

5   A.  Yes.

6   Q.  I'd ask you to turn to page 298, please, and we're going

7   to look what you testified to there on line 19.

8       "And 'your client' is referring to Palm Beach, Frank

9   Vennes, right?"

10      And you said, "Yes."

11  A.  Okay.

12  Q.  And this was back in 2017 when your memory was a little

13  fresher, right?

14  A.  Five years ago, yeah.  Thank you.

15  Q.  Now I'd like you to turn to Plaintiff's Exhibit 22,

16  please.

17  A.  Yes, I have it in front of me.

18  Q.  This is an e-mail that you sent to Ms. Coleman and to

19  Craig Howse on Tuesday, February 19th, 2008, correct?

20  A.  Yes.

21          MR. MARDER:  Your Honor, I'd offer Plaintiff's

22  Exhibit 22 into evidence.

23          MR. MOHEBAN:  No objection.

24          THE COURT:  Exhibit 22 is received.

25  BY MR. MARDER:

Flynn - Cross

1    Q.  In the second paragraph you refer to some advice that

2    you got from a lawyer and you say, "I believe this

3    arrangement as proposed would be difficult for the bank to

4    execute."  Right?

5    A.  Yes.

6    Q.  And you list reasons?

7    A.  That's correct.

8    Q.  And the second reason is you were unclear what value the

9    bank was providing, right?

10   A.  Yes.

11   Q.  And you said, "Why can't Petters do this directly?"

12   A.  That's correct.

13   Q.  And what you were asked to perform was the work of

14   administering account transfers, but you were only

15   transferring in accordance with direct instruction of

16   Petters, right?

17   A.  Yes.

18   Q.  Okay.  So this concern that you had about why can't

19   Petters do this directly was the same concern that you had

20   received in the earlier e-mails from the people in the other

21   departments, right?

22   A.  I don't know if that's the same context.

23   Q.  But, in any event, you were now echoing your own

24   concerns?

25   A.  Yeah.  With the document they had provided, yes.

Flynn - Cross

```
 1    Q.  Now, the bank ultimately ended up entering into three

 2    different DACAs relating to PCI, right?

 3    A.  I believe that's correct.

 4    Q.  And one of those was with Palm Beach, right?

 5    A.  Yes.

 6    Q.  And you were the person at M&I who made the decision to

 7    enter into this agreement, right?

 8    A.  It wasn't my decision alone, but it might -- I

 9    approached my supervisor, who advised me to engage legal to

10    work it through.

11    Q.  You weren't the person who made the decision?

12    A.  I don't recall who made what decisions on this.

13         (Pause)

14              MR. MARDER:  I apologize.  It appears I grabbed

15    the wrong transcript.

16    BY MR. MARDER:

17    Q.  Do you recall that you had your deposition taken in the

18    Palm Beach matter, I think we discussed?

19    A.  Yes.

20    Q.  And, again, that testimony was under oath?

21    A.  Yes.

22    Q.  Okay.  And if I could ask you to please turn to your

23    deposition transcript from September 21st, 2010.

24    A.  Okay.  What page, please?

25    Q.  194.
```

1    A.  Okay.

2    Q.  Do you see at line 5 you were asked --

3         MR. MOHEBAN:  Objection, Your Honor, it's not an

4    inconsistent statement.  It should be a refreshment of

5    recollection.

6         THE COURT:  Correct.

7         MR. MARDER:  Your Honor --

8         THE COURT:  Sustained.

9         MR. MARDER:  Sure.

10   BY MR. MARDER:

11   Q.  Mr. Flynn, could you please read that to yourself,

12   lines 5 through 7.

13   A.  On page 194, correct?

14   Q.  Yes.

15   A.  Okay.  Thank you.

16   Q.  Do you see that?

17   A.  Yes, I do.

18   Q.  Does that refresh your recollection as to who made the

19   decision to enter into the agreement?

20   A.  I see what I -- what I said in the deposition.  Today I

21   don't -- I just simply don't remember.  But I see what I put

22   forth in the deposition.

23   Q.  So you don't dispute now that you were the person who

24   made the decision?

25   A.  I don't dispute that.

1    Q.  I'd like you to go into your binder, please, now and

2    turn to Plaintiff's Exhibit 645.

3    A.  Yes.  Thank you.  Got it.

4    Q.  And is this a copy of the Palm Beach DACA?  I guess when

5    it was signed it was called a DAMA, Depository Account

6    Management Agreement.  This is a copy of the agreement?

7    A.  Yes.

8    Q.  And if we look at the last page of that agreement --

9    A.  Yes.

10   Q.  -- did you sign this agreement?

11   A.  Yes, I did.

12   Q.  And it's dated February 25th, 2005?

13   A.  2008, I believe.

14   Q.  I'm sorry.  2008?

15   A.  Yep.

16            MR. MARDER:  I'd offer Plaintiff's Exhibit 645

17   into evidence.

18            MR. MOHEBAN:  This is subject to our standing

19   objection.

20            THE COURT:  Overruled.  It's admitted.

21   BY MR. MARDER:

22   Q.  Mr. Flynn, what happened to this agreement after you

23   signed it?

24   A.  I don't recall.

25   Q.  Did you have a filing system where you filed away

1    agreements?

2    A.  I would generally not keep original documents in our

3    office.

4    Q.  Where would you send signed copies of documents?  What

5    was your practice?

6    A.  I don't recall exactly.  I would have given it to one of

7    the administrative assistants and they would have forwarded

8    it to, you know, an area in our Wisconsin headquarters or

9    operations area that would have stored it.

10   Q.  Do you know if or when BMO's copy of this agreement was

11   destroyed?

12   A.  I do not know.

13   Q.  When you signed this agreement, did you understand it?

14   A.  I believe I did, yes.

15   Q.  I want to draw your attention to the fourth paragraph on

16   the first page.

17           MR. MARDER:  If we could blow that up.

18   BY MR. MARDER:

19   Q.  It says there, "Whereas, from time to time Petters will

20   receive payments with respect to Transactions into its bank

21   account at M&I which should have been paid to a 'lockbox' of

22   a Protected Party or directly to a Protected Party."  Do you

23   see that?

24   A.  I do.

25   Q.  So this -- do you understand this agreement contemplated

1  that Petters would be receiving payments with respect to

2  transactions?

3  A.  My understanding is that that could possibly happen.

4  Q.  And you testified earlier that the business model was

5  that Petters was buying -- purportedly buying consumer goods

6  from wholesalers and then selling them to retailers, right?

7  A.  Yes.

8  Q.  So the payments that are being referenced here, you

9  understood those to be the payments from the retailers,

10  right?

11  A.  I understood them to be the payments to Petters.

12  Specifically who, I don't -- I can't say.

13  Q.  But the people that he was purportedly selling the

14  products to were retailers, right?

15  A.  Yes, that's correct.

16  Q.  Earlier you had mentioned Costco as being one of the

17  retailers with whom Petters did business, right, or

18  purportedly did business?

19  A.  Yeah, I believe so.

20  Q.  So using Costco as an example, did you understand this

21  was saying that Petters would receive payments from Costco

22  into the PCI bank account that Costco should have paid to a

23  lockbox or directly to a protected party?

24        MR. MOHEBAN:  I'm going to object.  The document

25  speaks for itself and this is calling for legal conclusions.

1          MR. MARDER:  Just asking for his understanding,

2     Your Honor.

3               THE COURT:  Sustained.

4     BY MR. MARDER:

5     Q.  Did you ever ask anyone why payments were sent -- being

6     sent to the PCI account at M&I when they should have been

7     paid to a protected party's lockbox or directly to a

8     protected party?  Did you ever ask why that was happening?

9     A.  I don't recall.

10    Q.  Did you ever ask anyone why can't the retailers just

11    send the payments to the lockbox or directly to the

12    protected party?

13    A.  I don't recall.

14    Q.  Let's go to Section 1(a).

15    A.  Yes, I see it.

16    Q.  What did you understand Section 1(a) to mean?

17              MR. MOHEBAN:  We have the same objection.  The

18    document speaks for itself.  It's a legal conclusion.  And

19    his understanding today is irrelevant.

20              MR. MARDER:  Your Honor, may I be heard about

21    this?

22              THE COURT:  You may.

23              MR. MARDER:  Thank you.

24         **(At sidebar)**

25              MR. MARDER:  Your Honor, as we discussed earlier,

1    the whole point of this is to show that Mr. Flynn understood

2    this agreement, that it was a sham agreement, and that he

3    never, ever either intended to comply with it and never did

4    comply with it.

5              And so it's important to understand -- to

6    establish for the record that he understand what his

7    requirements were under the agreement to comply with it.  So

8    I need to simply ask how he understood the agreement so we

9    can establish that he didn't execute under the agreement.

10             So I'm not asking him for a legal conclusion as to

11   what the actual interpretation is.  I'm asking him what his

12   understanding is.

13             MR. MOHEBAN:  You don't need that to make the

14   argument that he wants to make.  He's going to argue

15   whatever he says this contract means or should have

16   required.  All he needs from the witness is:  Did you do

17   this or did you do that?  He doesn't need legal

18   interpretation from the witness.

19             MR. MARDER:  It only makes sense if I salvage what

20   the witness's understanding of the contract is.  I'm not

21   asking for his legal interpretation.  I'm just asking his

22   understanding.

23             MR. MOHEBAN:  Doesn't need to make sense now.

24   He's going to do this in his closing.  Part of this is

25   argument and part of this is what facts does this witness

1    know.

2              The examination could be limited to the facts, not

3    his interpretation.  And if he is going to be asked about

4    interpretation, then it should be what did he understand at

5    the time, not what he understands today.

6              THE COURT:  The objection is overruled with the

7    understanding that the limitation that you had made in your

8    argument should be --

9              MR. MARDER:  As to the time?

10             THE COURT:  Exactly.

11             MR. MARDER:  Thank you, Your Honor.

12        **(In open court.)**

13   BY MR. MARDER:

14   Q.  I'd ask you, sir, to please read paragraph 1(a) to

15   yourself for a moment.

16   A.  Mm-hmm.

17        (Witness reviews document)

18   A.  Okay, sir.

19   Q.  I'd ask you, please, sir, to give us your understanding

20   of -- to tell us how you understood this agreement back when

21   it was signed.  And if it would be helpful, maybe to give us

22   an example.

23   A.  My understanding was that occasionally some form of

24   payment that should have gone into a lockbox may show up

25   into a Petters account; and if that were to happen, Petters

1    would notify the bank and I believe the other party to that

2    agreement and say, This money is in this account, please

3    move it to this -- wire it out to the other party's account

4    or whatever that might be.

5    Q.  And what do you mean by the term "lockbox"?

6    A.  A lockbox is a common term.  Many people if they send,

7    like, payments for car loans, they'll get a -- you know,

8    they'll send it to a P.O. Box that's generally kind of

9    considered a lockbox, where there's a party that kind of

10   controls money that goes in or comes out of an account.

11   Q.  And, again, can you give an example of the kind of money

12   that would be coming into the account?

13   A.  That could vary.  A lockbox could serve many different

14   purposes.  I'm not sure if I can help you there, but maybe

15   if you could --

16   Q.  Well, in this instance you understood that the sales

17   were allegedly being made to retailers, right?

18   A.  Yes.

19   Q.  So Costco would be one example, for example?

20   A.  Yes.

21   Q.  Okay.  Now, this agreement makes reference to protected

22   parties.  Who did you understand were the protected parties

23   under this agreement?

24   A.  I just -- I understand the parties were defined that

25   way.  I don't know why that was chosen, but whoever was

Flynn - Cross

1    executing this document, you know, in terms of this

2    agreement just identified themselves as protected parties.

3    Q.  And in this instance the protected parties were Palm

4    Beach, right?

5    A.  Yes.

6    Q.  If you could go back to the first page and look at the

7    second paragraph, you see there there's the term

8    "transaction" defined?

9    A.  Yes.

10   Q.  And that's the transactions comprising the sale and

11   purchase of consumer merchandise.  Do you see that?

12   A.  Yes.  That was my understanding, yes.

13   Q.  Okay.  Now, if we go to Section 2, it says that, "M&I

14   shall follow the following procedures with respect to all

15   monies deposited or credited into the Deposit Account."  Do

16   you see that?

17   A.  I do.

18   Q.  Now let's go to Section 2(b).  It says there that,

19   "Petters shall provide to each Protected Party" -- again,

20   that's Palm Beach, right?

21   A.  Yes.

22   Q.  -- "and M&I at least once a week (or more often if

23   necessary to enable M&I to discharge its obligations

24   hereunder), a list of all Transactions funded by a Protected

25   Party with respect to which payment may be received by M&I

1    for deposit into the Deposit Account."  Do you see that?

2    A.  Yes.

3    Q.  And then it describes what had to be on the transaction

4    list, right?

5    A.  Yes.

6    Q.  The transaction list had to have the name of purchaser

7    or obligor, right?

8    A.  Yes.

9    Q.  And the purchaser's payor bank and banking coordinates?

10   A.  Yes.

11   Q.  Had to have a purchase order date and number?

12   A.  Yes.

13   Q.  And various other information, right?

14   A.  Yes.

15   Q.  Now let's go to Section 2(c).  There it says, "M&I" --

16   that's referring to the bank, right?

17   A.  Yes.

18   Q.  It said, "M&I shall compare each payment received by

19   wire transfer or otherwise to the most recently received

20   Transaction List" -- right?

21   A.  Yes.

22   Q.  And that's a reference back to the transaction list that

23   you're supposed to get at least weekly, right?

24   A.  Yes.

25   Q.  -- "provided to it by Petters and shall automatically

Flynn - Cross

1    transfer each payment on a Transaction funded by a

2    Protective Party to an M&I account established by and for

3    the benefit of each Protected Party as required herein."

4    Have I read that correctly?

5    A.  Yes.

6    Q.  Now, Mr. Flynn, I want to go to the time period after

7    this agreement was signed.

8            You never once received a transaction list, did

9    you?

10   A.  No, I did not.

11   Q.  And you never picked up the phone and called Mr. Petters

12   to ask him why you had never received a transaction list; is

13   that correct?

14   A.  That's correct, I had never agreed to do that in this

15   agreement.

16   Q.  You never followed up with Mr. Petters in any way as to

17   why no transaction list was ever received, correct?

18   A.  That's correct.  I don't believe there was any

19   obligation to do so.

20   Q.  Did you tell anyone else at the bank that you had signed

21   these agreements?

22   A.  I believe so.  I don't recall specifically.

23   Q.  I think you testified earlier that there were actually

24   three DACAs that were entered into, right?

25   A.  Yes.

1    Q.  A second one was entered into with Ritchie Capital

2    Management, correct?

3    A.  Correct.

4    Q.  That's another lender?

5    A.  It was another party, yes.

6    Q.  Draw your attention, please, to Plaintiff's Exhibit 116.

7    Is this the second DACA that was entered into with Ritchie

8    Capital Management?

9    A.  I believe it was.

10   Q.  And is that your signature that appears on the last

11   page?

12   A.  Yes, it is.

13   Q.  And, again, it was your decision to enter into this

14   agreement, right?

15   A.  It was consistent with how we had done it up until that

16   point.  I don't recall if it was specifically my decision.

17   I understand from my deposition I said that.  I just -- as

18   of today, I don't specifically recall.

19   Q.  Did you ever call up Ms. Coleman and ask why there was

20   no transaction list?

21   A.  Did I -- pardon me.  Could you repeat?

22   Q.  Did you ever call Ms. Coleman and ask her why there was

23   no transaction lists?

24   A.  I don't recall doing that, no.

25           MR. MARDER:  Your Honor, I'd offer Plaintiff's

1   Exhibit 116 into evidence.

2          MR. MOHEBAN:  Subject to our standing objection.

3          THE COURT:  116 is received.

4          Counsel, it's time for us to take our afternoon

5   break.

6          Members of the Jury, please remember and continue

7   to abide by the instructions that you have been given.

8   Let's plan to return to the courtroom at 3:15.

9          All rise.

10     (Jurors excused)

11                    **IN OPEN COURT**

12                  **(JURY NOT PRESENT)**

13         THE COURT:  And we are in recess.

14         MR. MARDER:  Thank you, Your Honor.

15     (Recess taken at 2:59 p.m.)

16                   *    *    *    *    *

17     (3:26 p.m.)

18                    **IN OPEN COURT**

19                    **(JURY PRESENT)**

20         THE COURT:  Counsel, we are ready to proceed.

21         You may be seated.

22         MR. MARDER:  May I proceed, Your Honor?

23         THE COURT:  Yes, you may.

24         MR. MARDER:  Thank you.

25   BY MR. MARDER:

1    Q.  I want to follow up on a couple of your earlier answers.

2    I had asked you if you told anybody whether you signed these

3    DACAs, and you said that you thought you had?

4    A.  Yes.  It was a long time ago, so I --

5    Q.  Can you identify a single person at M&I Bank that you

6    told that you signed these documents?

7    A.  I -- it's been so long, I really can't.

8    Q.  Can you identify any e-mails or correspondence that

9    indicate that you had told anybody else at M&I that you were

10   signing these documents?

11   A.  I don't have any access to e-mails I might have sent at

12   that time.  I can't say.

13   Q.  I think you also testified that you could change the

14   agreement at any time to make it so that the bank was

15   charging a fee?

16   A.  That's possible, yes.

17   Q.  Can you go to Exhibit -- the Palm Beach agreement, which

18   I believe is Exhibit 645.  Can you tell me where in that

19   agreement it says you can change it at any time?

20   A.  Well, "any time" might be a little bit outside, but I

21   believe there was a clause that we could exit this agreement

22   with notice.

23   Q.  You could terminate the agreement with 120 days' notice?

24   A.  I don't recall the specific days, but we could terminate

25   the agreement.  And then if the parties wanted to negotiate

1    a different structure, which could include pricing for the

2    bank, then we could do that.

3    Q.  I think when we left we were getting to Plaintiff's

4    Exhibit 116, which was the second DACA.

5    A.  Yes.

6    Q.  That's in evidence, so we'll put that up.  So this is

7    the Deposit Control Agreement relating to a different lender

8    called Ritchie, right?

9    A.  Yes.

10   Q.  I want to draw your attention to the large --

11            MR. MARDER:  The paragraph at the end of the first

12   page, if we could blow that up, please.

13   BY MR. MARDER:

14   Q.  You see there's a discussion of merchandise subject to

15   and then it lists two purchase orders; do you see that?

16   A.  I do.

17   Q.  Now, from all your years in the banking field, you

18   understand what a purchase order is, right?

19   A.  Yes, I do.

20   Q.  A party that's purchasing something issues a purchase

21   order to the party they're purchase it from, right?

22   A.  Yes.

23   Q.  So if you look at Romanette ii, little ii -- do you see

24   that?

25   A.  Yes.

Flynn - Cross

1    Q.  -- it says, "the purchase order Number 49237 dated

2    March 19, 2008 issued by PCI to Nationwide International

3    Resources."  Do you see that?

4    A.  I do.

5    Q.  So did you understand that this agreement contemplated

6    that a purchase order was going to be issued by PCI to

7    Nationwide?

8    A.  I'm -- just as I'm reading it, I'm trying to understand

9    the roles of the different parties.  The purchase order was

10   issued by uBid to PCI?

11   Q.  Right.  And then there's a second purchase order that

12   was issued by PCI to Nationwide.  Do you see that?

13   A.  I do see that.  Thank you.

14   Q.  So in that context PCI was the purchaser and Nationwide

15   was the seller, right?

16   A.  I believe that's correct, yes.

17   Q.  And the converse of that was uBid.  So they were the

18   retailer that was going to purchase the goods, right?

19   A.  Yes.

20   Q.  Did you ever do any research to determine who Nationwide

21   was?

22   A.  I don't recall doing that, no.

23   Q.  Did you ever look at the account activity to see that

24   billions of dollars were going into the account from

25   Nationwide?

Flynn - Cross

1    A.  No, I don't ever recall doing that.

2    Q.  And if Nationwide was the wholesaler that was selling

3    the products to PCI, would it make any sense that Nationwide

4    would be wiring billions of dollars into the account?

5    A.  Well, I honestly don't know the nature of who these

6    entities are or what their agreements might have been with

7    other parties, so it's hard for me to really comment on what

8    I think should be or shouldn't be.  I'm just not aware of

9    these parties and what their virtual -- what their

10   agreements might be with one another.

11   Q.  Did you sign this agreement?

12   A.  Yeah, I signed this agreement, sure.

13   Q.  And you understood that by understanding this agreement

14   you were binding the bank, right?

15   A.  Yes.

16   Q.  And did you read through the agreement and try to

17   understand it?

18   A.  I did at the time.  This has been a long time.  This is

19   now -- what? -- 14 years, so it's hard for me to give you

20   what my interpretation was of certain language from 2008.

21   Q.  And then if we could just identify the third DACA that

22   was entered into.

23   A.  Yes, I have that.

24   Q.  I'd like you to turn to Plaintiff's Exhibit 117, please.

25   A.  Yes, I have that.  Thank you.

1    Q.  Is this a true and accurate copy of the third DACA

2    relating to Interlachen?

3    A.  As far as I can tell, it is.

4    Q.  That's your signature on the last page, right?

5    A.  Yes, it is.

6            MR. MARDER:  Your Honor, I'd offer this into

7    evidence as Plaintiff's Exhibit 117.

8            MR. MOHEBAN:  Maintain our standing objection.

9            THE COURT:  Exhibit 117 is received.

10   BY MR. MARDER:

11   Q.  If I could ask you to take a look at the second

12   paragraph, you see there there's a reference to a Note

13   Purchase Agreement?

14   A.  Yes, I do.

15   Q.  Do you recall if you ever saw a copy of that agreement?

16   A.  I don't recall.

17   Q.  Had you ever before in your banking career up until this

18   point entered into Deposit Control Agreements similar to

19   these?

20   A.  I don't recall doing so, no.

21   Q.  Had you ever before in your banking career agreed to

22   compare lists of incoming payments to determine what to

23   transfer out of an account and send to another party?

24   A.  Are you asking me if I've agreed to do what's in this --

25   with these documents, is that what your question is?

1    Q.  Have you ever agreed before to do what's contemplated in

2    these documents?

3    A.  I don't believe so, no.

4    Q.  After you signed these agreements, did you put in some

5    written procedures in place at the bank for complying with

6    them?

7    A.  I don't recall.

8    Q.  But as you sit here today, you can't identify any such

9    written procedures?

10   A.  I don't recall, no.

11   Q.  You recall earlier we looked at -- you recall earlier we

12   talked about one of the documents that had been redacted and

13   you said you couldn't look at it to determine profitability.

14   Opposing counsel have been good enough to give me a version

15   that's unredacted, so I think we're going to use that now,

16   if we could.

17   A.  Okay.

18           MR. MARDER:  Your Honor, may I approach?

19           THE COURT:  You may.

20           MR. MOHEBAN:  Just give him the book.

21       (Document handed to witness)

22   BY MR. MARDER:

23   Q.  I'd ask you, please, to turn to Plaintiff's

24   Exhibit 4026.

25           MR. MOHEBAN:  Defendant's.

1             MR. MARDER:  Thank you.

2     BY MR. MARDER:

3     Q.  I'm sorry.  Defendant's Exhibit 4026.

4     A.  Okay.  Thank you.

5             MR. MOHEBAN:  40296.

6     BY MR. MARDER:

7     Q.  4029.

8     A.  40296?

9     Q.  40296, yes.

10    A.  Okay.  Thank you.

11    Q.  Is this one of the ACE Reports relating to your clients?

12    A.  Yes, it is.

13            MR. MARDER:  I'd offer Defendant's Exhibit 4026

14    into evidence, Your Honor.

15            MR. MOHEBAN:  No objection.

16            THE COURT:  And you mean 40296?

17            MR. MARDER:  40296, yes.

18            THE COURT:  Okay.  40296 is received.

19    BY MR. MARDER:

20    Q.  Now, this is one of the ACE Reports from the time during

21    which you were managing the relationship, correct?

22    A.  Yes, it is.

23    Q.  And you see there it's listing your clients in the order

24    of profitability?

25    A.  In terms of the prior 12-month, yes.

1    Q.  And we see the fourth line down, you see it says --

2              MR. MARDER:  Maybe we could blow that up.

3              THE WITNESS:  Yes, I do see that.

4    BY MR. MARDER:

5    Q.  You see it says, "Petters Company, Inc."?

6    A.  Yes.

7    Q.  And so this document shows that was your fourth most

8    profitable client at least at that time?

9    A.  Yes.  At that moment in time, yes.

10   Q.  I want to ask you next about Plaintiff's Exhibit 57.

11   A.  Is this binder still needed?

12   Q.  No.  You can --

13   A.  Okay.

14   Q.  You'll need it when your counsel asks you questions.

15   A.  Okay.  Thank you.

16              I'm sorry.  Could you repeat the exhibit?

17   Q.  Sure.  If you could look at Plaintiff's Exhibit 57.

18   A.  Yes, I see that.

19   Q.  So, first of all, I want to verify what the account

20   number was of the PCI account.  Was it 59018?  Does that

21   ring a bell?

22   A.  I believe it's actually ███9018.

23   Q.  Right.  And you're aware that checks were written on

24   that account while -- both while you were managing

25   Mr. Jambor and while you were directly managing the

1    relationship, correct?

2    A.  Yes.

3    Q.  And you've seen -- you've corresponded with Ms. Munson

4    on multiple occasions, right?

5    A.  I knew her as Deanna Coleman at that time, but I believe

6    that was her name.

7    Q.  Yeah.  You have seen her signature before?

8    A.  Yeah.  Been a long time, but yes.

9    Q.  Okay.  I'd like you to go through this pile of checks,

10   and taking a look at the account numbers there and the

11   signatures and tell me if you can identify these as checks

12   that were written on the PCI account.

13   A.  Yes.  That is what they appear to be, yes.

14           MR. MARDER:  I'd offer this into evidence as

15   Plaintiff's Exhibit 57, Your Honor.

16           MR. MOHEBAN:  Your Honor, may I voir dire for

17   purposes of an objection?

18           THE COURT:  You may.

19                **VOIR DIRE EXAMINATION**

20   BY MR. MOHEBAN:

21   Q.  Mr. Flynn, we've met before.  I'm counsel for BMO Harris

22   Bank.

23   A.  Yes.

24   Q.  Good afternoon.

25   A.  Hello.

1    Q.  So Plaintiff's 57, can you tell me how many pages this

2    document is.  I mean, don't --

3    A.  It appears to be about 112.

4    Q.  And there's images on both sides of the page?

5    A.  Yes.

6    Q.  Okay.  It's fair to say in your time working for the

7    bank you've seen checks, right?

8    A.  Yes.

9    Q.  But this particular compilation of checks, in whatever

10   order they've been selected and however they were prepared,

11   have you ever seen this collection of checks before, to your

12   knowledge?

13   A.  No.

14            MR. MOHEBAN:  Okay.  We would object, Your Honor,

15   for lack of foundation.

16            MR. MARDER:  Your Honor, may I approach for a

17   sidebar?

18            THE COURT:  Yes, you may.

19        **(At sidebar)**

20            MR. MARDER:  Your Honor, for purposes of

21   authenticity, I need to establish that these checks are

22   authentic.  The witness has testified that he's familiar

23   with Ms. Munson's signature, he's familiar with the account

24   number, he reviewed the checks and said they appear to be

25   checks from the account during the time period he was either

Flynn - Voir Dire

1       managing the person who managed the account or he was the

2       manager of the account itself.

3              If defendants continue to object and if this

4       doesn't get admitted into evidence, our only recourse is

5       going to be to have to drag in a recordkeeper from BMO and

6       waste the jury's time and everybody's else time to

7       authenticate these.

8              And all of these documents, Your Honor, if you

9       look at the bottom, on the bottom right, these were all

10      produced by the bank.  So the bank is now objecting to

11      documents that it produced to us.  This is just an effort to

12      delay things and to keep relevant documents out of evidence.

13             MR. MOHEBAN:  If he wants to authenticate these

14      checks, Deanna Coleman is going to be -- she's on their

15      witness list.  She's going to testify here I believe next

16      week.

17             I'm just objecting to this witness.  He did not --

18      he's already testified he didn't monitor the account

19      activity.  He didn't look at checks as they came and went.

20      And so he's just not the right witness for this, and I don't

21      want him to be unfairly asked questions about a document

22      he's never seen before.

23             MR. MARDER:  But he asked if this particular

24      compilation of checks he's seen before and he said no, but

25      he was able, based upon knowing her signature, knowing the

1    account number, and all the other indicia of authenticity,

2    that they were authentic.  And that's all that's required

3    under the rules.

4                MR. MOHEBAN:  He's not the custodian of these

5    documents.

6                THE COURT:  Is there any basis for thinking or for

7    determining that these are not authentic?

8                MR. MOHEBAN:  I don't have grounds for saying

9    that.

10               MR. MARDER:  They produced them.

11               THE COURT:  The objection is overruled.

12          **(In open court.)**

13               MR. MARDER:  Your Honor, for the record I formally

14   offer Plaintiff's Exhibit 57 into evidence.

15               MR. MOHEBAN:  Based on our discussion, we will

16   object.

17               THE COURT:  And Exhibit 57 is received.

18                    **CROSS-EXAMINATION** (Resumed)

19   BY MR. MARDER:

20   Q.  Do you recall Mr. Paul Taunton being introduced to you

21   as an investor in PCI?

22   A.  Yes, I do.

23   Q.  And Mr. Taunton approached you because, similar to

24   Mr. Vennes, he wanted a credit line to invest in PCI

25   transactions, correct?

1    A.  That's correct.

2    Q.  And you told Mr. Taunton that you wanted to get some

3    financial information from PCI, right?

4    A.  Correct.

5    Q.  You wanted those financials to make an assessment of

6    whether PCI had creditworthiness sufficient to support the

7    payments for the note, right?

8    A.  Not exactly.  Mr. Taunton had offered as collateral a

9    note between himself or one -- an entity controlled by him

10   in Petters Company.  And so Petters Company -- you know, if

11   that's going to be the collateral, we have to go through

12   some financial statement analysis in order to make that

13   determination.

14   Q.  And who was Mr. Laumann?

15   A.  Mr. Laumann, I don't know his exact role, but I think of

16   him as an accountant or a controller that was working within

17   the Petters organization.

18   Q.  So you contacted Mr. Laumann and you asked for a balance

19   sheet and an income statement, right?

20   A.  I don't remember specifically what I asked for, but I

21   would have asked for financial information, yes.

22   Q.  And financials are typically balance sheet and income

23   statements, right?

24   A.  Yeah.  Could be more than that, but yeah.

25   Q.  A balance sheet is something that shows assets and

Flynn - Cross

1    liabilities, right?

2    A.  Correct.

3    Q.  And an income statement shows revenues and expenses?

4    A.  Yes.

5    Q.  And in the banking world, giving somebody a balance

6    sheet is a pretty common piece of information to get

7    somebody -- from somebody, right?

8    A.  If there is a loan request, yes.

9    Q.  That's basic financial information that you've gotten

10   from many of your customers in the past, correct?

11   A.  Yes.  It's usually in conjunction with a loan request.

12   Q.  And you weren't expecting PCI to say no to you, were

13   you?

14   A.  I don't recall what I was thinking or expecting.

15   Q.  Sir, I'd like you to pull out your 2010 deposition

16   there --

17   A.  Yes.

18   Q.  -- September 21st, 2010.

19   A.  I believe I have it, yes.

20   Q.  And if I could ask you to look at page 134, line 12.

21       And you were asked, "Did you expect them to say no?"

22       And you answered, No.

23           Right?

24   A.  Yes, I did.

25   Q.  And you never ended up getting a balance sheet or

Flynn - Cross

1    financial statement, did you?

2    A.  That's correct.

3    Q.  And because of that, you chose not to make the loan to

4    Mr. Taunton?

5    A.  That's correct.

6    Q.  Because PCI wouldn't give you the financial information?

7    A.  That's correct.

8    Q.  And at this point PCI had been a client of the bank for

9    over ten years?

10   A.  I don't know exactly how long they had been a client,

11   but, yes, they had been a client for a number of years.

12   Q.  And they're someone you now know who had deposited

13   billions of dollars into the account, right?

14   A.  Yes.

15   Q.  And all this issue with Mr. Taunton occurred after all

16   of these DACA agreements were signed, right?

17   A.  I don't have a direct memory of what the time frame was,

18   but you may have e-mails or something of that nature.  I

19   don't know exactly.

20   Q.  Sure.  If you could please turn to Plaintiff's

21   Exhibit 25.

22   A.  Okay.  Thank you.

23   Q.  Did you check with Mr. Taunton to see if he could get

24   financials from Mr. Petters?

25   A.  I don't recall.

1    Q.  Going now to the e-mail from Mr. Taunton, does this help

2    place in your mind -- does this help you place it in time?

3    A.  Yes, it does.  Thank you.

4    Q.  So this was after all the DACAs were signed, right?

5    A.  Yes.

6    Q.  And now I'd like you to take a look, please, at

7    Plaintiff's Exhibit 283.  Is this an e-mail that you sent to

8    Ann Fugleberg?

9    A.  It would be pronounced few-gull-berg.  I was responding

10   to an e-mail she sent to me.

11   Q.  And you responded to that --

12            MR. MOHEBAN:  I --

13   Q.  -- on September 3rd, 2009?

14            MR. MOHEBAN:  I'm sorry.  I thought you were going

15   to read the content.

16            MR. MARDER:  Not yet.

17            MR. MOHEBAN:  It was premature.  I apologize.

18            THE WITNESS:  That appears to be the date, yes.

19   BY MR. MARDER:

20   Q.  So we have an e-mail from her to you and then a response

21   back from you?

22   A.  Yes.

23   Q.  And this was from December of 2009?

24   A.  Yes, it was.

25            MR. MARDER:  Okay.  Your Honor, I'd offer this

1   document into evidence.

2            MR. MOHEBAN:  Your Honor, we object on 403

3   grounds.  And I'd like to explain that, if I may?

4            THE COURT:  You may.

5        **(At sidebar)**

6            MR. MOHEBAN:  This is just designed to embarrass

7   the witness.  It's a -- after everything was disclosed, he

8   and a colleague joked a little bit about -- I think it's

9   about the resemblance of Petters to one of their colleagues.

10  I think there's a photo on the next page.  There may be one

11  other document that is like this.  It's not probative of

12  anything.  It just makes him look bad.  I don't think it's a

13  fair exhibit to put in front of the jury.

14           MR. MARDER:  Your Honor, I would direct your

15  attention to Minnesota Statute 549.20, Subsection 3.  That's

16  the statute that lays out the elements for punitive damages,

17  and one of the elements for punitive damages is the attitude

18  of the defendant after the events in question.

19           Here we have an individual whose account was used

20  to launder the money for the second biggest Ponzi scheme of

21  all time and he's making jokes about it with one of his

22  colleagues, and that goes directly to the Minnesota statute

23  which addresses the attitude of the defendant.

24           MR. MOHEBAN:  The attitude of the defendant has to

25  do with how they performed their job duties, not as to jokes

1    among colleagues.  It's very prejudicial.  It's just to

2    embarrass him.  It doesn't advance their punitives case.

3              MR. MARDER:  It's designed to address the attitude

4    of the defendant.

5              THE COURT:  I'm going to sustain the objection.

6              MR. MOHEBAN:  Thank you.

7              Is that (indicating) mine or yours?

8              MR. MARDER:  Yours.

9         **(In open court)**

10             MR. MARDER:  Your Honor, that concludes my

11   examination.

12             MR. MOHEBAN:  Your Honor, I do plan to examine the

13   witness.  It will take us a minute or two to just get

14   reorganized, if that's all right?

15             THE COURT:  Certainly.

16             Members of the Jury, if you would like to stand in

17   your seat and take a stretch break, you should feel free to

18   do so, or stand at your seat, not in your seat.

19        (Laughter)

20             MR. MOHEBAN:  May I approach with the binders?

21             THE COURT:  You may.

22        (Binders handed to Court)

23             THE COURT:  You may proceed, Counsel.

24             MR. MOHEBAN:  Okay, Your Honor.  Thank you.

25                        **DIRECT EXAMINATION**

Flynn - Direct

1    BY MR. MOHEBAN:

2    Q.  Good afternoon, Mr. Flynn.

3    A.  Good afternoon.

4    Q.  There's a number of things that I want to talk about

5    with you.

6    A.  Okay.

7    Q.  But I want to start -- I want to clear something up

8    right away.  In Mr. Marder's examination, he on two

9    occasions suggested that you had some role in altering or

10   destroying documents.  Do you remember that?

11   A.  Yes.

12   Q.  There was a question regarding your MIContacts that had

13   an edit date on it.  Do you remember talking about that?

14   A.  Yes, I do.

15   Q.  And then there was a suggestion, without any follow-up,

16   that somehow M&I had destroyed one of the DACA agreements.

17   Do you remember hearing about that?

18   A.  Yes.

19   Q.  Did you play any role at all in altering or destroying

20   any evidence relevant to this case?

21   A.  No.

22   Q.  Are you aware of anyone else at the bank that destroyed

23   or altered evidence intentionally to conceal something in

24   this case?

25   A.  No.

1    Q.  All right.  Let me go back to that M&I -- MIContacts,

2    and I'd like to start with Plaintiff's Exhibit 11, if we

3    could put that up.

4              So you were asked about this.  You were asked

5    about Judy Glanner.  Do you remember that testimony earlier

6    today?

7    A.  Yes.

8    Q.  And feel free to use the screen.  Is your -- do you get

9    the display there?

10   A.  Okay.  Thank you.

11   Q.  If that works for you better than the binder, it might

12   be a little faster.

13   A.  Yes, less flipping.  Thank you.

14   Q.  So let's look at the date, first of all.  What's the

15   date that Ms. Glanner is e-mailing you?

16   A.  It's December 4th, 2008.

17   Q.  Okay.  3:25 in the afternoon, right?

18   A.  Yes.

19   Q.  And in -- I think you testified you weren't sure who she

20   was?

21   A.  Yes.  That's --

22   Q.  Okay.

23   A.  I didn't recall her name.

24   Q.  Okay.  Can you tell from the phone area code, is she

25   someone that was located in your offices in the Twin Cities?

Flynn - Direct

1   A.  No, that's not a local area code.

2   Q.  Okay.  And her title is deposit service team leader.  Do

3   you see that?

4   A.  Yes.

5   Q.  Do you know what the deposit service team was?

6   A.  I don't specifically recall.

7   Q.  I want to direct your attention to what she asks you

8   for.  She says, "I have asked several people in the loan

9   area, I cannot find anyone that has access to MIContacts to

10  get copies of the call reports you logged."  Do you see

11  that?

12  A.  Yes.

13  Q.  Okay.  So on December 4th, at 3:25 in the afternoon, is

14  it fair to say that Judy Glanner was looking for you to send

15  her Call Reports?

16  A.  That appears to be the case, yes.

17  Q.  And the subject is "Re:  Frank Vennes," right, in the

18  "Re" line?

19  A.  Yes.

20  Q.  Now can we go to the supposedly altered document.  Can

21  we go to P-2-14.  Actually, I'll go to P-2-13.  Okay.  So

22  you were asked about an edit date, right?

23  A.  Yes.

24  Q.  What's the date that this document says it was last

25  edited?

Flynn - Direct

1    A.  December 4th, 2008.

2    Q.  Okay.  Is this a Call Report?

3    A.  Yes.

4    Q.  Is that -- I mean, is that what it literally says right

5    before "Last edited"?

6    A.  Yes.

7    Q.  And is this the kind of document that Ms. Glanner

8    apparently was looking for on this same date, December 4th

9    of 2008?

10   A.  Yes, it appears to be.

11   Q.  Okay.  And the actual record we know, if we go to the

12   prior page -- I'm sorry, to the -- to 2-14, you'll see the

13   actual record was -- the call was done on May 2nd of 2002?

14   A.  Yes.

15   Q.  All right.  Now I'd like you to look in your binder for

16   Plaintiff's Exhibit 145.

17   A.  Yes, I see it.

18   Q.  Okay.  Now, do you recognize this document as an e-mail

19   between you and Ms. Glanner?

20   A.  Yes, I do.

21   Q.  And can you tell us the date.

22   A.  December 4th, 2008.

23   Q.  Okay.  And can you tell us the subject matter.

24   "MIContacts" -- can you read the subject matter of the

25   e-mail.

Flynn - Direct

1    A.  "MIContacts Call Report 3 of 3."

2    Q.  Okay.  And then does this document convey a MIContacts

3    report that you yourself prepared?

4    A.  Yes.

5    Q.  Okay.  Do you have an e-mail system at M&I Bank?

6    A.  Yes.

7    Q.  Do you recognize this as a form of e-mails that went

8    back and forth between M&I employees back in 2008?

9    A.  Yes.

10   Q.  Did the company keep a record of e-mails in the ordinary

11   course of business?

12   A.  I don't exactly know what their process was, but I would

13   say generally yes.

14   Q.  If you needed to find one of your old e-mails, there was

15   a way to do that?

16   A.  Yeah.

17   Q.  Okay.  And did you find that the e-mail system, if you

18   pulled up an e-mail, it would accurately reflect what you

19   had e-mailed?

20   A.  Yes.

21   Q.  Okay.  Do you rely on those e-mails in your business?

22   A.  Yes.

23            MR. MOHEBAN:  Your Honor, we offer

24   Plaintiff's 145.

25            MR. MARDER:  No objection Your Honor.

 1          THE COURT:  Exhibit 145 is received.

 2          MR. MOHEBAN:  Okay.  Can we now publish that to

 3   the jury?

 4          THE COURT:  It's been published, but you may.

 5          MR. MOHEBAN:  I'm sorry.  All right.  Going too

 6   fast.  I apologize.

 7          THE COURT:  That's quite all right.

 8          MR. MOHEBAN:  All right.  Let's go now -- if we

 9   could scroll down on page 4 of 145, we're going to want --

10   before we go -- yeah, if you can bring up the whole

11   document.  We're not going to go there yet.  If you could

12   give me the whole document.  At the very top, I want to look

13   at that language.

14   BY MR. MOHEBAN:

15   Q.  So, Mr. Flynn, do you see at the top, does this indicate

16   you conveying this MIContacts report to Ms. Glanner?

17   A.  Yes, it does.

18   Q.  And what's the data that that happened?

19   A.  December 4th, 2008.

20   Q.  Okay.  And the form of the contact report that you are

21   forwarding, is there a place where it says in that when it

22   was last edited?

23   A.  Yes, May 5th, 2002.

24   Q.  So the form of the MIContacts report that you are

25   forwarding to Ms. Glanner is -- was last edited on May 7th,

1    2002, right?

2    A.  Yes.

3    Q.  And that would be five days after your meeting?

4    A.  Yes.

5    Q.  Okay.  So now I want to look at the text of this Call

6    Report that was last edited on May 7th, 2002.  And this is

7    now where I'd like it, if you could, compare the text of the

8    May 7th, 2002 Call Report, so that's P-145-4, to the text of

9    the document you were shown earlier that you were asked if

10   it had been altered.

11            Okay.  Is there -- take a look.  Are there any

12   differences at all in the text of the Call Report that was

13   last edited on May 7th and the Call Report that indicated it

14   was last edited on December 8th of 2008?

15   A.  I don't see any difference in the underlying text of the

16   report.

17   Q.  So making that comparison, does that give you any

18   confidence as to whether any alterations to the substance of

19   your Call Report after May 7th of 2002?

20   A.  It doesn't appear that there's been any changes.

21   Q.  Okay.  Thank you.

22            I wanted to also -- we'll get into this a little

23   more later, but the DACA agreements -- okay.  There was just

24   a suggestion that somebody destroyed a DACA agreement.  Have

25   you ever heard anyone say that the bank destroyed a DACA

1    agreement?

2    A.  No.

3    Q.  Okay.  All right.  I wanted to cover that.  Now I want

4    to back up to what I had planned to talk about.

5             You are being asked about things that happened

6    20 years ago up to 14 years ago.  I'd like to round out to

7    know a little bit more -- let the jury know a little bit

8    more about you.

9             So let's start with:  Are you from the Twin

10   Cities?

11   A.  Yeah.  Raised in Minneapolis.

12   Q.  Okay.  Where did you go to high school?

13   A.  Holy Angels.  It's a Catholic school in Richfield.

14   Q.  Okay.  Did you go to college?

15   A.  Yes.

16   Q.  And where did you go to college?

17   A.  I graduated from the University of Notre Dame.

18   Q.  Are you still in the Twin Cities?  I know you're no

19   longer at M&I or BMO Bank; is that correct?

20   A.  That's correct, yes.

21   Q.  Where do you work today?

22   A.  Another financial services organization by the name of

23   Alerus Financial.

24   Q.  Okay.  Could you spell that for us.

25   A.  A-l-e-r-u-s.

Flynn - Direct

1    Q.  All right.  A little advertising and do a little

2    marketing while you're here.

3              What do you do at Alerus today?

4    A.  Similar, commercial banking role.

5    Q.  Okay.  Do you have a particular title there?

6    A.  Lead business advisor.

7    Q.  Okay.  And how long have you been at Alerus?

8    A.  Just under five years.

9    Q.  Where are you officed?

10   A.  Downtown Minneapolis.

11   Q.  Okay.  And where -- did you tell me where you live

12   today?

13   A.  Eagan.

14   Q.  Eagan, okay.  Are you married?

15   A.  Yes.

16   Q.  Do you have kids?

17   A.  I have one daughter, a freshman in college this year.

18   Q.  What's your wife's name?

19   A.  Carrie.

20   Q.  What does she do?

21   A.  She's mostly working from home.

22   Q.  And what is your daughter studying?

23   A.  Predentistry is what she's planning on for now.  She's a

24   freshman, so we'll see.

25   Q.  A freshman where?

1    A.   University of Minnesota here in the Twin Cities.

2    Q.   Okay.  Before you went to M&I, tell us a little bit

3    about between college and starting at M&I.  Just maybe walk

4    us through your professional career.

5    A.   Yeah.  I've been in banking since 1993, and that was

6    shortly after graduating from college.  Had you know, a

7    brief role elsewhere prior to that, but since then I've been

8    in banking, you know, for, well, 29 years now, I guess.

9            You know, primarily I started as a retail banker,

10   home equity loans and car loans and things like that, and

11   then later on, as I got married, went back to graduate

12   school, I became a credit analyst in a financial

13   institution's commercial banking group at that time.  It was

14   about, I don't know, mid to late '90s.

15   Q.   So "retail banking," is that another term for dealing

16   with ordinary folks, like individuals --

17   A.   Yeah.

18   Q.   -- not business banking?  Would that be what --

19   A.   Yeah.

20   Q.   -- you would call that in the banking world?

21   A.   Yeah.

22   Q.   And where did you do that work?

23   A.   I was primarily with a bank called Firstar, which later

24   merged in with U.S. Bank.

25   Q.   Okay.  How long did you do the retail banking?

1    A.  It was probably about five years-ish, something like

2    that.

3    Q.  And then you said you switched to become a credit

4    analyst?

5    A.  Yeah.

6    Q.  Was that also at Firstar?

7    A.  Yes.

8    Q.  Okay.  So what's the difference between a credit analyst

9    and a retail banker?

10   A.  Credit analyst role was designed at that time to be sort

11   of the gateway into a commercial banking career, which

12   appealed to me after talking to some folks in HR at the

13   organization.

14            And so the first step is being offered a position

15   as a credit analyst, and in that role you're often analyzing

16   financial statements, making calculations of, you know, the

17   company's creditworthiness, writing up reports to present to

18   our credit committee for approval.

19   Q.  So in doing credit analyst work, is that primarily

20   dealing with the loan side of the business?

21   A.  Yeah, almost entirely.

22   Q.  Does the credit analyst do any work with respect to

23   opening and maintaining checking accounts?

24   A.  No.

25   Q.  Okay.  Is there a credit analysis that's done for

1    someone in order to open a checking account?

2    A.   There's probably some sort of procedures that I'm just

3    not familiar with because I'm not involved in consumer

4    banking, but I'm sure there's some due diligence that's

5    done.

6    Q.   How long did you do the credit analyst work?

7    A.   About two and a half or so years, two and a half, three

8    years.

9    Q.   Okay.  And then where did you go?

10   A.   I was recruited to become a commercial banking

11   relationship manager at a bank in town here by the name of

12   National City.  There's a larger, more broadly known

13   national institution called National City.  This was just a

14   small, maybe billion dollar bank or so at that time.

15   Q.   And what was your title, then, when you started at

16   National City?

17   A.   Relationship manager.

18   Q.   For a particular area of the bank?

19   A.   No.  It was -- we were pretty much generalists.

20   Q.   So we've heard a lot about retail banking, about

21   business banking, about commercial banking.  At National

22   City bank did they have those distinctions?

23   A.   Not really, no.

24   Q.   So any account, any person, any business you could be

25   working with as a relationship person?

Flynn - Direct

1    A.   Yes.

2    Q.   Okay.  How long did you do that?

3    A.   Well, I joined in 1999, I believe, and then within about

4    two years M&I acquired National City.

5    Q.   When -- can you place that in time, the acquisition of

6    National City by M&I?

7    A.   I would guess it was around mid 2001-ish.  I don't

8    remember the exact dates, though.

9    Q.   And did your position or title change when you made that

10   transition to M&I?

11   A.   When M&I came in, they had more of a segmentation of

12   their business lines.  There was commercial banking and

13   there was business banking.  And we went through sort of a

14   vetting process to be assigned or possibly not assigned to

15   one of those business lines, and I was selected to be in the

16   commercial banking group.

17   Q.   Okay.  So when you're in commercial banking, give me a

18   sense of how many different customers you are the

19   relationship contact for.

20   A.   I would think, you know, somewhere between 25 and 30 is

21   a pretty full number.

22   Q.   And when you switched to business banking, did that

23   change in terms of the number of customers?

24   A.   It could, yeah.  It did a little bit for me, yes.

25   Q.   All right.  How long were you in commercial banking?

1    A.  It was probably about four, four and a half, five years,

2    something like that.

3    Q.  Okay.  So that's roughly 2005 time period, then?

4    A.  Yeah, sounds right.

5    Q.  And then from there, tell us what you did at that time.

6    What was the change?

7    A.  There was a -- I was approached by the individual that

8    was running our business banking line.  That group had been

9    somewhat underperforming, but mostly they were looking for

10   someone to take leadership of a team in that group.  Whoever

11   the -- I don't remember who was leading that group before,

12   but they weren't maybe a fit.  I don't recall exactly.

13           But I was asked -- you know, I had made it known

14   that from a career standpoint I was interested in becoming a

15   manager or a leader within the organization, and this was an

16   opportunity that then later presented itself.

17   Q.  Okay.  So at that point in time when you step into the

18   managerial role, how much experience, how many years had you

19   worked in the banking industry?

20   A.  About a dozen or so.

21   Q.  So in 2005 you're a manager in the business banking

22   division of M&I Bank; is that right?

23   A.  Yeah.

24   Q.  And M&I Bank at that time had offices outside of

25   Minnesota; is that right?

1    A.  Yes.

2    Q.  Do you remember all the states that M&I had offices in?

3    A.  I don't.  I remember some, but I don't know if I

4    remember all.

5    Q.  Do you know what state they were headquartered in?

6    A.  Yeah, Wisconsin.

7    Q.  Okay.  So did they have branches in Wisconsin?

8    A.  Yes.

9    Q.  Okay.  Can you think of any other states they had

10   branches in?

11   A.  Arizona, Florida, Missouri.  I'm not sure if I remember

12   any others.  It's been a while.

13   Q.  So your -- but your managerial responsibilities were

14   focused on a geographic area?

15   A.  Yes.

16   Q.  And what was the geographic area?

17   A.  I would loosely call it the southern part of the main

18   metro area of the Twin Cities.

19   Q.  So was there someone else who managed other parts of the

20   Twin Cities, then?  Was there a different group of business

21   bankers?

22   A.  Yeah.  There were, I think, four different teams of

23   business bankers.  I was one of the team leads for it.

24   Q.  Four different teams within the Twin Cities?

25   A.  Yes.

Flynn - Direct

```
1    Q.  Okay.  In that period of time, is that when you started

2    working with Ed Jambor?

3    A.  Yes.

4    Q.  And you managed him for a period of time?

5    A.  Yes.

6    Q.  What was your impression of him as an employee?

7    A.  He was a good guy, pretty likeable.  You know, I liked

8    Ed.

9    Q.  Did you give him significant responsibility?

10   A.  I don't know if I know how to characterize that

11   question.

12   Q.  Okay.

13   A.  He had a portfolio of clients.  It was a fairly large

14   one, if I recall.

15   Q.  Okay.  You thought he was capable of doing his job?

16   A.  Yeah, I thought he was doing a nice job.

17   Q.  Do you know when -- can we place in time when Mr. Jambor

18   left the bank?

19   A.  Yes.

20   Q.  Okay.  What's your best recollection of that?

21   A.  Sometime in the late summer, early fall of 2007.

22   Q.  Okay.  And that's a point in time when you had assumed

23   some responsibilities of his, including the PCI account; is

24   that right?

25   A.  Yes.
```

1    Q.  Okay.  I just want to sort of flesh out your chronology

2    and then we'll get back into some of the details we talked

3    about earlier today.

4            How long did you stay at M&I Bank?

5    A.  It was, I believe, until about March of 2011.

6    Q.  Okay.  And where did you go from there?

7    A.  I was a commercial banking team lead for a bank in town

8    called Associated Bank.

9    Q.  How long did you work at Associated?

10   A.  For about four and a half years.

11   Q.  And was Associated same kind of work you had done at

12   M&I?

13   A.  It was more commercial banking than business banking

14   relationships that my team served.  And as a team lead in

15   that organization, I did not handle a direct portfolio of

16   clients.

17   Q.  So it was more supervisory/managerial work?

18   A.  Yes.

19   Q.  Okay.  And after Associated Bank, how long -- or what

20   did you do after that?

21   A.  Associated went through a reorganization.  I was

22   promoted through that.  There was a lot of -- there was just

23   a lot of -- these reorgs can be kind of painful and there

24   was just a lot of issues of sorting through things.  About

25   that time I was, probably after about two and a half or

Flynn - Direct

1   so -- no, after four and a half years with Associated, then

2   I was being recruited by a local community bank -- it was

3   pretty well known -- by the name of Anchor Bank.

4   Q.  Okay.  So you went to work for Anchor?

5   A.  Yes.

6   Q.  And how long did you work for there?

7   A.  It was about two and a half years until they were

8   acquired by a bank out of Indiana by the name of Old

9   National.

10  Q.  Is that similar business banking work at Anchor as well?

11  A.  It was more commercial than business, but there was a

12  mix of both.

13  Q.  Okay.  And where did you go from Anchor?

14  A.  To Alerus --

15  Q.  Okay.

16  A.  -- five years ago.

17  Q.  So, all told, how many different banks have you worked

18  for?

19  A.  I'd say probably six.

20  Q.  Okay.  And how many years -- as we sit here today, how

21  many years do you have in the banking industry?

22  A.  Almost 30.

23  Q.  You must like it.  Do you enjoy your work?

24  A.  Yeah, I do like it.  I do enjoy it.

25  Q.  What do you like about it?

1    A.  You know, what I tell people is the banking business in

2    and of itself is interesting, but what's very interesting is

3    just learning about all the different clients and their

4    businesses and, you know, having kind of a view into so many

5    different types of companies and industries, it's pretty

6    interesting.

7    Q.  All right.  Well, thank you for that.

8            I now want to turn to -- actually, I want to get

9    into these ACE Reports.

10   A.  Sure.

11   Q.  You were able to look at one.  So one of the binders

12   that we have in front of you says, "Defense Exhibits" on it,

13   and in the binder we have about a dozen of these monthly

14   ACE Reports, similar to the one that you looked at with

15   Mr. Marder.

16           MR. MOHEBAN:  I think I would just ask for a

17   stipulation that we can put these in.

18           MR. MARDER:  We have no objection to the ACE

19   Reports, Your Honor, to all of them.

20           MR. MOHEBAN:  So I think I can give you -- I can

21   read a list of exhibits into the record rather than do the

22   exhibit thing we did yesterday, if that's all right?

23           THE COURT:  Please do.

24           MR. MOHEBAN:  So defense offers DX-40255, 40273,

25   40276, 40296, 40304, 40307, 40323, 40336, 40476, 40477,

1    40478, 40408, 40431, and 40451.

2              THE COURT:  Any objection, Counsel?

3              MR. MARDER:  No objection, Your Honor.

4              THE COURT:  The listed reports, 40255, 40273,

5    40276, 40296, 40304, 40307, 40323, 40336, 40476, 40477,

6    40478, 40408, 40431, and 40451, are received.

7              MR. MOHEBAN:  Thank you, Your Honor.

8    BY MR. MOHEBAN:

9    Q.  I would like you to go in your binder to 40255.

10   A.  Yeah, I think I have that.  Yes.

11             MR. MOHEBAN:  And we can put that up, if you

12   could, please.

13   BY MR. MOHEBAN:

14   Q.  So we've seen these before, and I just want to focus on

15   a couple of things that maybe we haven't focused on before.

16             So you testified earlier you received these on a

17   monthly basis?

18   A.  That's correct.

19   Q.  And this was a report you did review to find out the

20   relative profitability of your customers that were in your

21   portfolio; is that a fair statement?

22   A.  Yes.

23   Q.  So this particular one, can you tell me the date.

24   A.  January of 2008.

25   Q.  Okay.  And can you confirm that this would be a listing

Flynn - Direct

1    for your portfolio of customers?

2    A.  Yes, it is.

3    Q.  Okay.  And we find Petters Company on this list.  How

4    far down?

5    A.  It is the fourth one down.

6    Q.  Okay.  And so, then, before we go to a blow-up of that

7    section, the very first column after the customer name, it's

8    a Net Profit column.  Do you see that?

9    A.  Yes.

10   Q.  And at the very top, there are two numbers under -- in a

11   row called Totals, right?

12   A.  Yes.

13   Q.  Okay.  So for the first column, which is R12, can you

14   read what the total is there?

15   A.  $1,343,121.

16   Q.  And what does the R12 column represent?

17   A.  "R" is just an initial for rolling, and what this is

18   really trying to capture as of January of this -- the period

19   of this report, on a backward-looking 12th month, what was

20   the total profitability of each client and then that rolled

21   up into the total.  So this would have been probably as of

22   February 2007, ending in January of 2008.

23   Q.  Okay.  So we could tell from looking at that number, the

24   1,343,121, that's the total profit to the bank for the last

25   12 months of your portfolio of customers; is that right?

1    A.  Yes.

2    Q.  And then the number next to that, the 109,981, what

3    would that signify?

4    A.  That represents the profitability for the most recent

5    month.

6    Q.  Okay.

7    A.  So that R12 is the prior 12 months, and then the current

8    month is just for that period, for one month of profit.

9    Q.  So this tells you sort of how has the company done in

10   the last year and then how are they looking in terms of

11   profitability in the most recent month?

12   A.  Yes.

13   Q.  Okay.  So now when we get down to that fourth set of

14   rows where it's under the "Petters Co, Inc.," so that breaks

15   out into six different rows, correct?

16   A.  Yes.

17   Q.  Can you explain to the jury, why are there six rows

18   there, what do they represent?

19   A.  Each one of those would have been a separate entity

20   within that relationship, and you'll see that with other

21   similar relationships that are represented here.

22   Q.  And so for them to be parsed out separately in different

23   rows here, does that mean that they would have a separate

24   relationship with the bank, in other words, an account or a

25   loan or something of that nature?

Flynn - Direct

1    A.  Yeah, very possibly.

2    Q.  So when we look at that first row, we look at Petters

3    Capital, LLC.  What does that show for the R12 profit to the

4    bank?

5    A.  A negative $130.

6    Q.  And then under "Petters Company, LLC" and "Petters

7    International, LLC," are those also negative numbers?

8    A.  Yes.

9    Q.  So how would the bank have a negative profit with a

10   customer?

11   A.  Well, I'm not an accountant, but you're obviously

12   earning money on funds that are on deposit, but then you

13   also have servicing costs associated with it could be

14   printing statements or just general overhead in the bank

15   that gets applied to different clients and different

16   accounts.  So if there's not high balances, it's not

17   uncommon for those to be not very profitable.

18   Q.  Okay.  And for it to show up as negative, would that

19   mean that the bank didn't recoup those costs and fees?

20   A.  Yes.

21   Q.  Okay.  So we know that we've been focused in this case

22   on Petters Company, Inc.  Does it have its own line here on

23   your ACE Report?

24   A.  Yes, it does.

25   Q.  Okay.  And so if we want to know the profit to the bank

Flynn - Direct

1    in the last 12 months from Petters Company, Inc., does this

2    report tell us that number?

3    A.  Yeah.  It's a little over 61,000.

4    Q.  What's the exact number?

5    A.  $61,387.

6    Q.  So in that time period of, you said, February of '07 to

7    January of '08, that's what the bank made from its

8    relationship with Petters Company, Inc.?

9    A.  Yes.

10   Q.  And then the second number over, that would be what the

11   bank made in the last month?

12   A.  Yes.

13   Q.  1,537?

14   A.  Yes.

15   Q.  Mr. Flynn, were you prepared to risk prison and join a

16   Ponzi scheme so the bank could get $1,537 a month?

17          MR. MARDER:  Objection, Your Honor, argumentative

18   and he's leading his own client.

19          THE COURT:  Sustained.

20   BY MR. MOHEBAN:

21   Q.  I want to turn now to DX-40307, if you could do that.

22          MR. MOHEBAN:  40307.  Sorry.

23   BY MR. MOHEBAN:

24   Q.  All right.  So we have another ACE Report.  And if we

25   look at the top of this one, can you tell us the time period

Flynn - Direct

1     for this.

2     A.  It's June of 2008.

3     Q.  Okay.  So we're looking at the same report, but it's,

4     what, five months later; is that right?

5     A.  Yeah.

6     Q.  Okay.  And if we go to that Petters Company, Inc. line,

7     now it's running a 12-month running average from this date,

8     right?

9     A.  Yes.

10    Q.  So what would be the time period that's covered there?

11    A.  It would have been the prior 12 months, so beginning of

12    July of 2007 for the rolling 12 through June of 2008.

13    Q.  Okay.

14    A.  And then the most recent month.

15    Q.  So for this time period now, in June of 2008, what's the

16    annual profit to the bank from Petters Company, Inc.?

17    A.  $81,254.

18    Q.  I'm just asking you about the Petters Company, Inc.

19    line.

20    A.  Oh, I'm sorry.  Yeah, $53,198.

21    Q.  Okay.  So that's gone down from January?

22    A.  Yes.

23    Q.  Okay.

24            MR. MOHEBAN:  Let's have a look now at DX-40323.

25    Thank you.

Flynn - Direct

1    BY MR. MOHEBAN:

2    Q.  Now, can you tell me the date of this ACE Report.

3    A.  Yes, it's July of 2008.

4    Q.  So the next month from what we just looked at, right?

5    A.  Yes.

6    Q.  Okay.  How many rows down now do we have to go to get to

7    Petters Company on your list of top customers?

8    A.  It looks like it's down to about seventh.

9    Q.  Okay.  And then if we look at that Petters Company, Inc.

10   line, for the rolling 12, what's the number there?

11   A.  $50,866.

12   Q.  That's down from the month before, right?

13   A.  Yes.

14   Q.  Okay.  We're also missing a few lines there.  Any idea

15   what happened to the other -- there were six rows in that

16   before and now there's just three.  Any idea what happened

17   there?

18   A.  I don't.  Yeah, I don't know for sure.

19   Q.  Okay.  Now, the last one I want to show you is DX-40366.

20   I must have given you the wrong number.  Hold on one second

21   here.  40336.  I'm sorry.  All right.  This should be the

22   one for August of 2008.  Have I got that right?

23   A.  Yes.

24   Q.  How many rows down do we go now to get to Petters?

25   A.  I think they're about eighth now.

Flynn - Direct

1    Q.  Okay.  And when we get to that Petters Company, Inc.,

2    what's the number there, the 12-month rolling average

3    number?

4    A.  $47,544.

5    Q.  So that's gone down again, right?

6    A.  Yes.

7    Q.  Do you remember what happened the next month, September

8    of 2008, with Petters?

9    A.  Yes.  He was arrested.

10   Q.  That was the end of the Ponzi scheme, in September of

11   2008?

12   A.  It seems about right, yeah.

13   Q.  During that year of 2008, was this a growing customer

14   for you in terms of profitability?

15   A.  No.

16   Q.  Okay.  We've seen a lot of documents that talked about

17   opportunities for the bank, and I want to turn to one of

18   those.  If we could go to P-26, please.  We looked at this

19   earlier.  This is an e-mail from you to Jeanne Crain, your

20   boss, right?

21   A.  Yes.

22   Q.  And I think if we scroll down a bit, you are making a

23   report of some opportunities that had come up in a meeting

24   you had had with people with -- at Petters, right?

25   A.  That's correct.

Flynn - Direct

1    Q.  So --

2              MR. MOHEBAN:  I think we need to scroll down just

3    a bit more and we should get to -- maybe it's even the next

4    page.  There we go.  If we could just blow up the text part

5    of that, that would be great.  Perfect.

6    BY MR. MOHEBAN:

7    Q.  So this is September of 2007, right, September 13th,

8    2007?

9    A.  Yes.

10   Q.  So this would be shortly after you took over the Petters

11   relationship for Mr. Jambor?

12   A.  Yes, that's right.

13   Q.  And you're recounting this meeting you had with these

14   three individuals, Mr. Laumann, Mr. Wehmhoff, and

15   Mr. Salmen, right?

16   A.  Yes.

17   Q.  And they discuss the following credit opportunities in

18   order of urgency, right?

19   A.  Yes.

20   Q.  Why did you highlight that they were credit

21   opportunities?

22   A.  I guess I would say that a big part of the way in which

23   we serve our clients ultimately most profitable is through

24   lending money.

25   Q.  In your -- I mean, my impression from just hearing you

1    testify is that your job is essentially to be a salesman for

2    the bank.  Is that a fair statement?

3              MR. MARDER:  Objection, leading, Your Honor.

4              THE COURT:  Overruled.  He may answer.

5              THE WITNESS:  Yeah, I think that's fair.  We

6    work -- as relationship managers, sales is a central part of

7    what we do.

8    BY MR. MOHEBAN:

9    Q.  And at a bank -- what's the best way for a bank to make

10   money?

11   A.  Lending is the primary driver behind earnings.

12   Q.  And why is that?

13   A.  That's putting the capital to work and earning the

14   interest spread on it.

15   Q.  Okay.  Are checking accounts a big source of

16   profitability for a bank?

17   A.  Not especially.

18   Q.  Okay.  How do you make a profit at all in a checking

19   account?

20   A.  As the account -- basically, as your deposit base grows

21   as an institution, that helps fund the lending activity,

22   which really drives the profitability.  So deposits are an

23   important part of a relationship from the standpoint it

24   creates the capital to lend out.

25   Q.  Okay.  So in that sense, when you're looking at a

Flynn - Direct

1    checking account like Petters had, in terms of its

2    profitability to the bank, what's the important metric to

3    look at there?

4    A.   Average collected balance.

5    Q.   Okay.  And what -- why is that an important number?

6    A.   Because in -- collected balance means the funds are in,

7    there's no checks that haven't been honored yet that have

8    been deposited, everything that has been deposited by the

9    client has been presented to whatever other institutions and

10   has been honored.

11          A collected balance is really how you derive value

12   in an account.  If money comes and goes out of an account,

13   that isn't especially valuable because you can't really lend

14   that money.

15   Q.   Okay.

16   A.   You know, it's money that sticks.

17   Q.   Got it.  So a big number, like a billion dollars, going

18   in an account and going right back out of the account, does

19   that contribute to the average daily balance?

20   A.   No.

21   Q.   In light of that, in light of Petters Company, Inc.

22   having a checking account -- did Petters Company, Inc. have

23   any type of loan relationship with the bank?

24   A.   Not that I recall.

25   Q.   So where did you see the opportunities if you didn't

Flynn - Direct

```
 1   have a loan with Petters?  You had a checking account.
 2   Where did you see the opportunities as a person trying to
 3   generate opportunities for the bank?
 4   A.  Well, you just never know until you get to know people
 5   and understand what other sorts of needs they might have.
 6           You know, this Call Report seems to identify some
 7   things that they wanted to discuss with me around potential
 8   lending relationships.
 9   Q.  Okay.  So let's walk through these and see what happened
10   with them.
11           So the first one you identify as Aspen Walk.
12   "This is a 50 to 60 million dollar redevelopment project in
13   Aspen, Colorado," and it goes on to describe.  I'm not going
14   to read the whole thing.  Is this something you discussed in
15   this meeting in September of 2007?
16   A.  Yes.
17   Q.  Did anything come of this as far as the bank's
18   involvement with Aspen Walk?
19   A.  No.
20   Q.  Did you hear from them again about this after this
21   meeting, to your recollection?
22   A.  What I did is we had a separate area of the bank that
23   handled what we would consider investor commercial real
24   estate.  And my objective after learning of this was to
25   refer -- these opportunities, as they're described, tend to
```

Flynn - Direct

1    be more investor real estate.  My intent was to bring that

2    over to that group and let them vet and decide if it was a

3    potential fit for the institution.

4    Q.  Okay.  As we sit here today, do you know if this project

5    ever happened?

6    A.  I have no idea.

7    Q.  Okay.  You didn't -- whoever you referred it to didn't

8    come back to you and say, Hey, thanks for a great referral?

9    A.  Yeah, I don't really remember, but I remember passing it

10   along.

11   Q.  Okay.  Let's go down to the next one, Collegeville

12   Development, and this references, "Originally started by

13   John Petters (brother of Tom)."  Again, I'm not going to

14   read the whole thing, but it was a project -- "Northfield

15   and Winona are underway."

16          So they're telling you -- was it your

17   understanding this was a project or a developer that had

18   done some work and was looking to do more?

19   A.  I think it was a -- my understanding is it was a concept

20   they were trying to explore, to have a senior living

21   facility that was aligned with the education institutions --

22   Q.  Okay.

23   A.  -- so the seniors could take classes at the colleges and

24   this sort of thing.

25   Q.  What, if anything, did you do to follow up on this

Flynn - Direct

1     opportunity?

2     A.  I think with any of these real estate development

3     projects, I referred them over to our commercial real estate

4     group.

5     Q.  Did you hear back from them that these projects actually

6     happened, the bank did any work on them?

7     A.  I'm not aware that anything ever came of them, but I

8     don't know for sure.

9     Q.  As we sit here today, do you know whether this project

10    as described here ever happened?

11    A.  I don't.

12    Q.  All right.  Let's go to the next one, which is Keystone.

13    "This is a partnership with Vail Resorts.  Vail will hold a

14    20 percent ownership position in a $300 million development

15    of a new resort in Keystone."

16         Did the bank get any work out of this opportunity?

17    A.  Not to my knowledge.

18    Q.  Okay.  And then the last one is that Tom Petters had a

19    mortgage on his residence in Wayzata.  And I think we heard

20    some testimony that that one did result in a refinance?

21    A.  I believe it did, yeah.

22    Q.  Other than what's described here, are there any other,

23    you know, business that came your way from Petters in the

24    time period that you were working with them?

25    A.  Not that I recall.

Flynn - Direct

1    Q.  So we talked about bank profitability.  Now I want to

2    talk about Chris Flynn profitable and your compensation.

3            So can we go to P-9.  So we looked at this.  You

4    were asked some questions about this earlier, right?

5    A.  Yes.

6    Q.  So you remember this document.  This was from the time

7    period when you were a banker at M&I, right?

8    A.  Yes.

9    Q.  So this would apply to you?

10   A.  Yes.

11   Q.  Okay.  When you started at M&I -- well, let me go back,

12   if we can.  When you started in banking, do you remember

13   what your first salary was?

14   A.  $27,500.

15   Q.  And when was that?

16   A.  1993.

17   Q.  '93.  Okay.  And do you know when you started at

18   National City Bank what you were making?

19   A.  I believe it was about 48.

20   Q.  And do you -- at the time that you were a manager of the

21   business banking group at M&I, what's your best recollection

22   of what your salary was?

23   A.  I don't recall specifically, like those other two

24   examples, but I guess I would put it in a range of somewhere

25   between 80 to 100 to 110 thousand, something like that.

```
 1    Q.  So that was an annual salary that M&I paid you to be the

 2    manager of the business banking group?

 3    A.  Yes.

 4    Q.  Was it a salary or did you --

 5    A.  Yes.

 6    Q.  Was it a fixed salary?

 7    A.  Yes.

 8    Q.  Was there -- did you get any form of commissions?

 9    A.  There was annual incentive pay, but there wasn't

10    commissions, if I understand what you're asking there.

11    Q.  So, like, if somebody -- if you brought in a deal, you

12    don't get 20 percent of the deal or something like that?

13    Your compensation wasn't, like, directly tied to a -- some

14    piece of business; is that fair to say?

15    A.  Yes, that's fair to say.

16    Q.  Okay.  But you were able to earn a bonus?

17    A.  Yes.

18    Q.  Okay.  And did you get bonuses in the time that you

19    worked at M&I?

20    A.  Yes.

21    Q.  And what do you recall being the kind of bonuses in

22    terms of dollars that you received?

23    A.  Like maybe 10 to 15 thousand dollars, something like

24    that.

25    Q.  Okay.  Was that the range that was achievable?  I mean,
```

Flynn - Direct

1    if you did everything, if you hit the lights out, was that

2    what you would get or could you get more than that?

3    A.  You know, not knowing -- you know, it's been a long

4    time.  Without, you know, knowing the plan in detail, there

5    were a lot of components to that.  So I -- it's hard for me

6    to say really what -- you know, what was achievable under

7    that plan.  Could you make more?  I suppose you could.

8    Could you make less?  Probably that too.

9    Q.  Were there years when you didn't get a bonus?

10   A.  Not that I recall.

11   Q.  Okay.  And the 10 to 15 thousand, I just want to make

12   clear, that's in the time period where you were a manager of

13   the business banking group?

14   A.  Yes.

15   Q.  If we go to -- if we go to, I think, the third page of

16   this exhibit.

17

18           MR. MOHEBAN:  Yeah, that's what we're looking for,

19   the performance categories and weights that are referenced

20   here.

21   BY MR. MOHEBAN:

22   Q.  Okay.  So you talked about this a little bit earlier

23   today.  Let's see if we applied this to the PCI

24   relationship.

25           First of all, let me ask you this:  Were you ever

1    told that you got any portion of a bonus or a raise or any

2    compensation because of your relationship with the Petters

3    account?

4    A.  No.

5    Q.  Okay.  If we look at these financial contribution

6    measures, so when we look at portfolio loan balance growth,

7    do you know how exactly this would work?  Like if you grew

8    your overall loan balance, you could get 15 percent of --

9    that would get you some basis points; is that how that

10   works?

11   A.  Right.  So they would look at your loan balance at the

12   end of the year and then set a baseline growth expectation

13   over that, and that -- whatever that growth was in the loan

14   portfolio would -- basically would be weighted 15 percent of

15   your year-end bonus --

16   Q.  Okay.

17   A.  -- would be based on that specific line item number.

18   Q.  Okay.  So if you got the maximum under loan balance

19   growth, that could have been 15 percent of the 15,000; is

20   that what you're saying?

21   A.  Yeah, something like that.

22   Q.  That could comprise 15 percent of a bonus that could

23   be --

24   A.  Yeah.

25   Q.  -- in that range?

Flynn - Direct

1   A.  Yes.

2   Q.  And then DDA balance growth, what balance are we talking

3   about there?

4   A.  That would have been the average collected balance in

5   the portfolio.

6   Q.  Okay.  And so when we looked at those ACE Reports a

7   minute ago where we saw the R12 numbers --

8   A.  Yes.

9   Q.  -- is that what's being tracked --

10  A.  Yes.

11  Q.  -- with the DDA balance growth?

12  A.  Yes.

13  Q.  And if we thought about that in terms of Petters

14  Company, Inc. during 2008, during that first year, were you

15  seeing DDA balance growth with Petters?

16  A.  I don't remember specifically, but the account, you

17  know, by -- per the ACE Reports was becoming less profitable

18  each month.

19  Q.  And if the source of profitability for a demand deposit

20  account, checking account, is average daily balance and

21  profitability is going down, does it make sense that average

22  daily balance is going down?

23  A.  That seems reasonable, yeah.

24  Q.  Okay.  And that's all for this category -- I mean, is

25  there anything else on this measure here that would -- where

Flynn - Direct

1    Petters -- the Petters relationship could have possibly

2    contributed?

3    A.  Not that I can see, no.

4    Q.  Okay.  Let's talk about outside the bank for a minute.

5    So you had a -- you had occasion to meet some people from

6    Petters, right?

7    A.  Yes.

8    Q.  How many times did you meet with Tom Petters?

9    A.  One time.

10   Q.  Okay.  And did you ever meet in person with Deanna

11   Coleman?

12   A.  I don't believe I did.  I don't believe I ever met her

13   in person.

14   Q.  And at any point in time did you get anything from the

15   Petters people, from Tom Petters, like a -- did they take

16   you out to lunch or buy you dinner?

17   A.  No.

18   Q.  Did they give you sports tickets or send you on a

19   vacation?

20   A.  No.

21   Q.  Did they pay you bribes?

22   A.  No.

23   Q.  So any compensation that you got for your job as a

24   banker was paid to you by M&I?

25   A.  That's correct, yes.

Flynn - Direct

1    Q.   Okay.  Can we go to Exhibit P-19.  So we looked at these

2    earlier as well.

3    A.   Mm-hmm.

4    Q.   These are the dashboards.  And we saw there was some

5    discussion about rising stars and falling stars, right?

6    A.   Yes.

7    Q.   And so when we look at that section -- the whole section

8    has got a title.  What's the title for the entire section?

9    A.   Deposit Customer Relationships.

10   Q.   Okay.  So this is not covering -- is this covering all

11   the customers of the bank or is it just --

12   A.   This -- well, this specific report would be referencing

13   my specific portfolio of clients.

14   Q.   Okay.

15   A.   But each banker would have gotten a similar report.

16   Q.   Okay.  And we've talked about there's different Petters

17   entities, right?  There's Petters Company, Inc., which we

18   mostly talk about, and then there's Petters Capital, then

19   there's Petters Group Worldwide.

20          This refers to Petters Group Worldwide.  Do you

21   understand why it would say that as opposed to Petters

22   Company, Inc.?

23   A.   It was a separate entity from Petters Company.  They

24   were not affiliated.

25   Q.   Okay.  So if Petters Company, Inc. was a rising star, it

Flynn - Direct

1    would say, "Petters Company, Inc." there?  Is that your

2    recollection?

3    A.  Yes.  Yes.

4    Q.  Okay.  Can we also look at P-18.  So on this report I

5    wanted to ask about this sales activity graph, if we could

6    focus on that a little bit.

7             Okay.  What's your understanding of what the

8    meaning is of the term "sales" in this context?

9    A.  New loan sales would be closing new loans with existing

10   clients or with new relationships to the bank.

11   Q.  And what does it mean to say, "New Deposit Sales"?

12   A.  Similar, checking, savings.

13   Q.  Is this bringing in new accounts or is this having

14   higher account balances?

15   A.  You know, I haven't looked at this for so long.  It

16   says, New Deposits Sales," so I believe that's going to be

17   based on new accounts opened.

18   Q.  Okay.

19   A.  So if there were existing accounts that a client had and

20   the balances were growing, I don't believe this graph would

21   have picked that up.

22   Q.  Okay.  All right.  I think that's enough of that.

23             So I now want to go to -- sort of walk through

24   some of the contacts that you had with people at Petters or

25   people that were doing business with Petters.  And with that

1    I want to start with this meeting in 2002.  So that's P-2,

2    page 7, if we could go to that.

3    A.  Okay.

4    Q.  We looked at this just a minute ago, but now I'm going

5    to talk about the substance of the MIContacts, so I think

6    the next page talks about this.

7            So you talked a lot about this.  I'll try to be

8    somewhat surgical in my questions so that we can keep things

9    moving, but the basic idea was that Mr. Vennes had been

10   referred to you by this -- you'll have to pronounce his last

11   name -- Larry K.

12   A.  Kraayenbrink.

13   Q.  Okay.  And he was a colleague of yours?

14   A.  Yes, we worked together.

15   Q.  At a different bank; is that right?

16   A.  We worked together at National City --

17   Q.  Okay.

18   A.  -- when this was -- and I believe he was still -- yeah,

19   he would have still been with us in 2002.

20   Q.  And were the two of you friends?

21   A.  I'd say close acquaintances.

22   Q.  Okay.  When he sends you this opportunity and you go out

23   and meet them, ultimately there is a request for the bank to

24   provide a loan to Mr. Vennes, right?

25   A.  Yes.

1    Q.  Okay.  And tell me what the process is for the bank to

2    evaluate that request and make a decision.

3    A.  Well, first I think you have to just think through how

4    much is being asked for, what is its intended use, what is

5    the likelihood that the borrower will be able to repay the

6    loan under most circumstances.

7           And as you would think through that, you might

8    write up a document to disseminate to others to describe

9    that opportunity and then possibly schedule a meeting to get

10   together with multiple people and just sort of talk it

11   through together.

12   Q.  Well, I guess what I'm driving at:  Is this something

13   that you, as a relationship -- or as a banker going to take

14   a lead, do you make this decision about whether to approve

15   credit on your own?

16   A.  No.  No.

17   Q.  Is there a loan committee?

18   A.  Yeah.  For the most part, people in the role that I

19   serve in most banks do not have credit authority.

20   Q.  I'm sorry?

21   A.  In the sales role, in most banks you typically don't

22   have a great deal of credit authority.

23   Q.  Okay.  So I'm just asking you in this case, and I

24   recognize this is literally 20 years ago.

25   A.  Yeah.

1    Q.  But did you make the decision whether or not to take on

2    this loan?

3    A.  No.

4    Q.  Okay.  And do you recall that there was a process for a

5    loan committee to do that, or how was it decided?

6    A.  It wouldn't have -- you know, it was early stage before

7    anything was going to get prepared for a loan committee.  It

8    would have been -- we discussed it much sooner than that,

9    more preliminary and made the decision that it wouldn't be a

10   fit and there was no reason to try and put together a loan

11   presentation for a credit committee.

12   Q.  And what was the factor that made it not a fit?

13   A.  Mr. Vennes had a previous criminal history.

14   Q.  Did the bank have a policy of not doing business with

15   people who had a prior criminal history?

16   A.  I don't know specifically, but I know that was the

17   reason that we chose not to move forward here.

18   Q.  Okay.  Is, like, having a checking account different

19   from giving a loan in terms of risk to the bank?

20   A.  Yes.

21   Q.  So in evaluating a credit opportunity to make a loan, do

22   you do due diligence?

23   A.  Yes.

24   Q.  And what kind of things do you look for?

25   A.  Financial statements, primarily.  Could look at tax

Flynn - Direct

1    returns.  Could look at other collateral valuation items,

2    things of that nature.

3    Q.  Okay.  And in this case you're saying because of the

4    conviction, you didn't go into the full due diligence; is

5    that what you just said?

6    A.  That's correct.

7    Q.  Okay.  So the bank ultimately did not want to do

8    business with Frank Vennes because of his criminal history;

9    is that right?

10   A.  That's my recollection.

11   Q.  Did he pitch to you that he had reformed and, you know,

12   had seen the light?  Was that part of your meeting?

13   A.  Yeah.  Yeah, it was.

14   Q.  Could you describe what was said.

15   A.  It's been 20 years, but he was upfront that he had been

16   convicted of some crimes.  He went on to explain the rather

17   unusual circumstances that led to that.  And he told us that

18   while in prison he had become much more faith-driven, more

19   religious, and he had essentially gone through a process

20   where he had decided to, you know, walk a better path in his

21   life.  And so I remember that.

22   Q.  Okay.  So another thing that you did as part of this

23   process was, it appears that you created a summary of the

24   meeting for internal use.

25              Can we go to P-11, please.

1           MR. MOHEBAN:  I must have the wrong number written

2     down.  I'm sorry.  Give me one moment.

3        (Defendant's counsel confer)

4           MR. MOHEBAN:  All right.  I had the right exhibit.

5     We just need to keep going.  I need to persevere more.

6           Just keep going down.  There we go.  That's what

7     we're looking for.

8     BY MR. MOHEBAN:

9     Q.  So this is -- I think you testified earlier this is

10    something that you wrote; is that right?

11    A.  Yes, that's correct.

12    Q.  And it's called a pre-screen.  Can you tell the jury

13    what that means.

14    A.  A pre-screen is a less formal process for getting

15    together and discussing an opportunity.  You know, there's

16    not -- it's not an approval request.  It's a discussion on

17    whether or not there's enough merit in this specific

18    opportunity to try and pursue it further.

19    Q.  Okay.  Now, under "Source" you talk about your

20    acquaintance or former colleague, Mr. Stelter, right?

21    A.  Yes.

22    Q.  And let's highlight that.  I'd like to look at what

23    Mr. Stelter told you about Mr. Vennes.  Can you read that.

24    A.  Out loud?

25    Q.  I'll read it.  That's all right.

1    A.  Okay.

2    Q.  "Mr. Stelter has dealt with Mr. Vennes for a number of

3    years and found him to be an excellent business manager and

4    holds Mr. Vennes in very high regard."

5          So you wrote that in here.  Is that accurate?

6    A.  Yeah.

7    Q.  Okay.  And Mr. Stelter liked you, right?  He wasn't

8    trying to set you up with a bad client, right?

9          MR. MARDER:  Objection [inaudible].

10          MR. MOHEBAN:  I'll withdraw it.  I can do a better

11    question.

12          THE COURT REPORTER:  I'm sorry.  Could you repeat

13    that objection again?

14          MR. MARDER:  I said argumentative and leading.

15          MR. MOHEBAN:  I can do a better question.

16          THE COURT:  Okay.  Counsel, we are approaching our

17    closing hour too.

18          MR. MOHEBAN:  I could ask two questions and be

19    done and that would be a good stopping point if that works

20    for you.

21          THE COURT:  Please go ahead.

22    BY MR. MOHEBAN:

23    Q.  Mr. Stelter gave you a positive referral of Mr. Vennes;

24    is that right?

25    A.  Yeah.  He was essentially a character reference.

Flynn - Direct

1    Q.  Okay.  And you shared that with the people who were

2    going to pre-screen the loan --

3    A.  Yes.

4    Q.  -- to decide whether or not to give a loan to

5    Mr. Vennes?

6    A.  Yes.

7         MR. MOHEBAN:  That's a good stopping point right

8    there, Your Honor.

9         THE COURT:  Okay.  Members of the Jury, during

10   this recess and every recess remember that you must not

11   discuss the case with anyone, including other jurors,

12   members of your family, people involved in the case or

13   anyone else.  And don't allow anyone to discuss the case

14   with you or within your hearing.

15        And when I say "do not discuss the case," I also

16   mean do not e-mail or send text messages or blog or engage

17   in any other form of written or electronic communication, as

18   I've instructed you before.

19        Also, do not read any newspaper or written

20   accounts, watch any televised accounts, listen to any radio

21   program about this trial.  And also do not do any or conduct

22   any internet research or consult any other sources about the

23   case, about the people involved in the case, or the general

24   subject matter of the case.

25        As you know, you must keep an open mind that's

1   free of outside information and only in this way will you be

2   able to decide the case fairly based solely on the

3   testimony, the evidence presented in the courtroom, and the

4   instructions that I give you.

5          And it would be a violation of your oath if you

6   based your decision on anything other than that.  So it's

7   important for you to continue to follow these instructions,

8   and I thank you for doing so.

9          We will reconvene at the usual time.  That will be

10  8:30 tomorrow.  So please be prepared to come into the

11  courtroom at that time.  I hope you have a good evening.

12         All rise for the jury.  And thank you for your

13  service.

14         (Jurors excused)

15                       **IN OPEN COURT**

16                     **(JURY NOT PRESENT)**

17         THE COURT:  We will -- you may be seated if you

18  like.  We will convene, as I said, tomorrow at 8:30.

19         And, sir, it is as if you're on the witness stand

20  overnight.  That may sound like a nightmare, but I hope it

21  doesn't.  That is to say do not discuss your testimony with

22  anyone during the course of your evening.  I hope you have

23  other fun things to do.

24         THE WITNESS:  Thank you.

25         THE COURT:  This will conclude our session for

1    today.  Anything further, Counsel?

2              MR. MARDER:  Just very briefly, Your Honor.  It's

3    my --

4              THE COURT:  I should --

5              MR. MARDER:  I'm sorry.

6              THE COURT:  You are excused, sir, so you may go.

7              THE WITNESS:  Okay.  Thank you.

8              MR. MARDER:  Your Honor, it's my understanding

9    that the defendant filed a brief today with the Court around

10   noon relating to the deposition designation, I think it was

11   Mr. Scherer.  And before the Court rules on that, we would

12   just like an opportunity to file a responsive brief, if that

13   would be acceptable?

14             THE COURT:  That is acceptable.  Will you be

15   filing it this evening?

16             MR. MARDER:  If we could file it by tomorrow

17   morning?

18             THE COURT:  Okay.  I will --

19             MR. MARDER:  Thank you.  In addition, Mr. Collyard

20   had one issue to raise.

21             MR. COLLYARD:  Yeah, Your Honor.  We previewed one

22   issue for you regarding a proposed stipulation on -- you had

23   recommended in your order that the parties agree to basic

24   facts about the document destruction, for example, when

25   certain tapes were destroyed and things like that.  We've

1    done our best just to do a page-and-a-half stipulation.

2    It's about eight or

3    nine sentences long, quoting your order.

4            We proposed it last night to the other side.  We

5    understand that they're going to get back to us.  This is

6    important because it could alleviate some of the objections

7    or some of the issues on this briefing with David -- the

8    David Scherer deposition, so I just wanted to alert Your

9    Honor to that.

10           In the event that we can't agree on some of these

11   basic facts that are directly from your order, we would

12   intend to bring a motion asking that those findings be read

13   into the record to try to avoid having to deal with the time

14   of trying to establish this, now that we can't call lawyers

15   to the stand.

16           MR. SCHAPER:  Your Honor, Michael Schaper for the

17   defendant.

18           THE COURT:  Yes.

19           MR. SCHAPER:  We received the proposed stipulation

20   at 10:25 last night.  We're reviewing it.  We think some of

21   it is misleading or unfair.  I won't burden the Court with

22   that.  But we've told plaintiff's counsel that we'll get

23   back to them with some proposed edits, including some

24   proposed stipulations that we had related to the document

25   issue.

1678

1        THE COURT:  Okay.  Very well.  I hope counsel will

2   work together to reach an agreement that is satisfying to

3   both of you.

4        MR. SCHAPER:  And, Your Honor, I know that

5   Mr. Gleeson had one more point to raise with the Court.

6        THE COURT:  Thank you.

7        MR. GLEESON:  Good afternoon, Judge.

8        THE COURT:  Yes, good afternoon.

9        MR. GLEESON:  You, in the pretrial phase, made a

10  ruling that ruled out of bounds any evidence on the part of

11  the -- of BMO Harris Bank of investor complicity in the PCI

12  Ponzi scheme.

13       And in light of the way the examination of

14  Mr. Flynn went this afternoon, we respectfully ask the Court

15  to revisit that ruling and to allow that evidence to be

16  adduced.

17       And the reasons, Judge, are -- the main reason,

18  it's really impossible to overstate how misleading and how

19  unfairly prejudicial the examination of Mr. Flynn was and

20  prejudicial to BMO Harris.

21       And here's the -- Judge, here's the false

22  impression created by the examination of Mr. Marder in broad

23  strokes, and I assure the Court that a review of the

24  transcript will bear this out:

25       The Deposit Account Control Agreements have been

1    cast this afternoon before this jury as a way to protect

2    hedge funds.  The protected parties in those DACAs are hedge

3    funds.  And you heard that phrase "protected parties" used

4    dozens of time to refer to them.

5         They were earlier in the trial referred to in the

6    testimony by Ms. Pesch, because no one knew better in the

7    week after the scheme collapsed, but they were characterized

8    as victims.

9         And the -- and Mr. Marder's examination created

10   the impression that the agreement called for PCI to send

11   transactions lists of funds to be segregated at M&I Bank to

12   protect the hedge funds.  There was also an element that

13   this was kind of a secret agreement between just Mr. Flynn

14   and PCI.

15        And then you'll recall the examination to the

16   effect of:  Well, you never, you, Mr. Flynn, never picked up

17   the phone and called Petters to ask him why didn't you

18   submit those transactions lists?

19        The obvious inference, Judge, is that Mr. Flynn

20   failed to protect Palm Beach, Ritchie, Interlachen from harm

21   by PCI.  That's the false impression.

22        Here's the reality:  The hedge funds entered into

23   those DACAs to defraud their own investors.  Together with

24   PCI they used them, not for the hedge funds to get any

25   protection from PCI, but for the hedge funds to get

1   protection that they needed so their investors wouldn't make

2   capital calls.

3           What the hedge funds did was, in order to make

4   sure their own investors didn't realize how much in default

5   PCI was in 2008, they used rollover notes, which we

6   described in our pretrial briefing, which created the

7   misimpression that notes had not been defaulted upon;

8   roundtrip payments to the hedge funds and back so the hedge

9   funds could show their investors, no, they didn't default,

10  they actually paid; and then these DACAs, which they used, a

11  piece with the rollover notes and the roundtrips, to show

12  their investors that there was protection for them at M&I

13  Bank to fool them into thinking that PCI was not in default.

14          There's really no dispute about much of this.  The

15  principals of Palm Beach went to prison for this.  They --

16  the hedge funds -- one other piece I'll mention to the Court

17  that is part of the false impression.  It's true, as

18  Mr. Marder elicited from Mr. Flynn, it's true that the M&I

19  bankers wondered why these agreements were needed, what

20  value they provided.  And they were scratching their heads

21  because nobody told them that the value was to the hedge

22  funds to keep their investors -- not only keep them at bay,

23  but then to raise additional funds from them to invest in

24  the Ponzi scheme.  One of the investors, Ritchie, literally

25  knew it was a Ponzi scheme.

1   And, you know, without all of the evidence on this

2   issue, the trustee's counsel has been allowed to demonize

3   Christopher Flynn.  Hedge funds could not possibly have

4   relied on the DACAs.  They could not possibly have been

5   deceived by the DACAs.

6   And I'll end where I began, Judge.  You closed the

7   door on us.  We're not -- it's not a motion for

8   reconsideration.  You closed the door on investor conduct

9   for reasons the Court found sufficient, but it's really hard

10  to imagine a door being closed to one party in a case being

11  opened as wide as this door has by the other party.

12  So we ask the Court, respectfully, to revisit that

13  ruling in light of how this -- using this -- these evidence

14  as a sword and then they have a shield that would blow the

15  evidence out of the water.  We ask you to remove that shield

16  and allow us to present evidence of investor complicity in

17  the PCI scheme.

18  Thank you, Judge.

19  THE COURT:  Thank you, Counsel.

20  MR. MARDER:  Your Honor, the defendants have

21  approached both the Bankruptcy Court and this Court on

22  multiple occasions in an effort to offer highly prejudicial

23  evidence relating to investor knowledge, which is completely

24  irrelevant to this case.

25  Most recently this Court ruled very specifically

1    on this issue and it was in conjunction with the motions in

2    limine.  And what you did is reached a compromise, which was

3    a very fair compromise.  You said that investor knowledge

4    was out, but there's certain things that we could do.

5         And what we could do is to offer evidence and

6    testimony which would be directly relevant to the knowledge

7    of BMO Bank.  And you said that if we wanted to prove that

8    M&I entered into a sham Deposit Account Control Agreement

9    that was intended to mislead investors, that that would be

10   acceptable, that that was relevant to M&I's knowledge and

11   state of mind and to their conduct.  And in particular, Your

12   Honor, that's on page 21 of your order.

13        When I asked these questions, I was very, very

14   careful to remain within the scope of what Your Honor had

15   allowed us to do.  I asked the witness if he had entered

16   into the DACA agreement.  I asked him if he understood the

17   DACA agreement.  And then I asked him if he did anything to

18   comply with the agreement.

19        The evidence showed exactly what we said it would

20   show, that he entered into this agreement, that he agreed to

21   review transaction lists, and that he never received such a

22   transaction list and never did anything at all to comply

23   with the agreement, which is exactly what our argument was

24   and it's exactly what the Court said we could do.

25        This evidence was offered for the limited purpose

1    to show that this DACA agreement is a sham.  We did not put

2    in any evidence of whether investors were deceived or they

3    were not deceived.  I didn't even mention that topic and I

4    was very careful to avoid that topic.

5            So, Your Honor, this is essentially, I think, the

6    third time where the defendants have raised this issue of

7    investor knowledge.  The Court has ruled on it repeatedly.

8    He says he's not asking you -- Mr. Gleeson says he's not

9    asking you to revisit your motion -- your order, but that's

10   exactly what he's asking you to do, Your Honor.  And given

11   that we've done exactly what the Court said we could do,

12   there's absolutely no basis for doing that.

13           MR. GLEESON:  Just briefly, Judge.

14           We agree on two things.  The DACAs are a sham.

15   They presented evidence to say they're a sham in a way that

16   disadvantages the hedge funds.  We have powerful evidence

17   that it was a sham between PCI and the hedge funds to

18   deceive the hedge funds' investors.

19           The other thing we agree on is this is very

20   prejudicial evidence we're talking about that we want to

21   produce, but it's not unfairly prejudicial.  That's what's

22   properly precluded.  It's prejudicial in exactly the right

23   way.  It defeats their argument completely and we're not

24   allowed to present it.

25           Thank you, Your Honor.

1      MR. MARDER:  I have nothing further, Your Honor.

2      THE COURT:  Thank you, Counsel.  The matter is

3  taken under advisement.

4      We're in recess.

5   (Recess taken at 5:13 p.m.)

6               *   *   *   *   *

7   (5:14 p.m.)

8                **IN OPEN COURT**

9               **(JURY NOT PRESENT)**

10     THE COURT:  Please be seated.

11     So I am alerted that one of the jurors just

12 notified my judicial administrative assistant that she went

13 to high school with the current witness, Mr. Flynn.  And

14 although it was a small school, she has not stayed in touch

15 with him since high school.

16     I am asking now whether you would like to bring

17 the juror in for any questions regarding this.  She's still

18 in the jury room.

19     MR. MARDER:  Your Honor, could we just consult

20 with each other overnight and raise this issue in the

21 morning or would you need an answer now?

22     THE COURT:  You can consult overnight.

23     MR. MARDER:  Thank you, Your Honor.

24     THE COURT:  And so if you would let me know first

25 thing tomorrow morning.  The juror will have to come and may

```
 1    be sent home, but since we're receiving it at this late
 2    hour, I'll allow you to consult.
 3              MR. MARDER:  Thank you, Your Honor.
 4              THE COURT:  I assume that counsel is okay with
 5    postponing?  I heard from one counsel and not the other.
 6              MR. MOHEBAN:  Yeah.
 7              THE COURT:  You are?
 8              MR. MOHEBAN:  Yes, Your Honor.
 9              THE COURT:  Okay.  Very well.
10              MR. MARDER:  Do we know which juror it is, which
11    juror number?
12              MR. GLEESON:  May I make a suggestion, Judge?
13              THE COURT:  You may.
14              MR. GLEESON:  Can you think about whether we
15    should know which juror it is before you tell us who it is?
16              THE COURT:  Yes.
17              MR. GLEESON:  Thank you.
18              THE COURT:  I always think before I make my
19    decisions, but I appreciate your question and will do so.
20              So we are in recess now.
21              MR. GLEESON:  Thank you, Your Honor.
22              MR. MARDER:  Thank you, Your Honor.
23              (Court adjourned at 5:16 p.m.)
24                        *     *     *
25
```

1          I certify that the foregoing is a true and correct
copy of the transcript originally filed on 12/05/2022 and
2   incorporating redactions requested by Attorney Adine S.
Momoh.
3
                    Certified by:   *s/ Lori A. Simpson*
4
                              Lori A. Simpson, RMR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25