1            UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
4    Douglas A. Kelley, in his      )   File No. 19-cv-1756
     capacity as the Trustee of the )           (WMW)
     BMO Litigation Trust,          )
5                                   )
           Plaintiff,               )   St. Paul, Minnesota
6                                   )   October 21, 2022
     vs.                            )   8:35 a.m.
7                                   )
     BMO Harris Bank N.A., as       )
8    successor to M&I Marshall and  )
     Ilsley Bank,                   )
9                                   )
           Defendant.               )
10   ------------------------------------------------------------

11

12

13       BEFORE THE HONORABLE WILHELMINA M. WRIGHT
             UNITED STATES DISTRICT COURT JUDGE
14
        *    *    *    **REDACTED TRANSCRIPT**    *    *    *
15

16        **(JURY TRIAL PROCEEDINGS – VOLUME VIII)**

17

18

19

20

21

22

23

24
         Proceedings reported by certified court reporter;
25   transcript produced with computer.

```
 1      APPEARANCES:
          For the Plaintiff:        Robins Kaplan, LLP
 2                                   MICHAEL A. COLLYARD, ESQ.
                                     DAVID E. MARDER, ESQ.
 3                                   PETER C. IHRIG, ESQ.
                                     MORGIA D. HOLMES, ESQ.
 4                                   MICHAEL D. REIF, ESQ.
                                     800 LaSalle Avenue
 5                                   Suite 2800
                                     Minneapolis, Minnesota 55402
 6
                                     Anthony, Ostlund, Louwagie,
 7                                   Dressen, Boylan, P.A.
                                     JOSEPH W. ANTHONY, ESQ.
 8                                   JOSEPH R. RICHIE, ESQ.
                                     RYAN M. LAWRENCE, ESQ.
 9                                   90 South Seventh Street
                                     Suite 3600
10                                   Minneapolis, Minnesota 55402

11        For the Defendant:        Stinson, LLP
                                     KEITH S. MOHEBAN, ESQ.
12                                   ADINE S. MOMOH, ESQ.
                                     50 South Sixth Street
13                                   Suite 2600
                                     Minneapolis, Minnesota 55402
14
                                     Debevoise & Plimpton, LLP
15                                   JOHN GLEESON, ESQ.
                                     MICHAEL SCHAPER, ESQ.
16                                   SUSAN REAGAN GITTES, ESQ.
                                     MORGAN A. DAVIS, ESQ.
17                                   919 Third Avenue
                                     New York, New York 10022
18
                                     Mayer Brown, LLP
19                                   JOSHUA D. YOUNT, ESQ.
                                     71 South Wacker Drive
20                                   Chicago, Illinois 60606

21                                   Mayer Brown, LLP
                                     RICHARD A. SPEHR, ESQ.
22                                   GINA PARLOVECCHIO, ESQ.
                                     1221 Avenue of the Americas
23                                   New York, New York 10020

24        Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                     316 North Robert Street
25                                   St. Paul, Minnesota 55101
```

1                              **I N D E X**

2                                                                    PAGE

3       **DOUGLAS KELLEY**
             **CROSS-EXAMINATION** (Continued) by Mr. Spehr          2012
4            Cross-Examination (Continued) by Mr. Spehr              2012
             Redirect Examination by Mr. Anthony                     2029
5
        **CATHERINE GHIGLIERI**
6            Direct Examination by Mr. Anthony                       2038

7

8       PLAINTIFF'S EXHIBITS                                         REC'D
             572                                                     2091
9            573                                                     2081
             578                                                     2059
10           695                                                     2049
             703                                                     2136
11           705                                                     2156
             706                                                     2173
12           713                                                     2128

13

14      DEFENDANT'S EXHIBITS                                         REC'D
             9000                                                    1997
             10014                                                   1996
15           10111                                                   2018

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2    **IN OPEN COURT**

3    **(JURY NOT PRESENT)**

4    THE COURT:  Good morning.  Please be seated.

5    LAW CLERK:  The case before the Court is

6    19-cv-1756, Kelley vs. BMO Harris.

7    Counsel, please stand and note your appearances

8    for the record.

9    MR. ANTHONY:  Good morning, Your Honor.  Joe

10   Anthony for plaintiff.

11   THE COURT:  Thank you.  Good morning, Mr. Anthony.

12   MR. GLEESON:  Good morning, Judge.  John Gleeson

13   for the defendant BMO Harris Bank.

14   THE COURT:  Thank you.  Good morning, Mr. Gleeson.

15   We have some matters that we need to address with

16   regard to demonstrative exhibits.  Are the parties ready to

17   address those now?

18   MR. LAWRENCE:  Yes, Your Honor.

19   MR. SCHAPER:  Yes.

20   THE COURT:  And will you be addressing all of them

21   or how do you propose to do that?

22   MR. SCHAPER:  Yes, we will address all of them.

23   THE COURT:  You will all address all of them and

24   then counsel will respond to all?

25   MR. LAWRENCE:  Yes, Your Honor.

1    THE COURT REPORTER:  Can you remind me who you

2  are?  I'm so sorry.

3    MR. LAWRENCE:  Ryan Lawrence on behalf of the

4  trustee.

5    THE COURT REPORTER:  Thank you.

6    THE COURT:  Thank you.

7    MR. SCHAPER:  Your Honor, maybe we will just go

8  quickly to the defendant objections to the plaintiff's

9  demonstratives, some of which have been resolved.

10    So in our e-mail this morning, we had three

11  enumerated items for the Court.

12    THE COURT:  Yes.

13    MR. SCHAPER:  We have resolved with plaintiff's

14  counsel Objection Number 2, their images of a red flag.

15  They have removed them.  And we have also resolved Objection

16  Number 3 having to do with the wording around the

17  "round-trip transactions" that they put up on the slide.  So

18  I appreciate plaintiff's counsel's meeting and conferring on

19  that.

20    THE COURT:  Terrific.

21    MR. SCHAPER:  We maintain our objection to Item 1,

22  the reference to using the term "known money launderer."

23  Plaintiffs were willing to drop the word "known" and just

24  say "money launderer."  We still believe that that

25  improperly implies a conclusion being made by an expert

1    witness about the knowledge of M&I Bank or its employees.

2    The Court has already excluded Ms. Ghiglieri from testifying

3    about willful blindness or knowledge by bank employees and

4    their mental state, so we maintain that objection.

5         The plaintiff had the ability to cross Mr. Flynn

6    this week on this issue.  They did so.  If they want to make

7    arguments that flow from that in summation, that's fine, but

8    it's not proper for an expert witness to be testifying about

9    that.

10         THE COURT:  And so your objection is to both

11   "known" and "money laundering"?

12         MR. SCHAPER:  That's correct.

13         THE COURT:  "Money launderer."

14         MR. SCHAPER:  That's correct, Your Honor.  And

15   maybe I will stop there before we move on to plaintiff's

16   objections if plaintiff's counsel wants to be heard.

17         THE COURT:  Response, please.

18         MR. LAWRENCE:  Yeah, I think that makes more

19   sense.

20         Thank you, Your Honor.  And, again, Ryan Lawrence

21   on behalf of the trustee.

22         THE COURT:  Yes.  Good morning.

23         MR. LAWRENCE:  First, with respect to "known money

24   launderer," that issue is moot because the trustee has

25   already agreed to remove the word "known" out of the

1   demonstrative.  So the dispute is simply whether we can

2   present a demonstrative that says that Vennes was a money

3   launderer.

4        The defendant argues that that goes to knowledge,

5   but there's nothing in the demonstrative that suggests that

6   we're saying that the bank knew or any individual knew he

7   was a money launderer.  The fact that Frank Vennes was a

8   money launderer is essentially undisputed.  It is in the

9   record.  It's come in in various forms.  Plaintiff's

10   Exhibit 2, the MIContacts reports, has extensive discussion

11   of the money laundering conviction.  Witnesses have

12   testified about that, including Chris Flynn, who testified

13   about his knowledge of the fact that Mr. Vennes was a money

14   launderer and Exhibit 333-R, the post rate analysis, also

15   includes discussion of Mr. Vennes' money laundering

16   conviction.

17        Ms. Ghiglieri -- let me back up for one moment.

18   This slide is simply setting out the various red flags that

19   Ms. Ghiglieri is going to provide testimony about, and one

20   of those red flags is that Mr. Vennes was a money launderer,

21   and what Ms. Ghiglieri is going to testify to is that the

22   bank had access to the information that he was a money

23   launderer.  And that does not fun afoul of the Court's order

24   because she's not going say what any individual knew or

25   didn't know.  Consistent with the Court's *Daubert* ruling,

1   she's going to testify about observable facts that were

2   available to the bank.

3           This is a demonstrative simply outlining areas of

4   testimony she's going to provide, and there's nothing

5   prejudicial or improper about saying she's going to testify

6   about the fact that's in the record that he was a money

7   launderer.

8           THE COURT:  Is there anything more on this

9   objection?

10          MR. SCHAPER:  No, Your Honor.

11          THE COURT:  Okay.  Then I will overrule the

12  objection now that the "known" language -- the language or

13  term "known" is taken out of the description or use of the

14  term.

15          MR. SCHAPER:  Your Honor, the other and more

16  important matter is plaintiff's objection to defendant's

17  demonstratives, and it's not just defendant's demonstratives

18  which relate to the federal board examinations of M&I Bank,

19  but they also are asking the Court to exclude a number of

20  exhibits, in particular the fed's examination letters to the

21  bank.

22          This is a very important issue, Your Honor.  This

23  evidence is clearly relevant and admissible; and even if

24  there was any question, the plaintiff has already put at

25  issue the federal exams in this trial, and so it would come

1    in in any event.

2             So in terms of relevance, Your Honor, both parties

3    throughout the case have relied on what the fed exam -- what

4    the fed has done in its exams of M&I Bank.  The fed conducts

5    regular annual exams of the bank's BSA/AML compliance

6    program.  The plaintiff's expert has put that at issue in

7    her report.  She says that, "In 2003, the Federal Reserve

8    took an enforcement action against the bank to require

9    improvements in its BSA compliance, including implementing

10   an automated account monitoring system."  Our experts have

11   opined on it as well.

12            That's important because much of the plaintiff's

13   case is about whether our compliance program was adequate.

14   In fact, the first opinion in Ms. Ghiglieri's report is

15   that, "The bank's BSA/AML policies, procedures and systems

16   were severely flawed."  That's her first opinion.

17            The letters also are relevant to show that M&I

18   worked diligently with federal officials, thereby rebutting

19   the trustee's evidence that M&I ignored or turned a blind

20   eye to fraudulent activity.

21            Plaintiff suggests that the Court's order related

22   to federal investigations precludes this evidence.  That's

23   just not right for several reasons.

24            First, the fed exams were not before the Court on

25   the plaintiff's motion in limine.  The plaintiff's motion in

1  limine was about keeping out evidence regarding FBI

2  investigations and the like.  In fact, in their motion, the

3  plaintiffs disclaimed the notion that the fed exam evidence

4  would be out.  They told the Court, quote, plaintiff itself

5  intends to offer into evidence certain documents relating to

6  the examinations that indicate that FRB Chicago -- that's

7  the fed -- repeatedly found deficiencies in BMO's BSA/AML

8  procedures.  That's their motion at page 10.  They

9  disclaimed that that was part of the motion.  And,

10  Your Honor, so for them to do a 180 and now come to the

11  Court and say that Your Honor's decision on the motion keeps

12  that out is respectfully disingenuous.

13          Even looking at the text of Your Honor's order,

14  you said that evidence could be relevant to show that M&I

15  worked diligently with federal officials, thereby rebutting

16  the trustee's evidence that M&I ignored or turned a blind

17  eye to fraudulent activity.  And also that evidence may be

18  admissible to the extent that it is sufficiently probative

19  of M&I's knowledge, state of mind, or conduct.

20          Just backing up a half a step, Your Honor, the

21  federal examinations of BSA/AML compliance are not

22  investigations.  That's not an investigation by the fed in

23  the same way that the FBI investigates potentially unlawful

24  activity, which was the subject of your motion.

25          If the fed is going to do an actual investigation

1        for something like fraudulent activity, that's a different

2        animal.  That's not what is the subject of the fed exam

3        letters that we think we should be able to cross

4        Ms. Ghiglieri on and should be in evidence.  It's just a

5        different thing in the federal banking regulatory scheme.

6             Your Honor, just by way of example, when the fed

7        provided feedback to the bank in 2003, the feedback that

8        Ms. Ghiglieri stresses in her opinion, the fed said that the

9        bank needed to improve.  It said that the compliance program

10       was inadequate at the time.  The bank owned that, and we're

11       going to put on evidence in this case to show what the bank

12       did to improve its programs, and for the remainder of the

13       relevant period, the program was rated adequate or

14       satisfactory.  And that shows that how -- what the bank's

15       conduct was and what its reaction was to the fed feedback,

16       to use words from Your Honor's order.

17            And when M&I then received positive exam results

18       for the rest of the relevant period from the fed, it had

19       good reason, going to its state of mind, not to do things

20       differently.  To keep making the progress it was, whereas,

21       as plaintiffs would have it, there were red flags all over

22       the place.  You've heard that.  You will hear it from

23       Ms. Ghiglieri this morning or this afternoon.  But the

24       feds -- the bank's state of mind was such that it was

25       getting positive feedback.  It wasn't getting the kind of

1   feedback that the plaintiff now suggests would have had it

2   do something differently.

3           The evidence is otherwise admissible, Judge.

4   These are public records.  Even if not, they would come in

5   for state of mind.

6           Now, I mentioned, Your Honor, that the plaintiff

7   has already put the exams and these issues at issue in this

8   trial.  A couple points.

9           One, plaintiff said in opening that banks have a

10  responsibility to detect and prevent suspicious activity on

11  their accounts.  They said it's a responsibility that all

12  banks must live up to.

13          That responsibility does not exist in the ether or

14  in a vacuum.  It's a responsibility that flows from the

15  obligations that the bank has under federal banking rules

16  and what -- and the main way that that is monitored by the

17  government is through annual fed examinations.

18          So it can't be that plaintiff can say here's what

19  the bank has to do and then act as though nothing else sort

20  of existed in the landscape that the bank operated under day

21  to day, like all banks do.  It's a very heavily-regulated

22  industry.

23          Ms. Ghiglieri is a former bank regulator, and I'm

24  sure that plaintiff will draw that out when they go through

25  her qualifications.  She says, I approached this assignment

1    and did my analysis in the same way I would have as a

2    regulator.  It can't be that she can put on opinions under

3    the guise of doing the same thing as a regulator and we're

4    prohibited from crossing her on what the actual regulator

5    did at the actual time that the events in question were

6    taking place.  That would be unfair and prejudicial.

7              Now, I would like to just give you two brief

8    examples or maybe three, Judge, of how the plaintiffs have

9    specifically put this at issue in this trial.

10             The second witness was by deposition designation,

11   Ms. Hile, and plaintiff asked the following series of

12   questions:

13      "Did you ever provide -- do you know if M&I ever

14   provided any of those procedures or guidelines to the

15   Federal Reserve?"

16      Answer:  "I believe my recollection is that the

17   procedures were provided to the fed -- Federal Reserve."

18      Question:  "Was that done on an annual basis to the best

19   of your recollection?"

20      A.  "I don't recall" -- Answer:  "I don't recall."

21      Question:  "What would be the purpose for providing them

22   to the Federal Reserve?"

23      Answer:  "So that they could ensure that they were good

24   procedures that were following the law and that we were

25   adhering to the procedures."

1    Question:  "Would they provide feedback to M&I?

2    Answer:  "I would say yes."

3         It cannot be that the plaintiff can bring out the

4    fact that the fed was overseeing what the bank was doing,

5    that the fed was giving them feedback on what the bank was

6    doing, and then us not be able to fill in that huge blank

7    left by that line of questioning as to what that feedback

8    was, good or bad, and we'll put on both good or bad, but it

9    can't be that we can't put it on.

10        The next time that this came up with a live

11   witness was Ms. Ramlow during the plaintiff's examination of

12   her.

13   Question:  "Do you understand that there was initiative

14   at the bank back in the 2004-2005 time period while you were

15   in the AML Group to educate employees on the

16   responsibilities or importance of identifying and reporting

17   suspicious activity?"

18   Answer:  "I do remember."

19   Question:  "What was the reason for that?"

20   Answer:  "I don't remember."

21   Question:  "Do you recall that the Federal Reserve Bank

22   of Chicago had criticized the anti-money laundering program

23   at the bank back in 2003 or so?"

24   Question:  "Do you know, Ms. Ramlow, that there was

25   any -- do you know that there was any commentary by the

1    Federal Reserve back in 2003 about the bank's anti-money

2    laundering program at the time?"

3              That was a question put by plaintiff's counsel in

4    front of the jury.

5         The answer was:  "I was an analyst, so I wasn't in on

6    all of the conversations to know."

7              But the issue is squarely teed up by the plaintiff

8    in this case.

9              Somewhat related issue, Judge, you've heard

10   multitude of questions from plaintiffs about the filing of

11   SARs, about whether suspicious activity was reported.  Those

12   issues are overseen by the government.  If the bank was

13   derelict in whatever obligations it has to file SARs, the

14   government would be all over that.  That would be noted in

15   fed exam letters and elsewhere.

16             They asked Mr. Jambor 25 times, Did you file a

17   Suspicious Activity Report?  Did you report it on the

18   Suspicious Activity Logs?  And to say now that evidence of

19   whether the government said anything to that effect cannot

20   come in would be highly prejudicial.

21             So, Your Honor, the last two things I would close

22   with, I think there's no basis -- there's certainly no basis

23   to exclude the evidence, the actual defendant exhibits that

24   are subject to the e-mail that you received this morning.

25             We think that the demonstratives that we would

1    intend to use with Ms. Ghiglieri fairly draw out this point,

2    fairly draw the distinctions between what her analysis was

3    and conclusion; namely, that the bank's compliance programs

4    were severely flawed.  We think we fairly draw a contrast

5    with what the fed found at the time, and so that those

6    demonstratives are fair and should be able to be used with

7    this expert witness.

8            If for any reason the Court disagrees with that,

9    there certainly is no basis to keep out the underlying

10   evidence or to preclude us from questioning the witness on

11   the underlying evidence, which, by the way, Your Honor, I

12   should have mentioned, Ms. Ghiglieri cites all of these fed

13   exam letters in her expert report.

14           And so another issue is if the plaintiff is going

15   to get up here and tell you that actually, well,

16   Ms. Ghiglieri is going in a different direction in her

17   testimony, that's a violation of Rule 26.  Her opinions that

18   were disclosed to us are her opinions.  They can't come now

19   to court and say, Well, you're going to hear a different

20   thing, Judge.  She's not going to talk about that.  And even

21   if they say that, we still have the right to examine her on

22   her credibility as to why in 2018 her opinion was X; and if

23   she's coming to the stand and backing away from that, we

24   have the right to cross-examine her on that as an expert

25   witness.

1           The last thing I would say, Judge, is with respect

2      to other ways that the examination evidence will come into

3      this trial, the plaintiffs had on their list several other

4      AML witnesses.  They decided not to call them.  We will put

5      them on for the Court and the jury, including the people

6      directly involved in this federal examination procedure,

7      including the recipient of the federal examination letters,

8      Mr. Janczak, who was the bank's head of compliance.  And

9      we'll put that in front of the jury with a fact witness, and

10     it will all tie together with what we'll do with

11     Ms. Ghiglieri today.  So we would ask that Your Honor deny

12     the objections from the plaintiff.

13           MR. LAWRENCE:  Thank you, Your Honor.  Ryan

14     Lawrence again on behalf of the trustee.

15           The documents and information regarding the

16     Federal Reserve's recommendations and the bank's responses

17     to those recommendations are inadmissible under Rules 401,

18     402, and 403; and, frankly, it's our position that the Court

19     has already ruled on this issue, both in its order on the

20     motions in limine and in its *Daubert* ruling which is

21     incorporated in the motion in limine order.

22           Specifically in the Court's order on the motions

23     in limine, on page 17, the Court ordered that M&I's state of

24     mind, knowledge and conduct are relevant to the trustee's

25     claims, but the state of mind, knowledge, and conduct of

1    third-party investigators have no apparent relevance.

2           The Court then went on to note that, as addressed

3    in the *Daubert* order, the knowledge or mental state of one

4    person or entity has little or no probative value as to the

5    knowledge or mental state of another person or entity.

6           And what that incorporates specifically from the

7    Court's *Daubert* order, which is located on page 18, footnote

8    5 of that order, the Court held that Mr. Charles Grice,

9    BMO's expert, opines that PCI's fraud avoided detection from

10   others because of its complexity, because the funds flowing

11   through the PCI account were intentionally designed to avoid

12   detection, and because the Federal Reserve Bank investigated

13   PCI's account and identified no concerns about how M&I

14   handled that account.  These opinions all involve

15   speculation about the knowledge, intent and mental states of

16   M&I, its employees, and third parties.

17          So coming into the trial, the trustee, following

18   the Court's orders, understood that the Court had already

19   ruled that Ms. Ghiglieri and other witnesses are not

20   supposed to be testifying about what the Federal Reserve

21   believed, what it thought about the extent to which the bank

22   was complying with regulations and any findings that the

23   Federal Reserve made, and we do not intend for Ms. Ghiglieri

24   to offer that testimony.

25          I hear from opposing counsel that they think that

1    she's going to do that and that it's disclosed in her expert

2    report, but what is disclosed in the expert report is really

3    not what's at issue because the expert reports preceded the

4    Court's orders; and the parties have to follow the Court's

5    orders, and we intend to do that.  So it is our position

6    that the Court has already held this information is

7    inadmissible on the basis of relevance.

8            The Court also held that there were substantial

9    concerns under Rule 403 about the prejudicial impact and the

10   misleading impact of this information, specifically on page

11   17 of the motion in limine order, holding that whatever

12   probative value this information might have is substantially

13   outweighed by the danger of prejudice, including because the

14   jury might give the conclusions of federal investigators

15   weight that the jury might substitute for its own

16   conclusions.

17           And that is precisely what we believe the bank is

18   trying to do here, where they are going to suggest to the

19   jury that because the Federal Reserve examined the bank and

20   found certain aspects of the bank's policies to be adequate,

21   that that means that they were, and that they were

22   consistent with industry standards.  And the potential

23   prejudicial impact of that on the jury is substantial.

24           This is especially true because we believe that

25   what the bank is going to imply is that the Federal Reserve

1   evaluated the specific transactions at issue in this case

2   and determined that there was nothing suspicious about those

3   transactions, and that's just not what happened.

4           So the risk -- whether the bank says that or not,

5   the risk that the jury is going to think that that's what

6   the fed did when it then issued these recommendations that

7   found certain aspects of the regulations to be adequate, is

8   substantially outweighing whatever minimal probative value

9   this information has.

10          THE COURT:  Why can't this be addressed with a

11  limiting instruction?

12          MR. LAWRENCE:  A limiting instruction would

13  certainly help, Your Honor, but I don't think it cures the

14  issue completely, in part because the jury will find it

15  difficult to put out of their mind exactly what the findings

16  of the fed were.  So it will help --

17          THE COURT:  Jurors do difficult work every day,

18  but we presume that they follow the instruction when given

19  an instruction, correct?

20          MR. LAWRENCE:  Yes, Your Honor.  That also does

21  not resolve the relevance concern that I addressed earlier,

22  although it would help with the prejudice, Your Honor.

23          THE COURT:  Okay.

24          MR. LAWRENCE:  There was argument from opposing

25  counsel that the Court -- or the trustee has opened the door

1  because it elicited certain testimony that mentioned the

2  Federal Reserve, and merely mentioning the Federal Reserve

3  does not open the door to this issue.  None of the testimony

4  that has come into the court so far implicates the

5  recommendations or finding of the fed.  There were questions

6  about the education that certain bank employees had, but

7  what I'm hearing from the bank is that there's sort of

8  ephemeral in the air opening the door here because we

9  happened to be talking about the fact that the fed exists,

10  that the fed provides oversight to the bank, that there's a

11  regulatory scheme.  And merely mentioning those facts does

12  not specifically implicate the recommendations that the fed

13  made, sent to the bank, and the specific response that the

14  bank made.

15         So, respectfully, the trustee has not opened the

16  door to this issue.  I want to be very clear Ms. Ghiglieri

17  does not intend to testify about this issue because we

18  understood the Court has precluded that, and we believe that

19  that resolves the vast majority of the bank's concern about

20  its need to put this testimony on.

21         THE COURT:  Thank you, Counsel.  I'll hear a brief

22  rebuttal.

23         MR. SCHAPER:  I will be brief, Your Honor.  I

24  don't understand how the plaintiff characterizes the

25  testimony they elicited as a brief mention of the fed.  The

1       testimony that I read for the Court specifically asks about

2       fed exams, specifically about fed exams in 2003, what did

3       the feds say.  Not just the fact that there is such a thing

4       as a fed.  So that's -- that misses the mark.

5             Your Honor, as you said, to the extent that there

6       is any risk of prejudice, first of all, we don't think

7       there's any risk of unfair prejudice.  These are the facts

8       that happened at the time.  The Court can give a limiting

9       instruction and that would address the issue.

10            Just briefly, suggesting that this issue was

11      squarely ruled upon by *Daubert* or the motions in limine

12      makes no sense.  Our expert talked about the fed exams in

13      his report.  They filed a *Daubert* motion.  Nowhere in that

14      *Daubert* motion did it say those opinions should be excluded

15      because the fed stuff is out.  It's irrelevant.  That just

16      didn't happen.  And there's a reason it didn't happen,

17      because they've thought it's relevant all along, as have we.

18      It is relevant.  It's clearly relevant.

19            And, again, Judge, the federal board doing annual

20      routine statutory exams, it's not an investigation.  It's

21      not an investigator.  We're not going to say that they did

22      an investigation about how M&I handled the PCI account

23      specifically.  That didn't happen.  We're not going to do

24      that.  And to the extent they say, Well, maybe there will be

25      some implication, as the Court said, that can be addressed

1    by a limiting instruction.

2              Thank you, Your Honor.

3              THE COURT:  Thank you, Counsel.

4              MR. LAWRENCE:  Nothing further, Your Honor.  We'll

5    rest on our prior statements.

6              THE COURT:  Okay.  So I am going to deny the

7    motion or the request to put counsel on the stand.  There's

8    no basis, no reason for relitigating this matter.

9              I'll take under advisement the curative

10   instruction issue and I'll research that over lunch and also

11   address any other matters related to spoliation at that

12   time.

13             MR. SCHAPER:  Your Honor, just for clarity, did

14   the Court intend to rule on the objection about the fed exam

15   evidence?  I think the Court just referenced denying the --

16   I think the plaintiff's objection as to conduct of counsel,

17   but I don't know, respectfully, whether the Court misspoke

18   on that, and then --

19             THE COURT:  Well, no, as to this, I'm reserving

20   after the direct examination.

21             Are we ready to proceed?

22             MR. ANTHONY:  Yes, Your Honor.

23             MR. SPEHR:  We are ready.  I have two very brief

24   housekeeping matters for Your Honor, if I might, before we

25   put the witness back on.

1    By stipulation the parties have agreed that

2    DX-10014 should come in evidence, Your Honor.

3    THE COURT:  The parties have stipulated to that;

4    is that right?

5    MR. ANTHONY:  So stipulated, Your Honor.

6    THE COURT:  Okay.  It is received.

7    MR. SPEHR:  Second matter, Your Honor, again very

8    housekeeping in nature --

9    MR. ANTHONY:  Your Honor, that stipulation was

10   subject to no questions being asked about the document by

11   defense counsel, correct?

12   MR. SPEHR:  Yeah, we agree.

13   THE COURT:  I'm going to take a brief recess and

14   then are we ready to move forward?

15   MR. SPEHR:  I just wanted to touch on the second,

16   again, very brief housekeeping matter.  This document is not

17   in evidence, but it is DX-10124, which are plaintiff's

18   responses to a set of requests for admissions.  I was going

19   to use this document this morning and offer it in evidence,

20   and I realized that the electronic lawyers' signature page

21   is not attached to it.  So I had someone run down the full

22   document with the electronic signature page, which we will

23   offer as DX-9000.  I just wanted to make sure that the Court

24   understood that before I took the witness through it.

25   THE COURT:  Okay.  So both will be in evidence?

```
 1              MR. SPEHR:  I think I will just mark for
 2     identification DX-9000, and I will offer DX-9000 with a
 3     handwritten DX-9000, which we will supplement with the --
 4              THE COURT:  Understood.
 5              MR. SPEHR:  -- electronic exhibit sticker later.
 6              MR. ANTHONY:  Your Honor, I'll just need to see
 7     that before I can respond to it and confirm it with my
 8     client.
 9              THE COURT:  Okay.  We will take a brief recess.
10         (Recess taken at 9:04 a.m.)
11                        *    *    *    *    *
12         (9:08 a.m.)
13                         IN OPEN COURT
14                       (JURY NOT PRESENT)
15              MR. SPEHR:  Your Honor, one more housekeeping
16     matter, which is that DX-9000, which I just referenced in my
17     earlier comments, has now been stipulated, and I offer it in
18     evidence.
19              MR. ANTHONY:  So stipulated, Your Honor.
20              THE COURT:  Okay.  Then it is received.
21              Also, I want to raise the issue of a curative
22     instruction and let you know that this is what I plan to do.
23     I will hear any comments regarding that.
24              The curative instruction is:  "Yesterday
25     Mr. Kelley testified to his personal opinions about what M&I
```

1    employees should have done with regard to PCI's account.

2    You, Members of the Jury, are reminded that you are the sole

3    judges of the facts in this case.  At the end of trial I

4    will instruct you about the law that applies to this case

5    and you will make the ultimate decision as to the facts."

6           Is there any objection to that?

7           MR. ANTHONY:  Here's my observation, Your Honor,

8    on that curative instruction.  The curative instruction that

9    was requested was based on the allegation that plaintiff

10   provided testimony regarding his personal opinions on the

11   merits of his lawsuit and the legal standards governing this

12   lawsuit.  I don't think he did either one of those things in

13   the question and answer.  He didn't mention legal standards

14   or merits at all.  And the question to which the objection

15   was lodged, the question was:  "What did BMO do or didn't do

16   in general terms that you think caused the losses to PCI?"

17   That was a fair fact-based question on damages, causation,

18   what caused the losses.  And he responded with what he

19   thinks caused the losses.

20          A plaintiff can always comment on what he or she

21   thinks caused the losses.  He didn't mention -- he said, I

22   think they should have investigated more fully, reported it,

23   and let people know what was going on.  That is not legal

24   standards, merits.  It's causation, fact based.

25          Remember counsel elicited a fair amount of

1    testimony from Mr. Kelley on cross to the effect that an

2    extensive investigation was done by Mr. Kelley and his team

3    during this time as trustee for 14 years; and based on that

4    extensive investigation, which was elicited by counsel for

5    the defendant, he was permitted to say what caused the loss.

6         I think the curative instruction is unduly

7    prejudicial, brings attention to something that will

8    confuse, not illuminate, and will be, in fact, I think

9    repetitive of what you're going to say and have told us you

10   are going to say when you instruct the jury as to what their

11   duty is.  So I think it would be unduly prejudicial at this

12   time to do that.

13        THE COURT:  It's prejudicial at this time, but not

14   at the end?

15        MR. ANTHONY:  No, because I think at the end

16   what -- you are going to tell the jury that they are to

17   decide the case based on the evidence and the facts.  And

18   pointing it out now I think is unduly prejudicial because it

19   suggests that Mr. Kelley did something wrong when he didn't.

20   He responded fairly to a question that was put to him after

21   an extensive investigation that he did, and how else could

22   he testify other than the way he did?  It was fact based.

23   And you asked us to elicit the facts, and I did that in a

24   very narrow fashion with no narrative answer, no question

25   provoking.

1          So I think it would be unfair and unduly

2     prejudicial at this time to issue that curative instruction.

3     Thank you, Your Honor.

4          MR. GLEESON:  Just briefly.

5          THE COURT:  Yes, Counsel.

6          MR. ANTHONY:  Your Honor, I don't object to

7     Mr. Gleeson responding, but I think the Court's order was

8     that whoever was doing the questioning and the objecting

9     were going to argue.  If we are going to expand it to allow

10    anybody from the team to argue, I'm fine with that.  But I

11    just would like to know if that's going to be the standard,

12    I'm fine with it, but if it's not the standard and we're

13    going to stick to the lawyers who were involved in the fray,

14    which were me and Mr. Spehr, I would just like to know that.

15         MR. GLEESON:  I would like to ask leave of Court

16    to briefly address this.

17         THE COURT:  You may.

18         MR. GLEESON:  Thank you, Judge.  The testimony

19    yesterday included the following question:  "What did BMO do

20    or didn't do in general terms" -- this is from 1951 of the

21    transcript, line 6.  "What did BMO do or didn't do in

22    general terms that you think caused the losses to PCI?"

23    "Objection."  "Overruled."  And he gave a long answer

24    regarding facts.

25         And, Judge, parties to cases typically, I think,

1    never get to get on the witness stand and take the place of

2    the percipient witnesses that need to be called to prove a

3    party's claim.

4          So the -- we see the Court has struck from the

5    proposed instruction irrelevant.  With respect, we think his

6    factual views are, as Mr. Spehr said yesterday, relevance,

7    403, hearsay.  But this is not -- I think the jury needs to

8    be told the Court permitted, within its broad discretion, a

9    great deal of testimony about Mr. Kelley's stature in the

10   community and the things that he's done.  They did that --

11   I'm sure counsel did that to make sure that the testimony

12   that he gave would have great weight.

13         So with respect, this correction, we're not saying

14   he did anything wrong.  We want the Court to point out, as

15   the proposed instruction does, that the evidence in the case

16   comes from the percipient witnesses; that his view about the

17   merits of the case -- I don't mean to paraphrase the

18   proposed instruction.  We think it's important that it be

19   done and that it be done now so the jury doesn't sit for a

20   week or two, however long it takes for the case to get to

21   the jury, with this belief that Doug Kelley's --

22   Mr. Kelley's belief about the -- what happened, when he

23   wasn't even involved until after it all ended, is evidence

24   in the case.  It's not.

25         So thank you, Judge.

1          MR. ANTHONY:  Your Honor, if Mr. Kelley's view of

2     the facts are irrelevant, then why did the defense counsel

3     spend so much time questioning him yesterday about his view

4     of the facts after he did his investigation with respect to

5     whether Mr. Petters did anything wrong, Ms. Coleman did

6     anything wrong?  They were asking him at length about the

7     facts of the case and the facts of the Ponzi scheme, but

8     they want to prevent us from asking the same facts.  And

9     that was the point that I was inartfully trying to make

10    yesterday to you, Your Honor.

11          They have tried to squelch Mr. Kelley's ability to

12    describe the same set of facts that they are now eliciting

13    from him on cross.  We saw at length Mr. Spehr asking him

14    questions about, Well, you did an investigation, an

15    extensive one, and you found that Mr. Petters did this and

16    you found that Ms. Coleman did that.  And because they did

17    that, PCI -- you pled PCI guilty.  Where's the -- I can't

18    even say the word -- percipient witness for that rule?

19          So we just want to have the same rule they have.

20    And given the cross-examination so far, I think I'm entitled

21    to ask the same questions they asked about the investigation

22    that was done and the facts that were revealed.

23          So I would ask that the Court not issue a ruling

24    at this time because of what the defendants did on

25    cross-examination and the incongruity in the argument they

1   are making right now.

2           MR. GLEESON:  One brief response, Judge?

3           THE COURT:  Yes.

4           MR. GLEESON:  Mr. Kelley was questioned about his

5   own actions.  He pled guilty on behalf of PCI.  Mr. Spehr's

6   factual questions to him related to actions where he was the

7   actual witness who perceived the events, a percipient

8   witness, and that doesn't alter the fact that his view about

9   what happened pre-2008 as a factual matter is just not

10  something that the jury should rely -- should base a verdict

11  on, should consider as part of the evidence.

12          And, again, we suggest that part of the balancing

13  of the weight that he was allowed to accord his own

14  testimony with his background, part of the balancing is to

15  let the jury know it's going to decide the case about --

16  decide what the factual disputes about what happened in

17  2008, not on the plaintiff's testimony.  That never -- it

18  just never happens in a lawsuit.

19          THE COURT:  And your point is that Mr. Kelley

20  talked about matters that were done prior to 2008?

21          MR. GLEESON:  Yes.  What it is that BMO did wrong

22  in this case, which, as the plaintiff in the case, he's got

23  very able counsel who can prove it through the witnesses who

24  engaged in the events.

25          You know, and we talked about this yesterday.  We

1    know the Court would not allow us to put on a representative

2    from BMO Harris Bank to testify to its view of the facts and

3    the law and why it felt it important to try this case and

4    not consider even settling the case.  You would never let

5    that happen on the defense side for good reason.

6         And to the extent that that happened on the

7    plaintiff's side, it just needs to be corrected and

8    balanced, Judge.  We're not asking for the Court to convey

9    criticism of Mr. Kelley.  We're just asking the Court to

10   convey his proper role in the case, which is not as

11   plaintiff to essentially tell the jury we have a really --

12   we have a -- over objection -- our case really has merit

13   based on what they did prior to 2008.

14        It's not something that to my -- in my experience

15   happens in any lawsuit.  What he was questioned about were

16   the events in which he personally participated on behalf of

17   the estate that he now represents as the BMO liquidation

18   trustee.

19        Thank you, Your Honor.

20        MR. ANTHONY:  Your Honor, Mr. Spehr was doing the

21   questioning, so maybe Mr. Gleeson doesn't recall this line

22   of questioning.  Mr. Kelley was asked at page 1961, line 12:

23        "Fair that by the mid-1990s PCI didn't have any

24   legitimate business any longer, if it ever did?"

25        Next question:  "And you haven't identified any

1    legitimate business activity.  Is it also correct to say

2    that PCI was a Ponzi scheme by no later than 1995?"

3            Then he asks:  "Is it fair to say that PCI was

4    Petters and Petters was PCI?"

5            And Mr. Kelley said:  "No, I wouldn't agree with

6    that."  But they don't follow up on that.

7            The point is they asked him one question after

8    another about things that occurred before Mr. Kelley arrived

9    on the scene to support their defense; and now they have

10   successfully precluded us, by their multiple objections,

11   from asking the same questions of Mr. Kelley.  What did he

12   discover, what did he learn after he became trustee that

13   impacts the issues in this case?  If it's fair for them to

14   ask all those questions, then it's fair for us to ask those

15   questions.

16           He went on -- oh, "Coleman took direction from

17   Mr. Petters, correct?"

18           "Yes."

19           "White took direction from Mr. Petters?"

20           "Yes."

21           Now it's also the case that PCI was thus and such?

22   How would Mr. Kelley know that but for the investigation he

23   did?  How would he know what BMO bank did wrong but for the

24   investigation he did?

25           So why isn't he entitled to speak the same

1    historical facts that came up in his investigation that they

2    were entitled to elicit from him?  They've opened a door now

3    on this, Your Honor, and now they want not only to shut it,

4    but to nail it shut by having you diminish Mr. Kelley's

5    credibility when he answered fairly to the question for

6    which an objection was overruled.

7            THE COURT:  Well, no.  We're talking about what

8    M&I employees should have done with regard to the PCI

9    account.  That's what the instruction is going to address.

10           MR. ANTHONY:  So Mr. Kelley then can talk based on

11   his investigation about what they did do as opposed to what

12   they should have done?  Because if he's free to talk about

13   what his investigative -- extensive investigation showed

14   about what was done, and it's just a rewording of my

15   question to take out what they should have done to what his

16   investigation disclosed they actually did, I'm fine with

17   that.  Because if it's fine for them to ask what facts he

18   knows based on his investigation, then I'm entitled to ask

19   what facts he knows.

20           And if that's the Court's ruling, I'm fine as long

21   as I can ask Mr. Kelley the same battery of questions that

22   they're asking him.

23           MR. GLEESON:  Your Honor, that would just convert

24   Mr. Kelley into an expert witness, and they have expert

25   witnesses.  And, Judge, we're not looking for an advantage

1    on our part.  We're happy for the Court to give the

2    instruction and it applies to -- circumscribes the import of

3    Mr. Kelley's testimony generally.  He's just not here to

4    give factual evidence about pre-2008.

5            We did ask questions to establish the identity of

6    Mr. Kelley as trustee with PCI itself to make clear whom he

7    represents and on whose behalf he can bring claims and can't

8    bring claims.  But we ask the Court to give the curative

9    instruction that it came out and announced it intended to

10   give.

11           Thank you, Your Honor.

12           THE COURT:  So I just want to be clear, the

13   instruction that I plan to give is only with regard to

14   testimony regarding Mr. Kelley's personal opinions about

15   what M&I employees should have done.  That's the limit to

16   what I --

17           MR. GLEESON:  Understood.

18           THE COURT:  -- will be instructing about.

19           MR. GLEESON:  Understood.  Thank you.

20           MR. ANTHONY:  Your Honor, if you make -- take his

21   name out of it and make it more general to all witnesses as

22   to what someone should have done, because that would then be

23   applicable to much of the testimony from some of BMO's

24   witnesses where they made observations about what should

25   have done -- what people should have done, what people

1   should have done with respect to this action and that

2   action.  So people's opinions, if you were to say, all

3   witnesses' opinions aren't evidence and the jury should keep

4   that in mind that only the facts are evidence, that's an

5   instruction that I think would be fair.

6           But singling out Mr. Kelley, especially when he

7   was asked for his personal opinion about so many facts that

8   he learned of that date before his arrival on the scene is

9   simply unfair, and there's no reason to single out

10  Mr. Kelley.  Remember, before he gave that answer, which was

11  like two lines long, the objection had been overruled, and

12  properly so.  And then counsel jumped up to make an

13  objection that bore no relationship to the issue then before

14  the Court.

15          So we think it's highly prejudicial to do that

16  with Mr. Kelley or singling him out with that instruction.

17  But I think a broader instruction would be more fair.

18          MR. GLEESON:  Judge, I think I can almost promise

19  you it's my last time back up here on this issue.  They

20  opened the door.  They asked this question.  We did object.

21  We think the Court properly understood that that kind of

22  testimony from a party to a case, not a witness involved in

23  those events prior to 2008, we know Mr. Kelley has this

24  opinion.  We know he holds it in good faith, but it's not

25  evidence in the case.

1           Thank you, Your Honor.

2           THE COURT:  So I will modify my instruction such

3    that it will say that testimony about personal opinions

4    about what M&I employees should have done prior to 2008 with

5    regard to PCI's account is merely testimony.  You, Members

6    of the Jury, are reminded that you are the sole judges of

7    the facts in this case.

8           MR. ANTHONY:  The only qualification on that,

9    Your Honor, is we're going to be hearing from experts who

10   are going to be giving opinions.

11          MR. GLEESON:  Judge, it should be limited to

12   Mr. Kelley's testimony yesterday.  Otherwise, a bunch of

13   fact witnesses' testimony and all of -- and much of the

14   expert witnesses' testimony are going to be subject to that

15   instruction.  It needs to be restricted to the plaintiff's

16   own testimony.  Otherwise, it's going to wreak havoc on a

17   bunch of testimony you have already heard and some expert

18   testimony you are about to hear.

19          So what needs to be rectified, with respect, is

20   the plaintiff's own personal opinion about what should have

21   been done, which of course he thinks that because he brought

22   the case.  And the BMO Harris Bank representatives feel very

23   strongly about what was done and that the should have been

24   done is wrong.

25          Again, we know you wouldn't permit that -- or

1    maybe you will, but with respect, we think rather than go

2    down that rabbit hole about what the parties to the case

3    think about the merits of the case, which is quite a rabbit

4    hole, but that's -- it seems to me that's what would be put

5    in play.  We should just in the, I think, the very measured

6    way in which the Court came out on the bench this morning

7    thinking you would nip this in the bud, should be done.  It

8    needs to be limited to Mr. Kelley's testimony because if you

9    just do a word search on the transcript for "should have"

10   and "could have," that's going to come up innumerable times.

11            So, as Mr. Anthony pointed out, deleting from the

12   curative instruction a reference to Mr. Kelley is going to

13   confuse the jury to no end.

14            MR. ANTHONY:  Your Honor, I think that after

15   the -- I think Mr. Kelley is the last fact witness.  That

16   before we begin expert testimony, that it might be

17   appropriate at that point to say, You have heard from fact

18   witnesses.  Any opinions those fact witnesses have given you

19   are not -- whatever you are going to say -- but that now we

20   are going to begin expert testimony, and they are going to

21   be giving you expert opinions.  And that doesn't bring

22   attention to any particular person.  It applies to all the

23   fact witnesses to date, and it would be a fair way to

24   proceed.

25            And that would be a curative instruction that

1    would be fair and wouldn't give any party an advantage.  And

2    I hear counsel repeatedly say they're not looking for an

3    advantage, but, quite frankly, we all know they are.  So I

4    think that's a fair way to proceed, and that's what we would

5    ask the Court to do.

6              Thank you, Your Honor.

7              MR. GLEESON:  Judge, you felt this yesterday.

8              THE COURT:  I didn't hear you.

9              MR. GLEESON:  We got the impression that you felt

10   the need for this yesterday, which is why we proposed the

11   limiting instruction.  We're not asking you to change your

12   mind about the -- overruling the objection, but a limiting

13   instruction, and you know juries are presumed to follow

14   them, just gets them on the right track so they don't use

15   that bit of testimony for a purpose for which they should

16   not use it.

17             Thank you.

18             THE COURT:  Okay.  At this point, in light of the

19   arguments that have been made and the fear that it will draw

20   too much attention to the issue, I will not offer a curative

21   instruction.  I will see how the evidence goes and make a

22   determination or -- whether or not I will reconsider this

23   matter at a different time.  Okay?

24             Are we ready to proceed?

25             MR. SPEHR:  We are, Your Honor.  Thank you.

1              MR. ANTHONY:  We are, Your Honor.

2         (Pause)

3                        **IN OPEN COURT**

4                        **(JURY PRESENT)**

5              THE COURT:  Good morning, Members of the Jury.

6    Please be seated.

7              Counsel, are you ready to proceed?

8              MR. SPEHR:  Yes, Your Honor.  Thank you.

9              THE WITNESS:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11                      **(Douglas Kelley)**

12                 **CROSS-EXAMINATION** (Continued)

13   BY MR. SPEHR:

14   Q.  Good morning, Mr. Kelley.

15   A.  Good morning.

16   Q.  I'm going to show you what has been marked and offered

17   in evidence as DX-9000, which are Plaintiff Douglas A.

18   Kelley's Objections and second amended and supplemental

19   responses to Defendant BMO Harris Bank, NA's first set of

20   requests for admission.

21             MR. SPEHR:  May I approach, Your Honor?

22             THE COURT:  Yes, you may.

23             MR. SPEHR:  Do you have a copy?

24             MR. ANTHONY:  I do.

25             THE COURT:  And you may throughout your

1    examination.

2                   MR. SPEHR:  Excuse me?

3                   THE COURT:  I said you may throughout your

4    examination.

5                   MR. SPEHR:  Thank you.

6    BY MR. SPEHR:

7    Q.  Do you recognize this document, Mr. Kelley?

8    A.  Yes.

9    Q.  And what this document is is essentially a set of

10   requests from BMO to you to admit certain information,

11   correct?

12   A.  That's correct.

13   Q.  Would you turn to page 22 of DX- -- let me correct

14   something too.  I said 9000, and I was corrected.  Is it

15   right?  Oh, 9000.  Sorry, I don't need to correct myself.

16                   Would you turn to page 22, please?  We have it up

17   on the screen.

18                   MR. SPEHR:  Thank you, Mr. Herzka.

19   BY MR. SPEHR:

20   Q.  Request Number 24 reads, "Admit that representatives of

21   PCI made misrepresentations about PCI's business to M&I."

22   Do you see that?

23   A.  I do.

24   Q.  If you go down the page, there's some objections.  And

25   in the response, about midway through the page, it says,

Kelley - Cross

1    "Trustee admits."  Do you see that?

2    A.  I do.

3    Q.  And the trustee is you, correct?

4    A.  That's correct.

5    Q.  If you take a look at Request now Number 25, BMO asks,

6    "Admit that representatives of PCI took actions to hide the

7    Petters Ponzi scheme from M&I."  Do you see that?

8    A.  I do.

9    Q.  And if you flip to the next page, 23, trustee responds:

10   "Admits."  Do you see that?

11   A.  I do.

12   Q.  Thank you.  You can put that aside.

13           Now, Mr. Kelley, correct me if I'm wrong.  You sat

14   through a fair amount of testimony directed to a number of

15   BMO witnesses that went something like this:  If the AML

16   people at M&I had questions about PCI transactions, they

17   should have called the business bankers.  Do you recall

18   that?

19   A.  I do.

20   Q.  And questions were also directed to, Well, the business

21   bankers could have called PCI, Petters or Coleman, correct?

22   A.  Yes.

23   Q.  Do you remember that testimony?

24   A.  I do.

25   Q.  Now, based upon what you know in terms of your

1    investigation about PCI and the scheme, do you have any

2    doubt that if Jambor or Flynn or anyone from M&I called

3    Petters or Coleman about some transaction, that Petters and

4    Coleman simply would have lied to them?

5              MR. ANTHONY:  Objection, assumes facts not in

6    evidence that anyone from M&I called and inquired.

7              MR. SPEHR:  That's not my question.  My question

8    is --

9              THE COURT:  Counsel.

10             MR. SPEHR:  Oh, I'm sorry, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  Can you repeat the question?  I'm

13   sorry.

14   BY MR. SPEHR:

15   Q.  So we have the AML people and they see a suspicious

16   transaction, hypothetically, and they call the business

17   bankers, Jambor and Flynn.  Jambor and Flynn call Petters

18   and they say, Hey, we saw this transaction.  Do you have any

19   doubt that Petters would have lied to Jambor or Flynn?

20             MR. ANTHONY:  Same objection.

21             THE COURT:  Sustained.

22   BY MR. SPEHR:

23   Q.  Jambor -- Petters wouldn't have told them the truth

24   about the scheme, would he?

25   A.  I can't speak for Petters, but Petters lied a lot.

Kelley - Cross

```
 1    Q.  And he would have lied to M&I if M&I had asked
 2    questions, correct?
 3    A.  I'm not hiding that.
 4    Q.  Thank you.  Now I want to turn to a couple of questions
 5    about the eight hedge funds who were not repaid by PCI and
 6    who asserted claims in the PCI bankruptcy estate.
 7          You do recall that the eight hedge fund investors
 8    who are at issue in this case made claims in the PCI
 9    bankruptcy?
10          MR. ANTHONY:  Objection.  The investors have not
11    made claims in this proceeding.  Irrelevant.
12          MR. SPEHR:  My question was in the PCI bankruptcy
13    case, not this case.
14          MR. ANTHONY:  It's still -- Your Honor, it's still
15    irrelevant to this case, claims made in the bankruptcy case.
16    That has been excluded by the Court already.
17          THE COURT:  Sustained.
18          MR. SPEHR:  I'll move on, Your Honor.
19    BY MR. SPEHR:
20    Q.  Now, we talked a little bit yesterday about the BMO
21    Litigation Trust.  Do you recall that?
22    A.  Yes.
23    Q.  That trust was set up in 2016; is that correct?
24    A.  Yes.
25    Q.  And the trust was set up pursuant to the liquidation
```

1    plan submitted by you to the Bankruptcy Court, correct?

2    A.  That's correct.

3    Q.  And if I remember correctly, it was set up pursuant to

4    the second amended plan of liquidation that was submitted to

5    the Bankruptcy Court for approval?

6    A.  I think you're right.

7    Q.  And that plan, in turn, was approved, correct?

8    A.  Approved by Judge Kishel.

9    Q.  Judge Kishel.  Thank you.

10          Would you turn to tab 13 in your big binder.

11   A.  I'm fine with looking at the screen if it's coming up.

12   You have to tell me.

13   Q.  Let's see.  Let me -- let's see if we can do it that

14   way.  I've -- actually, you need to do it in your book first

15   because this document is not in evidence.  So if you would

16   turn to tab 13, which is DX-10111.

17   A.  I have it.

18   Q.  Ask you whether this is a copy of the second amended

19   Chapter 11 plan of liquidation that you submitted to Judge

20   Kishel April 8th, 2016?

21   A.  Yes.

22          MR. ANTHONY:  Objection, relevance.

23          THE COURT:  Overruled.

24          MR. SPEHR:  I offer DX-10111 in evidence, Your

25   Honor.

Kelley - Cross

```
1              MR. ANTHONY:  Same objection, relevance, Your
2      Honor.
3              THE COURT:  Overruled.
4      BY MR. SPEHR:
5      Q.  Would you turn to page 43 of this document.  Just make
6      sure I have it right.
7      A.  Is that the Bates number or the --
8      Q.  Yeah.  If you look at the bottom, Mr. Kelley, it's 0048
9      if you look at the very bottom.  It's a little hard to read.
10     My question, very general question is -- are you there?  I'm
11     sorry?
12     A.  I am here.
13     Q.  Very general question:  Is this the portion of the
14     second amended plan of liquidation that kind of lays out the
15     parameters and structures of the BMO Litigation Trust?
16     A.  Yes.
17     Q.  And as we've discussed, it appoints you as the trustee
18     of that trust, correct?
19     A.  That's correct.
20     Q.  And it also states, and if you look at the top of 0048,
21     it states that the purpose of the BMO Litigation Trust is to
22     prosecute and monetize claims against BMO; is that correct?
23     A.  Yes.
24     Q.  If you would keep that document handy, we may come back
25     to it.
```

Kelley - Cross

1              Mr. Kelley, who were the original beneficiaries of

2       the BMO Litigation Trust in 2016?

3              MR. ANTHONY:  Objection, irrelevant, already been

4       the subject of a court order.  PCI is the plaintiff in this

5       case.  No one else.

6              THE COURT:  Sustained.

7              MR. SPEHR:  Can I approach, Your Honor?  I just

8       want to make sure what I can ask and what I can't ask.

9              THE COURT:  You may.

10             **(At sidebar)**

11             MR. SPEHR:  I'll just make one point.  Some of

12      these objections are a bit loquacious, shall we say, by

13      counsel.  They are a little speaking, and I'm a little

14      concerned about that, but that's not the reason for the

15      sidebar.

16             THE COURT:  I will ask counsel to state the basis

17      for your objection without providing any more information to

18      the jury.

19             MR. ANTHONY:  I will do that, Your Honor.

20             MR. SPEHR:  Yeah.  So this is what I intend to do,

21      and it's going to be very short.  I established the

22      existence of the BMO Litigation Trust.  I established its

23      source through the second amended plan of liquidation.  I

24      would like to establish who the beneficiaries of the trust

25      are, and the reason for that is that I'm going to ask him

1       the question whether at least 95 percent of the recovery in

2       this case goes to the beneficiaries of that trust.  I think

3       it is important for the jury to understand who gets the

4       money.

5               The reason is that they have made the point that

6       who gets the money are, to use your words, police and

7       firefighters funds, charities.  This is what they said to

8       the jury in the voir dire and in the opening statement.  So

9       I think it's important for us to be able to rebut that and

10      let the jury know who gets the money.

11              MR. ANTHONY:  Well, I think the exhibit that you

12      just introduced answers that question.  But if he gets into

13      that, then you're going to hear about the police unions and

14      teachers unions and -- if that's where he's going with this

15      to try to make it seem like some hedge funds are going to

16      get it.

17              I think the problem with letting him get into that

18      is we get into the whole investor situation that's been

19      precluded from this case; and if we go down that road, next

20      thing you know we're going to be talking about the investors

21      and the hedge funds.  And that's why I think you've got the

22      plan in.  You can rely on the plan and argue from it.  But

23      if he goes down this road, then you are going to get

24      information he doesn't want.

25              THE COURT:  It seems to me you're saying that

1    addressing -- some who are beneficiaries doesn't -- means

2    that you have to address all of them, and that would be

3    hedge funds as well.  Is that what you're saying?

4              MR. ANTHONY:  What I'm saying is if he says the

5    money is going to the hedge funds, then I am going to have

6    to inquire of Mr. Kelley to say that it filters down to

7    teachers unions and people like that.  And as long as I can

8    do that without objection, I will stipulate that there's --

9    beneficiaries in this document are hedge funds.  But then

10   it's going to be fair game for me to ask him who is going to

11   get -- who is that going to filter down to.  Are you okay

12   with that?

13             MR. SPEHR:  I think I am okay with that.

14             THE COURT:  And why is that relevant?

15             MR. SPEHR:  The filtering down part I don't think

16   is relevant.

17             THE COURT:  No, no.

18             MR. SPEHR:  I'm sorry.

19             THE COURT:  I mean your objection is to relevance.

20             MR. ANTHONY:  Yes.

21             THE COURT:  So why is that relevant?

22             MR. SPEHR:  To refute the argument that they made

23   in voir dire and the opening that the beneficiaries of any

24   recovery here are charities and pension funds.  The

25   beneficiaries are the beneficiaries of BMO Litigation Trust

1    who are some subsection, I believe, of the eight hedge fund

2    investors who claim they were not repaid by PCI.  That's the

3    only relevance of this.

4        MR. ANTHONY:  As the Judge reminded everybody,

5    voir dire and opening statements are not evidence.  And

6    since we have not put in any evidence identifying anyone

7    other than the entities identified in here (indicating),

8    your argument that we have done so and therefore you need to

9    rebut it is just not supported.  We have not said -- we have

10   not elicited from this witness that teachers are going to

11   get it.  If we had, maybe you would have an argument, but we

12   didn't.

13       MR. SPEHR:  Okay.  Let me make a proposal and see

14   whether you agree with it.  You and I tend to work these

15   out.

16       I would like to simply ask the question that is it

17   correct that at least 95 percent of the recovery here will

18   go to the beneficiaries of the big BMO Litigation Trust.

19   Can I ask that question?  If I can ask that question, I'm

20   done.

21       I just want to establish the money is not going to

22   some far-flung bunch of creditors out here.  It's -- the

23   money here goes to the beneficiaries of this trust, and

24   that's what I want to ask.

25       MR. ANTHONY:  If that's all he asks, since it's

Kelley - Cross

```
1    already in evidence, I think --
2              THE COURT:  The objection is withdrawn?
3              MR. ANTHONY:  Yeah, I will withdraw the objection
4    if he limits it to that one question.
5              THE COURT:  And we understand the borders?
6              MR. SPEHR:  That's the only question.
7              THE COURT:  All right.
8         (In open court)
9         (The Court and law clerk confer)
10             MR. SPEHR:  Judge, we are going to move on.  Thank
11   you.
12   BY MR. SPEHR:
13   Q.  I want to keep you focused on DX-10111, Mr. Kelley.
14   Would you turn to -- again, it's in your tab 13, and I'm
15   going to focus you on 0078 to 0083.
16   A.  So I am on page 0078?
17   Q.  Yes, please.  Perfect.
18   A.  I'm there.
19   Q.  If you just scroll through those pages, my question to
20   you, as of the time at least of the plan of liquidation,
21   does this reflect the various lawsuits that you brought as
22   trustee of the PCI Liquidating Trust?
23             MR. ANTHONY:  Objection, Your Honor, beyond the
24   scope, irrelevant.  We may need a sidebar on this because it
25   needs explanation.
```

Kelley - Cross

```
 1              MR. SPEHR:  I can respond here, Your Honor.

 2              THE COURT:  Yes.

 3              MR. SPEHR:  Very simply, I'm just trying to show

 4     that sort of what Mr. Kelley has been doing in terms of the

 5     filing of these lawsuits, many of which are -- well, I'll

 6     stop there.

 7              THE COURT:  So you are going to address the fact

 8     that these lawsuits were filed?

 9              MR. SPEHR:  That's it.

10              MR. ANTHONY:  Your Honor, it goes to offsets,

11     which have already been excluded from the case.

12              MR. SPEHR:  It doesn't go to offsets.  It goes to

13     simply the point that Mr. Kelley, as trustee, has brought

14     the lawsuits that are contained in 0078 through 0083.

15     That's it.

16              MR. ANTHONY:  Your Honor, the document is in

17     record.

18              THE COURT:  The document is in record, you said?

19              MR. ANTHONY:  Yeah, it's already been admitted

20     into evidence, so it's -- if it's not for offsets, it's

21     already in evidence.

22              THE COURT:  Overruled.

23              MR. SPEHR:  Thank you.

24     BY MR. SPEHR:

25     Q.  Mr. Kelley, you've also, in addition to BMO, sued
```

Kelley - Cross

```
 1   numerous banks as well, right?

 2   A.  Yes.

 3   Q.  And you've sued Signature Bank?

 4   A.  I have.

 5   Q.  Associated Bank?

 6   A.  Yes.

 7   Q.  Crown Bank?

 8   A.  Yes.

 9   Q.  J.P. Morgan?

10   A.  Yes.

11   Q.  Home Federal Bank?

12   A.  Yes.

13   Q.  And American Express Bank; is that correct?

14   A.  I don't remember the last one, but I will take your word

15   for it.

16   Q.  And among the many complaints that you have filed that

17   are listed here, you also asserted something called a

18   clawback claim against a company called Opportunity Finance.

19   Do you recall that?

20               MR. ANTHONY:  Objection, relevance.

21               THE COURT:  Overruled.

22   BY MR. SPEHR:

23   Q.  Do you recall that?

24   A.  Yes.

25   Q.  And we talked about -- you talked about with your
```

Kelley - Cross

```
 1     counsel yesterday clawback claims, if you remember that,
 2     right?
 3     A.  Yes.
 4     Q.  And those are essentially claims designed to recover
 5     money from winning investors?
 6     A.  Correct.
 7     Q.  In some cases, though, you've actually brought clawback
 8     claims against losing investors in terms of recovering the
 9     principal on their loans, right?
10               MR. ANTHONY:  Objection, investor knowledge.
11               THE COURT:  Sustained.
12     BY MR. SPEHR:
13     Q.  Well, let me come back to Opportunity Finance.
14     Opportunity Finance was an investor in PCI, correct?
15     A.  Yes.
16     Q.  An investor for many years, correct?
17     A.  Yes.
18     Q.  And you recall, because I think you were in court that
19     day, that there was questioning of Mr. Jambor about a
20     meeting he had in 2003 with Jon Sabes of Opportunity
21     Finance.  Do you recall that?
22     A.  I do.
23     Q.  And is it correct to say that at the time of that
24     meeting in 2003, Opportunity Finance was a major investor in
25     PCI?
```

1          MR. ANTHONY:  Objection, investor knowledge, and

2     lack of foundation for this witness's testimony.

3          THE COURT:  Sustained.

4     BY MR. SPEHR:

5     Q.  Is it fair to say that Opportunity Finance was a net

6     winner to the tune of 2.5 billion?

7          MR. ANTHONY:  Objection, investor knowledge.

8          MR. SPEHR:  Opportunity Finance is not one of the

9     investors in this case that is claiming that it has not been

10    repaid.  That's a totally different investor, and I think

11    I'm entitled to establish that an investor not part of this

12    case was subject to litigation by Mr. Kelley.

13         MR. ANTHONY:  Objection, relevance, beyond the

14    issues in this case.

15         THE COURT:  Sustained.

16    BY MR. SPEHR:

17    Q.  Finally, Mr. Kelley, I think you were in court when

18    Mr. Anthony was voir diring the jury, correct?

19    A.  Yes, I was.

20    Q.  And do you recall Mr. Anthony saying to the jury that --

21         MR. ANTHONY:  I'm going to object prematurely.

22    Improper cross-examination.

23         THE COURT:  Sustained.

24         MR. SPEHR:  I'm sorry, Your Honor?

25         THE COURT:  Sustained.

1   BY MR. SPEHR:

2   Q.  Let me ask it this way:  In respect of the work that you

3   have done on the PCI Liquidating Trust, you've been paid

4   more than $6.3 million; isn't that correct?

5   A.  I've been paid $6.3 million as the commission in the

6   Chapter 11 bankruptcy, which went from 2008 to 2016.

7   Q.  So over that eight-year period of time, you were paid

8   approximately $6.3 million; is that correct?

9   A.  Yes.  The check was written out to me, but it went to my

10  law firm and it encompassed hours that my law firm put in as

11  well.

12  Q.  And so -- and you also did work as a receiver for many

13  years, and we heard quite a bit of about that in your

14  testimony, right?

15  A.  Yes.

16  Q.  And you were paid for that work as a receiver, right?

17          MR. ANTHONY:  Objection, beyond the scope of the

18  agreement that counsel made at sidebar.

19          THE COURT:  Sustained.

20  BY MR. SPEHR:

21  Q.  And you are also being paid for the work that you have

22  done as trustee of the BMO Litigation Trust, correct?

23  A.  Yes.

24  Q.  And you are being paid by the hour for work --

25  A.  Yes, that's correct.

1    Q.  -- on behalf of the trust?

2    A.  Um-hmm.

3    Q.  And how much are you paid an hour for the work that

4    you've done in respect of the BMO lawsuit?

5    A.  For most of it it was $625 an hour, and now it's $700 an

6    hour.

7            MR. SPEHR:  Your Honor, I have no further

8    questions.  Thank you.

9                    **REDIRECT EXAMINATION**

10   BY MR. ANTHONY:

11   Q.  Mr. Kelley, let's begin where they just left off on your

12   compensation.  How much have you been paid by the BMO

13   Litigation Trust for the work you've done over the last four

14   years on this matter?

15   A.  $150,000 to my firm.

16   Q.  Okay.  To your firm.

17           THE COURT:  Counsel, please sit down during

18   examination.

19           MR. SPEHR:  I'm sorry.  I was just organizing.

20   Thank you.

21   BY MR. ANTHONY:

22   Q.  And the $6.3 million I think that was paid to your firm

23   for the eight years of services that your firm provided,

24   tell the jury how long it took to get that money.

25   A.  Well, we didn't see any money for five years.  And just

Kelley - Redirect

1    so you know, we billed -- we would keep track of our time

2    and keep track of our hours in my law firm, and we did not

3    submit a fee application until after five years in the case

4    because there just wasn't enough money to pay us without

5    disrupting other things.

6    Q.   How many people in your firm?

7    A.   At various and sundry times, 15 to 20.

8    Q.   And so when you finally got paid, did you get interest?

9    A.   No.

10   Q.   And how many hours did that 6 million, approximately,

11   entail?  How many hours of service provided?

12   A.   12,000 hours of myself and employees.

13   Q.   You were asked about the extensive investigation that

14   you made, and you were also asked a couple of hypotheticals,

15   and I want to follow up on each of those points.

16            MR. ANTHONY:  Would you put up demonstrative

17   PD-14, please.

18   BY MR. ANTHONY:

19   Q.   I think we saw this in the opening.  Based on your

20   extensive investigation -- yesterday in response to

21   counsel's questions you talked about your extensive

22   investigation.  Based on that investigation, did you learn

23   who the wholesalers were that were supposedly selling

24   products to Petters Company?

25   A.   Yes.

1    Q.  Who were they?

2    A.  Nationwide and Enchanted.

3    Q.  And what did you learn about the facts relating to

4    Enchanted?

5    A.  Enchanted was Michael Catain, essentially.

6    Q.  What did they do?

7    A.  Michael Catain ran a car wash.

8    Q.  Where was the car wash?

9              MR. SPEHR:  Judge, same objections as yesterday;

10   relevance, 403, hearsay.

11             THE COURT:  Overruled.

12   BY MR. ANTHONY:

13   Q.  Where was Mr. Catain and Enchanted's car wash?

14   A.  I think in Minnetonka, I believe.

15   Q.  And did you ever learn any facts that would lead you to

16   conclude that they actually ever sold electronic goods to

17   Petters Company?

18             MR. SPEHR:  Same objection.

19             THE COURT:  Overruled.

20             THE WITNESS:  They did not.

21   BY MR. ANTHONY:

22   Q.  Okay.  Now, who is the other wholesaler who was supposed

23   to be selling electronic goods to PCI?

24   A.  Nationwide.

25   Q.  And was that Mr. Reynolds who --

1    A.  Yes, Mr. Reynolds from Los Angeles.

2    Q.  And did you ever see where his company was?

3            MR. SPEHR:  If I might, Your Honor, I'm just

4    objecting to this line of questioning around the factual

5    background pre-2008.  The witness was not around at that

6    time, so I object.

7            MR. ANTHONY:  Your Honor, I am doing -- I am just

8    asking what he learned through his extensive investigation

9    about the facts.

10            THE COURT:  Sustained.

11   BY MR. ANTHONY:

12   Q.  Okay.  So what did you -- did you ever see --

13            THE COURT:  I'm sorry.  The objection is

14   overruled.

15            MR. ANTHONY:  Thank you, Your Honor.

16   BY MR. ANTHONY:

17   Q.  Did you see anything about Nationwide's place of

18   business?

19   A.  It sold no TVs either.  It was in Los Angeles and Las

20   Vegas, as I recall.

21   Q.  Now, you were also asked a couple of hypotheticals and I

22   think the hypotheticals were about what if Mr. Jambor had

23   gone into PCI and had a conversation with Mr. Petters.  Do

24   you recall generally those questions, you were asked those

25   hypotheticals?

Kelley - Redirect

```
 1    A.  Yes.
 2    Q.  So what if Mr. Jambor had gone into PCI and asked
 3    Mr. Petters questions about Nationwide and Enchanted?  Do
 4    you have a view as to what Mr. Petters would have said in
 5    response to those questions?
 6              MR. SPEHR:  Objection, no foundation.  Also beyond
 7    the scope, speculative.  Thank you.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  Listen, I think Mr. Petters would
10    have lied, which is what he did about a lot of things,
11    but -- it's hard for me to put myself in Petters' shoes,
12    but -- to answer these questions.  I'm a little
13    uncomfortable with them.
14    BY MR. ANTHONY:
15    Q.  Okay.  So if Mr. Petters, for example, refused to
16    respond to those questions, are you able to indicate what
17    the facts in the record show would have occurred with
18    respect to whether or not Mr. Jambor would have followed up
19    with a call to Nationwide or Enchanted?
20              MR. SPEHR:  Same objection.
21              THE COURT:  Sustained.
22    BY MR. ANTHONY:
23    Q.  Now, you were asked about the DX-9000, and that was the
24    objections and second amended and supplemental responses to
25    the requests for admissions.  Do you recall that?
```

1    A.  Yes.

2    Q.  Now, you admitted that representatives of PCI took

3    certain actions, correct?

4    A.  Yes.

5    Q.  Now, who were the representatives you were referring to?

6    A.  Deanna Coleman and Bob White primarily, and Petters.

7    Q.  Were you talking about yourself?

8    A.  No.

9    Q.  Did you take any actions that you believed were done to

10   hide anything to do with the Petters Ponzi scheme?

11   A.  No.

12   Q.  Do you believe that you, as the trustee, did anything --

13   made any misrepresentations to anybody about PCI's business?

14   A.  No.

15          MR. ANTHONY:  Your Honor, may I have one moment,

16   please?

17          THE COURT:  You may.

18          MR. ANTHONY:  I think I am about done.

19      (Plaintiff's counsel confer)

20   BY MR. ANTHONY:

21   Q.  Now, other than your standard hourly rate, are you going

22   to receive any contingent fee or anything like that out of

23   any recovery in this case?

24   A.  No.

25          MR. ANTHONY:  Nothing further.  Thank you.

1           MR. SPEHR:  Nothing further, Your Honor.  Thank

2     you.

3           THE COURT:  Sir, you are excused.

4           THE WITNESS:  Thank you, Your Honor.

5           MR. ANTHONY:  Your Honor, we are going to need a

6     minute to swap out the PowerPoint for the next witness.

7           THE COURT:  Okay.

8           MR. ANTHONY:  Your Honor, I have been told by the

9     technical folks on both sides that they need five minutes to

10    change out the slides based on the changes that were made

11    during the break, so I wanted to alert the Court to that.

12          THE COURT:  Okay.  Members of the Jury, let's take

13    a break now so you are not seated here while that's going

14    on.  You may go back to the jury room.  All rise for the

15    jury.  And please remember to continue to abide by my

16    instructions.

17        (Jury excused)

18                      **IN OPEN COURT**

19                    **(JURY NOT PRESENT)**

20          THE COURT:  We are in recess.

21        (Recess taken at 10:06 a.m.)

22                    *    *    *    *    *

23        (10:26 a.m.)

24                      **IN OPEN COURT**

25                    **(JURY PRESENT)**

1          THE COURT:  Please be seated.  Counsel, you may

2      proceed.

3          MR. ANTHONY:  Thank you, Your Honor.  Your Honor,

4      we will be moving into the expert phase of the plaintiff's

5      case now with the next two witnesses.  There's a couple of

6      minor housekeeping matters that counsel has raised.  If we

7      may have a brief sidebar?  I don't think they will take very

8      long.

9          **(At sidebar)**

10          MR. ANTHONY:  It's really about what your

11      preferences are, Your Honor.  Ordinarily in this district

12      with many of the judges -- and I don't know your practice; I

13      looked at your practice pointers -- where there have been

14      *Daubert* challenges and like in this case where the witness's

15      qualifications have been challenged, you have not found them

16      lacking.  I think all the experts here are -- they are

17      qualified to testify to what they are going to testify.  We

18      may disagree about what they say.

19          But most times we don't spend time tendering the

20      expert.  I was wondering what your practice was with respect

21      to that in your courtroom.  Ordinarily we just go right from

22      the qualifications into the opinions.  If that's what you

23      would prefer, I am fine doing that.

24          THE COURT:  Any preference?

25          MR. SCHAPER:  We did not expect to challenge the

```
 1    tender, but I guess I typically see that the expert is

 2    tendered and then we're asked whether we have an objection

 3    to that and then --

 4        (Simultaneous indiscernible crosstalk)

 5            COURT REPORTER:  I'm sorry.  You're all talking at

 6    the same time.

 7            THE COURT:  Yes.

 8            MR. ANTHONY:  You are going to say, "No

 9    objection"?

10            MR. SCHAPER:  Correct.

11            THE COURT:  I think that's better for the jury

12    because the jury understands the distinction.

13            MR. ANTHONY:  The other question is:  Do you have

14    a preference in your courtroom for the way demonstratives

15    are introduced?  Is it just that it will aid you in giving

16    your testimony?  Is that sufficient in your courtroom to

17    introduce a demonstrative?  Not as evidence, but as a

18    demonstrative.

19            THE COURT:  Do you have any --

20            MR. SCHAPER:  That's fine.  We will do that with

21    our experts too.

22            THE COURT:  Exactly.

23            MR. ANTHONY:  Thank you.

24            THE COURT:  Thank you.

25        (In open court)
```

1          THE COURT:  Counsel, you may proceed.

2          MR. ANTHONY:  Thank you, Your Honor.  The trustee

3     for his next witness calls Ms. Catherine Ghiglieri, and I

4     will spell that as she's walking to the stand.

5     G-h-i-g-l-i-e-r-i.

6          THE COURT:  Please stand and be sworn.

7        (Witness sworn)

8          THE COURT:  Thank you.  Please be seated.  Would

9     you state your full name and spell your last name.

10         THE WITNESS:  My name is Catherine Ghiglieri,

11    G-h-i-g-l-i-e-r-i.

12         THE COURT:  I am going ask you to spell

13    "Catherine" having a daughter who is Kathryn and there are

14    many different spellings.

15         THE WITNESS:  C-a-t-h-e-r-i-n-e.

16         THE COURT:  Thank you.

17         Counsel, you may proceed.

18                     **(Catherine Ghiglieri)**

19                     **DIRECT EXAMINATION**

20    BY MR. ANTHONY:

21    Q.  Ms. Ghiglieri, I apologize.  I can't help myself.  Are

22    you older today than you were yesterday?

23    A.  I am.

24    Q.  How much older?

25    A.  By one year older.

Ghigtieri - Direct

1    Q.  Okay.  Happy birthday.

2    A.  Thank you.

3    Q.  You're being called as an expert in this case, correct?

4    A.  Yes.

5    Q.  You've been retained by the trustee?

6    A.  I have been, yes.

7    Q.  For what reason were you retained?

8    A.  I was asked to look at the manner in which BMO Harris

9    processed the transactions in the Petters 9018 account and

10   the manner in which they monitored the transactions for

11   suspicious activity.

12   Q.  All right.  Let's talk a little bit about your personal

13   history.  Are you married?

14   A.  Yes.

15   Q.  Any children?

16   A.  One son.

17   Q.  Tell me he's not a lawyer.

18   A.  He is a new lawyer.

19   Q.  A new lawyer?

20   A.  Yes.

21   Q.  Okay.  What's your background and education?

22   A.  So I graduated from the University of Notre Dame with a

23   bachelor of business administration degree, and many years

24   later I graduated from Georgia State University with a law

25   degree.

Ghigtieri - Direct

```
 1    Q.  Your family, do you have a banking background of any

 2    sort?

 3    A.  Yes.

 4    Q.  What is it?

 5    A.  So I'm from a third-generation community banking family

 6    in central Illinois in a small town of 1,300 people called

 7    Toluca, Illinois.

 8    Q.  Is that a big bank, small bank?

 9    A.  It was a very tiny bank, yes.

10    Q.  Now, you mentioned you went to Notre Dame.  When did you

11    graduate?

12    A.  1974.

13    Q.  What was distinctive, if anything, about Notre Dame's

14    graduating class that year?

15    A.  We were the first women to graduate from the University

16    of Notre Dame.

17    Q.  We're going to be going through some testimony here.

18    Did you prepare some slides in connection with your

19    testimony?

20    A.  Yes.

21    Q.  Will they assist your testimony?

22    A.  Yes.

23    Q.  I'd like to begin with Demonstrative PD Number 3, which

24    is your professional background slide, please.

25              When did you start in the banking industry?
```

1    A.  So when I was 14, I started working at our family bank,

2    and I did that after school and summers through college.

3    And then I became a bank regulator for the Office of the

4    Comptroller of the Currency, and the acronym for that is

5    OCC.  And that's --

6    Q.  Let me ask you -- let me stop you there.

7    A.  Okay.

8    Q.  So when did you start working for the Office of the

9    Comptroller of the Currency?

10   A.  1974, when I graduated from college.

11   Q.  And how much did they pay starting bank -- were you a

12   bank examiner?

13   A.  Yes.

14   Q.  How much did they pay starting bank examiners back then?

15   A.  I think it was like $9,000.

16   Q.  Okay.  And how long did you work at the Office of the

17   Comptroller of the Currency?

18   A.  I was there for 18 years.

19   Q.  What was the first job you had there?

20   A.  I was a field examiner in the Chicago area.

21   Q.  Okay.  So tell the jury, if you will, what a field

22   examiner does.

23   A.  So my title was assistant national bank examiner, but --

24   Q.  Is that a big title without much to do?

25   A.  It meant that I went from bank to bank with a crew, an

Ghigtieri - Direct

1    examination crew, and examined the books and records of the

2    banks.

3    Q.  Okay.  And why were you examining the books and records

4    of the bank?

5    A.  So banking is highly regulated, and the banks have an

6    annual examination.  Generally the ones in good condition

7    will have an annual examination.  So we would go from bank

8    to bank examining the books and records, making sure they

9    were in compliance with the banking laws and that they were

10   solvent and that they were operating in a safe and sound

11   manner.

12   Q.  So you said you were an assistant national bank

13   examiner?

14   A.  Yes.

15   Q.  And then did you move up the ladder, so to speak, and

16   become something other than an assistant?

17   A.  Yes.  So after five years, I took a five-day oral and

18   written examination, and I became a national bank examiner,

19   a commissioned national bank examiner.

20   Q.  Were there a lot of women national bank examiners at the

21   time?

22   A.  So I was the first woman commissioned national bank

23   examiner in the Chicago region.

24   Q.  Okay.  And what did that mean, that you were now the

25   national bank examiner?

1    A.  So now I was in charge of the examinations and I had a

2    crew of examiners that I -- I had a lot of training crews,

3    where I would teach them how to examine a bank and we would

4    go from bank to bank examining the banks.

5    Q.  So at some point did you progress and move to

6    Washington, D.C.?

7    A.  Yes.  I went --

8    Q.  When did you do that, and what job did you have?

9    A.  So in 1982, I moved to the headquarters Office of the

10   Comptroller of the Currency, and I was in the failing banks

11   section for two years.

12   Q.  And then what did you do?

13   A.  And then I became the assistant to the top policymaker,

14   and I did that for two years.  So I was in D.C. for four

15   years in total.

16   Q.  Did you then move -- is there a lot of movement in those

17   jobs, and did you move again?

18   A.  Yes.  It's a nationwide organization.  So I then got a

19   promotion to Atlanta, to the Southeastern District, and I

20   was in senior management as director for bank supervision.

21   Q.  During what time period?

22   A.  And that was 1986 to 1992.  I was there for six years.

23   Q.  And what were some of your responsibilities as the

24   director for bank supervision?

25   A.  So as the director for bank supervision, I was

1    responsible for all of the banks that were larger than a

2    billion dollars.

3    Q.  I'm sorry.  A billion dollars?

4    A.  A billion dollars, which was big at the time.  All the

5    big banks and --

6    Q.  It is still big, just so you know.

7    A.  That's right.

8         I was in charge of all the big banks in the

9    Southeastern District, which was nine states.  And as a

10   separate portfolio, I was responsible for all the problem

11   banks.

12   Q.  All right.  So while you were working in Atlanta as the

13   director for bank supervision, were you also the Atlanta

14   field office director?

15   A.  So that was a second position.  It was a lateral

16   position that I took.  They wanted to merge the Richmond

17   field office and the Atlanta field office together, and they

18   asked me to take that job.

19        So I was the Atlanta field office director, and I

20   had a portfolio of all the bank examiners; hiring them,

21   training them, you know, making sure that they had

22   everything they needed to do their job.  And then I was

23   responsible for the smaller banks and the nonproblem banks,

24   so kind of the reverse of the portfolio that I had just had.

25   Q.  All right.  So while you were working for the OCC as the

Ghigtieri - Direct

1   Atlanta field office director, did you go back to school?

2   A.  Yes.  So --

3   Q.  Let me ask you:  During the day or at night?  What did

4   you do?

5   A.  So I went to law school for four years at night while

6   serving as -- in a senior position at the OCC.

7   Q.  Okay.  Now, when did you get your law degree?  Where did

8   you go and when did you get your degree?

9   A.  I went to Georgia State University.  It's the only

10  school that had a night program.  And I graduated in 1991.

11  Q.  Did you ever practice law?

12  A.  No.  I ended up not practicing.

13  Q.  Do you have any licenses to practice law?

14  A.  Yes.  So I'm a member of the Georgia bar, member of the

15  District of Columbia bar.

16  Q.  Okay.  All right.  So you said you never practiced law,

17  and I see that at some point you became the Texas banking

18  commissioner.  When did that happen?

19  A.  So right after I graduated from law school and passed

20  the bar, they called and asked me if I would be interested

21  in becoming the Texas banking commissioner.

22  Q.  Tell the jury a little bit about what the Texas banking

23  commissioner is, does, how many banks it has, things of that

24  nature.

25  A.  So in the United States, we have a dual banking system.

1          So if you want a bank, you either get a charter

2     from the Comptroller of the Currency, which was where I was

3     for 18 years, or you get it from the banking commissioner

4     for the state.  So every state has a banking commissioner.

5     Minnesota has one.  And this was for Texas.

6          Texas was the third largest banking system --

7     state-chartered state banking system behind New York and

8     California in terms of size of banks, asset size, and at the

9     time was the second largest in terms of number of banks

10    behind my home state of Illinois.

11    Q.  Okay.  So how long did you work as Texas bank

12    commissioner?

13    A.  So I did that for seven and a half years.

14    Q.  And, briefly, what were your duties and

15    responsibilities?

16    A.  So I was responsible for all the state-chartered banks

17    in Texas and for the hiring and development of the bank

18    examiners.

19          And then we also had a lot of other types of

20    financial institutions, perhaps the most interesting of

21    which was prepaid funeral contract providers and perpetual

22    care cemeteries.  So we had all different manner of

23    financial institutions.

24    Q.  What year did you leave -- did you stop being Texas

25    banking commissioner?

Ghiglieri - Direct

1    A.  So that was in 1999.  From '92 to '99 I was Texas

2    banking commissioner.

3    Q.  So have you worked since 1999 to the present?

4    A.  Yes.  So I opened a consulting practice.

5    Q.  What's the name of it?

6    A.  Ghiglieri & Company.

7    Q.  And how many people are in your consulting practice?

8    A.  Just me, and my husband does the heavy lifting.

9    Q.  Of the books?

10   A.  Boxes.

11   Q.  Of the books?

12   A.  Yes.

13   Q.  Of which you have three of them in front of you.  Tell

14   the jury what that is.

15   A.  So this (indicating) is my report in this case, and this

16   (indicating) is my rebuttal report in this case.

17   Q.  All right.  So what has Ghiglieri & Company been doing

18   since 1999?

19   A.  So I do two basic things.  I do bank consulting and then

20   I do expert witness work.

21   Q.  And as a -- are you also an author?

22   A.  Yes.  I've published three books with a colleague of

23   mine from the OCC days.

24   Q.  Okay.  And just give us the name of one or two of them,

25   please.

1    A.  So we published one just to give an overview of banking

2    for bank directors.  It's called the *Ultimate Guide for Bank*

3    *Directors*.  And the other one is called *Boardroom*

4    *Strategies*.  And then we updated the *Ultimate Guide*.

5    Q.  Now, the nature of your bank consulting practice, do you

6    have confidentiality agreements with your clients?

7    A.  Yes.

8    Q.  Okay.  So don't tell us about any of the names of the

9    banks you consult for, but just give us an idea of the types

10   of services you provide to a bank from a consulting

11   standpoint.

12   A.  So I do a lot of enforcement-related work, where the

13   regulators are insisting that the banks do certain things,

14   mostly management studies, strategic plans, board governance

15   issues.  That's generally the themes of what I do for the

16   banks.

17   Q.  And tell the jury what you've done in the way of expert

18   witness work.

19   A.  In terms of the -- sort of the types of cases?

20   Q.  Yes.

21   A.  I've done Ponzi scheme cases.  I've done lender

22   liability cases, bookkeeper frauds.  Generally deposit and

23   loan issues, mainly.

24   Q.  What is your hourly rate?

25   A.  Well, for this case I contracted at 595 per hour, which

1    is for report preparation, file review, conference calls,

2    all those kinds of things, and 695 when I'm testifying for

3    the time that I'm testifying.  I've since raised my rate,

4    but I did not raise my rate for this case, which I don't do.

5    Once I contract, I keep the rate the same.

6            MR. ANTHONY:  Your Honor, we'll offer

7    Plaintiff's 695, which is Ms. Ghiglieri's resumé.  I

8    won't -- I don't feel the need to publish it.  It will be

9    available to the jury if they look at it.

10           MR. SCHAPER:  Objection, hearsay.

11           THE COURT:  Overruled.

12   BY MR. ANTHONY:

13   Q.  How many hours have you worked on this case,

14   approximately?

15   A.  I think it's just a little more than 800.

16   Q.  Okay.  And approximately how much have you been paid for

17   the work you've performed on this case?

18   A.  I've been paid about $500,000.

19   Q.  And is -- how does this case stack up in terms of the

20   size of the cases you've handled over the years?

21   A.  So I've had my consulting practice for 23 years.  This

22   is about the second biggest case I've had in terms of

23   dollars, revenue, I should say.

24   Q.  Have you ever been a director of a public company?

25   A.  Yes.

Ghigtieri - Direct

1    Q.  What's the name of the company?

2    A.  It was called NetBank.

3    Q.  Okay.  And how long did you serve there?

4    A.  I served for seven quarters.

5    Q.  Okay.  After you left the bank, did that bank -- was it

6    the subject of a lawsuit?

7    A.  Yes.

8    Q.  Were you named in the lawsuit?

9    A.  I wasn't initially.

10   Q.  And then what happened?

11   A.  I'm sorry?

12   Q.  And then what happened?

13   A.  Well, the bank failed about two years and two months

14   after I left, and so the shareholders filed a lawsuit

15   against certain officers and directors, not me initially.

16   And then about eight months later, I received a call from a

17   lawyer asking if he could accept service, that they had

18   added me to the case.

19   Q.  And then what happened?

20   A.  Well, I said no, and I hired my own lawyer, and I was

21   dismissed about ten weeks later.

22   Q.  Okay.  In this case what methodology did you use in

23   forming your opinions?  Before I get to your opinions, I

24   want to ask you about the methodology you used.

25   A.  So the methodology I used is the same that I used when I

Ghigtieri - Direct

```
 1    was examining banks, and what I did was I looked at the
 2    records of the bank from the time frame of the case.  I
 3    looked at what the laws and regulations and regulatory
 4    guidance was at the time, same as when I used to examine
 5    banks.
 6             And then in addition to that, because it's a court
 7    case, I read depositions of the bank people, as well as
 8    other folks that had been deposed.  I've listened to their
 9    testimony during this trial.
10             And I also did a transaction review of the
11    transactions in the PCI 9018 account.
12    Q.  Now, there's been some testimony or discussion about a
13    hindsight bias.  How did you account for that when you used
14    your methodology to prepare your report?
15    A.  So hindsight bias means that something you know today,
16    you put kind of a varnish on something that happened
17    yesterday.
18             And the very nature of being a banking expert, you
19    know, I wasn't at the bank at the time this was going on, so
20    what I do to prevent hindsight bias is I focus on the
21    documents that were contemporaneous at the time and I look
22    at the transactions so that I can see what the AML analysts
23    can see, for example, when they're working alerts.  And I
24    look at the regulatory materials at the time.
25             So I try and isolate the information to the time
```

1   frame of the case to mitigate hindsight bias.

2          MR. ANTHONY:  Your Honor, the trustee tenders the

3   witness as an expert on the banking industry, its rules and

4   regulations, usual and customary industry practices,

5   especially with respect to the matters that are the subject

6   of her report.

7          MR. SCHAPER:  No objection, Your Honor.

8          THE COURT:  She is received as such.

9   BY MR. ANTHONY:

10  Q.  Ms. Ghiglieri, do you have an opinion with respect to

11  the manner in which the bank -- I'm just going to ask you

12  for your overall opinion.

13         Do you have an opinion with respect to the manner

14  in which the bank processed wire transfers and other

15  transactions in the PCI 9018 account and the manner in which

16  it monitored transactions for suspicious activity?

17  A.  Yes, I do.

18  Q.  What is your opinion?

19  A.  So my opinion is that BMO Harris assisted Tom Petters in

20  the Ponzi scheme by ignoring the red flags of money

21  laundering and other types of financial fraud, and also by

22  engaging in atypical banking practices in the manner in

23  which they processed the wire transfers and other

24  transactions in the PCI account, which totaled $75 billion

25  in and out over the 2002 to 2008 time frame.  And also the

1     manner in which they looked at the transactions in the

2     account for suspicious activity.

3                MR. SCHAPER:  Objection, Your Honor, move to

4     strike and would appreciate being able to approach at

5     sidebar to be able to explain it.  It's outside the scope of

6     her opinion.

7                THE COURT:  You may approach.

8          **(At sidebar)**

9                MR. SCHAPER:  Your Honor, the witness just

10    testified that her opinion is that the bank assisted

11    Mr. Petters in the Ponzi scheme.  I do not believe that

12    that's in her report.  She says that the bank's conduct

13    allowed the Petters Ponzi scheme to flourish or to go

14    undetected, but I don't believe she provides an opinion that

15    the bank assisted.  And if I'm wrong, Mr. Anthony, correct

16    me.

17               MR. ANTHONY:  I don't have her report in front of

18    me, but it's on what page?

19               MR. SCHAPER:  Allowed the Petters Ponzi scheme to

20    flourish and go undetected.  That's not assistance.

21               MR. ANTHONY:  I will look at the report and read

22    it.

23               THE COURT:  The objection is sustained.

24               MR. SCHAPER:  Thank you.

25         **(In open court)**

Ghiglieri - Direct

1    BY MR. ANTHONY:

2    Q.  Ms. Ghiglieri, would you turn to your report, to your

3    table of contents.

4              THE COURT:  Counsel, I believe there was a motion

5    to strike pending.  Is that correct?

6              MR. SCHAPER:  Yes.

7              THE COURT:  That motion is sustained -- or

8    granted.

9    BY MR. ANTHONY:

10   Q.  And turn to page 8, please.

11   A.  Okay.

12   Q.  And read the opinion that appears in VI A.

13   A.  "The bank's BSA/AML policies, procedures, and systems

14   were severely flawed, which allowed the Petters Ponzi scheme

15   to flourish and go undetected.  For example, the bank

16   developed an expedited review process for accounts whose

17   alerts were evaluated against other peers, also known as the

18   QAPOR process.  But the bank had only two peer groups, one

19   for businesses and one for individuals, against which to

20   evaluate account activity, thereby rendering the peer

21   evaluation meaningless.  The bank also placed PCI on the

22   QAPOR list when it was not eligible for placement on the

23   list in violation of its own policies."

24   Q.  Is that your opinion?

25   A.  Yes.

Ghigtieri - Direct

1   Q.  Does it continue to be your opinion?

2   A.  Yes.

3   Q.  Let's discuss the overview -- let's discuss the legal

4   and regulatory framework that BMO Bank is subject to.

5          So describe generally how banks in the U.S. are

6   regulated.

7   A.  So banks are regulated by -- basically federal law

8   prevails for banks, whether they're state chartered or

9   federally chartered.  And in this case M&I Bank was state

10  chartered.  BMO Harris is federally chartered.  But they

11  both had to, and have to, comply with federal laws.

12         And so each -- the state, as well as the OCC, has

13  teams of examiners that go into the bank and they will look

14  at certain books and records, depending on what the scope of

15  their examination is.  Then they write a report.  The report

16  goes to the board of directors, and the board of directors,

17  you know, has the information on the conclusions that the

18  examiners are reaching.

19  Q.  Okay.  Banking is filled with a number of acronyms, and

20  we'll be using several of those during your testimony.

21  Let's review them so we're all -- so when we use the

22  shorthand, we know what we're talking about.

23  A.  Okay.

24         MR. ANTHONY:  Ms. Ellig, would you put up

25  demonstrative PD 4, please.

1    BY MR. ANTHONY:

2    Q.  So just briefly mention what each of these acronyms are

3    and what entity or institution they're referring to.

4    A.  So the first one is FDIC.  Is that right?  Can you see

5    that?

6    Q.  If you look in your book, I think there's probably --

7    A.  I'm just looking on the screen.

8    Q.  Okay.

9    A.  FDIC.  The FDIC is the organization that insures

10   deposits in banks, up to $250,000 per account.  And the FDIC

11   also is a primary federal regulator for state-chartered

12   banks that choose not to become a member of the Federal

13   Reserve.

14          The OCC is the Office of the Comptroller of the

15   Currency, and that's where I worked for 18 years.

16          The FFIEC is the Federal Financial Institutions

17   Examination Council, and this is comprised of all of the

18   federal regulatory agencies:  The FDIC, the Federal Reserve,

19   the OCC, the organization -- the entity that is responsible

20   for regulating credit unions called NCUA, and the CFPB,

21   which is a relatively new organization that is concerned

22   with consumer financial issues.

23          There's also a state liaison group that's made up

24   of state banking commissioners.  That's also a part of the

25   FFIEC.  So whenever they do anything, all of the regulatory

1    agencies, whether it's state or federal, for the banking

2    system are involved in this organization.

3              And then the Bank Secrecy Act, that's a law passed

4    by Congress to try and prevent money laundering in the

5    banking system.

6              Anti-money laundering is really the same as Bank

7    Secrecy, but sometimes the banks will use BSA and sometimes

8    they will use AML.  So that's why I wanted to put it on

9    here.  It's the same thing.

10             And then SAR is a Suspicious Activity Report, and

11   this is where banks find suspicious activity and then report

12   it to the federal government to another organization called

13   FinCEN, which is the Federal Crimes Enforcement Network.

14   Q.  Now, remind us who was M&I Bank regulated by during the

15   period 2002 to 2008.

16   A.  So they were regulated by the state banking commissioner

17   and by the Federal Reserve.

18   Q.  Was M&I Bank subject to the BSA, the Bank Secrecy Act,

19   during that time?

20   A.  Yes.  So they had to comply with all the federal banking

21   laws, and then, of course, they have to comply with the FDIC

22   regulations because they're an insured -- their deposits are

23   insured; and they have to comply with the Federal Reserve

24   not only because they were a Federal Reserve member, but

25   also because of their lending and deposit activities.  So

1   their regulations.

2   Q.  Do you find -- does FFIEC publish materials to the

3   banking industry?

4   A.  Yes.

5   Q.  Do you find those publications reliable?

6   A.  Yes, I do.

7   Q.  Why is that?

8   A.  Because the FFIEC is made up of all federal and state

9   regulators, and they publish information on a couple of

10  topics.  In particular, the Bank Secrecy Act; appraisals for

11  real estate loans; and information technology, the IT, so

12  that the examination procedures are consistent across all of

13  the federal regulators and the state regulators.

14  Q.  Do you rely on any other agency's publications?

15  A.  Yes.  I always pull the FDIC and the Federal Reserve

16  publications and regulations because the banks have to

17  comply with those also.  And then the OCC, if it's a

18  national bank, which BMO Harris is but M&I wasn't, so I

19  don't have OCC regulations cited in my report.

20  Q.  Turn, if you will, in your volumes to your right to what

21  would be Plaintiff's 578.

22          MR. ANTHONY:  Ms. Ellig, don't put this up yet

23  because it's not been admitted yet.

24  BY MR. ANTHONY:

25  Q.  Can you find Exhibit 578?  Do you have it in front of

1    you?

2    A.  I do.

3    Q.  Can you identify that, please.

4    A.  Yes.  This is the Bank Secrecy Act Examination Manual,

5    and this is published by the FFIEC, which is the

6    organization of all the federal and state regulators.

7    Q.  Do you find this -- what's the relevance of this Exhibit

8    578 to the banking industry?

9    A.  So this is considered the bible for Bank Secrecy Act.

10   It's just filled with great information on how banks can

11   comply with the Bank Secrecy Act.

12   Q.  Do persons in the banking industry rely on the -- on

13   Exhibit 578?

14   A.  They do.

15   Q.  Do you rely on it for your testimony here today?

16   A.  I do.

17              MR. ANTHONY:  Your Honor, we offer Exhibit 578.

18              MR. SCHAPER:  No objection, Your Honor.

19              THE COURT:  Exhibit 578 is received.

20              MR. ANTHONY:  Your Honor, someday somebody will

21   make a binder that will not catch when you try to move the

22   pages.  If I were an inventor --

23   BY MR. ANTHONY:

24   Q.  Okay.  We're talking about Plaintiff's 578, the FFIEC --

25   what do we call that?  Do we call it a manual?  What do you

```
1    call it?

2    A.  I call the Bank Secrecy Act Examination Manual.

3    Q.  Okay.  And who drafts this?

4    A.  So the FFIEC is the organization that the OCC, FDIC,

5    Federal Reserve, and other agencies, plus the state banking

6    commissioners, are a part of.  And so these FFIEC Bank

7    Secrecy Act manuals are the combined collective wisdom about

8    how to comply with the Bank Secrecy Act, and it's published

9    for the benefit of the banking system and the examiners.

10   It's an examination manual.  So the examiners know what

11   they're supposed to do when they go in to do a Bank Secrecy

12   Act examination, and the banks know what to expect.  Plus a

13   lot of helpful information in here on how to detect red

14   flags, for example, or -- in different areas.

15          MR. ANTHONY:  Would you publish page 01111 of

16   Exhibit 578, please.  Or just 11.  Counsel for the bank and

17   I have agreed that these are excerpts from the FFIEC manual.

18   Is that a fair statement?

19          THE WITNESS:  Well, yeah.  I mean, it's the page

20   in the manual, right?  Is that what you mean?  Or I don't

21   know.

22       (Mr. Anthony and Mr. Schaper confer)

23   BY MR. ANTHONY:

24   Q.  When he says the whole -- you have the whole thing.

25   A.  Yes.
```

Ghiglieri - Direct

1    Q.  We do not.

2    A.  Yes.  It's like, you know, 300 -- 350 pages.

3    Q.  So we only have a few of those pages.  You have the

4    whole thing in front of you.

5    A.  Yes, yes.

6    Q.  Thank you for clarifying that for us.

7            So let's look at page 11 of Exhibit 578 and let's

8    talk a little bit about what's on that page.

9    A.  So I like to use this in my reports because I think it

10   gives a snapshot of what the Bank Secrecy Act is all about

11   and --

12   Q.  Ms. Ghiglieri, could you go a little slower?

13   A.  I'm sorry.

14   Q.  No, it's not me you have to be sorry for.  I want you to

15   be mindful of the court reporter.

16           Okay.  So what page are you on?

17   A.  So I'm on the page that's on the screen, 11.

18   Q.  Okay.

19   A.  And the first sentence under "Money Laundering and

20   Terrorist Financing" I think is a good snapshot of why

21   Congress passed the Bank Secrecy Act.  And if I may read it,

22   it says, "The BSA is intended to safeguard the U.S.

23   financial system and the financial institutions that make up

24   that system from the abuses of financial crime, including

25   money laundering, terrorist financing, and other illicit

1    financial transactions."

2    Q.  So what do banks have to do to comply with the Bank

3    Secrecy Act?

4    A.  So there's a lot they have to do to comply with it, but

5    I think at a very, very high level, banks have to know their

6    customer; they have to monitor the transactions in the bank

7    for suspicious activity; and where they find it, they have

8    to report it.

9    Q.  Okay.  So if the bank -- does the bank have to know that

10   there's a crime in order to report suspicious activity?

11   A.  No.

12   Q.  Explain that to the jury, what the bank has to do when

13   it sees something suspicious.

14   A.  So what the bank is looking for are patterns of

15   suspicious activity.  They don't have to know exactly what

16   the crime is.  They don't have to put together a case to be

17   able to hand the prosecutor so the prosecutor can go into

18   court.  They have to be able to identify suspicious

19   activity, and where they do identify it, to report it to

20   FinCEN.

21   Q.  Now, is there a regulation that goes hand in glove with

22   this FFIEC Exhibit 578?

23   A.  So there's --

24          MR. SCHAPER:  Objection, Your Honor.  This is a

25   legal conclusion.  I would like to approach.

1            THE COURT:  The question calls for a legal

2      conclusion?

3            MR. SCHAPER:  This line of testimony is asking for

4      legal conclusions.

5            THE COURT:  You may answer the question.

6            THE WITNESS:  So there's a law that's called the

7      Bank Secrecy Act.  There are regulations that have been

8      promulgated by the various agencies.  And this is

9      considered, this 350 pages is regulatory guidance.  So

10     there's a lot of information and requirements in this Bank

11     Secrecy Act area for banks.

12     BY MR. ANTHONY:

13     Q.  Is there a federal regulation that deals with you having

14     to know your customer?

15     A.  Right, yes.

16            MR. ANTHONY:  And can we put up demonstrative

17     PD-5, please.

18     BY MR. ANTHONY:

19     Q.  Okay.  What is on the screen that we are seeing now,

20     PD-5?

21     A.  So this is not the "know your customer" regulation.

22     This is the regulation that requires banks to report

23     suspicious activity.  So this is 31 CFR -- you can see in

24     the bottom of the screen here -- 103.18.

25     Q.  All right.  So my bad.  I went ahead without bringing

1    you back to 578.  So let's talk about what's on the screen,

2    which is Demonstrative Number 5.  How does Demonstrative

3    Number 5, which is the federal reporting requirement, how

4    does that dovetail with Exhibit 578, the Bank Secrecy Act we

5    just saw?

6    A.  So there are a variety of regulations that have been

7    promulgated by the federal agencies -- FDIC, Federal Reserve

8    and OCC -- regarding the Bank Secrecy Act, of course

9    underneath the law that Congress passed.  And then 578,

10   which is the Bank Secrecy Act Examination Manual, is further

11   guidance on how to comply with the statute, the Bank Secrecy

12   Act statute, the law, and the regulations that have been

13   promulgated by the agencies.

14   Q.  Okay.  So there's a law, and then Exhibit 578 is the

15   manual to help banks comply with the law?

16   A.  Yes.  And then the regulations that the agencies, you

17   know, promulgate pursuant to the law to further refine what

18   banks should do, and then this is (indicating) even further

19   information.  So it's a lot of requirements for the bank.

20   Q.  All right.

21              MR. ANTHONY:  Would you publish PD-6, please.

22   BY MR. ANTHONY:

23   Q.  What is PD-6, which is up on the screen now?  It says,

24   "31 CFR 103.18."

25   A.  Yes.

Ghigtieri - Direct

1    Q.  Can you tell the jury what 31 CFR 103.18 refers to.

2    A.  So this and the previous screen are basically the text

3    of the regulation for reporting suspicious activity.

4    Q.  And where is this found, this text of this regulation?

5    A.  At 31 CFR 103.18.

6    Q.  A federal regulation?

7    A.  It's a federal regulation, yes.

8    Q.  And banks have to comply with it?

9    A.  Yes.

10   Q.  Okay.  So let's go through this slide as to what banks

11   have to do to comply with the federal reporting

12   requirements.

13   A.  So a transaction requires reporting if the bank knows or

14   has reason to suspect, and then they give different things.

15   The first one is if a "transaction involves funds derived

16   from illegal activities or is intended or conducted in order

17   to hide or disguise funds derived from illegal activities."

18   Q.  And what's the next one?

19   A.  The next one is -- so it would be a "transaction

20   requires reporting if the banks knows, suspects or has

21   reason to suspect that:" and then the "transaction has no

22   business or apparent lawful purpose or is not the sort in

23   which the particular customer would normally be expected to

24   engage, and the bank knows of no reasonable explanation for

25   the transaction after examining the available facts,

1    including the background and possible purpose of the

2    transaction."

3    Q.  Okay.  So the first line where it says, "The bank knows,

4    suspects, or has reason to suspect," do you see that?

5    A.  I do.

6    Q.  I think I know what "knows" means.  But what's the

7    difference between "suspects or has reason to suspect" in

8    the banking industry?

9    A.  So if --

10              MR. SCHAPER:  I object again and renew my argument

11   about a legal conclusion, about what a statute means.

12              THE COURT:  Overruled.

13              THE WITNESS:  So I'm sure there's a better

14   definition than this somewhere, but in my opinion, if the

15   bank knows or suspects, feels pretty certain or has reason

16   to suspect based on what they're seeing, then they need to

17   report the transaction.

18   BY MR. ANTHONY:

19   Q.  Okay.  So let's put Exhibit 578 back up, the first page.

20   What do -- what specific things do banks such as M&I have to

21   do to comply with the Bank Secrecy Act?

22   A.  So they have to have a written program to comply with

23   the Bank Secrecy Act, and this is basically a written policy

24   that will lay out how they're going to comply with the Bank

25   Secrecy Act.  And it runs the gamut of know your customer

Ghigrieri - Direct

1    information, how they're going to handle when customers come

2    and open accounts, what type of information they're going to

3    accept from them to make sure they know who the customer is.

4    They need to have a compliance officer to make sure that

5    someone is looking at everything in the bank to make sure

6    they're complying with the Bank Secrecy Act.  They're

7    supposed to have a third party come in and check their

8    compliance, and they're supposed to have training for their

9    employees.  That's sort of on a very high level.

10          And in addition to that, when they open accounts

11    and they obtain "know your customer" information, they also

12    want to find out what the account is going to be used for,

13    what kind of -- I'll stick to businesses rather than

14    personal accounts, but for businesses, what kind of a

15    business is it, what kind of transactions to expect, so that

16    they can then know when they see the transactions if they're

17    suspicious or not when they do their account monitoring.

18          And then they also have to have some sort of a way

19    to monitor the transactions, and banks have automated

20    systems and manual systems.

21          So there's a whole framework of things that banks

22    do to comply with the Bank Secrecy Act.

23    Q.  So what types of procedures did BMO, M&I, have from 2002

24    to 2008 to help it comply with the Bank Secrecy Act that you

25    observed?

1          MR. SCHAPER:  Objection, Your Honor.  Request a

2     sidebar.

3          THE COURT:  You may.

4     **(At sidebar)**

5          MR. SCHAPER:  Your Honor, the Court on the *Daubert*

6     motions opined that this expert cannot testify as to

7     conclusions about whether the bank complied with the BSA.

8          Now Mr. Anthony has just elicited a lot of

9     testimony about general BSA requirements.  My objections

10    were denied on that.  And now the witness is being asked,

11    Well, what did the bank do in connection with those

12    requirements.  If there's a line between that and asking for

13    the actual conclusion of did the bank comply or not, it's

14    thin beyond belief.  And the obvious implication of whatever

15    she's going to testify to is the conclusion of whether the

16    bank complied with the BSA or not.  She should not be

17    allowed to do that under the Court's prior order.

18         MR. ANTHONY:  I don't think we're at that point.

19    I haven't asked her --

20         THE COURT:  You haven't asked her what?

21         MR. ANTHONY:  I haven't asked her whether she has

22    an opinion on whether or not the bank has complied with the

23    Bank Secrecy Act.  I have asked her were there procedures in

24    place to enable the bank to comply, and I think she's going

25    to be saying yes.  So I'm not at the point where he is

1   objecting -- his objection is ripe.  I understand your

2   objection, but I haven't asked that question.

3              MR. SCHAPER:  We can't put the genie in the bottle

4   once he's asked what has the bank done, and she's already

5   explained what the bank is required to do or not.  And

6   that's not something that can be unheard.  So I just think

7   we are treading in very dangerous territory, Judge.

8              MR. ANTHONY:  Well, I don't think I am asking her

9   that.  She's going to say the bank had a written Bank

10  Secrecy Act program dated 2003 and it had a manual system

11  for monitoring accounts and delineating suspicious activity

12  on an Excel spreadsheet.  And then in 2005 to 2008, the bank

13  used an automated system known as Searchspace to help it

14  identify suspicious activity.  That's the answer I'm hoping

15  to elicit.

16             MR. SCHAPER:  And then I think, as a preview, what

17  we will hear probably later in the testimony is the bank did

18  all these things wrong.  Okay?  The bank did all these

19  things wrong, and tying it together what the testimony is

20  supposed to communicate is that the bank violated the Bank

21  Secrecy Act which is what the Court said is prohibited.

22             MR. ANTHONY:  But she has to be able to lay the

23  foundation for her opinions that the bank had these policies

24  in place.  The bank had policies in place.  She saw them.

25  She's prepared to say, This is what I saw the policies were.

Ghigtreri - Direct

```
 1              If I get to the point where you think I am seeking
 2      her opinion, if I ask the question did they violate the Bank
 3      Secrecy Act, then we can have this conversation.
 4              MR. SCHAPER:  My position is that's not the only
 5      question or the only testimony that should be barred by the
 6      Court's order.
 7              THE COURT:  Okay.  So far there has not been
 8      testimony that violates the order.  I think the order is
 9      clear, and I am directing counsel to abide by the order.
10              MR. ANTHONY:  And we will.
11              THE COURT:  So I understand your concerns.  Right
12      now the objection is, if there is an objection, is overruled
13      because there has not been any testimony that is contrary to
14      the ruling.
15              MR. SCHAPER:  I appreciate that.
16              MR. ANTHONY:  As I understand your argument, you
17      think she is going to give a legal opinion on the Bank
18      Secrecy Act.
19              MR. SCHAPER:  I think she is.
20              MR. ANTHONY:  And I am not going to try to elicit
21      or take a legal opinion on that.
22              MR. SCHAPER:  I have already stated the problem,
23      which is that even something short of that, given the
24      testimony that you have elicited about here's what the act
25      requires; and then if they go from, you know, Point A to
```

1    Point C and don't say Point B in the middle, the actual

2    conclusion, I still think that's a problem because it is

3    communicating to the jury what the Court has prohibited.

4         I understand the ruling now, but I appreciate that

5    the Court understands our concerns.  Thank you.

6         **(In open court)**

7         MR. ANTHONY:  May I proceed?

8         THE COURT:  You may.

9    BY MR. ANTHONY:

10   Q.  Ms. Ghiglieri, what policies or procedures did BMO or

11   M&I have from 2002 to 2008 to help it comply with the Bank

12   Secrecy Act?  We just want to know what policies and

13   procedures they had.

14   A.  They had a written -- they had a written Bank Secrecy

15   Act program that was in place throughout the whole time.

16   They had a manual account monitoring process from 2002 to

17   2005; and from 2005 to 2008, they had an automated account

18   monitoring system.  So they had a framework in place to

19   comply with the Bank Secrecy Act.

20   Q.  Okay.  Now, you've talked about -- so it was a manual

21   system between 2002 to 2005; an automated system, which I

22   think we have heard the word "Searchspace," from 2005 to

23   2008, right?

24   A.  Yes.

25   Q.  So now let's -- looking at Exhibit 578, and in

1    particular at page 66.

2    A.  I've got it.

3    Q.  And this is a description of how a bank would do manual

4    transaction monitoring, correct?

5    A.  Right.

6    Q.  Okay.  Now, tell the jury, if you will, what's the

7    difference between a manual system and what you call an

8    automated system, like Searchspace.  It seems obvious to me,

9    but maybe tell us a little bit about that.

10   A.  So the manual system, as it says in the first sentence,

11   is various reports that are issued by the bank's core

12   systems.  And examples -- about three or four sentences

13   down, examples include currency activity reports, funds

14   transfer reports, monetary instrument sales reports, large

15   item reports, significant balance change reports, and

16   nonsufficient (NSF) reports, which could also be considered

17   like overdraft reports.

18   Q.  Let me ask you this:  So whether you have a manual

19   system or an automated system, you have to do the same

20   thing, right?

21   A.  Yes.

22   Q.  So the bank has to do the same whether it's manual or

23   automated?

24   A.  Yes.  So they have to monitor the transactions in the

25   accounts for suspicious activity; and where they find it, to

1    report it, whether they have a manual system or an automated

2    system.

3    Q.  All right.  And so the automated system that's called

4    Searchspace, just give the jury a couple of minutes on what

5    that does and how it works and are there manuals for it.

6    How does that work?

7    A.  So -- and there is also a discussion of automated

8    systems in the FFIEC manual.

9          But Searchspace is a third-party vendor product

10   that banks buy and they bolt it onto their system.  And what

11   Searchspace does is it runs in the background while

12   transactions are flowing through the checking accounts and

13   various accounts.  And --

14          THE COURT:  Counsel, I'm going to direct you to

15   ask questions so as to avoid a narrative.

16          MR. ANTHONY:  Sure.  Thank you, Your Honor.

17   BY MR. ANTHONY:

18   Q.  So, Ms. Ghiglieri, Searchspace is an automated system

19   that operates in the background to do what?

20   A.  It identifies patterns of activities to alert the bank

21   that the transactions might be suspicious.

22   Q.  Okay.  So how does it do that?

23   A.  So it generates what's called alerts, which we've seen

24   testimony of here by the bank employees.

25   Q.  And then what happens with the alerts after they're

Ghigtier P - Direct

1    generated?

2    A.   So then a group of people at the bank will look at the

3    alerts to make a decision on whether or not the activity in

4    the account is suspicious in their view.

5    Q.   In various -- in banks, do these people who are given

6    these alerts typically have a name or a function that

7    describes what they're to do?

8    A.   Typically they're called analysts, AML analysts, Bank

9    Secrecy Act department, something like that; but they will

10   be trained individuals who will look at the alerts.

11   Q.   Okay.  So I'm going to shift gears to "know your

12   customer" now.  At every account opening we've heard some

13   testimony about knowing your customer.  So tell the jury

14   what in the banking industry a bank has to do -- the

15   information it has to get to know its customer.

16   A.   So on a base level, when someone comes into the bank to

17   open an account, in order to truly know who the customer is,

18   the bank needs to get, for a personal account, for example,

19   the name, physical address, date of birth, Social Security

20   number.  For a business account, they would get the federal

21   tax ID number.

22   Q.   Let me stop you there.

23   A.   Okay.

24   Q.   In addition to getting that information when a business

25   account opens, what other information does the bank have to

Ghigtier P. - Direct

1    get?

2    A.  So in order to know how to monitor the account, they

3    also find out what kind of business is it, what kinds of

4    transactions to expect.  For example, will they be doing

5    wire transfers?  Will the wire transfers be international or

6    domestic?  What dollar amounts might the wire transfers be?

7    And what would be the purpose of the business using the

8    account?

9    Q.  Okay.  So why does the bank -- why is it the custom and

10   practice in the industry for banks to get that information

11   from their business customers?

12   A.  So the regulation requires that the bank know who the

13   customer is to be able to get enough information to know

14   that.  And then in addition they need to get enough

15   information so that when they're monitoring the account,

16   they can determine if the transactions are suspicious.  So

17   the AML analysts will use that account opening information

18   in order to analyze whether something is suspicious.

19   Q.  So when we talk about when they get that information --

20   let me withdraw that.

21           What types of due diligence are banks required to

22   perform on business customers when they open their accounts?

23   A.  Well, it's called customer due diligence, and they get

24   enough information to truly know who the customer is.

25   Q.  What does that mean?

Ghigliery P. - Direct

```
1    A.  It means that they get information.  They then check it

2    with various databases to make sure that the person is who

3    they say they are; that they have the appropriate authority

4    to open a business account, for example; that the bank knows

5    what the reason is that they're opening the account, what

6    the account is going to be used for.

7    Q.  Let me ask you this:  Is it the practice in the industry

8    for banks to rate customers as low, medium or high risks?

9    A.  Yes.

10   Q.  Is there a different due diligence requirement depending

11   on what the rating of the customer is?

12   A.  Yes.  The higher the risk, of course the more due

13   diligence the banks want to do.  They want to make sure

14   someone is not going to open an account and then have some

15   kind of fraud running through it.

16   Q.  In the industry, give us some examples of the types of

17   business customers that would be high risk.

18   A.  High risk would be, first, the type of business.

19   Lawyers, for example, title companies, anybody who has other

20   people's money coming into their account are considered

21   higher risk.

22          And then also banks will look at the type of

23   products that they use.  Wire transfers are considered a

24   higher risk.

25   Q.  Why is that?
```

Ghiglieri - Direct

1    A.  Well, because once a wire transfer goes, the money is

2    gone.  You can't claw it back.  And it's easy for a money

3    launderer to use wire transfers to do money laundering.  So

4    the banks will look at the type of products that the

5    customer is going to use to determine if they're higher risk

6    also.

7    Q.  So when you say "type of product," are you saying that

8    the use of wire transfers is a type of product?

9    A.  Yes.

10   Q.  So if the bank sees a customer that's using a lot of

11   wire transfers, what does that signify in the context of

12   whether it's a high risk or low risk?

13   A.  So if they're going to be doing a lot of wire transfers,

14   the bank would rate it a higher risk.  They might rate it

15   medium.  They might rate it high.  If they are going to be

16   doing wire transfers to China all the time, they might rate

17   that the highest risk.  You know, there's high-risk

18   countries, high-risk products, high-risk types of businesses

19   to be in.  So the bank considers everything altogether in

20   order to determine the risk category of the customer.

21   Q.  Did M&I Bank ever classify PCI as high risk based on the

22   evidence you saw?

23   A.  No.

24   Q.  So you said that wire transfers are considered high-risk

25   transactions.  Are there any regulatory sources, like the

1    FDIC or the FFIEC, that describe wire transfers as high-risk

2    transactions?

3    A.  Yes.  So there's --

4    Q.  So let me stop you there.

5    A.  Okay.

6    Q.  Let's start with the FDIC.  Does what does the FDIC say

7    about wire transfers and high-risk transactions?

8    A.  They go through why wire transfers are high risk and

9    what banks can do to mitigate the risk.

10            MR. ANTHONY:  Would you please put up for

11   demonstrative purposes P-573, first page.

12            It's for demonstrative purposes.  We're not

13   offering it as evidence.

14        (Mr. Schaper and Mr. Anthony confer)

15            MR. SCHAPER:  Your Honor, I don't believe that

16   this has been disclosed as a demonstrative.

17            MR. ANTHONY:  All right.  We're going to offer it

18   as a demonstrative now because that's what it is.  We are

19   not offering to admit it in evidence.  Do you object?

20            MR. SCHAPER:  We object, untimely disclosure.

21            THE COURT:  Sustained.

22   BY MR. ANTHONY:

23   Q.  All right.  Are you familiar with DSC Risk Management

24   Manual of Examination Policies of the Federal Deposit

25   Insurance Corporation?

Ghigirer P77 Direct

1    A.  Yes.

2    Q.  What does that provide with respect to whether or not

3    wire transfers are considered high-risk transactions?

4    A.  So this is the FDIC's examination manual, like the FFIEC

5    examination manual.  So it's giving the examiners and the

6    banks information as far as in this section that we were

7    going to look at --

8         MR. SCHAPER:  Objection, Your Honor.  I believe

9    the witness is referring to a document that's not in

10   evidence and that has just been excluded as a demonstrative.

11   So if there are questions and answers to be had, fine, but I

12   don't believe that that should be permitted.

13        MR. ANTHONY:  Your Honor, I'm going to lay the

14   foundation to offer it as evidence.  We've disclosed it to

15   them.  We disclosed it for purposes of offering it as

16   evidence.  I was just going to do it as a demonstrative to

17   move it along and not go through that exercise, but I am

18   going to go through the foundation exercise now.

19        THE COURT:  You may lay foundation.  Let me just

20   ask, is it contested that this was disclosed as an exhibit?

21        MR. SCHAPER:  No, it's not.  But I haven't heard

22   any foundation laid --

23        THE COURT:  Right.  So you may seek to lay

24   foundation at this time.

25        MR. ANTHONY:  We disclosed this as an exhibit last

```
 1      night.
 2                  MR. SCHAPER:  I just said we don't contest that
 3      you did.
 4                  MR. ANTHONY:  Okay.  So I'll lay the foundation.
 5                  THE COURT:  You may seek to lay foundation.
 6                  MR. ANTHONY:  Okay.
 7      BY MR. ANTHONY:
 8      Q.  So take a look at Exhibit 573 and tell us what it is,
 9      please.
10      A.  So this is the FDIC's examination manual.
11      Q.  Is it -- and tell us how it is people in the banking
12      industry use the FDIC examination manual.
13      A.  So they use it in the same way as the FFIEC manual, in
14      order to comply with the standards in the banking industry.
15      In this case, this section --
16      Q.  Don't talk about the section yet.
17      A.  Okay.
18      Q.  Okay.  Is this the type of manual, Exhibit P-573, on
19      which banks in the industry typically rely?
20      A.  Yes.
21      Q.  And did you rely on this manual in connection with the
22      opinion that your -- the opinions you've rendered in this
23      case?
24      A.  I did.
25      Q.  And is this a publication that is provided and used by
```

```
 1    banks in the ordinary course of their business?
 2    A.  Yes.
 3              MR. ANTHONY:  We offer P-573.
 4              MR. SCHAPER:  No objection, Your Honor.
 5              THE COURT:  Exhibit P-573 is received.
 6    BY MR. ANTHONY:
 7    Q.  Okay.  Let's look at P-573 and specifically page --
 8    let's look at the cover page.  It says, "Bank Fraud and
 9    Insider Abuse."  And -- okay, the first sentence -- you
10    know, we've all heard about -- I think we've heard a lot
11    about the FDIC and protecting your money and things like
12    that.  Is that, you know, every bank provides some insurance
13    to protect a certain amount of your deposits; is that what
14    they do?
15    A.  So the FDIC is the insurer of federally insured
16    deposits, and they insure every account up to $250,000.  And
17    so by virtue of having federally insured deposits in the
18    bank, the bank has to comply with the FDIC regulations, and
19    this is regulatory guidance to help them do that.
20    Q.  Okay.  So the first sentence is -- says, "The early
21    detection of apparent fraud and insider abuse is an
22    essential element in limiting the risk to the FDIC's deposit
23    insurance funds and uninsured depositors."
24              What is the -- what are they talking about here?
25    A.  So what they're talking about here is, for example, when
```

1    I was at the OCC and I would go out and close a bank, we

2    would turn it over to the FDIC to resolve.  So in the times

3    when we had a lot of bank failures, the FDIC steps in and

4    they will sell the bank and they will try and get as much

5    money as they can for the uninsured depositors, and they

6    will insure and give -- make good on the accounts that are

7    up to $250,000.

8    Q.  Okay.  So now the next sentence says, "Although it is

9    not possible to detect all instances of apparent fraud and

10   insider abuse, potential problems can often be uncovered

11   when certain warning signs are evident."  Do you see that?

12   A.  Yes.

13   Q.  What guidance is the FDIC providing to banks in the

14   industry with that observation?

15   A.  So this is the red flags section, and so what the FDIC

16   is doing is saying we have seen these kinds of things where

17   it has been some sort of a fraud, and we want the banks to

18   know about some of these things so if they see something

19   similar, they can act to try and prevent a problem in their

20   bank.

21   Q.  Okay.  All right.  So this conversation started -- these

22   questions started with going to the FDIC portion about

23   high-risk customers.  So let's turn to that page.  I think

24   it's 13 of Exhibit 573.

25        MR. ANTHONY:  And if you would enlarge the "Wire

Ghigleri - Direct

1    Transfers" portion.

2    BY MR. ANTHONY:

3    Q.  What is the -- why are wire transfers considered in the

4    banking industry to be higher risk?

5    A.  They're considered high risk because once a wire

6    transfer is sent from a bank, the money is gone.  And so if

7    there's any kind of problem regarding that transaction, then

8    it can cause a loss to either the customer or the bank.  And

9    so they're considered high risk.

10          If you look at the last sentence in the "Potential

11   Problems" category there, it says, "Wire transfers are a

12   popular form of money laundering, providing an easy way of

13   sending funds to and from bank secrecy haven countries."

14   But also, you know, to non-secrecy -- bank secrecy haven

15   countries.  It's a fast way of moving money around, and that

16   makes it higher risk.

17   Q.  All right.  In the banking industry, what type of due

18   diligence is typically done for customers who conduct a lot

19   of wire transfers?

20   A.  So the bank would want to know what the purpose of the

21   activity is and what the sources and uses are for the

22   activity.  Sometimes they'll ask for customer information of

23   the customer, you know, who they're doing business with,

24   things that we've heard discussed from the AML analysts that

25   they would look at.

Ghigller P7 Direct

1    Q.   Okay.  You mentioned a few things there with respect to

2    due diligence.  The purposes, the purpose for what?

3    A.   The purpose of the incoming wire transfer or the purpose

4    of the outgoing wire transfer.  You know, what is the

5    customer doing with large wire transfers.

6    Q.   So what does the analyst need to look for to comply with

7    usual and customary banking practices to determine the

8    purpose of the wire transfer?

9    A.   They look at who the originator of the wire transfer is,

10   who's the beneficiary.  They can look at where the wire

11   transfer is going; how quickly money is moving in and out

12   with wire transfers; if wire transfers are going to and from

13   the same entity on the same day or within a couple days.  So

14   there are a lot of patterns that they can look at that have

15   been described in the regulatory guidance as potential

16   problems.

17   Q.   And in the industry if you see those patterns, what are

18   you supposed to do?

19   A.   So when you see those kinds of patterns, it's indicia of

20   money laundering or other type of financial fraud, and you

21   would expect the bank to report it to FinCEN as a suspicious

22   activity.

23   Q.   Now, you mentioned that one of the other things they

24   would look for are sources and uses.  How is purpose

25   different from sources and uses in the industry?

Ghigliery P - Direct

1    A.  I think I am using it in the same way.

2    Q.  Okay.  And then you said about how they're doing

3    business.  How is that different than purpose or sources and

4    uses?

5    A.  So the bank -- when a customer opens an account -- and

6    they are supposed to do this due diligence for the life of

7    the account.  If they have ever have any questions, they are

8    supposed to inquire.

9    Q.  Let me stop you there.

10   A.  Okay.

11   Q.  So they have to do this due diligence when they open the

12   account for sure, right?

13   A.  Yes.

14   Q.  And once they do it at the start, can they ignore it

15   after that or do they have to keep focused on due diligence?

16            MR. SCHAPER:  Objection, leading.

17            THE COURT:  Sustained.

18            MR. ANTHONY:  I will withdraw and rephrase.

19   BY MR. ANTHONY:

20   Q.  After they have done the opening due diligence, what, if

21   anything, does the bank have to do to maintain due diligence

22   going forward during the life of the account?

23   A.  So there are a couple of things.  For an account rated

24   high risk, they might do a review once a year to make sure

25   that the information is still current.  For medium and

Ghiglieri - Direct

1      low-risk accounts, they may only do an updated "know your

2      customer" information when they have a question, maybe as a

3      result of an alert that's generated from the automated

4      system.

5              But I think I failed to answer your question.

6      Q.  That's okay.  I'll catch you with another question.

7      A.  Okay.

8      Q.  So you said if a bank spots something that it thinks

9      looks suspicious, it's supposed to report it to FinCEN,

10     right?

11     A.  Yes.

12     Q.  Is it supposed to investigate it, the underlying

13     conduct, to see if there was a crime committed?

14     A.  No.

15     Q.  So do they have to do an investigation to see, for

16     example, if a Ponzi scheme was taking place?

17     A.  No.

18     Q.  So what are they required to do?

19     A.  So there's two things they should do.  If they identify

20     suspicious activity, they report it to FinCEN, as they're

21     required to do under the regulations for the Bank Secrecy

22     Act; and then they have to make a decision, are they going

23     to allow the customer to continue banking with them or are

24     they going to close the account.  And banks have policies

25     and procedures, and M&I did, on when they were going to

1    close accounts if they detect suspicious activity.

2    Q.  Okay.  Now, we've heard the phrase "red flag," and I

3    think you've mentioned it a couple of times.  So tell the

4    jury, if you will, what your definition of a "red flag" is

5    as it relates to the banking industry.

6    A.  So a "red flag" is a warning sign, I think you could

7    say -- I think that's what the FDIC said -- that something

8    might be suspicious that would lead the bank to look into it

9    further.

10   Q.  Does FinCEN talk about red flags?

11   A.  I don't cite FinCEN, but FFIEC does.

12   Q.  Okay.  I meant FFIEC.

13           MR. ANTHONY:  So let's put Exhibit 578 up, please,

14   and page 0314.

15   BY MR. ANTHONY:

16   Q.  Let's look at what FinCEN -- FFIEC says about red flags,

17   all right?  So generally what red flags are identified by

18   FFIEC?

19   A.  So let's see.  There's, I think, nine pages of red flags

20   in various categories in this manual.

21   Q.  All right.  I'm going to take -- I'm not going to make

22   you go through all nine pages.  I'm going to take you to the

23   one on page 315.

24           MR. ANTHONY:  And would you enlarge the bottom

25   half of the page 315 of Exhibit 578, please, entitled "Funds

1    Transfers."

2    BY MR. ANTHONY:

3    Q.  What is FFIEC saying about red flags as it relates to

4    Item Number 1 under "Funds Transfers"?  I would just like

5    you to focus on the first item, please.

6    A.  So funds transfers means wire transfers.  That's the

7    same thing.

8             And the first bullet underneath it says, "Many

9    funds transfers are sent in large, round dollar, hundred

10   dollar, or thousand dollar amounts."

11   Q.  So what's the problem with that?

12   A.  So bank examiners have seen where you see large round

13   dollars coming in and out in a circle, that that is an

14   indication or a warning sign of money laundering, of other

15   types of financial frauds, like check kiting, Ponzi schemes.

16   It can be different things.

17            The bank doesn't have to worry about the label.

18   They only have to worry about the pattern.  If they detect

19   suspicious activity, that's when they have to report it and

20   then make a decision on whether or not they're going to

21   close the account.

22   Q.  All right.  So then at the bottom it has -- third way up

23   from the bottom, third bullet point, "Funds transfer

24   activity is unexplained, repetitive, or shows unusual

25   patterns."  What's a bank supposed to do when it sees

Ghigtier1 - Direct

```
 1    something like that?
 2    A.  So this is what the AML analysts are looking at when
 3    something alerts for incoming and outgoing wire transfers,
 4    is the wire transfer activity unexplained, repetitive, or
 5    shows unusual patterns.
 6              Unexplained would be that it wouldn't make sense
 7    based on the "know your customer" information that was
 8    obtained at account opening as far as what the purpose or
 9    what the business is of the customer.
10    Q.  What is repetitive?
11    A.  Repetitive would be that it's happening over and over
12    again.
13    Q.  And then what's shows unusual patterns?
14    A.  Unusual pattern would be sending money to and from the
15    same entity over and over again.  So there's many examples
16    of unusual patterns, but that's just an easy one to be able
17    to see.
18    Q.  Okay.  So the bottom one is -- of red flags of wire
19    funds transfers is "Funds transfers are sent or received
20    from the same person to or from different accounts."
21    A.  Right.
22    Q.  What's -- why is that suspicious?
23    A.  Because when you see wire transfers going in and out,
24    you know, on the same day or maybe every couple days or
25    whatever, the AML analyst and the bank have to say to
```

1    themselves what business reason is this activity?  Why are

2    funds going in and out in a circular pattern over and over?

3           So these are just helpful examples from the

4    regulators of where bank examiners during examinations have

5    found different attributes of activity that later became --

6    you know, that they realized was some kind of a fraud going

7    through.

8    Q.  Okay.  Let's turn to the same exhibit, 578, page 316.

9    What does FFIEC say about activity inconsistent with the

10   customer's business?  Let's look at that.

11          And the bottom line is the one I would like you to

12   focus on right now.  It says -- at the top it says,

13   "Activity Inconsistent with the Customer's Business."  And

14   it says, "Goods or services purchased by the business do not

15   match the customer's stated line of business."

16          Now, what is that referring to?

17   A.  So that goes to the information on file about what does

18   this business do and how do the transactions that are

19   alerting make sense with what they know what the business

20   is.  So it's just helpful information for the bank to be

21   able to identify suspicious activity.

22   Q.  Please turn to Exhibit P-572 in your volumes there, and

23   I would like you to identify what that is, please.

24   A.  This is another section of the FDIC examination manual.

25   Q.  How is this different than the last one we saw?

Ghigliery P7 - Direct

```
1    A.  The last section was about red flags.  This section is

2    about Bank Secrecy Act and money laundering, more in-depth

3    information.

4    Q.  So is this Exhibit 572 something that you find reliable

5    and which is used by the industry regularly in the ordinary

6    course of banking business?

7    A.  Yes.

8    Q.  And have you relied on this in your report?

9    A.  I have.

10             MR. ANTHONY:  Plaintiff offers Exhibit 572.

11             MR. SCHAPER:  No objection, Your Honor.

12             THE COURT:  Exhibit 572 is received.

13   BY MR. ANTHONY:

14   Q.  It's entitled "Bank Secrecy Act, Anti-Money Laundering,

15   and Office of Foreign Assets Control."

16   A.  Yes.

17   Q.  Correct me if I'm wrong, but it seems to me I am seeing

18   a lot of FDIC stuff, FFIEC stuff, materials talking about

19   money laundering.  Is there a lot of this kind of material

20   available in the banking industry?

21             MR. SCHAPER:  Objection, leading, counsel

22   testifying.

23             THE COURT:  Sustained.  Reform your question.

24   BY MR. ANTHONY:

25   Q.  How much material is available generally to the banking
```

1    industry to enable it to comply with the Bank Secrecy Act?

2    A.  So the Bank Secrecy Act area --

3         (Binders shifted on bookcase)

4         THE WITNESS:  I hope everything doesn't come

5    crashing down.

6    A.  There is a lot of guidance by the regulators in the Bank

7    Secrecy Act area.  The FFIEC manual alone is 350; some of

8    the more recent volumes are 450 pages.  The FDIC has

9    information.  Of course the OCC has information for BMO

10   Harris, and the Federal Reserve has information.  So there's

11   a lot of material for the bank to be able to comply with the

12   Bank Secrecy Act.

13        MR. ANTHONY:  Okay.  Ms. Ellig, would you turn to

14   P-572-0039, please.  Actually, turn to -- publish page 38,

15   please, and highlight the three stages of money laundering,

16   please.

17   BY MR. ANTHONY:

18   Q.  This FDIC -- do we call this a manual?  What do we call

19   this?

20   A.  Examination manual.

21   Q.  This examination manual identifies three stages of money

22   laundering:  Placement, layering, and integration.  Briefly,

23   tell us what placement is.

24   A.  Placement is where the money is taken to the bank,

25   placed in the bank.

1    Q.  And what is integration?

2    A.  Integration is where money goes out washed for the

3    purchase of, say, a car to make-ill gotten gains; washed

4    through the bank and then made to look legitimate.

5    Q.  And what is integration?

6    A.  That's integration.

7    Q.  Okay.

8    A.  Layering is where you try and layer the transactions to

9    obfuscate, if you want, the money that's coming in that's

10   dirty.

11   Q.  So what role does the bank play in this three stages of

12   money laundering?

13   A.  Well, I mean, money laundering doesn't have to just be

14   cash, but that's what you normally think about is, you know,

15   people bringing in dirty money, having it be sort of

16   confused in the bank and then going out as clean money.

17   That's sort of what you normally think of money laundering.

18          But basically it's a fraudster trying to use the

19   banking system to make himself look legitimate, and that's

20   also money laundering and it can be done through wire

21   transfers.

22   Q.  And if we turn to page 39 of this exhibit, 572,

23   there's -- in the bottom right-hand corner there's "Money

24   Laundering Red Flags."  And it says -- it talks about the

25   red flags.  The last sentence says, "While these red flags

1    are not evidence of illegal activity, these common

2    indicators should be part of an expanded review of

3    suspicious activities."

4         What is the message being sent by the FDIC manual

5    in this regard?

6    A.  So similar to the FFIEC, these are red flags that the

7    regulators have seen, where it has been some sort of

8    fraudulent activity.  And so they're just saying to the

9    bank, if you see these, look further, look into it to

10   determine if it's truly suspicious activity.

11   Q.  I'm going to have you close to that exhibit and move to

12   another exhibit now.

13        THE COURT:  Counsel, we're at the time for our

14   midday break.  I will remind the jurors of your

15   instructions.  I won't repeat them other than to say do not

16   discuss the case among yourselves.  Do not do any kind of

17   research about the case or any person involved in the case.

18   Remember to keep an open mind as that is required of you to

19   perform your duties as a juror at this stage and throughout

20   the trial.

21        So we will take an hour for our lunch.  Please

22   prepare to be ready to return to the courtroom at 1:00,

23   okay?  Thank you.

24        All rise.

25     (Jury excused)

```
1                        IN OPEN COURT

2                      (JURY NOT PRESENT)

3              THE COURT:  And to our witness, you are excused.

4      Please be prepared to return at 1:00.

5              Anything further from counsel?

6              MR. ANTHONY:  Not from plaintiff.

7              THE COURT:  Thank you.  Have a good lunch.

8          (Lunch recess taken at 12:00 p.m.)

9                        *    *    *    *    *

10         (1:08 p.m.)

11                       IN OPEN COURT

12                      (JURY PRESENT)

13             THE COURT:  Please be seated.

14             Counsel, you may continue.  Good afternoon.

15             MR. ANTHONY:  Thank you.

16     BY MR. ANTHONY:

17     Q.  Good afternoon, Ms. Ghiglieri.

18             MR. ANTHONY:  Please -- Ms. Ellig, please put up

19     Plaintiff's 572, page 39.

20     BY MR. ANTHONY:

21     Q.  In the lower right-hand corner we had been talking about

22     money laundering, and there's a couple items on the next

23     page, 40, of Exhibit 572 that I wanted to bring to your

24     attention, Ms. Ghiglieri.

25             There's a discussion here of money laundering red
```

Ghiglieri - Direct

```
 1    flags, and one of them is -- third or fourth one up from the
 2    bottom -- "Even dollar amount transactions."  Do you see
 3    that?
 4    A.  Yes.
 5    Q.  And that's something you have touched on previously,
 6    correct?
 7    A.  Yes.
 8    Q.  And the one -- the second one up from the bottom,
 9    "Significant increases in the number or amount of
10    transactions."  Do you see that?
11    A.  Yes.
12    Q.  And when they use the word "large increase" or
13    "significant increases," in the industry what does that
14    signify?
15    A.  So when you see ever-increasing amounts that are in the
16    bank's view significant, it can be a red flag of money
17    laundering or other financial frauds, I mean, if you just
18    use that term, because it can be -- there are red flags that
19    are similar across different kinds of frauds, money
20    laundering, Ponzi schemes, check kiting.
21    Q.  And so let's back to page 40, the bottom item, and these
22    are transactions --
23            MR. ANTHONY:  The bottom one on the left-hand
24    side, please.
25            THE WITNESS:  Do you want me to read it?
```

Ghiglieri - Direct

1     BY MR. ANTHONY:

2     Q.  Go ahead.

3     A.  "Transactions which are not consistent with the

4     customer's business, occupation, or income level."

5     Q.  So that would be another red flag, right?

6     A.  Yes.

7     Q.  Now turn to page 41, please, Ms. Ghiglieri.

8              MR. ANTHONY:  And, Ms. Ellig, would you please

9     bring up page 41.

10    BY MR. ANTHONY:

11    Q.  And there's a reference here to "Deposit Accounts" on

12    the left-hand side going over to the right side?

13    A.  Yes.

14    Q.  And the third one up from the bottom on the right-hand

15    side in this Federal Deposit Insurance Corporation Manual is

16    the one I'm interested in, and this one refers to "Large

17    deposits and balances."

18              So if a customer is putting a lot of money into

19    their account with large balances, what's the significance

20    of that?

21    A.  So the whole point of this is with little or no apparent

22    justification, and that would be that the transactions --

23    where all of a sudden there's an influx of a lot of money or

24    in and out and it doesn't match what the customer's business

25    is or what was expected to happen, then it's a red flag that

1    the bank should look into further.

2    Q.  Okay.  So I want to go up on the same column.  We just

3    looked at "Large deposits and balances."  Now let's go up to

4    the next item up, "Accounts with a high volume of activity

5    and low balances."

6           So this would be -- what would be an example of an

7    account with a high volume of activity and a low balance?

8    A.  So the -- it's what happened here in this case.  So you

9    have large -- you know, billion dollars going in and out in

10   the month and you have low beginning and ending balances,

11   and what that's a sign of is some sort of a fraud, money

12   laundering, Ponzi scheme, whatever, because it's an

13   indication that it's just a passthrough account, that money

14   is just going in and out, in and out, so the bank is being

15   used to legitimize whatever this activity is.

16          MR. SCHAPER:  Objection, motion to strike.  May we

17   approach?

18          THE COURT:  You may.

19       **(At sidebar)**

20          MR. SCHAPER:  Your Honor, what she just testified

21   is that the -- she's now applying it to the PCI account at

22   M&I, saying that what the information was was a sign of

23   fraud that the bank should have caught.  That goes to bank

24   knowledge, which is out.  That goes to a legal conclusion as

25   to fraud.  And the bank observing it, which she has already

1    testified would be a problem under the BSA.  So I think

2    those -- that testimony we request be stricken and she not

3    be invited to give opinions like that going forward.

4           MR. ANTHONY:  I don't have her testimony in front

5    of me, but she's certainly going to testify that there was

6    indicia of fraud in this account given the various facts

7    that were observable to all the employees.

8           And I don't -- she's not giving a legal opinion.

9    She's giving it within the standard in the industry, if you

10   see this stuff happening, you've got to -- see something,

11   say something.  And she's going to say that.  We didn't --

12   and if that's evidence of suspicious activity, that's her

13   opinion.  You've got an expert who says none of this is

14   suspicious, and that's as much a, quote, legal conclusion as

15   her saying it's all suspicious.

16          I think it's cross-examination.  You know, we

17   can't be -- you can jump up as many times as you want, but I

18   think that this is all expert opinion.  It's opinion.

19   You're going to cross her.  I think that's how we do it.

20          MR. SCHAPER:  I think I've been judicious with my

21   objections.  I think that her testimony that she just gave

22   touched on bank people's knowledge, just not what the

23   underlying facts were, and so I think it went beyond what's

24   permissible.

25          MR. ANTHONY:  She didn't identify one bank person

1    who she said knew that this was fraud or Ponzi scheme.  And

2    I think I tried to make it clear with Mr. Kelley.  If I say

3    anybody was a participant in the fraud scheme or agreement,

4    you know, it's -- we haven't said that yet, I don't think.

5    She didn't say that just now.

6              THE COURT:  The objection is overruled.  I want

7    counsel to -- I understand the reason for the objection.  It

8    is overruled.  The Court's rulings need to be abided by and

9    I expect counsel to do so.  Objections will be made if you

10   believe that they aren't.  In this instance --

11             MR. SCHAPER:  Thank you, Your Honor.

12          **(In open court)**

13             MR. ANTHONY:  So I may proceed, Your Honor?

14   Objection overruled?

15             THE COURT:  The objection is overruled.

16             MR. ANTHONY:  Okay.

17   BY MR. ANTHONY:

18   Q.  Okay.  So we were talking about accounts with high

19   volume of activity with low balances, and I think you said

20   that you have the opinion -- do you have an opinion that

21   that occurred in the case involving M&I Bank?

22   A.  Yes.

23   Q.  Okay.  And we'll talk more about that when we get to red

24   flags.  Okay?

25   A.  Okay.

1              THE COURT:  Counsel, before you resume, I have a

2     technical issue that I need to address.

3              MR. ANTHONY:  We have a lot of technicians in this

4     courtroom, Your Honor.

5         (Pause)

6              THE COURT:  Thank you.  Counsel, you may proceed.

7              MR. ANTHONY:  Thank you, Your Honor.

8              Okay.  Turn, if you will, and please publish,

9     Ms. Ellig, P-572, page 44, and in the upper left-hand

10    corner, the second bullet point down -- or first bullet

11    point, "Frequent wire transfers."

12    BY MR. ANTHONY:

13    Q.  What is the significance of this reference to "Frequent

14    wire transfers with no appearance business reason"?  What's

15    the significance of that in the industry for purposes of

16    identifying red flags?

17    A.  So where -- say, for example, incoming or outgoing wire

18    transfers alert.  Then if the AML analysts see that the wire

19    transfers don't appear to match the business of the

20    customer, then that would be a red flag of suspicious

21    activity that would require further investigation.

22    Q.  And then there's a reference in here to "Incoming and

23    outgoing wires in similar dollar amounts."  Do you see that?

24    A.  I do.

25    Q.  And where would we see that?  What page is that on?

1    A.  It's 44.  It's just below.

2    Q.  Okay.  And tell us what the -- this manual is alerting

3    the industry to look out for with that paragraph.

4    A.  So if you see -- if for some reason the wire transfers

5    are alerting in an account and the AML analyst sees incoming

6    and outgoing wires in similar amounts, this is the large

7    round dollar in and out on the same day or within a couple

8    days, that pattern would be something that would be

9    potentially suspicious and would require some further

10   investigation to see if it lines up with what the business

11   is, what the purpose of the account is, you know, why is

12   this activity happening.

13   Q.  Okay.  Take a look in your book there at Exhibit P-573.

14            MR. ANTHONY:  Don't put this up yet, please,

15   Ms. Ellig.

16   BY MR. ANTHONY:

17   Q.  What is Exhibit P-573?

18   A.  I'm sorry.  I didn't hear what you said.

19   Q.  Exhibit 573, what is it?

20   A.  I have it.  What is it?  We've already looked at this.

21   These are the red flags in the FDIC's manual.

22   Q.  All right.

23   A.  And money laundering was the one we just covered.  So

24   that's in the same manual.

25   Q.  All right.  We've already covered that one?

Ghiglieri P7 Direct

1    A.  Yep.

2    Q.  All right.  Now I want to turn to the information in M&I

3    Bank's possession for purposes of monitoring the 9018

4    account.

5            What information, facts did you see in the bank's

6    records that was available to the bank's employees who were

7    monitoring the 9018 account?

8    A.  Well, of course, the Searchspace alerts that were

9    alerting.  They had manual reports that were generated.

10   Q.  Okay.  And we're going to go through each one of these

11   because I don't want you to do a narrative response.

12   A.  Okay.

13   Q.  Okay?

14   A.  Okay.

15   Q.  So let's start with the first thing that you observed

16   factually in the bank's records that would have been

17   available to the bank employees to look at.  And the first

18   thing you're mentioning is Searchspace?

19   A.  Searchspace.

20   Q.  So tell the jury what Searchspace is.

21   A.  So Searchspace is the automated account monitoring

22   system, and it alerted every month that it started in March

23   2005 and it alerted every month until 2008 when the Ponzi

24   scheme blew up.

25   Q.  Okay.

1   A.  Yep.

2   Q.  So did you look to see how much wires went into the 9018

3   account during the period of time 2005 to 2008?

4   A.  I did.

5   Q.  How many wires, approximately, went in and out of this

6   single 9018 account during that time period?

7   A.  So approximately 22,000, 11,081 in and approximately the

8   same number out.  I've got the exact number in one of my

9   charts in my report.

10  Q.  Okay.  So the alerts from Searchspace you mentioned, and

11  then you mentioned the 22,000 wires that were in the

12  account.

13         What other facts did you observe were in the

14  bank's records or that you heard in testimony or read in

15  testimony that were available to the bank employees to look

16  at?

17  A.  So they had the MIContacts information and --

18  Q.  So let's stop there and tell the jury again -- I think

19  they have seen it -- tell them again what MIContacts is.

20  A.  So MIContacts was what they called the database where

21  bank employees could go in and write notes.  And we heard

22  testimony in the last two weeks about various bank employees

23  having meetings, say, for example, with the Petters folks

24  and then recording the date and what was discussed and

25  things like that.

1   Q.  All right.

2   A.  So that was available to all the bank employees.

3   Q.  That's what I was going to ask you.  In a typical

4   banking -- in a typical bank, is all this information -- is

5   all the bank information available to the AML analysts?

6   A.  Yes.

7               MR. SCHAPER:  Objection, vague.

8               THE COURT:  Overruled.

9   BY MR. ANTHONY:

10  Q.  Yes?

11  A.  Yes.

12  Q.  So tell us why, in the banking industry, it's the custom

13  and practice that all the bank's information is available to

14  the analysts.

15  A.  So the AML analysts have to be able to access anything

16  in the bank to be able to clear alerts.

17              So they have access to, for example, MIContacts,

18  which would be sort of the database of notes that the

19  various bank employees put in about a certain customer.

20              They have to be able to contact the relationship

21  manager, which we know in this case that they testified that

22  they did.

23              And they have access to the bank statements, to

24  the deposit tickets, to the checks, to the wire transfer

25  statements, to anything that they need, the internet.  They

1    can do research on LexisNexis, whatever the systems are that

2    they have.

3              They have to be able to clear the alerts, and by

4    clearing it I mean they have --

5    Q.  I don't want you to go into that.  You're going --

6    A.  Okay.

7    Q.  So they have access to whatever information they need to

8    clear the alert --

9    A.  Right.

10   Q.  -- is that what you're saying?

11             Okay.  So what else, what other information,

12   facts, documents did you see that was in the bank that you

13   studied that was available to its employees?

14   A.  The "know your customer" information that was obtained

15   when the account was first opened.  And then, of course, any

16   due diligence that they did after the account was opened and

17   gathered information.  So -- and then that would be either

18   on file somewhere or noted in MIContacts.

19   Q.  Now, you mentioned Searchspace.  You've testified that

20   began in 2005.  Before Searchspace began, what documents

21   would have been available -- were available to the bank

22   employees to look at in order to clear whatever alerts might

23   be happening?

24   A.  So there's manual account monitoring, and that consists

25   of reports that are generated from their core system.  That

1   would be deposit fluctuation reports, overdraft reports,

2   wire transfer reports, large deposit reports, large item

3   reports.  So just whatever the daily reports that are

4   generated, the AML analysts would have access to that.

5   Q.  Did you see any facts that related to the bank -- any

6   bank employees monitoring the balances in the PCI 9081

7   account?

8   A.  Yes.

9   Q.  What did you see in that regard?

10  A.  I saw e-mails between the controller or the CFO of the

11  bank, asking the relationship managers if monies in the PCI

12  account were going to stay, were going to leave.  It was

13  affecting their own -- the bank's own balance sheets, so he

14  was trying to get a grip on that.

15          MR. ANTHONY:  Okay.  Put up, please, Ms. Ellig,

16  P-36, which is already admitted.  And, Ms. Ellig, would you

17  enlarge so we can see who is the author and the recipient of

18  this document, please.

19  BY MR. ANTHONY:

20  Q.  If I'm reading this right, it's to Mr. Edward Jambor at

21  M&I Corporation from Mr. Donatell, vice president and

22  controller of M&I.  Do you see that?

23  A.  I do.

24  Q.  Okay.  So this is in 2006, in September.  And is this

25  what you were just referring to?

1    A.  Yes.

2    Q.  Okay.  So tell us what the significance -- what this

3    tells you about what the bank had -- the employees of the

4    bank had at their disposal to look at.

5    A.  So the controller, who was managing the funds for the

6    bank itself, its own balance sheet, had information and was

7    reaching out to the relationship manager to determine how

8    sticky the funds were going to be, you know, are they going

9    to stay for a while, because the banks want to lend out

10   deposits and so he was trying to get a handle on that.

11            MR. ANTHONY:  Is there a second page to this?

12   Could you put that up so we can see it, please, and maybe

13   enlarge the top and then the bottom half of that so the jury

14   gets a chance to see it.

15   BY MR. ANTHONY:

16   Q.  And they are talking about the funds in the account and

17   there's a reference to purchase of 90-day treasuries.  Do

18   you see that?

19   A.  Yes.

20   Q.  Is that what you're referring to in your testimony?

21   A.  Yes.

22   Q.  Okay.  So did you look at the 11 -- I think it's 11,282

23   wires.  Is that what you said?

24   A.  So I didn't look at every single solitary one --

25   Q.  Okay.

```
 1    A.  -- but I had the folks at PwC do a spreadsheet for me

 2    that I asked them to do from the bank statement information.

 3    Q.  Is that spreadsheet in your report?

 4    A.  Yes.  It's --

 5    Q.  Please take a look at P-704.

 6          MR. ANTHONY:  And don't put it up yet, Ms. Ellig.

 7    BY MR. ANTHONY:

 8    Q.  Just describe -- first of all, was this --

 9    A.  Okay.

10    Q.  Okay.  Just describe what this is.

11    A.  This is what I asked PwC to do from the bank statements.

12    Q.  And remind the jury again.  PwC is Mr. Martens?

13    A.  Yes, PricewaterhouseCoopers.

14          MR. SCHAPER:  Your Honor, I don't know if this is

15    going to be offered into evidence or not, but if it is going

16    to be, I would ask that the foundation be laid so I have a

17    chance to object.

18          MR. ANTHONY:  I'm working towards that, Your

19    Honor.

20          THE COURT:  You're working towards laying the

21    foundation?

22          MR. ANTHONY:  Yes.  Yes.

23    BY MR. ANTHONY:

24    Q.  This was prepared at your request?

25    A.  Yes.
```

Ghigleri P - Direct

1    Q.  Prepared by PwC at your request?

2    A.  Yes.

3    Q.  And under your supervision?

4    A.  Well, I wasn't there when they did it, but I

5    spot-checked it with the bank statements.  So I -- there are

6    506 pages, and so I pulled up the bank statements and

7    spot-checked the amounts to make sure they were on here.

8    Q.  And your report was created and turned over to the bank

9    two years ago, three years ago?

10   A.  I think four.  2018.

11   Q.  Okay.  All right.  So is this report the type of report

12   that experts in your position typically create and rely on?

13   A.  It's what I do.  So yes.

14   Q.  And do you hire from time to time or rely on

15   professionals like Pricewaterhouse & Cooper to take massive

16   amounts of information and put them in a report that you can

17   use in your report?

18   A.  So I don't hire them, but I try and rely on the forensic

19   accountant whenever I'm working a case so that I can have

20   reliable information and be able to analyze transactions in

21   the spreadsheets rather than in the awkward manner of all

22   the bank statements.

23   Q.  Do you consider Exhibit 704 to be reliable?

24   A.  Yes, I do.

25   Q.  And did you rely on it in coming to your opinion?

Ghigliery P7 - Direct

1    A.  I did.

2              MR. ANTHONY:  We'll offer P-704, Your Honor.

3              MR. SCHAPER:  Objection, Your Honor.  Expert

4    reports and their contents are classic hearsay.  There's

5    case law on that.

6              MR. ANTHONY:  It's not her report.  We're not

7    offering her report.  We're offering an exhibit that was

8    created that it's in her report that she relied on in

9    reaching her opinion.

10             THE COURT:  The objection is sustained.

11             MR. ANTHONY:  Sustained?

12             THE COURT:  Yes.

13             MR. ANTHONY:  Okay.

14   BY MR. ANTHONY:

15   Q.  All right.  What does -- what did you do -- what was the

16   purpose in creating Appendix E-5 to your report?

17   A.  I had multiple purposes.  I wanted to do a review of the

18   transactions so that I could see -- and this sort of goes to

19   the whole hindsight bias and trying to prevent that.  I

20   wanted to look at the transactions that led up to the

21   alerts, and so this is a very efficient way of doing it

22   because all of the data is here rather than me fumbling

23   around with all the bank statements.

24   Q.  So what conclusions did you come to as a result of

25   reviewing the data that you compiled and included in

Ghiglieri P7-Direct

1    Appendix E-5 to your report?

2    A.  I found a lot of red flags of money laundering and other

3    financial fraud in my transaction review, and I looked to

4    see what -- I compared what I found with what the AML

5    analysts found in their analysis of the alerts.

6    Q.  Okay.  So you said this was 506 pages and you looked

7    at -- and you spot-checked it against the bank statements,

8    correct?

9    A.  Yes.

10   Q.  When you looked through that, did you see any record

11   where there were any wires from Walmart, for example?

12   A.  No.  And I had PwC, PricewaterhouseCoopers, sort this by

13   payee/payor, so I could look up to see that very thing, yep.

14   Q.  Okay.  Did you see any wires from Costco?

15   A.  No.

16   Q.  Best Buy?

17   A.  No.

18   Q.  BJ?

19   A.  No.

20   Q.  Boscov?

21   A.  No.

22   Q.  Okay.  I was asking you to detail the facts that bank

23   employees could see from the books and records of M&I Bank

24   going back to 2002.  What other facts did you observe when

25   you did your report?

1    A.  Of course, there were the Deposit Account Control

2    Agreements that was in the record -- the file.

3    Q.  All right.

4    A.  e-mails, of course, that various bank employees would

5    have access to.

6    Q.  Okay.

7    A.  I don't know.

8    Q.  Did you see any facts which led you to conclude that

9    there were any atypical banking practices being followed by

10   M&I Bank during the period 2002 to 2008?

11   A.  Yes.

12   Q.  Tell the jury about some of the atypical practices you

13   saw.

14   A.  Well, I think a big one is the fact that the 11,281

15   outgoing wires were processed manually by the bank, first of

16   all.

17   Q.  What's the significance of that?

18   A.  Well, it was 11,281 opportunities for the bank to look

19   at what was going on, first of all.  But also it required

20   someone at the bank to actually type in a large amount of

21   data.  And there are various automated systems now in place

22   and actually the bank did have one, but PCI didn't use it.

23   Q.  When you say "automated systems," I mean, you're talking

24   about going online?

25   A.  Right, you can call it up online and fill in the

1    information.

2    Q.  But PCI didn't do that?

3    A.  No.  They would call up or fax the information.  Then it

4    required the bank, somebody at the bank, to actually input

5    that information manually.  So, for example, you have to

6    give the beneficiary.  You have to make sure the account

7    number is given, the routing number of the bank, various

8    information in order for the wire to be able to be

9    transmitted.  And so that -- I found that to be an atypical

10   transaction.

11   Q.  Well, what's atypical about that?

12   A.  Well, it requires a large amount of bank employee time

13   to send out wires, high traffic wire activity for a

14   business, and it -- to me, it just -- it seemed atypical.

15   Q.  Okay.  Look at Exhibit 618, please, P-618.

16            MR. ANTHONY:  And, Ms. Ellig, would you put that

17   up on the screen, please, and turn to page 004 or 0004.

18   BY MR. ANTHONY:

19   Q.  And this is an e-mail dated October 20, 2005 from

20   Ms. Schwarz at MICorp to Mr. Menczynski, with a copy to

21   Mr. Jambor.  And the first line says "Hi Rich."

22            And Mr. Menczynski is at Petters Group.  Do you

23   see that?

24   A.  I do.

25   Q.  And it says, "Hi Rich.  I'll watch for the incoming wire

Ghigliew P7 Direct

1    tomorrow.  When I see it come into your account, I'll

2    initiate the transfer and send you a confirmation upon

3    completion."  Do you see that?

4    A.  I do.

5    Q.  Did you consider these facts in arriving at any

6    conclusion that the bank acted atypically with respect to

7    PCI?

8    A.  Yes.  I mean, watching for the wire and then initiating

9    it --

10   Q.  Why is that atypical?

11   A.  Because the bank usually doesn't do something like this.

12   They don't watch for wires and then initiate transfers and

13   do all these things.

14   Q.  How is it supposed to work in the customary banking

15   procedure?

16   A.  Well, if a customer has a wire transfer, they either do

17   it -- it's different if somebody does one wire transfer a

18   year.  But when you have a company that's doing a high

19   volume of wire transfers, there's software that they use to

20   input it.

21          And then what this signifies is she's looking for

22   an incoming wire.  She's on the alert to watch for an

23   incoming wire and then she's going to then do the transfer.

24   And I can't tell if it's to another account or an outgoing

25   wire.

1          So she's in the middle of facilitating the

2     transactions for PCI instead of them being in charge of it.

3     You know, conducting business --

4     Q.  "Them" being PCI?

5     A.  PCI, right.

6     Q.  Okay.  Now, let's look at Exhibit P-337 that's already

7     been admitted into evidence.  P-37 is a letter from

8     Mr. Jambor to the Board of Directors at Polaroid Holding

9     Company.  It's dated 12, it looks like, '04 or 2-04.  I

10    can't tell.

11         Let me ask you this.  This says -- it says what it

12    says.  "Petters has been" -- "Petters affiliates has been a

13    customer...for five years.  They have always handled their

14    accounts as agreed."  Up above it says a company has been

15    formed to complete a transaction for 410 million.  Do you

16    see that?

17    A.  I do.

18    Q.  Did you consider this to be atypical?

19    A.  I do.

20    Q.  Why?

21    A.  Well, because it -- he's saying that the size and scope

22    of the monthly activity runs in the nine figures.  He gives

23    the impression that the amount of money on deposit is high,

24    but, in fact, this is just that money that was running

25    through with low beginning and ending balances.

Ghigleri P. - Direct

1   Q.  Okay.

2   A.  So from an atypical standpoint, I feel like it's

3   misleading the reader in terms of what's actually in the

4   account.

5           MR. SCHAPER:  Objection, Your Honor, state of

6   mind.

7           THE COURT:  Overruled.

8   BY MR. ANTHONY:

9   Q.  So how would you characterize the level of insight that

10  employees of the bank had into the transactions that were

11  occurring in the 9018 account?

12  A.  It was extensive.

13  Q.  And why do you say that?

14  A.  Because the bank employees could see what was going -- I

15  mean, could see all the activity.  They could see all the

16  bank statements.  Of course, on their system it was all the

17  transactions.  They had access to the checks, the deposits,

18  the wire transfers.  They had access to everything.  They

19  could see all the transactions that were occurring.

20  Q.  Okay.  And could anyone else see all the transactions

21  that were occurring?

22          MR. SCHAPER:  Object to the form, vague.

23          THE COURT:  Overruled.

24          THE WITNESS:  Well, Petters Company, Inc. could

25  see it, so the employees of Petters Company, who were

1    initiating the transactions, could see it.

2    BY MR. ANTHONY:

3    Q.  And that would be?

4    A.  Deanna Coleman and Tom Petters and Robert White and Rich

5    Menczynski or however you say his name.

6    Q.  All right.  So those are the people who could see the

7    transactions?

8    A.  Correct.

9    Q.  And the bank could see all the transactions?

10   A.  Right.

11   Q.  Okay.  Were the bank employees trained to watch out for

12   red flags?

13   A.  Yes.

14   Q.  What sort of training did you observe from the records

15   that you saw were they provided?

16   A.  So it's been shown a couple times, but they had Bank

17   Secrecy Act training once a year.  They started it up in

18   sort of an intense way when they were doing their systems,

19   like adding Searchspace, things like that.  And so they went

20   over the requirements of the Bank Secrecy Act.  They had

21   handouts for red flags, many of them which paralleled the

22   regulatory guidance that we've discussed today.

23   Q.  Okay.  So, now, we've talked about the federal rules,

24   the regulations that describe generally red flags.  Did you

25   see any red flags in connection with the PCI 9018 account?

1    A.  Yes.

2    Q.  Okay.  What red flags, in your opinion, were apparent to

3    those persons who had access to the books and records of the

4    bank during the period 2002 to 2008?

5    A.  So I have quite a few.  So should I just say one?

6    Q.  Did you do a demonstrative that listed the red flags

7    that you found?

8    A.  I did.

9    Q.  And you created that demonstrative?

10   A.  Yes.

11   Q.  And it will aid in your testimony?

12   A.  Yes.

13          MR. ANTHONY:  We would like to put up PD-7,

14   please, as a demonstrative.  So let's go to the first page,

15   of 7, please, Ms. Ellig.

16   BY MR. ANTHONY:

17   Q.  So let's start with this red flag.  Why don't you

18   announce what the first red flag is you're referring to?

19   A.  So this is the transactions in the PCI 9018 account were

20   inconsistent with the business model, and what I mean by

21   that --

22   Q.  Okay.  Could you slow down just a little bit?

23   A.  Okay.

24   Q.  Okay.  So the transactions were?

25   A.  Inconsistent with PCI's purported business model.

1    Q.   Okay.  So what facts or records did you see in the

2    bank's possession that led you to that conclusion?

3    A.   So we've seen it this -- in the last two weeks.  The

4    first one would be the MIContact that Chris Flynn put in

5    where he met with Frank Vennes and discussed the Petters

6    business model.

7    Q.   Okay.  So let's look at that, and that would be -- let's

8    go to --

9              MR. SCHAPER:  Sorry, Counsel.

10             MR. ANTHONY:  I'm not doing any better than you

11   are, trust me.  I'm still trying to get this to work.

12   BY MR. ANTHONY:

13   Q.   Let's go to PD-14 to talk first about the business

14   model.  Okay.  So tell us what you saw from the records of

15   the bank that led you to conclude what the business model

16   was for Petters.

17   A.   So a couple of things that were in the record was:  The

18   discussion with Frank Vennes about the Petters business

19   model; the pre-screen from Metro Gem that Christopher Flynn

20   prepared, that discussed the business model; and, of course,

21   the testimony from a lot of the bank employees that knew

22   that the purported business model was purchasing consumer

23   electronics wholesale and on a pre-sale basis selling it to

24   big-box retailers.

25   Q.   Okay.  So let's go from Exhibit 14 to Exhibit P-2,

1   please, at 007.  And is this the MIContact that you're

2   referring to about where the business model is discussed?

3   A.  I am thinking -- I can't see it, but --

4   Q.  Okay.  Let's turn to the next page.  If you go to -- on

5   the bottom it will be 007 and then 008.  Do you have that?

6   A.  I do.

7   Q.  Okay.  So 007 is the first page.  It shows that --

8            MR. ANTHONY:  Let's go back to 007, please --

9   BY MR. ANTHONY:

10  Q.  That shows that Christopher Flynn is the reporting

11  person?

12  A.  Yes.

13           MR. ANTHONY:  And then let's go to the page after

14  that, 008, and let's highlight the first paragraph.

15  BY MR. ANTHONY:

16  Q.  And they are talking about financing Metro's factor

17  operations of Tom Petters.  Do you see that?

18  A.  I do.

19  Q.  And you were here for Mr. Flynn's testimony too, right?

20  A.  Yes.

21  Q.  You sat through it?

22  A.  Yes.

23  Q.  And then let's go down to the next paragraph beginning

24  with the words "All."  It says, "All financial" -- "financed

25  transactions are based on pre-sold merchandise to various

1    retailers such as Walmart, et cetera.  The merchandise is

2    primarily name brand 1st quality - Maytag."

3              So this information is in the bank's records,

4    right?

5    A.  Correct.

6    Q.  And this is information -- who is this information

7    available to at the bank?

8    A.  The bank employees.

9    Q.  Any and all?

10   A.  Yes, particularly the AML analysts and the relationship

11   managers, who we have been talking about.

12   Q.  Okay.  All right.  So then it says, "Petters has people

13   who verify shipments at point of origination (before they

14   have to pay for them) and typically drop ship (no

15   warehousing involved) to their destination."  Do you see

16   that?

17   A.  I do.

18   Q.  And then it goes on to say, "According to Frank, the

19   niche they have available is due to the potential negative

20   signal to the markets that would be created if a publicly

21   traded firm (Sony) were to arrange for an oversupply of

22   inventory (at a substantial discount) with a publicly traded

23   retailer such as Walmart."  Do you see that?

24   A.  I do.

25   Q.  Did you rely on that in forming your opinion?

1    A.  I did.

2    Q.  And then it says, "Further, Petters has developed

3    substantial vendor relationships and a reputation for

4    reliable dealings."  Do you see that?

5    A.  I do.

6    Q.  And did you rely on that information as well?

7    A.  Yes.

8    Q.  Okay.  So let's go back to red flag number 1, which was

9    P -- okay.  That's the red flag we're talking about, and

10   you're giving the information that supports your view that

11   red flags were there, right?

12   A.  Yes.

13   Q.  Okay.  So let's now go to -- back to P-2, the

14   MIContacts and -- I'm sorry.  Let's go back to -- let's go

15   to P-11, please.

16          MR. ANTHONY:  I think it's been admitted.  Would

17   you bring that up, please.

18      (Pause)

19          MR. ANTHONY:  Okay.  You can take that down.

20   Thank you.

21   BY MR. ANTHONY:

22   Q.  Did you hear any or read any testimony from any bank

23   employee that he was aware of Petters' purported business

24   model?

25   A.  That who was?

1    Q.  That he, the witness that you heard testify, did you

2    hear any M&I Bank employee testify that he was aware of the

3    business model?

4    A.  Well, I heard women and men both testify.  So the AML

5    analysts, several of them testified that they understood

6    what the business model was.  And then, of course,

7    Mr. Jambor and Mr. Flynn.

8    Q.  Let's go back to the --

9              MR. SCHAPER:  Object.  I'm going to move to

10   strike.  That's an individual knowledge, state of mind.

11             THE COURT:  Overruled.

12             MR. ANTHONY:  Okay.  Let's go back to the business

13   model, which was PD-14.

14   BY MR. ANTHONY:

15   Q.  Okay.  It's up on the screen, if that helps you.

16             Now, were the transactions that were occurring in

17   the 9018 account, PCI 9018 account, were they consistent

18   with the purported business model that was reflected in the

19   MIContacts?

20   A.  No.

21   Q.  How not and why not?

22   A.  So in two respects.  The first respect would be that

23   Nationwide and Enchanted were supposed to be the wholesalers

24   that Mr. Petters was buying the consumer electronics from.

25             And so if you just stop right there and you think

1    how should the transactions go, Mr. Petters is buying

2    something from them, so you would expect Mr. Petters to be

3    paying them some money.

4            But instead, as we've seen in the testimony in the

5    last two weeks and in my report, the wire transfers were

6    coming in in huge amounts from Nationwide and Enchanted into

7    the account.  So --

8    Q.  What's the significance of that?

9    A.  So it's the reverse of what should have been happening.

10   Instead of Mr. Petters paying them, shipping money out to

11   them --

12   Q.  For goods?

13   A.  For goods.

14           MR. SCHAPER:  Objection to the form, leading, Your

15   Honor.

16           THE COURT:  Sustained.

17   BY MR. ANTHONY:

18   Q.  So which way should the money have been going if Petters

19   was buying stuff from Enchanted and Nationwide?

20   A.  Mr. Petters should have been paying them.  So it should

21   have been outgoing wire transfers to them.

22   Q.  And what was happening?

23   A.  Incoming wire transfers from Nationwide and Enchanted,

24   the reverse, the exact reverse of what you would expect.

25   Q.  Okay.  So why would that -- should that create a red

1    flag in the banking industry in the ordinary course of

2    banking?

3    A.  Because it's the exact opposite of the business model of

4    what the bank had documented in its files as far as what

5    should be taking place.

6    Q.  All right.  So when -- what is the custom and practice

7    in the banking industry for a bank employee who sees

8    something like what you have just described occurring?  What

9    are they supposed to do?

10   A.  So they should determine if the activity is suspicious;

11   and if it doesn't match what they thought was going to

12   happen based on the business model, then they should report

13   it to FinCEN and think about whether or not they should

14   close the account.

15   Q.  Did you hear any testimony from any M&I Bank employee

16   that they understood that the money was going the wrong way?

17   A.  No.

18           And then the second way -- I said there were two

19   things.

20   Q.  What's the other thing?

21   A.  Was there were no payments coming in, no incoming wires

22   from Costco or Sam's Club or Walmart.

23   Q.  All right.  Let me ask you about that.  Okay.  So the

24   first thing is money is going the wrong way with the

25   wholesalers?

Ghigtler - Direct

1    A.   Yes.

2    Q.   And the second thing is -- which way should the money be

3    going if Petters were selling to big-box retailers?

4    A.   So if he was selling to Walmart, just, for example, you

5    would expect to see an incoming wire transfer from Walmart.

6    Q.   Did you see any such wire transfers?

7    A.   No.

8    Q.   Take a look, please, at Plaintiff's Exhibit 777.

9            MR. ANTHONY:  Do not put that up yet, please.

10   BY MR. ANTHONY:

11   Q.   What is Exhibit 777?

12   A.   This is a chart of the incoming and outgoing wires from

13   Enchanted and Nationwide as a percent of the total incoming

14   wires.

15   Q.   And why did you create this chart?

16   A.   I was looking to see what the percent of incoming wires

17   from the two supposed wholesalers was for each of the alert

18   dates.

19   Q.   And what information did you include -- did you create

20   this?

21   A.   I didn't create this exact chart, but I have a chart

22   like this in the back of my report that PwC created for me.

23   Q.   Oh.  Is that Exhibit P-713?  Take a look at

24   Exhibit P-713 and see if that's your chart.

25   A.   Yes.  So this is what I had in my report.

1    Q.  All right.  So let's look at P-713.  You created that

2    and put that in your report, did you?

3    A.  PwC created it for me.

4    Q.  Is it accurate?

5    A.  Yes.

6    Q.  And what does it show?

7    A.  It shows a little more information than the first chart.

8    It shows for each alert date the total number of incoming

9    wires up to that date, the total from Nationwide and the

10   total from Enchanted, and the percent of the incoming wires

11   for each and then the total of them combined.

12   Q.  Did you rely on this report that they created?

13   A.  Yes, sir.

14   Q.  Is it accurate, to the best of your knowledge and

15   belief?

16   A.  Yes.

17   Q.  Is it the type of information that experts like yourself

18   rely on in giving opinions?

19   A.  Yes.

20            MR. ANTHONY:  Okay.  We'll offer P-713.

21            MR. SCHAPER:  Objection.  Same objection to the

22   last exhibit to her report.  It's classic hearsay, Your

23   Honor.

24            THE COURT:  Overruled.

25            MR. ANTHONY:  Okay.  Let's put up P-713, please.

Ghigljieri - Direct

```
 1    BY MR. ANTHONY:
 2    Q.  Okay.  So let's look and see what P-713 is.  What
 3    conclusions did you draw from this exhibit that you created,
 4    P-17 [sic]?
 5    A.  That there were red flags at least every alert date, if
 6    not every month, that a majority, let's say 75 percent, of
 7    the incoming wires were coming in from Enchanted and
 8    Nationwide.
 9    Q.  Why is that a red flag?
10    A.  Because they were supposedly the wholesalers and the
11    money was going in the wrong direction.  And so it didn't
12    match the business that the bank had documented in their
13    files and that would be, as we looked at the regulatory
14    guidance, a red flag that should have -- should be looked
15    into further.
16    Q.  Okay.  Now, you were here for the AML analysts'
17    testimony.  Did some of them say they understood it and some
18    of them didn't?  Do you remember that testimony?
19    A.  Yes, yes.
20    Q.  So what do you remember them saying about what they knew
21    and what they didn't know?
22              MR. SCHAPER:  Objection, vague.
23              THE COURT:  Sustained.
24    BY MR. ANTHONY:
25    Q.  Okay.  What testimony did you hear from the AML analysts
```

1    that weighed into your opinion that these alerts on 713

2    were -- warranted further investigation?

3    A.  So even without their testimony, my own analysis

4    indicates to me, by just looking at this, knowing what the

5    business is and knowing that the funds are going in the

6    wrong direction, that if you have 75 percent of incoming

7    wires, which in some months totaled a billion dollars, where

8    the money is going the wrong way, that, to me, is a red flag

9    of suspicious activity.

10            And the analysts testified in various ways they

11   documented in the alert summaries, you know, the total

12   incoming wires and that a lot of them were coming from

13   Enchanted and Nationwide.  So they were taking a look at it,

14   but did not do any further analysis of it.

15   Q.  They never -- I'll withdraw.

16            All right.  So looking at 713, it looks like if we

17   go across -- just to give the jury an idea of how you went

18   about this, if we look at March of '05, there was an alert

19   that date, right?

20   A.  Yes.

21   Q.  And then across there's "Incoming Wires," "Outgoing

22   Wires."  Almost -- 613 million in, 615 million out, right?

23   A.  Yes.

24   Q.  And then you had 308 million coming in from Nationwide

25   and 211 million coming in from Enchanted?

1    A.   Enchanted.

2    Q.   And the total amount, then, coming in from Nationwide

3    and Enchanted just in that month was 84 percent of all the

4    wires coming in?

5    A.   Right.  So there's two red flags that you can look at

6    here.  The first one is incoming wires equals outgoing

7    wires, substantially equal, the same.

8    Q.   Why is that a red flag?

9    A.   Because it looks like the same amount that's coming in

10   is going straight out.  And if you look down the chart, you

11   see similar activity.

12             So we saw in the regulatory guidance that when you

13   have large dollar amounts of similar amounts going in and

14   out of the account with low beginning and ending balances,

15   that's a red flag of suspicious activity.

16   Q.   Okay.  Let me stop you there.  So you talked about --

17   earlier about patterns.  Does -- in your opinion, do you see

18   any patterns here in Exhibit 713?

19   A.   So the first pattern of -- that I believe is a red flag

20   is that the amount of the incoming wires and the amount of

21   the outgoing wires is substantially similar.  That would be

22   the first one.

23             The second one is that the money coming in from

24   Enchanted and Nationwide is huge compared to the total

25   incoming wires.  And based on the -- what we know about the

```
1    business that was supposed to be happening, the money is
2    going in the wrong direction.
3    Q.  Okay.
4    A.  So I guess you could say that's three red flags, two or
5    three, just in this chart.
6    Q.  Okay.  So anything else in this Exhibit 713 that
7    triggers a red flag in your mind?
8    A.  Well, we could go through the same thing for every
9    month.  It would be similar.
10   Q.  Okay.
11   A.  Yeah.
12   Q.  So what you said about March would apply to each of
13   these months?
14   A.  Yes.  And there are a couple of months towards the end
15   where the activity got very small and the activity kind of
16   transferred over to other things in the account.  But,
17   generally, for most of the months here, those things would
18   be consistent, those red flags.
19   Q.  So if an analyst, for example, were closing an alert,
20   let's say, in September of '07, would the alerts relating to
21   the months before them be available for that analyst to look
22   at?
23   A.  Yes.
24   Q.  So each analyst would be able to see what you have
25   described as a pattern of activity?
```

1    A.  Yes.

2    Q.  What, in your experience and in your opinion, would be

3    the usual and customary practice in the banking

4    industry where the transactions, like you've described in

5    Exhibit 713, are inconsistent with the business model; what

6    would the bank typically do in the industry?

7    A.  The bank would identify this activity as suspicious and

8    close the account.

9    Q.  Did you see any facts in any of the bank records you

10   observed where the bank made the decision to close the

11   account before the FBI raided the Petters empire?

12   A.  No.

13   Q.  Okay.

14          MR. ANTHONY:  Let's go back to the slide with the

15   red flags and let's put up the next slide after the first

16   one we put up, Ms. Ellig.

17   BY MR. ANTHONY:

18   Q.  Okay.  The second red flag you have identified is what?

19   A.  "PCI was doing business with a money launderer."

20   Q.  And who was that money launderer?

21   A.  Frank Vennes.

22   Q.  What information did the bank employees have access to

23   regarding PCI doing business with Mr. Vennes?

24   A.  So Christopher Flynn met with Frank Vennes in 2002 and

25   documented it in MIContacts.

1   Q.  So from a banking perspective, what is suspicious about

2   one of your customers doing business with a money launderer?

3   A.  Well, the whole purpose of the Bank Secrecy Act is you

4   don't want the bank to be used as an instrument of fraud,

5   right?  You're trying to protect the banking system.

6           So if the bank knows that someone is convicted for

7   money laundering, that would be the last person they would

8   want either to do business with or for their customers to do

9   business with.

10  Q.  Now, did you hear testimony from Mr. Flynn regarding

11  what he knew about Mr. Vennes and his felony convictions?

12  A.  Yes.

13  Q.  And how, if at all, did that factor in your opinion that

14  it was a red flag for PCI to be doing business with a money

15  launderer?

16  A.  It was just one more thing to add on top of all the

17  things, the transactions, everything we'll talk about here

18  in this chart.  It was just another chip on the stack of

19  things that raise red flags of suspicious activity.

20  Q.  Okay.  Let's go back to the slide here and do the next

21  red flag.  Okay.  What's the next red flag that you found in

22  your report?

23  A.  So this is -- I'm characterizing the transactions in a

24  broad way -- large round dollar equivalent amounts going in

25  and out of the account and also round-trip transactions with

Ghigliert - Direct

```
 1    the same party.
 2    Q.  Did you prepare or cause to be prepared a chart which
 3    showed similar amounts of incoming and outgoing wires on a
 4    monthly basis?
 5    A.  I have several charts in my report.  I'm not sure which
 6    one you're looking at, but --
 7    Q.  Take a look at P-703, please.
 8    A.  703, did you say?
 9    Q.  Yes.
10    A.  Okay.
11    Q.  Yes, ma'am.  I'm sorry.
12    A.  Hang on just a second.
13        (Pause)
14    A.  Okay.  I've got it.
15    Q.  What is Exhibit P-703?
16    A.  So I had PwC prepare this.
17    Q.  Was it an appendix in your report?
18    A.  Yeah.
19    Q.  And is it the type of information that experts such as
20    yourself prepare and rely on to aid their testimony?
21    A.  Yes.
22    Q.  And do you believe it to be true and accurate, to the
23    best of your knowledge?
24    A.  Yes.
25            MR. ANTHONY:  Okay.  We will offer P-703, Your
```

1    Honor.

2              MR. SCHAPER:  Objection, hearsay from her report

3    and also lack of foundation.  The witness didn't prepare it.

4              THE COURT:  Overruled.

5    BY MR. ANTHONY:

6    Q.  So what is P-703?  At the top it says, "Appendix E-4."

7    What is this -- it starts in January of '02.  Tell us what

8    you're showing from January of '02 to September of '08.

9    A.  So this was prepared from the bank statements and it's

10   the beginning -- if you just think about your own bank

11   statement, it's just the chart at the top.  So it's just the

12   beginning and ending balance, the total credits and debits,

13   and the number of credits and debits.  So I just -- I like

14   to review this with any case that I have because I think

15   it's very informative.

16   Q.  Okay.  So what does it tell you so that you can tell us?

17   A.  So if you look at the first month, January 2002, just

18   for example --

19   Q.  Okay.  And go slowly so I can follow along.

20   A.  So the beginning balance is over on the far right.

21   Q.  And that's 112 million, right?

22   A.  So all the way over to the right, opening balance is

23   1,400,000.

24   Q.  Okay.

25   A.  And then the closing balance is 377,000.

1    Q.  Okay.

2    A.  And then if you go back and look at the total credits of

3    112 million and the total debits of 113 million, you see

4    several things that we have discussed already.

5         You see large dollar amounts of transactions going

6    through the account with low beginning and ending balances

7    relative to the amount of activity going through.  And you

8    also see total credits and total debits being substantially

9    similar.

10        So that's two red flags of money laundering or

11   other types of financial fraud.  It can be Ponzi schemes,

12   check kiting.  It can be a lot of things, but it's a red --

13   two red flags just in this month chart.

14        And we can go down the chart and see --

15   Q.  Okay.  Let's go down the chart.

16   A.  -- some more things.

17   Q.  Pick a month and we'll just pick out one more month to

18   look at.

19   A.  So let's pick one after the Searchspace alerts, so let's

20   look at -- and I'm just going to pick this at random.  How

21   about April of 2005?

22   Q.  Okay.

23   A.  Are you okay?

24   Q.  Let's wait until Ms. Ellig gets there.

25   A.  Okay.  So they won't be able to tell what this is

Chigrier P. - Direct

1   without the --

2   Q.  The top part?

3   A.  -- top part.  I don't know if you can do both of those,

4   but --

5   Q.  Apparently she can.

6   A.  That's great.  So on the right-hand side you can see the

7   opening balance is 2 million 8 and the closing balance is

8   4 million 9.  And go to the left and you can see 521 million

9   in credits, which mostly are incoming wire transfers, and

10  outgoing debits 500 and if you round up, 20.  So that's

11  substantially similar in and out with relatively low opening

12  and closing balance compared to the activity.

13          So you have two red flags, low beginning and

14  ending balance with high level of activity and credits and

15  debits being substantially similar.

16  Q.  Okay.  Now, to move this along a little bit, I'm not

17  going to -- I'm going to ask you, without putting up another

18  exhibit, did you see similar activity of large dollar

19  volumes going in and out with other customers -- let me

20  rephrase that.

21          Did you see similar activity that you have just

22  described, for example, with Metro Gem?

23  A.  Yes.

24  Q.  Okay.  So describe what you observed with respect to

25  what was happening in the Metro Gem account.  And if you

1    need for us to go to your report or to pull up an exhibit,

2    you let us know.  But if you can do it without doing that so

3    we can move along, I would like you to do it without that.

4    A.  Okay.  So I -- just for purposes of maybe just a quick

5    demonstrative, I don't know if it's here, but I just picked

6    one series of transactions per year with Metro Gem.

7         And what happened with Metro Gem is money would

8    come in and go out, come in and go out.  And I've

9    characterized those as round-trip transactions.  It would

10   just keep going in and out, in and out.

11   Q.  This is Mr. Vennes, the money launderer?

12   A.  Yeah.

13        And it didn't match, again, what was supposed to

14   be happening between Metro Gem and Mr. Petters.

15   Q.  What was the business arrangement as reflected in that

16   first MIContact that we saw, what was the business

17   relationship supposed to be?

18   A.  It was supposed to be a factoring relationship.

19   Q.  Okay.  So tell the jury what a factoring relationship

20   is, who was the factor, what they're supposed to do and how

21   the money is supposed to flow.

22        MR. SCHAPER:  Objection, outside the scope of

23   expertise.

24        THE COURT:  Overruled.  You may answer if you can.

25        THE WITNESS:  I can.  I'm familiar with factoring

Ghiglieri PT - Direct

1    from examining banks.

2            What a factor does is a factor will buy a

3    company's accounts receivable.

4    BY MR. ANTHONY:

5    Q.  So say Metro Gem is the factor.

6    A.  Metro Gem is the factor.  Metro Gem was supposed to be

7    buying PCI's accounts receivable.  And what that allows a

8    company to do is liquid -- monetize their accounts

9    receivable instead of waiting for them to be paid.

10           So when that happens, Metro Gem, the factor, will

11   buy the accounts receivable and give money to PCI, and then

12   they will go off and collect them themselves.

13   Q.  Metro will?

14   A.  Metro Gem will.

15   Q.  But what was happening here?

16   A.  And what was happening here is money was going in and

17   out, in and out.  It shouldn't have been going out.  It

18   should have only been coming in.

19   Q.  So it should have only gone from Metro Gem to PCI?

20   A.  Right.

21   Q.  Instead of that, what did you see?

22   A.  I saw round-trip transactions just going in and out of

23   similar dollar amounts, in and out.

24   Q.  Okay.  So the bank employees had available to them

25   records that showed that Mr. Vennes was a money launderer,

1    correct?

2    A.  Yes.

3                MR. SCHAPER:  Objection, leading.

4                MR. ANTHONY:  I'll rephrase it.

5                THE COURT:  Sustained.

6    BY MR. ANTHONY:

7    Q.  And what else did the -- in addition to what the bank

8    had in its records about Mr. Vennes as a money launderer,

9    what other facts were available for the bank employees to

10   see with respect to what was happening with the flow of

11   funds with Mr. Vennes?

12   A.  So several things.

13               One is anybody who looked in the account on any

14   given day in any given month would be able to see these

15   round-trip transactions, as shown in the chart, the 500-page

16   chart, that I had of the bank statement activity.

17               And then they also had access to the MIContact

18   information that explained that Mr. Vennes was a factor --

19   had a factoring relationship with Mr. Petters through PCI.

20   Q.  All right.  So what is the custom and practice in the

21   industry with respect to banks when they see a customer

22   doing round, even dollar transactions with a convicted

23   felon?

24   A.  They would consider it suspicious, report it, and close

25   the account.

1    Q.  Okay.  Let's go back to --

2         (Plaintiff's counsel confer)

3              MR. ANTHONY:  Back to the red flag slide, please,

4    11.

5    BY MR. ANTHONY:

6    Q.  All right.  The next red flag.  Tell the jury what you

7    identified as the next -- how many red flags are there, by

8    the way, in your report?

9    A.  I don't know.  I think -- there's so many.  I think

10   category-wise I had seven, I think.

11   Q.  I think it might be six, but we'll see.

12   A.  Yeah.

13   Q.  Okay.  So what's number 4?

14   A.  So number 4 are the payments to the insiders.

15   Q.  Okay.  Why are those red flags?

16   A.  So the bank had in its records that the account was

17   being used to purchase consumer electronics from wholesalers

18   and on a pre-sold basis sell them to big-box retailers.

19              And this was not a payroll account, as we've heard

20   Mr. Jambor and Mr. Flynn testify, and yet there were large

21   checks and wire transfers to these insiders.

22   Q.  Do you recall how -- what transfers, transactions,

23   amounts that you saw in the bank's records that were

24   available to all the bank employees also to see?

25   A.  So I also had this in my report.  I think it was like

Ghigrief P - Direct

```
1      $47 million to Petters and --

2      Q.  Would you like to look at -- would your report refresh

3      your recollection?

4      A.  Yes, that would be great.

5      Q.  Okay.  Do you want to look at your report to refresh

6      your recollection?

7      A.  Yes.

8      Q.  So look at it, refresh your recollection, and then put

9      it down.  Then I'll ask you.  I think it's on page 140 of

10     your report, by the way.

11     A.  Okay.  Thank you.  Let's see here.

12     Q.  Okay.  Does it refresh your recollection?

13     A.  Yes.

14     Q.  Okay.  So look away from your report now.

15          How much in checks did you see in wire transfers

16     to Tom Petters?

17     A.  So 47 million, and 7 million to Coleman and 9 million to

18     White.

19     Q.  Did you do an appendix that showed the payments to those

20     three individuals as part of your report?

21     A.  I did.

22     Q.  And is that Appendix E-2 to your report?

23     A.  E-2 is all of the transactions in the bank statements by

24     payee/payor.

25     Q.  Okay.
```

1    A.  So we would look those names up, yes.

2    Q.  Okay.  And you're confident that you accurately counted

3    up the amounts?

4    A.  I mean, we could look and confirm, but that's the

5    general area.  That was generally the correct numbers, yes.

6    Q.  All right.  So what's the significance of those payments

7    in terms of them being red flags to the employees of the

8    bank?

9    A.  Because this was not a payroll account and there should

10   not have been these types of checks and wire transfers going

11   out of this business account.

12   Q.  Okay.  So please turn to Plaintiff's Exhibit 57.

13           MR. ANTHONY:  I think that's admitted into

14   evidence, if I'm correct.

15           THE WITNESS:  Okay.

16   BY MR. ANTHONY:

17   Q.  So, for example, look at page 2 of Plaintiff's

18   Exhibit 57.

19           MR. ANTHONY:  And enlarge that, please.

20   BY MR. ANTHONY:

21   Q.  So this is on February 20th, 2003?

22   A.  Yeah.

23   Q.  And this is the 901 [sic] account, right?

24   A.  Yes.

25   Q.  And it's to Robert White and he's one -- were you here

1     for the testimony that he was an officer of PCI?

2     A.  Yes.

3     Q.  And that's a hundred thousand dollars, correct?

4     A.  Yes.

5     Q.  All right.  And then look at page 4.  That's a

6     Mr. Wehmhoff, and I think there was some testimony that

7     Mr. Wehmhoff went to jail as well.  Do you recall that

8     testimony?

9     A.  I'm not sure.

10    Q.  Okay.  And he got a check for 250,000, right?

11    A.  Yes.

12    Q.  And then page 6, this is January of '04.  Another check

13    to Mr. Wehmhoff for 250,000, correct?

14    A.  Yes.

15    Q.  And then let's go to page 15 of Exhibit 57.  And this is

16    December 23, and Ms. Munson is signing a check to Bob White

17    for a million dollars.  Do you see that?

18    A.  Yes.

19    Q.  Now, you said that this account, the 901 [sic] account,

20    was not a payroll account.  What significance did you attach

21    to that fact in your opinion?

22    A.  Because you wouldn't expect to see any kind of

23    payroll-type transactions going through this account.  There

24    was documentation in the bank files, that I think Mr. Flynn

25    put in, that they had their payroll account at another bank.

1    And so if these were valid bonuses, for example, Merry

2    Christmas, then you would expect that this kind of

3    transaction would be over in the payroll account.

4    Q.  So in the ordinary, usual and customary practices of

5    banks, seeing a check like this would cause a bank employee

6    to do what?

7    A.  Well, they would consider it a red flag.  So the AML

8    analyst, for example, that would see checks or wire

9    transfers to the top officials at PCI would consider it a

10   red flag and would report it and they should consider

11   closing the account.

12   Q.  All right.  So this occurred before the Searchspace

13   automated system came into play, correct?

14   A.  Right.

15   Q.  And even though Searchspace wasn't in effect, the bank

16   still had to comply with the Bank Secrecy Act, did it not?

17   A.  Yes.  And they still had reports that would flag

18   something like this through a large dollar transaction

19   report, for example.

20   Q.  Okay.  So before Searchspace, what's the name of the

21   report they would have gotten again?

22   A.  Well, there are various reports that are generated on a

23   daily basis and they still would be generated today, like

24   large fluctuation reports, large dollar amount reports,

25   overdraft reports, wire transfer reports.  So there's daily

1    reports that are generated by the bank that they can use in

2    addition to Searchspace to identify suspicious activity.

3                 MR. ANTHONY:  Now, turn, if you will, Ms. Ellig,

4    to Plaintiff's 57, page 42.

5    BY MR. ANTHONY:

6    Q.  This is Ms. Munson on January 10th of '05 writing a

7    check to herself for a million dollars, correct?

8    A.  Yes.

9    Q.  Did this fact cause you to form an opinion, one way or

10   the other, whether there was suspicious activity going on?

11   A.  Yes, I would consider this a red flag on a couple of

12   levels.

13               One, you wouldn't expect to see someone writing a

14   check to themselves from a company, just period.  But she's

15   writing a check to herself.

16               And then if you remembered the signature card that

17   they showed to, I think, Mr. Jambor this week or last, two

18   signatures were required for anything over a certain dollar

19   amount.  I think it might have been $10,000.  So there

20   should have been two signatures on these checks that we're

21   looking at.  That would be another red flag.

22   Q.  Can you tell from looking at these checks what the

23   business purpose was for the million dollars?

24   A.  No.

25   Q.  Let's look to page 69 of Exhibit 57.  This is another

1    check dated -- this is a check dated December 27th, 2005 for

2    500,000 from Ms. Munson to herself again?

3    A.  Yes.

4    Q.  So at what point, in your opinion, would it be expected

5    in the business of banking, how many checks would you have

6    to see before you thought something was suspicious?

7    A.  Well, I think a few.  I mean, the first few that we saw

8    would -- just giving the bank the benefit of the doubt,

9    let's say.  After the first few and inquiring about why are

10   individuals from the company getting paid by check or wire

11   for large amounts out of an account that's not a payroll

12   account, you would have to conclude that it's suspicious

13   activity and report it and think about closing the account.

14   Q.  Okay.  Let's look at P-57, Exhibit -- page 74.  This is

15   Deanna Munson writing a check for 700,000 to Robert White?

16   A.  Yes.

17   Q.  And then on page 75 of 57, that's a million to

18   Mr. Wehmhoff.  Do you see that?

19   A.  Yes.

20   Q.  And then let's turn to page 76 of Exhibit 57.  And

21   that's a million again from -- to Deanna Munson on the 901

22   [sic] account, correct?

23   A.  Yes.

24   Q.  And that has two signatures, right?

25   A.  Yes.

1    Q.  So earlier we saw those -- that money laundering thing

2    in the FDIC, that description that had those three layers,

3    layering -- three things, layering, integration -- what were

4    those three things?

5    A.  Placement, layering, integration.

6    Q.  So how do these checks match up with placement,

7    layering, and integration?

8    A.  So -- well, money coming in could be from -- and I'm

9    just using the terms that are used in the regulatory

10   guidance.  The money coming in is from illicit activity and

11   it's placed in the bank and sort of clouded to try and make

12   it look legitimate, and then it gets sent out for whatever

13   purpose.

14           Here it's the officers of the company are getting

15   paid -- or it could be, you know, to buy a car or real

16   estate or something like that -- to legitimize the illicit

17   funds coming in, washing them through the bank, and then

18   sending them out.  So that's how it would kind of line up

19   with the money laundering theory.

20   Q.  Okay.  So you said it makes it -- you know, when the

21   money comes in, it gets kind of cloudy in the bank.  What do

22   you mean, it kind of gets cloudy in the bank?

23   A.  Well, you know, money is fungible.  So it comes into the

24   bank and it can be used for different things, and all of a

25   sudden it goes out to one of the officers.  So money coming

1   in from illicit activities is sitting in the account and

2   then it goes out.

3   Q.  So you need a bank to make it cloudy, is what you're

4   saying?

5   A.  Yes.  In order to launder money, you have to have a

6   bank.

7   Q.  Let's look at page 78 of Exhibit 57.  That's another

8   check to Mr. White for $500,000, correct?

9   A.  Yes.

10  Q.  Now, these are just the checks we're looking at,

11  correct?  I think you said that you're -- the report you did

12  and the appendix you did also took into account wires and

13  things like that?

14  A.  Right.

15  Q.  So look at page 721 -- or page 93 of Exhibit 57.  This

16  is a $250,000 check payable to the order of Jody Coleman by

17  Deanna Munson.

18          Now, we know Ms. Munson goes by two names, Munson

19  and Coleman, right?

20  A.  Yes.

21  Q.  Are you able to tell the jury whether there's any

22  relationship between Jody Coleman and Deanna Coleman?  Do

23  you know?

24  A.  I don't.

25  Q.  Okay.  Let's go back to page 77 of Exhibit 57.  So I

1   think we looked at page 76, which showed Ms. Munson getting

2   a million, but now we're looking at page 77, which is the

3   same date as page 76.  So a million -- on January 3rd, 2006

4   Ms. Munson writes a check to herself for $2.5 million.  Do

5   you see that?

6   A.  I do.

7   Q.  And then the last page I'd like you to look at is

8   Plaintiff's 57, page 112.  And this is Ms. Coleman to

9   herself for $170,000, correct?

10  A.  Yes.

11  Q.  And that looked like -- it's dated August 8th?

12          MR. ANTHONY:  If you scroll down, we can see the

13  top.

14  BY MR. ANTHONY:

15  Q.  It's August 7th?

16  A.  August 7th, yeah.

17  Q.  That's, I think, about a month or so before the FBI

18  comes in, right?

19  A.  (Nodding.)

20  Q.  Okay.  Let's go back to Demonstrative 11, please, the

21  red flags.  And the next one, number 5, "Unusual requests

22  from Petters and third parties."  I think you touched on

23  this a little bit earlier, maybe, in the atypical banking.

24  Do you recall that?

25  A.  Atypical banking practices.

Ghigirer P - Direct

```
 1    Q.  Yes.

 2    A.  Yes.

 3    Q.  Is that what you're talking about here again?

 4    A.  Yes.

 5    Q.  Okay.  And just tell the jury the information you saw in

 6    the bank records that were available to be seen by bank

 7    employees that you considered to be unusual requests from

 8    Petters and third parties.

 9    A.  So I think it -- if my memory is serving me correctly --

10    Q.  If you could stop after each one that you mention, then

11    I can ask a question in between.

12    A.  Okay.  So I'll give you the three and then you can ask

13    me a question.  Would that be okay?

14    Q.  Let's do it one at a time.

15    A.  So the first one -- I don't want to forget them.  The

16    first one would be how the wire transfers were processed.

17    Q.  Okay.  We talked about that.

18    A.  Not from the standpoint of checking the balances and

19    waiting --

20    Q.  Okay.  Tell us about that.

21    A.  Okay.  So normally if I go to the bank to do a wire

22    transfer, they are going to check my balance to see if I

23    have collected funds.  If I don't, they are going to say,

24    sorry, I can't send it.

25              But here PCI would request a wire transfer.  They
```

1    would look to see if there was collected funds; and if there

2    wasn't, Mr. Jambor came up with an exception to the bank

3    policy whereby the Money Transfer Center would be tasked

4    with checking multiple times a day, often calling PCI or

5    their relationship manager, either Mr. Jambor or Mr. Flynn,

6    and holding the wire until they could determine that there

7    were cleared funds, waiting for a wire to come in.

8              That's atypical banking practice.  It's not a good

9    use of the bank employee's time and it was a special

10   accommodation to PCI.

11   Q.  Okay.  That's one.  Have you got any others that you

12   recall?

13   A.  So there was a request from someone to confirm the

14   balance about Nokia phones.

15   Q.  Okay.  So tell us about the Nokia phones atypical

16   incident.

17   A.  Right.  So there was a request that came in to confirm

18   the balance for the purchase of -- I don't know how many

19   Nokia phones.  We saw it during, I believe, Mr. Jambor's

20   testimony.

21   Q.  I think he reports that it was 39 million.  Does that

22   sound right?

23   A.  Yes.  Wanting to know if they had enough money in there

24   for this purchase, and so Mr. Jambor sends it to Deanna

25   Coleman.

Ghigleri - Direct

1          And it just -- the whole way that that transpired

2     I believe is atypical because there was never $39 million,

3     you know, in the account, to my knowledge, and it was a red

4     flag of potentially fraudulent activity.

5     Q.  And then did you -- anything else come to mind that

6     would be a red flag with respect to atypical banking

7     practices?

8     A.  And then the Deposit Account Control Agreements, the

9     DACAs.

10    Q.  Just give us one aspect of that that struck you as

11    atypical.

12    A.  So the DACA mentioned retailer payments and the bank

13    entered into it, but there were no retailer payments.

14    Q.  Okay.

15    A.  Yeah.

16    Q.  And then I'd like you to look at -- let's go to the

17    sixth and -- I think the sixth and final red flag, "Large

18    overdrafts."

19          What information did the bank employees have

20    access to regarding overdrafts in the 9018 account?

21    A.  So an overdraft report is generated every day.  And PCI

22    did not have very many overdrafts, but when they did, they

23    were incredibly large.

24          And what is atypical banking practice is to allow

25    an account to overdraw.  I believe one of them was in the

1      $600,000 range, but very large overdrafts.  And it's very

2      high risk for a bank to allow large overdrafts because an

3      overdraft is a loan to a company without going through the

4      rigorous underwriting process.  It's an unexpected loan that

5      the bank makes.  And so that's an atypical banking practice

6      and another accommodation to PCI.

7      Q.  Okay.  So for those of us who have occasionally

8      overdrafted our account, I write a check and the bank

9      says -- can either call me up and say you're a really good

10     customer, we're going to cover this overdraft or they could

11     mark it NSF.  Insufficient funds, is that what that means?

12     A.  Yes.

13     Q.  And they won't cover the check?

14     A.  They will send it back.

15     Q.  They will send it back.

16           So if they cover the overdraft -- right? -- the

17     check that I've written for more than I have money in the

18     account, they are, in effect, making me a loan for that

19     overdraft amount that they've covered, right?

20     A.  Yes.

21     Q.  Okay.  So did you do a chart in your appendix to your

22     report that shows the number of overdrafts that the bank was

23     paying for PCI?

24     A.  I did.

25     Q.  Take a look at Exhibit 705.

Ghigliier P7 Direct

```
 1                MR. ANTHONY:  And, Ms. Ellig, don't put this up
 2      yet.
 3      BY MR. ANTHONY:
 4      Q.  And did you create Appendix E-6, Exhibit P-705?  Take a
 5      look at it, please.
 6      A.  I did.
 7      Q.  Okay.  And is it -- do you believe it to be accurate and
 8      reliable?
 9      A.  I believe it's reliable, yes, and accurate.
10      Q.  How did you create it?
11      A.  I looked at the overdrafts on the bank statements.
12      Q.  Okay.  And is it the type of chart that would be
13      typically prepared and used by experts such as yourself in
14      providing testimony in cases like this?
15      A.  Yes.
16      Q.  And did you rely on it in your report?
17      A.  I did.
18                MR. ANTHONY:  We offer -- plaintiff offers P-705.
19                MR. SCHAPER:  Same hearsay objection to an expert
20      report.
21                THE COURT:  P-705 is received.
22                MR. ANTHONY:  Okay.  Let's put up P-705 and --
23      thank you.
24                THE COURT:  And the objection is overruled.
25      BY MR. ANTHONY:
```

1    Q.  Okay.  So tell the jury what this shows in terms of what

2    employees of the bank would have seen if they were looking

3    at overdraft activity in the account.

4    A.  So these overdrafts would have set off gigantic alarm

5    bells in the bank because of the size of the dollar amounts.

6    Q.  What do you mean it would have set off gigantic alarm

7    bells?  What is it about the size that's so important?

8    A.  It's one thing if you overdraw your account a hundred

9    bucks or a thousand bucks, but when you overdraw your

10   account 643,000, 29,000, 70,000, 1.4 million, 1.6 million,

11   these are huge amounts.  These are loans that the bank made

12   to PCI without going through the rigorous underwriting

13   process.

14   Q.  Okay.  So let's stop there so we understand that.  Every

15   time -- are you saying that every time the bank paid or

16   honored one of these overdrafts, they were making a loan?

17   A.  Yes.

18          MR. SCHAPER:  Objection, leading.

19          THE COURT:  Sustained.

20   BY MR. ANTHONY:

21   Q.  Okay.  When the bank honored these overdrafts, what were

22   they doing?

23   A.  Making a loan to PCI.

24   Q.  And when a bank makes a loan to a customer -- and I

25   think we heard some testimony about it -- how does a bank in

Ghiglier P - Direct

1    the usual and customary practice of its business go about

2    making a loan of the magnitude we see here on Exhibit 705?

3    A.  So the way that it works and the way that we heard

4    testimony that it works for Mr. Flynn is there's a loan

5    committee.  And so there would be a write-up, say, for any

6    of these dollar amounts, let's say $643,000.

7            PCI wants to borrow money for X.  Mr. Flynn would

8    do up a loan committee memo.  It would go to the loan

9    committee.  The loan committee would deliberate, would look

10   at PCI's financial information, the guarantors, everything,

11   and they would decide if they were going to lend to it.

12   Instead, when you have an overdraft it's a surprise loan to

13   the bank.  It's a very high-risk situation.

14           The overdraft report is one of the reports that

15   everyone looks at every morning, and whoever has a customer

16   on the overdraft report immediately gets on their phone and

17   starts calling to say, Get in here and cover this overdraft.

18           It's very, very unusual to have overdrafts at this

19   magnitude.  And, like I said, the account wasn't overdrawn

20   very often because they had such large wires coming in, but

21   on these occasions, this account was overdrawn to this

22   magnitude.  So this, to me, is an atypical banking practice,

23   that they would allow these overdrafts to this magnitude.

24   Q.  Okay.  So do you recall testimony or do you recall

25   seeing any exhibits or documents in the bank records where

1    at one time or another they -- the bank asked Petters for

2    some financial statements; do you recall that?  And if you

3    don't, that's okay.

4    A.  I don't recall that there was any -- there were any

5    loans to Mr. Petters or his entities.

6    Q.  Okay.  So if -- the usual and customary banking practice

7    you mentioned is if there were a loan, for example, for

8    $1.6 million, you said that a bank would typically request

9    financial statements of the borrower, correct?

10   A.  Of the borrower.  Probably collateral would be required,

11   so they would have to put up real estate or, you know,

12   something.  And then probably guaranties -- a guarantor

13   would be required.  So it's a long, drawn-out process to get

14   $1.6 million from a bank.  And this was a surprise, that the

15   bank lent PCI this.

16   Q.  Okay.  So you mentioned that every morning in the

17   typical bank that this overdraft report would be seen by

18   someone.  And who would that someone typically be in the

19   bank?

20   A.  A whole -- well, a whole array of people look at the

21   overdraft reports.  So it would be the relationship manager

22   would look at it because they would be responsible for

23   calling the customer and saying get in here and cover these

24   overdrafts.  And then up the chain people would be looking

25   at it.  Mr. Donatell, the CFO or the controller, he would be

1    looking at it.  You know, everyone is looking at the

2    overdraft report.

3    Q.  Are overdrafts like this in this amount red flags?

4    A.  I would say not only a red flag, but an atypical banking

5    practice because of the size, the amount.

6    Q.  Okay.  Now I'm going to move to other documents in which

7    red flags were apparent.

8              THE COURT:  Counsel?

9              MR. ANTHONY:  Yes, Your Honor.

10             THE COURT:  It's about time for us to take our --

11             MR. ANTHONY:  Yes, Your Honor.

12             THE COURT:  -- midafternoon break.

13             MR. ANTHONY:  Yes, ma'am.

14             THE COURT:  So I think we'll do that at this time.

15   We'll take a 15-minute midafternoon break.  Please be ready

16   to return to the courtroom at ten minutes after 3:00.

17             You are free to take a break as well.  You're not

18   to discuss your testimony, however, with anyone during the

19   time that you take your break.

20             And, Members of the Jury, you will be required to

21   continue to abide by the instructions that I have given you

22   as jurors.

23             All rise.

24        (Jury excused)

25

**IN OPEN COURT**

**(JURY NOT PRESENT)**

1

2

3          MR. MOHEBAN:  Your Honor, I just have one matter,

4   just a notification to the Court.

5          COURT REPORTER:  And you are, again?

6          MR. MOHEBAN:  Keith Moheban on behalf of BMO

7   Harris.

8          So earlier this morning we filed the brief we

9   discussed yesterday regarding our arguments that the

10  investigator complicit issue has been -- the door has been

11  opened to that evidence.

12         Later today we're going to file an offer of proof,

13  which is separate from that, but I just wanted you to be

14  aware that we're going to file that.  We need to do that

15  under Rules of Evidence 103 to preserve appeal rights as to

16  that same evidence.

17         And it may be that what's in the offer of proof

18  would be useful to the Court in evaluating the issue that's

19  being briefed.  So I just wanted to make you aware and let

20  counsel know we will be filing that later today.

21         THE COURT:  I understand that.  And it sounds like

22  an invitation to reconsider?

23         MR. MOHEBAN:  It's a thing that we're required to

24  do to preserve evidence, and I think it's relevant to the

25  matter that's being briefed to you as to the issue of the

1    opening of the door as a result of the evidence that was

2    elicited by the trustee in the last couple of days.

3              THE COURT:  Okay.  Thank you, Counsel.

4              Anything further on this matter?

5              MR. ANTHONY:  Not from the plaintiff, Your Honor.

6              THE COURT:  Okay.  Very well.  Thank you.  We are

7    in recess.

8         (Recess taken at 2:57 p.m.)

9                        *   *   *   *   *

10        (3:18 p.m.)

11                       **IN OPEN COURT**

12                       **(JURY PRESENT)**

13             THE COURT:  You may be seated.  Thank you.

14             MR. ANTHONY:  Are we ready?

15             THE COURT:  Counsel, you may proceed.

16             MR. ANTHONY:  Thank you, Your Honor.

17   BY MR. ANTHONY:

18   Q.  Ms. Ghiglieri, we talked about the checks that we saw or

19   the payments that were going out of the checking account.

20   Now I want to talk about the wire transfers, and to do that

21   I'm going to have you look at the M&I Bank money transfer

22   statements that -- were you here when Ms. Lindstrom was here

23   and she introduced them?  That's what we're going to look

24   at.  So that's Exhibit P-660.

25             MR. ANTHONY:  And that's in evidence.

Ghigliery P - Direct

```
1              THE WITNESS:  And I have a bunch of volumes.
2      Which one do you want me to pull?
3      BY MR. ANTHONY:
4      Q.  It should be in Volume -- we don't know what volume it
5      is.
6      A.  Is the page you're looking for on the screen?
7      Q.  It is.
8      A.  Okay.  I've got it.
9      Q.  Do you have 660?
10     A.  I do.
11     Q.  All right.  Now, these documents are the Money Transfer
12     Statements that Ms. Lindstrom testified to, and they show
13     the wire transfers.
14             And what I'd like you to do is look at page -- if
15     you just look at even the first page we've got up on the
16     screen, that will show wire transfers to Nationwide, for
17     example, correct?
18     A.  So this is -- on page 1 it's an incoming wire transfer
19     from Anchor Bank, Enchanted Family Buying Company, and it's
20     for $24 million and change.
21     Q.  Look at page 660-400, please.  Oh, I'm sorry.  Go back
22     to the first page.  You were right.  You were right.
23             So that's a wire from Anchor Bank to -- originated
24     by Enchanted and that's March 1st, 2005 for $24 million,
25     right?
```

1    A.  Yes, and change, um-hum.

2    Q.  And so Enchanted is sending money to Petters Company?

3    A.  Yes.

4    Q.  Enchanted is the wholesaler, right?

5    A.  Yes.

6    Q.  Okay.  Now go to page -- Plaintiff's 660, page 784,

7    please, and that's going to be on the screen.  It might be

8    easier, if you can see the screen, to look at it on the

9    screen.  Then you won't have to search.

10   A.  Okay.

11   Q.  If you are comfortable doing that.  Are you comfortable

12   doing that?

13   A.  Yes, that's fine.

14   Q.  So 784 shows a wire -- tell me what it shows up at the

15   top.

16   A.  So this is a $5 million wire to -- the beneficiary is

17   Robert White at First Minnesota Bank in Minnetonka,

18   Minnesota.

19   Q.  Okay.  Let's go to page 809 of Exhibit 660.  And is

20   there a wire on that page to Mr. White as well?  And how

21   much is that?

22   A.  So it's the second one down, and it's for a million

23   dollars and it's to Robert White at First Minnesota Bank.

24   Q.  Let's go to page 891, please.  And is there also a wire

25   on that page to Mr. White?

1    A.  So on the bottom, $500,000, and it's to First Minnesota

2    Bank again.

3    Q.  And then go to page 993 of Exhibit 660, and there's a

4    payment on that page as well to Robert White.  How much is

5    that one?

6    A.  Yes.  So it's the third one down.  $500,000, and it's to

7    Robert White at First Minnesota Bank.

8    Q.  And then go to page 1027 of Exhibit 660.  Is there a

9    wire there to Deanna Munson?

10   A.  Let's see.  So the middle one for a million dollars to

11   U.S. Bank and the beneficiary is Deanna Munson.

12   Q.  Okay.  Now, we heard -- were you here for the testimony

13   of Ms. Lindstrom when she said that she and Deanna Munson

14   were the only ones who sent wires?

15   A.  So I wasn't here for her testimony.  I'm sorry.  I

16   nodded, but I wasn't here for her testimony.

17   Q.  Okay.  And then on Plaintiff's 660-1089, is there a wire

18   on that page to Mr. White?

19   A.  So it's the first one, a million dollars, beneficiary

20   Robert White, to First Minnesota Bank.

21   Q.  Now go to page 1248 of 660.  Is there a wire on that

22   page to either Mr. Petters, Ms. Munson, or Mr. White?

23   A.  So it's the middle one for $2 million.

24   Q.  And who is that to?

25   A.  And that's for Thomas Petters.

1    Q.  What's the date of that wire?

2    A.  February 16th, 2006.

3    Q.  And then go to page 1258 of Exhibit 660.  And is there a

4    wire on that -- what's the date of that wire?

5    A.  So the date is February 17th, 2006, and at the bottom

6    for $8 million is a wire to Petters to JPMorgan Chase.

7    Q.  And at the top it has -- does it have the account number

8    right under the date?

9    A.  Yes.  So that's the account number that these incoming

10   and outgoing wires are being transacted through.

11   Q.  So if you look at your check, for example, it's -- the

12   last four digits is your account number and the digits

13   before that are the bank number, or what's that?

14   A.  This is the entire account number for PCI.  I truncated

15   it and just called it the 9018 account, but the official

16   account number is ████9018.

17   Q.  And so would these Money Transfer Statements, for

18   example, as of February 17, 2006, in the ordinary course of

19   the banking business, be available to everyone in the bank

20   who wanted to see them?

21   A.  Sure.

22   Q.  Could the AML analysts who were looking at the wire

23   transfers have this information available to them?

24   A.  Yes.

25   Q.  So in addition to whatever was showing up in the alert

1    they were receiving, they could look at these Wire Transfer

2    Statements -- Money Transfer Statements and see what else

3    was happening?

4    A.   Yes.  And there's other documents that have this exact

5    information, the actual wire transfer.  And then this is the

6    statement that was sent out to the customer.  So there's

7    multiple things that the AML analysts had access to to get

8    the wire transfer information.

9    Q.   Let's look at page 1746 of Exhibit 660.  Do you see any

10   wires to either Petters, Coleman, or White on that page?

11   A.   So in the middle, 1.2 million, is a wire transfer to Tom

12   Petters at JPMorgan Chase.

13   Q.   Let's go to page -- and what is the amount?

14   A.   $1.2 million.

15   Q.   Okay.  And let's go to Plaintiff's 660, page 1873.  Do

16   you see anything on that page that would show a wire

17   transfer to either Munson, Petters, or White?

18   A.   So in the middle again, $2 million 875 --

19   Q.   And the date?

20   A.   -- to Petters.

21             June 16th, 2006.

22   Q.   So does anybody at the bank have to understand the

23   business purpose for these transactions?

24   A.   So these transactions would have alerted because of the

25   size.  They would have been a part of the AML -- well, the

1    account alerted every month.  So these transactions would

2    have been a part of the review of the AML analysts just for

3    one section of the bank, and they would have looked at them.

4          There was information in the bank documents saying

5    that this was not the payroll account.  The payroll account

6    was at another bank.  And so they should have questioned

7    this as a red flag, a potential fraud, a potential, you

8    know, theft of the company funds.

9    Q.  Okay.  Please turn to Plaintiff's 660, page 2091 and

10   tell us if you see on that page any wires to Petters,

11   Munson, or White.

12   A.  So the middle one again, $1 million is a wire out to

13   Petters.

14   Q.  And the date of that?

15   A.  And that's August 3rd, 2006.

16   Q.  Then turn to page 2125 of Exhibit 660 and tell us if you

17   see any payments to Petters, White, or Munson there by way

18   of wire transfer.

19   A.  Right.  So 800,000 in the middle, and that would be a

20   wire out to Petters August 10th, 2006.

21   Q.  And then turn to page 2299 of Exhibit 660, please, and

22   tell us if you see any payments -- any wire payments on that

23   page.

24   A.  So the one in the middle again for a million dollars is

25   a wire out to Petters --

1    Q.  And the date?

2    A.  -- at JPMorgan Chase.

3              September 13th, 2006.

4    Q.  Go to page 2349, please, and tell us if you see any wire

5    payments -- wire transfers to Petters, White, or Munson

6    there.

7    A.  So the one in the middle is a million dollars to

8    Petters, September 21st, 2006.

9    Q.  And on page 2385 of Exhibit 660, what do you see there?

10   A.  So the $700,000 transaction is a wire out to Petters,

11   September 27th, 2006.

12   Q.  I'm just going to point out a few more here, and I'm

13   going to try to stick to the ones that are a million dollars

14   or more.

15             So turn to page 2421 of 660, please.  And what do

16   you see on that page?

17   A.  So the one on the bottom for a million dollars is a wire

18   transfer out to Petters.

19   Q.  What's the date?

20   A.  October 5th, 2006.

21   Q.  And then let's look on the next page, 2422.  Is there a

22   wire transfer that date?

23   A.  Yes, October 5th, 2006, 1.5 million, is a wire transfer

24   out to Petters.

25   Q.  Now let's go to page 2440 of Exhibit 660, please.  Do

```
1    you see anything on that page?

2    A.  Yes.  The $1.2 million transaction is a wire out to

3    Petters, October 11th, 2006.

4    Q.  And go to page 2492 of Exhibit 660, please.  What do you

5    see there?

6    A.  So the one in the middle, 1.5 million, is a wire

7    transfers out to Petters, October 25th, 2006.

8    Q.  And go to page 2507 of Plaintiff's Exhibit 660 and tell

9    the jury, please, what you see there.

10   A.  $8 million in the middle is a wire transfer out to

11   Petters, October 27th, 2006.

12   Q.  And go to page 5233, please, of Exhibit 660.  What do

13   you see there?

14   A.  So $2 million in the middle there is a wire transfer out

15   to Thomas Petters, March 24th, 2008.

16   Q.  Now, these were portions of Exhibit 660 that the jury

17   will have.  Would these Money Transfer Statements that we

18   have just gone through have been available to the AML

19   analysts during the period 2005 to 2008 that we have just

20   seen?

21   A.  Yes.

22   Q.  All right.  So we've talked about the analysts would

23   have the checks available.  They'd have these Money Transfer

24   Statements available.  What other information or documents

25   would they have available to them to review?
```

Ghigiler P - Direct

1    A.  So they have the MIContact information that we talked

2    about.  They have the bank statements.  They've got another

3    system that the bank statements are generated from that has

4    the same information, the checks, the deposit tickets, the

5    wire transfer forms, those bank wire transfer statements

6    that were sent to PCI every month.  They have the ability to

7    contact the relationship manager.  They have access to

8    anything they need to be able to understand what the

9    transactions are and to clear the alert.  And also they have

10   different systems they can use to do research online.

11   Q.  So given what the AML analysts could see, what would be

12   the usual and customary practice in the banking industry for

13   them to do with that information?

14   A.  I would have expected them to conclude that the

15   transactions that we've gone over today were suspicious in

16   the PCI 9018 account and to report it and to close the

17   account.

18   Q.  Before I get into the details, do you have an opinion

19   with respect to whether the bank's AML analysts

20   appropriately performed their role?

21   A.  Yes.

22   Q.  What is your opinion?

23   A.  I don't think they did.

24   Q.  And on what do you base your opinion that you do not

25   think they performed their job the way they were supposed

1    to?

2    A.   They -- by looking at the information that they

3    summarized in the alert summaries, you can see red flags

4    right there.  It doesn't look like they did any analysis.

5    They just relied on the former AML statements that it was

6    expected for this type of company.

7              And the number of alerts -- the number of red

8    flags in the transactions alone, without looking at some of

9    the other things that we talked about today, would, I

10   believe, lead someone with the training that they had to

11   determine that these transactions were suspicious.

12   Q.   Okay.  So let's talk about -- I think you said just by

13   looking at the alerts.

14   A.   Yes.

15   Q.   So what do you think -- what do you conclude with

16   respect to the existence of suspicious or unusual activity

17   by looking at the alerts?

18   A.   So if you look at the actual alerts, the information

19   that they put down, you can see that for most of the alert

20   summaries it will show similar dollars going in and similar

21   dollars coming out, which is red flag of money laundering or

22   other financial fraud.

23             You can also see by their narrative that they

24   articulated who was receiving the funds and who was sending

25   the funds, and you could line up the same entities on each

1    side; another red flag.  Money is going out and back from

2    the same party over and over is a red flag of money

3    laundering or other financial fraud.

4    Q.  Did you do a chart as an appendix to your report that

5    lays this out?

6    A.  I did.

7    Q.  And is that the type of report someone who is trained,

8    as you are, in the business would typically create and rely

9    on for purposes of providing testimony?

10   A.  I believe so, yes.

11   Q.  And did you create the chart that's Appendix F and

12   marked as Plaintiff's Exhibit 706 in your report?

13   A.  I did.

14   Q.  And do you rely on it for your testimony?

15   A.  Yes.

16            MR. ANTHONY:  We offer Plaintiff's Exhibit 706.

17            MR. SCHAPER:  Same objection, hearsay.

18            THE COURT:  Overruled.  It is admitted.

19   BY MR. ANTHONY:

20   Q.  You can get 706 or you can look at it -- you might be

21   more comfortable looking out of your book at P-706.

22   A.  I think I can see it better if I look at it here.

23   Q.  Okay.  So let's go down to March and just highlight

24   that.  Actually, just go across the top row and tell us what

25   you've put on the top of this chart.

Ghiglieri P - Direct

1    A.  So --

2              MR. ANTHONY:  Maybe you could highlight that,

3    please, Ms. Ellig, up at the top.

4              THE WITNESS:  What I was trying to do was look at

5    the alerts, lay out the same information for each alert just

6    to see what was what.

7              And I have the alert number and the month that it

8    alerted and the date it was raised, and that's the actual

9    date of the -- where they started looking at it or working

10   the alert.

11             The score, I think we've talked about the scores

12   before in relation to QAPOR.

13   BY MR. ANTHONY:

14   Q.  We'll come back to the scores, but just tell us what you

15   put across the top and then we'll go down through one of the

16   alerts.

17   A.  Okay.  The account number.  9018, of course.  The name

18   of the account.  The alert source, in other words, why it

19   alerted.  The scenario description.  And this is all from

20   the alert.  The date of the last action.  And the state.

21   That's how they closed it.

22   Q.  By the "state," what they did with it?

23   A.  Right.  And they call it state, but it's what is kind of

24   the overarching reason that they closed it.

25             Who it was performed by.  What event -- they say

Chigrier P7 Direct

1      "event" in Searchspace.  It's sort of an odd word, but why

2      did the alert alert.  And the transaction type would show

3      exactly what transaction, if it was a check or wire or

4      whatever alerted.

5              And then examples of event value and volume, and

6      this is directly the analysis or the summarization that the

7      AML analyst put in the summary I put in here.

8              The distance from the threshold.  It means how far

9      away from the average business was -- were these incoming

10     and outgoing wires.

11     Q.  Could you explain that, the distance from the threshold

12     that these --

13     A.  Right.  They call it threshold, but remember there was

14     only two peer groups, the business and personal.  And so

15     what this is showing is how -- what is the average of

16     everybody having a wire transfer and how far away was the

17     volume of wire transfers for PCI.

18     Q.  Okay.  So PCI was in which -- was it in the business or

19     personal peer group?

20     A.  Business.

21     Q.  Okay.  And so how far away it is from the peer group,

22     explain -- first of all, how many were in the peer group and

23     how far away was PCI?

24     A.  Every business was in the peer group, which I -- you

25     know, I haven't seen before.  Usually there's a lot of peer

1    groups.

2           But this showed that what was going on in the PCI

3    group was way far away from the average going on in the

4    average business account at M&I.

5    Q.  Okay.  So what's the next --

6    A.  The Bates number where I got the information.  And then

7    any comments that I had, which -- I don't know.  I'm not

8    sure I made any comments.  Oh, I might have made one.  Yeah,

9    so...

10   Q.  All right.  So let's go down to March.  So if the jury

11   wanted to look at 706 to get a summary of some of the

12   information that's in Exhibit 183, which is all the alerts

13   that they saw reviewed earlier, they could find it here in

14   Exhibit 706, correct?

15   A.  Yes.

16           MR. SCHAPER:  Your Honor, I'm just going to

17   object.  That just laid the foundation that it's an improper

18   1006 exhibit.  The underlying evidence is already an

19   exhibit.

20           MR. ANTHONY:  I'll withdraw the question.

21           MR. SCHAPER:  It's still an objection to the

22   exhibit based on the testimony that was just elicited.

23           THE COURT:  Overruled.

24   BY MR. ANTHONY:

25   Q.  Okay.  All right.  So let's go down -- you know, one

Ghigliery - Direct

1    thing I want to ask you is:  How frequently were the AML

2    analysts supposed to close an alert, how often?  How much

3    time did they have to do it?

4    A.  So the industry standard is 30 days.

5    Q.  Okay.  So why is the industry standard to close an alert

6    30 days, as you understand it?

7    A.  Because you don't want fraud going through the bank just

8    willy-nilly.  You want to clamp down on it as soon as

9    possible.

10   Q.  Okay.  So, for example, if it took three, four months to

11   close an alert, what is the significance of that in terms of

12   your view of whether proper banking practices were followed?

13   A.  That would be an atypical banking practice because the

14   industry standard is 30 days.  If it took them four months

15   to close an alert, that means that suspicious activity was

16   continuing on for 120 days.

17   Q.  Okay.  So when you reviewed the alerts, what did you see

18   with respect to how successful M&I Bank was in closing the

19   alerts in 30 days?

20   A.  So they weren't successful.

21   Q.  Well, let's talk about that.  Tell us -- can you show us

22   an example of how long on occasion it took these analysts to

23   close an alert.  And maybe take us through one of them.  And

24   if you need to look at the alerts themselves, Exhibit 183;

25   or if it's in your chart, you can look at your chart.

1    A.  So you can see in the chart whenever it says under

2    "State," whenever it says, "Closed-Multiple Alerts" --

3    Q.  Let me stop you there.  Let's go down to May of '05 as

4    an example.  If there's another month we should pick, let us

5    know.

6    A.  We can -- let's use this as a quick example and then we

7    can look at one that was longer, but this means that --

8    Q.  Okay.

9          MR. ANTHONY:  Could we highlight May of '05,

10   please, Ms. Ellig, and maybe enlarge it if you can.

11         THE WITNESS:  And actually -- yes.  So May of '05,

12   that alert was not closed in 30 days and instead it was

13   closed with another alert.

14   BY MR. ANTHONY:

15   Q.  What does that mean, "closed with another alert"?

16   A.  So whenever the alerts were not closed timely -- in

17   other words, an alert was generated.  They would work it and

18   close it.  The next month an alert was generated.  They

19   would work it and close it.

20         If you saw anything -- see anything in my chart

21   that says, "Closed-Multiple," that means that month no alert

22   was worked and it scooted to the next month.  And that

23   happened, we'll see in this chart, sometimes two months,

24   sometimes three months, sometimes four months.

25   Q.  So what is the significance to your opinion of the fact

1     that the analysts weren't closing these alerts within the

2     30 days that was the custom in the industry?

3     A.  So the significance of it is that potentially suspicious

4     activity is continuing unabated and unchecked and

5     unreviewed.

6     Q.  Okay.

7     A.  That's the whole point of having Searchspace and that's

8     the whole point of working alerts, is to make sure that

9     there's no money laundering or other financial fraud going

10    through the bank.

11    Q.  Okay.  So let's go through your chart and point out

12    the -- those couple or three instances as examples.  This

13    will be available for people to look at, but point out a

14    couple or three where it shows multiple -- closed multiple

15    alerts and how long it took for them to close it.

16    A.  So if you look at the -- let's see.  Go to the second

17    page.

18    Q.  Okay.  Just wait for it to come up, please.  What month?

19    A.  And it would be September and October, Alert 58860.

20    Q.  Okay.  So let's wait until we get there.  What number?

21    A.  58860.  And the next one, yes, you've got it.

22            So these two were "Closed-Multiple Alerts," and

23    the next one was "Closed-Expected Activity."  So they

24    were -- the two of them were worked with the November alert.

25    So there was three months worked at one time.

Ghigliery I - Direct

1    Q.  Okay.  So I see the name of the -- on your chart where
2    it says, "Closed-Multiple Alerts."  And Ms. Ramlow, we heard
3    her testimony -- her testify here?
4    A.  Yes.
5    Q.  And so, again, this indicates how long it took to close
6    these alerts?
7    A.  So if you -- anything that says, "Closed-Multiple," that
8    means the alert wasn't worked that month and it was skipped
9    to the next month.  Then the next month, in October it says,
10   "Closed-Multiple."  So both of those months weren't worked
11   and it skipped to the next month.  November they finally
12   worked it.
13   Q.  Okay.
14   A.  And if --
15   Q.  Go ahead?
16   A.  I mean, these are just examples, but if you look at the
17   next month, December, and January of '06 --
18   Q.  And so if we look at November, that's Ms. Pesch.  I
19   think her name was Drewiske at the time?
20   A.  Yes.
21   Q.  And she was working that one.  And so what am I seeing
22   here?  There's a space of 11-7-05 to 3-23-06 and then
23   1-23-06.  Can you tell from the alerts how long it was
24   taking to attend to these alerts?
25   A.  So I think I'm lost on your question.  You mean for the

1    September and October alerts?

2    Q.  I'm looking at -- now I'm looking at January 23, '06,

3    "Closed-Multiple Alerts."

4    A.  Yes.  So -- and that was for December, right?  December

5    of 2005 it says, "Closed-Multiple."  And then January,

6    "Closed-Multiple."  And then you go to the next one,

7    February, "Closed-Multiple."  And then it would have been

8    worked in March.  So December, January, and February were

9    all glommed together with the March one and worked.

10           And then you keep going down -- let's see another

11   one that's multiple months.  If you go to October 2006,

12   Alert 81073, and the next one also, November '06.  So these

13   two were not worked and --

14   Q.  So take me through again when they alerted and when they

15   finally got closed, so --

16   A.  So 810 --

17           MR. SCHAPER:  Objection, Your Honor, cumulative.

18           THE COURT:  Overruled.

19           THE WITNESS:  81073, the alert month was October

20   and the next one was the alert month November '06, and they

21   were both closed to multiple, so that means they weren't

22   worked.  And the next month, December, was "Closed-Expected

23   Activity."  So all three of those months were worked at the

24   same time.

25   BY MR. ANTHONY:

1    Q.  Okay.  So if I'm looking at this, you go down to 82564,

2    December of '05, to see when October and November were

3    closed?

4    A.  Yes.

5    Q.  Okay.

6    A.  And the date of last action in theory -- I mean, we can

7    look at the actual alert to make sure that it's -- for this

8    particular one this is right, but the date of last action

9    means that that should be the date that they actually worked

10   all three of those alerts, February 12th, '07.  So it was a

11   little bit over 30 days for the December one, but it was

12   60 days late for October and 30 days late for November.

13            So any of these that say, "Multiple," you know it

14   wasn't worked and it goes to the next month and --

15   Q.  Let me ask you this:  Are there reasons that one could

16   expect in the ordinary course of business that would cause

17   AML analysts not to close alerts in a timely fashion?

18   A.  Most of the time it's because of lack of staffing.  They

19   have too many alerts to work and, you know, the bank hasn't

20   staffed up properly.

21   Q.  Okay.  All right.  So you talked about threshold, and we

22   saw in the opening statement a demonstrative.  I want to

23   talk about thresholds.

24            MR. ANTHONY:  And please put up for demonstrative

25   purposes Demonstrative 16, please.

1   BY MR. ANTHONY:

2   Q.  Okay.  So tell us what the threshold was at M&I Bank

3   between 2005 and 2008.

4   A.  So this is something different.  This is the score.

5   Q.  I'm sorry.  Score.  Let's talk about the score.

6   A.  So do you want to the thresholds or the scores?

7   Q.  Let's do the scores, but it says, "Threshold 75" on

8   there, right?

9   A.  It does.  And my chart has a different thing for

10  thresholds, so that's what I thought you were looking at.

11  Q.  Do you want to look at your chart?

12  A.  Sure.  I think it's important.

13  Q.  Let's go back to P-706 and show us --

14  A.  And I think --

15          MR. ANTHONY:  Highlight the column, please,

16  Ms. Ellig, where it shows "Score."

17          THE WITNESS:  "Distance From Threshold" is really

18  what I want.

19  BY MR. ANTHONY:

20  Q.  Okay.  Then let's go "Distance From Threshold."

21  A.  Yeah.

22  Q.  Okay.

23  A.  So what this means is that for the business accounts at

24  M&I, they -- there was an average incoming wire dollar

25  volume and outgoing.

1           And so just for this month, and I think it's --

2    let's see.  What is that?  513 million.  This is for March

3    of 2005.  The distance from the threshold means that the

4    volume of incoming wires, which was $607 million, was

5    $513 million away from the average.

6    Q.  Okay.  So tell us what the significance of that is.

7    A.  So that's --

8    Q.  Tell us what the average is and what this is and what's

9    the significance of the difference -- distance from the

10   threshold.

11   A.  The distance from the threshold means if you have large

12   amounts in the distance from the threshold, that means

13   that's how big the volume is compared to other businesses in

14   the peer group, which was all the other businesses.

15   Q.  So why is that a red flag?

16   A.  So it's a red flag because the volume of activity in the

17   Petters -- I'm sorry, the PCI 9018 account was extremely

18   large.  It -- because the total incoming wires for March was

19   600 million and it was 500 million away from the afternoon.

20   So the average was around 100 million, and Petters -- or PCI

21   was 600 million in incoming wires.

22           So it gives you an idea of how large dollar volume

23   wise the activity was, which in and of itself is a red flag,

24   which should be investigated further for suspicious

25   activity.

Ghigiler P7 Direct

1    Q.   Okay.  So it's March of '05.  You see it being --

2    513 million is the distance from the threshold and you say

3    it should be investigated.  What should be done?

4    A.   They should look at it.  And, of course, once they look

5    at it, they will see all these other red flags that we're

6    talking about, the transactions going in the wrong

7    direction, transactions going in and out with the same

8    parties, large round dollars going in and out.  They will

9    see all of these red flags.  So this is just a way for them

10   to signal to themselves that they need to look at things

11   further.  So that's what the distance from the threshold

12   significance is.

13   Q.   Okay.  All right.  So tell us what the account security

14   blanket is.

15   A.   The account security what?

16   Q.   Blanket for determining the threshold.

17   A.   Oh.  So in that other chart, it was either 75 or 150 was

18   the score.  Anything above that would alert.

19   Q.   Okay.

20   A.   Yeah.

21   Q.   And how is the account security blanket determined or

22   set?

23   A.   They are -- it's based on the activity.  It would be the

24   algorithm in Searchspace would give a score based on the

25   activity, the volume, and value of what was going through

1      the account.

2      Q.   Say, is there a customer security blanket and an account

3      security blanket?

4      A.   Right.

5      Q.   Okay.  What's the difference between the two?

6      A.   So the customer would be the -- in comparison to other

7      types of customers and the account would be the dollar

8      amount going through.

9              MR. ANTHONY:  Let's put up 16 for demonstrative

10     purposes.

11     BY MR. ANTHONY:

12     Q.   Okay.  So you see on this screen in front of you a

13     demonstrative that shows the alerts for each month, correct?

14     A.   Yes.

15     Q.   And so taking the first one, what is the 248 number,

16     what does that reflect?

17     A.   So if we looked at the actual alert, it would tell why

18     the alert was generated.  There would be maybe four

19     different reasons.  And these would -- the 248 would be the

20     sum of the values that were assigned by Searchspace for the

21     different reasons for the alert.  And I am -- I know one of

22     the AML analysts had that up on the screen during this

23     trial.

24     Q.   Okay.  So there's an algorithm.  So explain -- there's

25     an algorithm in Searchspace that determines when something

Ghigmer P. - Direct

```
 1    alerts, correct?
 2                MR. SCHAPER:  Objection, leading.
 3                THE COURT:  Sustained.
 4    BY MR. ANTHONY:
 5    Q.  Is there an algorithm in Search -- how is an alert
 6    determined based on the algorithm in Searchspace, if you
 7    know?
 8    A.  So the software has algorithms in it; and based on the
 9    activity in the account, whether it's dollar amount or
10    number of transactions or whatever, it will assign various
11    numbers.
12                And so if we looked at the actual alert, we would
13    see all the reasons why the account alerted.  And some of it
14    might be for customers.  Some of it might be for incoming
15    wires.  Some of it might be outgoing.  Some of it might be
16    large checks.  And they would -- Searchspace would assign a
17    value.
18                All those values are added up.  And for this
19    month -- and it's the very first alert -- the total was 248.
20    If it's over 75, it alerts.
21    Q.  Okay.  So the process -- what's the process -- what was
22    the process at M&I Bank when an account alerted?
23    A.  So when an account alerts, the alerts are assigned to
24    the AML analyst and they have, theoretically, 30 days to
25    work the alert.  And they would gather the information that
```

1    we discussed about.

2             If it alerted for incoming and outgoing wires,

3    Mary Pesch said she would get the information on the wire

4    transfers and put it on an Excel spreadsheet to be able to

5    analyze who they were from and what the dollar amounts were.

6             So that's how they were working the alerts.  They

7    would be doing research.  They would be looking at the

8    checks and the deposit tickets.  They would look at prior

9    alerts.  All of that, that's how they would work the alert.

10   Q.  Okay.  So I'm not going to spend a lot of time on this,

11   but I'd like you to go to Exhibit 183, which are the alerts

12   that we've seen before.  Do you have it?

13   A.  I have 183.

14   Q.  Okay.  So why don't you select an alert there that we

15   can review with the jury --

16   A.  Okay.

17   Q.  -- so that we can understand what you were saying about

18   how the analysts are supposed to look at this and your

19   opinion with respect to what they did.

20   A.  Okay.  So a good one to look at is --

21   Q.  Give us the page number, if you have it.

22   A.  14 and 15.  If we go to 14 first to see the alert and go

23   to 15 to see the information.

24   Q.  Okay.  Let me get to that page, please.  Okay.  So --

25   A.  So this is an alert --

1    Q.  So take us through it from the top and explain to us on

2    this one alert how you look at it.

3    A.  Right.  So the month for the alert is June 2005.

4    Q.  Okay.  Just slow down so -- because we're reading this

5    as you're talking.

6    A.  Okay.  And the date it was raised, which means when they

7    started working it, July 9th, 2005.  And this particular

8    alert alerted for customer security blanket.

9    Q.  Where do you see that?  Oh, right there.

10   A.  Just below.  And account security blanket.

11   Q.  Okay.  So you talked about customer security blanket and

12   that's -- what's customer security blanket alert; what does

13   that mean?

14   A.  So the customer is the -- a comparison of this customer

15   versus another customer in the algorithms, and then the

16   account would be the type of transactions or the volume of

17   transactions.

18   Q.  So the first one is a comparison of customers?

19   A.  Yes.

20   Q.  And the second one is a comparison of activity --

21   A.  Activity, yes.

22   Q.  -- in the account?  All right.

23   A.  And so we go to the next page and you can see that this

24   alert is being worked --

25   Q.  So I want to make sure we're on -- so what page is that?

Ghigleri - Direct

```
1    Page 15?

2    A.  15.  And so in the top square or the second square --

3    Q.  Okay.

4              MR. ANTHONY:  Let's highlight that.

5    BY MR. ANTHONY:

6    Q.  The one that's 8-22-2005?

7    A.  Yeah, at 9:31.  So it says it's going through now the

8    incoming wires for --

9    Q.  Wait a minute.  Where are you reading?

10   A.  In the comments.

11   Q.  Okay.

12   A.  They are reviewing May, June, and July of 2005, just

13   above "incoming/outgoing."

14   Q.  So does this mean they are reviewing alerts that -- for

15   May, June, and July?

16   A.  Yes.

17   Q.  Okay.

18   A.  Okay?  So not timely.  They are reviewing three months

19   together, May, June, and July.

20             And then they started -- this is Sara Johnson.

21   She started looking at the incoming wires.  So the average

22   is 500 million incoming for May, 173 wires incoming;

23   585 million for June, 174 number wires; and July -- I'm

24   sorry.  I -- let's do that again.

25             The average customer wire incoming and outgoing is
```

Ghigiler - Direct

1    500 million, and then now she's going by month.  Incoming

2    for May there's 173 incoming wires, totaling 585 million.

3    For June there was 174 wires, totaling 569 million.  For

4    July 154 wires, totaling 562 million.

5              In the next block, then, she is totaling up the

6    outgoing wires.  And if you look at the numbers for May,

7    June, and July, they are substantially similar to what came

8    in, which would be a red flag right off the bat with what

9    we're looking at here.

10   Q.  Well, were you here -- I don't remember what

11   Ms. Johnson's testimony was, but do you remember what it

12   was?

13   A.  Um-hum.  The video, um-hum.

14   Q.  What did she say about this?

15   A.  She didn't' remember.

16   Q.  Okay.  All right.

17   A.  Yeah.

18   Q.  All right.  So then let's go on.  What are you seeing in

19   this alert?

20   A.  So we're just seeing huge volume.  We're seeing similar

21   amounts going in and out for each month and -- which is a

22   red flag.

23             We don't see here an analysis or any kind of

24   statement on who is sending them in and where they are

25   going, the sources and uses.  Remember that was important in

Ghigltier P - Direct

1    the policy, that they were supposed to be looking at the

2    sources and uses of the funds.  We don't see anything about

3    that here.

4    Q.  And so when the analyst looks at this, the things they

5    look at -- what are the things they look at?  I think you

6    said why it alerted.  Do they look at why it's alerted?

7    A.  They should look at, right, like, when, where, why, and

8    how.  They should look at why did it alert and does that

9    make sense with the business of the company.  They should

10   look at sources and uses of funds.  They should understand

11   if it's a legitimate business purpose for the activity.  And

12   these are all things that we saw in the policy statements

13   over the course of the last two weeks.

14   Q.  In your opinion, is the custom and practice in the

15   industry that the analyst understand and explain what is

16   going on in the account with respect to the alert?

17   A.  Yes.  So it's standard in the industry and it is their

18   policy, the bank's policy, that whoever is working the alert

19   and for whatever reason they close it, that the reader can

20   understand why the activity was closed as not suspicious; or

21   if they say it is suspicious, then, you know, why and move

22   it up a level.

23   Q.  Okay.  So you said that the bank's policy is that

24   whoever is working the alert and for whatever reason they

25   close it, that the reader can understand why the activity --

1    or the alert was closed as not suspicious?

2    A.  Right.

3    Q.  Okay.  So explain the standard that you just described,

4    where it's found and how it's typically done -- implemented

5    in the banking industry.

6    A.  So we saw that in the bank's policy for what they are

7    supposed to do when they work an alert.

8    Q.  Okay.  Describe for the jury the bank's policy that you

9    saw and that was in this --

10   A.  And I'm not sure where it is in all this, but -- and

11   we've seen it.  When Searchspace was implemented, they had

12   written guidelines.  If you remember, I think "guidelines"

13   was one of the words in the title of the documents that I'm

14   thinking of.

15        And it went over what the analysts were supposed

16   to do and how they were supposed to document their review,

17   and it said, you know, make sure that you look at the

18   sources and use of the funds, make sure that it's

19   understandable why you closed the alert and -- so that

20   someone who is reading it can understand.

21        So these are all standards in the industry.  You

22   want to be able to have documentation on why an alert was

23   closed.

24   Q.  All right.  So when you, as an expert in the industry,

25   read the comment that closed the alert that's on the screen,

Ghigliery P7 - Direct

1    55878, what is your opinion as to whether the reason for

2    closing the alert is understood?

3    A.  Well, it says, "Activity does not appear suspicious."

4    And that, to me, is incorrect because just looking at the

5    high volume of incoming and outgoing wires and how similar

6    they are in dollar amounts would be the first red flag that

7    would tell me there's suspicious activity here.

8           And then the second thing she's got here is:

9    "Activity is consistent and expected for the type of

10   business customer."  I don't know how she came to that

11   conclusion.  It's not clear here.  We don't even have who

12   was sending in the money and where the money was going.  We

13   don't even have the first idea about the sources and uses of

14   funds.

15   Q.  All right.  So let's just do one more alert.  Pick one

16   out and we'll go through it and then we'll -- I think that

17   will give everybody a pretty good understanding of how to

18   read these.

19       (Pause)

20   A.  Okay.  This is a good one.

21   Q.  What's the number?

22   A.  Let's see.  It's on page 43 and 44, and it does go one

23   more page, but for our purposes 43 and 44 are good.  This

24   would be -- the alerted month would be May 2006 and the

25   alert number is 67366.

1    Q.  What page is that on?

2    A.  43.

3    Q.  43?

4    A.  Yeah.  And she's got it highlighted on the screen.

5    Q.  Okay.  What -- without going -- I think we've gone

6    through the alerts, so just give us the significance of what

7    you're seeing on this alert.

8    A.  So if you look at the second page, which she's got up on

9    the screen here, you'll see that in the third line down Mary

10   Ramlow is giving us the number of wires and the range and

11   the total.  And in the next block she's telling us that the

12   wires are primarily from Enchanted and Nationwide and Metro

13   Gem and Thousand Lakes.

14   Q.  Okay.  So this is different than the last alert we saw

15   because it now has a source, right?

16   A.  Yes.

17   Q.  So why isn't that satisfactory to meet the industry

18   standard?

19   A.  Well, because --

20            MR. SCHAPER:  Objection, leading.

21            THE COURT:  Sustained.

22   BY MR. ANTHONY:

23   Q.  Is it satisfactory?

24   A.  No.

25   Q.  And what is your reason for that?

Ghigliery - Direct

```
 1    A.  We need to look at one more thing here --

 2    Q.  Okay.

 3    A.  -- and that's the outflow of funds, so the two blocks at

 4    the bottom.

 5    Q.  Let's wait until they get up on the screen.

 6    A.  Yeah.  Where it says, "There were 347 outgoing wires."

 7    Yeah.  And then the wires were going to -- there's Metro Gem

 8    and Thousand Lakes.

 9              So -- and page 45 tells why it was closed.  I

10    think that would be beneficial to have also.

11    Q.  Okay.  Let's see page 45.

12    A.  And the last line says --

13    Q.  Where?  Oh, okay.

14    A.  -- "Based on the activity reviewed, the incoming and

15    outgoing wire activity is not unusual for this global

16    company and would be expected from a business."

17    Q.  Okay.  So do you believe that that alert and the

18    language in the Comments section complies with the custom

19    and practice in the industry?

20    A.  Applies what?

21    Q.  Does it meet the custom and practice in the industry?

22    A.  No.

23    Q.  Why not?

24    A.  Because the narrative itself is showing red flags of

25    money laundering and fraud.  And how is that?  Because it's
```

Chigrler P7 Direct

1   showing large dollar amounts coming in and going out to the

2   same parties, right?

3        And there's no indication of who Nationwide is or

4   who Enchanted is and what their connection is with the

5   Petters PCI account.  So we can't tell the sources and uses.

6   We can tell who the money is coming in from and where it's

7   going to, but we don't understand why and how it comports

8   with the business of the company.

9   Q.  Okay.  Bring up page -- Plaintiff's 183-0026, please.

10  This is Alert 60827.

11  A.  What page was that, did you say?

12  Q.  It's 0026 and 0027.

13  A.  26.

14  Q.  Take a moment to look at that to yourself.  Do you have

15  it in front of you?

16  A.  I do.

17  Q.  And I'm going to ask you to tell us, to give us your

18  opinion on whether you think this alert was closed in a

19  manner consistent with the custom and practice in the

20  industry.

21      (Witness reviews document)

22  A.  Okay.  So I've looked at it and, no, I don't think it

23  is.

24  Q.  And what is the basis for your opinion?

25  A.  So there's several things Here that jump out.  First one

```
1     is they are working an alert for four months.

2     Q.  You mean one that's four months old?

3     A.  Four different months.  So month one they didn't work

4     it, month two they didn't work it, month three they didn't

5     work it, and they glommed them all in month four.  And you

6     can see that on page 27.

7     Q.  Show us where you see that.

8     A.  Second to the bottom line.

9               MR. ANTHONY:  Let's enlarge that.

10              THE WITNESS:  And you can see --

11    BY MR. ANTHONY:

12    Q.  Wait until we can see it.

13    A.  Thank you.  I'm sorry.

14    Q.  Okay.

15    A.  And she's reporting for November, December, January, and

16    February.

17    Q.  There's another -- it says -- see at the top of that box

18    there it says, "See MIContacts for more info on Petters

19    Company, Inc."

20              And you have commented on what was in the

21    MIContacts about the purported business model, correct?

22    A.  Right.  So there's information in there that -- in

23    particular -- there's several sources, but in particular

24    what we talked about today is the meeting with Frank Vennes

25    who said that Petters was buying consumer electronics from
```

1    wholesalers, Nationwide and Enchanted, and selling them on a

2    pre-sale basis to the big-box retailers like Costco, Sam's

3    Club, things like that.  So that's what that would be a

4    reference to, what is the business here.

5          And then it says -- on the next page on the top it

6    doesn't break it down by month, but it breaks it down by

7    total.  In the four months there were 817 incoming wires for

8    $2.5 billion and they were coming in from Palm Beach,

9    Thousand Lakes, Enchanted, Metro Gem.  Nationwide is missing

10   here, but we know there were a lot from Nationwide by

11   looking at other documents that we looked at today.

12         And then if you look at the third to the bottom

13   line --

14   Q.  Okay.

15   A.  Yeah.

16   Q.  What does that show?

17   A.  She's already got it.  Thank you.

18         There were 715 wires, totaling 2.5 billion.  So

19   we're looking at 2.5 billion coming in, 2.5 billion going

20   out.

21   Q.  Slow down.  So what is the significance of those two

22   numbers, one going in, one going out?

23   A.  It's a gigantic amount of money and it's similar credits

24   and debits, which is a red flag of money laundering or other

25   financial fraud.

```
1              And then it's going out to some of the same

2      parties.  Metro Gem is listed as coming in and going out,

3      PAC Funding coming in and going out.  So that would indicate

4      the circular kind of round-trip transactions.  And that's

5      without even looking at the actual transactions, which I

6      did.  I actually looked at the actual transactions leading

7      up to each of these alerts.

8      Q.  Okay.  So what do you mean, you looked at the actual

9      transactions?

10     A.  Looked at the actual individual wire transfers coming in

11     and going out, coming in and --

12     Q.  What did you --

13     A.  -- going out.

14     Q.  -- see when you did that?

15     A.  You can see --

16              COURT REPORTER:  Excuse me.  You are both talking

17     at the same time.

18              MR. ANTHONY:  I apologize.

19     BY MR. ANTHONY:

20     Q.  What did you see when you looked at that?

21     A.  You can see red flags of money laundering or other

22     financial fraud by the round-trip transactions to Metro Gem,

23     for example, by the dollars going the wrong way for

24     Nationwide and Enchanted, and by large round dollars coming

25     in and out to the same parties.
```

Ghigliari - Direct

1    Q.  Okay.  I want to ask you about the Disney on Ice --

2    there's a reference to a Disney on Ice, and I'd like you to

3    look at page 183-0039.  It's Alert Number 64556.  If you

4    want to look at the first page, it's page 37 of Exhibit 183,

5    but the portion I want to bring to your attention is on

6    page 39.  It's the second box from the top.  Let's

7    enlarge -- okay.  Do you have that?

8    A.  I do.

9    Q.  Okay.  Now, are analysts supposed to -- they're supposed

10   to do sources and uses, correct?

11   A.  Yes.

12   Q.  Okay.  And so what, if any, significance do you attach

13   to the reference to -- that Ms. Pesch put on with respect to

14   Disney on Ice and the description of the comments for

15   closing this alert?

16   A.  Well, she talked about -- and some of the other AML

17   analysts did too -- performing a risk-based review.

18          And when she was testifying about this, I thought

19   to myself if you look at the other part of this alert, you

20   know, $1.4 billion came in, incoming wires, and $1.4 billion

21   went out and she's focused on checks from employees

22   reimbursing the company for Disney on Ice tickets, I just

23   thought I don't understand how that is risk based.  You

24   know, why is the focus not on the 1.4 in and 1.4 billion

25   out?  And instead, you know -- so I just -- I found it odd

1    and looking in the wrong direction, really.

2    Q.  Okay.  So the last one I want to bring to your attention

3    is on page 183-49.

4              MR. SCHAPER:  Your Honor, just move to strike the

5    last response as outside the scope of her report.

6              THE COURT:  Overruled.

7    BY MR. ANTHONY:

8    Q.  Let's look at 183-0049, and this is Alert 69663.  Let's

9    start with -- I mean, we've covered customer security

10   blanket at the top.  We've covered account security blanket.

11   So we know why it's alerted, right?

12   A.  (No response.)

13   Q.  That's why it's alerted?

14   A.  Yes.

15   Q.  Okay.

16   A.  It broke those 75 and 150 levels, yes.

17   Q.  Okay.  So we know why it's alerted.  And was this a

18   timely alert closure?

19   A.  So this one was for July and August of what year?  2006.

20   Q.  All right.

21   A.  So no.

22   Q.  And the one I want to bring your attention to is on the

23   second page, page 50, and in particular the comment at the

24   bottom of the page, 10/4/06.

25              And that's one where there were 346 outgoing

1    wires, and you can see there was 158 in July, 188 in August.

2    And the range is provided there for a total of

3    $1,237,431,259.71.  "The largest wire was to Kurt Bosshardt

4    & Associates, who are attorneys, accountants, and brokers

5    who focus on the yachting industry."

6            Okay.  First of all, do you think that -- well,

7    there's a reference to, apparently, the uses of the funds

8    here, correct?

9    A.  I didn't hear that.  Can you say it again?

10   Q.  Is there --

11           MR. SCHAPER:  Objection to that form of the

12   question.

13           THE COURT:  Sustained.

14   BY MR. ANTHONY:

15   Q.  Okay.  Do you understand -- let me ask you this:  What

16   significance is it to you, in determining whether this alert

17   was closed in the custom and practice of the industry, to

18   the reference to "The largest wire was to Kurt Bosshardt &

19   Associates, who are attorneys, accountants, and brokers who

20   focus on the yachting industry"?

21   A.  Well, the reason why it was closed, which is the second

22   to the last column on the next page, says, "Based on the

23   activity" --

24   Q.  Let's go back to that column if you're going to read

25   from it.

1          MR. SCHAPER:  I'm sorry.  Can the witness answer

2     the question?

3          THE COURT:  You're directed to answer the

4     question.

5     BY MR. ANTHONY:

6     Q.  Yeah.  Do you remember the question?  Why don't I give

7     it to you again.

8     A.  Yes, you referenced why it was closed and I just wanted

9     to reference why it was closed.

10    Q.  Okay.  So let's start with:  Why was it closed?

11    A.  It says it was closed -- so keep going.  It should be

12    there, the last big block, "Based on the activity" --

13    Q.  Don't -- because the court reporter is taking down

14    everything you say, so don't talk aloud there while you're

15    looking at that.

16         Okay.  So --

17    A.  Based on the activity reviewed, this is why she closed

18    it.  "Although this customer wire activity value and volume

19    continues to be greater than their peers, the activity does

20    not appear unusual and is that which would be expected from

21    a large multi-national company."

22         So going back to the largest wire being

23    $10 million to Kurt Bosshardt & Associates, who specialize

24    in the yachting industry, would seem to be contra to why a

25    company would be buying a $10 million yacht.  It would be a

Ghigiier P.J. - Direct

1    red flag of potentially suspicious activity that you would

2    think would be looked into.

3    Q.   Okay.  And did you see any training materials from the

4    bank where AML analysts were trained to look for the use of

5    funds to acquire things like cars, real estate, yachts,

6    things like that?

7    A.   Yes.

8              THE COURT:  Counsel, we've come to the close of

9    our day?

10             MR. ANTHONY:  I am ready.  I am close.

11             THE COURT:  So, Members of the Jury, during this

12   recess and every other recess you must not discuss this case

13   with anyone, including other jurors, members of your family,

14   people involved in the case or the trial or anyone else.

15             And don't allow anyone else to discuss the case

16   with you or within your hearing.  And you should not even

17   talk among yourselves about the case before you've heard all

18   of the evidence and the case has been submitted to you for

19   your deliberations, because that may affect your decision.

20   And if anyone tries to talk to you about the case, please

21   let me know that immediately.

22             And when I indicate do not discuss the case, I

23   mean all manners of communication, e-mailing, blogging, or

24   engaging in written or electronic communication.

25             Also, you know that if you decide this case on

1   anything other than the evidence that's been presented in

2   this courtroom and the instructions as to the law that I

3   give you, it would be an injustice and a violation of your

4   oath.  So I know that you will follow these instructions.  I

5   remind you of them for that purpose.

6           And we will conclude for today.  Thank you for

7   your service and have a good weekend.

8       (Jury excused)

9                     **IN OPEN COURT**

10                  **(JURY NOT PRESENT)**

11          THE COURT:  You may be seated.

12          You may be excused for the day.

13      (Witness excused)

14          THE COURT:  We'll take a brief recess before we

15   address the arguments that are to be made later today.

16      (Recess taken at 4:31 p.m.)

17                      *    *    *    *    *

18      (4:42 p.m.)

19                     **IN OPEN COURT**

20                  **(JURY NOT PRESENT)**

21          THE COURT:  Please be seated.  I have received the

22   e-mail that was provided about the dispute regarding the

23   bank regulator opinions; and if you wish to address this

24   issue now, you may do so.  And it goes to the objections to

25   the Exhibits D-11, D-13, D-14, et cetera.

1          MR. SCHAPER:  Thank you, Your Honor.  I will try

2     not to repeat what I said this morning.  I appreciate that

3     Your Honor reserved until after the direct of Ms. Ghiglieri.

4          Our position, Your Honor, is that the -- first of

5     all, these are clearly relevant for the reasons I stated.

6     To the extent there was any question about whether the

7     plaintiff has already opened the door in the trial before

8     Ms. Ghiglieri testified, I covered that earlier.  They asked

9     our witnesses questions about investigations from the

10     Federal Reserve, whether they got feedback.  So in

11     defendant's view, Your Honor, before we started today,

12     before we started that testimony, we think that this was

13     clearly -- should be admissible.

14          I think Ms. Ghiglieri's testimony only added to

15     that.  She testified about the bank regulatory landscape.

16     She testified about the fact that she was a bank regulator.

17     As I expected, she testified that she, in her view, took the

18     same approach that bank regulators take in her taking on

19     this assignment in this matter.  So clearly that begs the

20     question of, well, you know, what did regulators do?  What

21     did the regulators do in response to the questions to

22     Ms. Hile and Ms. Ramlow, asking about the fed actually

23     looking at the bank?

24          Ms. Ghiglieri reaffirmed her opinion that the

25     bank's BSA/AML policies, procedures, and systems were

1    severely flawed.  The fed's conclusions for the most part

2    are 180 degrees opposite of that.  And I can't see how we

3    cannot be able to do that on cross-examination to get at the

4    credibility of her conclusions.

5          She testified that the government has examiners

6    that go into banks.  They come from the fed.  They come from

7    the board.  She testified that those examiners reach

8    conclusions and they write reports.

9          She testified that M&I was regulated by the

10   Federal Reserve and that it has to comply with federal

11   regulations, and then she testified at some length about

12   what those regulations are and what in her view they mean.

13         So, Your Honor, if you put those pieces together,

14   it can't be more clear that what the fed actually did is

15   squarely at issue.  It's squarely relevant.  It will go to

16   impeach the witness, her opinions, her credibility, and to

17   fairly do so.

18         Your Honor, she also -- she talked about the

19   bank's purported misuse of Searchspace.  Searchspace

20   actually got mentioned in fed exam letters.  The fed knew

21   about that.  The fed knew the timing of launching

22   Searchspace and what did it do.

23         And I'm not saying with respect specifically to

24   the PCI account.  I'm just saying having that kind of

25   system, she critiques the fact that they didn't have it

1    before 2005.  That's covered.

2          And then she testified at length about the custom

3    and practice in the industry.  The custom and the practice

4    in the banking industry flows from the fed.  The fed and

5    banks that they regulate, it's a very close relationship

6    because, as Ms. Ghiglieri said, the soundness of the banking

7    system is what's at stake.

8          The fed does regular exams.  They are in the

9    bank's offices physically present and then they get

10   feedback.  They give feedback to the banks.  The banks try

11   to improve their processes, and the fed comes back in nine

12   months later to see how we're doing.

13         So that's the process, Judge.  I don't see how it

14   can be deemed irrelevant.  If there are particular

15   demonstrative exhibits that we propose to use with this

16   witness that there's an objection to because they feel that

17   some part of the way that they're depicted is unfair or

18   misleading in some way, we can have that discussion.

19         But the suggestion that the fed exam letters

20   themselves, which are public records, public record

21   exceptions to hearsay, and have been cited by both parties,

22   including Ms. Ghiglieri throughout, the thought that those

23   should be out, I just don't think that there's a basis for

24   that.

25         And, Your Honor, one point I didn't mention this

1   morning.  The plaintiff has a claim for punitive damages in

2   this case.  And so the extent to which the defendant was

3   working cooperatively with its regulator, was taking

4   suggestions to improve processes from its regulator on the

5   one hand or if the record was that the bank was deemed by

6   the fed to be inadequate in its compliance programs every

7   single year, surely if that was the case, which it's not,

8   surely if that was the case, the plaintiff would say that

9   supports a claim, among other things, for punitive damages.

10          And it can't be that the bank -- again, to the

11   sword and the shield issue that Your Honor has, I think,

12   raised several times, it can't be the bank cannot put

13   forward its evidence of good faith working with its

14   regulators on that issue, as well as on its state of mind

15   and what drove its conduct in terms of the focus of its

16   compliance programs.

17          So for all those reasons, Your Honor, we'd ask

18   that the plaintiff's objection to those exhibits be denied.

19          THE COURT:  Thank you, Counsel.

20          MR. LAWRENCE:  Thank you, Your Honor.  Ryan

21   Lawrence again for the trustee.

22          This morning I told you that it was the trustee's

23   understanding that the Court had already ruled on this

24   issue, both in the motions in limine order and in the

25   Court's *Daubert* order, and that based upon the trustee's

1     understanding that that excluded anything about the fed's

2     enforcement actions against M&I and the responses thereto,

3     Ms. Ghiglieri would not offer any testimony about that.

4              And we've lived up to that promise.  Ms. Ghiglieri

5     did not mention any enforcement action against M&I.  She did

6     not mention anything that M&I Bank did in response to an

7     enforcement action by the fed.

8              The fed is a federal agency and any enforcement

9     action would be the result of a government investigation,

10    and the Court has already ruled that that is inadmissible

11    both on relevance and Rule 403 rounds.

12             The only time in Ms. Ghiglieri's testimony today

13    that she mentioned the fed was, as I recall, very early on

14    in her testimony when she was talking about the general

15    regulatory scheme that exists in the industry.  And of

16    course she's going to mention that the Federal Reserve is a

17    body that exists that is part of that regulatory scheme.

18             But that is miles away from talking about a

19    specific instance of an enforcement action by the fed

20    against this bank.  That was not mentioned in her testimony.

21    Her direct is not quite done yet, but it's not going to be

22    mentioned tomorrow either.

23             MR. ANTHONY:  Monday.

24             MR. LAWRENCE:  Sorry.  Yes, Monday.  We won't be

25    here today, I hope.

1          So I think that rather than re-arguing what we did

2     this morning, the purpose of our argument right now is to

3     analyze whether Ms. Ghiglieri opened the door somehow,

4     because the Court has already decided this issue.  And it's

5     very clear that she did not open the door.  I will very

6     briefly address what opposing counsel said is the ways in

7     which she opened the door.

8          There was argument that she mentioned the

9     regulatory landscape and that includes the fed.  I just

10    discussed that.  The fact that the fed is part of the

11    landscape does not implicate the enforcement action.

12         Next they said that she said that she takes the

13    same -- "she" meaning Ms. Ghiglieri -- takes the same

14    approach as regulators and that was the methodology that she

15    used as an expert in this case.

16         But the fact that she uses the same methodology

17    that regulators use does not call into question a specific

18    instance of an enforcement action by the fed, which is what

19    the bank wishes to introduce at some point in this case.

20         They've argued that, you know, the fed reached

21    their conclusion, purportedly, that is 180 degrees opposite

22    of Ms. Ghiglieri's conclusions, but that has nothing to do

23    with what her testimony was today.  That's an argument they

24    could have made much earlier.

25         But, also, Ms. Ghiglieri is expressing her

1    opinions based on the evidence that has been presented in

2    this case and on this record.  The fact that the fed may

3    have reached different conclusions, as the Court already has

4    ruled, based on different evidence that we don't even know

5    is not probative in the same way that Ms. Ghiglieri's

6    opinions are.

7              Lastly, opposing counsel mentioned that she

8    mentioned Searchspace and Searchspace is mentioned in the

9    fed letters.  It cannot be the case that because there's a

10   term that happens to exist in the fed letters and it came

11   out of Ms. Ghiglieri's mouth, that that somehow brings the

12   specific enforcement action at issue.  Yes, she talked about

13   Searchspace and the fed at some point may have talked about

14   Searchspace, but that does not put this specific enforcement

15   action at issue.

16             Finally, there was an argument that somehow this

17   is relevant to a claim for punitive damages.  This is the

18   first time that we're hearing this argument and it is

19   something that the bank could have argued earlier, including

20   at the *Daubert* and motion in limine stage.

21             But to briefly respond to that on short notice, I

22   would argue that the response in the fed enforcement action

23   that the bank wishes to introduce is not about the conduct

24   in this case.

25             I believe it's undisputed that the fed did not

1    review the transactions that we have been talking about in

2    this case.  They were not looking specifically at the bank's

3    conduct vis-à-vis the PCI account.

4           So whatever extent there may be any relevance, it

5    would be highly attenuated, a very, very minimal probative

6    value, and outweighed by the risk of confusing the jury.

7           Thank you, Your Honor.

8           MR. SCHAPER:  May I respond briefly, Your Honor?

9           THE COURT:  You may, briefly.

10          MR. SCHAPER:  This hasn't -- none of this has

11   already been excluded.  The only attempt to exclude it came

12   this morning.  Your Honor's opinions on the motions in

13   limine, motions in limine in which they did not move to

14   exclude this, and so to the extent -- let me just back up a

15   bit.

16          To the extent that plaintiff's counsel believes

17   that the *Daubert* motions or the motions in limine were

18   briefed in a way that they moved to exclude that evidence, I

19   would like to understand that and -- because I don't think

20   that's the case.

21          In any event, the Court's order on the motions in

22   limine said that the fed exams are relevant -- recognize

23   that they could be relevant to show that M&I worked

24   diligently with federal officials, thereby rebutting the

25   trustee's evidence that M&I ignored or turned a blind eye to

1    fraudulent activity.  That's not Your Honor excluding them.

2    That's giving an indication of how they could be relevant.

3         Your Honor also noted that it may be admissible,

4    even if it indirectly pertains to federal investigations --

5    and, again, examinations that are statutory are not

6    investigations, like the FBI investigations that were at

7    issue on the motion -- to the extent that such evidence is

8    otherwise admissible and is sufficiently probative of M&I's

9    knowledge, state of mind or conduct, which this all plainly

10   is.  You get feedback from a regulator.  Do you act on it in

11   a way that furthers your compliance programs or do you

12   ignore it?  And M&I acted on it.

13        Your Honor, this is a pretty fundamental point

14   about cross-examination, cross-examination of experts.  The

15   thought that we are limited in our cross-examination of an

16   expert witness by what they specifically mentioned in their

17   direct testimony makes no sense.

18        If that were the case, experts couldn't be crossed

19   on things that they had ignored.  They could only be crossed

20   on what they actually did.  I mean, if an expert said two

21   plus two is five, could I not give them a calculator and say

22   I'd like you to add that up and see if it's correct and I

23   wouldn't be able to do that because they hadn't used a

24   calculator on direct?  I mean, that is not a limiting

25   principle of cross-examination of an expert.

1          We should be able to cross-examine them on things

2     that they ignored in their opinions, things that are --

3     evidence that's in the record that, by the way, this expert

4     cited in her expert reports.  She cited all the fed exam

5     letters.  And the fact that she nevertheless reached

6     conclusions that we feel are at odds with those exam letters

7     is completely fair game.

8          The notion that we somehow could have raised this

9     earlier, again, this morning at 7:00 a.m. is the first time

10    that they said they object to evidence about the fed exams.

11    What they told the Court in their motion in limine to

12    exclude government investigations, they told the Court,

13    "Plaintiff itself intends to offer into evidence certain

14    documents relating to the examinations that indicate that

15    FRB Chicago repeatedly found deficiencies in the BMO BSA/AML

16    procedures."  That's what they told the Court, and now

17    they're saying that this is the first time they're hearing

18    of it, that we want this stuff in.  They said they want it

19    in.

20         So I think, Your Honor, for all those reasons and

21    what we've already argued to the Court this should clearly

22    come in.

23              MR. LAWRENCE:  May I have 60 seconds, Your Honor?

24              THE COURT:  You may, 60 seconds.

25              MR. LAWRENCE:  The issue, Your Honor, is not about

1    really what the scope of the direct is or what evidence they

2    are allowed to use on cross.  It's a question of whether

3    otherwise inadmissible evidence now can come in because we

4    somehow opened the door.  And we haven't done that.

5           There are additional concerns that I failed to

6    mention before, which is that Ms. Ghiglieri's direct is

7    almost complete now.  We have just a little bit for Monday.

8    And we're sequestered from her.

9           So if at this point we're going to change the

10   rules of the game and evidence that it was our understanding

11   is inadmissible, regardless of whether it was in her expert

12   report, the *Daubert*, and motion in limine rulings came after

13   that, we made a decision about the scope of her examination

14   based upon that and we can't meet with the witness and talk

15   about this in order to bring in new testimony about these

16   federal exams that had been previously excluded.

17           MR. SCHAPER:  Judge, I just reiterate that this is

18   not an opening-the-door issue because the Court did not

19   close the door.  The Court said -- gave multiple reasons for

20   why this evidence may be admissible.  There's no closing the

21   door.  This is not like the investor complicity issue, which

22   the Court made a ruling on, and now we are arguing the door

23   has been opened.  The Court never closed this door, so the

24   opening-the-door paradigm does not apply here.

25           THE COURT:  I understood the arguments.  They are

```
 1    taken under advisement.  Thank you, Counsel.
 2              MR. LAWRENCE:  Thank you, Your Honor.
 3              MR. ANTHONY:  Thank you, Your Honor.  Have a nice
 4    weekend.
 5              THE COURT:  Thank you.  You too.
 6         (Court and the law clerk confer)
 7              THE COURT:  Yes, there is one more important
 8    matter, and that is a timing update as to where we are in
 9    the progress of the trial.
10              MR. ANTHONY:  I think you asked for a timely
11    update on the process of where we are.
12              THE COURT:  The progress of --
13              MR. ANTHONY:  Okay.  I think we'll be done maybe a
14    half hour.  I've got my outline -- I'm going to chop it
15    up -- for Ms. Ghiglieri.  I think maybe a half hour,
16    45 minutes.  I'll make it as short as I can.  And then I
17    don't know how long they have.  And then we have one more
18    witness, Mr. Martens, and I think that's it.
19              THE COURT:  You may be seated if you'd like.
20              MR. ANTHONY:  I think we've got one more witness,
21    Mr. Martens, which I think we will be appreciably shorter in
22    time than Ms. Ghiglieri, and I think that's -- is that the
23    end?
24              MR. COLLYARD:  Likely.  We still haven't decided.
25    We still have to --
```

1          MR. ANTHONY:  There might be one minor witness

2     having to do with one issue, but it wouldn't be long, would

3     it?  No.  So I think that's where we are.

4          THE COURT:  So --

5          MR. ANTHONY:  Monday, I think.

6          THE COURT:  Okay.

7          MR. ANTHONY:  I'm hoping, depending on how long

8     they take.

9          THE COURT:  Thank you.

10          MR. ANTHONY:  And he's assured me he would take no

11     more than a half hour or so.  Only kidding.

12          MR. SCHAPER:  That's hilarious.

13          MR. GLEESON:  Judge, just in the same vein, the --

14     as I mentioned to you, I think, the first day of trial, the

15     proposed jury instructions need some amending because of the

16     rulings the Court made on the motions in limine.  I think

17     we'll put our heads together with counsel about how we'll

18     meet and confer to supplement our -- or amend our jury

19     instructions.  I assume the Court wants us to do it pursuant

20     to the same process that produced what we filed?

21          THE COURT:  Yes.

22          MR. GLEESON:  And we were just wondering if the

23     Court -- wondering two things, if the Court could give us a

24     little guidance about timing and if you plan to have a

25     charge conference and when that would be, because we'll need

1    to do that work obviously before that could happen.

2              THE COURT:  Right.  And I do plan to have a charge

3    conference.  It will be dependent upon the question that I

4    asked, which is how much longer we think each side will be

5    taking.

6              MR. GLEESON:  Yeah.  Our case, we think, will take

7    us probably through next week.  We're not 100 percent sure

8    about that because it's tough to predict many things,

9    including our adversary's -- and perhaps into early the

10   following week.  So we're pretty confident we'll fill the

11   week.

12             So there -- can I switch to just one other

13   question I have for the Court?  And that is we intend to

14   file a Rule 50 motion at the close of plaintiff's case for

15   judgment as a matter of law, and it will have multiple

16   facets to it.

17             And, again, we were just curious as to the Court's

18   practice in general or practice with respect to this

19   particular case.  We're working on that motion.  Obviously,

20   it can't be finalized until they rest, but we'll get it

21   quickly in writing to the Court as quickly as we can after

22   they rest, and we don't think it will be that long.

23             And does the Court intend to go directly into the

24   defendant's case or take a moment to argue those, if you

25   could shed a little light --

1          THE COURT:  Take a moment to argue the judgment as

2     a matter of law?

3          MR. GLEESON:  Yes.

4          THE COURT:  Briefly, yes.

5          MR. GLEESON:  Okay.  And so we just don't want --

6          THE COURT:  Should the parties wish to argue it.

7          MR. GLEESON:  Yes.

8          THE COURT:  I mean, if you wish me to decide it on

9     the papers, I'm happy to do so.

10          MR. GLEESON:  Yes.  Good.  Thank you, Judge.

11          THE COURT:  Maybe the parties can agree to that.

12          MR. GLEESON:  And if we agree to -- if we agree,

13     or not, with regarding to arguing it, but one side wants to

14     argue it, can we -- Judge, we know how respectful you are --

15     and we admire it -- of the jury's time.  How much time would

16     we need to get the Rule 50 motion to the Court in writing so

17     that we might argue it before we begin the defense case?

18     Does that make sense, Judge?

19          THE COURT:  It does.  That depends on the rest of

20     the case, though, doesn't it?

21          MR. GLEESON:  It depends on the rest of their

22     case?

23          THE COURT:  Right.

24          MR. GLEESON:  Yeah, it does, and we're going to

25     try to shorten the period of time between when Mr. Collyard

1    or one of his colleagues says, "The plaintiff rests" and the

2    time that we hit send on a Rule 50 motion.

3           Because to be very serious about it, we would like

4    to be heard on it and we would like the Court to decide it

5    because whether it's all or parts of the plaintiff's case

6    that doesn't go forward matters a lot with respect to the

7    contours of the defendant's case.

8           THE COURT:  Understood.  And the Court does not

9    make judgments in haste because of the seriousness and

10   importance of the issues, and so providing me with your

11   arguments in a timely fashion will give me time then to

12   review them and make a decision, a sound decision.

13          MR. GLEESON:  Great.  That's what -- we will

14   endeavor to make that period of time as short as possible.

15   Thank you.

16          THE COURT:  Very well.  Is there anything further

17   that we need to address?

18          MR. ANTHONY:  Not from the plaintiff's standpoint,

19   Your Honor.

20          THE COURT:  Okay.

21          MR. SCHAPER:  No, Your Honor.

22          THE COURT:  As it is by my watch 5:05 on a Friday,

23   I hope everyone has a great weekend.  Thank you very much.

24       (Court adjourned at 5:05 p.m.)

25                    *     *   *

1           I certify that the foregoing is a true and correct
    copy of the transcript originally filed on 12/05/2022 and
2   incorporating redactions requested by Attorney Adine S.
    Momoh.

3
                    Certified by:   *s/ Lori A. Simpson*
4
                                    Lori A. Simpson, RMR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25