1          UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Douglas A. Kelley, in his      )   File No. 19-cv-1756
4    capacity as the Trustee of the )          (WMW)
     BMO Litigation Trust,          )
5                                    )
              Plaintiff,            )   St. Paul, Minnesota
6                                    )   October 25, 2022
     vs.                            )   10:56 a.m.
7                                    )
     BMO Harris Bank N.A., as        )
8    successor to M&I Marshall and   )
     Ilsley Bank,                   )
9                                    )
              Defendant.            )
10   ------------------------------------------------------------

11

12

13       BEFORE THE HONORABLE WILHELMINA M. WRIGHT
              UNITED STATES DISTRICT COURT JUDGE
14
         *   *   *   **REDACTED TRANSCRIPT**   *   *   *
15

16           **(JURY TRIAL PROCEEDINGS - VOLUME X)**

17

18

19

20

21

22

23

24
         Proceedings reported by certified court reporter;
25   transcript produced with computer.

```
 1       APPEARANCES:
           For the Plaintiff:        Robins Kaplan, LLP
 2                                   MICHAEL A. COLLYARD, ESQ.
                                     DAVID E. MARDER, ESQ.
 3                                   PETER C. IHRIG, ESQ.
                                     MORGIA D. HOLMES, ESQ.
 4                                   MICHAEL D. REIF, ESQ.
                                     800 LaSalle Avenue
 5                                   Suite 2800
                                     Minneapolis, Minnesota 55402
 6
                                     Anthony, Ostlund, Louwagie,
 7                                   Dressen, Boylan, P.A.
                                     JOSEPH W. ANTHONY, ESQ.
 8                                   JOSEPH R. RICHIE, ESQ.
                                     RYAN M. LAWRENCE, ESQ.
 9                                   90 South Seventh Street
                                     Suite 3600
10                                   Minneapolis, Minnesota 55402

11       For the Defendant:          Stinson, LLP
                                     KEITH S. MOHEBAN, ESQ.
12                                   ADINE S. MOMOH, ESQ.
                                     50 South Sixth Street
13                                   Suite 2600
                                     Minneapolis, Minnesota 55402
14
                                     Debevoise & Plimpton, LLP
15                                   JOHN GLEESON, ESQ.
                                     MICHAEL SCHAPER, ESQ.
16                                   SUSAN REAGAN GITTES, ESQ.
                                     MORGAN A. DAVIS, ESQ.
17                                   919 Third Avenue
                                     New York, New York 10022
18
                                     Mayer Brown, LLP
19                                   JOSHUA D. YOUNT, ESQ.
                                     71 South Wacker Drive
20                                   Chicago, Illinois 60606

21                                   Mayer Brown, LLP
                                     RICHARD A. SPEHR, ESQ.
22                                   GINA PARLOVECCHIO, ESQ.
                                     1221 Avenue of the Americas
23                                   New York, New York 10020

24       Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                     316 North Robert Street
25                                   St. Paul, Minnesota 55101
```

1                          **I N D E X**

2                                                              PAGE

3       **THEODORE MARTENS**
              Cross-Examination (Continued) by Mr. Spehr        2494
4             Redirect Examination by Mr. Anthony               2515

5       **JEANNE CRAIN**
              Direct Examination by Mr. Gleeson                 2529
6             Cross-Examination by Mr. Lawrence                 2634
              Redirect Examination by Mr. Gleeson               2676
7             Recross-Examination by Mr. Lawrence               2681
              Further Redirect Examination by Mr. Gleeson       2683
8
        **JOHN VANDERHEYDEN**
9             Direct Examination by Mr. Schaper                 2684

10

11      PLAINTIFF RESTS                                         2521
        RULE 50(a) MOTION                                       2522
12

13

14      PLAINTIFF'S EXHIBITS                                    REC'D
              72                                                2584
15            277                                               2654
              764                                               2507
16            766                                               2514

17

        DEFENDANT'S EXHIBITS                                    REC'D
18            40231                                             2564
              40238                                             2564
19            40248                                             2589
              40250                                             2599
20            40251                                             2599
              40252                                             2593
21            40269                                             2564
              40283                                             2564
22            40306                                             2564
              40308                                             2564
23            40330                                             2564
              40350                                             2564

24

25

1                      **P R O C E E D I N G S**

2                          **IN OPEN COURT**

3                          **(JURY PRESENT)**

4              THE COURT:  Please be seated.  Good morning.

5              MR. SPEHR:  May I proceed, Your Honor?

6              THE COURT:  Yes, you may.  Good morning.  We are

7       ready to proceed.

8                      **(Theodore Martens)**

9                  **CROSS-EXAMINATION** (Continued)

10      BY MR. SPEHR:

11      Q.  Good morning, Mr. Martens.

12      A.  Good morning.

13      Q.  When we left off yesterday, we were talking about the

14      SPEs, right?

15      A.  Correct.

16      Q.  And we were talking about how the investors controlled

17      the bank accounts of the SPEs, correct?

18      A.  That's correct.

19      Q.  And that meant that any funds wired out of the SPE

20      investor-controlled accounts were directed by the investors

21      themselves, correct?

22              MR. ANTHONY:  Objection, Your Honor, investor

23      information, knowledge.  We covered this yesterday, I

24      thought.  May we do a sidebar?  I had an objection at the

25      close of yesterday because I anticipated this is the

1    direction they were going.  May we have a sidebar to clarify

2    this?

3              THE COURT:  We may have a sidebar.

4         **(At sidebar)**

5              MR. ANTHONY:  Your Honor, yesterday you may recall

6    counsel for the defendant at some length saying that all

7    Mr. Martens could testify to was damages, his calculation.

8    He couldn't get into the Ponzi scheme.  He couldn't get into

9    any of the liability issues.  And our examination was

10   limited in that fashion due to their objection.

11             Now he has gone far beyond asking how he

12   calculated his damages.  He is getting into investor

13   activity, investor knowledge.  Yesterday alone he said:

14   "Based upon your investigation of the SPEs, you

15   concluded they had no operations, correct?"

16   "They did not have any operations."

17   "They were not well capitalized; is that correct?"

18   "I think you mentioned this.  They were owned and

19   controlled by Petters, correct?

20   "And, in fact, these SPEs for the investors had no

21   offices, correct?"

22             That's when I objected.  You struck those two

23   questions and answers.  Now we are going down that path

24   again.  If I'm barred from asking him about the liability

25   issues, then he is.

1          MR. SPEHR:  I'm simply asking questions about the

2     flowchart that they introduced as a demonstrative through

3     Mr. Martens; a flowchart showing the structure of the SPEs.

4     So I am just trying to pin down what he understands about

5     the flow of funds.  That's it.

6          MR. ANTHONY:  He didn't ask that.  You didn't ask

7     any of those questions.

8          MR. SPEHR:  This has nothing to do with investor

9     complicity at all.  It's just pure flow of funds analysis.

10          THE COURT:  We are not talking about investors, we

11     are talking about flow of funds?

12          MR. SPEHR:  That's right.

13          THE COURT:  So "investors" is not going to be a

14     word that's used?

15          MR. SPEHR:  The investors were directing the

16     money.  That's the key.  That's why I'm asking these

17     questions.

18          MR. ANTHONY:  And that gets --

19          MR. SPEHR:  That's why I got into the question of

20     who controls the SPE accounts, because the investors were

21     controlling the money.  The investors knew what money was

22     going out and what money was coming in.  That's what I am

23     trying to establish.

24          MR. ANTHONY:  He is getting into investor

25     knowledge and investor complicity.

1              THE COURT:  Right.  How does this witness know

2      about what the investor knows?

3              MR. SPEHR:  Because -- oh, he states it in his

4      report; that they knew that the money was going in and out

5      of their accounts and they had a line of sight into how the

6      money was moving.  That's all I'm trying to show,

7      Your Honor.

8              MR. ANTHONY:  Well, it's investor complicity,

9      investor knowledge, and I was barred from getting into this

10     altogether when I tried to show that exhibit.  They objected

11     and you sustained it, and so I respected it and now they're

12     going beyond that.

13             THE COURT:  I don't understand why you should be

14     able to get into investor knowledge when I have ruled.

15             MR. SPEHR:  They put the chart in -- the flowchart

16     that Mr. Martens created that shows the investors at the top

17     of the stack to the SPEs and down below and then the money

18     coming back to the investors.  I have to be able to ask him

19     about that chart.

20             They've also put another chart --

21             THE COURT:  So you are asking about the chart.

22     How does that go to investor knowledge?

23             MR. SPEHR:  It simply -- when we are talking about

24     knowledge, it's did the investors know what was coming into

25     and out of their accounts.  That's it.  That's all I'm

```
 1    trying to show.
 2              MR. ANTHONY:  He hasn't put the chart up.  He
 3    hasn't asked him if the money went from the investors, the
 4    SPE to Petters.  He hasn't asked any of those questions.  He
 5    is asking about what the investors, if they had offices,
 6    he's asking about if they had -- if they were well
 7    capitalized, if they had -- he asked him about his
 8    investigation of the SPEs.  I couldn't ask any of that, and
 9    I didn't.  Now --
10              MR. SPEHR:  You won that battle yesterday.  I am
11    trying to -- I am being very, very straight and honest.  I
12    am trying to simply establish that the investors knew what
13    was going into their controlled accounts and they knew what
14    was going out of their controlled accounts and they knew
15    that the money was going to Nationwide and Enchanted because
16    they were directing the transactions.  That has -- that's
17    all I'm trying to do.
18              THE COURT:  Why is that objectionable?
19              MR. ANTHONY:  If that's all he says, did the money
20    go to Nationwide and Enchanted, I'm fine with that.
21              THE COURT:  No, no.  Did the investors know
22    that --
23              MR. SPEHR:  That's right.
24              THE COURT:  -- right?
25              MR. ANTHONY:  Yeah.  And I think we can --
```

1          THE COURT:  So let's not take up a whole lot of

2     time.

3          MR. SPEHR:  I am not going to.

4          THE COURT:  And also let's not deviate from what

5     you have just represented.

6          MR. SPEHR:  I will not.

7          THE COURT:  Okay.

8          **(In open court)**

9     BY MR. SPEHR:

10    Q.  So I think the question that was pending during the

11    objection was that the investors directed the transactions

12    in their SPE accounts, correct?

13    A.  Once -- the investors controlled the account for

14    purposes of putting -- taking money out of the account,

15    putting money in.  That's the special purpose entity bank

16    account.

17    Q.  So, for example, when PCI and an investor or hedge fund

18    agreed to execute a transaction supposedly for the purchase

19    of electronics, the investor would direct funds to execute

20    that purchase, correct?

21    A.  Well, there would be two things that would happen.  The

22    investor would take and first of all be given a promissory

23    note, sign a promissory note and be given purchase orders

24    for the procurement of the goods and then for the subsequent

25    sale.  The goods were effectively presold, allegedly

1    presold.

2         The investor would then put the money into the

3    account and then direct then the transfer of that account --

4    the transfer of those funds out to the vendors, Nationwide

5    and Enchanted.

6    Q.  And just to be clear, the investor directed the wiring

7    out to Nationwide and Enchanted, correct?

8    A.  That's correct.

9    Q.  And the idea was that once the funds were wired by the

10   investor to Nationwide or Enchanted, they would purchase

11   electronics from a wholesaler such as Sony and resell those

12   electronics to a retailer such as Costco, correct?

13        MR. ANTHONY:  Objection, lacks foundation as to

14   who "they" is.

15        THE COURT:  Overruled.

16        THE WITNESS:  I'm sorry.  Could you repeat the

17   question?

18   BY MR. SPEHR:

19   Q.  Sure.  The idea was that once the funds were wired by

20   the investor to Nationwide or Enchanted, Nationwide or

21   Enchanted would purchase electronics from a wholesaler such

22   as Sony and resell those electronics to a retailer such as

23   Costco.  Is that a fair summary of the transaction as it was

24   supposed to occur?

25   A.  I think that's a fair summary from the perspective of

1   the vendor purportedly going ahead and acquiring the goods.

2   I don't know if it was necessarily Sony.  It probably wasn't

3   Sony in all instances.  And then ultimately then those goods

4   being delivered to a big-box retailer, a Costco, for

5   instance.

6   Q.  Thank you.

7            And then to finish off the transaction, the

8   electronics purchase transaction, is it correct to say that

9   the retailer was then expected to pay for the electronics by

10  sending funds directly to the controlled SPE accounts; is

11  that correct?

12  A.  I think -- I don't think that's correct.  I think what

13  was happening was the -- first of all, there were no

14  retailer payments, but, rather, what was -- what Mr. Petters

15  had explained to the investors was the money would come into

16  the PCI -- PCI M&I account from a retailer, and then he had

17  an agreement in place that within 24 hours, he would then go

18  ahead and then put those funds into the special purpose

19  entity bank account.  PCI could only put money into the

20  special purpose entity accounts for the various investors.

21  PCI could not take money out.

22  Q.  Right.  My question focused on the way the transaction

23  was designed through contractual arrangements and otherwise

24  was that once the retailers made payment for the

25  electronics, that payment was designed to go and intended to

1    go into the SPE-controlled account, correct?

2    A.  I'm not sure it was designed that way.  That's what I'm

3    saying.  I'm talking from my experience in tracking and

4    tracing the transactions.  I don't recall it necessarily

5    being designed that way.

6    Q.  Is it fair to say that the way the transactions were

7    constructed, the investors expected that retail payments

8    would be made into their controlled SPE accounts?

9            MR. ANTHONY:  Objection, invades the question of

10   investor knowledge.

11           THE COURT:  Sustained.

12   BY MR. SPEHR:

13   Q.  Now, what, in fact, happened here was that once

14   Nationwide or Enchanted got money from the investors,

15   Nationwide or Enchanted simply deducted a commission for

16   themselves and sent the remainder of the funds to PCI's

17   account at M&I, correct?

18   A.  That's correct.

19   Q.  And then PCI would, in turn, direct payment to the SPEs

20   from the M&I account to repay the investors for the loans

21   associated with the electronics purchases, correct?

22   A.  Those funds would be used to pay investors as notes

23   matured.  So on the maturity date, whatever funds had been

24   sent from Nationwide and Enchanted and other vendors back to

25   PCI, those funds would be then used to then pay notes as

Martens - Cross

1    they matured, not necessarily from the same investor.  Could

2    be, but other investors as well.

3    Q.  My only -- that's actually helpful, but my only question

4    was:  The end of the transaction was PCI paying out of the

5    M&I account to the controlled SPE accounts, correct?

6    A.  That's correct.

7    Q.  And just to be clear, the investors had a line of sight

8    into who was sending money into their controlled accounts --

9              MR. ANTHONY:  Objection.

10        (Simultaneous indiscernible crosstalk)

11   BY MR. SPEHR:

12   Q.  -- PCI, correct?

13             MR. ANTHONY:  Objection, Your Honor.  Seeking to

14   invade investor knowledge and in violation of the

15   conversation we just had.

16             THE COURT:  Sustained.

17   BY MR. SPEHR:

18   Q.  And just one other question.  The investors also knew

19   and understood that they were sending money to Nationwide

20   and Enchanted, correct?

21             MR. ANTHONY:  Objection, Your Honor, same

22   objection.

23             THE COURT:  Sustained.

24   BY MR. SPEHR:

25   Q.  To your knowledge, Mr. Martens, did any investor ever

1    advise anyone at M&I that they never received one dime in

2    retail payments into their restricted accounts?

3              MR. ANTHONY:  Objection, Your Honor, investor

4    knowledge.

5              THE COURT:  Sustained.

6              MR. ANTHONY:  Your Honor, may I ask for some

7    instruction to counsel that he refrain from asking about

8    investor knowledge?

9              THE COURT:  Counsel, you have been instructed not

10   to address investor knowledge and --

11             MR. SPEHR:  I -- I'm sorry.

12             THE COURT:  -- you're a very capable attorney and

13   you are not to -- and very able to craft questions that

14   comply with the Court's rulings.  It is your responsibility

15   as an officer of the court --

16             MR. SPEHR:  Understood.

17             THE COURT:  -- to comply with the Court's rulings.

18             MR. SPEHR:  Understood.

19             THE COURT:  I expect --

20             MR. SPEHR:  I didn't intend -- I'm sorry.

21             THE COURT:  I am speaking now.

22             MR. SPEHR:  Yes.

23             THE COURT:  That's one of the basic principles of

24   how we proceed in court.  You are to comply with the Court's

25   rulings.  You are not to deviate from the Court's rulings or

1    disregard the Court's rulings in order to try to get

2    evidence into the record that has already been ruled to not

3    be admissible.  Do you understand your responsibilities?

4                MR. SPEHR:  I do, Your Honor.  I understand.  I

5    did not think I was invading the Court's ruling, but I

6    understand and I will not ask any further questions around

7    this area.

8                THE COURT:  And I expect you to comply with all of

9    the Court's rulings.

10               MR. SPEHR:  I will do so.

11               THE COURT:  And I know of your intelligence.  It's

12   been displayed here in this courtroom.  So I know you can

13   understand the Court's rulings, and you are expected to

14   understand and follow them.

15               MR. SPEHR:  Thank you, Your Honor.  I appreciate

16   that.  I will do so.

17               Mr. Herzka, would you put up DD-26, which I

18   believe there has been no objection to.

19   BY MR. SPEHR:

20   Q.  Mr. Martens, can you see that on your screen?

21   A.  I can, yes.

22   Q.  Okay.  Is this a fair depiction of the flow -- the

23   typical flow of funds structure?

24   A.  I would say in terms of the investor depositing

25   investment funds into the SPE is a first step.  That second

Martens - Cross

 1    step being from the transfer of those funds to one of the

 2    vendors, to a vendor, Nationwide or Enchanted or the others.

 3    And what's happening next then from a cash flow perspective

 4    is the vendor goes ahead and returns those funds to PCI.

 5            MR. SPEHR:  Would you click the next one.

 6    BY MR. SPEHR:

 7    Q.  So this is the end of the transaction, PCI to the SPE

 8    account, correct?

 9    A.  That would be, once again, the cash flow once the money

10    is there.  Typically as the money came into the PCI M&I

11    account, that money was there maybe and transferred the same

12    day, no more than a day later back to the -- well, back to

13    be used then to go ahead and pay off maturing notes to the

14    SPEs.

15            MR. SPEHR:  Would you put up next, Mr. Herzka,

16    P-764.  I believe this has been admitted as a demonstrative,

17    Your Honor.  Let me just ask a foundational question and

18    then I will offer it.

19    BY MR. SPEHR:

20    Q.  This is a flowchart that you created, correct?

21    A.  That's correct.

22    Q.  And this is contained in your expert report; is that

23    correct?

24    A.  It's been contained in a number of my expert reports,

25    that's correct.

1    Q.  And to the best of your knowledge, this is an accurate

2    depiction of the typical flow of funds?

3    A.  It is, yes.

4         MR. SPEHR:  I offer P-764 in evidence, Your Honor.

5         MR. ANTHONY:  No objection.

6         THE COURT:  P-764 is received.

7         MR. SPEHR:  Thank you.

8    BY MR. SPEHR:

9    Q.  So, again, let's just go through this chart, which I

10   think you were shown in your direct examination.  So, again,

11   we have the investor on the top, right?

12   A.  That's correct.

13   Q.  And the investor is transferring money into the special

14   purpose entity, correct?

15   A.  That's correct.

16   Q.  And then Step 2, the special purpose entity transfers

17   funds to the vendor, correct?

18   A.  Correct.

19   Q.  And when we talk about vendor, we're basically talking

20   about Nationwide and Enchanted, correct?

21   A.  They were the two big ones, but there were others.

22   Q.  And the vendor then in Step 3 in the transaction deducts

23   a commission, right?

24   A.  Correct.

25   Q.  And then it pays the remainder down to the Petters

Martens - Cross

1    Company, Inc. account at M&I, correct?

2    A.  Correct.

3    Q.  And then the final stage -- well, there are two more

4    stages in your chart.  Step 4, PCI repays the controlled

5    investor account at the special purpose entity, correct?

6    A.  Correct.

7    Q.  And then there's -- I think you talked about this, sort

8    of a negotiation at the end of the day that resulted in the

9    special --

10        (Alerts going off from cell phones)

11            MR. SPEHR:  I think we have been Amber alerted,

12   Your Honor.

13            THE COURT:  Let's just wait.  The record will

14   reflect that there is an alert that has just gone off in the

15   courtroom.

16        (Alerts going off from cell phones)

17            MR. SPEHR:  Do we think it's over?  May I proceed?

18            THE COURT:  Yes, you may.

19            MR. SPEHR:  Thank you, Your Honor.

20   BY MR. SPEHR:

21   Q.  So you talked about this a little bit on your direct,

22   but basically the last stage or step in the transaction, I

23   think you have it as Step 6, is there was some transaction

24   that resulted in the special purpose entity making some

25   payment back into Petters Company, Inc., correct?

1    A.  Well, but you skipped a step, though.  You used the term

2    "negotiation."  There was no negotiation with Step 5.  Step

3    5 is the actual return of principal plus interest on the

4    outstanding promissory note.  That was paid at maturity

5    date.

6             The difference here, though, with Step 6 was that

7    PCI, per terms of the agreement, per terms of the note,

8    would put in some money in terms of as like sort of their

9    investment in the transaction to provide some -- how can I

10   say? -- additional funding.  But then ultimately when the

11   transaction closed, then would be returned back in Step 6.

12   Not every time.  It was in certain instances that PCI would

13   actually put the money in.  That's all I'm saying.  It

14   wasn't really a negotiation as much as what was understood

15   between the parties.

16   Q.  Very helpful.  Thank you.  I appreciate that.

17             MR. SPEHR:  Now I would like, Mr. Herzka, can you

18   do -- can you put up P-764 and side by side with PD-14,

19   please?

20   BY MR. SPEHR:

21   Q.  Now you're familiar with PD-14, correct?

22   A.  I have been in the courtroom.  I've seen PD-14 before.

23   Q.  Yeah, it's not something you created, correct?

24   A.  That's correct.

25   Q.  And looking at PD-14, there is no reference to any SPEs

Martens - Cross

1    in PD-14, correct?

2    A.  That's correct.

3    Q.  There's no reference to any vendors in PD-14, correct?

4    A.  Well, there's a reference to wholesale suppliers in the

5    second box there using a different term.

6    Q.  Well, Nationwide and Enchanted are not referenced here,

7    are they?

8    A.  They're not specifically referenced, that's correct.

9    Q.  And this does not show any flow of funds from the

10   investors to the SPEs to the vendors, does it?

11   A.  That's correct.

12   Q.  And what -- withdrawn.

13         Now turn to a different subject, Mr. Martens.  We

14   talked about the years that you've been conducting an

15   investigation into the Petters scheme, correct?

16   A.  That's correct.

17   Q.  And you've been doing it for, you know, approximately 14

18   years, correct?

19   A.  That's correct.

20   Q.  You've looked at an enormous amount of information and

21   data, correct?

22   A.  That's correct.  My team.

23   Q.  You and your team.

24         And in all your years of conducting your

25   investigation, is it correct to say that you found no

Martens - Cross

```
1    evidence that any M&I employee knew about the SPE
2    structures; is that correct?
3    A.   The SPE structures?
4    Q.   Right.
5    A.   I'm not aware of it -- in terms of -- when I think of it
6    in terms of an M&I employee with actual knowledge of the
7    fraud itself, I'm not aware of that, no.
8    Q.   My question was:  Are you aware of any evidence that
9    anyone at M&I understood the SPE structures that we just
10   discussed?
11             MR. ANTHONY:  Your Honor, objection, inquiring
12   about liability issues of a damages expert, which I thought
13   was off limits.
14             THE COURT:  Sustained.
15             MR. SPEHR:  I will move on.
16   BY MR. SPEHR:
17   Q.   Is it correct to say, Mr. Martens, that by January of
18   2008, the investors were owed billions of dollars by PCI?
19   A.   That's correct.
20   Q.   A couple of final questions.  I want to talk about --
21   briefly about the Interlachen, Ritchie, and Palm Beach DAMAs
22   and DACAs.  You understand what those are, right?
23   A.   I do, yes.
24   Q.   Is it correct to say that the Ritchie DACA was not
25   executed until after the last Ritchie loan to PCI or PGW?
```

```
1              MR. ANTHONY:  Objection, it goes to both investor

2     knowledge, to liability causation, and is unrelated to his

3     opinion on damages.

4              THE COURT:  Sustained.  Sustained.

5              MR. SPEHR:  Oh, I'm sorry.  Thank you, Your Honor.

6     BY MR. SPEHR:

7     Q.  Let me draw your attention -- I don't think this is in

8     the binder, so I am going to hand it out.  I'm referencing

9     P-766.

10             MR. SPEHR:  If I may approach, Your Honor?

11             THE COURT:  You may.

12        (Document handed to witness and the Court)

13             MR. SPEHR:  I don't think this is in evidence yet,

14    so, Mr. Herzka, don't put it up.

15    BY MR. SPEHR:

16    Q.  Foundational question, Mr. Martens:  Is this a document

17    that you prepared?

18    A.  Yes.

19    Q.  And this is a document that's contained in your expert

20    report, correct?

21    A.  For this case, for this matter, that's correct, yes.

22    Q.  And what this shows are cash and check payments to the

23    PCI insiders, correct?

24    A.  Well, it's cash and checks made payable to cash, not

25    just -- well, no, that's not correct, because this is -- the
```

1    individuals that are listed here are not all PCI insiders.

2    Q.  Well, Coleman is a PCI insider, right?

3    A.  Yes.

4    Q.  White is a PCI insider?

5    A.  Yes.  When you say "Coleman," you mean Deanna Coleman?

6    Q.  Yeah, I meant Deanna.  Thank you.  Because I see there's

7    another Coleman here.

8              Thomas Petters is an insider?

9    A.  He's an insider.

10   Q.  Lindstrom is an insider?

11   A.  Insider.

12   Q.  So just want to -- this reflects checks made out to cash

13   to these individuals, correct?

14   A.  Not necessarily just -- not necessarily checks.  There

15   could be cash, literal cash given to certain of the payees

16   that are listed on this schedule here.

17   Q.  Why don't you tell me what this reflects.

18   A.  Okay.  First of all, PCI had only five employees; Thomas

19   Petters, Deanna Coleman, Robert White, Debbie Lindstrom, and

20   their accountant, Sandy Indahl.  Those are the only five

21   people who worked for Petters Company, Inc.

22             What this schedule reflects is certain individuals

23   who worked for Petters Company, Inc. were given either cash,

24   literally cash, or checks made payable to cash.  There are

25   certain other individuals on this schedule that had nothing

1   to do with PCI, in certain cases were actually relatives of

2   Deanna Coleman.  And then there are other individuals on

3   this schedule that were Petters Group Worldwide employees

4   that worked closely with Thomas Petters.

5          And then there's just other items on here that are

6   just literally cash and/or petty cash, and I'm not quite

7   sure who was given those amounts.

8          MR. SPEHR:  I offer P-766 in evidence, Your Honor.

9          MR. ANTHONY:  No objection.

10          THE COURT:  P-766 is received in evidence.

11          MR. SPEHR:  If I may have a moment?

12          THE COURT:  Yes, you may.

13     (Defendant's counsel confer)

14          MR. SPEHR:  No further questions, Your Honor.

15   Thank you.

16          THE COURT:  May I just make one clarification?

17   The bottom of P-766 has a 001.  Let's just make a record of

18   the fact that P-766 is a one-page document.

19          MR. SPEHR:  Thank you.

20          THE COURT:  You may proceed, Counsel.

21          MR. ANTHONY:  Thank you, Your Honor.

22          Ms. Ellig, would you put back up on the screen the

23   one we were just looking at.  Thank you.

24

25

1          **REDIRECT EXAMINATION**

2     BY MR. ANTHONY:

3     Q.  Mr. Martens, this Exhibit 766 shows I think you said

4     cash and checks, right?

5     A.  Cash and checks payable to cash.

6     Q.  Does it include any of the tens of millions of dollars

7     in wires we've heard about in this case?

8     A.  No.

9     Q.  Do you know how much was -- went out of the PCI account

10    in wires to Mr. Petters, Ms. Coleman, and Mr. White, for

11    example?

12    A.  I know it was millions and millions of dollars went out

13    in wires to -- certainly to Deanna Coleman and to Tom

14    Petters over the years.

15    Q.  And that's not part of this schedule, though, correct?

16    A.  That's correct.  This is just cash and checks payable to

17    cash.

18    Q.  Where did you find all this information that's in 766

19    that's now in evidence in this case?

20    A.  Well, from the books and records of PCI.

21    Q.  What --

22    A.  If I can, what I think -- what I believe triggered this

23    particular schedule was the fact that Debbie Lindstrom, who

24    testified last week here in court, she was one -- she was

25    probably the first person that I interviewed at PCI.  And

1    she brought to my attention -- she handed me -- I asked

2    questions and so forth, and she proceeded to give me her --

3    a laptop that she had in a drawer in her office.  She was

4    Deanna Coleman's assistant.  She actually worked right

5    outside of Deanna Coleman's office on the third floor at the

6    Petters Company building there on 4400 Baker Road in

7    Minnetonka.

8           And her laptop had a spreadsheet on it that Deanna

9    would go ahead and direct her to go down to a local M&I

10   branch and bring back cash.  And then you'll see in the

11   account there, 37 instances of that happening.  And then

12   along the way, we also found payments and so forth that

13   Deanna Coleman made to her brother, Jody Coleman, and I

14   believe Scott Moellman was her boyfriend.

15          And the trustee -- as we found this information,

16   the trustee directed that we go ahead and find out any and

17   all instances where cash and/or checks payable to cash was

18   used.

19   Q.  So did you go to the M&I Bank records to confirm the

20   accuracy of the information you had?

21   A.  Yes.

22   Q.  And from looking at the M&I Bank records, what could you

23   see about -- what did you see that confirmed what you

24   thought with respect to cash and checks going out of the M&I

25   Bank account to these various individuals on P-766?

1    A.  Well, all the information was tied out; in other words,

2    we were able to -- the checks, the Deanna checks and so

3    forth were all written in certain amounts and so forth.  So

4    we were able to tie out the records.

5    Q.  So you could see the information on P-766 in the M&I

6    Bank records when you looked at them?

7    A.  Correct.

8    Q.  Now let's talk about who Jody Coleman was.  Who is Jody

9    Coleman?

10   A.  I believe that's Deanna Coleman's brother.

11   Q.  Any idea why Jody Coleman was getting -- what the

12   business purpose was for that 930,000 to Jody Coleman was

13   for?

14   A.  I have no idea.  I suspect it was not a business

15   purpose.

16        (Alerts going off from cell phones)

17             THE COURT:  Counsel, you may proceed.

18             MR. ANTHONY:  Thank you, Your Honor.

19   BY MR. ANTHONY:

20   Q.  Jody Coleman, her brother, got 930,000 in checks from

21   Ms. Coleman.  What about Scott Moellman?  Who is Scott

22   Moellman?

23   A.  I believe that was Deanna Coleman's boyfriend.

24   Q.  And her boyfriend, from your review of the records of

25   M&I Bank, got 275,000 in checks or cash?

1    A.  That's correct.

2    Q.  We know who Mr. Petters is.  We know who Ms. Lindstrom

3    is.  And we have Deanne Anderson, David Margolis.  Any idea

4    who they are?

5    A.  Deanne Anderson was Mr. Petters' administrative

6    assistant, and David Margolis was another assistant --

7         (Alerts going off from cell phones)

8    A.  -- another assistant to Mr. Petters.

9              THE COURT:  We will suspend testimony until these

10   alerts are completed.

11             Okay.  You may proceed.

12             MR. ANTHONY:  Thank you.

13   BY MR. ANTHONY:

14   Q.  So, for example, if there was a check in an M&I Bank

15   record that showed a payment to Jody Coleman, would that be

16   like in a monthly bank statement that you could find?

17   A.  Well, these transactions would be recorded in a monthly

18   bank statement, that's correct.

19   Q.  So if anybody were looking at that monthly bank

20   statement, either at PCI or at the bank, they could see a

21   check to Jody Coleman for some substantial amount; is that

22   correct?

23   A.  Well, the checks -- the check wouldn't be made payable

24   to Jody Coleman.  The check would be made payable -- these

25   checks were made payable to cash.  So that's how they were

1  transacted, and you would see the cash withdrawals on the

2  bank statements.

3  Q.  You were asked a couple of questions about some

4  investment funds.

5       MR. ANTHONY:  Ms. Ellig, would you turn the ELMO

6  on, please.

7       MS. ELLIG:  Do you want help?

8       MR. ANTHONY:  I always need help, but not right

9  now.  I will call you if I need it.

10  BY MR. ANTHONY:

11  Q.  You were asked questions about the Acorn fund.  Do you

12  remember that?

13  A.  Yes.

14  Q.  And I think you said Acorn had a loss.  According to

15  your report, was it 138 million?  Does that sound right?

16  A.  That sounds right.

17  Q.  And then I think you were asked about the Lancelot fund.

18  And how much was the loss of the Lancelot fund?

19  A.  I believe it was like over 700 million, like

20  760-some-odd million.

21  Q.  I think I looked at your testimony.  It said

22  764 million.  Does that sound right?

23  A.  That sounds right.

24  Q.  And then you mentioned I think the Palm Beach fund.  Do

25  you recall that?

1    A.  Yes.

2    Q.  And do you recall how much you said the Palm Beach fund

3    lost as a result?

4    A.  It was 600 -- if I can look at my report, I will be

5    precise.

6    Q.  Yeah, please do.

7        (Witness reviews document)

8    A.  Palm Beach was 632 million.

9    Q.  So if I add those up -- check my math, please -- it

10   seems to me that comes to about 1,534,000,000 roughly that

11   you calculated as the losses suffered by those three funds

12   that Mr. Kelley is attempting to collect, correct?

13   A.  That's correct.

14   Q.  And I think your total was 1.926 billion, was it?

15   A.  I can give you the exact number.

16   Q.  Would you, please.

17   A.  $1,925,748,160.

18   Q.  That's the total.  So the difference between the

19   1,534,000,000 and the total, represented losses from other

20   funds whose names have not been mentioned yet, correct?

21   A.  That's correct.

22   Q.  And I think you said that the 1,925,748,000 went into

23   the -- in the Ponzi scheme after December 5th, 2007.  Do you

24   recall that?

25   A.  Well, that's correct.  In other words, the last

1    outstanding start date of a promissory note was

2    December 5th, 2007.

3    Q.  And did substantially all of this 1.925 billion go

4    through -- let me rephrase that.

5              How many bank accounts did PCI have at M&I Bank?

6    A.  I believe there was 13 to 15, I believe.  PCI at M&I,

7    something like that, 13 to 15.

8    Q.  And we've been focusing on the 9018 account, correct?

9    A.  That's correct.

10   Q.  And how much of this money that went in after -- this

11   1.925 billion that went in after December 5, 2007, went

12   through that 9018 account?

13   A.  Substantially all of it.

14             MR. ANTHONY:  I have nothing further, Your Honor.

15             MR. SPEHR:  Nothing from me, Your Honor.  Thank

16   you.

17             THE COURT:  The witness is excused, then.

18             THE WITNESS:  Thank you.

19             THE COURT:  You're welcome.

20             MR. ANTHONY:  You can step down, Mr. Martens.

21   Thank you.

22             THE WITNESS:  Thank you, Judge.

23             MR. ANTHONY:  Safe travels, sir.

24             Plaintiff rests, Your Honor.

25             MR. MOHEBAN:  Good morning, Your Honor.  Keith

1    Moheban for BMO Harris Bank.

2            THE COURT:  Good morning.

3            MR. MOHEBAN:  BMO Harris has a motion it would

4    like to present to the Court.  We're prepared to argue it.

5    It may be a matter that you want to take up at sidebar in

6    terms of the procedure.

7            THE COURT:  I do wish to take it up outside of the

8    presence of the jury.  I just want to know whether this is a

9    time for us to excuse the jury from the courtroom or whether

10   it can be taken up shortly at sidebar.

11           MR. MOHEBAN:  We can do it however the Court

12   prefers.

13           THE COURT:  Let's begin with sidebar.  Members of

14   the Jury, we will have a sidebar.  Feel free to talk amongst

15   yourselves about anything other than this case, and feel

16   free to stretch and stand if that's your pleasure.

17           **(At sidebar)**

18           MR. MOHEBAN:  We will present a Rule 50(a) motion.

19   We have prepared a brief that we will file, but we need to

20   update it with testimony received today in plaintiff's case.

21   So once we get the daily -- we will finalize that brief when

22   we can file it this evening.

23           We're prepared to argue the motion.  What I intend

24   to do, because there are a lot of arguments, is give sort of

25   a high-level argument of what we think are the most

1   compelling points, which would be about a 15- or 20-minute

2   argument.  We could do that at the lunch hour.  I assume

3   that counsel at some point will want to submit an opposition

4   and may want to argue in opposition, but we're prepared to

5   get it into the Court today so you can start considering our

6   arguments.

7            THE COURT:  Okay.

8            MR. MARDER:  Your Honor, we defer to you as to the

9   appropriate procedure.  We're at a little bit of a

10  disadvantage here because we don't know what the basis of

11  the motion is.  So to the extent we are able to, we are

12  certainly happy to do a preliminary argument today, but we

13  certainly would like the opportunity to respond to the brief

14  as well so that our response is complete.  And we don't want

15  to be prejudiced in that the defendant has had obviously a

16  number of days to prepare this verse we're operating in the

17  dark and don't know exactly where they stand, so we would

18  like a few days to respond.

19           THE COURT:  Okay.  Let's talk about what we will

20  be doing with the jury in the meantime.  How do you propose

21  to proceed?

22           MR. MOHEBAN:  Well, I think we have the jury

23  impaneled.  We will put on our evidence --

24           THE COURT:  Okay.

25           MR. MOHEBAN:  -- while you are considering the

1    motion.

2                 THE COURT:  Okay.

3                 MR. MOHEBAN:  Obviously our position is that you

4    should enter a directed verdict.

5                 THE COURT:  I understand your position.

6                 MR. MOHEBAN:  But we also understand that you are

7    not going to have the jury wait for two or three days or

8    whatever it takes for them to respond.  So we're prepared to

9    put on our evidence.

10                THE COURT:  At the conclusion of this break?

11                MR. MOHEBAN:  Right.

12                THE COURT:  Very well.  So the matters are taken

13   under advisement.  I will give you some instructions about

14   how we will -- I will receive your arguments at a later

15   time, probably --

16                MR. MARDER:  Are you contemplating there will be

17   oral argument today during the lunch break, or are we going

18   to defer oral argument until the briefing is filed?

19                THE COURT:  I would like the benefit of the

20   briefing --

21                MR. MARDER:  Makes sense.

22                THE COURT:  -- and so we aren't having additional

23   argument, which I would expect counsel would --

24                MR. MARDER:  So they will just formally make their

25   motion, and then you will reserve judgment and we will have

1    an argument after the briefing is filed?

2                 THE COURT:  That's exactly right.

3                 MR. MARDER:  Thank you, Your Honor.  That makes

4    sense.

5                 MR. MOHEBAN:  We do -- the 15-minute argument

6    would highlight some of the most important points.  It might

7    be useful to the Court, but obviously it's up to you.

8                 THE COURT:  You said the 15 minutes?

9                 MR. MOHEBAN:  The 15-minute argument that I would

10   make at the lunch hour might be helpful to focus the Court

11   on what we think will be the most salient points to

12   consider, but that's obviously up to you.

13                THE COURT:  Well, I think I will hear from

14   opposing counsel.  I'm happy to hear 15 minutes of argument

15   at the lunch hour with the understanding that that will not

16   be all of the argument that will be made on these matters --

17                MR. MOHEBAN:  Sure.

18                THE COURT:  -- and that it will be considered

19   along with the briefing and other arguments in this case.

20   Is that agreeable to counsel?

21                MR. MARDER:  Your Honor, we'll defer to you again,

22   but it seems to me that if there's going to be briefing and

23   then further argument, having an argument today to highlight

24   certain points is just going to take up extra time.  We have

25   the jury here, and we don't want to impose on them.  And it

1    seems a more efficient process to just do it like you do

2    with any other motion, which is to have briefing and then

3    have argument on it.  And having a preargument that

4    highlights certain points seems redundant and seems to be a

5    waste of the Court's and the jurors' time.

6          MR. MOHEBAN:  We would do it during the lunch hour

7    so it wouldn't waste the jury's time.  But it's obviously

8    what's most helpful to you is what we'll do.

9          THE COURT:  I think I'm persuaded that it would be

10   redundant.  I will have all of the argument at the time that

11   I have all of the briefing and can fairly consider all of

12   the arguments at the same time --

13         MR. MARDER:  Thank you, Your Honor.

14         THE COURT:  -- and be well prepared for that.

15         MR. MOHEBAN:  So I do want to make sure we have

16   presented the argument or the motion today.

17         THE COURT:  Yes.

18         MR. MOHEBAN:  We all agree we've sufficiently

19   presented it?

20         MR. MARDER:  Yes, Your Honor, we agree that by

21   saying he's moving for JMOL and that Your Honor giving him

22   leave to file a brief constitutes his motion that he is

23   required to make under the rules.  We are not saying that

24   they have waived anything by only doing a preliminary

25   statement that they are moving and filing a brief later.

```
 1                  MR. MOHEBAN:  Good.

 2                  THE COURT:  We are all settled.

 3                  MR. MARDER:  Thank you, Your Honor.

 4                  THE COURT:  Thank you, Counsel.

 5             (In open court)

 6                  MR. GLEESON:  Good morning, Your Honor.

 7                  THE COURT:  Good morning.

 8                  MR. GLEESON:  Our first witness is Jeanne Crain.

 9      We just have some -- the typical notebook filing and

10      unraveling.  It will just take a moment.  Ms. Crain is here.

11                  THE COURT:  Thank you, Counsel.

12                  MR. MOHEBAN:  Your Honor, while we're getting set

13      up, it occurs to me there's one item we didn't address at

14      the sidebar.  That since we have a moment here, could I

15      impose on you to ask about that one more time at the

16      sidebar?

17                  THE COURT:  You may.

18             (At sidebar)

19                  MR. MOHEBAN:  One of my colleagues reminded me

20      that we should set a timing for the briefing, how much time

21      they get and then if we are going to have a reply.

22                  MR. MARDER:  Your Honor, it seems to me that if

23      they are going to be moving -- I think you said you would

24      move tonight.

25                  MR. MOHEBAN:  Yes.
```

1          MR. MARDER:  We would like until Friday to file a

2     response, and we don't think it's necessary to have a reply.

3     I mean, on a JMOL, typically you don't have a whole briefing

4     set up with a reply; and since we're the party against whom

5     the motion is filed, it seems to me that we should have the

6     last word on that.  So I would just propose that they file

7     their brief tonight and we file our response on Friday.

8          THE COURT:  Okay.  I'm happy to hear from you.

9          MR. MOHEBAN:  Well, it's a dispositive motion, so

10    the rules call for a reply.

11         THE COURT:  Um-hmm.

12         MR. MOHEBAN:  And Friday is a little late.  We

13    will be almost done with the trial, I think, if we wait that

14    long, so I was hoping they could do it by Thursday.

15         THE COURT:  Understood.

16         MR. MARDER:  What time on Thursday?

17         THE COURT:  You will get notice.

18         MR. MARDER:  Thank you.

19         **(In open court)**

20         MR. GLEESON:  Judge, can Mr. Burger approach with

21    the set of documents for you?

22         THE COURT:  Yes.

23     (Binders handed to Court)

24         THE COURT:  Members of the Jury, we will be

25    breaking for lunch at 12:15.

```
 1                  MR. GLEESON:  If you could remain standing,
 2       Ms. Crain, while the Court administers the oath.
 3            (Witness sworn)
 4                  THE COURT:  Please state your full name and spell
 5       your last name.
 6                  THE WITNESS:  Jeanne Crain, C-r-a-i-n.
 7                  THE COURT:  Thank you.  You may be seated.
 8                  COURT REPORTER:  Excuse me.  If you could also
 9       spell your first name.
10                  THE WITNESS:  Sure.  J-e-a-n-n-e.
11                  MR. GLEESON:  May I, Your Honor?
12                  THE COURT:  Yes, you may.
13                         (Jeanne Crain)
14                        DIRECT EXAMINATION
15       BY MR. GLEESON:
16       Q.  Ms. Crain, could you pull the base of that microphone a
17       little closer to you so everyone can hear you.
18       A.  Okay.
19       Q.  Thank you very much.
20                  Good morning.
21       A.  Good morning.
22       Q.  Are you currently employed?
23       A.  I am.
24       Q.  By whom?
25       A.  Bremer Bank.
```

Crain - Direct

1   Q.  What's your position at Bremer Bank?

2   A.  I am president and CEO.

3   Q.  Do you hold any other positions?

4   A.  I'm on a variety of different boards.

5   Q.  Can you tell us what boards you're on, Ms. Crain.

6   A.  I'm on the Federal Reserve Bank of Minneapolis.  I'm a

7   board of director there.  I'm on the St. Paul Downtown

8   Alliance Board.  I'm on the Minnesota Business Partnership

9   Board.  And I'm on the board for the YMCA of the North.

10  Q.  Okay.  Can you tell us about the Federal Reserve Bank of

11  Minneapolis.  What is that position?  You're a board member

12  there?

13  A.  Yes, I am.

14  Q.  Okay.  And first things first.  You're president and CEO

15  of Bremer Bank?

16  A.  Correct.  And I am on that board as well.

17  Q.  And what is the Federal Reserve Bank of Minneapolis?

18  A.  It's one of the 12 district banks that make up the

19  Federal Reserve system, which is the central banking system

20  for the United States.

21  Q.  And what does it do?

22  A.  Essentially the Federal Reserve is the -- is charged to

23  set interest rates, you know, establish monetary policy to

24  manage both pricing stability, manage inflation, and

25  maximize employment, is the mandate.

1    Q.  And are you on any committees in the Federal Reserve

2    Bank of Minneapolis?

3    A.  I chair their audit committee.

4    Q.  How many board members are there on the Federal Reserve

5    Bank of Minneapolis?

6    A.  There are nine board members.

7    Q.  And you may have said this already, but how many

8    regional Federal Reserve banks are there in the United

9    States?

10   A.  There's 12 total.

11   Q.  You mentioned you're on the board of the St. Paul

12   Downtown Alliance?

13   A.  Yes.

14   Q.  What is that?

15   A.  It's an organization that is really about creating a

16   strong economy and supporting all the businesses and really

17   the residents that live in the downtown St. Paul area.

18   Q.  And the Minnesota Business Partnership, you mentioned

19   you're on the board of directors of that organization?

20   A.  Yes.

21   Q.  And briefly, high level, can you tell us what that

22   organization does.

23   A.  Yes.  It's a group of CEOs and higher-level executives

24   from across the state of Minnesota, again, focused on the

25   economic health, well-being of the state.

```
 1    Q.  And are you on any committees of the board of the

 2    St. Paul Downtown Alliance?

 3    A.  Yes.  I'm on their executive committee.

 4    Q.  How long have you been the CEO of Bremer Bank?

 5    A.  Since the fall of 2016.

 6    Q.  How large a bank is Bremer Bank?

 7    A.  We are 16 billion in total assets.

 8    Q.  Did you ever work at M&I Bank?

 9    A.  I did.

10    Q.  When?

11    A.  I worked at M&I from June of 2007 until May of 2012.

12    Q.  What was your position at M&I Bank when you first joined

13    the bank?

14    A.  When I first started, I was -- I headed up their

15    business banking group.

16    Q.  What were your duties -- again, high level, generally

17    speaking, what were your duties as the head of the business

18    banking group at M&I Bank?

19    A.  I oversaw managers of bankers, so I oversaw a group of

20    individuals that were called team leaders and those

21    individuals managed bankers.  We worked to support

22    businesses, you know, that were in our portfolio to both

23    manage existing customers and seek new ones for the bank as

24    well.

25    Q.  So you supervised team leaders?
```

Crain - Direct

1    A.  I did.

2    Q.  And the team leaders supervised business bankers?

3    A.  That's correct.

4    Q.  And can you tell us generally, what was the province

5    within the bank of the business banking division?

6    A.  I'm sorry.  What was the question?

7    Q.  Were there other divisions besides business banking?

8    A.  Yes.  There were a number of other departments within

9    the region of Minnesota.  Commercial real estate was a

10   group.  Commercial banking was a group.  Wealth management

11   was a group.

12   Q.  And can you describe what it was that the business

13   banking group did as opposed to commercial banking, for

14   example.

15   A.  The business banking group largely -- our business

16   opportunity was to work with customers that had revenues of

17   25 million or less.

18   Q.  And was that a hard-and-fast rule in terms of divvying

19   up the customers of the bank?

20   A.  Not necessarily.  Some of those relationships followed a

21   banker who they had been working with in the past.  M&I was

22   made up of a number of different organizations that they had

23   purchased in the Twin Cities, so some of those relationships

24   followed the banker.  But when we were seeking new

25   relationships, often that was the delineating amount.

1   Q.  Was there any such thing in the M&I Bank when you were

2   there as a small business banking group?

3   A.  No.

4   Q.  You mentioned that the team leads you supervised in turn

5   supervised other business bankers?

6   A.  That's correct.

7   Q.  And in addition to those supervisory responsibilities,

8   did the team leads have their own portfolios?

9   A.  Yes, they did.

10  Q.  So they both supervised business bankers and acted as

11  business bankers themselves; is that fair to say?

12  A.  That is correct.

13  Q.  Did they typically -- did the team leads typically have

14  smaller portfolios than the business bankers they

15  supervised?

16  A.  Yes, because they were -- they had other scope of

17  responsibilities, yes.

18  Q.  And you supervised the team leads?

19  A.  I did.

20  Q.  Did you have a separate portfolio of customers yourself?

21  A.  I did not.

22  Q.  Did you directly supervise Chris Flynn?

23  A.  I did.

24  Q.  Did you directly supervise Ed Jambor?

25  A.  I did not.

1    Q.  Was there a reason you didn't supervise Ed Jambor?

2    A.  Ed was not a team lead.  He was a banker.

3    Q.  And did you overlap your -- could you remind the jury

4    when you arrived at M&I Bank.

5    A.  In June of 2007.

6    Q.  And did you overlap, did your tenure overlap with that

7    of Ed Jambor?

8    A.  I think for a very short while.  I think he left soon

9    after I joined the bank.  Not sure exactly when he left.

10   Q.  But he was in your department?

11   A.  Yes.  He was a business banker.

12   Q.  And under whose supervision was he during that brief

13   period?

14   A.  Chris Flynn.

15   Q.  Okay.  Let's back up a bit.  Where do you live,

16   Ms. Crain?

17   A.  In Minneapolis, Minnesota.

18   Q.  Were you born here?

19   A.  I was not.

20   Q.  Where were you born?

21   A.  I was born in New Rockford, North Dakota.

22   Q.  And did you grow up in North Dakota?

23   A.  I did.

24   Q.  When did you move -- when did you first move to the Twin

25   Cities?

 1    A.  I moved to the Twin Cities in December of 1990.

 2    Q.  And what occasioned your move to the Twin Cities from

 3    North Dakota?

 4    A.  I actually moved from Milwaukee, Wisconsin, but I moved

 5    to take a job with Marquette Bank.

 6    Q.  And are you married?

 7    A.  I am.

 8    Q.  Your husband's name?

 9    A.  Peter Crain.

10    Q.  And high level, what does -- does he work outside the

11    home?

12    A.  He does.

13    Q.  And what does he do?

14    A.  He has his own business.  He's a home builder, a general

15    contractor.

16    Q.  And do you have children?

17    A.  I do.

18    Q.  How many?

19    A.  I have three sons.

20    Q.  And ages?

21    A.  22, 25, and 28.

22    Q.  And do they all live in the Twin Cities area?

23    A.  They do.

24    Q.  What do they do, briefly?

25    A.  My oldest son is in a financial planning capacity, my

Crain - Direct

```
 1    middle son does recruiting for -- is an HR executive, and my
 2    youngest son is an engineer.
 3    Q.  Did you go to high school in North Dakota?
 4    A.  I did.
 5    Q.  College?
 6    A.  Undergraduate, yes.
 7    Q.  And when did you graduate?
 8    A.  From college, in 1982.
 9    Q.  And what college did you go to?
10    A.  University of North Dakota.
11    Q.  Your degree was in what?
12    A.  Banking and finance.
13    Q.  And did you get a job after graduating from college?
14    A.  I did.
15    Q.  What was your first job?
16    A.  My first job was as a commercial loan trainee.
17    Q.  At a bank?
18    A.  Yes.
19    Q.  What bank was it?
20    A.  It was at First Bank Grand Forks, North Dakota.
21    Q.  And how long did you have that position, Ms. Crain?
22    A.  I was there for about five years.
23    Q.  Was there anything in particular that drew you to
24    banking?
25    A.  My parents owned a small business.  I had, you know,
```

1    worked in my parents' business.  I was interested in just

2    the -- what it took to run a business.  I loved accounting

3    and I loved math and, you know, economics, but I didn't

4    really want to be an accountant.  And with my degree, I just

5    found my way into banking and working with business owners.

6    Q.  And did you like it when you first started?

7    A.  Yeah, I really did.

8    Q.  Do you still like it?

9    A.  I do.

10   Q.  How long have you been a banker?

11   A.  40 years.

12   Q.  After that first position in Grand Forks, where did you

13   go from there professionally?

14   A.  I moved to Milwaukee, Wisconsin.  I wanted to go to

15   graduate school.  This was in the '80s.  There weren't a lot

16   of evening programs available, so I found one in Milwaukee

17   so I could work full-time in banking as well.

18   Q.  And so did you go to graduate school at night?

19   A.  I did.

20   Q.  How long did that take?

21   A.  About two and a half years.

22   Q.  And where were you working during those two and a half

23   years when you were getting your MBA?

24   A.  When I first moved to Milwaukee, the bank I worked for

25   was Marine Bank.  During the time I was there it was

Crain - Direct

```
1   purchased by Banc One.
2   Q.  And when did you get your MBA?
3   A.  In December of 1989.
4   Q.  And you testified earlier you moved to the Twin Cities
5   in 1990 for a job opportunity?
6   A.  Correct.
7   Q.  What was that opportunity, Ms. Crain?
8   A.  I headed up the private banking group for Marquette Bank
9   Minneapolis.
10  Q.  And what is private banking?
11  A.  It's banking largely for more complex needs of high net
12  worth individuals.
13  Q.  And how long did you work at Marquette Bank Minneapolis?
14  A.  I was at Marquette Bank Minneapolis from 1990 until that
15  bank was sold in 1992.  I stayed with the Marquette
16  organization, but it was a new bank at that time.
17  Q.  And what bank -- do you recall what bank that was that
18  you went to after the acquisition?
19  A.  Yes.  There was a bank that I helped be part of the
20  start of, a de novo bank, a brand start-up bank, and that
21  was in 1992 until that bank was sold in 2002.
22  Q.  Banks get sold pretty frequently; is that correct?
23  A.  Pardon me?
24  Q.  Banks are often bought and sold --
25  A.  Yes.
```

1    Q.  -- is that fair to say?

2    A.  Yes.  I have experienced that, yes.

3    Q.  Where did you go from there?

4    A.  In 2002, when the bank was sold, I took a job with Excel

5    Bank.

6    Q.  Okay.  And what was the position you had at Excel Bank?

7    A.  I went in as an executive vice president and on their

8    board as well.

9    Q.  So you were on the board of directors and you were an

10   executive vice president?

11   A.  Correct.

12   Q.  Did there come a point when Excel Bank was sold?

13   A.  Yes.

14   Q.  To whom or to what?

15   A.  Excel was sold to M&I Bank in 2007.

16   Q.  And was that what occasioned your joining M&I Bank in

17   June of 2007?

18   A.  That's correct.

19   Q.  How long did you work at M&I Bank?

20   A.  I left M&I Bank, which had been sold to BMO Harris, in

21   2011.  I left there when it was BMO in 2012.

22   Q.  And at the time you left BMO Harris Bank, what was your

23   position?

24   A.  I was president of the Twin Cities region.

25   Q.  Did you leave BMO Harris Bank to go to Bremer Bank?

1    A.  I did.

2    Q.  Did you start as CEO and president of Bremer Bank in

3    2012?

4    A.  No.  I was president and CEO -- it was then Bremer Bank

5    of the Twin Cities.  Bremer still had nine separate banking

6    charters.  That all combined during the time after I joined

7    the bank.  But I went in as a CEO and president of one of

8    those charters for Bremer.

9    Q.  And then they were all consolidated?

10   A.  Correct.

11   Q.  And you're the CEO of the consolidated banks that are

12   now called Bremer Bank?

13   A.  Correct.

14   Q.  Let's go back to when you joined M&I Bank in June of

15   2007.  Could you tell us what the duties and

16   responsibilities of a business banking manager were,

17   generally speaking, at that period of time.

18   A.  It was really to work with our team leads and bankers to

19   both take care of our customers, work with our peers

20   throughout the region to deepen relationships with our

21   customers, and to find new opportunities for the bank as

22   well.

23   Q.  About how many direct supervisees, team leads did you

24   have during that period?

25   A.  I believe it was about four or five, five or so people.

1    Q.  And it varied from time to time?

2    A.  Yes.

3    Q.  Okay.  And same question.  Generally speaking,

4    approximately how many business bankers were under the

5    supervision of each of the team leads?

6    A.  I believe anywhere from probably five to seven bankers.

7    Q.  And tell us about your typical day.  What would you do

8    on a typical day as the business banking manager?

9    A.  Sure.  I would work -- I would talk with bankers.  I

10   would on occasion meet with customers, go along with bankers

11   on sales calls.  I would have meetings with my peers.  I

12   would have meetings with -- sales meetings with the team

13   leads in our group.  It was all about how we were developing

14   and managing the business.

15   Q.  And when you say your "peers," who are you referring to?

16   A.  Individuals like myself that were heading up different

17   groups, like the individual heading up commercial banking

18   and/or commercial real estate groups.

19   Q.  Did you regularly meet with the team leads that were

20   under your direct supervision?

21   A.  Yes.

22   Q.  And how frequently, approximately?

23   A.  We had sales meetings I believe weekly, and then I would

24   have one-on-one meetings with them at least once a month or

25   so.

1    Q.   Where was your office at the time?

2    A.   It was in downtown Minneapolis.

3    Q.   And the business banker team leads under your

4    supervision, were they also in downtown Minneapolis?

5    A.   Some were.  Not all.

6    Q.   And the others, where were they?

7    A.   They were at some of our branch locations throughout the

8    metro area.

9    Q.   One of your team lead supervisees was Chris Flynn,

10   correct?

11   A.   Yes.

12   Q.   What was the purpose of your individual meetings with

13   your team leads, generally, not Chris Flynn specifically,

14   but your team leads generally, what were your goals when you

15   met with them?

16   A.   Really just to understand how -- it was largely their

17   agenda -- how they were working with their bankers,

18   achieving their goals, talking about challenges,

19   opportunities, just anything they were working with to help

20   manage and grow the business.

21   Q.   You testified a few moments ago that on occasion you

22   would go with them to meet customers?

23   A.   Yes, I did.

24   Q.   When that happened -- withdrawn.

25             What purposes might be served by you or were

1    served by you going to meet customers with team leads?

2    A.  Because of my role, it was to reinforce M&I's interest

3    in the customer, to talk about our organization overall with

4    our capabilities, solutions, our presence in the market, our

5    interest in growing here.  So to reinforce M&I's status and

6    capability of working with customers.

7    Q.  As a general matter, when you would go with a team lead

8    to meet a customer or with a business banker to meet a

9    customer, was that at your instance or at their instance?

10   A.  It would have been at their request.

11   Q.  They would ask you to join them on -- for a visit with a

12   customer?

13   A.  Yes.

14   Q.  Were you aware at the time back in -- from June of 2007

15   through the end of 2008, that's the focus period --

16   withdrawn.

17            Did you know that Petters Company, Inc. was a

18   customer of the M&I Bank business banking section during

19   that period?

20   A.  Yes.

21   Q.  Okay.  And for the most part I will focus your attention

22   on that period between June of 2007 and towards the end of

23   2008.  Okay?

24   A.  Okay.

25   Q.  And if I refer to that entity as PCI, you're okay with

1     that?  You will understand what I am referring to?

2     A.  Yes.

3     Q.  Were you familiar with Tom Petters?

4     A.  I knew of Tom Petters, yes.

5     Q.  Okay.  Back then did you know him personally?

6     A.  No, I did not.

7     Q.  Did you ever go on a visit with Chris Flynn or any other

8     banker to PCI's offices?

9     A.  I did not.

10    Q.  Did you -- you didn't know Tom Petters personally?

11    A.  No.

12    Q.  You knew of him?

13    A.  Yes.

14    Q.  Did you associate him with any other business entities

15    besides PCI?

16    A.  Yes.  I generally knew that he had a number of different

17    entities, like, with warehousing companies and I think there

18    was an affiliation with Sun Country Airlines, Fingerhut.  He

19    had done some acquisitions, some relatively significant

20    acquisitions, yes.

21    Q.  And there came a point when PCI was in Chris Flynn's

22    portfolio, correct?

23    A.  Yes.

24    Q.  Okay.  Do you know whose portfolio he was in prior to

25    the time he came into Chris Flynn's portfolio?

1   A.  Yes.  I believe it was Ed Jambor's.

2   Q.  Okay.  And Ed Jambor left the bank and Chris Flynn took

3   over that account, that customer?

4   A.  That's correct.

5   Q.  As a general matter did you, as the business banking

6   manager, have responsibilities for placing particular

7   customers in particular bankers' portfolios?

8   A.  No.  I would have relied on the team leads to do that

9   work.

10  Q.  Was there any exception in that regard with PCI?

11  A.  No.

12  Q.  So you're in the business -- the banking business for

13  40 years?

14  A.  Yes.

15  Q.  Can you tell us, based on your experience, what goes

16  into being a good business banker, Ms. Crain.

17  A.  Someone who is interested in the customer they are

18  working with, someone who is interested in being out in the

19  marketplace selling and sharing the capabilities of the

20  organization that they're working for, someone who is

21  curious and, you know, loves working with people on a

22  relationship kind of basis.

23  Q.  You mentioned selling.  What did you mean by "selling"?

24  A.  Well, bankers are largely charged with understanding

25  what solutions and capabilities they can bring to a new

Crain - Direct

1    relationship to grow the business opportunity for the bank,

2    and that involves selling whether it's deposits or loans or

3    other solutions that the bank has to offer.

4    Q.  Okay.  Is that known as cross-selling?

5    A.  There's an element of cross-selling in that process,

6    yes.

7    Q.  Okay.  There's more to selling than just cross-selling,

8    I take it?

9    A.  Yes.

10   Q.  All right.  And is selling and cross-selling --

11   withdrawn.

12            Was that important when you were at M&I Bank, that

13   the business bankers sell and cross-sell?

14   A.  Very much, yes.

15   Q.  Why?

16   A.  It was how the -- the bank was interested in growing in

17   the Twin Cities.  M&I was a newer presence and very much

18   interested in expanding their market share.

19   Q.  And was that desire on the part of M&I Bank, in your

20   experience, unique to M&I Bank?

21   A.  No.  It's what all banks hope to achieve.

22   Q.  Has it been true at every bank that you have worked at?

23   A.  That I have worked for, yes.

24   Q.  Are business bankers given training to help them excel

25   at selling and cross-selling?

1    A.   Yes.

2    Q.   What kind of training?

3    A.   There's sales training offered.  Individual coaching,

4    that was part of my responsibility as a leader of a business

5    unit, was to work with bankers in that capacity.

6    Q.   Is cross-selling good for a bank?

7    A.   Yes, it is.

8    Q.   Okay.  Selling is good for a bank as well?

9    A.   Yes, it is.

10   Q.   Why is cross-selling good for a bank?

11   A.   Cross-selling, in the vernacular in which we use it, is

12   to deepen relationships.  So you are introducing other

13   capabilities of the bank to expand a relationship with the

14   customer, and it's what we call -- it makes a relationship

15   sticky.  It's harder to move because you have more that

16   you've offered to that customer in terms of under one roof,

17   under your own organization.

18   Q.   Helps you keep or hang on to the customers that you

19   already have?

20   A.   Correct.

21   Q.   All right.  Is cross-selling good for the customers?

22   A.   Yes.  It's where you are adding value to their

23   relationship beyond a single need based on what they may

24   need to run their business.

25   Q.   Let's turn to compensation.  Did business bankers at M&I

```
 1    Bank while you were there receive salaries?

 2    A.  Yes, they did.

 3    Q.  And was that the majority of their compensation?

 4    A.  Base salary would have been the majority, yes.

 5    Q.  Did business bankers receive commissions when they

 6    successfully cross-sold products of the bank?

 7    A.  No, I wouldn't describe it as commissions.  They had an

 8    annual bonus opportunity, but not on a commission basis for

 9    single products.

10    Q.  Got it.  So there were at least two components to their

11    compensation, their salary and their bonus, correct?

12    A.  Correct.

13    Q.  Were there any other components besides those?

14    A.  I believe there was on occasion, depending -- it wasn't

15    always consistent, but on occasion there was an opportunity

16    for some stock options.

17    Q.  Okay.  Did that happen every year?

18    A.  I just can't --

19    Q.  Withdrawn.

20    A.  -- recall.

21    Q.  Did the bonuses happen every year?

22    A.  Yes.

23              THE COURT:  Counsel?

24    BY MR. GLEESON:

25    Q.  And the -- what proportion, roughly, of the total pay of
```

Crain - Direct

1    a business banker did the bonus consist of?

2    A.  The bonus?  To the best of my recollection, it was maybe

3    15 to 20 percent.

4            THE COURT:  Counsel, this is a good time for us to

5    break for our lunch break and so we will take a one-hour

6    lunch break.

7            Members of the Jury, please be prepared to come

8    back to the courtroom at 1:15.

9            And certainly to our witness, you are free to go

10   for a lunch break.  Please be prepared to come back to the

11   courtroom at 1:15.  We will resume your testimony at that

12   time.

13           THE WITNESS:  Thank you.

14           THE COURT:  Remember our instructions and please

15   continue to follow them, Members of the Jury.

16           All rise.

17       (Jury excused)

18                        **IN OPEN COURT**

19                      **(JURY NOT PRESENT)**

20           THE COURT:  We are in recess.  Have a good lunch.

21       (Lunch recess taken at 12:15 p.m.)

22                   *    *    *    *    *

23       (1:18 p.m.)

24                        **IN OPEN COURT**

25                       **(JURY PRESENT)**

Crain - Direct

```
1              THE COURT:  Thank you.  Please be seated.  I do
2     have one housekeeping matter that I want to address with the
3     jury and the parties at this time.
4              The Court will be in recess next week from Monday,
5     October 31st, through Wednesday, November 2nd.  And we'll
6     resume the trial at 8:30 on Thursday, November 3rd.  So for
7     your planning purposes, we will not be in court on Monday,
8     October 31st, through Wednesday, November 2nd.  We'll resume
9     on November 3rd.
10             Okay.  Are we ready to go?
11             MR. GLEESON:  Yes.  May I?
12             THE COURT:  Yes, you may.
13             MR. GLEESON:  Thank you, Your Honor.
14    BY MR. GLEESON:
15    Q.  Ms. Crain, as part of your duties as manager of the
16    business banking section, did you conduct evaluations of the
17    team leads under your supervision?
18    A.  Yes, I did.
19    Q.  Okay.  Regularly?
20    A.  Yes.  We had a formal evaluation at least annually.
21    Q.  Okay.  And in what intervals?  Annually?
22    A.  Yes.
23    Q.  Okay.  And did you provide feedback to your team leads
24    throughout the year in addition to the formal evaluations at
25    the end of the year?
```

1    A.  Yes, absolutely.

2    Q.  Okay.  And you evaluated Chris Flynn's performance,

3    correct?

4    A.  Yes, I did.

5    Q.  Was he good at his job?

6    A.  Yes, he was.

7    Q.  Was he good with his customers?

8    A.  Yes, he was.

9    Q.  Good with his colleagues?

10   A.  Yes, he was.

11   Q.  Is he a solid banker?

12   A.  Yes.

13   Q.  Was there ever an instance in which, in your judgment,

14   he put the bank at risk?

15   A.  No.

16   Q.  PCI was one of Chris Flynn's customers.  It was in his

17   portfolio; is that correct?

18   A.  Yes, that's correct.

19   Q.  Was it his most profitable customer?

20   A.  No, it was not.

21   Q.  You are familiar with ACE Reports?

22   A.  Yes, I am.

23   Q.  You ran across those in your capacity as a business

24   banking manager at M&I Bank?

25   A.  Yes.  We used those, yes.

1      Q.  Okay.  Did you have a chance to review any of

2      Mr. Flynn's ACE Reports -- withdrawn.

3              There were ACE Reports for particular bankers,

4      correct?

5      A.  Yes.

6      Q.  And they covered the customers in that banker's

7      portfolio?

8      A.  Yes, that's correct.

9      Q.  Were there other ACE Reports as well?

10     A.  Yes.  There were reports that rolled up kind of on a

11     unit basis, so for the whole business banking group and then

12     for the region as well.

13     Q.  Okay.  And the unit would cover just the Minnesota --

14     what would the unit cover?

15     A.  Yeah, so it would be business banking within the

16     Minnesota region, would be one example.

17     Q.  Okay.  And then there were regional ACE Reports as well?

18     A.  That's correct.

19             MR. GLEESON:  Let me ask Mr. Herzka to pull up

20     Defendant's Exhibit 40296 in evidence, which is -- if you

21     could focus on the top.

22     BY MR. GLEESON:

23     Q.  Recognize this, Ms. Crain?

24     A.  Yes, I do.

25     Q.  Okay.  Is this an individual ACE Report or a regional

Crain - Direct

1     ACE Report?

2     A.  This would be an individual ACE Report for Chris Flynn.

3     Q.  Okay.  And you see his name next -- up there next to --

4              MR. GLEESON:  If you can go up higher.

5     BY MR. GLEESON:

6     Q.  Okay.  He's the officer and he was also, you mentioned,

7     a team lead at the time, correct?

8     A.  That's correct.

9     Q.  But you are there as his supervisor, a senior manager,

10    correct?

11    A.  Correct.

12    Q.  Okay.  And -- well, we've learned how to read these in

13    the course of the trial.

14              So let me just have you direct your attention,

15    with Mr. Herzka's benefit, to the Petters Company, Inc.

16    section of the report.  He will enlarge that for you.  Can

17    you see that okay?

18    A.  Yes, I can.

19    Q.  Okay.  There were multiple accounts within the Petters

20    Company, Inc. relationship that are listed there, correct?

21    A.  That's correct.

22    Q.  Looks like one, two, three, four, five, six.  Do you see

23    that?

24    A.  Yes, I do.

25    Q.  Are you familiar with the one on the bottom that says,

Crain - Direct

1    "FAC Acquisition, LLC?"

2    A.  Yes, I believe that was the Fingerhut acquisition.

3    Q.  Okay.  That was related to the acquisition of Fingerhut

4    by Tom Petters?

5    A.  Correct.

6    Q.  Okay.  And the total profit to the bank from the Petters

7    Company, Inc. portfolio, including all six of those accounts

8    for the preceding year, the rolling 12 preceding year, was

9    what?

10   A.  $100,682.

11   Q.  Okay.  And then there's -- within that, there's a

12   Petters Company, Inc. account.  Do you see that?

13   A.  Yes, I do.

14   Q.  And you understand that to be the focus of this case,

15   correct?

16   A.  That's correct.

17   Q.  Okay.  And the profit in the previous 12 months from

18   that account to M&I Bank was what?

19   A.  $57,916.

20   Q.  Okay.  And we can tell from this that in terms of

21   profitability, PCI or the Petters Company, Inc. accounts

22   were fourth in line in profitability in the portfolio of

23   Mr. Flynn, correct?

24   A.  That is correct.

25   Q.  Okay.  You mentioned there were ACE Reports that covered

Crain - Direct

```
 1    the region as a whole?
 2    A.  Yes.
 3    Q.  Okay.  You have before you, and counsel have, a big book
 4    of reports.  Do you see them up there before you?  It should
 5    say, "Regional ACE Reports."
 6    A.  Yes, I have that.
 7    Q.  Okay.  And you had a chance to review those -- that
 8    volume of reports before you came to court, correct?
 9    A.  I did, yes.
10    Q.  Okay.  And could you tell us, broadly speaking, what's
11    in there?
12    A.  It's just a list of, you know, like, the different
13    reports over the course of time, the ACE Reports showing
14    profitability of various customers in the portfolios.
15    Q.  For the region?
16    A.  For the region, yes.
17    Q.  Okay.  And is it a list or is it the actual ACE Reports
18    themselves?
19    A.  It's the actual reports themselves.
20    Q.  Okay.  And they were on what -- were they monthly
21    records?  Weekly reports?  Do you recall?
22    A.  I believe they were monthly reports.
23    Q.  Okay.  And there's a bunch of them in that volume,
24    correct?
25    A.  That's correct.
```

Crain - Direct

1      Q.  Okay.

2            MR. GLEESON:  I've got -- we did this earlier,

3      Judge, with the earlier ACE Reports, where rather than move

4      into evidence -- and I'm not going to spend much time on

5      this at all, the Court will be happy to hear.  I'm going to

6      move into evidence all of those reports, and their exhibit

7      numbers are set forth on DX-40496.

8            So, to sum up, I want to offer into evidence the

9      18 ACE Reports whose exhibit numbers are set forth on

10     Defendant's Exhibit 40496, which, if I may approach, I'll

11     hand up to the Court?

12           THE COURT:  Please.  And does opposing counsel

13     have a copy?

14           MR. GLEESON:  Yes.

15        (Document handed to the Court.)

16           THE COURT:  Thank you.

17           MR. LAWRENCE:  Your Honor, we'll object on

18     foundation as to those reports that precede Ms. Crain's

19     employment at M&I and on relevance as to those that postdate

20     September 2008.

21           THE COURT REPORTER:  Can I get your name?  Sorry.

22           MR. LAWRENCE:  Yes, Ryan Lawrence for the trustee.

23           THE COURT:  Do you wish to be heard, Counsel?

24           MR. GLEESON:  I'm sorry?

25           THE COURT:  Do you wish to be heard?

1           MR. GLEESON:  I'll lay additional foundation.

2           THE COURT:  Please.

3           MR. GLEESON:  May I?

4           THE COURT:  You may.

5    BY MR. GLEESON:

6    Q.  Okay.  These regional ACE Reports, Ms. Crain, were they

7    kept in the regular course of the business of M&I Bank?

8    A.  Yes, they were.

9    Q.  Okay.  And were they deployed, that is, used, in the

10   regular course of the business of the bank?

11   A.  Yes, they were.

12          MR. LAWRENCE:  Objection, foundation as to

13   preceding her employment.

14          MR. GLEESON:  I'm not done with the foundation,

15   but if I may?

16          THE COURT:  Please.

17   BY MR. GLEESON:

18   Q.  Okay.  The -- did you use these ACE Reports yourself as

19   the head of the business banking division at M&I Bank?

20   A.  Yes.  I -- yes, I did.

21   Q.  Okay.  And did you use these ACE Reports in the moment,

22   that is, on a particular month would you review an ACE

23   Report to help you perform your duties as supervisor of the

24   team leads?

25   A.  Yes, I would.

Crain - Direct

1    Q.  Okay.  Were these kept in the regular course of

2    business --

3    A.  Yes.

4    Q.  -- of M&I Bank?

5    A.  Yeah.

6    Q.  From time to time did you have occasion to resort and --

7    excuse me, to read, consult with ACE Reports prior to your

8    time at the bank?

9    A.  I don't recall specifically.

10   Q.  Okay.  At the -- during your time at the bank you used

11   them on a regular basis, correct?

12   A.  Yes, I did.

13   Q.  Okay.  Were they required to be maintained by the bank

14   in the regular course of its business?

15   A.  Yes, they were.

16   Q.  Okay.  And the data that came into the reports was data

17   that was collected within the bank under bank senior

18   management's supervision in order to provide data to you and

19   the business bankers under your supervision?

20   A.  That's correct.

21   Q.  Okay.  The --

22          MR. GLEESON:  Judge, I'm going to offer them all

23   into evidence.

24          MR. LAWRENCE:  Objection, foundation as to those

25   that predate her employment and relevance as to those that

1    postdate September 2008.

2                    THE COURT:  The objection is sustained.

3                    MR. GLEESON:  Judge, I'll just -- excuse me.  In

4    that event, I'll offer the ACE Reports within the tenure of

5    Ms. Crain as business records under 803(6) of the Federal

6    Rules of Evidence.

7                    THE COURT:  And those would be which ones?

8                    MR. GLEESON:  Those would be --

9    BY MR. GLEESON:

10   Q.  You began at the bank when, Ms. Crain?

11   A.  June of 2007.

12   Q.  Okay.  And you left?

13   A.  In May of 2012.

14                   MR. GLEESON:  Okay.  So that would be, Your Honor,

15   all the reports except for -- one, two, three, four, five,

16   six, seven -- the first six.  By now it's such a short list,

17   I could probably just read it, if the Court wants me to.

18                   THE COURT:  Let me -- there's one that is

19   February 2007, correct?

20                   MR. GLEESON:  Yes.  I'm not offering that.

21                   THE COURT:  Okay.  So that's more than six, then,

22   as I count.

23                   MR. GLEESON:  I'm sorry, Judge.  The left column.

24   Forgive me.  Why don't I just do the exhibit numbers, if

25   that's all right with the Court, if they are received?

Crain - Direct

1              THE COURT:  Well, I want to -- is there any
2      objection?
3              MR. LAWRENCE:  Your Honor, I believe the Court
4      sustained the objection as to the last three ACE Reports on
5      the list that is marked DX-40496.
6              THE COURT:  I have.
7              MR. GLEESON:  That's contrary to my understanding,
8      Judge.  Can we approach?
9              THE COURT:  You may.
10              **(At sidebar)**
11              THE COURT:  So let's be clear.  DX-40496, which is
12      posed and offered right now, has three columns.  The first
13      column you're not offering, correct?
14              MR. GLEESON:  I'm offering, but you have sustained
15      the objection.
16              THE COURT:  Okay.  So that's gone.  So now being
17      offered are the second column as well as the third column,
18      correct?
19              MR. GLEESON:  Yes.
20              THE COURT:  Okay.  And the objection is as to
21      December -- the third column, December 2008, January 2009,
22      February 2009; is that correct?
23              MR. LAWRENCE:  Correct, Your Honor.
24              THE COURT:  So you wanted to be heard?
25              MR. GLEESON:  Oh, yes.  She was here at the bank.

1    These are the last three -- the Petters Company accounts at

2    M&I Bank didn't terminate on the date of his arrest.  This

3    just completes the picture and is part of the wind-down of

4    the account at M&I Bank.

5            MR. LAWRENCE:  Your Honor, after September 2008

6    there's no relevance as to what would be the revenues or

7    profitability for the 9018 account to the bank.  And to the

8    extent that there was any probative value, it would be

9    outweighed by the risk of confusion to the jury.

10           MR. GLEESON:  With respect, there is really no

11   confusion to the jury.  This completes the picture of the

12   very account -- and it goes through February of 2009.  It

13   just completes the picture of the accounts that are at the

14   heart of this case.

15           THE COURT:  So the objection is sustained and

16   December 2008, January 2009, and February 2009 are not

17   received in evidence as to this exhibit.

18           MR. GLEESON:  Okay.

19           MR. LAWRENCE:  Thank you.

20           MR. GLEESON:  Judge, would you prefer me, since

21   we're -- we'll just cross those out or would you prefer me

22   just to read into the record the exhibits that you've

23   received?

24           THE COURT:  You need to read into the record what

25   evidence is received.  And this (indicating) will not go --

```
 1                MR. GLEESON:  Fair enough.

 2                THE COURT:  -- to the jury.

 3                MR. GLEESON:  Of course not.  I didn't intend it

 4      to, Judge.  I was just trying to make it easier rather than

 5      read all the --

 6                THE COURT:  So this is just a demonstrative

 7      exhibit --

 8                MR. GLEESON:  Yes.

 9                THE COURT:  -- that you offered for the assistance

10      of us at sidebar and --

11                MR. GLEESON:  Yes.

12                THE COURT:  -- to address the relevancy and --

13                MR. GLEESON:  It would never go to the jury.

14                THE COURT:  -- admissibility?

15                MR. GLEESON:  Correct.

16           (In open court)

17                MR. GLEESON:  Okay.  Thank you, Judge.  I'll read

18      into the -- in light of your rulings at sidebar, with the

19      Court's permission, I'll read into the record the exhibit

20      numbers of the ACE Reports that have been received in

21      evidence.  Do I have your permission to do that?

22                THE COURT:  You may.

23                MR. GLEESON:  They are -- and, Judge, is it all

24      right if I just mention the months as well that have been

25      received?
```

1              THE COURT:  So you're planning to read off of this

2     chart that I'm looking at and it would be August 2007 and

3     then the number; is that what you are asking?

4              MR. GLEESON:  Correct.

5              THE COURT:  Yes.

6              MR. GLEESON:  Thank you, Judge.  August 2007,

7     Defendant's Exhibit 40231; December 2007, Defendant's

8     Exhibit 40238; January 2008, Defendant's Exhibit 40269;

9     March 2008, Defendant's Exhibit 40283; May 2008, Defendant's

10    Exhibit 40306; June 2008, Defendant's Exhibit 40308;

11    July 2008, Defendant's Exhibit 40330; September 2008,

12    Defendant's Exhibit 40350; December -- no.

13             THE COURT:  Counsel?

14             MR. GLEESON:  Excuse me.  Sorry.

15             THE COURT:  That is the conclusion of the list.

16             MR. GLEESON:  Yes, September 2008 is the last one.

17    Forgive me, Judge.  Thank you, Your Honor.  May I continue?

18             THE COURT:  You may.

19    BY MR. GLEESON:

20    Q.  Can I show you what's in evidence now as 40308,

21    Ms. Crain.  It will come up on the screen in a moment.

22             MR. GLEESON:  And if you could go, Mr. Herzka --

23    there you go.  Maybe you could help us out at the top to

24    make it a little more readable, please.

25    BY MR. GLEESON:

1    Q.  And do what's easiest for you, Ms. Crain.  You have a

2    written version there.  This looks pretty readable, but it's

3    your call whether you want to go through the -- look at the

4    written version or what's on your screen.  Okay?

5    A.  Okay.

6    Q.  And if you need time to get to the written version,

7    please just tell us.

8              As with the ACE Reports for the particular

9    bankers, are these arranged in order of profitability?

10   A.  Yes, they are.

11   Q.  Okay.  And this at the top says, "ACE Profitability

12   Ranking Report, Relationship Banking by Region."  Correct?

13   A.  Yes, that's correct.

14   Q.  And remind me what the -- the jury, please, what this

15   covered.  What's the region?

16   A.  This is for the Minnesota region and it is for the

17   business banking group.

18   Q.  Are there separate ACE Reports for the commercial

19   banking group?

20   A.  Yes, there were.

21   Q.  And the other groups within the bank?

22   A.  Yes.

23   Q.  And this looks like a similar format.  Along the top it

24   says, "Net Profit" and includes the last rolling 12 months

25   before the report and the current month, correct?

1    A.  That is correct.

2    Q.  Okay.  And this report is from what date -- from what

3    month?

4    A.  This is from June of 2008.

5    Q.  Okay.  And at the top, the most profitable customer is

6    which one?

7    A.  The company is ███████, Inc.

8    Q.  Okay.  And the profit there is what?  Can you read that

9    all right?

10   A.  Yes.  It's $537,316.

11   Q.  Over the last 12 months from ███████, correct?

12   A.  Yes.

13   Q.  And is there a place on this regional ACE Report that

14   shows the relationship banker for the particular entries on

15   the report?

16   A.  Yes.  It's on the far right column, if I recall.  Yes.

17   Q.  Okay.  So at the top of the list is Sara Ausman.  Was

18   she the relationship banker for ███████ at that time?

19   A.  Yes, she was.

20   Q.  And, Mr. Flynn --

21          MR. GLEESON:  If we go down that side of the

22   column on the right side, Mr. Herzka.  Sorry.  Forgive me.

23   BY MR. GLEESON:

24   Q.  His -- the first time he appears is, looks like, on the

25   sixth most profitable customer; is that correct?

1    A.  Yes, that's correct.

2              MR. GLEESON:  And can we go back over.  There we

3    go.

4    BY MR. GLEESON:

5    Q.  That customer of Mr. Flynn's was?

6    A.  ███████████████████

7    Q.  Okay.  And does Petters appear on this regional report,

8    this profitability report?

9    A.  Yes.  I believe it's on the lower part of this report.

10   Q.  Can we --

11   A.  Yes.

12   Q.  So it's down there.  And its profitable over the

13   previous 12 months prior to this report was what?

14   A.  $81,254.

15   Q.  Okay.

16             MR. GLEESON:  And maybe you can -- I'm not going

17   to ask you to count it, but can you enlarge the -- sorry.

18   Can you scale down the -- there you go.

19   BY MR. GLEESON:

20   Q.  So it looks -- it's down there at the bottom, correct?

21   A.  Yes.

22   Q.  Okay.  Are there other customers of Mr. Flynn's that are

23   more profitable on this chart?

24   A.  Yes.  The other one of his noted was ██████, the sixth

25   one down.

1    Q.  There's ███████.

2            MR. GLEESON:  And then could you focus on the

3    column on the right, please, Mr. Herzka.

4    BY MR. GLEESON:

5    Q.  See a couple of others there.  Looks like one, two,

6    three, four five down another Chris Flynn account?

7    A.  Oh, yes, I see that.  It's like tenth down or something,

8    yeah.

9    Q.  Okay.  In any event, it's in evidence, but if one wanted

10   to see the -- how Chris Flynn's portfolio customers compared

11   to others in the region in terms of profitability, you'd

12   look at this regional ACE Report, correct?

13   A.  Yes, that's correct.

14   Q.  Okay.  If you go across the top of the report, you see a

15   column that says, "Average Loan Balance."

16           MR. GLEESON:  Can you focus on that, Mr. Herzka,

17   please.  Thank you.

18   BY MR. GLEESON:

19   Q.  For most of the customers on the page, there's a number

20   there, correct?

21   A.  Yes, that's the case.

22   Q.  Okay.  But for PCI there's none, correct?

23   A.  Yes, that's correct.

24   Q.  What does that mean?

25   A.  That we had no loans with PCI.

1    Q.  Okay.  And if there were a loan, the profitability or

2    lack thereof from that loan would be right there on the

3    chart, correct?

4    A.  Yes, it would be reflected on this report.

5    Q.  Okay.  What's more profitable, Ms. Crain, for a bank, a

6    loan relationship -- as a general matter -- a loan

7    relationship or a deposit relationship?

8    A.  Generally, a loan relationship.

9    Q.  Okay.  Is it meaningfully more profitable than a deposit

10   relationship as a general rule?

11   A.  Loans are our biggest driver of revenue -- generally are

12   the bigger driver of revenue, yes.

13   Q.  Why is that, briefly, for the benefit of the jury?

14   A.  It's just simply a pricing factor.  You -- it's the

15   amount you charge to lend money to someone and that's funded

16   by a deposit that is priced differently.  It's of less cost.

17   And it's the margin between the two in which the bank

18   largely makes its money.

19   Q.  Okay.  Do you recall any efforts on Chris Flynn's part

20   to establish a loan relationship with PCI?

21   A.  I do remember Chris having a conversation with

22   individuals at Petters who were interested in pursuing some

23   opportunities for credit, yes.

24   Q.  Okay.

25              MR. GLEESON:  Mr. Herzka, could you please pull up

Crain - Direct

1    Plaintiff's 26, which is already in evidence.  Maybe you can

2    pull out just a little bit, please.  There we go.

3    BY MR. GLEESON:

4    Q.  Ms. Crain, do you recognize this?

5    A.  Yes, I do.

6    Q.  Have you had a chance to look at this before you came to

7    court?

8    A.  I did.

9    Q.  It's an e-mail chain between you and Chris Flynn about

10   PCI?

11   A.  That's correct.

12   Q.  Okay.  And it occurs on what dates?  That one there

13   before you is September 14th, correct?

14   A.  Yes, 2007.

15   Q.  Okay.  And if you scroll down, you'll see there's an

16   attachment to this e-mail.

17          MR. GLEESON:  Thank you, Mr. Herzka.

18   BY MR. GLEESON:

19   Q.  And recognize that, recognize what form that is?

20   A.  Yes.  It's part of our customer relationship management

21   form.  It was called a MIContacts form.

22   Q.  Okay.  Did you see a lot of those in the course of your

23   duties at M&I Bank?

24   A.  Yes.  It was how we recorded information in terms of

25   connections with our customers.

1    Q.  Okay.  And the date on this report is?

2    A.  September 13th, 2007.

3    Q.  Okay.  And the -- next to "Summary," it says what?

4    A.  It says, "Introducing after Ed's Departure."

5    Q.  Okay.  And what do you understand that to mean?

6    A.  Chris made a call on the customer to introduce himself

7    as the relationship manager given that their banker had just

8    departed M&I.

9    Q.  And "their banker" being Edward Jambor, correct?

10   A.  That's correct.

11   Q.  Was it typical when one business banker left for another

12   business banker who took over that customer to do an

13   introductory visit?

14   A.  Very much so.

15   Q.  Okay.  And what was the purpose or purposes of those

16   visits?

17   A.  To make sure the customer knew who their new contact was

18   to help manage their relationship at the bank.

19   Q.  Is it important for the succeeding relationship banker

20   to visit customers in circumstances like that?

21   A.  Very much so, yes.

22   Q.  And this says that Chris met with Mark Laumann, Jim

23   Wehmhoff, and Tom Salmen.  Did you know those folks, those

24   men?

25   A.  I did not, no.

1     Q.  Okay.  You ever met them?

2     A.  No.

3     Q.  Okay.  Do you understand that they worked at PCI from

4     the context of this MIContact?

5     A.  Yes.  Yes.

6               MR. LAWRENCE:  Objection, foundation.

7               THE COURT:  Overruled.

8     BY MR. GLEESON:

9     Q.  And we don't need to read this whole thing, but you have

10    seen it before you came to court, you said.  Can you tell us

11    generally what's on here, Ms. Crain, what's on this

12    communication that was forwarded to you by Chris Flynn.

13    A.  Yes.  Chris had gone out to the customer to introduce

14    himself as the new banker.  And in the course of talking

15    with the individuals he was meeting with, they shared with

16    him some other interests they had in working with M&I,

17    largely with regard to some commercial real estate

18    opportunities, to extend some loans, and then there was an

19    opportunity for Mr. Petters himself as well.

20    Q.  And these are -- you understood these to be potential

21    opportunities for the bank mentioned during this

22    introductory meeting by -- between Chris and the folks at

23    PCI, correct?

24    A.  That's correct.

25    Q.  Okay.  And if you scroll up to the text of the e-mail

1    from Chris to you, it says, "Some large dollar

2    opportunities, can't assess their quality yet, but will be

3    setting up intro meeting for CRE."  Do you see that?

4    A.  I do.

5    Q.  What's "CRE"?

6    A.  Commercial real estate.

7    Q.  Okay.  Is that yet another division within M&I Bank at

8    the time?

9    A.  Yes, it was.

10   Q.  Okay.  And what -- I bet they were involved in

11   commercial real estate; is that correct?

12   A.  Yes.

13   Q.  Okay.  Was Mr. Flynn asking you to do anything at this

14   point?

15   A.  No.  He was just informing me of the call.

16   Q.  Okay.  Kind of a heads-up of the possible opportunities?

17   A.  That's correct.

18   Q.  Was that common for a team lead under your supervision,

19   to do that for you?

20   A.  Yeah.  I think it was particularly important here

21   because he would have been referring a business opportunity

22   to another division in the bank, someone -- one of my peers

23   in the commercial real estate group.

24   Q.  Would you have been involved in that -- in the referral

25   to the other group?

1    A.  Chris would have largely managed that.

2    Q.  And to your knowledge, did any of the prospects set

3    forth on the MIContact report that Chris Flynn forwarded to

4    you come to fruition?

5    A.  Not to my knowledge.

6    Q.  If they had gone through, would they have been

7    opportunities for Mr. Flynn or for the commercial real

8    estate department?

9    A.  The nature of what the customer was asking for was

10   largely something that would have been handled by our

11   commercial real estate group.  It wasn't an owner-occupied

12   loan.  It was something more of a development nature.

13   Q.  Okay.  And had those opportunities come to pass, had

14   they come to fruition, would M&I Bank need -- would it have

15   needed more financial information from PCI?

16   A.  Yes.  That's how we would have assessed the quality to

17   make the loan.

18   Q.  Okay.  Did you have financial information for PCI at the

19   time?

20   A.  No, we did not.

21   Q.  Okay.  How do you know that?

22   A.  We didn't have any loan -- loans with them.  It was a

23   deposit opportunity only at that point.

24   Q.  Okay.  And was it typical not to have financial

25   information when the only relationship with a customer was a

Crain - Direct

```
 1    deposit relationship?

 2    A.  Yes, that would be typical.

 3    Q.  Okay.  Was it typical for opportunities like the ones

 4    Chris described to you not to come to fruition?

 5    A.  Yes.  I mean, it was -- he was prospecting.  The

 6    customer was sharing what they were looking for.  But that

 7    didn't mean that it would actually happen.

 8    Q.  Okay.  And is this sort of -- looking for these kind of

 9    opportunities part of a business banker's obligation to the

10    bank?

11    A.  Yes.

12    Q.  Okay.  Are you familiar with the phrase "know your

13    customer" in the banking industry?

14    A.  Yes, I am.

15    Q.  Okay.  What do you understand that to mean, Ms. Crain?

16    A.  Largely it's a regulatory, you know, issue for us and

17    it's to make sure you know who you are doing business with

18    so that you can identify individuals that you are working

19    with, so those who are signing accounts to conduct business

20    with the bank, and understanding generally the nature of

21    someone's business.

22    Q.  Yes.  And I think you began to answer it, but could you

23    tell the jury, kind of at a high level, what level of detail

24    does a banker need to know about a customer's business?

25            MR. LAWRENCE:  Objection, improper opinion
```

```
 1    testimony.
 2              THE COURT:  Sustained.
 3    BY MR. GLEESON:
 4    Q.  You're in the business for 40 years, correct?
 5    A.  Correct.
 6    Q.  Okay.  And "know your customer" has been an element of
 7    banking for all or at least substantially all of those
 8    40 years, correct?
 9    A.  Yes.
10    Q.  Okay.  Do you -- when you became a banker, were you
11    instructed as to what it meant to know your customer?
12    A.  Yes.
13    Q.  Okay.  And did you put that into practice during your
14    work as a business banker and in other forms of banking over
15    the years?
16    A.  Yes.
17    Q.  Do you provide guidance to bankers now that are under
18    your supervision about what it means to know your customer?
19    A.  Yes.  We all have a good understanding how important
20    that is in our business, yes.
21    Q.  Okay.  You have a -- do you feel you have a good --
22    based on your experience, an understanding as to what level
23    of detail you need to have about your customers' business?
24    A.  It depends --
25              MR. LAWRENCE:  Objection, improper and undisclosed
```

```
 1    opinion testimony.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  It depends to what the nature of the

 4    business is with the customer.  For a depository account

 5    it's important to identify who the person is and know that

 6    they can sign a signature card, for instance.  When -- it

 7    depends.  If you have a loan with someone, then you are

 8    going much deeper into the information you would receive.

 9    BY MR. GLEESON:

10    Q.  Okay.  If you had a customer with just a deposit

11    relationship and it's a restaurant, would you expect a

12    banker under your supervision to know the names of the

13    restaurant's suppliers?

14              MR. LAWRENCE:  Objection, improper hypothetical

15    and opinion testimony.

16              THE COURT:  Sustained.

17    BY MR. GLEESON:

18    Q.  The -- would you expect Mr. Flynn -- who was under your

19    supervision, correct?

20    A.  Yes, he was.

21    Q.  -- would you expect -- do you know what the term

22    "counterparties" means?

23    A.  Yes.  I mean --

24    Q.  And in the context -- let's take PCI.  "Counterparties"

25    would mean the persons or entities with which PCI was doing
```

Crain - Direct

1    business, correct?

2    A.  Correct.

3    Q.  Okay.  When you were supervising Chris Flynn, did you

4    expect him to know who the counterparties were with PCI?

5    A.  No, I would not expect that to be something that he

6    would typically have, no.

7    Q.  Would you expect him to know -- as part of his "know

8    your customer" responsibilities, would you expect him to

9    know who PCI was transacting business with?

10   A.  No.

11          MR. LAWRENCE:  Objection, improper opinion.

12          THE COURT:  Sustained.

13   BY MR. GLEESON:

14   Q.  Did you ever hear -- back when you were working at M&I

15   Bank, did you ever hear of the entities Nationwide or

16   Enchanted?

17   A.  No.

18   Q.  Okay.  If they were doing business with PCI, would you

19   have expected Mr. Flynn to know who they were?

20          MR. LAWRENCE:  Objection, speculation,

21   hypothetical.

22          THE COURT:  Sustained.

23          MR. GLEESON:  Can I come up, please, Judge?  May I

24   approach the bench?  Withdrawn.

25          THE COURT:  I've ruled on the objection.

```
 1                    MR. GLEESON:  I understand that.  I have withdrawn

 2          my application to approach the sidebar.  Thank you,

 3          Your Honor.

 4                    THE COURT:  You're welcome.  Thank you.

 5          BY MR. GLEESON:

 6          Q.  If a business banker under your supervision has a

 7          customer with just a deposit relationship, would you expect

 8          that business banker to generate loan relationships with

 9          that customer?

10          A.  It would be part of the opportunity, yes.

11          Q.  And would you have expected Chris Flynn to know whether

12          PCI had loans with other entities?

13                    MR. LAWRENCE:  Objection, calls for speculation,

14          foundation.

15                    THE COURT:  Sustained.

16          BY MR. GLEESON:

17          Q.  Would you have expected him to know the average deposit

18          balance of his customers?

19                    MR. LAWRENCE:  Objection; same objection.

20                    THE COURT:  Sustained.

21          BY MR. GLEESON:

22          Q.  You're a business banker for a long time, correct, and a

23          commercial banker?

24          A.  Yes.

25          Q.  When you had deposit relationships -- withdrawn.
```

```
 1                    From time to time you yourself handled -- were the
 2       relationship manager for customers of banks, correct?
 3       A.  Correct.
 4       Q.  And when that happened and you had deposit
 5       relationships, did you care about the average deposit
 6       balance in your customers' accounts?
 7       A.  Yes, I did.
 8                    MR. LAWRENCE:  Objection, relevance.
 9       BY MR. GLEESON:
10       Q.  Why?
11                    THE COURT:  Overruled.
12       BY MR. GLEESON:
13       Q.  Why?
14                    THE COURT:  You may answer.
15                    THE WITNESS:  Yes, I did.  Why?
16       BY MR. GLEESON:
17       Q.  Yes.
18       A.  It was important to understand potentially what other
19       services and products we could offer -- I could offer to
20       someone based on those balances.  They might have had needs
21       for some of our treasury management services, investment
22       services, and it was just overall a part of how you would
23       manage a relationship.
24       Q.  And was the average deposit balance the key to the
25       profitability of a deposit account?
```

Crain - Direct

1    A.  Yes.

2    Q.  Okay.  Were the deposits into and withdrawals from that

3    account a matter of concern to you when you managed a

4    deposit relationship?

5    A.  That would not be typically something that I would have

6    looked at with any frequency, no.

7    Q.  You wouldn't pay attention to that in the regular

8    course?

9    A.  I wouldn't have had the information to look at that, no.

10   Q.  Okay.  And when you were managing such relationships,

11   did you pay attention to who the suppliers were of your

12   customer?

13            MR. LAWRENCE:  Objection, hypothetical, relevance.

14            THE COURT:  Sustained.

15   BY MR. GLEESON:

16   Q.  While you were supervising Mr. Flynn, did you -- did the

17   bank enter into any -- withdrawn.

18            Do you know what the phrase "Deposit Account

19   Agreements" -- you ever hear that phrase?

20   A.  Yes.

21   Q.  Okay.  What does that mean to you?

22   A.  It's a specific agreement to help govern how a deposit

23   account would be managed.

24   Q.  Okay.  While you were supervising Chris Flynn, did PCI

25   ask the bank to enter into any Deposit Account Agreements?

Crain - Direct

1    A.   Yes, they did.

2    Q.   Okay.  And are Deposit Account Agreements common?

3    A.   No, they are not common.

4    Q.   Okay.  Are they unheard of?

5    A.   Not unheard of, but not very common.

6    Q.   Okay.  And are you familiar with trust accounts,

7    Ms. Crain?

8    A.   Yes, I am.

9    Q.   Okay.  What's a trust account?

10   A.   Largely it's an account that you would hold -- be more

11   custodial, to hold funds, funds on behalf of a customer for

12   investments and/or for escrow purposes, a variety of

13   purposes.

14   Q.   So a trust account is like a separate account, correct?

15   A.   Yes.

16   Q.   And is there a beneficiary to a trust account?

17   A.   Yes.

18   Q.   Okay.

19   A.   Typically, yes.

20   Q.   And are deposit accounts analogous in any way to trust

21   accounts?

22   A.   They are both accounts that hold funds, and it depends

23   on who is the beneficiary of those accounts, yes.

24   Q.   Are trust accounts common?

25   A.   Yes.

Crain - Direct

1    Q.  Okay.  Was working -- back to PCI.  Was working with PCI

2    in order -- in relation to Deposit Account Agreements a

3    service to the bank's client?

4    A.  Yes, it was.

5    Q.  And did you work with Chris in connection with Deposit

6    Account Agreements, Chris Flynn?

7    A.  Yes, I did.

8    Q.  And do you recall when this was?

9    A.  I believe it was in -- I'd have to look back at some of

10   the documents, but in the 2007, 2008 time frame.

11   Q.  All right.  Let me ask you -- you have a book before

12   you, and there's a communication not yet in evidence, P-72.

13   Do you have that before you, Ms. Crain?

14   A.  Yes, I do.

15   Q.  Just generally, what is that?

16   A.  This is an e-mail that was sent to me by Carolyn Moline.

17   Q.  Okay.  And the date?

18   A.  February 20th, 2008.

19   Q.  Okay.  Does any part of that e-mail pertain to the

20   Deposit Account Agreement you worked with Chris Flynn with

21   regard to?

22   A.  Yes.  It's the very last paragraph of this e-mail.

23   Q.  Okay.  First two look like they relate to an unrelated

24   personnel matter?

25   A.  Yes, that's correct.

1    Q.  Okay.

2                MR. GLEESON:  I offer P-72 in evidence.

3                MR. LAWRENCE:  No objection.

4                THE COURT:  The exhibit is received, P-72.

5    BY MR. GLEESON:

6    Q.  Okay.  There's the e-mail.  You mentioned those first

7    two paragraphs relate to something entirely unrelated, so

8    let's focus on the third.

9                And before I ask you questions about this, tell us

10   a little bit about who Carolyn Moline is and what her role

11   was at the time.

12   A.  Carolyn Moline was a banking assistant supporting

13   bankers in managing customer relationships.

14   Q.  Okay.  And did you and the bankers under your

15   supervision work with her?

16   A.  Yes, we did.

17   Q.  She helped administer things at the bank?

18   A.  Yes.

19   Q.  Okay.  And she says to you, "One more thing, I had

20   mentioned this control agreement and Chris is kind of moving

21   forward in this process.  He mentioned he wanted to bring

22   you into the loop."  Let's stop there.

23               Did Mr. Flynn actually bring you into the loop

24   with regard to this Control Agreement she's referring to?

25   A.  Yes, he did.

Crain - Direct

1    Q.  Okay.  The next sentence says, "Kevin Busch" -- who's

2    Kevin Busch?

3    A.  Kevin Busch is an attorney.

4    Q.  Okay.  And who did he represent?

5    A.  M&I Bank.

6    Q.  Okay.  Was he working in the bank or was he outside

7    counsel for the bank?

8    A.  Outside counsel.

9    Q.  So "Kevin Busch," and then there's a redaction, "worked

10   with the other parties [sic] attorney to get something to

11   agree on."  We'll stop there.

12          Do you know who brought Kevin Busch into these

13   events?

14   A.  I believe it was Chris Flynn.

15   Q.  Okay.  And it goes on to say, "We did a conference call

16   today to try to get a handle on activity and pricing."  Do

17   you see that?

18   A.  I do.

19   Q.  What did you understand Ms. Moline to be referring to

20   when she said "activity and pricing"?

21   A.  We had been -- the customer had requested this

22   particular arrangement for a deposit account, a Control

23   Agreement to go with it.  We wanted to understand the kind

24   of volume activity and how to price it accordingly.

25   Q.  Okay.  How do -- when you say "how to price it," what do

Crain - Direct

1      you mean by that?

2      A.  Well, we wanted to make sure that what we were -- what

3      we were doing in terms of taking care of the customer and

4      providing this service is that we would be compensated

5      accordingly.

6      Q.  Okay.  And she goes on to say, "They mentioned U.S. Bank

7      charges them a flat rate of $5,000 annually."

8              As you understood it, who was charging -- who was

9      U.S. Bank charging $5,000 to?

10     A.  My understanding of this is they were charging PCI for

11     the same kind of arrangement, a $5,000 fee to do what they

12     were asking us to do.

13     Q.  A fee for a -- for the administration of a Deposit

14     Account Agreement?

15     A.  Correct.

16     Q.  Okay.  And as you understood it, pulling away from the

17     e-mail just for a moment, did you understand the deposit

18     account at issue here would be a source of income for the

19     bank?

20     A.  Yes.  We were looking for the opportunity to do more

21     business with the organization and having, you know, a new

22     depository account would provide the additional opportunity

23     for income.

24     Q.  I see.  You were looking for the potential for more

25     income?

Crain - Direct

1    A.  Yes.

2    Q.  Okay.  Did you understand that the deposit account

3    itself, if one were created, that the deposit account itself

4    would be a profit-making endeavor for the bank?

5    A.  The -- an actual account at the bank, yes.

6    Q.  Okay.  And the -- going down, Carolyn says to you, "So I

7    don't know who will pick up the tab for the attorney fee."

8           That's the attorney fee in connection with

9    creating the account?

10   A.  Creating the agreement, yes.

11   Q.  The agreement, okay.

12          "But I do have some reservations on the amount of

13   work this will be and the benefit to the bank.  Chris feels

14   there's potential for more business from Petters."  You see

15   that?

16   A.  Yes.

17   Q.  Is that what you are referring to when it was -- this

18   might be profitable to the bank because of additional

19   business?

20   A.  Correct.

21   Q.  Okay.  How did you -- did you understand Carolyn to have

22   a concern about this Deposit Account Agreement at this point

23   in time?

24   A.  I wouldn't characterize it as concern.  She was -- just

25   wanted to make sure that she understood what it would take

1    in terms of managing the account, what would be required,

2    the amount of work that it would take, and that we -- the

3    bank was being compensated appropriately as a result.

4    Q.  And was Carolyn part of the bank that would actually

5    implement the deposit agreement if the -- a deposit account

6    if an agreement were reached?

7    A.  Yes.

8    Q.  Let me ask you -- let me invite your attention, please,

9    to Defendant's Exhibit 40208 in the book before you.

10   A.  40248?

11   Q.  I'm being corrected.  Bear with me for one second.

12       (Pause)

13   Q.  Defendant's Exhibit 40248, do you have that in front of

14   you?

15   A.  I do have that, yes.

16   Q.  What is that?

17   A.  This is an e-mail exchange between Carolyn Moline and

18   myself.

19   Q.  Okay.  And is this on the same topic?  Does this relate

20   to the same topic we've just been -- you've been testifying

21   about?

22   A.  Yes, it is.

23   Q.  Okay.  Also a little bit related to the separate

24   personnel topic, correct?

25   A.  Correct.

1    Q.  Okay.

2             MR. GLEESON:  I offer it in evidence.

3             MR. LAWRENCE:  No objection.

4             THE COURT:  Exhibit 40248 is received, Defendant's

5    Exhibit.

6    BY MR. GLEESON:

7    Q.  You have it in front of you?

8    A.  I do.

9    Q.  Okay.  The date of this is what, Ms. Crain?  Do you see

10   it, the date of the --

11   A.  Yes, on February 20th, 2008.

12   Q.  And Carolyn Moline states to you --

13            MR. GLEESON:  And let's find it.  It's bottom of

14   the first page, Mr. Herzka.

15   BY MR. GLEESON:

16   Q.  She writes, "Also, regarding this Control with the

17   entity involved with Petters - they mentioned they may run

18   through 800 Million per quarter.  Although, it sounds like

19   there will not be a significant amount that stays here."  Do

20   you see that?

21   A.  I do.

22   Q.  Okay.  What did you understand Carolyn to mean when she

23   said "they may run through 8 [sic] million per quarter"?

24   Back up.  Withdrawn.

25            "Regarding this Control" pertains to what?  What

1    did you understand her to be referring to?

2    A.  She was talking about the Control Agreement that they

3    were asked to be put in place for a new depository

4    relationship.

5    Q.  Okay.  And do you recall now the entity that was

6    involved with Petters that she refers to here?

7    A.  Yes.  For -- in February, this was for Palm Beach, I

8    believe.

9    Q.  Okay.

10   A.  Yeah.

11   Q.  "They mentioned they may run through 8 [sic] million per

12   quarter.  Although, it sounds like there will not be a

13   significant amount that stays here."

14            What did you understand her to mean when she told

15   you that?

16   A.  She was just sharing with me that there was not going to

17   be a significant deposit balance, but a fair amount of

18   transactions.

19   Q.  So the deposit balance would mean the money that stayed

20   in the account, correct?

21   A.  Correct.

22   Q.  And Ms. Moline was telling you that there would be a lot

23   of money running through the account, but it wouldn't be

24   staying there, correct?

25   A.  Correct.

1    Q.  Okay.  And would that affect the profitability of the

2    account set up by this agreement if the agreement were

3    executed?

4    A.  Yes.  I mean, largely, again, the bank makes money by

5    having a higher average deposit than not.

6    Q.  Okay.  Carolyn goes on -- or Ms. Moline, excuse me, goes

7    on to say, "I told Chris today I thought he should mention

8    to Hank to see how this would affect the bank's books and he

9    thought it would be a good idea."  Do you see that?

10   A.  I do.

11   Q.  Who is Hank?

12   A.  Hank Donatell was the regional controller for the

13   Minnesota region for M&I Bank.

14   Q.  And is Carolyn saying to you that Hank agreed it would

15   be a good idea -- excuse me, that Chris agreed it would be a

16   good idea to talk to Mr. Donatell?

17   A.  Yes.

18   Q.  Okay.  And it goes on to say, "We conferenced in" --

19   well, first she says, "He mentioned he had e-mailed you

20   regarding some of this."  Do you see that?

21   A.  I do.

22   Q.  That's a reference to whom?

23   A.  Chris.

24   Q.  e-mailing you?

25   A.  Yes.

1    Q.  Did Chris keep you in the loop during this entire series

2    of events?

3    A.  Yes, he did.

4    Q.  And then it says, "We conferenced in Dave Preiner who is

5    in the trust department.  He could do more if there were

6    monies that needed to be invested, but we'll keep him in the

7    loop."  Do you see that?

8    A.  Yes.

9    Q.  The reference to Dave Preiner in the trust department,

10   what did you understand Carolyn to be telling you that for?

11   A.  We were -- I think both Chris and Carolyn were

12   anticipating that if there were substantial funds in the

13   account, Dave was someone in our trust department, that he

14   would be a resource they could introduce to the customer to

15   help invest those dollars.  Dave was a salesperson within

16   the trust department.

17   Q.  And when it says, "He could do more if there were monies

18   that needed to be invested," was Carolyn suggesting to you

19   that since the money is not staying in the account, Dave

20   Preiner can't help much?

21            MR. LAWRENCE:  Objection, leading.

22            THE COURT:  Sustained.

23            MR. GLEESON:  Okay.

24   BY MR. GLEESON:

25   Q.  Why could Dave Preiner do more if monies were needed to

1    be invested?

2    A.  He had alternative options for making those investments

3    by virtue of the part of the organization he worked within.

4    Q.  If money had stayed in the account, would the trust

5    department's abilities affect the profitability of the

6    account?

7    A.  Yes.  That would have been a cross-sell opportunity.

8    Q.  Let me invite your attention to Defendant's

9    Exhibit 40252, please.  What is this?

10   A.  This is an e-mail exchange.  It starts off with -- the

11   very first part of this exchange is from Kevin Busch to

12   Jamie Anderson, with Chris Flynn copied.

13   Q.  Okay.  And this, again, pertains to the Deposit Account

14   Agreement that you have been testifying about?

15   A.  Yes, it does.

16   Q.  Okay.  And the date is?

17   A.  February 21st, 2008.

18   Q.  Okay.

19              MR. GLEESON:  I offer it in evidence.

20              MR. LAWRENCE:  No objection.

21              THE COURT:  The exhibit is received.

22   BY MR. GLEESON:

23   Q.  So this is the very next day, correct?

24   A.  That is correct.

25   Q.  And in this e-mail from Chris Flynn to you --

1              MR. GLEESON:  At the top, Mr. Herzka, if you could

2      focus in on that.  Thank you, sir.

3      BY MR. GLEESON:

4      Q.  "Per my previous e-mail.  This account will have nominal

5      balances as funds transferred in from Petters will be wired

6      out by Palm Beach Capital the same day."  Do you see that?

7      A.  Yes.

8      Q.  Okay.  When he said "nominal balances," what did you

9      understand him to be referring to?

10     A.  That the account would not have a significant average

11     balance.

12     Q.  So what Chris Flynn was telling you in February of 2008,

13     this account itself wasn't going to be a moneymaker for the

14     bank, correct?

15     A.  That's correct.

16     Q.  But he had informed you -- withdrawn.

17             But this was a good reason for the bank -- a good

18     thing for the bank to consider why if it wasn't going to be

19     profitable?

20     A.  There were other opportunities that the customer had

21     informed us that they were interested in working with us on.

22     This was -- and this was something they had asked us to do

23     for them.

24     Q.  So this was a customer service?

25     A.  Yes.  This was an accommodation to this customer for

1    this particular need that they were requesting.

2    Q.  Okay.  It goes on to say -- Mr. Flynn's e-mail to you

3    goes on to say, "I have engaged Kevin Busch at Moss &

4    Barnett to help structure these agreements to protect the

5    bank."

6         What do they mean by protecting the bank, as far

7    as you understood?

8    A.  Well, if there were various requests by the customer in

9    terms of how the account was to be managed, we wanted to

10   make sure that we were abiding by any provisions that were

11   established and that they were done in a way that the bank

12   wouldn't be held liable or have any -- you know, have any

13   liability as a result.

14   Q.  Okay.  And he says, "We can discuss tomorrow."  Right?

15   A.  Yes.

16   Q.  Was this a continuing discussion among you and Kevin and

17   Carolyn Moline and others?

18   A.  Yes.

19   Q.  If you could turn in your book to Defendant's 40248,

20   please, Ms. Crain.  Are you there?

21   A.  I am.

22   Q.  What is that?

23   A.  40248, correct?

24   Q.  Okay.  It's a -- but what is it?  It's an e-mail?

25   A.  It's an e-mail, yes.  It's the one we were just talking

Crain - Direct

1    about.

2    Q.  Oh, I'm sorry.  Let me --

3              MR. GLEESON:  Judge, can I have just one moment to

4    consult?

5              THE COURT:  You may.

6         (Defendant's counsel confer)

7              MR. GLEESON:  Thank you, Judge.  I had a little

8    exhibit confusion.

9              THE COURT:  You're welcome.

10             MR. GLEESON:  If we can pull up Defendant's

11   Exhibits -- don't pull them up, Mr. Herzka.

12   BY MR. GLEESON:

13   Q.  If you could turn your attention, Ms. Crain, to

14   Exhibits 40250 and 40251.

15   A.  Okay.

16   Q.  Okay.  Got them both?

17   A.  I have both of them, yes.

18   Q.  You recognize those documents?

19   A.  Yes, I do.

20   Q.  Okay.  Briefly, could you say what they are.

21   A.  Yes.  One is a Release and Indemnification Agreement

22   between M&I Bank and the beneficiary of the new account.

23   And then the other is the Deposit Account Management

24   Agreement between M&I and the Petters Company.

25   Q.  Okay.  And are these the executed agreements?

1    A.  These are draft agreements.

2    Q.  And were these forwarded to you in connection with your

3    discussions about the deposit agreement that we've been

4    discussing?

5    A.  Yes.

6              MR. GLEESON:  Okay.  I offer them in evidence.

7              MR. LAWRENCE:  The objection is to foundation.  I

8    may need to be heard briefly, Your Honor.

9              THE COURT:  I didn't hear the last part of what

10   you said.  I heard you say the objection is to foundation.

11             MR. LAWRENCE:  Is to foundation.  And may I

12   briefly approach?

13             THE COURT:  Yes, you may.

14             Members of the Jury, you may stand and stretch

15   during this sidebar.

16       **(At sidebar)**

17             MR. LAWRENCE:  So, Your Honor, it appears that

18   Exhibits DX-40250 and 40251, which are what are being

19   offered into evidence right now, are the attachments to a

20   document that's Bates marked DX-40249 and that is not a

21   document that Ms. Crain is a recipient of.  So I don't

22   believe that the bank has laid foundation that these are the

23   actual documents that she just testified that she's seen

24   before.

25             MR. GLEESON:  She just testified that she

1    recognizes them as the documents -- as the drafts that she

2    discussed with her colleagues.  I can -- so that's the

3    foundation.  She recognizes the documents.

4              MR. LAWRENCE:  I don't think he's established that

5    these are the actual documents that -- he asked her if these

6    were sent to her, and she said yes and that they were drafts

7    that were sent to her.  But I don't believe that the bank

8    has established that these were actually the ones that were

9    shown to her.

10             THE COURT:  What more needs to be --

11             MR. LAWRENCE:  To lay proper foundation, I believe

12   the bank would need to introduce the e-mail in which these

13   were actually shared with Ms. Crain or establish the manner

14   in which she saw these documents.

15             THE COURT:  So you can lay more foundation to

16   establish how she understands those documents to be the ones

17   that she understands them to be.

18             MR. GLEESON:  Okay.

19             THE COURT:  So the objection is sustained with the

20   expectation of additional proper foundation being laid.

21             MR. GLEESON:  Thank you.

22         **(In open court)**

23   BY MR. GLEESON:

24   Q.  These drafts that you have before you, do you recall

25   these documents being the ones that you were discussing with

Crain - Direct

```
 1    Chris Flynn in connection with the Palm Beach Deposit

 2    Account Agreement?

 3    A.  Yes.

 4              MR. GLEESON:  Judge, I offer them in evidence.

 5              MR. LAWRENCE:  No objection.

 6              THE COURT:  They are received.

 7    BY MR. GLEESON:

 8    Q.  Okay.  They are both up on the screen.  And let me --

 9    there's two separate agreements, correct?

10    A.  Yes.

11    Q.  Okay.  The one on the left is 40250.  What is that?

12    A.  It's a Release and Indemnification Agreement.

13    Q.  Okay.  And it's a draft, correct?

14    A.  Yes.

15    Q.  These agreements were subsequently executed, correct?

16    A.  Yes.

17    Q.  Okay.  The -- who is that agreement between?

18    A.  That is between M&I Bank and in this case it was Palm

19    Beach, the beneficiary of the new account being set up by

20    the Deposit Account Control Agreement.

21    Q.  So if these agreements were executed, there would be a

22    new account, correct?

23    A.  Correct.

24    Q.  That would be the deposit account?

25    A.  Correct.
```

1    Q.  It would be to the benefit of Palm Beach, correct?

2    A.  Correct.

3            MR. LAWRENCE:  Objection, leading, foundation.

4            THE COURT:  Sustained.  Counsel keep your

5    questions direct.

6    BY MR. GLEESON:

7    Q.  If the account were set up, for whose benefit would the

8    account be?

9    A.  For Palm Beach.

10   Q.  Okay.  And this agreement, you said, is between Palm

11   Beach and M&I Bank, correct?

12   A.  That is correct.

13   Q.  Okay.  What's the purpose of this agreement?

14   A.  This was to make sure that the bank was held harmless,

15   was indemnified for any work that we were doing to -- on the

16   transaction of the new account for Palm Beach's benefit.  So

17   they were indemnifying us for any work that we were doing.

18   Q.  Could you just briefly tell the jury what you mean when

19   you say "indemnify."

20   A.  They were holding us harmless.  The bank would not be

21   held liable for, you know, any -- as the provisions were

22   laid out on the Deposit Account Control Agreement, that we

23   were doing what the bank, you know, was supposed to do and

24   that we would not be able to be sued by Palm Beach for

25   something that they thought we should have done.

1    Q.  If there --

2              MR. LAWRENCE:  Objection, Your Honor.  I'm going

3    to move to strike.  And may I be heard?

4              THE COURT:  You may.

5         **(At sidebar)**

6              MR. LAWRENCE:  I'll be brief, Your Honor.  The

7    concern is that we're getting dangerously close to running

8    afoul of the Court's instruction with respect to investor

9    knowledge.  We're now hearing about indemnification by one

10   of the investors provided to the bank.  A, I don't think

11   that's relevant to any issue in the case; and, B, because we

12   are now skirting the investor knowledge issue, the risk of

13   prejudice [inaudible].

14             THE COURT REPORTER:  I'm sorry.  Can you say the

15   last part again?

16             MR. LAWRENCE:  I said the minimal relevance is

17   outweighed by whatever tangential relevance the document

18   has.

19             MR. GLEESON:  Judge, this has literally nothing to

20   do with the investor knowledge issue that plaintiff's

21   counsel keeps raising.  What it has to do is with how the

22   bank arranged for the establishment of the Deposit Account

23   Agreement.

24             You may recall that in the testimony of Chris

25   Flynn, Mr. Marder suggested that Chris Flynn did this on his

1      own, that he did not tell his superiors about it.  The

2      suggestion was he was so enamored with Tom Petters, he would

3      do this as a favor to Petters, kind of *ultra vires*.

4              This is his supervisor.  This is to establish that

5      these Deposit Account Agreements are not the red flags that

6      the trustee suggests that they are, that they are -- they

7      are actually not uncommon.  There was one with another bank.

8      And that this one was implemented by the bank in exactly the

9      right way.  They consulted counsel.  Chris Flynn consulted

10     his boss.  They made sure everything was covered.  There was

11     an indemnification agreement.

12             This is -- it's relevant, of course.  It's a

13     relevant response to what they depicted as the way this

14     Deposit Account Agreement came about.  And it doesn't even

15     strike a glancing blow on the fact that the people at Palm

16     Beach were criminals and went to prison.  I'm not going

17     anywhere near that.  The Court has ruled that out.  We

18     respect the need to comply with that ruling and we will.

19             MR. LAWRENCE:  Whether Palm Beach was being

20     indemnified by the bank does not pertain to anything that

21     we've been talking about with respect to the DACAs, whether

22     they are normal or abnormal, whether they were red flags or

23     not.  The fact that the bank sought indemnification doesn't

24     relate to that.

25             And there's a risk that when we start introducing

1    evidence that the bank sought indemnity from an investor,

2    that that suggests that there was some potential wrongdoing

3    that the investor should be responsible for.  And the

4    jury -- the Court has ruled that the jury -- we should not

5    be putting on evidence that's going to give the jury the

6    suggestion that the investors are the ones that are liable

7    here.

8              MR. GLEESON:  Judge, with respect to my colleague,

9    I think it's a non sequitur to say that because one of the

10   indemnification agreement with both sides -- I'm about to

11   put in, have her testify that the arrangement was PCI would

12   set up an account for Palm Beach.  There might be fights

13   between PCI and Palm Beach about the moving of the money

14   within the accounts.  The bank just wanted indemnification

15   from both sides.  There's no suggestion here --

16             THE COURT:  Why is that relevant?

17             MR. GLEESON:  It's relevant because it is integral

18   to the Deposit Account Agreement that lies at the heart of

19   one of the causes of action and has been identified by the

20   plaintiff's expert as a red flag and indicative of an

21   unusual relationship.  This is how the bank engaged properly

22   in the conduct that the trustee says is indicative of its

23   culpability.

24             MR. LAWRENCE:  As to what I argued before, I think

25   that if there's any relevance for that, which there is none,

Crain - Direct

1      it's very minimal.

2             THE COURT:  Okay.  I'm going to overrule the

3      objection.  Counsel, you know the parameters --

4             MR. GLEESON:  Yes.

5             THE COURT:  -- in which you have represented to

6      the Court that you will be addressing this and the reasons,

7      and that is why I have overruled the objection.  Let's

8      caution all parties of the importance to comply with that

9      line and that narrow path.

10            MR. GLEESON:  Got it.  Can I ask one question,

11     Judge?  If you can just -- so that I don't go anywhere near

12     it, I would just like to ask one leading question, which is:

13     Does this mean if there were a dispute between the

14     accountholder and PCI, that both sides would hold M&I Bank

15     harmless?

16            And if I do that, I have -- I'll do it with an

17     open-ended question, but I'm just trying to short-circuit to

18     get from A to B because I know your concern.  I have no

19     interest in getting near your concern.  I can ask one or two

20     leading questions and avoid the concern entirely.

21            THE COURT:  It's -- do you have any objection to

22     that?

23            MR. LAWRENCE:  I have no objection to --

24            THE COURT:  For the purpose --

25            MR. LAWRENCE:  -- the one or two leading questions

1    in order to stay afield of the investor --

2              MR. GLEESON:  Yes.

3              THE COURT:  So I will rule that -- so you may.

4              MR. GLEESON:  Thank you.

5         **(In open court)**

6              THE COURT:  You may proceed, Counsel.

7              MR. GLEESON:  Thank you.

8    BY MR. GLEESON:

9    Q.  There's -- before our sidebar, Ms. Crain, you were

10   testifying about the indemnification agreement entered

11   into -- or this draft indemnification agreement to be

12   entered into if the agreement -- if the transaction went

13   forward between M&I Bank and Palm Beach, correct?

14   A.  Correct.

15   Q.  And skipping ahead for a second, is it also true that

16   there's a similar indemnification provision in the Deposit

17   Account Agreement that PCI would enter into with M&I Bank?

18   A.  That's correct.

19   Q.  And is it fair to say that the purpose of those dual

20   indemnification agreements was that if there were any

21   dispute between PCI and Palm Beach about money going into

22   the separate account, the deposit account, both sides would

23   hold the bank harmless for any problems with that dispute?

24   A.  That's correct.  That's why we had the separate release

25   and indemnification.

Crain - Direct

1    Q.  Thank you.

2         Okay.  Let's go to -- let's turn our attention to

3    40251 and let's go to Section 2 of that, please.

4         MR. GLEESON:  And, in particular, 2(b), if you can

5    bring that up, please, Mr. Herzka.

6    BY MR. GLEESON:

7    Q.  That says, "Petters shall provide to each Protected

8    Party and M&I at least once each week (or more if necessary

9    to enable M&I to discharge its obligations hereunder) a list

10   of all Transactions funded by a Protected Party."

11        Let me just stop there and ask you:  "Protected

12   party" here refers to whom?

13   A.  The beneficiary, in this case Palm Beach.

14   Q.  Okay.  "With respect to which payment may be received by

15   M&I for deposit in the Deposit Account."  And then it

16   defines that as "Transaction List."  Do you see that,

17   Ms. Crain?

18   A.  Yes.

19   Q.  You mentioned the beneficiary here, the protected party,

20   would be -- was Palm Beach, correct?

21   A.  Correct.

22   Q.  Okay.  Does the -- this provision require Palm Beach to

23   get the same transaction list that the bank would get?

24   A.  Yes.

25   Q.  Okay.  And then what did you understand this provision

1    to mean?

2              MR. LAWRENCE:  Objection, calls for a legal

3    conclusion.

4              THE COURT:  Sustained.

5    BY MR. GLEESON:

6    Q.  This agreement, if executed, would establish a separate

7    account?  I'm asking for your understanding.

8    A.  Yes.

9              MR. LAWRENCE:  Objection, leading.

10             THE COURT:  Overruled.  You may answer.

11   BY MR. GLEESON:

12   Q.  For the benefit of what entity?

13             THE COURT:  And, Counsel, please, as you have in

14   your follow-up question, keep your questions direct.

15             MR. GLEESON:  Yes.  Thank you, Judge.  I will.

16             THE WITNESS:  The account that was to be set up

17   for the beneficiary in this case was for Palm Beach.

18   BY MR. GLEESON:

19   Q.  Okay.  And if a -- if this agreement were to be

20   executed -- withdrawn.

21             This agreement eventually was executed, correct?

22   A.  Yes, it was.

23   Q.  Okay.  And when it was executed, it was the bank's

24   responsibility to fulfill it, correct?

25   A.  Yes.

```
 1              MR. LAWRENCE:  Objection, leading.

 2              THE COURT:  Sustained.

 3     BY MR. GLEESON:

 4     Q.  If it was executed, would the bank have a

 5     responsibility?

 6     A.  Yes.

 7     Q.  What would that responsibility be?

 8     A.  The bank needed to look at the provisions, and our role

 9     was to look at -- get the transaction list that was received

10     and then move monies as it was directed by the provisions in

11     the agreement.

12     Q.  Okay.  Would there be an obligation to move money in the

13     absence of a transaction list?

14     A.  No.

15              MR. LAWRENCE:  Objection, calls for a legal

16     conclusion.

17              THE COURT:  I didn't even hear what you said.

18     Please speak up.

19              MR. LAWRENCE:  I'm sorry.  Objection is calls for

20     a legal conclusion.

21              THE COURT:  Sustained.

22     BY MR. GLEESON:

23     Q.  Did you have an understanding as to what the role of a

24     transaction list would be in the bank's obligations under

25     the agreement?
```

```
 1              MR. LAWRENCE:  Objection; same objection.

 2              THE COURT:  Sustained.

 3    BY MR. GLEESON:

 4    Q.  The -- where would the money -- would this agreement be

 5    executed at the bank under your supervision?

 6    A.  Yes.

 7    Q.  Okay.  Were there people at the bank who would actually

 8    undertake the steps necessary to move funds from the PCI

 9    account to the deposit account?

10    A.  Yes, given that receipt of a transaction list would

11    dictate when and if those funds were to be moved.

12    Q.  Okay.  And would the funds be moved without the receipt

13    of a transaction list?

14    A.  No.

15    Q.  Okay.  And where would the funds be moved to?

16    A.  They would be moved to the new depository account, with

17    the beneficiary being Palm Beach.

18    Q.  Okay.  And then Section 2(c) --

19              MR. GLEESON:  Let's go back to 2(b).  Excuse me,

20    Mr. Herzka.

21    BY MR. GLEESON:

22    Q.  In terms of implementing the agreement and moving money

23    from the PCI account, was the transaction list the first

24    step?

25              MR. LAWRENCE:  Objection, calls for a legal
```

 1    conclusion.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.  My understanding is to

 4    receive -- the transaction list was the first step, having

 5    executed the agreement --

 6    BY MR. GLEESON:

 7    Q.  Okay.

 8    A.  -- to move monies, yes.

 9    Q.  And moving the money would be the second step?

10    A.  Correct.

11              MR. GLEESON:  If you could go to 2(c), please,

12    Mr. Herzka.

13    BY MR. GLEESON:

14    Q.  That says, "M&I shall compare each payment received by

15    wire transfer or otherwise to the most recently received

16    Transaction List provided to it by Petters and shall

17    automatically transfer each payment on a Transaction funded

18    by a Protected Party to an M&I account established by and

19    for the benefit of each Protected Party as required herein."

20    Do you see that?

21    A.  Yes.

22    Q.  Okay.  That was an obligation -- excuse me.  Did that

23    impose an obligation?

24    A.  Yes.  That's what our role was in executing this

25    agreement, was to receive -- upon receipt of a transaction

Crain - Direct

1    list, compare the payments received from the beneficiary in

2    this case and then move it to that account.

3    Q.   Okay.  And the -- by moving them to the account, is

4    anybody protected?

5                MR. LAWRENCE:  Objection, calls for a legal

6    conclusion, foundation.

7                THE COURT:  Sustained.

8    BY MR. GLEESON:

9    Q.   Is there protection afforded to Palm Beach by this

10   provision in the agreement?

11   A.   Yes, the --

12               MR. LAWRENCE:  Same objection.

13               THE COURT:  Sustained.

14   BY MR. GLEESON:

15   Q.   The transaction list you mentioned -- was this agreement

16   eventually executed?

17   A.   Yes, the agreement was executed.

18   Q.   Did M&I Bank ever receive a transaction list?

19   A.   Not that I'm aware of, no.

20   Q.   Did it ever receive a complaint from anyone that a

21   transaction list hadn't been received?

22               MR. LAWRENCE:  Objection, relevance.

23               THE COURT:  Overruled.

24               MR. GLEESON:  I'm sorry?

25               THE COURT:  I said, "Overruled."

1          THE WITNESS:  No.

2    BY MR. GLEESON:

3    Q.  You worked with Chris Flynn?

4    A.  Yes.

5    Q.  You got to know him?

6    A.  Yes.

7    Q.  Did you find him to be honest?

8    A.  Yes.

9    Q.  Ever give you any reason to question his honesty?

10   A.  No.

11          MR. LAWRENCE:  Objection, improper character.

12          THE COURT:  Sustained.

13          MR. GLEESON:  Excuse me?

14          THE COURT:  Sustained.

15          MR. GLEESON:  Can I approach?

16          THE COURT:  You may.

17      **(At sidebar)**

18          MR. GLEESON:  Under 608(b) of the Federal Rules of

19   Evidence, if somebody's honesty is attacked, I'm permitted

20   to elicit testimony about his honesty.  This is from a

21   person who knows him.

22          Chris Flynn was the person who was accused of

23   editing a MIContact report, of destroying a document.  He

24   had the judge's protective order read to him on that witness

25   stand as though he had violated that order.

1              THE COURT:  As though he --

2              MR. GLEESON:  As though he had violated that order

3      by editing a MIContact report.  His honesty was directly

4      challenged by Mr. Marder's questioning.  And I'm permitted,

5      I respectfully suggest to the Court, to elicit testimony

6      about his truthfulness from someone in a position to know.

7              MR. LAWRENCE:  Your Honor, although there has been

8      questions in evidence about Mr. Flynn's conduct, his honesty

9      or his character for truthfulness has not been put at issue.

10     So under the rules we have not opened the door to this type

11     of character evidence and we would request that the last two

12     questions and answers -- I believe it's two -- be struck.

13             THE COURT:  Anything else?

14             MR. GLEESON:  Nothing could go more to the heart

15     of somebody's honesty than the accusation that they edited a

16     document and then destroyed a document in defiance of a

17     court order.  There's nothing more dishonest than that.

18             THE COURT:  I will sustain the objection.

19             MR. LAWRENCE:  And, Your Honor, will you strike

20     the last two answers about his character?

21             THE COURT:  I will.

22         **(In open court)**

23             MR. LAWRENCE:  Your Honor, I renew my motion to

24     strike the, I believe, last two answers.

25             THE COURT:  The last two answers are stricken.

1     You are not to consider those answers in your deliberations

2     or consideration of this case.

3                 MR. GLEESON:  May I continue, Judge?

4                 THE COURT:  You may.

5     BY MR. GLEESON:

6     Q.  In connection with this Deposit Account Agreement, you

7     were -- were you involved in it every step of the way?

8     A.  I think for the most part, yes.

9     Q.  Okay.  Were you -- did Chris Flynn keep you in the loop?

10    A.  Yes, he did.

11    Q.  Okay.  Did you ever observe any indication that he was

12    hiding his work from you?

13                MR. LAWRENCE:  Objection, same basis as before and

14    relevance.

15                THE COURT:  Overruled.  You may answer.

16                THE WITNESS:  No.

17    BY MR. GLEESON:

18    Q.  Did you ever observe any indication that he altered bank

19    records?

20                MR. LAWRENCE:  Objection, foundation, improper.

21                THE COURT:  Establish the foundation.

22    BY MR. GLEESON:

23    Q.  Did you make observations of Chris Flynn in the

24    workplace?

25    A.  Yes.

```
 1    Q.  Did he say things to you?

 2    A.  Yes.

 3    Q.  Did you say things to him?

 4    A.  Yes.

 5    Q.  Did you see him in the workplace?

 6    A.  Yes.

 7    Q.  Did you ever make any observation that indicated to you

 8    that he altered bank records?

 9              MR. LAWRENCE:  Objection, foundation, improper

10    character testimony.

11              THE COURT:  Sustained.  Counsel, move on.

12    BY MR. GLEESON:

13    Q.  You left the bank in 2012?

14    A.  Yes.

15    Q.  Ten years ago?

16    A.  Yes.

17    Q.  Okay.  Do you know the law -- that this lawsuit was

18    filed in that year?

19    A.  Yes.

20    Q.  You left for Bremer Bank, correct?

21    A.  Correct.

22    Q.  Okay.  And to a degree, you stayed involved in this

23    lawsuit?

24    A.  Yes.

25    Q.  You were -- were you deposed?
```

Crain - Direct

```
 1    A.  Yes.

 2    Q.  Okay.  And you are here today?

 3    A.  Yes.

 4    Q.  Are you familiar, generally, with the allegations?

 5    A.  Yes.

 6    Q.  Between the period of June of 2007 and the end of

 7    September of 2008, were you at M&I Bank?

 8    A.  Yes.

 9    Q.  Were you in senior management at the bank?

10    A.  Yes.

11    Q.  Allegations in this case are serious, correct?

12    A.  Yes.

13    Q.  Did you take them seriously?

14    A.  Yes.

15    Q.  You know the bank was charged by Mr. Kelley of having

16    actual knowledge of the Ponzi scheme while it was underway?

17             MR. LAWRENCE:  Objection, assumes facts not in

18    evidence and legal conclusion.

19             THE COURT:  Sustained.

20             MR. GLEESON:  Excuse me, Judge.  I just want to

21    refresh.

22        (Defendant's counsel confer)

23    BY MR. GLEESON:

24    Q.  Do you recall the allegations in the Complaint in this

25    case in 2012?
```

 1    A.  Yes.

 2    Q.  Okay.  You were part of senior management during the

 3    period that those allegations related to, correct?

 4    A.  Yes.

 5    Q.  Okay.  Did the allegations include the contention by

 6    Mr. Kelley that the bank had actual knowledge of the Ponzi

 7    scheme while it was underway?

 8              MR. LAWRENCE:  Objection, relevance, misstates

 9    facts, calls for legal conclusion.  And we may need a

10    sidebar on this, Your Honor.

11              THE COURT:  I will sustain the objection.

12              MR. GLEESON:  Can I have a sidebar on it, please?

13              THE COURT:  We'll take our midafternoon break,

14    Members of the Jury.

15              Members of the Jury, please remember to not

16    discuss this case with anyone, including other jurors,

17    members of your family, other people involved in the trial.

18              And when I indicate don't discuss the case with

19    anyone, please also remember not to do any kind of text

20    messaging, blogging, or other types of communication, oral

21    or written, as I have instructed you before.  Do not consult

22    any references or read any newspaper articles or anything

23    like that.

24              You must keep an open mind free of outside

25    information, and you understand your oath that you've taken

Crain - Direct

1    and that it requires you to do just that.

2            So we will take our break now and begin to --

3    we'll plan to return to the courtroom at five minutes after

4    3:00.  Have a good break.

5            THE LAW CLERK:  All rise for the jury.

6                        **IN OPEN COURT**

7                     **(JURY NOT PRESENT)**

8            THE COURT:  And you are excused from the witness

9    stand during this break.

10           We'll take up the issue that needs to be taken up

11   at this time, if there is one.

12           MR. GLEESON:  Yes.  I'll wait for the witness to

13   be excused.

14      (Witness excused from courtroom)

15           MR. GLEESON:  Can I be heard on this last

16   objection that was sustained, Judge?

17           THE COURT:  The Court has addressed that.  I

18   thought there were other issues that needed to be addressed.

19   No?

20           MR. GLEESON:  I would like to address that.  I

21   would like to apply to the Court and to listen to the

22   reasons why that objection should not have been sustained,

23   if I can make a record, at least.  May I, please?

24           THE COURT:  You may.

25           MR. GLEESON:  Mr. Kelley was allowed to testify

 1     last week about why he brought his lawsuit, and he said he

 2     had a good-faith basis to bring this lawsuit.  But this

 3     lawsuit is not just a claim that M&I Bank, quote, should

 4     have investigated more fully.  I think they should have

 5     reported this to the feds, closed quote, that's what

 6     Mr. Kelley testified to.  That's the lawsuit he said he

 7     brought in good faith.  Incidentally -- and this is our

 8     Rule 50 motion -- that lawsuit should be dismissed.

 9             But the really important thing, Your Honor, is I

10     want to ask questions that shed further light on what this

11     lawsuit that Mr. Kelley said he brought in good faith is or

12     maybe was until his direct testimony in the case.

13             In both the original Complaint and the -- in 2012

14     and the Amended Complaint in 2016, the same sentence is

15     present.  It's in paragraph 97 of the original Complaint,

16     which is docketed on November 14th, 2012, that M&I had

17     actual knowledge of the fraud.  That very serious

18     allegation -- it was repeated in paragraph 161 of the

19     Amended Complaint in 2016 right before the depositions.

20             That extremely serious allegation has permeated

21     this case for a decade until last Thursday when Mr. Kelley

22     changed course, apparently.  There's been no formal

23     withdrawal.  But you heard his testimony as well as the rest

24     of us.  And the -- it actually affected the trial.  It's

25     been part of the trial.

1           Chris Flynn was accused of entering into that DACA

2    agreement -- it's a DAMA, Deposit Account Management

3    Agreement -- without telling his boss.  He's accused of

4    editing MIContacts reports.  He was accused, in front of the

5    jury, of -- by the questioning of Mr. Marder of violating

6    the court order.

7           And when Mr. Kelley said -- was asked whether,

8    last Thursday, whether he was claiming that M&I employees

9    knew there was a Ponzi scheme going on, he said no.  That

10   may be true now, but that -- there was no good-faith basis.

11          He was able to sit there, Judge, after having

12   provided his qualifications and his life experience, and say

13   that he thought essentially -- he thought carefully what was

14   appropriate and he brought this lawsuit in good faith.

15          THE COURT:  Counsel, what's the basis for your

16   argument?

17          MR. GLEESON:  My basis for the argument is I want

18   the jury to know what this lawsuit that Mr. Kelley claims to

19   have brought in good faith actually consisted of.  He

20   mentioned half of it, a part of it.  We think it's important

21   and relevant to how the case was presented and to undermine

22   his testimony.

23          THE COURT:  Understood.  I'll hear opposing

24   argument, and then we will take our break.

25          MR. LAWRENCE:  I will be brief, Your Honor.

Crain - Direct

1           The scope of the pleadings is not what's at issue.

2    This is just a preview of the Rule 50 argument they are

3    trying to make.

4           The problem is that this witness is offering

5    opinion testimony about the allegations in this Complaint.

6    She's not an appropriate witness to do that.  One, she can't

7    provide opinion testimony on this issue.  She's not a

8    representative of the bank.  She was not a representative of

9    the bank at the time that the Complaint was filed.

10          So she lacks foundation to talk about this in the

11   first place, but it's also just improper opinion.  So even

12   if it was permitted for them to make this sort of argument

13   with a witness, this is not the witness that they should do

14   it with.

15          The reason why I hesitantly asked for a sidebar

16   when I raised the objection was to caution the Court that we

17   believe this entire line of questioning is improper.

18          MR. GLEESON:  This is no opinion.  This is a fact.

19   These are Mr. Kelley's allegations.  Over our objection,

20   Judge, he was permitted to tell the jury, Solomon-like, that

21   here is what he looked at, here's what he decided.  I

22   brought this in good faith.  I'm not saying they had actual

23   knowledge.  And that was wrong.  He created a misimpression

24   that, respectfully, we should be permitted to correct.

25          MR. LAWRENCE:  I will only add that they had the

 1       opportunity to cross Mr. Kelley and they did.

 2              THE COURT:  The objection is overruled -- is

 3       sustained, excuse me.

 4              THE LAW CLERK:  All rise.

 5          (Recess taken at 2:53 p.m.)

 6                          *    *    *    *    *

 7          (3:10 p.m.)

 8                          **IN OPEN COURT**

 9                          **(JURY PRESENT)**

10              THE COURT:  Good afternoon.  Please be seated.

11              MR. GLEESON:  May I continue, Judge Wright?

12              THE COURT:  Yes, you may.

13              MR. GLEESON:  Thank you.

14              Mr. Herzka, could you pull up Plaintiff's 705 in

15       evidence, please.

16       BY MR. GLEESON:

17       Q.  Ms. Crain, this is titled "Summary of Overdraft

18       Activity."  Do you see that?

19       A.  Yes.

20       Q.  Have you seen it before?

21       A.  Yes.

22       Q.  Okay.  When did you first see it?

23       A.  When I was preparing for trial.

24       Q.  Okay.  There are seven entries on the chart.

25              MR. GLEESON:  Thank you, Mr. Herzka.

1    BY MR. GLEESON:

2    Q.  Four of which are dated in 2008, correct?

3    A.  Yes.

4    Q.  Okay.  One is 2005.  Another is 2005.  And the last is

5    2003, correct?

6    A.  Yes.

7    Q.  The first three on the chart are dates before you were

8    at M&I Bank, correct?

9    A.  Yes.

10   Q.  Okay.  Have you personally been involved with those

11   bottom four transactions, the February 8th, February 14th,

12   August 4th, August 6th of 2008 transactions?

13   A.  Yes.

14   Q.  Okay.  Have you personally been involved in an

15   allegation that they were loans to PCI?

16   A.  Yes.  I had a chance to review them as part of an

17   affidavit I signed.

18   Q.  Okay.  In this case?

19   A.  No.  It was in a different case.

20   Q.  Okay.  Prior -- before this?

21   A.  Correct.

22   Q.  Brought by whom?

23   A.  I believe Bankruptcy Trustee Doug Kelley.

24   Q.  Okay.  When was that case?

25   A.  In 2010.

1    Q.  Okay.  Against whom?

2    A.  M&I Bank.

3    Q.  What happened to that case?

4              MR. LAWRENCE:  Objection, relevance and

5    foundation.

6              THE COURT:  Sustained.

7              MR. GLEESON:  May I approach, Judge?

8              THE COURT:  No.

9              MR. GLEESON:  No?

10             THE COURT:  No.  You may proceed with your

11   questioning.

12             MR. GLEESON:  Okay.

13   BY MR. GLEESON:

14   Q.  The -- did you have occasion back then to determine

15   whether the four transactions listed at the bottom of -- the

16   2008 transactions created a debtor/creditor relationship?

17   A.  Yes.

18             MR. LAWRENCE:  Objection [inaudible].

19             THE COURT REPORTER:  I don't think your microphone

20   is on.

21             THE COURT:  No.  I can't hear you.

22             MR. LAWRENCE:  My apologies.  The objection was to

23   foundation as to time.

24             THE COURT:  Sustained.

25   BY MR. GLEESON:

1   Q.  Did you look into those four transactions?

2   A.  Yes, I did.

3   Q.  Okay.  When for the first time?

4   A.  After the -- there was a case that was filed against M&I

5   Bank indicating that these were loans made by the bank --

6          MR. LAWRENCE:  Objection, relevance.  Move to

7   strike.

8          THE COURT:  Sustained.

9   BY MR. GLEESON:

10  Q.  The -- you're familiar with --

11         THE COURT:  Let me stop here.  Members of the

12  Jury, when I grant a motion to strike, that means you are

13  not to consider that information.  Okay?

14         You may proceed.

15         MR. GLEESON:  Thank you, Judge.

16  BY MR. GLEESON:

17  Q.  You're familiar with the process pursuant to which

18  checks get cleared at banks, correct?

19  A.  Yes, I am.

20  Q.  Okay.  And could you describe to the jury the process

21  when a check is presented to a bank and there are

22  insufficient funds in the checking account, in a deposit

23  account.

24  A.  Yes.  How it works is as checks are presented to -- and

25  go through an account for clearing, there's an -- and if

Crain - Direct

1     there aren't enough funds in the account, the customer has

2     an opportunity to make a deposit to fund those, anything

3     clearing the account, and they have until midnight of the

4     next day to do that.

5     Q.  So if a check comes in -- for clarity purposes, let's

6     try to give an example to the jury.  If a check comes in at

7     Tuesday at noon and there are insufficient funds in the

8     account to pay the check -- you with me so far?

9     A.  Yes.

10    Q.  -- what are the options that a bank has?

11    A.  The bank can either determine to pay it or return the

12    check.

13    Q.  Okay.  And if it's not paid and not returned, the check

14    is still at the bank, correct?

15    A.  Yes.

16    Q.  Okay.  And what are the -- what's the process if the --

17    at the end of the day there's insufficient funds in the

18    account?

19    A.  Can you please ask that question again?

20    Q.  Sure.  When, if ever, does such a check come -- become a

21    loan to the bank -- a loan to the customer, excuse me?

22    A.  Sure.  If the bank determined not to return the check

23    and there was not enough funds in the account to honor the

24    check, pay the check, the next day we would recognize an

25    overdraft or -- which would be essentially a loan to the

Crain - Direct

1    customer.

2    Q.  Okay.  And is there a time within which a customer can

3    present -- can put funds in the account sufficient to pay

4    the check?

5    A.  Yes.  They -- yes.

6    Q.  How long does the customer have to do that?

7    A.  They have until midnight of the following business day.

8    Q.  Okay.  And is that a matter of bank policy?

9            MR. LAWRENCE:  Objection, vague as to "bank" and

10   foundation.

11           THE COURT:  Overruled.  You may answer.

12           THE WITNESS:  It's both bank policy and it's under

13   the Uniform Commercial Code in how banks operate.

14   BY MR. GLEESON:

15   Q.  And we'll spare the jury much detail on what the Uniform

16   Commercial Code is, but can you tell us generally what --

17   that's referred to as the UCC, correct?

18   A.  Yes.

19   Q.  And can you tell us generally what the UCC is --

20           MR. LAWRENCE:  Objection.

21   Q.  -- as it relates to banking?

22           MR. LAWRENCE:  Objection, legal testimony and

23   improper opinion.

24           THE COURT:  Sustained.

25   BY MR. GLEESON:

1    Q.  Is that the law that establishes the bank's obligations

2    in this regard?

3              MR. LAWRENCE:  Objection.  Same basis as before,

4    plus leading.

5              THE COURT:  Sustained.

6    BY MR. GLEESON:

7    Q.  Is what you are saying about the insufficient funds and

8    having until the next day at midnight just a policy of the

9    bank or is it also the law?

10             MR. LAWRENCE:  Objection.  Same as before,

11   including leading.

12             THE COURT:  Sustained.

13   BY MR. GLEESON:

14   Q.  Okay.  If sufficient funds are put in the account by

15   midnight the next day and then the check is paid, does that

16   produce a loan to the customer?

17   A.  No, it does not.

18   Q.  Okay.  The check is paid and funds are placed into the

19   account at the right time, correct?

20   A.  Correct.

21             MR. LAWRENCE:  Objection, leading.

22             THE COURT:  Sustained.

23             MR. GLEESON:  I'm sorry?

24             THE COURT:  Sustained.  And asked and answered.

25   BY MR. GLEESON:

Crain - Direct

1    Q.  Did you have occasion to check the bank's records with

2    regard to each of the seven entries on this chart?

3    A.  I remember checking the bank's records for the ones in

4    2008, the four in 2008.

5    Q.  And in this -- since this -- since last Thursday have

6    you had occasion to check the accounts -- the bank's records

7    with regard to the first three?

8    A.  Yes.  All of them in that regard, yes.

9    Q.  Okay.  Can you describe to the jury what you determined

10   with regard to each of those transactions.

11   A.  That there was not -- they were not -- I would not deem

12   any of them as overdrafts.  They were not -- there was

13   always a positive balance on the day that we would have, you

14   know, looked at it in terms of determining the status of the

15   customer's account.

16   Q.  Did all of these transactions involve checks?

17   A.  Yes.

18          MR. GLEESON:  Mr. Herzka, could you pull up

19   Plaintiff's 1 at page 548, please, and if you could put it

20   side by side with the exhibit that was just up there.  Thank

21   you.

22   BY MR. GLEESON:

23   Q.  The --

24          THE COURT:  Counsel, for the record, the other

25   exhibit number, would you just identify that?

Crain - Direct

1          MR. GLEESON:  Yes, Judge.  It's Plaintiff's 1.

2          THE COURT:  Yes.  Compared to the other exhibit?

3          MR. GLEESON:  Oh, it's up there next to

4    Plaintiff's 705.

5          THE COURT:  Thank you.

6          MR. GLEESON:  Sure, Judge.

7    BY MR. GLEESON:

8    Q.  And the August 6th transaction on Plaintiff's 705

9    reflects a $115,906.72 negative balance, correct?

10   A.  Yes, it does.

11   Q.  Okay.  If you look to, on page 548 --

12         MR. GLEESON:  And maybe we can remove 705, please,

13   Mr. Herzka.

14   BY MR. GLEESON:

15   Q.  If you look at Plaintiff's 1 at 548 on August 6th, do

16   you see three checks there on August 6th?

17   A.  Yes, I do.

18         MR. GLEESON:  And if you can tighten up that box,

19   please, and focus just on the checks, Mr. Herzka.

20   BY MR. GLEESON:

21   Q.  This reflects checks coming into the account on

22   August 6th, correct?

23   A.  Yes, it does.

24   Q.  Okay.  And then on the right side, at the end of the

25   August 6th entries, you see that negative balance of

1    115,906.72, correct?

2    A.  Yes.

3    Q.  The -- then right below that, the closing balance on

4    August 7th is what?

5    A.  757,567.94.

6    Q.  So by the end of August 7th there was a positive balance

7    in the deposit account, correct?

8    A.  Correct.

9    Q.  How does that bear on whether the debit of 115,906.72 at

10   the end of August 6th was a loan or not?

11              MR. LAWRENCE:  Objection, legal conclusion, as

12   well as improper opinion with respect to information the

13   witness did not contemporaneously look at.

14              THE COURT:  Overruled.  You may answer if you can.

15              THE WITNESS:  Sure.  So we, the bank -- if you

16   look at the three checks at the very top of this, one for

17   113, one for 64, one for 32,000, all of those the bank had

18   an opportunity to return by the following day to avoid an

19   overdraft.  Enough deposits came in on the 7th where that

20   wasn't necessary to do.

21   BY MR. GLEESON:

22   Q.  And so there were sufficient funds by midnight the

23   following day?

24   A.  Correct.

25   Q.  Okay.  Does that mean it did not become a loan?

Crain - Direct

1    A.  Yes.

2    Q.  Okay.  Did you conduct a similar analysis with regard to

3    all seven of the transactions on Plaintiff's 705?

4    A.  Yes.

5    Q.  Okay.  You testified earlier --

6              MR. GLEESON:  May I please approach, Your Honor?

7              THE COURT:  You may.

8          **(At sidebar)**

9              MR. GLEESON:  Judge, I just want to make an offer

10   of proof just so the record reflects what's been precluded.

11             In 2010 Mr. Kelley sued the bank, contending that

12   those four transactions in 2008 were alarms.  There was some

13   back and forth between his lawyers and the lawyers for the

14   bank.

15             Ms. Crain provided a declaration, provided it to

16   Mr. Kelley's lawyers; and eight days later, because of her

17   declaration, they dismissed the lawsuit because these are

18   not loans under the UCC.  You have what's called the

19   midnight rule in the UCC.  They were never loans, and

20   Mr. Kelley recognized that and dismissed the lawsuit.

21             But his expert witness, all these years later, has

22   identified those same four transactions as loans.

23   Obviously, as a factual matter we've established that they

24   are not and we can argue that in front of the jury.

25             But we think it's very important -- when the

```
 1    plaintiff in the case brings a lawsuit and then dismisses it

 2    and his lawyers are provided with a declaration identical to

 3    her testimony and then later on has his own expert provide

 4    the same allegation, the inference is he recognized then

 5    that it was essentially frivolous -- it was frivolous.

 6    These are not loans in any respect.

 7            But he recognized that and then he had his own

 8    expert, contrary to the resolution of that 2012 case

 9    involving the same parties, involving this witness, had his

10    own expert come forth and provide her testimony that this

11    was improper activity, these were gargantuan loans that were

12    a gigantic red flag and it wasn't presented to the loan

13    committee.

14            It was irresponsible and it undermines the

15    expert's testimony in a way that is -- to my mind and to our

16    mind, we're deprived of arguing that to the jury.  That's

17    the offer of proof I wanted to make.  The very same trustee,

18    very same plaintiff abandoned these claims ten years ago

19    because they were frivolous and here they are.  We should be

20    permitted to argue that to the jury.

21            Thank you.

22        (In open court)

23    BY MR. GLEESON:

24    Q.  Ms. Crain, did you ever have any contact in person with

25    any of the people at PCI?
```

1    A.  I did not.

2    Q.  Okay.  Did you ever speak to them by phone?

3    A.  No, I did not.

4    Q.  Did you ever receive any benefits of any sort from or on

5    behalf of PCI?

6    A.  I did not.

7    Q.  No one took you to dinner or gave you Twins tickets or

8    paid you some money, anything like that?

9    A.  No.

10           MR. GLEESON:  Okay.  Thank you.  I have no further

11   questions of this witness.

12           THE COURT:  Anything further for this witness?

13           MR. LAWRENCE:  Yes, Your Honor.  May we have a

14   moment just to set up?

15           THE COURT:  Yes, you may.

16           MR. LAWRENCE:  Thank you.

17       (Pause)

18           MR. LAWRENCE:  May I proceed, Your Honor?

19           THE COURT:  You may.

20                      **CROSS-EXAMINATION**

21   BY MR. LAWRENCE:

22   Q.  Good afternoon, Ms. Crain.

23   A.  Good afternoon.

24   Q.  You've heard me talking from over there, but we haven't

25   really been able to see one another.  My name is Ryan

1    Lawrence.  I represent the trustee.

2              You said during your direct examination that you

3    didn't join M&I Bank until June of 2007, correct?

4    A.  Correct.

5    Q.  And you recall that the FBI raid that shut down the

6    Petters scheme took place in September of '08?

7    A.  Yes.

8    Q.  So you were only at M&I for approximately a year and

9    three months during the time period that -- you know, prior

10   to that FBI raid, right?

11   A.  Correct.

12   Q.  Okay.  And it was sort of at the very end of the Ponzi

13   scheme that you were at M&I Bank?

14   A.  Yes, that's the time frame I was there.

15   Q.  Okay.  And is it fair to say that you didn't have very

16   much personal knowledge about what was happening with

17   respect to PCI's account at M&I Bank during the time that

18   you worked there?

19   A.  I didn't work on it directly, no.

20   Q.  And you were -- you said Chris Flynn reported to you,

21   correct?

22   A.  Yes.

23   Q.  Okay.  And you were relying on Mr. Flynn to keep you

24   apprised of anything important about the PCI account that

25   would need to be brought to your attention; fair?

Crain - Cross

1    A.  Yeah.  Generally, yes.

2    Q.  He -- you expected him to know his customers' business?

3    A.  I would expect him to know what he needed to do to take

4    care of the current relationship, yes.

5    Q.  And that involves knowing about his customers' business;

6    fair?

7    A.  For the nature of the business we had as a depository

8    account, yes.  It depends on the types of transactions and

9    relationship you have with the customer that defines that, I

10   guess.

11   Q.  Regardless of the type of relationship that the bank has

12   with the customer, knowing your customers' business is just

13   part of being a good banker, right?

14   A.  Understanding their industry that they are in generally,

15   yes.

16   Q.  And that means understanding their business; fair?

17   A.  I guess I would -- I'm not sure if I understand the

18   nature of the question in terms of what you are asking me

19   that he would understand.

20   Q.  Ms. Crain, do you recall that you were deposed in this

21   matter?

22   A.  Yes.

23   Q.  And you were under oath during that deposition, right?

24   A.  Yes.

25   Q.  And you provided truthful testimony?

Crain - Cross                                                          2637

1    A.  Yes.

2              MR. LAWRENCE:  Permission to approach the witness,

3    Your Honor?

4              THE COURT:  You may.

5        (Document handed to witness)

6              MR. LAWRENCE:  Permission to approach the bench,

7    Your Honor?

8              THE COURT:  You may.

9        (Document handed to the Court)

10   BY MR. LAWRENCE:

11   Q.  Ms. Crain, what I have handed you is a copy of your

12   deposition transcript dated December 18th, 2017.  Do you see

13   that in front of you?

14   A.  I do.

15   Q.  I'm going to direct your attention --

16             MR. LAWRENCE:  I'm sorry, Counsel.  Do you need a

17   copy?

18             MR. GLEESON:  I do not.

19   BY MR. LAWRENCE:

20   Q.  I'm going to direct your attention to page 29 of that

21   transcript.  If you could just let me know when you are

22   there.

23   A.  Okay.

24   Q.  And in that deposition were you asked this question and

25   did you provide this answer?

1        "Question:  So knowing your customers' business is just

2    part of being a good banker?

3        "Answer:  Correct."

4    A.  Yes.

5    Q.  You can set that aside for now.

6            That being -- the knowing your customers' business

7    is part of being a good banker, that was true during your

8    time at M&I, right?

9    A.  Yes.

10   Q.  And it's still true now?

11   A.  Yes.

12   Q.  Okay.  In fact, understanding a customer's business is

13   particularly helpful in trying to cross-sell products and

14   services to the customer; fair?

15   A.  Yes.

16   Q.  And when you were in charge of the business banking

17   group at M&I for the Minnesota region, you expected your

18   business bankers to cross-sell?

19   A.  Yes.

20   Q.  On direct I believe you testified that that was one of

21   the expectations that you had of Mr. Flynn in particular?

22   A.  Yes.

23   Q.  And knowing your customer, it's not just important for

24   cross-selling purposes.  It's also important for anti-money

25   laundering purposes as well, right?

1    A.  Well -- I'm sorry.  I'm not understanding the question.

2    Q.  Yeah.  Knowing -- so knowing your customer is important

3    for anti-money laundering purposes; is that correct?

4    A.  Comprehensively, yes.

5    Q.  So having a comprehensive understanding of your customer

6    is important for AML purposes?

7    A.  It -- knowing -- understanding the nature of the

8    customer's industry and business, yes.

9    Q.  That's just standard protocol in the banking industry?

10   A.  Yes.  And we -- yes.

11   Q.  Would you agree that the bank's employees, from the

12   people in the AML room all the way up to the business

13   bankers, they are the bank's first line of defense to

14   prevent fraud or other criminal activity that is being

15   routed through the bank?

16   A.  I would characterize it as those in the AML Group, as

17   you referenced, would be the first individuals to manage all

18   that.  I would not expect a business banker to have the same

19   information an AML group would have.

20   Q.  That doesn't mean, however, that the business banker has

21   no responsibility with respect to AML compliance, right?

22   A.  They don't have -- they don't get the same information

23   that an AML group would have.

24   Q.  I appreciate that, but my question is a little bit

25   different.  It's that the business bankers still have AML

1    responsibilities, right?

2    A.  Yes, yes, to be aware --

3    Q.  They are not allowed to just do nothing?

4    A.  Yes.

5    Q.  And I think on direct you testified that it's good for a

6    business banker to be curious?

7    A.  Yes.

8    Q.  And Chris Flynn, you said, was a good business banker?

9    A.  Yes.

10   Q.  So he, too, was curious?

11   A.  Yes.

12   Q.  And despite that, Mr. Flynn never told you that anything

13   suspicious was going on with respect to PCI's account at

14   M&I, did he?

15   A.  I don't know that Mr. Flynn had any information to give

16   me that information.

17   Q.  And I'm not asking you what Mr. Flynn knew.  He was

18   here; he testified.  I'm simply asking you whether --

19           MR. GLEESON:  Objection to the prefaces to the

20   Question, Judge.

21           MR. LAWRENCE:  Withdrawn.

22           THE COURT:  Overruled.

23   BY MR. LAWRENCE:

24   Q.  Let me start over.  I'm only asking you whether

25   Mr. Flynn ever communicated to you that there was suspicious

1    activity in PCI's account at M&I Bank.

2    A.  No, he did not.

3    Q.  Okay.  He never told you that PCI was doing business

4    with a money launderer?

5    A.  I don't have any reason to believe he would have had

6    that information to share that with me, no.

7    Q.  Again, my question is different.  I'm not asking you

8    what Mr. Flynn knew or did not know.  I'm only asking you

9    whether he ever shared with you that PCI was doing business

10   with a money launderer.

11              MR. GLEESON:  Objection to the form of the

12   question, "shared."

13              THE COURT:  Overruled.

14              MR. GLEESON:  Assumes facts not in evidence.

15              THE COURT:  Overruled.  You may answer the

16   question.

17              THE WITNESS:  Can you please ask the question

18   again?  I want to make sure I'm understanding the context of

19   the question.

20   BY MR. LAWRENCE:

21   Q.  Did Mr. Flynn ever share with you that PCI was in

22   business with a money launderer?

23   A.  No.

24   Q.  Okay.  Did Mr. Flynn ever share with you that there were

25   billions of dollars going in and out of the PCI account at

1    M&I on a regular basis?

2    A.  No.

3    Q.  Did you know that billions of dollars was going in and

4    out of the account?

5    A.  No.

6    Q.  Because you didn't have that level of personal

7    involvement on the ground with the account?

8    A.  None of us would in business banking, no.

9    Q.  So I assume, then, that nobody told you that even though

10   there were billions going in and out of the account, the

11   actual balances in the account were relatively small

12   compared to that?

13   A.  Yes.

14   Q.  Yes, nobody told you that?

15   A.  I'm sorry.  Please ask the question again.

16   Q.  Yeah.  Nobody at M&I Bank informed you that although

17   there were billions of dollars going in and out of the PCI

18   account, the actual end-of-day balances were relatively

19   small?

20   A.  That was the case, yes.  I mean, no one told me anything

21   other than I saw the average balance, yes.

22   Q.  So you knew the average balance was small?

23   A.  Yes.

24   Q.  What you did not know was the billions moving in and

25   out?

 1    A.  Correct.

 2    Q.  Mr. Flynn never told you that the transactions in the

 3    PCI account were inconsistent with the business model as the

 4    bank understood it?

 5    A.  I don't know that we considered it inconsistent with the

 6    nature of Petters' business.  I wouldn't characterize it

 7    that way, no.

 8    Q.  Again, not my question, Ms. Crain.  I'll try to be

 9    clear.  Mr. Flynn never raised to you a concern that the

10    activity in the account was inconsistent with his

11    understanding of what he would have expected to be going on

12    in the account?

13              MR. GLEESON:  Object, I object.

14              THE COURT:  Overruled.

15              THE WITNESS:  No, he never -- we never had a

16    conversation in that regard.

17    BY MR. LAWRENCE:

18    Q.  And you testified at the very end of your direct

19    examination that you were actually aware of the large

20    overdrafts in the account in 2008, right?

21    A.  They were not overdrafts.

22    Q.  Well, I understood your testimony was that you don't

23    characterize them as loans in your view, right?

24    A.  I -- they are one and the same.

25    Q.  So your testimony is that even though there was a

1   negative balance on the account, it was not an overdraft

2   because the following day money was replenished into the

3   account?

4   A.  Yes, they would not be -- fall into a category of an

5   official overdraft or loan because we still had an

6   opportunity to return a check.  So they were in a

7   nonsufficient funds status, and then we had until the next

8   business day to determine whether to return them.  And If we

9   did not return them and funds weren't deposited, that's when

10  an overdraft would be created.

11  Q.  So you were aware that there were instances where the

12  PCI account had nonsufficient funds in the hundreds of

13  thousands of dollars, including at times over a million

14  dollars?

15  A.  As I prepared for the affidavit and for court, yes.

16  Q.  I thought you said that contemporaneously, in 2008 when

17  you were working at the bank and those nonsufficient fund

18  instances happened, that you were aware of that.  Are you

19  saying you didn't know?

20          MR. GLEESON:  Objection, mischaracterizes her

21  testimony.

22          THE COURT:  Overruled.  You may answer the

23  question.

24          THE WITNESS:  I did not get that type of

25  information on a daily basis.  We got an daily overdraft

1    report, and there were never any overdrafts for those

2    accounts.

3    BY MR. LAWRENCE:

4    Q.  Do you remember discussing with Mr. Flynn any instances

5    in which PCI had insufficient funds in the account in the

6    hundreds of thousands or million dollar range?

7    A.  I do not.

8    Q.  He never told that to you?

9    A.  No.

10   Q.  And I know that Mr. Jambor was only -- he only had brief

11   overlap with you, but he never reported anything suspicious

12   about PCI's account to you either, right?

13   A.  No.

14   Q.  He never told you that there were checks being paid out

15   of the account for millions of dollars to PCI's insiders?

16   A.  Mr. Jambor wouldn't have had that information, but no.

17   Q.  He never told you that there were checks to insiders in

18   the amounts of millions of dollars?

19   A.  No.

20   Q.  And those are all -- assuming those happened, those are

21   all indicators of suspicious activity, right?

22   A.  For people who had that information, yes.

23   Q.  Yeah.  So those are signs of suspicious activity?

24   A.  Are you saying that Mr. Jambor had that information?

25   I'm sorry.  I'm not following.

1   Q.  No, Ms. Crain.  I'm asking you -- let me -- let's go

2   step by step.

3            Is a bank's customer doing business with a money

4   launderer suspicious?

5            MR. GLEESON:  Objection.  Can I approach?

6            THE COURT:  You may.

7       **(At sidebar)**

8            MR. GLEESON:  This is outside the scope of the

9   direct.  It's also just summing up.  Counsel is summing up

10  his case.  He's not asking her a question.  There's no

11  foundation for the question is the bank officer doing

12  business with a money launderer suspicious.  That's the

13  subject of expert testimony.

14           I've been very narrowly circumscribed in my

15  examination to the testimony of this witness as a percipient

16  witness to discrete factual events.  What you are seeing now

17  is bouncing off this witness the themes of the plaintiff's

18  case, not asking her for events that she participated in.  I

19  was certainly not permitted to ask her to conjecture, to

20  provide testimony about what would have happened if events

21  came to her attention.

22           So I object on those grounds.

23           MR. LAWRENCE:  Two responses.

24           First, on the direct they elicited testimony that

25  she supervised Mr. Flynn and that he was a good business

1    banker.  This is legitimate cross-examination about what she

2    saw or didn't see in her supervisory capacity at the bank.

3              Second, we have been going through this trial

4    where the cross-examinations are not limited to the scope of

5    the direct because we are only calling witnesses once.  In

6    theory, we could call this witness as a rebuttal witness,

7    but we are only going to call them a single time, so we

8    believe we should be given latitude with respect to the

9    scope of cross.

10             MR. GLEESON:  The last argument is false.  She was

11   not on their witness list.  So the notion that we can go

12   beyond the scope of direct when they call one of our

13   witnesses just doesn't apply here.

14             THE COURT:  Yeah, I agree.  So that's not a basis

15   for my ruling.

16             MR. GLEESON:  He --

17             THE COURT:  Go ahead.

18             MR. GLEESON:  And he's -- I'm sorry to interrupt

19   the Court.

20             THE COURT:  Go ahead.

21             MR. GLEESON:  And he's not asking her about facts.

22   He's asking her just to give her opinion about the bank

23   doing business with a money launderer.  It's not -- there's

24   no factual information being elicited from the witness, and

25   these questions are utterly at odds with the boundaries in

1   which my direct examination was constrained.

2             MR. LAWRENCE:  One more point, Your Honor.  There

3   was an entire section of the direct examination about how

4   much time she spent in the banking industry and her

5   familiarity with the banking standards.  So, again, I think

6   this is fair cross-examination, Your Honor.

7             THE COURT:  I overrule the objection only for

8   purposes of the last point that you made.  You need to keep

9   it close and you need to move forward.

10            MR. LAWRENCE:  Understood, Your Honor.  I will.

11            **(In open court)**

12   BY MR. LAWRENCE:

13   Q.  Thank you, Ms. Crain.  I believe the last question that

14   I'd asked you was that it would be suspicious for a bank's

15   customer to be doing business with a money launderer, right?

16   A.  If you knew you were -- they were working with a money

17   launderer, yes, certainly.

18   Q.  That's a sign of suspicious activity?

19   A.  I mean, I have no -- I don't know that any of us knew

20   that anybody was doing business with a money launderer, so

21   it feels like a very general question.  But, yes, if

22   someone -- one of your customers, any one of your customers

23   is working with a money launderer, that would be suspicious,

24   yes.

25   Q.  And it's suspicious if the company is paying billions of

1    dollars to its insiders?

2    A.  It depends on the nature of their business.

3    Q.  It's suspicious if there's billions of dollars moving in

4    and out of the account on the same day in equivalent

5    amounts?

6    A.  It's unusual activity, but it does depend on the

7    business.

8    Q.  And were you aware that the Searchspace software for

9    every month from 2005 to 2008 was setting off alerts for the

10   9018 account?

11            MR. GLEESON:  Objection, foundation.

12            THE COURT:  Overruled.

13            THE WITNESS:  I wasn't at the bank until 2007, but

14   I was not aware of anything, no.

15   BY MR. LAWRENCE:

16   Q.  So from the period June 2007, when you joined the bank,

17   to September of 2018, you were not aware of the AML alerts

18   going off?

19   A.  Did you say AML alerts?  No.

20   Q.  Nobody from M&I's AML Monitoring Group ever contacted

21   you about the activity in the account?

22   A.  They did not.

23   Q.  But they would have known that they could have reached

24   out to the business bankers if they had questions; fair?

25   A.  Yes.

Crain - Cross

1    Q.  Fair to say that M&I Bank saw -- or let me ask you a

2    different question.

3              Did you see Tom Petters as a business development

4    opportunity for M&I Bank?

5    A.  Yes.

6    Q.  And is it your understanding that Chris Flynn saw Tom

7    Petters as a business development opportunity?

8    A.  Tom Petters' company, yes.

9    Q.  In fact, I believe you said on direct examination that

10   during the time at which you worked at M&I Bank, the bank

11   was trying to increase its presence in Minnesota, right?

12   A.  Yes, that's correct.

13   Q.  And that means acquiring more clients within the state?

14   A.  Yes, that's correct.

15   Q.  High-profile clients?

16   A.  Any clients that fit the opportunity for the

17   organization, sure.

18   Q.  And I think you said that Tom Petters was a well-known

19   person at the time, especially within Minnesota; fair?

20   A.  Yes.  I believe he was a well-known person, yes.

21   Q.  He had a lot of different businesses?  You testified

22   about Sun Country and Fingerhut?

23   A.  Correct.

24   Q.  Okay.  So he would have -- you know, getting more

25   business from Tom Petters would have been a good way for the

Crain - Cross

1    bank to improve its presence in Minnesota; fair?

2    A.  Yes.

3    Q.  And that is principally -- withdrawn.  Let me ask

4    something different.

5              If you could turn to P-26.  It was one of the

6    documents that Mr. Gleeson asked you about.

7    A.  Okay.

8    Q.  And this was the e-mail between you and Chris Flynn with

9    the MIContact.  And if we can go to page 3, you remember

10   looking at this, right?

11   A.  Yes, I do.

12   Q.  And you said during your direct examination that Mark

13   Laumann, Jim Wehmhoff, and Tom Salmen were employees of PCI?

14   A.  Yes, that was my understanding.

15   Q.  Okay.  Do you know that for certain?

16   A.  Yes.  It indicates that Chris met with the company,

17   Petters Company, Inc., and he met with these individuals.

18   Q.  Okay.  But your understanding is just based on the fact

19   that this MIContacts is filed under Petters Company, Inc.,

20   right?

21   A.  Yes.

22   Q.  You don't have any independent knowledge about what

23   Mr. Laumann, Mr. Wehmhoff, or Mr. Salmen would have done for

24   PCI?

25   A.  I don't know what their roles were, no.

1    Q.  And when we were talking about this document, I heard

2    you say on direct that one of the reasons that the bank did

3    not move forward with any of the opportunities described on

4    page 3 of Exhibit P-26 and extending onto page 4 was that

5    the bank didn't have any financial information on PCI.  Is

6    that what you said?

7              MR. GLEESON:  Objection to the characterization of

8    the testimony.

9              THE COURT:  Overruled.  You may answer if

10   that's -- the question that was asked.

11             THE WITNESS:  I'm not sure if it was in relation

12   to these particular requests.  There was at some point in

13   time a loan request and that we did not get financial

14   information.  I can't recall which request that was for.

15   BY MR. LAWRENCE:

16   Q.  And so I want to make sure that we're on the same page

17   about what you mean by "financial information."

18             So you're not saying that the bank didn't have

19   access to financial information about what was happening in

20   the PCI account at the bank, right?

21   A.  By "financial information" I mean proprietary

22   information to that customer that they would provide us.

23   Q.  So you're talking about the types of materials that

24   would be provided in a loan application?

25   A.  Correct.

Crain - Cross

1   Q.  The bank did, however, have access to all of the

2   transaction activity with respect to PCI's account at the

3   bank, right?

4   A.  Different departments of the bank, yes.

5   Q.  Yes.  So this exhibit more broadly, P-26, fair to say

6   that Mr. Flynn was flagging this as some, in his words,

7   large money opportunities and you agreed that these were

8   some good-sized opportunities?

9   A.  Yes.

10  Q.  You can set that aside.

11       And if I could -- sorry.  One more question.

12  Those opportunities -- those good-sized opportunities were

13  with Tom Petters?

14  A.  They were with Tom Petters' company, yes.

15  Q.  And this was the type of business development that you

16  expected Chris Flynn to be doing?

17  A.  Yes.

18  Q.  Okay.  If you could turn in the binder that we provided

19  to you just recently, not that one that you used before, to

20  tab P-277.

21       MR. LAWRENCE:  And, Ms. Ellig, please don't

22  display this.  This is not yet admitted.

23  BY MR. LAWRENCE:

24  Q.  Let me know when you are there.

25  A.  Yes, I'm here.

1   Q.  Do you recognize this document?

2   A.  Yes.  It's an e-mail exchange.

3   Q.  Okay.  And who is it an e-mail exchange involving?

4   A.  It is involving myself and -- starting at the bottom

5   here, myself, some of the team leaders that worked for me,

6   and ends with an e-mail between Chris Flynn and myself.

7           MR. LAWRENCE:  We offer P-277 into evidence.

8           MR. GLEESON:  No objection.

9           THE COURT:  Exhibit P-277 is received.

10  BY MR. LAWRENCE:

11  Q.  So if we could start on -- let's start at the very

12  bottom of page 2, and this is going to be the first e-mail

13  in the chain at the very bottom.  It looks like it is from

14  Gigi Gilroy to you in June of 2008.  Do you see that?

15  A.  I do.

16  Q.  And who is Gigi Gilroy?

17  A.  She was my executive assistant.

18  Q.  Okay.  And she says, "Tom O'Neill is going to be in

19  town," later that month, "June 24 and 25.  Brad wants to

20  know if Business Banking has a couple of customers that

21  would be advantageous to have Tom to visit while he is

22  here."

23          Tom O'Neill is the -- at the time he was the

24  president of the bank?

25  A.  No.  Tom, he was a senior executive in the headquarters

1    for M&I.

2    Q.  Someone important?

3    A.  Yes.

4    Q.  All right.  And so the next e-mail up -- back onto

5    page 2, it looks like you then forward this e-mail on to a

6    handful of people, including Chris Flynn; fair?

7    A.  Yes.

8    Q.  And you say, "Please make your bankers aware of Tom's

9    visit and let's line him up for a couple calls."

10          So then if you could turn to page 1, Chris Flynn

11   responds to you and it looks like he suggests -- number one

12   on his list is Petters, right?

13   A.  Yes.  He suggests three customers.

14   Q.  And, finally, at the very top of the e-mail chain, "All

15   good ideas."

16          So you were agreeing with Mr. Flynn's

17   recommendation that it would be a good idea to set up a

18   meeting between Petters and Tom O'Neill, right?

19   A.  I would characterize it as I thought they were good

20   ideas for us to consider who we ended up having Tom go

21   visit.

22   Q.  And included in that, it was a good idea for him to

23   potentially go visit Tom Petters?

24   A.  He was one of the many to be considered, yes.

25   Q.  And, again, that's because you and Mr. Flynn saw the Tom

1  Petters relationship as a potential place to expand, to

2  grow?

3  A.  I'm sorry.  I didn't hear the last word.

4  Q.  "To grow."

5  A.  To grow, yes.

6  Q.  If you could go now to P-72, and I'm sorry to make you

7  switch back and forth, but that is in your original binder.

8  Or it might be in the one you have there as well.  Are you

9  with me?

10  A.  It's in this binder, yes.

11       MR. LAWRENCE:  And if you could, please, publish

12  that, Ms. Ellig.

13  BY MR. LAWRENCE:

14  Q.  And on direct you talked about the bottom paragraph of

15  P-72 where, among other things, Ms. Moline was telling you

16  that she had some reservations on the amount of work that

17  would be involved in putting together the DACAs, right?

18  A.  She had reservations about the amount of work it would

19  be to administer them, would be my understanding.

20  Q.  And did she also -- is it your understanding that she

21  also had some reservations about the amount of attorney's

22  fees that would be incurred in preparing them?

23  A.  Not so much about the amount, but who would be paying

24  for them.

25  Q.  And you don't know one way or the other whether PCI

1    ended up paying those attorney's fees, right?

2    A.  I don't know the outcome of that, no.

3    Q.  So it could have been that the bank ended up paying it?

4    A.  I don't know.

5              MR. GLEESON:  Objection, speculation, Judge.

6              THE COURT:  Sustained.

7    BY MR. LAWRENCE:

8    Q.  And Ms. Moline adds that, "Chris feels there's potential

9    for more business from Petters."

10             So among the reasons why it might be worth it to

11   put in the amount of work necessary to put these DACAs

12   together was that there might be more business with Petters

13   down the road, right?

14   A.  Yeah, I actually understand that in two perspectives.

15   One is there was more business opportunities, and the more

16   business opportunity we had was also another way to cover

17   the costs associated with putting this in place.

18   Q.  If you could turn to, in the original binder from this

19   morning, DX-40248.

20   A.  Okay.  I have it.

21   Q.  And we're going to --

22             MR. LAWRENCE:  If we could publish that,

23   Ms. Ellig, and look at the bottom of page 1.

24   BY MR. LAWRENCE:

25   Q.  You testified about the 800 million per quarter that

1    would be running through the account, right?

2    A.  Yes, I acknowledged that.

3    Q.  Yeah.  And even though 800 million was running through

4    every quarter, most of that money was just passing through,

5    it wasn't going to stay at the bank, right?

6    A.  That is correct.

7    Q.  Okay.  And that didn't strike you as suspicious?

8    A.  Based on the nature of the Petters enterprise and all

9    the companies he had, I think it was reflective of the kind

10   of business he was running.

11   Q.  So it wasn't suspicious because that's what was expected

12   of Petters?

13   A.  It was -- yeah, he had quite a large business

14   enterprise.

15   Q.  But not all large business enterprises pass hundreds of

16   millions of dollars through a checking account while

17   maintaining a low balance, right?

18   A.  No.

19              MR. GLEESON:  Object to arguing with the witness.

20              THE COURT:  Overruled.

21              THE WITNESS:  No.  Not all business enterprises,

22   no.

23   BY MR. LAWRENCE:

24   Q.  And do you agree that that's potentially a sign of money

25   laundering?

1    A.  No, I did not consider that at this time at all.

2    Q.  Okay.  And how would -- let me ask it a different way.

3    For Ms. Moline to be telling you that 800 million was going

4    to be passing through the account every quarter, that means

5    that somebody at the bank was paying attention to how much

6    money PCI was moving around, right?

7              MR. GLEESON:  Objection to the form of the

8    question.

9              THE COURT:  Overruled.

10             THE WITNESS:  The customer was indicating to us

11   the kind of volume they would have going through the account

12   and that was just something that, you know, they had shared

13   with us, but also we learned that a lot of it -- a lot of

14   that money wouldn't lead to a large account balance.

15   BY MR. LAWRENCE:

16   Q.  That's something people at the bank knew?

17   A.  Yes.

18   Q.  Okay.

19   A.  This is what they told us, what's in the e-mail, yes.

20   Q.  And if you would jump to DX-40252, which you were asked

21   about.

22             MR. LAWRENCE:  And we can publish that.

23   BY MR. LAWRENCE:

24   Q.  At the top, Mr. Flynn characterizes the amount of money

25   that would stay in the account as nominal, right?

Crain - Cross

1    A.  That's correct.

2    Q.  So clearly Mr. Flynn was watching this as well?

3    A.  Yes.

4    Q.  Now if you could turn to 40251 -- and this was the draft

5    DACA that we looked at -- and turn to page 2, paragraph(b)

6    at the top -- or, I'm sorry, page 3.

7    A.  Okay.

8    Q.  And you remember talking about this transaction list?

9    A.  I do.

10   Q.  Okay.  And at the end of the day the bank never received

11   the transaction list, I think you said that?

12   A.  Yes, that's my understanding.

13   Q.  The agreement said that a transaction list was going to

14   be provided weekly, right?

15   A.  Potentially, yes.

16   Q.  And you said that you were closely involved in this

17   process?

18   A.  I was involved in helping set up the Control Agreement,

19   but not in the day-to-day administration of the account

20   itself.

21   Q.  So did anyone ever tell you that no transaction list was

22   ever provided?

23   A.  Not that I recall.

24   Q.  Okay.  And did anyone ever tell you at the time that

25   the -- this DACA was being put together that there were no

Crain - Cross

1   retailer payments being placed into the PCI account at M&I?

2   A.  We wouldn't have had that information.

3   Q.  Well, you told me earlier that the bank has all of the

4   transaction information for the PCI account, right?

5   A.  The -- yeah, I mean, the operations department of the

6   bank would have that information, correct.

7   Q.  So if -- whether there were or were not retailer

8   payments is something someone at the bank could look at?

9   A.  I don't know that we would have had the detail to

10  understand who those payments were coming from or not.

11  Q.  Well --

12  A.  I don't know the nature of those reports myself

13  personally.

14  Q.  So you just don't know one way or the other whether, for

15  example, the information available to the bank would show

16  who was wiring money into one of the bank's accounts?

17  A.  A wire, yes.  Yes.

18  Q.  Okay.  And so if there were no wires from retailers like

19  Sam's Club or Costco, that would be within the knowledge of

20  the bank?

21  A.  Yes, the wire department would have that information.

22  Q.  And so back to my original question.  When you were

23  putting these DACAs together, Mr. Flynn and nobody else told

24  you that there were never any retailer payments that were

25  supposed to be the subject of this agreement?

1            MR. GLEESON:  Objection to the form of the

2    question and to the foundation, Judge.

3            THE COURT:  Overruled.

4            THE WITNESS:  No.  I mean, the agreement itself

5    laid out the requirements for the transaction list.  The

6    transaction list would have identified that, but we didn't

7    actually get a transaction list, is my understanding.

8    BY MR. LAWRENCE:

9    Q.  My question was a little bit different, Ms. Crain.

10   A.  Okay.

11   Q.  It was whether Mr. Flynn or anybody else at the bank

12   ever told you that there were never any retailer payments

13   that were supposed to be the subject of the agreement.

14   A.  No.  I mean, I don't know that we had the information

15   for them to share that.  I'm sorry.  I'm not exactly

16   following the question.  But, no, I personally didn't have a

17   conversation with anyone in that regard.

18   Q.  You said during your direct examination that Deposit

19   Account Control Agreements are not common, right?

20   A.  I did, yes.

21   Q.  It would not be typical to enter into a DACA for a

22   checking account at M&I Bank?

23   A.  Not typical, no.

24   Q.  Okay.  And it was unique that the DACAs were being put

25   into place for PCI at M&I Bank, right?

Crain - Cross

1    A.  Yes, we were asked by the customer and, yes, it was

2    unique to have that request.

3    Q.  The reason that the bank was willing to engage in this

4    atypical and unique step was as an accommodation for PCI,

5    right?

6    A.  Yes.

7    Q.  This was, as you said before, one of the things the bank

8    was doing to try to expand the relationship with PCI?

9    A.  Yes.

10   Q.  After these DACAs were put into place, though, you don't

11   know one way or the other whether the bank put any policies

12   or procedures in place in order to make sure that the bank

13   performed its obligations under the DACAs?

14   A.  We had -- Carolyn Moline's group had identified what the

15   requirements were within the DACAs, and her group would have

16   administered according to the agreement itself.

17   Q.  But you don't know one way or the other whether any

18   policies or procedures were put in place?

19   A.  I believe there were procedures established, you know,

20   by an understanding of Carolyn and her team.  I don't know

21   that there were any separate policies, no.

22   Q.  So I just -- I want to make sure, first, that I

23   understand your testimony.

24          You're saying that you believe there were

25   procedures put in place, but not policies?

1    A.  I'm sure there would have been a discussion by Carolyn

2    and her team to make sure that they abided by the provisions

3    within the agreement, yes.

4    Q.  Can you please locate your deposition transcript and

5    turn to page 97.

6    A.  Sure.

7    Q.  And beginning on line 19, were you asked this question

8    and did you provide this answer:

9        "Question:  Do you recall if M&I put any policies or

10   procedures in place in order to perform its obligations

11   under this agreement?

12       "Answer:  No."

13            MR. GLEESON:  Objection, that's not even remotely

14   inconsistent.

15            THE COURT:  Overruled.

16            THE WITNESS:  That's how I answered the question

17   specifically as stated.

18            So what you were just asking a moment ago, when I

19   think about procedures and how to administer this account,

20   I'm sure there were conversations.  I'm very confident that

21   would have been the case.

22   BY MR. LAWRENCE:

23   Q.  Okay.  My question was just were you asked that question

24   and did you give that answer at the deposition?

25   A.  Yes.  Five years ago I did, yes.

Crain - Cross

1   Q.  Five years ago was closer in time to these events than

2   today; fair?

3   A.  Pardon me?

4   Q.  Five years ago was closer in time -- --

5   A.  Oh, to the events --

6   Q.  -- to 2007 and 2008 than today?

7   A.  Yes.

8   Q.  And between now and then, I think you said you met with

9   the bank's lawyers?  Sorry.  Between then and now, you

10  testified earlier that you --

11          MR. GLEESON:  Objection.  Can I approach, Judge?

12          THE COURT:  You may.

13      **(At sidebar)**

14          THE COURT:  So the question is?

15          MR. GLEESON:  Between now and then you met with

16  the bank's lawyers.

17          THE COURT:  The objection?

18          MR. GLEESON:  My objection is the question from

19  the deposition passed in the night with her answer that she

20  had discussions about the protocol.  You overruled my

21  objection.  I got it.

22          Now he's suggesting that this is obviously -- she

23  didn't testify that she met with the bank's lawyers.  And

24  now there's a suggestion that her testimony has changed

25  because she met with the bank's lawyers.

1        But the testimony wasn't even inconsistent.  This

2   isn't fair.  What's happening here is suggesting to the

3   jury, based on nothing, something improper.  And with

4   respect, I don't think the Court should permit it.

5        MR. LAWRENCE:  I think it goes to credibility if

6   her testimony today is different than it was in her

7   deposition after she conferred with the bank.

8        MR. GLEESON:  If you read the allegedly

9   inconsistent statement and the answer -- I know it was

10   overruled; I'm not asking you to strike it -- there's no

11   inconsistent statement.

12        And anyway, I think it's a pretty thin read to

13   suggest that her testimony changed on this dimension after a

14   meeting with the bank.  And I think the suggestion is

15   borderline -- I think it's inappropriate.

16        THE COURT:  The objection is overruled.

17   **(In open court)**

18        COURT REPORTER:  The server, the real-time server,

19   went down for a second.  Sorry.

20   (Pause)

21        THE COURT:  Members of the Jury, you may take a

22   stretch break, if you would like, at your seats.

23        COURT REPORTER:  There we go.  Is everybody good?

24        MS. MOMOH:  Not yet.

25        THE COURT:  Please let us know when you are ready.

1      You are --

2              MS. MOMOH:  We can -- Your Honor, we can proceed,

3      but my real-time is still not showing on my computer.

4              MR. LAWRENCE:  May I proceed, Your Honor?  I have

5      been informed that apparently mine is the only one that

6      works.  So if we need to take a break for counsel, I'm happy

7      to or I'll proceed if the Court wishes.

8              THE COURT:  Well, let me ask:  One party does not

9      and one does; is that what I understand?

10             MR. COLLYARD:  This one does not work either,

11     Your Honor, but we're willing to move forward.  It makes no

12     difference to us.

13             MS. MOMOH:  Okay.  I guess we do have one on our

14     side that is now working, so we can proceed, Your Honor.

15             MR. GLEESON:  We're fine to go ahead, Judge.

16             THE LAW CLERK:  Mine just booted back up too, if

17     people want to try reconnecting.

18             THE COURT:  Mine is fine.  So it sounds like our

19     technical difficulties have been resolved.  Is that correct?

20             MS. MOMOH:  Yes, Your Honor.

21             MR. COLLYARD:  We're just fine, Your Honor, with

22     moving forward.

23             THE COURT:  Okay.  Let's move forward.

24             MR. LAWRENCE:  May I proceed?

25             THE COURT:  Yes, you may.

1    BY MR. LAWRENCE:

2    Q.  The question before our brief break was:  Between your

3    deposition and now, you've met with the bank's attorneys,

4    right?

5    A.  I have.

6    Q.  So let's -- that actually reminds me for us to look at

7    P-705.

8         MR. LAWRENCE:  If we could publish that.

9    BY MR. LAWRENCE:

10   Q.  And this was the document that you said that you'd had

11   occasion to look at when you were preparing for your

12   testimony today?

13   A.  Yes.

14   Q.  Right.  So this wasn't something you saw when you worked

15   at the bank or anything like that, it was shown to you for

16   today's testimony?

17   A.  That's correct.

18   Q.  And I know we have -- you've testified that you don't

19   think that these are really overdrafts, but they do show

20   that there were insufficient funds in the PCI account at

21   M&I Bank in amounts sometimes in excess of $1 million on

22   seven occasions, right?

23   A.  Nonsufficient funds is how I would characterize those,

24   which is a different definition than an overdraft.

25   Q.  And whether or not it's called an overdraft or not, this

1   is something that would draw the attention of someone at the

2   bank, right?

3   A.  We would look at this to make sure that there were

4   sufficient funds before we determined checks to clear the

5   bank, yes.

6   Q.  The bank would be concerned if one of its customers was

7   repeatedly having nonsufficient funds for tens or hundreds

8   of thousands of dollars, right?

9   A.  The bank would be concerned if there were overdrafts of

10  that amount, yes.

11  Q.  But they wouldn't be concerned if they were simply, as

12  you put it, nonsufficient funds that were later paid?

13  A.  As long as there were deposits to cover the amounts,

14  then there was a positive balance in the account as a

15  result.

16  Q.  Well, what if this type of thing was happening every

17  day?  Is that something that the bank would be fine with so

18  long as the money was paid back within 24 hours?

19          MR. GLEESON:  Objection, there's no foundation for

20  that.

21          THE COURT:  Sustained.

22  BY MR. LAWRENCE:

23  Q.  Let's look at one of those ACE Reports.  I think it's in

24  your large binder.  And the exhibit number -- give me one

25  moment.

1          (Pause)

2     Q.  I believe the exhibit you looked at before was DX

3     [inaudible].

4          THE COURT REPORTER:  Can you give me that number

5     again, please?

6          MR. LAWRENCE:  DX-40308.

7     BY MR. LAWRENCE:

8     Q.  And if we look at page 2, this is the June 2008 ACE

9     Report that you testified about on direct?

10    A.  Yes, it is.

11    Q.  And I think we saw on direct that Petters Co., Inc.

12    is -- it's three lines up from the bottom on page 2, right?

13    A.  Actually on page 1.

14    Q.  Sorry.  We're crossing wires.  When I'm saying page 2,

15    I'm referring in sort of the middle bottom it says DX-40308

16    dash --

17    A.  Oh, I see that, yes.

18    Q.  And PCI was -- it's at the bottom of that page, right?

19    A.  That's correct.

20    Q.  And you said that this is ranking the bank's customers

21    according to their profitability over the preceding

22    12 months, right?

23    A.  Not the bank's customers.  Just for the business banking

24    group.

25    Q.  For the Minnesota region?

Crain - Cross                                                           2671

1    A.  Yes.

2    Q.  And if you look down in the bottom, it says that this is

3    page -- now we're going to use your page numbers -- 1 of 42?

4    A.  Yes.

5    Q.  Okay.  So -- and you can page through here.

6            MR. LAWRENCE:  And, Ms. Ellig, if you could just

7    page forward to the next couple pages of the document.

8    BY MR. LAWRENCE:

9    Q.  The following pages in this document all look similar to

10   page 1, right?

11   A.  Yes, they do.

12   Q.  Okay.  And let's go back to -- let's just stay in one

13   place, so let's go back to Bates number 2 of this document,

14   where PCI was.

15           There's, what, 50 customers on the first page?

16   A.  Yeah, I would guess that's about right.

17   Q.  Okay.  And so if there's 50 customers on -- let's round

18   down -- 40 pages, to make the math easy, that's 2,000

19   customers listed?

20   A.  I don't know how many pages are in here, so...

21   Q.  Well, it says --

22   A.  I'll rely on your math.

23   Q.  -- this is page 1 of 42, right?

24   A.  Oh, yes.  Okay.

25   Q.  So if there's 50 customers on each page and there's

1    42 pages, there's over 2,000 customers listed, right?

2    A.  Yes, that's correct.

3    Q.  And let's actually -- let's go to page-0042 just

4    briefly.  All of the customers on this page, their net

5    profit in the "R12" column, it's in red text, right?

6    A.  Yes, it is.

7    Q.  And that means that they were unprofitable, they had a

8    negative net profit?

9    A.  Yes.

10   Q.  So this document has 2,000 customers ranging from the

11   ones that are most profitable to the bank all the way down

12   to the least profitable ones, meaning they were actually

13   costing the bank money in that time period, right?

14   A.  I would -- again, I wouldn't characterize it as the

15   bank.  It's for the business banking group within the

16   Minnesota region.

17   Q.  Thank you for that correction.

18       And PCI, that's on page 1, right?

19   A.  Yes.

20   Q.  So of the over 2,000 customers listed here in the

21   Minnesota region for business banking, PCI is still in the

22   top, for this month, top 50, right?

23   A.  Yes, it is.

24   Q.  And this document, as we saw before, this isn't just,

25   for example, Chris Flynn's customers, this is everybody

1      within the region's customers?

2      A.  For business banking, yes.

3      Q.  So for Chris Flynn, in this month PCI might not have

4      been his top customer, but it was one of his top customers?

5      A.  For Chris it was, yes.

6      Q.  You can set that aside.

7              So let's talk a little bit about business banking.

8      You said that at the time that you worked at M&I, the

9      business banking group was separate from the commercial

10     banking group, right?

11     A.  Yes, it was.

12     Q.  And I think you said that the difference was that

13     generally business banking handled customers with revenues

14     below $25 million a year?

15     A.  That's correct, generally, yes.

16     Q.  And just to make sure we're all on the same page, when I

17     say "revenues below 25 million," we're not talking about the

18     revenue the bank earns from the customer, but that's the

19     customer's revenue, what they earn in their business?

20     A.  That's correct.

21     Q.  Okay.  But PCI, with its billions of dollars in and out

22     of this account, it was in the business banking group,

23     right?

24              MR. GLEESON:  Object to the form of the question.

25              THE COURT:  Overruled.

Crain - Cross

```
 1                THE WITNESS:  Yes, it was in the business banking
 2      account -- or in the business banking group.
 3      BY MR. LAWRENCE:
 4      Q.  And you said that the bank had no small business banking
 5      group.  It was business banking, right?
 6      A.  Correct.
 7      Q.  And so I'd like to turn our attention to Exhibit P-2.
 8      It's an admitted exhibit.  And, unfortunately, I don't
 9      believe it's in your binder, so we're going to put it up on
10      the screen.  And if you feel that you need to see anything
11      else, let me know.  Okay?
12      A.  Okay.
13      Q.  And I want to draw your attention specifically to
14      P-2-36.  And do you see that this is a MIContacts entry that
15      looks like it's the report of a call involving Shari Rhode,
16      Edward Jambor, and Steve Berglund?
17      A.  Yes, I see that.
18      Q.  And if we turn, then, to P-35, I want to draw your
19      attention to the second sentence.  It says, "Because they
20      have only been a deposit customer, they have remained on the
21      small business banking side.  However, as they consolidate,
22      they want some lines of credit and now will need the
23      expertise of the commercial side."  Do you see that?
24      A.  Yes.
25      Q.  Okay.  And now if you could turn to --
```

1        MR. LAWRENCE:  Ms. Ellig, if you can put up

2   page 39 of this document.

3   BY MR. LAWRENCE:

4   Q.  And you see this is another PCI MIContacts entry?

5   A.  Yes.

6   Q.  And then on page 38, because it's weird and the page

7   before is actually what comes after, do you see that the

8   last sentence says, "This is now too large for small

9   business and Ed will transition to Chris Flynn"?

10  A.  Yes, I see that.

11  Q.  Okay.  So the bank's employees, at least, they refer to

12  the business banking group as the small business banking

13  group sometimes, right?

14  A.  This was in 2003 prior to my time at M&I, so I don't

15  know what the organization looked like prior to my joining.

16  Q.  But at least in that period of time it looks like they

17  refer to it as "small business"?

18  A.  I'm -- you know, the language is what they used, yes.  I

19  don't know about departments.  I just wasn't there at that

20  time.

21  Q.  Are you aware of any other account during your time at

22  M&I that was located in the business banking group of the

23  bank that had billions of dollars going in and out of the

24  account on a regular basis?

25  A.  I don't have that information.  I'm not aware of it, no.

```
 1                    MR. LAWRENCE:  May I have just one moment,
 2      Your Honor?
 3                    THE COURT:  You may.
 4             (Plaintiff's counsel confer)
 5                    MR. LAWRENCE:  Nothing further, Your Honor.
 6                    Thank you, Ms. Crain.  I appreciate it.
 7                    THE WITNESS:  Thank you.
 8                    MR. GLEESON:  May I pose a few questions to the
 9      witness on redirect?
10                    THE COURT:  You may.
11                    MR. GLEESON:  Thank you, Judge.
12                    If you could pull up 40251, please, Mr. Herzka,
13      and go to the second page of it, 2(b).  It might be the
14      third page.  There you go.  Thank you.
15                        REDIRECT EXAMINATION
16      BY MR. GLEESON:
17      Q.  You were asked about this --
18      A.  Yes.
19      Q.  -- on cross-examination.  Do you recall that?
20      A.  I do.
21      Q.  Okay.  It says -- you were asked about whether there was
22      a requirement that a transaction list be provided weekly.
23      Do you recall that questioning?
24      A.  Yes.
25      Q.  It says, "Petters shall provide to each Protected Party
```

1    and M&I at least once each week (or more if necessary to

2    enable M&I to discharge its obligations hereunder) a list of

3    all Transactions funded by a Protected Party with respect to

4    which payment may be received by M&I for deposit into the

5    Deposit Account."  Do see that?

6    A.  Yes.

7    Q.  If a payment was not received, would a transaction list

8    be provided?

9    A.  No.

10   Q.  The -- you said these agreements were uncommon, correct?

11   A.  Yes.

12   Q.  Okay.  And this was one certainly unique to the

13   relationship with PCI, you didn't do these with your -- your

14   bank didn't do it with PCI before, correct?

15           MR. LAWRENCE:  Objection, leading.

16           THE COURT:  Sustained.

17   BY MR. GLEESON:

18   Q.  Had you engaged in any of these with PCI before?

19   A.  I had not personally, no.

20   Q.  Was there anything, to your mind, at the time suspicious

21   about this transaction?

22   A.  No.

23   Q.  You were asked whether it was an accommodation to

24   Petters, to PCI, right?

25   A.  Yes.

```
 1    Q.  It was?

 2    A.  Yes.

 3    Q.  Is it an accommodation you would have provided to any

 4    customer in the business banking group who asked for it?

 5              MR. LAWRENCE:  Objection, leading.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  Yes, absolutely, we would have

 8    considered it.

 9    BY MR. GLEESON:

10    Q.  Okay.  You saw Petters and PCI as a business

11    opportunity, correct?

12    A.  Yes.

13    Q.  Did you see all of the customers in the business banking

14    group that you managed as business opportunities?

15    A.  Generally, yes.

16    Q.  Okay.  In this regard, Petters as a business

17    opportunity, did you treat PCI or Petters any differently

18    than you treated any of the other customers at the bank?

19    A.  No.

20    Q.  In any respect was the PCI account treated any

21    differently than any of the other customers?

22              MR. LAWRENCE:  Objection, foundation.

23              THE COURT:  Overruled.

24              THE WITNESS:  No.

25    BY MR. GLEESON:
```

1    Q.  You were asked about Mr. Laumann and Mr. Wehmhoff and

2    Mr. Salmen, whose names appeared on a MIContact report.

3    A.  Yes.

4    Q.  Do you remember that?

5    A.  Yes.

6            MR. GLEESON:  Mr. Herzka, could you pull up

7    Defendant's 40296.

8    BY MR. GLEESON:

9    Q.  And you were asked about whether they were PCI

10   employees.  Do you recall that testimony?

11   A.  I do.

12   Q.  Okay.  If you could focus on the PCI account.  And let's

13   reorient ourselves to this.  What date is it?

14           MR. GLEESON:  If you could focus on that.

15           THE WITNESS:  This is April of 2008.

16   BY MR. GLEESON:

17   Q.  And this is Chris Flynn's ACE Report for that month,

18   correct?

19   A.  That is correct.

20   Q.  Okay.  And let's go down to Petters.  On the left side,

21   the Petters accounts fall under what heading?

22   A.  "Petters Company, Inc."

23   Q.  Okay.  And were all of those accounts that you see there

24   part of the Petters Company, Inc. account at PCI -- at M&I

25   Bank?

1    A.  Yes, we rolled them all up to be part of the PCI

2    relationship.

3    Q.  So they were all part of the relationship, correct?

4    A.  That's correct.

5    Q.  So people who worked in connection with Petters Capital

6    or Petters Company, LLC, and the like would be part of that

7    account, correct?

8    A.  That's correct.

9    Q.  Okay.  And you were asked questions about whether there

10   were any other business enterprises that had the kind of

11   volume of transactions with M&I analogous to that that the

12   PCI account had.  Do you recall that?

13   A.  Yes.

14   Q.  Okay.  Did you have other accounts that had the kind of

15   business enterprise that Tom Petters had?

16   A.  Not that I recall.  Certainly not in business banking.

17   Q.  Yeah.  Did those -- would a typical business banking

18   customer also own Fingerhut and Sun Country Airlines?

19   A.  No, they did not.

20   Q.  Did you regard the amounts coming through the deposit

21   account as suspicious and remarkable?

22   A.  Not for the nature of the business that Petters Company,

23   Inc. overall was, no.

24   Q.  And, lastly, did it ever come to your attention -- and

25   I'm limiting my question to things that you were told or

1    observed --

2    A.  Okay.

3    Q.  -- in the workplace at M&I Bank.  Okay?

4    A.  Okay.

5    Q.  Did it ever come to your attention in any way that

6    anybody at M&I Bank even remotely suspected that PCI was a

7    Ponzi scheme?

8    A.  No.

9         MR. GLEESON:  Thank you, Judge.  I have nothing

10   further.

11        THE COURT:  Anything further for this witness?

12        MR. LAWRENCE:  Yes, Your Honor.

13                    **RECROSS-EXAMINATION**

14   BY MR. LAWRENCE:

15   Q.  Did you know that PCI, Petters Company, Inc., is not the

16   company that owned Sun Country?

17   A.  I don't have the knowledge of which entity owned which

18   entity, no.

19   Q.  Okay.  And it's not the company that owned Fingerhut?

20   A.  I don't have knowledge of the -- kind of the rollup of

21   the holding companies, no.

22   Q.  Okay.  So assuming that PCI is not the company that

23   owned Sun Country or Fingerhut, those businesses would not

24   explain the billions of dollars that was going in and out of

25   the PCI account, right?

```
 1                    MR. GLEESON:  Objection.

 2                    THE COURT:  Overruled.

 3                    THE WITNESS:  I have -- I don't know the makeup of

 4       PCI to understand whether or not that would have been, you

 5       know, taking in those transactions or not from those

 6       entities.  So I don't have knowledge of it enough to answer

 7       that question definitively.

 8       BY MR. LAWRENCE:

 9       Q.  My question was that if PCI didn't own Sun Country or

10       Fingerhut, then those businesses aren't the reason why

11       billions of dollars was going in and out of the PCI account,

12       right?

13                    MR. GLEESON:  Objection, this is argument.

14                    THE COURT:  Overruled.  You may answer if you can.

15                    THE WITNESS:  I don't know what made up the PCI

16       ownership structure, what -- if that was a holding company.

17       So I don't know what entities it owned to be able to answer

18       that question.

19       BY MR. LAWRENCE:

20       Q.  Right.  And I understand that and that's why I'm asking

21       you to assume, since you don't know, that PCI did not own

22       Sun Country or Fingerhut and that that was another aspect of

23       the Petters enterprise.  Assuming --

24                    MR. GLEESON:  Objection.  Sorry.  I thought you

25       were done.
```

1   BY MR. LAWRENCE:

2   Q.  Assuming that is true, the billions of dollars going in

3   and out of the PCI account is not explained by the fact that

4   Petters separately owned Sun Country and Fingerhut, right?

5           MR. GLEESON:  Objection to the form of the

6   question, to the facts asserted in it.  Objection.

7           THE COURT:  Sustained.

8           MR. LAWRENCE:  Nothing further.

9           MR. GLEESON:  I have two questions, Judge, if I

10  may?

11                  **FURTHER REDIRECT EXAMINATION**

12  BY MR. GLEESON:

13  Q.  This was a deposit account that PCI had at M&I Bank?

14  A.  That's correct.

15  Q.  Was there anything.  Anything at all that prohibited

16  Petters or a Petters-related company to make deposits into

17  that account?

18  A.  No.

19          MR. GLEESON:  I have nothing further.  Thank you.

20          THE COURT:  Anything further for this witness?

21          MR. LAWRENCE:  Nothing further from us,

22  Your Honor.  Thank you.

23          THE COURT:  May the witness be excused?

24          MR. GLEESON:  Yes.

25          THE COURT:  You're excused.

```
 1              MR. SCHAPER:  Your Honor, defendant's next witness
 2      is Mr. John Vanderheyden.
 3              THE COURT REPORTER:  Are you Mr. Schaper?
 4              MR. SCHAPER:  Yes.  Thank you.
 5              THE COURT:  And has the witness stand been cleared
 6      off?
 7              MR. SCHAPER:  We're working on it.  Thank you.
 8         (Pause)
 9              THE COURT REPORTER:  Come up and raise your right
10      hand.  I'll swear you in.
11         (Witness sworn)
12              THE COURT REPORTER:  Go ahead and have a seat in
13      the witness stand, please, and pull that microphone right up
14      to you and state your full name.
15              THE WITNESS:  John Vanderheyden.
16              THE COURT REPORTER:  And spell your name, please.
17              THE WITNESS:  V-a-n-d-e-r-h-e-y-d-e-n.
18              THE COURT:  Counsel, you may proceed.
19              MR. SCHAPER:  Thank you, Your Honor.
20                          (JOHN VANDERHEYDEN)
21                          DIRECT EXAMINATION
22      BY MR. SCHAPER:
23      Q.  Good afternoon, Mr. Vanderheyden.
24      A.  Good afternoon.
25      Q.  Mr. Vanderheyden, where are you from?
```

1    A.   I am from the Milwaukee area; Racine, Wisconsin.

2    Q.   You said "Racine, Wisconsin"?

3    A.   Yes.

4    Q.   How long have you lived there?

5    A.   All my life.

6    Q.   Did you attend college, Mr. Vanderheyden?

7    A.   I did.

8    Q.   Where did you go to college?

9    A.   I went to undergrad school at the University of

10   Wisconsin-Eau Claire, and then I subsequently went to

11   graduate school and got a master's degree at the University

12   of Wisconsin-Parkside in Kenosha, Wisconsin.

13   Q.   What was your undergraduate degree in, Mr. --

14   A.   Management information systems and economics.

15   Q.   And what about your graduate degree?

16   A.   Accounting and finance.

17   Q.   Mr. Vanderheyden, do you understand that you are here to

18   testify about a project at M&I's IT department to

19   consolidate some e-mail servers?

20   A.   Yes.

21   Q.   How long have you worked in the IT field?

22   A.   A bit over 40 years.

23   Q.   And what made you get into that line of work?

24   A.   When I started in college in the MIS degree, I got on to

25   something that I enjoyed and I continued down that road my

1    entire career.

2    Q.  Were you employed by M&I and BMO Harris at some point?

3    A.  I was.

4    Q.  And what role did you play at M&I and BMO Harris?

5    A.  Senior vice president of information technology services

6    with M&I Bank, and the role was defined as technology head

7    with BMO.

8    Q.  When did you begin working at M&I, Mr. Vanderheyden?

9    A.  December of 2000.

10   Q.  And just generally can you describe for the jury what

11   your role at M&I entailed.

12   A.  My role was to lead a group that basically ran the

13   operations of the M&I internal applications and services,

14   things that included the IT help desk, desktop services,

15   data center services, the wide area network for voice and

16   data.  And that pretty much covers it.

17   Q.  And were you promoted to senior vice president of

18   technology services at some point?

19   A.  Yes.

20   Q.  Do you recall roughly when that was?

21   A.  Maybe 2007 time frame.

22   Q.  And did you leave BMO Harris at some point?

23   A.  I did.

24   Q.  When was that?

25   A.  January of 2015.

1    Q.  Okay.  Thank you.

2            Let's talk for a few minutes about how e-mail

3    storage worked at M&I.  In the 2009-2010 time period, was

4    there a system at M&I to capture e-mail communications?

5    A.  Yes.

6    Q.  What was the name of that system?

7    A.  The name was Legato.

8    Q.  And when was the Legato system first implemented at M&I?

9    A.  It was fully implemented in March 2005.

10   Q.  And was there a reason that M&I implemented the Legato

11   system?

12   A.  Yes.  The Legato system -- the reason for the Legato

13   system started from a SEC or a Securities and Exchange

14   Commission ruling requirement that all broker-dealer

15   communications be held for six years.

16   Q.  And am I right that there were individuals employed at

17   M&I Bank that were broker-dealers?

18   A.  That is correct.

19   Q.  About how many broker-dealers were there at M&I Bank at

20   the time you implemented this Legato system?

21   A.  The number, I don't know the exact, but it was somewhere

22   between 50 and 200.

23   Q.  And just generally speaking or roughly speaking, about

24   how many employees did M&I have at the time?

25   A.  10,000.

1    Q.  So did M&I implement this Legato system only for the

2    broker employee -- the broker-dealer employees?

3    A.  No.

4    Q.  Can you tell me --

5    A.  Yeah.

6    Q.  -- what it covered.

7    A.  We did it for the entire population of the full 10,000

8    users, even though that requirement was only for less than

9    1 percent of that total population.

10   Q.  And prior to the SEC rule that you mentioned, was there

11   any requirement you were aware of for M&I to store copies of

12   all employee e-mails?

13   A.  No.

14   Q.  Mr. Vanderheyden, could you explain to the jury how

15   Legato worked in terms of storing e-mails.

16   A.  Legato was a software tool that sat on all of the e-mail

17   servers.  It would capture a copy of every e-mail sent and

18   received and place it on a specialized disk array called EMC

19   Centera that was certified nonalterable.

20   Q.  So let me ask you a few questions about that --

21   A.  Sure.

22   Q.  -- to make sure I understand some of that.

23          First of all, sometimes when we send e-mails, they

24   include attachments, like attaching a Word file or something

25   like that.  Did Legato capture attachments to e-mails?

1    A.  It did.

2    Q.  And so did the Legato system -- am I understanding your

3    testimony that it captured every e-mail and attachment that

4    an M&I employee sent or received from March 2005 forward?

5    A.  That's correct.

6    Q.  Well, what about if an employee on their own computer

7    deleted an e-mail, would that still be found in the Legato

8    system?

9    A.  Yes, it would because it was captured at the point in

10   time where that person received an e-mail or sent it and

11   then deleted it.

12   Q.  So you mentioned -- you used the word "unalterable" --

13   A.  Correct.

14   Q.  -- when you were describing the Legato system.  Can you

15   just explain what you meant by "unalterable."

16   A.  That it was impossible for us technicians, so to speak,

17   to alter anything on that disk or to delete anything from

18   that disk.

19   Q.  And to the best of your knowledge, Mr. Vanderheyden, how

20   long did M&I save the e-mails that were retained in Legato?

21   A.  Forever.

22   Q.  So, to sum up, Legato permanently stored all e-mails and

23   attachments that were sent and received at M&I after the

24   Legato system was implemented in March 2005.  Am I

25   understanding your testimony correctly?

 1    A.  That's absolutely correct.

 2              MR. COLLYARD:  Objection, leading.

 3              THE COURT:  Overruled.

 4              THE COURT REPORTER:  I'm sorry.  Who objected?

 5              MR. COLLYARD:  Mike Collyard.

 6              THE COURT:  Overruled.

 7    BY MR. SCHAPER:

 8    Q.  What was your answer, Mr. Vanderheyden?

 9    A.  Correct.

10    Q.  And you said that M&I put this system in place for all

11    10,000 or so of its employees even though the federal

12    regulations you mentioned only required it for a very small

13    subset of these employees.  Is that your testimony?

14    A.  That's correct.

15    Q.  Before the Legato system, before March 2005 -- did

16    Legato store the copies of e-mails that were sent prior to

17    March 2005?

18    A.  No.

19    Q.  And just why is that?

20    A.  It was a go-forward implementation from March 2005

21    forward.

22    Q.  Were there other ways that e-mails that were sent or

23    received before March 2005 were stored?

24    A.  They were stored on the e-mail server itself and they

25    were captured in the backups of that -- those e-mail

 1    servers.

 2    Q.  Okay.  And when you mention "backups," is that a

 3    reference to backup tapes?

 4    A.  That is.

 5    Q.  And can you explain what you mean by that.

 6    A.  Backup tapes -- tapes are no longer in vogue today.

 7    However, it was a way to back up everything on that server,

 8    meaning take a copy, generally run every day and run during

 9    the evening hours, 2:00 a.m., 3:00 a.m. in the morning.

10    Q.  How frequently were backup tapes created at M&I?

11    A.  They were done daily.

12    Q.  And were there also monthly and yearly backup tapes

13    created?

14    A.  That's correct.

15    Q.  Can you just explain that a bit.

16    A.  So the dailies were kept for 30, 31 days.  The last day

17    of the month was kept and taken, let's call it, out of

18    rotation so it couldn't be reused for a period of three

19    years.  And the end-of-year tape was also taken, then, out

20    of rotation and kept for seven years.

21    Q.  And what happened to the backup tapes after their time

22    in the rotation was up?

23    A.  I'm sorry.  What do you mean by that?

24    Q.  So what happened to the backup tapes after their -- say

25    the daily backup tape after it had been 30 days, then what

Vanderheyden - Direct

1   happens to that tape?

2   A.  Then it would be reused.

3   Q.  From time to time, Mr. Vanderheyden, did you have

4   occasion to assist M&I's legal department with implementing

5   legal holds?

6   A.  I did.

7   Q.  And just generally speaking, what was a legal hold?

8   A.  A legal hold was a notice to a set of people that they

9   should no -- they can no longer destroy any documents --

10  Q.  Okay.

11  A.  -- either paper or electronic.

12  Q.  And prior to 2010 -- if a legal hold required the

13  preservation of employee e-mails in this 2010 time frame,

14  how would M&I go about preserving those e-mails?

15  A.  We would get them from Legato, that e-mail archive.

16  Q.  Before Legato was implemented, how, if you needed them,

17  would you get employee e-mails?

18  A.  Just to pick them off the server as they sat.  It would

19  have -- it never came up, actually, prior to that.

20  Q.  Prior to the implementation of Legato --

21  A.  No.

22  Q.  -- did you ever go to e-mail backup tapes to retrieve

23  e-mails from employees?

24  A.  Never did.

25          MR. SCHAPER:  Your Honor, I'm about to start a new

```
 1    topic.  Would you like me to keep going?

 2               THE COURT:  No, I would not.  Thank you for

 3    letting me know that.

 4               Members of the Jury, we are ready to take our

 5    break for the day.

 6               You must not discuss this case with anyone,

 7    including other jurors, members of your family, or people

 8    involved in the trial or anyone else.  And don't allow

 9    anyone to discuss the case with you or within your hearing.

10               And when I say do not -- you must not discuss this

11    case with anyone, I also mean do not e-mail, send text

12    messages, blog, or engage in any other form of written,

13    oral, or electronic communication as I've instructed you

14    before.

15               Also, do not read any newspaper or any written

16    account, watch any televised account, or listen to any radio

17    program about the trial.  And do not conduct any internet

18    research or consult with any other resources about the case,

19    about the people involved in the case, or about the subject

20    matter of the case.

21               As you know, you must keep an open mind and that's

22    free from outside information.  And, as you know, it would

23    be a violation of your oath to base your decision on

24    information that you received or acquired outside of the

25    courtroom.
```

1          So we will plan to gather again for your service

2     at the same time tomorrow.  All rise.  Thank you.

3          A JUROR:  What time?

4          THE COURT:  9:00 we will begin.

5                          **IN OPEN COURT**

6                        **(JURY NOT PRESENT)**

7          THE COURT:  Sir, you are excused from testifying

8     today.  Please be prepared to come back tomorrow to continue

9     your testimony.  Okay.  Thank you.

10          Is there anything else that needs to be addressed

11     with the Court?

12          MR. SCHAPER:  Your Honor, did I hear you say that

13     we're starting at 9:00 a.m. tomorrow?

14          THE COURT:  I think you did hear me say that,

15     9:00 a.m.

16          MR. SCHAPER:  That's correct.  Thank you.

17          THE COURT:  Anything else?

18          MR. COLLYARD:  Yes, Your Honor, plaintiff has one

19     issue.  If I can just --

20          THE COURT:  You may be seated.

21          MR. COLLYARD:  If I can just be heard briefly,

22     Your Honor, I think this is relevant to the testimony we're

23     about to hear from Mr. Vanderheyden.  It goes to your ruling

24     earlier this morning.

25          I thought I'd raise it now instead of having to do

1    it on sidebar and waste the jury's time.  So if you're okay

2    with it, I'd just like to present to you the issue that

3    we're about to see.

4              THE COURT:  You may.

5              MR. COLLYARD:  So this morning there was an issue

6    as to whether or not plaintiff can use certain interrogatory

7    responses in questioning Mr. Vanderheyden.

8              And this exhibit that I have is Plaintiff's

9    Exhibit 149, which was actually disclosed on the defendant's

10   exhibit list to us, and it's an interrogatory response that

11   is signed or verified by Mr. Vanderheyden back in 2014.

12             And what this interrogatory response does is it

13   goes through this server consolidation project that

14   Mr. Schaper just kind of highlighted with Mr. Vanderheyden

15   was going to be the subject of his testimony.

16             And, Your Honor, what is happening here is what

17   the defendants are doing is they are precluding me from

18   using the exact evidence that Mr. Vanderheyden verifies

19   about the consolidation project.

20             And they are going to have him talk about that

21   consolidation project, but I'm not going to be allowed to

22   ask him certain questions or get to certain information

23   because they are going to say it goes to the implication of

24   counsel conduct.  What Mr. Vanderheyden then is now going to

25   testify to is this entire project that I'm not going to be

1    allowed to probe because they are saying it goes to counsel

2    conduct.

3              And so if I'm not allowed to ask questions of

4    Mr. Vanderheyden based on this project and based on his

5    verification in an interrogatory, which is an admission of a

6    party-opponent, they should not be allowed to question

7    Mr. Vanderheyden on this consolidation project that would go

8    to the destruction of the backup tapes in 2010 or 2011

9    either.  And that's the issue that we're now going to have.

10             So I would request to the Court that

11   Mr. Vanderheyden not be allowed to testify to anything about

12   a consolidation project pertaining to the destruction of

13   backup tapes in 2010 or 2011 as a result of the defendants

14   themselves precluding me from using any evidence whatsoever

15   about this, including the very interrogatories that

16   Mr. Vanderheyden himself signed.

17             MR. SCHAPER:  Your Honor, I'll just be brief on

18   this issue that I believe you ruled on less than 12 hours

19   ago.

20             First of all, this was on defendant's list because

21   it was before the Court had ruled to exclude counsel

22   conduct.  But clearly preparation of interrogatories is

23   bound up with counsel conduct, which I suspect is part of

24   the reason for the Court's ruling this morning.

25             Of course counsel can ask about the facts

2697

1    underlying the -- what was in the response to the

2    interrogatories.  And, also, I think if there is

3    inconsistent testimony, they could be used for impeachment

4    purposes.

5          But I think the Court has properly ruled already

6    that the interrogatories -- and I'm not going to do it

7    either -- the interrogatories cannot preemptively be used as

8    a basis to question the witness.

9          The witness can be questioned about the facts

10   within interrogatory responses or any other facts, for that

11   matter, if they are relevant, but showing the jury a court

12   document is obviously -- obviously, lawyers were involved in

13   the preparation of that.  Lawyers signed it also, as is the

14   case with interrogatories.

15         So that's why that brings into the conduct of

16   counsel that the Court has excluded, and the Court has

17   already sustained defendant's objection to the use of these

18   interrogatories as evidence.

19         MR. COLLYARD:  According to defendants,

20   Your Honor, all of the conduct of defense counsel is

21   implicated in this entire project based on what they just

22   argued and I would be precluded -- there's no way that I can

23   go through and elicit facts that are in an interrogatory

24   response properly without showing him the interrogatories.

25         And there's also an issue, too, where

1   Mr. Vanderheyden was involved in finding tapes back --

2   finding six backup tapes in 2014.  And they were destroyed.

3   And the date of that e-mail that he's on is dated August 26.

4   These interrogatories are dated three days later.  And it

5   goes to whether or not Mr. Vanderheyden is being truthful or

6   not in this verification.

7               THE COURT:  Okay.

8               MR. SCHAPER:  Your Honor, may I respond briefly?

9       (Pause)

10              MR. SCHAPER:  May I respond briefly, Your Honor?

11              THE COURT:  Yes.

12              MR. SCHAPER:  There is no counsel conduct involved

13  in the 2010 server consolidation project that will be a

14  chunk of my testimony with Mr. Vanderheyden.  Counsel was

15  not involved in that.  And that has nothing to do -- the

16  interrogatory responses that plaintiff's counsel is talking

17  about were prepared in 2014.

18              Plaintiff's counsel has already gotten into

19  evidence and the Court has allowed over our objection one

20  e-mail that was between Mr. Vanderheyden and counsel.  So

21  that's in evidence.  We will deal with that.  But these

22  interrogatory answers themselves, we are not going to

23  address those.

24              And, again, the server consolidation project that

25  is the root of this document retention issue in this case

1    happened in 2010.  We're going to elicit testimony about

2    what the nature of that project was, why it was undertaken

3    by the M&I IT department.  We'll actually elicit testimony

4    that counsel was not involved in it.  It's really the

5    opposite of what plaintiff's counsel is saying.

6            THE COURT:  You said that counsel was not

7    involved?

8            MR. SCHAPER:  Was not involved in it, yeah.  It's

9    an IT project.  I think the Court probably has a sense from

10   Mr. Vanderheyden already that he is an IT person through and

11   through.  And it was -- this was an IT project, as the Court

12   will see first thing tomorrow morning.  So that does not

13   implicate counsel conduct at all.

14           And as I said, plaintiff, just as defendant can

15   do, can ask the witness about underlying facts.  If they

16   believe something is inconsistent in terms of the testimony

17   as to those underlying facts with something that was stated

18   in an interrogatory, then they can -- if it's appropriate or

19   proper impeachment, they can use that for that narrow

20   purpose.

21           But as the Court ruled this morning, those

22   interrogatory responses in general should not be admitted as

23   exhibits for this witness or otherwise.

24           MR. COLLYARD:  Sorry, Your Honor.  I'll be brief.

25   That is simply not true.  And I'll just tell you that the

1    interrogatory starts out by asking what the interrogatory

2    is.  And their own answer starts saying as early as

3    June 2009 John Vanderheyden, the signature below, began

4    plans to consolidate server hardware, and it goes on to

5    explain it.  And it says in these interrogatory responses

6    that Minnesota regional e-mail backup tapes were collected

7    and destroyed in the time period of October 2010 and 2011.

8            That is what these interrogatory responses talk

9    about.  Those were the basic facts that I had asked them to

10   stipulate to that they would not stipulate to, for example,

11   when we proposed those findings to you.

12           So we have been at a disadvantage all because they

13   keep using this argument that it implicates the conduct of

14   counsel.  And what Mr. Schaper just said is nothing in these

15   interrogatories contemplates the conduct of counsel.  But

16   they argued to you this morning that that was the basis of

17   excluding this very thing.

18           And so if they are going to say that that is the

19   basis of excluding information about the server

20   consolidation project, then Mr. Vanderheyden should not be

21   allowed to testify at all about the consolidation project,

22   if that's what they have argued to this Court.

23           And if they are changing their mind and doing a

24   redo, then I should be able to use the interrogatory

25   responses that go to this that are the admissions of a

1    party-opponent that I can elicit testimony from

2    Mr. Vanderheyden on.

3            MR. SCHAPER:  Very briefly, Your Honor.

4            The fact that the interrogatories in 2014 refer to

5    events five years earlier, they don't refer to them as

6    saying counsel was involved.  The bank was asked questions

7    in 2014 about what happened with this server consolidation

8    project, so they had to respond.  But the responses -- and

9    plaintiff didn't indicate otherwise.

10           THE COURT:  Who responded?

11           MR. SCHAPER:  The bank did.

12           THE COURT:  Okay.

13           MR. SCHAPER:  And Mr. Vanderheyden verified those

14   bank responses in 2014.  But the description of what

15   happened in '09 and '10, which is what Mr. Vanderheyden will

16   be testifying about principally, did not involve counsel nor

17   do the interrogatory responses say that counsel was

18   involved.

19           THE COURT:  And you said "principally."  What else

20   will he be testifying about?

21           MR. SCHAPER:  So he also will be testifying about

22   the fact that in 2014 there was a search for backup tapes.

23   That was the subject of Mr. Scherer's deposition testimony

24   that was played for the Court.

25           The Court allowed one e-mail exhibit into evidence

1    in connection with that testimony, that it is an e-mail from

2    Mr. Vanderheyden to counsel that were involved in that.  And

3    so that's out of the bag, so to speak.

4           And so he will testify about that and what was

5    found and his understanding.  That will be quite brief

6    testimony because there's just not much to it.  And

7    that's -- that will be the testimony on that issue.

8           And, as I said, plaintiffs have the e-mail that

9    they wanted to get into evidence on that.  It's an e-mail

10   written by Mr. Vanderheyden.  I will ask him about it.  I'm

11   sure they will ask him about it.

12          But I think interrogatory responses in and of

13   themselves, you show a court document to the jury, obviously

14   counsel are involved in that.  So whether it's -- I'm not

15   sure what he means by that not being conduct of counsel.

16   Counsel is involved in preparing interrogatory responses and

17   court documents.  I suspect the jury has some sense of that

18   at this point.  So that's why we objected to it on that

19   basis.

20          MR. COLLYARD:  Just real quickly, Your Honor.  So

21   the exhibit that Mr. Schaper just referred to is this

22   Exhibit 325, which is the e-mail from John Vanderheyden to

23   two lawyers at Godfrey & Kahn, and that talks --

24          THE COURT:  I didn't hear you.  The two lawyers?

25          MR. COLLYARD:  The two lawyers from Godfrey &

1    Kahn.  And he's to writing them and saying David Scherer

2    found these six tapes.  And those were the six tapes that

3    the Court has already found were destroyed.

4         And so already I'm going to be talking about

5    something that has to do with their lawyers, and I'm

6    necessarily going to have to do that.  And I suspect they

7    are going to have objections on this.

8         But what this testimony all comes down to is

9    whether or not it's -- you allowed them to put on limited

10   proof of whether or not those documents that they destroyed

11   were harmful, and that's all this goes to.

12        And so if they are going to get into whether there

13   was intention to do this or how it was done, I need to be

14   able to go into those facts and talk about how exactly it

15   was done.  And the only way I can do that right now, without

16   putting their lawyers on the stand, is to talk about the

17   facts that Mr. Vanderheyden knows.

18        And I'm limited to what's in his interrogatory

19   responses, basically, because of how I'm handcuffed with not

20   being able to talk about areas where counsel was involved,

21   because counsel was involved in all of this.

22        MR. SCHAPER:  The last thing I'll say, Your Honor,

23   is, first of all, we don't believe that this Court has found

24   facts.  I think this Court -- this evidence is the first

25   time it's being presented in this court.

1          More importantly, I think counsel just ignored

2     that they argued to the Court that we should only be able to

3     put on evidence as to whether the destruction of tapes was

4     harmful.  That application was denied.

5          I believe the Court said it would allow us to put

6     on evidence of an innocent explanation, quoting the Eighth

7     Circuit *Stevenson* decision, so that's what we are about to

8     do.

9          And, as I said, they can use the interrogatories

10    for impeachment purposes, so if -- they can ask questions.

11    If the questions elicit testimony they feel is inconsistent

12    with what was said in the interrogatories, then they can use

13    them for that purpose.

14          THE COURT:  I am going to reserve my ruling on

15    this matter and digest this aspect of the arguments based on

16    the arguments that have been made today at this late hour.

17    And you will receive my ruling --

18          MR. COLLYARD:  Thank you, Your Honor.

19          THE COURT:  -- in the future.

20          THE LAW CLERK:  All rise.

21      (Court adjourned at 5:08 p.m.)

22                        *      *      *

23

24

25

1

2

3           I certify that the foregoing is a true and correct

4   copy of the transcript originally filed on 12/05/2022 and
    incorporating redactions requested by Attorney Adine S.
    Momoh.

5
                    Certified by:   *s/ Lori A. Simpson*
6
                            Lori A. Simpson, RMR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25