```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                    )
       Douglas A. Kelley, in his      )   File No. 19-cv-1756
 4     capacity as the Trustee of the )          (WMW)
       BMO Litigation Trust,          )
 5                                     )
               Plaintiff,             )   St. Paul, Minnesota
 6                                     )   October 26, 2022
       vs.                            )   9:01 a.m.
 7                                     )
       BMO Harris Bank N.A., as       )
 8     successor to M&I Marshall and  )
       Ilsley Bank,                   )
 9                                     )
               Defendant.             )
10     ------------------------------------------------------------

11

12

13            BEFORE THE HONORABLE WILHELMINA M. WRIGHT
                 UNITED STATES DISTRICT COURT JUDGE
14
          *    *    *    REDACTED TRANSCRIPT    *    *    *
15

16           (JURY TRIAL PROCEEDINGS - VOLUME XI)

17

18

19

20

21

22

23

24
           Proceedings reported by certified court reporter;
25     transcript produced with computer.
```

```
 1        APPEARANCES:
            For the Plaintiff:        Robins Kaplan, LLP
 2                                     MICHAEL A. COLLYARD, ESQ.
                                       DAVID E. MARDER, ESQ.
 3                                     PETER C. IHRIG, ESQ.
                                       MORGIA D. HOLMES, ESQ.
 4                                     MICHAEL D. REIF, ESQ.
                                       800 LaSalle Avenue
 5                                     Suite 2800
                                       Minneapolis, Minnesota 55402
 6
                                       Anthony, Ostlund, Louwagie,
 7                                     Dressen, Boylan, P.A.
                                       JOSEPH W. ANTHONY, ESQ.
 8                                     JOSEPH R. RICHIE, ESQ.
                                       RYAN M. LAWRENCE, ESQ.
 9                                     90 South Seventh Street
                                       Suite 3600
10                                     Minneapolis, Minnesota 55402

11      For the Defendant:             Stinson, LLP
                                       KEITH S. MOHEBAN, ESQ.
12                                     ADINE S. MOMOH, ESQ.
                                       50 South Sixth Street
13                                     Suite 2600
                                       Minneapolis, Minnesota 55402
14
                                       Debevoise & Plimpton, LLP
15                                     JOHN GLEESON, ESQ.
                                       MICHAEL SCHAPER, ESQ.
16                                     SUSAN REAGAN GITTES, ESQ.
                                       MORGAN A. DAVIS, ESQ.
17                                     919 Third Avenue
                                       New York, New York 10022
18
                                       Mayer Brown, LLP
19                                     JOSHUA D. YOUNT, ESQ.
                                       71 South Wacker Drive
20                                     Chicago, Illinois 60606

21                                     Mayer Brown, LLP
                                       RICHARD A. SPEHR, ESQ.
22                                     GINA PARLOVECCHIO, ESQ.
                                       1221 Avenue of the Americas
23                                     New York, New York 10020

24      Court Reporter:                LORI A. SIMPSON, RMR-CRR
                                       316 North Robert Street
25                                     St. Paul, Minnesota 55101
```

1                        **I N D E X**

2                                                      PAGE

3    **JOHN VANDERHEYDEN**
         Direct Examination (Continued) by Mr. Schaper    2772
4        Cross-Examination by Mr. Collyard               2735
         Redirect Examination by Mr. Schaper             2768
5        Recross-Examination by Mr. Collyard             2773

6    **DEANNA COLEMAN**
         Direct Examination by Mr. Gleeson               2779
7        Cross-Examination by Mr. Anthony                2828
         Redirect Examination by Mr. Gleeson             2854
8        Recross Examination by Mr. Anthony              2865

9    **PAUL STROBLE**
         Direct Examination by Ms. Gittes                2871
10
11   **THOMAS HALLER**
         Direct Examination by Ms. Momoh                 2898

12

13

14   PLAINTIFF'S EXHIBITS                                 REC'D
             120                                         2835
15           228                                         2724
             787                                         2756
16           788                                         2764
             791                                         2760
17

18   DEFENDANT'S EXHIBITS                                REC'D
             40026                                       2802
19           50386                                       2827
             70000                                       2712

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2                           **IN OPEN COURT**

3                           **(JURY PRESENT)**

4              THE COURT:  Good morning.  Please be seated.

5         Good morning.

6              THE WITNESS:  Good morning.

7              MR. SCHAPER:  Good morning, Your Honor.

8              THE COURT:  Good morning.

9              MR. SCHAPER:  May I proceed?

10             THE COURT:  Yes, you may.

11             MR. SCHAPER:  Thank you.

12                        **(John Vanderheyden)**

13                  **DIRECT EXAMINATION** (Continued)

14      BY MR. SCHAPER:

15      Q.  Mr. Vanderheyden, good morning.

16      A.  Good morning.

17      Q.  You testified yesterday that before 2005 -- before 2005,

18      e-mails were stored on backup tapes and e-mail servers; is

19      that right?

20      A.  That's correct.

21      Q.  At that time were e-mails also kept on individual users'

22      computers?

23      A.  They could be, yep.

24      Q.  Okay.  Now, I'd like to talk about the period before

25      2010.  Did M&I have servers where its e-mails were stored?

1    A.   Yes.

2    Q.   And can you tell me about the server system that M&I had

3    during that time.

4    A.   At that time we had a server system that consisted of, I

5    believe, 11 servers, nine of which were out in regional

6    hubs.  One of those regional hubs would have been Minnesota;

7    another would have been Arizona; another in Madison,

8    Wisconsin, so on and so forth.

9          There were also two e-mail servers that were in

10   the greater Milwaukee area; one at the headquarters in

11   downtown Milwaukee, the second in a location called

12   Brookfield, which was -- which is a suburb of Milwaukee.

13   Q.   Okay.  So with these 11 regional servers, did M&I decide

14   at some point to consolidate these regional servers?

15   A.   We did.

16   Q.   And why did M&I decide to do that?

17   A.   There were several reasons.  The largest was the fact

18   that we needed to upgrade the version of Lotus Notes

19   software, and when I say we needed to upgrade it, it is

20   because the version that we were running was about to go end

21   of life.

22          End of life means a few things.  Number One, no

23   additional support for problems.  It means no future

24   releases of functionality.  And the biggest is no further

25   security patches.

1    Q.  And when you say "no further security patches," what
2    does that refer to?
3    A.  That would refer to should some flaw in the software be
4    exploitable by a bad actor, there would be no further
5    patches to close that door.
6    Q.  And what about the hardware, the actual equipment of the
7    regional servers, was that also nearing end of life?
8    A.  Yeah.  The majority of it, greater than 75 percent of
9    those regional servers had reached basically their end of
10   life and would have needed replacement within a year or two.
11   Q.  When M&I was deciding to consolidate its servers, was
12   that something that was considered by your IT group at the
13   time?
14   A.  It was.
15   Q.  And did your group consult any outside software or
16   hardware providers as you were making this decision?
17   A.  Yeah.  We consulted with both Microsoft and with IBM.
18   Q.  And who made the recommendation to consolidate the
19   servers?
20   A.  That would have been me and my team.
21   Q.  And approximately when did the IT department begin
22   planning the consolidation project?
23   A.  Probably in the time frame of June-ish 2009, maybe just
24   a bit before that.
25   Q.  Mr. Vanderheyden, I'd like to show you what's been

1    marked for identification DX-70000.  If you would turn in

2    your binder to that.

3    A.  Okay.

4    Q.  Do you recognize this document, Mr. Vanderheyden?

5    A.  I do.

6    Q.  At a high level, what is it?

7    A.  This is a presentation that I actually authored and

8    presented to the management team of M&I support services,

9    which was the operational group within M&I Bank at the time,

10   describing what we were doing relative to the e-mail servers

11   and services.

12   Q.  And what's the date on this presentation?

13   A.  February 2010.

14   Q.  And you said that you authored it?

15   A.  I did.

16   Q.  And did you give the presentation?

17   A.  I did.

18   Q.  Did you create this presentation in the normal course of

19   your duties at M&I?

20   A.  Yes.

21             MR. SCHAPER:  Your Honor, we offer into evidence

22   DX-70000.

23             MR. COLLYARD:  Objection, Your Honor, based on the

24   basis that we spoke about late afternoon yesterday.

25             THE COURT:  Objection is overruled.

```
 1                    MR. SCHAPER:  All right.  If we could please
 2        publish that.
 3        BY MR. SCHAPER:
 4        Q.  So, again, just briefly, Mr. Vanderheyden, what was the
 5        purpose of this presentation?
 6        A.  It was just to describe at a very high level how we were
 7        rearchitecting and consolidating these services.
 8        Q.  Okay.  If we could please turn to the next page of your
 9        presentation.
10        A.  Would that be page 3?
11        Q.  Yes.  It's DX-70000-0003.  And this says, "Mail and
12        Application Servers (11)."  Are these the 11 regional
13        servers that you testified about a few minutes ago?
14        A.  They are.
15        Q.  And the Milwaukee and Brookfield servers are kind of set
16        off to the right in bigger boxes.  Can you explain what you
17        were communicating there.
18        A.  They were, in fact, larger servers and -- but, more
19        importantly, they were maintained in our two core data
20        centers at the time.  When I say "core data centers," it
21        meant that they were better environmentally protected with
22        redundant power, redundant cooling, Halon gas fire
23        suppression, video surveillance and badge access.
24        Q.  And did all the regional servers that are on the left,
25        did all of those servers have the same attributes that you
```

1    just described?

2    A.  Not the environmentals in their locations, no.

3    Q.  If you look at the next page of your presentation, 0004,

4    what were you communicating here when you gave this

5    presentation?

6    A.  Two points here.  One was elimination of all of those

7    e-mail servers in those regional hubs and the addition of

8    two larger boxes -- one again in Milwaukee at the downtown

9    data center, and one in Brookfield -- that would serve the

10   functions of all of those regional servers.

11   Q.  And if we turn to the next page of the presentation,

12   Mr. Vanderheyden, it says, "What We Gain.  Centralization,

13   Consolidation, and Clustering."  Does the remainder of the

14   presentation explain the benefits there?

15   A.  Yes, of each of them.

16   Q.  Okay.  So let's go to the next page, then, and this --

17   am I right that this is talking about the benefits of

18   centralization?

19   A.  Yes, the first page is about breaking down

20   centralization.

21   Q.  And can you just explain for the jury what you were

22   communicating here.

23   A.  Okay.  Well, the first bullet point is that all of our

24   e-mail will be served out of those two higher-grade

25   facilities.

1      It took advantage of upgrades to the Wide Area

2   Network, and that is the private network that M&I subscribed

3   to, such as what you would do for your own ISP at home and

4   what have you.

5   Q.  And protecting equipment in higher-grade data centers,

6   is that what you were referring to a few minutes ago?

7   A.  That's what I was referring to, yes.

8   Q.  So the Milwaukee and Brookfield, Wisconsin, data centers

9   were the higher-grade, higher-protection ones rather than

10  the regional servers?

11  A.  That's correct.

12  Q.  And what does "services and expertise in same location"

13  refer to?

14  A.  That simply meant that all of our messaging engineers

15  resided in the Milwaukee area.

16  Q.  Thank you, Mr. Vanderheyden.

17      Let's turn to the next page, and this says,

18  "Consolidation."  Can you please explain for the jury what

19  the benefits of consolidation were when it came to the

20  server consolidation project that you have been testifying

21  about.

22  A.  Correct.  Okay.  So the two keys on here are Points Two

23  and Three.  The end of the day there are just less moving

24  parts to manage, less servers, less service contracts on

25  each one, less licensing, you name it.  So at the end of the

1    day, less moving parts in the environment, and, therefore,

2    we lowered our overall operating costs in both licensing and

3    maintenance.

4    Q.  And you said, "The Less in Less is More."  What does

5    that refer to?

6    A.  That means even though we were not replacing all of

7    these servers one by one in kind, we will have less servers

8    in the environment, but it's actually going to provide us

9    more capability.

10   Q.  All right.  If we turn to the next page, and this is the

11   third of the benefits in your presentation, it talks about

12   "clustering."  Can you explain to the jury what this refers

13   to.

14   A.  Sure.  And this is an important point, because when we

15   put those two new larger servers, one in Milwaukee, one in

16   Brookfield, they were actually identical copies of each.  So

17   all mailboxes were available on each of those servers.  We

18   pointed half of the user population to say that's your

19   primary home.  The other half it was their primary home at

20   the other location.

21        The key is, should we have an issue, whatever the

22   issue might be, a network issue, a building fire, an

23   electrical issue, you name it, at one of those facilities,

24   we could simply point the users that were pointed there as

25   their primary to the other one, and within a matter of a

1      minute, have everybody back up and running.

2      Q.   Under the old regional server system, what would have

3      happened if there was some kind of outage at a regional

4      server, whether it be the one here in Minnesota or Phoenix

5      or wherever, what would have happened then?

6      A.   We would have waited for parts.  And it could have

7      been -- you know, we would have measured uptime again in

8      days or weeks rather than in minutes.

9      Q.   And can you just briefly explain, Mr. Vanderheyden, what

10     it means when you say, "Reduced unplanned incident outages

11     and reduced planned change outages."

12     A.   So reduced unplanned meant incidents that we didn't plan

13     for, such as, call it power, fire, network, what have you.

14              Planned outages are those that we would plan for

15     and, for instance, do a software, hardware, operating system

16     upgrade.

17     Q.   And then finally, can you just explain what you were

18     communicating in this presentation when you say, "The More

19     in Less is More."

20     A.   This is another example of how we are getting more out

21     of less equipment.

22     Q.   When was the server consolidation project that we've

23     been talking about completed?

24     A.   In the first quarter -- first or second quarter of 2010.

25     Q.   Okay.  To your knowledge, were any of M&I's lawyers

1    involved in or aware of this presentation?

2    A.  No.

3              MR. COLLYARD:  Objection, Your Honor, based on the

4    conversations we had yesterday and the rulings of the Court.

5              MR. SCHAPER:  I'm just asking about his knowledge,

6    Your Honor.

7              THE COURT:  Pardon me?

8              MR. SCHAPER:  I'm just asking about his own

9    personal knowledge.

10             THE COURT:  As to what?

11             MR. SCHAPER:  As to whether particular people were

12   aware of this presentation.

13             MR. COLLYARD:  Objection, Your Honor, he said

14   lawyers.

15             THE COURT:  Sustained.

16   BY MR. SCHAPER:

17   Q.  Mr. Vanderheyden, were there any M&I lawyers in

18   attendance when you gave this presentation?

19   A.  No.

20             MR. COLLYARD:  Same objection, Your Honor.

21             THE COURT:  Sustained.

22   BY MR. SCHAPER:

23   Q.  Mr. Vanderheyden, was all of the data from the regional

24   servers transferred and maintained on the consolidated

25   servers?

1    A.  Yes, all of the data that was on every one of those

2    regional servers was transferred over to that consolidated

3    server set.

4    Q.  And as part of this e-mail server consolidation, were

5    backup tapes made?

6    A.  There was a final -- yeah, there was normal course of

7    business backups made all along the way, and then we took a

8    final backup of those regional machines before we turned

9    them off.

10   Q.  Can you just explain -- I think you've talked about this

11   briefly yesterday, but what is a backup tape?

12   A.  A backup tape is simply a copy of what exists on that

13   server at the point in time where the backup is taken.

14   Q.  And what is the purpose of backup tapes?

15   A.  Disaster recovery.

16   Q.  So if a backup tape were made today and then a second

17   backup tape were made tomorrow, what would be the difference

18   in their contents?

19   A.  Well, the vast, vast majority would be the same.  The

20   only difference between Day One and Day Two would be new

21   mail sent or received on Day Two, which wouldn't have been

22   on Day One's, and any e-mail deleted on Day Two.  So add

23   one, subtract the other; but, in general, you know, 99

24   percent of the contents was the same.

25   Q.  Returning to the consolidation project, why were backup

1    tapes made as part of that project?

2    A.  Safety measure.

3    Q.  And so what happened to the e-mail backup tapes that

4    were made from those regional servers after the server

5    consolidation project was successful?

6    A.  Those were held.

7    Q.  I'm sorry?

8    A.  Those were held.

9    Q.  Did there come a time when -- after the consolidation

10   project was successful that those backup tapes were

11   recycled?

12   A.  I don't know for sure, and it could have happened after

13   I had left M&I.  I don't know.

14   Q.  Did there come a time after the server consolidation

15   project was successful that those backup tapes -- those

16   normal course backup tapes were no longer needed?

17   A.  Yes.

18   Q.  Okay.  And at that point when it was determined that

19   they were no longer needed, were they then recycled?

20   A.  Yes.

21   Q.  When that was done, did M&I even have the equipment that

22   would have been necessary to read those backup tapes?

23   A.  No.

24   Q.  And at the time of the consolidation, again, in 2010,

25   did M&I have an e-mail system for -- strike that.

```
1                   At the time of the consolidation, did M&I have a
2       system for e-mail retention?
3       A.  We did.
4       Q.  And what was that system?
5       A.  Again, that was the Legato e-mail system, which was an
6       actual archive of every transaction.
7       Q.  And is Legato what you talked about yesterday as
8       maintaining a copy of all e-mails sent and received from any
9       employee since March 2005?
10      A.  Yes.
11      Q.  And that also included all e-mail attachments?
12      A.  Yes.
13      Q.  Mr. Vanderheyden, did the server consolidation project
14      that we've been talking about have anything to do with Tom
15      Petters or PCI?
16      A.  No.
17      Q.  Did the recycling of backup tapes after that project was
18      complete have anything to do with Petters or PCI?
19      A.  No.
20      Q.  Did anyone from outside the IT department at M&I direct
21      that backup tapes be recycled?
22                  MR. COLLYARD:  Objection, leading.
23                  THE COURT:  Overruled.
24                  THE WITNESS:  Can I answer?
25                  THE COURT:  You may answer.
```

Vanderheyden - Direct

1      THE WITNESS:  No.

2  BY MR. SCHAPER:

3  Q.  Were the backup tapes recycled for the purpose of

4  concealing the information that was contained on them?

5      MR. COLLYARD:  Objection, leading, Your Honor.

6      THE COURT:  Sustained.

7  BY MR. SCHAPER:

8  Q.  Mr. Vanderheyden, when you were involved in the

9  consolidation project, did you even know what documents or

10  information were on the backup tapes?

11  A.  No.

12  Q.  Given that you didn't know, was there any reason for the

13  recycling that related to trying to conceal the information

14  on the tapes?

15      MR. COLLYARD:  Objection, leading and

16  argumentative.

17      THE COURT:  Sustained.

18  BY MR. SCHAPER:

19  Q.  Mr. Vanderheyden, what steps would you have needed to

20  take to have figured out what documents were on the backup

21  tapes?

22  A.  The only way to do that would have been to load up the

23  backup tape onto another server, open up a Lotus Notes

24  client and basically read every e-mail.  There were --

25  Q.  Did you -- I'm sorry.

1    A.  -- very limited search capabilities.

2    Q.  Did you ever consider doing that?

3    A.  Absolutely not.

4    Q.  Did you personally ever hear anyone else consider doing

5    that?

6    A.  No.

7    Q.  In recycling the backup tapes, did it ever occur to you

8    that you might be getting rid of the only copies of

9    documents that could be relevant to a litigation?

10              MR. COLLYARD:  Objection, Your Honor, leading.

11              THE COURT:  Overruled.

12              THE WITNESS:  No.

13   BY MR. SCHAPER:

14   Q.  Mr. Vanderheyden, do you -- am I correct that you have

15   been deposed in this case before?

16   A.  I have.

17   Q.  You've had your deposition taken?

18   A.  Correct.

19   Q.  Do you recall at one of your depositions seeing a

20   subpoena concerning PCI in 2008?

21   A.  Yes.

22   Q.  And before being involved in depositions for this

23   lawsuit, had you seen that subpoena before?

24   A.  That was the first time I saw that.

25   Q.  Okay.  If you would turn to P-228, Mr. Vanderheyden.

 1              Do you recognize this as the subpoena that you

 2      were shown during your deposition?

 3      A.  Yes.

 4      Q.  And it's dated September 23rd, 2008?

 5      A.  Yes.

 6              MR. SCHAPER:  Your Honor, we'd offer P-228 into

 7      evidence.

 8              MR. COLLYARD:  No objection, Your Honor.

 9              THE COURT:  P-228 is received.

10      BY MR. SCHAPER:

11      Q.  So if you look at the top, Mr. Vanderheyden, this was a

12      subpoena that was directed at the custodian of records at

13      M&I Bank.  Do you see that?

14      A.  I do.

15      Q.  And I'd like you to turn to the second page, and can you

16      describe at a high level the types of documents that this

17      subpoena was requesting.

18      A.  These are what would be considered official bank

19      records.

20      Q.  So -- and when you say "official bank records," so in

21      terms of the categories, savings account records, checking

22      account records, loan records, safe deposit box records,

23      certificates of deposit and money market certificates, are

24      you saying that those are what you view as official bank

25      documents?

1    A.  Yes.

2    Q.  And I don't need to go through each one of them, but on

3    the next page, 0003, treasury notes, credit card records,

4    purchases of bank checks, are those also, in your view,

5    official bank records?

6    A.  Yes.

7    Q.  Were these types of documents maintained by the IT group

8    that you oversaw?

9    A.  No.

10   Q.  Were they maintained by some other group within the

11   bank?

12   A.  They were.

13   Q.  Do you have any reason to believe that M&I did not take

14   steps to comply with this subpoena in 2008?

15   A.  I have no reason to believe that.

16   Q.  Okay.  Could you please turn to P-554.  Do you see this

17   document?

18   A.  I do.

19           MR. SCHAPER:  And this is a document that I

20   believe has already been admitted, Your Honor.  It's a court

21   order in a case against Mr. Petters.

22   BY MR. SCHAPER:

23   Q.  Mr. Vanderheyden, did you see this document for the

24   first time in preparing for your testimony?

25   A.  Yes.

1    Q.  And I'd like to direct your attention to page 9 of the

2    document.

3    A.  Okay.

4    Q.  Do you see that there's a section called, "Recordkeeping

5    and Business Operations"?

6    A.  I do.

7    Q.  And if you look towards the end of that first paragraph,

8    do you see that this concerns business, corporate,

9    foundation, banking, financial, and/or accounting records.

10   Do you see that reference?

11   A.  I do.

12   Q.  And is there a name as how you would describe these

13   types of documents?

14   A.  Again, these are all official banking documents.

15   Q.  And, again, were these types of documents maintained by

16   your IT group?

17   A.  They were not.

18   Q.  They were maintained by some other group in the bank?

19   A.  Yes.

20   Q.  Do you have any reason to believe that M&I did not take

21   steps to comply with this order?

22   A.  No.

23   Q.  You can put that aside.  Thank you.

24        Mr. Vanderheyden, did there come a time when you

25   received or your group received a litigation hold concerning

1    PCI?

2    A.  Yes.

3    Q.  And just briefly, what is a litigation hold?

4    A.  Litigation hold was a document issued by either internal

5    or external counsel that would list the names of the parties

6    who were being asked to hold all their documents.  There

7    would be a general reference to a case, and it would

8    basically describe to the folks not to destroy any of their

9    actual printed documents.  And we, myself and my team, would

10   be copied on that legal hold.

11   Q.  And when did you first receive that hold notice with

12   respect to PCI?

13   A.  I believe that was January of 2010.

14   Q.  And did your group have a practice regarding retaining

15   documents related to litigations?

16   A.  We did.

17   Q.  And was the legal hold that you received in January 2010

18   related to PCI the kind of notice that you would deal with

19   under those practices?

20   A.  Yes.

21   Q.  Did your team take steps to implement that hold notice?

22   A.  Yes, we did.

23   Q.  What steps did your team take?

24   A.  Okay.  So based on the names of the parties that were to

25   hold their documents, Number One, we took a copy, generally

Vanderheyden - Direct

1    on a thumb drive, of everything that was on their personal

2    computer, whether it was a laptop or a work station, and

3    retained that.

4         Secondly, we would go to their -- what we would

5    call network share, where they could save documents on a

6    network file server, and we took a copy of that as well.

7         Also, based on who they were, we could identify

8    what departmental file systems on that file server that they

9    could participate in, and we took copies of that as well.

10   Q.  Did there also come a time, Mr. Vanderheyden, when there

11   were searches in the Legato system you've testified about

12   with respect to this hold?

13   A.  Yes.

14   Q.  Did your team also do anything to look at backup tapes

15   for non-e-mail documents?

16   A.  We did.  So when we took all of those copies of the

17   personal computer and all of the potential network drives

18   that these people could store documents on, we also backed

19   that -- took a special backup of all of those and held that

20   and, in fact, later searched those.

21   Q.  And is it correct that there are different backup tapes

22   for non-e-mail documents than there are for e-mail

23   documents?

24   A.  Yes.  They are completely separate technologies and

25   systems.

1    Q.  And is there a reason that your team searched backup

2    tapes for non-e-mail documents but not backup tapes for

3    e-mails?

4    A.  We considered the Legato system our official archive of

5    all of the e-mail activity.

6    Q.  Mr. Vanderheyden, would you have taken all of these

7    steps if you wanted to hide documents related to Petters and

8    PCI?

9            MR. COLLYARD:  Objection, leading and

10   argumentative.

11           THE COURT:  Sustained.

12   BY MR. SCHAPER:

13   Q.  Mr. Vanderheyden, why did you take these steps?

14   A.  Because it was the right thing to do.  It was looking

15   everywhere we could find an electronic document that would

16   have been associated with the people that were so-called

17   custodians or those that were notified that they were on

18   legal hold.

19   Q.  Mr. Vanderheyden, have you -- did you ever use backup

20   tapes as a way to retrieve e-mails for litigation?

21   A.  Never.

22   Q.  By the time that you received this legal hold notice in

23   January 2010, had the server consolidation project you

24   testified about earlier already been planned?

25   A.  Yes.

Vanderheyden - Direct

1    Q.  When you received this hold notice, did you ever connect

2    the server consolidation project to the PCI hold notice?

3    A.  No.

4    Q.  Let me switch topics, Mr. Vanderheyden.  Were you aware

5    that there was an effort in 2014 to try to find backup

6    tapes?

7    A.  I am.

8    Q.  And in your understanding, what time period was the

9    focus of that effort in terms of the dates of the backup

10   tapes?

11   A.  Pre-March of 2005.

12   Q.  Was there a -- at this point had M&I become BMO Harris

13   in 2014?

14   A.  Yes.

15   Q.  Was there a BMO Harris --

16   A.  Excuse me.  No.  2014?

17   Q.  Well --

18   A.  Yes, yes, yes.

19   Q.  So BMO Harris had bought M&I?

20   A.  Yeah, yes.

21   Q.  Okay.  Just want to make sure I don't get the names

22   wrong.

23          Was there a BMO Harris location at which the

24   effort to find backup tapes was focused in 2014?

25   A.  Yes, there was.

1    Q.  And did people from your IT team conduct a search there?

2    A.  Yes, they did.

3    Q.  What was the name of that location?

4    A.  It was Centre Point.  It was an office facility.

5    Q.  Where is Centre Point?

6    A.  West Allis, Wisconsin.

7    Q.  And who on your team undertook that search?

8    A.  A gentleman -- a messaging engineer by the name of Dave

9    Scherer.

10   Q.  What is your understanding of what Mr. Scherer found?

11   A.  He was able to find some backup tapes.  He described to

12   me that -- yes, and he reported that back to me.

13   Q.  Were any of the backup tapes that he found dated prior

14   to March 2005?

15   A.  No.

16             MR. COLLYARD:  Objection, lack of foundation.

17             THE COURT:  Overruled.

18             THE WITNESS:  Should I answer?

19   BY MR. SCHAPER:

20   Q.  What was your answer?  Yes.

21   A.  No.

22   Q.  Did you communicate this information about the discovery

23   of tapes to anyone?

24   A.  I did.

25             MR. SCHAPER:  If we could please put up a document

1    that's already been admitted.  It's P-325.

2    BY MR. SCHAPER:

3    Q.  Mr. Vanderheyden, if you'd take a look at that, is this

4    the communication that you're talking about?

5    A.  Yes, it is.

6    Q.  And can you just read -- first of all, this is an e-mail

7    from yourself dated August 26th, 2014; is that right?

8    A.  That's correct.

9    Q.  And it's to two individuals at the Godfrey law firm?

10   A.  That's correct.

11   Q.  Can you just read what you wrote there.

12   A.  "Dave looked in all the nooks and crannies over there

13   today and found a total of (6) backup tapes from the

14   Minnesota e-mail server.  The oldest one was MSP105 labeled

15   'August '07.'"

16   Q.  Is the Dave that you reference in the e-mail, is that

17   Mr. Scherer who you just referred to?

18   A.  Yes.

19   Q.  And what was your intent in writing this e-mail?

20   A.  It was to inform our external counsel on this that we

21   didn't -- we were not able to find anything prior to March

22   2005, but we did find some things and reported what we did

23   find.

24   Q.  And you said that "The oldest one was MSP105 labeled

25   'August '07,'" correct?

1    A.  That's correct.

2    Q.  And looking at that e-mail, what does -- what did "MSP"

3    signify to you?

4    A.  MSP meant it was Minnesota.  For all of those regional

5    servers that were out there, those nine, we used the airport

6    code of the location.  So MSP meaning Minneapolis/St. Paul.

7    Q.  Were there other prefixes like that for other regional

8    servers?

9    A.  Yes, they all did.  We had prefixes on all of them, and

10   a couple that were pretty close were MSN, which was Madison,

11   Wisconsin, and MKE, which would have been Milwaukee.

12   Q.  And what about August '07, what does that refer to?

13   A.  That would have been the month end backup tape from

14   August of 2007.

15   Q.  Was it a practice to label backup tapes with the airport

16   code that you just explained and the date?

17   A.  Yes.

18   Q.  Do you know what 105 refers to?

19   A.  105 is just the directory sequential number generated by

20   the backup software.

21   Q.  Do you have any understanding of whether there's a

22   particular standard for that or is that the extent of your

23   understanding?

24   A.  That's the extent of my understanding.

25   Q.  But you were aware of a practice for MSP and August '07?

1    A.  Yes.

2    Q.  Mr. Vanderheyden, did you or anyone in your IT group, to

3    your knowledge, do anything further regarding these tapes

4    that were found in 2014?

5    A.  No.

6    Q.  And why not?

7    A.  Well, they were held there.  We had them and they were

8    held, but we were not asked at that point in time, I don't

9    believe, to search anything on them.

10   Q.  Can you remind us what date -- what kind of tapes, in

11   terms of their dates, were you looking for.

12   A.  We were really looking for anything pre-Legato or

13   pre-March 2005.

14   Q.  Are you aware of anyone at M&I destroying the backup

15   tapes after they were found at the Centre Point facility in

16   2014?

17   A.  No.

18   Q.  Mr. Vanderheyden, you just testified that you're

19   familiar with how parts of this MSP105 August '07 label were

20   generated; is that right?

21   A.  Yes.

22   Q.  And do you have a view on the likelihood that there

23   would be two tapes labeled MSP105 and dated August 2007?

24   A.  I don't think it would be possible.

25   Q.  All right.  So just to wrap up, Mr. Vanderheyden, did

Vanderheyden - Cross

```
 1    you ever ask anyone to destroy documents with the purpose of

 2    hiding information about PCI?

 3    A.  No.

 4    Q.  Did anyone ever instruct you to do that?

 5    A.  Absolutely not.

 6    Q.  At any time did you participate in an effort to do that?

 7    A.  No.

 8    Q.  Did you know what was on the backup tapes that were

 9    recycled in 2010?

10    A.  I did not.

11    Q.  Did the server consolidation project that your team led

12    have anything whatsoever to do with Tom Petters or PCI?

13    A.  No.

14             MR. SCHAPER:  No further questions at this time,

15    Your Honor.

16             MR. COLLYARD:  May I proceed, Your Honor?

17             THE COURT:  Yes, you may, with cross-examination.

18                        **CROSS-EXAMINATION**

19    BY MR. COLLYARD:

20    Q.  Good morning, Mr. Vanderheyden.

21    A.  Good morning.

22    Q.  If we can go back to Exhibit 325, please.  I'll put that

23    up.  And I just want to go through this e-mail with you too,

24    just so the jury understands and I understand what your

25    testimony was here.
```

Vanderheyden - Cross

```
 1                    This was an e-mail that you sent on August 26th of
 2       2014; is that right?
 3       A.  That's correct.
 4       Q.  And who are you sending the e-mail to?
 5       A.  Adam Cares at Godfrey & Kahn, as well as Jonathan
 6       Ingrisano at Godfrey & Kahn.
 7       Q.  And what you do is you say in here, you say, "Dave
 8       looked in all the nooks and crannies over there today and
 9       found a total of (6) backup tapes."  Do you see that?
10       A.  I do.
11       Q.  You testified earlier that you found some backup tapes,
12       right?
13       A.  Correct.
14       Q.  The Dave Scherer in the e-mail actually found six,
15       didn't he?
16       A.  Yes.
17       Q.  And, Mr. Vanderheyden, you have no idea if those tapes
18       exist today, do you?
19       A.  Today?
20       Q.  Yes.
21       A.  No.
22       Q.  And you have no idea if they were destroyed immediately
23       after this, do you?
24       A.  I don't have any reason to believe they would have been
25       destroyed.
```

```
1    Q.  For all you knew, they were destroyed after this e-mail,

2    correct?

3              MR. SCHAPER:  Objection, argumentative.

4              THE COURT:  Sustained.

5    BY MR. COLLYARD:

6    Q.  Mr. Vanderheyden, do you know that these tapes were

7    destroyed?

8    A.  No.

9    Q.  Do you have an understanding as to any court rulings in

10   this case about whether or not these tapes have been

11   destroyed?

12             MR. SCHAPER:  Objection, Your Honor,

13   argumentative, prejudicial as to court rulings.

14             THE COURT:  Sustained.

15   BY MR. COLLYARD:

16   Q.  So you can't testify one way or another whether or not

17   those tapes were in existence or destroyed after 2000 --

18   after August 26th, 2014?

19             MR. SCHAPER:  Objection, asked and answered.

20             THE COURT:  Sustained.

21   BY MR. COLLYARD:

22   Q.  You said -- you say there's one that was labeled August

23   of '07, right?

24   A.  Correct.

25   Q.  What was the exact label of that tape?
```

1    A.  MSP105 labeled August '07.

2    Q.  So the label actually just said "Aug '07"; is that

3    right?

4    A.  Yes.

5    Q.  Did the label have any more information on it?

6    A.  MSP105.

7    Q.  Other than that, anything else?

8    A.  That would have probably been it.

9    Q.  Do you have any idea what the labels were for the other

10   five tapes that Dave Scherer found?

11   A.  I do not because we were really looking for anything old

12   and that was the oldest.

13   Q.  My question is:  Do you have any idea what the labels

14   were for the other five tapes that were found?

15   A.  I do not.

16   Q.  Did you ever physically see the tapes?

17   A.  I did not.

18   Q.  So you have absolutely no knowledge of the tapes?

19           MR. SCHAPER:  Objection, foundation.

20           MR. COLLYARD:  I'm asking him about his knowledge

21   of the tapes.

22           THE COURT:  Overruled.

23   BY MR. COLLYARD:

24   Q.  You have no knowledge -- I'm sorry, let me back up.

25           You have absolutely no knowledge of the physical

1    tapes, correct?

2    A.  I have no reason to believe that Dave would have told me

3    information that was not accurate.

4    Q.  Mr. Vanderheyden, what I'm asking you is if you have any

5    knowledge of what the tapes were or if you ever saw them.

6    A.  I never saw them physically.

7    Q.  And M&I Bank, BMO Harris -- I'm sorry.  This was BMO

8    Harris Bank at this time, right?

9    A.  Correct.

10   Q.  BMO Harris Bank did not search those tapes, did they?

11   A.  Not to my knowledge.

12   Q.  And so you don't know -- let's start with you first.

13   You don't know of any e-mails that were on those backup

14   tapes, do you?

15   A.  No.

16   Q.  You can't tell the jury what the content was of any of

17   the information on these six backup tapes, right?

18   A.  Correct.

19   Q.  And you're not aware of anybody else at BMO Harris Bank

20   that could say what the content of any of those e-mails were

21   on those backup tapes, correct?

22            MR. SCHAPER:  Objection, vague as to time.

23            THE COURT:  Overruled.

24            THE WITNESS:  Should I answer?

25   BY MR. COLLYARD:

VanderHeyden - Cross

1    Q.  Yes, please.

2    A.  Okay.  Well, given the time frame, that that backup tape

3    was August '07, any e-mails that were actually on there that

4    were sent or received post-March 2005 were in the Legato

5    archive, that I can tell you for sure.

6    Q.  What I'm asking you, if you know of anybody at BMO

7    Harris Bank who knows what the exact content was of any

8    e-mails on those backup tapes.

9    A.  Not -- I don't.  Not personally.

10   Q.  Let's talk about backup tapes for a moment.  Okay?

11           And even if you take the one that is labeled Aug

12   of '07, are you with me?

13   A.  Yes.

14   Q.  Okay.  You understand that backup tapes can have years

15   of information going back, right?

16   A.  Absolutely.

17   Q.  So that Aug '07 backup tape could contain e-mails that

18   go years back, right?

19   A.  Yes.

20   Q.  And so it could contain e-mails, for example, that were

21   dated in 2003, right?

22   A.  Possible.

23   Q.  And it could contain e-mails that were dated in 2004,

24   correct?

25   A.  Possible.

Vanderheyden - Cross

1    Q.  And the other five backup tapes where there is no label

2    mentioned, all of those backup tapes could have contained

3    information going way back to 2002 or 2003, correct?

4    A.  They could, but that same old information would have

5    been on the August '07 tape.

6    Q.  What I'm asking you, Mr. Vanderheyden, is if those other

7    backup tapes that are not mentioned could have had e-mails

8    going all the way back to 2003 or 2004?

9    A.  Yes.

10   Q.  And they could have contained attachments going all the

11   way back from 2003 to 2004, correct?

12   A.  Correct.

13   Q.  Now, you talked about -- you testified that you were

14   looking for backup tapes that were dated before the

15   implementation of Legato, which was March of 2005; is that

16   right?

17   A.  That's correct.

18   Q.  Isn't it true, Mr. Vanderheyden, that what you were

19   doing when you were conducting this search is that you were

20   looking for backup tapes created before the implementation

21   of Legato so that you could locate e-mails that were sent or

22   received before M&I had implemented Legato?

23   A.  Yes.

24   Q.  Okay.  So what you were doing -- you weren't looking

25   necessarily just for backup tapes that were labeled after

Vanderheyden - Cross

1    2005, you were looking for backup tapes that contained

2    e-mails that were sent or received before March of 2005,

3    correct?

4           MR. SCHAPER:  Objection, misstates the testimony.

5           THE COURT:  Overruled.  You may answer whether

6    that's correct.

7           THE WITNESS:  Yes.

8    BY MR. COLLYARD:

9    Q.  Yes.  So what you were doing, just to be clear, is you

10   were looking for backup tapes that could have e-mails,

11   e-mails dated before March of 2005, correct?

12   A.  Yes.

13   Q.  And the reason why you were looking for this is because

14   BMO Harris Bank was involved in another lawsuit in Florida;

15   is that right?

16   A.  That's correct.

17   Q.  And as a result of that, BMO Harris Bank was being

18   questioned about whether or not any e-mails existed before

19   the implementation of Legato because of the backup tapes

20   that were destroyed in 2010 and 2011; is that also correct?

21          MR. SCHAPER:  Objection to form.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes.

24   BY MR. COLLYARD:

25   Q.  And you agree with me that backup tapes were destroyed

Vanderheyden - Cross

1    in 2010 and 2011, correct?

2    A.  Yes.

3    Q.  Do you have any idea how many backup tapes were

4    destroyed in 2010 and 2011?

5    A.  I do not.

6    Q.  Okay.  Let's talk about backup tapes again.  So we have

7    six backup tapes there.  Do you have any idea as to how many

8    pages of e-mails or documents could live on or exist on a

9    backup tape?

10   A.  I wouldn't have an actual count, but it would be a lot.

11   Q.  It would be a lot, right?

12   A.  Yes.

13   Q.  We're talking millions of pages of documents, right?

14   A.  Probably.

15   Q.  We're talking tens of millions of pages, correct?

16   A.  Could be.

17   Q.  And so is it fair to say, Mr. Vanderheyden, that there

18   could be millions of pages of documents on these backup

19   tapes that were found in August of 2014 that dated back to

20   2003 or 2004?

21   A.  It is possible.

22   Q.  Go back to the backup tapes that were destroyed in 2010

23   and 2011 real quickly.

24           You're not aware of any e-mails that were on those

25   backup tapes, correct?

1    A.  No.

2    Q.  So you can't say what the content of any of those

3    potentially millions and millions of pages of e-mails were,

4    correct?

5    A.  Right.

6    Q.  And you testified that nobody from the bank actually

7    looked at them, right?

8    A.  Not to my knowledge.

9    Q.  And you also testified that backup tapes could be

10   restored; is that right?

11   A.  They could be.

12   Q.  They can be brought back to life so you can actually

13   look at them, correct?

14   A.  Yes.

15   Q.  And that is something that BMO Harris Bank could have

16   done, right?

17   A.  Yeah.  But as I described, the process to do that would

18   have been basically reading every one of those millions of

19   e-mails to try to find relevant content.

20   Q.  I appreciate that, and that wasn't my question.

21        My question was:  Was it possible for BMO Harris

22   Bank to go back and restore those backup tapes?

23   A.  It was.

24   Q.  So that those backup tapes could be read and you could

25   see all the millions of pages of e-mails that were on them,

1     right?

2     A.  Yes.

3     Q.  That could be done?

4     A.  Yes.

5     Q.  Okay.  Now, you talked about how you're familiar with

6     the legal hold process in litigation, right?

7     A.  Correct.

8     Q.  And if we back up, let's just describe that a little bit

9     more.  Tell me if this is fair.  When a party is involved in

10    a lawsuit or they anticipate being involved in litigation,

11    that is when legal hold duties trigger; is that right?

12    A.  That's correct.

13    Q.  And so your department gets brought in at that point in

14    time to figure out, okay, there's either a lawsuit going on

15    or there might be a lawsuit that's coming up and we've got

16    to figure out how to preserve and keep the information in

17    evidence; is that right?

18    A.  That's correct.

19    Q.  And that was part of your duties and responsibilities?

20    A.  Yes.

21    Q.  Now, as part of that, do you understand what unique

22    information is?

23    A.  I would assume it's unique, meaning there's only one

24    place or one copy.

25    Q.  And have you dealt with, in the context of legal holds,

1    determining how to preserve and keep unique information?

2    A.  Could you repeat the question?

3    Q.  Sure.  In your experience, have you been involved in, in

4    the litigation hold process, trying to determine how to

5    preserve and keep unique information?

6    A.  Yes, not specifically just unique information, but

7    information.

8    Q.  And do you agree with me that if unique information

9    lives on backup tapes, backup tapes are kept in the course

10   of litigation, correct?

11   A.  Generally, yes.

12   Q.  And generally they're not destroyed, are they?

13             MR. SCHAPER:  Objection to form, vague.

14             THE COURT:  Overruled.  You may answer.

15             THE WITNESS:  Generally they wouldn't be.

16   BY MR. COLLYARD:

17   Q.  No, they would be kept so that that unique information

18   could be restored and looked at, correct?

19   A.  In general I'd have to say yes, you are correct, but in

20   this case practical to go through millions of e-mails and

21   read each one to determine if it had relevant content, I

22   don't think it was practical.

23   Q.  That's not what I'm asking you, Mr. Vanderheyden.

24   A.  I realize that.

25   Q.  Yeah.  What I'm asking you is that the reason why during

```
 1   the course of litigation in your roles and responsibility

 2   that that information is preserved and kept is so that

 3   unique information, unique evidence can go back and be

 4   looked at and found, right?

 5   A.  Correct.

 6   Q.  And of course there is a cost to that, correct?

 7   A.  There is big cost.

 8   Q.  Okay.  And the reason why litigation holds go in place

 9   is so that information can be kept so that parties and

10   courts can determine whether that information needs to be

11   looked at, right?

12   A.  Yes.

13   Q.  That's a fair characterization of that process?

14   A.  I would say so.

15   Q.  Now, can we please go back to Exhibit 554,

16   Mr. Vanderheyden.  And I am going to put that up on the

17   screen.  And I'm just going to walk through this with you

18   real quickly because you testified about the content of this

19   document.

20           And if we take a look at this document, can you

21   tell me what this document is.

22   A.  It appears to be a form of a legal hold that is ordered

23   by the U.S. District Court.

24   Q.  Okay.  Tell me if you agree to this.  If we go to the

25   very last page of this document, I'll show you, it's page
```

VanderHeyden - Cross

```
 1    17, and you see a sign there -- a signature by a judge here

 2    in the Federal District Court of Minnesota named Ann

 3    Montgomery.  Do you see that?

 4    A.  I do.

 5    Q.  And it's dated October 14th of 2008; is that right?

 6    A.  That's correct.

 7    Q.  If we go back and we flip to page 2, do you see at the

 8    top there -- I will highlight the top of that for you, and

 9    it reads, "Order for Entry of Preliminary Injunction,

10    Appointment of Receiver, and Other Equitable Relief."  Do

11    you see that?

12    A.  I do.

13    Q.  Do you understand that this is a court order?

14    A.  Yes.

15    Q.  Okay.  And go to the part that your counsel asked you

16    about.  It's on page 9, and the heading is, "Recordkeeping

17    and Business Operations."  Do you see that?

18    A.  I do.

19    Q.  And this is the part that you testified about, right?

20    A.  Correct.

21    Q.  And you were asked to interpret the Court's order based

22    on what you understood the documents that the Court was

23    ordering to be kept were, correct?

24              MR. SCHAPER:  Objection to form.

25              THE COURT:  Overruled.
```

CASE 0:19-cv-01756-WMW   Doc. 437   Filed 01/08/23   Page 44 of 279

1            THE WITNESS:  That's what this would have

2       indicated.

3       BY MR. COLLYARD:

4       Q.  Okay.  If we just go through this for a little bit,

5       we'll just start from the top, it says, "IT IS THEREFORE

6       ORDERED that the Defendants; their agents, including

7       financial and banking institutions and other persons having

8       possession or control of the Defendants' assets; their

9       officers; their employees; and all persons in active concert

10      or participating with the Defendants in their affairs must

11      maintain."  Do you see that?

12      A.  I do.

13      Q.  We'll just stop right there and we'll unpack it a little

14      bit.

15            And what that's saying -- what this did was this

16      required M&I Bank at the time, and then later BMO Harris

17      Bank, to keep this information, correct?

18      A.  Yes.

19      Q.  That's a fair characterization of that?

20      A.  It is.

21      Q.  And it was ordered by the Court to do that, right?

22      A.  Correct.

23      Q.  Regardless of cost or whether BMO wanted to have to pay

24      for something, right?

25      A.  I would assume so.

1   Q.  Okay.  So then it says, "Must maintain all business,

2   corporate, foundation, banking, financial, and/or accounting

3   records in their possession that could be material to this

4   cause of action."  Do you see that?

5   A.  I do.

6   Q.  "And are enjoined and restrained from," and then it

7   says, "altering," right?

8   A.  Yes.

9   Q.  And the next paragraph says "disposing," correct?

10  A.  Yes.

11  Q.  And what that was telling the bank is that the bank was

12  ordered to not alter, destroy, or dispose of any of this

13  type of information, correct?

14  A.  Correct.

15  Q.  Now, your counsel asked you to interpret some of the

16  Court's words here, so I just want to make sure we're on the

17  same page.

18          Where it says all business records in Part A, do

19  you see that?

20  A.  I do.

21  Q.  It says, "Any business," and then it says, "records in

22  their possession that could be material."  Do you see that?

23  A.  Yes.

24  Q.  You agree, Mr. Vanderheyden, that e-mails fall into

25  these categories of information, do you not?

1    A.  Well, those items identified specifically are all what I

2    would have considered earlier official bank records.

3    Q.  Mr. Vanderheyden, where it says -- it says, "Maintain

4    all business, corporate, banking, financial, accounting

5    records in their possession," you would agree with me that

6    that would include e-mails, right?

7               MR. SCHAPER:  Objection, asked and answered.

8               THE COURT:  Overruled.  You may answer.

9               THE WITNESS:  Okay.  So could you repeat it just

10   so I can --

11   BY MR. COLLYARD:

12   Q.  Yes.  I'm just asking you if here where the Court is

13   requiring the bank to maintain all business, corporate,

14   banking, financial, and accounting records in their

15   possession, if that could include e-mails.

16   A.  It could.

17   Q.  And then it says that the bank was enjoined or

18   restrained from altering any business, corporate, financial,

19   accounting records in their possession, and that could

20   include e-mails too, right?

21   A.  If you made that assumption from the first statement,

22   yes.

23   Q.  Well, you agree with me, right?

24   A.  Yeah.  Yeah.

25   Q.  Yes?

```
1    A.  Yes.

2    Q.  And then the bank has enjoined and restrained -- I'm

3    sorry.  The Court has enjoined and restrained the bank from

4    disposing of any business records, and that includes e-mails

5    as well, correct?

6    A.  It could.

7              MR. SCHAPER:  Objection to the form.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.

10   BY MR. COLLYARD:

11   Q.  Now, did I hear you correctly that you had never seen --

12   did you see this order before?

13   A.  I saw this I believe in 2017 for the first time.

14   Q.  And in your roles and responsibilities, were you

15   supposed to get court orders like this that required the

16   bank to not destroy or alter, for example, e-mails that the

17   bank had?

18   A.  I was not supposed to.  We acted on the legal holds

19   issued by corporate or external counsel, not by these.

20   Q.  You said that you got a legal hold in January of 2010;

21   is that right?

22   A.  That's correct.

23   Q.  Was that the first time you got a legal hold?

24   A.  Yes.

25   Q.  What did that legal hold say?
```

1    A.  It said -- it listed again the names of the folks that

2    were involved and told them not to destroy their documents,

3    which trigged us to get a copy of all of their electronic

4    documents.

5    Q.  You got that legal hold before the backup tapes were

6    destroyed in 2010 and 2011, right?

7    A.  It's possible, yes.

8    Q.  Well, you got it in January --

9    A.  Yeah.

10   Q.  -- of 2010 is what you testified to, right?

11   A.  Correct.

12   Q.  So you got that legal hold before the bank went ahead

13   and destroyed the potentially millions and millions of pages

14   of documents in 2010 and 2011, correct?

15   A.  We had no idea what the time frame of keeping this was

16   at that point in time, so we had the Legato archive at that

17   point for almost six years.

18   Q.  We'll talk about Legato in a second, but what my

19   question is is you got -- you received the legal hold in

20   January of 2010 and that was before the time that the bank

21   went ahead and destroyed all those millions of pages in 2010

22   and 2011, correct?

23   A.  It's possible, yes.

24   Q.  In fact, you started destroying --

25   A.  Yes.

1    Q.  -- the documents in 2010 and 2011 in September of 2010;

2    is that right?

3    A.  That sounds right.

4    Q.  So you had the legal hold nine months beforehand, right?

5    A.  Correct.

6    Q.  And the reason why you're on the legal hold is because

7    your group is responsible for making sure that e-mails and

8    things like backup tapes, if they need to be preserved for

9    litigation, are preserved, right?

10   A.  That's correct, but the legal hold never specified the

11   start time of the information in question; and we had,

12   again, six years' worth of every e-mail sent and received,

13   not just a copy of backup tapes.

14   Q.  My question -- I'm sorry, Mr. Vanderheyden.

15   A.  So that was, in our mind, the official record.

16   Q.  My question, Mr. Vanderheyden, was:  It was your role

17   and responsibility in getting the legal hold to ensure that

18   information was kept and preserved, correct?

19   A.  Yes, based on what I would read out of a legal hold, I

20   would take every action possible.

21   Q.  And you can't say, Mr. Vanderheyden, for a fact that

22   there was not unique information on all those millions of

23   pages of documents that were destroyed from those backup

24   tapes in 2010 and 2011, right?

25   A.  I cannot say that for --

1    Q.  You can't.  So what we can say is that there could have

2    been unique information on all of those millions of pages of

3    evidence and e-mails that were destroyed, right?

4    A.  Could have been.

5    Q.  Let's go back to some other questions your counsel asked

6    you in Exhibit 228 -- I'll pull that up for you -- and this

7    was that subpoena that you had talked about.

8         If we turn to page 3, please, Mr. Vanderheyden, I

9    believe it was under the "Other Records" portion.  We'll

10   look at that.  We'll focus on the second paragraph

11   underneath that I think is where you were asked questions.

12   Do you remember that?

13   A.  I do.

14   Q.  And it says, "All correspondence with the above

15   persons/entities and/or with third parties regarding the

16   above persons/entities."  Do you see that?

17   A.  I do.

18   Q.  And then it goes on and explains, "All memoranda, notes,

19   files, records relating to meetings or conversations

20   concerning the above persons/entities."  Do you see that?

21   A.  I do.

22   Q.  Now, certainly you agree, Mr. Vanderheyden, that that

23   includes e-mails, right?

24   A.  It would.

25   Q.  Let's go to -- let me change.  Let's go to Plaintiff's

 1    Exhibit 787.  Can you tell me what this is,

 2    Mr. Vanderheyden.

 3    A.  This is a summary of the M&I, still would have been M&I,

 4    I believe, records management policy.

 5    Q.  Is this a records management policy that you were

 6    involved in creating or implementing?

 7    A.  I had input into it, yes.

 8    Q.  What is the date of this policy?

 9    A.  January 15th, 2009.

10    Q.  So this is January 15th of 2009.  So more than a year

11    before M&I Bank started destroying the backup tapes from

12    2010 and 2011; is that right?

13    A.  Yes.

14    Q.  I just want to take a look at -- let me ask you some

15    more questions about it and lay some foundation here.  You

16    had input into this policy?

17    A.  I did.  I did.

18    Q.  You're familiar with it?

19    A.  Yes.

20    Q.  You understand what's being conveyed in this policy?

21    A.  Yes.

22              MR. COLLYARD:  I offer Plaintiff's Exhibit 787,

23    Your Honor.

24              MR. SCHAPER:  No objection, Your Honor.

25              THE COURT:  Exhibit 787 is received, Plaintiff's

1    Exhibit.

2    BY MR. COLLYARD:

3    Q.  Can we please turn to page 3, Mr. Vanderheyden.  I just

4    want to ask you something here.

5    A.  Okay.

6    Q.  You go to that Section VI, "Legal Holds and The Duty to

7    Preserve Records."  Do you see that?

8    A.  I do.

9    Q.  Let's just take a look at this.  On the -- I'll just

10   have to go through it first.  It says, "There are certain

11   circumstances where M&I may have a legal obligation to

12   retain Records that may some day become evidence in a legal

13   proceeding or government investigation."  Do you see that?

14   A.  I do.

15   Q.  And it says, "This legal obligation is known as the

16   'duty to preserve.'"  Do you see that?

17   A.  I do.

18   Q.  And the duty to preserve is what we were talking about

19   earlier for why legal holds or litigation holds get

20   implemented, right?

21   A.  That's correct.

22   Q.  The whole purpose of that is to make sure that evidence

23   is kept for real litigation or in anticipation of

24   litigation; is that right?

25   A.  Yes.

1   Q.  And then it says, "It supersedes the Records Disposal

2   Instructions outlined in this Policy."  Is that right?

3   A.  That's right.

4   Q.  And so is what your policy saying here is that the legal

5   hold is what's important?

6   A.  Yes.

7   Q.  And the legal hold supersedes any records management

8   policy that the bank has, right?

9   A.  Correct.

10  Q.  The legal hold overrides or supersedes any policy,

11  right?

12  A.  Correct.

13  Q.  And that would be the legal hold that you're talking

14  about that you got in January of two thousand and --

15  A.  Ten.

16  Q.  -- ten, right?

17  A.  Correct.

18  Q.  And so when you got the legal hold in January of 2010,

19  what this policy says is that legal hold overrode any other

20  document management policy that was in place at the bank,

21  correct?

22  A.  Correct.

23  Q.  Go back to Defendant's Exhibit 7000?  So it's DX-70000.

24  And if we take a look at the second page so we can see what

25  it was about, this was your "Lotus Notes Upgrade/Refresh."

1    Do you remember talking about this?

2    A.  Yes.

3    Q.  Was this -- do I understand that what your testimony was

4    is that this was the consolidation -- this really outlined

5    your consolidation project is what you were talking about?

6    A.  That's correct.

7    Q.  And this was -- this PowerPoint here was meant to

8    discuss or describe the important aspects of your project?

9    A.  Correct.

10   Q.  Where in this PowerPoint does it mention anything about

11   backup tapes?

12   A.  It's not mentioned.

13   Q.  Where in this PowerPoint does it mention how this

14   project could impact the existence of backup tapes that may

15   be subject to legal matters?

16   A.  It's not part of this presentation.

17   Q.  I think you told -- I think it was yesterday you

18   testified that the reason why Legato went into place was

19   because of requirements to keep records for six years; is

20   that right?

21   A.  Specifically for broker-dealers.

22   Q.  And that was -- and under the broker-dealer laws -- I

23   think you said because of broker-dealer laws, the bank is

24   required to keep information for six years, right?

25   A.  Yes.

Vanderheyden - Cross

1    Q.  Let's look at another document of yours.  Let's look at

2    Plaintiff's Exhibit 791.

3              And, Mr. Vanderheyden, can you please just tell me

4    what that document is.

5    A.  If I'm looking at the right one, it's labeled "Backup

6    Operation and Retention Standard"?

7    Q.  That's correct.

8    A.  Okay.  Yes.

9    Q.  What is that document?

10   A.  This is a document that describes our standard practice

11   solidified now and put in writing in terms of what we would

12   back up and how long we would retain it, how we would label.

13   Q.  You're familiar with this document?

14   A.  I am.

15   Q.  Did you have input into these policies or procedures?

16   A.  Yes.

17   Q.  And what's --

18              MR. COLLYARD:  I'll offer Plaintiff's Exhibit 791,

19   Your Honor.

20              MR. SCHAPER:  No objection.

21              THE COURT:  Exhibit 791 is received.

22   BY MR. COLLYARD:

23   Q.  We'll just pull it up here and take a look at it.  And

24   just look at the top where it says, "Purpose," just so we

25   can understand it.  It says, "This standard outlines the

1    requirements for backup operations and tape retention of M&I

2    data."  Do you see that?

3    A.  I do.

4    Q.  And what does that mean?

5    A.  Exactly what it says.  It outlines the standards and the

6    requirements.

7    Q.  To keep backup tapes?

8    A.  Yes.

9    Q.  And then the next paragraph below says, "Scope" and it

10   says -- I'm sorry, I'm going to go to the next paragraph.

11   There we go.  It says, "Scope," and it says, "This standard

12   applies to all information processed and stored on M&I-owned

13   equipment and that is backed up to the backup and

14   disk-to-disk backup systems managed by Information

15   Technology Services."  Do you see that?

16   A.  I do.

17   Q.  And the Information Technology Services is you, right?

18   A.  Correct.

19   Q.  What's the date of this document?  If you look down in

20   the bottom left-hand corner, do you see that it's July 22nd

21   of 2010?

22   A.  I do.

23   Q.  So this is seven months after you received the legal

24   hold in this case, correct?

25   A.  Correct.

1    Q.  Or I'm sorry.  This is seven months after you received

2    the legal hold pertaining to Petters matters; is that right?

3    A.  Yes.

4    Q.  And if we go to the next page, page 2, we're going to go

5    to the paragraph right above where it says, "Definitions."

6    It says, "An annual (January monthly backup) tape set will

7    be pulled from the monthly tape set and stored at the

8    designated off-site facility for a minimum of," and then it

9    says, "7 years."  Do you see that?

10   A.  I do.

11   Q.  And so these backup tapes were to be stored and kept for

12   seven years; is that right?

13   A.  That's correct.

14   Q.  If we go back to -- I'm sorry.  The date of your

15   presentation that we talked about earlier, that was -- was

16   that --

17   A.  February 2010.

18   Q.  That was February of 2010.  Okay.  So this is dated

19   after your presentation, right?

20   A.  Yes.

21   Q.  So you give the presentation and you're going to put in

22   your consolidation efforts and then you come out with a

23   retention policy that says backup tapes are stored for seven

24   years, right?

25   A.  Yes.

1    Q.  And why did you come out with a policy to keep backup

2    tapes for seven years?

3    A.  Seven years was just an industry standard.  Specifically

4    official bank records, seven years.

5              This policy that we're looking at at the present,

6    the true focus of this was on those file servers that had

7    the information that people could store them on.  That was

8    truly the focus of this, although it does not preclude

9    e-mail.

10   Q.  And, in fact, it does include e-mail backup tapes,

11   correct?

12   A.  Well, it does say all.

13   Q.  Well, you wrote the policy.  You know --

14   A.  Yes.

15   Q.  I'm sorry, Mr. Vanderheyden.  Sorry.  You know that this

16   policy to keep these backup tapes for seven years does

17   include the backup tapes that have e-mails on them, correct?

18   A.  Correct.

19   Q.  And those backup tapes were supposed to be kept for

20   seven years, right?

21   A.  Yes, as of January of 2022 -- or January of 2010, yes.

22   Q.  I'm sorry.  As of July --

23   A.  July of 2010, excuse me.

24   Q.  July of 2010, correct?

25   A.  Yes.

1    Q.  And the bank started destroying backup tapes after that

2    in September of 2010, correct?

3    A.  Possible, yes.  I guess so.  Yeah.

4    Q.  Am I right or am I wrong?

5    A.  I guess you're right.  I think you're right.

6    Q.  You said as well -- we can take that down.

7            You said something along the lines of Legato

8    creates -- is it a perfect archive or a perfect image?

9    A.  That's correct.

10   Q.  And so Legato supposedly keeps an exact replica of what

11   the documents are; is that right?

12   A.  That's correct.

13   Q.  Let me show -- let's go to Plaintiff's Exhibit 788 and I

14   just have a question for you.

15           This is an e-mail that you are on that you were

16   sent on September of 2009, correct?

17   A.  Yes.

18   Q.  And you agree with that?

19   A.  I do.

20   Q.  You received this e-mail?

21   A.  I do.

22           MR. COLLYARD:  I offer Plaintiff's Exhibit 788,

23   Your Honor.

24           MR. SCHAPER:  No objection, Your Honor.

25           THE COURT:  Exhibit 788 is received.

Vanderheyden - Cross

```
 1      BY MR. COLLYARD:
 2      Q.  And if we just focus on the top, is that an e-mail from
 3      Cathy Klitzka at M&I Corp.  Do you see that?
 4      A.  I do.
 5      Q.  And it's dated again September 2009, right?
 6      A.  That's correct.
 7      Q.  So this is when M&I is M&I, right?
 8      A.  Yes.
 9      Q.  M&I is not BMO at this point in time, is it?
10      A.  No, it is not BMO officially, no.
11      Q.  Well, it's not BMO at all at this point in time, is it?
12      A.  No.
13      Q.  Not officially, not unofficially.  It's M&I, right?
14      A.  M&I.
15      Q.  Okay.  And this e-mail -- this is an e-mail that was
16      from the Legato system, correct?
17      A.  Correct.
18      Q.  And your address there says, "john.vanderheyden@bmo,"
19      right?
20      A.  It does.
21      Q.  This is not an exact replica of the e-mail -- or, I'm
22      sorry.  Let me back up.
23           Legato did not capture a perfect image of the
24      exact e-mail that existed in September of 2009, did it?
25           MR. SCHAPER:  Objection, foundation.
```

1    THE COURT:  Overruled.  You may answer.

2    THE WITNESS:  I can't say that what it captured

3  versus what it retrieved at whatever point in time this was

4  retrieved from Legato.

5    So let me say it this way:  The e-mail that was

6  captured to Legato most likely was to me at M&I corp.  By

7  the time it was pulled out of, to create this document, the

8  Legato archive, it's quite possible that the parameters were

9  changed or were in the process of being changed because that

10  domain had changed by that time.  So this probably was

11  pulled after the BMO acquisition.

12  BY MR. COLLYARD:

13  Q.  So if we wanted to see what the exact document was, what

14  the exact e-mail was on Legato that you claim kept this

15  perfect image of everything and if we wanted to see that

16  e-mail from September of 2009, this e-mail would not be an

17  exact replica of the e-mail that existed on September 28th

18  of 2009; am I correct?

19  A.  Yes.  I can't argue that, no.

20  Q.  Right.  And you agree that Legato failed in that

21  respect, didn't it?

22  A.  I can't really say that.  I don't know what was really

23  in Legato.  I can see what Legato output.  Did the output

24  change that domain name to BMO?  That I don't know.  This

25  one I cannot explain.

 1    Q.  Sure.  And this is just one example, correct?

 2    A.  It is one example.

 3    Q.  And if we wanted to get the exact replica to see what

 4    the exact e-mail looked like back in 2009, would we have to

 5    go to a backup tape?

 6               MR. SCHAPER:  Objection to form --

 7               THE COURT:  Overruled.

 8               MR. SCHAPER:  -- foundation.

 9               THE COURT:  Overruled.

10               THE WITNESS:  Backup tape would have been another

11    source.

12    BY MR. COLLYARD:

13    Q.  And, in fact, the backup tape would actually have the

14    exact e-mail, the exact replica, correct?

15    A.  Most likely, yep.

16    Q.  And that would have been a better version than what

17    Legato had, right?

18    A.  Well, with the exception of that domain name changing as

19    a result of the acquisition in progress or whenever this was

20    pulled at the time, everything else on that e-mail is the

21    exact replica.

22    Q.  Mr. Vanderheyden, I understand, but that's not what I am

23    asking you.

24    A.  The time, the date, the subject line, the body, and then

25    if there were attachments, it would have been.

1    Q.  What I'm asking you, if I wanted to see the exact

2    replica, the best evidence of what the e-mail was on

3    September 28th of 2009 to see how it really existed in life,

4    I would have to go to the backup tape, right?

5            MR. SCHAPER:  Objection, asked and answered and

6    argumentative.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.

9            MR. COLLYARD:  No further questions, Your Honor.

10           THE COURT:  Cross-examination [sic]?

11           MR. SCHAPER:  Thank you, Your Honor.  If we can

12   put up P-325.

13                    **REDIRECT EXAMINATION**

14   BY MR. SCHAPER:

15   Q.  Are you there, Mr. Vanderheyden?

16   A.  I am.

17   Q.  Mr. Vanderheyden, when your IT group was looking for

18   e-mails in this 2014 time frame and looking for backup tapes

19   in particular, what was the date range of the backup tapes

20   that was the focus?

21   A.  We were specifically looking for pre-March 2005 tapes.

22   Q.  And as you understand it, were any pre-March 2005 tapes

23   found?

24   A.  There were not.  The oldest was August '07.

25           MR. SCHAPER:  Okay.  We can take that down.

1    BY MR. SCHAPER:

2    Q.  Mr. Vanderheyden, you were asked some questions about

3    the use of e-mail backup tapes for litigation purposes.

4            At M&I, in your recollection, did you ever use

5    e-mail backup tapes for litigation purposes?

6    A.  Never.

7    Q.  And in the 2010 time frame, if you needed to produce

8    e-mails in a litigation or save them, what system did you

9    rely on for that?

10   A.  We went to the Legato archive.

11   Q.  If we put up P-554 and go to page 9, do you recall being

12   asked about this language?

13   A.  Yes.

14   Q.  And when you first saw this document, Mr. Vanderheyden,

15   how did you interpret business, corporate, foundation,

16   banking, financial records?  What did you consider that a

17   reference to?

18   A.  Again --

19           MR. COLLYARD:  Objection, Your Honor, cumulative

20   and asked and answered.

21           THE COURT:  Overruled.

22           THE WITNESS:  Again, these are what I would

23   describe as official banking records.

24   BY MR. SCHAPER:

25   Q.  And did your department maintain those?

1     A.  We did not.

2              MR. SCHAPER:  If we would please, Mr. Herzka, if

3     you would pull up P-787?

4     BY MR. SCHAPER:

5     Q.  Do you recall being asked about this document by

6     plaintiff's counsel?

7     A.  Yes.

8     Q.  And plaintiff's counsel took you through to Section VI,

9     and I'd like to direct your attention to Section VII and

10    it's labeled "E-Mail Retention."  Do you see that?

11    A.  I do.

12    Q.  And it says that, "All e-mail messages sent and received

13    via the corporate Lotus Notes system will be retained in an

14    Authorized Repository."  Do you see that?

15    A.  I do.

16    Q.  What's your understanding of what authorized repository

17    refers to?

18    A.  That is Legato.

19    Q.  And as far as you know, were any e-mails in the Legato

20    system deleted or destroyed at any time during this time

21    period?

22    A.  No.

23    Q.  Was that even possible to do that?

24    A.  That would have been impossible to do.

25    Q.  You testified that when there was a search for backup

1    tapes in 2014, the oldest one that was found had a label

2    dated August 2007.  Do you recall that testimony?

3    A.  Yes.

4    Q.  If that tape eventually had been restored, is it

5    possible that that tape would contain pre-2005 e-mails?

6    A.  It is possible, yes.

7    Q.  As part of the server consolidation project,

8    Mr. Vanderheyden, did there come a time when the project was

9    deemed to be successful?

10   A.  Yes.

11   Q.  And was that because the servers actually had been fully

12   consolidated?

13   A.  Correct.

14   Q.  And why was there a decision to recycle backup tapes --

15   e-mail backup tapes at that time?

16   A.  Well, the tape format itself that was used on those

17   regional servers wasn't the same tape format that was used

18   in newer technology that we purchased, so I don't believe we

19   even had the capability to read them ourselves.  So we would

20   have had to send them out to some third party in order to

21   have them read those tapes.

22   Q.  At the time that decision was made in 2010, did you have

23   an understanding or belief that e-mails had been retained

24   within M&I?

25   A.  Yes.

1    Q.  And on what system were they retained?

2    A.  Legato.

3    Q.  To the extent that e-mails before 2005 were not

4    retained, could that have been a mistake?

5    A.  Rephrase the question.  I --

6    Q.  If it turned out that e-mails from before 2005 were not

7    retained, could that have been a mistake?

8    A.  Possibly.

9    Q.  I would just like to direct your attention back to

10   Defendant's Exhibit 70000.

11          Mr. Vanderheyden, with regard to all of the

12   testimony that you have been giving this morning about the

13   consolidation project and the fact that some tapes were

14   ultimately recycled, does that all relate to the fact that

15   there was this server consolidation in the first place?

16   A.  That's what it was all about.

17   Q.  And did this server consolidation project -- you led it,

18   correct?

19   A.  Correct.

20   Q.  And did this have anything whatsoever to do with

21   Mr. Petters or PCI?

22   A.  No.  In fact, it started well before we were even aware

23   of any of this.

24   Q.  Did it have anything to do with this lawsuit?

25   A.  No.

1      MR. SCHAPER:  No further questions, Your Honor.

2                    **RECROSS-EXAMINATION**

3      BY MR. COLLYARD:

4      Q.  I'm sorry, Mr. Vanderheyden.  Did you just say that your

5      consolidation project from 2010 happened well before the

6      bank was aware of the Petters matters?

7      A.  It was well before my team was aware of the matter,

8      which would have been the legal hold issued on January of

9      2010.

10     Q.  The consolidation project happened and was implemented

11     after the litigation hold?

12     A.  No.  The consolidation project started in June of the

13     prior year, 2009, and that was driven by the fact of

14     out-of-date software.

15     Q.  And the consolidation project happened after the

16     litigation hold went in in January of 2010, correct?

17     A.  It completed after.  It didn't start after.

18     Q.  And if you go back to Exhibit 554, please, and just so

19     we're clear as to what the bank knew, this court order was

20     dated in October of 2008, if we go to page 17, correct?

21     A.  Correct.

22     Q.  And that was well before the consolidation project ever

23     came about, right?

24     A.  I didn't see this document until 2017, but, yes.

25     Q.  Okay.  And, in fact --

1    A.  The specific answer is yes.

2    Q.  Okay.

3    A.  But our awareness wasn't until 2017.

4    Q.  Your awareness?

5    A.  My awareness.

6    Q.  Not the bank's awareness?

7    A.  Correct.

8    Q.  And if we go to page 9 real quickly of this document,

9    and you keep saying that you interpret this to be official

10   bank records of what the Court was ordering the bank to

11   keep, right?

12   A.  Correct.

13   Q.  And you agree, once again, that this includes e-mails,

14   right?

15   A.  Yes, it does, but the focus here -- I mean, the things

16   that are specified here are --

17   Q.  Mr. Vanderheyden, my question is --

18              MR. SCHAPER:  Can he let the witness please answer

19   the question, Your Honor.  Let the witness finish his

20   answer.

21              THE COURT:  Is that an objection?

22              MR. SCHAPER:  It's an objection to interrupting

23   the witness.

24              THE COURT:  Sustained.

25              THE WITNESS:  May I continue?  Okay.

Vanderheyden - Recross

1              No, I mean the items that are listed on here are

2      officially -- they are official bank records.  It does --

3      I'm not going to say it would exclude things beyond that,

4      but it seemed that the spirit of that sentence is around

5      official bank records.

6      BY MR. COLLYARD:

7      Q.  My question now, Mr. Vanderheyden, is:  This encompasses

8      e-mails, doesn't it?

9      A.  It does.

10     Q.  And e-mails are bank records, aren't they?

11     A.  I can't answer that question.

12     Q.  Okay.  Your testimony is that e-mails may not be bank

13     records?

14     A.  In the world of official banking records, it is not

15     accounting records, it's not deposits, it's not loans.  It's

16     correspondence, so.

17     Q.  E-mails are correspondence?

18     A.  E-mails are correspondence.

19     Q.  Correspondence are bank records, right?

20     A.  You could interpret it that way, but...

21     Q.  You interpret it that way as well, don't you?

22     A.  Again, I've looked at these categories and say there's

23     official banking documents, which we did not maintain.  We

24     maintained the e-mail applications --

25     Q.  Mr. Vanderheyden --

1    A.  -- and correspondence.

2    Q.  Mr. Vanderheyden, in all the time that you spend dealing

3    with legal holds and figuring out what information to keep

4    in your regular job on a regular basis, you include e-mails

5    as bank records, don't you?

6    A.  We include --

7              MR. SCHAPER:  Objection, asked and answered.

8              THE COURT:  Overruled.

9              THE WITNESS:  We include e-mail as bank documents,

10   but not official bank records, if that helps.

11   BY MR. COLLYARD:

12   Q.  And in all the times that you're involved in legal holds

13   and making sure that people don't destroy evidence, that

14   includes e-mails, correct?

15   A.  Yes.

16   Q.  Now, just to put another point on this, you don't -- you

17   weren't asked to interpret this document for anything with

18   respect to the bank, were you?

19   A.  I didn't see this document until 2017.

20   Q.  Your counsel asked you to interpret it; is that right?

21             MR. SCHAPER:  Objection, Your Honor.

22             THE COURT:  Overruled.

23             THE WITNESS:  I guess.

24   BY MR. COLLYARD:

25   Q.  You didn't interpret this document in the normal course

1    of your job at all, did you?

2    A.  I actually didn't see this document in the normal course

3    of my job.

4    Q.  So do you agree with me?

5    A.  Repeat the statement.

6    Q.  Yes.  You did not interpret this document in the normal

7    course of your job at all, did you?

8    A.  No.

9    Q.  And, in fact, when you receive legal holds, you don't

10   interpret the information that is supposed to be kept or

11   preserved, right?

12   A.  Yes and no.  So given the folks that were named as the

13   custodians for the legal hold, those people that were told

14   to maintain their records, we, as a value-added service to

15   that, based on our setup of where they could store documents

16   on those department shares and on their individual user

17   shares, we would go find all of those.

18   Q.  I --

19   A.  Those were not specified within the parameters of the

20   legal hold itself.

21   Q.  I get that.  What I'm -- that is completely fair.  What

22   I am talking about is the parameters of what is being told

23   to be kept and preserved.  That is not determined by your

24   group, that is determined by, for example, the legal group?

25   A.  That's correct.

Coleman - Direct

```
 1    Q.  Thank you, Mr. Vanderheyden.

 2    A.  Thank you.

 3              MR. COLLYARD:  No more questions, Your Honor.

 4              MR. SCHAPER:  No more questions, Your Honor.

 5              THE COURT:  Sir, you are excused.

 6              We will have our midmorning break now.  Please be

 7    prepared to come back to the courtroom at 10:45, Members of

 8    the Jury, and please be mindful and continue to abide by the

 9    instructions that I have given you regarding this case and

10    your duties as jurors.  Okay?  Thank you.

11         (Jury excused)

12                        IN OPEN COURT

13                      (JURY NOT PRESENT)

14              THE COURT:  We are in recess.

15         (Recess taken at 10:28 a.m.)

16                   *    *    *    *    *

17         (10:45 a.m.)

18                        IN OPEN COURT

19                       (JURY PRESENT)

20              THE COURT:  Please be seated.

21              MR. GLEESON:  Good morning, Your Honor.  For our

22    next witness, BMO Harris Bank calls Deanna Coleman.

23              THE COURT:  Thank you.

24              COURT REPORTER:  Please come forward and stop in

25    front of me.  Would you raise your right hand to be sworn,
```

1    please.

2        (Witness sworn)

3            COURT REPORTER:  You can have a seat in the

4    witness stand.  Speak into the microphone and state your

5    name, spelling your first and last name, please.

6            THE WITNESS:  Deanna Lynn Coleman; D-e-a-n-n-a,

7    C-o-l-e-m-a-n.

8            THE COURT:  Ms. Coleman, good morning.  Would you

9    please pull the base of the microphone a little closer to

10   you so that we can make sure we hear you.  Thank you.

11           THE WITNESS:  Yes.

12           THE COURT:  Counsel, you may proceed.

13           MR. GLEESON:  Thank you, Your Honor.

14                        **(Deanna Coleman)**

15                      **DIRECT EXAMINATION**

16   BY MR. GLEESON:

17   Q.  Good morning, Ms. Coleman.

18   A.  Good morning.

19   Q.  You worked with Tom Petters at PCI?

20   A.  I did.

21   Q.  Okay.  And were you an officer of PCI?

22   A.  Yes.

23   Q.  Okay.

24           MR. GLEESON:  Judge, can I approach?  Sorry.

25   There's one thing I neglected to mention.

Coleman - Direct

1          THE COURT:  You may.

2      **(At sidebar)**

3          THE COURT:  Counsel, we are going to refrain from

4   our normal practice of having frequent sidebars.

5          MR. GLEESON:  Definitely.

6          THE COURT:  I think I have advised you of that.

7          MR. GLEESON:  I just neglected to say I'm calling

8   her [inaudible].

9          THE COURT REPORTER:  Excuse me.  Calling her?

10          MR. GLEESON:  Forgive me.  Calling her adverse.

11          MR. ANTHONY:  I don't think you can say she's

12   adverse to him.  He's calling her in direct in his case, and

13   I am entitled to cross.

14          THE COURT:  Agreed.

15          MR. GLEESON:  Judge, all -- they called all of our

16   witnesses adverse even though they were calling them on

17   direct.

18          This is an officer of the company in whose shoes

19   Mr. Kelley stands, and it's adverse in that respect.  It's

20   the officer of PCI.

21          The fact that I'm calling her doesn't alter that

22   fact.  Just as when they called the bank employees and bank

23   officers in their direct, they called them adverse.

24          THE COURT:  Okay.  And by calling them adverse,

25   that means you are seeking to do what?

Coleman - Direct

1          MR. GLEESON:  I am just seeking to ask leading

2    questions.

3          MR. ANTHONY:  I object.  I object to that,

4    Your Honor.  We have had a problem with leading questions

5    throughout this case.

6          THE COURT:  I will allow you to ask leading

7    questions.  If there are objections as to the

8    appropriateness of the question, not the manner and form of

9    the question, I will rule on the objection and --

10          MR. ANTHONY:  My --

11          THE COURT:  -- expect an objection.

12          MR. ANTHONY:  My concern, Your Honor, is a leading

13    question oftentimes has facts embedded in the question.

14          So even if objectionable -- for example, if he

15    asks her, Did you tell the FBI that M&I Bank knew about this

16    fraud, that might be objectionable, but it's already out

17    there.  That's the problem with a leading question when it's

18    sought to solicit/elicit testimony about someone else's

19    knowledge.  It's too late once it's asked.  That's my

20    concern.

21          THE COURT:  And how is that different than the

22    ruling that I gave to your -- the parties across the way as

23    to witnesses called adversely?

24          MR. ANTHONY:  It's only different in the sense

25    that I don't think she's associated with either party.

Coleman - Direct

```
1    Mr. Kelley is not in her shoes.  He's the receiver and the

2    trustee.  He's not an officer of PCI, and, for that reason,

3    she's in an entirely different position.

4         Allowing her to be led, which Mr. Gleeson is very

5    capable at doing, will expose us to being unfairly

6    prejudiced under Rule 402 and 403 in our ability --

7    inability to object.  So that's my objection.

8         MR. GLEESON:  First of all, I apologize for the

9    sidebar.

10        Second of all, I heard your admonition.  I think I

11   respectfully suggest we play it by ear.  I'm going to ask

12   fair questions, but it is a -- in the same way that the M&I

13   employees were allowed to be questioned or the right to be

14   treated as adverse.

15        Ms. Coleman, because of her position at PCI, and

16   this is a claim brought on behalf of PCI, I should be

17   afforded the same opportunity.  I assure the Court I will

18   not abuse it.

19        MR. ANTHONY:  My only question -- observation is

20   that I would ask that he not be allowed to ask her what some

21   other party knows about the fraud.

22        For example, asking her whether the bank knew

23   about the fraud or any employee in the bank knew of the

24   fraud should be off limits.  She can't testify to what's in

25   someone else's head, nor can she -- there's that whole
```

1    nonverbal hearsay issue under 802.  And any

2    communications --

3              THE COURT:  So your objection has meandered.

4              MR. ANTHONY:  Okay.  My objection now is he should

5    not be permitted to ask her about the knowledge of any other

6    person.  She can only testify as to what she said, what she

7    heard.  She can't say, for example --

8              MR. GLEESON:  I agree with all of that.  I'm sorry

9    to interrupt.  I agree with that.

10             MR. ANTHONY:  So he's not going to ask about the

11   knowledge of other people.  As long as that's the ground

12   rules, I understand that.

13             MR. GLEESON:  I am going to ask about things that

14   she perceived, what people said to her, what she said to

15   them.  And I'm not going to ask what was in people's heads.

16             MR. ANTHONY:  What she perceived is different than

17   what she said and what was said to her.  What she perceived

18   is her opinion about what someone else thought.

19             As long as he's not asking for her opinion about

20   what others thought, I'm okay with what she said and what

21   she heard.

22             MR. GLEESON:  I don't disagree.

23             THE COURT:  Does everyone understand the ground

24   rules?

25             MR. GLEESON:  Yes.

1          THE COURT:  Okay.  Now, let's be clear, I want to

2     address these things outside of the presence of the jury.

3     Okay?

4          MR. ANTHONY:  Pardon me, Your Honor?

5          THE COURT:  I said I want to address these things

6     outside of the presence of the jury.  We just had a break,

7     we just come back in, and now we're spending time at

8     sidebar.

9          MR. GLEESON:  I apologize for that.

10         THE COURT:  Okay.  So just moving forward, notice

11    to both.

12         **(In open court)**

13         MR. GLEESON:  Thank you, Your Honor.

14         THE COURT:  You're welcome.  Counsel, you may

15    proceed.  Good morning.

16    BY MR. GLEESON:

17    Q.  I think when we broke, I asked you whether you were an

18    officer of PCI.  Were you?

19    A.  Yes.

20    Q.  And you were involved in the Ponzi scheme at PCI from

21    its inception; is that fair to say?

22    A.  Yes.

23    Q.  And that was approximately when, Ms. Coleman?

24    A.  Since day one.

25    Q.  Okay.  Is that roughly 1994?

Coleman - Direct

```
1    A.  Yes.

2    Q.  And in September of 2008, you reported the scheme to the

3    FBI, correct?

4    A.  Yes.

5    Q.  And you cooperated with the federal government?

6    A.  Yes.

7    Q.  Okay.  Do you know that PCI shortly thereafter went into

8    bankruptcy?

9    A.  Yes.

10   Q.  Okay.  And are you familiar with who the trustee for the

11   company in bankruptcy was?

12   A.  Doug Kelley?

13   Q.  Yes.

14   A.  Yeah.

15   Q.  Okay.  And in addition to cooperating with the

16   government, did you cooperate with Mr. Kelley in his

17   functions as trustee of PCI?

18   A.  Yes.

19   Q.  Okay.  Did you meet personally with him?

20   A.  With him in his office and other employees.

21   Q.  Okay.  Meet with other lawyers in the office?

22   A.  Yes.

23   Q.  And did you cooperate with the tasks that the trustee

24   performed in connection with the bankruptcy of PCI?

25   A.  Yes.
```

Coleman - Direct                                                    2786

1    Q.  And we've met before as well, correct?

2    A.  Yes.

3    Q.  In the past week or so, you and I and Mr. Moheban and

4    Ms. Tancil have had a couple of conversations, correct?

5    A.  Yes.

6    Q.  About an hour long?

7    A.  Yes.

8    Q.  One in person, one by Zoom?

9    A.  Yes.

10   Q.  Okay.  Could you tell us at a high level, Ms. Coleman,

11   what your role was in connection with the Ponzi scheme

12   perpetrated by PCI.

13   A.  I talked to some of the investors, and then I made up

14   purchase orders.

15   Q.  Okay.  And the purchase orders were fake?

16   A.  Yes.

17   Q.  What did they purport to show?

18   A.  That Petters Company was buying and selling large

19   amounts of inventory.

20   Q.  And were there other people -- and that wasn't true,

21   correct?

22   A.  Correct.

23   Q.  Ostensibly that was the business of PCI; fair to say?

24   A.  Yes.

25   Q.  Okay.  Were you the only one who was making up fake

```
 1    purchase orders?

 2    A.  No.

 3    Q.  Who else?

 4    A.  Bob White.

 5    Q.  Okay.  And who were the people that ran the Ponzi

 6    scheme?

 7    A.  Myself, Bob White, Tom Petters, Jim Wehmhoff.  Greg

 8    Bell knew about it --

 9    Q.  Excuse me.  Can I cut you off there?

10    A.  He did not run it.  Sorry.

11    Q.  Can I cut you off there?

12    A.  Yes.

13              MR. GLEESON:  Move to strike the last part of that

14    answer, just the last name, Your Honor.

15              THE COURT:  Any objection?

16              MR. ANTHONY:  No objection.

17              THE COURT:  Stricken.

18              MR. GLEESON:  Thank you.

19    BY MR. GLEESON:

20    Q.  And those people you mentioned, not the last one, those

21    people you mentioned, did they work at the PCI offices?

22    A.  Yes.

23    Q.  Okay.  And can you tell us generally what the roles of

24    those people were to the extent -- withdrawn.

25              You mentioned that you and Bob White created fake
```

1    purchase orders, correct?

2    A.  Yes.

3    Q.  Okay.  Anybody else participate in that besides you and

4    Mr. White?

5    A.  Tom Petters did.

6    Q.  Okay.  And did you -- on that particular function of the

7    scheme, did that last throughout the 14-year period, the

8    creation of fake purchase orders?

9    A.  Yes.

10   Q.  And were they just fake purchase orders with regard to

11   buying goods, ostensibly buying goods from manufacturers?

12   A.  Mainly from Enchanted and Nationwide.

13   Q.  Okay.  And could you describe to the jury the role of

14   Nationwide and Enchanted in the scheme.

15   A.  There were just two companies, individuals that Tom knew

16   that agreed to play along with the scheme.

17   Q.  Okay.  And that was two -- who were the principals of

18   those two entities; do you recall?

19   A.  Larry Reynolds was with Nationwide, and Mike Catain was

20   with Enchanted.

21   Q.  And they were in on the scheme?

22   A.  Yes.

23   Q.  Okay.  Were there other fake documents that were

24   prepared in connection with furthering the scheme?

25   A.  Yes.  There was fake invoices, bank statements, bill of

1    ladings.

2    Q.  Okay.  The invoices that were made up purported to

3    reflect what kind of transaction?

4    A.  Wholesale and buying and selling merchandise.  And we

5    invoiced Enchanted and --

6    Q.  Invoices from folks from entities that were purportedly

7    buying the goods?

8    A.  Yes.

9    Q.  Okay.  And you said fake bank statements.  Who prepared

10   the fake bank statements?

11   A.  Bob White and myself.

12   Q.  And the roles of the other people that you mentioned in

13   the scheme, can you briefly describe what they were.

14   A.  Tom --

15   Q.  For example, you mentioned Jim Wehmhoff.  Excuse me for

16   interrupting.

17   A.  He talked to some of the investors.  He was our

18   accountant.

19   Q.  And he talked to some investors and did he talk -- did

20   he tell lies to investors?

21   A.  You know, I wasn't -- with the conversation, I wasn't in

22   his office.

23   Q.  Fair enough.

24          How old were you when you first met Mr. Petters,

25   Ms. Coleman, approximately?

```
 1    A.   30s.

 2    Q.   Okay.

 3    A.   Late 20s, early 30s.

 4    Q.   How old are you now?

 5    A.   56.

 6    Q.   Okay.  And when you first started working for him, do

 7    you remember what your salary was or your pay was?

 8    A.   Rough guess, 30,000, maybe.

 9    Q.   And over the years, your compensation from

10    Mr. Petters -- were you employed by PCI?

11    A.   Yes.

12    Q.   And was your compensation provided by PCI?

13    A.   Yes.

14    Q.   Did you get additional compensation in addition to that

15    that you received from PCI?

16    A.   Bonuses.

17    Q.   Okay.  Were those paid by PCI?

18    A.   Yes.

19    Q.   Okay.  And over the years, those bonuses got larger and

20    larger?

21    A.   Yes.

22    Q.   And at their -- did they get increasingly higher each

23    year?

24    A.   Yes.

25    Q.   The scheme came to an end when?
```

Coleman - Direct

```
1    A.  2008.

2    Q.  And what was your bonus in the year that preceded that,

3    2007?

4    A.  Maybe 3 million.  I don't remember exactly.

5    Q.  Approximately 3 million?

6    A.  Yes.

7    Q.  Okay.  Did you ever make any payments to employees at

8    M&I Bank?

9    A.  No.

10   Q.  Did you ever give anybody at M&I Bank anything of value

11   in exchange for a favor?

12   A.  No.

13   Q.  To your knowledge, I'm limiting this to your personal

14   knowledge, did you ever see Tom Petters provide any M&I

15   employee with cash gifts?

16   A.  No.

17   Q.  Did he provide anything of value, to your knowledge, to

18   M&I employees?

19   A.  No.

20   Q.  Did you talk to Tom Petters from time to time during the

21   existence of the Ponzi scheme?

22   A.  Quite a bit.

23   Q.  Were you in the office with him on a daily basis?

24   A.  Yes.

25   Q.  Did you talk to him and to Bob White about how to
```

Coleman - Direct

1    advance the scheme?

2    A.  It was just a daily routine, but, yeah.

3    Q.  Okay.  And give the jury a feel, please, Ms. Coleman, as

4    to the nature of the relationships among you and Mr. Petters

5    and Mr. White.  For example, did you just take direction

6    from Mr. Petters or did you also participate in the planning

7    of the scheme?

8    A.  Both.  In the beginning, it was direction from

9    Mr. Petters, and then it just got to be routine, so it was

10   just a -- part of my daily job was just to make up purchase

11   orders and lie to investors.

12   Q.  Okay.  And over time, you participated in managing the

13   scheme?

14   A.  Yes.

15   Q.  Okay.  Was the same true with regard to Mr. White?

16   A.  Well, I wouldn't say I was managing -- all three of us

17   were doing it.  Tom was managing it.  We were both working

18   for Tom.

19   Q.  Who were -- withdrawn.

20             PCI had a bank account at M&I Bank, correct?

21   A.  Yes.

22   Q.  Did PCI have bank accounts at other banks?

23   A.  Yes.

24   Q.  Many other banks?

25   A.  Yes.

1    Q.   Okay.  And who were the -- did you have a relationship

2    manager?  Was there a particular person at M&I Bank who

3    handled the PCI account there?

4    A.   Ed did.

5    Q.   And were there -- what was his last name?  Do you

6    remember?

7    A.   If you said it, I would.

8    Q.   Jambor sound familiar?

9    A.   Yes.

10   Q.   Okay.  And did you have additional accounts --

11   withdrawn.

12              Petters Company, Inc. was one of the companies

13   located at Petters' offices -- correct? -- Tom Petters'

14   offices?

15   A.   Yes.

16   Q.   Okay.  There were other companies there as well?

17   A.   Yes.

18   Q.   What were the names of the other companies, as best you

19   can recall?

20   A.   Petters Group, Polaroid, Petters Worldwide.  There were

21   a couple other ones too, and I just don't remember offhand.

22   Q.   Was Sun Country Airlines there?

23   A.   No.

24   Q.   He owned Sun Country Airlines?

25   A.   Yes.

1    Q.  Okay.  He owned Polaroid?

2    A.  Yes.

3    Q.  And going back to the M&I Banking relationship, were

4    there additional accounts at M&I Bank, that is, in addition

5    to the PCI account?

6    A.  Yes.

7    Q.  Okay.  Were there any other relationship managers at M&I

8    Bank besides Ed?  Do you understand what I mean by

9    relationship manager?

10   A.  Yes, I do.  You know, Ed was my main person that I

11   talked to.

12   Q.  Okay.

13   A.  I don't know about the other companies.

14   Q.  The other companies.  Did you know if there was another

15   relationship manager after Ed Jambor?

16   A.  I don't believe so.

17   Q.  Do you recognize the name Chris Flynn?

18   A.  I do recognize the name.

19   Q.  Okay.  Do you recognize him as another banker at M&I

20   Bank who was responsible for the PCI account?

21   A.  Yes.

22   Q.  It seems like you remember him a little less well than

23   you remember Ed Jambor; is that correct?

24   A.  Correct.

25   Q.  Did you deal with Chris Flynn infrequently?

```
1    A.  I'm sure I've talked to him.  I just don't remember

2    offhand any conversations or anything.

3    Q.  How frequently did you deal with Ed Jambor?

4    A.  Not a lot.  Maybe a couple times a month.

5    Q.  Okay.  And did you try to limit your contacts with Ed

6    Jambor?

7    A.  I guess I -- I guess you could say that, yeah.

8    Q.  Well, you tell us.  What was the nature of that

9    relationship?  Did you look for opportunities to speak to

10   him or speak to him only when it was necessary?

11   A.  Only when it was necessary.

12   Q.  Were there other bankers at M&I Bank that you recall

13   having contact with?

14   A.  The wire department.

15   Q.  Okay.

16   A.  Oh, any other bankers?  No.

17   Q.  Wire department is different from the bankers?

18   A.  Well, the wire department is the only other --

19   Q.  I see.  We will get to the wire department in a second.

20          Other than Ed Jambor and -- other than Ed Jambor,

21   was there anybody at M&I Bank who was a banker with whom you

22   had contact that you recall?

23   A.  Not that I remember.

24   Q.  From time to time would Ed bring people to PCI's offices

25   to talk about banking matters?
```

1    A.   There was a couple times where we met with M&I Bank.

2    Q.   Okay.  And -- meaning Ed?

3    A.   Ed and there was -- I don't remember the names, but

4    there was maybe three of them.  There was a lady, and I

5    don't remember who all showed up.

6    Q.   People that Ed brought with him?

7    A.   Right.

8    Q.   Okay.  Sometimes did they talk to you about other bank

9    products they would like M&I Bank to avail itself -- excuse

10   me, PCI to avail itself of?

11   A.   Not with me directly, no.

12   Q.   Okay.  You mentioned the wire department.  Tell us about

13   your -- the frequency of your interactions with people in

14   the wire department.

15   A.   I dealt a lot with the wire department because we had so

16   many wires coming in and so many wires going out, that I

17   would just call the wire department to wire funds and to see

18   when a wire was coming in.

19   Q.   Okay.  How frequently did that happen?  Withdrawn.

20        Did that happen consistently over the years?

21   A.   Yes.

22   Q.   Okay.  And how frequently would you contact people in

23   the wire department?

24   A.   Probably an average, I don't know, six times a day.

25   Q.   Okay.  Well, let's unpack that a little bit.  That's a

1    lot of contacts with the wire department, correct?

2    A.  Correct.

3    Q.  Okay.  Could you tell the jury about the process that

4    you used to send wires from the PCI account at M&I Bank.

5    A.  We would -- the wires, when we got them in, we would pay

6    off the investors with it.

7    Q.  I'm sorry, I didn't --

8    A.  I guess I'm not sure.  What was your question?

9    Q.  Yeah.  You sent many wires over the years, correct?

10   A.  Correct.

11   Q.  Thousands and thousands of wires?

12   A.  Correct.

13   Q.  Tell us when you wanted to send a wire out of the bank

14   account at PCI [sic] Bank, how you went about doing it.

15   A.  I would call the wire department, tell them who I was

16   and then I would give them a code.

17   Q.  That was a PIN code or a code that you needed to give --

18              THE COURT:  Counsel, keep your questions direct.

19              MR. GLEESON:  Sorry, Judge?

20              THE COURT:  Your questions need to be direct as

21   opposed to leading.

22              MR. GLEESON:  Okay.

23   BY MR. GLEESON:

24   Q.  What was the purpose of the code?

25   A.  We did a lot wires to different investors, so each

Coleman - Direct

```
 1    investor had their own code so I didn't have to go through
 2    the bank and the routing number and the investor's name and
 3    their account number all the time.  I could just call the
 4    wire department, tell them who I was, give them our account
 5    number, and then I could just say, Wire $2 million to P960,
 6    and P960 would be like, say, Frank Vennes.
 7    Q.  And that's the -- and that's the process you engaged in
 8    many times a day, correct?
 9    A.  Correct.
10    Q.  Did you speak to the same person in the wire department
11    each time?
12    A.  No.
13    Q.  Did you get to know them?
14    A.  Not really.  I mean, I recognized some of the voices.
15    Q.  Okay.  Did any of them ever ask you about the business
16    of PCI?
17    A.  One lady did.
18    Q.  What did she say?
19    A.  She just asked us what Petters Company did because we --
20    I was calling there all the time, so she just wanted to know
21    what we did.
22    Q.  Okay.  Do you remember who that was?
23    A.  I do not.
24    Q.  Do you remember when it was?
25    A.  No.
```

1    Q.  Can you roughly approximate where within the 14-year

2    duration of the scheme it was?  Beginning?  Middle?  End?

3    A.  Probably more towards the middle/end.

4    Q.  Okay.  And did she tell you anything else about why she

5    was asking what Petters Company did?

6    A.  No.

7    Q.  And did you say anything in response to her question?

8         MR. ANTHONY:  Objection, lacks foundation,

9    hearsay.

10        THE COURT:  Sustained.

11   BY MR. GLEESON:

12   Q.  Did you hear back from that person at any point after

13   that conversation?

14   A.  No.

15   Q.  Did you tell that person at M&I Bank that Petters

16   Company, Inc. was a Ponzi scheme?

17        MR. ANTHONY:  Objection, leading, lacks

18   foundation.

19        THE COURT:  Sustained.

20        MR. GLEESON:  Judge, I am offering it for the

21   state of mind of the bank.

22        THE COURT:  Sustained.

23   BY MR. GLEESON:

24   Q.  Did you tell her the truth?

25   A.  No.

1    Q.  Did anybody else at M&I Bank inquire of you about the

2    business of PCI?

3    A.  No.

4    Q.  Do you recall any of the investors in PCI asking you to

5    create Deposit Account Agreements, to participate in

6    creating Deposit Account Agreements at M&I Bank?

7    A.  Yes.

8                MR. ANTHONY:  Objection, relevance, 402, 403,

9    foundation, also violates motion in limine order as to

10   investor knowledge.

11               THE COURT:  Sustained.

12   BY MR. GLEESON:

13   Q.  Did Ed Jambor provide assistance to you from time to

14   time?

15   A.  Yes.

16   Q.  Okay.  And can you tell the jury the types of assistance

17   that he would provide to you.

18   A.  There was a couple times where we were overdrawn because

19   a check came through, so I would call Ed up and ask him to

20   hold on to the check because we had a wire coming in.

21   Q.  And did he do that for you?

22   A.  Yes.

23   Q.  And how long did it take the wire to come in?

24   A.  We usually had it within the next hour or two.

25   Q.  Did any of those situations involve not covering the

1    wire that day?

2    A.  No.

3    Q.  You were always covered on that day?

4    A.  Yes.

5    Q.  Did -- was it your understanding you were getting any

6    special treatment from M&I Bank with regard to overdrafts?

7                MR. ANTHONY:  Objection, leading.

8                THE COURT:  Overruled.

9                THE WITNESS:  I guess I didn't look at it that

10   way.

11   BY MR. GLEESON:

12   Q.  Okay.  You covered the overdrafts when he called?

13   A.  Yes.

14               MR. GLEESON:  Let's pull up Defendant's Exhibit

15   40026.  No, don't, Mr. Herzka.

16               Judge, just to -- I don't want to take the jury's

17   time, but I want to make sure I understand the contours of

18   your sustained objection and I don't run afoul of it.

19               Can I briefly come to sidebar?

20               THE COURT:  No, Counsel.

21               MR. GLEESON:  Can you pull up 40026, please,

22   Mr. Herzka.  This is in evidence.

23   BY MR. GLEESON:

24   Q.  Have you seen this document, to your recollection, in

25   the last -- withdrawn.

1                Were you deposed in this case, Ms. Coleman?

2       A.  Yes.

3                MR. ANTHONY:  Your Honor, objection.  I don't

4       think this is admitted into evidence yet, but if he's

5       offering it, we have no objection.  But I just want to

6       confirm that it's not in evidence before we start talking

7       about it.

8                MR. GLEESON:  I'm sorry.  Forgive me.

9                THE COURT:  It is not in evidence.

10               MR. GLEESON:  Okay.

11               MR. ANTHONY:  If he's offering it, we do not have

12      an objection, Your Honor.

13               MR. GLEESON:  Thank you, Mr. Anthony.  Could you

14      pull it back up -- I offer it.

15               THE COURT:  Okay.  Let's not show the --

16               MR. GLEESON:  Yes.  Pull it down, please.

17               THE COURT:  -- exhibit until it has been admitted

18      into evidence.

19               MR. GLEESON:  Understood.

20               THE COURT:  The jury does not see evidence that is

21      not admitted.

22               MR. GLEESON:  I understand.  I offer it in

23      evidence without objection from my adversary.

24               MR. ANTHONY:  No objection, Your Honor.

25               THE COURT:  It is received.

1              MR. GLEESON:  Thank you, Judge.

2     BY MR. GLEESON:

3     Q.  Just take a moment and read that, please, Ms. Coleman.

4              THE COURT:  Let's establish for the record what

5     exhibit that is.

6              MR. GLEESON:  Yes.  This is Defendant's Exhibit

7     40026, Judge.

8     BY MR. GLEESON:

9     Q.  Let me know when you are finished, please, Ms. Coleman.

10         (Witness reviews document)

11    A.  Okay.

12    Q.  Okay.  As you sit here today in 2022, do you have any

13    recollection of this?

14    A.  Of this exact letter, no.

15    Q.  Okay.  Do you have a recollection of the events

16    surrounding this letter?

17    A.  Yes.

18    Q.  Okay.  This is a letter to you from Ed Jambor, correct?

19    A.  Correct.

20    Q.  And does it set forth a couple of options to accommodate

21    a request?

22    A.  Yes.

23    Q.  Okay.  One, and I am referring to the third paragraph,

24    is to set up a custodial checking account, correct?

25    A.  Correct.

1   Q.  Okay.  And that account -- the beneficiary of that

2   account would be one of the -- a company that PCI was doing

3   business with, correct?

4   A.  Correct.

5   Q.  And it goes on to say, "The Petters account would be

6   required move to M&I trust department in order to meet the

7   monitoring requirements requested by Opportunity Finance."

8   That was the customer, correct?

9   A.  Correct.

10  Q.  That was your entity you were doing business with?

11  A.  Correct.

12  Q.  Okay.  And then the next paragraph sets forth a second

13  option, which is a "Letter of Credit possibility."  I don't

14  see the need to read the rest of the paragraph.  Is that

15  correct, that it was a Letter of Credit possibility?

16  A.  Yes.

17  Q.  Okay.  And one would have required moving to the trust

18  department, the other would require a Letter of Credit,

19  correct?

20  A.  Correct.

21  Q.  Do you recall whether you exercised either of these

22  options?

23  A.  We did not.

24  Q.  Didn't exercise either one?

25  A.  No.

1    Q.  Okay.  Did -- was there anything about a Letter of

2    Credit and what that would mean that gave you pause?

3    A.  I'm sorry.  What was that?

4    Q.  Was there anything about having a Letter of Credit

5    arrangement with M&I Bank that gave you pause?

6    A.  Not with me, no.

7    Q.  Okay.  The account that you had with M&I Bank was a

8    deposit account -- correct? -- a checking account?

9    A.  A checking account, yes.

10   Q.  Not a loan account, correct?

11   A.  Correct.

12   Q.  Did you have to have a Letter of Credit with M&I Bank?

13   A.  I don't believe so.

14   Q.  Okay.  And the deposit account was in essence a checking

15   account; is that right?

16   A.  Yes.

17   Q.  Did you provide financial statements to M&I Bank in

18   order to open that deposit account?

19   A.  I did not.

20   Q.  Was there anything about providing financial statements

21   to M&I Bank that gave you pause?

22   A.  We didn't -- I mean, we couldn't do financial

23   statements.

24   Q.  Why?

25   A.  Because it was all a Ponzi scheme.

1    Q.  Okay.  And did you deliberately avoid arrangements like

2    a Letter of Credit because M&I Bank would find out about the

3    fraud?

4                MR. ANTHONY:  Objection, leading.

5                THE COURT:  Sustained.

6    BY MR. GLEESON:

7    Q.  Do you recall ever being asked to provide letters of

8    credit?

9    A.  I was not personally, no.

10   Q.  Okay.  Did you have a concern -- withdrawn.

11               Did you deliberately only have a deposit account

12   relationship with M&I Bank as opposed to a loan

13   relationship?

14   A.  Yes.

15   Q.  Why?

16   A.  We couldn't get a loan.

17   Q.  Why?

18   A.  Because it was all a Ponzi scheme.  We didn't -- there

19   was really no income.

20   Q.  And did you want to avoid having relationships with

21   other departments of the bank?

22   A.  I guess I never thought about that.

23   Q.  Never thought about asking for -- withdrawn.

24               Did anybody come to PCI's offices and talk in your

25   presence about a loan relationship with PCI?

 1    A.  Not directly with me, no.

 2    Q.  Okay.  Did you ever talk about that with Bob White or

 3    Tom Petters?

 4    A.  Not that I remember, no.

 5    Q.  Okay.  Let's go back to this other topic related -- this

 6    was in 2003, correct?

 7    A.  Yes.

 8    Q.  And it didn't happen, correct?

 9    A.  Correct.

10    Q.  In 2008, were any of the businesses that -- any of the

11    investors in PCI seeking deposit account relationships?

12    A.  Yes.

13    Q.  Okay.  And did any of those requests result in the

14    creation of deposit accounts at M&I Bank for those investors

15    as beneficiaries?

16    A.  We had a couple of them, yes.

17    Q.  Okay.  Do you recall with whom?

18    A.  Palm Beach was one, and I don't remember the other ones.

19    Q.  Just going to be brief on this to abide by the earlier

20    determination.

21         Let me ask you this, Ms. Coleman:  In connection

22    with those deposit accounts, was there a mechanism for M&I

23    Bank to be instructed by you to transfer funds into deposit

24    accounts?

25    A.  Yes.

1    Q.  Did you ever provide such instructions?

2    A.  No.

3    Q.  Fair to say you knew that what you were doing for the 14

4    years of the scheme was wrong?

5    A.  Yes.

6    Q.  Okay.  Did you have an understanding that if the scheme

7    were discovered, you would be in trouble?

8    A.  Well, yes.

9    Q.  Tell us, please, your thinking in that regard.  Were you

10   concerned about being arrested?

11              MR. ANTHONY:  Objection, Your Honor, relevance.

12              THE COURT:  Sustained.

13   BY MR. GLEESON:

14   Q.  Did there come a point when you expressed any concern to

15   Mr. Petters?

16              MR. ANTHONY:  Objection, relevance, hearsay.

17              THE COURT:  Sustained.

18   BY MR. GLEESON:

19   Q.  Did you try to hide the Ponzi scheme from people who

20   didn't know about it?

21   A.  Yes.

22   Q.  And were there people at PCI that you hid it from?

23   A.  Yes.

24   Q.  Who?

25   A.  David Baer, Tom Hay.  I mean, pretty much all the

1    employees.

2    Q.  Sorry?

3    A.  I said pretty much all the employees.

4    Q.  Okay.  All the employees except the ones you mentioned

5    earlier who were participants?

6    A.  Correct.

7    Q.  Was Tom Petters' image part of the success of the scheme

8    while it was successful?

9    A.  Yes.

10   Q.  And was that -- did he work on his image in order to

11   make it more successful?

12   A.  Yes.

13   Q.  Did you personally observe him in the company of

14   celebrities?

15   A.  Yes.

16   Q.  Which ones?  You tell us.

17   A.  He hired Ted Mondale.  I mean, there was quite a few

18   different ones.

19   Q.  Okay.  And just remind us who Ted Mondale is.

20   A.  The son of the vice president, former vice president.

21   Q.  Okay.  Did Mr. Petters have other important friends

22   besides the son of former Vice President Walter Mondale?

23          MR. ANTHONY:  Objection, lacks foundation as to

24   important.

25          THE COURT:  Overruled.

```
1              THE WITNESS:  He did, yes.
2    BY MR. GLEESON:
3    Q.  Okay.  Do you remember any of them?
4    A.  You know, there's so many other -- so many people that
5    he communicated with, I just can't think of any offhand.
6    Q.  Was he -- did you personally see him in the company of
7    politicians besides the son of former Vice President
8    Mondale?
9    A.  Yes.
10   Q.  Which ones that you recall?
11   A.  I don't.  I know he donated a lot of money and they were
12   always invited to Christmas parties or other events.
13   Q.  Okay.  So he engaged in philanthropy as well?
14   A.  Yes.
15   Q.  Was that part of the image that perpetuated -- helped to
16   perpetuate the scheme?
17   A.  Yes.
18   Q.  Did he -- do you remember any of the particular
19   charities that he contributed to?
20   A.  There was quite a few of them.  There again, offhand,
21   no.
22   Q.  Ever see him in the presence of governors or members of
23   Congress?
24   A.  Yes.
25   Q.  Do you remember which ones?
```

1    A.  Right off the top of my head, no, I don't remember.

2    Q.  Was the acquisition of other companies by Mr. Petters

3    part of his effort to burnish his image?

4    A.  Yes.

5    Q.  Do you remember any particular acquisitions that were

6    done for that purpose?

7    A.  Pretty much all of them; Sun Country, Polaroid,

8    Fingerhut.

9    Q.  What was Fingerhut?

10   A.  A catalog -- discounted catalog company.

11   Q.  Were all of those companies legitimate companies?

12   A.  Yes.

13   Q.  To your knowledge, was PCI the only illegitimate company

14   among them?

15   A.  Yes.

16   Q.  You know he owned Petters Warehouse Direct as well?

17   A.  Yes.

18   Q.  Let's talk about your decision to go to the FBI in

19   September of 2008.  Okay?

20   A.  Okay.

21   Q.  When did you make the decision to turn yourself in,

22   Ms. Coleman?

23   A.  In -- I think it was August actually.

24   Q.  Okay.  And why did you report yourself to the FBI?

25   A.  I just wanted it over with.

```
1    Q.  You wanted the scheme over with?

2    A.  Right.  No longer wanted to be part of it.

3    Q.  Okay.  Did you -- were you concerned about the

4    consequences that would -- you would face by disclosing your

5    crimes?

6            MR. ANTHONY:  Objection, leading.

7            THE COURT:  Overruled.

8            THE WITNESS:  No, I just wanted it over with.  I

9    guess I didn't care what happened to me.

10   BY MR. GLEESON:

11   Q.  You wanted to put it behind you?

12   A.  I did.

13   Q.  Did -- where did you -- how did you do it?  Where did

14   you go?  Who did you see when you turned yourself in to the

15   FBI?

16   A.  I went to the FBI.  And, you know, there was a table

17   full of people.  It was FBI, IRS.

18   Q.  Okay.

19   A.  Attorneys.

20   Q.  And you went in.  Were you accompanied by counsel?

21   A.  Yes.

22   Q.  Okay.  And let me ask you a few questions about 2008

23   before you turned yourself in.

24           Was the economy in trouble in 2008?

25           THE COURT:  Counsel, counsel, this is direct
```

```
1    examination; nonleading questions.

2    BY MR. GLEESON:

3    Q.  Could you describe for the jury what the economic

4    circumstances were in 2008, as best you can.

5        (No response.)

6    Q.  Let me try it this way:  Was it more difficult to raise

7    investments in 2008 than it had been previously?

8    A.  It was, yes.

9    Q.  Did that have anything to do with your decision to go to

10   the FBI?

11   A.  No.

12   Q.  You just wanted the whole thing behind you?

13   A.  I did.

14   Q.  Okay.  What was the first thing that happened when you

15   went in and said you wanted -- excuse me.

16       Tell us the first thing that happened when you

17   went to the FBI.

18       MR. ANTHONY:  Objection, relevance.

19       THE COURT:  Overruled.

20       THE WITNESS:  I brought them a stack of papers and

21   told them what was going on and who was involved in the

22   Ponzi scheme.  And they -- I went back to the office that

23   evening because Tom had a meeting, and they put a wire on me

24   and I started recording conversations.

25   BY MR. GLEESON:
```

```
1    Q.  Okay.  And did you have -- did you have to be truthful

2    to the FBI?  Was it your understanding you had to be

3    truthful?

4    A.  Yes.

5    Q.  Did -- what else was your understanding with regard to

6    the debriefings?  What were your obligations?

7    A.  You know, I honestly couldn't tell you.  I just know I

8    wanted it over with, and I was just ready to cooperate and

9    answer the questions they had and just do whatever they

10   said.

11   Q.  Did you have an understanding as to what would happen if

12   you told them lies?

13             MR. ANTHONY:  Objection, leading.

14             THE COURT:  Sustained.

15   BY MR. GLEESON:

16   Q.  You had an understanding you had to tell the truth,

17   correct?

18   A.  Yes.

19   Q.  And were you honest?

20   A.  Yes.

21   Q.  Did they ask you who was involved in the scheme?

22             MR. ANTHONY:  Objection, hearsay.

23             THE COURT:  Sustained.

24             MR. ANTHONY:  And leading.

25   BY MR. GLEESON:
```

1    Q.  Did you leave out any details in your description of the

2    events to the FBI?

3    A.  No.

4    Q.  Did you tell the FBI that anyone at M&I Bank was

5    involved in the scheme?

6             MR. ANTHONY:  Objection, leading, no foundation,

7    nonverbal hearsay, Rule 802.

8             THE COURT:  Sustained.

9             Counsel, keep your questions direct.

10            MR. GLEESON:  I'm sorry?

11            THE COURT:  Keep your questions direct.

12            MR. GLEESON:  Thank you, Your Honor.

13   BY MR. GLEESON:

14   Q.  Ms. Coleman, did anyone at M&I ever tell you they had

15   figured out that PCI was running a Ponzi scheme?

16            MR. ANTHONY:  Objection, leading, lacks

17   foundation.

18            THE COURT:  Sustained.

19   BY MR. GLEESON:

20   Q.  I just want to ask you about the things that you

21   personally observed.  All right?

22   A.  Okay.

23   Q.  Okay.  Did you ever observe anyone at M&I Bank indicate

24   that -- did you ever observe anyone at M&I Bank say that

25   they knew there was a Ponzi scheme at PCI before Tom Petters

Coleman - Direct

```
1    was arrested?

2              MR. ANTHONY:  Objection.

3              MR. GLEESON:  Can I approach, Your Honor?

4              THE COURT:  Yes, you may.

5         (At sidebar)

6              MR. GLEESON:  The motion that was made last night

7    that the Court rejected registered, as Mr. Anthony's

8    comments this morning did, an agreement that to the extent

9    that what she saw and heard is offered in evidence, that's

10   fine.  Not are you aware of whether they knew, but if -- the

11   question here is whether M&I Bank knew or had reason to

12   suspect there was a Ponzi scheme, and the fact that they

13   never told, all she's doing is an observation.  Obviously it

14   would be admissible to prove their state of mind if they

15   said they knew.  Obviously it would be admissible to prove

16   their state of mind if they said they suspected.  It's just

17   as equally probative of their state of mind if they didn't

18   say they knew and if they didn't say they suspected.

19             These are observations and lack of observations

20   that are directly probative.  This is the insider in the

21   scheme, and this is all about the intent of M&I Bank and the

22   knowledge of M&I Bank.  And this is how to prove an absence

23   of intent, is the person at PCI with whom they dealt on a

24   regular basis never saw or heard any indication that they

25   knew.
```

Coleman - Direct

1           This is precisely what the trustee's counsel said

2      in its motion last night was permissible.

3           MR. ANTHONY:  Okay.  So she's already disqualified

4      herself with respect to any wire room people because she

5      can't remember who she talked to, what they said, so that

6      group of people are out.  The only other people she says she

7      can recall talking to are Jambor, Flynn and Rhode.

8           So, first of all, the suggestion that did anyone

9      from the bank call you is overly broad and lacks in

10     foundation.  And if he's going to ask about conversations

11     with Mr. Jambor or Ms. Rhode or Mr. Flynn, I'd just like to

12     know what the conversation is, when it occurred, and if he's

13     going to ask in that conversation, Did they tell you they

14     knew about the Ponzi scheme, I'd just like to be able to

15     know when it occurred, as opposed to some broad statement,

16     Over 6 years or 14 years, did anybody ever ask you.

17          There's no way I can test her recollection.

18     There's no way I can test the veracity or the foundation.

19     It's overly broad, and it also --

20          THE COURT:  So your objection is overbroad?

21          MR. ANTHONY:  I have multiple objections.  I have

22     no foundation, it seeks to establish the bank's knowledge,

23     getting into the mind of the bank as to what the bank

24     thought based on what this witness's observations were.

25          What her observations are are irrelevant.  The

1   question is what -- all the bank employees have said they

2   don't know.  Whether she thinks they knew or not isn't

3   relevant, and that's what he's asking, basically.  He wants

4   to create the negative impression that she thought the bank

5   didn't know.

6              MR. GLEESON:  I'm not ask --

7              MR. ANTHONY:  And I don't think that's --

8              MR. GLEESON:  Excuse me.

9              MR. ANTHONY:  And I don't think that's

10  [inaudible] --

11             MR. GLEESON:  I'm not asking --

12             COURT REPORTER:  I'm sorry.  I don't think that's?

13             MR. ANTHONY:  I don't think that's admissible.

14             MR. GLEESON:  Judge, I am not asking her what she

15  thinks.  I'm asking her whether she's spoken about

16  participants in this scheme.  I'm asking her whether anybody

17  at M&I Bank told her, and I can break it down by individual.

18  I'm not asking about a particular discussion.  I'm asking

19  whether Ed Jambor ever told her that he knew about the

20  scheme or said anything to that effect or whether he said

21  anything to the effect that he was suspicious.  That's

22  directly probative.

23             The fact that he didn't do that and this was his

24  contact with somebody at the heart of the scheme is directly

25  probative of his knowledge, which, as Mr. Anthony just

```
 1    mentioned, is the key in the case.  It is the key of the

 2    case, the knowledge of the people at M&I Bank.

 3              MR. ANTHONY:  I think that his question is leading

 4    and suggests an answer.

 5              I think if he asked the question, Did you ever

 6    have any conversation with Mr. Jambor in which you discussed

 7    the Ponzi scheme, she can answer that question.  But to

 8    suggest that the bank -- I think he can ask her, Did you

 9    have a conversation with Mr. Jambor in which you discussed

10    the Ponzi scheme.  I think he can ask that question.  But to

11    ask it in the way he's proposing to ask it is -- Did anyone

12    from the bank tell you it was aware of the Ponzi scheme, is

13    objectionable for all the reasons we indicated.

14              MR. GLEESON:  Judge, with all respect to

15    Mr. Anthony, I would like to conduct my own examination.

16    And at the heart of the case is the absence -- for our case

17    is the absence of knowledge on the part of the M&I bankers.

18    And this is probative evidence of the absence of knowledge,

19    that they did not talk to Deanna about any suspicion or any

20    knowledge.

21              I should not be required, nor is it what I am

22    trying to prove, that in all of their various discussions,

23    she never mentioned it.  She's already said she never

24    mentioned it.  It's important to demonstrate the absence of

25    knowledge as evidenced by their never telling her they were
```

1    even suspicious.

2              MR. ANTHONY:  The fact they didn't tell her they

3    weren't suspicious does not prove that the bank didn't have

4    something in its mind that created suspicion.  That's the

5    impression it's giving.  This witness's views of whether the

6    bank knew or not are irrelevant.

7              MR. GLEESON:  I'm not asking her views.  And what

8    Mr. Anthony is arguing goes to the weight of this evidence,

9    Judge, not its probative value.

10             THE COURT:  I agree.  The objection is overruled.

11        **(In open court)**

12   BY MR. GLEESON:

13   Q.  Did Ed Jambor ever say to you that he had figured out

14   that PCI was running a Ponzi scheme?

15   A.  No.

16   Q.  Did he ever say to you that he had a suspicion that PCI

17   was running a Ponzi scheme?

18             MR. ANTHONY:  Objection, leading.

19             THE COURT:  Sustained.

20   BY MR. GLEESON:

21   Q.  Did -- on the subject of -- I want to limit your

22   answers -- I am limiting my question to things that you

23   observed, not what you thought.  Do you understand that

24   difference, Ms. Coleman?

25   A.  I do.

1    Q.  Okay.  On the subject of what you observed, did you --

2    what did you observe in connection with Ed Jambor's

3    suspicion, if anything, that there was a Ponzi scheme going

4    on at PCI?

5            MR. ANTHONY:  Objection, lacks foundation.

6            THE COURT:  Overruled.  You may answer.

7            THE WITNESS:  Nothing.

8    BY MR. GLEESON:

9    Q.  Okay.  The same question with regard to Chris Flynn.

10   What did you observe?

11   A.  Nothing.

12   Q.  Okay.  Same question with regard to anyone you dealt

13   with with whom you had conversations or communications at

14   M&I Bank.  Same question.

15   A.  Nothing.

16   Q.  Did you have -- you had meetings -- did you have

17   meetings at PCI with Ed Jambor?

18   A.  Yes.

19   Q.  Okay.  Roughly how many?  Do you recall?

20   A.  Just a couple.

21   Q.  Did the subject of retailer payments ever come up?

22   A.  I'm sure it did.  I just don't remember the exact

23   conversation.

24   Q.  Okay.  Did the subject of whether retailer payments were

25   to be made directly into PCI's account come up?

Coleman - Direct

```
1    A.  Not that I recall.

2    Q.  Okay.  Was it important to you that M&I -- withdrawn.

3              Was it important to you that PCI appeared to the

4    world as a legitimate business?

5    A.  Yes.

6    Q.  Was that important to everybody in the scheme?

7    A.  Yes.

8    Q.  Did you ever talk to Ed Jambor or Chris Flynn about

9    Nationwide and Enchanted's role in the scheme?

10   A.  Not that I remember, no.

11   Q.  Did you feel as though you received special treatment in

12   any regard in any way from M&I Bank?

13             MR. ANTHONY:  Objection, leading, lacks

14   foundation.

15             THE COURT:  Overruled.

16             THE WITNESS:  No.

17   BY MR. GLEESON:

18   Q.  Did you get special treatment from other banks?

19   A.  Yes.

20   Q.  Okay.  What special treatment did you get from other

21   banks?

22             MR. ANTHONY:  Objection, lacks foundation.

23             THE COURT:  Overruled.

24             THE WITNESS:  Crown Bank would wire funds when we

25   didn't have funds in their account or give Tom a cashier's
```

1    check.

2              Then Associated Bank, there was a time where I

3    needed someone from Associated Bank to talk to one of the

4    investors because we needed to buy another day for our bank

5    statement, and he did.

6    BY MR. GLEESON:

7    Q.  Did you ask that person to lie?

8    A.  Yes.

9    Q.  And did that happen?

10             MR. ANTHONY:  Objection, lacks foundation,

11   leading.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes.

14   BY MR. GLEESON:

15   Q.  Let's go back to Crown Bank.  Who was the person that

16   provided the favors at Crown Bank?

17             MR. ANTHONY:  Objection, relevance.

18             THE COURT:  Sustained.

19   BY MR. GLEESON:

20   Q.  Okay.  I'm going to show you what's in evidence as

21   Defendant's Exhibit --

22             MR. GLEESON:  I'm almost finished, Your Honor.

23   I'll finish before the lunch break.

24   BY MR. GLEESON:

25   Q.  -- Defendant's Exhibit 10014, which is in evidence.

```
1              MR. GLEESON:  Mr. Herzka, if you could pull it up
2     on the screen.  Hard to read.  Maybe it can be enlarged a
3     bit.
4     BY MR. GLEESON:
5     Q.  It's a Depository Agreement.  Do you see that?
6     A.  I do.
7     Q.  Okay.  There was a Depository Agreement between PCI and
8     M&I Bank, correct?
9     A.  I'm assuming there was.  I don't remember.
10             MR. GLEESON:  Okay.  Let's scroll to the
11    signature.  We can pull that out.  We don't need that.
12    BY MR. GLEESON:
13    Q.  Do you recall a Depository Agreement between M&I Bank
14    and PCI, that there was one, Ms. Coleman?
15    A.  You know, I'm sorry, I don't remember.
16    Q.  Kind of a lot of fine print there, correct?
17    A.  Well, this was after I was done.
18    Q.  Yeah.  My questions are actually different.  I have it
19    up there.
20    A.  Okay.
21    Q.  But my questions relate to conduct in which you engaged
22    or did not engage.  So let me ask you just a couple of
23    questions.
24             Did you receive account statements from M&I Bank?
25    A.  Bank statements?  Yes.
```

1    Q.  Yes.

2         Every month?

3    A.  Yes.

4    Q.  Excuse me.  Withdrawn.

5         How frequently did you receive them?

6    A.  Monthly.

7    Q.  Okay.  Did you review them?

8    A.  No.

9    Q.  Okay.  Did -- do you know if they -- do you have any

10   information about what they contained?

11   A.  Just like any other bank statement.

12   Q.  Someone else reviewed them at PCI, if they were reviewed

13   at all?

14   A.  I would turn them over to Sandy Indahl.

15   Q.  Okay.

16   A.  Or Jim Wehmhoff.

17   Q.  Who is Sandy Indahl?

18   A.  She was an employee at Petters Company in accounting.

19   Q.  Okay.  We don't need to pull it up.  It's in evidence.

20        The document says that PCI agrees to notify M&I

21   Bank within 30 days of the date the bank mailed or made

22   statements or items available to depositor.

23        Did you ever complain about bank statements to M&I

24   Bank, you personally?

25   A.  No.

1    Q.  Make any complaints about their content?

2    A.  No.

3    Q.  Okay.  You ever in any way indicate to M&I Bank that the

4    account statements were inaccurate?

5    A.  No.

6    Q.  You received -- as you testified earlier, you were

7    frequently involved with wire transfers, correct?

8    A.  Yes.

9    Q.  Okay.  Let me show you for identification -- there's a

10   book before you.  Do you see that little book?

11   A.  Yes.

12   Q.  In it is a document that's got a tab before it that

13   says, "DX-50386."  Let me know when you get to it.

14   A.  Okay.

15   Q.  Okay.  You got it?

16   A.  Yes.

17   Q.  What is it?  What does it say at the top?

18   A.  "Wire Transfer Agreement."

19   Q.  And do you recognize it?

20   A.  Not really.  It is my writing.

21   Q.  Is that your signature at the bottom?

22   A.  Yes.

23   Q.  And it's dated 1-17-06, correct?

24   A.  Correct.

25   Q.  And it's a Wire Transfer Agreement between M&I, Marshall

Coleman - Direct

```
 1      & Ilsley Bank and customer.  Do you see that?
 2      A.  Yes.
 3      Q.  Okay.
 4                  MR. GLEESON:  I offer it in evidence.
 5                  MR. ANTHONY:  No objection, Your Honor.
 6                  THE COURT:  It is received in evidence.
 7                  MR. GLEESON:  Thank you.  Could you pull it up,
 8      Mr. Herzka.
 9      BY MR. GLEESON:
10      Q.  Let's go to page 2, paragraph 8, and to the last line of
11      the paragraph.
12                  Again, completely unreadable, but it says in
13      there, right at the end, "All claims arising" -- are you
14      with me, Ms. Coleman?
15      A.  Yes.
16      Q.  There you go.  "All claims arising by reason of any
17      transfer must be submitted to Bank in writing within one
18      year after the Customer received notification from the Bank
19      identifying the order."  Do you see that?
20      A.  I do.
21      Q.  Did you ever complain to M&I Bank that the funds being
22      wired out of the account were inaccurate?
23      A.  No.
24      Q.  Okay.  Did you have the authorization to transfer wires?
25      A.  Yes.
```

1    Q.  Okay.  And was -- do you have any reason to believe M&I

2    was transferring wires except at your direction?

3    A.  No.

4              MR. GLEESON:  Can I just have one moment, Judge,

5    to confer with my colleagues?  I think I'm finished.

6              THE COURT:  You may.

7        (Defendant's counsel confer)

8              MR. GLEESON:  I have no further questions,

9    Your Honor.  Thank you.

10             Thank you, Ms. Coleman.

11             MR. ANTHONY:  It will just be a minute,

12   Your Honor, while we change over.

13             THE COURT:  Okay.  We will be taking our lunch

14   break at noon.

15             MR. ANTHONY:  Thank you, Your Honor.

16       (Pause)

17             THE COURT:  Counsel, you may proceed.

18             MR. ANTHONY:  Thank you, Your Honor.

19                     **CROSS-EXAMINATION**

20   BY MR. ANTHONY:

21   Q.  Good morning.

22   A.  Good morning.

23   Q.  You were an officer of PCI, correct?

24   A.  Correct.

25   Q.  I think on the documents we just saw, you were listed as

Coleman - Cross

```
1    the vice president of operations, correct?

2    A.  Yes.

3    Q.  And Mr. Petters was the CEO or president?

4    A.  Yes.

5    Q.  And Mr. White, what was his title again?

6    A.  I think it was chief financial officer, but I'm not

7    sure.

8    Q.  And you had mentioned in response to counsel's questions

9    a number of employees of PCI.  Dave Baer, Tom Hay.  Do you

10   remember that?

11   A.  Yes.

12   Q.  They weren't employees of PCI, were they?

13   A.  Correct, they were not.

14   Q.  Okay.  So I just want to focus for this question on who

15   were the employees of PCI?

16   A.  Debbie Lindstrom; Bob White; myself; and I'm not sure if

17   Sandy Indahl was an employee at Petters Company, Inc. or if

18   it was Petters Group.

19   Q.  And Mr. Petters was an employee as well?

20   A.  Yes.

21   Q.  So White, Petters, you, were clearly employees, right?

22   A.  Correct.

23   Q.  And Ms. Lindstrom and maybe Ms. Indahl might have also

24   been employees?

25   A.  Correct.
```

```
1    Q.  And I think the other people who you mentioned, they
2    were employed by Petters Group Worldwide; is that correct?
3    A.  Yes.
4    Q.  Okay.  And I think your testimony was that you and
5    Mr. Petters and Mr. White were trying to conceal from all
6    the other employees, including the ones at PCI, the Ponzi
7    scheme that was going on, correct?
8              MR. GLEESON:  Object to leading.
9              THE COURT:  Overruled.
10             THE WITNESS:  Yes.
11   BY MR. ANTHONY:
12   Q.  You mentioned the companies Nationwide and Enchanted.
13   Tell us first who controlled Nationwide.
14   A.  Larry Reynolds.
15   Q.  And who controlled Enchanted?
16   A.  Mike Catain.
17   Q.  And did they basically, the two of them, do the same
18   thing with their companies vis-a-vis this Ponzi scheme?
19   A.  I don't know what else they did with their companies.  I
20   just know Petters Company was the Ponzi scheme with them.
21   Q.  So what did Nationwide -- what was Nationwide's
22   participation in the Ponzi scheme?
23   A.  Petters Company, Inc. would wire them funds -- well, I
24   take that back.  The investor would wire Nationwide money,
25   according to the purchase order that I gave them, and then
```

1    Nationwide would turn around the same day and sometimes the

2    next day wire that money back to PCI.

3    Q.  And when Nationwide wired the money back to PCI, was the

4    money wired back to PCI's 9018 account in M&I Bank?

5    A.  That -- I don't remember the account number, but it kind

6    of sounds right.

7    Q.  Whether you remember the account number or not, you

8    remember Nationwide wiring the money back to PCI at M&I

9    Bank, correct?

10   A.  Correct.

11   Q.  And Enchanted would do the same thing, correct?

12   A.  Correct.

13   Q.  And you said you provided purchase orders and those were

14   fake purchase orders?

15   A.  Yes.

16   Q.  And with respect to the entities to whom PCI was going

17   to sell these electronic goods, did you create false

18   invoices showing that big-box retailers were going to buy

19   those goods?

20   A.  Yes.

21   Q.  Now, I understand your testimony, you could send wires,

22   correct?

23   A.  Yes.

24   Q.  And tell me if my understanding is correct.  You

25   didn't -- you could call up on the phone and tell the bank

 1    what you wanted it to do, correct?

 2    A.  Yes.

 3    Q.  You didn't have to fill out any paperwork for that

 4    particular wire instruction, you could just call them up on

 5    the phone and give them like a PIN number and it would work?

 6    A.  Yes.

 7    Q.  And as I understand it, when you weren't around to do

 8    the wires, you would instruct Ms. Lindstrom on how to do the

 9    wires?

10    A.  Yes.

11    Q.  It was pretty much just the two of you that went through

12    that wiring process, correct?

13    A.  Yes.

14          MR. GLEESON:  Your Honor, I will wait for your

15    signal as to when you are ready for us to stop.

16          THE COURT:  Okay.  Is this a break in the

17    questioning?

18          MR. GLEESON:  Yes, there is a break.

19          THE COURT:  Okay.  Members of the Jury, we will

20    take our lunch break.  Please plan to be back in the

21    courtroom at 1:00.

22          Please remember the instructions that I have given

23    you and do not discuss this case or anything about this

24    case.  Don't do any kind of research or anything else.  And

25    I hope you have a good -- and don't let anyone discuss the

1    case around you or with you.  Have a good lunch.

2         (Jury excused)

3                         **IN OPEN COURT**

4                     **(JURY NOT PRESENT)**

5              THE COURT:  And we are in recess.  We will resume

6    at 1:00.

7              MR. ANTHONY:  Thank you, Your Honor.

8              THE COURT:  You're welcome.

9         (Lunch recess taken at 12:00 p.m.)

10                      *   *   *   *   *

11        (1:01 p.m.)

12                        **IN OPEN COURT**

13                       **(JURY PRESENT)**

14             THE COURT:  Good afternoon.  Please be seated.

15             MR. ANTHONY:  Thank you, Your Honor.

16             THE COURT:  Good afternoon.

17   BY MR. ANTHONY:

18   Q.  Good afternoon, Ms. Coleman.

19   A.  Good afternoon.

20             THE COURT:  You may proceed, Counsel.

21             MR. ANTHONY:  Thank you.

22   BY MR. ANTHONY:

23   Q.  Before the break, Ms. Coleman, you were asked by counsel

24   for the bank if PCI had gotten any special treatment from

25   M&I Bank.  Do you recall those questions?

1    A.  Yes.

2    Q.  And I want to ask you about that.

3            MR. ANTHONY:  Ms. Ellig, please bring up P-37.

4    It's a letter to Polaroid.  It's in evidence.

5    BY MR. ANTHONY:

6    Q.  Showing you a document that's been marked as P-37, do

7    you recall asking Mr. Jambor to send this letter to Polaroid

8    on behalf of PCI?

9    A.  I don't.  I'm not sure if I did or not.

10   Q.  Okay.  Let's look at -- bring up -- look in your book at

11   Exhibit 120, please.  It's not in evidence.

12   A.  Okay.

13   Q.  Do you see the first page of Exhibit 120?  Do you

14   recognize that as a fax cover sheet to you from Mr. Jambor?

15   A.  Yes.

16   Q.  Okay.  And the second page is the exhibit we just saw?

17   A.  Yes.

18   Q.  Do you recall asking Mr. Jambor to send that letter on

19   your behalf?

20   A.  I don't.  It doesn't mean I didn't.  I just don't

21   remember.  It also is possible that Tom maybe asked him and

22   that he just sent it to me because Tom told him to.

23   Q.  Do you recognize yourself as the recipient of

24   Exhibit 120 on that fax cover sheet?

25   A.  Yes.

Coleman - Cross

```
 1                    MR. ANTHONY:  We'll offer Exhibit 120, Your Honor.
 2                    MR. GLEESON:  No objection.
 3                    THE COURT:  Exhibit 120 is received.
 4      BY MR. ANTHONY:
 5      Q.  And the letter, which is this second page, is to Michael
 6      Pocock at Polaroid, right?
 7      A.  Correct.
 8      Q.  Do you recall having your deposition being taken on
 9      October 31st, 2017, and saying in that deposition that you
10      asked Mr. Jambor to send that letter?
11      A.  That is very well possible.  I just don't remember it
12      today, but that is possible --
13      Q.  Okay.  Why don't you --
14      A.  -- if I said it back then.
15                    MR. ANTHONY:  Is her deposition exhibit up there
16      or do you have it here?
17                    MR. GLEESON:  Which one is it, Mr. Anthony?
18                    MR. ANTHONY:  It's from October 31st, 2017.
19                    MR. RICHIE:  May I approach the witness, Your
20      Honor?
21                    THE COURT:  You may.
22                    MR. ANTHONY:  I've got this one here.  That's
23      okay.
24      BY MR. ANTHONY:
25      Q.  Take a look at page 68, please.  And this deposition was
```

1    given by you under oath on October 31st, 2017, correct?

2    A.  Correct.

3    Q.  And turn to page 68, line 3.

4          MR. ANTHONY:  And if you will put up Exhibit 120,

5    please.

6    BY MR. ANTHONY:

7    Q.  And you were asked this question:

8        "I'm showing you, Ms. Coleman, Exhibit 120, which is a

9    fax from M&I Bank to you dated December 13, 2004."

10         And your answer to that question was:  "Yes."

11             Correct?

12   A.  Yes.

13   Q.  And then you were asked the question:

14       "And the second page is a letter directed to the board

15   of directors at Polaroid Holding Company, attention

16   J. Michael Pocock, president and chief executive officer,

17   and it's signed by Mr. Jambor.  Now, Mr. Jambor is basically

18   sending this letter to you; is that right?"

19         And your answer was:  "Yes."

20             Correct?

21   A.  Yes.

22   Q.  And the next question you were asked was:

23       "Did you or Mr. Petters ask Mr. Jambor to prepare and

24   send this letter to Polaroid?"

25         And you answered that question:  "Yes."

1    A.  Yes.

2    Q.  And then the next question was:

3        "Who drafted the letter?"

4        And the answer that you gave was:  "Ed did or I -- I

5    might have told him what to put in it, but he drafted it."

6        And then the next question was:  "And so he drafted it

7    at your direction, correct?"

8        And your answer was:  "Yes."

9            Correct?

10   A.  Yes.

11   Q.  And then the last question -- two questions:

12       "And you advised him what the subject of the letter

13   should be?"

14       And you answered that question "Yes."

15   A.  Yes.

16   Q.  Then the next question was:

17       "And do you agree it was, in fact, sent to Polaroid?"

18       And the answer was --

19           MR. GLEESON:  Objection --

20   Q.  -- "I'm almost positive it was."

21           MR. GLEESON:  Excuse me, Mr. Anthony.  I didn't

22   know you were finished.  I object to the improper use of the

23   deposition transcript.

24           THE COURT:  Overruled.

25           I didn't -- you were asking a final question, and

1    I didn't hear --

2                MR. ANTHONY:  Yes.

3                THE COURT:  -- whether you completed it.

4    BY MR. ANTHONY:

5    Q.  And the last question was:

6        "Do you agree that it was, in fact, sent to Polaroid?"

7        And your answer was:  "I'm almost positive it was."

8                THE COURT:  Now, is that a question?

9                MR. ANTHONY:  No.  I just read her question -- the

10   question and the answer, Your Honor.

11               THE COURT:  No.  Well, you can't do that.

12               MR. ANTHONY:  Okay.

13               THE COURT:  You can ask --

14               MR. ANTHONY:  You're correct, Your Honor.

15               THE COURT:  You're impeaching by a prior

16   inconsistent statement, and you're doing it improperly on

17   that last question.

18   BY MR. ANTHONY:

19   Q.  Were you asked this question:

20       "And do you agree that it was, in fact, sent to

21   Polaroid?"

22       And did you answer, "I'm almost positive it was"?

23   A.  Yes.

24   Q.  Okay.  Now, did you have that letter that you drafted to

25   be sent to Polaroid in mind when you answered counsel's

```
 1    earlier question that you didn't get any special treatment
 2    from the bank?
 3    A.  No, I didn't.
 4    Q.  Okay.  And I know you didn't remember it, and I'm not --
 5    I'm not saying anything about that.  I just wanted to bring
 6    it to your attention.
 7           The other thing is -- now, there's been some
 8    discussion here about DACAs.  You know what a DACA is,
 9    right, Deposit Account Control Agreement?
10    A.  Yes.
11    Q.  And you had conversations at various times with the bank
12    about providing DACAs to lenders or investors, correct?
13    A.  Yes.
14    Q.  And do you remember a time in 2008 when there was a
15    discussion about you providing a list of transactions to the
16    bank in connection with a DACA?
17    A.  Yes.
18    Q.  And you never did that, did you?
19    A.  No.
20    Q.  And the bank never asked you for it, did they -- did it?
21    A.  Correct.
22    Q.  And did you consider that to be special treatment when
23    you were asked the question of did you receive any special
24    treatment from this bank in response to counsel's questions?
25           MR. GLEESON:  Objection.  Ask to approach.
```

```
 1              THE COURT:  Overruled.  You may answer the
 2      question.
 3              THE WITNESS:  Okay.
 4      BY MR. ANTHONY:
 5      Q.  Did you have that in mind when you answered counsel's
 6      questions earlier?
 7      A.  No.
 8      Q.  Okay.  Then I want to invite your attention to
 9      Exhibit 55, which is already in evidence.  If you have it in
10      the book -- it might be there, but we're going to put it up
11      on the screen for you too.
12              This is an e-mail from you to Ed Jambor asking him
13      to fax a letter back to you.
14              MR. ANTHONY:  And would you turn to page 2,
15      please, and enlarge that, please.
16      BY MR. ANTHONY:
17      Q.  Now, did you ask Mr. Jambor to send this letter back to
18      Tom Petters in connection with the conversations that were
19      being had with respect to Opportunity Finance?
20      A.  Yes.
21      Q.  Okay.  And did you send a letter like this to Mr. Jambor
22      and ask him to put it on bank letterhead and send it back?
23      A.  I don't remember exactly how it happened.
24      Q.  Do you remember generally how it happened?
25      A.  I would assume that I would have asked him to do that
```

1   because otherwise how would he have known.

2   Q.  And so --

3        (Plaintiff's counsel confer)

4   BY MR. ANTHONY:

5   Q.  Let's look at Exhibit 56, please.

6             MR. ANTHONY:  And could you put 56 next to 55 on

7   the screen, please.

8   BY MR. ANTHONY:

9   Q.  Exhibit 56 -- so if you look at Exhibit 55, you'll see

10  that at the top there's a letter missing in the first

11  sentence, "Pursuant to our recent discussions we are

12  please."  Do you see that?

13  A.  Yes.

14  Q.  And then if you look at Exhibit 56, it looks like the

15  same misspelling appears on 56, the one that's on the bank

16  letterhead.  Do you see that?

17  A.  Yes.

18  Q.  Do you think that -- when you were asked questions about

19  special treatment in response to counsel's questions, did

20  you have anything like Exhibits 55 or 56 in mind when you

21  answered those questions?

22  A.  No.

23  Q.  Now, I know you've testified here in response to

24  counsel's questions that you thought you didn't get special

25  treatment from the bank, but you have testified that you

Coleman - Cross

```
 1    thought M&I would bend over backwards to help PCI out in
 2    whatever way they can.  Didn't you say that one time?
 3               MR. GLEESON:  Objection, leading.  Also ask to
 4    approach the bench, please.
 5               THE COURT:  Overruled as to leading.  You may
 6    approach.
 7        (At sidebar)
 8               MR. GLEESON:  Judge, the first time I'm alluding
 9    to this morning the Court allowed me to treat this as an
10    adverse witness, which I understood gave me some leeway
11    about leading, and then it turned out I was instructed not
12    to lead.
13               This -- I think it's hard to refute the notion
14    that Mr. Anthony should not be permitted to lead, but --
15    that's the Court's determination, but I'm a little perplexed
16    given the ruling this morning.
17               THE COURT:  I understand your concern.
18               MR. GLEESON:  And, second, the very argument we
19    had earlier -- this "bend over backwards" is a view in her
20    mind about what happened.  It reflects what she thinks about
21    what the bank would do, which is precisely what we ruled out
22    of bounds.
23               There's no -- there's not only no foundation for
24    it, but even if there were, her notion that the bank would
25    bend over backwards is not a substitute for discrete
```

1      historical facts about the relationship with the bank.

2             And there's a number of these questions in the

3      deposition, and that was a deposition.  No one was there to

4      rule on evidentiary objections.  But questions like this I

5      predict, given what happened in the deposition and given

6      that, are -- so this is the heart of my objection.  It's not

7      permissible -- it's not admissible evidence.  It's her state

8      of mind about what the bank would do for her, and that's

9      just not admissible.  That falls in the category was the

10     bank aware that there was a fraud.  That was ruled out of

11     bounds for me, and this is in principle no different.

12             MR. ANTHONY:  Your Honor, he opened the door by

13     asking her if she thought she got -- PCI got any special

14     treatment from the bank.  She's now -- she's going to

15     testify that -- that was her state of mind, no special

16     treatment from the bank.

17             I'm entitled to ask her, especially since she has

18     said, "It seemed like M&I Bank would bend over backwards to

19     help us out in whatever way they can" -- that directly

20     contradicts the testimony that she got no special treatment

21     or thought she was getting no special treatment.

22             He opened the door by asking if she got special

23     treatment.  I'm entitled to get her view as to whether or

24     not the bank would bend over backwards and, in fact, did

25     bend over backwards to help her.

1          And for them to elicit testimony that she didn't

2     get any special treatment but you got special treatment from

3     somewhere else, without any foundation, without any support,

4     undercuts my ability to present our case.

5          He started it, this closes it, and it's a fair

6     comment.

7          MR. GLEESON:  Judge, I think that's wrong because

8     Mr. Anthony has just demonstrated how by eliciting facts,

9     Polaroid letter, the two other instances, that he believes

10    that -- the trustee advances the view that they did get

11    special treatment by reference to specific facts.

12         This "bend over backwards" is an empty vessel.  We

13    don't even know what it means.  He's entitled, of course, to

14    elicit facts to rebut our -- she talked about overdrafts and

15    how the overdrafts were covered.  He's entitled to elicit

16    facts that will help rebut her factual claim that she did

17    not receive special treatment.  That's fine.  These are not

18    facts.

19         THE COURT:  Why aren't they facts?

20         MR. GLEESON:  I'm sorry?

21         THE COURT:  Why aren't they facts?

22         MR. GLEESON:  Her belief that the bank would bend

23    over backwards, that's her state of mind.  Her state of mind

24    is not at issue in the case.  I didn't put it in issue.  I

25    elicited whether factually there were -- she received

1    special treatment.  He's shown how he can try to demonstrate

2    otherwise.  But her state of mind about whether it's bend

3    over backwards or would do anything I asked, that's not

4    evidence, Judge.

5            MR. ANTHONY:  He asked whether she received

6    special treatment.  It wasn't -- he didn't elicit facts.  He

7    asked her state of mind.  He said, Did you receive special

8    treatment from the bank?  She said, No.

9            This is the same witness who's saying this bank

10   would bend over backwards for us.  And I think I'm entitled

11   to ask her about her view, just as he asked her about her

12   state of mind.  And that's all this is.

13           It's totally unfair to let him go down that road

14   and ask her about special treatment she got, but then when

15   we ask her if it's her view, having now demonstrated that

16   she forgot all the things that was happening to her -- I

17   think we're entitled to ask this.

18           THE COURT:  Well, it seems that the proper

19   impeachment would be to show what she got as opposed to her

20   view.  So you can ask did you get this, did you get that.

21   That is rebutting the statement.

22           MR. GLEESON:  Judge, in light of your -- you said

23   you understood what I was saying about leading.  I don't

24   want to keep objecting to leading if he's permitted to do

25   it, but I think he's not.

Coleman - Cross

```
 1              THE COURT:  Is she an adverse witness?
 2              MR. GLEESON:  Not for him.  She is to me.
 3              MR. ANTHONY:  Yes, she is.  She's adverse to the
 4     trustee.  He sued her.  The trustee has sued her and
 5     recovered all her money.
 6              MR. GLEESON:  Judge, she testified that she fully
 7     cooperated with the trustee, testified for him, sat with his
 8     lawyers.  She cooperated with him just like she cooperated
 9     with the government.  She is not adverse --
10              MR. ANTHONY:  The --
11              MR. GLEESON:  Let me finish, please.
12              MR. ANTHONY:  I know.  I am.
13              MR. GLEESON:  She's a former officer of the entity
14     in which -- the shoes of which Mr. Kelley stands, so she is
15     basically our adversary.  And she's cooperated with the
16     trustee and his counsel.  He should not be permitted to --
17     respectfully, Judge, he shouldn't be permitted to lead.
18     This is not an adverse witness for the trustee.
19              MR. ANTHONY:  Your Honor?
20              MR. GLEESON:  They haven't demonstrated --
21              MR. ANTHONY:  I'm sorry.  Counsel has met
22     [inaudible] --
23              THE COURT:  I didn't hear you.  Counsel has?
24              MR. ANTHONY:  Counsel has met with -- defense
25     counsel has met with her on at least two occasions to
```

Coleman - Cross

1    discuss her testimony.

2              Secondly, if I have to elicit testimony that she's

3    adverse to Mr. Kelley because he had to sue her to recover,

4    it will show she's adverse to Mr. Kelley.  She's not --

5    Mr. Kelley is not standing in her shoes.  I think I'm

6    entitled to both ask her this question and to elicit

7    testimony that shows that she's been less than accurate in

8    her testimony thus far.

9              THE COURT:  The objection is overruled.

10             MR. ANTHONY:  Okay.

11             MR. GLEESON:  Your Honor, that's on the leading.

12             MR. ANTHONY:  I didn't hear the last comment, Your

13   Honor.  He came back and I didn't hear what you said.  I'm

14   sorry.

15             THE COURT:  I said, "The objection is overruled."

16             MR. GLEESON:  The leading objection?  You earlier

17   said leading.  With respect to special treatment, he could

18   elicit only discrete facts and not bend over backwards.

19   That objection was sustained, I understood it.

20             MR. ANTHONY:  No.  It's overruled is what I

21   understood.

22             THE COURT:  Where -- what's the origin of the

23   "bend over backwards"?

24             MR. ANTHONY:  Her testimony in this proceeding in

25   the case and it's in her deposition.

Coleman - Cross

1                    THE COURT:  And you are?

2                    MR. ANTHONY:  I was just going to ask her if she

3      said that.

4                    THE COURT:  And that's objectionable because?

5                    MR. GLEESON:  As I stated a few minutes ago,

6      that's objectionable, and I thought the Court agreed.  He's

7      allowed to elicit discrete facts about special treatment

8      that the trustee claims was accorded to PCI by M&I Bank, but

9      this "bend over backwards" is not special treatment.  It's

10     precisely the kind of mind -- you know, it's the state of

11     mind of someone whose state of mind is not an issue.

12                   And it's no different than if I had asked her was

13     she -- is she aware whether M&I Bank new of the scheme.

14     That was placed out of bounds.  This is another way of

15     asking the same question.  Your Honor ruled on this a few

16     minutes ago.

17                   THE COURT:  Yes, I did.  It's out of bounds.

18                   MR. ANTHONY:  Okay.

19             **(In open court)**

20     BY MR. ANTHONY:

21     Q.  Ms. Coleman, any other areas, now that we've been

22     talking for a few minutes, where you think the bank provided

23     special treatment to PCI?

24                   MR. GLEESON:  Objection to the form of the

25     question.  The testimony was she didn't have it in mind.

1      She didn't say it was special treatment.

2                  THE COURT:  Overruled.  You may answer the

3      question.

4                  THE WITNESS:  Not offhand.

5      BY MR. ANTHONY:

6      Q.  Okay.  Now, you mentioned that, in your testimony, that

7      I think Mr. Jambor and -- neither Mr. Jambor or Mr. Flynn

8      never asked you about Enchanted or Nationwide, correct?

9      A.  Yes.

10     Q.  And you knew, from your review of the bank records, that

11     there were billions of dollars going through the M&I Bank

12     account from Nationwide and Enchanted, correct?

13     A.  Yes.

14     Q.  And in the couple times a month you met with Mr. Jambor,

15     did he ever raise with you what the purpose was for those

16     payments from Nationwide and Enchanted?

17     A.  Not that I can remember.

18     Q.  Now, did you consider him to be giving you any kind of

19     special treatment by not raising that with you?

20     A.  I guess not, no.

21     Q.  Okay.  So, in fact, didn't you have a conversation with

22     Mr. Jambor and Ms. Rhode in which you told them that there

23     were retailer payments being made into -- or supposed to be

24     made to the PCI account?

25     A.  Yes.

1    Q.  And let's talk about the conversation with Ms. Rhode and

2    Ms. [Sic] Jambor in which you told them that.

3              MR. ANTHONY:  Please put up DX-40026.  Ms. Ellig,

4    can you put up DX-40026, please.

5         (Plaintiff's counsel confer)

6              MR. ANTHONY:  It was admitted this morning, 40026.

7    BY MR. ANTHONY:

8    Q.  Do you remember this letter this morning, Ms. Coleman,

9    that this is a letter from Ed Jambor to you saying that

10   Shari, referring to Ms. Rhode, and he had met with you to

11   talk about the relationship?  Do you see that?

12   A.  I do.

13   Q.  Okay.  And in that meeting do you recall discussing with

14   Ms. Rhode and Mr. Jambor retailer payments?

15   A.  To some extent, yes.

16   Q.  All right.  So tell the jury what you recall telling

17   Ms. Rhode and Mr. Jambor about retailer payments from

18   big-box retailers into the M&I account.

19   A.  I don't remember the exact words or how it came about,

20   but Opportunity Finance wanted an account set up for the

21   retailer payments to go directly into that account.

22              And I know I told M&I Bank or Shari and Ed that we

23   couldn't do that because we could not have the retailers

24   send the money directly to M&I Bank.  They had to send it

25   to -- I can't remember the exact story, but basically how we

1    couldn't have the retailer sending it directly to M&I Bank

2    because it wouldn't look good on our part if we had, say,

3    National -- or not National, I'm sorry, say Costco sending

4    payments to all different banks because they wanted it set

5    up where -- I don't know if I'm making any sense, but they

6    wanted it set up where, like, Opportunity Finance invested

7    in this purchase order and they wanted that purchase order,

8    when it got paid, to go directly to M&I Bank.  And another

9    investor, who may have a bank out in New York, they would

10   want that money to go directly to that bank out in New York.

11            So we couldn't have the vendors sending wire

12   transfers all over the world, that they would only send it

13   to M&I Bank, if that makes sense.

14   Q.  Okay.  So you've been talking about the big-box retailer

15   payments that were supposed to come into the M&I account.

16   Did Mr. Jambor ask you any further questions about it?

17   A.  No.

18   Q.  How about Ms. Rhode, did she ask any questions about

19   these big-box retailers and the money that was supposed to

20   come into the account; did she ask any questions?

21   A.  No.

22   Q.  In fact, there was no money coming from big-box

23   retailers, was there?

24   A.  No.

25   Q.  And if one were to look at the bank statements and

1    records for the M&I PCI account, one wouldn't see any

2    payments from big-box retailers, would they?

3    A.  Correct.

4    Q.  So -- now, this was in 2003.  So between 2003 and 2007,

5    before Mr. Jambor left the bank, did he ever come back to

6    you and ask you where are the big-box retailer payments that

7    are supposed to go into the M&I account?

8    A.  No.

9    Q.  How about Ms. Rhode, did she ever come back and ask you?

10   A.  No.

11   Q.  Now, one of their bosses was a woman by the name of

12   Ms. Crain, who testified here yesterday.  Did Ms. Crain ever

13   come back and ask you about these big-box retailer payments?

14   A.  No.

15   Q.  How about any of the AML analysts, did they ever ask you

16   about big-box retailer payments?

17   A.  No.

18   Q.  Did I ask you about Mr. Flynn?  Maybe not.  Did he ever

19   ask you?

20   A.  No.

21   Q.  If M&I's business bankers dug into the absence of any

22   big-box retailer payments, would you have been able to

23   continue with the scheme?

24   A.  No.

25   Q.  And I think you said that you and Mr. Petters and

Coleman - Cross

1    Mr. White, you had access to the Petters bank account

2    records at M&I, correct?

3    A.  Yes.

4    Q.  And you could see what was going on in that account by

5    looking at whatever records you wanted to look at, right?

6    A.  Yes.

7    Q.  And PCI and you and Mr. Petters and Mr. White, you had

8    access to all those bank records, right?

9    A.  Yes.

10   Q.  And obviously M&I Bank had access to all of PCI's bank

11   records, right?

12   A.  Yes.

13   Q.  Did anyone else have access to all of M&I's bank

14   records, other than the bank itself and you and Mr. Petters

15   and Mr. White?

16   A.  Jim Wehmhoff did.

17   Q.  He was with PCI?

18   A.  Yep.  Or with Petters Group.

19          And Sandy Indahl, I believe.  I just don't

20   remember what exactly I gave her, but I think Sandy Indahl

21   might have had access to it too.

22   Q.  Is that it?

23   A.  Yes.

24   Q.  Now, PCI did not want the lenders to know -- PCI did not

25   want the lenders to bank at M&I Bank; is that correct?

1    A.  Correct.

2    Q.  And that was a concern, that if the lenders banked at

3    M&I Bank, they might discover -- I withdraw that.

4            Did you think PCI had a good relationship with M&I

5    Bank?

6    A.  Yes.

7    Q.  And did you think it was the kind of bank that PCI could

8    work with?

9    A.  Yes.

10   Q.  And PCI had been looking for a bank that it could work

11   with for ten years or so, hadn't it?

12   A.  Yes.

13   Q.  And it finally found one in M&I?

14   A.  Yes.

15   Q.  Now, was most of the money for this Ponzi scheme running

16   in and out of the M&I bank account?

17   A.  Yes.

18   Q.  You mentioned PCI had a few other bank accounts, but

19   this M&I bank account was the primary bank account for

20   running the Ponzi scheme?

21   A.  Yes.

22            MR. ANTHONY:  Nothing further, Your Honor.

23            MR. GLEESON:  May I, Your Honor?

24            THE COURT:  Yes, you may.

25                    **REDIRECT EXAMINATION**

```
1     BY MR. GLEESON:

2     Q.  You were asked, toward the end of your examination by

3     Mr. Anthony, about having found a bank that you could work

4     with, meaning M&I Bank, correct?

5     A.  Yes.

6     Q.  Was the Ponzi scheme that PCI was running in operation

7     before the M&I bank account was opened by PCI?

8     A.  Yes.

9     Q.  There were other banks with which the PCI scheme worked,

10    correct?

11    A.  Yes.

12    Q.  Okay.  And when you say "work with," was M&I part of the

13    scheme?

14    A.  No.

15    Q.  Okay.  Did you work with M&I Bank in the same way you

16    worked with Crown and Associated Bank?

17        (Pause)

18    Q.  Do you understand the question?

19    A.  Yeah.

20    Q.  Did Crown Bank assist in the perpetration of the scheme?

21    A.  No.

22    Q.  Did Associated Bank assist in the perpetration of the

23    scheme?

24    A.  No.

25    Q.  Did either lie to investors?
```

```
 1                    MR. ANTHONY:  I'm sorry.  I didn't hear that

 2    question.

 3    BY MR. GLEESON:

 4    Q.  Did either of the two -- you testified on direct

 5    examination about special treatment from Associated and

 6    Crown Bank.  Do you recall that?

 7    A.  Yes.

 8    Q.  Were there bankers at either of the two that assisted in

 9    the scheme by lying to investors?

10                    MR. ANTHONY:  Objection, foundation, relevance,

11    motion in limine with respect to investor knowledge.

12                    MR. GLEESON:  This was elicited on direct, Your

13    Honor.

14                    THE COURT:  Overruled.

15                    THE WITNESS:  No.

16    BY MR. GLEESON:

17    Q.  Okay.  Do you recall your testimony earlier this

18    morning?

19    A.  Well, I did.

20    Q.  Sorry?

21    A.  Yes.

22    Q.  Okay.  And do you recall testifying that one of the

23    bankers lied to investors for you -- lied to an investor for

24    you?

25    A.  Right, about a bank statement that -- yes, but it wasn't
```

1    part of the Ponzi scheme.  He lied to an investor, making an

2    excuse on why we did not -- he could not give out the bank

3    statements.

4    Q.  Understood.  He was not among the people you identified

5    as participating in the scheme, correct?

6    A.  Correct.

7    Q.  Did you ask that banker to help you in a way that would

8    help advance the scheme, by lying to investors?

9            MR. ANTHONY:  Objection, beyond the scope, lacks

10   foundation, relevance.

11           THE COURT:  Overruled.

12           THE WITNESS:  I asked the banker to lie about not

13   being able to get a bank statement.

14   BY MR. GLEESON:

15   Q.  In order that a fake bank statement -- you would have

16   time to make fake bank statements up, correct?

17   A.  Correct.

18   Q.  Did you tell that banker that was the reason for the

19   lie?

20           MR. ANTHONY:  Same objection, hearsay.

21           THE COURT:  Overruled.

22           THE WITNESS:  I don't recall exactly what I told

23   the banker.  It was a long time ago.

24   BY MR. GLEESON:

25   Q.  Okay.  Did Ed Jambor ever tell you that he looked and

Coleman - Redirect

```
 1    determined that the money in the account was not coming from

 2    retailers?

 3              MR. ANTHONY:  Objection, leading.

 4              THE COURT:  Sustained.

 5    BY MR. GLEESON:

 6    Q.  On the subject of retailer payments into the PCI

 7    account, on that topic, did Ed Jambor make any statements to

 8    you regarding that topic, his knowledge about that topic?

 9    A.  Not that I remember.

10    Q.  Okay.  Could you -- there's that big, thick document --

11    or notebook.

12              MR. ANTHONY:  Your Honor, before we go down this

13    path, these were undisclosed document.  I have no idea what

14    they are.

15              MR. GLEESON:  No, these are the transcripts.

16    BY MR. GLEESON:

17    Q.  If I could direct your attention to tab 10, your

18    deposition transcript in this case that Mr. Anthony invited

19    your attention to earlier you there.  Are you there?

20    A.  Yep.

21    Q.  If you could turn, please, to page 168 and if you could

22    read to yourself, Ms. Coleman, the -- on page 168, lines 3

23    through 6.  And please let me know when you finish.

24        (Witness reviews document)

25    Q.  You done?
```

```
1    A.  Yes.
2    Q.  Does that refresh your recollection about whether
3    Mr. Jambor ever spoke to you about retailer payments being
4    wired into the account?
5    A.  Yes.
6    Q.  And what is your recollection?
7    A.  No.
8    Q.  He did not?
9    A.  He did not.
10   Q.  Okay.  Did you ever have a conversation with him about
11   whether he even looked at who was wiring money into the
12   account?
13              MR. ANTHONY:  Objection, leading, argumentative.
14              THE COURT:  Overruled.
15              THE WITNESS:  Not that I remember.
16   BY MR. GLEESON:
17   Q.  On the same page, but -- it's page 167 of the
18   transcript.  It's on the same page of the book.  If you
19   could read to yourself, please, lines 10 through 13, and let
20   me know when you're finished.
21       (Witness reviews document)
22   A.  Okay.
23   Q.  Okay.  Does that refresh your recollection about a
24   conversation with Ed Jambor about whether he looked
25   specifically at who was wiring funds into the account?
```

1    A.  Yes.

2    Q.  And what is your recollection?

3    A.  That he didn't.

4    Q.  Okay.  If you were asked about big-box retailers -- if

5    you were asked questions about big-box retailers wiring

6    payments into the M&I account, would you have told the

7    truth?

8    A.  No.

9    Q.  You would have lied?

10   A.  Yes.

11   Q.  To keep the scheme going?

12   A.  Yes.

13   Q.  Did anybody within PCI itself raise any questions about

14   the origins and destinations of the wires into and out of

15   the account?

16   A.  No.

17   Q.  Okay.  You know Sandy Indahl?

18   A.  Yes.

19   Q.  Okay.  Did she ever raise a question about the wires?

20   A.  I don't remember her ever raising a question to me.

21   Q.  Okay.  Have you ever talked to Bob White about that

22   topic generally?

23   A.  Did I?

24   Q.  Yes.

25   A.  Not that I remember.

1    Q.  Okay.  You were asked whether you had in mind the letter

2    that was written to the board of directors of Polaroid when

3    you testified that you didn't receive special treatment from

4    M&I Bank.  Do you recall that questioning on your

5    cross-examination?

6    A.  Yes.

7    Q.  Okay.  Did you think that letter was special treatment?

8    A.  No.  I just thought it would be a letter that Ed would

9    write.

10   Q.  Okay.  Did you consider it customer service?

11   A.  Yes.

12   Q.  Okay.  Was the content of the letter, as far as you

13   know, truthful?

14   A.  I don't remember exactly what the letter said, but --

15   Q.  Okay.  On any occasion -- withdrawn.

16          Did you ever ask Ed Jambor to provide untruthful

17   information?

18   A.  No.

19   Q.  Okay.  To your knowledge, did he ever do so?

20          MR. ANTHONY:  Objection, lacks foundation.

21          THE COURT:  Sustained.

22   BY MR. GLEESON:

23   Q.  The -- you testified that you did not have in mind, when

24   you said you didn't receive special treatment from M&I Bank,

25   the Deposit Account Agreements.  Do you recall that?

1    A.  Yes.

2    Q.  You were asked about the transaction lists, correct?

3    A.  Correct.

4    Q.  Okay.  And no one -- you testified no one at M&I Bank

5    called you about the transaction list, correct?

6    A.  Correct.

7    Q.  Okay.  For whose benefit were those transaction lists?

8    A.  I'm not -- I'm sorry.  What was the question?

9    Q.  Yeah, it's a bad question.

10           You never sent them, correct?

11   A.  Correct.

12   Q.  Under the agreement that created the Deposit Account

13   Agreement, who was -- who would have been benefited had you

14   sent transaction lists?

15   A.  Nobody.

16   Q.  Okay.  The deposit account was to be held by whom?

17   A.  Petters Company and the investor.

18   Q.  Okay.  One of them was Palm Beach, correct?

19   A.  Correct.

20   Q.  Would anybody have benefited had you sent the

21   transaction list to M&I Bank?

22   A.  No, because I would have made it up.

23   Q.  Would it have gone into an account by Palm Beach -- held

24   by Palm Beach?

25   A.  Possibly, depending on if it was their funds or not.

1   Q.  Okay.  Why didn't you provide the transaction lists?

2   A.  It was never -- they never asked for it, M&I Bank

3   didn't.

4   Q.  Okay.  Did Palm Beach -- was Palm Beach aware you

5   weren't -- withdrawn.

6           Palm Beach was the counterparty, correct, to that

7   Deposit Account Agreement?

8   A.  I'm not sure how it -- I'm sorry.  I don't remember how

9   it all worked out.

10  Q.  Okay.  If you provided transaction lists, you would have

11  provided -- they would have been provided to Palm Beach,

12  correct?

13  A.  There again, I'm not sure.

14  Q.  Okay.  Did you regard the entry into the Deposit

15  Agreement as special treatment from M&I Bank to PCI?

16  A.  No, I guess not.

17          MR. GLEESON:  And let's pull up 55 and 56, please,

18  Mr. Herzka, P-55 -- Plaintiff's 55 and 56 in evidence.

19  BY MR. GLEESON:

20  Q.  You were examined about these two letters.  I might have

21  the exhibit numbers wrong.  They were letters that were

22  put --

23          MR. GLEESON:  There we go.  Thank you, Mr. Herzka.

24  BY MR. GLEESON:

25  Q.  You were asked by Mr. Anthony about the missing letter

1    in the first sentence, correct?

2    A.  Yes.

3    Q.  "Pleased" has a missing "d," correct?

4    A.  Correct.

5            MR. GLEESON:  Could you pull up the exhibit number

6    so we can see the exhibit numbers, because I think I want to

7    refer to 56.  Okay.  I've got it.

8    BY MR. GLEESON:

9    Q.  There's a missing sentence in one of these letters,

10   correct?

11   A.  I guess I'm not sure.

12   Q.  I'll help you out.  On the bottom of 56 it says, "We

13   understand" --

14           MR. GLEESON:  If you can enlarge that for all of

15   us, please, Mr. Herzka.

16   BY MR. GLEESON:

17   Q.  "We understand that you are interested in opening this

18   account as soon as possible.  We will work with you upon

19   satisfactory completion of the Opportunity Finance/West LB

20   facility."  Do you see that?

21   A.  Yes.

22   Q.  That's missing from the bottom of 55, correct?

23   A.  Yes.

24   Q.  Okay.  What's missing is the "satisfactory completion of

25   Opportunity Finance/West LB facility," right?

1    A.  Yes.

2    Q.  That was added to the letter by M&I Bank, correct?

3    A.  Yes.

4         MR. GLEESON:  And let's pull up Defendant's 40026.

5    BY MR. GLEESON:

6    Q.  This is the -- you testified about this on direct and

7    cross.  This is the Account Agreement -- this refers to an

8    Account Agreement, Deposit Account Agreement, that was never

9    created, correct?

10   A.  Correct.

11        MR. GLEESON:  I have nothing further.  Thank you,

12   Your Honor.

13                    **RECROSS EXAMINATION**

14   BY MR. ANTHONY:

15   Q.  Not too many more questions, Ms. Coleman.

16   A.  Okay.

17   Q.  You were asked about other banks that did business with

18   PCI.  Would it be fair to say that the Ponzi scheme

19   substantially grew in size after PCI began working with M&I

20   in 2001?

21   A.  Yes.

22   Q.  And you talked about another bank that was willing to

23   write a letter to one of PCI's customers.  Do you remember

24   that testimony at the outset just recently and that it was

25   an inaccurate letter?  Do you remember counsel's questions

1    on that?

2    A.  Another letter to an investor?

3    Q.  A letter.  Remember you said that a bank gave you

4    special help or treatment in writing a letter for you, other

5    than M&I?

6    A.  Where they talked about the bank statement?

7    Q.  Yes.

8    A.  That wasn't a letter, but a phone call.

9    Q.  A phone call, okay.

10   A.  Yes.

11   Q.  So let me -- I just want to understand your view.  So

12   the Polaroid letter, the Opportunity Finance letter where

13   you asked M&I Bank to draft a letter -- that you had asked

14   it to draft and send on its letterhead --

15   A.  Yes.

16   Q.  -- because you didn't want to send it yourself, did you

17   think that was misleading?

18            MR. GLEESON:  Objection to form.

19            THE COURT:  Overruled.

20            THE WITNESS:  Yes.

21   BY MR. ANTHONY:

22   Q.  Okay.  So you were willing to -- I mean, M&I was willing

23   to do things which you considered misleading.  And do you

24   think they considered it misleading?

25            MR. GLEESON:  Objection.

1          THE COURT:  Sustained.

2    BY MR. ANTHONY:

3    Q.  Okay.  When you asked the bank to send these letters as

4    though it came from them instead of from you, did anyone

5    from the bank, like Mr. Jambor, say we can't do that, that

6    would be misleading?

7          MR. GLEESON:  Objection, there's no foundation for

8    the premise of that question.

9          THE COURT:  Sustained.

10   BY MR. ANTHONY:

11   Q.  You asked Mr. Jambor to send a letter to Polaroid on

12   your behalf, correct?

13   A.  Yes.

14   Q.  And you asked him to send a letter to Opportunity

15   Finance on your behalf, correct?

16   A.  Yes.

17   Q.  In connection with either of those two letters, did

18   Mr. Jambor tell you, in substance or effect, that he

19   couldn't do that because it was misleading?

20   A.  No.

21   Q.  Now, when you had the meeting with Ms. Rhode and

22   Ms. [Sic] Jambor back in 2003 and talked about big-box

23   retailer payments, did Mr. Jambor say anything to you which

24   would have indicated to you that he didn't understand what

25   you were saying?

```
 1                 MR. GLEESON:  Objection to the form of the
 2      question.
 3                 THE COURT:  Overruled.
 4                 THE WITNESS:  No.
 5      BY MR. ANTHONY:
 6      Q.  How about Ms. Rhode, did she say anything about what you
 7      were telling her about the big-box retailer payments and the
 8      business model, did she say to you she didn't understand
 9      what you were saying?
10      A.  No.
11      Q.  You were asked this question by counsel.  The question
12      was:  If you had been asked by Mr. Jambor after this 2003
13      meeting about big-box retailer payments, would you have
14      lied?  Do you recall that question?
15      A.  I do.
16      Q.  And you said you would have lied, correct?
17      A.  Correct.
18      Q.  And would you agree that M&I Bank had all the records in
19      its possession to see whether big-box retailer payments were
20      going into the M&I account?
21      A.  Yes.
22      Q.  So if they had asked that question and if you had lied,
23      would you agree that they could have looked at the records
24      in the account and determined you were lying?
25                 MR. GLEESON:  Objection.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.

3    BY MR. ANTHONY:

4    Q.  And they never asked you that question, did they?

5    A.  No, they didn't.

6          MR. ANTHONY:  Nothing further.

7          MR. GLEESON:  We have nothing further.  The

8    witness may be excused as far as we're concerned.  Thank

9    you, Judge.

10          THE COURT:  May the witness be excused?

11          MR. ANTHONY:  Yes.

12          THE COURT:  You may.

13          MS. GITTES:  May I, Your Honor?

14          THE COURT:  You may.

15          MS. GITTES:  BMO Harris's next witness is Paul

16    Stroble.  Just give us a minute, if you don't mind, to get

17    reorganized.

18      (Pause in proceedings)

19          COURT REPORTER:  Stop there and I will swear you

20    in.

21      (Witness sworn)

22          MS. GITTES:  Your Honor, would you mind if we

23    approach the witness and just clear out some of those

24    binders?

25          THE COURT:  Not at all.  Please do.

1          MS. GITTES:  And I believe my colleague has just

2     one packet of materials for the Court and your clerk.

3          THE COURT:  Thank you.

4          Members of the Jury, if you would like to take a

5     stretch break during this transition, please feel free to do

6     so.

7        (Pause)

8          MS. GITTES:  Whenever the Court is ready.

9          THE COURT:  Thank you.

10          MS. GITTES:  May I proceed?

11          THE COURT:  You may.  And please raise your voice

12     so we can hear you.

13          MS. GITTES:  Oh, absolutely.

14          THE COURT:  You don't have to raise the podium,

15     just your voice.

16          MS. GITTES:  I'll raise the podium a little bit

17     too.

18          Did Mr. Stroble state his name for the record yet?

19          COURT REPORTER:  No.

20          Could you please state your full name and spell

21     your first and last name, please.

22          THE WITNESS:  Paul Brian Stroble, P-a-u-l,

23     B-r-i-a-n, S-t-r-o-b-l-e.

24          THE COURT:  Counsel, you may proceed.

25          MS. GITTES:  Thank you, Your Honor.

**(Paul Stroble)**

**DIRECT EXAMINATION**

BY MS. GITTES:

Q.  Good afternoon, Mr. Stroble.

A.  Good afternoon.

Q.  Where do you currently work?

A.  I work for BMO Harris.

Q.  And how long have you worked for BMO Harris?

A.  Since March of 2010.

Q.  And was it called BMO Harris in March of 2010, to your recollection?

A.  No, it was not.  When I started with the bank, it was M&I Bank.

Q.  And what's your current job title?

A.  Senior messaging technical specialist.

Q.  And at a very high level, because we'll get into the specifics, what does a senior messaging technical specialist do?

A.  We engineer the messaging or, like, the e-mail systems for the bank.

Q.  And has this generally been your job throughout your time at first M&I and then BMO Harris?

A.  Yes.

Q.  Okay.  And if I -- I'll try to be precise, but if I refer to the bank, does that work for you?

Strobie - Direct

```
1    A.  Yep.

2    Q.  Okay.  So before we get into more about your work, I'd

3    like to just take a step back.

4              Where do you currently live?

5    A.  Greendale, Wisconsin.

6    Q.  And where is that?

7    A.  It's a southern suburb of Milwaukee.

8    Q.  Are you married?

9    A.  I am.

10   Q.  And what's your spouse's name?

11   A.  Amy.

12   Q.  And do you and Amy have children?

13   A.  We do.  We've got two boys.

14   Q.  And what are their names?

15   A.  Jack and Matt.

16   Q.  And in terms of your background, did you go to college?

17   A.  I did.

18   Q.  And where did you go?

19   A.  I started with a two-year associate's degree at

20   Milwaukee Area Technical College.

21   Q.  And did you later -- is that the only degree that you

22   received?

23   A.  No.  After my first son was born, I went back and got my

24   bachelor's degree from Lakeland College in Sheboygan,

25   Wisconsin.
```

1   Q.  So if you got your associate's degree in 1998, what have

2   you been doing since that time?

3   A.  Been working in IT since then, including when I went

4   back and got my bachelor's.

5   Q.  And in the IT field, has there been a particular kind of

6   job that you've focused on in the last, I guess, 20,

7   24 years?

8   A.  Yeah.  I've been primarily a messaging system, mostly

9   Lotus Notes, administrator for the majority of my career.

10  Q.  And where do you currently work, like out of what office

11  or workspace?

12  A.  I actually currently work out of a home office.

13  Q.  That's nice.

14          And is it correct, then, that your work and

15  schooling have been pretty computer related?

16  A.  Yes.

17  Q.  And why is that?

18  A.  I have always enjoyed computers.  Took out a loan when I

19  was just out of high school to buy my own first computer.  I

20  just was kind of an early adopter of that technology and

21  enjoyed it.

22  Q.  So going back to when you started at M&I Bank -- which I

23  think you said was in March of 2010; is that right?

24  A.  Correct.

25  Q.  What was your title when you started?

Stroble - Direct

1    A.  Senior Lotus Notes administrator.

2    Q.  And, just quickly, what's Lotus Notes?

3    A.  Lotus Notes is a software platform that allows for

4    collaboration and e-mail.

5    Q.  And what were your responsibilities as a Lotus Notes

6    administrator?

7    A.  Primarily for the maintenance and administration and

8    troubleshooting if there were any issues of Lotus Notes and

9    the other messaging platforms within the bank.

10   Q.  And if I can direct you to sort of the 2014 to 2018 time

11   period.

12   A.  Okay.

13   Q.  Did you have colleagues who you worked with in your role

14   supporting the bank's Lotus Notes function?

15   A.  Yes.

16   Q.  How many colleagues do you recall you had in that

17   general time period?

18   A.  At that point supporting Lotus Notes, there would have

19   been two others other than me.

20   Q.  And do you recall the names of those other co-workers?

21   A.  Yes, Dave Schmitz -- I'm sorry, Dave Scherer and Brian

22   Schmitz.

23   Q.  Okay.  So you worked with Dave and Brian generally in

24   the period of 2014 to 2018?

25   A.  At least that time, yeah.  They had been with the bank

1    since about 2010 as well.

2    Q.  I see.

3    A.  Yeah.

4    Q.  So you worked with them, in fact, before 2018 --

5    A.  Yes.

6    Q.  -- excuse me, 2014?

7    A.  Yes.

8    Q.  And just focusing on Mr. Scherer, Dave Scherer, did he

9    have a similar role to yours?

10   A.  He did, yes.

11   Q.  And does he still work at the bank?

12   A.  He does not.

13   Q.  Do you know why he no longer works at the bank?

14   A.  He was laid off.

15   Q.  And when was he laid off?

16   A.  Roughly, 2020.

17   Q.  2020.

18          And do you know someone named John Vanderheyden?

19   A.  I do.

20   Q.  And who is Mr. Mr. Vanderheyden?

21   A.  He was the vice president of technology or IT for M&I

22   Bank.

23   Q.  And on the sort of corporate structure, where was

24   Mr. Vanderheyden in relation to you?

25   A.  He was my boss's boss.

Stroble - Direct

1    Q.  Boss's boss.

2            So in your work, first at M&I, then at BMO Harris,

3    have you become familiar with something called backup tapes?

4    A.  Yes.

5    Q.  And at a high level, what are backup tapes?

6    A.  Backup tapes are a physical media used to back up the

7    digital contents of servers.

8    Q.  And based on your experience and your time, again, at

9    M&I and now at BMO Harris, what's the purpose of a backup

10   tape?

11   A.  Backup tapes were used for -- to back up the contents

12   should we ever need to restore a server in the event of a

13   disaster scenario or for disaster recovery.

14   Q.  When you say "disaster recovery," what do you mean by

15   that?

16   A.  Server crashes, a server is -- you know, needs to be

17   rebuilt, fire, flood, that type of scenario, and we need to

18   bring the server back into an operational state.

19   Q.  So if there was some kind of disaster that damaged a

20   server, just at a high level, how could backup tapes be

21   used?

22   A.  You can restore the content of those tapes onto new

23   servers to get that data back and then functional again.

24   Q.  And, Mr. Stroble, I'd like to show you a document that's

25   already in evidence.  You have a hardcopy on your table

1      there.

2                  MS. GITTES:  And I'm going to ask Mr. Herzka to

3      put it up on the screen, please.  This is, for the record,

4      Plaintiff's Exhibit 796.

5      BY MS. GITTES:

6      Q.  Do you see that there?

7      A.  Mm-hmm.

8      Q.  And just for the record, this is, I think, a 25-,

9      26-page document?

10     A.  Yeah.

11     Q.  Do you recognize this document?

12     A.  I do.

13     Q.  And what is it?

14     A.  It's a picture of a backup tape.

15     Q.  And do you recall this particular backup tape for -- and

16     if you can -- if you need to flip through the document,

17     that's fine.

18     A.  No.  I mean, I do recall that these were the pictures

19     that were taken, not by me, of the backup tapes that I found

20     in 2017.

21     Q.  So you found -- just to make sure it's clear, you found

22     backup tapes when?

23     A.  In December of 2017.

24     Q.  And does this set of pictures, which we'll look at in a

25     few minutes, depict those tapes?

1    A.  It does.

2    Q.  You mentioned something a minute ago.  Do you -- you

3    said you didn't take these pictures?

4    A.  I did not take these pictures.  These pictures appear to

5    have been taken by the third-party company, eMag Solutions,

6    that the bank used to restore the content from these tapes.

7    Q.  So a vendor called eMag took the pictures --

8    A.  Mm-hmm.

9    Q.  -- to your knowledge?

10   A.  To my knowledge, yes.  And I say that because when I

11   found the pictures, it didn't have this barcode label on it

12   that says, "eMag Solutions."

13   Q.  Thank you.  That's helpful, Mr. Stroble.

14           MS. GITTES:  Actually, Mr. Herzka, could you just

15   blow up that -- the barcode on the left there.  I think

16   that's what Mr. Stroble was referring to.

17           THE WITNESS:  Yep, that's it.

18   BY MS. GITTES:

19   Q.  So just to be clear, what is that barcode with the white

20   label and the letters?

21   A.  It's a barcode that I can only assume was added by eMag

22   Solutions for them to keep track of each tape.

23           MS. GITTES:  You can zoom back out, Mr. Herzka.

24   Thank you.

25   BY MS. GITTES:

1    Q.  So other than those barcodes, does this reflect, I

2    guess, this particular tape as you found it?

3    A.  Yes.

4    Q.  And we're going to talk about this in a minute, but did

5    you review this document before you came here to testify

6    today?

7    A.  Yep.

8    Q.  And to the best of your recollection, is this an

9    accurate depiction of all the tapes you found in December of

10   2017?

11   A.  Yes.

12         MR. COLLYARD:  Objection, Your Honor, relevance.

13   And this might require a little bit of an explanation based

14   on your order.

15         THE COURT:  And when you're referring to "this,"

16   you meant Exhibit 796?

17         MS. GITTES:  Thank you, Your Honor.  I should have

18   been clear.  796.

19         THE COURT:  So you're asking for a sidebar?

20         MR. COLLYARD:  If you'll have one, yes, Your

21   Honor.

22         THE COURT:  I will.

23      **(At sidebar)**

24         MR. COLLYARD:  So, Your Honor, this entire line of

25   testimony is going to be about what they found in 2017.  It

1    has nothing to do with the issues in this case, which backup

2    tapes were destroyed in 2010, 2011, and 2014.  That was the

3    entire basis of the Bankruptcy Court's order.  That was the

4    entire basis of your affirmance.

5            What they're now going to do is try to relitigate

6    the issue to suggest and to confuse the jury that the tapes

7    found in 2017 are actually the tapes that have been found to

8    have been destroyed.  So now we will be back to relitigating

9    this entire matter all over again.

10           That is the only purpose of this witness's

11   testimony.  He has no knowledge of 2010, 2011, or the 2014

12   tapes that were found.  All this is meant to do is to

13   confuse the jury to suggest that those tapes that were

14   destroyed or intentionally lost, as found by the Court as

15   part of the bad faith and intentional destruction, to

16   suggest that they still exist.  That's all this is.

17           So now we're going to hear all about how he found

18   tapes in 2017 and how many there were, all for the

19   suggestion that they still exist.

20           MS. GITTES:  May I respond, Your Honor?

21           THE COURT:  You may.

22           MS. GITTES:  So a few things.

23           Number one, this exhibit was offered into evidence

24   by Mr. Collyard and his colleagues, Exhibit 796.  It was

25   part of the deposition testimony of Dave Scherer, who we

1    heard on video a few days ago, maybe.  I forget.

2    Mr. Scherer testified about finding tapes.  This was their

3    exhibit.

4         They have accused the bank of deleting these

5    backup tapes.  What we believe Mr. Stroble can testify to is

6    that there is a tape with the exact same name, lettering,

7    and information as the tapes Mr. Collyard claims were

8    deleted.  He will be free to argue to the jury that those

9    are different tapes.

10        But what we're doing through Mr. Stroble, which

11   they had full notice of -- they deposed Mr. Stroble.  He's

12   been on our list.  This is their exhibit.  To be able to --

13   they have accused the bank of deleting tapes in 2014.  What

14   this testimony is designed to do is to show that tapes were

15   found in 2017, which -- documents from which were produced

16   in this litigation.

17        Mr. Collyard has put this at issue and what we're

18   doing is providing our good-faith explanation, our innocent

19   explanation, as to --

20        THE COURT:  Shhh.

21        MS. GITTES:  I apologize, Your Honor.  -- our

22   innocent explanation as to what happened, consistent with

23   the Court's order.

24        MR. COLLYARD:  No.  What this goes to here -- what

25   the Court's order goes to is whether or not the documents

1    they destroyed were harmful, not whether or not they were

2    destroyed.

3           The reason why this is part of Mr. Scherer's

4    testimony is because we already had this fight and this was

5    inherent in the fight in order to prove that these documents

6    were not the same.  I have proven multiple times at the

7    Bankruptcy Court level that they lied and that implicated

8    counsel.

9           So if she is now allowed to go through and

10   relitigate this entire issue, I cannot rebut that because I

11   would have to call the lawyers.  I proved the destruction of

12   those tapes and I proved that their lawyers lied about these

13   tapes, to suggest that they were the same things, multiple

14   times.  I am now precluded from doing this.

15          This came in through depo designations that you

16   guys counter designated as well with Mr. Scherer, which was

17   the issue of whether or not they were the same, which I

18   proved at the Bankruptcy Court level and you affirmed it.

19          So now we have a ruling by the Bankruptcy Court

20   that these are not the same, that those tapes were

21   destroyed, and now we're going to relitigate this issue

22   again, but I can't call their lawyers to reprove what I

23   already proved at the Bankruptcy Court level and what Your

24   Honor has already affirmed in an order.

25          MS. GITTES:  A few points, Your Honor.

1            First, just as a procedural matter, Mr. Stroble

2    has been on our witness list.  He was first on their witness

3    list.  If they had had an issue with Mr. Stroble's

4    testimony, this is the topic of what he was deposed on.

5    They could have raised this before and they chose not to in

6    order to raise it now.

7            Second, Mr. Collyard has made this argument

8    several times and the Court, to my understanding, has at

9    each point rejected it and allowed us to put on evidence of

10   our good-faith -- of our innocent explanation for what

11   happened.

12           This is not long testimony.  He's going to testify

13   that he found the tapes.  We're not going to touch conduct

14   of counsel.  That's not going to be what happens.  He,

15   Mr. -- just as a short proffer, Mr. Stroble finds tapes.  He

16   identifies them in the picture that's already in evidence.

17           THE COURT:  Keep your voice down.

18           MS. GITTES:  I apologize.

19           He identifies them.  The pictures are already in

20   evidence.  He will testify as to how these tapes work.  He

21   will provide them to -- he will testify that he provided

22   them to the vendor.  And that's the extent of his knowledge.

23           THE COURT:  And why is that relevant?

24           MS. GITTES:  Because, Your Honor, plaintiffs have

25   put at issue this allegation that we destroyed tapes in

Stroble - Direct

1    2014.  This is directly probative to whether or not that is

2    true.

3            A tape -- according to the e-mail that

4    Mr. Collyard -- that is in evidence that was discussed with

5    Mr. Vanderheyden, the witness from this morning, it

6    specifically referenced a tape with "MSP105 Aug '07" on it.

7            What Mr. Scherer -- excuse me.  What Mr. Stroble

8    will testify to is that he found a tape with the label

9    "MSP105" on it that said, "Aug '07."  He will testify in his

10   experience there are never two backup tapes with the same

11   prefix and number.

12           MR. COLLYARD:  I'm sorry.  If I may, this -- and

13   this was litigated and this was why those depositions were

14   taken.  They had to pay for them.  The reason why he was

15   deposed was because BMO Harris Bank was sanctioned and I had

16   the opportunity to depose him on this matter to prove this.

17   And this was an issue at the Bankruptcy Court.

18           It doesn't say what she just said.  It says, "Full

19   system backup."  That is not in that e-mail.  I specifically

20   asked Mr. Vanderheyden if he knew what the label was, and he

21   said the label is this.  He did not say the label was that.

22           So now we're back to relitigating whether or not

23   the tapes in 2014 were actually destroyed.  Two courts have

24   already concluded that that has happened, and Your Honor

25   affirmed that decision.

1          And so whether they were destroyed is not the

2    issue.  Whether the information on the tapes was harmful and

3    whether there's an innocent explanation for destroying those

4    tapes is what Your Honor allowed by her order, not whether

5    or not these tapes are the same and whether they were

6    destroyed.  This is completely outside of the scope of your

7    order, Your Honor.

8          THE COURT:  I agree.  And so I -- the objection is

9    sustained as to that line of questioning.  I don't know

10   where you're going to go beyond that.

11         MS. GITTES:  Your Honor, if I may?  And I don't

12   mean to ask you to reconsider, but this is the sole --

13   Mr. Collyard has gotten up and accused the bank of deleting

14   tapes in 2014.  This is directly probative to the truth of

15   that allegation.

16         Mr. Collyard is entitled to draw out on

17   cross-examination the differences between the two, but he

18   stood up at opening -- in opening statements and said tapes

19   were deleted in 2014.  This is directly probative of that

20   not --

21         THE COURT:  Shhh.

22         MS. GITTES:  I apologize.

23         This is directly probative of that not happening.

24   And if we're unable to put on this evidence, respectfully, I

25   believe we're extremely prejudiced because we're not allowed

 1    to provide any answer to the argument that Mr. Collyard --

 2    the spoliation in the Court's -- and I was not involved at

 3    the time.  I'm not trying to relitigate this in front of

 4    Your Honor, but it was about the decommissioning.

 5            This 2014 deletion is a -- is something that came

 6    in and was talked about in opening statements.  It was --

 7    this was not what we understood would be the scope of

 8    spoliation.

 9            But we have no choice but to put this evidence in

10    in order to -- otherwise the jury is left with the

11    impression that we deleted tapes and we're unable to put in

12    what is -- what this witness will testify to, that he found

13    a tape that he will testify -- and Mr. Collyard is free to

14    try to attack his credibility, but these are the same tapes

15    that he -- that were found in 2014.

16            THE COURT:  How can he establish that these are

17    the same tapes that were found in 2014?

18            MS. GITTES:  What he can do is -- he worked at the

19    same location as Mr. Scherer, in the Centre Point location.

20    He can testify that he found a tape with this label that

21    matches what the tape -- well, what is in Mr. Vanderheyden's

22    e-mail that we saw this morning.  He can testify that, in

23    his experience, it is impossible for two backup tapes to

24    have the same prefix and number because they are assigned by

25    a system.

1          And so it is his having worked with backup tapes

2     through the course of his employment at M&I and BMO Harris

3     that this is in his view -- he can never be in Mr. Scherer's

4     head, but what he can do is say I found and provided a tape

5     with exactly the same prefix and number as the tape that

6     Mr. Collyard has accused the bank of deleting.

7          MR. COLLYARD:  Your Honor, that is not true.

8     Again, the label is not that.  But this, respectfully --

9          THE COURT:  You said the label is what?

10         MR. COLLYARD:  I'm sorry.  So the label in the

11    e-mail that I showed Mr. Vanderheyden -- and this was

12    already litigated, it was already ruled on by the Court --

13    did not include anything about a full system backup.  That

14    was a major issue at the Bankruptcy Court level that we had

15    hearings on where there were findings by the Court and it

16    was decided.

17         I didn't have the opportunity to take

18    Mr. Stroble's deposition on this particular issue because --

19    what I took his deposition on was whether or not those tapes

20    were destroyed.  And there is a finding by the Court that

21    those tapes were destroyed, not these.

22         And so, again, what the issue is is whether or not

23    that -- you've already found, the Court has already

24    concluded that there was destruction in 2010 and 2014, and I

25    stood up and I said in opening statements that there were

1    because you have already decided that those tapes were

2    destroyed.

3             And you will give a permissive adverse inference,

4    but you will allow them to put on limited evidence of an

5    innocent explanation as to why the tapes that were destroyed

6    were not harmful to BMO, not relitigating this issue as to

7    whether or not these tapes still exist and those other ones

8    were destroyed, because it has already been found that they

9    were destroyed.

10            And the only reason for this witness's testimony,

11   as I understand what I just heard from your direct, is to

12   now redo what the Court has already decided was done and

13   destroyed.

14            And I can't call their lawyers.  I can't redo this

15   entire issue, which I spent months doing through deposing

16   lawyers, through arguing briefs, through findings of the

17   Bankruptcy Court that they lied in documents, that they lied

18   in letters multiple times to the Bankruptcy Court.  That's

19   how I proved that.

20            MS. GITTES:  May I respond, Your Honor?

21        (The Court and law clerk confer)

22            THE COURT:  Go ahead.

23            MS. GITTES:  Thank you.  First of all, I have the

24   deposition of Mr. Stroble here.  Mr. Collyard had ample

25   opportunity to ask him about this exact topic.

Stroble - Direct

```
 1                    MR. COLLYARD:  This was years ago, right, this was
 2        a deposition years ago?
 3                    MS. GITTES:  2018.
 4                    MR. COLLYARD:  Yeah.
 5                    MS. GITTES:  Second of all, we have now put
 6        Mr. Stroble on the stand.  We have shown the jury that we
 7        believe he has backup tapes.  They could have raised this
 8        issue sooner.  They chose not to.
 9                    MR. COLLYARD:  I didn't know what you were going
10        to ask him on the stand.
11                    MS. GITTES:  The only topic of his deposition is
12        are these tapes.  You put this document in evidence.
13                    MR. COLLYARD:  Your Honor --
14                    THE COURT:  Okay.  Let's -- I think I understand
15        what the issue is.
16                    MR. COLLYARD:  Okay.
17                    THE COURT:  The objection is sustained.
18                    MR. COLLYARD:  Thank you, Your Honor.
19                    MS. GITTES:  Your Honor, can I -- may I have a --
20        I need to talk to my colleagues, if that's okay, to
21        understand what, if anything, we're going to do with
22        Mr. Stroble given the scope of your ruling.
23                    THE COURT:  What do you mean?
24                    MS. GITTES:  Would it be okay to take an afternoon
25        break right now?
```

Stroble - Direct

```
1                 THE COURT:  We are not --

2                 MS. GITTES:  I'm going to go -- just two minutes,

3      Your Honor?  Because I don't -- this witness has nothing

4      else to testify to.

5                 THE COURT:  So then he can step down.  If you want

6      to re-call him later, you may.

7                 MS. GITTES:  I'll just take one minute, if that's

8      okay.  I just need to ask my colleagues very quickly.

9           (Pause)

10          (In open court)

11                MS. GITTES:  Thank you, Mr. Stroble.  May I

12     proceed, Your Honor?

13                THE COURT:  Yes.  I believe the objection is

14     sustained.  I want to make sure that's on the record.

15     BY MS. GITTES:

16     Q.  I'll just ask you a few questions, Mr. Stroble, about

17     backup tapes generally.

18                I think you testified before we broke that you

19     were generally familiar with backup tapes in your time at

20     BMO Harris and M&I; is that right?

21     A.  Yes.

22     Q.  And I think -- can you just explain -- I think you said

23     it before, but I apologize, I've lost my train of thought --

24     as to what backup tapes capture.

25     A.  They capture a backup of what is digitally on the server
```

 1    by which it is used to back up.

 2    Q.  And you started at the bank in March of 2010, right?

 3    A.  Yes.

 4    Q.  And are you familiar with where the bank -- and so this

 5    would be M&I at the time -- had servers at that time?

 6    A.  Yes.

 7    Q.  Where do you recall the bank having servers?

 8    A.  We had servers regionally distributed in Naples,

 9    Florida; St. Louis, Missouri; Minneapolis, Minnesota;

10    Madison, Wisconsin; I believe there was one also in Arizona

11    somewhere that either -- was either just being shut down or

12    it had already been shut down when I joined the bank; as

13    well as the Milwaukee area.

14    Q.  And so you referenced shutting down.  Are these regional

15    servers still in place today?

16    A.  They are not, no.

17    Q.  Why not?

18    A.  The content of them was for Lotus Notes e-mail and that

19    application was consolidated down into the two Milwaukee

20    data center locations that M&I had.

21    Q.  So do you -- so was there a project to consolidate

22    servers, then --

23    A.  Yes.

24    Q.  -- based on your recollection?

25              MR. COLLYARD:  Objection, Your Honor, cumulative

 1    of Mr. Vanderheyden's testimony.

 2              THE COURT:  Sustained.

 3    BY MS. GITTES:

 4    Q.  Do you recall, in connection with the consolidation,

 5    whether any servers, backup tapes, or other materials were

 6    deleted or recycled?

 7              MR. COLLYARD:  Same objection, Your Honor.

 8              THE COURT:  Sustained.

 9    BY MS. GITTES:

10    Q.  So a backup tape -- turning back to your time in

11    early -- I guess early in your time at the bank, so in the

12    2010, 2011 time period, do you know how often backup tapes

13    were created?

14    A.  They were typically done nightly.

15    Q.  And in your experience, are backup tapes reused?

16              MR. COLLYARD:  Again, Your Honor, objection,

17    cumulative of Mr. Vanderheyden's entire testimony.

18              THE COURT:  Sustained.

19    BY MS. GITTES:

20    Q.  Can you tell what's on a backup tape just by looking at

21    it?

22    A.  No, you cannot.

23    Q.  Why not?

24    A.  Because it's stored on the tape digitally, just like I

25    couldn't look at my -- the outside of my cell phone and tell

Stroble - Direct

1    you what's on it.  You'd have to have something to read it.

2    Q.  And you became familiar -- were you familiar in your

3    time at the bank with how backup tapes were labeled?

4    A.  Yes.

5    Q.  And generally what kind of labeling system did the bank

6    use for backup tapes, again, back in the 2010 to 2013 time

7    period?

8         MR. COLLYARD:  Objection, Your Honor, cumulative

9    of Mr. Vanderheyden's testimony.

10        THE COURT:  Sustained.

11   BY MS. GITTES:

12   Q.  Are you aware of -- there's one --

13        MS. GITTES:  May I approach, briefly, Your Honor,

14   just to clarify where I'm going?

15        THE COURT:  You may.

16        **(At sidebar)**

17        MS. GITTES:  The one thing that Mr. Vanderheyden

18   was not able to testify to, which is how the numbering

19   system worked, and so what I'd like to do is elicit

20   testimony from him as to how that worked, but I can't do

21   that without asking him a few questions to sort of set the

22   stage.

23        MR. COLLYARD:  I don't understand what -- how the

24   numbering system worked for what?  For the 2017 --

25        MS. GITTES:  For backup tapes in his experience

1    and time at the bank.

2                MR. COLLYARD:  This witness has no knowledge of

3    the backup tapes from 2010, 2011, or 2014.  So this is

4    entirely irrelevant testimony.

5                And anything about backup tapes at this point in

6    time would be -- if he had knowledge, which he doesn't,

7    would be cumulative of Mr. Vanderheyden's testimony.  We are

8    wasting the jury's time at this moment.

9                MS. GITTES:  It's -- respectfully, it's not

10   cumulative.  Mr. Vanderheyden was not --

11               THE COURT:  Shhh.

12               MS. GITTES:  Mr. Vanderheyden was not familiar,

13   because of his seniority at the bank, with how backup tapes

14   were -- how the numbering system was assigned.  All I want

15   to do is elicit that from Mr. Stroble.

16               MR. COLLYARD:  There's no evidence of anything

17   about what these backup tapes said or what their labels were

18   or anything about them from 2010, 2011, or 2014.  So this

19   witness has absolutely no foundation or no knowledge about

20   any of it.

21               THE COURT:  And why is it relevant?  I agree with

22   foundation and all of that.  I want --

23               MS. GITTES:  Mr. Vanderheyden, there was a gap in

24   his testimony as to how the numbering system worked.  All

25   I'm trying to do is close that gap because Mr. Stroble has

1    that knowledge as a more -- as a person who dealt with the

2    backup system directly versus Mr. Vanderheyden, who was at a

3    higher level.

4              MR. COLLYARD:  And the answer would be it wouldn't

5    be relevant.  The only thing would be to again suggest

6    somehow that these tapes in 2017 that they found are somehow

7    to confuse the jury to believe that those tapes weren't

8    destroyed in 2014 or 2010 or 2011.  That's the only purpose

9    for this line of questioning.

10             THE COURT:  The objection is sustained.

11        **(In open court)**

12   BY MS. GITTES:

13   Q.  I'm almost finished, Mr. Stroble.

14             You said you worked with -- before you started

15   working from home, where did you work?

16   A.  The location called Centre Point.

17   Q.  And did Mr. Scherer work there as well?

18   A.  Yes.

19             MS. GITTES:  Just one moment.

20        (Pause)

21   BY MS. GITTES:

22   Q.  Just to wrap up, in your ten-plus years at the bank,

23   have you ever intentionally deleted or altered documents

24   with the purpose of preventing their disclosure in a

25   litigation or other court proceeding?

Stroble - Direct

```
 1    A.  No.

 2    Q.  What would happen if you did that?

 3    A.  I would lose my job and could see legal ramifications to

 4    that.

 5    Q.  You testified earlier that you have a team -- you worked

 6    with a team of colleagues at M&I and later at BMO Harris.

 7    Have you ever become aware of any of those employees

 8    intentionally deleting or altering documents for the purpose

 9    of avoiding their disclosure in a court proceeding or other

10    litigation?

11              MR. COLLYARD:  Objection, leading, argumentative,

12    and foundation.

13              THE COURT:  Sustained.

14              MS. GITTES:  Just one moment, Your Honor, and I

15    think I'm wrapped up.

16        (Defendant's counsel confer)

17              MS. GITTES:  No further questions at this time.

18    Thank you, Your Honor.

19              MR. COLLYARD:  I have no questions for this

20    witness, Your Honor.  Thank you.

21              THE COURT:  Sir, you are excused.

22              MS. MOMOH:  Good afternoon, Your Honor.

23              THE COURT:  Good afternoon.

24              MS. MOMOH:  Adine Momoh on behalf of the

25    defendant, BMO Harris Bank.  Given the time and the fact
```

Stroble - Direct

```
 1    that we need to switch things around on the table, may we
 2    just have about five minutes before we proceed?
 3                THE COURT:  Yes.
 4                MS. MOMOH:  Thank you, Your Honor.
 5         (Pause)
 6                MS. MOMOH:  Permission to approach, Your Honor?
 7                THE COURT:  Yes.
 8         (Binders handed to Court)
 9                THE COURT:  Counsel, are we ready to proceed?
10                MS. MOMOH:  Just maybe two minutes, Your Honor,
11    please?
12                THE COURT:  Okay.
13                MS. MOMOH:  Thank you.
14                THE COURT:  Members of the Jury, if you'd like to
15    take a stretch break, you should feel free to stretch at
16    your seats.
17         (Pause)
18                MS. MOMOH:  Your Honor, Defendant BMO Harris Bank
19    calls as our next witness Mr. Thomas Haller.
20                THE COURT:  Thank you.
21                THE COURT REPORTER:  Please raise your right hand.
22         (Witness sworn)
23                THE COURT REPORTER:  You can have a seat in the
24    witness chair.  Once you're seated, could you please state
25    your full name, spelling your first and your last name.
```

1      THE WITNESS:  Hi.  My name is Thomas Haller,

2  T-h-o-m-a-s, last name H-a-l-l-e-r.

3      THE COURT:  Thank you, Counsel.  You may proceed.

4      MS. MOMOH:  Thank you, Your Honor.

5                    **(Thomas Haller)**

6                **DIRECT EXAMINATION**

7  BY MS. MOMOH:

8  Q.  Good afternoon, Mr. Haller.

9  A.  Hello.

10  Q.  I hope that you are doing well.

11  A.  I am.  Thank you.

12  Q.  And you remember me?  My name is Adine Momoh.  Again, I

13  represent BMO Harris Bank.

14  A.  Yes.

15  Q.  Thank you for being with us this afternoon.

16      Where do you currently work?

17  A.  I work for BMO Harris Bank.

18      THE COURT:  Mr. Haller, would you pull the base of

19  the microphone a little bit closer so that I can hear you.

20      THE WITNESS:  Better?

21      THE COURT:  That is better for me.  Thank you.

22      THE WITNESS:  Okay.  Thanks.

23  BY MS. MOMOH:

24  Q.  Now, BMO Harris Bank is named and known as BMO Harris

25  Bank, but at a time its predecessor was M&I Bank, correct?

Maier - Direct

1    A.  Yes.

2    Q.  And you also worked at M&I?

3    A.  Yes, I did.

4    Q.  M&I and BMO combined, in total how many years have you

5    worked at the bank collectively?

6    A.  Approximately 25 years.

7    Q.  What brought you to M&I?

8    A.  My wife and I were relocating from the East Coast and I

9    was looking for employment.  I had interviews with a couple

10   of financial institutions in Milwaukee and ultimately chose

11   a position with M&I Bank.

12   Q.  Focusing on your time at M&I, can you please explain

13   generally what positions you held.

14   A.  Sure.  When I first started, I was a product analyst.  I

15   helped to design products for offering in our remote data

16   center locations across the country.  I then became a

17   support team manager.  I helped install an automated check

18   adjustment system.  I was an operations manager.  I became a

19   full-time project leader.  And then my last position was as

20   the manager of the check fraud detection department.

21   Q.  Okay.  And I want to focus on some of the later roles

22   that you mentioned.

23        My understanding is that you also held a position

24   in M&I's Fraud Detection Group?

25   A.  Yes.

Haller - Direct

1    Q.  And then you were later promoted to vice president of

2    fraud detection?

3    A.  Yes.

4    Q.  When was the Fraud Detection Group created at M&I?

5    A.  I believe it was 2001, 2002 time frame.

6    Q.  Mr. Haller, do you understand that you are here today to

7    testify about M&I's fraud detection monitoring during the

8    relevant period of 2002 to 2008?

9    A.  Yes.

10   Q.  Can you explain, what is fraud detection?

11   A.  Fraud detection is a dedicated group of people designed

12   to protect the bank and its customers against fraudulent

13   activity that occurs through bank accounts.

14   Q.  And you talked about the people that are tasked, charged

15   to do that sort of work.  But just taking a step back, the

16   concept of fraud detection, what is that?

17   A.  Well, the idea is to identify fraud that's being

18   perpetrated against M&I customer accounts and to be able to

19   mitigate -- identify and mitigate that activity.

20   Q.  What drew you to the field of fraud detection?

21   A.  Initially I was the project manager to implement this

22   tool and I was very excited about the opportunity about this

23   new software, and ultimately I posted for and became the

24   manager of that department.

25   Q.  So how did you become familiar with check processing?

1    A.  I had been involved with check processing for a number

2    of years.

3            Prior to joining M&I I was at the Federal Reserve

4    Bank of Boston, and the first job that I had there was in

5    check adjustment and that, I guess, was my initial exposure

6    to check processing, was with the Federal Reserve Bank.

7            The fed is a provider of services and a regulator,

8    and I worked in the operations group with the fed to get my

9    initial exposure with checks.

10   Q.  When did you become familiar with the mechanics of check

11   processing?

12   A.  Well, I think a part of it stemmed with my work done at

13   the fed.  Member financial institutions would send their

14   checks and clear them through the Federal Reserve.  At that

15   time the Federal Reserve was the largest check clearing

16   organization in the country and so there was a lot of energy

17   and effort put into clearing checks.  That was any initial

18   exposure.  And it's part of, I think, why I was hired at

19   M&I, was that prior experience at the fed in check

20   processing.

21   Q.  Okay.  And we'll talk about that experience with the

22   Federal Reserve in Boston in a few moments, but just

23   focusing on your time at M&I, over what period of time were

24   you the vice president of fraud detection?

25   A.  Approximately 2002 until I left the bank in 2012.

1    Q.  What were your job responsibilities as the vice

2    president of fraud detection?

3    A.  Well, I was responsible for managing and training the

4    staff.  I was responsible for developing and managing the

5    software tool.  I was responsible for all the reporting of

6    the department for check fraud-related activity, exposure,

7    loss, loss avoidance.

8         We were also responsible for reconciling the

9    general ledger account for check fraud losses that were

10   incurred with the bank.  The reason being is that was kind

11   of the backside of the check fraud activity, was

12   understanding the losses that we were taking in order to

13   help drive the effectiveness of the tool.

14   Q.  And you say "of the tool."  What tool are you referring

15   to?

16   A.  I'm sorry.  That's the software that we used in check

17   fraud detection.

18   Q.  What's the name of that software?

19   A.  The name of it is -- it was by a company called

20   Carreker, C-a-r-r-e-k-e-r.

21   Q.  Okay.  And we'll get into that --

22   A.  Okay.

23   Q.  -- a few moments later.

24        So you did say earlier that you would manage

25   employees as part of your role as vice president of fraud

1   detection.  So did you supervise bank employees at M&I --

2   A.  Yes.

3   Q.  -- in that role?

4   A.  Yes.

5   Q.  How many?

6   A.  Well, it changed over time, but I would guess that --

7   maybe 20 to 25 in total.

8   Q.  What was the extent of your managing or your supervision

9   of these employees?

10  A.  I'm sorry.  I don't understand the question.

11  Q.  Sure.  So you said that you supervised the employees at

12  M&I in your role as vice president of fraud detection.  How?

13  A.  Well, we were responsible -- I was responsible for

14  making sure that they were trained, that they were fluid in

15  the processes and procedures of the department, that they

16  understood the goals that we were trying to achieve, and

17  that they were executing to meet standards.

18  Q.  How would you determine if they were executing to meet

19  standards?

20  A.  Well, we would quality control their work and review and

21  get feedback from the employees.  We also had annual reviews

22  from corporate audit to make sure that we were meeting

23  overall standards.

24          The group, it was myself and I also had a couple

25  of supervisors.  And they had also a hands-on responsibility

1    in training the employees, making sure that they were

2    completing their work and that they were doing it according

3    to process and procedures.

4    Q.  Based on what you just testified to, were you involved

5    in the evaluation of the employees that you were

6    supervising?

7    A.  Yes.

8    Q.  How so?

9    A.  I would write the annual reviews.  I would do

10   performance checkups with them.  That all was part of my

11   responsibility.

12   Q.  I had asked you about what drew you to the world of

13   fraud detection, and you had mentioned that you were

14   involved in implementing the Fraud Detection Group.  Can you

15   tell me more about that.

16   A.  About the implementation?

17   Q.  Yes, please.

18   A.  Yes.  It stemmed out of a growing trend that was going

19   on across the country.  At that time --

20   Q.  What time?

21   A.  The 2002 time frame.  -- there was a dramatic increase

22   in check fraud activity related to scams, job scams, other

23   things like that, and there was a -- there was a big

24   increase in check fraud.

25              The bank wanted to protect itself and its

Hafler - Direct

1    customers from this increase in activity, and so the end

2    result was to implement this software and get a staff

3    together to specifically address this issue with the bank.

4    Q.  The software being the Carreker fraud system?

5    A.  Yes.

6    Q.  What is your understanding about why M&I implemented the

7    Fraud Detection Group in 2002?

8    A.  Well, as I had mentioned, check fraud was a phenomenon

9    that was occurring that was increasing across the country.

10   Larger financial institutions -- large and small financial

11   institutions were seeing an increase in check fraud activity

12   and losses according -- losses as a result of this increase.

13         And so the bank wanted to take action in order to

14   meet this new threat and combat the activity to avoid losses

15   for customers and the bank itself.

16   Q.  You testified that you have been with M&I and now BMO

17   for 25 years.  Have you worked for the bank throughout that

18   nearly 25-year period without interruption?

19   A.  No.  In --

20   Q.  Explain.

21   A.  I'm sorry.  In 2012 I left the bank and got a job at a

22   company called Fiserv, F-i-s-e-r-v.  They are a financial

23   services technology company, and they also were the company

24   that was the -- is the current owner of that software.  And

25   I took a job with them.  I was there for about four years.

Haller - Direct

1    I worked in the role of sales support and product

2    development.  And, like I said, I was with Fiserv for about

3    four years and then came back and rejoined the bank.

4    Q.  So why did you leave M&I to join Fiserv?

5    A.  BMO Harris had acquired M&I Bank.  There was a similar

6    process to what we were doing at M&I at BMO Harris Bank, and

7    there was an individual who had basically the same job that

8    I had.  My future was uncertain and so I made the decision

9    to look for other opportunities and got the job at Fiserv.

10   Q.  And then you left Fiserv to join BMO Harris Bank?

11   A.  Yes.

12   Q.  That was in approximately 2016?

13   A.  2016 is correct.

14   Q.  Tell the jury, why did you leave Fiserv to join BMO

15   Harris Bank?

16   A.  Well, the job that I had involved a lot of travel,

17   including international.  It was very unpredictable.  And

18   after four years on the road, I wanted to be home at night.

19   And so I started putting feelers out and eventually got a

20   job at BMO Harris.

21   Q.  When you joined BMO in 2016, what was your job title at

22   that time?

23   A.  I was the manager of the AML, anti-money laundering,

24   Investigations Unit.

25   Q.  Was your direct title vice president of investigations

Haller - Direct

1    in AML?

2    A.  Yes.

3    Q.  From when to when were you in that role?

4    A.  Well, I have been promoted since I have been there, but

5    I'm basically in that role to this day.

6    Q.  Before your promotion, though -- your promotion was in

7    2019?

8    A.  Yeah, I think it was about three years.  That's right.

9    Q.  Okay.  What's your current job title?

10   A.  I am vice president and senior manager of the Anti-Money

11   Laundering Investigations Unit.

12   Q.  Okay.  So when -- you were vice president of

13   investigations in AML at BMO.  Now you're vice president and

14   senior manager of the AML Investigations Unit.  Was that a

15   promotion?

16   A.  Yes.

17   Q.  What are your current job responsibilities?

18   A.  I manage the primary investigations -- AML

19   Investigations Unit for BMO Harris Bank.

20   Q.  Just to be clear, there's been discussion in this case

21   about AML analysts and the AML Monitoring Group.

22            When you were the vice president of the Fraud

23   Detection Group, you were not a member of the AML Monitoring

24   Group, correct?

25   A.  That is correct.

```
 1    Q.  When did you learn that Tom Petters and his entities,

 2    including PCI, were involved in the PCI Ponzi scheme?

 3    A.  It was basically before I was to be deposed -- in 2018?

 4    Q.  In 2018, then, how did you come -- so how, how did you

 5    come to learn about the PCI Ponzi scheme?

 6              MR. IHRIG:  Objection, Your Honor, relevance.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Again, it was through me being named

 9    to be deposed in this case.

10    BY MS. MOMOH:

11    Q.  Are you aware now that eventually Tom Petters, Deanna

12    Coleman, and a number of other people went to jail for their

13    role in the PCI Ponzi scheme?

14    A.  I am now, yes.

15    Q.  Did you know that the PCI Ponzi scheme was underway

16    before it was discovered by the authorities in 2008?

17    A.  No, I did not.

18    Q.  BMO is now accused of aiding and abetting PCI with

19    respect to the PCI Ponzi scheme and --

20              MR. IHRIG:  Objection, calls for a legal action.

21              THE COURT:  Counsel, why don't you approach.

22    Well, I'll overrule it at this point and you can ask the

23    question.

24              MS. MOMOH:  Thank you, Your Honor.

25    BY MS. MOMOH:
```

Haller - Direct

1   Q.  Let me restart my question.  BMO is now accused of

2   aiding and abetting PCI with respect to the PCI Ponzi

3   scheme, and the Fraud Detection Group that you supervised

4   and their work is being questioned.

5           What was the culture of your Fraud Detection Group

6   during the 2002 to 2008 period?

7           MR. IHRIG:  Objection, compound.  Foundation as

8   well.

9           MS. MOMOH:  Your Honor, if I may be heard briefly,

10  I've already laid the proper foundation with his role of

11  managing, supervising, and training employees and --

12          THE COURT:  Let's talk at sidebar.  We don't need

13  to do that in front of the jury.

14          MS. MOMOH:  Sure.

15      **(At sidebar)**

16          MS. MOMOH:  Your Honor --

17          THE COURT:  Let's wait until all of the lawyers

18  are here.

19          MS. MOMOH:  Sure.

20          THE COURT:  Don't start arguing until all the

21  lawyers are here.

22          MS. MOMOH:  Well, wait a minute.  Why are you

23  here, if you don't mind?  Isn't Mr. Ihrig the one --

24          MR. COLLYARD:  I can be here.

25          MS. MOMOH:  Understood.  That's fine.

Haller - Direct

1          THE COURT:  I know it is.  It's my bench.

2          MS. MOMOH:  Yes.

3          I've laid the proper foundation with respect to

4    Mr. Haller testifying as to the culture of his group.  He

5    testified that he was the vice president of the Fraud

6    Detection Group for several years.  He testified that he

7    managed, supervised, hired, trained, and evaluated the

8    employees within his group.  He mentioned the supervisors

9    over him.  I'm simply asking about the culture of the group.

10         And Mr. Ihrig's objection was with respect to

11   foundation and I believe a compound question.  So I can

12   certainly break up the question if need be, but I have

13   established foundation.

14         MR. IHRIG:  Your Honor, the question improperly

15   imposes -- interposes a narrative lead-in about the

16   allegations in this case, to which this witness has no

17   foundation to testify about, and then it improperly compares

18   them to his job responsibilities at M&I.  There's no

19   correlation between the two, and he doesn't have foundation

20   to speak to the correlation between the two.

21         THE COURT:  I didn't understand -- what is your

22   question?

23         MS. MOMOH:  I don't have a question.  Oh, the

24   question I'm asking?

25         THE COURT:  That's being objected to.

1          MS. MOMOH:  What's the culture of the Fraud

2    Detection Group, Your Honor, was the question.

3          THE COURT:  Okay.  So he's talking about it now?

4          MS. MOMOH:  I asked during the period of 2002 to

5    2008, which was the period of time when he was vice

6    president of that group.

7          MR. IHRIG:  And the objection is to the narrative

8    lead-in to that question in which she recited allegations of

9    aiding and abetting that are made in this case that have

10   nothing to do with the culture of Mr. Haller's group at M&I

11   in 2008.

12         THE COURT:  But you didn't object to those

13   questions.

14         MR. IHRIG:  I believe I did, Your Honor.

15         THE COURT:  Okay.  Okay.  So you may ask the

16   question.

17         MS. MOMOH:  Thank you.

18         THE COURT:  The objection is overruled.

19         MS. MOMOH:  Thank you.

20     **(In open court)**

21         MS. MOMOH:  Your Honor, the objection was

22   overruled?

23         THE COURT:  Yes.

24         MS. MOMOH:  Thank you.

25   BY MS. MOMOH:

1    Q.  Mr. Haller, again, what was the culture of your Fraud

2    Detection Group?

3    A.  We were a very enthusiastic, very dedicated group of

4    individuals.

5    Q.  Why do you say that?

6    A.  We were excited to do the work that we were doing.  We

7    felt that we were making a difference.  This was new.  It

8    was a little exciting.  And, like I said, we wanted to

9    perform well.  We were a dedicated group, enthusiastic about

10   the challenges ahead of us, and we wanted to perform well.

11   Q.  Was that your understanding of the Fraud Detection Group

12   throughout the entire time that you were a member of that

13   group?

14   A.  Absolutely.  It was a very desirable position, to work

15   in fraud detection.  There were a lot of other operations

16   groups that did various functions for the bank, but there

17   were always people that wanted to join our team and be a

18   part of the Fraud Detection Group.

19   Q.  How were members of the Fraud Detection Group evaluated

20   as it relates to fraud detection?

21   A.  Well, there are -- there are a few things.

22          One is we were evaluated against policy and

23   procedure.  We were evaluated with our ability to get our

24   work done in a timely manner.  We were evaluated by

25   corporate audit to make sure that we were following the

Haller - Direct

1    processes as defined.

2              And we also evaluated our performance.  I had

3    mentioned earlier about losses that were recorded by the

4    bank for check fraud, and we were responsible for

5    reconciling that general ledger.

6              That was very important for us because if we had

7    missed something and a loss was taken by the bank, we wanted

8    to understand that loss and understand -- if we needed to

9    make a change that was in our software and our procedure, to

10   make sure that we understood how it happened and that we

11   would do our best to make sure that it didn't happen again.

12             And the other aspect is that we also evaluated

13   ourselves against peer banks in the industry through

14   industry groups that M&I Bank belonged to.

15   Q.  And we'll talk about the evaluation with respect to

16   peers of the bank.  I want to focus on what you mentioned

17   about evaluation with respect to losses.

18             Would that -- what about losses compared to loss

19   avoidance?  Are those two separate things?

20   A.  Loss avoidance would be the exposure to loss, but our

21   actions have mitigated the loss and eliminated that from

22   occurring.  So, yes, we wanted to have a very high loss

23   avoidance ratio to losses.  So, yes, those two are related.

24   The opposite ends, I guess, of that spectrum.

25   Q.  Generally speaking, what do you mean by "loss"?

1    A.  Loss is a financial loss to the bank for this fraudulent

2    activity.

3    Q.  You mentioned the Corporate Audit Group.  So just to

4    kind of paint a picture for the jurors, you -- we have the

5    AML Monitoring Group, correct?  I'm just trying to paint the

6    picture.  So you have the AML Monitoring Group on one end,

7    correct?

8    A.  Yes.

9              MR. IHRIG:  Objection, vague as to time.

10             THE COURT:  Sustained.

11   BY MS. MOMOH:

12   Q.  Let's stick with 2002 to 2008.  So you have the AML

13   Monitoring Group.  The Fraud Detection Group, you said, was

14   not in the AML Monitoring Group, correct?

15   A.  That is correct.

16   Q.  Where -- in what department was the Fraud Detection

17   Group?

18   A.  The Fraud Detection Group reported through the corporate

19   security team.

20   Q.  The Corporate Securities Department?

21   A.  Yes.

22   Q.  Okay.  So we have the AML Monitoring Group on one side.

23   We have the Fraud Detection Group on another, which is

24   underneath the Corporate Securities Department.  Where would

25   the audit -- the Corporate Audit Group be that you just

1    referenced?

2    A.  Audit is its own entity.  They are an independent

3    internal group that -- their responsibility is to audit

4    operating areas around the bank to ensure compliance with

5    policy, procedure, regulation, et cetera, acting as an

6    independent arm to evaluate processes and procedures and

7    performance.

8    Q.  How did the Fraud Detection Group operate with the Audit

9    Group during the period of 2002 to 2008?

10   A.  Well, we considered corporate audit to be a strategic

11   partner, and I had invited the corporate audit team to be a

12   part of actually the strategic development of the fraud

13   detection team of the deployment of the software.

14          So we worked hand in hand and I kept them informed

15   of the activities that we were doing when we initially

16   started, and they continued to be a strategic partner for us

17   in fraud detection in our ongoing management of the systems

18   and the procedures for the department.

19   Q.  What would have happened to you and your colleagues in

20   the Fraud Detection Group during the period of 2002 to 2008

21   if you ignored fraud that was going through M&I's accounts?

22          MR. IHRIG:  Objection, calls for speculation,

23   foundation.

24          THE COURT:  Sustained.

25   BY MS. MOMOH:

```
 1    Q.  Mr. Haller, do you know what would have happened to you

 2    personally during the 2002 to 2008 period if you would have

 3    ignored fraud going through M&I's accounts?

 4              MR. IHRIG:  Same objection, calls for speculation.

 5              THE COURT:  Sustained.

 6    BY MS. MOMOH:

 7    Q.  Mr. Haller, during the 2002 to 2008 period when you were

 8    the vice president of the Fraud Detection Group, did you

 9    ever ignore fraud that was going through M&I's account at

10    that time?

11    A.  Never.

12    Q.  To your knowledge, did any of your employees that you

13    managed, trained, evaluated, and hired, did any of them

14    ignore fraud that was going through M&I's account during the

15    2002 to 2008 period?

16    A.  No.

17    Q.  Before we talk more about your role at the bank, can you

18    please tell the jurors what state you live in.

19    A.  I live in Wisconsin.

20    Q.  What city?

21    A.  Wauwatosa.

22    Q.  That's always a fun one for me to say, "Wauwatosa," and

23    I'm getting --

24    A.  Right.  It's a suburb of Milwaukee.

25    Q.  Okay.  Where did you grow up?
```

```
 1    A.  I grew up in Wausau, Wisconsin.

 2    Q.  Are you married?

 3    A.  I am.

 4    Q.  How long have you been married?

 5    A.  I should know this exactly.  I believe 34 years.

 6    Q.  And I believe you celebrated an anniversary last month?

 7    A.  Yes, September.

 8    Q.  Okay.  Congratulations.

 9    A.  Oh, thank you.

10    Q.  Any children?

11    A.  We have a son.

12    Q.  How old is he?

13    A.  He's 30.

14    Q.  What does he do?

15    A.  He is a musician.

16    Q.  Now, you haven't spent your entire life in Wisconsin,

17    right?

18    A.  That is correct.

19    Q.  Did you ever spend time abroad?

20    A.  Yes.

21    Q.  Okay.  So my understanding is that you spent time abroad

22    after high school; is that right?

23    A.  Yes.  I spent six months in Paris.  I went to school

24    there.  It was a school for foreigners to learn the language

25    and then also to take cultural classes as well.
```

Haller - Direct

1    Q.  Was that program connected to an institution in

2    Minnesota?

3    A.  Yes, it was.

4    Q.  And which institution?

5    A.  Saint Teresa College in Winona, Minnesota.

6    Q.  When did you graduate from college?

7    A.  1993 or 1994.

8    Q.  Where did you graduate from college?

9    A.  University of Wisconsin-Milwaukee.

10   Q.  What degree did you receive?

11   A.  I have a bachelor's degree in economics.

12   Q.  You lived in Wisconsin, as you mentioned.  You live in

13   Wisconsin currently.  You spent some time in Paris.  You

14   also spent time in Boston and Connecticut?

15   A.  Yes.

16   Q.  Please tell the jury briefly what brought you to Boston

17   and Connecticut.

18   A.  I had met my now wife shortly before she made a move to

19   go to Boston.  She was a registered nurse and had got a job

20   at Boston Children's Hospital.  We dated for a couple of

21   weeks and she made the move out to Boston.  After a year and

22   a half, two years of long-distance love, I took a job out in

23   Boston.

24   Q.  Was that the Federal Reserve Bank position in Boston

25   that you mentioned earlier?

Haller - Direct

1   A.  Yes.

2   Q.  Why did you decide to work with the Federal Reserve Bank

3   in Boston?

4   A.  I just thought it was a great opportunity to get the

5   macro perspective of the banking industry.  As I mentioned,

6   I was an economics major.  The Federal Reserve plays a

7   significant role in the nation's economy, and I thought it

8   would be a great education for me, a great opportunity.

9   Q.  What were your job responsibilities at the Federal

10  Reserve of Boston?

11  A.  Well, I started out in the check adjustment department,

12  as I had mentioned earlier.  I was responsible for fixing

13  check errors of member institutions as they -- as the check

14  processing took place.  So I worked in that job for probably

15  a year or a year and a half.

16          I then took a job doing reserve account analysis.

17  Member financial institutions have to keep a reserve balance

18  at the fed, and my job was to help calculate and monitor the

19  balances that institutions were keeping with the fed.

20          I took a job with the loan and credit department.

21  I was responsible for the state of Connecticut loan

22  collateral warehouses for a couple of distressed financial

23  institutions.  This was during the junk bond era, and there

24  were some financial institutions that had made some bad

25  investments in real estate and other such things and they

1    came to the fed as the lender of last resort.  I managed

2    several, maybe half a dozen loan collateral warehouses,

3    money that the banks were borrowing from the fed.

4            And I had another job at the -- after that.  I

5    apologize.  I don't remember exactly what it was.  I don't

6    remember what it was right now.

7    Q.  That's just fine.

8    A.  Okay.

9    Q.  So you mentioned Boston, and then you also mentioned

10   Connecticut as part of your position with the Federal

11   Reserve in Boston.  What led you to Connecticut?

12   A.  Thank you.

13           MR. IHRIG:  Objection, Your Honor, relevance.

14           THE COURT:  Sustained.

15   BY MS. MOMOH:

16   Q.  Mr. Haller, besides your experiences at M&I, BMO,

17   Fiserv, and the Federal Reserve of Boston, were there any

18   other jobs that you've held in the banking industry?

19   A.  Well, I started out as a teller at a local bank that is

20   now part of -- oh, my gosh.  Anyway, I started out as a

21   teller when I -- my very first banking job was a teller

22   position.

23           THE COURT:  Members of the Jury, we will take our

24   midafternoon break now.  Please be ready to return to the

25   courtroom at 3:25.

1      (Jurors excused)

2                          **IN OPEN COURT**

3                       **(JURY NOT PRESENT)**

4              THE COURT:  We are in recess.  Let's get to the

5      substance --

6              MS. MOMOH:  Thank you, Your Honor.

7              THE COURT:  -- and be mindful of the jury's time.

8      (Recess taken at 3:12 p.m.)

9                      *    *    *    *    *

10     (3:30 p.m.)

11                          **IN OPEN COURT**

12                        **(JURY PRESENT)**

13             THE COURT:  Thank you.  You may be seated.

14             Counsel, you may proceed.

15             MS. MOMOH:  Thank you, Your Honor.

16             THE COURT:  You're welcome.

17     BY MS. MOMOH:

18     Q.  Mr. Haller, before the last break you were telling the

19     jury that you were also a bank teller and you had outlined

20     your various positions in the banking industry.

21             How many years in total have you been in the

22     banking industry?

23     A.  Well, it's been over 30 in total.

24     Q.  Let's shift -- I want to talk about training.  Turning

25     your attention to the time when you first joined M&I's Fraud

```
1    Detection Department, what sort of training did you receive

2    outside of the bank?

3    A.  M&I participated with an information-sharing group, with

4    an organization called the American Bankers Association.

5          This consisted of a group of financial

6    institutions that would share fraud experience, fraud loss,

7    fraud information with each other through this committee.

8    We met quarterly and shared information among that group.

9          I would say that there were probably 20 to 25

10   financial institutions that participated in that group and

11   it was various sizes of financial institutions, from some of

12   the largest down to more regional banks, like M&I Bank.

13         I also participated in annual conferences with a

14   group called BAI that had an annual fraud conference and I

15   participated -- attended and also participated in that -- in

16   those conferences annually for several years.

17   Q.  What was the purpose of you attending these sorts of

18   conferences?

19   A.  Well, you know, it was really to have shared experiences

20   with other people that had similar roles to mine and

21   understand what they were doing, what their experiences were

22   related to fraud detection and to -- how to combat it.

23         For example, there were some large financial

24   institutions, nationwide financial institutions, such as

25   Bank of America, Citigroup, Wells Fargo, others of that
```

```
 1    national status, and they had a different perspective

 2    because they had footprint across the country.  Being a

 3    regional bank and basically being in the Midwest, some of

 4    the fraud trends would occur on the coast and then migrate

 5    to the Midwest.  So they had a view of --

 6              MR. IHRIG:  Objection, Your Honor, this is an

 7    improper narrative.

 8              THE COURT:  Sustained.

 9    BY MS. MOMOH:

10    Q.  Mr. Haller, I will try to keep my directions -- my

11    questions and where I'm going tight.  Okay?

12    A.  Okay.

13    Q.  So you generally explained the purpose of you attending

14    these conferences.  Who typically attended these sorts of

15    conferences?

16    A.  People that had positions similar to myself.

17    Q.  Can you just name the categories of people who would

18    attend these sorts of conferences.

19              MR. IHRIG:  Objection, relevance.

20              THE COURT:  Sustained.

21              MS. MOMOH:  Your Honor, if I may --

22              THE COURT:  You may.

23              MS. MOMOH:  -- approach?

24        (At sidebar)

25              MS. MOMOH:  I'm going to be laying the foundation
```

1    if Your Honor would --

2              THE COURT:  I can hear you.

3              MS. MOMOH:  I have a loud voice, Your Honor.

4              THE COURT:  I don't want --

5              MS. MOMOH:  I know.  I'm sorry.  I have a loud

6    voice.

7              THE COURT:  We can hear you.

8              MS. MOMOH:  I know.  I have a loud voice.

9              But I'm trying to lay the --

10             THE COURT:  Lower your voice.

11             MS. MOMOH:  Even my kids say that that's loud, so

12   I'll try my best.

13             I'm trying to lay the proper foundation with

14   respect to Mr. Haller's training in the fraud detection

15   industry because I'm going to be asking him questions with

16   respect to how M&I was perceived in the industry by its

17   peers.

18             He just mentioned a few banks.  I want to -- I

19   want him to answer questions with respect to how M&I was

20   perceived in the industry with respect to its peers during

21   the 2002 to 2008 period with respect to its check monitoring

22   system and fraud detection system.

23             MR. IHRIG:  Two things, Your Honor.  That topic, I

24   believe, is irrelevant.  M&I's peer banks' perception of M&I

25   does not have anything to do with this case.  And, number

1    two, I don't believe that Mr. Haller could possibly have

2    foundation to testify about how another bank perceived M&I.

3            MS. MOMOH:  And, Your Honor, if I may, I'm trying

4    to lay the foundation as to how he would be able to have

5    observed others with respect to their perception of the

6    bank.

7            And here's why it's relevant, Your Honor.  Last

8    week, in the first few days of trial --

9            THE COURT:  Your voice is loud.

10           MS. MOMOH:  -- plaintiff showed several of the

11   bank's witnesses checks and the implications of what those

12   checks revealed.  Tom Haller is the only witness that was on

13   either party's witness list that can address those

14   questions.

15           Given the accusations that have been made in this

16   case, it's only fair for us to also put forth evidence with

17   respect to how M&I Bank was perceived in the banking

18   industry during the relevant period of time with respect to

19   its fraud detection practices.

20           THE COURT:  The objection is sustained.  That is

21   beyond the scope and likely to confuse the jury as to the

22   matter.

23           MS. MOMOH:  Yes.  Before we go, I have a question.

24           THE COURT:  Counsel?

25           MS. MOMOH:  There were documents that were

1    objected to earlier this morning in the 7:00 e-mail by

2    plaintiff's counsel, and the response that we received from

3    your clerk was that we were going to address those issues

4    live.

5              I also wanted to offer those documents into

6    evidence to get into the concept and the line of questions

7    with respect to what was the prevailing sort of fraud with

8    respect to checks that existed in the 2002 to 2008 period,

9    Your Honor.

10             Your Honor, if I may, I will connect the dots.  I

11   will be brief on this.  I understand you don't want me to go

12   into, you know, the details of conferences, but I do want to

13   go into the detail with respect to the -- what was

14   prevailing at the time with respect to check fraud detection

15   and what was being looked at and specifically what was not

16   being looked at during the 2002 and 2008 period.

17             And I do need a little bit of leeway, Your Honor,

18   to get to those questions.  Otherwise, I'm going to be

19   getting foundation objections throughout.

20             MR. IHRIG:  If I may just quickly, I believe what

21   counsel is describing is expert testimony.  Defense will be

22   able to put on their experts to speak to custom and

23   practice.  That is not what Mr. Haller is here to testify

24   to.  He's not been -- he does not have specialized

25   expertise.  He's not been approved as an expert in this

1    case.  And I would submit that it would be improper for him

2    to even testify to those items.

3              MS. MOMOH:  And, Your Honor, we're not putting him

4    forth as an expert.  He is simply a factual witness.  And

5    given his 30 years of experience in the banking industry, we

6    are simply trying to get him to testify based on what he

7    knows and what his observations are of others.

8              THE COURT:  The objection is sustained.

9         **(In open court)**

10   BY MS. MOMOH:

11   Q.  Mr. Haller, you testified previously as to conferences

12   that you attended during the 2002 to 2008 period.  Was money

13   laundering discussed at these conferences?

14   A.  No.

15   Q.  Was the subject of Ponzi schemes ever discussed during

16   the 2002 to 2008 period at these conferences?

17             MR. IHRIG:  Objection, relevance.

18             THE COURT:  Sustained.

19   BY MS. MOMOH:

20   Q.  Now, Mr. Haller, I may come back to certain topics, but

21   I want to focus on our discussion earlier with respect to

22   fraud detection not being a part of M&I's AML organizational

23   structure.  Okay?

24   A.  Okay.

25   Q.  You testified that from an organizational chart

1    standpoint, that your role as vice president of the Fraud

2    Detection Group at M&I and BMO was in the Corporate Security

3    Group?

4    A.  Yes.

5    Q.  What was the purpose of the Corporate Security Group

6    during the 2002 to 2008 period?

7             MR. IHRIG:  Objection, calls for speculation,

8    lacks foundation.

9             THE COURT:  Overruled.

10            THE WITNESS:  Well, there were three primary

11   focuses for the Corporate Security Group, one being fraud

12   detection, the other being physical security, and the third

13   being cyber security.

14   BY MS. MOMOH:

15   Q.  Let's just focus on fraud detection.  What was the focus

16   of the Fraud Detection Group specifically during the 2002 to

17   2008 period?

18   A.  We were specifically tasked to identify fraudulent

19   activity as it related to check fraud, specifically checks

20   drawn on M&I accounts, checks deposited to M&I accounts, and

21   check kiting activity.

22   Q.  What was the mandate -- if your group had a mandate,

23   what was the mandate of the Fraud Detection Group during the

24   2002 to 2008 period?

25   A.  It was to identify counterfeit activity and maximize our

1    loss avoidance, minimize losses for the corp and its

2    customers.

3    Q.  Was there any sort of overlap between the Corporate

4    Securities Group and the Bank Secrecy Act/AML Monitoring

5    Group during the 2002 to 2008 period?

6              MR. IHRIG:  Objection, calls for speculation,

7    lacks foundation as to the AML Group.

8              THE COURT:  Sustained.

9    BY MS. MOMOH:

10   Q.  Mr. Haller, you testified that your role in 2002 to 2008

11   was in the Corporate Securities Group, yes?

12   A.  Yes.

13   Q.  But did you have any interaction with the AML Monitoring

14   Group during that period of time?

15   A.  Not on a day-to-day basis.

16   Q.  Not on a day-to-day basis, but did you have any

17   interaction with that group at all?

18   A.  Yes.

19   Q.  And how so?

20   A.  I guess two things.  One is that as a part of corporate

21   awareness I was -- I participated in monthly or bi-monthly

22   meetings with the AML Group.  The other aspect is that

23   confirmed fraudulent activity would be escalated through the

24   Corporate Security Group for SAR filing.

25   Q.  Focussing still on the Fraud Detection Group during the

1    relevant time period of 2002 to 2008, was money laundering

2    monitoring part of the work of that group during that time?

3    A.  Part of which group?

4    Q.  The Fraud Detection Group.

5    A.  No, it was not.

6    Q.  What about now, is money laundering a part of the Fraud

7    Detection Group?

8              MR. IHRIG:  Objection, relevance.

9              THE COURT:  Sustained.

10   BY MS. MOMOH:

11   Q.  Focusing on the relevant period of 2002 to 2008, how

12   did -- based on what you just testified, how did the Fraud

13   Detection Group and the AML Monitoring Group interact?

14   A.  Well, they did not on a regular basis, but there were

15   Suspicious Activity Reports that needed to be filed.  We

16   would submit our information to the Corporate Security Team

17   and they would meet with the AML Group for SAR filing.

18   Q.  Again, we're still talking about the 2002 to 2008

19   period.  Did you or anyone in your Fraud Detection Group use

20   the word quote, unquote, alert in your --

21             MR. IHRIG:  Objection.  Sorry.

22             MS. MOMOH:  Your Honor, if I may finish my

23   question?

24             THE COURT:  You may finish your question.

25             MS. MOMOH:  Thank you.

1    BY MS. MOMOH:

2    Q.  I'm going to restart, Mr. Haller.  Again, we're talking

3    about the 2002 to 2008 period.  Did you or anyone in your

4    group ever use the word quote, unquote, alert in your fraud

5    detection practice?

6              MR. IHRIG:  Objection, calls for speculation as to

7    other people in the witness's group.

8              THE COURT:  Sustained.

9    BY MS. MOMOH:

10   Q.  Just focusing on you, during the period of time 2002 to

11   2008, did you ever use the word "alert" in your fraud

12   detection practice?

13   A.  Our standard word was a suspect.

14   Q.  Why would you use the word "suspect"?

15   A.  Well, it was a part of the naming convention with the

16   reports that we used related to the fraud detection tools

17   and it was not confirmed fraud, but it was a suspect at that

18   point.

19   Q.  You were -- so you were talking about your role as vice

20   president of fraud detection during this relevant period.

21              Thinking about the wire side now, who would have

22   been your counterpart on the wire side?

23   A.  There's a gentleman by the name of Ray Neufeldt that ran

24   the wire department for M&I.

25   Q.  Please tell the jurors.  Who is Ray Neufeldt?

1    A.  Ray Neufeldt is -- was an M&I employee and he ran the

2    wire department.

3    Q.  In which instances would you interact with Mr. Neufeldt?

4    A.  It was not often that I interacted with Mr. Neufeldt,

5    but there might be times related to online fraud where we

6    would interact.

7    Q.  During the 2002 to 2008 period what would happen if

8    fraud activity was detected in a customer's account at M&I?

9    A.  Well, the first thing would be to mitigate the exposure

10   to the account and return any transactions that were

11   eligible for return.  Then there would be the standard

12   reporting.  And we would look to put a long-term solution in

13   place for the customer and their accounts.

14   Q.  Would be the example of mitigating the exposure to the

15   account?

16   A.  We could put protective status on the account.  If it

17   was a check that -- a counterfeit check that posted to the

18   customer's account, we would return that check back to the

19   bank of first deposit and credit the customer's account for

20   the debit for that counterfeit activity.

21   Q.  Are you familiar with what would have been called the

22   Exceptions Department at M&I?

23   A.  Yes.

24   Q.  What is the Exceptions Department?

25   A.  The Exceptions Department is a back office group that

1    handles -- "day two" is a typical word for that -- back

2    office transaction activity for a bank.

3    Q.  Was the Fraud Detection Department in the Exceptions

4    Department?

5    A.  No.  We were separate.

6    Q.  What did the Fraud Detection Department do that the

7    Exceptions Department did not do in this relevant period

8    that we've been talking about?

9    A.  Well, the Fraud Detection Department was specifically

10   tasked with identifying counterfeit activity.  The

11   Exceptions Department did more standard day two activity,

12   standard payment processing activity for the bank.

13   Q.  You're saying day two processes.  What do you mean?

14   A.  So there is a transaction posting process to customer

15   accounts, and then there is activity that would happen after

16   posting.

17           For example, if a check posted to a customer's

18   account and there was a stop payment on that check, it would

19   post to the customer's account on day one and it would be

20   returned via the stop pay process the following day.

21   Q.  Did either department have in their purview specific

22   procedures for large dollar checks?

23   A.  Yes.

24   Q.  What would be a large dollar designation?

25   A.  M&I had that at $50,000.

1    Q.  What would be the process for the Exceptions Department

2    to review a large dollar check?

3    A.  They would look to see if the item was properly payable,

4    meaning that there was a payee named, that there was a

5    customer signature on the check, that the check beared an

6    endorsement.  Those were the attributes of a large dollar

7    check.  And then also that there were funds in the account

8    to pay for that item.

9    Q.  Same period of time we've been talking about, 2002 to

10   2008.  What were your observations of the bank's support of

11   risk management?  To be clear, I'm not asking you what did

12   management at M&I say during this time with respect to risk

13   management, but I'm asking you about your view from the top.

14   What were your observations of managers with respect to risk

15   management?

16   A.  With my activity --

17             MR. IHRIG:  Objection, relevance.

18             THE COURT:  Overruled.

19             THE WITNESS:  Okay.  From my involvement, my

20   superiors were very supportive of the activities that we

21   did.  Not only were they spending money on people and

22   software and processes, but there was an attitude throughout

23   the bank that we were totally against fraud.  We were very

24   aggressive against it when -- and took a firm stance.  We

25   wanted to identify small frauds, not just big ones, because

1    small frauds --

2             MR. IHRIG:  I'm sorry, Your Honor.  Objection,

3    this is an improper narrative.

4             THE COURT:  Sustained.

5    BY MS. MOMOH:

6    Q.  Mr. Haller, with respect to my question about your

7    observations of managers, just so that we can have it clear

8    for the record because I'm not quite sure with respect to

9    the objection, succinctly, briefly, what were your

10   observations of managers with respect to risk management?

11   A.  They were very supportive of our efforts.

12   Q.  How did you try to share those observations that you

13   just shared with us with the employees that you supervised

14   when you were the vice president of fraud detection?

15   A.  I'm sorry.  I don't know that I understand the question.

16   Q.  Sure.  So you just shared your observations of

17   management at M&I with respect to risk management.  What I'm

18   asking you is:  How did you share your observations with

19   those that you supervised and managed during the period of

20   2002 to 2008?

21   A.  Well, I carried that message of support to my employees,

22   knowing that they had the backing and the support of

23   executive management.

24             There were policies and procedures that were

25   active that were very supportive to my team, as well as the

1   financial expenditures that were being made in order to

2   support the activities that my team did.

3   Q.  Were you ever asked to not escalate a check for further

4   review at any time?

5   A.  Never.

6   Q.  Did analysts in the Fraud Detection Group ever give my

7   sort of special treatment to accounts or customers based on

8   the customer's perceived status in the bank?

9          MR. IHRIG:  Objection, calls for speculation,

10  lacks foundation.

11         THE COURT:  Sustained.

12  BY MS. MOMOH:

13  Q.  Mr. Haller, did you ever give any sort of special

14  treatment to accounts or customers based on the customer's

15  perceived status in the bank?

16  A.  No.

17         MR. IHRIG:  Objection, relevance.

18         THE COURT:  Overruled.

19         THE WITNESS:  No, I did not.

20  BY MS. MOMOH:

21  Q.  Same question, but this time with respect to special

22  treatment based on a customer's perceived public profile or

23  celebrity status in the community.  Did you ever give

24  special treatment to accounts or customers under those

25  circumstances?

1    A.  I did not.

2    Q.  How did M&I try to ensure that a fresh set of eyes of

3    those on your team were looking at customer accounts with

4    the bank?

5            MR. IHRIG:  Objection, calls for speculation to

6    the extent it asks for testimony from M&I's point of view.

7            THE COURT:  Sustained.

8    BY MS. MOMOH:

9    Q.  Mr. Haller, if you know, how did M&I try to ensure that

10   employees in the Fraud Detection Group had fresh eyes on the

11   accounts they were reviewing?

12           MR. IHRIG:  Same objection, calls for speculation.

13           THE COURT:  Sustained.

14   BY MS. MOMOH:

15   Q.  Mr. Haller, do you know if M&I tried to ensure that

16   there were fresh eyes from your employees looking at

17   accounts at the bank?

18           MR. IHRIG:  Same objection, calls for speculation.

19           THE COURT:  Sustained.

20   BY MS. MOMOH:

21   Q.  Mr. Haller, what sort of suspicious activity is

22   implicated by check fraud?

23   A.  The number one activity is counterfeit activity.

24   Q.  By "counterfeit," what do you mean?

25   A.  This is a wholly manufactured document not authorized by

Haller - Direct

1    the accountholder and presented for payment.  That was the

2    most significant of all the activity.

3           Other fraud types are altered items, where a

4    legitimate check is written by a customer but either the

5    payee or the amount of the check is changed.  So the check

6    may be payable to Tom Haller, and I get it and I change it

7    to Mickey Mouse and try to collect on that check; or the

8    check was written for $100, but I change it to $1,000 and

9    present that check for payment.

10          Altered and counterfeit --

11          MR. IHRIG:  I'm sorry, Your Honor.  This is

12   another improper narrative.

13          THE COURT:  Overruled.

14   BY MS. MOMOH:

15   Q.  You may complete your answer, Mr. Haller.

16   A.  Altered and counterfeit were the two large transaction

17   types of fraud.

18   Q.  Did the focus on counterfeit change after September 11?

19   A.  Yes, it did.

20   Q.  And -- but before you explain how, just so we're all on

21   the same page, what happened on September 11?

22   A.  It was the Twin Tower attacks.

23   Q.  How, then, did the focus change from counterfeit to

24   something else after September 11?

25   A.  One of the things that happened after September 11th was

1    that all planes were grounded.  Checks -- physical checks

2    had to travel from one place to another in order be paid,

3    and as a result those checks sat.  They did not move from

4    one to another.

5            This created a risk to financial institutions

6    across the country, where items were taken in on deposit but

7    they could not be collected.  So we didn't know if those

8    checks were good or not.  This was a systemic risk to the

9    banking system.

10           And there were two initiatives really that came

11   out of that.  One was image -- check image processing.  So

12   you could take a picture of the check and send that for

13   payment as opposed to the physical document, and you could

14   send the picture electronically.  The other thing was an

15   expanded focus on online banking, so banking via the

16   internet for qualified customers.

17   Q.  Why did that become a focus -- let me back up.  You said

18   that there was a shift in focus also to online banking.

19   When was that shift to online banking?

20   A.  Well, I think that it was --

21           MR. IHRIG:  Objection, relevance.

22           THE COURT:  Sustained.

23           MS. MOMOH:  Your Honor, if I may?

24           THE COURT:  You may come to sidebar.

25           MS. MOMOH:  Thank you.

1           **(At sidebar)**

2                   THE COURT:  Relevance?

3                   MS. MOMOH:  I think they're proving my point with

4       respect to their objections here.  With respect to the PCI

5       account, there was no --

6                   THE COURT:  Speak closer to me.

7                   MS. MOMOH:  There was no issue with respect to

8       online banking.  There was no issue with respect to

9       counterfeit.  And that's what the bank was focused on at

10      that time, as were other peers.

11              I'm trying to make the connection, Your Honor, if

12      you would allow me to do so, that, again, Ponzi schemes, not

13      only were they not only a focus with respect to AML during

14      the relevant period of 2004 to 2008, it wasn't even a focus

15      with respect to the check fraud industry during the 2002 to

16      2008 period.

17                  MR. IHRIG:  Your Honor, if I might, this is all

18      irrelevant.  We are hearing about September 11th now and

19      systemic risks to the banking industry, and I don't see how

20      this even approaches anything that's relevant to this case.

21                  MS. MOMOH:  Your Honor, one of our key themes in

22      this case is hindsight bias.  And it's important for the

23      jurors to understand that there have been changes and

24      evolutions within the banking industry, not only with

25      respect to AML and money laundering, but also with respect

1    to the check industry.

2              Again, plaintiff showed several of the AML

3    witnesses checks that they were not in their purview to

4    review as far as Searchspace.  Now we have an actual witness

5    that can respond to questions with respect to how the bank

6    reviewed and treated checks as part of its check fraud

7    monitoring system.

8              MR. IHRIG:  Your Honor, plaintiffs show checks to

9    people with percipient knowledge.  At the time these events

10   occurred, Mr. Haller has already testified that he had no

11   interaction with this account during the relevant period of

12   time.

13             MS. MOMOH:  Your Honor, he has not -- for purposes

14   of trial, he has not testified to that whatsoever with

15   respect to any of my questions.  I'm not sure what Mr. Ihrig

16   is referring to.

17             THE COURT:  I don't see the relevance of this line

18   of questioning and I think it's likely to confuse the jury

19   and to waste time.

20             MS. MOMOH:  Your Honor, I -- again, he is the only

21   check witness that either side has called in this case.  I

22   ask for leeway, Your Honor, to ask my questions.  You will

23   see the connection that I am making.

24             THE COURT:  I need to see the connection in the

25   next question because I am evaluating the questions you're

```
1    asking, and they show no relevance.

2              MS. MOMOH:  Understood, Your Honor.  Thank you.

3              THE COURT:  The objection is sustained.

4              MS. MOMOH:  But you said I can continue to ask my

5    questions, though?

6              THE COURT:  Yes, one question.  The next question

7    needs to be relevant.

8         (In open court)

9    BY MS. MOMOH:

10   Q.  Mr. Haller, I want to talk about the Carraker fraud

11   system that you had mentioned as one of the -- the software

12   that you helped to implement at M&I.  Okay?

13   A.  Yes.

14   Q.  My understanding is that the Carraker fraud system has

15   three components?

16   A.  There were three, yes, software, yes.

17   Q.  What are those three components of the Carraker fraud

18   system?

19   A.  Are you talking about the applications that we installed

20   or the On-Us fraud system specifically?

21   Q.  Let's start with the former part that you had just

22   mentioned.

23   A.  Okay.  So there were --

24   Q.  And, Mr. Haller, at this point I'm just asking you to

25   identify the three different Carraker fraud systems that
```

1    were in place in 2002 to 2008.

2    A.  It was Carraker --

3              THE COURT:  Is this specific to the bank?

4              MS. MOMOH:  This is specific to the bank, M&I,

5    yes, Your Honor.

6              THE WITNESS:  It was Carraker On-Us, Carraker

7    Deposit, and Carraker Kite.

8    BY MS. MOMOH:

9    Q.  I want to just focus on the On-Us fraud system with

10   respect to Carraker.  From when to when has the bank,

11   whether M&I or now BMO, used the On-Us fraud system?

12             MR. IHRIG:  Objection, relevance as to any time

13   after 2008.

14             THE COURT:  Sustained.

15             MS. MOMOH:  Your Honor, if I may ask -- if I may

16   briefly, I'm simply asking him for a timestamp with respect

17   to when the fraud system has been used and I think it would

18   be relevant, if it's still presently used, for him to state

19   that; and if not, he can tell me a year that it ended in

20   use.

21             THE COURT:  Sustained.

22   BY MS. MOMOH:

23   Q.  Mr. Haller, when did M&I start using the On-Us fraud

24   system?

25   A.  I believe it was 2002.

1    Q.  Is M&I -- is BMO still using the same system?

2              MR. IHRIG:  Objection, relevance.

3              THE COURT:  Sustained.

4    BY MS. MOMOH:

5    Q.  Mr. Haller, during the two thousand -- I believe you

6    said 1999 is when the bank started using --

7              MR. IHRIG:  Objection, misstates the testimony.

8    BY MS. MOMOH:

9    Q.  I'm sorry.  Let me back up.  I believe you said it was

10   2002, correct?

11   A.  Yes.

12   Q.  Okay.  So from 2002 -- just focusing on the relevant

13   period of time at least.  So at least during the relevant

14   period of 2002 to 2008, was M&I using the On-Us Carraker

15   fraud system?

16   A.  Yes.

17   Q.  What is the On-Us fraud system?

18   A.  It is a software tool designed to identify anomalies in

19   M&I bank accounts related to check activity.

20   Q.  For purposes of the On-Us Carraker fraud system, what

21   question would M&I have been trying to answer during the

22   2002 to 2008 period?

23             MR. IHRIG:  Objection, calls for speculation,

24   lacks foundation as to M&I's point of view.

25             THE COURT:  Overruled.  You may answer if you

Haller - Direct

1    know.

2              THE WITNESS:  The objective was to identify

3    unauthorized activity and eliminate that risk from

4    counterfeit activity.

5    BY MS. MOMOH:

6    Q.  What do you mean by "unauthorized activity"?

7    A.  Meaning that we were looking to identify checks that

8    were not authorized by the customer, that the customer did

9    not write.

10   Q.  With that understanding for purposes of the On-Us

11   Carraker fraud system, what is check fraud?

12   A.  Check fraud is activity not authorized by the customer.

13   Q.  What are some examples of activity that would not be

14   authorized by the customer of the bank?

15   A.  Well, any check that posts to a customer's account that

16   they didn't write, a wholly manufactured counterfeit check

17   that was created by a third party and presented for payment.

18   Q.  What components make up the On-Us fraud system?

19   A.  There are three components to make this work.

20             The first one is account history.  There's 90 days

21   of check history in the filter.  This is important because

22   it allows the system to normalize at the account level.

23             The second are the rules --

24   Q.  So what -- so let's break it down.

25   A.  All right.

Haller - Direct

1    Q.   So you identified the first filter, which is history?

2    A.   Yes.

3    Q.   What's the second filter?

4    A.   The parameter settings.

5    Q.   What are the parameter filters?

6    A.   So these are the rules that would be used to help guide

7    the system to determine out-of-tolerance transactions.

8    Q.   What are out-of-tolerance transactions?

9    A.   Something out of norm for the account --

10   Q.   What --

11   A.   -- something that was unusual for the 90-day account

12   history.

13   Q.   Please provide examples.  What would be, again, out of

14   tolerance?

15   A.   Okay.  So it could be the number of checks that have

16   posted.  It could be the dollar amount of the check that is

17   posted.  It could be the serial number of a check that

18   posted.  Where the active range is, let's say, in the 1000

19   range and a check posts that has a serial number of 5000,

20   that would be out of tolerance for typical activity in the

21   account.

22   Q.   Those are examples of parameters?

23   A.   Yes.

24   Q.   What's the third filter in the On-Us fraud system?

25   A.   The third component is today's transactions, the checks

Haller - Direct

```
1    that posted to the customer's account today.
2    Q.  How do these filters operate with each other, if at all?
3    A.  So today's transactions are added to the software and
4    the software analyzes them compared to historical activity
5    through the lens of the parameter settings within the
6    system.
7    Q.  What is the On-Us Flag Report?
8    A.  It's the On-Us Suspect Report.
9    Q.  What is that?
10   A.  That is a list of the items that were identified by the
11   software as being out of tolerance with historical activity
12   for the account.
13   Q.  How frequently were the On-Us Suspect Reports generated?
14   A.  They were generated daily.
15   Q.  How many analysts were assigned to review the On-Us
16   Suspect Reports?
17   A.  I don't know exactly, but approximately a dozen or so.
18   Q.  During the 2002 to 2008 period, why was this level of
19   review being done on checks?
20   A.  Check fraud was increasing dramatically during that time
21   frame.  There were many scams that were being operated and
22   the numbers of counterfeit checks was growing across the
23   country.
24   Q.  Once a check is reviewed, what sort of decision would an
25   analyst make with respect to whether -- given the various
```

Haller - Direct

1    filters that are applied, how the check would be treated?

2    A.  If I understand your question correctly, an item on the

3    suspect report would be reviewed.

4         There would be information that would be provided

5    by the software, the reason why this item is identified for

6    review; some account history information, such as the

7    account number, the name, other historical information about

8    the account.

9         The analysts would look at the physical document,

10   looking at the color, the maker information, all of the

11   physical attributes of a check and compare that item to

12   historical items that have paid against the account.

13        Should they deem this of concern, they could raise

14   that to their supervisor and/or escalate to the account

15   officer to have them weigh in, including escalation to the

16   customer for that pay/no pay decision.

17   Q.  So that was my question.  The decision after a check is

18   reviewed could be one or the other.  What are the two

19   options with respect to a decision that could be made on a

20   check after it's reviewed?

21   A.  Either it would stay as a paid item or it would be

22   returned.

23   Q.  You testified that as part of the review that maker

24   information was considered.  Did you mean to say "maker

25   information"?

```
 1    A.  Maker.

 2    Q.  What's that?

 3    A.  That's the customer information, the accountholder

 4    information.

 5    Q.  During the 2002 to 2008 period, what, if anything, would

 6    have led to the parameters evolving?

 7              MR. IHRIG:  Objection, calls for speculation.

 8              THE COURT:  Overruled.  You may answer if you can.

 9              THE WITNESS:  Check fraud evolved over time.  We

10    would learn through our own experience and that of -- with

11    other peer financial institutions about trends that they

12    were seeing and -- as well as losses that we may have

13    sustained, meaning a check that we had missed and didn't

14    properly identify as a counterfeit check.

15              This transaction activity would change over time,

16    and we would address the fraud parameters in order to better

17    address the fraudulent activity that we were seeing.

18    BY MS. MOMOH:

19    Q.  What would happen if under the On-Us fraud system a

20    check was deemed a suspect?

21    A.  That item would show up on the report and an analyst

22    would review that document.  That check would be reviewed

23    for the physical nature of the check as well as account

24    history and make an evaluation to whether they had any

25    concerns or that they could remedy any discrepancy that was
```

1    identified by the fraud filter.

2    Q.  So even if a check was identified as a suspect, the

3    decision could still be to pay?

4    A.  The vast majority of the decisions that were made

5    with -- in regard to the On-Us system was to pay.

6    Q.  What if a check was not escalated for further review, in

7    other words, it wasn't deemed to be a suspect, would that

8    check get to the AML Monitoring Group for review?

9            MR. IHRIG:  Objection, calls for speculation,

10   lacks foundation.

11           THE COURT:  Sustained.

12   BY MS. MOMOH:

13   Q.  Mr. Haller, do you know what would happen if -- just in

14   the absence of a particular check, just generally as a

15   matter of process, do you know what would happen if a check

16   was not escalated for further review because it wasn't

17   deemed a suspect?

18           MR. IHRIG:  Objection, improper hypothetical,

19   improper opinion testimony, relevance.

20           THE COURT:  Overruled.

21           THE WITNESS:  That item would be paid.

22   BY MS. MOMOH:

23   Q.  Was the Carraker system intended to uncover a Ponzi

24   scheme?

25   A.  It was not.

```
 1                  MR. IHRIG:  Objection, lacks foundation, calls for

 2    speculation.

 3                  THE COURT:  Sustained.

 4    BY MS. MOMOH:

 5    Q.  Mr. Haller, you testified that you implemented the

 6    Carraker system at M&I around 2002, correct?

 7    A.  Yes.

 8    Q.  When you implemented the Carraker system at M&I, was it

 9    for purposes of uncovering a Ponzi scheme?

10    A.  It was not.

11    Q.  Throughout your time in the Fraud Detection Group until

12    2008, was that ever the purpose of the Carraker system, to

13    uncover a Ponzi scheme?

14    A.  It was not.

15    Q.  Mr. Haller, I want to apply some of the principles that

16    we've just been talking about.

17                  Let's start with parameters.  We talked about the

18    On-Us filters generally and the parameters specifically.

19    What are round number amounts on a check?

20    A.  A round dollar amount is typically where an item ends in

21    zeros, dollars and cents.

22    Q.  Would that constitute a parameter?

23    A.  There was not a parameter for round dollar checks in the

24    On-Us system.

25    Q.  So if a check had round dollar amounts, would that
```

1    constitute a check that would need to be escalated for

2    further review?

3             MR. IHRIG:  Objection, calls for speculation.

4             THE COURT:  Overruled.

5             THE WITNESS:  It would not.

6    BY MS. MOMOH:

7    Q.  On its own would a round number check be suspicious?

8    A.  It would not.

9    Q.  What is an example of a duplicate check?

10   A.  A duplicate check number would be where a customer has

11   presented two items on the same account with the same check

12   number.

13   Q.  Using that example, what would be the decision -- the

14   disposition of that sort of check?

15   A.  If there was no information available, that item would

16   be generally escalated to the account officer and

17   potentially to the customer to ask them whether they

18   authorized this particular document.

19   Q.  And if the customer authorized that check?

20   A.  That item would be paid.

21   Q.  Let's talk about memo lines on a check.  What's the

22   purpose of a memo line on a check?

23   A.  Well, it could be many things.  It's basically a note

24   from the maker of the check relative to purpose.

25   Q.  How, if at all -- I'll try to ask my question very

1  carefully.  Okay?

2  A.  Okay.

3  Q.  So how, if at all, would a memo line on a check be

4  considered for purposes of the On-Us fraud system?

5  A.  It would not be part of the consideration to be a -- to

6  be flagged as a suspect.

7  Q.  Why do you say that?

8  A.  Because there was no interrogation of the writing

9  associated with the check.  The Carraker system used the

10  transaction information based on what's called the MICR

11  line, which is the funny numbers that you see on the bottom

12  of checks.  It has the routing number, the account number,

13  the check number, and the dollar amount.

14  Q.  If the memo line on a check is blank, would that check

15  be deemed a suspect?

16  A.  No.

17  Q.  Would the check need to be escalated for further review

18  simply because the memo line was blank?

19  A.  No.  It's most often blank.

20  Q.  What if the check had in the memo line "Disney on Ice

21  tickets," would that check be a suspect?

22          MR. IHRIG:  Objection, calls for speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  On its own, no.

25  BY MS. MOMOH:

Haller - Direct

1    Q.  What if a check had on the memo line that the purpose of

2    the check was to build a home, would that check be a

3    suspect?

4    A.  No.

5    Q.  What if the check had on the memo line it was for a

6    loan, would that check be a suspect?

7    A.  No.

8    Q.  Are you familiar with the concept of dual signatures on

9    a check?

10   A.  Yes.

11   Q.  Explain to the jurors, please, what dual signatures on a

12   check means.

13   A.  Dual signature is a customer initiative whereby there

14   would be a dual control at the company for payments that

15   were being created, for example, like a check and balance

16   for the payments.  And it would typically be for larger

17   dollar payments.  So it would be one person writes the check

18   and a second person signs off on the check, so to speak,

19   prior to sending the check to the intended payee.

20   Q.  This concept that we've been talking about, dual

21   signatures, was this a service that was offered by M&I

22   during the period of 2002 to 2008?

23   A.  No, it was not really a service that was provided.  That

24   was a customer-initiated protocol that they would use.

25   Q.  Would you call that a control set by the customer, then?

Haller - Direct

1    A.  Yes.

2    Q.  What can you tell me about this control?

3    A.  So, again, it would be a process where it wouldn't just

4    be the one person that wrote the check, but a second person

5    would review the payment, make sure the payment was correct,

6    that the amount was correct.  And that process would happen

7    prior to sending that check to the intended recipient.

8    Q.  Let's say we have a check and there's two lines for a

9    signature.  There's only one signature on the check.  Would

10   the fact that there's only one signature on the check make

11   that check unpayable from the bank's perspective?

12   A.  It would not.

13   Q.  Why do you say that?

14   A.  The one signature is an authorized signature that would

15   make the item payable.

16   Q.  Is it a requirement -- well, just focus on the 2002 to

17   2008 period.  Was it a requirement of M&I to pay an item

18   only if the check had two signatures?

19   A.  No.

20          MS. MOMOH:  Mr. Herzka, if you can put up what's

21   been admitted as Plaintiff's Exhibit P-33.

22   BY MS. MOMOH:

23   Q.  Mr. Haller, you can look in your binder there.  You'll

24   see a tab that says P-33.  If you don't mind turning to that

25   document, please, and reviewing it before I ask you some

1    questions about it.

2    A.  This is quite a binder.

3    Q.  What is it that you're looking at?

4    A.  It appears to be a National City Bank signature card.

5    Q.  What's the account number that you see at the top?

6           MS. MOMOH:  Mr. Herzka, if you could highlight

7    that, please.

8           THE WITNESS:  ████9018.

9    BY MS. MOMOH:

10   Q.  Who's the customer associated with this account?

11   A.  Petters Company.

12   Q.  What's the address that you see on this document?

13   A.  7585 Equitable Drive, Eden Prairie, Minnesota 55344.

14   Q.  If I were to represent to you that what we are looking

15   at here is the signature card for the PCI account at M&I

16   that began initially at National City Bank, would you have

17   any reason to disagree with me?

18   A.  No.

19   Q.  Do you see where it says, "Number of Signatures

20   Required:  2 ON CHECKS OVER $5,000"?

21   A.  Yes.

22   Q.  And, Mr. Herzka [sic], I will direct your attention to

23   the screen as well because I know the document is difficult

24   to read.

25           Mr. Haller, if you turn your attention to the

1    monitor in front of you, you see that the language is blown

2    out for you there --

3    A.  Yes.

4    Q.  -- for you to see, correct?

5    A.  Yes.

6    Q.  Where it says, "Number of Signatures Required:  2 ON

7    CHECKS OVER $5,000," is that the dual signature that we've

8    been talking about generally?

9    A.  Yes, I assume so.

10   Q.  Who are the two signatures that are -- who are the two

11   authorized signers for the PCI account?

12   A.  Thomas Petters and Deanna Munson.

13          MS. MOMOH:  Mr. Herzka, if you can put up

14   Plaintiff's Exhibit 53 [sic] at page 9 and page 76 side by

15   side, please.  Mr. Herzka, Exhibit 57, please, page 9 and

16   76, please, side by side.  Do you mind calling out,

17   Mr. Herzka, the two checks.

18   BY MS. MOMOH:

19   Q.  Mr. Haller, I'm showing you for illustration purposes --

20   to put what you've already told us in context, I'm showing

21   you two pages from Exhibit P-57.  This is Plaintiff's

22   Exhibit.

23          Looking at the first check that's on page 9, who's

24   the payor?

25   A.  Petters Company -- Petters Company, Inc.

Haller - Direct

```
1    Q.  Petters Company, Inc., PCI.  And that's the same payor

2    that you see on the second check at page 76?

3    A.  The one on the right?

4    Q.  Correct.

5    A.  Yes.

6            MS. MOMOH:  Mr. Herzka, if you don't mind

7    highlighting the information as yellow as we proceed.

8    BY MS. MOMOH:

9    Q.  Who's the payee on both checks?

10   A.  Deanna L. Munson.  Deanna Munson on the other.

11   Q.  Do you see the account number for these two checks that

12   we're looking at on Plaintiff's Exhibit 57?

13   A.  Yes.

14   Q.  What are the account numbers?

15   A.  ███9018.

16   Q.  They're the same?

17   A.  Yes.

18   Q.  Let's look at the signatures.  Let's look at the one on

19   the left at page 9.  How many signatures do you see there?

20   A.  One.

21   Q.  Whose signature is that?

22   A.  Deanna Munson.

23   Q.  Let's look at the second check on page 76.  How many

24   signatures do we see?

25   A.  Two.
```

1    Q.  What could explain why we're seeing two signatures on a

2    check on the one on the right, page 76, compared to only one

3    signature on the left on page 9 of Plaintiff's Exhibit 57?

4             MR. IHRIG:  Objection, calls for speculation.

5             THE COURT:  Overruled.

6             THE WITNESS:  It appears as though there's two

7    different check stocks that are being used for this

8    particular account.

9    BY MS. MOMOH:

10   Q.  How do you know that?

11   A.  Well, one of them has one line for the signature.  The

12   other has two lines for the signature.

13             Also, there's M&I -- or, I'm sorry, M&I Marshall &

14   Ilsley Bank check on the right below the payee, and that is

15   not the same -- in the same location as the one that is on

16   the left.

17             There also appears to be two different addresses

18   that are being used by Petters Company in the maker block in

19   that upper left that's being highlighted right now.

20   Q.  Now, you mentioned that, looking at these two checks,

21   that it appears that they were on different check stock.

22   What's the significance of that?

23   A.  Well, that the customer is using two different active

24   check stocks on this particular account, at least two.

25   Q.  Again, just for illustration purposes, we're talking

Haller - Direct

```
 1    about this concept of dual signatures.  Comparing these two
 2    checks, especially the one on the left where there's only
 3    one signature, based on what you see and based on the
 4    signature card that you saw, what would have been the
 5    disposition of that check, in other words, what would have
 6    been the decision with respect to payment on that check?
 7              MR. IHRIG:  Objection, lacks foundation, calls for
 8    speculation.
 9              THE COURT:  Sustained.
10    BY MS. MOMOH:
11    Q.  Mr. Haller, just for illustration purposes, then, we've
12    been talking about generalities with respect to the
13    signature cards and whether a customer has asked for a
14    control that there be two signatures put on a check.
15              Looking at what we have here on the left, if there
16    was that check with just that one signature, when you saw
17    the signature card that said that there were two signatures,
18    what would be the decision on that check with respect to
19    payment?
20              MR. IHRIG:  Objection, lacks foundation, calls for
21    speculation, relevance, compound, assumes facts not in
22    evidence.
23              MS. MOMOH:  Your Honor, I'm just asking for
24    illustration purposes.
25              THE COURT:  Relevance.  Sustained.
```

1    BY MS. MOMOH:

2    Q.  Mr. Haller, you mentioned that there were two different

3    addresses on these two checks.

4    A.  Yes.

5         MS. MOMOH:  Mr. Herzka, if you could call out both

6    of those, please, and if you can make them larger, the

7    addresses, please.

8    BY MS. MOMOH:

9    Q.  What are the two addresses that you see here?

10   A.  The one on the top I believe says, "7586 Equitable

11   Drive, Eden Prairie, Minnesota, 55344."

12   Q.  The same address that was on the signature card that we

13   looked at at Exhibit P-33?

14   A.  I believe that's correct.

15   Q.  What is the address that you see on the second check?

16   A.  4400 Baker Road, Minnetonka, Minnesota, 55343-8684.

17   Q.  Mr. Haller, have you observed instances where a customer

18   has written checks from the same account during the same

19   period but the two checks bear different addresses?

20        MR. IHRIG:  Objection, relevance, calls for

21   speculation.

22        THE COURT:  Overruled.  You may answer if you can.

23        THE WITNESS:  Sure, it's very common.

24   BY MS. MOMOH:

25   Q.  What were the circumstances?

1    A.  So it could be that there were two different offices

2    associated with the same company, two different locations.

3    Each office may have their own series of checks that they

4    would use in the normal course of their business.

5    Q.  Again, the fact that the two checks have different

6    addresses for the same customer, would that make either

7    check a suspect?

8    A.  No.

9            MS. MOMOH:  Mr. Herzka, you can take those down,

10   please.

11   BY MS. MOMOH:

12   Q.  Mr. Haller, do you know what a general business

13   operating account is?

14   A.  Yes.

15   Q.  Do you know what a trust account is?

16   A.  Yes.

17   Q.  What is a general business operating account?

18   A.  An operating account for a business would be an account

19   used to pay and receive funds associated with the going

20   concern of the business.

21   Q.  What's a trust account?

22   A.  A trust --

23            MR. IHRIG:  Objection, foundation, relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  A trust account is an account that

1    has been set up for a specific purpose generally involving a

2    third party.

3    BY MS. MOMOH:

4    Q.  What's the different between the two?

5    A.  Well, a general operating account would be one that

6    would be used, again, for any purpose that the business

7    deemed as appropriate for that business account.

8              A trust account is one that is set up specifically

9    for an individual for a specific purpose, whatever that

10   purpose might be.

11   Q.  If I were to tell you that PCI had a general business

12   operating account at M&I during the relevant period of 2002

13   to 2008, would you have any reason to disagree with me?

14   A.  No, I do not.

15             MR. IHRIG:  Objection, assumes facts in

16   evidence -- not in evidence, excuse me.

17             THE COURT:  I didn't hear you.

18             MR. IHRIG:  Objection, assumes facts not in

19   evidence.

20             THE COURT:  Sustained.

21   BY MS. MOMOH:

22   Q.  Would the fact that a check for -- let's say that the

23   check had a memo line and the memo line said, "Bonus."

24   Would the fact that a check for a bonus was being written

25   out of an account during the 2002 to 2008 period be a

1    suspect?

2              MR. IHRIG:  Objection, assumes facts not in

3    evidence.

4              THE COURT:  Sustained.

5              MS. MOMOH:  Your Honor, I'm just asking about a

6    general check in this point.  I'm not talking about the PCI

7    account.  I'm just talking generally, as I had before, with

8    respect to checks and the decision to pay or to not pay

9    based on a limited set of facts that I'm sharing with

10   Mr. Haller.

11             MR. IHRIG:  Objection, relevance.

12             THE COURT:  Sustained.

13   BY MS. MOMOH:

14   Q.  Mr. Haller, what about checks where the payee on the

15   check is not a person, it just simply says, "Cash," what

16   does that mean?

17             MR. IHRIG:  Objection, assumes facts not in

18   evidence and vague.

19             THE COURT:  Sustained.

20             MS. MOMOH:  Your Honor, if I may approach for a

21   sidebar, please?

22             THE COURT:  You may.

23             The jury may feel free to stretch and stand.

24        **(At sidebar)**

25             MS. MOMOH:  If I understand the objection, it was

1      assumes facts not --

2                THE COURT:  Please lower your voice.

3                MS. MOMOH:  The objection was assumes facts not in

4      evidence and vague.  My question was simply what about

5      checks where the payee on the check is not a person.  So I'm

6      not referring to anything specifically with PCI.  I am doing

7      what I had done before, asking general questions about

8      checks, facts that may apply to those checks, and how the

9      Carraker filter would be used, essentially.

10               MR. IHRIG:  The facts that are not in evidence are

11     the hypothetical facts that the witness is being questioned

12     about.  It's completely irrelevant.  It appears to be

13     nothing more than dragging this out.

14               MS. MOMOH:  Your Honor, if I may?  I'm also -- for

15     the record, I'm concerned and do not understand the

16     objection with respect to assumes facts not evidence with

17     respect to the specific questions I'm asking.

18               Here I'm asking a general question, but even in

19     this very case, I am showing Mr. Haller Exhibit P-33, their

20     very own exhibit, which is over 100 pages, where you see

21     several checks from the PCI account that was with M&I where

22     the payee is identified as cash.  I've also shown --

23     Mr. Haller can see there are various checks as well where

24     the memo line said, "Bonus."

25               So for them to suggest that it assumes facts not

1    in evidence, this is evidence that they themselves offered

2    and that was received.

3         THE COURT:  What's the relevance of this and why

4    is this witness testifying about it?

5         MS. MOMOH:  Your Honor, we're simply putting on

6    our case-in-chief and --

7         THE COURT:  I'm asking about relevance.

8         MS. MOMOH:  The relevance, Your Honor, is to show

9    that the decisions that M&I made with respect to the various

10   PCI checks was all consistent with the fraud detection

11   system that was in place in 2002 and 2008.  The decision to

12   pay was proper.  That's what I'm trying to lay the

13   foundation for and certainly ask the questions of for this

14   case.

15        MR. IHRIG:  Your Honor, I would submit that the --

16   to elicit relevant testimony on that, it would require

17   presenting the checks to somebody who actually saw those

18   checks during the relevant time period or made a decision

19   with respect to those checks during the relevant time

20   period, none of which applies to this witness.  And,

21   therefore, everything that's being asked is irrelevant.

22   Nothing about a hypothetical check is relevant to this case.

23        MS. MOMOH:  Again, Your Honor, these are not

24   hypothetical checks.  If I needed to, I could simply go

25   through every single check with Mr. Haller and show him the

1    checks that had been admitted into evidence.  These are real

2    documents, live checks that M&I itself processed for

3    payment.

4              And these are the very checks that were shown to

5    witnesses of the bank who actually did not have any sort of

6    purview to checks.  They showed the checks to Mary Pesch,

7    who was an AML analyst.  She wasn't in the Fraud Detection

8    Group.  She testified that she didn't have any access to

9    checks and they were still permitted to show the checks to

10   Mary Pesch.  They showed the same checks --

11             THE COURT:  I'm trying to understand the purpose

12   of showing these checks to this witness.

13             MS. MOMOH:  Because he is the vice president of

14   the Fraud Detection Group.  This was all within his purview.

15             MR. IHRIG:  Your Honor --

16             MS. MOMOH:  And, Your Honor --

17             MR. IHRIG:  -- Mr. Haller's opinion on these

18   checks that he never saw in the ordinary course of business

19   is improper expert testimony and [inaudible].

20             COURT REPORTER:  I'm sorry.  Can you --

21             MR. IHRIG:  It's undisclosed opinion testimony.

22             MS. MOMOH:  Your Honor, if I may, what he's

23   arguing has not even come forth in this case.  I haven't

24   asked him any questions as to whether he has seen these

25   specific checks.

1          If they want to ask Mr. Haller questions about

2     that, my position is that that's appropriate for

3     cross-examination.  But for purposes of what I am doing --

4     he's putting forth evidence that's not even in the record

5     yet.  To me --

6          THE COURT:  It's evidence -- tell me again what

7     the evidence is and why it is relevant.

8          MS. MOMOH:  What he's arguing is --

9          THE COURT:  No.  You tell me what the evidence is

10    and why it's relevant.

11         MS. MOMOH:  The evidence is that Mr. Haller is the

12    vice president -- he was the vice president of the Fraud

13    Detection Group in 2002 to 2008.

14         THE COURT:  Okay.

15         MS. MOMOH:  That's the relevant period of time --

16         THE COURT:  Yes.

17         MS. MOMOH:  -- with respect to the M&I -- with

18    respect to the PCI Ponzi scheme.

19         They have put forth in this case checks to

20    question whether M&I was turning a blind eye to activity

21    with respect to the PCI account.  All I'm doing with this

22    witness is showing that, no, the bank did not turn a blind

23    eye with respect to activity -- check activity specifically

24    in the PCI account at the bank during this time and I'm

25    highlighting --

1              THE COURT:  And how is that shown by these two

2       exhibits?

3              MS. MOMOH:  The decision for these -- the decision

4       for these checks ultimately, Your Honor, was that they were

5       paid.

6              THE COURT:  Which means that they weren't turning

7       a blind eye?

8              MS. MOMOH:  Because, according to the Carraker

9       fraud system, the only decision that the Fraud Detection

10      Group had to make at that time was to pay the check or not

11      pay the check.

12             And if they were not to pay the check, one option

13      would be to escalate the check for further review, which

14      could lead to a decision with respect to the SAR Review

15      Committee, which we talked about.  As you know, it's hard to

16      not go any further than that for the purposes of what we

17      talked about.

18             MR. IHRIG:  Your Honor, I think we've spent half

19      an hour now with this witness discussing checks that he's

20      never actually seen, and I think it's reached the end of its

21      utility and it's, frankly, irrelevant.  That's our position.

22             THE COURT:  You may ask limited additional

23      questions, but this is getting to the point of a waste of

24      time and the clarity and purpose of your questioning of this

25      witness about these checks is minimal.

 1          MS. MOMOH:  Understood, Your Honor.  Thank you.

 2      **(In open court)**

 3      BY MS. MOMOH:

 4      Q.  Mr. Haller, would the fact that a payroll check was

 5      written from a depository account -- remember we were

 6      talking about general operating accounts of a business.

 7      Would the fact that a payroll check was written from that

 8      sort of account in and of itself make that check a suspect?

 9      A.  No.  It would be a part of the -- potentially the going

10      concern of the business.

11      Q.  There's been discussion in this case about checks being

12      written to business officers of PCI, otherwise known as

13      insiders.

14          I want to ask you a general question.  You

15      understand what an officer of a business is?

16      A.  Yes.

17      Q.  You understand what an insider of a business is?

18      A.  Yes, an employee.

19      Q.  So if a check from an account of a customer at M&I

20      during 2002 to 2008 was written to an insider or an employee

21      of the customer, the account of the customer was just a

22      general operating account, would that check have been a

23      suspect?

24          MR. IHRIG:  Objection, lacks foundation, assumes

25      facts not in evidence.

Haller - Direct

```
 1                THE COURT:  Overruled.  You may answer as to the
 2       scenario that was presented.
 3                THE WITNESS:  No.
 4       BY MS. MOMOH:
 5       Q.  What would have been the decision of payment under my
 6       scenario?
 7                MR. IHRIG:  Objection, calls for speculation,
 8       lacks foundation.
 9                THE COURT:  Overruled.
10       BY MS. MOMOH:
11       Q.  In other words, if the check is not a suspect, then what
12       would be the decision on that check?
13                MR. IHRIG:  Objection, leading.
14                THE COURT:  Overruled.
15                THE WITNESS:  That item would be paid.
16       BY MS. MOMOH:
17       Q.  The decision would be to pay?
18       A.  Yes.
19       Q.  Mr. Haller, to your knowledge, was anyone at M&I or BMO
20       ever arrested or charged with involvement in the PCI Ponzi
21       scheme?
22       A.  No.
23       Q.  To your knowledge, was anyone at M&I or BMO involved in
24       the PCI Ponzi scheme?
25       A.  No.
```

Haller - Direct

```
 1                    MR. IHRIG:  Objection, prosecutorial discretion.
 2                    THE COURT:  Sustained.
 3        BY MS. MOMOH:
 4        Q.  To your knowledge, did anyone at M&I or BMO know that
 5        there was a Ponzi scheme happening before it was discovered
 6        by the authorities in 2008?
 7                    MR. IHRIG:  Objection, lacks foundation.
 8                    THE COURT:  Sustained.
 9        BY MS. MOMOH:
10        Q.  Mr. Haller, do you know, you personally, do you know if
11        anyone at M&I or BMO was aware of the PCI Ponzi scheme
12        before it was discovered by the authorities in 2008?
13                    MR. IHRIG:  Objection, relevance.
14                    THE WITNESS:  Not to my knowledge.
15                    THE COURT:  Overruled.
16                    THE COURT REPORTER:  Your microphone isn't on.
17                    THE COURT:  Thank you.
18        BY MS. MOMOH:
19        Q.  To repeat your response, "Not to your knowledge."  Not
20        to your knowledge are you aware of anyone at M&I or BMO
21        knowing that there was a PCI Ponzi scheme happening before
22        it was discovered by the authorities in 2008?
23        A.  No.
24                    MR. IHRIG:  Objection, leading.
25                    THE COURT:  Sustained.
```

Haller - Direct

```
 1    BY MS. MOMOH:
 2    Q.  Would there have been any incentive to the Fraud
 3    Detection Group turning a blind eye and not properly
 4    reviewing a check?
 5              MR. IHRIG:  Objection, lacks foundation, calls for
 6    speculation.
 7              THE COURT:  Sustained.
 8    BY MS. MOMOH:
 9    Q.  You personally, Mr. Haller, would there have been any
10    incentive to you turning a blind eye and not properly
11    reviewing a check?
12    A.  No.
13    Q.  Mr. Haller, during the time that PCI was a customer of
14    M&I, did you receive any money or things of value from PCI
15    or any PCI personnel?
16    A.  No.
17    Q.  Did you receive any favors from PCI or PCI personnel?
18    A.  No.
19    Q.  Did any PCI personnel ever try to persuade you not to
20    file any sort of required report?
21    A.  No.
22    Q.  During the time that PCI was a customer of M&I and BMO,
23    did you ever provide any special favors for PCI personnel?
24    A.  No.
25    Q.  Are you aware of any M&I employee who did?
```

1           MR. IHRIG:  Objection, lacks foundation.

2           THE COURT:  Sustained.

3    BY MS. MOMOH:

4    Q.  Before September of 2008 did you have any reason to

5    suspect that PCI and Petters were involved in a Ponzi

6    scheme?

7    A.  No.

8    Q.  Did you have any incentive at all to look the other way

9    if you thought that there was suspicious activity in the PCI

10   account?

11   A.  No.

12          MS. MOMOH:  Your Honor, I have no further

13   questions for the witness at this time.

14          THE COURT:  Counsel, we have ten minutes before

15   the jury will be excused and I will be instructing them

16   during some portion of that ten minutes.

17          MR. IHRIG:  Okay.  Would you like me to get

18   started or would you like me to hold off?  Would you like me

19   to get started cross-examining the witness?

20          THE COURT:  I think we should reserve your cross

21   until tomorrow and give the jury the benefit of a few

22   minutes after a long day.

23          MR. IHRIG:  I'm sorry.  Did I misunderstand?  Did

24   you instruct me to wait until tomorrow?

25          THE COURT:  Yes.

1              MR. IHRIG:  Thank you, Your Honor.

2              THE COURT:  So, Members of the Jury, during this

3      recess and every recess you must not discuss this case with

4      anyone, including other jurors, members of your family,

5      people involved with the trial, or anyone else.  And do not

6      allow anyone to discuss the case with you or within your

7      hearing.

8              As you know, only you have been chosen as jurors

9      in this case and only you have sworn to uphold the law.  No

10     one else has been chosen to do this important work.

11             And as you know also, you should not discuss this

12     case among yourselves before the case has been heard --

13     you've heard all of the evidence in this case and the case

14     has been submitted to you by me for deliberations because it

15     may affect your final decision.

16             And when I say you must not discuss the case, I

17     also mean no other means of communication about the case,

18     such as e-mail, text messages, blogging, or engaging in

19     other written or oral forms or electronic forms of

20     communication.

21             Only in this way will you be able to decide the

22     case fairly based solely on the testimony, the evidence

23     presented in the courtroom, and my instructions.

24             And so, as you know, I don't repeat these

25     instructions every time, but it is certainly important that

1        you abide by them throughout your service.

2                I want to thank you for your service.  I hope you

3        have a great evening, and we will see you tomorrow.  All

4        rise for the jury.

5            (Jurors excused)

6                            **IN OPEN COURT**

7                        **(JURY NOT PRESENT)**

8                THE COURT:  Sir, you are excused from the witness

9        stand.  We will begin tomorrow at 9:00 a.m.

10                THE WITNESS:  Thank you.

11                THE COURT:  You're welcome.

12                MR. MOHEBAN:  Your Honor, if I may, we have a

13        couple, I think, scheduling and housekeeping things that

14        might be good to use this time, if we can?

15                THE COURT:  You may.

16                MR. MOHEBAN:  First of all, you'll probably be

17        happy to hear that we think we're getting close to

18        concluding our case.  It's possible that that would happen

19        by the end of this week.  We're going to evaluate that.  But

20        in light of the fact that you've told us -- so I'm not

21        guaranteeing that, but I want you to know that we're heading

22        into that direction.

23                THE COURT:  I appreciate the progress report --

24                MR. MOHEBAN:  Okay.

25                THE COURT:  -- and recognize the fact that it is a

1    prediction.

2              MR. MOHEBAN:  Right, it's an estimate.

3              THE COURT:  An estimate.

4              MR. MOHEBAN:  And in light of your announcing

5    yesterday that we're off Monday, Tuesday, and Wednesday of

6    next week, I think both sides are interested in a little bit

7    of planning.

8              One of the things we would like to do is

9    understand when -- now that you've given the briefing

10   schedule on the Rule 50, we'd like to know when we can argue

11   that motion because we think there are some pretty dramatic

12   things that have happened in the course of this case in

13   terms of the positions that the trustee has taken.

14             They started this case alleging that there was

15   actual knowledge of the bank, that the bank knew about the

16   fraud.  We had Mr. Kelley on the stand testifying that he

17   doesn't contend that anymore, as has their expert, and there

18   has been no evidence adduced to that.  That has a big impact

19   on their claims, which mostly involve -- require a showing

20   of actual knowledge.  And on the other remaining claim we

21   have some important issues on that.

22             So we'd like to be heard on the Rule 50 and we'd

23   like to know when that could happen.  We'd like to know when

24   we would be talking about a charging conference because we

25   think we could be looking at closing sometime next week.

1          THE COURT:  You said closing sometime?

2          MR. MOHEBAN:  Next week.

3          THE COURT:  Correct.

4          MR. MOHEBAN:  But there's only two days and those

5     are some things that have to happen between now and then.

6     So we're just interested in your thoughts, and I'm sure

7     counsel has their own thoughts on that.

8          THE COURT:  Thank you.

9          MR. COLLYARD:  Your Honor, I believe you addressed

10    the briefing schedule for the -- you addressed the briefing

11    schedule.  We're just going to wait for your guidance on

12    hearing that.  We don't think -- like you had already

13    indicated to us, it would be premature to have argument on

14    those issues until the briefing is done and considered.  So

15    to the extent that Mr. Moheban is suggesting we have any

16    argument in the next day or two, that would be premature and

17    we maintain that position.

18          I reached out to counsel last night to get an idea

19    as to when they may close their case.  They told me that

20    they'd let me know more about that hopefully at the end of

21    this session.

22          And so we, too, would reiterate the guidance on

23    when a charge conference may occur, if that would be this

24    week or if that would be next week.  That would be,

25    obviously, helpful information for us as well.  That would

1    be the only other thing that I would add.

2              MR. MOHEBAN:  And to be clear, we're not

3    suggesting that you take argument before the briefing is

4    done, but I'm just trying to figure out when that could

5    happen.

6              And there's -- I don't know if you want to talk

7    about that and complete that discussion?

8              THE COURT:  I think we've completed the

9    discussion.

10             MR. MOHEBAN:  Okay.  All right.  Then there's one

11   other thing I want to raise, and it has to do with a

12   rebuttal witness that we would like have you consider us

13   present.

14             There's two things that have happened relating to

15   issues about these backup tapes and the testimony.  Of

16   course, today you severely limited the testimony of

17   Mr. Stroble.  And in addition to that, we had the outright

18   exclusion of Mr. Grant.

19             And as a result of that, we have a hole in our

20   defense, which we think is not any of our doing, but it's a

21   result -- and I want to make sure you appreciate what has

22   happened.

23             The first thing is with respect to Mr. Grant,

24   there was an agreement of counsel that they were going to --

25   they had a witness they wanted to add to their list,

1    Mr. Kiefer.  We had a witness that we wanted to add,

2    Mr. Grant.  We had identified an FTI representative; we just

3    didn't have the name.  And then we gave them the name and

4    there were these cross objections.

5           We made an agreement, which was we wouldn't object

6    to Mr. Kiefer, and we didn't.  He came here and he testified

7    in support of their 1006 exhibits.  And their agreement was,

8    in writing, that they would not object to the addition of

9    the FTI witness in exchange for you not objecting to our

10   addition of Mr. Kiefer.

11          And so the result of that is we let Mr. Kiefer go

12   on.  We didn't object.  And then when it came to their turn,

13   they did object.  And for a variety of reasons, he hasn't

14   been able to testify so far.

15          The concern that we have now is focused on what

16   testimony has been heard by the jury about these tapes that

17   were found in 2014.  And we heard a lot of questions today

18   that there were millions of pages of e-mails on the backup

19   tapes that Mr. Vanderheyden was told you don't know whether

20   these were in existence or not.  And there's been a

21   misimpression given to the jury and it has to do with these

22   tapes that were located in 2017.

23          What we haven't been able to present to the jury

24   is that whether or not you want to think that the 2014 tapes

25   are the same as the 2017 tapes, the parties can debate that,

1    but with respect to the tapes that were found in 2017, it's

2    undisputed that, per Judge Sanberg, we produced -- we

3    recreated those tapes and produced millions of e-mails,

4    which then were the subject of many of the depositions that

5    are being presented here in this trial.

6           And the way that the evidence has gone in and

7    because of certain exclusions of certain witnesses

8    categorically, we haven't been able to simply make the point

9    that as of those 2017 tapes, we were able to restore them

10   and produce the documents and some of those records are in

11   the record in this trial.

12          So we would like to have you consider that with

13   respect to Mr. Grant, that he be allowed to testify on that

14   narrow subject.  We're not actually asking you to revisit

15   the other areas that have been excluded, but on that subject

16   we'd like to offer him.

17          THE COURT:  You want Mr. Grant to testify about

18   the restoration of the 2017 tapes?

19          MR. MOHEBAN:  That's right, and the fact that

20   there were documents and that they were -- his firm was

21   involved with the restoration and production of records that

22   then were provided to the trustee.

23          So there's sort of three sets of issues on tapes.

24   There's what happened in 2010 and '11, which has been

25   addressed at trial.  There's what happened in 2014, which

1    has been addressed at trial.  And the missing piece has been

2    this 2017 piece.  That's what we'd like you to consider.

3              Thank you.

4              THE COURT:  Thank you, Counsel.

5              MR. COLLYARD:  Just briefly, Your Honor, there was

6    absolutely no agreement that we would allow for Mr. Grant

7    to come here and testify in exchange for Mr. Kiefer

8    testifying.  What the agreement was is we wouldn't make some

9    objections based on untimeliness on the witness list.

10             We moved and he was -- Mr. Grant was excluded

11   under Rule 37(c)(1), I believe, of the Federal Rules of

12   Evidence, rightfully so.  That had been a witness that had

13   never been identified to us during this case, never had the

14   opportunity to depose him.

15             And the only subject matter that he would testify

16   to was the same exact subject matter that you yourself had

17   said that Mr. Stroble was not allowed to testify to, and

18   that was these 2017 tapes.

19             But what Mr. Grant wants to do is he wants to talk

20   about how many e-mails were produced from them, which is

21   completely irrelevant to the findings of both the Bankruptcy

22   Court and your reaffirmance.

23             And I'm going to go off the top of my head, so if

24   I need to provide you the correct citation, I will do it,

25   but I believe in your July order, Footnote 5, you even

1    addressed that very issue and you say something along the

2    lines of you are not persuaded about their argument for

3    producing millions of pages of e-mails as to how that

4    pertains to these particular issues.

5            So you've already addressed this issue.  The same

6    arguments apply, that I wouldn't be able to rebut any of it

7    by not calling lawyers, but not proving the lies, by doing

8    all of the things.  And so we've already litigated the 2017

9    issue to death.

10           And I think that covers it all, unless you have

11   covers for me, Your Honor.

12           THE COURT:  I don't.

13           MR. COLLYARD:  Thank you.

14           THE COURT:  Anything further?

15           MR. MOHEBAN:  Well, I have this -- the agreement.

16   It's in writing.  I can hand up to you the e-mail agreement.

17           THE COURT:  Do you have a specific rebuttal

18   witness in mind?

19           MR. MOHEBAN:  Mr. Grant.

20           THE COURT:  And then it seems to me, rather than

21   addressing arguments back and forth here, it needs to be --

22   a motion needs to be filed, briefed, and then I'll decide.

23           MR. MOHEBAN:  Okay.  I brought it up this way only

24   because of the instruction we got this morning about no more

25   briefs without approval.  So I'll take it that that's --

1          THE COURT:  You've received approval.

2          MR. MOHEBAN:  -- our approval and will proceed

3     accordingly.

4          All right.  Thank you.

5          THE COURT:  Okay.  I'm going to confer with my law

6     clerk about our timing for the charge conference and then

7     give you some information about that.  I assume that that's

8     something that you'd be interested in?

9          MR. ANTHONY:  So we'll wait.

10          LAW CLERK:  All rise.

11     (Discussion off the record)

12     (Court adjourned at 5:04 p.m.)

13                    *     *     *

14          I certify that the foregoing is a true and correct
      copy of the transcript originally filed on 12/05/2022 and
15     incorporating redactions requested by Attorney Adine S.
      Momoh.

16

          Certified by:   _s/ Lori A. Simpson_

17

                          Lori A. Simpson, RMR-CRR

18

19

20

21

22

23

24

25