<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                              )
      Douglas A. Kelley, in his )   File No. 19-cv-1756
 4    capacity as the Trustee of the )        (WMW)
      BMO Litigation Trust,     )
 5                              )
              Plaintiff,        )   St. Paul, Minnesota
 6                              )   October 27, 2022
      vs.                       )   8:35 a.m.
 7                              )
      BMO Harris Bank N.A., as  )
 8    successor to M&I Marshall and )
      Ilsley Bank,              )
 9                              )
              Defendant.        )
10    ------------------------------------------------------------

11

12

13           BEFORE THE HONORABLE WILHELMINA M. WRIGHT
                UNITED STATES DISTRICT COURT JUDGE
14
             *   *   *   REDACTED TRANSCRIPT   *   *   *
15

16            (JURY TRIAL PROCEEDINGS - VOLUME XII)

17

18

19

20

21

22

23

24
          Proceedings reported by certified court reporter;
25    transcript produced with computer.
</pre>

**APPEARANCES:**

| | |
|---|---|
| For the Plaintiff: | Robins Kaplan, LLP |
| | MICHAEL A. COLLYARD, ESQ. |
| | DAVID E. MARDER, ESQ. |
| | PETER C. IHRIG, ESQ. |
| | MORGIA D. HOLMES, ESQ. |
| | MICHAEL D. REIF, ESQ. |
| | 800 LaSalle Avenue |
| | Suite 2800 |
| | Minneapolis, Minnesota 55402 |
| | |
| | Anthony, Ostlund, Louwagie, |
| | Dressen, Boylan, P.A. |
| | JOSEPH W. ANTHONY, ESQ. |
| | JOSEPH R. RICHIE, ESQ. |
| | RYAN M. LAWRENCE, ESQ. |
| | 90 South Seventh Street |
| | Suite 3600 |
| | Minneapolis, Minnesota 55402 |
| | |
| For the Defendant: | Stinson, LLP |
| | KEITH S. MOHEBAN, ESQ. |
| | ADINE S. MOMOH, ESQ. |
| | 50 South Sixth Street |
| | Suite 2600 |
| | Minneapolis, Minnesota 55402 |
| | |
| | Debevoise & Plimpton, LLP |
| | JOHN GLEESON, ESQ. |
| | MICHAEL SCHAPER, ESQ. |
| | SUSAN REAGAN GITTES, ESQ. |
| | MORGAN A. DAVIS, ESQ. |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | |
| | Mayer Brown, LLP |
| | JOSHUA D. YOUNT, ESQ. |
| | 71 South Wacker Drive |
| | Chicago, Illinois 60606 |
| | |
| | Mayer Brown, LLP |
| | RICHARD A. SPEHR, ESQ. |
| | GINA PARLOVECCHIO, ESQ. |
| | 1221 Avenue of the Americas |
| | New York, New York 10020 |
| | |
| Court Reporter: | LORI A. SIMPSON, RMR-CRR |
| | 316 North Robert Street |
| | St. Paul, Minnesota 55101 |

1                         __I N D E X__

2                                                          __PAGE__

3     **THOMAS HALLER**
          Cross-Examination by Mr. Ihrig                   2987
4
      **KELLEY MALTSCH**
5         Direct Examination by Ms. Parlovecchio           2993
          Cross-Examination by Mr. Collyard                3061
6         Redirect Examination by Ms. Parlovecchio         3127

7     **KARL JAREK**
          Direct Examination by Ms. Gittes                 3140
8         Voir Dire Examination by Mr. Anthony             3151
          Direct Examination (Resumed) by Ms. Gittes       3153
9         Cross-Examination by Mr. Anthony                 3216

10    **SANDRA INDAHL**
          Cross-Examination by Mr. Moheban                 3264
11        Direct Examination by Mr. Reif                   3279

12

13    __PLAINTIFF'S EXHIBITS__                             __REC'D__
          239                                              3088
14        745                                              3175

15
      __DEFENDANT'S EXHIBITS__                             __REC'D__
16        50002                                            3016
          50009                                            3016
17        50060                                            3016
          50061                                            3016
18        50064                                            3018
          50083                                            3018
19        50084                                            3016
          50091                                            3016
20        50143                                            3016
          50145                                            3018
21        50190                                            3029
          50202                                            3016
22        50203                                            3016
          50204                                            3016
23        50237                                            3016
          50417                                            3009
24        50643                                            3016
          50645                                            3016
25        50928                                            3016

1                        **P R O C E E D I N G S**

2                         **IN OPEN COURT**

3                         **(JURY PRESENT)**

4              THE COURT:  Good morning.  Please be seated.

5              MR. IHRIG:  Good morning, Your Honor.

6              THE COURT:  Good morning, Counsel.

7              MR. IHRIG:  I believe the witness is on his way.

8        (Pause)

9              THE WITNESS:  Good morning.

10             THE COURT:  Good morning.  Good morning, sir, we

11      are ready to resume your testimony.  Counsel, you may

12      proceed.

13             MR. IHRIG:  Thank you, Your Honor.

14                        **(Thomas Haller)**

15                        **CROSS-EXAMINATION**

16      BY MR. IHRIG:

17      Q.  Good morning, Mr. Haller.

18      A.  Good morning.

19      Q.  My name is Peter Ihrig.  I represent the trustee in this

20      case, and I have just a few questions for you this morning.

21             I think yesterday you spoke with your counsel

22      about being involved in the Check Processing Department at

23      M&I Bank; is that right?

24      A.  In the Check Fraud Department, yes.

25      Q.  And there was -- was there a group within the Check

 1    Fraud or Check Processing Department called the Exceptions

 2    Department?

 3              MS. MOMOH:  Objection, Your Honor, to the extent

 4    counsel is mischaracterizing the testimony by distinguishing

 5    between Check Processing and Check Fraud Department.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I'm sorry.  Could you repeat the

 8    question?

 9    BY MR. IHRIG:

10    Q.  Sure.  Was there a group within the Check Processing or

11    Check Fraud Department called the Exceptions Department that

12    was involved in processing and reviewing checks?

13    A.  Yes.  As a part of the Check Processing Department,

14    there was the Exceptions Group, yes.

15    Q.  And as the name suggests, is the Exceptions Department

16    responsible for reviewing checks that contain certain types

17    of characteristics that warranted further review or

18    verification by M&I?

19    A.  Yes.  Certain exception typologies, yes.

20    Q.  And was one of those exceptions checks written for

21    $50,000 or more on M&I checking accounts?

22    A.  Yes.

23    Q.  And so from the time period of 2002 through 2008, was it

24    M&I's policy that the Exceptions Department would review all

25    checks for $50,000 or more written on M&I checking accounts?

1   A.  I don't know if it was all checks, but, yes, the vast

2   majority of checks.

3   Q.  So M&I's policy would be to review, if not all, at least

4   the vast majority of checks written for $50,000 or more on

5   M&I Bank checking accounts?

6   A.  Yes, sir.

7   Q.  And, you know, we've spoken about the Petters Company,

8   Inc. and the PCI account.  Do you know that the PCI account

9   was a checking account at M&I?

10  A.  I know that they had a checking account, yes, sir.

11  Q.  And so would you agree, then, that all or the vast

12  majority of checks written on the PCI account for $50,000 or

13  more would have been reviewed by M&I's Exception Department?

14  A.  I assume so, yes.

15  Q.  And this review by the Exception Department, it was done

16  by Exception Department employees as opposed to some

17  automated or computerized review, right?

18  A.  Yes.

19  Q.  And one part of that review would have involved the

20  Exception Department employees looking to see if the check

21  was signed by an authorized signer, right?

22  A.  The presence of a signature, yes.

23  Q.  And the signature being an authorized signature for the

24  accountholder, in this case Petters Company, Inc., right?

25  A.  I do not believe that the Exceptions Department was

1    validating signer signature.  I believe that they were

2    validating the presence of a signature on a check.

3    Q.  Okay.  Let's talk about the PCI checking account a

4    little bit.  I just want to make some things clear.

5            You didn't actually have any involvement with

6    Petters Company, Inc.'s checking account at M&I between 2002

7    and 2008, right?

8    A.  No, sir.

9    Q.  And so you never reviewed a single check on that account

10   between 2002 and 2008, right?

11   A.  I have not, sir, no.

12   Q.  Okay.  So you also never reviewed the transaction

13   activity in the PCI account between 2002 and 2008, right?

14   A.  I have not, no.

15   Q.  And you never saw the billions of dollars flowing in and

16   out of that account, right?

17   A.  No.

18   Q.  And you never personally saw the tens of millions of

19   dollars in checks to PCI insiders being written on that

20   account, right?

21   A.  I did not personally review that account.

22   Q.  And you spoke with your counsel yesterday about the

23   concept that identifying counterfeit checks was M&I's Check

24   Processing Department's number one focus; is that right?

25   A.  It was the Check Fraud Department's number one focus,

1   sir, yes.

2   Q.  And so that meant that the Check Fraud Group wasn't

3   necessarily focused on determining whether a check was

4   suspicious for reasons other than counterfeiting, right?

5   A.  In general, yes, sir.

6   Q.  So if a check wasn't suspected of being counterfeit but

7   was suspicious because it could be part of another crime,

8   like money laundering, that determination wouldn't have

9   fallen under your group's purview; is that right?

10  A.  That was not our primary focus, sir, you are correct.

11  Q.  And that would have been the primary focus of the

12  Anti-Money Laundering Group; is that right?

13  A.  Yes, sir.

14  Q.  But if an employee in the Check Fraud Department

15  identified a check as suspicious, nothing prevented that

16  employee from contacting the account officer about that

17  check, right?

18  A.  That is correct, sir.

19  Q.  And, similarly, nothing prevented that employee from

20  contacting the AML Group about that check, right?

21  A.  That is correct, sir.

22          MR. IHRIG:  Thank you.  I have no further

23  questions.  Thank you, Mr. Haller.

24          THE WITNESS:  Thank you, sir.

25          MS. MOMOH:  Good morning.

```
1              THE COURT:  Good morning.

2              MS. MOMOH:  Your Honor, no further questions for

3      this witness.

4              THE COURT:  May he be excused?

5              MS. MOMOH:  Yes, he may.  Thank you.

6              THE COURT:  Sir, you are excused.

7              THE WITNESS:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MS. PARLOVECCHIO:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MS. PARLOVECCHIO:  The defendant calls Kelley

12     Maltsch.

13             THE COURT:  I can't hear you.

14             MS. PARLOVECCHIO:  The defendant calls Kelley

15     Maltsch.

16             THE COURT:  Thank you.

17             COURT REPORTER:  Please come forward and stop in

18     front of me.  Would you raise your right hand to be sworn,

19     please.

20         (Witness sworn)

21             COURT REPORTER:  You can have a seat in the

22     witness stand.  Speak into the microphone and state your

23     name, spelling your first and last name, please.

24             THE WITNESS:  Sure.  My name is Kelley Maltsch.

25     First name is Kelley, K-e-l-l-e-y.  The last name Maltsch,
```

Maltsch - Direct

```
 1    M-a-l-t-s-c-h.
 2              MR. GLEESON:  May I approach, Judge?
 3              THE COURT:  You may.
 4         (Binders handed to the Court and witness)
 5                    (Kelley Maltsch)
 6                   DIRECT EXAMINATION
 7    BY MS. PARLOVECCHIO:
 8    Q.  Good morning, Ms. Maltsch.
 9    A.  Good morning.
10    Q.  Are you currently employed?
11    A.  I am not.  I am retired.
12    Q.  And prior to your retirement, where did you work?
13    A.  I worked for BMO Harris Bank.  And prior to that M&I,
14    which was purchased by BMO Harris Bank.
15    Q.  Approximately how long did you work for BMO and then --
16    or M&I Bank and then BMO?
17    A.  About 35 years.
18    Q.  Now, before I get into the roles that you served at the
19    bank, I'd just like to get -- ask you some questions about
20    your background.
21    A.  Sure.
22    Q.  Where do you currently live?
23    A.  I live in Pewaukee, Wisconsin.
24    Q.  Where did you grow up?
25    A.  I grew up basically in Pewaukee, Wisconsin.
```

```
 1     Q.  Are you married?

 2     A.  I am.

 3     Q.  Do you have any children?

 4     A.  I have two children.

 5     Q.  And how old are they?

 6     A.  They are 38 and 35.

 7     Q.  What do they do?

 8     A.  My son is a physical education teacher at a small

 9     Catholic school and my daughter is an occupational

10     therapist.

11     Q.  Do you have any grandchildren?

12     A.  I do.  I have two granddaughters.

13     Q.  I know you said you're retired.  How do you spend your

14     time now?

15     A.  I spend my time with my granddaughters.  I have been

16     watching my granddaughters since they were born, basically,

17     so.

18     Q.  Can you please tell us about your post high school

19     education.

20     A.  Yes.  I attended the University of Wisconsin-Whitewater.

21     I got a degree in finance.

22     Q.  And when did you graduate?

23     A.  I graduated in December of 1982.

24     Q.  Now, when you were still working at M&I and then BMO,

25     did you take any courses related to your work?
```

1      A.  I didn't -- I took -- I did take compliance-related

2      courses.  I did attend the National Deposit -- excuse me,

3      the National Compliance School that was offered by our

4      regulators.  I also attended the Wisconsin compliance

5      schools.

6      Q.  Have you belonged to any professional organizations

7      related to banking?

8      A.  Yes.

9      Q.  What organizations were those?

10     A.  Okay.  I was a member of the Wisconsin Bankers

11     Association Board for the compliance schools for loan

12     compliance as well as deposit compliance.

13     Q.  Have you ever taught any banking or AML-related courses?

14     A.  Yes.  I taught at the Deposit Compliance School and I

15     taught the BSA/AML section of that school.

16     Q.  And what topics did you teach?

17     A.  The AML/Bank Secrecy Act and anti-money laundering.

18     Q.  Did you serve any special roles at the banking

19     compliance school?

20     A.  I did.  I was a director of that Deposit Compliance

21     School, as well as teaching that section on BSA/AML.

22     Q.  Now, what, if any, AML and BSA training did you attend

23     as part of your job at M&I and BMO?

24     A.  Any that was available.  So we were very in tune to what

25     was available out there in the industry and if a seminar was

1    being offered either by a consulting firm, the regulators,

2    or the banking associations related to compliance,

3    particularly BSA/AML, I would sign up for it and I would

4    attend those.

5    Q.  And what was your understanding about the purpose of

6    attending compliance trainings as part of your job?

7    A.  Yeah.  There's a few different things that we got out of

8    it.  Certainly we got to meet a lot of people that were in

9    the industry in the same positions we were in in our

10   financial institutions and to keep, you know, abreast of

11   what was going on in the industry as well as what the

12   regulatory expectations were, other banks' experiences, that

13   type of thing.

14   Q.  Would you bring the information that you learned at

15   these conferences back to the bank?

16   A.  Yes, I would.

17   Q.  And what would you do with it?

18   A.  Disseminate it.  Part of -- we are going to talk --

19   well, we would -- I had -- excuse me.  I'm sorry.  I'm a

20   little nervous.

21   Q.  It's okay.

22   A.  We had an AML Committee, so I would bring that

23   information back and share it with the committee members at

24   that time.

25   Q.  Why did you pursue a career in the banking industry?

1    A.  Why did I pursue a career?

2    Q.  Yes.

3    A.  I took a couple courses in college on banking, and I

4    thought it was very interesting and it was something that I

5    wanted to pursue.

6    Q.  What was your first job in the banking industry after

7    you graduated from college?

8    A.  I joined the OCC, which is the Office of the Comptroller

9    of the Currency, as a national bank examiner.

10   Q.  And what did you do as a national -- or as a bank

11   examiner?

12   A.  We went out as a team to the banks that we oversaw and

13   we reviewed their loan portfolios for safety and soundness

14   issues, as well as their compliance with specific

15   regulations.

16   Q.  Why did you leave the OCC to pursue a job at M&I?

17   A.  While I enjoyed my job at the OCC as an examiner, I

18   wanted to be part of a program and help it grow and watch it

19   grow.  It was something I just really wanted to do.

20   Q.  Now, you testified that you worked at M&I and then BMO

21   for 35 years before you retired.

22   A.  Um-hmm.

23   Q.  Did you stay at M&I for the entire time?

24   A.  No.  I actually left for an 11-month period.  At the

25   time that BMO announced that it was purchasing M&I, I had

1    been at M&I for about 25 years at that time and I thought

2    maybe it's an opportunity to try something different.

3    Q.  And why did you return to BMO?

4    A.  I returned to BMO because I was recruited back and I

5    actually missed being part of a large financial institution.

6    Q.  Who recruited you back?

7    A.  The chief AML officer at BMO.

8    Q.  When did your job at M&I and then BMO over those

9    35 years first involve compliance issues?

10   A.  Back in the mid '80s.

11   Q.  And did all of your roles at the bank since the mid '80s

12   involve compliance?

13   A.  Yes.

14   Q.  I want to direct your attention to 2003.

15   A.  Um-hmm.

16   Q.  What was your role at the bank at that time?

17   A.  I was within -- I was in the Corporate Compliance

18   Department and I had responsibility over AML compliance

19   support.  In 2003, I'm sorry, that was -- I was responsible

20   for compliance support with just general compliance support

21   over lending regulations, deposit regulations, and AML.

22   Q.  And at a high level, what were your responsibilities in

23   that role?

24   A.  Basically training, communications, quality assurance.

25   Q.  Did you have any role in participating in fed exams?

1    A.  I did.

2    Q.  And now directing your attention to early 2004, what was

3    your role at that time?

4    A.  Okay.  I had focused on BSA/AML as a subject matter

5    expert for the bank at that time.

6    Q.  And was that a new role at the time?

7    A.  It was.

8    Q.  And approximately when did you serve as the BSA/AML

9    subject matter expert?

10   A.  At the beginning of 2004.

11   Q.  And how long did you do that?

12   A.  For about three years.

13   Q.  What were your responsibilities as the AML subject

14   matter expert at a high level?

15   A.  Okay.  It was to immerse myself in all of the

16   regulations that were related to BSA/AML and to work on

17   policies and procedures and work on enhancements to the

18   program.

19   Q.  I'm going to show you what's marked for identification

20   as DD-3.  Can you please explain to the jury where your role

21   fit on this chart when you were the subject matter expert.

22   A.  Yes.  I was right here (indicating).

23   Q.  Thank you.

24          Now, what was your understanding of why the AML

25   subject matter expert role was created?

Maltsch - Direct

```
 1    A.  So after our Federal Reserve exam in 2003, we were under
 2    board resolution and we needed to give very focused
 3    attention to our BSA/AML program and to make enhancements to
 4    it.
 5    Q.  Did you have a team supporting you in this new role?
 6    A.  I started as a team of one and then over time I was able
 7    to add a couple of individuals.
 8    Q.  Why did your team expand?
 9    A.  In later 2004.
10    Q.  And what was the purpose for adding folks to your group?
11    A.  We took over some functions that -- we didn't take
12    over some.  We built functions out for enhanced due
13    diligence of higher-risk customers.
14    Q.  What was your next role after you were the AML subject
15    matter expert?
16    A.  I was promoted to a compliance group manager.  What that
17    meant was I had oversight over multiple groups.  So I
18    retained that subject matter expert role within my group as
19    well as I had the AML Monitoring Group, the privacy group,
20    and then quality assurance.
21    Q.  And just referring you back to DD-3, that organizational
22    chart we see up here, can you show us where your -- that new
23    role in 2007 fit on the chart.
24    A.  It would fit right in here (indicating).
25    Q.  Thank you.
```

```
1              MS. PARLOVECCHIO:  We can take that down,

2      Mr. Herzka.  Thank you.

3      BY MS. PARLOVECCHIO:

4      Q.  Now, you've testified that you've served in several

5      different compliance roles at M&I since the mid '80s.  Can

6      you just explain to the jury at a high level what regulatory

7      oversight the bank had throughout that period.

8      A.  Sure.  The Federal Reserve was our primary regulator and

9      they were the entire time.

10     Q.  And at a high level, what does the Federal Reserve do?

11     A.  They ensure the safety and soundness of the banking

12     system.  So they come to the financial institutions and

13     examine us for not only compliance issue, but safety and

14     soundness as well, making sure we are making credible loans

15     and whatnot.

16     Q.  What regulations does the Federal Reserve oversee?

17     A.  All federal regulations, so -- which, of course, the BSA

18     and the AML regulations are part of the federal regulations.

19     Q.  How did the Federal Reserve determine whether M&I was

20     complying with its regulations?

21     A.  They would come in, look at our policies and procedures,

22     as well as samples of the work that we've done.

23     Q.  How often would the Federal Reserve examine M&I through

24     on-site visits?

25             MR. COLLYARD:  Objection, Your Honor, relevance.
```

Maltsch - Direct

```
 1     This may require some explanation.

 2               MS. PARLOVECCHIO:  Should we approach, Your Honor?

 3               THE COURT:  Are you asking to approach?

 4               MR. COLLYARD:  If you are willing to discuss it,

 5     ye, Your Honor.

 6               THE COURT:  You may.

 7               MR. COLLYARD:  Thank you.

 8          (At sidebar)

 9               MR. COLLYARD:  Your Honor, I fear that what

10     they're doing with this witness at this point in time is

11     they're turning her into an inappropriate expert on

12     Rule 701.

13          She's going to talk about regulatory compliance,

14     getting into the Federal Reserve issues that we've already

15     talked about.  And a lot of this testimony is completely

16     irrelevant to the issues at hand.

17          She's going to talk about her oversight for

18     federal regulations and get into the weeds on that, and

19     they're going to portray her to be an expert and that isn't

20     appropriate under Rule 701.

21          And I know you haven't gotten into the weeds of it

22     yet, but I raise this issue to the Court so we don't -- I

23     don't have to keep objecting and having these types of

24     sidebars on these issues.

25               MS. PARLOVECCHIO:  I appreciate that, Your Honor.
```

1          So there's no reason to fear.  We're not going to

2     turn her into an expert.

3          She's the first fact witness who's discussed

4     Federal Reserve issues.  It's going to be at a very high

5     level, just talking about the process she would go through

6     in providing documentation to the Federal Reserve and what

7     they would provide.

8          We've only heard testimony on this issue from an

9     expert witness about what would have happened if -- you

10    know, when they were -- when the bank was reviewed by the

11    Federal Reserve.  She's going to testify as to just very

12    factual issues, what they provided, the types of things the

13    fed asked for.

14         We're not going to get into the weeds.  We're not

15    going to go into individual years other than the 2003

16    Federal Reserve review at a very high level and what the

17    bank responded to -- how the bank responded to the 2003

18    Federal Reserve review because that's been put in issue by

19    plaintiff's expert.

20         MR. COLLYARD:  And the big issue there is going to

21    whether or not the Federal Reserve ultimately reviewed

22    anything with respect to the Petters Company activity or the

23    Petters Company account, and that's been an issue that was

24    decided on motion in limine and we had huge discussions

25    about that with the previous witnesses.

Maltsch - Direct

```
 1                THE COURT:  And so --
 2                MS. PARLOVECCHIO:  I'm sorry.  You have a
 3      question, Your Honor.  Go ahead.
 4                THE COURT:  I just wanted to know whether that is,
 5      in fact, the case, that you intend to do that in violation
 6      of the Court's order.
 7                MS. PARLOVECCHIO:  No, we're not going to violate
 8      the Court's order.  She's not going to go -- I've read the
 9      Court's order.  My understanding is that we're not to go
10      through -- the only reason we can talk about the Federal
11      Reserve exam at all Is to rebut testimony from
12      Ms. Ghiglieri.  I'm sorry for the mispronunciation.
13                MR. COLLYARD:  Ghiglieri.
14                MS. PARLOVECCHIO:  Ghiglieri.  Thank you.
15                We don't intend to get into depth about did they
16      go and look at the account, did they -- you know, that type
17      of issue.  We don't intend to do that.
18                THE COURT:  And the nature of the rebuttal is
19      what?
20                MS. PARLOVECCHIO:  Well, as I mentioned to Your
21      Honor, Ms. Ghiglieri testified about what would have
22      happened, what the Federal Reserve would have gotten.
23                She's going to testify as to what -- the process
24      they went through.  It's not in the weeds, as counsel
25      suggests.  It's very high level.  This is the process we
```

Maltsch - Direct

```
 1    went through, these are the types of policies and procedures
 2    that we provided to them.
 3            Ms. Ghiglieri has put into question the policies
 4    and procedures, what their training were, you know, the
 5    soundness of the AML program.  So this is --
 6            THE COURT:  This is a fact witness about what they
 7    actually did in evaluating the bank; is that correct?
 8            MS. PARLOVECCHIO:  Yes, what the bank provided to
 9    the Federal Reserve and the review process.
10            We're also laying a foundation for our expert
11    witness who's going to testify about this.  So this is
12    factual information that he's going to rely on in his
13    testimony.
14            MR. COLLYARD:  And this is getting very -- what
15    you just said is going to get very close to providing
16    inappropriate expert testimony under Rule 701 because
17    they're going to --
18            THE COURT:  What do you mean?  With this witness?
19            MR. COLLYARD:  Yes.  If she goes beyond anything
20    other than the facts of what was provided to the fed and she
21    talks about anything about regulatory guidance and things
22    like that, what they are doing is using her as an expert
23    inappropriately, who we did not have the ability to depose
24    as an expert or do anything as an expert.
25            They have a banking expert, Mr. Grice, who was
```

Maltsch - Direct

```
 1    retained, who was deposed to do the things that are inside

 2    the scope of the Court's orders.  And they are going to use

 3    this witness to try to get into those areas, and that's what

 4    I want to be very careful about.

 5              This testimony should be very, very limited based

 6    on counsel's representations just now.

 7              MS. PARLOVECCHIO:  So I can make an offer of

 8    proof, Your Honor, if that helps?

 9              THE COURT:  Please.

10              MS. PARLOVECCHIO:  So this witness will testify

11    about, as I mentioned a couple of times, the documentation

12    they provided to the fed, the fact that the fed would come

13    and talk to them and, you know -- at a very high level what,

14    you know, the outcome of the 2003 program.

15              In terms of expert testimony, there isn't going to

16    be anything.  I think the closest thing that we're going to

17    come to is she'll say we based our policies and procedures

18    on the regs.  And that's literally what her job was.  So

19    it's truly fact testimony.

20              MR. COLLYARD:  Then it sounds like this testimony

21    should be incredibly short.

22              THE COURT:  Well --

23              MS. PARLOVECCHIO:  There's other things she's

24    going to testify to.  She also in charge of training.  So

25    she's going to testify about the training that was given,
```

1     because that's been put into question by Ms. Ghiglieri, and

2     whether -- you know, what certain notes meant in the

3     training materials.  So --

4                THE COURT:  Did she provide the training?

5                MS. PARLOVECCHIO:  Yes, she provided the training.

6     She created the training.

7                THE COURT:  So she will talk about the notes that

8     she prepared?

9                MS. PARLOVECCHIO:  Exactly.

10               THE COURT:  Okay.

11               MR. COLLYARD:  Okay.

12               THE COURT:  The objection is overruled based on

13    the representations of counsel, and I expect counsel to

14    abide by those representations.

15               MS. PARLOVECCHIO:  Yes, Your Honor.

16               MR. COLLYARD:  Thank you.

17               MS. PARLOVECCHIO:  Thank you.

18          **(In open court)**

19               THE COURT:  Counsel, you may proceed.

20               MS. PARLOVECCHIO:  Thank you, Your Honor.

21    BY MS. PARLOVECCHIO:

22    Q.  Now, Ms. Maltsch, during your participation in these

23    yearly fed exams, what functions would the Federal Reserve

24    review during those exams?

25    A.  They would review our compliance functions as well as

Maltsch - Direct

1    our -- I'm not sure if you're asking me about the AML exam

2    specifically or exams in general.

3    Q.  Exams in general.

4    A.  Okay.  Exams in general, they would actually review all

5    areas of the bank.  Primarily lending operations to ensure

6    we were making loans in a sound manner.  They would review

7    our accounting area for internal controls.  They would

8    review our compliance area for compliance with all of the

9    big different regulations that banks have to follow,

10   including BSA/AML.

11   Q.  Now, you testified that you assisted with preparing the

12   bank for its examinations.  Just generally, what did the

13   Federal Reserve examination process consist of?

14   A.  Sure.  About six weeks prior to the examiners coming to

15   the bank, they send us what's called a request list.  That's

16   the information that they would like to see.  There's two

17   sections to that.

18        There's one section where they would like us to

19   provide that information before they come on site, and then

20   there's another section where we provide information that's

21   available to them when they get to the bank.

22   Q.  Who from M&I would be involved in the examination

23   process with the Federal Reserve in the 2002 to 2008 time

24   frame?

25   A.  Sure.  From the compliance perspective, it was myself

1    and my team was collecting the information for the exams.

2    Q.  Now I want to show you what's been marked for

3    identification just for the witness only as Defendant's

4    Exhibit 50417.

5         MS. PARLOVECCHIO:  Mr. Herzka.

6    BY MS. PARLOVECCHIO:

7    Q.  And that should be in your small binder.

8    A.  Thank you.  I found it.  Yes.  Yes.

9    Q.  And what are you looking at, Ms. Maltsch?

10   A.  This is a copy of some of the documentation that I was

11   using to collect the request information.

12   Q.  And how do you recognize it?

13   A.  Because I prepared it.

14   Q.  And is this a document that M&I made and maintained in

15   the regular course of business?

16   A.  It is.

17        MS. PARLOVECCHIO:  Your Honor, defendant offers

18   Defendant's Exhibit 50417 into evidence.

19        MR. COLLYARD:  No objection, Your Honor.

20        THE COURT:  Exhibit.  50417 is received.

21        MS. PARLOVECCHIO:  Thank you, Your Honor.  May I

22   publish it?

23        THE COURT:  You may.

24   BY MS. PARLOVECCHIO:

25   Q.  So, Ms. Maltsch, can you describe just generally what

1    we're looking at here.

2    A.  So what we're looking at is a listing of those items

3    that were in the request list.  For example, item 1 was the

4    name and title of designated BSA compliance officers.

5           And then on the next column I would list the

6    individual who was responsible for collecting that item.

7    This particular one was myself.

8           And then how we would respond to the examiners for

9    that.  So we would use our BSA/AML organizational chart, our

10   AML Committee members, as well as resumés of certain

11   individuals.

12   Q.  And could you just note for the jury what the date of

13   this document is.

14   A.  It's June of 2006.

15   Q.  Now, I'd like to direct your attention to box number

16   2 --

17   A.  Um-hmm.

18   Q.  -- where it says, "Copies of the most recent, written

19   BSA Compliance Program."

20          What is being collected here?

21   A.  So we have -- we had a BSA/AML compliance program that

22   was approved by our board of directors.  So it would be a

23   copy of that, as well as a copy of the approval that is

24   noted in the board minutes.

25   Q.  And you were in charge of collecting that?

Maltsch - Direct

```
1    A.  I was.

2    Q.  Now I would like to direct your attention to box

3    number 5.

4    A.  Okay.

5    Q.  And what on the list is being collected here?

6    A.  It's a list of customers and accounts that were

7    designated as high risk for money laundering.

8    Q.  And now I want to direct your attention to box 25.

9    A.  Yes.

10   Q.  And what document were you charged with collecting here?

11   A.  This was our schedule that we maintained of compliance

12   training, along with the dates, the attendees, and the

13   topics that were provided at that point in time.

14   Q.  Now, I see that this list was -- or which exam was this

15   list collected for?

16   A.  2006 AML exam.

17   Q.  And did you follow similar procedures for other years

18   when you participated in the fed exam?

19   A.  Yes.

20   Q.  Now, when you were involved with collecting documents

21   for the fed exams, was there ever an instance where you

22   refused to provide the fed with certain documentation?

23   A.  No.

24   Q.  Why not?

25   A.  That would not be a good idea.
```

1    Q.  Why not?

2    A.  The fed would probably find our program unacceptable at

3    that point.

4    Q.  And how long, generally, would the Federal Reserve

5    examination take?

6    A.  Two to three weeks on site.  A couple weeks off site.

7    Q.  Now, during the period when you were involved with the

8    fed's review, did the fed interview employees of the bank?

9    A.  They did.

10   Q.  And once the Federal Reserve examination was complete,

11   how were the examination results given to M&I?

12   A.  We were provided a report, a written report.

13   Q.  Were there any other meetings or discussions leading up

14   to the report?

15   A.  Sure.  At the end of their on-site portion we would have

16   a closing meeting, and at that point they would show us

17   their -- or provide us with their preliminary findings and

18   allow us to have discussions with them to add any additional

19   information that we felt was pertinent to those findings.

20   Q.  Were things like grades provided, commenting on how well

21   the bank complied with its applicable regulations?

22   A.  Yes.

23   Q.  And what were the possible grades?

24   A.  Well, they were basically a pass/fail.  They did change

25   over time.  So they were adequate, inadequate, satisfactory,

1    unsatisfactory.  Those were the grades that you would

2    receive.

3    Q.  Now I want to focus you on the meeting -- closing

4    meeting with examiners.  What was the primary purpose of

5    that closing meeting?

6    A.  It was to make sure that we were aware of what they were

7    finding, as well as to give us that opportunity to provide

8    them any additional information because they didn't want to

9    get it wrong either, so.

10   Q.  In your experience, was it common or uncommon for fed

11   examiners to call out specific accounts in giving the

12   results of their exam?

13   A.  So in the closing meeting they may provide us with

14   information as to support what their findings were, which

15   would include specific accounts, but in a closing letter --

16   or, I mean, a letter that had the results of the exam, they

17   would not put a customer's information in there.

18   Q.  Now, at the end of the federal exams, was it common or

19   uncommon for the fed to give banks areas of improvement?

20   A.  It was common.

21   Q.  And is that true even if the result of the exam was that

22   the bank's policies and procedures were deemed inadequate or

23   unsatisfactory?

24   A.  Yes.  Yes.

25   Q.  And would the fed give feedback to the bank even if the

Maltsch - Direct

1  policies and procedures were deemed to be adequate or

2  satisfactory?

3  A.  Yes.

4  Q.  Now, you testified that one of the things the Federal

5  Reserve would examine was the bank's policies and

6  procedures.  Did you have any role in developing M&I Bank's

7  policies and procedures?

8  A.  I did.  I did oversee the policy development as well as

9  the program development and procedures in certain areas.

10  Q.  Now, you have a big binder in front of you.  I will

11  direct your attention to that one.

12         MS. PARLOVECCHIO:  And this is a compilation

13  exhibit, Your Honor.  We have a separate exhibit listing the

14  exhibits.  So if I may have the ELMO, please.

15  BY MS. PARLOVECCHIO:

16  Q.  And, Ms. Maltsch, did you have a chance to review that

17  binder before you came to court today?

18  A.  I did.

19  Q.  And what's contained in this binder?

20  A.  It is our various policies, procedures, our program and

21  our procedures that lie underneath that.

22  Q.  And were these documents made and maintained in the

23  regular course of M&I's business?

24  A.  They were.

25         MR. COLLYARD:  Objection, Your Honor, publishing

1    an exhibit that has not been admitted.

2              MS. PARLOVECCHIO:  I'm sorry, Your Honor.

3              THE COURT:  That's quite all right.  Sustained.

4              MS. PARLOVECCHIO:  Thank you.

5    BY MS. PARLOVECCHIO:

6    Q.  And so were these made and maintained in the regular

7    course of business?

8    A.  They were, yes.

9              MS. PARLOVECCHIO:  Your Honor, the defendant moves

10   to admit the binder exhibit, which is a compilation, which

11   relates to a list that we have marked Defendant's

12   Exhibit 50928, which consists of a list of policies and

13   procedures from 2001 through 2008.

14             MR. COLLYARD:  Objection, Your Honor, as an

15   inappropriate compilation.  There's no evidence, there's no

16   testimony how these documents correlate or that are provided

17   as a compilation during the ordinary course of business.  If

18   she wants to talk about the documents individually, that

19   would be a different issue.

20             MS. PARLOVECCHIO:  Your Honor, I'm happy to offer

21   them one by one.  Just for purposes of efficiency, we put

22   them all together in this binder.  They're all business

23   records.  She's laid a foundation for the fact that she

24   developed the policies and procedures.  They're made and

25   maintained in the regular course of M&I's business.  We've

1     laid a fulsome foundation.

2               THE COURT:  The objection is overruled.

3               COURT REPORTER:  I don't have that.  I don't know

4     which exhibits those are.

5               MS. PARLOVECCHIO:  Sure.  My apologies.

6               May I approach, Your Honor?

7               THE COURT:  You may.

8          (Document handed to Court and court reporter)

9               MS. PARLOVECCHIO:  May I publish, Your Honor?

10              THE COURT:  You may.

11              MS. PARLOVECCHIO:  May I have the projector,

12    please.

13    BY MS. PARLOVECCHIO:

14    Q.  Ms. Maltsch, I am showing you what's marked as

15    Defendant's Exhibit 50928.  Is this a fair and accurate

16    representation of the -- correlating to the policies and

17    procedures contained in that big binder up there?

18    A.  It is.

19              MS. PARLOVECCHIO:  The government -- or, I'm

20    sorry, the defendant moves to admit 50928.

21              MR. COLLYARD:  Your Honor, I just reserve my same

22    objections.

23              THE COURT:  The exhibit is received.  The

24    objection is overruled.

25    BY MS. PARLOVECCHIO:

Maltsch - Direct

1    Q.  So, Ms. Maltsch, just generally, what years do these

2    policies and procedures pertain to?

3    A.  The 2001 through 2008 time period.

4    Q.  Did the policies and procedures remain the same

5    throughout that period or did they change over time?

6    A.  Oh, no, they evolved over time.

7    Q.  What caused them to evolve?

8    A.  Well, there's many things that cause them to evolve.  We

9    may have a change in process that needs to be incorporated

10   into it.  We certainly keep in tune to regulatory

11   expectations, regulatory changes that are out there and then

12   we will evolve our policy and our underlying program and

13   procedures at that time.

14   Q.  Approximately how often were these policies and

15   procedures updated?

16   A.  At least annually, but on an as-needed basis.

17   Q.  Now, in your various roles at M&I, did you have any role

18   with regard to BSA and AML compliance trainings?

19   A.  I did.

20   Q.  What was your role?

21   A.  My role was to ensure that all of the employees received

22   training that were to receive that training.  Also the

23   development of the training materials.

24   Q.  Now I am going to direct your attention back to your

25   small binder on your stand up there and specifically to

Maltsch - Direct

```
 1    Defendant's Exhibits 50064, 50083, and 50145.
 2    A.  Um-hmm.
 3    Q.  And did you have an opportunity to review those
 4    documents before you came to court today?
 5    A.  I did.
 6    Q.  And what are those documents?
 7    A.  These are our training guides.
 8    Q.  And how do you recognize them?
 9    A.  Because I oversaw the development of them.
10    Q.  Were these documents made and maintained in the regular
11    course of M&I's business?
12    A.  Yes.
13            MS. PARLOVECCHIO:  Your Honor, the defendant moves
14    to admit Defendant's Exhibits 50064, 50083, and 50145.
15            MR. COLLYARD:  No objection, Your Honor.
16            THE COURT:  The exhibits are received.
17    BY MS. PARLOVECCHIO:
18    Q.  Now, Ms. Maltsch, I want to direct your attention to the
19    early 2000s.  Did there come a time when the law governing
20    AML and the BSA changed?
21    A.  Yes.  So there was significant changes that occurred
22    after 9/11.  The U.S.A. PATRIOT Act was passed and that had
23    several requirements for us.
24    Q.  And what is the U.S.A. PATRIOT Act act at a high level?
25    A.  Sure.  So the U.S.A. PATRIOT Act is actually an acronym,
```

1   so it stands for Uniting and Strengthening America by

2   Providing Appropriate Tools Required to Intercept and

3   Obstruct Terrorism.

4           So it was a regulation that the government put in

5   place -- or not a regulation.  It was an Act that the

6   government passed to help identify terrorists, to give tools

7   to the government to identify terrorism.

8   Q.  How, if at all, did the passage of the U.S.A. PATRIOT

9   Act directly impact BSA and AML regulations at the bank?

10  A.  Sure.  Parts of the U.S.A. PATRIOT Act did impact the

11  BSA regulations.  For example, the Customer Identification

12  Program requirements came out with the U.S.A. PATRIOT Act

13  and some other as well.

14  Q.  Can you please explain to the jury some of the specific

15  changes to BSA and AML compliance that resulted from the

16  passage of the PATRIOT Act at the bank.

17  A.  Yes.  So we were now required -- every financial

18  institution was now required to have what's called a

19  Customer Identification Program.

20          That program involved ensuring that customers were

21  providing their true name, their legal name, as well as

22  their taxpayer identification number, their street address,

23  their date of birth.  And then the bank was required to

24  confirm that all of that information matched that individual

25  or that business that was opening the account at the bank.

1          So that was the CIP portion.  There were a few

2     other portions.  Section 314 talked about information

3     sharing between the banks and the law enforcement as well as

4     banks and other banks.  So there were some new requirements

5     there.

6          And there were also requirements in regards to

7     foreign correspondent banks and how we treated those in our

8     bank.

9     Q.  Approximately when was the deadline for banks to

10    implement these changes under the U.S.A. PATRIOT Act?

11    A.  Sure.  The deadline was 2003 -- the end of 2003 in most

12    cases.

13    Q.  Now, after the end of 2003, when the PATRIOT Act

14    requirements went into effect, what types of customers were

15    considered high risk?

16    A.  There were different types of customers.  The regulators

17    did provide listings of customer types or business types

18    that they considered higher risk, not necessarily high risk,

19    but higher risk, so that we would evaluate whether or not at

20    our financial institution we would have that consideration.

21    Q.  Could you give just a few high-level examples of

22    high-risk customers.

23    A.  Sure.  So money service businesses, ATM operators,

24    jewellers.

25    Q.  What's a money service business?

Maltsch - Direct

1    A.  Yes.  What's a money service business?  It is a business

2    like a check cashing store that you see on the corner.  It's

3    a business that actually provides financial services -- I'm

4    sorry, I talk with my hands a lot -- that provides financial

5    services to its clients.

6          So we would bank that money service business and

7    then they would have -- they would actually cash checks for

8    their customers, send money -- sell money orders to their

9    customers, maybe wire funds for their customers, that type

10   of thing.

11   Q.  In your compliance role, what guidance would you look to

12   to determine what types of business were considered high

13   risk?

14   A.  We looked at -- well, certainly all of the regulatory

15   guidelines that were provided.  And the regulators had an

16   examination manual, it's pretty lengthy, and within it they

17   actually list the types of businesses that are considered

18   higher risk.

19   Q.  Now, you testified there were increased regulations

20   around foreign correspondent banking as a result of the

21   U.S.A. PATRIOT Act.  Just briefly and at a very high level,

22   what is a foreign correspondent bank?

23   A.  Okay.  So there are banks that are not chartered within

24   the U.S. but they're chartered outside of the U.S., say in

25   England.  They periodically will have to do business or

1    their customers would like to do business in U.S. dollars.

2    In order for them to offer that service to their customers,

3    they have to have an account -- the bank -- the foreign bank

4    has to have an account at a U.S. bank.  So that's considered

5    a correspondent relationship.

6    Q.  And you mentioned the CIP program that involved

7    collecting information about a customer's name and address.

8    What did that entail just in terms of what the bank had to

9    do?

10   A.  Well, it entailed -- we had to update our systems to

11   ensure that we were recording that information as well as

12   validating that information.

13   Q.  And was the CIP or Customer Identification Program

14   required to be collected by banks before the U.S.A. PATRIOT

15   Act was passed?

16   A.  It was not.

17   Q.  So that basic information of that type wasn't required

18   by law to be collected before then?

19   A.  It wasn't required by law, but certainly common sense

20   makes, you know -- most financial institutions were

21   collecting that type of information.

22   Q.  Now, I want to take a step back and ask you some

23   questions about the bank's BSA and AML program before 2003.

24           Now, when you first took on the role at the bank

25   involving BSA and AML, what type of suspicious activity were

Maltsch - Direct

```
 1    banks focused on?
 2    A.  We were very --
 3              MR. COLLYARD:  Objection, Your Honor, beyond the
 4    scope of M&I or BMO Harris Bank.  She's asked questions
 5    about other banks and what other banks were focused on.
 6              THE COURT:  Understood.
 7              MS. PARLOVECCHIO:  I can recraft my question.
 8              THE COURT:  Sustained.
 9              MS. PARLOVECCHIO:  Thank you, Your Honor.
10    BY MS. PARLOVECCHIO:
11    Q.  Can you tell us what type of suspicious activity M&I was
12    focused on based on its understanding of the industry at the
13    time.
14    A.  Yes.  We were focused on cash activity.
15    Q.  What type of cash activity was the bank focusing on?
16    A.  Structuring, large cash transactions that were not
17    consistent with businesses.
18    Q.  What, if any, automation existed to review cash
19    transactions at M&I prior to 2003?
20    A.  So we did have reports of cash activity that were
21    manually reviewed by individuals.
22    Q.  And was anything done to review cash transactions in an
23    automated fashion?
24    A.  Prior to 2003 it was not.
25    Q.  Now, prior to 2003 how were AML responsibilities
```

1    organized across the whole bank?

2    A.  Prior to 2003 we had somewhat of a decentralized

3    environment where each business area was responsible for

4    understanding the policy and the program and developing

5    their policies and procedures.

6    Q.  And to be clear, what suspicious activity monitoring was

7    the bank doing in the pre-2003 time frame across the bank?

8    A.  It involved training and escalation of the

9    identification of unusual activity.

10            So if a teller identified someone coming in with

11   $10,000 in cash for a business, let's say it's a gas

12   station, they were coming in on a regular basis with $10,000

13   on a weekly basis and now it increased to 50,000, that would

14   have raised a red flag to the teller and the teller would

15   escalate that information to us.

16   Q.  Now, you mentioned that the bank before 2003 was using

17   cash transaction reports?

18   A.  Yes.

19   Q.  Who was actually monitoring those cash transaction

20   reports?

21   A.  It was part of our Support Services Group that was

22   outside of compliance.  That was a branch operations support

23   group.

24   Q.  Now, during this time period before 2003, was there a

25   centralized AML Group that oversaw all AML responsibilities

Maltsch - Direct

1    of the bank?

2    A.  No, there was not.

3    Q.  And did that eventually change?

4    A.  It did.

5    Q.  And when did it change?

6    A.  It changed in early 2004.

7    Q.  Okay.  We'll talk a bit about that later.

8              Now, do you recall receiving a copy of a letter in

9    2003 from the Federal Reserve with its results of the 2003

10   exam?

11   A.  Yes.

12   Q.  At a high level, what were the results of the exam?

13   A.  The results of the exam were not satisfactory.  We were

14   required to enhance our BSA/AML program.  Basically, there

15   were three pieces that we needed to work on and that was to

16   increase automation of our transaction monitoring, increase

17   our independent audit function, as well as training.

18   Q.  How did you react when you received the 2003 letter from

19   the Federal Reserve?

20   A.  Well, I was a little disappointed because all of those

21   things we had started to work on and we had some discussions

22   with them.  So we were certainly hoping that they would take

23   some of that into consideration.

24   Q.  At a high level, what were your plans at M&I to enhance

25   the program in light of receiving this letter?

1    A.  Sure.  Sure.  So, first of all, from the automation

2    perspective, automating transaction reporting, so that

3    manual report that we were getting and somebody was manually

4    flipping through each page, we were -- we began to create

5    some rules around those transactions and we were able to

6    apply those rules from a systematic perspective rather than

7    an individual in their mind as they were going through that

8    paper.  So we semiautomated the reports and some rules

9    against those cash transactions.  We then also started to

10   look at how can we look at foreign wires to and from

11   higher-risk countries.

12            So that was the first step.  The second step was

13   to look to a truly fully automated system, which eventually

14   was Searchspace, but.

15   Q.  Are there any other steps that you took to respond to

16   the fed's 2003 exam, in addition to automation and the other

17   steps you've described?

18   A.  Well, our audit area increased their reviews of the AML

19   function.  And the training, we developed training,

20   system-wide training, in-person training.  So we required

21   everyone to attend a two-hour session on BSA/AML in person

22   and that was conducted across the organization.

23   Q.  Were there any changes in staffing as a result of the

24   fed 2003 exam at a high level?

25   A.  Oh, yes, absolutely.  Sorry, I forgot this part.  We

 1   developed -- in addition to myself becoming the subject

 2   matter expert on BSA/AML for the company, we developed an

 3   AML Monitoring Group.  So that was the first time we

 4   centralized the function to monitor transactions for

 5   Suspicious Activity Reporting.

 6   Q.  Ms. Maltsch, I'm going to direct your attention back to

 7   DD-3, that diagram of the compliance structure.

 8           In using DD-3, can you just describe for the jury

 9   what we're seeing here at a high level.

10   A.  Sure.  This is our BSA/AML organizational chart.  So it

11   shows where some AML accountability and responsibilities

12   lied.

13   Q.  And was this the structure before or after the fed

14   exam --

15   A.  This was after.

16   Q.  -- in 2003?

17           I'm sorry.

18   A.  I'm sorry.

19   Q.  Was this the organizational structure before or after

20   the federal exam in 2003?

21   A.  After.

22   Q.  Now, I see here on the second box down on the

23   organizational chart we have "Corporate AML Committee."

24           And can you just describe for the jury at a high

25   level what the AML Committee is.

1    A.  Sure.  We brought together subject matter experts from

2    each of the business lines that also had some AML expertise.

3    So they were subject matter experts on their line of

4    business as well as they had AML expertise.

5              So we brought those individuals together and

6    formed a committee for AML and we met monthly to talk about

7    AML issues.  We talked about the fed exam and some of the

8    things that we were doing to enhance our program.  We talked

9    about the new Customer Identification Program rules that

10   were out there.

11             And the purpose of the meeting was to ensure that

12   we had consistent messaging across all of our business lines

13   and that we were then having an understanding of each

14   other's lines of business as well.

15   Q.  Were you a member of the AML Committee?

16   A.  I was.

17   Q.  And were you a member of the AML Committee from 2003 to

18   2008?

19   A.  I was.

20   Q.  You mentioned that there was representation from

21   different areas of the bank.  What was the purpose of having

22   representation from each business unit?

23   A.  It was because obviously -- not obviously.  Each

24   business area brought with it different products and

25   services that it oversaw and it was to, again, ensure

```
 1    consistency of messaging across all the business lines.

 2    Q.  What, if anything, did the committee do to memorialize

 3    meetings?

 4    A.  We developed minutes.

 5    Q.  I want to show you what is marked for identification as

 6    Defendant's Exhibit 50190, which will be in your small

 7    binder.

 8    A.  Um-hmm.

 9    Q.  And just at a high level, what is this?

10    A.  These are minutes to the meeting -- to one of our AML

11    Committee meetings.

12    Q.  And who drafted these minutes?

13    A.  I did.

14    Q.  Were the minutes made and maintained in the regular

15    course of M&I's business?

16    A.  They were.

17              MS. PARLOVECCHIO:  Your Honor, the defendant

18    offers Defendant's Exhibit 50190.

19              MR. COLLYARD:  No objection.

20              THE COURT:  50190 is received.

21              MS. PARLOVECCHIO:  Thank you, Your Honor.  May we

22    publish?

23              THE COURT:  (Indicating.)

24    BY MS. PARLOVECCHIO:

25    Q.  Ms. Maltsch, I want to direct your attention to page 4.
```

1    Oh, I'm sorry.  To page 2, rather.

2    A.  Sure.

3    Q.  Under "Targeted Face-to-Face AML Training," can you just

4    read the first sentence there.

5    A.  Okay.  "About half of the scheduled face-to-face

6    training sessions have been conducted."

7    Q.  And is there a date by which they will be completed?

8    A.  There is, June 30th.

9    Q.  And by the way, what is the date of these meeting

10   minutes?

11   A.  May 6, 2004.

12   Q.  So what was happening just generally around that period

13   of time?

14   A.  Well, we were working on enhancing our AML program,

15   again, the development of that AML Monitoring Group.  So we

16   gave updates on that as well.  And automation, looking for

17   increased automation.

18   Q.  And so was this a period of time where you were

19   implementing those post fed exam --

20   A.  Yes.

21   Q.  -- enhancements?

22        Now I want to direct your attention to page 4 and

23   Section 10 under the heading "Open Discussion."  Can could

24   you read -- under the first bullet, could you just read the

25   first sentence.

Maltsch - Direct

1    A.  Sure.  "The targeted training sessions have caused an

2    increase in the number of Suspicious Activity Logs submitted

3    by the branches and central business units."

4    Q.  And the next sentence?

5    A.  "This reflects favorably on the sessions."

6    Q.  And then also in the first bullet, the third and fourth

7    sentences there.

8    A.  I'm sorry.  Do you want the next one as well?

9    Q.  The next sentence says, "M&I has significantly improved

10   its ability to recognize and report suspicious activity."

11   A.  Yes.

12   Q.  "For example, 35 SARs were filed in April of 2004

13   compared to 2 SARs filed in April 2003."  Did I read that

14   correctly?

15   A.  You did.

16   Q.  Now I want to direct your attention to page 2,

17   Section 6.

18   A.  Okay.

19   Q.  Under "Update on Centralized AML Monitoring," could you

20   just read the first bullet.

21   A.  "Centralized AML Group:  John has begun the process of

22   interviewing candidates for the Analyst positions that will

23   be part of his group."

24          So the first thing we did for the development of

25   an AML Monitoring Group was hire a manager and then he was

Maltsch - Direct

1    identifying his team at this point.

2    Q.  And is that related to the AML Monitoring Group?

3    A.  It is.

4    Q.  Now I want to direct your attention under the same

5    section to the third bullet.

6    A.  Yes.

7    Q.  Is there a reference to Searchspace there?

8    A.  It does.

9    Q.  And what does it say about Searchspace?

10   A.  "Third-Party Automated System:  Searchspace has been

11   selected as the provider of AML monitoring software for

12   Marshall & Ilsley Corporation.  M&I is Searchspace's 18th

13   AML installation.  They have a proven track record of

14   providing a fully functional system in a relatively short

15   period of time."

16   Q.  Thank you.  And now, finally, I want to direct your

17   attention to page 3.

18   A.  Okay.

19   Q.  About halfway down the page after -- the first sentence

20   under "Enhanced Customer Due Diligence," what is just

21   generally being discussed here?

22   A.  It's the development of our enhanced due diligence

23   process for higher-risk customers.

24   Q.  And was that process being implemented during this

25   period of time?

 1    A.  It was.

 2            MS. PARLOVECCHIO:  We can take that down now.

 3    Thank you.

 4    BY MS. PARLOVECCHIO:

 5    Q.  What was your involvement with the system's automation

 6    that occurred after the Federal Reserve's examination?

 7    A.  Sure.  We developed or we brought together a search

 8    committee, basically, to identify what our system needs were

 9    as well as to begin the review of the various software

10    providers that were out there.  So I served on that

11    committee and -- yeah.

12    Q.  And I know that the meeting minutes reference

13    Searchspace.  Did you have an understanding of why M&I chose

14    Searchspace?

15    A.  We liked its functionality.  We liked the fact that it

16    was able to be installed in a relatively short period of

17    time so we could get it up and running.  And we also visited

18    other financial institutions that had it installed and got

19    their feelings on it as well.

20    Q.  When was Searchspace ultimately implemented?

21    A.  In 2005.

22    Q.  Now, what, if anything, did M&I do to enhance its

23    ability to detect suspicious activity in the time between

24    receiving the Federal Reserve's 2003 results and the

25    implementation of Searchspace in 2005?

1    A.  Sure.  We did some interim automation and that was

2    taking those cash reports that were being manually reviewed,

3    applying some sets of rules to them to provide us some

4    initial alerting of that activity, as well as began

5    development of international wire activity reports.

6    Q.  Did M&I do anything with regard to staffing during that

7    interim period to assist in --

8    A.  Yes.  So during that period, even though Searchspace

9    wasn't fully installed and up and running, we still had our

10   Centralized Monitoring Group being formed so that they could

11   start reviewing those reports from a centralized function

12   and help building and enhancing those reports as we went

13   along.

14   Q.  Now, you testified that there was a wire report focused

15   on foreign wires?

16   A.  Yes.

17   Q.  Can you just describe what types of foreign wires that

18   was focused on.

19   A.  Yes.  It was focused on foreign wires to higher-risk

20   jurisdictions, those countries that were known for terrorist

21   activity and drug activity, that type of thing.

22   Q.  How would you determine what a high-risk jurisdiction

23   was?

24   A.  The regulators did produce some lists of higher-risk

25   jurisdictions and those, of course, served as our baseline.

1    There were also other industry publications that we were

2    able to read and make that determination.

3    Q.  Now, you testified about the AML Monitoring Group being

4    developed after the 2003 exam.  Can you describe at a high

5    level what the function was of that group.

6    A.  The function was to have a centralized view of

7    transactions and transaction monitoring across the company.

8    Q.  Are you familiar with a 30-day deadline in connection

9    with the reporting of suspicious activity?

10   A.  I am.

11   Q.  What is the 30-day deadline and what is it tied to?

12   A.  The 30-day deadline requires us to file Suspicious

13   Activity Reports within 30 days of identifying activity as

14   suspicious.

15   Q.  So just in view of your understanding of the process of

16   how suspicious activity would be identified and reported,

17   can you just describe where in the process that clock starts

18   ticking.

19   A.  It would start ticking at the time we determined that --

20   so an investigation was completed and we determined a

21   Suspicious Activity Report needed to be filed.

22   Q.  In your AML-related roles between 2004 to 2008, did you

23   have an occasion to observe the staffing of the AML

24   Monitoring Group?

25   A.  I did.

Maltsch - Direct

```
1    Q.  Were there occasions when M&I decided to increase

2    staffing of the group?

3    A.  Yes.

4    Q.  And what prompted that increase?

5    A.  We had metrics that we watch very closely.  As the

6    system continued to be enhanced and additional alerts

7    started to generate, the volumes increased and we at that

8    point in time would go to management and request additional

9    staffing.

10   Q.  Do you recall approximately how large the AML Monitoring

11   Group was when it first started?

12   A.  It started with a manager and two analysts.

13   Q.  And approximately how big did it get by 2008?

14   A.  I believe about 20.

15   Q.  Are you aware of the staffing levels in the AML

16   Monitoring Group ever affecting the timeliness of suspicious

17   activity reporting?

18   A.  Not reporting, no.

19   Q.  How about the timeliness of SARs filing?

20   A.  No.

21   Q.  Are you familiar with something called the SAR

22   Committee?

23   A.  I am.

24   Q.  Were you a member of the SAR Committee?

25   A.  I was.
```

1          MS. PARLOVECCHIO:  And may we have DD-3 again,

2     please.

3     BY MS. PARLOVECCHIO:

4     Q.  Ms. Maltsch, I'm showing you again DD-3, which is the

5     BSA/AML organizational chart.

6          Could you just show the jury where the SAR

7     Committee sat in the organizational chart.

8     A.  It is right here (indicating).

9     Q.  Thank you.  Were you a member of the SAR Committee?

10    A.  I was.

11    Q.  And just at a high level, what was the SAR Committee?

12    A.  So the SAR Committee reviewed all SAR recommendations.

13    So the analysts came to the SAR Committee and presented

14    their case that they were recommending filing a SAR on, and

15    the SAR Committee would agree or perhaps ask for additional

16    information before filing a SAR.

17    Q.  What was the purpose of having a committee dedicated to

18    reviewing that type of information?

19    A.  It was -- the Centralized Monitoring Group was new, so

20    we wanted to ensure consistency of documentation as well as

21    consistency of decisioning as to whether or not to file a

22    SAR.

23    Q.  Are you familiar with the term "exit strategy" in

24    banking?

25    A.  Yes.

1    Q.  What does the term "exit strategy" mean?

2    A.  So "exit strategy" means that a customer is doing

3    something that's so egregious that we do not want to do

4    business with them anymore.  So we want to close their

5    account out.

6    Q.  What role, if any, did the SAR Committee play in

7    deciding when to use an exit strategy on a customer?

8    A.  Sure.  There were cases where after hearing the details

9    of the case, the SAR Committee would recommend that we close

10   the customer's accounts out.

11   Q.  Who made the ultimate decision about that?

12   A.  So the banker would make the ultimate decision.  The SAR

13   Committee would make the recommendation and we would ask the

14   banker to close that account.

15   Q.  If the bank filed a SAR on a customer, did the bank

16   automatically close the customer's account?

17   A.  No.

18   Q.  How long was the SAR Committee in place?

19   A.  It went about a year.

20              MS. PARLOVECCHIO:  Thank you.  You can take it

21   down.

22   BY MS. PARLOVECCHIO:

23   Q.  Ms. Maltsch, what, if any, impact did the 2003 Federal

24   Reserve exam have on the banking culture at M&I?

25   A.  I think it raised awareness through our training.  So we

1    did training for thousands of employees as well.  So it

2    certainly raised awareness of what AML is and what their

3    primary responsibilities are from a frontline banking

4    perspective.

5    Q.  Now, you testified earlier that you had a role in

6    developing trainings.  What, if any, role, did you have in

7    the trainings that the bank put together after the 2003

8    federal examination?

9    A.  So for the in-person training, my team did develop that

10    training as well as executed on it.  They provided that

11    in-person training as well.

12    Q.  Who was the training for?

13    A.  It was for any individual in the bank, any bank employee

14    that had customer contact or transaction contact.

15    Q.  So it was for employees all across the bank?

16    A.  All employees across the bank.

17    Q.  Now, what was the -- did you personally give any of the

18    trainings?

19    A.  I did.

20    Q.  What was the message you sought to communicate with

21    these trainings?

22    A.  So we were very lucky that we had a very supportive

23    senior executive management.  Our chief executive officer,

24    our president of the corporation provided us with a video.

25    He allowed us to videotape him with a message right at the

Maltsch - Direct

```
 1    beginning of the training that ended with, you know, this is
 2    not only a regulatory requirement, it's the right thing to
 3    do.
 4            So having that as a strong message was right at
 5    the beginning.  The employees all perked up and listened
 6    because they knew who this individual was and how important
 7    this was to our financial institution.
 8    Q.  Now, in seeking to communicate this strong message, did
 9    you have an understanding about whether you had the support
10    of the bank's management?
11    A.  Absolutely.
12    Q.  I want to show you what's in evidence as Defendant's
13    Exhibit 40067.  And just generally, what are we looking at
14    here?
15    A.  This is the deck, the training material that was used in
16    those face-to-face training sessions in 2004.
17    Q.  And just flipping ahead one slide, I see there's some
18    notes here as well.  Do you see the notes there?
19    A.  The Dennis Kuester one or --
20    Q.  Oh, at the bottom.
21    A.  Yep.
22    Q.  Okay.  So did you have any role in developing this
23    training and the notes?
24    A.  Yes.
25    Q.  What was your role?
```

 1    A.  I oversaw it.

 2    Q.  And just to be clear, that included drafting --

 3    overseeing drafting the notes?

 4    A.  It did.

 5    Q.  I want to direct your attention to slide 19 of this

 6    exhibit.  And specifically I want to direct your attention

 7    to the first speaker note, "Being familiar is not the same

 8    as knowing your customer and what their legitimate and

 9    expected activities are."  Do you see that?

10    A.  Yes.

11    Q.  What were you trying to convey with this note?

12    A.  That there's a difference between knowing what a

13    customer does on a regular basis and knowing whether -- what

14    they are doing is legitimate and should be expected for the

15    type of business they are.

16    Q.  And when you talk about what's expected, what's the type

17    of expectation?

18    A.  It's to understand what the business is that that

19    customer is in and if that kind of activity makes sense for

20    them.

21    Q.  And is this focused on the customer's typical

22    transactional activity or something else?

23    A.  Typical transaction activity.

24    Q.  Now, based on your understanding of the bank's policies

25    with regard to "know your customer," what party would

1    provide the information that a business banker could rely

2    upon in with to his or her customer's typical transaction

3    activity?

4    A.  The customer.

5    Q.  How did an AML analyst obtain information about a

6    customer's expected transactional activity?

7    A.  So they can could the banker and talk to the banker

8    about that.  We also had a new business account checklist

9    that might be available.

10   Q.  Now I want to direct your attention to slide 22 and

11   specifically I want to direct your attention to the second

12   bullet, where it says, "Suspicious/unusual is when a

13   person's transactions vary from the type or size expected."

14   Do you see that?

15   A.  Yes.

16   Q.  What is meant here by "type expected"?

17   A.  For that business type.

18   Q.  And how about "size expected"?

19   A.  It would be, you know, after -- just from what you know

20   about the customer's business and whether or not the

21   transaction activity makes sense, that value makes sense.

22   Q.  And could you just give us an example.

23   A.  Sure.  So if I have a business that's a gas station and

24   they're bringing in $10,000 in cash a week and we have

25   another business that has the same type of gas station and

1    they're bringing in a different volume, that might, you

2    know, question -- you might want to question that.

3    Q.  Now, the last line of the speaker notes on this slide

4    say, "When you see something that you can't explain or seems

5    suspicious, refer upward to your management or Corporate

6    Compliance."  Do you see that?

7    A.  Yes.

8    Q.  And what, generally, were you trying to communicate

9    here?

10   A.  That the banker is not alone, that it's not necessarily

11   up to them to determine is this really suspicious activity.

12   But if it's unusual and it just makes them go hmm, you know,

13   bring it up to your supervisor and escalate it to corporate

14   compliance and we'll take it from there and do some

15   investigation to determine if a SAR should be filed.

16   Q.  Now, when you were doing these trainings, did you ever

17   train business bankers to make a report to corporate

18   compliance if a customer asked them for a banking product

19   that was less common than other banking products?

20   A.  No.

21   Q.  As part of these trainings, did you instruct business

22   bankers to monitor their customer's transaction activity?

23   A.  No.

24   Q.  Did you ever train M&I employees to report a suspicious

25   wire transaction activity tied to a specific dollar amount

1    going in and out of an account?

2    A.  No.

3    Q.  Why not?

4    A.  Because we have lots of customers and we have some small

5    business customers, we have large business customers.  So

6    the volume is going to vary based on the customer.  It's

7    always going to be case specific, customer specific.

8    Q.  Now I want to direct your attention to slide 29, and

9    that's entitled "BSA Reporting and Recordkeeping

10   Requirements."

11        What type of recordkeeping requirements is this

12   slide addressing?

13   A.  It's addressing the data that we're required to retain

14   within our systems on each wire transaction that's either

15   sent or received.

16   Q.  Now, I want to direct your attention to the speaker note

17   on slide 29 that says, "Generally wires are considered

18   higher risk transactions, especially international wires."

19        Can you tell the jury what you meant with these

20   notes.

21   A.  It was meant to explain why the government requires us

22   to keep additional information about our wire transactions.

23        So wires, of course, can move quickly, can be a

24   little bit anonymous if we aren't keeping that documentation

25   on those wires.

```
1              So it was meant to explain why we have these

2    recordkeeping requirements.  And especially with

3    international wires, that was the focus of the terrorist

4    financing and drug trafficking.

5    Q.  So just with respect to international wires, is that

6    something that was discussed when you were giving these

7    trainings?

8    A.  It's all wire transactions that require the

9    recordkeeping and reporting requirements.  We were just

10   trying to give a little flavor behind why the government was

11   requiring us to keep some of that information.

12   Q.  And what is your understanding of why the government was

13   focused on international wires?

14   A.  Excuse me?

15   Q.  What was your understanding of why the government was

16   focused on international wires?

17   A.  Looking for terrorist activity.

18   Q.  When you delivered these trainings, what reaction were

19   you able to observe from the employees that were sitting in

20   those trainings with you?

21   A.  Okay.  So back to the beginning, you know, we were able

22   to have that video by Dennis Kuester, our CEO, and that

23   brought everybody's attention.  So there was a lot of

24   interaction throughout the session.

25   Q.  Did you observe any changes in the way employees at M&I
```

1     approached AML after receiving this training?

2     A.  We did.  We started to see an increase of referrals to

3     our AML Group for suspicious activity.

4     Q.  I now want to show you what's in evidence as Plaintiff's

5     Exhibit 5, PX-5.  And do you recognize this document?

6     A.  I do.

7     Q.  What is this?

8     A.  This is specific training for our Marshall & Ilsley

9     Trust Company employees.

10    Q.  And I see that you are listed on this training?

11    A.  I am.

12    Q.  Are you familiar with this training?

13    A.  I am.

14    Q.  How did you become familiar with this training?

15    A.  So Raissa Horstmeier, who was the compliance officer and

16    the BSA/AML officer for the Trust Company, developed this

17    training based on our deck that we just looked at and -- but

18    she made it specific to the Trust Company itself because

19    that's the right thing to do.  They're not part -- they were

20    not part of the bank.  They're the Trust Company and their

21    products and services and customers worked differently than

22    a bank.

23    Q.  And just to be clear, were depository accounts located

24    at the Trust Company?

25    A.  No.

1    Q.  Now, based on your AML Committee meetings with Raissa

2    Horstmeier, did you become familiar generally with the

3    documentation requirements for opening a trust account at

4    the Trust Company?

5    A.  I did.

6    Q.  And what are some of the document requirements?

7    A.  Some of the document requirements might be on financial

8    statements of their clients because they're dealing with the

9    higher end, higher net worth clients, that type of thing.

10   Q.  Anything else?

11   A.  Financials, their tax returns, their -- it's more that

12   deep information about the customer.

13   Q.  I want to direct your attention to slide 34 of PX-5 and

14   I specifically want to focus you on the last bullet where it

15   refers to "special treatment or exceptions to documentation

16   rules."

17          What do you understand this to be referring to?

18   A.  This would be if their documentation for a specific

19   account type would require the customer to provide three

20   years of tax returns -- this is just an example -- three

21   years of tax returns, but the customer only wanted to

22   provide two for some reason, that would be an exception to

23   their rule.

24   Q.  Now, was this training in PX-5, was this training given

25   to business bankers?

Maltsch - Direct

1    A.  It was not.

2    Q.  Why not?

3    A.  Because it was focused on trust, trust -- I don't know

4    if you want to call them bankers, but trust --

5    Q.  Trust employees?

6    A.  Trust employees.

7    Q.  Could you explain to the jury what "know your customer"

8    meant during the relevant period of 2002 to 2008.

9    A.  So "know your customer" is a concept.  It's not a

10   regulatory requirement, but it is generally ensuring you

11   know what type of business your customer is engaged in.

12   It's also ensuring you've performed your CIP, your Customer

13   Identification Program, requirements.

14   Q.  How did the "know your customer" policy or KYC policy

15   apply to AML analysts?

16   A.  From an AML perspective, those were basically frontline

17   responsibilities, was to collect that information, and the

18   AML analyst would use that information when they are

19   reviewing alerts that are occurring.

20   Q.  Does "know your customer" require an AML analyst to

21   investigate every party a customer is doing business with?

22   A.  No.

23   Q.  Based on the policies and procedures and trainings you

24   provided to AML analysts, were analysts required to research

25   whether an originator or a beneficiary to a wire transaction

Maltsch - Direct

1   was a prospective customer?

2   A.  No.

3   Q.  You testified earlier regarding the BSA requirements

4   related to Customer Identification Program or CIP.  What did

5   CIP require during the 2003 to 2008 period?

6   A.  What did CIP require?

7   Q.  Yes.

8   A.  That was the basic customer information, their legal

9   name, their address, street address, not a Post Office box,

10  a street address, as well as taxpayer identification number,

11  and date of birth if they were individuals.

12  Q.  I'm going to show you what's marked for identification

13  as Defendant's Exhibit 50002.  That's in your small binder.

14  I'm sorry.  That actually is in the big binder.  My

15  apologies.  It's actually -- it's in evidence.

16  A.  I'm there.

17  Q.  I'm sorry.

18  A.  Um-hmm.

19          MS. PARLOVECCHIO:  It's actually in evidence,

20  Mr. Herzka, so we can have that document, please.  Thank

21  you.

22  BY MS. PARLOVECCHIO:

23  Q.  And just generally, Ms. Maltsch, what are we looking at

24  here?

25  A.  We're looking at a business account checklist that had

1    been revised to include the Customer Identification Program

2    requirements.

3    Q.  When did this particular checklist come into use?

4    A.  In 2003.

5    Q.  What employees of the bank used this document?

6    A.  The business bankers.

7    Q.  Was the information in a CIP checklist like this

8    gathered for existing customers of the bank?

9    A.  It was not required.

10   Q.  And why wasn't it required?

11   A.  Because the regulations stated that the CIP regulations

12   applied to new customers on a go-forward basis, so you

13   didn't apply it to existing customers.

14   Q.  When, typically, would this form be used with new

15   customers?

16   A.  When a new account was opened.

17   Q.  I want to draw your attention to page 1, which is what

18   we have up here on the screen, of DX-50002 --

19   A.  Um-hmm.

20   Q.  -- where it says, "Description of Business."

21   A.  Um-hmm.

22   Q.  How many lines are there for that description of

23   business?

24   A.  There's two lines.

25   Q.  Now I want to direct your attention to page 2 of 50002.

Maltsch - Direct

```
 1   And just in that top box, what kind of information is
 2   anticipated transaction activity meant to capture?
 3   A.  So it's meant to capture the types of activity the
 4   customer wants to conduct with the bank.  And the primary
 5   purpose of this section was to ensure we were offering the
 6   customer the right products and services for their needs.
 7   Q.  And was there any other purpose for gathering this type
 8   of information?
 9   A.  It was to understand your customer, um-hmm, and their
10   needs.
11   Q.  Now, what would AML analysts have access to in terms of
12   "know your customer" information?
13   A.  So from a systems perspective, the CIP information was
14   online.  Some of this other information was on a piece of
15   paper that was stored with new account documentation.
16   Q.  Did the standards for "know your customer" at M&I stay
17   the same or did they change over time?
18   A.  They evolved over time.
19   Q.  How did they evolve?
20   A.  They evolved in the fact that over time we started to
21   identify higher-risk business types, and at that point in
22   time we would then require additional information about
23   those higher-risk business types.
24   Q.  And what caused "know your customer" requirements to
25   evolve over time?
```

1    A.  They -- it wasn't a regulatory requirement, but at the

2    same time the regulatory expectations were that if we had

3    what we considered higher-risk customers, that we would dive

4    deeper into their business models.

5    Q.  Did "know your customer" requirements during the period

6    of 2002 to 2008, were they the same as "know your customer"

7    requirements after 2008?

8    A.  So the --

9            MR. COLLYARD:  Objection, Your Honor, relevance.

10           THE COURT:  Overruled.  You may answer.

11           THE WITNESS:  So they were basically the same.  It

12   was, you know, knowing your customer's business type,

13   understanding.

14   BY MS. PARLOVECCHIO:

15   Q.  Was more information required over time?

16   A.  It was if they were considered higher risk.

17   Q.  Now, after 2003 were the "know your customer"

18   requirements the same for all customers or were there

19   different requirements for some customers?

20   A.  They were different requirements if they were high risk,

21   but generally they were the same for all customers.

22   Q.  Are you familiar with the term "enhanced due diligence"?

23   A.  Yes.

24   Q.  How are you familiar with enhanced due diligence?

25   A.  So my team developed the enhanced due diligence process,

1    which was the identification of customers that were

2    considered higher risk and the additional information that

3    we would collect based on that customer type.

4    Q.  And at a high level, which customers did enhanced due

5    diligence apply to?

6    A.  So, for example, money service business.

7    Q.  I want to direct your attention back to Defendant's

8    Exhibit 40067 and this time we're going to look at slide 38

9    and it's entitled, "What are some examples of high risk

10   businesses?"

11              So what do we see here on this slide?  What are

12   some examples?

13   A.  So we have money service businesses, which I keep

14   talking about; cash-intensive businesses; charities and

15   foundations; offshore corporations located in tax and/or

16   secrecy havens and jurisdictions.

17   Q.  How did you come up with those examples for this

18   training?

19   A.  So these are business types that the examiners focus on,

20   the regulators focus on and have information about them

21   within their examination manual that they share with us, of

22   course.

23   Q.  Now, I see there's some additional examples provided in

24   the notes there.

25   A.  Um-hmm.

1    Q.  Can you just please read them to me, starting with

2    "Security brokers and dealers."

3    A.  Sure.  "Security brokers and dealers; check cashing

4    services; currency dealers and exchangers; issuers,

5    redeemers" -- "issuers, sellers or redeemers of traveler's

6    checks, money orders, stored value cards; card clubs;

7    gambling casinos, money transmitters; convenience stores,

8    parking garages, restaurants, retail stores."

9    Q.  Were purchases of consumer electronics included on this

10   list?

11   A.  No.

12   Q.  Why not?

13   A.  It was not considered a higher-risk business type by the

14   regulators.

15   Q.  Would a customer be treated as high risk simply because

16   they conducted a substantial amount of wire transactions?

17   A.  No.

18   Q.  What, if any, concern in terms of AML risk did the use

19   of manual wires present?

20   A.  They were treated the same.

21   Q.  The same as the other customers?

22   A.  Yes.

23   Q.  Would the request for a manual wire alone raise any

24   concerns about potential suspicious activity?

25   A.  No.

1    Q.  In the 2002 to 2008 time frame, did M&I have something

2    known as medium-risk customers?

3    A.  We did not.

4    Q.  Based on your understanding of the banking regulations

5    during that time frame, was M&I required to have policies

6    and procedures to classify customers as medium risk?

7    A.  No.

8    Q.  How about low-risk customers, was M&I required to have

9    customers classified as low risk?

10   A.  No.

11   Q.  Based on your understanding of the banking regulations

12   during that time frame, was M&I required to have policies

13   and procedures to classify customers designated as low risk?

14   A.  No.

15   Q.  Did M&I have any policies and procedures requiring a

16   yearly review of medium- or low-risk customers?

17   A.  No.

18   Q.  Was enhanced due diligence part of the AML Monitoring

19   Group or was it part of something else?

20   A.  It was part of our AML Support Group, which my group was

21   the enhanced due diligence.

22   Q.  So that was separate from the AML Monitoring Group?

23   A.  It was separate, yes.

24   Q.  Now, what, generally, were the responsibilities of

25   business bankers with respect to anti-money laundering after

1    2003?

2    A.  So it was to ensure that when they opened up a new

3    account for a new customer, that they were collecting the

4    appropriate information as well as understanding that

5    customer's general business type.

6    Q.  Based on the policies and procedures, to what degree

7    were business bankers required to understand their

8    customer's business?

9    A.  So it was -- you know, there are two lines on the

10   business account checklist.  So it was just to generally

11   understand what business and industry that customer was in.

12   Q.  How did you view the work you were doing as a member of

13   the AML Group?

14   A.  I was actually quite proud of it.  I thought we had a

15   lot of dedicated individuals that were working to enhance

16   our program and to do the right thing for the bank as well

17   as for our customers.

18   Q.  When did you learn that Tom Petters and his entities,

19   including PCI, were involved in a Ponzi scheme?

20   A.  2008.

21   Q.  How did you come to learn about the Ponzi scheme?

22   A.  When -- part of our process was to review incoming

23   subpoenas, and we received a subpoena on the accounts.

24   Q.  I'm going to show you what is in evidence as DX-50725.

25   And just generally, what are we looking at here?

Maltsch - Direct

```
 1    A.  So this is after we received the subpoena.  Then Mary,

 2    one of our AML analysts, did the investigation or the

 3    initial investigation and this was a summary of what she

 4    initially found.

 5    Q.  And just scrolling up to the top there --

 6    A.  Um-hmm.

 7    Q.  -- were you a recipient of this e-mail?

 8    A.  I was.

 9    Q.  And what was the purpose of the review that Ms. Drewiske

10    was conducting here?

11    A.  Well, when we receive a subpoena on a customer and it's

12    not related to -- or it's related to something that requires

13    investigation, so it was -- the purpose was to -- we now

14    have new information, so we have new information about our

15    customer that we previously didn't know because of the

16    subpoena and it prompted a deep-dive review of the Petters

17    relationship with us.

18    Q.  I want to direct your attention to the first sentence of

19    the second paragraph of this e-mail.  And can you just read

20    it, please.

21    A.  Sure.  "The articles mention certain entities within the

22    Petters family of companies:  Enchanted Family Buying

23    Company, Nationwide International Resources and Metro Gem as

24    the shell companies in which he was using to lure customers

25    [sic]."
```

1    Q.  Did you know any of this information prior to receiving

2    this e-mail on September 29th, 2008?

3    A.  I did not.

4    Q.  And just directing your attention to further down the

5    e-mail chain, the first part of the e-mail we looked at --

6    A.  Um-hmm.

7    Q.  -- I see there's some links there to several news

8    articles.  Do you see that?

9    A.  Yes.

10   Q.  Was any of this information available to you prior to

11   September 29th, 2008?

12   A.  No.

13   Q.  And why wasn't this information available to you prior

14   to late 2008 -- September 2008?

15   A.  I had not seen -- it was not publicly available at that

16   point.

17   Q.  What was your reaction when you learned about the Ponzi

18   scheme?

19   A.  Shock, disappointment that, you know, our financial

20   institution was being used to defraud its customers.

21   Q.  Are you aware that Mary Drewiske did an analysis of the

22   PCI account after this e-mail was sent?

23   A.  Yes.

24   Q.  Did you eventually review that analysis?

25   A.  I did.

1    Q.  What was your understanding of whether she could have

2    performed that analysis without that publicly available news

3    information that we just talked about?

4    A.  It would be very difficult for her without having this

5    additional information.

6    Q.  Why is that?

7    A.  Because there was -- you know, we didn't know.  The

8    public didn't know about it, so.

9    Q.  Based on what you reviewed, what is your understanding

10   of how Mary was able to explain the complexity of the

11   scheme?

12   A.  Well, she was able to, you know, read the subpoena, read

13   the news articles, and then that helped her connect the dots

14   between all of the organizations that were involved.

15   Q.  Ultimately what was the purpose of Mary Drewiske doing

16   this review?

17   A.  To determine if we should file a Suspicious Activity

18   Report.

19   Q.  Now, without revealing whether a Suspicious Activity

20   Report was actually filed on the PCI account, can you tell

21   us whether you have an understanding of whether or not a SAR

22   was filed on the PCI account.

23   A.  I do.

24   Q.  Are you permitted to tell us whether or not a SAR was

25   filed on the PCI account?

Maltsch - Direct

```
 1     A.  I am not.

 2     Q.  Why --

 3     A.  The regulations --

 4     Q.  I'm sorry.

 5     A.  Go ahead.

 6     Q.  Why not?

 7     A.  The regulations are very specific in that we cannot

 8     disclose the information that a SAR was filed with anyone.

 9     Q.  What is your understanding of what would happen to you

10     if you disclosed that information?

11     A.  I would go to jail.  I could go to jail.

12     Q.  Are you aware that eventually Tom Petters, Deanna

13     Coleman, and a number of other people went to jail for their

14     role in the Ponzi scheme?

15     A.  I am.

16     Q.  Did you know there was a Ponzi scheme happening before

17     it was discovered by authorities in 2008?

18     A.  No.

19     Q.  Did you have any reason to suspect there was a Ponzi

20     scheme happening in the PCI account before September 2008?

21     A.  No.

22              MS. PARLOVECCHIO:  May I have a moment to consult

23     with my colleagues, Your Honor?

24              THE COURT:  You may.

25          (Defendant's counsel confer)
```

 1              MS. PARLOVECCHIO:  I have no further questions,

 2      Your Honor.

 3              MR. COLLYARD:  Your Honor, I will have extensive

 4      questions if you'd like to take a break.

 5              THE COURT:  I think it is appropriate for us to

 6      take our midmorning break now, Members of the Jury.  So

 7      please be prepared to return to the courtroom at 20 minutes

 8      after 10:00.  Okay?  And please remember your instructions

 9      and continue to abide by them.

10              LAW CLERK:  All rise for the jury.

11      (Jury excused)

12                          **IN OPEN COURT**

13                       **(JURY NOT PRESENT)**

14              THE COURT:  We are in recess.

15      (Recess taken at 10:07 a.m.)

16                      *    *    *    *    *

17      (10:24 a.m.)

18                          **IN OPEN COURT**

19                         **(JURY PRESENT)**

20              THE COURT:  Please be seated.  Good morning,

21      Counsel.  You may proceed.

22              MR. COLLYARD:  Thank you, Your Honor.

23                       **CROSS-EXAMINATION**

24      BY MR. COLLYARD:

25      Q.  Good morning, Ms. Maltsch.

Maltsch - Cross

1    A.  Good morning.

2    Q.  When did you stop working at BMO Harris Bank?

3    A.  In December of 2020.

4    Q.  I want to pick off -- I think it's easiest if we kind

5    pick off where your counsel left all.  I want to just ask

6    you a few questions.  First we'll start with Petters

7    Company, Inc.

8         Did you know during March of 2005 through June of

9    2008 that anti-money laundering alerts were sounding off on

10   a monthly basis for 39 months in a row for billions of

11   dollars going in and out of that account?

12   A.  I was not directly aware of that.

13   Q.  You didn't know that during that time period at all, did

14   you?

15        MS. PARLOVECCHIO:  Objection, asked and answered.

16        THE COURT:  Overruled.  You may answer with words.

17        THE WITNESS:  No.

18   BY MR. COLLYARD:

19   Q.  So I guess what my point is, Ms. Maltsch, is:  None of

20   the AML analysts came to you with all of your experience and

21   knowledge and said there's 39 -- there's been month after

22   month after month of alerts going off for billions of

23   dollars going in and out and those alerts are sounding off

24   for both the number or the value -- the value and the volume

25   of incoming and outgoing wires on the Petters Company, Inc.

1    account, nobody did that, right?

2    A.  No.

3    Q.  And certainly you didn't have the opportunity or you

4    didn't -- you weren't the one who was reviewing any of those

5    alerts for incoming and outgoing wires for billions of

6    dollars, right?

7    A.  Correct.

8    Q.  And your counsel asked you if you knew who Enchanted or

9    Nationwide was; is that right?

10   A.  At the time of the newsletter -- or the newspaper

11   articles.

12   Q.  Did you know, Ms. Maltsch, that between March of 2005

13   and through June of 2008 that Enchanted and Nationwide were

14   wiring in billions and billions of dollars into the account

15   and those wires in particular had alerted for 39 months for

16   three and a half years?

17   A.  No.

18   Q.  Did you know that your anti-money laundering analysts

19   actually identified wires from Enchanted and Nationwide and

20   listed them in the comments sections when they decided to

21   close those alerts?

22   A.  I was not directly involved in the alert --

23   Q.  And if the --

24   A.  -- process.

25   Q.  I appreciate that.  And if the anti-money laundering

1    analysts had seen billions of dollars in wires coming in

2    from Enchanted and Nationwide and those alerts were sounding

3    off for the value and volume of incoming wires, you would

4    have expected your anti-money laundering analysts to know a

5    little bit about whether or not the wires from Enchanted and

6    Nationwide made sense for the Petters Company, Inc.

7    business, correct?

8              MS. PARLOVECCHIO:  Objection to form, vague.

9              THE COURT:  Overruled.

10             THE WITNESS:  I would expect them to have

11   understood that those were related companies and it made

12   sense to them at the time.

13   BY MR. COLLYARD:

14   Q.  And they would have had to have actually figured out how

15   those wires fit into the business or made sense for the

16   Petters Company, Inc. business, right?

17   A.  That may have been the case.

18   Q.  Well, if the alerts were going off for value of incoming

19   wires and those two entities were wiring in the majority of

20   the money of the billions of dollars coming in, you would

21   have at least expected them, the AML analysts, to look into

22   and figure out how the activity from Enchanted and

23   Nationwide made sense for the business, right?

24             MS. PARLOVECCHIO:  Objection, lack of foundation.

25             THE COURT:  Overruled.

```
 1              MS. PARLOVECCHIO:  Your Honor, may we have a brief
 2    sidebar on this?
 3              THE COURT:  No.
 4              THE WITNESS:  In hindsight I can't -- I just can't
 5    answer that question.
 6    BY MR. COLLYARD:
 7    Q.  I'm not asking you in hindsight.  I'm asking if --
 8    A.  It's all hindsight now, so.
 9    Q.  Well, I understand everything in life is hindsight --
10    A.  Um-hmm.
11    Q.  -- if you're talking about something in the past, right?
12    A.  Um-hmm.
13    Q.  That's basically what you're saying; is that right?
14    A.  Yes, but I have to put myself back in that time period.
15    Q.  Okay.  So you just gave extensive testimony about what
16    anti-money laundering analysts would do, right?
17    A.  It was more for --
18              MS. PARLOVECCHIO:  Objection to characterization.
19              THE COURT:  I didn't hear what you said, Counsel.
20              MS. PARLOVECCHIO:  I'm sorry.  Objecting to the
21    characterization of testimony.
22              THE COURT:  Sustained.
23    BY MR. COLLYARD:
24    Q.  Did you just give testimony as to what anti-money
25    laundering analysts do?
```

Maltsch - Cross

1   A.  I gave some.

2   Q.  And you had an understanding as to what anti-money

3   analysts were supposed to do during the time period of March

4   of 2005 up through June of 2008, correct?

5   A.  So my testimony was primarily involving what AML is,

6   what anti-money laundering is, as well as the frontline

7   bankers' responsibilities.

8   Q.  My question is just a little bit different.

9   A.  I know.

10  Q.  Do you have knowledge, do you have an understanding as

11  to what anti-money laundering analysts were supposed to be

12  doing from March of 2005 up through June of 2008?

13  A.  I have a general understanding, yes.

14  Q.  And as part of your general understanding, not applying

15  hindsight bias, but as part of your general understanding,

16  if alerts are going off on the Petters Company, Inc. account

17  for incoming wires showing the value of those incoming wires

18  were billions and billions of dollars and most of that money

19  is being wired in from Enchanted and Nationwide, you would

20  have a basic expectation that the anti-money laundering

21  analysts would do some type of research or analysis on those

22  two entities to determine how that activity made sense for

23  the Petters Company, Inc. business?

24      MS. PARLOVECCHIO:  Objection to the form and lack

25  of foundation.

Maltsch - Cross

```
 1              THE COURT:  Overruled.  You may answer.
 2              THE WITNESS:  It's hard to answer that question.
 3    I don't know the answer.
 4    BY MR. COLLYARD:
 5    Q.  Did you --
 6    A.  I don't --
 7    Q.  I'm sorry.
 8    A.  I don't think that each of the alerts contained billions
 9    and billions of dollars.
10    Q.  Do you know that, Ms. Maltsch?
11    A.  I don't believe so.
12    Q.  I'm asking you if you know that.
13    A.  Well, from what I've seen during the -- what I saw
14    during the investigation.  I did review the investigation
15    that was conducted in 2008.
16    Q.  Okay.  What you're talking about, just so we're clear
17    for the jury --
18    A.  Yes.
19    Q.  -- is Ms. Pesch went back and looked at certain --
20    A.  Yes.
21    Q.  -- activity -- I'm sorry.  Just let me --
22              THE COURT:  I'm going to direct you to wait until
23    the question is asked --
24              THE WITNESS:  Yeah.
25              THE COURT: -- and then respond, please.
```

1   BY MR. COLLYARD:

2   Q.  I'm sorry.  And I'll go a little bit slower too.

3   A.  I'm sorry.  I --

4   Q.  I will give you some indication as to when I'm done.

5           So what you're talking about is Ms. Pesch, Mary

6   Pesch, was instructed to -- after the Ponzi scheme was

7   revealed to the world, Ms. Pesch was instructed to go back

8   and look at a time period, a certain time period in time,

9   and look at the activity in the Petters Company, Inc.

10  account that had alerted and that the bank chose to close to

11  see if information about what was revealed to the outside

12  world appeared in that transaction activity for that

13  brief transaction activity that Ms. Pesch looked at; is that

14  correct?

15  A.  Yes.

16  Q.  And what you're saying is you looked at that activity;

17  is that right?

18  A.  I did.

19  Q.  And so what you looked at was the activity that alerted

20  from January of 2008 up until August of 2008; is that

21  correct?

22  A.  I don't recall.

23  Q.  Do you recall that that was the time period that

24  Ms. Pesch limited her investigation to?

25  A.  That would make sense to me.

1     Q.  And do you understand that during that time period there

2     were billions of dollars going in and out of the Petters

3     Company, Inc. account?

4     A.  Yes.

5     Q.  Now, if I understand you correctly, what you did not do

6     is you did not go back before January 2008, so you did not

7     go all the way back to March of 2005, when these alerts

8     started sounding off, to see the activity from March of 2005

9     up to January of 2008; do I understand that correctly?

10    A.  I personally did not.

11    Q.  Do you know what the Petters Company, Inc. business was

12    or did from the time period of March of 2005 up through

13    2008?

14    A.  From what I've read in their case file.  That's my

15    knowledge, is from the case file.

16    Q.  Okay.  So between -- just so I have this clear, from

17    March of 2005 up until Mary Pesch was asked to go back and

18    do this analysis, you had absolutely no knowledge of what

19    the Petters Company, Inc. business was or did, right?

20    A.  Correct.

21    Q.  And nobody came to you and asked you any questions about

22    that, right?

23    A.  Correct.

24    Q.  Let's take a look at -- and just so I'm clear, too, you

25    had no understanding before that time that billions of

1    dollars were being wired in and out and every cent of those

2    billions of dollars from March of 2005 up until 2008, the

3    wire activity, had alerted in Searchspace?

4            MS. PARLOVECCHIO:  Objection, asked and answered.

5            THE COURT:  Sustained.

6    BY MR. COLLYARD:

7    Q.  Let's -- you also -- counsel asked you questions, and we

8    will stick on this concept of Mary Pesch's analysis.  I'm

9    going to show you that analysis in a second.

10           But counsel asked you questions about whether or

11   not Mary Pesch could have done this analysis before 2008,

12   right?

13           MS. PARLOVECCHIO:  Objection, mischaracterizes the

14   statement.

15           THE COURT:  Overruled.

16   BY MR. COLLYARD:

17   Q.  Do you recall that testimony?

18   A.  Yes.

19   Q.  And what was your answer?

20   A.  That she wouldn't have been able to connect the dots as

21   well without that information.

22   Q.  The information you're talking about, are you talking

23   about the information about the Ponzi scheme --

24   A.  Yes.

25   Q.  I'm sorry.

Maltschr - Cross

1    A.  I'm sorry.

2    Q.  -- the Ponzi scheme being revealed to the outside world?

3    A.  Yes.

4    Q.  Okay.  You're not suggesting that the transaction

5    activity was any different during the time period of January

6    2008 to August of 2008, correct?

7    A.  Correct.

8    Q.  In fact, that transaction activity was exactly the same,

9    wasn't it?

10   A.  It was.

11   Q.  So Ms. Pesch made her conclusions based on the same

12   exact transaction activity that the bank once concluded was

13   absolutely not suspicious.  Do I have that right?

14   A.  Yes, with the information that was available to her at

15   the time.

16   Q.  So let's go to Exhibit 333, so I can show you this.

17   Your counsel did not show you this, so I want to show you

18   this.  This is the analysis that Ms. Pesch did.

19          And so that the jury can see this other than just

20   the first page, which is meaningless, this is the beginning

21   of the analysis.  And it's on page 2, if you can get there.

22   You can also see it on your screen.

23          MS. PARLOVECCHIO:  I'm sorry, Counsel.  Which page

24   is it?

25          MR. COLLYARD:  Page 2.

CASE 0:19-cv-01756-WMW   Doc. 438   Filed 01/08/23   Page 89 of 305

1                    MS. PARLOVECCHIO:  Thank you.

2      BY MR. COLLYARD:

3      Q.  Are you there, Ms. Maltsch?

4      A.  Um-hmm.

5      Q.  Okay.  So if we just start at the top here, this is

6      called an AML Case Checklist; is this right?

7      A.  Yes.

8      Q.  And so what Ms. Pesch -- Ms. Pesch is opening or is

9      identifying information that goes into what you -- what the

10     bank calls a case; is that right?

11     A.  Yes.

12     Q.  And this identifies that it's for the Petters Company,

13     Inc. and the Petters Company, Inc. account; is that right?

14     A.  Yes.

15     Q.  And if we look down, I am going to bring us down a

16     little bit more until we get to "Accounts" and we see the

17     account number there and we see the ███9018.

18            Do you have an understanding that that is the

19     Petters Company, Inc. checking account that we've been

20     talking about in this case?

21     A.  I cannot verify the number, so.

22     Q.  Is this information that you would have looked at

23     when --

24     A.  Yes.

25     Q.  -- you went back and looked at the analysis?

1    A.  Yes.

2    Q.  If we take a look at -- I will just jump to the

3    conclusion before I start asking you questions on it.

4            Let's go to the bottom of page 15 of this exhibit,

5    and I'm going to bring up the bottom paragraph before we

6    bleed onto the next page.  Are you there, Ms. Maltsch?

7    A.  I can see on the screen, but I'm not quite there.

8    Q.  I'm sorry.  If you look at the bottom of the page of

9    your document, you see there's the P-0 -- I am going to the

10   one that ends in 15, if that's helpful to you.

11   A.  Okay.  I'm there now.

12   Q.  Okay.  There we go.  And Ms. Pesch says, "Based on the

13   review, transactions similar to those detailed in various

14   articles regarding the investment scam can be seen in

15   Petters Company, Inc.'s account during the review period."

16   Do you see that?

17   A.  Yes.

18   Q.  And do you have an understanding that what Ms. Pesch is

19   saying is that she took the information now that she is

20   looking at that was in the outside world and she's going

21   back and looking at the account activity and saying I can

22   see this in the account activity; is that right?

23   A.  That's correct.

24   Q.  And then she says, she says, "The incoming and outgoing

25   wires and funds transferred through checks between companies

1    and individuals known to have been involved in the fraud

2    such as Enchanted Family Buying Company, Nationwide

3    International Resources, Deanna Coleman, Bob White, Metro

4    Gem through its connection to Frank Vennes as well as

5    several other companies that have claimed to be victims."

6    Do you see that?

7    A.   Yes.

8    Q.   And what she's doing there is saying I see activity from

9    these individuals and these entities in the transaction

10   activity, right?

11   A.   Yes.

12   Q.   And she then on the next page she writes and says,

13   "appears suspicious."  Do you see that?

14   A.   Yes.

15   Q.   And do I understand Ms. Pesch correctly to be saying

16   that she's saying she then looked at that transaction

17   activity and that activity, based on some of her knowledge

18   here that she can see in the account, appears suspicious?

19   A.   That's correct.

20   Q.   And then the next line she says, "It also appears

21   suspicious that the Petters companies have business

22   relationships at numerous banks as it appears this may have

23   been intended to layer and conceal the nature of the

24   transactions."  Do you see that?

25   A.   Yes.

1    Q.  And do you have an understanding as to what layering is?

2    A.  Yes.

3    Q.  And is an example of layering, for example, if Tom

4    Petters had relationships at other banks and he was wiring

5    money out of the Petters Company, Inc. account to other

6    Petters entities at other banks; would that be an example of

7    layering?

8    A.  It could be.

9    Q.  And what Ms. Pesch is saying --

10              THE COURT:  I am going to stop you here.  Would

11   you please move your microphone a little bit closer.  I'm

12   having difficulty hearing you.

13              THE WITNESS:  Okay.

14              THE COURT:  I don't know whether the jury is, but

15   I am.

16   BY MR. COLLYARD:

17   Q.  That could be an example of layering, is that what you

18   answered?

19   A.  It could be.  I mean, it could have a legitimate

20   business purpose as well.

21   Q.  Well, what Ms. Pesch is saying here is she went back and

22   looked at the activity and the example that I just gave you

23   is an example that she believed to be indicative of

24   layering; is that right?

25              MS. PARLOVECCHIO:  Objection as to what Mary Pesch

1    believed.

2                THE COURT:  Overruled.

3                THE WITNESS:  She says "appears."

4    BY MR. COLLYARD:

5    Q.  And what does "appear" mean to you?

6    A.  It means that it appears to be to her based on the

7    information that she now has available to her.

8    Q.  The information that she has available to her in looking

9    at the account activity, it appears that the transaction

10   activity shows signs of layering; is that right?

11   A.  Based on the information she has available to her now.

12   Q.  And that's information that you would have went back and

13   looked at as well, correct?

14   A.  At the -- I would have reviewed her case file.

15   Q.  Did you go back and look at the wire activity that

16   showed signs of layering, for example?

17   A.  It was in the case file.  I'm not -- I'm sorry.  I'm not

18   sure what you're asking.

19   Q.  You told me earlier that you went back and looked at the

20   information, the transaction activity?

21   A.  It would have been in her case file.

22   Q.  Did you actually go back and look at the actual

23   transaction activity after Ms. Pesch did this analysis?

24   A.  I'm sorry.  I would have looked at the case file where

25   she would have summarized the transaction activity.

1    Q.  Sure.  I'm sorry, Ms. Maltsch.  What I'm showing you is

2    the actual analysis --

3    A.  Yes.

4    Q.  -- that Ms. Pesch did, correct?

5    A.  Yes.

6    Q.  Other than the words that Ms. Pesch wrote in this

7    document, I'm asking if you yourself went back and looked at

8    the transaction activity.

9    A.  She would have more supporting documentation that

10   supports this checklist, and I would have looked at that.

11   Q.  And can you identify that there was more supporting

12   information?

13   A.  I do recall there was.

14   Q.  Can you describe for me what that was?  Because all I

15   have is the information that was produced in this case.

16             MS. PARLOVECCHIO:  Objection to the colloquy about

17   what was produced.

18             THE COURT:  Overruled.  You may answer.

19             THE WITNESS:  She would have had charts that

20   indicated that -- that showed how those volumes added up and

21   from account to account.

22   BY MR. COLLYARD:

23   Q.  All right.  So that brings me to my point of what

24   Ms. Pesch had during the time of this analysis.  And based

25   on your answers to your counsel, I want to go back to --

CASE 0:19-cv-01756-WMW   Doc. 438   Filed 01/08/23   Page 95 of 305

1    let's go to page 5.  And I want to focus on really the

2    bottom portion where it starts with, "The monthly values of

3    credits and debits" and then ends in "The end of day

4    balance."  Do you see that, Ms. Maltsch?

5    A.  Yes.  Yes.

6    Q.  And do you agree that what Ms. Pesch did here is she

7    looked at the incoming and outgoing wires on the account and

8    she did a spreadsheet showing them, right?

9    A.  That's correct.

10   Q.  And it shows that there was $2.86 billion in and

11   $2.86 billion out for the time period of January 2008 up

12   through August of 2008, right?

13   A.  It does.

14   Q.  And you agree that those numbers are very similar,

15   right?

16   A.  Yes.

17   Q.  And she used the fact that those numbers are similar as

18   part of her analysis to determine that this activity was

19   indeed suspicious, correct?

20   A.  Yes.

21   Q.  In fact, she notes and she makes a point that the

22   difference is only $189,000 out of the $2.8 billion, right?

23   A.  Um-hmm.

24   Q.  And she used that as part of the analysis to conclude

25   that this activity was indeed suspicious, correct?

1    A.  Yes.

2    Q.  And then she makes a note at the bottom that says, "The

3    end of the day balance in the account during the review

4    period never exceeded $1.7 million."  Do you see that?

5    A.  Yes.

6    Q.  And she used that as part of her analysis that this

7    activity was indeed suspicious, right?

8    A.  Based on the information that she had available to her.

9    Q.  With all your experience in the AML world, you agree

10   that similar amounts of large amounts of money going in and

11   out of an account consistently where at the end of the day

12   there's a low balance, that could be indicative of

13   potentially suspicious activity, correct?

14   A.  It could be, but commercial customers also have sweep

15   accounts where they're sweeping the same amount of money out

16   on a daily basis.

17   Q.  I appreciate that, Ms. Maltsch.

18   A.  So there --

19   Q.  I appreciate that, Ms. Maltsch, but I'm not asking about

20   other commercial customers.

21   A.  Oh, I understand.  Um-hmm.

22   Q.  I'm asking you if you agree that similar amounts of

23   money for billions of dollars going in and out of an account

24   where the balance at the end of the day is low could be

25   indicative of suspicious activity?

1          MS. PARLOVECCHIO:  Objection, asked and answered.

2          THE COURT:  Overruled.  You may answer.

3          THE WITNESS:  I'm not sure exactly.

4   BY MR. COLLYARD:

5   Q.  You don't know?

6   A.  It may be indicative, yes.

7   Q.  So you agree --

8   A.  There's a "may" in there, um-hmm.

9   Q.  So do you agree with me or do you not agree with me?

10  A.  I agree with you, but.

11  Q.  And, in fact, that's what Ms. Pesch did?

12  A.  With the information she had available to her.

13  Q.  So this information about the billions -- the

14  $2.8 billion going in and out of the account, Ms. Pesch had

15  access to that and the anti-money laundering analysts had

16  access to that when they actually reviewed and closed those

17  alerts from this time period, correct?

18  A.  She would have, yes.

19  Q.  And the anti-money laundering analysts who closed those

20  alerts right had the same information too, correct?

21  A.  Yes.

22  Q.  And certainly somebody can -- who gets information about

23  the incoming and outgoing wires can create a spreadsheet

24  like this at any time they want, right?

25  A.  Of course.

1    Q.  And the AML analysts actually do do that, don't they?

2    A.  They do.

3    Q.  And if we turn to the next page, page 6, I'm going to

4    go towards the bottom of page 6 with Enchanted and I'm going

5    to bring in the top of page 7 to show you the full

6    Nationwide information.

7               And what Ms. Pesch did here is she actually looked

8    at the wire activity from Enchanted and Nationwide during

9    this time period and she made a chart of that, right?

10   A.  Yes.

11   Q.  And that information was available to Ms. Pesch and it

12   was also available to the anti-money laundering analysts who

13   had closed the alerts during that time period, correct?

14   A.  Correct.

15   Q.  And looking at the Nationwide and Enchanted wires and

16   adding them up and doing that type of analysis is what AML

17   analysts would actually do in their analysis of

18   investigating alerts, correct?

19   A.  If they had reason to suspect that something unusual was

20   going on.  They wouldn't do it with every transaction or

21   every account.

22   Q.  It is something that they could do at any time they

23   wanted, correct?

24   A.  They could.

25   Q.  So Ms. Pesch limited the time period for 2008.  Do you

1    have any idea why the bank didn't go all the way back to

2    March of 2005 during this investigation to see and to

3    analyze all of the other alerts and activity that had been

4    closed as not suspicious?

5    A.  Our procedures were to go back a certain number of

6    months at the time.

7    Q.  And how many months was that?

8    A.  I don't recall.

9    Q.  Do you have an understanding that Ms. Roehrig actually

10   told Ms. Pesch that she could go back as far as she wanted?

11   A.  No.

12   Q.  Do you know if the bank ever did -- besides whatever

13   procedures might exist, do you know if the bank ever said,

14   wow, we've got to go back and look at really what happened

15   here and go all the way back to March of 2005 and look at

16   that activity up to 2008 to see what happened?

17            MS. PARLOVECCHIO:  Object to form.

18            THE COURT:  Sustained.

19   BY MR. COLLYARD:

20   Q.  Was there any particular reason that the bank limited

21   its search going back to January of 2008 that you know of?

22            MS. PARLOVECCHIO:  Objection, asked and answered.

23            THE COURT:  Overruled.

24            THE WITNESS:  So basically we did our review and

25   did that lookback of this amount of time and sent this to

1    the government; and if at that point in time they came back

2    to us asking for more information, we would have done that

3    lookback further.

4    BY MR. COLLYARD:

5    Q.  So this limited period of time was enough to satisfy

6    that the activity had been suspicious; is that correct?

7    A.  Yes.

8    Q.  Now, you said there was more -- I want to ask you a

9    question about this real quickly, if you can go to page 92.

10   Do you have an understanding as to what's on page 92,

11   Ms. Maltsch?

12   A.  A general understanding, but I haven't seen one of these

13   charts in 14 years.

14   Q.  I understand that.  And we are still in Exhibit 333,

15   which is the analysis that you would have looked at.

16   A.  Um-hmm.

17   Q.  Can you describe for me what your understanding of this

18   chart is.

19   A.  It looks to be a chart of incoming wire deposits by

20   transaction volume between September of 2007 and August of

21   2008.

22   Q.  And do you see at the bottom here that there's a little

23   squiggly line that kind of goes across?

24   A.  Um-hmm.

25   Q.  And do you see that's called "peer average"?

Maltsch - Cross

```
1    A.  Yes.

2    Q.  Do you know what peer averages are?

3    A.  It means other customers who had this account type.

4    Q.  So what this is doing is you're taking this activity

5    from the Petters Company, Inc. account from September of '07

6    up through August of 2008 and you're comparing the wire at

7    the incoming wire activity compared to the peers, right?

8    A.  We're comparing it to customers who had a like account.

9    That is what was considered a peer at that point.

10   Q.  Do you know what the peer group consisted of for Petters

11   Company, Inc.?

12   A.  It would have been customers in that account type.

13   Q.  So when you say "account type," what do you mean?

14   A.  Right, the checking account.

15   Q.  So what this is doing is this is taking all of the

16   customers who have a depository account and comparing the

17   level of incoming wires compared to what the bank could see

18   that Petters Company, Inc. was wiring --

19   A.  A business -- I'm sorry.

20           THE COURT:  Let's wait.  One at a time.  You

21   finish your question and then you will be able to respond.

22   BY MR. COLLYARD:

23   Q.  Did you get my question?

24   A.  I did.  So it would be business checking account

25   customers.
```

Maltsch - Cross

```
1    Q.  Okay.  And so that little line at the bottom is showing
2    that comparing the eight and a half -- or, I'm sorry, the
3    800-plus million dollars that was coming into the Petters
4    Company, Inc. account and comparing it to the peers or the
5    other business customers --
6    A.  Um-hmm.
7    Q.  -- of about, what, 5 million or so; is that right?
8    A.  It appears as though, yes.  I'm not sure.  I can't tell.
9    Q.  And why is the bank doing this type of an analysis?
10   A.  It was the lookback that caused us to start to
11   develop -- you know, we looked all the time to enhance how
12   we reviewed things.  This was not the normal analysis that
13   was completed.
14   Q.  Well --
15   A.  It was lessons learned.
16   Q.  Do you understand how alerts are created in Searchspace?
17   A.  Yes.
18   Q.  And one of the ways that alerts are created in
19   Searchspace is that it looks at the incoming wires, for
20   example, and it compares them to the peers, right?
21   A.  Um-hmm, yes.
22   Q.  And then there's thresholds, right?
23   A.  Um-hmm.
24   Q.  And if it exceeds the thresholds, alarms go off; is that
25   right?
```

1    A.  Yes.

2    Q.  So this very analysis is done within Searchspace, is it

3    not?

4    A.  Yes.

5    Q.  And this analysis could have been done at any point in

6    time, correct?

7    A.  Yes.

8    Q.  And so, for example, for all those alerts that were

9    sounding off from March of 2005 up through June of 2008 for

10   all the billions of dollars of incoming wires, an AML

11   analyst could have went and looked at this very thing every

12   time or any time during any of those alerts, correct?

13          MS. PARLOVECCHIO:  Objection, foundation.  She

14   testified that she didn't have awareness of the wires

15   before -- alerts before January 2008.

16          THE COURT:  Sustained.

17          MR. COLLYARD:  I am -- Your Honor, with all due

18   respect, she was asked about -- she's testified that she has

19   an understanding as to what AML analysts did.  I'm asking

20   generally.

21          THE COURT:  Okay.  Overruled.

22          MS. PARLOVECCHIO:  There was a date range, Your

23   Honor, that exceeded the scope of what she's testified to.

24          THE COURT:  Overruled.

25          MR. COLLYARD:  Thank you, Your Honor.

Maltsch - Cross

```
 1                THE COURT:  You may answer.

 2                MR. COLLYARD:  Thank you.

 3                THE WITNESS:  Can you repeat your question,

 4    please?

 5    BY MR. COLLYARD:

 6    Q.  Sure.  What I am trying to get to, Ms. Maltsch, is this

 7    very thing.  An AML analyst could have -- going back to

 8    March of 2005 or up to 2008, an AML analyst reviewing the

 9    alerts that they were reviewing for incoming wires could

10    have gone back and seen this very thing at any time they

11    wanted to, correct?

12    A.  Yes.

13    Q.  And Ms. Pesch used this type of analysis to determine

14    that the activity in the account from this time period was

15    actually suspicious, correct?

16    A.  Yes, because she had reason to believe that the activity

17    in the account was suspicious, so she did a deeper dive.

18    Q.  Let's put that aside for just a moment.

19                Ms. Pesch -- I'm sorry.  Ms. Maltsch, let's take a

20    look at --

21                THE COURT:  I'm having trouble hearing you, so

22    please --

23                MR. COLLYARD:  I'm sorry.

24                THE COURT:  -- speak louder.

25                MR. COLLYARD:  I will.
```

1    BY MR. COLLYARD:

2    Q.  Let's take a look at Plaintiff's Exhibit 239 in your

3    binder there.  Do you see Exhibit 239?

4    A.  I do.

5    Q.  And you testified earlier to a different exhibit that

6    was Anti-Money Laundering Committee meeting notes.  Do you

7    remember that?

8    A.  Yes.

9    Q.  And is this that same type of thing?

10   A.  It is.

11   Q.  And is this -- are these notes that you would have

12   created?

13   A.  They are.

14            MR. COLLYARD:  I offer Plaintiff's Exhibit 239.

15            MS. PARLOVECCHIO:  No objection.

16            THE COURT:  Exhibit 239 is received.

17   BY MR. COLLYARD:

18   Q.  And if we just take a look at this, Ms. Maltsch, we'll

19   start from the top.

20   A.  Um-hmm.

21   Q.  It says, "Marshall & Ilsley Corporation Anti-Money

22   Laundering Committee Meeting Minutes, November 4, 2004."  Do

23   you see that?

24            Can you briefly describe again what the purpose of

25   these meetings and what these minutes are for.

1    A.  Sure.  The meetings consisted of individuals from the

2    various business units that had BSA responsibility for their

3    business units.

4         We would bring together those individuals on a

5    monthly basis to talk about the industry trends, what we

6    were doing internally, and anything else that was relevant

7    from a BSA perspective.  So one of the things we did look at

8    was enforcement actions.

9    Q.  And I believe what you said earlier was the group of

10   individuals here listed as attendees or the people who

11   attended these meetings were -- this is a group of subject

12   matter experts; is that right?

13   A.  Well, they're subject matter experts for their area as

14   far as what products and services that they have, as well as

15   then have some BSA/AML expertise.

16   Q.  And do I understand correctly that the purpose of these

17   meetings was to get together and talk about topics to get

18   educated so then these subject matter experts, including

19   yourself, could deliver proper messaging to ensure

20   consistency across the bank lines; is that right?

21   A.  Correct.

22   Q.  So these were concepts that you talked about and then

23   you went out and taught; is that right?

24   A.  Um-hmm.

25   Q.  And if we just take a look at the group of folks who

 1    were at this particular meeting at November 2004, it

 2    includes you, Kelley Maltsch, right?

 3    A.  Um-hmm.

 4    Q.  If you look in the -- I will highlight your name there

 5    in a second.

 6              It also included Ray Neufeldt there to the right.

 7    Do you see that?

 8    A.  Yes.

 9    Q.  Do you understand that Mr. Neufeldt was -- he was a wire

10    transfer expert; is that right?

11    A.  Yes.

12    Q.  And then I guess right above Mr. Neufeldt's name is a

13    man named Tom Haller.  Do you see that?

14    A.  Yes.

15    Q.  Tom Haller was the check guy; is that right?

16    A.  Yes.  Check fraud, um-hmm.

17    Q.  And then there's a lawyer -- or I'm sorry.  There's an

18    attendees that starts out with Elliot Berman.  Do you see

19    that?

20    A.  Yes.

21    Q.  And do you know who Mr. Berman is?

22    A.  I do.

23    Q.  And who's he?

24    A.  So he was acting as a consultant for us at the time

25    for -- to help enhance our AML program.

1    Q.  And he was a lawyer at the Godfrey & Kahn law firm; is

2    that right?

3    A.  Yes.

4    Q.  And then there's another gentleman below him named Peter

5    Janczak.  Do you see that?

6    A.  Yes.

7    Q.  And do you know who Mr. Janczak is?

8    A.  Yes.

9    Q.  Was Mr. Janczak your boss?

10   A.  He was.

11   Q.  Okay.  So if we take a look at the black box just to see

12   what that says, it says, "The Anti-Money Laundering

13   Committee meetings will generally be held," and it just

14   gives the time and date, right?

15   A.  Um-hmm.

16   Q.  And this was a meeting that you actually attended?

17   A.  I did.

18   Q.  So if we just go down to the first -- I'm going to show

19   you the first kind of paragraph here where it says -- I am

20   going to highlight this number 1 and the paragraph below it.

21   It says, "Recent Regulatory Actions and Regulatory

22   Emphasis."  Do you see that?

23   A.  Yes.

24   Q.  And this is giving an example of a bank where there was

25   regulatory actions taken against the bank for activity the

Maltsch - Cross

1    bank was involved in; is that right?

2    A.  Yes.

3    Q.  And the bank was AmSouth?

4    A.  Yes.

5    Q.  And before I go any further, in the time period of,

6    let's say -- when did you join the anti -- when was your

7    focus on anti-money laundering at the bank?

8    A.  So I had involvement in anti-money laundering since

9    2001.

10   Q.  By 2001 you had heard of the term "Ponzi scheme," right?

11   A.  Yes.

12   Q.  In fact, you know how that term became?

13   A.  I don't recall.  No, I do not recall.

14   Q.  Do you know who Charles Ponzi is?

15   A.  That would probably be where it began.

16   Q.  And was that in the 1920s?

17   A.  I don't have knowledge of that.

18   Q.  You don't?

19   A.  No.

20   Q.  That wasn't anything that you guys talked about --

21   A.  No.

22   Q.  -- Mr. Ponzi?

23            Okay.  Well, you had definitely heard of Ponzi

24   schemes?

25   A.  I had.

1    Q.  And you had heard of them in the early 2000s, right?

2    A.  Um-hmm.

3    Q.  And you knew what they were, correct?

4    A.  Yes.

5    Q.  And if we go down below, we're going to see a bullet

6    point here.  I'm going to take you down to this bullet --

7    the first bullet point right there (indicating) and I am

8    going to highlight that and talk about that.

9    A.  Um-hmm.

10   Q.  I'm just going to bring -- yes, let's do this.  It says,

11   "Despite warnings from several bank employees and other red

12   flags, the bank failed for two years to file SARs regarding

13   transactions related to what turned out to be a Ponzi

14   scheme."  Right?

15   A.  Yes.

16   Q.  And that was a topic that all of these high-ups at the

17   bank were talking about back in 2004, correct?

18   A.  Yes.

19   Q.  And, again, this message of the bank being involved in

20   transactions related to a Ponzi scheme is something that

21   this group would have talked about and decided to -- how to

22   educate folks at the bank to ensure there was consistent

23   messaging on these types of topics, correct?

24   A.  Yes.

25   Q.  So at this point in time in 2004, hearing the word

Maltsch - Cross

1    "Ponzi scheme," that wasn't news to you, right?

2    A.  No.

3    Q.  And if we go down below and grab the next bullet point,

4    it says, "Despite noticing unusual transactions, the bank

5    did not file SARs relating to a multi-million dollar

6    embezzlement scheme by the officer of one of its corporate

7    clients."  Do you see that?

8    A.  I do.

9    Q.  And you understand that the Tom Petters Ponzi scheme

10   related to activity of multi-billion dollar embezzlements

11   from officers of the Petters Company, Inc.; do you

12   understand that?

13   A.  That we did not have awareness of.

14   Q.  I'm asking if you understand that.

15   A.  Yes, I do.

16   Q.  If we go to page 2 just real quickly, under the heading

17   "Suspicious Activity Report Instructions."  Do you see that?

18   A.  Yes.

19   Q.  I'm just going to grab that second paragraph.  It says,

20   "All financial institutions are required to file a SAR

21   following discovery of known or suspected criminal

22   violations."  Do you see that?

23   A.  Yes.

24   Q.  And I want to talk about the standard for filing a SAR.

25   Okay?

1          Are you familiar with the standard for filing a

2    SAR with having been on the SAR Committee and those types of

3    things?

4    A.  Yes.  And this is directly from the regulation.

5    Q.  And I want to ask you about the standard of filing a SAR

6    and if you agree with me that in order to -- the requirement

7    triggers for a bank to file a SAR not when they actually

8    know, not when they actually know that the activity is

9    suspicious, it's enough to trigger that requirement if the

10   bank has reason to suspect that the activity is suspicious;

11   is that right?

12   A.  But that comes from -- it's information that it knows.

13   Q.  Well, I guess what I am asking --

14   A.  The reason to suspect comes from what it knows, the bank

15   knows.

16   Q.  Let me try it this way.  If the bank has reason to

17   suspect that there is suspicious activity, that triggers the

18   requirement to file a SAR, correct?

19   A.  It's based on the information that it has knowledge of.

20   Q.  Maybe this will be easier.  I'm going to take you to

21   Exhibit 399 real quickly --

22   A.  Um-hmm.

23   Q.  -- just to speed this up.

24   A.  Um-hmm.

25   Q.  And we're going to go to page 14.  Once you get there,

```
 1     Ms. Maltsch, I am going to bring you to part F.  I'm just
 2     going to pull that up right now.  Are you there,
 3     Ms. Maltsch?
 4     A.  Yes, I am.
 5     Q.  I just want to ask you this.  I'll highlight this for
 6     you.  Under "Suspicious Activity Monitoring and Reporting,"
 7     it reads, "If M&I has information about any customer or
 8     transaction that caused us to 'know, suspect, or have reason
 9     to suspect' suspicious activity, a SAR must be filed with
10     FinCEN."  Right?
11     A.  Yes.
12     Q.  So the standard is if the bank has reason to suspect,
13     correct?
14     A.  Right.  And that reason to suspect is -- comes from
15     knowledge.
16     Q.  You have to have enough knowledge?
17     A.  Information, um-hmm.
18     Q.  You have to have enough information to have reason to
19     suspect --
20     A.  Yes.
21     Q.  -- correct?
22     A.  Yes.
23     Q.  And my distinction is they don't have to actually know,
24     it's if they have reason to suspect?
25     A.  But they must have reason to suspect, um-hmm.
```

1    Q.   Then it says, "a SAR must be filed with FinCEN," right?

2    A.   Yes.

3    Q.   Who is FinCEN?

4    A.   The Financial Crime Enforcement Network.

5    Q.   And the reason why the bank files SARs with FinCEN is to

6    get FinCEN information that FinCEN then can choose to act

7    on; is that right?

8    A.   They would share with law enforcement to act on.

9    Q.   So, for example, if the bank filed a SAR with FinCEN,

10   FinCEN could reach out to the United States Attorney's

11   Office to see if action should be taken with respect to that

12   activity, correct?

13   A.   Yes.

14   Q.   And if we focus just -- stay on this part here, it says,

15   "If M&I has information about any customer or transaction."

16   Do you see that?

17   A.   Yes.

18   Q.   And that's the standard, right?

19   A.   Yes.

20   Q.   It's not only if M&I has information about somebody in a

21   high-risk checklist or category, it's if M&I has information

22   about any customer or transaction, correct?

23   A.   Yes.

24   Q.   It's not exclusive to just high-risk categories?

25   A.   Most SARs are not filed on customers in high-risk

1    categories.

2    Q.  I understand.

3    A.  So yes, that's correct.

4    Q.  And I will back up.  You were asked a lot of questions

5    about these checklists for things that are high risk,

6    jewelers, for example, money service providers, for example,

7    right?

8    A.  Yes.

9    Q.  It's not limited to just those folks, right?

10   A.  Absolutely not.

11   Q.  It's any customer?

12   A.  Um-hmm.

13   Q.  And Petters Company, Inc. would fall into this too,

14   correct?

15   A.  Yes.

16   Q.  Thank you.

17          Go back -- I'm sorry.  I'm going to go back to

18   where we left off just real quickly.  This was Plaintiff's

19   Exhibit, for the record, 239.  I'll go back to page 2 and

20   make you flip.

21          Now I'm going to down below where I was, where it

22   says, "Insider abuses.  "

23   A.  239, okay.  Okay.

24   Q.  And do you see, Ms. Maltsch, that this is calling out

25   insider abuses; do you see that?

Maltsch - Cross

```
1    A.  I do.

2    Q.  And it says, "For this purpose, insiders include

3    directors, officers, employees, or agents that have

4    committed or aided in the criminal act."  Do you see that?

5    A.  I do.

6    Q.  And what is being talked about there?

7    A.  Insiders of the bank that have done something, have

8    committed an act, criminal act.

9    Q.  Insiders of the bank or --

10   A.  That's correct.

11   Q.  Would this concept also apply to insiders of a customer?

12   A.  It would not.

13   Q.  No.  So if the bank, for example, had information that

14   an insider of a customer was engaged in potentially

15   suspicious or illegal activity, are you saying that that

16   would not merit the filing of a SAR?

17   A.  No.  All I'm saying is that this particular bullet is

18   referring to insiders of the bank.

19   Q.  I see.  But this concept also applies to insiders of a

20   customer, correct?

21          MS. PARLOVECCHIO:  Objection, asked and answered.

22          THE COURT:  Overruled.  You may answer.

23          THE WITNESS:  I would assume if -- yeah, because

24   if it would be illegal activity that was flowing through the

25   bank, it would apply.
```

Maltsch - Cross

1    BY MR. COLLYARD:

2    Q.  Thank you.

3            And if we go down below -- I'm going to go down

4    below and I'm going to talk about the next topic in this

5    area where it says, "Transactions that involve potential

6    money laundering."

7    A.  Yes.

8    Q.  I'm just going to highlight that heading before I go

9    into the last bullet.  "Transactions that involve potential

10   money laundering or violate the Bank Secrecy Act."  Do you

11   see that?

12   A.  Yes.

13   Q.  Do you agree that the purpose of the Anti-Money

14   Laundering Group was to look for activity or to research

15   activity that was indicative of money laundering?

16   A.  I do.

17   Q.  And do you agree that as part of that, the Anti-Money

18   Laundering Group would also be looking for activity that

19   would be indicative of a Ponzi scheme?

20   A.  That would be criminal activity, so yes.

21   Q.  Okay.  You agree with me?

22   A.  Yes.

23   Q.  And if we go down below on the last bullet point there,

24   it says, "The transaction has no business or apparent lawful

25   purpose or is not the sort in which the particular customer

Maltsch - Cross

1    would normally be expected to engage and the Bank knows of

2    no reasonable explanation for the transaction."  Do you see

3    that?

4    A.  Yes.

5    Q.  Now, this part about "the transaction has no business or

6    apparent lawful purpose," do you see that?

7    A.  Yes.

8    Q.  So, for example, if a business banker came across

9    activity that the business banker had reason to suspect had

10   no business or apparent lawful purpose, that is activity

11   that that business banker would have to escalate; is that

12   right?

13   A.  That's correct.

14   Q.  And that is what you were trying to teach all those

15   business bankers, correct?

16   A.  That's correct.

17   Q.  And if an anti-money laundering analyst came across

18   activity that the anti-money laundering analyst could not

19   determine had a business or apparent lawful purpose, the

20   anti-money laundering analyst would be expected to do more

21   research, to do something else to figure out why that was,

22   correct?

23   A.  Yes.

24   Q.  And that's what was taught to the anti-money laundering

25   analysts, correct?

Maltsch - Cross

1    A.  Yes.

2    Q.  Since we're talking about anti-money laundering

3    analysts, let's just talk about them for a second.

4            Let's go to Plaintiff's Exhibit 179 that is in

5    evidence.  If you take a look at this, Ms. Maltsch, at the

6    top it says, "Anti-Money Laundering Analyst" and above that

7    is "Position Description."  Do you see that?

8    A.  I do.

9    Q.  And then it says, "Primary Function" and "Essential

10   Duties."  Do you see that?

11   A.  Yes.

12   Q.  Do you agree with me that this describes the job

13   description from a high level of what an anti-money

14   laundering analyst would be doing?

15   A.  It is.

16   Q.  And if we look at "Essential Duties" just real quickly

17   here, it says, "Utilize various M&I automated systems to

18   evaluate customer transaction activity for unusual activity

19   that may be indicative of money laundering."  Do you see

20   that?

21   A.  Yes.

22   Q.  "Or other illegal activity."  Is that right?

23   A.  Yes.

24   Q.  And then down below it says, "perform research on the

25   customer activity," in that part 2.  Do you see where it

Maltsch - Cross

1    says, "perform research on the customer activity"?

2    A.  Yes.

3    Q.  And then it says, "As needed, review and analyze

4    customer transaction history as well as specific

5    transactions, for example" -- deposited checks would be an

6    example; is that right?

7    A.  As needed, um-hmm.

8    Q.  Wire transfers is definitely an example, correct?

9    A.  Yes.

10   Q.  Yes.  And what the analysts, just from a high level,

11   were required to do was they actually analyzed and

12   researched this type of activity, didn't they?

13   A.  They did.  Not each transaction.  It would be impossible

14   to do each transaction.

15   Q.  I understand.

16   A.  Um-hmm.

17   Q.  We'll stick on wire transfers, for example, that are

18   alerting for incoming and outgoing wires just to make it

19   easy.

20          Analysts would actually investigate that

21   information, wouldn't they?

22   A.  Yes.

23   Q.  And as part of that, they would look into entities

24   involved in those transactions, correct?

25   A.  They would look to see that they were related entities

Maltsch - Cross

1    and that that made sense for the customer.

2    Q.  They actually do research on those entities, don't they?

3    A.  They do.

4    Q.  And as part of that, you taught them to reach out, for

5    example, to business bankers if they had -- if they could

6    not find their answers during their research, correct?

7    A.  Yes.

8    Q.  And the business bankers could ask the customer,

9    correct?

10   A.  Yes.

11   Q.  And if the customer couldn't explain a legitimate

12   business purpose for the activity, you couldn't close an

13   alert, could you?

14   A.  Well, I wouldn't, no.

15   Q.  Am I correct?

16   A.  Yes.

17   Q.  And that was a process that happened all of the time at

18   M&I Bank, correct?

19           MS. PARLOVECCHIO:  Objection, vague, form.

20           THE COURT:  Sustained.

21           MR. COLLYARD:  I will rephrase it.

22   BY MR. COLLYARD:

23   Q.  From the time period of when the AML Group was

24   implemented and Searchspace was implemented in 2005 up

25   through 2008, that process that I just described of an

 1    analyst having questions about activity and reaching out to

 2    the business banker and the business banker reaching out to

 3    the customer, that was a practice in the Anti-Money

 4    Laundering Group, correct?

 5    A.  It was an option for the analyst to reach out to the

 6    banker, yes.

 7    Q.  And you know that analysts actually did do that,

 8    correct?

 9    A.  In this particular case?

10    Q.  I'm just asking you generally.

11    A.  I don't know.  What do you mean?

12    Q.  Did that process -- do you know that that process

13    actually happened?

14    A.  Oh, yes.

15    Q.  And, in fact, during your SAR Committee meetings you'd

16    talk about those types of things happening, right?

17    A.  Yes, we would ask if the analyst had reached out to the

18    banker, yes, we would ask that.

19    Q.  And bankers were expected to cooperate with analysts if

20    they had reached out to them to ask questions, right?

21    A.  Yes.

22    Q.  That was part of their job, right?

23    A.  Yes.

24    Q.  Ms. Maltsch, do you know of another -- do you know of

25    any customer at your time during M&I Bank from March of 2005

```
 1    up through June of 2008 that had billions of dollars wired
 2    in and out of their account?
 3    A.  I personally do not, no.
 4    Q.  In your experience as an anti-money laundering person,
 5    had you ever reviewed alerts, for example, that had similar
 6    amounts of billions of dollars going in and out of an
 7    account?
 8    A.  I personally have not reviewed alerts, so.  I was never
 9    an analyst.
10    Q.  Are you aware of anybody at M&I Bank who had ever
11    experienced reviewing an alert for incoming or outgoing
12    wires for billions and billions of dollars on a consistent
13    basis?
14              MS. PARLOVECCHIO:  Objection, foundation.
15              THE COURT:  Overruled.  You may answer if you can.
16              THE WITNESS:  I am not aware.
17    BY MR. COLLYARD:
18    Q.  So in all those SAR Committee meetings that you were
19    involved in and all these other meetings that you were
20    involved in, no one ever raised that any other customer had
21    wired in billions and billions of dollars and that activity
22    was alerted and needed to be researched, right?
23    A.  No, I'm not -- large amounts, millions.
24    Q.  Millions?
25    A.  Yeah.
```

1   Q.  Okay.  Do you know what the highest amount that you ever

2   saw on an alert was?

3   A.  No, I don't.

4   Q.  Let's talk about -- you did extensive effort to put

5   together training materials to teach all bank personnel how

6   to look for potentially suspicious activity, correct?

7   A.  Yes.

8   Q.  That was a massive effort, right?

9   A.  It was.

10  Q.  And it was a worthwhile effort, right?

11  A.  I believe so.

12  Q.  And you yourself have indicated that it actually works,

13  right?

14  A.  Yes.

15  Q.  And the concepts that you were teaching across the bank,

16  you weren't -- you were teaching basic concepts to look for

17  things that were, for example, interesting or unusual or

18  things that didn't feel right; is that right?

19  A.  Correct.

20  Q.  And if, for example, business bankers came across that

21  activity, that's the type of activity that they needed to

22  ask questions about and escalate, correct?

23  A.  Yes.

24  Q.  And that those same concepts applied to the anti-money

25  laundering analysts; is that right?

Maltsch - Cross

1    A.  Yes.

2    Q.  You had talked about some distinction.  You were shown

3    Exhibit 5 and you talked about how -- let's go to Exhibit 5.

4    I will just show you this and so the jury can see it.

5    A.  Yes.

6    Q.  This training session that you gave, right?

7    A.  Raissa did present it.  I was in attendance to support

8    her.

9    Q.  Okay.  Well, you were asked questions about the purpose

10   of this --

11   A.  Yes.

12   Q.  -- and how it went to the Trust Group, right?

13   A.  Yes.

14   Q.  And then you were asked questions about whether this

15   involved business bankers; is that right?

16   A.  Correct.

17   Q.  All right.  Well, you agree that all the concepts in

18   this training document applied to business bankers as well,

19   right?

20   A.  I would think so.  I have not looked at it that closely

21   to make that judgment at this point.

22   Q.  I'll give you a couple examples.

23   A.  Sure.

24   Q.  If we go to page 12, the concept of money laundering and

25   how money launderers clean their dirty money through banks,

 1     that was a concept that was taught across the bank and in

 2     particular to business bankers, right?

 3     A.  Absolutely.

 4     Q.  And that was obviously taught to the AML analysts; is

 5     that right?

 6     A.  Well, they would have received the first training, yes.

 7     Q.  That concept was -- I'm just adding them in.

 8     A.  Yes.

 9     Q.  That concept was also taught to the anti-money

10     laundering analysts --

11     A.  Yes.

12     Q.  -- correct?

13     A.  Yes.

14     Q.  So people like Sara Johnson, for example, would have

15     known that, correct?

16     A.  Yes.

17               MS. PARLOVECCHIO:  Objection as to what Sara

18     Johnson knew.

19               THE WITNESS:  Oh, I'm sorry.

20               THE COURT:  I did not hear what you said.  Did you

21     withdraw?

22               MS. PARLOVECCHIO:  I'm sorry, Your Honor.  I

23     objected to the form of the question as to what Sara Johnson

24     knew.

25               THE COURT:  Sustained.

1    BY MR. COLLYARD:

2    Q.  Do you know who Sara Johnson is?

3    A.  I do.

4    Q.  And how long was Sara Johnson in the Anti-Money

5    Laundering Group?

6    A.  I do not know.  Several years.

7    Q.  Fair to say she was at the bank for over a decade?

8    A.  I don't know that.

9    Q.  You don't know that?

10   A.  Um-hmm.

11   Q.  In your experience working with Ms. Johnson, did she

12   understand her roles and her responsibilities?

13   A.  Yes.

14   Q.  Would you expect her to know basic concepts of what the

15   function of the Anti-Money Laundering Group did?

16   A.  Yes.

17   Q.  And whether or not the Anti-Money Laundering Group was

18   looking for information indicative of money laundering, for

19   example?

20   A.  Yes.

21   Q.  Do you have an understanding that Sara Johnson closed

22   over $27 billion in alerts on the Petters Company, Inc.

23   account?

24   A.  No.

25   Q.  Let's go to slide 30 in Exhibit 5, concept of willful

1    blindness.

2    A.  Yes.

3    Q.  This was not a concept that was just taught to the Trust

4    Group, right?

5    A.  Absolutely not.

6    Q.  This was taught across the bank, correct?

7    A.  Correct.  It was part of our program.

8    Q.  And, in fact, just if we -- I am going skip to another

9    exhibit real quick just to show you.

10   A.  Yes.

11   Q.  Your counsel -- it's Defendant's Exhibit 40067 that you

12   went through.

13   A.  Um-hmm.

14   Q.  I'm just going to bring you to that real quickly and I

15   am going to bring you to page 17, which is slide 16, and the

16   title of this slide is "Risks of Noncompliance."  Do you see

17   that?

18   A.  Um-hmm.

19   Q.  And you're familiar with this slide, right?

20   A.  Yes.

21   Q.  And if we go down to the notes section or the notes, it

22   says, "Explain willful blindness."  Let's pull that up.  It

23   says, "Explain willful blindness - looking the other way."

24   Do you see that?

25   A.  Yes.

1    Q.  And that's the concept that was being taught across the

2    bank, correct?

3    A.  Correct.  It's like having knowledge that your customer

4    is doing something wrong and looking the other way.

5    Q.  And this was taught to business bankers, correct?

6    A.  Yes.

7    Q.  And it was taught to the anti-money laundering folks,

8    right?

9    A.  Yes.

10   Q.  It wasn't just taught to the Trust Group, correct?

11   A.  That's correct.

12   Q.  Do you want to go back to Exhibit 5 since you have it?

13   I see you have it.  Just go to the next slide you're on.

14   A.  Okay.

15   Q.  So Exhibit 5, page 31, if you just flip that page, you

16   will see it, where it says, "Know Your Customer and

17   Understand Their Activities."

18           And you were talking about "know your customer,"

19   right?

20   A.  Yes.

21   Q.  And the concept of "know your customer," how it's

22   described here, for example, was being taught across the

23   bank, right?

24   A.  Pretty much so, yes.

25   Q.  And this wasn't just a concept being taught to the Trust

1    Group, was it?

2    A.  No.

3    Q.  Let me ask you about this one.  Let's to Defendant's

4    Exhibit 50143.  So that's my binder -- wait.

5    A.  That's okay.

6    Q.  I think that's my binder.  Yeah, you've got to go to a

7    different binder.

8            MS. PARLOVECCHIO:  Your binder or my binder?

9            MR. COLLYARD:  I think that's your binder.  It's

10   your exhibit.  I think.

11           THE WITNESS:  Can you give me that number again?

12   BY MR. COLLYARD:

13   Q.  Yes.  It's DX-50143.  If it's easier, I have it on the

14   screen --

15   A.  That's fine.

16   Q.  -- if you are okay with doing that.

17   A.  Yes.

18           MS. PARLOVECCHIO:  It's in the big binder.

19   BY MR. COLLYARD:

20   Q.  Okay.  So this is Defendant's Exhibit 50143.  Let's

21   just -- I will flip to the next page and I will just show

22   you what this is.  It says, "M&I Anti-Money Laundering Risk

23   Assessment."  Do you see that?

24   A.  I do.

25   Q.  Are you familiar with this type of --

Maltsch - Cross

```
 1    A.  I am.

 2    Q.  -- document?

 3             And what is this?

 4    A.  I'm sorry.

 5    Q.  Go ahead.

 6    A.  So on a regular basis, probably annually, we did an M&I

 7    risk -- or a money laundering risk assessment.  So it was

 8    kind of an overview, an assessment, a risk assessment of our

 9    bank.

10    Q.  And if we go -- we will go to the bottom of this page

11    where it says, "Higher Risk Business Types" because you were

12    talking about that earlier.

13    A.  Um-hmm.

14    Q.  At the very bottom it says, the very last sentence,

15    "Business types having a higher likelihood of high-risk

16    activity include."

17             Then we flip to the next page, page 3, and it

18    gives a list up there.  Do you see that?

19    A.  I do.

20    Q.  And we'll just highlight a few.  I'm going to highlight

21    "Car, boat and other large vehicle dealers."  Do you see

22    that?

23    A.  Sure.

24    Q.  And then down below where it says, "Professional service

25    providers," do you see that?
```

1    A.  Yes.

2    Q.  Okay.  So those are -- those types of businesses or

3    those types of activities are considered to be involved in

4    higher risk; is that right?

5    A.  They are at higher risk for illegal activity, meaning

6    like a car, boat, and other large vehicle dealers, it was --

7    would be concerned if they start to bring in large amounts

8    of cash because criminals who have large amounts of cash

9    might be laundering their money through buying large

10   vehicles.

11   Q.  And when you're talking about money launderers buying

12   large vehicles, is that part of the integration process of

13   money laundering?

14   A.  It would be, yes.

15   Q.  That's where money launderers are using banks, for

16   example, to clean their money and use their money to buy

17   purchases to make it legitimate; is that right?

18   A.  Yes, to make it appear legitimate.

19   Q.  I just want to show you this.  So I am going to see if

20   we can keep this document and also show you another

21   document at the same time.  So if you'd go to Plaintiff's

22   Exhibit 183, please.  Are you at Exhibit 183?

23   A.  Yes.

24   Q.  I'll tell you that these are the alerts on the Petters

25   Company, Inc. account.  Do you see that?

 1    A.  Yes.

 2    Q.  You're familiar with these?

 3    A.  Yes.

 4    Q.  If you'd go to page 49, please.

 5            MS. PARLOVECCHIO:  Objection to this line of

 6    questioning, Your Honor.  May I have a brief sidebar?

 7            THE COURT:  Yes, you may.

 8            MS. PARLOVECCHIO:  Thank you.

 9            THE COURT:  Members of the Jury, please feel free

10    stand up and take a stretch break while we have this

11    sidebar.

12        **(At sidebar)**

13            MS. PARLOVECCHIO:  Your Honor, I see that

14    Mr. Collyard is about to start a line of questioning in

15    regard to the alerts contained in Plaintiff's Exhibit 183.

16    Right?  And the witness has already testified that she only

17    has reviewed the alerts going from January 2008 to August of

18    2008.

19            This line of questioning would, first of all, be

20    without foundation because she already testified that she

21    didn't review the alerts as part of her job.  It's outside

22    the scope.  We didn't ask her anything about the alerts.

23    And, of course, questioning about the alerts contained in

24    Ms. Pesch's analysis is fair game because we did raise that,

25    but anything outside of that is far beyond the scope.

1          It's also cumulative.  Counsel went through every

2     single one of these alerts with three different AML

3     analysts, the ones who were actually creating and reviewing

4     and understanding the concepts of what Searchspace comments

5     were supposed to contain in making that risk-based analysis.

6          So for all of those reasons we would object to

7     this entire line of questioning and ask that the Court

8     instruct counsel to move on from this exhibit.

9          MR. COLLYARD:  My questions are going to be very

10     limited on this.  She went through extensive testimony of

11     high risk and what things are high risk, and you made a big

12     point about that with her testimony.  And so she's talking

13     right now about things that are high risk.  I'm going to

14     show her an example and see if she agrees that that's high

15     risk.

16          THE COURT:  You are showing her one example?

17          MR. COLLYARD:  I'm going to go through one alert,

18     yep, that's it.

19          THE COURT:  I didn't hear what you said.

20          MR. COLLYARD:  Yeah, just one.  I am just going to

21     go through one alert and talk to her about whether that's

22     high risk.

23          MS. PARLOVECCHIO:  I just wanted to clarify about

24     her testimony was in regard to high-risk customers, and I

25     believe that the alert that Mr. Collyard is going to ask her

1    about is about -- I believe it is an originator of a wire,

2    so a noncustomer company that was doing a transaction that's

3    noted in the Searchspace comments.

4          Her testimony had nothing to do with, you know,

5    research of high-risk businesses that -- their customer's

6    customer and that type of thing.  She didn't go into any of

7    that and that is not what the guidance -- she testified the

8    guidance says.

9          MR. COLLYARD:  She was in charge of the group and

10   she knows everything about these alerts, Your Honor.  She

11   talked about high risk.  I'm going to give her an example to

12   see if she says it's high risk.

13         MS. PARLOVECCHIO:  She wasn't in charge of the AML

14   Monitoring Group, Your Honor.  She testified to that very

15   clearly.  She did not oversee the group.  She didn't manage

16   the group.  She was the AML subject matter expert.  So

17   she -- as you saw in the organizational chart, she was

18   outside of that --

19         MR. COLLYARD:  I'm sorry.  I just asked her if she

20   had knowledge of the alerts and she said yes.  I just asked

21   her that question.

22         MS. PARLOVECCHIO:  She had knowledge of the alerts

23   between January 2008 to August 2008.  This alert, I believe,

24   is from -- I can't remember the date.  I want to say it's

25   2007 or 2006.

```
 1              THE COURT:  When is the date for the alert?

 2              MR. COLLYARD:  I think it's sometime in 2006 or

 3    2007.  But she has knowledge of what the AML analysts do,

 4    what they document, how they do this.  And she herself

 5    talked about you focus on high risk, you focus on these

 6    activities.  She gave all the training on it.

 7              She is the person and I'm simply going to ask her

 8    a basic line of questions on whether or not the bank's own

 9    documentation, their own business records, their own

10    analysis shows that some of this activity was high risk

11    based on what she has just testified to.  It's complete fair

12    game.

13              MS. PARLOVECCHIO:  Your Honor, just to clarify the

14    factual record, she was still the BSA/AML subject matter

15    expert during the period up until 2007.  So this is -- this

16    alert is from a period of time where she was not -- did not

17    have any purview whatsoever about what the AML analysts were

18    actually doing and what they were supposed to be focusing on

19    in alerts.  So this is way beyond her knowledge and also --

20              THE COURT:  Shhh.

21              MS. PARLOVECCHIO:  I'm sorry.

22              THE COURT:  I am just worried --

23              MS. PARLOVECCHIO:  I'm sorry.  I'm usually a low

24    talker, so I am overcompensating.

25              So counsel went over these -- the particular alert
```

1    I think he is going to focus on is refers to yachts.  He

2    went over this with Ms. Ramlow, who is actually the analyst

3    who performed that alert and did the analysis.  So in

4    addition to the fact that this witness has no foundation,

5    it's cumulative.

6            MR. COLLYARD:  Your Honor, she trained people to

7    look for this stuff.  She started the Anti-Money Laundering

8    Group.  There is no better witness to ask this question than

9    Ms. Maltsch.  I will keep my questions limited to this area.

10           THE COURT:  I am going to overrule the objection

11   with the understanding that it will be very limited.

12           MR. COLLYARD:  Yep.

13           THE COURT:  And it will be with the understanding

14   that she is looking at the nature of the alert.

15           MR. COLLYARD:  Yes.  Thank you.

16       **(In open court)**

17   BY MR. COLLYARD:

18   Q.  Okay, Ms. Maltsch.  If we go back to Exhibit 183, I

19   think I directed you to -- did I direct you to page 49?

20   A.  No, but I will go there.  I'm there.

21   Q.  Okay.  I'm just going to ask you some quick questions

22   about this alert to get you oriented so I can ask you an

23   ultimate question.  Okay?

24           Do you see that this is an alert on the Petters

25   Company, Inc. account from July of 2006 that Mandy Ramlow

1    did; is that right?

2    A.  Yes.

3    Q.  Okay.  And if you flip the page to -- if we go to

4    page 50, I am going to take you towards the bottom.  It's

5    that last block on the bottom.  I am just going to blow this

6    up and go through it.

7              I'm sorry.  You know what the comments section is

8    in Searchspace, right?

9    A.  Yes.

10   Q.  And these are the comments that go into Searchspace,

11   correct?

12   A.  Yes.

13   Q.  And this is the documentation that is made when an alert

14   is closed; is that right?

15   A.  That's correct.

16   Q.  And you have an understanding that the analysts are

17   supposed to describe certain -- the basis for why they are

18   concluding that the alert was not suspicious; is that right?

19   A.  That's correct.

20   Q.  So if we go down and pull this up block, it says, "There

21   were 346 outgoing wires," and it gives a range.  Do you see

22   that?

23   A.  Yes.

24   Q.  It says --

25   A.  Yes.

1   Q.  -- the largest one is $10 million even.  Do you see

2   that?

3   A.  Sure.

4   Q.  For a total of $1.237 billion, right?

5           And then it says, "The largest wire was to Kurt

6   Bosshardt & Associates, who are attorneys, accountants and

7   brokers who focus on the yachting industry."  Do you see

8   that?

9   A.  Yes.

10  Q.  And you understand that the largest wire being referred

11  to there that's going to attorneys, accountants, and brokers

12  in the yachting industry is a $10 million wire, right?

13  A.  Yes.

14  Q.  And if you compare -- if you look at the screen, maybe

15  it's easiest for you to do that.  If you compare what you

16  were talking about of high-risk business types for car,

17  boat, and other large vehicle dealers and professional

18  service providers -- do you see that?  Do you see that?

19  A.  Yes.

20  Q.  -- this entry here of attorneys, accountants, and

21  brokers in the yachting industry would fall into that

22  category, correct?

23  A.  Yes.  This category -- the categories that are up on the

24  screen there are for customers of the bank, though, not

25  necessarily who our customers are doing business with.

Maltsch - Cross

1    Q.  All right.  These --

2    A.  I understand.

3    Q.  Do you agree with me that these activities fall within

4    the same activities that are identified as high risk?

5    A.  Yes.

6    Q.  And under your teachings as to whether or not something

7    appears to be unusual or I believe you described it as hmm,

8    something like that, that this type of activity then would

9    fall into that category of potentially having to be reviewed

10   and investigated, correct?

11   A.  Maybe in hindsight, but when we were talking within the

12   training, we were talking about our customers and doing a

13   deeper dive into our customers, not necessarily who our

14   customers are doing business with.

15   Q.  If the anti-money laundering analysts come across any

16   activity, any activity at all that the customer is involved

17   in or engaged in that is potentially suspicious, that is

18   activity that the bank needs to look into, correct?

19   A.  Absolutely.

20   Q.  Okay.  And so if the analysts come across activity like

21   this that they believe is unusual or interesting or falls

22   within high-risk categories, these are the types of things

23   that the bank would look into to see if that activity is

24   potentially suspicious, correct?

25           MS. PARLOVECCHIO:  Objection to form.

1              THE COURT:  Overruled.

2              THE WITNESS:  So, again, our training was focused

3      on our customers and whether or not our customers are in

4      those higher-risk industry types and to do additional due

5      diligence on those.  I understand what you're saying.  I'm

6      just saying our training was focused on the customer.

7      BY MR. COLLYARD:

8      Q.  I'm asking you if you agree with me, Ms. Maltsch, that

9      if a bank comes across any activity like this that could be

10     considered to be higher risk and the bank has some suspicion

11     or believes that this information leads to unusual activity,

12     the bank is required to look into this, right?

13             MS. PARLOVECCHIO:  Objection, asked and answered.

14             THE COURT:  Sustained.

15     BY MR. COLLYARD:

16     Q.  Is it your testimony, Ms. Maltsch, that if the bank

17     comes across activity, that it doesn't need to look into

18     that activity because it involves some other entity and not

19     just the customer?

20             MS. PARLOVECCHIO:  Objection, misstates the

21     testimony as argumentative.

22             THE COURT:  Overruled.  You may answer.

23             THE WITNESS:  I don't understand the question.

24     BY MR. COLLYARD:

25     Q.  Sure.  I'm sorry.  You're not -- let me do it this way.

1    If investigating activity on an alert for incoming or

2    outgoing wires and the bank comes across activity on an

3    outgoing wire, for example, that the customer is involved

4    in, the customer is actually making the wire, and they

5    believe that that activity is interesting or unusual or

6    falls within some type of high-risk category, the bank is

7    required to look into that activity, correct?

8    A.  I would agree --

9              MS. PARLOVECCHIO:  Objection, foundation.

10             THE COURT:  Overruled.

11             THE WITNESS:  So I would agree with the first

12   couple of concepts you indicated, but they have to have

13   reason to believe that that activity is suspicious.

14   BY MR. COLLYARD:

15   Q.  Under your training, if Petters Company, Inc., for

16   example, is making a $10 million wire to somebody in a

17   high-risk category, if Petters Company, Inc. is making that

18   wire to someone in a high-risk category and they have

19   information that it appears to be unusual or interesting,

20   your training says you need to look into that activity

21   further, correct?

22   A.  If they have --

23             MS. PARLOVECCHIO:  Objection to form.

24             THE COURT:  Sustained.

25             THE WITNESS:  Sorry.

```
 1                    THE COURT:  I sustained the objection.  It's an
 2         objection as to the form of the question.
 3         BY MR. COLLYARD:
 4         Q.  You agree here, Ms. Maltsch, that this is indicating a
 5         wire for $10 million that Petters Company, Inc. made,
 6         correct?
 7         A.  Yes.
 8         Q.  And this wire was to somebody who were attorneys,
 9         accountants, and brokers in the yachting industry, right?
10         A.  Yes.
11         Q.  And this would be the type of activity -- if it alerted
12         for outgoing wires, which it did, this would be the type of
13         activity that AML analysts would be looking into, correct?
14         A.  Well, they would look at the outgoing activity at the
15         wire.  We have a lot of customers who wire funds to
16         attorneys.
17         Q.  I'm just asking you, Ms. Maltsch, if this is the type of
18         activity that the AML analysts were expected to look into.
19                    MS. PARLOVECCHIO:  Objection, asked and answered.
20                    THE COURT:  Overruled.
21                    THE WITNESS:  So they are looking into it.  They
22         did look into it and they did not deem it suspicious.
23         BY MR. COLLYARD:
24         Q.  How do you know that?
25         A.  Because Mandy closed the wire or closed the alert.
```

```
 1    Q.  Do you know what Mandy did to look into it?

 2              MS. PARLOVECCHIO:  Objection, lack of foundation.

 3              THE COURT:  Overruled.

 4    BY MR. COLLYARD:

 5    Q.  Do you know what Ms. Ramlow did to look into this wire?

 6    A.  Absolutely, no, I do not.

 7    Q.  So you don't know anything about what Ms. Ramlow did

 8    about this wire, do you?

 9    A.  No, but I know Mandy Ramlow.

10    Q.  Just give me one second.

11         (Plaintiff's counsel confer)

12              MR. COLLYARD:  I have no further questions,

13    Your Honor.

14              Thank you, Ms. Maltsch.

15              THE WITNESS:  Thank you.

16              MS. PARLOVECCHIO:  I have some brief redirect,

17    Your Honor.

18              THE COURT:  You may.

19                      REDIRECT EXAMINATION

20    BY MS. PARLOVECCHIO:

21    Q.  Now, Ms. Maltsch, plaintiff's counsel asked you some

22    questions on cross about large quantities of wires going in

23    and out of account with a low balance.

24    A.  Um-hmm.

25    Q.  Do you recall those questions?
```

Maltsch - Redirect

1    A.  I do.

2    Q.  And you said it may be indicative of money laundering.

3    Could you explain what that means.

4    A.  Well, it may be indicative of layering of funds from one

5    account to another to hide the origin or the use of those

6    funds.

7    Q.  And you had testified about sweep accounts?

8    A.  Yes.

9    Q.  Can you explain what that means.

10   A.  Sure.  A lot of large businesses have multiple accounts

11   at multiple financial institutions and they have what are

12   called zero balance accounts and they sweep funds from other

13   financial institutions all into one account and then that

14   money will then be -- not swept, but used to -- and then

15   moved to their operations accounts.

16   Q.  So the sweep accounts, would that have that sort of in

17   and out of the account with low balance activity that was

18   described?

19   A.  Yes.

20   Q.  And would a sweep account be something that would be

21   suspicious?

22   A.  No.

23   Q.  You also testified that you know what Ponzi schemes are.

24   Do you recall that testimony?

25   A.  Yes.

```
 1    Q.  Were Ponzi schemes something that regulators were

 2    focused on between 2008 -- or 2002 to 2008?

 3              MR. COLLYARD:  Objection, lack of foundation as

 4    what regulators are focused on.

 5              THE COURT:  Sustained.

 6    BY MS. PARLOVECCHIO:

 7    Q.  You participated in the -- you testified earlier that

 8    you participated in the fed exams?

 9    A.  That's correct.

10    Q.  And in participating in the fed exams, did you have an

11    opportunity to observe what regulators were expecting from

12    banks in terms of looking for suspicious activity?

13              MR. COLLYARD:  Objection, hearsay and lack of

14    foundation.

15              THE COURT:  Overruled.

16              THE WITNESS:  So, yes, I did.  When the regulators

17    were there doing the AML exam, I was meeting with them on a

18    daily basis and having conversations with them about topics

19    that they were interested in.

20    BY MS. PARLOVECCHIO:

21    Q.  And were you also reviewing regulations when you were

22    putting together those trainings we looked at?

23    A.  Yes.

24    Q.  And based on that understanding, were Ponzi schemes

25    something that regulators were focused on between 2002 to
```

```
 1    2008?

 2                MR. COLLYARD:  Objection, Your Honor, lack of

 3    foundation, calls for speculation.

 4                THE COURT:  Overruled.  You may answer if you can.

 5                THE WITNESS:  Right, it was not.

 6    BY MS. PARLOVECCHIO:

 7    Q.  What was the focus of regulators in terms of illicit

 8    activity during the 2002 to 2008 time frame?

 9                MR. COLLYARD:  Same objections, Your Honor.

10                THE COURT:  As to your experience and knowledge,

11    you may answer.

12                THE WITNESS:  Okay.  To my experience and

13    knowledge, it was cash transactions and wires involving

14    higher-risk jurisdictions.

15    BY MS. PARLOVECCHIO:

16    Q.  Now, plaintiff's counsel also showed you Plaintiff's

17    Exhibit 399.

18                MS. PARLOVECCHIO:  May we have that, Mr. Herzka.

19    That's in evidence.  And page 14.

20    BY MS. PARLOVECCHIO:

21    Q.  And he asked you some questions about the language that

22    says, "reason to suspect."  Do you recall those questions?

23    A.  I do.

24    Q.  And you replied that the bank would have to know reason

25    to suspect.  Can you just explain what that means.
```

Maltsch - Redirect

```
1    A.  Well, I guess "know" is kind of not necessarily the
2    right word to use.  So if you know you have to file a
3    Suspicious Activity Report, but if you have reason to
4    suspect, for example, one of your employees has escalated
5    some concerns to you, that gives you reason to suspect.
6    Q.  So you would have to -- the bank would have to know the
7    reason; is that right?
8           MR. COLLYARD:  Objection, leading, Your Honor.
9    BY MS. PARLOVECCHIO:
10   Q.  Would the bank have to know the reason in order to take
11   that next step?
12   A.  Yes.
13   Q.  Now, plaintiff's counsel also asked you some questions
14   on cross about the AML Committee notes in regard to the
15   AmSouth situation.
16           I want to direct your attention to Plaintiff's
17   Exhibit 239, and these are AML Committee minutes from
18   November 4th, 2004 that was discussed during plaintiff's
19   questioning.  Do you recall those questions?
20   A.  I do.
21   Q.  So looking at number 1 on the first page, "Recent
22   Regulatory Actions and Regulatory Emphasis," generally
23   what's being discussed here?
24   A.  In general -- the AmSouth case specifically?
25   Q.  Yes.
```

Maltsch - Redirect

1    A.  In the AmSouth case it looked as though there were a lot

2    of warning signs.  So employees were escalating information

3    or providing warnings that were not heeded.  That's what we

4    really focused in on, was ensuring that any warnings that

5    are coming from bank employees are looked at.

6    Q.  So there were actual warnings coming from bank employees

7    in that case?

8    A.  Yes.

9    Q.  And can you just tell the jury why recent regulatory

10   actions like the AmSouth case and the fact that employees

11   were reporting suspicious activity and reporting it up the

12   chain was being discussed at the AML Committee meeting?

13   A.  Sure.  We like to look at enforcement actions to help

14   educate us as to potential ways to enhance our program.

15   And, again, the AmSouth one did talk a lot about warnings

16   from bank employees and how important those are to review

17   and to do a deeper dive.

18   Q.  So I just want to point out some of the circumstances in

19   this case that were skipped over when you were asked about

20   this originally.

21          So just looking at the second bullet here, it

22   says, "Despite noticing unusual transactions, the bank did

23   not file SARs relating to a multi-million dollar

24   embezzlement scheme by the officer of one of its corporate

25   clients."  Do you see that?

1    A.  I do.

2    Q.  And then can you look at the third bullet down.  It

3    says, "After being told of suspected forgeries of municipal

4    checks, the bank decided it was not necessary to file SARs

5    because the perpetrator had committed suicide."  Do you see

6    that?

7    A.  Yes.

8    Q.  And so in both of those instances did the bank know

9    about the suspicious activity that was identified by

10   employees?

11   A.  Yes.

12   Q.  But it failed to file a SAR, right?

13   A.  Correct.

14   Q.  And can you tell -- let's just look down at the seventh

15   bullet down.  There it says, "After notifying law

16   enforcement officials of a case involving an altered check

17   and an international transfer of funds, the bank failed to

18   also file a SAR."  Do you see that?

19   A.  Yes.

20   Q.  So in that instance did the bank know about the illicit

21   activity?

22   A.  Yes.

23   Q.  And the bank notified law enforcement?

24   A.  Yes.

25   Q.  But it still didn't file a SAR; is that right?

1    A.  Yes.

2    Q.  To your knowledge, were any of these circumstances

3    present with regard to the activity in the PCI account?

4    A.  They were not.

5    Q.  Was the focus of the AML Committee's discussion when it

6    was talking about AmSouth on Ponzi schemes?

7    A.  No.

8    Q.  After AmSouth was discussed by the AML Committee, did it

9    change the way you trained employees to identify suspicious

10   activity?

11   A.  No.  I think there just was a continued emphasis on

12   escalating unusual activity and ensuring when we got the

13   escalation that we looked into it.

14   Q.  And just to be clear, were any escalations of suspicious

15   activity in the PCI account ignored by M&I?

16   A.  No.

17   Q.  Now I want to turn your attention back to the questions

18   concerning high-risk businesses and what that meant.  Do you

19   recall those questions?

20   A.  I do.

21   Q.  Now, I want to bring up Defendant's Exhibit 50143,

22   please, and that's in evidence.  I want to focus you on

23   page 2.

24           And plaintiff's counsel asked you some questions

25   about high-risk businesses.  Do you recall those questions?

1    A.  I do.

2    Q.  Now, is that meant to -- are those lists of high-risk

3    businesses meant to apply to a customer's customer?

4    A.  They are not.

5    Q.  Is the potential purchase of a yacht by a wealthy person

6    in and of itself suspicious?

7    A.  No.

8    Q.  Now, plaintiff's counsel also asked you some questions

9    about Mary Pesch's review of the PCI account.  Do you recall

10   those questions?

11   A.  Yes.

12   Q.  When you reviewed Ms. Pesch's analysis, did you have any

13   concerns about the handling of prior AML alerts?

14   A.  Not at the time because it was the information that

15   they -- what I am trying to say is I didn't have concerns

16   about the other alerts having been closed because those

17   analysts hadn't had the information Mary had at the time she

18   did the 2008 review.

19   Q.  And just generally, what is that information that Mary

20   had at the time she did the review?

21   A.  We received a subpoena on the Petters accounts, and our

22   process was to actually do a deeper dive on a customer when

23   you receive a subpoena.  And when she did the deeper dive,

24   she had news stories that were out there, so found out about

25   the Ponzi scheme at that point in time.

1          MS. PARLOVECCHIO:  May I have a moment, please,

2     Your Honor?

3          (Defendant's counsel confer)

4          THE COURT:  You may.

5          MS. PARLOVECCHIO:  I have no further questions.

6          MR. COLLYARD:  No questions, Your Honor.  Thank

7     you.

8          THE COURT:  May the witness be excused?

9          MS. PARLOVECCHIO:  Yes, Your Honor.

10          THE COURT:  You are excused.

11          THE WITNESS:  Thank you.

12          THE COURT:  Counsel, please approach.  I just want

13     to address our scheduling.

14          MS. GITTES:  Thank you, Your Honor.  Is someone

15     going to join me?

16          **(At sidebar)**

17          THE COURT:  I assume that your testimony for the

18     next witness will take more than ten minutes?

19          MS. GITTES:  It will.  It's our damages expert.

20          And, Your Honor, there are a few issues raised in

21     our e-mails from this morning.  I don't know if you want

22     to --

23          MR. REIF:  I'm sorry.  I thought we were going to

24     have Ms. Indahl next based on your --

25          MS. GITTES:  Ms. Indahl can't come until 2:30.

 1    This ended sooner than what we expected.

 2              MR. REIF:  Okay.

 3              MS. GITTES:  So Mr. Jarek will go next in order to

 4    avoid a scheduling issue.

 5              MR. REIF:  Okay.

 6              THE COURT:  So we will take --

 7         (The Court and law clerk confer)

 8              MS. GITTES:  Sorry about that.

 9              MR. REIF:  No, that's all right.

10              MS. GITTES:  We thought it would go longer and she

11    can't be here until 2:30.

12              MR. REIF:  I figured she had issues with

13    scheduling.

14              MS. GITTES:  Yeah, she did.

15              THE COURT:  So we are going to take our lunch

16    break now and let's plan to begin at 1:15.

17              MS. GITTES:  1:15?

18              THE COURT:  Yes.

19              MS. GITTES:  Thank you, Your Honor.

20              MR. REIF:  If I may just ask, what's the plan

21    given Ms. Indahl's availability?  Are you planning to

22    interrupt or have her come another time?

23              MS. GITTES:  So I expect to have about an hour and

24    a half with Mr. Jarek.  So our hope is to get her in today,

25    depending on the length of cross.

1          MR. REIF:  Right.

2          MS. GITTES:  If not, we will make accommodations

3    for her to come back tomorrow if we have to.

4          MR. REIF:  Okay.

5          MS. GITTES:  I think we've asked her to stay.

6    Apologies, Your Honor.

7          THE COURT:  This is on the record?

8          MS. GITTES:  We can discuss it among counsel.

9    Apologies.

10          MR. REIF:  Okay.

11          THE COURT:  So we don't need to address that?

12          MR. REIF:  No, I don't think so.  Thank you, Your

13    Honor.

14          THE COURT:  Okay.

15       **(In open court)**

16          THE COURT:  We are back in session.  You may be

17    seated.

18          Members of the Jury, we will take our lunch break

19    now.  So please remember the instructions that I have given

20    you.  Do not discuss the case with anyone.  Don't do any

21    kind of research about the case with anyone.  Continue to

22    keep an open mind as you receive evidence and information

23    about this case in the courtroom.  Have a good lunch.  We

24    will plan to return at 1:00.

25          (Jury excused)

1              **IN OPEN COURT**

2            **(JURY NOT PRESENT)**

3          THE COURT:  And we are in recess.

4       (Lunch recess taken at 11:55 a.m.)

5                  *    *    *    *    *

6       (1:14 p.m.)

7              **IN OPEN COURT**

8             **(JURY PRESENT)**

9          THE COURT:  Good afternoon.  Please be seated.

10          MS. GITTES:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MS. GITTES:  May we proceed?

13          THE COURT:  Yes, you may.

14          MS. GITTES:  BMO Harris calls its next witness

15   Karl Jarek, an expert in forensic accounting and damages

16   issues.

17          THE COURT:  Thank you.

18          COURT REPORTER:  Please raise your right hand.

19       (Witness sworn)

20          COURT REPORTER:  You can have a seat.  Once you're

21   seated, state your name and spell your first and last name.

22          MS. GITTES:  Your Honor, is it okay if we approach

23   the witness and the bench to provide the small binder for

24   today?

25          THE COURT:  Let's -- first of all --

1         MS. GITTES:  Oh, I apologize.

2         THE COURT:  Please state and -- state your full

3    name and spell your last name.

4         THE WITNESS:  It's Karl Jarek.  It's K-a-r-l,

5    J-a-r-e-k.

6         THE COURT:  Thank you.

7         Counsel, you may approach.

8         MS. GITTES:  Thank you.

9    (Binders handed to the Court and witness)

10        MS. GITTES:  May I proceed, Your Honor?

11        THE COURT:  Yes, you may.

12        MS. GITTES:  Thank you.

13                    **(Karl Jarek)**

14                 **DIRECT EXAMINATION**

15   BY MS. GITTES:

16   Q.  Good afternoon, Mr. Jarek.

17   A.  Good afternoon.

18   Q.  What is your role in this litigation?

19   A.  I am a forensic accountant, and I was retained by BMO

20   Harris Bank.

21   Q.  And where do you currently work?

22   A.  I'm a director with Nottingham Group.  It's a forensic

23   accounting firm and we're based in Pittsburgh, Pennsylvania.

24   Q.  Do you live in Pittsburgh?

25   A.  I do.

1    Q.  Do you have family?

2    A.  Yes.

3    Q.  And who comprises your family?

4    A.  My wife Karen.  She's also a CPA but retired.  And I

5    have two daughters.  My older daughter is a senior at Elon

6    University in North Carolina, and she's an accounting major.

7    And my younger daughter is a senior in high school.

8    Q.  Thank you, Mr. Jarek.

9             Did you prepare slides to assist with your

10   testimony today?

11   A.  I did, yes.

12   Q.  Those have been marked as DD-50, I believe, the hard

13   copies in your binder.

14             MS. GITTES:  Your Honor, do I have permission to

15   use DD-50 for demonstrative purposes?

16             THE COURT:  Is there any objection?

17             MR. ANTHONY:  Yes, there is, Your Honor.  There is

18   about 20 pages in DD-50, and we object to a number of those

19   pages.  We don't object to the first page, so if we want to

20   start there.  But the pages are unnumbered.  I don't know

21   how I would object to them, even they're going to be offered

22   for demonstrative purposes, since they're unnumbered.

23             MS. GITTES:  There's a number in the lower

24   right-hand corner; it's just small.

25             MR. ANTHONY:  Well, the only number I see on mine

1    is my number.

2              MS. GITTES:  It comes up in the -- that's one.  It

3    comes up on the others.

4              MR. ANTHONY:  Well, it comes up on page 3, but

5    it's numbered page 2.  That's why I don't understand which

6    ones they're referring to.  So if you could tell me which

7    ones or show it to me.

8              MS. GITTES:  Sure.  So we're using -- apologies,

9    Your Honor.  We're using -- this is our slide 1, and the

10   rest of the numbers are on the right-hand corner.

11             MR. ANTHONY:  Okay.

12             MS. GITTES:  Thank you, Mr. Anthony.

13             MR. ANTHONY:  Thank you.  So we object to the

14   entire package, Your Honor, but we'll wait to see which ones

15   they offer out of this package.

16             MS. GITTES:  Your Honor, I believe those

17   objections were resolved by order during the lunch hour.

18             THE COURT:  That is the case.

19             MS. GITTES:  Permission to publish DD-50, Your

20   Honor?

21             THE COURT:  You may.

22   BY MS. GITTES:

23   Q.  Did you prepare this slide, Mr. Jarek?

24   A.  Yes.

25   Q.  And what's reflected here at a high level?

1    A.   Just relevant information from my background and

2    experience in forensic accounting.

3    Q.   Okay.  And what's your educational background?

4    A.   I have a bachelor's degree in accounting and a master's

5    in business administration with an emphasis in finance.

6    Q.   And what institutions did you get those degrees from?

7    A.   My undergrad was a small local college in Pennsylvania

8    in the town where I grew up.  It's Waynesburg University.

9    And I got my MBA from the University of Pittsburgh.

10   Q.   And do you have any professional certifications?

11   A.   Yes.  I'm a certified public accountant and I also --

12   Q.   And what's a certified public accountant?

13   A.   It's someone that's licensed as a professional in the

14   accounting industry.  So it's -- you're required to pass an

15   extensive examination and obtain so many credits in

16   accounting and other courses through college and then

17   fulfill the work experience requirement.

18   Q.   And in addition to being -- and when did you become a

19   CPA, if I missed that?

20   A.   So I passed the exam in my first sitting, which was in

21   1986.  And then I became licensed in 1988 after I completed

22   the two years of work experience.

23   Q.   And do you hold any other certifications in addition to

24   being a CPA?

25   A.   Yes.  So I'm a member of the American Institute of

1    Certified Public Accountants, and that's the national

2    organization for CPAs.  And through that organization I have

3    a certification in financial forensics, which is like fraud

4    investigation and damages analysis.  And I'm also accredited

5    in business valuation through the AICPA.

6    Q.  Thank you, Mr. Jarek.  Before we get into forensic

7    accounting, which you mentioned in discussing your

8    certifications, I'd just like to briefly go through your

9    work experience.

10           What kind of accounting work did you do once you

11   got your CPA?

12   A.  So after I graduated from college in 1986, I was hired

13   by KPMG, which is an international accounting firm, as an

14   auditor.

15   Q.  And did you focus on particular type of institutions as

16   an auditor?

17   A.  Yes.  So while I was there, I wasn't -- didn't really

18   intend to focus on it, but I was scheduled primarily almost

19   exclusively on banking clients.

20   Q.  And what's an auditor, just at a high level?

21   A.  As auditor is basically an accounting professional that

22   focuses on verifying transactions and books and records of a

23   company and validating the financial statements.

24   Q.  Okay.  And what did you do after you left KPMG?

25   A.  So when I worked at KPMG, I worked primarily on the

1   Mellon Bank audit, which was the largest client in our

2   Pittsburgh office.  And through the contacts that I had made

3   there, I was recruited by melon to come in-house and work

4   for Mellon Bank as a controller for a spin-off company

5   called Grant Street National Bank.

6   Q.  And so what position, if any, did you hold at Grant

7   Street National Bank?

8   A.  Well, I was -- I acted as a controller for the bank.

9   Q.  And what does it mean at a high level to be a controller

10  for a bank?

11  A.  So I was responsible for all of the accounting processes

12  and procedures for the bank and all of the financial

13  reporting.

14  Q.  And so how long did you work inside Grant Street Bank?

15  A.  About three years.

16  Q.  And did you gain any relevant experience in that role?

17  A.  Yes.

18  Q.  Can you just explain briefly.

19  A.  Well, just to be working inside a bank and we were still

20  affiliated with Mellon Bank, so I would interact with the

21  bigger bank as well just to understand, you know, all those

22  processes and procedures.

23  Q.  Okay.  So now let's turn, Mr. Jarek, to your work in

24  forensic accounting.  Can you explain at a high level just

25  what is forensic accounting.

```
 1    A.  Forensic accounting is -- some people call it forensic

 2    auditing because it's kind of investigative.  It's verifying

 3    information, but it's primarily in -- or typically in a

 4    litigation context, so think of things like fraud

 5    investigation, that's forensic accounting, and also damages

 6    analysis, evaluating loss claims and things of that nature.

 7    Q.  And when did you -- do you currently specialize in

 8    forensic accounting?

 9    A.  Yes, for -- I have for a long time.

10    Q.  That was my next question.  When, roughly, did you start

11    focusing on forensic accounting?

12    A.  I started specializing in forensic accounting in 1991,

13    right after I finished or I obtained my MBA degree.

14    Q.  And where did you work when you began to specialize in

15    forensic accounting?

16    A.  When I completed my MBA degree, I was recruited to join

17    PricewaterhouseCoopers as a senior consultant in the

18    Pittsburgh office.

19    Q.  And what role or roles did you hold at PwC?

20    A.  I was a senior accountant, and this was in the forensic

21    accounting practice of the firm in the Pittsburgh office.

22    After a couple of years I was promoted to manager, and a

23    couple years after that I was promoted to director.  And

24    when I left the firm, at that point I was director in charge

25    of forensic accounting services of the Pittsburgh office.
```

1    Q.  And how long were you at PwC in total?

2    A.  I think it was a little over eight years.

3    Q.  Okay.  And in, I think you said, three decades working

4    as a forensic accountant, have you developed any particular

5    expertise within the field of forensic accounting?

6    A.  Yes.

7    Q.  And what's that?

8    A.  So for over 30 years I've been doing forensic

9    accounting, which is mostly fraud investigation and damages

10   analysis.

11            Then within the past 10 to 12 years I've developed

12   a particular expertise and a lot of experience in examining

13   Ponzi schemes.

14   Q.  When did you start focusing on Ponzi schemes?

15   A.  The first Ponzi scheme I investigated was in 2009, and

16   it was a -- it was a Ponzi scheme in Washington D.C. that

17   had actually collapsed in 2008, along with a lot of other

18   Ponzi schemes that seemed to be exposed in 2008, along with

19   Petters, for example.

20   Q.  Was there anything happening that, in your experience,

21   caused those Ponzi schemes to be revealed at that time?

22   A.  Yes.

23   Q.  And what was that?

24   A.  So what happened was in 2007 and 2008 we had the great

25   recession or the financial collapse, whatever you want to

1    refer to it.  And as a result of that, investors weren't

2    putting -- weren't seeking new investments and putting new

3    money into Ponzi schemes and, as a result, a lot of them

4    were exposed, because without the new money coming in, the

5    fraud became exposed.

6    Q.  And how many Ponzi schemes in total, roughly, have you

7    examined in your career?

8    A.  Just in the past 10 or 12 years I've examined 17 Ponzi

9    schemes in 20 different lawsuits.

10   Q.  And where have those cases, those Ponzi schemes, been

11   located?

12   A.  All over the country.  Florida is a big spot for Ponzi

13   schemes.  Here in Minnesota I investigated a Ponzi scheme a

14   couple years ago, which was the -- actually the second

15   biggest Ponzi scheme in Minnesota history, which was known

16   as Crown Forex.  And then anywhere from Boston to

17   California.  California is another big area where there

18   seems to be a lot of Ponzi schemes.

19   Q.  And how did you develop your expertise in analyzing

20   Ponzi schemes?

21   A.  It's really been on-the-job training.  You know, when

22   these Ponzi schemes started to collapse in the late 2000s,

23   there wasn't a training manual or a seminar to go to to

24   learn how to examine Ponzi schemes.

25          So I basically over the past ten years have

1    developed methodologies to conduct the investigations that

2    were built on all the general forensic accounting and fraud

3    investigative skills that I had developed over the, you

4    know, 30 years that I've been doing forensic accounting.

5    Q.  Are you aware of any forensic accountant who has

6    examined more Ponzi schemes than you have?

7    A.  I'm really not.

8    Q.  And, Mr. Jarek, have you been asked to serve as an

9    expert witness in other cases in addition to this one?

10   A.  Yes.

11   Q.  Approximately how many?

12   A.  I mean, over 30 years it's a few hundred cases.

13   Q.  And do you typically represent banks in cases about

14   Ponzi schemes?

15   A.  Usually banks.  I work with banks on other types of

16   matters too just because most of my experience is in the

17   banking industry since 1986.

18   Q.  Have you ever been engaged to act as an expert witness

19   on behalf of an investor in a scheme?

20   A.  Yes, I have.

21   Q.  And when was that?

22   A.  That was in 2015, I believe.

23   Q.  Do you have any legal training, Mr. Jarek?

24   A.  No.

25   Q.  Are you offering any legal opinions today?

1    A.  No, I'm not.

2    Q.  And so, then, are your opinions that you will offer

3    today limited solely from your perspective as a forensic

4    accountant?

5    A.  Yes.

6    Q.  And just to be clear, which party retained you in this

7    case?

8    A.  The defendant, BMO Harris Bank.

9    Q.  And were you asked to look into a series of issues by

10   BMO Harris in connection with this case?

11   A.  Yes.

12   Q.  And did you summarize those on a slide, Mr. Jarek?

13   A.  Yes, I did.

14   Q.  Can I direct you to slide 2, "Issues Reviewed."

15          MR. ANTHONY:  Objection, Your Honor.  Is she going

16   to -- may I ask the Court if counsel is going to tender the

17   witness as an expert?

18          MS. GITTES:  Oh, I'm happy to -- defendants tender

19   Mr. Jarek as an expert witness in forensic accounting and

20   damages.

21          MR. ANTHONY:  Your Honor, we object to Mr. Jarek

22   being tendered as an expert on liability and causation.  We

23   do not object to him being tendered as or testifying as an

24   expert on damages.  And we'd ask for the opportunity to voir

25   dire him on his qualifications to testify as a liability and

1    causation expert.

2              THE COURT:  You may.

3              MR. ANTHONY:  Thank you, Your Honor.

4                     **VOIR DIRE EXAMINATION**

5    BY MR. ANTHONY:

6    Q.  Good afternoon, Mr. Jarek.

7    A.  Good afternoon.

8    Q.  Now, Mr. Jarek, do you have any training, experience, or

9    education as a bank examiner?

10   A.  No.

11   Q.  Do you have any training, education, or experience as a

12   bank regulator?

13   A.  No.  I don't apply those skills in my Ponzi work.

14   Q.  Do you hold yourself out as an expert on the Bank

15   Secrecy Act?

16   A.  No.

17   Q.  Do you know the BSA and anti-money laundering rules?

18   A.  No, I'm not an expert in that.

19   Q.  And you don't hold yourself out as an banking expert, do

20   you?

21   A.  I think in certain -- it depends on the issue.  There's

22   been certain cases where I've been qualified as an expert in

23   banking issues.

24   Q.  And you don't have any understanding of whether M&I had

25   a responsibility and obligation under the Bank Secrecy Act

1    or anti-money laundering rules to understand the Petters

2    business, right?  You're not giving an opinion on that?

3    A.  I'm not opining on that, no.  I view that more on the

4    AML side.

5    Q.  And you're not an expert in applying the legal

6    definition of "proximate cause" to a set of facts, are you?

7    A.  No, and I'm not applying any legal definition to that.

8    Q.  And you're -- you don't have a degree in sociobiology,

9    do you?

10   A.  No.

11   Q.  And that would be someone who would be studying human

12   nature or qualified to testify about human nature, correct?

13   A.  I guess.

14   Q.  And you're not going to be testifying about any human

15   nature, you don't have any expertise in that area, do you?

16          MS. GITTES:  Objection, Your Honor.  I think we've

17   exceeded the scope of voir dire.

18          MR. ANTHONY:  I have just a couple more questions,

19   Your Honor.

20   BY MR. ANTHONY:

21   Q.  You didn't --

22          THE COURT:  Is that an objection?

23          MS. GITTES:  Objection, Your Honor.

24          THE COURT:  Sustained.

25          MR. ANTHONY:  May I ask two more questions, Your

Jarek - Direct

```
1    Honor?

2              MS. GITTES:  Objection, Your Honor.

3              THE COURT:  As to what?

4              MR. ANTHONY:  To finish his voir dire.

5              THE COURT:  The voir dire is concluded.

6              MR. ANTHONY:  Okay.  Thank you, Your Honor.

7              MS. GITTES:  Defendants offer Mr. Jarek as an

8    expert in forensic accounting and damages issues.

9              MR. ANTHONY:  Same objections, Your Honor.

10             THE COURT:  Overruled.

11             MS. GITTES:  Thank you, Your Honor.

12                 DIRECT EXAMINATION (Resumed)

13   BY MS. GITTES:

14   Q.  I think when we stopped talking we were --

15             MS. GITTES:  Yes.  Thanks, Mr. Herzka.

16   BY MS. GITTES:

17   Q.  -- we were reviewing the issues that you were asked to

18   review in this matter.

19   A.  Yes.

20             MS. GITTES:  And the Court and counsel have a hard

21   copy as well in your binders, if it's helpful.

22   BY MS. GITTES:

23   Q.  What issues were you asked to look into on behalf of BMO

24   Harris Bank in this litigation?

25   A.  Basically, three broad issues.  The first was to
```

1   evaluate whether M&I caused PCI's alleged losses from a

2   forensic accounting perspective.

3   Q.  And was -- did you examine any other issues?

4   A.  Yes.  And the second was to analyze M&I's potential

5   profit on the PCI account.

6   Q.  And, finally, do you offer any -- one more opinion,

7   Mr. Jarek?

8   A.  Yes, and I also evaluate an alternative loss

9   calculation.

10  Q.  Okay.  Before we get into the substance of your

11  opinions, are you being compensated for your role in this

12  case?

13  A.  Yes.

14  Q.  How are you being compensated?

15  A.  Well, my firm is being compensated for my time at the

16  rate of $550 an hour.

17  Q.  Approximately how many hours have you personally spent

18  on this matter in the time since you were retained?

19  A.  It's over 1,200 hours.

20  Q.  And approximately how much has your firm been paid in

21  this matter in the time you've been retained?

22  A.  I think it's about 1.6 million.

23  Q.  Is your compensation for this case contingent on the

24  nature of your opinions?

25  A.  No.

1   Q.  Is your compensation contingent on the outcome of this

2   case?

3   A.  No.

4   Q.  Has your compensation impacted your professional opinion

5   in any way?

6   A.  No.

7   Q.  Okay.  Did you issue a report in this case?

8   A.  Yes.

9   Q.  In fact, did you issue two reports in this case?

10  A.  Yes.

11  Q.  And you have them there if you need to reference them.

12  A.  I do.

13  Q.  And did anyone help you work on this case at your firm?

14  A.  Yes.  I've a staff of forensic accountants at the firm.

15  I think about four people helped out on this project.

16  Q.  Okay.  So I'd like to transition and just give a brief

17  overview of the kinds of materials you consulted in this

18  matter.  Did you prepare a slide on this, Mr. Jarek?

19  A.  Yes, I did.

20          MS. GITTES:  Can we flip to slide 3, Mr. Herzka.

21  BY MS. GITTES:

22  Q.  At a high level, without going through everything on

23  this slide, can you explain the kinds of materials you and

24  your team reviewed in your analysis in this case.

25  A.  Yes.  So it's basically kind of four broad areas.  The

1    first --

2    Q.  Let's do them one by one, Mr. Jarek.  So what's the

3    first?

4    A.  The first is the PricewaterhouseCoopers, PwC, work

5    papers, which included the transaction database for the PCI

6    account.

7    Q.  And the PwC work papers, do you recall who, if anyone,

8    helped prepare those papers?

9    A.  Those were produced by PwC, Mr. Martens' firm.

10   Q.  "Mr. Martens" meaning plaintiff's expert witness?

11   A.  Yes.

12   Q.  And so you relied on the same data or at least some of

13   the same data as Mr. Martens did?

14   A.  Whatever they produced to us, we relied on, yes.

15   Q.  And did you take steps to ensure that data was accurate?

16   A.  Yes.  We did some sample testing of the database, you

17   know, looking at certain transactions and just confirming

18   our understanding based on the source documents of how the

19   data was captured in the database.

20   Q.  Okay.  Did you review any other categories of materials?

21   A.  Yes.

22   Q.  What's another category of materials you reviewed?

23   A.  Another really big area was researching the various

24   related lawsuits, bankruptcy cases, receivership actions,

25   and various other civil lawsuits that are all surrounding

Jarek - Direct

1    the entire Petters Ponzi scheme.

2    Q.  Did you review any testimony in this matter?

3    A.  Yes.

4    Q.  What kinds of testimony?

5    A.  A lot of depositions, I think there were at least 80

6    deposition transcripts; as well as hearing transcripts for

7    things like -- there would be hearings at the Bankruptcy

8    Court, where Mr. Martens had testified, so I made sure I

9    would go and review his testimony in these other types of

10   matters; trial testimony, some testimony from the Petters

11   criminal trial, for example.

12   Q.  And is there a final category?  Is there one more?  I

13   think you said four.

14   A.  Yeah, just generally documents produced by the parties.

15   Q.  Have you been present for some of these proceedings in

16   the courtroom in this trial the last few weeks?

17   A.  Yes.

18   Q.  And have you reviewed transcripts at times when you

19   weren't able to be in court?

20   A.  Yes.  Not everything, but a good bit.

21   Q.  How would you rate -- you've examined, Mr. Jarek, a

22   number of Ponzi schemes, as you said.  How would you compare

23   the amount of data in this case to other Ponzi scheme cases

24   that you've worked on?

25   A.  Well, the amount of data in this case is just

 1    astronomical.  I mean, it's got to be at least ten times the

 2    amount of data I've seen in other cases, other Ponzi cases.

 3    Q.  And have you become aware in the course of your work on

 4    this case that Mr. Kelley alleges that certain materials

 5    were deleted that might otherwise have been relevant?

 6    A.  Yes, I'm aware of that.

 7    Q.  And did that affect your ability to reach a conclusion

 8    in this matter?

 9    A.  No.

10              MR. ANTHONY:  Objection, undisclosed opinion.

11              THE COURT:  Overruled.

12    BY MS. GITTES:

13    Q.  Why not?

14    A.  Just the amount of data that I did have was so massive,

15    I had enough data.

16    Q.  Okay.  And so to move on to the opinions that you have

17    come to in this matter -- sorry, I strike that.

18              In your work on this matter, did you reach certain

19    opinions on the issues that we laid out a few minutes ago?

20    A.  Yes.

21    Q.  And did you prepare a slide on that, Mr. Jarek?

22    A.  I did.

23              MS. GITTES:  Okay.  Can we move to slide -- thank

24    you, Mr. Herzka.

25    BY MS. GITTES:

Jarek - Direct

1    Q.  Did you form an opinion about whether, from a forensic

2    accounting perspective, M&I caused PCI to suffer any harm?

3    A.  I did look at that, yes.

4    Q.  And what's your opinion on that issue?

5    A.  Based on my experience as a forensic accountant, M&I did

6    not cause PCI to suffer harm in the form of loans PCI was

7    unable to pay its creditors.

8              MR. ANTHONY:  Objection, beyond the scope of his

9    report, violates the earlier court orders.

10             THE COURT:  Overruled.

11   BY MS. GITTES:

12   Q.  Did you form an opinion on whether anyone at M&I or the

13   bank itself meaningfully profited from its relationship with

14   Petters and PCI?

15   A.  I did look at that.

16   Q.  And what was your opinion on that issue?

17   A.  That neither M&I, the company, nor any of its employees

18   meaningfully benefited from the Ponzi scheme.

19   Q.  Okay.  And, finally, did you form an opinion about if

20   you assume that BMO Harris were to be found liable in this

21   matter, what the proper measure of losses would be, from a

22   forensic accounting standpoint, in your opinion?

23             MR. ANTHONY:  Objection, the opinion offered by

24   this witness violates the Court's order on the proper

25   measure of damages.

1          THE COURT:  Overruled.

2    BY MS. GITTES:

3    Q.  And what's your opinion on that issue, Mr. Jarek?

4    A.  Well, if BMO Harris were to be found liable, the

5    maximum -- the range would be between zero and 78 million.

6    Q.  Okay.  So let's turn to the first of those opinions.

7    Can you explain to the jury the concept of causation, again,

8    in your role as a forensic accountant.  So what is causation

9    from a forensic accounting perspective?

10   A.  So as a forensic accountant in analyzing damages, we

11   need to consider what's being alleged against the defendant

12   and look at what loss calculations or other damages are

13   being claimed and validate that there's basically a logical

14   link between those two things in order to ensure that we're

15   reaching an opinion with a reasonable degree of certainty.

16          MR. ANTHONY:  Your Honor, may I have a continuing

17   objection to questions on causation?  I don't want to be

18   interrupting counsel.  But if you'll grant me a continuing

19   objection to all questions about causation, then I won't be

20   interrupting.  Is that acceptable?

21          THE COURT:  It is.

22          MR. ANTHONY:  Thank you, Your Honor.

23          MS. GITTES:  Thank you, Mr. Anthony.

24   BY MS. GITTES:

25   Q.  And is it important, this concept of causation, when

1    you're doing a forensic accounting analysis?

2    A.  Yes.

3    Q.  And why?

4    A.  Well, if the forensic accountant hasn't properly

5    evaluated these types of damages issues from a causation

6    perspective to link it to what the alleged actions of the

7    defendant were, there's -- it becomes a disconnect and your

8    loss calculations aren't reliable.

9    Q.  Are you aware of any forensic accounting guidance

10   explaining this concept?

11   A.  Yes.

12   Q.  And what's that?

13   A.  Well, one treatise in the forensic accounting field is

14   something called *Litigation Services Handbook* that I've used

15   for many years.

16   Q.  And who published that book?  What -- is there a firm

17   that was responsible for most of the content there?

18   A.  I don't know about published, but --

19   Q.  Okay.

20   A.  -- the majority of the authors in the chapters and the

21   editors of the chapters were PricewaterhouseCoopers

22   partners.

23   Q.  And PricewaterhouseCoopers was the firm -- is the firm

24   or was the firm that Mr. Martens was associated with?

25   A.  Yes.  In fact, when I worked at PricewaterhouseCoopers

Jarek - Direct

1    in forensic accounting, we were given these texts as part of

2    our training materials at the firm.

3    Q.  Okay.  And did you prepare a slide with an excerpt from

4    that treatise?

5    A.  I did.

6            MS. GITTES:  Okay.  Can we put up slide -- thank

7    you, Mr. Herzka.

8    BY MS. GITTES:

9    Q.  So what's reflected, again, at a high level, on slide 5?

10   A.  These are just some relevant quotes that I pulled out of

11   the treatise.

12   Q.  Okay.  And just to back up for a moment on this

13   treatise, you know, in the course of this trial we've seen

14   regulatory guidance and rules.  Is this that kind of a

15   source, in your opinion?

16   A.  No.  These -- you know, working as a CPA, we've got

17   generally accepted accounting principles and generally

18   accepted auditing standards that you have to follow.  That's

19   not what these are.  These are kind of peer-reviewed

20   treatises to establish best practices in the field of

21   forensic accounting and delineates basically generally

22   accepted methodologies that forensic accountants should use.

23   Q.  Thank you, Mr. Jarek.

24            I would like to start -- you've reviewed -- have

25   you reviewed in the course of your work on the matter the

1    opinions expressed by plaintiff's damages expert, Theodore

2    Martens?

3    A.  Yes.

4    Q.  And at a high level, what did he opine here?  What did

5    he -- what measure of damages did he propose, if any?

6    A.  Well, he calculated what is the net cash loss of the

7    biggest, the largest eight investors.

8    Q.  Okay.  And we'll talk more about that, but did

9    Mr. Martens analyze causation from a forensic accounting

10   perspective in offering his damages opinion here?

11   A.  No, not that I saw.

12   Q.  Even though his own firm wrote this treatise?

13   A.  Correct.

14           MR. ANTHONY:  Your Honor, may we have a sidebar on

15   this?

16           THE COURT:  Is there on objection?

17           MR. ANTHONY:  Yes, there is an objection, but I

18   don't want to articulate it in front of the jury.

19           THE COURT:  Understood.  You may.

20           **(At sidebar)**

21           MR. ANTHONY:  Thank you, Your Honor.  You know,

22   Mr. Martens was precluded from testifying about causation or

23   liability.

24           And I don't know if you -- it was at the outset of

25   his testimony on October 24th, 2022.  Mr. Spehr objected and

1    he repeatedly asked Your Honor at pages 2227, 2228, 2230.

2    "He is here to testify about damages."  If he goes beyond

3    his representation and talks about liability or causation,

4    then he can't testify to that.

5          You barred Mr. Martens from testifying to anything

6    but damages.  This witness has testified -- has given a

7    report that said he's not going to be talking about

8    liability.

9          THE COURT:  I didn't hear you.

10         MR. ANTHONY:  He's issued a report saying he's not

11   going to talk about liability.  In his deposition he twice

12   has said he's not going to talk about liability.  Now he's

13   going to be here -- two things, talking about liability and

14   then he's going to be talking about what Mr. Martens didn't

15   testify about because Mr. Spehr asked that he not be allowed

16   to testify about it.

17         So we're kind of in a quandary here with your

18   ruling.  You made the ruling you made at the time, and we

19   respected it and we didn't go forward with those questions.

20   We honored it.

21         We just expected it to be equally applied to Mr.

22   Jarek and that he be expected to testify only about damages,

23   not about liability and causation, and that's the direction

24   he's going now.

25         And not only that, he's criticizing Martens for

1    something that they prohibited Mr. Martens from talking

2    about.

3              MS. GITTES:  May I respond, Your Honor?

4              THE COURT:  You may.

5              MS. GITTES:  These issues were squarely raised in

6    the e-mails this morning, which I understand Your Honor has

7    ruled on.

8              THE COURT:  Keep your voice down.

9              MS. GITTES:  I'm sorry.

10             Mr. Jarek, unlike Mr. Martens -- Mr. Martens

11   assumed causation.  Mr. Jarek did not.  He performed an

12   analysis.  We moved to exclude that on *Daubert* grounds.

13   That motion was denied.

14             Now you've made these objections again this

15   morning.

16             THE COURT:  Keep your voice down.

17             MS. GITTES:  As far as I understand, those

18   objections were also overruled.  He has been explicit he is

19   opining --

20             THE COURT:  Keep your voice down.

21             MS. GITTES:  -- on causation from a forensic

22   accounting perspective.  He is not opining on liability or

23   legal causation.

24             MR. ANTHONY:  He's assuming liability, then?

25             MS. GITTES:  No.

1      MR. ANTHONY:  Well, then he's talking about

2  liability.  Either he has to assume liability, which is what

3  he said he was doing -- I can get his deposition, if you'd

4  like me to show you, where he said he's assuming liability.

5  If he's not assuming liability, then he can't testify.

6      MS. GITTES:  He opined on causation.  As you know,

7  you challenged it in a *Daubert* motion.  That motion was

8  denied.  Your Honor's ruling stated that he and his

9  experience as a forensic accountant could opine on issues

10  relevant to causation.  You squarely objected to this.  And

11  the Court, as far as I understand, has already dealt with

12  this on several occasions.

13      THE COURT:  I have, and so we're not going to deal

14  with it --

15      MR. ANTHONY:  I'm sorry?

16      THE COURT:  If you would like to make a continuing

17  objection now, but we're not going to disrupt the jury

18  hearing and flow of this witness.

19      MR. ANTHONY:  I hear you, Your Honor.

20      THE COURT:  I have ruled on this matter.  I

21  understand what your objection is.  Your objection is

22  overruled and the testimony will come in.  And I don't want

23  the obstruction that continuing objections before the jury

24  will cause.

25      MR. ANTHONY:  Okay.  Then I'll have a continuing

1    objection to --

2                THE COURT:  Yes.

3                MR. ANTHONY:  -- his testimony in its entirety for

4    liability and causation.  As long as I have that, then I

5    don't have to object.

6                THE COURT:  All right.

7                MS. GITTES:  That's fine, Your Honor.

8                THE COURT:  Okay.

9                MS. GITTES:  Thank you.

10   BY MS. GITTES:

11   Q.  Okay.  So just to back up a moment, as a forensic

12   accountant, did you form an opinion on Mr. Martens' failure

13   to analyze causation?

14   A.  Yes.

15   Q.  And what's your opinion on that issue?

16   A.  That Mr. Martens has not adequately or really at all

17   evaluated the causation issue from a forensic accounting

18   perspective in this case.

19   Q.  Are you aware that Mr. Martens assumed causation in

20   conducting his analysis?

21   A.  Yes, that's my understanding.

22   Q.  And did you review the factors set forth by PwC in the

23   *Litigation Services Handbook* excerpted on slide 5 of DD-50?

24   A.  I did, yes.

25   Q.  In your experience as a forensic accountant, which of

1    these considerations are Most important to the kind of

2    analysis you've done in this case?

3    A.   Probably the first, third -- I'm sorry.  First, third,

4    fourth, and fifth, I think, would be the most relevant.

5    Q.   And I don't want to belabor the point, but could you

6    just at a high level talk about what you do when you analyze

7    causation from the perspective of a forensic accountant?

8    A.   Yeah.  So you need to understand what's being alleged

9    against the defendant and assess what those issues are and

10   how they could have potentially led to the losses or other

11   damages that are being claimed by the plaintiff.

12   Q.   And based on the information you've reviewed, your

13   experience as a forensic accountant, in your experience

14   analyzing Ponzi schemes, in your opinion, did M&I cause PCI

15   to be unable to pay its investors?

16             MR. ANTHONY:  Same objections, Your Honor.

17             THE COURT:  Understood.  Overruled.

18             THE WITNESS:  No.

19   BY MS. GITTES:

20   Q.   Okay.  I'd like to direct you -- I believe you prepared

21   a slide just kind of laying out some of the considerations.

22   Is that right, Mr. Jarek?

23   A.   Yes.

24   Q.   Slide 6 of DD-50, for the record.  What's reflected,

25   just again at a high level, in this slide?

1    A.  These are some of the points that I considered most

2    relevant in this case as far as what I considered in

3    evaluating the forensic accounting issues around --

4    surrounding causation in this case.

5    Q.  Okay.  And so I'd like to -- we don't need to go through

6    all of them to be respectful of everyone's time, but if I

7    look at the first three, it appears to reference sort of PCI

8    being unable to repay its debts; is that right?

9    A.  Yes.

10   Q.  And what do you mean by that?  Can you expand on what it

11   means for PCI to have been unable to pay its debts.

12   A.  Yes.  Well, as Mr. Martens testified, he determined that

13   PCI was insolvent by at least 1996, I believe he said.

14   Q.  And can I stop you there, Mr. Jarek?  Just explain for

15   all of us what it means to be insolvent.

16   A.  Insolvent, from a forensic accounting standpoint, is

17   when a company's liabilities exceed its assets and the

18   company is unable to pay its debts.

19   Q.  And so during what period of time, based on your

20   analysis as a forensic accountant, was PCI unable to pay its

21   debts?

22   A.  Beginning in 1996, at least, and continuing through 2008

23   when the scheme collapsed.

24   Q.  And so, Mr. Jarek, what time period do you recall the

25   account that we've been talking to, that PCI account at M&I,

Jarek - Direct

1    what time period was it opened?

2    A.  M&I acquired the account in 2001.

3    Q.  Okay.  And when did the scheme shut down?

4    A.  In 2008.

5    Q.  And so from 2001 to 2008, was there any moment in time

6    where, based on your analysis, PCI was not insolvent?

7    A.  No.  It was insolvent the entire time.

8    Q.  And I think you have a reference to PCI being a Ponzi

9    scheme.

10   A.  Yes.

11   Q.  And you spent, I think you said, the last decade or so

12   examining Ponzi schemes; is that right?

13   A.  Yes.

14   Q.  And just -- we've heard it before, but just to make sure

15   we're on the same page, at the highest level, how does a

16   Ponzi scheme work?

17   A.  Generally, the common connection is when new investor

18   money is brought into the scheme in order to repay prior

19   investors.  Some of that money -- but some of that money is

20   also diverted for the personal benefit of the Ponzi

21   schemers.

22   Q.  And based on your analysis, when did PCI become a Ponzi

23   scheme?

24   A.  Well, Mr. Martens testified that at least by 1996, I

25   believe he said, PCI was a Ponzi scheme.  And I think I

Jarek - Direct

1    remember reading some testimony by Ms. Coleman that she

2    considered it to be a Ponzi scheme by 1994.

3    Q.  So PCI, if I have my math right, was a Ponzi scheme for

4    seven years before it had an account at M&I; is that right?

5    A.  Yes.  A long time.

6    Q.  And does that have any significance to you in your

7    analysis as a forensic accountant?

8    A.  Yes.

9    Q.  And what is that significance?

10   A.  Well, it shows that PCI was a Ponzi scheme for seven

11   years before that M&I account existed at M&I -- the PCI

12   account existed --

13   Q.  Thank you, Mr. Jarek.

14   A.  -- at M&I; therefore, M&I could not have caused PCI to

15   be a Ponzi scheme.

16   Q.  Okay.  And referring you to I think it's numbers 4 and 5

17   on slide 6 of DD-50, in the course of your work on this

18   matter, did you analyze loans that were given to PCI and

19   owed to PCI by its investors?

20   A.  Yes.

21   Q.  When, based on your analysis, did PCI become unable to

22   pay back those loans?

23   A.  Well, at least by 1996 when --

24   Q.  I -- yeah, I should -- sorry.  That was an inartful

25   question, Mr. Jarek.

 1              Was PCI unable to pay some of its loans starting

 2      in 1996?

 3      A.  Yes.

 4      Q.  So, again, focusing on the time period of 2002 to 2008,

 5      when PCI had the account at M&I Bank, during that time

 6      period did PCI have enough money to pay its investors back?

 7      A.  It -- no, it did not have the ability to repay investors

 8      during that time period.

 9      Q.  And was it able, based on your analysis, to repay its

10      investors before 2002?

11      A.  It did not.

12      Q.  I'd like to direct you, Mr. Jarek, to -- just one

13      moment -- slide 15.  Did you prepare slide 15?

14      A.  Yes.

15      Q.  And what's reflected on slide 15?

16              MR. ANTHONY:  Objection, Your Honor, undisclosed

17      report and undisclosed slide.

18              MS. GITTES:  Your Honor, I believe, has ruled on

19      that objection already.

20              THE COURT:  Pardon me?

21              MS. GITTES:  I believe that was subject to the

22      objections this morning.

23              MR. ANTHONY:  Objection under Rule 37 FRCP,

24      undisclosed report.

25              THE COURT:  Overruled.

1        MS. GITTES:  Thank you, Your Honor.

2    BY MS. GITTES:

3    Q.  What does this slide show, Mr. Jarek?

4    A.  I've summarized the PCI outstanding loan balances, the

5    principal balance of the notes at each year-end from 2001

6    through 2007.  Then 2008 would be at the end of the scheme,

7    which was September of that year.

8    Q.  So am I reading this right that at the end of 2006 PCI

9    owed investors $1.9 billion?

10   A.  Yes.

11   Q.  And where did you get -- and I guess, then, in 2007 PCI

12   owed its investors over $2.7 billion?

13   A.  Yes.

14   Q.  Where did you get the data underlying this slide?

15   A.  From the PricewaterhouseCoopers, PwC, work papers.

16   Q.  Okay.  You testified that you were -- you've attended

17   some of these proceedings, Mr. Jarek?

18   A.  Yes.

19   Q.  Did you attend the testimony of Mr. Martens, plaintiff's

20   expert?

21   A.  I did.

22   Q.  Did you hear him make a claim about I think it was

23   something like unpaid notes for the Petters Ponzi scheme

24   were written on or after December 5th, 2007?

25   A.  Yes, I remember hearing that.

1    Q.  And do you remember any other opinions by Mr. Martens

2    along those lines?

3    A.  One thing that I remember him saying, which really,

4    really stuck in my mind, was he had indicated that losses

5    were not incurred each year throughout the Ponzi scheme,

6    which is contradicted by his work papers.

7             And he also said that all of the losses --

8    something to the effect that all of the losses were incurred

9    after December 5th, 2007.  And that's -- I'm assuming he was

10   referring to his $1.9 billion number.

11   Q.  Okay.  So I want to break down your reactions --

12   A.  Yeah.

13   Q.  -- to Mr. Martens' testimony.

14            First, does the data reflected on slide 15 of

15   DD-50 in your mind contradict or support Mr. Martens'

16   opinion that all the losses here happened in the last year

17   of the scheme?

18   A.  It absolutely contradicts that statement.

19   Q.  And just -- why is that?

20   A.  Well, you can see that by 2006 there's 1.9 billion in

21   loans that were unable to be repaid at that point.  Those

22   should be considered losses at that time.

23   Q.  And am I right, Mr. Jarek, that not being able to pay

24   your investors is part of a Ponzi scheme?

25   A.  Yes.  Yes.

Jarek - Direct

1    Q.  I'd like to direct your attention to an exhibit that

2    is not in evidence but is in the binders of the Court and

3    plaintiffs.  It's marked as Plaintiff's Trial

4    Exhibit P-45 -- excuse me, Plaintiff's Exhibit 745.

5              Can you take a look at that document in your

6    binder, Mr. Jarek.

7    A.  I have it.

8    Q.  And do you recognize this document?

9    A.  Yes.

10   Q.  And what do you recognize this to be?

11   A.  This is one of Mr. Martens' work papers, and actually it

12   was also an exhibit attached to his report that he filed in

13   this litigation.

14   Q.  And did you rely on this exhibit in forming some of the

15   opinions you're speaking about today?

16   A.  Yes, I did.

17             MS. GITTES:  Defendants offer into evidences

18   Plaintiff's Exhibit 745.

19             MR. ANTHONY:  Objection, Your Honor, no

20   foundation.  It's not his work paper.

21             THE COURT:  Overruled.

22             MS. GITTES:  Is the exhibit admitted, Your Honor?

23             THE COURT:  Yes.

24             MS. GITTES:  Thank you.

25   BY MS. GITTES:

1    Q.  So, Mr. Jarek, reflected here?

2    A.  So this overall work paper demonstrates kind of the

3    overall flow of funds for Palm Beach.

4    Q.  And what was Palm Beach?

5    A.  Palm Beach was one of the hedge funds that is included

6    in Mr. Martens' loss calculation.  It's actually the second

7    largest hedge fund losing investor.

8    Q.  And I believe you said earlier you relied on this slide

9    in coming to some of the analysis you did today.  Which

10   particular parts did you review?

11   A.  Well, with respect to analyzing what Mr. Martens said

12   here in court, I relied on the bottom section, particularly

13   the net cash inflow/outflow line.

14   Q.  And what does that reflect for -- let's take a year.  At

15   the end of, let's say, 2005 what does that show?

16   A.  So for 2005 what that shows is Palm Beach incurred a

17   loss in that year only of $87,681,000.  It's the net cash

18   inflow/outflow.  And these numbers are from PCI's

19   perspective.  So when it says "inflow," that means Palm

20   Beach putting money into PCI and an outflow would be PCI

21   repaying the money back to Palm Beach.

22   Q.  And so if I direct you, Mr. Jarek, please, to Row I

23   believe it's J, "Notes Balance Outstanding" --

24   A.  Yes.

25   Q.  -- what's reflected there?

1    A.  So what that's reflecting is as of the end of -- is it

2    2005; was that your question?

3    Q.  Just in general, what does Row J reflect?

4    A.  Oh, that's the -- no balance outstanding, which that's

5    the numbers that were on the prior slide that I showed you

6    for all the investors.

7    Q.  So does this mean as of the end of 2005, in total Palm

8    Beach -- how much was Palm Beach owed at that point?

9    A.  At the end of 2005, it was 460,695,000.

10   Q.  And in your view does this information, in your opinion

11   as a forensic accountant, support or negate your view on

12   Mr. Martens' statement in this court a few days ago?

13   A.  Well, this absolutely contradicts what Mr. Martens said

14   here in court because he said the losses were not occurred

15   on a year-to-year basis throughout the Ponzi scheme.  He

16   specifically said all the losses were incurred after

17   December 5th, 2007.

18   Q.  Okay.  I'd like to direct you -- I have one more

19   question.  On the top, Row B, under "September 30th, 2008,"

20   the line I believe -- what does that line read?

21   A.  It reads, "Rolled Principal Investment."

22   Q.  And what does that mean, "rolled principal investment"?

23   A.  What those were were for Palm Beach, they had notes

24   which were -- had due dates prior to December 5th of 2007.

25   What Palm Beach was doing was basically, as its described

Jarek - Direct

1   here, rolled the principal of those notes just to a new

2   note, which effectively just extended the due date and the

3   maturity date of those notes.

4   Q.  And so does that mean that Palm Beach was owed that --

5   some amount of money on those rolled notes before the date

6   Mr. Martens gave of, I believe it was, December 5th, 2007?

7   A.  Yes.

8   Q.  Did you calculate how much?

9   A.  Yes.  So I looked at the detail of these rolled notes

10  after Mr. Martens' testimony and determined that about --

11  well, over 75 percent of this $1.14 billion rolled note

12  amount relates to notes that were due and represent losses

13  that were sustained prior to December 5th of 2007.

14           MR. ANTHONY:  Objection, undisclosed opinion and

15  report in violation of Federal Rules of Civil Procedure 37.

16           THE COURT:  Overruled.

17  BY MS. GITTES:

18  Q.  And did you observe whether there were similar -- I

19  don't need to go into them here -- but similar issues, like

20  the note rolling, with any other investors --

21  A.  Yes.

22  Q.  -- that formed the basis -- sorry, Mr. Jarek -- that

23  formed the basis of Mr. Martens'  damages calculation?

24  A.  Yes, and specifically what he testified to in court.

25  Q.  And do you recall the names of those investors?

Jarek - Direct

1    A.  Yes, Lancelot and Acorn.

2    Q.  And, again, without belaboring the point, they also had

3    in various ways, in your opinion, what -- describe to me

4    what similarities you saw as to Lancelot and Acorn relative

5    to Palm Beach.

6    A.  Those other two investors had similar arrangements where

7    they were effectively extending the maturity dates of the

8    notes.

9    Q.  And what would that mean in terms of when, in your

10   opinion as a forensic accountant, those losses were actually

11   sustained?

12   A.  The losses were sustained when the original notes were

13   actually made.  Because when you put money into a Ponzi

14   scheme, basically it's immediately lost because it's a

15   fraud.

16   Q.  Okay.  Thank you, Mr. Jarek.

17            MS. GITTES:  I'd like to direct you back, if you

18   don't mind, Mr. Herzka, back to slide 6.

19   BY MS. GITTES:

20   Q.  Okay.  And slide 6 has a reference -- let me ask it this

21   way.  Did you observe any other facts, in your expertise as

22   a forensic accountant, that undermine Mr. Martens' claim

23   that if you put in your money before December 200, you made

24   money and if you put in money after December 2007 you lost

25   money?

1    A.  Yes.

2    Q.  And what is that additional information?

3    A.  On point 6 of this slide I determined that after

4    December 5th of 2007, in fact, Lancelot, Palm Beach, and

5    Acorn were all net winners in the Ponzi scheme.

6              MR. ANTHONY:  Objection, violates court order with

7    respect to offsets and recoveries post 2008.

8              THE COURT:  Overruled.

9    BY MS. GITTES:

10   Q.  Did you prepare a slide on this, Mr. Jarek?

11   A.  Yes.

12             MS. GITTES:  And can I direct you, please, to

13   slide 16, Mr. Herzka.

14   BY MS. GITTES:

15   Q.  Okay.  And what's reflected here, Mr. Jarek?

16   A.  Yes.  So this is just a brief summary of the net

17   winnings of these three hedge funds between December 5th,

18   2007 and the end of the Ponzi scheme in September 2008.

19   Q.  And just to make sure I'm following, these funds still

20   lost money in the scheme overall, right?

21   A.  Correct.

22   Q.  So what analysis is different here?  What are you

23   isolating in slide 16 of DD-50?

24   A.  I'm merely looking at the net cash in and out of the

25   Ponzi scheme for these three investors from -- basically

1    from December 5th, 2007 to the end of the scheme.

2    Q.  Okay.  Can I -- and so for Lancelot, Lancelot made

3    $76 million in the period of I guess it's December 6th, 2007

4    to when the scheme ended?

5    A.  Yes, they got more money out of the scheme during that

6    period than they put in.

7    Q.  Same with Palm Beach.  How much did Palm Beach make?

8    A.  Over $132 million.

9    Q.  And Acorn?

10   A.  Almost 38 million.

11   Q.  Okay.  And I just want to show the backup, if that's

12   okay, for one of these slides so the jury can understand how

13   you made this calculation.

14        MS. GITTES:  Can I direct you to slide 17,

15   Mr. Herzka.

16   BY MS. GITTES:

17   Q.  Did you prepare this analysis as well, Mr. Jarek?

18   A.  Yes, I did.

19   Q.  And just explain for the jury what's reflected here.

20   A.  Yeah.  So I went to the note work papers in the

21   PricewaterhouseCoopers work paper files and found the

22   information for Palm Beach -- or I'm sorry.  This is

23   Lancelot, I guess.

24   Q.  Oh, I apologize.  Yes.  Can we do it for Lancelot,

25   Mr. Jarek?

Jarek - Direct

1    A.  Yeah, no problem.

2    Q.  Go ahead.

3    A.  For Lancelot.  I did all three, but we're using this One

4    as an example.  I looked at -- based on what

5    PricewaterhouseCoopers had disclosed, when new money was put

6    in by Lancelot, I noted the date and then when Lancelot

7    received repayments from PCI.

8            And so, again, these are -- these numbers are from

9    the perspective of PCI.  So when it's a positive number,

10   that's showing Lancelot putting money into the Ponzi scheme.

11   And when it's a negative number, that's Lancelot repaying --

12   I'm sorry, that's PCI repaying Lancelot.

13   Q.  I see.  So the numbers in parentheses there -- I'll

14   direct you to the line that says, "2008 Net Winnings."  When

15   we see that $85 million in net winnings, what does that

16   mean?

17   A.  That represents over $85 million that PCI paid to

18   Lancelot in that period in excess of what Lancelot paid into

19   PCI.

20   Q.  To your recollection, did Mr. Martens reference any of

21   this in his testimony before this Court?

22   A.  No, not that I heard.

23   Q.  Okay.  Just to shift a little bit.

24           MS. GITTES:  Mr. Herzka, can you take me back to

25   slide 6, please.

Jarek - Direct

1    BY MS. GITTES:

2    Q.  Do you recall -- you analyzed Mr. Martens' opinion in

3    this matter, correct?

4    A.  Yes.

5    Q.  And do you recall what start date he uses?

6    A.  Yes.  He uses January 1 of 2002.

7    Q.  And if I'm -- when was that in relation to the account

8    at M&I -- the PCI account at M&I being opened?

9    A.  M&I acquired the predecessor bank, but M&I took over the

10   account sometime, I believe, mid 2001.

11   Q.  And so you said it before.  How much was Mr. Martens'

12   damages calculation in this matter?

13   A.  1.9 billion.

14   Q.  And so by -- how does -- does the start date he chose

15   affect the amount that he calculated, that $1.9 billion

16   number?

17   A.  Yeah, significantly.

18   Q.  Can you explain what you mean by that.

19   A.  Well, we looked at the one slide for Palm Beach where it

20   showed the annual loss each year.  So the farther back you

21   go in time, the more annual losses you're picking up to get

22   to the $1.9 billion number.  So by going all the way back to

23   2002, he's maximizing the loss calculation as big as it can

24   be.

25   Q.  And what would be the effect, in your opinion,

Jarek - Direct

1    Mr. Jarek, of choosing a start date closer to September of

2    2008?  So say -- you know, let's use the date Mr. Martens

3    had, this December 5th or January 1st 2008.  What would

4    happen -- I'm sorry.  I want to make sure my question is

5    clear.  What would happen to Mr. Martens' $1.9 billion

6    number if you were to use that date instead?

7    A.  A January 2008 date?

8    Q.  Yeah.

9    A.  His number would be a fraction of what he reported as

10   1.9 billion because, for example, as I demonstrated, Palm

11   Beach, Lancelot, and Acorn were all net winning investors at

12   that time.  So from January of 2008 through the end of the

13   scheme, they actually made money, so they had no loss after

14   January 2008.

15   Q.  Okay.  And you certainly aren't here to dispute

16   Mr. Martens' qualifications in this matter, are you,

17   Mr. Jarek?

18   A.  No.  No, of course not.

19   Q.  And so you agree -- do you agree that Mr. Martens is

20   qualified to conduct the analysis we were just talking

21   about?

22   A.  Yeah.  I thought so, yes.

23   Q.  But he didn't conduct that analysis?

24   A.  Of the causation issues?

25   Q.  Well, no, I don't want to say it in that way.  He

1    didn't -- he assumed the January 1st, 2002 start date as

2    opposed to analyzing what would happen if there was a later

3    start date?

4    A.  Yes.  He only presented one calculation, which is the

5    maximum amount from 2002 through 2008.  He didn't calculate

6    any alternatives for the jury to consider.

7    Q.  Okay.  And so moving back to your slide 6 of DD-50 and

8    focusing for the moment on items 1 through 6, you

9    concluded -- and Mr. Martens assumed causation.  So did he

10   consider any of these considerations, based on your review

11   of his opinions?

12   A.  He didn't.

13   Q.  Okay.  And did you also, in the course of your work on

14   this matter, evaluate the claim that if M&I had shut down

15   the account, that would have stopped the scheme?

16   A.  Yes, I understand that.

17   Q.  And do you agree with that argument or premise?

18   A.  I don't.

19   Q.  Why not?

20   A.  In my experience, I have seen Ponzi schemes moved from

21   bank to bank.

22   Q.  Okay.  Let me stop you there, Mr. Jarek.  I just want to

23   make sure we're doing question and answer.

24           Did you prepare a slide on this specific topic?

25   A.  Yes.

Jarek - Direct

```
1    Q.  Is that slide 7?

2    A.  Yes, it is.

3    Q.  Okay.  So you said -- so why, in your opinion, do you

4    disagree with the premise that closing account 9018 would

5    necessarily have ended the scheme?

6    A.  Yeah, so one of the points is -- that I had listed is

7    that the PCI account at M&I was a basic checking account.

8    Q.  And what does it mean -- we've heard a lot about this.

9    What does it mean to have a basic checking account,

10   Mr. Jarek?

11   A.  There's nothing special about a checking account.  It's

12   the same as a checking account any of us would have

13   personally.

14   Q.  And did you analyze other banks Mr. Petters might have

15   been able to move the account to?

16   A.  I did.

17   Q.  And is that reflected on a slide in this -- in the

18   presentation you put together?

19   A.  Yes, it is.

20           MS. GITTES:  Can I direct you to slide 8,

21   Mr. Herzka.

22   BY MS. GITTES:

23   Q.  And what's reflected here, Mr. Jarek?

24   A.  Yeah, this is an exhibit that I had in my report that

25   maps out the bank accounts -- there's basically 21 banks --
```

 1   through which these Petters entities and Tom Petters himself

 2   had accounts during this time period, 2002 through 2008.

 3   Q.  How many banks are listed on this slide?

 4   A.  There's a total of 21 banks.

 5   Q.  And did you rely on the information set forth in slide 8

 6   in coming to any conclusions in this matter?

 7   A.  Yes.

 8   Q.  And what does this information suggest to you, in your

 9   opinion as a forensic accountant?

10   A.  Well, this shows a very broad banking relationship that

11   Tom Petters and his entities had.  Tom Petters had some

12   personal accounts at banks where he didn't have any business

13   banking.  For example, I believe JPMorgan Chase there were

14   six personal accounts for Tom Petters.

15   Q.  I'll -- thanks, Mr. Jarek.  I just want to make sure

16   we're abiding by the Court's instructions.

17           So to just point out a few relationships, this

18   indicates PCI had accounts at Associated Bank; is that

19   right?

20   A.  Yes.

21   Q.  And Crown Bank?

22   A.  Yes.

23   Q.  Are you aware of a Ponzi schemer moving accounts during

24   the time a scheme was ongoing?

25   A.  Yes.

Jarek - Direct

```
1    Q.  Can you give -- do you have an example of that, in your
2    experience?
3    A.  Yes, I do.
4    Q.  Could you provide that to -- what is the example of a
5    Ponzi schemer moving accounts during the period of the
6    fraud?
7    A.  Yes, the --
8              MR. ANTHONY:  Objection, foundation.
9              THE COURT:  Sustained.
10   BY MS. GITTES:
11   Q.  Mr. Jarek, in the course of your -- you testified
12   earlier about your experience evaluating Ponzi schemes,
13   correct?
14   A.  Yes.
15   Q.  And you've conducted a detailed -- and what kinds of
16   analysis of other Ponzi schemes have you done?
17   A.  It's similar to what I've analyzed here in tracing
18   transactions through the various bank accounts of the Ponzi
19   scheme.
20   Q.  So you've analyzed the banking relationships and
21   practices of other Ponzi schemers?
22   A.  Yes.
23   Q.  And have you ever observed an example of a Ponzi schemer
24   moving accounts?
25             MR. ANTHONY:  Objection, foundation as to who,
```

 1    what, where, when.  And it's also an undisclosed opinion, if

 2    he's about to give one.

 3              THE COURT:  Overruled.

 4    BY MS. GITTES:

 5    Q.  You may answer, Mr. Jarek.

 6    A.  Can I have the question again?

 7    Q.  Yeah, absolutely.  Do you have an example of a Ponzi

 8    schemer who moved accounts during the period of the fraud?

 9              MR. ANTHONY:  Same objection.

10              THE WITNESS:  I do.

11    BY MS. GITTES:

12    Q.  Can you provide that example, Mr. Jarek.

13    A.  Yeah.  So it was one of the Ponzi schemes that I

14    investigated in south Florida, the Fort Lauderdale/West Palm

15    Beach area, and the Ponzi schemer ran a Ponzi scheme through

16    five different banks, you know, one after the other.  One

17    bank closed his account.  He went to another one.  Five --

18    Q.  And that didn't --

19              MR. ANTHONY:  Well, before the next question,

20    objection, relevance.

21              THE COURT:  Overruled.

22    BY MS. GITTES:

23    Q.  And that changing of accounts, did that reveal the

24    scheme?

25    A.  It did not.  It continued.

1    Q.  Let's go back, Mr. Jarek, to slide 7.  I just want to --

2    I missed -- I wanted to ask you one more thing.  When you

3    say "a basic checking account," what's the significance of

4    PCI just having a basic checking account at M&I Bank?

5    A.  I guess it's the most common.  It's kind of the lowest

6    level type of deposit account you can have.  I guess that's

7    how I would describe it.

8    Q.  And does that affect your opinion at all as to whether

9    it would be possible, in your opinion as a forensic

10   accountant, for Mr. Petters to have moved banks?

11            MR. ANTHONY:  Objection, lacks foundation,

12   hypothetical, speculative.

13            THE COURT:  Sustained.

14            MS. GITTES:  I'll move on.

15   BY MS. GITTES:

16   Q.  And then the last -- on slide 7 of DD-50, did you

17   include any other or did you come to any other factors in

18   reaching the opinion that M&I -- that if M&I had closed the

19   account, that would not necessarily have been fatal to this

20   scheme?

21   A.  Yes.

22   Q.  And what's that?

23   A.  This is the third point on this slide, and that is that

24   the two fake vendors, Enchanted and Nationwide, we know now

25   were conspiring with Petters to funnel the Ponzi scheme

1    funds.

2            And, really, all Petters had to do was make two

3    phone calls, one to Enchanted and one to Nationwide, and

4    just tell them to reroute their wiring instructions to a

5    different bank account and then the majority of the money

6    would be going to a new bank, new bank account.

7    Q.   Okay.  So going back just for a moment to slide 6 of

8    DD-50, Mr. Jarek, to just briefly sum up, what's your

9    opinion on Mr. Martens' failure to conduct a causation

10   analysis in this matter?

11   A.   Well, given that he hasn't applied any type of forensic

12   accounting analysis to address these causation issues,

13   there's a disconnect between what he's calculated and the

14   alleged actions against M&I.

15   Q.   And based on your expertise as a forensic accountant,

16   did you observe -- or did you reach a conclusion about

17   whether M&I, from a forensic accounting perspective, caused

18   the investor losses here?

19   A.   I did reach an opinion.

20   Q.   And what's that opinion?

21   A.   That --

22            MR. ANTHONY:  Objection, undisclosed opinion.

23            THE COURT:  Counsel approach.

24            Members of the Jury, you may take a stretch break.

25        **(At sidebar)**

Jarek - Direct

1           (Pause)

2                THE COURT:  Are we ready?

3                MR. ANTHONY:  Yes.

4                THE COURT:  Okay.

5                MR. ANTHONY:  I think he's about to disclose --

6      about to give an opinion that's undisclosed.  I don't know

7      where it is, find the opinion.

8                MS. GITTES:  I'm just not following --

9                MR. ANTHONY:  You asked him in his opinion did M&I

10     cause the loss.

11               MS. GITTES:  Yeah.

12               MR. ANTHONY:  I mean, in his report -- I couldn't

13     find the portion of his report where it says who caused the

14     loss.  If he's saying M&I didn't cause it, who caused it?

15               MS. GITTES:  That's fine.  I don't think it's a

16     major point.  We can move on.  I don't need to --

17               MR. ANTHONY:  Okay.  I might as well raise right

18     now --

19               THE COURT:  So the objection -- you're withdrawing

20     it?

21               MS. GITTES:  I'll withdraw the question.  That's

22     fine, Your Honor.

23               MR. ANTHONY:  And so as to not obstruct

24     [inaudible].  And I'm not trying to do it deliberately.

25               You had previously ruled in the *Daubert* motion

1    hearing that the damages of the corporation's assets

2    [inaudible] --

3              COURT REPORTER:  Excuse me.  I can't hear you.

4    And can you slow down.

5              MR. ANTHONY:  I'm sorry.  "When a cooperation's

6    assets have been fraudulently depleted, the harm sustained

7    by the corporation is the corporation's 'insolvency and

8    inability to pay its creditors.'"  That's the measure of

9    damages.

10             He's -- I don't know what he's talking about, but

11   he doesn't have an opinion on that.  So he's going to give

12   an opinion inconsistent with the ruling you made in *Daubert*

13   and what's in your jury instructions.

14             And so I'm struggling with him offering

15   alternative opinions that are inconsistent with what you

16   ruled the law to be.  I'll ask him why he's not following

17   the damage model consistent with the order, but I don't want

18   to invite concern from the Court because I have to refer to

19   your order to do that.

20             So I don't think he's entitled to give an opinion

21   other than one that complies with your order that the

22   measure of damages is the corporation's inability to repay

23   its money.

24             He can fight about whether it's 1.9 or 1.5 or

25   whatever, but he can't say it's 70 because that's not what

Jarek - Direct

1   they can't pay back.  They can't pay 1.926 back.  And that's

2   where this is going, so.

3           MS. GITTES:  Your Honor, this is the same

4   objection they raised in their *Daubert* motions and that

5   they've raised this morning.  Your Honor's ruling obviously

6   permits --

7           THE COURT:  Keep your voice down.  I appreciate

8   that you can project in open court --

9           MS. GITTES:  I don't --

10          THE COURT:  -- but you cannot project at sidebar.

11          MS. GITTES:  It's not intentional, Your Honor.

12          THE COURT:  I know.  I know.

13          MS. GITTES:  The -- I'm sorry.  I lost my train of

14   thought.

15          Your opinion permitted Mr. Martens to proceed with

16   the damages analysis he provided to the Court, and we

17   respected that opinion.

18          This is another attempt by the plaintiffs to try

19   to claim that Mr. Jarek shouldn't be allowed to provide his

20   alternative damages calculation, which, as I understand it,

21   is an objection you have ruled on today and have reaffirmed

22   several times.

23          So I'm not -- he's not going to say that as a

24   legal matter Mr. Martens' opinion is wrong.  That's not --

25   he is going to address the opinion as a factual matter from

1    the perspective of a forensic accountant.  And as I read

2    your orders, you have been very clear that that is

3    permitted.

4         MR. ANTHONY:  My question goes to something

5    different than hearsay.

6         In your order you said, "The Minnesota Court of

7    Appeals' characterization of a corporation's injury in

8    *Greenpond* applies to the Trustee's claims against BMO Harris

9    in this case.  Consistent with *Greenpond,* Martens calculates

10   the Trustee's damages based on the amount PCI owed to its

11   eight largest unsecured creditors during the pre-bankruptcy

12   damage period, from 2002 to 2008."  That's the measure of

13   damages.

14        I think it would be very confusing and prejudicial

15   to have some expert getting up there saying that -- I mean,

16   they're going to get an instruction from you consistent with

17   *Greenpond* and he's offering a different methodology, a

18   different theory, and a different damage amount.  I think

19   he's got to stick with what the Judge ruled in *Daubert.*

20        MS. GITTES:  Your Honor, you have permitted

21   Mr. Jarek to both provide his opinion, as he's been doing,

22   as to why in his view as a forensic accountant Mr. Martens'

23   number is not a sound forensic accounting analysis and

24   you've permitted him to offer him an alternative measure of

25   damages.

1           As I hear it, Mr. Anthony keeps bringing up the

2     same objections.  As I understand it, you have now overruled

3     several times.

4           And so he's not going to say that as a legal

5     matter it's wrong, but he is -- has been permitted to say

6     what he thinks is wrong with it as a factual and forensic

7     accounting matter and then that he believes another measure

8     of damages is appropriate.

9           THE COURT:  And what is the "it"?

10          MS. GITTES:  Sorry?

11          THE COURT:  What is the "it?  It is wrong.

12          MS. GITTES:  Meaning he will opine, as he has

13    been, that there are factual issues that he believes

14    undermines, again, as a forensic accounting matter,

15    Mr. Martens' calculation of $1.9 billion of damages.  He's

16    going to say why, in his opinion as a forensic accountant,

17    he believes that measure is not correct --

18          MR. ANTHONY:  Your Honor?

19          MS. GITTES:  -- as he's been permitted --

20          MR. ANTHONY:  Sorry.

21          MS. GITTES:  -- by the Court's orders.

22          They can get up and cross-examine him as to -- I

23    don't believe they can do it with this.  This was late

24    disclosed and there's a Court ruling.  They can ask him

25    about the basis of his testimony.

1          But we cannot be deprived, respectfully, Your

2     Honor.  I believe we are entitled under the Court's rulings,

3     which you've reaffirmed several times this afternoon, to put

4     on both the reasons why we believe Mr. Martens' calculation

5     is wrong and Mr. Jarek's alternative methodology and

6     calculation.

7          MR. ANTHONY:  The Court has found that the

8     *Greenpond* decision determines that the measure of damages

9     are "the Trustee's damages based on the amount PCI owed to

10    its eight largest unsecured creditors during the

11    pre-bankruptcy period, from 2002 to 2008."

12         As long as his opinion coincides and relates to

13    what you've determined the proper measure of damages to be,

14    I'm fine with that.  If he wants to say it's not

15    1.926 billion, but it's 1.5 or 1.2, I'm fine with that.

16         But what they're trying to do is basically say

17    your finding on the law is accurate and they should be

18    allowed to offer some other opinion on damages that has not

19    been countenanced by you or any Minnesota Court of Appeals

20    or anybody.

21         THE COURT:  Why is his opinion consistent with my

22    determination?

23        (Simultaneous indiscernible crosstalk)

24         MS. GITTES:  Sorry.  I'm asking my colleague to

25    bring the decision.  Your opinion -- and, again, this was

1    raised in the e-mails this morning -- deals with he

2    proposes, and they opposed, his ability to put in a

3    decision -- an opinion based on a different way to measure

4    harm to PCI.  He's going to explain why, in his opinion,

5    that is a better measure of damages as a forensic

6    accountant.  He's not going to say the Court says mine is

7    right.  He's not here to opine on legal issues.

8              I feel like, respectfully, this is counsel trying

9    again and again to undermine the things Your Honor has

10   already ruled.  Respectfully, you've made your objections

11   clear.  But Mr. Jarek is entitled to explain why, in his

12   opinion as a forensic accountant, he believes there were

13   problems with Mr. Martens' methodology.

14             MR. ANTHONY:  But it's not Mr. Martens'

15   methodology he's finding the problem with.  He's saying that

16   the Judge's determination of what the proper measure of

17   damages is wrong and he should be the one determining what

18   the proper measure of damages is.

19             He can give an opinion consistent with the law of

20   the case, and the law of the case is that damages are what

21   Kelley owes creditors as of the time of the bankruptcy

22   filing.  And he's not offering that opinion.  He's going far

23   astray from that.

24             And I think he's limited -- he can't come up with

25   his own damage methodology or opinion that's inconsistent

 1    with the law or the Judge's rulings, and that's all he's

 2    doing.

 3            MS. GITTES:  Your Honor, we obviously dispute

 4    plaintiff's characterization as to what the proper damages

 5    instruction will be.

 6            In my view, Your Honor's willingness to permit

 7    Mr. Jarek to put on an alternative methodology demonstrates

 8    that that's not inconsistent with what the Court said.

 9    Plaintiffs had ample opportunity to challenge it and they'll

10    be able to challenge it on cross-examination and they can

11    make arguments in their closing.

12            But Your Honor permitted Mr. Jarek, both at the

13    *Daubert* stage and in the e-mails this morning, to put on an

14    alternative methodology.  And so I don't understand why it

15    would keep -- why we're here.

16            THE COURT:  Okay.  We're going to take our break

17    now.  I'll reserve my judgment.  I'm going to go back and

18    look at the ruling.

19            MR. ANTHONY:  Thank you, Judge.  Thank you.

20        **(In open court)**

21            THE COURT:  Members of the Jury, it's time for our

22    midafternoon break.  So please be prepared to come back to

23    the courtroom at ten minutes until 3:00.

24            All rise for the jury.

25        (Jurors excused)

```
 1                          IN OPEN COURT

 2                       (JURY NOT PRESENT)

 3              THE COURT:  You also may take a break, sir, but

 4       it's as if you're on the witness stand, so please don't

 5       consult with anyone during the course of that break.

 6              THE WITNESS:  I understand.

 7              THE COURT:  We are in recess.

 8          (Recess taken at 2:36 p.m.)

 9                           *    *    *    *    *

10          (2:52 p.m.)

11                          IN OPEN COURT

12                        (JURY PRESENT)

13              THE COURT:  You may be seated.

14              MS. GITTES:  May I proceed, Your Honor?

15              THE COURT:  Yes.  I believe there was an

16       objection.

17              MS. GITTES:  Yes.

18              THE COURT:  It is overruled.

19              MS. GITTES:  Thank you, Your Honor.

20       BY MS. GITTES:

21       Q.  And I believe just to reset -- so, Mr. Jarek, just to

22       sum up this section and kind of continue where we left off,

23       did Mr. Martens consider any of these factors in his

24       analysis of reaching a proposed damages figure in this

25       matter of $1.9 billion?
```

Jarek - Direct

1    A.  No, I did not see that he did.

2    Q.  And in your opinion as a forensic accountant, what does

3    that mean to his $1.9 billion damages calculation?

4    A.  He hasn't effectively or appropriately analyzed the

5    causation issues, as I explained, from a forensic accounting

6    standpoint and the damages number should be zero.

7    Q.  So I want to touch briefly on a different topic, if

8    that's okay, Mr. Jarek.

9            Did you analyze whether M&I or any M&I employee

10   profited from the scheme?

11   A.  I did.

12   Q.  And is this something you typically analyze in your

13   experience as a forensic accountant?

14   A.  Yes.

15   Q.  And why is that analysis relevant, if at all?

16   A.  Well, generally what I've seen is if a bank insider is

17   assisting in a Ponzi scheme, there's some type of

18   compensation that they're getting and so that's -- that's

19   one of the things I would typically look for.

20   Q.  And did you -- have you ever seen -- again, Mr. Jarek,

21   you've analyzed a lot of Ponzi schemes, correct?

22   A.  Yes.

23   Q.  And you've done so for banks before frequently?

24   A.  Yes.

25   Q.  Have you ever seen an example of a bank employee getting

1    a payment from a Ponzi schemer?

2    A.  Yes, I have.

3    Q.  Can you tell us about that very briefly, Mr. Jarek.

4    A.  Yes.  I can't disclose the name of the bank, but I

5    was -- a bank had gotten some information that there might

6    be a bank employee that was participating in a Ponzi scheme

7    and I was retained to be part of an internal investigation

8    with the board of directors to invest that.

9            And through that analysis I personally identified

10   a $500,000 wire transfer from the Ponzi scheme entity to a

11   bank employee, who later admitted his participation in the

12   Ponzi scheme.

13   Q.  Did you find anything -- did you analyze the records,

14   all the data from PwC that you discussed earlier for -- on

15   this point, Mr. Jarek?

16   A.  Yes, I did.

17   Q.  And did you find any evidence of that kind of payment?

18   A.  No, I saw no evidence of that.  And Mr. Martens hasn't

19   identified any either.

20   Q.  And I -- through the course of your analysis and

21   observing testimony in this matter, have you heard testimony

22   about the compensation paid to M&I Bank employees?

23   A.  Yes, I have.

24   Q.  And was that testimony and that analysis consistent with

25   your conclusion that M&I bankers didn't personally

1    financially benefit from this scheme?

2    A.  Yes.

3    Q.  Okay.  And I want to briefly -- did you also analyze

4    whether the bank made money on the M&I -- excuse me, whether

5    the bank made money on the PCI account?

6    A.  Yes, I did.

7    Q.  Can I direct you -- did you put that on the slide,

8    Mr. Jarek?

9    A.  Yes, there's a couple slides.

10   Q.  Can I direct you to slide 9 of DD-50.  Okay.  What

11   analysis is reflected here, Mr. Jarek?

12   A.  Yeah, this is my analysis of the fee income that M&I

13   received from the PCI account and the interest expense that

14   M&I Bank paid into the PCI account.

15   Q.  And what did that analysis lead you to conclude,

16   comparing the income to the interest expense?

17   A.  Looking at these two primary components of profitability

18   of the account, this demonstrates that M&I actually lost

19   money on these two components of the banking relationship.

20   Q.  And when you say "components," you mean based on this

21   analysis of comparing interest to expense?

22   A.  Correct.

23   Q.  Are there other ways a bank, in your experience, can

24   make money off of a deposit account?

25   A.  Yes.

Jarek - Direct

1    Q.  And what are those?

2    A.  Generally banks seek to maintain a deposit base that

3    they are then able to make loans, mortgages, car loans, what

4    have you or make other types of investments in

5    interest-earning assets.

6    Q.  And did you analyze whether the bank made money on the

7    interest on the funds in the 9018 account here?

8    A.  I did analyze that, yes.

9    Q.  And is that reflected on one of the slides you prepared,

10   Mr. Jarek?

11   A.  Yes, number 10.

12           MS. GITTES:  Okay.  Can we flip to slide 10,

13   please.

14   BY MS. GITTES:

15   Q.  And what is this -- what is the conclusion of the data

16   you found here or you set forth here, Mr. Jarek?

17   A.  The total of the income that M&I could have possibly

18   earned on the PCI account for the period of 2002

19   through 2008 was $1,433,000.

20   Q.  And did you use -- we've seen in the course of this

21   trial -- are you familiar with ACE Reports?

22   A.  Yes.

23   Q.  And what do those reflect, based on the testimony and

24   the documents you reviewed?

25   A.  They reflect some measures of profitability for the

1    banking relationships for the respective bank officers.

2    Q.  And did you use the ACE Reports in conducting this

3    analysis?

4    A.  I did not use the ACE Reports specifically for this, but

5    I compared my analysis to some of the ACE Reports.

6    Q.  And how does your analysis compare to the data that

7    we've seen in the ACE Reports?

8    A.  Well, I took a very conservative approach in calculating

9    the -- kind of the most that M&I could have earned, and so

10   what I was able to confirm is that my calculations of M&I's

11   profitability are much higher than what are reflected on the

12   ACE Reports.

13   Q.  So by "conservative," you mean your opinion overstated

14   the amount M&I actually made; is that right?

15   A.  Correct.  I'm overstating the amount of income that M&I

16   actually earned, but getting a good benchmark based on the

17   information that I found in the audited financial statements

18   of M&I.

19   Q.  Thank you, Mr. Jarek.

20            And at the bottom there, there's an average.  What

21   does that reflect?

22   A.  That's the average annual income for this period.  It's

23   $212,000.

24   Q.  Okay.  And can you put these numbers in perspective?

25   Because, I mean, 210,000, 212,000 dollars, that's a lot of

 1    money.  Can you put it in perspective for the bank at that

 2    time?

 3    A.  Yeah.  So what I did was I wanted to look at, okay,

 4    we've got $212,000 a year from this PCI account.  What

 5    percentage is that of M&I's overall annual income?  Just to

 6    get a sense of how significant it was.

 7    Q.  And did you reflect that analysis on a slide?

 8    A.  Yes, slide 11.

 9            MS. GITTES:  Can you turn to slide 11, Mr. Herzka.

10    BY MS. GITTES:

11    Q.  And what percentage on an annual basis is that $212,000

12    a year relative to M&I's total average earnings in that

13    period?

14    A.  So that average income of $212,000 per year is

15    0.023 percent of M&I's overall average annual income.

16    Q.  Math is not my forte.  Is that 2.3 hundredths of a

17    percent, Mr. Jarek?

18    A.  Yes.

19    Q.  Can you put that percentage in context in terms of, like

20    what would that mean for an everyday -- for a normal person?

21    A.  So what I did was I assumed -- let's say someone earning

22    50,000 a year.  If you multiple that by the 0.23 percent,

23    it's $11.50.

24    Q.  And you've analyzed a lot of Ponzi schemes, Mr. Jarek.

25    In your opinion, based on your forensic accounting

Jarek - Direct

1  expertise, your experience with Ponzi schemes, is that the

2  kind of profit you would expect to see from a bank that

3  turned a blind eye from a Ponzi scheme?

4  A.  No.

5  Q.  I'd like to move on to our last topic, Mr. Jarek.  If I

6  can direct you, did you -- let me back up.  I apologize.

7            As you said before, the effect, in your opinion as

8  a forensic accountant, of Mr. Martens' failure to analyze

9  causation means that what is under his theory the -- what

10  does it do to that $1.9 billion number that he's put forth

11  here?

12  A.  His methodology is overstating the loss calculation.

13  Q.  And so his failure to do that -- in your opinion as a

14  forensic accountant, what does that mean to that

15  $1.9 billion number?

16  A.  The loss number should be zero.

17  Q.  So I understand that's your opinion, but I want to ask

18  you to assume, for the purposes of this discussion, that M&I

19  were to be found liable.  What approach would you use, in

20  your expertise as a forensic accountant, to quantify the

21  loss for the alleged harm to PCI?

22  A.  So the methodology that I typically use in situations

23  like this and that I've seen other experts use in other

24  Ponzi cases is to look at the funds that were taken out of

25  the account 9018, the PCI account, and paid directly to the

1      Ponzi scheme insiders, the PCI insiders.

2      Q.  Did you prepare a slide just laying out how you did this

3      analysis, Mr. Jarek?

4      A.  Yes.

5      Q.  Is that slide 12?

6      A.  Yes.

7              MS. GITTES:  Can we put up slide 12, please.

8              MR. ANTHONY:  Your Honor, I'll just maintain my

9      continuing objection.

10             THE COURT:  Overruled.

11     BY MS. GITTES:

12     Q.  Okay.  So when you talk about PCI insiders, what do you

13     mean?

14     A.  So Tom Petters, Deanna Coleman, and Bob White, and I

15     also included all the other employees that were identified

16     as an employee in the PricewaterhouseCoopers database.

17     Q.  And would this include -- we've seen through the course

18     of this proceeding a lot of checks.  Is that -- did you see

19     some checks in your time in court?

20     A.  Saw a lot of checks, yes.

21     Q.  Are those checks included in the analysis you did?

22     A.  Yes, they are.

23     Q.  Okay.  Can I direct -- did you summarize your analysis

24     on a slide, Mr. Jarek?

25     A.  Yes, I did.

Jarek - Direct

1    Q.  Is that slide 13?

2    A.  Yes.

3    Q.  Okay.  And what's depicted here, Mr. Jarek?

4    A.  This is just a summary of what I found through the PCI

5    account database at PwC, and I've just summarized the three

6    main insiders and then an amount for other staff.

7    Q.  And what's the, based on your calculation, the total

8    maximum amount of damages that would be appropriate under

9    this methodology?

10   A.  The total amount, maximum amount, would be

11   $78.1 million.

12   Q.  And other staff, do you recall any of the people

13   included in that number?

14   A.  I think maybe Debbie Lindstrom was in that.  I can't

15   really recall the other names.  I just -- I relied on

16   PwC's -- they had a category column in the database that

17   said, "Employee," so I just -- I relied on that.

18   Q.  So were those payments necessarily improper based on

19   your analysis, the 11.2 to other staff?

20   A.  No.  I mean, I couldn't conclude that they were

21   improper, but I included them just to be conservative and

22   include all the employees.

23   Q.  Okay.  And did you perform a second calculation of this

24   damages method or this methodology for thinking about harm

25   suffered by PCI?

```
 1    A.  Yes.  That's why I prepared this.
 2    Q.  But do you have a second set of numbers related to the
 3    same methodology?
 4    A.  Yes, I prepared another --
 5    Q.  Is that slide 14?
 6    A.  Yes.
 7    Q.  Okay.  And what does this show, Mr. Jarek?
 8         MR. ANTHONY:  Same objection, Your Honor.
 9    BY MS. GITTES:
10    Q.  Actually, I -- so the 66 million to Petters, White, and
11    Coleman, what time period -- that we looked at a moment
12    ago -- what time period does that assume?
13    A.  I don't know if you want to go back to slide 13.
14         THE COURT:  Let me -- I want to clarify the
15    objection.  The objection is to this document; is that
16    correct?
17         MR. ANTHONY:  Yes, Your Honor, undisclosed.
18         THE COURT:  It is, okay.  Then the objection is --
19         MR. ANTHONY:  Continuing objection, Your Honor.
20         THE COURT:  Okay.  Overruled.
21    BY MS. GITTES:
22    Q.  So this time period, this -- let's say for Petters,
23    Coleman, and White, who we know were the primary wrongdoers
24    here, what time period does this cover?
25    A.  So this maximum scenario, this covers the entire period
```

1    from January 1, 2002 through September 2008.

2    Q.  And so now to flip to slide 14, what's reflected here,

3    Mr. Jarek?

4    A.  So this analysis is -- I was asked to assume different

5    dates of potential liability and then to run calculations

6    for each of those scenarios to assist the jury.

7    Q.  And so we asked you to assume -- if, for example,

8    liability were to be found as of November of 2006, what

9    would be the appropriate damages award, in your opinion as a

10   forensic accountant?

11   A.  Based on a November 6th timing, it would be 800,000,

12   which I have rounded as .8 million, but it would be

13   $800,000.

14   Q.  And, again, I think we talked about this earlier.  The

15   numbers get smaller the further -- the closer in time you

16   get to the end of the scheme; is that correct --

17   A.  Yes.

18   Q.  -- Mr. Jarek?

19   A.  Yes.

20   Q.  And based on your experience as a forensic accountant --

21   let me take one step back.

22          Just to wrap up, Mr. Martens opined that the

23   measure of harm to PCI can be -- is best reflected in net

24   investor losses.  Is that your understanding?

25   A.  I believe that's what he said, yes.

Jarek - Direct

1    Q.  And what financial instrument did investors use to give

2    PCI money?

3    A.  They were loans.

4    Q.  And did you analyze, in your experience as a forensic

5    accountant, Mr. Martens' opinion that the loans given to

6    investors by PCI harmed PCI?  Sorry.  I botched the

7    question.  Let me say it again.

8            Based on your experience as a forensic accountant,

9    did you analyze Mr. Martens' opinion that the loans from the

10   investors harmed PCI?

11   A.  I did.

12   Q.  And what did you conclude as a factual matter, in your

13   expertise as a forensic accountant?

14   A.  Just as a basic accounting premise, a loan that's on the

15   books of PCI that isn't repaid is not a measure of harm

16   because PCI still had use of the cash and it just hasn't

17   repaid the loan.

18   Q.  So if I loan you, Mr. Jarek, $100, I -- you owe me $100,

19   but what do you have?

20   A.  I still have the $100.

21   Q.  Okay.  Finally --

22            MS. GITTES:  I believe Plaintiff's Exhibit 764 is

23   already in evidence.  Let's not put it up until we're sure.

24   Thanks, Mr. Herzka.  Any --

25            MR. ANTHONY:  It is.

 1              MS. GITTES:  It is?  Okay.  Thank you.

 2      BY MS. GITTES:

 3      Q.  And so just to wrap up, Mr. Jarek, are you familiar with

 4      this diagram?

 5      A.  Yes.

 6      Q.  And who prepared this diagram, to your knowledge?

 7      A.  Mr. Martens or others at PwC.

 8      Q.  And so just to make sure we're understanding, how do

 9      losses -- you testified earlier that in your expertise

10      analyzing Ponzi schemes, money from one investor is funneled

11      to another investor; is that a fair characterization?

12      A.  Yes.

13      Q.  And so the losses that Mr. Martens is claiming, this

14      $1.9 billion, what are those if we're thinking about how PCI

15      worked as an entity?

16      A.  They are just funds flowing through a circular pattern

17      in the Ponzi scheme.

18      Q.  And so if you liken a Ponzi scheme to a game of musical

19      chairs, what are these investor losses, like what caused --

20      let me ask you a different way.

21              Can you liken this -- these losses to a game of

22      musical chairs?

23      A.  Yes, I've seen it described that way.

24      Q.  And what does that mean?

25      A.  Basically that, you know, when the music stops, you

```
 1    know, whoever's holding the loans, that's the losses.

 2    Q.  But as you testified earlier, the losses, in fact, had

 3    been ongoing the whole life of --

 4              MR. ANTHONY:  Objection, leading.

 5              THE COURT:  Sustained.

 6    BY MS. GITTES:

 7    Q.  Did you testify earlier about the period of time, in

 8    your opinion as a forensic accountant, that the losses were

 9    being incurred by investors to PCI?

10              MR. ANTHONY:  Objection, leading.

11              THE COURT:  Sustained.

12    BY MS. GITTES:

13    Q.  Did you make any analysis, Mr. Jarek, of the losses and

14    when they were sustained by the investors?

15              MR. ANTHONY:  Objection, repetitious, asked and

16    answered.

17              THE COURT:  Overruled.  You may answer.

18              THE WITNESS:  Yes, I did.

19    BY MS. GITTES:

20    Q.  And were there investor losses the entire time period

21    that PCI had an account at M&I?

22    A.  Yes, there were losses every year.

23    Q.  And so just to -- your alternative methodology, how

24    would you reflect it on this diagram?  What are the funds

25    going out -- what are the -- whether it's at most 66 million
```

Jarek - Direct

1    or down to 800,000, how do those -- how would you represent

2    those funds on this diagram?

3    A.  You would have to -- basically, it would be kind of

4    another arrow coming down out of "Petters Company, Inc." to

5    represent those funds that were taken out of the company and

6    paid to the insiders.  And so as a result, those funds were

7    not available to PCI to repay its creditors.

8    Q.  And so, in your opinion as a forensic accountant --

9    well, why do you believe this is the proper measure of harm

10   to PCI, as a forensic accountant, rather than Mr. Martens'

11   methodology?

12   A.  This is a direct analysis of the funds that were taken

13   out of the company by the insiders, which harmed PCI because

14   then those funds were not available for PCI to repay to

15   investors.

16   Q.  Okay.  Just to wrap up, Mr. Jarek, in your opinion as a

17   forensic accountant, what does Mr. Martens' failure to

18   analyze causation mean to his $1.9 billion damages opinion

19   in this matter?

20   A.  It is his methodology is unreliable and the loss number

21   should be zero.

22   Q.  And in your professional opinion, assuming liability,

23   which you haven't done but for the sake of this discussion,

24   what's the range of appropriate -- what's the appropriate

25   measure, in your opinion as a forensic accountant, as to the

1    amount of harm suffered by PCI?

2    A.  As I showed on some of the slides, the low range would

3    be zero, which is the February 2008 to the close of the

4    scheme, and the maximum amount would be the 78.1 million if

5    you were to look at the entire period, from 2002

6    through 2008.

7    Q.  Thank you, Mr. Jarek.  I have no more questions at this

8    time.

9         MS. GITTES:  Whoops.  Let me grab my stuff.  I

10   apologize.

11        THE COURT:  Counsel, you may proceed.

12        MR. ANTHONY:  Thank you, Your Honor.

13                    **CROSS-EXAMINATION**

14   BY MR. ANTHONY:

15   Q.  Good afternoon, Mr. Jarek.

16   A.  Good afternoon.

17   Q.  You were here for Ted Martens' testimony, correct?

18   A.  Yes.

19   Q.  Did you hear Mr. Martens say that people that invest

20   early in a Ponzi scheme and get out before the music stops

21   make money, people that wind up, though, that invest late in

22   the Ponzi scheme and still have their notes outstanding when

23   it implodes, they lose money; did you hear that testimony?

24   A.  Yes, I did.

25   Q.  In fact, you probably read it in the transcript, right?

Jarek - Cross

1    A.  Yes, I did.

2    Q.  Do you agree with that?

3    A.  In certain circumstances.

4    Q.  Well, do you agree that the people -- first, let's start

5    with the basics.  You agree that some investors lost money?

6    A.  Yes.

7    Q.  Okay.  And in your report you've provided a list of

8    them.  I'll put it up on the ELMO.  This is your report,

9    right?  You recognize that?

10   A.  Yes.

11   Q.  It's page 19.

12   A.  Yes.

13   Q.  And this is the schedule that's in your report and you

14   were referring it to -- you refer to that being the number

15   arrived at by Mr. Martens, correct?

16   A.  Yes.  These aren't my numbers.

17   Q.  No, but you've referenced them in your report, correct?

18   A.  Yes.

19   Q.  And you'll agree that Mr. Martens' underlying work and

20   PwC's underlying work and the materials they gathered

21   together are reliable, correct?

22   A.  Yes, I relied on them for my purposes.

23   Q.  Sure.  Now, are you saying that none of those investors

24   who showed up there lost money?

25   A.  No.  What I'm saying is --

1   Q.  I'm just asking -- my question is:  Are you saying none

2   of them lost money?

3           Let me rephrase.  Did any of them lose money?

4   A.  Yes, they lost money.

5   Q.  Which ones?

6   A.  They all lost money, but --

7   Q.  How much?

8   A.  -- not in the time period.

9   Q.  How much did they lose?

10  A.  They lost -- well, I mean, I'm assuming these amounts.

11  I didn't calculate them.

12  Q.  Okay.

13  A.  They're Mr. Martens' numbers.

14  Q.  Okay.  So you and Mr. Martens agree that a certain

15  number of investors lost money.  And you're willing to

16  accept his calculations because you know his numbers are

17  pretty reliable, right?

18  A.  No.  I mean, the numbers looked -- the loss numbers are

19  there.  What I'm disputing with his testimony is the time

20  period that he's saying they were incurred.

21  Q.  Sir, my question to you was:  "Did any of them lose

22  money?"  And you said, "Yes, they lost money."

23          And then my question to you is:  How much did they

24  lose?

25  A.  I'm assuming they lost these numbers.

Jarek - Cross

```
1    Q.  Well --
2    A.  I'm accepting Mr. Martens' calculations.  My point is
3    the timing of when they lost the money.
4    Q.  Sir, I'm not asking about timing.  I'm just asking if
5    you agree with Mr. Martens' numbers that those investors
6    lost $1.936 billion.
7    A.  They -- I'm assuming that they did if that's what he
8    calculated.
9    Q.  In fact, in your initial report you did your own
10   estimate and you came up with 1,900 -- 1,925 million,
11   correct?
12   A.  I'd have to refresh my recollection.
13   Q.  Do you want to look at your initial report?
14   A.  Do you have a page number?
15           (Plaintiff's counsel confer)
16               THE WITNESS:  Do you have a page number reference?
17   BY MR. ANTHONY.
18   Q.  No.  And you know what?  I'll withdraw it because you
19   said you agree with Mr. Martens' numbers.  No sense in --
20   A.  Yeah, I didn't think that number was in there.
21   Q.  Okay.  So -- now, you agree also that you never did a
22   damage calculation in this case that attempted to determine
23   the amount that was owed to the trustee that the trustee was
24   obligated to repay to creditors and lenders in this scheme,
25   correct?
```

Jarek - Cross

1                    MS. GITTES:  Object to form.

2                    THE COURT:  Overruled.

3                    THE WITNESS:  I'm not understanding the question.

4     Can you --

5     BY MR. ANTHONY:

6     Q.  Sure.  Did you do a calculation to determine the amount

7     that Mr. Kelley on behalf of PCI owes to the eight largest

8     unsecured creditors during their pre-bankruptcy damages

9     period from 2002 to 2008?  Did you do such a calculation?

10    A.  I didn't do that.  That's what Mr. Martens did.

11    Q.  I asked you:  Did you do that?

12    A.  No, I didn't do it.  I didn't need to.  It was done.

13    Q.  Sir, I didn't ask you if you needed to.  I just asked

14    you if you did it.

15                    MS. GITTES:  Your Honor, I object, argumentative.

16                    THE COURT:  Sustained.

17                    MR. ANTHONY:  Your Honor, I will ask that -- I've

18    tolerated him not responding and going on.  I'm going to

19    start asking the Court to direct him to answer.

20                    THE COURT:  Answer the question.

21    BY MR. ANTHONY:

22    Q.  All right.  So you -- the damage calculation you did was

23    the amount of money that PCI paid to, I think you said,

24    insiders and other people, correct?

25    A.  Correct.

Jarek - Cross

```
 1    Q.  Right.  You did a damage calculation that was different
 2    than the one that Mr. Martens did, right?
 3              MS. GITTES:  May I -- Your Honor, can we take --
 4    this is not in evidence, I believe.  Can you take it down?
 5              MR. ANTHONY:  I'm still questioning him about it.
 6              MS. GITTES:  The document is not in evidence.
 7              MR. ANTHONY:  It's from his report.  It's
 8    demonstrative.  It's questioning him about his own work.
 9              MS. GITTES:  We object.  He's permitted to
10    question, but we would object to the display of a document
11    not in evidence.
12              THE COURT:  Sustained.
13              MR. ANTHONY:  Okay.  Take it down, please.
14              MS. GITTES:  It's on the ELMO.
15              MR. ANTHONY:  Oh, I'm sorry.  It's on the -- thank
16    you.
17    BY MR. ANTHONY:
18    Q.  All right.  So you didn't do a -- your damage report was
19    the -- you say the payments made to insiders and others,
20    correct?
21    A.  Yes, as I explained.
22    Q.  Okay.
23              MR. ANTHONY:  I need that -- those.
24         (Plaintiff's counsel confer)
25    BY MR. ANTHONY:
```

1    Q.  And I think this is the -- well, let me ask you --

2        (Plaintiff's counsel confer)

3    BY MR. ANTHONY:

4    Q.  Here's your demonstrative.  So you put this together and

5    you thought this is the damage model that was appropriate,

6    not the amount of money lost or that was owed to creditors,

7    but the amount of money that was paid out to insiders and

8    others, correct?

9    A.  Yes.

10   Q.  Okay.  And let me ask you a little bit -- I don't agree

11   with your calculation, but let me ask you a little bit about

12   it.

13             The -- do you have anything on there for Jody

14   Coleman?

15   A.  I don't.

16   Q.  Who's Jody Coleman?

17   A.  Well, as I heard, I think it was Ms. Coleman's brother.

18   Q.  So Jody Coleman, 930,000, that didn't make it on your

19   damage calculation, right?

20   A.  No.  It wasn't listed as an employee.

21   Q.  It didn't make it on your damage calculation, correct,

22   sir?

23   A.  That's right.

24   Q.  And another thing that didn't make it on your damage

25   calculation was the $10 million for the yacht, correct?

1    A.  I didn't see any 10,000 -- or 10 million for a yacht in

2    the PwC database.  I'm not recalling that.

3    Q.  Oh, you didn't see the wire that was in one of the M&I

4    Bank alerts, that 10 million was paid to a yacht broker; you

5    didn't see that?

6              MS. GITTES:  Objection, foundation.

7              THE COURT:  Overruled.

8              THE WITNESS:  If it was, it wasn't identified as a

9    yacht in the PwC database.

10   BY MR. ANTHONY:

11   Q.  So you're unaware of the 10 million paid for the yacht

12   is what you're telling the jury, right?

13   A.  If I am, it's because Mr. Martens didn't identify it as

14   such in the PwC database.

15   Q.  And so you're blaming Mr. Martens because no one brought

16   to your attention the $10 million paid for the yacht; is

17   that what you're saying?

18             MS. GITTES:  Objection, argumentative.

19             THE COURT:  Overruled.

20             THE WITNESS:  I don't --

21   BY MR. ANTHONY:

22   Q.  You're blaming Mr. Martens because you don't --

23             THE COURT:  Counsel --

24             MR. ANTHONY:  Thank you, Your Honor.

25             THE COURT:  -- you don't need to repeat yourself.

Jarek - Cross

```
 1                   MR. ANTHONY:  Yeah.

 2                   THE COURT:  You may answer the question.

 3                   THE WITNESS:  Can I have the question, please?

 4       BY MR. ANTHONY:

 5       Q.  Sure.  I'll read it back to you.  So you're unaware of

 6       the $10 million that was paid for the yacht; is that

 7       correct?

 8       A.  Yeah, I don't recall seeing that in the PwC database.

 9       I'd have to see the wire you're discussing to see if it was

10       for a yacht.

11       Q.  So you wouldn't know whether the yacht was for the

12       benefit of Mr. Petters or Mr. Coleman or anybody else,

13       correct?

14       A.  No.  As I said, it wasn't identified in the database.

15                   MR. ANTHONY:  Your Honor, I'm going to ask the

16       witness to limit his answer to my question.  The answer was

17       "No," and I'll move to strike everything after his answer,

18       no, that he was unaware.  May it be stricken?

19                   THE COURT:  Sustained --

20                   MR. ANTHONY:  Thank you.

21                   THE COURT:  -- or motion granted.

22       BY MR. ANTHONY:

23       Q.  Okay.  So the reason why you created this alternative or

24       this damage model was because this was the benefit that

25       these folks got from the payments from PCI, right?
```

1    A.  That's partially true.

2    Q.  Well, can we agree they got a benefit from these

3    payments?

4    A.  They did.

5    Q.  Can we agree you put them and that amount on this list

6    because they got a benefit?

7    A.  Yes.  I'm saying that's not the only reason.

8    Q.  Oh, I understand that.

9            Now, were there any other payments made out of PCI

10   for anything else that provided benefit to the people on

11   this list, this demonstrative, that you have not included?

12   A.  Not that I was able to verify as a direct benefit

13   through the Pricewaterhouse database.

14   Q.  Okay.  So your calculation of this demonstrative is only

15   based on what you saw in the PwC database, correct?

16   A.  Primarily.  I mean, that was the primary source of the

17   data, yes.

18   Q.  Did you ask anyone from M&I Bank or anyone else in this

19   proceeding whether there was any money paid to benefit these

20   people on this list in any other fashion?

21   A.  No.  I don't see how that would be relevant.

22   Q.  Oh, so if, for example, the -- do you think the payment

23   to Jody Coleman was relevant to a calculation as to what

24   benefit the insiders got?

25   A.  It may be.  My point was that -- may I explain?

 1              MR. ANTHONY:  Your Honor, anything beyond "It may

 2      be" is not responsive.  I'm trying to move this along and

 3      limit narrative responses.  I just want him to answer my

 4      question.

 5              MS. GITTES:  Your Honor, we object -- or we

 6      disagree with that objection and Mr. Jarek -- we would ask

 7      that he be able to explain given the question asked.

 8              MR. ANTHONY:  That's why they have redirect, Your

 9      Honor.

10              THE COURT:  The objection is overruled.

11      BY MR. ANTHONY:

12      Q.  All right.  So you know that one of the ways this Ponzi

13      scheme got pulled off was because Tom Petters was able to

14      create the image that he had, correct?  You understand that?

15      Do you understand that?

16      A.  "Pulled off"?

17      Q.  Tom Petters -- do you know how to spell Mr. Petters'

18      name?

19      A.  Yes.

20      Q.  How do you spell it?

21      A.  P-e-t-t-e-r-s.

22      Q.  How did you spell it on your chart here?

23      A.  Incorrectly.

24      Q.  Yeah, okay.  So did you know that the way Mr. Petters

25      was able to pull off this scheme was he created this aura,

1    this appearance that he was larger than life, that he was a

2    big businessman, that he was a philanthropist?  You

3    understand that, right?

4    A.  Yes, I've seen evidence of that.

5    Q.  Okay.  So to the extent that Mr. Petters used the money

6    of PCI to enhance his image in the community, isn't that a

7    benefit he got?

8    A.  Potentially it could be.

9    Q.  You didn't include any of the money he spent to make it

10   appear as though he was a legitimate businessman, you didn't

11   put any of that on your damage calculation, did you?

12   A.  Well --

13   Q.  Sir, I just want to know if you've added that or not.

14   A.  I believe I have.

15   Q.  Okay.  Did you add anything for the $420 million that

16   Petters spent on Polaroid to this list?

17            MS. GITTES:  Objection, Your Honor, lacks

18   foundation.

19            THE COURT:  Overruled.

20   BY MR. ANTHONY:

21   Q.  Did you?

22   A.  No.  That's --

23   Q.  Okay.  Did you add anything to this list for the tens of

24   millions of dollars that he spent in charitable

25   contributions to make his image look better?

Jarek - Cross

1    A.  No.

2    Q.  Certainly made it look better for Mr. Petters to have

3    that image in the marketplace, didn't it?

4    A.  I don't know.

5    Q.  Oh, wait.  So you don't have an opinion, one way or the

6    other, whether looking like a successful businessman

7    impacted the success of this Ponzi scheme; is that what

8    you're saying?

9    A.  I don't know the -- I was referring to the charities.  I

10   don't know what charities you're talking about.

11   Q.  No.  My question is a little different than that.  Would

12   you agree that the money Petters spent that he took from PCI

13   and used to improve his image was an important part of him

14   pulling off this scheme?

15   A.  It potentially was.

16   Q.  Well, you're a Ponzi expert, right?

17   A.  Yes.

18   Q.  Can you say it was or wasn't, or is it you're just

19   equivocating?

20   A.  I would have to see -- I would have to see the numbers,

21   see the documentation.

22   Q.  So you haven't looked at this -- these hundreds of

23   thousands of pages closely enough to assure yourself that he

24   spent $400 million on Polaroid to make his business

25   enterprise look better; is that what you're saying?

1   A.  I've analyzed the PwC database.

2   Q.  Okay.  So the PwC database shows $400 million was spent

3   on Polaroid, you saw that?

4   A.  I believe something like that.

5   Q.  And that money made Petters look really good to those

6   investors who he was trying to attract, correct?

7   A.  I mean, he bought Polaroid.  I don't know that that had

8   anything to do with him attracting investors to PCI.

9   Q.  Okay.  How about Fingerhut, did the fact that Fingerhut

10  was part of his operation and he paid for that with PCI

11  money, did that improve his image?

12  A.  I mean, it may have.

13  Q.  Okay.

14          THE COURT:  I'm going to stop you here.  Sir,

15  would you pull your microphone closer.  I'm having trouble

16  hearing you.

17          THE WITNESS:  Yes, Your Honor.  Sorry.

18          THE COURT:  That's quite all right.  Thank you.

19  BY MR. ANTHONY:

20  Q.  How about the money that Petters used to acquire Sun

21  Country, did that improve his image?

22  A.  It may have.

23  Q.  Well --

24  A.  I've seen people talk about that, yes.

25  Q.  As a Ponzi person -- as a person who holds himself out

Jarek - Cross

1    as a Ponzi expert, wouldn't you say that it's important for

2    the person running the scheme to look like they're a

3    legitimate business person?

4    A.  Oh, yes, I think he did that.

5    Q.  And he used the money of PCI to pull that off, did he

6    not?

7              MS. GITTES:  Objection, Your Honor, assumes facts

8    not in evidence.

9              THE COURT:  Overruled.  You may answer the

10   question if you know the answer.

11             THE WITNESS:  Can I have the question again?

12   BY MR. ANTHONY:

13   Q.  Sure.  As a person who considers himself a Ponzi expert,

14   wouldn't you say that it's an important for the person

15   running the Ponzi scheme to appear to be a legitimate

16   business person?

17   A.  Yes.

18   Q.  Okay.  And so wouldn't it be fair to include all the

19   money that Tom Petters spent -- all the PCI money that Tom

20   Petters spent to make himself look like a legitimate

21   business person something that was for his benefit?

22   A.  That's not how I've seen it applied.

23   Q.  So you disagree with that, correct?

24   A.  Yes.

25   Q.  Okay.  So you would say that it didn't matter how much

Jarek - Cross

1    of PCI's money he took and spent to make himself look good,

2    you would say that shouldn't be part of any damage

3    calculation, correct?

4    A.  Well, it's not a direct measurement, so no.

5    Q.  Okay.

6    A.  It's not a direct --

7    Q.  All right.  Now, you said that you agreed with

8    Mr. Martens that people who invest late in the Ponzi scheme

9    and still have their notes outstanding when it implodes lose

10   money.  Do you recall that?

11   A.  Um --

12   Q.  That was the first thing I read to you when we started.

13            MS. GITTES:  Objection, Your Honor.  I would like

14   to ask Mr. Anthony to let the witness finish his answer.

15            THE COURT:  Please let the witness finish his

16   answer.

17            MR. ANTHONY:  I was trying to direct --

18            THE COURT:  You know how to perform proper

19   cross-examination.

20            MR. ANTHONY:  Yep.

21            THE COURT:  And you need to do that.

22            THE WITNESS:  May I have the question again,

23   please?

24   BY MR. ANTHONY:

25   Q.  Sure.  Do you recall that Mr. Martens said people that

1    invest early in a Ponzi scheme and get out before the music

2    stops make money; people that wind up, though, that invest

3    late in the Ponzi scheme and still have their notes

4    outstanding when it implodes, they lose money?

5    A.  Yes.

6    Q.  And you agreed with that?

7    A.  Yes.

8    Q.  So let's look at -- let me ask this.  I think you said

9    that the PCI account ended up at M&I Bank in like, I think

10   you said, 2001 when M&I Bank bought National City Bank.

11   A.  Yes.

12   Q.  Does that sound right?  Is that what you remember?

13   A.  Yes.

14   Q.  And so I'm trying to understand your -- this is one of

15   your slides.  It's number 15.  And what I'm trying to

16   understand is are you saying that -- and I wrote it down --

17   that you said if the Ponzi scheme had come to an end in

18   2001, there would have been 500,000 in losses?

19   A.  I don't recall saying that, but that would have

20   happened.

21   Q.  Okay.

22   A.  The 500,000 is the outstanding principal balance at that

23   time.

24   Q.  Okay.  So that's what this chart shows or this exhibit

25   shows, each year it shows how much would have been lost at

1    that year-end if the Ponzi scheme came to an end?

2    A.  Yes.

3    Q.  Okay.

4    A.  It's a loss every year.

5    Q.  All right.  So, for example, if someone -- so in 2001

6    the account went to M&I or M&I got control over the PCI

7    account, correct?

8    A.  Yes.

9    Q.  And so if we look at this, would you agree with me that

10   it appears to be a dramatic increase between the time M&I

11   Bank got this account and 2008 and the losses that would

12   have been sustained during that period of time; would you

13   agree?

14   A.  The losses are increasing.  That's what Ponzi schemes

15   do.

16   Q.  So if the account had shut down in 2002, the losses

17   would have been $57 million, correct?

18   A.  I'm sorry.  If --

19   Q.  If the account had been shut down in the end of 2002,

20   the losses would have been 57 million, correct?

21   A.  I don't agree with that.

22   Q.  Well, what would they have been in 2002 -- excuse me.  I

23   thought you just said that these would be the losses at each

24   year-end if the account were shut down.

25   A.  No.  If the scheme were stopped.  I'm sorry --

Jarek - Cross

1   Q.  Okay.

2   A.  -- if I said "account."  If this scheme were stopped.

3   As I mentioned, closing the account wouldn't have stopped

4   the scheme.

5   Q.  Okay.  Fair point.  If the scheme were stopped at the

6   end of 2001, the losses would have been $500,000?

7   A.  Yes.

8   Q.  And that's the first year M&I Bank had this account,

9   right?

10  A.  Yes.

11  Q.  And if in year 2002 it had been stopped, if the scheme

12  had been stopped, it would have been 57 million, correct?

13  A.  Yes.

14  Q.  2003 if the scheme had been stopped, it would have been

15  316 million?

16  A.  Yes.

17  Q.  In year 2004 it would have been 839 million if the

18  scheme had been stopped?

19  A.  Yes.

20  Q.  Now, 2005 was the time that M&I Bank implemented

21  Searchspace, you know that, correct?

22  A.  I recall that, yes.

23  Q.  And that was the time that its AML money laundering

24  analysts were looking at the Searchspace alerts, you know

25  that?

1    A.  I've heard testimony to that.

2    Q.  Okay.  You didn't read that testimony in any of the

3    transcripts?

4    A.  I recall reading some deposition testimony.

5    Q.  Okay.  I'm sensing that what happened with those alerts

6    were not an important part of your work.  Is that correct?

7    A.  That's more the AML/BSA expert.

8    Q.  That's more the liability expert for Bank Secrecy Act

9    stuff, right?

10   A.  In my experience, yes.

11   Q.  So in 2005 if the scheme had stopped, then the losses

12   would have been 1.4 billion, correct?

13   A.  Yes.

14   Q.  And in 2006 it would have been 1.9 billion, correct?

15   A.  Yes.

16   Q.  Now, you said that -- and I think you just said that --

17   I said, well, if the account had been closed and you said --

18   you corrected me.  You said if the scheme had been stopped.

19   Do you recall that exchange?

20   A.  I do.

21   Q.  Okay.  So would you agree with me that if the FBI had

22   been alerted to problems with PCI's activities in 2004, can

23   we agree that the scheme would likely have been stopped?

24        MS. GITTES:  Objection, Your Honor, calls for

25   speculation, outside the scope of Mr. Martens' report.

Jarek - Cross

1          MR. ANTHONY:  Your Honor, he's an expert.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm sorry.  May I have the question

4     again?

5     BY MR. ANTHONY:

6     Q.  Sure.  Would you agree with me that if the account had

7     been closed in 2004 and if the FBI had been alerted to what

8     was occurring in the account, that the losses would have

9     been capped at 839 million?

10    A.  I can't predict what the FBI would have done.  I know in

11    other schemes that's not been the case.

12    Q.  You understood how long it took for the FBI to close PCI

13    after Ms. Coleman turned herself in, right?

14    A.  After she confessed, it was a couple weeks, I think.

15    Q.  Yeah.  Do you have any reason to believe that if there

16    had been a SAR filed in 2004 that showed billions of dollars

17    going in and out of this account, that the FBI wouldn't have

18    acted?  Do you have an opinion on that one way or the other?

19          MS. GITTES:  Objection, Your Honor, form,

20    foundation, scope of his opinions, calls for speculation.

21          THE COURT:  Sustained.

22    BY MR. ANTHONY:

23    Q.  And so to what do you attribute the dramatic -- I won't

24    say "dramatic," but what do you attribute the increase in

25    what you've described the possible losses from 500,000 to

Jarek - Cross

1    3.1 billion during the time period that this account was at

2    M&I Bank?

3    A.  Well, what we had was -- can I explain that?

4    Q.  Yeah.  What do you attribute -- to what do you attribute

5    that increase?

6    A.  It's the -- that increase is related to the additional

7    investments that the -- primarily the three large hedge

8    funds, Lancelot, Palm Beach, and Acorn, had kept increasing

9    their investments.  And what happened was in those earlier

10   years there were winning investors that pulled their money

11   out of the scheme.

12           And so that's what was creating the losses every

13   year from 2002 through 2008, because winning investors were

14   pulling money out throughout that period and Lancelot, Palm

15   Beach, and Acorn were putting more money in, which was then

16   funneled to those investors that got out and were winners.

17   Q.  Okay.  So that's the whole musical chairs concept,

18   right?

19   A.  Sort of, but not the music stops at the end and then all

20   the losses occur.  There were losses that occurred

21   throughout the period.

22   Q.  But we can agree that when the music stopped at the end,

23   there was a significant number of investors who were not

24   repaid, correct?

25   A.  Yes.

Jarek - Cross

1    Q.  Okay.  And Mr. Martens pegs that number at

2    1.926 billion, correct?

3    A.  Yes.

4    Q.  Okay.  And what he said was was that when the music

5    stopped, those who had signed promissory notes after

6    December 5th, 2007, those were the big losers, correct?

7    A.  That's what he said, but that's not correct.

8    Q.  I understand you don't think it's correct, but I'm

9    asking you if that's what he said.

10   A.  I'd need to refresh my recollection.  He said -- I don't

11   know if he said signed notes or put money in or took loans.

12   I don't know if he said exactly what you're saying.

13   Q.  Well, what do you recall him saying --

14   A.  Something --

15   Q.  Maybe you don't recall.  Do you recall what he said?

16   A.  He said something to the effect that people that put

17   money in after December 5th, 2007 were losers.  If they put

18   money in before that, I believe is what he said, they were

19   repaid.

20   Q.  Okay.  I'm not trying to make this a memory test, so let

21   me read to you what he said?

22   A.  Okay.

23   Q.  "Essentially when you look at all of the notes and you

24   look at the history of what took place with the Thomas

25   Petters Ponzi scheme, those investors who invested in notes,

Jarek - Cross

1    I believe it was, December 5th of 2007 forward, they lost

2    money.  If you invested and had notes with start dates prior

3    to December 5, 2007, you were repaid.  And that really

4    depends on really where you were in that scheme of things,

5    but more often than not you made money."

6              So did you understand him to be saying that if you

7    invested early you were more likely to get paid back and if

8    you invested late you weren't?  Isn't that fair?

9    A.  I'm unclear that he's using the word "invested in the

10   scheme" the same way you were.

11   Q.  Well, just so we're on the same page, he said, "If you

12   invested and had notes with start dates prior to December 5,

13   2007, you were repaid."  Would you agree generally with that

14   statement?

15   A.  Generally, but not always paid in cash.  They were paid

16   with the note rolling that I talked about.

17   Q.  Right.  So they rolled their note after December 5th,

18   2007.  They, in fact, made another investment, correct?

19   A.  Well, they basically extended the due date.  That's why

20   I think we're parsing words on what was the investment.

21   Q.  Okay.  Rolling the note is making a second investment

22   decision, correct?

23   A.  It's just extending the maturity date.

24   Q.  Well, extending the maturity date means you're willing

25   to extend the time to be repaid the money, correct?

1    A.  Potentially.

2    Q.  Well, what is extend the maturity date if it doesn't

3    mean you're extending the time to get paid back?

4    A.  Well, Mr. Martens explained it a little differently in

5    his report.

6    Q.  Well, you used the word "maturity date," extending the

7    maturity date potentially.  I'm asking you what you mean

8    when you say -- when you extend the maturity date, are you

9    doing something other than extending the time for which

10   you'll get paid back?

11   A.  That's generally true.

12   Q.  Okay.  So when you decide to loan someone money and then

13   it's time for them to pay you back, you have a choice, you

14   can either get paid back or you can extend the time to get

15   paid back, correct?

16   A.  Yes, if you believe that there's money there for you to

17   be paid back --

18   Q.  Right.

19   A.  -- when it's due.

20   Q.  And when you extend the time to be paid back, you're in

21   a sense extending credit or a loan, correct?

22   A.  Assuming that you believe that you could have been paid

23   back when the original note was due, yes.

24   Q.  So I'd like to understand what you mean by -- what you

25   said about Exhibit 29.  This is Exhibit 29.  No, it's

1    P-745-002.  Maybe --

2            MR. ANTHONY:  It's Plaintiff's 745; is that right?

3    BY MR. ANTHONY:

4    Q.  I think you were shown this by Ms. Gittes.

5    A.  Yes.

6    Q.  Okay.  And this was one investor, right?

7    A.  Yes, the second largest loser.

8    Q.  Okay.  And how much did this investor lose in this

9    scheme?

10   A.  According to Mr. Martens, it's the 641,955,924 on the

11   net cash basis calculation that Mr. Martens did.

12   Q.  And Mr. Martens did a net cash basis calculation for

13   each of the eight investors, did he not?

14   A.  Yes.

15   Q.  And he totaled up, added those up and got to his number

16   of 1.926 billion, correct?

17   A.  Yes.

18   Q.  Now, for the most part, Petters was able to pay many of

19   these noteholders off for a number of years, correct, pay

20   the notes back?

21   A.  Yes.  With investments from new investors, yes.

22   Q.  That's how you keep a Ponzi scheme going, right?

23   A.  Yes.

24   Q.  So up until the time it imploded, most businesses or

25   entities that were loaning money to Petters were getting

1    paid back, correct?

2    A.  Yes.  Well, loans were being repaid, but they were not

3    being repaid to the extent that all the new investments were

4    being repaid.

5    Q.  Okay.  So --

6    A.  So that's what I was -- if I could explain?

7    Q.  So what you're saying is sometimes investors would get

8    paid back in full, sometimes they would roll their notes?

9    New money would come in.  Sometimes it would be used to pay

10   them back, sometimes it would be used to roll notes,

11   sometimes it would be used for other reasons?  Money is

12   fungible, right, it can be moved around?

13   A.  You asked a lot of questions there.

14   Q.  Fair point.  I'll ask you a different one.

15            Would you agree, given your experience with Ponzi

16   schemes, that if in 2003 Mr. Petters didn't pay back

17   $316 million, given your experience with Ponzi schemes, that

18   if somebody didn't get paid back $316 million, that somebody

19   might put up a stink?

20   A.  Well, if -- the problem is people don't know it's a

21   Ponzi scheme until it crashes.  That's why hedge funds, like

22   Lancelot, kept putting more money into the scheme, because

23   they didn't know it was a Ponzi scheme.

24   Q.  Okay.  Let me ask you it this way.  This is a

25   hypothetical.  I'd like you to assume that in 2004 Petters

1    can't get any more money and he can't get any more money, so

2    he can't continue to pay off the earlier investors.

3            Would you agree with me that one or more of those

4    investors who was out hundreds of millions of dollars would

5    have started a lawsuit against Petters and made a big stink

6    about it?

7    A.  I would assume so.  I can't speculate.

8    Q.  Well, I'm not asking you to speculate.  I'm asking you:

9    Based on your experience as a Ponzi scheme expert, isn't

10   that what would have happened?

11   A.  Probably.  I think it did happen in 2008.

12   Q.  Right, that's what happened in 2008.

13           So Petters needed to continue to pay off the early

14   lenders and investors to keep the Ponzi scheme going,

15   correct?

16   A.  He had to keep money coming in to pay all the investors.

17   The issue I'm having is that there were winning investors

18   that took money out throughout the year.  That's why hedge

19   funds, like Lancelot, didn't realize that they were already

20   not going to get their money back.

21   Q.  Okay.  I think my question was:  Petters had to keep

22   money coming in to pay all the investors in order to keep

23   the Ponzi scheme going, correct?

24   A.  Generally, yes.

25   Q.  All right.  And from your review, that's what he did

Jarek - Cross

```
1    until 2008, right?

2    A.  He kept it going for 14 years.

3    Q.  Yeah.  Well, up to 2008, correct?

4    A.  Yes.

5    Q.  So you said the bank made or could have made -- it was

6    unclear to me -- $1.4 million over the six or seven years

7    from 2002 to 2008.  Did I get that right?

8    A.  It's kind of the maximum potential that they could have

9    made investing at, as I had explained, kind of the highest

10   interest rates.

11   Q.  And you said, I think, that that wouldn't be enough

12   money for the bank to turn a blind eye to what was going on,

13   correct?

14           MS. GITTES:  Objection.  Oh, that wouldn't -- I

15   apologize.  I withdraw.  I just misread the question.

16           THE WITNESS:  I'm sorry.  Can you repeat the --

17   BY MR. ANTHONY:

18   Q.  Sure.  Your counsel asked you, she said, would that be

19   enough, 1.4 million, for the bank to turn a blind eye to

20   what was going on here.  Do you recall that?

21   A.  Yes.

22   Q.  Now, you're familiar or are you not familiar with the

23   efforts that the bank -- business bankers were making to try

24   to expand the business relationship?

25   A.  Oh, yes, definitely.
```

```
 1    Q.  Okay.  And you knew they had hopes, whether it was --

 2               MS. GITTES:  Excuse me, Mr. Anthony.  Are you done

 3    with the exhibit?

 4               MR. ANTHONY:  Sure.

 5               MS. GITTES:  Thank you.  Apologies for

 6    interrupting.

 7    BY MR. ANTHONY:

 8    Q.  You're aware of the efforts made by the bankers to

 9    expand the business relationship, correct?

10    A.  Yes.

11    Q.  Okay.  Do you recall that you were asked questions about

12    how easy it would have been for Petters to move this Ponzi

13    scheme to a different bank; do you remember that?

14    A.  Well, I said it could have been moved, yes --

15    Q.  Well --

16    A.  -- could have changed banks.

17    Q.  And you think that would have been something he could

18    have done easily, correct?

19    A.  I think relatively easily, yeah.

20    Q.  Okay.

21    A.  He had enough relationships.

22    Q.  And you referred to this slide, number 8 on DD-50, and I

23    want to talk to you about that.

24               How many years do you think it took for PCI to

25    finally find a bank that it could work with?
```

Jarek - Cross

```
1    A.  I don't understand the question.

2    Q.  Well, were you here for Ms. Coleman's testimony?

3    A.  I was not here.

4    Q.  Did you read her transcript?

5    A.  I skimmed through it.

6    Q.  Well, did you read the part where she said she had been

7    looking for a bank that it could work with -- PCI had been

8    looking for a bank that it could work with for ten years or

9    so; did you read that part of her testimony?

10   A.  I recall seeing that.  It didn't make sense to me, that

11   time period.

12   Q.  Okay.  So you thought it would be easy to move.  What

13   weight did you give to Ms. Coleman's testimony that they had

14   been looking for a bank for ten years that they could work

15   with?  Did you give any weight to it in rendering your

16   opinion?

17   A.  No.  No, it wouldn't be relevant.

18   Q.  Okay.  Now, you said -- you agree that the M&I bank

19   account was the primary bank account for running this Ponzi

20   scheme, correct?

21           MS. GITTES:  Objection, vague.

22           THE COURT:  Overruled.  You may answer if you can.

23           THE WITNESS:  You're saying I said it's the

24   primary bank account?

25   BY MR. ANTHONY:
```

1   Q.  Would you agree that M&I Bank was the primary bank

2   account for running the Ponzi scheme?

3   A.  I don't know that it was the primary bank account.  It

4   was a central account, as you can see from the diagram that

5   we showed earlier.

6   Q.  Did you happen to read Ms. Coleman's testimony where she

7   said it was the primary bank account?

8   A.  Well, it was the PCI account, so --

9   Q.  Did you read Ms. Coleman's testimony where she said

10  that there were a few other bank accounts, but the M&I Bank

11  account was the primary bank account for running the Ponzi

12  scheme; did you read that, sir?

13  A.  I don't recall seeing that part.

14  Q.  Now, you mentioned -- I think you mentioned Crown Bank

15  and Associated Bank as two possible contenders or candidates

16  for Petters to move this Ponzi scheme to.  Do you remember

17  that?

18  A.  Well, I think there's many.

19  Q.  Sir, I didn't ask you if there were many.  I asked you

20  if you remember saying -- identifying Crown Bank and

21  Associated Bank as two candidates for Petters moving this

22  Ponzi scheme to.  Do you remember that?

23  A.  During my direct I mentioned those -- I was asked are

24  these two accounts on the list, and I said yes.

25  Q.  Okay.  So you remember Crown and Associated, correct?

Jarek - Cross

1    A.  Yes, where there were relationships.

2    Q.  Okay.  Now, you're aware that counsel for the bank asked

3    Ms. Coleman whether Crown Bank assisted in the perpetration

4    of the scheme, correct?  Or maybe you're not.

5    A.  I was busy.  I couldn't be here yesterday.  I really

6    wanted to see Ms. Coleman testify and I couldn't be here.

7    Q.  Right.  And Ms. Coleman said that Crown Bank did not

8    assist in the Ponzi scheme, you understood that?

9    A.  I didn't read that part.

10   Q.  And did you read the part where she said Associated Bank

11   didn't assist in the perpetration of the scheme; did you

12   read that?

13   A.  I did not.

14   Q.  Okay.  So if it was going to be so easy to move this

15   Ponzi scheme around to other banks, why wouldn't -- using

16   your Ponzi scheme expertise, why wouldn't a fraudster like

17   Petters have multiple bank accounts set up to perpetrate

18   this scheme, why would he just have one primary one?

19   A.  Well, he would want to maintain control, probably,

20   within one account.  That would make sense to some degree.

21   Q.  And so having it at one place, like M&I Bank, was

22   keeping control, in your view?

23   A.  Well, to be able to keep track of the flow of funds

24   rather than having multiple PCI bank accounts that you would

25   have to keep track of.

Jarek - Cross

1    Q.  Do you have any basis for saying that if Mr. Petters had

2    moved this PCI account to another bank, that the new bank

3    would turn a blind eye to his activities?

4          MS. GITTES:  Objection, Your Honor, argumentative.

5          THE COURT:  Overruled.

6          THE WITNESS:  Um --

7    BY MR. ANTHONY:

8    Q.  Sir, do you understand the question?

9    A.  Can you --

10   Q.  Do you have any facts which would lead you to conclude

11   that if Petters had successfully moved this to another bank,

12   that it would have treated his account the same way M&I Bank

13   treated it?

14   A.  I mean, I can't speak to specific accounts here.  Just

15   that I've seen that happen in other Ponzi schemes.

16   Q.  Okay.  But you don't have any facts unique to this case

17   that allow you to say that, boy, Petters could have moved it

18   to another bank and it would have gone just the way it went

19   at M&I?

20   A.  Well, I mentioned those points on my direct.

21   Q.  Do you have any facts, sir, that lead you to conclude

22   that there was another bank willing to handle this account

23   the same way that M&I Bank did?

24   A.  I did not make inquiries at banks.  I'm merely pointing

25   out the relationships and the availability.

Jarek - Cross

1   Q.  Do you have an opinion, sir, on the moveability of this

2   PCI account to another bank if a SAR had been filed?  My

3   question is do you have an opinion.

4   A.  I don't other than to say --

5   Q.  Sir --

6   A.  -- I have seen that happen.

7   Q.  Sir --

8            MR. ANTHONY:  Your Honor, move to --

9            THE COURT:  Counsel --

10            MR. ANTHONY:  I will move to strike everything

11   after "no" because "no" was his answer and he wants to give

12   an explanation without -- instead of just answering the

13   question, so.

14            MS. GITTES:  Your Honor, I believe the question

15   was if he had ever seen it happen.  I think Mr. Jarek was

16   trying to answer.

17            MR. ANTHONY:  My question was does he have an

18   opinion, but we'll --

19            THE WITNESS:  Yes.

20            MR. ANTHONY:  -- go down a different road.

21            THE COURT:  Your question was do you have an

22   opinion.

23   BY MR. ANTHONY:

24   Q.  Now, Mr. Jarek, can you identify any investor before

25   December 5th, 2007 who had anything other than a book loss

Jarek - Cross

```
 1    from investing in the Petters Ponzi scheme?

 2    A.  Okay.  Can I have that back?

 3    Q.  Sure.  Can you identify any investor who had anything

 4    other than a book loss before December 5th, 2007 from

 5    investing in the Petters Ponzi scheme?

 6    A.  I'm not sure what you mean by "book loss."  I'm looking

 7    at the net cash losses from Mr. Martens' calculation.  I

 8    don't view those as book.  They're cash loss --

 9    Q.  You're using Mr. Martens' calculations, correct?

10    A.  Correct, that --

11    Q.  Okay.

12    A.  Correct.

13    Q.  So I want to understand what you did with this DD-50,

14    Defense Demonstrative 50, slide 17.  This is for -- it says

15    net cash activity for Lancelot December 5, 2007 through

16    September 2008, correct?

17    A.  Correct.

18    Q.  This schedule was not in your original report or in your

19    rebuttal report, was it?

20    A.  No.  I just --

21    Q.  Was it in either of those reports?

22    A.  No.  It couldn't have been.

23    Q.  Now, as I understand it, what you did was you said on

24    December 5 there was a $20 million new investment by this

25    entity, Lancelot Funds, correct?
```

Jarek - Cross

 1    A.  Yes.

 2    Q.  And then there was a repayment of $2.5 million the next

 3    day -- or the same day, right?

 4    A.  Same day.

 5    Q.  And a repayment the same day of another almost

 6    4 million, correct?

 7    A.  Yes.

 8    Q.  Were those repayments for notes entered into before

 9    December 5th, 2007?

10    A.  I don't know.  I'd have to go back and check the work

11    papers.

12    Q.  You just made this up, right, yesterday?  Day before?

13    A.  It was right after Mr. Martens' testimony.

14    Q.  Right.  So in the last few days you prepared this,

15    correct?

16    A.  Yes.

17    Q.  Did you prepare it or did somebody working for you

18    prepare it?

19    A.  My staff person did, yes.

20    Q.  Okay.  So this isn't something you personally did, this

21    DD-50?

22    A.  No.  I asked him to prepare it and instructed him.

23    Q.  Okay.  Well, does -- let me just say it seems unusual to

24    me that if you made an investment on December 5th for

25    20 million, that the same day you'd get 2.5 million repaid.

Jarek - Cross

1    So it struck me, when I looked at this, as though that

2    repayment on December 5th for almost $7 million was for a

3    note that was before December 5th.  Wouldn't that make sense

4    to you?

5    A.  Yes, that would make sense to me.

6    Q.  Okay.

7    A.  What I'm looking at is the net cash loss during the

8    period.

9    Q.  Yes.  And so what you're really not looking at is what

10   was lost on new investments after December 5th, you're

11   looking -- you're just taking what the new investments were

12   and what the payments -- repayments were for notes that may

13   have preexisted December 5th, correct?

14   A.  Correct.  The note dates don't matter.  It's the cash --

15   cash is king, as we say, in fraud investigation.

16   Q.  Well, for your presentation the cash matters, but what

17   Mr. Martens said was that people who invested after -- on or

18   after December 5th, 2007 lost money, that's what he said,

19   right?

20   A.  That's what he said.

21   Q.  Okay.  And so what this schedule shows is you showing

22   investments after December 5th, 2007, new investments, but

23   you're deducting from those new investments payments for

24   notes that are before December 5th, 2007; isn't that what

25   you're doing?

Jarek - Cross

1    A.  Well, it's the cash flow basis.  It's the same basis

2    Mr. Martens uses for his loss calculation.

3    Q.  Sir, my question is:  Aren't you showing payments made

4    for notes that predate December 5th, 2007 on this schedule?

5    A.  There could be.  From the cash --

6    Q.  Well, sir --

7    A.  From the cash basis, yes.

8    Q.  And I know things could be.  I'm asking you:  Is it true

9    that what you did here was you took the new investments from

10   2007 moving forward and then you applied against those new

11   investments payments for notes that predated December 5th,

12   2007, correct?

13   A.  I'm not applying the payments against the new notes.

14   I'm merely showing the net cash loss, consistent with what

15   Mr. Martens did in his damage calculation.

16   Q.  The payments that came in and that are shown on this

17   schedule, we can agree, relate to notes before December 5,

18   2007, can we not?

19         MS. GITTES:  Objection, Your Honor, asked and

20   answered.

21         THE COURT:  Overruled.  You may answer.

22         THE WITNESS:  Yes, there would be some on here.

23   BY MR. ANTHONY:

24   Q.  Yes.  So if you want -- so Mr. -- now, remember

25   Mr. Martens said he was calculating net winners and net

1    losers?

2    A.  He did that, yes.

3    Q.  And when he did his calculation of net winners and net

4    losers, he came up with 1.926 billion, roughly, in losses,

5    right?

6    A.  Yes, over the entire scheme period.

7    Q.  I'm going to round it off.  Now, what I understand you

8    to be saying is that you recently did a calculation that

9    says from December 5th, 2007 to the time the Ponzi scheme

10   imploded, that there was roughly another -- can you add

11   those numbers together in your head?

12   A.  Probably not sitting here today under stress.

13   Q.  Let's add them up the best we can.

14       (Pause)

15   Q.  Roughly 245 million is my number, right?

16   A.  I'd ballpark it about 250, yeah.

17   Q.  Yeah.  So if we say those were the net winnings for just

18   those three --

19       (Plaintiff's counsel confer)

20   Q.  Okay.  So if we give your calculation the benefit of

21   the -- and this is a calculation you did in the last few

22   days, right?

23   A.  Yes.

24   Q.  Okay.  If we give the calculation you did in the last

25   few days the benefit -- and apply that to Mr. Martens'

1    calculation and just do the simple math, it would be

2    $1.7 billion, just doing that math, correct?

3    A.  I mean, that looks like what your math did, but I

4    don't --

5    Q.  Right.

6    A.  -- see that as the loss calculation.

7    Q.  You don't agree with the calculation, I understand that.

8    I'm just asking you about the math.

9    A.  I mean, maybe.  I guess it's approximately.  I don't

10   know.

11   Q.  Okay.

12   A.  I can't really read that number.

13          THE COURT:  I didn't hear what you said.

14          THE WITNESS:  I can't really read that number, but

15   it looks approximate.

16   BY MR. ANTHONY:

17   Q.  And I think you did -- a similar calculation that you

18   did for Palm Beach, you did one for Acorn also, right, and

19   you came up with 37 million there?

20   A.  Yes.

21   Q.  Okay.  And we'll see that Acorn appears on your slide as

22   well?

23   A.  Correct.

24   Q.  And I think you did a similar calculation for Lancelot,

25   correct?

Jarek - Cross

1    A.  Yes.

2    Q.  Okay.  So these calculations you did, for example, on

3    Palm Beach, did you use Mr. Martens' work papers?

4    A.  Can you just clarify what calculations of Palm Beach?

5    This specific spreadsheet?

6    Q.  Yep, this one -- that's Lancelot, not Palm Beach.  Let's

7    look here.  Did you use Ted Martens' work papers to do this

8    calculation?

9    A.  Yes.  I believe they're called the note --

10   Q.  Okay.

11   A.  -- just note statements or something like that.

12           THE COURT:  Okay.  Counsel, identify for the

13   record what you're referring to.

14           MR. ANTHONY:  Oh, I'm sorry, Your Honor.  It would

15   be DD-50, slide 19.

16           THE COURT:  Thank you.

17      (Pause)

18           MR. ANTHONY:  Bear with me, Your Honor.  I'm just

19   looking for one document.

20           MS. GITTES:  Oh, Mr. Anthony.  Can you take that

21   down?

22           MR. ANTHONY:  Oh, sure.  Sorry about that.

23      (Plaintiff's counsel confer)

24   BY MR. ANTHONY:

25   Q.  Now, one of the things you opined on was that there was

1   no information provided to M&I that indicated that big-box

2   retailers should have been making direct payments into

3   account 9018.  Do you recall that?

4           MS. GITTES:  Objection, Your Honor, outside the

5   scope of the direct.

6           THE COURT:  Overruled.

7           THE WITNESS:  I'm sorry.  May I have the question

8   again, please?

9   BY MR. ANTHONY:

10  Q.  Sure.  I'm showing you page 28 of your report.

11          MS. GITTES:  Your Honor, I object to the showing

12  of the report.  If he wants to consult, he can direct

13  Mr. Martens.

14          THE COURT:  Objection sustained.

15          MR. ANTHONY:  Okay.

16  BY MR. ANTHONY:

17  Q.  Why don't you look at page 28 of your report.

18          THE COURT:  And, Counsel, you understand how to

19  refresh recollection --

20          MR. ANTHONY:  I do understand how to refresh

21  recollection.

22          THE COURT:  -- under the Rules of Evidence?

23          MR. ANTHONY:  Yeah, I will.

24          THE WITNESS:  I'm sorry.  What page?

25  BY MR. ANTHONY:

Jarek - Cross

1    Q.  Page 28 of your report.

2    A.  Yes.

3    Q.  Look at paragraph C.  And the question I'm going to ask

4    you and ask it if refreshes your recollection is:  Did you

5    opine that there was no information provided to M&I that

6    indicated that big-box retailers should have been making

7    direct payments into account 9018?

8    A.  Yes.

9    Q.  And you refer to that -- those facts as being at the

10   center of the trustee's allegations, correct?

11   A.  Correct.  Yes --

12   Q.  So did you opine --

13   A.  -- at the time --

14   Q.  -- that there was no evidence or information that

15   indicated that M&I Bank was aware that big-box retailers

16   were making payments into the M&I account?

17   A.  Well, I'm saying that no information was provided to

18   them to indicate that.

19   Q.  No information was provided to M&I Bank that that was

20   occurring, is that what your opinion is?

21   A.  Well, I didn't express that opinion here, but that's

22   what I have stated in my report.

23   Q.  Right.  And was it important to your opinion on Ponzi

24   schemes to think that M&I Bank didn't have any information

25   that big-box retailers were not making payments into the

1    account?

2              MS. GITTES:  Objection, Your Honor.  I renew my

3    objection in terms of scope of the direct.

4              THE COURT:  Overruled.

5              THE WITNESS:  I'm not sure what you mean by my

6    opinion on Ponzi schemes.

7    BY MR. ANTHONY:

8    Q.  Yeah, you give a number of opinions about this Ponzi

9    scheme and its detection and whether the bank employees were

10   aware of it.  Do you recall --

11   A.  I did not say anything about bank employees being aware

12   of it.

13   Q.  Okay.  Did you give opinions about Ponzi schemes in your

14   direct?

15   A.  Yes, generally.

16   Q.  Okay.  Was it important to whatever opinions you gave on

17   Ponzi schemes that you had opined that the bank was unaware

18   of big-box retailers supposedly being required to make

19   payments into the M&I account?

20   A.  What I've stated is no information provided to M&I

21   indicated that big-box retailers should have been making

22   direct payments into account 9018.

23   Q.  Okay.

24   A.  That's what I stated in my report.

25   Q.  Okay.  Did you hear Ms. Coleman's testimony that she had

1  conversations with Ms. Rhode and Mr. Jambor in which she

2  told them the business model contemplated big-box retailers

3  making payments into the PCI M&I account?

4          MS. GITTES:  Objection, Your Honor, misstates the

5  testimony and lack of foundation.

6          THE COURT:  Sustained.

7  BY MR. ANTHONY:

8  Q.  Did you read Ms. Coleman's testimony on her

9  conversations with Mr. Jambor and Ms. Rhode about big-box

10  retailers?

11  A.  In trial here?

12  Q.  Yes.

13  A.  I was not able to read the entire transcript.

14  Q.  Did anybody tell you what she said?

15  A.  I don't remember hearing that.  My report was written

16  four years ago.

17  Q.  Right.  Are you still of the opinion that there's no

18  evidence that M&I Bank's bank employees were made aware of

19  the expectation that big-box retailers would be making

20  payments?

21  A.  Can you repeat that?  Because you said "made aware" --

22  Q.  Sure.

23  A.  -- and that's not what's in my report.

24  Q.  I said are you still of the opinion that there's no

25  evidence or facts in the record that M&I Bank's employees

1    were made aware by Ms. Coleman that big-box retailers were

2    supposed to be making payments into the M&I account?

3              MS. GITTES:  Objection, form and foundation.

4              THE COURT:  Overruled.  You may state your

5    opinion.

6              THE WITNESS:  Well, anything by Ms. Coleman that

7    she said in trial I couldn't have considered in my report

8    four years ago.  And I saw contradicting evidence at that

9    time that other parties would -- were paying directly into

10   account 9018, which were indirect retailer payments, as I

11   stated in my report.

12   BY MR. ANTHONY:

13   Q.  So you're not aware of what Ms. Coleman said, right?

14   A.  Obviously.  I said that, yes.

15   Q.  Mr. Jarek, were you asked to opine on whether any of the

16   activity in the M&I Bank -- any of the activity in the PCI

17   M&I bank account was suspicious or unusual?  Did you give

18   any opinions on that?

19   A.  I have not given any opinions on that.  That's an AML

20   issue.

21   Q.  Okay.  So you don't have an opinion on that issue,

22   correct?

23   A.  No.  I've not stated any.

24   Q.  Okay.  Now, you understand that Mr. Kelley is trying to

25   collect money for those investors and creditors who have not

1  been paid, the claims that he thinks they are owed, correct?

2  A.  Well, I don't know how to answer that other than

3  Mr. Martens has calculated these losses based on the net

4  investor losses.

5  Q.  Right.  So you understand that is what Mr. Kelley is

6  attempting to recover, correct?

7  A.  I assume so.  That's what Mr. Martens calculated.

8          MR. ANTHONY:  Bear with me, Your Honor.

9      (Plaintiff's counsel confer)

10  BY MR. ANTHONY:

11  Q.  I'm about at my last question, Mr. Jarek.

12  A.  Famous last words.

13  Q.  Famous last words.  Everybody says that, right?

14          MS. GITTES:  Mr. --

15          MR. ANTHONY:  I know.  It's moving around.

16          MS. GITTES:  Thank you.

17  BY MR. ANTHONY:

18  Q.  You were not -- you are not giving an opinion on

19  liability in this case, correct?

20  A.  Correct.

21          MR. ANTHONY:  Nothing further, Your Honor.

22          MS. GITTES:  We have no further questions for this

23  witness.

24          THE COURT:  You are excused.

25          THE WITNESS:  Thank you.

1              MS. GITTES:  If Your Honor doesn't mind, just a

2      moment while we shuffle?

3              THE COURT:  I do not mind at all.

4              MS. GITTES:  Thank you.

5              THE COURT:  Members of the Jury, you should feel

6      free to take a stretch break.

7          (Pause)

8              MR. MOHEBAN:  Your Honor, BMO Harris Bank calls

9      adversely Sandra Indahl.

10             THE COURT:  Very well.

11             COURT REPORTER:  Please step up here.  Raise your

12     right hand.

13         (Witness sworn)

14             COURT REPORTER:  Please have a seat in the witness

15     chair.  Once you're seated, please state your full name and

16     spell your first and last name.

17             THE WITNESS:  Sandra K. Indahl, Sandra,

18     S-a-n-d-r-a, Indahl, I-n-d-a-h-l.

19             THE COURT:  Good afternoon.

20             Counsel, you may proceed.

21             MR. MOHEBAN:  Thank you, Your Honor.

22                          **(Sandra Indahl)**

23                        **CROSS-EXAMINATION**

24     BY MR. MOHEBAN:

25     Q.  Good afternoon, Ms. Indahl.

1    A.  Good afternoon.

2    Q.  I think I'll ask you to pull that -- the base of that

3    microphone closer, all the way to the edge there.  I think

4    it will move, and then we'll be able to hear you better.

5    A.  Okay.

6    Q.  Ms. Indahl, are you currently employed?

7    A.  No.  I'm retired.

8    Q.  Okay.  Can you tell the jury where you worked from 2002

9    to 2008.

10   A.  I worked for Petters Company.

11   Q.  And when you say "Petters Company," are you referring to

12   Petters Company, Inc.?

13   A.  Yes.

14   Q.  Okay.  Where was your office?

15   A.  Oh, let's see.  Minnetonka, I think it was, off of Baker

16   Road.

17   Q.  Okay.  You are speaking a little faintly.  So I know

18   that microphone might be too close now, but if you could

19   just try to speak up just a little bit --

20   A.  Okay.

21   Q.  -- we do want to hear what you have to say.

22          So from 2002 to 2008 you worked for PCI?

23   A.  Yes.

24   Q.  And what was your position there?

25   A.  I was the accountant.  I did the books for PCI and the

1    different finance companies.

2    Q.  And then in 2008 were you working for PCI when there was

3    an event with law enforcement?

4    A.  Yes.

5    Q.  And then after that did you continue to work for PCI?

6    A.  Yes.

7    Q.  And --

8    A.  Kind of part-time for a few years.

9    Q.  Okay.  Did you work for Mr. Doug Kelley?

10   A.  No.

11   Q.  Okay.  Do you remember working for a -- tell me who was

12   your employer at that time after 2008 --

13   A.  Oh, okay.

14   Q.  -- when you were still working for PCI.

15   A.  Okay.  It was PCI then.  I mean, my paychecks were

16   coming from PCI.  And then after that I worked for a legal

17   firm.  Maybe they were working for Kelley, for Doug Kelley.

18   I just don't remember their name.

19   Q.  Let me help you a little bit.  Were you working under

20   the direction of a law firm at that time?

21   A.  Yes.

22   Q.  Okay.  And you say when you worked -- I'm sorry.  I

23   didn't mean to cut you off.

24   A.  No, that's fine.

25   Q.  When you forked for PCI you were working as an

1    accountant?

2    A.  Yes.

3    Q.  Did you have a background and training as an accountant?

4    A.  Yes.

5    Q.  Okay.  Could you briefly tell us your educational

6    background.

7    A.  I had a business administration accounting degree from

8    University of Minnesota.

9    Q.  And when you -- after you got that degree, did you

10   practice in the area of accounting?

11   A.  Yes.

12   Q.  So between the time you got your degree and when you

13   worked for PCI, could you just describe the kind of

14   accounting jobs that you had.

15   A.  Okay.

16           THE COURT:  I'm going to ask you to please speak

17   up.  I'm having trouble hearing you.

18           THE WITNESS:  Okay.

19           THE COURT:  Thank you.

20           THE WITNESS:  I guess my mother is right.

21       (Laughter)

22   BY MR. MOHEBAN:

23   Q.  You can yell at us, that's fine.  There's been some of

24   that.

25   A.  Okay.  Well, I went to college at night while I was

1    working full-time, and I did that -- I worked for a company

2    called Data 100 Corporation, who was later acquired by

3    Northern Telecom, and I worked for them 17, 18, 19 years,

4    something like that.

5    Q.  Okay.  Let me stop you there.  So the company, you said,

6    was Data 100?

7    A.  Yes.

8    Q.  And then that got acquired by Northern Telecom?

9    A.  Yes.

10   Q.  And how many years did you work there?

11   A.  17, 18, something like that.  A little under 20, I

12   think.

13   Q.  And what kind of work did you do for that company over

14   the 17 years?

15   A.  Oh.  I started out as an accounting clerk.  Then I went

16   and worked in the tax department, did tax returns.  Then I

17   came back to accounting, and eventually I was accounting

18   manager.

19   Q.  Okay.  So when you finished at Northern Telecom, were

20   you an accounting manager?

21   A.  I -- well, no.  Let's see.  I was a -- I can't remember

22   what my title was.  They brought in someone else to be the

23   accounting manager and they promoted me --

24   Q.  Okay.

25   A.  -- to -- I don't know.

1    Q.  Tell me where you went after Northern Telecom.

2    A.  Oh, okay.

3    Q.  Okay.  It's a long time ago, so tell me --

4    A.  Yes.  I went to a small company called Data Hardware.  I

5    was there as their controller for maybe a year and a half.

6    Q.  Let me ask you about that.  You were a controller for

7    this firm?

8    A.  Yes.

9    Q.  And what does a controller do?

10   A.  Well, basically I did the books there and I handled some

11   of the financial transactions.

12   Q.  Okay.  So doing the books means, what, preparing

13   ledgers, and books of account, that kind of thing?

14   A.  Yes.  Well, I guess I didn't really do them.  Someone

15   else did the books, actually, come to think of it.  I took

16   care of payroll --

17   Q.  Okay.

18   A.  -- and HR-type stuff.

19   Q.  And after that, what was the next company you worked for

20   in the accounting field?

21   A.  Well, let's see.  After that NordicTrack, and there I

22   was the accounting manager.

23   Q.  Okay.  NordicTrack was a company that made those ski

24   machines --

25   A.  Yes.

1   Q.  -- exercise machines?

2   A.  Yes.  They were a very profitable company for a while

3   and then eventually they went bankrupt.

4   Q.  Okay.  Where did you go after NordicTrack?

5   A.  After that I went to Opus Corporation.  They're still in

6   existence and they are a construction company.

7   Q.  And what was your position at Opus?

8   A.  There I was a staff accountant or a senior accountant.

9   Q.  So in all the jobs we've talked about you worked as an

10  accountant?

11  A.  Correct.

12  Q.  Okay.  Tell me how it came about that you were hired to

13  work at PCI.

14  A.  At the time I wasn't working and a friend of mine worked

15  for the accounting firm that did the tax returns for Tom and

16  his companies and she said they were looking for someone

17  part-time, and so I went in and interviewed for the

18  position.

19  Q.  Who did you interview with?

20  A.  Bob White.

21  Q.  And what did you understand his position was in PCI when

22  you interviewed?

23  A.  VP of finance, CFO, something like that.

24  Q.  Did Mr. White ultimately hire you?

25  A.  Yes.

1    Q.  When he did hire you, did you report to him?

2    A.  Yes.

3    Q.  And what was your title at PCI?

4    A.  Just senior accountant.

5    Q.  Would you describe for the jury at the time you started

6    at PCI what your understanding was of the business of PCI.

7    A.  My understanding was that they were buying electronics,

8    for the most part, and then selling them to companies like

9    Sam's Club, Costco, just the big-box retailers, I guess

10   they're called.

11   Q.  Was that something that you discussed with Mr. White at

12   the time that you were interviewing?

13   A.  I don't recall if it was necessarily during the

14   interview or it could have been after.  My understanding was

15   that he was the one who got the orders from, like, Sam's

16   Club and Costco.  And Deanna, his co-worker, worked with

17   getting financing to pay for the goods that they were buying

18   to sell to Sam's Club and Costco.

19   Q.  And when you refer to "Deanna," are you referring to

20   Deanna Coleman?

21   A.  Yes.

22   Q.  So you told us what Ms. Coleman's role was in the

23   company.  You told us what Mr. White's role was.  Tell us

24   what your job duties were.

25   A.  Well, basically I kept track of all of the notes payable

 1    that were incurred to buy the goods that were sold to Sam's

 2    Club and then I did the books for the individual finance

 3    companies.  Let me explain.  Companies were set up and

 4    grouped by the company they were borrowing money from so

 5    that each company was separate and unique to the lender they

 6    were dealing with.

 7    Q.  Okay.  So you were involved with preparing accounts for

 8    that?

 9    A.  I basically was -- kept track of all the notes on

10    spreadsheets and recorded the interest expense, and I

11    recorded the transactions to buy the goods and the sale of

12    the goods.  So basically I was keeping the books for each of

13    these finance companies --

14    Q.  Okay.

15    A.  -- and --

16    Q.  And did you do that throughout the time 2002

17    through 2008?

18    A.  Yes.

19    Q.  In the time you were doing that, did you understand that

20    these were real transactions and that PCI was a real

21    company?

22    A.  Yes.

23    Q.  Did you later find out that it was all a Ponzi scheme

24    and a fraud?

25    A.  Yes.

1    Q.  Were you surprised to hear that?

2    A.  Yes, I was.  I didn't believe it.

3    Q.  In the time that you were working for PCI, did you

4    create financial reports?

5    A.  Yes, for each one of the finance companies as well as

6    for Petters Company.

7    Q.  So for the financial reports, did you need to have

8    access to bank statements?

9    A.  Well, I didn't.  Deanna gave me the banking transaction

10   information, the payment of the loans and the receipt of the

11   loans and the accounts receivable payments from the

12   customers.

13   Q.  So for you to prepare financial reports, you did not

14   have access to bank statements?

15   A.  Correct.

16   Q.  But you got some kind of document that Deanna Coleman

17   would prepare that would have the transactions?

18   A.  Right.

19   Q.  And that's what you worked from?

20   A.  Yes.

21   Q.  Did you from time to time ask for bank statements?

22   A.  Well, I did.  And I guess I talked to the accountant who

23   was taking care of all the tax returns and I just said,

24   Well, they won't give me the bank statements, so --

25              THE COURT:  I'm sorry.  We can't hear you.

1    BY MR. MOHEBAN:

2    Q.  You really have to speak up.

3    A.  Okay.

4    Q.  Go ahead and yell at us.  We won't --

5    A.  All right.  I talked to the -- they hired the guy from

6    the CPA firm, and so he was in-house and he did the tax

7    returns.  So I talked to him, because usually I gave him all

8    the financial information for the companies.  You know, I

9    talked to him and he asked Bob why I couldn't have them.

10   Bob just said, Well, she probably can't -- she wouldn't be

11   able to reconcile it anyhow, which --

12   Q.  Okay.  So is it fair to say that the time that you were

13   at PCI as an accountant, you wanted access to bank

14   statements, but they weren't provided?

15   A.  Correct.

16   Q.  Did you ever ask whether you could contact the bank

17   itself to get information?

18   A.  I don't think so.

19   Q.  Were you, in fact, directed not to speak with people at

20   the bank?

21   A.  That was my understanding, that only Deanna could talk

22   with the bankers.

23   Q.  Did you even know who the bank was?

24   A.  Yes.  I knew it was --

25   Q.  What bank was it?

1    A.  -- M&I Bank.

2    Q.  Did you, to your knowledge, ever speak with anyone at

3    M&I Bank?

4    A.  I may have.  I just don't remember his name.

5    Q.  Are you recalling something in particular or are you

6    just -- a fuzzy recollection?

7    A.  Yes, it's a fuzzy recollection.

8    Q.  All right.

9    A.  I guess I don't recall what it would have been about or

10   whatever.

11   Q.  Again, keep your voice up a little bit.

12   A.  Okay.  Okay.

13   Q.  Your understanding was that any contact to the bank was

14   supposed to go through Deanna Coleman?

15   A.  Yes.

16   Q.  In the time that you worked on the PCI accounting, were

17   there ever any loans that PCI had with M&I?

18   A.  Not that I recall.

19   Q.  Okay.  In the time that you were working as an

20   accountant for PCI, did you ever hear about companies called

21   Nationwide or Enchanted?

22   A.  Yes.  Those were the companies we were buying the

23   merchandise from.

24   Q.  Okay.  And did you understand that the customers, that

25   is, the retailers who were buying merchandise from PCI, did

1    you understand that they were sending the money to

2    Nationwide and Enchanted and then Enchanted and Nationwide

3    sent, you know, the money back to PCI?

4    A.  Yes, that's what I was told.

5    Q.  Who told you that?

6    A.  Bob White.

7    Q.  Okay.  How did it come up that you had that conversation

8    with Mr. White?

9    A.  One of the times when I received a spreadsheet from

10   Deanna, she had transactions on there for Nationwide and I

11   hadn't seen that before, so I wasn't quite sure what it was

12   about or whatever.

13   Q.  Did you raise it because you were -- had questions about

14   it?

15   A.  Yes, because I hadn't seen that before.

16   Q.  Okay.  And Mr. White told you that Nationwide and

17   Enchanted were acting as intermediaries for the retailers?

18   A.  Right.

19           MR. REIF:  Objection, Your Honor, hearsay.

20           MR. MOHEBAN:  It's not hearsay, Your Honor.  It's

21   a statement -- a nonhearsay statement under 801(d).  I'd

22   happy to be go through the role.  It's a statement of a

23   co-conspirator.

24           THE COURT:  Overruled.

25           MR. MOHEBAN:  Thank you.

1    BY MR. MOHEBAN:

2    Q.  In the time that you worked for PCI -- and you said you

3    were working in an office building in Minnetonka?

4    A.  Yes.

5    Q.  How many other people were working in that building that

6    worked for some of the Petters companies?

7    A.  I'm not sure what the actual head count was because I

8    didn't do the books for Petters Worldwide and that set of

9    companies, but I'm guessing, I don't know, somewheres

10   between 50 and 100 people.

11   Q.  So in the building that you were in, there were between

12   50 and 100 people?

13   A.  That's my guess, yes.

14   Q.  And did they work for -- I understand there's

15   different -- well, let me ask you this.  When you worked for

16   PCI, were you aware that there were different Petters-owned

17   companies in this building?

18   A.  Yes.

19   Q.  And so you worked with PCI.  You were aware that there

20   were other Petters companies?

21   A.  Yes.

22   Q.  Can you tell us the ones that you remember that had also

23   employees working in your building.

24   A.  Well, Fingerhut, that was the one -- oh, I think one of

25   the first companies that were acquired.  There was a company

1    called Petters Warehouse Direct and they had stores in the

2    city -- in the Twin Cities.  I think they had one in

3    St. Cloud.  There were some other little companies.  I don't

4    know exactly what they did --

5    Q.  Did -- okay.

6    A.  -- but there were other small companies.

7    Q.  To your understanding, were these other companies, like

8    Petters Warehouse Direct, real companies?

9    A.  Yes.

10   Q.  Did you ever do business with Petters Warehouse Direct?

11   A.  Yes.  I bought a dryer from them.

12   Q.  Okay.  Still have it?

13   A.  Still have it, yes.

14   Q.  Works okay?

15   A.  Yeah.

16   Q.  All right.  From the building that you worked in and

17   thinking about the different Petters companies were there

18   and how the office was set up, was there anything unusual or

19   different about that office that would make it seem like

20   there was something different from any other office

21   building?

22              MR. REIF:  Objection, Your Honor, vague.

23              THE COURT:  Overruled.

24              THE WITNESS:  Not that I recall.  I mean --

25   BY MR. MOHEBAN:

Indahl - Direct

1    Q.  Was it --

2    A.  We moved -- we were in one building.  And then when we

3    acquired Fingerhut, we moved into the Fingerhut building.

4    And then we moved into another building, and I think that

5    was on the Fingerhut property, but --

6    Q.  For the different offices that you worked in when you

7    were with PCI, did they just seem like ordinary office

8    buildings to you?

9    A.  Yes.

10   Q.  Okay.  Not different from the ordinary workplaces that

11   you were in for your other jobs?

12   A.  No.

13          MR. MOHEBAN:  Just one moment, Your Honor.

14      (Defendant's counsel confer)

15          MR. MOHEBAN:  Your Honor, I have no further

16   questions.  This is a subpoenaed witness and if there is a

17   way we can finish her today, that would be -- I'm sure she'd

18   appreciate it.

19          THE COURT:  Cross-examination [sic].

20                    **DIRECT EXAMINATION**

21   BY MR. REIF:

22   Q.  Good afternoon, Ms. Indahl.  My name is Michael Reif,

23   and I'm a lawyer for the plaintiff, Mr. Kelley, in this

24   case.  I think we'll be able to get you out of here today.

25   A.  Okay.

1   Q.  And I don't think those are famous last words on this.

2           You talked with counsel just a minute ago about a

3   conversation that you had with Mr. White, correct --

4   A.  Yes.

5   Q.  -- about Nationwide and Enchanted?

6   A.  Yes.

7   Q.  And is it true that you had that conversation only after

8   you saw an M&I bank statement for the first time?

9   A.  No.  I had that conversation because there were

10  transactions on the spreadsheet that Deanna gave me.

11  Q.  Okay.  You had told counsel that you were at various

12  points trying to get M&I bank statements; is that correct?

13  A.  Yes.

14  Q.  And have you -- you also said that you had trouble

15  getting those statements; is that right?

16  A.  Yes.

17  Q.  Did you try to find ways to get those statements from

18  other people within PCI?

19  A.  Eventually I did get copies of the bank statements from

20  the tax department because they used the bank statements to

21  do the tax returns.

22  Q.  And when did you eventually get those statements from

23  the tax department?

24  A.  2006, 2007, somewheres in there.

25  Q.  And when you got those statements, do you recall seeing

1    in them that they were funds that were coming into PCI from

2    Nationwide and Enchanted?

3    A.  I don't recall if there were names on the bank

4    statements themselves.  It was -- there were transactions

5    that I hadn't recorded based on the information from Deanna.

6    Q.  And do you recall the nature of those transactions?

7    A.  Well, they were -- some of them were Nationwide.  Others

8    were just other random transactions that I never had gotten

9    any information about.

10   Q.  And so was part of your issue in questioning what was

11   happening with Nationwide and Enchanted that you had seen

12   the bank statements and then you tried to reconcile them

13   with the statement from -- the spreadsheets from

14   Ms. Coleman?

15   A.  Yes.

16   Q.  So --

17   A.  And I couldn't.

18   Q.  Sorry.  So it was the process of seeing those bank

19   statements, comparing them to what Ms. Coleman was giving to

20   you that you saw that something didn't match up?

21   A.  Right, but I couldn't -- the transactions did not match

22   up individually.  They were always an accumulation.  You

23   know, they would be like millions of dollars, so I couldn't

24   match it to any one transaction.

25   Q.  I understand.  And it was not just the millions that

1    wouldn't match up, but it was the fact that money was

2    actually coming in from Nationwide and Enchanted when you

3    understood that PCI was supposed to be buying goods from

4    them, correct?

5    A.  Correct.

6    Q.  And at that point, when you realized that money was

7    going the wrong way, you talked to somebody about it, right?

8              MR. MOHEBAN:  Object to the form, his

9    characterization of "wrong way."

10             THE COURT:  Overruled.  You may answer.

11             THE WITNESS:  No. I don't think so because the

12   lenders were sending money to Nationwide to buy the goods

13   and Bob had told me that the money from the end customer was

14   going through Nationwide.

15   BY MR. REIF:

16   Q.  Ms. Indahl, do you remember giving a deposition in this

17   case?  It would have been back in October of 2017.

18   A.  Offhand, no.

19   Q.  Okay.

20             MR. REIF:  May I approach, Your Honor?

21             THE COURT:  You may.

22             MR. MOHEBAN:  I have it.

23   BY MR. REIF:

24   Q.  Ms. Indahl, can you turn in that deposition transcript

25   to page 72, please.

Indani - Direct

```
1    A.  7-0?

2    Q.  7-2, please.

3    A.  72?

4    Q.  Yes.

5    A.  Okay.

6    Q.  Are you there?

7    A.  Yes.  Yes.

8    Q.  I'll direct your attention to line 13.  Do you see that?

9    And there's a question that said, "How do the books" --

10             MR. MOHEBAN:  Objection, Your Honor.  Is counsel

11   using this to refresh or to impeach?  There's no

12   inconsistent statement established.

13             MR. REIF:  I think the transcript will show an

14   inconsistent statement, Your Honor.

15             MR. MOHEBAN:  He hasn't stated what he's doing

16   with the deposition at this point.

17             THE COURT:  Is it a prior inconsistent statement?

18             MR. REIF:  That's correct, Your Honor.

19             THE COURT:  And so you are essentially impeaching

20   the witness?

21             MR. REIF:  Yes.

22   BY MR. REIF:

23   Q.  Okay.  So I'm going to read you a statement and -- a

24   question and your answer, and I'm going to ask you if that

25   was your truthful testimony at the time.  Okay?
```

```
1    A.  Okay.

2    Q.  The question was:

3        "How did the books differ?  Was there any money going

4    from PCI to Enchanted and Nationwide?"

5        And you answered, "Money was coming from Nationwide or

6    Enchanted.  And I did ask Bob about that and I just said,

7    Are the customers sending the money to Nationwide rather

8    than to us directly?"

9           Do you see that?

10   A.  Yes.  Yes.

11   Q.  And so in this deposition you said that you were the one

12   that suggested that the customers were sending the money

13   directly to Nationwide and Enchanted, correct?

14   A.  Yes.

15   Q.  Okay.  And, Ms. Indahl, I'm wondering -- I think I asked

16   earlier when you made that realization that money was going

17   -- money was coming to PCI from Nationwide and Enchanted,

18   that's when you decided to talk to Mr. White, correct?

19   A.  Say that again.

20   Q.  You saw money coming into PCI from Nationwide and

21   Enchanted, right?

22   A.  Yes.

23   Q.  And that's when you went to talk to Mr. White?

24   A.  Yes.

25   Q.  And so when you saw something that didn't make sense
```

1    about where the money was flowing, you asked a question,

2    right?

3    A.  Yes.

4    Q.  Ms. Indahl, did you ever tell anyone at M&I what you

5    discussed with Mr. White about the flow of funds?

6    A.  No.

7              MR. REIF:  That's all I have, Your Honor.  Thank

8    you.

9              Thanks, Ms. Indahl.

10             THE WITNESS:  You're done?

11             THE COURT:  Anything further for this witness?

12             MR. MOHEBAN:  Nothing further for the witness.

13             THE COURT:  You are excused.

14             Members of the Jury, we have reached the end of

15   our day today, and so I will give you our recess

16   instruction.

17             You must not discuss this case with anyone,

18   including the other jurors, members of your family, or

19   people involved in the trial or anyone else.  And do not

20   allow anyone to discuss the case with you or within your

21   hearing.

22             And when I say you must not discuss the case with

23   anyone, I also mean do not e-mail or send text messages or

24   blog or engage in any other form of written, oral, or

25   electronic communication, as I've instructed you before.

1              Also, do not read any newspaper or other written

2       account, do not watch any television account or listen to

3       any radio program about this trial.  And do not conduct any

4       internet research or consult any other resources about the

5       case, about the people involved in the case, or about the

6       general subject matter of the case.

7              As you know, you must keep an open mind and that's

8       free -- one that is free of outside information.  And as you

9       know, it would be a violation of your oath for you to base

10      your decision on information that you gain from outside of

11      the courtroom.

12             So we will plan to continue with our trial

13      tomorrow.  Please be here at the same time that you were

14      here today.  I hope you have a good evening.  Thank you for

15      your service.

16         (Jurors excused)

17                             **IN OPEN COURT**

18                          **(JURY NOT PRESENT)**

19             THE COURT:  Please be seated.

20             Before we conclude today's session, I would like

21      to just like to get a bit of a progress report from counsel

22      about where we are in the case.

23             MR. SCHAPER:  Your Honor, Mike Schaper for

24      defendant.

25             We have two possible remaining witnesses.  We have

1     Mr. Grant, as to whom we have an application before the

2     Court to which I believe plaintiffs are due to respond by

3     7:00 p.m. this evening.

4          If Your Honor grants that application, we expect

5     that would be about 15 to 20 minutes of direct testimony.

6     And I think Mr. Grant has come back into town so that he

7     would available to testify in the morning.

8          And then the last witness we intend to put on is

9     our AML expert, Charles Grice, and we would do that shortly

10    after Mr. Grant.

11         THE COURT:  And can you give me a general idea of

12    the AML expert's testimony, at least the direct?  I'm trying

13    to get a sense of when we need to have our charge

14    conference.

15         MR. SCHAPER:  Sure.  I would expect the direct

16    would be in the range of three to three and a half hours.  I

17    don't know if counsel has any expectation as to what they

18    would expect for cross-examination of Mr. Grice.

19         MR. ANTHONY:  If you take three, we'll take -- if

20    you promise to take two and a half, we'll promise to take no

21    more than an hour 45.

22         MR. SCHAPER:  Well, move to strike as

23    nonresponsive, but I think we have a sense --

24         MR. ANTHONY:  Well, I think we should be able to

25    get him done tomorrow if -- in the morning -- if you finish

1    in the morning and I finish within an hour or two, you know,

2    maybe we could be done by 2:30 or so.  I'd like to shoot for

3    that if we could.

4         MR. SCHAPER:  That seems a little optimistic, but

5    from what I'm hearing, I think we would finish with him

6    tomorrow.

7         THE COURT:  Okay.  That's helpful to know.  I'm

8    not certain of my optimism that a charge conference is one

9    that we are able to have tomorrow, but it is helpful.  I

10   promise it was not a false enticement to get estimates about

11   where we are in the manner of the case and its proceedings.

12        So we will plan to see each other tomorrow and at

13   8:30 we'll plan to begin.  Thank you, Counsel.

14        MR. SCHAPER:  Thank you, Your Honor.

15        (Court adjourned at 5:03 p.m.)

16                    *     *     *

17

18        I certify that the foregoing is a true and correct
     copy of the transcript originally filed on 12/05/2022 and
19   incorporating redactions requested by Attorney Adine S.
     Momoh.

20        Certified by:  *s/ Lori A. Simpson*

21                       Lori A. Simpson, RMR-CRR

22

23

24

25